IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation,

Plaintiffs/Counterclaim Defendants,

v.

ARIAD PHARMACEUTICALS, INC., a Delaware corporation, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation, *et. al.*

Defendants/Counterclaim Plaintiffs.

Civil Action No. 06-259 (MPT)

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMMITED

**DECLARATION OF MELANIE K. SHARP**

I, Melanie K. Sharp, hereby declare as follows:

1. I am a partner at the law firm of Young, Conaway, Stargatt & Taylor LLP in Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter. I submit this Declaration in connection with Amgen's Opening Brief in Support of Their Motion for Summary Judgment of Non-Willfulness. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2. Attached hereto as Exhibit A is a true and correct copy of the Order Granting Request for Ex Parte Reexamination dated June 8, 2005.

3. Attached hereto as Exhibit B is a true and correct copy of the Response to July 6, 2007 Final Office Action dated October 22, 2007.

4. Attached hereto as Exhibit C is a true and correct copy of U.S. Patent Application 08/463,397.

5. Attached hereto as Exhibit D is a true and correct copy of the Response and Amendment filed September 21, 2001.

6. Attached hereto as Exhibit E is a true and correct copy of the Examiner's Amendment, mailed October 26, 2001.

7. Attached hereto as Exhibit F is a true and correct copy of the Request for Examination Pursuant to 35 U.S.C. § 302 dated April 4, 2005.

8. Attached hereto as Exhibit G is a true and correct copy of the Request for Ex Parte Reexamination of U.S. Patent No. 6,410,516.

9. Attached hereto as Exhibit H is a true and correct copy of the Order Granting Request for Ex Parte Reexamination dated June 8, 2005.

10. Attached hereto as Exhibit I is a true and correct copy of the Order Granting Request for Ex Parte Reexamination dated December 12, 2007.

11. Attached hereto as Exhibit J is a true and correct copy of the Decision Merging Reexamination Proceedings dated May 4, 2006.

12. Attached hereto as Exhibit K is a true and correct copy of the Office Action in Ex Parte Reexamination dated August 2, 2006.

13. Attached hereto as Exhibit L is a true and correct copy of the Office Action in Ex Parte Reexamination dated July 6, 2007.

14. Attached hereto as Exhibit M is a true and correct copy of the Letter from A. Naini to M. Semel and R. Stanley dated November 2, 2007.

15. Attached hereto as Exhibit N is a true and correct copy of the July 25, 2007 Petition under 37 C.F.R. § 1.181 to Withdraw the Finality of July 6, 2007 Final Office Action.

16. Attached hereto as Exhibit O is a true and correct copy of ARIAD's and the Institutions' Supplemental Responses and Objections to Amgen's Second Set of Requests for Admission dated January 2, 2008.

17. Attached hereto as Exhibit P is a true and correct copy of the relevant deposition transcript pages from the deposition of Craig Allen Smith taken on June 6, 2007.

18. Attached hereto as Exhibit Q is a true and correct copy of the Declaration of Fritz Casselman dated July 12, 2006.

19. Attached hereto as Exhibit R is a true and correct copy of ARIAD's December 18, 2001 Presentation for Board of Directors Meeting REDACTED.

20. Attached hereto as Exhibit S is a true and correct copy of the relevant deposition transcript pages of the deposition of Ryan M. Sullivan, Ph.D. dated March 25, 2008.

21. Attached hereto as Exhibit T is a true and correct copy of the Expert Report of Ryan M. Sullivan dated Jan. 18, 2008.

22. Attached hereto as Exhibit U is a true and correct copy of ARIAD's and the Institutions' Responses and Objections to Amgen's Second Set of Requests for Admission Dated December 17, 2007.

23. Attached hereto as Exhibit V is a true and correct copy of the Complaint in ARIAD v. Eli Lilly, entered June 25, 2002.

24. Attached hereto as Exhibit W is a true and correct copy of the relevant deposition transcript pages from the deposition of David Baltimore dated September 26, 2007.

25. Attached hereto as Exhibit X is a true and correct copy of registered patent Attorney Tamsen Valoir, Ph.D.,'s article, *Generic Treatment Claims*, from the March 14, 2003 John Marshall Law School Center for Intellectual Property Law News.

26. Attached hereto as Exhibit Y is a true and correct copy of Steven Lazar's *Found in Translation Newsletter* dated June 2006.

27. Attached hereto as Exhibit Z is a true and correct copy of The Wall Street Journal article, *Biotech Firm Says Lilly Drugs Step on Patent*, dated June 26, 2002.

28. Attached hereto as Exhibit AA is a true and correct copy of The Scientist article, *New Patent Worries Professor,* from Vol. 16, Issue 15, dated July 22, 2002.

29. Attached hereto as Exhibit BB is a true and correct copy of the Boston Globe article, *Parenting Biological Pathways – ARIAD Suit Raises Questions on Laying Claim to Processes in Treating Disease,* dated July 24, 2002.

30. Attached hereto as Exhibit CC is a true and correct copy of ARIAD's First Supplemental Responses and Objections to Amgen's First Set of Interrogatories.

31. Attached hereto as Exhibit DD is a true and correct copy of ARIAD's Second Supplemental Responses and Objections to Amgen's First Set of Interrogatories.

32. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Originally executed the 25th day of April, 2008.

Melanie K. Sharp, Esq. (No. 2501)

# EXHIBIT A



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,503 | 04/04/2005 | 6410516 | 05-280 | 5583 |

28120 7590 06/08/2005

FISH & NEAVE IP GROUP
ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA 02110-2624

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 06/08/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/007,503 | Patent Under Reexamination 6410516 | |
|---|---|---|---|
| | Examiner Terry A. McKelvey | Art Unit 1636 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed *04 April 2005* has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892, b)☒ PTO-1449, c)☐ Other: _____

1. ☒ The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐ The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____, or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )

**DECISION**

A substantial new question of patentability affecting claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 of United States Patent Number 6,410,516 to Baltimore et al ("Baltimore patent") is raised by the request for *ex parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in ex *parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 6,410,516 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of

any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

The request indicates that Requestor considers that claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 are unpatentable over one or more of the references cited below.

It is agreed that the consideration of Emmel, Schmidt, or Brini raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the Baltimore patent. As pointed out on pages 6-7, 20-22, and Exhibit G-1 of the request, Emmel, Schmidt, and Brini teach administration of cyclosporin A to cells substantially reduced NF-kB activity in those cells (and thus would inhibit expression of genes whose transcription is regulated by NF-kB activity). In addition, these references all utilized the HIV LTR in their experiments, they demonstrated that cyclosporin A reduced the expression of viral genes. The teaching as to administration of cyclosporin A which affects NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there

is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Emmel, Schmidt, or Brini raise a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of Meichle or Shirakawa raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, ~~53-54, 58-62, 64-65,~~ 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the Baltimore patent. As pointed out on pages 7, 22-24, and Exhibit G-2 of the request, Meichle and Shirakawa teach reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C. In addition, because Meichle used the HIV LTR in their experiments, this reference makes obvious claims drawn to regulating expression of viral genes. The teaching as to using agents that inhibit protein kinase C which reduce NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Meichle or Shirakawa raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of PDR(1985), Griffith I, Griffith II, Reed, Kronke, or Sienbelist raises a substantial new question of patentability as to claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86, and 88-97 of the Baltimore patent. As pointed out on pages 7, 26-34, and Exhibits H-1, H-2, and H-3 of the request, Griffith I, Griffith II, Reed, Kronke, and Sienbelist teach cyclosporin A administration of cells, which, as is shown from the teachings of Holschermann, Schmidt, Emmel, and Brini, inherently reduces NF-kB activity and thus would inhibit expression of genes whose transcription is regulated by NF-kB activity. The inhibition is done by reducing binding of NF-kB to NF-kB recognition sites, which also decreases the level of NF-kB not bound in a NF-kB-IkB complex, inhibiting the passage of NF-kB into the nucleus of cells,

inhibiting modification of an IkB protein, and inhibiting degradation of an IkB protein. Administration to different cell types are also taught. The teaching as to administration of cyclosporin A to cells which inherently reduce NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, PDR(1985), Griffith I, Griffith II, Reed, Kronke, or Sienbelist raises a substantial new question of patentability as to claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86, and 88-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, or Rigby II raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the Baltimore patent. As pointed out on pages 8, 34-37, and Exhibit H-4, H-5, and H-6 of the request, Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, and Rigby II teach administration of calcitriol to humans, which, as is shown from the teachings of Yu, inherently reduces NF-kB activity and thus

would inhibit expression of genes whose transcription is regulated by NF-kB activity. The teaching as to administration of calcitriol which inherently reduce NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, or Rigby II raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of Dew raises a substantial new question of patentability as to claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 of the Baltimore patent. As pointed out on pages 8, 37-39, and Exhibit H-7 of the request, Dew teaches administration of 5-ASA for the treatment of ulcerative colitis in humans, which inherently reduced NF-kB activity in the cells of the patients, by a mechanism including phosphorylation of IkB proteins. The teaching as to administration of 5-ASA was not present in the

prosecution of the application which became the Baltimore

patent.  Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in

deciding whether or not the claims are patentable.  Accordingly,

Dew raises a substantial new question of patentability as to

claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97,

which question has not been decided in a previous examination of

the Baltimore patent.


    It is agreed that the consideration of 1970 PDR, Lefring,

Nagasawa, or Rovera raises a substantial new question of

patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40,

53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of

the Baltimore patent.  As pointed out on pages 8-9, 39-43, and

Exhibit H-8 of the request, 1970 PDR, Lefring, Nagasawa, and

Rovera teaches administration of glucocorticoids such as

dexamethasone or TPA to control inflammation in diseases such as

rheumatoid arthritis, which inherently reduces NF-kB activity.

The teaching as to glucocortocoid administration was not present

in the prosecution of the application which became the Baltimore

patent.  Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in

deciding whether or not the claims are patentable.  Accordingly,

1970 PDR, Lefring, Nagasawa, or Rovera raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of 1970 PDR raises a substantial new question of patentability as to claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 of the Baltimore patent. As pointed out on pages 9, 43-45, and Exhibit H-10 of the request, 1970 PDR teaches administration of antibiotics such as erythromycin, gentamicin, and tetracycline to kill bacteria in animals. As evidenced by the Manolagas declaration, the use of antibiotics to kill bacteria reduces the amount of lipopolysaccharide (LPS, which inherently induces NF-kB activity), consequently reduces NF-kB activity and thereby reduce expression of LPS-induced and NF-kB-regulated cytokines. The teaching as to administration of antibiotics was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the

claims are patentable. Accordingly, 1970 PDR raises a substantial new question of patentability as to claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of King James Version Bible (1611), St. Leger, Dobrilla, or Jones raises a substantial new question of patentability as to claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 of the Baltimore patent. As pointed out on pages 10, 45-49, and Exhibit H-9 of the request, King James Version Bible (1611), St. Leger, Dobrilla, and Jones teach consumption of red wine as a medicine, which inherently inhibits NF-kB as a part of its activity. The teaching as to red wine consumption was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, King James Version Bible (1611), St. Leger, Dobrilla, or Jones raises a substantial new question of patentability as to claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98,

which question has not been decided in a previous examination of the Baltimore patent.

None of the references cited in the request are indicated as specifically raising a new question of patentability concerning claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 183-185, 187-191, 194-196, and 202-203. However, these claims will be reexamined along with claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 of the Baltimore patent.

### *Conclusion*

Certain papers related to this application may be submitted to Art Unit 1636 by facsimile transmission. The faxing of such papers must conform with the notices published in the Official Gazette, 1156 OG 61 (November 16, 1993) and 1157 OG 94 (December 28, 1993) (see 37 C.F.R. § 1.6(d)). The official fax telephone number for the Group is 571-273-8300. NOTE: If Applicant *does* submit a paper by fax, the original signed copy should be retained by applicant or applicant's representative. NO DUPLICATE COPIES SHOULD BE SUBMITTED so as to avoid the processing of duplicate papers in the Office.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to (571) 272-0547.

Patent applicants with problems or questions regarding electronic images that can be viewed in the Patent Application Information Retrieval system (PAIR) can now contact the USPTO's Patent Electronic Business Center (Patent EBC) for assistance. Representatives are available to answer your questions daily from 6 am to midnight (EST). The toll free number is (866) 217-9197. When calling please have your application serial or patent number, the type of document you are having an image problem with, the number of pages and the specific nature of the problem. The Patent Electronic Business Center will notify applicants of the resolution of the problem within 5-7 business days. Applicants can also check PAIR to confirm that the problem has been corrected. The USPTO's Patent Electronic Business Center is a complete service center supporting all patent business on the Internet. The USPTO's PAIR system provides Internet-based access to patent application status and history information. It also enables applicants to view the scanned images of their own application file folder(s) as well as general patent information available to the public.

For all other customer support, please call the USPTO Call Center (UCC) at 800-786-9199.

Any inquiry concerning rejections or objections in this communication or earlier communications from the examiner should be directed to Terry A. McKelvey whose telephone number is (571) 272-0775. The examiner can normally be reached on Monday through Friday, except for Wednesdays, from about 7:30 AM to about 6:00 PM. A phone message left at this number will be

responded to as soon as possible (i.e., shortly after the examiner returns to his office).

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Dr. Remy Yucel can be reached at (571) 272-0781.

Terry A. McKelvey

**Terry A. McKelvey, Ph.D.**
**Primary Examiner**
**Art Unit 1636**

May 30, 2005

# EXHIBIT B

Docket No. 74753/JPW/GJG

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

**A Merged Proceeding of *Ex Parte* Reexamination Control Nos:**

**90/007,503 and 90/007,828**

**Filed April 4, 2005 Filed December 2, 2005**

**Merged Pursuant to May 4, 2006 Merger Decision**
**Group Art Unit: 3991 Examiner: B.M. Celsa**

Patentees: David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.: 6,410,516 B1 Serial No: 08/464,364

Issue Date: June 25, 2002 Filed: June 5, 1995

For : NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

1185 Avenue of the Americas
New York, New York 10036
October 22, 2007

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION,**
**SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW,**
**STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565,**
**AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT**

A Final Office Action issued July 6, 2007 in connection with the above-identified merged *ex parte* reexamination. The July 6, 2007 Final Office Action set a two (2) month period for filing a response. Patentees petitioned, and on September 29, 2007 the U.S. Patent Office granted Patentees' petition, for a one (1) month extension of time such that a response to the July 6, 2007 Final Office Action was due October 6, 2007. Thereafter, on October 1, 2007 Patentees petitioned for, and the U.S. Patent Office granted Patentees' petition for a two (2) week extension

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 92 of October 22, 2007 Response*

of time such that a response to the July 6, 2007 Final Office
Action is now due October 20, 2007. However, since October 20,
2007 was a Saturday, a response filed on the next succeeding day
which is not a Saturday, Sunday or Federal holiday, i.e. Monday,
October 22, 2007, is to be considered timely filed under 37
C.F.R. § 1.7. Accordingly, this Response is being timely filed.

Patentees note that they are concurrently filing a Petition Under
37 C.F.R. § 1.182 And Request For Continued Reexamination.

ARI 84388

**In the Specification**

Please amend the specification of the subject patent under reexamination pursuant to 37 C.F.R. § 1.530(d)(1) as follows:

-delete the paragraph in column 10, lines 16-17; and

-amend the paragraph in column 28, lines 5-17 as follows:

The inhibitor fraction was treated with trypsin to test whether IkB is a protein (FIG. 35B). Tryptic digestion was stopped by the addition of bovine pancreas trypsin inhibitor (BPTI) and samples were analyzed for NF-kB inhibition. Trypsin treatment interfered with the activity of IkB, as shown by the complete inability of the treated sample to inhibit NF-kB activity (FIG. 35B, compare lanes 1 and 6). Trypsin that had been treated with BPTI had no effect (FIG. 35B, lane 5), demonstrating that the inactivation of IkB was specifically caused by the proteolytic activity of trypsin. It appears that IkB requires an intact polypeptide structure for its activity. ~~The nucleotide sequence of the IkB-α gene and the amino acid sequence of IkB-α are shown in FIG. 43.~~

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 92 of October 22, 2007 Response*

**In the Drawings**

Please cancel Figure 43 from the subject patent under reexamination pursuant to 37 C.F.R. § 1.530(d)(3). In accordance with 37 C.F.R. § 1.530(d)(3) a copy of Figure 43 surrounded by brackets and identified as "Canceled" is attached hereto as **Exhibit A**.

ARI 84390

**In the Claims**

Please amend the claims of the subject patent pursuant to 37 C.F.R. § 1.530(d)(2):

Specifically, please cancel the following claims[1]:

(a) 1, and 20-27 and 29 which depend from claim 1;

(b) 2, and 31-38 and 40 which depend from claim 2;

(c) 3, and 42, 43 and 47-51 which depend from claim 3;

(d) 4, and 192, 193 and 197-201 which depend from claim 4;

(e) 5, and 53-62 which depend from claim 5;

(f) 10, and 99, 100, 104 and 105 which depend from claim 10;

(g) 11, and 106, 107, 109, 110 and 114-117 which depend from claim 11;

(h) 12, and 119, 120 and 124-127 which depend from clam 12;

(i) 13, and 128, 129 and 133-137 which depend from claim 13;

(j) 15, and 149, 150 and 154-157 which depend from claim 15;

(k) 16, and 159, 160 and 164-166 which depend from claim 16; and

(l) 17, and 167, 168 and 172-175 which depend from claim 17.

In addition please add new claims 204-211 as follows:

204. (New) A method for reducing expression in a human cell of a gene, the expression of which has been induced by an extracellular polypeptide that activates NF-kB to act as an intracellular messenger to transmit a signal that induces expression of the gene from the plasma membrane of the cell to the nucleus of the cell, which comprises contacting the

[1]Please note that in the response to the August 2, 2006 Office Action the following claims were previously canceled: 7, 81, 83, 85, 86, 28, 39, and 203.

cell with a composition that inhibits transmission of the signal so as to thereby reduce expression of the gene in the cell.

205. (New) The method of claim 204, wherein the contacting of the cell with the composition that inhibits transmission of the signal is within the cell.

206. (New) The method of claim 204, wherein the extracellular polypeptide is TNF-α.

207. (New) The method of claim 205, wherein the extracellular polypeptide is TNF-α.

208. (New) The method of claim 204, wherein the composition is a protein.

209. (New) The method of claim 205, wherein the composition is a protein.

210. (New) The method of claim 206, wherein the composition is a protein.

211. (New) The method of claim 207, wherein the composition is a protein.

Support for new claim 204 may be found, *inter alia*, in column 3, line 59 - column 4, line 28; in column 12, line 36 - column 13, line 3; in column 15, line 54 - column 16, line 35; in column 2, line 57; and in column 17, lines 30-37 of the '516 patent.

Support for new claim 205 may be found, *inter alia*, in column 3, line 63-64 of the '516 patent.

Support for new claims 206 and 207 may be found, *inter alia*, in column 17, line 30-36 of the '516 patent.

Support for new claims 208-211 may be found, *inter alia*, in column 16, lines 4-10; and in column 37, line 55-56 and 43-49 of the '516 patent.

Accordingly, each of new claims 204-211 is fully supported by the specification of the '516 Patent and raises no issue of new matter. These new claims are added in response to issues and/or arguments raised for the first time in the July 6, 2007 Final Office Action. Therefore, entry and consideration of new claims 204-211 is respectfully requested.

As a result of this Amendment the following claims are pending:

(a) confirmed patentable claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202;

(b) rejected claims 6 and 64-73 which depend from claim 6; 8 and 75-80, 82 and 84 which depend from claim 8; 9 and 88-97 which depend from claim 9; 14 and 139, 140, and 144-147 which depend from claim 14; 18 and 177, 178, and 182-185 which depend from claim 18; and

(c) new claims 204-211.

**REMARKS**

Patentees respond below to the rejections set forth in the July 6, 2007 Final Office Action. The following Table of Contents is provided for the Examiner's convenient reference.

Table of Contents

Page

I. INTRODUCTION .......... 15

A. **Status of Claims Pursuant to 37 C.F.R. § 1.530(e)** ..... 15

B. **Objection to Claim 8** .......... 15

C. **Updated Status of Concurrent Proceedings Pursuant to 37 C.F.R. §1.565** .......... 17

II. SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW .......... 21

III. RESPONSE TO ART REJECTIONS .......... 29

A. **All Rejected Claims Now Pending Are Directed To Reducing Induced NF-kB Activity** .......... 29

1) All rejected, pending claims must be given their broadest reasonable interpretation .......... 30

2) Claim 6 Recites "diminishing induced NF-kB-mediated intracellular signaling"; Claim 8 recites modifying effects of external influences which induce NF-kB mediated intracellular signaling by reducing NF-kB activity in the cells such that NF-kB mediated effects ...are modified; Claim 9 Recites "reducing, in eukaryotic cells, the level of expression of genes which are activated"; Claim 14 Recites "reducing bacterial lipopolysaccharide-induced expression of cytokines"; and Claim 18 Recites reducing Interleukin-1 or Tumor Necrosis Factor-α activity ...so as to reduce "intracellular signaling caused by Interlukin-1 or Tumor Necrosis Factor-α in the cells" .......... 32

3) Each of Claim's 64-69, 75-80, 88-93, 139-144, 177, 178, and 182 Is Directed To Reducing Induced NF-kB Activity By Carrying Out A Specific Step Inside a Cell .......... 35

B. **The Rejected Claims Now Pending Are Not Anticipated By The Cited Art. For Each Rejected Claim It Has Not Been Shown That Every Element Explicitly or Necessarily Occurs in the Cited Art. Moreover, Certain Cited Art Clearly Does Not Enable The Method Described Therein So That Even If Each Element Of A Rejected Claim Were Disclosed The Cited Art Such Art Would Not Anticipate** .......... 36

1) CLAIM 14 AND CLAIMS 139, 140 and 144-147 WHICH DEPEND THEREON........................................... 38

*a) The Method of Claim 14 and Claims Dependent Thereon Does Not Occur In Any Person To Whom Antibiotics Are Administered* ...................... 39

*b) Performing Any Method Involving Administering An Antibiotic According to The Disclosure of the 1970 PDR Only Results In Killing Gram-Negative Bacteria Sometimes. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily or Inevitably Occurred.......* ...................... 40

*c) The Occasional Results Obtainable Following the Disclosure of the 1970 PDR Are Not Sufficient to Enable the Method Disclosed And Therefore Cannot Anticipate Claim 14 and Claims Dependent Thereon.......................................* 43

*d) Administering An Antibiotic As Disclosed in The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Recited in Claim 139, 140 and 144............................* 45

2) CLAIM 18 AND CLAIMS 177, 178 and 182-185 WHICH DEPEND THEREFROM ......................................... 48

<u>Rejection Based on Antibiotic Art</u> ...................... 49

*a) The Method of Claim 18 and Claims Dependent Thereon Does Not Occur In Any Person To Whom Antibiotics Are Administered* ...................... 49

*b) Performing Any Method Involving An Antibiotic According To the 1970 PDR Only Results In Killing Gram-Negative Bacteria Sometimes. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily Or Inherently Occurs* ...... 49

*c) The Occasional Results Obtainable Following The Disclosure of the 1970 PDR Are Not Sufficient to Enable the Method of Disclosed And Therefore Cannot Anticipate Claim 18 and Claims Dependent Thereon....* 49

*d) Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intravening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Required by Claims 177, 178 and 182.........................* 50

*e) Administering Antibiotics Does Not Involve*

*Reducing NF-kB Activity "caused by" IL-1 or TNF-α.* ........ 50

Rejection Based on NAC Art ........ 52

a) *The Experiments Disclosed in Staal et al., Do Not Involve The Method of Claim 18 or Claims 182-185 Which are Dependent Thereon.* ........ 52

b) *Staal et al. Do Not Enable the Method of Claim 18 Or Claims 182-185* ........ 53

c) *Staal et al. Do Not Anticipate Reducing Induced NF-kB Activity in Human Cells, as Recited in Claim 183* ........ 55

3) CLAIMS 6, 8 AND 9 AND CLAIMS DEPENDENT THEREON ........ 56

Rejections Based on Antibiotic Art ........ 60

a) *The Methods of Each of Claims 6, 8 and 9 and of Claims Dependent Thereon Do Not Occur In Any Person To Whom Antibiotics Are Administered. At most administering antibiotics prevents induction of the NF-kB intracellular signaling pathway. A method which comprises administering antibiotics is not a method which involves reducing induced NF-kB activity.* ........ *60*

b) *Performing Any Method Involving Administering An Antibiotic According To the 1970 PDR Only Sometimes Results in Killing Gram-Negative Bacteria. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily Or Inevitably Occurred* ........ 60

c) *The Occasional Results Obtainable following the Disclosure of The 1970 PDR Are Not Sufficient to Enable the Methods Disclosed And Therefore Cannot Anticipate Any Of Claim 6, 8 or 9 or Any Claim Dependent Thereon* ........ 60

d) *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Required by each of Claims 64, 65, 75, 76, 80, 88, 89 and 93* ........ 60

Rejections Based on Cyclosporin A Art ........ 61

*a) The Use of Cyclosporin A in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Each of Claims 6, 8 and 9 and Claims Dependent Thereon*.................................... 61

*b) The Cyclosporin A Art Does Not Disclose The Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon*.............................................. 62

*c) The Cited Cyclosporin A Art Is Not Enabling And Therefore Cannot Anticipate the Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon*.............................................. 63

*d) The Cited Cyclosporin Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specified Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64-69, 75-80 and 88-93* .............................................. 64

<u>Rejections Based on Protein Kinase C Inhibitor Art</u> ...... 66

*a) The Use of a Protein Kinase C Inhibitor in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon*.............................................. 66

*b) The Cited Protein Kinase C Inhibitor Art Does Not Disclose the Method of Any of Claim 6, 8, 9 or any Claim Dependent Thereon* ........................... 67

*c) The Cited Protein kinase C Inhibitor Art Does Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon*.............................................. 68

*d) The Cited Protein Kinase C Inhibitor Art Does Not Disclose a Method Which Anticipates Reducing Induced NF-kB Activity by Intervening within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Recited in Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.* ........................................ 69

Rejections Based on Vitamin D Art ........................ 70

a) *The Cited Vitamin D Art Does Not Disclose A Method of Using Vitamin D Which Anticipates Any Method Recited In Any of Claim 6, 8, or 9 and in any Claims Dependent Thereon* ........................................ 70

b) *The Cited Vitamin D Art Does Not Enable The Performance of Any Method Which Anticipates a Method of Any of Claim 6, 8 or 9 or Any Claim Dependent Thereon* ........................................ 74

c) *The Cited Vitamin D Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specific Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.* ............................ 75

Rejection Based on 5-ASA Art ............................ 76

a) *The Use of 5-ASA in Dew et al., Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.* ........................................ 76

b) *Dew et al. Do Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon* ........................................ 79

c) *Dew et al. Do Not Disclose A Method Which Anticipates Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Recited in Claims 64-69, 75-80 and 88-93.* ........................................ 80

Rejection Based on the Endogenous Glucocorticoid Art...... 81

a) *The Use of Endogenous Glucocorticoids Disclosed in Goodman and Gilman Does Not Involve Reducing Induced NF-kB Activity as Required by The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.* ........................................ 81

b) *Any Method Disclosed in Goodman and Gilman, Would At Most Only Involve Reducing Induced NF-kB Activity Sometimes. Any Such Occasional Result Is Not Sufficient To Establish An Element of the Claimed Methods Necessarily Or*

*Inevitably Occurs* .................................... 82

c) *Any Occasional Results Obtainable By Following The Disclosure of Goodman and Gilman Is Not Sufficient to Enable the Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon* ........................... 84

d) *Goodman and Gilman Do Not Disclose A Method Which Anticipates A Method Of Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway Inside a Cell at a Specific Segment of the Pathway As Required by each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93* ..................... 86

IV. THE USE OF NON-PRIOR ART REFERENCES AND EVIDENCE SUBMITTED IN A DECLARATION THAT GOES BEYOND EXPLAINING THE CONTENT OF CITED PRIOR ART AS A BASIS FOR AN INHERENCY REJECTION IS IMPROPER AND ULTRA VIRES .................................................. 88

A. **Statutory Grounds For Reexamination** ................ 88

B. **Impermissible Grounds of Rejection in a Reexamination** .................................. 88

C. **The Inherent Anticipation Rejections in the August 2, 2006 and July 6, 2007 Office Actions Are Improper; They Rely On Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute** ........................................ 89

D. **The Claims of the '516 Patent Are Method Claims and the Cited Prior Art Is At Most Evidence of What Occurred During A Prior Public Use** ......................... 91

V. <u>SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT</u> ........... 94

I. INTRODUCTION

**A. Status of Claims Pursuant to 37 C.F.R. § 1.530(e).**

Issued Claims Confirmed Patentable

Claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202 have been confirmed patentable.

Canceled Claims

Claims 1-5, 7, 10-13, 15-17, 20-29, 31-40, 42, 43, 47-51, 53-62, 81, 83, 85, 86, 99, 100, 104-107, 109, 110, 114-117, 119, 120, 124-129, 133-137, 149, 150, 154-157, 159, 160, 164-168, 172-175, 192, 193, 197-201 and 203 have been canceled.

(To reduce the number of issues in this reexamination Patentees have cancelled the claims listed above without disclaimer or prejudice.)

Rejected Claims

Claims 6, 8, 9, 14, 18, 64-74, 75-80, 82, 84, 88-97, 139, 140, 144-147, 177, 178, 182-185 as issued on June 25, 2002 are now pending and subject to rejection.

New Claims

New claims 204-211 have been added.

**B. Objection to Claim 8**

The July 6, 2007 Final Office Action on page 2 objected to claim 8 for being dependent on canceled claim 7, and required Patentees to rewrite claim 8 in independent form.

In response, Patentees respectfully direct the Examiner's attention to M.P.E.P. § 2260.01, which provides:

> If an unamended base patent claim (i.e., a claim appearing in the reexamination as it appears in the patent) has been rejected or canceled, any claim which is directly or indirectly dependent thereon should be confirmed or allowed if the dependent claim is otherwise allowable. The dependent claim should not be objected to or rejected merely because it depends on a rejected or canceled patent claim. No requirement should be made for rewriting the dependent claim in independent form.

Accordingly, claim 8 does not need to be rewritten and the objection to claim 8 should be withdrawn.

**C. Updated Status of Concurrent Proceedings Pursuant To 37 C.F.R. § 1.565**

*ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly and Co.*

Patentees previously informed the U.S. Patent and Trademark Office that a jury trial at the U.S. District Court for the District of Massachusetts (*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*, 02-CV-11280-RWZ) unanimously found claims 80, 95, 144, and 145 of the subject patent valid and infringed. The art presented to the Court included art relating to glucocorticoids, cyclosporin A, antibiotics, 5-ASA, and red wine. Expert reports and testimony including reports and testimony from Dr. Manolagas on which the Examiner has relied in part in the August 2, 2006 Office Action, were also presented to the Court. The jury also determined that the claims at issue were enabled and adequately described in U.S. Serial No. 07/431,436, filed April 21, 1989 and therefore entitled to an April 21, 1989 effective filing date.

From August 7, 2006 to August 10, 2006, an evidentiary hearing was conducted by the Court on four asserted defenses/counterclaims raised by Lilly which the Court did not submit to the jury. The four issues presented were whether the subject patent is a) unenforceable because of alleged inequitable conduct during prosecution, b) unenforceable because of alleged prosecution latches, c) invalid for covering non-patentable subject matter, and d) invalid for indefiniteness. On September 10, 2007 the Court entered a Final Judgment against Lilly.

On September 23, 2007, Lilly renewed its Motion for Judgment as a Matter of Law, or in the Alternative for a New Trial. On September 27, 2007, the Court issued an Order setting a briefing schedule on Lilly's motion. As set forth in the Order, all briefing is to be completed by December 24, 2007, and a hearing on Lilly's motion is scheduled for January 16, 2008.

*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*

A Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement of U.S. Patent No. 6,410,516 (the "'516 patent") was filed on April 20, 2006 in the U.S. District Court for the district of Delaware by Amgen Inc. and several affiliated companies (collectively, "Amgen") (*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, 06-CV-00259-MPT). In a written order on September 13, 2006, that Court (a) denied a motion by ARIAD to dismiss the case for lack of subject matter jurisdiction, and (b) denied without prejudice a motion by ARIAD a motion to dismiss for failure to join necessary and indispensable parties. On September 25, 2006, ARIAD answered the complaint and denied the allegations of patent invalidity and non-infringement. On November 3, 2006, the Court granted a motion by ARIAD for certification for appeal to the Court of Appeals for the Federal Circuit ("CAFC") of the Court's order denying the motion to dismiss for lack of subject matter jurisdiction. On December 29, 2006, the CAFC declined to hear that appeal.

On October 5, 2006, ARIAD filed a renewed motion to dismiss for failure to join indispensable parties. ARIAD moved in the alternative to transfer the case to the District of Massachusetts. On January 23, 2007, ARIAD moved to stay the case pending the present reexamination. On February 6, 2007, the Court denied without prejudice ARIAD's motion to stay. On March 27, 2007, the Court ordered that the case remain in the District of Delaware, and held that patent assignees Massachusetts Institute of Technology, President and Fellows of Harvard College, and the Whitehead Institute for Biomedical Research (collectively, the "Institutions") were necessary parties to the action.

On April 13, 2007, ARIAD and the Institutions asserted counterclaims against Amgen for infringement of the '516 patent, including

allegations of willful infringement. At the same time, ARIAD and the Institutions filed and served affirmative claims for infringement of the '516 patent, including allegations of willful infringement, against Wyeth. Wyeth has moved to sever and stay the case as it pertains to ARIAD and the Institutions' claims against Wyeth; the Court has not ruled on Wyeth's motion to sever and stay.

On May 30, 2007, ARIAD and the Institutions moved to amend their counterclaims to add claims of infringement of U.S. Patent No. 5,804,374 and U.S. Patent No. 6,150,090 against Amgen. The Court granted this motion on August 27, 2007.

Amgen and Wyeth have asserted affirmative defenses with regard to ARIAD and the Institutions' counterclaims, including allegations of inequitable conduct in the prosecution of the '516 patent and in the present reexamination. Patentees have furnished the U.S. Patent and Trademark Office with Amgen's and Wyeth's filings containing such allegations, as well as discovery responses, deposition transcripts, and other materials from this matter.

Amgen, ARIAD, and the Institutions have consented to the jurisdiction of Magistrate Judge Mary Pat Thynge, to whom the case was assigned when Judge Kent A. Jordan was elevated to the Third Circuit Court of Appeals. Judge Thynge has entered a scheduling order in the case, setting the matter concerning the '516 patent for trial in November 2008.

II. SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW

This Summary is filed pursuant to 37 C.F.R. § 1.560(b) to supplement the handwritten Interview Summary prepared by Examiner Bennett Celsa at the conclusion of an August 22, 2007 interview attended by Examiner Celsa; Examiner Ponnaluri Padmashri; Supervisory Examiner Deborah Jones; Dr. Inder Verma; John P. White, Esq.; and Gary J. Gershik, Esq. Patentees seek herein to provide a complete record of the reasons warranting favorable action in the above-identified reexamination which were discussed during the August 22, 2007 interview. Patentees acknowledge with appreciation the courtesy extended by Examiners Celsa, Padmashri and Jones in connection with the interview.

Patentees had requested the interview to discuss the grounds of rejection set forth in the July 6, 2007 Final Office Action issued in connection with this merged reexamination. The interview was spent discussing the proper interpretation of certain claims and the flaws in the inherent anticipation rejections of such claims in the July 6, 2007 Final Office Action. Patentees noted that they were considering canceling claims to reduce the number of issues in the reexamination and address the grounds of rejection set forth in the July 6, 2007 Final Office Action.

Claims Directed to a Method Involving Reducing NF-kB Activity by Intervening At A Specified Segment Within the NF-kB Intracellular Signaling Pathway Are Improperly Rejected Over Antibiotic Art.

Patentees first discussed certain claims rejected over antibiotic art, such as claim 139 which recites a method "wherein NF-kB activity is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB complex," and claim 140 which recites a method "wherein NF-kB activity is reduced by inhibiting the passage of NF-kB into the nucleus of cells." (Emphasis added.) Patentees pointed out that such claims are clearly directed to a method wherein reducing NF-kB activity is effected by intervening at a specified segment within the

NF-kB intracellular signaling pathway.

The use of antibiotics according to the 1970 Physician's Desk Reference ("1970 PDR") as set forth in the July 6, 2007 Final Office Action does not, and in fact cannot, inherently disclose reducing NF-kB activity by intervening with the NF-kB intracellular signaling pathway at the segments specified in these specific claims such as claim 139 and claim 140 since the antibiotics in question do not even enter mammalian cells. Patentees also pointed out that the rejection of claim 139 and claim 140 is inconsistent with the confirmation of patentability of claims 141-143 in the July 6, 2007 Final Office Action. Claims 141-143, like rejected claims 139 and 140, are directed to a method of reducing NF-kB activity by intervening at a specified segment within the NF-kB intracellular signaling pathway. Confirmed patentable claims 141-143 are analogous to claims 139 and 140 which have been rejected based on the use of antibiotics as discussed in the 1970 PDR. Importantly, there is no evidence or rationale in the July 6, 2007 Final Office Action establishing that the use of antibiotics is associated with reducing induced NF-kB activity by intervening within the NF-kB intracellular signaling pathway at the segments specified in claims 139 and 140, particularly since the Examiner previously acknowledged that antibiotics do not act at the specific segments of the intracellular pathway recited in claims 141-143.

Examiner Celsa suggested that an explanation for the rejection of these claims appears in the July 6, 2007 Final Office Action. Patentees have carefully reviewed the July 6, 2007 Final Office Action, as well as the Declaration of Dr. Manolagas and Exhibit H-10 which were submitted to the U.S. Patent Office by the requester of reexamination control number 90/007,503 and which are incorporated by reference into the July 6, 2007 Final Office Action. Patentees are unable to find any evidence or support for the proposition that antibiotics could anticipate a method of reducing induced NF-kB

activity "wherein NF-kB activity is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB complex" or "wherein NF-kB activity is reduced by inhibiting the passage of NF-kB into the nucleus of cells." (Emphasis added.) No specific discussion of claim 139 or of claim 140 appears in the July 6, 2007 Final Office Action. Exhibit H-10 has only the following quote separately repeated under each of the three (3) antibiotics being cited against claim 139: "Inherent. Reduction in LPS due to administration of antibiotic necessarily decreases NF-kB activation, and level of NF-kB not bound to NF-kB:Ikb complex." With respect to claim 140, Exhibit H-10 has only the following quote separately repeated for each of the three (3) antibiotics being cited against claim 140: "Inherent. Reduction in LPS due to administration of antibiotic in gram negative infection necessarily decreases NF-kB activation, and inhibits passage of NF-kB into the nucleus of cells." These conclusory statements provide no evidence or explanation how the use of antibiotics anticipates either a method which comprises reducing induced NF-kB activity, "wherein NF-kB activity is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB complex" or a method which comprises reducing induced NF-kB activity, "wherein NF-kB activity is reduced by inhibiting the passage of NF-kB into the nucleus of cells." Thus, there is no evidence or explanation in the July 6, 2007 Final Office Action how the use of antibiotics is reducing induced NF-kB activity at all, let alone by intervening within the NF-kB intracellular signaling pathway at the segment specified in the claims.

Therefore, Patentees maintain that claims such as claims 139 and 140 have been improperly rejected over the antibiotic art. Because claims 139 and 140 are rejected only on the basis antibiotic art, the rejection of these claims should be withdrawn and these claims should be confirmed patentable.

The Examiners agreed to reconsider the applicability of the inherent anticipation rejection as applied to claims such as claim 139 and

claim 140.

Reduction of NF-kB Activity is Not Inherent To Any Method Disclosed in the PDR 1970.

Patentees next pointed out that the use of antibiotics does not necessarily kill bacteria, let alone necessarily comprise reducing induced NF-kB activity. Numerous bacterial strains are resistant to antibiotics. Specifically, the listing of bacteria in the 1970 PDR includes strains that are resistant to the respective antibiotic which the 1970 PDR suggest using against the strains. Thus, when one skilled in the art treated a patient suffering from a bacterial infection following the disclosure provided in the 1970 PDR, the patient's bacterial infection would not necessarily or inevitably respond to the antibiotic. Thus, for example, patients infected with a strain of the bacteria resistant to the antibiotic would not respond to treatment with the antibiotic.

The Examiners acknowledged that resistant bacteria would not respond to an antibiotic to which they were resistant. The Examiners also acknowledged that any given patient might be infected with resistant bacteria but a physician treating the patient would not know this to be the case. Examiner Celsa questioned whether the foregoing facts impact the propriety of the inherent anticipation rejection based on the 1970 PDR. Patentees explained that an inherent anticipation rejection requires a showing that the purported inherently disclosed method necessarily and inevitably occurred in the prior art. If practicing the method disclosed in the 1970 PDR sometimes does not result in killing bacteria, (and the disclosed method clearly does not necessarily or inevitably kill bacteria) the 1970 PDR cannot inherently anticipate the claimed methods. In further reply to Examiner Celsa's inquiry, Patentees referred, for example, to *Glaxo Inc.v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) *cert.*

*denied*, 516 U.S. 988 (1995), holding that a prior art method which sometimes yielded crystals of one polymorph but other times yielded crystals of a different polymorph, i.e. a method of which did not always produce the claimed polymorph, did not inherently anticipate. A further discussion of this issue appears below in Section III B(1)(b).

Accordingly, a method of using antibiotics according to the 1970 PDR to treat a bacterial infection does not necessarily involve a method of reducing induced NF-kB activity and, therefore, the inherent anticipation rejection based on the 1970 PDR set forth on pages 105-111 of the July 6, 2007 Final Office Action should be withdrawn.

The Examiners agreed to review the legal standard for an anticipation rejection on the basis of inherency and to reconsider the propriety of this rejection based on the use of antibiotics set forth in the July 6, 2007 Final Office Action.

<u>The Antibiotic Art Cannot Anticipate a Method of Reducing Induced NF-kB Activity.</u>

Next Patentees pointed out that contrary to the interpretation of the claims advanced in the July 6, 2007 Final Office Action, a number of claims <u>explicitly</u> require reducing induced NF-kB activity. For example, Patentees pointed to claim 14 and claims dependent thereon as claims which explicitly require "reducing bacterial lipopolysaccharide induced expression of cytokines.

The 1970 PDR teaches that patients with a bacterial infection may be treated with one of the three antibiotics at issue. According to the rationale advanced in the July 6, 2007 Final Office Action, such antibiotic therapy necessarily involves reducing LPS as a result of administering the antibiotic in the case of gram negative infections and thus necessarily involves reducing NF-kB activity. However, obtaining a reduced level of "NF-kB activation" <u>does</u> <u>not</u> anticipate "reducing induced" NF-kB activity. Antibiotics do not have any

effect on NF-kB activity once the activity has been induced, and the July 6, 2007 Final Office Action does not assert otherwise. Therefore, the 1970 PDR does not anticipate a method which comprises reducing induced NF-kB activity.

Accordingly, the use of antibiotics to treat bacterial infection by a method disclosed in the 1970 PDR does not necessarily and inevitably involve reducing induced NF-kB activity and therefore cannot anticipate claim 14, claims dependent on claim 14, or any claims directed to reducing induced NF-kB activity (e.g., claims 6, 8 and 9, and claims dependent thereon). See further discussion of this issue in Section III.

The Examiners agreed to review and reconsider the applicability of the inherent anticipation rejection based on the 1970 disclosure of certain antibiotics in the PDR in so far as it was being applied against claims which require reducing induced NF-kB activity. To assist the Examiners, Patentees point out that claim 6 and claims dependent thereon recite "diminishing induced NF-kB-mediated intracellular signaling"; claim 8 and claims dependent thereon recite "modifying effects of external influences ... which induce NF-kB-mediated intracellular signaling by reducing NF-kB activity"; claim 9 and claims dependent thereon recite "reducing ... the level of expression of genes which are activated by extracellular influences which induce NF-kB mediated intracellular signaling"; claim 14 and claims dependent thereon recite "reducing bacterial lipopolysaccharide-induced expression of cytokines." ; and claim 18 and claims dependent thereon recite "reducing ...activity so as to reduce intracellular signaling caused by...".

Antibiotic Art has Been Improperly Applied to Claims Requiring Reducing Induced NF-kB Activity in Cells so as to Reduce Intracellular Signaling "Caused By Interlukin-1 or Tumor Necrosis Factor-α".

Patentees also specifically discussed claim 18 and claims dependent

thereon requiring reducing intracellular signaling "caused by" IL-1 or TNF-α. Specifically, Patentees requested clarification of the Examiner's rationale for the position that the use of antibiotics according to a method in the 1970 PDR could inherently anticipate the claimed method. Patentees pointed out that under the rationale advanced in the July 6, 2007 Final Office Action, any reduction in NF-kB activity attributable to the use of an antibiotic according to a method disclosed in the 1970 PDR would have been "caused by" LPS, not by IL-1 or TNF-α.

Examiner Celsa responded that LPS can regulate gene expression of TNF-α and referred Patentees to the July 6, 2007 Final Office Action for further clarification. Patentees have reviewed the July 6, 2007 Final Office Action and find the following passage on page 106: "Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-kB activity resulting in the production of cytokines regulated by NF-kB. Cytokines whose genes are regulated by NF-kB (at least in part) include tumor necrosis factor alpha (TNF-α)." In Exhibit H-10 referenced in the July 6, 2007 Final Office Action, the following passage appears next to claim 18: "Inherent. Reducing LPS by administration of antibiotic for treatment of gram negative bacterial infection necessarily reduces bacterial-induced NF-kB-mediated TNF-α production and resulting TNF-α induced intracellular signaling. *See* Galdiero, Yang, and Mori references (showing LPS regulates gene expression of TNF-α, IL-6, IL-8 and IL-10 via NF-kB)."

Patentees respectfully point out that notwithstanding the factual inaccuracies in the cited passages, particularly the passage from Exhibit H-10, the passages do not state or provide evidence supporting the statement that a method of using an antibiotic according to the 1970 PDR would have necessarily and inevitably involve a method of reducing induced NF-kB activity in the cells so as to reduce intracellular signaling <u>caused by</u> Interleukin-1 or Tumor

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92 of October 22, 2007 Response*

Necrosis Factor-α in the cells" as required by claim 18 and claims dependent thereon.

Therefore, there is no basis for maintaining the inherent anticipation rejection of claim 18 and claims dependent thereon over the disclosure of the 1970 PDR.

The Examiners agreed to review and reconsider the rejection of claim 18 and claims dependent thereon based on the use of antibiotics to treat bacterial infection according to the 1970 PDR.

ARI 84412

III. RESPONSE TO ART REJECTIONS

On pages 17-22, the July 6, 2007 Final Office Action sets forth an interpretation of the claims of the '516 Patent which suggests that many differently worded claims should be interpreted as having the same scope. To limit the issues in these proceedings, Patentees have herein cancelled more than 90 claims and respectfully direct the Examiner's attention to the pending rejected independent claims now pending, i.e. claims 6, 8, 9, 14 and 18, and to claims dependent thereon. Patentees maintain that the claim interpretation advanced in the July 6, 2007 Final Office Action (as well as that advanced in the earlier August 2, 2006 Office Action) is not applicable to the these now pending rejected claims. See, also the Second Declaration of Dr. Inder Verma, ¶¶ 6-10 , a copy of which is attached hereto as **Exhibit B.**

The entire contents of the Second Declaration of Dr. Inder Verma as well as that of the First Declaration of Dr. Verma is hereby incorporated herein by reference.

**A. All Rejected Claims Now Pending Are Directed To Reducing Induced NF-kB Activity**

In the absence of external inducing stimuli, NF-kB is present in the cytoplasm of a eukaryotic cell in an inactive form, i.e. there is no NF-kB activity. In the presence of external inducing stimuli NF-kB activity is induced in a cell. Such induced NF-kB activity persists so long as the external inducing stimuli are present. Broadly speaking, there are the two types of methods to obtain a cell exhibiting reduced NF-kB activity as follows: (a) reducing the induced NF-kB activity by intervening in the signaling pathway by which NF-kB activity is manifested including particularly intervening intracellularly at a specific segment within the signaling pathway; and (b) preventing the external inducing stimuli from inducing the

intracellular signaling pathway through which NF-kB activity is manifested.

Certain claims of the '516 Patent as issued covered both such types of methods. However, as discussed further in this response applicants maintain that the rejected claims now pending are directed only to type (a) above. (See, e.g., column 2, lines 20-63; column 10, lines 31-55; column 12, lines 57-66; column 13, line 13 - column 14, line 54; column 16, lines 22-63; and column 17, lines 30-37 of the '516 patent; and First Declaration of Dr. Verma, ¶¶ 5-9.)

In applying the cited art against claims of the '516 patent in the July 6, 2007 Final Office Action the Examiner consistently asserted that the claimed method encompasses administering an inhibitor of NF-kB activity (i) prior to, (ii) simultaneously with, <u>and</u> (iii) subsequent to, administering an inducer of NF-kB activity. (See, e.g. page 27, lines 16-18; page 36, lines 20-22; page 59, lines 4-10; page 80, lines 21-23; page 91, lines 26-29; page 98, lines 12-16; and page 112, lines 24-30 of the July 6, 2007 Final Office Action.) However, with respect to claims 6, 8, 9, 14 and 18, and claims dependent thereon, the only rejected claims now pending, this assertion is not correct. The rejected claims now pending do not encompass either case (i) or case (ii).

1) <u>All rejected, pending claims must be given their broadest reasonable interpretation</u>

While a claim under reexamination is to be given a broad interpretation, this interpretation must be *<u>reasonable</u>* in light of the specification. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). Additionally, the claims must be construed as one of skill in the art would construe them. *In re American Academy of Science Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). For the broadest reasonable interpretation of the claims by a person skilled in the

art see the previously filed Declaration of Dr. Verma, ¶¶ 5-9; and the Second Declaration of Dr. Verma ¶¶ 6-10 submitted herewith.

The case of *In re Baker Hughes Incorporated* is instructive. The patent at issue in *In re Baker* claimed a composition and process used to inhibit the release of toxic gas from a material comprising a hydrocarbon and the toxic gas. *In re Baker Hughes Incorporated*, 215 F.3d 1297, 1299 (Fed. Cir. 2000). Relying on parts of the specification that describe hydrocarbons as both liquids and gases, the Board of Patent Appeals and Interferences held that the broadest reasonable interpretation of the term "hydrocarbon" included both gases and liquids. *Id.* At 1303. Upon review, the Federal Circuit reversed this overly broad interpretation because it was inconsistent with the purpose of the invention as disclosed in the specification. *See id. (holding that "hydrocarbon" meant only a liquid as* "nowhere in the written description is there an example of the claimed process being used with a gaseous hydrocarbon.")

The now pending, rejected claims should not be construed so broadly that they are given a meaning inconsistent with that which one of skill in the art would attribute to them. An interpretation contrary to that which would be understood by a person skilled in the art is an unreasonably broad interpretation. *See In re Cortright*, 165 F.3d 1353, 1359 (Fed. Cir. 1999) (reversing the Examiner's rejection after finding that one skilled in the art would construe the claim more narrowly than had the examiner). When the claim terms "are examined through the viewing glass of a person skilled in the art," as they are supposed to be, it becomes clear here that the Examiner's interpretation is not reasonable. *Phillips v. AWH Corp*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 1332 (2006)(quoting *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003)). Such broad interpretations are impermissible. *See In re Marosi*, 710 F.2d 799 (Fed. Cir. 1983) (reversing a claim rejection under 35 U.S.C. §§102 or 103 that failed

to interpret the claim in light of the interpretation which one skilled in the art would have attributed to the claim).

2) Claim 6 Recites "diminishing induced NF-kB-mediated intracellular signaling"; Claim 8 Recites modifying effects of external influences which induce NF-kB mediated intracellular signaling by reducing NF-kB activity in the cells such that NF-kB mediated effects ... are modified; Claim 9 Recites "reducing, in eukaryotic cells, the level of expression of genes which are activated"; Claim 14 Recites "reducing bacterial lipopolysaccharide-induced expression of cytokines"; and Claim 18 Recites "reducing Interlukin-1 or Tumor Necrosis Factor-α activity ... so as to reduce intracellular signaling caused by Interlukin-1 or Tumor Necrosis Factor-α in the cells.".

More fully, independent claims 6, 8, 9, 14 and 18 read as follows:

6. A method for diminishing induced NF-κB-mediated intracellular signaling comprising reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished.

8. A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified.[2]

9. A method for reducing, in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said

---

[2]Claim 8 depends from canceled claim 7, but is presented here as if written in independent form to facilitate discussion.

genes is reduced.

14. A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

By reciting diminishing induced NF-kB mediated intracellular signaling by reducing NF-kB activity claim 6 is directed to reducing induced NF-kB activity. It is not directed to preventing induction of the NF-kB signaling pathway. Thus, only art involving administering an inhibitor subsequent to administering an inducer is relevant to the patentability of this claim.

Claim 8 recites modifying effects of external influence which induce NF-kB-mediated intracellular signaling by reducing NF-kB activity. The effects of external influences which induce NF-kB-mediated intracellular signaling result from the induction of the NF-kB signaling pathway caused by the external influence and the resulting NF-kB activity. Reducing this resulting NF-kB activity equates with reducing induced NF-kB activity. Thus, only art involving administering an inhibitor subsequent to administering an inducer is relevant to the patentability of this claim.

Similarly, claim 14 which recites reducing bacterial lipopolysaccharide induced expression of cytokines is directed to reducing induced NF-kB activity. It is not directed to preventing

induction of the NF-kB signaling pathway. Thus, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to its patentability.

Claim 9 recites reducing the level of expression of genes which are activated by extracellular influences which induce NF-kB-mediated intracellular signaling. Thus, claim 9 is directed to reducing induced NF-kB activity. It is not directed to preventing induction of the NF-kB signaling pathway. Once again, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to the patentability of the claim.

Finally, claim 18 recites reducing IL-1 or TNF-α activity by reducing NF-kB activity in cells so as to reduce intracellular signaling caused by IL-1 or TNF-α. Since IL-1 and TNF-α are inducers of NF-kB activity, claim 18 concerns reducing IL-1 or TNF-α induced NF-kB activity. Therefore, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to its patentability.

In summary, none of claims 6, 8, 9, 14 or 18 (or the claims dependent thereon) can properly be construed to encompass administering an inhibitor of NF-kB activity (i) prior to or (ii) simultaneously with, administration of an inducer of NF-kB activity.

3) Each of Claims 64-69, 75-80, 88-93, 139-144, 177, 178, and 182 Is Directed To Reducing Induced NF-kB Activity By Carrying Out A Specific Step Inside a Cell.

Each of claims 64-69, 75-80, 88-93, 139-144, 177, 178 and 182 specify that the reducing of induced NF-kB activity is effected by a specified step which is one of the following:

i. decreasing the level of NF-kB not bound in an NF-kB:IkB complex;

ii. inhibiting passage of NF-kB into the nucleus;

iii. inhibiting modification of an IkB protein;

iv. inhibiting degradation of an IkB protein;

v. inhibiting dissociation of NF-kB: IkB complexes; or

vi. reducing binding of NF-kB to NF-kB recognition sites.

Each of these steps, with the broadest reasonable interpretation attributable to it, requires that the step of reducing induced NF-kB activity take place at a specific intracellular segment within the NF-kB intracellular signaling pathway. (See first Declaration of Dr. Verma ¶¶ 14-15; and Second Declaration of Dr. Verma ¶¶ 10) To construe each of these claims as the Examiner has suggested, i.e. as covering reducing NF-kB activity by a step which occurs anywhere within the NF-kB intracellular signaling pathway is unreasonable in view of the requirement of 35 U.S.C. §112, paragraph 4, that a dependent claim must further define and limit the claim from which it depends.

Thus, each of dependent claims 64-69, 75-80, 88-93, 139-144, 177, 178 and 182, properly construed, specify a specific subcase in which the step of reducing induced NF-kB activity involves intervening at a specified segment within the NF-kB intracellular signaling pathway. To construe these claims otherwise is unreasonable.

B. **The Rejected Claims Now Pending Are Not Anticipated By The Cited Art. For Each Rejected Claim It Has Not Been Shown That Every Element Occur Explicitly or Necessarily Occurs in the Cited Art. Moreover, Certain Cited Art Clearly Does Not Enable The Method Described Therein So That Even If Each Element Of A Rejected Claim Were Disclosed In The Cited Art Such Art Would Not Anticipate.**

The now pending, rejected claims are the following:

a. Claim 14 and claims 139, 140 and 144-147 which depend therefrom;

b. Claim 18 and claims 177, 178 and 182-185 which depend therefrom;

c. Claim 6 and claims 64-73 which depend therefrom;

d. claim 8 and claims 75-80, 82 and 84 which depend therefrom; and

e. claim 9 and claims 88-97 which depend therefrom.

For any of these rejected claims to be properly rejected each and every element of such claim must be disclosed in a single prior art reference, either explicitly or inherently, and such allegedly anticipating prior art reference must enable the allegedly anticipating disclosure.

In the sections which follow Patentees explain that the rejected claims now pending, are not anticipated, either inherently or explicitly, by the art cited against such claims. In support of their position Patentees submit as **Exhibit B** a Second Declaration of Dr. Inder Verma.

Certain of the art rejections in the July 6, 2007 Final Office Action are based on alleged explicit anticipation; other rejections are based on alleged inherent anticipation.

With respect to the inherent anticipation rejections, Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to allegedly "explain" the prior art. Patentees do not repeat that explanation in its entirety but hereby incorporate that response by reference into this response. Patentees note, however, that the Examiner appears to have ignored the fact that <u>none</u> of the purported extrinsic evidence concerns what occurred in the cited prior art. The Examiner does not

dispute that none of the purported extrinsic evidence relates to any effort to reproduce any experiment in the cited art. Instead, the Examiner has merely asserted that "enablement and not actual use is the legal standard for demonstrating inherency." (See, e.g., page 97, line 19; page 93, lines 18-20 of the July 6, 2007 Final Office Action.) and proceeded to maintain the inherent anticipation rejections notwithstanding that none of the extrinsic evidence being relied upon addressed what element(s) of the claim necessarily and inevitably occurred in any specific cited reference.

Patentees certainly agree that for any anticipation rejection it is required that a prior art reference "must enable that which it is asserted to anticipate." *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003). A proper inherent anticipation rejection, however, must additionally include evidence to "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

Patentees, therefore, respectfully submit that all of the inherent anticipation rejections of record are fatally defective. Nevertheless, Patentees below explain why notwithstanding this improper reliance on the so-called extrinsic evidence, none of the cited art anticipates the rejected claims now pending.

1) CLAIM 14 AND CLAIMS 139, 140 and 144-147 WHICH DEPEND THEREON

Each of claims 14, 139, 140 and 144-147 is rejected solely on the ground that the claimed method is inherently anticipated by the disclosure in the 1970 PDR of instructions for using three antibiotics (gentamycin, tetracycline, and erythromycin). In support of this ground of rejection the Examiner relies upon the *Manolagas*

*Declaration*, *Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(1998)* 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. (*J*. Immunology 175(2005) 8069-8076) which perport to "explain" the disclosure in the 1970 PDR.

As an initial matter Patentees note that none of claims 14, 139, 140, or 144-147 are specifically discussed in the July 6, 2007 Final Office Action. Rather these claims are merely grouped with other claims which are worded differently and have different scopes. Properly construed, these claims are not subject to the reasoning set forth on pages 105-111 of the July 6, 2007 Final Office Action.

Patentees further note that in ¶¶ 113-123 of the Second Declaration of Dr. Inder Verma, Exhibit B hereto, Dr. Verma discusses the flaws in the Examiner's reasoning. See particularly the table in ¶ 113 which provides a point by point discussion in response to the Examiner's Rejection Summary on pages 105-107 of the July 6, 2007 Final Office Action; ¶ 114; ¶ 118; ¶ 119; and ¶¶ 121-123.

In the sections that follow, Patentees provide three reasons, each of which is sufficient to require withdrawal of the inherent anticipation rejection of claim 14, 139, 140 and 144-147 based on the 1970 PDR. Patentees have additionally provided a fourth reason for withdrawing the rejection as applied to claims 139, 140, and 144.

*a) The Method of Claim 14 and Claims Dependent Thereon Does Not Occur In Any Person To Whom Antibiotics Are Administered.*

According to the rationale advanced on pages 105-111 of the July 6, 2007 Final Office Action, administration of antibiotics to treat a gram-negative bacterial infection results in killing the bacteria which therefore no longer produce lipopolysaccharide ("LPS"), a known

inducer of NF-kB activity. Because there is less LPS in the subject to induce NF-kB activity, NF-kB activity is reduced.

Patentees respectfully point that even if this rationale as stated were accurate, it leads to the conclusion that administration of antibiotics, by killing gram-negative bacteria and causing a reduction in the level of LPS prevent induction of the NF-kB intracellular signaling pathway. This rationale does not support the conclusion that administering antibiotics, by killing gram-negative bacteria, and causing a reduction in the level of LPS, is reducing induced NF-kB activity as recited in claim 14 and in claims 139, 140 and 144-147 which depend therefrom.

As explained at length in the specification and by Dr. Verma, NF-kB is a nuclear transcription factor that unless and until activated is present only in an inactive complex in the cytoplasm of a eukaryotic cell. Upon activation by an external influence or stimulus capable of inducing activation the NF-kB signaling pathway, e.g. LPS, the inactive complex dissociates and NF-kB is created in a form which travels to the nucleus of the cell where it binds to specific binding recognition sites on genes that are regulated by NF-kB, resulting in transcription and often expression of such genes. Thus, although LPS when present induces NF-kB activity, its absence, as a result of administering an antibiotic has not effect on previously induced NF-kB activity, and such administration certainly does not involve reducing NF-kB activity. (See, e.g. column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; column 16, lines 22-63 of the subject patent; Declaration of Dr. Verma ¶¶ 8, 9; and Second Declaration of Dr. Verma ¶¶ 114.)

Because claim 14, 139, 140 and 144-147 recite reducing bacterial LPS-induced NF-kB activity, the administration of antibiotics cannot and does not result in the practice of the method recited in these claims.

For this reason alone, the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

*b) Performing Any Method Involving Administering An Antibiotic According To The Disclosure of the 1970 PDR Only Results In Killing Gram-Negative Bacteria Sometimes. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily or Inevitably Occurred.*

As Patentees' representative explained during the August 22, 2007 Examiner Interview and as Dr. Verma explained in his first Declaration in paragraph 128, resistant strains of gram-negative bacteria are widespread. Antibiotics would not kill such resistant strains contrary to the Examiner's rationale that administering antibiotics would kill such bacteria and thereby effect reduced levels of LPS and consequently reduced NF-kB activity. Resistant strains of gram-negative bacteria would continue to produce LPS, which would continue to induce the NF-kB signaling pathway. Thus, not only would administering the antibiotic not involve reducing LPS-induced NF-kB activity, such administration would not prevent further LPS-induced NF-kB activity from occurring.

Claims 14, 139, 140 and 144-147 are rejected as inherently anticipated by the administration of antibiotics according to the disclosure in the 1970 PDR. However, the 1970 PDR does not disclose each and every element of these claims as required for an anticipation rejection. Thus, the July 6, 2007 Final Office Action relies on purported extrinsic evidence including references published after the effective filing date of the rejected claims to argue that each and every element of the claimed method would inherently occur if antibiotics were used in a method according to the instructions in the 1970 PDR.

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

Even if the three cited antibiotics disclosed in the cited 1970 PDR *did* work as postulated by the Examiner, they only did so *sometimes*. The 1970 PDR does not teach a) which patients are infected with gram-negative bacteria as opposed to those infected with gram-positive bacteria or how to identify such patients b) which patients are infected by a strain which is not resistant to treatment by the antibiotics or how to identify such non-resistant strains of gram-negative bacteria, or c) which gram-negative bacteria produce LPS capable of inducing NF-kB activity since not all such bacteria produce LPS. Therefore, administering an antibiotic as instructed in the 1970 PDR would at most lead to occasional killing of gram-negative bacteria that produce LPS capable of inducing NF-kB. Therefore, the Examiner's theory at best shows that administration of an antibiotic as instructed in the 1970 PDR may, *possibly*, kill gram-negative bacteria that may possibly produce LPS capable of inducing NF-kB. (Declaration of Dr. Verma ¶¶ 128; and Second Declaration of Dr. Verma ¶¶ 113-114, 122-123)

However, a showing of mere "probabilities or possibilities" is insufficient to support a finding of inherent anticipation. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that could be used to obtain the same result). Where practice of the prior art only sometimes encompassed all elements of the claims, the art was held not to inherently anticipate because "occasional results are not

inherent." *See Mehl/Biophile Int'l. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that prior art did not anticipate a claim requiring a substantially vertical orientation even though use of the prior art method would sometimes result in such an orientation). See, also, *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) (affirming a district court holding that practice of a prior art method sometimes yielding crystals of one polymorph but other times yielding crystals of another polymorph did not inherently anticipate a claim reciting only one of the polymorphs.)

In *Perricone v. Medicis Pharmaceutical Corporation*, a district court held a method claim for treating a sunburn by applying a specific compound to the affected area was inherently anticipated by prior art disclosing "topical application" of the compound to the skin. On appeal, the Federal Circuit reversed the finding of inherent anticipation determining that the prior art did not anticipate the claim and stating "the district court's inherency analysis goes astray because it assumes what [the prior art] neither disclosed nor rendered inherent" because the prior art did not disclose applying the compound to a skin sunburn. *Perricone v. Medicis Pharmaceutical Corporation*, 432 F.3d 1368, 1378 (Fed. Cir. 2005). It was deemed irrelevant that the prior art compound *may* sometimes have been applied to sunburned skin. *Id.* At 1379.

In the present case, the administration of antibiotics according to the 1970 PDR may at most, result in killing gram-negative bacteria, which is contrary to a critical assumption in the Examiner's theory how administration of an antibiotic anticipates the method of claim 14. Thus, even if the Examiner's rationale is accepted, occasional results are insufficient to establish inherent anticipation under controlling Federal Circuit precedent.

For this reason alone, the inherent anticipation rejection of claims

14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

c) *The Occasional Results Obtainable Following the Disclosure of the 1970 PDR Are Not Sufficient to Enable the Method Disclosed And Therefore Cannot Anticipate Claim 14 and Claims Dependent Thereon.*

The occasional results that would have been obtained by practicing the method of administering antibiotics in the 1970 PDR are insufficient to enable the method disclosed and therefore cannot anticipate claim 14 and claims dependent thereon.

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v.U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Likewise, in *Application of Sheppard*, the Court of Customs and Patent Appeals held that a prior art reference which may have disclosed either the claimed compound *or* a different compound was not enabling and therefore could not anticipate the claim at issue. *Application of Sheppard*, 339 F.2d 238, 241-242 (C.C.P.A., 1964).

The 1970 PDR does not teach a) which patients are infected with gram-negative bacteria or how to identify such patents b) which patients

are infected by a strain of gram-negative bacteria which is not resistant to treatment by the antibiotics or how to identify such non-resistant strains or c) which gram-negative bacteria produce LPS capable of inducing NF-kB activity since not all such bacteria produce LPS. Therefore, administering an antibiotic as set forth in the 1970 PDR would at most lead to occasional killing of gram-negative bacteria that produce LPS capable of inducing NF-kB. (Declaration of Dr. Verma ¶¶ 128; and Second Declaration of Dr. Verma ¶¶ 113-114, 122-123)

Prior art whose disclosure would have only sometimes led to the practice of the claimed method, like the prior art in *Rockwell* and *Sheppard*, does not enable one skilled in the art to practice the claimed method. The Examiner's rationale for the rejection, even if factually correct, at most shows that administration of antibiotics according to the 1970 PDR may *sometimes* kill gram-negative bacteria that produce LPS capable of inducing NF-kB. Accordingly, the 1970 PDR is not enabling for the method upon which the Examiner relies and the 1970 PDR cannot anticipate claim 14 and claims dependent thereon.

For this reason alone, the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

*d) Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Recited in Claims 139, 140 and 144.*

Dependent claims 139, 140 and 144 further limit claim 14 by reciting that reducing induced NF-kB activity occurs as a result of a step inside the cell. The Examiner's theory as to how the use of antibiotics anticipate these claims involves antibiotics killing gram-negative bacteria outside the cell so as to reduce the levels

of LPS present outside the cell. Therefore, claims 139, 140 and 144 should not be rejected as inherently anticipated by the 1970 PDR.

Claim 139 requires that reducing LPS-induced NF-kB activity be effected "by decreasing the level of NF-kB not bound in an NF-kB:IkB complex." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve decreasing the level of NF-kB not bound in an NF-kB:IkB complex. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121.)

Claim 140 requires that reducing LPS-induced NF-kB activity be effected "by inhibiting the passage of NF-kB into the nucleus of cells." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve inhibiting the passage of NF-kB into the nucleus of cells. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121.)

Claim 144 requires that reducing LPS-induced NF-kB activity be effected by a step that "comprises reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121)

In conclusion, Patentees have provided three reasons each of which independently warranting withdrawal of the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR. Patentees have additionally provided a fourth reason requiring warranting the rejection of claims 139, 140 and 144.

Because the inherent anticipation rejection of claims 14, 139, 140 and 144-147 is the only ground of rejection of these claims in the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 44 of 92 of October 22, 2007 Response*

July 6, 2007 Final Office Action, Patentees respectfully submit that the rejection of claims 14, 139, 140 and 144-147 should be withdrawn and these claims should be confirmed patentable.

**ARI 84430**

2) CLAIM 18 AND CLAIMS 177, 178 AND 182-185 WHICH DEPEND THEREFROM

Each of claim 18, 177, 178 and 182-185 are rejected as allegedly inherently anticipated by the disclosure in the 1970 PDR of instructions for administering three antibiotics (gentamycin, tetracycline, and erythromycin.) In support of these rejections the Examiner relies upon the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(1998)* 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076) which purport to "explain" the disclosure in the 1970 PDR.

Claim 18 and dependent claims 182-185 have additionally been rejected as allegedly anticipated by Staal et al., PNAS 87:9943 (Dec. 1990).

Therefore claims 177 and 178, are only rejected as allegedly inherently anticipated by the 1970 PDR.

Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to support the inherent anticipation rejections based on the antibiotics disclosed in the 1970 PDR and do not repeat that explanation here.

Patentees explain below the deficiencies in both the inherent anticipation rejection based on the 1970 PDR, and the anticipation rejection based on Staal et al.

Rejection Based on Antibiotic Art

As an initial matter Patentees note that none of claims 18, 177, 178 and 182-185 are specifically discussed in the July 6, 2007 Final Office Action. Rather these claims are merely grouped with other claims which are worded differently and have different scopes. Properly construed, these claims are not subject to the reasoning set forth on pages 105-111 of the July 6, 2007 Final Office Action.

Patentees further note that in ¶¶ 113-123 of the Second Declaration of Dr. Inder Verma, Dr. Verma discusses the flaws in the Examiner's reasoning. See particularly the table in ¶ 113 which provides a point by point discussion in response to the Examiner's Rejection Summary on pages 105-107 of the July 6, 2007 Final Office Action; ¶ 114; ¶ 118; ¶ 120; and ¶¶ 121-123.

In the preceding Section, Patentees have provided four reasons why claim 14 and claim dependent thereon are patentable over the 1970 PDR. Each of the four reasons is also applicable to claim 18 and claims dependent thereon. Patentees do not repeat the explanations here, but instead summarize them as follow:

a) *The Method of Claim 18 and Claims Dependent Thereon Does Not Occur In Any Person To Whom Antibiotics Are Administered.*

b) *Performing Any Method Involving An Antibiotic According To the 1970 PDR Only Results In Killing Gram-Negative Bacteria Sometimes. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily Or Inherently Occurs.*

c) *The Occasional Results Obtainable Following the Disclosure of the 1970 PDR Are Not Sufficient to Enable the Method*

*Disclosed And Therefore Cannot Anticipate Claim 18 and Claims Dependent Thereon.*

d) *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Required by Claims 177, 178 and 182.*

Accordingly, Patentees respectfully request that the Examiner reconsider and withdraw the inherent anticipation rejection of claim 18 and claims dependent thereon in view of each of these four reasons, and the discussion by Dr. Verma with respect to claim 18 and claims dependent thereon. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 120-121)

Furthermore, there is another reason why administering antibiotics according to the 1970 PDR does not anticipate claim 18 and claims dependent thereon.

e) *Administering Antibiotics Does Not Involve Reducing NF-kB Activity "caused by" Il-1 or TNF-α.*

Claim 18 recites reducing NF-kB activity so as to reduce intracellular signaling "caused by" IL-1 or TNF-α. Antibiotics have no effect on intracellular signaling caused by IL-1 or TNF-α. While in the July 6, 2007 Final Office Action antibiotics are asserted to reduce levels of LPS, claim 18 is not directed to NF-kB activity induced by LPS. (Declaration of Dr. Verma ¶¶ 126-127; and Second Declaration of Dr. Verma ¶¶ 120) Claim 18 is directed to reducing NF-kB activity "caused by" IL-1 or TNF-α. There is no explanation whatsoever in the record how antibiotics could be used for reducing NF-kB activity caused by IL-1 or TNF-α.

Patentees have reviewed the July 6, 2007 Final Office Action and noted the following passage on page 106: "Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-kB activity resulting in the production of cytokines regulated by NF-kB. Cytokines whose genes are regulated by NF-kB (at least in part) include tumor necrosis factor alpha (TNF-α)." In Exhibit H-10 referenced by the July 6, 2007 Final Office Action, the following passage appears next to claim 18: "Inherent. Reducing LPS by administration of antibiotic for treatment of gram negative bacterial infection necessarily reduces bacterial-induced NF-kB-mediated TNF-α production and resulting TNF-α induced intracellular signaling. *See* Galdiero, Yang, and Mori references (showing LPS regulates gene expression of TNF-α, IL-6, IL-8 and IL-10 via NF-kB)." Notwithstanding the factual inaccuracies in the cited passages, particularly the passage from Exhibit H-10, Patentees respectfully point out that these passages do not even allege that administering an antibiotic as disclosed in the 1970 PDR involves reducing "NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" as required by claim 18 and claims dependent thereon.

In fact, the rationale advanced by the Examiner, that administering an antibiotic results in reduced levels of LPS and therefore reduced LPS-induced NF-kB activity is inapplicable to claims 18 and claims dependent thereon. Moreover, the LPS - induced NF-kB intracellular signaling pathway is separate from either the IL-1-or the TNFα-induced NF-kB intracellular signaling pathway.

Each of the foregoing reasons a) through e) are independently sufficient to warrant withdrawal of the inherent anticipation rejection based on the 1970 PDR of claim 18 and claims 177, 178 and 182-185 dependent thereon.

Moreover, because the inherent anticipation rejection based on the

1970 PDR is the only rejection raised against dependent claims 177 and 178 in the July 6, 2007 Final Office Action, Patentees respectfully submit that claims 177 and 178 should be confirmed patentable based on the foregoing reasons.

Rejection Based on NAC Art

Claims 18 and 182-185 are further rejected on pages 111-113 of the July 6, 2007 Final Office Action as allegedly anticipated by Staal et al., who disclose that N-acetyl-L-cysteine ("NAC") "prevents this thiol decrease [which leads to NF-kB activation] and blocks the activation of NF-kB". (Abstract of Staal et al.)

In ¶¶ 106-112 of the Second Declaration of Dr. Inder Verma, Dr. Verma provides a detailed rebuttal to the reasoning set forth by the Examiner in support of the rejection of claim 18 and 182-185 over Stall et al.

In addition, Patentees provide the following reasons why the rejection over Staal et al., should be withdrawn.

*a) The Experiments Disclosed in Staal et al., Do Not Involve The Method of Claim 18 or Claims 182-185 Which are Dependent Thereon.*

As explained above, claim 18 recites a method "comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells." "Caused By" is clearly past tense. Therefore claim 18 is directed to a method where there is intracellular signaling caused by IL-1 or TNF-α, i.e. there is induced NF-kB activity.

All of the experiments of Staal et al. involve simultaneous treatment

with TNF-α and NAC. There is no disclosure in Staal et al. of any method involving using NAC for reducing IL-1 or TNF-α induced NF-kB activity, i.e. reducing NF-kB activity so as to reduce intracellular signaling caused by IL-1 or TNF-α (Declaration of Dr. Verma ¶¶ 160-162; and Second Declaration of Dr. Verma ¶¶ 106-109, 112)

In fact, NAC does not reduce induced NF-kB activity according to Staal et al. themselves Staal et al. point out that "low thiol levels are required for activation" of NF-kB. (Page 9943, right column, second full paragraph.) Staal et al. elucidated that NAC prevents the decrease of intracellular thiol levels. For example, in their Abstract, Staal et al. disclose that NAC "prevents this thiol decrease [which leads to NF-kB activation] and blocks the activation of NF-kB". Decreasing thiol levels would have no effect on induced NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 108)

Similarly, Staal et al., state that their findings demonstrate that NAC blocks or inhibits cytokine-stimulated NF-kB activation. Staal et al. do not state that their findings show reducing cytokine-stimulated NF-kB activity.

Accordingly, Staal et al. do not anticipate claim 18 or claims 182-185.

*b) Staal et al. Do Not Enable the Method of Claim 18 or Claims 182-185.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find

anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The experiments in Staal et al. cannot be reproduced, and therefore, Staal et al. cannot anticipate the method recited in claims 18 or 182-185. Staal et al. do not describe how to obtain the cells they use. Specifically, the Jurkat tri-kB cells of Staal et al. were not available to, and could not be reproduced by the public, because the source of these cells is a "personal communication." (Second Declaration of Dr. Verma ¶¶ 110-111)

Since Staal et al., does not enable practicing the experiments which the Examiner relies upon as establishing an anticipation of claims 18 and 185-185, the rejection of these claims over Staal et al. should be withdrawn.

*c) Staal et al. Do Not Anticipate Reducing Induced NF-kB Activity in Human Cells as Recited in Claim 183.*

The cells Staal et al. used were not only unavailable to the public, they were not human cells. (Second Declaration of Dr. Verma ¶¶ 109-110)

Therefore, to contrary to the Examiner's ground of rejection claim 183 which recites the method performed in human cells, is not

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 52 of 92 of October 22, 2007 Response*

anticipated by Staal et al.

In conclusion, Patentees have provided two reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejection over Staal et al. as applied to claims 18 and 182-185. Patentees have additionally provided a third reason warranting withdrawal of the anticipation rejection based on Staal et al. as applied to claim 183.

Accordingly, Patentees respectfully submit that claims 18 and 177, 178 and 182-185 dependent thereon should be confirmed patentable.

ARI 84438

3) CLAIMS 6, 8 AND 9 AND CLAIMS DEPENDENT THEREON

Each of the following claims has been rejected based on art relating to each of the same six compounds (or classes of compounds):

Claim 6 and claims 64, 65 and 69-73 dependent thereon;
Claim 8 and claims 75, 76, 80, 82 and 84 dependent thereon; and
Claim 9 and claims 88, 89 and 93-97 dependent therein.

Specifically, each of these claims is rejected as follows:

1. Antibiotic Art

The claims are rejected as allegedly inherently anticipated by the 1970 PDR disclosure of the use of three antibiotics (gentamycin, tetracycline, and erythromycin), as explained by purported extrinsic evidence in the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(1998)* 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076), as set forth on pages 105-110 of the July 6, 2007 Final Office Action.

2. CsA Art

The claims are rejected as allegedly: i) anticipated, or alternatively rendered obvious under §103, by *Schmidt* et al., *J. Virology* 64:4037-4041 (August 1990), as set forth on pages 35-42 of the July 6, 2007 Final Office Action;

ii) anticipated, or alternatively rendered obvious under 103, by *Emmel* et al., Science, *246* (Dec. 1989): 1617-20, as set forth on pages 42-47 of the July 6, 2007 Final Office Action;

iii) anticipated, or alternatively, rendered obvious under § 103, by *Brini,* Eur. Cytokine Net. 1: 131 -139 (Sept. 1990), as set forth on pages 47-54 of the July 6, 2007 Final Office Action;

iv) inherently anticipated by the Physician's Desk Reference (PDR: 1985, pages 1811-13), *Griffith I* (Griffith et al., Ann. Surg. 196 (9/82):324-329), or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. 99 (12/84): 952-957), as evidenced by *Holschermann* et al., Circulation 96 (12/97) 4232-4238, as set forth on pages 54-66 of the July 6, 2007 Final Office Action;

v) inherently anticipated by *Reed* et al., J. Immunol. *137* (7/86): 150-154, as evidenced by *Brini*, Eur. Cytokine Net. 1:131-139 (Sept. 1990), as set forth on pages 66-74 of the July 6, 2007 Final Office Action; and

vi) inherently anticipated by *Kronke* et al. (PNAS USA 81(8/84) 5214-5218) and/or *Siebenlist* et al. (Mol. Cell. Biol. *6* (9/86) 3042-3049), as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al., Science, *246* (Dec. 1989):1617-20, and the *Dr. Manolagas Declaration*, as set forth on pages 74-78 of the July 6, 2007 Final Office Action.

3. Protein Kinase C Art

The claims are rejected as allegedly: i) anticipated by, or as obvious over, *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43), as set forth on pages 25-31 of the July 6, 2007 Final Office Action, and

ii) anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30), as set forth on pages 31-34 of the July 6, 2007 Final Office Action.

4. Vitamin D Art

The claims are rejected as inherently anticipated by *Tsoukas* (Science *224* (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74(8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. *74* (10/84) 1451-5), and *Manolagas* et al. (JCE&M, 63 (1986) 394-400), as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the

Declaration of Dr. *Manolagas* (paragraphs 7-24), as set forth on pages 78-89 of the July 6, 2007 Final Office Action.

5. 5-ASA Art

The claims are rejected as inherently anticipated by *Dew* (Br. Med. J. *287* (7/83):23-24)), as evidenced by *Baldwin II* (J. Clin. Invest. 107(1991):63-80), *Bantel* et al. (Amer. J. Gastroenterology *287* (2000):3452), *Yan* et al. (J. Biol. Chem. *274* (1999) 366631-36), and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application, as set forth on pages 90-94 of the July 6, 2007 Final Office Action.

6. Glucocorticoid Art

The claims are rejected as inherently anticipated by *Goodman and Gilman's* (The Pharmacological Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner), as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81), *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95), and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448) as set forth on pages 94-105 of the July 6, 2007 Final Office Action.

In addition, each of claims 66-68 (dependent on claim 6), claims 77-79 (dependent on claim 8), and claims 90-92 (dependent of claim 9) have been rejected based on art relating to only CsA and 5-ASA.

Patentees incorporate by reference their comments concerning this art as set forth in their November 6, 2006 response, and the first Declaration of Dr. Inder Verma.

Patentees also direct the Examiner's attention to the Second Declaration of Dr. Inder Verma and specifically to the following

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 56 of 92 of October 22, 2007 Response*

paragraphs:

1. Antibiotics ...........¶¶ 113-118 and 121-123

2. CsA ..................¶¶ 11-58

3. Protein Kinase C .....¶¶ 59-70

4. Vitamin D/Calcitrol...¶¶ 71-86

5. 5-ASA ................¶¶ 96-105

6. Glucocorticoids ......¶¶ 87-95

ARI 84442

Rejections Based on Antibiotic Art

Patentees have provided above four reasons why claim 14 is patentable over the 1970 PDR above. Each of these four separate reasons is also applicable to claims 6, 8 and 9 and claims dependent thereon. Patentees do not repeat the detailed explanations here, but instead summarize the reasons as follow:

a) *The Methods of Each of Claims 6, 8 and 9 and of Claims Dependent Thereon Do Not Occur In Any Person To Whom Antibiotics Are Administered. At most administering antibiotics prevents induction of the NF-kB intracellular signaling pathway. A method which comprises administering antibiotics is not a method which involves reducing induced NF-kB activity.*

b) *Performing Any Method Involving Administering An Antibiotic According To the 1970 PDR Only Sometimes Results in Killing Gram-Negative Bacteria. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily Or Inevitably Occurred.*

c) *The Occasional Results Obtainable following the Disclosure of The 1970 PDR Are Not Sufficient to Enable the Methods Disclosed And Therefore Cannot Anticipate Any Of Claim 6, 8 or 9 or Any Claim Dependent Thereon.*

d) *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Required by each of Claims 64, 65, 75, 76, 80, 88, 89 and 93.*

Accordingly, Patentees respectfully request that the Examiner reconsider and withdraw the inherent anticipation rejection based on

antibiotic art as applied against each of claims 6, 8 and 9 and claims dependent thereon in view of each of the preceding four reasons, and the discussion by Dr. Verma with respect to claims 6, 8 and 9 and claims dependent thereon. (Declaration of Dr. Verma ¶¶ 126-131; and Second Declaration of Dr. Verma ¶¶ 113-123)

Rejections Based on Cyclosporin A Art

Two types of anticipation rejections are set forth in the July 6, 2007 Final Office Action: anticipation based on a purported explicit disclosure and anticipation based on an alleged inherent disclosure. Patentee in their November 9, 2006 response have pointed out the deficiencies in the extrinsic evidence relied upon as establishing an inherent anticipation. In the sections that follow, Patentees provide additional reasons, each of which alone is sufficient to warrant withdrawal of all rejections based on CsA Art. See the Second Declaration of Dr. Inder Verma ¶¶ 11-58 for detailed comments on the July 6, 2007 Final Office Action.

a) *The Use of Cyclosporin A in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Each of Claims 6, 8 and 9 and Claims Dependent Thereon.*

Using CsA does not, and cannot, involve reducing induced NF-kB activity. CsA is not shown as reducing induced NF-kB activity in any of the cited references. At most certain of the cited references may be interpreted to suggest that use of CsA prevents induction of the NF-kB intracellular pathway. Importantly, a number of examples in the cited references clearly indicate that using CsA does not involve reducing induced NF-kB activity. For example, Schmidt et al. state, "direct addition of CsA to a prepared nuclear extract from activated cells had no effect on the factor binding, including binding of kB-binding factors (data not shown), which suggests that inhibition

occurs during the activation phase of NFAT-1 or the kB complex" (emphasis added, page 4038, second column, second paragraph). Further, Kronke et al., also of record, teach "when added 4 hr after induction, CsA did not alter TCGF mRNA levels" (emphasis added, page 5216, 2nd column, second paragraph). Finally, although induction of TCGF, also known as interleukin-2 (IL-2), is thought to be regulated by NF-kB, Reed et al., also of record, point out that "previous studies by us and by others have demonstrated that CsA (1 to 5ug/ml) does not interfere directly with IL 2 receptor function in that CsA fails to suppress IL 2-induced proliferation in long-term cultures of activated T cells" (emphasis added, page 153, 2nd column, first paragraph). Consequently, these results confirm that while contacting a cell with, or administering CsA to, a person, may possibly prevent induction of NF-kB activity by an external inducing stimulus, such use or administration of CsA does not, and cannot, involve reducing induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 23, 25, 37-38, 46, 55-56, 62-63, 66; and Second Declaration of Dr. Verma ¶¶ 12)

Because claims 6, 8 and 9 and claims dependent thereon require reducing induced NF-kB activity, the prior art disclosures of using or administering CsA are not and cannot be, a method for practicing the claimed methods.

For this reason alone the anticipation and obvious rejections of each of claims 6, 8 and 9 and of each of the claims dependent thereon based on the CsA Art should be withdrawn.

*b) The Cyclosporin A Art Does Not Disclose The Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon.*

The cited CsA references disclose experiments which may be interpreted as showing that use of CsA prevents induction of the intracellular signaling pathway NF-kB. Claims 6, 8 and 9, however,

are directed to reducing induced NF-kB activity. The experiments in the CsA references that purport to show a change in NF-kB activity all involve either pretreatment with CsA or simultaneous contact by, or administration of, CsA and a positive inducer of the NF-kB intracellular signaling pathway. None of these experiments involve first inducing NF-kB and then treating with CsA as reducing induced NF-kB activity. Therefore, such experiments do not anticipate the claims at issue, each of which requires claims reducing induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 25, 37-38, 45-46, 54-55, 62-63, 66; and Second Declaration of Dr. Verma ¶¶ 11-17, 22-28, 30-35, 37-50, 58)

For this reason alone the rejections of each of claim 6, 8 and 9, and of claims dependent thereon as being anticipated by or obvious over the cited CsA Art, should be withdrawn.

c) *The Cited Cyclosporin A Art Is Not Enabling And Therefore Cannot Anticipate the Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain

possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The experiments in the cited CsA references cannot be reproduced and therefore are not enabling. See the discussion of each reference in the Second Declaration of Dr. Verma ¶¶ 11-58.

For this reason alone, the rejections of each claim 6, 8 and 9 and of each claim dependent thereon based on the cited CsA Art, should be withdrawn.

*d) The Cited Cyclosporin Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specified Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64-69, 75-80 and 88-93.*

Each of claims 64-69, 75-80 and 88-93 further limit the respective independent claim from which they depend by reciting that the reducing of induced NF-kB activity occurs by intervening at a specific segment within the NF-kB intracellular signaling pathway. The CsA references cited in the July 6, 2007 Final Office Action report results observed at a specific segment within the NF-kB pathway when induction of the pathway is inhibited, but offer no evidence that use of CsA involves intervening at the specific segment within the NF-kB pathway as recited in each of claims 64-69, 75-80 and 88-93. (Declaration of Dr. Verma ¶¶ 56; and Second Declaration of Dr. Verma ¶¶ 11, 17, 22, 28, 30, 35, 41, 45, 49, 58)

Therefore, none of claims 64-69, 75-80 or 88-93 should be rejected as inherently anticipated by the CsA Art.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 62 of 92 of October 22, 2007 Response*

In conclusion, Patentees have provided clear reasons, each of which independently is sufficient to warrant withdrawal of the anticipation, and if applicable obvious, rejections of claims 6, 8 and 9 and of claims dependent thereon based on the disclosures of the CsA Art. Patentees have also provided a reason sufficient to warrant withdrawal of the rejection of each of dependent claims 64-69, 75-80 and 88-93. Accordingly, Patentees respectfully request all rejections based on CsA Art be reconsidered and withdrawn as currently applied to each of claims 6, 8, 9, 64-69, 75-80 and 88-93.

ARI 84448

<u>Rejections Based on Protein Kinase C Inhibitor Art</u>

For detailed comments concerning the rejections on the basis of Protein Kinase C Inhibitors in the July 6, 2007 Final Office Action see ¶¶ 59-70 of the Second Declaration of Dr. Inder Verma. A summary of the reasons why the rejections of claims 6, 8, 9 and claims dependent thereon on the basis of the Protein Kinase C Inhibitor Art should be withdrawn follows.

*a) The Use of a Protein Kinase C Inhibitor in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.*

A method which involves contacting a cell with, or administering to a person, a protein kinase C inhibitor ("pKCi") does not, and cannot, involve reducing induced NF-kB activity as recited in the rejected claims. Methods involving use of PKC inhibitor are not shown to involve reducing induced NF-kB activity in the cited references. At most the cited references can be interpreted to disclose that pKC inhibitors prevent or inhibit induction of the NF-kB intracellular signaling pathway, and thereby prevent or inhibit the manifestation of NF-kB activity.

Meichle et al. state "PK-C has not only been implicated in mediating TNF activation of the transcription factor AP-1 [], but is also likely to be involved in the <u>activation</u> of the IkB:NF-kB complex" (page 8339, second column). Likewise, Shirakawa et al. disclose "PKA and PKC can <u>activate</u> NF-kB" and they hypothesize "that IkB is the target of phosphorylation; the phosphorylated IkB would presumably have a decreased ability to bind NF-kB." (page 2428, second column).

Therefore, to the extent an inhibitor of protein kinase may have any effect on the NF-kB intracellular signaling pathway and thereby on NF-kB activity, (and it is unclear that it does have any such

effect), the only possible effect such an inhibitor could have would be to prevent or inhibit activation of NF-kB. Use of an inhibitor of protein kinase C cannot have any effect on induced NF-kB activity, and certainly cannot involve reducing induced NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 59-68)

Because each of claim 6, 8, 9 and claims dependent thereon are directed to reducing induced NF-kB activity, the use of a protein kinase C inhibitor as disclosed in the cited art does not, and cannot, involve practicing the claimed methods.

For this reason alone, the anticipation rejections of claims 6, 8 and 9 and of claims dependent thereon based on the protein kinase C inhibitor Art should be withdrawn.

*b) The Cited Protein Kinase C Inhibitor Art Does Not Disclose the Method of Any of Claim 6, 8, 9 or any Claim Dependent Thereon.*

The two cited protein kinase C inhibitor references, Meichle et al. and Shirakawa et al., disclose experiments which may be interpreted as showing that a protein kinase C inhibitor prevents induction of the NF-kB intracellular signaling pathway and thereby effects the appearance of NF-kB activity. However, each of claims 6, 8 and 9, recite <u>reducing induced NF-kB activity</u>. Thus, the experiments in the cited references that purport to show a change in NF-kB activity involve either pretreating cells with a pKCi or administering the pkci simultaneously with a purported inducer of NF-kB. Performing such experiments does not anticipate the rejected claims that recite reducing induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 148-149, 153-154; and Second Declaration of Dr. Verma ¶¶ 59-66)

For this reason alone, the anticipation rejections of each of claim 6, 8, 9, and claims dependent thereon based on Meichle et al. and

Shirakawa et al., should be withdrawn.

c) *The Cited Protein kinase C Inhibitor Art Does Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or of Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the disclosures prior art reference cannot be reproduced, then that reference is not enabling.

The disclosures of protein kinase C inhibitor cited in the July 6, 2007 Final Office Action cannot be reproduced. See the specific discussion as to each reference in the Second Declaration of Dr. Verma ¶¶ 70.

For this reason alone the anticipation rejections of claims 6, 8, 9 and claims dependent thereon based on the Protein kinase C Inhibitor Art, should be withdrawn.

*d) The Cited Protein Kinase C Inhibitor Art Does Not Disclose a Method Which Anticipates Reducing Induced NF-kB Activity by Intervening within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Recited in Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 further limit the independent claim by requiring that the reducing of induced NF-kB activity involve intervening at a specific segment of the NF-kB intracellular signaling pathway inside a cell. The pKCi references cited in the July 6, 2007 Final Office Action report results observed at a specific segment of the NF-kB intracellular signaling pathway, but provide no evidence that any pKCi is reducing induced NF-kB activity by intervening at such specific segment as required by each of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93. (Declaration of Dr. Verma ¶¶ 148-155; and Second Declaration of Dr. Verma ¶¶ 67-69)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 is inherently anticipated by any method involving the use of any pKCi disclosed in Meichle et al. or Shirakawa et al.

In conclusion, Patentees have provided reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejections of claims 6, 8 and 9 and of claims dependent thereon based on Meichle et al. or Shirakawa et al. Patentees have provided an additional reason warranting withdrawal of the rejection as applied to dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93. Accordingly, Patentees respectfully request all rejections based on Meichle et al. or Shirakawa et al. as applied to claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89 and 93 be withdrawn.

Rejections Based on Vitamin D Art

For detailed comments concerning the rejection on the basis of the basis of Vitamin D in the July 6, 2007 Office Action, see ¶¶ 71-86 of the Second Declaration of Dr. Inder Verma. A summary of the reasons why the rejections of claims 6, 8, 9 and claims dependent thereon the basis of the Vitamin D Art should be withdrawn follows.

a) *The Cited Vitamin D Art Does Not Disclose A Method of Using Vitamin D Which Anticipates Any Method Recited In Any of Claim 6, 8, or 9 and in any Claims Dependent Thereon..*

Of the prior art vitamin D references cited in the July 6, 2007 Final Office Action, each reference other than Rigby I discussed below clearly does not disclose a method, the practice of which would anticipate any of claim 6, 8 or 9. These claims require reducing induced NF-kB activity, and the cited references do not disclose a method which does so. Each specific reference is explained and inaccurate characterizations in the July 6, 2007 Final Office Action are noted by Dr. Verma. (See Second Declaration of Dr. Verma ¶¶ 71-86) The cited vitamin D references, therefore, do not anticipate the method of any of claim 6, 8 or 9.

One reference Rigby I purports to show an experiment where vitamin D was administered to PBM cells stimulated with PHA. Rigby I et al. disclose calcitriol-mediated reduction in cellular proliferation and, in Figure 4, a reduction in the level of IL-2 production mediated by calcitriol over the course of 18 hours. A noticeable reduction in IL-2 production is observed at 12 hours post-calcitriol treatment and, at 18 hours, no IL-2 is observed (Figure 4). The production of IL-2 is thought to be regulated, at least in part, by NF-kB. As explained below and in the Second Declaration of Dr. Verma, the results in Figure 4 cannot be a consequence of reducing induced NF-kB activity.

Schmidt et al. and Emmel et al., both of which are of record, have demonstrated that factors, other than NF-kB, can have a role in regulating IL-2 production. Schmidt et al. point out that the "NFAT-1-binding site ... has been implicated directly in playing a major role during transcriptional <u>activation of IL-2</u>" (emphasis added, page 4037, first column). Likewise, Emmel et al. state "NF-AT, AP-3 and to a lesser extent NF-kB ... appear to be important in the transcriptional activation of genes for interleukin-2.." (page 1617, abstract). Additionally, cellular proliferation, the result observed in Rigby I, is a process regulated by many factors, and therefore not necessarily regulated by NF-kB. Thus, cellular proliferation and IL-2 production are not necessarily or inevitably indicative of changes in NF-kB activity. Moreover and importantly, the cellular proliferation and IL-2 production results reported in Rigby I are <u>not</u> attributable to reducing induced NF-kB activity as explained by Yu et al., Takeuchi et al. and Alroy et al. (Second Declaration of Dr. Verma ¶¶ 77)

Yu et al. evaluated the effects of calcitriol on IL-2 production and cellular proliferation noting that:

> NF-kB enhances the expression of IL-2 and the IL-2 receptor, two molecules critical for lymphocyte proliferation. On the other hand, $1,25(OH)_2D_3$ inhibits IL-2 production and lymphocyte proliferation, raising the possibility that the antiproliferative effects of $1,25(OH)_2D_3$ could have been mediated via inhibition of NF-kB. However, the time courses of the effects of $1,25(OH)_2D_3$ on NF-kB expression and lymphocyte proliferation were different. Specifically, whereas $1,25(OH)_2D_3$ could inhibit cell proliferation only when it was added in the first 24 hr following activation <u>1, $25(OH)_2D_3$ decreased p50 and 105 levels when added to the culture as late as 64 hr following addition of the activating agent. This suggests that the antiproliferative effect of $1,25(OH)_2D_3$ is not the result of it effects on NF-kB"</u> (page 10994, first column).

Yu et al. demonstrated that the addition of calictriol 48 hours after activation with PHA inhibits the transcription of the <u>NF-kB subunits p50 and p105</u> as disclosed in Figure 1. On page 10992, Yu et al.

teach that "PBMCs were activated for 72 hr with PHA, and 1,25(OH)$_2$D$_3$ was added either simultaneously with addition of PHA or 24, 48, 64, 68, or 70 hr following addition of PHA (Fig. 3). The inhibiting effect of 1,25(OH)$_2$D$_3$ on p50 and p105 was apparent when the hormone was added simultaneously with PHA or 24, 48, or 64 hr following addition of PHA." Therefore, Yu et al., demonstrate that whatever effect 1,25(OH)$_2$D$_3$ has on IL-2 production, that effect is different from and not attributable to reducing induced NF-kB.

The time course of the effects of 1,25(OH)$_2$D$_3$ observed by Yu et al. is notably different from the time course observed by Rigby et al. I. Rigby I demonstrated in Figure 4, that the effects on IL-2 production of calcitriol on PHA-stimulated PBMs occurred within 18 hours, and after 18 hours no IL-2 production remained to inhibit. According to Yu et al., however, the only effect of 1,25(OH)$_2$D$_3$, ie. its effect on transcription of p50 and p105 is only detected after 24 hours.

The effect of calictriol on cell proliferation and IL-2 production in Rigby et al. I occurs too rapidly to be attributed to the effect of 1,25(OH)$_2$D$_3$ on the transcription of the NF-kB subunits p50 and p105. As described in the '516 patent, column 16, lines 22-28, "NF-kB is initially located in the cytoplasm in a form unable to bind DNA because it is complexed with IkB. Various inducers then cause an alteration in IkB allowing NF-kB to be released from the complex. Free NF-kB then travels to the nucleus and interacts with its DNA recognition sites to facilitate gene transcription." Thus, transcription of p50 and p105 genes is not needed for induction of NF-kB activity.

Takeuchi et al. and Alroy et al. both demonstrate that IL-2 production can be activated by any one of four factors: NF-kB, NFAT, AP-1 and OCT-3 (see Takuechi et al. at page 209). Based on Yu et al.'s teaching that the only effect of 1,25(OH)$_2$D$_3$ relative to NF-kB

is its inhibition of transcription of p105 and p50, it is evident that the results observed in Rigby et al. I in terms of cellular proliferation and IL-2 production did not, and could not have involved reducing induced NF-kB activity. Therefore, the results observed in Rigby I must have been due to a factor other than NF-kB resulting in the reduced transcription of IL-2.

Furthermore, suppression production of p50 and p105 would not lead to reducing induced NF-kB activity. The only effect of vitamin D relative to NF-kB shown of record is suppression of the production of p50 and p105. However, suppression of the production of p50 and p105 would not lead to reducing induced NF-kB activity because p65/RelA alone is sufficient to promote transcription of IL-2. See e.g. Nishiyama et al., page 704, Figure 4, discussed by Dr. Verma. (Second Declaration of Dr. Verma ¶¶ 78-82)

For this reason alone the anticipation rejections of each of claim 6, 8 and 9, and of each claim dependent thereon based on the Vitamin D Art, should be withdrawn.

b) *The Cited Vitamin D Art Does Not Enable The Performance of Any Method Which Anticipates a Method of Any of Claim 6, 8 or 9 or Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide

sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The cited Vitamin D art cannot be reproduced and is not enabling. See the discussion in the Second Declaration of Dr. Verma ¶¶ 84-86.

For this reason alone the anticipation rejections of each of claim 6, 8 and 9 and of each claim dependent thereon based on the vitamin D art, should be withdrawn.

*c) The Cited Vitamin D Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specific Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 further limit the independent claim from which it depends by reciting that the reducing of induced NF-kB activity occurs by intervening at a specific segment within the NF-kB intracellular signaling pathway inside a cell. Vitamin D has no effect on reducing induced NF-kB activity. Moreover, any effect it may have on NF-kB does not involve reducing induced NF-kB activity by intervening at the specific segment within the NF-kB intracellular signaling pathway recited in any of claim 64, 65, 69, 75, 76, 80, 88, 89 and 93. (See also Declaration of Dr. Verma ¶¶ 108; and Second Declaration of Dr. Verma ¶¶ 76)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 should be rejected as inherently anticipated by any use of vitamin D disclosed in any of the cited Vitamin D Art.

In conclusion, Patentees have provided reasons, each of which independently warrants withdrawal of the anticipation rejection of each of claims 6, 8 and 9 and of claims dependent thereon based on the Vitamin D art. Patentees have also provided an additional reason warranting withdrawal of the rejection of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.

Accordingly, Patentees respectfully request all rejection based on the cited Vitamin D art be withdrawn with respect to each of claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89 and 93.

Rejection Based on 5-ASA Art

For detailed comments concerning the rejection on the basis of 5-ASA in the July 6, 2007 Final Office Action see ¶¶ 96-105 of the Second Declaration of Dr. Inder Verma. A summary of the reasons why the rejection of claims 6, 8, 9 and claims dependent thereon on the basis of the cited 5-ASA Art should be withdrawn follows.

a) *The Use of 5-ASA in Dew et al., Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.*

The sole 5-ASA art reference cited, Dew et al., does not anticipate claims 6, 8 and 9 and claims dependent thereon. Dew et al. disclose administration of 5-ASA to prevent reocurrence of ulcerative colitis in patients who "all were in remission with ulcerative colitis or proctitis and had passed three or less stools daily without blood or slime during the previous month" (emphasis added, page 23 of Dew et al). Even if ulcerative colitis were associated with induced NF-kB activity, and there is no evidence that it is, the patients in Dew et al. were asymptomatic with respect to ulcerative colitis and therefore could not have been exhibiting induced NF-kB activity. Each of claims 6, 8 and 9 require reducing induced NF-kB activity. Therefore, Dew et al. does not disclose a method of reducing induced NF-kB. (Declaration of Dr. Verma ¶¶ 156-158; and Second Declaration of Dr. Verma ¶¶ 95-103)

In the July 6, 2007 Final Office Action, the Examiner alleged that Yamamoto et al. teach patients in remission still have elevated cytokine levels, indicating NF-kB is active. This assertion is misleading because Yamamoto et al. evaluated patients "who had been diagnosed with endoscopically and histologically confirmed UC" (page 590, first column). Thus, the disclosure of Yamamoto et al. does not involve asymptomatic patients, such those in Dew et al. When cytokine levels in patients with inactive disease are analyzed, the

levels are similar to healthy volunteers. See the discussion by Dr. Verma of Braegger et al. and Mitsuyama et al., each of whom analyzed patients with inactive disease, i.e. patients in "remission", and showed that such patients in remission have cytokine levels similar to the cytokine levels of the healthy control patients. Specifically, Braegger et al. state "in patients with inactive disease, either as a result of surgery or treatment with steroids, the concentration of stool TNF alpha fell to those of control" (abstract). Likewise, Figure 1 of Mitsuyama et al. demonstrates that the colonic levels of IL-8 in patients with inactive ulcerative colitis are no different from those observed in control patients. The Examiner has acknowledged on page 92 of the Final Office Action, that TNF and IL-8 are regulated by NF-kB. Since the asymptomatic patients in Dew et al. would not have had elevated cytokine levels, these patients would not have had induced NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 101-102)

Moreover, the presence of proinflammatory cytokines and colonic inflammation have been shown to occur in NF-kB deficient mice. (Second Declaration of Dr. Verma ¶¶ 105) Thus, regardless of what "remission" means in Dew et al., there is no evidence in the record showing that NF-kB is necessarily induced in patients with ulcerative colitis, and certainly nothing showing that NF-kB was necessarily induced in the patients of Dew et al.

An inherent anticipation rejection requires that the evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Dew et al. do not describe induced NF-kB activity as recited by the claims. Yamamoto et al. do not make clear that the patients of Dew et al. had induced NF-kB activity.

Even if there was a possibility that the patients of Dew et al. had

induced NF-kB activity, such a possibility cannot support an inherent anticipation rejection. "Inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in a single prior art reference. *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted). By referring to Yamamoto et al., the July 6, 2007 Final Office Action merely raises the possibility that a patient in Dew et al. had induced NF-kB activity. That possibility, however, is both clearly rebutted by others as discussed by Dr. Verma and insufficient as a matter of law to support a rejection on the basis of inherent anticipation. Accordingly, an inherent anticipation rejection based on Dew et al. is not proper.

Finally, although Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to explain Dew et al., the Examiner alleged that the difference between the formulations of 5-ASA used by Dew et al. and by the extrinsic evidence is of no consequence. The Examiner is mistaken. (Second Declaration of Dr. Verma ¶¶ 104) Differences in formulation do matter and the use of different formulations in the non-prior art references relied upon to justify the inherency rejection establishes both that the non-prior art references are not being used to "explain" the prior art, and more importantly that these references do not show that the use of different formulations in Dew et al. inherently anticipates the claimed methods.

For this reason alone the anticipation rejections of each of claims 6, 8 and 9, and of claims dependent thereon based on Dew et al., should be withdrawn.

*b) Dew et al. Do Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The disclosure of Dew et al. cannot be reproduced and is not enabling for the method disclosed. See the discussion in the Second Declaration of Dr. Verma ¶¶ 104.

For this reason alone the anticipation rejections of each of claims 6, 8 and 9 and of each claim dependent thereon based on Dew et al., should be withdrawn.

*c) Dew et al. Do Not Disclose A Method Which Anticipates Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Recited in Claims 64-69, 75-80 and 88-93.*

Each of dependent claims 64-69, 75-80 and 88-93 further limits the independent claim from which it depends by requiring that the

reducing of induced NF-kB activity involve intervening at a specific segment of the NF-kB intracellular signaling pathway inside a cell. Dew et al., at most report results observed at a specific segment, but provide no evidence that 5-ASA actually is reducing induced NF-kB activity by intervening at such specific segment as required by each of claims 64-69, 75-80 and 88-93. (Declaration of Dr. Verma ¶¶ 156-159; and Second Declaration of Dr. Verma ¶¶ 103)

Therefore, none of claims 64-69, 75-80 and 88-93 is inherently anticipated by any method disclosed in Dew et al.

In conclusion, Patentees have provided reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejections of claims 6, 8 and 9 and of claims dependent thereon based on Dew et al. Patentees have also provided an additional reason warranting withdrawal of the rejection as applied to dependent claims 64-69, 75-80 and 88-93. Accordingly, Patentees respectfully request all rejections based on Dew et al. As applied to claims 6, 8, 9, 64-69, 75-80 and 88-93 be withdrawn.

Rejection Based on the Endogenous Glucocorticoid Art

For detailed comments concerning the rejections on the basis of the Glucocorticoid Art in the July 6, 2007 Final Office Action see ¶¶ 87-95 of the Second Declaration of Dr. Inder Verma. A summary of the reasons why the rejection of claims 6, 8, 9 and claims dependent thereon on the basis of the Glucocorticoid Art should be withdrawn follows.

a) *The Use of Endogenous Glucocorticoids Disclosed in Goodman and Gilman Does Not Involve Reducing Induced NF-kB Activity as Required by The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.*

The sole Glucocorticoids reference cited, Goodman and Gilman, does not anticipate any of claims 6, 8, 9 or claims dependent thereon. Goodman and Gilman describe the production of endogenous glucocorticoids by the body in response to "agonal state, severe infections, surgery, parturition, cold, exercise and emotional stress" (Goodman and Gilman's page 1469, second column). As an initial threshold matter there is no evidence of record that any of these conditions referred to involves induced NF-kB activity. Each of claims 6, 8 and 9 as well as each claim dependent thereon is directed to reducing induced NF-kB activity. Because there is not showing that Goodman and Gilman disclose induced NF-kB activity, the claimed method cannot be anticipated. (Declaration of Dr. Verma ¶¶ 102-104; and Second Declaration of Dr. Verma ¶¶ 87-95)

Moreover, even if one or more of the conditions listed in Goodman and Gilman involved the presence of proinflammatory cytokines, this fact would not establish that there was induced NF-kB activity. Proinflammatory cytokines and inflammation has been shown to occur without NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 95)

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Goodman and Gilman do not describe induced NF-kB activity as recited by the claims, and the purported extrinsic evidence does not make clear that Goodman and Gilman had induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 102-104; and Second Declaration of Dr. Verma ¶¶ 87-95)

For this reason alone the anticipation rejections of each of claims 6, 8 and 9, and of claims dependent thereon based on Goodman and Gilman, should be withdrawn.

*b) Any Method Disclosed in Goodman and Gilman, Would At Most Only Involve Reducing Induced NF-kB Activity Sometimes. Any Such Occasional Result Is Not Sufficient To Establish An Element of the Claimed Methods Necessarily Or Inevitably Occurs.*

Nothing of record establishes that the use of glucocorticoids necessarily or inevitably involves reducing induced NF-kB activity. Therefore, even if following the disclosure of Goodman and Gilman could, under some undefined circumstance, involve reducing induced NF-kB activity, (and there is no teaching in Goodman and Gilman of such a circumstance,) any such reducing would have only occurred occasionally. (Declaration of Dr. Verma ¶¶ 102-106; and Second Declaration of Dr. Verma ¶¶ 87, 94-95)

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Inherency may not be established by probabilities or

possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Int'l.; Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

Thus, even if following the disclosure of Goodman and Gilman could occasionally involve reducing induced NF-kB activity this is insufficient to establish inherent anticipation. Critical information is missing from Goodman and Gilman including the type of cell, the type of inducer, and the conditions for administering a glucocorticoid to possibly effect reducing induced NF-kB activity. Without such critical information in Goodman and Gilman, the most the cited non prior art reference could ever show is that there was a possibility of reducing induced NF-kB activity by following the teaching of Goodman and Gilman (Declaration of Dr. Verma ¶¶ 103-105; and Second Declaration of Dr. Verma ¶¶ 87-93)

However, a showing of mere "probabilities or possibilities" is insufficient to support a finding of inherent anticipation. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that could be used to perform the same result with a slightly different structure). Where practice of the prior art only sometimes involves all of the elements of a claim the art was held to <u>not</u> inherently anticipate because "occasional results are not inherent." *See Mehl/Biophile Int'l. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that prior art did not anticipate a claim requiring a substantially vertical orientation even though practicing the prior art would sometimes result in such an orientation). See, also, *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) (affirming a district court holding that practice of a prior art method sometimes yielding crystals one of two polymorphs but other times yielding the other did not inherently anticipate a claim to only one of the polymorphs.)

In the present case, even accepting the Examiner's rationale advanced

in the July 6, 2007 Final Office Action, the use of glucocorticoids as taught by Goodman and Gilman would at most only *sometimes* have involved reducing induced NF-kB activity. Such an occasional result is insufficient to establish inherent anticipation under controlling Federal Circuit precedent.

For this reason alone the inherent anticipation rejection of each of claim 6, 8, 9 and each claims dependent thereon based on the Goodman and Gilman should be withdrawn.

*c) Any Occasional Results Obtainable By Following The Disclosure of Goodman and Gilman Is Not Sufficient to Enable the Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon.*

Any occasional result that might have occurred upon practicing any method disclosed by Goodman and Gilman would be insufficient to enable the method of any of claims 6, 8, 9 or any claim dependent thereon, and therefore, Goodman and Gilman cannot anticipate any of these claims.

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v.U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358,

1364 (Fed. Cir. 1998). Likewise, in *Application of Sheppard*, the Court of Customs and Patent Appeals held that a prior art reference which disclosed either the claimed compound or a different compound was not enabling and therefore could not anticipate the claim at issue. *Application of Sheppard*, 339 F.2d 238, 241-242 (C.C.P.A., 1964).

Goodman and Gilman do not disclose how to carry out a method which necessarily and inevitably involves reducing induced NF-kB activity using glucocorticoids (assuming it is even possible to carry out such a method.) Glucocorticoids have many effects and their mechanism of action is poorly understood. (Declaration of Dr. Verma ¶¶ 105; and Second Declaration of Dr. Verma ¶¶ 94-95)

Prior art whose disclosure would have only sometimes involved practicing the claimed method, like the prior art in *Rockwell* and *Sheppard*, does not enable one skilled in the art to practice the claimed method and therefore cannot anticipate the claimed method. The Examiner's rationale for the rejection, even assuming it were factually correct (which is unclear) would at most establish that the use of glucocorticoids as taught by Goodman and Gilman could *sometimes* have involved reducing induced NF-kB activity. Such a teaching in Goodman and Gilman does not enable the practice of the method of any of claim 6, 8, 9, or any claim dependent thereon.

For this reason alone the inherent anticipation rejection of each of claims 6, 8 and 9, and claims dependent thereon based on the Goodman and Gilman should be withdrawn.

*d) Goodman and Gilman Do Not Disclose A Method Which Anticipates A Method Of Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway Inside a Cell at a Specific Segment of the Pathway*

*As Required by each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 further limit the independent claim from which it depends by requiring that the reducing of induced NF-kB activity involve intervening at a specific segment within the NF-kB intracellular signaling pathway inside a cell. Neither Goodman and Gilman, nor any of the non-prior art references cited in the July 6, 2007 Final Office Action, provide any information as to how glucocorticoids work. Certainly none of the cited references provide evidence that the use of glucocorticoids involves reducing induced NF-kB activity by intervening at the specific segment of the NF-kB intracellular signaling pathway as required in each of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93. (Declaration of Dr. Verma ¶¶ 102-103; and Second Declaration of Dr. Verma ¶¶ 93)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 is inherently anticipated by Goodman and Gilman and the rejection on this basis should be withdrawn.

In conclusion, Patentees have provided reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejections of each of claims 6, 8, 9 and claims dependent thereon based on Goodman and Gilman. Patentees have provided an additional explanation warranting withdrawal of the rejection of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93. Accordingly, Patentees respectfully request the rejections based on Goodman and Gilman as applied to claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89 and 93 be withdrawn.

IV. THE USE OF NON-PRIOR ART REFERENCES AND EVIDENCE SUBMITTED IN A DECLARATION THAT GOES BEYOND EXPLAINING THE CONTENT OF CITED PRIOR ART AS A BASIS FOR AN INHERENCY REJECTION IS IMPROPER AND *ULTRA VIRES*

**A. Statutory Grounds For Reexamination**

Statutory authority proscribes that in reexamination proceedings consideration by the Patent Office be limited to "prior art consisting of patents or printed publications" that have a bearing on patentability. 35 U.S.C. § 301. *See also* 37 C.F.R. § 1.501. Indeed, the Manual of Patent Examining Procedure ("MPEP") states that substantial new questions of patentability must be based on "prior art patents or printed publications." Prior art includes that relied on in the reexamination request, that found elsewhere by the PTO, or that in the patent file from submissions under 37 C.F.R. § 1.501. All such art must be "prior art consisting of patents and printed publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.

**B. Impermissible Grounds of Rejection in a Reexamination**

The Patent Office does not have statutory authority to entertain a prior public use in a reexamination. 35 U.S.C. § 301, *et seq.*; e.g., M.P.E.P. § 2216 (Rev. 2, May 2004) ("Examples of such questions that will not be considered are public use, on sale, and fraud.")

The lack of statutory authority cannot be circumvented by reliance on a printed publication that merely describes the public use. A prior art citation "cannot include ... a statement as to the public use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent or printed publication cannot be properly applied as a ground for reexamination if it is merely used as evidence of alleged prior public use or on sale, insufficiency of disclosure, etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Thus, it is clear that the PTO does not have statutory authority to rely on, as a ground for reexamination, a printed publication which does not itself contain the necessary disclosure, but describes an alleged prior public use. In support of this legal challenge to the subject reexamination proceeding Patentees also rely upon, and hereby incorporate by reference the Petitions, Requests for Reconsideration, and Pleadings filed in the Mandamus action initiated by Patentees in the U.S. District Court for the Eastern District of Virginia.

**C. The Inherent Anticipation Rejections in the August 2, 2006 and July 6, 2007 Office Actions are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute.**

As noted above, a reexamination must be based on "prior art consisting of patents and printed publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501. Nothing in the statute, the rules, or the M.P.E.P. dictates a different understanding. Indeed, even prior art patents or printed publications cannot be grounds for reexamination if used merely as evidence of alleged prior public use or on sale activity. MPEP 2217. Affidavits or declarations may be considered in reexamination to explain the content or pertinent date of a prior art patent or printed publication. *Id.* However, rejection on prior art "cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications." *Id.* at 2258(I)(E).

Likewise, an admission may not be the basis for establishing a substantial new question of patentability, although an admission may be used "to determine the scope and content of the prior art in conjunction with prior art patents and printed publications, whether such admissions result from patents or printed publications or from some other source." *Id.* at 2217 and 2258(I)(F)(1)-(2). "An admission as to what is in the prior art is simply that, an admission, and requires no independent proof. It is an acknowledged,

declared, conceded, or recognized fact or truth." *Id.* at 2258(I)(F)(2). However, information supplementing or further defining the admission is improper, as the admission must stand on its own. *Id.* at 2217.

It is clear that reexamination proceedings were designed to be limited in scope to consideration of prior art patents and printed publications, "lest the life of an issued patent be wasted and the patentee's legitimate rights be abused by third party requests for reexamination, for there are myriad grounds on which patentability is subject to challenge." *In re Lonardo*, 119 F.3d 960, 969, 43 USPQ2d 1262 (Fed. Cir. 1997)(Newman, J., dissenting and noting legislative history's "serious concern that reexamination not create new opportunities for abusive tactics and burdensome procedures")(quoting *In re Recreative Technologies Corp.*, 83 F.3d 1394, 1397, 38 USPQ2d 1776, 1778 (Fed. Cir. 1996)).

Despite the statute, the rules and the MPEP, the Examiner advances the following case law on pages 8-9 of the August 2, 2006 Office Action as relevant to the use of non-prior art references in a reexamination:

> The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." Atlas *Powder* Co. v. *Ireco* Inc., 190 F.3d 1342,1347,51 USPQ2d 1943,1947 (Fed. Cir. 1999). Thus the claiming of a new use, new function or unknown property which is inherently present in the prior art does not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ 430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter. 1993); *In re Cruciferous Sprout Litigation*, 301 F3d. 1343,64 USPQ2d 1202 (Fed. Cir. 2002); *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004). Although, normally, only one reference should be used in making a rejection under 35 U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be proper when the extra references are cited to show that a characteristic not disclosed in the reference is inherent. See MPEP 2131.01. Once a reference's teaching is shown to provide evidence or reasoning tending to show inherency, the burden shifts to Applicant to show an unobvious difference. MPEP 2112 (V).

Patentees respectfully point out that not one of the cases cited by

the Examiner involves a reexamination or discusses what is a legitimate ground for rejection in a reexamination.

35 U.S.C. § 303 specifically refers to §§ 301 and 302, which require the basis of reexamination to be prior art, whether "patents or publications discovered by [the Director] or cited under the provisions of section 301 [for citation of prior art in a request for reexamination under section 302]." 35 U.S.C. § 303. The Examiner proffers no rationale for interpreting the reexamination statute in a different manner. Yet, the Examiner proceeds to assert that non-prior art documents can be considered during reexamination to show inherent anticipation as "extrinsic evidence" of what is inherent in a prior art reference even when such "extrinsic evidence" does not refer to or reproduce the teachings of the prior art being cited.

**D. The Claims of the '516 Patent Are Method Claims and the Cited Prior Art Is At Most Evidence of What Occurred During A Prior Public Use.**

Each of the prior art references cited in the August 2, 2006 Office Action expressly describes methods that were publicly used, e.g. drinking red wine. The cited prior art, therefore, merely provides evidence of the prior public use of the methods described.

The logic used in the August 2, 2006 Office Action is that when the methods described in the printed publications were practiced by the public, the claimed methods of the '516 Patent "inherently" were practiced. Clearly, however, anything that "inherently" happened, must have occurred *during the public use* of methods described in cited references.

Indeed, the August 2, 2006 Office Action relies on non-prior art references as "extrinsic evidence," as well as a Declaration offered by the Requestor, to allegedly "explain" what would have "inherently" happened during such public use. Clearly, the methods which are actually described in the cited prior art do not raise any

substantial new question of patentability, and the August 2, 2006 Office Action does not allege otherwise. What the August 2, 2006 Office Action effectively relies upon to support the inherent anticipation rejections is evidence of a prior public use.

The Federal Circuit has held in standard patent prosecution that a method is inherently anticipated only by the actual public use of the method (which may or may not have been described in a printed publication).[3]

A method of preparing and administering a food product rich in glucosinolates was found to be inherently anticipated where members of the public have "heretofore grown and eaten one of the many suitable cultivars identified by its patents." *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1351 (Fed. Cir. 2002). However, the rationale of this holding is prior public use, not prior publication. This rationale is not available as a ground for rejection in a reexamination.

A claim to a method of hair depilation has been found inherently anticipated on the basis of prior public use in an experiment investigating the safety of a laser on guinea pig backs. The experiment was described in a printed publication, but it was the public use which inherently anticipated, not the publication. Again, prior public use is not available as a basis for a rejection in a reexamination. *MEHL/BIOPHILE International Cor. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999). Moreover, a different printed publication that merely provided instructions for the use of the same laser to remove tattoos from skin, where there was no prior public

---

[3] The Federal Circuit has found a claim to a *compound* inherently anticipated by a disclosure in a *patent* of administering to a patient a precursor which was necessarily converted in the patient to the compound. *Schering Corporation v. Geneva et al.*, 339 F.3d 1373 (Fed. Cir. 2003). However, the Federal Circuit in *Schering* explicitly stated that the *method* of treatment claims were not inherently anticipated by such a disclosure. *Id.* at 1381.

use, was held not to inherently anticipate a claimed depilation method. *Id* at 1365.

Accordingly, it is clear that inherent anticipation of a patented method only occurs during a prior public use, not in a printed publication describing that prior public use; and prior public use is not a permitted basis for a rejection in a reexamination.

The Office's own rules recognize that a prior art citation "cannot include ... a statement as to the public use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent or printed publication <u>cannot</u> be properly applied as a ground for reexamination <u>if it is merely used as evidence of alleged prior public use</u> or on sale, insufficiency of disclosure, etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Accordingly, the August 2, 2006 Office Action contains improper rejections of a patented method based on prior public use.

V. SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R. §1.555, Patentees direct the Examiner's attention to the following disclosures, which are listed on Form PTO-1449 (**Exhibit C**). Copies of the disclosures listed below as items 1-6 including listed attachments are attached hereto as **Exhibits 1-6**, respectively.

1. July 16, 2007 Memorandum In Support of Eli Lilly And Company's Motion To Stay Entry of Judgement Pending Reexamination or For Settlement of Form of Final Judgement, Document 409, filed 07/16/2007, pgs. 1-18 in Civil Case 02 CV 11280 RWZ (**Exhibit 1**);

2. August 22, 2007 Reply Memorandum In Support of Eli Lilly And Company's Motion To Stay Entry of Judgement Pending Reexamination or For Settlement of Form of Final Judgement, Document 414, filed 08/22/2007, pgs. 1-11, including Exhibits 2-6 in Civil Case 02 CV 11280 RWZ (**Exhibit 2**);

3. September 10, 2007 Final Judgement, Document 417, filed 09/10/2007, pgs. 1-5 in Civil Case 02 CV 11280 RWZ (**Exhibit 3**);

4. September 23, 2007 Memorandum In Support of Defendant's Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, A New Trial, Document 420, filed 09/23/2007, pgs. 1-53, including Exhibit 2 in Civil Case 02 CV 11280 RWZ (**Exhibit 4**);

5. July 16, 2007 Declaration Of Laura P. Masurovsky For Eli Lilly And Company's Motion To Stay Entry Of Judgment Pending Reexamination Or For Settlement Of Form of Final Judgment, Document 410, filed 07/16/2007, pgs. 1-2, including Exhibits 2-13 in Civil Case 02 CV 11280 RWZ (**Exhibit 5**); and

6. July 26, 2007 Plaintiffs' Opposition To Lilly's Motion To Stay Entry Of Judgment Pending Reexamination or for Settlement of Form of Final Judgement, Document 411, filed 07/26/2007, pgs. 1-11, including Exhibit 2 in Civil Case 02 CV 11280 RWZ (**Exhibit 6**).

Pursuant to the May 4, 2006 Merger Decision, this Response is being filed in duplicate, each original bearing an original signature and identifying data for both reexamination files.

No fee is deemed necessary in connection with the filing of this Response. However, if any additional fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 31-3125.

Respectfully submitted,

[signature]

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No., 39,992
Attorneys for Patentees
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this correspondence is being deposited this date with the U.S. Postal Service with sufficient postage as first class mail in an envelope addressed to:

Mail Stop Ex Parte Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450.

[signature] 10/22/07

John P. White — Date
Reg. No. 28,678

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing **RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION, SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 22nd day of October, 2007.

John P. White

# EXHIBIT C

PATENT APPLICATION SERIAL NO. [illegible]

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

240 FJ 06/23/95 08463397
1 201 865.00 CK MIT4167A3FY

PTO-1556
(5/87)

M/465677

| DIVISION-CONTINUATION PROGRAM APPLICATION UNDER 37 CFR 1.60 TRANSMITTAL FORM | | | ATTORNEY'S DOCKET NO. MIT-4167A3FY | |
|---|---|---|---|---|
| PRIOR DOCKET NUMBER: MIT-4167A3K | ANTICIPATED CLASSIFICATION OF THIS APPLICATION: CLASS | SUBCLASS | PRIOR APPLICATION: EXAMINER N. Vogel | ART UNIT 1805 |

To the Assistant Commissioner for Patents:

This is a request for filing as: [ ] continuation [X] divisional application under 37 CFR 1.60, of pending prior application serial no. 08/418,266 filed on April 6, 1995,

which is a continuation of U.S.S.N. 07/791,898, filed November 13, 1991 which is a continuation-in-part of U.S.S.N. 06/946,365, filed December 24, 1986 and of U.S.S.N. 07/318,901, filed March 3, 1989 and of U.S.S.N. 07/162,680, filed March 1, 1988 and of U.S.S.N. 07/341,436, filed April 21, 1989 and of U.S.S.N. 06/817,441, filed January 9, 1986 and of U.S.S.N. 07/155,207, filed February 12, 1988 and of U.S.S.N. 07/280,173, filed December 5, 1988

of David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan and Thomas P. Maniatis

for NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

All of the above applications are incorporated herein by reference in their entirety.

1. [X] Enclosed is a copy of the latest inventor signed prior application, including the oath or declaration as originally filed. I hereby verify that the attached papers are a true copy of the latest inventor signed prior application serial no. 07/791,898 as originally filed on November 13, 1991, and further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

**CERTIFICATION UNDER 37 CFR 1.10**

"EXPRESS MAIL" Label No. EG982413031US

Date of Deposit June 5, 1995

I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Assistant Commissioner for Patents, Washington, D.C. 20231

JOAN Z. GRAHAM
(Type or print name of person mailing paper or fee)

Joan Z. Graham
(Signature of person mailing paper or fee)

-2-

2. The filing fee has been calculated on the claims

a. [ ] as filed in the instant application.

b. [X] remaining after the entrance of the Preliminary Amendment.

| FOR | (Col. 1) NO. FILED | (Col. 2) NO. EXTRA | SMALL ENTITY RATE | SMALL ENTITY FEE | OTHER THAN A SMALL ENTITY RATE | OTHER THAN A SMALL ENTITY FEE |
|---|---|---|---|---|---|---|
| BASIC FEE | | | | $ 365 | | $ 730 |
| TOTAL CLAIMS | 24 - 20 = | * 4 | x 11 = | $ 44 | x 22 = | $ |
| INDEP CLAIMS | 15 - 3 = | * 12 | x 38 = | $ 456 | x 76 = | $ |
| [ ] MULTIPLE DEPENDENT CLAIM PRESENTED | | | +120 = | $ | +240 = | $ |
| | | | Assignment Fee | $ | Assignment Fee | $ |
| | | | Total: | $ 865 | Total: | $ |

*If the difference in Col. 1 is less than zero, enter "0" in Col. 2

3. [X] A Verified Statement of Small Entity Status was filed in the prior application on January 10, 1992.

4. [ ] A Verified Statement of Small Entity Status is enclosed.

5. [X] Cancel in this application original claims 1-47, 50-65,86 of the prior application before calculating the filing fee. (At least one original independent claim must be retained for filing purposes.)

6. [ ] This application is being filed by less than all the inventors named in the prior application in order to correct inventorship. In accordance with 37 CFR 1.60(b), the Commissioner is requested to delete the name(s) of the following person(s) who are not inventors of the invention being claimed in this application:

7. [X] Amend the specification as follows:

a. [ ] Insert the following paragraph before the first line of the specification:

Related Application

This application is a

[ ] continuation [ ] division [ ] continuation-in-part

of co-pending application Serial No.______ filed ______ which is incorporated herein by reference in its entirety.

b. [X] Replace the paragraph after "Related Applications" with the following:

This application is a [ ] continuation [XX] division of co-pending application Serial No. 08/418,266 filed April 6, 1995 which is a continuation of U.S.S.N. 07/791,898, filed November 13, 1991 which is a continuation-in-part of U.S.S.N. 06/946,365, filed December 24, 1986 and of U.S.S.N. 07/318,901, filed March 3, 1989 and of U.S.S.N. 07/162,680, filed March 1, 1988 and of U.S.S.N. 07/341,436, filed April 21, 1989 and of U.S.S.N. 06/817,441, filed January 9, 1986 and of U.S.S.N. 07/155,207, filed February 12, 1988 and of U.S.S.N. 07/280,173, filed December 5, 1988. All of the above applications are incorporated herein by reference in their entirety.

8. [X] Enclosed are the following:

a. [XX] Informal drawings as originally filed.

b. [ ] Formal drawings as originally filed.

c. [ ] New formal drawings.

9. [ ] Priority of application serial no. ________ filed on ________ in ________ (country) is claimed under 35 U.S.C. 119.

[ ] The certified copy has been filed in prior application serial no. ________, filed ________.

10. [X] The prior application is assigned of record to: Massachusetts Institute of Technology at Reel 6017, Frames 0298-0317 and 0324-0328; Whitehead Institute for Biomedical Research at Reel 6017, Frames 0286-0297, 0318-0323, 0329-0340 and at Reel 6059, Frames 0495-0500; President and Fellows of Harvard College at Reel 6017, Frames 0341-0348

11. [ ] A preliminary amendment is enclosed.

12. [ ] Also enclosed ________

13. [X] The power of attorney in the prior application is to

David E. Brook, Reg. 22,592; James E. Smith, Reg. 28,043; Leo R. Reynolds, Reg. No. 20,884; Richard A. Wise, Reg. 18,041; Patricia Granahan, Reg. 32,227; Mary Lou Wakimura, Reg. 31,804; Thomas O. Hoover, Reg. 32,470; Alice O. Carroll, Reg. 33,542

a. [X] The power appears in the original papers in the prior application.

b. [ ] An associate power of attorney to ________ was filed in the prior application on ________. ________ is enclosed herewith.

c. [ ] Since the power does not appear in the original papers, a copy of the power in the prior application is enclosed.

14. [X] Address all future communications to:

Patricia Granahan, Esq.
Hamilton, Brook, Smith & Reynolds, P.C.
Two Militia Drive
Lexington, MA 02173

15. [ ] Please charge my Deposit Account No. 08-0380 in the amount of $________. Two duplicate copies of this letter are enclosed.

16. [X] A check in the amount of $ 865.00 to cover the filing fee is enclosed.

17. [X] Authorization is hereby granted to charge payment of the following fees associated with this communication or credit any overpayment to Deposit Account No. 08-0380. (Two duplicate copies of this letter are enclosed.)

a. [X] Any additional filing fees required under 37 CFR 1.16.

b. [X] Any patent application processing fees under 37 CFR 1.17.

18. [X] Authorization is hereby granted to charge payment of the following fees during pendency of this application or credit any overpayment to Deposit Account No. 08-0380. (Two duplicate copies of this letter are enclosed.)

a. [X] Any patent application processing fees under 37 CFR 1.17.

b. [X] Any filing fees under 37 CFR 1.16 for presentation of extra claims.

Respectfully submitted,

HAMILTON, BROOK, SMITH & REYNOLDS, P.C.

By: Patricia Granahan
Patricia Granahan
Registration No. 32,227
Attorney for Applicant(s)
(617) 861-6240

Dated: June 5, 1995

Two Militia Drive
Lexington, MA 02173

[XX] Attorney or Agent of Record

[ ] Filed under Rule §1.34(a)

TVCONAP.FOR-REV.-4/20/95

# EXHIBIT D

#43/h 
3ita

EXPEDITED AFTER FINAL PROCEDURE

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the application of: Baltimore et al.<br>Serial No.: 08/464,364<br>Filed: June 5, 1995<br>For: *Nuclear Factors Associated With Transcriptional Regulation* | Group Art Unit: 1636<br>Examiner: Schwartzman, R.<br>Attorney Docket No.: APV-035.03 |

Box AF
Assistant Commissioner for Patents
Washington, D.C. 20231

**Certificate of Facsimile**

I hereby certify that this correspondence is being submitted by facsimile to the United States Patent and Trademark Office on the date set forth below.

September 12 2001
Date of Signature and of Facsimile Transmission

By

**RESPONSE AND AMENDMENT**

Sir:

In response to the Office Action mailed 11 August 2000 (herein the "Office Action"), and Notice of Appeal filed 15 February 2001, Applicants submit the following Response and Amendment. A Notice of Appeal and a Petition for a Five Months Extension of Time and appropriate fees are filed concurrently herewith. Please amend the application as follows.

A. Amendment of Claims

Please amend the claims as follows:

- **Cancel claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 without prejudice**

Faxpat

**Optipat**®

Dear Valued Customer:

☐ Paper number ________ is missing from the United States Patent and Trademark Office's original copy of the file history. No additional information is available.

☒ The following page(s) 2 of paper number 42 is/are missing from the United States Patent and Trademark Office's original copy of the file history. No additional information is available

Additional comments: ______

If you have any questions or comments, please contact a Faxpat / Optipat Customer Assistance representative at 800-445-9760. We appreciate your patronage. Thank you.

5350 Shawnee Road • Suite 110 • Alexandria, VA 22312
Phone: 800.445.9760 or 703.916.1500 • fax: 800.445.9761 or 703.916.1727
www.faxpat.com www.optipat.com

158. (new) A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

159. (new) A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

160. (new) A method for reducing the level of expression of a viral gene in a eukaryotic cell by reducing NF-κB activity in the cell.

161. (new) The method of claim 160, wherein the viral gene is a CMV, HIV or SV40 gene.

162. (new) A method for reducing the level of expression of a cytokine gene in a eukaryotic cell by reducing NF-κB activity in the cell.

163. (new) A method for diminishing induced NF-κB-mediated intracellular signaling by reducing NF-κB activity in cells.

164. (new) A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cell.

8 165. (new) The method of claim 164, 7 wherein NF-κB activity in the cell is reduced.

166. (new) A method for inhibiting, in eukaryotic cells, expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells.

167. (new) A method for reducing the effects of infection by reducing NF-κB activity in cells.

168. (new) The method of claim 167, wherein the infection is a viral infection.

169. (new) The method of claim 167, wherein the infection is a bacterial infection.

170. (new) A method for reducing the effects of bacterial lipopolysaccharide by reducing NF-κB activity.

171. (new) A method for reducing bacterial lipopolysaccharide-induced expression of cytokines, which method comprises reducing NF-κB activity.

172. (new) A method for reducing bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-alpha, which method comprises reducing NF-κB activity.

173. (new) A method for reducing bacterial lipopolysaccharide-mediated stimulation of immune cells, which method comprises reducing NF-κB activity.

174. (new) A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells.

175. (new) A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity by reducing intracellular NF-κB activity.

176. (new) A method for reducing bacterial lipopolysaccharide-induced translocation of NF-κB comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-κB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB—IκB complexes.

177. (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

178. (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

179. (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

180. (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting degradation of an IκB protein.

181. (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting dissociation of NF-κB—IκB complexes.

182. (new) The method of any of claims 158 – 175 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

183. (new) The method of any of claims 158 – 176, carried out on mammalian cells.

184. (new) The method of claim 183, wherein the mammalian cells are human cells.

185. (new) The method of claim 183, carried out on immune cells.

186. (new) The method of claim 183, carried out on lymphoid cells.

187. (new) The method of claim 183, carried out on liver cells.

188. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to decrease the level of NF-kB not bound in an NF-kB:IkB complex

189. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the dissociation of NF-kB IkB complexes..

190. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the modification of IkB.

191. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the degradation of IkB.

192. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the passage of NF-kB into the nucleus of cells.

193. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to reduce the binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB-mediated signal transduction.

*Attached hereto is a marked-up version of the changes made to the claims by the current amendment. The attached page is captioned "Version with markings to show changes made." For the convenience of the Examiner, all claims being examined, whether or not amended, are presented in that section.*

B. Support for Amended Claims

Support for such phrases as "inhibiting nuclear localization of a NF-κB protein", "inhibiting a DNA binding activity of an NF-κB protein" and "inhibiting dissociation of NF-κB--IκB complexes" have previously been demonstrated. Support for other phrases can be found inter alia as follows:

| phrase | page/paragraph of specification |
|---|---|
| *reducing the effects of infection on cells by reducing NF-kB activity in the cells* | Page 30, paragraph 1; Page 74, lines 10-14; Figures 20, 21 and 42 |
| *reducing the effects of bacterial lipopolysaccharide by reducing NF-kB activity* | Page 30, paragraph 1; Example 8; Figures 20 and 21 |
| *reducing bacterial lipopolysaccharide induced expression of cytokines* | Page 74, lines 5-7; Page 30, paragraph 1; Example 8; Figures 20 and 21 |
| *reducing bacterial lipopolysaccharide induced* | Page 39, line 29 – Page 40, line 1; Page 30, |

| | |
|---|---|
| *expression of Tumor Necrosis Factor-α* | paragraph 1; Example 8; Figures 20 and 21 |
| *reducing bacterial lipopolysaccharide-mediated stimulation of immune cells* | Page 30, paragraph 1; Example 8; Figures 20 and 21 |
| *reducing Interleukin-1 or Tumor Necrosis Factor-α activity by reducing intracellular NF-κB activity* | Page 74, lines 5-7; Page 39, line 29 – Page 40, line 1 |
| *modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling* | Page 23, lines 17-18 |
| *inhibiting, in eukaryotic cells, expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling* | Page 7, lines 26-30 |
| *modification of an IκB protein which reduces binding to NF-κB* | Page 40, lines 14-22; and page 37, lines 10 - 11 |

C. Outstanding Rejection Of Certain Pending Claims

In the outstanding Office Action, claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 were rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to "reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention".

There, the Examiner noted Applicants' previously made points, including the following:

- applicants are the pioneers who identified NF-κB as a key mediator of biological phenomena,
- the specification explicitly lays claim to methods of modulating NF-κB and signaling through NF-κB,
- one can affect NF-κB directly or indirectly,
- a variety of classes of substances could be used for that purpose, and
- the specification discloses several examples of substances which modulate NF-κB.

The Examiner did not dispute the veracity of those points, but rather took issue specifically with the recitation of agents in the then pending method claims. The Examiner's position was based on the grounds that the specification lacked adequate description of those

agents *per se*, especially in view of the structural diversity of agents that modulate NF-κB activity. This is discussed in greater detail on pages 4 – 5 of the Office Action.

Moreover, the Examiner considered the specification's guidance on how to use such agents to be inadequately enabling to the extent that those agents were recited as agents identified by a particular assay, rather than as structurally identified agents. Additionally, a number of issues were raised regarding support for the method for inhibiting expression of HIV DNA recited in withdrawn claims 62 and 153. See the Office Action at pages 6 – 7.

Applicants do not agree with the Examiner's conclusions for the reasons presented below.

Additionally, a number of issues were raised regarding support for the method for inhibiting expression of HIV DNA recited in withdrawn claims 62 and 153. See the Office Action at pages 6 – 7. While Applicants' stand by the points made in their prior traversal of the rejection of claims 62 and 153 (See their May 30, 2000 Response and Amendment, see especially pages 9 - 10) and do not acquiesce to the maintenance of the rejection, they have withdrawn claims 62 and 153, rendering this issue moot.

D. Applicant's Rebuttal of the Rejections

The amendments to the claims are believed to render moot all outstanding grounds for rejection with respect to claims 158 – 187. Those claims, as well as new claim 188 and the cancelled claims are believed to comply with the requirements of Section 112 for the reasons set forth below, as well as in our prior responses.

*(i) Applicants Possessed the Claimed Invention*

According to the USPTO, the written description requirement is met by the Applicants if it would be apparent to those skilled in the art or science that the inventor was in possession of the claimed invention at the time of filing the patent application. See Guidelines for Examination of Patent Applications Under the 35 U.S.C. 112 1, 66 Fed. Reg. 4, 1099 (2001). The courts have repeatedly articulated a similar standard. There is no *per se* rule that, to show possession of the claimed invention, the Applicants must have been able to describe the structure of the chemical entities which could be identified in the assay steps. As the Examiner has stated, sufficient description can be provided not only by disclosure of structure, but also by disclosure of relevant identifying characteristics, i.e., "by other physical and/or chemical properties, by functional characteristics coupled with a known or disclosed correlation between function and structure, or

a by a combination of such identifying characteristics". See Office Action at page 5, citing the Written Description Guidelines. Clearly the courts and the patent office contemplate something other than merely structure alone for the definition of a class of substances *per se*, let alone for describing a method using such substances. In this case, as discussed in greater detail below, substances of structurally diverse types are, and would have been expected to be, useful in practicing the claimed methods. Thus it would be impractical and unreasonable to require a structural definition of each of the diverse kinds of agents useful in practicing the claimed methods. And, importantly, a structural definition would be unnecessary to convey to the reader Applicants' possession of the invention. Possession was manifested by the disclosed discovery of the signaling pathway and ways to identify and use inhibitors thereof. Thus, it is appropriate under the circumstances for Applicants to have defined the method of use with reference to agents identified or characterized by their method of selection or identification, as that inherently defines characteristic properties of useful agents.

The screening assays taught by the present application permit the identification or characterization of substances that modulate NF-κB activity by various mechanisms. And there is no question about Applicants' possession of the screening methods. That is clear from US 6,150,090, which is based on the same specification as the subject application.

By definition, substances identified or characterized by the disclosed assays, irrespective of how widely they may vary from one another in chemical structure, are useful for inhibiting or potentiating (as the appropriate case may be) NF-κB-mediated cellular signaling. No more need be known of the chemical structure of the substance to appreciate its utility in the claimed methods. To the contrary, a person of skill in the art would have reasonably expected that the screening steps of the prior claims would identify a diverse group of substances having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and use covered by the prior claims. That is, a person of skill in the art would have readily appreciated that all modulators of NF-κB would not have the same or similar structure. Even compounds regulating NF-κB by the same mechanism, such as by inhibiting modification or degradation of IκB, would have been expected to include any of a variety of different structures.

Indeed, at the time the present application was filed, there was ample precedent in the scientific literature for identifying structurally diverse agents based on their common activity against a selected biological target. For instance, Weinstein et al. (1989) Am J Hypertens 2:205 review the state of calcium antagonists, and note the identification of calcium antagonists of "very diverse structure." See also Triggle et al. (1983) Circ Res 52: 117. Likewise, Mills et al. (1989) Methods Find Exp Clin Pharmacol 11 Suppl 1: 87 reviews the state-of-the-art of H2-

receptor antagonists, and notes that "numerous compounds with diverse chemical structures have been shown to possess H2-receptor antagonist activity. See also Badger et al. (1984) Int J Immunopharmacol 6:467. The art already recognized many instances wherein structurally unrelated compounds acted on the same target protein(s). Thus, one of ordinary skill in the art would not have doubted applicants' possession of the invention based on the existence of NF-κB modulators of diverse structures, or on the reference in the method claims to such agents identified or characterized in appropriate functional assays.

Applicants' argument is further substantiated by the Declaration of David Baltimore under Rule 1.132 and In re Brana, a copy of which is attached hereto as Exhibit A. Dr. Baltimore points out examples of the types of compounds that have been found, as predicted by the application, to alter NF-κB and/or IκB activity and affect NF-κB mediated gene expression in cells. These compounds are structurally diverse. However, each is characterized by its ability to alter NF-kB signaling activity and to influence NF-κB mediated gene expression. Dr. Baltimore's declaration is not offered to render an insufficient disclosure enabling, rather, they prove that the disclosure was in fact enabling when filed. In re Braña, 51 F2d 1560 (CAFC 1995).

Further to this point, the Examiner's attention is directed to the attached publications of White et al (2000) British Journal of Hematology 110:130 (Exhibit B) and Fujihara et al. (2000) Journal of Immunology 165:1004 (Exhibit C). These references describe the use of compounds which reduce bacterial lipopolysaccharide (LPS) mediated activation of NF-κB signaling activity leading to inhibition of NF-κB dependent gene expression. For instance, Fujihara et al. describe the use of an intracellularly targeted peptide inhibitor of NF-κB nuclear translocation. In particular, they used cell permeable peptides carrying two nuclear localization sequences (NLS) and demonstrated that these peptides inhibited LPS-induced NF-κB nuclear translocation leading, inter alia, to inhibition of expression of the κ Ig light chain gene, a gene whose transcription is regulated by NF-κB. White et al. demonstrate that another polypeptide product, activated protein C, also inhibited LPS-induced activation of NF-κB, leading, *inter alia*, to inhibition of expression of the TNF gene, another gene whose transcription is regulated by NF-κB. Although those two inhibitors of NF-κB signaling activity are each demonstrated to inhibit LPS induction of NF-κB signaling activity and NF-κB-mediated gene transcription, and can reduce the effect of infection, they are clearly very different from one another in structural terms. While published after the priority date of the present application, these references are being offered merely as non-limiting examples to substantiate that the disclosure was in fact enabling when filed. In re Braña, supra. Additional supporting references from the scientific literature are provided in Exhibit D hereto.

Thus, it is evident from the specification and corroborated by the post-filing evidence, that one skilled in the art having read the application when it was filed would have expected, and would have been justified in that expection, that a wide range of structurally diverse substances would be identified or characterized using the assays taught by the present application and would be useful for inhibiting or potentiating NF-κB signaling activity. Moreover, it would be apparent to those skilled in the art that Applicants specifically contemplated that many different classes of substances could be identified or characterized in the subject assays as having such activity, and that such substances could then be used to modify NF-κB mediated signalling in cells, both in vitro and in vivo, as recited by the pending claims. This is believed to be amply borne out in the accompanying In re Brana showing. Although the compounds regulating NF-κB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-κB signal transducing activity.

It is submitted that Applicants' possession of the invention, including the invention defined in claims 188 – 193, would have been evident upon reading the application as filed.

*(ii) The Pending Claims are Enabled*

Long before the earliest priority date of the present application, the applied sciences of formulation and use of new drugs had become a matter of routine experimentation. As a practical matter, that scientific legacy is reapplied, rather than reinvented, in the case of each new drug selected for development. That is true regardless of the particular structure of a substance to be developed. As a matter of Patent Law, the ordinarily skilled artisan reading applicants' disclosure is charged with knowledge of that legacy, and applicants need not and should not dwell in their application on that which is already known in the art.

Applicants contributions include the identification of a very important cellular signal transduction pathway and the disclosure of a number of exemplary assays for finding or characterizing agents which modulate that pathway. When the practitioner selects such an agent, s/he usually need only apply the routine experimentation involved in formulating and using the agent. This is true regardless of the structure of the agent. While drug development is usually time consuming and expensive, it is routine—not undue experimentation. This is reflected in the commercial reality of high value agreements between companies for the identification of new drug discovery targets, contrasted with the routine drug development work often delegated to relatively low value contract labs.

In short, the routine craft of drug development is well known and applicable across structural lines. Accordingly, Applicants submit that the structural range of agents useful in practicing the method claims does not actually give rise to an enablement deficit.

*(iii) Additional In re Brana references*

As mentioned above, the references provided as part of Exhibit D offer additional substantiation under *In re Brana* of the operability of the claimed invention in both *in vitro* and *in vivo* contexts to show, among other things, examples of successful achievement of Applicants' claimed objectives through direct or indirect reduction of NF-kB signal transducing activity. The embodiments described in the attached references range from use of nucleic acid decoys, to expression vectors encoding IκB proteins (wild-type and mutant), to small molecule inhibitors of IκB degradation. In each case, structurally diverse substances were deployed in accordance with Applicants' methods—i.e., to reduce NF-kB activity in cells which were contacted with the agents, both in culture and in animals. Moreover, in none of these references disclosed any peculiar problems in putting into practice the inhibition of NF-kB signaling activity.

*(iv) Precedence set by other issued patents*

The pending claims, directed as they are to methods rather than compositions-of-matter, are consistent with claims issuing in a variety of arts. As such, they appear to comport with the PTO's working standards for form, semantics and determination of possession of invention.

With particular regard to claims 188 - 193, Applicants note that there are numerous issued patents in the chemical, mechanical and software arts directed to methods in which a product of one step is passed onto subsequent steps without specifying its structure, noting simply that the product was the thing produced or identified etc. by the preceding step. US Patent 6,171,813 is an example of claims issued in the chemical art in which a product of one step is provided into a next step of the claimed method:

> 1. A method of catalysis of at least one substrate into a product in an organic reaction solvent, comprising the steps of:
> (a) obtaining a catalyst comprising an enzyme-surfactant ion pair complex comprising an enzyme and an ionic surfactant capable of forming an ion pair complex with the enzyme, the complex being produced by extracting an aqueous solution of the enzyme with the ionic surfactant and a water immiscible organic solvent,
> (b) combining the catalyst with an organic reaction solvent, comprising an organic solvent and water in an amount sufficient to increase the rate of catalysis relative to a water-free organic reaction solvent, the amount of water ranging from about 0.03% to about 2.5% v/v, and
> (c) allowing catalysis of the at least one substrate into the product.

2. The method of claim 1, further comprising recovering the product after catalysis is substantially completed.

Likewise, US Patent 5,666,415 is an example of claims issued in the software art in which a product (the encrypted file) of one step is passed into the next step (decryption) of the claimed method:

1. In an information handling system in which secret information is maintained within a first protected environment, a method of transferring said secret information from said first protected environment to a second protected environment, said method being performed by one or more authorities, said information within said protected environments being unobtainable in clear form by said one or more authorities, said method comprising the steps of:

establishing within said first and second protected environments a shared secret transport key that is obtainable in clear form only within said first and second protected environments and is unobtainable in clear form by said one or more authorities;

encrypting said secret information within said first protected environment using said transport key to generate encrypted secret information that is obtainable in encrypted form by at least one of said one or more authorities; and

decrypting said encrypted secret information within said second protected environment using said transport key to regenerate the original secret information within said second protected environment, said regenerated secret information being unobtainable in clear form by said one or more authorities.

The Examiner's attention is also directed to US Patent 6,271,197, which includes claims directed to a combination of screening assay with treatment step

1. A method for inhibiting growth of a fungal pathogen comprising
   (a) forming a reaction mixture including:
      (i) a fungal geranylgeranyl transferase (GGPTase);
      (ii) a GGPTase substrate;
      (iii) a test compound, under conditions whereunder, in the absence of the test compound, the GGPTase and the GGPTase substrate interact,
   (b) detecting interaction of the GGPTase substrate with the GGPTase,
   wherein a statistically significant decrease in the interaction of the GGPTase substrate and GGPTase in the presence of the test compound, relative to the level of interaction in the absence of the test compound, indicates a potential GGPTase inhibitory activity for the test compound; and
   (c) contacting the pathogen with the test compound identified as having a potential GGPTase inhibitory activity, whereby growth of the fungal pathogen is inhibited.

In those illustrative cases, the inventors' possession of their claimed methods was evident without the need for structural identification of the class of agents used in the claimed method. The inventors were permitted to use normal language to describe their methods, rather than being forced to describe their method without mentioning the agent involved in the method. The same should be true in the subject case.

B. State of Fact Finding by PTO

The final guidelines for section 112 clearly state there is a strong presumption that the specification as filed provides adequate written description support for the claimed invention. See *Guidelines*, 64 Fed. Reg. 71 at page 1105. A disclosure as filed is prima facie adequate. To support a rejection, the PTO has the burden of showing why the Applicant's evidence is

insufficient. In any case where lack of written description is found, the PTO should cite documentary evidence in support of the finding. As expressly stated by the guidelines, where documentary evidence is not available, technical reasoning, as distinguished from legal reasoning, may support the finding when the technical line of reasoning relates to fact finding regarding possession of the invention.

Moreover, the Federal Circuit has recently articulated a standard whereby the PTO must establish a rational connection between the agency's fact findings and its ultimate action. Dickinson v. Zurko, 119 S. Ct. 1816 (1999). In light of the Applicants arguments of record, and the presumption in favor of the Applicants, it is respectfully asserted that the Examiner's maintenance of the present rejection is not supported by substantial evidence, and as such, does not meet the "arbitrary, capricious" standard applied under the "substantial evidence" test of Section 706(2)(E) of the Administrative Procedure Act. The Examiner has not cited any relevant art nor relied on any other fact finding results which rebut the presumption in favor of the Applicants.

F. Entry of Amendment

Applicants respectfully request that the Examiner enter this Amendment and Response. It is expected that the instant paper should place the present application in condition for allowance. However, if the Examiner maintains the present rejection, it is believed that the arguments provided herein, though supplementing past remarks by the Applicants, can be useful towards fully developing the file history for appeal. It is noted by the Applicants would be severely prejudiced should they be required to refill this application (e.g., as an RCE or CPA) by the loss of potential patent term.

This case reflects a good faith, earnest effort by Applicants to define patentable subject matter commensurate in scope and effect with the significance of the disclosed invention. To bring these efforts to an appropriate conclusion, Applicants have during the course of this important prosecution sought the advice of experienced attorneys at three well known patent law firms. And during that time, Applicants gratefully note, the Examiner has been very helpful and has made a clear effort to advance prosecution.

However, Applicants believe that the criteria used for examining the pending claims of the present application (and analogous claims in other cases) have been shifting over the last several office actions. This is apparently due in part to changing ideas about PTO policies on the Written Description Requirement of §112, or to variability in their application, prior to and

perhaps after the PTO's adoption of the new Guidelines for the Written Description Requirement. In certain instances, the remarks and amendments which Applicants have presented have been rebutted in part by reference to recent announcements on these guidelines. In particular, the most recent office action is the first to articulate the rejection of the pending claims with reference to the Written Description guidelines. It in fact refers to the interim guidelines published in 1999. Since that time, the final guidelines for examination with respect to the written description requirement of 35 USC §112 were published in the Federal Register. 66 Fed. Reg. 1092. The final guidelines included several changes relative to the interim guidelines, and also provide clarifying statements in response to public comment on the interim guidelines. Moreover, the very promulgation of these guidelines evidences a need, perceived by the PTO itself, to impose a consistency of policy or its application—where one was previously lacking.

The past, including the recent past, saw variability in the understanding and application of §112 standards by different examiners, and thus a variability in the understanding of those standards by the public. Consistency has hopefully been achieved through the recent promulgation of official Guidelines combined with educational efforts within the PTO.

In the course of prosecution of this case, applicants and their various attorneys have parsed the language of the office actions and attempted to craft language to overcome the §112 issues noted in the office actions—based on their collective experiences at the PTO, including their experiences with application of Written Description notions by other examiners. It is noted that the present office action identifies for the first time the particular language in the claims to which the Examiner's rejection under 35 USC §112 is drawn. As set forth in the office action, it is the "second part of the method drawn to using an agent" which the Examiner identifies as lacking adequate written description in the specification. That new, more specific guidance from the Examiner, combined with careful study of the Official Guidelines for the Written Description Requirement has given Applicants confidence that the claims 158-188 define patentable subject matter that will meet with the Examiner's approval.

In this regard, we note that MPEP Section 706.07 states that "before final rejection is in order a clear issue should be developed between the examiner and applicant". It is submitted that under the totality of circumstances noted above, the development of a clear issue had been incomplete at the time the last office action issued. Accordingly, Applicants request that the finality of the outstanding office action be reconsidered and withdrawn to provide Applicants a better opportunity to address the rejection in view of the final Written Description guidelines, and present claims which address the particular features to the pending claims which where objected to by the Examiner.

Applicants believe that such an action is required for the development of a clear issue between Applicants and the Examiner, if possible, should appeal be necessary. While Applicants understand that it is to the interest of the applicants as a class as well as to that of the public that prosecution of an application be confined to as few actions as possible, Applicants believe that the present request is consistent with a balance which includes a thorough consideration of the merits of the case.

Finally, as a consequence to the loss of a substantial portion of the patent term because of the early priority date of the instant application, Applicants note that they would be severely prejudiced should they be required to refile this application in order to have these issues considered.

G. Conclusion

In view of the above remarks and the amendments to the claims, it is believed that this application is in condition for allowance. If a telephone conversation with Applicant's Attorney would expedite prosecution of the above-identified application, the Examiner is urged to call the undersigned at (617) 951-7000.

Ropes & Gray
One International Place
Boston, Massachusetts 02110
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Customer No.: 28120

Dated: ____________

Respectfully submitted,
ROPES & GRAY

Matthew P. Vincent
Registration No.: 36,709

VERSION WITH MARKINGS TO SHOW CHANGES MADE

111. (reiterated) A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to said gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB.

158. (new) A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

159. (new) A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

160. (new) A method for reducing the level of expression of a viral gene in a eukaryotic cell by reducing NF-κB activity in the cell.

161. (new) The method of claim 160, wherein the viral gene is a CMV, HIV or SV40 gene.

162. (new) A method for reducing the level of expression of a cytokine gene in a eukaryotic cell by reducing NF-κB activity in the cell.

163. (new) A method for diminishing induced NF-κB-mediated intracellular signaling by reducing NF-κB activity in cells.

164. (new) A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cell.

165. (new) The method of claim 164, wherein NF-κB activity in the cell is reduced.

166. (new) A method for inhibiting, in eukaryotic cells, expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells.

167. (new) A method for reducing the effects of infection by reducing NF-κB activity in cells.

168. (new) The method of claim 167, wherein the infection is a viral infection.

169. (new) The method of claim 167, wherein the infection is a bacterial infection.

170. (new) A method for reducing the effects of bacterial lipopolysaccharide by reducing NF-κB activity.

171. (new) A method for reducing bacterial lipopolysaccharide-induced expression of cytokines, which method comprises reducing NF-κB activity.

172. (new) A method for reducing bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-alpha, which method comprises reducing NF-κB activity.

173. (new) A method for reducing bacterial lipopolysaccharide-mediated stimulation of immune cells, which method comprises reducing NF-κB activity.

174. (new) A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells.

175. (new) A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity by reducing intracellular NF-κB activity.

176. (new) A method for reducing bacterial lipopolysaccharide-induced translocation of NF-κB comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-kB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB --IκB complexes.

177. (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

178. (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

179. (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting modification of an IκB protein, which modification otherwise reduces IkB binding to NF-kB.

180. (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting degradation of an IκB protein.

181. (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting dissociation of NF-κB --IκB complexes.

182. (new) The method of any of claims 158 175 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

183. (new) The method of any of claims 158 – 176, carried out on mammalian cells.

184. (new) The method of claim 183, wherein the mammalian cells are human cells.

185. (new) The method of claim 183, carried out on immune cells.

186. (new) The method of claim 183, carried out on lymphoid cells.

h

187. (new) The method of claim 183, carried out on liver cells.

188. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to decrease the level of NF-kB not bound in an NF-kB:IkB complex

189. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the dissociation of NF-kB—IkB complexes.

190. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the modification of IkB.

191. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the degradation of IkB.

192. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the passage of NF-kB into the nucleus of cells.

193. (new) A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to reduce the binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB-mediated signal transduction.

# EXHIBIT E

| *Notice of Allowability* | Application No. 08/464,364 | Applicant(s) BALTIMORE ET AL |
|---|---|---|
| | Examiner David Guzo | Art Unit 1036 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS. This application is subject to withdrawal from issue at the initiativ of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *9/12/01*.
2. ☒ The allowed claim(s) is/are *108-187 and 194-366*.
3. ☐ The drawings filed on ____ are accepted by the Examiner.
4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ *All* b) ☐ *Some** c) ☐ *None* of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. ____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: ____.
5. ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).
   (a) ☐ The translation of the foreign language provisional application has been received.
6. ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.

7. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

8. ☒ CORRECTED DRAWINGS must be submitted.
   (a) ☒ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
   1) ☐ hereto or 2) ☒ to Paper No. *44*.
   (b) ☐ including changes required by the proposed drawing correction filed ____, which has been approved by the Examiner.
   (c) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No. ____.

Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the top margin (not the back) of each sheet. The drawings should be filed as a separate paper with a transmittal letter addressed to the Official Draftsperson.

9. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Attachment(s)

1 ☐ Notice of References Cited (PTO-892)
3 ☒ Notice of Draftperson's Patent Drawing Review (PTO-948)
5 ☒ Information Disclosure Statements (PTO-1449), Paper No. ____
7 ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
2 ☐ Notice of Informal Patent Application (PTO-152)
4 ☐ Interview Summary (PTO-413), Paper No. ____
6 ☒ Examiner's Amendment/Comment
8 ☐ Examiner's Statement of Reasons for Allowance
9 ☐ Other

U.S. Patent and Trademark Office
PTO-37 (Rev. 04-01)

Notice of Allowability

Part of Paper No 44

ADL 0000923

Application/Control Number: 08/464,364 Page 2

Art Unit: 1636

cancelled

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview with Matthew Vincent on September 14, 2001.

The application has been amended as follows:

In the claims:

Claims 153 and 188-193 were canceled.

158. (amended) A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising [by] reducing NF-κB activity in the cell such that expression of said gene is inhibited.

2.

159. (amended) A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-κB, the method comprising [by] reducing NF-κB activity in the cell such that expression of said genes is inhibited.

3.

160. (amended) A method for reducing the level of expression of a viral gene whose transcription is regulated by NF-κB in a eukaryotic cell, the method comprising [by] reducing NF-κB activity in the cell such that expression of said viral gene is reduced.

4.

161. (amended) The method of claim 160, wherein the viral gene is a cytomegalovirus (CMV), human immunodeficiency virus (HIV) or simian virus 40 (SV40) [CMV, HIV or SV40] gene.

5.

162. (amended) A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-κB in a eukaryotic cell comprising [by] reducing NF-κB activity in the cell such that expression of said cytokine gene is reduced.

6.

163. (amended) A method for diminishing induced NF-κB-mediated intracellular signaling comprising [by] reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished.

7. 164. (amended) A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified.

9. 166. (amended) A method for reducing [inhibiting], in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

10. 167. (amended) A method for reducing the effects of bacterial infection on mammalian cells comprising [by] reducing NF-κB activity in mammalian cells so as to reduce bacterial lipopolysaccharide-induced gene expression in the mammalian cells.

11. 168. (amended) [The] A method for reducing the effects of [of claim 167, wherein the infection is a] viral infection on mammalian cells comprising [by] reducing NF-κB activity in mammalian cells so as to reduce virus-mediated gene expression in the mammalian cells.

12. 169. (amended) [The] A method [of claim 167, wherein the infection is a] for reducing the effects of bacterial infection on mammalian immune cells comprising [by] reducing NF-κB activity

in mammalian immune cells so as to reduce bacterial lipopolysaccharide-mediated stimulation of the immune cells.

170. 13 (amended) A method for reducing the effects of bacterial lipopolysaccharide on mammalian cells comprising [by] reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced gene expression in the cells.

171. 14 (amended) A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

172. 15 (amended) A method for reducing bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-α in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-α in the cells.

173. 16 (amended) A method for reducing bacterial lipopolysaccharide-mediated stimulation of immune cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-mediated stimulation of the immune cells.

17. 174. (amended) A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial-induced NF-κB signaling in the cells.

18. 175. (amended) A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising [by] reducing [intracellular] NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

19. 176. (amended) A method for reducing bacterial lipopolysaccharide-induced nuclear translocation of NF-κB in eukaryotic cells comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-κB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB-IκB complexes so as to reduce nuclear translocation of NF-κB in the cells.

20. 177. (amended) The method of claim 158 [any of claims 158 - 175] wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

21. 178. (amended) The method of claim 158 [any of claims 158 - 175] wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

22. 179. (amended) The method of claim 158 [178], wherein NF-κB activity is reduced by [inhibiting passage of NF-κB into the nucleus comprises] inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

23. 180. (amended) The method of claim 158 [178], wherein NF-κB activity is reduced by [inhibiting passage of NF-κB into the nucleus comprises] inhibiting degradation of an IκB protein.

24. 181. (amended) The method of claim 158 [178], wherein NF-κB activity is reduced by [inhibiting passage of NF-κB into the nucleus comprises] inhibiting dissociation of NF-κB:IκB complexes.

25. 182. (amended) The method of claim 158 [any of claims 158 - 175] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

26. 183. (amended) The method of claim 158 [any of claims 158 - 176], carried out on mammalian cells.

27. 184. (amended) The method of claim 158 [183], carried out on [wherein the mammalian cells are] human cells.

28
185. (amended) The method of claim 26 ~~183~~ or 27 ~~184~~, carried out on immune cells.

29
186. (amended) The method of claim 26 ~~183~~ or 27 ~~184~~, carried out on lymphoid cells.

30
187. (amended) The method of claim 26 ~~183~~ or 27 ~~184~~, carried out on liver cells.

31
194. (new) The method of claim 2 ~~159~~ wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

32
195. (new) The method of claim 2 ~~159~~ wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

33
196. (new) The method of claim 2 ~~159~~, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

34
197. (new) The method of claim 2 ~~159~~, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

35
198. (new) The method of claim 2 ~~159~~, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

199. (new) The method of claim 159 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

200. (new) The method of claim 159, carried out on mammalian cells.

201. (new) The method of claim 159, carried out on human cells.

202. (new) The method of claim 200 or 201, carried out on immune cells.

203. (new) The method of claim 200 or 201, carried out on lymphoid cells.

204. (new) The method of claim 200 or 201, carried out on liver cells.

205. (new) The method of claim 160 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

206. (new) The method of claim 160 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

207. (new) The method of claim 160, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

208. (new) The method of claim 160, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

209. (new) The method of claim 160, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

210. (new) The method of claim 160 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

211. (new) The method of claim 160, carried out on mammalian cells.

212. (new) The method of claim 160, carried out on human cells.

213. (new) The method of claim 211 or 212, carried out on immune cells.

214. (new) The method of claim 211 or 212, carried out on lymphoid cells.

215. (new) The method of claim 211 or 212, carried out on liver cells.

216. (new) The method of claim 162 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

217. (new) The method of claim 162 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

218. (new) The method of claim 162, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

219. (new) The method of claim 162, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

220. (new) The method of claim 162, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

221. (new) The method of claim 162 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

222. (new) The method of claim 162, carried out on mammalian cells.

223. (new) The method of claim 162, carried out on human cells.

224. (new) The method of claim 222 or 223, carried out on immune cells.

225. (new) The method of claim 222 or 223, carried out on lymphoid cells.

226. (new) The method of claim 222 or 223, carried out on liver cells.

227. (new) The method of claim 163 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

228. (new) The method of claim 163 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

229. (new) The method of claim 163, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

230. (new) The method of claim 163, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

231. (new) The method of claim 163, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

232. (new) The method of claim 163 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

233. (new) The method of claim 163, carried out on mammalian cells.

234. (new) The method of claim 163, carried out on human cells.

235. (new) The method of claim 233 or 234, carried out on immune cells.

236. (new) The method of claim 233 or 234, carried out on lymphoid cells.

237. (new) The method of claim 233 or 234, carried out on liver cells.

238. (new) The method of claim 165 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

239. (new) The method of claim 165 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

240. (new) The method of claim 165, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

241. (new) The method of claim 165, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

242. (new) The method of claim 165, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

243. (new) The method of claim 165 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

244. (new) The method of claim 164, carried out on mammalian cells.

245. (new) The method of claim 165, carried out on mammalian cells.

246. (new) The method of claim 164, carried out on human cells.

247. (new) The method of claim 165, carried out on human cells.

248. (new) The method of any of claims 244-247, carried out on immune cells.

249. (new) The method of any of claims 244-247, carried out on lymphoid cells.

250. (new) The method of any of claims 244-247, carried out on liver cells.

251. (new) The method of claim 166 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

252. (new) The method of claim 166 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

253. (new) The method of claim 166, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

254. (new) The method of claim 166, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

255. (new) The method of claim 166, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

256. (new) The method of claim 166 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

257. (new) The method of claim 166, carried out on mammalian cells.

258. (new) The method of claim 166, carried out on human cells.

259. (new) The method of claim 257 or 258, carried out on immune cells.

260. (new) The method of claim 257 or 258, carried out on lymphoid cells.

261. (new) The method of claim 257 or 258, carried out on liver cells.

262. (new) The method of claim 167 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

263. (new) The method of claim 167 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

264. (new) The method of claim 167, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

265. (new) The method of claim 167, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

266. (new) The method of claim 167, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

267. (new) The method of claim 167 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

268. (new) The method of claim 167, carried out on human cells.

269. (new) The method of claim 268, carried out on immune cells.

270. (new) The method of claim 268, carried out on lymphoid cells.

271. (new) The method of claim 268, carried out on liver cells.

272. (new) The method of claim 168 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

273. (new) The method of claim 168 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

274. (new) The method of claim 168, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

275. (new) The method of claim 168, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

276. (new) The method of claim 168, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

277. (new) The method of claim 168 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

278. (new) The method of claim 168, carried out on human cells.

279. (new) The method of claim 168 or 278, carried out on immune cells.

280. (new) The method of claim 168 or 278, carried out on lymphoid cells.

281. (new) The method of claim 168 or 278, carried out on liver cells.

282. (new) The method of claim 169 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

283. (new) The method of claim 169 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

284. (new) The method of claim 169, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

285. (new) The method of claim 169, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

286. (new) The method of claim 169, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

287. (new) The method of claim 169 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

288. (new) The method of claim 169, carried out on human immune cells.

289. (new) The method of claim 169, carried out on lymphoid cells.

290. (new) The method of claim 288, carried out on lymphoid cells.

291. (new) The method of claim 170 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

292. (new) The method of claim 170 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

293. (new) The method of claim 170, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

294. (new) The method of claim 170, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

295. (new) The method of claim 170, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

296. (new) The method of claim 170 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

297. (new) The method of claim 170, carried out on human cells.

298. (new) The method of claim 170, carried out on immune cells.

299. (new) The method of claim 297, carried out on immune cells.

300. (new) The method of claim 170 or 297, carried out on lymphoid cells.

301. (new) The method of claim 170 or 297, carried out on liver cells.

302. (new) The method of claim 171 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

303. (new) The method of claim 171 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

304. (new) The method of claim 171, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

305. (new) The method of claim 171, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

306. (new) The method of claim 171, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

144
~~150~~
~~307~~. (new) The method of claim 14 ~~171~~ wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

145
~~151~~
~~308~~. (new) The method of claim 14 ~~171~~, carried out on human cells.

146
~~152~~
~~309~~. (new) The method of claim 14 ~~171~~ or 145 ~~151~~, carried out on immune cells.

147
~~153~~
~~310~~. (new) The method of claim 14 ~~171~~ or 145 ~~151~~, carried out on lymphoid cells.

148
~~154~~
~~311~~. (new) The method of claim 14 ~~171~~ or 145 ~~151~~, carried out on liver cells.

149
~~155~~
~~312~~. (new) The method of claim 15 ~~172~~ wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

150
~~156~~
~~313~~. (new) The method of claim 15 ~~172~~ wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

151
~~157~~
~~314~~. (new) The method of claim 15 ~~172~~, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

315. (new) The method of claim 172, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

316. (new) The method of claim 172, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

317. (new) The method of claim 172 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

318. (new) The method of claim 172, carried out on human cells.

319. (new) The method of claim 172 or 318, carried out on immune cells.

320. (new) The method of claim 172 or 318, carried out on lymphoid cells.

321. (new) The method of claim 172 or 318, carried out on liver cells.

322. (new) The method of claim 175 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

323. (new) The method of claim 173 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

324. (new) The method of claim 173, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

325. (new) The method of claim 173, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

326. (new) The method of claim 173, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

327. (new) The method of claim 173 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

328. (new) The method of claim 173, carried out on human cells.

329. (new) The method of claim 173 or 328, carried out on lymphoid cells.

167 ~~173~~

~~330.~~ (new) The method of claim 17 ~~174~~ wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

168 ~~174~~

~~331.~~ (new) The method of claim 17 ~~174~~ wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

169 ~~175~~

~~332.~~ (new) The method of claim 17 ~~174~~, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

170 ~~176~~

~~333.~~ (new) The method of claim 17 ~~174~~, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

171 ~~177~~

~~334.~~ (new) The method of claim 17 ~~174~~, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

172 ~~178~~

~~335.~~ (new) The method of claim 17 ~~174~~ wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

173 ~~179~~

~~336.~~ (new) The method of claim 17 ~~174~~, carried out on human cells.

337. (new) The method of claim 174 or 336, carried out on immune cells.

338. (new) The method of claim 174 or 336, carried out on lymphoid cells.

339. (new) The method of claim 174 or 336, carried out on liver cells.

340. (new) The method of claim 175 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

341. (new) The method of claim 175 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

342. (new) The method of claim 175, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

343. (new) The method of claim 175, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

344. (new) The method of claim 175, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

345. (new) The method of claim 175 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

346. (new) The method of claim 175, carried out on human cells.

347. (new) The method of claim 175 or 346, carried out on immune cells.

348. (new) The method of claim 175 or 346, carried out on lymphoid cells.

349. (new) The method of claim 175 or 346, carried out on liver cells.

350. (new) The method of claim 176, carried out on mammalian cells.

351. (new) The method of claim 176, carried out on human cells.

352. (new) The method of claim 350 or 351, carried out on immune cells.

353. (new) The method of claim 350 or 351, carried out on lymphoid cells.

354. (new) The method of claim 350 or 351, carried out on liver cells.

355. (new) The method of claim 161 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

356. (new) The method of claim 161 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

357. (new) The method of claim 161, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

358. (new) The method of claim 161, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

359. (new) The method of claim 161, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

360. (new) The method of claim 161 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

361. (new) The method of claim 161, carried out on mammalian cells.

362. (new) The method of claim 161, carried out on human cells.

363. (new) The method of claim 361 or 362, carried out on immune cells.

364. (new) The method of claim 361 or 362, carried out on lymphoid cells.

365. (new) The method of claim 361 or 362, carried out on liver cells.

The following is an examiner's statement of reasons for allowance:

Examiner has reviewed the last response and accompanying references which provide substantiating examples of the claimed methods. The claims are deemed allowable in view of applicants' claim amendments and arguments, applicants' withdrawal of the remaining pending claims to expedite prosecution and their agreement to make several language changes of a formal nature.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from the examiner should be directed to David Guzo whose telephone number is (703) 308-1906. The examiner can normally be reached on Monday-Thursday from 8:00 AM to 5:30 PM. The examiner can also be reached on alternate Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's acting supervisor Robert Schwartzman, can be reached at (703) 308-7307. The fax phone number for the organization where this application is assigned is (703) 308-4242.

Any inquiry of a general nature or relating to the status of this application or relating to attachments to this Office Action should be directed to Patent Analyst Zeta Adams, whose telephone number is (703) 305-3291.

DAVID GUZO
PRIMARY EXAMINER

October 4, 2001

Form PTO 948 (Rev. 03/01) U.S. DEPARTMENT OF COMMERCE - Patent and Trademark Office Application No. 8/464,264

# NOTICE OF DRAFTSPERSON'S PATENT DRAWING REVIEW

The drawing(s) filed (insert date) 6-5-95 are:

A. ☐ approved by the Draftsperson under 37 CFR 1.84 or 1.152.

B. ☑ objected to by the Draftsperson under 37 CFR 1.84 or 1.152 for the reasons indicated below. The Examiner will require submission of new, corrected drawings when necessary. Corrected drawing must be submitted according to the instructions on the back of this notice.

1. DRAWINGS. 37 CFR 1.84(a): Acceptable categories of drawings. Black ink. Color.
   - ___ Color drawings are not acceptable until petition is granted. Fig(s) ______
   - ___ Pencil and non black ink not permitted. Fig(s) ______
2. PHOTOGRAPHS. 37 CFR 1.84(b)
   - ___ 1 full-tone set is required. Fig(s) ______
   - ___ Photographs may not be mounted. 37 CFR 1.84(e)
   - ___ Poor quality (half-tone). Fig(s) ______
3. TYPE OF PAPER. 37 CFR 1.84(e)
   - ___ Paper not flexible, strong, white, and durable. Fig(s) ______
   - ✓ Erasures, alterations, overwritings, interlineations, folds, copy machine marks not accepted. Fig(s) 21A – 43
   - ___ Mylar, velum paper is not acceptable (too thin). Fig(s) ______
4. SIZE OF PAPER. 37 CFR 1.84(f): Acceptable sizes:
   - ___ 21.0 cm by 29.7 cm (DIN size A4)
   - ___ 21.6 cm by 27.9 cm (8 1/2 x 11 inches)
   - ___ All drawing sheets not the same size. Sheet(s) ______
   - ___ Drawings sheets not an acceptable size. Fig(s) ______
5. MARGINS. 37 CFR 1.84(g): Acceptable margins:

   Top 2.5 cm Left 2.5 cm Right 1.5 cm Bottom 1.0 cm
   SIZE: A4 Size

   Top 2.5 cm Left 2.5 cm Right 1.5 cm Bottom 1.0 cm
   SIZE: 8 1/2 x 11

   Margins not acceptable. Fig(s) 13A, 21B – 23B, 24C – 27, 29, 32, 36 – 38
   - ✓ Top (T) ✓ Left (L)
   - ✓ Right (R) ___ Bottom (B)
6. VIEWS. 37 CFR 1.84(h)

   REMINDER: Specification may require revision to correspond to drawing changes.

   Partial views. 37 CFR 1.84(h)(2)
   - ___ Brackets needed to show figures as one entity. Fig(s) ______
   - ✓ Views not labeled separately or properly. Fig(s) 18B
   - ___ Enlarged view not labeled separately or properly. Fig(s) ______
7. SECTIONAL VIEWS. 37 CFR 1.84 (h)(3)
   - ___ Hatching not indicated for sectional portions of an object. Fig(s) ______
   - ___ Sectional designation should be noted with Arabic or Roman numbers. Fig(s) ______
8. ARRANGEMENT OF VIEWS. 37 CFR 1.84(i)
   - ___ Words do not appear on a horizontal, left-to-right fashion when page is either upright or turned so that the top becomes the right side, except for graphs. Fig(s) ______
9. SCALE. 37 CFR 1.84(k)
   - ___ Scale not large enough to show mechanism without crowding when drawing is reduced in size to two-thirds in reproduction. Fig(s) ______
10. CHARACTER OF LINES, NUMBERS, & LETTERS. 37 CFR 1.84(l)
    - ✓ Lines, numbers & letters not uniformly thick and well defined, clean, durable, and black (poor line quality). Fig(s) 1A – 17, 21A – 43
11. SHADING. 37 CFR 1.84(m)
    - ___ Solid black areas pale. Fig(s) ______
    - ___ Solid black shading not permitted. Fig(s) ______
    - ___ Shade lines, pale, rough and blurred. Fig(s) ______
12. NUMBERS, LETTERS, & REFERENCE CHARACTERS. 37 CFR 1.84(p)
    - ✓ Numbers and reference characters not plain and legible. Fig(s) 1A – 17, 21A – 43
    - ___ Figure legends are poor. Fig(s) ______
    - ___ Numbers and reference characters not oriented in the same direction as the view. 37 CFR 1.84(p)(1) Fig(s) ______
    - ___ English alphabet not used. 37 CFR 1.84(p)(2) Figs ______
    - ___ Numbers, letters and reference characters must be at least .32 cm (1/8 inch) in height. 37 CFR 1.84(p)(3) Fig(s) ______
13. LEAD LINES. 37 CFR 1.84(q)
    - ___ Lead lines cross each other. Fig(s) ______
    - ___ Lead lines missing. Fig(s) ______
14. NUMBERING OF SHEETS OF DRAWINGS. 37 CFR 1.84(t)
    - ___ Sheets not numbered consecutively, and in Arabic numerals beginning with number 1. Sheet(s) ______
15. NUMBERING OF VIEWS. 37 CFR 1.84(u)
    - ___ Views not numbered consecutively, and in Arabic numerals, beginning with number 1. Fig(s) ______
16. CORRECTIONS. 37 CFR 1.84(w)
    - ___ Corrections not made from prior PTO-948 dated ______
17. DESIGN DRAWINGS. 37 CFR 1.152
    - ___ Surface shading shown not appropriate. Fig(s) ______
    - ___ Solid black shading not used for color contrast. Fig(s) ______

COMMENTS

REVIEWER J. Chase DATE 10-26-95 TELEPHONE NO. 703 305 8430

ATTACHMENT TO PAPER NO. ______

**Attachment for PTO-948 (Rev. 03/01, or earlier)**
6/18/01

**The below text replaces the pre-printed text under the heading, "Information on How to Effect Drawing Changes," on the back of the PTO-948 (Rev. 03/01, or earlier) form.**

**INFORMATION ON HOW TO EFFECT DRAWING CHANGES**

**1. Correction of Informalities -- 37 CFR 1.85**

New corrected drawings must be filed with the changes incorporated therein. Identifying indicia, if provided, should include the title of the invention, inventor's name, and application number, or docket number (if any) if an application number has not been assigned to the application. If this information is provided, it must be placed on the front of each sheet and centered within the top margin. If corrected drawings are required in a Notice of Allowability (PTOL-37), the new drawings MUST be filed within the THREE MONTH shortened statutory period set for reply in the Notice of Allowability. Extensions of time may NOT be obtained under the provisions of 37 CFR 1.136(a) or (b) for filing the corrected drawings after the mailing of a Notice of Allowability. The drawings should be filed as a separate paper with a transmittal letter addressed to the Official Draftsperson.

**2. Corrections other than Informalities Noted by Draftsperson on form PTO-948.**

All changes to the drawings, other than informalities noted by the Draftsperson, MUST be made in the same manner as above except that, normally, a highlighted (preferably red ink) sketch of the changes to be incorporated into the new drawings MUST be approved by the examiner before the application will be allowed. No changes will be permitted to be made, other than correction of informalities, unless the examiner has approved the proposed changes.

**Timing of Corrections**

Applicant is required to submit the drawing corrections <u>within the time period set in the attached Office communication</u>. See 37 CFR 1.85(a).

Failure to take corrective action within the set period will result in **ABANDONMENT** of the application.

06/01/01

ADL 0000955



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

## NOTICE OF ALLOWANCE AND ISSUE FEE DUE

ROPES & GRAY
ONE INTERNATIONAL PLACE
BOSTON MA 02110-2624

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | DATE MAILED |
|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

First Named Applicant: BALTIMORE,

TITLE OF INVENTION: [illegible] GEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL [illegible]

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| APBI-P03-035 | 514-440.000 | [illegible] | UTILITY | YES | [illegible] | [illegible] |

***THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.***

***THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.***

### HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is changed, pay twice the amount of the FEE DUE shown above and notify the Patent and Trademark Office of the change in status, or

B. If the status is the same, pay the FEE DUE shown above.

If the SMALL ENTITY is shown as NO:

A. Pay FEE DUE shown above, or

B. File verified statement of Small Entity Status before, or with, payment of 1/2 the FEE DUE shown above.

II. Part B-Issue Fee Transmittal should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE. Even if the ISSUE FEE has already been paid by charge to deposit account, Part B Issue Fee Transmittal should be completed and returned. If you are charging the ISSUE FEE to your deposit account, section "4b" of Part B-Issue Fee Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give application number and batch number. Please direct all communications prior to issuance to Box ISSUE FEE unless advised to the contrary.

***IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.***

PATENT AND TRADEMARK OFFICE COPY

PTOL-85 (REV. 10-96) Approved for use through 06/30/99. (0651-0033)

# EXHIBIT F

Doc Code:

PTO/SB/57 (09-04)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO - 1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

4660 U.S. PTO
04/04/05

Address to:
Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Attorney Docket No. 05-280

Date: April 4, 2005

1. ☒ This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number 6,410,516 issued June 25, 2002. The request is made by:

4660 U.S. PTO
90007503
04/04/05

☐ patent owner. ☒ third party requester.

2. ☒ The name and address of the person requesting reexamination is:
Grantland G. Drutchas, Reg. No. 32,565
McDonnell Boehnen Hulbert & Berghoff LLP
300 S. Wacker Drive, Suite 3100, Chicago, IL 60606

3. ☒ a. A check in the amount of $ 2520.00 is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(1);

☒ b. The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(1) to Deposit Account No. 13-2490 (submit duplicative copy for fee processing); or

☐ c. Payment by credit card. Form PTO-2038 is attached.

4. ☒ Any refund should be made by ☐ check or ☒ credit to Deposit Account No. 13-2490. 37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. ☒ A copy of the patent to be reexamined having a double column format on one side of a separate paper is enclosed. 37 CFR 1.510(b)(4)

6. ☐ CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
☐ Landscape Table on CD

7. ☐ Nucleotide and/or Amino Acid Sequence Submission
*If applicable, items a.-c. are required.*
a. ☐ Computer Readable Form (CRF)
b. Specification Sequence Listing on:
i ☐ CD-ROM (2 copies) or CD-R (2 copies); or
ii ☐ paper
c. ☐ Statements verifying identity of above copies

8. ☐ A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

9. ☒ Reexamination of claim(s) 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182-186, 192-193, 197-201 is requested.

RSALDANA 00000003 90007503
01 FC:1812 2520.00 OP

10. ☒ A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on Form PTO-1449 or equivalent.

11. ☐ An English language translation of all necessary and pertinent non-English language patents and/or printed publications is included.

This collection of information is reequired by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stpe *Ex Parte* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Doc Code:

PTO/SB/57 (09-04)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12. ☒ The attached detailed request includes at least the following items:
   a. A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1)
   b. An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13. ☐ A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e)

14. ☒ a. It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
The name and address of the party served and the date of service are:
Matthew P. Vincent
Fish & Neave IP Group
Ropes & Gray, One International Place, Boston, MA 02110-2624

Date of Service: April 4, 2005; or

☐ b. A duplicate copy is enclosed since service on patent owner was not possible.

15. ☒ Correspondence Address: Direct all communication about the reexamination to:

☒ The address associated with Customer Number: 20306

*OR*

| ☐ Firm or Individual Name | | | | | |
|---|---|---|---|---|---|
| Address | | | | | |
| City | | State | | Zip | |
| Country | | | | | |
| Telephone | | Fax | | | |

16. ☒ The patent is currently the subject of the following concurrent proceeding(s):
   ☐ a. Copending reissue Application No. ______
   ☐ b. Copending reexamination Control No. ______
   ☐ c. Copending Interference No. ______
   ☑ d. Copending litigation styled:

Ariad Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College, v. Eli Lilly and Company, US Dist. Court for the Dist. of MA, Action No. 02 CV 11280 RWZ (2002)

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

[signature]
Authorized Signature

April 4, 2005
Date

Grantland G. Drutchas
Typed/Printed Name

32,565
Registration No.

☐ For Patent Owner Requester
☑ For Third Party Requester

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
(Case No. 05-280)

| | |
|---|---|
| In re U.S. Patent No. 6,410,516 ) | |
| Date of Issue: June 25, 2002 ) | |
| Name of Patentee: David Baltimore et al. ) | |
| Serial No.: 08/464,364 ) | Group Art Unit: Not Yet Assigned |
| Filed: June 5, 1995 ) | Examiner: Not Yet Assigned |
| Assignees: President and Fellows of Harvard College, Massachusetts Institute of Technology, Whitehead Institute For Biomedical Research ) | Box: ***Ex Parte* Reexam** |
| Title: **NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION** ) | |

**REQUEST FOR REEXAMINATION**
**PURSUANT TO 35 U.S.C. § 302**

Mail Stop Ex Parte Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

Eli Lilly and Company ("Lilly") submits this Request for Reexamination of claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, 197-201 of U.S. Patent No. 6,410,516 ("the '516 patent") (Exhibit A) pursuant to 35 U.S.C. § 302. This Request is supported by the attached prior art that establishes substantial new questions of patentability of these claims.

# TABLE OF CONTENTS

I. Introduction ..... 1

II. RELATED PENDING LITIGATION ..... 5

III. Statements of Substantial New Questions of Patentability ..... 6
- A. The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103 ..... 6
  - 1. Cyclosporin A References ..... 6
  - 2. Protein Kinase C Inhibitor References ..... 7
- B. Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103 ..... 7
  - 1. Cyclosporin A References ..... 7
  - 2. Vitamin D (Calcitriol) References ..... 8
  - 3. 5-ASA References ..... 8
  - 4. Glucocorticoid References ..... 8
  - 5. Antibiotics Targeted to Gram Negative Bacteria References ..... 9
  - 6. Red Wine References ..... 10

IV. Background ..... 10
- A. The Natural Mechanism ..... 10
- B. The Claims of the '516 Patent ..... 12
  - 1. Virtually all of the claims require a single functional step of "reducing NF-κB activity . . . in cells," typically in response to some type of external influence. There are only three exceptions: ..... 13
  - 2. Some claims indicate that NF-κB activity is reduced in specified ways: ..... 13
  - 3. All claims recite the effect caused by reducing NF-κB activity: ..... 13
  - 4. Some of the claims specify certain cell types: ..... 14
- C. Under 35 U.S.C § 132, None Of The Applications Filed Before November 13, 1991 Support The Claims At Issue In The '516 Patent ..... 15

V. Detailed Description Of The SNQ of Patentability ..... 20
- A. The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103 ..... 20
  - 1. Cyclosporin A References: *Emmel*, *Schmidt*, and *Brini* Expressly Anticipate or Alternatively Render Obvious the Subject Claims ..... 20
  - 2. Protein Kinase C Inhibitor References: *Meichle* and *Shirakawa* Expressly Anticipate or Render Obvious the Subject Claims ..... 22

B. Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103 .......... 24
1. Cyclosporin A References .......... 26
2. Vitamin D (Calcitriol) References .......... 34
3. 5-ASA References .......... 37
4. Glucocorticoid References .......... 39
5. Antibiotic References .......... 43
6. Red Wine References .......... 45
7. Additional Compounds .......... 50

VI. Conclusion .......... 52

**Table of Prior Art Relied Upon**

**Cyclosporin A References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 1 | *Emmel* | Emmel et al., *Cyclosporin A Specifically Inhibits Function of Nuclear Proteins Involved in T Cell Activation*, Science, 246: 1617-20 (December, 1989) |
| 2 | *Schmidt* | Schmidt et al., *Inducible Nuclear Factor Binding to the κB Elements of the Human Immunodeficiency Virus Enhancer in T Cells Can be Blocked by Cyclosporin A In a Signal-Dependent Manner*, J. of Virology, 64:4037-4041 (August 1990) |
| 3 | *Brini* | Brini et al., *Cyclosporin A Inhibits Induction of IL-2 Receptor a Chain Expression by Affecting Activation of NF-κB-Like Factor(s) in Cultured Human T Lymphocytes*, Eur. Cytokine Net., 1:131-139 (September 1990) |
| 4 | *PDR 1985* | The Physician's Desk Reference, 1811-13 (1985 Ed.) |
| 5 | *Griffith I* | Griffith et al., *Cardiac Transplantation with Cyclosporin A and Prednisone*, Ann. Surg. 196:324-329 (September 1981) |
| 6 | *Griffith II* | Griffith et al., *Targeted Blood Levels of Cyclosporine for Cardiac Transplantation*, J. Thorac. Cardiovasc. Surg. 99:952-957 (December, 1984) |
| 7 | *Baldwin I* | Baldwin, *The NF-κB and IκB Proteins: New Discoveries and Insights*, Annu. Rev. Immunol. 14:649-81 (1996) |
| 8 | *Baldwin II* | Baldwin, *The Transcription Factor NF-κB and Human Disease*, J. Clin. Invest. 107:3 (January 2001) |
| 9 | *Baeuerle I* | Baeuerle, *The Inducible Transcription Activator NF-κB: Regulation by Distinct Protein Subunits*, Biochimica et Biophysica Acta, 1072:63-80 (1991) |
| 10 | *Baeuerle II* | Baeuerle and Henkel, *Function and Activation of NF-κB in the Immune System*, Ann. Rev. Immunol., 12:141-79 (1994) |
| 11 | *Reed* | Reed et al., *Effect of Cyclosporin A and Dexamethasone on Interleukin 2 Receptor Gene Expression*, J. Immunol. 137:150-154 (July 1986) |
| 12 | *Krönke* | Krönke et al., *Cyclosporin A Inhibits T-Cell Growth Factor Gene Expression At the Level of Gene Expression*, Proc. Natl. Acad. Sci. USA 81:5214-5218 (August 1984) |

**Table of Prior Art Relied Upon (cont.)**

**Cyclosporin A References (cont.)**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 13 | *Siebenlist* | Siebenlist et al., *Promoter Region of Interleukin-2 Gene Undergoes Chromatin Structure Changes and Confers Inducibility on Chloramphenicol Acetyltransferase Gene During Activation of T Cells*, Molecular and Cell Biol. 6:3042-3049 (Sept. 1986) |
| 14 | Hölschermann | Hölschermann et al., *Cyclosporin A Inhibits Monocyte Tissue Factor Activation in Cardiac Transplant Recipients*, Circulation, 96:4232-4238 (December, 1997) |
| 15 | *Alkalay* | Alkalay, et al., *In Vivo Stimulation of IκB Phosphorylation is Not Sufficient to Activate NF-κB*, Mol. Cell Biol. 15:1294-1301 (1995) |
| 16 | *Hoyos* | Hoyos et al., *Kappa B-Specific DNA Binding Proteins: Role in the Regulation of Human Interleukin-2 Gene Expression*, Science 244:457-460 (April 1989) |

**Protein Kinase C Inhibitor References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 17 | *Meichle* | Meichle et al., *Protein Kinase C-Independent Activation of Nuclear Factor κB by Tumor Necrosis Factor*, J. Biol. Chem. 265:8339-8343 (May 15, 1990) |
| 18 | *Shirakawa* | Shirakawa et al., *In vitro Activation and Nuclear Translocation of NF-κB Catalyzed by Cyclic AMP-Dependent Protein Kinase and Protein Kinase C*, Mol. And Cell. Biol., 9: 2424-2430 (June 1989) |

**Vitamin D (Calcitriol) References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 19 | *Tsoukas* | Tsoukas, *et al. 1,25-Dihydroxyvitamin $D_3$: A Novel Immunoregulatory Hormone*, Science 224:1438-40 (June 1984) |

**Table of Prior Art Relied Upon (cont.)**

| | | |
|---|---|---|
| **20** | *Manolagas* | Manolagas et al., *The Anti-Proliferative Effect of Calcitriol on Human Peripheral Blood Mononuclear Cells*, JCE&M, 63:394-400 (1986) |
| **21** | *Yu* | Yu et al., *Down-regulation of NF-κB Protein Levels in Activated Human Lymphocytes by 1,25-Dihydroxyvitamin $D_3$*, Proc. Natl. Acad. Sci., 92:10990-10994 (November, 1995) |

**Vitamin D (Calcitriol) References (cont.)**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| **22** | *Lemire I* | Lemire et al., *1,25-Dihydroxyvitamin $D_3$ Suppresses Proliferation and Immunoglobulin Production by Normal Human Peripheral Blood Mononuclear Cells*, J. Clin. Invest., 74:657-661 (August 1984) |
| **23** | *Lemire II* | Lemire et al., *1,25-Dihydroxyvitamin $D_3$ Suppresses Human T Helper/Inducer Lymphocyte Activity in Vitro*, J. Immunol., 134:3032-3035 (May 1985) |
| **24** | *Rigby I* | Rigby et al., *Inhibition of T Lymphocyte Mitogenesis by 1,25-Dihydroxyvitamin D3 (Calcitriol)*, J. Clin. Invest. 74:1451-1455 (October, 1984) |
| **25** | *Rigby II* | Rigby et al., *The Effects of 1,25-Dihydroxyvitamin D3 on Human T Lymphocyte Activation and Proliferation: A Cell Cycle Analysis*, J. Immunol. 135:2279-2286 (October 1985) |
| **26** | *Colston* | Colston et al., *1,25-Dihydroxyvitamin $D_3$ and Malignant Melanoma: The Presence of Receptors and Inhibition of Cell Growth in Culture*, Endocrinology 108:1083-1086 (1981). |
| **27** | *Semmler* | Semmler, *The Synthesis of 1α,25-Dihydroxycholecalciferol – A Metabolically Active Form of Vitamin $D_3$*, Tetrahedron Lett. 40:4147-50 (1972) |
| **28** | *Holick* | Holick, *Identification of 1α,25-Dihydroxycholecalciferol, a Form of Vitamin $D_3$ Metabolically Active in the Intestine*, P.N.A.S. 68:803 (1971) |
| **29** | *Norman* | Norman, *1,25-Dihydroxycholecalciferol: Identification of the Proposed Active Form of Vitamin $D_3$ in the Intestine*, Science 173:51-54 (1971) |

**Table of Prior Art Relied Upon (cont.)**

| | | |
|---|---|---|
| **30** | *Lawson* | Lawson, *Identification of 1,25-Dihydroxycholecalciferol, a New Kidney Hormone Controlling Calcium Metabolism*, Nature 230:228-30 (1971) |
| **31** | *Adams* | Adams, *et al.*, *1α,25-Dihydroxycholecalciferol Inhibits Apoptosis in C3H10T1/2 Murine Fibroblast Cells Through Activation of Nuclear Factor κB*, Am. Soc. Nut. Sci. 134:2948 (2004) |
| **32** | *Ebert* | Ebert, *et al.*, *Down-Regulation by Nuclear Factor κB of Human 25-Hydroxyvitamin $D_3$ 1α-Hydroxylase Promoter*, Mol. Endocrinology 18:2440-50 (2004) |
| **33** | *Berry* | Berry, *et al.*, *1α,25-Dihydroxyvitamin $D_3$ Stimulates Phosphorylation of IκBα and Synergizes with TPA to Induce Nuclear Translocation of NF-κB During Monocytic Differentiation of NB4 Leukemia Cells*, Exp. Cell Res. 272, 176-84 (2002) |
| **34** | *Xing* | Xing, *et al.*, *Distinctive Dendritic Cell Modulation by Vitamin $D_3$ and Glucocorticoid Pathways*, Biochem. and Biophys. Res. Comm. 297:645-652 (2002) |
| **35** | *Komine* | Komine, *et al.*, *The Action of a Novel Vitamin $D_3$ analogue, OCT, on Immunomodulatory Function of Keratinocytes and Lymphocytes*, Arch. Dermatol. Res. 291:500-06 (1999) |
| **36** | *Harant* | Harant, *et al.*, *1α,25-Dihydroxyvitamin $D_3$ Decreases DNA Binding of Nuclear Factor-κB in Human Fibroblasts*, FEBS Lett. 436:329-34 (1998) |
| **37** | *Harant* | Harant, *et al.*, *1α,25-Dihydroxyvitamin $D_3$ and a Variety of Its Natural Metabolites Transcriptionally Repress Nuclear-Factor-κB-Mediated Interleukin-8 Gene Expression*, Eur. J. Biochem., 250:63-71 (1997) |
| **38** | *Provvedini* | Provvedini, *et al.*, *1,25 dihydroxyvitamin $D_3$ Receptors in Human Leukocytes*, Science, 221:1181-83 (1983) |

**Table of Prior Art Relied Upon (cont.)**

**5-ASA References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 39 | *Dew* | Dew et al., *Maintenance of Remission in Ulcerative Colitis With 5-Amino Salicylic Acid in High Doses By Mouth*, Br. Med. J. 287:23-24 (July 1983) |
| 40 | *Bantel* | Bantel et al., *Mesalazine Inhibits Activation of Transcription Factor NF-κB in Inflamed Mucosa of Patients with Ulcerative Colitis*, Amer. J. of Gastroenterology 287:3452 (2000) |
| 41 | *Yan* | Yan and Polk, *Aminosalicylic Acid Inhibits IκB Kinase a Phosphorylation of IκBa in Mouse Intestinal Epithelial Cells*, J. Biol Chem. 274:366631-36 (1999) |

**Glucocorticoid References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 42 | *PDR 1970* | Physicians' Desk Reference (1970 Ed.) |
| 43 | *Lefring* | Lefring and Neugebauer, *Steroid Controversy in Sepsis and Septic Shock: A Meta-Analysis*, Crit. Care. Med., 23:1294-1303 (July 1995) |
| 44 | *Nagasawa* | Nagasawa et al., *Induction of Human Malignant T-Lymphoblastic Cell Lines Molt-3 and Jurkat by 12-O-Tetradecaoylphorbol-13-Acetate: Biochemical, Physical and Morphological Characterization*, J. Cell. Phys. 109:181-192 (1981) |
| 45 | *Rovera* | Rovera et al., *Induction of Differentiation in Human Promeolytic Leukemia Cells by Tumor Promoters*, Science 204:868-970 (1979) |
| 46 | *Auphan* | Auphan et al., *Immunosuppression by Glucocorticoids: Inhibition of NF-κB Activity Through Induction of IκB Synthesis*, Science 270:286-290 (1995) |
| 47 | *Scheinman I* | Scheinman et al., *Characterization of Mechanisms Involved in Transrepression of NF-κB by Activated Glucocorticoid Receptors*, Mol. Cell. Biol. 15:943-53 (February 1995) |

**Table of Prior Art Relied Upon (cont.)**

| | | |
|---|---|---|
| 48 | *Scheinman II* | Scheinman et al., *Role of Transcriptional Activation of IκBα in Mediation of Immunosuppression by Glucocorticoids,* Science 270:283-186 (October 1995) |
| 49 | *Mukaida* | Mukaida et al., *Novel Mechanism of Glucocorticoid-mediated Gene Repression,* J. Biol Chem. 269:13289-95 (May 1994) |

**Antibiotic References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| | *PDR 1970* | Physicians' Desk Reference (1970 Ed.) |
| 50 | *Galdiero* | Galdiero et al., *Porins From* Salmonella Enterica *Serovar Typhimurium Induce TNF-α, IL-6 and IL-8 Release By CD14-Independent And CD11a/CD18-Dependent Mechanisms,* Microbiology, 147:2697-2704 (2001) |
| 51 | *Yang* | Yang et al., *Toll-Like Receptor-2 Mediates Lipopolysaccharide-Induced Cellular Signaling,* Nature 395, 284–288 (1998) |
| 52 | *Mori* | Mori et al., *Activation of the Interleukin-10 Gene In The Human T Lymphoma Line Hut78: Identification And Characterization Of NF-kB Binding Sites In The Regulatory Region of the Interleukin-10 Gene.,* Eur. J. Haematol. 59:162-170 (1997) |

**Red Wine References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 53 | *Bible* | Various excerpts from the Bible, King James Version (1611) |
| 54 | *St. Leger* | St. Leger et al., *Factors Associated with Cardiac Mortality in Developed Countries With Particular Reference to the Consumption of Wine,* The Lancet, 1017-1020 (May 1979) |
| 55 | *Dobrilla* | Dobrilla et al., *Is Ethanol Metabolism Affected by Oral Administration of Cimetidine and Ranitidine at Therapeutic Doses?* Hepato-Gastroenterol., 31:35-37 (February 1984) |
| 56 | *Jones* | Jones, *Elimination Half-Life of Methanol During Hangover,* Pharm. & Tox. 60:217-220 (March 1987) |
| 57 | *Blanco-Colio* | Blanco-Colio et al., *Red Wine Intake Prevents Nuclear Factor-κB Activation in Peripheral Blood Mononuclear Cells of Healthy Volunteers During Postprandial Lipemia,* Circulation, 102:1020-1026 (August 2000) |

## Table of Prior Art Relied Upon (cont.)

| | | |
|---|---|---|
| 58 | *Holmes-McNary/Baldwin* | Holmes-McNary and Baldwin, *Chemopreventive Properties of* trans-*Resveratrol are Associated with Inhibition of Activation of the IκB Kinase*, Cancer Res., 60:3477-483 (July 2000) |
| 59 | *Manna* | Manna et al., *Resveratrol Suppresses TNF-Induced Activation of Nuclear Transcription Factors NF-κB, Activator Protein-1, and Apoptosis: Potential Role of Reactive Oxygen Intermediates and Lipid Peroxidation*, J. of Immunol., 164:6509-6519 (2000) |

**Additional References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 60 | *Weissmann* | Weissmann, *Aspirin*, Sci. American, 84-90 (January 1991) |
| 61 | *Kopp* | Kopp and Ghosh, *Inhibition of NF-κB by Sodium Salicylate and Aspirin,* Science 265:956-959 (August 1994) |
| 62 | *Bayer web page* | Bayer web page |
| 63 | *PDR 1980* | Physicians' Desk Reference (1980 Ed.) |
| 64 | *Yamamoto* | Yamamoto, *et al.*, *Sulindac Inhibits Activation of the NF-κB Pathway*, J. Biol. Chem. 274:27307 (1999) |
| 65 | *Richards* | Richards et al., *Gold and Its Relationship to Neurological/Glandular Conditions*, International Journal of Neuroscience, 112:31-53 (2002) |
| 66 | *Jeon* | Jeon, *et al.*, *Thiol-reactive Metal Compounds Inhibit NF-κB Activation by Blocking IκB kinase*, J. Immunol. 164:5981-5989 (June, 2000) |
| 67 | *www.tea.co.uk* | Chinese Legend, www.tea.co.uk |
| 68 | *Yang* | Yang, *et al.*, *Green Tea Polyphenols Block Endotoxin-Induced Tumor Necrosis Factor-Production and Lethality in a Murine Model*, 128 J. Nutr. 2334 (1998) |
| 69 | *Black Tea* | Pan, *Suppression of Lipopolysaccharide-Induced Nuclear Factor κB Activity by Theaflavin-3,3'-Digallate from Black Tea and Other Polyphenols through Downregulation of IκB Kinase Activity in Macrophages*, Biochem. Phamacol. 59:357 (2000) |
| 70 | *Tumeric* | Turmeric Monograph, Nutrisana International |
| 71 | *Singh* | Singh and Aggarwal, J. Biol Chem. 270:24995-2500 (1995) |

**Table of Prior Art Relied Upon (cont.)**

| | | |
|---|---|---|
| **72** | *Manson* | M.M. Manson, et al., *Modulation of signal-transduction pathways by chemopreventive agents*, 28 Biochem. Soc. Trans. 7, 9 (2000) |
| 73 | *Pliny, Virgil* | Pliny's Natural History, XIX, 34; Virgil's Eclogues; www.Botanical.com |
| 74 | *Ide* | Ide and Lau, *Garlic Compounds Minimize Intracellular Oxidative Stress and Inhibit Nuclear Factor-κB Activation*, 131 J. Nutr. 1020S (2001) |

# I. INTRODUCTION

The claims of the '516 patent all relate to methods of reducing or otherwise modifying NF-κB activity in cells in order to achieve a variety of claimed results. NF-κB is a naturally occurring transcription factor that affects gene expression in response to extracellular stimuli. For example, claim 1 of the '516 patent reads as follows:

> 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that expression of said gene is inhibited.

The only method step identified in this claim, and in each of the claims at issue, is the wholly functional step of "reducing NF-κB activity."[1] In this regard, the claims are so broad as to encompass numerous prior art methods employing compounds now known to necessarily modulate NF-κB activity. Indeed, the prior art references cited herein either expressly or inherently disclose the use of a variety of prior art compounds as reducing NF-κB activity and resulting gene expression – references that, had they been cited and considered, would have compelled the Examiner to reject the claims. Thus, this reexamination request raises substantial new questions of patentability (SNQ) under 35 U.S.C. § 102 and/or § 103.

Patentees explicitly acknowledged that compounds identified through the application of assays taught in the '516 patent inherently possessed the ability to reduce NF-κB activity and inhibit concomitant gene expression. Indeed, Patentees argued that their method claims need not

[1] The exception is claim 7 and dependent claims 81, 83, and 85-87, which require "modifying NF-κB activity."

identify the actual structure of an inhibitory agent because disclosure of an assay suitable for measuring the activity in question was sufficient to describe the agent itself: "it is appropriate . . . to have defined the method of use with reference to agents identified or characterized by their method of selection or identification, as that *inherently defines characteristic properties of useful agents*." '516 patent file history, Response and Amendment, mailed September 12, 2001, p. 8. (emphasis added). However, while Patentees acknowledged the inherent properties of such agents, they never disclosed, and the Examiner never considered, that the use of such agents was publicly described prior to the filing of the applications leading to the '516 patent.

In that regard, the extrinsic references cited herein essentially repeat the methods of using various compounds as was taught in the prior art references discussed herein. The extrinsic references then used the very tests taught in the '516 patent to measure the inherent characteristic properties of various prior art compounds, that is the effect of such compounds on NF-κB activity and concomitant gene expression when used as taught in the prior art. The results of these tests confirm that the use of these compounds as taught in the prior art references reduced NF-κB activity as called for by the claims, and met each of the limitations of the claims that are the subject of this reexamination request. The prior art references describing the use of these compounds, inherently anticipate the subject claims.

Cyclosporin A is a particularly good example. The administration of Cyclosporin A to humans was taught to minimize organ transplant rejection since the early 1980's, as demonstrated by the attached prior art references. More recent testing under the same conditions taught in these prior art references confirms that the administration of Cyclosporin A to humans necessarily reduced NF-κB activity. Additional prior art references teach the use of Cyclosporin

A in cell cultures under conditions that likewise are now recognized to have reduced NF-κB activity in those cell cultures. The direct correspondence between conditions used in the prior art references and the extrinsic references confirms, as discussed below and in the accompanying declaration of Dr. Stavros Manolagas (Exhibit J), that the administration of Cyclosporin A as taught in the prior art references necessarily reduced NF-κB activity and concomitant gene expression.

Furthermore, several references that were published more than a year before the last continuation-in-part filing date in this application (November 13, 1991) explicitly disclose that Cyclosporin A reduces NF-κB activity. Such references expressly anticipate the claims at issue because the granted claims have an effective filing date of no earlier than November 13, 1991 under 35 U.S.C. § 132.

Similarly, other references discussed herein disclosed the prior use of various other compounds in humans or cell cultures in such a way that reducing NF-κB activity as called for by the claims was either expressly disclosed or, through subsequent study, has now been recognized to necessarily have had such effect. Such references disclosed, *inter alia*, the use of calcitriol (the active metabolite of Vitamin D), 5-aminosalicylic acid (5-ASA), dexamethasone, and red wine, all of which necessarily reduce NF-κB activity. Antibiotics – including gentamicin, erythromycin, and tetracycline, are also now recognized as having necessarily reduced NF-κB activity in instances of gram-negative infection. By eliminating the source of lipopolysaccharide ("LPS") (i.e., gram negative bacteria), these antibiotics reduce LPS-induced NF-κB activity and cytokine expression.

Just to make clear the impact of the claims at issue, a person who takes any of these compounds, as taught in the attached prior art references – including Cyclosporin A used to prevent transplant rejection since the early 1980's, 5-ASA used since the 1980's to treat ulcerative colitis, dexamethasone used since the 1960's to treat rheumatoid arthritis, antibiotics used since at least 1964 to treat gram-negative infection, or red wine as taught in the *Bible* – would now be infringing the claims at issue in this reexamination request. If these claims were allowed to stand, such a person would be subject to an injunction or a royalty payment simply for using agents as they have been used in the same way since before the discovery of NF-κB (which, in some instances, may be for decades, centuries, or millenia).

The Federal Circuit addressed the identical situation in *In re Cruciferous Sprout Litigation*, 310 F.3d 1343, 1351 (Fed. Cir. 2002). In *Cruciferous*, as in the instant case, the patentee had discovered an inherent characteristic property of a prior art compound, specifically, that sprouts contain compounds that have anti-cancer properties and that certain types of sprouts are particularly rich in those compounds. *Id.* The patentees' claims were directed to the cultivation and use of those sprouts as food for the purpose of providing a "chemoprotective effect" to the recipient thereof. Even though the Court acknowledged that the patentee may have, indeed, been the first to recognize the chemoprotective properties of the sprouts, and that a "food product" made using these sprouts may help prevent cancer, *the prior art cultivation and consumption of the claimed sprouts by humans (even without knowing their use as chemoprotective agents) rendered these claims invalid.* *Id.* at 1350-1351. Patentees here have identified, by means of their assays, a characteristic property that has now been found to be

present in the prior art administration of compounds such as Cyclosporin A, calcitriol, 5-ASA, dexamethasone, antibiotics, and even red wine.

A further significant public interest is at stake because of the stifling effect of the '516 patent claims on the future development of pharmaceuticals. This public interest also supports the need for reexamination of this patent given the clear over-breadth of the claims of the '516 patent. Upon issuance of the '516 patent, the exclusive licensee, ARIAD Pharmaceuticals, notified at least fifty companies that either have products on the market or are developing new pharmaceuticals that purportedly work via the NF-κB pathway. *See* Begley and Johannes, *ARIAD Patent Spurs Legal Battle Between Biotech Firm, Eli Lilly*, Wall Street Journal, June 26, 2002 (Exhibit B). Even Stuart Schreiber, a Harvard Professor, co-founder of ARIAD Pharmaceuticals, and the current Chair of ARIAD's Board of Scientific and Medical Advisors, has admitted concerns over the broad scope of this '516 patent and its effect on innovation in drug discovery. Joanna Ownes, *Stuart Schreiber: Biology from a Chemist's Perspective*, Drug Discovery Today 9:299-303, 303 (April 2004) (Exhibit C) ("I am concerned about this; it doesn't feel right to me. I have always believed in maximizing freedom to operate and in the level playing field model of drug discovery.").

## II. RELATED PENDING LITIGATION

The '516 patent has been asserted against Eli Lilly and Company (Lilly) by the Assignees and ARIAD Pharmaceuticals in the United States District Court for the District of Massachusetts, Civil Action No. 02 CV 11280 RWZ (2002) ("the Massachusetts litigation") for the manufacture and sale of two products, Evista® (raloxifene hydrochloride) and Xigris® (recombinant human

activated Protein C), the active ingredients of which both were discovered and disclosed for human therapy prior to the discovery of NF-κB. That litigation is currently pending.

Lilly is also seeking a stay of that lawsuit pending resolution of this reexamination, and therefore requests prompt action in this proceeding.

## III. STATEMENTS OF SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

This Request for Reexamination of at least claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182,186, 192-193, 197-201 of the '516 patent is premised on SNQ of patentability of those claims as set forth below.[2]

### A. The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103

#### 1. Cyclosporin A References

*Emmel*, *Schmidt*, and *Brini* each expressly disclosed, more than one year before the November 13, 1991 effective filing date of the '516 patent, administration of Cyclosporin A to induced cells that substantially reduced NF-κB activity in those cells in accordance with the claims in question. Such determination was made utilizing the very assays taught in the '516 patent. As such, these references raise SNQ of patentability under 35 U.S.C. § 102 or § 103 for at least claims

[2] Lilly asserts that many of the claims that are not explicitly the subject of this request for reexamination are also anticipated by inherency by the various prior art references cited herein. Lilly identified the '516 claims that are the subject of this request for reexamination because the extrinsic evidence presented herein unambiguously demonstrates that the methods described in the prior art references are now recognized to have necessarily and inherently reduced NF-κB activity and resulting gene expression as called for by those claims.

1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the '516 patent.

### 2. Protein Kinase C Inhibitor References

*Meichle* and *Shirakawa* each expressly disclosed, more than one year before the November 13, 1991 effective filing date of the '516 patent, reduction of NF-κB activity in induced cells using agents that inhibit the naturally occurring enzyme Protein Kinase C. As such, these references raise SNQ of patentability under 35 U.S.C. § 102(b) or § 103 for at least claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the '516 patent.

## B. Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103

### 1. Cyclosporin A References

Long before the first possible effective filing date of the '516 patent, prior art references including the *PDR (1985)*, *Griffith I*, *Griffith II*, *Reed*, *Krönke* , and *Siebenlist* each inherently disclosed, as discussed below and in the Manolagas declaration submitted herewith (Exhibit J), that Cyclosporin A necessarily reduced NF-κB activity and concomitant gene expression in accordance with the claims in question. Such determination is apparent from the disclosures of *Hölschermann*, *Schmidt*, *Emmel*, and *Brini*, which utilized the very assays taught in the '516 patent to confirm the inhibitory effect of Cyclosporin A on NF-κB activity and gene expression when administered as taught in these prior art references. Thus, these prior art references raise SNQ of patentability under 35 U.S.C. § 102(b) or § 103 for at least claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86 and 88-97 of the '516 patent.

**2. Vitamin D (Calcitriol) References**

Calcitriol, chemical name 1,25-dihydroxyvitamin $D_3$, is the active form of vitamin D. In addition to having been administered as vitamin D to humans for decades, and naturally produced in cells since time immemorial, calcitriol has also been studied for its anti-tumor activities. As discussed below and in the Manolagas declaration, the use of calcitriol as disclosed in prior art references *Tsoukas, Manolagas*, *Lemire I*, *Lemire II*, *Rigby I*, and *Rigby II* has now been conclusively shown by extrinsic evidence, including especially *Yu*, to necessarily reduce NF-κB activity as called for by the claims. As such, these references raise SNQ of patentability under 35 U.S.C. § 102(b) or § 103 for at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent.

**3. 5-ASA References**

5-Aminosalicylic acid, or 5-ASA, is a particular form of salicylate. 5-ASA is the active moiety in sulfasalazine, which has been administered since the 1950's for ulcerative colitis, a form of inflammatory bowel disease or IBD. 5-ASA alone has been administered primarily for the treatment of ulcerative colitis since the 1970's. Today, ulcerative colitis, is widely recognized as being associated with NF-κB activation. The cited references disclose that the use of 5-ASA necessarily resulted in NF-κB activity reduction as called for by the claims. As such, these references raise SNQ of patentability under 35 U.S.C. § 102 or § 103 for at least claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 of the '516 patent.

**4. Glucocorticoid References**

Glucocorticoids – a large class of pharmaceutical agents, including for example dexamethasone, long used to control inflammation in various disease states such as rheumatoid

arthritis – are now recognized to necessarily reduce NF-κB activity in cells under conditions taught in the prior art. The references cited herein raise SNQ of patentability under 35 U.S.C. § 102 or § 103 for at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent.

**5. Antibiotics Targeted to Gram Negative Bacteria References**

In view of the voluminous references relating to the administration of antibiotics for use against gram negative bacterial infections, just a few illustrative examples are cited herein in the Table of Prior Art Relied Upon. Antibiotics, including erythromycin, gentamicin, and tetracycline, have been administered for decades before the discovery of NF-κB to treat gram negative bacterial infections. Gram negative bacteria, such as *E. coli, Salmonella, Pseudomonas aeruginosa, Shigella, V. Parvulla,* and *H. pertussis* produce a compound known as lipopolysaccharide, or LPS. When LPS comes into contact with cells in the human body, it is now known to induce NF-κB activity and, in turn, increase the production of cytokines that are regulated at least in part by NF-κB. Antibiotics fight infection by killing the bacteria. As discussed in ¶¶ 33-40 of the Manolagas declaration, the use of antibiotics to kill bacteria reduces the amount of LPS and consequently reduces NF-κB activity and concomitant cytokine production. As such, these references constitute invalidating art under 35 U.S.C. § 102 or § 103 for the subject claims reciting LPS-induced NF-κB activity, i.e., at least claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 of the '516 patent.

### 6. Red Wine References

A multitude of prior art references – ranging from the *Bible* to *St. Leger* – establish the medicinal value of red wine consumption. This effect is now recognized as being at least in part a result of red wine's inhibitory effect on NF-κB. Indeed, references cited herein establish under very controlled studies that typical and customary consumption of red wine as taught in prior art references necessarily reduce NF-κB activity and resulting gene expression. As such, these references raise SNQ under 35 U.S.C. § 102 or § 103 for at least claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, 93-98 of the '516 patent.

## IV. BACKGROUND

On June 25, 2002, the '516 patent, titled "Nuclear Factors Associated with Transcriptional Regulation" issued to the assignees, the President and Fellows of Harvard College, the Massachusetts Institute of Technology, and the Whitehead Institute For Biomedical Research. The '516 patent issued from application serial number 08/464,364 filed on June 5, 1995.

### A. The Natural Mechanism

The '516 patent relates to the discovery of a naturally occurring protein named nuclear factor κB, or NF-κB, that regulates gene expression in response to extracellular stimuli.

As described in a declaration submitted by Dr. David Gilmore, an expert for the current assignees of the '516 patent in the pending litigation against Lilly, "[c]ells of higher animals have a complex system of proteins that enables them to respond to signals from other cells and to changes in their environment, for example, invasion by foreign organisms such as viruses or

bacteria." Gilmore Decl., ¶ 7 (Exhibit D). In such cells, in Nature, when a cell receptor is activated by binding to such a signal, "it triggers a complex cascade of protein interactions inside a cell that ultimately leads to a change in the activity of the cell." *Id.* at ¶ 8. The activation or inactivation of key enzymes leads, in turn, "to the switching on and off of specialized proteins called transcription factors. Transcription factors are proteins that act in the nucleus at the level of DNA to regulate the expression of genes, by increasing or decreasing their expression levels." *Id.* NF-κB is one of these transcription factors, and its discovery is discussed in the '516 patent. NF-κB acts as a cellular messenger in a wide variety of cell types, *see id.* at ¶ 11, and regulates the expression of more than 300 genes. NF-κB is also reputed to play a pivotal role in the pathology of a wide range of diseases, including those involving immune and inflammatory responses. *See id.* at ¶ 12.

As described by Dr. Gilmore, the name "NF-κB" arises out of an early misconception by Dr. Baltimore and others as to the function of the transcription factor. "The Baltimore '516 patent inventors first identified NF-κB in the course of research to determine how the expression of immunoglobulin genes was regulated; namely, NF-κB was identified as a transcription factor that regulated the expression of the gene encoding the kappa immunoglobulin gene in specialized immune cells, called B cells." *Id.* at 10. The specification of the '516 patent contains remnants from applications filed when this early misconception was still current (NF-κB at this stage was referred to as κ3):

> [T]wo [of the factors that bind to transcriptional regulatory DNA elements of Ig genes] IgNF-B and κ-3 (hereinafter NF-κB) are lymphoid cell specific.

'516 Patent, Col. 1, lines 65-66.

> NF-κB (previously referred to as Kappa-3) binds only to the Ig light chain enhancer. The binding is mediated by the sequence TGGGATTCCCA. The factor initially was characterized as lymphoid cell specific and also as lymphoid stage specific; that is, work showed that it is expressed only by mature B-cells.

'516 Patent, Col. 12, lines 18-23. As discussed in portions of the specification added in later continuation-in-part applications, the Patentees purportedly discovered that NF-κB was an inducible factor in many cell types. *See, e.g.*, Col. 12, lines 25-35.

In addition, at some point between the discovery of the transcription factor and 1991, when the last continuation-in-part application was filed, Patentees purportedly discovered that, in Nature, NF-κB was bound to a natural inhibitor in the cell cytoplasm, which they termed "IκB" for inhibitor of NF-κB. Although Patentees were unaware of the mechanism, they postulated that IκB was altered (by what is now understood as phosphorylation and ubiquitination), leaving NF-κB free to translocate to the nucleus, bind to DNA recognition sites, and increase expression of genes downstream from those recognition sites:

> NF-κB is initially located in the cytoplasm in a form unable to bind DNA because it is complexed with I-κB. Various inducers then cause an alteration in I-κB allowing NF-κB to be released from the complex. Free NF-κB then travels to the nucleus and interacts with its DNA recognition sites to facilitate gene transcription.

'516 Patent, Col. 16, lines 23-28. The first application that contained any purported amino acid or DNA sequence for IκB was the November 1991 application

**B. The Claims of the '516 Patent**

In spite of the large number of claims in the '516 patent, all of the claims at issue are closely interrelated, and break down into four relatively straightforward categories. A review of these categories may be helpful in the Examiner's understanding that all of the claims that are the

subject of this reexamination request (1) call for the same single step of reducing NF-κB activity, and (2) encompass literally all methods, new or old, of reducing NF-κB activity:

1. **Virtually all of the claims require a single functional step of "reducing NF-κB activity . . . in cells," typically in response to some type of external influence. There are only three exceptions:**

- Claim 7 and its dependent claims, claims 81, 83, and 85-87 call for "altering NF-κB activity" instead of "reducing NF-κB activity."
- Claim 19 and its dependent claims, claims 187-190, call for "inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-κB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB-IκB complexes."
- Claim 203 calls for "introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB."

2. **Some claims indicate that NF-κB activity is reduced in specified ways:**

- "reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, and the like);
- "decreasing the level of NF-κB not bound in an NF-κB:IκB complex" (e.g., claims 20, 31, 42, and the like);
- "inhibiting the passage of NF-κB into the nucleus of cells" (e.g., claims 21, 32, 43, and the like);
- "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, 44, and the like);
- "inhibiting degradation of an IκB protein" (e.g., claims 23, 34, 45, and the like);
- "inhibiting dissociation of NF-κB:IκB complexes" (e.g., claims 24, 35, 46, and the like).

3. **All claims recite the effect caused by reducing NF-κB activity:**

- "such that expression of said gene [whose transcription is regulated by NF-κB] is inhibited" (claims 1 and 2 and their dependent claims);

- "such that expression of said viral gene [whose transcription is regulated by NF-κB] is reduced" (claim 3 and its dependent claims);
- "such that expression of said cytokine gene [whose transcription is regulated by NF-κB] is reduced" (claim 5 and its dependent claims);
- "such that NF-κB-mediated intracellular signaling is diminished" (claim 6 and its dependent claims);
- "such that NF-κB-mediated effects of external influences are" modified or reduced (claims 7 and 8 and their dependent claims);
- "such that expression of said genes [which are activated by extracellular influences] is reduced" (claim 9 and its dependent claims);
- "so as to reduce bacterial lipopolysaccharide-induced gene expression in the mammalian cells" (claims 10, 13 and 16 and their dependent claims);
- "so as to reduce virus-mediated gene expression in the mammalian cells" (e.g., claim 11 and its dependent claims);
- "so as to reduce bacterial lipopolysaccharide-mediated stimulation of the immune cells" (claim 12 and its dependent claims);
- "so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells" (claim 14 and its dependent claims);
- "so as to reduce bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-α in the cells" (claim 15 and its dependent claims);
- "so as to reduce bacterial-induced NF-κB signaling in the cells" (claim 17 and its dependent claims);
- "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" (claim 18 and its dependent claims);

4. **Some of the claims specify certain cell types:**

- eukaryotic cells (e.g., claims 1, 2, 5, 7, 9, 19, and the like);
- mammalian cells (e.g., claims 10-15, 26, 37, 48, 70, 82, 94, and the like);
- human cells (e.g., claims 27, 38, 49, 71, 84, 95, 145, 155, and the like);
- immune cells (e.g., claims 12, 16, 28, 39, 50, 61, 72, 85, and the like);

- lymphoid cells (e.g., claims 29, 40, 62, 73, 86, 97, 107, 108, and the like);
- liver cells (e.g., claims 30, 41, 63, 74, 87, 98, and the like).

During prosecution of the '516 patent and the Massachusetts Litigation, Patentees have argued for a broad claim construction for each of the above terms. The Court's order on claim construction is attached hereto as Exhibit E.

**C. Under 35 U.S.C § 132, None Of The Applications Filed Before November 13, 1991 Support The Claims At Issue In The '516 Patent**

The '516 patent is actually an amalgam of several separate patent application families, many identifying disparate Patentee-inventors, with David Baltimore as the only common inventor identified on all applications. The various applications were filed between January 9, 1986 and November 13, 1991, when the last continuation-in-part application was filed. After November 1991, only continuation and divisional applications were filed. Moreover, on September 12, 2001, the Applicants deleted all pending claims, and submitted an entirely new set of claims in the '364 application, which issued, with modification, as the '516 patent claims. '364 application, Response to Office Action (September 12, 2001) (Paper No. 43). There is no evidence in the record that the Examiner reviewed these claims to determine whether they constituted new matter, or considered the effective filing date for these claims. None of the pre-November 1991 applications teaches or describes any methods of reducing NF-κB activity ***in cells*** as called for by all of the claims of the '516 patent. As such, under 35 U.S.C. § 132, the earliest effective filing date that the '516 patent can be afforded is November 13, 1991.

Figure 1 below shows the relationship of the various applications in the extended family. All of the applications stem from three separate applications, S.N. 06/817,441, filed January 9, 1986 ("the '441 application"), S.N. 06/946,365, filed December 24, 1986 ("the '356 application), and S.N. 07/162,680, filed March 1, 1988 ("the '680 application"). These applications, or their descendants, were combined within one omnibus continuation-in-part application, S.N. 07/791,898, filed November 13, 1991 ("the '898 application"). Thereafter, the Patentees filed a file-wrapper-continuation application, S.N. 08/418,266 ("the '266 application"). A divisional application of the '266 application, S.N. 08/464,364 ("the '364 application"), ultimately resulted in the '516 patent.

Early in the prosecution of the '364 application, the Examiner gave Patentees the benefit the March 1, 1988 application with respect to the claims that were then pending in the application. Office Action, January 7, 1997 ('364 application, Paper No. 7). However, in September 2001, the Patentees cancelled all of the existing claims, and submitted an entirely new slate of claims. Response to Office Action, September 12, 2001 ('364 application, Paper No. 43). The Examiner never addressed the effective filing date for these claims. The March 1, 1988 application, in particular, does not provide support for the issued claims.[3]

All of the claims in the '516 patent encompass reducing NF-κB activity in cells in humans, in other words, human therapy. As found by the District Court in the Massachusetts action (with respect to the '516 patent claims asserted in that litigation) in its Order on claim construction, "These claims encompass methods wherein NF-κB is modulated in cells, wherever they may be found." Exhibit E. Indeed, Plaintiffs have asserted the claims of this patent against the administration of two Lilly products in human therapy, Evista® and Xigris®. None of the pre-November, 1991 applications, however, discloses any method for reducing NF-κB activity in cells in human therapy.

---

[3] The '680 application discusses ***inducing*** NF-κB activity in cells, for example, by using TPA (*see, e.g.,* the '680 application, p. 16), but in no way even mentions a method for ***reducing*** NF-κB activity in cells. To the contrary, the only reference in that application to the reduction of NF-κB activity is the postulation that there may be some form of natural inhibitor. "It seems that the appearance of binding activity ***may be due to separation of NF-κB from an inhibitor***." '680 application, p. 17 (emphasis added). The '680 application does not contain a discussion of whether or how the natural inhibitor, later coined IκB, could be used to inhibit NF-κB activity. Nor does it contain an assertion that methods for reducing NF-κB activity in general were contemplated.

In the pre-November, 1991 applications, IκB, the natural inhibitor of NF-κB, was identified as a protein, but no amino acid sequence or DNA sequence was given.[4] Nor were any deposits containing the DNA sequence encoding IκB ever made or referenced in the patent specification at any time. Even assuming that IκB could be purified sufficiently based on what is disclosed in these earlier applications, none of these applications disclosed how to administer a purified protein such as IκB to a cell, much less how to deliver such a protein to a cell within a human.

The only other inhibitors of NF-κB activity mentioned in the specification of any of these pre-November 1991 applications – even hypothetically – were decoy molecules and dominantly interfering molecules. *See, e.g.,* S.N. 07/341,436, pp. 29-30 (April 21, 1989 application). But the Applicants did not disclose in these applications any methods for delivering these molecules for human therapy. Indeed, the technology arguably does not exist even today, fifteen (15) years after the last filing date of these pre-November 1991 applications. *See* Juengst, *What Next for Human Gene Therapy?*, BMJ, 326:1410-11 (2003); Check, *Cancer Risk Prompts US to Curb*

[4] A purported DNA sequence and amino sequence for IκB was not disclosed until the November 1991 application (Fig. 43). Even this sequence is not, however, IκB, but an avian protein, pp40. Because of this error, Plaintiffs withdrew Fig. 43 from two related applications, S.N. 08/418,266 ("the '266 application," which issued as U.S. Patent No. 5,804,374) and S.N. 08/463,397 ("the '397 application," which issued as U.S. Patent No. 6,150,090), during prosecution of those applications, ***but failed to withdraw Fig. 43 from this application.*** "It has recently come to Applicants' Attorney's attention that Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein." '266 application, Amendment Under 37 C.F.R. §1.312(b), p. 20 (September 11, 1997) (Paper No. 38). Applicants' Attorney used this identical language in deleting Fig. 43 two and a half years later before issuance in the '397 application. *See* '397 application, Petition Under 37 C.F.R. §1.312(b), p. 22 (January 12, 2000) (Paper No. 31). Although prosecution on the application for the '516 patent was proceeding throughout this entire time range, no explanation was given for the failure to inform the examiner that Fig. 43 was in error or delete it from this application.

*Gene Therapy*; Nature, 422:7 (2003); Rosenberg, *et al.*, *Gene Therapist, Heal Thyself*, Science, 287:1751 (2000); Friedmann, *Principles for Human Gene Therapy Studies*; Science, 287:2163-65 (2000); Anderson, *Human Gene Therapy*, Nature, 392:25-30 (1998); Verma *et al.*, *Gene Therapy – Promises, Problems, and Prospects*, Nature, 389:239-42 (1997); Touchette, *Gene Therapy: Not Ready for Prime Time,* Nat. Med., 2(1):7-8 (1996).

Moreover, certain claims contain additional limitations that are not supported by the pre-November 1991 applications. For example, none of the pre-November 1991 applications disclose how, in cells, to "reduce[e] binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 69, 80, 93, 144, and 154). Similarly, some of the claims call for "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, and 44), "inhibiting degradation of an IκB protein" (e.g., claims 23, 34, and 45), or "inhibiting dissociation of NF-κB:IκB complexes" (e.g., claims 24, 35, and 46). None of these limitations is disclosed in any of the pre-November, 1991 applications, however, and thus also constitute new matter.

Again, the pre-November 1991 applications do not even disclose the sequence or structure of the natural inhibitor or that it can be modified or degraded, let alone the concept that NF-κB activity can be reduced by inhibiting modification, degradation, or dissociation of IκB. The pre-November 1991 applications provide no support whatsoever for any of the claims at issue in this reexamination request. Thus, all of the added claims constitute added matter and are to be examined in view of the prior art in existence as of November 1991.

## V. DETAILED DESCRIPTION OF THE SNQ OF PATENTABILITY

### A. The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103

#### 1. Cyclosporin A References: *Emmel*, *Schmidt*, and *Brini* Expressly Anticipate or Alternatively Render Obvious the Subject Claims

Three references dated only a few months apart, *Emmel*, *Schmidt*, and *Brini*, each disclose that Cyclosporin A reduces NF-κB in cells and, therefore, reduces NF-κB-regulated gene expression.

*Schmidt*, in particular, used the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the κB enhancer was completely abrogated by [1 μg/ml] CsA (Fig. 1, lane 6; no B or A shifts). . . ." *Id.* at 4038.[5] Schmidt confirmed these results using an NF-κB CAT reporter assay. In the CAT reporter assay, *Schmidt* transfected Jurkat cells with a CAT gene that was regulated by an NF-κB enhancer region containing two NF-κB binding sites derived from the HIV enhancer region.[6] As depicted in Fig. 4, "CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039. Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB. In addition, because *Schmidt* used the HIV LTR, *Schmidt* demonstrated that Cyclosporin A reduced the expression of viral genes, thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193, and 197-201. At the very least, *Schmidt* rendered

---

[5] *Schmidt* also found, by contrast, that induction of NF-κB activity with a different inducer, PMA, was not affected by Cyclosporin A. *Id.*

[6] The CAT reporter assay is described in the '516 patent, for example at Col. 17, line 66 – Col. 18, line 23. Notably, like *Schmidt*, the CAT assay as described in the '516 patent also used the

these claims obvious in light of the fact that the HIV LTR is responsible for regulating the expression of viral (HIV) genes.

Similarly, *Emmel* described both an NF-κB binding assay (i.e., EMSA) and a CAT reporter assay for measuring NF-κB activity in Jurkat cells. Like *Schmidt*, *Emmel* described the effects of Cyclosporin A on Jurkat cells that had been induced with PHA and PMA. As shown in Figure 3, 0.01-1 μg/ml (10-1000 ng/ml) Cyclosporin A was found to reduce NF-κB binding activity. In the CAT reporter assay, cells again were transfected with a CAT reporter gene that had specifically been engineered to be regulated by the HIV LTR, i.e., the gene had an NF-κB binding site incorporated into its regulatory region. As shown in Figure 2D, Cyclosporin A significantly reduced NF-κB activity at these same concentrations, thereby reducing the NF-κB-mediated expression of CAT.

Likewise, *Brini* disclosed the use of 1 μg/ml Cyclosporin A in human PBM cell cultures (peripheral blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same HIV-1 LTR site used in the '516 patent to assess NF-κB activity and binding, *see* '516 patent, columns 17-18. *Brini* concluded that "CsA reduced the PHA-induced binding of transacting factors from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figs. 3 and 4)." *Id.* at 137.

*Brini* also reported the effect of Cyclosporin A on expression levels of IL-2 Receptor-α, which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24. ("NF-κB is induced in T-cells by a trans- activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene.")

---

NF-κB binding sites on the HIV enhancer.

> We have examined the effect and potential mechanism of Cyclosporin A (CsA) on the Interleukin-2 receptor alpha chain (IL-2Rα) expression in human T-lymphocytes. CsA pretreatment of PHA-activated T-cells led to 30-50% decrease in Tac antigen surface expression and a concomitant decrease in the steady state IL-2Rα mRNA levels.

*Id.* at 131 (Abstract). Compare '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a transactivator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene.").

Thus, *Schmidt*, *Emmel*, and *Brini* each described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB-regulated gene expression. As such, as shown in more detail in Exhibit G-1, these references expressly anticipate at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent. In addition, because *Schmidt*, *Emmel*, and *Brini* all utilized the HIV LTR, they demonstrated that Cyclosporin A reduced the expression of viral genes, thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193, and 197-201. At the very least, these references render such claims obvious in light of the fact that the HIV LTR is responsible regulating the expression of viral (HIV) genes. Moreover, even if the '516 patent is afforded an effective filing date before November 13, 1991 these references provide extrinsic evidence of inherent anticipation as discussed below.

### 2. Protein Kinase C Inhibitor References: *Meichle* and *Shirakawa* Expressly Anticipate or Render Obvious the Subject Claims

*Meichle* and *Shirakawa* expressly disclose the prior art reduction of NF-κB activity in induced cells using Protein Kinase C inhibitors:

*Meichle* conducted an analysis of various protein Kinase C inhibitors and their effect on both PMA- and TNF-induced NF-κB activity in Jurkat cells. Using an EMSA (binding assay) similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3 vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

*Shirakawa* performed similar tests with Protein Kinase C Inhibitor H8 on cells that had been induced with IL-1. The authors first demonstrated that IL-1 induced NF-κB activity in 70Z/3 cells as reflected by EMSA and CAT reporter assays. *Id.* at 2425 (Figure 1), 2426 (Figure 2). They then confirmed that Protein Kinase Inhibitor H8 reduced NF-κB activity in both the binding assays and reporter assays, and, importantly, reduced the resulting CAT gene expression. *Id.* In the EMSA, they found that "[t]he induction by IL-1 was abolished by treatment of cells with H8 (Fig. 2A, lane 5)." *Id.* at 2426. Similarly, using the CAT reporter assay, they found that when cells were treated with H8, "IL-1-induced κ immunoglobulin expression was markedly inhibited . . . ." *Id.* at 2435. This was consistent with results using other assay methods, such as flow cytofluorometry, which measured the actual production of proteins enhanced by NF-κB. "H8 also inhibited IL-1-induced κ immunoglobulin protein expression . . ." *Id.* These results were confirmed in another cell line, designated YT. *Id.* at 2436 ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9).")

Thus, *Meichle* and *Shirakawa* teach the use of Protein Kinase Inhibitor H8, among others, to reduce NF-κB-mediated gene transcription by reducing NF-κB activity and reducing binding of NF-κB to NF-κB binding sites. As such, as shown in more detail in the table in Exhibit G-2,

these references expressly anticipate at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent. In addition, because *Meichle* used the HIV LTR, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193, and 197-201 obvious in light of the fact that the HIV LTR is responsible for regulating the expression of viral (HIV) genes.

**B.    Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103**

Even assuming, *arguendo*, that Patentees are entitled to an earlier effective filing date than November 13, 1991 for any of the claims at issue in this reexamination request, the claims are still invalid under the doctrine of anticipation by inherency. "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed functions, it anticipates." *Atlas Powder Co. v. IRECO, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). Moreover,

> the discovery of a previously unappreciated property of a prior art composition *or of a scientific explanation for the prior art's functioning*, does not render the old composition patentably new to the discoverer." An inherent structure, composition or function is not necessarily known. . . . Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation.

*Id.* (emphasis added).

There is no requirement, however, that a person of ordinary skill in the art would have recognized the inherent disclosure *at the time of the invention*, but only that the matter is in fact inherent in the prior art reference. *Toro Company v. Deere & Co.*, 355 F.3d 131 (Fed. Cir. 2004) (" For inherent anticipation, the '516 patent must have sufficiently described and enabled at least

one embodiment that necessarily featured or resulted in the subject matter embraced by [the limitation] but *neither description nor contemporaneous recognition of these necessary features or results was required*") (emphasis added); *Schering Corp. v. Geneva Pharm. Inc.*, 339 F. 3d 1373, 1377 (Fed. Cir. 2003) ("The record shows that DCL necessarily and inevitably forms from loratidine under normal conditions. . . . [T]his court's precedent does not require a skilled artisan to recognize the inherent characteristic in the prior art that anticipates the claimed invention."). Stated another way, the prior art references need not have disclosed or recognized the claimed functions; indeed, they can remain unrecognized until *after* the patentee's discovery and filing of a patent application, yet anticipate the claimed invention. That is, a reference will anticipate *even though it is silent about an inherent characteristic*. *See, e.g., Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991).

Importantly, the Federal Circuit explicitly stated, "such [silence] in the reference may be filled with recourse to extrinsic evidence." *Id.* at 1268. *See also EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 268 F.3d. 1342, 1351 (Fed. Cir 2001), and *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d. 1342, 1347 (Fed. Cir. 1999). Furthermore, the critical date of the extrinsic evidence that is relied upon to show that a characteristic not disclosed in the reference is inherent need not antedate the filing date. MPEP § 2131.01.

Further, the MPEP §2112 (V), provides that once a reference's teaching is shown to provide evidence or reasoning tending to show inherency then the burden shifts to the Applicant to show an unobvious difference. As will be explained in the detailed description of the references that follows, the teachings and reasonings clearly show inherency.

### 1. Cyclosporin A References

Various prior art Cyclosporin A references describing the administration of Cyclosporin A to humans or its use in human cell cultures inherently anticipate the subject claims. Indeed, the ability of Cyclosporin A, as administered in the prior art, to reduce NF-κB activity is well recognized. As acknowledged by one of the Patentees, Dr. Albert Baldwin, "Cyclosporin A (CsA) and rapamycin, both important immunosuppressants that target T cells, inhibit the activation of NF-κB induced in T cells by different mechanisms. CsA blocks the activation of NF-κB in response to the engagement of the T cell receptor." *Baldwin I*, pp. 671-72. Another of the Patentees has confirmed the effect of Cyclosporin A on NF-κB activity in T cells:

> Experiments with the immunosuppressive drug Cyclosporin A and FK 506 suggest that the activation of NF-κB in T cells involves two separate pathways. . . . Only the calcium dependent pathway is sensitive towards Cyclosporin A and FK 506.

*Bauerle I*, p 76.

Thus, Cyclosporin A is clearly recognized as reducing NF-κB activity and resulting gene expression. The references discussed in more detail below confirm that Cyclosporin A necessarily reduced NF-κB activity and resulting gene expression under the very conditions disclosed in the prior art.

#### a) Cyclosporin A in Cardiac Transplant Patients

Among numerous prior art references, at least *PDR 1985*, p. 1811-13, *Griffith I*, and *Griffith II*, report the *in vivo* administration of Cyclosporin A to cardiac transplant patients. *PDR 1985* teaches that Cyclosporin A should be administered before and after surgery for 1-2 weeks at a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a final level of 5-10

mg/kg/day. *PDR 1985* also taught that when monitoring whole blood levels, a 24-hour trough value of 250-800 ng/ml Cyclosporin appeared to minimize side effects and rejection events. *Griffith I* reports the administration of 4-10 mg/kg/d of Cyclosporin A (average 8 mg/kg/d); *Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to obtain a targeted blood level of Cyclosporin of about 1000 ng/ml.

*Hölschermann* provides extrinsic evidence that *PDR 1985*, *Griffith I*, and *Griffith II* inherently anticipate the subject claims. *Hölschermann* essentially repeated the tests disclosed in *Griffin I* and *Griffith II*, administering 3.4 ± 0.4 mg/kg/day Cyclosporin A to cardiac transplant patients, resulting in blood levels of 681 ± 176 ng/ml. PBM cells were isolated from the blood of the patients before and after Cyclosporin A therapy, and nuclear extracts from the cells were prepared. *Id.* *Hölschermann* then conducted an EMSA using the nuclear extracts. (*see* Figure 4) the same assay format taught by the '516 patent for determining whether compounds (i) reduce NF-κB activity and (ii) reduce binding of NF-κB to NF-κB recognition sites. *See* '516 patent, Col. 18, line 52 – Col. 20, line 25.

*Hölschermann* unequivocally confirms that the administration of Cyclosporin A to cardiac patients as taught by the prior art *PDR 1985* and *Griffith* references necessarily and always reduced NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected (Fig. 4), whereas cells separated from blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. Specificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides.

*Id.* at 4236. *Hölschermann* also showed that the administration of Cyclosporin A to these

patients as taught in the prior art *PDR 1985* and *Griffith* references also reduced TF gene transcription, which is recognized as being regulated by NF-κB. "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237. Thus, Cyclosporin A, as administered in the prior art *PDR 1985* and *Griffith* references,

- inhibited expression of a gene whose transcription is regulated by NF-κB (claims 1 and 2 and their dependent claims);
- diminished NF-κB-mediated intracellular signaling (claim 6 and its dependent claims); and
- reduced NF-κB-mediated effects of external influences (claims 7 and 8 and their dependent claims).

Because Cyclosporin A was shown to reduce binding of NF-κB in an EMSA, which measures binding of NF-κB to NF-κB recognition sites, *Holschermann* confirms that the prior art administration of Cyclosporin A to cardiac patients reduces NF-κB activity by

- "reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 58)

Furthermore, because unbound NF-κB translocates to the nucleus, the reduced binding activity in the nucleus of cells reflected in *Holschermann* means that Cyclosporin A, as administered in *PDR 1985* as well as *Griffith I* and *II*, necessarily reduced NF-κB activity by

- "decreasing the level of NF-κB not bound in an NF-κB-IκB complex" (e.g., claims 20, 31, 42, 53); and

- "inhibiting the passage of NF-κB into the nucleus of cells (e.g., claims 21, 32, 43, 54);

Thus, each of these claims is inherently anticipated by the *PDR 1985*, *Griffith I*, and *Griffith II.*

Furthermore, as *Hölschermann* indicates, Cyclosporin A is recognized as being able to "abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein I-κB." *Id.* at 4237 (citing *Alkalay*). *Hölschermann* confirms that this effect on degradation of IκB is the mechanism by which Cyclosporin A reduced NF-κB activity in these cardiac patients. Thus, Cyclosporin A administered as taught in *PDR 1985* as well as *Griffith I* and *Griffith II* reduces NF-κB activity as claimed in many of the remaining claims as well:

- "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, 44, 55);
- "inhibiting degradation of an IκB protein." (e.g., claims 23, 34, 45, 56);

Thus, each of these claims is also inherently anticipated by the administration of Cyclosporin A as taught in the prior art *Griffith I* and *Griffith II* references.

Finally, *PDR 1985* and the *Griffith* references teach administration of Cyclosporin A to human patients, thereby reducing NF-κB activity in those patients' PBM cells as demonstrated by *Hölschermann*. The PBM cells affected in patients to whom administration of Cyclosporin A was taught in *PDR 1985*, *Griffith I*, and *Griffith II* were (1) eukaryotic cells (e.g., claims 1, 2, 5, 7, 9 and 19,); (2) mammalian cells (e.g., claims 10-15, 26, 37, 48, 70, 82 and 94); (3) human cells (e.g., claims 27, 38, 49, 71, 84, 95, 145 and 155); (4) immune cells (e.g., claims 12, 16, 28, 39, 50, 61, 72, 85, 146 and 156); and (5) lymphocyte cells (e.g., claims 29, 40, 62, 73, 86, 97, 107 and 108,).[7] As such, *PDR 1985*, *Griffith I*, and *Griffith II* clearly anticipate each of these claims

[7] "The resulting population, called peripheral blood mononuclear cells, consists mainly of lymphocytes and monocytes." Janeway C., *et al.*, Immunobiology, p. 635 (5th Ed. 2001)

as well.

The dosage and blood levels of Cyclosporin A shown by *Holschermann* to reduce NF-κB activity is slightly lower than the dosages and blood levels of Cyclosporin A taught in *PDR 1985*, *Griffith I*, and *Griffith II*. As such, an even greater reduction in NF-κB activity would result from the prior art administration of Cyclosporin A to patients as described these references than shown in *Holschermann*. Moreover, regardless whether the effect of Cyclosporin A in reducing NF-κB activity and resulting monocyte TF activation is direct (by directly affecting monocytes) or indirect (by interfering with stimulatory lymphocytes), *Holschermann* shows that Cyclosporin A, as administered in the prior art references reduces NF-κB activity and resulting TF gene expression. Thus, its administration to cardiac transplant patients as taught in *PDR 1985*, *Griffith I*, and *Griffith II* anticipates at least claims 1-2, 6-9, 20-28, 31-39, 64-72, 75-85, 88-96 of the '516 patent, as set forth in more detail in Exhibit H-1.

**b) Cyclosporin A in Human PBM Cell Cultures**

The *in vivo* effect of Cyclosporin A in reducing NF-κB activity in human PBM cells is confirmed by tests using Cyclosporin A in human PBM cell cultures. For example, *Reed* taught the prior art use of Cyclosporin A in human PBM cell cultures that had been induced with PHA. Using the same inducer, the same human immune cells, and the same concentration of Cyclosporin A, *Brini* showed that Cyclosporin A reduced NF-κB activity and NF-κB-mediated IL-2 Receptor-α gene expression in PBM cells.[8] As such, Cyclosporin A, as administered in the

(Garland Pub.) (emphasis in original).

[8] The '516 patent confirms the IL-2 receptor-α (IL-2Rα") gene is regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24. ("NF-κB is induced in T-cells by a trans- activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene.")

prior art *Reed* reference necessarily and inherently reduced both NF-κB activity and NF-κB-mediated gene expression in human PBM cells.

In particular, *Reed* teaches that Cyclosporin A (1 μg/ml) significantly reduced PHA induced IL-2Rα gene transcription (Figs. 1 and 2) and Tac antigen surface expression (Fig. 3b) in human PBM cells:

> The data presented here demonstrate that CsA and DEX concentrations that inhibited PHA-induced proliferation by about 80 to 90% diminished by about 50% (on average) the expression of receptors for IL-2 on PBMC. This inhibition of IL 2 receptor expression occurred at least in part at a pretranslational level and involved a reduction in both high affinity and low affinity forms of the receptor.

*Reed* at 152. *Reed* also found that Cyclosporin A reduced IL-2 gene transcription: "1 μg/ml CsA and $10^{-4}$ M DEX completely blocked the PHA-induced accumulation of mRNA for IL 2 (Fig. 2)." *Id.* at 151.

Several years later, *Brini* also looked at the effect of Cyclosporin A on IL-2 Receptor-α production and Tac antigen surface expression and confirmed *Reed's* results:

> These results are in accordance with Reed et al., who found that CsA inhibits Tac induction in mitogen-activated PBMC. The CsA-mediated reduction in Tac antigen expression on T-Cells was reflected by a decrease in the steady state mRNA levels of the IL-2Rα chain (Figure 2).

*Brini* at 137 (citations omitted). *Brini* then went on, however, to show that Cyclosporin A, as administered in the prior art, reduced binding of NF-κB to NF-κB recognition sites for more than one NF-κB-meditated gene:

> CsA reduced the PHA-induced binding of transacting factors from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figures 3 and 4).

*Id.* at 137. Notably, *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same HIV-1

LTR site as used by the '516 patent to assess NF-κB activity and binding. *Compare Brini* at 132 (Material and Methods), with '516 patent, at col. 37, Table 2 (HIV-1 sequence). *See also* '516 patent, at col. 17, line 66-col. 18, line 15. As such, *Brini* concluded that Cyclosporin A regulated IL-2Rα gene expression by reducing activation of NF-κB:

> Taken together, these results suggest that one of the effects of CsA in the regulation of the IL-2Rα chain expression in human peripheral T lymphocytes is on the activation of sequence specific DNA-binding proteins which recognize sequences containing the NF-κB binding site.

*Id.* at 137. This conclusion was based on their own studies, as well as closely related studies that demonstrated that Cyclosporin A reduced NF-κB activity in another human T-cell line, Jurkat, discussed below. Thus, *Brini* and the related human T-cell culture studies discussed below confirm that Cyclosporin A necessarily and inherently reduced NF-κB activity and resulting gene expression in PBM cell cultures as taught in *Reed*, thus anticipating at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97. A claim element-by-element comparison is attached as Exhibit H-2.

**c) Cyclosporin A in Human T-Cells**

The effect of Cyclosporin A on reduction of NF-κB activity as administered in the prior art is also confirmed by tests involving the use of Cyclosporin A in human T-cell (Jurkat) cultures, including two prior art references, *Krönke* and *Siebenlist*. Using the same inducers, the same human immune cells, and the same concentration of Cyclosporin A taught in *Krönke* and *Siebenlist*, *Schmidt* and *Emmel* provide confirming extrinsic evidence that the use of Cyclosporin A in Jurkat cells reduced NF-κB activity. Thus, Cyclosporin A is clearly recognized to have necessarily and inherently reduced NF-κB activity and resulting gene expression in those cells as

called for by the subject claims.

*Krönke* and *Siebenlist* each disclosed the use of PHA (1 μg/ml) and PMA (50 ng/ml) to induce human T-cells (Jurkat cells). These compounds are described in the '516 patent as being inducers of NF-κB activity. *See, e.g.*, '516 patent, Col. 33, lines 52-59. *Krönke* and *Siebenlist* also report the effect of 1 μg/ml Cyclosporin A (among other concentrations) on the cell cultures. Both references report that IL-2 (also known as "TCGF") gene transcription and/or expression was increased with administration of the NF-κB inducers PHA and PMA, and that such induced IL-2 gene expression was reduced by Cyclosporin A. *Krönke*, p. 5217 ("The results of our study demonstrate that TCGF [IL-2] mRNA accumulation in induced Jurkat cells is diminished by CsA in a dose-dependent manner and that CsA acted by blocking TCGF mRNA transcription."); *Siebenlist*, p. 3044, Fig. 2 ("CsA at 1 μg/ml . . . prevented IL-2 message induction.")[9]

Using the same conditions and the same assay formats described in the '516 patent – an EMSA and a CAT reporter assay – the *Schmidt* reference clearly demonstrates that Cyclosporin A used as disclosed in *Krönke* and *Siebenlist* reduced NF-κB activity in Jurkat cell cultures. *Schmidt* reported that "PHA-mediated induction of complexes binding to the κB enhancer was completely abrogated by CsA (Fig. 1, lane 6; no B or A shifts). . . ." *Id.* at 4038. *Schmidt* reported, however, that there were inducers of NF-κB, which had different mechanisms of induction than PHA-induction, for which Cyclosporin A had no effect. Specifically, *Schmidt* found that PMA-mediated induction of NF-κB activity was not affected by Cyclosporin A. The

---

[9] The Il-2 gene is now recognized as being regulated at least in part by NF-κB. *See* Hoyos et al., *Kappa B-Specific DNA Binding Proteins: Role in the Regulation of Human Interleukin-2 Gene Expression*, Science 244:457-460 (April 1989). *See also Baldwin I, Bauerle*, and *Schmidt* at 4037 ("κB nuclear factor-binding elements also play important roles in the activation of the gene coding for IL-2 and other genes in T cells.")

NF-κB CAT reporter assay confirmed this data, as depicted in Figure 4. "CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039.[10]

*Similarly, Emmel* describes the effect of 1 μg/ml of Cyclosporin A on NF-κB activity in Jurkat cells that had been induced with both PHA and PMA. As shown in Figure 1, 1 μg/ml Cyclosporin A, among other concentrations, reduced NF-κB binding activity. *Emmel* at 1618. ("NF-κB binding was reduced 10-20% in nuclear extracts of CsA-treated cells"). Furthermore, a CAT assay confirmed these results, as shown in Figure 2D. *Id.* That figure demonstrates that Cyclosporin A significantly reduced NF-κB activity at the same 1 μg/ml concentration taught in *Krönke* and *Siebenlist*, as shown by the reduced expression of the NF-κB-regulated CAT gene in those cells. Thus, as discussed above and in the attached Manolagas Decl., ¶¶ 25-32 (Exhibit J), *Schmidt* and *Emmel* confirm that *Krönke* and *Siebenlist*, which disclose the inhibitory effect of Cyclosporin A on NF-κB activity in Jurkat cell cultures, anticipate claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent (as shown in Exhibit H-3, attached).

**2. Vitamin D (Calcitriol) References**

Calcitriol, chemical name 1,25-dihydroxyvitamin $D_3$, is the active form of vitamin D. *See, e.g., Colston.* Although it has been administered as vitamin D to humans for decades, and

[10] The similarity of conditions between both of the prior art *Siebenlist* and *Kronke* references and the *Schmidt* reference that established that Cyclosporin A reduces NF-κB activity in these Jurkat cell cultures is hardly surprising. Each of these studies was performed at the NIH. Two of the papers – *Siebenlist* and *Schmidt* – share a common author (Dr. Siebenlist). Thus, Patentees cannot argue any significant variability of conditions that could possibly prevent a finding of anticipation by inherency.

naturally produced in cells since time immemorial, calcitriol has recently been studied for its anti-tumor activities. *Id.* Notably, there are numerous prior art publications that report the study of calcitriol in various human cell cultures, including human Jurkat leukemic cells and peripheral blood monocyte ("PBM") cells, including *Tsoukas, Lemire I, Lemire II, Rigby I, and Rigby II.* Calcitriol has been conclusively shown to reduce NF-κB activity in such cell cultures by *Yu.* Thus, these prior art references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent.

*Tsoukas* teaches the use of at least $10^{-8}$ M calcitriol in PBM cells that have been induced by PHA. *Tsoukas* at 1438. Manolagas repeated these tests and confirmed that a more recent reference, *Yu*, shows that NF-κB activity is ***necessarily*** reduced in PBM cells under the exact conditions specified prior art in the *Tsoukas* and Manolagas references. Specifically, *Yu* demonstrated that $10^{-8}$ M calcitriol reduced NF-κB activity that had been induced by PHA in both PBM cells (Fig. 5) and Jurkat cells (Fig. 6). Additionally, *Yu* describes the use of a CAT assay to confirm that calcitriol reduced NF-κB-regulated gene transcription (Fig. 6). Again, the similarity of conditions for administration of calcitriol to induced PBM cells in these three references is not surprising, as Dr. Manolagas was a co-author of each of them. Indeed, the Dr. Manolagas states that he utilized the same conditions in Yu as he did in his prior art references. Manolagas Decl., at ¶¶ 7-24. As such, the administration of calcitriol to these induced PBM cells taught in his prior art references is now clearly recognized to have necessarily and inherently reduced NF-κB activity in these cells. A claim element-by-element comparison of *Tsoukas and Manolagas* is provided in Exhibit H-4. Like Dr. Manolagas' prior art references, the *Lemire* prior art references also taught the use of calcitriol in PHA-induced human cells under conditions

that are now recognized as reducing NF-κB activity, as demonstrated by *Yu*. Specifically, *Lemire I* reports, *inter alia*, that $10^{-8}$ M calcitriol significantly reduced DNA synthesis in PHA-induced PBM cells *Lemire I* at 659 (Fig. 2 and Table II). *Lemire II* also taught the use of $10^{-8}$ M calcitriol in PHA-induced PBM cells and reported a significant reduction of DNA synthesis by PHA-induced T lymphocytes *Lemire II* at 3033 (Table I). Furthermore, as noted in *Lemire II*, calcitriol caused "a dramatic and specific reduction of IL 2 production by activated PBM." *Id.* at 3034. Although the mechanism may not have been known at the time of these publications, *Yu* now confirms that calcitriol necessarily and inherently reduced NF-κB activity in these induced cells under these conditions, thus reducing the expression of NF-κB-regulated proteins.[11] Thus, as shown on an element-by-element basis in Exhibit H-5, the *Lemire* references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent.

Similarly, *Rigby I* and *Rigby II* also taught the use of calcitriol in PBM cells that had been induced with PHA. *See Rigby I* at 1452-53 (Fig. 1 and Fig. 3); *Rigby II* at 2282, Fig. 2 (10 nM data point)). Like *Lemire II*, *Rigby I* demonstrated that $10^{-8}$ M calcitriol significantly reduced the level of IL-2 production in PHA-induced cells. *Rigby I* at 1453, Fig. 3). As with the *Tsoukas*, *Manolagas* and *Lemire* references, the *Yu* reference again confirms that NF-κB activity was reduced in the cells treated in *Rigby I* and *Rigby II*, which resulted in reduced gene expression. Thus, as shown on an element-by-element basis in Exhibit H-6, the *Rigby* references anticipate these same claims of the '516 patent.

[11] As noted above at footnote 9, the Il-2 gene is now recognized as being regulated at least in part by NF-κB.

Thus, as discussed by Dr. Manolagas in his declaration, the administration of calculated as taught in each of those prior art references has been confirmed by the *Yu* study to necessarily and inherently have reduced NF-κB activity and the resulting NF-κB-mediated gene expression.

**3. 5-ASA References**

5-Aminosalicylic acid, or 5-ASA, is a specific compound of the general class of compounds known as salicylates. 5-ASA is the active moiety in sulfasalazine, which itself has been administered for ulcerative colitis since the 1950's. As described in *Dew,* 5-ASA alone has been administered primarily for the treatment of ulcerative colitis since the 1980's. Ulcerative colitis, an inflammatory bowel disease, is widely recognized as being associated with NF-κB activation. *Baldwin II* (Table 1). *Bantel,* which reports the results of *in vivo* tests in human patients within the same dosage range in *Dew* for the same indication described in *Dew* (i.e., ulcerative colitis), showed that such administration of 5-ASA reduced NF-κB activity in the cells of those patients. Moreover, as discussed below, the Patentees admitted during prosecution that 5-ASA reduces NF-κB activity as claimed in the '516 patent claims at issue.

Specifically, *Dew* teaches the oral administration (up to 4.4 g/day) of a delayed release formulation of 5-ASA to ulcerative colitis patients. *Bantel,* likewise, administered a delayed release formulation of 5-ASA (under the tradename Mesalazine) at dosages ranging from 1.4 to 4.5 g/day of 5-ASA to such patients and used immunostaining of tissue samples taken from those patients before and after treatment with 5-ASA to measure NF-κB activity.[12] *Bantel* at 3453.

---

[12] *Bantel* used an antibody to detect the p65 subunit of NF-κB, which would otherwise be masked by bound IκB.

*Bantel* found that (1) NF-κB activity is increased in patients with ulcerative colitis, and (2) therapeutic administration of 5-ASA as taught in *Dew* effectively reduced NF-κB activity in these patients. *Id.* at 3454-55. As such, "5-ASA is a potent inhibitor of NF-κB activation *in vivo,*" at dosage levels and under the same conditions taught in *Dew*. *Id.* at 3456.

At dosages of 3 g/day (well below the highest taught in *Dew*), *Bantel* found that 5-ASA treatment in patients with ulcerative colitis "almost completely abrogated NF-κB activation." *Id.* at 3455 (Figure 3 legend). Indeed, *Bantel* concludes,

> We clearly demonstrate an inhibitory effect of 5-ASA on NF-κB activation in [ulcerative colitis] patients that was in agreement with clinical observations, such as the improvement of inflammatory symptoms including abdominal pains and diarrhea, and endoscopic observations including tissue damage. Before 5-ASA therapy, tissue sections of patients with active ulcerative colitis showed areas of inflammation with NF-κB-positive epithelial cells and macrophages. After 5-ASA treatment, cells containing activated NF-κB were mostly completely absent.

*Id.* at 3456. Thus, the administration of 5-ASA taught in *Dew* for ulcerative colitis inherently and necessarily reduces NF-κB activity in cells as called for by the claims of the '516 patent.

This conclusion is in fact supported by arguments presented by the Patentees themselves during prosecution of the '516 patent. In response to a rejection under 35 U.S.C. § 112 in the '364 application, Patentees submitted a declaration by one of the inventors, David Baltimore. Baltimore Decl. (February, 2001) (Exhibit F) ("Baltimore"). Dr. Baltimore directed the Examiner to consider the *Yan* reference as conclusively demonstrating that 5-ASA reduces NF-κB activity as called for by the claims: "Treatment of cells with such compounds as . . . 5-aminosalicylic acid . . . inhibits NF-κB mediated gene expression by a mechanism which

includes inhibition of phosphorylation of IκB proteins." Baltimore, *supra*, ¶ 9 (citations omitted) (citing Yan).[13]

As shown on an element-by-element basis in the table attached as Exhibit H-7, the administration of 5-ASA as taught in the prior art *Dew* reference is now recognized as ***necessarily*** reducing NF-κB activity and, thus, anticipating at least claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97.

**4. Glucocorticoid References**

Like 5-ASA , glucocorticoids – that have been used since at least the 1950s to control inflammation in various disease states, including rheumatoid arthritis and – are now known to reduce NF-κB activity in cells at dosage levels taught in the prior art. As confirmed again by Dr. Baldwin in his 1996 review article, glucocorticoids have been shown to reduce NF-κB activity in two ways, by "directly interact[ing] with and inhibit[ing] activated NF-κB subunits" and "by upregulating IκBα protein levels . . . to block nuclear translocation of NF-κB and DNA-binding." *Baldwin I*, p. 671.

Dexamethasone is a specific glucocorticoid compound used in the prior art to treat a number of inflammatory rheumatic and allergic conditions, including asthma and arthritis. Dexamethasone was used in patients to treat bacterial infections in 1952, *see, e.g.*, *Lefring* (and references cited therein) and approved for human use in 1958 under the trade name Decadron®. *1970 PDR.*

[13] The Patentees did not, however, disclose to the Examiner that 5-ASA was a prior art compound administered to humans for more than a decade before Patentees' discovery, as shown by the *Dew* reference.

Separate and apart from this administration to humans, dexamethasone has been the subject of a substantial amount of testing in cell cultures in the prior art. *Nagasawa* taught the induction of human leukemic T-cells (MOLT-3) by TPA, followed by the administration of $10^{-6}$ M (1 μM) dexamethasone. *See Nagasawa* at 185, Table 2. Similarly, *Rovera* taught the induction of human leukemic cells (promyelocytes and mature myeloid cells) with TPA, also followed by administration of $10^{-6}$ M dexamethasone. *See Rovera* at 869, Table 1. Several publications cited by Dr. Baldwin in his 1996 review article (*Baldwin I*) demonstrate that dexamethasone is recognized to have ***necessarily*** reduced NF-κB activity in induced cells. *See Scheinman I*; *Scheinman II*; *Auphan*; and *Mukaida*. Notably, the two *Scheinman* publications were co-authored by Dr. Baldwin.

Each of these references provides extrinsic evidence that the *1970 PDR* and the studies described in *Lefring, Nagasawa* and *Rovera* inherently anticipate the subject claims, demonstrating that dexamethasone reduces NF-κB activity and concomitant gene expression as called for by the claims. An element-by-element comparison of the claims to the *Nagasawa* and *Rovera* references confirms that these references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent.

**a) Extrinsic Evidence of Inherency as Provided by *Auphan***

*Auphan* describes methods for reducing NF-κB activity in an induced leukemic T-cell line at the same $10^{-6}$ M concentration of dexamethasone taught by *Nagasawa* and *Rovera*. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA as described in *Nagasawa* and *Rovera* and used an EMSA, as described in the '516 patent, to

demonstrate NF-κB activity. *See Auphan* at 287-288. *Auphan* then exposed the cells to $10^{-6}$ M (1 μM) dexamethasone. *Id. Auphan* reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility-shift assays (EMSAs) revealed that both AP-1 and NF-κB DNA binding activities were elevated in nuclear extracts of activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB binding activity and reduced the amount of AP-1 binding activity . . . . DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo (Fig. 1D).
>
> * * *
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat human T cell leukemia line stably transfected with a GR expression vector (Fig. 2A). . . .Inhibition of NF-κB activity was also observed in cells stimulated by either 12-o-tetradecanoryl-phorbal 13-acetate (TPA) alone or by tumor necrosis factor (TNF-α).

*Id.* (citations omitted). As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the transcriptional activation of the IκBα gene" in these human leukemic cells and therefore, "by upregulating IκBα protein levels, function to block nuclear translocation of NF-κB and DNA-binding."[14] *Baldwin I* at 671.

**b) Extrinsic Evidence of Inherency as Provided by *Scheinman I* and *Scheinman II***

*Scheinman I* and *Scheinman II* provide extrinsic evidence that the *1970 PDR and* the studies described in *Lefring*, *Nagasawa*, and *Rovera* inherently anticipate the subject claims. Each *Scheinman* publication confirms that dexamethasone, as used in the prior art, reduces NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures, *Scheinman I* at 944. NF-κB activity was

[14] As discussed below, Dr. Baldwin's own results as reported in his Science reference (*Scheinman II*, discussed below) confirmed this mechanism for glucocorticoid action.

measured in at least two assay formats disclosed in the specification of the '516 patent – EMSA and reporter assays. Immunological assays, such as Western blot assays were also used. As shown in Figures 1A and B, Figure 4, and Figure 7, dexamethasone reduced endogenous NF-κB activity in cells. "Pretreatment with DEX resulted in a profound loss of TNF-α-induced NF-κB as well as p50 homodimer (KBF1) gel shift activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not shown)." *Id.* at 949.

*Scheinman I* concluded that dexamethasone reduces NF-κB activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also block their ability to bind DNA. In addition, we present new data showing that dexamethasone (DEX) treatment of HeLa cells causes a significant reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able to inhibit NF-κB activity by a novel mechanism involving a block of cytokine-induced nuclear translocation.
>
> * * *
>
> With EMSA analysis, we found that DEX treatment caused a marked reduction in the ability of NF-κB/Rel subunits to bind DNA despite the presence of equal amounts of NF-κB subunit protein in the EMSA DNA-binding reaction mixtures (Fig. 5, EMSA).

*Id.* at 944, 948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same $10^{-7}$ M concentration as *Scheinman I* (and at a 10-fold lower concentration than taught in *Nagasawa* and *Rovera*), reduces NF-κB activity as called for by the claims that are the subject of this reexamination request. *Scheinman II* confirmed the *Auphan* conclusion that dexamethasone inhibits TNF-α-induced NF-κB activity, at least in part, by inducing the transcription of the IκBα gene:

> Together, these data indicate that DEX treatment induces the transcription of the IκBα gene. This induction results in the increased synthesis of the

> IκBα protein. This increase in protein synthesis leads to the rapid turnover of IκBα protein associated with preexisting NF-κB complexes. In the presence of an activator such as TNF-α, newly released NF-κB reassociates with the DEX-induced IκBα and thus reduces the amount of NF-κB translocating to the nucleus.

*Id.* at 286.

**c) Extrinsic Evidence of Inherency as Provided by *Mukaida***

*Mukaida* provides extrinsic evidence that the *1970 PDR*, the studies described in *Lefring*, *Nagasawa*, and *Rovera* inherently anticipate the subject claims. *Mukaida* observed that IL-8 production was mediated by NF-κB in all cells they previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-κB-regulated IL-8 production by more than 60% at concentrations equal to and higher than $10^{-8}$ molar. *Id.* at 13290.

Thus, the use of dexamethasone in cells induced by TPA under the conditions taught by *Nagasawa* and *Rovera* is now recognized as clearly and necessarily reducing NF-κB activity as called for by the subject claims of the '516 patent.

**5. Antibiotic References**

Antibiotics, including erythromycin, gentamicin, and tetracycline, have been administered for decades before the discovery of NF-κB to treat gram negative bacterial infections. Gram negative bacteria, such as *E. coli, Salmonella, Pseudomonas aeruginosa, Shigella, V. parvula,* and *H. pertussis* produce a compound known as lipopolysaccharide, or LPS. When LPS comes into contact with cells in the human body, it is now known to induce NF-κB activity and, in turn, increase the production of cytokines that are regulated by NF-κB activity. Cytokines whose genes

are regulated by NF-κB (at least in part) include TNF-α, IL-2, IL-6, IL-8 and IL-10. *E.g.*, *Galdiero*; *Yang*; and *Mori*. Thus, the use of antibiotics as taught in a variety of prior art references – including, *inter alia*, the *1970 PDR* – to treat gram negative infections would thus necessarily reduce NF-κB activity and thereby reduce the expression of LPS-induced (and NF-κB-regulated) cytokines. As such, the *1970 PDR* anticipates claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178 and 182-186 of the '516 patent.

Once produced by gram negative bacteria, LPS activates NF-κB, which translocates to the nucleus and binds to the NF-κB recognition sites on genes that are regulated at least in part by NF-κB. *E.g.*, '516 patent, Col. 2, lines 54-57 ("Release of active NF-κB from the IκB-NF-κB complex has been shown to result from stimulation of cells by a variety of agents, such as bacterial lipopolysaccharide . . . ."). In treating gram negative bacterial infections, antibiotics are recognized function by killing or interfering with normal function of the bacteria and thereby ultimately reduce bacterial production of LPS. Manolagas Decl., ¶¶ 33-40. By reducing LPS production, the antibiotics necessarily reduce NF-κB activity and the concomitant expression of NF-κB-regulated cytokines in cells.

The *1970 PDR* teaches the administration of a variety of antibiotics to treat gram negative bacterial infections. Erythromycin, for example, is taught as being active against *H. pertussis*, among other gram negative bacteria. *Id.* at 1379. Gentamicin sulfate, under the trade name Garamycin®, was taught for the treatment of infections caused by gram negative bacteria *Pseudomonas aeruginosa*, *Aerobater aerogenes*, *E. coli*, *Proteus vulgaris*, and *Klebsiella pneumoniae*. *Id.* at 1167. Tetracycline is a broad spectrum antibiotic that was taught for

administration, under the trade name Sumycin®, for treatment of infections caused by a wide variety of gram negative bacteria, including *E. coli* and *Shigella*. *Id.* at 1309.

By blocking LPS that reaches the cell, the administration of these antibiotics as taught in the *1970 PDR* would necessarily reduce NF-κB activity in cells in the human body, and thereby reduce the expression of cytokines. Manolagas Decl., ¶ 40. As noted in *Galdiero*, "The lowest concentration of LPS able to induce cytokine release was 10 ng $ml^{-1}$." Galdiero, *supra*, at 2700. Thus, using antibiotics to eliminate the underlying bacterial infection and reduce circulating LPS levels would completely abrogate NF-κB-mediated cytokine production.

In treating gram negative infections as taught in *1970 PDR*, these antibiotics (among many others not cited herein) reduce NF-κB activity and reduce NF-κB-mediated expression of cytokines that have been induced by LPS, such as TNF-α, IL-6, IL-8 and IL-10. As such, as shown on an element-by-element basis in Exhibit H-10, *1970 PDR* entries for such antibiotics would inherently anticipate the subject claims requiring LPS-induced NF-κB activity.

### 6. Red Wine References

A multitude of prior art references teach and evidence the consumption of red wine for medicinal, and other more or less noble purposes, in copious amounts. The consumption of red wine, in particular, is described in several passages of the *Bible*.[15] King James Version (1611).

---

[15] **Luke 10:34** And went to *him*, and bound up his wounds, pouring in oil and wine, and set him on his own beast, band brought him to an in and took care of him.

**1 Timothy 5:23** Drink no longer water, but use a little wine for thy stomach's sake and thine often infirmities.

**Isaiah 27:2** In that day sing ye unto her, A vineyard of red wine.

More recently, a study conducted in the late 1970's comparing cardiac problems with factors such as wine, cigarette, and fat consumption obtained a surprising result: France, the country with the highest per capita consumption of wine and a very high per capita consumption of fats, had the lowest rate of cardiac-disease related deaths. *St. Leger*. This effect became known as the "French Paradox." As discussed in more detail below, and as admitted by Patentees, the French Paradox is now recognized as being at least in part a result of red wine's inhibitory effect on NF-κB and resulting gene expression.

It is important to point out that the Federal Circuit Court was presented with this very same fact pattern in *In re Cruciferous Sprout Litigation*, 310 F.3d 1343, 1351 (Fed. Cir. 2002). As in *Cruciferous*, the present Patentees have not invented new pharmaceutical compounds or new methods for using such compounds. They have simply discovered that, in nature, many cells transmit extracellular signals through NF-κB. Therefore the subject claims, which call for the reduction of NF-κB activity in cells, is inherently anticipated through the centuries old practice of consuming red wine.

*Dobrilla* and *Jones*, like *St. Leger*, have carefully studied the effects of consuming red wine and foods. In each of these studies, substantial amounts of red wine (20-33 fluid ounces and 33-50 fluid ounces, respectively) were given with fatty foods (ham sandwich and potato chips and cheese, respectively).

---

**Psalms 75:8** For in the hand of the LORD there is a cup, and the wine is red; it is full of mixture; and he poureth out of the same: but the dregs thereof, all the wicked of the earth shall wring them out, and drink them.

**Proverbs 23:31** Look not thou upon the wine when it is red, when it giveth his colour in the cup, when it moveth itself aright.

*Blanco-Colio* provides extrinsic evidence that *St. Leger, Dobrilla* and *Jones* inherently anticipate the subject claims. The *Blanco-Colio* study determined that just 4-8 fluid ounces of red wine[16] – significantly less than consumed in *Dobrilla, Jones* or *St. Leger* – taken with fatty foods, were sufficient to reduce NF-κB activity that had been induced by the triglycerides resulting from such fatty foods. *Blanco-Colio* at 1023, Fig. 2. The authors isolated PBM cells from volunteers at various time points after the food and wine consumption. *Id.* at 1021. NF-κB activity initially increased, induced by post-prandial lipemia (the result of the triglyceride-rich lipoproteins consumed). *Id.* at 1022. After 6-9 hours, patients receiving red wine saw a significant reduction in NF-κB activity:

> In conclusion, red wine intake, but not another form of alcohol beverage intake (vodka), prevents NF-κB activation in PBMCs elicited in healthy volunteers by postprandial lipemia. Because NF-κB activation is involved in the pathogenesis of atherosclerotic lesions, the inhibitory effect of red wine on NF-κB activation provides a further explanation of the beneficial effects of red wine intake in cardiovascular disease.

*Id.* at 1025. Thus, the reduction in NF-κB activity caused by red wine consumption (certainly at levels within the range of common intake) necessarily and always reduces the expression of NF-κB-regulated proteins that are involved in the development of

---

[16] *Blanco-Colio* reports a reduction in NF-κB activity in male subjects that were administered 84 kcal/m$^2$ red wine, and female subjects that were administered 50 kcal/m$^2$. According to Webster's New World Medical Dictionary, the average body surface area for males is 1.9 m$^2$, whereas the average body surface area for females is 1.6 m$^2$, which yields a range of 80-160 kcal. As red wine contains approximately 20 kcal (nutritional calories) per fluid ounce (*see e.g.*, http://www.healthyweightforum.org/eng/calorie-counter), a range of approximately 4-8 fluid ounces were administered to the subjects in *Blanco-Colio*, substantially below the amounts administered in the prior art as described in St. Leger, Dobrilla or Jones. (Alternatively, Blanco-Colio provides the gram/m$^2$, which could be used to determine the number of ounces as well, as wine has the same approximate density as water.)

atherosclerotic lesions.

The recognized inherent effects of red wine on NF-κB activity are attributed to the flavonoids and other compounds contained in red wine, including resveratrol ("Res"). Dr. Baldwin, one of the Patentees, has published a report confirming that resveratrol is recognized as a potent inhibitor of NF-κB activity and resulting gene expression:

> Res was shown to be a potent inhibitor of both NF-κB activation and NF-κB-dependent gene expression through its ability to inhibit IκB kinase activity, the key regulator in NF-κB activation, likely by inhibiting an upstream signaling component. In addition, Res blocked the expression of mRNA-encoding monocyte chemoattractant protein-1, a NF-κB-regulated gene.

*Holmes-McNary/Baldwin* at 3477. Moreover, Patentees' own publications have confirmed that the inhibitory effect of compounds in red wine, such as resveratrol, on NF-κB activity is largely responsible for the French Paradox:

> Extensive data are now accumulating that dietary constituents can strongly influence the potential for disease outcome. In epidemiological studies, Red wine consumption was shown to have numerous protective effects, and Res has been shown to be responsible for those beneficial effects. In particular, a phenomenon defined as the "French paradox" has emerged, which is the association of reduced mortality from coronary disease and breast cancer. Although it is well established that naturally occurring compounds function as chemopreventive agents, the physiological mechanisms of these dietary constituents as extracellular signals involved in transcription activation are only presently emerging.

*Id.* at 3481 (citations omitted). Thus, Patentees' own publication confirms the results on NF-κB activity that were disclosed in *Blanco-Colio* and helps to explain the mechanism by which red wine constituents ***necessarily*** inhibit NF-κB activity.

*Manna* also provides extrinsic evidence that *St. Leger, Dobrilla* and *Jones* inherently anticipate the subject claims. Similar to *Blanco-Colio, Manna* looked at the effect of resveratrol

on NF-κB induced by a wide range of inducers, including TNF and LPS, and in a wide range of cells. *Id.* at 6511, 6514. Their conclusion affirmed that resveratrol, as found in red wine, reduced NF-κB activity and NF-κB-mediated gene transcription in all cell types and with all inducers tested:

> We found that resveratrol is indeed a potent inhibitor of TNF-induced activation of NF-κB, and this inhibition is not cell type specific. The suppression is observed in both normal and tumor cells. Besides TNF, resveratrol also blocked NF-κB activation induced by a wide variety of other inflammatory agents. NF-κB-dependent report gene transcription was also suppressed by resveratrol.

*Id.* at 6516. *See also id.* at 6512-6513, Figs. 2, 4 and 5. Moreover, the effects of resveratrol were found at concentrations that are achievable by administration of red wine:

> Considering that each gram of fresh grape skin contains 50-100 μg (200-400 μM) resveratrol and red wine has 1.5-3 mg/L, this suggests that resveratrol concentration used in our studies is achievable *in vivo* by consumption of grapes or wine.

*Id.* at 6517 (citations omitted).

In short, any time someone, over the last several hundred or thousand years, drank even a moderate amount of red wine with food containing significant fats (e.g., the typical French diet) they were reducing NF-κB activity that had been induced by the fat content in the food, and reducing the concomitant gene expression. The consumption of red wine as taught in *Dobrilla* and *Jones* thus ***necessarily and always*** reduced NF-κB activity and concomitant NF-κB-mediated gene expression.

The table in Exhibit H-9 sets forth, on an element by element basis, how at least claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89 and 93-98 are inherently anticipated by *St. Leger*, *Dobrilla*, and *Jones* (not to mention the *Bible*!).

### 7. Additional Compounds

There are numerous additional examples of compounds that existed and were administered to humans prior to the earliest effective filing date of the '516 patent which are now known to reduce NF-κB activity as required by the claims at issue in this Reexamination request. The table attached as Exhibit I offers numerous, albeit non-exhaustive, examples of such well-known compounds. In fact, for a more complete and up-to-date list of compounds which are reported to inhibit NF-κB, the Examiner is directed to the NF-κB.org website, specifically http://people.bu.edu/gilmore/nf-kb/inhibitors/index.html.[17]

For example, Aspirin, whose active ingredient is acetylsalicylic acid, is a powerful non-steroidal anti-inflammatory drug ("NSAID") first made commercially available in 1899. *See Weissmann.* In recent years, scientists have discovered that "NF-κB activity is inhibited by sodium salicylates and aspirin." *Kopp.* The active ingredient in aspirin, acetylsalicylic acid, and its equivalents have been known to effect fever reduction and pain relief since as early as 400 B.C. *See, e.g., Bayer web page.* In 1897, Felix Hoffman, a chemist for Bayer, developed a formulation of acetylsalicylic acid that he used to treat his father's rheumatism. *Id.* Bayer subsequently began to distribute aspirin commercially in 1899 and it was rapidly adopted becoming the largest selling drug in the world. *Id.* Aspirin was used in the prior art at lower doses to reduce pain or fever, and was also used at "much higher doses (four to eight grams a day) [to] reduce the redness and

[17] Lilly alerts the Examiner to the existence of this website merely as a courtesy to the Examiner as the site lists numerous prior art compounds and provides hyperlinks to references establishing that those compounds reduce NF-κB activity. Lilly does not assert that this list is exhaustive, however. This website is maintained by Dr. Gilmore, who, as noted above, is serving as an expert for Plaintiffs in the Massachusetts' litigation.

swelling of joints in diseases such as rheumatic fever, gout, and rheumatoid arthritis." *Weissmann* at 84 (and prior art references cited therein). In fact, the observation that salicylates, such as Aspirin, reduced NF-κB activity occurred at such physiological concentrations as "are maintained in the plasma for treatment of chronic inflammatory states like arthritis." *Kopp* at 958.

In addition to Aspirin, other salicylates have now been demonstrated to reduce NF-κB activity. For example, Sulindac is an NSAID marketed under the brand name Clinoril®. Merck introduced Clinoril for the treatment of rheumatoid arthritis in the late 1970's. *See, e.g., PDR 1980.* Much like aspirin, sulindac has been shown to effect translocation of NF-κB from the cytoplasm to the cell nucleus, thereby reducing transcription of certain NF-κB-mediated genes. *Yamamoto.*

Gold compounds are another example of compounds that have been used decades before the earliest priority date as a treatment of rheumatoid arthritis. *Richards* (citing Forester, J., *Rheumatoid arthritis and its treatment by gold salts*, JOURNAL OF LABORATORY AND CLINICAL MEDICINE, 20, 827-840. (1935)). These compounds have also been found to inhibit NF-κB activity. *Jeon.*

Moreover, in addition to Red Wine, other dietary components that have been used for decades, and even centuries, before the earliest possible filing date of the '516 patent have now been demonstrated to reduce NF-κB activity. According to Chinese legend, tea was discovered in 2737 B.C. by the Chinese Emperor Shen Nung, a scholar and herbalist. The first book on tea, a three volume treatise named "Ch'a Ching," was written by the Chinese author Lu Yu in approximately 780 AD. Since that time, tea has been used around the world for its medicinal properties and has become a major part of many Asian and Western cultures. *See www.tea.co.uk.* Recent studies have shown that components of both black tea and green tea inhibit the NF-κB

pathway. *See Yang, Black Tea.*

Further, Turmeric, which has been used as an Indian medicinal for a long period of time, is

mentioned in an Assyrian herbal description dating from about 600 B.C. Turmeric Monograph,

Nutrisana International. Indian researchers have discovered that turmeric has anti-inflammatory

properties, based on the action of the component curcumin. Recent studies have shown that

curcumin works to inhibit the NF-κB pathway. *See Singh.* In that study, the authors demonstrated

that curcumin, a "powerful anti-inflammatory," inhibits NF-κB activation. *See Manson.*

Similarly, garlic, one of the most commonly used spices in the world, has also been used

for its medicinal purposes for thousands of years, dating back to at least the Egyptians. Writings

describing its health benefits go back to the time of Pliny. *See Pliny, Virgil.* Recent studies have

shown that a component of aged garlic extract, S-allylcysteine, also works to inhibit the NF-κB

pathway. *See Ide.* In this study, the authors demonstrated that S-allylcysteine inhibited

activation of NF-κB by TNF-α in human endothelial cells. *Id.* at 1025S.


## VI.  CONCLUSION

As discussed above, a variety of prior art references teach that compounds are capable of

reducing NF-κB activity and concomitant gene expression. These references, published more than

a year prior to the November 13, 1991 effective filing date of the application that issued as the '516

patent, expressly anticipate (or render obvious) the claims of the '516 patent that are the subject of

this reexamination request.

Furthermore, the remaining prior art references cited above inherently anticipate the claims

of the '516 patent that are the subject of this reexamination request. As in *Cruciferous*, the present Patentees have not invented new pharmaceutical compounds or new methods for administration of such compounds; they have simply discovered that, in nature, many cells transmit extracellular signals through NF-κB. The claims, which call for the reduction of NF-κB activity in cells, merely recite a property inherent in the use of many prior art pharmaceuticals and other compounds all of which have not been discussed here.

Indeed, the situation presented here is a *stronger* case for inherency than in *Cruciferous*. That is, in *Cruciferous* the prior art consumption of the sprouts was unrelated to their unrecognized properties, i.e., people ate sprouts because they were hungry, not because of their anti-cancer effect. Whereas, in the instant case, prior art use of many of the compounds discussed herein is for the same purpose as they are used today. It simply turns out that their benefits can now be explained in part from the mechanism claimed by Patentees - the reduction of NF-κB activity. Even the beneficial effects of red wine – long considered as a digestive aid and recognized as having medicinal properties – is explained, at least in part, by its effects on NF-κB.

As discussed in detail above, the references cited in this reexamination request conclusively show that the administration of compounds such as Cyclosporin A, 5-ASA, calcitriol, dexamethasone and antibiotics – to either humans or human cell cultures – was in the prior art. And, that these prior art references evidence and teach that, regardless of whether those of ordinary skill recognized it at the time, the administration of these compounds is now recognized to have necessarily reduced NF-κB activity as claimed in the '516 patent. Patentees, like the patentee in *Cruciferous Sprouts*, only discovered a natural biological mechanism that has

proven to be inherent in the use of a wide variety of prior art compounds. As such, the prior art use of these compounds anticipate the subject claims of the '516 patent.

For these reasons, favorable consideration and grant of Lilly's Request for Reexamination of the '516 patent claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, 197-201 is, therefore, courteously solicited.

Respectfully submitted,

Dated: April 4, 2005

Grantland G. Drutchas
Reg. No. 32,565
McDONNELL BOEHNEN HULBERT & BERGHOFF

300 South Wacker Drive, Suite 3200
Chicago, Illinois 60606
Telephone No. 312-913-0001
Facsimile No. 312-913-0002

**Certification Pursuant to 37 C.F.R. 1.510(b)(5)**

A copy of this request has been serve in its entirety on the patent owner at the address as provided for in 37 C.F.R. 1.33(c) as set forth below:

Matthew P. Vincent
Fish & Neave IP Group
Ropes & Gray
One International Place
Boston, MA 02110-2624

Grantland G. Drutchas
Reg. No. 32,565

# EXHIBIT G

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Reexamination of:

U.S. Patent No. 6,410,516

12/02/05

70181 U.S. PTO
90007828

Inventors: David BALTIMORE *et al.*

Issued: June 25, 2002

Title: NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 6,410,516**

MS Ex Parte Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

The undersigned requests reexamination, pursuant to 35 U.S.C. §§ 302-307 and 37 C.F.R. § 1.510, of U.S. Patent No. 6,410,516 (hereinafter the "the '516 patent"), which issued on June 25, 2002, to Baltimore *et al.* Attached at **Appendix A** is a copy of the '516 patent, as required by Rule 510(b)(4).

**Statement About the '516 Patent**

The '516 patent issued on June 25, 2002, from U.S. Patent Appl. No. 08/464,364 (the '364 application), filed on June 5, 1995. The '364 application is a divisional of U.S. Patent Appl. No. 08/418,266, not U.S. Patent Appl. No. 07/791,898, now abandoned. The '898 application is continuation-in-part claiming priority to three separate applications originating with U.S. Patent Appl. Nos. 06/817,441 filed January 9, 1986, 06/946,365 filed December 24, 1986, and 07/162,680 filed March 1, 1988, which were combined into the '898 omnibus continuation-in-part application, filed November 13, 1991. This omnibus '898 application ultimately issued as U.S. Patent Nos. 5,804,374, 6,150,090, and the subject patent of this request,

U.S. Patent No. 6,410,516. **Appendix B** summarizes the relationship between the various patent applications and patents in the '516 patent lineage.

The '364 application, which issued as the '516 patent should not have been awarded benefit of the March 1, 1988, filing date. The earliest possible priority date that the '516 patent should be awarded is that of the '898 omnibus application, November 13, 1991. Still, the claims of the '516 patent are not enabled or sufficiently described even in the '898 omnibus application filed on November 13, 1991, and the '516 patent should have a priority date no earlier than the June 5, 1995, filing date.

The submitted references constitute prior art to the '516 patent under 35 U.S.C. §§ 102(a) and (b), and § 103(a).

The prior art under header I is prior art to the '516 patent under §§ 102(b) and 102(a).

The prior art under header II is prior art to the '516 patent under § 102(b).

The prior art under header III is prior art to the '516 patent under § 103(a).

**SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY**

Requester sets forth the following basis for unpatentability:

I. Bielinska, Tanaka and Eck, submitted herewith, anticipate under 35 U.S.C. §§ 102(a) and (b), claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203 of the '516 patent. These references generally are directed to the use of oligonucleotides having a NF-κB binding site for reduction of NF-κB activity. Alternatively Bielinska, Tanaka, and Eck establish a case of obviousness under 35 U.S.C. § 103(a) so close to claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203 of the '516 patent that it is unrebuttable. The references are:

Bielinska *et al., Science* 250:997 (1990).

Tanaka *et al., Nucleic Acids Res.* 22: 3069 (1994).

Eck *et al. Mol. Cell. Biol.* 6530 (1993)

Copies of Bielinska, Tanaka and Eck are attached at **Appendix C.** These references were not considered during examination of the application which issued as the '516 patent application.

**II.** Staal and Schreck, submitted herewith, anticipate under 35 U.S.C. § 102(b) claims 18, 177, and 182-185 of the '516 patent relating to a method for reducing interleukin-1 or tumor necrosis factor-α activity in a mammalian cells comprising reducing NF-κB activity. Alternatively, Staal and Schreck establish a case of obviousness under 35 U.S.C. § 103(a) so close to claims 18, 177, and 182-185 of the '516 patent that it is unrebuttable. The references are:

Staal *et al., Proc. Nat'l Acad Sci* 87:9943 (December 1990).

Schreck *et al., J. Exp. Med.* 175: 1181 (May 1992).

Copies of Staal and Schreck are attached at **Appendix C.** These references were not considered during examination of the application which issued as the '516 patent application.

**III.** Baldwin and Sharp, submitted herewith, renders obvious under 35 U.S.C. § 103(a) claim 203 of the '516 patent relating to a method of inhibiting expression in a mammalian cell of a gene whose transcriptional activity is activated by binding of NF-κB to the gene using a nucleic acid decoy molecule. The reference is:

Baldwin and Sharp, *Proc. Nat'l Acad. Sci.* 85:723 (February 1988).

A copy of Baldwin and Sharp is attached at **Appendix C.** This reference was not considered during examination of the application which issued as the '516 patent application.

Requester notes that the submitted references are merely exemplary. Other references were found that make similar disclosures. However, in the interest of brevity, Requester only submits certain exemplary references.

## CLAIMS FOR WHICH REEXAMINATION IS REQUESTED

Reexamination of all claims of the '516 patent is requested. Specifically, reexamination of claims 1-2, 5-9, 18, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, 177, 182-185, and 203 is requested.

## PERTINENCY AND APPLICATION OF THE PRIOR ART TO THE IDENTIFIED CLAIMS

A detailed, element-by-element chart demonstrating how Bielinska, Tanaka , and Eck anticipate claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203 is attached as **Appendix D**.

A detailed, element-by-element chart demonstrating how Staal and Schreck anticipate claims 18, 177, and 182-185 is attached as **Appendix E**.

A detailed, element-by-element chart demonstrating how Baldwin and Sharp renders claim 203 obvious under 35 U.S.C. § 103(a) is attached as **Appendix F**.

In addition, the following explanation of the prior art is provided for each basis of unpatentability.

**<u>The '516 Patent Is Should Not Be Entitled to a Priority Date Earlier Than June 5, 1995</u>**

The earliest possible priority date that the '516 patent should be accorded is June 5, 1995. U.S. Patent Appl. No. 08/418,266, from which the '516 patent most immediately claims priority, does not adequately teach one of ordinary skill in the art how to make or use the invention as claimed in claims 1-2, 5-9, 18, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, 177, 182-185 and 203. Even though the '516 patent specification and its '898 priority application contain the same information, the PTO is still required to determine whether the '516 claims are supported by its priority application(s). Indeed, the PTO already determined that such

an analysis is proper in the present case. *See* Decision on Petition to Vacate Order Granting Reexamination and On Petition to Stay Reexamination mailed October 6, 2005, at page 6.[1]

If the PTO agrees with the Requester that priority should be denied because the subject claims lack support in the '516 patent specification, then a rejection on intervening art is properly made. A determination by the PTO that the claims are not supported by the immediate specification necessarily means that the claims also are not supported by the priority application, which is the same as the issued '516 patent specification. This is certainly the case with the '516 patent.

Here, the subject claims are extremely broad, directed to general methods for NF-κB inhibition. These claims are the product of sheer speculation based upon the Patentees' discovery of NF-κB biology and mechanisms of action. The specification provides no specific guidance of how to effect NF-κB inhibition in a mammalian cell and there are no working or prophetic examples demonstrating inhibition of gene expression as a result of NF-κB inactivation.

Rather, the '516 disclosure is predominantly limited to characterization of NF-κB protein and its binding site, as well as its cellular localization and interactions with its inhibitor, I-κB. The only experimental data correlating NF-κB with a biological result demonstrates NF-κB's ability to activate or increase gene expression. *See* Example 15, columns 78-81. No experimental data or specific teachings ever demonstrate NF-κB-mediated inhibition. This is particularly significant, because oligonucleotide therapy, as suggested by the use of a decoy in claim 203 was "in a very preliminary stage" around the time of filing. Nagel *et al.* 1993, attached at Appendix G. Consequently, a higher threshold of "specific and useful teaching" would therefore be necessary for enablement. *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004). The '516 disclosure clearly falls short.

---

[1] In its October 6, 2005, Decision on the Patentee's Petition to Vacate the PTO determined that a U.S.C. § 112 support analysis of the '516 patent claims is proper in the present case, because there is no evidence in the record that this analysis was carried out during examination of the '516 patent or any parent application. *See* pages 5-7.

In summary, because the '516 disclosure contains neither working nor prophetic examples, and does not otherwise contain any specific teachings pertaining to the subject matter of claims 1-2, 5-9, 18, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, 177, 182-185 and 203, the '516 specification does not enable these claims, and priority as to these claims should be limited to the immediate filing date. Thus, the subject claims of the '516 patent should be entitled to a June 5, 1995, priority date, with a June 5, 1994, critical date. Accordingly, the intervening prior art discussed below, published between the '898 priority date and the '516 immediate filing date, should be considered as proper bases for rejection.

**Statement Regarding the Claims of the '516 Patent**

Reexamination of independent claims 1-2, 5-7, 9, 18, and 203 and certain dependent claims of the '516 patent is requested. With the exception of claim 203 (directed to a method comprising administration of a nucleic acid decoy), these independent claims are all very similar in scope and all require reducing or altering NF-κB activity to produce some effect on NF-κB-mediated gene expression or intracellular signaling. Specifically, the methods of independent claims can be characterized as requiring the following:

> **Claims 1 and 2**: reducing NF-κB activity in the cell such that expression of a gene whose transcription is regulated by NF-κB is inhibited
>
> **Claim 5**: reducing NF-κB activity in the cell such that expression of a cytokine gene whose transcription is regulated by NF-κB is reduced
>
> **Claim 6**: reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished
>
> **Claim 7**: altering NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified
>
> **Claim 9**: reducing NF-κB activity in the cells such that expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling is reduced
>
> **Claim 18**: reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells

> **Claim 203**: introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB

Each of the above independent claims, with the exception of claim 203, has an essentially identical set of dependent claims. Specifically, the dependent claims further require that the method involves decreasing the level of NF-κB not bound in an NF-κB:I-κB complex (claims 20, 31, 53, 64, 75, 88, and 177) or reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB (claim 25, 36, 58, 69, 80, 93, and 182). Other dependent claims require that the method be carried out on mammalian cells (claims 26, 37, 59, 70, 81-82, and 94), human cells (claims 27, 38, 6, 71, 83-84, 95, and 183), immune cells (claims 28, 39, 61, 72, 85, 96, and 184), or lymphoid cells (claims 29, 40, 62, 73, 86, 97, and 185).

## I. <u>The Case of Invalidity with Bielinska, Tanaka and Eck.</u>

Claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203 of the '516 patent are anticipated by Bielinska, Tanaka and Eck Under 35 U.S.C. § 102, a claim is anticipated, and therefore invalid, when each and every element set forth in the claim is found, either expressly or inherently, in a single prior art reference. M.P.E.P. § 2131, *Verdegaal Brothers, Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987). Bielinska, Tanaka and Eck teach each and every element of 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203, thus anticipating these claims.

### A. Bielinska Anticipates Claims 1, 2, 20, 25-29, 31, 36-40, and 203

Claims 1, 2, 20, 25-29, 31, 36-40, and 203 of the '516 patent are clearly anticipated under 35 U.S.C. § 102(b) by Bielinska, because Bielinska teaches each and every element of these claims. *See* **Appendix D**.

Bielinska discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 13 B-lymphoblastoid cells. *See, e.g.,* page 997, Abstract at mid-paragraph and page 998 at right-hand column, adjacent to Fig. 1D. Specifically, Bielinska discloses the use of phosphorothioate oligonucleotides as decoys molecules that competitively bind NF-κB in clone 13 B cells. *Id.* These cells contain an HIV-CAT reporter gene construct

that is transcriptionally-regulated by NF-κB by two κB binding sites found within the HIV enhancer. Fig. 1, and middle of right-column on page 997.

Bielinska teaches that phosphorothioate oligonucleotides having an NF-κB binding site consensus sequence, GGGGACTTTCC (the same as that disclosed in the '516 patent in Table 2 at column 37), competitively bind NF-κB, reducing the amount of NF-κB/HIV enhancer-regulated transcription of chloramphenicol acetylatransferase (CAT). *See* page 1000, fn. 19. Administration of these NF-κB decoy molecules in clone 13 cells inhibits HIV-CAT expression by more than 80%. *See, e.g.,* page 998, right-hand column next to Fig. 1D.

Bielinska teaches reducing NF-κB activity in a eukaryotic cell such that expression of a gene whose transcription is regulated by NF-κB is inhibited, as required by claims 1 and 2. Specifically, as discussed above, Bielinska teaches a method of inhibiting expression of NF-κB/HIV enhancer-regulated CAT clone 13 B lymphoblastoid cells. *See, e.g.,* page 998, right-hand column next to Fig. 1D. This decrease in NF-κB is accomplished by administration of double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC. Page 1000, fn. 19. Thus, as of November 1990, Bielinska clearly disclosed each and every element of independent claims 1 and 2.

Bielinska also teaches the methods of claims 20, 25-29, 31, and 36-40, which depend from claims 1 and 2. Claims 20 and 31 depend from claims 1 and 2, respectively, and are directed to the method wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:I-κB complex. Bielinska teaches that double-stranded phosphorothioates that containing the NF-κB binding sequence, GGGGACTTTCC, competitively bind NF-κB in clone 13 B cells. *See* page 997, Abstract and page 998, right-hand column, next to Fig. 1D. Because binding of NF-κB by a decoy molecule decreases the amount of free NF-κB in the cell, the method taught by Bielinska necessarily decreases the level of NF-κB not bound in an NF-κB:I-κB complex, as required by claims 20 and 31.

Claims 25 and 36 also depend from claims 1 and 2, respectively, and are directed to the method wherein reducing NF-κB binding of NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. As discussed above for dependent claims 20 and 31, Bielinska discloses double-stranded

oligonucleotide phosphorothioates that compete with the NF-κB binding site, thus reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB, as required by claims 25 and 36. *See* page 997, Abstract and page 998, right-hand column.

Claims 26-29 and 36-40 depend from claims 1 and 2, respectively and are directed to the method carried out on mammalian cells (claims 26 and 37), human cells (claims 27 and 38), immune cells (claims 28 and 39), and lymphoid cells (claims 29 and 40). The clone 13 B cells used in the Bielinska studies are human B lymphoblastoid cells and are, thus, mammalian, human, immune, and lymphoid cells, as recited in the dependent claims. *See,* Bielinska at page 998, left-hand column at top and Ho , *Proc. Nat'l Acad. Sci. USA* 86:6714 (1989), provided in **Appendix C**. Therefore, Bielinska meets each and every limitation of dependent claims 20, 25-29, 31, and 36-40.

Claim 203 of the '516 patent recites:

> A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB.

As discussed above, Bielinska teaches a method of inhibiting expression of a CAT reporter gene using an nucleic acid decoy molecule. Transcription of the CAT reporter gene is regulated by a NF-κB/HIV enhancer and the decoy molecule disclosed in Bielinska possesses the NF-κB binding site consensus sequence, GGGGACTTTCC (the same as that disclosed in the '516 patent in Table 2 at column 37). Bielinska teaches that Introduction of this NF-κB decoy molecule into the clone 13 B cells inhibits HIV-CAT expression by more than 80%. *See, e.g.,* page 998, right-hand column next to Fig. 1D. Therefore, Bielinska teaches each and every limitation of claim 203.

Accordingly, Bielinska anticipates claims 1, 2, 20, 25-29, 31, 36-40, and 203.

**B.     Tanaka Anticipates Claims 1, 2, 20, 25-27, 31, 36-38, and 203**

Claims 1, 2, 20, 25-27, 31, 36-38, 5, 53, 58-62, and 203 of the '516 patent are also anticipated under 35 U.S.C. § 102(a) by Tanaka for essentially the same reasons as discussed with respect to Bielinska. *See* **Appendix D.**

Tanaka describes the use of oligonucleotide decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in HeLa cells. The oligonucleotide decoy phosphorothioate molecules contain an NF-κB recognition/binding sequence. *See* page 3070, first paragraph. The reporter gene plasmid construct comprises a CAT reporter gene under the control of NF-κB. *See* page 3070, top-right of entitled "CAT assay." The nucleic acid decoy molecules competitively bind NF-κB. *See* page 3072, Fig. 3 and last paragraph of left-column. This competitive inhibition produces approximately 90% reduction of reporter gene expression in transfected HeLa cells, which are of mammalian (human) origin. *See* page 3072 at Fig. 4 and discussion in right-column.

Tanaka teaches reducing NF-κB activity in a eukaryotic cell such that expression of a gene whose transcription is regulated by NF-κB is inhibited, as required by claims 1 and 2. Specifically, Tanaka teaches a method of inhibiting expression NF-κB-dependent expression of a reporter gene in HeLa human origin cells by introduction of oligonucleotide decoy molecules contain an NF-κB recognition/binding sequence. *See* page 3070, first paragraph, page 3072, right column and Fig. 4. Thus, Tanaka clearly disclosed each and every element of independent claims 1 and 2.

Tanaka also teaches the methods of claims 20, 25-27, 31, and 36-38, that depend from claims 1 and 2. As discussed with respect to Bielinska, claims 20 and 31 depend from claims 1 and 2, respectively, and are directed to the method wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:I-κB complex. Tanaka teaches the use of oligonucleotide containing an NF-κB recognition/binding sequence. The oligonucleotide decoy molecules compete for NF-κB binding indicating that NF-κB binds to the decoys. *See* page 3072, Fig. 3 and last paragraph of left column. Because binding of NF-κB by a decoy molecule decreases the amount of free NF-κB in the cell, the method taught by Tanaka necessarily

decreases the level of NF-κB not bound in an NF-κB:I-κB complex, as required by claims 20 and 31.

Claims 25 and 36 also depend from claims 1 and 2, respectively, and are directed to the method wherein reducing NF-κB binding of NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. As discussed above for dependent claims 20 and 31, Tanaka discloses oligonucleotide decoy molecules that compete with the NF-κB binding site, thus reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB, as required by claims 25 and 36.

Claims 26-27 and 37-38 depend from claims 1 and 2, respectively and are directed to the method carried out on mammalian cells (claims 26 and 37) and carried out on human cells (claims 27 and 38). The HeLa cells used in the Tanaka studies are human carcinoma cells and, thus, mammalian cells and human cells as recited in the dependent claims. Therefore, Tanaka meets each and every limitation of dependent claims 20, 25-27, 31, and 36-38.

Tanaka also anticipates the method of claim 203, because Tanaka discloses introducing a nucleic acid decoy molecule having an NF-κB binding site into a eukaryotic cell in an amount sufficient to inhibit expression of a gene whose transcriptional activity is activated by binding of NF-κB, as required by claim 203. In this regard, Tanaka teaches introduction of an oligonucleotide decoy molecule containing an NF-κB recognition/binding sequence which produces approximately 90% reduction of reporter gene expression in transfected HeLa cells. *See* page 3070, first paragraph, page 3072 at Fig. 4 and discussion in right-column. Therefore, Tanaka teaches each and every limitation of claim 203.

Thus, as of August 1994, prior to the filing date of the application that issued as the '516 patent, Tanaka publicly disclosed each and every element of claims 1, 2, 20, 25-27, 31, 36-38, and 203. Accordingly, claims 1, 2, 20, 25-27, 31, 36-38, and 203 are anticipated under § 102(a).

**C. Eck Anticipates Claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203**

Claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203 of the '516 patent are anticipated by Eck under 35 U.S.C. § 102(b). *See* **Appendix D.**

Eck describes the use of double-stranded phosphorothioate oligonucleotides (denoted κB-PTs) containing the NF-κB binding sequence, GGGACTTTCC, which specifically inhibits NF-κB- mediated transcription. Page 6530, Abstract and right column and page 6532. The oligonucleotide inhibits phorbol-12-myristate 13-acetate (PMA)-induced adhesion and morphological changes in the HL-60 cells. Page 6530, Abstract, page 6532, Fig. 2. The oligonucleotide also inhibits PMA-induced CD11b expression in HL-60 cells. Page 6530, Abstract and page 6533, Fig. 4. Eck also discloses inhibition of PMA-induced ICAM expression in endothelial cells. Page 6533, left column and page 6534, Fig. 6.

Eck anticipates claims 1-2, 20, 25-29, 31, 36-40 for essentially the same reasons as discussed for Bielinska and Tanaka (above). Specifically, Eck teaches reducing NF-κB activity in a eukaryotic cell (HL-60 or endothelial cell) such that expression of a gene whose transcription is regulated by NF-κB is inhibited, as required by independent claims 1 and 2. *See, e.g.* page 6530, Abstract (κB-PT oligonucleotides inhibit PMA-induced CD11b expression in HL-60 cells) and page 6533 (κB-PT oligonucleotides inhibit PMA-induced ICAM expression in endothelial cells). For reasons previously discussed and because the HL-60 cells used in this study are human myeloid leukemia cells, Eck also discloses each and every element of dependent claims 20, 25-29, 31, 36-40.

Eck also anticipates independent claims 5-7 and 9. Claim 5 is directed to a method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-κB comprising reducing NF-κB activity in the cell such that expression of the cytokine gene is reduced. Eck discloses reducing NF-κB activity by administration of an oligonucleotide containing an NF-κB binding site and further discloses that NF-κB is involved in transcriptional activation of genes that encode, among other proteins, cytokines. *See* page 6530, Abstract and left hand column, first paragraph. Therefore, Eck teaches each and every element of independent claim 5, thus anticipating claim 5.

Independent claim 6 is anticipated by Eck, because Eck teaches diminishing induced NF-κB-mediated intracellular signaling by reducing NF-κB activity in cells such that the NF-κB-mediated intracellular signaling is diminished, as required by claim 6. For example, PMA-induced cellular adhesion, morphological changes and cell differentiation, and expression of leukocyte integrin CD11b occurs via NF-κB-mediated intracellular signaling. Page 6530, left column, page 6531-3. This intracellular signaling is inhibited by double-stranded oligonucleotides containing the κB binding sequence and which can bind endogenous NF-κB. *Id., see also,* Figs. 2 and 4. Thus, Eck discloses a method of diminishing induced NF-κB-mediated intracellular signaling by reducing NF-κB activity in cells such that the NF-κB-mediated intracellular signaling is diminished, anticipating claim 6.

Independent claim 7 is also anticipated by Eck. Eck discloses a method for modifying the effects of external influences on a eukaryotic cell by altering NF-κB activity in the cells such that the NF-κB-mediated effects of external influences are modified, as required by claim 7. Specifically, Eck teaches that a double-stranded oligonucleotide having an NF-κB binding sequence will bind endogenous NF-κB in HL-60 cells. Page 6531 and Fig. 1. This oligonucleotide can inhibit cellular adhesion, morphological changes and cell differentiation, and gene expression which are induced by PMA, an external influence. Page 6530, Abstract and left column, page 6531-3. Thus, Eck teaches the method of claim 7.

Eck also anticipates independent claim 9. Eck discloses a method for reducing the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling by reducing NF-κB activity in the cells such that expression of said genes is reduced, as recited in claim 9. For example, Eck teaches that PMA induces, among others, expression of the CD11b gene and the ICAM gene. Page 6530, Abstract, page 6533. Eck also teaches that an oligonucleotide containing the NF-κB binding sequence will bind to the NF-κB which is upregulated due to intracellular signaling induced by PMA, thus inhibiting expression of CD11b and ICAM. Page 6531, right column, page 6533, and Figs. 4 and 6. Thus, Eck teaches the method of claim 9.

Eck also anticipates the claims that depend from claims 5-7 and 9. Claim 8 depends from claim 7 and is directed to the method where the NF-κB activity in the cell is reduced. Eck clearly discloses reduction of NF-κB activity, satisfying the limitation of claim 8.

Claims 53, 64, 75, and 88, depend from claims 5-7 and 9, respectively, and are directed to the method wherein reducing NF-κB binding of NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. Eck clearly discloses oligonucleotide molecules that bind endogenous NF-κB, thus reducing free NF-κB available for binding to the NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB as recited in the claims. *See* page 6530, Abstract and page 6531.

Claims 58-62, 69-73, 80-86, and 93-97 also depend from claims 5-7 and 9, respectively and are directed to the method carried out on mammalian cells, carried out on human cells, carried out on immune cells, and carried out on lymphoid cells. The HL-60 cells used in the Eck study is a human myeloid leukemia cell line and, thus, meets the limitations of these claims. Therefore, Eck meets each and every limitation of dependent claims 53, 58-62, 64, 69-73, 75, 80-86, 88 and 93-97.

Eck also anticipates claim 203, because Eck discloses introducing a nucleic acid decoy molecule having an NF-κB binding site into a eukaryotic cell in an amount sufficient to inhibit expression of a gene whose transcriptional activity is activated by binding of NF-κB, as required by claim 203. In this regard, Eck teaches introduction of a double stranded oligonucleotide that binds NF-κB and which inhibits NF-κB-mediated expression of CD11b, as well as NF-κB-mediated morphological changes and cell adhesion. Page 6530, Abstract, page and right column, and pages 6531-3. Eck also teaches the use of a double-stranded decoy that specifically inhibits NF-κB-mediated transcription for inhibition of PMA induced ICAM expression in endothelial cells. *See* page 6531-6533 and Fig. 6. Therefore, Eck teaches each and every limitation of claim 203.

Accordingly, Eck anticipates each of claims 1-2, 5-9, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, and 203 of the '516 patent under 35 U.S.C. § 102(b).

## II. The Case of Invalidity With Staal and Schreck

Claims 18, 177 and 182-185 of the '516 patent are clearly anticipated under 35 U.S.C. 102(b) by Staal and Schreck. *See* **Appendix E.**

### A. Claims 18 and 182-185 Are Anticipated by Staal

Claim 18 of the '516 patent is clearly anticipated under 35 U.S.C. 102(b) by Staal. Claim 18 recites:

> A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

Staal teaches a method of inhibiting TNF-α activation and, thus, signaling, in mammalian cells by reducing NF-κB activity. Specifically, Staal discloses inhibiting TNF-α stimulation of 293.27.2 and Jurkat cells by selectively blocking NF-κB activation through by administration of *N*-acetyl-L-cysteine (NAC). *See* abstract, and Fig. 5, left. Reduction of intracellular TNF-α signaling is demonstrated by decreased expression of a β-galactosidase reporter gene in Jurkat cells, which are mammalian (human) in origin. *See* Fig. 4. Accordingly, claim 18 is anticipated under 102(b) by Staal

Claim 182 of the '516 patent is clearly anticipated by Staal. Claim 182 depends from claim 18 and further recites that wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

Staal teaches that high thiol levels inhibit NF-κB activation by preventing phosphorylation of IκB, because phosphorylation of IκB is necessary for dissociation of NF-κB from IκB. Thus, NAC-mediated inactivation of NF-κB described in Staal inherently and necessarily results from reduced NF-κB binding to its recognition sites.

A proper inherency rejection requires that the allegedly inherent characteristic necessarily flows from the teachings of the prior art. *Ex parte Levy,* 17 USPQ2d 1461, 1464 (Bd. Pat. App. & Inter. 1990). The NAC-mediated NF-κB inactivation taught by Staal necessarily, and thus inherently, involves reduction of NF-κB binding to its recognition sites of its target genes. In

fact, it was Patentees themselves who discovered that activation of NF-κB is inhibited in its DNA binding activity by its protein inhibitor, IκB, and that NF-κB activation requires its dissociation from this inhibitor. *See* Column 2, Lines 46-63 of '516 patent. Inhibition of NF-κB by occurs because NF-κB remains bound to its inhibitor and is, thus, unable to bind to its recognition sites. Accordingly, claim 182 is anticipated under 102(b).

Claims 183-185, which depend from claim 18, are also anticipated by Staal. Claims 183-185 further require that the method is carried out on human cells (claim 183), immune cells (claim 184) and lymphoid cells . Staal discloses NAC inhibition of TNF-α stimulation in Jurkat cells (claim 185). *See* Fig. 4, page 9945. Jurkat cells are derived from a human T cell leukemia cell line, and, thus, are human, immune and lymphoid. Therefore, claims 183-185 are anticipated.

Accordingly, claims 18 and 182-185 of the '516 patent are anticipated by Staal.

**B. <u>Schreck Anticipates Claims 18, 177 and 182-185</u>**

Claims 18, 177 and 182-185 of the '516 patent are clearly anticipated under 35 U.S.C. 102(b) by Schreck. Schreck teaches potently blocking NF-κB activation by suppressing NF-κB dissociation from its inhibitor IκB in IL-1 and TNF-α stimulated Jurkat cells by administration of dithiocarbamates and metal chelators to. *See* abstract, p. 1181.

Claim 18 of the '516 patent is clearly anticipated by Schreck. As discussed above, claim 18 recites, "a method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells." Schreck teaches each and every limitation of claim 18.

Schreck discloses reduction of IL-1 and TNF-α stimulation of Jurkat cells by potently blocking NF-κB activation via suppression of NF-κB dissociation from IκB. *See* abstract, p. 1181. NF-κB activity reduction is achieved by using dithiocarbatmates and metal chelators. Reduced IL-1 and TNF-α signaling is evidenced by a decreased expression of various reporter genes. *See, e.g.*, Fig. 6, page 1187. Thus, Scheck clearly discloses a method for reducing interleukin-1 and TNF-α activity in mammalian (Jurkat) cells comprising reducing NF-κB

activity in the cells (by administration of dithiocarbamates and metal chelators that suppress dissociation of the NK-κB-I κB complex) so as to reduce intracellular signaling caused by IL-1 or TNF-α as recited in claim 18. Therefore, as of May 1992, Schreck publicly disclosed each and every element of claim 18. Accordingly, Claim 18 is anticipated.

Claim 177 is anticipated by Schreck, because Schreck discloses that dithiocarbamate inhibits TNF-α-induced expression of reporter genes was inhibited by NAC due to suppression of a reaction required for release of IκB from NF-κB which would necessarily decrease the level of NF-κB not bound in an NF-κB:IκB complex. Page 1190, right column, penultimate paragraph. Accordingly, Scheck discloses all limitations of claim 177.

Claim 182 is also anticipated under 35 U.S.C. 102(b) by Schreck. Claim 182 depends from claim 18 and further recites that reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. Schreck discloses that PCTC reduces NF-κB activity by suppressing the release of the inhibitory subunit, IκB, from NF-κB. *See* page 1181 at Abstract, 1184 at right-hand column, last paragraph, and Fig. 3 (left) on page 1186. When IκB, is bound to NF-κB, NF-κB cannot bind to NF-κB recognition sites. Therefore, Scheck discloses a method for reducing IL-1 or TNF-α activity by reducing binding of NF-κB to NF-κB recognition sites. Accordingly, claim 182 is anticipated.

Claims 183-185, which also depend from claim 18, are clearly anticipated by Schreck. Claims 183-185 further require that the method is carried out on human cells (claim 183), immune cells (184) and lymphoid cells (claim 185). The Jurkat T cells used in the Schreck study are derived from a human T cell leukemia cell line, are thus human cells. Accordingly, claims 183-185 are anticipated.

Accordingly, claims 18, 177 and 182-185 of the '516 patent are anticipated by Schreck.

## III. <u>The Case of Invalidity With Baldwin and Sharp: Baldwin and Sharp Renders Claim 203 Obvious</u>

If the PTO were to reach the unlikely conclusion that the '516 disclosure is indeed enabling, then prior art still exists to renders the subject matter of claim 203 obvious under 35

U.S.C. § 103(a). The first appearance of any claims or disclosure relating to nucleic acid decoy molecules occurred in U.S. Patent Appl. No. 07/341,436, filed on April 21, 1989. Accordingly, the priority as to claim 203 can be no earlier than April 21, 1989. Baldwin and Sharp was published in February 1988, more than one year before filing the '436 application.

Claim 203 is obvious over Baldwin and Sharp. *See* **Appendix F.** As discussed above, claim 203 is directed to a method of inhibiting expression of a gene whose transcriptional activity is activated by binding of NF-κB to the gene by introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, and where the decoy includes a NF-κB binding site that binds to NF-κB.

"To establish a *prima facie* case of obviousness, three basic criteria must be met. First, there must be some suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings. Second, there must be a reasonable expectation of success. Finally, the prior art reference (or references when combined) must teach or suggest all the claim limitations. The teaching or suggestion to make the claimed combination and the reasonable expectation of success must both be found in the prior art, and not based on applicant's disclosure. *In re Vaeck*, 947 F.2d 488, 20 USPQ2d 1438 (Fed. Cir. 1991)." M.P.E.P. § 2142.

Baldwin and Sharp disclose the use of various DNA probes to compete for NF-κB binding in nuclear extracts of various cell types. *See* Materials and Methods, p. 723. One such probe, the k3 probe, contains the NF-κB binding site. *See* page 724, Fig. 1. Competitive DNA binding assays demonstrating the ability of k3 probe and kappa enhancer to compete for NF-κB binding are also described. *See* Fig. 2b, page 724; left-column of page 725.

This disclosure of Baldwin and Sharp establishes a *prima facie* case of obviousness, because a person of ordinary skill in the art would have been motivated to modify the competitive DNA binding assays of Baldwin and Sharp in order to inhibit expression of NF-κB

target genes in mammalian cells, would have a reasonable expectation of success, and would have been apprised of all claimed limitations.[2]

Based on published research relating to various transcription factors, it would have been obvious to one of ordinary skill that a nucleotide sequence that specifically and competitively binds a transcription factor would reduce expression of a gene controlled by that transcription factor. For example, Schorpp *et al., J. Mol. Biol.* 202:307 (1988), provided in **Appendix C**, teaches that a double-stranded oligonucleotide (HP1), which contains a cis-element region specifically inhibits the transcription of a syn0-TG reporter gene in rat liver nuclear abstract. Schorpp states, "If binding is a prerequisite for HP1 function, addition of an oligonucleotide containing HP1 might compete with transcriptional activation. Page 317, right hand column. Moreover, Schorpp's data shows that "transcription of syn0-TG is inhibited by added HP1 oligo." *Id; see also,* Figure 10.

Similarly, Li *et al., Mol. Cell Biol.* 8:432 (1988), provided in **Appendix C**, teaches that inclusion of a double-stranded oligonucleotide containing hepatocyte nuclear factor (HNF-1 and HNF2) binding region inhibits transcriptional activity of the nuclear transcription factor in liver nuclear extracts. Page 4362, Abstract, page 4366, right-hand column and FIG. 6, and page 4367, FIG. 7. Also, Hai *et al., Cell* 54:1043 (1988), **Appendix C,** teaches that mammalian transcription factor ATF-dependent transcription of E4 is inhibited by a double-stranded oligonucleotide containing an ATF binding site. Page 1043-1044, bridging paragraph and Figure 1. Thus, one of ordinary skill in the art would have expected an oligonucleotide that specifically and competitively binds a transcription factor would reduce expression of a gene controlled by that transcription factor.

Additionally, prior to the April 1989 filing date, several methods were known for introducing exogenous DNA into mammalian cells, providing support for the use of the known *in vitro* methods *in vivo*. For example, Chu *et al., Nucleic Acids Res.*, 15: 1311-1326(1987),

[2] It should also be noted that references published before the April 21, 1989, filing date of 07/341,436 application that disclose an NF-κB binding site. Such references include Nabel and Baltimore, *Science* 326:711 (1987), Wu *et al., EMBO J.* 7:2117 (1988), Kaufman *et al. Mol. Cell. Biol.* 7:3759 (1987), among many others.

**Appendix C**, teaches that "[a] large number of methods are used" for transfection of DNA into eukaryotic cells, including protoplast fusion, DEAE dextran, calcium phosphate coprecipitation with either DNA or recombinant bacteriophage. Page 1311, first paragraph.

It was also known that the oligonucleotides introduced into cells readily enter into nuclei through nuclear pores on the nuclear membrane. For example, the textbook "Molecular Biology of THE CELL", 2d Ed. (1989), states:

> A protein of 17,000 daltons equilibrates between cytoplasm and nucleus within 2 minutes; a protein of 44,000 daltons takes 30 minutes to equilibrate, while a globular protein larger than about 60,000 daltons seems hardly able to enter the nucleus at all.

Page 423, lines 11-15. According to this description, in case of nucleotides, an oligonucleotide smaller than 60,000 daltons can enter a nucleus by equilibrations. Therefore, an oligonucleotide consisting of 245 nucleotides or less can enter a nucleus from the cytoplasm, because the average molecular weight of a single nucleotide is about 245 daltons. Thus, one of ordinary skill in the art would have understood that an oligonucleotide decoy oligonucleotides containing NF-κB binding site introduced into cells could enter the nucleus, thus inhibiting the expression of a gene whose transcriptional activity is activated by binding of NF-κB to the gene.

Therefore, Baldwin and Sharp, in combination with knowledge in possession of one of ordinary skill in the art as of 1989, discloses all the limitations of claim 203. Because the disclosed k3 probe and kappa enhancer fragments contain the NF-κB binding site, these nucleic acid decoy molecules can compete with the natural NF-κB binding site for NF-κB, thus inhibiting the expression of NF-κB target genes as recited in claim 203. Additionally, Baldwin and Sharp conducted their studies using various mammalian cell extracts. *See* page 723, "Nuclear Extracts." Thus, Baldwin and Sharp disclose all limitation of claim 203. Accordingly, Baldwin and Sharp renders claim 203 obvious.

Patentees may not rely on the disclosure of similar data as that of Baldwin and Sharp to antedate this reference, because the subject matter of claim 203, namely nucleic acid decoy molecules, was not presented until April 1989. The written description requirement is satisfied only by describing the actual invention, and not that which makes it obvious. *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572. Because priority as to the claim is established in

relation to what is actually disclosed, and not merely that which is suggested, the Patentees priority date for claim 203 is no earlier than April 21, 1989, the date on which they first disclosed and claimed nucleic acid decoys. Accordingly, Baldwin and Sharp, published in February 1988, renders Claim 203 obvious.

**FEE FOR REEXAMINATION**

A check in the amount of $2520 is submitted herewith for the request for reexamination.

In view of the foregoing, Requester respectfully requests reexamination and a determination that at least claims 1-2, 5-9, 18, 20, 25-29, 31, 36-40, 53, 58-62, 64, 69-73, 75, 80-86, 88, 93-97, 177, 182-185, and 203 of the '516 patent are unpatentable over prior art submitted herewith.

Respectfully submitted,

Date: Nov 30, 2005

R. Bawa

Dr. Raj Bawa
Registration No.: 51,385

Bawa Biotechnology Consulting, LLC
21005 Starflower Way
Ashburn, VA 20147

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this day, service of a true and complete copy of this Request for Reexamination of U.S. Patent No. 6,410,516 and attachments was made upon the counsel-of-record of the '516 patent:

Matthew P. Vincent
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Dated: Nov 30, 2005

Respectfully submitted,

R. Bawa

Dr. Raj Bawa
Registration No.: 51,385

Bawa Biotechnology Consulting, LLC
21005 Starflower Way
Ashburn, VA 20147

# EXHIBIT H



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,503 | 04/04/2005 | 6410516 | 05-280 | 5583 |

28120 7590 06/08/2005

FISH & NEAVE IP GROUP
ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA 02110-2624

| EXAMINER | |
|---|---|
| | |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 06/08/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| Order Granting / Denying Request For Ex Parte Reexamination | Control No. | Patent Under Reexamination | |
|---|---|---|---|
| | 90/007,503 | 6410516 | |
| | Examiner | Art Unit | |
| | Terry A. McKelvey | 1636 | |

--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--

The request for *ex parte* reexamination filed 04 April 2005 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892, b)☒ PTO-1449, c)☐ Other: _____

1. ☒ The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the date of service of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐ The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____, or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )

**DECISION**

A substantial new question of patentability affecting claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 of United States Patent Number 6,410,516 to Baltimore et al ("Baltimore patent") is raised by the request for *ex parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 6,410,516 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of

any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

The request indicates that Requestor considers that claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 are unpatentable over one or more of the references cited below.

It is agreed that the consideration of Emmel, Schmidt, or Brini raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the Baltimore patent. As pointed out on pages 6-7, 20-22, and Exhibit G-1 of the request, Emmel, Schmidt, and Brini teach administration of cyclosporin A to cells substantially reduced NF-kB activity in those cells (and thus would inhibit expression of genes whose transcription is regulated by NF-kB activity). In addition, these references all utilized the HIV LTR in their experiments, they demonstrated that cyclosporin A reduced the expression of viral genes. The teaching as to administration of cyclosporin A which affects NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there

is a substantial likelihood that a reasonable examiner would

consider this teaching important in deciding whether or not the

claims are patentable.  Accordingly, Emmel, Schmidt, or Brini

raise a substantial new question of patentability as to claims

1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65,

69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117,

192-193, and 197-201, which question has not been decided in a

previous examination of the Baltimore patent.


It is agreed that the consideration of Meichle or Shirakawa

raises a substantial new question of patentability as to claims

1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, ~~53-54, 58-62, 64-65,~~

69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117,

192-193, and 197-201  of the Baltimore patent.  As pointed out

on pages 7, 22-24, and Exhibit G-2  of the request, Meichle and

Shirakawa teach reduction of NF-kB activity in induced cells

using agents that inhibit protein kinase C.  In addition,

because Meichle used the HIV LTR in their experiments, this

reference makes obvious claims drawn to regulating expression of

viral genes.  The teaching as to using agents that inhibit

protein kinase C which reduce NF-kB activity was not present in

the prosecution of the application which became the Baltimore

patent.  Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Meichle or Shirakawa raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of PDR(1985), Griffith I, Griffith II, Reed, Kronke, or Sienbelist raises a substantial new question of patentability as to claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86, and 88-97 of the Baltimore patent. As pointed out on pages 7, 26-34, and Exhibits H-1, H-2, and H-3 of the request, Griffith I, Griffith II, Reed, Kronke, and Sienbelist teach cyclosporin A administration of cells, which, as is shown from the teachings of Holschermann, Schmidt, Emmel, and Brini, inherently reduces NF-kB activity and thus would inhibit expression of genes whose transcription is regulated by NF-kB activity. The inhibition is done by reducing binding of NF-kB to NF-kB recognition sites, which also decreases the level of NF-kB not bound in a NF-kB-IkB complex, inhibiting the passage of NF-kB into the nucleus of cells,

inhibiting modification of an IkB protein, and inhibiting degradation of an IkB protein. Administration to different cell types are also taught. The teaching as to administration of cyclosporin A to cells which inherently reduce NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, PDR(1985), Griffith I, Griffith II, Reed, Kronke, or Sienbelist raises a substantial new question of patentability as to claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86, and 88-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, or Rigby II raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the Baltimore patent. As pointed out on pages 8, 34-37, and Exhibit H-4, H-5, and H-6 of the request, Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, and Rigby II teach administration of calcitriol to humans, which, as is shown from the teachings of Yu, inherently reduces NF-kB activity and thus

would inhibit expression of genes whose transcription is regulated by NF-kB activity. The teaching as to administration of calcitriol which inherently reduce NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, or Rigby II raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of Dew raises a substantial new question of patentability as to claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 of the Baltimore patent. As pointed out on pages 8, 37-39, and Exhibit H-7 of the request, Dew teaches administration of 5-ASA for the treatment of ulcerative colitis in humans, which inherently reduced NF-kB activity in the cells of the patients, by a mechanism including phosphorylation of IkB proteins. The teaching as to administration of 5-ASA was not present in the

prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Dew raises a substantial new question of patentability as to claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of 1970 PDR, Lefring, Nagasawa, or Rovera raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the Baltimore patent. As pointed out on pages 8-9, 39-43, and Exhibit H-8 of the request, 1970 PDR, Lefring, Nagasawa, and Rovera teaches administration of glucocorticoids such as dexamethasone or TPA to control inflammation in diseases such as rheumatoid arthritis, which inherently reduces NF-kB activity. The teaching as to glucocortocoid administration was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly,

1970 PDR, Lefring, Nagasawa, or Rovera raises a substantial new question of patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of 1970 PDR raises a substantial new question of patentability as to claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 of the Baltimore patent. As pointed out on pages 9, 43-45, and Exhibit H-10 of the request, 1970 PDR teaches administration of antibiotics such as erythromycin, gentamicin, and tetracycline to kill bacteria in animals. As evidenced by the Manolagas declaration, the use of antibiotics to kill bacteria reduces the amount of lipopolysaccharide (LPS, which inherently induces NF-kB activity), consequently reduces NF-kB activity and thereby reduce expression of LPS-induced and NF-kB-regulated cytokines. The teaching as to administration of antibiotics was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the

claims are patentable. Accordingly, 1970 PDR raises a substantial new question of patentability as to claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of King James Version Bible (1611), St. Leger, Dobrilla, or Jones raises a substantial new question of patentability as to claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 of the Baltimore patent. As pointed out on pages 10, 45-49, and Exhibit H-9 of the request, King James Version Bible (1611), St. Leger, Dobrilla, and Jones teach consumption of red wine as a medicine, which inherently inhibits NF-kB as a part of its activity. The teaching as to red wine consumption was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, King James Version Bible (1611), St. Leger, Dobrilla, or Jones raises a substantial new question of patentability as to claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98,

which question has not been decided in a previous examination of the Baltimore patent.

None of the references cited in the request are indicated as specifically raising a new question of patentability concerning claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153; 161-163, 169-171, 179-181, 183-185, 187-191, 194-196, and 202-203. However, these claims will be reexamined along with claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 of the Baltimore patent.

***Conclusion***

Certain papers related to this application may be submitted to Art Unit 1636 by facsimile transmission. The faxing of such papers must conform with the notices published in the Official Gazette, 1156 OG 61 (November 16, 1993) and 1157 OG 94 (December 28, 1993) (see 37 C.F.R. § 1.6(d)). The official fax telephone number for the Group is 571-273-8300. NOTE: If Applicant does submit a paper by fax, the original signed copy should be retained by applicant or applicant's representative. NO DUPLICATE COPIES SHOULD BE SUBMITTED so as to avoid the processing of duplicate papers in the Office.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to (571) 272-0547.

Patent applicants with problems or questions regarding electronic images that can be viewed in the Patent Application Information Retrieval system (PAIR) can now contact the USPTO's Patent Electronic Business Center (Patent EBC) for assistance. Representatives are available to answer your questions daily from 6 am to midnight (EST). The toll free number is (866) 217-9197. When calling please have your application serial or patent number, the type of document you are having an image problem with, the number of pages and the specific nature of the problem. The Patent Electronic Business Center will notify applicants of the resolution of the problem within 5-7 business days. Applicants can also check PAIR to confirm that the problem has been corrected. The USPTO's Patent Electronic Business Center is a complete service center supporting all patent business on the Internet. The USPTO's PAIR system provides Internet-based access to patent application status and history information. It also enables applicants to view the scanned images of their own application file folder(s) as well as general patent information available to the public.

For all other customer support, please call the USPTO Call Center (UCC) at 800-786-9199.

Any inquiry concerning rejections or objections in this communication or earlier communications from the examiner should be directed to Terry A. McKelvey whose telephone number is (571) 272-0775. The examiner can normally be reached on Monday through Friday, except for Wednesdays, from about 7:30 AM to about 6:00 PM. A phone message left at this number will be

responded to as soon as possible (i.e., shortly after the examiner returns to his office).

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Dr. Remy Yucel can be reached at (571) 272-0781.

Terry A McKelvey

**Terry A. McKelvey, Ph.D.**
**Primary Examiner**
**Art Unit 1636**

May 30, 2005

# EXHIBIT I



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828 | 12/02/2005 | 6410516 | | 4525 |

28120 7590 12/12/2005

FISH & NEAVE IP GROUP
ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA 02110-2624

| EXAMINER | |
|---|---|
| | |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 12/12/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa
Bawa Biotechnology Consulting, LLC
21005 Starflower Way
Ashburn, VA 20147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. 90/007,828.

PATENT NO. 6410516.

ART UNIT 3991.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| Order Granting / Denying Request For Ex Parte Reexamination | Control No. | Patent Under Reexamination | |
|---|---|---|---|
| | 90/007,828 | 6410516 | |
| | Examiner | Art Unit | |
| | Bennett Celsa | 3991 | |

--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--

The request for *ex parte* reexamination filed 02 December 2005 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☒ PTO-892, b)☐ PTO-1449, c)☐ Other: _____

1. ☒ The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐ The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____, or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Bennett Celsa
Primary Examiner
Art Unit: 3991

cc:Requester ( if third party requester )

**DETAILED ACTION:** ***Reexamination: Granting of Request***

**Procedural Posture:**

The 3rd party Request (dated 12/02/05) for *ex parte* reexamination of claims 1-203 of U.S. Patent No. 6,410,516 to Baltimore et al. (hereinafter "Baltimore patent") is acknowledged.

**Decision:**

A substantial new question of patentability of claims 1-203 of United States Patent Number No 6,410,516 is raised by the Request for *ex parte* reexamination.

**Ongoing Duty To Disclose:**

The Request provided reference(s) for reexamination along without providing a PTO-1449 listing said references. Enclosed, please find an initialed copy of the PTO-892 indicating Examiner consideration of publications filed with the request and any newly cited examiner documents.

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 5,578,334 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

**The 6,410,516 Patented Invention:**

The Baltimore patent claims are directed to methods of reducing or otherwise modifying the naturally occurring transcription factor NF-κB activity in cells affecting gene expression. Claims 1 and 203 are illustrative:

*1.* A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the expression of said gene is inhibited.

*203.* A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to said gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds NF-κB.

**Substantial New Question of Patentability Raised By The Request**

For "a substantial new question of patentability" to be present, it is only necessary that:

A. The prior art patents and/or printed publications raise a substantial question of patentability regarding at least one claim i.e. the prior art teaching is such that there is a substantial likelihood that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and it is not necessary that the prior art establish a prima facie case of unpatentability and;

B. The same question of patentability as to the claim has not been decided by the Office in a previous examination or pending reexamination of the patent or in a final holding of invalidity by the Federal Courts in a decision on the merits involving the claim.

See MPEP 2242.

For a reexamination that was ordered on or after November 2, 2002 (the date of enactment of Public Law 107-273; see Section 13105, of the Patent and Trademark Office Authorization Act of 2002), reliance *solely* on old art (as the basis for a rejection) does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is

based exclusively on that old art. Determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis. For example, a SNQ may be based solely on old art where the old art is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation presented in the request. MPEP 2258.01.

If a substantial new question of patentability is found as to one claim, all claims will be reexamined during the ex parte reexamination process. See MPEP 2216.

*Priority*

Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374

which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);

which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92)

AND:

-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)

-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)

-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)

- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)

-a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)

- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC 120 priority, the above-identified CIP applications (e.g. original specification and original claims) fail to adequately describe and/or enable the methods of the current Baltimore Patent claims subject to reexamination. Accordingly, at best, the

reexamination patent claims are entitled to the filing date (e.g. 11/13/91) of continuation application 07/791,898 for purposes of prior art.

For example, the pre-November 1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;

b. an NF-κB inhibitor. The 07/341,436 although mentioning nucleic acid decoy molecules fails to disclose sequences thereof or a means of delivering these molecules for in vivo use.

c. support for the Baltimore patent claim limitations including (but not limited to):

-"reducing NF-κB activity" in a cell (e.g. mammalian/eukaryotic) and/or an enabling means thereof (e.g. administering a NF-κB inhibitor) to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as required in all the claims;

-"reduce binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 69, 80, 93, 144, and 154);

-"inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, and 44);

-"inhibiting degradation of an IKB protein" (e.g., claims 23, 34, and 45);

- "inhibiting dissociation of NF-KB:IKB complexes" (e.g., claims 24, 35, and 46).

It is also duly noted that failure of the 06/946,365 (filed 12/24/86) (ABN: 3/24/92) application to satisfy 35 USC 112, first paragraph would render the 07/162,680; 07/155,207 and 06/817,441 applications unavailable for 35 USC 120 priority because they would not be co-pending with the 07/791,898 (filed 11/13/91) application. It is further noted that the Griffith document (with Hölschermann et al as evidence of inherency in which its publication date is not critical), newly cited by the Examiner below, establishes a substantial new question of

patentability which predates the earliest possible assertion of 35 USC 120 priority (e.g. CIP of 06/817,441 01/09/1986). See MPEP 2131.01 Multiple Reference 35 U.S.C. 102 Rejections.

***Documents Cited By The Requester:***

1. **Bielinska et al.** *Science* 250 :997 (1990) ;

2. **Tanaka et al.** *Nucleic Acids Res.* 22:3069 (1994);

3. **Eck et al.** Mol. *Cell. Biol.* 6530 (1993) ;

4. **Staal et al.** *Proc. Nat'l Acad Sci* 87 :9943 (Dec. 1990) ;

5. **Schreck et al.** *J. Exp. Med.* 175:1181 (May 1992);

6. **Baldwin and Sharp,** *Proc. Nat'l Acad Sci* 85:723 (Feb. 1988).

7. **Schorpp et al.** J. Mol. Biol. 202:307 (1988);

8. **Li et al.** Mol. Cell. Biol. 8:432 (1988);

9. **Hai et al.** Cell 54 :1043 (1988) ;

10. **Chu et al.** Nucleic Acids Res. 15:1311-1326 (1987);

11. **Molecular Biology of THE CELL,** 2nd Ed. (1989) page 423.

***Documents Cited By The Examiner:***

12. **Griffith et al** Targeted Blood Levels of Cyclosporine for Cardiac Transplantation, J. Thorac. *Cardiovasc. Surg.* 99:952-957 (December, 1984);

13. **Hölschermann et al.**, Cyclosporin ad Inhibits Monocyte Tissue Factor Activation in Cardiac Transplant Recipients, *Circulation* 96:4232-4238 (December, 1997). Since this document is being cited as evidence of inherency, as such, its publication date is not critical. See MPEP 2131.01.

## Discussion of the Cited Documents

**1. Bielinska et al.**

As pointed out on pages 7-9 of the request, Bielinska et al.(e.g. at pages 197-198 and Fig. 1) disclose the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 13 B-lymphoblastoid cells.

It is agreed that consideration of the newly cited Bielinska et al. document raises a substantial new question of patentability over the claims of the Baltimore patent since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

**2. Tanaka et al.**

As pointed out on pages 10-11 of the request, Tanaka et al. (e.g. at pages 3070,3072 and Figures 3 and 4) disclose the use of decoy molecules (e.g. phosphorothionates containing an NF-κB recognition/binding sequence) to inhibit NF-κB-dependent expression of a reporter gene in HeLa cells.

It is agreed that consideration of the newly cited Tanaka et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

**3. Eck et al.**

As pointed out on pages 12-14 of the request, Eck et al. (e.g. at pages 6530-32;Figures 2, 4 and 6) disclose the use of double-stranded phosphorothionate oligonucleotides (denoted κB-

PTs) containing the NF-κB binding sequence, GGGACTTTTCC, which specifically inhibits NF-κB-mediated transcription.

It is agreed that consideration of the newly cited Eck et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

4. **Staal et al.**

As pointed out on pages 15-16 of the request, Staal et al. (e.g. see Abstract; page 9945; Figures 4-5) disclose a method of inhibiting TNF-α by blocking NF-κB activation in mammalian cells (e.g. Jurkat cells) by administration of N-acetyl-L-cysteine (NAC).

It is agreed that consideration of the newly cited Staal et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

5. **Schreck et al.**

As pointed out on pages 16-17 of the request, Schreck et al. (e.g. see Abstract, pages 1181, 1186-1187; Figures 3 and 6) disclose blocking NF-κB activation by suppressing NF-κB dissociation from its inhibitor IκB in IL-1 and TNF-α stimulated Jurkat cells by administration of dithiocarbamates and metal chelators.

It is agreed that consideration of the newly cited Schreck et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a

substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable.

6. **Baldwin and Sharp,** *Proc. Nat'l Acad Sci* 85:723 (Feb. 1988).

7. **Schorpp et al.** J. Mol. Biol. 202:307 (1988);

8. **Li et al.** Mol. Cell. Biol. 8:432 (1988);

9. **Hai et al.** Cell 54 :1043 (1988) ;

10. **Chu et al.** Nucleic Acids Res. 15:1311-1326 (1987);

11. **Molecular Biology of THE CELL,** 2nd Ed. (1989) page 423.

As pointed out on pages 17-18 of the request, the Baldwin and Sharp reference disclose (e.g. pages 724-725; Fig. 2) the use of various DNA probes to compete for NF-κB binding in nuclear extracts of various mammalian cell types.

Additionally, as pointed out on page 19 of the request, the Schorpp et al., Li et al. and Hai et al. references teach that an oligonucleotides that specifically and competitively binds a transcription factor would reduce expression of a gene controlled by the transcription factor.

Further, as pointed out on page 19 of the request, Chu et al. teaches methods for transfection of oligonucleotides (e.g. DNA) into eukaryotic cells, which once introduced into cells, readily enter the nucleus through pores. See Molecular Biology of THE CELL at p.423.

It is agreed that consideration of the combined teaching of the newly cited Baldwin and Sharp,. Schorpp et al. , Li et al. , Hai et al. , Chu et al. and Molecular Biology of THE CELL documents raise a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the combined

teaching of these references important in deciding whether or not the Baltimore patent claims are patentable.

12. **Griffith et al.** and

13. **Hölschermann et al.**

Griffith et al. teach (e.g. see abstract) the administration of cyclosporin to cardiac transplant plantations.

Hölschermann et al teach (e.g. see page 4236, left column; Fig. 4) that the administration of cyclosporin to cardiac patients (as taught by Griffith et al.) necessarily (e.g. inherently) results in reduced NF-κB activity.

Consideration of the newly cited Griffith et al. and Hölschermann et al. documents would raise a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of the Griffith et al. reference in view of the Hölschermann et al. document (as evidence of the Griffith reference method's reduction of NF-κB activity) important in deciding whether or not the Baltimore patent claims are patentable.

***Conclusion***

A substantial new question of patentability of claims 1-203 of United States Patent Number No 6,410,516 is raised by the Request for *ex parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

***Future Correspondences***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Bennett Celsa whose telephone number is 571-272-0807. The examiner can normally be reached on M-F from 8-5.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jean Vollano can be reached at 571-272-0648.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

All correspondence relating to this ex parte reexamination proceeding should be directed:

By Mail to: Mail Stop ex parte Reexam
Central Reexamination Unit
Office of Patent Legal Administration
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to: (571) 273-9900
Central Reexamination Unit

By hand: Customer Service Window
Randolph Building
401 Dulany St.

Application/Control Number: 90/007,828
Art Unit: 3991

Page 12

Alexandria, VA 22314

Bennett Celsa
Primary Examiner
Art Unit 3991

Conferees:

# EXHIBIT J



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Mailed :

DDJ

John P. White
COOPER & DUNLAP LLP
1185 Avenue of the Americas
New York, New York 10036

(for Patent Owner)

Grantland G. Drutchas
MCDONNELL BOEHNEN HULBERT
& BERGHOFF LLP
300 S. Wacker Drive, Suite 3100
Chicago, IL 60606

(for Third Party Requester)

MAILED
MAY 0 4 2006
REEXAM UNIT

*In re Baltimore et al*
Reexamination Proceeding
Control No.: 90/007,503
Filed: April 4, 2005
For: U.S. Patent 6,410,516

Dr. Raj Bawa
BAWA BIOTECHNOLOGY CONSULTING LLP
21005 Starflower Way
Ashburn VA 20147

(for Third Party Requester)

*In re Baltimore et al*
Reexamination Proceeding
Control No.: 90/007,828
Filed: December 2, 2005
For: U.S. Patent 6,410,516

DECISION MERGING
REEXAMINATION
PROCEEDINGS

The above noted reexamination files are before the Director of the Central Reexamination Unit for consideration of the proceedings under 37 C.F.R. 1.565(c).

**BACKGROUND**

1. United States Patent 6,410,516, issued June 25, 2002, is the subject of Reexamination Control Nos. 90/007,503 and 90/007,828.

2. A first request for reexamination, assigned Reexamination Control No. 90/007,503, was filed April 4, 2005 by Grantland G. Drutchas of McDonnell Boehnen Hulbert & Berghoff LLP in Chicago, IL 60606. The request urged that a substantial new question of patentability was raised by the newly cited references which either inherently or expressly disclose the use of a variety of prior art compounds as reducing NF-κB activity and resulting gene expression.

3. Reexamination was ordered for 90/007,503 on April 4, 2005.

4. A second request for re-examination, assigned Reexamination Control No. 90,007,828, was filed December 2, 2005 by Dr. Raj Bawa of Bawa Biotechnology Consulting LLP in Ashburn VA 20147. The request urged that a substantial new question of patentability was raised by the newly cited references which are directed to the use of oligonucleotides having a NF-κB binding cite for reduction of NF-κB activity.

5. Reexamination was ordered for 90/007,828 on December 2, 2005.

6. No Office action has been issued in either reexamination.

7. A petition was filed on April 4, 2006 by Patent Owner to merge the above-identified re-examination proceedings 90/007,503 and 90/007,828.

**DISCUSSION**

Under 37 C.F.R. 1.565(c):

> If *ex parte* reexamination is ordered while a prior *ex parte* reexamination proceeding is pending and prosecution in the prior *ex parte* proceeding has not been terminated, the *ex parte* reexamination proceedings will be consolidated and result in the issuance of a single certificate under para 1.570.

As noted in the above review of facts, reexamination has been ordered in each of the above reexamination proceedings. Accordingly, merger of the proceedings under 37 C.F.R. 1.5659 (c) is appropriate. MPEP 2283 further sets forth:

> If the second request is based upon essentially the *same* patents or publications as in the first request or on patents or printed publications which raise essentially the same issues as those raised in the first request, and if reexamination is ordered, the examination of the merged proceeding will continue at the point reached in the first reexamination proceeding. If, however, *new* patents or printed publications are presented in the second request which raise different questions than those raised in the first request, then prosecution in the merged reexamination proceeding will be reopened, if applicable, to the extent necessary to fully treat the question raised.

**DECISION**

I. MERGER OF PROCEEDINGS

In accordance with 37 C.F.R. 1.565(c), the 90/007,503 and 90/007,828 reexamination proceedings are merged. The merged proceeding will be conducted in accordance with the following guidelines and requirements.

II. THE SAME CLAIMS MUST BE MAINTAINED IN BOTH PROCEEDINGS

Patent owner is required to maintain the same claims (and specification) in both files throughout the merged proceeding. Since the claims are the same in both files, a "housekeeping amendment" is NOT needed. See MPEP 2283, "Merger of Reexaminations."

III. CONDUCT OF MERGED PROCEEDING

All papers mailed by the Office throughout the merged proceeding will take the form of a single action which applies to all proceedings. All papers issued by the Office of filed by the patent owner will contain the identifying data for <u>all</u> files and will be physically entered in each reexamination file. All papers filed by the patent owner must consist of a single response, **filed in duplicate**, each bearing a signature and identifying data for **all** files, for entry into each file.

All correspondence from the USPTO will be addressed to the patent owner's representative address listed in Reexamination Control Nos. 90/007,503 and 90/007,828 as:

John P. White
COOPER & DUNLAP LLP
1185 Avenue of the Americas
New York, New York 10036

A copy of all correspondence from the USPTO will be served on the third party requester at the address listed in Reexamination Control No. 90/007,503 as:

Grantland G. Drutchas
MCDONNELL BOEHNEN HULBERT
& BERGHOFF LLP
300 S. Wacker Drive, Suite 3100
Chicago, IL 60606

A copy of all correspondence from the USPTO will be served on the third party requester at the address listed in Reexamination Control No. 90/007,828 as:

Dr. Raj Bawa
BAWA BIOTECHNOLOGY CONSULTING LLP
21005 Starflower Way
Ashburn VA 20147

**CONCLUSION**

Reexamination Control Nos. 90/007,503 and 90/007,828 are merged. The merged reexamination files are being forwarded to the examiner for preparation of an Office action, to be issued in due course

Any inquiry concerning this decision should be directed to Deborah Jones, Special Programs Examiner, at telephone No. (571) 272-1535.

for Lissi M. Marquis, Director
Central Reexamination Unit

# EXHIBIT K



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828<br>90/007,503 | 12/02/2005 | 6410516 | | 4525 |

23432 7590 08/02/2006

COOPER & DUNHAM, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

| EXAMINER | |
|---|---|
| Celsa, Bennett | |
| ART UNIT | PAPER NUMBER |
| 3991 | |

DATE MAILED: 08/02/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa

Bawa Biotechnology Consulting, LLC

21005 Starflower Way

Ashburn, VA 20147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. 90/007,828.

PATENT NO. 6410516.

ART UNIT 3991.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

DO NOT USE IN PALM PRINTER

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Grantland G. Drutchas

MCDONNELL BOEHNEN HULBERT & BERGHOFF

300 S. Wacker Drive, Suite 3100

Chicago, IL 60606

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. 90/007,503.

PATENT NO. 6410516.

ART UNIT 3991.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| *Office Action in Ex Parte Reexamination* | Control No. 90/007,828 90/007,503 | Patent Under Reexamination 6410516 | |
|---|---|---|---|
| | Examiner Bennett Celsa | Art Unit 3991 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

a☒ Responsive to the communication(s) filed on *04 May 2006*. b☐ This action is made FINAL.
c☒ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire *two* month(s) from the mailing date of this letter. Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).** If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☒ Information Disclosure Statement, PTO-1449.
3. ☐ Interview Summary, PTO-474.
4. ☐ _____.

Part II SUMMARY OF ACTION

1a. ☒ Claims *1-203* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims *19,44-46,52,101-103,108,111-113,118,121-123,130-132,141-143,151-153,161-163,169-171,179-181,187-191,194-196 and 202* are patentable and/or confirmed.

4. ☒ Claims *1-18,20-43,47-51,53-100,104-107,109,110,114-117,119,120,124-129,133-140,144-150,154-160,164-168,172-178,182-186,192,193, 197-201and 203* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some* c)☐ None of the certified copies have

1☐ been received.

2☐ not been received.

3☐ been filed in Application No. _____.

4☐ been filed in reexamination Control No. _____.

5☐ been received by the International Bureau in PCT application No. _____.

* See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

**DETAILED ACTION:** ***Reexamination:***

***First Office Action In Merged '7503 and '7828 Proceedings.***

***Procedural Posture*:**

1. U.S. Patent No. 6,410,516 issued on June 25, 2002.
2. A request for reexamination, assigned control No. 90/007,503, was filed by a third party requester on April 4, 2005. Reexamination was ordered for the '7503 proceeding on June 8, 2005.
3. A request for reexamination, assigned control No. 90/007,828, was filed by a third party requester on December 2, 2005. Reexamination was ordered for the '7828 proceeding on December 12, 2005.
4. No Patent Owner's Statement was received in either reexamination.
5. No Office action has been issued in either reexamination.
6. Reexams 90/007,503 and 90/007,828 were merged on May 4, 2006.

***Status of the Claims***

U.S. Patent 6,410,516 claims 1-203 are subject to reexamination.

**Ongoing Duty to Disclose**

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 6,410,516 throughout the course of this reexamination proceeding. The third party requesters are also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

***Information Disclosure Statement (IDS)***

It is noted that the present proceedings contain more than 1,000 documents submitted in several separate IDS's. It is noted that:

Once the minimum requirements of 37 CFR 1.97 and 37 CFR 1.98 are met, the examiner has an obligation to consider the information. **It is to be noted, however, that consideration by the examiner of the information submitted in an IDS will be considered in the same manner as other documents in Office search files are considered by the examiner while conducting a search of the prior art in a proper field of search.** See MPEP 609, at page 600-125, Revision 2, May 2004. The initials of the examiner placed adjacent to the citations on the PTO-1449 or PTO/SB/08A and 08B or its equivalent mean that the information has been considered by the examiner to the extent noted above. If there is a reference of particular relevance, the patentee is required to point out the document and its relevance to the Examiner.

***Priority***

Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374
which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);
which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92)
AND:
-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)
-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)
-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)
- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)
-a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)
- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC 120 priority, the above-identified CIP applications (e.g. original specification and original claims) fail to adequately describe and/or enable the methods of claims 1-203 of the instant Baltimore Patent claims subject to reexamination. See MPEP 2258. Accordingly, **claims 1-203**, the reexamination patent claims are entitled to the filing date **11/13/91** of continuation application 07/791,898 for purposes of prior art. Every claim of the '516 patent (1-203) recites at least one of the following features which the pre-1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;

b. support for the Baltimore patent claim limitations including (but not limited to):

-"reducing NF-κB activity" in a cell (e.g. especially mammalian/eukaryotic) and/or an enabling means thereof (e.g. administering a NF-κB inhibitor) to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as *required in all the claims*;

-"reduce binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 69, 80, 93, 144, 154 and 182);

-"inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, and 44);

-"inhibiting degradation of an IκB protein" (e.g., claims 23, 34, and 45);

-"inhibiting dissociation of NF-κB:IκB complexes" (e.g., claims 24, 35, and 46).

Regarding claim 203 directed to nucleic acid decoy molecules, the first appearance of any claims or disclosure relating to nucleic acid decoy molecules occurred in U.S. Patent Appl. 07/341,436 (filed April 21, 1989). However, the 07/341,436 specification (at page 29, lines 9-14) and 07/341,436 original claim 18 provide support and enablement only for the use of "decoy" molecules for inhibiting expression in a cell, as in cell culture, and NOT for *in vivo* use in *mammalian cells* as encompassed by the instant claim. This is true since there is no disclosed support in the 07/341,436 for DNA delivery or transfection of nucleic acid decoys for NF-κB inhibition in mammalian cells as required in the instant claims; nor are there any disclosed sequences of nucleic acid decoy molecules for *in vivo* use. The only experimental data correlating NF-κB with a

biological result demonstrates NF-κB's ability to activate or increase gene expression. See instant patent, Example 15, Col. 73-81. It is noted that the written description requirement is satisfied only by describing the actual invention, and not that which makes it obvious. *Lockwood v. American Airlines, Inc.* 107 F.3d 1565, 1572. 41 USPQ2d 1961, 1968 (Fed. Cir. 1997).

Both 3rd Party requesters argue that the instant patent claims should be afforded the priority of the 08/464,364 (filed 6/5/95) since the newly introduced claims therein constitute new matter or lack written description under 35 USC 112, first paragraph.

The requester's proposed effective filing date of March 27, 1995 is not adopted. It is noted that, although a reexamination proceeding provides a complete reexamination of the patent claims on the basis of prior art patents and printed publications, issues relating to 35 U.S.C. 112 are addressed only with respect to new claims or amendatory subject matter in the specification, claims or drawings during the reexamination proceeding. See 37 CFR 1.552;MPEP 2258 (Scope of Ex Parte Reexamination). In the reexamination context, effective filing date priority of patented claims to continuation or divisional applications that do not contain new matter is presumed valid.

***Prior Court Proceedings and Substantial New Question of Patentability***

When the initial question as to whether the prior art raises a substantial new question of patentability as to a patent claim is under consideration, the existence of a final court decision of claim validity in view of the same or different prior art does not necessarily mean that no new question is present, because of the different standards of proof employed by the Federal District Courts and the Office. While the Office may

accord deference to factual findings made by the district court, the determination of whether a substantial new question of patentability exists will be made independently of the court's decision on validity, because it is not controlling on the Office. MPEP 2242.

***Unsuccessful Assertions of a Substantial New Question of Patentability***

1. **The 90/007,503 Request**: On pages 50-52 of the '7503 request, under the heading "Additional Compounds", the requester points the Examiner to an NF-κB org website which lists additional compounds which are reported to inhibit NF-κB including aspirin, sulindac, gold compounds, tea, turmeric and garlic to which references were cited without any indication of the relevant document portions or how these documents were to be applied to the instant claims. A proper request for reexamination must include: (1) A statement pointing out each substantial new question of patentability based on prior patents and printed publications; and (2) An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited prior art to every claim for which reexamination is requested. 37 C.F.R. 1.510 (b)(1)(2); 35 U.S.C. 302; MPEP 2214. Accordingly, the '7503 request regarding "Additional Compounds" fails to raise a substantial new question of patentability since the requester fails to specifically recite the substantial new question of patentability by providing a detailed explanation of the pertinency and manner of applying the cited prior art to every claim requested for reexamination.

2. **The 90/007,828 Request**: Upon reconsideration of the Order Granting *Ex Parte* Reexamination mailed on December 12, 2005 (hereinafter the Order), it is determined that certain of the grounds upon which substantial new questions of patentability

(SNQs) were found to exist are not proper grounds. Specifically, the '516 patent derives 35 U.S.C. § 120 benefit as being a division of application No. 08/ 418,266 (now U.S. patent No. 5,804,374), which in turn was a continuation of abandoned application 07/791,898, filed November 13, 1999. Since the patent being reexamined claims benefit of prior patents and/or applications that are directly related to the patent being reexamined as continuations and/or divisions, without intervening patents or applications that are continuations-in-part, the patent claims being reexamined are entitled to the presumption that examiner considered the question of entitlement to the Section 120 benefit claims during the examination of the '516 patent for purposes of this reexamination. Accordingly, the question of such entitlement does not raise a SNQ for purposes of the present *ex parte* reexamination proceeding, and any statement to that effect in the December 12, 2005 Order is hereby expressly withdrawn. Therefore, the action that follows will not contain any discussion of *prior art documents* dated subsequent to November 13, 1991 including:

1. *Tanaka* et al. *Nucleic Acids Res.* 22:3069 (1994);
2. *Eck* et al. Mol. *Cell. Biol.* 6530 (1993);
3. *Schreck* et al. *J. Exp. Med.* 175:1181 (May 1992).

and will not apply such documents under 35 U.S.C. 102 or 35 U.S.C. 103.

**The 6,410,516 Patented Invention:**

The Baltimore patent claims are directed to methods of reducing or otherwise modifying the naturally occurring transcription factor NF-κB activity in cells affecting gene expression. Claim 1 is illustrative:

1. A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the expression of said gene is inhibited.

***Claim Interpretation***

Initially, it is noted that The USPTO must give claims their broadest reasonable interpretation, in light of and consistent with the written description of the invention in the application. See *In re Donaldson Co.*, 16 F.3d 1189, 29 USPQ2d 1845 (Fed. Cir. 1994). With respect to claim 1 it is noted that the sole method step is functional i.e. reducing NF-κB activity. Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural (indirect) or man-made (direct) means of reducing NF-κB activity. Indeed, most of the method steps recited in the Baltimore patent are purely functional with the exception of claim 7 and dependent claims 81, 83 and 85-87 which require "modifying NF-κB activity" (which are partially functional) and claim 203 which requires "introducing a nucleic acid decoy molecule into the cell" which requires an active step. The summary of the remaining reexamination claims provided in pages 12-15 of the '7503 request is herein incorporated by reference.

***Relevant Case law***

"The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347, 51 USPQ2d 1943, 1947 (Fed. Cir. 1999). Thus the claiming of a new use, new function or unknown property which is inherently present in the prior art does not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ

430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter. 1993); *In re Cruciferous Sprout Litigation,* 301 F3d. 1343, 64 USPQ2d 1202 (Fed. Cir. 2002); In *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004). Although, normally, only one reference should be used in making a rejection under 35 U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be proper when the extra references are cited to show that a characteristic not disclosed in the reference is inherent. See MPEP 2131.01. Once a reference's teaching is shown to provide evidence or reasoning tending to show inherency, the burden shifts to Applicant to show an unobvious difference. MPEP 2112 (V).

***Claim Rejections - 35 USC § 102***

1. The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.
> (e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

The changes made to 35 U.S.C. 102(e) by the American Inventors Protection Act of 1999 (AIPA) and the Intellectual Property and High Technology Technical Amendments Act of 2002 do not apply when the reference is a U.S. patent resulting directly or indirectly from an international application filed before November 29, 2000. Therefore, the prior art date of the reference is determined under 35 U.S.C. 102(e) prior to the amendment by the AIPA (pre-AIPA 35 U.S.C. 102(e)).

***Claim Rejections - 35 USC § 103***

2. The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**I. PROTEIN KINASE C INHIBITORS: (intervening prior art): *Express anticipation by Meichle or Shirakawa.***

3. Claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).

**Rejection Summary**: *Meichle* teaches the reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

*Meichle* analyzed various Protein Kinase C inhibitors and their effect on both PMA- (phorbol 12-myristate-13-acetate) and TNF- (tumor necrosis factor) induced NF-κB activity in eukaryotic Jurkat cells. Using an EMSA binding assay similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, *Meichle* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request, hereby incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

Additionally, because *Meichle* used a genetic construct comprising HIV LTR and NF-κB binding site, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively *prima facie* obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been immediately envisaged, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Meichle* in order to affect associated viral (e.g. HIV) gene expression.

4. Claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30).

**Rejection Summary**: *Shirakawa* teaches reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (claims 1-2) expression of a cytokine protein (claim 5) in a eukaryotic cell.

Analogous to *Meichle* discussed *supra*, *Shirikawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The authors first demonstrated that IL-1 acted to induce NF-κB activity in 70Z/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2). The EMSA binding and CAT reporter assays then confirmed that Protein Kinase Inhibitor H8 reduced NF-κB activity and reduced the resulting CAT gene expression. More particularly, the treatment of cells with H8 using EMSA resulted in "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced κ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, *Shirikawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request herein incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

**IIa. CYCLOSPORIN A (intervening prior art): *Express anticipation by Schmidt, Emmel* and *Brini***

5. Claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, over *Schmidt* et al., J. Virology 64:4037-4041 (August 1990). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Schmidt* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Schmidt* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-κB-regulated gene expression. In particular, *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1ug/ml] CsA (Fig. 1, lane 6; no B or A shifts) ....". See *Schmidt* at 4038. These results were confirmed using an NF-κB CAT reporter assay as described in the '516 patent, for example at Col. 17, line 66-Col. 18, line 23.

Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB. Accordingly, *Schmidt* described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression. As such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (herein incorporated by reference), the *Schmidt* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in

light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV)

genes. Therefore, it would have anticipated, or alternatively *prima facie* obvious, to

regulate NF-κB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene

expression.

6.        Claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73,

75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are

rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious

under § 103, by *Emmel* et al., Science, 246 (Dec. 1989):1617-20 See MPEP 2131.01.

**Rejection Summary:**  *Emmel* teaches administration of Cyclosporin A (CsA) to cells

which substantially reduced NF-κB activity in those cells thus inhibiting expression of

genes whose transcription is regulated by NF-κB activity. In addition, these references

all utilized the HIV LTR promoter in their experiments and demonstrated that CsA

reduced the expression of viral genes.

        The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under

transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein

(claim 5) in a eukaryotic cell.

        Similar to the *Schmidt* reference discussed above, the *Emmel* reference

discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g.

eukaryotic Jurkat cells) that inherently reduces NF-κB-regulated gene expression.

Like *Schmidt*, *Emmel* described the effects of CsA on Jurkat cells that were induced with PHA and PMA and CsA was shown (Fig. 3, .01-1ug/ml) to reduce NF-κB binding activity. In the CAT reporter assay, cells were transfected with a CAT reporter gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-κB binding site incorporated into its regulatory region. As shown in Fig. 2D, CsA significantly reduced NF-κB activity thereby reducing the NF-κB-mediated expression of CAT. Additionally, as shown in Figure 3, 0.01-1ug/ml (10-10000 ng/ml) CsA was found to reduce NF-κB binding activity. Thus, *Emmel* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression, and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (incorporated by reference), the *Emmel* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Since *Emmel* used the HIV LTR gene, *Emmel* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionaly, *Emmel's* use of the HIV LTR gene renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Emmel* in order to affect associated viral (e.g. HIV) gene expression.

7.     Claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103 by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990).

**Rejection Summary:**   *Brini* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity.  In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. T-cells) that inherently reduces NF-κB-regulated gene expression.

Particularly, *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516 patent to assess NF-κB activity and binding (see '516 patent, columns 17-18). *Brini* concluded that "CsA reduced the PHA-induced binding of transactivating factors from T-

cells and κB-like sequences which are present in the IL-2R alpha gene and in the HIV-1 LTR gene (Figures 3 and 4)". See *Brini* at page 137. Additionally, *Brini* reported the effects of CsA on expression levels of IL-2 Receptor-alpha (*Brini* at page 131 Abstract) which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-cells. See '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (incorporated by reference), the Emmel reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Additionally, since *Brini* used the HIV LTR gene, *Brini* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Brini's* use of HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Brini* in order to affect associated viral (e.g. HIV) gene expression.

**IIb. CYCLOSPORIN A: (references prior to 12/24/86): inherent anticipation**

**A. Inherent *Anticipation by PDR 1985, Griffith I and Griffith II (CsA reduction of* NFκB activity *in Cardiac Transplant Patients).***

8. Claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by the Physician's Desk Reference (*PDR: 1985*) pages 1811-13, *Griffith I* (Griffith et al., Ann. Surg. 196 (9/82): 324-329) or *Griffith II* .(Griffith et al., J. Thorac. Cardiovasc. Surg. 99 (12/84): 952-957) as evidenced by Holschermann et al., Circulation 96 (12/97) 4232-4238. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *PDR* (1985), *Griffith I and, Griffith II* teach cyclosporin A (CsA) administration of cells, which is shown from the teaching of *Holschermann,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different eukaryotic cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing

the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene (claims 1-2) expression in a eukaryotic cell.

The *PDR 1985*, *Griffith I* and *Griffith II* references all teach the *in vivo* administration of CsA to cardiac transplant patients.

*PDR 1985* teaches that CsA should be administered before and after surgery for 1-2 weeks at a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a final level of 5-10 mg/kg/day. When monitoring whole blood levels, a 24-hour trough value of 250-800 ng/ml CsA appeared to minimize side effects and rejection effects.

*Griffith I* reports the administration of 5-10 mg/kg/d of CsA (average 8 mg/kg/d); while *Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to obtain a targeted blood level of CsA of about 1000ng/ml.

*Hölschermann* provides extrinsic evidence that the PDR 1985, Griffith I, and Griffith II references inherently anticipate the subject claims.

*Hölschermann* essentially repeated the tests disclosed in the *Griffith I* and *II* references by administering 3.4 ± 0.3 mg/kg/day CsA to cardiac transplant patients, resulting in blood levels of 681 ± 176 ng/ml. PBM cells were isolated from the blood of the patients before and after CsA therapy, and nuclear extracts from the cells were prepared. Id. *Hölschermann* then conducted an EMSA assay using nuclear extracts. (see Figure 4) which is the same assay format taught by the '516 patent for determining whether compounds (i) reduce NF-κB activity and (ii) reduce binding of NF-κB to NF-κB recognition sites. See '516 patent, Col. 18, l.52 - Col. 20, l. 25.

*Hölschermann* confirms that administering CsA to cardiac patients as taught by the prior art *PDR 1985* and *Griffith I* and *II* references necessarily inherently reduces NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected (Fig. 4), whereas cells separated from blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. Specificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides. *Id.* at 4236.

*Hölschermann* also showed that the administration of CsA to these patients as taught in the prior art *PDR 1985* and *Griffith I* and *II* references reduced Tissue Factor (TF) gene transcription, which is recognized as being regulated by NF-κB: "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237.

Thus, Cyclosporin A, as administered in the prior art *PDR 1985* and *Griffith I* and *II* references:

a. inhibited expression of a gene whose transcription is regulated by NF-κB (instant claims 1 and 2 and their dependent claims);

b. diminished NF-κB-mediated intracellular signaling (clm 6 and dependent claims); and

c. reduced NF-κB-mediated effects of external influences (claims 7 and 8 and dependent claims).

Since CsA was shown to reduce binding of NF-κB in an EMSA assay which measures binding of NF-κB to NF-κB recognition sites, *Hölschermann* confirms that the prior art administration of CsA to cardiac patients reduces NF-κB activity by "reducing binding of NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g. claims 25, 36 and 58). Additionally, because unbound NF-κB translocates to the nucleus, the reduced binding activity in the nucleus of cells reflected in *Hölschermann* means that CsA, as administered in *PDR 1985* and *Griffith I* and *II*, necessarily reduced NF-κB activity by:

a. "decreasing the level of NF-κB not bound in any NF-κB- IκB complex" (e.g. claims 20, 31 and 53); and

b. "inhibiting the passage of NF-κB into the nucleus of cells (e.g. claims 21, 32 and 54).

Furthermore, as *Hölschermann* indicates, CsA is recognized as being able to "abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB." *Id.* at 4237 (citing *Alkalay*). *Hölschermann* confirms that this effect on degradation of IκB is the mechanism by which CsA reduced NFκB in these cardiac patients. Thus, Cyclosporin A when administered to humans as in the *PDR 1985* and *Griffith I* and *II* references reduces NF-κB activity by:

a. "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g. claims 22 and 33); and

b. "inhibiting degradation of an I-κB protein" (e.g. claims 23 and 34).

Finally, as demonstrated by *Hölschermann*, the *PDR 1985* and *Griffith I* and *II* reference CsA administration to human patients reduced NF-κB activity in those patients' peripheral blood mononuclear cells (PBM's comprised of lymphocytes and monocytes) which anticipates:

(1) eukaryotic cells (claims 1-2, 5, 7 and 9);

(2) mammalian cells (claims 26, 37, 70, 82 and 94);

(3) human cells (claims 27, 38, 71, 84 and 95);

(4) immune cells (claims 28, 39, 61, 72 and 85); and

(5) lymphocyte cells (claims 29, 40, 62, 73, 86 and 97).

It is noted that the dosage and blood levels of CsA shown by *Holschermann* to reduce NF-κB activity is slightly lower than the dosages and blood levels of CsA taught in the *PDR 1985,Griffith I* and *II* references. Accordingly, an even greater reduction in NF-κB activity would result from the prior art administration of CsA to patients as described these references than shown in *Holschermann*. Moreover, regardless whether the effect of CsA in reducing NF-κB activity and resulting monocyte TF activation is direct (by directly affecting monocytes) or indirect (by interfering with stimulatory lymphocytes), *Holschermann* shows that CsA, as administered in the prior art references reduces NF-κB activity and resulting TF gene expression. Thus, its administration to cardiac transplant patients as taught in *PDR 1985*, *Griffith I* and *II* anticipates at least claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97 of the'516 patent, as set forth in more detail in *Exhibit H-1* of the 90/007,503 Request (incorporated by reference).

**B. Inherent *Anticipation by Reed (CsA reduction of* NF-κB activity *in vivo* and *in vitro* in *Human PBM Cell Cultures).***

9. Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Reed* et al., J. Immunol. 137 (7/86): 150-154 as evidenced by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Reed* teaches cyclosporin A (CsA) administration of cells, which, as is shown from *Brini*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The *in vivo* effect of CsA in reducing NF-κB activity in human PBM cells is confirmed by tests using CsA in human PBM cell cultures.

For example, *Reed* taught the prior art use of CsA in human PBM cell cultures that had been induced with phytohaemaglutinin (PHA). In particular, *Reed* teaches that CsA (1ug/ml) significantly reduced PHA induced IL-2 R alpha gene transcription (Figs. 1 and 2) and Tac antigen surface expression (Fig. 3b) in human PBM cells:

> The data presented here demonstrate that CsA and DEX concentrations that inhibited PHA-induced proliferation by about 80 to 90% diminished by about 50% (on average) the expression of receptors for IL-2 on PBMC. This inhibition of IL-2 receptor expression occurred at least in part at a pretranslational level and involved a reduction in both high affinity and low affinity forms of the receptor. *Reed* at 152.

*Reed* also found that CsA reduced IL-2 gene transcription:"1ug/ml CsA and $10^{-4}$ M DEX completely blocked the PHA-induced accumulation of mRNA for IL 2 (Fig. 2)." *Id* at 151.

Several years later, *Brini* also looked at the effect of Cyclosporin A on IL-2 Receptor-α production and Tac antigen surface expression and confirmed *Reed's* results:

> These results are in accordance with Reed et al., who found that CsA inhibits Tac induction in mitogen-activated PBMC. The CsA-mediated reduction in Tac antigen expression on T-cells was reflected by a decrease in the steady state mRNA levels of the IL-2Rα chain (Figure 2). *Brini* at 137 (citations omitted).

*Brini* then went on, however, to show that CsA, as administered in the prior art, reduced binding of NF-κB to NF-κB recognition sites for more than one NF-κB -meditated gene:

> CsA reduced the PHA-induced binding of transacting factors from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figures 3 and 4). *Brini* at 137.

Notably, *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same H1V-1 LTR site as used by the instant '516 patent to assess NF-κB activity and binding. As such

*Brini* concluded that CsA regulated IL-2Rα gene expression by reducing activation of NF-κB:

> Taken together, these results suggest that one of the effects of CsA in the regulation of the IL-2Rα chain expression in human peripheral T lymphocytes is on the activation of sequence specific DNA-binding proteins which recognize sequences containing the NF-κB binding site. *Brini* at 137.

Using the same inducer, the same immune cells, and the same concentration of CsA as in *Reed*, *Brini* showed that CsA reduced NF-κB activity and NF-κB –mediated IL-2 Receptor-α gene expression in PBM cells. In this respect, the instant '516 patent confirms that the IL-2 receptor alpha (IL-3Rα) gene is regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* and the related human T-cell culture studies discussed below confirm that CsA necessarily and inherently reduced NF-κB activity and resulting gene expression in PBM cell cultures as taught in *Reed*, thus anticipating at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97. A claim element-by-element comparison is provided in *Exhibit H-2* of the 90/007,503 Request (incorporated by reference).

**C. Inherent *Anticipation by Kronke and Siebenlist* (*CsA reduction of* NF-κB activity in vivo *and* in vitro *in Human T-Cell (Jurkat) Cell Cultures).***

10. Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by

*Kronke* et al.(PNAS USA 81 (8/84) 5214-5218) and/or *Siebenlist* et al.(Mol. And Cell Biol. 6 (9/86) 3042-3049) as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al. Science, 246 (Dec. 1989):1617-20 and the *Dr. Manolagas Declaration.* See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Kronke*, or *Siebenlist* teach cyclosporin A (CsA) administration of cells, which, as is shown from the teachings of *Schmidt and Emmel*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The effect of CsA on reduction of NF-κB activity as administered in the prior art is also confirmed by tests involving the use of CsA in human T-cell (Jurkat) cultures including two prior art references, *Kronke* and *Siebenlist*. Using the same inducers, the

same human immune cells, and the same concentration of CsA taught in *Kronke* and *Siebenlist*, *Schmidt* and *Emmel* provide confirming extrinsic evidence that the use of CsA in Jurkat cells reduced NF-κB activity. Thus, CsA is clearly recognized to have necessarily and inherently reduced NF-κB activity and resulting gene expression in those cells as called for by the instant claims. *Kronke* and *Siebenlist* each disclosed the use of phytohaemaglutinin (PHA: 1ug/ml) and PMA (50ng/ml) to induce human T-cells (Jurkat cells). These compounds are described in the instant '516 patent as being inducers of NF-κB activity (see e.g., '516 patent, col. 33, lines 52-59). *Kronke* and *Siebenlist* also reported on the effect of 1ug/ml CsA (among other concentrations) on the cell cultures. Both references report that IL-2 (also known as "TCGF") gene transcription and/or expression was increased with administration of the NF-κB inducers phytohaemaglutinin (PHA) and phorbol 12-myristate-13-acetate (PMA), and that such induced IL-2 expression was reduced by CsA:

> The results of our study demonstrate that TCGF [IL-2] mRNA accumulation in induced Jurkat cells is diminished by CsA in a dose-dependent manner and that CsA acted by blocking TCGF mRNA transcription. *Kronke at page 5217.*
>
> * * * *
>
> CsA at 1 ug/ml ... prevented IL-2 message induction. *Siebenlist at page.3044, Fig. 2.*

Using the same conditions and the same EMSA and CAT reporter assay formats as described in the instant '516 patent, the *Schmidt* reference clearly demonstrates that CsA as utilized in the *Kronke and Siebenlist* references reduced NF-κB activity in Jurkat cell cultures. *Schmidt* reported, however, that there were inducers of NF-κB,

which had different mechanisms of induction than PHA-induction, for which CsA had no effect. Specifically, *Schmidt* found that phorbol 12-myristate-13-acetate (PMA)-mediated induction of NF-κB activity was not affected by CsA. The NF-κB CAT reporter assay confirmed this data, as depicted in Figure 4 ("CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039).

Similarly, *Emmel* describes the effect of 1ug/ml of CsA on NF-κB activity in Jurkat cells that had been induced with both PHA and PMA. As shown in Figure 1, 1ug/ml CsA (among other concentrations), reduced NF-κB activity ("NF-κB binding was reduced 10-20% in nuclear extracts of CsA-treated cells": *Emmel* at 1618). Furthermore, a CAT assay confirmed these results, as shown in Figure 2d (*Emmel* at 1618) which demonstrates that CsA significantly reduced NF-κB activity at the same 1ug/ml concentration taught in *Kronke* and *Sibenlist*, as shown by the reduced expression of the NF-κB regulated CAT gene in those cells.

Thus, as discussed above, and in the *Dr. Manolagas Declaration* (*Exhibit J:* paragraphs 25-32 of 90/007,503 request: incorporated by reference), Schmidt and Emmel confirm that *Kronke* and *Siebenlist,* which disclose the inhibitory effect of CsA on NF-κB activity in Jurkat cell cultures, anticipate claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97of the '516 patent (and as shown in *Exhibit H-3* of 90/007,503 request: incorporated by reference).

**III. VITAMIN D (CALCITRIOL) (references prior to 12/24/86): inherent anticipation by *Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I* and *Rigby II* (Calcitriol reduces NF-κB activity *in vivo* and *in vitro* in human cell cultures).**

11. Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Tsoukas* (Science 224 (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74 (8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. 74 (10/84) 1451-5) or *Rigby II* (J. Immunol. 135 (10/85) 2279-86) and *Manolagas* et al. (JCE&M, 63(1986) 394-400 as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the *Declaration of Dr. Manolagas* (paragraphs 7-24) provided in the 90/007,503 request. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Tsoukas*, *Manolagas*, *Lemire I*, *Lemire II*, *Rigby I*, or *Rigby II* teach administration of calcitriol to humans, which, as is shown from the teachings of *Yu,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

Calcitriol (1,25-dihydroxyvitamin $D_3$) is the active form of Vitamin D that has been administered to humans for decades.

There are numerous prior art publications that report the study of calcitriol in various human cell cultures, including human Jurkat (T-cell line) leukemic cells (citations omitted) and human peripheral blood monocyte ("PBM") cells, including *Tsoukas* (PBM), *Manolagas* (PBM) *Lemire I*, *Lemire II Rigby I* and *Rigby II. Tsoukas and Manolagas* teach that the administration of calcitriol (at least $10^{-8}$ M) in PBM cells reduced IL-2 activity; a result which was confirmed by *Lemire I, Rigby* and *Lemire II* (e.g. *Lemire II* at 3034 demonstrated that calcitriol exhibited "a dramatic and specific reduction of IL-2 production by activated PBM ...").

Independent studies show that IL-2 expression is regulated, at least in part, by NFκB . See *Manolagas Declaration* at page 8, paragraph 15 and documents cited therein.

*Yu* et al. under the same conditions utilized in *Tsoukas* and *Manolagas* (i.e. calcitriol application to PHA activated PBM cells) found that calcitriol reduced NF-κB as well as NF-κB –regulated gene expression in PBM cell cultures. *Yu* described the use of Electrophoretic Mobility Shift Assays ("EMSAs" as in Ex.15 of the instant '516 patent) and the NF-κB binding sequence of human IL-6 promoter to demonstrate (by EMSA) that calcitriol administration "caused a significant reduction in the DNA-protein complex, as evidenced by the decrease in the intensity of this band (lane 4)" (see *Yu* at 10993 and Fig. 5). This data was confirmed using Western blot analyses (Figs. 1 and 3), which showed that calcitriol added to PHA-activated cells (as taught in *Tsoukas* and

*Manolagas*) "caused a significant decrease in the expression of p50 [subunit of NF-κB] at all time points examined". *Id.* at 10991-2. In an analogous manner in human Jurkat leukemic cells transfected with a CAT gene regulated by NF-κB and activated with PHA, *Yu* found that calcitriol cell application resulted in reduced NF-κB gene expression. See Yu at 10993.

Although the mechanism may not have been known at the time of the *Tsoukas, Manolagas* , *Lemire I,* Lemire II *Rigby I and Rigby II* publications, the *Yu* reference evidence proved that the administration of calcitriol by these prior art references necessarily and inherently reduced NF-κB activity in induced human cells (PBM/Jurkat) and reduced expression of NF-κB-regulated proteins (IL-2). Thus, these prior art references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent as shown on an element-by-element basis in *Exhibit H-4, H5 and H6* of the 90/007,503 request (incorporated by reference).

**IV. 5-ASA (references prior to 12/24/86): inherent anticipation by *Dew.***

12. Claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Dew* (Br. Med. J. 287 (7/83):23-24) as evidenced by *Baldwin II*, J. Clin. Invest. 107(1991):63-80, *Bantel* et al. (Amer. J. Gastroenterology 287 (2000):3452), *Yan* et al. (J. Biol. Chem. 274 (1999) 366631-36) and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application which issued as the Baltimore '526 patent. See MPEP 2131.01 (evidence of inherency).

**Summary:** *Dew* teaches administration of 5-ASA for the treatment of ulcerative colitis in humans, which inherently reduced NF-κB activity in the cells of the patients, by a mechanism including phosphorylation of IκB.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

*Dew* teaches the administration (oral delayed release of up to 4.4 g/day) of 5-aminosalicyclic acid (5-ASA) to humans for the treatment of ulcerative colitis (an inflammatory bowel disease).

Ulcerative colitis is recognized as being associated with NF-κB activation. See *Baldwin II* at Table 1.

*Bantel* conducted *in vivo* tests (tissue sample immunostaining using p65 NF-κB subunit antibody before/after 5-ASA administration) on human ulcerative colitis patients administered the same 5-ASA formulation (tradename MESALAZINE) in the same amounts (from 1.7-4.5 g/day) as in the *Dew* reference and reported that 5-ASA administration reduced NF-κB activity in the cells of these patients. *Bantel* at 3453. Specifically, *Bantel* found that (1) NF-κB activity is increased in patients with ulcerative colitis, and (2) therapeutic administration of 5-ASA (as in *Dew*) effectively reduced NF-κB activity in these patients. *Id.* at 3454-55. Accordingly, *Bantel* concluded that "5-ASA

is a potent inhibitor of NF-κB activation *in vivo*," at dosage levels and under the same conditions taught in *Dew. Id.* at 3456. Thus, *Dew's* administration of 5-ASA for ulcerative colitis inherently and necessarily reduces NF-κB activity in human cells.

Moreover, during prosecution of the Baltimore 08/464,364 application, while referring to the *Yan* reference (cited above), *Dr. Baltimore in his declaration* admitted that 5-ASA reduces NF-κB activity as in the instant '516 patent claims: "Treatment of cells with such compounds as ... 5-aminosalicyclic acid ... inhibits NF-κB mediated gene expression by a mechanism which includes inhibition of phosphorylation of I-κB proteins"(which is the naturally occurring NF-κB inhibitor). See *David Baltimore Declaration* paragraph 9.

Accordingly, the prior art *Dew* administration of 5-ASA necessarily and inherently reduced NF-κB activity and, thus anticipated at least claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 as shown on an element-by-element basis in *Exhibit H-7* (herein incorporated by reference) provided by the requester in the 90/007,503 proceeding.

**V. GLUCOCORTICOIDS (references prior to 12/24/86): inherent anticipation by 1970 PDR, Lefring, Nagasawa, or Rovera**

13. Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *1970 PDR, Lefring et al.* (Crit. Care. Med. 23 (7/95) 1294-1303: References Cited Therein), *Nagasawa* et al. (J. Cell. Phys. 109 (1981) 181-192), or *Rovera* et al. (Science 204 (1979) 868-970) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14

(1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (raised by Examiner). See MPEP 2131.01 (inherency evidence).

**Rejection Summary:** *1970 PDR, Lefring, Nagasawa, and Rovera* teach administration of glucocorticoids (e.g. dexamethasone) to control inflammation in diseases such as rheumatoid arthritis, which inherently reduces NF-κB activity that inhibits NF-κB - associated cytokine gene expression.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

Glucocorticoids, such as dexamethasone, were conventionally used to treat inflammatory and allergic conditions (including asthma and arthritis) and bacterial infections in the 1950's (see *Lefring* and prior art cited therein) and approved for human therapeutic use under the trade name DECADRON (see 1970 PDR). Additionally, the prior art discloses the use of the dexamethasone in human cell culture tests. For example, *Nagasawa* taught the induction of human leukemic T-Cells (MOLT-3) by TPA, followed by the administration of $10^{-6}$ M (1uM) dexamethasone. See *Nagasawa* at 185, Table 2. Similarly, *Rovera* taught the induction of human leukemic cells (promyelocytes

and mature myeloid cells) with TPA, also followed by administration of $10^{-6}$ M (1uM) dexamethasone. See *Rovera* at 869, Table 1.

However, it has been known since the mid-1990's, that glucocorticoids effect their immunosuppression by reducing NF-κB activity by preventing NF-κB from binding to the appropriate sites on the DNA and/or by increasing the transcription, expression and/or release of IκB, thereby reducing the amount of activated NF-κB that can translocate into the nucleus. In this regard, several publications cited by Dr. Baldwin in his 1996 review article (*Baldwin I*), including the *Auphan*, *Scheinman I*, *Schmeinman II and*, *Mukaida,* in addition to the *Padgett* document, provide extrinsic evidence that administered glucocorticoids (as described in*1970 PDR* in *Lefring Nagasawa* and *Rovera references),* such as dexamethasone and cortisol, are recognized to *necessarily and inherently* reduce NF-κB activity and concomitant cytokine production,

**a) Extrinsic Evidence of Inherency as Provided by *Auphan***

Auphan describes methods for reducing NF-κB activity in an induced leukemic T-cell line at the same $10^{-6}$ concentration of dexamethasone taught by *Nagasawa* and *Rovera*. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA as described in *Nagasawa* and *Rovera* and used EMSA, as described in the'516 Baltimore patent, to demonstrate NF-κB activity. See *Auphan* at 287-8. Auphan then exposed the cells to $10^{-6}$ M dexamethasone. Id. Auphan reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility shift assays (EMSAs) revealed that both AP-l and NF-κB DNA binding activities were elevated in nuclear extracts of activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB

> binding activity and reduced the amount of AP-1 binding activity . . . . DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo (Fig. 1D).
>
> * * *
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat human T cell leukemia line stably transfected with a GR expression vector (Fig. 2A). . . .Inhibition of NF-κB activity was also observed in cells stimulated by either 12-O-tetradecanoryl-phorbal13-acetate (TPA) alone or by tumor necrosis factor (TNF-α). Id. (citations omitted).

As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the transcriptional activation of the I-κBα gene" in these human leukemic cells and therefore, "by upregulating I-κBα protein levels, function to block nuclear translocation of NF-κB and DNA binding." *Baldwin* at 671. As discussed below, Dr. Baldwin's own results, as reported in the *Scheinman II* document discussed below, confirms this mechanism for glucocorticoid action.

**b) Extrinsic Evidence of Inherency as Provided by *Scheinman I & II***

*Scheinman I* and *Scheinman II* confirm that dexamethasone, as used in the prior art, reduces NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures. *Scheinman I* at 944. NF-κB activity was measured in at least two assay formats disclosed in the Baltimore '516 patent (EMSA and reporter assays) as well as Western blot immunological assays. Dexamethasone was shown (Figs 1A and B; Fig. 4; and Fig. 7) to reduce endogenous NF-κB activity in cells ("Pretreatment with DEX resulted in a profound loss of TNF-α induced NF-κB as well as p50 homodimer (KBF1) gel shift activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not

shown)." *Id* at 949. *Scheinman I* concluded that dexamethasone reduces NF-κB activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also block their ability to bind DNA. In addition, we present new data showing that dexamethasone (DEX) treatment of HeLa cells causes a significant reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able to inhibit NF-κB activity by a novel mechanism involving a block of cytokine-induced nuclear translocation.
>
> * * *
>
> With EMSA analysis, we found that DEX treatment caused a marked reduction in the ability of NF-κB /Rel subunits to bind DNA despite the presence of equal amounts of NF-κB subunit protein in the EMSA DNA-binding reaction mixtures (Fig. 5, EMSA). *Id.* at 944,948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same $10^{-7}$ M concentration as *Scheinman I* (and at a 10 fold lower concentration than taught in *Nagasawa* and *Rovera*), reduces NF-κB activity as called for by the claims that are the subject of this reexamination request. *Scheinman II* confirmed the *Auphan* conclusion that dexamethasone inhibits TNF-α induced NF-κB activity, at least in part, by inducing the transcription of the IκB-α gene:

> Together, these data indicate that DEX treatment induces the transcription of the IκB-α gene. This induction results in the increased syntheses of the IκB-α protein. This increase in protein synthesis leads to the rapid turnover of the IκB-α protein associated with preexisting NF-κB complexes. In the presence of an activator such as TNF-α, newly released NF-κB reassociates with the DEX-induced Iκ-Bα and thus reduces the amount of NF-κB translocating to the nucleus. *Scheinman II* at 286.

**c) Extrinsic Evidence of Inherency as Provided by *Mukaida***

*Mukaida* provides extrinsic evidence that the 1970 PDR, the studies described in *Lefring*, *Nagasawa*, and *Rovera* inherently anticipate the subject claims. *Mukaida*

observed that IL-8 production was mediated by NF-κB in all cells they previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-κB-regulated IL-8 production by more than 60% at concentrations equal to and higher than $10^{-8}$M. *Id* at 13290.

**d) Extrinsic Evidence of Inherency as Provided by *Padgett***

Consistent with the *Scheinman* II and *Auphan* references, *Padgett* teaches that the body responds to external stressors by release of glucocorticoid hormones, including cortisol, which binds glucocorticoid receptors expressed on a variety of immune cells to interfere with NF-κB function, resulting in reduced cytokine production. See Abstract; p.445 (right column) to p. 446; footnotes 32 and 33; and p. 447 under "Conclusions".

Thus, the prior art use of corticosteroids (dexamethasone, cortisol) are now recognized as inherently reducing NF-κB activity as called for by the subject claims of the Baltimore '516 patent. See 90/007,503 *Exhibit H8* claim analysis herein incorporated by reference.

**VI. ANTIBIOTICS (references prior to 12/24/86): inherent anticipation by 1970 PDR**

14. Claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 are rejected under 35 U.S.C. 102(b) as being anticipated by *1970 PDR* as evidenced by the *Manolagas declaration, Galdiero et al.* (Microbiology, 147 (2001): 2697-2704), *Yang* et al. (Nature 395 (1998) 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. (J. Immunology

175(2005) 8069-8076) (newly raised by the Examiner). See MPEP 2131.01 (evidence of inherency, including extrinsic publications of any date and intrinsic evidence using applicant's own specification: see *Ex parte Novitski* cited therein).

**Rejection Summary:** As detailed in *Exhibit H-10* of the 90/007,503 request (herein incorporated by reference), *1970 PDR* teaches administration of antibiotics such as erythromycin, gentamicin, and tetracycline to kill bacteria in animals. As evidenced by the *Manolagas declaration*, gram (-) bacteria produce lipopolysaccharides (LPS) which induce NF-κB regulated cytokine production. Antibiotics that kill gram-negative bacteria thereby act to inherently reduce LPS-induced and NF-κB-regulated cytokine production.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claims 5 and 18) and reduce the effects of bacterial lipopolysaccharides (claims 12-17) on eukaryotic (e.g. mammalian) cells.

The instant claims are drawn to a method of inhibiting NF-κB activity (e.g. diminishing bacterially LPS induced NF-κB expression of cytokines mediated, for example, through intracellular signaling: in claims 6-10) and associated gene (claims 1-2) expression (e.g. of a cytokine protein: claim 5) in a eukaryotic cell.

The *1970 PDR* teaches the administration of antibiotics (erythromycin, gentamicin, tetracycline) to treat gram-negative bacterial infections. Erythromycin, for

example, is active against *H. pertusis.* infections (*Id.* at 1379); and gentamicin sulfate (trade name GARAMYCIN) treats infections caused by *Pseudomona aeruginosa, Aerobater aerogenes, E.coli, Proteus vulgaris,* and *Klebsiella pneumoniae* (*Id.* at 1167). Tetracycline is a broad spectrum antibiotic (trade name SUMYCIN) which treats a variety of infectious gram (-) bacteria, including *E. coli* and *Shigella* (*Id* at 1309).

Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-κB activity resulting in the production of cytokines regulated by NF-κB. Cytokines whose genes are regulated by NF-κB (at least in part) include tumor necrosis factor alpha (TNF-α) and interleukins 2, 6, 8 and 10 (IL 2, 6, 8 and 10). E.g., *Galdiero*; *Yang;* and *Mori*. As noted in *Galdiero* (page 2700), "The lowest concentration of LPS able to induce cytokine release was 10 ng $ml^{-1}$".

Once produced by gram-negative bacteria, LPS activates NF-κB, which translocates to the nucleus and binds to the NF-κB recognition sites on genes that are regulated, at least in part, by NF-κB. E.g., *Baltimore patent*, Col. 2, lines 54-57 ("Release of active NF-κB from the I-κB- NF-κB complex has been shown to result from stimulation of cells by a variety of agents, such as bacterial lipopolysaccharide ... "). In treating gram-negative bacterial infections, antibiotics kill bacteria or impair bacterial function thereby reducing bacterial production of LPS (*Manolagas Declaration*, paragraphs 33-40). For example, erythromycin has been shown to inhibit the activation of NF-κB in T cells; and in normal and inflamed human bronchial epithelial cells along with modulating IL-8 expression. See *Yasutomi* et al. at page 8068 at the bottom of the right column and footnotes 5-7 (citations therein). *Yasutomi* further demonstrated the

ability of tetracycline to inhibit lipopolysaccharides and NF-κB activation in human monocyte-derived dendritic cells and suppress NF-κB induced cytokine (e.g. IL-6, 10, 12p70, 13 and IFN-γ ) production. See Abstract, page 8071-3, see Table 1 and Figures especially 1-3 and 8.

Thus, by blocking LPS that reaches the cell, administration of the *1970 PDR* antibiotics to combat gram-negative bacterial infections would necessarily reduce NF-κB activity in human cells and thereby reduce cytokine expression. As such, as shown on an element-by-element claim basis in *Exhibit H-10* of the 90/007,503 request (incorporated by reference), the 1970 PDR antibiotics would inherently anticipate the subject claims requiring LPS-induced NF-κB activity.

**VII. RED WINE (e.g. RESVERATROL) (references prior to 12/24/86): inherent anticipation by *King James Version Bible* (1611), *St. Leger, Dobrilla*, or *Jones***

15. Claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 are rejected under 35 U.S.C. 102(b) as being anticipated by *King James Version Bible* (1611) (excerpts), *St. Leger* (The Lancet (5/79) 1017-20), *Dobrilla* (Hepato-Gastroenterol. 31 (2/84) 35-37), and *Jones* (Pharm. & Tox. 60 (3/87) 217-20) as evidenced by *Blanco-Colio* (Circulation 102 (8/00) 1020-6), *Holmes-McNary/Baldwin* (Cancer Res. 60 (7/00) 3477-83) and *Manna* (J. Immunol. 164 (2000) 6509-6519). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** As pointed out in *Exhibit H-9* of the 90/007,503 request (herein incorporated by reference), the *King James Version Bible* (1611), *St. Leger*, *Dobrilla*,

and *Jones* teach consumption of red wine that inherently inhibits NF-κB as a part of its activity.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression in a eukaryotic cell.

The human consumption of red wine harkens back to the *King James (1611) version of the bible*:

> **Luke 10:34** And went to him, and bound up his wounds, pouring in oil and wine, and set him on his own beast, band brought him to and in and took care of him.
>
> **1 Timothy 5:23** Drink no longer water, but use a little wine for thy stomach's sake and thine often infirmities.
>
> **Isaiah 27:2** In that day sing ye unto her, A vineyard of red wine.
>
> **Psalms 75:8** For in the hand of the LORD there is a cup, and the wine is red ... and drink them.
>
> **Proverbs 23:31** Look not thou upon the wine when it is red ... .

More recently, a study conducted in the late 1970's comparing cardiac problems with factors such as wine, cigarette, and fat consumption obtained a surprising result: France, the country with the highest per capita consumption of wine and a very high consumption of fats, had the lowest rate of cardiac-disease related deaths (*St. Leger*). This effect became known as the "French Paradox" and as discussed below (and as

admitted by the Patentees), the French Paradox is now recognized as being at least in part a result of red wine's inhibitory effect on NF-κB and resulting gene expression.

*Dobrilla and Jones*, like *St. Leger*, conducted studies evaluating the effects of red wine and foods which involved the human consumption of substantial amounts of red wine (20-33 fluid ounces and 33-50 fluid ounces, respectively) along with fatty foods (ham sandwich and potato chips and cheese).

*Blanco-Colio* provides extrinsic evidence that *St. Leger*, *Dobrilla* and *Jones* inherently anticipate the subject claims. The *Blanco-Colio* study determined that just 4-8 fluid ounces of red wine (significantly less than consumed in *Dobrilla, Jones* or *St. Leger*-taken with fatty foods) were sufficient to reduce NF-κB activity that had been induced by consuming triglycerides. *Blanco-Colio* at 1023, Fig. 2. The authors isolated PBM cells from volunteers at various points in time after food and wine consumption. *Id.* at 1021. NF-κB activity initially increased, induced by post-prandial lipemia resulting from the consumed triglyceride lipoproteins (*Blanco-Colio* at 1022), but after 6-9 hours, patients receiving red wine saw a significant reduction of NF-κB activity:

> In conclusion, red wine intake ... prevents NF-κB activation in PBMC's elicited in healthy volunteers by postprandial lipemia. Because NF-κB activation is involved in the pathogenesis of atherosclerotic lesions, the inhibitory effect of red wine on NF-κB activation provides a further explanation of the beneficial effects of red wine intake in cardiovascular disease. *Blanco-Colio* at 1025.

Thus, the reduction in NF-κB activity caused by red wine consumption (at levels within the range of common human intake) necessarily and always inherently reduces the

expression of NF-κB-regulated proteins that are involved in the development of atherosclerotic lesions.

The recognized inherent effects of red wine on NF-κB activity are attributed to the flavenoids and other compounds contained in red wine, including resveratol ("Res"). In this regard, Dr. Baldwin, one of the patentees, published a report confirming that resveratrol is recognized as a potent inhibitor of NF-κB activity and resulting gene expression:

> Res was shown to be a potent inhibitor of both NF-κB activation and NF-κB-dependent gene expression through its ability to inhibit IκB kinase activity, the key regulator in NF-κB activation, likely by inhibiting an upstream signaling component. In addition, Res blocked the expression of mRNA-encoding monocytes chemoattractant protein-1, a NF-κB-regulated gene. *Holmes-McNary/Baldwin* at 3477.

Moreover, Patentee's own publications have confirmed that the inhibitory effect of compounds in red wine, such as resveratrol, on NF-κB activity is largely responsible for the French paradox:

> Extensive data are now accumulating that dietary constituents can strongly influence the potential for disease outcome. In epidemiological studies, red wine consumption was shown to have numerous protective effects, and Res has been shown to be responsible for those beneficial effects. In particular, a phenomenon defined as the "French paradox" has emerged, which is the association of reduced mortality from coronary disease and breast cancer. Although, it is well established that naturally occurring compounds function as chemopreventive agents, the physiological mechanisms of these dietary constituents as extracelluair signals involved in transcription activation are only presently emerging. *Holmes-McNary/Baldwin* at 3481 (citations omitted).

Thus, *Holmes-McNary/Baldwin* (Patentee's own publication) confirms the results on NF-κB activity that were disclosed in *Blanco-Colio* and helps to explain the mechanism by which red wine constituents necessarily inherently inhibits NF-κB activity.

*Manna* also provides extrinsic evidence that *St. Leger*, *Dobrilla* and *Jones* inherently anticipate the subject claims. Similar to *Blanco-Colio*, *Manna* looked at the effect of resveratrol on NF-κB activity induced by a large range of inducers, including TNF and LPS, and in a wide range of cells. *Id.* at 6511,6514. *Manna's* conclusion affirmed that resveratrol, as found in red wine, reduced NF-κB activity and NF-κB-mediated gene transcription in all cell types and with all inducers tested:

> We found that resveratrol is indeed a potent inhibitor of TNF-induced activation of NF-κB, and this inhibition is not cell type specific. The suppression is observed in both normal and tumor cells. Besides TNF, resveratrol also blocked NF-κB activation induced by a wide variety of other inflammatory agents. NF-κB-dependent report gene transcription was also suppressed by resveratrol. *Id.* at 6516. See also *id.* at 6512-13, Figs. 2, 4 and 5.

Moreover, the effects of resveratrol were found at concentrations that are achievable by normal red wine consumption:

> Considering that each gram of fresh grape skin contains 50-100 μg (200-400 μM) resveratrol and red wine has 1.5-3 mg/L, this suggests that resveratrol concentration used in our studies is achievable *in vivo* by consumption of grapes or red wine. Id. at 6517 (citations omitted).

In short, any time someone, over the last several hundred or thousand years, drank even a moderate amount of red wine with food containing significant fats (e.g., the typical French diet) they were reducing NF-κB activity (and concomitant NF-κB mediated gene expression) that had been induced by the fat content in the food. The

consumption of red wine, as taught in *Dobrilla* and *Jones,* thus inherently reduces NF-κB activity and concomitant NF-κB mediated gene expression. The table in *Exhibit H-9* provided with the 90/007,503 request (incorporated by reference), sets forth, on an element by element basis, how the instant claims are inherently anticipated by The *King James Version Bible* (1611), *St. Leger*, *Dobrilla*, or *Jones references.*

**VIII. N-ACETYL-L-CYSTEINE (intervening prior art): *Express anticipation by Staal.***

16. Claims 18 and 182-185 are rejected under 35 U.S.C. 102(a) as being anticipated by *Staal* et al. *Proc. Nat'l Acad Sci* 87 :9943 (Dec. 1990) ('7828 appendix E: incorporated by reference).

**REJECTION SUMMARY:** *Staal* et al. (see Abstract; page 9945; Figures 4-5) disclose a method of inhibiting TNF-α by blocking NF-κB activation in mammalian cells (e.g. Jurkat cells) by administration of N-acetyl-L-cysteine (NAC).

Instant claim 18 recites: A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor necrosis Factor-α in the cells.

*Staal* teaches a method of inhibiting TNF-α activation and, thus, signaling, in mammalian cells by reducing NF-κB activity. Specifically, *Staal* discloses inhibiting TNF-α stimulation of 293.27.2 and Jurkat cells by selectively blocking NF-κB activation by administration of N-acetyl-L-cysteine (NAC). See Abstract, and Fig. 5. Reduction of intracellular TNF- α signaling is demonstrated by decreased expression of a beta-galactosidase reporter gene in Jurkat cells, which are mammalian (human) in origin. See Fig. 4. Accordingly, claim 18 is anticipated.

Instant claim 182, depending from claim 18, further recites that reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. *Staal* anticipates claim 182 by teaching that high thiol levels (resulting from NAC administration) inhibit NF-κB activation by preventing phosphorylation of I-κB, since phosphorylation of I-κB is necessary for dissociation of NF-κB from its complex with I-κB. Since NAC administration keeps NF-κB complexed to its naturally occurring inhibitor I-κB, NF-κB is unavailable for binding NF-κB recognition sites on genes that are transcriptionally regulated by NF-κB. Thus, instant claim 182 is anticipated since NAC-mediated inactivation of NF-κB described in *Staal* inherently and necessarily results in reduced NF-κB binding to its recognition sites.

Instant claims 183-185, depending from claim 18, are also anticipated by *Staal*. These claims further require that the method is carried out on human cells (claim 183), immune cells (claim 184) and lymphoid cells (claim 185). *Staal* discloses NAC inhibition of TNF- α stimulation in Jurkat cells (see Fig. 4, p. 9945) which are cells derived from a human T-cell leukemia cell line, and, thus, are human, immune and lymphoid anticipating claims 183-185.

**IX. NUCLEIC ACID DECOYS: (intervening prior art): *Express anticipation by Bielinska***

17. Claims 1, 2, 20, 25-29, 31, 36-40 and 203 are rejected under 35 U.S.C. 102(a) as being anticipated by *Bielinska* et al. *Science* 250 :997 (Nov. 16, 1990) as evidenced by *Ho*, PNAS USA 86 :6714 (1989) for purposes of defining clone 13B cells disclosed in

*Bielinska.* See MPEP 2131.01: Multiple Reference 35 U.S.C. 102 Rejections (primary reference term meaning) ('7828 Appendix D: incorporated by reference).

**Rejection Summary:** *Bielinska* (e.g. at pages 197-198 and Fig. 1) discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 13 B-lymphoblastoid cells.

*Bielinska* discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 12 B-lymphoblastoid cells. See, e.g., p. 997, Abstract at mid-paragraph and p. 998 right hand column and Fig. 1D. Specifically, *Bielinska* discloses the use of phosphoroothioate oligonucleotides as decoy molecules that competitively bind NF-κB in clone 13 B cells. Id. These cells contain an HIV-CAT reporter gene construct that is transcriptionally- regulated by NF-κB by two κB binding sites found within the HIV enhancer. Fig. 1, and middle of right column on page 997.

*Bielinska* teaches that phosphorothioate oligonucleotides having an NF-κB binding site consensus sequence, GGGGACTTTCC (the same as disclosed in the instant '516 patent in Table 2 at col. 37), competitively bind NF-κB, reducing the amount of NF-κB/HIV enhancer-regulated transcription of chloramphenicol acetyltransferase (CAT). See p. 1000, fn. 19. Administration of these NF-κB decoy molecules in clone 13 cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998, right-hand column next to Fig. 1D.

Thus, *Bielinska* teaches reducing NF-κB activity in eukaryotic cells such that expression of a gene whose transcription is regulated by NF-κB is inhibited, as required

by instant claims 1 and 2. Specifically, as discussed above, *Bielinska* teaches a method of inhibiting expression of NF-κB/HIV enhancer-regulated CAT clone 13B lymphoblastoid cells. See e.g. p. 998, right-hand column next to Fig. 1D. This decrease in NF-κB is accomplished by administration of double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC. See p. 1000, fn 19.

*Bielinska* also teaches the methods of instant claims 20, 25-29, 31 and 36-40, which depend from claims 1 and 2.

Instant claims 20 and 31 are drawn to a method wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:I-κB complex. These claims are anticipated by the *Bielinska* teaching (discussed *supra*) that double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC, competitively bind NF-κB in clone 13B cells since binding of NF-κB by a decoy molecule necessarily decreases the amount of free NF-κB in the cell which necessarily decreases the level of NF-κB not bound in an NF-κB:I-κB complex.

Instant claims 25 and 36 are drawn to a method wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. As discussed for dependent claims 20 and 31, *Bielinska* discloses double-stranded oligonucleotide phosphorothioates that compete with the NF-κB binding site, thus reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

Instant claims 26-29 and 36-40 are drawn to reducing NF-κB activity in a cell resulting in inhibited expression of a gene regulated by NF-κB, wherein the method is carried out on mammalian cells (claims 26 and 37), human cells (claims 27 and 38), immune cells (claims 28 and 39) and lymphoid cells (claims 29 and 40). The *Bielinska* clone 13 B cells are human B lymphoblastoid cells and are thus, mammalian, human, immune, and lymphoid cells, as recited in the instant claims. See *Bielinska* p. 998 (left hand column at top) and *Ho* provided in Appendix C.   *Bielinska* also anticipates instant claim 203 which is drawn to:

> A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes an NF-κB binding site that binds to NF-κB.

As discussed above, *Bielinska* teaches a method of inhibiting expression of a CAT reporter gene using a nucleic acid decoy molecule. Transcription of the CAT reporter gene is regulated by an NF-κB/HIV enhancer and the *Bielinska* decoy molecule possesses the NF-κB binding site consensus sequence GGGGACTTTCC disclosed in the instant patent.  *Bielinska* teaches that introduction of this NF-κB decoy molecule into the clone 13B cells inhibits HIV-CAT expression by more than 80%.  See, e.g., p. 998, right hand column next to Fig. 1D. Therefore, *Bielinska* teaches each and every element of instant claim 203.

**X. NUCLEIC ACID DECOYS: Obviousness (references prior to 12/24/86)**

18. Claim 203 is rejected under 35 U.S.C. 103(a) as being unpatentable over *Baldwin and Sharp*, Proc. Nat'l Acad Sci 85:723 (Feb. 1988) in view of *Schorpp* et al. J. Mol. Biol. 202:307 (1988); . *Li* et al. Mol. Cell. Biol. 8:432 (1988); *Hai* et al. Cell 54 :1043 (1988) ; *Chu* et al. Nucleic Acids Res. 15:1311-1326 (1987); and *Molecular Biology of THE CELL*, 2nd Ed. (1989) page 423 ('7828 Appendix F: incorporated by reference.

**Rejection Summary:** *Baldwin and Sharp* disclose (e.g. pages 724-725; Fig. 2) the use of various DNA probes to compete for NF-κB binding in nuclear extracts of various mammalian cell types. Additionally, the *Schorpp* et al., *Li* et al. and *Hai* et al. references teach that oligonucleotides that specifically and competitively bind a transcription factor reduce expression of a gene controlled by the transcription factor. Further, *Chu* teaches methods for transfection of oligonucleotides (e.g. DNA) into eukaryotic cells, which once introduced into cells, readily enter the nucleus through pores. See *Molecular Biology of THE CELL* at p.423.

Claim 203 is drawn to a method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes an NF-κB binding site that binds to NF-κB.

*Baldwin and Sharp* disclose the use of various DNA probes to compete for NF-κB binding in nuclear extracts of various cell types including mammalian cells. See Materials and Methods, p. 723. One such probe, the k3 probe, contains the NF-κB

binding site. See p. 724, Fig. 1. Competitive DNA binding assays demonstrating the ability of k3 probe and kappa enhancer to compete for NF-κB binding are also described. See Fig. 2b, page 724; left-column of page 725.

The *Baldwin and Sharp* reference teaching differs from the instantly claimed method by failing to disclose the use of its NF-κB binding DNA probes (k3 probe) as a means of inhibiting NF-κB regulated gene mammalian gene expression.

*Schorpp* et al., *Li* et al. and *Hai* et al. references teach that oligonucleotides that specifically and competitively binds a transcription factor would reduce expression of a gene controlled by the transcription factor; and thus these references provide motivation to one of ordinary skill in the art to utilize the Baldwin and Sharp NF-κB binding DNA probes to inhibit mammalian gene expression regulated by NF-κB.

Specifically, *Schorpp* teaches that a double-stranded oligonucleotide (HP1), which contains a cis-element region specifically inhibits the transcription of a synO-TG reporter gene in rat liver nuclear extract. *Schorpp* states, "If binding is a prerequisite for HP1 function, addition of an oligonucleotide containing HP1 might compete with transcriptional activation. See p. 317, right hand column. Moreover, *Schorpp's* data shows that "transcription of synO-TG is inhibited by added HP1 oligo." *Id.*; see Fig. 10.

Similarly, *Li* teaches that inclusion of a double-stranded oligonucleotide containing hepatocyte nuclear factor HNF-1 and HNF-2) binding region inhibits transcriptional activity of the nuclear transcription factor in liver nuclear extracts. page 4362, Abstract, p. 4366 (right hand column); page 4367 and Fig's 6 and 7.

Analogously, *Hai* teaches that mammalian transcription factor ATF-dependent transcription of E4 is inhibited by a double-stranded oligonucleotide containing an ATF binding site. Pages 1043-4.

Additionally, methods for introducing exogenous DNA into mammalian cells were known in the art. For example, *Chu* teaches that "[a] large number of methods are used" for transfection of DNA into eukaryotic cells, including protoplast fusion, DEAE dextran, calcium phosphate co-precipitation with either DNA or recombinant bacteriophage. Page 1311, first paragraph. Further, once introduced into cells, oligonucleotides readily enter the nucleus through nuclear pores on the nuclear membrane:

> A protein of 17,000 daltons equilibrates between cytoplasm and nucleus within 2 minutes; a protein of 44,000 daltons takes 30 minutes to equilibrate; while a globular protein larger than about 60,000 daltons seems hardly able to enter the nucleus at all. Molecular Biology of THE CELL, 2nd Ed. (1989) page 423, lines 11-15.

In accordance with this teaching an oligonucleotide smaller than 60,000 daltons (e.g. 245 nucleotides or less) can enter the nucleus by equilibration.

Thus, it would have been *prima facie* obvious to one of ordinary skill in the art at the time the instant invention was made to utilize the *Baldwin* and *Sharp* NF-κB binding DNA probes to inhibit gene expression regulated by NF-κB in mammalian cells since one would be motivated to utilize the *Baldwin and Sharp* NF-κB binding DNA probes as inhibitors of proteins regulated by NF-κB as suggested by *Schorpp* et al., *Li* et al. and *Hai* et al. references utilizing conventional transfection techniques as taught by *Chu* with a reasonable expectation of achieving sufficient inhibiting amounts of a DNA decoy in a

mammalian cell as suggested by the *Molecular Biology of THE CELL*, 2nd Ed. (1989) reference.

**XI. ENDOGENOUS GLUCOCORTICOIDS (reference prior to 12/24/86): Inherent anticipation by *Goodman & Gilman* (*Newly Raised Examiner Rejection*)**

19. Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Goodman and Gilman's* (The Pharmacological Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286) and *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (newly raised by Examiner). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary**: *Goodman & Gilman* teach the naturally occurring endogenous production and release of glucocorticoids (cortisol) in response to many different types of environmental stressors which *inherently* results in the reduction of NF-κB activity that acts to inhibit expression, in a eukaryotic cell, of cytokines whose transcription is regulated by NF-κB. In this respect, the NF-κB inhibiting evidence provided by the Baldwin I, Auphan, Scheinman I/II and the Mukaida documents, regarding the synthetically administered steroid dexamethasone (DEX) has been found to be analogous with what occurs upon release of the endogenous cortisol glucocorticoid as evidenced by *Padgett*.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The instant claims broadly encompass the natural process in which an animal responds to environmental stressors by increasing production of endogenous glucocorticoids (cortisol, cortisone, hydrocortisone, corticosterone, aldosterone: see e.g. page 1473 Table 63-2) that are secreted into the bloodstream. Increased glucocorticoids are produced in response to many different types of stressors including "agonal state, severe infections, surgery, parturition, cold, exercise, and emotional stress" (*Goodman and Gilman*, 1469, "Example of Effective Stimuli of Secretion"). These elevated quantities of endogenous glucocorticoids are known to "prevent or suppress the inflammatory response that takes place as a consequence of the hypersensitivity reactions" (Goodman and Gilman, page 1479, left column, "Immune Responses").

However, it has been known since the mid-1990's, that glucocorticoids effect their immunosuppression by reducing NF-κB activity by preventing NF-κB from binding to the appropriate sites on the DNA and by increasing the transcription, expression and/or release of IκB, thereby reducing the amount of activated NF-κB that can translocate into the nucleus. In this regard, several publications cited by Dr. Baldwin in

his 1996 review article (*Baldwin I*), including *Auphan*, *Scheinman I*, *Schmeinman II and*, *Mukaida,* in addition to the *Padgett* document, provide extrinsic evidence that endogenously produced glucocorticoids, such as cortisol, are recognized to *necessarily and inherently* reduce NF-κB activity thus inhibiting cytokine production, *in vivo*, upon the body's release of glucocorticoids in response to external stimuli, such as stress, as described in *Goodman and Gilman.*

**a) Extrinsic Evidence of Inherency as Provided by *Auphan***

Auphan describes methods for reducing NF-κB activity in an induced leukemic T-cell line. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA and used EMSA, as described in the'516 Baltimore patent, to demonstrate NF-κB activity. See *Auphan* at 287-8. *Auphan* then exposed the cells to $10^{-6}$ M dexamethasone. Id. Auphan reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility shift assays (EMSAs) revealed that both AP-I and NF-κB DNA binding activities were elevated in nuclear extracts of activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB binding activity and reduced the amount of A.P-1 binding activity . . . . DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo (Fig. 1D).
>
> * * *
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat human T cell leukemia line stably transfected with a GR expression vector (Fig. 2A). . . .Inhibition of NF-κB activity was also observed in cells stimulated by either 12-O-tetradecanoryl-phorbal 13-acetate (TPA) alone or by tumor necrosis factor (TNF- α). Id. (citations omitted).

As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the transcriptional activation of the I-κBα gene" in these human leukemic cells and

therefore, "by upregulating I-κBα protein levels, function to block nuclear translocation of NF-κB and DNA binding." *Baldwin* at 671. As discussed below, Dr. Baldwin's own results, as reported in the *Scheinman II* document discussed below, confirms this mechanism for glucocorticoid action.

**b) Extrinsic Evidence of Inherency as Provided by Scheinman I & II**

*Scheinman I* and *Scheinman II* confirm that dexamethasone, as used in the prior art, reduces NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures. *Scheinman I* at 944. NF-κB activity was measured in at least two assay formats disclosed in the Baltimore '516 patent (EMSA and reporter assays) as well as Western blot immunological assays. Dexamethasone was shown (Figs 1A and B; Fig. 4; and Fig. 7) to reduce endogenous NF-κB activity in cells ("Pretreatment with DEX resulted in a profound loss of TNF-α induced NF-κB as well as p50 homodimer (KBF1) gel shift activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not shown)." *Id* at 949. *Scheinman I* concluded that dexamethasone reduces NF-κB activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also block their ability to bind DNA. In addition, we present new data showing that dexamethasone (DEX) treatment of HeLa cells causes a significant reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able to inhibit NF-κB activity by a novel mechanism involving a block of cytokine-induced nuclear translocation.
>
> * * *
>
> With EMSA analysis, we found that DEX treatment caused a marked reduction in the ability of NF-κB /Rel subunits to bind DNA despite the presence of equal amounts of NF-κB subunit protein in the EMSA DNA-

binding reaction mixtures (Fig. 5, EMSA). *Id.* at 944,948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same $10^{-7}$ M concentration as *Scheinman I*, reduces NF-κB activity as called for by the claims that are the subject of this reexamination request. *Scheinman II* confirmed the *Auphan* conclusion that dexamethasone inhibits TNF α induced NF-κB activity, at least in part, by inducing the transcription of the IκB-α gene:

> Together, these data indicate that DEX treatment induces the transcription of the IκB-α gene. This induction results in the increased syntheses of the IκB-α protein. This increase in protein synthesis leads to the rapid turnover of the IκB-α protein associated with preexisting NF-κB complexes. In the presence of an activator such as TNF α, newly released NF-κB reassociates with the DEX-induced IκBα and thus reduces the amount of NF-κB translocating to the nucleus. *Scheinman II* at 286.

**c) Extrinsic Evidence of Inherency as Provided by *Mukaida***

*Mukaida* observed that IL-8 production was mediated by NF-κB in all cells they previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-κB-regulated IL-8 production by more than 60% at concentrations equal to and higher than $10^{-8}$M. *Id* at 13290.

**d) Extrinsic Evidence of Inherency as Provided by *Padgett***

Consistent with the *Scheinman* II and *Auphan* references, *Padgett* teaches that the body responds to external stressors by release of glucocorticoid hormones, including cortisol, which bind glucocorticoid receptors expressed on a variety of immune cells to interfere with NF-κB function, resulting in reduced cytokine production. See

Abstract; p.445 (right column) to p. 446; footnotes 32 and 33; and p. 447 under "Conclusions".

Thus, endogenous production of glucocorticoids in response to external body stimuli as described in *Goodman and Gilman* is now recognized as necessarily inherently reducing NF-κB activity as called for by the subject claims of the Baltimore '516 patent. See also '7503 *Exhibit H8* (incorporated by reference) application to claims regarding exogenous glucocorticoid administration.

**Status of Claims**

Claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182-186, 192-193, 197-201 and 203 are rejected. Claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-196, and 202 are confirmed patentable.

**STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION**

The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding: Claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-196, and 202 are confirmed patentable since none of the references cited in the 90/007,503 or 90/007,828 proceedings raise a substantial new question of patentability concerning these claims. Any comments considered necessary by PATENT OWNER regarding the above statement must be submitted promptly to avoid processing delays. Such submission by the patent owner

should be labeled: "Comments on Statement of Reasons for Patentability and/or Confirmation" and will be placed in the reexamination file.

***Extensions of Time***

Extensions of time under 37 CFR 1.136 (a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to an applicant and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be concluded with special dispatch" (37 CFR 1.555(a) ). Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

***Service on the Other Party (3rd Party Request)***

After the filing of a request for reexamination by a 3rd party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550 (f).

***Patent Owner Amendment***

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c). In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action. Submissions after the next Office action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR 41.33 after appeal, which will be strictly enforced.

***Future Correspondences***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Bennett Celsa whose telephone number is 571-272-0807. The examiner can normally be reached on 8-5. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Deborah D. Jones can be reached on 571-272-1535. The fax phone number for the organization where this application or proceeding is assigned is 571-273-9900.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA 22313-1450

Please FAX any communications to:

(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:
Customer Service Window
Attn: Central Reexamination Unit
Randolph Building
401 Dulany Street
Alexandria, VA 22314

*Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).*

Bennett Celsa
Primary Examiner
Art Unit 3991

Conferees:

TABLE OF CONTENTS

**PRIOR ART REJECTION SUMMARY** — **PAGES**

**I. PROTEIN KINASE C INHIBITORS (intervening prior art):** — 10-13
Express anticipation: *Meichle* or *Shirikawa* ('7503 Exhibit. G2) of claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201.

**IIa. CYCLOSPORIN A (intervening prior art)** — 13-18
Express anticipation: *Schmidt, Emmel* and *Brini* ('7503 Exhibit G1) of claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201.

**IIb. CYCLOSPORIN A (references prior to 12/24/86)** — 19-29
A. Inherent anticipation: *PDR* (1985), *Griffith I, Griffith II* ('7503 Exhibit H1) of claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97. — 19-23

B. Inherent anticipation *by Reed ('7503 Exhibit H2) of claims 1-2, 5-9, 20-21* 25-29,31-32,36-40,53-54,58-62,64-65,69-73,75-76,80-86,88-89, and 93-97. — 24-26

C. Inherent anticipation *by Kronke or* Siebenlist ('7503 Exhibit H3) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97. — 26-29

**III. VITAMIN D (CALCITRIOL) (references prior to 12/24/86)** — 30-32
Inherent anticipation by *Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I* and *Rigby II* ('7503 Exhibits H4-H6) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

**IV. 5-ASA (references prior to 12/24/86)** — 32-34
Inherent anticipation by *Dew* ('7503 Exhibit H7) of claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86 and 88-97.

**V. GLUCOCORTICOIDS (references prior to 12/24/86)** — 34-39
Inherent anticipation by *1970 PDR, Lefring, Nagasawa*, or *Rovera* ('7503 Exhibit H8) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97.

**VI. ANTIBIOTICS (references prior to 12/24/86)** — 39-42
Inherent anticipation by *1970 PDR* ('7503 Exhibit H10) of claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140,144-150,154-160, 164-168,172-178, and 182-186.

**VII. RED WINE (references prior to 12/24/86)** — 42-47
Inherent anticipation by *King James Version Bible* (1611), *St. Leger, Dobrilla*, or *Jones* ('7503 Exhibit H9) of claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98.

**VIII. N-ACETYL-L-CYSTEINE (intervening prior art)** — 47-48
Express anticipation by *Staal* of claims 18 and 182-185 ('7828 Appendix E).

**IX. NUCLEIC ACID DECOYS: (intervening prior art):** — 48-51
Express anticipation by *Bielinska* of claims 1, 2, 20, 25-29, 31, 36-40 and 203 ('7828 Appendix D).

**X. NUCLEIC ACID DECOYS (Obviousness ) (references prior to 12/24/86)** — 52-55
Obviousness of claim 203 ('7828 Appendix F).

**XI. ENDOGENOUS GLUCOCORTICOIDS (references prior to 12/24/86)** — 55-60
Inherent anticipation by *Goodman & Gilman* ('7503 Exhibit H8) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97.

# EXHIBIT L



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828 | 12/02/2005 | 6410516 | | 4525 |

23432 7590 07/06/2007

COOPER & DUNHAM, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 07/06/2007

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa

Bawa Biotechnology Consulting, LLC

21005 Starflower Way

Ashburn, VA 20147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. 90/007,828.

PATENT NO. 6410516.

ART UNIT 3991.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| **Office Action in Ex Parte Reexamination** | Control No. (90/007,503) 90/007,838 | Patent Under Reexamination 6410516 | |
|---|---|---|---|
| | Examiner Bennett Celsa | Art Unit 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on *17 November 2006*. b☒ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire 2 month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☒ Information Disclosure Statement, PTO/SB/08.
3. ☐ Interview Summary, PTO-474.
4. ☐ _____.

Part II SUMMARY OF ACTION

1a. ☒ Claims *1-6,8-27,29-38,40-80,82,84 and 87-202* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☒ Claims *7,28,39,81,83,85,86 and 203* have been canceled in the present reexamination proceeding.

3. ☒ Claims *see cont. sheet below* are patentable and/or confirmed.

4. ☒ Claims *see cont. sheet below* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All b)☐ Some* c)☐ None of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____.

   4☐ been filed in reexamination Control No. _____.

   5☐ been received by the International Bureau in PCT application No. _____.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

**Continuation Sheet (PTOL-466)**                                                    **Reexam Control No.**

Rejected: claims 1-6, 8-18, 20-27, 29, 31-38, 40, 42-43, 47-51, 53-62, 64-73, 75-80, 82, 84, 88-97, 99-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-137, 139,140, 144-147, 149, 150, 154-157, 159, 160, 164-168, 172-175, 177, 178, 182-185, 192-193 and 197-201.

Confirmed: claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202.

**DETAILED ACTION: *Reexamination: Final Rejection***

***In Merged '7503 and '7828 Proceedings.***

***Procedural Posture:***

1. U.S. Patent No. 6,410,516 issued on June 25, 2002.

2. A request for reexamination, assigned control No. 90/007,503, was filed by a third party requester on April 4, 2005. Reexamination was ordered for the '7503 proceeding on June 8, 2005.

3. A request for reexamination, assigned control No. 90/007,828, was filed by a third party requester on December 2, 2005. Reexamination was ordered for the '7828 proceeding on December 12, 2005.

4. No Patent Owner's Statement was received in either reexamination.

5. Reexams 90/007,503 and 90/007,828 were merged on May 4, 2006.

6. First Office action (FAOM: dated August 2, 2006) in merged proceedings.

7. Patent Owner Amendment dated Nov. 17, 2006 (canceling claims 7, 28, 39, 81, 83, 85, 86 and 203), supplemental disclosure statement and Declaration of Dr. Verma along with accompanying exhibits is acknowledged.

The text of those sections of Title 35, U.S. Code not included in this action can be found in a prior Office action.

***Status of the Claims***

U.S. Patent 6,410,516 claims 1-203 were initially subject to reexamination.

Canceled Claims: 7, 28, 39, 81, 83, 85, 86 and 203.

Pending Claims: 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202.

**Informal Claim**

Patentee's amendment canceling claim 7 has resulted in claim 8 being improperly dependent upon a cancelled base claim. The Patent Owner is required to cancel the claim(s), or amend the claim(s) to place the claim(s) in proper dependent form, or rewrite the claim(s) in independent form.

***Purported Inconsistency Within the August 2, 2006 Office Action:***

Patentee Argument: *Each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 recite specific ways of reducing NF-κB activity, and have been rejected. In contrast, analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 also recite the same specific ways of reducing NF-κB activity, but have been confirmed patentable. No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable. Accordingly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 should be confirmed patentable.* Amendment dated Nov. 17, 2006 page 17.

Examiner Response: Each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 have been rejected since there is prior art which raises rejections of these claims. In contrast, claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 have been confirmed patentable since none of the references cited in the 90/007,503 or 90/007,828 proceedings raised a substantial new question of patentability concerning these claims.

It is also noted that rejected claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 are dependent upon independent claims 1, 2, 5, 6, 8 and 9, respectively that are different from those of confirmed claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 which refer to independent claims 3, 10, 11, 12, 13, 14, 15, 16, 17 and 4, respectively.

***Ultra Vires Argument:***

The patent owner response (pp.18-23) provides arguments as to why the ordering of the reexamination of the instant U.S. Pat. No. 6,410,516 in merged proceedings 90/007,503 and 90/007,828 is *ultra vires*.and should be vacated. Patentee's petition to vacate was denied (10/6/05 and reconsideration 2/8/06) and the patent owner's district court appeal was ultimately dismissed by the CAFC (11/22/06) under Fed. R. App. P. 42(b) (of record: 11/22/06).

A summary of patentee's arguments and an Examiner rebuttal consistent with the October 6, 2005 petition denial and the Solicitor's "Memorandum of Points and Authorities In Support of Motion To Dismiss Or In the Alternative For Summary Judgement and Opposition to Plaintiff's Motion For Summary Judgement": pages 1-30

presented in *Ariad Pharmaceuticals v. Dudas* U.S. District Court (Eastern District of Va.) (copy enclosed) follows:

1. Patentee Argues: Inherency case *law and MPEP 2131.01 is not applicable since 35 USC 301-303 limits reexam to the use of "prior art" publications. Response* pp. 20-21.

Examiner Response:

Contrary to the patentee's position, reliance on extrinsic evidence to better understand the teachings of a prior art reference has been common in reexamination proceedings. For example, in *In re Baxter Travenol Labs*, 952 F.2d 388 (Fed. Cir. 1991), the Federal Circuit rejected the patent owner's argument that the PTO could not rely on declarations and other written materials submitted along with a prior art publication to reject its claims in a reexamination. 952 F.2d at 390. The Federal Circuit explained that the declarations and other extrinsic evidence were properly relied upon during the reexamination to explain the printed publication:

> Baxter argues that these depositions, declarations, and admissions are extrinsic evidence, which may not be considered when determining the anticipatory teaching of a reference. This is incorrect. Baxter acknowledges, as it must, that extrinsic evidence may be considered when it is used to explain, but not expand, the meaning of a reference. Id. (emphasis added).

The Federal Circuit upheld the anticipation rejection of the reexam claims based on the prior art document itself, as illuminated by the extrinsic evidence. Id.; see also *In re Bass*, 314 F.3d 575, 576 (Fed. Cir. 2002) (extrinsic evidence of Schofield declaration explaining teachings of Lucander prior art document establishes SNQ for reexamination); see also *Heinl*, 143 F.Supp.2d at 604-05 (permitting use of extrinsic evidence to explain a reference and finding "unpersuasive" patent owner's argument that reexaminations are limited purely to prior art documents and any other materials are prohibited).

Consistent with Federal Circuit case law, the MPEP provides that any claim rejection in reexamination based on prior patents or printed publications may use

extrinsic evidence, such as affidavits or declarations, to explain the meaning of the prior art reference:

> Affidavits or declarations which explain the contents or pertinent dates of prior art patents or printed publications in more detail may be considered in reexamination, but any rejection must be based upon the prior patents or printed publications as explained by the affidavits or declarations. The rejection in such circumstances cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications.MPEP § 2258 I. E.

Thus, it is appropriate for the PTO to consider extrinsic evidence in a reexam proceeding to explain the meaning and contents of prior art.

2. Patentee Argues: *The method inherency rejections are based upon "prior public use". Patent owner cites Schering Corporation v. Geneva et al, 339 F.3d 1373 (Fed. Cir. 2003), Cruciferous Sprout Litigation, 301 F.3d 1343 (Fed. Cir. 2002) and MEHL/BIOPHILE International Corp. v. Milgraum, 192 F.3d 1362 (Fed. Cir. 1999) as cases standing for the proposition that subject matter which is inherently described in a patent or printed publication is applicable to anticipate a claimed invention only as a prior public use of the inherently disclosed subject matter, and not as an anticipation by the patent or printed publication. Patent owner quotes MPEP § 2217 as indicative of the proposition that "a prior art patent or printed publication cannot be properly applied as a ground for reexamination if it is merely used as evidence of prior public use .... ". Patent owner additionally argues that the Court of Appeals for the Federal Circuit has held that a method is inherently anticipated only by the actual public use of the method which may or may not have been described in a printed publication.*Amendment at pp. 21-23.

Examiner Response:

It is clear from a consideration of *Smithkline Beecham Corporation et al v. Apotex Corporation et al*, 403 F.3d 1331 (Fed. Cir. 2005), as well as from the precedential case law cited by the patent owner above, that a prior art patent or publication containing an enabling disclosure that inherently anticipates a claimed invention which was not expressly known or appreciated at the time that the patent or publication was published is to be regarded as an anticipatory prior art patent or printed publication. That the inherent anticipation exists by reason of the fact that the claimed invention would be produced by following the teachings of the patent or printed publication does not mean that the teachings of the patent or printed publication had to have been, or have to be,

publicly performed prior to an applicant's invention. Nor does it mean that the anticipation is the result of a prior public use. This follows from the principle that it is not necessary that an invention disclosed in a patent or printed publication shall actually have been made or practiced, provided that the disclosure in the publication is described so as to have placed the public in possession of it. This further follows from the uniform pronouncement in the case law "that inherent anticipation does not require that a person of ordinary skill in the art recognize the inherent disclosure in the prior art at the time the prior art is created." *Schering Corporation*, 403 F.3d at 1343.

Thus, so long as a patent or printed publication enables the practice of a method that would inherently anticipate a different method not expressly disclosed in the patent or printed publication, the patent or printed publication is considered to be an anticipatory disclosure of the inherently disclosed method, even if at the time of publication or issuance of the patent, the expressly disclosed invention had not been practiced and a person of ordinary skill in the art would not necessarily have recognized the inherently disclosed method. The patent or printed publication is not regarded as evidence of prior public use of the inherently disclosed method; the cases do not require that the inherently disclosed method be publicly performed at the time of patenting or publication, therefore the reference is indeed a reference.

***Withdrawn Rejection (s)***

Rejection of claim 203 (section X. on pages 52-55 of FAOM) under 35 U.S.C. 103(a) as obvious over *Baldwin and Sharp*, Proc. Nat'l Acad Sci. 85:723 (Feb. 1988) in view of *Schorpp* et al. J. Mol. Biol. 202:307 (1988); . *Li* et al. Mol. Cell. Biol. 8:432 (1988); *Hai* et al. Cell 54 :1043 (1988) ; *Chu* et al. Nucleic Acids Res. 15:1311-1326 (1987); and *Molecular Biology of THE CELL*, 2nd Ed. (1989) page 423 is withdrawn in response to the Patent Owner's amendment canceling claim 203.

Rejection of claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 under 35 U.S.C. 102(b) as anticipated by *King James Version Bible* (1611) (excerpts), *St. Leger* (The Lancet (5/79) 1017-20), *Dobrilla* (Hepato-Gastroenterol. 31 (2/84) 35-37), and *Jones* (Pharm. & Tox. 60 (3/87) 217-20) as evidenced by *Blanco-Colio* (Circulation 102 (8/00) 1020-6), *Holmes-McNary/Baldwin* (Cancer Res. 60 (7/00) 3477-83) and *Manna* (J. Immunol. 164 (2000) 6509-6519). See MPEP 2131.01 (evidence of inherency) is hereby withdrawn. The role and bioavailabilty of red wine components (resveratrol and other polyphenol anti-oxidants) involving regulation of NF-κB activity with regard to a post-prandial hyperlipidemia is unclear.

The rejection of claims 1-2, 5-6, 8-9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80, 82, 84, 88–89 and 93-97 under 35 U.S.C. 102(b) as being anticipated by *1970 PDR*, *Lefring et al.* (Crit. Care. Med. 2:3 (7/95) 1294-1303: References Cited Therein), *Nagasawa* et al. (J. Cell. Phys. 109 (1981) 181-192), or *Rovera* et al. (Science 204 (1979) 868-970) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 is withdrawn in order to simplify issues for appeal since this rejection is cumulative to the anticipation rejection over the *Goodman and Gilman* reference in view of the same evidentiary documents.

***Priority***

Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374
which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);
which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92) AND:
-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)
-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)
-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)
- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)
-a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)
- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC §120 priority, the above-identified CIP applications (i.e. original specification and original claims) fail to adequately describe and/or enable the methods of currently pending claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202 of the instant Baltimore Patent claims subject to reexam. See MPEP 2258. Accordingly, **claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202** of the reexamination patent claims are entitled to the **filing date 11/13/91** of continuation application 07/791,898 for purposes of prior art. Every claim of the '516 patent recites at least one of the following features which the pre-1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;
b. support for the Baltimore patent claim limitations including (but not limited to):
-"reducing NF-κB activity" in a cell (especially mammalian/eukaryotic) and/or an enabling means thereof e.g.administering a NF-κB Inhibitor, to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as *required in all the claims*;

-"reduce binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" e.g. claims 25, 36, 47, 69, 80, 93, 144, 154 & 182;
-"inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" e.g. claims 22, 33, and 44;
-"inhibiting degradation of an IκB protein" e.g.claims 23, 34, and 45;
-"inhibiting dissociation of NF-κB:IκB complexes" e.g. claims 24, 35, and 46.

It is noted that the written description requirement is satisfied only by describing the actual invention, and not that which makes it obvious. *Lockwood v. American Airlines, Inc.* 107 F.3d 1565, 1572. 41 USPQ2d 1961, 1968 (Fed. Cir. 1997).

1. Patentee's Argument: *Claims 1-9,11, 18, 20, 21, 25-27, 29, 31, 32, 36-38, 40, 42, 43; 47-51, 53, 54, 58-60, 61, 62, 64, 65, 69-73, 75, 76, 80, 82, 84, 88, 89, 93-97, 106, 107, 109, 110, 114-117, 182-185, 192, 193 and 197-201 subject to "intervening prior art rejections" are entitled to 35 USC 120 priority to the April 21,1989 filing date of the 07/341,436 application*. See response at pages 33-39; the declaration of Dr. Verma, ¶¶ 16-21; and Claim Support Chart, attached as Exhibit 3 to the Declaration of Dr. Verma.

*Additionally, Patentee points out that to the extent support for the pending claims appears in U.S. Serial Nos. 06/817,441, filed January 9, 1986; 07/155,207, filed February 12, 1988; and/or 07/280,173, filed December 5, 1988, each of these applications is incorporated by reference into the April 21, 1989 application on page 1, lines 4-8 thereof (citing M.P.E.P. 608.01(p) (I)).*

*More particularly, Patentee notes that contrary to the Examiner's assertions:*

*1. Amino acid or nucleic acid sequences corresponding to* NF-κB *are not recited in the pending claims nor are they necessary to enable these claims as of April 21, 1989.*

*2.The phrase "reducing* NF-κB *activity" in the pending claims finds support in 07/341,436 at p.5, lines 13-16: "Alteration or modification, whether to enhance or reduce* NF-κB *activity ... is referred to herein as regulation of* NF-κB *activity.".*

*3. "mammalian cells" & "eukaryotic cells" finds support in 07/341,436 at:*
*- p.1, lines 4-8 (incorporating 07/155,207, p. 77, lines 8-9): "* NF-κB *[is] present in a wide variety of mammalian cells"; and*
*- p.1, lines 4-8, (incorporating 07/280,173, p.4, line 21): "In the present work with eukaryotic cells.".*

*4. although "reducing* NF-κB *activity" in a cell ( especially mammalian/eukaryotic) and/or an enabling means thereof (administering a* NF-κB *inhibitor) to effect various functions (inhibit expression generally, reduce cytokine expression etc.)" is not disclosed in the*

*subject patent, Patentees point to 07/341,436 at p. 23, line 22- p.30, line 25 describing how one skilled in the art may proceed to reduce* NF-κB *activity.*

*5. "reducing binding of* NF-κB *to* NF-κB *recognition sites on genes transcriptionally regulated by* NF-κB *" in the pending claims is supported in 07/341,436 at:*
*- p.5, line 31- p.6, line 8: "* NF-κB*-mediated gene expression can also be selectively regulated by altering the binding domain of* NF-κB *in such a manner that binding specificity and/or affinity are modified.";*
*- p.24, lines 9-29: "According to the methods described herein, the expression of genes under the control of one of these elements is subject to modulation by alteration of the concentration or availability of* NF-κB. *This can also be carried out, according to the present method, for any gene which contains an* NF-κB *binding site."; and*
*- the Title: "*NF-κB *-Mediated Transcriptional Regulation".*

*6. "inhibiting modification of an I-κB protein, which modification otherwise reduces I-κB binding to NF-kB" in the pending claims finds support in 07/341,436 at:*
*-p. 18, lines 28-29: "Inactive* NF-κB *is complexed with a labile inhibitor protein,* I-κB.*";*
*- p.19, lines 20-21: "The implication is that activation of* NF-κB *involves a modification of I-κB and not* NF-κB.*"; and*
*-p.5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or modify the activity of* NF-κB *as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through* NF-κB *activity .... In particular, the present invention relates to a method of regulating (enhancing or diminishing) the activity of* NF-κB *in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method."*

*7. "inhibiting degradation of an* I-κB *protein" finds support in 07/341,436 at:*
*-p. 20, lines 1-3: "Various inducer then cause an alteration in I-*κB *allowing* NF-κB *to be released from the complex."; and*
*- p.5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or modify the activity of* NF-κB *as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through* NF-κB *activity .... "In particular, the present invention relates to a method of regulating (enhancing or diminishing) the activity of* NF-κB *in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method.".*

*8. "inhibiting dissociation of* NF-κB/I-κB *complexes" finds support in 07/341,436 at:*
*- p.19, lines 1-3: "... dissociating agents such as formamide and deoxycholate to unmask very high levels of* NF-κB *activity."; and*
*-p. 20, lines 5-7: "The complex formation of* NF-κB *with I-*κB *appears to be rapidly and efficiently reversible ...."*

2. Examiner Response: Instant pending claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202 are denied 35 USC §120 priority to the April 21, 1989 filing date of the CIP 07/341,436 application for failure to satisfy 35 USC §120 for the reasons already pointed out above and as further elaborated below in response to patentee's arguments. Accordingly, these claims are entitled to the filing date 11/13/91 of continuation application 07/791,898 for purposes of prior art.

Initially, it is noted that patent owner arguments provided in Items 2-8 above (*ipsis verbis* argument) will be addressed 1st, and the Item 1 (non-enablement and possession argument) will be addressed 2nd.

***I. Even assuming direct (ipsis verbis) support was the legal standard for satisfying 35 USC 112, 1st ¶, the Patent Owner's showing is not commensurate.***

**The Reexamination 6,410,516 Invention (08/464,364 filed application):**

The patent specification addresses (among others) the following related inventions:

**1**. Four transcriptional regulatory factors (including NF-κB) and encoding sequences for use in screening putative binding proteins (see col. 3, lines 18-40);

**2**. Partial I-κB alpha (natural inhibitor) [1] c-DNA & protein sequence of (Fig. 43);

**3**. Natural Mechanism of Activation of NF-κB upon external stimulus:

**4**. Improved screening assay for identifying agonist or antagonist compounds (now U.S. Patent 5,804,374); and

**5**. Methods for regulating NF-κB activated protein expression including:

"[M]ethods for regulating (inducing or preventing) activation of NF-κB controlling expression of the immunoglobulin kappa light chain gene and other genes whose expression is controlled by NF-κB (e.g. HIV)" (col. 3, lines 54-67) including "regulating (enhancing or diminishing) the activity of NF-κB in cells which it is capable of acting as an intracellular messenger, as well as the substances or composition useful in such a method" (col. 4, lines 28).

[1] It is unclear from the record whether the disclosed sequence is human or avian.

**The 6,410,516 Patented Invention:**

The Baltimore patent claims are directed to methods of reducing or otherwise modifying the naturally occurring transcription factor NF-κB activity in cells affecting gene expression. The following claim is illustrative:

1. A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the expression of said gene is inhibited.

Inhibiting expression of various types of genes (e.g. viral and cytokine genes in claims 3-5) in various cells, from mammalian to human, as well as various cell types including lymphoid, liver and immune cells is encompassed.

Although claims 1, 2 and 5 are open to any (mechanistic) means of directly or indirectly inhibiting (reducing) NF-κB activity or inhibiting (reducing) NF-κB intracellular signaling (claim 7), these claims would also encompass affecting NF-κB activity at the defined points of a proposed 6 step NF-κB induction mechanism (see Dr. Verma declaration: Schematic 3) which is particularly claimed (see claims 19-25).

**The Extent of the New Matter:**

The following chart illustrates the extent of new matter added to the instant CIP patent disclosure of the 08/464, 364 application as compared to the parent 07/341,436 application relied upon for 37 CFR §120 priority:

| Application | specification | claims | Abstract | TOTAL PAGES |
|---|---|---|---|---|
| **08/464,364** | pp1-189<br>Fig. 1-43<br>Examples 1-15<br>Tables 1-2 | pp190-206<br>claims 1-88 | p207(4 sentences) | 207 |
| **07/341,436** | pp. 1-39<br>Fig. 1-4c (39-42c)<br>Example 15<br>Table 1 | pp. 40-45 | p46 (1 sentence) | 46 |

NOTE: Table 1 of 07/341,436 corresponds to Table 2 of 08/464,364.
Figures1-4c of 07/341,436 corresponds to Figures 39-42C of 08/464,364.

A copy of the 07/341,436 application (minus the Abstract) is found in Exhibit 2 of Dr. Verma's Declaration. The missing Abstract is titled: "NF-κB -mediated Transcriptional Regulations" and states: "Methods and compositions for altering or modifying NF-κB activity in cells and for regulating NF-κB -mediated gene expression."

*Examples of Subject Matter Missing from the 07/341,436 application which is present in 08/464,364 application:Figures 1-38 and 43 and corresponding examples include:*

a. isolated transcription regulatory factors, including NF-κB cDNA & protein sequence;

b. isolated partial cDNA and protein sequence of natural inhibitor I-κB;

c. disclosure of evidence of NF-κB -I-κB complex; and

d. disclosure of assay for screening transcriptional regulators and for identifying agonist or antagonist compounds.

*Shared Subject Matter:*

1. achieving "Negative Regulation" by addition to a biological system an effective amount of : I-κB or a decoy molecule or an "inhibitor molecule which is also a protein" in which "the gene can be identified ... " or "dominantly interfering" molecules. See instant '516 patent at col. 37 (Table 2) to col. 38, line 22);

2. Table exemplifying NF-κB recognized sequences (see instant '516 patent Table 2);

3. Instant '516 patent Example15 drawn to a "Demonstration of the Role of the NF-κB as Mediator in Regulation of a Gene in Non-Lymphoid Cells".

Patentee items 2-8 above as well as the 125 page Claim Support Chart in Exhibit 3 of the Dr. Verma Declaration fails to satisfy 35 USC 112, ¶ 1 for the following reasons:

a. The disclosure and limited examples in the *07/341,436* application directed to establishing nuclear NF-κB regulation of specific cytokine genes, such as interferon and specific cells such as lymphocytes and fibroblasts, is not a commensurate showing of the ability to broadly inhibit various other genes and cell types.

b. A hypotheses regarding intracellular signaling in the 07/341,436 application without isolation, sequencing (c-DNA, protein) and characterization of NF-κB and I-κB and their complex is not possession of the mechanism nor the ability to design inhibitors at any point of the proposed mechanism. The absence of an inhibitor screening assay further makes drug design difficult if not prohibitive.

c. To the extent (as discussed above) that the reexamination claims broadly encompass new matter missing from the 07/341,436 application, the 07/341,436 application is clearly not commensurate in scope.

d. The 07/341,436 application fails to disclose an inhibiting compound, as well as the necessary conditions to effect inhibition e.g. means of addition to a biological system (*in vitro, in vivo*) and the corresponding effective amounts.

e. As discussed below the instant invention fails to satisfy §112, 1st ¶ with regard to an interfering compound necessary to practice the presently claimed method.

**II. Under the correct legal standard, the 07/341,436 application fails to satisfy 35 USC § 112, ¶ 1 for the instantly claimed invention.**

<u>A. The Correct Legal Standard:</u>

The written description requirement of § 112, ¶ 1 is set forth as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, ¶ 1 (1994) (emphasis added). Written description is independent of enablement. *Vas-Cath*, 935 F.2d at 1563, 19 USPQ2d at 1117 (recognizing the severability of the "written description" and "enablement" provisions of § 112, ¶ 1). Under 35 U.S.C. §120, patent claims are entitled to the benefit of the filing date of an earlier filed U.S. application if the subject matter of the claim is disclosed in the manner provided by 35 U.S.C. §112, 1st ¶ in the earlier filed application. See, e.g., *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 47 USPQ2d 1829 (Fed. Cir. 1998); *In re Scheiber*, 587 F.2d 59, 199 USPQ 782 (CCPA 1978). The examiner has the initial burden of presenting by a preponderance of evidence why a person skilled in the art would not recognize in an applicant's disclosure a description of the invention defined by the claims. *In re Wertheim*, 541 F.2d 257, 263, 191 USPQ 90, 97 (CCPA 1976).

The written description requirement, a question of fact, ensures that the inventor conveys to others possession of the claimed invention; whereas, the enablement

requirement, a question of law, ensures that the inventor conveys to others how to make and use the claimed invention." See 1242 OG 169 (January 30, 2001) citing *University of California v. Eli Lilly & Co* With regard to the description requirement.

Additionally, *ipsis verbis* inclusion of claim words from the specification into the claims does not necessarily satisfy the written description requirement. See *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998).

In *Eli Lilly,* the Court of Appeals for the Federal Circuit held that a "written description of an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *University of California v. Eli Lilly and Co.,* 43 USPQ2d 1398, 1405 (1997), quoting *Fiers v. Revel,* 25 USPQ2d 1601, 1606 (Fed. Cir. 1993).

Regarding a compound, the complete structure of a species or embodiment typically satisfies the requirement that the description be set forth "in such full, clear, concise, and exact terms" to show possession of the claimed invention. 35 U.S.C.112, ¶ 1. Cf. *Fields v. Conover*, 443 F.2d 1386, 1392, 170 USPQ 276, 280 (CCPA 1971). Alternatively, written description may be satisfied through disclosure of function and structure when there is a well-established correlation between structure and function:

> "[T]he written description requirement can be met by 'show[ing] that an invention is complete by disclosure or sufficiently detailed, relevant identifying characteristics ... i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics.'" *Enzo Biochem. Inc. v. Gen-Probe Inc.*, 296 F.3d 1316,1324, 63 USPQ 2d 1609, 1613 (Fed. Circ. 2002).
>
> In contrast, without such a correlation, the capability to recognize or understand the structure from the mere recitation of function and minimal structure is highly unlikely. In this latter case, disclosure of function alone is little more than a *wish for possession;* it does not satisfy the written description requirement. See *Eli Lilly*, 119 F.3d at 1566 and 1568, 43 USPQ2d at 1404 and 1406; *In re Wilder*, 736 F.2d 1516, 1521, 222 USPQ 369, 372-73 (Fed. Cir. 1984).

B. "Reach-Through Claims" and Written Description:

Biotechnology and pharmaceutical drug discovery involves the time and expense of making and screening a large number of potential candidate compounds (upstream: research) in order to obtain a relatively small number of useful (e.g. therapeutically) compounds (downstream: application). A "reach-through claim" is an attempt by a discoverer of an "upstream research tool" to seek patent protection encompassing "downstream" inventions. See Stephen G. Kunin, Mark Nagumo, Brian Stanton, Linda S. Therkorn, and Stephen Walsh, *Reach-Through Claims in the Age of Biotechnology,* 51 AM. U.L. REV. 609-638 (2002) at pages 609-616 (overview) and pages 616-619 ("reach-through claim" definition) (copy enclosed).

The *Kunin et al.* article provides a framework for applying a written description analysis toward "reach-through claims" in conformance with the written description guidelines (MPEP 2163) and relevant CAFC case law. In a prophetic example of a disclosure of a newly discovered receptor, receptor screening assay and three screened agonist compounds containing no common core structure and lacking a structure activity correlation, the application of written description analysis found the isolated/purified receptor and agonist receptor screening assay of claims 1-2 patentable but the "generic" agonists compounds obtainable from the assay (claim 3) and the use of these agonists to treat disease (claim 4) unpatentable for failure to adequately describe the compound claim 3 "generic" which rendered the corresponding therapeutic use of such compounds (of the same scope) equally unpatentable for lack of written description. See *Id.* at pp.621-622 (example patent claims 1-5); pp. 626-627 (case law summary) and pp.628-630.

The CAFC in the *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 69 USPQ2d 1886 (Fed.Cir. 2004) was faced with the application of both the written description and enablement requirements in the context of a reach-through method

claim. [2] The problem addressed in *Rochester* was that traditional non-steroidal anti-inflammatory drugs (NSAIDS, such as aspirin, ibuprofen) obtained their anti-inflammatory effects by binding cyclooxygenase-2 (COX-2) but also had gastrointestinal side-effects caused by the NSAID binding a different cyclooxygenase (COX-1 related to the PGHS-2 gene expression). Accordingly, after obtaining a patent on an assay for screening compounds selective for COX-2 (i.e. didn't bind COX-1), the claim at issue in Rochester was a method drawn to the use of a "non-steroidal" COX-1 selective inhibitor obtainable from the screening assay.[3] Rochester's claim was invalidated for failing to meet the written description and enablement requirements of 35 U.S.C. Section 112, 1st ¶. Specifically, the court held that the written description requirement was not met due to the patent specification's failure to disclose any examples of COX-2 inhibitors. Additionally, with respect to enablement, it was held that the disclosure of a COX-2 inhibitor screening method without guidance on the characteristics of probable inhibitor candidates failed to enable one skilled in the art to isolate the claimed inhibitors without undue experimentation.

**iii. The Parent 07/341,436 application fails to satisfy 35 USC 112, ¶ 1:**

The 07/341,436 application fails to adequately describe or enable the scope of the instantly claimed method invention for at least the following reasons:

a. *ipsis verbis* support is absent, but even if present would fail to adequately describe or enable the functional class of NF-κB inhibitors presently claimed;

b. fails to disclose a single NF-κB inhibiting compound;

c. lack of correlation of structure to function; and

d. fails to teach how to screen NF-κB -inhibiting compounds..

---

[2] Arguably, the CAFC in the *University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998) case already addressed the lack of a written description of a "reach-through" DNA compound claim in which the DNA was obtainable by screening a cDNA assay.

[3] Claim 1 drawn to a method for selectively inhibiting PGHS-2 activity in a human host, comprising administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product to a human host in need of such treatment is illustrative.

***Claim Interpretation: Reexamination Standard***

Patent claims are examined on the basis of prior art patents or printed publications under the appropriate parts of 35 U.S.C. § 102 and §103. An admission may not be the basis for establishing a substantial new question of patentability, although patent owner admissions as to any matter affecting patentability may be utilized to determine the scope and content of the prior art in conjunction with patents and printed publications in a prior art rejection, whether such admissions result from patents or printed publications or from some other source. See MPEP § 2217.

During reexamination, claims are given the broadest reasonable interpretation consistent with the specification without reading specification limitations into the claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)). The 35 U.S.C. § 282 presumption of patent validity has no effect in reexamination (*In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)) and reexam is conducted according to the procedures established for initial examination under 35 U.S.C. §132, § 305 and §1331 without the burdens and presumptions that accompany litigation of an issued patent. *Laitram Corp. v. NEC Cow*, 952 F.2d 1357, 1360 (Fed. Cir. 1991); MPEP § 2258.

***Claim Interpretation:***

With respect to independent claim 1 (which is representative) it is noted that the sole method step is functional i.e. reducing NF-κB activity. Accordingly, the claims would encompass any *in vitro* or *in vivo*, direct or indirect or natural or man-made means of reducing NF-κB activity. Indeed, most of the Baltimore patent methods steps are purely functional with the exception of claim 7 and dependent claims 81, 83 and 85-87 that require "modifying NF-κB activity" (which are partially functional) and claim 203 which requires "introducing a nucleic acid decoy molecule into the cell" which requires an active step. The summary of the remaining reexamination claims provided in pages 12-15 of the '7503 request is herein incorporated by reference. See FAOM page 8.

1. Patentee Argues: *Reducing NF-κB activity in the claims encompasses using agents that interfere at any of six activation events spanning the membrane receptor, cytoplasm NF-κB-I-κB complex, translocation or nuclear protein transcription to inhibit gene expression (see schematic 1 or exhibit 1) and the claims should be restricted to* ***affirmative acts and manipulative steps*** *for interfering along* ***any one of the six proposed NF-κB activating mechanism segments*** *(claims 1, 2 and 5) unless limited to specific mechanism segments (claims 20, 22, 24, 31, 33, 35, 42, 44 and 46).* Dr. Verma Declaration ¶¶ 5-15.

*The model is summarized in the instant patent (col. 16) and by Dr. Verma as follows:*

> *Upon activation in response to signals triggered by the interaction of certain external influences with receptors on the surface on the cell, NF-κB is released from its complex with I-κB. The released NF-κB then moves to the nucleus of the cell, where it participates in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes.* Dr Verma Declaration ¶ 8.

*Accordingly, as described in the instant specification (bottom of col. 3-top of col. 4) the instant methods encompass "alter(ing) or modify(ing) the activity of NF-κB as an intracellular messenger" and thus regulates "NF-κB-mediated gene expression". See* Dr. Verma Declaration ¶11.

**Examiner's Response:**

The Examiner agrees that the term "reducing NF-κB activity" *at least* encompasses interference with any one of the six activation segments which liberates NF-κB from its complex to effectuate nuclear transcription, unless the claims specifically require interference at a particular segment.

Additionally, "reducing NF-κB activity" can also "involve several different steps including inhibiting the interaction of NF-κB with other transcription factors, inhibiting the NF-κB translocation of NF-κB to the nucleus, inhibiting the interaction of NF-κB with NF-κB binding sites on DNA, and altering the concentration or availability of NF-κB" (*Declaration of Dr. Thomas D. Gilmore* pages 6-7, ¶ 14 submitted by Patentee in Massachusetts District Court Litigation).

Accordingly, the term "reducing NF-κB activity" would encompass both <u>direct</u> and <u>indirect</u> interference with NF-κB activity, e.g. via other transcription factors or affecting NF-κB/I-κB amounts, via patentee's or other NF-κB mediated mechanism.

It is noted that "NF-κB-mediated transcription" is <u>broadly interpreted</u> by Dr. Verma to include the ability of NF-κB to enhance transcription by "recognized sites" on the genes which may include binding to an NF-κB enhancing sequence <u>but is not so limited</u>. The examiner agrees that the claims are not limited to regulation (inhibition or otherwise) of nuclear gene transcription by NF-κB only at NF-κB binding sites since the claims are not so limited and the instant description broadly encompasses the ability of NF-κB to act as a messenger to effect protein transcription (see column 17). This interpretation is consistent with the instant patent teaching of using various known NF-κB enhancing sequences to obtain a "consensus sequence" for cell transfection to obtain modulation by NF-κB. Optionally, a more specific NF-κB binding site can also be introduced into a cell to obtain "discrimination among members of a related family of NF-κB binding sites". See instant patent col. 35-col. 37 (Table 2).

Finally, although the claims require "reducing NF-κB activity" the claims are not restricted to NF-κB-mediated affects but would include additional regulators working with, or independent of NF-κB.

The above-interpretation is further supported by the patentee response (dated 9/12/01, pages 6-10) in the 08/464, 364 application to a rejection in which it was argued that the instant invention encompasses:

a. affecting NF-κB signal transducing activity <u>directly</u> or <u>indirectly</u> ( page 6);

b. NF-κB modulation is <u>not limited to a particular mechanism</u>:

> "Possession was manifested by the disclosed discovery of the signaling pathway and ways to identify and use inhibitors thereof. Thus, it is appropriate under the circumstances for Applicants to have defined the method of use with reference to agents identified or characterized by their method of selection or identification ... **The screening assays taught by the present application permit the identification or characterization of *substances that modulate NF-kB activity by various mechanisms*".** (with emphasis: 9/12/01 response page 7);

c. use of a variety of classes of substances of <u>diverse and unrelated structure</u> that possess the capability (*<u>in vitro</u>* <u>or</u> *<u>in vivo</u>*) to modulate signal transducing activity:

> "...To the contrary, *a person of skill in the art would have reasonably expected that the screening steps of the prior claims would identify a diverse group of substances having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and use covered by the prior claims....* Even compounds regulating NF-κB by the same mechanism, such as by inhibiting modification or degradation of I-κB would have been expected to include any of a variety of different structure". ... that such substances could then be used to modify NF-κB mediated signalling in cells, both *in vitro* and *in vivo*, as recited by the pending claims ... Although the compounds regulating NF-κB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-κB signal transducing activity."

2. <u>Patent Owner</u>: *When read in light of the teachings of the patent disclosure, one of skill in the art would understand and interpret the claims to require affirmative acts and manipulative steps, calculated to achieve specific results.* Dr. Verma Declaration, ¶ 11.

<u>Examiner Response:</u>

The claimed invention is not so limited. Neither the specification nor the prosecution history place any restrictions on the means by which "NF-κB activity" is regulated (enhanced or reduced). Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural or man-made, or direct or indirect method of reducing NF-κB activity

3. <u>Patent Owner</u>: *The instant claims should be interpreted to require a first activating step which excludes prophylaxis, pretreatment or simultaneous activator and inhibitor administration; and thus be limited solely to treatment of an already NF-κB-induced cell or organism.* Dr. Verma Declaration ¶¶13-14.

<u>Examiner's Response:</u>

The claimed methods are drawn to "reducing NF-κB activity" to inhibit NF-κB regulated gene expression in a eukaryotic (or mammalian) cell. There is nothing in the independent claims compelling a person of ordinary skill in the art to include any particular steps including a <u>1st</u> activation step.

Patentee's proposed interpretation of the instant claims improperly fails to give the claims the broadest reasonable interpretation consistent with the specification and improperly requires that limitations be read into the claims. As pointed out in instant patent:

> The subject invention further relates to methods of regulating (<u>inducing or preventing</u>) activation of NF-κB, controlling expression of the immunoglobulin kappa light chain gene and of other genes whose expression is controlled by NF-κB (e.g., HIV). ... See 6,410,516 patent col. 3, lines 54-58.

Patentee's reliance on their mechanism to read into the claims a proviso excluding "prevention" and/or requiring that any activation precede an inhibiting step (see Dr. Verma declaration, ¶¶ 7-8, 11-13) is not supported by the specification.

Further, to the extent that patentee's claim construction is tantamount to rewriting the claims to insert a negative claim limitation, it is noted that a negative limitation or exclusionary proviso must have basis in the original disclosure. *Ex parte Grasselli*, 231 USPQ 393 (Bd. App. 1983), aff 'd mem, 738 F.2d 453 (Fed. Cir. 1984).

In fact, patentee's proposed narrower claim interpretation is inconsistent with the prosecution history that indicates the patentee's desire to expand method claim coverage.

In a written description rejection of claims then pending (subsequently cancelled) the examiner asserted, *inter alia*, that:

> The present claims are very broad, encompassing any type of cell from any organism, eukaryotic or prokaryotic, and in any location *in vitro*, ex vivo or *in vivo*. The claims further encompass **any agent or substance of any structure which has the claimed functional activity,** any assay to be used to identify the agent or substance and **<u>any method of contacting the cell with the agent or substance</u>. (with emphasis).** See 08/464,364 office action dated July 14, 1998 pages 4-10; at page 7, lines 3-8.

In response, patentee argued that their methods be broadly construed since:

a. one can affect NF-κB signal transducing activity <u>directly or indirectly</u> (08/464,364 applicant response dated 9/12/01 page 6);

b. NF-κB modulation is <u>not limited to a particular mechanism</u>;

"Possession was manifested by the disclosed discovery of the signaling pathway and ways to identify and use inhibitors thereof. Thus, it is appropriate under the circumstances for Applicants to have defined the method of use with reference to agents identified or characterized by their method of selection or identification ... The screening assays taught by the present application permit the identification or characterization of *substances that modulate* NF-κB *activity by various mechanisms*". (with emphasis: 9/12/01 response page 7); and

c. the instant method encompasses the use of a <u>variety of classes of substances of diverse and unrelated structure</u> that possess the capability <u>*(in vitro or in vivo)*</u> to modulate NF-κB signal transducing activity:

"By definition, substances identified or characterized by the disclosed assays, inespective of how widely they may vary from one another in chemical structure, are useful for <u>inhibiting</u> or potentiating (as the appropriate case may be) NF-κB - mediated cellular signaling. No more need be known of the chemical structure of the substance to appreciate its utility in the claimed methods. To the contrary, *a person of skill in the art would have reasonably expected that the screening steps of the prior claims would identify <u>a diverse group of substances having any of a wide variety of structures, with no common structure expected</u> to link the function disclosed by the specification and use covered by the prior claims.* That is, a person of skill in the art would have readily appreciated that all modulators of NF-κB would not have the same or similar structure. Even compounds regulating NF-κB by the same mechanism, such as by inhibiting modification or degradation of I-κB, would have been expected to include any of a variety of different structure". ... that such substances could then be used to modify NF-κB mediated signalling in cells, both in vitro and in vivo, as recited by the pending claims ... Although the compounds regulating NF-κB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-κB signal transducing activity." (9/12/01 Patentee response pages 8 and10 08/464,364 application.).

## <u>*Relevant Case law:*</u> *Inherency*

### i. *Inherency Standard:*

The legal standard for demonstrating inherency is as follows:

"the examiner must provide a basis in fact and/or technical reasoning to reasonably support the determination that the allegedly inherent characteristic necessarily flows from the teachings of the applied prior art." *Ex parte Levy*, 17 USPQ2d 1461, 1464 (Bd. Pat. App. & Inter. 1990).

ii. ***Nature of the proof:***

With regard to demonstrating inherency:

Any extrinsic (or intrinsic) source of evidence can be utilized. In fact, evidence of an inherent feature (e.g. in a method claim preamble) resulting from a reference practicing the steps of a method can be gleaned from applicant's own specification. See MPEP §2112.02; *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat. App. & Inter.1993).

***iii. Use of multiple documents permitted:***

Although, normally, only one reference should be used in making a rejection under 35 U.S.C. §102, a rejection over multiple documents has been held to be proper when the extra documents are cited to show that a characteristic not disclosed in the reference is inherent. MPEP §2131.01.

***iv. §102 or §102/§103 product-by-process rationale is equally applicable to claims (compounds, methods, apparatus) relying on function and/or mechanism:***

When compositions are claimed in terms of a function, property or characteristic and the composition of the prior art appears to be the same as that of the claim but the function, property or characteristic is not explicitly disclosed by the reference, the examiner may make a rejection under 35 U.S.C. §102 or §102/§103 rejection. . *In re Best*, 562 F.2d 1252, 1255, 195 USPQ 430, 433 (CCPA 1977). This same rationale applies to products, apparatuses, or processes claimed in terms of function, property or characteristics. See MPEP §2112.

***v. Anticipation Requires An Enabling Disclosure Not Actual Practice:***

As recognized by the CAFC, "Anticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure." See *In re Donohue*, 766 F.2d 531,533[ 226 USPQ 619] (Fed. Circ. 1985; *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373,1380 [ 67 USPQ2d 1664] (Fed. Cir. 2003).

Accordingly, in *Smithkline Beecham Corp. v. Apotex Corp.*,403 F.3d 1331, [74USPQ2d 1398] (Fed. Cir. 2005) the Federal Circuit held that the district courts' use of "an actual practice standard" for inherent anticipation was clear error:

> Contrary to this court's precedents, the district court's analysis of inherent anticipation did not consider the teachings of the [prior art] separately from the actual production of PHC hemihydrate." Id. at 1344.

The *Apotex* court stated that what was actually done, or possible to do, in the prior art was "irrelevant since disclosure, not practice, is necessary for anticipation". *Id.*

Additionally, the threshold for enabling a prior art reference is lower than the threshold for enablement under 35 USC §112, 1st ¶ required for a patented invention insofar that the prior art reference need not demonstrate efficacy or utility. See e.g. in *Rasmusson v. Smithkline Beecham Corp.* 75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, No. 05-1313 (Fed. Cir. Nov. 20, 2006) concurring with the *Rasmusson* holding.

***vi. Contemporaneous Prior Art Recognition of Inherency Not Required***

Inherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created. *Schering Corp. v. Geneva Pharms.,Inc. 339 F.3d 1373 at 1377 [ 67 USPQ2d 1664] (Fed. Cir. 2003) citing In re Cruciferous Sprout Litig. 301 F.3d 1343,1351 [64 USPQ2d 1202] (Fed. Cir. 2002); Mehl/Biophile Int'l Corp. v. Milgraum, 192 F3d 1362,1366 [52 USPQ2d 1303] (Fed. Cir. 1999); Atlas Powder Co. v. Hanex Prods, Inc., 190 F.3d 1342,1348-49 [51 USPQ2d 1943] (Fed. Cir. 1999).*

Similarly, theoretical mechanisms or rules of natural law that are recited in a claim, that themselves are not patentable, do not need to be recognized by one of ordinary skill in the art for a finding of inherency. A person of ordinary skill does not need to recognize that a method or structure behaves according to a law of nature in order to fully and effectively practice the method or structure. *In re Ackenbach*, 45 F.2d 437, 439, 7 USPQ 268, 270 (CCPA 1930); *EMI Group North America, Inc. v. Cypress*

*Semiconductor Corporation*, 268 F.3d 1342, 60 USPQ 2d 1423, 1429 (CAFC Sept. 21, 2001).

The *EMI court* used the following hypothetical example to clarify this principle:

> Humans lit fires for thousands of years before realizing that oxygen is necessary to create and maintain a flame. The first person to discover the necessity of oxygen certainly could not have obtained a valid patent claim for "a method of making a fire by lighting a flame in the presence of oxygen." Even if prior art on lighting fires did not disclose the importance of oxygen and one of ordinary skill in the art did not know about the importance of oxygen, understanding this law of nature would not give the discoverer a right to exclude others from practicing the prior art of making fires. *EMI Group North America, Inc. v. Cypress Semiconductor Corporation*, 268 F.3d 1342, 60 USPQ 2d 1423, 1429 (CAFC Sept. 21, 2001).

**vii. *Shift of Burden:***

Once the examiner provides evidence or reasoning tending to show the inherent presence of a property or function, the burden shifts to applicant. See *Ex parte Levy cited supra; In re Fitzgerald*, 619 F.2d 67, 205 USPQ 594 (CCPA 1980). See MPEP § § 2112- 2112.02. *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Since the PTO lacks facilities to compare prior art products or methods to that claimed, the *prima facie* case can be rebutted by evidence showing lack of the inherent feature in the prior art product or method. See *In re Best*, 562 F.2d at 1255,195 USPQ at 433. See also *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 227 USPQ 773 (Fed. Cir. 1985); *In re Brown*, 459 F.2d 531, 535, 173 USPQ 685, 688 (CCPA 1972).

***Outstanding Claim Rejections - 35 USC § 102 and 35 USC § 103:***

**I. PROTEIN KINASE C INHIBITORS (intervening prior art):**

1. Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).

**Rejection Summary:** *Meichle* teaches the reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV

LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic, e.g. claims 1 or 2, or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

*Meichle* analyzed various Protein Kinase C inhibitors and their effect on both PMA- (phorbol 12-myristate-13-acetate) and TNF- (tumor necrosis factor) induced NF-κB activity in eukaryotic Jurkat cells. Using an EMSA binding assay similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, *Meichle* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request, hereby incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

Additionally, because *Meichle* used a genetic construct comprising HIV LTR and NF-κB binding site, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively *prima facie* obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been immediately envisaged, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Meichle* in order to affect associated viral (e.g. HIV) gene expression.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC § 120 for purposes of prior art.

2. Patentee Argument: *The Examiner has erroneously stated on page 10 of the Office Action that "Meichle teaches the reduction of NF-κB activity in induced cells ...." The experiments Meichle describes in which H7, H8 or staurosporine were administered to cells, including the specific experiments the Examiner relies on (portions of Figs. 2 and 3), were all conducted by pretreating cells with these protein kinase inhibitors for 30 to 45 minutes before cells were stimulated with any inducing substance. (Meichle at 8341-2, Figs. 2 and 3; Declaration of Dr. Verma, ¶.149.) . See response at page 41.*

Examiner Response:

In response to patentee's argument that the reference fails to show certain features of patentee's invention, it is noted that the feature upon which patentee relies i.e, *in vitro* cell contacting with inducer prior to contacting with inhibitor is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass "pretreating" cells with an NF-κB inhibitor prior to introduction of an NF-κB inducing or activating compound (TNF or PMA in *Meichle*).

Further, it is noted that the patentee has overlooked the *conclusion* drawn from the *Meichle* reference experimental results. The reference clearly teaches to one of ordinary skill in the art that the disclosed kinase inhibiting compounds act to inhibit activated NF-κB regulated viral transcription in eukaryotic (mammalian) cells.

3. Patentee Argument: *None of the experiments with TNF in Meichle are relevant to any of the '516 patent claims. Meichle reports various experiments conducted in two human leukemic cell lines, K562 and Jurkat cells. Meichle describes a series of experiments investigating whether in these cell lines, protein kinase C was necessary for the ability of tumor necrosis factor (TNF) to stimulate NF-κB binding activity. (Meichle at 8339, abstract). Meichle investigated this question by pretreating the cell with H7, H8 or staurosporine, three relatively non-specific protein kinase inhibitors. Id. Notably, the ability of TNF to stimulate NF-κB binding activity was unaffected by pretreatment with these inhibitors, and Meichle concludes that its ability to induce NF-κB binding activity did not involve activation of protein kinases, in particular protein kinase C (PK-C).* (Dr. Verma Declaration ¶¶ 147-148.)

Examiner Response:

Patentee, by concentrating on TNF NF-κB activation, has failed to consider the *Meichle* reference teaching as a whole which also addresses phorbol ester (PMA) NF-κB activation and the use of protein kinase inhibitors H7, H8 and staurosporine to act as NF-κB inhibitiors of PMA induced protein expression.

As taught by *Meichle* both TNF and PMA stimulate NF-κB dependent viral (HIV-1) protein expression. See *Meichle* p. 8339, particularly 2nd column: "Release of NF-κB can be achieved by treating cells with phorbol esters, "; and p.8340: "TNF, like PMA, strongly stimulated both HIV-1 and SV40 enhancer-driven chloramphenicol acetyltransferase gene expression in Jurkat cells."

The *Meichle* reference EMSA experimental evidence demonstrates that protein kinase inhibitors H7/H8 and staurosporine inhibit PMA-induced NF-κB activation in Jurkat cells. See *Meichle* p. 8341, left col. to top right col.: "H7 pretreatment of Jurkat cells impaired NF-κB activation by PMA (Fig. 2B, lane 3 versus 5)" and "At 150 nM, staurosporine blocked PMA but not TNF-induced activation of NF-κB (Fig. 2B, lanes 6 and 7)".

4. Patentee Argument: *Page 11 of the Office Action stated that Meichle teaches the use of PK inhibitors to reduce NF-κB -mediated gene transcription by reducing NF-κB activity and that because Meichle used a genetic construct comprising HIV LTR, Meichle either would anticipate or render obvious claims 3, 4, ll, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. However, nothing in Meichle either suggests or provides any data showing that PK inhibitors inhibited gene expression induced by any agent, or could do so as a result of reducing NF-κB binding activity. Meichle reports experiments conducted with Jurkat cells transfected with two different CAT reporter constructs, each of which are described as containing a CAT gene and an enhancer with an NF-κB binding site. (Meichle at 8340). However, none of the experiments with these constructs, which are reported in Fig. 3, used a PK inhibitor. (Meichle at 8341, Fig. 3). Additionally, Meichle provides no data as to whether PK inhibitors affected expression of any endogenous gene. Therefore, one would not read Meichle as either describing or suggesting use of PK inhibitors to reduce NF-κB -mediated gene transcription by reducing NF-κB activity.* (Declaration of Dr. Verma, ¶150).

Examiner Response:

As discussed, *supra*, by concentrating on TNF NF-κB activation, patentee has failed to consider the *Meichle* teaching of PMA-induced NF-κB activation and the use of H7, H8 & staurosporine as NF-κB inhibitors of PMA- induced protein expression.

The CAT reporter and EMSA assays first established that both PMA and TNF act as inducers of NF-κB mediated viral (HIV-1 and SV40) gene expression in human (Jurkat) cells transfected with an HIV-1 long terminal repeat enhancer (comprising NF-κB binding site) or SV40 enhancer linked to a chloramphenicol reporter. See *Meichle* p.8340 and Fig.1, particularly Fig.1B establishing that "TNF, like PMA, strongly stimulated both HIV-1 and SV40 enhancer-driven chloramphenicol acetyltransferase gene expression in Jurkat cells".

Additionally, in a separate EMSA inhibition assay, *Meichle* further established that protein kinase inhibitors (H7, H8 and staurosporine) block PMA-induced HIV protein expression modulated by NF-κB in Jurkat cells. See *Meichle* p. 8341, bottom left col. to top right column: "H7 pretreatment of Jurkat cells impaired NF-κB activation by PMA (Fig. 2B, lane 3 versus 5)" and "At 150 nM, staurosporine blocked PMA but not TNF-induced activation of NF-κB (Fig. 2B, lanes 6 and 7)".

Accordingly, *Meichle* provides an enabled teaching of inhibiting NF-κB mediated viral (HIV or SV40) gene expression in induced human cells (Jurkat cells).

5. Patentee Argument: *Meichle is missing critical controls necessary to show* NF-κB *effects. In his EMSA assays (Figs. 2 and 3), Meichle employed a 29 base pair oligonucleotide corresponding to a portion of the HIV enhancer. This sequence, however, has been shown to bind not only* NF-κB *but also other transcription factors including factors in the NFAT transcription factor family. To substantiate that the most slowly migrating complex observed in Meichle's EMSA assay corresponded to* NF-κB, *it would have been necessary to determine whether mutation of the putative* NF-κB *binding site abrogated binding. Without this control, the data is insufficient to support the conclusion that PK inhibitors reduced* NF-κB *binding activity.* (Dr. Verma, Dec. ¶151).

Examiner Response:

Initially, it is noted that the patentee has not provided any evidence challenging the reproducibility of *Meichle's* results nor has any evidence been provided concerning the contamination of *Meichle's* samples with other transcription regulaters (NFAT family) that bind the NF-κB enhancer.

Additionally, the *Meichle* reference acknowledged the art-recognized use of the 29 base pair oligonucleotide HIV enhancer as a control for obtaining NF-κB -specific binding (citation 42 to *Baldwin* reference on p.8340) and provided its own experimental evidence demonstrating the ability of the HIV enhancer segment to adequately function as a control:

> "The formation of the most slowly migrating complex could be inhibited by addition of excess unlabeled NF-κB oligonucle-otide (Fig. 1A, lanes 10 and 11) or an oligonucleotide containing the H2TFI binding site of the H-2K$^b$ promoter (42) (not shown). In contrast, the same amount of a size-matched oligonucleotide lacking a κB site did not compete (Fig. 1A, lane 12), indicating κB -specific binding. Induction of this complex was not inhibitable by preincubation of the cells with 30 uM cycloheximide for 30 min (not shown), which is characteristic of NF-κB activation (21, 24). " See *Meichle* p.8340, right column, 2nd ¶ under Results".

It is also noted that the 29 base HIV enhancer sequence used by *Meichle* comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and CMV found in Table 2 of the instant patent at col. 37 (as well as the consensus sequence) for vector insertion for use in conducting NF-κB modulation EMS assays. See instant patent col. 35, lines 54-col. 36, line 24.

Additionally, as pointed out in the instant patent:

> A level of discrimination among members of a related family of NF-κB binding sites, by a modified NF-κB molecule, **can** also be introduced ... A copy of a cloned NF-κB gene can be mutagenized to alter the binding domain by well known techniques ...". Instant '516 patent col. 36, line 40-47 (with emphasis).

Thus, in accordance with the instant patent's teaching, it is not necessary, but merely optional to determine whether mutation of the putative NF-κB binding site abrogates binding.

Further, *Meichle's* EMSA assay is virtually identical to that disclosed in the instant patent with the exception of the use in the instant patent assay of an alternating duplex poly (dI-dC)-poly(di-dC) copolymer as a competitor DNA species to increase sensitivity. See instant patent col. 18-19. [4]

In any event, patentee's argument is not commensurate with the instantly claimed invention that is not limited to reducing NF-κB activity by interferening with nuclear NF-κB binding at an NF-κB enhancing sequence. Per patentee's own model, the reference compound can be interfering with the ability of messenger NF-κB at the level of the cell membrane receptor or more likely at the level of the NF-κB-I-κB complex in the cytoplasm and still be within the scope of the instant claims e.g. claims 23 and 24. See Dr. Verma's Declaration ¶¶ 8 and 11.

Accordingly, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to inhibit NF-κB at the receptor and/or cytoplasmic segments of patentee's proposed model.

2. Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30).

**Rejection Summary:** *Shirakawa* teaches reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (claims 1-2) expression of a cytokine protein (claim 5) in a eukaryotic cell.

---

[4] The parent 08/418,266 application drawn to the assay issued as U.S. Pat. No. 5,804,374.

Analogous to *Meichle* discussed *supra*, *Shirikawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The authors first demonstrated that IL-1 acted to induce NF-κB activity in 70Z/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2). The EMSA binding and CAT reporter assays then confirmed that Protein Kinase Inhibitor H8 reduced NF-κB activity and reduced the resulting CAT gene expression. More particularly, the treatment of cells with H8 using EMSA resulted in "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced κ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, *Shirikawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request herein incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Shirakawa does not show reduction of NF-κB activity in induced cells since the experiments Shirakawa describes in which H8 was administered to cells, including the specific experiments the Examiner relied on (Fig. 1, portions of Fig. 2), were all conducted by pretreating cells with H8 for 2 hours before cells were stimulated with IL-I. In fact, Fig. 1 indicates that before being treated with IL-I, the cells were washed and the H8 removed. The use of H8 in this experiment as described by Shirakawa, therefore, was not in induced cells and could not have reduced any induced effect in the cell. See Shirakawa at 2425-2426.* See Response at pages 46-47; and Declaration of Dr. Verma, ¶¶ 153 and 154.

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation section *supra*, the instantly claimed invention encompasses administering the inhibitor prior to or along with the inducing compound.

Further, it is noted that the patentee has overlooked the *Shirikawa* teaching of the ability of protein kinase inhibitors, such as H-8, to reduce IL-1 induced NF-κB activity and *inhibit* protein expression *resulting from* NF-κB activation. See *Shirikawa* p. 2425, right column under "Results".

3. Patentee Argument: *Shirakawa is missing critical controls to show NF-κB effects. Each of the three PK inhibitors (H7, H8 and staurosporine) in particular at dose ranges used in Meichle and Shirakawa, are relatively unspecific and in addition to PK-C and PK-A affect numerous kinases. Significantly, by inhibiting other kinases, these agents can inhibit transcription unrelated to effects on PKC, or NF-κB. In particular, both H7 and H8 have been demonstrated to block gene expression and to inhibit mRNA chain elongation, most likely by inhibiting TFIIH kinase activity. (Yankulov et al. 1995; Kumahara et al. 1999; Declaration of Dr. Verma, ¶155). Therefore, appropriate controls are a necessity in order to properly interpret the effects of such inhibitors on a transcriptional assay, such as CAT reporter assay, as being related to NF-κB. Shirakawa omits any such controls from CAT reporter experiment described in Fig. 1, such as, for example, evidence that H8 would not affect expression of appropriately matched CAT construct lacking an NF-κB binding site. One of skill would therefore not have read Shirakawa as teaching that one could use H8 to reduce NF-κB activity.* Response at page 47-48 and Declaration of Dr. Verma, ¶¶ 152-155.

Examiner Response:

The patentee has provided no evidence regarding the presence of protein kinases other than the PKA or PKC used to induce NF-κB activity in the *Shirikawa* assay samples. Similarly, the patentee has not provided any evidence challenging the reproducibility of *Shirakawa's* results nor has any evidence been provided concerning the contamination of *Shirakawa's* samples with transcription regulaters other than NF-κB.

As noted by *Shirikawa,* the use of protein kinase inhibitors to interfere with NF-κB activity stemmed from the author's belief that the kinases PKA and PKC activate NF-κB at the level of the cytoplasm by a phosporylation event involving the naturally occurring inhibitor I-κB: "We, like *Baeurele and Baltimore* (5), favor the view that I-κB is the target of phosphorylation; the phosphorylated I-κB would presumably have a decreased ability to bind NF-κB". *Shirikawa* at p. 2428, right column. The patentee has provided no reason to challenge the inherent ability of the *Shirikawa* protein kinase inhibitors to interfere with NF-κB activation at the level of the NF-κB/ I-κB complex.

Additionally, patentee's unsupported argument calling for controls at the level of nuclear transcription is not commensurate with the instantly claimed invention that is not limited to reducing NF-κB activity by interfering with nuclear NF-κB binding at an NF-κB enhancing sequence. Per patentee's own model, compounds may interfere with the activation of NF-κB at the level of the receptor, NF-κB-I-κB complex or translocation. See Dr. Verma Declaration ¶¶ 8 and 11. Accordingly, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to interfere with NF-κB at the receptor and/or cytoplasmic segments of patentee's proposed model.

*Shirikawa's* method uses protein kinase inhibitors (H8) that are *structurally* and *functionally* within the scope of instant claims since the treatment of eukaryotic cells with H8 in the EMSA assay resulted in the reduction of already induced NF-κB activity and inhibition of protein expression. See *Shirikawa* "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced κ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were *further confirmed* in a different cell line ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, the *Shirikawa* reference provides an enabling disclosure of the ability of protein kinase inhibitors to reduce NF-κB activity and the patentee has not provided any evidence challenging the reproducibility of *Shirakawa's* results.

**IIa. CYCLOSPORIN A (intervening prior art):**

3. Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, over *Schmidt* et al., J. Virology 64:4037-4041 (August 1990). See MPEP 2131.01 (evidence of inherency).

4. **Rejection Summary:** *Schmidt* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Schmidt* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-κB-regulated gene expression. In particular, *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1ug/ml] CsA (Fig: 1, lane 6; no B or A shifts) ....". See *Schmidt* at 4038. These results were confirmed using an NF-κB CAT reporter assay as described in the '516 patent, for example at Col. 17, line 66-Col. 18, line 23.

Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB. Accordingly, *Schmidt* described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression. As such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (herein incorporated by reference), the *Schmidt* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in

light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene expression.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Schmidt does not show reduction of NF-κB activity in induced cells, as required by the claims. Patentee argues that Schmidt teaches simultaneous treatment with CsA and activator which is outside of the claim scope requiring prior cell induction.* See Response at page 51; Declaration of Dr. Verma, ¶ 25.

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with inhibitor, is not recited in the claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering the NF-κB inhibitor prior to, or with, an NF-κB activating compound.

Further, *Schmidt* teaches the addition of CsA during, as well as subsequent, to cell induced activation to reduce NF-κB activity. See *Schmidt*: "... addition of CsA during the cellular activation phase completed abolished this binding" (page 4038 left column, last ¶) and "Direct addition of CsA to a prepared nuclear extract from activated cells had no effect on the factor binding ..." (page 4038, right ¶, lines 1-8).

3. Patentee Argument: *Schmidt did not utilize the same Electrophoretic Mobility Shift Assay ("EMSA") in Jurkat cells (human T-cell leukemic cell line) disclosed in the '516 patent since Schmidt's EMSA assay differs by using HIV-LTR enhancer, instead of kappa immunoglobulin enhancer (kappa 3) to be activated by PMA and/or PHA. Schmidt's enhancing sequence fails to discriminate between the transcriptional regulators NF-κB and NFAT-1 which is a T-cell nuclear activation factor which binds -κB regulatory elements from the human immunodeficiency virus 1 (HIV-1).* Response p.51, Dr. Verma Dec. ¶¶ 22, 26-30.

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific enhancer sequence (e.g kappa 3). The instant claims require the use of a compound (e.g. cyclosporine) that exclusively or non-exclusively reduces NF-κB activity.

The *Schmidt* EMSA assay for PHA/PMA activation utilized a conventional [5] 26 base HIV enhancer sequence that comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and "consensus sequence" found in Table 2 of the instant patent for vector insertion and use in conducting EMSA assays. See *Schmidt* at page 4037, right column; and instant patent col. 35, lines 54-col. 36, line 24; col. 37 Table 2.

*Schmidt's* T-cell activation using PMA and PHA in the EMSA assay resulted in:

a. major B complex to the NF-κB enhancer; and

b. more slowly migrating A complex (Fig. 1, lane 3) which was more clearly seen when PHA alone was used (Fig. 1 lane 7).

The *Schmidt* article utilized controls in performing both the EMSA and CAT assays. For example, after performing the following *controls, Schmidt* concluded that the major B complex was ascribed to the nuclear factor NF-κB because the complex appears identical to previously reported complexes (endnotes 2, 3 and 19) obtained with similar HIV κB oligonucleotide probes since:

(i) the shift was not detected with a mutant enhancer, nor was the B shift completed for by this mutant described in reference 19 (Baltimore Nature article); and

[5] Schmidt cites an article including one of the instant inventors (Dr.Baltimore) for support: Nabel, G. and D. Baltimore 1987 Nature (London) 326:711-713.

(ii) this induced shift comigrated with a shift formed with nuclear extracts from Namalwa cells, which contain a constitutively activated kB complex (citing reference 13). *Schmidt* found that "[A]ddition of CsA during stimulation with both PHA and PMA significantly reduced the major shift (B shift) and completely abrogated the A shift (Figure 1 lane 4)". See *Schmidt* at page 4037, right column.

Additionally, patentee's "control" argument regarding the lack of a deletion mutation nuclear DNA analysis to discriminate messenger NF-κB binding to NFAT enhancer instead of NF-κB enhancer is not persuasive since this argument is *not commensurate with the instant invention* which is not limited to NF-κB binding an NF-κB enhancing sequence. See instant claims 23 and 24; and Dr. Verma's claim interpretation analysis Declaration ¶¶ 8 and 11. Thus, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to inhibit at the receptor and/or cytoplasmic segments of patentee's proposed model.

4. <u>Patentee Argument:</u> *Schmidt's CAT reported data utilizing artificial transfected cells bearing foreign bacterial DNA is outside the scope of the instant invention since:*
*a. the instant claims are not drawn to an assay and thus don't incorporate specification assays utilizing bacterial constructs; and*
*b. human, mammal or eukaryote cells of the instant claims does not normally contain foreign bacterial DNA.* Dr. Verma declaration ¶ *33.*

<u>Examiner Response:</u> The instant patent encompasses NF-κB occurrence and activation in host cell types, including T cell lines (H9, Jurkat) as well as NF-κB -related control (enhanced, reduced) of IL-2 production in said host cells as taught by *Schmidt*. See col. 26, lines 39-45; and col. 35. Neither the specification, nor the instant claims exclude the presence of bacterial DNA in eukaryotic or mammalian cells and in fact exemplify the presence of bacterial DNA in assays. In this respect, although not drawn to an assay, the instant claims clearly encompass both *in vitro* and *in vivo* NF-κB regulation.

5. Patentee Argument: *Positive EMSA binding activity induced by PHA treatment that Schmidt observed with the HIV enhancer corresponds to NFAT since "when Schmidt assessed induction of NFAT binding activity in Jurkat cells using an EMSA specific for NFAT, (Schmidt, fig. 2), there was 'good activation of NFAT-1 with PHA alone, but not with PMA alone." Additionally, in Schmidt, CsA did not prevent PMA-induced binding activity to the HIV enhancer in Jurkat cells. Verma Declaration ¶¶ 31 and 32.*

Examiner Response:

*Schmidt* (p.4037, left column) acknowledges the ability of both NF-κB and NFAT-1 to induce HIV gene expression by binding to HIV enhancers but proposed separate mechanisms upon co-activation. Accordingly, separate inducers were selected:

phytohemaglutinin (PHA) mimicking induction via the T-cell receptor; and
phorbol myristate acetate (PMA) inducing via direct activation of protein kinase C.

CsA activity was tested utilizing PHA and PMA together as well as separately. See *Schmidt*, page 4037, left column; page 4038, left column.

*Schmidt's* T-cell activation using PMA and PHA in the EMSA assay resulted in:

a. major B complex to the NF-κB enhancer; and
b. more slowly migrating A complex (Fig. 1, lane 3) which was more clearly seen when PHA alone was used (Fig. 1 lane 7).

The *Schmidt* article, after performing *controls*, concluded that the major B complex was ascribed to the nuclear factor NF-κB and found that "[A]ddition of CsA during stimulation with both PHA and PMA significantly reduced the major shift (B shift) and completely abrogated the A shift (Figure 1 lane 4)". See *Schmidt* at page 4037, right column.

After co-activation with PHA and/or PMA, the effects of CsA upon CAT inducibility conferred by HIV enhancer (kB-binding sites) in Jurkat cells was tested where it was found that CsA inhibited the PHA-derived activation signal but not the PMA signal (see Fig. 4: last four bars); and co-activation with PMA and PHA together (Fig. 4: about 47) exceeded PHA alone (Fig. 4: about 13) and PMA alone (Fig. 4: about 17).

*Accordingly, Schmidt* teaches (from two different assays utilizing HIV promoter) CsA inhibition of PHA and (PHA and PMA) NF-κB activated Jurkat cell binding and there is no evidence provided to rebut this teaching.

*Schmidt* further teaches that activation by PHA and PMA is synergistic (Fig. 4 and compare PHA and PMA alone and their combined activation).

Thus, the *Schmidt* reference teaches the ability of CsA to inhibit NF-κB activity in cells activated by PHA/PMA and thus enables the use of CsA to reduce intracellular NF-κB activity and inhibit NF-κB-mediated gene expression.

6. Patentee Argument: The *positive EMSA binding activity induced by PHA treatment that Schmidt observed with the HIV enhancer corresponds to NFAT in light of accumulated scientific evidence that CsA exerts its clinical effect through its ability to inhibit an intracellular enzyme called calcineurin that regulates the activity of NFAT (nuclear factor of activated T cells transcription factor)* citing:
*Exhibit 7: Loh et al., J. Biol. Chem.* *271(18)* *(May 1996) pages 10891-10891;*
*Exhibit 13 : Giffin et al. Nature Structure Biology,* *10(10)* *(Aug. 2003) pages 800-806;*
*Exhibit: 8: Hogan et al. Genes and Development,* *17* *(2003) pages 2205-2232;*
*Exhibit 14: Kinoshita et al. Immunity,* *6* *(March 1997) pages 235-244;*
*Exhibit 9 : Ho et al. Clin. Immun. And Immunopath.* *80(3)* *(9/96) pages S40-S45.*

See Response at page 52; and Dr. Verma Declaration ¶¶ 22, 26-36 and 40.

Examiner Response:

The evidence of record supports CsA's ability to inhibit both NF-κB and NFAT regulated intracellular gene expression within the instant claims and the above-cited documents do not support patentee's assertion that CsA does not affect NF-κB activity. A brief summary of the patentee cited documents follows:

*Loh* teaches that the calcineurin phosphatase enzyme binds NFAT (which translocates to the nucleus to bind DNA) to reversibly regulate its activity. CsA addition results in rephosphorylation of NFAT and inhibition of NFAT activated transcription.

*Giffin* teaches that NFAT1 binds cooperatively as a dimer to the NF-κB site of human immunodeficiency virus 1 (HIV-1). See Abstract; p. 801 (Fig. 1) and p. 804.

*Hogan* teaches that the NFAT family of transcription factors are evolutionary related to the Rel/NFkB family but are distinguished by their regulation by cell surface-activated calcium ion with the cytosol bound calcium ion dependent serine

phosphatase calcineurin.- NFAT complex. See Fig. 1 p.2207. NFAT also acts synergistically with transcription factors other that Fos and Jun. See Abstract and pages 2213-2214.

*Kinoshita* teaches that certain NF-AT (Rel) family members bind the κB regulatory elements and synergize with NF-κB and Tat in transcriptional activation of HIV-1, and enhance HIV-1 replication in T cells. See Abstract.

*Ho* teaches that calcineurin is an essential component of the T-cell activation pathway involving the action of CsA that acts by inhibiting signal transduction pathways (e.g. see page S42, Fig. 1). Ho teaches that one of the effects of CsA on cytokine expression in Jurkat human T-cells results from the release of calcineurin that inhibits NFAT regulated cytokine expression. See *Ho* Abstract; p. S43.

Contrary to patentee's assertion, the *Ho* reference acknowledges that CsA does affect NF-κB activity in Jurkat cells citing the *Emmel* Science 246, 1617-1620 (1989) teaching corresponding to endnote 30 for support:

> Other targets for calcineurin are likely to play a role in this process. For example, the transcriptional activity of NF-κB is inhibited by about twofold and certain AP-1 sites are inhibited by three-to fourfold (30). However, these effects are quite small compared to the several hundred- or thousandfold inhibition of properly initiated transcription at the NF-AT site (30). Ho p.S43, right col. lines 22-29.

Additionally, it is art-recognized that CsA does affect NF-κB activity consistent with the *Schmidt* and *Emmel* teaching. The following three articles (copies enclosed) *rebut* patentee's assertion regarding NF-κB's lack of a role involving CsA immunosuppresion:

*Roman-Blas* M.D. et al., Osteoarthritis and Cartilage, 14 (2006) pages 839-848 ;
*Frantz et al.* Embo J. 13 (1994) pages 861-870 ;
*Meyer et al.*, FEBS Lett 413 (1997) pages 354-358.

*Roman-Blas* teaches therapeutic strategies based on the established role of immunosuppressive agents, including CsA, to inhibit the NF-κB pathway: "Cyclosporin A inhibits the protease activity of the 20S proteasome complex preventing I-κBα degradation in murine macrophages, Jurkat lymphoma cells, and mouse and human T-lymphocytes [72,73] " See *Roman-Blas*: p. 842 (right col.at bottom) to p. 843 (left col.) and also p. 843 under "Conclusion" to p.844 including Fig. 3.
*Frantz and Meyer* represent endnotes 72 and 73, respectively cited in *Roman-Blas*.

*Frantz et al.* teach that calcineurin acts in synergy with PMA to inactivate I kappa B/MAD3, an inhibitor of NF-κB.

*Meyer et al.* teach that CsA is an uncompetitive inhibitor of proteasome activity and prevents NF-κB activation.

Accordingly, *Schmidt and Emmel* enable methods of using CsA to reduce NF-κB activity and inhibit NF-κB-mediated eukaryotic and viral gene expression.

5. Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, by *Emmel* et al., Science, 246 (Dec. 1989):1617-20 See MPEP 2131.01.

**Rejection Summary:** *Emmel* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.

Similar to the *Schmidt* reference discussed above, the *Emmel* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. eukaryotic Jurkat cells which are a human leukemic T- cell line) that inherently reduces NF-κB-regulated gene expression.

Like *Schmidt*, *Emmel* described the effects of CsA on Jurkat cells that were induced with PHA and PMA and CsA was shown (Fig. 3, .01-1ug/ml) to reduce NF-κB binding activity. In the CAT reporter assay, cells were transfected with a CAT reporter gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-κB binding site incorporated into its regulatory region. As shown in Fig. 2D, CsA significantly reduced NF-κB activity thereby reducing the NF-κB-mediated expression of CAT. Additionally, as shown in Figure 3, 0.01-1ug/ml (10-10000 ng/ml) CsA was found to reduce NF-κB binding activity. Thus, *Emmel* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene

expression, and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (incorporated by reference), the *Emmel* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Since *Emmel* used the HIV LTR gene, *Emmel* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionaly, *Emmel's* use of the HIV LTR gene renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Emmel* in order to affect associated viral (e.g. HIV) gene expression.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee argues that numerous claims are entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436. Response at page 54.*

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Emmel does not show reduction of* NF-κB *activity in induced cells, as required by the claims but teaches simultaneous treatment with CsA and activator which is outside of the claim scope requiring prior cell induction. See Response at page 55; Declaration of Dr. Verma, ¶ 38.*

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with activator prior to inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention encompasses "treating" cells with an NF-κB inhibitor prior to, with or subsequent to administration of an NF-κB activating compound.

Further, the *Emmel* reference teaches the ability to measure CsA inhibition of "stimulated" untransfected as well as transfected Jurkat cells upon incubation of these cells for 40 hours with PHA (2ug), PMA (50 ng/ml) and CsA (concentratrions of 10-1000 ng/ml)..E.g. See Fig. 2, page 1618, left column. Accordingly, contrary to patentee's argument, the *Emmel* reference teaches the treatment of stimulated or activated cells with CsA in order to determine cyclosporin's effect on NF-κB activity e.g. effect of NFk-B on the regulated gene chloramphenicol acetyltransferase or CAT.

3. Patentee Argument: *Emmel did not utilize the same Electrophoretic Mobility Shift Assay ("EMSA") in Jurkat cells (human T-cell leukemic cell line) disclosed in the '516 patent since Emmel's EMSA assay differs by using HIV-LTR enhancer, instead of kappa immunoglobulin enhancer (kappa 3) to be activated by PMA and/or PHA. Emmel's enhancing sequence fails to discriminate between the transcriptional regulators* NF-κB *and NFAT which binds kB regulatory elements from the human immunodeficiency virus 1 (HIV-1).* Response at p. 56, Dr. Verma Dec. ¶¶ 39 and 41-42.

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific enhancer sequence (kappa 3).

However, the instant claims do require the use of a compound (e.g. cyclosporine) that reduces NF-κB activity (and concomitant transcription), but need not be an exclusive, or even, a selective NF-κB inhibitor. Additionally, any amount of reduced NF-κB activity and inhibition of NF-κB mediated gene expression is within the instant method claim scope.

*Emmel* teaches the ability of CsA to inhibit NF-κB activity in PHA and PMA activated cells as discussed in the rejection above, and herein summarized.

The *Emmel* EMSA-CAT assays for PHA and PMA activation utilized a conventional 26 base HIV enhancer sequence that comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and "consensus sequence found in Table 2 of the instant patent for vector insertion and use in conducting EMSA assays. See *Emmel* at p. 1618, Fig. 2 (D) citing endnote 17 to *Nabel and Baltimore* Nature article; and instant patent col. 35, lines 54-col. 36, line 24 and col. 37 Table 2.

Upon performing the CAT assay, *Emmel* concluded that "Smaller inhibitory effects of CsA were detected for the ability of the site to activate expression of CAT ...". *Emmel* at page 1618 bottom of middle column to top of 3rd column; and Fig. 2 (D).

*Emmel* further performed the nuclear extract EMSA to measure the NF-κB effects of CsA on the appearance of binding activity on various transcriptional regulators including NF-κB. Again *Emmel* concluded that CsA acted to inhibit NF-κB activity: "NF-κB binding was reduced 10 to 20% in nuclear extracts of CsA-treated cells". See *Emmel* at page 1618, right column and Fig. 3C.

In light of the assay evidence, *Emmel* enables the use of cyclosporine to reduce NF-κB activity and NF-κB mediated gene expression in activated T-cells.

4. Patentee Argument: *Emmel provides the following evidence that NF-κB does not mediate effects of CsA on gene expression and that CsA acts through NFAT, not through NF-κB:*

*- In the Fig. 1 CsA "sensitivity" assay of single deletion of IL-2 enhancer effects on CAT transcription, "deleting the* NF-κB *binding site did not affect the ability of CsA to prevent PHA/PMA from inducing CAT expression" (Dr. Verma: ¶ 40, lines 6-8).*

*- Emmel states: "A binding site for NF-κB is present in the long terminal repeat of the human immunodeficiency virus (HIV-LTR) (17), yet CsA "sensitivity" of the HIV-LTR is independent of this site (18)" (Emmel page 1619, middle column). See Dr. Verma's Declaration, ¶¶ 39-40.*

*-In the Fig. 2 CAT expression assay, CsA abolished the ability of tandem repeats of the NFAT construct to direct transcription of the CAT gene (page 1618, middle column and Figure 2); and*

Examiner Response:

The evidence of record indicates that CsA inhibits intracellular gene transcription via both NF-κB and NFAT within the instant claims scope.

Evidence of the ability of CsA to activate nuclear protein transcription (IL-2 or HIV) independent of the nuclear NF-κB enhancing sequence as in *Emmel* Fig. 1 for the IL-2 enhancer and as in reference (17) for HIV-LTR enhancer is not dispositive of the

ability of CsA to reduce NF-κB activity outside the nucleus i.e. at the level of the cytoplasm NF-κB/I-κB complex.

Regarding the Fig. 1 CsA "sensitivity" assay, at best, the results of this assay are inconclusive regarding CsA's affect on NF-κB activity. As noted by *Emmel*, more than a single region is responsible for the inhibitor effect of CsA, and in this regard the CsA "sensitivity" deletion assay (Fig. 1) is a ***relative*** measure of the importance of various transcriptional binding DNA protein regions present on the IL-2 enhancer and **additional assays were necessary** to "further define the effects of CsA on the function of the IL-2 enhancer". See *Emmel* at page 1618, left column.

Accordingly, patentee's first two arguments addressing deletion of a nuclear NF-κB binding site is not persuasive since such evidence is not determinative of the effects of CsA on NF-κB activity and protein (e.g.IL-2 or HIV) transciption. Additionally, such evidence overlooks the ability of CsA to interfere with NF-κB activity at the level of I-κB in the cytoplasm. Further, the instant claims are not limited to inhibition of nuclear gene transcription by NF-κB only at nuclear NF-κB binding sites.

With regard to the Fig. 2 assay and the *Emmel* statement that CsA abolished the ability of the NFAT construct to direct transcription of the CAT gene, patentee overlooks the fact that in the same CAT receptor assay (Fig. 2D) CsA *still inhibited* NF-κB activated CAT expression albeit to a smaller extent as compared to NFAT (Fig. 2B). Accordingly, the *Emmel* teaching of CsA reduction of NF-κB activity is within the instant claimed scope that is not limited by NF-κB inhibitory degree or NF-κB exclusivity. This is consistent with the *Emmel* Abstract: teaching that cyclosporin A was found to specifically inhibit the appearance of DNA binding activity of NFAT, AP-3, and to a lesser extent NF-κB nuclear proteins that appear to be important in the transcriptional activation of the genes for interleukin-2 and its receptor, as well as several other lymphokines.

5. Patentee Argument: *Emmel's NF-κB inhibition data should be attributed to NFAT in light of the accumulated scientific evidence that indicates that CsA exerts its clinical effect through its ability to inhibit an intracellular enzyme called calcineurin which regulates the activity of the NFAT and that CsA does not affect NF-κB activity (e.g. inhibits Il-2 expression) in Jurkat cells*" (Dr. Verma, ¶¶ 34 for Schmidt and 40 for Emmel: response page 52 (top) for Schmidt and page 56 top for Emmel) *citing:*

*Exhibit 7: Loh et al., J. Biol. Chem.* 271(18) *(May 1996) pages 10891-10891;*
*Exhibit 13 : Giffin et al. Nature Structure Biology,* 10(10) *(Aug. 2003) pages 800-806;*
*Exhibit: 8: Hogan et al. Genes and Development,* 17 *(2003) pages 2205-2232;*
*Exhibit 14: Kinoshita et al. Immunity,* 6 *(March 1997) pages 235-244; and*
*Exhibit 9 : Ho et al. Clin. Immun. And Immunopath.* 80(3) *(9/96) pages S40-S45.*

*See* Response at page 52; and Dr. Verma Declaration ¶¶ 22 and 26-36.

Examiner Response:

As discussed *supra* under the *Schmidt* rejection the evidence of record supports CsA inhibition of both NF-κB and NFAT regulated intracellular gene expression within the instant claim scope and the above-cited documents do not support patentee's assertion that CsA does not affect NF-κB activity and the inhibition of IL-2 expression.

6. Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103 by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990).

**Rejection Summary:** *Brini* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. T-cells) that inherently reduces NF-κB-regulated gene expression.

Particularly, *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516 patent to assess NF-κB activity and binding (see '516 patent, columns 17-18). *Brini* concluded that "CsA reduced the PHA-induced binding of transactivating factors from T-cells and κB-like sequences which are present in the IL-2R alpha gene and in the HIV-1 LTR gene (Figures 3 and 4)". See *Brini* at page 137. Additionally, *Brini* reported the effects of CsA on expression levels of IL-2 Receptor-alpha (*Brini* at page 131 Abstract) which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-cells. See '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (incorporated by reference), the Emmel reference expressly anticipates at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 85, 88-89, and 93-97 of the '516 patent.

Additionally, since *Brini* used the HIV LTR gene, *Brini* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Brini's* use of HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Brini* in order to affect associated viral (e.g. HIV) gene expression.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee argues that numerous claims are entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436. Response at page 58.*

Examiner Response: For the reasons discussed *supra,* the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Brini does not show reduction of NF-κB activity in induced cells, as required by the claims. Brini teaches that "CsA was always added to the cells 30 min before stimulation with PHA" which is outside of the claim scope requiring prior cell induction.* See Response at p. 59; Dr. Verma, ¶¶ 44-46.

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with an inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation *supra*, the instantly claimed invention encompasses administering the NF-κB inhibitor prior to (e.g. pretreatment) or with the NF-κB activating compound.

Further, the *Brini* reference clearly addresses the ability of CsA to inhibit gene expression in a eukaryotic cell that is induced by PHA to release NF-κB and express protein: "Here we have examined the *inhibitory effect of CsA* on the activation of the IL-2Ralpha gene expression in primary human T lymphocytes induced by PHA (emphasis provided)." See p.132, left column, 2nd full ¶.

Additionally, *Brini* teaches that, unlike the IL-2 receptor beta subunit, the IL-2 alpha subunit is not expressed in resting T-cells, but only is expressed on the surface of activated T-cells. Accordingly, any CsA inhibition of IL-2 alpha subunit transcription shown in the *Brini* assays must result from the inhibition of already activated T-cells. See *Brini* at page 131, right column last ¶.

3. Patentee Argument: *The Examiner relies on EMSA binding assays (Fig. 3 and 4) utilizing an oligonucleotide probe corresponding to the Il-2 receptor promoter or a sequence corresponding to a portion of the HIV LTR both showed "several discrete-retarded DNA proteins" but neither of the EMSA Brini assays demonstrates whether the CsA sensitive binding activity corresponds to* NF-κB. *A control DNA sequence is important to distinguish* NF-κB *from other nuclear transcription factors, such as NFAT discussed in Schmidt and Emmel, so as to confirm the identity of any CsA-sensitive*

*binding complexes and discriminate between* NF-κB *activity and NFAT binding activity. Dr. Verma ¶¶ 47-49.*

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific "control" enhancer sequence. Additionally, the instant claims are not limited to nuclear transcription inhibition only at an NF-κB enhancer sequence.

Regarding the EMSA enhancer sequence, it is noted that *Brini* utilized an IL-2R-alpha enhancing sequence (245-291) that comprised the underlined GGGAATCTCC NF-κB binding sequence disclosed in the instant patent (col. 37, Table 2 3rd from the bottom) recommended for use in EMSA binding assays. It is further noted that the underlined nucleotide sequence is within the scope of the instant patent's "consensus sequence" (see col. 36, lines 5-15).

As pointed out in the instant patent, the utilization of mutation assays to obtain selective NF-κB inhibition is optional. See instant patent col. 36, lines 40-55. Accordingly, patentee's argument regarding the non-use by *Brini* of a discriminatory control sequence is not commensurate to the scope of the instant claims that do not require "selective" NF-κB inhibition.

Further, it is noted that the Examiner does not specifically rely on any one of the particular *Brini* assay results but is considering the *Brini* teaching as a whole, which includes all of the *Brini* assay results in light of what was known in the prior art regarding CsA regulation of IL-2 receptor alpha chain expression.

In this regard, previous mutation-deletion analysis established a 5' IL-2R alpha regulatory region (between –267 and –244) that shares high homology with the NF-κB binding sites with kappa light chain immununoglobulin gene and an NF-κB binding site for HIV-1 and is recognized by specific nuclear binding proteins including HIVEN86 and NF-κB. This suggested that NF-κB activation may be due to dissociation from a cytoplasmic inhibitor IκB. Brini at page 132, left column.

The *Brini* nuclear extract EMSA assays using an IL-2R-alpha probe containing an NF-κB binding site (Fig. 3) and an HIV-LTR probe containing an NF-κB binding site (Fig. 4) that confirmed the ability of CsA to retard the formation of two separate DNA-protein complexes one of which was concluded by *Brini* to be attributed to NF-κB. After reviewing their assay evidence the *Brini* authors concluded that CsA acted to inhibit NF-κB regulated expression, not at the nuclear level, but *indirectly* through its effect on the cytoplasmic I-κB inhibitor. Brini at p.137.

4. Patentee Argument: *The fact that Brini observed a substantial level of binding activity in untreated cells makes it unlikely that the complexes Brini observed correspond to NF-κB, because one would not observe NF-κB activity in uninduced cells. (see '516 patent, Example 8 and Fig..24A). Moreover, CsA alone appears to increase levels of the complexes that Examiner interprets correspond to NF-κB. (Fig. 3, lane 2). In particular, the assumption that these complexes correspond to NF-κB is inconsistent with the premise that in the Brini experiments, NF-κB activity regulated IL-2 receptor expression, because there is no correlation between the presence of these complexes in the EMSA assays (Figs. 3 and 4) and IL-2 receptor mRNA expression (Fig. 2). Dr. Verma Dec.¶¶ 50 and 52.*

Examiner Response:

Initially, it is noted that that patentee's argument is not commensurate with the instant claimed scope that is not limited to a specific assay e.g patentee's Example 8.

In any event, patentee's comparison between the instant patent Example 8 and Fig. 24A results with *Brini's* is not a valid comparison.

*Brini's* Fig. 3 assay gel retardation patterns utilized "human peripheral blood T-lymphocytes isolated from heparinized venous blood of healthy volunteers" (see *Brini* at p.132 under "Materials and Methods") whereas the instant patent's gel assays utilized Jurkat cells (a human T leukemia cell line).

Accordingly, under different experimental conditions, utilizing different cells (Jurkat leukemia cells), the instant patent's uninduced Jurkat cells were negative for NF-κB activity, whereas stimulated Jurkat cells contained detectable levels of NF-κB with combined PHA/PMA being synergistic. Instant Patent at: col. 73, lines 1-7.

However, the presence of NF-κB complexes in uninduced Brini T-cells may be explained by:

A. a difference in *NF-κB* regulation and CsA inhibition between Jurkat leukemic cells and human peripheral blood T-lymphocytes. This difference is supported by *Brini*: "CsA shows no inhibitory effect on the surface expression of the IL2Ralpha in the human Tcell Jurkat, whereas, in human mitogen activated PBMC (13) and in murine thymocytes (14) CsA inhibits the IL2R-alpha chain (Tac) surface expression". See *Brini* at page 131, right column;

B. the nature of *Brini's* PBMC sample since "constitutive expression" of NF-κB may be occurring in *Brini's* isolated human T-cell samples or the *Brini* isolated T-cell sample may have come from an individual who was experiencing, or had recently experienced, an NF-κB inducing stimulus (infection, virus etc.) or

C. different experimental conditions.

Regarding, the correlation between NF-κB release (upon PHA activation) and CsA inhibition of IL-2R-alpha expression, *Brini* attempted to delineate the CsA mechanism for reducing PHA-induced expression of IL-2R-alpha. In this respect, the Fig. 2 Brini assay results showed that "IL-2R-alpa mRNA's were readily induced by PHA and pretreatment with CsA at 1ug/ml before cell activation caused a significant inhibition of the IL-2R-alpha mRNA inhibition". *Brini* at p. 134. Insofar that PHA acts to release NF-κB, the Fig. 2 data suggests that NF-κB is playing a role in the ability of CsA to inhibit IL-2R-alpha expression in T-cells.

5. Patentee Argument: *Brini provides "no evidence as to whether PHA treatment alone would induce* NF-κB *activity so as to induce IL-2 receptor expression". In this regard, Examiner's reliance on data indicating cyclosporin's ability to slightly decrease (approximately 40-50%) PHA-induced IL-2 receptor alpha expression is insufficient. Additionally, patentee argues that the Examiner's interpretation of the instant '516 patent teaching that "NF-kB is induced in T cells ... by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene ..." is erroneous. Dr. Verma Declaration at ¶ 51.*

Examiner Response:

Initially, it is noted that *Brini* labels CsA as achieving "significant" inhibition of 41+3% (at 24 hours) and 52 + 4% (at 40 hours) of IL-2Ralpha mRNA induction. See p.134, left column and Fig. 2.

Additionally, as pointed out in the rejection above, the total *Brini* assay evidence in light of what was known in the art discloses that administration of CsA reduces NF-κB in cells e.g. T-cells that inherently reduces NF-κB-regulated gene expression.

As further pointed out above, *Brini* suggests a CsA mechanism in PMA/PHA activated T-cells (interference at the cytoplasm inhibitor level) that is consistent with patentee's own specification statement (now produced in context):

> Recently, NF-kappa.B has been implicated in several other inducible systems. For example, NF-kappa.B is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor .alpha. gene and possibly the IL-2 gene. Bohnlein et al., Cell, 53:827-836 (1988); Leung, K. and G. Nabel, Nature, 333:776-778 (1988); Ruben et al., Science, 241:89-92 (1988); Cross et al., Science, (1989); and Lenardo et al., Proc. Natl. Acad. Sci. USA, 85:8825-8829 (1988). '516 patent, col. 17, lines 20-28: relevant part underlined.

Accordingly both *Brini* and the instant patent (see underlined text above) teach that PHA (and/or PMA as underlined) activated T-cells release NF-κB to induce gene expression.

Thus, *Brini's* data indicating that CsA acts at the level of the NF-κB-I-κB complex to inhibit NF-κB regulation of IL-2 receptor- alpha gene expression is consistent with the above-referred to instant patent teaching. See also instant patent at col. 35, lines 13-20 regarding the role of activated NF-κB in IL-2R-alpha transcription.

6. Patentee Argument: *Without data, the Examiner has no basis to assume that treatment of T-cells with PHA alone (as compared to PHA and PMA) induce* NF-κB *activity so as to induce expression of any gene. In fact; Brini reports that PHA appeared to induce binding activity of at least one other transcription factor, AP1, having binding sites in the IL-2 receptor promoter (Fig. 5). Dr. Verma Declaration at ¶ 52.*

As discussed *supra*, it is clear from the *Brini* article that PHA (and PMA) activates NF-κB to induce gene expression. Additionally, *Brini* provides evidence that CsA reduces NF-κB activity indirectly at the level of its inhibitor I-κB and not directly at the level of nuclear protein transcription. See detailed *Brini* discussion at page 136-137.

With respect to AP1, although patentee is correct that Fig. 5B shows that APA binds a nuclear enhancer sequence upon PHA activation, the author further notes that "CsA does not affect AP-1 binding site" (see Fig. 5 explanation) and thus is not inhibiting directly at the nuclear level of transcription.

However, the argument that other NF-κB like factors (including APA) in addition to NF-κB, may be inhibited by CsA is irrelevant since the instant claims are not limited to exclusive NF-κB inhibition.

Additionally, to the extent that the patentee is arguing that *Brini* fails to completely elucidate the mechanism involving CsA inhibition of activated human T-cells gene expression it is noted that mechanisms need not be recognized by one of ordinary skill in the art for a finding of inherency. *EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, [60 USPQ 2d 1423] (CAFC Sept. 21, 2001).

**IIa. CYCLOSPORIN A (references prior to 12/24/86)**

7. Claims 1-2, 6, 8-9, 20-27, 29, 31-38, 40, 64-73, 75-80, 82, 84 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by the Physician's Desk Reference (*PDR: 1985*) pages 1811-13, *Griffith I* (Griffith et al., Ann. Surg. 196 (9/82): 324-329) or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. 99 (12/84): 952-957) as evidenced by Holschermann et al., Circulation 96 (12/97) 4232-4238. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *PDR* (1985), *Griffith I and*, *Griffith II* teach cyclosporin A (CsA) administration of cells, which is shown from the teaching of *Holschermann,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different eukaryotic cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene (claims 1-2) expression in a eukaryotic cell.

The *PDR 1985*, *Griffith I* and *Griffith II* references all teach the *in vivo* administration of CsA to cardiac transplant patients.

*PDR 1985* teaches that CsA should be administered before and after surgery for 1-2 weeks at a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a final level of 5-10 mg/kg/day. When monitoring whole blood levels, a 24-hour trough value of 250-800 ng/ml CsA appeared to minimize side effects and rejection effects.

*Griffith I* reports the administration of 5-10 mg/kg/d of CsA (average 8 mg/kg/d); while *Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to obtain a targeted blood level of CsA of about 1000ng/ml.

*Holschermann* provides extrinsic evidence that the PDR 1985, Griffith I, and Griffith II references inherently anticipate the subject claims.

*Holschermann* essentially repeated the tests disclosed in the *Griffith I* and *II* references by administering 3.4 ± 0.3 mg/kg/day CsA to cardiac transplant patients, resulting in blood levels of 681 ± 176 ng/ml. PBM cells were isolated from the blood of the patients before and after CsA therapy, and nuclear extracts from the cells were prepared. Id. *Hölschermann* then conducted an EMSA assay using nuclear extracts (see Figure 4) which is the same assay format taught by the '516 patent for determining whether compounds (i) reduce NF-κB activity and (ii) reduce binding of NF-κB to NF-κB recognition sites. See '516 patent, Col. 18, l.52 - Col. 20, l. 25.

*Holschermann* confirms that administering CsA to cardiac patients as taught by the prior art *PDR 1985* and *Griffith I* and *II* references necessarily inherently reduces NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected (Fig. 4), whereas cells separated from blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. Specificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides. *Id.* at 4236.

*Holschermann* also showed that the administration of CsA to these patients as taught in the prior art *PDR 1985* and *Griffith I* and *II* references reduced Tissue Factor

(TF) gene transcription, which is recognized as being regulated by NF-κB: "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237.

Thus, CsA, as administered in *PDR 1985* and *Griffith I* and *II*:

-inhibited expression of a gene whose transcription is regulated by NF-κB (instant claims 1 and 2 and their dependent claims);

-diminished NF-κB-mediated intracellular signaling (clm 6 and dependent claims); and

-reduced NF-κB-mediated effects of external influences (claims 7 and 8 and dependent claims).

Since CsA was shown to reduce binding of NF-κB in an EMSA assay which measures binding of NF-κB to NF-κB recognition sites, *Holschermann* confirms that the prior art administration of CsA to cardiac patients reduces NF-κB activity by "reducing binding of NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g. claims 25, 36 and 58). Additionally, because unbound NF-κB translocates to the nucleus, the reduced binding activity in the nucleus of cells reflected in *Hölschermann* means that CsA, as administered in *PDR 1985* and *Griffith I* and *II*, necessarily reduced NF-κB activity by:

A. "decreasing the level of NF-κB not bound in any NF-κB- IκB complex" (e.g. claims 20, 31 and 53); and

B. "inhibiting the passage of NF-κB into the nucleus of cells (e.g. claims 21, 32 and 54).

Furthermore, as *Hölschermann* indicates, CsA is recognized as being able to "abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB." *Id.* at 4237 (citing *Alkalay*). *Hölschermann* confirms that this effect on degradation of IκB is the mechanism by which CsA reduced NFκB in these cardiac patients. Thus, Cyclosporin A when administered to humans as in the *PDR 1985* and *Griffith I* and *II* references reduces NF-κB activity by:

A. "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g. claims 22 and 33); and

B. "inhibiting degradation of an I-κB protein" (e.g. claims 23 and 34).

Finally, as demonstrated by *Hölschermann*, the *PDR 1985* and *Griffith I* and *II* reference CsA administration to human patients reduced NF-κB activity in those patients'

peripheral blood mononuclear cells (PBM's comprised of lymphocytes and monocytes) which anticipates:

(1) eukaryotic cells (claims 1-2, 5, and 9);
(2) mammalian cells (claims 26, 37, 70, 82 and 94);
(3) human cells (claims 27, 38, 71, 84 and 95);
(4) immune cells (claims 61 and 72); and
(5) lymphocyte cells (claims 29, 40, 62, 73 and 97).

It is noted that the dosage and blood levels of CsA shown by *Holschermann* to reduce NF-κB activity is slightly lower than the dosages and blood levels of CsA taught in the *PDR 1985,Griffith I* and *II* references. Accordingly, an even greater reduction in NF-κB activity would result from the prior art administration of CsA to patients as described these references than shown in *Holschermann*. Moreover, regardless whether the effect of CsA in reducing NF-κB activity and resulting monocyte TF activation is direct (by directly affecting monocytes) or indirect (by interfering with stimulatory lymphocytes), *Holschermann* shows that CsA, as administered in the prior art references reduces NF-κB activity and resulting TF gene expression. Thus, its administration to cardiac transplant patients as taught in *PDR 1985, Griffith I* and *II* anticipates at least claims 1-2, 6, 8-9, 20-27, 29, 31-38, 40, 64-73, 75-80, 82, 84, 86 and 88-97 of the'516 patent, as set forth in more detail in *Exhibit H-1* of the 90/007,503 Request (incorporated by reference).

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Griffith 1981 and 1984 describe various clinical studies conducted to evaluate use of CsA in transplant patients. The 1985 PDR describes potential use of CsA in transplant patients. None of these references describes method of using CsA that would carry out the method recited in any of the claims. None of these references mention* NF-κB, *describes any external influence that would necessarily induce* NF-κB *activity or* NF-κB *mediated intracellular signaling or describe any effect of CsA necessarily resulting from or mediated through* NF-κB. *Moreover, I disagree that Holschermann provides any basis for concluding that such elements would necessarily have occurred in any prior use of CsA as described by Griffith 1981 or 1984, or the 1985 PDR. Dr. Verma Declaration ¶¶ 65 and 66.*

Examiner Response:

In response to patentee's arguments against the *Griffith (1981 or 1984)* and *1985 PDR* references individually, it is noted that the above rejection is based on the prior art teaching of these references along with the *Holschermann* evidentiary document. The *Holschermann* document is being cited to demonstrate that the *Griffith (1981 and 1984)* and *1985 PDR* teaching of administering CsA inherently produces inhibition of NF-κB activity within the scope of the instant claims. Accordingly, the prior art references anticipate the instant invention since these references enable the practice of a method that inherently is NF-κB-mediated. Contemporaneous recognition of NF-κB's role in the prior art method is not necessary for anticipation.

2. Patentee Argument: *The claims are directed to methods carried out on cells in which NF-κB activity has first been induced by some inducing stimulus (external influence). Neither the Griffith studies, nor the 1985 PDR identifies an external influence that would have necessarily induced NF-κB activity. Moreover, in the patient studies reported in Griffith 1981 and 1984, CsA was administered before transplantation. As the Examiner indicates, the 1985 PDR teaches CsA should be administered first before and then after surgery. There is no evidence that any of these methods of using CsA described in the pre-April 21, 1989 references art would necessarily involve administration of CsA in cells in which NF-κB activity has first been induced.* Dr. Verma Declaration ¶¶ 65-66 and 68.

Examiner Response:

As pointed out above, *Holschermann* provides evidentiary support for the prior art (Griffith 1981 and 1984; and 1985 PDR) methods *in vivo* "inherent" reduction of NF-κB activity and inhibition of NF-κB regulated intracellular eukaryotic gene expression. *Holschermann* teaches that CsA administration in cardiac transplant patients, as taught by the *Griffith and PDR* references, acts at the cellular level to inhibit NF-κB regulated gene expression (e.g. tissue factor).

The instant claims don't require identification of "an inducing stimulus" or "external influence" occurring in cardiac transplant patients that triggers the release of NF-κB. Additionally, to the extent that patentee is arguing that the references fail to

teach the mechanism of NF-κB activation occurring in these patients, courts have recognized that a mechanism need not be recognized by one of ordinary skill in the art for purposes of inherency.

Regarding, patentee's "first to induce" argument it is again noted that the claims do not specify that cell induction (at whatever level) occurs prior to the cell being contacted with an NF-κB inhibitor. The claims merely require a method that reduces NF-κB activity and inhibits NF-κB regulated gene expression. Additionally, as further discussed in the claim interpretation section *supra*, the instantly claimed invention would encompass administering an NF-κB inhibitor prior to, with or subsequent to the administration of an NF-κB inducing compound.

In any event, the *1985 PDR* reference teaches administeing the NF-κB inhibitor cyclosporine both prior and <u>subsequent</u> to the transplant, thus rendering patentee's "first to induce" argument moot.

Additionally, the *1985 PDR* and *Griffith* references teach <u>treating</u> cardiac transplant patients by administering CsA to "inherently" interfere with the NF-κB pathway (abolish inducible phosphorylation and degradation of IκB) to inhibit an NF-κB regulated effect as taught by *Holshermann*. The prior art teaching of treating patients with CsA is consistent with the patentee argument that the instant claims encompass "providing a <u>therapeutic benefit</u> by intervening in the processes that constitute the NF-κB pathway, are associated with NF-kB activity, and cause subsequent NF-κB regulated effects" (with emphasis). See Response p.30.

3. <u>Patentee Argument</u>: *The accumulated scientific evidence indicates that CsA exerts its clinical effect as an immunosuppressant through its effect on transcriptional factor NFAT. The only potential effect of CsA on gene expression which the 1985 PDR mentions is on expression of IL-2, which the data discussed above indicates is mediated not through* NF-κB *but through NFAT.* Dr. Verma Declaration ¶ 67.

Examiner Response:

Initially, it is noted that the instant claims don't require the use of an selective NF-κB inhibitor and accordingly, CsA is still within the scope of the instant invention even if it down-regulates gene expression via both NF-κB and NFAT.

Further, it is the position of the Examiner that the accumulated scientific evidence indicates that CsA exerts its effect via an NF-κB mediated mechanism as indicated by:
*Schmidt & Emmel:* CsA inhibits NF-κB mediated IL-2 and HIV protein transcription.

*Brini:* CsA affects NF-κB mediated IL-2 receptor and HIV protein expression via a mechanism that includes interference with the NF-κB/IκB complex.

*Roman-Blas* et al (citing *Frantz et al.* and *Meyer et al.,* ) teaches therapeutic strategies (e.g. arthritis) based on the established role of immunosuppressive agents, including CsA, to inhibit the NF-κB pathway by affecting the NF-κB/IκB complex in murine macrophages, Jurkat lymphoma cells, and mouse and human T-lymphocytes.

*Holschermann* teaches that CsA administered to heart transplant patients interferes in the NF-κB pathway by abolishing inducible phosphorylation and degradation of I-kB to inhibit an NF-κB regulated effect (tissue factor expression).

4. Patentee Argument: *Patentee argues that Holschermann failed to "repeat the use" described in the PDR 1985 and Griffith I and II references noting differences in the timing and amounts of patient CsA administration as well as the further administration of azathioprene and aspirin. Additionally, Holschermann's in vitro manipulation of cells does not reflect what is occurring in the PDR 1985 and Griffith patients in vivo.* Response at pages 69-70; Dr. Verma Declaration ¶¶ 69 and 72.

Examiner Response:

As recognized by the CAFC, "Anticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure." See *In re Donohue*, 766 F.2d 531,533[ 226 USPQ 619] (Fed. Circ. 1985; *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373,1380 [ 67 USPQ2d 1664] (Fed. Cir. 2003).

As discussed in the rejection above, the *PDR 1985* and the *Griffith I and II* documents enable the use of cyclosporine (CsA) to treat cardiac transplant patients.

*Holschermann* provides *ex vivo* and *in vitro* assay (TF-mRNA expression; EMSA determined NF-κB binding activity in lymphocytes and monocytes) evidence obtained from transplant patient (and controls) correlative to human utility to establish CsA's ability to inhibit NF-κB regulated gene (i.e. TF) expression. *Holschermann* further elucidates the *in vitro* and *in vivo* mechanism by which CsA inhibits NF-κB activation.

The patentee has failed to provide any evidence to rebut the *Holschermann* teaching of the inherent effect of CsA upon administration to cardiac transplant patients including those disclosed in the *PDR 1985* and *Griffith* references. Nor has the patentee provided evidence and/or a scientific rationale that the referred to method differences between *Holschermann* and the *PDR 1985* and *Griffith* references would interfere with CsA's ability to regulate NF-κB-mediated gene expression.

A document teaching is presumed operable and enabled absent rebuttal evidence (MPEP § 2121 at 2100-64 to 2100-67). Additionally, the threshold for enabling an anticipatory document is lower than the threshold for enablement under 35 USC 112, first ¶ required for a patented invention. See *Rasmusson v. Smithkline Beecham Corp.* 75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, 81 USPQ2d (Fed. Cir. 2006).

5. Patentee Argument: *The authors observed that TF activity appeared to be reduced in PBMC's isolated from some, but notably, not from all patients after being administered CsA. Holscherman Fig. 2B.* .Dr. Verma Declaration, ¶ 70.

Examiner Response: The Examiner disagrees with Dr. Verma's analysis of the data presented in the *Holschermann* assays.

The *Holschermann* assays described in Figures 1-2 and Table 2 teach:

a. Fig. 1: In 10 samples from 10 different cardiac patients, isolated mononuclear cells had markedly increased TF generation after incubation with or without LPS compared with healthy control subjects (unrelated to increased monocyte counts).

b. Table 2: 10 samples of isolated mononuclear cells from 10 cardiac transplant patients before and after daily CsA administration were assayed for the effect of CsA on TF activity. Table 2 demonstrates that the degree of TF activity generated by mononuclear cells was inversely related to CsA blood levels which was reproducible. Additionally,

both Fig. 2A and Table 2 show that monocyte TF induction was reduced after CsA application in **all transplant recipients** and "Likewise, a similar inverse relationship between CsA blood concentrations and TF inducibility was observed when highly purified monocytes/macrophages were analyzed instead of whole mononuclear cells (Fig. 2B)". *Holschermann* at page 4234 (with emphasis). Fig.1,2 and Table 2.

Upon review of Fig. 2B it is clear that <u>at least</u> 9 out of 10 patient samples had decreasing TF activity with increasing CsA administration as indicated by negative sloping lines. It's only with respect to the lowest amount of TF activity (about 10ml/$10^6$ cells) that CsA administration had only a slight effect on decreasing TF activity that would be expected in light of the small TF sample amount capable of being induced.

Additionally, patentee's argument is not commensurate to the claimed invention, which does not require CsA achieve 100% NF-κB inhibition and/or successfully treat 100% of the patients. In this respect, the Board of Patent Appeals and Interferences held that a method claim limitation reciting "inoculating said plant with <u>a nematode inhibiting</u> strain of *P.Cecapia*" was inherent to the reference Dart inoculating method using a *P.Cecapia* strain in light of patentee's specification page 18 teaching that *P.Cecapia* possessed an 18% nematode-inhibition rating. The Board held that the strain was "nematode-inhibiting" and met the claim that did not recite a specific degree of inhibition. See *Ex parte Novitski*, 26 USPQ2d 1389, 1391 (B.P.A.I. 1993).

6. <u>Patentee Argument</u>: *The only data relating to transcription of the TF gene in patients (Holschermann Fig. 3) fails to demonstrate any link between NF-κB activity and TF expression. In particular, Fig. 3 reports TF mRNA levels in cells directly isolated from patients before CsA treatment (lane 2) and after treatment (lane 5). Holschermann purportedly found significant activation of* NF-κB *in mononuclear cells directly isolated from patients before CsA treatment (Fig.4), but at the same time, did not observe detectable TF mRNA expression in such cells. (Fig.3, lane 2). These data show that in vivo, there was an apparent lack of correlation between purported NF-κB activity and transcription of the TF gene in the mononuclear cells of the transplant patients. Thus this data fails to support the inference that in transplant patients, TF gene expression is necessarily mediated by NF-κB or caused by induced NF-κB activity.* Dr.Verma Declaration ¶ 71.

Examiner Response:

Patentee's analysis is deficient in the following ways.

The *Holschermann* Fig. 3 assay of TF-mRNA expression employs a dye (e.g. ethidium bromide) that is less sensitive than the radiolabel employed in Fig. 4 for detecting NF-κB in the EMSA assay and Fig. 3 is a colorimetric assay that is more difficult to visualize than the black and white radiolabel utilized in the Fig. 4 assay, especially when viewing a photocopy of a photocopy.

Upon viewing the original *Holschermann* document, even in black and white, the Examiner was able to visualize in Fig. 3 discernible bands representative of Lane 2 (*ex vivo* unpurified) and particularly Lane 3 (more pure sample), both of which represent the presence of TF mRNA in the *ex-vivo* blood samples. This observation is consistent with the *Holschermann* teaching (p.4235, right column, with emphasis) that

> "Cells obtained from transplant recipients in the presence of low baseline CsA blood levels (sample before CsA administration) **exhibited moderate TF mRNA expression** in the absence of LPS" (representative of Fig. 3 Lanes 2 and 3) and "a strong TF mRNA expression when challenged with LPS" (representative of Fig. 3, Lane 4 which is more readily visible).

Thus, contrary to patentee's argument, the presence of NF-κB in human transplant patient's PBM's shown in the EMSA assay Fig. 4 Lanes 1-3 correlates with moderate TF mRNA expression in the same transplant patient as indicated in the Fig. 3 assay.

7.  Patentee Argument: *With regard, to the Fig. 4 data, Holschermann provides no indication on how many patients this data is based on, or the degree to which the effect was reproducible from patient to patient.* Dr. Verma Declaration ¶ 72.

Examiner Response:

*Holschermann* (p. 4232, right column under "Methods" to p. 4233) describes the demographics of the ten heart transplant recipients and their "Baseline Patient Characteristics" (see Table 1) from which blood was extracted and purified for use in their assays and further discusses in detail the electrophoretic mobility shift assay (EMSA) utilized (see pp.4233-4234) to obtain the Fig. 4 data.

Regarding reproducibility, the article further indicates (p.4236, left column; and Fig. 4) that "In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected" and that the "[S]pecificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides" in which the "[A]nalysis was performed *in triplicate*". See explanation under Fig. 4 page 4236.

8. Patentee Argument: *Regarding the Fig. 4 data Holschermann provides, the apparent decrease in binding in extracts from CsA treated patients cannot be interpreted as showing decreased binding of NF-κB. Several studies (Giffin 2003, Kinoshita et al. 1997) have demonstrated that the consensus sequence that Holschermann used in the EMSA to assess binding of NF-κB binds other transcription factors, such as NFAT. Accordingly, the EMSA binding assay Holschermann used lacked sufficient controls, such as an appropriate antibody control, to confirm that the binding complex reported as being affected by CsA was in fact NF-κB. As the data in Fig. 4 is insufficient to demonstrate that CsA reduced NF-κB binding in the patients Holschermann studied, one could not reasonably infer from this study that* NF-κB *activity was reduced in all patients during prior use of CsA as described in 1985 PDR, Griffith 1981 and Griffith.* Dr. Verma Declaration paragraph 72.

Examiner Response:

Contrary to patentee's argument, the *Holschermann* document provided further evidence to confirm the NF-κB-mediated affect of CsA on gene expression in PBM's.

The established role of NF-κB in affecting gene expression in monocyte containing PBM's was recognized by the *Holschermann* document "[T]he observed decrease inTF mRNA expression in mononuclear cells obtained during high CsA blood levels led us to *investigate the activation of the transcription factor NF-κB, known to be required for TF gene transcription in monocytes*". See p.4235, right column.

Upon evaluating Fig. 4 data addressing the presence of NF-κB *both* before and after CsA administration, *Holschermann* concluded that "cells separated from the blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. See p.4236, left column.

Accordingly, the Fig. 4 evidence evidence suggests that the transcriptional activation of the monocyte TF gene is inhibited in the presence of high CsA blood

concentrations *in vivo* which acts to prevent the marked activation of the NF-κB transcription factor by its ability to abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB. See p. 4237, 2nd full ¶.

Regarding, the NF-κB consensus sequence utilized by *Holschermann* (5'-AGTTGAGGGGACTTTCCCAGGC-3') this sequence comprises the underlined GGGAATCTCC NF-κB binding sequence which corresponds to that disclosed in the instant patent specification (col. 37, Table 2 : 1st sequence) as well as the patent's "consensus sequence" (see Table 2, last sequence and col. 36, lines 5-15), both of which are suggested for use in EMSA assays.

Although, it is true that the *Giffin and Kinoshita* documents indicate the ability of the transcriptional regulator NFAT to bind an NF-κB binding sequence, unlike NF-κB, there is no evidence of record that NFAT regulates tissue factor (TF) transcription in peripheral blood monocytes (PBM'S). Additionally, there is no evidence of record that the role of NFAT (and NF-κB) in regulating IL-2 expression is extrapolatable to TF expression in PBM's as alleged by the patentee. In this respect, it is also noted that the instant claims are not limited to exclusive NF-κB regulation of gene expression.

Regarding controls it is noted that *Holschermann* utilized controls employing monospecific antibodies against NF-κB family members in competitiive binding assays in order to ensure binding specificity. See p.4233, bottom ¶ and Fig. 4 description.

Finally, regarding reduced NF-κB in all patients, the instant claims do not require the use of an NF-κB inhibitor that achieves 100% NF-κB inhibition and/or successfully treats 100% of the patients.

9: Patentee Argument: *Holschermann does not provide a sufficient basis from which one could infer that the patients studied were characteristic of transplant patients treated with CsA as described in the cited references published before 1989. Both Griffith 1981 and Griffith 1984 note the effects of CsA in vivo can vary from patient to patient in part from the high incidence of toxicity and various side effects, and considerable variability in blood and tissue levels. Holschermann observed "a high inter-individual variation in monocytes TF inducibility." (p. 11).* Dr. Verma Declaration ¶ 74.

Examiner Response:

Enablement, and not actual reduction, is required for anticipation. As discussed above, the *Holschermann* document (p 4232, right col.under "Methods" to p.4233) describes in detail the demographics of the ten heart transplant recipients and their "Baseline Patient Characteristics" (see Table 1) from which blood was extracted and purified for use in their assays and additionally discusses in detail the EMSA assay utilized (see pp. 4233-4234). Further, patient variability, toxicity and side effects are common variables in any clinical study and the demographics and patient number in the *Holschermann* study would be expected to adequately account for these variables.

Regarding, *Holschermann's* statement of observing a high interindividual variation in monocyte TF inducibility, *Holschermann* goes on to further indicate that their study nevertheless showed that the levels of monocyte TF expression remained essentially constant in individual patients. See *Holschermann* p.4237, right column first full paragraph.

Accordingly, *Holschermann* provides a sufficient basis from which one could infer that the patients studied were characteristic of transplant patients treated with CsA as described in the cited references published before 1989.

8. Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Reed* et al., J. Immunol. 137 (7/86): 150-154 as evidenced by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Reed* teaches cyclosporin A (CsA) administration of cells, which, as is shown from *Brini*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.The *in vivo* effect of CsA in reducing NF-κB activity in human PBM cells isconfirmed by tests using CsA in human PBM cell cultures.

For example, *Reed* taught the prior art use of CsA in human PBM cell cultures that had been induced with phytohaemaglutinin (PHA). In particular, *Reed* teaches that CsA (1ug/ml) significantly reduced PHA induced IL-2 R alpha gene transcription (Figs. 1 and 2) and Tac antigen surface expression (Fig. 3b) in human PBM cells:

> The data presented here demonstrate that CsA and DEX concentrations that inhibited PHA-induced proliferation by about 80 to 90% diminished by about 50% (on average) the expression of receptors for IL-2 on PBMC. This inhibition of IL-2 receptor expression occurred at least in part at a pretranslational level and involved a reduction in both high affinity and low affinity forms of the receptor. *Reed* at 152.

*Reed* also found that CsA reduced IL-2 gene transcription:"1ug/ml CsA and $10^{-4}$ M DEX completely blocked the PHA-induced accumulation of mRNA for IL 2 (Fig. 2)." *Id* at 151.

Several years later, *Brini* also looked at the effect of Cyclosporin A on IL-2 Receptor-α production and Tac antigen surface expression and confirmed *Reed's* results:

> These results are in accordance with Reed et al., who found that CsA inhibits Tac induction in mitogen-activated PBMC. The CsA-mediated reduction in Tac antigen expression on T-cells was reflected by a decrease in the steady state mRNA levels of the IL-2Rα chain (Figure 2). *Brini* at 137 (citations omitted).

*Brini* then went on, however, to show that CsA, as administered in the prior art, reduced binding of NF-κB to NF-κB recognition sites for more than one NF-κB -meditated gene:

> CsA reduced the PHA-induced binding of transacting factors from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figures 3 and 4). *Brini* at 137.

Notably, *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same HIV-1 LTR site as used by the instant '516 patent to assess NF-κB activity and binding. As such *Brini* concluded that CsA regulated IL-2Rα gene expression by reducing activation of NF-κB:

> Taken together, these results suggest that one of the effects of CsA in the regulation of the IL-2Rα chain expression in human peripheral T lymphocytes is on the activation of sequence specific DNA-binding proteins which recognize sequences containing the NF-κB binding site. *Brini* at 137.

Using the same inducer, the same immune cells, and the same concentration of CsA as in *Reed*, *Brini* showed that CsA reduced NF-κB activity and NF-κB –mediated IL-2 Receptor-α gene expression in PBM cells. In this respect, the instant '516 patent confirms that the IL-2 receptor alpha (IL-2Rα) gene is regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* and the related human T-cell culture studies discussed below confirm that CsA necessarily and inherently reduced NF-κB activity and resulting gene expression in PBM cell cultures as taught in *Reed,* thus anticipating at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97. A claim element-by-element comparison is provided in *Exhibit H-2* of the 90/007,503 Request (incorporated by reference).

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Reed does not show reduction of* NF-κB *activity in induced cells, as required by the claims since Reed teaches "CsA was always added to the cells 20 to 30 minutes before other reagents (which included PHA)." Reed at 150.* Declaration of Dr. Verma, ¶¶ 54-55.

Examiner Response:

The feature upon which patentee relies (i.e, *in vitro* cell contacting with inducer prior to contacting with an inhibitor) is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation *supra*, the instantly claimed invention would encompass "pretreating" cells with an NF-κB inhibitor.

Further, the *Reed* reference clearly addresses the ability of CsA to inhibit gene expression in a eukaryotic activated cell : "Although both CsA and DEX inhibited IL-2 receptor expression by about 50%, only CsA blocked the PHA-mediated induction of IL-2 (receptor) responsivity in PBMC cultures". See *Reed* Abstract.

2. Patentee Argument: *As discussed above, none of the data in Brini demonstrate that CsA either reduced NF-κB activity, or provide any basis for concluding that under the experimental conditions Brini used, IL-2 receptor expression was regulated in any way by NF-κB. Brini has no data regarding I-κB, let alone any data regarding degradation or modification of I-κB. Brini also does not provide data demonstrating that CsA inhibited translocation of NF-κB into the nucleus.* Dr. Verma Declararation, ¶ 56.

Examiner Response:

The argument that *Brini* fails to provide evidence linking CsA inhibition to NF-κB fails to appreciate the whole *Brini* reference teaching of CsA inhibition via NF-κB including teaching a mechanism involving inhibition of PPlase (*Brini* at page 137). The following is a summary of the *Brini* teaching:

A. Fig. 1: in vitro gel mobility shift assays using 245-291 IL-2Ralpha enhancer and HIV LTR enhancer comprising NF-κB binding sequences showed the same band increased with PHA was inhibited by CsA treatment 24 and 48 hours post-activation. See Abstract; page 132-133, Fig. 1; page 137, left column at top.

B. Fig. 2: northern blot IL-2Ralpha chain mRNA in human peripheral blood T-cells: "IL-2Ralpha mRNA's were readily induced by PHA and pretreatment with CsA at 1ug/ml before cell activation caused a significant inhibition of the of IL-2Ralpha mRNA induction" (page 134, left column). "The CsA-mediaed reduction in TAC antigen expression on T-cells was reflected by a decrease in the steady state mRNA levels of the IL-2Ralpha chain (Figure2)" (page 137 at top).

C. Fig. 3: T-cell nuclear extracts (gel mobility shift assay): gel retardation pattern using radiolabeled 245-291 IL-2Ralpha chain enhancer oligonucleotide sequence containing NF-kB binding sequence. Showed that "... CsA blocked the activation of specific transacting factor(s) able to interact with the regulatory sequence of the IL-2Ralpha." (page 135, left column).

D. Fig. 4: T-cell nuclear extracts (gel mobility shift assay): gel retardation patter using radiolabeled HIV-1 LTR oligonucleotide sequence containing NF-kB binding sequence. Showed the same pattern of binding activity as 245-295 IL-2 enhancer in Figure 3. See abstract; pages 134-135.

E. Figure 4: T-cell nuclear extracts (gel mobility: competitive binding assay) PHA-stimulated T-cells incubated for 15 minutes with 50-fold excess of unlabeled double stranded oligonucleotides of IL-2Ralpha, HIV-1 LTR or AP-1 site prior to addition of corresponding radiolabeled sequences. Unlabeled 291-245 IL-2Ralpha and unlabeled HIV-1 LTR blocked the formation of the corresponding radiolabeled oligonucleotide sequences. Pages. 135-136 and Figure 5 description.

In accordance with the Fig. 3 and 4 data *Brini* concluded that "CsA reduced PHA-induced binding of transacting factors from T-cells and kB-like sequences which are present in the IL-2Ralpha gene and in the HIV-1 LTR (Figures 3 and 4)" page137, bottom ¶.

3. Patentee Argument: *The Brini 1990 inherency document fails to "repeat the use" described in the Reed 1986 prior art document noting the following differences:*

| *Reed 7/86:* | *Brini 9/90* |
|---|---|
| *PHA + PMA* | *PHA alone as inducer* |
| *PBMs (human peripheral blood mononuclear cells)* | *>95% pure CD3 T-lymphocytes)* |

*It is further asserted that PBM cells (Reed at page 150):*
*a. do not refer to a single defined cell type but include a heterogenous cell population comprised of T and B lymphocytes, NK cells, moncytes and macrophages;*
*b. vary depending upon protocol and conditions of isolation;*
*c. studies reported conflicting data in PBM cells regarding the particular endpoint Reed measured, IL-2 receptor alpha expression.*
See Attorney 11/17/06 Response pages 70-71; Dr. Verma Declaration ¶¶ 58-59 citing Exhibit 15: *David et al.* Blood (1998) 165-172 at pages 165 and 170-171.

Examiner Response:

Initially, it is noted that the reference method must be enabled but there is no legal requirement that the inherency evidence "repeat the use" as alleged by the patentee.

With respect to the first purported difference, the patentee is in error since both *Reed* and *Brini* teach PHA alone as an inducer.

With regard to the second difference addressing cell population (*Brini* human T-cell vs *Reed* human PBM cells) and the citation of the *David* article, the following is noted:

Regarding different cell types, although the *David* article teaches that *Reed's* heparinized Ficoll-Hypaque purified human PBM cells most likely comprise a heterogenous cell population (T and B lymphocytes, NK cells, monocytes and macrophages) it is noted that the the *David* article teaches that B lymphocytes failed to express any IL-2R chains (Abstract, lines 8-9) and "[I]t has been shown that CsA acts

primarily on T lymphocytes sparing the immunocompentence of B cells and macrophages" (*Kronke* PNAS USA 81, 5214-5218 at 5214 left column, 1st full ¶).

In this respect, *Reed* specifically addressed in its assays the ability of CsA to inhibit PHA-mediated induced expression (e.g. IL-2R) in T-cells (e.g. see *Brini* abstract) by using a monoclonal antibody (anti-Tac or IgG2a) specific for activated and functionally mature human T-cells. See *Reed* at page 151, left column. Accordingly, it is clear that *Reed* was assaying IL-2 receptor alpha expression of a PBM T-cell fraction which is consistent with the *Brini* documents' acknowledgement of the *Reed* teaching that CsA inhibits IL2R alpha chain (Tac) surface expression in human mitogen (PHA) activated PBMC (Brini at page 131, right column).

In fact, both *Brini* and *Reed* address by assay, the ability of CsA to inhibit expression of a specific IL-2 receptor subunit using *anti-Tac monoclonal antibody* for activated and functionally mature human T-cells (See *Brini* at page 131, right column to page 132, left column and page 132, right column under "Flow cytometric analysis"; and *Reed* at page 151, left column, 1st ¶ and summary of citations (13) and (14) on p.154). In this respect, the *David* document does not address the *Brini and Reed* use of specific monoclonal assays (with controls) to target T-cell specific IL-2 receptors.

Regarding, the problems of IL-2R subunit expression being sensitive to blood collection and PBMC preparation (*David* p.171) and conflicting prior art data regarding IL-2R expression (*David* p.170, right column), it is noted that the *David* document teaches that using a blood collection and PBMC preparation protocol, such as heparinized Ficoll-Hypaque purified PBM cells (employed by both *David* and *Reed*) serves to address these problems.

4. Patentee Argument: *In support of his arguments regarding Reed, the Examiner also contends that "expression levels of IL-2 Receptor-alpha is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T cells." (8/2/06 Office Action at p.26). As noted before, the Examiner's interpretation of the '516 patent is erroneous as the passage the Examiner cites to notes only that " NF-κB is induced in T cells...by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene..." (Office Action at 25). As discussed above, the data in the '516 patent indicate that treatment of T cells with PHA alone does not result in any measurable activation of NF-κB, in*

*contrast to treatment with PMA, or PMA in combination with PHA. Moreover, the '516 patent examples the Examiner refers to (Fig. 24) were conducted with a human T-cell lymphoma cell line, and not under the experimental conditions of Reed using PBM cells.* Dr. Verma Declaration ¶ 60.

Examiner Response:

As pointed out in the rejection above, the *Brini* document suggests the mechanism that produces *Reed's* CsA inhibition of T-cell expression of IL-2R alpha that is further supported by patentee's own specification statement now produced in context:

> Recently, NF-kappa.B has been implicated in several other inducible systems. For example, NF-kappa.B is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor .alpha. gene and possibly the IL-2 gene. Bohnlein et al., Cell, 53:827-836 (1988); Leung, K. and G. Nabel, Nature, 333:776-778 (1988); Ruben et al., Science, 241:89-92 (1988); Cross et al., Science, (1989); and Lenardo et al., Proc. Natl. Acad. Sci. USA, 85:8825-8829 (1988). '516 patent, col. 17, lines 20-28 (relevant part underlined).

Accordingly, both *Brini* and the instant patent (see underlined text above) teach that PHA (and/or PMA as underlined above) activation of T-cells would release NF-κB and affect protein expression. See also instant patent at col. 35, lines 13-20 (role of activated NF-κB in transcription of IL-2R alpha).

The instant patent's Fig. 24 A displays the presence of NF-κB in nuclear extracts prepared from Jurkat cells (human T-leukemia cells) stimulated by PHA, PMA or PHA and PMA.

Patentee's statement that the '516 patent indicates in Fig. 24A that treatment of T cells with PHA alone does not result in any measurable activation of NF-κB is not accurate since "...extracts made from Jurkat cells which had been stimulated either with PHA or PMA *contained detectable levels* of NF-κB". See instant patent col. 72, lines 65-col. 73, line 6 and Fig. 24A, lane 5.

Accordingly, to the extent that the Fig. 24A data regarding PHA activation in Jurkat cells *is even relevant* to PHA activation in normal human T-cells (Brini and Reed), measurable NF-κB activation in Jurkat cells did occur.

In any event, with respect to IL-2Rα expression, *Brini* recognized that CsA shows no inhibitory effect on surface expression of IL-2Rα in the human Jurkat T-cells, in contradiction to the ability of CsA to inhibit PHA induced IL-2Rα expression in normal T-cells (as in *Brini*) and PBMC (as in *Reed*). See *Brini* p.131, right column (see also *Brini* teaching of CsA inhibition of Tac or IL-2Rα surface expression in murine thymocytes).

Accordingly, the Fig. 24A data showing detectable, but small NF-kB amounts in PHA activated Jurkat leukemic T-cells, is consistent with the inability of CsA to inhibit IL-2Rα expression in these cells as recognized by *Brini*.

5. Patentee Argument: *Regardless, we know now that CsA affects the activity of NFAT, not* NF-κB. Dr. Verma Declaration ¶ 60.

Examiner Response:

It is noted that the instant claims do not require the use of a selective NF-κB inhibitor. Accordingly, CsA is within the scope of the instant invention even if it down-regulates a protein's expression via **both** NF-κB and NFAT.

In contradiction to patentee's argument, the accumulated scientific evidence indicates that CsA exerts its effect via an NF-κB mediated expression mechanism for different proteins (IL-2, IL-2 receptor: IL-2Rα and Tissue factor or TF) in different human and viral cell types:

*Schmidt and Emmel* references teach that CsA acts on NF-kB mediated IL-2 and HIV protein transcription.

*Brini* reference teaches that CsA affects NF-kB mediated IL-2 receptor and HIV protein transcription including teaching a mechanism of action (at the level of the NF-κB -IkB complex: inhibition of PPIase activity). CsA inhibits IL-2Rα chain expression in T-cells by NF-κB -like protein.

*Roman-Blas* (citing Frantz et al. and Meyer et al.) The Roman-Blas document teaches therapeutic strategies (e.g. arthritis) based on the established role of immunosuppressive agents, including CsA, to inhibit the NF-κB pathway by affecting

the NF-κB-IκB complex in murine macrophages, Jurkat lymphoma cells, and mouse and human T-lymphocytes.

*Holschermann* teaches that CsA administered to heart transplant patients interferes in the NF-κB pathway (by abolishing inducible phosphorylation and degradation of IκB) to inhibit an NF-κB regulated effect (tissue factor expression).

9. Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Kronke* et al.(PNAS USA 81 (8/84) 5214-5218) or *Siebenlist* et al.(Mol. And Cell Biol. 6 (9/86) 3042-3049) as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al. Science, 246 (Dec. 1989):1617-20 and the *Dr. Manolagas Declaration*. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Kronke*, or *Siebenlist* teach cyclosporin A (CsA) administration of cells, which, as is shown from the teachings of *Schmidt and Emmel*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The effect of CsA on reduction of NF-κB activity as administered in the prior art is also confirmed by tests involving the use of CsA in human T-cell (Jurkat) cultures including two prior art references, *Kronke* and *Siebenlist*. Using the same inducers, the same human immune cells, and the same concentration of CsA taught in *Kronke* and *Siebenlist*, *Schmidt* and *Emmel* provide confirming extrinsic evidence that the use of CsA in Jurkat cells reduced NF-κB activity. Thus, CsA is clearly recognized to have necessarily and inherently reduced NF-κB activity and resulting gene expression in those cells as called for by the instant claims. *Kronke* and *Siebenlist* each disclosed the use of phytohaemaglutinin (PHA: 1ug/ml) and PMA (50ng/ml) to induce human T-cells (Jurkat cells). These compounds are described in the instant '516 patent as being inducers of NF-κB activity (see e.g., '516 patent, col. 33, lines 52-59). *Kronke* and *Siebenlist* also reported on the effect of 1ug/ml CsA (among other concentrations) on

the cell cultures. Both references report that IL-2 (also known as "TCGF") gene transcription and/or expression was increased with administration of the NF-κB inducers phytohaemaglutinin (PHA) and phorbol 12-myristate-13-acetate (PMA), and that such induced IL-2 expression was reduced by CsA:

> The results of our study demonstrate that TCGF [IL-2] mRNA accumulation in induced Jurkat cells is diminished by CsA in a dose-dependent manner and that CsA acted by blocking TCGF mRNA transcription. *Kronke at page 5217.*
>
> * * * *
>
> CsA at 1 ug/ml ... prevented IL-2 message induction. *Siebenlist at page.3044, Fig. 2.*

Using the same conditions and the same EMSA and CAT reporter assay formats as described in the instant '516 patent, the *Schmidt* reference clearly demonstrates that CsA as utilized in the *Kronke and Siebenlist* references reduced NF-κB activity in Jurkat cell cultures. *Schmidt* reported, however, that there were inducers of NF-κB, which had different mechanisms of induction than PHA-induction, for which CsA had no effect. Specifically, *Schmidt* found that phorbol 12-myristate-13-acetate (PMA)-mediated induction of NF-κB activity was not affected by CsA. The NF-κB CAT reporter assay confirmed this data, as depicted in Figure 4 ("CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039).

Similarly, *Emmel* describes the effect of 1ug/ml of CsA on NF-κB activity in Jurkat cells that had been induced with both PHA and PMA. As shown in Figure 1, 1ug/ml CsA (among other concentrations), reduced NF-κB activity ("NF-κB binding was reduced 10-20% in nuclear extracts of CsA-treated cells": *Emmel* at 1618). Furthermore, a CAT assay confirmed these results; as shown in Figure 2d (*Emmel* at 1618) which demonstrates that CsA significantly reduced NF-κB activity at the same 1ug/ml concentration taught in *Kronke* and *Sibenlist*, as shown by the reduced expression of the NF-κB regulated CAT gene in those cells.

Thus, as discussed above, and in the *Dr. Manolagas Declaration* (*Exhibit J:* ¶¶ 25-32 of 90/007,503 request: incorporated by reference), Schmidt and Emmel confirm that *Kronke* and *Siebenlist*, which disclose the inhibitory effect of CsA on NF-κB activity in Jurkat cell cultures, anticipate claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97of the '516 patent (and as shown in *Exhibit H-3* of 90/007,503 request: incorporated by reference).

**Discussion**

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *None of experiments in Siebenlist describe use of CsA in cells* ***first induced*** *with PHA and PMA and therefore none of the methods of using CsA that Sienbenlist describes would have reduced either induced NF-κB activity or induced NF-κB -mediated intracellular signaling. Kronke describes only a single experiment in which cells were treated with CsA after exposure to PHA/PMA, and concludes in the title of Table 1 "CsA does not inhibit PHA- and PMA- induced expression of TCGF receptors in Jurkat cells." Moreover, as is evident from Fig. 4, CsA treatment appeared to have a significant effect on IL-2 expression only when CsA was added either before or with PHA/PMA treatment, but not when added after cells had been induced with PHA/PMA. Kronke at 5217. Indeed, when added four hours after induction, CsA did not alter TCGF (IL2) mRNA levels. Id. at 5216. These data suggest that while treatment with CsA appeared able to prevent induction of IL-2 expression, it had no substantial effect on induced IL2 expression.* Declaration of Dr. Verma, ¶ 63.

Examiner Response:

The feature upon which patentee relies (*in vitro* cell contacting with inducer prior to applying an inhibitor) is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering an NF-κB inhibitor prior to, with or subsequent to the addition of an NF-κB activating compound.

Even assuming arguendo, that cell activation must precede inhibition as argued by the Patentee, the *Siebenlist* reference teaching encompasses Jurkat cell activation preceding CsA inhibition.

Initially, as discussed in the rejection above, *Siebenlist* clearly teaches CsA inhibition (or modification or reduction) of IL-2 expression in a eukaryotic or mammalin Jurkat cell resulting from an external stimulus (PHA and PMA) within the scope of the instant claims.

Additionally, *Siebenlist* teaches that "Jurkat cells were stimulated with PHA and PMA for the times indicated" (Fig. 2B bands) which demonstrated that "Jurkat cells are **rapidly inducible** for IL-2 with substantial amounts of IL-2 message apparent after 2.5 h of stimulation (with emphasis). High message levels for IL-2 were observed for well over 8.5 h (Fig. 2B)" (See *Siebenlist* right column, lines 15-20).

*Siebenlist* further teaches that "In the case of Jurkat cells, a 2.5- and 4.5-h stimulation were done also **in the presence of** CsA at 1ug/ml (see text), which prevented IL-2 message induction". See Figure 2. last two lines and Fig. 2B, last 2 bands.

The *Siebenlist* reference teaching of PHA and PMA stimulation done in the "presence of" CsA reads (chronologically) on addition of CsA either during or separately adding after PMA and PHA addition. Additionally, the rapid appearance of IL-2 message would support Jurkat cell activation prior to the action of CsA to further "prevent" ("or inhibit" or "diminish" or "modify") additional IL-2 message induction.

Patentee's arguments regarding *Kronke* are equally non-persuasive.

Patentee's Table 1 argument regarding *Kronke's* prior teaching (endnote 25) of lack of CsA inhibition of **IL-2 alpha- receptor** expression in Jurkat cells is not relevant to the rejection above regarding expression of **IL-2 (or TCGF)** in cloned leukemic T cells (Jurkat, subclone 32).

Patentee's second argument regarding Fig. 4 ("Time course of CsA action") that CsA only had a "*significant* effect on IL-2 expression" when introduced prior (1 hr: see circular first band, Fig. 4A) or "concurrent" with PHA and PMA (0 hr: see circular second band) is not persuasive since <u>such an argument is not commensurate to the instant claims</u> which do not recite a degree of inhibited expression. In this respect, Fig. 4A circular bands 3-5 representing CsA administration 30 min, 1hr and 2 hr clearly demonstrate inhibition of TGGF (IL-2) expression as compared to the larger circular band representing the 6 hr induced (PMA and PHA) Jurkat cell. See also *Kronke* discussion of Fig. 4 on page 5216, right column 2nd full ¶.

Additionally, "As shown in Fig. 4, 1 hr preincubation or concurrent administration of CsA resulted in <u>almost</u> complete inhibition of TCGF mRNA production" (with emphasis) (Kronke at page 5216, right column). Both Fig 4a (2nd spot compared to uninduced and Iriduced) and Fig. 5 (lanes 3-5 compared to lanes 1 and 2) teach the concurrent administration inhibited but did not prevent IL-2 expression nor did it preclude cell activating signaling and transcription.

As discussed in the rejection above, *Kronke* clearly teaches CsA inhibition of IL-2 expression in a mammalin Jurkat cell resulting from an external stimulus (PHA and PMA) within the scope of the instant claims. See *Kronke page 5215 and Fig. 1; and pages 5216, right column ("CsA inhibits TCGF Gene Transcription") to 5217, left column and Fig. 4 and 5 with Table 2; and page 5217 under "Discussion to page 5218.*

**III. VITAMIN D (CALCITRIOL) (references prior to 12/24/86):**

10. Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Tsoukas* (Science 224 (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74 (8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. 74 (10/84) 1451-5) or *Manolagas* et al. (JCE&M, 63(1986) 394-400 as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the *Declaration of Dr. Manolagas* (¶¶ 7-24) provided in the 90/007,503 request. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary**: *Tsoukas, Manolagas, Lemire I, Lemire II or Rigby I* teach administration of calcitriol to humans, which, as is shown from the teachings of *Yu*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

Calcitriol (1,25-dihydroxyvitamin $D_3$) is the active form of Vitamin D that has been administered to humans for decades.

There are numerous prior art publications that report the study of calcitriol in various human cell cultures, including human Jurkat (T-cell line) leukemic cells (citations omitted) and human peripheral blood monocyte ("PBM") cells, including *Tsoukas* (PBM), *Manolagas* (PBM) *Lemire I, Lemire II* and *Rigby I*.

*Tsoukas and Manolagas* teach that the administration of calcitriol (at least $10^{-8}$ M) in PBM cells reduced IL-2 activity; a result which was confirmed by *Lemire I, Rigby I* and *Lemire II* (e.g. *Lemire II* at 3034 demonstrated that calcitriol exhibited "a dramatic and specific reduction of IL-2 production by activated PBM ...").

Independent studies show that IL-2 expression is regulated, at least in part, by NFκB . See *Manolagas Declaration* at page 8, ¶ 15 and documents cited therein.

*Yu* et al. under the same conditions utilized in *Tsoukas* and *Manolagas* (i.e. calcitriol application to PHA activated PBM cells) found that calcitriol reduced NF-κB as well as NF-κB –regulated gene expression in PBM cell cultures. *Yu* described the use of Electrophoretic Mobility Shift Assays ("EMSAs" as in Ex.15 of the instant '516 patent) and the NF-κB binding sequence of human IL-6 promoter to demonstrate (by EMSA) that calcitriol administration "caused a significant reduction in the DNA-protein complex, as evidenced by the decrease in the intensity of this band (lane 4)" (see *Yu* at 10993 and Fig. 5). This data was confirmed using Western blot analyses (Figs. 1 and 3), which showed that calcitriol added to PHA-activated cells (as taught in *Tsoukas* and *Manolagas*) "caused a significant decrease in the expression of p50 [subunit of NF-κB] at all time points examined". *Id.* at 10991-2. In an analogous manner in human Jurkat leukemic cells transfected with a CAT gene regulated by NF-κB and activated with PHA, *Yu* found that calcitriol cell application resulted in reduced NF-κB gene expression. See Yu at 10993.

Although the mechanism may not have been known at the time of the *Tsoukas*, *Manolagas*, *Lemire I*, Lemire II and *Rigby I* publications, the *Yu* reference evidence proved that the administration of calcitriol by these prior art references necessarily and inherently reduced NF-κB activity in induced human cells (PBM/Jurkat) and reduced expression of NF-κB-regulated proteins (IL-2). Thus, these prior art references anticipate at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 of the '516 patent as shown on an element-by-element basis in *Exhibit H-4, H5 and H6* of the 90/007,503 request (incorporated by reference).

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

Additionally, upon further consideration, the above rejection has been modified to withdraw the *Rigby II* reference that is cumulative.

1. <u>Patentee Argument</u>: *The cited publications describe experiments conducted in various types of cultured cells. None of these publications describe methods for using calcitriol in humans.* Dr.Verma Declaration ¶ 109

Examiner Response:

Anticipation requires an enabling disclosure, not actual practice. The cited prior art, as well as the state of the prior art, as discussed in the *Manolagas Declaration* (items 1-10), teach the biological activities such as calcium metabolism, cell division, differentiation; and immunosuppression in humans of Vitamin D and its active metabolite 1, 25-dihydoxyvitamin $D_3$ (calcitriol) and present laboratory evidence correlative to *in vivo* utility. An applicant (enabling a patent claim) or an examiner (enabling a reference) need not provide data from human clinical trials to establish utility for an invention or for enablement of a reference. This is especially true regarding references that are presumed operable and enabled absent rebuttal evidence (MPEP § 2121 at 2100-64 to 2100-67).

2. Patentee Argument: *With the exception of Rigby I, the other prior art documents fail to administer calcitriol to cells in which NF-κB activity has first been induced by an external stimulus. Tsoukas 1984 and Lemire I simultaneously stimulate (with PHA or other activators) while Lemire II either pretreat or simultaneously treat with calcitriol.* Dr.Verma Declaration ¶¶ 111-114.

Examiner Response:

As discussed *supra*, the two steps upon which patentee relies (*in vitro* cell contacting with inducer followed by applying an inhibitor) are not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instant invention encompasses administering an NF-κB inhibitor prior to, with or subsequent to administering an NF-κB activating compound.

Further, in contrast to patentee's argument, the prior art references establish the ability of calcitriol to "inhibit" protein (e.g. IL-2) production in an "activated" mammalian or eukaryotic cell(s) whether coincubated or subsequently contacted with an already actived cell as in *Tsoukas 1984* (Abstract, page1438 and Table 1) which teaches that vitamin D3 (calcitriol) "inhibited IL2" production in PHA "induced" human peripheral blood mononuclear cells (PBM) leucocytes when coincubated with PHA.

Similarly, *Manolagas 1986* taught the ability of calcitriol in the presence of PHA and calcium (Fig. 3) or a calcium chelator (EGTA) (Fig.4) to inhibit "PHA-activated PBM". *See also abstract.*

Contrary to patentee's argument, both the *Lemire I and II* references read on two separate steps with activation preceding the addition of calcitriol.

In *Lemire I*, human PBM cell cultures were activated with pokeweed mitogen (PWA), PHA or dermatophyton at the initiation of the culture period followed by the addition of 1,25-$(OH)_2$-$D_3$ *(see p. 658 "Culture conditions" and p 659).*

Similarly in *Lemire II* (see pages 3032 under "Cell culture conditions" to top of page. 3033 (top)) the cells are first activated with PWA, concanavalin A or PHA followed by the addition of $10^{-8}$ M 1,25-$(OH)_2$ which serves in the assays to suppress Ig production (see page 3033 under "Results and Discussion" and page 3034 right column: "... dramatic and specific reduction of IL-2 production by activated PBM incubated with 1,25-$(OH)_2$,-$D_3$).

However, even if *Lemire I or II* is drawn to a single co-administration step, as alleged by the patentee, it is clear from both of these documents that calcitriol is inhibiting DNA syntheses and Ig production (IgG and IgM) production in *already activated cells* (See *Lemire I*, page 658, right column; *Lemire II* Abstract; page 3033 right col. under "Results and Discussion" and p. 3034, bottom right column).

3. Patentee Argument: *Yu (1995) fails to "replicate (or reproduce) the conditions" of the prior art references by use of a different PBM cell sample. Yu differs by using an additional Ficoll purification step to remove adherent monocytes which "constitutively" (i.e. naturally and therefore not stimulus induced) possess a vitamin D receptor (VDR) to obtain a non-adherent fraction comprising T and B lymphocytes, NK (natural killer) cells, monocytes and macrophages (citing David et al. Blood 1998 reference). In regard to evaluating the effects of calcitriol, removing the adherent (and calcitriol responsive) monocytes from the cell population would most likely hava a substantial effect on the overall effect of calcitriol in the cell culture."* See Dr. Verma Declaration ¶¶ 115-117; 11/17/06 Amendment at pages 72 and 73 reciting Trial Testimony day 13, page 17 Manolagas Deposition.

Examiner Response:

Contrary to patentee's argument, evidence of an inherent property or effect present in a prior art document(s) need not be demonstrated by "repeating the use" of that prior art document.

As recited in the rejection above, the prior art references (*Tsoukas, Lemire I, Lemire II and Rigby I)* teach that contacting peripheral blood monocyte cells with calcitriol inhibits PHA-activated cytokine expression and the *Yu (1995)* document provides extrinsic evidence to reasonably support that calcitriol's immunological effect is mediated by NF-κB.

With respect to patentee's assertion of the absence of the adherent monocyte fraction producing a "substantial effect" on calcitriol's effects in culture, it is not seen how the *Yu (1995)* teaching of *NF-kB involvement* in calcitriol protein inhibition of activated PBM's in its assays would differ from that expected in the prior art PBM samples.

Further, patentee's argument is not supported by subsequent evidentiary references including those submitted by the patentee which cite the *Yu(1995)* findings regarding NF-κB involvement in calcitriol protein inhibition in PBM cells.

In this respect the *Adams document* (p.2948, right col.) acknowledges the cell line specificity of NF-κB activity and additionally cites references that teach the decreased NF-κB activity relating to calcitriol's inhibition of cytokine expression in PBM's including the *Yu (1995)* teaching of the following:

- Down-regulation of NF-κB protein levels in activated human lymphocytes by vitamin D3;
- Jurkat T cell calcitriol treatment's decrease in activation of an NF-κB -CAT reporter gene and
- Calcitriol's ability to decrease DNA binding of NF-κB subunits in human lymphocytes, *through inhibition of expression of the p50 NF-κB subunit and its precursor p105*

Similarly, citing *Yu (1995)*, the *Takeuchi* document indicates that " ... it has been shown that 1 alpha, $25(OH)_2D_3$ down-modulates NF-κB p50 protein and its precursor, p105 , in

human peripheral lymphocytes" which supports in a manner analogous to corticosteroids "... the involvement of *NFAT and* NF-κB in 1 alpha, 25(OH)$_2$D$_3$ mediated effects ... by which the steroid hormones exert their effects by targeting other transcription factors. ". *Takeuchi* at p.210, left col.

Each of the instant claims require "reducing NF-kB activity". The *Yu (1995)* teaching of calcitriol's inhibition of NF-κB expression in PBM's cells would necessarily "reduce NF-κB activity" and "reduce NF-κB mediated intracellular signaling" along every segment of patentee's intracellular proposed NF-κB messenger mechanism including interference at the level of the cytoplasm NF-κB / I-κB complex, translocation and nuclear protein expression. See also *Declaration of Dr. Thomas D. Gilmore* pages 6-7, ¶ 14 *supra* under "claim interpretation" defining "reducing NF-κB activity" to encompass "altering the concentration or availability of NF-κB".

4. Patentee Argument: *Regarding the Yu (1995) Fig. 1 data evaluating the effects of calcitriol on NF-κB expression in PHA-activated human lymphocytes, there is no correlation between the time course for the processes measured in the earlier studies, such as IL-2 production and proliferation, and the purported inhibitory effects of calcitriol on NF-κB. In particular, Yu (1995) reports that substantial induction of p50* NF-κB *expression occurred only 72 hours after treatment of PBMCs with PHA, with virtually no induction detectable at 24 hours (Yu 1995 at 10991; Fig. 1). In contrast, earlier studies observed that IL2 production peaked no later than 24 hours after PHA treatment. From this data, there is no basis for concluding that IL2 production was linked to induction of* NF-κB *activity.* Dr. Verma Declaration ¶118.

Examiner Response:

As discussed above, the *Yu(1995)* evidence need not "repeat the use" of the prior art references . Accordingly, the *Yu (1995)* assay results performed using their own samples and experimental conditions stand alone for their teaching of NF-κB involvement in calcitriol immunoregulation of human PBM's cells.

In this respect, the *Yu(1995)* document teaches that NF-κB in human lymphocyte samples was detectable in both the cytoplasm and nucleus by an anti- p50/ p105 antibody within 24 hours of PHA activation and "increased progressively" over a period of 72 hours. See *Yu (1995)*, right column.

Thus, the *Yu (1995)* document provides evidence of the presence of NF-κB in the prior art PBM's samples upon being contacted with PHA.

The constitutive or PHA- induced presence of NF-κB in immunological cells (e.g. B or T-cells) as indicated by the *Yu (1995)* evidence is consistent with the teaching of the instant patent. See col. 17, lines 20-52; col. 26, lines 40-46; col. 29, lines 46-56; col. 30, lines 40-55; and col. 68, lines 34-56.

It is further noted that *Yu (1995)* teaches the ability of calcitriol to inhibit the presence of NF-κB (p50 and p105) when added simultaneously with PHA or 24, 48, 64, 68 or 70 hours following addition of PHA. See *Yu (1995)* p. 10992, left col.; and Fig. 3.

5. Patentee Argument: *The CAT reporter experiments (Yu 1995: Fig. 6) do not reproduce any use of calcitriol described in the cited primary reference since the transfected Jurkat cells used by Yu differ significantly from the PBM cells and Jurkat cells used in the prior studies. In particular, the artificial (quadruple repeat) NF-κB binding site, on which the reporter construct was based, is not found in any endogenous gene, and would not have been present in any of the cells used in the earlier studies. There is no basis for assuming that the response of this reporter construct reflects the regulation of any endogenous gene. These CAT data therefore provide no basis for assuming that calcitriol, as used in the prior studies, would have necessarily affected NF-κB mediated gene expression.* Dr. Verma Declaration ¶¶ 121-122.

Examiner Response:

As discussed above, the *Yu (1995)* assay results performed using their own samples and experimental conditions stand alone for their teaching of NF-κB involvement in calcitriol immunoregulation of human PBM's cells.

In utilizing an "artificial" NF-κB consenus sequence quadruple repeat construct p(NF-κB)$_4$-CAT in human leukemic T-cells (Jurkat cells) the *Yu (1995)* document teaches that calcitriol inhibits NF-κB regulatory sequence driven transcription. See *Yu (1995)* page 10993, left column 2nd full ¶ and Fig. 6.

More particularly, the use of this "artificial" NF-κB repeat construct "demonstrated that the inhibiting effect of 1,25(OH)$_2$D$_3$ on NF-κB protein syntheses is of functional relevance to NF-κB -driven transcription" and additionally that the "inhibiting effect of the activity of this promoter by decreasing the levels of such proteins induced

following lymphocyte activation rather than through a direct interaction of the 1,25 $(OH)_2D_3$ receptor with this DNA segment".[6] *Yu (1995)* page 10994, left column.

As pointed out by *Yu (1995)*, the structure of the "artificial" NF-κB consensus sequence (in tandem) would ensure that "its transcription activity can be regulated only by proteins that recognize this consensus sequence." See *Yu (1995)*, left column. Accordingly, there is a scientific basis for assuming that the response of this reporter construct would reflect endogenous gene regulation mediated by NF-κB consensus sequence(s).

Thus, the *Yu (1995)* document provides evidence of NF-κB's role in activated cytokine gene expression which is consistent with the instant patent's teaching that cytokine (e.g. interferon) gene expression is activated, at least in part, by induction of NF-κB. See instant patent col. 13, lines 14-28; and col. 14, lines 40-60.

6. Patentee Argument: *The CAT reporter (Yu Fig. 6) and EMSA (Yu Fig. 5) assays do not replicate the use of calcitriol in already induced cells as required by the claims because the cells were pretreated with calcitriol for 40 hours before being stimulated with PHA in the CAT assay and the cells were simultaneously treated with both calcitriol and PHA in the EMSA assay.* Dr. Verma Declaration ¶¶ 122 and 124.

Examiner Response:

*Yu (1995)* need not reproduce the use but need only provide an enabling teaching for purposes of anticipation. Additionally, the patentee's arguments are not commensurate in scope since the instant claims do not require the performance of an assay (CAT reporter assay, EMSA or otherwise) nor the conditions relating thereto.

7. Patentee Argument: *Regarding the electrophoretic mobility shift assay (EMSA) and Yu (1995) results in Fig. 5, it is questionable, absent appropriate antibody or mutational controls, that the bound complex (lane 4) represents only NF-κB binding activity (and not some other factor) since one would not expect to achieve significant competition with only a 5-fold excess of unlabeled competititor (Yu Fig. 5, lane 5); and competition with a "non-specific" oligonucleotide containing an AP-1 binding motif actually increased binding to the labeled EMSA probe (Yu Fig. 5, lane 7).* Dr. Verma Declaration ¶ 124.

[6] Vitamin D receptor (VDR) is a nuclear receptor that surfaces from the cytoplasm to bind ligand and translocates to the nucleus to affect transcription.

Examiner Response:

Using the same EMSA protocol, including the human IL-6 gene promoter, as in the instant patent, *Yu (1995)* confirmed the inhibitory effect of calcitriol on NF-κB expression as found in their previous assays. Additionally, the EMSA assays results (Fig. 5) are consistent with the results subsequently obtained in the CAT reporter assay (Fig. 6).

It is noted that the patentee has not provided any evidence challenging the reproducibility of the *Yu(1995)* results nor has any evidence been provided concerning the contamination of *Yu (1995)* samples with other transcription regulaters that bind the NF-κB enhancer.

Additionally, it is noted that the claims are not limited to NF-κB being the only mediator of calcitriol's immunoregulatory role in activated PBM cells.

8. Patentee Argument: *There is no evidence that NF-κB mediated any of the other effects of calcitriol that were investigated in the earlier studies described in the primary references. Calcitriol inhibited proliferation of PBMCs only when it was added during the first 24 hours data suggesting "that the antiproliferative effect of 1,25-(OH)$_2$D$_3$ is not the result of its effects on NF-κB." (Yu 1995 at 10994).* Dr. Verma Declaration ¶ 120; Patentee 11/17/06 response page 73 reciting admission of Dr. Manolagas in Trial Testimony, day 10, Manolagas deposition page 68.

Examiner Response:

Vitamin $D_3$ (calcitriol) affects bone and mineral (e.g. calcium) homeostasis, regulates the immune system and regulates cell growth, differentiation and death (apoptosis). See *Adams (2004)*, left column.

As pointed out in *Yu (1995)* at page 10994, and as admitted by Dr. Manolagas at trial, their data regarding calcitriol's inhibition of PBM cellular proliferation does not correlate to NF-κB activity

However, this result does not affect the above rejection which is directed to calcitriol's affect to reduce NF-κB activity related to calcitriol's PBM immunological effect and more particularly, the involvement of NF-κB in calcitriol's

immunosuppressive effect by inhibiting gene expression (e.g. cytokines such as IL-2) in PHA activated PBM's.

9. Patentee Argument: *Yu (1995) at p.10994, last ¶ states that "[T]he relevance of the inhibiting effects of 1,25$(OH)_2D_3$ on NF-κB proteins to the immunoregulating properties of this hormone is a matter of conjecture." Such speculation cannot reasonably support a conclusion that the effect of calcitriol on IL-2 production or cell proliferation provides evidence that use of calcitriol in any study described in any of the primary reference necessarily reduced NF-κB activity and consequent expression of NF-κB regulated proteins.* Dr. Verma Declaration¶120.

Examiner Response:

Patentee has failed to appreciate the context of the *Yu(1995)* teaching since one needs to consider what follows (starting with "Nevertheless .... to the end of the article) the author's speculation. When taken in context, the author is commenting on a proposed mechanism that takes into account "the down-regulating effect of 1,25$(OH)_2D_3$ on new syntheses of NF-κB related proteins" as sustaining activated lymphocyte function (which relies on both preexisting and "de novo synthesized NF-κB subunits") and the few hours delay needed for the lymphocyte to express the vitamin D receptor. In this context the author expresses his speculation as follows:

> "In view of these considerations, it is *tempting to speculate* that the expression of the 1,25$(OH)_2D_3$ receptor following activation and the down-regulating effect of 1,25$(OH)_2D_3$ on new synthesis of *NF-κB*-related proteins represent a *biologic mechanism* whereby excessive lymphocyte activation might be prevented."
> *Yu (1995)* at page 10994, right column.

Accordingly, the author's speculation is not directed to the NF-κB mediated effect of calcitriol but toward a possible negative feedback mechanism regarding the calcitriol receptor following calcitriol inhibition.

10. Patentee Argument: *Analyses of the IL-2 promoter in other studies has demonstrated that repression by calcitriol of IL-2 expression, as well as aspects of its immunosuppressive activity in T cells likely occurs through an NF-κB independent mechanism involving NFAT-driven transcription as a target. (Alroy et al 1995, Takeuchi et al. 1998 attached hereto as Exhibits 24 and 25). For example, Alroy et al. in PHA/PMA stimulated Jurkat cells, found when activated by calcitriol, the vitamin D3 receptor directly repressed the ability of NFAT to activate transcription of the IL-2 gene by interfering with assembly and binding of an NFAT/AP1 complex to the IL2 promoter, and thereby reduced IL2 gene expression. (Alroy at 6796, see also Alroy Figs. 3, 5 and 8). Similarly, Takeuchi found that calcitriol treatment of activated T cells "resulted in inhibition of NFAT complex formation" to the human IL-2 promoter NFAT site, as well as diminished NFAT-driven transcription of a reporter gene in calcitriol-treated Jurkat cells. (Takeuchi at 210, 215, Figs. 1 and 6). Notably, Takeuchi "found no significant effect of [calcitriol] on NF-κB binding activity under T cell activation conditions [ionomycin and PMA] used here." (Takeuchi at 215).* Dr. Verma Declaration ¶ 119.

Examiner Response:

The instant claims merely require the use of a compound (e.g. calcitriol) that exclusively or non-exclusively reduces NF-κB activity.

In this respect, as discussed *supra*, the *Adams* (exhibit 26) and *Takeuchi* (exhibit 25) documents specifically acknowledged the role of NF-κB in calcitriol inhibition of cytokine expression in PBM's citing the *Yu (1995)* document

Additionally, the *Adams* document further cites *Harant et al.* Eur. J. Biochem. 250, 63-71 (1997) (copy enclosed) which further positively cites *Yu (1995)* (Harant p. 64, left column) while additionally teaching the role of NF-κB in calcitriol's 50% inhibition of activated IL-8 expression in A3 human melanoma cells.

Accordingly, the ability of calcitriol to act via NF-κB (as demonstrated by *Yu 1995*) or NFAT, as demonstrated by *Alroy (exhibit 24)* and *Takeuchi (exhibit 25),* to affect cytokine expression does not adversely effect the instant rejection.

11. Patentee Argument: *Studies show that calcitriol treatment can increase NF-κB activity citing Adams et al. (2004) and Berry et al. (2002). Adams reports that calcitriol alone stimulated NF-κB activity in C3H10T1/2 cells. (Adams at 2948: Exh. 26). Berry reports that calcitriol increased NF-κB activity in a TPA-stimulated promyeloytic leukemia cells by stimulating phosphorylation and degradation of I-κB. (Berry at 183: Exh. 27). Such studies provide evidence that the Examiner is incorrect in assuming that calcitriol administration to cells reduces NF-κB activity.* Dr. Verma Declaration ¶125.

Examiner Response:

Vitamin $D_3$ (calcitriol) affects bone and mineral (e.g. calcium) homeostasis, regulates the immune system and regulates cell growth, differentiation and death (e.g. apoptosis). See *Adams (2004)*, left column.

The rejection is directed to calcitriol's immunological (immunosuppressive) effect in (PBM's) and more particularly, the involvement of NF-κB in calcitriol's immunosuppressive effect of inhibiting cytokine gene expression in PHA activated PBM's.

The *Adams* and *Berry* studies are not relevant to the above rejection since they address a different calcitriol effect (cell growth, differentiation and apoptosis) in different cell types, C3H10T1/2 mouse fibroblasts in *Adams;* and NB4 acute promyelocytic leukemia cells in *Berry*.

In this respect *Adams* (p. 2948, right col.) acknowledges the cell line specificity of NF-κB activity and additionally cites articles teaching the decreased NF-κB activity relating to calcitriol's inhibition of cytokine expression in PBM's including the *Yu (1995) teaching* and the *Harrant (1997)* teaching that in A3 human melanoma cells stably transfected with the IL-8 promoter luciferase construct, calcitriol inhibited activation of the reporter gene by 50%.

**IV. 5-ASA (references prior to 12/24/86)**

11. Claims 1-2, 5-6, 8-9, 20-27, 29, 31-38, 40, 53-62, 64-73, 75-80, 82, 84 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Dew* (Br. Med. J. 287 (7/83):23-24) as evidenced by *Baldwin II*, J. Clin. Invest. 107(1991):63-80, *Bantel* et al. (Amer. J. Gastroenterology 287 (2000):3452), *Yan* et al. (J. Biol. Chem. 274 (1999) 366631-36) and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application which issued as the Baltimore '516 patent. See MPEP 2131.01 (evidence of inherency).

**Summary:** *Dew* teaches administration of 5-ASA for the treatment of ulcerative colitis in humans, which inherently reduced NF-κB activity in the cells of the patients, by a mechanism including phosphorylation of IκB.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

*Dew* teaches the administration (oral delayed release of up to 4.4 g/day) of 5-aminosalicyclic acid (5-ASA) to humans for the treatment of ulcerative colitis (an inflammatory bowel disease).

Ulcerative colitis is recognized as being associated with NF-κB activation. See *Baldwin II* at Table 1.

*Bantel* conducted *in vivo* tests (tissue sample immunostaining using p65 NF-κB subunit antibody before/after 5-ASA administration) on human ulcerative colitis patients administered the same 5-ASA formulation (tradename MESALAZINE) in the same amounts (from 1.7-4.5 g/day) as in the *Dew* reference and reported that 5-ASA administration reduced NF-κB activity in the cells of these patients. *Bantel* at 3453. Specifically, *Bantel* found that (1) NF-κB activity is increased in patients with ulcerative colitis, and (2) therapeutic administration of 5-ASA (as in *Dew*) effectively reduced NF-κB activity in these patients. *Id.* at 3454-55. Accordingly, *Bantel* concluded that "5-ASA is a potent inhibitor of NF-κB activation *in vivo*," at dosage levels and under the same conditions taught in *Dew*. *Id.* at 3456. Thus, *Dew's* administration of 5-ASA for ulcerative colitis inherently and necessarily reduces NF-κB activity in human cells.

Moreover, during prosecution of the Baltimore 08/464,364 application, while referring to the *Yan* reference (cited above), *Dr. Baltimore in his declaration* admitted

that 5-ASA reduces NF-κB activity as in the instant '516 patent claims: "Treatment of cells with such compounds as .... 5-aminosalicyclic acid ... inhibits NF-κB mediated gene expression by a mechanism which includes inhibition of phosphorylation of I-κB proteins"(which is the naturally occurring NF-κB inhibitor). See *David Baltimore Declaration* ¶ 9.

Accordingly, the prior art *Dew* administration of 5-ASA necessarily and inherently reduced NF-κB activity and, thus anticipated at least claims 1-2, 5-6, 8-9, 20-27, 29, 31-38, 40, 53-62, 64-73, 75-80, 82, 84 and 88-97 as shown on an element-by-element basis in *Exhibit H-7* (herein incorporated by reference) provided by the requester in the 90/007,503 proceeding.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. <u>Patentee Argument</u>: *The claimed methods require a first cellular stimulus that induces NF-κB activity. Patentee argues that Dew's comparative study (sulfasalazine verse 5-amino salicyclic acid or 5-ASA) comprising the oral administration of coated 5-ASA to inhibit colitis in those patients in remission does not constitute "treatment of ulcerative colitis in humans" since these remission patients are not "currently suffering from active ulcerative colitis". There is no evidence that use of 5-ASA described in Dew would have involved administration of 5-ASA to cells in which NF-κB activity was induced since patients in Dew were not suffering from active colitis, but were in remission. The non-prior art evidence, including Bantel, relying on active colitis patients for induced NF-κB activity is not relevant to patients in remission as in Dew.* Dr. Verma Declaration ¶¶ 157 and 158

<u>Examiner Response</u>:

Patentee's argument is not commensurate to the instant claims that are not limited to "active" disease.

Additionally, there is no definition in the instant specification defining "treatment" to exclude <u>inhibiting inflammation</u> such as inhibiting ulcerative colitis.

In fact, as pointed out in the rejection above, *Dr. Baltimore's Declaration* (item 9) specifically states that 5-ASA is among:

"The classes of compounds which are able to affect NF-κB mediated gene expression in cells": "***Treatment*** with cells with such compounds as ... 5-aminosalicyclic acid inhibits NF-κB mediated gene expression by a mechanism which includes inhibition of degradation of IκB proteins" (with emphasis). See 08/464,364 Declaration items 7 and 9.

Further, patentee fails to appreciate the *Dew* reference suggestion that high doses of 5-ASA, effective in maintaining remission in ulcerative colitis, "might be of value in *treating* ulcerative colitis". It is legally settled that anticipation does not require actual performance of a suggestion in a disclosure, but only requires that the suggestion be enabling to one of ordinary skill in the art. *Bristol-Meyers Squibb Co. v. Ben Venue Laboratories*, Inc. 246 F.3d 1368, 1379 (Fed. Cir. 2001); *In re Donohue*, 766 F.2d 531,533 (Fed. Cir. 1985). The *Dew* reference clearly enables the administration of oral coated 5-ASA to "treat" ulcerative colitis patients.

Still further, patentee's *assumption* that *Dew's* patients in remission with ulcerative colitis or proctitis were free of NF-κB activated cells is not supported by scientific evidence. In fact, patients undergoing ulcerative colitis remission with apparently normal mucosa, still possess higher expressed levels of cytokines including TNF, IL-1, IL-2, IL-6 and IL-8 (that are known to be regulated by NF-κB) (see *Bantel*, p. 2452, right column) as compared to normal patients indicating the presence of "activated cells". See also enclosed: *Yamamoto et al.*, Inflamm. Bowel Dis. 11(6) (June 2005) pages 589-596 document at p. 589 (right column), p. 592 and p. 594 (right column).

Accordingly, the *Dew* study involving colitis remission patients necessarily involved the administration of 5-ASA to already "activated cells".

2. Patentee Argument: *It is asserted that Dew does not mention NF-κB nor describe an external stimulus that would have induced NF-κB activity.* Dr. Verma Declaration ¶ 158.

Examiner Response:

Regarding the *Dew* reference's failure to mention NF-κB, or a stimulus activating NF-κB, it is noted that the rejection clearly points to evidentiary documents that

demonstrate that NF-κB and its activating stimulus is inherent to the *Dew* reference teaching including:

*Baldwin II*, J. Clin. Invest. 107(1991):63-80,
*Bantel* et al. (Amer. J. Gastroenterology 287 (2000):3452),
*Yan* et al. (J. Biol. Chem. 274 (1999) 366631-36) and
*David Baltimore's Declaration* submitted Feb.2001 in the 08/464,364 application.

3. Patentee Argument: *Baldwin II, Bantel, Yan and the David Baltimore Declaration do not repeat the use described by Dew (Amendment at page 66-67). Additionally, the patients in the Bantel study could not have been "administered the same 5-ASA formulation (tradename MESALAZINE) in the same amount as in the Dew reference" since Bantel's patients were participating in a study "investigating the therapeutic effect of a newly developed mesalazine." (emphasis added) (Bantel at 3453). While, the 5-ASA Dew formulation was made by coating 5-ASA with **Eudragit S**, the formulation used in Bantel consisted of pellets coated instead with **Eudragit L**. (Bantel at 3453). In the absence of any evidence demonstrating these formulations to be equivalent, one cannot assume they would necessarily act in the same manner.* Dr. Verma Dec.¶ 159.

Examiner Response:

Contrary to patentee's argument, evidence of an inherent property need not be demonstrated by "repeating the use" of that prior art document. A prior art document need only provide an enabling disclosure for purposes of anticipation.

Patentee provides no evidence as to why 5-ASA formulations utilizing different methacrylic acid copolymers (EUDRAGIT) delayed release coatings would prevent 5-ASA cell treatment from reducing NF-κB activity and inhibiting NF-κB mediated gene expression by a mechanism which includes inhibition of phosphorylation of IκB proteins as admitted by *Dr. Baltimore* in his Feb. 2001 Declaration.

Once the examiner provides evidence or reasoning tending to show the inherent presence of a property or function, the burden shifts to the patentee to show the lack of the inherent feature in the prior art reference method.

**V. GLUCOCORTICOIDS (references prior to 12/24/86)**

12. Claims 1-2, 5-6, 8-9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88–89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Goodman and Gilman's* (The Pharmacological Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286) and *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (newly raised by Examiner). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary**: *Goodman & Gilman* teach the naturally occurring endogenous production and release of glucocorticoids (cortisol) in response to many different types of environmental stressors which *inherently* results in the reduction of NF-κB activity that acts to inhibit expression, in a eukaryotic cell, of cytokines whose transcription is regulated by NF-κB. In this respect, the NF-κB inhibiting evidence provided by the Baldwin I, Auphan, Scheinman I/II and the Mukaida documents, regarding the synthetically administered steroid dexamethasone (DEX) has been found to be analogous with what occurs upon release of the endogenous cortisol glucocorticoid as evidenced by *Padgett*.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The instant claims broadly encompass the natural process in which an animal responds to environmental stressors by increasing production of endogenous glucocorticoids (cortisol, cortisone, hydrocortisone, corticosterone, aldosterone: see e.g. page 1473 Table 63-2) that are secreted into the bloodstream. Increased glucocorticoids are produced in response to many different types of stressors including "agonal state, severe infections, surgery, parturition, cold, exercise, and emotional stress" (*Goodman and Gilman*, 1469, "Example of Effective Stimuli of Secretion"). These elevated quantities of endogenous glucocorticoids are known to "prevent or suppress the inflammatory response that takes place as a consequence of the hypersensitivity reactions" (Goodman and Gilman, page 1479, left column, "Immune Responses").

However, it has been known since the mid-1990's, that glucocorticoids effect their immunosuppression by reducing NF-κB activity by preventing NF-κB from binding to the appropriate sites on the DNA and by increasing the transcription, expression

and/or release of IκB, thereby reducing the amount of activated NF-κB that can translocate into the nucleus. In this regard, several publications cited by Dr. Baldwin in his 1996 review article (*Baldwin I*), including *Auphan*, *Scheinman I*, *Schmeinman II and*, *Mukaida*, in addition to the *Padgett* document, provide extrinsic evidence that endogenously produced glucocorticoids, such as cortisol, are recognized to *necessarily and inherently* reduce NF-κB activity thus inhibiting cytokine production, *in vivo*, upon the body's release of glucocorticoids in response to external stimuli, such as stress, as described in *Goodman and Gilman.*

**a) Extrinsic Evidence of Inherency as Provided by *Auphan***

Auphan describes methods for reducing NF-κB activity in an induced leukemic T-cell line. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA and used EMSA, as described in the'516 Baltimore patent, to demonstrate NF-κB activity. See *Auphan* at 287-8. *Auphan* then exposed the cells to $10^{-6}$ M dexamethasone. Id. Auphan reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility shift assays (EMSAs) revealed that both AP-I and NF-κB DNA binding activities were elevated in nuclear extracts of activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB binding activity and reduced the amount of A.P-1 binding activity . . . . DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo (Fig. 1D).
>
> * * *
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat human T cell leukemia line stably transfected with a GR expression vector (Fig: 2A). . . .Inhibition of NF-κB activity was also observed in cells stimulated by either 12-O-tetradecanoryl-phorbal 13-acetate (TPA) alone or by tumor necrosis factor (TNF- α). Id. (citations omitted).

As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the transcriptional activation of the I-κBα gene" in these human leukemic cells and therefore, "by upregulating I-κBα protein levels, function to block nuclear translocation of NF-κB and DNA binding." *Baldwin* at 671. As discussed below, Dr. Baldwin's own results, as reported in the *Scheinman II* document discussed below, confirms this mechanism for glucocorticoid action.

**b) Extrinsic Evidence of Inherency as Provided by Scheinman I & II**

*Scheinman I* and *Scheinman II* confirm that dexamethasone, as used in the prior art, reduces NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures. *Scheinman I* at 944. NF-κB activity was measured in at least two assay formats disclosed in the Baltimore '516 patent (EMSA and reporter assays) as well as Western blot

immunological assays. Dexamethasone was shown (Figs 1A and B; Fig. 4; and Fig. 7) to reduce endogenous NF-κB activity in cells ("Pretreatment with DEX resulted in a profound loss of TNF-α induced NF-κB as well as p50 homodimer (KBF1) gel shift activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not shown)." *Id* at 949. *Scheinman I* concluded that dexamethasone reduces NF-κB activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also block their ability to bind DNA. In addition, we present new data showing that dexamethasone (DEX) treatment of HeLa cells causes a significant reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able to inhibit NF-κB activity by a novel mechanism involving a block of cytokine-induced nuclear translocation.
>
> * * *
>
> With EMSA analysis, we found that DEX treatment caused a marked reduction in the ability of NF-κB /Rel subunits to bind DNA despite the presence of equal amounts of NF-κB subunit protein in the EMSA DNA-binding reaction mixtures (Fig. 5, EMSA). *Id.* at 944,948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same $10^{-7}$ M concentration as *Scheinman I*, reduces NF-κB activity as called for by the claims that are the subject of this reexamination request. *Scheinman II* confirmed the *Auphan* conclusion that dexamethasone inhibits TNF α induced NF-κB activity, at least in part, by inducing the transcription of the IκB-α gene:

> Together, these data indicate that DEX treatment induces the transcription of the IκB-α gene. This induction results in the increased syntheses of the IκB-α protein. This increase in protein synthesis leads to the rapid turnover of the IκB-α protein associated with preexisting NF-κB complexes. In the presence of an activator such as TNF α, newly released NF-κB reassociates with the DEX-induced IκBα and thus reduces the amount of NF-κB translocating to the nucleus. *Scheinman II* at 286.

**c) Extrinsic Evidence of Inherency as Provided by *Mukaida***

*Mukaida* observed that IL-8 production was mediated by NF-κB in all cells they previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-κB-regulated IL-8 production by more than 60% at concentrations equal to and higher than $10^{-8}$M. *Id* at 13290.

**d) Extrinsic Evidence of Inherency as Provided by *Padgett***

Consistent with the *Scheinman* II and *Auphan* references, *Padgett* teaches that the body responds to external stressors by release of glucocorticoid hormones, including cortisol, which bind glucocorticoid receptors expressed on a variety of immune

cells to interfere with NF-κB function, resulting in reduced cytokine production. See Abstract; p.445 (right column) to p. 446; footnotes 32 and 33; and p. 447 under "Conclusions".

*Thus, endogenous production of glucocorticoids in response to external body stimuli as described in* Goodman and Gilman *is now recognized as necessarily inherently reducing NF-κB activity as called for by the subject claims of the Baltimore '516 patent.* *See also '7503* Exhibit H8 *(incorporated by reference) application to claims regarding exogenous glucocorticoid administration.*

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Baldwin I, Auphan, Scheinman I, Scheinman II, Mukaida, and Padgett do not "repeat the use" described in Goodman and Gilman. The Auphan, Scheinman I and II and Mukaida evidentiary references in vitro assays do not provide data relating to clinical in vivo use of glucocorticoids in patients due to differences in cell type or mode of activation.* See Amendment pages 76-77 and Declaration of Dr. Verma, ¶¶ 75-101):

Examiner Response:

Enablement and not actual use is the legal standard for demonstrating inherency. Thus, there is no legal requirement that the inherency evidence "repeat the use" as alleged by the patentee.

In this regard, there is no requirement to provide data from human clinical trials to establish utility or enablement for an invention related to the treatment of human disorders. Additionally, an article teaching is presumed enabled absent rebuttal evidence. See MPEP § 2121 at 2100-64 to 2100-67; see also *Rasmusson v. Smithkline Beecham Corp*. 75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, No. 05-1313 (Fed. Cir. Nov. 20, 2006) concurring with the *Rasmusson* holding.

The above rejection provides evidence and reasoning demonstrating that the prior art enables methods of contacting glucocorticoids to eukaryotic (e.g human) immune cells that *inherently* reduces NF-κB activity affecting cytokine expression as

evidenced by the combined *Baldwin I, Auphan, Scheinman I, Scheinman II, Mukaida* and *Padgett* et al. evidentiary teaching.

Additionally, the evidentiary documents utilize in *vitro cell* systems and assays recognized by the patentee's own disclosure as relevant to evaluating NF-κB activity and NF-κB regulated expression. See *Auphan* mouse data; *Scheinman II* HeLa cells; *Auphan* Jurkat cells; *Mukaida* IL-8 promoter CAT reporter assay; and *Scheinmann I and II* CAT reporter and EMSA assays. See also *Padgett* at pages 144-145 summarizing >150 clinical studies and animal data.

2. Patentee Argument: *Auphan, Scheinman I and II and Mukaida evidentiary in vitro assays do not activate before inhibiting.* See Dr. Verma Declaration 88-93.

Examiner Response:

As discussed *supra*, the two steps upon which patentee relies, cell contacting with an inducer followed by applying an inhibitor, are not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instant invention encompasses prior, concomitant or subsequent cellular administration of the inhibitor relative to the administrion of the inducer compound.

Further, in contrast to patentee's argument, all of the evidentiary references teach inhibition of NF-κB activated cells utilizing a glucocorticoid (cortisol or dexamethasone) regardless of the sequence of activation and inhibition. In this respect, the evidentiary documents teach glucocorticoid interference with NF-κB activity and related NF-κB mediated gene expression in eukaryotic cells or organisms composed of said cells.

3. Patentee Argument: *The glucocorticoid mechanism of action is poorly understood and the effects of glucocorticoids have been observed to vary between different cell types, citing Padgett, Hart 2000, Schule 1990, Padgett I and II, Bourke 1999, Han 2001* (exhibits 16-21) in support. *11/17/06* Amend. p.77 and Verma Declaration ¶¶ 95-101.

Examiner Response:

The evidentiary documents teach the ability of glucocorticoids to interfere with NF-κB activity and NF-κB mediated expression of proinflammatory genes (e.g. *cytokine genes such as IL-2, IL-8 and TNF-alpha*) in eukaryotic **immune cells** or eukaryotic organisms composed of said cells.

As summarized by *Baldwin I* glucocorticoids inhibit NF-κB by *transcriptionally activating the I-κBα gene* in human immune cells and therefore upregulate I-κBα protein levels that function to block nuclear translocation of NF-κB and DNA binding. See *Baldwin I* p.671, right col. citing *Scheinman II*, and *Auphan* in endnotes 157 and 158. Accordingly, glucocorticoids act to promote the translation of I-κBα.

Additionally, contrary to patentee's argument, the enclosed rebuttal *Roman-Blas* et al. document recognizes NF-κB's role in a number of inflammatory disorders including arthritis and asthma, due to its mediation of proinflammatory cytokine genes. See *Roman-Blas* at page 839 (Summary) and pages 840-842.

As of 2006, it is recognized that anti-inflammatory glucocorticoids act to "induce expression of I-κB, causing an increased cystolic retention of NF-κB." See *Roman-Blas* at p. 842, right col. under "Inhibition of NF-κB by pharmacologic agents", citing *Auphan and Scheinman II*, respectively.

Regarding different genes or different cells, the *Roman-Blas* article recognizes that glucocorticoids *may further* act through different mechanisms involving the interaction of the activated glucocorticoid (nuclear) receptor (GR) with NF-κB (and other coactivators). See *Roman-Blas* p. 842, right column.

Patentee's documentary evidence is not commensurate in scope to the instantly claimed invention nor is the evidence sufficient to rebut the prima facie anticipation rejection showing above.

Patentee's argument that the *mechanism* of action of glucocorticoids has been observed to vary between different cell types, although true regarding non-immune cells, is nevertheless *not commensurate* to the instantly claimed invention which is not

cell specific. The instant claims encompass, as a species, the use of glucocorticoids in mammalian or eukaryotic immune cells to interfere with NF-κB activity at the level of the inhibitor and thus inhibit pro-inflammatory cell gene expression.

Accordingly, *Padgett* cited by the patentee (Dr. Verma Dec. ¶¶ 89 and 90) recognizes the *Scheinman II and Auphan* (page 446, left column and endnotes 32, 33) teaching of glucocorticoids to *promote the making of I-κBα in immune cells* and that induction of I-κB syntheses "might be limited to certain cell types, such as monocytes and lymphocytes" and additionally may "not be mutually exclusive" of other mechanisms. (page 446 left column to top of right column).

Although the patentee points to *Padgett* at page 447 (as well as *Schule 1990*) regarding the ability of the (nuclear) glucose receptor to "undoubtedly interfere with other transcriptional regulators" the primary focus of the anti-inflammatory effects of glucocorticoids centers on NF-κB inhibition. See *Padgett* p. 447 in entire context. To the extent there are *additional* mechanisms involving the glucocorticoid receptor, the instant claims are not limited to exclusive NF-κB mediated inhibition.

*Bergman I* (immunology 2004), *Bergman II* (Am. J. Resp. Biol. 2004) and *Hart 2000* are cited to challenge the role of NF-κB in dexamethasone's inhibition of cytokine transcription. See Exhibits 17-19; Dr. Verma Dec. ¶¶ 89, 97 and 98.

With respect to the *Hart 2000* biopsy evidence, Dr. Verma states that glucocorticoid administration increased NF-κB transcription and taught away from the glucocorticoid receptor's binding NF-κB.

However, the *Hart 2000* article distinguished their NF-κB DNA binding and NF-κB protein expression data obtained from alveolar macrophage bronchial biopsy patients receiving inhaled corticosteroid therapy since they had not examined "the expression of I-κBα in our biopsies" and thereby the authors recognized that "Glucocorticoids may rapidly induce I-κBα messenger RNA and protein synthesis (endnote 27 to *Auphan*), and therefore I-κBα may mediate the effects of corticosteroids". *Hart 2000* at p. 230.

Similarly, *Bergman I and II* concluded that dexamethasone's inhibition of the cytokine *GM-CSF* was via a *post-transcriptional/ translational mechanism* that does not exclude *post-translational* I-κBα production which, like *Hart 2000,* was not addressed.

In fact, the finding that "GM-CSF is primarily regulated by *de novo* mRNA and protein syntheses" (*Bergmann II*, p. 561, left col.) is consistent with NF-κB being regulated by *post-translational* I-κBα production.

In this respect it is noted that both *Bergman I and II* reinforce NF-κB's role in dexamethasone's ability to inhibit GM-CSF expression (*Bergman I* at p. 433, right col.: "In summary, the data presented here confirm the key role of the NF-κB (-85/-76) and CLEO(-54/-31) elements in the proximal region of the human GM-CSF promoter in T-cell lines"; *Bergman II* abstract: "Taken together our data support an important role for the NF-κB and CLEO sites in the transcriptional control of GM-CSF expression in primary human T-cells ...").

Dr. Verma's conclusion (Declaration ¶¶ 99 and 100 & exhibits 20 and 21) that NF-κB-mediated inhibition of cytokine release was not linked to *post-translational* I-κBα production in the *Han (2001)* study in fibroblast-like rheumatoid synoviocytes (FLS) and in *Bourke's (1999)* study in brain cells was distinguished by both authors as being "cell type specific". See quoted language in *Bourke* at page 2118, bottom of left column to top of right column; and *Han et al.* at page 272 stating that "[T]his anti-inflammatory mechanism of glucocorticoid may differ depending on cell-type".

 4.  Patentee Argument: When read in light of the instant patent disclosure, one of skill in the art would understand and interpret the claims to require affirmative acts and manipulative steps, calculated to achieve specific results and would not have understood the natural production and release of endogenous glucocorticoids as carrying out any of the '516 patent claims.  Dr. Verma Declaration, ¶¶ 11 and 103.

Examiner Response:

The claimed invention is not so limited. Additionally, neither the specification nor the prosecution history place any restrictions on the means by which  "NF-κB activity" is

regulated (enhanced or reduced). Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural (indirect) or man-made (direct) means of reducing NF-κB activity.

5. Patentee Argument: *There is no showing in Goodman and Gilman (1980) in connection with the "environmental stressors" referred to ("agonal state, severe infections, surgery, parturition, cold, exercise and emotional stress"), of what, if anything, would necessarily induce NF-κB activity in cells in connection with any particular stressor, such that the induced NF-κB activity could be reduced as required by the claims. The Examiner refers to "hypersensitivity reactions" but provides no evidence, nor is there any reason to believe, that the different environmental stressors that the Examiner contends would cause production of endogenous glucocorticoids would necessarily be associated with "hypersensitivity reactions." (Office Action, at 56.)* Dr. Verma Declaration ¶ 104.

Examiner Response:

*Goodman and Gilman's* method of corticosteroid cell contacting in response to environmental stressors (e.g. an *NF-κB* inducing cellular event) is taught by the evidentiary documents as inherently reducing NF-κB activity and gene expression.

In response to the first argument, the instant claims do not require the identification of an NF-κB inducing stimulus. In any event, as discussed in the rejection above, the evidentiary documents, particularly the *Padgett* document, provides evidence that environmental stressors trigger NF-κB mediated immune dysregulation (overproduction of cytokines).

Regarding patentee's second argument addressing hypersensitivy reactions, *Goodman and Gilman* teach that the organism responds to stress by increasing blood levels of anti-inflammaory glucocorticoids, which as taught by *Padgett*, effect their action by binding glucocorticoid (GC) receptors and inhibiting cytokine production.

The nexus between between glucocorticoid production and the treatment of cytokine induced inflammatory disorders, such as hypersensititivity reactions, is addressed in detail in the rejection above and summarized briefly as follows:

*Goodman & Gilman* (p.1469, right col.) teach that stress results in *in vivo elevated* glucocorticoid (GC) hormone plasma concentrations which are anti-

that takes place as a consequence of the hypersensitivity reactions" (*Goodman and Gilman*, page 1479, left column, "Immune Responses": see also pages 1479-80 discussing anti-inflammatory properties).

The *Padgett* review article elaborates on clinical (">150 clinical studies") and animal data that demonstrates the relationship between stress and aberrant immune function contributing to poor health and the role of "stress hormones" to ***suppress the production of proinflammatory cytokines and chemokines and downregulate the production of cytokines necessary for the generation of adaptive immune response.*** " See *Padgett* pages 444 and 445 (left column, with emphasis). *Padgett* addresses the mechanism of action of glucocorticoids (GC) as follows:

> "Being lipophilic molecules, GC hormones readily pass through the plasma membrane of all cells in the body. If a cell possesses a GC receptor (GR), that cell can be a target for action. There are two receptors for GC hormones, the GR and the mineralocorticoid receptor (MR). Because corticosterone has a higher affinity for MR than for GR [24], at low circulating levels glucocorticoid hormones bind preferentially to MR. Only at *high circulating or tissue levels* (i.e. during stress) is the GR occupied [25]. In immune cells, such as macrophages and T lymphocytes, the primary receptor for glucocorticoid hormones is GR; more specifically, the influence of glucocorticoid hormones on immune function is mediated by the GR [26] ". *Padgett p. 445, right column.*

Additionally, *Padgett* teaches that "Glucocorticoid receptors expressed on a variety of immune cells bind cortisol and interfere with the function of NF-κB which regulates the activity of cytokine-producing immune cells" (*Padgett* Abstract).

The *Baldwin I, Auphan et al., Scheinman I, Scheinman II and Mukaida* documents provide further evidence of the inherent intracellular mechanism of action of of the natural and synthetic corticosteroid's affect on "NF-κB activity" at the level of increasing inhibitor syntheses.

6. Patentee Argument: *The Examiner has no basis for assuming that cortisol would necessarily affect NF-κB in the same way as dexamethasone since:*

-.*Goodman and Gilman describe cortisol while the later references are drawn to the NF-κB* effects *in experiments using synthetic steroid dexamethasone;*
-.*Padgett indicates glucocorticoids mediate two different receptors, the glucocorticoid receptor and the mineralocorticoid receptor (Padgett at 445);*
- *Goodman and Gilman (p. 1473) indicate, and as evidenced from numerous later publications, the spectrum of biological effects of different glucocorticoids can vary at least in part due to the different interactions of each distinct glucocorticoid with each of these receptors, and the specific pattern of receptor expression on any individual cell.*
- *Although the Examiner asserts that Padgett provides analogous "NF-kB inhibiting evidence" as that in Baldwin I, Auphan, Scheinman I/II and the Mukaida documents regarding dexamethasone, the Padgett review provides no primary data, and does not discuss any experiments which examined the effect of cortisol (or any endogenous glucocorticoid) on NF-κB activity.* Dr. Verma Dec. ¶ 105; 11/17/06 Amendment p.78.

Examiner Response:

The *Goodman and Gilman* reference teaching is not limited to cortisol but is directed to the glucocorticoid class of compounds comprising natural and synthetic corticosteroids which share a common core (steroid) structure and a common activity (e.g. anti-inflammatory):

> "The naturally occurring corticosteroids cortisol and cortisone as well as synthetic corticosteroids such as prednisolone and triamcinolone are glucocorticoids". Goodman and Gilman p. 1473, right col. and Table 63-2: "Antiinflammatory Effect". See also Goodman and Gilman page 1479-80 addressing "Anti-inflammatory Properties" of "[C]ortisol and the synthetic analogs of cortisol...".

Similarly, the later published documents provide inherent evidence of the ability of corticosteroids (generally), and dexamethasone (particularly), to treat inflammation by interfering with NF-κB- induced cytokine production in mammalian immune cells.

Although all glucocorticoids have different structures and biological activities, the above rejection focuses on the anti-inflammatory activity of glucocorticoids effected by binding the glucocorticoid receptor (GR) present on immune cells.

Regarding the ability of glucocorticoids to bind the glucocorticoid receptor (GR) and mineralocorticoid receptor (MR), *Padgett* points out that stress-inducing high

plasma glucocorticoid levels results in glucorticoids binding the (GR) present on immune cells responsible for immune function (e.g. cytokine production):

> "[O]nly at *high circulating or tissue levels* **(i.e. during stress)** is the GR occupied [25]. In immune cells, such as macrophages and T lymphocytes, the primary receptor for glucocorticoid hormones is GR; more specifically, the influence of glucocorticoid hormones on immune function is mediated by the GR [26]"

The argument that the *Padgett* review article lacks "primary data" or experiments regarding the effect of cortisol (or any endogenous glucocorticoid) on NF-κB activity is not persuasive since *Padget* relies on the results of previously conducted animal studies as well as ">150 clinical studies" for their inherent teaching that natural <u>and</u> synthetic glucocorticoids act via the same immune cell receptor (GC receptor) to inhibit NF-κB mediated inflammation in cytokine-producing immune cells.

**VI. ANTIBIOTICS (references prior to 12/24/86)**

13. Claims 1-2, 5-6, 8-10,12-18, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64, 65, 69-73, 75, 76, 80, 82, 84, 88-89, 93-97, 99, 100, 104-105, 119-120, 124-129, 133-137, 139,140,144-147, 149,150,154-157, 159, 160, 164-168,172-175, 177, 178, and 182-185 are rejected under 35 U.S.C. 102(b) as being anticipated by *1970 PDR: pages 1167 (GARAMYCIN$_{TM}$ :gentamycin),* 1309-1310 (SUMYCIN$_{TM}$ : tetracycline), 1379-1380 (E-MYCIN$_{TM}$ :erythromycin) as evidenced by the *Manolagas declaration, Galdiero et al.* (Microbiology, <u>147</u> (2001): 2697-2704), *Yang* et al. (Nature <u>395</u> (1998) 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. (J. Immunology 175(2005) 8069-8076) (newly raised by the Examiner). See MPEP 2131.01 (evidence of inherency, including extrinsic publications of any date and intrinsic evidence using applicant's own specification: see *Ex parte Novitski* cited therein).

**<u>Rejection Summary</u>:** As detailed in *Exhibit H-10* of the 90/007,503 request (herein incorporated by reference), *1970 PDR* teaches administration of antibiotics such as erythromycin, gentamicin, and tetracycline to kill bacteria in animals. As evidenced by the *Manolagas declaration*, gram (-) bacteria produce lipopolysaccharides (LPS) which induce NF-κB regulated cytokine production. Antibiotics that kill gram-negative bacteria thereby act to inherently reduce LPS-induced and NF-κB-regulated cytokine production.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claims 5 and 18) and reduce the effects of bacterial lipopolysaccharides (claims 12-17) on eukaryotic (e.g. mammalian) cells.

The instant claims are drawn to a method of inhibiting NF-κB activity (e.g. diminishing bacterially LPS induced NF-κB expression of cytokines mediated, for example, through intracellular signaling: in claims 6, 8-10) and associated gene (claims 1-2) expression (e.g. of a cytokine protein: claim 5) in a eukaryotic cell.

The *1970 PDR* teaches the administration of antibiotics (erythromycin, gentamicin, tetracycline) to treat gram-negative bacterial infections. Erythromycin, for example, is active against *H. pertusis* infections (*Id.* at 1379); and gentamicin sulfate (trade name GARAMYCIN) treats infections caused by *Pseudomona aeruginosa*, *Aerobater aerogenes*, *E.coli*, *Proteus vulgaris*, and *Klebsiella pneumoniae* (*Id.* at 1167). Tetracycline is a broad spectrum antibiotic (trade name SUMYCIN) which treats a variety of infectious gram (-) bacteria, including *E. coli* and *Shigella* (*Id* at 1309).

Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-κB activity resulting in the production of cytokines regulated by NF-κB. Cytokines whose genes are regulated by NF-κB (at least in part) include tumor necrosis factor alpha (TNF-α) and interleukins 2, 6, 8 and 10 (IL 2, 6, 8 and 10). E.g., *Galdiero*; *Yang;* and *Mori*. As noted in *Galdiero* (page 2700), "The lowest concentration of LPS able to induce cytokine release was 10 ng $ml^{-1}$ ".

Once produced by gram-negative bacteria, LPS activates NF-κB, which translocates to the nucleus and binds to the NF-κB recognition sites on genes that are regulated, at least in part, by NF-κB. E.g., *Baltimore patent*, Col. 2, lines 54-57 ("Release of active NF-κB from the I-κB- NF-κB complex has been shown to result from stimulation of cells by a variety of agents, such as bacterial lipopolysaccharide ... ").

In treating gram-negative bacterial infections, antibiotics kill bacteria or impair bacterial function thereby reducing bacterial production of LPS (*Manolagas Declaration*, ¶¶ 33-40).

For example, erythromycin has been shown to inhibit the activation of NF-κB in T cells; and in normal and inflamed human bronchial epithelial cells along with modulating IL-8 expression. See *Yasutomi* et al. at page 8068 at the bottom of the right column and footnotes 5-7 (citations therein). *Yasutomi* further demonstrated the ability of tetracycline to inhibit lipopolysaccharides and NF-κB activation in human monocyte-derived dendritic cells and suppress NF-κB induced cytokine (e.g. IL-6, 10, 12p70, 13 and IFN-γ ) production. See Abstract, page 8071-8073, see Table 1 and Figures especially 1-3 and 8.

Thus, by blocking LPS that reaches the cell, administration of the *1970 PDR* antibiotics to combat gram-negative bacterial infections would necessarily reduce NF-κB activity in human cells and thereby reduce cytokine expression. As such, as shown on an element-by-element claim basis in *Exhibit H-10* of the 90/007,503 request (incorporated by reference), the disclosed 1970 PDR antibiotics would inherently anticipate the subject claims requiring LPS-induced NF-κB activity.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

Additionally, the above rejection was modified to further remove the applicability of the above rejection to liver cells (claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186) since the above cited documents fail to teach that eukaryotic liver cells are affected by LPS-induced NF-κB activity so as to affect gene expression.

1. Patentee Argument: *The 1970 PDR reference teaches that antibiotics either kill bacteria or interfere with bacterial cell growth but do not act "by blocking LPS that reaches the cell," as alleged on p. 42 of the Office Action. Antibiotics have no effect on any of the 6 segments of the NF-κB pathway as illustrated in Schematic 10 of Exhibit 1. As also illustrated in Schematic 10, antibiotics neither act on the mammalian cell, nor do they act to interfere with the induction by the external influence to which the Examiner refers, i.e. LPS. Thus, one skilled in the art would not contemplate using antibiotics to "reduce NF-κB activity" as claimed. Even if one viewed the external stimulus as the bacterial infection, antibiotics act on the bacteria and do not act on any of the 6 segments of NF-κB pathway. Additionally, claims 8-9, 75-80, 82, 84, 88-98, are further directed to methods carried out on cells in which the "external influences induce NF-κB mediated intracellular signaling" in which the induction is maintained by the presence of the external influence. Killing bacteria, even if doing so could also remove the LPS, cannot practice any of the claims that require maintained induction by the external influence.* Dr. Verma Declaration ¶¶ 127 and 131; 11/17/06 Amendment at pages 14 and 80-82.

Examiner Response:

Although claims 8 and 9 (and dependent claims) require that the "external" (or "extracellular") influences induce *NF-κB signaling*, these claims do not require maintained induction as argued by the patentee.

Additionally, although the instant claims encompass patentee's 6 segments of the NF-κB pathway, they are not limited thereto, as discussed in the claim interpretation section *supra*.

Further, patentee's argument restricting the instant claim coverage to direct effects on the 6 segment pathway is not commensurate to the scope of the claims, since reducing cellular NF-κB activity in the instant claims encompasses both direct and indirect interference with NF-κB activity. Accordingly, treating gram (-) bacterial infections by killing or interfering with the growth of bacterial cells would necessarily reduce LPS levels and thereby indirectly "alter the concentration or availability of NF-κB" and "reduce NF-κB activity". Reducing intracellular LPS-induced NF-κB concentration necessarily decreases the level of NF-κB-I-κB complex, NF-κB translocation, NF-κB binding to its DNA recognition sites and the expression of NF-κB regulated and bacterial LPS-induced cytokines in cells.

3. Patentee Argument: *The premise that the use of antibiotics to treat bacterial infections would necessarily reduce LPS levels is incorrect. In this regard, the Manolagas declaration indicates that one possible (but not necessary) outcome of antibiotic treatment is to reduce LPS levels, contingent on completely resolving a bacterial infection. (Manolagas Decl. ¶¶ 38-39.) However, as acknowledged by the PDR there are several common reasons why antibiotic treatment fails to do so including:*
*-antibiotic-resistant bacterial cells;*
*-antibiotics can be bacteriocidal but also bacteriostatic which does not result in killing bacteria. (1970 PDR at 880, 1167, 1309, 1310, 1379);*
*-little effect on enteric bacteria, including LPS surface-containing gram (-) bacteria. Thus, the bacteria with LPS remains and continues to induce* NF-κB. Dr. Verma Declaration ¶ 128.

Examiner Response:

Initially, patentee's arguments addressing patient criteria, such as antibiotic resistance, antibiotic action (bacteriocidal/bacteriostatic) and targeting (enteric or otherwise) is not commensurate to the instant claims that are not so limited.

Additionally, as pointed out in the rejection above, the *1970 PDR* reference teaches the use of an antibiotic therapeutic protocol of at least two days, but often

longer, which enables the treatment of gram (-) patients (including guidance regarding the screening for antibiotic resistant gram (-) infections) which reduces LPS levels. See 1970 PDR and antibiotic "Dosage and Administration" pages 1167, 1310 and 1380 for gentamycin, tetracycline and erythromycin, respectively.

4. Patentee Argument: *As evidence that antibiotic treatment would reduce LPS levels, Dr. Manolagas specifically refers to only (Galdiero (2001), Manolagas Declaration ¶¶ 37-39). Galdiero however, neither mentions antibiotics, nor does the paper provide any information relating to the effect of LPS in any human patient. Indeed, Galdiero indicates that in cultured cells, even extremely low levels of LPS, such as 10ng/ml were sufficient to induce release of cytokines from the cells. Dr. Manolagas' assumption that in a patient, LPS levels to below 1ug/ml would no longer stimulate NF-κB -mediated cytokine production therefore has no support in Galdiero, which indicates that 100-fold lower levels of LPS (0.01 ug/ml) induced expression of such genes in cultured cells.* Dr. Verma Declaration ¶ 129.

Examiner Response:

Patentee has mischaracterized the *Galdiero (2001)* teaching.

As described in *Galdiero (2001)*, the LPS dose dependent effect (minimum effect at 10ng/ml and maximum effect at 1000 ng/ml or $1x10^{-6}$/ml) of stimulating cytokine (TNF-α and interleukins 6 and 8) production in Vitamin $D_3$-treated human THP-1 cells (see Fig. 3 at page 2700) was "completely blocked" by the antibiotic polymyxin B (data not shown).

The *Dr. Manolagas Declaration* statement mistakenly referred to the maximally effective LPS dose, and NOT the minimally effective dose necessary to "completely abrogate NF-κB -mediated cytokine production" in accordance with the *Galdiero (2001)* cellular assay evidence.

Patentee fails to provide evidence that the *in vitro* LPS dose-dependent cytokine cell release and the blocking effect of the gram (-) antibiotic polymyxin B found by *Galdiero (2001)* is not equally applicable *in vivo* to other antibiotics including erythromycin, gentamicin and tetracycline.

Additionally, as discussed in the rejection above, there is evidence supporting the ability of erythromycin, gentamicin and tetracycline to inhibit LPS and NF-κB activation. For example, erythromycin has been shown to inhibit the activation of NF-κB in T cells; and in normal and inflamed human bronchial epithelial cells along with modulating IL-8 expression. See *Yasutomi* et al. at page 8068 at the bottom of the right column and footnotes 5-7 (citations therein). *Yasutomi* further demonstrated the ability of tetracycline to inhibit lipopolysaccharides and NF-κB activation in human monocyte-derived dendritic cells and suppress NF-κB induced cytokine production e.g. IL-6, 10, 12p70, 13 and IFN-γ. See Abstract, pp. 8071-8073, Table 1 and Figures 1-3 and 8.

5. Patentee Argument: The following *studies indicate that antibiotic treatment can disrupt bacterial membranes, which by releasing and solubilizing LPS, can be expected to increase circulating LPS levels in the body:*
*a. Lepper et al.; Int. Care Med. 28:824-833 (2002) (Exhibit 28)*
*b. Shenep and Mogan, J. Inf. Diseases, 150:380-388 (1984) (Exhibit 29);*
*c.Hurley et al., Antimicrob. Agents Chemother. 351:2388-2394 (1991) (Exhibit 30);*
*d. Dofferhoff et al., Scand. J. Infect. Dis. 23:745-754 (1991) (Exhibit 31);*
*e. Mustafa et al., J. Infect. Dis. 160:891-5 (1989) (Exhibit 32).*
*f. Leeson and Morrison, Shock 2:235-245 (1994) (Exhibit 33).*
Dr. Verma Declaration ¶ 130.

Examiner Response:

Non-Beta lactam antibiotics (such as erythromycin, gentamicin and tetracycline) are clinically indicated since they do not act on the bacterial cell wall and thus release lower amounts of LPS endotoxins, with aminoglycosides, such as gentamicin, tobramycin and amikacin being shown to neutralize the effects of endotoxin. See *Lepper et al.*, pp.827-828 and Fig. 4; *Dofferhoff* at page 753.

Additionally, any antibiotic-induced endotoxin (LPS) release occurs quickly (within the first two hours) and is of short duration (ending within the first six hours) at which time the endotoxin is cleared as a result of the antibiotic treatment. See *Dofferhoff* at page 752 and Fig. 4; See *Shenep* at page 382, Fig. 1 and page 386, left column.

The *1970 PDR* teaches an antibiotic therapeutic protocol of at least 2 day duration. See antibiotic "Dosage and Administration" pages 1167, 1310 and 1380 for gentamycin, tetracycline and erythromycin, respectively).

Accordingly, the *1970 PDR* therapeutic protocol enables the treatment of gram (-) patients regardless of whether an initial spike of LPS occurs. Since the instant claims fail to address therapeutic protocol (e.g. duration), the *1970 PDR* therapeutic daily antibiotic protocol would result in an inherent reduction of NF-κB activity after as little as 6 hours by decreasing LPS-induced NF-κB intracellular amounts.

**VII. N-ACETYL-L-CYSTEINE (intervening prior art)**

14 Claims 18 and 182-185 are rejected under 35 U.S.C. 102(a) as being anticipated by *Staal* et al. *Proc. Nat'l Acad Sci* 87:9943 (Dec. 1990) ('7828 appendix E: incorporated by reference).

**REJECTION SUMMARY:** *Staal* et al. (see Abstract; page 9945; Figures 4-5) disclose a method of inhibiting TNF-α by blocking NF-κB activation in mammalian cells (e.g. Jurkat cells) by administration of N-acetyl-L-cysteine (NAC).

Instant claim 18 recites: A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor necrosis Factor-α in the cells.

*Staal* teaches a method of inhibiting TNF-α activation and, thus, signaling, in mammalian cells by reducing NF-κB activity. Specifically, *Staal* discloses inhibiting TNF-α stimulation of 293.27.2 and Jurkat cells by selectively blocking NF-κB activation by administration of N-acetyl-L-cysteine (NAC). See Abstract, and Fig. 5. Reduction of intracellular TNF- α signaling is demonstrated by decreased expression of a beta-galactosidase reporter gene in Jurkat cells, which are mammalian (human) in origin. See Fig. 4. Accordingly, claim 18 is anticipated.

Instant claim 182, depending from claim 18, further recites that reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. *Staal* anticipates claim 182 by teaching that high thiol levels (resulting from NAC administration) inhibit NF-κB activation by preventing phosphorylation of I-κB, since phosphorylation of I-κB is necessary for dissociation of NF-κB from its complex with I-κB. Since NAC administration keeps NF-κB complexed to its naturally occurring inhibitor I-κB, NF-κB is unavailable for binding

NF-κB recognition sites on genes that are transcriptionally regulated by NF-κB. Thus, instant claim 182 is anticipated since NAC-mediated inactivation of NF-κB described in *Staal* inherently and necessarily results in reduced NF-κB binding to its recognition sites.

Instant claims 183-185, depending from claim 18, are also anticipated by *Staal*. These claims further require that the method is carried out on human cells (claim 183), immune cells (claim 184) and lymphoid cells (claim 185). *Staal* discloses NAC inhibition of TNF- α stimulation in Jurkat cells (see Fig. 4, p. 9945) which are cells derived from a human T-cell leukemia cell line, and, thus, are human, immune and lymphoid anticipating claims 183-185.

***Discussion***

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.* Response at p. 63.

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC §120 for purposes of prior art.

2. Patentee Argument: *Staal does not show reduction of NF-κB activity in induced cells, as required by the claims since "... the aim of the Staal study was to determine whether NAC (N-acetyl-cysteine), by inhibiting thiol levels could act on cells before they experienced stimulation." (Staal at 9944) and in the Staal experiments "... cells were always treated simultaneously with both NAC and* TNF-α.*" (Staal at 9945-46). Response at pages 61-63.* Dr. Verma Declaration ¶¶ *161-162.*

Examiner Response:

In response to patentee's argument that the reference fails to show certain features of patentee's invention, it is noted that the feature upon which patentee relies (i.e, *in vitro* cell contacting with activator prior to contacting with an inhibitor) is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering the NF-κB inhibitor prior to or with an NF-κB activating compound.

Contrary to patentee's argument *Staal* does show that simultaneous administration of PMA, TNF-α and NAC results in "reduction of NF-κB activity in induced cells" since *Staal* demonstrates:

- inhibition of *basal level* stimulated B-galactosidase (B-gal.) cell production,
- > 95% inhibition of PMA stimulated cellular B-gal production, and
- about 70% inhibition of TNF-α stimulated cellular B-gal production.

See *Staal* at p. 9944 under "Results" and Fig. 1; See also p. 9945, right col. and Fig. 4 for analogous NAC "reduction of NF-κB activity in (PMA/ TNF-α) induced cells".

**VIII. NUCLEIC ACID DECOYS: (intervening prior art)**

15. Claims 1, 2, 20, 25-27, 29, 31, 36-38 and 40 are rejected under 35 U.S.C. 102(a) as being anticipated by *Bielinska* et al. *Science* 250 :997 (Nov. 16, 1990) as evidenced by *Ho*, PNAS USA 86 :6714 (1989) for purposes of defining clone 13B cells disclosed in *Bielinska*. See MPEP 2131.01: Multiple Reference 35 U.S.C. 102 Rejections (primary reference term meaning) ('7828 Appendix D: incorporated by reference).

**Rejection Summary**: *Bielinska* (e.g. at pages 197-198 and Fig. 1) discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 13 B-lymphoblastoid cells.

*Bielinska* discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 12 B-lymphoblastoid cells. See, e.g., p. 997, Abstract at mid-¶ and p. 998 right hand column and Fig. 1D. Specifically, *Bielinska* discloses the use of phosphoroothioate oligonucleotides as decoy molecules that competitively bind NF-κB in clone 13 B cells. Id. These cells contain an HIV-CAT reporter gene construct that is transcriptionally- regulated by NF-κB by two κB binding sites found within the HIV enhancer. Fig. 1, and middle of right column on page 997.

*Bielinska* teaches that phosphorothioate oligonucleotides having an NF-κB binding site consensus sequence, GGGGACTTTCC (the same as disclosed in the instant '516 patent in Table 2 at col. 37), competitively bind NF-κB, reducing the amount of NF-κB/HIV enhancer-regulated transcription of chloramphenicol acetyltransferase (CAT). See p. 1000, fn. 19. Administration of these NF-κB decoy molecules in clone 13 cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998, right-hand column next to Fig. 1D.

Thus, *Bielinska* teaches reducing NF-κB activity in eukaryotic cells such that expression of a gene whose transcription is regulated by NF-κB is inhibited, as required

by instant claims 1 and 2. Specifically, as discussed above, *Bielinska* teaches a method of inhibiting expression of NF-κB/HIV enhancer-regulated CAT clone 13B lymphoblastoid cells. See e.g. p. 998, right-hand column next to Fig. 1D. This decrease in NF-κB is accomplished by administration of double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC. See p. 1000, fn 19.

*Bielinska* also teaches the methods of instant claims 20, 25-29, 31 and 36-40, which depend from claims 1 and 2.

Instant claims 20 and 31 are drawn to a method wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:I-κB complex. These claims are anticipated by the *Bielinska* teaching (discussed *supra*) that double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC, competitively bind NF-κB in clone 13B cells since binding of NF-κB by a decoy molecule necessarily decreases the amount of free NF-κB in the cell which necessarily decreases the level of NF-κB not bound in an NF-κB:I-κB complex.

Instant claims 25 and 36 are drawn to a method wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. As discussed for dependent claims 20 and 31, *Bielinska* discloses double-stranded oligonucleotide phosphorothioates that compete with the NF-κB binding site, thus reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

Instant claims 26-29 and 36-40 are drawn to reducing NF-κB activity in a cell resulting in inhibited expression of a gene regulated by NF-κB, wherein the method is carried out on mammalian cells (claims 26 and 37), human cells (claims 27 and 38), immune cells (claims 28 and 39) and lymphoid cells (claims 29 and 40). The *Bielinska* clone 13 B cells are human B lymphoblastoid cells and are thus, mammalian, human, immune, and lymphoid cells, as recited in the instant claims. See *Bielinska* p. 998 (left hand column at top) and *Ho* provided in Appendix C. *Bielinska* also anticipates instant claim 203 which is drawn to:

> A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes an NF-κB binding site that binds to NF-κB.

As discussed above, *Bielinska* teaches a method of inhibiting expression of a CAT reporter gene using a nucleic acid decoy molecule. Transcription of the CAT reporter gene is regulated by an NF-κB/HIV enhancer and the *Bielinska* decoy molecule possesses the NF-κB binding site consensus sequence GGGGACTTTCC disclosed in

the instant patent. *Bielinska* teaches that introduction of this NF-κB decoy molecule into the clone 13B cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998, right hand column next to Fig. 1D. Therefore, *Bielinska* teaches each and every element of instant claim 203.

***Discussion***

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.* 11/17/06 amendment page 34.

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC §120 for purposes of prior art.

**Final Status of the Claims**

1. **Rejected**: claims 1-6, 8-18, 20-27, 29, 31-38, 40, 42-43, 47-51, 53-62, 64-73, 75-80, 82, 84, 88-97, 99-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-137, 139,140, 144-147, 149, 150, 154-157, 159, 160, 164-168, 172-175, 177, 178, 182-185, 192-193 and 197-201.

2. **Confirmed**: claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202.

3. **Cancelled**: 7, 28, 39, 81, 83, 85, 86 and 203

13. **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire two months from the mailing date of this action.

**Extensions of time under 37 CFR § 1.136(a) do not apply in reexamination proceedings.** The provisions of 37 CFR § 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. § 305 and in 37 CFR §1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR §1.550(c).** A request for extension of time must be filed on or before the day on which a response to this action is due, and it must be accompanied by the petition fee set forth in 37 CFR § 1.17(g). The mere filing of a request will not effect any extension of time. An extension of time will be granted only for sufficient cause, and for a reasonable time specified.

The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional month, which will be granted even if previous extensions have been granted. In no event however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action. See MPEP § 2265.

***Service on the Other Party (3rd Party Request)***

After the filing of a request for reexamination by a 3rd party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR §1.248. See 37 CFR §1.550 (f).

***Patent Owner Amendment***

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR § 1.530(d)-(j), must be formally presented pursuant to 37 CFR § 1.52(a) and (b), and must contain any fees required by 37 CFR §1.20(c). In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action. Further submissions will be governed by the requirements of 37 CFR §1.116, after final rejection and 37 CFR §41.33 after appeal, which will be strictly enforced.

NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR §1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an ex *parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007) (Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR §1.33(c), automatically changed to that of the patent file as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, including the present reexamination proceeding, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination and Amendment Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

***Future Correspondences***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Bennett Celsa whose telephone number is 571-272-0807. The examiner can normally be reached on 8-5. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Deborah D. Jones can be reached on 571-272-1535. The fax phone number for the organization where this application or proceeding is assigned is 571-273-9900.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria,VA 22313-1450

Please FAX any communications to:
(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:
Customer Service Window
Attn: Central Reexamination Unit
Randolph Building
401 Dulany Street
Alexandria, VA 22314

*Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).*

Bennett Celsa
Primary Examiner
Art Unit 3991

Conferees:

DEBORAH D. JONES
SPRE-AU 3991
CENTRAL REEXAMINATION UNIT

PADMASHRI PONNALURI
CRU EXAMINER - AU 3991

TABLE OF CONTENTS

PRIOR ART PENDING REJECTION SUMMARY — PAGES

**I. PROTEIN KINASE C INHIBITORS (intervening prior art):** — 26-32
Anticipation: *Meichle (p.25)* or *Shirikawa (p. 31)* ('7503 Exhibit. G2) of claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, & 197-201.

**IIa. CYCLOSPORIN A (intervening prior art)** — 35-48
Anticipation: *Schmidt (pp. 35-36), Emmel (pp. 42-43)* and *Brini (pp. 47-48)* ('7503 Exhibit G1) of claims 1-6, 8-9, 11, 20-21, 25-27,29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 & 197-201.

**IIb. CYCLOSPORIN A (references prior to 12/24/86)** — 54-75
A. Anticipation: *PDR* (1985), *Griffith I, Griffith II* ('7503 Exhibit H1) of claims 1-2, 6, 8-9, 20-27, 29, 31-38,40, 64-73, 75-80, 82, 84 and 88-97. — 54-57

B. Anticipation *by Reed ('7503 Exhibit H2) of claims* 1-2, 5-6,8,9, 20-21, 25-27 29,31-32,36-38, 40,53-54,58-62,64-65,69-73,75-76,80, 82, 84,88-89, and 93-97. — 66-68

C. Anticipation *by Kronke and/ or Siebenlist* ('7503 Exhibit H3) of claims 1-2, 5-6, 8,9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, and 93-97. — 74-75

**III. VITAMIN D (CALCITRIOL) (references prior to 12/24/86)** — 78-79
Anticipation by *Tsoukas, Manolagas, Lemire I, Lemire II and Rigby I* ('7503 Exhibits H4-H6) of claims 1-2, 5-6, 8, 9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97.

**IV. 5-ASA (references prior to 12/24/86)** — 90-91
Anticipation by *Dew* ('7503 Exhibit H7) of claims 1-2, 5-6, 8, 9, 20-27, 29, 31-38, 40, 53-62, 64-73, 75-80, 82, 84 and 88-97.

**V. GLUCOCORTICOIDS (references prior to 12/24/86)** — 94-97
Anticipation by *Goodman & Gilman* ('7503 Exhibit H8) of claims 1-2, 5-6, 8, 9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97.

**VI. ANTIBIOTICS (references prior to 12/24/86)** — 105-107
Anticipation by *1970 PDR* ('7503 Exhibit H10) of claims 1-2, 5-6, 8-10,12-18, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64, 65, 69-73, 75, 76, 80, 82, 84, 88-89, 93-97, 99, 100, 104-105, 119-120, 124-129, 133-137, 139,140,144-147, 149,150,154-157, 159, 160, 164-168,172-175, 177, 178, and 182-185.

**VII. N-ACETYL-L-CYSTEINE (intervening prior art)** — 111-112
Anticipation by *Staal* of claims 18 and 182-185 ('7828 Appendix E).

**VIII. NUCLEIC ACID DECOYS: (intervening prior art):** — 113-116
Anticipation by *Bielinska* of claims 1, 2, 20, 25-27, 29, 31, 36-38 and 40 ('7828 Appendix D).

# EXHIBIT M

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CA 92660-6324
TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CALIFORNIA 90067-4276

TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199
WEBSITE: www.irell.com

WRITER'S DIRECT
TELEPHONE (310) 203-7190
FACSIMILE (310) 203-7199

November 2, 2007

**VIA E-MAIL**

Marcus E. Sernel, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601-6636

Robert C. Stanley
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.
303 Peachtree St., N.E.
Sun Trust Plaza, Suite 3500
Atlanta, GA 30308

Re: *Amgen Inc. et al. v. ARIAD Pharms., Inc. et al.*, C.A. No. 06-259-MPT

Dear Marc and Robert:

I write to inform you that ARIAD has cancelled, among others, claims 1, 2, 5, 26, 27, 29, 37, 38, 40, and 59-62 in the pending '516 patent reexamination proceedings. As a result, these claims are no longer asserted in this case. We will be providing supplemental interrogatory responses in due course, but we wanted to inform you promptly of the claim cancellation.

Please let me know if you have any questions.

Very truly yours,

*/s/ Amir A. Naini*

Amir A. Naini

cc: Counsel of Record

# EXHIBIT N

Jul-25-07 16:51 From-Cooper&Dunham LLP +212 391 0526 T-426 P.001/008 F-503

FAX RECEIVED
JUL 25 2007
CENTRAL REEXAMINATION UNIT

--URGENT ACTION REQUESTED--
*Ex Parte* REEXAMINATION

Docket No. 74753/JPW/GJG

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

| 90/007,503 | and | 90/007,828 |
|---|---|---|
| Filed April 4, 2005 | | Filed December 2, 2005 |

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991 Examiner: B.M. Celsa

Patentees: David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.: 6,410,516 B1 Serial No: 08/464,364

Issue Date: June 25, 2002 Filed: June 5, 1995

For : NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

1185 Avenue of the Americas
New York, New York 10036
July 25, 2007

BY FACSIMILE 571-273-9900
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Attn. Director, Central Reexamination Unit

FACSIMILE CERTIFICATE OF TRANSMISSION
IN CONNECTION WITH THE ABOVE-IDENTIFIED APPLICATION

Date of Facsimile: July 25, 2007. I hereby certify that this paper, along with a Petition Under 37 C.F.R. §1.181 To Withdraw The Finality Of July 6, 2007 Final Office Action (7 pages), is being transmitted to the United States Patent and Trademark Office on the date indicated above by facsimile and is addressed to Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, Attn. Director, Central Reexamination Unit.

Susan Kotas

Printed Name: Susan Kotas

Respectfully submitted,

John P. White

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Applicants
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
Tel. (212) 278-0400

Copied from 90007503 on 08/31/2007

**--URGENT ACTION REQUESTED--**
**Ex Parte REEXAMINATION**

Docket No. 74753/JPW/GJG

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

**A Merged Proceeding of *Ex Parte* Reexamination Control Nos:**

**90/007,503** **and** **90/007,828**
**Filed April 4, 2005** **Filed December 2, 2005**

**Merged Pursuant to May 4, 2006 Merger Decision**
**Group Art Unit: 3991 Examiner: B.M. Celsa**

Patentees: David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.: 6,410,516 B1 Serial No: 08/464,364

Issue Date: June 25, 2002 Filed: June 5, 1995

For : NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

1185 Avenue of the Americas
New York, New York 10036
July 25, 2007

BY FACSIMILE 571-273-9900
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Attn. Director, Central Reexamination Unit

**PETITION UNDER 37 C.F.R. § 1.181 TO**
**WITHDRAW THE FINALITY OF JULY 6, 2007 FINAL OFFICE ACTION**

This Petition submitted under 37 C.F.R. §1.181 requests that the finality of the July 6, 2007 Final Office Action Rejection issued in connection with the above-identified merged reexamination proceeding be withdrawn as premature. Pursuant to 37 C.F.R. §1.181(f), this Petition is being filed within two (2) months of the mailing date of the July 6, 2007 Final Office Action. Accordingly, this Petition is timely filed.

Copied from 90007503 on 08/31/2007

**Requirements of a Petition Under 37 C.F.R. §1.181**

A petition under 37 C.F.R. §1.181 must contain a statement of the facts involved, the point or points to be reviewed, and the action requested.

**Statement of the Facts Involved, the Point or Points to be Reviewed, and the Action Requested**

Facts Involved and Point to be Reviewed

A final Office Action was issued July 6, 2007 in connection with the subject reexamination by the U.S. Patent and Trademark Office which contained new grounds of rejection and new arguments in support of rejections including new references cited and applied by the Examiner for the first time. The July 6, 2007 Final Office Action was accompanied by a form PTO-892 (Notice of References Cited By Examiner) listing seven references, six of which were neither previously cited by the Examiner nor submitted by the Patent Owners in an Information Disclosure Statement. The six newly cited references were used to support new grounds of rejection and/or to substantially modify previous grounds such that the Patent Owners are now being required to address new grounds of rejection set forth for the first time in the July 6, 2007 Final Office Action.

Specifically, the July 6, 2007 Final Office Action set forth the following new grounds or arguments in support of rejecting claims:

1) On pages 15-16, the ground of rejection entitled "'Reach-Through Claims' and Written Description" appeared for the first time in the July 6, 2007 Final Office Action and relies on a newly cited document (Kunin et al.).

2) On pages 35-42, the ground of rejection entitled "Cyclosporin A" relies for the first time on three new references (Roman-Blas,

Copied from 90007503 on 08/31/2007

et al.; Frantz et al.; and Meyer et al.) (on pages 41-42) for the assertion that Cyclosporin A ("CsA") inhibits NF-kB. This ground of rejection is substantially new in that the previous ground of rejection based on CsA art was deficient in failing to show that CsA necessarily inhibits NF-kB, as Patent Owners pointed out in their November 9, 2006 response. In an attempt to remedy this deficiency in the previous Office Action, the July 6, 2007 Final Office Action for the first time cited these three new references (Roman-Blas, et al.; Frantz et al.; and Meyer et al.), thereby substantially changing the ground of rejection. With the addition of these three newly cited references, the ground of rejection is effectively a new ground of rejection.

3) On pages 78-89, the ground of rejection entitled "Vitamin D (calcitriol)" relies for the first time on Herant et al. (on page 88) for the assertion that NF-kB has a role in calcitriol's 50% inhibition of activated IL-8 expression in A3 human melanoma cells. This ground of rejection is substantially different from the previous ground of rejection based on calcitriol art which was deficient in failing to show that calcitriol necessarily inhibits NF-kB in human cells, as the Patent Owners pointed out in their November 9, 2006 response. In an attempt to remedy this deficiency in the previous Office Action, the July 6, 2007 Final Office Action for the first time cited to Herant et al., thereby substantially changing the ground of rejection. With the addition of this newly cited reference, the ground of rejection is effectively a new ground of rejection.

4) On pages 90-93, the ground of rejection entitled "5-ASA" relies for the first time on Yamamoto et al. (on page 92) for the assertion that the Dew reference, previously cited, necessarily involved the administration of 5-ASA to already "activated cells". This ground of rejection is substantially new in that the previous ground of rejection based on 5-ASA art was deficient

Copied from 90007503 on 08/31/2007

in failing to show that the Dew reference administered 5-ASA to activated cells, as the Patent Owners pointed out in their November 9, 2006 response. In an attempt to remedy this deficiency in the previous rejection based on 5-ASA art, the July 6, 2007 Final Office Action for the first time cited Yamamoto et al., thereby substantially changing the ground of rejection. With the addition of this newly cited reference, the ground of rejection is effectively a new ground of rejection.

In discussing when it is proper to designate an action "final" in a reexamination proceeding, M.P.E.P. § 2271 provides that:

> Before a final action is in order, a clear issue should be developed between the examiner and the patent owner. To bring the prosecution to a speedy conclusion and at the same time deal justly with the patent owner and the public, the examiner will twice provide the patent owner with such information and references as may be useful in defining the position of the Office as to unpatentability before the action is made final. (Emphasis added.)

Designation of the July 6, 2007 Office Action "final" is contrary to this procedure of the U.S. Patent Office. Patentees have not been provided with the newly cited references twice.

M.P.E.P. § 706.07(a), which is referenced by M.P.E.P. § 2271, further explains that:

> [A] second or any subsequent action on the merits in any application or patent undergoing reexamination proceedings will not be made final if it includes a rejection, on newly cited art, other than information submitted in an information disclosure statement filed under 37 CFR 1.97(c) with the fee set forth in 37 CFR 1.17(p), of any claim not amended by applicant or patent owner in spite of the fact that other claims may have been amended to require newly cited art. (Emphasis added.)

Copied from 90007503 on 08/31/2007

Patent Owners point out that none of the newly cited art in the July 6, 2007 Final Office Action was cited in an information disclosure statement. Citation of the new references was also not necessitated by the Patent Owners' amendment since no claim amendments were made in the response filed November 9, 2006.

Accordingly, Patent Owners respectfully submit that the designation of the July 6, 2007 Office Action "final" was premature and inappropriate.

Patent Owners further point out that by designating the July 6, 2007 Office Action "final", the U.S. Patent Office is denying Patent Owners a full and complete opportunity to address the newly cited references and to fully develop the record for any possible appeal. Thus, Patent Owners are being procedurally disadvantaged in contravention of the Office's stated policy to "deal justly with the patent owner and the public". Patentees are entitled to address each and every new reference cited against their claims, and entitled to have a technical expert review each new reference and submit an expert report if needed. Imposing a final rejection while at the same time citing new references significantly constraints Patent Owners' ability to make amendment, submit evidence and fully develop the record for appeal. Equity requires that the U.S. Patent Office withdraw the finality of the July 6, 2007 Final Office Action so that Patent Owners may be afforded a full and complete opportunity to reply to the new grounds of rejection and address the newly cited references.

<u>Action Requested</u>

Accordingly, Patent Owners respectfully request that the finality of the July 6, 2007 Final Office Action be withdrawn and the Office Action mailed July 6, 2007 be designated a non-final Office Action.

Copied from 90007503 on 08/31/2007

If a telephone interview would be of assistance in advancing prosecution of the subject application, Patent Owners' undersigned attorneys invites the Examiner to telephone either of them at the number provided below.

The undersigned hereby authorize the Commissioner to charge any fee required in connection with this Petition to Deposit Account No. 03-3125.

Pursuant to the May 4, 2006 Merger Decision, this Petition is being filed in duplicate, each original bearing an original signature and identifying data for both reexamination files. As set forth above, the undersigned authorizes the Commissioner to charge any fee required in connection with the filing of this Petition to Deposit Account No. 03-3125.

Respectfully submitted,

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Patent Owners
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

Copied from 90007503 on 08/31/2007

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,

Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,

Defendants.

ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,

Counterclaim Plaintiffs,

v.

AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and AMGEN,

Counterclaim Defendants.

C.A. No. 06-259-MPT

**ARIAD'S AND THE INSTITUTIONS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO REQUESTS NOS. 202, 203, 212 AND 213 OF AMGEN'S SECOND SET OF REQUESTS FOR ADMISSION**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Local Rules for the District of Delaware, Defendants and Counterclaim-Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("MIT"), The President and Fellows of Harvard College ("Harvard"), and The Whitehead Institute for Biomedical Research (collectively, with MIT and Harvard, the "Institutions") hereby respond to Requests Nos. 202,

11. ARIAD and the Institutions object to the Second Set of Requests for Admissions and each request for admission therein to the extent that they pertain to issues of which ARIAD has no personal knowledge.

12. ARIAD and the Institutions object to the Second Set of Requests for Admissions and each request for admission therein to the extent that they pertain to issues that are, or are soon to be, dismissed by ARIAD. In particular, ARIAD and the Institutions object to and decline to respond to requests for admissions on issues relating solely to ARIAD's claims for infringement of U.S. Patent Nos. 5,804,374 and 6,150,090, which are being dismissed voluntarily.

**RESPONSES TO SPECIFIC REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 202:**

Enbrel® was not developed by copying the alleged inventions of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 202:**

ARIAD and the Institutions object to Request for Admission No. 202 because it is unduly burdensome and not relevant to the claim or defense of any party. ARIAD and the Institutions do not intend to rely on copying as a secondary indicium of nonobviousness.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 202:**

Subject to their objections, ARIAD and the Institutions state that they do not currently have evidence that Enbrel was developed by copying the subject matter disclosed in the applications to the '516 patent, which did not become public until June 2002.

**REQUEST FOR ADMISSION NO. 203:**

The Defendants are aware of no evidence that The Amgen Entities copied the alleged invention of the '516 patent when developing Enbrel®.

**RESPONSE TO REQUEST FOR ADMISSION NO. 203:**

# EXHIBIT P

# REDACTED

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION<br><br>Plaintiff,<br><br>vs.<br><br>ARIAD PHARMACEUTICALS, INC.<br><br>Defendant. | CIVIL ACTION No. 06-259-KAJ |

**DECLARATION OF FRITZ CASSELMAN**

I, Fritz Casselman, declare as follows:

1. From February 2001 to October 2003, I was Chief Business Officer and Senior Vice President of ARIAD Pharmaceuticals, Inc. ("ARIAD"). I continued to serve as Senior Vice President of ARIAD until February 2004, at which time I left full-time employment by the company. Since leaving full-time employment by the company, I have from time-to-time served as a consultant to ARIAD. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. When I arrived at ARIAD, I learned that, on May 15, 2000, ARIAD had sent a mass mailing to approximately 25 companies, announcing its intellectual property portfolio relating to NF-κB and IκB and seeking to grant non-exclusive licenses in this area. ARIAD sent a second mass mailing on February 8, 2001, to approximately 40 companies, including Amgen and Immunex, with respect to ARIAD's NF-κB portfolio. To the best of my knowledge, ARIAD did not send either of these letters to Synergen, the original developer of the product Kineret®.

3. Amgen did not express interest in a license after these overtures, and ARIAD did not press the matter. I did have a number of conversations with representatives of Immunex in 2001, before that company was acquired by Amgen, regarding the possibility of licensing our NF-κB patent portfolio. During those conversations, I never accused Immunex of infringing any ARIAD patent, and never threatened to file suit against ARIAD. Although Immunex expressed some preliminary interest in entering into a license, the parties were ultimately unable to agree upon terms.

4. On June 25, 2002, ARIAD sent a letter announcing the '516 patent to approximately 50 companies, including Amgen and Immunex, but not Synergen (to the best of my knowledge). I followed up the June 2002 letter by making marketing calls to a number of the companies who had received this letter, both to gauge and to attempt to stimulate their interest in licensing the '516 patent. I selected those companies by reviewing their literature and websites to identify research or products potentially touching the NF-κB pathway. I also selected companies that I thought might have or develop a genuine interest in taking a license notwithstanding the pendency of the litigation against Lilly. Companies receiving calls like this seldom volunteer information about their research and products, so it was my practice to attempt to stimulate conversation by throwing out the name of some project or product that the company's website or literature appeared to implicate the NF-κB pathway. When making these calls, I did not accuse any company of infringing any ARIAD patent, nor did I ever threaten to file suit if the company did not agree to enter into a license agreement. I do not specifically recall making such a telephone call to Amgen.

Executed on July 12, 2006, at Boston, Massachusetts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Fritz Casselman

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of July, 2006, the attached **DECLARATION OF FRITZ CASSELMAN** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

HAND DELIVERY

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

VIA FEDERAL EXPRESS

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800

VIA FEDERAL EXPRESS

*/s/ John G. Day*

John G. Day

# EXHIBIT R

# REDACTED

# EXHIBIT S

# REDACTED

# EXHIBIT T

# REDACTED

# EXHIBIT U

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,

Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,

Defendants.

ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,

Counterclaim Plaintiffs,

v.

AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and AMGEN,

Counterclaim Defendants.

C.A. No. 06-259-MPT

**ARIAD'S AND THE INSTITUTIONS' RESPONSES AND OBJECTIONS TO AMGEN'S SECOND SET OF REQUESTS FOR ADMISSION**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Local Rules for the District of Delaware, Defendants and Counterclaim-Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("MIT"), The President and Fellows of Harvard College ("Harvard"), and The Whitehead Institute for Biomedical Research (collectively, with MIT and Harvard, the "Institutions") hereby respond to Amgen Inc.,

Immunex Corporation, Amgen USA Inc., Amgen Manufacturing Limited, And Immunex Rhode Island Corporation's (collectively, "Amgen") Second Set of Requests for Admissions as follows:

## GENERAL OBJECTIONS

ARIAD and the Institutions assert the following General Objections, which are expressly incorporated into each specific response to the requests for admission set forth below as if set forth in full therein:

1.     ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each definition, instruction, and request for admission therein to the extent that they impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules for the District of Delaware ("Local Rules"), or any order or ruling by the Court in this action.

2.     ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each request for admission therein to the extent that they seek information protected by the work product doctrine, attorney-client privilege, or any other privilege or restriction on discovery. ARIAD will not produce information protected by such privileges or restrictions. Any inadvertent or unintentional disclosure of such information shall not be deemed a waiver of any applicable privilege or restriction.

3.     ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each request for admission therein to the extent that they are overbroad, unduly burdensome, oppressive, or seek information that is beyond the scope of discovery under the Federal Rules of Civil Procedure.

4.     ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each request for admission therein to the extent they are vague, ambiguous, or without sufficient specificity.

5.     ARIAD and the Institutions object to the Second Set of Requests for Admissions as premature, because, among other things, ARIAD and the Institutions' investigation of the facts is continuing and may result in additional responses.

6. ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each request for admission therein to the extent that they prematurely seek information that may be the subject of expert discovery along the schedule set by the Court.

7. ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each request for admission therein to the extent that they seek information that is publicly available, in the possession, custody or control of Amgen or any third person or entity, or is equally accessible to Amgen.

8. ARIAD and the Institutions object to the Second Set of Requests for Admissions and to each request for admission therein to the extent that they call for a legal conclusion.

9. ARIAD and the Institutions object to Amgen's purported definitions of words and phrases contained in the Second Set of Requests for Admissions. ARIAD and the Institutions object to Amgen's definitions to the extent that they: (i) are unclear, ambiguous, overly broad, or unduly burdensome; (ii) are inconsistent with the ordinary and customary meaning of the words or phrases they purport to define; (iii) seek to impose obligations different from, or in excess of, those created by the Federal Rules of Civil Procedure and the Local Rules; or (iv) include assertions of purported fact that are inaccurate or at the very least are disputed by the parties to this action.

10. ARIAD and the Institutions, in particular, object to the definitions of "ARIAD," "Ariad," "Harvard," "MIT," and "Whitehead," as set forth in Appendix A of Amgen's First and Second Interrogatories, to the extent they purport to impose discovery obligations on persons or entities other than the parties to this action, and to the extent they seek discovery from individuals or entities over which ARIAD has no control.

11. ARIAD and the Institutions object to the Second Set of Requests for Admissions and each request for admission therein to the extent that they pertain to issues of which ARIAD has no personal knowledge.

12. ARIAD and the Institutions object to the Second Set of Requests for Admissions and each request for admission therein to the extent that they pertain to issues that are, or are

soon to be, dismissed by ARIAD. In particular, ARIAD and the Institutions object to and decline to respond to requests for admissions on issues relating solely to ARIAD's claims for infringement of U.S. Patent Nos. 5,804,374 and 6,150,090, which are being dismissed voluntarily.

**RESPONSES TO SPECIFIC REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 142:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities infringed United States Patent No. 5,804,374 (the "'374 patent").

**RESPONSE TO REQUEST FOR ADMISSION NO. 142:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 143:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities likely infringed the '374 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 143**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 144:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities used a luciferase reporter gene assay that infringed the '374 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 144:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 145:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities likely used a luciferase reporter gene assay that infringed the '374 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 145:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 142:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities infringed United States Patent No. 6,150,090 (the "'090 patent").

**RESPONSE TO REQUEST FOR ADMISSION NO. 142:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 143:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities likely infringed the '090 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 143:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 144:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities used a luciferase reporter gene assay that infringed the '090 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 144:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 145:**

One or more of the Defendants have believed since February 2001 that the Amgen Entities likely used a luciferase reporter gene assay that infringed the '090 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 145:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 146:**

One or more of the Defendants have known since February 2001 that the Amgen Entities used a luciferase reporter gene assay.

**RESPONSE TO REQUEST FOR ADMISSION NO. 146:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 147:**

One or more of the Defendants have known since February 2001 that the Amgen Entities used a luciferase reporter gene assay to study NF-kB activity.

**RESPONSE TO REQUEST FOR ADMISSION NO. 147:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 148:**

The publication EMBOJ 2000 19, 1976-85, Deficiency of T2K Leads to Apoptotic Liver Degeneration and Impaired NF-κB-Dependent Gene Transcription (the "Deficiency of T2K Reference") (attached at Exhibit B) discloses a luciferase reporter gene assay.

**RESPONSE TO REQUEST FOR ADMISSION NO. 148:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 149:**

The Deficiency of T2K Reference discloses a luciferase reporter gene assay that one or more of the Defendants believe practices one or more claims of the '374 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 149:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 150:**

The Deficiency of T2K Reference does not disclose a luciferase reporter gene assay that one or more of the Defendants believe practices one or more claims of the '374 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 150:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 151:**

The Deficiency of T2K Reference discloses a luciferase reporter gene assay that one or more of the Defendants believe practices one or more claims of the '090 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 151:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 152:**

The Deficiency of T2K Reference does not disclose a luciferase reporter gene assay that one or more of the Defendants believe practices one or more claims of the '090 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 152:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 153:**

One or more of the Defendants were aware of the Deficiency of T2K Reference on or before February 2001.

**RESPONSE TO REQUEST FOR ADMISSION NO. 153:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 154:**

One or more of the Defendants have believed since February 2001 that the Deficiency of T2K Reference shows that the Amgen Entities infringe the '374 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 154:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 155:**

One or more of the Defendants have believed since February 2001 that the Deficiency of T2K Reference shows that the Amgen Entities infringe the '090 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 155:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 156:**

Figure 43 of United States Patent No. 6,410,516 (the "'516 patent"), as issued on June 25, 2002, shows the nucleotide sequence and the amino acid sequence of IκB-α.

**RESPONSE TO REQUEST FOR ADMISSION NO. 156:**

Subject to their objections, ARIAD and the Institutions deny that Figure 43 shows the nucleotide sequence and the amino acid sequence of IκB-α and further state that, subsequent to filing of the application from which the '516 Patent issued, ARIAD and the Institutions determined that Figure 43 did not show the nucleotide sequence and the amino acid sequence of IκB-α.

**REQUEST FOR ADMISSION NO. 157:**

Figure 43 of the '516 patent, as issued on June 25, 2002, does not show the nucleotide sequence and the amino acid sequence of IκB-α.

**RESPONSE TO REQUEST FOR ADMISSION NO. 157:**

Subject to their objections, ARIAD and the Institutions admit that Figure 43 does not show the nucleotide sequence and amino acid sequence of IκB-α and further state that, subsequent to filing of the application from which the '516 Patent issued, ARIAD and the Institutions determined that Figure 43 did not show the nucleotide sequence and the amino acid sequence of IκB-α.

**REQUEST FOR ADMISSION NO. 158:**

Figure 43 of the '516 patent, as issued on June 25, 2002, shows the nucleotide sequence and the amino acid sequence of chicken pp-40.

**RESPONSE TO REQUEST FOR ADMISSION NO. 158:**

Subject to their objections, ARIAD and the Institutions admit that, subsequent to the filing of the application from which the '516 Patent issued, ARIAD and the Institutions

determined that Figure 43 shows a substantially complete nucleotide and amino acid sequence of pp40-rel associated protein.

**REQUEST FOR ADMISSION NO. 159:**

Figure 43 of the '516 patent, as issued on June 25, 2002, does not show the nucleotide sequence and the amino acid sequence of chicken pp-40.

**RESPONSE TO REQUEST FOR ADMISSION NO. 159:**

Subject to their objections, ARIAD and the Institutions deny that Figure 43 does not show a substantially complete nucleotide sequence and amino acid sequence of pp40-rel associated protein.

**REQUEST FOR ADMISSION NO. 160:**

Figure 43 was canceled from U.S. Patent Application No. 08/418,266.

**RESPONSE TO REQUEST FOR ADMISSION NO. 160:**

ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that on September 11, 1997, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '266 Application, and which was subsequently entered by the U.S. Patent and Trademark Office.

**REQUEST FOR ADMISSION NO. 161:**

Figure 43 was canceled from U.S. Patent Application No. 08/418,266 prior to June 25, 2002.

**RESPONSE TO REQUEST FOR ADMISSION NO. 161:**

ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that on September 11, 1997, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted

Figure 43 from the '266 Application, and which was subsequently entered by the U.S. Patent and Trademark Office.

**REQUEST FOR ADMISSION NO. 162:**

During prosecution of U.S. Patent Application No. 08/418,266, Applicant stated to the U.S. Patent Office that "Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein."

**RESPONSE TO REQUEST FOR ADMISSION NO. 162:**

ARIAD and the Institutions object to Request for Admission No. 162 as vague and ambiguous as to the time period in which the statement was purportedly made. Subject to their objections, ARIAD and the Institutions admit that on September 11, 1997, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '266 Application. ARIAD and the Institutions further admit that the amendment stated that Figure 43 was being deleted because it was "not necessary for an understanding of the invention" and that "[i]t has recently come to Applicants' Attorney's attention that Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40-rel associated protein."

**REQUEST FOR ADMISSION NO. 163:**

Applicant was correct when it stated during prosecution of U.S. Patent Application No. 08/418,266 that "Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40-rel associated protein."

**RESPONSE TO REQUEST FOR ADMISSION NO. 163:**

ARIAD and the Institutions object to Request for Admission No. 163 as vague and ambiguous as to the time period in which the statement was purportedly made. Subject to their objections, ARIAD and the Institutions admit that on September 11, 1997, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '266 Application.

ARIAD and the Institutions further admit that the amendment stated that Figure 43 was being deleted because it was "not necessary for an understanding of the invention" and that "[i]t has recently come to Applicants' Attorney's attention that Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40-rel associated protein." ARIAD and the Institutions admit that, at the time the amendment was filed, ARIAD and the Institutions believed that the statements contained therein were correct, and it has subsequently come to ARIAD and the Institutions' attention that Figure 43 omits a portion of the nucleotide sequence of pp40-rel associated protein.

**REQUEST FOR ADMISSION NO. 164:**

Figure 43 was canceled from U.S. Patent Application No. 08/418,266 while U.S. Patent Application No. 08/464,364 was pending at the U.S. Patent and Trademark Office.

**RESPONSE TO REQUEST FOR ADMISSION NO. 164:**

ARIAD and the Institutions object to Request for Admission No. 164 as vague and ambiguous as to time period. ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that on September 11, 1997, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '266 Application, and which was subsequently entered by the U.S. Patent and Trademark Office. ARIAD and the Institutions further admit that the '364 Application was filed on June 5, 1995 and issued as a patent on January 25, 2002.

**REQUEST FOR ADMISSION NO. 165:**

Figure 43 was canceled from U.S. Patent Application No. 08/463,397.

**RESPONSE TO REQUEST FOR ADMISSION NO. 165:**

ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that on

January 12, 2000, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '397 Application, and which was subsequently entered by the U.S. Patent and Trademark Office.

**REQUEST FOR ADMISSION NO. 166:**

Figure 43 was canceled from U.S. Patent Application No. 08/463,397 prior to June 25, 2002.

**RESPONSE TO REQUEST FOR ADMISSION NO. 166:**

ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that on January 12, 2000, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '397 Application, and which was subsequently entered by the U.S. Patent and Trademark Office.

**REQUEST FOR ADMISSION NO. 167:**

Figure 43 was canceled from U.S. Patent Application No. 08/463,397 while U.S. Patent Application No. 08/464,364 was pending at the U.S. Patent and Trademark Office.

**RESPONSE TO REQUEST FOR ADMISSION NO. 167:**

ARIAD and the Institutions object to Request for Admission No. 167 as vague and ambiguous as to time period. ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that on January 12, 2000, they submitted an amendment under 37 C.F.R. §1.312(b), which deleted Figure 43 from the '397 Application, and which was subsequently entered by the U.S. Patent and Trademark Office. ARIAD and the Institutions further admit that the '397 Application was filed on June 5, 1995 and issued as a patent on November 21, 2000.

**REQUEST FOR ADMISSION NO. 168:**

Figure 43 was canceled from the '516 patent during ex parte reexamination proceedings at the U.S. Patent and Trademark Office with Control Nos. 90/007,503 and 90/007,828.

**RESPONSE TO REQUEST FOR ADMISSION NO. 168:**

ARIAD and the Institutions object to Request for Admission No. 168 as vague and ambiguous as to time period. ARIAD and the Institutions object to the use of the term "canceled" in the request as vague and ambiguous. ARIAD and the Institutions object to the request on the grounds that the reexamination proceedings are not relevant to this case. Subject to their objections, ARIAD and the Institutions admit that Figure 43 has been withdrawn during the course of the reexamination proceedings relating to the '516 Patent.

**REQUEST FOR ADMISSION NO. 169:**

The Defendants knew prior to June 25, 2002 that Figure 43 did not show the nucleotide sequence and the amino acid sequence of IκB-α.

**RESPONSE TO REQUEST FOR ADMISSION NO. 169:**

ARIAD and the Institutions object to Request for Admission No. 169 as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that, prior to June 25, 2002, it filed amendments under 37 C.F.R. §1.312(b) in connection with the '266 and '397 Applications, which deleted Figure 43 from those applications. ARIAD and the Institutions admit that prior to filing those amendments, they became aware that Figure 43 did not show the nucleotide sequence and amino acid sequence of IκB-α.

**REQUEST FOR ADMISSION NO. 170:**

At no time during the prosecution of U.S. Patent Application No. 08/464,364 did Applicant state to the U.S. Patent and Trademark Office that Figure 43 does not show the nucleotide sequence of IκB-α but the nucleotide of pp40 rel-associated protein.

RESPONSE TO REQUEST FOR ADMISSION NO. 170:

ARIAD and the Institutions object to Request for Admission No. 170 as vague and ambiguous as to time period. Subject to their objections, ARIAD and the Institutions deny the request and state that amendments under 37 C.F.R. §1.312(b) were filed on September 11, 1997 and January 12, 2000 in connection with related Applications Nos. '266 and '397. ARIAD and the Institutions admit that each of those amendments stated that "Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40-rel associated protein."

REQUEST FOR ADMISSION NO. 171:

The authors of the reference Osborn et al., Proceedings of the National Academy of Sciences of the United States 86: 2336-2340 (1989) ("Osborn et al. (1989)") were Laurelee Osborn, Steven Kunkel, and Gary J. Nabel.

RESPONSE TO REQUEST FOR ADMISSION NO. 171:

Subject to their objections, ARIAD and the Institutions admit Request for Admission No. 171.

REQUEST FOR ADMISSION NO. 172:

Osborn et al. (1989) was referenced in the specification of the '516 patent.

RESPONSE TO REQUEST FOR ADMISSION NO. 172:

Subject to their objections, ARIAD and the Institutions admit Request for Admission No. 172.

REQUEST FOR ADMISSION NO. 173:

Osborn et al. (1989) was referenced in the specification of the '516 patent in support of the statement "IL-1 and TNF-α activate NF-κB binding and both have been shown known [sic] to induce β-IFN."

**RESPONSE TO REQUEST FOR ADMISSION NO. 173:**

Subject to their objections, ARIAD and the Institutions admit Request for Admission No. 173.

**REQUEST FOR ADMISSION NO. 174:**

Osborn et al. (1989) was not referenced in the specification of the '516 patent in support of the statement "IL-1 and TNF-α activate NF-κB binding and both have been shown known [sic] to induce β-IFN."

**RESPONSE TO REQUEST FOR ADMISSION NO. 174:**

Subject to their objections, ARIAD and the Institutions deny Request for Admission No. 174.

**REQUEST FOR ADMISSION NO. 175:**

The reference to the work of Osborn et al. (1989) is the only statement in the '516 patent that associates IL-1 with activation of NF-κB binding.

**RESPONSE TO REQUEST FOR ADMISSION NO. 175:**

ARIAD and the Institutions object to Request for Admission No. 175 as vague and ambiguous. Subject to their objections, ARIAD and the Institutions deny Request for Admission No. 175.

**REQUEST FOR ADMISSION NO. 176:**

The reference to the work of Osborn et al. (1989) is the only statement in the '516 patent that associates TNF-α with activation of NF-κB binding.

**RESPONSE TO REQUEST FOR ADMISSION NO. 176:**

ARIAD and the Institutions object to Request for Admission No. 176 as vague and ambiguous. Subject to their objections, ARIAD and the Institutions deny Request for Admission No. 176.

**REQUEST FOR ADMISSION NO. 177:**

Work other than Osborn et al. (1989) cited as prior art or referenced in the specification of the '516 patent describes experiments that purportedly relate IL-1 and TNF-α to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 177:**

ARIAD and the Institutions object to the use of "work" and "purportedly relate" in the request as vague and ambiguous. ARIAD and the Institutions object to the request because it is overly broad and unduly burdensome. ARIAD and the Institutions further object to the request because it is not clear which word or words "cited as prior art or referenced in the specification" is intended to modify. ARIAD and the Institutions object to the request because it prematurely seeks information that may be the subject of expert discovery along the schedule set by the Court. Subject to their objections, ARIAD and the Institutions state that although they have conducted a reasonable inquiry in an attempt to respond to this request, ARIAD and the Institutions do not currently have sufficient information to admit or deny this request.

**REQUEST FOR ADMISSION NO. 178:**

None of the named inventors of the '516 patent contributed to any of the work described in Osborn et al. (1989).

**RESPONSE TO REQUEST FOR ADMISSION NO. 178:**

ARIAD and the Institutions object to the use of "contributed" and "any of the work" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions deny Request for Admission No. 178.

**REQUEST FOR ADMISSION NO. 179:**

Applicants did not inform the Examiner that one or more of Laurelee Osborn, Steven Kunkel, and Gary J. Nabel should have been named inventors of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 179:**

Subject to their objections, ARIAD and the Institutions admit that they did not inform the Examiner that one or more of Laurelee Osborn, Steven Kunkel, and Gary J. Nabel were to be named inventors of the '516 patent, but deny that they had an obligation to so inform the Examiner.

**REQUEST FOR ADMISSION NO. 180:**

Each claim of the '090 patent recites an assay for identifying a compound which modulates a type of NF-κB activity.

**RESPONSE TO REQUEST FOR ADMISSION NO. 180:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 181:**

Not every claim of the '090 patent recites an assay for identifying a compound which modulates a type of NF-κB activity.

**RESPONSE TO REQUEST FOR ADMISSION NO. 181:**

See Objection No. 12.

**REQUEST FOR ADMISSION NO. 182:**

Jonathan LeBowitz worked with NF-κB while he was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 182:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Jonathan LeBowitz testified that he "didn't do any experiments on NF-kappa B" and that he "participated in conversations with other scientists that encompassed discussions of NF-kappa B [i]f that constitutes work" while employed at MIT.

**REQUEST FOR ADMISSION NO. 183:**

Jonathan LeBowitz did not work with NF-κB while he was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 183:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Jonathan LeBowitz testified that he "didn't do any experiments on NF-kappa B" and that he "participated in conversations with other scientists that encompassed discussions of NF-kappa B [i]f that constitutes work" while employed at MIT.

**REQUEST FOR ADMISSION NO. 184:**

Jonathan LeBowitz performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 184:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Jonathan LeBowitz testified that he "didn't do any experiments on NF-kappa B" and that he "participated in conversations with other scientists that encompassed discussions of NF-kappa B [i]f that constitutes work" while employed at MIT.

**REQUEST FOR ADMISSION NO. 185:**

Jonathan LeBowitz has never performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 185:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Jonathan LeBowitz testified that he "didn't do any experiments on NF-kappa B" and that

he "participated in conversations with other scientists that encompassed discussions of NF-kappa B [i]f that constitutes work" while employed at MIT.

**REQUEST FOR ADMISSION NO. 186:**

Roger Clerc worked with NF-κB while he was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 186:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Roger Clerc's work at MIT included interactions relating to NF-κB as reflected in his deposition testimony and his laboratory notebooks, and that he testified that his work at MIT included work that aided in "enabling the discovery of NF-kappa B and other transcription factors."

**REQUEST FOR ADMISSION NO. 187:**

Roger Clerc did not work with NF-κB while he was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 187:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Roger Clerc's work at MIT included interactions relating to NF-κB as reflected in his deposition testimony and his laboratory notebooks, and that he testified that his work at MIT included work that aided in "enabling the discovery of NF-kappa B and other transcription factors."

**REQUEST FOR ADMISSION NO. 188:**

Roger Clerc performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 188:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Roger Clerc's work at MIT included interactions relating to NF-κB as reflected in his

deposition testimony and his laboratory notebooks, and that he testified that his work at MIT included work that aided in "enabling the discovery of NF-kappa B and other transcription factors."

**REQUEST FOR ADMISSION NO. 189:**

Roger Clerc has never performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 189:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Roger Clerc's work at MIT included interactions relating to NF-κB as reflected in his deposition testimony and his laboratory notebooks, and that he testified that his work at MIT included work that aided in "enabling the discovery of NF-kappa B and other transcription factors."

**REQUEST FOR ADMISSION NO. 190:**

Lynn Corcoran worked with NF-κB while she was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 190:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Lynn Corcoran did "not specifically" "study NF-kappa B itself while at Dr. Baltimore's laboratory," that Dr. Corcoran's work at Whitehead included interactions relating to NF-κB as reflected in her deposition testimony, and that Dr. Corcoran testified that she did work at Whitehead with respect to NF-κB including "assisting in protocols and . . . experiments[,] providing controls and reagents, [and] enabling the sorts of experiments that we did in cloning and characterizing transcription factors."

**REQUEST FOR ADMISSION NO. 191:**

Lynn Corcoran did not work with NF-κB while she was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 191:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Lynn Corcoran did "not specifically" "study NF-kappa B itself while at Dr. Baltimore's laboratory," that Dr. Corcoran's work at Whitehead included interactions relating to NF-κB as reflected in her deposition testimony, and that Dr. Corcoran testified that she did work at Whitehead with respect to NF-κB including "assisting in protocols and . . . experiments[,] providing controls and reagents, [and] enabling the sorts of experiments that we did in cloning and characterizing transcription factors."

**REQUEST FOR ADMISSION NO. 192:**

Lynn Corcoran performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 192:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Lynn Corcoran did "not specifically" "study NF-kappa B itself while at Dr. Baltimore's laboratory," that Dr. Corcoran's work at Whitehead included interactions relating to NF-κB as reflected in her deposition testimony, and that Dr. Corcoran testified that she did work at Whitehead with respect to NF-κB including "assisting in protocols and . . . experiments[,] providing controls and reagents, [and] enabling the sorts of experiments that we did in cloning and characterizing transcription factors."

**REQUEST FOR ADMISSION NO. 193:**

Lynn Corcoran has never performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 193:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Lynn Corcoran did "not specifically" "study NF-kappa B itself while at Dr. Baltimore's laboratory," that Dr. Corcoran's work at Whitehead included interactions relating to NF-κB as reflected in her deposition testimony, and that Dr. Corcoran testified that she did work at Whitehead with respect to NF-κB including "assisting in protocols and . . . experiments[,] providing controls and reagents, [and] enabling the sorts of experiments that we did in cloning and characterizing transcription factors."

**REQUEST FOR ADMISSION NO. 194:**

Louis Staudt worked with NF-κB while he was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 194:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Louis Staudt testified that, as part of a "very collaborative effort" in Dr. Baltimore's laboratory, he "made an intellectual contribution to the understanding of the work in [the '516] patent having to do with DNA-binding proteins in general and their use to study octamer proteins as well as NF-kappa B." Dr. Staudt also testified that he contributed to the study of NF-κB as reflected in his acknowledgment in a paper concerning NF-κB authored by Drs. Sen and Baltimore, which contribution included providing extracts and contributing the idea that a particular "cell line model seemed ideal to [study] the inducible activation of immunoglobulin genes," which led to a greater understanding of "the role of the NF-kappa B factor in inducing the transcription of kappa immunoglobulin by binding to the intronic enhancer of the gene."

**REQUEST FOR ADMISSION NO. 195:**

Louis Staudt did not work with NF-κB while he was employed at one of the Institutions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 195:**

ARIAD and the Institutions object to the use of the term "worked with" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Louis Staudt testified that, as part of a "very collaborative effort" in Dr. Baltimore's laboratory, he "made an intellectual contribution to the understanding of the work in [the '516] patent having to do with DNA-binding proteins in general and their use to study octamer proteins as well as NF-kappa B." Dr. Staudt also testified that he contributed to the study of NF-κB as reflected in his acknowledgment in a paper concerning NF-κB authored by Drs. Sen and Baltimore, which contribution included providing extracts and contributing the idea that a particular "cell line model seemed ideal to [study] the inducible activation of immunoglobulin genes," which led to a greater understanding of "the role of the NF-kappa B factor in inducing the transcription of kappa immunoglobulin by binding to the intronic enhancer of the gene."

**REQUEST FOR ADMISSION NO. 196:**

Louis Staudt performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 196:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Louis Staudt testified that, as part of a "very collaborative effort" in Dr. Baltimore's laboratory, he "made an intellectual contribution to the understanding of the work in [the '516] patent having to do with DNA-binding proteins in general and their use to study octamer proteins as well as NF-kappa B." Dr. Staudt also testified that he contributed to the study of NF-κB as reflected in his acknowledgment in a paper concerning NF-κB authored by Drs. Sen and Baltimore, which contribution included providing extracts and contributing the idea that a

particular "cell line model seemed ideal to [study] the inducible activation of immunoglobulin genes," which led to a greater understanding of "the role of the NF-kappa B factor in inducing the transcription of kappa immunoglobulin by binding to the intronic enhancer of the gene."

**REQUEST FOR ADMISSION NO. 197:**

Louis Staudt has never performed research directed to NF-κB.

**RESPONSE TO REQUEST FOR ADMISSION NO. 197:**

ARIAD and the Institutions object to the use of the term "research directed to" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that Louis Staudt testified that, as part of a "very collaborative effort" in Dr. Baltimore's laboratory, he "made an intellectual contribution to the understanding of the work in [the '516] patent having to do with DNA-binding proteins in general and their use to study octamer proteins as well as NF-kappa B." Dr. Staudt also testified that he contributed to the study of NF-κB as reflected in his acknowledgment in a paper concerning NF-κB authored by Drs. Sen and Baltimore, which contribution included providing extracts and contributing the idea that a particular "cell line model seemed ideal to [study] the inducible activation of immunoglobulin genes," which led to a greater understanding of "the role of the NF-kappa B factor in inducing the transcription of kappa immunoglobulin by binding to the intronic enhancer of the gene."

**REQUEST FOR ADMISSION NO. 198:**

The '516 patent issued after Enbrel® was commercialized.

**RESPONSE TO REQUEST FOR ADMISSION NO. 198:**

ARIAD and the Institutions object to the use of the term "commercialized" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that the '516 patent issued after Enbrel was approved for use in patients as of November 2, 1998.

**REQUEST FOR ADMISSION NO. 199:**

The Amgen Entities developed Enbrel® prior to issuance of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 199:**

ARIAD and the Institutions admit Request for Admission No. 199.

**REQUEST FOR ADMISSION NO. 200:**

The Amgen Entities received FDA approval to market Enbrel on November 2, 1998 for treatment of moderately to severely active rheumatoid arthritis.

**RESPONSE TO REQUEST FOR ADMISSION NO. 200:**

Subject to their objections, ARIAD and the Institutions admit that Enbrel was approved by the FDA on November 2, 1998 for the treatment of moderately to severe active rheumatoid arthritis in patients who had an inadequate response to prior treatment with "disease-modifying antirheumatic drugs."

**REQUEST FOR ADMISSION NO. 201:**

The Amgen Entities received FDA approval to market Enbrel for treatment of moderately to severely active rheumatoid arthritis before the '516 patent issued.

**RESPONSE TO REQUEST FOR ADMISSION NO. 201:**

Subject to their objections, ARIAD and the Institutions admit that the '516 patent issued on June 25, 2002. ARIAD and the Institutions further admit that Enbrel was approved by the FDA on November 2, 1998 for the treatment of moderately to severe active rheumatoid arthritis in patients who had an inadequate response to prior treatment with "disease-modifying antirheumatic drugs," prior to the issuance of the '516 patent.

**REQUEST FOR ADMISSION NO. 202:**

Enbrel® was not developed by copying the alleged inventions of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 202:**

ARIAD and the Institutions object to Request for Admission No. 202 because it is unduly burdensome and not relevant to the claim or defense of any party. ARIAD and the Institutions do not intend to rely on copying as a secondary indicium of nonobviousness.

**REQUEST FOR ADMISSION NO. 203:**

The Defendants are aware of no evidence that The Amgen Entities copied the alleged invention of the '516 patent when developing Enbrel®.

**RESPONSE TO REQUEST FOR ADMISSION NO. 203:**

ARIAD and the Institutions object to this interrogatory on the grounds that it is irrelevant to the claims at issue in that ARIAD and the Institutions do not intend to rely on copying as a secondary indicium of nonobviousness.

**REQUEST FOR ADMISSION NO. 204:**

The Amgen Entities did not use any assay relating to NF-κB to identify etanercept as a candidate for drug development.

**RESPONSE TO REQUEST FOR ADMISSION NO. 204:**

ARIAD and the Institutions object to this request on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Although ARIAD and the Institutions have conducted a reasonable inquiry in attempt to respond to this request, the information known or readily obtainable by ARIAD and Institutions is insufficient to enable them to admit or deny this request.

**REQUEST FOR ADMISSION NO. 205:**

The Defendants are aware of no evidence showing that The Amgen Entities used any assay relating to NF-κB when the Amgen Entities identified etanercept as a candidate for drug development.

RESPONSE TO REQUEST FOR ADMISSION NO. 205:

ARIAD and the Institutions object to this request on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Subject to their objections, ARIAD and the Institutions admit this request.

REQUEST FOR ADMISSION NO. 206:

The Amgen Entities did not use any assay relating to NF-κB when screening compounds to identify potential TNF-α inhibitors.

RESPONSE TO REQUEST FOR ADMISSION NO. 206:

ARIAD and the Institutions object to this request on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Although ARIAD and the Institutions have conducted a reasonable inquiry in attempt to respond to this request, the information known or readily obtainable by ARIAD and Institutions is insufficient to enable them to admit or deny this request.

REQUEST FOR ADMISSION NO. 207:

The Defendants are aware of no evidence showing that The Amgen Entities used any assay relating to NF-κB when screening compounds to identify potential TNF-α inhibitors.

RESPONSE TO REQUEST FOR ADMISSION NO. 207:

ARIAD and the Institutions object to this request on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Subject to their objections, ARIAD and the Institutions deny this request.

REQUEST FOR ADMISSION NO. 208:

The '516 patent issued after Kineret® was commercialized.

**RESPONSE TO REQUEST FOR ADMISSION NO. 208:**

ARIAD and the Institutions object to the use of the term "commercialized" in the request as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that the '516 patent issued on June 25, 2002. ARIAD and the Institutions further admit that Kineret was approved by the FDA for use in humans as of November 14, 2001, prior to the issuance of the '516 patent.

**REQUEST FOR ADMISSION NO. 209:**

The Amgen Entities developed Kineret® prior to issuance of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 209:**

ARIAD and the Institutions object to the term "developed" as vague and ambiguous. Subject to their objections, ARIAD and the Institutions admit that the '516 patent issued on June 25, 2002. ARIAD and the Institutions further admit that Kineret was approved by the FDA for use in humans as of November 14, 2001, prior to the issuance of the '516 patent.

**REQUEST FOR ADMISSION NO. 210:**

The Amgen Entities received FDA approval to market Kineret® on November 14, 2001 for treatment of moderately to severely active rheumatoid arthritis.

**RESPONSE TO REQUEST FOR ADMISSION NO. 210:**

Subject to their objections, ARIAD and the Institutions admit that Kineret was approved by the FDA as of November 14, 2001 to treat moderately to severely active rheumatoid arthritis in patients who had failed one or more "disease modifying antirheumatic drugs."

**REQUEST FOR ADMISSION NO. 211:**

The Amgen Entities received FDA approval to market Kineret® for treatment of moderately to severely active rheumatoid arthritis before the issuance of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 211:**

Subject to their objections, ARIAD and the Institutions admit that the '516 patent was issued on June 25, 2002. ARIAD and the Institutions further admit that Kineret was approved by the FDA as of November 14, 2001 to treat moderately to severely active rheumatoid arthritis in patients who had failed one or more "disease modifying antirheumatic drugs," prior to the issuance of the '516 patent.

**REQUEST FOR ADMISSION NO. 212:**

Kineret was not developed by copying the alleged inventions of the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 212:**

ARIAD and the Institutions object to this request because it is unduly burdensome and not relevant to the claim or defense of any party. ARIAD and the Institutions do not intend to rely on copying as a secondary indicium of nonobviousness.

**REQUEST FOR ADMISSION NO. 213:**

The Defendants are aware of no evidence that The Amgen Entities copied the alleged invention of the '516 patent when developing Kineret®.

**RESPONSE TO REQUEST FOR ADMISSION NO. 213:**

ARIAD and the Institutions object to Request for Admission No. 213 because it is unduly burdensome and not relevant to the claim or defense of any party. ARIAD and the Institutions do not intend to rely on copying as a secondary indicium of nonobviousness.

**REQUEST FOR ADMISSION NO. 214:**

The Amgen Entities did not use any assay relating to NF-κB to identify anakinra as a candidate for drug development.

**RESPONSE TO REQUEST FOR ADMISSION NO. 214:**

ARIAD and the Institutions object to Request for Admission No. 214 on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Although ARIAD and the Institutions have conducted a reasonable inquiry in attempt to respond to this request, the information known or readily obtainable by ARIAD and Institutions is insufficient to enable them to admit or deny this request.

**REQUEST FOR ADMISSION NO. 215:**

The Defendants are aware of no evidence showing that The Amgen Entities used any assay relating to NF-κB when the Amgen Entities identified anakinra as a candidate for drug development.

**RESPONSE TO REQUEST FOR ADMISSION NO. 215:**

ARIAD and the Institutions object to Request for Admission No. 215 on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Subject to their objections, ARIAD and the Institutions admit this request.

**REQUEST FOR ADMISSION NO. 216:**

The Amgen Entities did not use any assay relating to NF-κB when screening compounds to identify potential Il-1RA inhibitors during the development of Kineret®.

**RESPONSE TO REQUEST FOR ADMISSION NO. 216:**

ARIAD and the Institutions object to Request for Admission No. 216 on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Although ARIAD and the Institutions have conducted a reasonable inquiry in

attempt to respond to this request, the information known or readily obtainable by ARIAD and Institutions is insufficient to enable them to admit or deny this request.

**REQUEST FOR ADMISSION NO. 217:**

The Defendants are aware of no evidence showing that The Amgen Entities used any assay relating to NF-κB when screening compounds to identify potential Il-1RA inhibitors.

**RESPONSE TO REQUEST FOR ADMISSION NO. 217:**

ARIAD and the Institutions object to Request for Admission No. 217 on the ground that discovery is continuing and that information concerning assays performed by the Amgen Entities is more likely to be in possession of the Amgen Entities than ARIAD and the Institutions. Subject to their objections, ARIAD and the Institutions deny this request.

**REQUEST FOR ADMISSION NO. 218:**

ARIAD has never sublicensed the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 218:**

Subject to their objections, ARIAD and the Institutions admit that ARIAD has never sublicensed the '516 patent.

**REQUEST FOR ADMISSION NO. 219:**

ARIAD has never paid The President and Fellows of Harvard College, the Massachusetts Institute of Technology, or the Whitehead Institute for Biomedical Research any royalties under the '516 patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 219:**

Subject to their objections, ARIAD and the Institutions admit that ARIAD has not made any payments to the Massachusetts Institute of Technology pursuant to subparagraphs (d), (e) and (f) of paragraph 4.1 of the ARIAD License Agreement dated August 19, 1991.

**REQUEST FOR ADMISSION NO. 220:**

Sharon Hausdorff was employed by ARIAD after June 25, 2002.

**RESPONSE TO REQUEST FOR ADMISSION NO. 220:**

Subject to their objections, ARIAD and the Institutions deny Request for Admission No. 220.

**REQUEST FOR ADMISSION NO. 221:**

Sharon Hausdorff was not employed by ARIAD after June 25, 2002.

**RESPONSE TO REQUEST FOR ADMISSION NO. 221:**

Subject to their objections, ARIAD and the Institutions admit Request for Admission No. 221.

December 17, 2007

CRAVATH, SWAINE & MOORE LLP

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Counsel for ARIAD Pharmaceuticals, Inc., the
Massachusetts Institute of Technology, the President
& Fellows of Harvard College, and the Whitehead
Institute for Biomedical Research*

*Of Counsel:*

Morgan Chu
David I. Gindler
Richard M. Birnholz
Perry M. Goldberg
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone:  (302) 654-1888

Dated:  December 17, 2007

# EXHIBIT V

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

02 CV 11280 RWZ

ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

Plaintiffs,

v.

ELI LILLY & CO.,

Defendant.

No. ______________

Jury Trial Demanded

RECEIPT # 40085
AMOUNT $ 150.00
SUMMONS ISS. yes
LOCAL RULE 4.1 ______
WAIVER OF SERV. ______
MCF ISSUED ______
AO 120 OR 121 ______
BY DPTY CLK ______
DATE 6/25/02

FILED IN CLERKS OFFICE
2002 JUN 25 P 3: 24
U.S. DISTRICT COURT DISTRICT OF MASS.

COMPLAINT

Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs"), through their attorneys, for their Complaint against Defendant Eli Lilly & Co. ("Lilly"), allege as follows:

NATURE OF THE ACTION

1. This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation." A copy of the patent is attached as Exhibit 1.



2. Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

**PARTIES, JURISDICTION AND VENUE**

3. ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

4. M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

5. THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

6. HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

7. Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

8. This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

9. Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

**FACTUAL BACKGROUND**

10. Living cells respond to a vast array of different signals in their environment, including natural regulatory factors (e.g. hormones) and harmful factors (e.g. toxins). A primary way that cells respond to such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers" to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins with other proteins and DNA. Identifying these "messenger" proteins and how they function is a crucial step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

11. The invention of the '516 patent arose from a collaboration between research groups at three of the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of Molecular and Cellular Biology at HARVARD.

12. In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they named "NF-KB." As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially believed that NF-KB was only found in certain cells known as "B cells" and, therefore, had a limited role in cell signaling and gene regulation.

13. Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr. Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines

29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

14. ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

15. In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

16. In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed. Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology. The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

**THE PATENT-IN-SUIT**

17. On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T, THE WHITEHEAD INSTITUTE, and HARVARD.

18. Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to

one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19.    Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

20.    Upon information and belief, Evista® is a form of the selective estrogen receptor modulator raloxifene hydrochloride, and was approved for sale by the United States Food and Drug Administration on or about December 10, 1997, for the prevention and treatment of osteoporosis in postmenopausal women.

21.    Upon information and belief, a molecular basis for the action of Evista® in treating osteoporosis has been demonstrated to occur through the modulation of NF-KB activity.  Some of these findings were published by Lilly scientists in a World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137.  A copy of this patent application is attached as Exhibit 2.

22.    Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

23.    Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

24.    Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity.  These findings were published

by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

25. Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

26. Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate. Defendant Lilly has failed to respond to these efforts.

**COUNTS**

**Count 1 – Patent Infringement of the '516 Patent**

27. Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

28. Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marketed as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

29. Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

30. Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for use in an infringment of the '516 patent. Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing

use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

31.    Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

32.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

WHEREFORE, Plaintiff respectfully request that the Court:

A.    Award to Plaintiffs damages adequate to compensate Plaintiffs for infringement of the '516 patent, but in no event less than a reasonable royalty, together with interest and costs.

B.    Enter an order declaring this an exceptional case pursuant to 25 U.S.C. § 285 and award to Plaintiffs reasonable attorney fees;

and,

C.    Grant to Plaintiffs such other and further relief as may be just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs respectfully demand a trial by jury on all issues that are properly triable to a jury in this action.

BROMBERG & SUNSTEIN LLP

By: [signature]

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
Anne Marie Longobucco, BBO#649299
125 Summer Street
Boston, MA 02110-1618
Tel: (617) 443-9292

CLIFFORD CHANCE ROGERS & WELLS LLP

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
200 Park Avenue
New York, NY, 10166
(212) 878-8000

Attorneys for Plaintiffs ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College

02695/00501 206781.1

# EXHIBIT W

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ORIGINAL

CIVIL ACTION NO. 06-259-(MPT)

AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda corporation; and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation,

Plaintiffs,

vs.

ARIAD PHARMACEUTICALS, INC., a Delaware corporation,

Defendants.

DEPOSITION OF

DAVID BALTIMORE

TAKEN ON WEDNESDAY, SEPTEMBER 26, 2007

Reported by:

Daryl Baucum, RPR, CRR, CBC, CSR No. 10356

Page 126

13:02:13 Q. But they -- while their structures differ, they share a common function in the ability to reduce NF-kB activity in cells, correct?

13:02:24 MR. GINDLER: Objection; calls for expert testimony.

09:59:57 BY MR. PALS:

13:02:28 Q. That's what you are saying, correct?

13:02:29 A. Yes, they all have the ability of inhibiting NF-kB activity in cells.

13:02:36 Q. And if I understand correctly, what you are telling the patent office is there are compounds that are not structurally related, point one, correct?

13:02:47 A. Yes.

13:02:47 Q. That point two, share the functional capability of reducing NF-kB activity in cells; is that right?

13:02:54 A. Yes.

13:02:54 MR. GINDLER: Objection; calls for expert testimony.

13:02:56 THE WITNESS: That was the point of this.

08:06:54 BY MR. PALS:

13:03:28 Q. As of 1991, Dr. Baltimore, had you done any work with TNF alpha?

13:03:36 A. We had done work with TNF alpha about that time.

13:03:41 Q. In what contexts?

Page 127

13:03:43 A. As we had studied it as an activator of NF-kB.

13:03:51 Q. As of 1991, had you done work with IL-1?

13:04:01 A. I'm not sure.

13:04:04 Q. Do you recall whether as of 1991, you had used IL-1 in connection with studies of NF-kB?

13:04:13 A. That's what I am not sure of.

13:04:50 Q. Are you familiar with a compound called H7?

13:04:57 A. I have heard of it.

13:04:58 Q. Is that a compound you have done any work with?

13:05:01 A. I do not believe we have done any work with it. That is -- the reason I put it that way is that people in my lab sometimes do things that I'm not aware of.

13:05:16 Q. Are you aware of work that others have done with H7 as a protein kinase inhibitor?

13:05:24 A. I am aware that there are people that have used H7 as a protein kinase inhibitor.

13:05:30 Q. And are you aware of people who have used H7 to reduce NF-kB activity in cells?

13:05:34 A. I have seen papers in which that was done.

13:05:36 Q. Do you recall any of the papers that you have seen?

13:05:38 A. No.

13:05:38 (Plaintiffs' Exhibit 178 was marked for identification by the court reporter and is attached hereto.)

Page 128

13:05:38 BY MR. PALS:

13:06:18 Q. Dr. Baltimore, I am handing you an E-mail -- it's actually an E-mail exchange that was produced to us from the Whitehead Institute. We have marked it as Plaintiff's Exhibit 178 and it has Whitehead production numbers 1612 through 1613. That's just a small carryover on the top of 1613.

13:06:59 Dr. Baltimore, initially, do you recognize Plaintiff's Exhibit 178 as an E-mail exchange you had with John Pratt on April 20, 2006?

13:07:10 A. I do now. I haven't seen it in a while.

13:07:16 Q. Have you had an opportunity to review it?

13:07:18 A. I have just begun.

13:07:25 MR. GINDLER: Take the time to read it.

13:07:56 THE WITNESS: Yes, I have read it.

13:07:57 BY MR. PALS:

13:07:58 Q. And just to orient this process, it looks like there was an initial E-mail to you from Mr. Pratt toward the bottom of that exchange.

13:08:10 A. That's correct.

13:08:10 Q. And then that's a response to you -- or from you to Mr. Pratt that begins "John" --

13:08:17 A. Yes.

13:08:17 Q. -- is that correct?

13:08:18 And then he responds to you in the final in this chain saying, "David, thanks for the clear and proper response, I will keep working on it"; is that right?

Page 129

13:08:26 A. Yes.

13:08:27 Q. In your E-mail to Mr. Pratt in the last sentence of the paragraph beginning "John" --

13:08:34 A. Yep.

13:08:36 Q. -- you state quote, anyway, I'll be amazed if Ariad prevails at trial, and then the sentence continues.

13:08:43 Do you see that?

13:08:43 A. Yes.

13:08:44 Q. Why did you say you would be amazed if Ariad prevails at trial?

13:08:48 A. Because I thought that it would be very difficult to -- for Ariad to be able to claim that they could get royalties from these -- from these various compounds, and I thought taking on Lilly that they were going to be -- they were going to lose.

13:09:31 I was -- I was amazed when they prevailed.

13:09:39 Q. Why did you think it would be very difficult for Ariad to be able to claim they could get royalties from the various compounds?

13:09:49 A. Largely because I had thought of the patent as focusing on direct inhibitors of NF-kB, but when I --

Page 130

when I thought back later to how the patent is written, I realized that it had a much broader application, but I didn't know that that broad application would be accepted by a court.

You have got to understand here that I am trying to be a lawyer without a license.

Q. I am just -- I am trying to understand what your thinking was behind this, and I understand that you are not an attorney.

The -- when you talk about direct inhibitors of NF-kB, what did you mean by that in your previous answer?

A. Compounds that directly interact with the NF-kB protein.

Q. Did you have a belief that a court would be unlikely to accept a broader application of the patent beyond direct inhibitors of NF-kB?

MR. GINDLER: Objection; calls for a legal conclusion.

THE WITNESS: Yeah, it all calls for a legal conclusion, but I started it by writing this, I guess, and I was wrong.

BY MR. PALS:

Q. Did you have a belief that the patent should be limited to direct inhibitors of NF-kB?

Page 131

A. One of the reasons I have stayed in the academic world rather than being more involved in biotechnology, which I enjoy immensely, is that my guesses about patents are always wrong. I -- I don't -- I don't think like patents. I think like a scientist.

Q. Did you discuss the Lilly trial with anyone at Ariad?

A. Not beyond -- you mean the outcome of it or the trial, itself?

Q. Going into the trial or the outcome of the trial.

A. No.

Q. Did you discuss the Lilly trial with anyone at any of the institutions, Harvard, MIT or the Whitehead Institute?

A. I have commented to my friends about it, and some of those people are at Harvard and MIT and Whitehead, mostly to indicate my amazement.

Q. Your amazement with what?

A. That Lilly prevailed.

Q. That Ariad prevailed?

A. I am sorry, that Ariad prevailed over Lilly.

Q. And your amazement derives from a surprise that broad claims could be -- broad claims in the 516 patent could be upheld in court?

Page 132

MR. GINDLER: Objection; misstates his testimony, calls for a legal conclusion.

THE WITNESS: I -- right. I was amazed that those claims were accepted.

BY MR. PALS:

Q. Who determined who should be the inventors on these three patents, the 516, 090 and 374 patent?

A. Well, each one was -- I mean each of the contributing patents that were officially filed were decided upon separately.

Q. Who decided it?

A. Well, largely me -- sorry -- me and Phil Sharp and Tom Maniatis really, because some things had happened in their laboratories and they made the judgment about who in their laboratories should be part of the patent.

Q. And did you work with them in arriving at an identification of the inventors?

A. We talked it over.

Q. What criteria did you consider in determining who should be named as an inventor?

A. Who made significant contributions to the individual filings.

Q. And when you say "significant contributions," what do you mean by "significant contributions"?

Page 133

A. Either had important ideas that got into the work or actually did work that is represented by the figures in the patent or by figures in the paper.

Q. Was there ever an effort to -- let me start that over.

Do you know whether there was ever an effort to look at the claims that came out of the patent office and make a determination as to whether the proper people were named as inventors for those claims?

A. I do not know that that was done.

Q. When you were making your initial determination, were you making a determination based on what the claims were that were being sought or based on the work that was reported -- reported in the application.

A. Well, this was on the original filings, and it was really the work that was being described there rather than the claims, but the claims followed from that work.

Q. Did anyone ever come back to you at any point in time to confirm whether the proper people had been identified as inventors given the claims that were being sought in the patent office?

A. Well, if what you are asking is after the patents were put together and then individual patents

# EXHIBIT X

# "Generic Treatment Claims"

## One District Court Decides They are Invalid

*by Tamsen Valoir, Ph.D.*

As our knowledge of biochemical pathways continues to increase, so do the numbers of issued patents directed to what might be called "generic treatment claims." These are methods of treating disease by modulating a particular protein target in the body. Such patents often don't disclose any specific drugs that modulate target protein X. I call these "generic treatment claims" because they are not linked to the use of any particular class of drug, but read on any drug that functions to modulate protein X.

Because "generic treatment claims" are not limited to any particular class of drugs, they may be subject to three possible invalidity attacks:

First, the claims may be invalid for failure of "enablement," particularly where the patent does not disclose any drug that modulates protein X. In other words, the patent does not adequately "enable" or "teach" the reader "how" to practice the invention.

Second, the claims may be invalid for failure of "written description," because the patent does not "describe" any embodiment of the invention with enough particularity to convince the reader that the inventor is even "in possession of the invention." Although written description is similar to enablement, it is a distinct requirement in the patent law.

Third, the claims may be invalid as "anticipated" by drugs already in use that function to modulate protein X. Thus, the invention is not "novel" or "new" and cannot be patented.

Until now, no court has addressed the validity of generic treatment claims. However, on March 5, 2003, a Western District Court in New York decided that certain generic treatment claims are invalid for failure of enablement and written description where the patent failed to describe any drug that could be used in the treatment. This short article describes the case and its outcome, and a similar case that is pending in Boston.

### The University of Rochester COX2 Patent

On April 11, 2000, U.S. Patent No. 6,048, 850 (the '850 patent) issued to the University of Rochester. The '850 patent inventors discovered that there are two cyclo-oxygenase enzymes, called COX1 and COX2.[1] They also discovered that preferentially inhibiting COX2 allows the control of pain and inflammation without the common stomach pain produced by drugs like aspirin that inhibit both COX1 and COX2. The inventors also described screening methods whereby such drugs could be identified, but did not themselves identify any COX2 specific drug.

The '850 patent does not claim any screening methods, but instead claims treating humans by administering COX2 inhibitors. On the very day the patent issued, the University of Rochester sued Pfizer,[2] alleging that the sale and use of "Celebrex"™ infringed the '850 patent. Sales of Celebrex were $3.1 billion in 2001 and the University of Rochester stood poised to collect significant royalties if the case was decided in its favor.

Unfortunately, on March 5, 2003, a Western District of New York Judge decided on motion for summary judgment that the claims were invalid for lack of written description and enablement because the patent did not describe a single drug that could be used in the claimed method and did not teach how to make any such drug. All the patent taught was how to search for such drugs.

The University of Rochester argued that it didn't have to describe any particular drug because its claims were directed to treatment methods, not drugs per se. But the Judge correctly noted that without a drug, the treatment claims could not be practiced.

Also unfortunately, the patent did not include any screening claims, although that was the most important aspect of the invention. Had the inventors included screening claims—methods of drug screening by testing drugs against COX1 and COX2 and identifying those that selectively inhibit COX2—they might have had an

Tamsen Valoir, Ph.D., © March 14, 2003.

opportunity to collect royalties to the extent that Pfizer continued drug screening after the patent issued.

Although the University of Rochester case is only a district court case, the decision goes a long way to helping companies and courts determine whether generic treatment claims are valid where no drugs are taught. The case has been appealed to the Federal Circuit, and we will continue to monitor its progress.

## The Baltimore NFKB Patent

Meanwhile, on June 25, 2002, another patent issued with generic treatment claims that target the NFKB protein (pronounced en-ef-kappa-bee).

U.S. Patent No. 6,410,516 (the '516 patent) issued to three co-owners: the President & Fellows of Harvard College, the Massachusetts Institute of Technology, and the Whitehead Institute for Biomedical Research. Inventors on the patent include the famous (at least to molecular biologists) Dr. Tom Maniatis, who wrote what is affectionately called "the bible" of biotechnology, a three-volume treatise that teaches all of the fundamental techniques of the genetic engineering revolution. Other notables include Drs. David Baltimore and Phillip A. Sharp. Dr. Baltimore shared the 1975 Nobel Prize for the discovery of the enzyme reverse transcriptase and Dr. Sharp shared the 1993 Nobel Prize for the discovery of split genes.

Dr. Baltimore and the three-institution team of inventors discovered the NFKB protein in 1986. The team showed that NFKB acts to increase the expression of several other genes important in inflammation and immune responses. However, the team didn't purify the protein, but only showed its presence by a technique that indicates a protein's presence by a change in the mobility of the DNA to which it binds. The team attempted to clone and claim the gene encoding NFKB, but the sequence they obtained was not from NFKB. Instead, another group cloned the full NFKB gene in 1991.[3]

On the very same day that the '516 patent issued, Ariad Pharmaceuticals, exclusive licensee of the '516 patent, sued Eli Lilly in a Federal court in Boston for infringing the patent by the sale and use of the drug Evista ($665 million in sales in 2001) and the recently approved Xigris ($1 billion in sales in 2002).

The first claim of the 203 claims in the '516 patent is typical and reads:

> A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NFKB, the method comprising reducing NFKB activity in the cell such that expression of said gene is inhibited.

Thus, the claim covers the use of any drug that inhibits NFKB. The patent itself fails to describe any drug that inhibits NFKB, although it does describe a single protein inhibitor of NFKB that is called "Inhibitor of Kappa B" or "IKB." This claim, at least, has serious invalidity issues under both the written description and enablement requirements of the patent statute.[4]

Further, long before the patent was filed, drugs existed that are *now* known to act by inhibiting NFKB. A well-known example is Ibuprofen® which has been around since 1969.[5] Although it was not appreciated until 1998 that Ibuprofen inhibited NFKB,[6] knowledge of that fact is not required under existing patent law principles of inherency. It is enough that the drug necessarily inhibited NFKB.

Other well-known drugs that act by inhibiting NFKB include aspirin,[7] the immunosuppressive drug gliotoxin[8] and the rheumatoid arthritis drug sulfasalazine.[9] NFKB inhibitors that have been in use for thousands of years include garlic,[10] red wine,[11] capsaicin (the "hot" ingredient in peppers)[12] and caffeic acid (from honeybee propolis, the material used to seal the honeycomb).[13] Even vitamin E has been shown to inhibit NFKB.[14]

Eli Lilly has filed a motion for summary judgment, asserting that the claims are invalid as anticipated, and well as not enabled because no method of practicing the method is taught. A decision on the summary judgment motions can be expected shortly.

As one or both of these cases wind their way up to the Federal Circuit, we will continue to monitor them for their importance to the biotech and pharmaceutical industries. In the interim, one might consider the lesson taught by the University of Rochester case—the importance of not overreaching in drafting patent claims at the expense of including narrowly drafted, fully exemplified claims.

*Tamsen Valoir, Ph.D., is an associate in the Houston office of Jenkens & Gilchrist, P.C.*

## Notes

1. COX1 and COX2 are more properly called PTGS1 and PTGS2. However, the medical community and the public may be more familiar with the COX designation because the well known pain medications Celebrex™ and Vioxx™ are advertised as COX2 inhibitors.

2. The case is actually styled University of Rochester v. G.D. Searle & Co. Inc. Other defendants included Pfizer, Inc. Pharmacia, Inc. and Monsanto Co. Monsanto was spun off as an independent company, and the remaining entities are now owned by Pfizer. Thus, I refer to the defendant as Pfizer herein.

3. Meyer, R., *et al.*, Cloning of the DNA-binding subunit of human nuclear factor kappa B: the level of its mRNA is strongly regulated by phorbol ester or tumor necrosis factor alpha, Proc. Natl. Acad. Sci. U.S.A. 88(3), 966-970 (1991).

4. 35 U.S.C. § 112.

5. *See e.g.*, Boardman P.L., *et al.*, Ibuprofen in the treatment of rheumatoid arthritis and osteo-arthritis. Ann. Rheum. Dis. 26(6):560-1 (1967).

6. *See e.g.*, Scheuren N., *et al.*, Modulation of transcription factor NF-kappaB by enantiomers of the nonsteroidal drug ibuprofen, Br. J. Pharmacol. 123(4):645-52 (1998).

7. Amann R. & Peskar B.A., Anti-inflammatory effects of aspirin and sodium salicylate, Eur J Pharmacol 28;447(1):1-9 (2002) ("inhibitory effects of salicylates have been observed on several nuclear transcription factors, such as nuclear transcription factor kappa B . . .").

8. Fitzpatrick L.R., *et al.*, Gliotoxin, an inhibitor of nuclear factor-kappa B, attenuates peptidoglycan-polysaccharide-induced colitis in rats, Inflamm Bowel Dis. 8(3):159-67 (2002).

9. Wahl C. *et al.*, Sulfasalazine: a potent and specific inhibitor of nuclear factor kappa B, J Clin Invest. 101(5):1163-74 (1998). Sulfasalazine was first synthesized in 1942.

10. Ide N. & Lau B.H., Garlic compounds minimize intracellular oxidative stress and inhibit nuclear factor-kappa b activation, J Nutr. 131(3s):1020S-6S (2001).

11. Blanco-Colio L.M., *et al.*, Red wine intake prevents nuclear factor-kappaB activation in peripheral blood mononuclear cells of healthy volunteers during postprandial lipemia, Circulation 102(9):1020-6 (2000).

12. Singh S., *et al.*, Capsaicin (8-methyl-N-vanillyl-6-nonenamide) is a potent inhibitor of nuclear transcription factor-kappa B activation by diverse agents, J Immunol. 157(10):4412-20 (1996).

13. Natarajan K., *et al.*, Caffeic acid phenethyl ester is a potent and specific inhibitor of activation of nuclear transcription factor NF-kappa B, Proc Natl Acad Sci U S A. 93(17):9090-5 (1996).

14. Liu S.L. *et al.*, Vitamin E therapy of acute CCl4-induced hepatic injury in mice is associated with inhibition of nuclear factor kappa B binding, Hepatology 22(5):1474-81 (1995).

The John Marshall Law School Center for Intellectual Property Law

## ADVISORY BOARD

John R. Kirk, Chair
*Jenkens & Gilchrist*
*Houston, TX*

Brian E. Banner
*Banner & Witcoff*
*Washington, D.C.*

Donald W. Banner
*Banner & Witcoff*
*Washington, D.C.*

Sharon R. Barner
*Foley & Lardner*
*Chicago, IL*

Roger N. Coe
*Hilton Head Island, SC*

Helen S. Cordell
*Argonne National Laboratory*
*Argonne, IL*

Q. Todd Dickinson
*Howrey Simon Arnold & White*
*Washington, D.C.*

Donald R. Dunner
*Finnegan, Henderson,*
*Farabow, Garrett & Dunner*
*Washington, D.C.*

Raymond I. Geraldson, Jr.
*Pattishall, McAuliffe, Newbury,*
*Hilliard & Geraldson*
*Chicago, IL*

Robert F. Green
*Leydig, Voit & Mayer, Ltd.*
*Chicago, IL*

Dolores K. Hanna
*Bell, Boyd & Lloyd*
*Chicago, IL*

Hon. James F. Holderman
*U.S. District Court,*
*Northern District of Illinois*
*Chicago, IL*

Professor Paul M. Janicke
*Institute for Intellectual Property*
*& Information Law*
*University of Houston Law Center*
*Houston, TX*

Marylee Jenkins
*Robin, Blecker & Daley*
*New York, NY*

Hon. Matthew F. Kennelly
*U.S. District Court, Northern*
*District of Illinois*
*Chicago, IL*

Karl M. Maersch
*Jones, Day, Reavis & Pogue*
*Cleveland, OH*

Alice O. Martin
*Barnes & Thornburg*
*Chicago, IL*

John J. McDonnell
*McDonnell, Boehnen, Hulbert*
*& Berghoff*
*Chicago, IL*

Steven F. Weinstock
*Abbott Laboratories*
*Abbott Park, IL*

# Source Software ////Is It Really Free?

*by Kevin Young and Christopher Verstrate*

Today, nearly every person or company with a computer is or should be familiar with one of the hottest topics in the computer software industry, open source software (OSS). OSS, and applications based upon open source code, presents real issues not only for high-tech companies, but also for any company that relies on computers to conduct or assist in its business. A sub-issue of the OSS movement, of which many people may not be aware, is the role that licenses play in the use of open source software and products. When considering open source options, you must be aware of the fact that "open source" does not mean license-free or restriction-free.

Open source systems and software were center court at the most recent U.S. Open and Australian Open tennis tournaments. IBM, in providing the computer and Internet technology for these two major tennis events, used computers running Linux, one of the most well-known open source products, for many different functions. IBM also relied on several other open source systems to provide related technology solutions for these major sporting events.

### Risk Factors Associated with OSS

You may wonder why, if open source products are viable and stable enough to run the computer systems at a major sporting event, your company isn't incorporating open source into your computer systems or playing with open source code to produce applications that are perfectly suited to your specific needs. If using open source products such as Apache on your Web servers, or Linux for your databases, truly represents a free open source option, you might ask, "What are the risks?" You might even presently be using OSS or open source products without being aware of certain risks involved in such use. In either case, you must bear the following in mind when exploring or utilizing open source products and dabbling in open source code.

Open source does not necessarily mean free in price. Organizations or companies that facilitate the work on open source programs may often package, distribute, and sell such products for a charge. Of course, because these programs are based on open source code, one can often go online and download the code for such programs for free. Nonetheless, whether you pay for OSS or download it to use or refine yourself, as mentioned above, the second and more crucial item to be aware of is that, in general, even open source products and code remain subject to license agreements.

In a majority of cases, OSS is not free of licensing restrictions. For example, the most applicable of the open source licenses is the GNU General Public License (GPL). If you are already familiar with the GPL, you know that it looks much like any other software license you might see when purchasing proprietary software off the shelf. It is a lengthy license with many terms and conditions covering use of OSS licensed under the GPL.

Many other open source products, especially those released from software manufacturers, contain their own specific licenses. If you decide to use the open source version of a piece of software, make sure that you are well aware of and follow the terms of the license for that open source version. Don't make the assumption that, just because you decide to go with the open source version of a particular piece of software, no restrictions exist on your use of that product. Some open source product licenses can be as long and confusing and restrictive as the software licenses associated with the products your company purchases from a vendor.

////In general, open source products and code remain subject to license agreements////////.

# EXHIBIT Y



Found In Translation
The Life Science Newsletter on Translational Medicine

# FiT Newsletter

**June 2006**

In This Issue

The Fit Mission

FiT This Issue: Translational Medicine Making It Easier To Breathe

Clearing The Path To FasterCures

A New Cure for an Old Headache? Or, A New Headache for an Old Cure?

Getting FiT

Staying FiT

FiT Archives

Submit a story

Ideas? Click here to submit a story idea.

Our Sponsors

Acretia Inc.

E-mail us to learn more about becoming a FiT Sponsor

Join our mailing list!

## New Cure For An Old Headache? Or, New Headache For An Old Cure?

**US Patent 6,410,516, relating to NF-KAPPA-B Pathway, a hi-tech mechanism for curing headaches?**

*Translational medicine supporters would likely applaud a piece of intellectual property that has the potential to save time, money, effort and provide a useful screening mechanism for a panoply of diseases and disease mechanisms. However, the grant of such a patent may actually become an impediment to the commercial implementation of downstream inventions by others. Steven Lazar explores the validity of this idea in an unusual case and the potential impacts of patents which attempt to 'jump the gap' between basic research discoveries and clinically useful inventions which operate by taking advantage of such discoveries.*

Perhaps, like me, you were not feeling too well on the evening of June 25, 2002. Perhaps, like me, you decided to take two aspirin for your headache, then hit the hay for a good night's sleep. Perhaps, like me, you woke up on June 26, 2002, feeling refreshed a beautiful day ahead of you as you realize the old headache was gone. But, beware, a new headache might well appear, in the form of a knock on the door and service of a summons and complaint for patent infringement.

Just the day before, on June 25, 2002, United States Patent 6,410,516, entitled "Nuclear factors associated with transcriptional regulation" was issued. But wait a minute. I don't recall using any 'nuclear factors.' I'm not certain I would know a 'nuclear factor' if it came up and kissed me on both cheeks. All we did was take two aspirin for our headache, then went to bed. Well, why would the authors and assignees of this patent, these stalwart institutions of education, Nobel Prize Winners, preeminent authors of scientific papers and texts --- why would they pick on us? It turns out that, when one reads the text of US Patent 6,410,516, one learns that this document indeed describes an immensely important discovery. The important knowledge that a cellular factor, previously known as Nuclear Factor-kappa 3, now known as Nuclear Factor-Kappa B, or



NF-kB, plays a central role in providing intracellular signals in a wide range of physiological processes. Heady stuff, this NF-kB! As we read deeper into the patent, we can begin to glean an inkling of what it is we may have done to offend. The invention did not just involve NF-kB and its use:

*It [the invention] further relates to NF-KB inhibitors, including isolated IkB, the gene encoding IkB* ***and agents or drugs which enhance or block the activity of NF-KB or of the NF-KB inhibitor*** *(e.g., IkB).*

In fact, the patent included claims to methods of inhibiting NF-kB activity using such agents or drugs.

The patent thus claimed not only the basic discovery, which was mechanistic in nature, but also any clinical or therapeutic method which operated through the basic mechanism --- including later invented pharmaceutical drugs. OK, so now we can understand what we did wrong. We took aspirin salicylic acid, which is now known to have the effect of reducing NF-kB activity. [See, for example, Science. 265:956-9 (1994)]. In turn, the reduction of NF-kB activity may have lowered the level of inflammatory cytokines expressed in the body in association with the headache. With reduced inflammation levels, the symptoms of the headache improved, and we felt better. If so, we clearly infringed the patent, and we should be held accountable for our infringement.

But wait, the patent was issued in 2002; even looking back to its earliest claims of priority, the earliest application from which the patent issued was filed in 1986. It seems to me that I frequently took aspirin for headaches back in college -- before 1981. Therefore, I would have been infringing the patent 5 years before the patent application was ever filed.

In nearly plain English, if the claims of US Patent 6,410,516 are interpreted such that taking aspirin to treat a headache in June of 2002 infringes the patent, then performance of the same act: taking aspirin to treat a headache in 1981, would necessarily anticipate the invention filed in 1986 - and would invalidate the patent claim. "That which infringes if later, anticipates, if earlier". As long as our use of aspirin to treat headaches was practiced openly and aspirin was certainly promoted for such use by Bayer and other aspirin makers, our prior use should be considered to be part of the public domain, not subject to anyone's later proprietary patent claim. Alas, this discussion is just a bit hypothetical, a bit too indefinite to really sink our teeth into. After all, no one has really sued us for infringement of United States Patent 6,410,516. Not me, anyway. So, let's turn to some real news.

On June 25, 2002, Ariad Pharmaceuticals sued Eli Lilly, for infringement of newly issued United States Patent 6,410,516. The complaint alleged that the commercial sale of at least two pharmaceutical products sold by Eli Lilly infringed the claims of the patent.

Ariad announced in a Press Release, May 4, 2006, that a jury

awarded Ariad and its co-plaintiffs damages in the amount of $65.2 million, based on sales of Evista and Xigris to date, with royalties to be paid in the amount of 2.3% on continuing sales.

In many ways, the trouble here lies in the distinction between a patentable *invention* and a scientific *discovery*. The scientific community absolutely recognized the importance of the scientific discovery that NF-kB represents a vital link in many physiological pathways. This discovery helped to explain why and how many pharmaceuticals operate in the body on a physiological level. The discovery also provided a target by which scientists and researchers can explore for further pharmaceutical agents which have effects on NF-kB, and perhaps enabled the use of NF-kB in a method for screening for such agents. However, the discovery itself did not give rise to any new pharmaceutical agents such as the accused Lilly products. Thus, a problem arises in the patent's attempt to cover not only the use of the basic discovery, but also the 'translational' uses of the discovery --- which in this case might include not only later-invented drugs, but also, pre-existing substances operating through the NF-kB mechanism. The fact that this is such a core discovery, involved in so many pathways and mechanisms, magnifies the important distinction in that a claim to rights on all the concurrent developments seems too encompassing.

The discovery helped explain why and how aspirin may exert its anti-inflammatory effects, and elucidated the mechanistic pathway through which for example, Eli Lilly's products Evista and Xigris, might exert their effects. However, the discovery did not in any way alter the manner in which one might practice the invention. That is, people still take aspirin for headaches today, just as they did in 1981 - - two pills, with water, and go to sleep. And Eli Lilly still sells Evista for treatment of osteoporosis and Xigris for treatment of sepsis, just as Lilly asserts to have publicly demonstrated in its patent applications filed in 1981 and 1985. If we were regulating the effects of NF-kB by taking aspirin *even without knowing we were doing so* such actions should be held to have inherently anticipated the claims of any later patent which attempts to cover such conduct, and remove it from the public domain.

It is likely that Lilly will appeal this decision. In the meantime, the validity of US Patent 6,410,516 is undergoing continued scrutiny.

Until all of the lawsuits and patent office proceedings are sorted out - - Keep a low profile on how you treat your headaches, or you might hear a knock on your door.

***Steven R. Lazar** is a registered patent attorney, and sole proprietor of SRL Patents Consulting, of Arlington, Massachusetts. The views stated above constitute the personal opinions of the author, and should not be construed as patent or legal advice, nor should they be attributed to the publisher.*

The Fit Mission | FiT This Issue: Translational Medicine Making It Easier To Breathe | Clearing The Path To FasterCures | A New Cure for an Old Headache? Or, A New Headache for an Old Cure? | Getting FiT | Staying FiT

# EXHIBIT Z

Copyright 2002 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2002, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.
The Wall Street Journal

June 26, 2002 Wednesday

**SECTION:** Corporate Focus; Pg. B1

**LENGTH:** 1114 words

**HEADLINE:** Biotech Firm Says Lilly Drugs Step On Patent

**BYLINE:** By Sharon Begley and Laura Johannes

**BODY:**

EVER SINCE their discovery in 1986, biomolecules that scientists describe as "sitting at the crossroads of life and death" have been the subject of a marathon patent quest -- and more than 5,000 scientific papers. Yesterday, after 16 years, the U.S. Patent Office issued a patent to scientists at three top research institutes, covering ways to treat disease by regulating the family of molecules known as NF-kB.

Immediately after the patent was issued, the institutes -- the Whitehead Institute for Biomedical Research, the Massachusetts Institute of Technology and Harvard University -- along with the Cambridge, Mass., biotech firm that holds the exclusive license, Ariad Pharmaceuticals Inc., filed suit in U.S. District Court in Boston, accusing drug company Eli Lilly & Co. of patent infringement. The suit claims two of Lilly's most important products, the osteoporosis drug Evista and the sepsis drug Xigris, work in a way now covered by the patent.

Lilly disagrees. "This appears to us an after-the-fact patent," says Robert Armitage, vice president of Lilly Research Laboratories Law. "Our original work on the discovery and identity of Evista and Xigris goes back to the 1980s. A patent doesn't allow you to take away something the public already has the benefit of."

Harvey Berger, chairman and chief executive of Ariad, predicts the "methods" patent -- which covers ways to affect the molecules, not the molecules themselves -- could prove to be as important to the biotech and pharmaceutical industries as the two seminal genetic-engineering patents. "This represents a similar landmark in intellectual property and could revolutionize the industry," Dr. Berger says. The patent "has great medical relevance," agrees molecular biologist Inder Verma of the Salk Institute, who isn't involved in the claim, "but there will be plenty of challenges to it."

Applied for on Christmas Eve in 1986, the patent covers treatments for all diseases that work through the NF-kB (pronounced N-F-kappa-B, where NF stands for "nuclear factor") cell-signaling pathway, which has been implicated in cancer, osteoporosis and inflammatory diseases including atherosclerosis, rheumatoid arthritis and septic shock.

Legal scholars and patent attorneys are divided on the merits of Ariad's claim. It isn't uncommon for a drug to be

found effective against disease, even if the inventor doesn't fully understand all the ins and outs of how the molecules work. "It's unlikely that the courts would construe the patent to cover a compound whose inventors didn't know worked by this pathway," says law professor Harold Edgar of Columbia University School of Law. "I don't think you can control all uses of a pathway by identifying several factors that activate it."

Ariad says it is has done a "comprehensive analysis" of Lilly's prior patents on Evista and Xigris and believes none exempt Lilly from paying it royalties. "There is no way a company Ariad's size would make the decision to take on Eli Lilly without multiple support from various law firms on the validity of the patents," Dr. Berger says.

The patent office allowed an unusually high 203 claims for methods affecting NF-kB, including dozens of ways to inhibit the molecules' activity in various cell types. Some of those methods are identical to the mechanism of action of drugs now in development or on the market, including Lilly's Evista and Xigris. Ariad says it tried to interest Lilly more than a year ago in licensing the NF-kB technology, "but after one friendly response they didn't bother to answer," says Dr. Berger. "We had to get their attention," and so filed suit.

Yesterday, Ariad mailed letters to about 50 other companies with products either on the market or in development that work via the NF-kB pathway, asking them to license its methods. Dr. Berger says Ariad is "asking for royalties based on future sales." One of the companies is Millennium Pharmaceuticals, Inc., of Cambridge, whose anticancer drug Velcade has been granted fast-track designation at the Food and Drug Administration. Millennium questions whether Ariad's claims are valid and says the patent won't hinder development of its drug.

Three research teams -- under David Baltimore at Whitehead, Philip Sharp at MIT and Thomas Maniatis at Harvard -- did the original work on NF-kB, starting in 1986. The labs' institutions tried for years to interest companies in licensing the core technology, but had no takers until Ariad came along. Says Dr. Berger, "It was we who took the risk of investing in this area and we who saw the medical implications of regulating NF-kB."

Found in all mammalian cells, NF-kB ordinarily is bound to a molecule called IkB, which keeps it biologically inert in the cell cytoplasm. But a host of different signals from inside or outside the cell, including interferons and interleukins of the immune system, as well as bacterial and viral infections, can activate NF-kB.

In each case, these signals separate IkB from NF-kB within minutes: The IkB is destroyed by cellular garbage disposals called proteasomes, and the NF-kB moves into the cell nucleus. There, it makes inactive genes issue instructions for proteins, including those involved in immunity and cell growth. Because NF-kB can activate so many genes -- more than 150, at last count -- it has been implicated in many diseases.

Preventing NF-kB activation -- by any of the ways claimed in the new patent -- may therefore be key to treating the diseases. NF-kB, for instance, can turn on genes that block programmed cell death, or apoptosis. Because this is one of the key mechanisms by which chemotherapy and radiation kill cancer cells, NF-kB activation may lie behind tumor resistance to these therapies.

"Many tumor cells find a way to circumvent apoptosis and so grow into a malignant tumor," says University of Chicago cancer biologist Anning Lin. "NF-kB certainly plays a critical role in the regulation of apoptosis: in many cell lines, inhibition of NF-kB makes those cells sensitive" to radiation and chemo. High levels of NF-kB are typically found in the cell nuclei of breast, ovarian, prostate and colon cancers, and in Hodgkin's lymphoma.

It is far from clear that NF-kB will prove to be a disease panacea, as even its inventors and Ariad admit. And because NF-kB activation also is required for immune response, drugs that interfere with it could leave patients immune-compromised -- the last thing a cancer patient needs. "Drugs that inhibit the NF-kB pathway would have to be given only for short periods of time, not continuously, to minimize immunosuppression," says cancer biologist Richard Gaynor, of the University of Texas Southwestern Medical Center.

**NOTES:**

Page 3

Biotech Firm Says Lilly Drugs Step On Patent The Wall Street Journal June 26, 2002 Wednesday

PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# EXHIBIT AA

Volume 16 | Issue 15 | Page 19

by Peg Brickley

NEWS

# New Patent Worries Professors

*The Scientist* 2002, **16**(15):19

**Published**      22 July 2002

A new patent on disease treatments that operate through a key biological trigger, the NF-κB messenger protein, has lawyers, university researchers, and technology transfer officers bracing for an intellectual property crackdown that they fear could reach into academia. Issued June 25, 2002, to a dozen researchers including **David Baltimore**, who identified the NF-κB signaling pathway, the patent was granted to the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and Harvard University. The patent, which expires in June 2019, covers disease treatment methods that affect the NF-κB pathway, a trigger described in more than 5,000 scholarly papers. The research institutions had already licensed the method to a biotechnology company, which has sued a pharmaceutical giant, claiming patent infringement.

Photo: Courtesy of Johns Hopkins University



**William P. Tew**

The lawsuit highlights fears that the aggressive prosecution involving a patent that protects drugs already on the market is a potential threat to future scientific investigation. This fear extends even to university settings, which have historically been safe from patent fights. "It does present an area of concern because we don't want to blatantly flaunt the law," says **William P. Tew**, assistant dean and executive director of licensing and business development for the Johns Hopkins University School of Medicine. "But the fact is, I have thousands of researchers and it would be an administrative nightmare to try to sort out what might be infringing."

**EXCLUSIVITY AND COLLABORATION** Ariad Pharmaceuticals, a Cambridge, Mass.-based biotechnology firm founded in 1991 owns the

exclusive license to the NF-κB patent. Within hours of the patent issuance, Ariad sued Eli Lilly and Co. in Boston, demanding damages for continued sales of two drugs: raloxifene (Evista) for osteoporosis, and drotrecogin alfa (Xigris) for septic shock. The Indianapolis-based Eli Lilly denies that its drugs infringe the NF-κB patent.

Tew and other academics fear Ariad could also charge universities with patent infringement. The company's chief executive, **Harvey Berger**, counters that Ariad has no intention to defend its patents against university-based research projects unconnected to commercial sponsors. But, Ariad may require licenses for corporate-sponsored academic research projects, in spite of the experimental use exception that generally protects academic labs. "Once the commercial hand touches pure academic research, that's when the exception dies," says **Don J. Pelto**, a Washington, DC, patent lawyer.

But when it comes to patent exemptions and legal complications, NF-κB research projects are no different from other commercially sponsored work, points out genetics researcher **Inder Verma** of the Salk Institute for Biological Studies in La Jolla, Calif. "If you have a commercial sponsor, it is their responsibility to make sure your work is not infringing" on the patent, he says.

**BROAD CONCERNS** What makes the NF-κB patent so troublesome, however, is its scope, which appears to cover dozens of important projects now underway. The schools that own the patent, of course, are in the clear. "We have full rights to practice the science [including under the patents] for our research and educational purposes," MIT technology licensing director **Lita L. Nelsen** writes in an E-mail. "And anyone can practice what is not covered by the patents."

The June 25 patent is the third in a series issued to MIT, Harvard, and the Whitehead Institute and licensed to Ariad. The problem, say some, is that the patents could be read to cover every therapeutic application related to NF-κB. "Claim 1 would cover a huge number of potential mechanisms, such as antibodies or ligands that bind to this transcription factor. Just about anything that blocks the activity of NF-κB would appear to come under this claim," says **Michael B. Farber**, a Harvard-trained scientist and now a patent lawyer in Los Angeles. "All you have to do is block the activity of this factor at the transcriptional level, the translational level, the protein level, or any combination of mechanisms, and this patent is implicated." For example, the Eli Lilly drugs at issue in the Ariad lawsuit each employ different methods of activating the NF-κB pathway: Evista is a selective estrogen receptor modulator, and Xigis is a recombinant human activated protein.

"I feel that [the patent] is overly broad," says **Sankar Ghosh**, a professor at Yale University School of Medicine. His recent work with NF-κB

focuses on the signaling pathway's crucial role in cellular immune response. Ghosh has little fear of direct legal action against his laboratory, since it is not involved in commercializing drugs. But he worries that academic researchers will experience a spillover from Ariad's legal action. "A lot of the science we do is for the purpose of finding new drugs," the Yale researcher says. "And if this prevents research in this area, it seems to be not in the best interest of the science,"

Ariad chief executive Berger insists the NF-κB patent is not broad. "The claims in the patent are really very specific to NF-κB and to specific ways, methods of regulating NF-κB cell signaling," Berger says.

Lawyers who glanced through the hefty, 203-claim patent, however, say it is not only broad, but "extremely," "incredibly," and "surprisingly" broad. Washington patent lawyer **Paul J. Berman** says the breadth and assertiveness of the Ariad claims could signal a paradigm shift among academic research institutions historically devoted to collaboration. "Does the activity of this licensee [Ariad] suggest ... that institutions are going to start collecting patents and using patents in the same way that they go after and compete with each other for faculty and research dollars and grants?"

**Peg Brickley (pegbrickley@hotmail.com) is a freelance writer in Philadelphia.**

Return to top

# EXHIBIT BB

Copyright 2002 Globe Newspaper Company
The Boston Globe

July 24, 2002, Wednesday ,THIRD EDITION

**SECTION:** BIOTECHNOLOGY; Pg. C4

**LENGTH:** 1443 words

**HEADLINE:** PATENTING BIOLOGICAL PATHWAYS ARIAD SUIT RAISES QUESTIONS ON LAYING CLAIM TO PROCESSES IN TREATING DISEASE

**BYLINE:** By Naomi Aoki, Globe Staff

**BODY:**

Among the inventors listed on US Patent No. 6,410,516 are three of the nation's most influential biologists, and their discovery, made in the mid-1980s while the scientists were at Harvard University, the Massachusetts Institute of Technology, and MIT's Whitehead Institute, promised to open an entirely new avenue of research into treating disease.

But the patent, awarded last month after 16 years of review by Patent and Trade Office examiners, is now at the center of a legal controversy potentially worth tens of millions of dollars a year. Immediately after it was issued, the Cambridge biotech firm that holds an exclusive license to the patent, Ariad Pharmaceuticals Inc., filed suit against Eli Lilly & Co., claiming that two of the Indiana drug maker's products infringe the patent.

Outlining 203 separate claims, the patent covers methods of treating disease by regulating a family of molecules known as NF-kB, a biological trigger believed to play a role in a wide range of illnesses from cancer to osteoporosis to bacterial infections. Ariad argues that the patent applies even to treatments discovered before 1986 when the patent was filed and that its breadth befits the pioneering nature of the discovery.

"Few recognized the profound clinical impact of this pioneering work at the time," said Dr. Harvey J. Berger, Ariad's chairman and chief executive. "Today, over 10 years and thousands of papers later, the full impact of this discovery in treating human disease has become more widely appreciated."

The same day the company filed suit against Lilly, it also sent letters to 50 other companies with products on the market or in development that work through the NF-kB pathway, asking them to license its methods. Berger said the company is only defending its interests and those of the 13 scientists whose work shed light on the potential of NF-kB in treating disease.

"We're not trying to keep anybody off the market," Berger said. "We're trying to create value for the scientists and shareholders who took a risk early on to invest in this work. There's nothing unusual about this patent and how it has played out."

Attorneys say the patent and looming legal battle raise some nettlesome issues, however. Patents are meant to spur scientific advance by making public key discoveries. But if a researcher or a company can lay claim to a significant piece of the biological landscape and any drug that treads upon it without actually discovering a drug, some question whether society is giving up more than it is gaining.

"It's a touchy area," said Leon Yankwich, a patent attorney in Boston. "Your research has laid the foundation for all

Page 2
PATENTING BIOLOGICAL PATHWAYS ARIAD SUIT RAISES QUESTIONS ON LAYING CLAIM TO PROCESSES IN TREATING DISEASE The Boston Globe July 24, 2002, Wednesday

further research. Yet you yourself have not discovered a drug that has any effect. You've made it possible, shown the direction of future research. But you haven't contributed directly to the pharmaceutical art."

The law allows anyone who invents or discovers "a new and useful process, machine, manufacture, or composition of matter" to get a patent. The discovery can not be obvious to those who are trained in the field, and it must be sufficiently detailed as to allow others schooled in that field to reconstruct the invention.

Describing the importance of blocking a biological cascade of events in treating disease and methods of doing so in lab experiments is a major scientific contribution. But it is a far cry from discovering and developing a drug that acts on the biological pathway to effectively treat disease. And legal scholars are split on whether the discovery is sufficient to merit a patent that lays claim to any treatment acting on the pathway.

Medically, the implications are potentially vast. A single pathway may be involved in a number of diseases, and a patent on it could be used to block research that could result in a variety of treatments. Even if the patent holder didn't aim to block competition, some fear the very existence of such patents would discourage others from working on the pathway out of fear of litigation.

"In my mind, it may actually inhibit the progress of scientific research," said Anthony Butler, a pharmaceutical analyst with Lehman Brothers. "The discovery of a pathway can be a great piece of science. But it is not equal to the practical result. If you stake out a pathway, which never results in a practical invention, then it makes the idea of an invention an anomaly."

Patent attorneys say it could also give rise to an ever-increasing number of conflicting patents and a morass of litigation. Drug discovery is still more art than science. Researchers may know a drug is effective without fully understanding how it works. As biological advances are made and patented, however, researchers could find themselves unwittingly infringing patents and many drugs could be found to infringe patents that were issued long after the drugs themselves were discovered.

The legal arguments quickly become bogged down in a quagmire of logic, said J. Charles Mokriski, a patent attorney with Day, Berry & Howard. If a researcher discovers a drug without ever knowing the drug acts on a patented pathway or before the pathway is understood, does that constitute infringement? If the drug was acting on the pathway before the pathway was discovered, does the existence of the drug invalidate the patent on the pathway by rendering it not "new"?

"People presume patent law is a precise logical corpus of rules and regulations," Mokriski said. "In fact, it's not precise. Technology moves much faster than law moves. This case raises some issues that will likely have to be sorted out by the courts."

Three research teams - headed by David Baltimore at the Whitehead Institute, Philip Sharp at MIT, and Tom Maniatis at Harvard - did the original work on NF-kB in the mid-1980s. Found in all mammalian cells, NF-kB is bound to another molecule called IkB, which keeps it biologically inert. A host of different signals from inside or outside the cell can activate NF-kB, however, and once active, it moves into the cell nucleus where it triggers genes to produce proteins.

Because NF-kB can activate so many genes - more than 150, at last count - it is implicated in many diseases and could prove key in treating those diseases. Patent No. 6,410,516 describes more than a dozen ways of blocking NF-kB in various cell types - some of which are identical to the mechanisms of action of drugs now in development or on the market, including Lilly's osteoporosis drug, Evista, and its sepsis therapy, Xigris.

Ariad's Berger said papers published by Lilly's own researchers clearly elucidate the infringement. He said he has tried in vain to engage Eli Lilly in discussions to negotiate a licensing deal. Those two facts are in large part why Ariad, a company of just 70 employees, decided to take on a giant like Lilly, Berger said.

Page 3

PATENTING BIOLOGICAL PATHWAYS ARIAD SUIT RAISES QUESTIONS ON LAYING CLAIM TO PROCESSES IN TREATING DISEASE The Boston Globe July 24, 2002, Wednesday

Berger brushes aside Lilly's claim that its drugs do not infringe. He said other companies, looking at the same basic facts, are negotiating licenses. He adamantly denies any allegation that Ariad is trying to impede research or free ride off the success of others. The company is seeking "reasonable royalties" that are in line with industry standards, he said, and there are no plans to file additional lawsuits.

But the financial lure is undeniable. Evista generated $665 million in sales last year. Xigris, which was approved late last year, reaped $22 million in sales in the first three months of this year. Analysts predict that both drugs could reach $1 billion in sales a year. At their peak, Berger noted in a conference call to analysts, patents seminal to the biotech industry have generated more than $100 million a year in revenue for their owners.

"We are very committed to fighting as hard as is necessary," Berger said. "We believe very strongly that we are in the right."

Robert Armitage, Eli Lilly's vice president and general patent counsel, however, could not disagree more vehemently. The initial patents on Evista and Xigris were filed in 1981 and 1985, respectively, Armitage said, and as a matter of law, Ariad can't reach back and claim a prior invention. Moreover, he said, the very existence of Evista and Xigris likely invalidates the Ariad patent.

"Unfortunately for them, if they are correct that they have successfully patented our prior work, their patents are invalid," Armitage said. "The patent has to be limited to subject matter that is novel and not obvious. If the patent is so broad that it covers activity that was already in practice, then the patent falls like a house of cards."

Naomi Aoki can be reached at naoki@globe.com.

**GRAPHIC:** PHOTO, "We're not trying to keep anybody off the market," says Ariad chief Harvey J. Berger, on the company's suit against Eli Lilly. / GLOBE FILE PHOTO

**LOAD-DATE:** July 24, 2002

# EXHIBIT CC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION,

Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC.,

Defendant.

C.A. No. 06-259-KAJ

**DEFENDANT ARIAD PHARMACEUTICALS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF AMGEN, INC.'S FIRST SET OF INTERROGATORIES TO DEFENDANT**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Local Rules for the District of Delaware, Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") hereby supplements its responses to Plaintiffs' First Set of Interrogatories To Defendant as follows:

**INTRODUCTION**

This response is made solely for the purpose of this action. The response is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at the time of trial.

Objections to each interrogatory are made on an individual basis below. From time to time, for special emphasis, ARIAD will repeat in the specific objections certain objections also set forth in the general objections. The specific objections are submitted without prejudice to, and without in any way waiving, the general objections listed

below, but not expressly set forth in the response. The assertion of any objection to any interrogatory below is neither intended as, nor shall in any way be deemed, a waiver of ARIAD's right to assert that or any other objection at a later date. At this time, ARIAD shall not provide any information protected by any applicable privilege or doctrine.

No incidental or implied admissions are intended by the responses below. The fact that ARIAD has answered or objected to any interrogatory should not be taken as an admission that ARIAD accepts or admits the existence of any "facts" set forth or assumed by such interrogatory. The fact that ARIAD has answered part or all of any interrogatory is not intended to be, and shall not be construed to be, a waiver by ARIAD of any part of any objection to the interrogatory.

ARIAD's responses herein, and its disclosure of information, do not in any way constitute an acceptance of Plaintiffs' purported Instructions or its purported Definitions of words or phrases contained in its interrogatories. Consistent with applicable law, and without waiver or limitation of any of its objections, ARIAD has made a good faith effort to interpret the objectionable Definitions in Plaintiffs' interrogatories.

To the extent that ARIAD responds to any interrogatory, its responses reflect only the current state of knowledge, understanding, and belief of ARIAD with regard to matters about which inquiry has been made. As discovery in this matter is not yet complete, ARIAD may not yet have uncovered all information or facts pertinent to any such interrogatory and may not yet have identified or located all persons with knowledge of pertinent information or facts. ARIAD expects and consequently reserves the right to modify or supplement its response at a later time with any subsequently discovered fact or information that it may later recall or discover. ARIAD further reserves the right to change, amend or supplement any or all of the matters contained in this response as additional facts are ascertained, analyses are performed, research is completed and contentions are made. Furthermore, this response is provided without prejudice to using or relying on at trial any subsequently discovered information or facts, or information

omitted from these responses as a result of mistake, oversight, or inadvertence. ARIAD further reserves the right to produce additional facts and evidence at trial and to object on appropriate grounds to the introduction into evidence of any portion of these responses. This response is also given without prejudice to ARIAD's right to advance contentions or make claims not yet advanced or made in the present action and to supplement this response as appropriate.

**GENERAL OBJECTIONS**

ARIAD asserts the following General Objections with respect to each interrogatory:

1. ARIAD objects to the First Set of Interrogatories and to each definition, instruction, and interrogatory therein to the extent that they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules for the District of Delaware ("Local Rules"), or any order or ruling by the Court in this action. ARIAD shall not comply with any purported obligation not imposed by law.

2. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein on the ground and to the extent that they purport to seek information protected by the work product doctrine, attorney-client privilege, or any other privilege or restriction on discovery. ARIAD will not produce information protected by such privileges or restrictions. Any inadvertent or unintentional disclosure of such information shall not be deemed a waiver of any applicable privilege or restriction.

3. ARIAD objects to the First Set of Interrogatories on the ground and to the extent that they seek information that is neither relevant to any claim or defense of a party, nor reasonably calculated to lead to the discovery of admissible evidence.

4. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are overbroad, unduly burdensome, oppressive, or seek

information that is beyond the scope of discovery under the Federal Rules of Civil Procedure, including but not limited to Federal Rule of Civil Procedure 26(b).

5.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they are vague, ambiguous, or without sufficient specificity to identify what information is requested.

6.    ARIAD objects to Plaintiffs' Interrogatories as premature. In particular, ARIAD objects to Plaintiffs' Interrogatories as premature to the extent that they seek information that ARIAD is not required to disclose at this stage of litigation. In addition, ARIAD's investigation is continuing and may result in additional contentions. For the foregoing reasons, ARIAD's responses are not complete and cannot be completed at this time, and are subject to revision.

7.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are compound and are actually multiple interrogatories, on the ground that they are an impermissible effort to circumvent the fifty interrogatory limit set forth in Local Rule 26.1(b).

8.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek information that is publicly available, in the possession, custody or control of Plaintiffs or any person or entity other than ARIAD, and is equally accessible to Plaintiffs through means less burdensome to ARIAD.

9.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they call for a legal conclusion.

10.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek personal information that is protected by statutory, constitutional, common law or privacy rights. ARIAD reserves the right not to provide any of this information until it receives appropriate approvals. To the extent that ARIAD responds to these Interrogatories by referring Plaintiffs to documents pursuant to Federal

Rule of Civil Procedure 33(d), nothing herein shall affect in any way the confidentiality designations, if any, of those documents.

11. ARIAD objects to Plaintiffs' purported definitions of words and phrases contained in its interrogatories. ARIAD objects to Plaintiffs' definitions to the extent that they: (i) are unclear, ambiguous, overly broad, or unduly burdensome; (ii) are inconsistent with the ordinary and customary meaning of the words or phrases they purport to define; (iii) seek to impose obligations different from, or in excess of, those created by the Federal Rule of Civil Procedure and the Local Rules; (iv) include assertions of purported fact that are inaccurate or at the very least are disputed by the parties to this action; or (v) incorporate other purported definitions that suffer from such defects.

12. ARIAD, in particular, objects to the definition of "Ariad" set forth in paragraph 2 of the Definitions and Instructions to the extent it purports to impose discovery obligations on persons or entities other than the parties to this action, and to the extent it seeks discovery from individuals or entities over which ARIAD has no control.

13. ARIAD, in particular, objects to the definition of the term "document" on the grounds that the definition is compound, vague, and ambiguous, and to the extent that it purports to impose duties beyond those required by the Federal Rules of Civil Procedure, the Local Rules, or any order or ruling by the Court in this action. ARIAD further objects to this definition as unduly burdensome, harassing, oppressive, and overbroad, to the extent that it purports to include documents that are not within the possession, control, or custody of ARIAD.

14. ARIAD, in particular, objects to the definitions of "identify," "identity," and "identification" set forth in paragraphs 6 and 7 of the Definitions and Instructions to the extent they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules, or any order or ruling by the Court in this action.

15. ARIAD, in particular, objects to the definition of "Related Patent" set forth in paragraph 11 of the Definition and Instructions to the extent that it encompasses information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.

16. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information concerning patent claims and claim terms that have not yet been construed by the Court. ARIAD reserves its right to modify or supplement its responses as a result of any rulings by the Court bearing on claim construction, and/or discovery bearing on claim construction.

17. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information dependent upon documents or other information in the possession, custody and control of Plaintiffs, Plaintiffs' counsel, or third parties. ARIAD reserves its right to modify or supplement its responses in view of the discovery of information and review of documents received from Plaintiffs or third parties.

18. ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent that they purport to require ARIAD to search for information that is not within its possession, custody, or control. ARIAD will use reasonable diligence to locate information within its control.

19. ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent they call for information ARIAD does not have the authority to release. ARIAD will not disclose any of this information without approval.

20. ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent that they seek information that is duplicative of the information sought from third parties, including the information sought pursuant to Plaintiffs' subpoena to Eli Lilly & Company ("Lilly").

21. ARIAD expressly incorporates each of the foregoing General Objections into each specific response to the interrogatories set forth below as if set forth in full therein. An answer to an interrogatory shall not work as a waiver of any applicable specific or general objection to an interrogatory.

**RESPONSES TO SPECIFIC INTERROGATORIES**

**INTERROGATORY NO. 1:**

For each claim of the '516 patent, identify any and all claim term(s) and phrase(s) that Ariad believes need to be construed by the Court, Ariad's proposed claim construction of those term(s) and phrase(s) and any term(s) and phrase(s) whose claim construction is in dispute, and all bases or evidence on which Ariad relies in support of that proposed claim construction.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature. The Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)." ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. Additionally, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

**INTERROGATORY NO. 2:**

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to ENBREL, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms

and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to ENBREL that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that ENBREL infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether ENBREL infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

ARIAD supplements its initial response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify

the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

**INTERROGATORY NO. 3:**

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to KINERET, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to KINERET that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To

Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. Additionally, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that KINERET infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether KINERET infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

ARIAD supplements its initial response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. In light of the Court's rulings at the hearing

conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

**INTERROGATORY NO. 4:**

Identify any licenses or other grant of rights, including but not limited to sublicenses, that Ariad or another party has granted for the '516 patent and/or any Related Patents, including but not limited to the name of the licensee/grantee, the date of the license/grant, the rights granted under each license/grant, the royalty rate and/or other compensation arrangements under the license/grant, the royalty base, the total amount of royalties or other payments received from that licensee/grantee each month from the inception of the license/grant to the present, and the person most knowledgeable regarding such licensing/grant.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD also objects to this interrogatory as overbroad and unduly burdensome, and objects to the extent that it calls for information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence. ARIAD objects to this interrogatory as overbroad and unduly burdensome, especially with regard to its use of the term "Related Patents." In addition, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. ARIAD reserves the right to modify or supplement its

responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

ARIAD supplements its initial response to Interrogatory No. 4 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to documents produced or to be produced in this action from which the answers to this interrogatory may be ascertained. Specifically, ARIAD directs Plaintiffs to the transcript of the deposition of ARIAD Pharmaceuticals, Inc. through its representative, Dr. Harvey J. Berger, dated July 29, 2005, in *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.). The person with most knowledge concerning the information requested in this interrogatory is Dr. Harvey J. Berger.

ARIAD also directs Plaintiffs to the following documents:

License Agreement between Massachusetts Institute of Technology, the Whitehead Institute, Harvard University, and ARIAD, dated August 19, 1991, as subsequently amended by the First Amendment, dated November 20, 2001, and subsequently amended by the Second Amendment, dated January 2, 2002;

Non-Exclusive Research License Agreement between Bristol-Myers Squibb Company and ARIAD, dated November 6, 2002;

Non-Exclusive License Agreement between DiscoveRx Corporation and ARIAD, dated May 2, 2003.

ARIAD is continuing to investigate the information requested in this interrogatory. ARIAD will supplement its responses and will identify additional documents when and if it locates further non-privileged, relevant information.

**INTERROGATORY NO. 5:**

Identify any litigation or other legal or administrative proceeding (including but not limited to reexamination, reissue, opposition or similar proceedings) involving, or that has involved, the '516 patent and/or any Related Patents.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as overbroad and unduly burdensome, and objects to the extent that it calls for information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence. ARIAD also objects to this interrogatory as overbroad and unduly burdensome, especially with regard to its use of the term "Related Patents." In addition, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. ARIAD reserves the right to modify or supplement its responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

ARIAD supplements its initial response to Interrogatory No. 5 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

ARIAD identifies the following United States proceedings involving the '516 patent:

U.S. Patent Application Ser. No. 06/817,441, filed Jan. 9, 1986;

U.S. Patent Application Ser. No. 07/155,207, filed Feb. 12, 1988;

U.S. Patent Application Ser. No. 07/162,680, filed Mar. 1, 1988;

U.S. Patent Application Ser. No. 07/280,173, filed Dec. 5, 1988;

U.S. Patent Application Ser. No. 07/318,901, filed Mar. 3, 1989;

U.S. Patent Application Ser. No. 07/341,436, filed Apr. 21, 1989;

U.S. Patent Application Ser. No. 08/418,266, filed Apr. 6, 1995;

U.S. Patent Application Ser. No. 06/946,365, filed Dec. 24, 1986;

U.S. Patent Application Ser. No. 07/791,898, filed Nov. 13, 1991;

U.S. Patent Application Ser. No. 08/418,266, filed Apr. 6, 1995;

U.S. Patent Application Ser. No. 08/464,364, filed June 5, 1995;

U.S. Reexamination Ser. No. 90/007,503, filed Apr. 4, 2005;

U.S. Reexamination Ser. No. 90/007,828, filed Dec. 2, 2005;

U.S. Reexamination Ser. No. 90/007,999, filed Apr. 7, 2006;

*ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.);

*Amgen, Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, 06-259 (D. Del.);

*ARIAD Pharmaceuticals, Inc. et al. v. Dudas*, 06-679 (E.D. Va.).

**INTERROGATORY NO. 6:**

For each of the claims of the '516 patent, explain in detail the dates and circumstances of the conception, actual and/or constructive reduction to practice, first written description, first disclosure to another, first public sale, and first public use, including but not limited to identifying all documents, materials and/or witnesses that Ariad contends corroborate or support the dates and circumstances identified or that contradict or may contradict Ariad's contentions as to such dates and circumstances.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay

Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. ARIAD also objects to this interrogatory to the extent that it seeks information more properly acquired through other methods of discovery. In addition, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

ARIAD supplements its initial response to Interrogatory No. 6 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

The claims of the '516 patent were conceived and reduced to practice no later than April 21, 1989, and U.S. Patent Application Ser. No. 07/341,436 evidences such conception and reduction to practice.

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to documents produced or to be produced in this action from which the answers to this interrogatory may be ascertained. Specifically, ARIAD directs Plaintiffs to the prosecution history of the '516 patent.

In addition, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to the following documents from *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.):

ARIAD's responses to Eli Lilly & Co.'s Interrogatory No. 8;

Rule 26(a)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D.;

Rule 26(a)(2) Rebuttal Report of George R. Stark. Ph.D.;

Deposition of Patrick Baeuerle, dated December 1, 2004;

Deposition of Albert Baldwin, dated October 26, 2004;

Deposition of David Baltimore, dated August 23, 2004;

Deposition of Chen-Ming Fan, dated October 21, 2004;

Deposition of Thomas Kadesch, dated December 20, 2005

Deposition of Jonathan Lebowitz, dated June 28, 2004;

Deposition of Michael Lenardo, dated October 22, 2004;

Deposition of Thomas Maniatis, dated November 10, 2004;

Deposition of Ranjan Sen, dated October 12, 2004;

Deposition of Phillip Sharp, dated September 30, 2004;

Deposition of Harinder Singh, dated June 30, 2004;

Deposition of George Stark, dated December 9, 2005;

Transcripts of jury trial held between April 10, 2006 and April 28, 2006;

Special verdict form, dated May 4, 2006;

Transcripts of bench trial held between August 7, 2006 and August 10, 2006.

ARIAD is continuing to investigate the information requested in this interrogatory. ARIAD will supplement its responses and will identify additional documents when and if it locates further non-privileged, relevant information.

**INTERROGATORY NO. 7:**

For each of the claims of the '516 patent, identify what Ariad contends is its effective priority date and explain in detail the factual and legal bases supporting that date, including but not limited to specific citations to any and all portions of any patent application that Ariad contends provide written description and enablement support for such claim of priority, and identify all documents, materials and/or witnesses that Ariad contends corroborate or support the dates identified or that contradict or may contradict Ariad's contentions as to the dates identified.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. In addition, ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

ARIAD supplements its initial response to Interrogatory No. 7 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

The priority date for the '516 patent is no later than April 21, 1989, and U.S. Patent Application Ser. No. 07/341,436 provides written description for and enables the '516 patent.

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to documents produced or to be produced in this action from which the answers to this interrogatory may be ascertained. Specifically, ARIAD directs Plaintiffs to the prosecution history of the '516 patent, and to the public records of the reexaminations listed in response to Interrogatory No. 5.

In addition, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to the following documents from *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.):

ARIAD's responses to Eli Lilly & Co.'s Interrogatory No. 8;

Rule 26(a)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D.;

Rule 26(a)(2) Rebuttal Report of George R. Stark, Ph.D;

Deposition of Patrick Baeuerle, dated December 1, 2004;

Deposition of Albert Baldwin, dated October 26, 2004;

Deposition of David Baltimore, dated August 23, 2004;

Deposition of Brendan Boyce, dated December 17, 2005;

Deposition of Chen-Ming Fan, dated October 21, 2004;

Deposition of Thomas Kadesch, dated December 20, 2005

Deposition of Jonathan Lebowitz, dated June 28, 2004;

Deposition of Michael Lenardo, dated October 22, 2004;

Deposition of Thomas Maniatis, dated November 10, 2004;

Deposition of Ranjan Sen, dated October 12, 2004;

Deposition of Phillip Sharp, dated September 30, 2004;

Deposition of Harinder Singh, dated June 30, 2004;

Deposition of George Stark, dated December 9, 2005;

Transcripts of jury trial held between April 10, 2006 and April 28, 2006;

Special verdict form, dated May 4, 2006;

Transcripts of bench trial held between August 7, 2006 and August 10, 2006;

Expert Report of David Latchman, DSc., Ph.D.;

Reply Expert Report of David Latchman, DSc., Ph.D.

ARIAD is continuing to investigate the information requested in this interrogatory. ARIAD will supplement its responses and will identify additional documents when and if it locates further non-privileged, relevant information.

**INTERROGATORY NO. 8:**

Explain in detail Ariad's contention as to the qualifications for a person who is of ordinary skill in the art for the subject matter disclosed and/or claimed in the '516 patent,

including but not limited to the educational and work experience qualifications that person would have, and identify the legal and factual bases on which Ariad relies in support of that contention.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory to the extent it seeks information regarding contentions that ARIAD has not made. Furthermore, ARIAD objects to this interrogatory to the extent it seeks information more appropriately sought through expert discovery. ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

ARIAD supplements its initial response to Interrogatory No. 8 as follows:

ARIAD objects to this interrogatory because it seeks an expert determination and therefore is premature. ARIAD further objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to documents produced or to be produced in this action from which the answers to this interrogatory may be ascertained. Specifically, ARIAD directs Plaintiffs to the prosecution history of the '516 patent. ARIAD also directs Plaintiffs to the Rule 26(a)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D., and to trial testimony of Thomas R. Kadesch, Ph.D. on April 27, 2006 in *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly &*

*Co.*, 02-11280 (D. Mass.). ARIAD is continuing to investigate the information requested in this interrogatory and will supplement its responses when and if it locates further non-privileged, relevant information.

**INTERROGATORY NO. 9:**

Identify all prior art to the '516 patent (for purposes of this interrogatory, that in existence as of June 5, 1995) of which Ariad is aware, including but not limited to any and all references that any third party has asserted may be invalidating prior art to the '516 patent.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD further objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, settlement privilege, or any other applicable privilege or protection. ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

ARIAD supplements its initial response to Interrogatory No. 9 as follows:

ARIAD objects to this interrogatory as unduly burdensome because it requires ARIAD to survey all of its employees and agents. ARIAD also objects to this interrogatory because the term "prior art" is vague and ambiguous, and requires ARIAD to make a legal determination. ARIAD further objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD refers Plaintiffs to the references cited in the prosecution history of the '516 patent, and the references cited in the reexaminations listed in response to Interrogatory No. 5.

ARIAD also refers Plaintiffs to the references cited in discovery responses, expert reports, and submissions to the court, in *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.). In particular, ARIAD refers Plaintiffs to:

Expert Report of Peter Barnes, Ph.D.;

Reply Expert Report of Peter Barnes, D.M. D.S.c.;

Expert Report of Dr. Jesus Egido;

Reply Expert Report of Dr. Jesus Egido;

Expert Report of Stanley Lieberstein;

Reply Expert Report of Stanley Lieberstein;

Expert Report of David Latchman, DSc., Ph.D.;

Expert Report of Stavros C. Manolagas, M.D., Ph.D.;

Reply Expert Report of Stavros C. Manolagas, M.D., Ph.D., Regarding Invalidity of the Asserted Claims;

Eli Lilly & Company's Notice Pursuant to 35 U.S.C. Section 282, filed March 10, 2006.

ARIAD is continuing to investigate the information requested in this interrogatory and will supplement its responses when and if it locates further non-privileged, relevant information.

**INTERROGATORY NO. 10:**

Describe in detail all facts and circumstances pertaining to any instance in which a person has contended that any claim of the '516 patent and/or Related Patents is invalid or unenforceable, including but not limited to the identity of the person who made such

contention, the nature of the person's contention that the claims were invalid or unenforceable, all factual and legal bases in support of the person's contention, and all factual and legal bases that Ariad contends rebut such contention.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. ARIAD also objects to this interrogatory as overbroad and unduly burdensome and objects to the extent that it calls for information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence. ARIAD further objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. Furthermore, ARIAD objects to this interrogatory to the extent that it seeks information more properly acquired through other methods of discovery. ARIAD also objects to this interrogatory as overbroad and unduly burdensome with regard to its use of the term "Related Patents." ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

ARIAD supplements its initial response to Interrogatory No. 10 as follows:

ARIAD objects to this interrogatory as unduly burdensome to the extent it calls for information regarding the '516 patent that is publicly available from the U.S. Patent and Trademark Office. ARIAD further objects to this interrogatory as premature in light

of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD identifies *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.), as an instance in which Lilly has contended that claims of the '516 patent are invalid and/or unenforceable. The facts and circumstances pertaining to those contentions are in publicly available documents and in documents produced by Lilly in the instant action. In particular, ARIAD refers Plaintiffs to:

Expert Report of Peter Barnes, Ph.D.;

Reply Expert Report of Peter Barnes, D.M. D.S.c.;

Expert Report of Dr. Jesus Egido;

Reply Expert Report of Dr. Jesus Egido;

Expert Report of Stanley Lieberstein;

Reply Expert Report of Stanley Lieberstein;

Expert Report of David Latchman, DSc., Ph.D.;

Reply Expert Report of David Latchman, DSc., Ph.D.;

Expert Report of Stavros C. Manolagas, M.D., Ph.D.;

Reply Expert Report of Stavros C. Manolagas, M.D., Ph.D., Regarding Invalidity of the Asserted Claims;

Eli Lilly & Company's Notice Pursuant to 35 U.S.C. Section 282, filed March 10, 2006;

Transcripts of jury trial held between April 10, 2006 and April 28, 2006;

Transcripts of bench trial held between August 7, 2006 and August 10, 2006.

ARIAD also identifies the petition for reexamination in U.S. Reexamination Ser. No. 90/007,503 as an instance in which Lilly has contended that claims of the '516 patent

are invalid. The facts and circumstances pertaining to those contentions are in publicly available documents. ARIAD further identifies the petition for reexamination in U.S. Reexamination Ser. No. 90/007,828 as an instance in which Raj Bawa of Bawa Biotechnology Consulting, LLC has contended that claims of the '516 patent are invalid. The facts and circumstances pertaining to those contentions are in publicly available documents. ARIAD further identifies the petition for reexamination in U.S. Reexamination Ser. No. 90/007,999 as an instance in which the owners of the '516 patent contended that claim 6 of the '516 patent might be considered invalid under the doctrine of obviousness-type double patenting in light of claim 16 of U.S. Patent No. 6,150,090. The facts and circumstances pertaining to the contention are in publicly available documents.

ARIAD is continuing its investigation and will identify any further non-privileged instances known to ARIAD officers in which a person has contended that any claim of the '516 patent is invalid or unenforceable.

**INTERROGATORY NO. 11:**

If Ariad contends that any claim of the '516 patent is not invalid under 35 U.S.C. § 103, explain in detail the legal and factual bases for Ariad's contentions, including but not limited to whether and how its contentions of non-obviousness are supported by secondary considerations, such as to commercial success, long-felt need, copying by others, prior failure by others, licensing, or unexpected results.

**RESPONSE TO INTERROGATORY NO. 11:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. Furthermore, ARIAD objects to this

interrogatory to the extent that it seeks information more properly acquired through other methods of discovery. ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

ARIAD supplements its initial response to Interrogatory No. 11 as follows:

ARIAD objects to this interrogatory because it seeks an expert determination and therefore is premature. ARIAD further objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

The '516 patent is presumed valid pursuant to 35 U.S.C. § 282. The '516 patent issued after detailed scrutiny of validity by the U.S. Patent and Trademark Office. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD directs Plaintiffs to the publicly available prosecution record. ARIAD also directs Plaintiffs to information that is publicly available from *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.), and information produced by Lilly in this action.

Plaintiffs have not provided information regarding their contention that the '516 patent is invalid, including information regarding any contention that the '516 patent is invalid for obviousness under 35 U.S.C. § 103. ARIAD reserves the right to respond to any future contention by Plaintiffs regarding obviousness through supplemental interrogatory responses, production of relevant documents, and/or other methods of discovery.

**INTERROGATORY NO. 12:**

If Ariad contends that any claim of the '516 patent is not invalid under 35 U.S.C. § 102, explain in detail the legal and factual bases for Ariad's contentions, including but

not limited to a detailed explanation of why Ariad contends that a reference that has been alleged to be anticipatory, either expressly or inherently, of any claim of the '516 patent is not so.

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD further objects to this interrogatory as vague and ambiguous with respect to the phrase "reference that has been alleged to be anticipatory," as ARIAD is not aware of any allegations made in this action under 35 U.S.C. § 102. In addition, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

ARIAD supplements its initial response to Interrogatory No. 12 as follows:

ARIAD objects to this interrogatory because it seeks an expert determination and therefore is premature. ARIAD further objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

The '516 patent is presumed valid pursuant to 35 U.S.C. § 282. The '516 patent issued after detailed scrutiny of validity by the U.S. Patent and Trademark Office. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD directs Plaintiffs to the publicly available prosecution record. ARIAD also directs Plaintiffs to information

that is publicly available from *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.), and information produced by Lilly in this action.

Plaintiffs have not provided information regarding their contention that the '516 patent is invalid, including information regarding any contention that the '516 patent is invalid for anticipation under 35 U.S.C. § 102. ARIAD reserves the right to respond to any future contention by Plaintiffs regarding anticipation through supplemental interrogatory responses, production of relevant documents, and/or other methods of discovery.

**INTERROGATORY NO. 13:**

If Ariad contends that any claim of the '516 patent is not invalid under 35 U.S.C. § 112, explain in detail the legal and factual bases for Ariad's contentions, including but not limited to specific citations to any and all portions of U.S. Patent Application Serial No. 08/464,364 that Ariad contends provide written description for and an enabling disclosure of the full scope of such claim, and identify all references, knowledge or facts allegedly supporting such contentions.

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD further objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

ARIAD supplements its initial response to Interrogatory No. 13 as follows:

ARIAD objects to this interrogatory because it seeks an expert determination and therefore is premature. ARIAD further objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

The '516 patent is presumed valid pursuant to 35 U.S.C. § 282. The '516 patent issued after detailed scrutiny of validity by the U.S. Patent and Trademark Office. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD directs Plaintiffs to the publicly available prosecution record. ARIAD also directs Plaintiffs to information that is publicly available from *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.), and information produced by Lilly in this action. In particular, ARIAD refers Plaintiffs to:

ARIAD's responses to Eli Lilly & Co.'s Interrogatory No. 8;

Rule 26(a)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D.;

Rule 26(a)(2) Rebuttal Report of George R. Stark, Ph.D.

Plaintiffs have not provided information regarding their contention that the '516 patent is invalid, including information regarding any contention that the '516 patent is invalid for lack of enablement or inadequate written description under 35 U.S.C. § 112. ARIAD reserves the right to respond to any future contention by Plaintiffs regarding enablement and/or written description through supplemental interrogatory responses, production of relevant documents, and/or other methods of discovery.

**INTERROGATORY NO. 14:**

Identify each molecule, compound, or other substance that can be used to practice the method of reducing NF-κB activity disclosed in the '516 patent and/or recited in the '516 patent claims.

**RESPONSE TO INTERROGATORY NO. 14:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery.    ARIAD also objects to this interrogatory as overbroad and unduly burdensome and objects to the extent that it calls for information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.  In addition, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.  ARIAD objects to this interrogatory to the extent it seeks information regarding contentions that ARIAD has not made.  ARIAD further objects to this interrogatory to the extent it seeks information beyond the scope of ARIAD's knowledge.  ARIAD reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

ARIAD supplements its initial response to Interrogatory No. 14 as follows:

ARIAD objects to this interrogatory because it seeks an expert determination and therefore is premature.  ARIAD further objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, ARIAD directs Plaintiffs to the publicly available prosecution record, and to the public records for the reexaminations listed in response to Interrogatory No. 5. ARIAD also directs Plaintiffs to

information that is publicly available from *ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly & Co.*, 02-11280 (D. Mass.), and information produced by Lilly in this action.

Plaintiffs have not provided information regarding their contention as to any molecule, compound, or other substance that can be used to practice the method of reducing NF-κB activity disclosed in the '516 patent and/or recited in the '516 patent claims. ARIAD is continuing to investigate the information requested in this interrogatory and will supplement its responses when and if it locates further non-privileged, relevant information.

**INTERROGATORY NO. 15:**

Explain in detail the damages claimed by Ariad for what Ariad contends is the Amgen Entities' infringement of the '516 patent, including but not limited to the legal basis for the damages claim, including whether the damages are the result of the alleged lost profits, price erosion or reasonable royalty, identification of any documents that support Ariad's claim for damages, and the person or persons most knowledgeable of Ariad's claimed damages, including any experts that Ariad has retained in furtherance of its damages claims.

**RESPONSE TO INTERROGATORY NO. 15:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to this interrogatory as premature and non-sensical in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. In addition, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in its Rule 26(a)(1) Initial Disclosure, in light of its pending Motion to Dismiss, ARIAD does not seek damages at this time, as ARIAD believes that the case should be dismissed for lack of subject matter jurisdiction. ARIAD expressly reserves the right to seek damages at a later date if this suit is not dismissed, and to

modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

ARIAD supplements its initial response to Interrogatory No. 15 as follows:

ARIAD objects to this interrogatory because it seeks an expert determination and therefore is premature. ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine, (1) whether any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs, or (2) the amount of damages that ARIAD would be entitled to recover based on any such infringement. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken on these issues. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes an infringement contention and its analysis is completed.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Dated: October 11, 2006

174126.1

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2006, the attached **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF AMGEN INC.'S FIRST SET OF INTERROGATORIES TO DEFENDANT** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

BY HAND and VIA ELECTRONIC MAIL

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

VIA ELECTRONIC MAIL

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800

VIA ELECTRONIC MAIL

John G. Day

# EXHIBIT DD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION,

Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC.,

Defendant.

C.A. No. 06-259-MPT

**DEFENDANT ARIAD PHARMACEUTICALS, INC.'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Local Rules for the District of Delaware, Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") hereby supplements its responses to Plaintiffs' First Set of Interrogatories to Defendant as follows:

**INTRODUCTION**

This response is made solely for the purpose of this action. The response is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at the time of trial.

Objections to each interrogatory are made on an individual basis below. From time to time, for special emphasis, ARIAD will repeat in the specific objections certain objections also set forth in the general objections. The specific objections are submitted without prejudice to, and without in any way waiving, the general objections listed

below, but not expressly set forth in the response. The assertion of any objection to any interrogatory below is neither intended as, nor shall in any way be deemed, a waiver of ARIAD's right to assert that or any other objection at a later date. At this time, ARIAD shall not provide any information protected by any applicable privilege or doctrine.

No incidental or implied admissions are intended by the responses below. The fact that ARIAD has answered or objected to any interrogatory should not be taken as an admission that ARIAD accepts or admits the existence of any "facts" set forth or assumed by such interrogatory. The fact that ARIAD has answered part or all of any interrogatory is not intended to be, and shall not be construed to be, a waiver by ARIAD of any part of any objection to the interrogatory.

ARIAD's responses herein, and its disclosure of information, do not in any way constitute an acceptance of Plaintiffs' purported Instructions or its purported Definitions of words or phrases contained in its interrogatories. Consistent with applicable law, and without waiver or limitation of any of its objections, ARIAD has made a good faith effort to interpret the objectionable Definitions in Plaintiffs' interrogatories.

To the extent that ARIAD responds to any interrogatory, its responses reflect only the current state of knowledge, understanding, and belief of ARIAD with regard to matters about which inquiry has been made. As discovery in this matter is not yet complete, ARIAD may not yet have uncovered all information or facts pertinent to any such interrogatory and may not yet have identified or located all persons with knowledge of pertinent information or facts. ARIAD expects and consequently reserves the right to modify or supplement its response at a later time with any subsequently discovered fact or information that it may later recall or discover. ARIAD further reserves the right to change, amend or supplement any or all of the matters contained in this response as additional facts are ascertained, analyses are performed, research is completed and contentions are made. Furthermore, this response is provided without prejudice to using or relying on at trial any subsequently discovered information or facts, or information

omitted from these responses as a result of mistake, oversight, or inadvertence.  ARIAD further reserves the right to produce additional facts and evidence at trial and to object on appropriate grounds to the introduction into evidence of any portion of these responses. This response is also given without prejudice to ARIAD's right to advance contentions or make claims not yet advanced or made in the present action and to supplement this response as appropriate.

## GENERAL OBJECTIONS

ARIAD asserts the following General Objections with respect to each interrogatory:

1.    ARIAD objects to the First Set of Interrogatories and to each definition, instruction, and interrogatory therein to the extent that they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules for the District of Delaware ("Local Rules"), or any order or ruling by the Court in this action.  ARIAD shall not comply with any purported obligation not imposed by law.

2.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein on the ground and to the extent that they purport to seek information protected by the work product doctrine, attorney-client privilege, or any other privilege or restriction on discovery.  ARIAD will not produce information protected by such privileges or restrictions.  Any inadvertent or unintentional disclosure of such information shall not be deemed a waiver of any applicable privilege or restriction.

3.    ARIAD objects to the First Set of Interrogatories on the ground and to the extent that they seek information that is neither relevant to any claim or defense of a party, nor reasonably calculated to lead to the discovery of admissible evidence.

4.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are overbroad, unduly burdensome, oppressive, or seek

information that is beyond the scope of discovery under the Federal Rules of Civil Procedure, including but not limited to Federal Rule of Civil Procedure 26(b).

5.     ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they are vague, ambiguous, or without sufficient specificity to identify what information is requested.

6.     ARIAD objects to Plaintiffs' Interrogatories as premature.  In particular, ARIAD objects to Plaintiffs' Interrogatories as premature to the extent that they seek information that ARIAD is not required to disclose at this stage of litigation.  In addition, ARIAD's investigation is continuing and may result in additional contentions.  For the foregoing reasons, ARIAD's responses are not complete and cannot be completed at this time, and are subject to revision.

7.     ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are compound and are actually multiple interrogatories, on the ground that they are an impermissible effort to circumvent the fifty interrogatory limit set forth in Local Rule 26.1(b).

8.     ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek information that is publicly available, in the possession, custody or control of Plaintiffs or any person or entity other than ARIAD, and is equally accessible to Plaintiffs through means less burdensome to ARIAD.

9.     ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they call for a legal conclusion.

10.     ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek personal information that is protected by statutory, constitutional, common law or privacy rights.  ARIAD reserves the right not to provide any of this information until it receives appropriate approvals.  To the extent that ARIAD responds to these Interrogatories by referring Plaintiffs to documents pursuant to Federal

Rule of Civil Procedure 33(d), nothing herein shall affect in any way the confidentiality designations, if any, of those documents.

11. ARIAD objects to Plaintiffs' purported definitions of words and phrases contained in its interrogatories. ARIAD objects to Plaintiffs' definitions to the extent that they: (i) are unclear, ambiguous, overly broad, or unduly burdensome; (ii) are inconsistent with the ordinary and customary meaning of the words or phrases they purport to define; (iii) seek to impose obligations different from, or in excess of, those created by the Federal Rule of Civil Procedure and the Local Rules; (iv) include assertions of purported fact that are inaccurate or at the very least are disputed by the parties to this action; or (v) incorporate other purported definitions that suffer from such defects.

12. ARIAD, in particular, objects to the definition of "Ariad" set forth in paragraph 2 of the Definitions and Instructions to the extent it purports to impose discovery obligations on persons or entities other than the parties to this action, and to the extent it seeks discovery from individuals or entities over which ARIAD has no control.

13. ARIAD, in particular, objects to the definitions of "identify," "identity," and "identification" set forth in paragraphs 6 and 7 of the Definitions and Instructions to the extent they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules, or any order or ruling by the Court in this action.

14. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information concerning patent claims and claim terms that have not yet been construed by the Court. ARIAD reserves its right to modify or supplement its responses as a result of any rulings by the Court bearing on claim construction, and/or discovery bearing on claim construction.

15. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information dependent upon documents or other

information in the possession, custody and control of Plaintiffs, Plaintiffs' counsel, or third parties. ARIAD reserves its right to modify or supplement its responses in view of the discovery of information and review of documents received from Plaintiffs or third parties.

16. ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent that they purport to require ARIAD to search for information that is not within its possession, custody, or control. ARIAD will use reasonable diligence to locate information within its control.

17. ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent they call for information ARIAD does not have the authority to release. ARIAD will not disclose any of this information without approval.

18. ARIAD expressly incorporates each of the foregoing General Objections into each specific response to the interrogatories set forth below as if set forth in full therein. An answer to an interrogatory shall not work as a waiver of any applicable specific or general objection to an interrogatory.

**RESPONSES TO SPECIFIC INTERROGATORIES**

**INTERROGATORY NO. 2:**

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to ENBREL, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to ENBREL that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that ENBREL infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether ENBREL infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

ARIAD supplements its initial response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

ARIAD supplements its response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory insofar as the Court has not yet construed the claims of the '516 patent, ARIAD's investigation is still continuing, discovery is ongoing, and Plaintiffs did not produce any documents in this action until April 11, 2007. ARIAD reserves the right to modify or supplement its responses as ARIAD continues its investigation and as ARIAD reviews documents produced and other information provided by Plaintiffs or third parties (including but not limited to documents and information regarding ENBREL and Plaintiffs' activities related to ENBREL). ARIAD further reserves the right to modify or supplement its responses based on subsequent rulings by the Court, including but not limited to claim construction.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Plaintiffs and Wyeth have been and are currently directly infringing, contributorily infringing, and/or inducing infringement of the '516 patent by, among other things, making, using, offering to sell, selling and/or importing ENBREL, without authority or license from ARIAD. Plaintiffs' and Wyeth's activities related to ENBREL

are currently believed to infringe at least the claims listed below. ARIAD's investigation is continuing and discovery is still ongoing. ARIAD has not had an opportunity to review Plaintiffs' April 11, 2007 document production, which appears to contain over half a million pages based on Bates ranges produced. ARIAD expressly reserves the right to modify or supplement the information provided below, including but not limited to adding or removing particular claims from the '516 patent.

| **'516 Patent Claim** | **ENBREL** |
|---|---|
| **Claim 1** | |
| 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said gene is inhibited. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 2** | |
| 2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said genes is inhibited. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds selectively to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes. |

| '516 Patent Claim | ENBREL |
|---|---|
| | Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF selectively inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 5** | |
| 5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-kB in a eukaryotic cell comprising reducing NF-kB activity in the cell such that expression of said cytokine gene is reduced. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates certain cytokine genes.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF reduces the level of expression of certain cytokine genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 6** | |
| 6. A method for diminishing induced NF-kB-mediated intracellular signaling comprising reducing NF-kB activity in cells such that NF-kB-mediated intracellular signaling is diminished. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB-mediated intracellular signaling.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF diminishes induced NF-kB-mediated intracellular signaling by reducing NF-kB activity in human cells. |
| **Claim 18** | |
| 18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF |

| ’516 Patent Claim | ENBREL |
|---|---|
| mammalian cells comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells. | (including the subtype of TNF called TNF-α) and renders it unavailable for binding to TNF receptor, thereby reducing TNF-α activity.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF’s binding to its receptor causes intracellular signaling.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL’s binding to TNF-α reduces intracellular signaling caused by TNF-α by reducing NF-kB activity in human cells, which are a type mammalian cell. |
| **Claim 26** | |
| 26. The method of claim 1, carried out on mammalian cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on human cells, which are mammalian cells. |
| **Claim 27** | |
| 27. The method of claim 1, carried out on human cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on human cells. |
| **Claim 29** | |
| 29. The method of claim 26 or 27, carried out on lymphoid cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on lymphoid cells, including white blood cells of the immune system. |
| **Claim 37** | |
| 37. The method of claim 2, carried out on mammalian cells. | See claim 26. |
| **Claim 38** | |
| 38. The method of claim 2, carried out on human cells. | See claim 27. |
| **Claim 40** | |
| 40. The method of claim 37 or 38, carried | See claim 29. |

| ’516 Patent Claim | ENBREL |
|---|---|
| out on lymphoid cells. | |
| **Claim 59** | |
| 59. The method of claim 5, carried out on mammalian cells. | See claim 26. |
| **Claim 60** | |
| 60. The method of claim 5, carried out on human cells. | See claim 27. |
| **Claim 61** | |
| 61. The method of claim 59 or 60, carried out on immune cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on immune cells, including white blood cells of the immune system. |
| **Claim 62** | |
| 62. The method of claim 59 or 60, carried out on lymphoid cells. | See claim 29. |
| **Claim 70** | |
| 70. The method of claim 6, carried out on mammalian cells. | See claim 26. |
| **Claim 71** | |
| 71. The method of claim 6, carried out on human cells. | See claim 27. |
| **Claim 72** | |
| 72. The method of claim 70 or 71, carried out on immune cells. | See claim 61. |
| **Claim 73** | |
| 73. The method of claim 70 or 71, carried out on lymphoid cells. | See claim 29. |
| **Claim 183** | |
| 183. The method of claim 18, carried out on human cells. | See claim 27. |

| '516 Patent Claim | ENBREL |
|---|---|
| **Claim 184** | |
| 184. The method of claim 18 or 183, carried out on immune cells. | See claim 61. |
| **Claim 185** | |
| 185. The method of claim 18 or 183, carried out on lymphoid cells. | See claim 29. |

Facts relating to the above include information in the '516 patent and its prosecution history, the references cited in the prosecution history, Plaintiffs' prescribing information for ENBREL, information provided on Plaintiffs' websites at http://www.amgen.com and http://www.enbrel.com, and U.S. Patent Nos. 5,395,760; 5,605,690; 5,712,155; 5,945,397; 6,201,105; 6,572,852; and Re 36,755.

**INTERROGATORY NO. 3:**

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to KINERET, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to KINERET that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories.

Additionally, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that KINERET infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether KINERET infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

ARIAD supplements its initial response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly,

indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

ARIAD supplements its response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory insofar as the Court has not yet construed the claims of the '516 patent, ARIAD's investigation is still continuing, discovery is ongoing, and Plaintiffs did not produce any documents in this action until April 11, 2007. ARIAD reserves the right to modify or supplement its responses as ARIAD continues its investigation and as ARIAD reviews documents produced and other information provided by Plaintiffs or third parties (including but not limited to documents and information regarding KINERET and Plaintiffs' activities related to KINERET). ARIAD further reserves the right to modify or supplement its responses based on subsequent rulings by the Court, including but not limited to claim construction.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Amgen Inc., Amgen USA Inc., and Amgen Manufacturing Limited ("Kineret-Related Entities") have been and are currently directly infringing, contributorily infringing, and/or inducing infringement of the '516 patent by, among other things, making, using, offering to sell, selling and/or importing KINERET, without authority or license from ARIAD. The Kineret-Related Entities' activities related to KINERET are currently believed to infringe at least the claims listed below. ARIAD's investigation is continuing and discovery is still ongoing. ARIAD has not had an opportunity to review Plaintiffs' April 11, 2007 document production, which appears to contain over half a million pages based on Bates ranges produced. ARIAD expressly reserves the right to

modify or supplement the information provided below, including but not limited to adding or removing particular claims from the '516 patent.

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 1** | |
| 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said gene is inhibited. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 2** | |
| 2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said genes is inhibited. | Under one way in which the Kineret-Related Entities infringe, KINERET binds selectively and competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor selectively inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 5** | |
| 5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-kB in a eukaryotic cell comprising reducing NF-kB activity in the cell such that expression of said cytokine gene is reduced. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates certain cytokine genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor reduces the level of expression of certain cytokine genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 6** | |
| 6. A method for diminishing induced NF-kB-mediated intracellular signaling comprising reducing NF-kB activity in cells such that NF-kB-mediated intracellular signaling is diminished. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB-mediated intracellular signaling.<br><br>Under one way the Kineret-Related Entities infringe, KINERET's binding to Il-1 receptor diminishes induced NF-kB-mediated intracellular signaling by reducing NF-kB activity in human cells. |
| **Claim 18** | |
| 18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor, thereby reducing IL-1 activity.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to |

| '516 Patent Claim | KINERET |
|---|---|
| | its receptor causes intracellular signaling.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor reduces intracellular signaling caused by IL-1 by reducing NF-kB activity in human cells, which are a type of mammalian cell. |
| **Claim 26** | |
| 26. The method of claim 1, carried out on mammalian cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on human cells, which are mammalian cells. |
| **Claim 27** | |
| 27. The method of claim 1, carried out on human cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on human cells. |
| **Claim 29** | |
| 29. The method of claim 26 or 27, carried out on lymphoid cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on lymphoid cells, including white blood cells of the immune system. |
| **Claim 37** | |
| 37. The method of claim 2, carried out on mammalian cells. | See claim 26. |
| **Claim 38** | |
| 38. The method of claim 2, carried out on human cells. | See claim 27. |
| **Claim 40** | |
| 40. The method of claim 37 or 38, carried out on lymphoid cells. | See claim 29. |
| **Claim 59** | |
| 59. The method of claim 5, carried out on mammalian cells. | See claim 26. |

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 60** | |
| 60. The method of claim 5, carried out on human cells. | See claim 27. |
| **Claim 61** | |
| 61. The method of claim 59 or 60, carried out on immune cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on immune cells, including white blood cells of the immune system. |
| **Claim 62** | |
| 62. The method of claim 59 or 60, carried out on lymphoid cells. | See claim 29. |
| **Claim 70** | |
| 70. The method of claim 6, carried out on mammalian cells. | See claim 26. |
| **Claim 71** | |
| 71. The method of claim 6, carried out on human cells. | See claim 27. |
| **Claim 72** | |
| 72. The method of claim 70 or 71, carried out on immune cells. | See claim 61. |
| **Claim 73** | |
| 73. The method of claim 70 or 71, carried out on lymphoid cells. | See claim 29. |
| **Claim 183** | |
| 183. The method of claim 18, carried out on human cells. | See claim 27. |
| **Claim 184** | |
| 184. The method of claim 18 or 183, carried out on immune cells. | See claim 61. |
| **Claim 185** | |

| '516 Patent Claim | KINERET |
|---|---|
| 185. The method of claim 18 or 183, carried out on lymphoid cells. | See claim 29. |

Facts relating to the above include information in the '516 patent and its prosecution history, the references cited in the prosecution history, Plaintiffs' prescribing information for KINERET, information provided on Plaintiffs' websites at http://www.amgen.com and http://www.kineretrx.com, and U.S. Patent Nos. 5,075,222 and 6,599,873.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated: April 12, 2007

179674.1

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of April, 2007, the attached **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

BY HAND and ELECTRONIC MAIL

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

VIA FEDERAL EXPRESS and ELECTRONIC MAIL

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800

VIA FEDERAL EXPRESS and ELECTRONIC MAIL

[signature]
Tiffany Geyer Lydon