IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>　　　　　　　Defendants.<br><br>ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>　　　　　　　Counterclaim-Plaintiffs,<br><br>v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH,<br><br>　　　　　　　Counterclaim-Defendants. | C.A. No. 06-259-MPT<br><br>**REDACTED**<br>**PUBLIC VERSION** |

**DEFENDANTS-COUNTERCLAIM-PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
AMGEN'S MOTION TO PRECLUDE THE OPINIONS OF DR. KATHRYN CALAME
RELATING TO EXPERIMENTS CONDUCTED BY DR. JOEL POMERANTZ**

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard College and the Whitehead Institute for Biomedical Research*

{00218733;v1}

## Table of Contents

*Page*

Table of Authorities ..................................................................................................... ii

I.   Introduction ..................................................................................................... 1

II.  Summary of Argument ................................................................................... 3

III. Statement of Facts .......................................................................................... 3

IV.  Argument ......................................................................................................... 6

    A.  Rule 703 Permits Dr. Calame to Rely on the Results of the Infringement Experiments Even Though She Did Not Supervise Their Performance Herself. ............................................................. 6

    B.  Dr. Calame Can Offer Reliable Opinions on the Results of the Infringement Experiments. ........................................................... 10

V.   Conclusion ..................................................................................................... 14

## Table of Authorities

*Page(s)*

**Cases**

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002)..................................................................10, 11

*Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*,
  430 F. Supp. 2d 346 (D. Del. 2006)..................................................................3, 9, 11

*Daubert v. Merrell Dow Pharm. Inc.*,
  509 U.S. 579 (1993) .............................................................................................7, 9

*Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ................................................................................3, 8

*Ecolab, Inc. v. Amerikem Labs, Inc.*,
  98 F. Supp. 2d 569 (D.N.J. 2000) ..........................................................................10

*Gussack Realty Co. v. Xerox Corp.*,
  224 F.3d 85 (2d Cir. 2000) ......................................................................................8

*In re Paoli RR. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ....................................................................................10

*Inline Connection Corp. v. AOL Time Warner Inc.*,
  470 F. Supp. 2d 435 (D. Del. 2007).................................................................8, 9, 10

*Magistrini v. One Hour Martinizing Dry Cleaning*,
  180 F. Supp. 2d 584 (D.N.J. 2002) ........................................................................11

*Monsanto Co. v. David*,
  516 F.3d 1009 (Fed. Cir. 2008) .............................................................................3, 7

*Ratliff v. Schiber Truck Co.*,
  150 F.3d 949 (8th Cir. 1998)....................................................................................7

*Valentine v. Pioneer Chlor Alkali Co., Inc.*,
  921 F. Supp. 666 (D. Nev. 1996)............................................................................11

**Rules**

Fed. R. Evid. 703 ................................................................................................2, 3, 7, 10

Fed. R. Evid. 902 ............................................................................................................5

Defendants-counterclaim-plaintiffs (collectively, "ARIAD") submit this memorandum in opposition to plaintiffs-counterclaim-defendants' (collectively, "Amgen") motion to preclude certain opinions proffered by Dr. Kathryn Calame.

## I.  Introduction

In 2007, ARIAD retained Professor Joel Pomerantz, Ph.D., a molecular biologist and immunologist at the Johns Hopkins University School of Medicine, and former student of several leaders in the field of NF-κB research (including U.S. Patent No. 6,910,516 (the "'516 Patent) inventors, Ranjan Sen, David Baltimore, and Philip Sharp (Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 29:6-29:17, 119:10-21, 120:22-121:2)[1]), to perform certain experiments. The purpose of the experiments was to determine whether the administration of Enbrel to relevant cells exhibiting NF-κB activity induced by tumor necrosis factor ("TNF") inhibited that induced activity. To that end, using well-known, reliable biochemical assays strikingly similar to those Amgen itself uses in its own drug development work, Dr. Pomerantz conducted a series of experiments (the "Infringement Experiments"), and in accord with scientific practice designed to enable review and reliance by other scientists, carefully recorded his results in a laboratory notebook. (*See id.* at 18:1-5, 18:16-19:8.) That notebook was produced to Amgen in its entirety at the outset of expert discovery.

