## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION,
AMGEN USA INC., AMGEN MANUFACTURING
LIMITED, and IMMUNEX RHODE ISLAND
CORPORATION,

                Plaintiffs,

     v.

ARIAD PHARMACEUTICALS, INC., and THE
WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH,

                Defendants.

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, THE PRESIDENT AND FELLOWS
OF HARVARD COLLEGE, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,

           Counterclaim-Plaintiffs,

     v.

AMGEN INC., IMMUNEX CORPORATION,
AMGEN USA INC., AMGEN MANUFACTURING
LIMITED, IMMUNEX RHODE ISLAND
CORPORATION, and WYETH,

           Counterclaim-Defendants.

C.A. No. 06-259-MPT

**REDACTED**
**PUBLIC VERSION**

## DEFENDANTS-COUNTERCLAIM-PLAINTIFFS' MEMORANDUM IN OPPOSITION TO AMGEN'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc.,
Massachusetts Institute of Technology, the
President and Fellows of Harvard College and the
Whitehead Institute for Biomedical Research*

**Table of Contents**

Page

Table of Authorities ............................................................................................ ii

I.      Introduction and Summary of Argument .................................................. 1

II.     Summary Judgment Standards ................................................................. 2

III.    Relevant Background ................................................................................ 3

IV.     Argument .................................................................................................. 7

        A.    The Asserted Claims Cover Extracellular Methods of Reducing
              NF-κB Activity in Cells ................................................................... 7

        B.    ARIAD Has Not Disclaimed During the Reexamination of the '516
              Patent Extracellular Methods of Reducing NF-κB Activity. .......... 7

              1.    The Law of Prosecution Disclaimer ...................................... 8

              2.    Statements by ARIAD's Counsel During the
                    Reexamination Do Not Amount to a Disclaimer of
                    Extracellular Methods ............................................................ 9

              3.    Statements by Dr. Verma During the Reexamination
                    Concerning the Use of Antibiotics Do Not Amount to a
                    Disclaimer of Extracellular Methods. .................................. 12

        C.    ARIAD's Infringement Expert Did Not Testify that Enbrel Does
              Not Infringe the Asserted Claims. ................................................ 17

        D.    ARIAD Has Made out a Prima Facie Case of Indirect
              Infringement. ................................................................................. 19

              1.    The Law of Indirect Infringement ........................................ 19

              2.    ARIAD Has Made out a Prima Facie Case of Induced
                    Infringement. ....................................................................... 20

              3.    ARIAD Has Made out a Prima Facie Case of Contributory
                    Infringement. ....................................................................... 22

V.      Conclusion .............................................................................................. 28

## Table of Authorities

**Cases** *Page(s)*

*Allen Organ Co. v. Kimball Int'l, Inc.,*
    839 F.2d 1556 (Fed. Cir. 1988) ................................................................20

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
    377 U.S. 476 (1964) ................................................................................20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................................3

*Cordant Tech., Inc. v. Alliant Techsys. Inc.,*
    45 F. Supp. 2d 398 (D. Del. 1999) ............................................................24

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005) ................................................................28

*DSU Medical Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) ................................................................21

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
    508 F.2d 1366 (Fed. Cir. 2007) ..................................................................9

*Felix v. Am. Honda Motor Co., Inc.,*
    2008 WL 961311 (D. Kan. April 9, 2008) ..................................................16

*Festo Corp. v. Shoketsu Kinzolu Kogyo Kabushiki Co., Ltd.,*
    344 F.3d 1359 (Fed. Cir. 2003) ................................................................16

*Hughes Aircraft Co. v. United States,*
    717 F.2d 1351 (Fed. Cir. 1983) ................................................................24

*Inline Connection Corp. v. AOL Time Warner, Inc.,*
    470 F. Supp. 2d 424 (D. Del. 2007) ............................................................3

*Innogenetics, N.V. v. Abbott Labs.,*
    512 F.3d 1363 (Fed Cir. 2008) ................................................................2, 8

*Insituform Techs., Inc. v. Cat Contracting, Inc.,*
    161 F.3d 688 (Fed. Cir. 1998) ..................................................................20

*Intel Corp. v. United States Int'l Trade Comm'n,*
    946 F.2d 821 (Fed. Cir. 1991) ..................................................................22

*Lucent Techs., Inc. v. Gateway, Inc.,*
    —F.3d—, 2008 WL 1970225 (Fed Cir., May 8, 2008) ..................................9

*Manville Sales Corp. v. Paramount Sys., Inc.,*
  917 F.2d 544 (Fed. Cir. 1990) ...................................................................19, 21

*Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,*
  66 F.3d 285 (Fed. Cir. 1995) ...........................................................................9

*Minnesota Mining & Mfg. Co. v. Chemque, Inc.,*
  303 F.3d 1294 (Fed. Cir. 2002) ..................................................................2, 21

*N. Telecom Ltd. v. Samsung Elecs. Co.,*
  215 F.3d 1281 (Fed. Cir. 2000) ........................................................................8

*Omega Eng'g., Inc. v. Raytek Corp.,*
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................8

*Purdue Pharma L.P. v. Endo Pharm. Inc.,*
  438 F.3d 1123 (Fed. Cir. 2006) ........................................................................8

*Reynolds Metals Co. v. Aluminum Co. of Am.,*
  457 F. Supp. 482 (N.D. Ind. 1978) ................................................................28

*Southwall Techs., Inc. v. Cardinal IG Co.,*
  54 F.3d 1570 (Fed. Cir. 1995) .........................................................................9

*Symantec Corp. v. Computer Assocs. Int'l.,*
  522 F.3d 1249 (Fed. Cir. 2008) ......................................................................20

*Trell v. Marlee Elecs. Corp.,*
  912 F.2d 1443 (Fed. Cir. 1990) ......................................................................20

*Warner-Lambert Co. v. Apotex Corp.,*
  316 F.3d 1348 (Fed. Cir. 2003) ......................................................................22

*Water Techs. Corp. v. Calco, Ltd.,*
  850 F.2d 660 (Fed. Cir. 1988) ........................................................................20

*Zenith Labs, Inc. v. Bristol-Myers Squibb Co.,*
  1992 WL 171910 (D.N.J. July 21, 1992) ........................................................23

**Statutes & Rules**

35 U.S.C § 271.............................................................................5, 7, 19, 28

Fed. R. Civ. P. 56.....................................................................................2

Defendants and counterclaim plaintiffs (collectively, "ARIAD") respectfully submit this memorandum in opposition to plaintiffs' (collectively, "Amgen") motion for summary judgment of noninfringement of U.S. Patent No. 6,410,516 (the "'516 Patent").

