## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br> Defendants. | C.A. No. 06-259-MPT <br><br> **REDACTED PUBLIC VERSION** |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH, <br><br> Counterclaim-Defendants. | |

## DEFENDANTS-COUNTERCLAIM-PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO AMGEN'S MOTION FOR SUMMARY JUDGMENT ON WILLFULNESS

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard College and the Whitehead Institute for Biomedical Research*

**Table of Contents**

*Page*

Table of Authorities .................................................................................................. ii

I.    Introduction ................................................................................................ 9

II.   Statement of Facts....................................................................................... 2

      A.    Amgen's Knowledge of the '516 Patent .......................................... 2

      B.    Additional Facts That Support a Finding That Amgen Acted
            Despite an Objectively High Likelihood That Its Actions
            Constituted Infringement of a Valid Patent ..................................... 4

      C.    Amgen Knew or Should Have Known of the Risk of Infringement............ 6

III.  Argument ..................................................................................................... 9

      A.    Relevant Legal Standards................................................................. 9

      B.    The Evidence Supports a Finding That Amgen Acted Despite an
            Objectively High Likelihood That Its Actions Constituted
            Infringement of a Valid Patent ...................................................... 10

      C.    The Evidence Supports a Finding That Amgen Knew or Should
            Have Known the Risk of Infringement ........................................... 12

      D.    Amgen Cannot Prove as a Matter of Law That Its Infringement
            Was Not Willful............................................................................. 13

            1.    The Date ARIAD Filed Its Counterclaims of Infringement
                  Does Not Bear on Amgen's Willfulness............................... 13

            2.    Amgen's Citation to Statements and Actions of Third
                  Parties Does Not Preclude a Finding of Willful
                  Infringement by Amgen. ..................................................... 14

            3.    PTO Reexamination Does Not Justify Willful Infringement,
                  Either Pre-Dating or Post-Dating the Initiation of the
                  Reexamination ................................................................... 17

            4.    Amgen's Election Not to Rely Upon an Opinion of Counsel
                  Weighs Against the Entry of Summary Judgment........................... 19

IV.   Conclusion................................................................................................. 19

## Table of Authorities

*Page(s)*

**Cases**

Acoustical Design, Inc. v. Control Elecs. Co.,
  932 F.2d 939 (Fed. Cir. 1991) ..........................................................................18, 19

Am. Med. Sys., Inc. v. Med. Eng'g Corp.,
  6 F.3d 1523 (Fed. Cir. 1993) ........................................................................... 16-17

Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.,
  No. 05 C 3684, 2008 WL 834443 (N.D. Ill. Mar. 27, 2008)...............................10

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ...........................................................................................13

Comark Commc'ns, Inc. v. Harris Corp.,
  156 F.3d 1182 (Fed. Cir. 1998) ...........................................................................15

Depomed, Inc. v. Ivax Corp.,
  532 F. Supp. 2d 1170 (N.D. Cal. 2007) ......................................................9, 10, 12

Energy Transp. Group, Inc. v. William Demant Holding AS,
  C.A. No. 05-422 GMS, 2008 WL 114861 (D. Del. Jan. 7, 2008)...................17, 19

Hoechst Celanese Corp. v. BP Chems. Ltd.,
  78 F.3d 1575 (Fed. Cir. 1996) .............................................................................17

In re Seagate Tech.,
  497 F.3d 1360 (Fed. Cir. 2007)......................................................................*passim*

Translogic Tech., Inc. v. Hitachi, Ltd.,
  No. CV 99-407-PA, 2004 WL 2260606 (D. Or. Oct. 5, 2004) .............................18

Transmatic, Inc. v. Gulton Indus., Inc.,
  53 F.3d 1270 (Fed. Cir. 1995) .............................................................................17

VNUS Med. Techs., Inc. v. Diomed Holdings, Inc.,
  527 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................10, 12, 13

**Statutes & Rules**

35 U.S.C. § 134...................................................................................................4, 18

35 U.S.C. § 141...................................................................................................4, 18

35 U.S.C. § 302.................................................................................................3

35 U.S.C. § 306...........................................................................................4, 18

Fed. R. Civ. P. 56.............................................................................................13

Defendants-counterclaim-plaintiffs (collectively, "ARIAD") submit this memorandum in opposition to the motion of plaintiffs-counterclaim-defendants (collectively, "Amgen") for summary judgment on willfulness.[1]

## I.    Introduction

Pointing to a handful of press articles, the ongoing reexamination proceedings and a few additional, external sources — but ignoring the evidence of willfulness ARIAD has adduced and citing no opinion of counsel — Amgen asks this Court to rule that its actions cannot, as a matter of law, support a jury finding that any of its infringement was willful.  The evidence already in the record, however, easily supports a finding of willful infringement.  At the very least, triable issues of fact exist that preclude summary judgment in Amgen's favor.

