# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION,
AMGEN USA INC., AMGEN MANUFACTURING
LIMITED, and IMMUNEX RHODE ISLAND
CORPORATION,

    Plaintiffs,

  v.

ARIAD PHARMACEUTICALS, INC., and THE
WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH,

    Defendants.

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, THE PRESIDENT AND FELLOWS
OF HARVARD COLLEGE, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,

    Counterclaim-Plaintiffs,

  v.

AMGEN INC., IMMUNEX CORPORATION,
AMGEN USA INC., AMGEN MANUFACTURING
LIMITED, IMMUNEX RHODE ISLAND
CORPORATION, and WYETH,

    Counterclaim-Defendants.

C.A. No. 06-259-MPT

**REDACTED
PUBLIC VERSION**

---

## DEFENDANTS-COUNTERCLAIM-PLAINTIFFS' BRIEF IN OPPOSITION
## TO AMGEN'S MOTION FOR SUMMARY JUDGMENT FOR
## LACK OF ADEQUATE WRITTEN DESCRIPTION

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc.,
Massachusetts Institute of Technology, the
President and Fellows of Harvard College and the
Whitehead Institute for Biomedical Research*

## Table of Contents

*Page*

Table of Authorities ................................................................................................ ii

I. Summary of Argument ................................................................................ 1

II. Statement of Facts ...................................................................................... 2

    A. The Asserted Claims of the '516 Patent Relate to Methods for Regulating Inducible Gene Expression by Reducing Induced NF–κB Activity. ................................................................................................ 2

    B. The Specification Discloses Multiple Embodiments of the Claimed Methods. ................................................................................................ 4

    C. The Claims of the '516 Patent Have Been Found to Comply with the Written Description Requirement in Prior Litigation. ............................ 7

III. Argument ...................................................................................................... 8

    A. Legal Standards ...................................................................................... 8

        1. Written Description ........................................................................ 8

        2. Summary Judgment ...................................................................... 11

    B. The Asserted Claims Are Adequately Described by the Disclosure of the '516 Patent .................................................................................... 12

    C. Amgen Misapplies the Law of Written Description ............................ 17

    D. Amgen Has Failed to Meet its Burden of Establishing the Lack of a Genuinely Disputed Material Fact .................................................... 19

    E. The Limitation "in cells" Is Adequately Supported by the Specification of the '516 Patent ............................................................ 22

IV. Conclusion .................................................................................................. 26

## Table of Authorities

*Page(s)*

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
    314 F.3d 1313 (Fed. Cir. 2003) ................................................................................25

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................12

*ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.,*
    Civil Action No. 02 CV 11280-RWZ (D. Mass.) ................................................7, 8

*Capon v. Eshhar,*
    418 F.3d 1349 (Fed. Cir. 2005) ................................................................8, 10, 23

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................12

*Cordis Corp. v. Medtronic AVE, Inc.,*
    339 F.3d 1352 (Fed. Cir. 2003) ................................................................ passim

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
    323 F.3d 956 (Fed. Cir. 2002) ................................................................10, 11, 13, 26

*Falkner v. Inglis,*
    448 F.3d 1357 (Fed. Cir. 2006) ................................................................9, 10, 22, 23

*Inline Connection Corp. v. AOL Time Warner Inc.,*
    470 F. Supp. 2d 242 (D. Del. 2007) ................................................................12

*Noelle v. Lederman,*
    355 F.3d 1343 (Fed. Cir. 2004) ................................................................24, 25

*Regents of Univ. of Cal. v. Eli Lilly & Co.,*
    119 F.3d 1559 (Fed. Cir. 1997) ................................................................24

*Schering Corp. v. Geneva Pharms.,*
    339 F.3d 1373 (Fed. Cir. 2003) ................................................................23

*SunTiger, Inc. v. Scientific Research Funding Group,*
    189 F.3d 1327 (Fed. Cir. 1999) ................................................................12

*Union Oil Co. of Cal. v. Atlantic Richfield Co.,*
    208 F.3d 989 (Fed. Cir. 2000) ................................................................9

*Univ. of Rochester v. G.D. Searle & Co.,*
   249 F. Supp. 2d 216 (W.D.N.Y. 2003) ..................................................11

*Univ. of Rochester v. G.D. Searle & Co.,*
   358 F.3d 916 (Fed. Cir. 2004) ...................................................... passim

*Vas-Cath Inc. v. Mahurkar,*
   935 F.2d 1555 (Fed. Cir. 1991) ...............................................8, 9, 15

*Waldemar Link, GmbH & Co. v. Osteonics Corp.,*
   32 F.3d 556 (Fed. Cir. 1994) ...............................................................9

## Statutes & Rules

35 U.S.C. § 112.................................................................................1, 8, 27

35 U.S.C § 282.......................................................................................12

Fed. R. Civ. P. 56..................................................................................12

Defendants-counterclaim-plaintiffs (collectively, "ARIAD") respectfully submit this memorandum in opposition to plaintiffs-counterclaim-defendants' (collectively, "Amgen") motion for summary judgment of invalidity of U.S. Patent 6,410,516 (the "'516 Patent") for lack of adequate written description under 35 U.S.C. § 112.[1]

