# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION,
AMGEN USA INC., AMGEN MANUFACTURING
LIMITED, and IMMUNEX RHODE ISLAND
CORPORATION,

        Plaintiffs,

    v.

ARIAD PHARMACEUTICALS, INC., and THE
WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH,

        Defendants.

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, THE PRESIDENT AND FELLOWS
OF HARVARD COLLEGE, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,

        Counterclaim Plaintiffs,

    v.

AMGEN INC., IMMUNEX CORPORATION,
AMGEN USA INC., AMGEN MANUFACTURING
LIMITED, IMMUNEX RHODE ISLAND
CORPORATION, and WYETH,

        Counterclaim Defendants.

C.A. No. 06-259-MPT

**REDACTED
PUBLIC VERSION**

## DEFENDANTS-COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO AMGEN'S MOTION TO PRECLUDE THE TESTIMONY OF DR. RYAN SULLIVAN

*Of counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc.,
Massachusetts Institute of Technology, the
President and Fellows of Harvard College and the
Whitehead Institute for Biomedical Research*

## Table of Contents

*Page*

Table of Authorities ......................................................................................................... ii

I.    Introduction and Summary of the Argument ............................................................ 1

II.   Relevant Background ................................................................................................ 3

III.  Argument .................................................................................................................. 7

      A.    Applicable Legal Standards ........................................................................... 7

      B.    Dr. Sullivan's Conclusions with Respect to the Royalty Rate Are
            Sound and Supported by the Factual Record .................................................. 8

            1.    Dr. Sullivan's enforceability calculations are sound and
                  supported by the factual record. ........................................................... 8

            2.    Dr. Sullivan's conclusion as to the nature of the
                  hypothetical license is sound and supported by the factual
                  record. ................................................................................................. 19

      C.    Dr. Sullivan's Conclusions with Respect to the Royalty Base Are
            Sound and Supported by the Factual Record ................................................. 26

IV.   Conclusion ............................................................................................................... 32

# Table of Authorities

*Page(s)*

**Cases**

*Cordant Tech., Inc. v. Alliant Techsys. Inc.,*
    45 F. Supp. 2d 398 (D. Del. 1999)..................................................................28

*Daubert v. Merrell Dow Pharm.,*
    509 U.S. 579 (1993) ...............................................................................7, 8

*Fromson v. Western Litho Plate & Supply Co.,*
    853 F.2d 1568 (Fed. Cir. 1998) ...................................................................11

*Georgia–Pacific Corp. v. U.S. Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970) ..........................................................2, 25

*Hughes Aircraft Co. v. United States,*
    717 F.2d 1351 (Fed. Cir. 1983) ...................................................................28

*Inline Connection Corp. v. AOL Time Warner Inc.,*
    470 F. Supp. 2d 424 (D. Del. 2007) ...............................................................7

*Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.,*
    761 F.2d 649 (Fed. Cir. 1985) ....................................................................31

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996) ....................................................................11

*Micro Chem. Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003) .....................................................................8

*Mobil Oil Corp. v. Amoco Chem. Corp.,*
    915 F. Supp. 1333 (D. Del. 1995) ...........................................................11, 12

*Monsanto Co. v. Bayern Bioscience, N.V.,*
    No. 4:00CV01915 ERW, 2005 WL 5989796 (E.D. Mo. Oct. 28, 2005) ...............10, 11

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995) ......................................................................2

*Stecyk v. Bell Helicopter Textron, Inc.,*
    295 F.3d 408 (3d Cir. 2002) ...............................................................8, 23, 24

*Story Parchment Co. v. Paterson Parchment Co.,*
    282 U.S. 55 (1931) ..................................................................................31

*United States v. 0.59 Acres of Land,*
    109 F.3d 1493 (9th Cir. 1997) .....................................................................16

*Zenith Labs, Inc. v. Bristol-Myers Squibb Co.*,
    No. 91-3423, 1992 WL 171910 (D.N.J. July 12, 1992).........................................................31

## Statutes & Rules

35 U.S.C. § 284..................................................................................................................2

Fed. R. Evid. 408 .............................................................................................................22

Fed. R. Evid. 702 ...............................................................................................................7

Fed. R. Evid. 705 .............................................................................................................16

## Other Authorities

John M. Skenyon, et al., *Patent Damages Law & Practice* (2007) .......................................13, 24

Roman L. Weil, et al., *Litigation Services Handbook, The Role of the Financial Expert*
    (4th ed. 2007).................................................................................................................13, 24

Defendants-counterclaim-plaintiffs (collectively, "ARIAD") respectfully submit this memorandum in opposition to plaintiffs-counterclaim-defendants' (collectively, "Amgen") motion to preclude the testimony of Dr. Ryan Sullivan, ARIAD's damages expert.[1]

## I.    Introduction and Summary of the Argument

Amgen has moved to preclude the testimony of ARIAD's patent damages expert, Dr. Ryan Sullivan, asserting that his opinions are theoretically and factually unsupported. Even though Amgen equivocates as to the remedy it seeks — whether partial or complete preclusion — it appears that Amgen's motion is based upon three broad complaints about Dr. Sullivan's analyses. Two of those relate to Dr. Sullivan's conclusions with respect to the royalty rate that the jury should employ in assessing damages, while the third relates to Dr. Sullivan's conclusions with respect to the royalty base.

