IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>Defendants. | C.A. No. 06-259-MPT<br><br><br><br><br><br>**REDACTED PUBLIC VERSION** |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>Counterclaim-Defendants. | |

## SUPPLEMENTAL DECLARATION OF DAVID GREENWALD

### (VOLUME II OF IV)

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (I.D. #2403)
John G. Day (I.D. #2114)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, The President and Fellows of Harvard College and The Whitehead Institute for Biomedical Research*

# EXHIBIT 17

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

### A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

**90/007,503**          **and**          **90/007,828**

**Filed April 4, 2005          Filed December 2, 2005**

### Merged Pursuant to May 4, 2006 Merger Decision
### Group Art Unit: 3991   Examiner: B.M. Celsa

| | |
|---|---|
| Patentees: | David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis |

Patent No.:    6,410,516 B1            Serial No: 08/464,364

Issue Date:    June 25, 2002            Filed:    June 5, 1995

For        :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
                REGULATION

                            1185 Avenue of the Americas
                            New York, New York 10036
                            October 22, 2007

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION,
### SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW,
### STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565,
### AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

A Final Office Action issued July 6, 2007 in connection with the
above-identified merged *ex parte* reexamination. The July 6, 2007
Final Office Action set a two (2) month period for filing a
response. Patentees petitioned, and on September 29, 2007 the
U.S. Patent Office granted Patentees' petition, for a one (1)
month extension of time such that a response to the July 6, 2007
Final Office Action was due October 6, 2007. Thereafter, on
October 1, 2007 Patentees petitioned for, and the U.S. Patent
Office granted Patentees' petition for a two (2) week extension

ARI 84387

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 92 of October 22, 2007 Response*

of time such that a response to the July 6, 2007 Final Office
Action is now due October 20, 2007. However, since October 20,
2007 was a Saturday, a response filed on the next succeeding day
which is not a Saturday, Sunday or Federal holiday, i.e. Monday,
October 22, 2007, is to be considered timely filed under 37
C.F.R. § 1.7. Accordingly, this Response is being timely filed.

Patentees note that they are concurrently filing a Petition Under
37 C.F.R. § 1.182 And Request For Continued Reexamination.

ARI 84388

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 3 of 92 of October 22, 2007 Response*


**In the Specification**

Please amend the specification of the subject patent under
reexamination pursuant to 37 C.F.R. § 1.530(d)(1) as follows:

-delete the paragraph in column 10, lines 16-17; and

-amend the paragraph in column 28, lines 5-17 as follows:

> The inhibitor fraction was treated with trypsin to
> test whether IkB is a protein (FIG. 35B). Tryptic
> digestion was stopped by the addition of bovine
> pancreas trypsin inhibitor (BPTI) and samples were
> analyzed for NF-kB inhibition. Trypsin treatment
> interfered with the activity of IkB, as shown by the
> complete inability of the treated sample to inhibit
> NF-kB activity (FIG. 35B, compare lanes 1 and 6).
> Trypsin that had been treated with BPTI had no effect
> (FIG. 35B, lane 5), demonstrating that the
> inactivation of IkB was specifically caused by the
> proteolytic activity of trypsin. It appears that IkB
> requires an intact polypeptide structure for its
> activity. ~~The nucleotide sequence of the IkB-α gene~~
> ~~and the amino acid sequence of IkB-α are shown in FIG.~~
> ~~43.~~

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 92 of October 22, 2007 Response*

## In the Drawings

Please cancel Figure 43 from the subject patent under reexamination pursuant to 37 C.F.R. § 1.530(d)(3). In accordance with 37 C.F.R. § 1.530(d)(3) a copy of Figure 43 surrounded by brackets and identified as "Canceled" is attached hereto as **Exhibit A**.

ARI 84390

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 5 of 92 of October 22, 2007 Response*

## In the Claims

Please amend the claims of the subject patent pursuant to 37
C.F.R. § 1.530(d)(2):

Specifically, please cancel the following claims[1]:

(a)  1, and 20-27 and 29 which depend from claim 1;

(b)  2, and 31-38 and 40 which depend from claim 2;

(c)  3, and 42, 43 and 47-51 which depend from claim 3;

(d)  4, and 192, 193 and 197-201 which depend from claim 4;

(e)  5, and 53-62 which depend from claim 5;

(f)  10, and 99, 100, 104 and 105 which depend from claim
     10;

(g)  11, and 106, 107, 109, 110 and 114-117 which depend
     from claim 11;

(h)  12, and 119, 120 and 124-127 which depend from clam
     12;

(i)  13, and 128, 129 and 133-137 which depend from claim
     13;

(j)  15, and 149, 150 and 154-157 which depend from claim
     15;

(k)  16, and 159, 160 and 164-166 which depend from claim
     16; and

(l)  17, and 167, 168 and 172-175 which depend from claim
     17.

In addition please add new claims 204-211 as follows:

204. (New) A method for reducing expression in a human cell of
     a gene, the expression of which has been induced by an
     extracellular polypeptide that activates NF-kB to act as an
     intracellular messenger to transmit a signal that induces
     expression of the gene from the plasma membrane of the cell
     to the nucleus of the cell, which comprises contacting the

---

[1]Please note that in the response to the August 2, 2006 Office Action the following
claims were previously canceled: 7, 81, 83, 85, 86, 28, 39, and 203.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 6 of 92 of October 22, 2007 Response*

cell with a composition that inhibits transmission of the
signal so as to thereby reduce expression of the gene in
the cell.

205. (New) The method of claim 204, wherein the contacting of
the cell with the composition that inhibits transmission of
the signal is within the cell.

206. (New) The method of claim 204, wherein the extracellular
polypeptide is TNF-α.

207. (New) The method of claim 205, wherein the extracellular
polypeptide is TNF-α.

208. (New)  The method of claim 204, wherein the composition is
a protein.

209. (New)  The method of claim 205, wherein the composition is
a protein.

210. (New)  The method of claim 206, wherein the composition is
a protein.

211. (New)  The method of claim 207, wherein the composition is
a protein.

Support for new claim 204 may be found, *inter alia*, in column 3,
line 59 - column 4, line 28; in column 12, line 36 - column 13,
line 3; in column 15, line 54 - column 16, line 35; in column 2,
line 57; and in column 17, lines 30-37 of the '516 patent.

Support for new claim 205 may be found, *inter alia*, in column 3,
line 63-64 of the '516 patent.

Support for new claims 206 and 207 may be found, *inter alia*, in
column 17, line 30-36 of the '516 patent.

ARI 84392

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 7 of 92 of October 22, 2007 Response*

Support for new claims 208-211 may be found, *inter alia*, in
column 16, lines 4-10; and in column 37, line 55-56 and 43-49 of
the '516 patent.

Accordingly, each of new claims 204-211 is fully supported by the
specification of the '516 Patent and raises no issue of new
matter. These new claims are added in response to issues and/or
arguments raised for the first time in the July 6, 2007 Final
Office Action. Therefore, entry and consideration of new claims
204-211 is respectfully requested.

As a result of this Amendment the following claims are pending:

    (a)    confirmed patentable claims 19, 30, 41, 44-46, 52, 63,
        74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-
        132, 138, 141-143, 148, 151-153, 158, 161-163, 169-
        171, 176, 179-181, 186-191, 194-196, and 202;

    (b)    rejected claims 6 and 64-73 which depend from claim 6;
        8 and 75-80, 82 and 84 which depend from claim 8; 9
        and 88-97 which depend from claim 9; 14 and 139, 140,
        and 144-147 which depend from claim 14; 18 and 177,
        178, and 182-185 which depend from claim 18; and

    (c)    new claims 204-211.

**ARI 84393**

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 8 of 92 of October 22, 2007 Response*

## REMARKS

Patentees respond below to the rejections set forth in the July
6, 2007 Final Office Action.  The following Table of Contents is
provided for the Examiner's convenient reference.

Table of Contents

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 15 |
| | A. **Status of Claims Pursuant to 37 C.F.R. § 1.530(e)** | 15 |
| | B. **Objection to Claim 8** | 15 |
| | C. **Updated Status of Concurrent Proceedings Pursuant to 37 C.F.R. §1.565** | 17 |
| II. | SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW | 21 |
| III. | RESPONSE TO ART REJECTIONS | 29 |
| | A. **All Rejected Claims Now Pending Are Directed To Reducing Induced NF-kB Activity** | 29 |
| | 1) All rejected, pending claims must be given their broadest reasonable interpretation | 30 |
| | 2) Claim 6 Recites "diminishing induced NF-kB-mediated intracellular signaling"; Claim 8 recites modifying effects of external influences which induce NF-kB mediated intracellular signaling by reducing NF-kB activity in the cells such that NF-kB mediated effects ...are modified; Claim 9 Recites "reducing, in eukaryotic cells, the level of expression of genes which are activated"; Claim 14 Recites "reducing bacterial lipopolysaccharide-induced expression of cytokines"; and Claim 18 Recites reducing Interleukin-1 or Tumor Necrosis Factor-α activity ...so as to reduce "intracellular signaling caused by Interlukin-1 or Tumor Necrosis Factor-α in the cells" | 32 |
| | 3) Each of Claim's 64-69, 75-80, 88-93, 139-144, 177, 178, and 182 Is Directed To Reducing Induced NF-kB Activity By Carrying Out A Specific Step Inside a Cell | 35 |
| | B. **The Rejected Claims Now Pending Are Not Anticipated By The Cited Art. For Each Rejected Claim It Has Not Been Shown That Every Element Explicitly or Necessarily Occurs in the Cited Art. Moreover, Certain Cited Art Clearly Does Not Enable The Method Described Therein So That Even If Each Element Of A Rejected Claim Were Disclosed The Cited Art Such Art Would Not Anticipate** | 36 |

ARI 84394

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 9 of 92 of October 22, 2007 Response*

1)    CLAIM 14 AND CLAIMS 139, 140 and 144-147 WHICH DEPEND
      THEREON........................................... 38

a)    *The Method of Claim 14 and Claims Dependent*
      *Thereon Does Not Occur In Any Person To Whom*
      *Antibiotics Are Administered* ..................... 39

b)    *Performing Any Method Involving Administering An*
      *Antibiotic According to The Disclosure of the 1970 PDR*
      *Only Results In Killing Gram-Negative Bacteria*
      *Sometimes. Such Occasional Results Are Not Sufficient*
      *To Establish An Element of the Claims Necessarily or*
      *Inevitably Occurred........ ...................... * 40

c)    *The Occasional Results Obtainable Following the*
      *Disclosure of the 1970 PDR Are Not Sufficient to*
      *Enable the Method Disclosed And Therefore Cannot*
      *Anticipate Claim 14 and Claims Dependent*
      *Thereon........................................* 43

d)    *Administering An Antibiotic As Disclosed in The 1970*
      *PDR Does Not Anticipate Reducing Induced NF-kB*
      *Activity by Intervening Within the NF-kB Intracellular*
      *Signaling Pathway At A Specified Segment as Recited in*
      *Claim 139, 140 and 144..........................* 45

2)    CLAIM 18 AND CLAIMS 177, 178 and 182-185 WHICH DEPEND
      THEREFROM ....................................... 48

Rejection Based on Antibiotic Art ..................... 49

a)    *The Method of Claim 18 and Claims Dependent*
      *Thereon Does Not Occur In Any Person To Whom*
      *Antibiotics Are Administered* ..................... 49

b)    *Performing Any Method Involving An Antibiotic*
      *According To the 1970 PDR Only Results In Killing*
      *Gram-Negative Bacteria Sometimes. Such Occasional*
      *Results Are Not Sufficient To Establish An Element of*
      *the Claims Necessarily Or Inherently Occurs* ...... 49

c)    *The Occasional Results Obtainable Following The*
      *Disclosure of the 1970 PDR Are Not Sufficient to*
      *Enable the Method of Disclosed And Therefore Cannot*
      *Anticipate Claim 18 and Claims Dependent Thereon....* 49

d)    *Administering An Antibiotic As Disclosed In The 1970*
      *PDR Does Not Anticipate Reducing Induced NF-kB*
      *Activity by Intravening Within the NF-kB Intracellular*
      *Signaling Pathway at a Specified Segment as Required*
      *by Claims 177, 178 and 182......................* 50

e)    *Administering Antibiotics Does Not Involve*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 10 of 92 of October 22, 2007 Response*

       *Reducing NF-kB Activity "caused by"*
       *IL-1 or TNF-α.....................................* 50

Rejection Based on NAC Art ............................ 52

a)   *The Experiments Disclosed in Staal et al., Do Not*
     *Involve The Method of Claim 18 or Claims 182-185 Which*
     *are Dependent Thereon. ..........................* 52

b)   *Staal et al. Do Not Enable the Method of Claim 18*
     *Or Claims 182-185 ................................* 53

c)   *Staal et al. Do Not Anticipate Reducing*
     *Induced NF-kB Activity in Human Cells,*
     *as Recited in Claim 183 ..........................* 55

3) CLAIMS 6, 8 AND 9 AND CLAIMS DEPENDENT THEREON ....... 56

Rejections Based on Antibiotic Art ...................... 60

a)   *The Methods of Each of Claims 6, 8 and 9 and of Claims*
     *Dependent Thereon Do Not Occur In Any Person To Whom*
     *Antibiotics Are Administered. At most administering*
     *antibiotics prevents induction of the NF-kB*
     *intracellular signaling pathway. A method which*
     *comprises administering antibiotics is not a method*
     *which involves reducing induced NF-kB activity......* 60

b)   *Performing Any Method Involving Administering An*
     *Antibiotic According To the 1970 PDR Only Sometimes*
     *Results in Killing Gram-Negative Bacteria. Such*
     *Occasional Results Are Not Sufficient To Establish An*
     *Element of the Claims Necessarily Or Inevitably*
     *Occurred .........................................* 60

c)   *The Occasional Results Obtainable following the*
     *Disclosure of The 1970 PDR Are Not Sufficient to*
     *Enable the Methods Disclosed And Therefore Cannot*
     *Anticipate Any Of Claim 6, 8 or 9 or Any Claim*
     *Dependent Thereon ................................* 60

d)   *Administering An Antibiotic As Disclosed In The 1970*
     *PDR Does Not Anticipate Reducing Induced NF-kB*
     *Activity by Intervening Within the NF-kB Intracellular*
     *Signaling Pathway At A Specified Segment as Required*
     *by each of Claims 64, 65, 75, 76, 80, 88, 89*
     *and 93............................................* 60

Rejections Based on Cyclosporin A Art ................... 61

**ARI 84396**

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 11 of 92 of October 22, 2007 Response*

a)  *The Use of Cyclosporin A in The Cited Art Does Not
    Involve Reducing Induced NF-kB Activity As Required By
    The Methods of Each of Claims 6, 8 and 9 and Claims
    Dependent Thereon*................................... 61

b)  *The Cyclosporin A Art Does Not Disclose The Method of
    Any of Claim 6, 8 or 9 or of Any Claim Dependent
    Thereon*............................................. 62

c)  *The Cited Cyclosporin A Art Is Not Enabling And
    Therefore Cannot Anticipate the Method of Any of Claim
    6, 8 or 9 or of Any Claim Dependent
    Thereon*............................................. 63

d)  *The Cited Cyclosporin Art Does Not Anticipate Reducing
    Induced NF-kB Activity by Intervening at a Specified
    Segment Within the NF-kB Intracellular Signaling
    Pathway as Recited in Each of Claims 64-69, 75-80 and
    88-93* .............................................. 64

Rejections Based on Protein Kinase C Inhibitor Art ...... 66

a)  *The Use of a Protein Kinase C Inhibitor in The Cited
    Art Does Not Involve Reducing Induced NF-kB Activity
    As Required By The Methods of Claims 6, 8 and 9 and
    Claims Dependent
    Thereon*............................................. 66

b)  *The Cited Protein Kinase C Inhibitor Art Does Not
    Disclose the Method of Any of Claim 6, 8, 9 or any
    Claim Dependent Thereon* ........................... 67

c)  *The Cited Protein kinase C Inhibitor Art Does Not
    Enable the Performance of a Method of Any of Claims 6,
    8 or 9 or Any Claim Dependent
    Thereon*............................................. 68

d)  *The Cited Protein Kinase C Inhibitor Art Does Not
    Disclose a Method Which Anticipates Reducing Induced
    NF-kB Activity by Intervening within the NF-kB
    Intracellular Signaling Pathway At A Specified Segment
    as Recited in Claims 64, 65, 69, 75, 76, 80, 88, 89
    and 93.* ........................................... 69

ARI 84397

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 12 of 92 of October 22, 2007 Response*

Rejections Based on Vitamin D Art ........................ 70

    a)    *The Cited Vitamin D Art Does Not Disclose A Method of Using Vitamin D Which Anticipates Any Method Recited In Any of Claim 6, 8, or 9 and in any Claims Dependent Thereon* ......................................... 70

    b)    *The Cited Vitamin D Art Does Not Enable The Performance of Any Method Which Anticipates a Method of Any of Claim 6, 8 or 9 or Any Claim Dependent Thereon* ......................................... 74

    c)    *The Cited Vitamin D Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specific Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.* ............................. 75

Rejection Based on 5-ASA Art ........................... 76

    a)    *The Use of 5-ASA in Dew et al., Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon* ......................................... 76

    b)    *Dew et al. Do Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon* ......................................... 79

    c)    *Dew et al. Do Not Disclose A Method Which Anticipates Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Recited in Claims 64-69, 75-80 and 88-93.* ...................................... 80

Rejection Based on the Endogenous Glucocorticoid Art...... 81

    a)    *The Use of Endogenous Glucocorticoids Disclosed in Goodman and Gilman Does Not Involve Reducing Induced NF-kB Activity as Required by The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon* ......................................... 81

    b)    *Any Method Disclosed in Goodman and Gilman, Would At Most Only Involve Reducing Induced NF-kB Activity Sometimes. Any Such Occasional Result Is Not Sufficient To Establish An Element of the Claimed Methods Necessarily Or*

ARI 84398

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 13 of 92 of October 22, 2007 Response*

   *Inevitably Occurs* ................................. 82

  c) *Any Occasional Results Obtainable By Following The*
   *Disclosure of Goodman and Gilman Is Not Sufficient to*
   *Enable the Method of Any of Claims 6, 8 or 9 or Any*
   *Claim Dependent Thereon* ........................... 84

  d) *Goodman and Gilman Do Not Disclose A Method Which*
   *Anticipates A Method Of Reducing Induced NF-kB*
   *Activity by Intervening Within the NF-kB Intracellular*
   *Signaling Pathway Inside a Cell at a Specific Segment*
   *of the Pathway As Required by each of Claims 64, 65,*

   *69, 75, 76, 80, 88, 89 and 93* ...................... 86

IV. THE USE OF NON-PRIOR ART REFERENCES AND EVIDENCE SUBMITTED
  IN A DECLARATION THAT GOES BEYOND EXPLAINING THE CONTENT OF
  CITED PRIOR ART AS A BASIS FOR AN INHERENCY REJECTION IS
  IMPROPER AND ULTRA
  VIRES.................................................. 88

  A. **Statutory Grounds For Reexamination** ................ 88

  B. **Impermissible Grounds of Rejection in a**
   **Reexamination** ...................................... 88

  C. **The Inherent Anticipation Rejections in the August 2, 2006**
   **and July 6, 2007 Office Actions Are Improper; They Rely On**
   **Evidence Other Than "prior art consisting of patents or**
   **printed publications" in Violation of the Reexamination**
   **Statute**.......................................... 89

  D. **The Claims of the '516 Patent Are Method Claims and the**
   **Cited Prior Art Is At Most Evidence of What Occurred**
   **During A Prior Public Use** ......................... 91

V. SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT ........... 94

ARI 84399

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 14 of 92 of October 22, 2007 Response*

I.    INTRODUCTION

   A.    **Status of Claims Pursuant to 37 C.F.R. § 1.530(e).**

Issued Claims Confirmed Patentable

Claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113,
118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-
171, 176, 179-181, 186-191, 194-196, and 202 have been confirmed
patentable.

Canceled Claims

Claims 1-5, 7, 10-13, 15-17, 20-29, 31-40, 42, 43, 47-51, 53-62, 81,
83, 85, 86, 99, 100, 104-107, 109, 110, 114-117, 119, 120, 124-129,
133-137, 149, 150, 154-157, 159, 160, 164-168, 172-175, 192, 193,
197-201 and 203 have been canceled.

(To reduce the number of issues in this reexamination Patentees have
cancelled the claims listed above without disclaimer or prejudice.)

Rejected Claims

Claims 6, 8, 9, 14, 18, 64-74, 75-80, 82, 84, 88-97, 139, 140, 144-
147, 177, 178, 182-185 as issued on June 25, 2002 are now pending and
subject to rejection.

New Claims

New claims 204-211 have been added.

   B. **Objection to Claim 8**

The July 6, 2007 Final Office Action on page 2 objected to claim 8
for being dependent on canceled claim 7, and required Patentees to
rewrite claim 8 in independent form.

ARI 84400

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 15 of 92 of October 22, 2007 Response*

In response, Patentees respectfully direct the Examiner's attention

to M.P.E.P. § 2260.01, which provides:

> If an unamended base patent claim (i.e., a claim appearing
> in the reexamination as it appears in the patent) has been
> rejected or canceled, any claim which is directly or
> indirectly dependent thereon should be confirmed or
> allowed if the dependent claim is otherwise allowable. The
> dependent claim should not be objected to or rejected
> merely because it depends on a rejected or canceled patent
> claim. No requirement should be made for rewriting the
> dependent claim in independent form.

Accordingly, claim 8 does not need to be rewritten and the objection

to claim 8 should be withdrawn.

ARI 84401

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 16 of 92 of October 22, 2007 Response*

### C.    **Updated Status of Concurrent Proceedings Pursuant To 37 C.F.R. § 1.565**

*ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly and Co.*

Patentees previously informed the U.S. Patent and Trademark Office
that a jury trial at the U.S. District Court for the District of
Massachusetts (*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and
Co.*, 02-CV-11280-RWZ) unanimously found claims 80, 95, 144, and 145
of the subject patent valid and infringed. The art presented to the
Court included art relating to  glucocorticoids, cyclosporin A,
antibiotics, 5-ASA, and red wine.   Expert reports and testimony
including reports and testimony from Dr. Manolagas on which the
Examiner has relied in part in the August 2, 2006 Office Action, were
also presented to the Court.   The jury also determined that the
claims at issue were enabled and adequately described in U.S. Serial
No. 07/431,436, filed April 21, 1989 and therefore entitled to an
April 21, 1989 effective filing date.

From August 7, 2006 to August 10, 2006, an evidentiary hearing was
conducted by the Court on four asserted defenses/counterclaims raised
by Lilly which the Court did not submit to the jury.  The four issues
presented were whether the subject patent is a) unenforceable because
of alleged inequitable conduct during prosecution, b) unenforceable
because of alleged prosecution latches, c) invalid for covering non-
patentable subject matter, and d) invalid for indefiniteness.   On
September 10, 2007 the Court entered a Final Judgment against Lilly.

On September 23, 2007, Lilly renewed its Motion for Judgment as a
Matter of Law, or in the Alternative for a New Trial. On September
27, 2007, the Court issued an Order setting a briefing schedule on
Lilly's motion. As set forth in the Order, all briefing is to be
completed by December 24, 2007, and a hearing on Lilly's motion is
scheduled for January 16, 2008.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 17 of 92 of October 22, 2007 Response*

### *Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*

A Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement of U.S. Patent No. 6,410,516 (the "'516 patent") was filed on April 20, 2006 in the U.S. District Court for the district of Delaware by Amgen Inc. and several affiliated companies (collectively, "Amgen") (*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, 06-CV-00259-MPT). In a written order on September 13, 2006, that Court (a) denied a motion by ARIAD to dismiss the case for lack of subject matter jurisdiction, and (b) denied without prejudice a motion by ARIAD a motion to dismiss for failure to join necessary and indispensable parties. On September 25, 2006, ARIAD answered the complaint and denied the allegations of patent invalidity and non-infringement. On November 3, 2006, the Court granted a motion by ARIAD for certification for appeal to the Court of Appeals for the Federal Circuit ("CAFC") of the Court's order denying the motion to dismiss for lack of subject matter jurisdiction. On December 29, 2006, the CAFC declined to hear that appeal.

On October 5, 2006, ARIAD filed a renewed motion to dismiss for failure to join indispensable parties. ARIAD moved in the alternative to transfer the case to the District of Massachusetts. On January 23, 2007, ARIAD moved to stay the case pending the present reexamination. On February 6, 2007, the Court denied without prejudice ARIAD's motion to stay. On March 27, 2007, the Court ordered that the case remain in the District of Delaware, and held that patent assignees Massachusetts Institute of Technology, President and Fellows of Harvard College, and the Whitehead Institute for Biomedical Research (collectively, the "Institutions") were necessary parties to the action.

On April 13, 2007, ARIAD and the Institutions asserted counterclaims against Amgen for infringement of the '516 patent, including

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 18 of 92 of October 22, 2007 Response*

allegations of willful infringement. At the same time, ARIAD and the
Institutions filed and served affirmative claims for infringement of
the '516 patent, including allegations of willful infringement,
against Wyeth. Wyeth has moved to sever and stay the case as it
pertains to ARIAD and the Institutions' claims against Wyeth; the
Court has not ruled on Wyeth's motion to sever and stay.

On May 30, 2007, ARIAD and the Institutions moved to amend their
counterclaims to add claims of infringement of U.S. Patent No.
5,804,374 and U.S. Patent No. 6,150,090 against Amgen. The Court
granted this motion on August 27, 2007.

Amgen and Wyeth have asserted affirmative defenses with regard to
ARIAD and the Institutions' counterclaims, including allegations of
inequitable conduct in the prosecution of the '516 patent and in the
present reexamination. Patentees have furnished the U.S. Patent and
Trademark Office with Amgen's and Wyeth's filings containing such
allegations, as well as discovery responses, deposition transcripts,
and other materials from this matter.

Amgen, ARIAD, and the Institutions have consented to the jurisdiction
of Magistrate Judge Mary Pat Thynge, to whom the case was assigned
when Judge Kent A. Jordan was elevated to the Third Circuit Court of
Appeals. Judge Thynge has entered a scheduling order in the case,
setting the matter concerning the '516 patent for trial in November
2008.

ARI 84404

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 19 of 92 of October 22, 2007 Response*

II.    SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW

This Summary is filed pursuant to 37 C.F.R. § 1.560(b) to supplement the handwritten Interview Summary prepared by Examiner Bennett Celsa at the conclusion of an August 22, 2007 interview attended by Examiner Celsa; Examiner Ponnaluri Padmashri; Supervisory Examiner Deborah Jones; Dr. Inder Verma; John P. White, Esq.; and Gary J. Gershik, Esq. Patentees seek herein to provide a complete record of the reasons warranting favorable action in the above-identified reexamination which were discussed during the August 22, 2007 interview.    Patentees acknowledge with appreciation the courtesy extended by Examiners Celsa, Padmashri and Jones in connection with the interview.

Patentees had requested the interview to discuss the grounds of rejection set forth in the July 6, 2007 Final Office Action issued in connection with this merged reexamination.    The interview was spent discussing the proper interpretation of certain claims and the flaws in the inherent anticipation rejections of such claims in the July 6, 2007 Final Office Action.    Patentees noted that they were considering canceling claims to reduce the number of issues in the reexamination and address the grounds of rejection set forth in the July 6, 2007 Final Office Action.

Claims Directed to a Method Involving Reducing NF-kB Activity by Intervening At A Specified Segment Within the NF-kB Intracellular Signaling Pathway Are Improperly Rejected Over Antibiotic Art.
Patentees first discussed certain claims rejected over antibiotic art, such as claim 139 which recites a method "wherein NF-kB activity is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB complex," and claim 140 which recites a method "wherein NF-kB activity is reduced by inhibiting the passage of NF-kB into the nucleus of cells." (Emphasis added.) Patentees pointed out that such claims are clearly directed to a method wherein reducing NF-kB activity is effected by intervening at a specified segment within the

ARI 84405

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 20 of 92 of October 22, 2007 Response*

NF-kB intracellular signaling pathway.

The use of antibiotics according to the 1970 Physician's Desk Reference ("1970 PDR") as set forth in the July 6, 2007 Final Office Action does not, and in fact cannot, inherently disclose reducing NF-kB activity by intervening with the NF-kB intracellular signaling pathway at the segments specified in these specific claims such as claim 139 and claim 140 since the antibiotics in question do not even enter mammalian cells. Patentees also pointed out that the rejection of claim 139 and claim 140 is inconsistent with the confirmation of patentability of claims 141-143 in the July 6, 2007 Final Office Action. Claims 141-143, like rejected claims 139 and 140, are directed to a method of reducing NF-kB activity by intervening at a specified segment within the NF-kB intracellular signaling pathway. Confirmed patentable claims 141-143 are analogous to claims 139 and 140 which have been rejected based on the use of antibiotics as discussed in the 1970 PDR. Importantly, there is no evidence or rationale in the July 6, 2007 Final Office Action establishing that the use of antibiotics is associated with reducing induced NF-kB activity by intervening within the NF-kB intracellular signaling pathway at the segments specified in claims 139 and 140, particularly since the Examiner previously acknowledged that antibiotics do not act at the specific segments of the intracellular pathway recited in claims 141-143.

Examiner Celsa suggested that an explanation for the rejection of these claims appears in the July 6, 2007 Final Office Action. Patentees have carefully reviewed the July 6, 2007 Final Office Action, as well as the Declaration of Dr. Manolagas and Exhibit H-10 which were submitted to the U.S. Patent Office by the requester of reexamination control number 90/007,503 and which are incorporated by reference into the July 6, 2007 Final Office Action. Patentees are unable to find any evidence or support for the proposition that antibiotics could anticipate a method of reducing induced NF-kB

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 21 of 92 of October 22, 2007 Response*

activity "wherein NF-kB activity is reduced <u>by decreasing the level</u> <u>of NF-kB not bound in an NF-kB:IkB complex</u>" or "wherein NF-kB activity is reduced <u>by inhibiting the passage of NF-kB into the</u> <u>nucleus of cells</u>." (Emphasis added.) No specific discussion of claim 139 or of claim 140 appears in the July 6, 2007 Final Office Action. Exhibit H-10 has only the following quote separately repeated under each of the three (3) antibiotics being cited against claim 139: "Inherent. Reduction in LPS due to administration of antibiotic necessarily decreases NF-kB activation, and level of NF-kB not bound to NF-kB:Ikb complex." With respect to claim 140, Exhibit H-10 has only the following quote separately repeated for each of the three (3) antibiotics being cited against claim 140: "Inherent. Reduction in LPS due to administration of antibiotic in gram negative infection necessarily decreases NF-kB activation, and inhibits passage of NF-kB into the nucleus of cells." These conclusory statements provide no evidence or explanation how the use of antibiotics anticipates either a method which comprises reducing induced NF-kB activity, "wherein NF-kB activity is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB complex" or a method which comprises reducing induced NF-kB activity, "wherein NF-kB activity is reduced by inhibiting the passage of NF-kB into the nucleus of cells." Thus, there is no evidence or explanation in the July 6, 2007 Final Office Action how the use of antibiotics is reducing induced NF-kB activity at all, let alone by intervening within the NF-kB intracellular signaling pathway at the segment specified in the claims.

Therefore, Patentees maintain that claims such as claims 139 and 140 have been improperly rejected over the antibiotic art. Because claims 139 and 140 are rejected only on the basis antibiotic art, the rejection of these claims should be withdrawn and these claims should be confirmed patentable.

The Examiners agreed to reconsider the applicability of the inherent anticipation rejection as applied to claims such as claim 139 and

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 22 of 92 of October 22, 2007 Response*

claim 140.


## Reduction of NF-kB Activity is Not Inherent To Any Method Disclosed in the PDR 1970.


Patentees next pointed out that the use of antibiotics does not
necessarily kill bacteria, let alone necessarily comprise reducing
induced NF-kB activity.  Numerous bacterial strains are resistant to
antibiotics.  Specifically, the listing of bacteria in the 1970 PDR
includes strains that are resistant to the respective antibiotic
which the 1970 PDR suggest using against the strains.  Thus, when one
skilled in the art treated a patient suffering from a bacterial
infection following the disclosure provided in the 1970 PDR, the
patient's bacterial infection would not necessarily or inevitably
respond to the antibiotic.   Thus, for example, patients infected
with a strain of the bacteria  resistant to the antibiotic would not
respond to treatment with the antibiotic.

The Examiners acknowledged that resistant bacteria would not respond
to an antibiotic to which they were resistant.  The Examiners also
acknowledged that any given patient might be infected with resistant
bacteria but a physician treating the patient would not know this to
be the case.  Examiner Celsa questioned whether the  foregoing facts
impact the propriety of the inherent anticipation rejection based on
the 1970 PDR.   Patentees explained that an inherent anticipation
rejection requires a showing that the purported inherently disclosed
method necessarily and inevitably occurred in the prior art.   If
practicing the method disclosed in the 1970 PDR sometimes does not
result in killing bacteria, (and the disclosed method clearly does
not necessarily or inevitably kill bacteria) the 1970 PDR cannot
inherently anticipate the claimed methods.   In further reply to
Examiner Celsa's inquiry, Patentees referred, for example, to *Glaxo
Inc.v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) *cert.*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 23 of 92 of October 22, 2007 Response*

*denied*, 516 U.S. 988 (1995), holding that a prior art method which sometimes yielded crystals of one polymorph but other times yielded crystals of a different polymorph, i.e. a method of which did not always produce the claimed polymorph, did not inherently anticipate. A further discussion of this issue appears below in Section III B(1)(b).

Accordingly, a method of using antibiotics according to the 1970 PDR to treat a bacterial infection does not necessarily involve a method of reducing induced NF-kB activity and, therefore, the inherent anticipation rejection based on the 1970 PDR set forth on pages 105-111 of the July 6, 2007 Final Office Action should be withdrawn.

The Examiners agreed to review the legal standard for an anticipation rejection on the basis of inherency and to reconsider the propriety of this rejection based on the use of antibiotics set forth in the July 6, 2007 Final Office Action.

The Antibiotic Art Cannot Anticipate a Method of Reducing Induced NF-kB Activity.

Next Patentees pointed out that contrary to the interpretation of the claims advanced in the July 6, 2007 Final Office Action, a number of claims explicitly require reducing induced NF-kB activity. For example, Patentees pointed to claim 14 and claims dependent thereon as claims which explicitly require "reducing bacterial lipopolysaccharide induced expression of cytokines.

The 1970 PDR teaches that patients with a bacterial infection may be treated with one of the three antibiotics at issue. According to the rationale advanced in the July 6, 2007 Final Office Action, such antibiotic therapy necessarily involves reducing LPS as a result of administering the antibiotic in the case of gram negative infections and thus necessarily involves reducing NF-kB activity. However, obtaining a reduced level of "NF-kB activation" does not anticipate "reducing induced" NF-kB activity. Antibiotics do not have any

ARI 84409

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 24 of 92 of October 22, 2007 Response*

effect on NF-kB activity once the activity has been induced, and the July 6, 2007 Final Office Action does not assert otherwise. Therefore, the 1970 PDR does not anticipate a method which comprises reducing induced NF-kB activity.

Accordingly, the use of antibiotics to treat bacterial infection by a method disclosed in the 1970 PDR does not necessarily and inevitably involve reducing induced NF-kB activity and therefore cannot anticipate claim 14, claims dependent on claim 14, or any claims directed to reducing induced NF-kB activity (e.g., claims 6, 8 and 9, and claims dependent thereon). See further discussion of this issue in Section III.

The Examiners agreed to review and reconsider the applicability of the inherent anticipation rejection based on the 1970 disclosure of certain antibiotics in the PDR in so far as it was being applied against claims which require reducing induced NF-kB activity. To assist the Examiners, Patentees point out that claim 6 and claims dependent thereon recite "diminishing induced NF-kB-mediated intracellular signaling"; claim 8 and claims dependent thereon recite "modifying effects of external influences ... which induce NF-kB-mediated intracellular signaling by reducing NF-kB activity"; claim 9 and claims dependent thereon recite "reducing ... the level of expression of genes which are activated by extracellular influences which induce NF-kB mediated intracellular signaling"; claim 14 and claims dependent thereon recite "reducing bacterial lipopolysaccharide-induced expression of cytokines." ; and claim 18 and claims dependent thereon recite "reducing ...activity so as to reduce intracellular signaling caused by...".

Antibiotic Art has Been Improperly Applied to Claims Requiring Reducing Induced NF-kB Activity in Cells so as to Reduce Intracellular Signaling "Caused By Interlukin-1 or Tumor Necrosis Factor-$\alpha$".

Patentees also specifically discussed claim 18 and claims dependent

ARI 84410

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 25 of 92 of October 22, 2007 Response*

thereon requiring reducing intracellular signaling "caused by" IL-1
or TNF-α.   Specifically, Patentees requested clarification of the
Examiner's rationale for the position that the use of antibiotics
according to a method in the 1970 PDR could inherently anticipate the
claimed method.   Patentees pointed out that under the rationale
advanced in the July 6, 2007 Final Office Action, any reduction in
NF-kB activity attributable to the use of an antibiotic according to
a method disclosed in the 1970 PDR would have been "caused by" LPS,
not by IL-1 or TNF-α.

Examiner Celsa responded that LPS can regulate gene expression of
TNF-α and referred Patentees to the July 6, 2007 Final Office Action
for further clarification.   Patentees have reviewed the July 6, 2007
Final Office Action and find the following passage on page 106:
"Gram-negative bacteria produce lipopolysaccharide (LPS), which when
in contact with human cells induces NF-kB activity resulting in the
production of cytokines regulated by NF-kB.   Cytokines whose genes
are regulated by NF-kB (at least in part) include tumor necrosis
factor alpha (TNF-α)."   In Exhibit H-10 referenced in the July 6,
2007 Final Office Action, the following passage appears next to claim
18: "Inherent.   Reducing LPS by administration of antibiotic for
treatment of gram negative bacterial infection necessarily reduces
bacterial-induced NF-kB-mediated TNF-α production and resulting TNF-α
induced intracellular signaling.   *See* Galdiero, Yang, and Mori
references (showing LPS regulates gene expression of TNF-α, IL-6, IL-
8 and IL-10 via NF-kB)."

Patentees respectfully point out that notwithstanding the factual
inaccuracies in the cited passages, particularly the passage from
Exhibit H-10, the passages do not state or provide evidence
supporting the statement that a method of using an antibiotic
according to the 1970 PDR would have necessarily and inevitably
involve a method of reducing induced NF-kB activity in the cells so
as to reduce intracellular signaling <u>caused by</u> Interleukin-1 or Tumor

ARI 84411

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92 of October 22, 2007 Response*

Necrosis Factor-α in the cells" as required by claim 18 and claims dependent thereon.

Therefore, there is no basis for maintaining the inherent anticipation rejection of claim 18 and claims dependent thereon over the disclosure of the 1970 PDR.

The Examiners agreed to review and reconsider the rejection of claim 18 and claims dependent thereon based on the use of antibiotics to treat bacterial infection according to the 1970 PDR.

ARI 84412

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 27 of 92 of October 22, 2007 Response*

III.    RESPONSE TO ART REJECTIONS

On pages 17-22, the July 6, 2007 Final Office Action sets forth an interpretation of the claims of the '516 Patent which suggests that many differently worded claims should be interpreted as having the same scope. To limit the issues in these proceedings, Patentees have herein cancelled more than 90 claims and respectfully direct the Examiner's attention to the pending rejected independent claims now pending, i.e. claims 6, 8, 9, 14 and 18, and to claims dependent thereon. Patentees maintain that the claim interpretation advanced in the July 6, 2007 Final Office Action (as well as that advanced in the earlier August 2, 2006 Office Action) is not applicable to the these now pending rejected claims. See, also the Second Declaration of Dr. Inder Verma, ¶¶ 6-10 , a copy of which is attached hereto as **Exhibit B.**

The entire contents of the Second Declaration of Dr. Inder Verma as well as that of the First Declaration of Dr. Verma is hereby incorporated herein by reference.

## A.    All Rejected Claims Now Pending Are Directed To <u>Reducing Induced</u> NF-kB Activity

In the absence of external inducing stimuli, NF-kB is present in the cytoplasm of a eukaryotic cell in an inactive form, i.e. there is no NF-kB activity. In the presence of external inducing stimuli NF-kB activity is induced in a cell. Such induced NF-kB activity persists so long as the external inducing stimuli are present. Broadly speaking, there are the two types of methods to obtain a cell exhibiting reduced NF-kB activity as follows: (a) reducing the induced NF-kB activity by intervening in the signaling pathway by which NF-kB activity is manifested including particularly intervening intracellularly at a specific segment within the signaling pathway; and (b) preventing the external inducing stimuli from inducing the

ARI 84413

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 28 of 92 of October 22, 2007 Response*

intracellular signaling pathway through which NF-kB activity is
manifested.

Certain claims of the '516 Patent as issued covered both such types
of methods.   However, as discussed further in this response
applicants maintain that the rejected claims now pending are directed
only to type (a) above.   (See, e.g., column 2, lines 20-63; column
10, lines 31-55; column 12, lines 57-66; column 13, line 13 - column
14, line 54; column 16, lines 22-63; and column 17, lines 30-37 of
the '516 patent; and First Declaration of Dr. Verma, ¶¶ 5-9.)

In applying the cited art against claims of the '516 patent in the
July 6, 2007 Final Office Action the Examiner consistently asserted
that the claimed method encompasses administering an inhibitor of NF-
kB activity (i) prior to, (ii) simultaneously with, <u>and</u> (iii)
subsequent to, administering an inducer of NF-kB activity. (See, e.g.
page 27, lines 16-18; page 36, lines 20-22; page 59, lines 4-10; page
80, lines 21-23; page 91, lines 26-29; page 98, lines 12-16; and page
112, lines 24-30 of the July 6, 2007 Final Office Action.)   However,
with respect to claims 6, 8, 9, 14 and 18, and claims dependent
thereon, the only rejected claims now pending, this assertion is not
correct.   The rejected claims now pending do not encompass either
case (i) or case (ii).

    1)    All rejected, pending claims must be given their <u>broadest</u>
           <u>reasonable interpretation</u>

While a claim under reexamination is to be given a broad
interpretation, this interpretation must be *reasonable* in light of
the specification.   *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir.
1984).   Additionally, the claims must be construed as one of skill
in the art would construe them.   *In re American Academy of Science
Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).   For the broadest
reasonable interpretation of the claims by a person skilled in the

ARI 84414

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 29 of 92 of October 22, 2007 Response*

art see the previously filed Declaration of Dr. Verma, ¶¶ 5-9; and the Second Declaration of Dr. Verma ¶¶ 6-10 submitted herewith.

The case of *In re Baker Hughes Incorporated* is instructive. The patent at issue in *In re Baker* claimed a composition and process used to inhibit the release of toxic gas from a material comprising a hydrocarbon and the toxic gas. *In re Baker Hughes Incorporated*, 215 F.3d 1297, 1299 (Fed. Cir. 2000). Relying on parts of the specification that describe hydrocarbons as both liquids and gases, the Board of Patent Appeals and Interferences held that the broadest reasonable interpretation of the term "hydrocarbon" included both gases and liquids. *Id.* At 1303. Upon review, the Federal Circuit reversed this overly broad interpretation because it was inconsistent with the purpose of the invention as disclosed in the specification. *See id. (holding that "hydrocarbon" meant only a liquid as "nowhere in the written description is there an example of the claimed process being used with a gaseous hydrocarbon.")*

The now pending, rejected claims should not be construed so broadly that they are given a meaning inconsistent with that which one of skill in the art would attribute to them. An interpretation contrary to that which would be understood by a person skilled in the art is an unreasonably broad interpretation. *See In re Cortright*, 165 F.3d 1353, 1359 (Fed. Cir. 1999) (reversing the Examiner's rejection after finding that one skilled in the art would construe the claim more narrowly than had the examiner). When the claim terms "are examined through the viewing glass of a person skilled in the art," as they are supposed to be, it becomes clear here that the Examiner's interpretation is not reasonable. *Phillips v. AWH Corp*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 1332 (2006)(quoting *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003)). Such broad interpretations are impermissible. *See In re Marosi*, 710 F.2d 799 (Fed. Cir. 1983) (reversing a claim rejection under 35 U.S.C. §§102 or 103 that failed

ARI 84415

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 30 of 92 of October 22, 2007 Response*

to interpret the claim in light of the interpretation which one
skilled in the art would have attributed to the claim).

    2)    Claim 6 Recites "<u>diminishing induced</u> NF-kB-mediated
intracellular signaling"; Claim 8 Recites <u>modifying
effects of external influences which induce</u> NF-kB mediated
intracellular signaling <u>by reducing NF-kB activity</u> in the
cells <u>such that NF-kB mediated effects ... are modified</u>;
Claim 9 Recites "<u>reducing</u>, in eukaryotic cells, the level
of <u>expression of genes which are activated</u>"; Claim 14
Recites "<u>reducing</u> bacterial lipopolysaccharide-<u>induced</u>
expression of cytokines"; and Claim 18 Recites "<u>reducing</u>
Interlukin-1 or Tumor Necrosis Factor-α <u>activity</u> ... so as
<u>to reduce intracellular signaling caused by</u> Interlukin-1
or Tumor Necrosis Factor-α in the cells.".

More fully, independent claims 6, 8, 9, 14 and 18 read as follows:

    6. A method for diminishing induced NF-κB-mediated
intracellular signaling comprising reducing NF-κB activity
in cells such that NF-κB-mediated intracellular signaling
is diminished.

    8. A method for modifying effects of external influences on a
eukaryotic cell, which external influences induce NF-κB-
mediated intracellular signaling, the method comprising
reducing NF-κB activity in the cells such that NF-κB-mediated
effects of external influences are modified.[2]

    9. A method for reducing, in eukaryotic cells, the level
of expression of genes which are activated by
extracellular influences which induce NF-κB-mediated
intracellular signaling, the method comprising reducing
NF-κB activity in the cells such that expression of said

---

[2]Claim 8 depends from canceled claim 7, but is presented
here as if written in independent form to facilitate
discussion.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 31 of 92 of October 22, 2007 Response*

genes is reduced.

14. A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

By reciting <u>diminishing induced</u> NF-kB mediated intracellular signaling by reducing NF-kB activity claim 6 is directed to reducing induced NF-kB activity. It is not directed to preventing induction of the NF-kB signaling pathway. Thus, only art involving administering an inhibitor subsequent to administering an inducer is relevant to the patentability of this claim.

Claim 8 recites <u>modifying effects of external influence which induce</u> NF-kB-mediated intracellular signaling by reducing NF-kB activity. The effects of external influences which induce NF-kB-mediated intracellular signaling result from the induction of the NF-kB signaling pathway caused by the external influence and the resulting NF-kB activity. Reducing this resulting NF-kB activity equates with reducing induced NF-kB activity. Thus, only art involving administering an inhibitor subsequent to administering an inducer is relevant to the patentability of this claim.

Similarly, claim 14 which recites <u>reducing</u> bacterial lipopolysaccharide <u>induced</u> expression of cytokines is directed to reducing induced NF-kB activity. It is not directed to preventing

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 32 of 92 of October 22, 2007 Response*

induction of the NF-kB signaling pathway. Thus, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to its patentability.

Claim 9 recites <u>reducing</u> the level of expression of genes which are <u>activated by extracellular influences which induce</u> NF-kB-mediated intracellular signaling. Thus, claim 9 is directed to reducing induced NF-kB activity. It is not directed to preventing induction of the NF-kB signaling pathway. Once again, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to the patentability of the claim.

Finally, claim 18 recites reducing IL-1 or TNF-$\alpha$ <u>activity</u> by reducing <u>NF-kB activity</u> in cells <u>so as</u> to <u>reduce intracellular signaling caused by</u> IL-1 or TNF-$\alpha$. Since IL-1 and TNF-$\alpha$ are inducers of NF-kB activity, claim 18 concerns reducing IL-1 or TNF-$\alpha$ induced NF-kB activity. Therefore, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to its patentability.

In summary, none of claims 6, 8, 9, 14 or 18 (or the claims dependent thereon) can properly be construed to encompass administering an inhibitor of NF-kB activity (i) prior to or (ii) simultaneously with, administration of an inducer of NF-kB activity.

    3)    Each of Claims 64-69, 75-80, 88-93, 139-144, 177, 178, and 182 Is Directed To Reducing Induced NF-kB Activity By Carrying Out A Specific Step Inside a Cell.

Each of claims 64-69, 75-80, 88-93, 139-144, 177, 178 and 182 specify that the reducing of induced NF-kB activity is effected by a specified step which is one of the following:

    i.    decreasing the level of NF-kB not bound in an NF-kB:IkB complex;

    ii.    inhibiting passage of NF-kB into the nucleus;

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 33 of 92 of October 22, 2007 Response*

    iii.   inhibiting modification of an IkB protein;

    iv.   inhibiting degradation of an IkB protein;

    v.    inhibiting dissociation of NF-kB: IkB complexes; or

    vi.   reducing binding of NF-kB to NF-kB recognition sites.

Each of these steps, with the broadest reasonable interpretation attributable to it, requires that the step of reducing induced NF-kB activity take place at a specific intracellular segment within the NF-kB intracellular signaling pathway. (See first Declaration of Dr. Verma ¶¶ 14-15; and Second Declaration of Dr. Verma ¶¶ 10) To construe each of these claims as the Examiner has suggested, i.e. as covering reducing NF-kB activity by a step which occurs anywhere within the NF-kB intracellular signaling pathway is unreasonable in view of the requirement of 35 U.S.C. §112, paragraph 4, that a dependent claim must further define and limit the claim from which it depends.

Thus, each of dependent claims 64-69, 75-80, 88-93, 139-144, 177, 178 and 182, properly construed, specify a specific subcase in which the step of reducing induced NF-kB activity involves intervening at a specified segment within the NF-kB intracellular signaling pathway. To construe these claims otherwise is unreasonable.

B.    **The Rejected Claims Now Pending Are Not Anticipated By The Cited Art. For Each Rejected Claim It Has Not Been Shown That Every Element Occur Explicitly or Necessarily Occurs in the Cited Art. Moreover, Certain Cited Art Clearly Does Not Enable The Method Described Therein So That Even If Each Element Of A Rejected Claim Were Disclosed In The Cited Art Such Art Would Not Anticipate.**

The now pending, rejected claims are the following:

    a.    Claim 14 and claims 139, 140 and 144-147 which depend
          therefrom;

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 34 of 92 of October 22, 2007 Response*

    b.    Claim 18 and claims 177, 178 and 182-185 which depend therefrom;

    c.    Claim 6 and claims 64-73 which depend therefrom;

    d.    claim 8 and claims 75-80, 82 and 84 which depend therefrom; and

    e.    claim 9 and claims 88-97 which depend therefrom.

For any of these rejected claims to be properly rejected each and every element of such claim must be disclosed in a single prior art reference, either explicitly or inherently, and such allegedly anticipating prior art reference must enable the allegedly anticipating disclosure.

In the sections which follow Patentees explain that the rejected claims now pending, are not anticipated, either inherently or explicitly, by the art cited against such claims. In support of their position Patentees submit as **Exhibit B** a Second Declaration of Dr. Inder Verma.

Certain of the art rejections in the July 6, 2007 Final Office Action are based on alleged explicit anticipation; other rejections are based on alleged inherent anticipation.

With respect to the inherent anticipation rejections, Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to allegedly "explain" the prior art. Patentees do not repeat that explanation in its entirety but hereby incorporate that response by reference into this response. Patentees note, however, that the Examiner appears to have ignored the fact that <u>none</u> of the purported extrinsic evidence concerns what occurred in the cited prior art. The Examiner does not

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 35 of 92 of October 22, 2007 Response*

dispute that <u>none</u> of the purported extrinsic evidence relates to any effort to reproduce any experiment in the cited art. Instead, the Examiner has merely asserted that "enablement and not actual use is the legal standard for demonstrating inherency." (See, e.g., page 97, line 19; page 93, lines 18-20 of the July 6, 2007 Final Office Action.) and proceeded to maintain the inherent anticipation rejections notwithstanding that <u>none</u> of the extrinsic evidence being relied upon addressed what element(s) of the claim necessarily and inevitably occurred in any specific cited reference.

Patentees certainly agree that for any anticipation rejection it is required that a prior art reference "must enable that which it is asserted to anticipate." *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003). A proper <u>inherent</u> anticipation rejection, however, must additionally include evidence to "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

Patentees, therefore, respectfully submit that all of the inherent anticipation rejections of record are fatally defective. Nevertheless, Patentees below explain why notwithstanding this improper reliance on the so-called extrinsic evidence, none of the cited art anticipates the rejected claims now pending.

    1)    CLAIM 14 AND CLAIMS 139, 140 and 144-147 WHICH DEPEND THEREON

Each of claims 14, 139, 140 and 144-147 is rejected solely on the ground that the claimed method is inherently anticipated by the disclosure in the 1970 PDR of instructions for using three antibiotics (gentamycin, tetracycline, and erythromycin). In support of this ground of rejection the Examiner relies upon the *Manolagas*

ARI 84421

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 36 of 92 of October 22, 2007 Response*

*Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704),
*Yang* et al. (Nature *395(1998)* 284-288), *Mori* et al. (Eur. J.
Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi*
et al. *(J.* Immunology 175(2005) 8069-8076) which perport to "explain"
the disclosure in the 1970 PDR.

As an initial matter Patentees note that none of claims 14, 139, 140,
or 144-147 are specifically discussed in the July 6, 2007 Final
Office Action. Rather these claims are merely grouped with other
claims which are worded differently and have different scopes.
Properly construed, these claims are not subject to the reasoning set
forth on pages 105-111 of the July 6, 2007 Final Office Action.

Patentees further note that in ¶¶ 113-123 of the Second Declaration
of Dr. Inder Verma, Exhibit B hereto, Dr. Verma discusses the flaws
in the Examiner's reasoning. See particularly the table in ¶ 113
which provides a point by point discussion in response to the
Examiner's Rejection Summary on pages 105-107 of the July 6, 2007
Final Office Action; ¶ 114; ¶ 118; ¶ 119; and ¶¶ 121-123.

In the sections that follow, Patentees provide three reasons, each
of which is sufficient to require withdrawal of the inherent
anticipation rejection of claim 14, 139, 140 and 144-147 based on the
1970 PDR. Patentees have additionally provided a fourth reason for
withdrawing the rejection as applied to claims 139, 140, and 144.

> a)  *The Method of Claim 14 and Claims Dependent Thereon Does*
>     *Not Occur In Any Person To Whom Antibiotics Are*
>     *Administered.*

According to the rationale advanced on pages 105-111 of the July 6,
2007 Final Office Action, administration of antibiotics to treat a
gram-negative bacterial infection results in killing the bacteria
which therefore no longer produce lipopolysaccharide ("LPS"), a known

ARI 84422

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 37 of 92 of October 22, 2007 Response*

inducer of NF-kB activity. Because there is less LPS in the subject to induce NF-kB activity, NF-kB activity is reduced.

Patentees respectfully point that even if this rationale as stated were accurate, it leads to the conclusion that administration of antibiotics, by killing gram-negative bacteria and causing a reduction in the level of LPS prevent induction of the NF-kB intracellular signaling pathway. This rationale does not support the conclusion that administering antibiotics, by killing gram-negative bacteria, and causing a reduction in the level of LPS, is reducing induced NF-kB activity as recited in claim 14 and in claims 139, 140 and 144-147 which depend therefrom.

As explained at length in the specification and by Dr. Verma, NF-kB is a nuclear transcription factor that unless and until activated is present only in an inactive complex in the cytoplasm of a eukaryotic cell. Upon activation by an external influence or stimulus capable of inducing activation the NF-kB signaling pathway, e.g. LPS, the inactive complex dissociates and NF-kB is created in a form which travels to the nucleus of the cell where it binds to specific binding recognition sites on genes that are regulated by NF-kB, resulting in transcription and often expression of such genes. Thus, although LPS when present induces NF-kB activity, its absence, as a result of administering an antibiotic has not effect on previously induced NF-kB activity, and such administration certainly does not involve reducing NF-kB activity. (See, e.g. column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; column 16, lines 22-63 of the subject patent; Declaration of Dr. Verma ¶¶ 8, 9; and Second Declaration of Dr. Verma ¶¶ 114.)

Because claim 14, 139, 140 and 144-147 recite reducing bacterial LPS-induced NF-kB activity, the administration of antibiotics cannot and does not result in the practice of the method recited in these claims.

ARI 84423

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 38 of 92 of October 22, 2007 Response*

For this reason alone, the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

> b) *Performing Any Method Involving Administering An Antibiotic According To The Disclosure of the 1970 PDR Only Results In Killing Gram-Negative Bacteria Sometimes. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily or Inevitably Occurred.*

As Patentees' representative explained during the August 22, 2007 Examiner Interview and as Dr. Verma explained in his first Declaration in paragraph 128, resistant strains of gram-negative bacteria are widespread. Antibiotics would not kill such resistant strains contrary to the Examiner's rationale that administering antibiotics would kill such bacteria and thereby effect reduced levels of LPS and consequently reduced NF-kB activity. Resistant strains of gram-negative bacteria would continue to produce LPS, which would continue to induce the NF-kB signaling pathway. Thus, not only would administering the antibiotic not involve reducing LPS-induced NF-kB activity, such administration would not prevent further LPS-induced NF-kB activity from occurring.

Claims 14, 139, 140 and 144-147 are rejected as inherently anticipated by the administration of antibiotics according to the disclosure in the 1970 PDR. However, the 1970 PDR does not disclose each and every element of these claims as required for an anticipation rejection. Thus, the July 6, 2007 Final Office Action relies on purported extrinsic evidence including references published after the effective filing date of the rejected claims to argue that each and every element of the claimed method would inherently occur if antibiotics were used in a method according to the instructions in the 1970 PDR.

· Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 39 of 92 of October 22, 2007 Response*

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

Even if the three cited antibiotics disclosed in the cited 1970 PDR *did* work as postulated by the Examiner, they only did so *sometimes*. The 1970 PDR does not teach a) which patients are infected with gram-negative bacteria as opposed to those infected with gram-positive bacteria or how to identify such patients b) which patients are infected by a strain which is not resistant to treatment by the antibiotics or how to identify such non-resistant strains of gram-negative bacteria, or c) which gram-negative bacteria produce LPS capable of inducing NF-kB activity since not all such bacteria produce LPS. Therefore, administering an antibiotic as instructed in the 1970 PDR would at most lead to occasional killing of gram-negative bacteria that produce LPS capable of inducing NF-kB. Therefore, the Examiner's theory at best shows that administration of an antibiotic as instructed in the 1970 PDR may, *possibly*, kill gram-negative bacteria that may possibly produce LPS capable of inducing NF-kB. (Declaration of Dr. Verma ¶¶ 128; and Second Declaration of Dr. Verma ¶¶ 113-114, 122-123)

However, a showing of mere "probabilities or possibilities" is insufficient to support a finding of inherent anticipation. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that could be used to obtain the same result). Where practice of the prior art only sometimes encompassed all elements of the claims, the art was held not to inherently anticipate because "occasional results are not

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 40 of 92 of October 22, 2007 Response*

inherent." *See Mehl/Biophile Int'l. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that prior art did not anticipate a claim requiring a substantially vertical orientation even though use of the prior art method would sometimes result in such an orientation). See, also, *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) (affirming a district court holding that practice of a prior art method sometimes yielding crystals of one polymorph but other times yielding crystals of another polymorph did not inherently anticipate a claim reciting only one of the polymorphs.)

In *Perricone v. Medicis Pharmaceutical Corporation*, a district court held a method claim for treating a sunburn by applying a specific compound to the affected area was inherently anticipated by prior art disclosing "topical application" of the compound to the skin. On appeal, the Federal Circuit reversed the finding of inherent anticipation determining that the prior art did not anticipate the claim and stating "the district court's inherency analysis goes astray because it assumes what [the prior art] neither disclosed nor rendered inherent" because the prior art did not disclose applying the compound to a skin sunburn. *Perricone v. Medicis Pharmaceutical Corporation*, 432 F.3d 1368, 1378 (Fed. Cir. 2005). It was deemed irrelevant that the prior art compound *may* sometimes have been applied to sunburned skin. *Id*. At 1379.

In the present case, the administration of antibiotics according to the 1970 PDR may at most, result in killing gram-negative bacteria, which is contrary to a critical assumption in the Examiner's theory how administration of an antibiotic anticipates the method of claim 14. Thus, even if the Examiner's rationale is accepted, occasional results are insufficient to establish inherent anticipation under controlling Federal Circuit precedent.

For this reason alone, the inherent anticipation rejection of claims

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 41 of 92 of October 22, 2007 Response*

14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

> *c)*    *The Occasional Results Obtainable Following the Disclosure*
> *of the 1970 PDR Are Not Sufficient to Enable the Method*
> *Disclosed And Therefore Cannot Anticipate Claim 14 and*
> *Claims Dependent Thereon.*

The occasional results that would have been obtained by practicing
the method of administering antibiotics in the 1970 PDR are
insufficient to enable the method disclosed and therefore cannot
anticipate claim 14 and claims dependent thereon.

"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate. A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled"    *Elan*
*Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted). Courts have refused to find
anticipation based on prior art that is not enabling. For instance,
in *Rockwell Intern. Corp v.U.S.*, the Federal Circuit refused to
invalidate patent claims based on prior art which did not "provide
sufficient basic chemistry information to enable one skilled in the
art to grow epitaxial . . . semiconductors" (i.e. practice the
claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358,
1364 (Fed. Cir. 1998). Likewise, in *Application of Sheppard*, the
Court of Customs and Patent Appeals held that a prior art reference
which may have disclosed either the claimed compound *or* a different
compound was not enabling and therefore could not anticipate the
claim at issue.    *Application of Sheppard*, 339 F.2d 238, 241-242
(C.C.P.A., 1964).

The 1970 PDR does not teach a) which patients are infected with gram-
negative bacteria or how to identify such patents b) which patients

ARI 84427

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 42 of 92 of October 22, 2007 Response*

are infected by a strain of  gram-negative bacteria which is not
resistant to treatment by the antibiotics or how to identify such
non-resistant strains or c) which gram-negative bacteria produce LPS
capable of inducing NF-kB activity since not all such bacteria
produce LPS. Therefore, administering an antibiotic as set forth in
the 1970 PDR would at most lead to occasional killing of gram-
negative bacteria that produce LPS capable of inducing NF-kB.
(Declaration of Dr. Verma ¶¶ 128; and Second Declaration of Dr. Verma
¶¶ 113-114, 122-123)


Prior art whose disclosure would have only sometimes led to the
practice of the claimed method, like the prior art in *Rockwell* and
*Sheppard*, does not enable one skilled in the art to practice the
claimed method.  The Examiner's rationale for the rejection, even if
factually correct, at most shows that administration of antibiotics
according to the 1970 PDR may *sometimes* kill gram-negative bacteria
that produce LPS capable of inducing NF-kB.  Accordingly, the 1970
PDR is not enabling for the method upon which the Examiner relies and
the 1970 PDR cannot anticipate claim 14 and claims dependent thereon.


For this reason alone, the inherent anticipation rejection of claims
14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

> d)   *Administering An Antibiotic As Disclosed In The 1970 PDR*
>      *Does Not Anticipate Reducing Induced NF-kB Activity by*
>      *Intervening Within the NF-kB Intracellular Signaling*
>      *Pathway At A Specified Segment as Recited in Claims 139,*
>      *140 and 144.*

Dependent claims 139, 140 and 144 further limit claim 14 by reciting
that reducing induced NF-kB activity occurs as a result of a step
inside the cell.   The Examiner's theory as to how the use of
antibiotics anticipate these claims involves antibiotics killing
gram-negative bacteria outside the cell so as to reduce the levels

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 43 of 92 of October 22, 2007 Response*

of LPS present outside the cell. Therefore, claims 139, 140 and 144 should not be rejected as inherently anticipated by the 1970 PDR.

Claim 139 requires that reducing LPS-induced NF-kB activity be effected "by decreasing the level of NF-kB not bound in an NF-kB:IkB complex." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve decreasing the level of NF-kB not bound in an NF-kB:IkB complex. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121.)

Claim 140 requires that reducing LPS-induced NF-kB activity be effected "by inhibiting the passage of NF-kB into the nucleus of cells." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve inhibiting the passage of NF-kB into the nucleus of cells. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121.)

Claim 144 requires that reducing LPS-induced NF-kB activity be effected by a step that "comprises reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121)

In conclusion, Patentees have provided three reasons each of which independently warranting withdrawal of the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR. Patentees have additionally provided a fourth reason requiring warranting the rejection of claims 139, 140 and 144.

Because the inherent anticipation rejection of claims 14, 139, 140 and 144-147 is the only ground of rejection of these claims in the

ARI 84429

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 44 of 92 of October 22, 2007 Response*

July 6, 2007 Final Office Action, Patentees respectfully submit that
the rejection of claims 14, 139, 140 and 144-147 should be withdrawn
and these claims should be confirmed patentable.

ARI 84430

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 45 of 92 of October 22, 2007 Response*

> 2)    CLAIM 18 AND CLAIMS 177, 178 AND 182-185 WHICH DEPEND
>       THEREFROM

Each of claim 18, 177, 178 and 182-185 are rejected as allegedly
inherently anticipated by the disclosure in the 1970 PDR of
instructions for administering three antibiotics (gentamycin,
tetracycline, and erythromycin.) In support of these rejections the
Examiner relies upon the *Manolagas Declaration, Galdiero* et al.
(Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(1998)*
284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the
*Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005)
8069-8076) which purport to "explain" the disclosure in the 1970 PDR.

Claim 18 and dependent claims 182-185 have additionally been rejected
as allegedly anticipated by Staal et al., PNAS 87:9943 (Dec. 1990).

Therefore claims 177 and 178, are only rejected as allegedly
inherently anticipated by the 1970 PDR.

Patentees have explained in their November 9, 2006 response the
deficiencies of the purported extrinsic evidence being relied upon
to support the inherent anticipation rejections based on the
antibiotics disclosed in the 1970 PDR and do not repeat that
explanation here.

Patentees explain below the deficiencies in both the inherent
anticipation rejection based on the 1970 PDR, and the anticipation
rejection based on Staal et al.

ARI 84431

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 46 of 92 of October 22, 2007 Response*

### Rejection Based on Antibiotic Art

As an initial matter Patentees note that none of claims 18, 177, 178
and 182-185 are specifically discussed in the July 6, 2007 Final
Office Action.  Rather these claims are merely grouped with other
claims which are worded differently and have different scopes.
Properly construed, these claims are not subject to the reasoning set
forth on pages 105-111 of the July 6, 2007 Final Office Action.

Patentees further note that in ¶¶ 113-123 of the Second Declaration
of Dr. Inder Verma, Dr. Verma discusses the flaws in the Examiner's
reasoning.  See particularly the table in ¶ 113 which provides a
point by point discussion in response to the Examiner's Rejection
Summary on pages 105-107 of the July 6, 2007 Final Office Action; ¶
114; ¶ 118; ¶ 120; and ¶¶ 121-123.

In the preceding Section, Patentees have provided four reasons why
claim 14 and claim dependent thereon are patentable over the 1970
PDR.  Each of the four reasons is also applicable to claim 18 and
claims dependent thereon.  Patentees do not repeat the explanations
here, but instead summarize them as follow:

   a)    *The Method of Claim 18 and Claims Dependent Thereon Does
         Not Occur In Any Person To Whom Antibiotics Are
         Administered.*

   b)    *Performing Any Method Involving An Antibiotic According To
         the 1970 PDR Only Results In Killing Gram-Negative
         Bacteria Sometimes.  Such Occasional Results Are Not
         Sufficient To Establish An Element of the Claims
         Necessarily Or Inherently Occurs.*

   c)    *The Occasional Results Obtainable Following the Disclosure
         of the 1970 PDR Are Not Sufficient to Enable the Method*

ARI 84432

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 47 of 92 of October 22, 2007 Response*

> *Disclosed And Therefore Cannot Anticipate Claim 18 and*
> *Claims Dependent Thereon.*

d)  *Administering An Antibiotic As Disclosed In The 1970 PDR*
    *Does Not Anticipate Reducing Induced NF-kB Activity by*
    *Intervening Within the NF-kB Intracellular Signaling*
    *Pathway at a Specified Segment as Required by Claims 177,*
    *178 and 182.*

Accordingly, Patentees respectfully request that the Examiner
reconsider and withdraw the inherent anticipation rejection of claim
18 and claims dependent thereon in view of each of these four
reasons, and the discussion by Dr. Verma with respect to claim 18 and
claims dependent thereon. (Declaration of Dr. Verma ¶¶ 127; and
Second Declaration of Dr. Verma ¶¶ 120-121)

Furthermore, there is another reason why administering antibiotics
according to the 1970 PDR does not anticipate claim 18 and claims
dependent thereon.

e)  *Administering Antibiotics Does Not Involve Reducing NF-kB*
    *Activity "caused by" Il-1 or TNF-α.*

Claim 18 recites reducing NF-kB activity so as to reduce
intracellular signaling "caused by" IL-1 or TNF-α. Antibiotics have
no effect on intracellular signaling caused by IL-1 or TNF-α. While
in the July 6, 2007 Final Office Action antibiotics are asserted to
reduce levels of LPS, claim 18 is not directed to NF-kB activity
induced by LPS. (Declaration of Dr. Verma ¶¶ 126-127; and Second
Declaration of Dr. Verma ¶¶ 120) Claim 18 is directed to reducing
NF-kB activity "caused by" IL-1 or TNF-α. There is no explanation
whatsoever in the record how antibiotics could be used for reducing
NF-kB activity caused by IL-1 or TNF-α.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 48 of 92 of October 22, 2007 Response*

Patentees have reviewed the July 6, 2007 Final Office Action and noted the following passage on page 106: "Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-kB activity resulting in the production of cytokines regulated by NF-kB. Cytokines whose genes are regulated by NF-kB (at least in part) include tumor necrosis factor alpha (TNF-$\alpha$)." In Exhibit H-10 referenced by the July 6, 2007 Final Office Action, the following passage appears next to claim 18: "Inherent. Reducing LPS by administration of antibiotic for treatment of gram negative bacterial infection necessarily reduces bacterial-induced NF-kB-mediated TNF-$\alpha$ production and resulting TNF-$\alpha$ induced intracellular signaling. *See* Galdiero, Yang, and Mori references (showing LPS regulates gene expression of TNF-$\alpha$, IL-6, IL-8 and IL-10 via NF-kB)." Notwithstanding the factual inaccuracies in the cited passages, particularly the passage from Exhibit H-10, Patentees respectfully point out that these passages do not even allege that administering an antibiotic as disclosed in the 1970 PDR involves reducing "NF-kB activity in the cells so as to reduce intracellular signaling <u>caused by</u> Interleukin-1 or Tumor Necrosis Factor-$\alpha$ in the cells" as required by claim 18 and claims dependent thereon.

In fact, the rationale advanced by the Examiner, that administering an antibiotic results in reduced levels of LPS and therefore reduced LPS-induced NF-kB activity is inapplicable to claims 18 and claims dependent thereon. Moreover, the LPS - induced NF-kB intracellular signaling pathway is separate from either the IL-1-or the TNF$\alpha$-induced NF-kB intracellular signaling pathway.

Each of the foregoing reasons a) through e) are independently sufficient to warrant withdrawal of the inherent anticipation rejection based on the 1970 PDR of claim 18 and claims 177, 178 and 182-185 dependent thereon.

Moreover, because the inherent anticipation rejection based on the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 49 of 92 of October 22, 2007 Response*

1970 PDR is the only rejection raised against dependent claims 177
and 178 in the July 6, 2007 Final Office Action, Patentees
respectfully submit that claims 177 and 178 should be confirmed
patentable based on the foregoing reasons.


### Rejection Based on NAC Art


Claims 18 and 182-185 are further rejected on pages 111-113 of the
July 6, 2007 Final Office Action as allegedly anticipated by Staal
et al., who disclose that N-acetyl-L-cysteine ("NAC") "prevents this
thiol decrease [which leads to NF-kB activation] and blocks the
activation of NF-kB". (Abstract of Staal et al.)


In ¶¶ 106-112 of the Second Declaration of Dr. Inder Verma, Dr. Verma
provides a detailed rebuttal to the reasoning set forth by the
Examiner in support of the rejection of claim 18 and 182-185 over
Stall et al.


In addition, Patentees provide the following reasons why the
rejection over Staal et al., should be withdrawn.


> a)   *The Experiments Disclosed in Staal et al., Do Not Involve*
>      *The Method of Claim 18 or Claims 182-185 Which are*
>      *Dependent Thereon.*


As explained above, claim 18 recites a method "comprising reducing
NF-kB activity in the cells so as to reduce intracellular signaling
<u>caused by</u> Interleukin-1 or Tumor Necrosis Factor-$\alpha$ in the cells."
"Caused By" is clearly past tense. Therefore claim 18 is directed
to a method where there is intracellular signaling caused by IL-1 or
TNF-$\alpha$, i.e. there is induced NF-kB activity.


All of the experiments of Staal et al. involve simultaneous treatment

ARI 84435

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 50 of 92 of October 22, 2007 Response*

with TNF-α and NAC. There is no disclosure in Staal et al. of any
method involving using NAC for reducing IL-1 or TNF-α induced NF-kB
activity, i.e. reducing NF-kB activity so as to reduce intracellular
signaling caused by IL-1 or TNF-α (Declaration of Dr. Verma ¶¶ 160-
162; and Second Declaration of Dr. Verma ¶¶ 106-109, 112)

In fact, NAC does not reduce induced NF-kB activity according to
Staal et al. themselves  Staal et al. point out that "low thiol
levels are required for <u>activation</u>" of NF-kB. (Page 9943, right
column, second full paragraph.)  Staal et al. elucidated that NAC
prevents the decrease of intracellular thiol levels. For example,
in their Abstract, Staal et al. disclose that NAC "prevents this
thiol decrease [which leads to NF-kB activation] and blocks the
activation of NF-kB". Decreasing thiol levels would have no effect
on induced NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 108)

Similarly, Staal et al., state that their findings demonstrate that
NAC blocks or inhibits cytokine-stimulated NF-kB activation. Staal
et al. do not state that their findings show reducing cytokine-
stimulated NF-kB activity.

Accordingly, Staal et al. do not anticipate claim 18 or claims 182-
185.

b)    *Staal et al. Do Not Enable the Method of Claim 18 or
      Claims 182-185.*

"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate. A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled"    *Elan
Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted). Courts have refused to find

ARI 84436

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 51 of 92 of October 22, 2007 Response*

anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The experiments in Staal et al. cannot be reproduced, and therefore, Staal et al. cannot anticipate the method recited in claims 18 or 182-185. Staal et al. do not describe how to obtain the cells they use. Specifically, the Jurkat tri-kB cells of Staal et al. were not available to, and could not be reproduced by the public, because the source of these cells is a "personal communication." (Second Declaration of Dr. Verma ¶¶ 110-111)

Since Staal et al., does not enable practicing the experiments which the Examiner relies upon as establishing an anticipation of claims 18 and 185-185, the rejection of these claims over Staal et al. should be withdrawn.

> c)  *Staal et al. Do Not Anticipate Reducing Induced NF-kB Activity in Human Cells as Recited in Claim 183.*

The cells Staal et al. used were not only unavailable to the public, they were not human cells. (Second Declaration of Dr. Verma ¶¶ 109-110)

Therefore, to contrary to the Examiner's ground of rejection claim 183 which recites the method performed in human cells, is not

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 52 of 92 of October 22, 2007 Response*

anticipated by Staal et al.

In conclusion, Patentees have provided two reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejection over Staal et al. as applied to claims 18 and 182-185. Patentees have additionally provided a third reason warranting withdrawal of the anticipation rejection based on Staal et al. as applied to claim 183.

Accordingly, Patentees respectfully submit that claims 18 and 177, 178 and 182-185 dependent thereon should be confirmed patentable.

**ARI 84438**

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 53 of 92 of October 22, 2007 Response*

### 3) CLAIMS 6, 8 AND 9 AND CLAIMS DEPENDENT THEREON

Each of the following claims has been rejected based on art relating to each of the same six compounds (or classes of compounds):

Claim 6 and claims 64, 65 and 69-73 dependent thereon;
Claim 8 and claims 75, 76, 80, 82 and 84 dependent thereon; and
Claim 9 and claims 88, 89 and 93-97 dependent therein.

Specifically, each of these claims is rejected as follows:

### 1. Antibiotic Art

The claims are rejected as allegedly inherently anticipated by the 1970 PDR disclosure of the use of three antibiotics (gentamycin, tetracycline, and erythromycin), as explained by purported extrinsic evidence in the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(1998)* 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076), as set forth on pages 105-110 of the July 6, 2007 Final Office Action.

### 2. CsA Art

The claims are rejected as allegedly: i) anticipated, or alternatively rendered obvious under §103, by *Schmidt* et al., *J. Virology* 64:4037-4041 (August 1990), as set forth on pages 35-42 of the July 6, 2007 Final Office Action;

ii) anticipated, or alternatively rendered obvious under 103, by *Emmel* et al., Science, *246* (Dec. 1989): 1617-20, as set forth on pages 42-47 of the July 6, 2007 Final Office Action;

iii) anticipated, or alternatively, rendered obvious under § 103, by *Brini,* Eur. Cytokine Net. 1: 131 -139 (Sept. 1990), as set forth on pages 47-54 of the July 6, 2007 Final Office Action;

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 54 of 92 of October 22, 2007 Response*

iv) inherently anticipated by the Physician's Desk Reference (PDR: 1985, pages 1811-13), *Griffith I* (Griffith et al., Ann. Surg. <u>196</u> (9/82):324-329), or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. <u>99</u> (12/84): 952-957), as evidenced by *Holschermann* et al., Circulation <u>96</u> (12/97) 4232-4238, as set forth on pages 54-66 of the July 6, 2007 Final Office Action;

v) inherently anticipated by *Reed* et al., J. Immunol. *137* (7/86): 150-154, as evidenced by *Brini,* Eur. Cytokine Net. 1:131-139 (Sept. 1990), as set forth on pages 66-74 of the July 6, 2007 Final Office Action; and

vi) inherently anticipated by *Kronke* et al. (PNAS USA 81(8/84) 5214-5218) and/or *Siebenlist* et al. (Mol. Cell. Biol. *6* (9/86) 3042-3049), as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al., Science, *246* (Dec. 1989):1617-20, and the *Dr. Manolagas Declaration*, as set forth on pages 74-78 of the July 6, 2007 Final Office Action.

3. <u>Protein Kinase C Art</u>
The claims are rejected as allegedly: i) anticipated by, or as obvious over, *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43), as set forth on pages 25-31 of the July 6, 2007 Final Office Action, and

ii) anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30), as set forth on pages 31-34 of the July 6, 2007 Final Office Action.

4. <u>Vitamin D Art</u>
The claims are rejected as inherently anticipated by *Tsoukas* (Science *224* (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74(8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. 74 (10/84) 1451-5), and *Manolagas* et al. (JCE&M, 63 (1986) 394-400), as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 55 of 92 of October 22, 2007 Response*

*Declaration of Dr. Manolagas* (paragraphs 7-24), as set forth on pages 78-89 of the July 6, 2007 Final Office Action.

5. 5-ASA Art

The claims are rejected as inherently anticipated by *Dew* (Br. Med. J. 287 (7/83):23-24)), as evidenced by *Baldwin II* (J. Clin. Invest. 107(1991):63-80), *Bantel* et al. (Amer. J. Gastroenterology *287* (2000):3452), *Yan* et al. (J. Biol. Chem. *274* (1999) 366631-36), and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application, as set forth on pages 90-94 of the July 6, 2007 Final Office Action.

6. Glucocorticoid Art

The claims are rejected as inherently anticipated by *Goodman and Gilman's* (The Pharmacological Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner), as evidenced by *Baldwin I* (Annu. Rev. Immunol. <u>14</u> (1996) 649-81), *Auphan* et al. (Science <u>270</u> (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman I1* (Science <u>270</u> (10/95) 283-286), *Mukaida* (J. Biol. Chem. <u>269</u> (5/94) 13289-95), and - *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448) as set forth on pages 94-105 of the July 6, 2007 Final Office Action.

In addition, each of claims 66-68 (dependent on claim 6), claims 77-79 (dependent on claim 8), and claims 90-92 (dependent of claim 9) have been rejected based on art relating to only CsA and 5-ASA.

Patentees incorporate by reference their comments concerning this art as set forth in their November 6, 2006 response, and the first Declaration of Dr. Inder Verma.

Patentees also direct the Examiner's attention to the Second Declaration of Dr. Inder Verma and specifically to the following

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 56 of 92 of October 22, 2007 Response*

paragraphs:

1. Antibiotics ...........¶¶ 113-118 and 121-123

2. CsA ..................¶¶ 11-58

3. Protein Kinase C .....¶¶ 59-70

4. Vitamin D/Calcitrol...¶¶ 71-86

5. 5-ASA ................¶¶ 96-105

6. Glucocorticoids ......¶¶ 87-95

ARI 84442

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 57 of 92 of October 22, 2007 Response*

Rejections Based on Antibiotic Art

Patentees have provided above four reasons why claim 14 is patentable over the 1970 PDR above. Each of these four separate reasons is also applicable to claims 6, 8 and 9 and claims dependent thereon. Patentees do not repeat the detailed explanations here, but instead summarize the reasons as follow:

a) *The Methods of Each of Claims 6, 8 and 9 and of Claims Dependent Thereon Do Not Occur In Any Person To Whom Antibiotics Are Administered. At most administering antibiotics prevents induction of the NF-kB intracellular signaling pathway. A method which comprises administering antibiotics is not a method which involves reducing induced NF-kB activity.*

b) *Performing Any Method Involving Administering An Antibiotic According To the 1970 PDR Only Sometimes Results in Killing Gram-Negative Bacteria. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily Or Inevitably Occurred.*

c) *The Occasional Results Obtainable following the Disclosure of The 1970 PDR Are Not Sufficient to Enable the Methods Disclosed And Therefore Cannot Anticipate Any Of Claim 6, 8 or 9 or Any Claim Dependent Thereon.*

d) *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Required by each of Claims 64, 65, 75, 76, 80, 88, 89 and 93.*

Accordingly, Patentees respectfully request that the Examiner reconsider and withdraw the inherent anticipation rejection based on

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 58 of 92 of October 22, 2007 Response*

antibiotic art as applied against each of claims 6, 8 and 9 and
claims dependent thereon in view of each of the preceding four
reasons, and the discussion by Dr. Verma with respect to claims 6,
8 and 9 and claims dependent thereon. (Declaration of Dr. Verma ¶¶
126-131; and Second Declaration of Dr. Verma ¶¶ 113-123)


### Rejections Based on Cyclosporin A Art

Two types of anticipation rejections are set forth in the July 6,
2007 Final Office Action: anticipation based on a purported explicit
disclosure and anticipation based on an alleged inherent disclosure.
Patentee in their November 9, 2006 response have pointed out the
deficiencies in the extrinsic evidence relied upon as establishing
an inherent anticipation. In the sections that follow, Patentees
provide additional reasons, each of which alone is sufficient to
warrant withdrawal of all rejections based on CsA Art. See the
Second Declaration of Dr. Inder Verma ¶¶ 11-58 for detailed comments
on the July 6, 2007 Final Office Action.

> a)   *The Use of Cyclosporin A in The Cited Art Does Not Involve*
>      *Reducing Induced NF-kB Activity As Required By The Methods*
>      *of Each of Claims 6, 8 and 9 and Claims Dependent Thereon.*

Using CsA does not, and cannot, involve reducing induced NF-kB
activity. CsA is not shown as reducing induced NF-kB activity in any
of the cited references. At most certain of the cited references may
be interpreted to suggest that use of CsA prevents induction of the
NF-kB intracellular pathway. Importantly, a number of examples in
the cited references clearly indicate that using CsA does not involve
reducing induced NF-kB activity. For example, Schmidt et al. state,
"direct addition of CsA to a prepared nuclear extract from activated
cells had no effect on the factor binding, including binding of kB-
binding factors (data not shown), which suggests that inhibition

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 59 of 92 of October 22, 2007 Response*

occurs during the activation phase of NFAT-1 or the kB complex"
(emphasis added, page 4038, second column, second paragraph).
Further, Kronke et al., also of record, teach "when added 4 hr after
induction, CsA did not alter TCGF mRNA levels" (emphasis added, page
5216, 2nd column, second paragraph). Finally, although induction of
TCGF, also known as interleukin-2 (IL-2), is thought to be regulated
by NF-kB, Reed et al., also of record, point out that "previous
studies by us and by others have demonstrated that CsA (1 to 5ug/ml)
does not interfere directly with IL 2 receptor function in that CsA
fails to suppress IL 2-induced proliferation in long-term cultures
of activated T cells" (emphasis added, page 153, 2nd column, first
paragraph).    Consequently, these results confirm that while
contacting a cell with, or administering CsA to, a person, may
possibly prevent induction of NF-kB activity by an external inducing
stimulus, such use or administration of CsA does not, and cannot,
involve reducing induced NF-kB activity.  (Declaration of Dr. Verma
¶¶ 23, 25, 37-38, 46, 55-56, 62-63, 66; and Second Declaration of Dr.
Verma ¶¶ 12)

Because claims 6, 8 and 9 and claims dependent thereon require
reducing induced NF-kB activity, the prior art disclosures of using
or administering CsA are not and cannot be, a method for practicing
the claimed methods.

For this reason alone the anticipation and obvious rejections of each
of claims 6, 8 and 9 and of each of the claims dependent thereon
based on the CsA Art should be withdrawn.

> b)    *The Cyclosporin A Art Does Not Disclose The Method of Any
> of Claim 6, 8 or 9 or of Any Claim Dependent Thereon.*

The cited CsA references disclose experiments which may be
interpreted as showing that use of CsA prevents induction of the
intracellular signaling pathway NF-kB.  Claims 6, 8 and 9, however,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 60 of 92 of October 22, 2007 Response*

are directed to reducing induced NF-kB activity.  The experiments in
the CsA references that purport to show a change in NF-kB activity
all involve either pretreatment with CsA or simultaneous contact by,
or administration of, CsA and a positive inducer of the NF-kB
intracellular signaling pathway.  None of these experiments involve
first inducing NF-kB and then treating with CsA as reducing induced
NF-kB activity.  Therefore, such experiments do not anticipate the
claims at issue, each of which requires claims reducing induced NF-kB
activity.  (Declaration of Dr. Verma ¶¶ 25, 37-38, 45-46, 54-55, 62-
63, 66; and Second Declaration of Dr. Verma ¶¶ 11-17, 22-28, 30-35,
37-50, 58)

For this reason alone the rejections of each of claim 6, 8 and 9, and
of claims dependent thereon as being anticipated by or obvious over
the cited CsA Art, should be withdrawn.

c) *The Cited Cyclosporin A Art Is Not Enabling And Therefore*
*Cannot Anticipate the Method of Any of Claim 6, 8 or 9 or*
*of Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate.  A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled"    *Elan*
*Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted).  Courts have refused to find
anticipation based on prior art that is not enabling.  For instance,
in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to
invalidate patent claims based on prior art which did not "provide
sufficient basic chemistry information to enable one skilled in the
art to grow epitaxial . . . semiconductors" (i.e. practice the
claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358,
1364 (Fed. Cir. 1998).  Prior art is not enabling if it requires one
of skill in the art to undertake "undue experimentation" to "gain

possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The experiments in the cited CsA references cannot be reproduced and therefore are not enabling. See the discussion of each reference in the Second Declaration of Dr. Verma ¶¶ 11-58.

For this reason alone, the rejections of each claim 6, 8 and 9 and of each claim dependent thereon based on the cited CsA Art, should be withdrawn.

d) *The Cited Cyclosporin Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specified Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64-69, 75-80 and 88-93.*

Each of claims 64-69, 75-80 and 88-93 further limit the respective independent claim from which they depend by reciting that the reducing of induced NF-kB activity occurs by intervening at a specific segment within the NF-kB intracellular signaling pathway. The CsA references cited in the July 6, 2007 Final Office Action report results observed at a specific segment within the NF-kB pathway when induction of the pathway is inhibited, but offer no evidence that use of CsA involves intervening at the specific segment within the NF-kB pathway as recited in each of claims 64-69, 75-80 and 88-93. (Declaration of Dr. Verma ¶¶ 56; and Second Declaration of Dr. Verma ¶¶ 11, 17, 22, 28, 30, 35, 41, 45, 49, 58)

Therefore, none of claims 64-69, 75-80 or 88-93 should be rejected as inherently anticipated by the CsA Art.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 62 of 92 of October 22, 2007 Response*

In conclusion, Patentees have provided clear reasons, each of which independently is sufficient to warrant withdrawal of the anticipation, and if applicable obvious, rejections of claims 6, 8 and 9 and of claims dependent thereon based on the disclosures of the CsA Art. Patentees have also provided a reason sufficient to warrant withdrawal of the rejection of each of dependent claims 64-69, 75-80 and 88-93. Accordingly, Patentees respectfully request all rejections based on CsA Art be reconsidered and withdrawn as currently applied to each of claims 6, 8, 9, 64-69, 75-80 and 88-93.

ARI 84448

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 63 of 92 of October 22, 2007 Response*

## Rejections Based on Protein Kinase C Inhibitor Art

For detailed comments concerning the rejections on the basis of
Protein Kinase C Inhibitors in the July 6, 2007 Final Office Action
see ¶¶ 59-70 of the Second Declaration of Dr. Inder Verma. A summary
of the reasons why the rejections of claims 6, 8, 9 and claims
dependent thereon on the basis of the Protein Kinase C Inhibitor Art
should be withdrawn follows.

> a)    *The Use of a Protein Kinase C Inhibitor in The Cited Art
>       Does Not Involve Reducing Induced NF-kB Activity As
>       Required By The Methods of Claims 6, 8 and 9 and Claims
>       Dependent Thereon.*

A method which involves contacting a cell with, or administering to
a person, a protein kinase C inhibitor ("pKCi") does not, and cannot,
involve reducing induced NF-kB activity as recited in the rejected
claims. Methods involving use of PKC inhibitor are not shown to
involve reducing induced NF-kB activity in the cited references. At
most the cited references can be interpreted to disclose that pKC
inhibitors prevent or inhibit induction of the NF-kB intracellular
signaling pathway, and thereby prevent or inhibit the manifestation
of NF-kB activity.

Meichle et al. state "PK-C has not only been implicated in mediating
TNF activation of the transcription factor AP-1 [], but is also
likely to be involved in the <u>activation</u> of the IkB:NF-kB complex"
(page 8339, second column). Likewise, Shirakawa et al. disclose "PKA
and PKC can <u>activate</u> NF-kB" and they hypothesize "that IkB is the
target of phosphorylation; the phosphorylated IkB would presumably
have a decreased ability to bind NF-kB." (page 2428, second column).
    Therefore, to the extent an inhibitor of protein kinase may have
any effect on the NF-kB intracellular signaling pathway and thereby
on NF-kB activity, (and it is unclear that it does have any such

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 64 of 92 of October 22, 2007 Response*

effect), the only possible effect such an inhibitor could have would
be to prevent or inhibit activation of NF-kB. Use of an inhibitor
of protein kinase C cannot have any effect on induced NF-kB activity,
and certainly cannot involve reducing induced NF-kB activity. (Second
Declaration of Dr. Verma ¶¶ 59-68)

Because each of claim 6, 8, 9 and claims dependent thereon are
directed to reducing induced NF-kB activity, the use of a protein
kinase C inhibitor as disclosed in the cited art does not, and
cannot, involve practicing the claimed methods.

For this reason alone, the anticipation rejections of claims 6, 8 and
9 and of claims dependent thereon based on the protein kinase C
inhibitor Art should be withdrawn.

> b)    *The Cited Protein Kinase C Inhibitor Art Does Not Disclose*
>       *the Method of Any of Claim 6, 8, 9 or any Claim Dependent*
>       *Thereon.*

The two cited protein kinase C inhibitor references, Meichle et al.
and Shirakawa et al., disclose experiments which may be interpreted
as showing that a protein kinase C inhibitor prevents induction of
the NF-kB intracellular signaling pathway and thereby effects the
appearance of NF-kB activity. However, each of claims 6, 8 and 9,
recite reducing induced NF-kB activity. Thus, the experiments in the
cited references that purport to show a change in NF-kB activity
involve either pretreating cells with a pKCi or administering the
pkci simultaneously with a purported inducer of NF-kB. Performing
such experiments does not anticipate the rejected claims that recite
reducing induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 148-
149, 153-154; and Second Declaration of Dr. Verma ¶¶ 59-66)

For this reason alone, the anticipation rejections of each of claim
6, 8, 9, and claims dependent thereon based on Meichle et al. and

Shirakawa et al., should be withdrawn.

c) *The Cited Protein kinase C Inhibitor Art Does Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or of Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the disclosures prior art reference cannot be reproduced, then that reference is not enabling.

The disclosures of protein kinase C inhibitor cited in the July 6, 2007 Final Office Action cannot be reproduced. See the specific discussion as to each reference in the Second Declaration of Dr. Verma ¶¶ 70.

For this reason alone the anticipation rejections of claims 6, 8, 9 and claims dependent thereon based on the Protein kinase C Inhibitor Art, should be withdrawn.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 66 of 92 of October 22, 2007 Response*

> d) *The Cited Protein Kinase C Inhibitor Art Does Not Disclose
> a Method Which Anticipates Reducing Induced NF-kB Activity
> by Intervening within the NF-kB Intracellular Signaling
> Pathway At A Specified Segment as Recited in Claims 64,
> 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93
further limit the independent claim by requiring that the reducing
of induced NF-kB activity involve intervening at a specific segment
of the NF-kB intracellular signaling pathway inside a cell. The pKCi
references cited in the July 6, 2007 Final Office Action report
results observed at a specific segment of the NF-kB intracellular
signaling pathway, but provide no evidence that any pKCi is reducing
induced NF-kB activity by intervening at such specific segment as
required by each of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.
(Declaration of Dr. Verma ¶¶ 148-155; and Second Declaration of Dr.
Verma ¶¶ 67-69)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 is
inherently anticipated by any method involving the use of any pKCi
disclosed in Meichle et al. or Shirakawa et al.

In conclusion, Patentees have provided reasons, each of which
independently is sufficient to warrant withdrawal of the anticipation
rejections of claims 6, 8 and 9 and of claims dependent thereon based
on Meichle et al. or Shirakawa et al. Patentees have provided an
additional reason warranting withdrawal of the rejection as applied
to dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.
Accordingly, Patentees respectfully request all rejections based on
Meichle et al. or Shirakawa et al. as applied to claims 6, 8, 9, 64,
65, 69, 75, 76, 80, 88, 89 and 93 be withdrawn.

Rejections Based on Vitamin D Art

ARI 84452

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 67 of 92 of October 22, 2007 Response*

For detailed comments concerning the rejection on the basis of the basis of Vitamin D in the July 6, 2007 Office Action, see ¶¶ 71-86 of the Second Declaration of Dr. Inder Verma. A summary of the reasons why the rejections of claims 6, 8, 9 and claims dependent thereon the basis of the Vitamin D Art should be withdrawn follows.

a) *The Cited Vitamin D Art Does Not Disclose A Method of Using Vitamin D Which Anticipates Any Method Recited In Any of Claim 6, 8, or 9 and in any Claims Dependent Thereon.*

Of the prior art vitamin D references cited in the July 6, 2007 Final Office Action, each reference other than Rigby I discussed below clearly does not disclose a method, the practice of which would anticipate any of claim 6, 8 or 9. These claims require reducing induced NF-kB activity, and the cited references do not disclose a method which does so. Each specific reference is explained and inaccurate characterizations in the July 6, 2007 Final Office Action are noted by Dr. Verma. (See Second Declaration of Dr. Verma ¶¶ 71-86) The cited vitamin D references, therefore, do not anticipate the method of any of claim 6, 8 or 9.

One reference Rigby I purports to show an experiment where vitamin D was administered to PBM cells stimulated with PHA. Rigby I et al. disclose calcitriol-mediated reduction in cellular proliferation and, in Figure 4, a reduction in the level of IL-2 production mediated by calcitriol over the course of 18 hours. A noticeable reduction in IL-2 production is observed at 12 hours post-calcitriol treatment and, at 18 hours, no IL-2 is observed (Figure 4). The production of IL-2 is thought to be regulated, at least in part, by NF-kB. As explained below and in the Second Declaration of Dr. Verma, the results in Figure 4 cannot be a consequence of reducing induced NF-kB activity.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 68 of 92 of October 22, 2007 Response*

Schmidt et al. and Emmel et al., both of which are of record, have demonstrated that factors, other than NF-kB, can have a role in regulating IL-2 production. Schmidt et al. point out that the "NFAT-1-binding site ... has been implicated directly in playing a major role during transcriptional <u>activation of IL-2</u>" (emphasis added, page 4037, first column). Likewise, Emmel et al. state "NF-AT, AP-3 and to a lesser extent NF-kB ... appear to be important in the transcriptional activation of genes for interleukin-2.." (page 1617, abstract). Additionally, cellular proliferation, the result observed in Rigby I, is a process regulated by many factors, and therefore not necessarily regulated by NF-kB. Thus, cellular proliferation and IL-2 production are not necessarily or inevitably indicative of changes in NF-kB activity. Moreover and importantly, the cellular proliferation and IL-2 production results reported in Rigby I are <u>not</u> attributable to reducing induced NF-kB activity as explained by Yu et al., Takeuchi et al. and Alroy et al. (Second Declaration of Dr. Verma ¶¶ 77)

Yu et al. evaluated the effects of calcitriol on IL-2 production and cellular proliferation noting that:

> NF-kB enhances the expression of IL-2 and the IL-2 receptor, two molecules critical for lymphocyte proliferation. On the other hand, $1,25(OH)_2D_3$ inhibits IL-2 production and lymphocyte proliferation, raising the possibility that the antiproliferative effects of $1,25(OH)_2D_3$ could have been mediated via inhibition of NF-kB. However, the time courses of the effects of $1,25(OH)_2D_3$ on NF-kB expression and lymphocyte proliferation were different. Specifically, whereas $1,25(OH)_2D_3$ could inhibit cell proliferation only when it was added in the first 24 hr following activation <u>1, $25(OH)_2D_3$ decreased p50 and 105 levels when added to the culture as late as 64 hr following addition of the activating agent. This suggests that the antiproliferative effect of $1,25(OH)_2D_3$ is not the result of it effects on NF-kB</u>" (page 10994, first column).

Yu et al. demonstrated that the addition of calictriol 48 hours after activation with PHA inhibits the transcription of the <u>NF-kB subunits p50 and p105</u> as disclosed in Figure 1. On page 10992, Yu et al.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 69 of 92 of October 22, 2007 Response*

teach that "PBMCs were activated for 72 hr with PHA, and $1,25(OH)_2D_3$ was added either simultaneously with addition of PHA or 24, 48, 64, 68, or 70 hr following addition of PHA (Fig. 3). The inhibiting effect of $1,25(OH)_2D_3$ on p50 and p105 was apparent when the hormone was added simultaneously with PHA or 24, 48, or 64 hr following addition of PHA." Therefore, Yu et al., demonstrate that whatever effect $1,25(OH)_2D_3$ has on IL-2 production, that effect is different from and not attributable to reducing induced NF-kB.

The time course of the effects of $1,25(OH)_2D_3$ observed by Yu et al. is notably different from the time course observed by Rigby et al. I. Rigby I demonstrated in Figure 4, that the effects on IL-2 production of calcitriol on PHA-stimulated PBMs occurred within 18 hours, and after 18 hours no IL-2 production remained to inhibit. According to Yu et al., however, the only effect of $1,25(OH)_2D_3$, ie. its effect on transcription of p50 and p105 is only detected after 24 hours.

The effect of calictriol on cell proliferation and IL-2 production in Rigby et al. I occurs too rapidly to be attributed to the effect of $1,25(OH)_2D_3$ on the transcription of the NF-kB subunits p50 and p105. As described in the '516 patent, column 16, lines 22-28, "NF-kB is initially located in the cytoplasm in a form unable to bind DNA because it is complexed with IkB. Various inducers then cause an alteration in IkB allowing NF-kB to be released from the complex. Free NF-kB then travels to the nucleus and interacts with its DNA recognition sites to facilitate gene transcription." Thus, transcription of p50 and p105 genes is not needed for induction of NF-kB activity.

Takeuchi et al. and Alroy et al. both demonstrate that IL-2 production can be activated by any one of four factors: NF-kB, NFAT, AP-1 and OCT-3 (see Takeuchi et al. at page 209). Based on Yu et al.'s teaching that the only effect of $1,25(OH)_2D_3$ relative to NF-kB

ARI 84455

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 70 of 92 of October 22, 2007 Response*

is its inhibition of transcription of p105 and p50, it is evident
that the results observed in Rigby et al. I in terms of cellular
proliferation and IL-2 production <u>did not</u>, and <u>could not</u> have
involved reducing induced NF-kB activity.  Therefore, the results
observed in Rigby I must have been due to a factor other than NF-kB
resulting in the reduced transcription of IL-2. .

Furthermore, suppression production of p50 and p105 would not lead
to reducing induced NF-kB activity.  The only effect of vitamin D
relative to NF-kB shown of record is suppression of the production
of p50 and p105.  However, suppression of the production of p50 and
p105 would not lead to reducing induced NF-kB activity because
p65/RelA alone is sufficient to promote transcription, of IL-2. See
e.g. Nishiyama et al., page 704, Figure 4, discussed by Dr. Verma.
(Second Declaration of Dr. Verma ¶¶ 78-82)

For this reason alone the anticipation rejections of each of claim
6, 8 and 9, and of each claim dependent thereon based on the Vitamin
D Art, should be withdrawn.

     b)    *The Cited Vitamin D Art Does Not Enable The Performance of*
              *Any Method Which Anticipates a Method of Any of Claim 6,*
              *8 or 9 or Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate.  A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled" *Elan
Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted).  Courts have refused to find
anticipation based on prior art that is not enabling.  For instance,
in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to
invalidate patent claims based on prior art which did not "provide

ARI 84456

sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The cited Vitamin D art cannot be reproduced and is not enabling. See the discussion in the Second Declaration of Dr. Verma ¶¶ 84-86.

For this reason alone the anticipation rejections of each of claim 6, 8 and 9 and of each claim dependent thereon based on the vitamin D art, should be withdrawn.

c) *The Cited Vitamin D Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specific Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 further limit the independent claim from which it depends by reciting that the reducing of induced NF-kB activity occurs by intervening at a specific segment within the NF-kB intracellular signaling pathway inside a cell. Vitamin D has no effect on reducing induced NF-kB activity. Moreover, any effect it may have on NF-kB does not involve reducing induced NF-kB activity by intervening at the specific segment within the NF-kB intracellular signaling pathway recited in any of claim 64, 65, 69, 75, 76, 80, 88, 89 and 93. (See also Declaration of Dr. Verma ¶¶ 108; and Second Declaration of Dr. Verma ¶¶ 76)

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 72 of 92 of October 22, 2007 Response*

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 should be rejected as inherently anticipated by any use of vitamin D disclosed in any of the cited Vitamin D Art.

In conclusion, Patentees have provided reasons, each of which independently warrants withdrawal of the anticipation rejection of each of claims 6, 8 and 9 and of claims dependent thereon based on the Vitamin D art. Patentees have also provided an additional reason warranting withdrawal of the rejection of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.

 Accordingly, Patentees respectfully request all rejection based on the cited Vitamin D art be withdrawn with respect to each of claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89 and 93.

ARI 84458

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 73 of 92 of October 22, 2007 Response*

Rejection Based on 5-ASA Art

For detailed comments concerning the rejection on the basis of 5-ASA
in the July 6, 2007 Final Office Action see ¶¶ 96-105 of the Second
Declaration of Dr. Inder Verma.  A summary of the reasons why the
rejection of claims 6, 8, 9 and claims dependent thereon on the basis
of the cited 5-ASA Art should be withdrawn follows.

> a)    The Use of 5-ASA in Dew et al., Does Not Involve Reducing
>       Induced NF-kB Activity As Required By The Methods of
>       Claims 6, 8 and 9 and Claims Dependent Thereon.

The sole 5-ASA art reference cited, Dew et al., does not anticipate
claims 6, 8 and 9 and claims dependent thereon.  Dew et al. disclose
administration of 5-ASA to prevent reoccurrence of ulcerative colitis
in patients who "all were <u>in remission with ulcerative colitis</u> or
proctitis and had passed three or less stools daily without blood or
slime during the previous month" (emphasis added, page 23 of Dew et
al).  Even if ulcerative colitis were associated with induced NF-kB
activity, and there is no evidence that it is, the patients in Dew
et al. were asymptomatic with respect to ulcerative colitis and
therefore could not have been exhibiting induced NF-kB activity.
Each of claims 6, 8 and 9 require reducing induced NF-kB activity.
Therefore, Dew et al. does not disclose a method of reducing induced
NF-kB.  (Declaration of Dr. Verma ¶¶ 156-158; and Second Declaration
of Dr. Verma ¶¶ 95-103)

In the July 6, 2007 Final Office Action, the Examiner alleged that
Yamamoto et al. teach patients in remission still have elevated
cytokine levels, indicating NF-kB is active.  This assertion is
misleading because Yamamoto et al. evaluated patients "who had been
diagnosed with endoscopically and histologically confirmed UC" (page
590, first column).  Thus, the disclosure of Yamamoto et al. does not
involve asymptomatic patients, such those in Dew et al.  When
cytokine levels in patients with inactive disease are analyzed, the

ARI 84459

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 74 of 92 of October 22, 2007 Response*

levels are similar to healthy volunteers. See the discussion by Dr. Verma of Braegger et al. and Mitsuyama et al., each of whom analyzed patients with inactive disease, i.e. patients in "remission", and showed that such patients in remission have cytokine levels similar to the cytokine levels of the healthy control patients. Specifically, Braegger et al. state "in patients with inactive disease, either as a result of surgery or treatment with steroids, the concentration of stool TNF alpha fell to those of control" (abstract). Likewise, Figure 1 of Mitsuyama et al. demonstrates that the colonic levels of IL-8 in patients with inactive ulcerative colitis are no different from those observed in control patients. The Examiner has acknowledged on page 92 of the Final Office Action, that TNF and IL-8 are regulated by NF-kB. Since the asymptomatic patients in Dew et al. would not have had elevated cytokine levels, these patients would not have had induced NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 101-102)

Moreover, the presence of proinflammatory cytokines and colonic inflammation have been shown to occur in NF-kB deficient mice. (Second Declaration of Dr. Verma ¶¶ 105) Thus, regardless of what "remission" means in Dew et al., there is no evidence in the record showing that NF-kB is necessarily induced in patients with ulcerative colitis, and certainly nothing showing that NF-kB was necessarily induced in the patients of Dew et al.

An inherent anticipation rejection requires that the evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Dew et al. do not describe induced NF-kB activity as recited by the claims. Yamamoto et al. do not make <u>clear</u> that the patients of Dew et al. had induced NF-kB activity.

Even if there was a possibility that the patients of Dew et al. had

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
Page 75 of 92 of October 22, 2007 Response

induced NF-kB activity, such a possibility cannot support an inherent anticipation rejection. "Inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in a single prior art reference. *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted). By referring to Yamamoto et al., the July 6, 2007 Final Office Action merely raises the possibility that a patient in Dew et al. had induced NF-kB activity. That possibility, however, is both clearly rebutted by others as discussed by Dr. Verma and insufficient as a matter of law to support a rejection on the basis of inherent anticipation. Accordingly, an inherent anticipation rejection based on Dew et al. is not proper.

Finally, although Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to explain Dew et al., the Examiner alleged that the difference between the formulations of 5-ASA used by Dew et al. and by the extrinsic evidence is of no consequence. The Examiner is mistaken. (Second Declaration of Dr. Verma ¶¶ 104) Differences in formulation do matter and the use of different formulations in the non-prior art references relied upon to justify the inherency rejection establishes both that the non-prior art references are not being used to "explain" the prior art, and more importantly that these references do not show that the use of different formulations in Dew et al. inherently anticipates the claimed methods.

For this reason alone the anticipation rejections of each of claims 6, 8 and 9, and of claims dependent thereon based on Dew et al., should be withdrawn.

> b)   *Dew et al. Do Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The disclosure of Dew et al. cannot be reproduced and is not enabling for the method disclosed. See the discussion in the Second Declaration of Dr. Verma ¶¶ 104.

For this reason alone the anticipation rejections of each of claims 6, 8 and 9 and of each claim dependent thereon based on Dew et al., should be withdrawn.

*c) Dew et al. Do Not Disclose A Method Which Anticipates Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Recited in Claims 64-69, 75-80 and 88-93.*

Each of dependent claims 64-69, 75-80 and 88-93 further limits the independent claim from which it depends by requiring that the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 77 of 92 of October 22, 2007 Response*

reducing of induced NF-kB activity involve intervening at a specific
segment of the NF-kB intracellular signaling pathway inside a cell.
Dew et al., at most report results observed at a specific segment,
but provide no evidence that 5-ASA actually is reducing induced NF-kB
activity by intervening at such specific segment as required by each
of claims 64-69, 75-80 and 88-93. (Declaration of Dr. Verma ¶¶ 156-
159; and Second Declaration of Dr. Verma ¶¶ 103)


Therefore, none of claims 64-69, 75-80 and 88-93 is inherently
anticipated by any method disclosed in Dew et al.


In conclusion, Patentees have provided reasons, each of which
independently is sufficient to warrant withdrawal of the anticipation
rejections of claims 6, 8 and 9 and of claims dependent thereon based
on Dew et al. Patentees have also provided an additional reason
warranting withdrawal of the rejection as applied to dependent claims
64-69, 75-80 and 88-93. Accordingly, Patentees respectfully request
all rejections based on Dew et al. As applied to claims 6, 8, 9, 64-
69, 75-80 and 88-93 be withdrawn.

ARI 84463

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 78 of 92 of October 22, 2007 Response*

### Rejection Based on the Endogenous Glucocorticoid Art

For detailed comments concerning the rejections on the basis of the Glucocorticoid Art in the July 6, 2007 Final Office Action see ¶¶ 87-95 of the Second Declaration of Dr. Inder Verma.  A summary of the reasons why the rejection of claims 6, 8, 9 and claims dependent thereon on the basis of the Glucocorticoid Art should be withdrawn follows.

  a)  *The Use of Endogenous Glucocorticoids Disclosed in Goodman and Gilman Does Not Involve Reducing Induced NF-kB Activity as Required by The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.*

The sole Glucocorticoids reference cited, Goodman and Gilman, does not anticipate any of claims 6, 8, 9 or claims dependent thereon. Goodman and Gilman describe the production of endogenous glucocorticoids by the body in response to "agonal state, severe infections, surgery, parturition, cold, exercise and emotional stress" (Goodman and Gilman's page 1469, second column).  As an initial threshold matter there is no evidence of record that any of these conditions referred to involves induced NF-kB activity.  Each of claims 6, 8 and 9 as well as each claim dependent thereon is directed to reducing induced NF-kB activity.  Because there is not showing that Goodman and Gilman disclose induced NF-kB activity, the claimed method cannot be anticipated.  (Declaration of Dr. Verma ¶¶ 102-104; and Second Declaration of Dr. Verma ¶¶ 87-95)

Moreover, even if one or more of the conditions listed in Goodman and Gilman involved the presence of proinflammatory cytokines, this fact would not establish that there was induced NF-kB activity. Proinflammatory cytokines and inflammation has been shown to occur without NF-kB activity.  (Second Declaration of Dr. Verma ¶¶ 95)

ARI 84464

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 79 of 92 of October 22, 2007 Response*

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Goodman and Gilman do not describe induced NF-kB activity as recited by the claims, and the purported extrinsic evidence does not make clear that Goodman and Gilman had induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 102-104; and Second Declaration of Dr. Verma ¶¶ 87-95)

For this reason alone the anticipation rejections of each of claims 6, 8 and 9, and of claims dependent thereon based on Goodman and Gilman, should be withdrawn.

> b)   *Any Method Disclosed in Goodman and Gilman, Would At Most Only Involve Reducing Induced NF-kB Activity Sometimes. Any Such Occasional Result Is Not Sufficient To Establish An Element of the Claimed Methods Necessarily Or Inevitably Occurs.*

Nothing of record establishes that the use of glucocorticoids necessarily or inevitably involves reducing induced NF-kB activity. Therefore, even if following the disclosure of Goodman and Gilman could, under some undefined circumstance, involve reducing induced NF-kB activity, (and there is no teaching in Goodman and Gilman of such a circumstance,) any such reducing would have only occurred occasionally. (Declaration of Dr. Verma ¶¶ 102-106; and Second Declaration of Dr. Verma ¶¶ 87, 94-95)

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Inherency may not be established by probabilities or

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 80 of 92 of October 22, 2007 Response*

possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Int'l.; Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

Thus, even if following the disclosure of Goodman and Gilman could occasionally involve reducing induced NF-kB activity this is insufficient to establish inherent anticipation. Critical information is missing from Goodman and Gilman including the type of cell, the type of inducer, and the conditions for administering a glucocorticoid to possibly effect reducing induced NF-kB activity. Without such critical information in Goodman and Gilman, the most the cited non prior art reference could ever show is that there was a possibility of reducing induced NF-kB activity by following the teaching of Goodman and Gilman (Declaration of Dr. Verma ¶¶ 103-105; and Second Declaration of Dr. Verma ¶¶ 87-93)

However, a showing of mere "probabilities or possibilities" is insufficient to support a finding of inherent anticipation. *See In re Robertson,* 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that could be used to perform the same result with a slightly different structure). Where practice of the prior art only sometimes involves all of the elements of a claim the art was held to <u>not</u> inherently anticipate because "occasional results are not inherent." *See Mehl/Biophile Int'l. Corp. v. Milgraum,* 192 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that prior art did not anticipate a claim requiring a substantially vertical orientation even though practicing the prior art would sometimes result in such an orientation). *See, also, Glaxo, Inc. v. Novopharm, Ltd.,* 52 F.3d 1043 (Fed. Cir. 1995) (affirming a district court holding that practice of a prior art method sometimes yielding crystals one of two polymorphs but other times yielding the other did not inherently anticipate a claim to only one of the polymorphs.)

In the present case, even accepting the Examiner's rationale advanced

ARI 84466

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
Page 81 of 92 of *October 22, 2007 Response*

in the July 6, 2007 Final Office Action, the use of glucocorticoids
as taught by Goodman and Gilman would at most only *sometimes* have
involved reducing induced NF-kB activity. Such an occasional result
is insufficient to establish inherent anticipation under controlling
Federal Circuit precedent.

For this reason alone the inherent anticipation rejection of each of
claim 6, 8, 9 and each claims dependent thereon based on the Goodman
and Gilman should be withdrawn.

     *c)    Any Occasional Results Obtainable By Following The
         Disclosure of Goodman and Gilman Is Not Sufficient to
         Enable the Method of Any of Claims 6, 8 or 9 or Any Claim
         Dependent Thereon.*

Any occasional result that might have occurred upon practicing any
method disclosed by Goodman and Gilman would be insufficient to
enable the method of any of claims 6, 8, 9 or any claim dependent
thereon, and therefore, Goodman and Gilman cannot anticipate any of
these claims.

"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate. A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled" *Elan
Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted). Courts have refused to find
anticipation based on prior art that is not enabling. For instance,
in *Rockwell Intern. Corp v.U.S.*, the Federal Circuit refused to
invalidate patent claims based on prior art which did not "provide
sufficient basic chemistry information to enable one skilled in the
art to grow epitaxial . . . semiconductors" (i.e. practice the
claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 82 of 92 of October 22, 2007 Response*

1364 (Fed. Cir. 1998). Likewise, in *Application of Sheppard*, the
Court of Customs and Patent Appeals held that a prior art reference
which disclosed either the claimed compound *or* a different compound
was not enabling and therefore could not anticipate the claim at
issue. *Application of Sheppard*, 339 F.2d 238, 241-242 (C.C.P.A.,
1964).

Goodman and Gilman do not disclose how to carry out a method which
necessarily and inevitably involves reducing induced NF-kB activity
using glucocorticoids (assuming it is even possible to carry out such
a method.) Glucocorticoids have many effects and their mechanism of
action is poorly understood. (Declaration of Dr. Verma ¶¶ 105; and
Second Declaration of Dr. Verma ¶¶ 94-95)

Prior art whose disclosure would have only sometimes involved
practicing the claimed method, like the prior art in *Rockwell* and
*Sheppard*, does not enable one skilled in the art to practice the
claimed method and therefore cannot anticipate the claimed method.
The Examiner's rationale for the rejection, even assuming it were
factually correct (which is unclear) would at most establish that the
use of glucocorticoids as taught by Goodman and Gilman could
*sometimes* have involved reducing induced NF-kB activity. Such a
teaching in Goodman and Gilman does not enable the practice of the
method of any of claim 6, 8, 9, or any claim dependent thereon.

For this reason alone the inherent anticipation rejection of each of
claims 6, 8 and 9, and claims dependent thereon based on the Goodman
and Gilman should be withdrawn.

   d)   *Goodman and Gilman Do Not Disclose A Method Which*
        *Anticipates A Method Of Reducing Induced NF-kB Activity by*
        *Intervening Within the NF-kB Intracellular Signaling*
        *Pathway Inside a Cell at a Specific Segment of the Pathway*

ARI 84468

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 83 of 92 of October 22, 2007 Response*

> *As Required by each of Claims 64, 65, 69, 75, 76, 80, 88,*
> *89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93
further limit the independent claim from which it depends by
requiring that the reducing of induced NF-kB activity involve
intervening at a specific segment within the NF-kB intracellular
signaling pathway inside a cell. Neither Goodman and Gilman, nor any
of the non-prior art references cited in the July 6, 2007 Final
Office Action, provide any information as to how glucocorticoids
work. Certainly none of the cited references provide evidence that
the use of glucocorticoids involves reducing induced NF-kB activity
by intervening at the specific segment of the NF-kB intracellular
signaling pathway as required in each of claims 64, 65, 69, 75, 76,
80, 88, 89 and 93. (Declaration of Dr. Verma ¶¶ 102-103; and Second
Declaration of Dr. Verma ¶¶ 93)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 is
inherently anticipated by Goodman and Gilman and the rejection on
this basis should be withdrawn.

In conclusion, Patentees have provided reasons, each of which
independently is sufficient to warrant withdrawal of the anticipation
rejections of each of claims 6, 8, 9 and claims dependent thereon
based on Goodman and Gilman. Patentees have provided an additional
explanation warranting withdrawal of the rejection of dependent
claims 64, 65, 69, 75, 76, 80, 88, 89 and 93. Accordingly,
Patentees respectfully request the rejections based on Goodman and
Gilman as applied to claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89
and 93 be withdrawn.

ARI 84469

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 84 of 92 of October 22, 2007 Response*

IV.  THE USE OF NON-PRIOR ART REFERENCES AND EVIDENCE SUBMITTED IN
A DECLARATION THAT GOES BEYOND EXPLAINING THE CONTENT OF CITED
PRIOR ART AS A BASIS FOR AN INHERENCY REJECTION IS <u>IMPROPER AND
ULTRA VIRES</u>

A.  **Statutory Grounds For Reexamination**

Statutory authority proscribes that in reexamination proceedings
consideration by the Patent Office be limited to "prior art
consisting of patents or printed publications" that have a bearing
on patentability.  35 U.S.C. § 301. *See also* 37 C.F.R. § 1.501.
Indeed, the Manual of Patent Examining Procedure ("MPEP") states that
substantial new questions of patentability must be based on "prior
art patents or printed publications."  Prior art includes that relied
on in the reexamination request, that found elsewhere by the PTO, or
that in the patent file from submissions under 37 C.F.R. § 1.501.
All such art must be "prior art consisting of patents and printed
publications."  MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.

B.  **Impermissible Grounds of Rejection in a Reexamination**

The Patent Office does not have statutory authority to entertain a
prior public use in a reexamination. 35 U.S.C. § 301, *et seq.*; e.g.,
M.P.E.P. § 2216 (Rev. 2, May 2004) ("Examples of such questions that
will not be considered are public use, on sale, and fraud.")

The lack of statutory authority cannot be circumvented by reliance
on a printed publication that merely describes the public use.  A
prior art citation "cannot include ... a statement as to the public
use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004);
"a prior art patent or printed publication <u>cannot</u> be properly applied as
a ground for reexamination <u>if it is merely used as evidence of
alleged prior public use</u> or on sale, insufficiency of disclosure,
etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

ARI 84470

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 85 of 92 of October 22, 2007 Response*

Thus, it is clear that the PTO does not have statutory authority to rely on, as a ground for reexamination, a printed publication which does not itself contain the necessary disclosure, but describes an alleged prior public use. In support of this legal challenge to the subject reexamination proceeding Patentees also rely upon, and hereby incorporate by reference the Petitions, Requests for Reconsideration, and Pleadings filed in the Mandamus action initiated by Patentees in the U.S. District Court for the Eastern District of Virginia.

**C.    The Inherent Anticipation Rejections in the August 2, 2006 and July 6, 2007 Office Actions are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute.**

As noted above, a reexamination must be based on "prior art consisting of patents and printed publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501. Nothing in the statute, the rules, or the M.P.E.P. dictates a different understanding. Indeed, even prior art patents or printed publications cannot be grounds for reexamination if used merely as evidence of alleged prior public use or on sale activity. MPEP 2217. Affidavits or declarations may be considered in reexamination to explain the content or pertinent date of a prior art patent or printed publication. *Id.* However, rejection on prior art "cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications." *Id.* at 2258(I)(E).

Likewise, an admission may not be the basis for establishing a substantial new question of patentability, although an admission may be used "to determine the scope and content of the prior art in conjunction with prior art patents and printed publications, whether such admissions result from patents or printed publications or from some other source." *Id.* at 2217 and 2258(I)(F)(1)-(2). "An admission as to what is in the prior art is simply that, an admission, and requires no independent proof. It is an acknowledged,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 86 of 92 of October 22, 2007 Response*

declared, conceded, or recognized fact or truth." *Id.* at
2258(I)(F)(2). However, information supplementing or further
defining the admission is improper, as the admission must stand on
its own. *Id.* at 2217.

It is clear that reexamination proceedings were designed to be
limited in scope to consideration of prior art patents and printed
publications, "lest the life of an issued patent be wasted and the
patentee's legitimate rights be abused by third party requests for
reexamination, for there are myriad grounds on which patentability
is subject to challenge." *In re Lonardo*, 119 F.3d 960, 969, 43
USPQ2d 1262 (Fed. Cir. 1997)(Newman, J., dissenting and noting
legislative history's "serious concern that reexamination not create
new opportunities for abusive tactics and burdensome
procedures")(quoting *In re Recreative Technologies Corp.*, 83 F.3d
1394, 1397, 38 USPQ2d 1776, 1778 (Fed. Cir. 1996)).

Despite the statute, the rules and the MPEP, the Examiner advances
the following case law on pages 8-9 of the August 2, 2006 Office
Action as relevant to the use of non-prior art references in a
reexamination:

> The discovery of a previously unappreciated property of a prior art composition, or of
> a scientific explanation for the prior art's functioning, does not render the old
> composition patentably new to the discoverer." Atlas *Powder* Co. v. *Ireco* Inc., 190
> F.3d 1342,1347,51 USPQ2d 1943,1947 (Fed. Cir. 1999). Thus the claiming of a new
> use, new function or unknown property which is inherently present in the prior art does
> not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ
> 430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter.
> 1993); *In re Cruciferous Sprout Litigation*, 301 F3d. 1343,64 USPQ2d 1202 (Fed. Cir.
> 2002); *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004).
> Although, normally, only one reference should be used in making a rejection under 35
> U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be
> proper when the extra references are cited to show that a characteristic not disclosed in
> the reference is inherent. See MPEP 2131.01. Once a reference's teaching is shown to
> provide evidence or reasoning tending to show inherency, the burden shifts to
> Applicant to show an unobvious difference. MPEP 2112 (V).

Patentees respectfully point out that not one of the cases cited by

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 87 of 92 of October 22, 2007 Response*

the Examiner involves a reexamination or discusses what is a
legitimate ground for rejection in a <u>reexamination</u>.

35 U.S.C. § 303 specifically refers to §§ 301 and 302, which require
the basis of reexamination to be prior art, whether "patents or
publications discovered by [the Director] or cited under the
provisions of section 301 [for citation of prior art in a request for
reexamination under section 302]." 35 U.S.C. § 303. The Examiner
proffers no rationale for interpreting the reexamination statute in
a different manner. Yet, the Examiner proceeds to assert that non-
prior art documents can be considered during reexamination to show
inherent anticipation as "extrinsic evidence" of what is inherent in
a prior art reference even when such "extrinsic evidence" does not
refer to or reproduce the teachings of the prior art being cited.

> **D.    The Claims of the '516 Patent Are Method Claims and the
> Cited Prior Art Is At Most Evidence of What Occurred
> During A Prior Public Use.**

Each of the prior art references cited in the August 2, 2006 Office
Action expressly describes methods that were publicly used, e.g.
drinking red wine. The cited prior art, therefore, merely provides
evidence of the prior public use of the methods described.

The logic used in the August 2, 2006 Office Action is that when the
methods described in the printed publications were practiced by the
public, the claimed methods of the '516 Patent "inherently" were
practiced. Clearly, however, anything that "inherently" happened,
must have occurred *during the <u>public use</u>* of methods described in
cited references.

Indeed, the August 2, 2006 Office Action relies on non-prior art
references as "extrinsic evidence," as well as a Declaration offered
by the Requestor, to allegedly "explain" what would have "inherently"
happened during such public use. Clearly, the methods which are
actually described in the cited prior art do not raise any

ARI 84473

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 88 of 92 of October 22, 2007 Response*

substantial new question of patentability, and the August 2, 2006 Office Action does not allege otherwise. What the August 2, 2006 Office Action effectively relies upon to support the inherent anticipation rejections is evidence of a prior public use.

The Federal Circuit has held in standard patent prosecution that a method is inherently anticipated only by the actual public use of the method (which may or may not have been described in a printed publication).[3]

A method of preparing and administering a food product rich in glucosinolates was found to be inherently anticipated where members of the public have "heretofore grown and eaten one of the many suitable cultivars identified by its patents." *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1351 (Fed. Cir. 2002). However, the rationale of this holding is prior public use, not prior publication. This rationale is not available as a ground for rejection in a reexamination.

A claim to a method of hair depilation has been found inherently anticipated on the basis of prior public use in an experiment investigating the safety of a laser on guinea pig backs. The experiment was described in a printed publication, but it was the public use which inherently anticipated, not the publication. Again, prior public use is not available as a basis for a rejection in a reexamination. *MEHL/BIOPHILE International Cor. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999). Moreover, a different printed publication that merely provided instructions for the use of the same laser to remove tattoos from skin, where there was no prior public

---

[3] The Federal Circuit has found a claim to a *compound* inherently anticipated by a disclosure in a *patent* of administering to a patient a precursor which was necessarily converted in the patient to the compound. *Schering Corporation v. Geneva et al.*, 339 F.3d 1373 (Fed. Cir. 2003). However, the Federal Circuit in *Schering* explicitly stated that the *method* of treatment claims were not inherently anticipated by such a disclosure. *Id*, at 1381.

ARI 84474

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 89 of 92 of October 22, 2007 Response*

use, was held not to inherently anticipate a claimed depilation
method.  *Id* at 1365.

Accordingly, it is clear that inherent anticipation of a patented
method only occurs during a prior public use, not in a printed
publication describing that prior public use; and prior public use
is not a permitted basis for a rejection in a reexamination.

The Office's own rules recognize that a prior art citation "cannot
include ... a statement as to the public use of the claimed
invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent
or printed publication <u>cannot</u> be properly applied as a ground for
reexamination <u>if it is merely used as evidence of alleged prior
public use</u> or on sale, insufficiency of disclosure, etc." M.P.E.P.
§ 2217 (Rev. 2, May 2004) (Emphasis added).

Accordingly, the August 2, 2006 Office Action contains improper
rejections of a patented method based on prior public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 90 of 92 of October 22, 2007 Response*

V.    SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R. §1.555,
Patentees direct the Examiner's attention to the following
disclosures, which are listed on Form PTO-1449 (**Exhibit C**). Copies
of the disclosures listed below as items 1-6 including listed
attachments are attached hereto as **Exhibits 1-6**, respectively.


1.    July 16, 2007 Memorandum In Support of Eli Lilly And Company's
      Motion To Stay Entry of Judgement Pending Reexamination or For
      Settlement of Form of Final Judgement, Document 409, filed
      07/16/2007, pgs. 1-18 in Civil Case 02 CV 11280 RWZ (**Exhibit
      1**);

2.    August 22, 2007 Reply Memorandum In Support of Eli Lilly And
      Company's Motion To Stay Entry of Judgement Pending
      Reexamination or For Settlement of Form of Final Judgement,
      Document 414, filed 08/22/2007, pgs. 1-11, including Exhibits
      2-6 in Civil Case 02 CV 11280 RWZ (**Exhibit 2**);

3.    September 10, 2007 Final Judgement, Document 417, filed
      09/10/2007, pgs. 1-5 in Civil Case 02 CV 11280 RWZ (**Exhibit 3**);

4.    September 23, 2007 Memorandum In Support of Defendant's Renewed
      Motion For Judgment As A Matter Of Law Or, In The Alternative,
      A New Trial, Document 420, filed 09/23/2007, pgs. 1-53,
      including Exhibit 2 in Civil Case 02 CV 11280 RWZ (**Exhibit 4**);

5.    July 16, 2007 Declaration Of Laura P. Masurovsky For Eli Lilly
      And Company's Motion To Stay Entry Of Judgment Pending
      Reexamination Or For Settlement Of Form of Final Judgment,
      Document 410, filed 07/16/2007, pgs. 1-2, including Exhibits 2-
      13 in Civil Case 02 CV 11280 RWZ (**Exhibit 5**); and

ARI 84476

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 91 of 92 of October 22, 2007 Response*

6.     July 26, 2007 Plaintiffs' Opposition To Lilly's Motion To Stay
       Entry Of Judgment Pending Reexamination or for Settlement of
       Form of Final Judgement, Document 411, filed 07/26/2007, pgs.
       1-11, including Exhibit 2 in Civil Case 02 CV 11280 RWZ
       (**Exhibit 6**).

Pursuant to the May 4, 2006 Merger Decision, this Response is being
filed in duplicate, each original bearing an original signature and
identifying data for both reexamination files.

No fee is deemed necessary in connection with the filing of this
Response. However, if any additional fee is required, authorization
is hereby given to charge the amount of any such fee to Deposit
Account No. 31-3125.

                              Respectfully submitted,



I hereby certify that this correspondence is being deposited
this date with the U.S. Postal Service with sufficient postage as
first class mail in an envelope addressed to:

    Mail Stop Ex Parte Reexamination
    Central Reexamination Unit
    Commissioner for Patents
    P.O. Box 1450
    Alexandria, VA 22313-1450.

_____  (0\ ০০/0੭
John P. White                     Date
Reg. No. 28,678

                              John P. White
                              Registration No. 28,678
                              Gary J. Gershik
                              Registration No., 39,992
                              Attorneys for Patentees
                              Cooper & Dunham LLP
                              1185 Avenue of the Americas
                              New York, New York 10036
                              (212) 278-0400

**ARI 84477**

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 92 of 92 of October 22, 2007 Response*

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION, SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

       and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 22nd day of October, 2007.

John P. White

ARI 84478

# EXHIBIT 18

# KIRKLAND & ELLIS LLP

**AND AFFILIATED PARTNERSHIPS**

200 East Randolph Drive
Chicago, Illinois 60601

Jamie H. McDole
To Call Writer Directly:
312 861-2048
jmcdole@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200

November 9, 2007

<u>**VIA E-MAIL**</u>

David I. Gindler
Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276

Re:     Re: *Amgen et al. v. ARIAD Pharmaceuticals, Inc.*, D. Del. Civil Action
No. 06-259-MPT

Dear David:

Pursuant to paragraph 3(c) of the Court's Second Amended Scheduling Order, I write to inform you that the Amgen Entities elect not to rely on advice of counsel as a defense to willful infringement with respect to the '516 patent at this time. The Amgen Entities reserve their right to change this election to the extent the nature of the pleadings change and/or ARIAD's and/or the Institutions' contentions change. We would further note that ARIAD and the Institutions have not to date provided a Rule 11 basis for maintaining an allegation of willful infringement in this case under the heightened standard of *In re Seagate Technology*, thus further necessitating the reservation of rights at this time.

As a result of this election not to rely on advice of counsel, the Amgen Entities maintain their objections as stated to ARIAD's Fifth Notice of Deposition of Plaintiffs Pursuant to Federal Rule of Civil Procedure 30(b)(6). In response to this notice, the Amgen Entities will only offer a witness on the non-privileged portion of the following subject matter:

- The date on which the Amgen Entities first became aware of the '516 patent and the circumstances of how the Amgen Entities became aware of the '516 patent.

- The Amgen Entities' communications with ARIAD relating to the '516 patent or the '516 patent family.

We do not believe there is any discoverable information relating to these topics beyond that information set forth in Mr. Frank Ungemach's declaration filed earlier in this case -- all other

# KIRKLAND & ELLIS LLP

November 9, 2007
Page 2

information is privileged.  Please contact us in the event you still wish to pursue a deposition on these topics.  Please note that if a deposition does proceed, Mr. Ungemach will be the designated witness (as opposed to Stuart Watt) as to the above subject matter from ARIAD's Fifth Notice of Deposition.  In addition, the Amgen Entities object to any personal deposition of Stuart Watt as any information Mr. Watt possesses relating to the present suit is privileged.

Finally, given the Amgen's election not to rely on the advice of counsel, please confirm that ARIAD will no longer pursue the subpoenaed deposition of Vasant Ghandi.  As we have previously stated, Mr. Ghandi recalls very little information (most, if not all, of which is privileged) relating to discussions with ARIAD or relating to ARIAD's intellectual property, outside correspondence which Amgen has already produced to you.

If you have any questions, please feel free to contact me.

Sincerely,

*/s/ Jamie McDole*

Jamie McDole

# EXHIBIT 19

# EXHIBIT REDACTED

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
)
               Plaintiffs, )
)
     v. )
)
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, )
)
               Defendants. )   Civil Action No. 06-259 (MPT)
_____ )
)
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, MASSACHUSETTS )
INSTITUTE OF TECHNOLOGY, THE )
PRESIDENT AND FELLOWS OF HARVARD )
COLLEGE, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, )
)
         Counterclaim Plaintiffs, )
     v. )
AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, and )
WYETH, )
)
        Counterclaim Defendants. )
)
)
)
)
)
_____ )

**THE AMGEN ENTITIES' FIRST SUPPLEMENTAL RESPONSES TO ARIAD'S
SECOND SET OF REQUESTS FOR ADMISSION NOS. 205-215**

Pursuant to Federal Rules of Civil Procedure 26 and 36, plaintiffs Amgen, Inc. ("Amgen"); Immunex Corporation ("Immunex"); Amgen USA Inc. ("Amgen USA"); Amgen Manufacturing, Limited ("Amgen Mfg."); and Immunex Rhode Island Corporation ("Immunex R.I.," together with Amgen, Immunex, Amgen USA, and Amgen Mfg. the "Amgen Entities") hereby object and respond to defendant ARIAD Pharmaceuticals, Inc.'s ("ARIAD's") Second Set of Requests for Admission. These responses are based on the Amgen Entities' present state of recollection, knowledge, and belief. They are subject to additional or different information that discovery may disclose, and, while based on the present state of recollection, are subject to such refreshing of recollection, and such knowledge or facts, as may result from further investigation by the Amgen Entities or their attorneys, or further discovery from ARIAD or third parties. The Amgen Entities reserve the right to supplement these responses.

## SPECIFIC OBJECTIONS AND RESPONSES

### REQUEST NO. 205:

Admit that YOU are aware of the GOTTLIEB ARTICLE.

### RESPONSE:

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

### FIRST SUPPLEMENTAL RESPONSE:

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the

2

Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 206:**

Admit that YOU were aware of the GOTTLIEB ARTICLE as of January 25, 2005.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 207:**

Admit that YOU were aware of the GOTTLIEB ARTICLE as of June 1, 2005.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is

3

not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 208:**

Admit that YOU were aware of the GOTTLIEB ARTICLE as of January 1, 2006.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 209:**

Admit that YOU were aware of the GOTTLIEB ARTICLE prior to the filing of this lawsuit.

4

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 210:**

Admit that YOU are aware that a manuscript of the GOTTLIEB ARTICLE was submitted on October 18, 2004.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

5

065028.1001

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 211:**

Admit that as of October 25, 2004, YOU were aware that a manuscript of the GOTTLIEB ARTICLE had been submitted on October 18, 2004.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 212:**

Admit that prior to January 25, 2005, YOU were aware that a manuscript of the GOTTLIEB ARTICLE was submitted on October 18, 2004.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is

6

protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 213:**

Admit that prior to January 25, 2005, YOU had received a copy of a manuscript of the GOTTLIEB ARTICLE.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

7

**REQUEST NO. 214:**

Admit that the GOTTLIEB ARTICLE is in YOUR possession.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that they first received a manuscript of the Gottlieb article on October 15, 2004. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

**REQUEST NO. 215:**

Admit that the study in the GOTTLIEB ARTICLE was supported in part by grants from YOU.

**RESPONSE:**

The Amgen Entities specifically object to this request as it calls for an admission relating to the Amgen Entities relationship with Dr. Alice Gottlieb who is a non-testifying expert witness retained by the Amgen Entities in this case. Any evidence relating to this relationship is protected by attorney-client privilege or the attorney work product rule (as reflected by the Court's decision on pages 33-34 of the transcript of the June 4, 2007 hearing in this case) and is not subject to discovery. Except as expressly admitted herein, the Amgen Entities deny this request.

8

**FIRST SUPPLEMENTAL RESPONSE:**

The Amgen Entities supplement their response to this request as follows:

Subject to, and without waiving any of the previously listed Specific Objections and General Objections, the Amgen Entities admit that Dr. Alice Gottlieb received funding from Amgen to perform research relating to etanercept but denies that it controlled the design of the study or the author's interpretation of the data or outcome of the study. Except as expressly admitted herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request.

The Amgen Entities specifically object to this request as vague and ambiguous as to the meaning of the term "supported" which leaves it unclear whether ARIAD is seeking an admission about whether the Amgen Entities only provided funding to publish a manuscript even though the Amgen Entities do not control the content of, or influence the conclusions in, the manuscript. Likewise, it is unclear whether ARIAD is seeking an admission about whether the Amgen Entities only provided funding to an independent investigator to conduct a study even though the Amgen Entities do not control the design of the study, or the author's interpretation of the data or outcome of the study.

## GENERAL OBJECTIONS

1.      The Amgen Entities object to ARIAD's Second Set of Requests for Admission to the extent that they purport to impose discovery or other requirements on the Amgen Entities greater than those authorized under, or permitted by, the Federal Rules of Civil procedure, the Rules of the United States District Court for the District of Delaware, and applicable case law. The Amgen Entities shall not comply with any purported obligation not imposed by law.

2.      The Amgen Entities object to ARIAD's Second Set of Requests for Admission to the extent that it calls for the production of information that is protected by the attorney-client privilege, the work product doctrine and/or any other applicable privilege or immunity. The Amgen Entities will not produce information protected by such privileges or immunities.

9

Moreover, nothing contained in these objections and responses is intended to be, or in any way constitutes, a waiver of any such applicable privilege or immunity.

3.    The Amgen Entities object to ARIAD's Second Set of Requests for Admission as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence 1) to the extent they seek information relating to sales of Enbrel® outside of the United States; and 2) because the definitions and instructions are overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

For instance, ARIAD's purported definition of "ENBREL" is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence as it not only includes the Amgen Entities' and Wyeth's commercially available products sold under the brand name Enbrel® and/or the respective generic name etanercept, but additionally includes "any analog, derivative or predecessor of the same whether commercially available or not." Analogs, derivatives and/or predecessors of Enbrel® are not at issue in, or relevant to, this case.

4.    The Amgen Entities object to ARIAD's Second Set of Requests for Admission and to each and every request to the extent they are vague, ambiguous, and lack specificity as to the requested information. *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 107-108 (D.Del.2002) (J. Thynge) (requests for admission should be phrased so that they may be admitted or denied with little or no explanation or qualification). The Amgen Entities object to the terms "process," "processed," and "processes" as vague and ambiguous.

5.    The Amgen Entities object to ARIAD's Second Set of Requests for Admission and each and every request to the extent that they call for information that can be readily obtained from other discovery already taken in this case and therefore are of no greater burden for ARIAD to obtain than for the Amgen Entities to obtain.

6.    The Amgen Entities object to ARIAD's Second Set of Requests for Admission and each and every request to the extent that they call for a legal conclusion. *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 107-108 (D.Del.2002) (J. Thynge) (requests that seek legal conclusions are not allowed under Rule 36").

10

065028.1001

7.    By responding to a request, the Amgen Entities do not concede the relevance or admissibility of the information provided.

8.    The Amgen Entities reserve the right to supplement and/or amend these responses as discovery continues.

9.    The Amgen Entities expressly incorporate each of the foregoing General Objections into each specific response to the requests set forth above as if set forth in full therein. An answer to a request shall not work as a waiver of any applicable specific or general objection to a request.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Melanie K. Sharp (No. 2501)
Mary F. Dugan (No. 4704)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals
Marcus E. Sernel
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Drew Diamond
KIRKLAND & ELLIS LLP
South Figueroa Street
Los Angeles, CA 900017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA Inc., Amgen Manufacturin Limited, and Immunex Rhode Island Corporation*

Dated: December 19, 2007

11

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on December 19, 2007, I caused a copy

of The Amgen Entities' First Supplemental Responses to ARIAD'S Second Set of Requests For

Admission Nos. 205-215, to be served on the following counsel of record in the manner

indicated below:

### BY HAND DELIVERY & E-MAIL

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

Frederick L. Cottrell, III
Anne Shea Gaza
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

### BY E-MAIL (by agreement of counsel)

Charles E. Lipsey
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive, Suite 800
Reston, VA 20190-5675

Morgan Chu
David I. Gindler
Amir A. Naini
Christopher M. Newman
Elizabeth L. Rosenblatt
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

Howard W. Levine
Robert D. Bajefsky
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC 20001-4413

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Melanie K. Sharp (No. 2501)

065028.1001

# EXHIBIT 21

# EXHIBIT REDACTED

# EXHIBIT 22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION, AMGEN )
USA, INC., AMGEN MANUFACTURING, LIMITED, and )
IMMUNEX RHODE ISLAND CORPORATION, )
                       )
        Plaintiffs, )
v.                         )
                       )
ARIAD PHARMACEUTICALS, INC., HARVARD )
UNIVERSITY, MASSACHUSETTS INSTITUTE OF )
TECHNOLOGY, and THE WHITEHEAD INSTITUTE )
FOR BIOMEDICAL RESEARCH, )
                       )
        Defendants, )    Civil Action No. 06-259-MPT
—————————————————————— )
ARIAD PHARMACEUTICALS, INC., HARVARD )
UNIVERSITY, MASSACHUSETTS INSTITUTE OF )
TECHNOLOGY, and THE WHITEHEAD INSTITUTE )
FOR BIOMEDICAL RESEARCH, )
                       )
        Counterclaim-Plaintiffs, )
v.                         )
                       )
AMGEN, INC., IMMUNEX CORPORATION AMGEN )
USA, INC., AMGEN MANUFACTURING, LIMITED, and )
IMMUNEX RHODE ISLAND CORPORATION, )
                       )
        Counterclaim-Defendants. )
                       )

## EXPERT REPORT OF AARON CIECHANOVER, M.D., D.Sc.

## I.    **INTRODUCTION.**

I am a distinguished research professor at the Technion - Israel Institute of Technology in Haifa, Israel. I have prepared this report pursuant to my role as an expert witness on behalf of Amgen Inc. and the other companies identified as plaintiffs in connection with the above referenced litigation. I have been retained as a technical expert to address, among other things, the role of the ubiquitin proteasome system in the regulation of the transcription factor NF-κB and its natural inhibitor IκB; the manner in which proteasome inhibition necessarily and inevitably negatively effects the activation of NF-κB; whether the experiments described in the 1988 Saito paper, referenced below, would have necessarily and inevitably led to a reduction of NF-κB activity; the development of the understanding of the role of ubiquitin and the proteasome in regulation of NF-κB processing and activation; and whether anyone could have recognized in 1991, based on the disclosure in the '516 patent, that the patent applicants had invented methods of "reducing NF-κB activity" involving "inhibiting modification of an IκB protein," "inhibiting degradation of an IκB protein," or "inhibiting dissociation of NF-κB:IκB complexes."

I expect to testify at trial based on the background and opinions I provide in this report. Because my opinions are based upon the information I have received so far, I may supplement my background and opinions to reflect additional information I may receive; reply to additional information provided by ARIAD and/or the Institutions, including information or opinions provided by their witnesses and experts; or respond to issues that may arise at trial.

I have summarized in this section my educational background, career history, and other relevant qualifications, including the work I performed that led to my being awarded the 2000 Albert Lasker Award for Basic Medical Research and 2004 Nobel Prize in Chemistry  In addition to certain of my publications referenced throughout this report, a complete list of my publications can be found in my full *curriculum vitae*, attached to this report as Appendix A.

## II.    **QUALIFICATIONS: EDUCATIONAL BACKGROUND/CAREER HISTORY.**

In 2004, I was awarded the Nobel Prize in Chemistry along with two of my esteemed colleagues, Avram Hershko and Irwin A. Rose. We were given this honor based upon our fundamental discoveries concerning how cells regulate the breakdown of intracellular proteins with extreme specificity as to target, time and space. As a graduate student of Hershko, and in collaboration with Rose, I discovered ubiquitin-mediated proteolysis, a process where an enzyme system tags unwanted proteins with many molecules of the 76-amino acid residue protein ubiquitin. The tagged proteins are then transported to the proteasome, a large multisubunit protease complex, where they are degraded. While our hypothesis predicted the existence of a protease that will degrade, specifically, ubiquitinated proteins, a process during which ubiquitin will be recycled, the later discovery of the proteasome and its role in the system was made by others.

In 2000, I was awarded, along with Avram Hershko and Alexander Varshavsky, the Albert Lasker Award for Basic Medical Research (often referred to as the "American Nobel"). This too was in honor of my contribution to the discovery and recognition of the significance of the ubiquitin system of regulated protein degradation.

2

In 2007, I was elected as a Foreign Associate of the USA National Academy of Sciences, one of the most prestigious scholarly bodies in the world -- an honorific society of distinguished scholars engaged in scientific research.

Between the 1950s and 1980s, scientists were focused extensively on how the genetic code is transcribed to RNA and translated to proteins, but how proteins are degraded has remained a neglected research area. With the discovery of the lysosome by Christian de Duve it was assumed that cellular proteins are degraded within this organelle. Yet, several independent lines of experimental evidence strongly suggested that intracellular proteolysis is largely non-lysosomal, but the mechanisms involved had remained obscure. The discovery of the ubiquitin-proteasome system resolved this enigma. We now recognize that ubiquitin- and proteasome-mediated degradation of intracellular proteins is involved in regulation of a broad array of cellular processes, such as cell cycle and division, regulation of transcription factors, and assurance of the cellular quality control. Not surprisingly, aberrations in the system have been implicated in the pathogenesis of many human diseases, malignancies and neurodegenerative disorders among them, which led subsequently to an increasing effort to develop mechanism-based drugs, one of which (a proteasome inhibitor -- "Velcade") is already in commercial therapeutic use against one malignancy in particular.

## A.     Early Research, Including The Work Leading to the Nobel Prize.

I received my M.D. in 1974 from the Hebrew University and "Hadassah" Medical School in Jerusalem, Israel. After my clinical internship and subsequent service as a military physician, I started graduate studies under Avram Hershko in the Faculty of Medicine at the Technion in November of 1976. I was looking forward to continuing research that I had carried out with him earlier regarding serum induced "pleiotropic response."[1] and earlier basic research I had carried out during my medical studies (which earned me an M.Sc. degree in Biochemistry). At that time, however, his group focused mostly on studying intracellular proteolysis, though the mechanism(s) involved had been elusive. I learnt from him that he had given up on trying to identify the mediator(s) and mechanism(s) involved in serum-induced "pleiotropic response". Nonetheless, that earlier work had, for me, kindled a small flame.

The model system that we chose to study proteolysis was degradation of abnormal hemoglobin in the reticulocyte which is the terminally differentiating red blood cell. The reason for the selection of the reticulocyte as a model system was that we were looking for a non-lysosomal and energy-requiring proteolytic system, as from many studies it had become clear that regulated proteolysis of intracellular proteins is non-lysosomal, and the reticulocyte no longer contains lysosomes which are removed during the final stages of its maturation before its release into the circulation. Another reason for the choice of the reticulocyte as a model for studying intracellular proteolysis was that in its final stages of maturation in the bone marrow and prior to entering the peripheral circulation, a massive proteolytic burst destroys many of its machineries, making it clear that the cell is equipped with an efficient proteolytic system. Earlier

---

[1]     Ciechanover, A. and Hershko, A., Early effects of serum on phospholipid metabolism in untransformed and oncogenic virus-transformed cultured fibroblasts, *Biochem. Biophys. Res. Commun.* 1976 Nov 8;73(1):85-91.

studies by Rabinovitz and Fisher demonstrated that the reticulocyte degrades abnormal, amino acid analogue-containing hemoglobin, yet the mechanisms had remained elusive. We assumed that the same mechanism that is involved in differentiation and maturation of the reticulocyte is also involved in the removal of "naturally occurring" mutant abnormal hemoglobins that are synthesized in different hemoglobinopathies, such as thalassemias and sickle cell anemia, and also in the destruction of the amino acid analogs - containing abnormal hemoglobins. We wanted to believe and hoped that this mechanism would turn out to be "universal", and involved in regulated specific degradation of normal proteins in all cells. Years later this assumption turned out to be correct.  It was still necessary to demonstrate that the process requires energy, and indeed, following our initial characterization of degradation of abnormal hemoglobin in the intact cell, we showed that the process required energy, and felt that the time was ripe to break the cell open and isolate and characterize the non-lysosomal and ATP-dependent proteolytic enzyme(s).[2]  Shortly before we published our initial data, working apparently in parallel, Dr. Alfred Goldberg and his post-doctoral fellow Dr. Joseph Etlinger at Harvard Medical School characterized and published (January 1977), for the first time, the existence of a cell-free proteolytic system in reticulocytes, which was exactly the same system we had been working on. However, at that point, the route taken by the two groups to isolate and characterize the system in the crude reticulocyte extract had been separated.

I will not describe here the detailed history of the discovery of the ubiquitin system, but rather highlight two important points along the five years of my graduate studies (1976-1981) with Avram and Irwin A. Rose (Ernie) that led to the discovery of the system. The more detailed history can be found in several review articles written on the system at that time (most notable is Hershko, A. and Ciechanover, A., *Mechanisms of intracellular protein breakdown*, Annu. Rev. Biochem., 1982;51:335-64 and my biography described in the the Nobel Prize web site www.nobelprize.org).

(1) The first point relates to the multiplicity of enzymatic components of the system: Our first aim along the purification process of the ATP-dependent "protease" was to remove hemoglobin, the major (~90%) protein in the crude extract. Towards that end, we resolved the extract on an anion exchange resin, where we encountered already the first exciting finding. The proteolytic activity could be found neither in the non-adsorbed material which we denoted Fraction I, nor in the high salt-eluted material (denoted Fraction II). Rather, we recovered the activity following reconstitution of the two Fractions. We learnt two important lessons from this experiment which was published in 1978 in *Biochemical and Biophysical Research Communications* (BBRC; in my opinion the first paper in the long historical trail of the ubiquitin system -- and which I regard as one of two or three key publications in the field): (i) The first was that the protease we were after was not a "classical" single enzyme that degrades its substrate, but had at least two components. This was already a digression from the paradigm in the field at that time that proteolytic substrates, almost without exception, can be cleaved, at least partially, by single proteases with limited, yet defined specificities. Now, following the

---

[2]    Ciechanover, A., Hod, Y., and Hershko, A., A heat-stable polypeptide component of an ATP-dependent proteolytic system from reticulocytes, Biochem. *Biophys. Res. Commun.* 1978 Apr 28;81(4):1100-5.)

unraveling of the human genome and the discovery of commonly or similarly shared structural domains within several groups of enzymes of the system, we know that the number of components of the ubiquitin system exceeds one thousand, but the first hint was already there; once one is left without a paradigm, all possibilities are open. (ii) The second lesson was a methodological one. Each time we lost the proteolytic (or later conjugating) activity during purification of any of the components we were characterizing, we "returned" to the chromatographical column fractions and tried to reconstitute it via complementation: "classical" biochemistry at its best was on our side.

Standing at a crossroad, we decided to start first with purification and characterization of the active component in Fraction I. We decided so because Fraction I was the hemoglobin-containing fraction that did not adsorb to the resin, and since many proteins do adsorb, we thought that this fraction should not contain too many additional proteins beyond hemoglobin, and it would be easy to purify the active component. Ten months after I started my studies (summer of 1977), Avram started his sabbatical with Ernie at the Fox Chase Cancer Center in Philadelphia, PA, USA, and left me with the task to purify the active component from Fraction I. After many unsuccessful trials along with another graduate student of Avram, Yaacov Hod, my colleague Mickey (Michael) Fry, who was the Faculty member appointed as my substitute thesis advisor for this year (1977-1978), came with the idea to heat Fraction I and see if the active component is heat-stable, and indeed it was. He did so as all our attempts to resolve the activity - despite the large difference in the molecular mass between the active protein (~10 kDa) and hemoglobin, the other major protein in Fraction I (65 kDa) - failed: hemoglobin, that is so abundant, "contaminated" the entire resolution span of each gel filtration column we tried, and its abundance limited the ability to load large enough quantity of Fraction I on ion-exchange resins in every single resolution method we used. Following 5-10 min at 90°C, the hemoglobin in crude Fraction I was "cooked" and precipitated like "mud", and the activity remained soluble in the supernatant. It was hard to believe it was a protein, but Mickey remembered several other heat-stable proteins. Immediately after, we showed directly that the activity in Fraction I was also a protein: it was sensitive to trypsin and precipitable with ammonium sulfate. Further characterization revealed that the protein had a molecular mass of ~8,500 Da, and we called it ATP-dependent Proteolysis Factor-1, APF-1, to denote that this was the first component in the system that we characterized. All along the way I corresponded with Avram by mail, sent him my results, and during his sabbatical we wrote the BBRC paper.

(2) The second key finding was also discovered in Haifa during the winter of 1978-1979. We purified APF-1 to homogeneity and labeled it with radioactive iodine. When the radio-labeled protein was incubated in crude reticulocyte Fraction II in the presence of ATP, we observed a dramatic increase in its molecular weight: it now migrated as a sharp peak in the void volume of the gel filtration chromatographical column, in a significantly higher molecular mass zone than the protein incubated in the absence of ATP. For several months we tried to elucidate the mechanism that underlies the change in the molecular weight of APF-1, hypothesizing, for example, that APF-1 could be an activator of a protease that must generate a binary complex with the proteolytic enzyme in order to activate it, but to no avail. An important breakthrough occurred during our 1979 summer stay of several months in the laboratory of Ernie. Through a series of extremely elegant, yet simple, experiments, in the design of which the broad knowledge of Ernie in protein chemistry and enzymology played a critical role, we found that APF-1 is covalently attached to the substrate through a bond that had all the characteristics of a peptide

bond. Furthermore, we found that multiple moieties of APF-1 are attached to each substrate molecule, and that the reaction is reversible: APF-1 can be removed from the substrate or its degradation products and recycled, though not via reversal of the conjugation reaction. Accordingly, we hypothesized that covalent attachment of multiple moieties of APF-1 to the target substrate is necessary to render it susceptible to degradation by a downstream protease that recognizes only ubiquitin-tagged but not untagged proteins, followed by the release of free and reusable APF-1.

The APF-1 cycle predicted the existence of three, entirely novel activities: (i) APF-1 conjugating enzyme(s), (ii) a protease that recognizes specifically the tagged, but not the un-tagged substrates and degrades them, and (iii) APF-1-recycling enzymes. All these activities were identified later by us and by others. For the conjugating arm, we identified and purified the three conjugating enzymes, E1, E2, and E3. The degrading and recycling enzymes, though shown by us in crude extract, were identified later by others -- as the 26S proteasome complex and the isopeptidases, or deubiquitinating enzymes (DUBs). The findings describing the covalent tagging of the target substrate by APF-1 as a degradation signal, along with the first model of the newly discovered proteolytic system, were published in 1980 in two manuscripts that appeared in the Proceedings of the National Academy of Sciences of the USA (PNAS).[3]

Another important development also occurred during our stay in Ernie's laboratory. We were not aware of any other precedent of a modification of a protein by another protein. The neighboring laboratories of Martin Nemer, Alfred Zweidler, and Leonard Cohen studied dynamics of variants of different histones during sea urchin development. They drew our attention to a protein called A24 (uH2A) which was discovered earlier by Ira Goldknopf and Harris Busch, and that was a covalent conjugate between two proteins - a small, ~8.5 kDa protein called ubiquitin, and histone 2A (H2A). Goldknopf and Busch, and in parallel Lois Hunt and Margaret Dayhoff , identified the nature of the bond between the two protein moieties in the conjugate. They found that the ubiquitin-histone bond was an isopeptide/bifurcated bond between the C-terminal Gly76 residue in the ubiquitin moiety, and the ε-NH2 group of Lys119 in the histone moiety of the conjugate. The role of this conjugate was not clear at the time, though its level was found to be dynamic and change during differentiation, when the histone moiety is subjected to ubiquitination and de-ubiquitination. This information on the ubiquitin-histone adduct along with the striking similarities we found between APF-1 and ubiquitin in their general characteristics such as molecular mass and amino acid composition, led Keith Wilkinson and his colleague Arthur (Art) Haas who were post-doctoral fellows in the laboratory of Ernie, along with Michael Urban from Zweidler's laboratory, to carry out a series of direct experiments, showing unequivocally that APF-1 is indeed ubiquitin. Our study on the characterization of APF-1 and its possible similarity to ubiquitin, and Wilkinson's study (along with Urban and Haas) on the identification of APF-1 as ubiquitin, led to the convergence of two fields, that of histone

---

[3]    Ciechanover, A., Heller, H., Elias, S., Haas, A.L., and Hershko, A., ATP-dependent conjugation of reticulocyte proteins with the polypeptide required for protein degradation, Proc. Nat'l Acad. Sci. USA. 1980 Mar;77(3):1365-8. and Hershko, A., Ciechanover, A., Heller, H., Haas, A.L. and Rose, I.A., Proposed role of ATP in protein breakdown: Conjugation of proteins with multiple chains of the polypeptide of ATP-dependent proteolysis, *Proc. Nat'l Acad. Sci. USA.* 1980 Apr;77(4):1783-6.

research and proteolysis. More important, they suggested that the bond between ubiquitin and the target proteolytic substrate might be identical to that between ubiquitin and histone, which turned out later to be true. The two studies were published in tandem in 1980 in the Journal of Biological Chemistry (JBC). The identification of the nature and structure of the bond clearly paved the road to the later purification and characterization of the conjugating enzymes and their mode of action. Nevertheless, there was a striking difference -- histone modification was a single ubiquitin modification - whereas degradation required ubiquitination by multiple moieties.

As for ubiquitin, the protein was identified in the 1970s by Gideon Goldstein (in the Memorial Sloan-Kettering Cancer Center in New York City) as a small, 76 residue thymic polypeptide hormone that stimulates T cell differentiation via activation of adenylate cyclase. Additional studies by Gideon Goldstein had suggested that it was universally distributed in both prokaryotes and eukaryotes, thus giving rise to its name (coined by Gideon Goldstein). Later studies by Allan Goldstein showed that the thymopoietic activity was due to an endotoxin contamination in the protein preparation, and not to ubiquitin. Using functional assays, it was found in my laboratory, and I believe that in several others as well (our data have never been published), that ubiquitin was limited to eukaryotes, and its apparent presence in bacteria was due to the contamination of the bacterial extract with the yeast extract in which the bacteria were grown: growing the bacteria in a synthetic medium containing carbon (glucose) and nitrogen (ammonium chloride) sources and vitamins resulted in "disappearance" of ubiquitin from the preparation. The later unraveling of the bacterial genome demonstrated unequivocally that the ubiquitin tagging system does not exist in prokaryotes, though there is some similarity between the proteasome and certain bacterial proteolytic complexes. Thus, in a relatively short period of time, ubiquitin was "converted" from a "ubiquitous thymopoietic hormone" to a eukaryotic proteolytic marker. While it appeared that the term ubiquitin was not justified anymore, as it is clearly not ubiquitous, we stopped using the term APF-1 and adopted the term ubiquitin for the modifying protein in the newly discovered proteolytic system. At times habits and tradition are stronger than the scientific validity and/or the logic in nomenclature. Accordingly, we adopted a general policy to use in our terminology the name/term that was first coined by the discoverer of any novel protein.

From that point on, the road was relatively short to the identification and characterization of the conjugation mechanism and the three enzymes involved in this process. Between 1981 and 1983, we worked out the multi-step ubiquitin-tagging hypothesis by isolating and characterizing three separate enzyme activities, E1, E2 and E3. This work is still the basis for the description of the ubiquitin system in all text books. All of the three enzymes act successively and in concert in order to allow ubiquitination to occur.

En route we followed partially, with great admiration, the footsteps of Dr. Fritz Lipmann, the great biochemist from the Rockefeller University (who was awarded the 1953 Nobel Prize in Physiology or Medicine for the discovery of Coenzyme A). Lipmann continued to contribute enormously to our understanding of basic biochemical processes. Among his many discoveries was the mechanism of non-ribosomal (and hence non-genetically encoded) peptide bond formation that is involved in the biosynthesis of bacterial oligopeptides such as Gramicidin S. We learnt that the basic biochemical principles, such as generation of high-energy intermediates involved in peptide bond formation, were preserved along evolution regardless of whether the bond is encoded genetically or not, or whether it links two amino acids, or two proteins, or an

7

amino acid to the elongating polypeptide chain. Initially, we identified the general mechanism of activation of ubiquitin in crude extract. Later, using "covalent" affinity chromatography over immobilized ubiquitin and a stepwise elution (that was based on the general mechanism we deciphered earlier), we purified the three conjugating enzymes that act successively, in a cascade-like mechanism, and catalyze this unique process: (1) ubiquitin-activating enzyme, E1, the first enzyme in the ubiquitin system cascade, (2) ubiquitin-carrier protein, E2, to which the activated ubiquitin is transferred from E1, and (3) ubiquitin-protein ligase, E3, the last and critical component in the three step conjugation mechanism that specifically recognizes the target substrate and conjugates it with ubiquitin.[4]

The E3 was also adsorbed to the immobilized ubiquitin, although via a yet unknown mechanism, distinct from that of E1 and E2: the binding of these two enzymes was mediated by the activation mechanism. Later studies by Avram in the late 1980s revealed that the E3 adsorbed by the column was E3α that recognizes substrates via their N-terminal residue. At this point, however, unknowingly and unintentionally, we were extremely lucky when we used as model substrates commercial proteins such as BSA, lysozyme and RNase, that were all recognized (as we learnt later) by this ligase and via a similar targeting motif - their N-terminal residue. Had we used other substrates, such as globin, the protein we used in our initial experiments, the E3 adsorbed to the ubiquitin column would have probably escaped our attention, as E3s do not typically adsorb to ubiquitin. Independently, and in parallel to the later characterization of the enzyme by Avram, I also used this enzyme in order to characterize a distinct subset of proteins recognized via this signal. Lastly, using antibodies that we raised against ubiquitin with the help of Arthur Haas, we found that the ubiquitin system is involved in degradation of abnormal, short-lived proteins in hepatoma cells, demonstrating that the system is not limited to the terminally differentiating reticulocyte, but is probably distributed "universally" in nucleated mammalian cells, playing an important role in maintaining the cell's quality control, by removing abnormal proteins.[5]

As noted, I spent an important part of my graduate studies in Ernie's laboratory. Avram spent a sabbatical in his laboratory in 1977-1978, and I joined him for the first time for several months in the summer of 1978, after I completed the initial characterization of APF-1 in Haifa. I returned to Ernie's laboratory during the summers of 1979, 1980, and 1981. As noted, during our

---

[4]   Ciechanover, A., Heller, H., Katz-Etzion, R., and Hershko, A., Activation of the heat-stable polypeptide of the ATP-dependent proteolytic system, *Proc. Nat'l. Acad. Sci. USA* 1981 Feb;78(2):761-5; Hershko, A., Ciechanover, A., and Rose, I.A. Identification of the active amino acid residue of the polypeptide of ATP-dependent protein breakdown. *J. Biol. Chem.* 1981 Feb 25;256(4):1525-8; Haas, A.L., Rose, I.A., and Hershko, A., Purification of the ubiquitin activating enzyme required for ATP-dependent protein breakdown, 1981; *Fed. Proc.* 40, 1691; Ciechanover, A., Elias, S., Heller, H., and Hershko, A., "Covalent affinity" purification of ubiquitin-activating enzyme, *J. Biol. Chem.* 1982 Mar 10;257(5):2537-42; Haas, A.L., and Rose, I.A., The mechanism of ubiquitin activating enzyme, *J. Biol. Chem.* 1982 Sep 10;257(17):10329-37; Hershko, A., Heller, H., Elias, S., and Ciechanover, A., Components of ubiquitin-protein ligase system, *J. Biol. Chem.* 1983 Jul 10;258(13):8206-14.

[5]   Hershko, A., Eytan, E., Ciechanover, A., and Haas, A.L., Immunochemical analysis of the turnover of ubiquitin-protein conjugates in intact cells, *J. Biol. Chem.* 1982 Dec 10;257(23):13964-70.

summer stay in 1979, we resolved the problem of the nature of the high molecular mass "compound" generated when APF-1 was incubated with Fraction II in the presence of ATP. This change in the molecular mass of APF-1 was discovered several months earlier in Haifa. However, we were not able to unravel the nature of the "compound"; this had to await the knowledge and wisdom of Ernie. In a breakthrough discovery (that was made, as noted, during the summer of 1979), we found that the target substrate is covalently modified by multiple moieties of APF-1, a reversible modification that renders the protein substrate susceptible to degradation. This was a novel type of post-translational modification (see, however, above for the modification of histone H2A by ubiquitin) and clearly a new biological paradigm, the elucidation of which required - as I feel today in retrospect - a different type of knowledge in biology and enzymology, and an original experimental approach. Elucidation of this modification would not have been possible without Ernie's advice that was based on his immense knowledge in enzymology and protein chemistry, accompanied by his unbiased original thinking and approach to problem resolving. This discovery, along with the discovery in 1980 that APF-1 is ubiquitin, made Ernie and his fellows critically important partners in the historical trail of the discovery of the ubiquitin system. Interestingly, Ernie studied proteolysis before Avram joined him first, but had never published in the field before.

**B.      Later Research Related to Elucidating the Ubiquitin Proteasome System.**

Towards graduation I had to think of the next step - post-doctoral training and planning of my future career as an independent scientist. I started a period of three years (1981-1984) in Harvey Lodish's laboratory in the Department of Biology at M.I.T. After those three years at M.I.T., it was time to seek an independent academic position. After many deliberations, I decided to return home, to Israel. With the help of Avram, I obtained an independent academic position in the Department of Biochemistry at the Faculty of Medicine of the Technion (where I graduated), and returned home towards the end of 1984, after a productive post-doctoral period. Importantly, I already had a research subject I wanted to pursue, the effect of RNase on ubiquitin-mediated proteolysis.

In our first series of independent studies we elucidated the role of tRNA in the proteolytic process, a subject I discovered as a graduate student and continued to study independently while at M.I.T.. Along with one of my first graduate students, Sarah Ferber, we demonstrated that proteins with acidic N-termini, Asp or Glu, undergo arginylation at the N-terminus, converting the acidic, negatively charged residue at this site to a positively charged residue. The reaction is catalyzed by Arg tRNA-protein transferase, a known protein with an hitherto unknown function. The enzyme uses charged $tRNA^{Arg}$ as a source of activated Arg. Therefore, digestion of the cell extract RNA with RNase A inhibits this reaction. This finding explained the selectivity of the RNase effect to BSA and not to lysozyme: BSA has an Asp residue in the N-terminus, while lysozyme has lysine (a basic residue) in this position. Therefore, only the degradation of BSA requires conversion of the acidic N-terminal residue into a basic one, a reaction requiring tRNA. Lysozyme, with a basic amino acid residue (lysine) at the N-terminus, does not require any modification, and is therefore insensitive to the ribonuclease. Interestingly, the ligase involved in BSA ubiquitination is E3α that was discovered during my graduate studies. In parallel to our work on the RNase effect, Avram and his graduate student Yuval Reiss characterized the enzyme and identified on it three distinct substrate binding sites for: (i) basic (the one involved in recognition of basic and Arg-modified acidic N-termini) and (ii) bulky-hydrophobic N-termini,

but also for (iii) larger, yet still undefined "body" sites that reside downstream to the N-terminal residue. Because the enzyme recognized certain substrates at their N($\alpha$)-terminal residue, it was termed E3$\alpha$. In parallel and using a systematic genetic approach in the yeast *S. cerevisiae*, Dr. Alexander Varshavsky and his colleagues at the M.I.T. formulated a general rule ('N-end rule') for recognition and degradation of substrates with all 20 different amino acid residues at their N-terminal site.

Research in the laboratory has evolved in other directions. We have shown that N-$\alpha$-acetylated proteins are also targeted by the ubiquitin system. This important finding demonstrated that this N-terminally modified "family" of proteins, a group that constitutes a large proportion of cellular proteins (according to different estimates - 50-80%), must be targeted by signals that are distinct from the N-terminal residue and reside downstream to it: since they do not have free N-termini, they cannot be recognized by this residue. Along with the discovery of the "body" site in E3$\alpha$ and the knowledge coming from processing of N-termini of nascent polypeptide chains that most proteins do not have basic or bulky hydrophobic N-termini, we felt that N-terminal recognition involves only a small and limited set of proteins, and the mode of recognition of the numerous substrates of the ubiquitin system must be broad and diverse: they must be recognized by multiple and distinct targeting motifs. At that point, the end of the 1980s, we felt it was time to move from studying model substrates to investigating the fate of specific native cellular substrates. Accordingly, we have shown that an important group of cell regulators - tumor suppressors (*e.g.* p53) and growth promoters (c-Myc) are targeted by the ubiquitin cell free system. We strongly believed that this must be also true for targeting of these substrates in the cell as well, which later, through the work of many others and our own, turned out to be the case. We continued and demonstrated that, unlike the paradigm in the field until that time, that degradation of proteins in the lysosome proceeds independently from the ubiquitin system - the two proteolytic pathways are actually linked to one another, and ubiquitination is required for stress-induced lysosomal degradation of cellular proteins. This area has later evolved in a dramatic manner, and engulfed involvement of the ubiquitin system in receptor-mediated endocytosis and autophagy. Other studies involved elucidation of some of the mechanisms involved in the two step ubiquitin-mediated proteolytic activation of the centrally important transcriptional regulator NF-$\kappa$B, demonstration of a role for heat shock proteins in targeting certain protein substrates, and identification of a novel site of ubiquitination - the N-terminal residue of the protein substrate. This modification is clearly different and distinct from recognition of the substrate by E3$\alpha$ at the N-terminal residue. In the latter case, the ligase binds to the N-terminal residue while ubiquitination occurs on an internal lysine residue(s). In N-terminal ubiquitination, modification occurs at the N-terminal residue, while the ligase binds, most probably, to an internal sequence in the protein target molecule. This subject has evolved in a surprising manner and changed another paradigm in the field that ubiquitination is limited to internal lysine(s) of the target substrate; we, and later others, have shown that the phenomenon is not limited to the one protein we identified initially - the muscle-specific transcriptional regulator MyoD, and identified a large group of proteins that undergo N-terminal ubiquitination. This group of proteins contain many that have internal lysine(s), but that from some reason(s) cannot be targeted. Interestingly, it contains also a large group of proteins (such as p16$^{INK4a}$ that plays an important role in cell cycle regulation), that are devoid of any lysine residue. To be degraded by the ubiquitin system, these proteins probably have to undergo N-terminal ubiquitination, though potentially they can be targeted by conjugation of ubiquitin to other acceptor amino acids such as cysteine, threonine and serine.

A further recent development in the system was the discovery of novel types of polyubiquitin chains that involve non-canonical lysine residues in the ubiquitin moiety. These chains are also complex in the sense that they can have doubly branched ubiquitin moieties (*i.e.*, two ubiquitin molecules can be attached to a single one). These chains serve a non-proteolytic function, and in this case of the doubly branched moieties identified on a ubiquitin ligase E3, lead to activation of the ligase to which they are attached. This recent development is a part of yet another paradigm change in the area. It was believed that polyubiquitination is limited to one single lysine residue in the ubiquitin chain [lysine 48] and serves as a targeting signal to the proteasome. The discovery of ubiquitin-like proteins and novel types of polyubiquitin chains in which ubiquitin moieties are conjugated to different lysine residues within the ubiquitin molecule, has broadened the scope of the ubiquitin system well beyond proteolysis to serve numerous non-proteolytic functions -- from regulation of transcription and enzymatic activities to routing of different proteins to their proper sub-cellular destination. It is clear that we now see only the tip of the iceberg of this novel mode of post-translational modification, only one function of which is to target proteins for degradation.

## III.    GENERAL INTRODUCTION TO THE UBIQUITIN PROTEASOME SYSTEM

I will be prepared to speak generally about the ubiquitin-proteasome system, as well as its central role in regulating the processing and activation of NF-κB and its natural inhibitor, IκB. To the extent any of such discussion requires background information covering issues of gene expression (including transcription, translation, and the cellular components involved in expression) or so-called intra-cellular signaling, I will be prepared to address those as well.

### *Ubiquitination.*

*Ubiquitination is marking a protein for destruction.* Degradation of a protein via the ubiquitin-proteasome pathway involves two discrete and successive steps: (i) tagging the substrate by covalent attachment of multiple ubiquitin molecules that generate a polyubiquitin chain, and (ii) degradation of the tagged protein by the 26S proteasome complex with release of free and reusable ubiquitin. Recycling of ubiquitin is mediated by ubiquitin C-terminal hydrolases (isopeptidases; de-ubiquitinating enzymes - DUBs).

Conjugation of ubiquitin, a highly evolutionarily conserved 76 residue polypeptide, to the protein substrate proceeds via a three-step cascade mechanism. Initially, the ubiquitin-activating enzyme, E1, activates ubiquitin in an ATP-requiring reaction to generate a high-energy thiol ester intermediate, E1-S~ubiquitin. One of several E2 enzymes (ubiquitin-carrier proteins or ubiquitin-conjugating enzymes [UBCs]) transfers the activated ubiquitin from E1, via an additional high-energy thiol ester intermediate, E2-S~ubiquitin, to the substrate that is specifically bound to a member of the ubiquitin-protein ligase family, E3. There are several classes of E3 enzymes. Members of the RING finger-containing E3s, the largest family of ubiquitin ligases, bind the ubiquitin-charged E2 and catalyze direct transfer of the activated ubiquitin from E2 to the E3-bound substrate. For HECT (Homologous to the E6-AP C-Terminus) domain E3s, the ubiquitin moiety is transferred from the E2 enzyme to an active site Cys residue on the E3 to generate a third high-energy thiol ester intermediate, E3-S~ubiquitin, prior to its final transfer to the ligase-bound substrate.

11

E3s catalyze the last step in the conjugation process: covalent attachment of ubiquitin to the substrate. The ubiquitin molecule is generally transferred to an $\varepsilon$-NH$_2$ group of an internal lysine residue in the substrate to generate a covalent isopeptide bond. In some cases however, ubiquitin is conjugated in a linear manner to the N-terminal amino group of the substrate, and potentially also to other internal residues such as threonine, cysteine, and serine. By successively adding activated ubiquitin moieties to internal lysine residues on the previously conjugated ubiquitin molecule, a polyubiquitin chain is synthesized. The chain is recognized by the downstream 26S proteasome complex. It should be noted that in few cases, the first ubiquitin moiety is conjugated to the substrate by one E3, whereas chain elongation is catalyzed by a different ligase often termed E4. Thus, E3s play a key role in the ubiquitin-mediated proteolytic cascade because they serve as the specific substrate-recognition elements of the system. Approximately 1,000 different E3s have been identified in the human genome, based on specific, commonly shared structural motifs. Modification by a single moiety of ubiquitin is catalyzed via an identical mechanism and set of enzymes. Conjugation of ubiquitin-like proteins is catalyzed in a similar manner, though the E1, E2 and E3 enzymes are different and are not exchangeable with those involved in conjugation of ubiquitin.

### Degradation.

*After they are ubiquitinated, the tagged proteins can be destroyed by the proteasome.* Degradation of polyubiquitinated substrates is carried out by the 26S proteasome that does not recognize substrates that are not modified by ubiquitin. In one established case however, that of the polyamine synthesizing enzyme ornithine decarboxylase (ODC), the proteasome recognizes and degrades the substrate without prior ubiquitination, but following its association with a specific protein partner—antizyme. A few other cases of ubiquitin-independent, yet proteasome-dependent degradation have been described, yet none of them has been established firmly. The proteasome is a multicatalytic protease that degrades polyubiquitinated proteins to short peptides. It is composed of two subcomplexes: a 20S core particle (CP) that carries the catalytic activity, and a regulatory 19S regulatory particle (RP). The 20S CP is a barrel-shaped structure composed of four stacked rings, two identical outer $\alpha$ rings and two identical inner $\beta$ rings. The eukaryotic $\alpha$ and $\beta$ rings are composed each of seven distinct subunits, giving the 20S complex the general structure of $\alpha_{1-7}\beta_{1-7}\beta_{1-7}\alpha_{1-7}$. The catalytic sites are localized to some of the $\beta$ subunits. Each extremity of the 20S barrel can be capped by a 19S RP, or, in some cases, by other regulatory particles. The 19S RP itself can be further dissected into two multi-subunit substructures, a lid and a base. Six homologous ATPases (Rpt1-6) are present in the base together with three non-ATPases subunits (Rpn1, 2, and 10). The lid of the RP contains eight non-ATPase subunits which can be released from the proteasome or rebind under certain conditions. The role of the lid is still unclear, though it is necessary for proper degradation of polyubiquitinated proteins.

One important function of the 19S RP is to recognize ubiquitinated proteins and other potential substrates of the proteasome. At least two ubiquitin-binding subunits of the 19S RP have been reported; however, their biological function and mode of action have not been discerned. A second function of the 19S RP is to open an orifice in the $\alpha$-ring that will allow entry of the substrate into the proteolytic chamber. Also, since a folded protein would not be able to fit through the narrow proteasomal channel, it is assumed that the 19S particle unfolds substrates and inserts them into the 20S CP. Both the channel opening function and the unfolding of the substrate require metabolic energy, and these functions are carried out, most probably, by

the ATPase subunits. Following degradation of the substrate, short peptides derived from the substrate are released, as well as reusable ubiquitin.

Ubiquitin is released via the activity of de-ubiquitinating enzymes. These enzymes belong to two classes, they are either proteasomal or soluble. The proteasomal enzymes can be part of the 26S complex (the Rpn11 subunit of the lid is a metalloprotease) or are only associated with it. The different roles played by the different ubiquitin recycling enzymes have yet to be determined. The released peptides derived from the substrates are further degraded into free amino acids by cytosolic amino- and carboxypeptidases. A small fraction of the peptides is transported across the ER membrane (using the TAP transporters), further processed by specific protease(s), bind to the MHC class I complex, and are carried to the cell surface to be presented to cytotoxic T cells. In case the peptides are derived from a "nonself" (foreign) antigen, such as a viral protein, the T cell lyses the presenting cell.

Another group of important cytosolic proteins such as Rad23 and Dsk10 serve to shuttle polyubiquitinated substrates from the ligases to the proteasome, and interruption of their function interferes with the degradation of at least certain proteins.

Proteasomal degradation is not always complete. In some cases, the proteasome processes the ubiquitinated substrate in a limited manner, releasing a truncated product. In the case of the NF-κB transcriptional regulators, for example, an active subunit (p50 or p52) is thus released from a longer inactive precursor (p105 or p100, respectively).

### Substrate recognition.

*How the ubiquitin system is so selective is still not fully known.* A major, yet unresolved problem is how the ubiquitin system achieves its high specificity and selectivity toward its innumerable substrates. Why are certain proteins extremely stable in the cell, whereas others are extremely short-lived? Why are certain proteins degraded only at a particular time point during the cell cycle or only following specific extracellular stimuli, yet they are stable under most other conditions? It appears that specificity of the ubiquitin system is determined by two distinct and unrelated groups of proteins: (i) E3s and (ii) modifying enzymes and ancillary proteins. Within the ubiquitin system, substrates must be recognized and bind to a specific E3 as a prerequisite to their ubiquitination. In most cases, however, the substrates are not recognized in a constitutive manner and they must undergo post-translational modifications such as specific phosphorylation or oxidation that render them susceptible for recognition. In other cases the target proteins are not recognized directly by the E3, and their recognition depends on association with ancillary proteins such as molecular chaperones (or viral proteins) that act as recognition elements in *trans* and serve as a link to the appropriate ligase. Other proteins, such as certain transcription factors, have to dissociate from the specific DNA sequence to which they bind in order to be recognized by the system. Stability of yet other proteins depends on oligomerization. Thus, in addition to the E3s, modifying enzymes (such as kinases), ancillary proteins, or DNA sequences to which substrates bind, also play an important role in the recognition process. In some instances, it is the E3 that must "be switched on" by undergoing post-translational modification (such as phosphorylation) in order to yield an active form that recognizes the target substrate.

13

### Regulation of the ubiquitin-proteasome system.

*The ubiquitin-proteasome system can be regulated at the level of ubiquitination or at the level of proteasome activity.* Since conjugation and proteasomal degradation are required for multitude of cellular functions, regulation must be delicately and specifically tuned. In a few cases, general rather than specific components of the pathway can be modulated by physiologic signals. For example, upregulation of the pathway is observed during massive degradation of skeletal muscle proteins that occurs under normal fasting, and also under pathologic conditions such as malignancy-induced cachexia, severe sepsis, metabolic acidosis, or following denervation. In most cases, however, regulation is specific, and the target substrates are recognized by specific ligases that bind to defined motifs. The targeting motif can be a single amino acid residue (*e.g.*, the N-terminal residue), a specific sequence (the Destruction box in cyclins), or a domain (such as a hydrophobic patch) that is not normally exposed. In other cases the motif is generated by a post-translational modification such as phosphorylation (two neighboring Ser residues in the case of $I\kappa B\alpha$, or a single Ser residue in the case of p27), or oxidation (hydroxyproline in the case of the Hypoxia Inducible Factor-$1\alpha$ - HIF$1\alpha$). As noted, phosphorylation is required also to activate certain ligases, such as c-Cbl and APC (anaphase-promoting complex: cyclosome).

### Deubiquitinating enzymes.

*Removing ubiquitin is another way to regulate the system.* Deubiquitination serves several functions, among them is release and recycling of free ubiquitin which is important for maintenance of the cellular ubiquitin pool. Another important role is regulation of processes that are activated or inactivated by ubiquitination. For example, removal of ubiquitin from active transcriptional regulators (as ubiquitination serves not only to signal degradation, but in several cases to activate transcription factors) may serve to decrease transcriptional activation. Thus, because of the central role deubiquitinating enzymes play in many different processes, it is not surprising that aberrations in their activity have also led to the discovery of certain pathologies.

### The ubiquitin system and pathogenesis of human diseases

*With the many processes and substrates targeted by the ubiquitin pathway, it has not been surprising to find that aberrations in the system underlie, directly or indirectly, the pathogenesis of many diseases.* While inactivation of a major enzyme such as E1 is obviously lethal, mutations in enzymes or recognition motifs in substrates that do not affect vital pathways, or that affect the involved process only partially, may result in a broad array of phenotypes. Likewise, acquired changes in the activity of the system can also evolve into certain pathologies. The pathologic states associated with the ubiquitin system can be classified into two groups: those that result from loss of function— mutation in a ubiquitin system enzyme or in the recognition motif in the target substrate that result in stabilization of the target proteins or maintenance of their ubiquitinated states; and those that result from gain of function—abnormal or accelerated degradation of the target protein. Better understanding of the processes and identification of the components involved in the degradation of key regulatory proteins will lead to the development of mechanism-based drugs that will target specifically only the involved proteins, and will have less side effects than the currently available drugs.

14

The NF-κB transcription factor is activated by the ubiquitin system via a two step proteolytic mechanism: limited processing of the precursor protein p105 to yield the active subunit p50 (or limited processing of the precursor protein p100 to yield the active subunit p52), and signal-induced phosphorylation and subsequent degradation of the inhibitor IκBα that enables translocation of the NF-κB into the nucleus where it initiates specific transcriptional activity. An interesting case in that respect involves mutations in NEMO [NF-κB Essential Modifier; a regulator of the IKK (IκB Kinase) signaling complex] which is an essential component in the signaling complex that contains also the IκB kinases (IKKs) 1 and 2 that phosphorylate IκBα (a step necessary for its ubiquitination and degradation) and also the precursor proteins p100 and p105. The phosphorylation of the precursors is necessary for accelerated processing to the active subunits p50 and p52, respectively. Mutations in NEMO lead to a series of diseases that affect the skin, among them incontinentia pigmenti (IP), hypohidrotic/anhidrotic ectodermal dysplasia, but also to immune deficiency. IP is an X-linked dominant genodermatosis which is lethal in males. The mutation in NEMO results in undetectable NEMO protein and almost complete lack of active NF-κB. Hypohidrotic/anhidrotic ectodermal dysplasia (HED/EDA) is attributed to defects in at least three genes, but involves also defective NF-κB activation. Hypomorphic NEMO mutations have been found to cause anhidrotic ectodermal dysplasia with immunodeficiency (EDA–ID), while stop codon mutations cause a more severe phenotype that includes, in addition to EDA–ID, also osteopetrosis and lymphoedema (OL–EDA–ID). The immunologic and infectious features observed in the patients result from impaired NF-κB signaling, including cellular response to LPS and a variety of cytokines. In that context, an important player is the deubiquitinating enzyme CYLD, which is involved in deubiquitinating K63-Ub from NEMO. CYLD is also involved in the deubiquitination of TRAF2 (Tumor necrosis factor Receptor [TNFR]-Associated Factor 2) and TRAF6. Ubiquitination of NEMO and the TRAF proteins (which are also ubiquitin ligases), and generation of polyubiquitin chains linked via Lys63 of the ubiquitin moiety, do not target these proteins for degradation, but result in their activation. Thus, inhibition of deubiquitination of NEMO, by a mutation in CYLD for example, may lead to uncontrolled activation of the IKK complex with increased activity of NF-κB. Indeed, CYLD was found mutated in Familial Cylindromatosis, a rare pathology characterized predisposition to multiple tumors of the skin appendages, such as the salivary gland.

## IV.    HISTORICAL DEVELOPMENT OF THE RECOGNITION OF THE ROLE OF THE UBIQUITIN PROTEASOME SYSTEM IN THE REGULATION OF NF-κB.

I will be prepared to speak generally about the historical development of knowledge relating to the central role of the ubiquitin-proteasome system in regulating the processing and activation of NF-κB and its natural inhibitor, IκB. I will be prepared to discuss the specifics of the analysis and experiments set forth in the literature cited below, including the specifics of the 1988 Saito reference.

Over the last 16 years, scientists have developed an understanding of a previously unknown connection between NF-κB activation and the ubiquitin proteasome system. Specifically, in contrast with the knowledge of the early 1990s, scientists now recognize both the centrality of the ubiquitin proteasome system in the activation of canonical NF-κB and the down-regulation of NF-κB that necessarily and inevitably resulted from the use of even the earliest known proteasome inhibitors. It is now understood, for example, that, under activation

conditions, release of canonical NF-κB from its inhibitor first requires multiple modifications of IκB (phosphorylation and ubiquitination) and subsequent degradation of IκB by the proteasome.

While it is now understood that the ubiquitin-proteasome system plays a key role in the regulation of NF-κB activation, there was no such understanding in the early 1990s. This knowledge was developed through a series of discoveries made primarily in the mid-to-late 1990s (which is not to say that our knowledge is now complete - new insights are being gained even today).

At the end of 1991, the relationship between NF-κB activation and the ubiquitin-proteasome system had not been established. At that time, the only publication that even hinted at the possibility of such relationship was a paper published in December of 1991 by Fan and Maniatis.[6] This paper, however, which simply showed that the processing of the p105 precursor of the p50 subunit of NF-κB occurs through an ATP-dependent pathway, did not establish or present any evidence for any direct linkage between NF-κB activation and the proteasome. The Fan and Maniatis paper only enumerated certain dependencies and modes of inhibition for p105 processing and noted that, "[a]lthough all of these characteristics are shared by the ATP-dependent protease complex of the ubiquitin-mediated protein degradation pathway, additional studies will be required to determine whether this pathway or another ATP-dependent protease is involved in p105 processing."[7]

### Processing of NF-κB precursors.

*Proteasome inhibitors reduce NF-κB activity.* In a patent filed in 1994 (U.S. Patent No. 6,660,268 -- "the '268 patent" -- listing Harvard as the assignee and naming among its inventors Tom Maniatis), the '268 patentees acknowledged that, while the Fan and Maniatis publication had "suggested ... that the ATP-dependent protease complex of the ubiquitin-mediated protein degradation pathway was involved (*i.e.*, proteasome) ... this structure was only known [at that time] to catalyze the complete degradation of proteins to small acid-soluble peptides and was not believed capable of processing precursors to generate active proteins, such as p50 NF-κB."[8] The '268 patentees then identified themselves as having been the ones to "have proven that the proteasome is indeed required for the processing of p105 to p50."[9]

One of the first papers to establish the link between the ubiquitin-proteasome system and the activation of NF-κB was published in Cell in September of 1994 by Palombella et al. - the

---

6    Fan CM, Maniatis T., Generation of p50 subunit of NF-kappa B by processing of p105 through an ATP-dependent pathway, *Nature*. 1991 Dec 5;354(6352):395-8.

7    *Id.* at 396.

8    '268 patent at col. 8, lns. 23-36.

9    '268 patent at col. 8, lns. 37-39.

same individuals listed as inventors on Harvard's '268 patent.[10]   In this paper, the authors demonstrated an essential role of the proteasome in two of the processes required for NF-κB activation: the processing of the p105 precursor protein into the p50 subunit of NF-κB, and the rapid degradation of IκB upon induction.   As part of the process of establishing the link between the ubiquitin-proteasome system and NF-κB, the authors first demonstrated that p105 processing requires ubiquitination.   They then demonstrated that p105 processing does not occur in the absence of the proteasome.   Finally, they demonstrated that both *in vivo* and *in vitro* treatment with known proteasome inhibitors could block formation of the p50 subunit of NF-κB.

For the proteasome inhibition experiments, the authors of the Palombella paper chose, among other things, to use a series of peptide aldehydes as potential inhibitors of NF-κB activation.   Provided by a company then called MyoGenics, these peptide aldehydes were identified in the paper as MG101, MG115, and MG132.   All three of these compounds had been established at the time of the Palombella paper as "potent inhibitors of the chymotryptic site on the 20S particle."[11]   While MG115 and MG132 were compounds that had apparently been developed in-house at MyoGenics, MG101 was a preexisting compound that had been known previously by the name "Calpain Inhibitor I."[12]

In addition to "Calpain Inhibitor I," MG101 has been known by many other names, including   "N-Acetyl-L-leucyl-L-leucyl-L-norleucinal,"   "Ac-Leu-Leu-Nle-al,"   "LLnL," "ALLN," and "ALLNal."   Although first known as an inhibitor of calpain and certain lysosomal cathepsins, it was because of its ability to also serve as a selective inhibitor of the proteasome degradative pathway that it became a powerful compound for research applications directed to the ubiquitin-proteasome system.

Even before it had been experimentally established that ALLNal (aka MG101, Calpain Inhibitor I, etc.) also worked as an inhibitor of the proteasome, it nonetheless had been used in experiments that necessarily and inevitably resulted in proteasome inhibition.   One example of this is seen in a 1988 paper by Saito et al. published in Neuroscience Letters.[13]   In this paper, the authors described experiments in which PC12h cells were treated with 40ng/ml of nerve growth factor (NGF) at the same time as they were treated with ALLNal at concentrations ranging from 0.6 to 3 μM.   While in this publication, the authors focused on the phenotype of neurite outgrowth resulting from this treatment, our present knowledge allows me to conclude that, though unknown to the authors at the time, the experimental protocol employed in the Saito

---

[10]   Palombella VJ, Rando OJ, Goldberg AL, Maniatis T., The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B, *Cell*. 1994 Sep 9;78(5):773-85.

[11]   *Id.* at 776.

[12]   *Id.* See also the Calbiochem Product Data Sheet: (www.emdbiosciences.com/Products/pds.asp?catno=208719), which describes it as "inhibit[ing] the proteolysis of IκBα and IκBβ by the ubiquitin-proteasome complex."

[13]   Saito Y, Kawashima S., Enhancement of neurite outgrowth in PC12h cells by a protease inhibitor, *Neurosci. Lett.* 1988 Jun 17;89(1):102-7.

paper also would have had the actual effect of necessarily and inevitably inhibiting, via the proteasome, at least some of the induction of NF-κB that would otherwise normally have resulted from the treatment with NGF and therefore led to a reduction of NF-κB activity. Treatment of neuronal cells with NGF induces activation of NF-κB. Because ALLNal is a proteasome inhibitor, however, its co-treatment with NGF as described in the paper would have necessarily and inevitably reduced the activity of NF-κB that would otherwise have resulted from the activation induced by NGF (and any of the gene expression that would otherwise have resulted from such induced activation).

Using MG101, MG115, and MG132, the authors of the Palombella paper demonstrated *in vivo* and *in vitro* inhibition of p105 processing. They then used the two most potent inhibitors -- MG115 and MG132 -- to demonstrate inhibition of the inducible degradation of IκB.[14]

While still acknowledging the uncertainty as to whether phosphorylation of p105 and/or IκB is required before ubiquitination of these proteins, the authors of the Palombella paper noted from other studies that (1) in the ubiquitin-dependent degradation of other proteins called cyclins, degradation is triggered by phosphorylation; and (2) proteasome inhibitors stabilize a phosphorylated form of IκB while completely blocking activation of NF-κB. Based in part on these observations, the authors proposed, among other things, that the ubiquitin-proteasome system may act on modified and bound protein rather than on the un-modified and free one.[15]

### Modification and degradation of IκB in response to induction.

*How NF-κB was released from IκB was unknown in 1991.* The elucidation of the facts regarding the modification and degradation of IκB in response to NF-κB activation proceeded along a similar timeline. In mid-1993, a group of authors, including Albert Baldwin, Jr., published a paper providing what they themselves characterized as the "the first evidence that the *in vivo* mechanism of NF-κB activation is through the phosphorylation and subsequent loss of its inhibitor, IκB."[16]    This paper acknowledged that, at that time, "the *in vivo* mechanism of activation [was] unknown," but used a series of experiments to demonstrate that, after cells were treated with a variety of known NF-κB inducers, IκBα/MAD-3 could be first shown to have been phosphorylated and subsequently shown to have disappeared from cellular exrracts. Nevertheless, the authors acknowledged that they did not have enough information to determine "the exact role of IκBα/MAD-3 phosphorylation [] in its *release* from NF-κB."[17] (emphasis added).

---

14  Palombella et al. at 778-80.

15  *Id.* at 780-81.

16  Beg AA, Finco TS, Nantermet PV, Baldwin AS Jr., Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation, *Mol. Cell. Biol.* 1993 Jun;13(6):3301-10.

17  *Id.* at 3307.

The paper to first establish that "rapid proteolysis of IκB is necessary for activation of NF-κB" was published later in 1993, and was authored, among others, by Patrick Baeuerle.[18] Among other things, this paper first demonstrated that "interference with the normal turnover rate of IκBα is not sufficient for a rapid activation of NF-κB."[19] The authors then demonstrated that a series of serine protease inhibitors with chymotrypsin-like specificity could actually prevent NF-κB DNA binding activity in response to induction. While the authors concluded that the data supported "the requirement of proteolytic degradation of IκB for the activation of NF-κB," they admitted ignorance as to the mechanism by which such degradation might occur, including whether the unknown protease that degraded IκB was constitutive or newly activated in response to induction, whether IκB was first tagged for degradation by some sort of covalent modification, whether IκB could be attacked by the unknown protease while complexed with NF-κB or only after its release from NF-κB, and whether phosphorylation was required for the "release" of IκB from NF-κB.[20]

That question was answered in a number of papers published in 1995. In one paper, which included Tom Maniatis among its authors, the investigators identified, among other things, *in vitro* and *in vivo* ubiquitination of phosphorylated IκBα. They also pointed out, to their apparent surprise, that "neither phosphorylation nor ubiquitination results in the dissociation of IκBα and NF-κB, and . . . that the 26S proteasome recognizes and degrades ubiquitinated IκBα in the ternary NF-κB complex.[21] In another paper, one that I published with my colleagues in November of 1995, we identified the mechanism of stimulation-dependent phosphorylation of IκB, followed by its subsequent ubiquitination and degradation by the proteasome, as the means by which activation of canonical NF-κB occurs.[22] We accomplished this by, among other things, demonstrating: (1) that use of the proteasome inhibitor ALLN (aka MG101) on phorbol ester-stimulated Jurkat cells led to the appearance of both phosphorylated and unphosphorylated IκB; (2) that, in the presence of ZLLF, a potent proteasome inhibitor, "there was stimulation-dependent accumulation of high molecular weight IκBα cross-reactive proteins, and (3) that in a cell line with a temperature sensitive mutant in the E1 ubiquitin-activating enzyme, there was markedly less degradation of IκBα at the nonpermissive temperature.

---

[18]  Henkel T, Machleidt T, Alkalay I, Krönke M, Ben-Neriah Y, Baeuerle PA., Rapid proteolysis of I kappa B-alpha is necessary for activation of transcription factor NF-kappa B, *Nature.* 1993 Sep 9;365(6442):182-5.

[19]  *Id.* at 183.

[20]  Id. at 184.

[21]  Chen Z, Hagler J, Palombella VJ, Melandri F, Scherer D, Ballard D, Maniatis T., Signal-induced site-specific phosphorylation targets I kappa B alpha to the ubiquitin-proteasome pathway, *Genes Dev.* 1995 Jul 1;9(13):1586-97.

[22]  Alkalay I, Yaron A, Hatzubai A, Orian A, Ciechanover A, Ben-Neriah Y., Stimulation-dependent I kappa B alpha phosphorylation marks the NF-kappa B inhibitor for degradation via the ubiquitin-proteasome pathway, *Proc. Nat'l Acad. Sci. USA.* 1995 Nov 7;92(23):10599-603.

*Later development of novel NF-κB inhibitors based upon the ubiquitin-proteasome system.*

Research regarding the specific ubiquitin ligase responsible for p105 processing was ongoing, and, along with various colleagues, I published a paper in 1995 identifying a putative novel E3 ligase involved in the process.[23]  My later research in the mid-to-late 90s focused, among other things, on the use of specially constructed phosphorylated polypeptides to specifically inhibit the ubiquitination of pIκBα and pIκBβ and preventing their subsequent degradation by the proteasome.[24]  Some of my colleagues also performed work, for example, on the inhibition of ubiquitination of pIκBα through the expression of F-box deletion mutants of core receptor components the E3 ubiquitin ligase, mutants that act *in vivo* as dominant negative molecules, inhibiting the degradation of pIκBα (and, consequently, inhibit NF-κB activation).[25]

## V.    APPLICATIONS TO MODULATE THE UBIQUITIN PROTEASOME SYSTEM IN ORDER TO REGULATE NF-κB ACTIVITY IN THE CELL.

Inhibition of enzymes common to the entire pathway, such as E1 or the proteasome, may affect many processes nonspecifically, although a narrow window between beneficial effects and toxicity can be identified for a short-term treatment. Recent experimental evidence strongly suggests that proteasome inhibitors may indeed be beneficial in certain pathologies, such as in several malignancies, asthma, brain infarct, and autoimmune encephalomyelitis. As a matter of fact, for multiple myeloma, a malignancy of the immune plasma cells, a specific proteasome inhibitor (PS-341; bortezomib; Velcade) was approved for use in patients.  Velcade, a product of Millenium Pharmaceuticals, is a tripeptide derivative with boronate in the active site - a later variation of the older peptide aldehydes like MG101, MG115, and MG132 that were used in such research as that communicated in the Palombella reference.  In malignancies, the drugs can act via inhibition of degradation of different cell cycle inhibitors, via inhibition of proteolytic activation of the anti-apoptotic transcriptional regulator NF-κB, or more likely, by inhibiting degradation of abnormal/misfolded proteins, thus eliciting the cell stress response and inducing apoptosis. In immune disorders, they may act by inhibiting presentation of "self" peptides, but also by interfering with signal transduction along cellular immune cascades.  A different approach to drug development can be the development of small molecules that bind and inhibit specific E3s. For example, specific phospho-peptide derivatives that span the phosphorylation targeting domains in different substrates can serve as "baits" to the respective E3s.

---

[23]    Orian A, Whiteside S, Israël A, Stancovski I, Schwartz AL, Ciechanover A., Ubiquitin-mediated processing of NF-kappa B transcriptional activator precursor p105. Reconstitution of a cell-free system and identification of the ubiquitin-carrier protein, E2, and a novel ubiquitin-protein ligase, E3, involved in conjugation, *J. Biol. Chem.* 1995 Sep 15;270(37):21707-14.

[24]    Yaron A, Gonen H, Alkalay I, Hatzubai A, Jung S, Beyth S, Mercurio F, Manning AM, Ciechanover A, Ben-Neriah Y., Inhibition of NF-kappa-B cellular function via specific targeting of the I-kappa-B-ubiquitin ligase, *EMBO J.* 1997 Nov 3;16(21):6486-94.

[25]    Yaron A, Hatzubai A, Davis M, Lavon I, Amit S, Manning AM, Andersen JS, Mann M, Mercurio F, Ben-Neriah Y., Identification of the receptor component of the IkappaBalpha-ubiquitin ligase. *Nature.* 1998 Dec 10;396(6711):590-4.

## VI.    ASSUMPTIONS AND OPINIONS.

With the exception of claim 7, which I understand from counsel was cancelled by ARIAD, I understand that all of the independent claims of the '516 patent require some minor variation on the term "reducing NF-κB activity in the cell."

As part of my role, I was asked to review the '516 patent and its claims while assuming that the term "reducing NF-κB activity in the cell(s)," as used in the claims, includes, at the least, decreasing levels of NF-κB through direct manipulation of the various steps of NF-κB activation, including both the liberation of NF-κB from the NF-κB:IκB complex and the subsequent action of NF-κB in acting as transcriptional activator.  Specifically, I was asked to opine as to whether, by November 13, 1991, the '516 patent disclosure could have indicated to anyone of any level of skill working with NF-κB or the ubiquitin-proteasome system that the named inventors on the '516 patent had invented a method for "reducing NF-κB activity" that involved "inhibiting modification of an IκB protein," "inhibiting degradation of an IκB protein," or "inhibiting dissociation of NF-κB:IκB complexes."

As a preliminary matter, the assumption provided by counsel - that the term "reducing NF-κB activity in the cell(s)," as used in the claims, includes, at the least, modulation of levels of NF-κB through direct manipulation of the various steps of NF-κB activation - appears bolstered by the dependent claims of the patent, certain ones of which suggest various general ways in which NF-κB activation might be directly manipulated.   For example, claims 20-25, which depend from claim 1, enumerate a few ways by which "NF-κB activity" can be "reduced":

- by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

- by inhibiting the passage of NF-κB into the nucleus of cells

- by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB

- by inhibiting degradation of an IκB protein

- by inhibiting dissociation of NF-κB:IκB complexes

- by reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

The '516 patent's other independent claims also have similar dependent claims that set forth these various ways of directly disrupting NF-κB activation.

Some of the ways in which the claims specify that NF-κB's activities can be directly manipulated, however, find little or no support in the patent.  For example, there is no support or reference in the specification or claims to a way in which one could "inhibit[] degradation of an IκB protein."  Nor do the specification or claims provide any indication that the patentees had an understanding of the process by which or circumstances under which IκB degradation can occur.  Similarly, there is no support or reference in the specification or claims to a way in which one

21

could "inhibit[] modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" Indeed, to the extent that the patent could be said to reference "modification of an IκB protein" at all, it does so only in the context of stating the unproven hypotheses that IκB *may* be phosphorylated and that such phosphorylation (if it even occurs) *may* have an effect on the ability of IκB to remain complexed with NF-κB. Clearly, from the language of the specification itself, the patentees lacked an understanding of the process by which and the circumstances under which IκB modification can occur.

I have already demonstrated through my summary of the NF-κB literature of the early-to-mid-1990s that, as of November of 1991, *no one* had yet established either (1) the essential involvement of the ubiquitin-proteasome system in processing the inactive NF-κB precursors p105 and p100 into the functional NF-κB subunits p50 and p52 or (2) the essential role of the ubiquitin-proteasome system in the NF-κB activation process (including the ubiquitination of phosphorylated IκB and the subsequent ubiquitin-mediated proteasomal degradation of IκB from the NF-κB:IκB complex). These concepts are not described in the '516 patent, and indeed could not have been described in the patent as of November 1991 (although the applicants most certainly were aware that these aspects of NF-κB activation and regulation were then unknown and required extensive research and experimentation in order to elucidate them).

As of November 13, 1991, so little was known about the mechanism by which canonical NF-κB was liberated from its natural inhibitor that no one could have disclosed anything that would have allowed others to recognize that the named inventors had actually invented a way of directly manipulating this aspect of the so-called "NF-κB pathway." Even proteasome inhibitors --some of which had been in use long before November 1991 -- had not yet, by that time, been recognized to play a role in inhibition of NF-κB activation. Indeed, the patent's repeated use of the word "dissociation" with respect to IκB instead of "degradation/destruction/complete disappearance" reveals the ignorance at that time regarding the fate of IκB under conditions of NF-κB activation.

It is my opinion that, in light of the lack of research that had been performed as of November 13, 1991 regarding the relationship between the ubiquitin-proteasome system and NF-κB activation, the disclosure within the '516 patent would not have led anyone to recognize at that time that the applicants had invented any methods of "reducing NF-κB activity" involving "inhibiting modification of an IκB protein," "inhibiting degradation of an IκB protein," or "inhibiting dissociation of NF-κB:IκB complexes."

As I also stated above, based upon my knowledge of the ubiquitin-proteasome system and my review of the 1988 Saito et al. reference (published in Neuroscience Letters), the experimental protocol employed in the Saito paper also would have had the actual effect of necessarily and inevitably inhibiting, via the proteasome, at least some of the induction of NF-κB that would otherwise normally have resulted from the treatment with NGF and therefore led to a reduction of NF-κB activity.

## VII.    ADDITIONAL POINTS.

I am being paid at a rate of $800 per hour for my study and testimony in this matter, plus compensation for out-of-pocket expenses. I have not testified at trial or by deposition in the last 4 years. A list of the data and other information that I considered in forming my opinions here is attached as Appendix B.

In my testimony, I expect to use as exhibits some of the materials that I considered, including various of their figures and cartoons. Furthermore, I may incorporate demonstratives explaining the technology and the various references discussed herein, such as the various tutorial slides used by both parties in this litigation, images from papers and patents, and not-yet-created images that reflect the substance of the background and opinions presented herein.

Dated: January 15, 2008

_____
Aaron Ciechanover, M.D., D.Sc.

# EXHIBIT 23

# EXHIBIT REDACTED

# EXHIBIT 24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION, AMGEN
USA, INC., AMGEN MANUFACTURING, LIMITED, and
IMMUNEX RHODE ISLAND CORPORATION,

                Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., HARVARD
UNIVERSITY, MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and THE WHITEHEAD INSTITUTE
FOR BIOMEDICAL RESEARCH,

                Defendants,

Civil Action No. 06-259-MPT

ARIAD PHARMACEUTICALS, INC., HARVARD
UNIVERSITY, MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and THE WHITEHEAD INSTITUTE
FOR BIOMEDICAL RESEARCH,

                Counterclaim-Plaintiffs,

v.

AMGEN, INC., IMMUNEX CORPORATION AMGEN
USA, INC., AMGEN MANUFACTURING, LIMITED, and
IMMUNEX RHODE ISLAND CORPORATION,

                Counterclaim-Defendants.

## EXPERT REPORT OF RANDOLPH WALL, Ph.D.

## I.    INTRODUCTION - QUALIFICATIONS AND BACKGROUND.

I am currently a Distinguished Professor in the Department of Microbiology, Immunology and Molecular Genetics in the David Geffen UCLA School of Medicine and a member of the UCLA Molecular Biology Institute and the UCLA Institute for Stem Cell Biology and Medicine.  I received my A.B. degree in Botony-Bacteriology in 1965 from the University of South Florida and my Ph.D. in Microbiology from Indiana University in 1970.

Throughout my career, my research has relied on recombinant DNA cloning and other related methodologies for studying and understanding the molecular biology of the immune system and cancer.  For the last 36 years, I have conducted research in the UCLA Molecular Biology Institute and taught courses in the Department of Microbiology, Immunology and Molecular Genetics of the UCLA School of Medicine.  Prior to coming to UCLA, I was a Damon Runyon Memorial Fund for Cancer Research Fellow at Columbia University.  I have served on the editorial boards of the Journal of Immunology and the Journal Molecular and Cellular Biology, as well as the editorial advisory board of Molecular and Cellular Immunology.

Since receiving a Ph.D. in Microbiology, my research interests have focused on molecular genetics and immunology using recombinant DNA technology and cloning. Since joining UCLA, my research has concentrated on genes and molecular mechanisms in immunology and cancer.  In particular, my research has focused on the molecular mechanisms controlling B cell development and function.  I have published over 100 research papers (identified in my curriculum vitae - attached as Exhibit A). I also have presented a number of lectures on my work at other universities and in national and international meetings in immunology and cancer.

After graduate school, I joined the laboratory of Dr. James Darnell at Columbia University as a post-doctoral fellow.  My research there was directed at finding out how mammalian cells make messenger RNA (mRNA).  In my postdoctoral studies, I discovered the poly(A) tail on the end of mRNA, and established that essentially all eukaryotic mRNA contain this tail.  This discovery provided, for the first time, a rapid and efficient way of identifying and purifying mRNA (and its precursors) from eukaryotic cells.  The discovery of the poly(A) tail on mRNA also represented a fundamental advance in the development of cloning complementary DNA (cDNA) from mRNA using reverse transcriptase and complementary oligo(dT) primers.

When I joined the faculty of the UCLA School of Medicine in 1972, I set out to purify mRNAs and generate cDNA clones from mRNA for use in cloning genes from chromosomal DNA and for analyzing mRNA synthesis and processing.  The genes I chose to study code for immunoglobulins, which are the circulating antibodies produced by B-cells that protect higher organisms from infections and foreign substances.  My work through the early 1980s at UCLA produced some of the earliest papers on the isolation of mRNAs and the cloning of cDNAs from globin mRNA and from immunoglobulin light and heavy chain mRNAs.  I then used these cDNA clones in a number of studies to analyze immunoglobulin mRNA processing and to clone and characterize, by mapping and sequencing, multiple immunoglobulin heavy and light chain genes from genomic DNA.  My lab was one of the first to show that alternative mRNA splicing is used to generate immunoglobulin proteins with different functions from the same gene.  I also employed cloned immunoglobulin cDNA and genes for studying immunoglobulin gene

activation and transcription regulation in B-cells as well as in transfected host cells. Over the years, my lab has generated a number of cDNA libraries and identified a large number of genes induced in cytokine signaling or activated during normal B-cell development and in human B-cell immunodeficiencies. These include cDNAs and genes that encode specialized proteins that are expressed exclusively in B-lymphocytes (*i.e.*, so-called B-cell specific genes) and that carry out essential activities for B-cell function and development.

In related studies, my lab also characterized the promoters and other transcription control regions that regulate the tissue-specific activation and expression of these genes. Focusing on the immunoglobulin genes, my lab was the first to show that induction of the kappa immunoglobulin was induced by an inhibitor of protein synthesis. This finding predicted the presence of a labile inhibitor controlling kappa gene induction by blocking the activity of trans-activating transcription factor. Later research confirmed the existence of that trans-activating factor, now called NF-κB. The putative labile inhibitor was later identified as IκB. In collaboration with my colleagues at the University of Washington School of Medicine, La Jolla Institute for Allergy and Immunology, and the Max Planck Institute, my laboratory was the first to show that cells from mice deficient for a specific isoform of protein kinase C (PKCβ) failed to degrade IκB or to activate the IKK complex in response to B-cell receptor engagement. These studies were the first to identify the essential role of a PKCβ in B-cell receptor-mediated NF-κB activation.

Other studies from my lab demonstrated that genetic instabilities resulting from the silencing of gene expression and from aberrant mutations of B-cell genes occur frequently in the generation of human B-cell malignancies. In collaboration with my UCLA colleague, Dr. Michael Teitell, my lab carried out a large scale gene discovery program aimed at identifying genes and pathways involved in human leukemia and lymphoma, including AIDS-related lymphoma. These studies identified several thousand cDNAs that are differentially expressed in AIDS lymphoma versa normal lymph node B-cells. The lead candidate oncogene identified in these studies has been linked to most of the prevalent classes of late stage, aggressive human B-cell lymphoma and now has been shown to cause multiple types of B-cell lymphoma in transgenic mice that correspond to the most prevalent classes of human lymphoma.

I also have considerable experience in the biotechnology industry. In 1980, I co-founded and served as a Director of Ingene (International Genetic Engineering Inc), one of the early biotech companies. At Ingene, I supervised research and development projects on recombinant cloning, manipulation and expression of antibody and antibody fragment constructs in a wide range of host cells including bacteria, yeast and mammalian cells. I am a co-inventor on 6 issued U.S. patents that cover fundamental technologies for construction and bacterial expression of antibodies and antibody fragments. These patents have been licensed to more than thirty (30) biotech and pharmaceutical companies worldwide by Xoma Corporation which acquired Ingene in 1989. I also have served as a member of the Scientific Advisory Boards and as a consultant to Xoma Corporation, FMC Bioproducts and Wella Corporation.

I expect to testify at trial based on the background and opinions I provide in this report. I base my opinions and observations on my nearly 40 years of experience as a biological scientist, on the references cited herein, on other pertinent scientific literature, and on certain assumptions that I will provide below. These opinions and observations are based on information currently

available to me.  As new issues arise or as new information is made known to me through, for example, ARIAD's experts' reports and testimony and the Court's interpretation of the '516 patent claims, I may supplement or amend my opinions and observations.

Within the last four years, I have served as an expert witness in two patent cases on behalf of several parties, as described in my attached C.V.  In forming my opinions here, I considered the information and data cited herein.

## II.    LEGAL ASSUMPTIONS.

I understand that the patent specification is the foundation that describes what the claims, properly construed, can validly cover.  But in exchange for being excluded from practicing an invention for a limited period of time, the public must receive meaningful disclosure from the patentee.

**WRITTEN DESCRIPTION:** I understand that, in furtherance of the requirement of meaningful disclosure I mentioned above, the law requires that a patent specification must contain a sufficient "written description" of the invention.  I understand that this written description requirement is meant to guard against overreaching by requiring inventors to disclose the full scope of their inventions to the public.  I have been informed that a patent's written description is only sufficient if the patent application as originally filed allows persons of ordinary skill in the art to recognize that the applicant invented what is claimed.  Put another way, this means that the patentees' originally-filed disclosure must convey to one of skill in the art that, at the time of filing, the inventors had possession of the full scope of the later claimed subject matter.

**ENABLEMENT:** I understand that the law requires that a patent specification must contain "the manner and process of making and using the claimed invention, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected to make and use the same."  I have been informed that, to be enabling, the specification must teach one of ordinary skill in the art how to make and use the "full scope" of the claimed invention without "undue experimentation."  I have been informed that the issue as to whether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed.  I have been advised that it is appropriate to consider the following factors in assessing whether a disclosure would require undue experimentation:

- the quantity of experimentation necessary,

- the amount of direction or guidance presented,

- the presence or absence of working examples,

- the nature of the invention,

- the state of the prior art,

- the relative skill of those in the art,

4

- the predictability or unpredictability of the art, and

- the breadth of the claims.

I have been informed, however, that these factors are illustrative, not mandatory, and that all need not be reviewed when determining whether a disclosure is enabling.

      **BEST MODE:** I understand that the law requires that a patent specification set forth the best mode contemplated by the inventor of carrying out his invention. I have been informed that this means that the patent specification must set forth what the inventor perceived, at the effective filing date, as the best way of practicing the claimed invention.

      **CLAIM CONSTRUCTION:** In undertaking my analysis, I have been asked to consider certain constructions of the claims of the '516 patent that I understand ARIAD has advanced previously in litigation and/or with the patent office. I have been asked to consider that the claims of the '516 patent encompass actions taken both inside and outside of cells that have the effect (directly or indirectly) of "reducing" or "diminishing" NF-κB activity (i.e. "the function of NF-κB to act as an intracellular messenger that turns on transcription of particular genes in response to certain stimuli"). I have further been asked to consider that to the extent the claims of the '516 patent do not have limitations as to the types of cells, that the full scope of these claims would encompass cells of all types and from all organisms. I have not been asked to date, and have not attempted, to assess whether these claim constructions are correct or whether I agree with them or not. By considering these constructions in the context of my analysis, I do not mean to suggest that they are correct or that I agree with them in any way.

      **PERSON OF ORDINARY SKILL IN THE ART:** I have also been asked to consider the level of ordinary skill in the art of the '516 patent at the time the various patent applications were filed. In my opinion, the person of ordinary skill would have had a Ph.D. in molecular biology, cellular biology, microbiology, or a related field, and at least two additional years of laboratory experience in these areas.

## III.    SUMMARY OF OPINIONS.

As set forth in more detail below, the summary of the opinions I have reached to date in analyzing the '516 patent are as follows:

- It is my opinion that the '516 patent lacks an adequate written description of the full scope of the inventions claimed in the patent. The description in the '516 patent does not suggest that the inventors had possession of any specific methods for practicing the claimed inventions, let alone methods across the full scope of the claims. Moreover, the description in the '516 patent merely provides an invitation to search for compounds that might practice the claimed methods, and does not define the class of compounds, or even a distinguishing feature of the class of compounds, that would practice these methods.

- It is my opinion that the '516 patent does not provide sufficient instruction to enable one of ordinary skill in the art to practice the full scope of the claimed methods. The '516 patent merely postulates five possible mechanisms for practicing the claimed methods, but does not

provide a sufficient teaching with respect to any of these methods to enable one of ordinary skill to practice them, let alone to practice methods across the full scope of the claims. To the extent the claims encompass reduction of NF-κB activity in cells *in vivo*, the '516 patent is especially lacking with respect to any teaching to enable one of ordinary skill in the art to practice these methods.

- If the claims of the '516 patent are described and enabled at all -- and as discussed herein I do not believe that they are -- it is my opinion that the claims should only be afforded a priority date consistent with the most recently-filed patent application, Appl. No. 08/464,364, dated June 5, 1995.

- My opinions regarding enablement and written description none-the-less are not solely a function of the June 5, 1995 filing date, as the earlier-filed applications would, to an even greater degree, lack enablement and written description.

- It is my opinion that the '516 patent does not disclose the best mode for practicing the claimed invention contemplated by named inventor Thomas Maniatis as of November 1991. Dr. Maniatis admitted that he considered the best mode of carrying out the invention of the '516 patent was to use antisense RNA technology, yet there is no discussion of antisense RNA technology anywhere in the patent.

- It is my opinion that ARIAD's expert, Dr. Thomas Kadesch, recanted his trial testimony from ARIAD's case with Lilly and now agrees, as do I, that the claims of the '516 patent directed to all cells and/or all eukaryotic cells lack adequate description.

- It is my opinion that ARIAD's expert, Dr. Inder Verma, has made statements to the United States Patent & Trademark Office regarding various compounds and their impact on NF-κB activity that are inconsistent with statements that he has made in publications on the same subjects.

## IV.     HISTORY OF THE DISCOVERY AND INVESTIGATION OF NF-κB/IκB.

The last 22 years have seen a tremendous expansion in our scientific understanding of NF-κB, IκB, and the components and processes involved with NF-κB activity. Indeed, even the in the first twelve years of NF-κB research (1986-1997), our knowledge evolved from a mere skeletal awareness of some of the players of the so-called "NF-κB pathway," to a more detailed grasp of some of the complexity that had been earlier acknowledged but not then explored.

From the prediction of a putative labile inhibitor of κ-light chain gene transcription to the elucidation of some of the higher aspects of NF-κB activation through, for example, IκB phosphorylation, ubiquitination, and degradation, scientists gradually developed their comprehension in this area, abandoning some concepts while adopting or modifying others. As I will discuss below, the disclosure of U.S. Patent No. 6,410,516 B1 (hereinafter "the '516 patent") simply provides a partial snapshot of the earlier NF-κB knowledge base as of November 13, 1991 (the latest date upon which the patent disclosure was significantly modified). Both contemporaneous and subsequent references, however, show that even that snapshot was incomplete and, in some aspects, wholly inaccurate.

As part of my testimony, I expect to provide an overview of how scientific understanding regarding NF-κB evolved over 1986-1997 time frame.  I may include in this overview a discussion of the following developments and references and how they fit into the growth of scientific knowledge regarding NF-κB and IκB that took place after my original prediction of a labile inhibitor.

**A.    Discovery of IκB and NF-κB - 1986-88.**

From early 1986 to mid 1988, preliminary progress was made in the field: establishing the existence of a putative labile inhibitor of κ light chain gene expression; observing what was then thought to be a B-cell specific binding activity -- an activity consequently called "NF-κB;" identifying a DNA motif to which NF-κB bound, and demonstrating an activity in the cytoplasm that was bound in an inactive complex with NF-κB – this inhibitory activity could be "dissociated" with detergent and thus was called IκB.

> 1/86: Ig κ gene activated without new protein synthesis indicates post-translational mechanism - induction by protein synthesis inhibitor (CHX) predicts labile inhibitor controlling Ig κ activation.[1]
>
> 8/86: B-cell specific transcription factor (i.e., stage- & tissue-specific) & binding site (aka NF-κB motif) identified in Ig κ intron enhancer.[2]
>
> 12/86: NF-κB binding activity induced in pre-B-cells, T-cells & HeLa by post-translational mechanism, also confirmed induction by CHX (experimental strategy based on Wall et al., 1986).[3]
>
> 4/88: Detergent-dissociated inhibitor (native mol. wt. ~60-70 kDa, called IκB) detected bound to NF-κB (~55-62 KDa activity) in inactive complex in cytoplasm.[4]

During this time, however, little was actually known about NF-κB or IκB.  They were functionally defined as "activities."

---

[1]  Wall, R., Briskin, M., Carter, C., Govan, H., Taylor, A., and Kincade, P.  A Labile Inhibitor blocks Immunoglobulin k-Light-Chain-Gene Transcription in a Pre-B Leukemic Cell Line.  *Proc. Nat'l. Acad. Sci. USA*, 83(2):295-298, 1986.

[2]  Sen, R. and Baltimore, D.  Multiple nuclear factors interact with the immunoglobulin enhancer sequences. *Cell* 46(5):705-716, 1986.

[3]  Sen, R. and Baltimore, D.  Inducibility of kappa immunoglobulin enhancer-binding protein NF-kappaB by a posttranslational mechanism.  *Cell* 47(6):921-928, 1986.

[4]  Baeuerle, P.A. and Baltimore, D.  Activation of DNA-binding activity in an apparently cytoplasmic precursor of the NF-kappa B transcription factor.  *Cell* 53(2):211-217, 1988.

Q.    So turning back to NF-kB, NF-kB in the 1991 time frame was identified in essence by its activity.

A.   That is right.

Q.   Is that a fair statement?

A.   That's right.

Q.   Was IkB also identified by its activity?

A.   IkB was also identified by its activity, by it's inhibitory activity.

Deposition of Dr. David Baltimore, taken September 26, 2007 (hereinafter "Baltimore Dep. Tr.") 84:24-85:6.

Q.   What in 1991 -- so that's the time frame that I am asking you to turn your mind back to that time period -- did you understand NF-kB to be? So in 1991.

A.    Right.   We had not then cloned the genes for NF-kB.   So our knowledge of it was entirely operational. It was the molecule which bound to DNA and showed up in a gel shift assay or which when expressed in cells led to increases in reporter -- in reporter assays.

Q.   Anything else?

A.   I can't remember whether we had a rough size for it at that point.   I would guess we did.   So there might have been -- might have been able to use a size criterion, but no, it was pretty virtual.

Q.   So it was a -- these functional characteristics defined something as NF-kB?

A.   That's correct.

Baltimore Dep. Tr. 64:7-64:23.

THE WITNESS:  As I said the fundamental properties by which NF-kappaB was initially discovered and which represents sort of the hallmark of the transcription factor, those have remained unchanged over the period of time that we're talking about.

Q   And what fundamental properties of the transcription factor are you talking about?

THE WITNESS:  It's a DNA binding protein that recognizes a particular DNA sequence, and its activity is regulated by different signaling pathways.  Those are fundamental features that are unchanged.  They were discovered then and they remain unchanged.

Q  So you're focusing on the DNA binding properties of these proteins, correct?

THE WITNESS:  No, I indicated there are two fundamental properties. Of course, DNA binding and engaging target genes, but also the fact that they are induced by a variety of signaling pathways, NF-kappaB is a prototypical example of a signal induced -- signaling induced transcription factor.

Q  So the two factors you're focusing on to characterize NF-kappaB are the fact that it's signal induced and binds to DNA, certain DNA element?

THE WITNESS:  Those would be two critical features, yes, of this transcription factor.

Deposition of Dr. Harinder Singh, taken April 27, 2007 (hereinafter "Singh Dep. Tr.") 25:5-26:2.


Q.    But again, NF-kappa B activity at the time, in 1987, was simply having something that bound to the DNA binding domain of the kappa 3 sequence that you were looking at, correct?

MR. GINDLER:  Objection, misstates his testimony, objection, calls for expert opinion, objection, calls for a legal conclusion.

A.    From the scientific perspective, NF-kappa B activity referred, even back in '87, to DNA binding to the site and other properties, such as post-translational induction, induction with other proteins, competition, induction with the presence of cycloheximide, et cetera.  So it was a summation of properties and not only one property of being able to bind or not.

Deposition of Dr. Ranjan Sen, taken May 3, 2007 (hereinafter "Sen Dep. Tr.") 109:12-110:1

At this time, the EMSA (aka "gel shift") and CAT were the predominant assays used for studying NF-κB and it activity.  Neither those assays nor their adjuncts required structural knowledge of NF-κB or IκB.

Q.  Now, how did you in 1991 determine whether you had NF-kB?  What tests did you use?

A.  Well, originally --

THE WITNESS:  Our original test was the gel shift assay, and later when we knew what the sequence -- that it was -- that it bound to and we could put that sequence into reporter constructs, we could show increases in activity by the expression of NF-kB in reporter assays.

Baltimore Dep. Tr. 65:10-20.

Q.   Dr. Baltimore, I would like to turn now to IkB as a molecule and inhibitor, and first, ask you what as of 1991 you knew about IkB.

A.   We knew how to prepare it and -- and how to then demonstrate its inhibitory effect on NF-kB DNA binding.

Q.  How did you characterize something as IkB?

A.   It was characterized by the fact that we eluded it from inhibited NF-kB, released it from inhibited NF-kB, and we showed that it would then inhibit active NF-kB, inhibit its DNA binding, and we showed specificity. It would not inhibit other things -- other DNA binding proteins.  And I think that was probably the definition.

Baltimore Dep. Tr. 84:10-23.

Q.  So at the time of this publication on October 20th, 1988, if a protein had satisfied those criteria, the existence of an inhibitory activity, the fact that it's a protein and that it was about the size of a protein, what you would expect for a protein, you would characterize that molecule as being an IkB at this time period; is that correct?

A.  This is part of its definition.  The other very essential element of it is that IkB, to start with the purification characterization, comes along with NF-kB in a complex, and in that complex NF-kB is not active.

Q.  So if you took this protein that you wanted to determine whether it was IkB and it complexed with NF-kB, that's an additional criteria that you would use to determine whether something was IkB at this time?

A.   Plus it would get out of that complex by addition of DOC and formamide.  That's yet another definition of that protein at that time.

Q.   Are there any other criteria that would -- that you would use to determine whether something was IkB in this time period?

A.  Yeah, you can come up with other definitions.  One is that if you just take cytosol from any cell, there is no active IkB in there simply because it's all in complex with NF-kB, so there's no access of it.

Q.  Any other criteria?

A.  That the complex of IkB with NF-kB is in the cytosol.  It cannot be removed by so-called denucleation of cells, as is exemplified in figure 5 in Exhibit 150.  Eventually there are others, but I need to read through the papers to find them.

Deposition of Dr. Patrick A. Baeuerle, taken August 20, 2007 and August 21, 2007 (hereinafter (Baeuerle Dep. Tr.) 105:13-107:4.

Q.    What defines the IkB proteins are some of the functional characteristics that we've been discussing today, correct?

A.  That's my understanding.

Q.  And one of those characteristics was the retention of NF-kB in the cytoplasm, correct?

A.  Yes.

Baeuerle Dep. Tr. 246:10-18.

Q.    At the time of this publication would you have referred to the inhibitory activity that you would have identified as a result of running, for example, an EMSA as being IkB?

A.  Yeah.

Q.  So at this time in 1988 IkB was the same thing as the inhibitory activity; is that correct?

A.  As far as I remember.

Baeuerle Dep. Tr. 53:15-54:2.

The EMSA could not provide information as to whether NF-κB in a cell had actually bound to its target DNA sequence.

Q.    Does a gel shift assay -- does a gel shift assay allow someone to determine whether or not a protein is bound to a specific DNA sequence in the nucleus of a cell?

THE WITNESS:  It is a key assay, in terms of measuring DNA binding potential.

Q.    What do you mean by, "DNA binding potential"?

THE WITNESS:  Whether a factor, one, is in the nucleus, and, two, can bind to its relevant target sequence.

Q.    Does it provide information as to whether or not it -- a factor has, in fact, bound to its relevant target sequence?

THE WITNESS:  It's a measure of its potential to bind to that sequence.

Q.    But does it provide information as to whether or not a factor has, in fact, bound to the relevant target sequence?

THE WITNESS:  That would require a separate assay.

Deposition of Dr. Albert S. Baldwin, Jr., taken May 25, 2007 (hereinafter "Baldwin Dep Tr.") 30:17-31:20.

Q.     So having used an EMSA with respect to the identification of -- of NF-kB binding to MHC Class I promoter -- MHC Class I promoter, you weren't able to actually identify if NF-kB was binding in the cell to the promoter; is that correct?

THE WITNESS:  We had no assay to do that.

Baldwin Dep. Tr. 51:25-52:6.

## B.     Purification of the NF-κB & IκB Proteins - 1988-92.

In the 1988 to 1992 time frame, various groups of scientists began work to purify, from various sources, NF-κB and its inhibitor IκB -- factors that up to that time were still characterized as "activities."  During this period, different groups purified forms of NF-κB and species of IκB from, among other sources, bovine spleen, HeLa cells, rabbit lung, and human placenta.  Scientists also began to study in more detail the interactions between NF-κB and IκB; the binding relationships between NF-κB and DNA; and the mechanism by which NF-κB is released from IκB.  It should be noted, however, that at this time, the release of NF-κB from IκB was misunderstood to be a "dissociation" and the mechanism of NF-κB activation was incorrectly thought to likely involve direct phosphorylation of IκB by protein kinase C and protein kinase A.

7/88:   NF-κB (~50 kDa ) purified from bovine spleen nuclear extracts by specific DNA affinity chromatography.[5]

10/88:  Detergent-dissociated IκB shown to dislodge DNA-bound NF-κB, PMA activation of PKC resulted in nuclear translocation of active NF-κB via release of IκB inhibition.[6]

12/88:  NF-κB (~42 & 44 kDa) purified from bovine spleen nuclear extracts by specific DNA affinity chromatography.[7]

9/89:   NF-κB (p50 & p65) purified from DOC-treated cultured HeLa cytoplasmic extracts by specific DNA affinity chromatography, p50 homodimers

---

[5]    Kawakami, K., Scheidereit, C., and Roeder, R.G. Identification and purification of a human immunoglobulin-enhancer-binding protein (NF-kappa B) that activates transcription from a human immunodeficiency virus type 1 promoter in vitro.  *Proc Natl Acad Sci U S A.*  85(13):4700-4704, 1988.

[6]    Baeuerle, P.A. and Baltimore, D.  I kappa B: a specific inhibitor of the NF-kappa B transcription factor.  *Science*  242(4878):540-546,1988.

[7]    Lenardo, M.J., Kuang, A., Gifford, A., and Baltimore, D.  NF-kappa B protein purification from bovine spleen: nucleotide stimulation and binding site specificity. *Proc Natl Acad Sci U S A.* 85(23):8825-8829, 1988.

& p50:p65 heterodimers shown to bind DNA, p65 found to be required for inhibition of binding by IκB.[8]

4/90: NF-κB (p50 & p65) & IκB (~35 kDa) purified from detergent DOC-treated rabbit lung cytoplasmic extract. Reaction of purified IκB with PKC in cell extracts inhibited binding to NF-κB – predicted that IκB phosphorylation released active NF-κB.[9]

4/90: IκB purified from human placenta (native form = 70 kDa, major band in denaturing gel = 37 kDa, called IkBα. minor band = 40-45 kDa, called IκBβ only partially purified here, see Link et al. reference footnoted for 1/92, below). Both IκB forms similarly inactivated free NF-κB (with p65) & dislodged DNA-bound NF-κB complexes in a cell-free assay.[10]

1/92: IκBβ purified to homogeneity (43 kDa), both purified IκB forms reported to be inactivated in a cell-free assay by purified PKC & PKA phosphorylation – suggested direct kinase phosphorylation of inhibitors.[11]

Some of the named inventors have also confirmed that the sequence of NF-κB was not known during this time frame.

> Q.   In early 1987 when you left the Baltimore lab, you didn't know the genetic sequence that coded for what has now come to be known as NF-kappa B, correct?
>
> ----
>
> A.   We did not.
>
> Q.   And at the time you left the Baltimore lab in early 1987, you also did not know what the amino acid sequence was for the protein, correct?
>
> A.   Correct.
>
> Sen Dep. Tr. 81:21-25 and at 80:17-20.

---

[8]   Baeuerle, P.A. and Baltimore, D.   A 65-kappaD subunit of active NF-kappaB is required for inhibition of NF-kappaB by I kappaB. *Genes Dev.* 3(11):1689-1698, 1989.

[9]   Ghosh, S. and Baltimore, D.  Activation in vitro of NF-kappa B by phosphorylation of its inhibitor I kappa B. *Nature* 344(6267):678-682, 1990.

[10]   Zabel, U., and Baeuerle PA.  Purified human I kappa B can rapidly dissociate the complex of the NF-kappa B transcription factor with its cognate DNA. *Cell* 61(2):255-265, 1990.

[11]   Link, E., Kerr, L.D., Schreck, R., Zabel, U., Verma, I., and Baeuerle, P.A.   Purified I kappa B-beta is inactivated upon dephosphorylation. *J. Biol. Chem.* 267(1):239-246, 1992.

Q.  Had the amino acid sequence of the NF-kB been determined as of 1988?

A.  Not that I know of.

Q.  Had the cDNA for NF-kB been cloned as of 1988?

A.  Not that I know.

Baeuerle Dep. Tr. 37:4-9.


Q.   NF kappa B was not among those that had been characterized in terms of their DNA and amino acid sequence as of 1990, correct?

A.   I believe as of April, 1990 in the recollection of this work, I believe that is the case.

Q.  That it had not been so characterized, correct?

A.  I mean I can't be specifically sure, but I believe that is the case.

Deposition of Dr. Philip A. Sharp, taken May 16, 2007 (hereinafter "Sharp Dep. Tr.") 96:7-16.


Q.  What in 1991 -- so that's the time frame that I am asking you to turn your mind back to that time period -- did you understand NF-kB to be? So in 1991.

A.   Right.  We had not then cloned the genes for NF-kB.  So our knowledge of it was entirely operational.  It was the molecule which bound to DNA and showed up in a gel shift assay or which when expressed in cells led to increases in reporter -- in reporter assays.

Q.  Anything else?

A.   I can't remember whether we had a rough size for it at that point.  I would guess we did.  So there might have been -- might have been able to use a size criterion, but no, it was pretty virtual.

Q.  So it was a -- these functional characteristics defined something as NF-kB?

A.  That's correct.

Baltimore Dep. Tr. 64:7-23.

There isn't amino acid sequence information for NF kappa B in the '516 patent, correct?

A.   I'm not aware there is amino acid sequence for NF kappa B in the '516 patent.

Q.   Okay.  Did you have amino acid sequence information for NF kappa B that you chose not to put in the application, or did you just not have it as of the filing date?

A.  Specifically to my lab we did not have it.

Q.   Okay.  Do you know if anybody else, any of the other named inventors had it?

A.   I have no specific recollection that anyone had sequence for NF kappa B specifically at the time.  I can't -- I don't know what other people have.

Q.   When you say "sequence," I raised the question initially with amino acid sequence.  Does your answer apply to DNA sequence as well, in that you're not aware that anyone had the DNA sequence for NF kappa B as of the filing date for the '516?

A.   I'm not aware that anyone had sequence related to NF kappa B activity at the time of filing this patent.

Sharp Dep. Tr. 152:6-153:7.

## C.    Recombinant DNA Cloning of the NF-κB & IκB Proteins - 1989-92.

### 1.    c-Rel cDNA cloning - 1989

In the late 1989 time frame, the proto-oncogene, c-Rel, was cloned from the cDNA of various species (*e.g.*, human, mouse, and chicken).  Although it was noted that the clones bore high homology to known v-Rel (an avian virus) and *dorsal* (a fruit fly gene), it was not understood at the time that c-Rel was related in any way to the NF-κB "activity" that had been reported in other publications.

1989:  c-Rel cDNA cloned - complete deduced amino acid sequences reported for multiple species prior to NF-kB cloning – high homology to known v-Rel & *Drosophila dorsal* sequences.  Examples:

7/89    Cloning of human c-Rel[12]

---

[12]    Brownell, E., Mittereder, N. and Rice, N.R.   A human rel proto-oncogene cDNA containing an Alu fragment as a potential coding exon.  *Oncogene* 4(7):935-942, 1989.

7/89    Cloning of murine c-Rel[13]

10/89   Cloning of avian c-Rel[14]

### 2.    NF-κB cDNA cloning - 1990-92.

References disclosing the initial cDNA cloning of various NF-κB subunits were published in the 1990-92 time period.  These cDNA clones were mostly obtained using oligonucleotide probes based on tryptic peptides from the purified NF-κB protein described previously.  During this time frame, various groups made comparisons of these clones with other already characterized proteins, noting, among other things, the homology of the NF-κB proteins with rel and dorsal proteins.  It was also noted that there is a precursor/active protein relationship between p50 and p105 and between p52 and p100, although the nature of the processing of p105 and p100 was not fully elucidated until years later.

9/90 – 2/91:    p50/p105 (NFKB1) cDNA cloning reports revealed first insights into complexities of NF-κB.  p50 located at N-terminus of p105 precursor – p50 contains 300 amino acid sequence with DNA binding & dimerization sequences (Rel homology domains, RHD)  like rel proteins & *dorsal*.  Cloning of p50/p105 using oligonucleotide probes based on purified protein tryptic peptides.[15]

---

[13]  Grumont, R.J. and Gerondakis, S.    Structure of a mammalian c-rel protein deduced from the nucleotide sequence of murine cDNA clones. *Oncogene Res.* 4(1):1-8. 1989.

[14]  Hannink, M. and Temin, H.M.   Transactivation of gene expression by nuclear and cytoplasmic rel proteins. *Mol Cell Biol.*  9(10):4323-4336, 1989.

[15]  9/90:  Ghosh, S., Gifford, A.M., Riviere, L.R., Tempst, P., Nolan, G.P., and Baltimore, D.   Cloning of the p50 DNA binding subunit of NF-kappa B: homology to rel and dorsal. *Cell* 62(5):1019-1029, 1990.

9/90:  Kieran, M., Blank, V., Logeat, F., Vandekerckhove, J., Lottspeich, F., Le Bail, O., Urban, M.B., Kourilsky, P., Baeuerle, P.A., and Israël, M.   The DNA binding subunit of NF-kappa B is identical to factor KBF1 and homologous to the rel oncogene product. *Cell*  62(5):1007-1018, 1990.

11/90: Bours, V., Villalobos, J., Burd, P.R., Kelly, K., and Siebenlist, U. Cloning of a mitogen-inducible gene encoding a kappa B DNA-binding protein with homology to the rel oncogene and to cell-cycle motifs.  *Nature* 348(6296):76-80, 1990.

2/91:  Meyer, R., Hatada, E.N., Hohmann, H.P., Haiker, M., Bartsch, C., Röthlisberger, U., Lahm, H.W., Schlaeger, E.J., van Loon, A.P., Scheidereit, C.   Cloning of the DNA-binding subunit of human nuclear factor kappa B: the level of its mRNA is strongly regulated by phorbol ester or tumor necrosis factor alpha. *Proc Natl Acad Sci U S A.* 88(3):966-970, 1991.

3/91:   p65 cDNA (RelA) cloning using oligonucleotide probes based on tryptic peptides from purified protein. Protein sequence from cloned p65 showed high homology to Rel and dorsal.[16]

8/91 – 2/92:   p52/p100 (NFKB2) cDNA clones obtained by three approaches:

> 1)  screening with oligonucleotides based on tryptic peptides from purified NF-kB protein - p52/p100 more homologous to p50/p105 than other Rel family members, p52 also formed heterodimers with p65 like p50.[17]

> 2)  p52p100 cloned as B-cell lymphoma associated translocated (t10:14) lyt-10 gene. [18]

> 3)  p52/p100 isolated in cDNA cloning of mitogen-inducible immediate early genes in T-cells.[19]

Cloning of the subunits of NF-κB began to change the way in which NF-κB was perceived.  Many of the earlier assumptions regarding NF-κB structure, some of which remain in the '516 patent disclosure, were discarded.

> Q.  What did you understand in 1991 regarding the members of the family of NF-kB subunits?

> Q.  Did you have an understanding in 1991 that there were multiple subunits of NF-kB?

> A.  I'm having a hard time placing the dates basically.  It was clear in Chen-Ming Fan's paper that -- which was in 1991 -- that the P-50 subunit was generated by processing a P-105, and I don't know whether the P-65 subunits had been identified at that time or not so I can't -- I don't have -- I can't remember specifically when the two subunits were

---

[16]  Ruben, S.M., Dillon, P.J., Schreck, R., Henkel, T., Chen, C.H., Maher, M, Baeuerle, P.A., and Rosen, C.A. Isolation of a rel-related human cDNA that potentially encodes the 65-kD subunit of NF-kappa B.  *Science* 251(5000):1490-1493, 1991.

Nolan, G.P., Ghosh, S., Liou, H.C., Tempst, P., and Baltimore, D.  DNA binding and I kappa B inhibition of the cloned p65 subunit of NF-kappa B, a rel-related polypeptide.  *Cell* 64(5):961-969, 1991.

[17]  8/91:  Schmid, R.M., Perkins, N.D., Duckett, C.S., Andrews, P.C., and Nabel, G.J.  Cloning of an NF-kappa B subunit which stimulates HIV transcription in synergy with p65. *Nature* 352(6337):733-736, 1991.

[18]  12/91: Neri, A., Chang, C.C., Lombardi, L., Salina, M., Corradini, P., Maiolo, A.T., Chaganti, R.S., and Dalla-Favera, R.  B cell lymphoma-associated chromosomal translocation involves candidate oncogene lyt-10, homologous to NF-kappa B p50.  *Cell*  67(6):1075-1087, 1991.

[19]  2/92:  Bours, V., Burd, P.R., Brown, K., Villalobos, J., Park, S., Ryseck, R.P., Bravo, R., Kelly, K., and Siebenlist, U.  A novel mitogen-inducible gene product related to p50/p105-NF-kappa B participates in transactivation through a kappa B site. *Mol Cell Biol.* 12(2):685-695, 1992.

identified, but certainly P-50 was in 1991.  I don't know when the other subunit was identified.

Q.  Could I have you turn back to Exhibit 1 -- actually, yeah, you got it right there, the '516 patent.  To make it easier, if you could turn to column 30 of the patent, please starting at -- oh, sorry, starting at line 42, where it says:  "Mechanism of NF-kB activation"?

A.  Yes.

Q.  If you could just read that first paragraph to yourself at this point and let me know when you've read that paragraph and I'm going to ask you a question about it?

A.  Okay.

Q.  Let's see, if you'd go to line, I believe it's 48, where it says:  "This complex is apparently," do you see where it says that?

A.  Yes.

Q.  "This complex is apparently a heterodimer consisting of about 60 kD NF-kB molecule and

a 60 to 70 kD IkB molecule," is that an accurate description of the NF-kB complex?

A.  What did you say?

A.  Oh, this was the understanding at the time; it's not an accurate understanding of the current -- not a current understanding of the composition of the complex.

Q.  If you'd go to the last sentence of the paragraph where it says:  "This releases NF-kB, which appears now to form a homodimer and can translate it into the nucleus," I guess that's the second to last sentence and then the last sentence is:  "Whether dimerization is required for activation of NF-kB is not known," is that an accurate reflection of what was understood at the time with respect to NF-kB and its structure?

A.  I believe that that was an accurate understanding at the time.

Q.  Does that reflect your understanding after 1991 regarding the structure of NF-kB?

A.  No, the current understanding is that NF-kB is a heterodimer.

Q.  Going back, I want to just clarify something where I'd asked you a question where I'd said, was that the understanding at the time; by "at the time," in my question I meant 1991, and I think that's what you meant as well, but let me just ask you the question again to make sure the record is clear ... the final two sentences dealing with NF-kB and its structure you believe was an accurate reflection of the understanding in 1991 regarding the structure of NF-kB, is that correct?

A.  Now, as I said in response to your earlier question, I can't place the dates precisely of when the heterodimer was recognized, so I can't answer that unequivocally.

Q.  …  When the application was filed in 1991, did you believe it to be correct?

A.  Yes, I did believe it was correct.

Deposition of Dr. Tom Maniatis, taken October 3, 2007 and October 4, 2007 (hereinafter "Maniatis Dep. Tr.") 192:15-196:1.


Q.  Okay.  Now, this statement in the patent, column 14 of the '516 patent, that NF-kappa B is a single factor as opposed to a family of factors, that's actually not correct, right?

A.  Now we know that it's a family of factors.

Q.  Right.  How many family members are there in the NF-kappa B family of factors?

A.  There are five family members in mammalian cells.  There are two family members in flies, and none in worms, so --

Q.  So in mammalian cells, there are five family members.  Can you list those family members for me?

A.  Sure.  There's P105, P100, C-Rel, Rel-A and Rel-B.

Q.  Now, is there a most common form of NF-kappa B that you would consider to be the most prominent family member?

A.  Common is a hard -- is hard to define, so clearly depending on the circumstance, there are different family members that come into play.

Sen Dep. Tr. 102:1-24.


Q  You just said initially it wasn't clear that it was a family of related transcription factors, correct?

A  Correct.

Q  When did it become clear that it was a family of related transcription factors?

THE WITNESS:  As I indicated after the determination of the amino acid sequence of the subunits.

Q  Do you recall when that determination of the amino acid sequence of the subunits was made?

19

THE WITNESS: I don't recall the exact date, no.

Singh Dep. Tr. 22:12-23:2.


Q.   Okay.  When you stated in the 516 patent that NF-kB appears now to be a homodimer, what led you to that belief in this time frame?

A.   At that time, we didn't know that there were multiple subunits, and so -- I tell you I honestly can't remember why we thought it was a dimer at all.  Probably it was a matter of size. And so our guess as reflected there was that we were only thinking about a single subunit.   We weren't thinking about multiple subunits, and we guessed that it was inactive as a monomer and only activated by dimerization after release of IkB, but that all turns out to be wrong.

Q.   Okay.  And what turns out to be correct?

A.   NF-kB is inhibited as a dimer by IkB, not as a monomer, and it can be either a heterodimer or a homodimer.

Baltimore Dep. Tr. 106:3-106:19.


### 3.      *IκBα and IκBβ cDNA cloning/characterization - 1991-92.*

In the 1991-92 time frame, different groups began cloning, in different species, possible candidates for NF-κB inhibitors.  There was considerable confusion, however, as to just what these different cDNA clones represented -- based on studies both with the clones and with purified proteins, it was unclear, for example, what the MAD-3 and pp40 clones represented (whether, IκBα, IκBβ, or some other homologous rel proteins).

6/91:   MAD-3 cDNA clone isolated as immediate early gene induced in adherent human monocytes, sequence predicted 36-38 kDa protein (like 37 kDa for purified IkBα) with putative PKC motif, also multiple ankyrin repeats (ARD) like p105 precursor to p50 – translated MAD-3 protein inhibited p50 homodimer binding like purified IκB. Cloned MAD-3 cDNA predicted to be human IκBα based on identical match to two tryptic peptides & cross reactivity with anti-pp40 antibody (*see* Davis et al., at 9/91, below).[20]

8/91:   Kerr et al. concluded that pp40 is IκBβ - based on comparisions of purified chicken pp40 protein compared to purified human placenta IκBα & IκBβ. pp40 reportedly resembled purified IκBβ in inhibitory properties (blocked c-rel -

---

[20]   Haskill, S., Beg, A.A., Tompkins, S.M., Morris, J.S., Yurochko, A.D., Sampson-Johannes, A., Mondal, K., Ralph, P., and Baldwin, A. S., Jr.  Characterization of an immediate-early gene induced in adherent monocytes that encodes I kappa B-like activity.  *Cell* 65(7):1281-1289, 1991.

IκBα did not ), showed anti-pp40 antibody blocked IκBβ but not IκBα inhibition of NF-κB binding. Tryptic peptides from pp40 showed similar pattern to IκBβ & differed from IκBα.  No sequence data was disclosed in this paper and these findings are contradicted by results in mouse IκBβ cDNA cloning paper (*see* Thompson et al., 1995, below).[21]

9/91:  Rel family member, pp40, purified from v-rel transformed chicken lymphocytes & determined to have inhibitory properties like purified IκB. Chicken pp40 cDNA cloned using tryptic peptides from purified chicken protein. Chicken pp40 and MAD-3 cDNA sequences encode similar molecular weight proteins with homologous amino acid sequences, appearing to support prediction that pp40 is chicken IκBα.[22]

10/92:  Characterization of cloned MAD-3 expressed IκB interactions with NLS of NF-kB (p50, p65 homo- & heterodimers).  Paper, which includes named inventor Baldwin, states that in 1992 relationship of IκB forms to MAD-3 & pp40 "not completely clear." This uncertainty is also summarized in Discussion (p.1910).[23]

2/95:  IκBβ cDNA (mouse) cloned based on tryptic peptides from purified rabbit lung IκBβ protein.  Cloned mouse sequence closely related to other then cloned IκB family members (human IκBα/MAD-3), mouse IkBγ, human Bcl-3, *Drosophila cactus*.  Expressed protein shown to bind p65 & c-Rel, but not p50.[24]

### 4.    *Mechanisms of IκB/NF-κB degradation and processing.*

In the 1993-94 time frame, with the availability of cloned NF-κB and IκB genes and specific antibodies based on the protein sequences translated from these genes, scientists begin to further explore the mechanisms of NF-κB and IκB processing in cells..  Specifically, they began to explore (1) the way in which NF-κB and IκB physically interact and the process by which NF-κB is freed from that natural inhibitor and (2) the way in which certain NF-κB precursors are processed to become active NF-κB subunits.  It was then that scientists first began to understand

---

[21]  Kerr, L.D., Inoue, J., Davis, N., Link, E., Baeuerle, P.A., Bose, H.R., Jr., and Verma, I.M.  The rel-associated pp40 protein prevents DNA binding of Rel and NF-kappa B: relationship with I kappa B beta and regulation by phosphorylation. *Genes Dev*. 5(8):1464-1476, 1991.

[22]  Davis, N., Ghosh, S., Simmons, D.L., Tempst, P., Liou, H.C., Baltimore, D., and Bose, H.R.  Rel-associated pp40: an inhibitor of the rel family of transcription factors. *Science* 253(5025):1268-1271, 1991.

[23]  Beg, A.A., Ruben, S.M., Scheinman, R.I., Haskill, S., Rosen, C.A., and Baldwin, A.S.  I kappa B interacts with the nuclear localization sequences of the subunits of NF-kappa B: a mechanism for cytoplasmic retention. *Genes Dev*. 6(10):1899-1913, 1992.

[24]  Thompson, J.E., Phillips, R.J., Erdjument-Bromage, H., Tempst, P., and Ghosh, S.  I kappa B-beta regulates the persistent response in a biphasic activation of NF-kappa B. *Cell* 80(4):573-582, 1995.

aspects of IκB phosphorylation, ubiquitination, and proteasomal degradation, as well as related events in p105 and p100 processing.

> (a)    Mechanisms of IκB degradation in cells - 1993-94.

> 1993:   Early pre-1993 studies indicated that cell-free treatment of IκB with PKC & PKA released active NF-κB, predicting that phosphorylation inactivated IκB. Mechanism of NF-κB activation in cells was uncertain until the following six reports showed: 1) IκBα is rapidly degraded in response to a variety of extracellular signals, 2) disappearance of IκBα coincided with release and translocation of active NF-κB to the nucleus.  3) NF-κB induced synthesis of new IκBα that formed complexes with NF-κB, thereby limiting activity via an auto-regulatory loop, 4)  overexpressed IκBα (*i.e.*, in excess of NF-κB in cells) is labile and is rapidly degraded.   It was noted that transiently phosphorylated IκBα species preceded rapid inhibitor degradation in induced cells, suggesting that phosphorylation may tag IκBα for proteolysis but is not sufficient to release active NF-κB (see Beg et al., & Mellits et al., below).[25]

> 6/93:   Known inducers of NF-κB activity lead to the phosphorylation and subsequent rapid disappearance of cellular IκB in cells.[26]   The authors, including named inventor Baldwin, Jr., state that before this study, "the *in vivo* mechanism of activation [was] unknown," and that even still, "the exact role of IκBα/MAD-3 phosphorylation in its ***release*** from NF-κB [is similarly unclear]."

---

[25]  9/93:  Brown, K., Park, S., Kanno, T., Franzoso, G., and Siebenlist, U.   Mutual regulation of the transcriptional activator NF-kappa B and its inhibitor, I kappa B-alpha.  *Proc Natl Acad Sci U S A*  90(6):2532-2536, 1993.

3/93:  Sun, S.C., Ganchi, P.A., Ballard, D.W., and Greene, W.C.  NF-kappa B controls expression of inhibitor I kappa B alpha: evidence for an inducible autoregulatory pathway. *Science*  259(5103):1912-1915, 1993

6/93:  Beg, A.A., Finco, T.S., Nantermet, P.V., and Baldwin, A.S., Jr.   Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation.  *Mol Cell Biol.* 13(6):3301-3310, 1993.

7/93:  Scott, M.L., Fujita, T., Liou, H.C., Nolan, G.P., and Baltimore, D.   The p65 subunit of NF-kappa B regulates I kappa B by two distinct mechanisms.  *Genes Dev.* 7(7A):1266-1276, 1993.

9/93:  Henkel, T., Machleidt, T., Alkalay, I., Krönke, M., Ben-Neriah, Y.,and  Baeuerle, P.A. Rapid proteolysis of I kappa B-alpha is necessary for activation of transcription factor NF-kappa B.  *Nature* 365(6442):182-185, 1993.

11/93 Mellits K.H., Hay, R.T., and Goodbourn, S.  Proteolytic degradation of MAD3 (I kappa B alpha) and enhanced processing of the NF-kappa B precursor p105 are obligatory steps in the activation of NF-kappa B. *Nucleic Acids Res.* 21(22):5059-5066, 1993.

[26]  Beg AA, Finco TS, Nantermet PV, Baldwin AS Jr., Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation, *Mol. Cell. Biol.* 1993 Jun;13(6):3301-10.

9/93:  Several serine protease inhibitors were found to prevent NF-κB binding to DNA in response to proven inducers.[27]  The inhibition of NF-κB DNA binding was coupled with a preservation of cellular IκB.  Conclusion: NF-κB activation requires rapid proteolysis of IκB.  Authors admit ignorance as to whether IκB is degraded while complexed to NF-κB and also as to whether phosphorylation was required for "release" of IκB from NF-κB.

10/94:  First conclusive evidence that the ubiquitin-mediated proteolytic complex ("proteasome") was necessary for NF-κB activation.[28]  Named inventor Maniatis and coworkers demonstrated that the proteasome is responsible for the inducible proteolysis of IκB that leads to activation of NF-κB in the canonical pathway. Well-known and commercially-available proteasome inhibitors of the peptide aldehyde family (e.g. MG115 and MG132) were able to inhibit the inducible degradation of IκB.  Authors hypothesized that the proteasome may act on NF-κB-IκB complexes rather than on free IκB protein.

7/95:  First demonstration that *phosphorylated* IκBα is first ubiquitinated and then degraded by the 26S proteasome.[29] Authors, including named inventor Maniatis, demonstrated that both phosphorylated and ubiquitinated IκB remain bound to NF-κB, and that the 26S proteasome recognizes the ubiquitinated IκB:NF-κB complex.

11/95:  Elucidation of the full canonical mechanism of induced NF-κB activation via step-wise phosphorylation, ubiquitination and degradation of NF-κB-bound IκB.[30]  This was accomplished by showing that (1) Proteasome inhibitor MG101 (a.k.a. "ALLN") lead to the accumulation of both phosphorylated and non-phosphorylated IκB after phorbol ester induction, (2) Proteasome inhibitor ZLLF led to the accumulation of IκB with an increased molecular mass due to the attachment of polyubiquitin chains, and (3) In cells expressing a switchable mutant of the E1 ubiquitin activating enzyme, a marked reduction of IκBα degradation was observed under E1-deactivating conditions.

---

[27]  Henkel T, Machleidt T, Alkalay I, Krönke M, Ben-Neriah Y, Baeuerle PA., Rapid proteolysis of I kappa B-alpha is necessary for activation of transcription factor NF-kappa B, *Nature*. 1993 Sep 9;365(6442):182-5.

[28]  Palombella VJ, Rando OJ, Goldberg AL, Maniatis T., The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B, *Cell*. 1994 Sep 9;78(5):773-85.

[29]  Chen Z, Hagler J, Palombella VJ, Melandri F, Scherer D, Ballard D, Maniatis T., Signal-induced site-specific phosphorylation targets I kappa B alpha to the ubiquitin-proteasome pathway, *Genes Dev*. 1995 Jul 1;9(13):1586-97.

[30]  Alkalay I, Yaron A, Hatzubai A, Orian A, Ciechanover A, Ben-Neriah Y, Stimulation-dependent I kappa B alpha phosphorylation marks the NF-kappa B inhibitor for degradation via the ubiquitin-proteasome pathway, *Proc. Nat'l Acad. Sci. USA*. 1995 Nov 7;92(23):10599-603.

8/97: First identification and characterization of the kinase responsible for the phosphorylation of IκB, named IκB kinase, or IKK.[31]

11/97: Engineered phosphorylated polypeptides used to inhibit the ubiquitination of phosphorylated IκBα and IκBβ.[32] Same polypeptides led to decreased proteolytic degradation of endogenous IκB.

12/98: "Dominantly interfering" mutants of E3 ubiquitin ligase (*i.e.*, mutants that bind to phosphorylated IκB but do not ubiquitinate it) led to decreased degradation of IκB and inhibition of NF-κB activation.[33]

Dr. Maniatis admitted that the mechanistic details of the NF-κB pathway were unknown in 1991, and that in fact, even as late as 1994, the specific mechanism of NF-κB was still poorly understood.

A. The mechanistic details of the pathway were not known in 1991.

Q. What do you mean by "the mechanistic details"?

A. That there was a phosphorylation-dependent association of IkBa with a ubiquitin ligase that ultimately led to IkBa degradation. I believe that it was known that signals that activate NF-kB lead to its dissociation from IkB and its nuclear translocation, but the means by which that occurred was not understood.

Maniatis Dep. Tr. 112:7-18.

Q. Let's go back up to the sentence that you read before regarding the --

A. Okay.

Q. -- signal transduction pathways: "Neither of the signal transduction pathways leading up to NF-kB activation nor the mechanisms of NF-kB for P-100/P-105 processing are understood," was that a correct statement when it was made in 1994 when this application was filed?

---

[31]  Didonato J, Hayakawa M, Rothwarf D, Zandi E, Karin M, A Cytokine-Responsive IκB Kinase That Activates the Transcription Factor NF-κB, *Nature* 1997 Aug; 388:548.

[32]  Yaron A, Gonen H, Alkalay I, Hatzubai A, Jung S, Beyth S, Mercurio F, Manning AM, Ciechanover A, Ben-Neriah Y, Inhibition of NF-kappa-B cellular function via specific targeting of the I-kappa-B-ubiquitin ligase, *EMBO J.* 1997 Nov 3;16(21):6486-94.

[33]  Yaron A, Hatzubai A, Davis M, Lavon I, Amit S, Manning AM, Andersen JS, Mann M, Mercurio F, Ben-Neriah Y., Identification of the receptor component of the IkappaBalpha-ubiquitin ligase. *Nature.* 1998 Dec 10;396(6711):590-4.

A.  I believe that this work preceded the identification of the specific serines in IkB alpha that were phosphorylated and the precise mechanism of the IkB degradation.  In fact, it was later shown that the IkBa is actually removed when it is still part of the IkB complex; and we couldn't have known that at the time, so it does reflect the state of understanding at that time.

Q.  And by that time you mean 1994?

A.  Yes.

Maniatis Dep. Tr. 216:23-217:18.

A.  That there are ways of inhibiting NF-kB activity by targeting specific steps in the signaling pathway.

Q.  Was this a step that you understood in 1991 to even be a part of the signaling pathway for NF-kB?

A.  We knew that there was evidence that phosphorylation was involved, and that dissociation from IkBa is involved, and so that the basic concept of the mechanism was known, but the understanding of the mechanistic details were not; that is, that there are specific serine residues, and they're phosphorylated; and that those are required for ubiquitination, which, in turn, is required for its degradation; degradation of the IkBa.

Q.  So none of that was understood as of 1991?

A.  The only thing that was understood was that inducers lead to the dissociation of IkBa and the translocation of NF-kB in the nucleus, and the means by which this dissociation from IkBa occurred was not known.

Maniatis Dep. Tr. 133:2-134:2.

Dr. Maniatis noted the proteasome was subsequently determined to play an essential role in the degradation of IκB.

Q.  If you could turn back to Exhibit 189 for me, please, that's the 1994 Palombella paper from Cell.  Just looking at the summary on the left-hand column, could you read that first sentence for me?

A.  "We demonstrated an essential role for the proteasome complex and two proteolytic processes required for activation of the transcription factor NF-kB:  the P-105 precursor and the P-50 subunit of NF-kB is processed in vivo by ATP-dependent process that requires proteasomes and the ubiquitin conjugation."

Q.  That's fine, I didn't mean for you to read the whole thing but thanks.  Going back to just that first sentence:  "We demonstrate an essential role," what was your understanding when you wrote this that the proteasome complex had an essential role?

25

A.  What we meant was that these events do not occur; that is to say, processing of P-105 and the degradation of IkBa in the presence of known inhibitors of the proteasome.

Maniatis Dep. Tr. 116:25-117:24.

Additionally, while the involvement of ubiquitination and proteolysis of IκB are now known to be integral steps in the NF-κB activation pathway, the inventors of the '516 patent admitted that these steps were unknown at the time of the patent

Q.  So going back to this Chen paper, which I believe we have as Exhibit 188, this marks the first time that it was, that the phosphorylation of IkBa was coupled to the ubiquitin proteasome; is that right?

A.  That's right.

Q.  So in 1991 was there any understanding at all that there was a relationship between IkB and the ubiquitin proteasome system?

A.  No, that was -- I mean, these are the papers that really make that connection and the -- I think the paper that preceded this was the -- it should be listed here -- yeah, this was in, in 1994; there's a reference on Page 1597 of that paper.  It's Palombella, et al., with the title of:  The ubiquitin proteasome pathway as required for processing the NF-kB precursor protein in the activation of NF-kB, and that was the first time that that connection would have been made between the phosphorylation and ubiquitin proteasome degradation, and that was demonstrated for both precursor NF-kB and IkBa; and the later two papers you're referring to, including the Chen paper, are the in vitro experiments, biochemical experiments, that demonstrate that link.

Q.  So does an understanding of the relationship between the degradation of the NF-kB precursor and IkBa differ from the understanding that you and your co-inventors had in 1991 as to how NF-kB and IkB were regulated?

A.  The mechanistic details of the pathway were not known in 1991.

Maniatis Dep. Tr. 110:21-112:8.

More specifically, Dr. Maniatis admitted that as of 1991, there was no direct evidence that NF-κB activation required IκB degradation.

Q.  So my question to you is how, in 1991, did you believe that anyone could practice claim 34 of the '516 patent?

A.  Well, the evidence at that time was related to dissociation and I know of no direct evidence regarding degradation.

Q.  So you're saying you didn't have an understanding in 1991 as to how someone could practice claim 34 of the '516 patent?

A.  The -- it would not be unprecedented that when a protein associates from another protein that it's normally bound to that it would, it would be

26

> degraded, so I assume that this relates to inhibiting the association of IkB
> with NF-kB.
>
> Maniatis Dep. Tr. 148:7-149:1.

Dr. Sen confirmed that ubiquitin's role in the IκB degradation pathway was not determined until around 1995.

> Q.    And do you know when that focus on I kappa B alpha and the
> ubiquitination process first came about?
>
> A.   '95ish.
>
> Sen Dep. Tr. 206:12-16.

Moreover, Dr. Baltimore testified that in 1991, IKK was not identified as the kinase responsible for phosphorylating IκB.

> Q.   Now, in 1991 -- so turning back the clock to the time frame of the
> applications in the 516 patent and the others -- in 1991, you didn't know
> of the existence of IKK at that point, correct?
>
> A.   It is correct we did not know about IKK.
>
> Baltimore Dep. Tr. 45:7-11.

In addition, Dr. Sen confirmed that the IKK family of kinases were not cloned until the late 1990s.

> Q.    When was it found out, again, approximately, that there were
> different forms of I kappa B that participated in these various pathways?
>
> A.   We are talking about I kappa B kinases, IKKs, not I kappa Bs.
>
> Q.   Okay.
>
> A.   So the question is --
>
> Q.   Let's do it with respect to IKK first.
>
> A.   Yes, so IKKs I think were cloned late '90s. I'm not sure.  In that time
> frame, few years before the knockout, so late '90s I would think.
>
> Sen Dep. Tr. 200:17-201:3.

Dr. Maniatis further testified that phosphorylation of IκB as a step in the activation of NF-κB was merely a hypothesis as of 1991.

> Q.   In 1991 it was a hypothesis that IkB was phosphorylating, is that
> correct?
>
> A.    This description is based on indirect observations, but TPA
> stimulation results in the nuclear translocation of NF-kB; that TPA

27

activates protein kinase C, and that's, as it says here, therefore, a reasonable hypothesis that direct/indirect phosphorylation of IkB will result in its dissociation of NF-kB.

Q.  So I guess you're just saying it was a hypothesis based on indirect observation, is that correct?

A.   Yes, that there was no direct demonstration that IkB was phosphorylated upon TPA treatment.  I believe that there were experiments at that time from Baltimore's lab in vitro that indicated that the phosphorylation of IkB by these kinases would have the in vitro effect of dissociating the two; but, again, I can't place the exact date of the, of the publication of those studies.

Q.  If you could read the next paragraph down column three, line one, please?

A.  Okay.

Q.  Was it believed in 1991 that protein kinase C was responsible for the phosphorylation of IkB?

A.  That hypothesis, as it's said in the previous paragraph, was made based on the information available at the time.  I don't, I don't believe it says it's the only kinase involved, but it states that it's a candidate kinase for this activity.

Maniatis Dep. Tr. 197:16-199:1.

Dr. Maniatis further admitted that as of the early 1990s, scientists' knowledge of the NF-κB pathway was limited to circumstantial evidence that phosphorylation of IκB was required for "dissociation" of IκB from its complex with NF-κB, yet the identity of the kinase responsible for IκB phosphorylation was unknown.  His testimony reflects their belief at the time that kinase inhibitors could be used to reduce NF-κB activity.

Q.  I guess I just need to ask the question again: what did you in 1991 believe someone could do to inhibit dissociation of the NF-kB complex?

A.  Well, as I said, at that time there was evidence that phosphorylation of IkBa is required for the dissociation of IkBa from NF-kB, and, therefore, any --

Q.  Excuse me.

A.  -- any inhibition of the steps required for that dissociation would be, would be effective in inhibiting NF-kB activity because it would prevent the nuclear translocation and -- well, it would hinder the nuclear translocation of NF-kB.

Q.  So are you saying that kinase inhibitors would be an example of something that you would have believed, in 1991, could be used to inhibit dissociation of NF-kB IkB complexes?

28

> A.  Yes.  As I said, at the time there was evidence that phosphorylation of IkBa was induced and that phosphorylation led in ways that weren't known at the time to a dissociation in the activation of NF-kB ...so if one had a selective inhibitor of the kinase that phosphorylates IkBa, which we now know to be IKK, that would be a way of inhibiting the dissociation of IkBa from NF-kB.
>
> Q.  In 1991 did you or any of your colleagues have any idea as to what kinase it was that phosphorylates Ik --
>
> A.  Baltimore had --
>
> A.  Okay.  Baltimore had investigated the in vitro activities of a number of kinases that, in that assay, led to dissociation and it was -- and he was investigating whether any one of these kinases were actually involved in vivo.
>
> Maniatis Dep. Tr. 150:12-152:3.

Dr. Baltimore confirmed Dr. Maniatis' testimony, admitting that while they had observed that TPA, an activator of PKC, could induce NF-κB activity, whether PKC participates in this pathway and at what step is, even today, still poorly understood.

> Q.  We talked earlier about IkB and phosphorylation of IkB and so forth. As of 1991, was it your belief that protein kinase C was responsible for phosphorylating IkB?
>
> A.   We had some evidence that protein kinase C might have been responsible largely through TPA, the effect of TPA which is an activator of protein kinase C, but we didn't have direct evidence that that was the mode of phosphorylation of IkB.
>
> Q.   What is your understanding as to how to -- how TPA stimulates NF-kB activity?
>
> A.  Well, at the time it was that it activates protein kinase C, and then we assume that protein -- we suggested that protein kinase C might directly phosphorylate IkB. It was a good guess but it was wrong.  The good guess was that something did phosphorylate IkB and so we made the suggestion in the right direction, but the particular protein involved -- so today I can't tell you how protein kinase C works.  It presumably works at a more upstream position of a signal transduction pathway.
>
> Q.  In some cascade that leads to activation of IKK?
>
> A.  Somewhere upstream, I presume.
>
> Baltimore Dep. Tr. 85:7-86:5.

Indeed, Dr. Baltimore later testified that the hypothesis stated in the '516 patent that PKC was responsible for the phosphorylation of IκB was incorrect.  In particular, Dr. Baltimore admitted to the complexity of interactions initiated by phosphorylation of IκB by IKK and culminating in the degradation of IκB.

29

Q.    Now, in the patent what you described is consistent with the hypothesis that protein kinase C is responsible for phosphorylating IkB, correct?

A.  That's correct.

Q.   And furthermore, that this phosphorylation leads to disassociation of IkB from NF-kB, correct?

A.  We suspected that the phosphorylation led to disassociation.

Q.   Now, as you pointed out, it turns out that the phosphorylation is not protein kinase C but IKK, correct?

A.  That's correct.

Q.   And it turns out that the phosphorylation of IkB serves as sites for ubiquitination of IkB.

A.    No, it does not serve as sites.   It serves as a signal for the ubiquitination of IkB.

Baltimore Dep. Tr. 86:6-21.

Dr. Baeuerle also admitted the ignorance of scientists in the field as to how the NF-κB:IκB complex was broken up upon induction.

Q.  So at the time of this publication you didn't know whether the steps among those various agents were common or uncommon or both; is that correct?

A.  They all have one common step.  This is the dissociation of the NF-kB IkB complex.

Q.  Are you saying here, though, that you don't know how each of those agents accomplishes that step?

A.  That's more or less what I want to say here.

Baeuerle Dep. Tr. 143:11-21.

Furthermore, Dr. Baldwin admitted that, as of 1993, the role of IκB modification in NF-κB activation was not well understood.

Q.    I'm sorry.  Prior to the 1993 time frame, what understanding did you have as to IkB modification as part of the process of NF-kB activation?

THE WITNESS:  I'm not aware of -- there was another paper that came out about this time, I believe, from Warner Green's group, but prior to that within a cell I don't believe that there was any other evidence for modification.

Baldwin Dep. Tr. 121:4-12.

Several inventors also confirmed that when they referred to the "NF-κB pathway," that term hid great molecular complexity that, as admitted above, was not well understood at the time.

> Q    Okay.  So, you just said -- I want to focus on something that you said.  You said, "It's shorthand for many things not specified that can trigger the NF-kappa B pathway," right?
>
> A    Well, again, you're getting into semantics about how one speaks of a set of molecular  interactions that leads to this particular conclusion in the cell, which is the activation of a set of genes by this set of DNA binding transcription factors.  And so, I'm not wanting to put more words to that than to say that it is a concept that would encompass anything that has been shown to be able to stimulate this set of factors inside the cell.  So, that could be a variety of cell surface proteins and, as we discussed earlier, certain kinases from the cell can activate these NF-kappa B transcription factors to turn on their target genes.  So, it's not that there's no specificity to it.  It's that you talk about it in sort of these terms that don't specify all that you could write about that.
>
> ----
>
> Q    The first sentence on the first page under introduction says that, "The Rel/nuclear factor, NF-kappa B transcription factors integrate diverse intracellular signaling pathways that are activated during normal cellular differentiation and during immune responses."  Do you see that?
>
> A    Mm-hmm.  Yes.
>
> Q     What do you mean by "integrate diverse intracellular signaling pathways"?
>
> THE WITNESS:  So, that would be another shorthand for what we've been talking about on quite a few occasions, which is that -- and we talked about it explicitly that various signaling events in the cell, various binding events of ligands and cell surface receptors, various kinases being activated are able to make molecular interaction, once again, to use that term, with these protein components of the NF-kappa B pathway that are -- that -- that make the actual transcriptional regulation that are the DNA binding parts of -- that -- that control the transcription of NF-kappa B dependent genes.
>
> Deposition of Dr. Louis M. Staudt, taken August 7, 2007 (hereinafter "Staudt Dep. Tr.") 134:7-135:1 and at 151:8-152:5.

The inventors of the '516 patent also provided confirmation that regulation of NF-κB is complex and that one cannot know beforehand whether interference with a signaling cascade influences NF-κB activation without detailed exploration into the biochemical steps of that signaling cascade.

> Q.  You talk about inhibition along the top arrows in Figure 4A in Exhibit 170.
>
> A.  Yes, I did.

31

Q.   Is that something that would be to you inhibition of NF-kB activation?

THE WITNESS:  It would be -- it could be inhibition of NF-kB activity if it was inhibition of NF-kB activity.

Q.   So if I understand you correctly, what you are saying is, if you interfered somewhere along that -- one of those arrows at the top of Figure 4A, you will still have to look and see if there is an effect on NF-kB activity.

THE WITNESS:  Yeah, that's not what I said.

Q.  I am sorry, please.

A.   But it is true that you have to do an experiment to understand whether what you are thinking is correct or not.

Q.   What do you mean by what you indicated you would still have to see if there was an effect on NF-kB activity?

A.   Well, those arrows hide a lot of complexity. They're just arrows. There are many different biochemical processes that are subsumed by those arrows, some of which may affect NF-kB activity and some of which might not because they affect other pathways in the cell. So to know whether a particular portion of one of the signaling pathways is responsible for NF-kB activation, you do have to look.

Baltimore Dep. Tr. 47:5-48:15.

Dr. Baltimore also confirmed that there is the possibility of several parallel pathways for the activation of NF-κB, each of which could be activated or inhibited independently.

Q.   Okay.  Let me try it. Does interference with the inputs into the module -- the boxes at the top of Figure 4A -- does that prevent the module, the signaling module, from becoming activated?  Can you answer that?

THE WITNESS:  But I think it's plain from the figure that you can interfere on one of those pathways and yet the module could be activatable by another pathway.

Baltimore Dep. Tr. 49:13-24.

The inventors of the '516 patent admitted to a lack of knowledge about the modification of IκB responsible for NF-κB activation.  In particular, they testified that they were only aware that phosphorylation led to dissociation from the complex with NF-κB.  None of the complexity involving ubiquitination and degradation of IκB was known.

Q.   In 1991 neither you nor your co-inventors, though, knew for sure whether IkB was definitively phosphorylated; isn't that correct?

A.  What do you mean definitively phosphorylated?

Q.  You had -- if I understand correctly, you had stated that you had evidence that IkB could be phosphorylated; had it been determined that IkB was for phosphorylated as part of NF-kB activation?

A.  The -- what was known, as I recall, is that the, that the inducers of the IkB pathway led in vivo led to the dissociation of NF-kB and IkBa in the nuclear translocation of NF-kB.  It was known from in vitro experiments that phosphorylation of IkBa led to its dissociation from NF-kB, and so it was based on those two observations:  the hypothesis that induction involves phosphorylation, and dissociation was based on those findings.

Q.  * So in 1991 did you or your co-inventors conceive of any way of inhibiting IkB degradation or dissociation apart from your use of kinase inhibitors?

A.  I believe that that's the only -- that's the only method that was referred to.

Maniatis Dep. Tr. 152:14-153:19.

(b)      Mechanisms of NF-κB precursor processing in cells - 1994.

12/91:  Early study of processing demonstrated that the processing of the p105 protein into the p50 NF-κB subunit was dependent upon ATP.  Named inventors Maniatis and Fan noted in their paper that the ubiquitin-mediated proteolytic pathway is also dependent upon ATP in a similar fashion, but that "additional studies will be required to determine whether [the ubiquitin-mediated proteolytic] pathway or another ATP-dependent protease is involved in p105 processing."[34]

1994:  Two reports established that IκBα degradation & NF-κB activation in cells utilizes ubiquitin-mediated proteasome degradation pathway.  Same mechanism also confirmed for p105 processing to p50 (*see* Palombella et al.).  Proteasome inhibitors stabilized phosphorylated IκBα & blocked proteolytic degradation required for NF-κB release. Conclusion: Ub-proteasome pathway degrades phosphorylated IκBα complexed to NF-κB.[35,36]

---

[34]  Fan CM, Maniatis T., Generation of p50 subunit of NF-kappa B by processing of p105 through an ATP-dependent pathway, *Nature*. 1991 Dec 5;354(6352):395-8.

[35]  9/94: Palombella, V.J., Rando, O.J., Goldberg, A.L., and Maniatis, T.  The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B.  *Cell* 78(5):773-785, 1994.

[36]  11/94: Traenckner, E.B., Wilk, S., and Baeuerle, P.A.   A proteasome inhibitor prevents activation of NF-κB and stabilizes a newly phosphorylated form of IκB-α that is still bound to NF-κB.   *EMBO J*. 13(22):5433-5441, 1994.

10/94:  First conclusive evidence that the ubiquitin-mediated proteolytic complex ("proteasome") was necessary for NF-κB activation.[37]  Named inventor Maniatis and coworkers demonstrated that (1) ubiquitination of p105 was a necessary first step for generation of the NF-κB subunit p50 and (2) the proteasome was responsible for the generation of p50 by partial proteolysis of ubiquitinated p105. Well-known and commercially-available proteasome inhibitors of the peptide aldehyde family (e.g. MG115, MG132 and MG101[38] (aka "Calpain Inhibitor I," "ALLN")) were able to block the formation of p50 both in cell culture and in living organisms.

9/95: Identified putative novel E3 ligase as responsible for p105 ubiquitination.[39]


# V.    INVALIDITY ANALYSIS.

The claims of the '516 patent generally recite a method comprising reducing or altering NF-κB activity in the cell to inhibit the expression of genes regulated by NF-κB ("the method comprising reducing NF-kB activity in the cell …" or "the method comprising altering NF-κB activity in the cell …" (Claims 1-18, 20-186, 191-202.))[40]  The usual claimed result of this reduction or alteration of NF-κB activity is the reduction or inhibition of gene expression. (Claims 1-5, 9-11, 13-15, and their dependent claims.)

In the two sections below, I will analyze the patent and provide my opinion as to why the patent claims are invalid for both lack of enablement and lack of written description.

## A.    ENABLEMENT: The '516 Patent's Disclosure is Inadequate to Allow One of Ordinary Skill in the Art to Practice the Claimed Methods Without Undue Experimentation.

This section analyzes whether the disclosure of the '516 patent as issued provides sufficient enablement for its claims.  In particular, I will focus here on whether the claims are

---

[37]  Palombella, V. J., et al., *Cell*, 1994, *Supra*

[38]  *Id.  See also* the Calbiochem Product Data Sheet: (www.emdbiosciences.com/Products/pds.asp?catno=208719), which describes it as "inhibit[ing] the proteolysis of IκBα and IκBβ by the ubiquitin-proteasome complex."

[39]  Orian A, Whiteside S, Israël A, Stancovski I, Schwartz AL, Ciechanover A., Ubiquitin-mediated processing of NF-kappa B transcriptional activator precursor p105. Reconstitution of a cell-free system and identification of the ubiquitin-carrier protein, E2, and a novel ubiquitin-protein ligase, E3, involved in conjugation, *J. Biol. Chem.* 1995 Sep 15;270(37):21707-14.

[40]  Of the remaining claims, claims 19 and 187-190 relate to methods "for reducing bacterial lipopolysaccharide – induced nuclear translocation of NF-κB in eukaryotic cells…," and claim 203 relates to "a method of inhibiting expression … comprising introducing a nucleic acid decoy molecule into the cell…."  This portion of claim 203 is discussed in the context of one of the hypothesized mechanisms of inhibiting or reducing expression.

sufficiently enabled, given that the patent only provided a list of hypothetical reducers, failed to disclose how any protein or DNA could be consistently delivered, and failed to show how to carry out the claimed methods in as wide a variety of cell types as claimed.

### 1.    The '516 Patent Contemplates Use of Protein and DNA-based Methods of Practicing the Claimed Methods, but Ignores the Complexities.

It is my understanding, the claims of the '516 patent can be read to encompass use of the claimed methods *in vivo*, that is, in living organisms.  However,  the specification of the '516 patent does not provide an enabling disclosure of reducing NF-κB activity in cells of any type or within living organisms.  Moreover, the specification does not even disclose a method of reducing NF-κB activity in cell culture.  Although the specification speculates about the use of the IκB protein or gene in cells, as discussed below, no working examples are provided of this. The only examples included in the specification are examples of inactivating NF-κB contained in cell-free nuclear extracts by adding purified IκB protein[41].  In other words, the discussion relates to "test tube" experiments in a cell-free system (using nuclear extracts), rather than in cell culture, let alone in intact cells within organisms.  As I will explain below, cell-free experiments ignore the complexities associated with experiments in cell culture, which become even more pronounced as the strategy is contemplated for therapeutic use in living organisms, which is encompassed by the full scope of the claims.

In addition to IκB, the '516 patent postulates four other mechanisms to reduce NF-κB activity; 1) agents or drugs, 2) antagonists, 3) decoy molecules, and 4) dominantly interfering molecules, without disclosing any specific molecules that can be used in the claimed methods to do this.  These disclosures are general and hypothetical, and do not provide any working example.  Because the specification provides no illustrative examples (not even a specific name) of the supposed agents or drugs, antagonists, decoy molecules, and dominantly interfering molecules, there is no guidance as to how to make such hypothetical molecules or use such proposed mechanisms to reduce NF-κB activity in cells.  With a general hypothesis that agents or drugs, antagonists, decoy molecules, and dominantly interfering molecules might reduce NF-κB activity in cells, the specification has provided only the mere germ of an idea for the claimed method, which does not constitute enabling disclosure.  Here, the five proposed mechanisms set forth in the specification provide no more than a plan or invitation for those of skill in the art to experiment in an attempt to reduce NF-κB activity in cells. They do not provide sufficient guidance or specificity as to how to execute that plan.  These are merely hypothetical starting points from which one of skill in the art would need to perform extensive further research in order to practice the claimed invention -- not enough for enablement.

(a)    The patent does not enable delivery of a compound into cells.

Given the highly unpredictable nature of the art of manipulating transcription factor activity in cells, reducing NF-κB binding activity in a cell-free system does not correlate with

---

[41]    *See e.g.*, '516 patent, col. 8, lines 5-10.

reducing NF-κB activity in cells or in organisms. The only activity actually tested by this assay was the natural NF-κB-inhibiting protein, IκB. Thus, even assuming, for the sake of argument, that the specification enables reducing NF-κB activity in cell-free nuclear extracts, the single example of IκB as an inhibitor of such cell-free NF-κB DNA-binding activity, combined with the general description of the other hypothetical mechanisms of inhibition contained in the specification, does not provide sufficient guidance to allow a person of skill in the art to reduce NF-κB activity in cells within living organisms.

NF-κB exists in an inactive form in complex with IκB *in the cytoplasm*.[42] Upon release from IκB, NF-κB exerts its DNA binding activity and transcription-activating activity *in the nucleus*.[43] By the inventor's own admissions, to affect the activity of NF-κB, any molecule must be able to cross the cell membrane to reach the bound, cytosolic form of NF-κB, and indeed may even need to also cross the nuclear membrane in order to affect the active, nuclear form of NF-κB.

Activator-induced NF-κB activity was demonstrated in 70Z/3, HeLa, and Jurkat cell lines Additionally, NF-κB was shown biochemically to exist in human placenta tissue and murine kidney, liver, spleen, lung, muscle and brain tissues, but because NF-κB is latently inactive in these cells, no NF-κB activity was demonstrated. Not once in any of these experiments did the inventors demonstrate a working example of "reducing NF-κB activity in cells." Additionally, activation of NF-κB in the few cell lines that were tested was accomplished using different conditions depending on the experiment. Thus, even across a relatively small subset of cell lines and tissues, there exists no universal strategy for activating NF-κB. It is thus reasonable to infer that, likewise, no universal strategy for reducing induced NF-κB activity will exist across these cell lines and certainly not across *all* cell lines and tissue types in *all* organisms.

The patent does not enable one to practice the invention through the introduction of a gene expressing IκB into cells. The patent notes that with the clone of the IκBα gene, "it is now possible, through the method of the present invention, to block or inhibit NF-κB passage into the nucleus of cells in which it occurs and thus, block (partially or totally) binding of NF-κB to NF-κB binding sites on genes which include such recognition sites."[44] This method requires knowledge of the correct sequence of the IκB gene, which was not cloned until 1991.[45] Additionally, the patent makes this assertion in reference to treatment of the cells with IκB, yet does not instruct one on *how* to get the IκB into cells or ensure that it is not degraded before affecting NF-κB activity. This is a task made all the more daunting given that the sequence

---

[42]    '516 Patent, col. 16, lines 22-23.

[43]    '516 Patent, col. 16, lines 27-28.

[44]    '516 Patent, col. 31-32, lines 65-68 and 1-3.

[45]    Haskill, S., et al., *Cell*, 1991; *Supra*; Additionally, the pp40 sequence upon which the Figure 43 disclosure is based was not even known until September 1991 by Davis, N., et al., *Science*, 1991, *Supra*.

provided in Fig. 43 of the patent is, in fact, not the correct nucleotide or amino-acid sequence of the IκB protein.

The patent specification provides, as one of the few examples of how one could *hypothetically* practice the claims in a living cell, that "a vector capable of expressing IκB can be introduced into HIV-1 infected cells (e.g. T cells) in order to inhibit HIV-1 gene expression and activity in cells."[46]  Assuming that the vector containing the IκB or other inhibitor DNA can be constructed, the specification fails to provide adequate guidance on how to introduce that vector into the cell or organism.  The specification merely suggests, e.g., that "[c]ells in which IκB (or other rel-associated protein) is to be expressed in this manner to inhibit NF-κB (or other rel-related protein can be removed from the body, the IκB-expressing vector can be introduced, using "known methods," and the resulting cells, which contain the IκB-expressing vector, then reintroduced into the body."[47]  To my knowledge, there is, even today, no known working example of such a scheme.  Thus, such a thought experiment is fanciful, and would require more than undue experimentation to be accomplished.

The only suggestion the patent provides to accomplish this task is to use "known methods."  As noted below, such a scheme has faced insurmountable problems in the past and is far from routine to conduct.  Apart from the lack of past success, the "known methods" can include a large variety of protocols ranging from electroporation, cationic lipid transfection or viral vector insertion, none of which could be expected to work in any particular cell line without first extensively optimizing the conditions.  Additionally, these "known methods" are transfection conditions established to work in cell lines that have been chosen for study because they are particularly susceptible to transfection.  Such techniques are known to work relatively poorly on primary cells taken directly from organisms.

The patent disucsses a method of inserting a vector containing a reporter gene controlled by NF-κB into L929 and S194 cells using the cationic polymer, DEAE-Dextran.[48]  Using this scheme, the inventors were able to get expression of the reporter gene after induction of NF-κB.[49]  The inventors make no analogy to the insertion of a vector containing the gene for IκB or a "dominantly-interfering" protein that would reduce NF-κB activity.  Indeed, the inventors provide no example of inserting a gene encoding a protein that would inhibit NF-κB activity, like IκB.  For the reasons discussed above, a protocol for reducing NF-κB activity in cells might involve different parameters than those used to express a reporter gene.  Additionally, the inventors only demonstrated insertion of vectors into two highly-transfectable cell types.  As discussed above, cell types can have wildly different uptake properties, and the same cell type in culture can even exhibit different uptake profiles from the same cell type in tissue.  Thus, the

---

[46]  '516 Patent, col. 32, lines 16-19.

[47]  '516 Patent, col. 32, lines 41-46.

[48]  '516 Patent, col. 79, lines 1-3.

[49]  '516 Patent, col. 80, lines 50-67.

demonstration of the introduction of vectors containing genes distinct from the ones identified by the inventors as necessary to practice the invention (like IκB) in a limited subset of highly-transfectable cell lines does not enable one skilled in the art to practice the invention in every cell type both in cell culture and in whole organisms without undue experimentation.

Dr. Baltimore also stated that as of 1991, he was not aware of anyone transfecting IκB into a cell.

> Q.   As of 1991, you had not transfected cells with the gene for IκB, correct?
>
> A.   That is correct.  I had not done that.
>
> Q.   As of 1991, you had not -- I am sorry, let me start over and try it this way.  In the applications for the 516 patent, you don't report any work by anyone else transfecting cells with IκB, correct?
>
> A.   That's correct.  We didn't -- I did not -- I was not aware of anybody and did not report it in the patent -- or record it in the patent.
>
> Baltimore Dep. Tr. 119:4-20.

Dr. Sharp also stated that he was not aware of anyone inserting the IκB gene into a cell.

> Q.   As of the 1991 time period, are you aware of anyone in any of the laboratories of the people named as inventors on the '516 patent who inserted the gene for I kappa B into a cell?
>
> A.   I'm -- I don't recall one way or the other if that experiment was done by 1991.
>
> Q.   Since 1991, are you aware of anyone who inserted the gene for I kappa B into a cell to effect expression of I kappa B protein?
>
> A.   I do not have specific recall of that experiment.
>
> Q.   So you don't know of anyone who's done it?
>
> A.   I can't give you specific recall of that experiment.  I don't know of anyone who has done that specific experiment.
>
> Sharp Dep. Tr. 140:2-17.

The inventors of the '516 patent have further acknowledged the problems associated with delivery of DNA-based molecules into cells and organisms in their deposition testimony.  For example, Dr. Maniatis confirmed that the DNA sequence is necessary for treatment of intact cells in humans.

> Q.  Okay, and what were the ways one could imagine doing it in 1991?
>
> A.  Well, any way that one could think of in introducing the -- either the -- the most likely way would be through IκBa into cells insufficient amounts

to inhibit, so, for example, applying some kind of viral vector or by fusing to a peptide that allows ready translocation of the cell.

Q.  And for both of those you needed to know the DNA sequence for IκBa, is that correct?

A.  And you needed to know the DNA sequence of an IκBa.

Q.  And without that DNA sequence, you would -- one would not be able to use the procedures that you've outlined?

A.  If you didn't know the sequence, you obviously could not put it into a viral vector or introduce it to the cells through liposomes or whatever.

Q.  So that was a necessary rendition of being able to follow either of the procedures you've outlined?

A.  Yes, you'd have to have the sequence to do that.

Maniatis Dep. Tr. 273:24-275:5.

Dr. Baltimore provided confirmation that the insertion of IκB gene into a vector is highly experimental.

Q.  Let's go back to column 32 of the patent, if we could.  Column 32 of the patent at line 12 says, "The IκB gene and the encoded IκB protein can be used to negatively regulate NF-κB activity in cells."  Do you see that?

A.  Yes.

Q.  Okay.  And as it's being referred to there, you say, "For example, the IκB gene can be incorporated into an appropriate vector."

A.  Right.

Q.  As it's being referred to there, you are talking about a highly experimental form of therapy; is that correct?

THE WITNESS:  Yes, I am talking there about a highly experimental therapy.

Baltimore Dep. Tr. 183:16-184:12.

The patent also does not enable one to practice the invention by inserting IκB protein into cells.  The '516 patent states that the addition of purified IκB protein can reduce the DNA-binding activity of NF-κB *in cell-free gel-shift assays*.[50]  Thus, the patent concludes that IκB protein is able to reduce NF-κB activity.  However, this assay does not assess the ability of

---

[50]  '516 Patent, col. 27-28.

IκB to do so *in cells*. Because of the problems associated with the cellular uptake of proteins, as well as the additional challenges associated with administering proteins to organisms, such cell-free proof that IκB can reduce NF-κB activity in an extract does not enable one to practice the invention "in cells" without undue experimentation.

In addition to DNA-based transfection, the specification also suggests that the IκB protein itself could be inserted directly into cells into inhibit NF-κB.[51] However, aside from this one sentence, no other guidance is provided by the specification. There are no working examples disclosing the actual insertion of a IκB protein into a cell. In addition, aside from the disclosure involving expressing a protein in a cell through a expression vector discussed above, no other methods are provided or suggested on how to facilitate the insertion of a protein into a cell.

The '516 patent itself discloses that IκB is rapidly degraded by the protease trypsin,[52] a protease that is common in many cell types. Additionally, the inventors note that "IκB requires an intact polypeptide structure for its [inhibitory] activity."[53] Also, the inventors note that "IκB is apparently unstable when not complexed with NF-κB."[54] Thus, the use of IκB as a protein to reduce NF-κB activity in cells will likely be hindered by the susceptibility of the protein to proteolytic degradation, a problem not addressed by the cell-free EMSA assay.

In addition to the degradation problems discussed above, effective delivery is also dependent upon the ability of the protein to cross the cell membrane. The ability of a protein to diffuse across plasma membrane is highly dependent of the protein solution's charge and partition coefficient.[55] For example, Burton presented the following mechanistic model for crossing a biomembrane:

> For very polar solutes with small partition coefficients, entry into the cell membrane is unfavorable and transport across the epithelium is correspondingly slow and occurs to a significant extent by diffusion via the aqueous, paracellular pathway that is molecular size and charge dependent. As the partition coefficient increases, the ability to enter into the cell membrane increases, resulting in increasing permeability until a plateau is reached that is representative of diffusion through the unstirred aqueous boundary layer adjacent to the cell membrane.[56]

---

[51]   '516 patent, col. 32, ll. 54-56.

[52]   '516 Patent, col. 28, lines 13-14.

[53]   '516 Patent, col. 28, lines 13-14.

[54]    '516 Patent, col. 31, lines 42-43.

[55]   Burton, P. S., Conradi, R. A., Ho, N. F. H., Hilgers, A. R., and Borchard, R. T., How structural features influence the biomembrane permeability of peptides, *J. Pharm. Sci.* 85(12):1336-1340, 1996.

[56]   *Id.*

Based on the above, delivering a protein such as IκB into a cell or into an organism involves a highly complex, unpredictable mechanism that requires, even today, a high level of experimentation in order to effectively administer the protein.

Moreover, even if one of skill in the art were able to deliver the IκB protein into the cell, based on the teachings of the specification, one of skill in the art would be doubtful that the IκB protein would even work to reduce NF-κB activity.  The specification provides no guidance as to whether or not endogenous NF-κB would form complexes with exogenously added IκB and ultimately reduce NF-κB activity in cells.  Although the specification discloses that "[i]n vivo activated NF-κB is responsive to IκB," the experiment described therein is performed using isolated nuclear extracts from TPA-stimulated HeLa and H-9 T-lymphoma cells that were treated with IκB isolated from a mouse pre-B cell line.[57]  At best, this experiment shows that IκB can inhibit activated NF-κB in cell extracts.  As noted above, such cell-free experiments do not necessarily correlate to success in cell culture or in cells from living organisms.  Thus, this disclosure fails to provide adequate guidance on whether or not exogenously-added IκB would bind to endogenous NF-κB and reduce its activity.

The specification also casts doubts on whether any added IκB would be degraded due to the instability of the IκB protein.  As noted elsewhere in this report, the specification states that "IκB is apparently unstable when not complexed with NF-κB."  Moreover, as noted elsewhere, the inventors of the '516 patent confirmed that they indeed believe that IκB is unstable when not complexed with NF-κB.  Thus, because the specification does not provide any guidance on whether the exogenously-added IκB will actually bind to and complex with endogenous NF-κB, coupled with the disclosure in the specification regarding the instability of IκB alone, one of skill in the art would not know if delivery of the IκB protein would reduce NF-κB activity.

Dr. Baltimore further admitted that he was not aware of anyone adding exogenous IκB to a cell.

> Q.  Are you aware of anyone who has as added exogenous IκB protein to a cell to reduce NF-κB activity?
>
> A.  No, I am not aware of it.
>
> Baltimore Dep. Tr. 92:17-20.

Dr. Baltimore also admitted that his lab never attempted to insert intact IκB protein into a cell.

> Q.  Did you ever attempt to insert the intact protein, itself, into a cell to affect NF-κB activity?

---

[57]  '516 patent, col. 29, ll. 33-46.

A.  I do not believe we have ever done that.

Baltimore Dep. Tr. 90:9-11.

Dr. Sharp also stated that he was not aware of anyone inserting the IκB protein into a cell.

Q   Are you aware of anybody in Dr. Baltimore's laboratory in the 1991
time frame who inserted, for lack of a better word, I kappa B into intact
cells, the protein itself?

A.  I kappa B as a protein, inserting it into cells?

Q.  Yes.

A.  I'm not aware that anyone did that in that time period.

Q.   Are you aware of anyone in Dr. Maniatis's lab who did that in that
time period?

A.  No, I'm not aware of anyone who inserted I kappa B as a protein into
the cells in that time period.

Sharp Dep. Tr. 139:1-14

The '516 patent also speculates on the use of "agents or drugs" which could "enhance or block NF-κB activity."[58]   Apart from making this broad statement, the inventors offer no example or guidance on how to select such a molecule.  Given the vast variety of naturally-occurring and man-made molecules, the conspicuous lack of guidance provided by the patent would not enable one to practice the invention using "agents or drugs."

The patent also speculates to the use of "decoy" molecules as one way to practice the invention.  In such a scheme, the "decoy" DNA, "which are designed to mimic a region of the gene whose expression would normally be induced by NF-κB…[would be introduced into cells and] NF-κB would bind the decoy and, thus, not be available to bind its natural target."[59]  This represents a DNA-based method of practicing the invention.  The '516 patent indicates that these small "decoy" DNA molecules containing binding sites for NF-κB were able to effectively compete with labeled DNA fragments containing NF-κB binding sites in cell-free systems. However, such cell-free experiments do not enable one to then practice a similar inhibition of NF-κB in cells.  This is due to the problems with introducing active DNA-based macromolecules into living cells discussed above in relation to the use of a plasmid encoding IκB to practice the invention.

In addition, the patent speculates that "dominantly interfering" molecules are a way to practice the invention.   Such molecules "would be a truncated molecule retaining the DNA

---

58    '516 patent, col. 3, line 24.

59    '516 patent, col. 37, lines 51-54.

binding domain, but lacking the RNA polymerase activating domain.  Such a "dominantly interfering" molecule would recognize and bind to the NF-κB binding site, however, the binding would be non-productive."[60]  This again represents a protein-based method of practicing the invention and faces the challenges discussed above with the use of IκB to practice the invention. It is further complicated by the fact that David Baltimore has admitted that, as of November of 1991, it had not yet been determined whether the DNA binding domain and the RNA polymerase-activating domain of NF-κB were spatially distinct, which was not possible without cloning and sequencing NF-κB.

> Q.   With that correction, at this point in time --  well, at the time of the applications for the 516 patent, you did not yet know whether the DNA binding domain and the RNA polymerase activating domain of NF-kB were spatially distinct, correct?
>
> A.   No, we did not, but I think that was known in other transcription factors.  In fact, it was known in other transcription factors.  So it was not unreasonable to expect that it would be true.
>
> Q.   Okay, but as to NF-kB at the time of the applications --
>
> A.   We did not know.
>
> Q.   -- for the 516 patent, you did not know, correct?
>
> A.   Yes.
>
> Baltimore Dep. Tr. 79:25-80:14.

Dr. Maniatis admitted that dominantly interfering molecules have not been used to treat humans.

> Q.   Has a dominantly interfering molecule been used today to treat human beings for any condition, any transcription factor?
>
> A.   Not to my knowledge.
>
> Maniatis Dep. Tr. 280:20-25.

Thus, the patent refers to a very general and undefined set of molecular strategies for "reducing NF-κB activity in cells."  Most of these strategies rely on the introduction of either protein or DNA into the cytoplasm or nuclei of living cells, though it should be noted that "agents or drugs" certainly encompass compounds not comprised of nucleic acid or protein.  The patent provides no working example of such a strategy, and, even based on the state of the art in 1995, one seeking to practice the invention would face significant hurdles both in cell culture and in living organisms.  With respect to practicing the invention in cell culture, the patent provides

---

60   '516 patent, col. 38, lines 12-14.

no guidance on how to get intact, large protein molecules across the cellular membrane, a task that even today has only been accomplished with limited success. This limited success is due primarily to the fact that cells possess a myriad of proteases capable or rapidly degrading protein. The patent notes that, empirically, IκB (the protein contemplated by the inventors to practice the invention) is particularly susceptible to proteolytic degradation, but offers no strategies on how to protect it from such degradation. Thus, with respect to the protein-based methods of practicing the invention, the invention is not enabled.

Nor are the DNA-based methods of practicing the invention enabled. Again, the inventors provide no working example of the introduction of a DNA-based molecule that is capable of "reducing NF-κB activity in cells." While the inventors do provide two working examples of the introduction of DNA into L929 and S194 cells and expression of that NF-κB reporter gene from that DNA, such a strategy is not transferable to the contemplated methods of reducing NF-κB activity in all cell types and certainly not in normal cells from patients.

While the discussion above demonstrates that the patent does not enable one to practice the invention in cell cultures, the system becomes infinitely more complicated when the invention is to be practiced in intact tissues within whole organisms. Problems with pharmacokinetics, including biostability and the ability of the molecule to selectively reach its target cell types, are compounded compared to the cell culture system for both the protein- and DNA-based methods of practicing the invention. Additionally, many of the invasive techniques for introducing DNA macromolecules into cells such as cationic lipid transfection (the method used by the inventors for the introduction of reporter genes into cultured cell lines) are invasive and destructive, and cannot be used on organisms without careful and specific procedures. The patent's recitation of inserting the macromolecule in cells extracted from organisms using "known methods" does not do enough to enable one to practice the invention. There are many "known methods" of introducing DNA into cells, but none has proven universally useful in all cell types. Thus, it would take more than routine experimentation to identify the method that would work for the cells of interest.

Protein delivery to intact cells within organisms remains a highly unpredictable area of biotechnology. Even in 2004, numerous problems with drug delivery remain. These include, in part, low bioavailability, short half-life, and serious side-effects, the reduction of which require targeted delivery.[61] Additional obstacles to delivery of proteins include formulation problems (such as aggregation and solubility), metabolic problems (such as nonlinear pharmacokinetics and uptake by non-target organs and tissues), and antigenicity problems.[62] These problems are still being addressed today. One way in which the art has tried to address the problem of protein delivery is to modify the way the protein is inserted, particularly at an organismic level. As of 1991, most protein-based drugs were delivered invasively through intravenous, intramuscular, or subcutaneous routes. Even today, many protein-based drugs are administered through invasive

---

[61]  Muller, R. H. and Keck, C. M., Challenges and solutions for the delivery of biotech drugs - a review of drug nanocrystal technology and lipid nanoparticles, *J. Biotech.* 113:151-170, 2004.

[62]  Wearly, L.L., Recent progress in protein and peptide delivery by noninvasive routes, *Crit. Rev. Therapeutic Drug Carrier Systems* 8(4):331-394, 1991.

techniques. Therefore, alternative, non-invasive methods have been explored such as ocular, nasal, buccal, oral, pulmonary, transdermal, vaginal and rectal deliveries.[63]

Each of these methods of protein delivery, however, continue to have physiological limitations in relation to delivery of the drug to the site of action. As noted by Wearley, a major challenge to protein delivery is half-life of the protein.[64] Unlike small molecules, proteins and peptides are subject to degradation throughout the body, not just at the site of clearance. In addition, many different enzymes can act on a protein to degrade it before it has a chance to reach its target location.[65]

In addition to rapid enzymatic degradation, another challenge to delivery is antigenicity. Drug delivery inherently involves delivering a foreign substance (be it a small molecule, protein, or oligonucleotide) into the body. Thus, these foreign substances can induce an immune response in the host, resulting in rapid elimination of the drug from systemic circulation and prevention of the drug from reaching its target location.[66] Moreover, development of an immune response is also a concern because of the possibility that dangerous allergic reactions or anaphylactic shock may occur upon repetitive or continuation administrations.[67]

Given the highly unpredictable nature of the art of manipulating transcription factor activity in cells, reducing NF-κB activity in a cell-free system does not correlate with reducing NF-κB activity in cells either in culture or in organisms. A basic tenet in developing a molecule for use in organisms is that results obtained from cellular experiments may not be predictive of results obtained from a whole animal.

This opinion is further supported by statements made by Dr. Baldwin, who admitted that it is unclear whether one would obtain the same response in an animal as seen in cell culture.

> So I -- I'm hesitant to start throwing things around that -- there have been lots of compounds that have been described as NF-κB inhibitors. Where in a cell culture if you add a high level of that compound, it might have a measurable effect on something that you would say is an NF-κB response, but whether that in vivo, in an animal, ever leads to the same effect for those categories is unclear.

> Baldwin Dep. Tr. 85:7-13.

---

[63]  *Id.*

[64]  Wearly, L. L., *Crit. Rev. Therapeutic Drug Carrier Systems*, 1991, *Supra.*

[65]  *Id.*

[66]  Torchilin et al., *supra* at note 43.

[67]  *Id.*

Similarly, Dr. Corcoran noted during her deposition testimony that cell or tissue culture experiments may not be able to accurately predict the outcome in a whole animal.

> Q. So before you do these experiments in whole animals, you can't be absolutely certain that the results of the tissue function experiments are correct. Is that right?
>
> THE WITNESS: You can be -- you can be sure that the tissue culture experiments were correct and that the assays you did and the performance of those assays is correct if they are done correctly, but you might not be able to project the outcome into the whole animal.
>
> Corcoran Dep. Tr. 64:9-20.

Moreover, Dr. Baldwin further stated that cell culture experiments are used as a model to move forward. However, something that may work in cell culture, may not work in an animal and *vice-versa*.

> Q. You've mentioned cell culture models, and you've also mentioned earlier disease models. What are the -- what's your understanding of the differences between something that's a cell culture model and something that's a disease model?
>
> THE WITNESS: A cell culture is just that. Its -- cells are in tissue culture. You add a compound. You observe an effect. A disease model is an animal model that attempts to mimic a human disease. Compounds are given, and one looks for an effect.
>
> Q. Can't conclusions be drawn with respect to cells in tissue culture regarding the effects of a compound?
>
> THE WITNESS: I would say you can model where you're going, but there are compounds that work in cell culture that don't work in animal models, because of complications to metabolism and uptake, et cetera. There are some compounds that don't work very well in cell culture that seem to work very well in animal models. So it's difficult. You typically use a cell-based system to provide model data to move ahead.
>
> Baldwin Dep. Tr. 167:5-168:4.

Apart from not providing enabling disclosures on how to reduce NF-κB in living organisms, the specification of the '516 patent also fails to provide any disease where a suitable IκB or any other inhibitor of NF-κB would be useful as a therapeutic molecule. Such therapeutic use is within the full scope of the clims. The only mention of any therapy in the specification is that "[t]he antagonists may be used to decrease the activity of the factors and thus may be useful in the therapy of diseases associated with overactivity of a transcriptional regulatory factor."[68] The specification fails to provide to define a "disease associated with overactivity of a

---

[68] '516 Patent, col. 35, lines 7-10.

transcriptional regulatory factor" and fails to provide examples of such diseases.  Without further guidance from the specification, a person of ordinary skill in the art would not recognize the therapeutic utility of using an antagonist of NF-κB, let alone what disease that antagonist would be useful to treat.   For example, it was only later appreciated that inflammation and inflammatory diseases may be controlled by NF-κB.  In addition, knowledge of the disease is necessary in order to identify the target of delivery and to design the therapeutically-relevant molecule.  For example, two ways of drug targeting to patient include direct application of a drug to the affected site and targeting the affected site using a specific "vector" molecule having an increased affinity for the affected site.[69]   Therefore, without knowledge of the affected site, targeted delivery of an antagonist of NF-κB activity would be, at best, difficult.

Dr. Baltimore also testified that he was not aware of IκB being used in gene therapy.

> Q.   In the application for the 516, you -- in the text we looked at in column 32, you had imagined the transfection of cells with IκB, correct?
>
> A.   Yes.
>
> Q.   And that's something that has not to date been done, correct, that particular description of gene therapy on cells by transfecting them with IκB and reinjecting them?
>
> A.   Has not been done in humans?
>
> THE WITNESS:  Has not been done in humans?  Is that the question are you asking?
>
> Q.   Well, let me -- let me ask it more generally.   Have cells been transfected with genes to express IκB and then reinjected into any organism?
>
> A.   I don't think I would know that.
>
> Q.   Do you know whether cells have been transfected to express increased levels of IκB and then reinjected into humans?
>
> THE WITNESS:  I don't know that that has been done.
>
> Baltimore Dep. Tr. 116:13-117:12.

Dr. Baltimore also provided further confirmation that gene therapy is not used to treat immune disorders.  For example, he testified that as of 2006, no one had used gene therapy to modify the immune system.

> Q.   And so even as of 2006, no one had used gene therapy to modify the immune system, correct?

---

[69]   Torchilin, *supra* at note 44.

A.   That's correct.

Baltimore Dep. Tr. 182:14-16.

Even if the specification provided more than a mere suggestion that antagonists of NF-κB may be useful in a therapy, a use that is within the full scope of the claims, the specification fails to provide any guidance on how to construct and deliver a such a protein.  As discussed in more detail herein, the type of molecule intended to be delivered will dictate the mechanisms by which the molecule is constructed, formulated, and delivered.  Although delivery of all molecules have some common hurdles to overcome, as discussed above, use of a polypeptide has different obstacles to effective delivery to intact cells in organisms than delivery of an oligonucleotide, such as a decoy or antisense molecule.

The failure of the '516 patent specification to provide guidance on how to deliver an IκB or any other inhibitor of NF-κB for therapy was further confirmed by the inventors of the '516 patent in their deposition testimony.  For example, Dr. Maniatis admitted that neither NF-κB nor IκB has been introduced into humans.

Q.  Sure.  Were either of the procedures you specified used as of today to introduce IκBa into a human being for the purpose of inhibiting NF-κB activity in a human being?

A.  Not that I'm aware of.

Maniatis Dep. Tr. 275:13-19.

Dr. Baltimore admitted that no animal or human work at all is described in the patent.

Q.   You agree that there are no examples of using compounds to treat disease in any animal; is that correct?

THE WITNESS:  Yes, there was no work done in this patent on animals.

Q.   And likewise, there are no examples of using compounds of any sort to treat disease in a person, correct?

A.  Correct.  We did not -- did no work with human beings.

Baltimore Dep. Tr. 176:19-177:5.

In more complex systems, unexpected non-specific effects of signaling molecules - and indeed the effects that they may have upon one another -- make predictability difficult.  This situation is only compounded when moving from cells in culture to cells in an intact organism.

The inventors of the '516 patent provided further confirmation that signaling molecules, including inhibitors of a signal pathway, could potentially have unexpected non-specific effects.  For example, Dr. Baldwin acknowledged by example during his deposition testimony that certain compounds may have nonspecific effects on NF-κB activation.

A.     Well, an example for what I'm getting at, it's been subsequently shown that these compounds have nonspecific effects on NF-kB

48

activation. So we will always have to -- unless you do the experiments, and unless you have rigorously controlled an experiment, this is why we say things like, these authors propose. So science is cautious.

Q.    So what's your understanding as to these nonspecific effects on NF-kB activation you just mentioned?

THE WITNESS: Again, we didn't do the experiment. So I can't, you know, conversely conclude that they're correct, but it was a publication.

Q.    That wasn't exactly what I was asking, though. I -- you stated that it's been subsequently shown that these have nonspecific --

A.    It's been -- I'll say it's been subsequently published that these compounds have effects on the NF-kB pathway distinct from their ability to scavenge reactive oxygen species.

Q.    And that effect is still an effect of reducing NF-kB activity in the cell; is that right?

THE WITNESS: Yeah. It doesn't argue that those compounds don't affect NF-kB activation. It argues that they don't do it through reactive oxygen species.

Baldwin Dep. Tr. 123:4-124:7.

Moreover, Dr. Staudt further confirmed potential off-target effects of inhibitors. In particular, Dr. Staudt stated that a molecular inhibitor may have other effects than what is thought to be their particular mechanism of action.

Q    In the next sentence, it says, "However, for most of these inhibitors, the specificity of the inhibition and the potential for off-target effects have not been fully investigated." Do you see that?

A    Mm-hmm.

Q    What do you mean by "off-target effects"?

THE WITNESS: Well, what's generally meant is that an inhibitor, molecular inhibitor, is thought by the experimenters to have a particular mechanism action based on what molecules it might interact with, et cetera, and any other effects that those molecules might have on -- that have not been investigated would -- might be referred to as off-target, but it's -- so, that's generally what one refers to as -- when one says "off target."

Staudt Dep. Tr. 180:23-181:14.

Additionally, Dr. Staudt also acknowledged during his deposition testimony that inhibitor molecules may do things that are not predicted.  For example, Dr. Staudt stated that inhibitors may do what they are expected to do as well as other things.

> It's -- it's -- loosely speaking, what I said is that you would have an effect on something else that you didn't predict from your known molecular interactions of that molecule.  So, generally speaking, it's referred to the fact that we treat cells with various inhibitors.  And they may do what we say they do and they may do other things.
>
> Staudt Dep. Tr. 182:4-11.

Dr. Baldwin confirmed that cross-talk between cytokines can interfere with signal transduction of the cytokines.  In particular, Dr. Baldwin stated during his deposition testimony that a cytokine could interfere with another signal on any other pathway.  The relevant portions of his testimony are as follows.

> Q.    So it's also correct, is it not, Dr. Baldwin, that the presence or absence of different cytokines can affect whether or not a cell will respond to something that might otherwise be considered an inducer of NF-kB activation?
>
> THE WITNESS:  Are you asking whether a cytokine could interfere with another signal?
>
> Q.    That would be one way in which I would be wondering about how different cytokines and different cells might affect a response.  Yes.
>
> A.    A cytokine could interfere with another signal on any kind of regulatory pathway.
>
> Baldwin Dep. Tr. 78:13-79:1.

Dr. Sharp confirmed the complexity involved in determining the regulation of a gene.  For example, Dr. Sharp testified during his deposition testimony that detecting the presence of a transcription factor is insufficient to determine the affect of that transcription factor on transcription.  He confirmed that additional experiments were needed.  The relevant portions of his testimony are as follows.

> Q.    Isn't it correct that merely detecting the presence of a transcription factor does not indicate whether transcription of any particular gene in a cell is actually enhanced, diminished or unaffected?
>
> A.    The detection of a transcription factor allows, as outlined in this paragraph, a series of experiments that helps you elucidate those questions.
>
> Sharp Dep. Tr. 79:1-9.

Dr. Sharp also confirmed during his deposition testimony that multiple transcription factors are associated with most genes. The relevant portions of his testimony are provided as follows.

> Q.    Are you aware of any genes whose transcription is -- whose transcription only involves NF kappa B as the sole transcription factor?
>
> A.    Transcription factors can have a variety of roles in the expression of a gene. Some we think are necessary to just get transcription, some we think are necessary to regulate, and there's a gray line between the two. But my conceptual basis in 1991 would have been there would have been multiple transcription factors associated with the transcription of most genes.
>
> Sharp Dep. Tr. 158:10-159:1.

In addition, Dr. Staudt also confirmed that multiple, different signaling pathways could impact the transcription of a gene.

> Q    So, different multiple pathways can impact the output which is the transcription of a particular gene?
>
> A    Yes.
>
> Staudt Dep. Tr. 147:14-17.

Dr. Staudt also provided further confirmation of the complexity involved in gene regulation during his deposition testimony. For example, Dr. Staudt acknowledged that an individual transcription factor could bind multiple recognition sites.

> Q    And -- and that's what you mean by "pleiotropy," the fact that other transcription factors may bind to those other sites?
>
> THE WITNESS:  Yeah.  Again, I don't remember what I meant when I wrote that sentence, but what it seems to say is that the -- when an enhancer or regulatory element has other binding sites in addition to NF-kappa B, then those other binding sites and the transcription factors that bind to them could modulate the end result of transcription from that gene.
>
> Staudt Dep. Tr. 98:19-99:4.

Moreover, the inventors of the '516 patent have provided further confirmation that regulation of a gene by NF-κB, like other transcription factors, is complex. For example, Dr. Sen has acknowledged during his deposition testimony that NF-κB works with other

transcription factors to turn genes on and off. In addition, Dr. Sen admits that he knows of no transcription factor that works in the absence of other transcription factors.

> Q.   Are there any -- strike that. Would it be fair to refer to NF-kappa B as essentially the on-off switch for gene transcription?
>
> A.   I've written some reviews on transcription. I've never put it as bluntly as that, so I would say that NF-kappa B is a transcription factor that is required for turning genes on and off, but it usually works with other transcription factors as well.
>
> Q.   Do you know of any genes, sitting here today, where NF-kappa B is sufficient to turn the gene on in the absence of any other transcription factors?
>
> A.   I don't know of a promoter or an enhancer that fits that description.
>
> ----
>
> Q.   Okay. If we could turn to page 140 of Exhibit 65 please, the first sentence in this page says, "Typically, NF-kappa B binding sites in gene regulatory sequences are present along with other motifs that probably impose constraints on the specific pattern of transcriptional activity." In this sentence, are you simply referring to this concept that genes are going to be under the control of multiple transcription factors and binding sequences?
>
> A.   Although I wrote this in 1992, I think that's true. In other words, my interpretation of reading my own sentence 15 years later is that that's what I was referring to, that there aren't any NF-kappa B alone promoters or enhancers.
>
> Sen Dep. Tr. 183:25-184:15 and at 195:10-24.

The more complex the manner in which a gene is controlled by transcription factors, the more difficult it is to predict how the gene is being regulated. Dr. Maniatis confirmed, for example, that β interferon is controlled by multiple transcription factors. Dr. Maniatis testified that NF-κB is not the only transcription factor necessary to activate the β interferon gene, complicating the understanding of how that gene is regulated.

> Q.   Would you consider the research that you're doing relating to regulation of the beta interferon gene to be NF-kB research?
>
> A.   No, I think what I said was that NF-kB is one of many components of the machinery necessary to turn the gene on in response to signals.
>
> Q.   My question was about your research, though; would you consider that to be research that could be characterized as NF-kB research?
>
> A.   Actually, the answer to that is no, I wouldn't -- again, just to restate it, that NF-kB is an important player in activation of the interferon gene; but, in fact, over the past few years, we've focused on other transcription

factors that are called interferon regulatory factors that also bind to the promoter of the interferon gene and are coordinately activated with NF-kB, and so much of our work has been on this other transcription factor in the signaling pathways that lead to its activation.

Q.  When you say "coordinately activated with NF-kB," what is that; what do you mean by that?

A.  What I mean is that the regulatory element for the interferon gene is a composite element that contains multiple recognition sequences that functions as a code or a dress for the gene; and in order for the gene to be turned on, the proteins that bind to that element have to be coordinately activated so they have to respond to these signals in a way that allows them to converge on the promoter simultaneously.

Maniatis Dep. Tr. 33:5-34:19.

Dr. Sen has provided further confirmation of the complexity of regulation by discussing the kappa enhancer.  Dr. Sen admitted that control of the kappa enhancer is by multiple factors, acknowledging that control of the kappa enhancer is thus still an active area of research today.

Q.    Okay.  And you can see here that there are actually several other elements and binding sequences that are associated with the kappa enhancer in this table.

A.    Yes, for example, kappa -- are you referring to kappa A3, kappa A2?

Q.    Those are a few of them, but there's other ones as well, correct?

A.    Well, in this table, kappa A1, kappa A2, kappa E3 and kappa B are the four things associated with the kappa enhancer.

Q.    Right, so is it fair to say that all of these binding elements and then associated transcription factors control the expression of the Ig kappa gene?

A.    This is still -- still being worked out.  I mean, it's not clear what the functions of each of these proteins are and how and when they work, so this is an active area of research even in '07.

Sen Dep. Tr. 188:4-22.

Moreover, Dr. Baldwin testified that an alternate signaling pathway needs to be known before someone can determine whether or not it is being inhibited.

Q.    Are there other signaling pathways that can be inhibited?

A.    Most can be --

THE WITNESS:  Excuse me.

THE WITNESS:  Most can be inhibited.  One has to have knowledge as to how that pathway works to be able to predictably do it.

Baldwin Dep. Tr. 71:15-23.

Although in deposition one of the inventors indicated that the invention might best be practiced using an antisense oligonucleotide – and indeed, researchers reading the patent might turn to antisense technology to practice the invention in cells – that technique is not enabled by the patent; indeed, it is not even mentioned within the patent.  Even if it were mentioned, the use of oligonucleotides ("ODNs") also faces significant challenges that the patent does not enable one seeking to practice the invention by this technique to overcome.  Major challenges still exist today in introducing antisense ODNs into cells and organisms, particularly in designing ODNs for delivery.[70]  For example, Shi et al. discusses the difficulties in designing an ODN that is target-specific, effective, and has non-toxic side effects.[71]  One of the principal challenges in delivering an ODN is crossing the plasma membrane of the cell.  Most ODNs are hydrophilic and highly charged, thus preventing them from being absorbed through the plasma membrane.  The sheer size of ODNs further prevent the molecules from passively diffusing and entering through the plasma membrane. Most ODNs range in molecular weight from 3-12 kilodaltons.[72]  Thus, ODNs are generally actively transported across the plasma membrane through the process of endocytosis.[73]  However, as noted by Heidenreich et al., even when ODNs are modified as phosphorothioates to increase cell adherency, only a small fraction of the ODNs is released from the endosome into the cytosol or nucleus.  Most remain trapped in the endosome where they are either degraded or exported back out of the cell by the cell machinery.[74]  Thus, in order to be effectively delivered, ODNs generally need to be complexed to a carrier molecule.  Heidenreich et al. acknowledged that, as of 1995, "there are several approaches currently available for the exogenous delivery of oligonucleotides; however, their applicability for oligonucleotide delivery to intact cells has yet to be demonstrated.[75]

In addition to target-specific delivery problems, the use of ODNs, specifically antisense ODNs, may also have antisense-independent biological effects.  Figure 3 of Heidenreich et al. highlights some of the major antisense independent effects.  For example, the ODNs can bind to and interfere with proteins binding to their receptors on the cell.  In addition, once in the cell, the

---

[70]  Shi, F. and Hoekstra, D., Effective intracellular delivery of oligonucleotides in order to make sense of antisense, *J. Controlled Release* 97:189-209, 2004.

[71]  *Id.*

[72]  Heidenreich, O., Kang, S-H. Xu, X. and Nerenberg, M., Application of antisense technology to therapeutics,, *Mol. Med. Today* 1(3):128-133, 1995.

[73]  *Id.*

[74]  *Id.*

[75]  *Id.*

ODNs can also interfere with signal transduction pathways by binding to molecules within these pathways. Moreover, as noted by Heidenreich, "[d]istinguishing between these sequence specific, antisense-independent, effects of oligonucleotides can be extremely tricky and usually requires the inclusion of multiple controls."[76]

Use of gene-based, ODNs molecules in cells within living organisms have also been plagued by toxicity problems. Toxicity of the ODNs to organisms generally correlates with the capture and long-term deposition of ODNs at the sites of clearance, e.g., the RES (reticuloendothelial system) organs, including the liver, kidney, spleen, and lungs and causing harmful side effects within those organs. Thus, Shi et al. notes that "[i]n spite of the fact that successful clinical trials have been reported…skepticism [sic] remains as to unambiguous proof for accomplishing a genuine antisense effect."[77]

In view of the foregoing, it would have required undue experimentation to make or identify a compound that would reduce NF-κB activity and introduce that compound into a cell to achieve a reduction of NF-κB activity. Reducing NF-κB activity in the cell, even beginning at one of the hypothetical starting points discussed in the patent – such as IκB, decoy molecules, and dominant interfering molecules – would also have required undue experimentation. Thus, the full scope of the claims is not enabled.

> (b) The patent does not enable the practice of the methods in all cell types.

The claims of the '516 patent all require the reduction of NF-κB in a cell. Some of the independent claims, e.g., claim 6, provide no further limitation on the word "cell", while other claims, e.g., claim 1, provide a further modifier that the cells be a "eukaryotic cell." The claims that depend from the independent claims reciting "eukaryotic cell" further delineate that the eukaryotic cell must be mammalian (e.g., claim 26), human (e.g., claim 27), immune cells (e.g., claim 28), lymphoid cells (e.g., claim 29), or liver cells (e.g., claim 30).

Those claims that recite only a "cell" encompass <u>all</u> cells, whether eukaryotic, prokaryotic, or plant. Eukaryotic cells are commonly known to be cells that are nucleated and encompass a wide variety of cell types including mammalian, insect, and yeast cells. Thus, assuming the broadest construction possible, the claims that recite a "eukaryotic cell" can be read to encompass all nucleated cells, whether mammalian, insect, yeast, or another nucleated cell type. However, the specification fails to adequately describe a representative number of the genus of eukaryotic cells, let alone the broader genus of all cells.

The specification discloses generally that the invention of the '516 patent related to a methods of inducing expression of a gene in a cell. Moreover, in discussing the embodiments in which the invention would work, the specification continuously characterizes the cell type in

---

[76]   *Id.*

[77]   Shi et al., *supra* at note 85.

which the invention purportedly works as "in a variety of cells"[78] and as "many different cell types."[79]  However, the specification fails to further define or limit the types of cells that are purportedly encompassed by the invention.

The specification makes limited reference to eukaryotic cells in general.  For example, in discussing the modified DNA binding assay, the specification discloses that the assay could be applicable "for analysis of protein DNA interactions in eukaryotic cells."[80]  In addition, the specification references eukaryotic cells in the context of a "method for transiently expressing a gene product in a eukaryotic cell"[81] and cells and promoter regions that could used for transfection.[82]  Nothing in the specification discusses reducing NF-κB activity in all eukaryotic cells.  Moreover, the specification fails to provide any working examples to disclose and enable the use of the method of reducing NF-κB in eukaryotic cells.  Thus, based on the disclosure of the '516 patent one of ordinary skill in the art would not have known the inventors of the '516 patent possessed the claimed methods of inhibiting NF-κB activity in all mammalian cell lines, let alone the broader classes of all eukaryotic cells or all cells.

The inventors of the '516 patent provided further confirmation that the invention of the '516 patent is neither adequately described nor enabled to be practice in all different cell types, including eukaryotic and mammalian cells.  For example, Drs. Baltimore and Baldwin admitted that different inhibitors might work in different types of cells.  Specifically, Dr. Baltimore testified during his deposition testimony that the inventors of the '516 patent did not contemplate an inhibitor that would work in every eukaryotic cell because different inhibitors might work in different cells.

> Q.  And as of 1991, what did you have in mind as a method that would allow someone to reduce NF-κB activity in every single eukaryotic cells -- cell that has NF-κB activity?
>
> THE WITNESS:  I don't think we were implying that we were only referring to an inhibitor that would work in every eukaryotic cell.  Different inhibitors might work in different cells.
>
> Baltimore Dep. Tr. 95:1-10.

Similarly, Dr. Baldwin testified during his deposition testimony that different signaling pathways may allow a particular inhibitor, including IκB, to work in some settings but not in others.

---

78    '516 patent, col. 2, lines 46-47.

79    '516 patent, col. 13, lines 4-12.

80    '516 patent, col. 3, lines 1-2.

81     '516 patent, col. 33, lines 20-21.

82     '516 patent, col. 33, lines 48-49.

THE WITNESS:  There are cell type differences in NF-κB activation pathways that would not allow every mechanism -- or a specific mechanism to work in every setting, for example.

Q.    Oh, "for example," I thought was the -- comma, leading to something else.  Not your --

A.    No.  That was for example.

Q.    Not your ending. Okay.  Are there any other examples?

THE WITNESS:  There are signaling pathways that are different that would allow -- or would not allow some inhibitor to work in a certain setting.

Q.    What are some examples of some of those signaling pathways that are different?

THE WITNESS:  There are pathways that lead to different modifications of IκB, such that an -- an inhibitor might not work in one pathway, where it would work in another pathway.

Baldwin Dep. Tr. 70:8-71:6.

In addition, Dr. Baldwin also testified that differences in cells can lead to differences in response to stimulus, which may affect how a particular inhibitor may work in that environment.

Q.    You had stated earlier that cell type differences may also have an effect as to whether or not NF-κB activity --whether or not NF-κB can be activated.  Could you help me understand what you mean by cell type differences?

THE WITNESS:  Cells have different receptors, different molecular pathways that can be different in terms of leading to any kind of response to a stimulus.

Q.    What other differences might lead to a different response to a stimulus?

THE WITNESS:  Other than receptors and different regulatory molecules, maybe things as general as their growth state, but that's going to affect regulatory molecules.  I'm not sure that other than those two there's anything else.

Baldwin Dep. Tr. 76:4-22.

Dr. Sharp also concluded during his deposition testimony that it would be impossible to determine whether claim 1 of the '516 patent applies to all eukaryotic cells without assaying those cells.

Q.    Okay.  In 1991, was it your expectation that there were eukaryotic cells in which you couldn't reduce NF kappa B activity and practice the method of claim one?

A.   I would not have an answer to that, because the only way you could determine that is to assay all eukaryotic cells, and don't have a -- didn't, we didn't do that, in fact it's impossible.

Sharp Dep. Tr. 149:13-21.

Dr. Lenardo testified that while he tested some types of cells, he did not test all types of eukaryotic cells.

Q    The question is, did you go on to test all these different cell types for the presence of NF.kappa.B in beta interferon gene expression?

A    What different cell types?

Q    You just said a wide variety of cell types.

A    Right.

Q    I'm referring to the wide variety of cell types you were talking about.

A    Mm-hmm.

Q    Did you go on to test this wide variety of cell types?

A    I would say I tested a wide variety of cell types, yeah.

Q    What did this wide variety of cell types include?

A    Well, they would have included L929 cells.

Q    What sort of cell is that?

A    It's a mouse fibroblast, I believe.  It's a mouse L-cell.

Q    Did you test all different cell types?

THE WITNESS:  Did I test all different cell types?

Q    Yeah.

A    Which all different cell types?  Are you  talking about every cell type in the world?

Q    Yeah.

A    No, I did not test every cell type in the world.

Q    Did you test cell types in organisms other than mice, humans, cows, or rabbits?

THE WITNESS:  I tested human cells, I remember distinctly.  I tested mouse cells.  I tested cow cells.  That's all I can remember at this time.  There may have been other species that I tested as well.

58

Q    Okay.  No fish cells?

A    Did I test fish cells?  I don't have a remembrance of testing any fish cells.

Q    Did you test plant cells?

THE WITNESS:  As I said, I don't have any recollection of that.  I gave you the ones that I have a distinct remembrance of.

Q    So, besides --

A    I may have tested plant cells.  I don't know.

Q    So, besides the ones you listed, you don't have a distinct recollection of testing other cell types?

THE WITNESS:  I don't have a distinct recollection of testing other cell types.  I may have.  I did a lot of experiments.

Deposition of Dr. Michael J. Lenardo, taken June 7, 2007 (hereinafter "Lenardo Dep. Tr.") 171:10-173:21.

Although Dr. Baltimore testified that he could imagine a single inhibitor of NF-κB, such as an IκB analog, that could work in all cells, this type of inhibitor was not described in the '516 patent.

Q.   In 1991, did you have in mind a single inhibitor that could be used in a method to reduce NF-κB activity in every eukaryotic cell that had NF-κB?

 THE WITNESS:  Yes, I could at that time imagine such an inhibitor based on the fact that IκB, for instance, worked across different species.  And so you could imagine an IκB analog that would get into cells and that would inhibit in all eukaryotic cells.  You could also imagine something that -- and we did -- that would affect DNA binding, and since the DNA binding site seems to be the same in all different kinds of eukaryotic cells, that would be able to work universally.

Q.   You said you could imagine an IκB analog.  You didn't in the 516 patent identify or describe such an analog, did you?

A.  No.

Baltimore Dep. Tr. 96:1-20.

Moreover, Dr. Baltimore further testified that he did not identify how to modify NF-κB to block binding in all cell types in 1991 or in the '516 patent.

As of 1991, and in the applications of the 516 patent, you did not identify how one would modify NF-κB so that it would not bind to its DNA binding site across all eukaryotic cells, correct?

A.  Right.

THE WITNESS: We did not make such a determination.

Baltimore Dep. Tr. 98:4-11.

In view of the foregoing, it would have required undue experimentation to reduce NF-κB activity in a single type of cell, let alone the full scope of cell types addressed by the claims.

The two Declarations by Dr. Baltimore submitted during the prosecution of the '516 patent provide further confirmation that the specification was not enabling. In particular, in each Declaration, Dr. Baltimore only relied on scientific articles published well after the filing date of the '516 patent in support of his arguments that the specification was enabled. Dr. Baltimore did not, and for the reasons set forth herein in my report, could not, rely on knowledge known in the art at the time of filing of the '516 patent.

A Declaration by Dr. Baltimore was first submitted with the Response and Amendment filed on September 17, 1999. This Declaration was submitted in support of arguments that the specification was enabling for screening assays capable of identifying inhibitors of phosphorylation and/or degradation of IκB. In his Declaration, Dr. Baltimore stated in part:

> In view of the Examiner's remarks, I understand his argument to be that the present Specification does not sufficiently establish we (me and the other co-inventors) were in possession of the claimed drug screening assays in so far as they recite specific steps for identifying inhibitors of phosphorylation and/or degradation of IκB.
>
> It is my contention that the present Application clearly conveys and provides adequate guidance for embodiments of the subject assays involving direct detection of IκB phosphorylation or IκB degradation. Based on (I) the experimental results described in the specification, and (II) the general knowledge in the art of protein phosphorylation at the time the invention was made, one of ordinary skill in the art would reasonably believed that NF-κB can be activated as a result of phosphorylation and degradation of IκB.
>
> Declaration Under 37 C.F.R. § 1.132 by David Baltimore (hereinafter "Baltimore Declaration"), ¶¶ 5-6.

Although Dr. Baltimore references the "general knowledge in the art of protein phosphorylation," he provides no evidence of that general knowledge to support his contention that the specification is enabled for such screening assays for inhibitors of phosphorylation and/or degradation of IκB. Instead, Dr. Baltimore cites that "TPA and LPS activate protein kinases, resulting in phosphorylation of specific proteins."[83] Dr. Baltimore further stated the following:

> Thus, I believe that the experimental results described in the specification combined with the general knowledge in the art of protein

---

[83]    Baltimore Declaration, ¶ 8.

phosphorylation at the time of the invention was made, in particular, an understanding of similar mechanisms of action for other signal transduction pathways, would be reasonably understood by those of ordinary skill in the art to be sufficiently convincing of a mechanism for NF-κB activation involving phosphorylation of IκB and subsequent proteolytic degradation of the modified protein.

Baltimore Declaration, ¶ 9.

Moreover, in support of the assertion that the specification was enabling, Dr. Baltimore further cites numerous references filed after the filing date of the application. For example, Dr. Baltimore cites to papers published in 1993-1997 in stating that "[f]urthermore, the mechanism of activation of NF-κB described in the specification is still accepted today."[84] However, as noted above, the specification merely postulated that protein kinases directly phosphorylated IκB. This proposition was further proven to be incorrect. It was not until much later that the kinase responsible for phosphorylating IκB, IKK, was discovered. The citation to post-filing date references only confirms that the specification did not adequately describe inhibition of phosphorylation and/or degradation of IκB.

An additional Declaration of Dr. Baltimore was submitted with a Response and Amendment on February 12, 2001 and again on September 12, 2001. This Declaration was submitted in support of arguments that the specification adequately described compounds capable of reducing NF-κB activity. In particular, Dr. Baltimore states in part:

… I understand that the Examiner's rejection is premised at least in part on his assertion that there is not "a description of a representative number of species in terms of a partial structure and relevant identifying characteristics as there is no disclosed correlation between particular structures and the desired capabilities.

Declaration of David Baltimore under Rule 1.132 and In re Brana (hereinafter "Baltimore Declaration II), ¶ 1.

In support of this assertion that compounds that inhibit NF-κB are structurally diverse, Dr. Baltimore cites to numerous compounds including sesquiterpene lactones (citing to Lyss et al., *J. Biol. Chem* 273:33508 (1998)); 15-deoxy-A[12, 14]-prostaglandin J2 and 5-aminosalicylic acid (citing to Castrillo et al., *Mol. Cell. Biol.* 20:1692 (2000) and Yan et al., J. Biol. Chem. 243:36631 (1998), respectively); 3-methyl-1,6,8-trihydroxyanthraquinone (citing to Kumar et al., Oncogene 17:913 (1998)); Pyz-Phe-bornLeu (citing to Palombella et al., PNAS 95:15671 (1998)); and quinazoline compounds (citing to Palanki et al., U.S. Patent No. 5,939,421 issued August 1999).[85] Each of these compounds were published at least 3 years from the latest filing date of the '516 patent (e.g., June 1995). Baltimore did not cite to one single inhibitory compound that was published in the art at the time of the invention. The compounds cited by

---

[84]   Baltimore Declaration, ¶ 10.

[85]   Baltimore Declaration II, ¶¶ 8-12.

Dr. Baltimore were not known in the art at the time of the invention and therefore cannot support the contention that the specification provides the requisite representative number of compounds that inhibit NF-κB or even that the specification enables one of ordinary skill in the art to make the connection between identifying a compound and identifying that the compound can inhibit NF-κB without undue experimentation.

Dr. Baltimore's inability to provide any evidence available at the time of the invention either in support of ARIAD's argument for screening for inhibitors of IκB phosphorylation and/or degradation or in support of ARIAD's argument that compounds that inhibit NF-κB are structurally diverse further confirms that the specification of the '516 patent fails to enable to the full scope of the claimed invention.

### 2.    Challenges to Using Biological Macromolecules.

(a)    Challenges for Nucleic Acid-Based Delivery and Therapeutics.

Cell culture use of nucleic acid therapeutics also faces significant challenges. Most often, naked DNA is introduced into cells in the form of a plasmid vector. This technique, however, is inefficient (i.e. only a few cells take up the DNA and express the gene).[86] Researchers have used strong electric fields (electroporation) to cause the breakdown of the cell membrane to aid in plasmid entry into the cell.[87] This technique is, however, quite invasive, and in some cases results in only a modest 10-fold increase in expression levels over the low levels seen using naked plasmid DNA.[88] In addition, different cell types respond differently to electroporation and thus, parameters may need to be individually optimized for each transfer protocol.[89] Researchers have also utilized cationic lipid carriers such as the DEAE-Dextran carrier used by the inventors of the '516 patent. However, as noted in the transfection handbook from Promega, a supplier of transfection reagents, "As DEAE-Dextran is toxic to cells, transfection conditions for individual cell lines may require careful optimization of both DEAE-Dextran concentration and exposure times."[90] There are a myriad other commercially-available transfection agents, however, choosing the one that will work in the particular cell line of interest can often be more of an art form than a science. Additionally, optimal lipid/DNA ratios, transfection times, and cell harvest times "will be different for each vehicle and cell line and will require optimization."[91]

---

[86]    Li, S., and Ma, Z., Nonviral gene therapy, *Curr. Gene Therapy*, 1:201-226, 2001.

[87]    *Id.*

[88]    *Id.*

[89]    *Id.*

[90]    http://www.promega.com/guides/transfxn_guide/transfxn.pdf - Promega Transfection Guide (1998).

[91]    Stein, C. A., Two problems in antisense biotechnology: in vitro delivery and the design of antisense experiments, *Biochmica et Biophysica Acta*, 1489:45-52, 1999.

The early 1990's saw an explosion of enthusiasm for DNA and RNA-based therapeutics.[92]  It is telling, however, that to date, few such therapeutics have achieved the efficacy and specificity necessary to make it to market.  Even as late as 1999, the field of DNA-based therapeutics was plagued by "a lack of full understanding of the *pharmacodymanics* of [oligonucleotides]."[93]  Indeed, in 1999, DNA-based therapeutics were characterized as "an entirely new class of therapeutic agents, and are larger, and more complex molecules than conventional drugs."[94]  One of the most significant challenges associated with introducing exogenous DNA into living systems is that cells are replete with nucleases that degrade DNA in a highly efficient manner.[95]  Significant hurdles associated with DNA-based therapeutics include the fact that the large macromolecule must pass from the extracellular space across both the cellular and nuclear membranes in order to have any effect.  Because of their size and the fact that they are polyanionic, oligonucleotides cannot passively diffuse across cell membranes.[96]

The strategies explored to date to accomplish cellular and nuclear uptake of DNA are numerous.  They include the use of viruses whose own genetic material has been replaced with the DNA therapeutic of interest,[97] cationic liposomes of a myriad of chemical compositions,[98] and conjugation to cell- and nuclear-uptake sequences.[99]  Each of these strategies faces their own unique problems and challenges and cannot be consistently relied upon to deliver any DNA-based therapeutic.  For example, the use of retrovirus carriers suffers from the problem that they can only infect actively dividing cells as they cannot deliver the DNA through the nuclear membrane, thus requiring that that nuclear membrane not be intact.[100]  Similarly, cationic liposome delivery often suffers from low transfection efficiency[101] and has been shown to be

---

[92]  Romano, G., Claudio, P.P., Kaiser, H.E., and Giordano, A., Recent advances, prospects and problems in designing new strategies for oligonucleotide and gene delivery in therapy, *In Vivo*, 12:59-68, 1998.

[93]  Juliano, R. L., Alahari, S., Yoo, H., Kole, R, and Cho, M, Antisense pharmacodynamics and critical issues in the transport and delivery of antisense oligonucleotides, *Pharm. Res.*, 16:494-502, 1999.

[94]  *Id.*

[95]  Ma H, and Diamond S.L.., Nonviral gene therapy and its delivery systems, *Curr. Pharm. Biotechnol.*, 2:1-17, 2001.

[96]  Stein, C. A., *supra* at note 54.

[97]  Cournoyer, D., and Caskey, C.T., Gene therapy of the immune system, *Ann. Rev. Immunol.*, 11:297-329, 1993.

[98]  Audouy, S. A., de Leij, L.F., Hoekstra, D., and Molema, G., In vivo characteristics of cationic liposomes as delivery vectors for gene therapy, *Pharm. Res.*, 19:1599-1605, 2002.

[99]  Bayard, B., Bisbal C., and Lebleu B., Activation of ribonuclease L by (2'-5')(A)4-poly(L-lysine) conjugates in intact cells, *Biochemistry*, 25:3730-3736, 1986.

[100]  Romano, G., et al., supra at note 55.

[101]  *Id.*

toxic to certain cell types but not others.[102]   Faced with the multiple possible delivery facilitation strategies and their limited success, it is unlikely that a researcher can, prior to testing or via routine experimentation, choose a delivery mechanism that will lead to the desired effect in cells.

In addition to the challenges associated with crossing the cellular membrane, large DNA molecules face an additional challenge crossing the nuclear membrane.   For large macromolecules, nuclear transport is an active process mediated by the nuclear pore complex.[103] Most studies suggest that nuclear transport of plasmid DNA is the key limiting step for plasmid DNA-based therapeutics.[104]   This is especially true for non-dividing cells.[105]   Because many of the cell types used in cell culture experiments are cancerous and thus rapidly dividing, techniques for delivering active DNA therapeutics to these cells may not be generally applicable to other cell types.   Strategies such as conjugating the DNA to a protein nuclear localization sequence has been shown to increase plasmid-mediated gene expression in some cell types but not in others.[106]   An additional limitation to the use of plasmid DNA molecules to drive expression of a protein therapeutic is that the transfection is transient, and expression from the plasmid can only be detected for a few cell cycles.[107]

Even as late as 1999, researchers recognized that significant advances were necessary to identify a consistently applicable strategy to create effective DNA-based therapeutics.   As noted, "improvements in the chemical and biological characteristics of [nucleic acid] compounds themselves will be important."[108]   In view of the foregoing, it would have required undue experimentation to make and use a nucleic acid-based delivery vehicle and/or therapeutic to achieve a reduction of NF-κB activity in the cell, let alone the full scope of the claims.

(b)    Challenges for Protein Delivery and Protein Therapeutics.

Cell culture use of protein and peptide molecules that act within the cytoplasm or nucleus of cells poses significant challenges to biomedical researchers.   Even as of 2001, it has been recognized that there are significant challenges to using peptides and proteins as moelcular biology tools in cell culture and intact tissues in organisms.[109,110]   Peptides are rapidly degraded

---

[102]   Stein, C. A., *supra* at note 54.

[103]   Li, S., et al., *supra* note 50.

[104]   *Id.*

[105]   *Id.*

[106]   *Id.*

[107]   *Id.*

[108]   Juliano, R. L., et al., supra at note 56.

[109]   *See e.g.*, Senel, S., Kremer, M., Nagy, K. and Squier, C., Delivery of bioactive peptide and proteins across oral (buccal) mucosa, *Cur. Pharm. Biotechnol.*, 2:175-186, 2001 ("The use of peptides and proteins as therapeutic
(Continued…)

by proteases existing within cells.[111]   In addition, the cellular membrane poses a significant barrier to the entry of protein macromolecules to the cytoplasm.[112]

In addition to the degradation and uptake problems detailed above associated with cell culture use of proteins and peptides that act within the cell, additional problems arise when the same protein molecules are contemplated for use in normal cells or in whole organisms. Additional steric barriers impede the macromolecule in reaching its site of action.  As noted by one expert, "to reach the site of action, the drug has to cross many biological barriers, such as other organs, cells and intracellular compartments, where it can be inactivated or…cause many negative side effects."[113]   It is telling that of the protein-based drugs available on the market today, few have been shown to act *within* the cell as opposed to at its exterior surface

Because of the magnitude of the problems with cell uptake, cell targeting and degradation of protein-based therapeutics, researchers have devised a myriad of strategies for overcoming these hurdles.  For example, there are many diverse strategies for attempting to improve the cellular uptake of drugs.  However, as noted in one recent review, the diversity of peptidic compounds being explored as potential therapeutics "have different physical and chemical characteristics (molecular size, stability, conformation, etc.) as well as different sites and modes of action within the body."[114]   Thus, the "development of a universal delivery system for peptides and proteins...[is] preclude[d]."[115]   As such, one cannot predict beforehand with any certainty whether any particular delivery method will work.

Researchers have also identified a number of strategies for targeting a potential therapeutic to the tissue of interest within an organism.  For example, peptides and proteins can be conjugated to small molecules or other peptides that target the molecule to a particular cell type.[116]  The targeting moiety contains some epitope that is specifically recognized by the target cell.  This interaction thus directs the protein drug to the target cell where it has a better chance

---

agents for human and animal diseases offers many challenges to the clinical pharmacist concerned with drug delivery.").

[110]  Sanders, L. M., Drug delivery systems and routes of administration of peptide and protein drugs, *Eur. J. Drug Metabolism and Pharmacokinetics*, 15(2):95-102, 1990.

[111]  Senel, S., et al., *supra* at note 40.

[112]  Torchilin, V. P. and Lukyanov, A.N., Peptide and protein drug delivery to and into tumors:  challenges and solutions, *Drug Discovery Today*, 8(6): 259-265, 2003.

[113]  Torchilin, V. P., Drug Targeting, *Eur. J. Pharm. Sci.*, 11 Suppl. 2:S81-91, 2000.

[114]   Senel, S., et al., *supra* at note 40.

[115]  *Id.*

[116]  Torchilin, V. P., *supra* at note 44 .

of entering that cell to exert its effect. Various molecules have been used in the past, including antibody fragments, cytokines and hormones.[117] Given the complexity of the cell surface receptor profiles of different cell types, it would require complex experimentation to identify a targeting molecule that fit the needs of a particular application.

Likewise, various strategies have been employed in an attempt to protect protein-based therapeutics from degradation. These range from organic carriers such as liposomes, nanoparticles and micelles to viral vectors.[118] Again, like the molecules used to target a therapeutic to a particular cell type or tissue, it is impossible to predict beforehand which strategy will prove successful in a given situation. It would therefore require more than routine experimentation to identify a successful carrier for a therapeutic targeted to NF-κB activity. In fact, it requires undue experimentation.

Even today, serious hurdles must be overcome for the successful introduction of functional protein macromolecules into cells. Due to the variety of different cellular functions and types, no strategy exists that is universally applicable to any protein drug in any cell type. In view of the foregoing, it would have required undue experimentation to make and use a protein-based inhibitor and/or therapeutic to achieve a reduction of NF-κB activity in the cell, let alone the full scope of the claims.

       (c)     Cell Type Differences Preclude a Universal Strategy for Protein or DNA-based Molecular Biology Tools and Therapeutics.

Experiments done in one cell type may not be good indicators that a similar effect can be demonstrated in other cell types. For example, Dervan and colleagues examined the cellular and nuclear localization of a series of peptide heterocycles across a panel of human and murine cell types. They found that the uptake profile of each molecule varied wildly across cell types. The same molecule would be nuclear in one cell line, cytoplasmic in another, and completely excluded from the cell in another.[119] This is just one example of the differences in pharmacokinetics exhibited by different cell types in cultures. Thus, experiments showing an effect in one cell type can not easily be extrapolated to success in another cell type.

In addition, experiments done in cell culture are not necessarily predictors of the function of the molecule tested on normal tissue and in whole organisms. This is due to the fact that cultured cells can exhibit vastly different gene expression patterns as the same cells in living organisms. For example, there may be fundamental differences in oligonucleotide uptake and transport processes in the different environments.[120] Additionally, cells can alter their ability to

---

[117]  *Id.*

[118]  *Id.*

[119]  Best T.P., Edelson B.S., Nickols N.G., and Dervan P.B., Nuclear localization of pyrrole-imidazole polyamide-fluorescein conjugates in cell culture, *Proc. Natl. Acad. Sci. USA*, 100:12063-12068, 2003.

[120]  Juliano, R. L., et al., supra at note 56..

respond to drugs when they are taken from tissue into cell culture.[121]   Thus, successful cell culture experiments cannot easily be extrapolated to success in normal cells or in living organisms.

This helps explain why, as discussed above, it would have required undue experimentation to reduce NF-κB activity across the full scope of the cell types addressed by the claims.

For the foregoing individual and collective reasons, the full scope of the claims is not enabled.

### B.    WRITTEN DESCRIPTION: The '516 Patent's Disclosure is Inadequate to Describe the Full Scope of the Claimed Methods.

This section analyzes whether the specification of the '516 patent as issued sets forth an adequate written description of the claimed methods.  In particular, I will focus here on whether the claims are sufficiently described, given that the only molecule described (although not complete or correct detail) at that time believed to be theoretically capable of altering NF-κB activity is IκB, and IκB was not shown to reduce NF-κB in any cells.

### 1.    "method for … the method comprising reducing [or altering] NF-κB activity in the cell"

Although the claims of the '516 patent are not limited by their language to particular methods mentioned in the specification, the specification of the '516 patent, as I mentioned above, only posits five possible ways to reduce NF-κB activity in cells:  (a) inhibitors, for example IκB, (b) agents or drugs, (c) antagonists, (d) decoy molecules, and (e) dominantly interfering molecules.  None of the posited compounds are sufficiently described.

> (a)    The disclosure of IκB is insufficient to satisfy the written description requirement.

Among the five mechanisms hypothesized in the '516 patent for reducing NF-κB activity in cells, IκB is the only molecule even mentioned.  The '516 patent identifies IκB as an example of "a specific inhibitor molecule which is able to block (reduce or eliminate) NF-κB binding.…"[122]   The patent describes the purported isolation of IκB and characterizes it as a protein of an approximate molecular weight of 67 kDa.[123]   The patent however, provides a nucleotide and amino acid sequence for IκB that is not actually IκB.

---

[121]  *Id.*

[122]  '516 patent, col. 37, ll. 43-49.

[123]  '516 patent, col. 27, l. 11. to col. 30, l. 5.

The '516 patent proposes that the "IκB gene and IκB protein can be used to negatively regulate NF-κB activity in cells."[124] It postulates transformation of cells with the IκB gene and expression of IκB to reduce NF-κB activity.[125]  The specification does not provide a working example of this, however, and does not say that it has been done.

The '516 patent states that "IκB is apparently unstable when not complexed with NF-κB,"[126] and that IκB is rapidly degraded by the protease trypsin,[127] thereby abolishing it's inhibitiory effect on NF-κB.[128]  The specification does not provide a method for overcoming this challenge to practicing the invention using IκB.

IκB instability has been further confirmed by the inventors of the '516 patent. Dr. Baltimore testified that he believed in 1991 that IκB was unstable in the cytoplasm when not bound to NF-κB:

> Q.  And your belief in 1991 as of the filing of the 516 patent was that IkB was unstable in the cell cytoplasm in a form not bound to NF-kB, correct?
>
> A.  That's correct.
>
> Q.  And that's what you reported in the 516 patent, correct?
>
> A.  That's right.
>
> Baltimore Dep. Tr. 92:21-93:2.

Dr. Baeuerle also testified that he believed IκB was unstable when not complexed with NF-κB:

> Q.  And that's what you mean by "unstable," that the IkB that was not complexed with NF-kB would have degraded in the cytoplasm but for the complex with NF-kB?
>
> Q.  Is that correct?
>
> A.  Again, reading my discussion from 1988, it says here in the next sentence, "In a situation where the production of new inhibitor is impaired, the decay of occasionally released inhibitor activate NF-kB." So the idea here really is that whenever IkB is on its own, it's degraded

---

[124]  '516 patent col. 32, ll. 12-13.

[125]  '516 patent, col. 32, ll. 13 ff.

[126]  '516 patent, col. 31, ll. 42-43.

[127]  '516 patent, col. 28, ll. 13-14.

[128]  *Id.*

and it's not stable. This is, again, speculation. This paper did not formally show that.

Baeuerle Dep. Tr. 110:14-111:4.

Moreover, Dr. Baeuerle testified that IκB is rapidly degraded upon stimulation:

A. It's an aspect of that paper, but central is not so much the effect of the protease inhibitors than the observation that IκB upon stimulation of cells is rapidly degraded.

Baeuerle Dep. Tr. 207:12-15.

In June 1991, a protein dubbed MAD-3 was cloned.[129] While this protein would later be determined to be IκBα, this was not postulated at the time of its cloning. In August 1991, researchers concluded that the chicken protein pp40 was IκBβ,[130] and, due to similarities between MAD-3 and pp40 other researchers postulated that pp40 was in fact IκBα.[131] This confusion extended well past this period. As noted by researchers, including named inventor Albert Baldwin, Jr. in September of 1992, the relationship between IκB, pp40 and MAD-3 is "not completely clear."[132] Because there was considerable confusion over what constituted IκB as late as 1992, neither the IκB DNA or amino acid sequence was known and, therefore, the patent does not disclose that sequence. Without the correct cDNA sequence, the patent does not provide a written description sufficient to show one of ordinary skill that the inventors were in possession of IκB or the IκB gene, let alone the full scope of the claims.

The inventors of the '516 patent, such as Dr. Baeuerle, confirmed during their deposition testimony that IκB was originally cloned as MAD-3.

A. These days it's hard to say whether something has been cloned or not. You may be familiar with how IkB was cloned. It was cloned as something else, as a protein called MAD-3.

Baeuerle Dep. Tr. 54:23-55:2.

In addition, Dr. Baldwin confirmed that MAD-3 was not identified as IκB in the first publication of its sequence.

Q.    But this paper does not state that this molecule, MAD-3, is, in fact, IkB, does it?

---

[129]  Haskill, S.et al., *Cell* 1991, *Supra.*

[130]  Kerr, L.D., et al., *Genes Dev.*, 1991, *Supra.*

[131]  Davis, N., et al., *Science*, 1991, *Supra.*

[132]  Beg, A.A., *Genes Dev.*, 1992, *Supra.*

THE WITNESS:  It states that it is an IkB-like molecule.  That's in the title.

Q.    But it didn't -- it wasn't in the title that this was IkB?

THE WITNESS:  No.

Baldwin Dep. Tr. 94:6-17.

However, when the sequence of rabbit IκB became known, Dr. Baldwin testified that he compared that sequence to MAD-3 and found that it was identical.

Q.    So when this paper came out identifying the protein sequence for a rabbit form of IkB, did you compare that to the sequence you predicted for your MAD-3 molecule?

A.    Yes.

Q.    And what did you find?

A.    They were identical.

Q.    And at what point in time did you determine that?

A.    That sequence was made available to us approximately the time this paper was published.  Maybe a little bit before.

Q.    That would be in mid 1991?

A.    Yeah, or early to mid -- mid -- mid spring or something.

Q.    Do you recall the authors on the publication in which the rabbit form of IkB -- in which the sequence for the rabbit form of IkB was disclosed?

A.    Sankar Ghosh was one of the authors, David Baltimore.

Q.    And that was published in 1991, to your understanding?

A.    Yes.

Baldwin Dep. Tr. 96:22-97:17.

The inventors of the '516 patent confirmed that prior to 1989-1990, little information was known about IκB.  For example, Dr. Sen stated the following.

Q.    And by the time you left the Baltimore lab in early 1987, you didn't know any of the characteristics of what is now known as I kappa B or I kappa B alpha, correct?

----

A.    In retrospect, we knew it was -- we had postulated a labile repressor.  That turns out to be I kappa B alpha, so in retrospect, we

could say that we knew some -- a characteristic that turns out to be the characteristic of I kappa B alpha.

Q.    At the time you left the Baltimore lab in early 1987, you didn't know the protein -- or amino acid sequence of the protein I kappa B alpha, correct?

A.    We did not.

Q.    And you also didn't know in early 1987 the gene that would encode for the protein I kappa B alpha, correct?

A.    We did not.

Sen Dep. Tr. 82:1-4 and 7-19.


Dr. Baeuerle further testified that the sequence of IκB was not known in 1988.

Q.  Let me ask it in a different way.  Had a cDNA sequence -- a specific cDNA sequence been associated with IkB at the time of this publication in 1988?

A.  Not that I know of.

----

Q.  Was a cDNA with a specific sequence associated with an IkB at this time?

A.  Not that I know of.

Q.  So the specific cDNA sequence of IkB had not yet been cloned; is that correct?

A.  These papers just describe the discovery of IkB and not its cloning.

Q.  Of the activity of IkB?

Q.  Is that correct?

A.  They identify a new protein with a new activity which is responsible for the activation of NF-kB and its cytoplasmic retention.

Q.  As of the date of this publication, October 28th, 1988, was the amino acid sequence of the IkB protein determined?

A.  Not that I know of.

Baeuerle Dep. Tr. 55:9-13 and at 107:13-108:6.

Dr. Sen testified during his deposition that IκBα was cloned in 1989-1990.

71

Q.   Okay, and then with respect to different forms of I kappa B --

A.   That came earlier.

Q.   Okay.  How much earlier?

A.   Quite a lot earlier.  I kappa B alpha, probably around '89 or '90, and then I kappa B beta is soon thereafter, '92 maybe.  I mean, that kind of time frame, yes.  We are talking about a good six years, seven years before the IKKs.

Sen Dep. Tr. 201:4-12.  The relevant portions of Dr. Baldwin's testimony are as follows.

Dr. Baldwin confirmed that no additional structural IκB information was known in 1991.

Q.   But at this time you didn't have any structural information regarding what IkB looked like from a protein structure perspective, did you?

THE WITNESS:  No.

Baldwin Dep. Tr. 93:18-22.

Moreover, Dr. Baldwin confirmed that additional IκB family members were identified after 1991; however, the particular sequence of a protein is necessary for it to be called an IκB.

Q.   So are there particular amino acid sequences that are necessary for a protein to be considered IkB?

THE WITNESS:  By current tradition, yes.

Q.   And when did that current tradition originate?

THE WITNESS:  As additional IkB family members were identified.

Q.   And that would be after this 1991 time frame?

A.   Yes.

Baldwin Dep. Tr. 99:17-100:5.

In addition, Dr. Baltimore admitted that IκB is required to be in the cell in order to reduce NF-κB activity in a cell.  The relevant portions of his testimony are as follows.

Q.   Now, you said that you had in fact identified IkB as an example of a specific inhibitor; is that correct?

A.   Yes, we did identify IkB as an inhibitor.

Q.   And you agree that IkB is a protein?

A.   IkB is a protein.

72

Q.   And IkB will not work as a specific inhibitor unless it gets into the cell; is that correct?

A.   Yes, it has to be inside a cell to act as -- wait a minute. No, we can use it in vitro to inhibit.  Doesn't have to be inside a cell.

Q.   If -- if you want to use IkB to reduce NF-kB activity within a cell, you have to get IkB inside the cell; is that correct?

A.   Yes.

Q.   And prior to November of 1991, you had never tried to add IkB to intact cells; is that true?

THE WITNESS:  Yeah, I believe we had not tried to do that.

Q.   And that's because in general the protein IkB will not get into the cells, correct?

THE WITNESS:  Yes, the protein will not in its naked form get into cells, as far as I know.  I mean I have not looked directly at that question.  So I can't say.

Q.   And consequently, you never attempted in fact to use IkB in either animals or humans as a way of inhibiting NF-kB activity.

A.   We did not.

Baltimore Dep. Tr. 177:6-178:14.

Dr. Baltimore also admitted that IκB was not used to reduce NF-κB in intact cells until the mid-1990s or later.

Q.  Have you ever used IkB to reduce NF-kB activity in any intact cell?

THE WITNESS:  Have I used IkB to inhibit NF-kB in an intact cell.

Q.  Let me -- I meant to ask it a little differently than that --

A.  All right.

Q.  -- and I didn't.  So let me try it again.

A.  Okay.

Q.  Have you ever used IkB to reduce NF-kB activity in any intact cell?

A.  Yes, I have, or my laboratory has.

Q.  Yeah, when did you do that?

A.   I don't know when we did that, but that's been a sort of standard methodology since I would guess the mid 90's.

73

Q.   To the best of your recollection, the first time you would have done that would be the mid-1990's?

A.   And later, yes.

Q.   And that was done by transfecting the gene for IkB into a cell?

A.   That would be, or by transfecting the gene for a dominant negative form of IkB.

Baltimore Dep. Tr. 89:8-90:8.

The inventors of the '516 patent provided further confirmation that not only did the '516 patent fail to describe the use of inhibitors of NF-kB activity in intact cells, but that none of the inventors actually used any inhibitors of NF-kB activity in intact cells as of 1991. For example, Dr. Baltimore admitted during his deposition testimony that the '516 patent fails to describe the use of IkB to reduce NF-kB in an intact cell. The relevant portions of his testimony are as follows.

Q.   And there is no description in the patent of the use of IkB to reduce NF-kB activity in an intact cell, correct?

A.   I think that is correct.

Baltimore Dep. Tr. 90:23-91:1.

Dr. Baltimore also admitted that he did not actually use IκB to reduce NF-κB in an intact cell as of 1991.

Q.   As of 1991, you had not used IkB to reduce NF-kB activity in an intact cell, correct?

A.   We had not as of 1991 tried to do that experiment.

Baltimore Dep. Tr. 90:19-22.

As I have established above, it is certainly not enough to show that the inventors possessed knowledge regarding the proper nucleotide and amino acid sequence for IκB for determining whether or not they had possession of the inventions they now claim. However, it is an essential requirement.[133] For the reasons set forth below, the '516 patent indicates that the inventors were not in possession of the correct IκB nucleotide sequence, a necessary prerequisite to possessing the claimed invention.

I have reviewed portions of Responses and Amendments submitted to the USPTO in response to Office Actions during the prosecution of the '516 patent. On numerous occasions,

---

[133]  This is not to say that written description could ever be met by IκB alone.

74

the prosecuting attorneys made statements that emphasize their own recognition that describing and enabling their claims requires, among other things, knowledge of the IκB sequence.

For example, in an Amendment and Response filed on June 10, 1998, applicants' attorney, Dr. Matthew Vincent added claims 93–154 (as renumbered by the Examiner), which included the following two:

> 125.    The method of claim 112, wherein the agent is identified in an assay using a recombinant IκB protein.
>
> Prosecution History of U.S. Patent Application No. 08/464,364 ('364 application), ADL 0000522.
>
>
> 153.    The method of claim 61, wherein the agent is a gene construct for expressing an IκB polypeptide which binds to and inhibits NF-κB from binding to the transcriptional control elements.
>
> '364 application, ADL 0000525.

Claim 125 requires "using a recombinant IκB protein."  A recombinant protein is generally known as a protein coded by a cloned gene, usually referred to as recombinant DNA, that has been inserted by vectors into cells, thus allowing for expression of the gene and translation of the messenger RNA into the protein.  Claim 153 requires "a gene construct for expressing an IκB polypeptide".  This gene construct is the vehicle by which DNA encoding a protein, when inserted into cells, makes or "expresses" a recombinant protein.  The first step in possessing the full scope of such a claim would be possessing the gene that would be inserted into that construct -- namely, the IκB gene.  If the sequence were incorrect, one of skill in the art could not recognize that the inventors possessed the claimed subject matter.

In the Remarks section of a Response and Amendment filed on January 14, 1999, Dr. Vincent stated in part:

> For instance, the specification teaches the generation of antibodies to proteins.  Such antibodies could be used to generate immunoaffinity columns, as was known to do in the art, which could be used to purify the proteins.  Likewise, affinity purification of IκB by immobilized NF-κB would be envisaged as a method for purifying IκB.  Likewise, the present application teaches how to make recombinant forms of the proteins.
>
> '364 application, ADL 0000585.

Moreover, Dr. Clauss filed a Response and Amendment on May 30, 2000, in which she stated, among other things, the following:

> In view of the Examiner's admission that the application teaches how to find agents which regulate the NF-κB activity, the Examiner's rejection then turns on whether the specification, in light of the level of skill in the art, provides sufficient guidance as to administering such agent. Applicants point out again that the specification teaches, e.g., that proteins can be expressed in cells by using expression vectors. Various other methods for introducing proteins, nucleic acids, and small

>molecules were well-known in the art at the time the application was
>filed, as pointed out by the Applicants in their previous response.

>'364 application, ADL 0000729.

As discussed elsewhere in this report, the specification discloses that Figure 43 is the nucleotide and amino acid sequence of IκBα. Figure 43 is the only disclosure of the '516 patent that discloses a sequence for IκB. The specification further supports the assumption that Figure 43 is the murine IκBα sequence. However, as I noted above, Figure 43 is not the sequence of murine IκBα.[134] Indeed, Figure 43 is actually a partially out-of-frame, incomplete sequence of the chicken pp40 rel-associated protein. This error in Figure 43 is not disclosed in the specification. This information would be relevant to a person of ordinary skill in the art -- including a Patent Examiner -- in order to assess the inventors' possession of the matter sought to be claimed.

An Interview Summary from an Interview with Examiner Schwartzman with Matthew Vincent, David Berstein, and Sharon Hausdorff stated in part:

>Discussed providing support for in vivo aspect of claims.

>'364 application, ADL 0000609.

Isabelle Clauss, an attorney for the applicants, filed a Response and Amendment on September 17, 1999 stating in part:

>The specification provides sufficient teachings for a person of skill in the
>art to alter NF-κB activity in a cell in vivo with any type of compound,
>such as nucleic acids, proteins, and small organic molecules, according
>to the methods of the invention without undue experimentation. For
>example, the paragraph bridging pages 75 and 76 [of the specification]
>provides that,

>>the expression vector containing IκB-encoding DNA can be
>>introduced into an individual, using known techniques, by
>>any of a variety of routes, such as intramuscular,
>>intravenous, intraperitoneal administration. IκB itself (or
>>other rel-associated protein) can also introduced into cells to
>>inhibit NF-κB or (other rel-related protein).

>'364 application, ADL 0000702.

As I have already noted, either DNA (e.g., as an oligonucleotide) or protein may be delivered to cells. Obviously, delivery of a particularly-desired sequence of DNA into cells, whether in culture or part of an animal or human, requires knowledge of that underlying nucleotide sequence. As discussed above, however, the sequence listed in Figure 43 is incorrect.

---

[134] Haskill, S., et al., *Cell*, 1991, *Supra.*

Thus, the patent indicates that the inventors were not in possession of the correct IκB nucleotide sequence, a necessary prerequisite to possessing the claimed invention.

        (b)        No identification of particular agents or drugs, antagonists, decoy molecules, or dominantly interfering molecules in the specification.

The specification of the '516 patent proposes four other mechanisms (agents or drugs, antagonists, decoy molecules, and dominantly interfering molecules) without disclosing any specific molecules that can be used in the claimed methods to reduce NF-κB activity in cells to inhibit the expression of genes regulated by NF-κB.  These disclosures are general and hypothetical, and do not contain any structures, sequences, formulae, chemical names, physical properties or any other specific identification of any molecules to do this.  Because there is no disclosure of which supposed agents, antagonists, decoy molecules, and dominantly interfering molecules have the desired characteristics of reducing NF-κB activity, this description is insufficient to satisfy the written description requirement.

Dr. Baltimore provided further confirmation on the difficulty in identifying a selective inhibitor of NF-κB.  In particular, Dr. Baltimore admitted during his deposition testimony that after more than twenty years of research, a selective inhibitor of NF-κB activity has not been identified.

> Q.   Could you turn, Dr. Baltimore -- and these aren't numbered.  At least I can't see a number on them.
>
> A.   No.
>
> Q.   There's a slide -- it's in the front half toward the back of the front half that is headed "Other Intracellular Targets."
>
> A.   Got it.
>
> Q.   "Transcription Factors."The last bullet on that slide states, quote, just came from a conference on NF-kB, a transcription protein that orchestrates inflammation -- 400 plus working on it but still no selective inhibitor of transduction pathway or the protein itself:  We discovered 20 years ago. Do you see that?
>
> A.   Yep.
>
> Q.   In the "we discovered 20 years ago," who is the "we"?
>
> A.   Well, the "we" refers to my laboratory.
>
> Q.   And what are you referring to as to what was discovered 20 years ago?
>
> A.   We discovered the existence of NF-kB as a transcription factor or transcription protein 20 years ago, 1986.

Baltimore Dep. Tr. 56:4-57:2.

Moreover, Dr. Baltimore further confirmed during his deposition testimony that he has not used selective inhibitors of NF-κB in his own laboratory.

> Q.   In your testimony, you are indicating that selective inhibiting of the IKK-IkB-NF-kB-signaling module had been studied in the lab?
>
> A.   Yes.
>
> Q.   What selective inhibitors had been studied in the lab?
>
> A.   I don't remember the chemical names for them, but I have seen lots of things along the way.  We have -- I have never used these molecules in my own work and so I am just not familiar -- you know, they're not on the tip of my tongue.
>
> Q.   Okay.  So you haven't used in your own work selective inhibitors of the signaling module?
>
> A.   No.
>
> Q.   I am correct, you haven't used those?
>
> A.   You are correct, I have not used those.
>
> Baltimore Dep. Tr. 63:1-16.

Dr. Sharp testified that no other structures besides IκB, decoy molecules, and dominant negative molecules were even contemplated to reduce NF-κB activity in 1991.

> Q.   Did you have in 1991 any particular chemical structures in mind as to compounds that  could be used to reduce NF kappa B activity in the cell?
>
> A.   Other than I kappa B, I don't believe so.
>
> Q.   Did you in 1991 have any -- in mind any chemical structures that you believed could be used to reduce NF kappa B activity in the cell other than I kappa B?
>
> A.   We talked about the possibility and a certain amount, my recollection, of decoy-type molecules and dominant inhibiting activities. But other than those, I don't believe we would have had structures that we were thinking specifically about.
>
> Sharp Dep. Tr. 170:23-171:14.

Dr. Baltimore admitted that, setting aside possible disclosure regarding IκB, the '516 patent fails to provide any guidance regarding the structure of anything else that would be thought to reduce NF-κB activity.

> Q.   And the 516 patent doesn't provide any specific structures for any inhibitor of NF-kB; is that correct?

THE WITNESS:  Structures.  No, I guess not.

Q.    And the 516 patent doesn't provide the structures for any agents to reduce NF-kB activity in a cell, correct?

THE WITNESS:  Well, I'm sorry, it does describe, because the sequence of IkB is in there.  It does describe the structure of an inhibitor that can be put into cells and an inhibitor of NF-kB.

Q.    Let's set aside Figure 43 for a moment.  Other than what's in Figure 43, the 516 patent does not describe the structure of any agent to reduce NF-kB activity in a cell, correct?

THE WITNESS:  I really would have to go back and read the whole patent to be sure that that's true.

Q.    Do you recall any structures given for agents to reduce NF-kB activity in a cell, again, for the moment setting aside Figure 43?

A.    No, I don't.

Q.    Do you recall any formula for any compound to reduce NF-kB activity in a cell that's disclosed in the 516 patent, again, for the moment setting aside Figure 43?

A.    No, I do not.

Q.    And we discussed this morning as to Figure 43, you're not aware of any issue or question or admissions with respect to whether Figure 43 is in fact IkB or something else, correct?

A.    I am not aware, no.

----

"QUESTION:  Because there aren't structures or formulas of agents identified in the patent to reduce NF-kB activity in a cell, do you agree that somebody reading the patent has to experiment through trial and error to identify such an agent to reduce NF-kB activity in a cell?")

THE WITNESS:  Yeah, I mean that's sort of my problem with it.  I don't -- the fact that there is nothing described in the patent has implications, but I'm not sure that's one.

Baltimore Dep. Tr. 120:9-121:19 and at 122:5-122:19.

Dr. Baltimore also confirmed that the '516 patent fails to identify any small molecule inhibitors.

Q.    All right.  Dr. Baltimore, you indicated that large molecules was another area that you had imagined could inhibit various points of the pathway.  Did you have any large molecules in particular -- well, you know what, let me go back and finish the small molecule point.  I'm sorry.  Your patent doesn't identify any small molecules that are capable of inhibiting NF-kB activity in a cell, correct?

A.  I believe the patent does not identify any particular molecules.

Baltimore Dep. Tr. 74:1-11.

Dr. Maniatis testified that the use of kinase inhibitors to reduce NF-κB activity in intact cells was not disclosed in the '516 patent.

Q.  The use of kinase inhibitors in intact cells to reduce NF-kB activity had not been disclosed in the patent, though; isn't that correct?

A. That's correct.

Maniatis Dep. Tr. 154:8-12.

Dr. Maniatis confirmed during his deposition testimony that the '516 patent also fails to identify any antisense molecules that could be used to reduce NF-κB activity.

Q.  Was the use of Antisense RNA disclosed in the '516 patent?

A.  Well, in that sense I think that this was the first experiment that -- the Thanos and Maniatis paper was the first direct demonstration of that; it wasn't disclosed in the patent.

Q.  Did you say disclosed to the public or disclosed in the '516 patent?

A.  In the patent.

Q.  Just checking.

A.  In the '516 patent.

Maniatis Dep. Tr. 156:10-24.

Dr. Baltimore confirmed that the '516 patent fails to identify antibodies that could act to reduce NF-κB activity.  Moreover, Dr. Baltimore further admitted that the patent did not even discuss the use of monoclonal antibodies or receptor traps in reducing NF-κB  activity.

Q.  You did not in your patent identify any monoclonal antibodies for use as inhibitors, correct?

A.  No, we did not.

----

Q.  Let me back up.  I apologize, Dr. Baltimore.  On monoclonal antibodies, not only did you not describe particular antibodies in your patent, you didn't discuss the concept of using monoclonal antibodies in your patent for reducing NF-kB activity, correct?

A.  I don't think we did.

Q.  And the same for receptor trap technology.  In addition to not describing particular receptor trap technology in the patent, you didn't

describe the concept of using receptor trap technology to reduce NF-kB activity, correct?

A.  I believe that's true.

Baltimore Dep. Tr. 75:4-6 and at 77:16-78:3.

While the 516 patent specification refers to "'decoy' molecules, which are designed to mimic a region of the gene whose expression would normally be induced by NF-κB,"[135] ('516 patent, col. 37, ll. 51-53), and refers to "an effective amount of a decoy sequence encoding the NF-κB binding domain,"[136] (*Id.* at col. 37, ll. 66-67), and the sequence of various NF-κB binding domains identified in the patent, ('516 patent. at col. 37, Table 2), its disclosure of decoy molecules is still insufficient, as there are no examples provided.  The specification discusses EMSA experiments demonstrating the ability of a construct containing the entire β-IFN regulatory element (IRE) and an oligonucleotide comprised of two copies of a virus-inducible element in the β-IFN gene (PRDII2) to compete with a κB oligonucleotide for NF-κB binding. (*Id.* at col. 80, ll. 2-27.)  However, the specification does not explicitly identify IRE, PRDII2 or κB oligonucleotides as "decoy molecules."  The competition experiments were performed in nuclear extracts and the specification does not mention how to deliver any such constructs or oligonucleotides to a cell or whether they would have worked as decoy molecules in the cell.

The '516 patent says nothing about how to produce "decoy molecules" for NF-κB. Specifically, it does not disclose what modifications or manipulations of a DNA sequence having the binding site for NF-κB would be required, nor does it disclose how such a sequence could be delivered to the cells of interest -- especially if such cells were in a living organism versus in a cell culture.

The inventors of the '516 patent provided further confirmation regarding the difficulty in using "decoy molecules" to reduce NF-κB activity either in cells or therapeutically.  For example, Dr. Baltimore acknowledged in his deposition testimony that, as of 1991, "decoy molecules" could not be introduced into a cell.  In particular, Dr. Baltimore asserted that he believed that "decoy molecules" were not stable enough to be therapeutically useful.

Q.  And you did not in your patent identify any receptor trap technology for inhibiting or reducing NF-kB activity, correct?

A.  No, we did not.  We did show that you could get inhibition through competitive DNA that would -- that would compete at the binding to reporter -- a particular test piece of DNA.

Q.  The use of a co-called decoy molecule?

---

[135]  '516 patent, col. 37, lines 51-53.

[136]  '516 patent, col. 37, lines 66-67.

A.   The use of so-called decoy DNA, but I never thought that would be pharmaceutically interesting.

Q.   Why not?

A.   It's hard to deliver, very unstable.

Q.   And that the issue is that what you would use as decoys would be degraded by enzymes within the cells?

A.   That's right.  There are ways around that but certainly in '91, that was not an established method of doing anything.

Q.   So as far as potential for use to reduce NF-kB activity in a cell, you didn't believe that decoys were something that could be used to reduce activity of NF-kB in a cell.

THE WITNESS:  Yes, I certainly thought it could be used in a cell but that it wouldn't be stable enough in the body to be used therapeutically.

Q.   Okay.  So in as of 1991, your belief was that decoy molecules could be used in cells in culture to reduce NF-kB activity but you didn't believe they could be used in cells in an organism to reduce NF-kB activity; is that right?

THE WITNESS:  Yeah, I mean I suppose you could try to use them in an organism but it just -- as a -- as a form of pharmaceutical -- of a pharmaceutical agent, it didn't seem likely to me it was ever going to get developed to that point, but on the other hand, there is no theoretical reason why it couldn't.  I just -- I was making my own guess about where pharmaceutical companies would put their money.  So far I am not wrong.

Baltimore Dep. 75:7-77:4.

Dr. Maniatis also confirmed during his deposition testimony that neither "decoy molecules" nor IκB were used to treat humans as of 1991.

Q.   In November of 1991 had you or any of the other named inventors on the application identified any specific inhibitor molecules that could be used to inhibit the activity of NF-kB?

A.   Well, we knew that the DNA binding could function as a competitive inhibitor as we showed in the Lenardo paper, and we also knew of the existence of IkBa, so those two means of control we knew of.

Q.   Now, the competitive inhibition, the second paragraph in column 37 it refers to decoy molecules and the competitive inhibition would be a decoy molecule; is that correct, sir?

A.   Yes.

Q.   And were you aware of any way of inhibiting NF-kB in a human using decoy molecules?

82

A.  Do you mean had it been shown that you could do this in humans?

Q.  Sure, let's take that as a first step.

A.  No.

Q.  Has it been shown to date that it could be done in humans to your knowledge?

A.  I'm not sure it's been shown.

Q.  Now, you also mentioned IkB?

A.  Uh-huh.

Q.  The inhibition of NF-kB had been shown by Baltimore before your collaboration began, is that correct?

A.  I believe that I don't have the exact date of that reference, but I believe it was before the Mercola article.

Q.  Now, was there any way of getting, in 1991, were you aware of any way of treating human beings using the IkB as an inhibitor of NF-kB?

A.  Do you mean any way that's been demonstrated as or hypothetical?

Q.  Well, let's say had been demonstrated as of 1991?

A.  Specifically, for IkB?

Q.  Correct.

A.  And did you say in humans?

Q.  In humans.

A.  Again, I don't -- I mean, there are ways that one could imagine doing it, but it was not done.

Maniatis Dep. Tr. 271:21-273:23.

With respect to dominantly interfering molecules, the '516 patent specification only refers to a hypothetical "truncated molecule retaining the DNA binding domain, but lacking the RNA polymerase activating domain."[137]  Even this minimal disclosure, however, depends upon a hypothesis: "…if the DNA-binding domain and the DNA polymerase activating domain of NF-kB are spatially distinct…"[138]  It does not convey that the inventors were in possession of such a

---

[137]  '516 patent, col. 38, lines 13-14.

[138]  '516 patent, col. 3, lines 8-10.

molecule or even of how to make such a molecule. And the specification gives no "precise definition" or specific sequence or structure of any dominantly interfering molecules. This is because, as acknowledged in the patent, it was unknown which part of NF-κB constitutes the activating domain and which part of NF-κB constitutes the DNA binding domain. In addition, it was not even known whether these domains were spatially distinct.

Dr. Maniatis confirmed that the actual use of a dominant negative molecule in intact cells was not disclosed in the '516 patent.

> Q. You had mentioned dominant negative components of the NF-kB activity a few moments ago; to your knowledge, had any experiments been performed that were disclosed in the '516 patent involving the use of a dominant negative in intact cells to reduce NF-kB activity?
>
> A. It was -- that method was being used in other systems but it had not been -- was not disclosed in this patent.
>
> Maniatis Dep. Tr. 155:25-156:9.

Dr. Baltimore testified during his deposition that the '516 patent only hypothesized a dominant negative molecule -- a truncated form of NF-κB.

> A. You mean there is no specification of which amino acids in the protein would be in a dominant negative? Is that the question you're asking?
>
> Q. Well, let's start with that. The only dominant negative hypothesized in the 516 patent is this truncated form of NF-kB, correct?
>
> A. That's correct.
>
> Baltimore Dep. 81:19-25.

Further, Dr. Lebowitz testified during his deposition that truncating a protein does not necessarily mean that truncated form will function as a dominant negative molecule. He confirmed that one would have to perform additional experiments to determine this.

> Q And in fact, you couldn't predict one way or the other whether this truncated form of the Oct-2 protein would in fact interfere with Oct-2 activity or not, correct?
>
> THE WITNESS: Well, my recollection --recollection is that there would have been tools in place that would have enabled one to do that experiment.
>
> Q Right. But just by virtue of having the truncated form of the Oct-2 protein didn't tell you without doing the experiment whether in fact it would impact the expression of the gene controlled by the Oct-2 protein, correct?
>
> THE WITNESS: Could you repeat the question, please?

84

Q    You said that you could do experiments to figure out whether this truncated form of the Oct-2 protein that you had would interfere with Oct-2 activity in expression of genes controlled by Oct-2. And my question is without doing those experiments, could you predict with any degree of certainty whether it would in fact interfere with that activity?

THE WITNESS: Well, what I recollect knowing at the time was that we knew with some accuracy where the DNA binding domain was in the protein. So I recollect that we knew how to make a protein molecule that would contain the DNA binding domain. If one were interested particularly in the experiment that you're describing, one might well have been able to do that.

Q    And what tools or experiments would one run in order to determine whether a truncated form of a particular transcription factor would in fact interfere with the activity of the full transcription factor?

THE WITNESS: Well, based on what I recollect of what I knew at the time, I think I might have used in vitro transcription assay to address that question.

Q    An in vitro transcription assay, is that like a CAT reporter assay?

A    What I was thinking of was an experiment in vitro that looked --  that looked at RNA production directly.

Lebowitz Dep. Tr. 179:13-181:18.

Moreover, Dr. Maniatis testified that a sequence is required in order to design a dominantly interfering molecule.

Q.  All right.  A third class of potential negative regulation is discussed in the first full paragraph on column 38:  "dominantly interfering molecules;" do you see that?

A.  Yes.

Q.  As of November of 1991, were you or any of the other inventors of the '516 patent aware of any "dominantly interfering" molecules that could be used to inhibit the activity of NF-kB?

A.  So I'm just trying to place the dates ... obviously, you'd have to have enough NF-kB to do this; and, again, I don't know the exact dates of the cloning and so on, but I'm not aware of any demonstration of the dominant negative effect at that time.

Q.  And in order to achieve that, you would need to have cloned NF-kB?

A.  In order to synthesize a truncated form of NF-kB, you would require the DNA coding sequence of NF-kB.

Maniatis Dep. Tr. 277:18-278:17.

Dr. Baltimore further testified that he never made a truncated form of NF-κB as a dominant negative molecule.

> Q.  Now, you don't -- or you hadn't as of -- well, let me open the question up.  I am sorry.  Did you ever make a truncated form of NF-kB to explore its use as a dominant negative?
>
> A.  No, we did not.
>
> Q.   So there's, obviously, no working example of doing that in the 516 patent, correct?
>
> A.  No, there is not.
>
> Baltimore Dep. Tr. 81:3-10.

        (c)      Simply providing assays that purport to allow for identification of possible NF-κB reducers is not enough to describe the full scope.

While the specification identifies assays that can be used to identify, under certain circumstances, whether NF-κB activity has been reduced, the '516 patent does not describe a way to identify all compounds that inhibit gene expression, which is what the claims purport to cover.  The EMSA assay is an analysis of protein-DNA interaction or the binding between NF-κB and the NF-κB binding site, rather than a direct measure of expression of the gene regulated by NF-kB.  The specification introduces the CAT assay only to "screen for agonists or antagonists of a factor-coding gene or of the factor coded by the gene."  Therefore, because the specification discloses only assays to identify agonists or antagonists of a transcription factor (as opposed to agonists or antagonists of gene expression), the relevant claims covering inhibiting gene expression are not sufficiently described.

The two assays (EMSA and CAT) described in the patent simply lead to a trial and error approach.  The specification does not report a single example of a specific molecule reducing NF-kB activity in cells identified by the CAT assay.  The specification names only one molecule (or, more specifically, an "activity" -- IκB) based on the result of the cell-free EMSA assay.  One of skill in the art would not believe that the inventors were even in possession of an assay that would allow them to determine whether a particular substance was an agonist or antagonist of gene expression, let alone a method for reducing gene expression by reducing NF-kB activity.

Dr. Baltimore admitted that the '516 patent fails to disclose assays that could be used to identify agonists or antagonists of NF-κB activity.

> Q.  Okay.  Column 34 beginning at line 66 and then carrying over into column 35 talks about assays to screen for agonists and antagonists.  Do you see that?
>
> A.  Yes, I do.
>
> Q.   And so these are methods for identifying compounds that could either augment or reduce the activity of NF-kB in cells; is that right?

THE WITNESS: Well, I would have to read more why they didn't know if this paragraph is a general statement or is a statement about NF-kB. Looks to me like it is not related directly to NF-kB.

Q.   Is it your understanding that you disclosed any assays in this -- in the 516 patent that someone could use to attempt to identify compounds that would either augment or reduce the activity of NF-kB in the cells?

A.   No, I don't think we tried to do that.

Baltimore Dep. Tr. 175:9-176:3

Dr. Sharp further confirmed that a gel shift assay would not have been sufficient to show a method of inhibiting expression of NF-kB activity.

Q.   Okay.  I changed it up on you and asked a slightly different question. I asked if it was a sufficient -- if it was sufficient to show that, so let me try it again, Dr. Sharp.  If one ran a gel shift assay that showed observations consistent with increased NF kappa B binding to an NF kappa B recognition site, and shows that upon treatment with some compound the amount of NF kappa B binding to that recognition site is decreased, is that sufficient to establish, as you understood claim one which lists you as an inventor, to practice claim one of the '516 patent?

A.   I would not necessarily think that would be sufficient.

Q.   What else would be necessary?

A.   Any other assays one could devise to assay the possible effects of NF kappa B.

Sharp Dep. Tr. 163:14-164:12.

Dr. Lenardo confirmed that a scientist would need more information than localization of the consensus sequence to the promoter region of a gene in order to determine the role of NF-kB in that gene's regulation.

Q   If someone were to locate the consensus sequence you have listed here in the promoter region of the gene, would you expect them to draw any conclusions about the role of NF.kappa.B in the regulation of that gene?

A   I have no expectation.

Q   If you located the consensus sequence listed here in the promoter region of a gene, would you draw any conclusions about the role of NF.kappa.B in the regulation of that gene?

A   I would draw no conclusions until I had done an experiment.

Lenardo Dep. Tr. 188:10-21.

The inventors of the '516 patent further confirmed the importance of cloning and protein characterization in understanding the biological function of a protein. For example, Dr. Corcoran stated that determining DNA-binding activity only showed one aspect of a protein's behavior. She admitted that by cloning the gene, more structural information, such as protein domains, could be discerned in addition to be able to assay for other activities of the protein.

> Q. What was the purpose of trying to obtain the cDNA clone of Oct-2? What sort of information did this provide to you that you didn't have when you just knew it was a DNA-binding activity?
>
> THE WITNESS: In having a DNA-binding activity, we were only able to distinguish one aspect of the protein's behavior. It didn't tell us anything about what else it might do in the cells and it didn't give us any tools to study where it might be expressed and how it might be regulated and how it might be acting in -- in other assays.
>
> Q. So it was your understanding that obtaining the cDNA clone was an important aspect of understanding how Oct-2 worked.
>
> Q. Do you want me to repeat the question?
>
> A. Yes. And I would like you to repeat what you said, too, because I didn't hear you.
>
> Q. So my question was, it was your understanding that obtaining a cDNA clone was an important aspect of understanding how Oct-2 worked.
>
> THE WITNESS: By obtaining the cDNA, we would be able to look at all the domains of the protein and look at any other activities that it might have in addition to DNA binding.
>
> Q. Obtaining the cDNA probe, then, enabled you to obtain more information about how Oct-2 functioned. Is that correct?
>
> A. Yes.
>
> Corcoran Dep. Tr. 21:3-22:13.

Dr. Clerc also stated that it is necessary to clone the genomic sequences of the genes involved in a particular gene regulation in order to elucidate the mechanism by which the gene is regulated.

> Q. Was it necessary to clone those genes in order to more fully understand the complex mechanism underlying MRP regulation?
>
> THE WITNESS: You need the regulatory sequences to ident- -- to elucidate this mechanism and the way you get this is by getting the genomic sequence. That's what we did here.
>
> Clerc Dep. Tr. 104:1-9.

Dr. Baeuerle also confirmed that not only is cloning important to understand the biological function of the protein but that protein characterization also needs to be performed.

> A. It's part of the paper. The cloning alone wouldn't help you. I think what you need to do is to express the encoded protein and to characterize the expressed protein and to verify the biological activity of the expressed protein.
>
> Baeuerle Dep. Tr. 216:16-20.

Even though the inventors of the '516 patent have confirmed that cloning and protein characterization are necessary to fully elucidate the biological function of a protein or gene, as confirmed by Dr. Singh, cloning genes as of the late 1980s was difficult to do.

> Q At the time was it difficult to clone genes encoding proteins?
>
> THE WITNESS: At the time actually cloning of genes encoding these transcription factors was a difficult endeavor. In fact, the other thing that I did as a post doctoral fellow at MIT was to develop a new method that would make possible cloning of genes encoding --specifically encoding transcription factors, and that is a part of the patents that we have as well.
>
> Singh Dep. Tr. 58:13-23.

> (d) One of skill in the art would not consider the inventors to have been in possession of a method of use in all cells.

The '516 patent does not provide a single working example of a method of practicing the claims in *any* cell. The patent notes that an EMSA assay performed on nuclear extracts from HeLa and H-9 cell lines showed NF-κB binding activity that was inhibited by the addition of IκB in the cell-free assay.[139]  As noted above however, significant challenges attend the introduction of molecules into cells. Because the specification does not provide any detail on how to obtain analogous results in cells (a limitation of many of the claims), the specification fails to show one of ordinary skill in the art that the inventors were in possession of the method of use in any cell type, let alone in *all* cell types.

> (e) One of skill in the art would not consider the inventors to have been in possession of a method of that covers the "degradation," "dissociation," or "modification" of IκB.

---

[139] '516 patent, col. 29, ll. 10-46.

As I noted above, it was not until October 1994 that it was shown that ubiquitin-mediated degradation of IκB was a necessary step in NF-κB activation.[140]  Thus, as of 1991, the inventors did not know how IκB is degraded in the context of NF-κB activation.  I have read portions of Aaron Ciechanover's expert report, and his views are in accord with the views stated here.  Because the patent lacks any description of how IκB is degraded in the context of NF-κB activation, one of ordinary skill in the art would not have considered the inventors to be in possession of the full scope of (1) inhibiting the degradation of IκB, (2) inhibiting the dissociation of NF-κB:IκB complexes, or (3) inhibiting modification of the IκB protein in a way that reduces the binding of IκB to NF-κB.  Thus, the specification fails to show one of ordinary skill in the art that the inventors were in possession of the full scope of the claims.

### C.    My Conclusions that the Claims Are Invalid for Lack of Enablement and Written Description Apply to All of the Earlier Filed '516 Applications.

If the claims of the '516 patent are described and enabled at all -- and as discussed herein I do not believe that they are -- it is my opinion that the claims should only be afforded a priority date consistent with the most recently-filed patent application, Appl. No. 08/464,364, dated June 5, 1995.

However, because it is my opinion that the claims of the '516 patent are neither described nor enabled by the patent as issued under the applicable standards in 1995, it follows that these claims are neither described nor enabled by any of the various patent applications that were filed in the chain leading up to the issuance of the '516 patent.  These applications merely have the same (or a smaller subset of the) disclosure set forth in the issued patent.  In assessing whether these various applications provided an adequate written description and enabling disclosure of the full scope of the issued claims, I have the following additional opinions:

_Application No. 08/418,266 filed April 5, 1995_ -- Because of the proximity of the filing date of this application to the June 5, 1995 filing date of Appl. No. 08/464,364, one of ordinary skill in the art would have substantially the same knowledge in either case.  Therefore, my opinions as to the lack of an adequate written description and enablement apply to this application as well; the claims are neither described nor enabled by this patent application.

_Application No. 07/791,898 filed Nov. 13, 1991_ -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in 1991 than in 1995 or later years, as reflected in my summary above as to the discoveries in the intervening period.  For example, as of November 13, 1991, nothing of the complex mechanistic details of IκB regulation of NF-κB was known.  For example, it was not until June 1993 that the mechanism was shown to

---

[140]  Palombella, V.J., et al., _Cell_, 1994, _Supra_.

be dependent upon the phosphorylation of IκB,[141] and not until November 1995 that the full mechanism of IκB regulation of NF-κB was understood (i.e. phosphorylation leads to ubiquitination, which leads to 26S proteasome-mediated degradation of IκB, which in turn leads to formation of active NF-κB.[142] As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the 1991 application based on the more limited knowledge of one of ordinary skill in the art at this time.

_Application No. 07/341,436 filed Apr. 21, 1989_ -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in 1989 than in 1991, as reflected in my summary above as to the discoveries in the intervening period. For example, in addition to the lack of key understanding noted above, in April 1989, researchers had not yet determined that NF-κB referred to a family of related dimers,[143] or that the subunits' various functional domains (e.g. DNA-binding domain, transactivation domain, etc.) were spatially distinct.[144] ARIAD contends in its Second Supplemental Response to Interrogatory Nos. 6 and 7 that asserted claims 18, 183, 184 and 185 are entitled to claim priority to the April 1989 application, citing various sections of the patent as support. I have reviewed the various parts of this application that are cited and disagree with ARIAD's contention for the reasons previously stated. In addition to the other information discussed above, I would note that the April 1989 application does not contain any detailed disclosure of IκB, including the lack of any amino acid or nucleotide sequence for this inhibitor protein.[145] The April 1989 application further lacks any disclosure of the various complexities of NF-κB dimerization or domain organization. As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the April 1989 application as a result of the more limited disclosure and more limited knowledge of one of ordinary skill in the art at this time.

---

[141] Beg AA, Finco TS, Nantermet PV, Baldwin AS Jr., Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation, _Mol. Cell. Biol._ 1993 Jun;13(6):3301-10.

[142] Alkalay I, Yaron A, Hatzubai A, Orian A, Ciechanover A, Ben-Neriah Y, Stimulation-dependent I kappa B alpha phosphorylation marks the NF-kappa B inhibitor for degradation via the ubiquitin-proteasome pathway, _Proc. Nat'l Acad. Sci. USA_. 1995 Nov 7;92(23):10599-603.

[143] Baeuerle, P.A., Baltimore, D., A 65-kD subunit of active NF-kappa B is required for inhibition of NF-kappa B by I kappa B, _Genes Dev._, 3(11):1689-1698, 1989

[144] Meyer, R., Hatada, E.N., Hohmann, H.P., Haiker, M., Bartsch, C., Röthlisberger, U., Lahm, H.W., Schlaeger, E.J., van Loon, A.P., Scheidereit, C. Cloning of the DNA-binding subunit of human nuclear factor kappa B: the level of its mRNA is strongly regulated by phorbol ester or tumor necrosis factor alpha. _Proc Natl Acad Sci U S A._ 88(3):966-970, 1991.

[145] Haskill, S., Beg, A.A., Tompkins, S.M., Morris, J.S., Yurochko, A.D., Sampson-Johannes, A., Mondal, K., Ralph, P., and Baldwin, A. S., Jr. Characterization of an immediate-early gene induced in adherent monocytes that encodes I kappa B-like activity. _Cell_ 65(7):1281-1289, 1991.

*Application No. 07/318,901 filed 3/3/89* -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in 1989 than in 1991, as reflected in my summary above as to the discoveries in the intervening period. For example, in addition to a lack of knowledge of the mechanistic details of NF-κB regulation, in 1989, the protein structure and amino acid and nucleotide sequences of NF-κB itself were unknown.[146] ARIAD contends in its Second Supplemental Response to Interrogatory Nos. 6 and 7 that asserted claims 6 and 70-73 are entitled to claim priority to the March 1989 application, citing various sections of the patent as support. I have reviewed the various parts of this application that are cited and disagree with ARIAD's contention for the reasons previously stated. In addition to the other information discussed above, I would note that the March 1989 application does not contain any disclosure of TNF-α or its relationship with NF-κB, despite the fact that ARIAD is asserting its claims in this case against a TNF-antagonist product (and thus the full scope of these claims must encompass this according to ARIAD). Furthermore, the March 1989 application does not contain any disclosure of the (incorrect) consensus sequence, and does not even contain the passing mention of the five possible ways that are hypothesized as ways of reducing NF-κB in the later filings. The March 1989 application further lacks any disclosure of the actual structure of the NF-κB gene or protein. As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the March 1989 application as a result of the more limited disclosure and more limited knowledge of one of ordinary skill in the art at this time.

*Application No. 07/162,680 filed March 1, 1988* -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in March 1988 than in 1989, as reflected in my summary above as to the discoveries in the intervening period. For example, in addition to the shortcomings in understanding noted above, in March 1988, researchers were not yet aware that NF-κB-inhibitory activity could be attributable to the non-covelent association of some other protein or cellular factor.[147] ARIAD contends in its Second Supplemental Response to Interrogatory Nos. 6 and 7 that asserted claims 6 and 70-73 are entitled to claim priority to the March 1988 application, citing various sections of the patent as support. I have reviewed the various parts of this application that are cited and disagree with ARIAD's contention for the reasons previously stated. In addition to the other information discussed above, I would note that the March 1988 application contains no disclosure of IκB at all. The March 1988 application further lacks any disclosure of an NF-κB-inhibitory activity attributiable to some cellular factor. As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the March 1988 application as a result of the more limited disclosure and more limited knowledge of one of ordinary skill in the art at this time.

---

[146] Ghosh, S., Gifford, A.M., Riviere, L.R., Tempst, P., Nolan, G.P., Baltimore, D., Cloning the p50 DNA binding subunit of NF-kappa B: homology to rel and dorsal. *Cell*, 62(5):1019-1029, 1990.

[147] Baeuerle, P.A., Baltimore, D., I kappa B: a specific inhibitor of the NF-kappa B transcription factor. *Science*, 242(4878):540-546, 1988.

It is my understanding that ARIAD is not seeking to claim priority for any claim of the '516 to any application earlier than the March 1988 application. If this turns out not to be the case, I reserve my right to supplement my opinions on this subject.

**D.      ARIAD's Own Expert, Dr. Kadesch, Agrees that the Claims Lack Support.**

I understand that Dr. Thomas Kadesch testified on behalf of ARIAD and the Institutions in a separate patent infringement litigation regarding the '516 patent. I have read Dr. Kadesch's trial testimony from that case,[148] in which he opines that the claims of the '516 patent are adequately described and enabled. I understand, however, that, while being deposed in an unrelated litigation, Dr. Kadesch recanted his earlier testimony and testified that he no longer believes that the claims of the '516 patent are sufficiently described as to allow the claimed methods to be practiced all eukaryotic cells, much less all cells.[149] I have read this recantation, which is critically important, as it casts additional doubt on the validity of the '516 patent claims and provides support for my opinion that description and enablement of the claims in the '516 patent for use in all cell types (or even all eukaryotic cell types) is absent.

**E.      The Patent Claims Are Invalid for Failure to Disclose the Best Mode.**

The claims of U.S. Patent No. 6,410,516 are invalid for failure to satisfy the best mode requirement. Claims 1-18, 20-186, 191-203 relate to methods for inhibiting, selectively inhibiting, or "reducing NF-κB activity in the cell," "altering NF-κB activity in the cell," or "introducing a nucleic acid decoy molecule into the cell. Claims 19 and 187-190 include the limitation of "reduc[ing] nuclear translocation of NF-κB in the cells." The disclosure of the '516 patent fails to describe the best mode as contemplated by named inventor Thomas Maniatis as of November 1991.

Dr. Maniatis testified that, as of 1991, he knew of two different ways of reducing NF-κB activity: the use of dominant negative molecules or the use of antisense RNA.

> Q.  Did you have any better ways of knowing how to reduce NF-kB activity than the use of Antisense RNA as of November of 1991?
>
> A.  At that time Antisense -- there were two ways that you could do this: one was with Antisense RNA or with so-called dominant/negative components of the NF-kB pathway.
>
> Maniatis Dep. Tr. 155:7-15.

---

[148]  Ariad v. Eli Lilly, Kadesch, T.R., Trial Tr. Day 13;. 113:20-114:12; 117:1-118:11.

[149]  Amgen, Inc. v. F. Hoffmann-La Roche Ltd., Kadesch, T.R., Depo. 257:24-270:16.

When questioned which of these methods he considered to be the best way to reduce NF-κB activity, Dr. Maniatis responded as follows:

> Q.  Which way in November of 1991 did you consider to be the best way to reduce NF-kB activity?
>
> A.  Well, it's obvious from this paper, I think, that we thought that Antisense was the better way to go.
>
> Maniatis Dep. Tr. 155:16-24.

Thus, Dr. Maniatis admitted that the best mode of carrying out the invention of the '516 patent was to use antisense RNA technology.  The specification does not just fail to adequately describe Dr. Maniatis' manifested best mode, however, it fails to disclose the use of antisense RNA completely.  Thus, by failing to disclose antisense RNA as means of reducing NF-κB activity in the cell, the best way of practicing the claimed invention was concealed from one of skill in the art and the patent is invalid.

### F.    ARIAD's Expert, Dr. Verma, Made Statements to the PTO that are Contradicted by Statements He Has Made in Certain of His Publications.

I have reviewed the November 9, 2006 declaration of Dr. Inder Verma, submitted to the U.S. Patent & Trademark Office by ARIAD as part of the reexamination proceedings for the '516 patent.[150]  In his declaration, Dr. Verma made certain statements in an attempt to rebut the Examiner's position that the '516 patent was inherently anticipated by various compounds and references describing such compounds.  However, the statements and conclusions set forth by Dr. Verma in his deposition directly contradict the statements and conclusions published that Dr. Verma, along with others, published prior to November 9, 2006.

For instance, regarding the references that were cited as prior art in the reexamination request as based on the use of glucocorticoids -- and, in particular, dexamethasone ("dex") -- to reduce NF-κB activity, Dr. Verma stated, among other things, the following:

> As discussed below, there is considerable uncertainty relating to the potential mechanism of action of glucocorticoids in cells, including whether there are any potential effects on NF-κB, as reflected in a substantial amount of contradictory data reported in the scientific literature.
>
> Verma Declaration, ¶ 82.

---

[150]  Declaration of Dr. Inder Verma, filed November 9, 2006 in the Merged Proceeding of Ex Parte Reexamination Control Nos: 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005) (hereinafter "the Verma Declaration).

The mechanisms by which glucocorticoids, including dexamethasone, mediate inflammatory responses are poorly understood, and as Padgett and these other papers discuss, substantial evidence demonstrates that glucocorticoids can act through a variety of mechanisms which are independent of NF-κB.  (Padgett at 445, Han at 271, Hart at 224).  For example, glucocorticoids function by binding in the cytoplasm to glucocorticoid receptor (GR), which then translocate to the nucleus as a glucocorticoid-GR complex and bind to target elements or glucocorticoid response elements (GREs) to function as direct enhancers or repressors of gene transcription.  (Padgett at 445-46).  As Padgett also notes, the glucocorticoid receptor "undoubtedly interferes with the function of other transcriptional regulators," such as activator protein-1 (AP-1) and NF-AT.  (Padgett at 447, see also Han at 271, Hart at 224).  Such evidence includes work from my laboratory, which demonstrated the ability of glucocorticoid receptor to prevent AP-1 dependent transcription through a mechanism likely involving protein-protein interactions between GR and Jun/AP-1.  (Schule et al 1990, attached hereto as Exhibit 16.)

Verma Declaration, ¶ 90.

In summary, the fact that dexamethasone (or any other glucocorticoid) is administered to cells does not indicate that the administration of that glucocorticoid necessarily reduced induced NF-κB activity or NF-κB mediated-intracellular signaling.

Verma Declaration,  ¶ 101.

Third, the allegedly anticipating pre-April 21, 1989 art the Examiner relies on describes cortisol.  The later references the Examiner relies on regarding effect on NF-κB all describe various experiments using the synthetic steroid dexamethasone, which is a different compound.  One cannot assume that the effects of different glucocorticoids and steroids are necessarily the same, as is evident from the fact that numerous, different steroid drugs have been developed, and have different indications.

Verma Declaration, ¶ 105.

Lastly, even if one were to erroneously assume that one could equate the effect of cortisol with dexamethasone, for all the same reasons as explained above regarding use of dexamethasone, the fact that cells were exposed to cortisol produced and released naturally in the body does not indicate that such exposure necessarily reduced induced NF-κB activity or NF-κB mediated-intracellular signaling.

Verma Declaration, ¶ 106.

However, a paper co-authored by Dr. Verma, Doucas et al.[151], explains how glucocorticoids, through the glucocorticoid receptor ("GR"), inhibit NF-κB activity.  In that paper, Dr. Verma, with his co-authors, stated that "we demonstrated that GR-mediated inhibition of NF-κB translocation is PKAc-dependent."[152]  Dr. Verma and his co-authors also affirmed the work of previous studies linking dexamethasone, a particular glucocorticoid, with inhibition of NF-κB activity, stating that "[p]revious studies have shown that treatment of cells with Dex, a synthetic GR ligand, leads to repression of NF-κB-activated transcription."[153]

In addition, in a scientific review article in which Dr. Verma was a co-author, Withoff et al.[154], Dr. Verma and his co-authors identified glucocorticoids, including dex, as inhibitors of NF-κB activity.  In particular, he and co-authors stated:

> The most widely prescribed anti-inflammatory and immunosuppressive drugs are glucocorticoids (GCs), of which dexamethasone and hydrocortisone are the best known…it was later shown that GCs also inhibit the action of several transcription factors that are essential for immunity, such as AP-1, NF-AT, and NF-κB.[155]

Regarding the use of red wine to reduce NF-κB activity in the references cited as prior art in the requests for reexamination, Dr. Verma further stated in part:

> Red wine as a chemical mixture would not be found *per se* in the body after it is consumed and therefore could not act *per se* on cells (Schematic 15 of Exhibit 1).  Red wine is a generic term covering many different mixtures having in common the characteristic of being of red color.  Each such mixture has many variable constituents, which these pre-April 21, 1989 studies never identified or analyzed.  Without any description of what, if anything, would have induced NF-κB activity in cells, or what, if anything, would have acted to reduce NF-κB activity in cells, one skilled in the art would not read any of the primary references as describing any of the claimed methods.

> Verma Declaration, ¶ 133.

---

[151] Doucas V., Shi Y., Miyamoto S., West A., Verma I., and Evans R.M., Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression by NF-κB and the glucocorticoid receptor, *Proc. Natl. Acad. Sci. U S A*, 97(22):11893-11898, 2000.

[152] *Id*. at p. 11893.

[153] *Id*. at p. 11897.

[154] Withoff, S., Tergaonkar, V., and I.M. Verma, Regulating the master regulator NF-κB:  From natural strategies to rationally designed superdrugs.  *in*: Ghosh, S., *Handbook of Transcription Factor NF-kappaB* (Boca Raton, FL, CRC Press, 2007), pp. 195-221.

[155] *Id*. at p. 203.

> Further, neither Blanco-Colio nor anyone else would be readily able to replicate the experiments of the earlier studies because the type of red wine was not specified in those earlier studies.

> Verma Declaration, ¶ 137.

However, Dr. Verma and his co-authors in Withoff et al., specifically identified the use of resveratrol, a component of red wine, as resulting in a decrease in NF-κB activity.  In particular, Dr. Verma and his co-authors stated the following:

> Polyphenols curcumin, which can be isolated from the spice turmeric, and resveratrol, which is found in grapes and red wine, have been found to downregulate NIK and IKKα/β, resulting in inhibition of IKK activation, decreased IκBα-degradation, decreased p65 translocation, and a decrease in NF-κB activity.[156]

Thus, Dr. Verma made contradictory statements in his declaration to the Patent Office regarding the validity of the anticipation arguments made by the Examiner during the reexamination proceeding of the '516 patent.

---

[156] *Id*. at p. 205.

## VII.    **ADDITIONAL POINTS.**

I am being paid at a rate of $600 per hour for my study and testimony in this matter, plus compensation for out-of-pocket expenses.  In addition to certain of my publications referenced in this report, a complete list of my publications can be found in my full *curriculum vitae*, attached to this report as Appendix A.

In my testimony, I expect to use as exhibits some of the materials that I considered, including various of their figures and cartoons.  Furthermore, I may incorporate demonstratives explaining the technology and the various references discussed herein, such as the various tutorial slides used by both parties in this litigation, images from papers and patents, and not-yet-created images that reflect the substance of the background and opinions presented herein.

Dated: January 18, 2008

_____

Randolph Wall, Ph. D.

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 06-259-MPT |
| v. | ) ) ) | |
| ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) | |
| Defendants | ) ) ) ) | |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT and FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH | ) ) ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) ) | |
| v. | | |
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION | | |
| Counterclaim Defendants. | | |

**EXPERT REPORT OF JEFFREY V. RAVETCH, M.D., Ph.D.**

I, Jeffrey V. Ravetch, M.D., Ph.D., submit the following report on behalf of

ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead Institute

for Biomedical Research, and the President and Fellows of Harvard College (collectively

"ARIAD") in the above-captioned action.

## I.    BACKGROUND

1.    I have been asked to opine on several subjects relevant to the litigation of the

above-captioned action, including the level of skill in the art, the proper construction of certain

claims of U.S. Patent No. 6,410,516 (the "'516 patent"), and the priority dates to which they are

entitled. I have also been asked to opine on several other subjects, for which I intend to submit

a report rebutting the opinions of Amgen's experts.

### A.    Professional Experience

2.    I am presently the Theresa and Eugene M. Lang Chair, Professor and Head of the

Laboratory of Molecular Genetics and Immunology at The Rockefeller University. I joined the

faculty of The Rockefeller University in 1996. Prior to that I was a member of the faculty of the

Sloan-Kettering Institute of the Memorial Sloan-Kettering Center (1982-1996) where I was

named a full Member in 1990.

3.    I received my Bachelor of Science degree in Molecular Biophysics and

Biochemistry from Yale University in 1973. In 1978, I received my Ph.D. in Genetics from The

Rockefeller University and in 1979, I received my M.D. from Cornell Medical College. From

1979 to 1982, I did post-doctoral work at the Laboratory of Molecular Genetics at the National

Institutes of Health, Bethesda, Maryland.

4.      I have extensive experience in the fields of molecular biology and immunology. The Laboratory of Molecular Genetics and Immunology, which I direct at The Rockefeller University, is focused on dissecting the cellular and molecular mechanisms governing the generation of antibody specificity and the translation of that specificity into cellular responses, including autoimmune responses. I have extensive knowledge of the science and technology underlying the patents involved in this lawsuit.

5.      I am a named inventor on nine United States patents or patent applications. These patents relate to Fc receptor technology and include inventions directed to autoimmune therapeutic targets and autoimmune disease models.

6.      I am the author or co-author of nearly 150 scientific papers in the fields of genetics and immunology. I have published scientific articles regarding the use of technologies described in the patents in suit and have extensive professional experience in the application of those technologies to in vitro and in vivo studies. I have investigated mechanisms of innate and adaptive immunity for the last 30 years, focusing on the role of effector cells, such as macrophages and mast cells and cytokines, such as TNF–α, on the inflammatory response, and in particular, pathways that lead to NF–κB activation.

7.      I am a member of a number of professional organizations, including the American Association of Immunology, the American Association of Allergy and Immunology, the American Society for Biochemistry and Molecular Biology and the American Society for Cell Biology, among others.

8.      I am an Advisory Editor for the *Journal of Experimental Medicine* and a Transmitting Editor for *International Immunology*. I also serve on the Scientific Advisory Boards for several research organizations, philanthropic foundations and corporations.

3

9.    I have received numerous awards and honors for my research efforts in immunology including the Pew Scholar Award, the Burroughs-Wellcome Award, the National Institutes of Health Merit Award, the Lee C. Howley Award, the AAI Huang Award for Meritorious Career and the Coley Award from the Cancer Research Institute. I was elected to the National Academy of Sciences of the United States in 2006 and the Institute of Medicine in 2007 in recognition of my seminal contributions to the field of antibody structure and function. I am a frequent lecturer at numerous universities, medical centers and international symposia.

10.    My curriculum vitae, which describes in greater detail my professional experience and qualifications, is attached as Exhibit 1.

**B.    Prior Expert Testimony**

11.    During the preceding five years, I have testified at deposition or at trial in the following cases:

- *Ariad Pharmaceutical, et al. v. Eli Lilly & Co.*, 2007 U.S. Dist. LEXIS 49076 (D. Mass. July 6, 2007).
- *Goldenberg v. Cytogen, Inc.*, 2003 U.S. Dist. LEXIS 26075 (D. N.J. April 30, 2003).
- *Medimmune, Inc. v. Centocor, Inc., et al.*, Docket No. 8:02-cv-01135-AN; U.S. District Court of Maryland; filed 04/05/02, ended 08/15/2007.
- *University of Michigan, et al. v. Bristol-Myers Squibb Company*, 301 F. Supp. 2d 633 (E.D. Mich. 2003).
- *Inverness Medical SW, et al. v. Pfizer, Inc., et al.*, Docket No. 2:02-cv-01029-KSH-PS; U.S. District Court of New Jersey; filed 03/07/2002, ended 02/20/2004.
- *Talecris Biotherapeutics, Inc. v. Baxter International, Inc., et al.*, 491 F. Supp. 2d 510 (D. Del. June 14, 2007).

**C.    Compensation**

12.    I am being compensated for my work in connection with this litigation at my customary rate of $800 per hour for the time I spend working on this matter.

4

## II.    BASIS FOR OPINIONS

13.    I have based my opinions in this case on my 30 years of experience in the field of molecular genetics and immunology, on the '516 patent and file history, references cited in the patent, additional references cited here, as well as scientific literature in the field of the invention.

14.    I reserve the right to supplement my report in light of any additional fact discovery, opinions by Amgen's experts, and/or trial testimony. I also reserve the right to provide rebuttal opinions and testimony in response to Amgen's experts and fact witnesses. In connection with my anticipated trial testimony in this action, I may use as exhibits various documents produced in this litigation which refer to or relate to the matters discussed in this report. In addition, I reserve the right to use animations, demonstrative exhibits, enlargements of actual exhibits, and other information in order to convey my opinions.

## III.    BACKGROUND

15.    The basic structural unit of living organisms is the cell. Traditionally, biologists have divided cells into two classes — prokaryotic and eucaryotic — defined by whether the cell contains a nucleus. Eucaryotic cells have a nucleus, which encapsulates chromosomes containing DNA and segregates those chromosomes from the surrounding cytoplasm. In contrast, procaryotic cells lack a nucleus. Eucaryotes includes all plants and animals, including humans. Prokaryotes comprise most bacteria (other than archaebacteria[1]).

---

[1] Over the past thirty years, biologists have come to recognize a third domain of organisms — "archaea" or "archaebacteria" — which, though non-nucleated microorganisms, appear to be more closely related to eucaryotic forms of life than to procaryotic.

**B.    Gene Expression**

16.    DNA is a macromolecule made up of a long polymeric strand of covalently linked "nucleotides" non-covalently complexed with a complementary strand of nucleotides. A nucleotide is a molecule consisting of a purine or pyrimidine base, bound to a ribose sugar moiety and a phosphate group. The four nucleotides found in DNA are adenosine ("A"), guanosine ("G"), cytidine ("C"), and thymidine ("T"). In DNA, A always forms a complementary base pair with T, and G with C. A series of nucleotides — *e.g.*, CTCCGATATC — is referred to as a "sequence." When a strand of DNA arranged in a sequence associates with a strand having a complementary sequence, it naturally forms a distinctive, double helix structure, regardless of the sequence of nucleotides on each strand.

17.    The fundamental functional unit of DNA is the "gene," the sequence of DNA necessary to permit synthesis of a particular protein. Proteins are polymeric chains of amino acids, of which there are approximately twenty different types. Genes consist of a region that direct the construction of the protein and a region that regulates this function. As outlined below, the expression of a gene to form a protein involves a complex series of steps describing two general processes: transcription and translation.

18.    Transcription is the first step of gene expression. During transcription, the genetic information in DNA encoding the amino acid sequence of a particular protein is converted by the enzyme, "RNA polymerase," into a complementary strand of "messenger RNA" ("mRNA"), a single-stranded nucleotide polymer similar to DNA. After the DNA sequence encoding a particular protein has been transcribed into its complementary mRNA equivalent, the mRNA travels out of the nucleus to a cytoplasmic organelle known as a ribosome, where the mRNA strand provides a blueprint for the synthesis of the protein by the ribosome.

6

19.     In the ribosome, cellular machinery, some consisting of proteins, some consisting of RNA, assembles chains of amino acids to create different proteins according to the sequence data originally stored in the gene.  This process is called translation.

20.     As discussed in more detail below, gene expression is modulated in eucaryotic cells by "transcription factors," of which NF-κB is a prime example.

C.     **Signal Transduction**

21.     A fundamental question of biology is how information about conditions outside a cell can trigger changes within the cell, including, most fundamentally, changes in gene expression.  As elucidated over the past fifty years in hundreds of different cellular pathways, the process of "signal transduction" involves the following general elements:  (i) the binding of an extracellular molecule to a "receptor," followed by (ii) a cascade of intracellular reactions that (iii) culminate in targeted expression or inhibition of particular genes.

22.     Cell surface receptors are proteins embedded within the cell membrane that bind to specific extracellular substances, called ligands.  Examples of naturally-occurring ligands include hormones, neurotransmitters, cytokines, growth factors, and antigens.  When a ligand binds to its receptor, it triggers a response within the cell that results in a change in the cell's function.   Observable cellular responses that can be triggered by signal transduction include proliferation, apoptosis (cell death), and changes in cellular metabolism, structure, or appearance.

23.     A characteristic of signal transduction is a long and complex cascade of "downstream signaling" reactions that occur between binding of a ligand to a receptor and ultimate gene expression.  Important intermediaries (or "messengers") in this cascade are "transcription factors."   Transcription factors are proteins that bind to certain "recognition sequences" in DNA that are generally distinct from the site at which the gene's protein coding

7

sequence begins. Through that binding to the recognition sequence, transcription factors affect

the expression or inhibition of genes. Transcription factors can either promote or inhibit the

expression of certain genes, and are believed to do so by, among other things, facilitating the

initiation of gene transcription by enzymes involved in that process, such as RNA polymerase.

Abnormalities in transcription factor activity can manifest themselves in the form of disease.

   **D.**  **NF–κB**

   24.  One major family of transcription factors is the family of proteins referred to as

NF–κB. The NF–κB family of proteins is "dimeric": it is composed of individual proteins (p50,

p52, p65, c-Rel, and Rel-b) that associate together in pairs to integral homo- (*e.g.*, p50/p50) or

hetero-dimers (*e.g.*, p50/p65, p65/c-Rel). The NF–κB family of proteins was originally

identified as part of a search for transcription factors controlling expression of genes for the

kappa immunoglobulin light chain, a portion of an antibody molecule that is responsible for

recognition of foreign molecules ("antigens"). Hence they were originally identified in

B lymphocytes, immune cells that produce antibodies. Subsequent work, however, showed

unexpectedly that NF–κB proteins were present in most eucaryotic cells, and that their function

was not limited to the regulation of kappa light chain gene expression. M. Lenardo, C. Fang, T.

Maniatis & D. Baltimore, *The Involvement of NF–κB in B-interferon Gene Regulation Reveals Its Role*

*as Widely Inducible Mediator of Signal Transduction*; D. Baltimore, *Preface*, in Sankar Ghosh, *ed.*,

Handbook of Transcription Factor NF-kappaB (2007); S. Ghosh, *The NF–κB Pathway: a Paradigm*

*for Inducible Gene Expression*, in Sankar Ghosh, *ed.*, Handbook of Transcription Factor NF-

kappaB, at 1 (2007).

25.    Today, NF–κB is one of the most widely studied eucaryotic transcription factors. NF–κB has been shown to control expression of a wide variety of genes in several physiological contexts.  For example, NF–κB is involved in the regulation of the cellular response to stress or damage, including the inflammatory/immune response.  NF–κB also performs several functions in the nervous system, and also plays roles in embryonic development.  Baltimore, *supra*, in Sankar Ghosh, *ed.*, Handbook of Transcription Factor NF-kappaB (2007); L.A.J. O'Neill et al., *NF-κB:  A Crucial Transcription Factor for Glial and Neuronal Cell Function*, TINS 20(6):252-257 (1997).

26.    Experimental work conducted during the 1980s by scientists in the laboratories of David Baltimore, Philip Sharp and Thomas Maniatis, and disclosed in the specification of the '516 patent, showed that NF–κB was constitutively present in cytoplasm, where it is bound to other proteins referred to as "IkB" proteins because of their role in inhibiting NF–κB.  That NF–κB was present constitutively in the cytoplasm in an inactive form, rather than within the nucleus, was itself a striking discovery.  Most previously characterized transcription factors were constitutively present in the nucleus.  It was further discovered that in response to an extracellular signal, such as the binding of a ligand to its receptor, a signaling cascade occurred that led to the phosphorylation (*i.e.*, addition of a phosphate group to the side chain of certain amino acids) of IkB by IkB "kinases" ("IKKs"), and the subsequent degradation of that phosphorylated IkB.  Phosphorylation and degradation of IkB lead to the release of NF–κB from its complex with that inhibitor molecule.  Upon release, NF–κB travels to the nucleus, where it binds to exposed NF–κB DNA "recognition sequences":  specific 10-nucleotide sequences that have affinity for NF–κB proteins.  Phosphorylation of NF–κB also occurs, and is important to its activity.  L.  Chen & W.C. Greene, *Regulation of Nucler NF-κB Action:  a Key Role for Posttranslational Modification*, in Sankar Ghosh, ed., Handbook of Transcription Factor NF-

kappaB (2007), at 88-91; N. Sizemore et al., *Activation of Phosphotadylinositol 3-Kinase in Response to Interleukin-1 Leads to Phosphorylation and Activation of the NF-kappaB p65/RelA subunit*, Mol. Cell. Biol. 19(7):4798-4805 (1999); M. Naumann et al., *Activation of NF-kappaB in Vivo Is Regulated By Multiple Phosphorylations*, Embo J. 13(19):4597-4607 (1994).

27.     There are many inducers of NF-κB activity, including growth factors, bacterial and viral proteins, and, importantly in this context, cytokines. L. Chen & W.C. Greene, *Regulation of Nuclear NF-κB Action: a Key Role for Posttranslational Modification*, in Sankar Ghosh, ed., Handbook of Transcription Factor NF-kappaB (2007), at 88; S. Ghosh & M. Karin, *Missing Pieces in the NF-kappaB Puzzle*, Cell 109 Suppl, S81-96 (2002). Cytokines are soluble proteins cells secrete as a means of sending "signals" to other cells. One of the most widely studied cytokine inducers of NF-κB activity is "tumor necrosis factor-alpha," or "TNF-α". TNF-α is a cytokine secreted by several different types of cells: primarily by immune cells, such as macrophages, monocytes (which mature into macrophages), and mast cells, as well as by lymphoid cells (*e.g.,* B and T lymphocytes), and keratinocytes. Originally identified as a factor that was toxic to tumor cells, TNF-α is now known to have a large number of physiological roles, including effects on metabolism, antiviral effects and growth regulation. But perhaps its most important role is in the mediation of the immune and inflammatory response. TNF-α is the "primary trigger for the inflammatory response by promoting the synthesis of other proinflammatory cytokines." Seth R. Stevens & Ting H. Chang, *History of Development of TNF Inhibitors*, in Jeffrey M. Weinberg *et al.*, eds., TNF-αlpha Inhibitors, at 9 (2006). TNF-α is among the first cytokines secreted by activated macrophages, one of the cells responsible for mounting an immune response. The effects of TNF-α on immune cells such as macrophages are not just chemical, but visible. Immune cells that have been exposed to ("induced by") TNF-α have a distinctive physical appearance compared to those that have not been exposed.

10

28.     Consistent with general principles of signal transduction and with what is
known about the NF–κB pathway, the binding of TNF–α to its specific cell surface receptor
causes a cascade of reactions that leads to the phosphorylation of IkB and the subsequent
translocation of NF–κB to the nucleus, where NF–κB then mediates the expression of certain
genes. Those genes include the gene for TNF–α itself, as well as the genes for other cytokines.
Hence, if not inhibited, TNF–α–induced activation of NF–κB can lead to amplification of levels
of TNF–α itself, as well as enhanced expression and secretion of other cytokines involved in the
immune/inflammatory response, such as interleukin ("IL")-1, IL-2, IL-6, IL-8,
granulocyte-macrophage colony stimulating factor, transforming growth factor, and
interferon-gamma. TNF–α also stimulates the appearance of greater numbers of TNF–α
receptors on certain cell surfaces, which further amplies the effects of circulating TNF–α.

   **E.     Role of NF–κB Activity in Inflammatory Diseases**

29.     As noted, one of the many important functions of NF–κB is the regulation of the
inflammatory/immune response. The process of inflammation results from the combined
effects of several different cells and chemicals, most of which are directed toward the
recruitment of immune cells to an area of infection. The immune response is generally divided
into two broad components: the "innate" response and the "adaptive" response. The innate
response is characterized by the activation of cells such as granulocytes, macrophages, mast
cells, NK cells and dendritic cells. It is not specific for a particular antigen nor does it display
memory of prior encounters. The innate response involves the release of potent inflammatory
molecules, such as cytokines, that facilitate the clearance of the invading pathogen. It does so by
increasing vascular permeability and recruiting other inflammatory cells to the site of a
microbial insult. It is an essential aspect of the immune response, protecting the organism in the
first hours and days after an infectious insult. It also serves the key function of priming the

11

immune system to mount an adaptive response. The adaptive response is mediated by cells such as B cells and T cells, displays exquisite specificity for particular antigens and retains a memory of each prior exposure to an antigen.

30.    Inflammation is a natural, beneficial, and indeed, essential process. For example, the movement of plasma fluid into inflamed tissue carries antibodies to the sites of infections and the antibodies participate in the organism's immune response to the infections. However, inflammation can also characterize abnormal, disease states. Abnormal inflammation is the hallmark of "autoimmune diseases," diseases in which the immune system mistakenly recognizes an organism's own cells as foreign invaders. Rheumatoid arthritis, systemic lupus erythematosis and Crohn's disease are examples of diseases characterized all or in part by a distorted/exacerbated autoimmune inflammatory response.

31.    NF–$\kappa$B is a critical player in the inflammatory response in both healthy and diseased organisms. NF–$\kappa$B is both activated by and stimulates production of cytokines, such as TNF–$\alpha$. And the specific roles of excessive TNF–$\alpha$ activity and concomitantly, excessive NF–$\kappa$B activity, in rheumatoid arthritis, psoriasis, and psoriatic arthritis, a form of arthritis that afflicts a substantial proportion of psoriasis sufferers, have been well-established. High levels of TNF–$\alpha$ are expressed in arthritic serum and synovial fluid, where they exacerbate inflammation. T. Saxne et al., *Detection of tumor necrosis factor alpha but not tumor necrosis factor beta in rheumatoid arthritis synovial fluid and serum*, Arthritis Rheum. 31: 1041 (1988); E.H.S. Choy, *Cytokine pathways and joint inflammation in rheumatoid arthritis*, New England J. Med. 344: 907 (2001). High levels of TNF–$\alpha$ are also present in psoriatic tissue, where they cause proliferation of keratinocytes. R. Shukla & R.B. Vender, *Pharmacology of TNF Inhibitors*, in Jeffrey M. Weinberg *et al.*, eds., TNF–$\alpha$lpha Inhibitors, at 24 (2006); P.S. Yamauchi et al., *The treatment of psoriasis and psoriatic arthritis with etanercept: practical considerations on monotherapy, combination*

*therapy, and safety*, 22 Dermatol. Clin.: 449 (2004); P. Malerich & D.M. Elston, *Introduction to TNF/pathophysiology of TNF*, in Jeffrey M. Weinberg *et al.*, eds., TNF–alpha Inhibitors, at 6 (2006).

32.     Studies have shown high levels of activated NF-κB in cells from joints of rheumatoid arthritis sufferers, M.L. Handel et al., Arthritis Rheum., 38:1762 (1995); R. Marok *et al.*, Arthritis Rheum. 39:583 (1996); Dichamp et al., *Increased Nuclear Factor-κB Activation in Peripheral Blood Monocytes of Patients with Rheumatoid Arthritis Is Mediated Primarily by Tumor Necrosis Factor-α*, J. Rheumatol. 34:1976-83 (2007). And research funded by Amgen has shown that psoriatic keratinocytes have much higher levels of nuclear — *i.e.*, active — NF–κB than do normal, nonlesional keratinocytes, thereby confirming the role of excess NF-κB activity in psoriasis. P.F. Lizzul et al., *Differential Expression of Phosphorylated NF–κB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF–κB in Response to Treatment with Etanercept*, J. Invest. Dermatol., 124:1275 (2005).

33.     Conversely, studies have shown that agents that inhibit the activity of NF–κB specifically can mitigate the symptoms of arthritis and psoriasis. For example, in 1998, researchers showed that, in an experimental animal model of arthritis, injection into rat joints of DNA "decoy" molecules replicating the NF–κB recognition sequence inhibited the progression of a form of arthritis (adjuvant-induced arthritis) used as a model for human rheumatoid arthritis. Alexei V. Miagkov *et al.*, *NF–κB Activation Provides the Potential Link Between Inflammation and Hyperplasia in the Arthritic Joint*, PNAS 95:13859-13864 (1998). The same researchers reported that administration of compounds that inhibit the degradation of IkB, also increased the rate of apoptosis (cell death). The finding was notable because NF–κB is believed to exacerbate the hyperplasia — *i.e.*, proliferation — of synovial cells characteristic of arthritis by suppressing apoptosis. *Id.*; *See also* Albert S. Baldwin, *NF–κB and IKK as Key Mediators of Inflammation and Oncogenic Progression*, in Sankar Ghosh, ed., Handbook of Transcription Factor

13

NF-kappaB (2007), at 169. Similarly, compounds that inhibit IKKs — the enzymes that, by phosphorylating IkB, permit release of NF-κB from its complex with IkB and the subsequent translocation of NF-κB to the nucleus — have been shown in animal models to reduce joint inflammation. K.W. McIntyre et al., *A Highly Selective Inhibitor of IkB Kinase, BMS-345541, Blocks Both Joint Inflammation and Destruction in Collagen-Induced Arthritis in Mice*, Arthritis Rheum., 48:2652 (2003); D. Hammaker et al., *Signal Transduction Networks in Rheumatoid Arthritis*, Ann. Rheum. Dis. 62(Suppl II):ii86-ii89 (2003). For this and other reasons, NF-κB has been hailed as a "master switch" in the control of the cytokines and other compounds implicated in rheumatoid arthritis. Baldwin, supra, at 170.

34.    Consistent with this understanding of NF-κB's role in inflammatory disease, several drugs that target steps in the NF-κB pathway (and thereby reduce preexisting abnormal levels of NF-κB activity) are effective in treating inflammatory diseases, such as arthritis and psoriasis. One such drug is etanercept, marketed by Amgen and Wyeth in the United States as Enbrel. Enbrel is a synthetically engineered dimer of the extracellular portion of the p75 human TNF-α receptor, fused to the Fc portion of an immunoglobulin protein. In 1998, Enbrel was approved for treatment of adult rheumatoid arthritis. Subsequently, Enbrel has been approved for the treatment of psoriasis, psoriatic arthritis, and other inflammatory conditions. Enbrel was one of the first anti-cytokine therapeutics to receive FDA approval. X.R. Song et al., *Coming of Age: Anti-Cytokine Therapies*, Mol. Interventions 2:36-46 (2002).

35.    Because Enbrel possesses the portion of the p75 TNF-α receptor that includes the TNF-α-binding site, circulating Enbrel can bind to TNF-α, and thereby prevent it from interacting with TNF-α receptors on activated cells involved in the inflammatory response, such as macrophages and lymphoid cells. Reduced binding of TNF-α to its receptor, in turn, reduces signal transduction through the TNF-α receptor that would ordinarily lead to the

14

translocation of NF–κB to the nucleus and its activation of gene expression. Confirming that understanding of Enbrel's mechanism of action is the finding that the administration of Enbrel reduces the translocation of NF–κB from the cytoplasm to the nucleus in psoriatic keratinocytes. P. Lizzul *et al., Differential Expression of Phosphorylated NF–κB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF–κB in Response to Treatment with Etanercept*, J. Invest. Dermatol., 124:1275 (2005). Another recently-published, independent study demonstrated that Enbrel also reduces NF–κB activity in monocytes from rheumatoid arthritis patients. Dichamp et al., *Increased Nuclear Factor-κB Activation in Peripheral Blood Monocytes of Patients with Rheumatoid Arthritis Is Mediated Primarily by Tumor Necrosis Factor-α*, J. Rheumatol. 34:1976-83 (2007).

## IV.    PERSON OF ORDINARY SKILL IN THE ART

36.    For the purposes of my analysis in this case, I have considered the questions put to me in the context of a person of ordinary skill in the art, a scientist with a Ph.D. in chemistry, biology, or related field, or a degree in medicine and having at least three years of post-doctoral laboratory training or other laboratory experience related to molecular biology and gene regulation. I base my opinion on the level of skill in the art on the level of education, skill and experience possessed by individuals working in the field of molecular biology in the mid-to-late 1980s, including the inventors named on the '516 patent.

## V.    PRIORITY DATE

### A.    Background on '516 Patent Applications

37.    The '516 patent issued from an extensive prosecution lineage involving several divisional, continuation and continuation-in-part applications. The first application was submitted to the USPTO on January 9, 1986, a few months before the publication of Ranjan Sen & David Baltimore's seminal article on the discovery of NF–κB. R. Sen & D. Baltimore, *Multiple*

*Nuclear Factors Interact With the Immunoglobulin Enhancer Sequences*, CELL, 46:705-716 (1986).

When it was first discovered, as reflected in the earliest applications in the lineage of the '516 patent, NF–κB was believed to be specific to B-lymphocytes because it is not constitutively present in its active form in many cell types. The discovery that NF–κB existed in many more cell types as an inactive cytosolic precursor, bound to a natural inhibitor, and that it was inducible led to the invention of the claims that ultimately issued in the '516 patent. The inventions of the asserted claims 6 and 18 were first described in U.S. Patent Application No. 07/162,680 (filed March 1, 1988) and U.S. Patent Application No. 07/341,436 (filed April 21, 1989), respectively.

### B. Legal Standards

38.    I understand that a claim in a patent issued from a continuation-in-part application is entitled to the filing date of an earlier application if that application satisfies the written description, enablement and best mode requirements of 35 U.S.C. § 112.

39.    I understand that, for the purpose of determining the effective filing date of a patent claim, the sufficiency of disclosure in a patent application is measured from the perspective of a hypothetical "person of ordinary skill in the art" (a "POSA") as of the filing date. Accordingly, I understand that the specification need not recite knowledge or facts that are well-known in the art.

40.    I understand that § 112 requires that the disclosure in a patent application must be sufficiently clear and complete to teach a POSA how to make and use the invention as it is claimed without necessitating undue experimentation. I also understand that an application need not describe all possible applications or variants of the claimed invention to enable the invention.

41.    I also understand that, while escaping precise definition, undue experimentation is analyzed by consideration of several factors, including: (1) the quantity of actual experimentation necessary, (2) the amount of guidance present in the specification, (3) the presence or absence of working examples in the specification, (4) the nature of the invention, (5) the state of the prior art at the time the application was filed, (6) the relative skill of those in the relevant art at the time of filing, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

42.    I understand that to satisfy the written description requirement of 35 U.S.C. § 112, an application must describe the claimed invention in such a way as to make clear to a POSA that the patent applicants invented what is claimed in the issued patent. In other words, the claimed invention must be supported by the disclosure of the application in such a way as to show that the inventors were in possession of the claimed invention. I understand the disclosure of identifying characteristics such as structure, properties or functional characteristics coupled with a correlation between structure and function may satisfy the written description requirement.

**C.    Claims 6, 70, 71 and 72 are adequately supported by the disclosures of U.S. Patent Application No. 07/162,680 (filed March 1, 1988).**

43.    Claim 6 and claims dependent thereon are adequately supported by the disclosures of U.S. Patent Application No. 07/162,680 (filed March 1, 1988) ("'680 App."). To demonstrate to a POSA in 1988 ("POSA-'88") that the inventors of the '516 patent were "in possession" of the method of claim 6, the disclosure of the '680 application must include the elements of claim 6 as it issued. Thus, the '680 application must disclose: (1) the identity and general function of NF-κB and its natural inhibitor; (2) the basic steps of the NF-κB pathway, from induction of intracellular NF-κB signaling to the binding of NF-κB to its DNA recognition

sites in the nucleus; and (3) reduction of NF-κB activity as a means of altering NF-κB mediated gene expression.

44.    The '680 application discloses the identity and general function of NF-κB and its natural inhibitor. From the '680 application, a POSA-'88 would understand that NF-κB is a DNA-binding protein factor ('680 App. Page 3). Similarly, the '680 application teaches that NF-κB is constitutively present in the cytoplasm of unstimulated cells as a precursor bound to its natural inhibitor, which is disclosed but not yet named IκB. (Pages 6-7, "Detailed Description of the Invention"). The application also discloses that, upon stimulation with certain inducing molecules, the NF-κB-IκB complex dissociates and NF-κB translocates to the nucleus where it mediates the transcription of certain genes. (Pages 6-7, "Detailed Description of the Invention").

45.    The '680 application discloses the basic steps of the NF-κB pathway. The disclosure of the '680 application teaches that NF-κB is present as an inactive cytosolic precursor, bound in a complex with its natural inhibitor that dissociates in response to signals initiated by certain extracellular stimuli. (Pages 6-7, "Detailed Description of the Invention"). The '680 application also discloses that, upon dissociation of the NF-κB-inhibitor complex, NF-κB translocates to the nucleus, where it mediates gene transcription. (Pages 3, 7). As such, the '680 application teaches a POSA-'88 the basic steps of the NF-κB pathway: an extracellular stimulus, which triggers dissociation of the NF-κB-inhibitor complex, activation and translocation of NF-κB, and the binding of NF-κB to its DNA recognition sequences in the nucleus.

46.    The '680 application discloses reduction of NF-κB activity as a means of altering NF-κB mediated gene expression. The '680 application states that the claimed invention "relates to ... methods of causing and preventing activation of" NF-κB and to "control of induction of activity of the [NF-κB] precursor." (Page 3). The application identifies these

18

methods of controlling induction of NF-κB activity as "useful in determining/controlling …

expression of additional genes for which NF-κB…participates in transcriptional activation of

the gene." (Page 3). The disclosure specifically refers to controlling NF-κB mediated gene

expression, which necessarily includes both promotion and reduction of NF-κB mediated gene

expression. Thus, a POSA-'88 would understand the '680 application to disclose reduction of

induced NF-κB activity, including reduction of NF-κB mediated intracellular signaling.

47.     The '680 application teaches that the claimed methods can be carried out in

human immune cells. Some of the examples which are disclosed in the application involve

experiments run on 70z/3 cells, which are a murine pre-B cell line that is often used to model

human immune cells. (Pages 7-11). A POSA-'88 would know that murine pre-B cells are

immune cells, and that the results of experiments using 70z/3 cells can be extrapolated to

human immune cells. Therefore, the disclosure of the '680 application teaches that the methods

can be practiced in mammalian, human, and immune cells: the limitations added in dependent

claims 70-72.

48.     The '680 application would enable a POSA-'88 to practice the method of claim 6

in at least three ways. First, given the disclosure of the '680 application, a POSA-'88 would

understand that NF-κB's natural inhibitor, later referred to as IκB, could be isolated and cloned

using routine methods, and then used to reduce NF-κB activity in cells. *See generally*, J.

Sambrook, E.F. Fritsch & T. Maniatis, *Molecular Cloning: A Laboratory Manual* (2d ed. 1989). By

1988, a POSA would know how to isolate IκB, given the disclosure of its function and the

location of the NF-κB-IκB complex in the cytosol. Similarly, by 1988, a person of ordinary skill

in the art could obtain the DNA sequence encoding of an isolated protein and, given the

disclosure of its function as an inhibitor of NF-κB, create proteins capable of binding and

inhibiting NF-κB. A POSA-'88 would understand how to apply this knowledge to reduce NF-

19

κB activity in cells by introducing IkB into cells either by (1) introducing a vector containing a gene capable of expressing IκB into a target cells, thereby resulting in the production of IkB, (2) introducing RNA encoding IkB into a cell such that the IkB protein can be translated, or (3) introducing the IkB protein into a cell.

49.    Second, the '680 application would enable a POSA-'88 to practice claim 6 because, by 1988, a person of ordinary skill in the art would have known how to create small DNA molecules that contain an NF-κB binding site sequence and can be used to interfere with the binding of NF-κB to cellular DNA, thereby reducing NF-κB activity. When NF-κB comes into contact with one of these "decoy molecules," it binds to its recognition site on the decoy molecule. Once bound to a decoy molecule, an NF-κB molecule cannot bind to recognition sites on the cellular DNA, and therefore cannot mediate gene transcription. Given the disclosure of the NF-κB pathway, a POSA-'88 would know that one way to reduce NF-κB activity in cells would be to prevent NF-κB from binding to DNA macromolecules in the nucleus using decoy molecules. By 1988, the creation of antisense oligonucleotides and their use to inhibit gene expression was routine to one skilled in the art. *See e.g.,* Carol J. Marcus-Sekura, *Techniques for Using Antisense Oligodeoxyribonucleotides to Study Gene Expression,* Anal. Biochem. 172:289-295 (1988). Because certain NF-κB recognition sequences were well known within the art, such as the κ light chain enhancer, a POSA-'88 would know how to create decoy molecules for NF-κB. *See, e.g.,* R. Sen & D. Baltimore, Cell, 46:705-716 (1986) (disclosing the sequence of the κ light chain enhancer GGGGACTTTCC, to which NF-κB binds).

50.    Although a POSA-'88 would have known, based on knowledge in the art, how to use decoy molecules to inhibit NF-κB, those methods were nonetheless added to the disclosure of the U.S. Patent Application No. 07/341,436 (filed April 21, 1989). In addition to the κ light chain enhancer sequence, the '436 application discloses several additional sequences that could

be incorporated into decoy molecules in Table 1. (Page 28). The '436 application also discloses the consensus recognition sequence for NF-κB, which can be used to discover new NF-κB binding sequences for incorporation into decoy molecules. (Page 28). The actual use of decoy molecules to inhibit NF-κB in cells implicated in arthritis is reported in A.V. Miagkov et al., *NF-κB Activation Provides the Potential Link Between Inflammation and Hyperplasia in the Arthritic Joint,* PNAS 95:13859-13864 (1998).

51. Third, by 1988, a person of ordinary skill in the art would also know how to create molecules that contain the DNA binding domain of NF-κB, called dominantly interfering molecules, which bind to NF-κB recognition sites on nuclear DNA but do not initiate transcription. See e.g., I. Herskowitz, *Functional Inactivation of Genes By Dominant Negative Mutations,* Nature 329:219-222 (1987); A.D. Friedman et al., *Expression of a Truncated Viral Trans-Activator Selectively Impedes Lytic Infection By Its Cognate Virus,* Nature 335:452-454 (1988). Like most transcription factors, NF-κB is composed of both a DNA binding domain, which binds to the recognition sequence, and a transcriptional activation domain, which is involved in the activation of RNA polymerase—a step that is required for transcription to occur. Dominantly interfering molecules have the NF-κB DNA binding domain, but lack a functional transcriptional activation domain. When a dominantly interfering molecule binds to a κB site on the nuclear DNA, it blocks NF-κB from binding to that site and initiating transcription. Because dominantly interfering molecules were well known by 1988, a person of ordinary skill in the art would know that they could be used to practice the claimed methods, and would know how to create molecules containing the DNA binding domain.

52. By 1990, at least one laboratory had created molecules that inhibited NF-κB from binding to its recognition sequences by taking advantage of the same principles underlying dominantly interfering molecules and decoy molecules. F. Logeat et al., *Inhibition of*

21

*Transcription Factors Belonging to the Rel/NF-κB Family By a Transdominant Negative Mutant,* The

EMBO Journal 10(7):1827-1832 (1991). Specifically, Logeat created a mutant p50 NF-κB subunit

that was capable of forming a dimer with p65, but which could not bind to DNA. Logeat

demonstrated that these molecules inhibited NF-κB mediated gene expression.

**D.      Claims 18, 183, 184 and 185 are adequately supported by the disclosures of U.S. Patent Application No. 07/341,436 (filed April 21, 1989).**

53.      To demonstrate to a person of ordinary skill in the art that the inventors of the

'516 patent were "in possession" of the method of claim 18, the disclosure of the '436 application

must include the elements of claim 18 as it issued. The '436 application must disclose, in

addition to those elements required to describe claim 6 discussed in the preceding subsection,

that TNF-α and IL-1 activate the NF-κB signaling pathway. Accordingly, claim 18 is entitled to

the benefit of the filing date of the '436 application, the first application to disclose that TNF-α

and IL-1 induce NF-κB activity in cells. See ('436 App. Pages 22-23) ("NF-κB has been

implicated in several other inducible systems...IL-1 and TNF-α activate NF-κB binding").

54.      A person of ordinary skill in the art would be able to practice the methods of

claims 18 and 183-185, given the disclosure of the '436 application, through the use of decoy

molecules, dominantly interfering molecules and synthetic IκB-like proteins, as described in

section V. C. above. Although a person of ordinary skill in the art would have known to use

decoy molecules or dominantly interfering molecules as of 1988, these methods were added to

the disclosure of the 1989 application. ('436 App., pages 29-30). The '436 application also

discloses several additional sequences that could be incorporated into decoy molecules in Table

1 ('436 application, page 28) and the consensus recognition sequence for NF-κB, which can be

used to discover new NF-κB binding sequences to incorporate into decoy molecules. ('436

application, page 28).

## VI.    CLAIM CONSTRUCTION

55.    I have been asked to construe the limitations of claims 6, 18, 70, 71, 72, 183, and 184 of the '516 patent ("the asserted claims") against Amgen.  The language of claims 6 and 18 is reproduced below:

56.    "Claim 6:  A method for diminishing induced NF–κB-mediated intracellular signaling comprising reducing NF–κB activity in cells such that NF–κB mediated intracellular signaling is diminished."

57.    "Claim 18:  A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF–κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells. "

58.    I understand that claims are construed according to their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art at the time of the invention and in light of the specification.  I understand that claim construction is a matter of law, to be determined by the Court in advance of trial.  In my opinion, the Court would appropriately construe the limitations of the asserted claims as follows.

### B.    Terms Found in Each Asserted Claim

| Claim Limitation | Proposed Construction |
|---|---|
| "NF–κB" | A DNA-binding protein factor found in many eucaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive precursor, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes. |

59.    NF–κB is a DNA -binding protein factor found in many eucaryotic cells. As disclosed by the specification of the '516 patent, NF–κB is a "DNA-binding protein" that was "initially thought to be a B-cell specific factor," but is now known to be "present in many, if not all, cell types." (12:36-39), (35:42-45), (17:45-47). NF–κB is not found in procaryotic cells, but the specification discloses that it is present many different eucaryotic cells, including different species (14:64-66), (25:41-43), (26:40-44) and different tissues: liver cells (17:28-30); kidney, spleen, lung, muscle, brain (26:40-44); immune and lymphoid cells (1:51-52), (13:21-22), (17:1-2), (78:56-57).

60.    NF–κB is constitutively present in the cytoplasm of unstimulated cells as an inactive precursor, bound to inhibitory IκB proteins. The specification teaches that, in most unstimulated cells, NF–κB exists in the form of an inactive precursor, bound in a complex to its natural inhibitor, IκB. (2:46-63), (10:46-54), (12:28-35), (26:66-27:10). While bound to IκB, NF–κB cannot translocate to the nucleus, and thus cannot mediate transcription. (16:23-24), (31:11-14).

61.    Upon dissociation from IκB, NF–κB translocates to the nucleus of the cell. As disclosed in the specification, the cytosolic NF–κB-IκB complex dissociates in response to signals initiated by certain extracellular stimuli. (15:12-14), (17:47-50), (30:42-31:56). Once it is released from its inhibitor, NF–κB is able to enter the nucleus of the cell. (10:46-54), (17:51-52), (30:52-53).

62.    Once in the nucleus, NF–κB mediates the transcription of certain genes by binding to specific DNA recognition sequences. The '516 patent discloses that NF–κB mediates the transcription of many different genes by binding to specific sequences of DNA. (4:12-23); (16:26-28). The specification teaches that NF–κB can regulate the expression of certain genes: "[t]he expression of a gene having an NF–κB binding recognition sequence can be positively or negatively regulated to provide, respectively, for increased or decreased production of the protein whose expression is mediated by NF–κB." (35:45-46).

| Claim Limitation | Proposed Construction |
|---|---|
| "Reducing NF–κB activity" | Decreasing the ability of NF–κB to act as an intracellular messenger that regulates transcription of particular genes, by inhibiting any step along the NF–κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor and ends with the synthesis of the protein whose expression is regulated by NF–κB. |

63.    "Reducing NF–κB activity" refers to inhibition of any step along the NF–κB signal transduction pathway. As used in the specification, the term "NF–κB activity" refers to the ultimate effect of activated NF–κB upon a gene regulated by NF–κB. Thus, "reduction" of NF–κB activity can occur by inhibiting any step along the NF–κB signal transduction pathway, beginning with the binding of an extracellular receptor ligand, such as a cytokine, to its receptor and ending with synthesis of the protein whose expression is regulated by NF–κB. (3:59-64 ("[I]t is now possible ... to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF–κB activity")); (16:22-35). Thus, the specification teaches that "NF–κB activity" can be "reduc[ed]" in numerous ways, including (1) preventing dissociation of the NF–κB-IκB complex, (2) inhibiting NF–κB's translocation to the nucleus, or (3) preventing NF–κB from binding to its DNA recognition sequences within the nucleus. (35:13-15), (37:43-49); (37:50-54); (38:6-22).

25

64.    The specification notes that the NF-κB precursor may not be constitutively present in all cells. (12:36-41). In cells lacking NF-κB, NF-κB activity, by definition, does not exist, and thus, in such cells, NF-κB activity cannot be "reduced." Hence, the methods of claims 6 and 18 (and their dependent claims) can be performed only on cells that contain NF-κB.

C.    Terms Found in Claim 6 and Claims Dependent Thereon

| Claim Limitation | Proposed Construction |
|---|---|
| "NF-κB-mediated intracellular signaling" | Means the intracellular steps of the NF-κB signal transduction pathway. |
| "Diminishing induced NF-κB-mediated intracellular signaling" | Means inhibition of the intracellular steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the claimed method. |
| "Comprising reducing NF-κB activity in cells" | Means that the claimed method of "reducing NF-κB activity" (as construed above) is performed on intact cells containing NF-κB, whether in cell culture or in living tissue. |
| "Such that NF-κB mediated intracellular signaling is diminished" | Means the resultant reduction of NF-κB-mediated intracellular signaling, as construed above. |

65.    "NF-κB-mediated intracellular signaling" means the intracellular steps of the NF-κB signal transduction pathway. As explained in the specification, the NF-κB-IκB cytosolic precursor dissociates when "[v]arious inducers...cause an alteration in I-κB allowing NF-κB to be released from the complex." (16:24-26). Once released from the complex, NF-κB travels to the nucleus and binds to DNA recognition sites to affect gene transcription. (16:26-28). The end point of NF-κB mediated intracellular signaling is the expression of those proteins regulated by NF-κB.

66.    "Diminishing induced NF-κB signaling" means inhibition of the intracellular steps of the NF-κB signal transduction pathway, initiated in response to a stimulus, prior to the performance of the claimed method. As used in claim 6, the word "induced" is a past participle that modifies "signaling." That indicates that the induction of NF-κB-mediated

26

intracellular signaling must take place *before* the performance of the claimed method. The '516 patent discloses several extracellular substances, such as the pro-inflammatory cytokines IL-1 and TNF-α, that induce intracellular NF-κB signaling (17:30-33). The method of claim 6 can be performed only upon cells that have already been exposed to an external stimulus that induces NF-κB mediated intracellular signaling. In the absence of such a construction, the term "induced" would be superfluous.

67.    **"In cells" means that the claimed method is performed on intact cells containing NF-κB, whether in cell culture or in living tissue.** The specification discloses modulation of NF-κB activity in cultured, immortal cell lines, such as Jurkat cells, HeLa cells, and 70Z/3 cells. (17:58-61), (25:40-26:38). The '516 patent also discloses performance of the claimed methods on intact cells found in living tissue, as in a human patient. (3:23-26); (4:23-28). In light of these disclosures, a POSA would understand the limitation "in cells" to refer to methods performed on such cells, in contrast to methods performed on lysed cellular extracts, or non-cellular, nuclear or cytosolic vesicles. Because the pathway of NF-κB-mediated intracellular signaling involves both cytosolic (e.g., receptor, IκB, IKK) and nuclear (e.g., translocated NF-κB, RNA polymerase) components, extracts or vesicles containing only a portion of these components could not display "induced NF-κB-mediated intracellular signaling" capable of subsequent diminution according to the method of claim 6.

68.    **"Such that NF-κB mediated intracellular signaling is diminished" means the resultant reduction of "NF-κB-mediated intracellular signaling."** The specification teaches several ways of diminishing "NF-κB-mediated intracellular signaling," including (1) preventing dissociation of the NF-κB-IκB complex, (2) inhibiting NF-κB's translocation to the nucleus, or (3) preventing NF-κB from binding to its DNA recognition sequences within the nucleus. (35:13-15), (37:43-49); (37:50-54); (38:6-22).

### D.    Terms Found in Claim 18 and Claims Dependent Thereon

| Claim Limitation | Proposed Construction |
|---|---|
| "Reducing Interleukin-1 or Tumor Necrosis Factor-α activity" | Means inhibiting intracellular NF–κB signal transduction induced by the circulating cytokines, IL-1 or TNF–α. |
| "in mammalian cells" | Means intact cells, whether in cell culture or in living tissue, from species falling within the class of mammals. |
| "comprising reducing NF–κB activity in the cells" | See above, ¶¶ 65-67. |
| "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" | Means inhibiting the intracellular steps of the NF–κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method in mammalian cells. |

69.    "Reducing Interleukin-1 or Tumor Necrosis Factor-α activity" means inhibiting intracellular NF–κB signal transduction induced by IL-1 or TNF–α. The '516 patent discloses that the NF–κB-IκB cytosolic precursor dissociates when "[v]arious inducers…cause an alteration in I-κB allowing NF–κB to be released from the complex." (16:24-26). The pro-inflammatory cytokines, TNF–α and IL-1, are two inducers of NF–κB activity that are disclosed in the specification. (17:30-33). When, for example, TNF–α binds extracellularly to its receptor on the cell membrane, it initiates a signaling cascade within the cell that results in the dissociation of the NF–κB-IκB complex. Once released from the complex, NF–κB travels to the nucleus and binds to DNA recognition sites to effect gene transcription. (16:26-28).

70.    "In mammalian cells" means intact cells, whether in cell culture or in living tissue, from species falling within the class of mammals. The limitation "in mammalian cells" has the same meaning that is possessed by the limitation "in cells" in claim 6, except for its restriction to cells from species falling within the class of mammals.

71.    "So as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" means inhibiting the intracellular steps of the NF–κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method in mammalian cells.  As used in claim 18, "caused by Interleukin-1 or Tumor Necrosis Factor- α" is a past participial phrase that modifies "signaling." That indicates that these cytokines must "cause" NF–κB-mediated intracellular signaling *before* the performance of the claimed method.   Hence, the method of claim 18 can be performed only upon cells that have already been exposed to TNF–α or IL-1.

E.    **Terms Found in Dependent Claims**

| Claim Limitation | Proposed Construction |
|---|---|
| "Mammalian cells" | In claim 70, "mammalian cells" means intact cells containing NF–κB, whether in cell culture or living tissue, that come from a species falling within the class of mammals. |
| "Human cells" | In claims 71 and 183, "human cells" means intact cells containing NF–κB, whether in cell culture or living tissue, that come from a human being. |
| "Immune cells" | In claims 72 and 184, "immune cells" means intact cells containing NF–κB, such as monocytes, mast cells, macrophages, and lymphocytes, whether in cell culture or living tissue, that help protect the body of a mammal from foreign materials and infection. |

72.    **"Mammalian cells"** has the same meaning in claim 70 that it carries in claim 18, construed above.

73.    **"Human cells"** has the same meaning in claims 71 and 183 that is possessed by the limitation "in cells" in claim 6, except for its restriction to cells from human beings.

74.    "Immune cells" means intact cells containing NF–κB, such as monocytes, mast cells, macrophages, and lymphocytes, whether in cell culture or living tissue, that help protect the body of a mammal from foreign materials and infection.  Although the term is not explicitly defined in the '516 patent, a POSA would know that the phrase "immune cells" includes, but is not limited to lymphocytes (e.g., T cells and B cells), monocytes and monocyte derived cells (e.g. macrophages), neutrophils, eosinophils, basophils, and fixed or tissue specific leukocytes (e.g., mast cells, dendritic cells and histiocytes).

_____
Jeffrey V. Ravetch, M.D., Ph.D.

1/18/08
_____
Date

30

MATERIALS RELIED UPON

**F.**     **US Patents & Patent Applications**

- D. Baltimore et al., "Nuclear Factors Associated With Transcriptional Regulation", U.S. Patent No. 6,410,516.

- U.S. Patent Application No. 07/162,680.

- U.S. Patent Application No. 07/341,436.

**G.**     **Publications**

- E.H.S. Choy & G.S. Panayi, *Cytokine Pathways And Joint Inflammation In Rheumatoid Arthritis*, New England J. Med. 344: 907-916 (2001).

- Dichamp et al., *Increased Nuclear Factor-κB Activation in Peripheral Blood Monocytes of Patients with Rheumatoid Arthritis Is Mediated Primarily by Tumor Necrosis Factor-α*, J. Rheumatol. 34:1976-83 (2007).

- A.D. Friedman et al., *Expression of a Truncated Viral Trans-Activator Selectively Impedes Lytic Infection By Its Cognate Virus*, Nature 335:452-454 (1988).

- S. Ghosh, *ed.*, Handbook of Transcription Factor NF-kappaB (2007).

- S. Ghosh & M. Karin, *Missing Pieces in the NF-kappaB Puzzle*, Cell 109(Suppl):S81-S96 (2002).

- D. Hammaker et al., *Signal Transduction Networks In Rheumatoid Arthritis*, Ann. Rheum. Dis. 62(Suppl II):ii86-ii89 (2003).

- M.L. Handel et al., *Nuclear Factor–κB In Rheumatoid Synovium*, Arthritis Rheum., 38:1762-1770 (1995).

- I. Herskowitz, *Functional Inactivation of Genes By Dominant Negative Mutations*, Nature 329:219-222 (1987).

- M. Lenardo, C. Fang, T. Maniatis & D. Baltimore, *The Involvement of NF–κB in B-interferon Gene Regulation Reveals Its Role as Widely Inducible Mediator of Signal Transduction.*

- P.F. Lizzul et al., *Differential Expression of Phosphorylated NF-kB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF-kB in Response to Treatment with Etanercept*, J. Invest. Dermatol., 124:1275 (2005).

- F. Logeat et al., *Inhibition of Transcription Factors Belonging to the Rel/NF-κB Family By a Transdominant Negative Mutant*, THE EMBO JOURNAL 10(7):1827-1832 (1991).

31

- C.J. Marcus-Sekura, *Techniques for Using Antisense Oligodeoxyribonucleotides to Study Gene Expression*, Anal. Biochem. 172:289-295 (1988).

- R. Marok et al., *Activation of the Transcription Factor Nuclear Factor–κB In Human Inflamed Synovial Tissue*, Arthritis Rheum. 39:583-591 (1996).

- K.W. McIntyre et al., *A Highly Selective Inhibitor Of Ikb Kinase, BMS-345541, Blocks Both Joint Inflammation And Destruction In Collagen-Induced Arthritis In Mice*, Arthritis Rheum. 48:2652-2659 (2003).

- A.V. Miagkov et al., *NF-Kb Activation Provides The Potential Link Between Inflammation And Hyperplasia In The Arthritic Joint*, PNAS 95:13859-13864 (1998).

- M. Naumann et al., *Activation of NF-kappaB in Vivo Is Regulated By Multiple Phosphorylations*, Embo J. 13(19):4597-4607 (1994).

- L. A.J. O'Neill et al., *NF-κB: A Crucial Transcription Factor for Glial and Neuronal Cell Function*, TINS 20(6):252-257 (1997).

- J. Sambrook, E.F. Fritsch & T. Maniatis, *Molecular Cloning: A Laboratory Manual* (2d ed. 1989).

- T. Saxne et al., *Detection of Tumor Necrosis Factor Alpha But Not Tumor Necrosis Factor Beta in Rheumatoid Arthritis Synovial Fluid and Serum*, Arthritis Rheum. 31: 1041-1045 (1988).

- R. Sen & D. Baltimore, *Multiple Nuclear Factors Interact With the Immunoglobulin Enhancer Sequences*, Cell, 46:705-716 (1986).

- N. Sizemore et al., *Activation of Phosphotadylinositol 3-Kinase in Response to Interleukin-1 Leads to Phosphorylation and Activation of the NF-kappaB p65/RelA subunit*, Mol. Cell. Biol. 19(7):4798-4805 (1999).

- X.R. Song et al., *Coming of Age: Anti-Cytokine Therapies*, Mol. Interventions 2:36-46 (2002).

- Jeffrey M. Weinberg et al., eds., TNF-alpha Inhibitors (2006).

- P.S. Yamauchi et al., *The Treatment Of Psoriasis And Psoriatic Arthritis With Etanercept: Practical Considerations On Monotherapy, Combination Therapy, And Safety*, 22 Dermatol. Clin.: 449-459 (2004).

## CURRICULUM VITAE

**Name:**     Jeffrey V. Ravetch

**Date and Place of Birth:**  May 3, 1951; New York, New York

**Citizenship:**    United States

**Education:**

| | | |
|---|---|---|
| June 1973 | - | **B.S.,** Yale University, New Haven, CT |
| June 1978 | - | **Ph.D.,** Laboratory of Genetics (N. Zinder and P. Model), The Rockefeller University, New York, NY |
| June 1979 | - | **M.D.,** Cornell University Medical College, New York, NY |

**Postdoctoral Training:**

1979 - 1982  Laboratory of Molecular Genetics (P. Leder), NICHD, NIH, Bethesda, MD

**Positions and Appointments:**

| | |
|---|---|
| 1997- | **Theresa and Eugene M. Lang Chair,** The Rockefeller University |
| 1996- | **Professor,** The Rockefeller University |
| 1993- | **Adjunct Professor,** Department of Microbiology and Immunology, Jefferson Medical College and Jefferson Cancer Institute |
| 1990 -1996 | **Attending,** Division of Hematologic Oncology, Department of Medicine, Memorial Hospital for Cancer and Allied Diseases |
| 1990 - 1996 | **Member,** Division of Molecular Biology, Memorial Sloan-Kettering Cancer Center |
| | **Professor,** Cornell University Medical College |
| 1986 - 1990 | **Associate Attending,** Division of Medical Oncology, Hematology-Lymphoma Service, Department of Medicine, Memorial Sloan-Kettering Cancer Center |
| 1986 - 1990 | **Associate Member,** Division of Molecular Biology, Memorial Sloan-Kettering Cancer Center |
| | **Associate Professor,** Cornell University Medical College |
| 1984 - 1987 | **Guest Investigator,** Laboratory of Cellular Physiology and Immunology, The Rockefeller University |
| 1982 - 1986 | **Assistant Member,** Division of Molecular Biology, Memorial Sloan-Kettering Cancer Center |
| | **Assistant Professor,** Cornell University Medical College |
| 1979 - 1982 | **Research Associate,** Laboratory of Molecular Genetics, NICHD, National Institutes of Health |
| 1973 - 1979 | **Biomedical Fellow,** The Rockefeller University |
| 1972 - 1973 | **Teaching Assistant,** Dept. of Chemistry, Yale University |

**Honors and Awards:**

NSF Summer Research Fellowships, 1971, 1972
Cum laude, Yale College, 1973
Charles E. Culpeper Fellow, 1983-1985
Pew Scholar, 1985-1989
Burroughs-Wellcome Award in Molecular Parasitology, 1986
Irma T. Hirschl/Monique Weill-Caulier Trust Career Scientist Award, 1986
Boyer Research Award, Memorial Sloan-Kettering Cancer Center, 1988
Kunkel Lecturer, Rockefeller University, 1996
NIH MERIT Award, 1997
Ecker Lecturer, Case Western Reserve University, 2000
Lee J. Howley, Jr. Award, 2004
AAI-Huang Foundation Meritorious Career Award, 2005
Member, National Academy of Sciences, 2006
William B. Coley Award, Cancer Research Institute, 2007
Member, Institute of Medicine, 2007

**Patents:**

5,116,965-Methods of obtaining histidine-rich protein genes of plasmodia
5,723,593-Diagnostic assay for Charcot Marie Tooth disease type 1B
5,728,377-Methods and compositions Incorporating IP-10
5,824,487-Method for screening for targets for anti-inflammatory or anti-allergic agents.
5,876,927-Nucleic acid diagnostic assay for Charcot-Marie-Tooth Disease type IB
5,877,396-Mice mutant for Fc Receptors and method of treating autoimmune disease.
6,676,927-Animal model and methods for its use in the selection of cytotoxic antibodies
7,038,031-DNA encoding FcγR receptor protein on NK cells.

**Other Activities:**

**National**

Ad hoc member, Immunobiology Study Section, 1986-1990
Ad hoc member, Tropical Medicine and Parasitology Study Section, 1988-1990
Member, Allergy and Immunology Study Section, 1990-1994
Member, Blood Diseases Advisory Panel of The New York Community Trust, 1990-1996
Founder and Organizer (with D. Wirth and L. van der Ploeg), Annual Woods Hole Molecular Parasitology Meeting, 1990-1992
NIH Task Force on Immunology and Aging, 1994
Institute of Medicine, Nat'l Academy of Sciences, Committee on Malaria Vaccines, 1995
AAI, American Association of Immunologists, Public Affairs Committee, 2003-2005

**Editorial**
Advisory Editor, The Journal of Experimental Medicine
Transmitting Editor, International Immunology
Editorial Advisory Board, Current Drug Targets – Inflammation & Allergy

**Scientific Advisory Board**
Cancer Research Fund of the Damon Runyon - Walter Winchell Foundation 1996-2000
Cancer Research Institute
Irvington Institute for Medical Research
Portola Pharmaceuticals

**Professional Memberships:**
American Society for Biochemistry and Molecular Biology
American Society for Cell Biology
Harvey Society
AAAS
AAI
The Kunkel Society

**Home Address:**    500 Park Ave., 39th floor          **Tel. #:** (212) 371-1247
                     New York, NY 10022

**Office Address:**  The Rockefeller University          **Tel. #:** (212) 327-7321
                     1230 York Ave., Box 98              **FAX #:** (212) 327-7318
                     New York, NY 10021

                     **E-Mail:** ravetch@rockefeller.edu

**Dependents #:**    2

**Military Services:**  1979-1982  USPHS  Surgeon (04)

## Bibliography

1.  **Ravetch, J.V.**, Gralla, J. and Crothers, D.M. (1974)  Thermodynamic and kinetic properties of short RNA helices: the oligomer series $A_nGCU_n$. *Nucleic Acids Research* 1:109-127.

2.  **Ravetch, J.V.** and Jakes, K.S. (1976)  Intact 3' end of 16S rRNA is not required for specific mRNA binding. *Nature* 262:150-153.

3.  **Ravetch, J.V.**, Model, P. and Robertson, H.D. (1977)  Isolation and characterization of the φx174 ribosome binding sites. *Nature* 265:698-702.

4.  **Ravetch, J.V.**, Horiuchi, K., and Model, P. (1977)  Mapping of bacteriophage f1 ribosome binding sites to their cognate genes. *Virology* 81:341-351.

5.  **Ravetch, J.V.**, Horiuchi, K. and Zinder, N.D. (1977)  Nuceotide sequences near the origin of replication of bacteriophage f1. *Proc. Natl. Acad. Sci. USA* 74:4219-4222.

6.  **Ravetch, J.V.**, Horiuchi, K. and Zinder, N.D. (1978)  Nucleotide sequence of the recognition site for the restriction-modification enzyme of *Escherichia coli B*. *Proc. Natl. Acad. Sci. USA* 75:2266-2270.

7.  Horiuchi, K., **Ravetch, J.V.** and Zinder, N.D. (1978)  DNA replication of bacteriophage f1 in vivo. *Cold Spring Harbor Symposium on Quantitative Biology*, Vol. 43.

8.  **Ravetch, J.V.**, Horiuchi, K. and Zinder, N.D. (1979)  DNA sequence analysis of the defective interfering particles of bacteriophage f1. *J. Mol. Biol.* 128:305-318.

9.  **Ravetch, J.V.**, Ohsumi, M., Model, P., Vovis, G.F., Fischoff, D. and Zinder, N.D. (1979)  Organization of a hybrid between phage f1 and plasmid pSC101. *Proc. Natl. Acad. Sci. USA* 76:2195-2198.

10. **Ravetch, J.V.**, Kirsch, I.R. and Leder, P. (1980)  Evolutionary approach to the question of immunoglobulin heavy chain switching: Evidence from cloned human and mouse genes. *Proc. Natl. Acad. Sci. USA* 77:6734-6738.

11. Korsmeyer, S.J., Hieter, P., **Ravetch, J.V.**, Poplack, D., Waldmann, T. and Leder, P. (1981) Developmental hierarchy of immunoglobulin gene rearrangements in human leukemic pre-B cells. *Proc. Natl. Acad. Sci. USA* 78:7096-7100.

12. Kirsch, I., **Ravetch, J.V.**, Kwan, S.-P., Max, E.E., Ney, R.L. and Leder, P. (1981)  Multiple immunoglobulin switch region homologies outside the heavy chain constant region locus. *Nature* 292:585-587.

13. Siebenlist, U., **Ravetch, J.V.**, Korsmeyer, S., Waldmann, T. and Leder, P. (1981) Human immunoglobulin D segments encoded in tandem multigenic families. *Nature* 294:631-635.

14. **Ravetch, J.V.**, Siebenlist, U., Korsmeyer, S., Waldmann, T. and Leder, P. (1981) The structure of the human immunoglobulin μ locus: characterization of embryonic and rearranged J and G genes. *Cell* 27:583-591.

15. Korsmeyer, S.J., Arnold, A., Bakhshi, A., **Ravetch, J.V.**, Siebenlist, U., Hieter, P.A., Sharrow, S.O.,LeBien, T.W., Kersey, J.H., Poplack, D.G., Leder, P. and Waldmann,T.A. (1983) Immunoglobulin gene rearrangement and cell surface antigen expression in acute lymphocytic leukemias of T-Cell and B-Cell precursor origins. *J. Clin. Invest.* 71:301-313.

16. Waldmann, T.A., Korsmeyer, S.J., Hieter, P.A., **Ravetch, J.V.**, Broder, S. and Leder, P. (1983) Regulation of the humoral immune response: from immunoglobulin genes to regulatory T cell networks. *Fed. Proc.* 42:2498-2503.

17. Shin, H.-S., Flaherty, L., Artzt, K., Bennett, D. and **Ravetch, J.V.** (1983) Inversion in the H-2 complex of t-Haplotypes in mice. *Nature* 306:380.

18. **Ravetch, J.V.**, Feder, R., Pavlovec, A. and Blobel, G. (1984) Primary structure and genomic organization of the histidine-rich protein of the malaria parasite *Plasmodium lophurae*. *Nature* 312:616.

19. **Ravetch, J.V.**, Kochan, J. and Perkins, M. (1985) Isolation of the gene for a glycophorin-binding protein implicated in erythrocyte invasion by a malaria parasite. *Science* 227:1593-1597.

20. Luster, A.D., Unkeless, J.C. and **Ravetch, J.V.** (1985) γ-interferon transcriptionally regulates an early-response gene with homology to platelet proteins. *Nature* 315:672-676.

21. Bakshi, A., Guglielmi, P., Siebenlist, U., **Ravetch, J.V.**, Jensen, J.P. and Korsmeyer, S.J. (1986) A DNA insertion/deletion necessitates an aberrant RNA splice accounting for a μ heavy chain disease protein. *Proc. Natl. Acad. Sci. USA* 83:2689-2693.

22. Kochan, J., Perkins, M. and **Ravetch, J.V.** (1986) A tandemly repeated sequence determines thebinding domain for an erythrocyte receptor binding protein of *P. falciparum*. *Cell* 44:689-696.

23. Pologe, L. and **Ravetch, J.V.** (1986) A chromosomal rearrangement in a *P. falciparum* histidine-rich protein gene is associated with the knobless phenotype. *Nature* 322:474-477.

24.   Portnoy, D.A., Erickson, A.H., Kochan, J., **Ravetch, J.V.** and Unkeless, J.C. (1986) Cloning and characterization of a mouse cysteine proteinase. *J. of Biol. Chem.* 261:14697-14703.

25.   **Ravetch, J.V.**, Luster, A., Weinshank, R., Kochan, J., Pavlovec, A., Portnoy, D., Hulmes, J., Pan, Y-C. and Unkeless, J. (1986) Structural heterogeneity and functional domains of murine immunoglobulin G Fc receptors. *Science* 234:718-725.

26.   Luster, A., Jhanwar, S., Chaganti, R.S.K., Kersey, J., and **Ravetch, J.V.** (1987) Interferon-inducible gene maps to a chromosomal band associated with a (4;11) translocation in acute leukemia cells. *Proc. Natl. Acad. Sci. USA* 84:2868-2871.

27.   Pologe, L., Pavlovec, A., Shio, H. and **Ravetch, J.V.** (1987) Primary structure and subcellular localization of the knob-associated histidine-rich protein of *Plasmodium falciparum. Proc. Natl.Acad. Sci. USA* 84:7139-7143.

28.   Luster, A.D. and **Ravetch, J.V.** (1987) Genomic characterization of gamma-interferon-inducible gene (IP-10) and identification of an interferon-inducible hypersensitive-site. *Mol. Cell. Biol.* 7:3723-3731.

29.   Luster, A.D. and **Ravetch, J.V.** (1987) Biochemical characterization of a γ interferon inducible cytokine (IP-10). *J. Exp. Med.* 166:1085-1097.

30.   Weinshank, R.L., Luster, A.D. and **Ravetch, J.V.** (1988) Function and regulation of a murine macrophage-specific IgG Fc receptor, FcγR-α. *J. of Exp. Med.* 167:1909-1925.

31.   Luster, A.D., Weinshank, R.L. and **Ravetch, J.V.** (1988) Molecular and biochemical characterization of a novel γ-interferon-inducible protein. *J. of Biol. Chem.* 263:12036-12043.

32.   Pologe, L.G. and **Ravetch, J.V.** (1988) Large deletions result from breakage and healing of *P. falciparum* chromosomes. *Cell* 55:869-874.

33.   Perussia, B., Tutt, M.M., Qiu, W.Q., Kuziel, W.A., Tucker, P.W., Trinchieri, G., Bennett, M., **Ravetch, J.V.** and Kumar, V. (1989) Murine natural killer cells express functional Fcγ Receptor II encoded by the FcγRα gene. *J. Exp. Med.* 170:73-86

34.   **Ravetch, J.V.** and Perussia, B. (1989) Alternative membrane forms of FcγRIII(CD16) on human natural killer cells and neutrophils: Cell-type specific expression of two genes that differ in single nucleotide substitutions. *J. Exp. Med.* 170:481-497.

35.   Brooks, D., Qiu, W.Q., Luster, A.D. and **Ravetch, J.V.** (1989)  Structure and expression of human IgG FcRII(CD32):  Functional heterogeneity is encoded by the alternatively spliced products of multiple genes. *J. Exp. Med.* 170:1369-1385.

36.   Kurosaki, T. and **Ravetch, J.V.** (1989)  A single amino acid substitution in the GPI attachment domain is responsible for the alternative membrane anchoring of FcγRIII(CD16). *Nature* 342:805-807.

37.   Pologe, L.G., de Bruin, D. and **Ravetch, J.V.** (1990)  A and T homoplymeric stretches mediate a DNA inversion in *Plasmodium falciparum* which results in loss of gene expression. *Mol. Cell. Biol.* 10:3243-3246.

38.   Qiu, W.Q., de Bruin, D., Brownstein, B.H., Pearse, R., and **Ravetch, J.V.** (1990) Organization of the human and mouse low-affinity FcγR genes:  Duplication and Recombination. *Science* 248:732-735.

39.   Perussia, B. and **Ravetch, J.V.**  (1991) FcγRIII(CD16) on human macrophages is a functional product of the FcγRIII-2 gene. *Eur. J. Immunol.* 21:425-429.

40.   Kurosaki, T., Gander, I. and **Ravetch, J.V.** (1991)  A subunit common to an IgG Fc receptor and the T cell receptor mediates assembly through different interactions. *Proc. Natl Acad. Sci. USA*, 88:3837-3841.

41.   Seykora, J., **Ravetch, J.V.** and Aderem, A. (1991)  Cloning and molecular characterization of the murine macrophage "68-kDa" protein kinase C substrate, and its regulation by bacterial lipopolysaccharide. *Proc. Natl Acad. Sci. USA*, 88:2505-2509.

42.   Pearse, R., Feinman, R. and **Ravetch, J.V.** (1991).  Characterization of the promoter of the human gene encoding the high-affinity IgG receptor:  Transcriptional induction by γ-interferon is mediated through common DNA response elements. *Proc. Natl Acad. Sci. USA*, 88:11305-11309.

43.   Kurosaki, T., Gander, I., Wirthmueller, U. and **Ravetch, J.V.** (1992). The β subunit of the FcεRI is associated with the FcγRIII on mast cells. *J. Exp. Med.*, 175:447-451.

44.   Wirthmueller, U., Kurosaki, T., Murakami, M. and **Ravetch, J.V.** (1992). Signal transduction by FcγRIII(CD16) is mediated through the γ chain, *J. Exp. Med.*, 175:1381-1390.

45.   Lanzer, M., de Bruin, D. and **Ravetch, J.V.**  (1992). Transcription mapping of a 100 kb locus of *P. falciparum* identifies an intergenic region in which transcription terminates and reinitiates, *EMBO*, 11:1949-1955.

46.  Schenkman, S., Kurosaki, T. **Ravetch, J.V.**, and Nussenzweig, V. (1992) Evidence for the participation of the Ssp-3 antigen in the invasion of non-phagocytic mammalian cells by *Trypanosoma cruzi*, *J. Exp. Med.*, 175:1635-1641.

47.  Lanzer, M., de Bruin, D. and **Ravetch, J.V.** (1992) A sequence element associated with the *Plasmodium falciparum* KAHRP gene is the site of developmentally regulated protein interactions, *Nucl.Acids Res.*, 20:3051-3056.

48.  de Bruin, D., Lanzer, M. and **Ravetch, J.V.** (1992) Characterization of yeast artificial chromosomes from *Plasmodium falciparum*: Construction of a stable, representative library and cloning telomeric DNA fragments, *Genomics*, 14:332-339.

49.  Lanzer, M., de Bruin, D. and **Ravetch, J.V.** (1993). Cloning of a complete *Plasmodium falciparum* chromosome reveals transcriptional differences in polymorphic and conserved domains, *Nature*, 361:654-657.

50.  Salcedo, T.W., Kurosaki, T., Kanakaraj, P., **Ravetch, J.V.** and Perussia, B. (1993) Physical and functional association of p56$^{lck}$ with FcγRIIIA (CD16) in Natural Killer cells, *J. Exp. Med.*, 177:1475-1480.

51.  Pearse, R.N., Feinman, R., Darnell, J.E., Jr., and **Ravetch, J.V.** (1993) IFN-γ induction of FcγRI transcription requires assembly of a complex which includes a 91 kDa DNA binding protein, *Proc. Natl. Acad. Sci., USA*, 90:4314-4318.

52.  Sarris, A., Broxmeyer, H., Wirthmueller, U., Karasavvas, N., Cooper, S., Lu, L., Krueger, J., and **Ravetch, J.V.** (1993) Human interferon-inducible protein 10: Expression and purification of recombinant protein demonstrate inhibition of early human hematopoietic progenitors, *J. Exp. Med.*, 178:1127-1132.

53.  Muta, T., Kurosaki, T., Sanchez, M., Misulovin, Z., Nussenzweig, M., and **Ravetch, J.V.** (1994) A 13 amino acid motif in the cytoplasmic domain of FcγRIIB modulates B-cell receptor signalling. *Nature*, 368:70-73.

54.  Su, Y., Brooks, D., Li, L., Lepercq, J., Trofatter, J., **Ravetch, J.**, and Lebo, R. (1993) Peripheral myelin protein zero gene mutated in Charcot-Marie-Tooth type 1B patients, *Proc. Natl Acad. Sci., USA*, 90:10856-10860.

55.  de Bruin, D., Lanzer, M., and **Ravetch, J.V.** (1994) Conserved arrays of repetitive sequences in the subtelomeric regions of *Plasmodium falciparum* chromosomes promote genetic diversity. *Proc. Natl. Acad. Sci., USA*, 91:619-623.

56.  Takai, T., Li, M., Sylvestre, D., Clynes, R., and **Ravetch, J.V.** (1994) FcR γ chain deletion results in pleiotropic effector cell defects. *Cell*, 76:519-529.

57.   Feinman, R., Qiu, W.Q., Pearse, R.N., Nikolajczyk, B.S., Sen, R., Sheffery, M., and **Ravetch, J.V.** (1994) PU.1 and an HLH family member contribute to the myeloid-specific transcription of the FcγRIIIA promoter. *EMBO*, 13:3852-3860.

58.   Sylvestre, D.L. and **Ravetch, J.V**. (1994) Fc receptors initiate the Arthus reaction: Redefining the inflammatory cascade. *Science*, 265:1095-1098.

59.   Lanzer, M., Wertheimer, S.P., de Bruin, D. and **Ravetch, J.V**. (1994) Chromatin structure determines the sites of chromosome breakages in *Plasmodium falciparum*. *Nucl. Acids Res.*, 22:3099-3103.

60.   Lanzer, M., de Bruin, D., Wertheimer, S.P., and **Ravetch, J.V.** (1994) Transcriptional and nucleosomal characterization of a subtelomeric gene cluster flanking a site of chromosomal rearrangements in *Plasmodium falciparum*. *Nucl.Acids Res.*, 22:4176-82.

61.   Clynes, R., and **Ravetch, J.V.** (1995) Cytotoxic antibodies trigger inflammation through Fc receptors. *Immunity*, 3:21-26.

62.   Rubio, J.P., Triglia, T., Kemp, D.J., de Bruin, D., **Ravetch, J.V.** and Cowman, A.F. (1995) A YAC contig map of *Plasmodium falciparum* chromosome 4; Transcriptional analysis and characterization of a DNA amplification between two recently separated isolates. *Genomics*, 26: 192-198.

63.   Su, X-z, Heatwole, V., Wertheimer, S., Guinet, F., Herrfeldt, J.A., Peterson, D.S., **Ravetch, J.V.** and Wellems,T.E. (1995) The large diverse gene family *var* encodes proteins involved in cytoadherence and antigenic variation of *Plasmodium falciparum*-infected erythrocytes. *Cell*, 82:89-100.

64.   Park, S.Y., Arase, H., Wakizaka, K., Hirayama, N., Masaki, S., Sato, S., **Ravetch, J.V.** and Saito, T.(1995) Differential contribution of the FcRγ chain to the surface expression of the T cell receptor among T cells localized in epithelia: analysis of the FcRγ deficient mice. *Eur. J. Immun.*, 25(7):2107-10.

65.   Economides, A.N., **Ravetch, J.V.**, Yancopolous, G.D. and Stahl, N (1995) Designer Cytokines: Targetting actions to cells of choice. *Science* 270: *1351-1353.*

66.   Li, M., Wirthmueller, U. and **Ravetch, J.V.** (1995) Reconstitution of human FcγRIII cell-type specificity in transgenic mice, *J. Exp. Med.*, 183: 1259-1263

67.   Seykora, J.T., Myat, M.M. Allen, L-A, **Ravetch, J.V.** and Aderem, A. (1996) Molecular determinants of the myristoyl-electrostatic switch of MARCKS, *J. Biol.Chem.*, 271: 18797-802

68.   Takai, T., Ono, M., Hikida, M., Ohmori, H. and **Ravetch, J.V.** (1996) Augmented humoral and anaphylactic responses in FcγRII-deficient mice, *Nature*, 379:346-349.

69.   Sylvestre, D., Clynes, R., Ma, M., Warren, H., Carroll, M. and **Ravetch, J.V.**(1996) IgG mediated inflammatory responses develop normally in complement deficient mice, *J. Exp. Med*, 184:1-8.

70.   Sylvestre, D. and **Ravetch, J.V.** (1996) A dominant role for mast cell Fc receptors in the Arthus reaction, *Immunity*, 5: 387-390

71.   Ono, M., Bolland, S., Tempst, P. and **Ravetch, J.V.**(1996) The role of the inositol phosphatase SHIP in negative regulation of the immune system by the receptor FcγRIIB, *Nature* 383: 263-266.

72.   Heiken, H., Schulz, R-J., **Ravetch, J.V.**, Reinherz, E. L., and Koyasu,S. (1996) T lymphocyte development in the absence of FcεRIγ subunit: analysis of thymic dependent and independent α-β and γ-δ pathways, *Eur.J.of Immunol.* 26:1935-1943.

73.   Vasovic, L.V., Dyall R., Clynes, R., **Ravetch, J.V.** and Nikolic-Zugic, J.(1997) Synergy between an antibody and CD8+ cells in eliminating an established tumor, *Eur. J of Immunol.*, 27:374-82.

74.   Miyajuma, I., Dombrowicz, D., Martin, T. R., **Ravetch, J.V.**, Kinet, J-P., and Galli, S. J. (1997) Systemic anaphylaxis in the mouse can be mediated largely through IgG₁ and FcγRIII. Assessment of the cardiopulmonary changes, mast cell degranulation, and death associated with active or IgE- or IgG₁ dependent passive anaphylaxis, *J. of Clin. Invest.* 99:901-914.

75.   Dombrowcz, D., Flamand, V., Miyajima, I., **Ravetch, J. V.**, Galli, S. J., and Kinet, J.-P. (1997) Absence of FcεRIα chain results in upregulation of FcγRIII-dependent mast cell degranulation and anaphylaxis. Evidence of competition between FcεRI and FcγRIII for limiting amounts of FcRβ and γ chains. *J. of Clin. Invest.*, 99:915-925.

76.   Ono, M., Okada, H., Bolland, S., Yanagi, S., Kurosaki, T. and **Ravetch, J.V.** (1997) Deletion of SHIP or SHP-1 reveals two distinct pathways for inhibitory signaling, *Cell*, 90:293-301.

77.   Vora, K.A., **Ravetch, J.V.** and Manser, T. (1997) Amplified follicular immune complex deposition in mice lacking the Fc receptor γ-chain does not alter maturation of the B Cell response. *J. Immunol.* 159:2116-2124.

78.   Jankovic, D., Cheever, A.W., Kullberg, M.C., Wynn, T.A., Yap, G., Caspar, P., Lewis, F.A., Clynes, R., **Ravetch, J.**, and Sher, A. (1997) CD4+ T cell-mediated granulomatous pathology in schistosomiasis is down-regulated by a B lymphocyte-dependent mechanism requiring Fc receptor signalling. *J. Exp. Med.*, 187:619-629.

79.    Clynes, R., Takechi, Y., Moroi, Y., Houghton, A. and **Ravetch, J.V.** (1998) Fc Receptors are required in passive and active immunity to melanoma. *Proc. Nat'l Acad. Sci.., USA,* 95:652-656.

80.    Shores, E., Kawabe, K., Ono, M., Sommers, C.L., Tran, T., Liu, K., Udey, M., **Ravetch, J.** and Love, P.E. (1998) T cell development in mice lacking all TCR-ς family members (ς, η, and FcεRIγ). *J. Exp. Med,* 187:1093-1101.

81.    Clynes, R., Dumitru, C. and **Ravetch, J.V.** (1998) Uncoupling of immune complex formation and kidney damage in autoimmune glomerulonephritis. *Science* 279:1052-54..

82.    Yuan, R. Clynes, R., Oh, J., **Ravetch, J.V.** and Scharff, M.D. (1998) Antibody-mediated modulation of *Cryptococcus neoformans* infection is dependent on distinct Fc receptors and IgG subclasses. *J. Exp. Med.,* 187:641-648.

83.    Bolland, S., Pearse, R., Kurosaki, T. and **Ravetch, J.V.** (1998) SHIP modulates immune receptor responses by regulating membrane association of BTK. *Immunity,* 8:509-516.

84.    Okada, H., Bolland, S., Hashimoto, A., Kurosaki, M., Iino, M., **Ravetch, J.V.** and Kurosaki, T. (1998). Role of the inositol phosphatase SHIP in B cell receptor-induced $Ca^{2+}$ oscillatory response. *J. Immunol.* 161:5129-5132.

85.    Suzuki, Y., Shirato, I., Okumura, K., **Ravetch, J.V.,** Takai, T., Tomino, Y., and Ra, C.S. (1998) Distinct contribution of Fc receptors and angiotensin II-dependent pathways in anti-GBM glomerulonephritis. *Kidney Int.* 54:1166-1174.

86.    Clynes, R., Maizes, J.S., Guinamard, R., Ono, M., Takai, T., and **Ravetch, J.V.** (1999) Modulation of immune complex-induced inflammation *in vivo* by the coordinate expression of activation and inhibitory Fc receptors. *J. Exp. Med.,* 189:179-185.

87.    Yuasa, T., Kubo, S., Yoshino, T., Ujike, A., Matsumura, K., Ono, M., **Ravetch, J.V.** and Takai, T. (1999) Deletion of FcγRIIB renders H-$2^{b}$ mice susceptible to collagen-induced arthritis. *J. Exp. Med.,* 189:187-194.

88.    Kubagawa, H., Chen, C.-C., Ho, L., Shimada, T., Gartland, L., Mashburn, C., Uehara, T., **Ravetch, J.V.** and Cooper, M.D. (1999) Biochemical nature and cellular distribution of the Paired Immunoglobulin-like Receptors, PIR-A and PIR-B. *J. Exp. Med.* 189:309-317.

89.    Qin, D., Wu, J., Vora, K., **Ravetch, J.V.,** Szakal, A.K., Manser, T. and Tew, J.G. (2000) FcγRIIB on follicular dendritic cells regulates the B cell recall response. *J. Immunology,* 164:6268-6275.

90. Ujike, A., Ishikawa, Y., Ono, M., Yuasa, T., Yoshino, T., Fukumoto, M., **Ravetch, J.V.**, and Takai, T. (1999) Modulation of IgE-mediated systemic anaphylaxis by low affinity Fc receptors for IgG. *J. Exp. Med.,* 189:1573-1579.

91. Pearse, R.N., Kawabe, T., Bolland, S., Kurosaki, T., and **Ravetch, J.V.** (1999) SHIP recruitment attentuates FcγRIIB induced B cell apoptosis. *Immunity* 10:753-760.

92. Guinamard, R., Signoret, N., Masamichi, I., Marsh, M., Kurosaki, T. and **Ravetch, J.V.** (1999) B cell antigen receptor engagement inhibits SDF-1α chemotaxis and promotes PKC-induced internalization of CXCR4. *J. Exp. Med.* 189:1461-1466.

93. Nakamura, A., Yuasa, T., Ujike, A., Ono, M., Nukiwa, T., **Ravetch, J.V.** and Takai, T. (2000) FcγRIIB-deficient mice develop Goodpasture's Syndrome upon immunization with Type IV collagen: a novel murine model for autoimmune GBM disease. *J. Exp. Med.,* 191:899-905.

94. Jimack, L.F., Reininger, L., Chicheportiche, Y., Clynes, R., **Ravetch, J.V.**, Honjo, T., and Izui, S. (1999) High pathogenic potential of low-affinity autoantibodies in experimental autoimmune hemolytic anemia. *J. Exp. Med.* 190:1689-1696.

95. Clynes, R.A., Towers, T.L., Presta, L.G. and **Ravetch, J.V.** (2000) Inhibitory Fc receptors modulate *in vivo* cytotoxicity against tumor targets. *Nature Med.* 6:443-446.

96. Guinamard, R., Okigaki, M., Schlessinger, J. and **Ravetch, J.V.** (2000) Absence of marginal zone B cells in Pyk-2 deficient mice defines their role in the humoral response. *Nature Immunology,* 1:31-35.

97. Bolland, S. and **Ravetch, J.V.** (2000) Spontaneous autoimmune disease in FcγRIIB deficient mice results from strain-specific epistasis. *Immunity,* 13:277-285.

98. Samuelsson, A., Towers, T. and **Ravetch, J.V.** (2001) Anti-inflammatory activity of IVIG mediated through the inhibitory Fc receptor. *Science,* 291:484-486.

99. Hawiger, D., Inabe, K., Dorsett, Y., Guo, M., Mahnke, K., Rivera, M., **Ravetch, J.V.**, Steinman, R. and Nussenzweig, M. (2001) Dendritic cells induce peripheral T cell unresponsiveness under steady state conditions in vivo. *J. Exp. Med.* 194:769-779.

100. Khalil, M., Inaba, K., Steinman, R., **Ravetch, J.** and Diamond, B. (2001) T cell studies in a peptide-induced model of systemic lupus erythematosus. *J. Immunol.,* 66:1667-1674.

101. Bolland, S., Yim, Y-S., Tus, K., Wakeland, E.K. and **Ravetch, J.V.** (2002) Genetic modifiers of SLE in FcγRIIB[-/-] mice. *J. Exp. Med.* 195:1167-1174.

102.  Kalergis, A. and **Ravetch, J.V.** (2002) Inducing tumor immunity through the selective engagement of activating Fcγ receptors on dendritic cells. *J. Exp. Med.* <u>196</u>:1-8.

103.  Trcka, J., Moroi, Y., Clynes, R.A., Goldberg, S.M., Bergtold, A., Perales, M-A., Ma, M., Ferrone, C.R., Carroll, M.C., **Ravetch, J.V.** and Houghton, A.N. (2002) Redundant and alternative roles for activating Fc Receptors and complement in an antibody-dependent model of autoimmune vitiligo. *Immunity,* <u>16</u>:861-868.

104.  Green, S.K., Karlsson, M.C.I., **Ravetch, J.V.** and Kerbel, R.S. (2002) Disruption of cell-cell adhesion enhances antibody-dependent cellular cytotoxicity: Implications for antibody-based therapeutics of cancer. *Cancer Research* <u>62</u>:6891-6900.

105.  Wang, C., Khalil, M., **Ravetch, J.** and Diamond B. (2003) The naive B cell repertoire predisposes to antigen-induced systemic lupus erythematosus. *J. Immunol.,* <u>170</u>:4826-4832.

106.  Bruhns, P., Samuelsson, A., Pollard, J. and **Ravetch, J.V.** (2003) Colony stimulating factor-1-dependent macrophages are responsible for IVIG protection in antibody-induced autoimmune disease. *Immunity,* <u>18</u>:573-581.

107.  Karlsson, M.C.I., Guinamard, R., Bolland, S., Steinman, R.M. and **Ravetch, J.V.** (2003) Macrophages control the retention and trafficking of B lymphocytes in the splenic marginal zone. *J. Exp. Med.* <u>198</u>:333-340.

108.  Zhang, Z., Zhang, M., **Ravetch, J.V.**, Goldman, C. and Waldmann, T.A. (2003) Effective therapy for a murine model of Adult T-cell Leukemia with the humanized anti-CD2 monoclonal antibody, MEDI-507. *Blood,* <u>102</u>:284-288.

109.  Zhang, Z., Zhang, M., Goldman, C., **Ravetch, J.V.** and Waldmann, T.A. (2003) Effective therapy for a murine model of Adult T-cell Leukemia with the humanized anti-CD52 monoclonal antibody, CAMPATH-1H. *Cancer Research,* <u>63</u>:6453-6457.

110.  Muhlfeld, A.S., Segerer, S., Hudkins, K. Carling, M.D., Wen, M., Farr, A.G., **Ravetch, J.V.** and Alpers, C.E. (2003) Deletion of the fcgamma receptor Iib in thymic stromal lymphopoietin transgenic mice aggravates membranoproliferative glomerulonephritis. *Am J Pathol.* <u>163</u>(3):1127-1136.

111.  Turhan, A., Jenab, P., Bruhns, P., **Ravetch, J.V.**, Coller, B.S., and Frenette, P.S. (2004) Intravenous immune globulin prevents venular vaso-occlusion in sickle cell mice by inhibiting leukocyte adhesion and the interactions between sickle erythrocytes and adherent leukocytes. *Blood,* <u>103</u>:2397-2400.

112.  Uchida, J., Hamaguchi, Y., Oliver, J.A., **Ravetch, J.V.**, Poe, J.C., Haas, K.M. and Tedder, T.F. (2004) The Innate Mononuclear Phagocyte Network Depletes B Lymphocytes Through Fc Receptor-Dependent Mechanisms During Anti-CD20 Antibody Immunotherapy. *J. Exp. Med.*,199(12):1659-1669.

113.  Moll, T., Nitschke, L., Carroll, M., **Ravetch, J.V.** and Izui, S. (2004) A Critical Role for FcγRIIB in the Induction of Rheumatoid Factors. *J. Immunology*, 173:4724-4728.

114.  McGaha, T., Sorrentino, B. and **Ravetch, J.V.** (2005) Restoration of tolerance in lupus by targeted inhibitory receptor expression. *Science*, 307:590-593.

115.  Fukuyama, H., Nimmerjahn, F. and **Ravetch, J.V.** (2005) The inhibitory Fcγ receptor modulates autoimmunity by limiting the accumulation of immunoglobulin G$^+$ anti-DNA plasma cells. *Nature Immunology*, 6:99-106.

116.  Dhodapkar, K.M., Kaufman, J.L., Ehlers, M., Banerjee, D.K., Bonvini, E., Koenig, S., Steinman, R.M., **Ravetch, J.V.** and Dhodapkar, M.V. (2005) Selective blockade of inhibitory Fcγ receptor enables human dendritic cell maturation with IL-12p70 production and immunity to antibody coated tumor cells. *Proc. Natl. Acad. Sci.* 102(8):2910-2915.

117.  Olsson, M., Bruhns, P., Frazier, W.A., **Ravetch, J.V.** and Oldenborg, P-A. (2005) Platelet homeostasis is regulated by platelet expression of CD47 under normal conditions and in passive immune thrombocytopenia. *BLOOD*, 105(9):3577-3582.

118.  Nimmerjahn, F., Bruhns, P., Horiuchi, K. and **Ravetch, J.V.** (2005) FcγRIV: A novel FcR with distinct IgG subclass specificity. *Immunity*, 23:41-51.

119.  Boruchov, A.M., Heller, G., Concetta-Veri, M., Bonvini, E., **Ravetch, J.V.** and Young, J.W. (2005) Activating and inhibitory IgG Fc receptors mediate opposing effects on human dendritic cell function. *J. Clin. Invest.*, 115: 2914-23

120.  Nimmerjahn, F. and **Ravetch, J.V.** (2005) Divergent immunoglobulin G subclass activity through selective FcR binding. *Science* 310: 1510-12

121.  Okazaki, T., Otaka, Y., Wang, J., Hiai, H., Takai, T., **Ravetch, J.V.** and Honjo, T. (2005) Hydronephrosis associated with antiurethelial and antinuclear autoantibodies in BALB/c-FcγR2b-/-Pdcd1-/- mice. *J. Exp. Med.* 202: 1643-8

122.  Yamazaki, S., Patel, M., Harper, A., Bonito, A., Fukuyama, H., Pack, M., Tarbell, K., Talmor, M., **Ravetch, J. V.**, Inaba, K. and Steinman, R.M. (2006) Effective expansion of alloantigen-specific Foxp3+CD25+ CD4+ regulatory T cells by dendritic cells during the mixed leukocyte reaction. *Proc. Natl. Acad. Sci. USA* 103: 2758-63

123. Ehlers, M., Fukuyama, H., McGaha, T., Aderem, A. and **Ravetch, J.V.** (2006) TLR9/MyD88 signaling is required for class switching to pathogenic IgG2a and 2b autoantibodies in SLE. *J. Exp. Med.* 203: 553-61

124. Kaneko, Y., Nimmerjahn, F., Madaio, M. and **Ravetch, J.V.** (2006) Pathology and protection in nephrotoxic nephritis is determined by selective engagement of specific Fc receptors. *J. Exp. Med.* 203: 789-97

125. Zhang, M., Yao, Z., Zhang, Z., Garmestani, K., Goldman, C.K., **Ravetch, J. V.**, Janik, J., Brechbiel, M.W. and Waldmann, T.A. (2006) Effective therapy for a murine model of human anaplastic large-cell lymphoma with the anti-CD30 monoclonal antibody HeFi-1, does not require activating Fc receptors. *Blood* 108: 705-710

126. Kaneko, Y., Nimmerjahn, F. and **Ravetch, J.V.** (2006) Anti-inflammatory activity of Immunoglobulin G resulting from Fc sialylation. *Science* 313:670-673

127. Mackay, M., Staversky, A., Wang, T., Aranow, C., Li, M., Koenig, S., **Ravetch, J.V.** and Diamond, B. (2006) Selective dysregulation of the FcgammaRIIB receptor on memory B cells in SLE. *J. Exp. Med.* 203: 2157-64

128. Dhodapkar, KM, Banerjee, D, Connolly, J, Kukreja, A, Matayeva, E, Veri, MC, **Ravetch, JV**, Steinman, RM and Dhodapkar, MV (2007) Selective blockade of the inhibitory Fc{gamma} receptor (Fc{gamma}RIIB) in human dendritic cells and monocytes induces a type I interferon response program.*J. Exp. Med.* 204:1359-69

129. Nimmerjahn, F, Anthony, RM and **Ravetch, JV** (2007) Agalactosylated IgG antibodies depend on cellular Fc receptors for in vivo activity. *Proc Natl Acad Sci* U SA 104:8433-7

130. Kowalewska J, Muhlfeld AS, Hudkins KL, Yeh MM, Farr AG, **Ravetch JV**, Alpers CE.(2007) Thymic stromal lymphopoietin transgenic mice develop cryoglobulinemia and hepatitis with similarities to human hepatitis C liver disease. *Am J Pathol.* 170:981-9.

131. Wermeling, F., Chen, Y., Pikkarainen, T., Scheynius, A., Winqvist, O., Izui, S., **Ravetch, J. V.**, Tryggvason, K. and Karlsson, M. (2007) Class A scavenger receptors regulate tolerance against apoptotic cells, and autoantibodies against these receptors are predictive of systemic lupus. *J. Exp. Med.*, 204:, 2259-2265

132. Nandakumar, K.S., Collin, M., Olsen, A., Nimmerjahn, F., Blom, A., **Ravetch, J.V.,** and Holmdahl, R. (2007) Endoglycosidase treatment abrogates IgG arthritogenicity: Importance of IgG glycosylation in arthritis. *Eur. J. Imm.* 37: 2973-2982

Chapters and Reviews

1.  Korsmeyer, S.J., Hieter, P., **Ravetch, J.V.**, Poplack, D., Leder, P. and Waldmann, T.A. Pattern of immunoglobulin gene arrangements in human lymphocytic leukemias. In: Leukemia Markers (Knapp, W., ed.) 1981; Academic Press, London.

2.  **Ravetch, J.V.**, Kirsch, I.R., Siebenlist, U. and Leder, P. Multiple somatic recombination events generate heavy chain immunoglobulin genes. In: Mechanism of Lymphocyte Activation, Proceedings of the 14th Leucocyte Culture Conference (Resch, K. and Kirschner, E., eds.) 1981; Elsevier/North Holland Press, Amsterdam.

3.  Leder, P., Hieter, P., Hollis, G., Kirsch, I.R., Leder, P., Nau, M. and **Ravetch, J.V.** (1982) The new image of the mammalian genome. In: Perspectives on Genes and the Molecular Biology of Cancer (Robberson, D.L., Saunders, G.F., ed.) Raven Press.

4.  Kirsch, I.R., **Ravetch, J.V.**, Hieter, P.A., Korsmeyer, S.J., Waldmann, T.A. and Leder, P. (1982) Genetic rearrangements in the humoral immune system. In: Current Concepts in Human Immunology and Cancer Immunomodulations (Serrou, B., ed.) Elsevier Biomedical Press B.V.

5.  Waldmann, T.A., Korsmeyer, S.J., Hieter, P.A., **Ravetch, J.V.**, Arnold, A. and Leder, P. (1983) Immunoglobulin gene rearrangements in human lymphocytic leukemia. In: Recombinant DNA Applications to Human Disease, Banbury Report 14 (Caskey, C.T. and White, R.L., ed.) Cold Spring Harbor Press, N.Y.

6.  **Ravetch, J.V.**, Young, J. and Poste, G. (1985) Molecular genetic strategies for the development of anti-malarial vaccines. *Biotechnology* 3:729-740.

7.  Perkins, M., and **Ravetch, J.V.** (1985) Interaction of *Plasmodium falciparum* merozoite proteins with the erythrocyte surface. In: Vaccines, Cold Spring Harbor Laboratory Press, N.Y.

8.  **Ravetch, J.V.** and Pologe, L.G. (1988) Molecular genetic strategies for parasite survival in *P. falciparum* malaria. In: Immunization (Root, Warren, Griffiss and Sande, eds.) Churchill Livingstone, Inc., New York, N.Y.

9.  **Ravetch, J.V.** (1989) Chromosomal polymorphisms and gene expression in *Plasmodium falciparum. Exp. Parasitol.* 68:121-125.

10. **Ravetch, J.V.** and Anderson, C. (1989) Molecular diversity of FcγRs in Fc receptors and the action of antibodies chapter VI, ed. H. Metzger (American Society of Microbiology, Washington, D.C.).

11.  **Ravetch, J.V.** and Kinet, J-P. (1991) Fc receptors. In: <u>Annual Review of Immunology</u> <u>9</u>:457-92.

12.  **Ravetch, J.V.** and Colton, H. (1992) Section editor: Innate Immunity in *Current Opinion in Immunology,* <u>4</u>:1.

13.  Lanzer, M., Wertheimer, S., de Bruin, D., and **Ravetch, J.** (1993) Plasmodium: Control of gene expression in malaria parasites. *Exp. Parasitol.* <u>77</u>:121-128.

14.  Lanzer, M., de Bruin, D., Wertheimer, S., and **Ravetch, J.V.** (1994) Organization of chromosomes in *Plasmodium falciparum:* A model for generating karyotypic diversity. *Parasitology Today,* <u>10</u>:114-117.

15.  Brooks, D. and **Ravetch, J.V.** (1994) Fc Receptor Signalling. In: <u>Mechanisms of Lymphocyte Activation and Immune Regulation V,</u> (Gupta, S., De Franco, A., Paul, W. and Perlmutter, R., ed.) Plenum Publishing, N.Y.

16.  **Ravetch, J.V.** (1994) Atopy and Fc receptors: mutation is the message? *Nature Genetics,* <u>7</u>:117-118.

17.  **Ravetch, J.V.** (1994) Fc Receptors: Rubor Redux. *Cell,* <u>78</u>:553-560.

18.  **Ravetch, J.V.** and Margulies, D.H. (1994) New tricks for old molecules. *Nature* <u>372</u>:323-324.

19.  **Ravetch, J.V.** and Colton, H. (1995) Section editor: Innate Immunity in *Current Opinion in Immunology,* <u>7</u>:1-3.

20.  **Ravetch, J.V.** (1997) Fc receptors. *Current Opinion in Immunology,* <u>9</u>:121-125.

21.  Vora, K.A., **Ravetch, J.V.** and Manser, T. (1997) Maturation of the B cell response in genetically altered mice. In: <u>Developmental Immunology.</u>

22.  **Ravetch, J.V.** and Clynes, R.A. (1998) Divergent roles for Fc receptors and complement *in vivo*. In: <u>Annual Review of Immunology,</u> <u>16</u>:421-32.

23.  Bolland, S. and **Ravetch, J.V.** (1999) Inhibitory pathways triggered by ITIM-containing receptors. *Advances in Immunology,* <u>72</u>:149-177.

24.  **Ravetch, J.V.** and Lanier, L.L. (2000) Immune Inhibitory Receptors. *Science,* <u>290</u>:84-89.

25.  **Ravetch, J.V.** and Bolland, S. (2001) IgG Fc Receptors. In: <u>Annual Review of Immunology,</u> <u>19</u>:275-90.

26.    **Ravetch, J.**V. (2002) A full complement of receptors in immune complex diseases. *J. Clin. Invest.* 110:1759-1761.

27.    **Ravetch, J.V.** (2003) Fc Receptors.  In Fundamental Immunology, 5th edition, W. M. Paul, editor.

28.    Steinman, R.M., Hawiger, D., Liu, K. Bonifaz, L., Bonnyay, D., Mahnke, K., Iyoda, T., **Ravetch, J.**, Dhodapkar, M., Inaba, K. and Nussenzweig, M. (2003) In: *Ann. N.Y. Acad. Sci.* 987:15-25.

29.    **Ravetch, J.V.** and Carroll, M.C. (2004) Fc and Complement Receptors. In:  Molecular Biology of B cells. ed. T. Honjo, F. Alt and M. Neuberger, chapter 18, pages 275-289.

30.    Nimmerjahn, F. and **Ravetch, J.V.**  (2006) Fcgamma receptors: old friends and new family members. *Immunity* 24: 19-28

31.    Ehlers, M. and **Ravetch, J.V.** (2006) Opposing effects of Toll-like receptor stimulation induce autoimmunity or tolerance.  *Trends Immunol., in press*

32.    Nimmerjahn, F. and **Ravetch, J.V.** (2007) The anti-inflammatory activity of IgG: the intravenous IgG paradox.  *J. Exp. Med.,* 204: 11-15

33.    **Ravetch, J.V.** and Nimmerjahn, F. (2007) Fc Receptors.  In Fundamental Immunology, chapter 22, 6th edition, W. M. Paul, editor.

34.    **Ravetch, J.V.** and Nussenzweig, MC (2007) Killing some to make way for others. *Nat Immunol.* 8:337-9

35.    Nimmerjahn, F. and **Ravetch, J.V.** (2007) Antibodies, Fc receptors and cancer. *Curr Opin Immunol.*19:239-45

36.    **Ravetch, J.V.** and Aderem, A. (2007) Phagocytic cells. *Immunol. Rev.* 219: 5-7

# EXHIBIT 26

# EXHIBIT REDACTED

# EXHIBIT 27

# EXHIBIT REDACTED