Based on review of the Infringement Experiments recorded in Dr. Pomerantz's notebook, Dr. Kathryn Calame, Professor of Biochemistry & Molecular

---

[1] Amgen's Memorandum in Support of the Motion to Preclude Certain Proffered Opinions of Dr. Kathryn Calame Relating to Experiments Conducted By Dr. Joel Pomerantz (D.I. 595) is referred to herein as "Amgen Br."; documents cited to herein are attached to the Supplemental Declaration of David Greenwald ("Greenwald Supp. Decl.") dated May 22, 2008.

{00218733;v1}                                   1

Biophysics and Microbiology at the Columbia University College of Physicians and Surgeons, and also an expert on gene regulation in immune cells (Greenwald Supp. Decl. Ex. 38, 3/26/2008 Calame Dep. at 5:20-21),

**REDACTED**

(Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶¶ 24-29, 33-40.)

Amgen has now moved to preclude Dr. Calame from testifying about the highly probative results of the Infringement Experiments. Amgen's motion has two prongs:

> (i) that the experimental results recorded in Dr. Pomerantz's notebook are not "data 'of a type reasonably relied upon by experts'" in Dr. Pomerantz's and Dr. Calame's common field because Dr. Calame did not design or conduct the experiments herself (*see* Amgen Br. at 5-7); and

> (ii) that ARIAD cannot meet its burden of proving that the Infringement Experiments are reliable because Dr. Calame is not sufficiently familiar with how they were performed (*see id.* at 7-8).

The Rules of Evidence and case law reject both arguments. Just as reliance by senior scientists on experiments performed by others, whether in their own labs or in the labs of others, is a staple of modern scientific practice, so too, Federal Rule of Evidence 703 and cases construing it, fully contemplate expert testimony by a scientific expert about experiments conducted by other eminently qualified scientists in her own field, even if she did not direct or perform the experiments herself. Dr. Calame's credentials, background, and personal experience with performing the same type of standard gene

{00218733;v1}                                              2

expression assays Dr. Pomerantz used (Greenwald Supp. Decl. Ex. 38, 3/26/2008 Calame Dep. at 91:8-15), fully qualified her to rely upon the results of the Infringement Experiments in formulating her opinion that Amgen is infringing the patent-in-suit.

## II.   Summary of Argument

1.   That Dr. Calame did not personally perform or direct the experiments did not affect her ability to rely upon their results in formulating her expert opinion. *See Monsanto Co. v. David*, 516 F.3d 1009 (Fed. Cir. 2008); *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002); *Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346 (D. Del. 2006). The weight of case law as well as the plain language of Rule 703 indicate that Dr. Calame may rely on the Infringement Experiments, since they possess indicia of reliability and are the type of experiments on which experts in Dr. Calame's field would typically rely. (*See infra* at IV.A.)

2.   Dr. Calame's opinions regarding the Infringement Experiments are reliable. (*See infra* at IV.B.) Dr. Calame works in the same field as Dr. Pomerantz and is personally familiar with the type of assays and techniques Dr. Pomerantz used. Dr. Calame's interpretation of those experiments is highly reliable. *See Dura Automotive*, 285 F.3d at 612-13.

## III.   Statement of Facts

Dr. Kathryn Calame is Professor of Biochemistry and Molecular Biophysics and Microbiology at Columbia University's College of Physicians and Surgeons. (Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 1.) Dr. Calame has devoted her 33-year career to the study of gene regulation, particularly in cells of the immune system. Dr. Calame has submitted two expert reports on behalf of ARIAD, in which she has opined that         **REDACTED**

{00218733;v1}                                3

REDACTED

**REDACTED**   (*Id.* ¶ 10.) In her own work as a scientist, Dr. Calame has assessed the effect of transcriptional factors, including NF-κB, on gene expression through the use of "reporter assays." (*See* Greenwald Supp. Decl. Ex. 59, A. Shrivastava, S. Saleque, G. Kalpana, S. Artandi, S. Goff and K. Calame, *Inhibition of Transcriptional Regulator Yin-Yang-1 by Association with c-Myc Association*, 262 Science 1889-92 (1993); Ex. 60, Y. Lin, K. Wong and K. Calame, *Repression of c-myc Transcription by Blimp-1, an Inducer of Terminal B Cell Differentiation*, 276 Science 596-99 (1997).)