## I.    Introduction and Summary of Argument

Even though ARIAD has adduced substantial evidence that will enable it to prove indirect infringement by Amgen, Amgen has moved for summary judgment, arguing that (i) the asserted claims of the '516 Patent do not cover extracellular methods of reducing NF-κB activity; (ii) ARIAD has disclaimed an interpretation of the asserted claims that would reach the administration of Enbrel; (iii) ARIAD's infringement expert has purportedly admitted that the administration of Enbrel does not in fact infringe the asserted claims; and (iv) ARIAD cannot prove indirect infringement against Amgen. Amgen's motion should be denied for at least the following reasons:

1.    Amgen's argument that Enbrel does not infringe the '516 Patent fails because it is contingent upon an incorrect construction of the claims ARIAD has asserted against Enbrel.  In particular, as ARIAD demonstrated in its Opening Brief on Claim Construction (D.I. 577) and the Opposition Brief to Amgen's Opening Brief on Claim Construction being filed concurrently herewith, the asserted claims encompass both intracellular and extracellular methods of reducing NF-κB activity in cells.  Thus, even though available evidence indicates that Enbrel acts extracellularly, its administration falls within the scope of the asserted claims.

2.    Contrary to Amgen's assertions, certain statements made during the re-examination of the '516 Patent by counsel for ARIAD and by an expert retained by

ARIAD, Dr. Inder Verma, do not disclaim a construction of the asserted claims that includes extracellular methods of reducing NF-κB activity.

3.    Amgen is incorrect that ARIAD's infringement expert in this case, Dr. Kathryn Calame, conceded that the administration of Enbrel does not fall within the scope of the asserted claims.

4.    Amgen's argument that ARIAD's claim for induced infringement should be dismissed because ARIAD will be unable to prove Amgen's intent to induce infringement is incorrect because it relies upon a fundamental misinterpretation of the applicable law. Because the administration of Enbrel infringes the '516 Patent and there are no approved, non-infringing uses for Enbrel, Amgen's admissions that it promotes Enbrel and that it provides prescribing information for Enbrel to treating physicians and patients, are sufficient to support a finding of intent to induce. *See Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002).

5.    Summary judgment is similarly inappropriate with respect to Amgen's contributory infringement claims because it is genuinely disputed that Enbrel has any noninfringing approved use, let alone "substantial noninfringing uses."

II.    **Summary Judgment Standards**

Summary judgment is appropriate when, "drawing all reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact and no reasonable jury could return a verdict for the non-movant." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1378 (Fed Cir. 2008); *see also* Fed. R. Civ. P. 56(c). The movant bears the burden of establishing that there is no genuine issue of material fact by demonstrating "an absence of evidence to support the nonmoving party's case." *Inline*

*Connection Corp. v. AOL Time Warner, Inc.*, 470 F. Supp. 2d 424, 431 (D. Del. 2007)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

**III.    Relevant Background**

Nuclear transcription factor NF-kappaB ("NF-κB") is an intracellular

messenger found in the cytoplasm of many eucaryotic (including human) cells.

(Greenwald Supp. Decl. Ex. 25, 1/18/08 Ravetch Rep. ¶¶ 24-25.)  NF-κB is involved in,

among other things, the regulation of the cellular response to stress or damage,

including the inflammatory/immune response.  (*Id.*)  In cells where it is present, NF-κB

is normally found in an inactivated complex with an inhibitory protein called IκB.

(Greenwald Supp. Decl. Ex. 25, 1/18/08 Ravetch Rep. ¶ 26; Greenwald Supp. Decl. Ex.

23, 1/18/08 Calame Rep. ¶ 7.)  Upon stimulation by an external stimulus, NF-κB

dissociates from that complex and translocates to the nucleus to initiate the process of

gene expression.  (Greenwald Supp. Decl. Ex. 25, 1/18/08 Ravetch Rep. ¶ 26.)

There are many extracellular stimuli that induce NF-κB activity,

including growth factors, bacterial or viral proteins (*i.e.*, proteins produced by bacteria

or viruses, respectively) and cytokines (soluble proteins produced by cells as a means of

sending "signals" to other cells).  (*Id.* at ¶ 27.)  One cytokine that has been demonstrated

to play a role in the induction of NF-κB activity is tumor necrosis factor ("TNF").  (*Id.*)

The binding of TNF to its cell-surface receptor induces the intracellular NF-κB signal

transduction pathway, which ultimately stimulates, among other things, the further

production of TNF, whose gene is under the control of NF-κB.  (*Id.* at ¶ 28.)  Increased

levels of TNF in the extracellular space also stimulate the appearance of greater numbers

of TNF receptors on certain cell surfaces, thereby amplifying the effects of circulating

TNF and stimulating further production of TNF.  (*Id.*)

TNF has been implicated in a number of inflammatory diseases, including rheumatoid arthritis, psoriasis and psoriatic arthritis, a form of arthritis that affects many psoriasis patients. (*Id.* at ¶ 31.) Thus, high levels of TNF are present in arthritic serum and synovial fluid, where they exacerbate inflammation. (*Id.*) High levels of TNF are also present in psoriatic tissue, where they cause proliferation of keratinocytes (*i.e.*, one of the four principal types of cells that make up the outermost layer of the skin). (*Id.*) Ankylosing spondylitis, an autoimmune disease unrelated to arthritis, has similarly been reported by some researchers to be associated with elevated levels of TNF. (Greenwald Supp. Decl. Ex. 5, Jenniffer D. Gorman, *et al.*, *Treatment of Ankylosing Spondylitis by Inhibition of Tumor Necrosis Factor a*, 346 New England J. Med. 1349-56 (2002) ("Gorman, New England J. Med.").)

The '516 Patent, entitled "Nuclear Factors Associated with Transcriptional Regulation," claims certain artificial methods of regulating the activity of NF-κB. Importantly, the asserted claims of the '516 Patent are directed to reducing NF-κB activity in cells where NF-κB activity has already been induced, *i.e.*, activated. The manipulation taught by the '516 Patent can occur at any of the steps of the NF-κB pathway, which consists of a cascade of signaling events that begins with the binding of an extracellular stimulus to its receptor, continues with the intracellular transmission of the signaling cascade leading to NF-κB activation, and culminates with the expression of genes and the synthesis of proteins encoded by those genes, including TNF. (Greenwald Supp. Decl. Ex. 25, 1/18/08 Ravetch Rep. ¶ 63.)