Amgen and Immunex, Amgen's subsidiary since July 2002, received notice of U.S. Patent No. 6,410,516 (the "'516 Patent") on June 25, 2002, the day the patent issued, having both been previously informed of its pendency.  The '516 Patent covers methods of inhibiting the expression of genes whose transcription is regulated by nuclear factor kappa B ("NF–κB").  Amgen's drug Enbrel inhibits the binding of tumor necrosis factor-α ("TNF") to its receptor, and TNF, in turn, induces NF-κB activity, a link that was known by the time the patent issued in 2002.  (*See infra* II.B.)  That Enbrel, in fact, reduces NF-κB activity has since been disclosed in publicly available articles (*see id.*) and demonstrated by Amgen's own studies (*see id.*).  The sources Amgen relies upon

---

[1] Amgen's Memorandum in Support of the Motion for Summary Judgment of Non-Willfulness (D.I. 605) is referred to herein as "Amgen Br."; documents cited to herein are attached to the Supplemental Declaration of David Greenwald ("Greenwald Supp. Decl.") dated May 22, 2008.  The Declaration of Melanie K. Sharp in support of Amgen's motion for summary judgment of non-willfulness is referred to herein as "Sharp Decl."

simply do not show as a matter of law that Amgen did not willfully infringe the '516

Patent because those sources are either irrelevant, incompetent or create triable issues of

fact (particularly when placed in the context of the affirmative evidence of willfulness

ARIAD has adduced) as to the weight they should be afforded. Moreover, several

sources Amgen relies upon, such as the reexamination proceeding, originated well *after*

issuance of the '516 Patent and the onset of Amgen's infringing activities.

## II.    Statement of Facts

### A.    Amgen's Knowledge of the '516 Patent

The '516 Patent issued on June 25, 2002, from U.S. Patent Application No.

08/464,364 ("'364 application"), filed June 5, 1995. Amgen and Immunex (the maker of

Enbrel, which was acquired by Amgen in July 2002) received actual notice of the

issuance of the '516 Patent from ARIAD on the day that the patent issued.[2] (*See*

Greenwald Supp. Decl. Ex. 15, 7/11/2007 Amgen's Response to ARIAD's Interrog. No.

18.) Through communications that pre-date June 25, 2002, Amgen, Immunex and

Amgen/Immunex's marketing partner, Wyeth, received notice of the pendency of the

'516 Patent. (Greenwald Supp. Decl. Ex. 2, ARI72027-030; Ex. 3, ARI71888-92; Ex. 4, ARI

71841-42.)

At the time the '516 Patent issued, Enbrel, the product whose

administration is alleged to infringe the '516 Patent, had been marketed for four years

and was a hugely successful product. (Greenwald Supp. Decl. Ex. 26, 1/18/2008

Sullivan Initial Report ¶¶ 80-84.) Enbrel's enormous market success notwithstanding,

neither Amgen nor Immunex took a license to the '516 Patent. Immunex, however,

contemplated the possibility of litigation with ARIAD immediately after it received notice of the pending claims of the '516 Patent. (Greenwald Supp. Decl. Ex. 14, 8/10/2007 Amgen Supp. Privilege Log, Item Nos. 3, 8, 9, 22 (asserting work product protection for documents dated 2001 and 2002).) There is no evidence that Immunex or Amgen attempted to design around the '516 Patent.

On April 4, 2005, before Amgen initiated the instant action, but well after Amgen received notice of the '516 Patent and continued selling Enbrel, Eli Lilly and Co. ("Lilly") petitioned the United States Patent & Trademark Office ("PTO") to reexamine the '516 Patent pursuant to 35 U.S.C. § 302. The PTO granted Lilly's petition, and commenced an *ex parte* reexamination proceeding. At that time, Lilly was involved in separate litigation with ARIAD relating to Lilly's infringement of the '516 Patent.[3] Following a fourteen-day trial, a jury returned a verdict in favor of ARIAD. The jury rejected Lilly's allegations that the '516 Patent was invalid and awarded ARIAD $65.2 million for past infringement, plus a running royalty equal to 2.3% of U.S. sales of Lilly's drugs, Evista and Xigris, through the year 2019, when the '516 Patent expires. (Greenwald Supp. Decl. Ex. 68, *Lilly* Verdict Form.) In July 2007, after a bench trial, the court rejected further challenges by Lilly to the validity and enforceability of the '516 Patent. (Greenwald Supp. Decl. Ex. 66, *Lilly* Findings of Fact.)