## I.    Summary of Argument

1.    Amgen's argument that the claims of the '516 Patent are invalid for lack of adequate written description fails because it is premised on a fundamental misinterpretation of the applicable law, under which a patentee would be required to provide an express structural description of every compound that could be used to practice a claimed method.  Contrary to Amgen's interpretation, the written description requirement does not require the inventor to "describe in the specification every conceivable and possible future embodiment of his invention." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003).  Indeed, a specification may "contain a written description of a broadly claimed invention without describing all the species" encompassed by the claims. *Id.*

2.    Summary judgment would be improper because the specification of the '516 Patent describes several modes by which the methods of the asserted[2] claims

---

[1] Amgen's Opening Brief on Summary Judgment of Invalidity for Lack of Adequate Written Description (D.I. 584) is referred to herein as "Amgen Br."; documents cited to herein are attached to the Supplemental Declaration of David Greenwald ("Greenwald Supp. Decl.") dated May 22, 2008.

[2] Notwithstanding the apparent generality of Amgen's motion, its application is properly limited to those claims that ARIAD has asserted in this case.  Amgen, who bears the burden of proving invalidity, has failed to advance constructions of any of those limitations found in the unasserted claims.  Moreover, because ARIAD has

can be practiced; Amgen's arguments to the contrary give rise, at most, to genuinely disputed issues of fact.

      3.    Summary judgment would also be improper because the modes disclosed in specification of the '516 Patent are sufficient to provide adequate written description of the asserted claims; Amgen's arguments to the contrary give rise, at most, to genuinely disputed issues of fact.

      4.    Amgen is incorrect that ARIAD's validity expert in this case, Dr. Jeffrey V. Ravetch, conceded that the '516 Patent "provides no structures, formulae, chemical names or physical properties to identify or allow the identification of any specific compounds" that can be used to practice the asserted claims. (Amgen Br. at 6-8.) Amgen has misinterpreted Dr. Ravetch's testimony, as is clear from the remainder of his deposition testimony and the opinions that Dr. Ravetch expressed in his report.

      5.    Summary judgment would be improper because the specification of the '516 Patent provides adequate support for the breadth of cell types upon which the claimed methods can be practiced.

## II.    Statement of Facts

### A.    The Asserted Claims of the '516 Patent Relate to Methods for Regulating Inducible Gene Expression by Reducing Induced NF-κB Activity.

Through an extensive collaborative effort, involving the MIT and Whitehead Institute laboratories of Nobel laureates David Baltimore and Phillip Sharp

---

recently granted Amgen a covenant not to sue on the claims not asserted against the infringing products, the Court lacks jurisdiction to entertain Amgen's challenges to unasserted claims. *See* ARIAD's Mem. in Supp. of Mot. for Partial Dismissal for Lack of Subject Matter Jurisdiction (D.I. 576); ARIAD's Opening Brief on Claim Construction (D.I. 577 at 1.)

and the Harvard laboratory of Thomas Maniatis, the inventors of the '516 Patent discovered the transcription factor NF–κB and its function as a mediator of inducible gene expression.[3]  In elucidating the basic steps of the NF–κB signaling pathway, the inventors conceived several practical methods for regulating inducible gene expression by reducing induced NF–κB activity.  These methods are the subjects of the claims of the '516 Patent, which issued on June 25, 2002.

The asserted claims are directed towards reducing induced NF–κB activity in cells, so as to reduce "NF–κB–mediated intracellular signaling" or "intracellular signaling caused by Interleukin–1 or Tumor Necrosis Factor–α."  ('516 Patent claims 6, 70-72, 18, 183-184.)  These claims are not limited to the use of any particular mode of reducing NF–κB activity, but are directed, generally, towards modulation of the NF–κB signaling pathway through which NF–κB activity is manifested.  As described in the specification of the '516 Patent, the pathway by which the "message" of an external stimulus is "transduced within cells through NF–κB activity"[4] consists of five general steps:  (1) occurrence of an external stimulus, such as the binding of an agonist to its receptor on the cell surface;[5] (2) dissociation of the NF–κB:IκB complex;[6] (3) nuclear translocation of NF–κB;[7] (4) the binding of NF–κB to its

---

[3] For a fuller review of the technology underlying the inventions claimed in the '516 Patent, see ARIAD's Opening Brief on Claim Construction (D.I. 577) at 4-13.

[4] '516 Patent at 3:59-64.

[5] '516 Patent at 2:36-40, 3:59-64, 10:41-50, 12:36-41, 17:45-47.

[6] '516 Patent at 2:54-63, 10:52-54, 12:25-35, 15:12-14, 16:24-26.

[7] '516 Patent at 2:54-63, 10:52-54, 12:32-35, 16:26-28, 27:5-7.

DNA recognition sequences;[8] and (5) expression of the gene mediated by NF–κB.[9]  The inventors of the '516 Patent determined that, by interfering with *any* step along the activated NF–κB pathway, one could impede NF–κB's "ability to act as an intracellular messenger,"[10] and thereby reduce the expression of genes mediated by NF–κB.