With respect to Dr. Sullivan's conclusions regarding the royalty rate, Amgen attacks certain calculations that Dr. Sullivan performed to illustrate the impact of the most fundamental premise of the *Georgia-Pacific* analysis, that the parties to the hypothetical negotiation would have considered the United States Patent No. 6,410,516 (the "'516 Patent") to be valid, enforceable and infringed by Amgen's blockbuster drug,

---

[1] Amgen's Memorandum in Support of the Motion to Preclude Certain Opinions of Dr. Ryan Sullivan (D.I. 592) is referred to herein as "Amgen Br."; documents cited to herein are attached to the Supplemental Declaration of David Greenwald ("Greenwald Supp. Decl.") dated May 22, 2008. The Declaration of Melanie K. Sharp in support of Amgen's motion to preclude Dr. Sullivan's testimony is referred to herein as "Sharp Decl."

Enbrel.[2]  Amgen argues that (i) Dr. Sullivan has improperly employed a "litigation kicker" — *i.e.*, a premium applied *on top of* a royalty rate that is already reasonable, designed to compensate ARIAD for litigation expenses; and (ii) even if an adjustment were warranted, Dr. Sullivan's calculations are speculative and/or based on statistical data whose presentation to the jury would prejudice Amgen.  Amgen also attacks Dr. Sullivan's conclusion that the hypothetical negotiation between ARIAD and Amgen would have resulted in an agreement giving Amgen the exclusive right to market and sell Enbrel, arguing that such a conclusion is legally improper, based on speculation and at odds with the evidence.

With respect to Dr. Sullivan's conclusions regarding the royalty base, Amgen attacks Dr. Sullivan's assumption that all of Amgen's sales of Enbrel in the United States and Canada made to entities other than the United States government should be included in the royalty base.  Amgen relies entirely upon several sound bites from the deposition testimony of ARIAD's infringement expert, Dr. Katherine Calame, in which Dr. Calame allegedly made "concessions" that are directly at odds with the conclusion in her expert report that the administration of Enbrel to a patient suffering

---

[2] The seminal case, *Georgia–Pacific Corporation v. United States Plywood Corporation*, 318 F. Supp. 1116 (S.D.N.Y. 1970) (hereinafter, "*Georgia-Pacific*"), sets forth certain principles that consistently have been followed for determining patent infringement damages based on the "reasonably royalty" theory set forth in 35 U.S.C. § 284.  *Georgia-Pacific* contemplates a "hypothetical negotiation[] between the plaintiff and the defendant" and requires "the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began."  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).  *Georgia-Pacific* sets forth fifteen factors that can be considered as part of the analysis.  318 F. Supp. at 1120-21.  Those factors, however, are not necessarily exhaustive. *Id.*

from rheumatoid arthritis, psoriasis, psoriatic arthritis or ankylosing spondylitis infringes the '516 Patent.

Amgen's arguments in support of preclusion rest upon fundamental mischaracterizations of the applicable law and of the evidentiary record. As demonstrated below, Dr. Sullivan's consideration of "enforceability adjustments" as part of his overall analysis is consistent with *Georgia-Pacific* and is appropriate with respect to the facts of this case. Similarly, Dr. Sullivan's conclusion that Amgen would have requested, and ARIAD would have given Amgen, the exclusive right to market and sell Enbrel until the expiration of the '516 Patent is sufficiently supported by the record and is consistent with *Georgia-Pacific*. Finally, Amgen's mischaracterization of Dr. Calame's deposition testimony notwithstanding, Dr. Sullivan's assumption that all non-governmental sales of Enbrel in the United States and Canada should be included in the royalty base is fully consistent with Dr. Calame's anticipated expert testimony and other evidence to be adduced at trial.

## II.    Relevant Background

Dr. Sullivan is the Chief Economist of Quant Economics, Inc., a consulting firm that specializes in economic analysis. (Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 1.) On January 18, 2008, Dr. Sullivan submitted an expert report addressing patent damages in this matter. (*Id.*) In his report, following the *Georgia-Pacific* framework, Dr. Sullivan opined that

**REDACTED**

**REDACTED**

(*Id.* ¶ 13.)  On March 8, 2008, Dr. Sullivan submitted a reply expert report responding to the opinions of Amgen's damages expert, Walter Bratic. (Greenwald Supp. Decl. Ex. 35, 3/7/2008 Sullivan Reply Report.)  In his reply report, Dr. Sullivan adhered to the conclusions he had previously set forth.

The opinions expressed by Dr. Sullivan in his initial and reply reports

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶¶ 14, 45.)  Among the numerous facts and circumstances Dr. Sullivan considered in his analyses, several bear particular relevance to Amgen's motion.

ARIAD's efforts to sublicense the application to the '516 Patent:  Between 2000 and 2002, ARIAD set out to sublicense its NF-κB intellectual property portfolio, which at the time included two issued patents (U.S. Patent Nos. 5,804,374 and 6,150,090 (collectively, the "Assay Patents")) and the patent application that on June 25, 2002 would issue as the '516 Patent.  To initiate licensing discussions, ARIAD sent letters to a number of pharmaceutical and biotechnology companies.  The letters were accompanied by term sheets, which proposed two running royalty rates:  (i) a running royalty in the

---

3

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 12.)  For the sake of simplicity, however, ARIAD refers to all three of ARIAD's counterparties to the hypothetical agreement as "Amgen."

amount of 1% of net sales of products whose "discovery, optimization, development or testing . . . was conducted or accomplished in whole or in part through the use of [the Assay Patents]"; and (ii) a running royalty in the amount of 5% of net sales of products whose "manufacture, use or sale of which would infringe an issued, valid claim of a Licensed Patent but for th[e] license." (Sharp Decl. Ex. F at ARI 71993-94.) Several companies responded to ARIAD's licensing overtures, expressing an interest in the pending claims of the '516 Patent.[4] In particular, Millennium Pharmaceuticals, Inc. ("Millennium"), Wyeth and Bristol-Myers Squibb ("BMS") each independently proposed a 2.5% rate for licensing those pending claims, thus halving the 5% royalty rate that ARIAD initially proposed.[5]

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 55.)