The term, "reporter assay," refers to a standard class of assays used to assess the extent to which a transcription factor can activate transcription of a gene. For example, in a "luciferase reporter" assay — one of several types of reporter assays commonly used by molecular biologists (*see* Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 131:16-24; Ex. 38, Calame Dep. at 89:18-90:16)[2] — transcription of a gene for the firefly-derived protein enzyme, "luciferase," is measured by assessing the amount of light emitted when the natural substrate of that enzyme, "luciferin," is added to cells that have been genetically engineered to carry a gene for luciferase. Because the light-emitting enzyme, luciferase, is produced by such cells only in the presence of a transcription factor, such as, for example, activated NF-kB, the amount of light that is emitted when luciferin is added directly correlates to the amount of activated transcription factor present in the cell. The light, which can be precisely measured by a

---

[2] *See, e.g.*, Greenwald Supp. Decl. Ex. 65, Fujita, *et al.*, *Interferon-β gene regulation: tandemly repeated sequences of a synthetic 6 bp oligomer function as a virus-inducible enhancer*, 49 Cell 357-367 (1987); Ex. 64, Pomerantz, *et al.*, *Card 11 mediated factor-specific activation of NF-κB by the T cell receptor complex*, 21 The EMBO Journal 5184, 5187 (2002).

machine, serves as a direct measure of gene expression promoted by the transcription factor of interest. Conversely, if an effective inhibitor of that transcription factor has been added, less light will be emitted, because the inhibition of the transcription factor will result in lower expression of luciferase. The use of luciferase reporter assays is standard within the field of transcription factor research. (*See* Greenwald Supp. Decl. Ex. 61, J. Hong, *et al.*, *TAZ, a Transcriptional Modulator of Mesenchymal Stem Cell Differentiation*, 309 Science 1074-77 (2005); Ex. 62, M. Schilling, *et al.*, *Re-evaluating the FOXO1-PGC-1α connection*, 443 Nature E10-11 (2003); Ex. 63, C. Malone, *et al.*, *B29 Gene Silencing in Pituitary Cells Is Regulated by Its 3' Enhancer*, 362 J. Mol. Biol., 173-183 (2006)[3]; *see also* Ex. 41, 5/12/2008 Pomerantz Dep. at 131:16-24)

In the course of formulating her opinions in this matter, Dr. Calame reviewed the laboratory notebook of Dr. Pomerantz.[4] The laboratory notebook records the results of several "NF-kB luciferase reporter assays" Dr. Pomerantz performed personally over the second half of 2007, in immune cells, including U-937 cells. U-937 cells are derived from human monocytes (*see* Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 18), a type of cell whose TNF-induced activity has been implicated in rheumatoid arthritis. (*See id.* ¶¶ 18, 23; *see also* Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 25:1-13.) Using standard molecular biology "transfection" techniques, Dr. Pomerantz engineered the U-937 cells to contain NF-kB luciferase

---

[3] Amgen's expert, Dr. Randolph Wall, is the senior author of this article.

[4] Although ARIAD does not believe that Dr. Calame's testimony about the results of the experiments requires admission of the underlying notebook, *see* below, section IV.A., ARIAD has laid a foundation for its admission. Dr. Pomerantz has executed a certification of the notebook complying with Fed. R. Evid. 902(11), and that certification has been produced to Amgen. (Greenwald Supp. Decl. Ex. 50, 5/12/2008.)

reporters — *i.e.*, genes encoding for production of luciferase only in the presence of activated NF-kB. He then exposed those transfected cells to TNF, and a few hours thereafter added Enbrel. He found that the resulting level of luciferase gene expression from the NF-kB-controlled reporter (as measured by light emission after luciferin is added) was higher in the presence of TNF, consistent with TNF's role as an inducer of NF-kB activity. By contrast, Dr. Pomerantz found the level to be significantly lower when Enbrel was added thereafter, demonstrating Enbrel's role as an inhibitor of TNF-induced NF-kB activity. Based in part on the results of the Infringement Experiments,

**REDACTED**

(Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶¶ 10-16.)

Dr. Calame's reliance on the results of luciferase NF-kB reporter assays to assess NF-kB activity has a counterpart in Amgen's own practice predating this lawsuit.

**REDACTED**

IV.  **Argument**

   A.  **Rule 703 Permits Dr. Calame to Rely on the Results of the Infringement Experiments Even Though She Did Not Supervise Their Performance Herself.**

Federal Rule of Evidence 703 provides in relevant part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to* the expert at or before the hearing.

Fed. R. Evid. 703 (emphasis added). The Advisory Committee note further explains:

> a source [of information upon which an expert may base an opinion] contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. . . . Thus a physician in his own practice bases his diagnosis on information from numerous sources . . . including . . . reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. . . . His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

Fed. R. Evid. 703 cmt. "Unlike an ordinary witness, *see* Rule 701, an expert is permitted wide latitude to offer opinions, including those not based on first hand knowledge or observation." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 592 (1993).

Consistent with this principle, and as the case law discussed below confirms, a scientific expert may form an opinion based on the results of experiments she neither designed nor conducted, so long as those experiments are reliable and of a type reasonably relied upon by experts in the field. In *Monsanto Co. v. David*, 516 F.3d 1009 (Fed. Cir. 2008), the Federal Circuit affirmed the admission of testimony by an expert who had relied on work conducted by a party's in-house scientists: "[n]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule 703." *Id.* at 1015 (citing *Ratliff v. Schiber Truck Co.*, 150 F.3d 949, 955 (8th Cir. 1998) (allowing an expert to base testimony on an unaffiliated and non-testifying third party's report)); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (stating that an expert "need not have conducted her own tests" and upholding admission of expert testimony where expert conducted no tests of her own and instead relied on experiments performed by defendant and a government agency). And in *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002), the court, per Judge Posner, stated that an expert is not limited to opining only on his own work. In a passage

especially germane to this motion, the court added that whether the individuals generating the underlying information are classified as "assistants" or as "independent experts" "make[s] no difference" to the analysis. *Id.* at 613. Although *Dura* noted that the analysis might be different if the testifying expert were acting as the "mouthpiece of a scientist in a different specialty," *id.* at 614, that is emphatically not the case here. Dr. Pomerantz and Dr. Calame are both molecular biologists who have devoted their careers to the study of gene regulation, particularly in immune cells. (*See* Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. Tr. 130:11-14; Ex. 23, 1/18/2008 Calame Report ¶ 5.) Both use and rely upon the type of reporter assays employed in the Infringement Experiments. (*See* Greenwald Supp. Decl. Ex. 38, 3/26/2008 Calame Dep. at 87:7-9; Ex. 41, 5/12/2008 Pomerantz Dep. at 102:24-103:3.)

Case law from this district is also in accord. In *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435 (D. Del. 2007), this Court declined to preclude testimony from economic/accounting experts who relied on "interviews with defendant's employees and third parties." *Id.* at 442. Because reliance on such sources of information was standard within the experts' field, this Court held preclusion was not appropriate. *See id.* at 443.

And in *Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346 (D. Del. 2006), the patentee moved to preclude, at the summary judgment stage, the opinion of the accused infringer's invalidity expert. The basis for the motion was the expert's "reliance in his report on the statements" of another expert who provided the testifying expert with his *recollection* — not written record — of experiments conducted several years prior. *Id.* at 363. The court denied the motion, holding that such reliance was proper and that any concerns "can fairly be dealt with on cross-examination, as it

goes to the weight, not the admissibility" of the expert's testimony. *Id.; cf. Daubert*, 509 U.S. at 596 (stating "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the appropriate means for attacking admissible expert testimony). Therefore, even if there were a genuine issue as to whether the Infringement Experiments are of a type reasonably relied upon by experts in Dr. Calame's field — 

**REDACTED**

makes no such argument here — the appropriate resolution would be for Amgen to attack the reliability of the experiments during deposition and cross-examination of Dr. Calame.[5] Exclusion of evidence — particularly evidence as central to this infringement suit as Dr. Calame's interpretation of the results of the Infringement Experiments — is not proper. *See Inline*, 470 F. Supp. 2d at 438 (citing *In re Paoli RR. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) ("exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant' disregard of a court order by the proponent of the evidence")).