Enbrel, a product Amgen manufactures, markets and sells in the United States and Canada, is a "fusion protein," consisting of the portion of the TNF receptor (*i.e.*, the cell-surface receptor to which TNF binds) fused to a portion of an antibody

protein.  (1/18/08 Ravetch Rep. ¶ 34.)  Enbrel is approved by the Food and Drug

Administration ("FDA") for the treatment of rheumatoid arthritis, psoriasis, psoriatic

arthritis and ankylosing spondylitis.  (Greenwald Supp. Decl. Ex. 26, 1/18/08 Sullivan

Rep. ¶ 37.)

> In this litigation, ARIAD claims that the administration of Enbrel to

rheumatoid arthritis, psoriasis, psoriatic arthritis and ankylosing spondylitis patients

directly infringes the '516 Patent, and that Amgen's promotion and sale of Enbrel for

treatment of those conditions amounts to indirect infringement (*i.e.*, inducement,

contributory infringement and violations of 35 U.S.C. 271(f)) of the '516 Patent.  ARIAD

possesses substantial evidence that the administration of Enbrel for any of the conditions

for which it bears FDA approval directly infringes the asserted claims of the '516 Patent.

As noted, patients with psoriasis, psoriatic arthritis, rheumatoid arthritis and ankylosing

spondylitis are known to possess elevated levels of TNF.  (Greenwald Supp. Decl. Ex. 36,

3/20/08 Koch Dep. at 23:5-24:22; Gorman, New England J. Med.)  Although Enbrel's

mechanism of action is not fully characterized, Enbrel appears to work by binding to

circulating TNF, thereby interfering with its interaction with TNF receptors on a cell's

surface.  (Greenwald Supp. Decl. Ex. 25, 1/18/08 Ravetch Rep. ¶ 35.)  By interfering

with the binding of TNF to receptors on the cell, the NF-κB signaling cascade is

inhibited.  (*Id.*)  Medical literature indicates that NF-κB activity is induced in patients

with psoriasis and patients with rheumatoid arthritis, and that Enbrel reduces those

induced levels.  (P. Lizzul, *et al.*, *Differential Expression of Phosphorylated NF-κB/RelA in*

*Normal and Psoriatic Epidermis and Downregulation of NF-κB in Response to Treatment with*

*Etanercept*, J. Invest. Dermatol., 124:1275-1283 (2005) (the "Lizzul article"); I. Dichamp, *et*

*al.*, *Increased Nuclear Factor-κB Activation in Peripheral Blood Monocytes of Patients with*

*Rheumatoid Arthritis Is Mediated Primarily by Tumor Necrosis Factor-a*, J. Rheumatol. 34:1976-83 (2007) (the "Dichamp article").)  In addition, laboratory experiments conducted by Dr. Joel Pomerantz, a professor at Johns Hopkins University School of Medicine retained by ARIAD, demonstrate that NF-κB activity induced by the prior administration of TNF is reduced by the administration of Enbrel.  This evidence, individually and in the aggregate, demonstrates that the administration of Enbrel directly infringes the asserted claims of the '516 Patent.

Furthermore, ARIAD possesses substantial evidence that Amgen promotes such direct infringement by encouraging and assisting patients to use Enbrel for treatment of conditions for which it is FDA-approved.

REDACTED

(Greenwald Supp. Decl. Ex. 23, 1/18/08 Calame Rep. ¶¶ 35-42.)

REDACTED

(*id.* ¶ 41).[1]  ARIAD alleges that, by promoting the use of Enbrel for patients with rheumatoid arthritis and psoriasis, with full knowledge that such use would result in direct infringement of the '516 Patent, Amgen possesses the requisite specific intent to induce infringement pursuant to 35 U.S.C § 271(b).

In addition, by selling and promoting the use of Enbrel to patients with psoriasis and rheumatoid arthritis, Amgen contributorily infringes the asserted claims of

---

[1] In addition, on January 31, 2008, ARIAD sent Amgen's general counsel a copy of the October 2007 Dichamp article, which demonstrates that treating rheumatoid arthritis patients with Enbrel infringes the '516 Patent. (Greenwald Supp. Decl. Ex. 28, 1/31/2008 Allen Letter to David Scott.)

the '516 Patent pursuant to 35 U.S.C. 271(c). Amgen has had notice of the '516 Patent

since that patent's issuance, and has also known that patients using Enbrel directly

infringe the '516 Patent. ARIAD disputes that Enbrel has any approved non-infringing

use. (Greenwald Supp. Decl. Ex. 23, 1/18/08 Calame Rep. ¶ 17.)

IV.     **Argument**

> A.     **The Asserted Claims Cover Extracellular Methods of Reducing NF-κB
>        Activity in Cells.**

As a threshold matter, Amgen argues that the asserted claims of the '516

Patent cover only intracellular methods of reducing NF-κB Activity. As ARIAD

demonstrated in its Opening Brief on Claim Construction (D.I. 577) and in its Opposition

to Amgen's Opening Brief on Claim Construction being filed concurrently with this

pleading, the asserted claims do not draw the distinction that Amgen urges the Court to

adopt between extracellular and intracellular methods of reducing NF-κB activity in

cells. Amgen admits that whether it is entitled to summary judgment on this ground is

entirely contingent upon a ruling from this Court adopting the constructions of the

asserted claims that Amgen has proposed. (Amgen Br. at 14-15.) For the reasons set

forth in ARIAD's claim construction briefs, Amgen's constructions should be rejected.

> B.     **ARIAD Has Not Disclaimed During the Reexamination of the '516
>        Patent Extracellular Methods of Reducing NF-κB Activity.**

Amgen contends that during the reexamination of the '516 Patent ARIAD

disclaimed, through statements made by its reexamination counsel and its expert, an

interpretation of the asserted claims that covers "the situation in which an inhibiting

agent prevents an external stimulus, *i.e.* something outside the cell, from having the

functional effect of inducing NF-κB activity." (Amgen Br. at 6-7; *see also id.* at 16-20.) In

other words, Amgen claims that ARIAD has disavowed an interpretation of the asserted

claims that would read on NF-κB inhibitors that, like Enbrel, do not enter the cell, but appear instead to act entirely outside it.

Amgen's disavowal arguments — which must be judged against a stringent standard that Amgen's brief omits to acknowledge — fail because they rely upon an inaccurate characterization of the reexamination record and of Dr. Verma's statements.

### 1.    The Law of Prosecution Disclaimer

A finding of prosecution history disclaimer requires a "clear and unmistakable disavowal." *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). As a matter of law, a finding of prosecution disclaimer is not appropriate in instances "where the alleged disavowal of claim scope is ambiguous," or where the record alleged to give amount to a disclaimer is "amenable to multiple reasonable interpretations." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (citing *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000)). Where there is a dispute as to what the patent applicant intended by particular statements alleged to give rise to a disclaimer, summary adjudication is inappropriate. *See Innogenetics*, 512 F.3d 1363, 1378 (Fed Cir. 2008).