Amgen, which is headquartered in California, monitored the *Lilly* litigation and sent an in-house counsel and one of its Chicago outside counsel to attend

---

[2] **REDACTED** (Greenwald Supp. Decl. Ex. 30, 2/22/2008 Manbeck Report ¶ 15.)

[3] That litigation, filed in the United States District Court for the District of Massachusetts as *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.*, Civil Action No. 02 CV 11280 (the "*Lilly* litigation"), concerned claims distinct from those asserted here.

at least portions of that trial, which took place in Boston. (Amgen Mem. in Opp'n to ARIAD's Mot. to Dismiss (D.I. 21) at 5 ("Amgen in-house counsel Mr. Siegmund Gutman was present in the courtroom during the *Lilly* trial when ARIAD's 'list' of targeted companies and products was published to the world."); Declaration of Patricia Carson (D.I. 33) ¶ 8 ("Mr. Cantrell also discusses a conversation that I had during a break in the *Lilly* trial . . . with Siegmund Gutman and Mark Pals (who is lead counsel for Amgen in the current ARIAD-Amgen litigation).").)

Amgen has elected not to rely upon any opinion of counsel that it was not infringing the '516 Patent through its Enbrel-related activities, or that the patent was invalid. (Greenwald Supp. Decl. Ex. 18, 11/9/2007 McDole Letter at 1.)

After this litigation commenced, ARIAD moved for a stay of this litigation pending the resolution of the reexamination. This Court, however, denied ARIAD's motion. The reexamination proceeding is ongoing, and any adverse final decision can be appealed by ARIAD to the Board of Patent Appeals and Interferences, and thereafter to the Federal Circuit. *See* 35 U.S.C. §§ 306, 134, 141.

**REDACTED**

(*See* Greenwald Supp. Decl. Ex. 34, 3/7/2008 Manbeck Report ¶ 17.)

**B.    Additional Facts That Support a Finding That Amgen Acted Despite an Objectively High Likelihood That Its Actions Constituted Infringement of a Valid Patent**

The '516 Patent broadly covers a method of inhibiting the expression of genes whose transcription is regulated by NF–κB. NF–κB is a protein transcription factor that mediates the expression of a wide variety of genes in eukaryotic cells. (Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 7.) TNF is a cytokine that

induces NF–κB activity in cells. (*Id.* ¶ 8.)   Enbrel is a drug approved for the treatment of patients with rheumatoid arthritis, psoriatic arthritis and psoriasis. (*Id.* ¶ 9.)  Elevated levels of TNF have been identified in tissues from patients with these diseases. (*Id.*) Enbrel blocks the ability of TNF to bind to TNF receptors. (*Id.*)  Administration of Enbrel to a patient suffering from the inflammatory conditions for which it is prescribed reduces the level of TNF-induced NF–κB activity. (*Id.* ¶ 10.)

**REDACTED**

. (*Id.* ¶ 32; Greenwald Supp. Decl. Ex. 25, 1/18/2008 Ravetch Report ¶ 31 (citing publicly available articles); Ex. 33, 3/7/2008 Calame Report ¶ 33 n.52.)

**REDACTED**

(Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 32; Ex. 33, 3/7/2008 Calame Report ¶ 33.)

**REDACTED**

(Greenwald Supp. Decl. Ex. 33, 3/7/2008 Calame Report ¶¶ 33-34

**REDACTED**

(Greenwald Supp. Decl. Ex. 33, 3/7/2008 Calame Report ¶¶ 3-4).)  The first such study — which was funded by Amgen —and reported in Paul F. Lizzul, *et al.*, *Differential Expression of Phosphorylated NF-κB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF-κB in Response to*

*Treatment with Etanercept*, 124 J. Invest. Dermatol. 1275-83 (2005) (Greenwald Supp. Decl.

Ex. 6, the "Lizzul article"), provided powerful scientific evidence that etanercept (*i.e.*,

Enbrel) reduces NF–κB activity in psoriasis patients.  (*See id.* at 1276 (describing NF–κB

as one of the "downstream effectors" induced by TNF); *see also* Greenwald Supp. Decl.