**B.     The Specification Discloses Multiple Embodiments of the Claimed Methods.**

As explained in the expert report of Dr. David M. Livingston, the Emil Frei Professor of Genetics and Medicine at Harvard Medical School, the specification of the '516 Patent discloses multiple embodiments of practicing the claimed methods of reducing induced NF–κB activity.  (Greenwald Supp. Decl. Ex. 46, 2/22/08 Livingston Report ¶¶ 28–40.)  In one embodiment, the specification teaches the use of "decoy molecules" to inhibit the binding of NF–κB to genomic DNA, in the nucleus of an induced cell.[11]  Decoy molecules are short DNA molecules (oligonucleotides) that are designed to mimic one of the DNA sequences to which NF–κB binds (an "NF–κB recognition sequence"), such as those listed or predicted by the consensus sequence in Table 2 of the '516 Patent.  If introduced into a cell, decoy molecules "can accumulate in the nucleus where they competitively bind to NF–κB, reducing the amount of NF–κB available to bind to the genomic DNA, thus reducing NF–κB activity."  (Greenwald Supp. Decl. Ex. 46, 2/22/08 Livingston Report ¶ 14.)  Several methods of introducing short oligonucleotides into cells were known in the art as of the late 1980s.  (*Id.* at ¶¶ 14,

---

[8] '516 Patent at 4:5–15, 35:42–49, 35:55–58, 37:43–38:22.

[9] '516 Patent at 4:12–23, 16:26–28, 35:45–49, 37:43–38:22.

[10] '516 Patent at 32:19–23.

[11] '516 Patent at 37:50–54.

20.) Thus, "[b]y treating cells that have induced NF–κB activity with decoy

oligonucleotides, one could reduce induced NF–κB activity." (*Id.* at ¶ 14.) In fact,

**REDACTED**

(Greenwald Supp. Decl. Ex. 25, 1/18/2008 Ravetch Report ¶¶ 33, 50;

Alexei V. Miagkov *et al.*, *NF-kB Activation Provides the Potential Link Between Inflammation*

*and Hyperplasia in the Arthritic Joint*, 95 Proc. Nat'l Acad. Sci. 13859-13864 (Nov. 1998).)

In Table 2, the '516 Patent lists the nucleotide sequence of ten different

NF–κB recognition sites, and a "consensus sequence"[12] that can be used to predict

additional sequences to which NF–κB binds.  The specification notes that most of the

recognition sequences listed in Table 2 had been proven effective at binding to NF–κB

and/or inhibiting its binding to a particular enhancer.[13]  Thus, Dr. Livingston opines,

each of the disclosed sequences is the precise sequence and structure of a decoy

molecule.  (Greenwald Supp. Decl. Ex. 46, 2/22/08 Livingston Report ¶ 40.)

**REDACTED**

(Greenwald Supp. Decl. Ex. 25, 1/18/2008 Ravetch

---

[12] A "consensus sequence" is a sequence of nucleotides that is substantially
conserved throughout different species.

[13] '516 Patent at 37:34-37.

Report ¶¶ 49-50; Greenwald Supp. Decl. Ex. 32, 2/22/2008 Ravetch Rebuttal Report ¶¶ 72, 74.)

Dr. Livingston's report also notes that the '516 Patent describes several additional embodiments of the claimed methods of reducing induced NF–κB activity. (Greenwald Supp. Decl. Ex. 46, 2/22/08 Livingston Report ¶¶ 13-16, 18, 34.)  For example, the specification teaches that IκB — the natural inhibitor of NF–κB — or IκB-like molecules can be used to reduce induced NF–κB activity by introducing large amounts of such proteins into the cells.[14]  Excess IκB molecules bind to activated NF–κB molecules and inhibit their translocation to the nucleus of the cell, thus reducing NF–κB activity.  (*Id.* ¶16.)  The specification also discloses the use of "dominantly interfering molecules" that recognize and bind to NF–κB recognition sequences without initiating transcription.[15]  Once introduced into a cell, dominantly interfering molecules competitively bind to NF–κB recognition sites, preventing active molecules of NF–κB from binding to those sites.  Thus, by transfecting a cell to express dominant negative mutants of NF–κB, which have active DNA binding domains but inactive or non-existent transcriptional activation domains, a POSA could reduce induced NF–κB activity in those cells.  (*Id.* ¶ 15.)  Each of these methods has been used to inhibit NF–κB activity.  (*Id.* ¶ 15, 16; Greenwald Supp. Decl. Ex. 25, 1/18/2008 Ravetch Report  ¶¶ 50, 52.)

Finally, the '516 Patent also teaches that additional antagonists of NF–κB activity — which can act extracellularly — can be discovered through routine drug

---

[14] '516 Patent at 37:43-49, 37:55-63.

[15] '516 Patent at 38:6-22.

screening, using either of the two assays disclosed in the specification.[16]  The specification describes the use of certain assays (a "chloramphenicol acetyl-transferase gene" (CAT) reporter assay[17] and an "electrophoretic mobility shift assay"[18] (EMSA)) to detect NF–κB activity.  Dr. Livingston opined that a person of ordinary skill in the art could use these assays to screen for antagonists of NF–κB activity, guided by the disclosure of the steps of the NF–κB pathway.  (Greenwald Supp. Decl. Ex. 46, 2/22/08 Livingston Report ¶ 13.)