<u>Royalty rates contained in license agreements related to Enbrel to which</u> <u>Amgen is a party</u>: In the course of his analysis, Dr. Sullivan considered royalty rates contained in patent license agreements into which Amgen claims to have entered to obtain rights to patents needed for the development of and manufacturing process for Enbrel. There is no evidence that, during the negotiations that led up to the signing of

---

[4] Tularik and Immunex (Enbrel's maker as of 2001) also expressed an interest in licensing the '516 Patent application. Tularik proposed a 1% royalty rate, which ARIAD rejected as a "low-ball[]" offer. (Greenwald Supp. Decl. Ex. 21, 12/20/2007 Casselman Dep. at 101:9-11.) The terms of Immunex's counterproposal are not known because the relevant documents appear to have been lost by both parties to this litigation.

[5] Since the '516 Patent covers method claims directed the modulation of NF-κB activity, it is clear that the latter royalty rate proposed by ARIAD was intended by ARIAD to correspond to the '516 Patent.

those patent license agreements, Amgen conceded that the intellectual property that was the subject of licensure was valid, enforceable and infringed by Enbrel.

Past and projected metrics for Enbrel's commercial success:  Dr. Sullivan analyzed data concerning Enbrel's past financial performance and projections for Enbrel's future performance, including prior to and after expiration of patent protection.[6]  Dr. Sullivan noted that, at the time of the hypothetical negotiation, Amgen considered "Enbrel . . .

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 81.)  As Dr.

**REDACTED**

(*Id.* ¶ 84.)

**REDACTED**

(*Id.* ¶¶ 66-67.)

---

[6] Amgen holds several patents that cover certain aspects of the manufacturing process and use of Enbrel.  (Greenwald Supp. Decl. Ex. 29, 2/22/2008 Bratic Report ¶ 193.)

**REDACTED**

(*See* Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 66.)

**REDACTED**

(*Id.* at 21 n.65.)

### III.    Argument

#### A.    Applicable Legal Standards

Federal Rule of Evidence 702 confers upon the trial judge a "gatekeeping role" in deciding questions of the admissibility of proffered expert testimony. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). In *Daubert*, to assist trial courts in discharging those responsibilities, the Supreme Court provided a non-exclusive "checklist" intended to guide the assessment of whether expert testimony meets the reliability requirement of Rule 702. *Id.* at 593. Among the factors to be considered are "(1) whether the expert's technique or theory can be or has been tested — that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *Id.; see also* Fed. R. Evid. 702, advisory committee's note (2000).

Despite bearing the burden of establishing admissibility, the "profferors of expert testimony do not have to demonstrate by a preponderance of the evidence that the assessments of their experts are *correct,* they need only demonstrate by a preponderance of the evidence that their opinions are reliable." *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 424, 430 (D. Del. 2007) (emphasis in the original; citations and punctuation omitted). Indeed, "*Daubert* emphasized that the trial court must 'focus' solely on principles and methodology, and not on the conclusions they generate." *Id.* Where "the parties' experts rely on conflicting sets of facts, it is not the

role of the trial court to evaluate the correctness of facts underlying an expert's testimony." *Id.* (quoting *Micro Chem. Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003)). Indeed, where the record reflects a factual foundation sufficient to support an expert's opinion, it is incumbent upon the attorney cross-examining the expert "to explore any deficiencies in the expert's sources." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002). That is because "[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross examination." *Id.; see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Absent proof that no reasonable expert could base his opinion on a particular set of facts, criticisms directed to the factual foundation for expert testimony "raise precisely the type of issues that must be resolved by a fact-finder having the benefit of the adversary process." *Stecyk*, 295 F.3d at 415 n.3.

    **B.**    **Dr. Sullivan's Conclusions with Respect to the Royalty Rate Are Sound and Supported by the Factual Record.**

        **1.**    **Dr. Sullivan's enforceability calculations are sound and supported by the factual record.**

            **i.**    **Dr. Sullivan's illustrative calculations are consistent with *Georgia-Pacific*.**

As previously noted, among the many considerations Dr. Sullivan examined in reaching his conclusions were certain licensing discussions between ARIAD and Millennium, Wyeth and BMS that took place prior to the issuance of the '516 Patent, and, thus, prior to the hypothetical negotiation. As Dr. Sullivan notes in

his report, important differences exist between the hypothetical negotiation and those

licensing discussions,[7] and, although

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008

Sullivan Initial Report ¶ 50.)

Although Amgen does not challenge Dr. Sullivan's reliance on those 2001

negotiations,[8] Amgen takes issue with Dr. Sullivan's opinion that the parties to the

hypothetical negotiation would have made an upward adjustment to the 2.5% royalty

rate Millennium, Wyeth and BMS actually offered to ARIAD to account for the fact that

in the hypothetical negotiation, unlike in those "real world" negotiations, Amgen would

have conceded that the '516 Patent was valid, enforceable and infringed by Enbrel.

Differently put, it is clear from the documentary evidence, and Dr. Sullivan has so

concluded, that Millennium, Wyeth and BMS each used explicit and suggested threats of

litigation as a bargaining chip in their respective licensing discussions with ARIAD,[9]

---

[7]        **REDACTED**

(*See* Greenwald Supp. Decl. Ex. 26, Sullivan Initial Report ¶ 54.)

[8]        **REDACTED**

(Greenwald Supp. Decl.
Ex. 29, 2/22/2008 Bratic Report at 34–41.)