Amgen's arguments to the contrary do not withstand analysis. According to Amgen, an unpublished laboratory notebook reflecting experiments not designed or conducted by the testifying expert can *never* meet the indicia of reliability

---

[5] Amgen has also had a full and fair opportunity to depose Dr. Pomerantz. Even though after receiving Dr. Pomerantz's notebook in January Amgen affirmatively elected *not* to depose Dr. Pomerantz, ARIAD, upon Amgen's belated request well after the close of expert discovery, made Dr. Pomerantz available for deposition. Amgen availed itself of this opportunity on May 12. *See Inline Connection Corp.*, 470 F. Supp. 2d at 442 (denying motion to preclude expert testimony based on information from third parties, when opponent had opportunity to depose sources of information).

necessary under Rule 703. (*See* Amgen Br. at 5-6.) But the cases Amgen cites stand, at most, for the uncontroversial principle that experiments an expert designs and supervises herself *can* be reliable, even if she does not perform them herself; not that personal design/supervision is a *sine qua non* of admissibility. In *Ecolab, Inc. v. Amerikem Labs, Inc.*, 98 F. Supp. 2d 569 (D.N.J. 2000), cited by Amgen at pages 5 and 6 of its opening brief, the defendant brought a motion to preclude the plaintiff's experts from testifying on the data informing their opinions, arguing the experts did not have sufficient knowledge of the underlying data to form reliable opinions. *Id.* at 574-75. The court *denied* the motion to preclude, having found "no legal authority holding that data are inadmissible unless the expert rendering an opinion personally conducted every aspect of the testing." *Id.* at 574. The other case Amgen cites, *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423 (S.D.N.Y. 2002), also fails to support its argument. Here too, the court *denied* motions to strike various experts' testimony, concluding that expert testimony is reliable where the testifying expert "relie[d] on his laboratory and competent scientist[s]" to conduct experiments upon which he based his opinion. *Id.* at 492. That holding is both uncontroversial and largely irrelevant. It does not follow that, contra, *e.g., Daubert, Dura, Monsanto, Inline,* and *Cryovac,* a scientific expert cannot rely on experiments not performed in her own laboratory.

   **B. Dr. Calame Can Offer Reliable Opinions on the Results of the Infringement Experiments.**

Amgen attempts to impeach Dr. Calame's understanding of the experiments Dr. Pomerantz performed, by suggesting that she lacked knowledge about "key" aspects of their design and execution. (Amgen Br. at 7-8.) An informed review of those aspects reveals, however, that nearly all relate to experiments either that Dr.

Pomerantz did *not* perform or to experiments he did perform but that did not yield results relevant to Dr. Calame's opinions. Amgen's arguments betray not only a fundamental misunderstanding of the law of expert evidence[6] but also of the nature of the experiments Dr. Pomerantz performed and on which Dr. Calame relied.

For example, Amgen faults Dr. Calame for not knowing why Dr. Pomerantz ordered cells from a "Ramos RA-1 cell line but never performed experiments with them." (Amgen Br. at 7.) But as Dr. Pomerantz testified at his deposition, there was a non-nefarious, fairly uninteresting explanation for the omission: Dr. Pomerantz ordered these lymphocytic cells at the very outset of his engagement, but then decided, after consultation with an expert retained by ARIAD, that use of U-937 cells would provide results more meaningfully related to rheumatoid arthritis; U-937 cells were monocytic, not lymphocytic, and were therefore felt to be more relevant to the pathophysiology of that disease. (*See* Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 25:1-13, 79:17-80:13; Ex. 23, 1/18/2008 Calame Report ¶¶ 18, 28-29; Ex. 25, 1/18/2008 Ravetch Report ¶¶ 32, 35.)[7] Because Dr. Pomerantz performed no

---

[6] The two cases Amgen does cite are irrelevant to Dr. Calame's ability to opine on the infringement experiments. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584 (D.N.J. 2002), cited by Amgen at page 7 of its brief, stands for only the uncontroversial proposition that expert opinion resting on "subjective belief or unsupported speculation" is not reliable. *Id.* at 603. In *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666 (D. Nev. 1996), also cited by Amgen at page 7 of its brief, expert testimony was precluded where the opinions were so deficient that they did not "rise to the level of 'scientific knowledge'." *Id.* at 672. These two extreme examples of defective expert opinion have no relevance to Dr. Calame's opinion or the experiments.