Statements alleged to amount to a disavowal must be examined in context. That is because "the prosecution history must be viewed as a whole to determine whether and what subject matter was surrendered to procure issuance of the patent." *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 292 (Fed. Cir. 1995); *Lucent Techs., Inc. v. Gateway, Inc.*, —F.3d—, 2008 WL 1970225, at *9 (Fed Cir., May 8, 2008) (noting that the disputed statements regarding the prior art "must be read in the context of its overall argument distinguishing the claimed method from the method

disclosed" in the prior art); *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.2d 1366, 1372 (Fed. Cir. 2007) (finding no disclaimer after considering "the prosecution history as a whole," and rejecting defendant's claim that discrete statements effected a disclaimer); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1582 (Fed. Cir. 1995) ("[T]he prosecution history must be examined as a whole in determining whether, based on a particular argument, a particular estoppel applies.").

      2.      **Statements by ARIAD's Counsel During the Reexamination Do Not Amount to a Disclaimer of Extracellular Methods.**

Amgen argues that certain statements made by counsel for ARIAD in a submission to the PTO during the reexamination of the '516 Patent establish that the asserted claims do not cover agents that act extracellularly to prevent induction of NF-κB activity. (Amgen Br. at 6-9.) In the submission in question, in response to an Office Action rejecting a number of claims (including the seven asserted claims), counsel for ARIAD explained that the rejected claims were not anticipated by certain prior art references because, unlike the methods disclosed in those references, the methods of reducing induced NF-κB activity taught by the relevant claims of the '516 Patent contemplate the administration of an inhibitor of NF-κB activity only "subsequent to[] administering an inducer of NF-κB activity." (Greenwald Supp. Decl. Ex. 17, Reexamination Control No. 90/007,503 and 90/007,828, 10/22/2007 Response to Office Action ("10/22/07 Response") at 28.) In other words, counsel for ARIAD explained to the examiner the important distinction between methods of *reducing the effects of*

*induction* after the onset thereof (which are covered by the asserted claims) and methods

of *preventing induction* initially (which are not covered by the asserted claims).[2]

        In particular, Amgen points to the statement of ARIAD's reexamination

counsel that:

> Broadly speaking, there are the two types of methods to obtain a
> cell exhibiting reduced NF-κB activity[, which are] as follows:
> (a) reducing the induced NF-κB activity by intervening in the
> signaling pathway by which NF-κB activity is manifested
> including particularly intervening intracellularly at a specific
> segment within the signaling pathway; and (b) preventing the
> external inducing stimuli from inducing the intracellular signaling
> pathway through which NF-κB activity is manifested.

> Certain claims of the '516 Patent as issued covered both types of
> methods.  However, as discussed further in this response
> applicants maintain that the rejected claims now pending [which
> include claims 6, 18, 70-72 and 183-184]  are directed only to
> type(a) above.

(*See* Amgen Br. at 7 (quoting Greenwald Supp. Decl. Ex. 17, 10/22/2007 Response at 27-

28).)  Properly read in context, the statements at issue draw a distinction between (i)

methods of *reducing* pre-existing NF-κB activity, *i.e.*, treatment; and (ii) methods aimed

at *preventing* the very initiation of induction, *i.e.*, prevention or prophylaxis.  The former

are covered by the asserted claims of the '516 Patent, whereas the latter are not.  By

drawing this distinction, ARIAD did not thereby disclaim extracellular methods of

inhibiting previously induced NF-κB activity.  ARIAD's counsel was careful to note that

"intervening intracellularly" was a method that was "includ[ed]" within those falling

---

[2] ARIAD also incorporates by reference the discussion in its opposition, being filed
concurrently herewith, to Amgen's Opening Brief on Claim Construction (D.I. 581),
which presents at pp. 20-21 a similar "disclaimer" argument in support of Amgen's
position that the asserted claims are limited to intracellular methods of reducing NF-κB
activity.

within category (a), but did not thereby *exclude* extracellular methods from that category of methods.

That ARIAD did not intend to exclude extracellular methods is clear from the same submission. Immediately after making the quoted statement, and as a further explanation of ARIAD's position, counsel for ARIAD directed the examiner to, among other things, specific paragraphs of Dr. Verma's November 2006 declaration, on file with the PTO. (Greenwald Supp. Decl. Ex. 17, 10/22/07 Response at 28.) That declaration explained ARIAD's position that the NF-κB pathway consists of six steps, beginning with the "interaction of [an] extracellular influence with [a] receptor on [the] cell membrane" and ending with "[n]uclear processes leading to gene transcription." (Greenwald Supp. Decl. Ex. 7, November 9, 2006 Declaration of Dr. Inder Verma ("2006 Verma Declaration"), ¶ 9 and Exhibit 1, Schematic 2.) Dr. Verma further explained that the '516 Patent teaches methods of reducing induced NF-κB activity by "interfering anywhere along any" of those six steps, including "interfering" with the "interaction of [an] extracellular influence with [a] receptor on [the] cell membrane." (*See* Greenwald Supp. Decl. Ex. 7, 2006 Verma Declaration ¶¶ 9, 12 & Exhibit 1, Schematics 2, 3.) Thus, the position that reduction of induced NF-κB activity can be achieved through both intracellular and extracellular interventions is one ARIAD has consistently and unwaveringly taken. Had ARIAD intended to disclaim all methods, including treatment methods, of reducing NF-κB activity that involved blocking the interaction of an extracellular agent (*e.g.*, a cytokine) with its receptor, Dr. Verma's statement that the '516 Patent teaches methods that included interfering with the first step — binding of an extracellular influence with its external membrane receptor — would not have made sense.

Nor is there any risk that the examiner does not understand ARIAD's position. In a July 6, 2007 Office Action,[3] the examiner noted that ARIAD had argued that "[r]educing NF-κB activity . . . encompasses using agents that interfere at *any* of six activation events," and that the "activation in response to signals triggered by the interaction of certain *external* influences with receptors on the surface on the cell" was the first of those six "activating events." (Greenwald Supp. Decl. Ex. 12, 07/06/08 Office Action at 18 (emphases added).)[4] ARIAD respectfully submits that the examiner's interpretation of ARIAD's position in the reexamination is compelling proof that ARIAD did not disavow extracellular methods of inhibiting induced NF-κB activity.

### 3. Statements by Dr. Verma During the Reexamination Concerning the Use of Antibiotics Do Not Amount to a Disclaimer of Extracellular Methods.