Ex. 23, 1/18/2008 Calame Report at ¶¶ 24-26; Ex. 33, 3/7/2008 Calame Report ¶ 4; Ex.

34, 3/7/2008 Manbeck Report ¶ 11.)

**REDACTED**

(*See* Greenwald

Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 41 (citing AM-AR0225027); *see also* Ex.

20, 12/19/2007 Amgen RFA Resp. No. 205.)

The second study, reported in Isabelle Dichamp, *et al.*, *Increased Nuclear

Factor-κB Activation in Peripheral Blood Monocytes of Patients with Rheumatoid Arthritis Is

Mediated Primarily by Tumor Necrosis Factor-a*, 34 J. Rheumatol. 1976-83 (2007) (the

"Dichamp article"), demonstrates that Enbrel reduces TNF–induced NF–κB activity in

human immune cells taken from patients with rheumatoid arthritis.  (Greenwald Supp.

Decl. Ex. 9.)  The authors observed that those cells had elevated NF–κB activity, which is

"mediated primarily through production of endogenous TNF–α" and which can be

reduced by treatment with Enbrel.  (*Id.* at 1977.)

**REDACTED**

(Greenwald Decl. Ex. 23, 1/18/2008 Calame Report ¶¶ 27-29; Ex. 33, 3/7/2008 Calame

Report ¶ 4.)

**C.    Amgen Knew or Should Have Known of the Risk of Infringement.**

Much evidence already in the record supports a finding that Amgen

knew or should have known of the risk of infringement.

*First*, Amgen's own documents produced in this litigation show that Amgen knew or should have known of the relationship between Enbrel and NF-κB activity.  For example:

- REDACTED

  (*See, e.g.*, Greenwald Supp. Decl. Ex. 23, 1/18/2008 Calame Report ¶ 33 **REDACTED***see also id.* ¶ 35.)

- REDACTED    (*Id.* ¶ 42.)

- REDACTED    (*Id.* ¶ 36.)[4]

- REDACTED    (*Id.* ¶ 39.)[5]

*Second*, deposition testimony by Amgen scientists **REDACTED** (*See id.* ¶ 40 (citing **REDACTED** Mukku Dep. at 191:12-194:1; Goeddel Dep. at 45:22-52:23); Ex. 33, 3/7/2008 Calame Report ¶ 40 (citing Sealock Dep. at 58:6-60:10).)

---

[4]  REDACTED

(*Id.* ¶ 36 (citing AM-AR20000809).)

(citing AM-AR20000827).)    **REDACTED**    . (*Id.* ¶ 37

(*Id.*)

[5]    REDACTED    (Greenwald Decl. Ex. 33, 3/7/2008 Calame Report ¶ 41.)

*Third,* the evidence presented in response to ARIAD's Requests for

Admission

### REDACTED

(*See, e.g.,* Greenwald Decl. Ex. 23, 1/18/2008 Calame Report ¶ 45; *see also*

Ex. 13, Amgen Resp. to RFA Nos. 131, 132, 134, 136, 138 (admitting that Amgen

intentionally promotes the use of Enbrel in the United States).)

*Fourth,*
### REDACTED
(*See* Greenwald Decl. Ex. 23,

1/18/2008 Calame Report ¶ 41 (citing AM-AR0225027); *see also* Ex. 20, 12/19/2007

Amgen RFA Resp. No. 205.)

### REDACTED

(Greenwald Decl. Ex. 33, 3/7/2008 Calame Report

¶ 35.)

### REDACTED

(*See id.* ¶ 36 (citing AM-AR0402508, AM-AR0439038).)

### REDACTED

(Greenwald Supp. Decl. Ex. 31, 2/22/2008 Hooper Dep. at 67-

71.)

*Fifth,* ARIAD sent Amgen's General Counsel a copy of the Dichamp

article on January 31, 2008. (*See* Greenwald Supp. Decl. Ex. 9, 1/31/2008 Allen Letter.)

The accompanying letter informed Amgen's General Counsel that the Dichamp article

"confirm[s] that . . . Enbrel infringes" the '516 Patent when administered to patients. (*Id.*)

Finally, Amgen appears to have carefully monitored the *Lilly* litigation, even sending its in-house and outside counsel across the country to observe the *Lilly* trial firsthand. (*See supra* at 3-4.)