    **C.**    **The Claims of the '516 Patent Have Been Found to Comply with the Written Description Requirement in Prior Litigation.**

On the day that the '516 Patent issued, ARIAD brought an infringement action against Eli Lilly & Co. in the United States District Court of Massachusetts, *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.*, Civil Action No. 02 CV 11280-RWZ ("*ARIAD v. Lilly*").  In its reply, Lilly alleged that the '516 Patent was invalid and unenforceable on the ground that, *inter alia,* the asserted claims were not supported by an adequate written description.  (Greenwald Supp. Decl. Ex. 66, Findings of Fact and Conclusions of Law at 3.)  After a fourteen day trial, the jury unanimously found that claims 80, 95, 144 and 145[19] of the '516 Patent were supported by adequate written description.  (*Id.* at 8-9; Greenwald Supp. Decl. Ex. 68, Questions to the Jury on Special Verdict.)  After trial, Eli Lilly moved for judgment as a matter of law that the asserted

---

[16] '516 Patent at 34:66-35:12.

[17] '516 Patent at 78:44-82:4.

[18] '516 Patent at 18:52-20:62.

[19] Although the claims at issue in *Lilly* depend on independent claims 7 and 14, those claims are as broad, with respect to the compounds and cell types encompassed, as those asserted in this case.

claims were not supported by adequate written description. (Greenwald Supp. Decl. Ex. 67, Lilly's Mem. in Sup. of Renewed Mot. for JMOL at 8-14.) The court denied that motion,[20] rejecting most of the same arguments that Amgen now asserts support its motion for summary judgment, including whether the outcome of this case is dictated by *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916 (Fed. Cir. 2004).

### III.    Argument

#### A.    Legal Standards

##### 1.  Written Description

To satisfy the written description requirement under 35 U.S.C. § 112, a patent applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). Satisfaction of written description is an issue of fact, to be determined, on a claim by claim basis, "in the context of the particular invention and state of knowledge" *Capon v. Eshhar*, 418 F.3d 1349, 1358, 1360 (Fed. Cir. 2005). Because "each case must be decided on its own facts," the value of precedent in the area of written description is "extremely limited." *Vas-Cath*, 935 F.2d at 1562.

The written description requirement "does not require the applicant to describe explicitly the subject matter claimed." *Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir. 2000) (affirming a finding that claims to gasoline mixtures with a range of chemical properties were adequately supported by a

---

[20] RWZ Docket Entry 2/12/2008 *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.*, C.A. No. 02-11280 (D. Mass.).

specification that did not "describe the exact chemical component of each combination that falls within the range of the claims."). Nor is the inventor required to "describe in the specification every conceivable and possible future embodiment of his invention." *Cordis*, 339 F.3d at 1365. Indeed, a specification may "contain a written description of a broadly claimed invention without describing all the species" encompassed by the claims. *Id.* The description contained in the specification need only "allow persons of ordinary skill in the art to [clearly] recognize that [the inventors] invented what is claimed." *Union Oil*, 208 F.3d at 997. That is, a person of ordinary skill need only be able to "discern the limitation[s] at issue" in the claims within the disclosure provided. *Waldemar Link, GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).

A claim is not invalid "simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language," *Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006) (holding that claims to vaccines involving poxvirus are adequately supported by a specification that discusses poxvirus vaccines, but does not describe working examples of vaccines to that type of virus), or, *a fortiori*, every mode of practicing the invention's full scope. That principle flows from the well established axiom of patent law that actual reduction to practice is not required to satisfy the written description requirement. *Id.* ("the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before."); *see also Rochester*, 358 F.3d at 926 ("We of course do not mean to suggest that the written description requirement can be satisfied only by providing a description of an actual reduction to practice. Constructive reduction to practice is an established method of disclosure . . ."). If satisfaction of written description required the specification to include examples describing an actual reduction

to practice, then, contrary to well-established law, an invention could never be constructively reduced to practice.

Federal Circuit precedent is clear that "[w]hether the inventors demonstrated sufficient generality to support the scope of some or all of their claims, must be determined claim by claim. *Capon*, 418 F.3d at 1360. In the context of genetic and chemical inventions, Federal Circuit law makes clear that the written description inquiry is flexible. *Id.* at 1358 ("The 'written description' requirement states that the patentee must describe the invention; it does not state that every invention must be described the same way."). To that end, the Federal Circuit has repeatedly held that adequate written description of a genetic or chemical macromolecule does not always require recitation of a sequence. *Id.; accord Falkner*, 448 F.3d at 1367-68. Similarly, the Federal Circuit has explicitly stated that functional descriptions of genetic material can be sufficient. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002) ("It is not correct, however, that all functional descriptions of genetic material fail to meet the written description requirement."). This flexible approach is encapsulated in the PTO's guidelines for written description, which have been adopted by the Federal Circuit:

> The written description requirement "can be met by 'showing that an invention is complete by disclosure of sufficiently detailed, relevant identifying characteristics . . . i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics."

*Enzo Biochem*, 323 F.3d at 964 (quoting the Manual of Patent Examining Procedure).

Thus, the written description inquiry allows consideration of functional characteristics

in the context of other disclosures in the specification, such as the physical and chemical properties of a disclosed embodiment.