[9] *E.g.*, Greenwald Supp. Decl. Ex. 44, 11/27/2001 **REDACTED** E-mail w/ attachment,
at ARI 72467-68

**REDACTED**

Greenwald Decl. Ex. 4, 10/24/2001     e-
mail, at ARI 71841

**REDACTED**

thereby cutting the 5% royalty rate proposed by ARIAD in half.  Nonetheless, Amgen

argues that Dr. Sullivan should not be permitted to perform a calculation designed to

ascertain the terms Millennium's, Wyeth's and BMS's counterproposals would have

contained had those parties conceded — as *Georgia-Pacific* requires— that the '516 Patent

was valid, enforceable and infringed.


**REDACTED**


(Greenwald Supp. Decl. Ex. 35, 3/7/2008 Sullivan Reply Report ¶ 28.)  Indeed, an expert

opinion that fails to take fully into account the fundamental premise of validity,

enforceability and infringement, and seeks to lower the reasonable royalty rate by

resorting to "real world" discount factors like "patent risk," is subject to preclusion.  For

instance, in *Monsanto Co. v. Bayern Bioscience N.V.*, No. 4:00CV01915 ERW, 2005 WL

5989796 (E.D. Mo. Oct. 28, 2005), the court precluded the testimony of an expert whose

opinion with respect to damages took into account "doubts about [the plaintiff's] patent

position" and management assessments that licensing plaintiff's patents would be

"difficult." *Id.* at *14.  As the court explained, preclusion was appropriate because the

expert's analysis improperly "infus[ed] . . . 'real world factors'" into the hypothetical

---

is that such enablement, at least to the extent demonstration of utility is [sic] generally
accepted animal models, is required by the USPTO."); Sharp Decl. Ex. G, 10/16/2001
E-mail, at ARI 81592
**REDACTED**

negotiation context, thereby "undermin[ing] the very important assumption underlying the hypothetical negotiation, that the patent is valid and infringed." *Id.*

In sum, because Dr. Sullivan's assessment of the evidence indicates that the 2.5% rate independently offered to ARIAD by Millennium, Wyeth and BMS reflected a significant discount on account of litigation risk, it was perfectly appropriate for Dr. Sullivan to seek to illustrate how the parties to the hypothetical negotiation would have adjusted that rate to eliminate the impact of that risk.

Amgen's accusations that Dr. Sullivan resorted to a so-called "litigation kicker" mischaracterize Dr. Sullivan's opinion and, for that reason, the cases cited by Amgen have no application here. It is clear that, unlike the experts in the cases cited by Amgen, Dr. Sullivan did not apply a "'kicker' *on top of* a reasonable royalty." *Cf. Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1581 (Fed. Cir. 1996) (emphasis added).[10] Instead, consistent with *Georgia-Pacific*, Dr. Sullivan simply illustrated how the parties to the hypothetical negotiation would have adjusted a royalty rate that was *unreasonable* and depressed on account of litigation risk. Put differently, Dr. Sullivan's calculations have nothing to do a "litigation kicker" and everything to do with the uncontroversial principle that "real world" patent license negotiations do not necessarily — and indeed, generally do not — incorporate the *Georgia-Pacific* assumption that the intellectual

---

[10] In *Mahurkar*, the district court "calculated an initial [reasonable] royalty rate of 25.88%," but then added to that rate a 9% "kicker" to compensate the patent holder for "heavy litigation or other expenses." *Id.* at 1580-81. The Federal Circuit held that the district court abused its discretion in awarding the "'kicker' on top of [the] reasonable royalty rate." *Id.* The other cases cited by Amgen, *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir. 1988) and *Mobil Oil Corp. v. Amoco Chem. Corp.*, 915 F. Supp. 1333, 1352-53 (D. Del. 1995), stand for the uncontroversial proposition that a patent holder may not recover litigation expenses under the guise of a reasonable royalty award because, among other things, the Patent Act provides that such expenses may be recovered only under certain conditions.

property subject to licensure is valid, enforceable and infringed. Notably, Amgen has not contested the fundamental theoretical premise that "patent risk" or "patent litigation" discounts must be ignored in the *Georgia-Pacific* context, and, indeed, Amgen's own "litigation kicker" cases note that the assumption of validity, enforceability and infringement is a cornerstone of *Georgia-Pacific*. *E.g.*, *Mobil Oil*, 915 F. Supp. at 1352-53 ("[F]or purposes of the hypothetical negotiation, [plaintiff's] patents are deemed unquestionably valid and enforceable and will be infringed by [defendant] if the parties do not negotiate a license.").

Amgen's conclusory argument that Dr. Sullivan's analysis would somehow award ARIAD damages "more than 'adequate to compensate for the infringement'" (Amgen Br. at 20) is thus equally unpersuasive. Although it is true that Dr. Sullivan testified at his deposition that

**REDACTED**

(*see id.* at 20-21), that testimony does not establish that Dr. Sullivan's damages theory is flawed, let alone that it should be precluded. As Dr. Sullivan noted,

**REDACTED**

But, in the *Georgia-Pacific* context, which, as set forth above, assumes validity, enforceability and infringement, ARIAD's willingness to compromise on account of these pressures is simply irrelevant. And while Amgen suggests that Dr. Sullivan is engaged in voodoo economics, the evidence is very much to the contrary: Dr. Sullivan's approach is perfectly consistent with common sense and

economic theory.  As Dr. Sullivan pointed out in his reply report, commentators have noted that:

**REDACTED**

(Greenwald Supp. Decl. Ex. 35, 3/7/2008 Sullivan Reply Report at 8 n. 8 (quoting Roman L. Weil, *et al.*, *Litigation Services Handbook, The Role of the Financial Expert*, ch. 22 at 22 (4th ed. 2007)); *see also* John M. Skenyon, *et al.*, *Patent Damages Law & Practice* § 1:13 ("Reasonable royalty *damages* can be far different from any pre-infringement, real-world royalty the parties would have actually negotiated.  Indeed, the Federal Circuit has routinely affirmed 'reasonable royalty' awards that are obviously well in excess of what the parties would have actually agreed to as a result of licensing negotiations prior to infringement." (emphasis in the original)).  Indeed, Amgen's own patent damages expert agrees that royalty rates that are agreed upon in "real life" negotiations oftentimes, if not always, reflect discounts on account of patent litigation risk.[11]

---

[11] Greenwald Supp. Decl. Ex. 39, 4/1/2008 Bratic Dep. at 108:21-110:19

**REDACTED**

### ii. Dr. Sullivan's illustrative calculations are neither unreliable nor speculative.

Amgen's assertions that Dr. Sullivan's calculation of the adjustment that is warranted to eliminate litigation risk is unreliable and speculative do not withstand scrutiny. While Amgen suggests that there is no basis for Dr. Sullivan's illustrative calculations, Amgen's brief itself makes clear that Dr. Sullivan's analyses rely on two separate sources. (Indeed, Amgen has moved to preclude Dr. Sullivan from informing the jury about one of those sources.) Most importantly,

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report at 18 n.57.) As Dr. Sullivan explained in his reply report:

**REDACTED**

(Greenwald Supp. Decl. Ex. 35, 3/7/2008 Sullivan Reply Report ¶ 29.) In other words, to remove the impact of "litigation risk," as directed by *Georgia-Pacific*, Dr. Sullivan simply reversed the calculation that the parties to the ARIAD-Millennium negotiation

—————————————

**REDACTED**

employed to deduct such risk from the 5% royalty rate initially proposed by ARIAD.[12]

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008

Sullivan Initial Report at 18 n.57.)  These probabilities directly corroborate the actual

discount used by Millennium in its negotiations with ARIAD.

**REDACTED**

There is nothing speculative about Dr. Sullivan's

---

[12] Amgen has concocted several absurd examples that supposedly illuminate the flaws in Dr. Sullivan's analysis.  For instance, Amgen claims that if a patent that bears a 1% chance of being held valid, enforceable and infringed is licensed in "real life" for a royalty rate of 2.5%, Dr. Sullivan's damages theory would dictate that the royalty rate that would result from a hypothetical negotiation for that patent would translate to 250%.  (*See* Amgen Br. at 22.)  While Amgen's math checks out, Amgen's facile example does not.  The premise of its syllogism — that a patent that bears virtually no chance of surviving a court challenge could ever be licensed in practice, let alone for a running royalty rate of 2.5% — is not realistic.  The factual premises of Amgen's illustration are simply at odds with the actual facts surrounding ARIAD's negotiations with Millennium, Wyeth and BMS.  Amgen's statement that "Dr. Sullivan's 'litigation risk' theory is more akin to roulette (where pay-outs are greater for riskier bets) than a sound damages theory" (Amgen Br. at 22) is simply misguided rhetoric.

13

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 61.)  For the reasons already discussed, Dr. Sullivan's opinions in that regard should not be precluded.

**REDACTED**

(Greenwald Supp. Decl. Ex. 39, 4/1/2008 Bratic Dep. at 223:6-224:4, 234:2-235:3, 237:12-239:12, 251:6-24, 258:9-24, 263:14-264:5.)

adjustments, and Amgen and its expert will have ample opportunity at trial to try to persuade the jury otherwise.

Amgen's protestations that Dr. Sullivan's testimony should be precluded because "[a]llowing ARIAD and Dr. Sullivan to present . . . probabilities and statistics to the jury would unduly prejudice Amgen by implying to the jury what 'normally happens' with respect to defenses of invalidity and non-infringement" (Amgen Br. at 23) have no merit. It is well established that "an expert may base his opinion at trial on inadmissible facts and data of a type reasonably relied upon by experts in his field." *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997). And, where, as here, "inadmissible evidence used by an expert is admitted to illustrate and explain the expert's opinion," the usual remedy is a simple "instruct[ion to] the jury that the otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence." *Id.* (citations and punctuation omitted). Moreover, Rule 705 provides that "[t]he expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination." Fed. R. Evid. 705. Thus, even if the Court finds that Amgen would be improperly prejudiced by Dr. Sullivan's explaining to the jury the particular methodology he used to account for the absence of "litigation risk," preclusion is not the appropriate remedy.

### iii. Even if Dr. Sullivan's calculations were precluded, the additional remedy requested by Amgen would be unwarranted.

Finally, even if preclusion of Dr. Sullivan's illustrative calculations were appropriate, which it is not, the additional, arithmetical remedy that Amgen is

requesting — a downward adjustment to Dr. Sullivan's ultimate conclusion regarding the reasonable royalty rate (*see* Amgen Br. at 26) — would still be inappropriate. The adjustment that Amgen requests might be warranted only if (i) Dr. Sullivan had arrived at his conclusion as to the reasonable royalty rate in a purely mechanical, additive fashion by ascribing particular weight to individual *Georgia-Pacific* factors (here, factors 1 and 2); *and* (ii) the calculations that Dr. Sullivan performed were the sole support for his opinions

REDACTED

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 52) — and the rates in comparable licenses related to Enbrel (4%-5%). Neither proposition is consistent with Dr. Sullivan's opinions.

As Dr. Sullivan explained in his initial report,

REDACTED

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 14.)

REDACTED

(*Id.* ¶ 47.)