[7] Dr. Pomerantz also supplied a wholly non-nefarious explanation for why in certain preliminary experiments, he "added Enbrel before adding TNF-alpha." As Dr. Pomerantz testified, "I wanted to see what the effect would be if I added Enbrel first." (Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 82:16-17; *see also id.* at 55:1-9.) **REDACTED**

experiments with these cells, there was no reason for Dr. Calame to learn why they were ordered. That Dr. Calame might not, at her deposition, have been able to explain why certain experiments were not performed, does not mean she cannot opine on the reliability of experiments that were.

Similarly, Amgen attempts to disparage Dr. Calame's opinions because she did not take part in selecting the cell lines utilized in the experiments. (*See* Amgen Br. at 8.) That criticism is unfounded. That Dr. Calame did not play a role in the selection of the U-937 cell lines that Dr. Pomerantz used successfully, does not mean she cannot opine on the proper interpretation of the results of experiments in those lines. As an immunologist with extensive experience working with U-937 immune cells in culture, Dr. Calame is fully knowledgeable about the characteristics of U-937 cells — *e.g.*, monocytic lineage, responsiveness to TNF — that made them suitable hosts for the experiments Dr. Pomerantz performed. (*See* Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 18

**REDACTED**

Ex. 38, 3/26/2008 Calame Dep. at 45:3-7.)

Amgen's criticism of Dr. Calame that she did not know why Dr. Pomerantz chose the concentrations of TNF that he chose also misses the mark. (Amgen Br. at 8.) Based on his own experience in working with TNF, Dr. Pomerantz selected a

---

**REDACTED**
(*See* Greenwald Supp. Decl. Ex. 38, 3/26/2008 Calame Dep. at 79:16-80:7.)

suitable concentration of TNF, sufficient to generate measurable induction of NF-kB activity, which Dr. Pomerantz measured and documented. (*See* Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 42:15-43:23.) As he explained at his deposition, "I used a similar concentration [to the ones used in the experiments] in the past and similar concentrations have been used in the literature to induce NF-κB in different cells." (*Id.* at 42:17-22.) Amgen adduces nothing to suggest that the concentrations he used were in fact improper or excessive,

**REDACTED**

(*See* Greenwald Supp. Decl. Ex. 38, 3/26/2008 Calame Dep. at 81:25-82:3.) Amgen tellingly omits to mention this testimony by Dr. Calame.

Amgen also faults Dr. Calame because she did not know why Dr. Pomerantz "used certain stimuli other than Enbrel in his experiments." (Amgen Br. at 8.) Putting aside that Enbrel — an NF-kB *inhibitor* — was not used as a *stimulus* in any experiment, Amgen's argument does not undercut the force of Dr. Calame's opinions. In the specific experiments in U-937 cells on which Dr. Calame opined, the only NF-kB stimulus that was administered was TNF. In certain other experiments using a different, "Jurkat" cell line, Dr. Pomerantz used "anti-CD3" and "anti-CD28" antibodies, but simply as a positive control to ensure that those cells had intact NF-kB signaling pathways. (Greenwald Supp. Decl. Ex. 41, 5/12/2008 Pomerantz Dep. at 41:6-25.) Those stimulants — antibodies to surface molecules *not* present on the surface of U-937 cells — were not used in — and had no relevance to the Infringement Experiments in U-937 cells upon which Dr. Calame based her conclusion. Hence, again, there was no

reason for her to concern herself with the details of these separate, independent experiments, which her report did not concern.[8]

## V.  Conclusion

For all of the foregoing reasons, ARIAD respectfully requests that the Court deny Amgen's motion to preclude the opinions of Dr. Kathryn Calame relating to the Infringement Experiments.

ASHBY & GEDDES

/s/ *Lauren E. Maguire*

---

Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard College and the Whitehead Institute for Biomedical Research*

---

[8] Although Dr. Pomerantz was able to show successful inhibition of TNF-induced NF-kB activity in Jurkat cells, Dr. Calame relied on the results of experiments in U-937 cells in her expert report.

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008