Amgen also argues that ARIAD's reexamination expert, Dr. Verma, disclaimed in a declaration submitted to the PTO, a construction of the asserted claims that covers the administration of Enbrel. In the declaration in question, in response to an office action rejecting a number of claims (including the seven asserted claims), Dr. Verma sought to explain, among other things, why prior art references disclosing treatment with antibiotics does not inherently anticipate those rejected claims. The particular prior art references raised by the examiner relate to a type of toxins secreted by certain ("gram negative") bacteria — lipopolysaccharides (commonly referred to as

---

[3] Notably, the statements alleged to amount to a disclaimer appear in ARIAD's response to the July 2007 Office Action.

[4] *See also id.* ("the term 'reducing NF-κB activity' *at least* encompasses interference with any one of the six activation segments") (emphasis in the original); *see also* Exhibit 1, schematic 2 of 2006 Verma Declaration (delineating the six segments of the NF-κB pathway).

"LPS") — that have been demonstrated to induce NF-κB-regulated cytokine production. The examiner had argued that the use of antibiotics to combat bacterial infections caused by gram negative bacteria, prior to the applications for the '516 Patent, inherently anticipated the asserted claims because, by killing those bacteria, antibiotics eliminate the source of LPS and thereby reduce induced NF-κB activity. Responding to the examiner's concerns, in the portion of his declaration alleged to give rise to the disclaimer, Dr. Verma explained:

> In the case where LPS has already induced NF-κB activity, removal of LPS does not change such induced activity. The absence of LPS does not reduce induced NF-κB activity. LPS, when present, induces NF-κB activity, but when absent does not. Thus, according to the Examiner's theory, antibiotics can only prevent *induction* of NF-κB by LPS but under no theory or evidence presented in the July 6, 2007 Final Office Action can antibiotics *reduce NF-κB activity* . . . . .
>
> Though LPS induced activation of NF-κB, removing LPS ... merely prevents *further* induction of NF-κB. Thus the 1970 PDR provides no evidence that antibiotics can diminish induced NF-κB-mediated intracellular signaling as recited by claim 6.

(Greenwald Supp. Decl. Ex. 16, October 19, 2007 Declaration of Dr. Inder Verma ("2007 Verma Declaration") ¶¶ 114-15 (emphases added).)

Initially, Amgen appears to assert that the quoted portions of Dr. Verma's declaration are but a "repet[ition]" (Amgen Br. at 7) of reexamination counsel's arguments addressed in the foregoing pages. Because, as already discussed, no argument by ARIAD's counsel amounts to a disclaimer, Dr. Verma's alleged repetition of those arguments cannot give rise to a disclaimer either. Amgen also appears to argue that, standing on their own, Dr. Verma's statements disclaim (i) methods of reducing the activity of NF-κB targeting any external stimuli known to be inducers of such activity (such as TNF); and (ii) methods that prevent "further induction of NF-κB activity." (*See*

Amgen Br. at 7-8, 17.)  As is clear from an examination of the context for Dr. Verma's statements and of the entire record of the reexamination, Amgen has again misconstrued the course and content of the reexamination proceedings.

In arguing that the "[u]se of ENBREL to bind to TNF-α is analogous to use of antibiotics to stop bacteria from producing LPS" (Amgen Br. at 17), Amgen obscures an important distinction between antibiotics and agents that reduce NF-κB activity by interfering along the steps of the NF-κB pathway.  Whereas anti-cytokine agents, such as Enbrel, intervene at the first step of the NF-κB pathway — the binding of an extracellular agent to a surface membrane receptor, antibiotics do not intervene at that or at any of the five other steps of the pathway. That is because, as Dr. Verma explained, antibiotics, though extracellular, do not selectively target agonists (e.g., LPS, cytokines) that, but for their interception, would initiate the activation of NF-κB. Instead, antibiotics target and, if successful, kill the bacteria that would otherwise produce LPS. (Greenwald Supp. Decl. Ex. 16, 2007 Verma Declaration ¶ 114.)  It is therefore not surprising that Dr. Verma would argue that treatment with antibiotics does not fall within the scope of the asserted claims, while, as noted above, correctly maintaining that treatment with antagonists that act along the NF-κB pathway would be covered by those claims under ARIAD's view (and reexamination counsel's, for that matter).  The NF-κB pathway commences with the binding of a stimulus to its extracellular receptor, not further upstream.  The analogue to antibiotics in the context of this case would be an agent that, rather than binding to extracellular TNF, instead, killed the cells that were secreting it.   That is not the mechanism of action of Enbrel, and, more important, such an agent would not intervene at any of the six steps of the NF-κB pathway, as outlined by Dr. Verma and ARIAD during the reexamination.

Explanatory statements that Dr. Verma had provided in an earlier declaration submitted in the reexamination similarly demonstrate that Dr. Verma was well aware of, and did not attempt to blur, the distinction between antibiotics and agents that intercept agonists at the outset of the NF-κB pathway, before they bind to their receptors on the cell's surface. Thus, Dr. Verma explained that the use of antibiotics did not anticipate the claims because "[a]ntibiotics have no effect on any of the segments of the NF-κB pathway" and because they "do not act 'by blocking LPS that reaches the cell'" as the examiner had contended. (Greenwald Supp. Decl. Ex. 7, 2006 Verma Declaration ¶ 127.) Because Dr. Verma was drawing a sharp distinction between antibiotics and agents that do "block [cytokines from] reach[ing] the cell" (*see id.*), Amgen's statement that the "[u]se of ENBREL to bind to TNF-α is analogous to use of antibiotics" (Amgen Br. at 17) is wrong.

If anything, Amgen's conclusory argument that Dr. Verma's statement that "removing LPS . . . merely prevents further induction" amounts to an "explicit[] acknowledge[ment] that 'preventing further induction' was not covered by the remaining claims" (Amgen Br. at 8), is even more flawed. Indeed, the explanation that Amgen provides for its interpretation — "that ARIAD admits that the claims do not cover any type of interference with an external stimulus, whether it is done before or after an initial induction has taken place" (*id.*) — is the same erroneous argument repeatedly addressed above.