## III.    Argument

### A.    Relevant Legal Standards

"[T]o establish willful infringement, a patentee must [first] show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007). "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.* Among the factors to be considered in an analysis of willfulness is whether an alleged infringer received advice of counsel. Thus, "[a]lthough an infringer's reliance on favorable advice of counsel, or conversely his failure to proffer any favorable advice, is not dispositive of the willfulness inquiry, it is crucial to the analysis." *Id.* at 1369.

Where a party has moved for summary judgment of non-willfulness, the motion should be denied where "there is ample evidence upon which a reasonable juror could base the conclusion" that defendant sold its product "despite an objectively high likelihood that [its] actions constituted infringement of a valid patent." *Depomed, Inc. v. Ivax Corp.,* 532 F. Supp. 2d 1170, 1186 (N.D. Cal. 2007) (denying motion for summary judgment of no willful infringement "[b]ecause reasonable jurors could disagree on the

issue of willful infringement"); *accord VNUS Med. Techs., Inc. v. Diomed Holdings, Inc.,* 527

F. Supp. 2d 1072, 1075-76 (N.D. Cal. 2007). Similarly, summary judgment of non-

willfulness should be denied where alleged infringer had knowledge of the patent in

suit, and consequently "a trier of fact could reasonably find that [the infringing party]

had obtained actual knowledge of [the patent holder's] patented methods." *See VNUS*

*Med. Techs.,* 527 F. Supp. 2d at 1075.

Summary judgment may be denied even where the allegedly infringing

party argues that it was not aware of all steps in the patented method. *Id.* (rejecting

motion for summary judgment of no willful infringement where jury could find that the

infringer had obtained actual knowledge of the patented methods, including an

allegedly unknown step); *cf. Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.,*

No. 05 C 3684, 2008 WL 834443, at *16 (N.D. Ill. Mar. 27, 2008) (denying reconsideration

of finding of willful infringement where infringer was aware of the patent-in-suit and

continued sales after being sued). Summary judgment may also be denied where a

patent was well publicized and "[a] reasonable party would therefore have had ample

time to investigate and discover the relevant patent." *Depomed,* 532 F. Supp. 2d at 1186.

**B.**    **The Evidence Supports a Finding That Amgen Acted Despite an Objectively High Likelihood That Its Actions Constituted Infringement of a Valid Patent.**

There is ample evidence in the record upon which a reasonable juror

could find that Amgen sold Enbrel despite an objectively high likelihood that its actions

constituted infringement of a valid patent, including awareness of the patent and

knowledge that its product practiced the patented methods.

Amgen and its predecessor Immunex received notice from ARIAD of the

'516 Patent's issuance on June 25, 2002, the day the patent issued, having previously

been informed of ARIAD's pending patent rights. (*See supra* at 2.) There can be no question that Amgen and Immunex appreciated the potential implications of ARIAD's intellectual property; indeed, Amgen has asserted work product protection with respect to documents dating all the way back to 2001 and 2002. (Greenwald Supp. Decl. Ex. 14, 8/10/2007 Amgen Supp. Privilege Log, Item Nos. 3, 8, 9, 22.) There is no evidence of any efforts to design around the '516 Patent, nor Amgen has produced — and has formally elected not to rely on — any opinion of counsel that Amgen was not infringing the '516 Patent or that the patent was invalid. (*See supra* at 2, 4.) And the validity of the '516 Patent was upheld in the *Lilly* litigation, in which the jury and court found in favor of ARIAD and rejected Lilly's arguments that the '516 Patent was invalid and unenforceable. (*See id.* at 3.)

Enbrel blocks the ability of TNF to bind to TNF receptors (*see id.* at 5), and by the time that the '516 Patent issued in 2002, it was well known that treatment with TNF stimulates NF–κB activity (*see id.* at 5). Therefore, even before the link between Enbrel and NF–κB activity was made explicit in scientific articles, such as the Lizzul and Dichamp articles, the link between TNF and NF–κB had been established. (*See id.* at 5.) Later, the Lizzul and Dichamp articles confirmed that administration of Enbrel to patients diminishes induced NF–κB activity, and, therefore, that Enbrel works in a manner that infringes claims of the '516 Patent. (*See id.* at 5-6.)

Because there is ample evidence in the record upon which a reasonable juror could find that Amgen acted despite an objectively high likelihood that its sale of Enbrel constituted infringement of a valid patent, summary judgment should be denied. *Depomed*, 532 F. Supp. 2d at 1186; *VNUS Med. Techs.*, 527 F. Supp. 2d at 1075 (denying summary judgment of no willful infringement, where patent holder introduced

evidence that the alleged infringer had actual knowledge of the patent, and therefore "a trier of fact could reasonably find that [the alleged infringer's] sales thereafter constituted willful infringement").