In *Rochester*, the Federal Circuit defined the outer limits of the written description inquiry: a description of genus compounds by their desired properties, without the disclosure of a single species within the genus, and without a proven assay for identifying those compounds, is inadequate. 358 F.3d at 927. The patent at issue (the "Rochester Patent") was directed to methods for selectively inhibiting a particular enzyme (PGHS-2), "comprising administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product to [or in] a human host in need of such treatment." *Id.* at 918. Although it provided an assay that could potentially be used to screen for compounds with the desired function, it was undisputed that the Rochester Patent failed to "disclose *any* compounds that [could] be used in [the] claimed methods," and, of crucial importance, no compounds were known in the art that could selectively inhibit PGHS-2. *Id.* at 927 (emphasis added). Nor was there any indication that the disclosed assay would, in fact, identify any such compounds — it was "essentially a trial-and-error process." *Univ. of Rochester v. G.D. Searle & Co.*, 249 F. Supp. 2d 216, 221 (W.D.N.Y. 2003). That uncertainty meant that the claimed methods "could not be practiced based on the patent's specification, even considering the knowledge of one skilled in the art." *Rochester*, 358 F.3d at 927. Accordingly, the Federal Circuit held that the inventors were not in possession of the claimed inventions. *Id.*

## 2. Summary Judgment

Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no issue as to any material fact that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to a material fact exists — and summary judgment is improper — if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The party seeking summary judgment bears the initial burden of establishing the lack of a genuinely disputed material fact by demonstrating that there is an absence of evidence to support the nonmoving party's case." *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 242, 431 (D. Del. 2007) (citations omitted). Because an issued patent is presumed to be valid under 35 U.S.C § 282, it is only after the moving party has proven invalidity by clear and convincing evidence that the non-moving party must establish that a genuine issue of material fact exists. *Anderson*, 477 U.S. at 248. Summary judgment is inappropriate in cases where experts have submitted competent, conflicting testimony on how a person of ordinary skill in the art would have understood the invention described in the patent application. *SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1334 (Fed. Cir. 1999).

**B.    The Asserted Claims Are Adequately Described by the Disclosure of the '516 Patent.**

Amgen argues that the asserted claims are invalid because the specification does not contain an express structural description of every compound that could be used to practice a claimed method. (Amgen Br. at 3.) Contrary to Amgen's interpretation, the written description requirement does not require the inventor to "describe in the specification every conceivable and possible future embodiment of his invention." *Cordis*, 339 F.3d at 1365. Indeed, a specification may "contain a written

description of a broadly claimed invention without describing all the species"

encompassed by the claims. *Id.* Moreover, satisfaction of the written description

requirement does not require adherence to a precise formula; instead patentees can

satisfy that requirement by disclosing sufficiently detailed identifying characteristics of

the invention, such as a complete or partial structure, physical and/or chemical

properties, or functional characteristics coupled with a known or disclosed correlation

between function and structure. *Enzo Biochem*, 323 F.3d at 964.

The asserted claims are directed towards methods for reducing "NF–κB–

mediated intracellular signaling" or "intracellular signaling caused by Interleukin–1 or

Tumor Necrosis Factor–α" by reducing induced NF–κB activity in cells. ('516 Patent

claims 6, 70-72, 18, 183-184). These claims are not limited to the use of any particular

mode of reducing NF–κB activity, but are directed, generally, towards modulation of the

NF–κB signaling pathway through which NF–κB activity is manifested. In his expert

report, Dr. Livingston — whose testimony Amgen has not moved to preclude — opines

that the inventors on the '516 Patent were in possession of the claimed inventions as of

the effective filing dates of the claims. (Greenwald Supp. Decl. Ex. 46, 2/22/2008

Livingston Report ¶ 30.)

**REDACTED**

(Greenwald Supp. Decl. Ex. 25, 1/18/2008 Ravetch Report ¶¶ 43-54; Ex.

32, 2/22/2008 Ravetch Rebuttal Report ¶¶ 65-77.)

**REDACTED**

**REDACTED**

(Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶ 29; Ex. 25, 1/18/2008 Ravetch Report ¶ 43.)

As previously explained, the '516 Patent discloses the five basic steps of the NF–κB signaling pathway, from (1) occurrence of an external stimulus, such as the binding of an agonist to its receptor on the cell surface to (5) expression of the gene mediated by NF–κB.  According to Dr. Livingston, the specification also specifically describes several different modes of reducing induced NF–κB activity:  decoy molecules, antagonists, IκB and IκB-like molecules, and dominantly interfering molecules. (Greenwald Supp. Decl. Ex. 46, Livingston Report ¶ 34.)

**REDACTED**

(Greenwald Supp. Decl. Ex. 57, 3/5/2008 Ravetch Reply Report ¶ 11.)

**REDACTED**

*(Id.)*

**REDACTED**

---

[21] '516 Patent at 37:50-54, 37:64-38:22.

[22] '516 Patent at 32:19-23, 37:55-63.

Attempting to shoehorn the facts of this case into the easily distinguished facts of *Rochester*, and ignoring the Federal Circuit's admonition that "questions of compliance with the description requirement of § 112 . . . must be decided on [the facts of each particular case]," *Vas-Cath*, 935 F.2d at 1562, Amgen argues that the modes of reducing NF–κB activity disclosed in the specification are merely "hypothetical," and that the '516 Patent "provides no structures, formulae, chemical names or physical properties to identify or allow identification of any specific compounds" that can be used to practice the asserted claims. (Amgen Br. at 6-8.)