Similarly, Dr. Sullivan made it crystal clear in his report that

REDACTED

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 108);

(ii)                                    **REDACTED**

(*id.* ¶ 54); (iii)

(*id.* ¶ 109); and (iv)

**REDACTED**

(*id.* ¶¶ 109-110).

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 61),

**REDACTED**

(*id.* ¶ 60).

**REDACTED**

(*Id.* ¶ 47.)

**2. Dr. Sullivan's conclusion as to the nature of the hypothetical license is sound and supported by the factual record.**

In his expert report, Dr. Sullivan examined the overall record to conclude that

**REDACTED**

Amgen attacks Dr. Sullivan's conclusion arguing that it is, in turn, at odds with the law of patent damages, speculative and refuted by the record evidence.  Amgen's arguments are addressed below, in reverse order.

**i.  Dr. Sullivan's conclusion is sufficiently supported by the evidentiary record.**

Although Amgen asserts that "Dr. Sullivan's exclusivity contention lacks a proper factual foundation" and "is flatly contradicted by the record evidence in this case" (Amgen Br. at 15), that is plainly not the case.

**REDACTED**

(Greenwald Supp. Decl. Ex. 26, Sullivan Initial Report, Appendix 3 and Exhibit 17); (ii) **REDACTED** (*id.* ¶ 66); (iii) (*id.* at 21 n.64); (iv)

**REDACTED**

(*id.* ¶ 67); and (v)

**REDACTED**

**REDACTED**

(*Id.* ¶ 67.)

Amgen's argument that Dr. Sullivan does not

**REDACTED**

(Amgen Br. at 16) is particularly cynical given that

Amgen (i) has either misplaced or destroyed the term sheet reflecting the

counterproposal that Immunex made to ARIAD in February 2002; (ii) has produced no

documents reflecting the terms on which Immunex and/or Amgen would have been

willing to take a license to the '516 Patent; and (iii) has invoked the attorney-client

privilege and work product doctrine over a number of documents that purportedly

reflect Immunex's and Amgen's licensing strategy vis-à-vis ARIAD. (*See, e.g.,*

Greenwald Supp. Decl. Ex. 14, Amgen Supp. Privilege Log, Item Nos. 3, 5, 6-9, 14-15.)

Moreover, while Amgen's damages expert, Mr. Bratic,

**REDACTED**

1

**REDACTED**

[14] And while Amgen,

relying on a mischaracterization of Dr. Sullivan's deposition testimony, claims that

Amgen has never entered into compound-exclusive licenses with respect to Enbrel (*see*

Amgen Br. at 16),

**REDACTED**

(Greenwald Supp. Decl.

Ex. 26, 1/18/2008 Sullivan Initial Report ¶¶ 64-65.)

**REDACTED**

---

[14] *See* Greenwald Decl. Ex. 39, 4/1/2008 Bratic Dep. at 211:11-212:7

**REDACTED**

[15] Greenwald Supp. Decl. Ex. 39, 4/1/2008 Bratic Dep. at 254:9-12

**REDACTED**                                    260:23-261:4

REDACTED                          (Greenwald Supp. Decl. Ex. 35, 3/7/2008

Sullivan Reply Report ¶ 53.)

REDACTED

‚Greenwald Supp. Decl. Ex. 26,

1/18/2008 Sullivan Initial Report ¶¶ 64–65.)

Amgen is wrong that Dr. Sullivan's conclusion that

REDACTED                          is "flatly contradicted by

all of the admissible record evidence on this issue." (Amgen Br. at 17.) In fact, as Dr.

Sullivan noted in his report,          REDACTED

And although it is true that Amgen

initially offered to license its NF-κB patent portfolio on non-exclusive terms (*see id.* at 17–

18), it simply does not follow that ARIAD would have been unwilling to enter into

---

[16] *See* Greenwald Decl. Ex. 26, 1/18/2008 Sullivan Initial Report at 21 n.63. Amgen claims that

REDACTED          ' (Amgen Br. at 15 n.11.) That is not true, as          REDACTED

Amgen is similarly incorrect that the settlement offer that ARIAD made to Lilly is inadmissible under Federal Rule of Evidence 408, which prohibits the use of settlement offers for purposes of, among other things, proving the "amount of a claim." Fed. R. Evid. 408(a).          REDACTED

does not fall within the scope of Rule 408 since the document in question is not being used to prove the "amount of a claim." Notably, Dr. Sullivan '

REDACTED          Finally, Amgen is wrong that "ARIAD still refuses to produce other settlement offers from the *Eli Lilly* case, or allow discovery on any underlying settlement negotiations." (Amgen Br. at 15–16 n.11.) In fact,

REDACTED

(Greenwald Decl. Ex. 19, 11/30/2007 Allen Dep. at 171:11–176:17.)

REDACTED                          (*Id.* at

176:1–17.)

compound-exclusive licenses.

## REDACTED

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶ 65.)

Moreover, because a semi-exclusive license would not have frozen any existing market

participants out of the market, and would have permitted ARIAD to continue licensing

its NF-κB patents to interested market participants who were not manufacturing Enbrel,

such a license would not have been inconsistent with the statements by ARIAD

management that Amgen quotes in its brief. (*See* Amgen Br. at 18.)

In sum, Amgen's claim that Dr. Sullivan's exclusivity "contention is flatly

contradicted by the admissible record evidence" such that it should be precluded

(Amgen Br. at 18) is without merit. While it is clear that Amgen and its damages expert

intend vigorously to contest Dr. Sullivan's conclusions and their factual support,

Amgen's attacks amount at this juncture to nothing more than a dispute over what

inferences the jury ought to draw from the disputed evidentiary record. Such

arguments "raise precisely the type of issues that must be resolved by a fact-finder

having the benefit of the adversary process." *Stecyk*, 295 F.3d at 415 n.3.