In fact, it is evident that what Dr. Verma intended to illustrate by using the phrase quoted by Amgen (*i.e.*, removal of LPS "merely prevents *further* induction," 2007 Verma Dec. ¶ 115), has nothing to do with a disavowal of scope that would eliminate Amgen's liability for infringement based on its manufacture and sales of

Enbrel. Because eucaryotic (*i.e.*, non-bacterial) cells do not produce LPS, the most that

removal of a source of LPS — such as the elimination of LPS-generating bacteria — will

accomplish is to prevent induction that would otherwise occur in the presence of the

LPS produced by those bacteria. Any NF-κB-induced gene products (such as, *e.g.*, TNF),

will continue to be produced, and if, like TNF, those gene products in turn stimulate and

amplify their own production, it is clear that antibiotics will not reduce any induced NF-

κB activity. Anti-cytokine agents, however, are different. As noted, the gene for TNF is

itself under the control of NF-κB. (*See* S. Ghosh, ed., Handbook of Transcription Factor

NF-kappaB (2007) at 6, 160-61.) Hence, blocking TNF from binding to its receptor will

not only reduce the extant amount of circulating TNF, but will also short-circuit the

further TNF-induced-, NF-κB-mediated production of TNF (and with it, induced NF-κB

activity), to the same extent and in the same way that an intracellular agent that blocks

transmission of a TNF-induced NF-κB signal would. Hence, Dr. Verma's observation

that antibiotics "merely prevent further induction," but do not "diminish induced NF-

κB-mediated intracellular signaling as recited by claim 6" (2007 Verma Dec. ¶ 115),

while true, has no implication for this case.[5]

---

[5] Referencing two publications that list Dr. Verma as co-author, specifically a 2002 publication that Dr. Verma co-authored with Dr. Qiutang Li (Sharp Decl. Ex. F) and a 2007 publication that Dr. Verma co-authored with Dr. Sebo Withoff and Dr. Vinay Tergaonkar (Sharp Decl. Ex. G), Amgen notes that "it is telling that Dr. Verma himself has described ENBREL's mode of action in terms that exclude it from coverage of the asserted claims." (Amgen Br. at 18.) As a threshold matter, even if Amgen were correct in its interpretation of those publications, which it is not, such publications may not support a finding of prosecution disclaimer because they were made by Dr. Verma and his co-authors outside the context of the reexamination. *See Felix v. Am. Honda Motor Co., Inc.*, No. 05-2525-CM, 2008 WL 961311, at *3 (D. Kan. April 9, 2008) (noting, in the context of a prosecution history estoppel claim, that "[t]he court may not consider information outside of the prosecution history record") (citing *Festo Corp. v. Shoketsu Kinzolu Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1370 (Fed. Cir. 2003)). To the extent that Amgen is arguing that those publications confirm Amgen's interpretation of Dr. Verma's statements already discussed above, Amgen is wrong. Most fundamentally,

C.     **ARIAD's Infringement Expert Did Not Testify that Enbrel Does Not Infringe the Asserted Claims.**

Amgen also takes the puzzling position that ARIAD's infringement

expert, Dr. Calame,                    **REDACTED**

(Greenwald Supp. Decl. Ex. 23,

1/18/2008, Calame Report ¶ 17),

       **REDACTED**                              (Amgen Br. at 18).  According to

Amgen, at her deposition, Dr. Calame,

                        **REDACTED**

       (*Id.* at 18-19.)  Amgen's characterization of Dr. Calame's deposition testimony

is inaccurate.  In fact, at her deposition and in her opening expert report, Dr. Calame

explained that

                        **REDACTED**

---

the publications in question do not draw a distinction between prevention of induction (*i.e.*, prevention or prophylaxis) and treatment of cells in which NF-κB activity is already induced.  Moreover, although the authors of the two publications explained that there are two broad categories of agents that can impact NF-κB, *i.e.*, agents that work outside the cell (such as antibiotics and TNF inhibitors) and agents that work inside the cell, the authors did not seek to categorize agents falling in the former category further, for instance based on whether they interact with the NF-κB pathway or, like antibiotics, act outside the pathway.  As previously explained, however, even though it is true that antibiotics and TNF inhibitors both work outside the cell, the crucial distinction between the two is that only the latter act directly on the NF-κB pathway, thereby infringing the '516 Patent.

(Greenwald Supp. Decl. Ex. 38, 3/26/08 Calame Dep. 238:9-14 (emphasis added);
*see also* Greenwald Supp. Decl. Ex. 23, 1/18/2007 Calame Report ¶¶ 10-29):[6]

**REDACTED**

(Greenwald Supp. Decl. Ex. 38, Calame Dep. 144:9-13.)

A simple illustration illuminates the fallacy in Amgen's argument.
Assume that at a given time, 100 molecules of TNF are present in the tissue surrounding
the joint of a rheumatoid arthritis patient, and that certain cells wherein NF-κB has
already been activated are in the process of producing another 100 such molecules of
TNF.[7] Assume that Enbrel is administered, and that, as a result 75 of the 100 TNF
molecules already present in the extracellular space are bound and prevented from
binding to TNF receptors. After the cells that were in the process of producing TNF
secrete those cytokines, the number of TNF molecules present in the extracellular space
would be 125 (25 original + 100 new). Assume that a second administration of Enbrel
will again bind 75 of those molecules, thereby leaving 50 unbound TNF molecules in the
extracellular space. It is thus clear that, after only two administrations of Enbrel, the
overall number of pro-inflammatory cytokines in that patient's tissue will have been
reduced. And because fewer TNF molecules continue to induce NF-κB, the level of
originally induced NF-κB activity will similarly decrease. And, lest there be any doubt

---

[6] At bottom, Amgen's argument with respect to Dr. Calame's testimony is nothing
but another version of its contention that the asserted claims do not cover extracellular
methods of diminishing induced NF-κB activity.

[7] As noted, ARIAD contends that the asserted claims read only on methods of
treatment that are practiced on cells in which NF-κB is already activated.

that Enbrel accomplishes a reduction in induced NF-κB activity, ARIAD has provided

ample, concrete evidence of infringement, including (i)

**REDACTED**

(Greenwald Supp. Decl. Ex. 23, 1/18/08 Calame Rep. ¶¶ 17-23);

**REDACTED**                           (*id.* at ¶¶ 24-29).

### D.    ARIAD Has Made out a Prima Facie Case of Indirect Infringement.

Amgen argues that ARIAD will be unable to prove induced infringement

at trial because it has no evidence that "Amgen had the intent specifically directed to

encouraging others to reduce NF-κB activity in cells, as required by the claims."

(Amgen Br. at 22.) Similarly, Amgen contends that, because "there is . . . no dispute that

ENBREL has substantial non-infringing uses" (*id.* at 24), it is entitled to summary

judgment on ARIAD's claim for contributory infringement.

### 1.    The Law of Indirect Infringement

The Patent Act proscribes both direct and indirect infringement. Thus,

provided that the patentee adduces proof of direct infringement, 35 U.S.C. § 271(b)

establishes liability for those who "actively induce[] infringement of a patent." To prove

active inducement, the patent holder must prove the indirect infringer's "specific intent

to encourage another's infringement." *Manville Sales Corp. v. Paramount Sys., Inc.,* 917

F.2d 544, 553 (Fed. Cir. 1990). Without more, mere "knowledge of the acts alleged to

constitute infringement" is insufficient to prove intent. *Id.* The burden is upon the

patentee to show that the accused indirect infringer "induced infringing acts *and* that he

knew or should have known his actions would induce actual infringements." *Id.* This

proof of intent need not be by direct evidence; circumstantial evidence may suffice.

*Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988); *Symantec Corp. v. Computer Assocs. Int'l.*, 522 F.3d 1249, 1293 (Fed. Cir. 2008). In addition, the accused indirect infringer must also have at least constructive knowledge of the patent in suit. *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 695 (Fed. Cir. 1998). An inquiry aimed at determining the presence or absence of intent contemplates "a factual determination particularly within the province of the trier of fact." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

Contributory infringement requires a showing that (i) the accused product is a non-staple, *i.e.*, it has no "substantial" non-infringing uses; (ii) the infringer knew that its product had no substantial non-infringing uses; and (iii) the infringer had knowledge of the patent in suit. *See Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447-48 (Fed. Cir. 1990); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964). [8]

### 2.    ARIAD Has Made out a Prima Facie Case of Induced Infringement.

Amgen argues that its efforts to market and sell Enbrel with full knowledge that such efforts would lead to infringement are insufficient to establish an intent to induce infringement. Instead, according to Amgen, ARIAD must prove that Amgen possessed the specific intent to "encourage others [specifically] to *reduce NF-κB activity in cells*." (Amgen Br. at 21 (emphasis added).) In other words, Amgen claims that, even though it admits that its sales force promotes Enbrel for infringing uses, thereby inducing direct infringement, Amgen may continue its infringing activities (i) because magic words such as "NF-κB" or "reduce NF-κB activity" are not featured in

---

[8] **REDACTED**
(Greenwald Supp. Decl. Ex. 15, 7/11/2007 Amgen's Responses to ARIAD's Second Set of Interrogatories, Response to Interrogatory No. 18.)

promotional literature and sales pitches; and (ii) treating physicians have no appreciation for Enbrel's mechanism of action. (*Id.* at 22-23.) Amgen's arguments are unavailing.

As the Federal Circuit noted in *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006), to prove inducement a plaintiff must prove direct infringement and the defendant's "affirmative intent to cause direct infringement."

REDACTED

(Greenwald

Supp. Decl. Ex. 23, 1/18/08 Calame Rep. ¶ 17),          REDACTED

(Greenwald Supp. Decl. Ex. 13, 7/11/2007 Amgen's Responses to ARIAD's First Set of Requests for Admission, Response to RFA No. 132; (ii)

REDACTED
; (Greenwald

Supp. Decl. Ex. 70, 12/21/2007 Amgen's Responses to ARIAD's Third Set of Requests for Admission, Responses to RFA Nos. 243-44); (iii)

REDACTED

(*id.* Response to RFA No. 257); and (iv)

REDACTED
(*id.* Response to RFA No. 256). In

other words, because ARIAD has adduced evidence of both direct infringement and intent to induce such infringement, it has made out a prima facie case of inducement. *See Minnesota Mining & Mfg. Co.*, 303 F.3d at 1305 (Fed. Cir. 2002) (holding that the defendant induced infringement of the plaintiffs' patents where, with awareness of those patents, the defendant supplied the infringing products to its customers with instructions on how they were to be used); *Manville*, 917 F.2d at 553 (holding that proof of intent is satisfied by proof that the inducer "knew or should have known his actions

would induce actual infringements."). Amgen's argument that, with respect to the intent element of the test, ARIAD must prove that Amgen intends to do more than promote and sell Enbrel with full knowledge that such promotion and sales efforts will lead to infringement (Amgen Br. at 21-24) is directly contrary to Federal Circuit precedent.[9]

Amgen is also wrong to suggest that the treating physicians' — or, for that matter, the patients' — failure to appreciate Enbrel's mechanism of action establishes that Amgen lacks the intent to induce infringement. "[T]here is no intent element to *direct* infringement." *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) (emphasis in the original).

### 3. ARIAD Has Made out a Prima Facie Case of Contributory Infringement.

Amgen also argues that ARIAD cannot prove contributory infringement because "there is and can be no dispute that ENBREL has substantial non-infringing uses." (Amgen Br. at 24.) To support this contention, Amgen appears to refer to

---

[9] Amgen's citation to *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003), as support for its contention only highlights the error in Amgen's arguments. In *Warner-Lambert*, Apotex obtained FDA approval to manufacture a generic version of Warner-Lambert's drug, Neurontin, for the treatment of epilepsy. Even though the use of Neurontin for epilepsy was non-infringing, the use of Neurontin for a whole host of neurodegenerative diseases was covered by a Warner-Lambert patent. Warner Lambert then sued Apotex for induced infringement, arguing that Apotex's generic product was being prescribed for the treatment of neurodegenerative diseases. Even though Warner-Lambert had no evidence that Apotex was promoting its generic Neurontin product for such infringing uses (indeed, such promotion would have been illegal), Warner Lambert argued that it was common knowledge in the industry that Apotex's generic product was being used off-label. After the district court dismissed Warner-Lambert's claim for induced infringement, the Federal Circuit affirmed. The Court reasoned that, absent evidence of Apotex's promotion or encouragement of off-label, infringing uses, Apotex's mere knowledge that infringement would occur was not enough to prove its intent. *Warner-Lambert*, 316 F.3d at 1364. Because there are no non-infringing uses for Enbrel and, unlike Apotex, Amgen actively encourages and promotes the use of Enbrel for infringing uses — indeed, Amgen claims to promote Enbrel for infringing uses *only* (Amgen Br. at 24) — Amgen's citation to *Warner-Lambert* is unpersuasive.

snippets of Dr. Calame's deposition testimony that purportedly establish that: (i) Dr. Calame cannot opine that "all" patients who have taken Enbrel in the United States and Canada since June 25, 2002, have infringed the '516 Patent; (ii) certain patients taking Enbrel for rheumatoid arthritis and psoriasis do not infringe the patent; and (iii) the use of Enbrel for ankylosing spondylitis does not infringe the '516 Patent. (*Id.*) ARIAD, however, disputes that Enbrel has noninfringing uses, let alone substantial noninfringing uses.