### C.    The Evidence Supports a Finding That Amgen Knew or Should Have Known of the Risk of Infringement.

There is also ample evidence in the record upon which a reasonable juror could find that Amgen knew or should have known the risk of infringement. Amgen had knowledge of the '516 Patent since at least June 25, 2002 (*see supra* at 2); Amgen likely knew the mechanism of action of Enbrel (*id.* at 7); Amgen likely knew, based upon the Lizzul article, that the administration of Enbrel infringed the claims of the '516 Patent (*id.* at 8); and the validity of that patent was upheld in the *Lilly* litigation (*id.* at 3). Such evidence suggests that Amgen was aware of infringement yet disregarded it, especially as the scientific evidence became increasingly clear over time.

### REDACTED

(*Id.* at 9.) Not only did Amgen fund and receive the Lizzul article, but also, shortly after its publication, its senior author, Dr. Alice B. Gottlieb, was invited by Amgen to speak at its December 7, 2005 National Advisory Board Meeting to discuss, among other things, the findings of her article. (*Id.* at 8.) Because Amgen scientists were aware of the Lizzul article, Amgen likely knew of the risk of infringement. Even before the Lizzul article, Amgen likely knew or should have known the risk of infringement, because Enbrel

inhibits TNF and, by the time the '516 Patent issued, articles had linked TNF to NF-κB activity.[6] (*Id.* at 5.) And despite now suggesting that it has never taken the '516 Patent seriously, Amgen appears to have carefully monitored the *Lilly* litigation, even sending its in-house and outside counsel across the country to observe the *Lilly* trial firsthand. (*See supra* at 3-4.)

### D. Amgen Cannot Prove as a Matter of Law That Its Infringement Was Not Willful.

Although Amgen offers several theories why its actions could not be considered willful, none precludes a finding of willfulness as a matter of law. At most, the "evidence" Amgen proffers creates triable issues of fact with respect to the issue of willfulness. Accordingly, summary judgment should be denied. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### 1. The Date ARIAD Filed Its Counterclaims of Infringement Does Not Bear on Amgen's Willfulness.

Amgen argues that "Amgen's conduct cannot be reckless" because ARIAD did not allege infringement "for nearly five years after issuance of the '516 [P]atent (and one year after the declaratory judgment action)." (Amgen Br. at 15-16.) However, Amgen's behavior — not ARIAD's — is at issue, and whether *ARIAD* knew that the administration of Enbrel infringed the '516 Patent or had performed experiments to confirm that fact is entirely irrelevant to the issue of *Amgen's* willfulness. Rather, the relevant inquiry under *Seagate* relates to Amgen's knowledge only. *See Seagate*, 497 F.3d at 1371. The evidence showing Amgen *knew* it was infringing the '516

---

[6] Even if Amgen had not known the precise method by which the administration of Enbrel infringed the patent at the time the '516 Patent issued, that would not preclude a finding that Amgen acted willfully. *See VNUS Med. Techs*, 527 F. Supp. 2d at 1075.

Patent is overwhelming.  Amgen anticipated litigation with ARIAD immediately after learning of the pendency of the '516 Patent, monitored Lilly's challenges to the '516 Patent with concern and sent its counsel to attend the *Lilly* trial firsthand.  (*See supra* at 3–4).

### 2.    Amgen's Citation to Statements and Actions of Third Parties Does Not Preclude a Finding of Willful Infringement by Amgen.

In an attempt to negate the objectively high likelihood of infringement by the sale of Enbrel, Amgen points to several public statements from the "commercial marketplace": *i.e.,* excerpts of public news or other articles, suggesting that third parties (not Amgen) thought the '516 Patent might be invalid.  (Amgen Br. at 5-9.)  Those sources, however, cannot preclude a showing of willfulness on Amgen's part, particularly in the absence of evidence that Amgen read and, more important, justifiably relied on such statements.