### REDACTED

(Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶ 15, 16; Ex. 25, 1/18/2008 Ravetch Report ¶¶ 43-54.)

In particular, the structure and sequence of at least ten decoy molecules are expressly provided in Table 2 of the '516 Patent, which includes ten known and predicted NF–κB recognition sequences, as well as a consensus sequence that can be used to generate additional sequences. (Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶ 34 ; Ex. 25, 1/18/2008 Ravetch Report ¶¶ 49-50.) Using well known methods, a person of ordinary skill in the art could have synthesized decoy molecules and introduced them into cells — *in vitro* or *in vivo* — to reduce induced NF–κB activity as of the effective filing date of the asserted claims. (Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶ 14; Ex. 25, 1/18/2008 Ravetch Report ¶¶ 49-50.)

The specification also provides a detailed functional description of IκB, as well as methods for detecting, characterizing and purifying the IκB protein, which a person of ordinary skill in the art could have used to carry out the claimed methods.

(Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶¶ 16, 37.)  Using the disclosure of the specification — and identical portions of the '436 Application — a person of ordinary skill in the art would also have been able to isolate and clone IκB using only routine techniques.  (*Id.* ¶ 16.)  Using the cloned IκB, one could reduce induced NF–κB activity in cells by transfecting the cells to overexpress IκB, or by introducing RNA encoding the sequence of IκB so that it would be translated by the cell. (*Id.*)  Since the effective filing date of the '516 Patent, overexpression of IκB has been used to reduce NF–κB activity in cells, demonstrating that it is an effective, not hypothetical, mode of practicing the claimed inventions.  (*Id.*)

Finally, the specification teaches the use of routine methods of identifying additional compounds that can be used to practice the asserted claims, using the disclosed assays[23] to detect NF–κB activity.  A person of ordinary skill in the art would know that screening using either of the disclosed assays would be likely to lead to additional inhibitors of NF–κB activity because the specification demonstrates that each is capable of detecting the ability of decoy molecules (described as "mutant" κB oligonucleotides) to reduce NF–κB activity.[24]  Further, by disclosing the steps of the NF–κB pathway, including the disclosure of a number of different extracellular inducers of NF–κB activity, the specification provides guidance for a person of ordinary skill in the art to begin screening for additional molecules.  For example, the disclosure that TNF is a cytokine that induces NF-kB activity ('516 Patent at 17:30-35) would immediately indicate to a person of ordinary skill that one could, without undue experimentation,

_____

[23] '516 Patent at 18:52-20:62, 78:44-82:4.

[24] '516 Patent at 6:12-47, 78:44-82:4.

generate antibodies to TNF that could inhibit that induced activity. (Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶ 13.)

In sum, the express description of particular compounds, and the teaching of routine methods of identifying additional compounds, for use in practicing the claimed methods demonstrate that the inventors of the '516 Patent were in possession of the full scope of the asserted claims.

### C.    Amgen Misapplies the Law of Written Description

Amgen argues that the outcome of this case is dictated by *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916 (Fed. Cir. 2004). However, the facts of *Rochester* are plainly distinguishable. And the disputed issues that Amgen inaccurately describes as "undisputed facts" are, in fact, the central issues with respect to written description that must be decided by a jury. Amgen's mischaracterization of the issues as undisputed only emphasizes that those issues must be decided before the question of adequate of written description can be determined, and that summary judgment is inappropriate in this case.

The patent at issue in *Rochester* expressly claimed the use of molecules — which were unknown, and defined only by their hoped for activity — and an unproven method for discovering them. *Rochester*, 358 F.3d at 925-27. The inventors of the Rochester Patent could not even be sure that selective inhibitors of PGHS-2 existed, and there was no indication that the disclosed assay would, in fact, identify any such compounds. Lacking any disclosure of a molecule that could be used to practice the invention, and without a proven means of assaying for such selective inhibitors, the claimed methods "could not be practiced based on the patent's specification, even considering the knowledge of one skilled in the art." *Id.* at 927. Therefore, it was plain

to one of ordinary skill in the art that the inventors on the Rochester Patent were not in possession of the claimed methods.

Unlike the claims at issue in *Rochester*, the claims of the '516 Patent are supported by a definite disclosure of several molecules that can be used to practice the full scope of the claimed methods. While the Rochester Patent failed to disclose "a *single* non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product," 358 F.3d at 928, the '516 Patent expressly provides the precise nucleotide sequences of at least 10 decoy molecules, and provides adequate structural and functional disclosures of multiple additional types of molecules that can be used to reduce induced NF–κB activity. (Greenwald Supp. Decl. Ex. 46, 2/22/2008 Livingston Report ¶¶ 14, 34.) For example, the specification provides a detailed functional description of IκB, as well as methods for detecting, characterizing and purifying the IκB protein, which a person of ordinary skill in the art could have used to carry out the claimed methods. (*Id.* ¶¶ 16, 37.) The specification also provides direction for one of ordinary skill to construct dominantly interfering molecules, and certain kinds of antagonist molecules. (*Id.* ¶¶ 13, 15, 34-35.)