### ii. Dr. Sullivan's exclusivity valuation is not speculative.

Amgen also argues that Dr. Sullivan improperly illustrated the impact of

exclusivity by conducting a valuation aimed at quantifying the incremental revenues

and profits that Amgen would have earned as a result of that license. This argument is

flawed for at least two reasons.

It was perfectly permissible for Dr. Sullivan to rely on estimates of future

financial performance to perform his *Georgia-Pacific* analyses and evaluate the

incremental benefits to Amgen that could result from a compound-exclusive patent license. In fact, the past, present and projected profitability of the infringing product lies at the heart of patent damages analyses.[17]

And while it is true that any projections, including those used by Dr. Sullivan, are by definition "uncertain," Amgen's assertion that Dr. Sullivan's analyses employed data that is "'uncertain,' and thus, speculative" (Amgen Br. at 14) is simply disingenuous considering that                     REDACTED

(Greenwald Supp. Decl. Ex. 26, 1/18/2008 Sullivan Initial Report at 59.) If such "uncertain" and "speculative" projections were good enough to justify an $18 billion acquisition two weeks after the hypothetical negotiation (*id.*), they should be deemed good enough when used by Dr. Sullivan. And even if the type of data used by Dr. Sullivan were subject to reasonable question, preclusion would not be the appropriate remedy because Amgen will have an opportunity to attack the credibility of its own forecasts at trial. *Stecyk*, 295 F.3d at 414 ("[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross examination.").

---

[17] *Rite-Hite*, 56 F.3d at 1577 ("[A]nticipated profit is a factor in hypothetical negotiations."); Roman L. Weil, *et al.*, *Litigation Services Handbook, The Role of the Financial Expert*, ch. 22 at 25 (4th ed. 2007) ("Profitability, of course, lies at the heart of market value. . . . The analysis should focus on the projected profits of the infringer and the patentee at the time of the hypothetical negotiations."); John M. Skenyon, *et al.*, *Patent Damages Law & Practice* § 1:13 (2007) ("One approved method of arriving at reasonable royalty damages is called the 'analytical approach,' which, in reality has nothing at all to do with any hypothetical licensing negotiation. Essentially, in one form, this approach involves calculating damages based on the infringer's own profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer.").

### iii. *Georgia-Pacific* expressly contemplates the possibility of excusive licenses.

Finally, without citing any legal support, Amgen asserts that, because "Dr. Sullivan concede[d at his deposition] that a non-exclusive license would have been adequate to provide Amgen freedom to operate under the '516 patent,"

**REDACTED**

(Amgen Br. at 12.)  Amgen appears to be arguing that, because Amgen and ARIAD *could have* agreed to a non-exclusive license to the '516 Patent, they would have in fact so agreed.  In other words, even though the third factor of the *Georgia-Pacific* analysis expressly tasks the expert to determine whether the parties would have been best suited by an exclusive *or* non-exclusive license, 318 F. Supp. at 1120, Amgen argues that, because one could conceive that the hypothetical negotiation here would have resulted in a non-exclusive hypothetical license,              **REDACTED**

Merely to state that argument demonstrates its flaws:  the purpose of the *Georgia-Pacific* inquiry is not to ascertain the terms of the barest patent license that the parties thereto might have agreed upon; rather, the focus of the inquiry is to ascertain the terms of the agreement that *would have best suited* the respective needs of the parties.  Here, as previously noted,

**REDACTED**

While Amgen and its damages expert are free to take issue with Dr. Sullivan's conclusion at trial, there is nothing "unlawful" about it and nothing that

would have prevented the parties from making an agreement on the terms Dr. Sullivan

believes would have been agreed upon.[18]

C.    **Dr. Sullivan's Conclusions with Respect to the Royalty Base Are Sound and Supported by the Factual Record.**

In her opening expert report, Dr. Calame,

**REDACTED**

(Greenwald Decl. Ex. 23, 1/18/2008 Calame Initial Report ¶ 17

**REDACTED**                              Relying upon Dr. Calame's opinion for

purposes of calculating damages,

**REDACTED**

(Greenwald Decl. Ex. 26, 1/18/2008 Sullivan Initial Report ¶¶ 92-

93.)

Amgen appears to be seeking the complete preclusion of Dr. Sullivan's

testimony on the basis that Dr. Calame testified at her deposition that

**REDACTED**

‘                              (Amgen Br. at 24.)  Amgen also places special

---

[18] Indeed, Amgen has entered into at least two patent license agreements that are "exclusive as to Enbrel."  *See supra* n.15.

emphasis on a purported "concession" by Dr. Calame that

**REDACTED**

(*See* Amgen Br. at 23-24.)  Because Amgen seeks to

impose upon Dr. Calame an impossible standard of proof that is at odds with precedent,

Amgen's attacks on Dr. Calame have no merit.

Amgen claims that

**REDACTED**

That is incorrect; indeed, it is no more true than saying that

Enbrel should not bear FDA approval because a small subset of rheumatoid arthritis

patients who take Enbrel do not respond to treatment.  In Dr. Calame's opinion,

**REDACTED**

(Greenwald Supp. Decl. Ex. 23,

1/18/2008 Calame Report ¶¶ 27-29.)

**REDACTED**

(Greenwald Supp.