Contrary to Amgen's characterization, Dr. Calame's testimony that she could not opine that *all* patients who take Enbrel infringe the '516 Patent does not reflect an underlying defect in ARIAD's infringement argument, let alone an acknowledgement that Enbrel has no infringing uses. As a careful scientist, adherent to principles of empiricism,

**REDACTED**

Without analyzing the tissues of each of the hundreds of thousands of patients that have taken Enbrel, a principled scientist would hesitate to offer the opinion, as an absolute, that the population is without any variation. However, even if it were possible to collect tissue samples from each and every patient who has used Enbrel in the United States and Canada, it would have been unethical to do so (or, indeed, to take a sample from a *single* patient) for purposes of proving infringement in litigation. (Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 23.) *See also Zenith Labs, Inc. v. Bristol-Myers Squibb Co.*, No. 91-3423, 1992 WL 171910, at *17 (D.N.J. July 21, 1992) ("The opinions of [defendant's experts] that, given the nature of the experiments which would be required, *in vivo* experimentation could not be justified under medical ethics constraints merely to prove patent infringement, stands unrefuted

by Zenith."). Even though Amgen is correct that a 2007 clinical study

**REDACTED**

(Greenwald Supp. Decl. Ex. 38, 3/26/08

Calame Dep. 153-54), it would be incorrect to conclude that, in the case of rheumatoid

arthritis patients, the administration of Enbrel results in infringement in only 6 out of 7

cases. Indeed, that is no more true than saying that Enbrel should not bear FDA

approval because a small subset of rheumatoid arthritis patients who take Enbrel do not

respond to treatment.

Although, as a precondition of demonstrating Amgen's liability for

indirect infringement, ARIAD has the burden of proving direct infringement, ARIAD

need only do so by the preponderance of the evidence.[10]  It has clearly done so here:

even taking the 1-out-of-7 response rate on its face, it is more likely than not — *i.e.*, there

is a 84% chance — that a rheumatoid arthritis patient receiving Enbrel will exhibit a

reduction in her levels of activated NF-κB.  Amgen's infringement expert, Dr. Alisa

Erika Koch, does not meaningfully disagree:

**REDACTED**

---

[10] *Cordant Tech., Inc. v. Alliant Techsys. Inc.*, 45 F. Supp. 2d 398, 414 (D. Del. 1999)
(citing *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir. 1983)).

**REDACTED**

(Greenwald Supp. Decl. Ex. 36, 3/20/08 Koch Dep. at 161:13–162:19.)  Moreover, even if

Amgen were correct that Enbrel works in only 6 out of 7 patients, it would be wrong to

conclude that an *unsuccessful* administration of Enbrel to a rheumatoid arthritis amounts

to a "use" for Enbrel.  At bottom, Amgen's argument is that, because it is not always

efficacious, Enbrel has noninfringing "uses," and that such "uses" doom ARIAD's

contributory infringement claim.  But that is no more correct than saying that a

manufacturer of a non-staple product can avoid a charge of contributory infringement

by pointing out that one out of seven of its accused products is defective.  Clearly,

however, Enbrel is purchased and administered by patients because it is highly likely to

be effective in combating that disease, thereby infringing the '516 Patent.  Patients do not

"use" Enbrel because it may *not* be efficacious.  Thus, whether or not treatment is

ultimately successful, Amgen is wrong to suggest that some rheumatoid arthritis patients use its product for reasons other than treating their disease.[11]

ARIAD also disputes that infringement ceases to exist in a subset of psoriasis patients whose symptoms may abate after treatment with Enbrel. Psoriasis is a chronic disease characterized by elevated levels of TNF-$\alpha$, a pro-inflammatory cytokine that triggers the activation of NF-$\kappa$B. (Greenwald Decl. Ex. 23, 1/18/08 Calame Rep. ¶¶ 9, 11 & 25.) Although some psoriasis patients receiving treatment with Enbrel may stop exhibiting symptoms at some point during treatment, that does not mean that their NF-$\kappa$B levels cease to be downregulated by treatment with Enbrel. As Dr. Calame explained at her deposition:

**REDACTED**

(Greenwald Supp. Decl. Ex. 38, 3/26/08 Calame Dep. at 215:10-18.) Amgen's experts agree that, simply because the symptoms of psoriasis may no longer be noticeable, it doesn't mean that the underlying disease is "cured":

**REDACTED**

---

[11] Moreover, even if clinical trials for Enbrel may have shown that certain patients do not respond to treatment, outside the clinical trial context it is improbable that patients would pursue a treatment regimen with Enbrel if their condition did not improve as a result thereof.

**REDACTED**

(Greenwald Supp. Decl. Ex. 36, 3/20/08 Koch Dep. at 176:13-25.)

**REDACTED**

(Greenwald Supp. Decl. Ex. 37, 3/21/08 Jackson Dep. at 47:1-20.)

          Amgen's conclusory argument that the administration of Enbrel to an

ankylosing spondylitis patient does not infringe the '516 Patent is similarly unavailing.

As noted, ankylosing spondylitis is an autoimmune disease that appears to be associated

with elevated levels of TNF.  (Greenwald Supp. Decl. Ex. 5, Gorman, New England J.

Med.)  Because (i) TNF has been demonstrated to be an NF-κB inducer, (ii) Enbrel acts

by binding TNF and (iii) is efficacious in treating ankylosing spondylitis, it is reasonable

— and the jury should be permitted — to infer that the administration of Enbrel to an ankylosing spondylitis patient infringes the '516 Patent.

Moreover, even if Amgen were correct that the administration of Enbrel to an ankylosing spondylitis does not infringe the '516 Patent, ARIAD contests that its use to treat that fairly rare condition would be "substantial" for purposes of 35 U.S.C. § 271(c).                    **REDACTED**

(Greenwald Supp. Decl. Ex. 71, 3/7/08 Bratic Rep. Ex. 2.)  Whether such a small percentage constitutes a "substantial" use is a question more appropriately left to the jury, and summary judgment would be inappropriate.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1314 (Fed. Cir. 2005) (reversing a grant of summary judgment where "[a]s to contributory infringement, there [wa]s a genuine issue of material fact as to whether there [we]re substantial non-infringing uses of [defendant's] devices."); *Reynolds Metals Co. v. Aluminum Co. of Am.*, 457 F. Supp. 482, 509 (N.D. Ind. 1978), *rev'd on other grounds*, 609 F.2d 1218 (7th Cir. 1979).[12]

V.     **Conclusion**

For the foregoing reasons, Amgen's motion for summary judgment of noninfringement of U.S. Patent No. 6,410,516 should be denied.

---

[12] Enbrel obtained FDA approval for ankylosing spondylitis in July 2003, whereas Amgen's infringement began in June 2002.  Thus, even if Enbrel treatment for ankylosing spondylitis were noninfringing, the jury may still find contributory infringement for the time period between June 2002 and July 2003.

ASHBY & GEDDES

/s/ *Lauren E. Maguire*

Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology, the*
*President and Fellows of Harvard College and*
*the Whitehead Institute for Biomedical Research*

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008