*First*, it is notable that Amgen cites press articles that were published shortly after the *Lilly* litigation was filed.  That litigation, of course, resulted four years later in a finding that the '516 Patent is *not* invalid, after which Amgen continued to infringe.  Amgen's unabated infringement even after the return of the verdict in *Lilly* underscores the need for a jury determination here whether Amgen's conduct has been willful, after and before the return of that verdict.[7]

---

[7] It is also noteworthy that Amgen cites David Baltimore as expressing "'amazement' that the claims in the '516 could be upheld in Court." (Amgen Br. at 7.) Although Dr. Baltimore expressed that sentiment, he admitted in retrospect that he was wrong. (*See* Greenwald Supp. Decl. Ex. 45, 9/26/2007 Baltimore Dep. at 129:13-130:6 ("Q. Why did you say you would be amazed if Ariad prevails at trial? . . . A. Largely because I had thought of the patent as focusing on direct inhibitors of NF-kB, but when I — when I thought back later to how the patent is written, I realized that it had a much broader application. . . . You have got to understand here that I am trying to be a lawyer

*Second*, Amgen relies on articles by "two independent registered patent attorneys" (Amgen Br. at 15) discussing the '516 Patent. As an initial matter, those articles discuss the '516 Patent generally, without reference to this case or the seven specific claims asserted here. (*See* Sharp Decl. Exs. X, Y.) Amgen cites no case law establishing that, where the validity of a patent is questioned generally by two patent attorneys not retained by the infringer, infringement cannot be willful. *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998) (noting that a valid opinion letter requires a defendant to obtain such a letter from retained counsel). To the contrary, Amgen has expressly elected *not* to introduce evidence of any favorable opinion of counsel, and in the absence of proof that Amgen itself relied on such an opinion, it is hard to see how articles by third parties, which there is no proof or even suggestion Amgen read, can overcome that failure of proof.

*Third*, Amgen purports to show, through only a handful of citations to public statements and articles, that "public opinions" on the validity and scope of the '516 Patent was monolithically negative. (Amgen Br. at 5-9.) Not so. Amgen relies upon three articles that simply report on the '516 Patent, including both unfavorable and favorable statements regarding validity and the scope of the claims. (*See* Sharp Decl. Exs. Z, AA, BB.) Amgen has presented no testimony on or explanation of the credibility or reliability of those sources, nor has it weighed those sources against the decision in the *Lilly* litigation upholding the validity of the patent. Indeed, there is no evidence in

---

without a license."); *id.* at 130:15-22 ("Q. Did you have a belief that a court would be unlikely to accept a broader application of the patent beyond direct inhibitors of NF-kB? . . . A. Yeah, it all calls for a legal conclusion, but I started it by writing this, I guess, and I was wrong.").)

the record that Amgen shared those opinions, and its careful monitoring of the *Lilly* litigation suggests that it did not.

Finally, Amgen asserts that "ARIAD's efforts to sublicense the '516 [P]atent failed completely," because ARIAD did not license the '516 Patent. (Amgen Br. at 6-7.) That circumstance is not probative of Amgen's state of mind during the alleged period of willful infringement. Even if Amgen had known of the failure of others to license the '516 Patent — which it could not have, prior to discovery in this case — that knowledge could not have given Amgen any confidence that the '516 Patent was invalid; for all Amgen knew, those other manufacturers had no product that so clearly infringed the '516 Patent. Perhaps more important, to rely on the absence of licensing agreements in assessing whether there is an objective risk that the patent is invalid would be a mistake, as exemplified by the litigation history of the '516 Patent itself: Lilly did not take a license, but has nonetheless found itself liable for infringing the '516 Patent and has had its invalidity arguments rejected. (*See supra* at 3.)

Accordingly, the willfulness determination should not be kept from a jury, especially where, as here, Amgen implicitly has asked the Court to weigh the value of the "independent legal opinions" it references, while failing to obtain (or at least advance) an opinion of counsel of its own, and where the validity of the patent has been upheld in recent litigation (*id.* at 3-4). *See Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1530 (Fed. Cir. 1993) (stating determinations of willfulness are to be made by "the

fact-finder" after "consideration of the totality of the circumstances"); *accord Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1279 (Fed. Cir. 1995).[8]

> **3.    PTO Reexamination Does Not Justify Willful Infringement, Either Pre-Dating or Post-Dating the Initiation of the Reexamination.**

Amgen argues that the PTO's rejection of claims during the reexamination "is conclusive evidence" that Amgen did not act willfully. Amgen is wrong. Contrary to Amgen's argument, the granting of a reexamination is "not probative of unpatentability." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996). **REDACTED**

(*see* Greenwald Supp. Decl. Ex. 34, 3/7/2008 Manbeck Report ¶ 16),

**REDACTED**

(*Id.*) After a reexamination petition is granted, the reexamination proceeds in a similar manner to an initial examination: there are office actions (in which claims are sometimes rejected), responses and amendments.

**REDACTED**

(*Id.* ¶ 18.)