The '516 Patent also provides screening assays that permit the identification and characterization of additional molecules that are capable of reducing NF–κB. Thus, the specification clearly contemplates that the claimed methods of reducing NF–κB activity can be practiced using structurally and chemically diverse group of substances that cannot be identified by common structure, and must be identified by their function — affecting the biochemical steps involved in NF–κB activity. That additional inhibitors can be identified — *e.g.*, by using the disclosed assays — does not render the asserted claims invalid. *See Cordis*, 339 F.3d at 1365.

Unlike the Rochester Patent, the specification of the '516 Patent demonstrates that the disclosed assays were effective at detecting the ability of decoy molecules to inhibit NF–κB activity.[25]  Together, the express description of particular compounds and routine methods for identifying additional compounds for use in the claimed methods demonstrate that the inventors were in possession of the full scope of the asserted claims.

> **D.    Amgen Has Failed to Meet its Burden of Establishing the Lack of a Genuinely Disputed Material Fact.**

Amgen inaccurately identifies as "undisputed," several highly contested factual issues that are central to the resolution of this case.  (Amgen Br. at 4-14.)

For example, whether the '516 Patent describes *any* compound that can be used to practice the asserted claims is central to the question of written description.  *See Rochester*, 358 F.3d at 927.  Amgen inaccurately contends that it is "undisputed" that the '516 Patent "fails to describe the compounds or methods that are within the scope of the claims."  (Amgen Br. at 4-9.)  As explained in section II.B. above, the '516 Patent discloses several agents that can be used to reduce induced NF–κB activity in cells.  Amgen's protestations notwithstanding, many of the techniques disclosed in the '516 Patent can and have been used to reduce induced NF–κB activity.  (Greenwald Supp. Decl. Ex. 46, Livingston Report at ¶¶ 18-19.)  Moreover, also explained in section II.B., Drs. Livingston and Ravetch have opined that the specification describes the use of decoy molecules, IκB, dominantly interfering molecules, and other antagonists identified by the two proven methods of screening.

---

[25] '516 Patent at 18:52-20:62, 78:44-82:4.

Amgen also mischaracterizes deposition testimony of ARIAD's expert Dr. Jeffrey Ravetch and an inventor, David Baltimore, in an attempt to support its claim that it is "undisputed" that the '516 Patent "provides no structures, formulae, chemical names or physical properties to identify or allow identification of any specific compounds" that can be used to practice the asserted claims.  (Amgen Br. at 6-8.)  For example,

**REDACTED**

of NF–κB.  (Greenwald Supp. Decl. Ex. 40, 4/3/2008 Ravetch Dep. at 154:20-155:24.)

**REDACTED**

(Greenwald. Supp. Decl. Ex. 40, 4/3/2008 Ravetch Dep. at 141:4-16.)

**REDACTED**

**REDACTED**

(Greenwald Supp. Decl.

Ex. 25, 1/18/2008 Ravetch Report ¶¶ 43-54; Ex. 32, 2/22/2008 Ravetch Rebuttal Report

¶¶ 65-77.)

**REDACTED**

(Greenwald Supp.

Decl. Ex. 40, 4/3/2008 Ravetch Dep. at 141:22-142:5.)

Similarly, Amgen inaccurately asserts that Dr. Baltimore "admitted that

the specification provides no structural characteristics or formula for any compound that

could reduce NF–κB activity in cells." (Amgen Br. at 6.) However, notwithstanding

Amgen's sound bite, Dr. Baltimore testified that that patent clearly described several

molecules that could be used to reduce NF–κB activity:

> Q. The 516 patent doesn't give someone reading it guidance that
> in order to develop a compound to reduce NF-kB activity in a cell,
> they should develop a compound of this — of some particular type
> of structure. Is that a fair statement? . . .
>
> A: And I don't think it's a fair statement because by describing
> IkB, by describing decoy molecules, by drawing attention to
> dominant interfering molecules and even describing how they
> might be made, I think a lot of direction is given . . .

(Greenwald. Decl. Ex. 45, 9/26/2007 Baltimore Dep. at 123:2-15.) As before, it is only

through mischaracterizing deposition testimony that Amgen is able to argue that it is

"undisputed" that the '516 Patent fails to disclose molecules that can be used to practice

the asserted claims. Contrary to Amgen's unsupported contention, it is apparent that

there is a genuine dispute as to the material issue of fact whether the specification

discloses molecules that can be used to practice the asserted claims.

E.    **The Limitation "in cells" Is Adequately Supported by the Specification of the '516 Patent.**

Amgen also argues that the asserted claims of the '516 Patent are invalid for lack of written description because the specification does not report the results of any experiment in which NF–κB activity was reduced in whole cells rather than extracts. However, again, it is well established that actual reduction to practice is not required to satisfy the written description requirement. *Falkner*, 448 F.3d at 1366. Accordingly, the claims cannot be invalid simply because the specification does not "describe even a single species of intact cells in which the claimed methods were *practiced*." (Amgen Br. at 24.)

To support its argument that the claims are not adequately described by experiments conducted in cell extracts, Amgen cites to language from Dr. Ravetch's Rebuttal Report in which he explains that certain cell extract experiments did not *inherently anticipate* claims limited to methods practiced "in cells." (*See Id.* (citing Greenwald Supp. Decl. Ex. 32 ¶¶ 46, 51).) In the quoted section of his report, Dr. Ravetch applied the correct legal standard for anticipation — that *all* the elements of the claim must be met by the allegedly anticipating reference — and did not, as Amgen implies, suggest that the claimed inventions could not be adequately described without proof of reduction to practice. The legal standards are entirely distinct. *Compare Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) ("A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention") *with Falkner*, 448 F.3d at 1366 (a claim is not invalid for lack of written description "simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language.").