Decl. Ex. 33, 3/7/2008 Calame Report ¶ 19.)  As Amgen's infringement expert, Dr. Alisa

Erika Koch, testified:

**REDACTED**

**REDACTED**

(Greenwald Decl. Ex. 36, 3/20/2008 Koch Dep. 161:13-162:19.)  Although, as a

precondition of demonstrating Amgen's liability for indirect infringement, ARIAD has

the burden of proving direct infringement, ARIAD need only do so by the

preponderance of the evidence.[19]  It has clearly done so here:  even taking the 1-out-of-7

response rate on its face, it is more likely than not — *i.e.*, there is an 86% chance — that a

rheumatoid arthritis patient receiving Enbrel will exhibit a reduction in her levels of

activated NF-κB.

---

[19] *Cordant Tech., Inc. v. Alliant Techsys. Inc.*, 45 F. Supp. 2d 398, 414 (D. Del. 1999)
(citing *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir. 1983)).

ARIAD also disputes that infringement ceases to exist in a subset of psoriasis patients whose symptoms may abate after treatment with Enbrel. Psoriasis is a chronic disease characterized by elevated levels of TNF-$\alpha$, a pro-inflammatory cytokine that triggers the activation of NF-$\kappa$B. (Greenwald Decl. Ex. 23, 1/18/2008 Calame Report ¶¶ 8-9.) Although some psoriasis patients receiving treatment with Enbrel may stop exhibiting symptoms at some point during treatment, that does not mean that their NF-$\kappa$B levels cease to be downregulated by treatment with Enbrel. As Dr. Calame explained at her deposition:

**REDACTED**

(Greenwald Supp. Decl. Ex. 38, 3/26/2008 Calame Dep. at 215:10-18.) Amgen's experts agree that, simply because the symptoms of psoriasis may no longer be noticeable, that does not mean that the underlying disease is "cured":

**REDACTED**

(Greenwald Supp. Decl. Ex. 36, 3/20/2008 Koch Dep. at 176:13-25.)

**REDACTED**

**REDACTED**

(Greenwald Supp. Decl. Ex. 37, 3/21/2008 Jackson Dep. at 47:1-20.)

ARIAD disputes that the administration of Enbrel to an ankylosing spondylitis patient does not infringe the '516 Patent. Ankylosing spondylitis is an autoimmune disease that appears to be associated with elevated levels of TNF-α. Jennifer D. Gorman, *et al., Treatment of Ankylosing Spondylitis by Inhibition of Tumor Necrosis Factor* α, 346 New England J. Med. 1349-56 (2002). Since TNF-α has been demonstrated to be an NF-κB inducer, Enbrel acts by binding TNF-α and it is efficacious in treating ankylosing spondylitis, it is likely that the administration of Enbrel to an ankylosing spondylitis patient infringes the '516 Patent.

Finally, Amgen seeks to preclude testimony by Dr. Sullivan because, in response to a question whether she could opine that *all* patients who take Enbrel infringe the '516 Patent, Dr. Calame answered that she could not so opine. Dr. Calame's response reflected her integrity as a scientist, rather than some underlying defect in the admissibility of her expert opinions, or of the expert opinions Dr. Sullivan has sponsored

based thereon. Because even very homogenous populations may have *some* small amount of variation, it would not have been appropriate for Dr. Calame — as a scientist adherent to principles of empiricism — to opine that *all* patients who take Enbrel infringe the '516 Patent. Without analyzing tissue samples from the hundreds of thousands of patients that have taken Enbrel, a principled scientist would hesitate to offer the opinion, as an absolute, that the population is without any variation. However, even if it were possible to collect tissue samples from each and every patient who has used Enbrel in the United States and Canada, it would have been unethical to do so (or, indeed, to take a sample from a *single* patient) for purposes of proving infringement in litigation. (Greenwald Decl. Ex. 23, 1/18/2008 Calame Initial Report ¶ 23.) *See also Zenith Labs, Inc. v. Bristol-Myers Squibb Co.*, No. 91-3423, 1992 WL 171910, at *17 (D.N.J. July 12, 1992) ("The opinions of [defendant's experts] that, given the nature of the experiments which would be required, *in vivo* experimentation could not be justified under medical ethics constraints merely to prove patent infringement, stands unrefuted by Zenith."). In light of the practical and ethical impossibility of performing such studies, accepting Amgen's position would disregard the "[f]undamental principles of justice [that] require [the courts] to throw any risk of uncertainty upon the wrongdoer rather than upon the injured party." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 655 (Fed. Cir. 1985) (citing *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563 (1931)). The wealth of evidence adduced by Dr. Calame (and relied upon by Dr. Sullivan) shows that at least the overwhelming majority of psoriasis and rheumatoid arthritis patients who take Enbrel not only obtain relief, but also show statistically significant reductions in their levels of activated NF-κB. That is more than adequate proof to support the base for Dr. Sullivan's royalty calculations under the

preponderance of evidence standard ARIAD faces in proving infringement and

damages therefrom.

## IV.    Conclusion

        For the foregoing reasons, ARIAD respectfully requests that the Court

deny Amgen's motion to preclude Dr. Sullivan's testimony.


        ASHBY & GEDDES

        */s/ Lauren E. Maguire*

        _____

        Steven J. Balick (#2403)
        John G. Day (#2114)
        Lauren E. Maguire (#4261)
        500 Delaware Avenue, 8th Floor
        P.O. Box 1150
        Wilmington, DE 19899
        302-654-1888
        sbalick@ashby-geddes.com
        jday@ashby-geddes.com
        lmaguire@ashby-geddes.com

        *Attorneys for ARIAD Pharmaceuticals, Inc.,*
        *Massachusetts Institute of Technology, the*
        *President and Fellows of Harvard College and*
        *the Whitehead Institute for Biomedical Research*

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008