: (*see id.* ¶ 17),

---

[8] Amgen's argument that *Seagate* eliminated a "totality of circumstances" analysis (Amgen Br. at 13 n.5) is not supported by the opinion in that case. Although under *Seagate* subjective knowledge is now considered separately, 497 F.3d at 1371, and a failure to obtain counsel "does not give rise to an adverse inference with respect to willfulness," *id.* at 1370, *Seagate* does not otherwise cabin the inquiry, and courts still routinely consider a totality of circumstances in determining willfulness. *See, e.g., Energy Transp. Group, Inc. v. William Demant Holding AS*, C.A. No. 05-422 GMS, 2008 WL 114861, at *1 (D. Del. Jan. 7, 2008) (concluding that "nothing in *Seagate* forbids a jury to consider whether a defendant obtained advice of counsel as part of the totality of the circumstances in determining willfulness").

**REDACTED**   (*id.*).  No final decision has been issued from the reexamination proceeding,

and ARIAD's appeal rights have not been exhausted.  *See* 35 U.S.C. §§ 306, 134, 141.

**REDACTED**

(Greenwald Supp. Decl. Ex. 34, 3/7/2008 Manbeck Report ¶ 16.)  Indeed, the case law

makes clear that a jury may find willfulness where claims have been rejected during a

reexamination.  *See Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir.

1991) (rejecting infringer's argument that it "had a good faith belief" that the infringed

patents were invalid "based on the fact that the patent examiner initially rejected [the

defendant's] patent applications on reexamination," and noting that "the jury found by

clear and convincing evidence that appellant's infringement was willful").

Even if the pendency of a reexamination precluded a finding of

willfulness, that would not give Amgen a green light here.  As a threshold matter, the

petition for reexamination of the '516 Patent was not granted until June 2005 — after the

publication of the Lizzul article and well after the issuance of the '516 Patent and

Amgen's infringing activities.  Thus, Amgen cannot rely on those proceedings to justify

its infringing actions, at least prior to June 2005.  *See Translogic Tech., Inc. v. Hitachi, Ltd.*,

No. CV 99-407-PA, 2004 WL 2260606 (D. Or. Oct. 5, 2004) (holding a PTO's decision to

engage in a reexam "is *not relevant* to willfulness because the PTO's decision occurred

after the alleged willful conduct") (emphasis added).[9]

---

[9] Amgen, which opposed a stay of this litigation pending the resolution of the
reexamination, should not be heard to argue that the normal course of an ongoing
reexamination justifies Amgen's present *and past* willful behavior with respect to this

**4.    Amgen's Election Not to Reply Upon an Opinion of Counsel Weighs Against the Entry of Summary Judgment.**

Although Amgen cites a handful of press articles, the PTO reexamination and a few additional, external sources purportedly showing that it could not have acted willfully, it is considerably more telling that Amgen does not rely on the advice of its *own* counsel. (*See* Greenwald Supp. Decl. Ex. 18, 11/9/2007 McDole Ltr.) The "failure to proffer any favorable advice," although "not dispositive of the willfulness inquiry" is nevertheless "crucial to the analysis." *In re Seagate*, 497 F.3d at 1369; *see also Energy Transp. Group, Inc. v. William Demant Holding AS*, C.A. No. 05-422 GMS, 2008 WL 114861, at *1 (D. Del. Jan. 7, 2008) (concluding that "nothing in *Seagate* forbids a jury to consider whether a defendant obtained advice of counsel as part of the totality of the circumstances in determining willfulness"). Amgen asks the court to conduct that analysis without a "crucial" component, yet to find as a matter of law that the sources on which Amgen relies are sufficiently weighty to foreclose a jury from considering the matter. The Court should reject that request.

**IV.    Conclusion**

Based upon the foregoing, ARIAD respectfully requests that the Court deny Amgen's motion for summary judgment of non-willfulness.

---

litigation. If that argument were to prevail, it would be conceivable that ARIAD could suffer a loss of its rights to collect damages for willful infringement in this litigation, yet still have all those rights found valid and fully enforceable by the PTO when the reexamination proceedings ultimately conclude. *Cf. Acoustical Design*, 932 F.2d at 942 ("[I]t is clear that initial rejection by the [PTO] of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the claims."); Greenwald Supp. Decl. Ex. 34, 3/7/2008 Manbeck Report ¶ 17 ("

**REDACTED**

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

_____

Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology, the*
*President and Fellows of Harvard College and*
*the Whitehead Institute for Biomedical Research*

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008