Amgen also argues that the claims of the '516 Patent are invalid because the specification provides explicit evidence of the presence of NF–κB in only a limited number of cells. (Amgen Br. at 25.) Even if Amgen's arguments were availing, they would apply only to claims directed to "cells" or "mammalian cells," and not to dependent claims that are directed only to human cells and subsets thereof.[26] Amgen's arguments are not persuasive, even when applied to the independent claims directed to the broader classes. In *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), relied on by Amgen, the Federal Circuit held invalid claims to vectors encoding the genes to human, mammalian and vertebrate insulin — a vast majority of which had not been sequenced, and were not known in the art — where the specification disclosed the sequence to rat insulin only. Thus, the *Lilly* court held that the disclosure of one sequence of mammalian DNA was insufficient to claim all other insulin-encoding mammalian DNA because the sequences were required to practice the invention.

The claims of the '516 Patent, however, are not directed to DNA, and do not require the sequence of any gene. A person of ordinary skill in the art would understand, upon reading the specification and its teaching as to the ubiquity of NF–κB,[27] that the methods of the '516 Patent can be practiced on any cell that contains NF–κB. Unlike the patent in *Lilly*, which required detailed structural information from each

---

[26] Even if Dr. Kadesh had recanted his testimony, which ARIAD contests (*see* ARIAD's Mem. In Sup. of Mot. for Partial Summary Judgment on Inequitable Conduct (D.I. 574)), because satisfaction of the written description requirement is determined "claim by claim," the alleged recantation is similarly irrelevant. *Capon*, 418 F.3d 1360. That is because Dr. Kadesh's testimony was limited to the scope of claims that have not been asserted in this case. (*Id.* at 7.)

[27] '516 Patent at 2:26:31.

cell type before the claims could be practiced, the '516 Patent describes methods that are transferable to any cell that contains NF–κB.  By analogy, if the claims were drawn to methods of lysing mammalian cells with a centrifuge, those methods could be practiced just as well on a rat cell as a human cell, or any other mammalian cell, because — unlike the claims at issue in *Lilly* — no undisclosed genetic sequence is required to practice the claims.

The other cases relied upon by Amgen are even more easily distinguished.  In *Noelle v. Lederman,* 355 F.3d 1343, 1349-50 (Fed. Cir. 2004), the Federal Circuit held that, although an antibody could be functionally described by characterizing the antigen to which it binds, a human antibody could not be described by characterization of a rat antigen.  In other words, the Federal Circuit found it unsatisfactory for a patent applicant to attempt to define an unknown (the human antibody) by its binding affinity to another unknown (the human antigen).  *Id.*  Like the patent in *Lilly*, the patent in *Noelle* lacked structural specificity that was required to practice the claimed inventions.  In *Noelle*, as in *Lilly*, the claims were directed to molecules whose structure and physical characteristics would differ across species.

Here, by contrast, the claimed methods can be practiced on any cell that contains NF–κB, because the NF–κB pathway is generally conserved across species:  it is virtually ubiquitous.[28]  Indeed, where the claim terms merely identify the types of cells upon which claims are to be practiced, "the word[]. . . 'mammalian' readily conveys distinguishing information concerning their identity such that one of ordinary skill in the art could 'visualize or recognize the identity of members of the genus."  *Amgen Inc. v.*

---

[28] '516 Patent at 2:26:31.

*Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1332 (Fed. Cir. 2003). Because the different species that fall within "human" or "mammalian" cells are well known to those of skill in the art, use of those terms alone provides adequate written description of the scope of the cells encompassed by the claims. *Id.* Indeed, because of the large number of different type of cells in individual species and, *a fortiori*, the large number of species falling within taxonomic classes such as mammals, the implication of Amgen's argument is that one could never describe a method applicable throughout a species, genus, class, or kingdom, for that matter, without including in the specification a description of each of its members. That is in irreconcilable tension with, *inter alia*, the holding of *Cordis*, 339 F.3d at 1365, that an applicant is not required to "describe in the specification every conceivable and possible future embodiment of his invention."

For similar reasons, Amgen's reliance on *Enzo*, 323 F.3d 956 is also misplaced. Amgen argues that *Enzo* stands for the proposition that "claims to a broad genus are not adequately described by deposit of only three specific examples." (Amgen Br. at 26.) However, contrary to Amgen's description of the case, the court did not decide whether the genus claims at issue were adequately described by the deposit of three specific examples; it merely directed the court below to address the issue on remand. In fact, the Federal Circuit actually *reversed* a grant of summary judgment of invalidity for inadequate written description —implying that the three species were *not* insufficient, as a matter of law, to provide adequate descriptive support for the entire genus. *Id.* at 970.

## IV.    Conclusion

For the foregoing reasons, Amgen's motion for summary judgment of invalidity of U.S. Patent 6,410,516 for lack of adequate written description under 35 U.S.C. § 112 should be denied.

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology, the*
*President and Fellows of Harvard College and*
*the Whitehead Institute for Biomedical Research*

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008