IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>   Plaintiffs,<br><br>  v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>   Defendants. | C.A. No. 06-259-MPT |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>   Counterclaim-Plaintiffs,<br><br>  v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>   Counterclaim-Defendants. | **REDACTED PUBLIC VERSION** |

## SUPPLEMENTAL DECLARATION OF DAVID GREENWALD

### (VOLUME IV OF IV)

*Of Counsel:*

Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: May 22, 2008

ASHBY & GEDDES
Steven J. Balick (I.D. #2403)
John G. Day (I.D. #2114)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, The President and Fellows of Harvard College and The Whitehead Institute for Biomedical Research*

# EXHIBIT 42

# EXHIBIT REDACTED

# EXHIBIT 43

# EXHIBIT REDACTED

# EXHIBIT 44

# EXHIBIT REDACTED

# EXHIBIT 45

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CIVIL ACTION NO. 06-259-(MPT)


AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington    )
corporation; AMGEN USA INC., a       )
Delaware corporation; AMGEN          )
MANUFACTURING, LIMITED, a Bermuda    )
corporation; and IMMUNEX RHODE       )
ISLAND CORPORATION, a Delaware       )
corporation,                         )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             )
                                     )
ARIAD PHARMACEUTICALS, INC.,         )
a Delaware corporation,              )
                                     )
          Defendants.                )
_____)


DEPOSITION OF

DAVID BALTIMORE

TAKEN ON WEDNESDAY, SEPTEMBER 26, 2007


Reported by:

Daryl Baucum, RPR, CRR, CBC, CSR No. 10356

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 120

| 12:51:01 | 1 | done in vitro, in other words, not in the body, correct? |
| 12:51:06 | 2 | A.   We had not done work in the human body. |
| 12:51:40 | 3 | Q.   The 516 patent doesn't discuss any way to |
| 12:51:43 | 4 | target delivery of IkB genes for transfection to |
| 12:51:50 | 5 | particular cells, correct? |
| 12:51:53 | 6 | A.   It does not require -- it does not describe |
| 12:51:57 | 7 | methods for selectively infecting particular cell types, |
| 12:52:02 | 8 | no. |
| 12:52:26 | 9 | Q.   And the 516 patent doesn't provide any specific |
| 12:52:31 | 10 | structures for any inhibitor of NF-kB; is that correct? |
| 12:52:41 | 11 | MR. GINDLER:  Objection; the question's vague. |
| 12:52:51 | 12 | THE WITNESS:  Structures.  No, I guess not. |
| 12:52:53 | 13 | BY MR. PALS: |
| 12:52:55 | 14 | Q.   And the 516 patent doesn't provide the |
| 12:53:00 | 15 | structures for any agents to reduce NF-kB activity in a |
| 12:53:03 | 16 | cell, correct? |
| 12:53:06 | 17 | MR. GINDLER:  Objection; vague. |
| 12:53:07 | 18 | THE WITNESS:  Well, I'm sorry, it does |
| 12:53:09 | 19 | describe, because the sequence of IkB is in there.  It |
| 12:53:13 | 20 | does describe the structure of an inhibitor that can be |
| 12:53:16 | 21 | put into cells and an inhibitor of NF-kB. |
| 12:53:22 | 22 | BY MR. PALS: |
| 12:53:22 | 23 | Q.   Let's set aside Figure 43 for a moment. |
| 12:53:25 | 24 | Other than what's in Figure 43, the 516 patent |
| 12:53:29 | 25 | does not describe the structure of any agent to reduce |

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 121

| | | |
|---|---|---|
| 12:53:33 | 1 | NF-kB activity in a cell, correct? |
| 12:53:37 | 2 | MR. GINDLER:  Objection; it's vague. |
| 12:53:40 | 3 | THE WITNESS:  I really would have to go back |
| 12:53:42 | 4 | and read the whole patent to be sure that that's true. |
| 23:59:57 | 5 | BY MR. PALS: |
| 12:53:45 | 6 | Q.  Do you recall any structures given for agents |
| 12:53:48 | 7 | to reduce NF-kB activity in a cell, again, for the |
| 12:53:51 | 8 | moment setting aside Figure 43? |
| 12:54:04 | 9 | A.  No, I don't. |
| 12:54:06 | 10 | Q.  Do you recall any formula for any compound to |
| 12:54:09 | 11 | reduce NF-kB activity in a cell that's disclosed in the |
| 12:54:14 | 12 | 516 patent, again, for the moment setting aside |
| 12:54:16 | 13 | Figure 43? |
| 12:54:21 | 14 | A.  No, I do not. |
| 12:54:26 | 15 | Q.  And we discussed this morning as to Figure 43, |
| 12:54:28 | 16 | you're not aware of any issue or question or admissions |
| 12:54:35 | 17 | with respect to whether Figure 43 is in fact IkB or |
| 12:54:39 | 18 | something else, correct? |
| 12:54:42 | 19 | A.  I am not aware, no. |
| 12:54:58 | 20 | Q.  In order -- because there aren't structures or |
| 12:55:00 | 21 | formulas of agents identified in the patent to reduce |
| 12:55:05 | 22 | NF-kB activity in a cell, do you agree that somebody |
| 12:55:09 | 23 | reading the patent has to experiment through trial and |
| 12:55:15 | 24 | error to identify such an agent to reduce NF-kB activity |
| 12:55:18 | 25 | in a cell? |

Page 122

| 12:55:29 | 1 | MR. GINDLER: Hang on one second. Can I have |
| 12:55:31 | 2 | that question back, please. |
| 12:55:32 | 3 | (The previous question was read back |
| 12:55:32 | 4 | by the court reporter as follows: |
| 12:55:32 | 5 | "QUESTION: Because there aren't |
| 12:55:32 | 6 | structures or formulas of agents |
| 12:55:32 | 7 | identified in the patent to reduce |
| 12:55:32 | 8 | NF-kB activity in a cell, do you |
| 12:55:32 | 9 | agree that somebody reading the |
| 12:55:32 | 10 | patent has to experiment through |
| 12:55:32 | 11 | trial and error to identify such an |
| 12:55:32 | 12 | agent to reduce NF-kB activity in a |
| 12:55:32 | 13 | cell?") |
| 12:55:56 | 14 | MR. GINDLER: Objection; it's vague, calls for |
| 12:56:00 | 15 | a legal conclusion. |
| 12:56:08 | 16 | THE WITNESS: Yeah, I mean that's sort of my |
| 12:56:10 | 17 | problem with it. I don't -- the fact that there is |
| 12:56:19 | 18 | nothing described in the patent has implications, but |
| 12:56:23 | 19 | I'm not sure that's one. |
|  | 20 | BY MR. PALS: |
| 12:56:26 | 21 | Q. Well, what implications does it have? |
| 12:56:29 | 22 | A. Well, I mean you're -- it has implications that |
| 12:56:35 | 23 | we did not -- has the direct statement that we did not |
| 12:56:39 | 24 | then know about particular structures, but to say that |
| 12:56:45 | 25 | that implies that you have to do whatever you said has |

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 123

12:56:49    1    to be done sounds vague to me.

12:56:54    2        Q.    Okay.   Let me try it again.

12:57:02    3            The 516 patent doesn't give someone reading it

12:57:06    4    guidance that in order to develop a compound to reduce

12:57:12    5    NF-kB activity in a cell, they should develop a compound

12:57:17    6    of this -- of some particular type of structure.

12:57:20    7            Is that a fair statement?

12:57:22    8            MR. GINDLER:   Objection; the question's vague,

12:57:23    9    it calls for expert testimony, calls for a legal

12:57:26    10    conclusion.

12:57:29    11            THE WITNESS:   And I don't think it's a fair

12:57:30    12    statement because by describing IkB, by describing decoy

12:57:39    13    molecules, by drawing attention to dominant interfering

12:57:47    14    molecules and even describing how they might be made, I

12:57:52    15    think a lot of direction is given -- never mind that

12:57:59    16    sort of obvious direction that if you have an activity,

12:58:02    17    you go out and try to make an inhibitor of it.

12:58:07    18            (Plaintiffs' Exhibit 177 was marked

12:58:07    19            for identification by the court

12:58:07    20            reporter and is attached hereto.)

12:58:07    21    BY MR. PALS:

12:58:42    22        Q.    Dr. Baltimore, I have marked and handed to you

12:58:46    23    Amgen's Exhibit 177, which is headed "Declaration of

12:58:51    24    David Baltimore under Rule 1.132 and In re Brana,"

12:58:56    25    relating to U.S. patent application 08/464,364 with

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 124

12:59:07    1    production numbers ADL 17839 through 842.

12:59:15    2        Dr. Baltimore, do you recognize Exhibit 177 as

12:59:18    3    a declaration that you signed in connection with the

12:59:22    4    prosecution of the 516 patent?

12:59:31    5        A.    I do recognize it.

12:59:36    6        Q.    And I am sorry, I misidentified the production

12:59:38    7    numbers on the document.

12:59:40    8        Just for the record, the exhibit copy has

12:59:44    9    ADL 13048 through 13051.

12:59:52    10        And, Dr. Baltimore, Exhibit 177 is a

12:59:55    11    declaration that you executed in connection with

12:59:58    12    prosecution of the 516 patent, correct?

13:00:02    13        A.    Yes, it is.

13:00:04    14        Q.    And you -- you executed this knowing that this

13:00:09    15    would be submitted to the patent office?

13:00:13    16        A.    I did understand it would be submitted to the

13:00:15    17    patent office.

13:00:26    18        Q.    In paragraph seven of your declaration,

13:00:28    19    Dr. Baltimore, you state, quote, the classes of

13:00:35    20    compounds which are able to affect NF-kB mediated gene

13:00:40    21    expression in cells are structurally diverse, close

13:00:43    22    quote.

13:00:43    23        Do you see that?

13:00:44    24        A.    Yes, I do.

13:00:45    25        Q.    Is the point that you are making there that

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

| 13:00:48 | 1 | someone can't just look at a structure and know whether |
| 13:00:52 | 2 | that's something that would affect NF-kB mediated gene |
| 13:00:56 | 3 | expression? |
| 13:00:56 | 4 | A.    No, that's not the point that was being made. |
| 13:00:58 | 5 | The point is that there are a number of compounds -- |
| 13:01:04 | 6 | were at that time a number of compounds known and they |
| 13:01:10 | 7 | came from many different classes of chemical compounds. |
| 13:01:18 | 8 | Q.    You said "at that time." |
| 13:01:21 | 9 | If you look at the last page, Dr. Baltimore, is |
| 13:01:24 | 10 | that your signature that appears? |
| 13:01:27 | 11 | A.    Roughly, yes, I presume it is. |
| 13:01:32 | 12 | Q.    It appears that this declaration was signed in |
| 13:01:35 | 13 | the February 2001 time frame? |
| 13:01:37 | 14 | A.    Yes. |
| 13:01:37 | 15 | Q.    So as of February 2001, you had become aware of |
| 13:01:41 | 16 | some compounds that you -- actually, some of which you |
| 13:01:45 | 17 | identify in the declaration -- |
| 13:01:46 | 18 | A.    Yes. |
| 13:01:46 | 19 | Q.    -- that reduce NF-kB activity in cells, |
| 13:01:48 | 20 | correct? |
| 13:01:49 | 21 | A.    Yes, I had. |
| 13:01:57 | 22 | Q.    And the compounds that you discuss in |
| 13:02:00 | 23 | paragraphs 8, 9, 10, 11 and 12 of your declaration are |
| 13:02:09 | 24 | in fact structurally diverse, correct? |
| 13:02:11 | 25 | A.    They -- they are that. |

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 126

| | | |
|---|---|---|
| 13:02:13 | 1 | Q.   But they -- while their structures differ, they |
| 13:02:17 | 2 | share a common function in the ability to reduce NF-kB |
| 13:02:23 | 3 | activity in cells, correct? |
| 13:02:24 | 4 | MR. GINDLER:  Objection; calls for expert |
| 13:02:26 | 5 | testimony. |
| 09:59:57 | 6 | BY MR. PALS: |
| 13:02:28 | 7 | Q.   That's what you are saying, correct? |
| 13:02:29 | 8 | A.   Yes, they all have the ability of inhibiting |
| 13:02:32 | 9 | NF-kB activity in cells. |
| 13:02:36 | 10 | Q.   And if I understand correctly, what you are |
| 13:02:38 | 11 | telling the patent office is there are compounds that |
| 13:02:41 | 12 | are not structurally related, point one, correct? |
| 13:02:47 | 13 | A.   Yes. |
| 13:02:47 | 14 | Q.   That point two, share the functional capability |
| 13:02:51 | 15 | of reducing NF-kB activity in cells; is that right? |
| 13:02:54 | 16 | A.   Yes. |
| 13:02:54 | 17 | MR. GINDLER:  Objection; calls for expert |
| 13:02:55 | 18 | testimony. |
| 13:02:56 | 19 | THE WITNESS:  That was the point of this. |
| 08:06:54 | 20 | BY MR. PALS: |
| 13:03:28 | 21 | Q.   As of 1991, Dr. Baltimore, had you done any |
| 13:03:32 | 22 | work with TNF alpha? |
| 13:03:36 | 23 | A.   We had done work with TNF alpha about that |
| 13:03:40 | 24 | time. |
| 13:03:41 | 25 | Q.   In what contexts? |

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 128

| 05:50:41 | 1 | Q    And do you have any knowledge about the |
| 05:50:44 | 2 | positions of area or Amgen in the context of this |
| 05:50:49 | 3 | litigation? |
| 05:50:50 | 4 | A    No. |
| 05:50:51 | 5 | Q    Or do you have any knowledge as to Amgen's |
| 05:51:00 | 6 | -- strike that. |
| 05:51:01 | 7 | Do you have any knowledge as to the use or |
| 05:51:05 | 8 | dosing regimen of patients taking Enbrel? |
| 05:51:10 | 9 | MR. GREENWALD:  Mark, under what -- |
| 05:51:14 | 10 | MR. SERNEL:  I'm trying to figure out if |
| 05:51:14 | 11 | there's any -- I'm trying to close him out as to |
| 05:51:15 | 12 | whether he's tied in his experiments to the real world |
| 05:51:22 | 13 | or not. |
| 05:51:22 | 14 | MR. GREENWALD:  Well, it's not what I -- |
| 05:51:24 | 15 | it's not what I understood to be within the scope of |
| 05:51:26 | 16 | relevant background as I understand it. |
| 05:51:28 | 17 | MR. SERNEL:  Are you instructing? |
| 05:51:29 | 18 | MR. GREENWALD:  Yes, I'll instruct.  I'll |
| 05:51:30 | 19 | instruct. |
| 05:51:31 | 20 | MR. SERNEL:  Well, I don't know that I'm in |
| 05:51:33 | 21 | background.  I think I'm just summarizing the tie -- |
| 05:51:35 | 22 | what these experiments are and how they relate to the |
| 05:51:38 | 23 | issues in the case.  And if he doesn't know or, you |
| 05:51:40 | 24 | know, he's just a fact guy, then we can leave it at |
| 05:51:44 | 25 | that.  Are you instructing? |

bf4b933d-7b85-4afc-9f5f-059ccf6be790

Page 129

05:51:48    1          MR. GREENWALD:  Yes, I'm instructing.  I

05:51:49    2    think it's beyond the scope of what we discussed.

05:51:52    3    BY MR. SERNEL:

05:52:03    4          Q    Would it be fair to say that you relied on

05:52:05    5    your education and professional background in the

05:52:10    6    choices that you made in designing and implementing

05:52:13    7    the experiments set forth in Pomerantz Exhibit 1?

05:52:20    8          A    I guess so, yes.

05:52:22    9          Q    And would you agree with me that throughout

05:52:25    10   your entire training as a scientist, you were being

05:52:31    11   advised as both an undergraduate, a graduate and a

05:52:35    12   postdoc by inventors on the '516 patent?

05:52:42    13         MR. GREENWALD:  Objection.

05:52:45    14         A    That was actually a year when I was in Karl

05:52:49    15   Cable's lab and not affiliated with the inventors.

05:52:53    16         Q    So -- let me ask a different question.  So

05:52:56    17   for one of the years of the dozen or so that you were

05:52:58    18   an undergrad, graduate or postdoc, except for one of

05:53:02    19   those years you were being advised by one of the

05:53:05    20   inventors on the '516 patent, correct?

05:53:09    21         A    Yes.

05:53:15    22         MR. SERNEL:  With the caveat that I think

05:53:16    23   Mr. Greenwald has improperly instructed not to answer

05:53:20    24   on a variety of questions to which we wholly disagree,

05:53:26    25   and I'll reserve my right to seek further testimony on

bf4b933d-7b85-4afc-9f5f-059ccf6be790

Page 130

| | | |
|---|---|---|
| 05:53:30 | 1 | those subjects, I am finished with my questioning. |
| 05:53:37 | 2 | MR. GREENWALD:  All right.  I would like to |
| 05:53:37 | 3 | do some cross or redirect or whatever you call it. |
| 05:53:41 | 4 | EXAMINATION BY COUNSEL FOR DEFENDANTS |
| 05:53:41 | 5 | BY MR. GREENWALD: |
| 05:53:42 | 6 | Q    Dr. Pomerantz, what is your position at the |
| 05:53:45 | 7 | Johns Hopkins University School of Medicine? |
| 05:53:47 | 8 | A    I'm an assistant professor. |
| 05:53:49 | 9 | Q    In what department? |
| 05:53:50 | 10 | A    In the Department of Biological Chemistry. |
| 05:53:53 | 11 | Q    How would you describe the -- your |
| 05:53:55 | 12 | profession? |
| 05:53:57 | 13 | A    I'm a scientist.  I'm an immunologist and |
| 05:54:06 | 14 | molecular biologist. |
| 05:54:08 | 15 | Q    Generally, without going into too much |
| 05:54:10 | 16 | detail, what is the focus of your work? |
| 05:54:12 | 17 | A    It's on molecular biology cells in the |
| 05:54:16 | 18 | immune system. |
| 05:54:18 | 19 | Q    Focusing upon what's been marked here as |
| 05:54:20 | 20 | Pomerantz Exhibit 1, your notebook, this has been |
| 05:54:24 | 21 | covered, but just so the record is clear, what |
| 05:54:25 | 22 | information does it record? |
| 05:54:26 | 23 | A    It records the experiments that I did. |
| 05:54:31 | 24 | Q    Who recorded the information in the |
| 05:54:32 | 25 | notebook? |

bf4b933d-7b85-4afc-9f5f-059ccf6be790

Page 131

| 05:54:33 | 1 | A    I did. |
| 05:54:34 | 2 | Q    Did you record the information in the |
| 05:54:35 | 3 | notebook at or near the time you performed the |
| 05:54:37 | 4 | experiments the notebook describes? |
| 05:54:41 | 5 | A    Yes. |
| 05:54:41 | 6 | Q    Is it your regular practice to perform |
| 05:54:43 | 7 | experiments of the type described in your notebook? |
| 05:54:46 | 8 | A    Yes. |
| 05:54:46 | 9 | Q    And is it your regular practice to prepare |
| 05:54:50 | 10 | notebooks such as this that record the results of the |
| 05:54:51 | 11 | experiments you perform? |
| 05:54:52 | 12 | A    Yes. |
| 05:54:53 | 13 | Q    And is it your regular practice to keep such |
| 05:54:55 | 14 | notebooks? |
| 05:54:55 | 15 | A    Yes. |
| 05:54:58 | 16 | Q    How widely used would you say are luciferase |
| 05:55:02 | 17 | reporter assays within your field? |
| 05:55:04 | 18 | MR. SERNEL:  Objection.  Vague. |
| 05:55:06 | 19 | A    They're very widely used.  They're very |
| 05:55:07 | 20 | commonly used. |
| 05:55:10 | 21 | Q    Within your field, are the results of such |
| 05:55:12 | 22 | assays when performed properly considered to be |
| 05:55:14 | 23 | reliable? |
| 05:55:15 | 24 | A    Yes. |
| 05:55:26 | 25 | MR. GREENWALD:  That's all. |

bf4b933d-7b85-4afc-9f5f-059ccf6be790

Page 232

| | | |
|---|---|---|
| 16:12:34 | 1 | Q.    And that's the same number that's on the actual |
| 16:12:36 | 2 | assignment doc? |
| 16:12:37 | 3 | A.    Right. |
| 16:12:37 | 4 | Q.    And do you recognize this assignment then as |
| 16:12:40 | 5 | relating to the patent application on which you were |
| 16:12:41 | 6 | coinventor in which some of the coinventors were from |
| 16:12:45 | 7 | the Whitehead Institute and some of the coinventors were |
| 16:12:48 | 8 | from Harvard? |
| 16:12:49 | 9 | A.    Yes, I do. |
| 16:12:49 | 10 | Q.    And in particular, you and Dr. Lenardo were |
| 16:12:53 | 11 | from the Whitehead Institute and Dr. Fan and |
| 16:12:56 | 12 | Dr. Maniatis were from Harvard, correct? |
| 16:12:59 | 13 | A.    Correct. |
| 16:12:59 | 14 | Q.    And then do you recognize then that this is an |
| 16:13:04 | 15 | assignment then to the Whitehead Institute by you and |
| 16:13:10 | 16 | Dr. Fan? |
| 16:13:14 | 17 | A.    Let's have that question again. |
| 16:13:16 | 18 | Q.    You recognize that this document is an |
| 16:13:18 | 19 | assignment by you -- I'm sorry -- you and Dr. Lenardo to |
| 16:13:22 | 20 | the Whitehead Institute of your rights in that patent |
| 16:13:28 | 21 | application? |
| 16:13:28 | 22 | MR. GINDLER:  Objection; calls for a legal |
| 16:13:29 | 23 | conclusion. |
| 16:13:30 | 24 | THE WITNESS:  Yeah, it certainly does. |
| 16:13:31 | 25 | I don't understand this. |

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 233

16:13:32  1    BY MR. FRAZIER:

16:13:37  2        Q.   Well, it says,

16:13:38  3                  "Whereas Whitehead

16:13:38  4             Institute for Biomedical Research, a

16:13:41  5             corporation organized and existing

16:13:43  6             under the laws of the State of

16:13:44  7             Delaware and having the usual place

16:13:46  8             of business."  And then it tells the

16:13:48  9             address for the Whitehead Institute.

16:13:49  10            Do you see that?

16:13:50  11       A.   Yeah.

16:13:50  12       Q.   And then it says,

16:13:51  13                 "Now, therefore, to all

16:13:53  14            whom it may concern, be it known that

16:13:55  15            for good and valuable consideration,"

16:13:57  16            and it goes on with some legal

16:13:59  17            terminology, "we have sold, assigned

16:14:01  18            and transferred and by these presents

16:14:04  19            do hereby assign and transfer unto

16:14:05  20            said assignee," and you see the

16:14:08  21            assignee is the Whitehead Institute?

16:14:10  22       A.   Yes.

16:14:11  23       Q.   And so this is an assignment --

16:14:13  24       A.   Okay.

16:14:13  25       Q.   -- from you and your coinventor at the

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 234

| 16:14:16 | 1 | Whitehead to the Whitehead Institute. |

16:14:16    1    Whitehead to the Whitehead Institute.

16:14:19    2         A.    Right.

16:14:19    3              MR. GINDLER:   Objection; calls for a legal

16:14:20    4    conclusion.

23:59:57    5    BY MR. FRAZIER:

16:14:22    6         Q.    And then if you actually look two pages

16:14:23    7    further, you will see there is a similar one from

16:14:25    8    Dr. Fan and Dr. Maniatis --

16:14:27    9         A.    Uh-huh.

16:14:27   10         Q.    -- to Harvard University.

16:14:31   11         A.    Yes.

16:14:35   12         Q.    And that clears up the point that we had talked

16:14:37   13    about --

16:14:38   14         A.    It does.

16:14:38   15         Q.    -- earlier that you had an obligation to assign

16:14:41   16    to the Whitehead Institute.

16:14:42   17         A.    And I fulfilled it, apparently --

16:14:44   18         Q.    Exactly?

16:14:44   19         A.    -- and they fulfilled theirs.

16:14:47   20         Q.    And their obligation was to assign to Harvard.

16:14:50   21         A.    Right.

16:14:56   22              MR. FRAZIER:   If there is nothing else from my

16:14:58   23    colleagues, I think I have no further questions at this

16:15:01   24    time.

16:15:05   25              MR. GINDLER:   I have a couple questions.

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 235

| | | |
|---|---|---|
| 16:15:08 | 1 | THE VIDEOGRAPHER:  You might need to change |
| 16:15:10 | 2 | tapes right now. |
| 16:15:11 | 3 | MR. GINDLER:  Go right ahead. |
| 16:15:14 | 4 | THE VIDEOGRAPHER:  This marks the end of |
| 16:15:15 | 5 | videotape number three in the deposition of David |
| 16:15:17 | 6 | Baltimore. |
| 16:15:17 | 7 | Going off the record, the time is 4:15. |
| 16:15:28 | 8 | (Off the record.) |
| 16:23:24 | 9 | THE VIDEOGRAPHER:  Here marks the beginning of |
| 16:23:26 | 10 | video tape number four in the deposition of David |
| 16:23:28 | 11 | Baltimore, and the time is 4:23. |
| 16:23:29 | 12 | |
| 16:23:29 | 13 | EXAMINATION |
| 12:59:57 | 14 | BY MR. GINDLER: |
| 16:23:31 | 15 | Q.   Dr. Baltimore, could you, please, find |
| 16:23:32 | 16 | Exhibit 177 among your documents. |
| 16:23:35 | 17 | It is the declaration of David Baltimore under |
| 16:23:38 | 18 | Rule 1.132. |
| 16:23:45 | 19 | A.   Got it. |
| 16:23:46 | 20 | Q.   Dr. Baltimore, did Ariad pay you to provide |
| 16:23:49 | 21 | this declaration? |
| 16:23:51 | 22 | A.   No. |
| 16:23:52 | 23 | Q.   Did anyone at Ariad suggest to you that your |
| 16:23:55 | 24 | consultancy would be terminated if you did not provide a |
| 16:23:58 | 25 | declaration along these lines? |

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 236

| 16:24:01 | 1 | A.   No. |

16:24:01    2         MR. PALS:  Objection; to form.

16:24:02    3    BY MR. GINDLER:

16:24:03    4         Q.   Did anyone from Harvard, MIT or the Whitehead

16:24:05    5    Institute offer to pay you money to provide this

16:24:08    6    declaration?

16:24:10    7         MR. PALS:  Objection to form.

16:24:11    8         THE WITNESS:  No.

16:24:11    9    BY MR. GINDLER:

16:24:14   10         Q.   Did you have any concern at the time that you

16:24:16   11    signed this declaration that if you did not do so, that

16:24:21   12    your consultancy with Ariad would be terminated?

16:24:23   13         MR. PALS:  Objection to form.

16:24:25   14         THE WITNESS:  No, I did not.

16:24:26   15    BY MR. GINDLER:

16:24:27   16         Q.   If you will remember -- look back at the last

16:24:31   17    page -- this was signed in 2001?

16:24:33   18         A.   Yes.

16:24:34   19         Q.   In 2001, were you a member of Amgen's Board of

16:24:38   20    Directors?

16:24:38   21         A.   I was.

16:24:39   22         Q.   And are you paid by Amgen to be a member of the

16:24:42   23    Board of Directors?

16:24:43   24         A.   I am.

16:24:45   25         Q.   Are you paid more by Amgen at that time to be a

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 237

16:24:48    1    member of its Board of the Directors than Ariad pays

16:24:51    2    you?

16:24:52    3         MR. PALS:  Object as outside the scope of

16:24:54    4    cross-examination with these questions.

16:24:56    5         THE WITNESS:  Yes.

16:24:56    6    BY MR. GINDLER:

16:24:57    7    Q.   Are you paid in fact a lot more by Amgen than

16:24:59    8    you are by Ariad?

16:25:00    9         MR. PALS:  Objection -- I'm sorry -- same

16:25:00   10    objection and objection to form.

16:25:02   11         MR. FRAZIER:  Objection; relevance.

16:25:05   12         THE WITNESS:  That's a matter of judgment,

16:25:07   13    what's a lot.

16:25:09   14    BY MR. GINDLER:

16:25:10   15    Q.   It's just more?

16:25:11   16    A.   It's just more.

16:25:13   17         MR. GINDLER:  Thank you, Dr. Baltimore.

16:25:17   18         MR. PALS:  No further questions.

16:25:18   19         MR. FRAZIER:  No questions.

16:25:20   20         THE VIDEOGRAPHER:  All right.  This concludes

16:25:24   21    the deposition of David Baltimore.

16:25:25   22         The number of tapes used was four.  The

16:25:28   23    original video tapes will be retained by Merrill Legal

16:25:30   24    Solutions at 20750 Ventura Boulevard, Suite 205,

16:25:36   25    Woodland Hills, California 91264.

0b8ae7db-061e-4518-9c7d-6e7102ee0bc1

Page 238

16:25:40    1          Going off the record, the time is 4:25.

2          (The deposition was concluded at

3          4:25 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 46

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-259-MPT |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) | |
| Defendants | ) ) | |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT and FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH | ) ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION | ) ) ) ) | |
| Counterclaim Defendants. | | |

## EXPERT REPORT OF DAVID M. LIVINGSTON, M.D.

I, David M. Livingston, M.D., submit the following report on behalf of ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, and The President and Fellows of Harvard College (collectively "ARIAD") in the above-captioned action.

# I.     BACKGROUND

## A.     Professional Background

1.     I currently serve as the Deputy Director for the Dana-Farber/Harvard Cancer Center ("DFCI") in Boston, Massachusetts, where I am also a member of the Executive Committee, Chair of the Executive Committee for Research at DFCI, and Program Director of the Charles A. Dana Division of Human Cancer Genetics, also at DFCI.  I am also the Emil Frei Professor of Genetics and Medicine at Harvard Medical School.  Brigham and Women's Hospital appointed me a physician in 1982, a position I held until 1999, when I was appointed senior physician.

2.     I received my medical degree from Tufts University School of Medicine in 1965.  I then received clinical training in internal medicine at Peter Bent Brigham Hospital from 1965 to 1967.  I also served research fellowships at the National Cancer Institute in Bethesda, Maryland from 1967 to 1969 and 1971 to 1973, where one of my preceptors was Dr. Philip Leder, and a post doctoral fellowship at Harvard Medical School from 1969 to 1971 under the supervision of Dr. Bert Vallee.  I joined the faculty of Harvard Medical School and the Dana-Farber/Harvard Cancer Center in 1973.  I specialize in research regarding the molecular mechanisms associated with the development of cancer.  My laboratory was the first to discover the basic transcriptional coactivation function of the p300 protein, which was later shown to be a major coactivator of NF–κB.

3.     In 1990, I was elected to the Institute of Medicine of the National Academy of Sciences.  In 1995, I was elected to the National Academy of Sciences, U.S.  I was also elected a Fellow by the American Academy of Arts and Sciences in Cambridge, Massachusetts.  I have received the Claire W.  & Richard P.  Morse Research Award from the Dana-Farber Cancer Institute, the Baxter Award for Distinguished Research in the Biomedical Sciences of the

2

Association of American Medical Colleges, the Brinker International Award for Breast Cancer Research of the Susan G. Komen Breast Cancer Foundation, the Lila Gruber Honor Award for Cancer Research from the American Academy of Dermatology, the American Association for Cancer Research-G.H.A. Clowes Award, and the Theodore Boveri Award for Molecular Cancer Genetics of the German Cancer Society.

4.      I serve as a member of the External Advisory Committee of the Center for Cancer Research at MIT and the Vice Chair for Scientific Programs of the Board of Directors of the Damon Runyon Cancer Research Fund in New York, New York. I serve on the editorial boards of Cell Growth & Differentiation, Molecular and Cellular Biology, Cancer Cell, and Molecular Cell. I am an author of more than 185 articles and have also written reviews and contributed to multiple books and monographs. I am named as an inventor on five patents. I have attached my CV, which includes a list of the publications I have authored or co-authored in the past ten years, as Exhibit 1.

**B.      Summary of Opinions & Assumptions**

5.      I have been asked to opine on issues related to the validity of claims 6, 18, 70, 71, 72, 183 and 184  (the "asserted claims") of U.S. Patent No. 6,410,516 (the "'516 Patent"), and to rebut certain opinions expressed in Dr. Randolph Wall's report, served on behalf of Amgen on January 19, 2008. I expect to testify that the asserted claims of the '516 Patent comply with the enablement, written description and best mode requirements of 35 U.S.C. § 112. In other words, I expect to testify that the asserted claims are not invalid.

6.      I have based my opinions in this case on my 43 years of experience in the fields of molecular genetics and medicine, on the '516 Patent and its prosecution history, references cited in this report and scientific literature in the field of the invention. I understand that the Court has not yet issued a claim construction order in this case. For the purposes of my

3

analysis, I have considered the definition of a person of ordinary skill in the art (a "POSA") and claim construction proposed in the initial report of Dr. Jeffrey Ravetch, submitted on behalf of ARIAD on January 19, 2008. To the extent that they differ, I have also considered the claim construction proposed by ARIAD in its litigation against Eli Lilly & Co., summarized in the initial report of Dr. Warner C. Greene, submitted on behalf of Amgen in this matter.

7.      My rate of compensation for my work in this action is $750 per hour. My compensation is not dependent upon the outcome of this case.

8.      I reserve the right to supplement my report in light of any additional fact discovery, opinions by Amgen's experts, and/or trial testimony. I also reserve the right to provide rebuttal opinions and testimony in response to Amgen's experts and fact witnesses. In connection with my anticipated trial testimony in this action, I may use as exhibits various documents produced in this litigation that refer to or relate to the matters discussed in this report. In addition, I reserve the right to use animations, demonstrative exhibits, enlargements of actual exhibits, and other information in order to convey my opinions.

## II.    THE SPECIFICATION OF THE '516 PATENT SATISFIES THE REQUIREMENTS OF 35 U.S.C. § 112

9.      I have read the initial report of Dr. Jeffrey Ravetch, and I agree with his conclusion that claims 6, 70, 71 and 72 are entitled to an effective filing date of March 1, 1988, and that claims 18, 183 and 184 are entitled to an effective filing date of April 21, 1989. Because the question of whether a patent's specification satisfies the requirements of 35 U.S.C. § 112 is determined in light of the level of knowledge of a POSA at the time that the application was filed, my analysis focuses on the knowledge and level of skill possessed by a POSA between 1988 and 1989.

10.     I expect to testify that, by the late 1980s, a POSA would have several viable means of practicing the methods of the asserted claims.  From the disclosure of the '680 application and the state of the art in 1988, a POSA would have been able to practice the invention by using antagonists to inducing molecules, decoy molecules, dominantly interfering molecules and cloned IκB or IκB-like molecules.  Each of these methods is explicitly disclosed in the '436 application.  Moreover, given the state of the art, the disclosure of the NF–κB pathway, and the modulation of reducing induced NF–κB activity, a POSA would have known to use each of these methods after reviewing the '680 application.  I also expect to testify that the asserted claims are adequately described by the specification of the '516 Patent and the disclosures of the '680 and '436 applications, and that the best mode requirement is satisfied for all of the asserted claims.

**A.     The Asserted Claims are Enabled.**

11.     I understand that 35 U.S.C. § 112 requires that the disclosure in a patent specification be sufficiently clear and complete to teach a hypothetical POSA how to make and use the invention as it is claimed without undue experimentation.  I also understand that undue experimentation, while escaping precise definition, involves consideration of several factors, including:  (1) the quantity of actual experimentation needed to use the invention, (2) the amount of guidance present in the specification and available to one who wishes to use the invention, (3) the presence or absence of working examples in the specification, (4) the nature of the invention, (5) the state of the prior art at the time the application was filed, (6) the relative skill of those in the relevant art at the time of filing, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.  The mere fact that a large amount of work is required to reduce a claimed invention to practice does not require a finding of undue experimentation.

12.      I also understand that whether a disclosure is enabling is determined as of the effective filing date of the patent, not the time of litigation.  However, I also understand that post-filing references are relevant to enablement to the extent that they demonstrate the existence of an enabling disclosure, or lack thereof.  I understand that, while the full scope of the claimed invention must be enabled, the inventors need not have predicted and disclosed every possible means of practicing the invention.  In particular, the patent need not enable the accused product, Enbrel.

13.      **Antagonists and Drugs.**  By the 1980s, a POSA could have practiced the inventions of the asserted claims by using antibodies to any NF-kB inducing molecule, such as cytokines.  The specification of the '516 Patent teaches that:

> [A]ntagonists may be used to decrease the activity of the factors and thus may be useful in the therapy of diseases associated with overactivity of a transcriptional regulatory factor.  Such agonists or antagonists identified by assays employing the factor-encoding genes of this invention are within the scope of this invention.[1]

The specification also discloses that tumor necrosis factor α ("TNF-α") acts on the NF–κB pathway.[2]  Monoclonal antibodies to TNF-α could be obtained or created without undue experimentation by the late 1980s.[3]  Using analytical techniques well-known in the art, such as the CAT reporter assay described in Example 15,[4] a POSA would know how to design an

---

[1] '516 Patent at (35:7-12).

[2] *Id.* at (17:30-35).

[3] Tracey *et al.*, *Anti-Cachectin/TNF Monoclonal Antibodies Prevent Septic Shock During Lethal Bacteraemia*, Nature, 330:662-4 (1987); Osborne *et al.*, *Tumor Necrosis Factor a and Interleukin 1 Stimulate the Human Immunodeficiency Virus Enhancer by Activation of the Nuclear Factor κB*, PNAS USA 86:2336-2340 (1989).

[4] '516 Patent at (78:44-82:4).

experiment to determine whether antibodies to TNF-α could be used to practice the asserted claims.

14. **Decoy Molecules**. By 1988, the use of short nucleotide molecules (oligonucleotides) as competitive inhibitors of transcription factors was well known to those skilled in the art. From the disclosure of the basic steps of the NF–κB signaling pathway in the '680 or '436 applications, a POSA would understand that a critical step of NF–κB mediated gene expression is the binding of NF–κB to genomic DNA, in the nucleus of an induced cell. With the sequence of a NF–κB recognition sequence, such as the κB binding site disclosed in the '680 application or any of the sequences disclosed in Table 1 of the '436 application, a POSA would have known how to construct a short oligonucleotide which could be delivered into cells by known techniques, such as microinjection, red-cell-mediated fusion, liposomes, competitor plasmids or electroporation.[5] Once inside a cell, decoy oligonucleotides can accumulate in the nucleus where they competitively bind to NF–κB, reducing the amount of NF–κB available to bind to the genomic DNA, thus reducing NF–κB activity. By treating cells that have induced NF–κB activity with decoy oligonucleotides, one could reduce induced NF–κB activity. Thus, the disclosure of decoy molecules would enable one to practice asserted claims 6 (diminishing induced NF–κB-mediated intracellular signaling by reducing NF–κB activity in cells) and 18 (reducing intracellular NF–κB signaling that was caused by IL-1 or TNF-α), and claims dependent thereon.

15. **Dominantly Interfering Molecules.** By the late 1980s, the use of dominant mutant alleles of protein transcription factors to inhibit gene expression was well known in the

---

[5] See ¶ 20 below.

7

art.[6]  As described in Dr. Ravetch's initial report, "dominantly interfering molecules," as they are called in the specification, take advantage of the fact that NF–κB has a DNA binding domain that is spatially distinct from its transcriptional activation domain.  By transfecting a cell to express dominant negative mutants of NF–κB, which have active DNA binding domains but inactive or non-existent transcriptional activation domains, a POSA could reduce induced NF–κB activity in those cells.  By 1990, the lab of Alain Israël had created dominant negative mutants of NF–κB.[7]

16.  **IκB and IκB-like Molecules.**  By the late 1980s, given the disclosure of the '516 Patent's specification, a POSA could have isolated and cloned IκB using routine methods. Using the cloned IκB, a POSA could reduce induced NF–κB activity in cells by transfecting the cells to overexpress IκB, or by introducing RNA encoding the sequence of IκB so that it would be translated by the cell.  Since the effective filing date of the '516 Patent, overexpression of IκB has been demonstrated as an effective means of reducing NF–κB activity in cells.[8]

**B.    The Report of Dr. Wall Does Not Demonstrate That the Asserted Claims Are Not Enabled.**

17.  I have read the report of Dr. Randolph Wall, and I understand that he believes the asserted claims of the '516 Patent to be invalid for lack of enablement because "the patent only provide[s] a list of hypothetical reducers [of induced NF–κB activity]," "fail[s] to disclose how any protein or DNA could be consistently delivered [to cells]," and "fail[s] to show how to

---

[6] Herskowitz, *Functional Inactivation of Genes By Dominant Negative Mutations*, Nature 329:219-222 (1987); Friedman *et al.*, *Expression of a Truncated Viral Trans-Activator Selectively Impedes Lytic Infection By Its Cognate Virus*, Nature 335:452-454 (1988).

[7] Logeat *et al.*, *Inhibition of Transcription Factors Belonging to the Rel/NF–κB Family by a Transdominant Negative Mutant*, EMBO J 10(7):1827-1832 (1991).

[8] Esslinger *et al.*, *Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IkappaB Alpha*, J Immunol 158:5075-5078 (1997).

carry out the claimed methods in as wide a variety of cell types as claimed."[9]  I disagree with these opinions, and with Dr. Wall's ultimate conclusion that the asserted claims are not enabled. In this section, I address each of the arguments Dr. Wall makes for lack of enablement, and explain why they are either incorrect or insufficient to invalidate the asserted claims.

18.    **Actual Reducers of NF–κB Activity Are Disclosed in the Patent.**  In his report, Dr. Wall opines that the asserted claims are not enabled because the patent provides only "hypothetical" reducers of induced NF–κB activity.  However, the specification clearly discloses methods of practicing the claimed inventions that were well known within the prior art by the time of the '680 and '436 applications, and which have been proven to be effective means of practicing the claimed inventions.  As described in section II.A. above, a POSA would have been able to construct decoy molecules and use them to practice the asserted claims with knowledge of an NF–κB recognition sequence and the general steps of the NF–κB pathway – both of which are disclosed in the '680 application – and with only routine experimentation. The construction and use of oligonucleotides as competitive inhibitors were known in the art since the early 1980s.[10]  Decoy molecules were used to inhibit NF–κB activity by scientists in the lab of Gary Nabel as early as 1990.[11]  Additionally, the specification teaches that the claimed

---

[9] Wall Report at 35.

[10] *See, e.g.,* Marcus-Sekura, *Techniques for Using Antisense Oligodeoxyribonucleotides to Study Gene Expression,* Anal. Biochem. 172:289-295 (1988).

[11] Bielinska *et al., Regulation of Gene Expression with Double-Stranded Phosphorothioate Oligonucleotides,* Science 250:997-1000 (1990); *See also,* Morishita *et al., In Vivo Transfection of Cis Element 'Decoy' Against Nuclear Factor-KappaB Binding Site Prevents Myocardial Infarction,* Nat Med 3:894-899 (1997); Khaled *et al., Use of Phosphorothioate-Modified Oligodeoxynucleotides to Inhibit NF-kappaB Expression and Lymphocyte Function, Clin Immunol Immunopathol* 86:170-179 (1998); Tomita *et al., Transcription Factor Decoy for NFkappaB Inhibits TNF-alpha-induced Cytokine and Adhesion Molecule Expression In Vivo,* Gene Therapy 7:1326-1332 (2000); Tomita *et al., Transcription Factor Decoy for Nuclear Factor-kappaB Inhibits Tumor Necrosis Factor-alpha-induced Expression of Interleukin-6 and Intracellular Adhesion Molecule-1 in Endothelial Cells,* J Hypertens 16:993-1000 (1998); Ye *et al., Regulation of Interleukin-6 Gene expression in Brain of Aged Mice by*

inventions can be practiced by transfecting cells to overexpress IκB, or by causing cells to express dominant negative mutants of NF–κB.  Each of these methods has been demonstrated as effective means of reducing NF–κB activity.[12]

19.     Dr. Wall cites the deposition testimony of inventors David Baltimore, Thomas Maniatis and Phillip A. Sharp to imply that the insertion of the IκB gene into a plasmid vector was "highly experimental" in the late 1980s to early 1990s.[13]  I disagree with Dr. Wall's statement that the insertion of a gene into a plasmid vector was "highly experimental" at that time.  By then, it was standard laboratory practice internationally.  Indeed, I believe that Dr. Wall has mischaracterized the inventors' testimony to support his opinion.  At Dr. Baltimore's deposition, counsel for Amgen asked him whether incorporation of the IκB gene into a vector was "a highly experimental *form of therapy*," to which Dr. Baltimore replied that it was a "highly experimental *form of therapy*."[14]  The qualification "form of therapy" implies not the mere transfection of cells with a vector carrying the IκB gene, but its use on a living being for therapeutic purposes, a still experimental procedure referred to as gene therapy.  By 1988, creation of a vector encoding a gene of interest, and transfecting it into a cultured cell was routine for a POSA.  That neither the inventors nor anyone else had transfected a cell with IκB

---

*Nuclear Factor kappaB*, J Neuroimmunol 39:749-757 (2000); Du *et al.*, *NF-κb Mediates Amyloid & Peptide-Stimulated Activity of the Human Apolipoprotein κ Gene Promoter in Human Astroglial Cells*, Molecular Brain Research 136:177-188 (2005).

[12] *See* Logeat *et al.*, *Inhibition of Transcription Factors Belonging to the Rel/NF–κB Family by a Transdominant Negative Mutant*, EMBO J 10(7):1827-1832 (1991) (dominantly interfering molecules); Esslinger *et al.*, *Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IkappaB Alpha*, J Immunol 158:5075-5078 (1997) (IκB).

[13] Wall Report at 39-40.

[14] Baltimore Dep. Tr. at 183:16-184:12 (emphasis added).

does not support Dr. Wall's conclusion that the transfection of cells (even for the purpose of

overexpressing a gene) would require more than routine experimentation for a POSA.

     20.    **Methods of Delivering Molecules Into Cells Were Well Known Within the**

**Prior Art.** Dr. Wall also opines that the asserted claims are not enabled because the

specification "fail[s] to disclose how any protein or DNA could be consistently delivered [to

cells]." Although the patent does not explicitly describe any particular mechanism by which

DNA or proteins could be introduced into cells, several methods were well known to a POSA

and could be practiced without undue experimentation at that time. In the case of decoy

molecules, no specialized transport mechanism is necessarily required: at high concentrations,

oligonucleotides can be taken up by some cells without added reagents.[15] Once inside the cell, a

fraction of the oligonucleotides migrate to the nucleus where they affect gene expression. By

the late 1980s, oligonucleotides could also be introduced into cells by mechanical or chemical

methods, including electroporation,[16] plasmid transfection,[17] microinjection[18] and liposome[19] or

red blood cell–mediated fusion.[20]

---

[15] *See, e.g.,* Kitajima *et al., Ablation of Transplanted HTLV-I Tax-Transformed Tumors in Mice by Antisense Inhibition of NF–κB,* Science 258:1792-1795 (1992).

[16] Shigekawa & Dower, *Electroporation of Eukaryotes and Prokaryotes:  A General Approach to the Introduction of Macromolecules into Cells,* Biotechniques 6(8):742-751 (1988); Knutson & Yee, *Electroporation:  Parameters Affecting Transfer of DNA into Mammalian Cells,* Anal Biochem 164:44-52 (1987).

[17] Schöler & Gruss, *Specific Interaction Between Enhancer-Containing Molecules and Cellular Components,* Cell 36:403-411 (1984); Wang & Calame, *SV40 Enhancer-Binding Factors Are Required at the Establishment but Not the Maintenance Step of Enhancer-Dependent Transcriptional Activation,* Cell 47:241-247 (1986).

[18] Diacumakos, *Methods for Micromanipulation of Human Somatic Cells in Culture,* Methods Cell Biol. 7:287-311 (1973); Graessmann *et al., Microinjection of Early SV40 DNA Fragments and T Antigen,* Methods Enzmol. 65(1):826-825 (1980).

21.     Dr. Wall also opines that the '516 Patent "does not enable one to practice the invention by inserting IκB protein into cells."[21]  The patent, however, teaches that cells can be transfected with a vector encoding the gene for IκB, and caused to overexpress this naturally occurring and specific inhibitor of NF–κB.[22]  Dr. Wall argues that the specification of the '516 Patent provides no evidence that activated NF–κB is responsive to exogenous IκB.  However, at column 29, lines 33-46, the specification discloses that activated NF–κB from HeLa cell nuclear extracts is responsive to IκB derived from a murine cell line.  These results demonstrate that activated NF–κB endogenous to a human cell line (HeLa) can be inhibited with exogenous IκB, isolated from murine cells.  I also disagree with Dr. Wall's opinion that these experimental results cannot be extrapolated to intact cells.  I understand that the specification need not provide experimental results to enable a claimed method.  So-called "prophetic examples" can enable and describe a claimed invention.  That the inventors had not yet practiced the claimed method by causing cells to overexpress IκB does not mean that the invention is not enabled.  I understand that post-filing experiments showing that the claims can be practiced according to the methods taught by the patent are relevant to enablement.  In fact, as shown above, over-expression of IκB has been used to inhibit NF–κB activity in transfected cells.[23]

---

[19] *See* Fraley *et al.*, *Introduction of Liposome-encapsulated SV40 DNA into Cells*, J. Biol. Chem. 225:10431-10435 (1980); Schaefer-Ridder *et al.*, *Liposomes as Gene Carriers:  Efficient Transformation of Mouse L Cels by Thymidine Kinase Gene*, Science 215:166-168 (1982).

[20] *See* Kriegler and Livingston, *Chemically Facilitated Microinjection of Proteins into Intact Monolayers of Tissue Culture Cells*, Somatic Cell & Molecular Genetics 3:0740-7750 (1977); Wasserman *et al.*, *A Quantitative Study of Ultramicroinjection of Macromolecules into Animal Cells*, Cell 7:551-556 (1976).

[21] Wall Report at 39.

[22] '516 Patent at (32:12-38), (37:55-63).

[23] Esslinger *et al.*, *Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IkappaB Alpha*, J Immunol 158:5075-5078 (1997).

22.    Dr. Wall believes that certain language in the specification "casts doubt on whether added IκB would be degraded due to the instability of the protein."[24]  That opinion, however, supports enablement of the claims.  If  Dr. Wall intended to argue that the specification casts doubt on the ability to practice the claimed methods by increasing the concentration of unbound IκB in cells because it might be degraded, I note that nothing in the specification suggests that all unbound IκB will degrade before it can bind and inactivate free NF–κB.  That some of the IκB may be degraded does not mean that all of the IκB would be degraded or that its rate of degradation would be fast enough that it cannot exert a negative effect on NF–κB.  Dr. Wall suggests that because the '516 Patent discusses the use of trypsin to degrade IκB, that one skilled in the art would think that free IκB would be degraded by that protease, which Dr. Wall asserts is "common in many cell types."[25]  For several reasons, that argument is indefensible.

23.    Trypsin is a serine protease that is commonly used in the field of biochemistry to digest proteins, either to characterize a compound as a protein – as in the '516 Patent – or to cleave a protein at a specific point in its sequence, *i.e.*, after a lysine or  arginine residue.  That IκB is subject to degradation by trypsin merely tells a POSA that IκB is a protein that contains lysyl or arginyl residues; it does not suggest that unbound IκB is particularly unstable.  More importantly, active trypsin is not typically found in any type of cell, certainly not in "many cells" as Dr. Wall seems to believe.  Rather, trypsin is constitutively present only in certain cells of the exocrine pancreas and only in its inactive form, trypsinogen.  Trypsin is not activated in these cells, but is activated in the lumen of the small intestine.  If trypsin were activated inside

---

[24] Wall Report at 41.

[25] Wall Report at 40, citing the '516 Patent at (28:13-14).

of a cell, it would cleave almost any protein that it came into contact with, and the cell would die. No POSA would believe, as Dr. Wall apparently has implied, that free IκB, whether exogenously produced or over-expressed by a transfected cell, would be subject to degradation by activated, intracellular trypsin based on the specification of the '516 Patent.

24.      Dr. Wall also suggests that one skilled in the art would question the viability of IκB-based methods of practicing the invention in light of the statements in the specification that "IκB requires an intact polypeptide structure for its [inhibitory] activity" and that "IκB is apparently unstable when not complexed with NF-κB."[26]  However, the former statement was made in the context of experiments performed to characterize IκB. In those experiments, it was observed that IκB activity in a gel shift assay was eliminated when the inhibitor-containing fraction of cell extracts was treated with trypsin. The message of this result is merely that IκB is a protein, not that it cannot function inside a cell.[27]  When the extracts were treated with trypsin plus BPTI (bovine pancreatic trypsin inhibitor), IκB was not degraded and it was able to bind NF–κB.[28]  The characterization of IκB as an inhibitory protein that loses its inhibitory abilities when degraded would not suggest to one skilled in the art that IκB is particularly unstable. The latter statement, that "IκB is apparently unstable when not complexed with NF–κB," is merely a proposed explanation for the observation that free IκB is not found in large quantities in cytosolic fractions of unstimulated cells.[29]  In light of the specification, which repeatedly suggests practicing the claimed methods by increasing the amount of IκB in cells, this one

---

[26] Wall Report at 40, citing '516 Patent at (28:15-16; 31:42-43).

[27] '516 Patent at (28:5-16).

[28] *Id.*

[29] *Id.* at (31:42-44).

14

statement would not dissuade a POSA from attempting to practice the claims using IκB. Nothing in the specification suggests that proteolytic degradation of IκB would complicate practicing the claimed invention, and in fact, it would not.  Although IκB is subject to proteolytic degradation by the 26S proteasome, IκB is not subject to such degradation until it has been phosphorylated and ubiquitinated.[30]  In fact, studies published after the effective filing date of the '516 Patent demonstrate that over-expression of IκB is a viable means of inhibiting NF–κB and does not require additional steps to protect the additional IκB from proteolytic degradation.[31]

25.    **Gene therapy is not claimed and need not be enabled to enable the full scope of the asserted claims.**  In his report, Dr. Wall opines that the asserted claims are not enabled because the specification does not enable *in vivo* gene therapy.  However, the asserted claims are not directed toward gene therapy; rather they are directed towards reducing induced NF–κB activity in cells (claim 6 and claims dependent thereon) and reducing TNF-α or IL-1 activity in mammalian cells (claim 18).  The terms, "in cells" or "in mammalian cells" encompass different types of cells, but there is nothing in the language of the claims that requires that the patent specifically illustrate *in vivo*, therapeutic use of the claimed methods.  The asserted claims are simply directed towards cells with induced NF–κB activity.

26.    Much of Dr. Wall's report is devoted to explaining the difficulties inherent in the use of *in vivo* gene therapy, and is therefore irrelevant to the asserted claims and to this

---

[30] Chen *et al.*, *Signal-induced Site-specific Phosphorylation Targets I Kappa B Alpha to the Ubiquitin-Proteasome Pathway*, Genes Dev. 9(13):1586-1597 (1995); Alkalay *et al.*, *Stimulation-Dependent I Kappa B Alpha Phosphorylation Marks the NF-kappa B Inhibitor for Degradation Via the Ubiquitin-Proteasome Pathway*, PNAS USA 92(23):10599-10603 (1995); Ciechanover Report at 19.

[31] Esslinger *et al.*, *Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IκBa*, J. Immunol. 158:5075-5078 (1997).

litigation.  For example, Dr. Wall argues that the claimed inventions are not enabled because the patent does not disclose methods of delivering DNA- or protein-based inhibitors to specific cells of a living organism, for therapeutic purposes.  However, as explained above, *in vivo* gene therapy is not claimed and need not be specifically illustrated to enable the claims.  Many of the obstacles cited, and the exaggerated negative effects proposed by Dr. Wall apply only to such *in vivo* gene therapy uses:  issues related to drug (gene) delivery, such as pharmacokinetics and bioavailability are of little or no concern in experiments directed at cultured cells or tissue samples.  Similarly, while toxicity and other side-effects are highly relevant to *in vivo* therapeutic uses, they are less relevant to *in vitro* and *ex vivo* methods of practicing the invention.  Dr. Wall even admits that "either DNA (e.g. as an oligonucleotide) or protein may be delivered to cells."[32]  The obstacles to effective, *in vivo* therapeutic use are irrelevant to enablement of the claims.

27.     **The asserted claims are enabled in all cells that contain NF–κB.**  Dr. Wall argues that the asserted claims are not enabled because the patent does not prove that the methods work in all claimed cells.  Specifically, he argues that "in cells" and "in mammalian" cells cannot be enabled because the specification of the '516 Patent includes experiments on only a limited universe of cells.  Dr. Wall's analysis is deficient.  Dr. Wall fails to acknowledge that the proper construction of the asserted claims is necessarily limited to those cells containing NF–κB.  As explained in Dr. Ravetch's first report, in order for a cell to have induced NF–κB activity, it is assumed that NF–κB must be constitutively expressed and must be capable of being activated in that cell.  Therefore, the fact that yeast cells may not contain an NF–κB gene does not mean that the full scope of the claim terms "in cells" or "in eukaryotic cells" is not

---

[32] Wall Report at 76.

enabled.  Properly construed, claims with those terms do *not* encompass yeast cells, or any other

cells that do not contain an NF–κB gene.   Second, Dr. Wall argues that differences among cell

types would frustrate a POSA's ability to practice the invention in different cells.   However,

because the claims are limited to cells that contain inducible NF–κB, Dr. Wall's concerns are

beside the point.

     **C.**     **The Specification of the '516 Patent Includes Adequate Written Description of the Asserted Claims.**

     28.     I understand that to satisfy the written description requirement of 35 U.S.C. §

112, a patent specification must describe the claimed invention in such a way as to make clear to

a POSA that the inventors actually invented what was claimed in the issued patent.  In other

words, the specification must demonstrate that the inventors were in possession of the claimed

invention.  I understand that the disclosure of identifying characteristics such as structure,

properties or functional characteristics coupled with a correlation between structure and

function may satisfy the written description requirement.

     29.     The specification of the '516 Patent, and the disclosures included in the '680, '436

and '898 applications, describe methods of reducing induced NF–κB activity in cells that contain

active NF–κB.  Specifically, the asserted claims are directed towards reducing NF–κB activity so

as to reduce "NF–κB-mediated intracellular signaling" or "intracellular signaling caused by

Interleukin-1 or Tumor Necrosis Factor–α" in cells.  I understand that to adequately describe the

asserted claims, such that a POSA would understand that the inventors were in possession of

the claimed inventions, the patent specification must describe the basic steps of the NF–κB

pathway which are to be modulated, reduction of induced NF–κB activity, and methods for

practicing the claims.

30.      In my opinion, the specification of the '516 Patent adequately describes the basic

steps of the NF–κB pathway.  Although certain details of the precise mechanism of NF–κB

activation were not yet understood as of the effective filing date of the '516 Patent, and are still

not to this day, the specification discloses the canonical steps of the NF–κB signaling pathway.

That disclosure provides an adequate description of the scientific theory underlying the claimed

inventions, which a POSA could rely upon, along with a description of the claimed inventions,

to practice the asserted claims.  The specification discloses that NF–κB is a DNA-binding protein

present in many eukaryotic cells:[33] (a) that is constitutively present in the cytoplasm of

unstimulated cells as an inactive precursor, bound to an inhibitory IκB protein;[34] (b) that, upon

dissociation from IκB, translocates to the nucleus of the cell;[35] and (c) that, once in the nucleus,

mediates the transcription of certain genes, in part, by binding to specific DNA recognition

sequences present in those genes.[36]

31.      The specification also discloses the reduction of induced NF–κB activity:

> As a result of this finding, it is now possible to alter or modify the
> activity of NF–κB as an intracellular messenger and, as a result, to
> alter or modify the effect of a variety of external influences,
> referred to as inducing substances whose messages are
> transduced within cells through NF–κB.[37]

32.      The reduction of NF–κB activity is described as a means of reducing the

expression of its target genes:

---

[33] '516 Patent at (2:26-31).

[34] *Id.* at (2:46-63), (10:46-54), (12:28-35).

[35] *Id.* at (16:22-28).

[36] *Id.*

[37] *Id.* at (3:59-64).

> The expression of a gene having an NF-κB binding recognition sequence can be positively or negatively regulated to provide, respectively, for increased or decreased production of the protein whose expression is mediated by NF-κB.[38]

33.     The specification also discloses that TNF-α and IL-1 are inducers of NF–κB activity:

> Results described here suggest that inducibility of NF–κB plays a prominent role in interactions between cytokines. IL-1 and TNF-α activate NF–κB binding and both have been shown known to induce β-IFN.[39]

34.     The '516 Patent also describes several methods of practicing the inventions of the asserted claims, including the use of decoy molecules, antagonist drugs, exogenously produced IκB, and dominantly interfering molecules.[40]   Decoy molecules are further described by the disclosures of NF–κB recognition sequences in Table 2,[41] and by the use of κB oligonucleotides in example 15.[42]

35.     In light of these disclosures, one of ordinary skill in the art would recognize that the specification of the '516 Patent describes methods of reducing induced NF–κB activity for the purpose of reducing "NF–κB-mediated intracellular signaling" or "intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor–α."   In other words, the asserted claims are supported by adequate written description, and are not invalid under 35 U.S.C. § 112.

---

[38] *Id.* at (35:45-49).

[39] *Id.* at (17:30-35).

[40] *Id.* at (37:43-38:22).

[41] *Id.* at (37:1-43).

[42] *Id.* at (78:44-82:4).

19

36.    In his report, Dr. Wall opines that the asserted claims are not supported by an adequate written description.  Specifically, Dr. Wall argues that the complete and accurate sequence of IκB is needed to adequately describe the claims.  I disagree.  None of the asserted claims, and indeed none of the issued claims of the '516 Patent, recites either purified or recombinant IκB as a claim limitation.  None of the asserted claims even refers to IκB.  Although IκB is a critical part of the NF–κB pathway, a POSA need not isolate or sequence it to practice any of the claimed inventions.  Even those claims, which are not asserted in this litigation, that relate to the dissociation of the NF–κB:IκB complex, do not require a detailed understanding of the amino acid or nucleotide sequences of IκB.  All that a POSA must know of IκB to practice any of the claims of the '516 Patent is that which is disclosed in the specification:  its existence and the nature of its function as a specific biological inhibitor of NF–κB.

37.    Further, should a POSA wish to practice the asserted claims using IκB or an IκB-like protein, the sequence provided in Figure 43 is sufficient.[43]  Dr. Wall opines that Figure 43 is not the sequence for IκB, but is a partial sequence of a homologous NF–κB inhibitor derived from chicken cells, referred to as pp40.  However, a partial sequence of pp40 would still enable one of skill in the art to practice the claimed inventions through protein-based methods.[44]  In the late 1980s, before complete genomic sequences of mammals and avian species were deciphered, a POSA would not have been able to synthesize an entire gene based upon the mere knowledge of a peptide sequence encoded by a fragment of that gene.  Instead, a POSA would have used that partial polypeptide sequence to synthesize short oligonucleotide fragments that are

---

[43] I do not agree that Figure 43 is required to practice the asserted claims.  I also note that Figure 43 first appeared in the '898 application.  Accordingly, my opinions relating to Figure 43 are confined to the time period after November 13, 1991, the filing date of the '898 application.

[44] Davis *et al.*, *Rel-Associated pp40:  An Inhibitor of the Rel Family of Transcription Factors*, Science 253:1268-1271 (1991).

predicted to be complementary to a segment of the gene of interest to probe a cDNA library in search of a cDNA copy of the complete gene. A POSA would decipher the sequence of the cDNA isolated from the aforementioned library, and compare it to the sequence from Figure 43. Upon discovering that the newly identified and the disclosed sequence were not a perfect match, a POSA could refer to other publications that included the correct IκB sequence – in fact, most POSA read publications, not patents to find the proper sequence of a gene. In this process, a POSA would realize that the gene isolated from the cDNA library was the correct one for IκB, and could use that sequence to practice the invention. Although time-consuming and laborious, cloning and sequencing a gene, and checking the sequence for errors against published sequences (or today, a database) was a matter of robust but routine experimentation by the late 1980s.

38.     Dr. Wall attempts to support his argument by pointing to statements made during the prosecution of the '516 Patent that refer to the need for the correct sequence of IκB to enable and describe certain claims.[45] For example, Dr. Wall opines that "Claim 125 requires 'using a recombinant IκB protein'" and "Claim 153 requires a 'gene construct for expressing an IκB polypeptide,'" and explains why a POSA would need to sequence IκB before those claims could be practiced. However, Dr. Wall fails to note that neither of those claims issued in the '516 Patent. Issued claims 125 and 153 do not relate to recombinant IκB in any way. None of the issued claims recites recombinant or purified IκB as claim limitations, and none requires the sequence for enablement or written description.

39.     Dr. Wall also makes several arguments, ostensibly related to written description, which are merely restatements of his (mistaken) opinions about enablement. For example, Dr.

---

[45] Wall Report at 75.

Wall argues that, because the patent doesn't "provide a method for overcoming [the] challenge" of preventing the proteolytic degradation of unbound IκB by trypsin, protein-based methods of practicing IκB are not enabled.  As explained above, a POSA would know that trypsin is not activated within cells, but is activated in the lumen of the small intestine, and would therefore not require an explanation provided in the patent of how to overcome Dr. Wall's purported obstacle.  More significantly, although unbound IκB may be subject to proteolytic degradation, it has been demonstrated that over-expression of IκB is capable of reducing NF–κB activity without taking any additional steps to promote the stability of unbound IκB.[46]

40.    Dr. Wall also argues that the asserted claims are not adequately described because the specification does not identify "particular agents or drugs, antagonists, decoy molecules, or dominantly interfering molecules."[47]  However, a POSA would understand that certain decoy molecules are adequately described by the disclosure of a canonical NF–κB DNA binding sequence:  a short oligonucleotide that includes this NF–κB recognition sequence could serve as a decoy molecule.  The '680 application disclosed the κB sequence, the earliest known NF–κB recognition sequence.  The '436 application included a number of additional NF–κB recognition sequences, as well as a consensus sequence that could be used to develop additional decoy molecules.  Although decoy molecules are adequately described by the disclosure of NF–κB recognition sites, the patent itself also reports the results of a gel-shift assay using κB oligonucleotides.[48]  This indicates that these sequences can actually function as NF–κB binding sites.  Dr. Wall's insistence notwithstanding, it is not relevant that the specification does not

---

[46] Esslinger *et al.*, *Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IkappaB Alpha*, J Immunol 158:5075-5078 (1997).

[47] Wall Report at 77.

[48] '516 Patent at (78:43-82:4).

explicitly identify the κB oligonucleotides as one example of decoy molecules, because that fact would be clear to a POSA.

### D.    Best Mode

41.     I understand that 35 U.S.C. § 112 also requires disclosure of that particular embodiment or means of carrying out the invention that the inventors contemplated as the best mode of practicing the claimed invention.  I also understand that the question whether the inventors were in possession of a best mode is resolved by a factual inquiry into the inventors' subjective state of mind at the time the patent application was filed.  I also understand that an inventor has no duty to update a patent application with a newly discovered best mode when a divisional, continuation or continuation-in-part application is filed.  In other words, if a claim was adequately described and enabled by an application filed at a time that an inventor had not contemplated a later-discovered better mode, the inventor need not disclose a newly contemplated best mode in a later-filed application.

42.     In his report, Dr. Wall opines that Dr. Thomas Maniatis admitted at his deposition that, by November 1991, he considered the use of antisense RNA to be the best way to reduce NF–κB activity.  Accordingly, Dr. Wall asserts that the '516 Patent is invalid because it does not disclose this mode.  Although I agree that the specification does not disclose the use of antisense RNA to practice the asserted claims, I do not agree with Dr. Wall's conclusion that the disclosure of the '516 Patent fails to satisfy the best mode requirement of 35 U.S.C. § 112.  As explained in Section II above, the asserted claims are entitled to the effective filing date of either the '680 or '436 application, which were filed before the date on which Dr. Maniatis purportedly contemplated the use of antisense RNA as the "best way to reduce NF–κB activity."[49]

---

[49] Maniatis Dep. Tr. at 155:15-18.

Therefore, the '516 Patent need not disclose the use of antisense RNA, because the inventors did not consider it to be the best mode at the time that the asserted claims were adequately described and enabled by the '680 or '436 applications.

43.     That one of the inventors may have considered antisense RNA to be the best method of practicing the claimed inventions at some later date, after the effective filing date to which the asserted claims are entitled, does not obligate update of the disclosure of the patent with that newly contemplated best mode.  Moreover, it is not clear from his testimony that Dr. Maniatis considered antisense RNA to be the best way to reduce *induced* NF–κB activity.  In other words, it is not clear from his testimony that Dr. Maniatis considered antisense RNA to be the best mode of practicing the claimed inventions.  Accordingly, it my opinion that the asserted claims are supported by a disclosure that complies with the best mode requirement of 35 U.S.C. § 112.

David M. Livingston, M.D.                                    Date

24

## III.    MATERIALS CONSIDERED

### A.    US Patents & Patent Applications

- Baltimore *et al.*, "Nuclear Factors Associated With Transcriptional Regulation", U.S. Patent No. 6,410,516.

- U.S. Patent Application No. 07/162,680 (filed March 1, 1988).

- U.S. Patent Application No. 07/341,436 (filed April 21, 1989).

- U.S. Patent Application No. 07/791,898 (filed November 13, 1991).

### B.    Publications

- Alkalay *et al.*, *Stimulation-Dependent I Kappa B Alpha Phosphorylation Marks the NF-kappa B Inhibitor for Degradation Via the Ubiquitin-Proteasome Pathway*, PNAS USA 92(23):10599-10603 (1995).

- Bielinska *et al.*, *Regulation of Gene Expression with Double-Stranded Phosphorothioate Oligonucleotides*, Science 250:997-1000 (1990).

- Chen *et al.*, *Signal-induced Site-specific Phosphorylation Targets I Kappa B Alpha to the Ubiquitin-Proteasome Pathway*, Genes Dev. 9(13):1586-1597 (1995).

- Davis *et al.*, *Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors*, Science 253:1268-1271 (1991).

- Diacumakos, *Methods for Micromanipulation of Human Somatic Cells in Culture*, Methods Cell Biol. 7:287-311 (1973).

- Du *et al.*, *NF-κb Mediates Amyloid & Peptide-Stimulated Activity of the Human Apolipoprotein κ Gene Promoter in Human Astroglial Cells*, Molecular Brain Research 136:177-188 (2005).

- Esslinger *et al.*, *Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IkappaB Alpha*, J Immunol 158:5075-5078 (1997).

- Fraley *et al.*, *Introduction of Liposome-encapsulated SV40 DNA into Cells*, J. Biol. Chem. 225:10431-10435 (1980).

- Friedman *et al.*, *Expression of a Truncated Viral Trans-Activator Selectively Impedes Lytic Infection By Its Cognate Virus*, Nature 335:452-454 (1988).

- Graessmann *et al.*, *Microinjection of Early SV40 DNA Fragments and T Antigen*, Methods Enzmol. 65(1):826-825 (1980).

- Herskowitz, *Functional Inactivation of Genes By Dominant Negative Mutations*, Nature 329:219-222 (1987).

- Khaled *et al.*, *Use of Phosphorothioate-Modified Oligodeoxynucleotides to Inhibit NF-kappaB Expression and Lymphocyte Function*, Clin Immunol Immunopathol 86:170-179 (1998).

- Kitajima *et al.*, *Ablation of Transplanted HTLV-I Tax-Transformed Tumors in Mice by Antisense Inhibition of NF–κB*, Science 258:1792-1795 (1992).

- Knutson & Yee, *Electroporation: Parameters Affecting Transfer of DNA into Mammalian Cells*, Anal Biochem 164:44-52 (1987).

- Kriegler and Livingston, *Chemically Facilitated Microinjection of Proteins into Intact Monolayers of Tissue Culture Cells*, Somatic Cell & Molecular Genetics 3:0740-7750 (1977).

- Logeat *et al.*, *Inhibition of Transcription Factors Belonging to the Rel/NF–κB Family by a Transdominant Negative Mutant*, EMBO J 10(7):1827-1832 (1991).

- Marcus-Sekura, *Techniques for Using Antisense Oligodeoxyribonucleotides to Study Gene Expression*, Anal. Biochem. 172:289-295 (1988).

- Morishita *et al.*, *In Vivo Transfection of Cis Element 'Decoy' Against Nuclear Factor-KappaB Binding Site Prevents Myocardial Infarction*, Nat Med 3:894-899 (1997).

- Osborne *et al.*, *Tumor Necrosis Factor a and Interleukin 1 Stimulate the Human Immunodeficiency Virus Enhancer by Activation of the Nuclear Factor κB*, PNAS USA 86:2336-2340 (1989).

- Schaefer-Ridder *et al.*, *Liposomes as Gene Carriers: Efficient Transformation of Mouse L Cels by Thymidine Kinase Gene*, Science 215:166-168 (1982).

- Schöler & Gruss, *Specific Interaction Between Enhancer-Containing Molecules and Cellular Components*, Cell 36:403-411 (1984).

- Shigekawa & Dower, *Electroporation of Eukaryotes and Prokaryotes: A General Approach to the Introduction of Macromolecules into Cells*, Biotechniques 6(8):742-751 (1988).

- Tomita *et al.*, *Transcription Factor Decoy for NFkappaB Inhibits TNF-alpha-induced Cytokine and Adhesion Molecule Expression In Vivo*, Gene Therapy 7:1326-1332 (2000).

- Tomita *et al.*, *Transcription Factor Decoy for Nuclear Factor-kappaB Inhibits Tumor Necrosis Factor-alpha-induced Expression of Interleukin-6 and*

*Intracellular Adhesion Molecule-1 in Endothelial Cells*, J Hyptertens 16:993-1000 (1998).

- Tracey *et al.*, *Anti-Cachectin/TNF Monoclonal Antibodies Prevent Septic Shock During Lethal Bacteraemia*, Nature, 330:662-4 (1987).

- Wang & Calame, *SV40 Enhancer-Binding Factors Are Required at the Establishment but Not the Maintenance Step of Enhancer-Dependent Transcriptional Activation*, Cell 47:241-247 (1986).

- Wasserman *et al.*, *A Quantitative Study of Ultramicroinjection of Macromolecules into Animal Cells*, Cell 7:551-556 (1976).

- Ye *et al.*, *Regulation of Interleukin-6 Gene expression in Brain of Aged Mice by Nuclear Factor kappaB*, J Neuroimmunol 39:749-757 (2000).

**C.    Litigation Documents:**

- Initial Report of Dr. Jeffrey Ravetch, submitted on behalf of ARIAD.

- Initial Report of Dr. Kathryn Calame, submitted on behalf of ARIAD.

- Initial Report of Dr. Randolph Wall, submitted on behalf of Amgen.

- Initial Report of Dr. Warner Greene, submitted on behalf of Amgen.

- Initial Report of Dr. Aaron Ciechanover, submitted on behalf of Amgen

- Dep. Tr. of Thomas Maniatis, Ph.D.

- Dep. Tr. of David Baltimore, Ph.D.

# CURRICULUM VITAE

## PART I:  General Information

DATE PREPARED:  **November 2007**

**Name:**            David Morse Livingston

**Office Address:**  Dana-Farber Cancer Institute, 44 Binney St. (SM870), Boston, MA

**Home Address:**    11 Powell Street, Brookline, MA 02446

**E-Mail:**          david_livingston@dfci.harvard.edu

**Phone/Fax:**       **T:** 617-632-3074  **F:** 617-632-4381

**Place of Birth:**  Cambridge, MA

**Education:**
| | |
|---|---|
| 1961 A.B. | Harvard University, Cambridge, MA |
| 1965 M.D. | Tufts University School of Medicine, Boston, MA |

**Postdoctoral Training:**
Internship and Residencies:
| | |
|---|---|
| 1965-1966 | Intern in Medicine, Peter Bent Brigham Hospital, Boston, MA. |
| 1966-1967 | Junior Resident in Medicine, Peter Bent Brigham Hospital, Boston, MA |

Research Fellowships:
| | |
|---|---|
| 1967-1969 | Research Associate, Laboratory of Biochemistry, NCI, Bethesda, MD |
| 1969-1971 | Research Fellow in Biological Chemistry, Harvard Medical School, Boston, MA |
| 1971-1972 | Senior Staff Fellow, National Cancer Institute, Bethesda, MD |

**Licensure and Certification:**
| | |
|---|---|
| 1971 | American Board of Internal Medicine |
| 1969 | Massachusetts License |

**Academic Appointments:**
| | |
|---|---|
| 1973-1976 | Assistant Professor of Medicine, Harvard Medical School, Boston, MA |
| 1976-1982 | Associate Professor of Medicine, Harvard Medical, Boston, MA |
| 1982-1992 | Professor of Medicine, Harvard Medical School, Boston, MA |
| 1992- | Emil Frei Professor of Medicine, Harvard Medical School, Boston, MA |
| 1997- | Professor of Genetics, Harvard Medical School, Boston, MA |

**Hospital Appointments:**
| | |
|---|---|
| 1973-1977 | Senior Clinical Associate, Dana-Farber Cancer Institute; Associate in Medicine, Brigham and Women's Hospital, Boston, MA |
| 1976-1982 | Senior Associate in Medicine, Brigham and Women's Hospital, Boston |
| 1977-1983 | Associate Physician, Dana-Farber Cancer Institute, Boston, MA |
| 1982-1999 | Physician, Brigham and Women's Hospital, Boston, MA |

1

| 1999- | Senior Physician, Brigham and Woman's Hospital |
| 1983-1996 | Physician, Active Staff, Dana-Farber Cancer Institute, Boston, MA |
| 1989-1991 | Vice-President, Dana-Farber Cancer Institute, Boston, MA |
| 1991-1995 | Director and Physician-in-Chief, Dana-Farber Cancer Institute, Boston |
| 1995 | Chair, Department of Medicine, Dana-Farber Cancer Institute, Boston |
| 1995-2000 2005- | Chair, Executive Committee for Research, Dana-Farber Cancer Institute, Boston, MA |
| 1997- | Distinguished Consultant in Cancer Medicine, Dana-Farber Cancer Institute, Boston, MA |
| 1997- | Program Director, The Charles A. Dana Division of Human Cancer Genetics, Dana-Farber Cancer Institute, Boston, MA |
| 1997-1999 | Chair, Dana-Farber/Harvard Cancer Center Grant Planning Committee |
| 1999- | Deputy Director, Dana-Farber/Harvard Cancer Center |
| 1999- | Member, Dana-Farber/Harvard Cancer Center Executive Committee |
| 2000-2004 | Member, Executive Committee for Research, Dana-Farber Cancer Institute |

**Other Professional Positions:**

| 1972-1973 | Senior Investigator, National Cancer Institute, Bethesda, MD |
| 2005 | Findling Visiting Professor (4/27), Mayo Clinic, Rochester, MN |

**Awards and Honors:**

| 1961 | A.B., Cum Laude, Harvard University, Cambridge |
| 1962 | Anatomy Prize, Tufts University School of Medicine, Boston |
| 1963 | Pathology Prize; Bertha Spector Award in the History of Medicine; Mosby Scholarship Book Award, Tufts University School of Medicine |
| 1964/1965 | President, Alpha Omega Alpha, Tufts Chapter |
| 1965 | Alumni Prizes, highest class rank, Tufts University School of Medicine |
| 1965 | M.D. Magna Cum Laude, Tufts University School of Medicine |
| 1991 | Claire W. & Richard P. Morse Research Award, Dana-Farber Cancer Institute, Boston |
| 1990- | elected to Institute of Medicine of the National Academy of Sciences |
| 1995- | elected to National Academy of Sciences, U.S. |
| 1997 | Baxter Award for Distinguished Research in the Biomedical Sciences of the Association of American Medical Colleges |
| 1997 | Brinker International Award for Breast Cancer Research of The Susan G. Komen Breast Cancer Foundation |
| 2001 | Lila Gruber Honor Award for Cancer Research, American Academy of Dermatology |
| 2001- | Fellow, American Academy of Arts and Sciences, Cambridge, MA |
| 2005- | American Association for Cancer Research-G.H.A. Clowes Award. Theodore Boveri Award for Molecular Cancer Genetics of the German Cancer Society, |

**Major Committee Assignments:**
**National, Regional, International:**

| 1979-1983 | Member, Virology Study Section, Division of Research Grants, NIH |
| 1986-1988 | Chairman, Virology Study Section, Division of Research Grants, NIH |
| 1988-1992 | Member, Scientific Advisory Board, Damon Runyon-Walter Winchell Cancer Research Fund, New York, NY |
| 1989-1990 | Chairman, Scientific Advisory Board, Damon Runyon-Walter Winchell Cancer Research Fund, New York, NY |
| 1991-1996 | Member, Scientific Advisory Committee, Institute for Cancer Research, Fox Chase Cancer Center, Philadelphia, PA |
| 1991 | Co-Chairman, Third Pezcoller Symposium, Rovereto, Italy |

| | |
|---|---|
| 1992-1997 | Member, Board of Directors, Damon Runyon-Walter Winchell Cancer Research Fund, New York, NY |
| 1992 | Member, Program Committee, Fourth Pezcoller; Co-Chairman, Session III, Adhesion Molecules, Trento, Italy. |
| 1992-1996 | Member, Board of Scientific Counselors, Division of Cancer Biology, Diagnosis, and Centers, National Cancer Institute, National Institutes of Health, Bethesda,MD |
| 1992-1994 | Member, Advisory Board, <u>Tufts Medicine</u>, Tufts University School of Medicine Alumni  Periodical |
| 1993 | Chairman, Session III, Fifth Pezcoller Symposium on Apoptosis, Trento, |
| 1993-96 | Member, External Advisory Committee, Fred Hutchinson Cancer Research Center, Seattle, WA |
| 1993-95 | Member,  Scientific Advisory Board, University of North Carolina- Lineberger Comprehensive Cancer Center, Chapel Hill, NC |
| 1994- | Member, External Advisory Committee, Center for Cancer Research, MIT |
| 1994 | Member, Program Committee, Sixth Pezcoller Symposium, Rovereto, Iraly |
| 1994 | Vice Chairman, Scientific Advisory Committee, Pezcoller Foundation, Trento, Italy |
| 1994-1995 | Member, Ad hoc Advisory Committee to Review the Internal Program of the National Cancer Institute |
| 1995 | Vice-President, Scientific Committee for the Pezcoller Symposia, Pezcoller Foundation, Trento, Italy |
| 1995 | Member, Fourth Pezcoller Award Committee, European School of Oncology, Milan, Italy |
| 1995 | Member, Program Committee, Seventh Pezcoller Symposium, Trento, Italy |
| 1995-1999 | Chairman,  Board of Scientific Advisors, National Cancer Institute, Bethesda, |
| 1995- | Member, Scientific Board, International Institute of Genetics and Biophysics, Naples, Italy |
| 1996 | Member, Program Committee, Eighth Pezcoller Symposium, Rovereto, Italy |
| 1999-2004 | Member, Advisory Committee to the Director, National Cancer Institute |
| 1997 | Member, Program Committee, Ninth Pezcoller Symposium, Rovereto, Italy |
| 1997-2000 | Member, National Research Council Commission on Life Sciences |
| 1997- | President, Board of Directors, Cancer Research Fund of the Damon- Runyon Walter Winchell Foundation, New York |
| 1997-2000 | Member (ex officio) AACR-Pezcoller International Award for Cancer |
| Research | Selection Committee |
| 1997-2002 | Member, Tufts University  Medica/Sackler Board of Overseers, Boston, MA |
| 1998-2001 | Member, Scientific Review Board, Howard Hughes Medical Institute, Chevy Chase, MD |
| 1998 | Member, Program Committee, Tenth Pezcoller Symposium, Trento, Italy |
| 1999 | Member, Program Committee, Eleventh Pezcoller Symposium, Roverto, Italy |
| 1999-2004 | Member, Corporation Visiting Committee for the Division of Bioengineering and Environmental Health, Massachusetts Institute of Technology, Cambridge, MA |
| 2000 | Member, Program Committee, Twelfth Pezcoller Symposium,  June 1-3, Trento |
| 2000- | Member, U. S. Scientific Advisory Board, Pan Pacific Pharmaceuticals, Inc., Menlo Park, CA |
| 2001 | Member, Program Committee, Thirteenth Pezcoller Symposium, May 31-June 2, Rovereto, Italy |
| 2001-2004 | Member, Institute of Medicine and Division of Earth and Life Sciences' National Cancer Policy Board |

| | |
|---|---|
| 2003 | Member, Program Committee, 15th Pezcoller Symposium, June 12-14, Rovereto, Italy |
| 2003 | Chairman, International Advisory Board Committee, Institute for Cancer Research and Treatment,, June 18, Torino, Italy |

**Hospital:**

| | |
|---|---|
| 1974-1991 | Chairman, Medical Oncology Fellowship Selection Committee, Dana-Farber Cancer Institute, Boston, MA |
| 1991-1995 | Member, Medical Oncology Fellowship Selection Committee, Dana-Farber Cancer Institute, Boston, MA |
| 1975-1987 | Member, Medical Internship Selection Committee, Bigham and Women's Hospital, Boston, MA |
| 1977-1984 | Chairman, Biohazard Control Committee, Dana-Farber Cancer Institute, Boston, MA |
| 1984-1987 | Member, Biohazard Control Committee, Dana-Farber Cancer Institute, Boston, MA |
| 1995-1996 | Deputy Chair/Secretary, Medical Oncology Academic Executive Committee, Dana-Farber Cancer Institute, Boston |
| 1997 | Member, Quality Improvement Committee, Dana-Farber Cancer Institute |

**Editorial Boards:**

| | |
|---|---|
| 1976-1980 | Ce11 |
| 1977-1979 | Archives of Virology |
| 1977-1997 | Journal of Virology |
| 1982-1997 | Virology |
| 1985-1987 | Virus Research |
| 1986-1987 | Molecular Biology & Medicine |
| 1986-2000 | Editor, Biochimica et Biophysica Acta Reviews on Cancer On-Line (ROCO) |
| 1990-1993 | Journal of Cellular Biochemistry |
| 1993- | Genes & Development |
| 1997- | Cell Growth & Differentiation |
| 1998-2003 | Molecular and Cellular Biology |
| 2003-2006 | |
| 2001- | Physiological Genomics |
| 2001- | Molecular Cell |

**Memberships, Offices and Committee Assignments in Professional Societies:**

| | |
|---|---|
| 1968- | American Federation of Clinical Research |
| 1970- | American Society for Microbiology |
| 1976- | American Society for Clinical Investigation |
| 1976- | American Society of Biological Chemists |
| 1989- | Association of American Physicians |
| 1992- | Royal Society of Medicine |
| 1994- | American Academy of Microbiology |
| 2000- | Associate Member, EMBO |

**Teaching Experience:**

| | |
|---|---|
| 1974-1985 | Visiting Physician, Medical Service, Brigham and Women's Hospital, Boston, MA |
| 1975-1988 | Visiting Physician, Medical Oncology, Dana-Farber Cancer Institute, Boston, MA |
| 1974-1976 | Instructor,'Introduction to the Clinic' Harvard-MIT HST students |
| 1975- | Thesis Advisor, 7 undergraduates; 7 graduate students, Harvard University |

| 1976/ | Co-Director, Postgraduate Course in Tumor Cell and Molecular |
| 1978/ | Biology, Dana-Farber Cancer Institute and Department of |
| 1980/1982 | Continuing Education, Harvard Medical School, Boston, MA |
| 1977- | Lecturer and course co-director, Biochemistry 165, Department of |
| | Biochemistry and Molecular Biology, Harvard University, Cambridge, MA |
| 1978-1979 | Lecturer in HST Microbiology Course |
| 1982- | Tutor in Biochemical Sciences, Department of Biochemistry and |
| | Molecular Biology, Harvard University, Cambridge, MA |
| 1985- | Member, Committee on Virology, Harvard Medical School |
| 1986-1991 | Member, Committee on Cell and Developmental Biology, Harvard |
| | Medical School |
| 1987-1988 | Co-Director, Biochemistry 165: Oncogenes: Structure and Function |
| | Harvard University, Cambridge, MA |
| 1989 | William Warner Brockman Memorial Lecture: Functional Interactions |
| | Between the SV40 Large T Antigen and the RB Gene Product, University |
| | of Michigan Medical School, Ann Arbor, MI |
| 1992 | Gerhard Schmidt Lecture: Growth Regulation by RB and Related Nuclear |
| | Proteins, Tufts University, Boston, MA |
| 1992 | Lecturer: Oncogenes and Bladder Cancer; Urologic Cancer Course, |
| | Harvard Medical School, Boston, MA |
| 1992 | Richard Parker Memorial Lecture: Functional Analysis of the RB Gene |
| | Product and Related Proteins, College of Physicians & Surgeons, Columbia |
| | University, NY |
| 1992 | The 1992 Gordon Hamilton Fairley Memorial Lecture, British Society of |
| | Cancer Meeting in Honor of Sir Hamilton Fairley |
| 1992 | Mariani Distinguished Oncology Lecture, Department of Pathology, |
| | Columbia University, NY |
| 1993 | Chairman, 1993 FASEB Summer Research Conference: Cellular and |
| | Molecular Genetics, Copper Mountain, CO |
| 1994 | Member, Program Committee, Sixth Pezcoller Symposium, Trento, Italy |
| 1995 | Keynote Speaker, 1995 FASEB Summer Research Conference on |
| | Hematopoietic Neoplasms: Altered State of Transcriptional Regulation, |
| | Saxton's River, VT |
| 1996 | Earle P. Charlton Lecturer, Tufts University School of Medicine, Boston, MA |
| 1997 | Julia and Patricia Kingsbury Memorial Lecture, Yale Comprehensive |
| | Cancer Center, New Haven, CT |
| 1997 | Guest Speaker, Annual Awards Dinner, STOP CANCER, Los Angeles, CA |
| 1998 | Keynote Speaker, 1998 Cologne Spring Meeting on Molecular Medical |
| | Genetics, Institute of Genetics, University of Cologne, Germany |
| 1998 | Lecturer, Karolinska Research Lecture Series at the Nobel Forun, |
| | Stockholm, Sweden |
| 1998 | George E. Cartwright Visiting Professor in Hematology-Oncoloy, University |
| | of Utah School of Medicine, Salt Lake City, Utah |
| 1999 | Julia Hudson Freund Memorial Lecturer, The Cancer Center, Washington |
| | University School of Medicine, St. Louis, MO |
| 2001 | George Khoury Lecture, NIH Lecture Series, Nov 28, National Institutes |
| | of Health, Bethesda, MD |
| 2002 | Roma Eisenstark Memorial Lecture in Cancer Research, University of |
| | Missouri, Columbia, MO |
| 2002-present | numerous named lectureships given in the US and Europe. |

**Principal Clinical and Hospital Service Responsibilities:**

| 1974-1985 | Visiting Physician, Medical Service, Brigham and Women's |
| | Hospital, Boston, MA |

1975-1988      Visiting Physician, Medical Oncology, Dana-Farber Cancer Insttute

## BIBLIOGRAPHY
### Original Reports:

1.   Livingston D, Crawford F, Friedkin MF.  Studies with tetrahydrohomofolate and thymidylate synthetase from amethopeterin-resistant mouse leukemia cells. Biochemistry 1968; 7:2814-2818.

2.   Livingston D, Leder P. Deformylation and protein biosynthesis. Biochemistry 1969; 8:435-443.

3.   Chabner B, Livingston D.  A simple enzymatic assay for pyridoxal phosphate. Analy Biochem 1970; 34:413-423.

4.   Chabner BA, DeVita VT, Livingston DM, Oliverio, VT. Abnormalities of tryptophan metabolism and plasma pyridoxal phosphate in Hodgkin's disease. New Engl J Med 1970; 282:838-843.

5.   DeVita VT, Chabner BA, Livingston DM, Oliverio VT.  Anergy and tryptophan metabolism in Hodgkin's disease. Am J Clin Nutr 1971; 24:835-840.

6.   Livingston DM, Wacker WEC. Trace metal methods for nutritional studies. Am J Clin Nutr 1971; 24:1082-1085.

7.   Riordan JF, Livingston DM. Conformational and activity changes on subtilisin cleavage of caboxypeptidase. Biochem Biophys Res Commun 1971; 44:695-701.

8.   Vallee PL, Riordan JF, Johansen JT, Livingston DM. Spectrochemical probes for protein conformation snd function.  Cold Spring Marbor Symp Quant Biol. 1971; 36:517-531.

9.   Livingston DM, Scolnick E, Parks W, Todaro GJ. Affinity chromatography of RNA-dependent DNA polymerase from RNA tumor viruses on a solid immuno-adsorbent. Proc Natl Acad Sci (USA) 1972; 69:393-397.

10.   Johansen JT, Livingston DM, Vallee BL. Chemical modification of carboxy crystals. Azo coupling of tyrosine-248. Biochemistry 1972; 11:2584-2588.

11.   Scolnick EM, Parks WP, Livingston DM. Radioimmunoassay of type C viral proteins. I. Species specific reactions of murine and feline viruses. J Immunol 1972; 109:570-577.

12.   Livingston DM, Parks WP, Scolnick EM, Ross J. Affinity chromatography of avian type C viral reverse transcriptase.Studies with Rous sarcoma virus transformed rat cells.Virology 1972; 50: 388-395.

13.   Parks WP, Livingston DM, Todaro GJ, Benveniste RE, Scolnick EM. Radioimmunoassay of mammalian type C viral proteins. III. Detection of viral antigen in normal murine cells and tissues. J Exptl Med 1973; 137:622-635.

14.   Livingston DM, Todaro GJ.  Endogenous type C virus from a cat cell clone with properties distinct from previously described feline type C virus. Virology 1973; 53:142-151.

15.     Lieber MM, Livingston DM, Todaro GJ.  Superinduction of endogenous type C virus by 5-bromodeoxyuridine from transformed mouse clones. Science 1973; 181:443-444.

16.     Lieber MM, Benveniste RE, Livingston DM, Todaro GJ.  Mammalian cells in culture frequently release type C viruses. Science 1973; 182:56-59.

17.     Todaro GJ, Benveniste RE, Lieber MM, Livingston DM.  Infectious type C viruses released by normal cat embryo cells. Virology 1973; 55:506-517.

18.     Livingston DM, Todaro GJ. Murine sarcoma virus-transformed non-producer rat cell lines resistant to type C virus infection. Intervirology 1973;1: 329-337.

19.     Livingston DM, Serxner L, Howk D, Hudson J, Todaro GJ. Characterization of a new murine cellular DNA polymerase. Proc Nat Acad Sci (USA) 1974; 71: 57-62.

20.     Gallagher RF, Todaro GJ, Smith RG, Livingston DM, Gallo RC. Relationship between RNA- directed DNA polymerase (reverse transcriptase) from human acute leukemic blood cells and primate type C viruses. Proc Nat Acad Sci (USA) 1974; 71:1309-1313.

21.     Benveniste RE, Lieber MM, Livingston DM, Sherr CJ, Todaro GJ.  Infectious C-type virus isolated from a baboon placenta. Nature 1974; 248:17-19.

22.     Auld D, Kawaguchi H, Livingston D, Vallee B. RNA dependent DNA polymerase (reverse transcriptase) from avian myeloblastosis virus. A zinc metalloenzyme. Proc Nat Acad Sci (USA) 1974; 71:2091-2095.

23.     Auld D, Kawaguchi H, Livingston D, Vallee B. Reverse transcriptase from avian myeloblastosis virus: a zinc metalloenzyme. Biochem Biophys Res Commun 1974; 57:967-972.

24.     Desai LS, Livingston DM.Specific basis for type C viral replication in MSV-transformed rat non- producer variant clones. Virology 1974; 62:337-343.

25.     Henderson IC, Livingston DM. Parial purification and characterization of the SV40 T antigen. Cell 1974; 3:65-70.

26.     Livingston DM, Henderson IC, Hudson J. SV40 T antigen. Partial purification and properties. Cold Spring Harber Symp Quant Biol. 1974; 39:283-289.

27.     Jessel D, Hudson J, Landau T, Tenen D, Livingston D. Interaction of partially purified SV40 T antigen with circular viral DNA molecules. Proc Natl Acad Sci (USA) 1975; 72:1960-1964.

28.     Auld D, Kawaguchi H, Livingston D, Vallee B. Zinc reverse transcriptases from mammalian RNA type C viruses. Biochem Biophys Res Commun 1975; 62:  296-302.

29.     Tenen DG, Baygell P, Livingston DM. Thermolabile T (tumor) antigen from cells transformed by a temperature-sensitive mutant of Simian virus 40. Proc Nat Acad Sci (USA) 1975; 72:4351-4355.

30.     Livingston DM, Ferguson C, Gollogly B, Lazarus H. Accumulation of cystine auxotrophic thymocytes accompanying type C leukemogenesis in the mouse.  Cell 1976: 70:432-439.

31.   Livingston DM, Howard T, Spence C. Identification of infectious virions which are vesicular stomatitis virus pseudotypes of murine type C virus. Virology 1976; 70:432-439.

32.   Jessel D, Landau T, Hudson J, Lalor T, Tenen D, Livingston D.Identification of regions of the SV40 genome which contain preferred SV40 T antigen binding sites. Cell 1976; 8:535-545.

33.   Anderson J, Martin R, Chang C, Mora P, Livingston DM. Nuclear preparations of SV40-transformed cells contain tumor-specifiic transplantation antigen activity. Virology 1977; 76: 420-425.

34.   Tenen DG, Martin RG, Anderson J, Livingston DM. Biological and biochemical studies of cells transformed by SV40 temperature sensitive gene A mutants and A mutant revertants. J Virol 1977; 22:210-218.

35.   Iglehart J, York M, Modest A, Lazarus H, Livingston DM. Cystine requirement of continuous human lymphoid cell lines of normal and leukemic origin. J Biol Chem. 1977; 252:7184-7191.

36.   Tenen DG, Garewal H, Haines LL, Hudson J, Woodard V, Light S, Livingston DM. Purification of Simian virus 40 tumor antigen from a line of Simian virus 40 transformed human cells. Proc Nat Acad Sci (USA) 1977; 74:3745- 3749.

37.   Kriegler MP, Livingston DM Chemically facilitated microinjection of proteins into intact monolayers of tissue culture cells. Somat Cell Genet 1977 3:603-610.

38.   Persico-DiLauro M, Martin RG, Livingston DM.  Interaction of SV40 chromatin with SV40 T antigen. J Virol 1977; 24:451-460.

39.   Livingston DM, Tenen DG, Garewal H, Light S.  Extensive purification and initial chemical characterization of the SV40 T antigen. Inserm 1977; 69: 51-62.

40.   Bikel I, Pavlatos T, Livingston DM. Purification and subunit structure of mouse liver cystathionase.  Arch Biochem Biophys 1978; 186:168-174.

41.   Lazarus H, Barell E, Latt S, Krishan A, Livingston DM, Harris K, Shlossman SF, Chess L. Isolation and characterization of a unique cell line (LAZ 221) from a case of human acute lymphocytic ("null" cell) leukemia. Cancer Res 1978; 38:1363-1367.

42.   Griffin JD, Light S, Livingston DM. Measurements of the molecular size of the Simian virus 40 large T antigen. J Virol 1978; 27:218-226.

43.   Kriegler MP, Griffin JD, Livingston DM. Phenotypic complementation of the SV40 tsA mutant defect in viral DNA synthesis following microinjection of SV40 T antigen. Cell 1978; 14:983-995.

44.   Bikel I, Faibes D, Uren JR, Livingston DM. Immunologic analyses of mouse cystathionase in normal and leukemic cells. Biochemistry 1978;17:5181-5187.

45.   Chang C, Martin RG, Livingston DM, Luborsky S, Hu CP, Mora P. Relationship between T-antigen and tumor-specific transplantation antigen of simian virus 40-transformed cells. J Virol 1979; 29:69-75.

8

46.  Griffin JD, Spangler G, Livingston DM.  Protein kinase activity associated with SV40 T antigen. Proc Nat Acad Sci (USA) 1979; 76:2610-2614.

47.  Roberts TM, Bikel I, Yocum R, Livingston DM, Ptashne M. Synthesis of small t antigen in *E. coli*. Proc Nat Acad Sci (USA) 1979; 76:5596-5600.

48.  Shalloway D, Kleinberger T, Livingston DM.  Mapping of DNA binding sites for the lactose repressor and the SV40 T antigen by protection against Exonuclease III digestion. Cell 1980; 20:411-422.

49.  Griffin JD, Spangler G, Livingston DM. Enzymatic activities associated with the SV40 large T antigen.Cold Spring Harbor Symp Quant Biol 1980; 44: 113-122.

50.  Antman, K, Livingston D. Intracellular neutraliztion of SV40 tumor antigens following microinjection of specific antibody. Cell 1980; 19:627-636.

51.  Spangler G, Griffin JD, Rubin H, Livingston DM. Identification and initial characterization of a new low molecular weight, virus-encoded T antigen in a line of SV40-transformed cells. J Virol 1980; 36:488-498.

52.  Glode M, Kriegler M, Livingston DM. Cysteine auxotrophy of human leukemic 1ymphoblasts is associated with decreased amounts of intracellular cystathionase protein. Biochemistry 1981; 20: 1306-1311.

53.  Kriegler M, Pawlowski A, Livingston DM. Cysteine auxotrophy of human leukemic lymphoblasts is associated with decreased amounts of intracellular cystathionase messenger RNA. Biochemistry 1981; 20:1312-1318.

54.  Kilton LJ, Bradley MK, Mehta C, Livingston DM. Rapid and sensitive quantitative immunoassay for the large simian virus 40 T antigen. J Virol 1981; 38:612-620.

55.  Bradley MK, Griffin JD, Livingston DM. Phosphotransferase activities associated with large T antigen. CSH Conf Cell Proliferation 1981; 8:1263-1271.

56.  Hansen U, Tenen DG, Livingston DM, Sharp PA.T antigen repression of SV40 early transcription from overlapping promoters. Cell 1981; 27:603-612.

57.  Bradley MK, Griffin JD, Livingston DM. Relationship of oligomerization to enzymatic and DNA binding properties of the Sv40 large T antigen. Cell 1982; 603-612.

58.  Tenen DG, Haines LL, Livingston DM. Binding of an analog of the SV40 T antigen to wild type and mutant viral replication origins. J Mol Biol 1982; 157:473-492.

59.  Rubin H, Figge J, Bladon MT, Chen LB, Ellman M, Bikel I, Farrell M, Livingston DM. Role of small t antigen in the acute transforming activity of SV40. Cell 1982; 30:469-480.

60.  Lynch DC, Williams R, Zimmerman TS, Kirby EP, Livingston DM. Biosynthesis of the subunits of factor VIIIR (von Willebrand Factor) by bovine aortic endothelial cells. Proc Nat Acad Sci (USA) 1983; 80:2738-2742.

61.  Bikel I, Roberts RM, Bladon MT, Green R, Amann E, Livingston DM. Purification of biologically active simian virus 40 small tumor antigen.  Proc Nat Acad Sci (USA) 1983; 80:906-910.

62.   Tenen DG, Taylor TS, Haines LL, Bradley MK, Martin RG, Livingston DM.  Binding of SV40 large T antigen from virus-infected monkey cells to wild-type and mutant viral replication origins. J Mol Biol 1983; 168:791-808.

63.   Tenen DG, Livingston DM, Wang SS, Martin RG. Effect of a stem-loop structure within the SV40 replication origin upon SV40 T antigen binding to origin region sequences. Cell 1983; 34:629-639.

64.   Lynch DC, Zimmerman TS, Kirby EP, Livingston DM. Subunit composition of oligomeric human von Wi11ebrand factor. J Biol Chem 1983; 258:12757-12760.

65.   Ellman M, Bikel I, Figge J, Roberts T, Schlossman R, Livingston DM. Nuclear and cytoplasmic localization of the SV40 small t antigen. J Virol 1984; 50: 623-628.

66.   Bradley MK, Hudson J, Villanueva MS, Livingston DM. Specific *in vitro* adenylation of the simian virus 40 large tumor antigen. Proc Nat Acad Sci (USA) 1984; 81:6574-6578.

67.   Lynch DC, Zimmerman TS, Collins CJ, Morin MJ, Ling EH, Livingston DM.  Molecular cloning of cDNA for human von Willebrand factor: Authentication by a new method. Cell 1985; 41:49-56.

68.   Tenen DG, Haines LL, Hansen UM, Martin RG, Livingston DM. Formation of a cruciform structure at the SV40 replication origin abolishes T antigen binding to the origin *in vitro*. J Virol 1985; 56:293-297.

69.   Bikel I, Mamon H, Brown EL, Boltax J, Agha M, Livingston DM. The t-unique coding domain is important to the transformation maintenance function of the simian virus 40 small t antigen. Mol Cell Biol 1986; 6:1172-1176.

70.   Murphy C, Bikel I, Livingston DM. Cellular proteins which can specifically associate with simian virus 40 small t antigen. J Virol 1986; 59:692-702.

71.   Brown M, McCormack M, Zinn KG, Farrell MP, Bikel I, Livingston DM. A recombinant murine retrovirus for simian virus 40 large T cDNA transforms mouse fibroblasts to anchorage- independent growth. J Virol 1986; 60:290-293.

72.   Bikel I, Montano X, Agha ME, Brown M, McCormack M, Boltax J, Livingston DM. SV40 small t antigen enhances the transformation activity of limiting concentrations of SV40 large T antigen. Cell 1987; 48:321-330.

73.   Collins CJ, Underdahl GP, Levene RB, Dombalagian MB, Lynch DC, Livingston DM. Molecular cloning of a human segment encoding the plasma portion of von Willebrand factor. Proc Natl Acad Sci (USA) 1987; 84:4393-4397.

74.   Bradley MK, Smith TF, Lathrop RH, Livingston DM, Webster TA. Consensus topography in the ATP binding site of the Simian virus 40 and polyoma virus large tumor antigens. Proc Natl Acad Sci (USA) 1987; 84:4026-4030.

75.   Livingston DM, Bradley MK. The SV40 large T antigen - a lot packed into a little. Mol Biol Med 1987; 4:63-80.

76.   Brown M, Figge J, Hansen U, Wright C, Keang K-T, Khoury G, Livingston DM, Roberts TM. *lac* repressor can regulate expression from a hybrid SV40 early promoter containing a *lac* operator in animal cells. Cell 1987; 49: 603-612

77.  Levene RB, Booyse FM, Chediak J, Zimmerman TS, Livingston DM, Lynch DC. Expression of abnormal von Willebrand factor by endothelial cells from a patient with type IIA von Willebrand's disease. Proc Natl Acad Sci (USA) 1987; 84:6550-6554.

78.  Figge J, Wright C, Collins CJ, Roberts TM, Livingston DM. Stringent regulation of stably integrated chloramphenicol acetyl transferase genes by *E.coli lac* repressor in monkey cells. Cell 1988; 52:713-722.

79.  Murphy CI, Weiner B, Bikel I, Piwnica-Worms H, Bradley MK, Livingston DM. Purification and functional properties of Simian virus 40 large and small T antigens overproduced in insect cells. J Virol 1988; 62:2951-2959.

80.  DeCaprio JA, Ludlow JW, Figge J, Shew JY, Huang CM, Lee WH, Marsilio E, Paucha E, Livingston DM. SV40 large tumor antigen forms a specific complex with the product of the retinoblastoma susceptibility gene. Cell 1988; 54:275-283.

81.  Loeken M, Bikel I, Livingston DM, Brady J. Transcriptional transactivation of RNA polymerase II and III promoters by SV40 small t antigen. Cell 1988; 55:1171-1177.

82.  Ludlow JW, DeCaprio JA, Huang CM, Lee WH, Paucha E, Livingston DM. SV40 large T antigen binds preferentially to an underphosphorylated member of the retinoblastoma susceptibility gene product family. Cell 1989; 56:57-65.

83.  Ewen ME, Ludlow JW, Marsilio E, DeCaprio JA, Millikan RC, Cheng SH, Paucha E, Livingston DM. An amino terminal transformation governing sequence of SV40 large T antigen contributes to the binding of both p110$^{Rb}$ and a second cellular protein, p120. Cell 1989; 58: 257-267.

84.  DeCaprio JA, Ludlow JW, Lynch DC, Furukawa Y, Griffin JD, Piwnica-Worms H, Huang CM, Livingston DM. The product of the retinoblastoma suscetibility gene has properties of a cell cycle regulatory element. Cell 1989; 58:1085-1095.

85.  Ludlow JW, Shon J, Pipas JM, Livingston DM, DeCaprio JA. The retinoblastoma susceptibility gene product undergoes cell cycle-dependent dephosphorylation and binding to and release from SV40 large T-antigen. Cell 1990; 60: 387-396.

86.  Furukawa Y, DeCaprio JA, Freedman A, Kanakura Y, Nakamura M, Ernst TJ, Livinston DM, Griffin JD. Expression and state of phosphorylation of the retinoblastoma susceptibility gene product in cycling and non-cycling human hematopoietic cells. Proc Natl Acad Sci (USA) 1990; 87: 2770-2774.

87.  Kaelin WG Jr,  Ewen ME, Livingston DM.  Definition of the minimal SV40 large T antigen and adenovirus EIA binding domain in the retinoblastoma gene product.  Mol Cell Biol 1990; 10: 3761-3769.

88.  Laiho M, DeCaprio JA, Ludlow JW, Livingston DM, Massague J.  Growth inhibition by TGF-β  linked to suppression of retinoblastoma protein phosphorylation. Cell 1990; 62:175-185.

11

89.   Montano X, Millikan R, Milhaven JM, Newsome DA, Ludlow JW, Arthur AK, Fanning E, Bikel I, Livingston DM. SV40 small t and an amino terminal domain of large T share a common transforming function. Proc Natl Acad Sci USA 1990; 87:7448-7452.

90.   Kaelin WG Jr, Pallas DC, DeCaprio JA, Kaye FJ, Livingston DM. Identification of cellular proteins which can interact specifically with the T-E1A-binding region of the retinoblastoma susceptibility gene product. Cell 1991; 64:521-532.

91.   Laiho M, Rönnstrand L, Heino J, DeCaprio JA, Ludlow JW, Livingston DM, Massagué. Control of junB and extracellular matrix protein expression by transforming growth factor-b1 is independent of SV40 T antigen-sensitive growth inhibitory events. Mol Cell Biol 1991; 11:972- 978.

92.   Chittenden T, Livingston DM, Kaelin WG Jr. The T/E1A binding domain of the retinoblastoma product can interact selectively with a sequence-specific DNA binding protein. Cell 1991; 65: 1073-1082.

93.   Ewen ME, Xing Y, Lawrence JB, Livingston DM. Molecular cloning, chromosomal mapping, and expression of the cDNA for p107, a retinoblastoma gene product-related protein. Cell, 1991; 66, 1155-1164.

94.   Ewen ME, Faha B, Harlow E, Livingston DM. Interaction of p107 with cyclin A independent of complex formation with viral oncoproteins. Science 1992; 255:85-87.

95.   Faha B, Ewen ME, Tsai L-H, Livingston DM, Harlow E. Interaction between human cyclin A and adenovirus E1A-associated p107 protein.Science 1992; 255:87-90.

96.   Shirodkar S, Ewen M, DeCaprio JA, Morgan J, Livingston DM, Chittenden, T. The transcription factor E2F, interacts with the retinoblastoma product and a p107/cyclin A complex in a cell cycle-regulated manner. Cell 1992; 68:157-166.

97.   Qin X, Chittenden T, Livingston DM, Kaelin Jr, WG. Identification of a growth suppression domain within the retinoblastoma gene product. Genes Develop 1992; 6: 953-964.

98.   DeCaprio JA, Furukawa Y, Ajchenbaum F, Griffin JD, Livingston DM. The retinoblastoma-susceptibility gene product becomes phosphorylated in multiple stages during cell cycle entry and progression. Proc Natl Acad Sci USA 1992; 89:1795-1798.

99.   Kaelin WG Jr, Krek W, Sellers WR, DeCaprio JA, Ajchenbaum F, Fuchs CS, Chittenden, T, Li Y, Farnham PJ, Blanar MA, Livingston DM, Flemington EK. Expression cloning of a cDNA encoding a retinoblastoma binding protein with E2F-like properties. Cell 1992; 70:351-364.

100.  Ewen ME, Sluss HK, Sherr CJ, Matsushime H, Kato J-Y, Livingston DM. Functional interactions of the retinoblastoma protein with mammalian D-type cyclins. Cell 1993; 73:487-497.

101.  Livingston DM, Kaelin W, Chittenden T, Qin X. The 1992 Hamilton Fairley Lecture: Structural and functional contributions to the G1 blocking action of the retionoblastoma protein. Brit J Cancer 1993; 264-268.

102.    Ludlow JW, Glendening CL, Livingston DM, DeCaprio JA. Specific enzymatic dephos-phorylation of the retinoblastoma protein. Mol Cell Biol. 1993; 13: 367-372.

103.    Chittenden T, Livingston DM, DeCaprio, JA. Cell cycle analysis of E2F in primary human T cells reveals novel E3F complexes and biochemically distinct forms of "free" E2F. Mol Cell Biol 1993; 13:3975-3983.

104.    Ewen ME, Sluss HK, Whitehouse LL, Livingston DM.  TGFb inhibition of cdk4 synthesis is linked to cell cycle arrest.  Cell 1993; 74:1009-1020.

105.    Krek W, Livingston DM, Shirodkar S. Binding to DNA and the retinoblastoma gene product promoted by complex formation of different E2F family members. Science 1993; 262:1557-1560.

106.    Zhu L, van der Heuvel S, Helin K, Fattaey A, Ewen M, Livingston DM, Dyson N, Harlow E. Inhibition of cell proliferation by p107, a relative of the retinoblastoma protein. Genes & Dev 1993; 7:1111-1125.

107.    Eckner R, Ewen ME, Newsome D, Gerdes M, DeCaprio JA, Lawrence JB, Livingston DM. Molecular cloning and functional analysis of the adenovirus E1A-associated 300 kD protein (p300) reveals a protein with properties of a transcriptional adaptor. Genes & Develop 1994; 8:869-884.

108.    Krek  W, Ewen ME, Shirodkar S, Arany ZP, Kaelin WG, Livingston DM. Negative regulation of the growth promoting transcription factor E2F-1 by a stably bound cyclin A-dependent protein kinase. Cell 1994; 78:161-172.

109.    Arany Z, Sellers WR, Livingston DM, Eckner R. E1A-associated p300 and CREB-associated CBP belong to a conserved family of coactivators. Cell (Letter to Editor) 1994; 77:799-800.

110.    Wang W-B, Bikel I, Marsilio E, Newsome D, Livingston D. Transrepression of RNA polymerase II promoters by the Simian virus 40 small t antigen. J Virol 1994; 68:6180-6187.

111.    Ginsberg D, Vairo G, Chittenden T, Xiao Z-X, Xu G, Wydner KL, DeCaprio JA, Lawrence JB, Livingston DM. E2F-4, a new member of the E2F transcription factor family, interacts with p107. Genes & Develop 1994; 8: 2665-2679.

112.    Qin X-Q, Livingston DM, Kaelin Jr WG, Adams PD. Deregulated transcription factor E2F-1 expression leads to S-phase entry and p53-mediated apoptosis. Proc Natl Acad Sci 1994; 91:10918-10922.

113.    Qin X-Q, Livingston DM, Ewen M, Arany Z Sellers WR, Kaelin Jr WG.  The transcription factor E2F-1 is a downstream target of RB action.  Mol Cell Biol 1995; 15:742-755.

114.    Arany Z, Newsome D,  Oldread E, Livingston DM, Eckner R. A family of transcriptional adaptor proteins targeted by the E1A oncoprotein. Nature 1995; 374:81-84.

115.    Xu G, Livingston DM, Krek W. Multiple members of the E2F transcription factor family are the products of oncogenes. Proc Natl Acad Sci (USA) 1995; 92:1357-1361.

116.    Vairo G, Livingston DM, Ginsberg D. Functional interaction between E2F-4 and p130: evidence for distinct mechanisms underlying growth suppression by different retinoblstoma protein family members. Genes & Develop 1995; 9:869-881.

13

117. Xiao Z, Chen J, Levine AJ, Modjtahedi N, Xing J, Sellers WR, Livingston DM. Functional interaction between the retinoblastoma protein and the oncoprotein, MDM2. Nature 1995; 375:694-698.

118. Missero C, Calautti E, Eckner R, Chin J, Tsai LH, Livingston DM, Dotto GP. Involvement of the cell-cycle inhibitor *Cip1/WAF1* and the E1A-associated p300 protein in terminal differentiation. Proc Natl Acad Sci USA 1995; 92:5451-5455.

119. Kitabayashi I, Eckner R, Arany Z, Chiu R, Gachelin G, Livingston DM, Yokoyama KK. Phosphorylation of the adenovirus E1A-associated 300 kDa protein in response to retinoic acid and E1A during the differentiation of F9 cells.EMBO J 1995; 14:3496-3509.

120. Lee J-S, Galvin KM, See RH, Eckner R, Livingston D, Moran E, Shi Y. Relief of YY1 transcriptional repression by adenovirus E1A is mediated by E1A-associated protein p300. Genes & Develop 1995; 9:1188-1198.

121. Wydner K, Bhattacharya S, Eckner R, Lawrence JB, Livingston DM. Localization of human CREB binding protein gene to 16p13.2-13.3 by fluorescent in situ hybridization. (Brief Reports). Genomics 1995; 30:395-396.

122. Krek W, Xu G, Livingston DM. Cyclin A-kinase regulation of E2F-1 DNA binding function underlies suppression of an S phase checkpoint. Cell 1995; 83:1149-1158.

123. Hofmann F, Livingston DM. Differential effects of cdk2 and cdk3 on the control of pRb and E2F function during G1 exit. Genes & Develop 1996; 10:851-861.

124. Scully R, Ganesan S, Brown M, DeCaprio JA, Cannistra SA, Feunteun J, Scvhnitt S, Livingston DM. Location of BRCA-1 in human breast and ovarian cancer cells [Technical Comment]. Science 1996; 272:123-125.

125. Xiao Z-X, Ginsberg D, Ewen M, Livingston DM. Regulation of the retinoblastoma protein-related protein p107 by G1 cyclin-associated kinases. Proc Natl Acad Sci USA 1996; 93: 4633-4637.

126. Field SJ, Tsai F-Y, Kuo F, Zubiaga AM, Kaelin WG Jr, Livingston DM, Orkin SH, Greenberg ME. E2F-1 functions in mice to promote apoptosis and suppress proliferation. Cell 1996; 85:549-561.

127. Eckner R, Ludlow J, Lill N, Oldread E, Arany Z, Modjtahedi N, DeCaprio JA, Livingston DM, Morgan JA. Association of p300 and CBP with SV40 Large T Antigen. Mol Cell Biol 1996; 16:3454-3464.

128. Eckner R, Yao T-P, Oldread E, Livingston DM. Interaction and functional collaboration of p300/CBP and bHLH proteins in muscle and B-cell differentiation. Genes & Develop 1996; 10:2478-2490.

129. Bhattacharya S, Eckner R, Grossman S, Oldread E, Arany Z, D'Andrea A, Livingston DM.Cooperation of Stat2 and p300/CBP in signalling induced by interferon-α. Nature 1996; 383:344-347.

130. Yao T-P, Ku G, Zhou N, Scully R, Livingston DM. The nuclear hormone receptor co-activator SRC-1 is a specific target of p300. Proc Natl Acad Sci USA 1996; 93:10626-10631.

14

131.  Arany Z, Huang LE, Eckner R, Bhattacharya S, Jiang C, Goldberg MA, Bunn HF, Livingston DM.An essential role for p300/CBP in the cellular response to hypoxia. Proc Natl Acad Sci USA 93: 1996; 93: 12969-12973.

132.  Huang LE, Arany Z, Livingston DM, Bunn FH. Activation of hypoxia-inducible transcription factor depends upon redox-sensitive stabilization of its $\alpha$ subunit. J Biol Chem 1996; 271:32253-32259.

133.  Hofmann F, Martelli F, Livingston DM, Wang Z. The retinoblastoma gene product protects E2F-1 from degradation by the ubiquitin-proteasome pathway. Genes & Develop 1996;10: 2949-2959.

134.  Scully R, Chen J, Plug A, Xiao Y, Weaver D, Feunteun J, Ashley T, Livingston DM. Association of BRCA1 with Rad51 in mitotic and meiotic cells. Cell 1997: 88:265-275.

135.  Lill NL, Tevethia MJ, Eckner R, Livingston DM, Modjtahedi N. p300 family members associate with the carboxyl terminus of simian virus 40 large tumor antigen. J Virol 1997; 71: 129-137.

136.  Scully R, Anderson SF, Chao DM, Wei W, Ye L, Young RA, Livingston DM, Parvin JD. BRCA1 is a component of the RNA polymerase II holoenzyme.    Proc Natl Acad Sci USA 1997; 94:5605-5610.

137.  Lindeman GJ, Gaubatz S, Livingston DM, Ginsberg D. The subcellular localization of E2F-4 is cell-cycle dependent. Proc Natl Acad Sci USA 1997; 94:5095-5100.

138.  Lill NL, Grossman SR, Ginsberg D, DeCaprio J, Livingston DM. Binding and modulation of p53 by p300/CBP coactivators. Nature 1997; 387:823-827.

139.  Scully R, Chen J, Ochs RL, Keegan K, Hoeckstra M, Feunteun J, Livingston DM.  Dynamic changes during the S phase of BRCA1 subnuclear localization and phosphorylation state are initiated by DNA damage.  Cell 1997;90:425-435.

140.  Lindeman GJ, Dagnino L, Zu Y, Gaubatz S, Bronson R, Warren HB, Livingston DM. E2F-5 has a unique, organ-specific, non-proliferative function as defined in knock-out mice. Genes & Dev 1998;1092-1098.

141.  Yao T-P, Oh SP, Fuchs M, Zhou N-D, Ch'ng L, Newsome D, Bronson RT, Li E, Livingston DM, Eckner R. Gene dosage-dependent embryonic development and proliferation defects in mice lacking the transcriptional integrator, p300. Cell 1998; 93: 361-372.

142.  Kawasaki H, Eckner R, Yao T-P, Taira K, Chiu R, Livingston DM, Yokoyama KK Distinct roles of the co-activators p300 and CBP in retinoic acid-induced F9 celldifferentiation. Nature 1998;393:284-289.

143.  Gaubatz S, Livingston DM. Unusual proliferation arrest and transcritional control properties of a newly discovered E3F family member, E2F-6. Proc Natl Acad Sci USA 1998;95:9190-9195.

144.  Chen J, Silver DP, Walpita D, Cantor SB, Gazdar AF, Tomlinson G, Minna JD, Couch FJ, Weber BL, Ashley T, Livingston DM, Scully R. Stable interaction the products of the BRCA1 and BRCA2 tumor suppressor genes in mitotic and meiotic cells. Mol Cell 1998; 2:317-328.

15

145.    Grossman SR, Perez M, Kung AL, Joseph M, Mansur C, Xiao Z-X, Kumar S, Howley PM, Livingston DM. p300/mdm-2 complexes participate in mdm-2 mediated p53 degradation. Mol Cell 1998; 2: 405-415.

146.    Wang ZM, Wang H, Livingston DM. Endogenous E2F-1 promotes timely Go exit of resting mouse embryo fibroblasts. Proc Natl Acad Sci USA 1998;95: 15583-15586.

147.    Bhattacharya S, Michels CL, Leung M-K, Arany ZP, Kung AL, Livingston DM. Functional role of p35srj, a novel p300/CBP binding protein, during transactivation by HIF-1. Genes & Development 1999; 13: 64-75.

148.    Martelli F, Livingston DM.  Regulation of endogenous E2F1 stability by the retinoblastoma family proteins.  Proc Natl Acad Sci USA 1999;96:2858-2863.

149.    Wilson CA, Ramos L, Villasenor MR, Anders KH, Press MF, Clarke K, Karlan B, Chen, J-J, Scully R, Livingston D, Zuch RH, Kanter MH, Cohen S, Calzone FJ, Slamon DJ. Localization of human BRCA1 and its loss in high-grade non-inherited breast carcinomas. Nature Genetics 1999; 21:236-240.

150.    Leung M-K, Jones T, Michels CL, Livingston DM, Bhattacharya S. Molecular cloning and chromosomal localization of the human *CITED2* gene encoding p35srj/Mrg1. Genomics 1999; 61: 307-313.

151.    Scully R, Ganesan S, Vlasakova K, Chen JJ, Socolovsky M, Livingston DM. Genetic analysis of BRCA1 function in a defined tumor cell line. Mol Cell  1999; 4:1093-1099.

152.    Wilson CA, Ramos L, Villasenor MR, Anders KH, Press MF, Clarke K, Karlan B, Chen J, Scully R, Livingston D, Zuch RH, Kanter MH, Cohen S, Calzone FJ, Slamon DJ. Localization of human BRCA1 and its loss in high-grade,non-inherited breast carcinomas. Nature Genetics 1999; 21:236-240.

153.    Kung AL, Rebel VI, Bronson RT, Ch'ng LE, Sieff CA, Livingston DM, Yao TP.  Gene dose-dependent control of hematopoiesis and hematologic tumor suppression by CBP. Genes Dev 2000; 14: 272-277.

154.    Wu X, Ranganathan V, Weisman DS, Heine WF, Ciccone DN, O'Neill TB, Crick KE, Pierve KA, Lane WS, Rathbun G, Livingston DM, Weaver DT. ATM phosphorylation of Nijmegen breakage syndrome protein is required in a DNA damage response. Nature 2000; 405:477-481.

155.    Wu X, Petrini J, Heine W, Weaver DT, Livingston DM, Chen J.  Independence of N/M/R focus formation and the presence of intact BRCA1. Technical Comment. Science 2000; 289: 11.

156.    Eid JE, Kung AL, Scully R, Livingston DM. P300 interacts with the nuclear proto-oncoprotein, SYT, as part of the active control of cell adhesion. Cell  2000; 102: 839-848.

157.    Gaubatz S, Lindeman GJ, Ishida S, Jakoi L, Nevins JR, Livingston DM, Rempel RE. E2F4 and E2F5 play an essential role in pocket protein-mediated G1 control. Molecular Cell 2000; 6: 729-735.

158.    Kung AL, Wang S, Klco JM, Kaelin Jr WG, Livingston DM. Suppression of tumor growth through disruption of hypoxia-inducible transcription. Nature Med 2000; 6: 1335-1340.

159. Tibbetts RS, Cortez D, Brumbaugh KM, Scully R, Livingston DM, Elledge SJ, Abraham RT. Functional interactions between BRCA1 and the checkpoint kinase ATR during genotoxic stress. Genes Develop; 2000, 14: 2989-3002.

160. Gaubatz S, Lees JA, Lindemn GJ, Livingston DM. E2F4 is exported from the nucleus in a crml-dependent manner. Mol Cell Biol 2001; 21: 1384-1392.

161. Cantor SB, Bell DW, Ganesan S, Kass EM, Drapkin R, Grossman S, Wahrer DCR, Sgroi DC, Lane WS, Haber DA, Livingston DM. BACH1, a novel helicase-like protein, interacts directly with BRCA1 and contributes to its DNA repair function. Cell 2001;105:149-160.

162. Martelli F, Hamilton T, Silver DP, Sharpless NE, Bardeesy N, Rokas M, DePinho RA, Livingston DM, Grossman SR. p19ARF targets certain E2F species for degradation. Proc Natl Acad Sci USA 2001; 98:4455-4460.

163. Mullen AC, High FA, Hutchins AS, Lee HW, Villarino AV, Livingston DM, Kung AL, Cereb N, Yao T-P, Yang SY, Reiner SL. Role of T-bet in commitment of $T_H1$ cells before IL-12-dependent selection. Science 2001; 292: 1907-1910.

164. Fuchs M, Gerber J, Ikura T, Sif S, Drapkin R, Lane WS, Nakatani Y, Livingston DM. The p400 complex is an essential E1A transformation target. Cell 2001; 106: 297-307.

165. Silver D, Livingston DM. Self-excising retroviral vectors encoding the Cre recombinase overcome Cre-mediated cellular toxicity. Mol Cell 2001; 8:233-243.

166. Joukov V, Chen J, Fox EA, Green JB, and Livingston DM. Functional communication between endogenous BRCA1 and its partner, BARD1, during *Xenopus laevis* development. Proc Natl Acad SCi USA 2001; 98:12078-12083.

167. Joo WD, Jeffrey PD, Cantor SB, Finnin MS, Livingston DM, Pavletich N. Structure of the 3BP1 BRCT region bound to p53 and its comparison to the Brca1 BRCT structure. Genes & Develop 2002; 16:583-593.

168. Freedman SJ, Sun ZYJ, Poy F, Kung AL, Livingston DM, Wagner G, Eck MJ. Structural basis for recruitment of CBP/p300 by hypoxia-inducible factor-1α.Proc Natl Acad Sci USA 2002; 99:5367-5372.

169. Yang H, Williams B, Hinds P, Shih S, Jacks T, Bronson R, Livingston DM. Tumor suppression by a severely truncated species of the retinoblastoma protein. Molec Cell Biol 2002; 22: 3103--3110.

170. Ogawa H, Ishiguro K, Gaubatz S, Livingston DM, Nakatani. A complex containing chromatin modifiers that occupies E2F- and Myc-responsive genes in quiescent cells. Science 2002; 296; 1132-1136.

171. Rebel VI, Kung AL, Tanner EA, Yang H, Bronson RT, Livingston DM. Distinct roles for CRED-binding protein and p300 in hematopoietic stem cell self-renewal. Proc Natl Acad Sci USA 2002; 99:14789-14794.

172. Ganesan S, Silver D, Feunteun J, Avni D, Drapkin R, Miron A, Mok S, Randrianarison V, Broadie S, Klimke A, Marrese C, Deng C-X, Livingston DM.

17

BRCA1 supports XIST RNA concentration on the inactive X chromosome.. Cell 2002; 111: 393-405.

173.  Dahme T, Wood J, Livingston DM, Gaubatz S. Two different E2F6 proteins generated by alternative splicing and internal translation initiation. Eur J Biocem 2002; 269:5030-5036.

174.  Bassing CH, Chua KF, Sekiguchi J, Suh H. Whitlow SR, Fleming JC, Monroe BC, Ciccone DN, Yan C, Vlasakova K, Livingston DM, Ferguson DO, Scully, R, Alt, FW. Increased ionizing radiation sessitivity and genomic instability in the absence of histone H2AX. Proc Natl Acad Sci USA 2002: 99: 8173-8178.

175.  Storre J, Elsasser H-P, Fuchs M, Ullmann D, Livingston DM, Gaubatz S. Homeotic transformations of the axial skeleton that accompany a targeted deletion of E2f6. EMBO Reports 2002; 3:695-700.

176.  Grossman SR, Deato ME, Brignone C, Chan HM, Kung AL, Tagami H, Nakatani Y, Livingston DM. polyubiquitination of p53 by a ubiquitin ligase activity of p300. Science 2003; 300: 342-344.

177.  Avni D, Yang H, Martelli F, Hofmann F, ElShamy WM, Ganesan S, Scully R, Livingston DM. Active localization of the retinoblastoma protein in chromatin and its response to S phase DNA damage. Molec Cell 2003; 12:735-746.

178.  Frank SR, Parisi T, Taubert S, Fernandez P, Fuchs M, Chan HM, Livingston DM, Amati B. Myc recruits the Tip60 histone acetyltransferase complex to chromatin. EMBO Reports 2003; 4: 575-580.

179.  Livingston DM. EMSY, a BRCA-2 partner in crime. Nature Med 2004; 10:127-128.

180.  Cantor S, Drapkin R, Zhang F, Lin Y, Han J, Pamidi S, Livingston DM. The BRCA1-associated protein BACH1 is a DNA helicase targeted by clinically relevant inactivating mutations. Proc Natl Acad Sci USA 2004; 101:2357-2362.

181.  Elshamy WM, Livingston DM. Identification of BRCA1-IRIS, a BRCA1 locus product. Nature Cell Biology. 2004; 6:954-967.

182.  Wu X, Avni D, Chiba T, Yan F, Zhao Q, Lin Y, Heng H, Livingston DM. SV40 T antigen interacts with Nbs1 to disrupt DNA replication control. Genes Dev 2004; 18:1305-1316.

183.  Kung AL, Zabludoff SD, France DS, Freedman SSJ, Tanner, EA, Viera A, Cornell-Kennon S, Lee J, Wang B, Wang J, Memmert K, Naegeli H-U, Petersen F, Eck MJ, Bair KW, Wood AW Livingston DM. Small molecule blockade of transcriptional coactivation of the hypoxia-inducible factor pathway. Cancer Cell 2004; 6: 33-43.

184.  Taubert, S, Frank SR, Parisi, T, Fuchs M, Chan HM, Livingston DM, Amati B. E2F dependent histone acetylation and recruitment of the Tip60 acetyltransferase complex to chromatin in late G (1). Mol Cell. Biol 2004; 24: 4546-4556.

185.  Ganesan S, Silver, D, Drapkin R, Greenberg R, Feunteun J, Livingston DM. Association of BRCA1 with the inactive X chromosome and XIST RNA. Phil Trans R Soc London 2004; 359: 123-128.

186.   Chan HM, Masako N, Lowe SW,  Livingston DM.   The P400 E1A-associated protein is a
       novel component of the p53/p21 senescence pathway.  Genes Dev  2005; 19:196-201,

187.   Kanellopoulou C,  Muljo SA, Kung AL, Ganesan S, Drapkin R, Jenuwein T, Livingston DM,
       Rajewsky K. Dicer-deficient mouse embryonic stem cells are defective in differentiation and
       centromeric silencing. Genes Dev 2005, 19:489-501

188.   Muljo SA, Ansel KM, Kanellopoulou C, Livingston DM, Rao A, Rajewsky K. Aberrant T
       cell differentiation in the absence of dicer. J Exptl Med 2005; 202:261-269.

189.   Greenberg RA, Sobhian, B,  Pathania, S, Cantor SB, Nakatani Y, Livingston DM.
       Multifactorial contributions to an acute DNA  damage response by BRCA1/BARD1-
       containing complexes. Genes & Devel, 2006; 20: 34-46.

190.   Richardson AL, Wang ZC, De Nicolo A, Lu X, Brown M, Miron A, Liao X, Iglehart JD,
       Livingston DM, Ganesan S. X chromosomal  abnormalities in basal-like, human breast
       cancer. Cancer Cell 2006; 9:121-132.

191.   Xia B, Sheng Q, Nakanishi K, Ohashi A, Wu J, Christ N, Liu X, Jasin M, Couch FJ,
       Livingston, DM. Control of BRCA2 cellular  and clinical  functions by  a nuclear  partner,
       PALB2. Mol Cell 2006;22: 719-729.

192.   Joukov V, Groen AC,  Prokhorova T, Gerson R, White E, Rodriguez A, Walter
       JC, Livingston DM. Thwe BRCA1/BARD 1 heterodimer modulates ran-
       dependent mitotic spindle assembly. Cell 2006; 127: 539-552.

193.   Xia B, Dorsman JC, Ameziane N, de Vries Y, Rooimers MA, Sheng Q, Pals G,
       Errami A, Gluckman E, Llera J,  Wang W, Livingston DM,  Joenje  H, deWinter
       JP. Fanconi anemia is associated with a defect in the BRCA2 partner PALB2.
       Nature Genetics 2007; 39:159-161.

194.   Erkko H*, Xia B*, Jenni Nikkilä, Johanna Schleutker,  Kirsi Syrjäkoski, Arto
       Mannermaa, Anne Kallioniemi, Katri Pylkäs, Sanna-Maria Karppinen, Katrin
       Rapakko, Alexander Miron, Qing Sheng, Guilan Li, Henna Mattila, Daphne W.
       Bell, Daniel A. Haber, Mervi Grip, Mervi Reiman, Arja Jukkola-Vuorinen, Aki
       Mustonen, Juha Kere, Lauri A. Altonen, Veli-Matti Kosma, Vesa Kataja, Ylermi
       Soini, Ronny I. Drapkin, David M. Livingston & Robert Winqvist (2007) A
       recurrent mutation in PALB2 in Finnish cancer families Nature. 2007. Mar 15;
       446(7133): 316-9. Epub 2007 Feb 7

195.   Silver D, Dimitrov S, Feunteun J, Gelman R, Drapkin R, Lu S, Shestakova E,
       Soundarapandian V,  DeNuzio N, Dragomir S, Mar J, Liu X, Rottenberg S,
       Jonkers J, Ganesan S, Livingston DM. Further Evidence for BRCA1
       Communication with the Inactive X Chromosome. Cell 2007; 128:991-1002.

196.   Tischkowitz, M.*, Xia, B.*, Sabbaghian, N., Reis-Filho, J., Hamel, N., Li, G.,
       van Beers, E.H., Li, L., Khalil, T., Quenneville, L.A., Omeroglu, A., Poll, A.,
       Lepage, P., Wong, N., Nederlof, P.M., Ashworth, A., Tonin, P.N., Narod, S.A.,

19

Livingston, D.M. and Foulkes, W.D. (2007) Analysis of PALB2/FANCN-associated breast cancer families. Proc Natl Acad Sci USA 104: 6788-93

197.    Sobhian B, Shao G, Lilli DR, Culhane AC, Moreau LA, Xia B, Greenberg RA, Livingston DM. Rap80 Targets BRCA1 to Specific Ubiquitin Structures at DNA Damage Sites. Science 2007; 316: 1198-1202.

198.    Gevry N, Chan HM, Laflamme L, Livingston DM, Gaudreau L. p21 transcription is regulated by differential localization of histone H2A.Z. Genes & Development, August 2007; 21: 1869-1881

199.    Pujana MA, Han JD, Starita LM, Stevens KN, Tewari M, Ahn JS, Rennert G, Moreno V, Kirchhoff T, Gold B, Assmann V, Elshamy WM, Rual JF, Levine D, Rozek LS, Gelman RS, Gunsalus KC, Greenberg RA, Sobhian B, Bertin N, Venkatesan K, Ayivi-Guedehoussou N, Sole X, Hernandez P, Lazaro C, Nathanson KL, Weber BL, Cusick ME, Hill DE, Offit K, Livingston DM, Gruber SB, Parvin JD, Vidal M. Network modeling links breast cancer susceptibility and centrosome dysfunction. Nature Genetics 2007; 39(11): 1338-49.

**Reviews:**

1.  Livingston DM, Wacker WC.  The roIe of magnesium in neuromuscular physiology. Triangle 1971; 10:169-172.

2.  Livingston DM, Wacker WEC. Magnesium metabolism. In: Greep R, Astwood E, Aurbach G, Geiger S, eds. <u>Handbook of Physiology</u>. Washington, DC: American Physiological Society, 1976:215-223.

3.  Livingston DM, Mihich E. Third Annual Pezcoller Symposium: Tumor Suppressor Genes. (Proceedings of the Third Annual Pezcoller Symposium on Tumor Suppressor Genes, held June 5-7, 1991, in Trento, Italy). Cancer Res. 1992; 52:3246-3249.

4.  Leis J, Livingston DM. The tumor suppressor genes and their mechanisms of action. In: Bishop JM, Weinberg RA, eds., SCIENTIFIC AMERICAN Molecular Oncology. New York:Scientific American, Inc. 1996: 111-141.

5.  Hofmann F and Livingston DM.E2F-1 Degradation by the Ubiquitin-Proteasome Pathway. In: Mihich E and Hartwell L, (eds.) Genomic Instability and Immortalilty in Cancer, Pezcoller Foundation Symposia 8, NY and London: Plenum Press 1996, pp 215-227. (Proceedings of the Eighth Annual Pezcoller Symposium on Genomic Instability and Immortality in Cancer, held June 17-19, 1996, in Trento, Italy).

6.  Livingston DM, Genetics is coming to Oncology (Editorial). JAMA 1997; 277:1476-1477.

7.  Chen J, Silver D, Cantor S, Livingston DM, Scully R. BRCA1, BRCA2, and Rad51 operate in a common DNA damage response pathway. Cancer Res 1999; 1752s-1756s.

8.  Scully R, Livingston DM. In search of the tmour-suppressor functions of BRCA1 and BRCA2, Progress Article. Nature, 2000; Nature 2000; 408:429-432.

9.  Livingston DM. Cancer: Chromosome defects in the colon. (News and Views). Nature 2001; 536-537.

10. Livingston DM, Shivdasani R. Toward mechanism-based cancer care. JAMA 2001; 285:588-593.

**Books and Monographs:**

1. Leder P, Pernardi A, Livingston D, Loyd P, Roufa D, Skogerson L. Protein Piosynthesis: Studies using synthetic and viral mRNAs. In: <u>The Mechanism of Protein Synthesis.</u> Cold Spring Harber Symp Quant Biol 1969; 34:411-417.

2. Todaro GJ, Scolnick EM, Parks WP, Livingston DM, Aaronson SA.  Detection of type C viruses in normal and transformed cells. In: Beers Jr R, Tilgham R, eds, <u>Cellular Modification and Genetic Transformation by Exogenous Nucleic Acids</u>, Proc 6th Internatl Symp Molec Biol. Baltimore:The Johns Hopkins Univ Press, 1973:231-244.

3. Livingston DM. Immunoaffinity chromatography of proteins. In: Colowick SP, Kaplan NO, eds, <u>Methods in Enzymology</u>  New York:Academic Press. 1974;34: 723-731.

4. Livingston DM, Tenen DG, Jessel D, Haines LL, Woodard V, Modest A, Maxam A, Hudson J.  Interaction of SV40 T antigen with selected regions of SV40 DNA.  In: Schultz J, Brada Z, eds, <u>Genetic Manipulations as it Affects the Cancer Probelm</u>, Miami Winter Symposium, 1977; 14: 103-107.

5. Kriegler M, Livingston DM. Chemically facilitated microinjection of proteins into cells in monolayers. In: <u>Introduction of Macromolecules into Viable Mammalian Cells</u>; Workshop, Temple Univ Sugar Loaf Conf Ctr; New York:Alan R. Liss, Inc; 1980:261-296.

6. Ellman M, Bikel I, Figge J, Roberts T, Schlossman R, Livingston DM. Nuclear and cytoplasmic localization of the SV40 small t Antigen. In: <u>Cancer Cells 2/0ncogenes and Viral Genes.</u> NY:Cold Spring Harbor Laboratory.1984; 369-375.

7. Livingston DM, Bikel I. Replication of papovaviruses. In: Fields BN, ed, <u>VIROLOGY</u> NY: Raven Press, 1985;393-410.

8. Bikel I, Mamon H, Brown EL, Boltax J, Agha M, Livingston DM. The role of small t antigen in the SV40 transforming mechanism. In: <u>Cancer Cells 4/DNA Tumor Viruses: Control of Gene Expression and Replication.</u> NY: Cold Spring Harbor Laboratory.1986; 405-412.

9. Livingston DM, DeCaprio J, Ludlow J, Figge J, Marsilio E, Shew J-Y, Lee W-H,  Huang C-M, Paucha E. Binding of the SV40 Major Transforming Gene Product to the Product of the Retinoblastoma Susceptibility Locus. In: General Motors Accomplishments in Cancer Research/1988. Philadelphia:J B Lippincott Co., 1989; 213-225.

10. Livingston DM, DeCaprio J, Ludlow J, Figge J, Marsilio E, Lee W-H, Paucha E. Binding of the SV40 Major Transforming Gene Product to the Product of the Retinoblastoma Susceptibility Locus. In: Villarreal LP, ed., Common Mechanisms of Transformation by Small DNA Tumor Viruses [Proceedings of the 1988 ICN-UCI International Conference on Virology, January 20-21, 1989, Newport Beach, CA.] Washington DC:ASM Publications, 1989; 39-50.

11. Livingston DM, DeCaprio J, Ludlow J. Does the product of the *RB1* Locus Have a Cell-Cycle Regulatory Function? In: Cavenee W, Hastie N, Stanbridge E, eds., Recessive Oncogenes and Tumor Suppression, Current Communications in Molecular Biology, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, 1989, pp 141-144.

12.    Livingston DM, DeCaprio JA, Ludlow JW. Does the product of the *RB-1* locus have a cell cycle regulatory function? In: Knudson AG Jr et al., eds. Genetic Basis for Carcinogenesis: Tumor Suppressor Genes and Oncogenes (Proc 20th Internatl Symposium of The Princess Takamatsu Cancer Research Fund, Tokyo, Japan, Nov 14-16, 1989). Tokyo: Japan Sci Soc Press, 1990:187-190.

13.    Kaelin Jr WG, Pallas DC, DeCaprio JA, Kaye FJ, Livingston DM. Cellular proteins that can interact specifically to the retinoblastoma susceptibility gene product. In: Origins of Human Cancer: A Comprehensive Review, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, 1991:423-431.

14.    Livingston DM. Functional analysis of the retinoblastoma gene product and of RB-SV40 T antigen complexes. in: Frank LM, ed., Cancer Surveys, vol 12: Tumor Suppressor Genes, the Cell Cycle and Cancer (Levine AJ, guest ed.). Cold Spring Harbor Laboratory Press for Imperial Cancer Research Fund, 1992:153-160.

15.    Eckner R, Arany Z, Ewen M, Sellers W, Livingston DM. The adenovirus E1A-associated 300kD protein (p300) exhibits properties of a transcriptional coactivator and belongs to an evolutionarily conserved family. Cold Spring Harbor Symp Quant Biol 1994; vol LIX, 85-95.

16.    Eckner R, Arany Z, Livingston DM. A family of high molecular weight proteins active in differentiation and growth control. In: Normal and Malignant Hematopoiesis: New Advances, eds, Mihich E, Metcalf D (Proc, Pezcoller Symposium, June 29-July 1, 1994, Rovereto, Italy); Plenum Publishing Corp., NY, 1995.

17.    Wu X, Rathbun G, Lane WS, Weaver DT, Livingston DM. Interactions of the Nijmegen breakage syndrome protein with ATM and BRCA1. Cold Spring Harbor Symp Quant Biol Vol LXV, 2000; Cold Spring Harbor Laboratory, NY.

18.    Ganesen S, Richardson A L, Wang ZC, Iglehart JD, Miron A, Feunteun J, Silver D, Livingston DM. Abnormalities of the inactive X chromosome are a common feature of BRCA1 mutant and sporadic basel-like breast cancers. Cold Spring Harbor Symposium of Quantitative Biology Vol 70, 2005; pp 93-97, Cold Spring Harbor Laboratory Press.

**Patents:**

Livingston DM, Ewen ME. DNA encoding p107 tmor suppressor. US Patent 5,262,321; November 16, 1993.

Eckner R, Ewen M, Livingston D. Nucleic acid encoding transcription factor p300 and uses of p300. US Patent  5,658,784; August 19, 1997.

Kaelin Jr WG, Flemington E, Sellers W, Livingston DM. Recombinant Retinoblastoma-Associated Protein 1 (E2F-1) Polypeptides and CDNA. US Patent 5,759,803; June 2, 1998.

Kaelin Jr WG, Flemington, E, DeCaprio JA, Sellers W, Livingston DM. Retinoblastoma-Associated Protein 1 cDNA. US Patent 5,981,723; Nov 9, 1999.

Livingston DM, Ewen ME. DNA encoding p107 tumor suppressor and related polypeptides. US Patent 5,962,315; Oct 5, 1999.

Kaelin Jr.., WG, Livingston DM, Kim  T-Y. Transgenic  animals expressing light-emitting fusion proteins and diagnostic and therapeutic methods therefore. US Patent 7,176,345: Feb 13, 2007.

# EXHIBIT 47

# EXHIBIT REDACTED

# EXHIBIT 48

*Proc. Natl. Acad. Sci. USA*
Vol. 95, pp. 13859–13864, November 1998
Medical Sciences

# NF-κB activation provides the potential link between inflammation and hyperplasia in the arthritic joint

(arthritis/apoptosis/tumor necrosis factor α/Fas/gene therapy)

Alexei V. Miagkov*, Dmitry V. Kovalenko*, Chadwick E. Brown†, John R. Didsbury†, John P. Cogswell†, Stephen A. Stimpson†, Albert S. Baldwin‡§, and Sergei S. Makarov*¶

*Thurston Arthritis Research Center and ‡Lineberger Cancer Research Center and Department of Biology, University of North Carolina, Chapel Hill, NC 27599; and †Glaxo Wellcome Research Institute, Research Triangle Park, NC 27709

Communicated by Clyde A. Hutchison III, University of North Carolina, Chapel Hill, NC, September 10, 1998 (received for review February 22, 1998)

**ABSTRACT**     The transcription factor NF-κB is a pivotal regulator of inflammatory responses. While the activation of NF-κB in the arthritic joint has been associated with rheumatoid arthritis (RA), its significance is poorly understood. Here, we examine the role of NF-κB in animal models of RA. We demonstrate that *in vitro*, NF-κB controlled expression of numerous inflammatory molecules in synoviocytes and protected cells against tumor necrosis factor α (TNFα) and Fas ligand (FasL) cytotoxicity. Similar to that observed in human RA, NF-κB was found to be activated in the synovium of rats with streptococcal cell wall (SCW)-induced arthritis. *In vivo* suppression of NF-κB by either proteasomal inhibitors or intraarticular adenoviral gene transfer of super-repressor IκBα profoundly enhanced apoptosis in the synovium of rats with SCW- and pristane-induced arthritis. This indicated that the activation of NF-κB protected the cells in the synovium against apoptosis and thus provided the potential link between inflammation and hyperplasia. Intraarticular administration of NF-kB decoys prevented the recurrence of SCW arthritis in treated joints. Unexpectedly, the severity of arthritis also was inhibited significantly in the contralateral, untreated joints, indicating beneficial systemic effects of local suppression of NF-κB. These results establish a mechanism regulating apoptosis in the arthritic joint and indicate the feasibility of therapeutic approaches to RA based on the specific suppression of NF-κB.

Inflammation and hyperplasia of the synovium are the hallmarks of rheumatoid arthritis (RA) (1). The normal synovium is a delicate tissue lining the joint capsule; however, in RA, the synovium transforms into an aggressive, tumor-like structure called the pannus (1, 2). It is a common belief that inflammation promotes hyperplasia in the synovium, but the underlying mechanisms for this are largely unknown.

Impaired regulation of apoptosis has been associated with RA (3–5). Experimental evidence suggests that tumor necrosis factor α (TNFα)- and Fas-mediated apoptosis is important in the regulation of hyperplasia in the synovium (5, 6). The human RA synovium contains a significant proportion of apoptotic cells (7, 8), and elevated expression of TNFα protein and functional FasL in the synovium is a common feature of RA (1, 9).

Gene expression is transcriptionally controlled by inducible transcription factors. The transcription factor NF-κB (reviewed in ref. 10) is particularly important in the regulation of inflammation. In unstimulated cells, NF-κB is retained in the cytoplasm through an interaction with inhibitory proteins known as IκB. Cell stimulation causes degradation of IκB, leading to nuclear translocation of NF-κB and activation of transcription. Inducers of NF-κB include interleukin (IL)-1, TNFα, platelet-derived growth factor, lipopolysaccharide, oxidative stress, and viral products. In turn, NF-κB can activate transcription of IL-1, TNFα, IL-6, IL-8, the adhesion molecules ICAM-1 (intercellular adhesion molecule-1), VCAM-1 (vascular cell adhesion molecule 1), E-selectin, the growth factor granulocyte/macrophage colony-stimulating factor, and inducible nitric oxide synthase. Since NF-κB is activated in human RA synovium (11, 12), and the list of inducers and targets of NF-κB almost perfectly matches the profile of mediators of inflammation in RA, this suggests an important role of NF-κB in the control of inflammation in the synovium. Furthermore, the recent discovery of a protective function of NF-κB against the cytotoxicity of TNFα (13–16) suggests the involvement of this transcription factor in the regulation of apoptosis in the synovium.

Here, we used animal models of RA to examine the relationship between inflammation, activation of NF-κB, and apoptosis in the synovium. We demonstrate that in primary synovial fibroblasts, NF-κB is required for induction of multiple inflammatory molecules, including IL-1β and TNFα. Specific suppression of NF-κB potentiated TNFα- and FasL-mediated apoptosis. Similar to that in human RA, NF-κB was found activated in the synovium of rats with streptococcal cell wall (SCW) arthritis. Suppression of NF-κB by intraarticular (i.a.) administration of proteasomal inhibitors and i.a. adenoviral gene transfer of super-repressor IκBα profoundly enhanced apoptosis in the synovium of rats with SCW- and pristane-induced arthritis. This indicated that activation of NF-κB by inflammation inhibited apoptosis in the synovium, thereby potentially contributing to hyperplasia. Administration (i.a.) of NF-κB decoy oligodeoxynucleotides (ODNs) significantly inhibited the severity of recurrent SCW arthritis in treated joints. Unexpectedly, the severity of arthritis also was inhibited in untreated, contralateral joints, indicating systemic therapeutic effects of local treatment.

---

Abbreviations: RA, rheumatoid arthritis; SCW, streptococcal cell wall-induced arthritis; Ad, adenoviral; PG-APS, peptidoglycan–polysaccharide complex; TNFα, tumor necrosis factor α; FasL, Fas ligand; IL, interleukin; i.a., intraarticular; ODN, oligodeoxynucleotide; CMV, cytomegalovirus; wt, wild type; mut, mutated; EMSA, electrophoretic mobility-shift assay; TUNEL, terminal deoxynucleotidyltransferase-mediated UTP end labeling; Ab, antibody; GFP, green fluorescent protein.

§To whom reprint requests should be addressed at: 222 Lineberger Comprehensive Cancer Center, CB 7295, University of North Carolina, Chapel Hill, NC 27599.

¶To whom reprint requests should be addressed at: 4109 Thurston Arthritis Research Center, CB 7280, University of North Carolina, Chapel Hill, NC 27599. e-mail: smak@med.unc.edu.

The publication costs of this article were defrayed in part by page charge payment. This article must therefore be hereby marked "*advertisement*" in accordance with 18 U.S.C. §1734 solely to indicate this fact.

© 1998 by The National Academy of Sciences 0027-8424/98/9513859-6$2.00/0
PNAS is available online at www.pnas.org.

13860    Medical Sciences: Miagkov *et al.*    *Proc. Natl. Acad. Sci. USA 95 (1998)*

## MATERIALS AND METHODS

**Adenoviral (Ad) Vectors.** The Ad vectors were derivatives of Ad5 adenovirus with deleted E1A and E1B regions. Expression of the transgene was driven by the cytomegalovirus (CMV) promoter. The srI$\kappa$B$\alpha$ cDNA was obtained by a double point mutation of cDNA of I$\kappa$B$\alpha$ (Ser 32/36 to Ala 32/36) (17, 18). The resulting construct was subcloned into pAdCMV transfer vector (Genvec, Rockville, MD) and cotransfected with the linearized vector IN34051 into the HEK 293 cells. The Ad virus was purified on a CsCl gradient and dialyzed. The recombinant AdLacZ and AdGFP vectors (gift of Doug McCarty, Vector Core facility, University of North Carolina) were derivatives of Ad5 with deleted E1 and E3 regions.

**NF-$\kappa$B Decoys.** The ODNs were synthesized as phosphorothioate (PT) derivatives, which are resistant to degradation by endonucleases. The single-stranded (ss) ODNs sequences were as follows (5' → 3'): *wt $\kappa$B-PT*: CTGGGGACTTTCCAT (underlined is $\kappa$B-binding site from the HIV long terminal repeat); *mut $\kappa$B-PT*: TAACCGACTTTGCAT; fluorescein-labeled *wt $\kappa$B-PT*: fluorescein-CTGGGGACTTTCCAT. Desalted ODNs were extracted with phenol/chloroform and purified on the C$_{18}$ Sephac cartridges (Waters). The double-stranded (ds) ODNs were prepared by annealing the ss ODNs in 150 mM NaCl, and unannealed ss ODNs were removed by using Probind columns (Waters). For *in vivo* delivery, the ds ODNs were mixed with DOTAP (Boehringer Mannheim) at the ratio of 1:1 (wt/wt) in the buffer containing 140 mM NaCl/7 mM Hepes, pH 7.5, and injected i.a. in a volume of 10 $\mu$l.

**Synoviocytes.** Fibroblast-like synoviocytes were established by enzymatically dispersing synovial explants from rats with SCW arthritis (19). Cells were maintained in RPMI 1640 medium supplemented with 10% FBS and antibiotics.

**Luciferase Assay.** The reporter plasmids 3x wild-type (wt) $\kappa$BLUC and 3x mutated (mut) $\kappa$BLUC containing three repeats of the wt or mut $\kappa$B sites from the class I major histocompatibility complex enhancer were described previously (20). The plasmids were purified from endotoxin by using Detoxigel (Pierce). Cells were transiently transfected with DOTAP. One day later, cells were stimulated and the luciferase activity was determined by using a chemiluminometer and normalized on total protein.

**Electrophoretic Mobility-Shift Assay (EMSA).** The nuclear extracts of stimulated cells were incubated with a $^{32}$P-labeled ds UV21 probe containing the $\kappa$B-binding site and resolved on nondenaturing polyacrylamide gel (19). Where indicated, a competitive cold probe was included along with the radiolabeled probe at the molar ratio of 100:1. For the supershift analysis, anti-RelA antibody (Ab) sc109 (Santa Cruz Biotechnology) was included into the reactions.

**Northern Blotting.** Synoviocytes were transduced at the third passage with the AdCMV or AdsrI$\kappa$B$\alpha$ adenovirus at the multiplicity of infection of 100. Two days later, cells were stimulated and total RNA was extracted and resolved on a formaldehyde agarose gel (10 $\mu$g/lane). Blots were consecutively hybridized with $^{32}$P-labeled DNA probes to rat IL-1$\beta$ (gift of A. Shaw, Glaxo), rat IL-6 [American Type Cell Collection (ATCC)], rat TNF$\alpha$ (gift of K. Decker, Universitat Freiburg, Germany), rat VCAM-1 (gift of T. Collins, Harvard Medical School, Cambridge, MA), and mouse GAPDH (ATCC).

**Cytotoxicity Assay.** Cell viability *in vitro* was determined by using the MTT assay. Synoviocytes (second to fourth passages) were transduced with Ad vectors and 2 days later stimulated with rat TNF$\alpha$ (rTNF$\alpha$) (BioSource) or FasL (Alexis) for an additional 24 hr. At the end of treatment, cells were incubated for 4 hr in the growth medium containing MTT (0.5 mg/ml). The precipitate was solubilized, and the number of live cells was determined with a spectrophotometer.

**Western Blotting.** The animals were sacrificed at the indicated intervals after i.a. injection of Ad vectors. Excised joints were pulverized in liquid nitrogen and extracted in a buffer (20 mM Tris, pH 7.6/140 mM NaCl/2.5% Triton X-100) supplemented with protease and proteasomal inhibitors [2 mM phenylmethylsulfonyl fluoride/4 $\mu$g/ml aprotinin/2 $\mu$g/ml leupeptin/10 $\mu$M MG132 (Peptides International)]. The extracts were resolved on SDS/PAGE, transferred to nitrocellulose, and immunodetected using primary Ab against human I$\kappa$B$\alpha$ (Rockland, Gilbertsville, PA) and green fluorescent protein (GFP) (CLONTECH).

**In Situ Detection of Apoptosis.** Synovial tissue explants were cut into 5-$\mu$m cryostat sections, and apoptosis was evaluated by using a quantitative terminal deoxynucleotidyltransferase-mediated UTP end labeling (TUNEL) assay. After a brief fixation in acetone/methanol, samples were stained with a fluorescein In Situ Cell Death Detection kit (Boehringer



FIG. 1.    Suppression of NF-$\kappa$B inhibits inflammatory responses in primary rat synovial fibroblasts. (*A*) Induction of NF-$\kappa$B-mediated transcription *in vitro*. For luciferase assay, cells were transfected with a 3x wt $\kappa$BLUC reporter vector followed by an overnight incubation in a low serum (0.5% FBS) medium and stimulated for 3 hr with IL-1$\beta$ (10 ng/ml), lipopolysaccharide (10 $\mu$g/ml), and TNF$\alpha$ (10 ng/ml). The specificity of NF-$\kappa$B activation was determined by assessing the expression of a 3x mut $\kappa$BLUC vector (data not shown). (*B*) Induction of NF-$\kappa$B DNA-binding activity. For EMSA, quiescent synoviocytes were stimulated for 1 hr with lipopolysaccharide (10 $\mu$g/ml) and TNF$\alpha$ (10 ng/ml). The nuclear extracts were preincubated with a radiolabeled $\kappa$B probe and resolved on PAGE. The specificity of NF-$\kappa$B binding was assessed by including an excessive amount (100:1) of cold wt and mut NF-$\kappa$B decoys into the binding reactions. Both major NF-$\kappa$B bands (arrows) contained RelA subunits, as determined by the supershift by a RelA (p65) Ab (data not shown). (*C*) AdsrI$\kappa$B$\alpha$ expression inhibits NF-$\kappa$B activation *in vitro*. Cells were transduced with indicated Ad vectors and 2 days later stimulated with TNF$\alpha$ (100 ng/ml) for 30 min. NF-$\kappa$B DNA-binding activity was determined by EMSA as in *B*. (*D*) Suppression of NF-$\kappa$B inhibits inflammatory responses *in vitro*. For Northern blotting, cells were transduced as indicated in the legend to *C* and stimulated with IL-1$\beta$ (10 ng/ml) and TNF$\alpha$ (10 ng/ml). Total RNA was analyzed by sequentially hybridizing the blot with indicated radiolabeled probes.

Medical Sciences: Miagkov *et al.*                    *Proc. Natl. Acad. Sci. USA 95* (1998)    13861

Mannheim) and examined under a fluorescence microscope. Discrimination and count of bright apoptotic cells were facilitated by using a digital charge-coupled device camera with IMAGE 1/METAMORPH software (Universal Imaging, Media, PA). The total number of cells in the field was counted based on a blue fluorescence of 4′,6-diamidino-2-phenylindole-counterstained nuclei.

**Immunodetection of Activated NF-κB and AdsrIκBα Expression.** Cryostat sections of synovial explants were air-dried, fixed in the paraformaldehyde, and immunostained with a primary Ab against human IκBα (Rockland) (final dilution 1:200). The expression of srIκBα was assessed by immunostaining with an mAb against human RelA NLS (12, 21) (Boehringer Mannheim) (final dilution 1:100). Immunostaining was visualized by using the HRP ABC Vectastain kit (Vector). The specificity of NF-κB immunodetection was assessed by immunostaining serial cryostat sections with the primary Ab preabsorbed with the RelA NLS peptide (21) (Quality Control Biochemicals, Hopkington, MA).

**Rat Models of Arthritis.** The model of recurrent SCW arthritis was reproduced as described (19, 22). Female Lewis rats (Charles River Breeding Laboratories) weighing ≈150 g were injected into both ankle joints with 5 µg of a rhamnose equivalent of peptidoglycan–polysaccharide complex (PG-APS) (fraction 10s) (19, 21) isolated from group A streptococci. Four weeks later, reactivation was induced by i.v. injection of PG-APS at a dose of 200–300 µg. The severity of arthritis was assessed as described (19). The model of pristane polyarthritis was reproduced as described (23). Female DA rats (Harlan Breeders, Indianapolis) weighing ≈180 g received a s.c. injection of 0.15 ml of pristane into the base of the tail (Sigma). At day 12, animals were divided into groups with a similar degree of inflammation in ankle joints and i.a. injected with 10 µl of Ad vectors.

## RESULTS

**NF-κB Controls Inducible Expression of Inflammatory Molecules in Synoviocytes *in Vitro*.** To assess the role of NF-κB in controlling inflammatory responses in synoviocytes, NF-κB activation was suppressed by expression of srIκBα. The srIκBα is a mutant form of wt IκBα (17). In contrast to wt IkBa, srIκBα cannot be phosphorylated and degraded and thus affords strong inhibition of NF-κB (18). Stimulation of primary rat synovial fibroblasts with IL-1, TNFα, and lipopolysaccharide induced DNA-binding and transcriptional activity of NF-κB (Fig. 1*A* and *B*). The DNA-binding activity was composed of two major complexes, both of which contained the RelA (p65) subunit of NF-κB (Fig. 1*B*). Expression of srIκBα ablated NF-κB activation (Fig. 1*C*) and strongly inhibited the induction of IL-1β, TNFα, IL-6, and VCAM-1 messages by TNFα and IL-1 (Fig. 1*D*). This indicated the requirement of NF-κB activation for induction of IL-1, IL-6, and TNFα in synovial fibroblasts and suggested the involvement of NF-κB in VCAM-1-mediated recruitment of inflammatory cells to the RA joints.

**Suppression of NF-κB Activation Potentiates the Cytotoxicity of TNFα and FasL in Rat Synoviocytes.** Activation of NF-κB provides protection against the cytotoxicity of TNFα in a variety of cell types (13–16). TNFα and FasL are important mediators of apoptosis in RA (5–9), and, therefore, we examined the potential involvement of NF-κB in TNFα- and FasL-mediated apoptosis in synovial fibroblasts. We found that similar to TNFα (Fig. 1 *B* and *C*), recombinant FasL (Fig. 2*B*) induced NF-κB activation in synovial fibroblasts, although with a slower kinetics (Fig. 2*B*). Untransduced cells and those transduced with a control AdCMV vector were equally resistant to TNFα and FasL cytotoxicity, but AdsrIkBα expression rendered the cells susceptible to both TNFα- and FasL-induced apoptosis (Fig. 2 *A* and *B*). These findings demonstrate that in primary synovial fibroblasts, activation of NF-κB



FIG. 2. Suppression of NF-κB potentiates the TNFα- and FasL-induced cytotoxicity in rat synovial fibroblasts. (*A*) The expression of srIκBα potentiates the cytotoxicity of TNFα. Cells were transduced in duplicate with the AdsrIκBα vector and, 2 days later, stimulated with indicated concentrations of TNFα for an additional 24 hr. The cell viability was determined by using the MTT assay. (Bars = SD.) The significance of difference was calculated by using unpaired two-tailed Student's *t* test. Data are representative of two experiments. (*B*) Activation of NF-κB by FasL inhibits the cytotoxicity of FasL. (*Upper*) Induction of NF-κB DNA-binding activity by FasL. For EMSA, cells were stimulated with FasL (100 ng/ml), and NF-κB DNA-binding activity was determined by EMSA as described in the legend to Fig. 1*B*. The nuclear extracts of TNFα-stimulated cells (see Fig. 1*C*) were used as a positive control. (*Lower*) srIκBα expression potentiates cytotoxicity of FasL. Cells were transduced in duplicate with the AdsrIκBα vector, and 2 days later, stimulated with the indicated concentrations of FasL for an additional 24 hr. Control, untransduced cells. The cell viability was determined by using the MTT assay. The significance of difference was calculated by using unpaired two-tailed Student's *t* test. (Bars = SD.) Data are representative of three experiments.



FIG. 3. Induction of the recurrence of SCW arthritis is associated with activation of NF-κB in the synovium. Activated NF-κB was detected by HPR immunostaining by using primary mAb against RelA NLS (21). (*a*) Normal synovium. Original magnification, ×200. (*b*) Inflamed synovium at day 1 after reactivation of SCW arthritis. Original magnification, ×200. (*c*) Same as *b*; original magnification, ×400. (*d*) Control immunostaining of the inflamed synovium (day 1 after reactivation) by using an mAb preabsorbed with a RelA NLS peptide. Original magnification, ×200. Data are representative of two experiments.

serves as a protective mechanism against the cytotoxicity of TNFα and FasL. Since TNFα is a potent mitogen in synovial fibroblasts (24), NF-κB activation appears to be a master switch determining whether TNFα elicits mitogenic or cytotoxic responses. Similar to that with TNFα, activation of NF-κB in synoviocytes by FasL provided a negative feedback to the cytotoxic action of FasL. Therefore, these results strongly suggested the potential involvement of NF-κB in the protection of synovial cells against apoptosis in the RA synovium, where both FasL and TNFα are overexpressed (1, 5, 9).

**The Onset of SCW Arthritis Coincides with Activation of NF-κB in the Synovium.** Based on our *in vitro* data, we next assessed the role of NF-κB in the regulation of apoptosis *in vivo*. For these studies, we employed the model of recurrent SCW arthritis in rats, which truly reproduces many features of human RA (21). In this model, initial i.a. injection of PG-APS produces transient acute joint inflammation. Several weeks later, a recurrence of chronic inflammation in the preinjured joint can be induced by i.v. injection of PG-APS. This model provides a predictable reactivation of chronic inflammation that reaches a peak in 2–4 days after the i.v. injection (21).

The activation of NF-κB in human RA synovium has been well documented (11, 12). To assess NF-κB activation in the SCW rat synovium, we used immunostaining with an mAb specifically recognizing activated NF-κB (12). Activated NF-κB was absent in the normal rat synovium (Fig. 3*a*) and hardly detectable in rats at 5 weeks after the initial i.a. injection of PG-APS (data not shown). Reactivation of SCW arthritis caused strong activation of NF-κB (Fig. 3*c*), which persisted for

at least 4 days (data not shown). Thus, similar to that in human RA, SCW arthritis is associated with activation of NF-κB in the synovium.

**Inhibitors of NF-κB Accelerate Apoptosis in the Inflamed Synovium.** Numerous studies demonstrated the presence of apoptosis in human RA synovium (7, 8). Similar to that in human RA, we found that SCW rat arthritic joints contained a significant proportion of apoptotic cells. As assessed by a quantitative TUNEL assay, 1 day after reactivation of SCW arthritis, the average frequency of apoptosis in the synovium was approximately 6.6%. This was independently confirmed by detecting apoptotic fragmentation in genomic DNA isolated from the whole joint (D.K. and S.M., unpublished data).

To explore the role of NF-κB in the regulation of apoptosis *in vivo*, we utilized two approaches. In an initial experiment, we assessed proteasome inhibitor peptide aldehyde MG132, which inhibits NF-κB by preventing IκBα degradation (25). Administration (i.a.) of MG132 dramatically increased the frequency of apoptosis in SCW arthritic joints (9.3% in the control, vehicle-treated rats vs. 25.8% in MG132-treated rats, *P* < 0.01) (Fig. 4*A* and *D*). To substantiate these data, we employed a more specific approach based on Ad gene transfer of srIκBα. Ad gene transfer (i.a.) affords efficient transduction *in vivo*, targeting both fibroblast- and macrophage-like synoviocytes (26, 27). In our study, low titers (≤10^7 plaque-forming units/joint) of i.a. injected Ad vectors did not cause apparent gross inflammation (data not shown), yet afforded an appreciable expression of srIκBα protein (Fig. 4*B*). I.a. injected AdsrIκBα did not increase apoptosis in the normal rat joint (data not shown), but significantly accelerated apoptosis in the



FIG. 4.    Inhibitors of NF-κB accelerate apoptosis in the inflamed rat synovium. (*A*) Proteasomal inhibitor MG132 induces apoptosis in the SCW arthritic joint. At day 1 after reactivation of the recurrence of SCW arthritis, ankle joints were injected either with MG132 dissolved in 10% DMSO (5 μg/joint) (*a* and *c*) or with the vehicle (*b*). One day later, synovial tissue was explanted and apoptosis was assessed by using TUNEL assay. Some of apoptotic cells are indicated by the arrowheads. Original magnification, ×100. (*B*) *In vivo* adenovirus-mediated gene transfer of srIκBα in the SCW arthritic joint. One day after reactivation of SCW arthritis, ankle joints were injected with the AdsrIκBα vector. Two days later, synovial tissue was explanted and srIκBα expression was assessed by HRP immunostaining for human IκBα (*b*). The specificity detection was confirmed by immunostaining the AdCMV-transduced joints (*a*). Data are representative of two experiments. Original magnification, ×200. (*C*) *In vivo* gene transfer of srIκBα induces apoptosis in the SCW arthritic joint. At day 1 after reactivation of SCW arthritis, ankle joints were injected either with the AdsrIκBα (*a*) or with the AdCMV (*b*) vectors. One day later, synovial tissue was explanted and apoptosis was assessed by TUNEL assay. Some of apoptotic cells are indicated by the arrowheads. Note nuclear fragmentation in apoptotic cells. Data are representative of two experiments. Original magnification, ×1,000. (*D*) Quantitative assessment of apoptosis in SCW arthritic joints. A summary of the experiments is described in the legends to *A* and *C*. Each bar represents the average percentage of apoptotic cells counted in randomly chosen fields. (Bars = SD.) The frequency of apoptosis was counted at a low magnification in the indicated numbers of randomly chosen fields and compared with that in untransduced SCW arthritic rat synovium (the first bar in the row). MG 132, 12 fields in the explants of four joints; vehicle, 12 fields in the explants of four joints; AdsrIκBα, nine fields in the explants of three joints; AdCMV, nine fields in the explants of three joints. The significance of the difference between treated and untreated SCW joints was calculated by using unpaired two-tailed Student's *t* test. (*E*) Time course of AdGFP (*Upper*) and AdsrIκBα (*Lower*) expression in rats with pristane-induced arthritis. Rats with established pristane-induced arthritis received AdsrIκBα or AdGFP vectors into both ankle joints. Expression of the transgene was analyzed by Western blotting. (*Upper*) Immunodetection of Ad GFP in AdGFP-transduced joints. GFP, the arrow indicates the position of the band of recombinant GFP protein (not shown). (*Lower*) Immunodetection of srIκBα in AdsrIκBα-transduced joints. Pos., a positive control (*in vitro* AdsrIκBα-transduced cells); Neg., a negative control (*in vitro* AdCMV-transduced cells); srIκBα, the arrow indicates the position of the band of the srIκBα protein; n.s., a nonspecific band unrelated to human or rat IκBα, as determined by immunodetection with a peptide-blocked primary Ab (data not shown).

Medical Sciences: Miagkov *et al.*    *Proc. Natl. Acad. Sci. USA 95* (1998)    13863

SCW arthritic joints (8.9% vs. 29.5% in the AdCMV- and AdsrIκBα-transduced joints, $P < 0.01$) (Fig. 4 *C* and *D*). To rule out the possibility that increased apoptosis was a nonspecific effect of overexpressing an exogenous transgene, we additionally examined gene transfer of reporter Ad vectors expressing GFP and β-galactosidase genes. It was found that neither vector significantly increased apoptosis (data not shown). To ascertain that our findings were not restricted to the SCW model, the consequences of suppression of NF-κB were examined in pristane-induced arthritis in rats (22). Similar to that found in SCW model, expression of srIκBα drastically accelerated apoptosis in pristane-induced arthritis (data not shown). We reasoned that if exogenous srIκBα expression "deprotected" transduced cells, srIκBα protein would be rapidly lost. Indeed, while the expression of a reporter GFP protein persisted in the arthritic joints for at least 1 week, srIκBα protein was detectable only during the first 2 days after gene transfer (Fig. 4*E*). Taken together, these data demonstrate the antiapoptotic function of NF-κB activation in the arthritic synovium.

**Suppression of Recurrent SCW Arthritis in Rats by NF-κB Decoys.** While Ad gene transfer of srIκBα afforded effective suppression of NF-κB *in vitro*, inflammatory reaction to the Ad vectors itself represented a serious obstacle for *in vivo* therapeutic protocols (27). This has been particularly detrimental for delivery of intracellular inhibitors, such as srIkBα, when exogenous protein has to be expressed in the majority of targeted cells. In pilot experiments, we found that high titers of either AdsrIκBα or AdCMV vectors provoked recurrence of SCW arthritis, whereas low titers of AdsrIkBα were not effective. Thus, we attempted an alternative approach that is based on the use of NF-κB decoys, the ds ODNs containing NF-κB-binding sites (28, 29).

Synthesized decoys were found to be functionally active in competing for binding NF-κB *in vitro* (see Fig. 1*B*). Liposomal delivery of fluorescein-labeled decoys to the SCW arthritic joint afforded efficient transduction of the synovium (Fig. 5*A*). The highest intensity of fluorescence was observed at the interface of the pannus and subchondral cartilage in the injected joint (data not shown), while no fluorescence was detected in the contralateral, uninjected ankle joints (data not shown). The ODNs persisted in the synovium for at least 8 days, as determined by hybridization of recovered ODNs with a complementary radiolabeled probe (data not shown). However, consistent with the data by others (27), we observed significant variations in the efficacy of liposomal delivery between experiments.

The therapeutic efficacy of NF-κB decoys was assessed by using the recurrent SCW arthritis rat model. Rats were injected in both ankle joints with PG-APS, and 4 weeks later, reactivation of arthritis in preinjured joints was induced by the i.v. injection of PG-APS (Fig. 5*B*). I.v. injection of liposomal complexes containing NF-κB decoys 24 hr before reactivation markedly inhibited development of arthritis in treated rats. Unexpectedly, the severity of inflammation was also inhibited in the contralateral, untreated ankle joints (Fig. 5*C*). This suppression was NF-κB-specific, since the wt NF-κB decoys were more effective as compared with the mut decoys (Fig. 5*C*), albeit some suppression of inflammation was evident in the mut NF-κB decoy-treated joints. In a separate experiment, it was found that i.a. injection of "empty" liposomes did not influence the severity of inflammation (data not shown). These data demonstrate therapeutic efficacy of specific inhibitors of NF-κB in SCW arthritis and indicate systemic therapeutic effects of local treatment.

## DISCUSSION

In the present study, we examined the role of NF-κB in the arthritic joint in animal models of RA. We demonstrated that



FIG. 5. I.a. administration of NF-κB decoys inhibit the recurrence of SCW arthritis. (*A*) Distribution of fluorescein-labeled ODNs in the synovium. Ankle joints of rats with established SCW arthritis were injected with liposomal complexes of fluorescein-labeled NF-κB decoys. One day later, synovial explants were isolated, sectioned, counterstained with propidium iodide, and analyzed under a fluorescent microscope equipped with a fluorescein filter set. Note the brightyellow fluorescent nuclei and red fluorescence of cytoplasmic RNA. Original magnification, ×200. (*B* and *C*) Therapeutic protocol. (*B*) Schedule of injections. Rats were injected into both ankle joints with PG-APS. Four weeks later, at Day 0, animals were divided into three groups and monoarticularly injected with liposomal complexes of NF-κB decoys (10 μg ODNs/joint). In the experimental group, animals were injected with wt-κB decoys, and two control groups received mut κB-PT decoys and saline. The contralateral ankle joints were injected with saline. At Day 1, reactivation of arthritis was induced by i.v. injection of PG-APS. (*C*) The severity of recurrent SCW arthritis in treated rats. The average mean values of joint swelling were calculated in each group as $d_n = <D_n - D_1>$, where $D_n$ and $D_1$ are joint diameters at day *n* and day 1, respectively. After reactivation, the maximal joint swelling in all groups was registered at day 4. ODNs, liposome-treated joints; CL, contralateral joints; N, number of joints per group. The significance of difference with the control, saline-treated group was calculated by using unpaired two-tailed Student's *t* test. (Bars = SEM.) Results of a single experiment are shown. The therapeutic effect of wt NF-κB decoys was reproduced in an identical experiment.

reactivation of arthritis caused activation of NF-κB in the synovium and that specific suppression of NF-κB activation induced apoptosis. We thus concluded that the activation of NF-κB in the inflamed synovium protected the cells against apoptosis, thereby providing a putative link between inflammation and hyperplasia. Our *in vitro* studies in primary synovial fibroblasts demonstrated that one conceivable mechanism whereby NF-κB exerted its protective function was suppression of the cytotoxicity of TNFα and FasL, factors strongly implicated in apoptosis in the RA synovium (5, 6). Our data suggest a dual role of NF-κB in RA pathology (Fig. 6). Activation of NF-κB in synoviocytes is required for the induction of inflammatory cytokines, including IL-1β, IL-6, and TNFα. On the other hand, the activation of NF-κB by inflammation inhibits TNFα- and FasL-mediated apoptosis, thereby promoting hyperplasia. The requirement of NF-κB for the induction of VCAM-1 suggests its potential role in the recruitment of inflammatory cells into the synovium. Our preliminary studies have revealed a requirement of NF-κB for mitogenic activity



Fig. 6. NF-κB in the regulation of inflammation and apoptosis in the arthritic joint.

of growth factors in synovial fibroblasts (J. Romashkova and S.M., unpublished observations), thus implicating NF-κB in the control of proliferation of the inflamed synovium.

Importantly, our data indicate that NF-κB activation in synoviocytes is protective against the cytotoxicity of both TNFα and FasL. The protective function of NF-κB in TNFα apoptosis has been recognized (13–16), but the role of NF-κB in Fas-mediated apoptosis remains obscure. As with TNFα, engagement of Fas receptors can activate NF-κB, at least in some cells (30); however, activation of NF-κB by Fas does not correlate with FasL cytotoxicity (30). Our data suggest that this mechanism may be cell type-specific.

The present study focused on the net aspects of activation of NF-κB and apoptosis. Further analysis should determine the role of NF-κB in regulation of apoptosis in distinct cell populations in the inflamed synovium, macrophage- and fibroblast-like synoviocytes, recruited leukocytes, and APC and T cells. Another important question is the relevance of our findings to human RA. Since suppression of NF-κB accelerates apoptosis in distinctively different models of RA and SCW- and pristane-induced arthritis, we believe that our observations are not limited to a particular model of RA, but are directly relevant to human disease.

In line with the evidence of general involvement of NF-κB in the pathogenic processes in the synovium, it was not surprising that inhibitors of NF-κB alleviated SCW arthritis in treated joints, but systemic therapeutic effects of local treatment were completely unexpected. However, our data are consistent with findings by Ghivizzani *et al.* (31), who demonstrated that the combined i.a. gene transfer of soluble IL-1 and TNFα in adjuvant-induced arthritis in rabbits exerted beneficial effects in distal joints. Although the mechanisms underlying the systemic therapeutic effects of local treatment are unclear, these findings suggest that in human RA, efficacious therapy may be achieved by an adequate treatment of a limited number of involved joints.

In conclusion, data presented here demonstrate the crucial involvement of NF-κB in the pathogenesis of arthritis and establish a putative mechanism whereby inflammation facilitates the expansion of synovial stroma. Our data suggest that targeting NF-κB should not only alleviate inflammation, but may also inhibit hyperplasia in the RA synovium.

We thank R. Rajendran, O. Aprelikova, O. Sirenko, J. Karastoianova, R. Brown, and S. Anderle for technical assistance, D. McCarty for the gift of AdGFP and AdLacZ vectors, S. Neill and J. Bisi for help in production of the AdsrIκBα vector, T. Deaton for assistance in preparation of joint sections, K. Decker for the gift of rat TNFα cDNA, T. Collins for the gift of rat VCAM-1 cDNA, A. Shaw for the gift of rat IL-1β cDNA, J. Watson for help in editing the manuscript, and J. Schwab and P. Cohen for stimulating discussions. This work was supported by National Institutes of Health Grants AR/AI 44564 (to A.S.B. and S.S.M.), 5-P60-AR30701-14 (to S.S.M.), and AI 35098 (to A.S.B.), and by a grant from the Arthritis Foundation (to S.S.M.).

1. Firestein, G. S. (1996) *Arthritis Rheum.* **39**, 1781–1790.
2. Zvaifler, N. J., Tsai, V., Alsalameh, S., von Kempis, J., Firestein, G. S. & Lotz, M. (1997) *Am. J. Pathol.* **150**, 1125–1138.
3. Mountz, J. D., Wu, J., Cheng, J. & Zhou, T. (1994) *Arthritis Rheum.* **37**, 1415–1420.
4. Firestein, G. S., Nguyen, K., Aupperle, K. R., Yeo, M., Boyle, D. L. & Zvaifler, N. J. (1996) *Am. J. Pathol.* **149**, 2143–2151.
5. Nishioka, K., Hasunuma, T., Kato, T., Sumida, T. & Kobata, T. (1998) *Arthritis Rheum.* **41**, 1–9.
6. Zhou, T., Edwards, C. K., III, Yang, P., Wang, Z., Bluethmann, H. & Mountz, J. D. (1996) *J. Immunol.* **156**, 2661–2665.
7. Firestein, G., Yeo, M. & Zvaifler, N. J. (1995) *J. Clin. Invest.* **96**, 1631–1638.
8. Nakajima, T., Aono, H., Hasunuma, T., Yamamoto, K., Shirai, T., Hirohata, K. & Nishioka, K. (1995) *Arthritis Rheum.* **38**, 485–491.
9. Asahara, H., Hasunuma, T., Kobata, T., Inoue, H., Muller-Ladner, U., Gay, S., Sumida, T. & Nishioka, K. (1997) *J. Rheumatol.* **24**, 430–435.
10. Baldwin, A. S. (1996) *Annu. Rev. Immunol.* **14**, 649–683.
11. Handel, M. L., McMorrow, L. B. & Gravallese, E. M (1995) *Arthritis Rheum.* **38**, 1762–1770.
12. Marok, R., Winyard, P. G., Coumbe, A., Kus, M. L., Gaffney, K., Blades, S., Mapp, P. I., Morris, C. J., Blake, D. R., Kaltschmidt, C., *et al.* (1996) *Arthritis Rheum.* **39**, 583–591.
13. Beg, A. A. & Baltimore, D. (1996) *Science* **274**, 782–784.
14. Wang, C.-Y., Mayo, M. W. & Baldwin, A. S., Jr. (1996) *Science* **274**, 784–787.
15. Van Antwerp, D. J., Martin, S. J., Kafri, T., Green, D. R. & Verma, I. M. (1996) *Science* **274**, 787–789.
16. Liu, Z. G., Hsu, H., Goeddel, D. V. & Karin, M. (1996) *Cell* **87**, 565–576.
17. Brown, K., Gerstberger, S., Carlson, L., Franzoso, G. & Siebenlist, U. (1995) *Science* **267**, 1485–1488.
18. Brockman, J. A., Scherer, D. C., McKinsey, T. A., Hall, S. M., Qi, X., Lee, W. Y. & Ballard, D. W. (1995) *Mol. Cell. Biol.* **15**, 2809–2818.
19. Makarov, S. S., Olsen, J. C., Johnston, W. N., Anderle, S. K., Brown, R. R., Baldwin, A. S., Jr., Haskill, J. S. & Schwab, J. H. (1996) *Proc. Natl. Acad. Sci. USA* **93**, 402–406.
20. Cheshire, J. C. & Baldwin, A. S., Jr. (1993) *Mol. Cell. Biol.* **17**, 6746–6754.
21. Kaltschmidt, C., Kaltschmidt, B., Henkel, T., Stockinger, H. & Bauerle, P. (1995) *Biol. Chem. Hoppe-Seyler* **376**, 9–16.
22. Schwab, J. H. (1995) in *Mechanisms and Models In Rheumatoid Arthritis*, eds. Henderson, B., Pettipher, R. & Edwards, J. (Academic, New York), pp. 431–446.
23. Vingsbo, C., Sahlstrand, P., Brun, J. G., Jonsson, R., Saxne, T. & Holmdahl, R. (1996) *Am. J. Pathol.* **149**, 1675–1683.
24. Fujisawa, K., Aono, H., Hasunuma, T., Yamamoto, K., Mita, S. & Nishioka, K. (1996) *Arthritis Rheum.* **39**, 197–203.
25. Palombella, V. J., Rando, O. J., Goldberg, A. L. & Maniatis, T. (1994) *Cell* **78**, 773–785.
26. Roessler, B. J., Allen, E. D., Wilson, J. M., Hartman, J. W. & Davidson, B. L. (1993) *J. Clin. Invest.* **92**, 1085–1092.
27. Nita, I, Ghivizzani, S. C., Galea-Lauri, J., Bandara, G., Georgescu, H. I., Robbins, P. D. & Evans, C. H. (1996) *Arthritis Rheum.* **39**, 820–828.
28. Bielinska, A., Shivdasani, R. A., Zhang, L. & Nabel, G. (1990) *Science* **247**, 891–893.
29. Morishita, R., Sugimoto, T., Aoki, M., Kida, I, Tomita, N., Moriguchi, A., Maeda, K., Sawa, Y., Kaneda, Y., Higaki, J., *et al.* (1997) *Nat. Med.* **3**, 894–899.
30. Ponton, A., Clement, M. V. & Stamenkovic, I. (1996) *J. Biol. Chem.* **271**, 8991–8995.
31. Ghivizzani, S. C., Lechman, E. R., Kang, R., Tio, C., Kolls, J., Evans, C. H. & Robbins, P. D. (1998) *Proc. Natl. Acad. Sci. USA* **95**, 4613–4618.

# EXHIBIT 49



**Pergamon**

*Int. J. Biochem. Cell Biol.* Vol. 29. No. 12. pp. 1305–1312. 1997
© 1997 Elsevier Science Ltd. All rights reserved
Printed in Great Britain
1357-2725/97 $17.00 + 0.00

PII: S1357-2725(97)00085-X

# INTRODUCTORY OVERVIEW

## Transcription Factors: An Overview

### DAVID S. LATCHMAN

*Department of Molecular Pathology, Windeyer Institute of Medical Sciences, University College London Medical School, The Windeyer Building, 46 Cleveland Street, London W1P 6DB, U.K.*

This special issue of the *International Journal of Biochemistry and Cell Biology* contains a series of review articles and original papers dealing with the topic of transcription factors. The purpose of this introductory article is to provide an overview of these factors, their mechanism of action, their regulation and the manner in which alterations in them can result in disease. © 1997 Elsevier Science Ltd. All rights reserved

Keywords: Transcription factors    Gene regulation

*Int. J. Biochem. Cell Biol.* (1997) **29**, 1305–1312

### TRANSCRIPTIONAL CONTROL

The regulation of gene transcription is central both to tissue specific-gene expression and to the regulation of gene activity in response to specific stimuli (for review, see Latchman, 1995a). Thus, whilst some cases of regulation after transcription do exist, in most cases regulation occurs at the level of transcription by deciding which genes will be transcribed into the primary RNA transcript. Once this has occurred, the remaining stages of gene expression, such as RNA splicing, occur automatically and result in the production of the corresponding protein.

Inspection of the regulatory regions of genes which showed similar patterns of transcription, revealed the presence of short DNA sequences which were held in common by genes with a particular pattern of regulation but were absent from other genes which did not show this pattern of regulation. Thus, for example, genes whose transcription is induced in response to exposure to elevated temperature contain a common regulatory element known as the heat shock element (HSE), which is absent from genes that do not show heat inducible transcription (Davidson *et al.*, 1983). Similarly, genes whose transcription is induced by exposure to glucocorticoid hormone contain a common glucocorticoid response element (GRE), which is absent in genes which do not show this pattern of induction.

The proof that such sequences are of critical importance in producing the pattern of gene transcription was provided in the case of the HSE by the experiments of Pelham (1982), who transferred the heat shock element from the heat inducible hsp70 gene onto the non-heat inducible thymidine kinase gene. When this hybrid gene was introduced into cells and the temperature subsequently raised, increased thymidine kinase production was detected indicating that the HSE can direct heat inducible transcription of a gene which is not normally inducible in this manner. Subsequent studies have produced similar results with other such regulatory elements such as the GRE or the cyclic AMP response element (CRE) (for review, see Latchman, 1995a).

It is now clear that these short DNA sequences act by binding specific regulatory proteins known as transcription factors, which in turn regulate the transcription of the gene either positively or negatively so as to produce the observed effect on transcription (for review, see Latchman, 1995b).

### MECHANISM OF ACTION OF TRANSCRIPTION FACTORS

In order to produce their effects, transcription factors will, in general, require the ability to bind to DNA and then to influence tran-

David S. Latchman



Fig. 1. Structure of the yeast GCN-4 factor: (a) and the mammalian glucocorticoid receptor; (b) indicating the distinct regions that mediate DNA binding or transcription activation.

scription either positively or negatively. Each of these aspects will be considered in turn.

*DNA binding*

Detailed analysis of a number of different transcription factors has indicated that they have a modular structure in which specific regions of the molecule are responsible for binding to the DNA, whilst other regions produce a stimulatory or inhibitory effect on transcription (Fig. 1). Studies on the DNA binding regions of different transcription factors have revealed several distinct structural elements which can produce DNA binding (for reviews, see Harrison, 1991; Travers, 1993).

Indeed transcription factors are frequently classified on the basis of their DNA binding domains and a selection of these binding domains is listed in Table 1. Well characterized DNA binding domains include: the helix–turn–helix motif found in the homeobox tran-

scription factors (for review, see Kornberg, 1993); the two cysteine–two histidine zinc finger (for review, see Rhodes and Klug, 1993) which is found, for example, in the Sp transcription factor family (see Lania *et al.*, this issue); the multi-cysteine zinc finger (for review, see Parker, 1993) which is found in the steroid–thyroid hormone receptor family (see Grandien *et al.* and Tenbaum and Baniahamad, this issue); the Ets domain (see Sharrocks *et al.*, this issue); and the basic DNA binding domain.

This last example is of particular interest since factors containing the basic DNA binding domain can only bind to DNA once they have formed transcription factor dimers. Hence, factors containing the basic binding domain are further sub-grouped according to the nature of the dimerization motif which they contain. Thus, some of these factors such as the transcription factors discussed in the

Table 1. Transcription factor families classified by their DNA binding domains

| Domain | Factors containing domain | Comments |
|---|---|---|
| Homeobox | Numerous Drosophila homeotic genes, related genes in other organisms | DNA binding mediated via helix–turn–helix motif |
| POU | Oct-1, Oct-2, Pit-1, Unc-86 | Consists of POU-specific domain and POU-homeobox |
| Paired box | Various Drosphila segmentation genes, PAX factors | Often found together with a homeobox in PAX factors |
| Cysteine–histidine zinc finger | TFIIIA, Kruppel, SP1, etc. | Multiple copies of finger motif |
| Cysteine–cysteine zinc finger | Steroid–thyroid hormone receptor family | Single pairs of fingers, related motifs in Adenovirus E1A and yeast GAL4, etc. |
| Basic element | C/EBP, c-fos, c-jun, GCN4 | Often found in association with leucine zipper or helix–loop–helix dimerization motifs |
| Ets domain | Ets-1, Elk-1, SAP | Contain helix–turn–helix motif |

article by Kageyama *et al.* (this issue), contain a helix–loop–helix motif which mediates dimerization (for review, see Littlewood and Evan, 1995). In contrast, other basic DNA binding domain-containing factors such as the CREB factor discussed by Sassone-Corsi (this issue), undergo dimerization via the so-called leucine zipper motif which contains a regular array of leucine residues (for reviews, see Hurst, 1996; Kerppola and Curran, 1995).

Thus, a wide variety of DNA binding domains (which in some cases have associated dimerization domains) allow transcription factors to bind to their appropriate DNA sequences within target genes. It is now necessary to consider how the transcription factors are able to influence the rate of transcription following such DNA binding.

### Activation of transcription

As illustrated in Fig. 1, many transcription factors contain, in addition to the DNA binding domain, specific regions which are necessary for the activation of transcription. Such regions were identified on the basis that they can stimulate transcription when linked to the DNA binding domain of a completely unrelated factor and are known as activation domains (for review, see Mitchell and Tjian, 1989). As with DNA binding domains, a number of distinct types of activation domain have been identified which are defined on the basis that they are rich in acidic amino acids, glutamine residues or proline residues, respectively.

These activation domains appear to function by interacting with components of the basal transcriptional complex. This is a complex of RNA polymerase II and various transcription factors such as TFIIB and TFIID which assembles at the gene promoter and is essential for transcription to occur (Fig. 2) (for review, see Roeder, 1996; Nikolev and Burley, 1997). Activation domains have been shown to interact either directly with specific components of this complex, or indirectly by interacting with so called co-activator molecules which then interact with the basal complex itself. Whatever the case, such interactions appear to result in enhanced transcription either by stimulating the rate of transcription factor complex assembly, or by stimulating the level of its activity (see Fig. 2).

Hence, following binding to their appropriate DNA binding site mediated via the DNA binding domain, the activation domains of



Fig. 2. An activator (A) bound to its binding site (ABS) can stimulate either the assembly of the basal transcriptional complex consisting of RNA polymerase and its associated factors, or stimulate its activity once it has assembled.

specific activating transcription factors can interact with the basal transcriptional complex so as to stimulate transcription. In this manner, the binding of specific transcription factors can stimulate gene transcription.

### Repression of transcription

Although it was originally thought that most eukaryotic transcription factors acted by stimulating transcription, it has now become clear that a wide variety of factors act by inhibiting the transcription of specific genes and that such inhibitory transcription factors may be at least as important as stimulatory factors (for review, see Herschbach and Johnson, 1993; Hanna-Rose and Hansen, 1996; Latchman, 1996b).

The earliest examples of such inhibitory transcription factors were shown to act by interfering with the activity of a positively acting factor, thereby blocking its stimulatory effect on transcription (Fig. 3a–c). This could be achieved, for example, by preventing the positively acting factor from binding to DNA



Fig. 3. Potential mechanisms by which a transcription factor can repress gene expression. This can occur; (a) by the repressor (R) binding to DNA and preventing an activator (A) from binding and activating gene expression; (b) by the repressor interacting with the activator in solution and preventing its DNA binding; (c) by the repressor binding to DNA with the activator and neutralizing its ability to activate gene expression; or (d) by direct repression by an inhibitory transcription factor.

either via the negatively acting factor binding to its DNA binding site (Fig. 3a), or by the formation of a non-DNA binding protein–protein complex between the positively acting factor and the negatively acting factor (Fig. 3b). Alternatively, the negatively acting factor could act by interacting with the positively acting factor to block the activity of its activation domain in a phenomenon known as quenching (Fig. 3c).

It has now become clear, however, that a class of inhibitory transcription factors exists which can directly inhibit transcription even in the absence of a positively acting factor (Fig. 3 d). These factors can thus reduce the basal level of transcription below that observed even in the absence of any activating molecule and appear to function by interacting either directly or indirectly with the basal transcriptional complex so as to reduce its activity. They thus constitute the antithesis of the activating molecules discussed in the previous section and possess defined inhibitory domains which are responsible for their effects and which, like activation domains, can function when transferred to the DNA binding domain of another molecule (for review, see Latchman, 1996b).

Hence, the balance between binding of transcriptional activators and transcriptional repressors to the regulatory region of a particular gene will determine the rate of its transcription in any particular situation. Clearly, however, in order for a particular gene to respond to specific signals or to be regulated in a cell type specific manner, the balance between these activating and repressing molecules must change in different situations. The mechanisms which are used to regulate transcription factor activity are discussed in the next section.

## REGULATION OF TRANSCRIPTION FACTORS

Transcription factors can be regulated at two levels, namely the regulation of transcription factor synthesis and the regulation of transcription factor activity (Fig. 4).

### Regulation of synthesis

In a number of different situations, a transcription factor is regulated by being synthesized in one particular tissue or cell type and not in other tissues. The most dramatic example of this concerns the MyoD transcription factor which is synthesized only in skeletal muscle cells. Thus, in this case, the over-expression of the MyoD factor in undifferentiated fibroblast cells is sufficient to convert them to skeletal muscle cells indicating the

Transcription factors: an overview                                                                    1309



Fig. 4. Gene activation mediated by the synthesis of a transcription factor only in a specific tissue (a), or its activation in a specific tissue (b).

critical role for this factor in the induction of muscle specific gene expression (for review, see Edmondson and Olson, 1993).

Although regulation of synthesis is primarily used to regulate transcription factors which control cell type or tissue specific gene expression, it can also be used to regulate transcription factors which play a key role in the induction of specific genes in response to a specific stimulus. Thus, in the case of the cytokine IL-6, the synthesis of a specific transcription factor NFIL-6β is induced in response to

exposure to IL-6 (Ramji et al., 1993) as discussed in the article by Akira et al. (this issue).

*Regulation of transcription factor activity*

Although the regulation of transcription factor synthesis is an important control point, it cannot be the only regulatory mechanism which controls transcription factor activity. Thus, if this was the case, the enhanced synthesis of a transcription factor in response to a particular stimulus would be controlled by enhanced transcription of its corresponding gene, which in turn would require the *de novo* synthesis of further transcription factors, so resulting in the need for new transcription of these genes and so on.

Therefore, it is necessary to have an additional mechanism which allows *de novo* gene transcription by the activation of pre-existing transcription factors (Fig. 4b). Indeed, even in the case of IL-6, as discussed by Akira (this issue), the enhanced synthesis of the transcription factor NF-IL6β induced by IL-6, is complemented by the activation of other transcription factors, NF IL-6 and STAT-3 which pre-exist in an inactive form in unstimulated cells (Lutticken et al., 1994; Nakajima et al., 1993).

Such activation of pre-existing transcription factors can occur via a number of different mechanisms (Fig. 5), which can involve ligand binding, alterations in protein–protein interaction and transcription factor phosphorylation. Thus, for example, in the case of the



Fig. 5. Mechanisms by which transcription factors can be activated by post-translational changes.

steroid receptors discussed by Tenbaum and Baniahmad (this issue), the inactive receptor is associated with an inhibitory protein hsp90. Following binding of the steroid hormone ligand, hsp90 dissociates and the receptor moves to the nucleus where it can bind to its appropriate response element and switch on transcription. Similar dissociation of an inhibitory protein allowing DNA binding by the active transcription factor also occurs for the hypoxia inducible factor HIF-1, as discussed by Wood and Ratcliffe (this issue) and for the NFκB factor, as discussed by Perkins (this issue).

Interestingly, however, in this latter case the dissociation of the inhibitory protein IκB from the NFκB is mediated via the phosphorylation of the IκB protein which results in its dissociation from NFκB and targets it for rapid degradation. Hence, in this case, the mechanisms of regulatory protein–protein interaction and transcription factor phosphorylation are combined.

Transcription factor phosphorylation is also involved in the post-translational activation of the NFIL-6 and STAT-3 factors following treatment by IL-6, which was discussed above and in the article by Akira et al. (this issue). Thus, following exposure to IL-6, the NFIL-6 factor is phosphorylated on a specific threonine residue by the mitogen activated protein kinase (Nakajima et al., 1993) whilst the STAT-3 factor is phosphorylated on a tyrosine residue by Jak family kinases (Lutticken et al., 1994). In the case of STAT-3, such phosphorylation allows the STAT-3 factor to dimerise and move to the nucleus where it can switch on specific gene expression (for review, see Ihle and Kerr, 1995).

A similar regulation of transcription factor activity by phosphorylation is seen in the case of the CREB factor which binds to the cyclic AMP response element (CRE) and plays a critical role in the regulation of transcription in response to cyclic AMP as discussed by Sassone-Corsi (this issue). Thus, following treatment with cyclic AMP, the CREB factor becomes phosphorylated on a serine residue at position 133 (for review, see Lalli and Sassone-Corsi, 1994).

Unlike the other situations discussed so far, however, such phosphorylation does not result in enhanced ability of CREB to bind to the CRE. Indeed, CREB is already bound to the CRE before exposure of cells to cyclic AMP but is unable to activate transcription. Such phosphorylation results, however, in CREB being able to bind another protein CBP which does not bind to unphosphorylated CREB.

This CBP factor appears to play a critical role in the activation of transcription. Thus, this factor is able to bind to specific components of the basal transcriptional complex thereby linking CREB to this complex and allowing stimulation of its activity following cyclic AMP treatment (Kwok et al., 1994). In addition, however, CBP has recently been shown to process histone acetyl transferase activity (Ogryzko et al., 1996). Such enhanced acetylation of histones has been shown to occur in regions of DNA which are active or potentially active in transcription (for review, see Turner, 1993) and to be involved in the open chromatin structure characteristic of such regions. It is therefore possible that the binding of CBP to CREB recruits it to the DNA and allows it to produce changes in the chromatin structure which facilitate enhanced transcription.

Hence, in a specific cell type or in response to a specific stimulus, specific transcription factors are either synthesised or become activated following post-translational modification. The binding of these transcription factors to their appropriate recognition sequences thus produces specific patterns of gene transcription and is responsible for the observed dependence of particular patterns of gene activity on specific DNA binding sequences, which was discussed in the introduction.

### TRANSCRIPTION FACTORS AND DISEASE

Given the vital role of transcription factors in a wide variety of cellular processes, it is not surprising that alterations in these factors can result in human disease (for review, see Latchman, 1996a). Such diseases can conveniently be divided into three major groups.

### Developmental disorders

A number of developmental abnormalities have been shown to result from mutations which result in the inactivation of specific transcription factors. Thus, for example, mutations in the gene encoding the POU family transcription factor Pit-1 have been identified in patients with combined pituitary hormone deficiency in whom there is no production of growth hormone, prolactin and thyrotropin resulting in mental retardation and growth de-

ficiency (Radovic et al., 1992). Similarly, several different diseases have been shown to result from mutations in the genes encoding members of the PAX family of transcription factors which are discussed by Barr (this issue). Thus, for example, mutations in PAX-3 result in Waardenburg's syndrome (Tassabehji et al., 1992) whilst mutations in PAX-6 are associated with eye defects such as anirida (Glaser et al., 1992).

Interestingly, such mutations resulting in developmental defects can also affect non-DNA binding co-factors as well as DNA binding transcription factors. This is seen in the case of the CBP factor which was discussed above where it was indicated that it binds to the DNA binding CREB factor via a protein–protein interaction and is essential for transcriptional activation. Thus, inactivation of the gene encoding CBP results in Rubinstein–Taybi syndrome involving mental retardation and various physical abnormalities (Petrij et al., 1995); (for review, see D'Arcangelo and Curran, 1995).

Hence, a variety of developmental disorders can arise from inactivation of transcription factors by mutation. It is likely, however, that such mutations which allow live individuals to be born represent the tip of the iceberg of transcription factor mutation with the inactivation of many genes encoding transcription factors producing such a severe defect that it is not compatible with the individual's survival.

### Disorders of the hormone response

As discussed above, the receptors for many steroid hormones and related molecules such as thyroid hormone are transcription factors which, following binding of the hormone, bind to specific response elements and activate transcription. Clearly, therefore, mutations in the genes encoding such receptors which interfere with this process will result in disorders of the response to that particular hormone. These disorders are discussed in detail in the article in this issue by Tenbaum and Baniahmad (1997) which indicates that such mutations can affect a wide variety of different receptors and produce very severe phenotypes. Thus, for example, individuals carrying mutant thyroid hormone receptors exhibit mental retardation and growth defects.

### Cancer

The growth of cells is controlled by the action of a variety of proteins, some of which stimulate cellular growth whilst others inhibit it. Cancer can thus arise from the aberrant activation of specific genes encoding growth promoting factors. These genes are therefore known as oncogenes (for review, see Bourne and Varmus, 1992). Similarly, cancers also arise due to the inactivation of genes encoding growth inhibiting proteins which are known as anti-oncogenes (for review, see Knudson, 1993). Interestingly, some oncogenes and anti-oncogenes encode transcription factors which exert their effects by modulating transcription of other specific genes.

As with other oncogenes, cancers caused by oncogenes which encode transcription factors arise when such genes are expressed at higher levels than normal or alternatively are mutated so that they encode a protein with abnormal activity.

In humans, such changes have been most intensively characterized in different leukemias in which genes encoding specific oncogenic transcription factors have been involved in chromosomal rearrangements, so that they are either expressed at a higher level or become fused to a part of another protein. A novel protein with oncogenic activity is therefore produced (for review, see Rabbitts, 1994). Such chromosomal rearrangements are of particular importance in the case of acute and chronic myeloid leukaemia. They also occur, however, in solid tumours and this is discussed in the article by Barr (this issue).

In contrast to oncogenes, cancer occurs in the case of anti-oncogenes where the anti-oncogene is inactivated by mutation or deleted completely. Mutations in one such oncogene, that encoding the transcription factor p53, are particularly common in cancers and it has been estimated that the majority of human cancers contain mutations in the p53 gene (Berns et al., 1994). When taken together with the existence of other anti-oncogenes, encoding transcription factors such as the retinoblastoma gene (for review, see Weinberg, 1993) and the Wilms' tumour gene (for review, see Hastie, 1993), as well as the existence of many oncogenic transcription factors, it is clear that alterations in such transcription factors are likely to be involved in virtually all human cancers.

### CONCLUSION

In this introductory article, I have attempted to provide an overview of the man-

David S. Latchman

ner in which transcription factors act, the way in which they are regulated and the alterations in them which can result in disease. All these processes are discussed in more detail in the various review articles and original papers which make up this issue. It should be clear, however, from this introductory article that transcription factors are vital to the process of transcriptional control of gene expression which in turn underlies normal embryonic development, the creation and maintenance of tissue specific protein synthesis and the response to specific cellular signalling pathways.

## REFERENCES

Berns A. (1994) Is p53 the only real tumour suppressor gene? *Curr. Biol.* **4**, 137–139.

Bourne H. R. and Varmus H. E. (1992) Oncogenes and cell proliferation. *Curr. Opin. Genet. Dev.* **2**, 1–57.

D'Arcangelo G. and Curran T. (1995) Smart transcription factors. *Nature* **376**, 292–293.

Davidson E. H., Jacobs H. T. and Britten R. J. (1983) Very short repeats and coordinate induction of genes. *Nature* **301**, 468–470.

Edmondson D. F. and Olson E. N. (1993) Helix-loop-helix proteins as regulators of muscle-specific transcription. *J. Biol. Chem.* **268**, 755–758.

Glaser T., Walton D. S. and Maas R. L. (1992) Genomic structure, evolutionary conservation and aniridia mutations in the human PAX6 gene. *Nature Genet.* **2**, 232–239.

Hanna-Rose W. and Hansen U. (1996) Active repression mechanisms of eukaryotic transcription repressors. *TIGS* **12**, 229–234.

Harrison S. C. (1991) A structural taxonomy of DNA binding domains. *Nature* **353**, 715–719.

Hastie N. D. (1993) Wilm's tumour gene structure and function. *Curr. Opinion Genet. Dev.* **3**, 408–413.

Herschbach B. M. and Johnson A. D. (1993) Transcriptional repression in eukaryotes. *Annual Rev. Cell Biol.* **9**, 479–509.

Hurst H. C. (1996) bZip proteins. *Protein Profile* **3**, 1–72.

Ihle J. N. and Kerr I. M. (1995) Jaks and Stats in signalling by the cytokine receptor superfamily. *TIGS* **11**, 69–74.

Kerppola T. and Curran T. (1995) Zen and the art of Fos and Jun. *Nature* **373**, 199–200.

Knudson A. G. (1993) Anti-oncogenes and human cancer. *Proc. Natl. Acad. Sci.* **90**, 10914–10921.

Kornberg T. B. (1993) Understanding the homeodomain. *J. Biol. Chem.* **268**, 26813–26816.

Kwok R. P. S., Lundblad J. R., Chrivia J. C., Richards J. P., Bachinger H. P., Brennan R. G., Roberts S. G. E., Green M. R. and Goodman R. H. (1994) Nuclear protein CBP is a coactivator for the transcription factor CREB. *Nature* **370**, 223.

Lalli E. and Sassone-Corsi P. (1994) Signal transduction and gene regulation. The nuclear response to cAMP. *J. Biol. Chem.* **269**, 17359–17362.

Latchman D. S. (1995a) *Gene Regulation—A Eukaryotic Perspective*, 2nd edn, p. 271. Chapman and Hall, London.

Latchman D. S. (1995b) *Eukaryotic Transcription Factors*, 2nd edn. Academic Press, New York.

Latchman D. S. (1996a) Transcription factors mutations and disease. *New Eng. J. Med.* **234**, 28–33.

Latchman D. S. (1996b) Inhibitory transcription factors. *Int. J. Biochem. Cell. Biol.* **28**, 965–974.

Littlewood T. and Evan G. (1995) Helix-loop-helix. *Protein Profile* **2**, 621–702.

Lutticken C., Wegenka U. M., Yuan J., Buschmann J., Schindler C., Ziemiecki A., Harpur A. G., Wilks A. F., Yasukawa K., Taga T., Kishimoto T., Barbieri G., Pellegrini S., Sendtner M., Heinrich P. C. and Horn F. (1994) Association of transcription factor APRF and protein kinase Jak1 with the interleukin-6 signal transducer gp130. *Science* **263**, 89–92.

Mitchell P. J. and Tjian R. (1989) Transcriptional regulation in mammalian cells by sequence specific DNA binding proteins. *Science* **245**, 371–378.

Nakajima T., Kinoshita S., Sasagawa T., Sasaki K., Naruto M., Kishimoto T. and Akira S. (1993) Phosphorylation at threonine-235 by a ras-dependent mitogen activated protein kinase cascade is essential for transcription factor NF-IL6. *Proc. Natl. Acad. Sci.* **90**, 2207–2211.

Nikolev D. B. and Burley S. K. (1997) RNA polymerase II transcription initiation: a structural view. *Proc. Natl. Acad. Sci. U.S.A.* **94**, 15–22.

Ogryzko V., Schiltz R. L., Russanova V., Howard B. H. and Nakatani Y. (1996) The transcriptional coactivators p300 and CBP are histone acetyltransferases. *Cell* **87**, 953–959.

Parker M. G. (1993) Steroid and related receptors. *Curr. Opin. Cell. Biol.* **1**, 512–518.

Pelham H. R. B. (1982) A regulatory upstream promoter element in the Drosophila hsp70 heat shock gene. *Cell* **30**, 517–528.

Petrij F., Giles R. H., Dauwerse H. G., Saris J. J., Hennekam R. C. M., Masuno M., Tommerup N., van Ommen G. J. B., Goodman R. H., Peters D. J. M. and Breunig M. H. (1995) Rubinstein–Taybi syndrome caused by mutations in the transcriptional co-activator CBP. *Nature* **376**, 348–351.

Rabbits T. H. (1994) Chromosomal translocations in human cancer. *Nature* **372**, 143–149.

Radovick S., Nations M., Du Y, Berg L. A., Weintraub B. D. and Wondisford F. E. (1992) A mutation in the POU-homeodomain of Pit-1 responsible for combined pituitary hormone deficency. *Science* **257**, 1115–1118.

Ramji D. P., Vitelli A., Tronche F., Cortese R. and Ciliberto G. (1993) The two C/EBP isoforms, IL-6DBP/NF-IL6 and C/EBP/NF-IL6B are induced by IL-6 to promote acute phase gene transcription via different mechanisms. *Nucl. Acids Res.* **21**, 289–294.

Rhodes D. and Klug A. (1993) Zinc finger structure. *Scient. Am.* **268**, 32–39.

Roeder R. G. (1996) The role of general initiation factors in transcription by RNA polymerase II. *TIBS* **21**, 327–334.

Tassabehji M., Read A. P., Newton V. E., Harris R., Balling R., Gruss P. and Strachan T. (1992) Waardenburg's syndrome patients have mutations in the human homologue of the Pax-3 paved box gene. *Nature* **355**, 635–636.

Travers A. (1993) *DNA—Protein Interactions*. Chapman and Hall, London.

Turner B. M. (1993) Decoding the nucleosome. *Cell* **75**, 5–8.

Weinberg R. (1993) Tumour supressor genes. *Neuron* **11**, 191–196.

# EXHIBIT 50

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 06-259-MPT

**Certification Pursuant to**
**Fed. R. Evid. 902(11)**

---

| | |
|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT and FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH <br><br> Counterclaim Plaintiffs, <br><br> v. <br><br> AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION <br><br> Counterclaim Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

---

I, Joel Pomerantz, Ph.D., declare pursuant to 28 U.S.C. § 1746:

    1. I am an Assistant Professor in the Department of Biological Chemistry of the Johns Hopkins University School of Medicine.

2.  Attached hereto is a copy of a laboratory notebook (the "Notebook," bearing identification numbers ARI-KC0001-162) I prepared, recording the results of experiments I performed during 2007 at my laboratory at the Johns Hopkins University School of Medicine.

3.  I made entries in the Notebook at or near the time I performed the experiments whose results are recorded therein.

4.  I kept the Notebook in the course of my regularly conducted activity as an experimental scientist.

5.  I made the Notebook as a regular practice of my regularly conducted activity as an experimental scientist.

I declare under penalty of perjury that the foregoing is true and correct.

May 12, 2008

_____

# EXHIBIT 51

# EXHIBIT REDACTED

# EXHIBIT 52

EXPEDITED AFTER
FINAL PROCEDURE

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the application of: Baltimore et al. | Group Art Unit: 1636 |
| Serial No.: 08/464,364 | Examiner: Schwartzman, R. |
| Filed: June 5, 1995 | Attorney Docket No.: APV-035.03 |
| For: *Nuclear Factors Associated With Transcriptional Regulation* | |

Box AF
Assistant Commissioner for Patents
Washington, D.C. 20231

**Certificate of First Class Mailing (37 CFR 1.8(a))**
I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Box AF, Assistant Commissioner for Patents, Washington, D.C. 20231 on the date set forth below.

___February 12, 2001___                    By: *Isabelle Clauss*
Date of Signature and of Mail Deposit

## RESPONSE AND AMENDMENT

Sir:

In response to the Office Action mailed 11 August 2000 (herein the "Office Action"), Applicants submit the following Response and Amendment. A Notice of Appeal and a Petition for a Three Months Extension of Time and appropriate fees are filed concurrently herewith. Please amend the application as follows.

A. Amendment of Claims

Please amend the claims as follows:

57.    (amended) A method for altering expression, in a mammalian cell, of a gene, the transcription of which is regulated by NF-κB, comprising

providing a formulation of an agent identified by its ability to alter [altering] the level of NF-κB--IκB complex present in the cytoplasm of said cell with an agent that binds a NF-κB protein or an IκB protein and alters the association between the two proteins and alters expression of the gene, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

58.    (amended) A method of inhibiting expression, in a mammalian cell, of a gene, the transcription of which is dependent on a DNA binding activity of a NF-κB protein, the method comprising

providing a formulation of a substance identified by its ability to [ inhibiting the DNA binding activity of the NF-κB protein by contacting the cell with an agent which (i) inhibits] inhibit phosphorylation of an IκB protein and/or (ii) prevents degradation of an IκB protein, which IκB forms a transcriptionally inactive complex with the NF-κB protein, wherein the agent inhibits expression of the gene, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

59.    (amended) A method of activating NF-κB-dependent transcription in a mammalian host cell, comprising

providing a formulation of a substance identified by its ability to dissociate [contacting the host cell with a substance which causes dissociation of] NF-κB--IκB complexes and promotes NF-κB-dependent transcription, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

61.    (amended) A method of inducing DNA-binding and nuclear translocation of NF-κ present in the cyotosol of a mammalian host cell, comprising

providing a formulation of a substance identified by its ability to cause [treating the cell with a substance which causes] dissociation of NF-κB--IκB complexes, resulting in induction of DNA-binding activity and nuclear translocation of the NF-κB present in the complex, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

B.    Finality of Office Action.

Applicants respectfully request that the finality of the present   Office Action be withdrawn.  As set forth below, certain of the Examiner's rejections are not supported by evidence of adequate fact finding, e.g., refer to positions as "well known in the art." Accordingly, Applicants have not been able to adequately ascertain the Examiner's factual position and have therefore, been prejudiced with regard to directly addressing the Examiner's concerns.

C. <u>Outstanding Rejection Of Certain Pending Claims</u>

Applicants note with appreciation that claim 111 is deemed to be patentable by the Examiner.

In the outstanding Office Action, claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 have been rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to "reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention". In particular, the Examiner stated that

> "[t]he specification discloses a few agents which activate NF-kB when they contact a cell (...), oligonucleotide decoys comprising the NF-kB binding site and the use of NF-kB and IkB proteins as agents to modulate NF-kB-dependent transcription. No other agents are disclosed, in particular agents which inhibit phosphorylation of IkB, prevent degradation of IkB, decrease the level of IkB or stimulate phosphorylation of IkB. The disclosure of the compounds listed above is not deemed to be descriptive of the complete structure of a representative number of species encompassed by the claims as one of skill in the art cannot envision agents having each of the claimed capabilities or even other agents having the same capabilities of the compounds listed above. Nor is there a description of a <u>representative number of species in terms of a partial structure and relevant identifying characteristics</u> as there is <u>no disclosed correlation between particular structures and the desired capabilities</u>." [emphasis added]

See the Office Action at pages 4-5.

Claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 have also been rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not enabled in the specification. The Examiner contends that the specification fails to provide any guidance on how to use the claimed agents as the agents have yet to be identified. In particular, the Examiner supports this rejection by stating

> Although it was well known in the prior art how to administer a variety of agents to cells *in vitro* to alter protein expression and/or interaction, administration of agents to a subject *in vivo* for this purpose was not routine, particularly in terms of delivering and expressing a nucleic acid or a protein which must act intracellularly. Tremendous difficulties in targeting the appropriate cells and delivering sufficient amounts of material for a sufficient length of time for a desired effect to be obtained were well known in the art. It would therefore require more than routine experimentation to determine how to carry out the in vivo scope of the claims.

See the Office Action at pages 6-7.

D.  Applicants' Rebuttal of the Rejections

(i)  Applicants Possessed the Claimed Invention

The pending claims involve, inter alia, the use of substances identified using assay approaches as disclosed in the specification. The claims of related US Patent 6,150,090 (based on the same specification, and attached as Exhibit A) include subject matter relating to such assays. During the prosecution of the '090 patent, the PTO determined that Applicants had been in possession of the various claimed assays. Accordingly, and as is borne out by the prosecution history of the present application, the Examiner's position that the pending claims fail to meet the requirements of 35 U.S.C. §112, first paragraph with respect to possession of the claimed invention arises solely from the "use" recitation in the subject claims, and is founded at least in part on the opinion that one of ordinary skill in the art, in order to believe that the Applicants had possession of the claimed invention, would have needed the present application to show a correlation between particular structures and the desired capabilities.

According to the USPTO, the written description requirement is met by the Applicants if it would be apparent to those skilled in the art or science that the inventor was in possession of the claimed invention at the time of filing the patent application. See *Guidelines for Examination of Patent Applications Under the 35 U.S.C. 112 ¶1*, 66 Fed. Reg. 4, 1099 (2001). The courts have repeatedly articulated a similar standard.  There is no per se rule that, to show possession of the claimed invention, the Applicants must have been able to describe the structure of the chemical entities which could be identified in the assay steps.  The examiner recognizes that sufficient description can be met by not only by structure, but also by disclosure of relevant identifying characteristics, e.g., "other physical and/or chemical properties, by functional characteristics coupled with a known or disclosed correlation between function and structure, or a by a combination of such identifying characteristics".  Office Action at page 5, citing the Written Description Guidelines.  Clearly the courts and the patent office contemplate something more than the number of compounds whose structures specifically enumerated in the specification as a touchstone for written description.  The case at hand involves the pioneering discovery a multicomponent pathway susceptible to intervention at a number of points, necessarily with substances of a variety of structures—as is clear from the disclosure. Under these circumstances, and by analogy to the original rationale for product-by-process claims, it is appropriate for the Applicants to have defined the substances useful in the claimed methods by their method of identification, rather than by reference to a particular chemical structure.

Reference to screening assays allows the identification of compounds that modulate NF-κB activity by various mechanisms, as is disclosed in the specification.  By definition,

compounds identified in the assay step, irrespective of how widely they may vary from one another in chemical structure, are useful for inhibiting or potentiating (as the case may be) NF-kB dependent gene transcription. No more need be known of the chemical structure. On the contrary, a person of skill in the art would have reasonably expected that the screening steps of the pending claims would identify a diverse group of compounds having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and covered by the pending claims. That is, a person of skill in the art would have envisioned that all modulators of NF-κB activity would not have the same or similar structure. Even compounds regulating NF-κB by the same mechanism, such as by inhibiting phosphorylation or degradation of IκB, would have been expected to include any of a variety of different structures. Unlike the case of a structurally-defined chemical genus, here a person of skill in the art would not expect to find a correlation, as posited by the Office Action, between particular structures and the desired function, since since more than one molecular mechanisms of action were contemplated, described and recited in the claims..

Furthermore, at the time the present application was filed, there was ample precedent in the scientific literature for chemical diversity even among agents identified for their activity against selected biological targets. For instance, Weinstein et al. (1989) Am J Hypertens 2:205 review the state of calcium antagonists, and note that compounds identified as calcium antagonists are of "very diverse structure." See also Triggle et al. (1983) Circ Res 52: I17. Likewise, Mills et al. (1989) Methods Find Exp Clin Pharmacol 11 Suppl 1: 87 reviews the state-of-the-art of H2-receptor antagonists, and notes that "numerous compounds with diverse chemical structures have been shown to possess H2-receptor antagonist activity. See also Badger et al. (1984) Int J Immunopharmacol 6:467. The art already recognized many instances wherein structurally unrelated compounds acted on the same target protein(s).

Applicants' argument is further supported by the Declaration of David Baltimore under Rule 1.132 and In re Braña, which is attached hereto as Exhibit B. Dr. Baltimore points out examples of the types of compounds that have been found, as contemplated by the application, to alter NF-κB and/or IκB activity and affect NF-κB mediated gene expression in cells. These compounds are structurally diverse. However, each is characterized by its activity on NF-κB mediated gene expression – as the pending claims require. Dr. Baltimore's declaration is not offered to render an insufficient disclosure enabling, rather, they prove that the disclosure was in fact enabling when filed. In re Braña, 51 F2d 1560 (CAFC 1995).

Thus, as is evident from the specification and corroborated by the post-filing evidence provided in the Declaration of Dr. Baltimore, one skilled in the art would have understood at the

time the application was filed that Applicants expected that a wide range of structurally diverse substances would be identified using the disclosed assays and would therefore be useful for inhibiting or potentiating NF-κB dependent gene transcription. It would be apparent to those skilled in the art that Applicants specifically contemplated that molecules of a variety of diverse structures could be routinely identified in the disclosed assays as having such activity, and that such compounds could then be used to modify NF-κB mediated gene expression as recited in the pending claims. Although the compounds regulating NF-kB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-kB activity. Given the state of the art, including the expectation that those of ordinary skill in the art that diverse classes of compounds would be identified in the assay step, we submit that it is evident from the specification of the present application that the Applicants were in possession of the invention covered by the scope of the pending claims as of the filing date of the instant application.

Finally, being directed to methods, rather than compositions-of-matter, the pending claims comport with the standard of practice in determining possession of invention for other arts, taking into account issues of predictability. For instance, there are many issued patents in the chemical, mechanical and software arts directed to methods whereby a product of one step is passed onto subsequent steps, and in many cases, the identity of the product is unknown other than its characteristics of being produced by the preceeding step. US Patent 6,171,813 is an example of claims issued in the chemical art in which a product of one step is provided into a next step of the claimed method:

> 1. A method of catalysis of at least one substrate into a product in an organic reaction solvent, comprising the steps of:
>    (a) obtaining a catalyst comprising an enzyme-surfactant ion pair complex comprising an enzyme and an ionic surfactant capable of forming an ion pair complex with the enzyme, the complex being produced by extracting an aqueous solution of the enzyme with the ionic surfactant and a water immiscible organic solvent,
>    (b) combining the catalyst with an organic reaction solvent, comprising an organic solvent and water in an amount sufficient to increase the rate of catalysis relative to a water-free organic reaction solvent, the amount of water ranging from about 0.03% to about 2.5% v/v, and
>    (c) allowing catalysis of the at least one substrate into the product.
>
> 2. The method of claim 1, further comprising recovering the product after catalysis is substantially completed.

Likewise, US Patent 5,666,415 is an example of claims issued in the software art in which a product (the encryted file) of one step is passed into the next step (decryption) of the claimed method:

> 1. In an information handling system in which secret information is maintained within a first protected environment, a method of transferring said secret information from said first protected environment to a second protected environment, said method being performed by one or more authorities, said information

within said protected environments being unobtainable in clear form by said one or more authorities, said method comprising the steps of:

    establishing within said first and second protected environments a shared secret transport key that is obtainable in clear form only within said first and second protected environments and is unobtainable in clear form by said one or more authorities;

    encrypting said secret information within said first protected environment using said transport key to generate encrypted secret information that is obtainable in encrypted form by at least one of said one or more authorities; and

    decrypting said encrypted secret information within said second protected environment using said transport key to regenerate the original secret information within said second protected environment, said regenerated secret information being unobtainable in clear form by said one or more authorities.

The point made here is that in both exemplary sets of issued claims, there is no common structural feature to the intermediate product of the method -rather, those products are defined by the characteristics imparted through the step in the method by which they are produced.

While many claim to have made pioneering inventions, the present applicants truly deserve that distinction. They discovered a crucial biological signaling pathway. Artificially limiting the claims to the use of specified chemical structures, rather than to the use of substances identified as disclosed in the specification, would deny these inventors their due.

### (ii) The Pending Claims are Enabled

By the time of the earliest priority date of the present application, the drug discovery industry was very mature. Applicants assert that, for the typical marketed drug, the associated costs and length of time for bringing the drug to market is not the result of any undue experimentation. The amount of experimentation is the product of stringent safeguards by regulatory agencies, as well as developing statistially relevant patient populations - and that should not be confused with "undue experimentation" as used in section 112. Methods for formulating the subject compounds, testing bioavailability (in vivo), and establishing dose/response relationships, to name but a few activities which are undertaken prior to administration of a drug to humans, while potentially time consuming and expensive if done as part of a regulatory approval process, do not require undue experimentation -only routine experimentation.

A priori, there is no rule that a method for treating a human, though it may require regulatory approval, necessitates the practioneer to engage in any undue experimentation to achieve that method. The Federal Circuit noted that tests on standard experimental animals to prove a compound's alleged pharmaceutical properties are sufficient to establish utility. The Federal Circuit in Brana made the clear statement that tests for FDA approval of a pharmaceutical compound are not equivalent to and should not be confused with the 35 U.S.C. §

101 utility requirement for patentability. Nor should that requirement be confused with enablement under section 112.

The Examiner has also stated that "there is no suggestion or guidance as to screening for agents that alter the level of phosphorylation of IKB or the level or stability of IKB." That argument is respectfully traversed.

Applicants contend that the specification, read as a whole, provides adequate direction to the skilled artisan to screen for agents that modulate IkB phosphorylation or stability or alter other activities associated with NF-kB activation. In support of this contention, Applicants submit herewith as Exhibit C, a copy of another Declaration of Dr. David Baltimore, made of record in parent application 08/463,397, setting forth that the application clearly conveys and provides adequate guidance for embodiments of the subject assays involving direct detection of IkB phosphorylation or IkB degradation, and that, based on the experimental results described in the application and on the general knowledge in the art at the time the application was filed, one of ordinary skill in the art would have reasonably believed that NF-kB can be activated as a result of phosphorylation and degradation of IkB.

In particular, Dr. Baltimore lists evidence provided in the present application which supports the pending claims directed to, for example, screening for agents that modulate IkB phosphorylation or stability (see, page two of the Declaration), and concludes that it would have been evident that to one skilled in the art that the present application specifically contemplated NF-kB activation by a mechanism which included the phosphorylation of IkB and the subsequent proteolytic degradation of the modified IkB protein.

Dr. Baltimore further indicates that it was well known in the art at the time the invention was made, that TPA and LPS activate protein kinases, resulting in phosphorylation of specific proteins., and that, in view of the general knowledge of protein phosphorylation at the time the invention was made, the results described in the specification would have reasonably been understood by those of skill in the art to be sufficiently convincing of a mechanism for NF-kB activation involving phosphorylation of IkB and subsequent degradation of the modified protein.

Furthermore, it is apparent from even a general reading of the specification and original claims, that the invention relates to the identification (and subsequent use) of compounds which can, as appropriate, inhibit or potentiate NF-kB function in, for example, gene expression. It would be evident to one skilled in the art, therefore, that each of the assays described in the specification in the context of elucidating the mechanism by which NF-kB acts are also useful as drug screening assays for the identification of exogenous agents which affect that mechanism. In this context, support for individual claims, other support for use of assays in a manner consistent with the pending claims can be found in the specification, *inter alia*, as follow:

\*       at page 6, the specification states that the invention relates to drugs which enhance or block the activity of NF-kB or of the NF-kB inhibitor (e.g., IkB);

\*       at page 7, the specification states the subject invention further relates to methods of regulating (inducing or preventing) activation of NF-kB, controlling expression of the immunoglobulin kappa light chain gene and other genes whose expression is controlled by NF-kB;

\*       at page 8, the specification states k[a]lteration or modification, whether to enhance or reduce NF-kB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-kB activity;

\*       at page 9, the specification states the cloned genes permit development of assays to screen for agonists or antagonists of gene expression and/or of the factors themselves. Further, because the binding site for NF-kB in the kappa gene is clearly defined, an assay for blockers or inhibitors of binding is available, as is an assay to determine whether active NF-kB is present;

The Examiner's attention is also directed to page 23, lines 2-29; page 55, lines 5-16; page 74, lines 1-14; page 87, line 1 - page 88, line 17; and claims 57-63 as originally filed. These and other teachings of the instant application provide ample guidance and sufficient written description for the pending claims.

The level of skill in the art is high. Those skilled in the art would be able to carry out a variety of different drug screening assays based on the disclosure and experience developed in the art. As of the priority date of the present application, the art recognized generic formats for, e.g., detecting inhibitors of protein phosphorylation, detecting inhibitors of protein degradation, detecting inhibitors of protein:protein interaction, detecting inhibitors of protein localization in a cell, detecting inhibitors of protein:DNA interaction and the like. The NF-kB and IkB proteins are sufficiently well characterized by the subject application that the skilled artisan would be able to provide such assays involving one or both of the proteins without much guidance beyond the identification of the mechanism of action, which the present application provides. Indeed, Applicants allege the application provides more disclosure than would be required. Moreover, those skilled in the art would recognize that assays described in the present application for discerning the mechanism of action of NF-kB and IkB could be readily adapted for screening small molecules and the like for their ability to modify an NF-kB pathway.

In addition, Applicants are entitled to rely on the knowledge in the art regarding assays for identifying compounds which modulate IkB phosphorylation, since assays for identifying

compounds which modulate phosphorylation of proteins in general were available and that such assays can be applied to identify agents which modulate IkB phophorylation in particular. In *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, cited by the Examiner, the Court found that "when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required" (Emphasis added). However, in the instant case, Applicants have provided methods to isolate IkB, which can then be used as a specific starting material in the known methods for determining the state of phosphorylation of a protein. Thus, since the specification describes specific starting materials, the holding of *Hybritech Inc. v. Monoclonal Antibodies, Inc.* is not applicable here. In addition, no undue experimentation is required for applying these methods to the IkB protein.

The Examiner's rejection of the pending claims as not being enabled is premised on an argument that the Examiner characterizes as being "well known in the prior art". However, the Examiner has, to date, not provided any evidence of fact finding to support the allegation. Should the Examiner continue to maintain this rejection, it is respectfully requested that the art upon which he relies be made of record, or if the Examiner is relying on personal knowledge, that an affidavit setting forth that knowledge be provided to the Applicants, in order that they more clearly understand the Examiner's position and directly address his concerns.

E.  State of Fact Finding by PTO

The final guidelines for section 112 clearly state there is a strong presumption that the specification as filed provides adequate written description support for the claimed invention. See *Guidelines*, 64 Fed. Reg. 71 at page 1105. A disclosure as filed is prima facie adequate. To support a rejection, the PTO has the burden of showing why the Applicant's evidence is insufficient. In any case where lack of written description is found, the PTO should cite documentary evidence in support of the finding. As expressly stated by the guidelines, where documentary evidence is not available, technical reasoning, as distinguished from legal reasoning, may support the finding when the technical line of reasoning relates to fact finding regarding possession of the invention.

Moreover, the Federal Circuit has recently articulated a standard whereby the PTO must establish a rational connection between the agency's fact findings and its ultimate action. Dickinson v. Zurko, 119 S. Ct. 1816 (1999). In light of the Applicants arguments of record, and the presumption in favor of the Applicants, it is respectfully asserted that the Examiner's maintenance of the present rejection is not supported by substantial evidence, and as such, does not meet the "arbitrary, capricious" standard applied under the "substantial evidence" test of

Section 706(2)(E) of the Administrative Procedure Act. The Examiner has not cited any relevant art nor relied on any other fact finding results which rebut the presumption in favor of the Applicants.

## F. Entry of Amendment

Applicants respectfully request that the Examiner enter this Amendment and Response. It is expected that the instant paper should place the present application in condition for allowance. However, if the Examiner maintains the present rejection, it is believed that the arguments provided herein, though supplementing past remarks by the Applicants, can be useful towards fully developing the file history for appeal. It is noted by the Applicants would be severely prejudiced should they be required to refill this application (e.g., as an RCE or CPA) by the loss of potential patent term.

## G. Conclusion

In view of the above remarks and the amendments to the claims, it is believed that this application is in condition for allowance. If a telephone conversation with Applicant's Attorney would expedite prosecution of the above-identified application, the Examiner is urged to call the undersigned at (617) 832-1000.

Respectfully submitted,
FOLEY, HOAG & ELIOT LLP

By: _Isabelle M. Clauss_

Isabelle M. Clauss, Ph.D.
Attorney for Applicants
Registration No. 47,326

One Post Office Square
Boston, MA 02109
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

Date: February 12, 2001

# EXHIBIT 53

*43/h
3eta*

EXPEDITED AFTER
FINAL PROCEDURE

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the application of: Baltimore et al. | Group Art Unit: 1636 |
| Serial No.: 08/464,364 | Examiner: Schwartzman, R. |
| Filed: June 5, 1995 | Attorney Docket No.: APV-035.03 |
| For: *Nuclear Factors Associated With Transcriptional Regulation* | |

Box AF
Assistant Commissioner for Patents
Washington, D.C. 20231

---

### Certificate of Facsimile

I hereby certify that this correspondence is being submitted by facsimile to the United States Patent and Trademark Office on the date set forth below.

   September, 12 2001          By:

Date of Signature and of Facsimile Transmission

---

### RESPONSE AND AMENDMENT

Sir:

     In response to the Office Action mailed 11 August 2000 (herein the "Office Action"), and Notice of Appeal filed 15 February 2001, Applicants submit the following Response and Amendment. A Notice of Appeal and a Petition for a Five Months Extension of Time and appropriate fees are filed concurrently herewith. Please amend the application as follows.

A. Amendment of Claims

Please amend the claims as follows:

      **Cancel claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 without prejudice**

no page 2

for paper 43 / H

158. (new) A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

159. (new) A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

160. (new) A method for reducing the level of expression of a viral gene in a eukaryotic cell by reducing NF-κB activity in the cell.

161. (new) The method of claim 160, wherein the viral gene is a CMV, HIV or SV40 gene.

162. (new) A method for reducing the level of expression of a cytokine gene in a eukaryotic cell by reducing NF-κB activity in the cell.

163. (new) A method for diminishing induced NF-κB-mediated intracellular signaling by reducing NF-κB activity in cells.

164. (new) A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cell.

165. (new) The method of claim 164, wherein NF-κB activity in the cell is reduced.

166. (new) A method for inhibiting, in eukaryotic cells, expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells.

167. (new) A method for reducing the effects of infection by reducing NF-κB activity in cells.

168. (new) The method of claim 167, wherein the infection is a viral infection.

169. (new) The method of claim 167, wherein the infection is a bacterial infection.

170. (new) A method for reducing the effects of bacterial lipopolysaccharide by reducing NF-κB activity.

171. (new) A method for reducing bacterial lipopolysaccharide-induced expression of cytokines, which method comprises reducing NF-κB activity.

172. (new) A method for reducing bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-alpha, which method comprises reducing NF-κB activity.

173. (new) A method for reducing bacterial lipopolysaccharide-mediated stimulation of immune cells, which method comprises reducing NF-κB activity.

194

174.    (new) A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells.

175.    (new) A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity by reducing intracellular NF-κB activity.

176.    (new) A method for reducing bacterial lipopolysaccharide-induced translocation of NF-κB comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-kB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB—IκB complexes.

177.    (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

178.    (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

179.    (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-kB.

180.    (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting degradation of an IκB protein.

181.    (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting dissociation of NF-κB—IκB complexes.

182.    (new) The method of any of claims 158 – 175 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

183.    (new) The method of any of claims 158 – 176, carried out on mammalian cells.

184.    (new) The method of claim 183, wherein the mammalian cells are human cells.

185.    (new) The method of claim 183, carried out on immune cells.

186.    (new) The method of claim 183, carried out on lymphoid cells.

187.    (new) The method of claim 183, carried out on liver cells.

188.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to decrease the level of NF-kB not bound  in an NF-kB:IkB complex

189.    (new)   A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the dissociation of NF-kB—IkB complexes.

190.    (new)   A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the modification of IkB.

191.    (new)   A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the degradation of IkB.

192.    (new)   A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit  the passage of NF-kB into the nucleus of cells.

193.    (new)   A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to reduce the binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB-mediated signal transduction.

---

*Attached hereto is a marked-up version of the changes made to the claims by the current amendment. The attached page is captioned "Version with markings to show changes made." For the convenience of the Examiner, all claims being examined, whether or not amended, are presented in that section.*

B.  Support for Amended Claims

    Support for such phrases as "inhibiting nuclear localization of a NF-κB protein", "inhibiting a DNA binding activity of an NF-κB protein" and "inhibiting dissociation of NF-κB--IkB complexes" have previously been demonstrated.  Support for other phrases can be found inter alia as follows:

| phrase | page/paragraph of specification |
|---|---|
| *reducing the effects of infection on cells by reducing NF-kB activity in the cells* | Page 30, paragraph 1; Page 74, lines 10-14; Figures 20, 21 and 42 |
| *reducing the effects of bacterial lipopolysaccharide by reducing NF-kB activity* | Page 30, paragraph 1; Example 8; Figures 20 and 21 |
| *reducing bacterial lipopolysaccharide induced expression of cytokines* | Page 74, lines 5-7; Page 30, paragraph 1; Example 8; Figures 20 and 21 |
| *reducing bacterial lipopolysaccharide induced* | Page 39, line 29 – Page 40, line 1; Page 30, |



| | |
|---|---|
| *expression of Tumor Necrosis Factor-α* | paragraph 1; Example 8; Figures 20 and 21 |
| *reducing bacterial lipopolysaccharide-mediated stimulation of immune cells* | Page 30, paragraph 1; Example 8; Figures 20 and 21 |
| *reducing Interleukin-1 or Tumor Necrosis Factor-α activity by reducing intracellular NF-kB activity* | Page 74, lines 5-7; Page 39, line 29 – Page 40, line 1 |
| *modifying effects of external influences on a eukaryotic cell, which external influences induce NF-kB-mediated intracellular signaling* | Page 23, lines 17-18 |
| *inhibiting, in eukaryotic cells, expression of genes which are activated by extracellular influences which induce NF-kB-mediated intracellular signaling* | Page 7, lines 26-30 |
| *modification of an IkB protein which reduces binding to NF-kB* | Page 40, lines 14-22; and page 37, lines 10 - 11 |

## C.  Outstanding Rejection Of Certain Pending Claims

In the outstanding Office Action, claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 were rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to "reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention".

There, the Examiner noted Applicants' previously made points, including the following:

- applicants are the pioneers who identified NF-κB as a key mediator of biological phenomena,
- the specification explicitly lays claim to methods of modulating NF-κB and signaling through NF-κB,
- one can affect NF-κB directly or indirectly,
- a variety of classes of substances could be used for that purpose, and
- the specification discloses several examples of substances which modulate NF-κB.

The Examiner did not dispute the veracity of those points, but rather took issue specifically with the recitation of agents in the then pending method claims. The Examiner's position was based on the grounds that the specification lacked adequate description of those

agents *per se*, especially in view of the structural diversity of agents that modulate NF-κB activity. This is discussed in greater detail on pages 4 –5 of the Office Action.

Moreover, the Examiner considered the specification's guidance on how to use such agents to be inadequately enabling to the extent that those agents were recited as agents identified by a particular assay, rather than as structurally identified agents. Additionally, a number of issues were raised regarding support for the method for inhibiting expression of HIV DNA recited in withdrawn claims 62 and 153. See the Office Action at pages 6 – 7.

Applicants do not agree with the Examiner's conclusions for the reasons presented below.

Additionally, a number of issues were raised regarding support for the method for inhibiting expression of HIV DNA recited in withdrawn claims 62 and 153. See the Office Action at pages 6 – 7. While Applicants' stand by the points made in their prior traversal of the rejection of claims 62 and 153 (See their May 30, 2000 Response and Amendment, see especially pages 9 - 10) and do not acquiesce to the maintenance of the rejection, they have withdrawn claims 62 and 153, rendering this issue moot.

D.  Applicant's Rebuttal of the Rejections

The amendments to the claims are believed to render moot all outstanding grounds for rejection with respect to claims 158 – 187.  Those claims, as well as new claim 188 and the cancelled claims are believed to comply with the requirements of Section 112 for the reasons set forth below, as well as in our prior responses.

*(i)  Applicants Possessed the Claimed Invention*

According to the USPTO, the written description requirement is met by the Applicants if it would be apparent to those skilled in the art or science that the inventor was in possession of the claimed invention at the time of filing the patent application. See Guidelines for Examination of Patent Applications Under the 35 U.S.C. 112 1, 66 Fed. Reg. 4, 1099 (2001). The courts have repeatedly articulated a similar standard. There is no *per se* rule that, to show possession of the claimed invention, the Applicants must have been able to describe the structure of the chemical entities which could be identified in the assay steps.  As the Examiner has stated, sufficient description can be provided not only by disclosure of structure, but also by disclosure of relevant identifying characteristics, i.e., "by other physical and/or chemical properties, by functional characteristics coupled with a known or disclosed correlation between function and structure, or



a by a combination of such identifying characteristics". See Office Action at page 5, citing the Written Description Guidelines. Clearly the courts and the patent office contemplate something other than merely structure alone for the definition of a class of substances *per se*, let alone for describing a method using such substances. In this case, as discussed in greater detail below, substances of structurally diverse types are, and would have been expected to be, useful in practicing the claimed methods. Thus it would be impractical and unreasonable to require a structural definition of each of the diverse kinds of agents useful in practicing the claimed methods. And, importantly, a structural definition would be unnecessary to convey to the reader Applicants' possession of the invention. Possession was manifested by the disclosed discovery of the signaling pathway and ways to identify and use inhibitors thereof. Thus, it is appropriate under the circumstances for Applicants to have defined the method of use with reference to agents identified or characterized by their method of selection or identification, as that inherently defines characteristic properties of useful agents.

The screening assays taught by the present application permit the identification or characterization of substances that modulate NF-κB activity by various mechanisms. And there is no question about Applicants' possession of the screening methods. That is clear from US 6,150,090, which is based on the same specification as the subject application.

By definition, substances identified or characterized by the disclosed assays, irrespective of how widely they may vary from one another in chemical structure, are useful for inhibiting or potentiating (as the appropriate case may be) NF-κB-mediated cellular signaling. No more need be known of the chemical structure of the substance to appreciate its utility in the claimed methods. To the contrary, a person of skill in the art would have reasonably expected that the screening steps of the prior claims would identify a diverse group of substances having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and use covered by the prior claims. That is, a person of skill in the art would have readily appreciated that all modulators of NF-κB would _not_ have the same or similar structure. Even compounds regulating NF-κB by the same mechanism, such as by inhibiting modification or degradation of IκB, would have been expected to include any of a variety of different structures.

Indeed, at the time the present application was filed, there was ample precedent in the scientific literature for identifying structurally diverse agents based on their common activity against a selected biological target. For instance, Weinstein et al. (1989) Am J Hypertens 2:205 review the state of calcium antagonists, and note the identification of calcium antagonists of "very diverse structure." See also Triggle et al. (1983) Circ Res 52: 117. Likewise, Mills et al. (1989) Methods Find Exp Clin Pharmacol 11 Suppl 1: 87 reviews the state-of-the-art of H2-

receptor antagonists, and notes that "numerous compounds with diverse chemical structures have been shown to possess H2-receptor antagonist activity. See also Badger et al. (1984) <u>Int J Immunopharmacol</u> 6:467. The art already recognized many instances wherein structurally unrelated compounds acted on the same target protein(s). Thus, one of ordinary skill in the art would not have doubted applicants' possession of the invention based on the existence of NF-κB modulators of diverse structures, or on the reference in the method claims to such agents identified or characterized in appropriate functional assays.

Applicants' argument is further substantiated by the <u>Declaration of David Baltimore under Rule 1.132 and In re Brana</u>, a copy of which is attached hereto as <u>Exhibit A</u>. Dr. Baltimore points out examples of the types of compounds that have been found, as predicted by the application, to alter NF-κB and/or IκB activity and affect NF-κB mediated gene expression in cells. These compounds are structurally diverse. However, each is characterized by its ability to alter NF-κB signaling activity and to influence NF-κB mediated gene expression. Dr. Baltimore's declaration is not offered to render an insufficient disclosure enabling, rather, they prove that the disclosure was in fact enabling when filed. <u>In re Braña</u>, 51 F2d 1560 (CAFC 1995).

Further to this point, the Examiner's attention is directed to the attached publications of White et al (2000) <u>British Journal of Hematology</u> 110:130 (<u>Exhibit B</u>) and Fujihara et al. (2000) <u>Journal of Immunology</u> 165:1004 (<u>Exhibit C</u>). These references describe the use of compounds which reduce bacterial lipopolysaccharide (LPS) mediated activation of NF-κB signaling activity leading to inhibition of NF-κB dependent gene expression. For instance, Fujihara et al. describe the use of an intracellularly targeted peptide inhibitor of NF-κB nuclear translocation. In particular, they used cell permeable peptides carrying two nuclear localization sequences (NLS) and demonstrated that these peptides inhibited LPS-induced NF-κB nuclear translocation leading, inter alia, to inhibition of expression of the κ Ig light chain gene, a gene whose transcription is regulated by NF-κB. White et al. demonstrate that another polypeptide product, activated protein C, also inhibited LPS-induced activation of NF-κB, leading, *inter alia*, to inhibition of expression of the TNF gene, another gene whose transcription is regulated by NF-κB. Although those two inhibitors of NF-κB signaling activity are each demonstrated to inhibit LPS induction of NF-κB signaling activity and NF-κB-mediated gene transcription, and can reduce the effect of infection, they are clearly very different from one another in structural terms. While published after the priority date of the present application, these references are being offered merely as non-limiting examples to substantiate that the disclosure was in fact enabling when filed. In re Braña, supra. Additional supporting references from the scientific literature are provided in <u>Exhibit D</u> hereto.



Thus, it is evident from the specification and corroborated by the post-filing evidence, that one skilled in the art having read the application when it was filed would have expected, and would have been justified in that expection, that a wide range of structurally diverse substances would be identified or characterized using the assays taught by the present application and would be useful for inhibiting or potentiating NF-κB signaling activity. Moreover, it would be apparent to those skilled in the art that Applicants specifically contemplated that many different classes of substances could be identified or characterized in the subject assays as having such activity, and that such substances could then be used to modify NF-κB mediated signalling in cells, both in vitro and in vivo, as recited by the pending claims. This is believed to be amply borne out in the accompanying In re Braña showing. Although the compounds regulating NF-κB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-κB signal transducing activity.

It is submitted that Applicants' possession of the invention, including the invention defined in claims 188 – 193, would have been evident upon reading the application as filed.

*(ii) The Pending Claims are Enabled*

Long before the earliest priority date of the present application, the applied sciences of formulation and use of new drugs had become a matter of routine experimentation. As a practical matter, that scientific legacy is reapplied, rather than reinvented, in the case of each new drug selected for development. That is true regardless of the particular structure of a substance to be developed. As a matter of Patent Law, the ordinarily skilled artisan reading applicants' disclosure is charged with knowledge of that legacy, and applicants need not and should not dwell in their application on that which is already known in the art.

Applicants contributions include the identification of a very important cellular signal transduction pathway and the disclosure of a number of exemplary assays for finding or characterizing agents which modulate that pathway. When the practitioner selects such an agent, s/he usually need only apply the routine experimentation involved in formulating and using the agent. This is true regardless of the structure of the agent. While drug development is usually time consuming and expensive, it is routine—not undue—experimentation. This is reflected in the commercial reality of high value agreements between companies for the identification of new drug discovery targets, contrasted with the routine drug development work often delegated to relatively low value contract labs.

In short, the routine craft of drug development is well known and applicable across structural lines. Accordingly, Applicants submit that the structural range of agents useful in practicing the method claims does not actually give rise to an enablement deficit.

### (iii) Additional In re Braña references

As mentioned above, the references provided as part of Exhibit D offer additional substantiation under *In re Braña* of the operability of the claimed invention in both *in vitro* and *in vivo* contexts to show, among other things, examples of successful achievement of Applicants' claimed objectives through direct or indirect reduction of NF-kB signal transducing activity. The embodiments described in the attached references range from use of nucleic acid decoys, to expression vectors encoding IκB proteins (wild-type and mutant), to small molecule inhibitors of IκB degradation. In each case, structurally diverse substances were deployed in accordance with Applicants' methods—i.e., to reduce NF-κB activity in cells which were contacted with the agents, both in culture and in animals. Moreover, in none of these references disclosed any peculiar problems in putting into practice the inhibition of NF-kB signaling activity.

### (iv) Precedence set by other issued patents

The pending claims, directed as they are to methods rather than compositions-of-matter, are consistent with claims issuing in a variety of arts. As such, they appear to comport with the PTO's working standards for form, semantics and determination of possession of invention.

With particular regard to claims 188 - 193, Applicants note that there are numerous issued patents in the chemical, mechanical and software arts directed to methods in which a product of one step is passed onto subsequent steps without specifying its structure, noting simply that the product was the thing produced or identified etc. by the preceding step. US Patent 6,171,813 is an example of claims issued in the chemical art in which a product of one step is provided into a next step of the claimed method:

1.  A method of catalysis of at least one substrate into a product in an organic reaction solvent, comprising the steps of:
    (a) obtaining a catalyst comprising an enzyme-surfactant ion pair complex comprising an enzyme and an ionic surfactant capable of forming an ion pair complex with the enzyme, the complex being produced by extracting an aqueous solution of the enzyme with the ionic surfactant and a water immiscible organic solvent,
    (b) combining the catalyst with an organic reaction solvent, comprising an organic solvent and water in an amount sufficient to increase the rate of catalysis relative to a water-free organic reaction solvent, the amount of water ranging from about 0.03% to about 2.5% v/v, and
    (c) allowing catalysis of the at least one substrate into the product.

> 2. The method of claim 1, further comprising recovering the product after catalysis is substantially completed.

Likewise, US Patent 5,666,415 is an example of claims issued in the software art in which a product (the encrypted file) of one step is passed into the next step (decryption) of the claimed method:

> 1. In an information handling system in which secret information is maintained within a first protected environment, a method of transferring secret information from said first protected environment to a second protected environment, said method being performed by one or more authorities, said information within said protected environments being unobtainable in clear form by said one or more authorities, said method comprising the steps of:
>
> establishing within said first and second protected environments a shared secret transport key that is obtainable in clear form only within said first and second protected environments and is unobtainable in clear form by said one or more authorities;
>
> encrypting said secret information within said first protected environment using said transport key to generate encrypted secret information that is obtainable in encrypted form by at least one of said one or more authorities; and
>
> decrypting said encrypted secret information within said second protected environment using said transport key to regenerate the original secret information within said second protected environment, said regenerated secret information being unobtainable in clear form by said one or more authorities.

The Examiner's attention is also directed to US Patent 6,271,197, which includes claims directed to a combination of screening assay with treatment step

> 1. A method for inhibiting growth of a fungal pathogen comprising
> (a) forming a reaction mixture including:
>     (i) a fungal geranylgeranyl transferase (GGPTase);
>     (ii) a GGPTase substrate;
>     (iii) a test compound, under conditions whereunder, in the absence of the test compound, the GGPTase and the GGPTase substrate interact,
> (b) detecting interaction of the GGPTase substrate with the GGPTase,
> wherein a statistically significant decrease in the interaction of the GGPTase substrate and GGPTase in the presence of the test compound, relative to the level of interaction in the absence of the test compound, indicates a potential GGPTase inhibitory activity for the test compound; and
> (c) contacting the pathogen with the test compound identified as having a potential GGPTase inhibitory activity, whereby growth of the fungal pathogen is inhibited.

In those illustrative cases, the inventors' possession of their claimed methods was evident without the need for structural identification of the class of agents used in the claimed method. The inventors were permitted to use normal language to describe their methods, rather than being forced to describe their method without mentioning the agent involved in the method. The same should be true in the subject case.

F. State of Fact Finding by PTO

The final guidelines for section 112 clearly state there is a strong presumption that the specification as filed provides adequate written description support for the claimed invention. See *Guidelines*, 64 Fed. Reg. 71 at page 1105. A disclosure as filed is prima facie adequate. To support a rejection, the PTO has the burden of showing why the Applicant's evidence is



insufficient. In any case where lack of written description is found, the PTO should cite documentary evidence in support of the finding. As expressly stated by the guidelines, where documentary evidence is not available, technical reasoning, as distinguished from legal reasoning, may support the finding when the technical line of reasoning relates to <u>fact finding</u> regarding possession of the invention.

Moreover, the Federal Circuit has recently articulated a standard whereby the PTO must establish a rational connection between the agency's fact findings and its ultimate action. Dickinson v. Zurko, 119 S. Ct. 1816 (1999). In light of the Applicants arguments of record, and the presumption in favor of the Applicants, it is respectfully asserted that the Examiner's maintenance of the present rejection is not supported by substantial evidence, and as such, does not meet the "arbitrary, capricious" standard applied under the "substantial evidence" test of Section 706(2)(E) of the Administrative Procedure Act. The Examiner has not cited any relevant art nor relied on any other fact finding results which rebut the presumption in favor of the Applicants.

F.  <u>Entry of Amendment</u>

Applicants respectfully request that the Examiner enter this Amendment and Response. It is expected that the instant paper should place the present application in condition for allowance. However, if the Examiner maintains the present rejection, it is believed that the arguments provided herein, though supplementing past remarks by the Applicants, can be useful towards fully developing the file history for appeal. It is noted by the Applicants would be severely prejudiced should they be required to refill this application (e.g., as an RCE or CPA) by the loss of potential patent term.

This case reflects a good faith, earnest effort by Applicants to define patentable subject matter commensurate in scope and effect with the significance of the disclosed invention. To bring those efforts to an appropriate conclusion, Applicants have during the course of this important prosecution sought the advice of experienced attorneys at three well known patent law firms. And during that time, Applicants gratefully note, the Examiner has been very helpful and has made a clear effort to advance prosecution.

However, Applicants believe that the criteria used for examining the pending claims of the present application (and analogous claims in other cases) have been shifting over the last several office actions. This is apparently due in part to changing ideas about PTO policies on the Written Description Requirement of §112, or to variability in their application, prior to and



perhaps after the PTO's adoption of the new Guidelines for the Written Description Requirement. In certain instances, the remarks and amendments which Applicants have presented have been rebutted in part by reference to recent announcements on these guidelines. In particular, the most recent office action is the first to articulate the rejection of the pending claims with reference to the Written Description guidelines. It in fact refers to the interim guidelines published in 1999. Since that time, the final guidelines for examination with respect to the written description requirement of 35 USC §112 were published in the Federal Register. 66 Fed. Reg. 1092. The final guidelines included several changes relative to the interim guidelines, and also provide clarifying statements in response to public comment on the interim guidelines. Moreover, the very promulgation of these guidelines evidences a need, perceived by the PTO itself, to impose a consistency of policy or its application—where one was previously lacking.

The past, including the recent past, saw variability in the understanding and application of §112 standards by different examiners, and thus a variability in the understanding of those standards by the public. Consistency has hopefully been achieved through the recent promulgation of official Guidelines combined with educational efforts within the PTO.

In the course of prosecution of this case, applicants and their various attorneys have parsed the language of the office actions and attempted to craft language to overcome the §112 issues noted in the office actions—based on their collective experiences at the PTO, including their experiences with application of Written Description notions by other examiners. It is noted that the present office action identifies for the first time the particular language in the claims to which the Examiner's rejection under 35 USC §112 is drawn. As set forth in the office action, it is the "second part of the method drawn to using an agent" which the Examiner identifies as lacking adequate written description in the specification. That new, more specific guidance from the Examiner, combined with careful study of the Official Guidelines for the Written Description Requirement has given Applicants confidence that the claims 158-188 define patentable subject matter that will meet with the Examiner's approval.

In this regard, we note that MPEP Section 706.07 states that "before final rejection is in order a clear issue should be developed between the examiner and applicant". It is submitted that under the totality of circumstances noted above, the development of a clear issue had been incomplete at the time the last office action issued. Accordingly, Applicants request that the finality of the outstanding office action be reconsidered and withdrawn to provide Applicants a better opportunity to address the rejection in view of the final Written Description guidelines, and present claims which address the particular features to the pending claims which where objected to by the Examiner.



Applicants believe that such an action is required for the development of a clear issue between Applicants and the Examiner, if possible, should appeal be necessary. While Applicants understand that it is to the interest of the applicants as a class as well as to that of the public that prosecution of an application be confined to as few actions as possible, Applicants believe that the present request is consistent with a balance which includes a thorough consideration of the merits of the case.

Finally. as a consequence to the loss of a substantial portion of the patent term because of the early priority date of the instant application, Applicants note that they would be _severely_ prejudiced should they be required to refile this application in order to have these issues considered.

G. Conclusion

In view of the above remarks and the amendments to the claims, it is believed that this application is in condition for allowance. If a telephone conversation with Applicant's Attorney would expedite prosecution of the above-identified application, the Examiner is urged to call the undersigned at (617) 951-7000.

Ropes & Gray                              Respectfully submitted,
One International Place                    ROPES & GRAY
Boston, Massachusetts 02110
Telephone:  (617) 951-7000
Facsimile:  (617) 951-7050
**Customer No.: 28120**

Dated: _____                   Matthew P. Vincent
                                          Registration No.:  36,709



VERSION WITH MARKINGS TO SHOW CHANGES MADE

111.    (reiterated) A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to said gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB.

158.    (new) A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

159.    (new) A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-κB by reducing NF-κB activity in the cell.

160.    (new) A method for reducing the level of expression of a viral gene in a eukaryotic cell by reducing NF-κB activity in the cell.

161.    (new) The method of claim 160, wherein the viral gene is a CMV, HIV or SV40 gene.

162.    (new) A method for reducing the level of expression of a cytokine gene in a eukaryotic cell by reducing NF-κB activity in the cell.

163.    (new) A method for diminishing induced NF-κB-mediated intracellular signaling by reducing NF-κB activity in cells.

164.    (new) A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cell.

165.    (new) The method of claim 164, wherein NF-κB activity in the cell is reduced.

166.    (new) A method for inhibiting, in eukaryotic cells, expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells.

167.    (new) A method for reducing the effects of infection by reducing NF-κB activity in cells.

168.    (new) The method of claim 167, wherein the infection is a viral infection.

169.    (new) The method of claim 167, wherein the infection is a bacterial infection.

170.    (new) A method for reducing the effects of bacterial lipopolysaccharide by reducing NF-κB activity.

171.    (new) A method for reducing bacterial lipopolysaccharide-induced expression of cytokines, which method comprises reducing NF-κB activity.

172.   (new) A method for reducing bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-alpha, which method comprises reducing NF-κB activity.

173.   (new) A method for reducing bacterial lipopolysaccharide-mediated stimulation of immune cells, which method comprises reducing NF-κB activity.

174.   (new) A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells.

175.   (new) A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity by reducing intracellular NF-κB activity.

176.   (new) A method for reducing bacterial lipopolysaccharide-induced translocation of NF-κB comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-kB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB--IκB complexes.

177.   (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

178.   (new) The method of any of claims 158 – 175 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

179.   (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting modification of an IκB protein, which modification otherwise reduces IkB binding to NF-kB.

180.   (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting degradation of an IκB protein.

181.   (new) The method of claim 178, wherein inhibiting passage of NF-κB into the nucleus comprises inhibiting dissociation of NF-κB--IkB complexes.

182.   (new) The method of any of claims 158 – 175 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

183.   (new) The method of any of claims 158 – 176, carried out on mammalian cells.

184.   (new) The method of claim 183, wherein the mammalian cells are human cells.

185.   (new) The method of claim 183, carried out on immune cells.

186.   (new) The method of claim 183, carried out on lymphoid cells.

187.    (new) The method of claim 183, carried out on liver cells.

188.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to decrease the level of NF-kB not bound  in an NF-kB:IkB complex

189.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the dissociation of NF-kB---IkB complexes.

190.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the modification of IkB.

191.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit the degradation of IkB.

192.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to inhibit  the passage of NF-kB into the nucleus of cells.

193.    (new)  A method of any of claims 158 - 175, wherein the NF-kB activity is reduced by administration of an agent which had been found to reduce the binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB-mediated signal transduction.

# EXHIBIT 54

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of: Baltimore et al.

Serial No.: 08/464,364

Filed: June 5, 1995

For: *Nuclear Factors Associated With Transcriptional Regulation*

Attorney Docket No.: APV-035.03

        (Formerly MIT416A3FZ)

Group Art Unit: 1636

Examiner: Schwartzman

RECEIVED

JAN 27 1999

MATRIX CUSTOMER
SERVICE CENTER

Assistant Commissioner for Patents

Washington, D.C. 20231

---

### Certificate of Facsmile

I hereby certify that this correspondence is being transmitted by facsimile to: Assistant Commissioner for Patents, Washington, D.C. 20231 on the date set forth below.

1/14/99

Date of Signature and Mail Deposit

By _____

    Matthew P. Vincent

---

## Response and Amendment

Dear Sir:

In response to the non-final office action mailed July 14, 1998, please enter the following remarks and amendments.

Serial No.: 08/464,364                     - 2 -

<u>In the Claims:</u>

**For the Examiner's convenience, all of the pending claims are reiterated below.**

57.     (*amended*) A method for altering expression, in a <u>mammalian</u> cell, of a gene, <u>the</u> <u>transcription of which is regulated by NF-κB</u> [whose transcriptional activity is altered by binding of NF-κB to the enhancer of said gene], comprising [controlling] <u>altering</u> the level of NF-κB–IκB complex present in the cytoplasm of said cell with an agent that binds [an] <u>a</u> NF-κB protein or an IκB protein and alters the association between the two proteins <u>and alters expression of the gene</u>.

58.     (*amended*) A method of [reducing] <u>inhibiting</u> expression, in a <u>mammalian</u> cell, of a gene, <u>the transcription of which is dependent</u> [that is transcriptionally-dependent] on a DNA binding activity of [an] <u>a</u> NF-κB protein, the method comprising inhibiting the DNA binding activity of the NF-κB protein by contacting the cell with an agent which (i) inhibits phosphorylation of an IκB protein and/or (ii) prevents degradation of an IκB protein, which IκB forms a transcriptionally inactive complex with the NF-κB protein, <u>wherein the agent inhibits expression of the gene</u>.

59.     (*amended*) A method of activating NF-κB-dependent transcription in a <u>mammalian</u> host cell, comprising contacting the host cell with a substance which causes dissociation of NF-κB–IκB complexes and promotes NF-κB-dependent transcription.

61.     (*amended*) A method of <u>inducing DNA-binding and nuclear translocation of NF-κB</u> [causing activation of NF-κB-dependent transcription precursor,] present in the cytosol of a <u>mammalian</u> host cell, [the NF-κB precursor being an NF-κB–IκB complex,] comprising treating the cell with a substance which causes dissociation of [the] NF-κB–IκB <u>complexes</u>, resulting in induction of DNA-binding activity and nuclear translocation of the NF-κB present in the complex.

62.     (*amended*) A method of inhibiting expression of human immunodeficiency virus DNA in a <u>human</u> host cell infected with human immunodeficiency virus DNA, comprising contacting the infected cell with <u>a nucleic acid decoy including a κB</u> <u>binding site that binds to NF-κB, which decoy inhibits</u> [an agent that prevents] binding

Serial No.: 08/464,364                - 3 -

of NF-κB to the transcriptional control elements of the human immunodeficiency virus and inhibits expression of human immunodeficiency virus DNA.

63.    (*amended*) A method of [claim 62 wherein binding of NF-κB to the transcriptional control elements is prevented by increasing formation of complexes of the NF-κB and one or more IκB proteins] inhibiting expression of human immunodeficiency virus DNA in a human host cell infected with human immunodeficiency virus DNA, comprising contacting the infected cell with an agent that prevents binding of NF-κB to the transcriptional control elements of the human immunodeficiency virus, which agent increases the stability of the IκB protein and inhibits expression of human immunodeficiency virus DNA.

93.    (*reiterated*) The method of claim 63, wherein the agent inhibits phosphorylation of the IκB protein.

✢ **Please cancel claims 94, 95 and 96 without prejudice**

97.    (*amended*) The method of claim 59, wherein the substance binds [an] a NF-κB protein or IκB protein and disrupts NF-κB–IκB complexes.

98.    (*amended*) The method of claim 59, wherein the substance decreases the stability of IκB.

99.    (*reiterated*) The method of claim 98, wherein the substance causes degradation of IκB.

100.    (*reiterated*) The method of claim 59, wherein the substance stimulates phosphorylation of IκB.

101.    (*reiterated*) The method of claim 59, 97, 98, 99, or 100, wherein the cell is a mammalian cell.

102.    (*reiterated*) The method of claim 61, wherein the substance is an agent which binds NF-κB protein or IκB protein.

Serial No.: 08/464,364                 - 4 -

103.  (amended) ~~The method of claim 61, wherein the substance decreases the stability of IκB.~~

104.  (reiterated) The method of claim 103, wherein the substance causes degradation of IκB.

105.  (reiterated) The method of claim 61, wherein the substance stimulates phosphorylation of IκB.

106.  (reiterated) ~~The method of claim 61, 102, 103, 104, or 105, wherein the cell is a mammalian cell.~~

107.  (reiterated) The method of claim 58, wherein the agent inhibits phosphorylation of IκB.

108.  (reiterated) The method of claim 107, wherein the agent inhibits degradation of the IκB protein.

109.  ~~The method of claim 58, 107 or 108, wherein the cell is a mammalian cell.~~

110.  (reiterated) The method of claim 109, wherein the cell is a human cell.

111.  (amended) A method of [reducing] inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to said gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes [an] a NF-κB binding site that binds to NF-κB.

112.  (amended) A method for altering NF-κB-dependent gene transcription in a mammalian cell, comprising
      (a) identifying an agent by its ability to
            (i)   alter the level of phosphorylation [phophorylation] of an IκB protein,
            (ii)  alter the stability of an IκB protein,
            (iii) alter the nuclear localization of [an] a NF-κB protein,

193                              D

Serial No.: 08/464,364          - 5 -

    (iv)  alter the level of protein:protein complexes including NF-κB and IκB proteins, and/or

    (v)  alter the DNA binding activity of NF-κB,

which agent alters NF-κB-dependent gene transcription in a cell; and

    (b) [treating] contacting a mammalian cell with an agent identified in (a)[, or an analog derived therefrom,] in an amount sufficient to alter NF-κB-dependent gene transcription in the cell.

113. (*reiterated*) The method of claim 112, wherein the agent inhibits NF-κB-dependent gene transcription.

114. (*reiterated*) The method of claim 112, wherein the agent potentiates NF-κB-dependent gene transcription.

115. (*reiterated*) The method of claim 112 or 113, wherein the agent inhibits phosphorylation of an IκB protein.

116. (*reiterated*) The method of claim 112 or 113, wherein the agent increases the stability of an IκB protein.

117. (*amended*) The method of claim 112 or 113, wherein the agent inhibits nuclear localization of [an] a NF-κB protein.

118. (*amended*) The method of claim 112 or 114, wherein the agent potentiates nuclear localization of [an] a NF-κB protein.

119. (*amended*) The method of claim 112, wherein the agent inhibits formation of protein:protein complexes including NF-κB and IκB proteins.

120. (*reiterated*) The method of claim 112 or 113, wherein the agent inhibits a DNA-binding activity of NF-κB.



Serial No.: 08/464,364                    - 6 -

121.    (*reiterated*) The method of claim 120, wherein the agent is a decoy molecule.

122.    (*reiterated*) The method of claim 112, wherein the agent is identified in an assay using purified or semipurified NF-κB.

123.    (*reiterated*) The method of claim 112, wherein the agent is identified in an assay using a recombinant NF-κB protein.

124.    (*reiterated*) The method of claim 112, wherein the agent is identified in an assay using purified or semipurified IκB.

125.    (*reiterated*) The method of claim 112, wherein the agent is identified in an assay using a recombinant IκB protein.

126.    (*amended*) The method of claim 112, wherein the agent is identified in an assay using a fusion protein including all or a portion of [an] a NF-κB or IκB protein.

127.    (*reiterated*) The method of claim 112, wherein the agent is identified in an transcription assay using a reporter gene construct comprising a reporter gene operably linked to a κB element.

128.    (*amended*) The method of claim 112, 122, 123, 123, 125 or 126, wherein the agent is identified in [an] a competitive binding assay using [an] a NF-κB or IκB protein, or portion thereof.

129.    (*reiterated*) The method of claim 112, wherein the agent is identified in a gel shift assay.

130.    (*reiterated*) The method of claim 112, 124, 125 or 126, wherein the agent is identified in an assay which directly detects phosphorylation of an IκB protein, or portion thereof.

131.    (*reiterated*) The method of claim 112, 124, 125 or 126, wherein the agent is identified in an assay which directly detects stability of an IκB protein, or portion thereof.

Serial No.: 08/464,364                  - 7 -

132.  (*amended*) The method of claim 112, 122, 123 or 126, wherein the agent is identified in [an] a nuclear localization assay which directly detects [an] a NF-κB protein.

133.  (*reiterated*) The method of claim 112, wherein the treated cell is part of a cell culture.

134.  (*reiterated*) The method of claim 112, wherein the treated cell is part of an animal.

135.  (*amended*) A method for altering an activity of [an] a NF-κB gene product in a mammalian cell comprising

(a) identifying an agent by its ability to bind to [an] a NF-κB protein or an IκB protein, which agent alters an activity of the NF-κB protein in a cell; and

(b) treating a mammalian cell with an agent identified in (a), in an amount sufficient to alter the activity of NF-κB in the cell,

to thereby modulate the activity of NF-κB in the cell.

136.  (*reiterated*) The method of claim 135, wherein modulating the activity of NF-κB in a cell comprises modulating the interaction of NF-κB with a protein or nucleic acid.

137.  (*amended*) The method of claim 136, wherein [the molecule is (an)] modulating the activity of NF-κB in a cell comprises modulating the interaction of NF-κB with an IκB protein.

138.  (*amended*) The method of claim 136, wherein [the molecule is an] modulating the activity of NF-κB in a cell comprises modulating the interaction of NF-κB with a NF-κB protein.

139.  (*reiterated*) The method of claim 136, wherein the agent is a decoy molecule.

140.  (*amended*) The method of claim 139, wherein the decoy molecule comprises [an] a NF-κB binding site.

141.  (*reiterated*) The method of claim 135, wherein modulating the activity of NF-κB is a cell comprises modulating the activity of IκB.

Serial No.: 08/464,364                - 8 -

*Sub Eg*

142.  ~~(reiterated) The method of claim 141, wherein modulating the activity of IκB comprises modulating the stability of IκB.~~

143.  (*reiterated*) The method of claim 141, wherein modulating the activity of IκB comprises modulating phosphorylation of IκB.

144.  (*reiterated*) The method of claim 136, wherein identifying the agent which modulates NF-κB activity comprises contacting a cell with a test agent, said cell comprising a gene operably linked to at least one NF-κB binding site, and comparing expression of the gene in the cell contacted with the test agent, relative to a cell which was not contacted with the test agent, wherein a difference in the expression of the gene in the cell contacted with the test agent relative to a cell which was not contacted with the test agent indicates that the test agent modulates the activity of NF-κB.

145.  (**amended**) The method of claim 136, wherein identifying a̲n agent which modulates NF-κB activity comprises
      (a)  contacting [an] a̲ NF-κB protein [or gene] or an IκB protein [or gene] with a test agent; and
      (b)  comparing the activity of the NF-κB or IκB protein in the presence or in the absence of the test agent, wherein a difference in NF-κB or IκB activity in the presence relative to the absence of a test agent indicates that the test agent modulates NF-κB or IκB activity.

146.  (**amended**) The method of claim [146] 145̲, wherein the NF-κB or IκB protein is a purified protein.

147.  (*amended*) The method of claim 135, wherein modulating the activity of NF-κB is increasing the transcriptional̲ activity of the̲ NF-κB protein̲.

148.  (*amended*) The method of claim 135, wherein modulating the activity of NF-κB is decreasing the transcriptional̲ activity of the̲ NF-κB protein̲.



Serial No.: 08/464,364    - 9 -

149.    (*reiterated*) The method of claim 135, wherein the cell is in an animal.

150.    (*amended*) A method for inhibiting the activity of NF-κB in a <u>mammalian</u> cell, comprising

> (a)    identifying a<u>n</u> agent which inhibits IκB phosphorylation; and
>
> (b)    treating a <u>mammalian</u> cell with the agent of (a) in an amount sufficient to inhibit the activity of NF-κB in the cell,
>
> to thereby inhibit the activity of NF-κB in the cell

151.    (*reiterated*) The method of claim 140, wherein the NF-κB binding site includes a nucleotide sequence GGGRHTYYHC.

152.    (*amended*) The method of claim 140 <u>or 151</u> [of 152], wherein the decoy molecule includes at least two tandemly arranged NF-κB binding sites.

153.    (*amended*) The method of claim 62, wherein the agent is a gene construct for expressing an IκB polypeptide, <u>which IκB polypeptide</u> binds to and inhibits NF-κB from binding to the transcriptional control elements.

154.    ~~(*amended*) The method of claim 112, 135 and 151, wherein the agent has not previously been identified as a pharmaceutical agent~~

### *Remarks*

Claims 58, 59, 61-63, 97, 98, 103, 111, 112, 117-119, 126, 128, 132, 135, 138, 140, 145, 146-148, 150, 152-154 have been amended, claims 94-96 have been canceled. No new subject matter has been added.

### Claim formalities

Applicants have amended the claims to address the Examiner's objections to the claims set forth at pages 2 and 3 of the outstanding office action. In particular, claims 146 and 152 have been amended to correct obvious typographical errors of claim



Serial No.: 08/464,364               - 10 -

dependency. Claims 57, 58, 98, 103, 112, 128, 132, 135 and 152 have been amended to correct grammatical and typographical errors.


## The claims comply with 35 USC §112, first paragraph

The Examiner has rejected claims 57, 58, 97-110 and 112-154 under section 112 on the grounds that the claimed subject matter is not enabled. Applicants respectfully traverse the Examiner's rejection.

One prong of the Examiner's rejection of claims 57, 58, 97-110 and 112-154 is based on the viewpoint that the specification is speculative and as such

> The specification speculates that IκB may become phosphorylated to release NK-κB and that uncomplexed IκB may be unstable based on the facts that NF-κB activating signals such as phorbol esters work through protein kinase C and that following activation there is no free IκB in the cytoplasm (pages 71-73). These speculations are not considered to provide adequate direction to the skilled artisan to screen for agents that modulate IκB phosphorylation or stability as such speculation as to the mechanism of NF-κB activation, in the absence of any evidence in support of the mechanism or guidance toward exogenously regulating the phosphorylation state or stability of IκB, is not sufficient to teach the skilled artisan to search for and use the claimed agents.

Applicants contend that the specification, read as a whole, provides adequate direction to the skilled artisan to screen for agents that modulate IκB phosphorylation or stability or alter other activities associated with NF-κB activation. For instance, Applicants assert that one of ordinary skill in the art would have reasonably concluded from the evidence and other teachings of the instant application that such phenomena as the interaction between NF-κB and IκB, phosphorylation of IκB, and destabilization of IκB, were real, that they occurred in whole cells, and that they were part of the biological function of NF-κB. Moreover, the skilled artisan would have, and indeed did, accept the evidence provided in the instant application as persuasively supporting Applicants' position that artificial induction of IκB, or inhibition of IκB phosphorylation or other means for preventing destabilization of IκB could be used as a means for inhibiting such NF-κB activities as its regulation of gene transcription.



Serial No.: 08/464,364                - 11 -

For example, the specification plainly teaches, and provides the experimental data to support, that IκB converts NF-κB to an inactive precursor, e.g., which inhibits the transcriptional activity of NF-κB, in the form of a IκB:NF-κB protein complex.

Experimental evidence provided in the present application which supports the pending claims directed to, for example, screening for agents that modulate IκB phosphorylation or stability, include the following:

- Induction of NF-κB takes place in the absence of new protein synthesis. NF-κB induction, therefore, involves the conversion of a pre-existing precursor to an active form. Summarized in the Specification at page 36 and 73.

- Cytosolic extracts from uninduced cells can be treated in vitro with dissociating agents to unmask very high levels of NF-κB activity. Summarized in the Specification at page 55-57.

- The inhibitory activity was shown to be due to IκB proteins, and could be isolated by chromatography. Moreover, preparations of IκB can inhibit NF-κB derived from cells which have been activated. The inactivation of NF-κB is the results of simple physical affinity of NF-κB and IκB, not an enzymatic activity of IκB. Summarized in the Specification at page 36 and 61-76.

- Inactivation of NF-κB by IκB is reversible, saturable and specific. Summarized in the Specification at page 66

- Treatment with TPA, which activates NF-κB, involves alteration of IκB but not NF-κB. After TPA stimulation, no IκB is found in the cell. Whereas the activated NF-κB remains sensitive to subsequent treatment with unmodified IκB. Summarized in the Specification at page 71.

- In activated cells, IκB becomes modified to a form that no longer binds to NF-κB. Additionally, IκB can be specifically inactivated as an inhibitor of NF-κB upon treatment with a proteolytic activity. Summarized in the Specification at page 40 and 64-65.

- Inactivation of IκB in whole cells involves phosphorylation, as demonstrated by treatment of cells with phorbol esters – which were understood in the art to activate protein kinases. Summarized in the Specification at page 72.



Serial No.: 08/464,364                    - 12 -

Such experimental results, combined with an understanding of similar mechanisms of action for other signal transduction pathways, would be reasonably understood by those of ordinary skill in the art to be sufficiently convincing of a mechanism for NF-κB activation involving phosphorylation of IκB and subsequent proteolytic degradation of the modified protein. Indeed, publication by the Applicants of the descriptions and results set forth in the present application in peer-reviewed scientific journals have been widely accepted in the field as teaching the mechanism of action for IκB set forth in this application. Indeed, this mechanism of action is still accepted today. See, for example, Applicants' article Baeuerle and Baltimore (1988) Science 242:540, and Ghosh and Baltimore (1990) Nature 344:678, and articles and patents which reference those papers, such as: Shao-Cong et al. (1993) Science 259: 1912 (exhibit A); Gilmore et al. (1993) TIGS 9:427 (exhibit B); Siebenlist et al. (1994) Ann Review Cell Biol 10:405 (exhibit C); Finco et al. (1995) Immunity 3:263-272 (exhibit D); Jung et al. (1995) Science 268:1619 (exhibit E); and US Patents 5,723,300 (exhibit F) and 5,814,482 (exhibit G).

Another prong of the Examiner's arguments is based on the Examiner's assertion that

> the specification suggests that the cloning of NF-κB and IκB will allow the development of assays for inhibitors and activators of these proteins ... but does not disclose any general assay methods and does not teach any specific assays to detect agents which alter protein phosphorylation, protein stability, protein degradation or protein binding .... Since the specification does not teach how to identify the agents to be used in the claimed methods, does not teach how to use the agents in the claimed methods and does not even teach that these agents should be looked for, the specification does not provide sufficient guidance to support the present claims .... No working examples of the claimed method are disclosed in the specification.

Applicants disagree. It is apparent from even a general reading of the specification and original claims, relates to the identification (and subsequent use) of compounds which can, as appropriate, inhibit or potentiate NF-κB function in, for example, gene expression. It would be evident to one skilled in the art, therefore, that each of the assays described in the specification in the context of elucidating the mechanism by which NF-κB acts are also useful as drug screening assays for the identification of exogenous agents which affect that mechanism. In this context, support for individual claims, other support for use of assays in a



Serial No.: 08/464,364                - 13 -

manner consistent with the pending claims can be found in the specification, *inter alia*, as
follow:

- at page 6, the specification states that the invention relates to *"drugs which enhance or block the activity of NF-κB or of the NF-κB inhibitor (e.g., IκB)"*;

- at page 7, the specification states *"the subject invention further relates to methods of regulating (inducing or preventing) activation of NF-κB, controlling expression of the immunoglobulin kappa light chain gene and other genes whose expression is controlled by NF-κB"*;

- at page 8, the specification states *"[a]lteration or modification, whether to enhance or reduce NF-κB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-κB activity"*;

- at page 9, the specification states *"the cloned genes permit development of assays to screen for agonists or antagonists of gene expression and/or of the factors themselves. Further, because the binding site for NF-κB in the kappa gene is clearly defined, an assay for blockers or inhibitors of binding is available, as is an assay to determine whether active NF-κB is present"*;

The Examiner's attention is also directed to page 23:lines 2-29, page 55:lines 5-16, page 74:lines
1-14; page 87:line 1 - page 88:line 17 and claims 57-63 as originally filed.  These and other
teachings of the instant application provide ample guidance and sufficient written description
for the pending claims.

As the Examiner admits, the level of skill in the art is high.  Office Action at page 7.
Those skilled in the art would be able to carry out a variety of different drug screening assays
based on the disclosure and experience developed in the art.  As of the priority date of the
present application, the art recognized generic formats for, e.g., detecting inhibitors of protein
phosphorylation, detecting inhibitors of protein degradation, detecting inhibitors of
protein:protein interaction, detecting inhibitors of protein localization in a cell, detecting
inhibitors of protein:DNA interaction and the like.  The NF-κB and IκB proteins are
sufficiently well characterized by the subject application that the skilled artisan would be able
to provide such assays involving one or both of the proteins without much guidance beyond
the identification of the mechanism of action, which the present application provides.  Indeed,
Applicants allege the application provides more disclosure than would be required.  Moreover,



those skilled in the art would recognize that assays described in the present application for discerning the mechanism of action of NF-κB and IκB could be readily adapted for screening small molecules and the like for their ability to modify an NF-κB pathway.

Finally, with respect to the rejection of claims 57, 58, 97-110 and 112-154, the Examiner argues that

> [t]he quantity of experimentation necessary to carry out the claimed invention is high as the skilled artisan could not rely on the prior art or the present specification to teach how to carry out the claimed methods. One of skill in the art would first have to determine if IκB binding to NF-κB or IκB is regulated by phosphorylation and a change in stability of IκB as the specification does not teach this. One would then have to develop assays for identifying agents which modulate the phosphorylation or stability of IκB or which can bind to NF-κB or IκB and alter their interaction as the specification does not teach this. One would then have to determine how to administer the identified agents, which could be of any structure (e.g., nucleic acid, protein, organic molecule), to any cell of any organism *in vitro* or *in vivo* as the specification does not teach this.

Applicants disagree. Issues relating to the mechanism of action of IκB are addressed above, and elsewhere in the present response. The types of experimentation described by the Examiner for development of drug screening assays would be considered to be routine, not undue. As Applicants have argued in the present response and the response of 13 April 1998, generic drug screening techniques based on detecting the type interactions, modifications and biological activity as is involved in the claimed assays were well known in the art.

Furthermore, subsequent publications by the inventors and others bear out the assertions made in the instant application and address the Examiner's concerns. For instance, Gehrt et al. (1998) J Antibiot 51: 455-63, entitled *"Cycloepoxydon, 1-hydroxy-2-hydroxymethyl-3-pent-1-enylbenzene and 1-hydroxy-2-hydroxymethyl-3-pent-1,3-dienyl-benzene, new inhibitors of eukaryotic signal transduction"* (abstract attached hereto as exhibit H) describes the screening, and identification of inhibitors of NF-κB. Certain of the compounds are understood to inhibit NF-κB activity by inhibiting IκB phosphorylation. The screening technique, incidentally, utilize an NF-κB-responsive reporter gene, as is described in the present application.



USSN 08/464,364                              - 15 -                         Group Art Unit: 1636

Fiedler et al. (1998) <u>Am J Respir Cell Mol Biol</u> 19:259, entitled *"Inhibition of TNF-alpha-induced NF-kappaB activation and IL-8 release in A549 cells with the proteasome inhibitor MG-132"* (abstract attached as exhibit I) demonstrates that the proteasome inhibitor N-cbz-Leu-Leu-leucinal(MG-132) can inhibit "proteasome-mediated IkappaB degradation [which] results in inhibition of TNF-alpha induced IL-8 production in A549 cells by limiting NF-kappaB-mediated gene transcription". Ray et al. (1995) <u>J Biol Chem</u> 270:10680 and Cai et al. (1997) <u>J Biol Chem</u> 272:96 (previously made of record) each teach that NF-κB-dependent gene transcription can be inhibited, *in vitro*. Cai et al. show, for example, NF-κB-dependent gene transcription can be inhibited in the human breast carcinoma MCF7 cells by overexpression of a recombinant IκB gene. Esslinger et al. (1997) <u>J Immunol</u> 158:5075 (previously made of record) demonstrate inhibition of NF-κB-dependent gene transcription, *in vivo*, in transgenic mice engineered to overexpress an IκB gene. Applicants note that the above-referenced articles, though published after Applicants' filing date, are offered merely to substantiate the credibility of the asserted enablement of the subject invention with respect to other embodiments within the scope of the claims. These references are not offered to render an insufficient disclosure enabling, rather, they prove that the disclosure was in fact enabling when filed. <u>In re Brana</u>, 51 F2d 1560 (CAFC 1995).

Finally, the Examiner has offered no evidence, nor cited any prior art, which would tend to support his argument. If the Examiner maintains this rejection, Applicants respectfully request that record be more clearly developed as to the basis of these assertions so that Applicants can specifically address the Examiner's concerns.

□□□

The Examiner's rejection of claims 145-148 at page 10 of the outstanding office action are believed to overcome by amendment of those claims.

□□□

Applicants also contest the Examiner's rejection of claims 122, 124 and 146 on the grounds that the specification "fails to teach how to completely purify either [NF-κB or IκB] protein". The specification sets forth ample guidance for obtaining purified preparations of the NF-κB or IκB proteins, including working examples. For example, at page 65, and referring to Figure 35, the specification describes the isolation of the subject proteins by gel



filtration and sedimentation through a glycerol gradient. At page 175, the specification describes the isolation, and renaturation, of NF-κB from an SDS-polyacrylamide gel. The purified, renatured NF-κB was demonstrated to have κB-specific DNA binding activity.

Moreover, in light of the teachings of the present specification, one of ordinary skill in the art would be able to purify NF-κB and IκB by other methods using no more than routine experimentation. The specification provides a wide range of information about the characteristics of the NF-κB and IκB proteins which would aid greatly in purification protocols. For instance, the specification teaches molecular weight characteristics, protein-protein binding and (for NF-κB) protein-DNA binding characteristics and the like, as well as many assays for readily detecting the activity of NF-κB and IκB proteins. With such vital information available, the skilled artisan would reasonably expect s/he could successfully adapt known protein purification techniques to the purification of NF-κB or IκB. In general, purification techniques of the art, while tedious in some instances, require no more than routine experimentation, and therefore fall within the permissible standard of enablement under section 112, first paragraph. For instance, the specification teaches the generation of antibodies to the proteins. Such antibodies could be used to generate immunoaffinity columns, as was known to do in the art, which could be used to purify the proteins. Likewise, affinity purification of IκB by immobilized NF-κB would be envisaged as a method for purifying IκB proteins. Likewise, the present application teaches how to make recombinant forms of the proteins. As of the priority date of the present application, an array of techniques were known in the art for isolating and purifying recombinant protein.

□□□

The Examiner has also rejected certain claims, although they are not enumerated in the outstanding office action, on the general grounds that specification does not adequately direct the artisan to practice the drug screening assays of the pending claims nor teach that the NF-κB pathway can be manipulated by addition of exogenous agents. See pages 11-14 of the outstanding office action. Applicants respectfully dispute the Examiner's basis for these rejections. The specification provides ample guidance for identifying a variety of different agents, such as peptides, oligonucleotides and small organic molecules, which alter NF-κB function(s) in whole cells

As part of his argument, the Examiner states



the knowledge of those skilled in the art regarding says for identifying
such compounds cannot be relied on to enable methods using such agents
[to alter NF-κB and IκB activities]

However, Applicants discussion in their response of 13 April 1998 of techniques known in the art for, e.g., for assay formats to detect inhibitors of phosphorylation, proteolytic degradation, etc, was merely to illustrate the general guidance in the art.  It is Applicants position that the successes described for other drug screening efforts of the prior art provides a reasonable expectation to those of ordinary skill in the art that they would be successful in finding agents which are useful as inhibitors or activators of NF-κB dependent gene transcription as described the present application.

That is, in addition to those drug screening assays specifically enumerated in the application, Applicants contend that, at the time the present application was filed those skilled in the art, in light of the teachings of the present application, would have understood that they could *adapt* any of a variety of drug discovery techniques already known in the art for use in the subject invention as means for identifying agents which, as the application directs *inter alia*, alter the level of expression of an NF-κB protein, alter the level of expression of an IκB protein, alter the level of phophorylation of an IκB protein, alter the stability of an IκB protein, alter the nuclear localization of an NF-κB protein, alter the level of protein:protein complexes including NF-κB and IκB proteins, and/or alter the DNA binding activity of NF-κB. These assay systems could be based on whole cells, lysates and/or purified protein preparations.   The art, for example, provides the general guidance for drug screening assays designed to detect inhibitors or potentiators of a transcriptional factor by monitoring the level of expression of a reporter gene.  Assays were also known in the art, and provide general guidance for the practice of drug screening assays described in the instant application, for detecting agents which inhibit protein degradation or protein-protein interactions. The art also taught a number of assays for detecting changes in phosphorylation of intracellular proteins upon treatment of a cell with a small organic molecule, protein, or other agent likely to be tested in a drug screening assay.  Given the extensive characterization in the specification of NF-κB and IκB, and their biological activities, such assays as described in the art could be readily adapted for detecting agents which altered, e.g., NF-κB dependent gene transcription in manners set forth in the pending claims.

Applicants also assert that, as of the effective filing date for each of the pending claims, the art was replete with examples of the development of similar *classes* of pharmaceutical



agents, e.g., kinase inhibitors, proteolysis inhibitors, and inhibitors of protein-protein or protein-DNA interactions. Thus, for example, the use of compounds which inhibit phosphorylation, proteolysis, etc, as therapeutic compounds was well known in the art prior to the effective priority date. Thus, for example, upon identifying an agent which alters the biological activity of NF-κB, one skilled in the art would possess a reasonable degree of confidence that such an agent could be used to regulate NF-κB dependent gene transcription *in vitro* and *in vivo*, and such practice would require no more than routine experimentation.

The Examiner also argues that

> the knowledge of those skilled in the art cannot be relied on to make the long leap from disclosure in the specification that IκB <u>might</u> be phosphorylated and IκB <u>might</u> be unstable and that these factors <u>might</u> be related to the mechanism of NF-κB activation to the claimed invention of searching for agents which alter the phosphorylation and stability of IκB and using such agents to alter NF-κB activation. Nowhere in the specification is it disclosed that the interaction of NF-κB and IκB is dependent on the stability of IκB and that the stability of that protein is in turn dependent, at least in part, on its state of phosphorylation. [emphasis original]

It appears that this argument stems from the Examiner's view that such functions of NF-κB and IκB were not taught by the specification but were "only guessed at". In this regard, the Examiner has pointed out that specification couches certain statements in terms of "reasonable hypothesis" or "is apparently unstable". With all due respect, Applicants note that their application clearly discloses that complexation with IkB inhibits NF-kB activity, but that TPA blocks that activity by altering IkB. Since TPA is known to lead to protein phosphorylation, one of ordinary skill in this art would reasonably conclude, and in fact did conclude (see exhibits cited above) that that alteration comprised phosphorylation. For example, see the Specification at pages 71 - 72. The fact that applicants expressed this using the language of scientific modesty does render this important part of the teaching insufficient.

□□□

The Examiner's rejection of claims 62, 63, 95 and 96 under section 112 are believed to obviated by the amendment of claims 62 and 63, and cancellation of claims 94-96. However, the subject amendments were made merely to expedite prosecution of the present application.



USSN 08/464,364                          - 19 -                     Group Art Unit: 1636

For those reasons set forth in the record for other methods of inhibiting NF-κB transcriptional activity, Applicants' believe that the cancelled claims were fully enabled.

## The claims comply with 35 USC §112, second paragraph

The Examiner has rejected claims 57, 58, 97-110 and 112-154 under section 112 on the grounds that the claimed subject matter is not enabled. Applicants respectfully traverse the Examiner's rejection.

## The claimed subject matter is patentable over the art

Applicants note with appreciation that the Examiner has deemed the claimed subject matter to be patentable over the art of record.

## Conclusion

In view of the above remarks and the amendments to the claims, it is believed that this application is in condition for allowance. If a telephone conversation with Applicant's Attorney would expedite prosecution of the above-identified application, the Examiner is urged to call the undersigned at (617) 832-1000.

Respectfully submitted,
FOLEY, HOAG & ELIOT LLP

By: _____

Matthew P. Vincent
Attorney for Applicants
Reg. No. 36,709

Date: 1/14/98
One Post Office Square
Boston, MA 02109
Telephone: (617) 832-1000
Facsimile: (617) 832-7000



# EXHIBIT 55



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/464,364 | 06/05/95 | BALTIMORE | D | MIT-4167-A3F |

HM11/0714

PATENT GROUP
FOLEY, HOAG AND ELIOT, LLP
ONE POST OFFICE SQUARE
BOSTON MA 02109

| EXAMINER |
|---|
| SCHWARTZMAN, R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1636 | #21 |

DATE MAILED: 07/14/98

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

1- File Copy

| | Application No. 08/464,364 | Applicant(s) Baltimore et al. |
|---|---|---|

**Office Action Summary**

| Examiner Robert Schwartzman | Group Art Unit 1636 |
|---|---|

☒ Responsive to communication(s) filed on _Jun 11, 1998_ .

☐ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, **prosecution as to the merits is closed** in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ___3___ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) _57-59, 61-63, and 93-154_ is/are pending in the application.

Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) _57-59, 61-63, and 93-154_ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐ approved ☐ disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) _____ .

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). ___19___

☐ Interview Summary, PTO-413

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- SEE OFFICE ACTION ON THE FOLLOWING PAGES ---

Serial Number: 08/464,364                                                    Page 2

Art Unit: 1636

# DETAILED ACTION

This Office action is in response to the amendment filed June 11, 1998.  Claims 64-66 and 89-92 have been canceled and new claims 93-154 have been added.  Note that the new claims numbered as 94-155 have been renumbered under 37 CFR 1.126 as 93-154.  Claims 57-59, 61-63 and 93-154 are pending in this application.

## *Transitional After Final Practice*

Since this application is eligible for the transitional procedure of 37 CFR 1.129(a), and the fee set forth in 37 CFR 1.17(r) has been timely paid, the finality of the previous Office action is hereby withdrawn pursuant to 37 CFR 1.129(a).

## *Claim Objections*

Claims 146 and 152 are objected to as each claim is dependent from itself.  In the interest of compact prosecution claim 146 has been examined as if it is dependent from claim 145 and claim 152 has been examined as if it is dependent from claims 140 and 151.

Serial Number: 08/464,364                                                          Page 3

Art Unit: 1636

Claim 154 is objected to under 37 CFR 1.75(c) as being in improper form because a multiple

dependent claim should refer to other claims in the alternative only.  See MPEP § 608.01(n).  In

the interest of compact prosecution claim 154 has been examined as if it were dependent from

claims 112, 135 or 151.

The claims contain numerous grammatical and typographical errors, for example:

Claim 57, line 4, "an NF-κB"

Claim 58, lines 2-3, "an NF-κB"

Claim 98, line 1, "the substance decrease"

Claim 103, line 1, "the substance decrease"

Claim 112, lines 2 and 10, "a agent"

Claim 128, line 2 "an competitive"

Claim 132, line 1, "an nuclear"

Claim 135, lines 2 and 4, "a agent"

Claim 152, line 1, "claim 140 of 152"

A review of the claims and correction of such errors is required.

Serial Number: 08/464,364                                                    Page 4

Art Unit: 1636

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and
> process of making and using it, in such full, clear, concise, and exact terms as to enable any
> person skilled in the art to which it pertains, or with which it is most nearly connected, to
> make and use the same and shall set forth the best mode contemplated by the inventor of
> carrying out his invention.

Claims 57, 58, 93, 94, 97, 100-110, 112, 113, 115, 116, 119, 122-138, 141-150 and 154

are rejected under 35 U.S.C. 112, first paragraph, as containing subject matter which was not

described in the specification in such a way as to reasonably convey to one skilled in the relevant

art that the inventor(s), at the time the application was filed, had possession of the claimed

invention.

This rejection is based on the Interim Guidelines for the Examination of Patent

Applications Under the 35 U.S.C. 112, first paragraph "Written Description" Requirement

published in the Federal Register (Volume 63, Number 114, Pages 32639-32645). The present

claims are drawn to methods of modulating NF-κB activity. The claimed methods <u>require</u> the use

of agents or substances which have the ability to bind an NF-κB protein or an IκB protein and

alter the association between the two proteins, to enhance or inhibit phosphorylation of an IκB

protein, to enhance or inhibit degradation of an IκB protein or to increase or decrease the stability

of an IκB protein. These are all genus claims encompassing any number of possible agents or

Serial Number: 08/464,364                                                    Page 5

Art Unit: 1636

substances.  The products to be used in the claims are described only in terms of a function.  The

specification does not describe the full structure of any species encompassed by the genus and

thus does not describe a representative number of species for any of the genus claims.

Furthermore, the specification does not describe any agent or substance in terms of a partial

structure coupled with other relevant identifying characteristics.  Therefore, the specification does

not describe the claimed agents or substances have the functions identified above in such full,

clear, concise and exact terms so as indicate that applicants had possession of these agents and

substances at the time of filing of the present application.  Thus, the written description

requirement has not been satisfied.


        Claims 57, 58, 97-110 and 112-154 are rejected under 35 U.S.C. 112, first paragraph, as

containing subject matter which was not described in the specification in such a way as to enable

one skilled in the art to which it pertains, or with which it is most nearly connected, to make

and/or use the invention.


        Claim 57 is drawn to a method of altering expression in a cell of a gene whose

transcription rate is altered by NF-κB comprising controlling the level of NF-κB--IκB complex

with an agent that binds one of the proteins and alters the association between the two proteins.

Claims 58 and 107-110 are drawn to a method of reducing expression in a cell of a gene that is

Serial Number: 08/464,364                                             Page 6

Art Unit: 1636

transcriptionally dependent on a DNA binding activity of NF-κB comprising inhibiting the DNA

binding activity by contacting the cell with an agent which inhibits phosphorylation of IκB and/or

prevents degradation of IκB.  Claims 97-106 are drawn to a method of activating NF-κB-

dependent transcription in a cell by contacting the cell with a substance which binds an NF-κB

protein or an IκB protein and disrupts NF-κB--IκB complexes, decreases the stability of IκB,

causes degradation of IκB or stimulates phosphorylation of IκB.  Claims 112-134 are drawn to a

method for altering NF-κB-dependent gene transcription in a cell comprising identifying an agent

by its ability to alter the level of phosphorylation of IκB, alter the stability of IκB, alter the nuclear

localization of NF-κB alter the level of NF-κB--IκB complexes or alter the DNA binding activity

of NF-κB and then treating the cell with the identified agent.  Claims 135-149 are drawn to a

method for altering an activity of NF-κB in a cell comprising identifying an agent by its ability to

bind NF-κB or IκB and alter NF-κB activity and then treating the cell with the identified agent.

Claims 150-154 are drawn to a method for inhibiting the activity of NF-κB in a cell comprising

identifying an agent which inhibits phosphorylation of IκB and treating the cell with the identified

agent.

        The following factors have been considered in formulating this rejection (*In re*

*Wands*, 858F.2d 731, 8 USPQ2d 1400 (Fed. Cir. 1988)): the breadth of the claims, the nature of

the invention, the state of the prior art, the relative skill of those in the art, the predictability or

Serial Number: 08/464,364                               Page 7

Art Unit: 1636

unpredictability of the art, the amount of direction or guidance presented, the presence or absence

of working examples of the invention and the quantity of experimentation necessary.

The present claims are very broad, encompassing any type of cell from any organism,

eukaryotic or prokaryotic, and in any location *in vitro*, *ex vivo* or *in vivo*. The claims further

encompass any agent or substance of any structure which has the claimed functional activity, any

assay to be used to identify the agent or substance and any method of contacting the cell with the

agent or substance.

The nature of the invention is the modulation of gene transcription in a cell by the

modulation of NF-κB--IκB complexes within the cell.

The state of the prior art for gene regulation by NF-κB as of the effective filing date of the

present application indicated that the skilled artisan did not know that NF-κB existed in most

mammalian cell types, that NF-κB existed as part of an inhibited cytoplasmic complex bound to

IκB or that activation of NF-κB comprised release from the inhibitory complex and translocation

to the nucleus. The mechanism by which any of this occurred was completely unknown.

The relative skill of those in the art of gene regulation is high.

The area of the invention is completely unpredictable as the art is silent regarding the mechanism of NF-κB activation and the existence of NF-κB--IκB complexes.

The present specification fails to provide sufficient direction or guidance to support the full scope of the present claims. The specification speculates that IκB may become phosphorylated to release NF-κB and that uncomplexed IκB may be unstable based on the facts that NF-κB activation appears to involve a post-translational modification, that NF-κB activating signals such as phorbol esters work through protein kinase C and that following activation there is no free IκB in the cytoplasm (pages 71-73). These speculations are not considered to provide adequate direction to the skilled artisan to screen for agents that modulate IκB phosphorylation or stability as such speculation as to the mechanism of NF-κB activation, in the absence of any evidence in support of the mechanism or guidance toward exogenously regulating the phosphorylation state or stability of IκB, is not sufficient to teach the skilled artisan to search for and use the claimed agents. Additionally, the specification suggests that the cloning of NF-κB and IκB will allow the development of assays for inhibitors and activators of these proteins (page 9, line 28-page 10, line 4; page 81, lines 4-18) but does not disclose any general assay methods and does not teach any specific assays to detect agents which alter protein phosphorylation, protein stability, protein degradation or protein binding. The specification does not provide any guidance as to how to use these agents to alter NF-κB activation, particularly in an animal as is encompassed by the claims, and further does not teach a use for altering NF-κB activation in vivo

than an impled use to treat human immunodeficiency virus (HIV) infection.   The specification

generally discloses that an inhibitory protein such as IκB can be administered to a cell or that

DNA encoding an inhibitory protein can be administered to a cell using a plasmid or viral vector

and that cells can be treated *ex vivo* and returned to the animal or the protein or vector

administered directly to the animal (pages 75-76).  No guidance other than these vague

suggestions is provided. Since the specification does not teach how to identify the agents to be

used in the claimed methods, does not teach how to use the agents in the claimed methods and

does not even teach that these agents should be looked for, the specification does not provide

sufficient guidance to support the present claims.


No working examples of the claimed method are disclosed in the specification.


The quantity of experimentation necessary to carry out the claimed invention is high as the

skilled artisan could not rely on the prior art or the present specification to teach how to carry out

the claimed methods.  One of skill in the art would first have to determine if IκB binding to NF-

κB is regulated by phosphorylation and a change in the stability of IκB as the specification does

not teach this.  One would then have to develop assays for identifying agents which modulate the

phosphorylation or stability of IκB or which can bind to NF-κB or IκB and alter their interaction

as the specification does not teach this.  One would then have to determine how to administer the

identified agents, which could be of any structure (e.g., nucleic acid, protein, organic molecule), to any cell of any organism *in vitro* or *in vivo* as the specification does not teach this.

Based on the broad scope of the claims, the unpredictability in the area of the invention, the lack of sufficient guidance or working examples in the specification and the quantity of experimentation necessary, it would clearly require undue experimentation by one of skill in the art to carry out the claimed methods within the full scope of the claims.

Claims 145-148 are drawn to a method for altering the activity of a NF-κB gene product in a cell which comprises the step of identifying an agent which alters the activity of a NF-κB gene. The specification fails to teach what activity of a gene can be measured or how this activity can be altered by an agent and how to use such an agent to alter the activity of a NF-κB gene product. It would require undue experimentation by one of skill in the art to determine how to carry out this embodiment of the claimed method.

Claims 122, 124 and 146 are drawn to the use of purified NF-κB or IκB. The specification discloses some separation steps for the partial purification of NF-κB (page 63) and IκB (page 64) but fails to teach how to completely purify either protein. The specification also refers to two references teaching the purification of NF-κB (Kawakami et al., Lenardo et al., page

34) but both references were published after the effective filing date of the present application. Without direction and guidance in the specification and in the absence of teachings in the prior art as to how to purify each protein, it would clearly require undue experimentation by the skilled artisan to first determine how to purify each protein before being able to carry out the claimed methods.

Applicants argue that a general reading of the specification and the original claims by one of skill in the art would point out that an important aspect of the invention is the identification and use of compounds which can alter NF-κB function and that the skilled artisan would recognize that the assays described in the specification in the context of elucidating the mechanism by which NF-κB acts would also be useful as drug screening assays for the identification of agents which affect that mechanism. Applicants further argue that the specification provides ample evidence, examples and other forms of guidance to fully enable the skilled artisan to practice the claimed invention and that the post-filing date art submitted by applicants bears out the assertions made in the instant application. Applicants argue that techniques for the identification of functional variants and fragments of a protein were well known in the art. Applicants further argue that the specification provides more than sufficient factual basis for one of ordinary skill in the art to accept that the mechanism of action of IκB includes the ability to inhibit nuclear translocation of NF-κB. Applicants further argue that the specification describes a range of methods for inhibiting the activity of NF-κB, the use of a reporter gene construct including a κB response element as a

means for detecting agents which inhibit NF-κB, examples of assays for identifying agents which

inhibit nuclear localization of NF-κB, that the interaction of NF-κB and IκB is dependent on the

stability of IκB and that the stability of that protein is in turn dependent, at least in part, on its

state of phosphorylation.  Thus, as the application describes, inhibitors of the phosphorylation of

IκB or inhibitors of the degradation of IκB can be used to prevent the dissociation of NF-κB--IκB

complexes.  The application provides sufficient guidance for assays which, in the context of

screening for inhibitors of NF-κB-dependent transcription, directly detect phosphorylation of IκB,

the formation of NF-κB--IκB complexes and the nuclear localization of NF-κB.  Applicants

further argue that drug discovery assays known in the art could be used in the present invention as

means for identifying agents which alter the level of expression of NF-κB protein, alter the level

of expression of IκB, alter the level of phosphorylation of IκB, alter the stability of IκB, alter the

nuclear localization of NF-κB, alter the level of NF-κB--IκB complexes or alter the DNA binding

activity of NF-κB.


These arguments have been fully considered but are not deemed to be persuasive.  The

argument that assays for detecting functional variants and fragments of proteins and drug

screening assays for phosphorylation, stability and other factors were well known in the art are

not persuasive because the assays for identification of agents that have these functions is a critical

part of the claims as the methods could not be carried out without these agents.  It is noted in

*Genentech Inc. v. Novo Nordisk A/S*, 42 USPQ2d 1005 (CA FC 1997) that:

a specification need not disclose what is well known in the art.  *See, e.g., Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1385, 231 USPQ 81, 94 (Fed. Cir. 1986).  However, that general, oft-repeated statement is merely a rule of supplementation, not a substitute for a basic enabling disclosure.  It means that the omission of minor details does not cause a specification to fail to meet the enablement requirement.  However, when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required; there is a failure to meet the enablement requirement that cannot be rectified by  asserting that all the disclosure related to the process is within the skill of the art.  It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.

It is clear that the novel aspect of the present claims is the agents which have been identified to alter NF-κB and IκB activities.  Thus, the knowledge of those of skill in the art regarding assays for identifying such compounds cannot be relied to enable methods using such agents.

Furthermore, the knowledge of those of skill in the art cannot be relied to make the long leap from disclosure in the specification that IκB <u>might</u> be phosphorylated and that IκB <u>might</u> be unstable and that these factors <u>might</u> be related to the mechanism of NF-κB activation to the claimed invention of searching for agents which alter the phosphorylation and stability of IκB and using such agents to alter NF-κB activation.  Nowhere in the specification is disclosed that the interaction of NF-κB and IκB is dependent on the stability of IκB and that the stability of that protein is in turn dependent, at least in part, on its state of phosphorylation.  What the specification, in fact, says is that "it is a reasonable hypothesis that direct or indirect phosphorylation of IκB results in its dissociation from NF-κB" and that "IκB is apparently unstable when not complexed with NF-κB" (page 73).  These speculations can hardly be the basis

for the presently claimed methods as they cannot be considered to provide adequate direction and

guidance to teach one of skill in the art how to make and use the claimed invention. Applicants

cannot rely on the skilled artisan's realization after reading the specification that the described

experimental methods can also be used as screening assays for agents which affect biological

functions of NF-κB and IκB when those functions weren't even taught in the specification but

were only guessed at. Contrary to applicants' assertion, the specification does not provide

sufficient guidance for assays which directly detect phosphorylation of IκB as such assays are not

even mentioned and the specification does not teach in any fashion that inhibitors of the

phosphorylation of IκB or inhibitors of the degradation of IκB can be used to prevent the

dissociation of NF-κB--IκB complexes. It is agreed that the specification provides sufficient

evidence to show that the mechanism of action of IκB includes the ability to inhibit nuclear

translocation of NF-κB. However, this was not the point of the rejection made in the previous

Office actions. The point was that even if one knows that this is the mechanism of action of IκB

there is no evidence provided to show that the mechanism can be manipulated by addition of

exogenous agents such as recombinant or purified IκB. The post-filing date art provided by

applicants is deemed to be sufficient to show that applicants' assertions regarding the use of full

length IκB and decoy nucleic acids as inhibitors of the activation of NF-κB in isolated cells. They

are not sufficient, however, to support any other form of inhibitor or *in vivo* methods for

inhibiting activation of NF-κB.

Claims 62, 63, 95 and 96 are rejected under 35 U.S.C. 112, first paragraph, because the specification, while being enabling for a method of inhibiting expression of HIV DNA in an isolated cell infected with HIV DNA comprising contacting the cell with a decoy nucleic acid containing a NF-κB binding site or a vector encoding full length IκB, does not reasonably provide enablement for a method of inhibiting expression of HIV DNA in any infected host cell with any agent that prevents binding of NF-κB to the transcriptional control elements of HIV. The specification does not enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the invention commensurate in scope with these claims.

Claims 62 is drawn to a method of inhibiting expression of HIV DNA in a host cell infected with HIV DNA comprising contacting the infected cell with an agent that prevents binding of NF-κB to the transcriptional control elements of HIV. Claim 63 is further limited to the prevention of NF-κB binding to the transcriptional control elements by increasing formation of NF-κB--IκB complexes. Claims 95 and 96 are further limited to an agent that inhibits a DNA binding activity of NF-κB and a decoy nucleic acid.

The following factors have been considered in formulating this rejection (*In re Wands*, 858F.2d 731, 8 USPQ2d 1400 (Fed. Cir. 1988)): the breadth of the claims, the nature of the invention, the state of the prior art, the relative skill of those in the art, the predictability or

Serial Number: 08/464,364                                    Page 16

Art Unit: 1636

unpredictability of the art, the amount of direction or guidance presented, the presence or absence

of working examples of the invention and the quantity of experimentation necessary.

The present claims are very broad, encompassing any type of HIV-infected cell from any

organism in any location *in vitro*, *ex vivo* or *in vivo*. The claims further encompass any agent of

any structure that prevents binding of NF-κB to the transcriptional control elements of HIV and

any method of contacting the cell with the agent. The *in vivo* embodiment of the claims reads on

a method of treating HIV infection in an individual. This scope is supported by the present

specification, which states that "[t]his method of altering NF-κB-mediated gene expression is

useful, for example, for inhibiting viral gene expression in infected cells, such as in an individual

infected with the HIV-1 or cytomegalovirus" (page 74, lines 10-14). Since a method claim must

be enabled for the full scope encompassed by the method the specification must be enabled for the

treatment of HIV infection using the claimed method.

The nature of the invention is the inhibition of expression of HIV DNA in HIV infected

cells by the control of NF-κB activity.

The state of the prior art for the role of NF-κB in the transcription of HIV DNA indicated

that the skilled artisan recognized that the HIV long terminal repeat (LTR) contained binding sites

for NF-κB and that signals which activate transcription of HIV DNA in T cells (such as phorbol

esters) are the same as signals which activate NF-κB in T cells, suggesting that NF-κB may play a

role in transcription of HIV DNA.  Additionally, when the HIV LTR is linked to a reporter gene

and placed in a T cell lymphoma line the reporter gene is expressed in response to phorbol esters

and other signals and the expression of the reporter gene is dependent on intact NF-κB DNA

binding sites in the LTR.  However, it was further known that binding sites for many other

transcription factors are present in the LTR and that it is likely that HIV transcription is

dependent on multiple transcription factors (see Wu et al., cited in the previous Office action

mailed January 7, 1997).


The relative skill of those in the art of gene regulation is high.


The area of the invention is unpredictable as the regulation of expression of HIV in T cells

was known to be complex and the regulation of expression of HIV in any other cell type was

unknown as of the effective filing date of the present application.  Furthermore, several years after

the effective filing date of the present application, those of skill in the art recognized that no *in

vivo* or *ex vivo* treatment of HIV infected cells based on a protein or nucleic acid therapeutic had

been developed which was effective in eliciting any therapeutic response (see Johnston et al. cited

in the previous Office action mailed January 7, 1997).

Serial Number: 08/464,364                                              Page 18

Art Unit: 1636

The present specification fails to provide sufficient direction or guidance to support the full scope of the present claims. The specification suggests several ideas for inhibiting the activity of NF-κB, including administration of IκB, decoy nucleic acids, dominantly interfering molecules or NF-κB binding domains but provides no details on how to make and use these inhibitors (pages 87-88). The specification generally discloses that an inhibitory protein such as IκB can be administered to a cell or that DNA encoding an inhibitory protein can be administered to a cell using a plasmid or viral vector and that cells can be treated *ex vivo* and returned to the animal or the protein or vector administered directly to the animal (pages 75-76). No guidance other than these vague suggestions is provided. The specification does not teach how to administer these inhibitors *in vivo* to obtain a therapeutic effect in infected individuals, *e.g.*, how to target the inhibitor to infected cells, how to get the inhibitor into the cells, how to accumulate a sufficient quantity of the inhibitor in the correct compartment within the cell to achieve the desired effect, how to achieve sustained delivery and/or expression of the inhibitor to effect a treatment. Thus, the specification does not teach how to carry out the *in vivo* embodiment of the claimed method. The post filing date art submitted by applicants contains several teachings of the effective use of nucleic acid decoys and expression of full length IκB in cultured cells to block NF-κB activation and inhibit the transcription of genes containing NF-κB binding sites, including the HIV LTR, as was taught in the specification. This is deemed to substantiate the disclosure of the present application in terms of using full length IκB or a decoy nucleic acid to inhibit the expression of HIV DNA in isolated cells infected with HIV.

Serial Number: 08/464,364                                    Page 19

Art Unit: 1636

No working examples of the claimed method are disclosed in the specification.

The quantity of experimentation necessary to carry out the claimed invention is high as the skilled artisan could not rely on the prior art or the present specification to teach how to carry out the claimed method. One of skill in the art would first have to determine what inhibitors other than full length IκB or a decoy nucleic acid can be used to inhibit HIV DNA expression. One would then have to determine how to use any inhibitor *in vivo* to inhibit HIV DNA expression.

Based on the broad scope of the claims, the unpredictability in the area of the invention, the lack of sufficient guidance or working examples in the specification and the quantity of experimentation necessary, it would clearly require undue experimentation by one of skill in the art to carry out the claimed methods within the full scope of the claims. Since the specification and the material filed in support of the teachings in the specification are deemed to provide adequate enablement for use of full length IκB or a decoy nucleic acid as an inhibitor in isolated HIV-infected cells the claims should be limited to these embodiments.

Applicants argue that the specification provides ample evidence to show that NF-κB is involved in the regulation of transcription of HIV and that inhibition of NF-κB activity is a useful target for managing HIV infection. Applicants further argue that Demarchi et al. (a post-filing date publication) supports the assertions in the specification as it teaches tat-induced HIV LTR

transcription is mediated by NF-κB and that a decoy nucleic acid inhibits transcription.

Applicants also argue that the examiner has failed to meet his burden of demonstrating that one of

ordinary skill in the art would not consider the asserted utilities to be credible, that the claims

cover methods which are useful both *in vivo* and *in vitro* and that the method is a credible means

for managing AIDS in HIV-infected individuals as inhibitors of NF-κB could be used clinically to

reduce the viral load in a patient.

These arguments have been fully considered and are deemed to be partially persuasive. It is

agreed that sufficient evidence is provided in the specification to show that activation of HIV

transcription in T cells involves, in part, the activation of NF-κB. However, it does not directly

follow from this fact that inhibition of NF-κB will inhibit HIV transcription as the control of HIV

is complex and involves many transcription factors and other regulators. The post-filing date art

does support the assertion that inhibition of NF-κB will inhibit transcription of HIV DNA in an

isolated cell but this does not provide support for the *in vivo* embodiment of the claimed method

or the treatment of HIV infection in an individual. The potential *in vitro* uses of the claimed

method mentioned in applicants' response are not sufficient to enable the method as the

specification must teach how to use a method within the full scope encompassed by the claim and

therefore must teach how to use the claimed method *in vivo*. Additionally, these *in vitro* uses are

not disclosed in the specification. As stated in the previous Office actions, Johnston et al.,

published six years after the effective filing date of the present application, shows that no protein-

or nucleic acid-based therapeutic agents had been developed and that the effective use of such

agents was faced with several obstacles.  The absence of any therapeutics even remotely related to

those that are presently claimed is sufficient to show that the area of the invention is

unpredictable.  It is noted that the unpredictability of a particular art area may alone provide

reasonable doubt as to the accuracy of the broad statement made in support of enablement of

claims. See *Ex parte Singh*, 17 USPQ2d 1714 (BPAI 1991).  It is also well established in case law

that the specification must teach those of skill in the art how to make and how to use the

invention as broadly claimed.  *In re Goodman*, 29 USPQ2d at 2013 (Fed. Cir. 1994), citing *In re*

*Vaeck*, 20 USPQ2d at 1445 (Fed. Cir. 1991).  Thus, a *prima facie* case for lack of enablement has

been made and the burden is on the applicants to show that the *in vivo* embodiment of the claimed

method is enabled.  Applicants' statement that inhibitors of NF-κB could be used clinically to

reduce the viral load in a HIV-infected patient carries no weight as no evidence in the form of a

reference or a declaration has been provided.  No evidence is provided to show that a decrease in

the transcription of HIV in a cell leads to a decrease in viral load in a patient.  No guidance is

provided to show that a NF-κB inhibitor can be administered *in vivo* and targeted to HIV-infected

cells.  It is likely that only activated T cells will be affected by the inhibitor as NF-κB is not

activated until the T cell is activated.  Thus, the inhibitor will have no effect on latently infected T

cells or other cells which harbor HIV such as macrophages.  Thus, it is by no means clear that any

NF-κB inhibitor can decrease viral load in a patient.  In the absence of any evidence that the

claimed method will have any effect *in vivo* the claims should be limited to isolated cells.

Serial Number: 08/464,364                                                Page 22

Art Unit: 1636

Claims 59, 61 and 111 are rejected under 35 U.S.C. 112, first paragraph, because the specification, while being enabling for a method of activating NF-κB-dependent transcription in an isolated cell and a method of reducing expression of a gene whose transcriptional activity is activated by binding of NF-κB in an isolated cell, does not reasonably provide enablement for a method of activating NF-κB-dependent transcription in a cell *in vivo* and a method of reducing expression of a gene whose transcriptional activity is activated by binding of NF-κB in a cell *in vivo*. The specification does not enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the invention commensurate in scope with these claims.

Claims 59 and 61 are drawn to a method of activating NF-κB-dependent transcription in a host cell comprising contacting the cell with a substance which causes dissociation of the NF-κB-IκB complex. Claim 111 is drawn to a method of reducing expression in a cell of a gene whose transcriptional activity is activated by binding of NF-κB to said gene comprising introducing a nucleic acid decoy molecule into the cell, which decoy includes an NF-κB binding site that binds NF-κB. As stated above in the previous rejections, the specification, although enabling for the use of a decoy nucleic acid to inhibit NF-κB activation in an isolated cell, is not enabling for a method of reducing NF-κB-dependent gene expression in a cell *in vivo*. The specification fails to teach how to deliver the decoy nucleic acid to a cell, how to get the decoy into the cell and how to get a sufficient quantity into the proper compartment of the cell to achieve an inhibitory effect.

Serial Number: 08/464,364                                    Page 23

Art Unit: 1636

In the absence of such guidance or any examples it would require undue experimentation by one

of skill in the art to carry out the claimed method within its *in vivo* embodiment and the claim

should be limited to an isolated cell.  Similarly, the specification is deemed to be enabling for the

use of a substance which causes dissociation of the NF-κB--IκB complex in an isolated cell as the

specification discloses and exemplifies several substances (e.g., phorbol esters,

phytohemagglutinin, protein synthesis inhibiters, double stranded RNA) which cause dissociation

of the NF-κB--IκB complex when added to isolated cells.  However, the specification does not

teach how to administer these substances to an organism *in vivo*, how to target the substance to

particular cells or how to achieve effect doses of the substances.  In the absence of such disclosure

it would require undue experimentation by the skilled artisan to carry out the *in vivo* embodiment

of the claimed methods and the claims should be limited to an isolated cell.


    The following is a quotation of the second paragraph of 35 U.S.C. 112:

>    The specification shall conclude with one or more claims particularly pointing out and
>    distinctly claiming the subject matter which the applicant regards as his invention.

    Claims 57, 58, 61-63, 93-96, 102-134, 137, 138, 145-148, 153 and 154 are rejected

under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and

distinctly claim the subject matter which applicant regards as the invention.

Serial Number: 08/464,364                                              Page 24

Art Unit: 1636

      Claim 57 is incomplete as it does not recite a positive process step which clearly refers back to the preamble.  Additionally, it is not clear what is meant by "controlling the level" as it could mean changing the level, keeping the level constant, etc.  It is suggested that the word "altering" be used instead.  Furthermore, the phrase "transcriptional activity" of a gene is vague.  It is unclear if this means the rate of transcription of the gene or something else.

      Claim 58 is incomplete as it does not recite a positive process step which clearly refers back to the preamble.  Additionally, the phrase "transcriptionally-dependent " is vague.  It is unclear if it means that the transcription rate of the gene is regulated by NF-κB or something else.  Furthermore, the term "reducing" is indefinite as it does not state what level the expression is being reduced from.  For instance, in most cells NF-κB is normally inactive and there would be no gene expression due to NF-κB.  Thus, the level could not be reduced.  It is suggested that the claim be amended to indicate that it is the expression level of a gene which is being transcribed in response to the presence of active NF-κB which is being reduced.

      Claim 61 is incomplete as it does not recite a positive process step which clearly refers back to the preamble.  Additionally, the phrase "activation of NF-κB-dependent transcription precursor" is unclear.

Claim 62 is incomplete as it does not recite a positive process step which clearly refers back to the preamble. Additionally, the phrase "expression of HIV DNA" is indefinite as it is not clear if this means replication of the DNA, transcription of the DNA or something else.

Claim 111 is incomplete as it does not recite a positive process step which clearly refers back to the preamble. Furthermore, the phrase "transcriptional activity" of a gene is vague. It is unclear if this means the rate of transcription of the gene or something else.

Claim 112 is vague and indefinite as the phrase "analog derived therefrom" is unclear. There is no art-recognized definition for the term analog and the specification does not define what is meant by analog or how closely two agents must be related to be considered analogs.

Claim 119 is vague and indefinite as it is not clear what is encompassed by "inhibits protein:protein complexes", i.e., inhibit formation, of the complex, inhibit degradation of the complex, inhibit activity of the complex.

Claim 126, 128, 130 and 131 are vague and indefinite as they are drawn to portions of NF-κB or IκB. The term "portions" encompasses fragments as small as two amino acids, for which there would be no disclosed use. It also covers portions which cannot participate in NF-κB--IκB complexes. Therefore, the metes and bounds of the claim are unclear.

Claim 137 is vague and indefinite as it is not clear what is meant by the phrase "(an) IκB".

Claims 137 and 138 are vague and indefinite as the phrase "the molecule" lacks proper antecedent basis.

Claims 145, 147 and 148 are vague and indefinite as the claims are drawn in part to contacting an NF-κB gene with a test agent and measuring the activity of the gene. It is not clear what activity of the gene is being measured.

Claim 153 is vague and indefinite as it is unclear whether it is the gene construct or the IκB which binds to and inhibits NF-κB.

Claim 154 is vague and indefinite as it is unclear what is meant by pharmaceutical, *e.g.*, something which has a therapeutic effect, something which can be safely administered in vivo.

### *Claim Rejections - 35 USC § 102*

The rejection of claim 57 under 35 U.S.C. 102(b) as being anticipated by Wall et al. is withdrawn in view of the amendment to the claim.

Serial Number: 08/464,364                                        Page 27

Art Unit: 1636

The rejection of claim 57 under 35 U.S.C. 102(b) as being anticipated by Leonard et al. is withdrawn in view of the amendment to the claim.

## *Conclusion*

Claims 57-59, 61-63 and 93-154 are rejected.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Robert Schwartzman whose telephone number is (703) 308-7307. The examiner can normally be reached on Monday through Friday from 6:30 AM to 4:00 PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, George Elliott, can be reached at (703) 308-4003. The fax number for this group is (703) 305-3014.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the Group receptionist whose telephone number is (703)-308-0196.

Robert A. Schwartzman, Ph.D.
July 12, 1998

# EXHIBIT 56

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office

## NOTICE OF ALLOWANCE AND ISSUE FEE DUE

```
028120                          HM22/1026
ROPES & GRAY
ONE INTERNATIONAL PLACE
BOSTON MA 02110-2624
```

| APPLICATION NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/464,364 | 06/05/95 | 209 | GUZO, D | 1636 | 10/26/01 |

| First Named Applicant | BALTIMORE, | 35 USC 154(b) term ext. = | 0 Days. |
|---|---|---|---|

TITLE OF INVENTION  NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 1  APBI-P03-035 | 514-440.000 | 004 | UTILITY | YES | $640.00 | 01/28/02 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.**

**THE ISSUE FEE MUST BE PAID WITHIN _THREE MONTHS_ FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED.  _THIS STATUTORY PERIOD CANNOT BE EXTENDED._**

## HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.
  If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is changed, pay twice the amount of the FEE DUE shown above and notify the Patent and Trademark Office of the change in status, or
B. If the status is the same, pay the FEE DUE shown above.

If the SMALL ENTITY is shown as NO:

A. Pay FEE DUE shown above, or

B. File verified statement of Small Entity Status before, or with, payment of 1/2 the FEE DUE shown above.

II. Part B-Issue Fee Transmittal should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE.  Even if the ISSUE FEE has already been paid by charge to deposit account, Part B Issue Fee Transmittal should be completed and returned.  If you are charging the ISSUE FEE to your deposit account, section "4b" of Part B-Issue Fee Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give application number and batch number.
    Please direct all communications prior to issuance to Box ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees.  It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PATENT AND TRADEMARK OFFICE COPY

PTOL-85 (REV. 10-96) Approved for use through 06/30/99. (0651-0033)

| | Application No. | Applicant(s) |
|---|---|---|
| **Notice of Allowability** | 08/464,364 | BALTIMORE ET AL. |
| | Examiner | Art Unit | |
| | David Guzo | 1636 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to _9/12/01_.

2. ☒ The allowed claim(s) is/are _158-187 and 194-365_.

3. ☐ The drawings filed on _____ are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

      a) ☐ All    b) ☐ Some*    c) ☐ None    of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

      * Certified copies not received: _____ .

5. ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

      (a) ☐ The translation of the foreign language provisional application has been received.

6. ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

7. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

8. ☒ CORRECTED DRAWINGS must be submitted.

    (a) ☒ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☒ to Paper No. _44_.

    (b) ☐ including changes required by the proposed drawing correction filed _____ , which has been approved by the Examiner.

    (c) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No. _____ .

    Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the top margin (not the back) of each sheet. The drawings should be filed as a separate paper with a transmittal letter addressed to the Official Draftsperson.

9. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

| | |
|---|---|
| 1☒ Notice of References Cited (PTO-892) | 2☐ Notice of Informal Patent Application (PTO-152) |
| 3☒ Notice of Draftperson's Patent Drawing Review (PTO-948) | 4☐ Interview Summary (PTO-413), Paper No.____ |
| 5☒ Information Disclosure Statements (PTO-1449), Paper No. ____. | 6☒ Examiner's Amendment/Comment |
| 7☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material | 8☐ Examiner's Statement of Reasons for Allowance |
| | 9☐ Other |

Application/Control Number: 08/464,364                                    Page 2

Art Unit: 1636                          *amdt ✓*


## EXAMINER'S AMENDMENT


An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.


Authorization for this examiner's amendment was given in a telephone interview with Matthew Vincent on September 14, 2001.


The application has been amended as follows:


In the claims:


Claims 153 and 188-193 were canceled.

---

158. (amended) A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising [by] reducing NF-κB activity in the cell such that expression of said gene is inhibited.

195

Application/Control Number: 08/464,364                                    Page 3

Art Unit: 1636

159. (amended)  A method for selectively inhibiting expression, in a eukaryotic cell, of genes

whose transcription is regulated by NF-κB, the method comprising [by] reducing NF-κB activity

in the cell such that expression of said genes is inhibited.

160. (amended)  A method for reducing the level of expression of a viral gene whose transcription

is regulated by NF-κB in a eukaryotic cell, the method comprising [by] reducing NF-κB activity in

the cell such that expression of said viral gene is reduced.

161. (amended)  The method of claim 160, wherein the viral gene is a cytomegalovirus (CMV),

human immunodeficiency virus (HIV) or simian virus 40 (SV40) [CMV, HIV or SV40] gene.

162. (amended)  A method for reducing the level of expression of a cytokine gene whose

transcription is regulated by NF-κB in a eukaryotic cell comprising [by] reducing NF-κB activity

in the cell such that expression of said cytokine gene is reduced.

163. (amended)  A method for diminishing induced NF-κB-mediated intracellular signaling

comprising [by] reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling

is diminished.

Application/Control Number: 08/464,364                                    Page 4

Art Unit: 1636

7.
~~164.~~ (amended)  A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified.

9.
~~166.~~ (amended)  A method for reducing [inhibiting], in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

10.
~~167.~~ (amended)  A method for reducing the effects of bacterial infection on mammalian cells comprising [by] reducing NF-κB activity in mammalian cells so as to reduce bacterial lipopolysaccharide-induced gene expression in the mammalian cells.

11.
168.    (amended) [The] A method for reducing the effects of [of claim 1̶6̶7̶, wherein the infection is a] viral infection on mammalian cells comprising [by] reducing NF-κB activity in mammalian cells so as to reduce virus-mediated gene expression in the mammalian cells.

12.
~~169.~~    (amended) [The] A method [of claim 1̶6̶7̶, wherein the infection is a] for reducing the effects of bacterial infection on mammalian immune cells comprising [by] reducing NF-κB activity

Application/Control Number: 08/464,364                                    Page 5

Art Unit: 1636

in mammalian immune cells so as to reduce bacterial lipopolysaccharide-mediated stimulation of

the immune cells.

170. (amended) A method for reducing the effects of bacterial lipopolysaccharide on

mammalian cells comprising [by] reducing NF-κB activity in the cells so as to reduce bacterial

lipopolysaccharide-induced gene expression in the cells.

171. (amended) A method for reducing bacterial lipopolysaccharide-induced expression of

cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as

to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

172. (amended) A method for reducing bacterial lipopolysaccharide-induced expression of

Tumor Necrosis Factor-α in mammalian cells, which method comprises reducing NF-κB activity

in the cells so as to reduce bacterial lipopolysaccharide-induced expression of Tumor Necrosis

Factor-α in the cells.

173. (amended) A method for reducing bacterial lipopolysaccharide-mediated stimulation of

immune cells, which method comprises reducing NF-κB activity in the cells so as to reduce

bacterial lipopolysaccharide-mediated stimulation of the immune cells.

Application/Control Number: 08/464,364                                    Page 6

Art Unit: 1636

174.    (amended) A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial-induced NF-κB signaling in the cells.

175.    (amended) A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising [by] reducing [intracellular] NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

176.    (amended) A method for reducing bacterial lipopolysaccharide-induced nuclear translocation of NF-κB in eukaryotic cells comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-κB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB-IκB complexes so as to reduce nuclear translocation of NF-κB in the cells.

177.    (amended) The method of claim 158 [any of claims 158 - 175] wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

178.    (amended) The method of claim 158 [any of claims 158 - 175] wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

Application/Control Number: 08/464,364                                    Page 7

Art Unit: 1636

179. (amended) The method of claim 158 [178], wherein NF-κB activity is reduced by [inhibiting passage of NF-κB into the nucleus comprises] inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

180. (amended) The method of claim 158 [178], wherein NF-κB activity is reduced by [inhibiting passage of NF-κB into the nucleus comprises] inhibiting degradation of an IκB protein.

181. (amended) The method of claim 158 [178], wherein NF-κB activity is reduced by [inhibiting passage of NF-κB into the nucleus comprises] inhibiting dissociation of NF-κB:IκB complexes.

182. (amended) The method of claim 158 [any of claims 158 - 175] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

183. (amended) The method of claim 158 [any of claims 158 - 176], carried out on mammalian cells.

184. (amended) The method of claim 158 [183], carried out on [wherein the mammalian cells are] human cells.

Application/Control Number: 08/464,364                              Page 8

Art Unit: 1636

185.    (amended) The method of claim 183 or 184, carried out on immune cells.

186.    (amended) The method of claim 183 or 184, carried out on lymphoid cells.

187.    (amended) The method of claim 183 or 184, carried out on liver cells.

194.    (new) The method of claim 159 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

195.    (new) The method of claim 159 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

196.    (new) The method of claim 159, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

197.    (new) The method of claim 159, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

198.    (new) The method of claim 159, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

Application/Control Number: 08/464,364                                    Page 9

Art Unit: 1636

36 ~~47.~~   199.   (new) The method of claim ~~159~~ 2 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

37 ~~43.~~   200.   (new) The method of claim ~~159~~ 2, carried out on mammalian cells.

38 ~~44.~~   201.   (new) The method of claim ~~159~~ 2, carried out on human cells.

39 ~~45.~~   202.   (new) The method of claim ~~200~~ 37 or ~~201~~ 38, carried out on immune cells.

40 ~~46.~~   203.   (new) The method of claim ~~200~~ 37 or ~~201~~ 38, carried out on lymphoid cells.

41 ~~47.~~   204.   (new) The method of claim ~~200~~ 37 or ~~201~~ 38, carried out on liver cells.

42 ~~48.~~   205.   (new) The method of claim ~~160~~ 3 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

43 ~~49.~~   206.   (new) The method of claim ~~160~~ 3 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

Application/Control Number: 08/464,364                                    Page 10

Art Unit: 1636

207. (new) The method of claim 160, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

208. (new) The method of claim 160, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

209. (new) The method of claim 160, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

210. (new) The method of claim 160 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

211. (new) The method of claim 160, carried out on mammalian cells.

212. (new) The method of claim 160, carried out on human cells.

213. (new) The method of claim 211 or 212, carried out on immune cells.

214. (new) The method of claim 211 or 212, carried out on lymphoid cells.

Application/Control Number: 08/464,364                                    Page 11

Art Unit: 1636

215.    (new) The method of claim 211 or 212, carried out on liver cells.

216.    (new) The method of claim 162 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

217.    (new) The method of claim 162 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

218.    (new) The method of claim 162, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

219.    (new) The method of claim 162, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

220.    (new) The method of claim 162, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

221.    (new) The method of claim 162 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

Application/Control Number: 08/464,364                          Page 12

Art Unit: 1636

222.    (new) The method of claim 162, carried out on mammalian cells.

223.    (new) The method of claim 162, carried out on human cells.

224.    (new) The method of claim 222 or 223, carried out on immune cells.

225.    (new) The method of claim 222 or 223, carried out on lymphoid cells.

226.    (new) The method of claim 222 or 223, carried out on liver cells.

227.    (new) The method of claim 163 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

228.    (new) The method of claim 163 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

229.    (new) The method of claim 163, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

Application/Control Number: 08/464,364                                    Page 13

Art Unit: 1636

230.    (new) The method of claim 163, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

231.    (new) The method of claim 163, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

232.    (new) The method of claim 163 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

233.    (new) The method of claim 163, carried out on mammalian cells.

234.    (new) The method of claim 163, carried out on human cells.

235.    (new) The method of claim 233 or 234, carried out on immune cells.

236.    (new) The method of claim 233 or 234, carried out on lymphoid cells.

237.    (new) The method of claim 233 or 234, carried out on liver cells.

Application/Control Number: 08/464,364                                    Page 14

Art Unit: 1636

238. (new) The method of claim 165 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

239. (new) The method of claim 165 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

240. (new) The method of claim 165, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

241. (new) The method of claim 165, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

242. (new) The method of claim 165, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

243. (new) The method of claim 165 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

244. (new) The method of claim 164, carried out on mammalian cells.

Application/Control Number: 08/464,364                                    Page 15

Art Unit: 1636

245. (new) The method of claim 165, carried out on mammalian cells.

246. (new) The method of claim 164, carried out on human cells.

247. (new) The method of claim 165, carried out on human cells.

248. (new) The method of any of claims 244-247, carried out on immune cells.

249. (new) The method of any of claims 244-247, carried out on lymphoid cells.

250. (new) The method of any of claims 244-247, carried out on liver cells.

251. (new) The method of claim 166 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

252. (new) The method of claim 166 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

253. (new) The method of claim 166, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

Application/Control Number: 08/464,364                                      Page 16

Art Unit: 1636

254.    (new) The method of claim 166, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

255.    (new) The method of claim 166, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

256.    (new) The method of claim 166 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

257.    (new) The method of claim 166, carried out on mammalian cells.

258.    (new) The method of claim 166, carried out on human cells.

259.    (new) The method of claim 257 or 258, carried out on immune cells.

260.    (new) The method of claim 257 or 258, carried out on lymphoid cells.

261.    (new) The method of claim 257 or 258, carried out on liver cells.

Application/Control Number: 08/464,364                              Page 17

Art Unit: 1636

262.    (new) The method of claim 167 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

263.    (new) The method of claim 167 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

264.    (new) The method of claim 167, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

265.    (new) The method of claim 167, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

266.    (new) The method of claim 167, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

267.    (new) The method of claim 167 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

268.    (new) The method of claim 167, carried out on human cells.

Application/Control Number: 08/464,364                                      Page 18

Art Unit: 1636

269. (new) The method of claim 268, carried out on immune cells.

270. (new) The method of claim 268, carried out on lymphoid cells.

271. (new) The method of claim 268, carried out on liver cells.

272. (new) The method of claim 168 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

273. (new) The method of claim 168 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

274. (new) The method of claim 168, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

275. (new) The method of claim 168, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

276. (new) The method of claim 168, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

Application/Control Number: 08/464,364                                    Page 19

Art Unit: 1636

277. (new) The method of claim 168 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

278. (new) The method of claim 168, carried out on human cells.

279. (new) The method of claim 168 or 278, carried out on immune cells.

280. (new) The method of claim 168 or 278, carried out on lymphoid cells.

281. (new) The method of claim 168 or 278, carried out on liver cells.

282. (new) The method of claim 169 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

283. (new) The method of claim 169 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

284. (new) The method of claim 169, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

Application/Control Number: 08/464,364                                    Page 20

Art Unit: 1636

285.    (new) The method of claim 169, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

286.    (new) The method of claim 169, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

287.    (new) The method of claim 169 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

288.    (new) The method of claim 169, carried out on human immune cells.

289.    (new) The method of claim 169, carried out on lymphoid cells.

290.    (new) The method of claim 288, carried out on lymphoid cells.

291.    (new) The method of claim 170 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

Application/Control Number: 08/464,364                          Page 21

Art Unit: 1636

292. (new) The method of claim 170 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

293. (new) The method of claim 170, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

294. (new) The method of claim 170, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

295. (new) The method of claim 170, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

296. (new) The method of claim 170 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

297. (new) The method of claim 170, carried out on human cells.

298. (new) The method of claim 170, carried out on immune cells.

Application/Control Number: 08/464,364                                      Page 22

Art Unit: 1636

~~299~~    (new) The method of claim ~~297~~, carried out on immune cells.

300.    (new) The method of claim ~~170~~ or ~~297~~, carried out on lymphoid cells.

301.    (new) The method of claim ~~170~~ or ~~297~~, carried out on liver cells.

302.    (new) The method of claim ~~171~~ wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

303.    (new) The method of claim ~~171~~ wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

304.    (new) The method of claim ~~171~~, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

305.    (new) The method of claim ~~171~~, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

306.    (new) The method of claim ~~171~~, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

307.    (new) The method of claim 171 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

308.    (new) The method of claim 171, carried out on human cells.

309.    (new) The method of claim 171 or 308, carried out on immune cells.

310.    (new) The method of claim 171 or 308, carried out on lymphoid cells.

311.    (new) The method of claim 171 or 308, carried out on liver cells.

312.    (new) The method of claim 172 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

313.    (new) The method of claim 172 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

314.    (new) The method of claim 172, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

Application/Control Number: 08/464,364                                    Page 24

Art Unit: 1636

315.    (new) The method of claim 172, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

316.    (new) The method of claim 172, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

317.    (new) The method of claim 172 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

318.    (new) The method of claim 172, carried out on human cells.

319.    (new) The method of claim 172 or 318, carried out on immune cells.

320.    (new) The method of claim 172 or 318, carried out on lymphoid cells.

321.    (new) The method of claim 172 or 318, carried out on liver cells.

322.    (new) The method of claim 173 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

Application/Control Number: 08/464,364                                        Page 25

Art Unit: 1636

323. (new) The method of claim 173 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

324. (new) The method of claim 173, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

325. (new) The method of claim 173, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

326. (new) The method of claim 173, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

327. (new) The method of claim 173 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

328. (new) The method of claim 173, carried out on human cells.

329. (new) The method of claim 173 or 328, carried out on lymphoid cells.

Application/Control Number: 08/464,364                                    Page 26

Art Unit: 1636

330. (new) The method of claim 174 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

331. (new) The method of claim 174 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

332. (new) The method of claim 174, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

333. (new) The method of claim 174, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

334. (new) The method of claim 174, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

335. (new) The method of claim 174 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

336. (new) The method of claim 174, carried out on human cells.

Application/Control Number: 08/464,364                                    Page 27

Art Unit: 1636

337.    (new) The method of claim 174 or 336, carried out on immune cells.

338.    (new) The method of claim 174 or 336, carried out on lymphoid cells.

339.    (new) The method of claim 174 or 336, carried out on liver cells.

340.    (new) The method of claim 175 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

341.    (new) The method of claim 175 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

342.    (new) The method of claim 175, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

343.    (new) The method of claim 175, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

344.    (new) The method of claim 175, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

Application/Control Number: 08/464,364                                    Page 28

Art Unit: 1636

345. (new) The method of claim 175 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

346. (new) The method of claim 175, carried out on human cells.

347. (new) The method of claim 175 or 346, carried out on immune cells.

348. (new) The method of claim 175 or 346, carried out on lymphoid cells.

349. (new) The method of claim 175 or 346, carried out on liver cells.

350. (new) The method of claim 176, carried out on mammalian cells.

351. (new) The method of claim 176, carried out on human cells.

352. (new) The method of claim 350 or 351, carried out on immune cells.

353. (new) The method of claim 350 or 351, carried out on lymphoid cells.

Application/Control Number: 08/464,364                                    Page 29

Art Unit: 1636

354. (new) The method of claim 350 or 351, carried out on liver cells.

355. (new) The method of claim 161 wherein NF-κB activity is reduced by decreasing the level

of NF-κB not bound in an NF-κB:IκB complex.

356. (new) The method of claim 161 wherein NF-κB activity is reduced by inhibiting the

passage of NF-κB into the nucleus of cells.

357. (new) The method of claim 161, wherein NF-κB activity is reduced by inhibiting

modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

358. (new) The method of claim 161, wherein NF-κB activity is reduced by inhibiting

degradation of an IκB protein.

359. (new) The method of claim 161, wherein NF-κB activity is reduced by inhibiting

dissociation of NF-κB:IκB complexes.

360. (new) The method of claim 161 wherein reducing NF-κB activity comprises reducing

binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by

NF-κB.

Application/Control Number: 08/464,364                                    Page 30

Art Unit: 1636

361.    (new) The method of claim 161, carried out on mammalian cells.

362.    (new) The method of claim 161, carried out on human cells.

363.    (new) The method of claim 361 or 362, carried out on immune cells.

364.    (new) The method of claim 361 or 362, carried out on lymphoid cells.

365.    (new) The method of claim 361 or 362, carried out on liver cells.

The following is an examiner's statement of reasons for allowance:


Examiner has reviewed the last response and accompanying references which provide

substantiating examples of the claimed methods.  The claims are deemed allowable in view of

applicants' claim amendments and arguments, applicants' withdrawal of the remaining pending

claims to expedite prosecution and their agreement to make several language changes of a formal

nature.


Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

Application/Control Number: 08/464,364                              Page 31

Art Unit: 1636

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to David Guzo whose telephone number is (703) 308-1906. The examiner can

normally be reached on Monday-Thursday from 8:00 AM to 5:30 PM. The examiner can also be

reached on alternate Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's acting

supervisor Robert Schwartzman, can be reached at (703) 308-7307. The fax phone number for

the organization where this application is assigned is (703) 308-4242.

Any inquiry of a general nature or relating to the status of this application or relating to

attachments to this Office Action should be directed to Patent Analyst Zeta Adams, whose

telephone number is (703) 305-3291.

DAVID GUZO
PRIMARY EXAMINER

October 4, 2001

# EXHIBIT 57

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION, AMGEN          )
USA INC., AMGEN MANUFACTURING LIMITED, and      )
IMMUNEX RHODE ISLAND CORPORATION,               )
                                                )
                                                )          C.A. No. 06-259-MPT
            Plaintiffs,                         )
                                                )
                                                )
        v.                                      )
                                                )
                                                )
ARIAD PHARMACEUTICALS, INC., and THE            )
WHITEHEAD INSTITUTE FOR BIOMEDICAL              )
RESEARCH,                                       )
                                                )
                                                )
            Defendants                          )
                                                )
                                                )
ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS      )
INSTITUTE OF TECHNOLOGY, THE PRESIDENT and      )
FELLOWS OF HARVARD COLLEGE, and THE             )
WHITEHEAD INSTITUTE FOR BIOMEDICAL              )
RESEARCH                                        )
                                                )
            Counterclaim Plaintiffs,            )
                                                )
        v.
AMGEN INC., IMMUNEX CORPORATION, AMGEN
USA INC., AMGEN MANUFACTURING LIMITED,
IMMUNEX RHODE ISLAND CORPORATION

            Counterclaim Defendants.

**REPLY REPORT OF JEFFREY V. RAVETCH, M.D., Ph.D.**

        I, Jeffrey V. Ravetch, M.D., Ph.D., submit the following report on behalf of

ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead Institute

for Biomedical Research, and The President and Fellows of Harvard College (collectively

"ARIAD") in the above-captioned action.

*Amgen v. Ariad*
**Ravetch Dep Exhibit**

**3**

## I.    BACKGROUND

1.    I have been asked to opine on several subjects relevant to the litigation of the above-captioned action, including the proper construction of certain claims of U.S. Patent No. 6,410,516 (the "'516 Patent"). Specifically, I have been asked to respond to certain of the opinions expressed in the reports of Dr. Alisa Koch and Dr. Randolph Wall, submitted on behalf of Amgen on February 22, 2008.

## II.    PERSON OF ORDINARY SKILL IN THE ART

2.    In my initial report, I opined that a hypothetical person of ordinary skill in the art (a "POSA"), for the purpose of interpreting the claims of the '516 Patent and reducing those claimed inventions to practice is a scientist with a Ph.D. in chemistry, biology, or related field, or a degree in medicine and having at least three years of post-doctoral laboratory training or other laboratory experience related to molecular biology and gene regulation. I based that opinion on the level of skill in the art on the level of education, skill and experience possessed by individuals working in the field of molecular biology in the mid-to-late 1980s.

3.    I have read the second report of Dr. Randolph Wall and I understand that he has opined that a POSA should be defined as a person with "a Ph.D. in molecular biology, cellular biology, microbiology, or a related field, and at least two additional years of laboratory experience in [those] areas."[1] I note that Dr. Wall's definition is similar to my own, in large part, because a scientist with a Ph.D. and post-doctoral experience in one of the named fields would mostly likely have significant experience in gene regulation. However, to the extent that Dr. Wall's definition does not explicitly require post-doctoral experience in gene regulation, it is

---

[1] Wall Rebuttal Rep. at 4.

2

incomplete.  The specification and the claims of the '516 Patent are clearly directed towards

gene regulation.

### III.    CLAIM CONSTRUCTION

4.      I understand that claims are construed according to their ordinary and

customary meaning, as would be understood by a person of ordinary skill in the art at the time

of the invention and in light of the specification.  Although my proposed definition of a POSA

differs from Dr. Wall's proposed definition, my construction of the claims does not change upon

application of either definition.

#### A.      Construction of Terms Found in Claim 6

Claim 6:  A method for diminishing induced NF–κB-mediated intracellular
signaling comprising reducing NF–κB activity in cells such that NF–κB–mediated
intracellular signaling is diminished.

5.      I have read Dr. Wall's second report and I disagree with his construction of claim

6 of the '516 Patent.  Specifically, I disagree on the proper meaning to accord (1) the preamble of

the claim, (2) "reducing," (3) "NF–κB activity," (4) "in cells, (5) "NF–κB–mediated–intracellular

signaling" and (6) "is diminished."

6.      **Preamble of Claim 6:  A method for diminishing induced NF–κB–mediated**

**intracellular signaling.**  Below is a table reproducing my previous construction of the preamble

of the '516 Patent ("ARIAD's Construction") and Dr. Wall's construction ("Amgen's

Construction") of the same:

| ARIAD'S Construction | Amgen's Construction |
|---|---|
| A method for inhibiting the intracellular steps of the NF–κB signal transduction pathway, performed after the pathway has been initiated in response to application of a stimulus. | A method for decreasing any existing molecular interactions within cells effected by, or conveyed through NF–κB. |

3

7.     I disagree with Dr. Wall's opinion that the preamble of claim 6 need not be construed to define the proper scope of the claim.[2]  I have been informed by counsel for ARIAD that the preamble may limit the scope of a claim when it contributes to the definition of the claimed invention.  At minimum, the word "induced" in the preamble informs the meaning of the phrase "reducing NF–κB activity" in the body of the claim.  In other words, because the preamble states that the claimed method is directed towards the reduction of "*induced* NF–κB–mediated intracellular signaling," one must interpret the terms "*reducing* NF–κB activity" and "such that NF–κB–mediated intracellular signaling *is diminished*" to require the induction of NF–κB activity to have occured prior to the performance of the method.

8.     The limitation, "a method for diminishing," requires an affirmative act directed towards causing a reduction of NF–κB activity.  The specification teaches that the claimed inventions are not directed towards any natural processes by which NF–κB activity may be reduced:

> Different cell types and different genes respond to this one signal [NF–κB], which serves as a central "control," whose activity can be *altered* by means of the present invention.  As used, the terms altering or modifying mean changing the activity or function of NF–κB *in such a manner that it differs from the naturally occurring activity* of NF–κB under the same conditions (e.g. is greater than or less than, including no activity, the naturally occurring NF–κB activity ... etc.).[3]

In other words, the claims are directed to alteration (*e.g.*, reduction) of NF–κB activity such that it differs from the naturally occurring NF–κB activity under the same conditions:  *e.g.*, the reduction of NF–κB activity to a greater extent than would occur naturally.  That natural processes are not encompassed by the scope of the claims is further supported by the fact that

---

[2] Wall Rebuttal Rep. at 12-13.

[3] '516 Patent at 12:48-56.

4

the specification of the '516 Patent teaches only artificial means of reducing induced NF–κB activity, requiring affirmative steps to manipulate the level of gene expression mediated by active NF–κB.

9.    **Body of Claim 6: reducing NF–κB activity in cells such that NF–κB–mediated intracellular signaling is diminished.** Below is a table reproducing my previous construction of the terms "NF–κB", "NF–κB activity" and "NF–κB–mediated intracellular signaling" ("ARIAD's Construction") and Dr. Wall's construction of the same:

| Term | ARIAD'S Construction | Amgen's Construction |
|------|----------------------|----------------------|
| NF–κB | A DNA-binding protein factor found in many eucaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes. | A protein having each NF–κB activity. |
| NF–κB Activity | The ability of NF–κB to act as an intracellular messenger that regulates transcription of particular genes. | The ability [of NF–κB] to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 of the '516 Patent. |
| NF–κB–Mediated Intracellular Signaling | The intracellular steps of the NF–κB signal transduction pathway. | Molecular interactions within cells effected by, or conveyed through NF–κB. |

10.    I generally agree with the functional definition of "NF–κB" proposed in Dr. Wall's report, to wit: NF–κB is a protein that functions as an intracellular messenger by (a) dissociating from its natural inhibitor IκB, (b) translocating into the nucleus of the cell, and (c)

5

binding to specific DNA recognition sequences.[4]  However, I regard the definition that I

provided in my first report as more complete, and more accurate, because it reflects the facts

that NF-κB, as noted in the specification,[5] is not found in all cells, and is bound to an inactive

precursor in unstimulated cells.  Further, while I agree that NF-κB is capable of binding to the

recognition sequences listed in Table 2 of the '516 Patent, I would not limit the definition of NF–

κB to a protein that binds only those sequences.  As the specification indicates, Table 2 is a list of

the sequences recognized by NF-κB that were known at the time, and a proposed consensus

sequence; it is not an exhaustive list.[6]  To the extent that Dr. Wall implies otherwise, he is

incorrect.

      11.     Dr. Wall's proposed definition for "NF-κB activity" is inadequate because it is

limited to three discrete steps of the NF-κB pathway.  Although each of the three steps of the

NF-κB pathway identified by Dr. Wall is properly considered part of "NF-κB activity," the

term, as it is used in the asserted claims, is not so limited.  The specification of the '516 Patent

describes the role of NF-κB as a mediator of gene expression, which is activated in response to

external stimuli.[7]  As described in the specification, the NF-κB signal transduction pathway

consists of (and is described in the specification of the '516 Patent as containing) five general

steps:  (1) occurrence of an external stimulus, such as the binding of an agonist to its receptor on

the cell surface; (2) dissociation of the NF-κB:IκB complex; (3) translocation of NF-κB; (4) the

binding of NF-κB to its DNA recognition sequences; and (5) expression of the gene mediated by

---

[4] Wall Rebuttal Rep. at 7.

[5] '516 Patent at 2:27-29.

[6] '516 Patent at 36:1-37:42 (note the apparent typo at 36:56, where Table 2 is misidentified as Table 1).

[7] '516 Patent at 15:12-14; 17:47-50; 30:42-31:56.

6

NF–κB.[8]  As I opined in my initial report, reduction of NF–κB activity can be accomplished by

inhibiting any step along this pathway.  Inhibition of any one step along the pathway will cause

a reduction of the occurrence the downstream steps of the pathway, which is a reduction of NF–

κB activity.  For example, as Dr. Wall notes, certain claims that depend on claim 6 are directed

to reducing NF–κB activity by "decreasing the level of NF–κB not bound in an NF–κB:IκB

complex, " "inhibiting modification of an IκB protein, which modification otherwise reduces

IκB binding to NF–κB," "inhibit[ing] degradation of an IκB protein," and "inhibiting

dissociation of NF–κB:IκB complexes."[9]  Although these methods can be practiced by

intracellular methods, they can also be practiced by interfering with the first step of the NF–κB

pathway – *i.e.*, the binding of an agonist of the NF–κB pathway to its receptor – thereby

preventing dissociation of NF–κB:IκB complexes, which can be accomplished extracellularly.

        12.        That Dr. Wall's definition erroneously narrows the scope of the term "NF–κB

activity" is immediately apparent upon comparison to his definition for "NF–κB–mediated

intracellular signaling."  Dr. Wall defines the latter as "molecular interactions within cells,

effected by, or conveyed through NF–κB."[10]  However, I understand  "molecular interactions

within cells, effected by, or conveyed through NF–κB" to be limited to the same three steps of

the NF–κB pathway that Dr. Wall suggests delimit the scope of "NF–κB activity."  In other

words, Dr. Wall's definitions conflate the terms "NF–κB–mediated intracellular signaling" and

"NF–κB activity."  Applying these coextensive definitions, Dr. Wall would appear to argue that

claim 6 means:  a method for reducing induced NF–κB activity comprising reducing NF–κB

---

[8] '516 Patent at 35:13-15; 37:43-49; 37:50-54; 38:6-22.

[9] '516 Patent Claims 20, 22-24.

[10] Wall Rebuttal Rep. at 11.

7

activity such that NF–κB activity is reduced. Dr. Wall's construction would render the claim

meaningless. To avoid that result, it is necessary, and more natural, to read "NF–κB–mediated

intracellular signaling" to refer to the intracellular steps of the NF–κB signal transduction

pathway, and "NF–κB activity" to refer to the activity by which NF–κB acts as an intracellular

messenger that regulates the transcription of particular genes, i.e. the steps of the NF–κB

signaling pathway.

      13.     **Body of Claim 6: reducing NF–κB activity in cells such that NF–κB–mediated**

**intracellular signaling is diminished.** Below is a table reproducing my previous construction

("ARIAD's Construction") of the terms "Reducing" and "Diminished" and Dr. Wall's

construction ("Amgen's Construction") of the same:

| Term | ARIAD'S Construction | Amgen's Construction |
|---|---|---|
| **Reducing [an Activity]** | Decreasing an existing activity. | Decreasing an existing activity, or preventing that activity from ever coming to be. |
| **[Signaling] is Diminished** | [Signaling] is reduced from an existing state to a lower state. | [Signaling] is reduced from an existing state to a lower state, or is inhibited from existing or from reaching an elevated state. |

      14.     In his report, Dr. Wall also opines that the term "reducing" should be defined

broadly to encompass both the process of decreasing an existing activity and the process of

preventing that activity from coming to be. In other words, Dr. Wall suggests, counter

intuitively, that a quantity that does not yet exist can be reduced. Similarly, he suggests "is

diminished" should be defined to encompass both the reduction of signaling activity from an

elevated state to a lower state, and the prevention of that activity from ever reaching an

elevated state, or the prevention of that activity from coming into existence. Dr. Wall's claim

construction not only disregards the ordinary meanings of the relevant verbs, but also fails to

8

account for the significant biological difference between influencing an activated (and/or diseased) cell and prophylactic treatment of quiescent (and/or healthy) cells.

15.    As I explained in ¶ 7 above, the word "induced" in the preamble of claim 6 provides context for the terms "reducing" and "is diminished" in the body of claim 6. As I explained in my initial report, the word "induced" is a past participle – a word that expresses a completed action – that modifies "NF–κB–mediated intracellular signaling" in the preamble of the claim. In other words, the preamble indicates that claim 6 is directed to a method for reducing NF–κB–mediated intracellular signaling that has already been induced by a stimulus. The stimulus must have been applied to the cells to induce the intracellular signaling, before the method can be practiced.

16.    Even ignoring the contextual importance of the word "induced" in the preamble, the claims cannot fairly be read to encompass the addition of a stimulus at the same time as, or after the addition of, an inhibitor of NF–κB activity. An act of "reducing" an activity necessarily requires that the activity exist at some level capable of reduction. Similarly, for an activity to "[be] diminished," that activity must already exist and must exist at an elevated state from which it can be diminished. Indeed, Dr. Wall concedes that NF–κB mediated intracellular signaling exists only insofar as it has been induced:

> "NF–κB–mediated intracellular signaling" only exists insofar as it has been "induced." In other words, "NF–κB–mediated intracellular signaling" *only exists insofar as it has been "induced."* …
>
> [T]o one of ordinary skill in the art, "induced" qualifies "NF–κB–mediated intracellular signaling" and means that the "NF–κB–mediated intracellular signaling" is "existing" such that it can be diminished.[11]

_____

[11] Wall Rebuttal Rep. at 13.

9

Dr. Wall appears to make the contradictory argument that "NF–κB–mediated intracellular signaling" exists only after it has been induced, but that it can be reduced by application of an antagonist of NF–κB activity before the signaling exists. This ignores both the language of the claims, and the significant difference between reduction of an elevated activity (treatment) and prophylaxis (prevention).

17.    Dr. Koch misinterprets and misapplies the requirement of prior induction, as explained in my first report, and which Dr. Verma explained in his declarations submitted during the reexamination of the '516 Patent. As Dr. Verma noted in his Nov. 9, 2006 declaration:

> [T]he above claims [including 6, 18, 70-72 & 183-184] are directed to methods carried out on cells *in which NF–κB activity has first been induced* by some external stimulus, in other words a eukaryotic cell in which NF–κB activity is activated by the presence of an external influence.[12]

Thus, the asserted claims are directed to reducing NF–κB activity in cells, in which NF–κB activity has been induced by some external stimulus. The requirement of prior induction draws a distinction between the treatment of activated cells and prophylactic treatment of quiescent cells.

18.    Dr. Koch misinterprets the limitation of prior induction as requiring that the method specifically intercept a discrete intracellular signal. Specifically, Dr. Koch suggests that Enbrel does not infringe the asserted claims because it "only prevents additional NF–κB from becoming activated." That opinion mischaracterizes the claim construction opinion expressed in my first report, and the declarations of Dr. Verma, and reflects a misunderstanding of NF–κB activity. The induction of NF–κB activity by TNF–α does not result in a discrete signaling event,

---

[12] Verma Decl. at ¶ 127 (Nov. 9, 2006), cited in Koch Rep. at 62.

but is characterized by a cascade of intracellular signaling. Once NF–κB activity is induced, the cell is in an activated state. To reduce NF–κB activity, after it has been induced, a method need not impede a particular signal or specific molecule of NF–κB to infringe the asserted claims. To infringe the asserted claims, a method, applied to eukaryotic cells, need only reduce NF–κB activity previously induced by an external stimulus, to a greater extent than would otherwise occur.

19.    **Body of Claim 6: reducing NF–κB activity in cells such that NF–κB–mediated intracellular signaling is diminished.** Below is a table reproducing my previous construction ("ARIAD's Construction") of the term "in cells" and Dr. Wall's construction ("Amgen's Construction") of the same:

| Term | ARIAD'S Construction | Amgen's Construction |
|------|----------------------|----------------------|
| [reducing NF–κB activity] In Cells | Means that the claimed method of "inhibiting NF–κB activity" is performed using intact cells, whether in cell culture or in living tissue, as opposed to methods performed in cell extracts. | Means taking action inside a cell to directly inhibit (interfere or block) an NF–κB activity. |

20.    As, I explained in my initial report, the limitation "in cells" means that the claimed method must be performed using intact cells, rather than lysed cellular extracts, or non-cellular, nuclear or cytosolic vesicles. The specification describes modulation of NF–κB activity in cultured, immortal cell lines[13] and in intact cells found in living tissue.[14] The '516 Patent also

---

[13] '516 Patent at 17:58-61; 25:40-26:38.

[14] '516 Patent at 3:23-26; 4:23-28.

describes the results of many experiments involving cell extracts.[15]  In fact, the phrase "NF–κB

activity" is used in the specification to describe more than one phenomena.  As used in the

specification, "NF–κB activity" not only describes the activity by which NF–κB acts as an

intracellular messenger,[16] it also describes the appearance of a band (reflecting a binding

"activity") on a gel from an EMSA assay.[17]  In light of the specification, a POSA would

understand the limitation "in cells" to exclude methods of reducing NF–κB activity in cell

extracts from the scope of claim 6.  To the extent that Dr. Wall implies that, in the context of the

'516 Patent, "NF–κB activity" describes only an activity occurring in cells, he is incorrect.

21.    Dr. Wall's interpretation of the term "reducing NF–κB activity in [] cell[s]"[18] to

mean "taking action inside the cell to directly inhibit (interfere or block) an NF–κB activity" is

inconsistent with the teachings of the specification.  Dr. Wall's insistence notwithstanding, it is

not apparent "[o]n its face"[19] that the prepositional phrase "in cells" modifies "reducing."  To

the contrary, a more natural reading of claim 6 suggests that "in cells" modifies the closer term,

"NF–κB activity."  Thus, the claim is infringed so long as an agent or technique reduces that

activity "in cells" in some way, without regard to whether the reducing agent/technique is itself

"in" a cell.  It is clear from the breadth of the asserted claims, and the language of the

---

[15] *See, e.g.,* '516 Patent at 76:13-77:3, 78:14-41.

[16] *See, e.g.,* '516 Patent at 15:54-16:35.

[17] *See, e.g.,* '516 Patent at 23:19-21 ("In nuclear extracts from TPA-stimulated cells, NF–κB activity was exclusively found in a molecular weight region of 62-55kDa."); 23:24-27 ("In nuclear extracts from control cells, much less NF–κB activity was found in the same molecular weight fraction after renaturation (FIG. 30, lanes 3 and 4).").

[18] I note that, contrary to the implication of Dr. Wall's report, the phrase "in *the* cell" does not appear in claim 6.

[19] Wall Rebuttal Rep. at 8.

12

specification that the limitation "in cells" does not require that the reducing agent/technique be

introduced into the target cells. Although several of the unasserted claims recite methods of

reducing NF–κB activity that necessarily take place in the cell – such as the use of vectors

encoding the gene for IκB, prevention of the translocation of NF–κB to the nucleus, or

preventing NF–κB from binding to its DNA recognition sequences – it is clear that the asserted

claims are not so limited. For example, as described in Dr. Livingston's report, the specification

also teaches the use of antagonists of NF–κB activity, and methods of screening for such

antagonists.[20] As Dr. Livingston noted in his discussion of cytokine antibodies, a POSA would

not understand methods employing antagonists to be limited to intracellular methods.

> **B.**    **Construction of Terms Found in Claim 18**

> Claim 18: A method for reducing Interleukin–1 or Tumor Necrosis Factor–α
> activity in mammalian cells comprising reducing NF–κB activity in the cells so as
> to reduce intracellular signaling caused by Interleukin–1 or Tumor Necrosis
> Factor–α in the cells.

22.    **Preamble of Claim 18: A method for reducing Interleukin–1 or Tumor**

**Necrosis Factor–α activity in mammalian cells.** Below is a table reproducing my previous

construction ("ARIAD's Construction") of the preamble of claim 18 and Dr. Wall's construction

("Amgen's Construction") of the same:

| ARIAD'S Construction | Amgen's Construction |
|---|---|
| A method for inhibiting the intracellular NF–κB signal transduction induced by the circulating cytokines, Interleukin–1 or Tumor Necrosis Factor–α. | A method for taking action inside the cell to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin–1 or Tumor Necrosis Factor–α. |

---

[20] In light of the discussion of screening for antagonists of gene expression, it is clear that the breadth of the independent claims 6 and 18 is not limited to the combined breadth of claims dependent thereon, as Dr. Wall implies in his rebuttal report at page 10.

23.    As with his construction of claim 6, Dr. Wall erroneously opines that the preamble of claim 18 does not limit the scope of the claims. However, there are two important elements contained with the preamble of claim 18 that are necessary to properly define the scope of the claim. First, it is clear that the preamble is intended to limit the claim because it contains the phrase "in mammalian cells" (defined in ¶ 27 below), which is not repeated in the body of the claim. The phrase "in the cells," which is repeated twice in the body of the claim, refers back to and is limited by the phrase "in mammalian cells" in the preamble. As with claim 6, the prepositional phrase "in … cells" modifies "activity," not the act of reduction. Hence, as with claim 6, the claim is infringed so long as the activity of NF-kB within a cell is reduced, without regard to the location of the reducing agent or technique.

24.    The phrase "Interleukin–1 or Tumor Necrosis Factor–α activity" (hereinafter "IL–1 or TNF–α activity") provides additional context for the meaning of the word "activity" as it is used in claim 18, and in other asserted claims. Dr. Wall's definition of "NF–κB activity" is limited to three steps of the NF–κB signaling pathway that involve the release, transport, and binding of an NF–κB molecule. If Dr. Wall is correct that the "activity" of a molecule refers only to events involving the binding or transport of that molecule, then "IL–1 or TNF–α activity" necessarily refers only to the extracellular transport and extracellular binding of the cytokines to their receptors. That is inconsistent, however, with Dr. Wall's definition of "IL–1 or TNF–α activity," which he defines as "any molecular interaction within cells caused by Interleukin–1 or Tumor Necrosis Factor–α."[21] This definition is similar to the broad definition of NF–κB activity that I have proposed: the activity by which NF–κB acts as an intracellular messenger that regulates the transcription of particular genes, i.e. the steps of the NF–κB signaling pathway.

---

[21] Wall Rebuttal Rep. at 14.

14

Thus, Dr. Wall appears to propose both a narrow (limited to binding and translocation) and broad (describing the signaling pathway) construction to the same word within a single claim. It cannot be both. Properly construed, "IL–1 or TNF–α activity" refers to the intracellular NF–κB signal transduction induced by the circulating cytokines, IL–1 or TNF–α, and can be reduced by inhibiting any step along the NF–κB pathway.

      25.     **Body of Claim 18:  A method for reducing Interleukin–1 or Tumor Necrosis Factor–α activity in mammalian cells.**  Below is a table reproducing my previous construction ("ARIAD's Construction") of the terms "intracellular signaling caused by IL–1 or TNF–α," "reducing" and  "so as to reduce" and Dr. Wall's construction ("Amgen's Construction") of the same:

| Term | ARIAD'S Construction | Amgen's Construction |
|---|---|---|
| **Intracellular Signaling Caused by IL–1 or TNF–α** | Signaling along the intracellular steps of the NF–κB pathway, having been induced by the binding of IL–1 or TNF–α to their receptors, prior to the performance of the claimed method. | Any molecular interaction within cells caused by Interleukin–1 or Tumor Necrosis Factor–α. |
| **Reducing [an activity] … So As to Reduce [-signaling]** | Decreasing [an existing activity] so as to decrease [signaling]. | Decreasing an existing activity, or preventing the induction of that activity, so as to reduce signaling or to prevent that signaling from occurring. |

      26.     As discussed in ¶¶ 13-18 above, the claim limitation "reducing" necessarily requires that the activity must already exist and must exist at an elevated state from which it can be diminished.  Dr. Wall's construction of the term "reducing [an activity]" to encompass preventing the induction of that activity is overbroad and not supported by the language of the claim or the teaching of the patent.

C.    **Construction of Terms Found in Dependent Claims.**

27.    Below is a table reproducing my previous construction ("ARIAD's

Construction") of the terms "mammalian cells," "human cells" and "immune cells" and Dr.

Wall's construction ("Amgen's Construction") of the same:

| Limitation | ARIAD'S Construction | Amgen's Construction |
|---|---|---|
| "Mammalian cells" | Intact cells containing NF–κB, whether in cell culture or living tissue, that come from a species falling within the class of mammals. | Intact cells, whether in cell culture or living tissue, from a human being. |
| "Human cells" | Intact cells containing NF–κB, whether in cell culture or living tissue, that come from a human being. | Intact cells, whether in cell culture or living tissue, from a human being. |
| "Immune cells" | Intact cells containing NF–κB, such as monocytes, mast cells, macrophages, and lymphocytes, whether in cell culture or living tissue, that help protect the body of a mammal from foreign materials and infection. | Intact cells involved in the immune response. |

28.    I do not agree with Dr. Wall's construction of the terms "mammalian cells,"

"human cells" or "immune cells" because his definitions are not limited to cells that contain

NF–κB, as required by the specification of the '516 Patent. The asserted claims are plainly

directed towards reduction NF–κB activity, a result that can be achieved only in cells that

contain NF–κB. As the specification notes, the NF–κB precursor may not be constitutively

present in all cells,[22] and the claimed inventions relate to "method[s] of regulating…the activity

of NF–κB in cells *in which it is present and capable of acting as an intracellular messenger.*"[23]  In cells

lacking the NF–κB precursor, NF–κB cannot be activated and NF–κB activity, by definition,

---

[22] '516 Patent at 12:36-41.

[23] '516 Patent at 4:5-8.

16

cannot exist, and cannot be reduced.  It is clear to a POSA that the methods of the asserted claims can be performed only on cells that contain NF–κB.

29.    Dr. Wall's argument that the terms are "generic and do[] not include any information on the factors present within the cell" is irrelevant, and ignores the teaching of the specification.[24]  The additional claim limitation requiring that the cells contain NF–κB is required not by the terms "human cells," "mammalian cells" or "immune cells" in isolation, but by the claims' requirement a *reduction* of NF–κB activity.  As such, the asserted claims are necessarily limited to those human, mammalian, or immune cells that exhibit NF–κB activity that can be reduced.

_____

Jeffrey V. Ravetch, M.D., Ph.D.

3|5|08

**Date**

---

[24] Wall Rebuttal Rep. at 10.

17

# EXHIBIT 58

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re the application of: Baltimore et al. | Group Art Unit: 1636 |
| Serial No.: 08/464,364 | Examiner: Schwartzman, R. |
| Filed: June 5, 1995 | |
| For: *Nuclear Factors Associated With Transcriptional Regulation* | |
| Attorney Docket No.: APV-035.03 | |

Assistant Commissioner for Patents
Washington, D.C. 20231

**Certificate of First Class Mailing (37 CFR 1.8(a))**

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Assistant Commissioner for Patents, Washington, D.C. 20231 on the date set forth below.

May 30, 2000                              By: _____
Date of Signature                              Isabelle M. Clauss
and of Mail Deposit

## RESPONSE AND AMENDMENT

Sir:

Applicants submit this Response and Amendment in response to the Office Action dated November 29, 1999. A Request for a Three-month Extension of Time and appropriate fee are submitted concurrently herewith.

Please amend the Application as follows.

## In the claims:

Please cancel claims 133 and 134 without prejudice and amend the remaining claims as follows:

57.    **(Amended)** A method for altering expression, in a mammalian cell, of a gene[, the transcription of which] whose expression is regulated by NF-kB, comprising altering the level of NF-kB—IkB complex present in [the cytoplasm of] said cell with an agent that binds a NF-kB protein or an IkB protein and alters the association between the two proteins and alters expression of the gene.

58.    **(Amended)** A method of inhibiting expression, in a mammalian cell, of a gene[, the transcription of which] whose expression is dependent on a DNA binding activity of a NF-kB protein, [the method] comprising inhibiting the DNA binding activity of the NF-kB protein by] contacting the cell with an agent which (i) inhibits phosphorylation of an IkB protein and/or (ii) prevents degradation of an IkB protein, or both [which IkB forms a transcriptionally inactive complex with the NF-kB protein, wherein the agent inhibits expression of the gene].

61.    **(Amended)** A method of inducing DNA-binding and nuclear translocation of NF-kB present in the cyotosol of a mammalian host cell, comprising treating the cell with a substance which causes dissociation of NF-kB--IkB complexes, resulting in induction of DNA-binding activity and nuclear translocation of the NF-kB present in the complex.

103.    **(Amended)** The method of claim 61, wherein the substance leads to a decrease[s] in the level of IkB.

104.    **(Amended)** The method of claim 103, wherein the substance [causes] leads to degradation of IkB.

105.    **(Amended)** The method of claim 61, wherein the substance leads to [stimulates] stimulation of phosphorylation of IkB.

108.    **(Amended)** The method of claim 107, wherein the agent leads to [inhibits] inhibition of degradation of the IkB protein.

110.    **(Amended)** The method of claim [109] 58, wherein the cell is a human cell.

113.    **(Amended)** The method of claim 112, wherein the agent [inhibits] leads to inhibition of NF-kB-dependent gene transcription.

114.    **(Amended)** The method of claim 112, wherein the agent leads to potentiation of [potentiates] NF-kB-dependent gene transcription.

115.    **(Amended)** The method of claim 112 or 113, wherein the agent [inhibits] leads to inhibition of phosphorylation of an IkB protein.

116.    **(Amended)** The method of claim 112 or 113, wherein the agent [increases] leads to an increase in the stability of an IkB protein.

117.    **(Amended)**   The method of claim 112 or 113, wherein the agent [inhibits] <u>leads to inhibition of</u> nuclear localization of a NF-kB protein.

118.    **(Amended)**   The method of claim 112 or 114, wherein the agent <u>leads to potentiation of</u> [potentiates] nuclear localization of a NF-kB protein.

119.    **(Amended)**   The method of claim 112, wherein the agent [inhibits] <u>leads to inhibition of</u> formation of protein:protein complexes including NF-kB and IkB proteins.

120.    **(Amended)**   The method of claim 112 or 113, wherein the agent agent [inhibits] <u>leads to inhibition of</u> a DNA-binding activity of NF-kB.

128.    **(Amended)** The method of claim 112, 122, 123[, 123], 125 or 126, wherein the agent is identified in a competitive binding assay using a NF-kB or IkB protein, or portion thereof.

132.    **(Amended)** The method of claim 112, 122, 123 or 126, wherein the agent is identified in a nuclear localization assay which [directly] detects a NF-kB protein.

135.    **(Amended)** A method for altering an activity of [a] NF-kB [gene product] in a mammalian cell, comprising

(a)    identifying an agent by its ability to bind to a NF-kB protein or an IkB protein, which agent alters an activity of the NF-kB protein in a cell; and

(b)    treating a mammalian cell with an agent identified in (a) [, in an amount sufficient] to alter the activity of NF-kB in the cell [,
to thereby modulate the activity of NF-kB in the cell].

141.    **(Amended)** The method of claim 135, wherein modulating the activity of NF-kB [in a cell] comprises modulating the activity of IkB.

144.    **(Amended)** The method of claim 136, wherein identifying the agent which modulates NF-kB activity comprises [contacting a cell with a test agent, said cell comprising] <u>comparing expression of</u> a gene operably linked to at least one NF-kB binding site, [and comparing expression of the gene in the cell contacted with the] <u>in the presence and absence of a</u> test agent, [relative to a cell which was not contacted with the test agent,] wherein a difference in the expression of the gene [in the cell contacted with the test agent relative to a cell which was not contacted with the test agent] indicates that the test agent modulates the activity of NF-kB.

150.    (Amended) A method for inhibiting the activity of NF-kB in a mammalian cell, comprising

   (a)    identifying an agent which inhibits IkB phosphorylation; and
   (b)    treating a mammalian cell with the agent of (a) [in an amount sufficient] to inhibit the activity of NF-kB in the cell [,
   to thereby inhibit the activity of NF-kB in the cell].

Please add new claims 155-157:

−155.    A method for altering NF-kB-dependent gene transcription in a mammalian cell, comprising contacting a mammalian cell with an agent that has been identified by its ability to

   (i)    alter the level of phosphorylation of an IkB protein,
   (ii)    alter the level of an IkB protein,
   (iii)    alter the nuclear localization of a NF-kB protein,
   (iv)    alter the level of protein:protein complexes including NF-kB and IkB proteins, and/or
   (v)    alter the DNA binding activity of NF-kB,
   to alter NF-kB-dependent gene transcription in the cell.

156.    A method for altering an activity of NF-kB in a mammalian cell, comprising contacting a cell with an agent that has been identified by its ability to bind to a NF-kB protein or an IkB protein, which agent alters an activity of the NF-kB protein in a cell, to modulate the activity of NF-kB in the cell.

157.    A method for inhibiting the activity of NF-kB in a mammalian cell, comprising contacting a cell with an agent that has been identified by its ability to inhibit phosphorylation, to inhibit NF-kB in the cell.−−

## Remarks

Claims 57-59, 61-63, 93, and 97-108 and 110-154 are pending. Claims 133 and 134 have been canceled. Claims 57, 58, 61, 103-105, 108, 110, 113, 120, 128, 132, 135, 141, 144, and 150 have been amended. New claims 155-157 have been added. Support for the claim amendments and new claims can be found throughout the specification. No new matter has been added.

Cancellation and/or amendment of claims should in no way be construed as an acquiescence to any of the Examiner's rejections. The cancellation and/or amendments to the claims are being made solely to expedite prosecution of the present application. Applicants

reserve the option to further prosecute the same or similar claims in the instant or in a subsequent patent application.

### Claim objections

Claims 110 and 128 have been objected to by the Examiner. The claims have been amended, and as amended are believed to obviate the objection. Withdrawal of this rejection is thus respectfully requested.

### Rejection of claims 57-59, 61, 63, 93, 97-108, 110, 112-152 and 154 under 35 U.S.C. § 112, first paragraph

Claims 58-59, 61, 63, 93, 97-108, 110, 112-152 and 154 have been rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention. Applicants respectfully traverse this rejection.

The Examiner states that "[t]he specification discloses a few agents which activate NF-κB when they contact a cell (...), oligonucleotide decoys comprising the NF-κB binding site and the use of NF-κB and IκB proteins as agents to modulate NF-κB-dependent transcription. No other agents are disclosed, in particular agents which inhibit phosphorylation of IκB, prevent degradation of IκB, decrease the level of IκB or stimulate phosphorylation of IκB. The disclosure of the compounds listed above is not deemed to be descriptive of the complete structure of a representative number of species encompassed by the claims as one of skill in the art cannot envision agents having each of the claimed capabilities or even other agents having the same capabilities of the compounds listed above. Nor is there a description of a representative number of species in terms of a partial structure and relevant identifying characteristics as there is no disclosed correlation between particular structures and the desired capabilities."

An essential goal of the written description of the invention requirement is to clearly convey that an applicant has invented the subject matter which is claimed. An objective standard for determining compliance with the written description requirement is whether the description clearly allows persons of ordinary skill in the art to recognize that s/he invented what is claimed. In re Gosteli, 872 F.2d 1008, 1012, 10 USPQ2d 1614, 1618 (Fed. Cir. 1989). As the PTO has previously articulated in its guidelines for Examiners, to satisfy the written description requirement, "a patent specification must describe the claimed invention in sufficient detail that one skilled in the art can reasonably conclude that the inventor had possession of the claimed invention." See Federal Register June 15, 1998 (Volume 63, Number 114) entitled "Request for Comments on Interim Guidelines for Examination of Patent Applications Under the 35 U.S.C.

112 para. 1 Written Description Requirement". Such a review should be conducted from the standpoint of one of skill in the art at the time the application was filed. Moreover, what is well known to one skilled in the art need not be disclosed. See Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367 (Fed. Cir. 1986). If a skilled artisan would have understood the inventor to be in possession of the claimed invention at the time of filing, even if every nuance of the claims is not explicitly described in the specification, then the adequate description requirement is met. See Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555 (Fed. Cir. 1991); Martin v. Johnson, 454 F.2d 746 (CCPA 1972); and M.P.E.P. § 2163.

Applicants respectfully submit that one of ordinary skill in the art would recognize from the disclosure that Applicants were in possession of the claimed invention. The claims that stand rejected are drawn to a method for modulating certain biological phenomena by modulating the activity of NF-kB or its inhibitory binding partner, Ik-B. Applicants are the pioneers who identified NF-kB as a key mediator of fundamental biological phenomena and elucidated the mechanism of NF-kB-mediated signaling. The claims are directed to the application of those discoveries, first disclosed in the subject application. The specification explicitly lays claim to: "methods of regulating (inducting or preventing) activation of NF-kB, controlling the expression of .... genes whose expression is controlled by NF-kB ..." (page 7, last paragraph, of the specification); "alter[ing] or modify[ing] the activity of NF-kB as an intracellular messenger ... "(page 8, first paragraph, of the specification); "a method of regulating or influencing transduction, by NF-kB, of extracellular signals ..." (page 8, end of first paragraph, of the specification); doing so for the "medical implications" of NF-kB function (page 9, end of bridging paragraph, of the specificaiton); with reference to both genetic and drug approaches (see e.g. page 6, end of 1st full paragraph) and with reference to the various approaches for modulating NF-kB functioning (see chart in prior response).

In a nutshell, Applicants disclosed that one can modulate biological functions by modulating NF-kB-mediated signaling; disclosed that one can do so by affecting NF-kB or Ik-B, directly or indirectly; and disclosed that a variety of classes of substances could be used to do just that. Certainly other agents could also be used in the practice of the invention, but that is not inconsistent with Applicants' possession of the claimed invention as of their filing date.

The specification provides several examples of agents which have positive and negative modulating effects, as recognized by the Examiner. Under the circumstances, that should suffice to support the generic claims. According to the USPTO Training Materials for the Revised Interim Written Description Guidelines, in cases such as this one where one would have recognized from the disclosed species that applicant was in possession of the necessary common attributes or features of the members of the genus (modulaters of NF-kB activity), then the written description requirement is met. See" Genus Analysis", page 9, of the Guidelines.

This should suffice to demonstrate possession of the generic invention, which is defined through method claims.

Furthermore, as set forth in the Synopsis of Application of Written Description Guidelines, "[t]here is a strong presumption that an adequate written description of the claimed invention is present in the specification as filed," and that "the examiner has the initial burden, …, of presenting evidence or reasons why a person skilled in the art would not recognize that the written description of the invention provides support for the claims." Applicants respectfully submit that this high standard of burden has not been met in the instant case, i.e., insufficient evidence has been set forth to prove that a person skilled in the art would not recognize that the written description of the invention provides support for the claimed methods. In particular, the evidence that was provided focuses on agents, rather than on the claimed methods. Thus, no evidence has been provided why a person skilled in the art would not recognize that the Applicants had invented methods for modulating NF-kB in a cell by identifying an agent which affects a biological activity of NF-kB and then contacting the cell with the agent.

Thus, in view of the above, Applicants respectfully request reconsideration and withdrawal of this rejection.

## Rejection of claims 57-59, 61, 63, 93, 97-108, 110, 112-152 and 154 under 35 U.S.C. § 112, first paragraph

Claims 58-59, 61, 63, 93, 97-108, 110, 112-152 and 154 have been rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to enable one skilled in the art to which it pertains, or with which it is most nearly connected, to make and/or use the invention. Applicants respectfully traverse this rejection.

The Examiner states that "[m]ost of these claims are drawn to a method of using an agent which has been identified by a particular assay," but that "[s]ince the claimed method involve the use of agents which are not disclosed in the present specification as they have yet to be identified, the specification does not teach one skill in the art how to use the unidentified agents." The Examiner further states that "[a]gents having the claimed capabilities might have any structure, including proteins, nucleic acids, small organic molecules, polymers, etc.," and that "[e]ach agent would require specific knowledge in terms of how to make it, how much to use, methods by which it can be delivered to a cell *in vitro* and *in vivo*, how it can be delivered inside a cell, how to target it to the appropriate cells and other such factors." In particular, the Examiner states that "[i]t is not sufficient that one of skill in the art knew in general how to administer DNAs, proteins, and small organic molecules to an individual. The skilled artisan did not know how to administer these agents in order to modulate NF-κB activity in a desired fashion."

The enablement requirement is met so long as the specification teaches at least one method of making and using the claimed invention. The claims that stand rejected are drawn to a method for altering an activity of NF-κB, expression of a gene whose transcription is regulated

by NF-κB, e.g., HIV, in a mammalian cell comprising, e.g., identifying an agent by its ability to alter the level of phosphorylation or the stability of an IκB protein; alter the nuclear localization of an NF-κB protein; alter the level of NF-κB-IκB complex; alter the DNA binding activity of NF-κB; or by its ability to bind to an NF-κB or IκB protein, and contacting a mammalian cell with such an agent to alter NF-κB-dependent gene transcription in the cell.

As set forth above, the Examiner acknowledged in the Office Action dated March 17, 1999 that "the specification **does** suggest that agents which regulate these two proteins could be screened for" (emphasis added), and that "[t]he experimental techniques disclosed in the specification that were used to elucidate the mechanism of NF-κB regulation could be readily adapted by the skilled artisan to screen for agents which alter NF-κB and IκB activity." Thus, the specification teaches how to screen for molecules, e.g., small molecules, peptides or nucleic acids, which modulate an activity of NF-κB.

In view of the Examiner's admission that the application teaches how to find agents which regulate NF-kB activity, the Examiner's rejection then turns on whether the specification, in light of the level of skill in the art, provides sufficient guidance as to administering such agents. Applicants point out again that the specification teaches, e.g., that proteins can be expressed in cells by using expression vectors. Various other methods for introducing proteins, nucleic acids and small molecules were well known in the art at the time the application was filed, as pointed out by Applicants in their previous response. In addition, since the skill in the art was high at the time the application was filed, a person of skill in the art could have determined using routine experimentation how to administer these molecules to a subject to obtain the desired effect. It was generally also known in the art how to determine the dose and the route of administration of a drug to a subject to obtain a desired effect, and specific doses and routes of administration could be determined by routine experimentation without undue experimentation, such as in clinical trials. In particular, at the time the application was filed, drugs were already used for treating disorders in which modulators of NF-kB can also be used, e.g., inflammation, and thus, the mode and route of administration of modulators of NF-kB can be mirrored on those of these known drugs.

Thus, reconsideration and withdrawal of this rejection is respectfully requested.


### _Rejection of claims 62, 11 and 153 under 35 U.S.C. § 112, first paragraph_

Claims 58-59, 61, 63, 93, 97-108, 110, 112-152 and 154 have been rejected under 35 U.S.C. § 112, first paragraph,

> because the specification, while being enabling for a method of inhibiting HIV DNA expression or inhibiting expression of a NF-κB-dependent gene using a nucleic acid decoy in cells _in vitro_, does not reasonably provide enablement for a method of inhibiting HIV DNA expression or inhibiting expression of a NF-κB-dependent gene using a nucleic acid decoy molecule in cells _in vivo_. The

specification does not enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to use the invention commensurate in scope with these claims.

Applicants respectfully traverse this rejection.

The enablement requirement is met so long as the specification teaches at least one method of making and using the claimed invention. Here, the specification teaches that decoy nucleic acids can be administered to a subject to inhibit NF-κB activity, e.g., to inhibit HIV replication. At the time the application was filed, techniques for introducing nucleic acids, e.g., decoy oligonucleotides, into cells were known. For example, it was known that the nucleic acids can be prepared in liposomes and the liposomes administered to a subject (see, e.g., Nicolau et al. (1984) Ciba Found. Symp. 1984 103: 254, entitled "Liposomes for gene transfer and expression *in vivo*" (abstract attached hereto as Exhibit A). The use of liposomes for administration of DNA is substantiated by, e.g., Nabel et al. (1996) *P.N.A.S.* 93: 15388, attached hereto as Exhibit B, describing clinical trials of melanoma patients with DNA-liposome complexes. Alternatively, nucleic acids can be expressed in cells *in vivo* by administration of naked vectors or recombinant viral particles to the subject. As set forth by Applicants in their last response, the use of vectors to express nucleic acids *in vivo* was well known in the art and was credible to a person of skill in the art at the time the application was filed. In this particular case, the decoy would either be the DNA in the vector, or it could be RNA molecules encoded by the vector. Thus, the specification in light of the general knowledge in the art provide sufficient guidance to allow a person of skill in the art to practice the claimed invention without undue experimentation.

Applicants respectfully submit that it is not necessary to provide working examples of *in vivo* inhibition of HIV DNA expression in a subject, so long as the use alleged in the specification is credible to a person of skill in the art. As set forth by Applicants in their last response, the use of vectors to deliver nucleic acids into cells was credible to a person of skill in the art at the time the application as filed, as demonstrated, e.g., by the adoption of gene therapy guidelines by the NIH in 1985. In addition, some experimentation is allowed to determine the exact doses and details of the clinical protocol for treating HIV.

In fact, since the application was filed, decoy oligonucleotides have been used to inhibit binding of a transcription factor to its DNA binding site both *in vitro* and *in vivo*. Numerous articles describe the efficiency of NF-κB decoy oligonucleotides for inhibiting NF-κB mediated gene expression, such as HIV replication. See for example: Khaled et al. (1998) *Clin. Immunol. Immunopath.* 86: 170 entitled "Use of phophorothioate-modified oligodeoxynucleotides to inhibit NF-κB expression and lymphocyte function," attached hereto as Exhibit C; and Tomita et al. (1998) *J. Hypertens.* 16: 993, entitled "Transcription factor decoy for nuclear factor-kappaB inhibits tumor necrosis factor-alpha-induced expression of interleukin 6 and intracellular adhesion molecule 1 in endothelial cells," attached hereto as Exhibit D."

NF-κB decoy oligonucleotides have also been used *in vivo* in animal models. For example, Kawamura et al. describe that injection of NF-kappa B decoy oligonucleotides into tumors of mice results in the inhibition of cachexia (Kawamura et al. (1999) *Gene Ther*. 6: 91 entitled "Intratumoral injection of oligonucleotides to the NF kappa B binding site inhibits cachexia in a mouse tumor model," attached hereto as Exhibit E. Morishita et al. *Nat. Med.* (1997) 3:894 and Sawa et al. *Circulation* (1997) 96:II-280 (attached hereto as Exhibits F and G, respectively), each describe a gene therapy approach for myocardial protection using in vivo transfection of cis element decoys using kB response elements. Sawa et al. describes that rat hearts were transfected with either a kB decoy or a scrambled decoy (control) by coronary infusion of hemagglutinating virus of Japan (HVJ)-liposome during cardioplegic arrest. The authors demonstrated that hearts transfected with the cis element decoy which binds NF-κB showed significant improvement in tolerance against ischemia-reperfusion injury in association with the inhibition of neutrophil adeherence and tissue IL-8 production.

Further support for substantiating the credibility of administration of decoys to inhibit transcriptional stimulation by a specific transcription factor is provided in U.S. Patent No. 6,060,310 by Cho Chung, entitled "Transcription factor decoy and tumor growth inhibitor," attached hereto as Exhibit H. In particular, in Example 5, the inventor describes that intraperitoneal injection of a decoy oligonucleotide comprising a cAMP response element (CRE) to a nude mouse that was inoculated with tumor cells resulted in greater than 85% inhibition of tumor growth, thus demonstrating the *in vivo* efficiency of decoy oligonucleotides that compete with the binding of transcription factors to their DNA binding.

The above-cited references are not offered to render an insufficient disclosure enabling, rather, they prove that the disclosure was in fact enabling when filed. In re Brana, 51 F2d 1560 (CAFC 1995).

Thus, reconsideration and withdrawal of this rejection is respectfully requested.

## Conclusion

In view of the above remarks and the amendments to the claims, it is believed that this application is in condition for allowance. If a telephone conversation with Applicant's Agent would expedite prosecution of the above-identified application, the Examiner is urged to call the undersigned at (617) 832-1000.

Respectfully submitted,
FOLEY, HOAG & ELIOT LLP

By: _____

Isabelle M. Clauss, Ph.D.
Registration No. (*see enclosed*)
Agent for Applicants

One Post Office Square
Boston, MA 02109
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

Date: May 30, 2000

# EXHIBIT 59

REPORTS

4303 (1981); J. E. Smith, B. S. Cooperman, P. Mitchell, *Biochemistry* **31**, 10825 (1992).

5. D. Dubin and R. Taylor, *J. Mol. Biol.* **121**, 523 (1978); R. Baer and D. Dubin, *Nucleic Acids Res.* **9**, 323 (1981).

6. J. Klootwijk, I. Klein, L. Grivell, *J. Mol. Biol.* **97**, 337 (1975); A. Lambowitz and D. Luck, *J. Biol. Chem.* **251**, 3081 (1976).

7. K. Struhl, *Proc. Natl. Acad. Sci. U.S.A.* **82**, 8419 (1985).

8. _____, *Nucleic Acids Res.* **13**, 8587 (1985).

9. K. Sirum-Connolly and T. L. Mason, GenBank accession number L19947.

10. GenBank accession numbers X02392 and M32744; J. Devereux, P. Haeberli, O. Smithies, *Nucleic Acids Res.* **12**, 387 (1984); S. F. Altschul, W. Gish, W. Miller, E. W. Myers, D. J. Lipman, *J. Mol. Biol.* **215**, 403 (1990); Pet56p also has 64% similarity to a partial sequence (138 amino acids) of the Pet56p homolog in *Saccharomyces kluyveri* (GenBank accession number Z14125).

11. E. Cundliffe and J. Thompson, *J. Gen. Microbiol.* **126**, 185 (1981); J. Thompson and E. Cundliffe, *Biochim* **73**, 1131 (1991).

12. Rich medium was composed of 1% yeast extract, 2% bacto-peptone, and either 2% galactose (YP-Gal), or 2% glycerol and 2% ethanol (YPGE).

13. K. Sirum-Connolly, K. Fearon, T. L. Mason, unpublished results.

14. K. Fearon and T. L. Mason, *J. Biol. Chem.* **267**, 5162 (1992).

15. K. Sirum-Connolly and T. L. Mason, unpublished results.

16. A. M. Myers, L. K. Pape, A. Tzagoloff, *EMBO J.* **4**, 2087 (1985).

17. K. Fearon and T. L. Mason, *Mol. Cell. Biol.* **8**, 3636 (1988).

18. G. Faye, C. Kujawa, H. Fukuhara, *J. Mol. Biol.* **88**, 185 (1974); G. Faye, *FEBS Lett.* **69**, 167 (1976); V. S. Parikh, M. M. Morgan, R. Scott, L. S. Clements, R. A. Butow, *Science* **235**, 576 (1987); S. Merten, R. M. Synenki, J. Locker, T. Christianson, M. Rabinowitz, *Proc. Natl. Acad. Sci. U.S.A.* **77**, 1417 (1980).

19. B. Maden and M. Salim, *J. Mol. Biol.* **88**, 133 (1974).

20. F. A. O. Marston, *Biochem. J.* **240**, 1 (1986); A. Hoess, A. K. Arthur, G. Wanner, E. Fanning, *Bio/Technol.* **6**, 1214 (1988).

21. D. Moazed and H. F. Noller, *Cell* **57**, 585 (1989); *Proc. Natl. Acad. Sci. U.S.A.* **88**, 3725 (1991).

22. W. Krzyzosiak *et al.*, *Biochemistry* **26**, 2353 (1987); P. Melançon, M. Gravel, G. Boileau, L. Brakier-Gingras, *Biochem. Cell Biol.* **65**, 1022 (1987); P. Cunningham, R. Richard, C. Weitzmann, N. Nurse, J. Ofengand, *Biochimie* **73**, 789 (1991).

23. M. Chelbi-Alix, A. Expert-Benzancon, F. Hayes, *Eur. J. Biochem.* **115**, 627 (1981).

24. Plasmids were constructed as follows. We obtained pKS1 and pKF513 by ligating a 2.8-kb Pst I fragment containing *PET56* from Ylp5-Sc3339 into the Pst I site of M13mp19 and pUC18, respectively. The plasmid pKS3 was derived from pKF513 by removal of a 710-bp Nco I–Apa I fragment within the coding region of the *PET56* gene and insertion of the *URA3* gene flanked by *hisG* repeats from the plasmid pNKY51 (25). The plasmid pDT1R contains sequences encoding domains IV and V of the 23S rRNA under the control of a T7 promoter. We obtained pKS9 and pKS10 by inserting, in both orientations, a 985-bp Ava II fragment of yeast mitochondrial 21S rDNA from an intronless *omega*⁻ strain at the Sma I site of pBluescript KS(+) (Stratagene) such that the T7 promoter could be used to generate sense (pKS10) and antisense (pKS9) transcripts of domain IV plus V of 21S rRNA. We created pKS13, a multicopy 2-μm based vector containing a *GAL1-PET56* promoter fusion, by fusing *PET56* at −15 with respect to the ATG start codon to the *GAL1* promoter in pB656 (26). And lastly, pKF517 was obtained by ligation of a 1.8-kb Bam HI–Pst I fragment from pKF513 into pATH10 (27) and was used to express a TrpE-Pet56p fusion protein in *E. coli*.

25. E. Alani, L. Cao, N. Kleckner, *Genetics* **116**, 541 (1987).

26. M. I. Ciu, T. L. Mason, G. R. Fink, *ibid.* **132**, 987 (1992).

27. T. J. Koerner, J. E. Hill, A. M. Myers, A. Tzagoloff, *Methods Enzymol.* **194**, 477 (1991).

28. *Saccharomyces cerevisiae* transformations and genetic analyses were done by standard methods. The following yeast strains were used: MM1403 ρ⁺ (*MAT**a** ade2-101 his3-Δ200 leu2-Δ1 lys2-801 trp1-Δ101 ura3-52*); COP161 U7 ρ⁺ (*MAT**a** ade lys ura3*) and the isonuclear F11ρ⁻ derivative (18); the HIS3 strain, KSY35 ρ⁺ (*MAT**a** ade2-101 leu2-Δ1 lys2-801 trp1-Δ101 ura3-52*) [obtained from MM1403 by transformation with a Pst I fragment from pKS1 (24)], and KSY24 F11ρ⁻ (*MAT**a** ade lys pet56::URA3*) [generated from COP161 U7 F11ρ⁻ by transformation with a Eco RI–Sph I fragment from pKS3 (18, 24)].

29. G. Daum, P. C. Bohni, G. Schatz, *J. Biol. Chem.* **257**, 13028 (1982); H. Zhu, I. G. Macreadie, R. A. Butow, *Mol. Cell. Biol.* **7**, 2530 (1987).

30. J. A. Partaleis and T. L. Mason, *Mol. Cell. Biol.* **8**, 3647 (1988).

31. The Pet56 polyclonal antibody was hyperimmune ascites fluid from mice immunized with a recombinant TrpE-Pet56p fusion protein expressed in *E. coli* from pKF517 (24, 27).

32. E. Kuechler, G. Steiner, A. Barta, *Methods Enzymol.* **164**, 361 (1988).

33. The 50-μl methylation reaction mixture contained ~50 μg of purified Pet56 enzyme, 1 μM RNA, 2 μM [³H]SAM (80 Ci/mmol, New England Nuclear), 50 mM tris-HCl (pH 8.0), 50 mM KCl, 2 mM dithiothreitol, 4 mM EDTA, and bovine serum albumin (0.4 mg/ml), and the reactions were incubated at 30°C for 3 hours; D. Eichler, N. Raber, C. Shumard, S. Eales, *Biochemistry* **26**, 1639 (1987).

34. A. Al-Arif and M. Sporn, *Anal. Biochem.* **48**, 386 (1972).

35. J. Sambrook, E. F. Fritsch, T. Maniatis, *Molecular Cloning: A Laboratory Manual* (Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, ed. 2, 1989).

36. We thank D. Thurlow and K. Struhl for providing plasmids; C. Martin for T7 RNA polymerase; J. Woolford for the strain MM1403; J. Wower, K. Rosen, R. Zimmermann, and T. Fox for advice and discussions; and K. Fearon for help in the early stages of the work. Supported by NSF grant DMB-8719558 to T.L.M.

21 June 1993; accepted 29 October 1993

Downloaded from www.sciencemag.org on May 20, 2008

# Inhibition of Transcriptional Regulator Yin-Yang–1 by Association with c-Myc

A. Shrivastava, S. Saleque, G. V. Kalpana, S. Artandi, S. P. Goff, K. Calame*

Yin-Yang–1 (YY1) regulates the transcription of many genes, including the oncogenes c-*fos* and c-*myc*. Depending on the context, YY1 acts as a transcriptional repressor, a transcriptional activator, or a transcriptional initiator. The yeast two-hybrid system was used to screen a human complementary DNA (cDNA) library for proteins that associate with YY1, and a c-*myc* cDNA was isolated. Affinity chromatography confirmed that YY1 associates with c-Myc but not with Max. In cotransfections, c-Myc inhibits both the repressor and the activator functions of YY1, which suggests that one way c-Myc acts is by modulating the activity of YY1.

**Z**inc finger protein Yin-Yang–1 (CF1, δ, NF-E1, or UCRBP) is a 65-kD DNA binding protein, belonging to the GLI-Krüppel family, which is widely expressed and highly conserved between humans and mice (1). Depending on the context, YY1 can function as an activator, a repressor, or an initiator of transcription (1). YY1 represses the adeno-associated virus (AAV) P5 promoter (1), the immunoglobulin (Ig) κ 3′

A. Shrivastava, S. Saleque, G. V. Kalpana, Department of Biochemistry and Molecular Biophysics, Columbia University College of Physicians and Surgeons, New York, NY 10032.
S. Artandi, Department of Microbiology, Columbia University College of Physicians and Surgeons, New York, NY 10032.
S. P. Goff, Department of Biochemistry and Molecular Biophysics, Department of Microbiology, and Howard Hughes Medical Institute, Columbia University College of Physicians and Surgeons, New York, NY 10032.
K. Calame, Department of Biochemistry and Molecular Biophysics and Department of Microbiology, Columbia University College of Physicians and Surgeons, New York, NY 10032.

*To whom correspondence should be addressed.

enhancer (1), the c-*fos* promoter (2), the human papilloma virus–18 promoter (3), the skeletal α-actin promoter (4), the long terminal repeat of Moloney murine leukemia virus (1), and on the basis of sequence similarity, the N-*ras* promoter (3, 5). YY1 repression of the P5 promoter is relieved by adenovirus E1A protein (1). In some of these genes YY1 DNA binding sites overlap with serum response elements or 12-0-tetradecanoyl phorbol-13-acetate (TPA) response elements and repression is relieved when activators such as serum response factor or AP-1 displace YY1 (2–4, 6). A fusion protein of YY1 and the GAL4 DNA binding domain represses transcription of a thymidine kinase promoter with GAL4 binding sites (1). However, YY1 is an activator for the c-*myc* promoter, the IgH intronic enhancer, and the promoters of ribosomal proteins L30 and L32 (7). Finally, YY1 acts as a transcriptional initiator at nucleotide position +1 in the AAV P5 promoter (8).

A simple model to explain the functional versatility of YY1 is that interactions

with different cellular proteins alter its activity. To investigate this possibility, we used the yeast two-hybrid system to identify cDNAs that encoded proteins that associate with YY1 (9). This assay depends on the ability of the interacting proteins to bring together the GAL4 DNA binding (GAL4DB) and activation (GAL4AD) domains, which results in the expression of a *lacZ* reporter driven by a GAL1 promoter. LacZ expression, detected by the formation of blue colonies after staining with X-gal, indicates protein association.

We constructed a vector, GAL4DB-YY1, that expressed a fusion protein with the DNA binding domain of the first 147 amino acids of GAL4 [GAL4(1–147)] (10) and YY1. This plasmid did not activate *lacZ* transcription upon transformation into yeast strain GGY1:171 (11), which contains a *lacZ* gene whose expression is dependent on a GAL1 promoter (Fig. 1A). Subsequently, GAL4DB-YY1 was cotransformed into GGY1:171 with pools of plasmids from a library expressing the GAL4 activation domain fused to cDNAs from the human monocytic line HL-60 (12). We screened 300,000 colonies (9), and over 50 potential positives were identified. Subsequent rescreening produced several strong positives. Upon sequence analysis, one of these, pGADMyc, was found to encode the COOH-terminal 190 amino acids of c-Myc protein (13) fused to the GAL4AD (Fig. 1B).

Further controls confirmed the specificity of the apparent association between YY1 and c-Myc in the two-hybrid system (Fig. 1A). The pGADMyc did not cause LacZ expression when transformed into GGY1:171 alone, and there was no LacZ expression upon cotransformation of pGADMyc with a plasmid encoding GAL4DB or a heterologous protein (human immunodeficiency virus integrase) fused to the GAL4DB (GAL4DBHI). This suggests that YY1 interacts specifically with c-Myc. A vector was also constructed that expressed YY1 as a fusion protein with the LEXA DNA binding domain, LDBYY1 (14). LDBYY1 and pGADMyc were cotransformed into CTY10-5d (15). The pGADMyc hybrid activated LacZ expression only in the presence of LDBYY1 and not in the presence of LEXADB alone. Thus, we conclude that in the two-hybrid system, YY1 associates in vivo with the COOH-terminal portion of c-Myc. We also tested the ability of the GAL4DB-YY1(1–343) and GAL4DB-YY1-(1–201) hybrids to interact with pGAD-Myc. Only GAL4DB-YY1(1–343) gave blue-colored yeast colonies when cotransfected with pGADMyc (Fig. 1A), although immunoblotting with a YY1 polyclonal antiserum showed both proteins were expressed in similar amounts. These results delimit a portion of YY1 essential for interaction with

c-Myc to 142 amino acids. Amino acids 201 to 343 do not contain the NH2-terminal acidic region of YY1 or the histidine-rich

region of YY1 and also lack two and a half COOH-terminal zinc fingers (1).

We used a glutathione-S-transferase





Fig. 1. (A) Summary of two hybrid experiments. Left column, GAL4(1–147) DNA binding domain hybrids with the corresponding (middle column) GAL4 activation domain hybrid (amino acids 768 to 881) and (right column) yeast colony color after cotransformation; the relative color is in parentheses; HIV int., human immunodeficiency virus integrase. (B) Region of c-Myc in pGADMyc; bHLHZ, basic helix-loop-helix zipper. The numbers refer to the amino acids.



Fig. 2. GST assays. (A) [35S]Methionine c-Myc, synthesized in vitro with the rabbit reticulocyte lysate system (Promega), was incubated at 4°C with GST, GST-YY1, or GST-Max matrices with 50 mM NaCl and bovine serum albumin (BSA) (1 mg/ml) for 1.5 hours and analyzed with 0.1% NP-40 in phosphate-buffered saline at room temperature; bound proteins were resolved by SDS-PAGE (16). (B) [35S]Methionine E1A was incubated at 4°C with GST or GST-YY1 matrices and analyzed as in (A). (C) [35S]Methionine c-Myc was incubated at 4°C with GST and GST-YY1 matrices in the presence of either 0.5 μl (1) or 2.0 μl (3) of reticulocyte lysate (ret.) programmed with E1A mRNA or 0.5 μl (2) or 2.0 μl (4) of unprogrammed reticulocyte lysate and washed four times with 0.1% NP-40; bound protein was resolved by SDS-PAGE. (D) [35S]Methionine YY1 was incubated at 4°C with GST, GST-Max, GST-Myc(345–439), GST-Myc(250–353), and GST-Myc(250–439) with 65 mM NaCl and BSA (2 mg/ml) and analyzed as in (A). (E) [35S]Methionine USF was incubated at 4°C with GST and GST-YY1 matrices and analyzed as in (A). (F) [35S]Methionine c-Myc was incubated with GST, with GST-YY1 with 2 μg of bacterially expressed Max that was purified as GST protein and cleaved by thrombin, with GST-YY1 with cleavage buffer and thrombin, or with GST-YY1 with 2 μg of bacterially expressed E2F that was also purified as GST protein and then cleaved by thrombin (3); bound protein was resolved by SDS-PAGE and analyzed as in (A).

Downloaded from www.sciencemag.org on May 20, 2008

(GST) affinity matrix assay (16) to determine if YY1 and c-Myc can associate in vitro. A GST-YY1 fusion protein was bound to glutathione-agarose to make a YY1 affinity matrix; control matrices with GST alone and GST-Max were prepared in parallel. A [35S]methionine-labeled c-Myc protein prepared by in vitro transcription-translation was incubated with these matrices, and the specifically bound protein was eluted and resolved by SDS–polyacrylamide gel electrophoresis (PAGE). c-Myc bound equally well to the GST-Max and GST-YY1 matrices but bound poorly to the GST matrix (Fig. 2A). This confirms that c-Myc and YY1 associate and further shows that the association is not unique to a truncated form of c-Myc, because full-length c-Myc protein was used in this experiment. Our results also show that the association between YY1 and c-Myc can occur in the absence of DNA or other transcription proteins.

The function of YY1 is altered in the presence of adenovirus E1A protein; E1A relieves YY1 repression (1) and synergizes with YY1 activation (7). Therefore, the ability of GST-YY1 to associate with E1A was tested. E1A binds to YY1 in the GST assay (Fig. 2B). In a competition experiment, unlabeled E1A competed with c-Myc for binding to GST-YY1 (Fig. 2C), which demonstrates that E1A and c-Myc cannot associate simultaneously with YY1. Others have also demonstrated a direct interaction between YY1 and E1A (17). It has previously been noted that E1A and c-Myc have structural similarity (18); thus, structurally similar regions of the two proteins may associate with YY1. Retinoblastoma protein is the only other non–helix-loop-helix zipper (HLHZ) protein known to associate with E1A as well as with c-Myc (19).

Max and Myn heterodimerize with c-Myc by way of the HLHZ domains (20). YY1 is a different kind of c-Myc partner that does not contain HLHZ domains. A GST fusion protein containing only the c-Myc basic HLHZ region, amino acids 345 to 439, does not associate with YY1 (Fig. 2D). A fusion protein containing amino acids 250 to 353 binds YY1 but less effectively than a fusion protein containing amino acids 250 to 439 (Fig. 2D). Thus, both amino acids 250 to 353 and the basic HLHZ region appear to be required for interaction with YY1. The c-Myc amino acids 250 to 353 contain a nuclear localization signal, nonspecific DNA binding activity, and a casein kinase II phosphorylation site (13, 21). There is evidence that the region of amino acids 250 to 353 is functionally important. (i) Amino acids 290 to 318 are conserved among species and among N-Myc, L-Myc, and c-Myc (13). (ii) Removal of amino acids 265 to 353 decreases (but does not abolish) the ability of c-Myc to cooperate with Ras in transforming rat embryo fibroblasts (22). (iii) This region is required for transformation of Rat1 cells (23).

The ability of YY1 to interact with two other HLHZ proteins, Max and upstream stimulatory factor (USF) (24), was also tested, but the association of YY1 with Max or USF was not detected (Fig. 2, D and E). This is consistent with the idea that YY1 does not associate with the HLHZ region alone and emphasizes the specificity of the YY1–c-Myc association. To probe whether YY1, c-Myc, and Max could form a ternary complex, we added unlabeled c-Myc and 35S-labeled YY1 to a GST-Max column; no retention of YY1 was observed. Furthermore, addition of bacterially expressed Max abolished the binding of c-Myc to GST-YY1 (Fig. 2F). Thus, there is no evidence for ternary complex formation, which is also consistent with the finding that the basic HLHZ region of c-Myc is important for association with YY1 (Fig. 2D).

We investigated whether c-Myc affects the activator and repressor functions of YY1. The ability of c-Myc to affect YY1-GAL4 repression of a thymidine kinase promoter with upstream GAL4 binding sites ($G_5$tk) (1) in NIH 3T3 cells was tested. YY1-GAL4 repressed the $G_5$tk promoter approximately 55% (Fig. 3A). This repression was completely inhibited in a dose-dependent manner by cotransfection of a c-Myc expression vector, which demonstrates that c-Myc interferes with the ability of YY1 to repress transcription. The ability of c-Myc to affect YY1-dependent activation of a c-myc promoter was also tested with P3X plasmacytoma cells, with which we have observed the strongest activation by YY1 (7). Upon transfection, YY1 activated a c-myc promoter (pSNLUC) eightfold (Fig. 3B, bars 1 and 3). This activation increased only twofold when a c-Myc expression vector was included in the cotransfection (Fig. 3B, bar 4), although c-Myc expression had little effect on pSNLUC alone (bar 2), which demonstrates that c-Myc inhibits the activating ability of YY1.

It is unknown how c-Myc inhibits YY1 activity. One simple model is that association with c-Myc blocks the ability of YY1 to interact with other activators or the basal transcription machinery. Alternatively, association with c-Myc may inhibit the ability of YY1 to bind DNA. A third possibility is that c-Myc sequesters YY1.

The c-Myc protein is a potent regulator of cell growth and differentiation (13, 25); elevated c-Myc levels are associated with tumorigenesis or apoptosis (13, 25). Only

**Fig. 3.** Cotransfection assays for YY1 function. (**A**) Inhibition of the transcriptional repressor activity of YY1 by c-Myc. NIH 3T3 cells were cotransfected with 5 μg of a luciferase reporter dependent on the thymidine kinase promoter (nucleotides −200 to +56) with five GAL4 binding sites 5′ of the promoter. Two expression vectors were included as indicated: (i) 2 μg of pSV2-GAL4(1–147) (G) or 2 μg of pSV2-GAL4-YY1 (GY) and (ii) varying amounts of pSV2-β-gal (BG) or pSV2-c-Myc (Myc), with the sum of the two choices constant (2 μg). Total DNA was kept constant at 20 μg, and transfections were done with the Ca₃(PO₄)₂ method (1). Results represent the averages of three independent transfections and have been corrected for the effect of Myc on the reporter by simultaneously doing the experiment with GAL4 and YY1-GAL4 for each concentration of Myc; bars show 1 SD. (**B**) Inhibition of the transcriptional activator ability of YY1 by c-Myc. Plasmacytoma P3X cells were cotransfected with 10 μg of a luciferase reporter containing 758 base pairs of the murine c-Myc promoter. Two expression vectors were included as indicated: (i) 0.3 μg of cytomegalovirus (CMV) (C) or 0.3 μg of CMV-YY1 (CY) and (ii) 0.9 μg of pSV2-β-gal (BG) or 0.9 μg of pSV2-c-Myc (Myc). Twenty micrograms of pUC19 DNA was added as a carrier in each transfection, and transfections were done by electroporation at 240 V, 960 μF, and 200 ohms. Results show the average of three independent transfections, and the bars indicate 1 SD.



Downloaded from www.sciencemag.org on May 20, 2008

a few proteins have been shown to associate with c-Myc, and the exact mechanisms of c-Myc action are poorly understood. Inhibition of YY1 activity may be one mechanism by which c-Myc acts. YY1 regulates transcription of many genes, including the oncogenes *c-fos* and *c-myc*, and also acts as a transcription initiator (8). The amounts of c-Myc are highly regulated and differ markedly between dividing and nondividing cells. YY1 may function only when the amounts of c-Myc drop below some threshold level. Lack of YY1 activity would activate some genes and repress others. Concentrations of c-Myc compatible with YY1 activity may vary with cell type or with the YY1 target gene or with both. It is also interesting that c-Myc has recently been shown to inhibit the activity of another transcriptional initiator, TFII-I (26). In addition to affecting YY1 function, there is increasing evidence that c-Myc–Max heterodimers regulate gene transcription directly (27).

The YY1-Myc association gives a partial indication of the complex equilibria that appear to exist among transcriptional regulators. For example, c-Myc transcription is negatively autoregulated by c-Myc (28), *c-myc* transcription is activated by YY1 (7), and, as shown here, c-Myc blocks this activation, explaining in part the autoregulation mechanism. Thus, *c-myc* transcription is probably sensitive to changes in relative and absolute amounts of c-Myc and YY1.

Another regulatory loop may involve putative cellular E1A-like proteins. E1A and c-Myc compete for association with YY1. E1A relieves YY1 repression (1) and synergizes with YY1 activation (7), whereas c-Myc inhibits YY1 repression and activation. Cellular E1A-like proteins could have a strong effect on YY1 activity by simultaneously displacing the inhibitor (c-Myc) and directly activating YY1.

## REFERENCES AND NOTES

1. Y. Shi *et al.*, *Cell* **67**, 377 (1991); E. Kakkis *et al.*, *Nature* **339**, 718 (1989); N. Hariharan, D. E. Kelley, R. P. Perry, *Proc. Natl. Acad. Sci. U.S.A.* **88**, 9799 (1991); K. Park and M. L. Atchison, *ibid.*, p. 9804; J. R. Flanagan *et al.*, *Mol. Cell. Biol.* **12**, 38 (1992).
2. A. Gualberto *et al.*, *Mol. Cell. Biol.* **12**, 4209 (1992).
3. T. Bakuncht *et al.*, *EMBO J.* **11**, 4607 (1992).
4. T. C. Lee, Y. Shi, R. J. Schwartz, *Proc. Natl. Acad. Sci. U.S.A.* **89**, 9814 (1992).
5. P. Paciucci and A. Pellicer, *Mol. Cell. Biol.* **11**, 1334 (1991).
6. C. K. Vincent, A. Gualberto, C. V. Patel, K. Walsh, *ibid.* **13**, 1264 (1993).
7. K. J. Riggs *et al.*, *ibid.* **11**, 1765 (1991); K. J. Riggs *et al.*, *ibid.* **13**, 7487 (1993); N. Hariharan *et al.*, *Genes Dev.* **3**, 1789 (1989).
8. E. Seto, Y. Shi, T. Shenk, *Nature* **354**, 241 (1991).
9. S. Fields and D. K. Song, *ibid.* **340**, 245 (1989).
10. YY1 cDNA was excised from pGEM-4Z (1) by partial Ava I and Sma I digestion and inserted into pBSKII (Stratagene). It was excised with Eco RI and Sal I and inserted into pMA424 [J. Ma and M. Ptashne, *Cell* **51**, 113 (1987)]. GAL4DB and GAL4DBHI were also pMA424 plasmids.
11. G. Gill and M. Ptashne, *Cell* **51**, 121 (1987).
12. J. Luban *et al.*, *ibid.* **73**, 1067 (1993).
13. K. J. Marcu, S. A. Bossone, A. J. Patel, *Annu. Rev. Biochem.* **61**, 809 (1992).
14. YY1 cDNA was transferred from GAL4DB-YY1 by cutting with Eco RI and Sal I into the pSH2 plasmid, which contains a LEXADB (amino acids 1 to 87).
15. CTY10-5d is a yeast strain that has a *lacZ* reporter gene whose expression is dependent on upstream LEXA binding sites.
16. S. Artandi and K. Calame, *Methods Mol. Genet.* **1**, 267 (1993).
17. T. Shenk, personal communication.
18. R. Ralston and J. M. Bishop, *Nature* **306**, 803 (1983).
19. A. K. Rustgi *et al.*, *ibid.* **352**, 541 (1991).
20. E. M. Blackwood and R. N. Eisenman, *Science* **251**, 1211 (1991); E. M. Blackwood *et al.*, *Genes Dev.* **6**, 71 (1992); G. C. Prendergast *et al.*, *Cell* **65**, 395 (1991).
21. C. V. Dang and W. F. Lee, *Mol. Cell. Biol.* **8**, 4048 (1988); B. Luscher, E. A. Kuenzel, E. G. Krebs, R. N. Eisenman, *EMBO J.* **8**, 1111 (1989).
22. L. Penn *et al.*, *Mol. Cell. Biol.* **10**, 4961 (1990).
23. J. Stone *et al.*, *ibid.* **7**, 1697 (1987).
24. P. D. Gregor, M. Sawadogo, R. G. Roeder, *Genes Dev.* **4**, 1730 (1990).
25. B. Luscher and R. N. Eisenman, *ibid.*, p. 2025; R. Dalla-Favera, in *Origins of Human Cancer*, J. Brugge, T. Curran, E. Harlow, F. McCormick, Eds. (Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, 1991), pp. 543–551.
26. A. L. Roy *et al.*, *Nature* **365**, 359 (1993).
27. B. Amati *et al.*, *ibid.* **359**, 423 (1992); L. Kretzner, E. M. Blackwood, R. N. Eisenman, *ibid.*, p. 426.
28. F. Grignani *et al.*, *EMBO J.* **9**, 3913 (1990).
29. We thank A. Berk, S. Chellapan, R. Eisenman, S. Fields, P. Gregor, S. Hanes, R. Perry, R. Roeder, and R. Schwartz for various constructs and R. Sternglanz for strain CTY10-5d. We thank R. Dalla-Favera, D. Shore, and M. Carlson for reading the manuscript and members of our laboratories for helpful discussions. Supported by U.S. Public Health Service grants CA 38571 and GM29361.

8 July 1993; accepted 21 October 1993

# Attachment of *Helicobacter pylori* to Human Gastric Epithelium Mediated by Blood Group Antigens

Thomas Borén,* Per Falk, Kevin A. Roth, Göran Larson, Staffan Normark

*Helicobacter pylori* is associated with development of gastritis, gastric ulcers, and adenocarcinomas in humans. The Lewis$^b$ (Le$^b$) blood group antigen mediates *H. pylori* attachment to human gastric mucosa. Soluble glycoproteins presenting the Le$^b$ antigen or antibodies to the Le$^b$ antigen inhibited bacterial binding. Gastric tissue lacking Le$^b$ expression did not bind *H. pylori*. Bacteria did not bind to Le$^b$ antigen substituted with a terminal GalNAcα1-3 residue (blood group A determinant), suggesting that the availability of *H. pylori* receptors might be reduced in individuals of blood group A and B phenotypes, as compared with blood group O individuals.

*Helicobacter pylori*, a prevalent human-specific pathogen, is a causative agent in chronic active gastritis (1), gastric and duodenal ulcers (2), and gastric adenocarcinoma (3), one of the most common forms of cancer in humans. This genetically diverse bacterial species (4) has been estimated to infect the gastric mucosa of >60% of adults over the age of 60 in industrialized countries (5). In developing countries, most individuals are infected during childhood (6).

Attachment is a prerequisite for microbial colonization of epithelial surfaces and is mediated by molecules on the bacterial surface, adhesins (7), that recognize proteins or glycoconjugates on the surface of the eukaryotic cell (8). The specificity of this interaction and the limited distribution of receptors often results in a restricted range of hosts and tissues utilized for colonization. This phenomenon is known as tropism. Bacteria unable to adhere to epithelium tend to be rapidly removed by shedding of surface cells and mucus layer.

*Helicobacter pylori* expresses sialic acid–specific hemagglutinins, the gene for one of which has been cloned (9). In addition to sialylated glycoconjugates, *H. pylori* binds to sulfatide ($SO_3$-Galβ1-1Cer) (10). However, *H. pylori* adhesion to HeLa cells appears to be independent of sialic acid (11). Cell-specific attachment of *H. pylori* to human gastric surface mucous cells is inhibited by human colostrum secretory immunoglobulin A (sc-IgA) (12, 13), a glycoprotein carrying a highly variable set of N- and O-linked oligosaccharides (14). The less glycosylated serum IgA (S-IgA) (15) is devoid of such inhibitory properties. The adherence-inhibiting activity of sc-IgA is

T. Borén and S. Normark, Department of Molecular Microbiology, Washington University School of Medicine, St. Louis, MO 63110.
P. Falk, Department of Molecular Biology and Pharmacology, Washington University School of Medicine, St. Louis, MO 63110.
K. A. Roth, Departments of Pathology, and Molecular Biology and Pharmacology, Washington University School of Medicine, St. Louis, MO 63110.
G. Larson, Department of Clinical Chemistry, University of Göteborg, Sahlgren's Hospital, S-413 45 Göteborg, Sweden.

*To whom correspondence should be addressed.

Downloaded from www.sciencemag.org on May 20, 2008

# EXHIBIT 60

by Eye (Erlbaum, Hillsdale, NJ, 1988).
22. E. T. Bullmore et al., Magn. Reson. Med. **35**, 261 (1996).
23. Areas of activation shown are those corresponding to the largest clusters. A complete list of activations can be obtained from the corresponding author. Within each cluster the coordinates of the voxel with the maximum FPQ are shown.
24. Supported by an Oxford University Pump Priming

grant and the Bethlem and Maudsley Research Fund. E.T.B. and P.K.M. were supported by the Wellcome Trust, G.A.C. by the Medical Research Council of Great Britain, and P.W.R.W. by British Telecom. We are grateful to I. C. Wright and R. Howard and to two anonymous reviewers for their helpful comments on this manuscript.

16 October 1996; accepted 27 February 1997

# Repression of c-*myc* Transcription by Blimp-1, an Inducer of Terminal B Cell Differentiation

Yi Lin, Kwok-kin Wong, Kathryn Calame*

Transcription of c-*myc* in plasma cells, which are terminally differentiated B cells, is repressed by plasmacytoma repressor factor. This factor was identified as Blimp-1, known for its ability to induce B cell differentiation. Blimp-1 repressed c-*myc* promoter activity in a binding site–dependent manner. Treatment of BCL₁ lymphoma cells with interleukin-2 (IL-2) plus IL-5 induced Blimp-1 and caused a subsequent decline in c-Myc protein. Ectopic expression of Blimp-1 in Abelson-transformed precursor B cells repressed endogenous c-Myc and caused apoptosis; Blimp-1–induced death was partially overcome by ectopic expression of c-Myc. Thus, repression of c-*myc* is a component of the Blimp-1 program of terminal B cell differentiation.

**C**-Myc functions at a critical decision point of cell growth to favor proliferation and to block terminal differentiation (1). c-Myc is present in dividing cells but is not expressed in quiescent or terminally differentiated cells (2); addition of exogenous c-Myc blocks terminal differentiation of several hematopoietic cell lines (3) and of myogenic cells (4), whereas inhibitors of c-Myc expression accelerate terminal differentiation of promonocytic HL60 cells (5), M1 leukemic myeloid cells (6), F9 teratocarcinoma cells (7), and human esophageal cancer cells (8).

Murine plasmacytomas are the transformed counterparts of plasma cells, which are terminally differentiated, nondividing B lymphocytes (9). Plasmacytomas have a characteristic reciprocal chromosomal translocation that juxtaposes one allele of the c-*myc* gene with an immunoglobulin heavy- or light-chain locus (10). The translocated c-myc allele is deregulated and over-expressed; however, the nontranslocated c-myc allele is transcriptionally silent (1). This state is thought to correspond to the silent state of the c-*myc* gene in normal plasma cells.

A plasmacytoma-specific protein, plasmacytoma repressor factor (PRF), binds in the c-*myc* promoter 290 base pairs (bp) 5′ of the P1 transcriptional start site. PRF represses c-*myc* transcription in plasmacytomas and has not yet been cloned (11). The PRF binding site is similar in sequence to the interferon-stimulated response elements (ISREs) in many interferon-regulated genes (12) and to the positive regulatory domain 1 (PRD1) sequence of the human interferon-β (IFN-β) gene (13). Electrophoretic mobility shifts assays (EMSAs) with nuclear extracts from the plasmacytoma P3X63-Ag8 (P3X) and a c-*myc* promoter probe containing the PRF site confirmed that both ISRE and PRD1 oligonucleotides could compete for binding of PRF in this assay; PRD1 oligonucleotides competed more strongly than ISRE oligonucleotides (14).

PRD1-BF1 is a human zinc finger protein that was cloned by virtue of its ability to bind to the PRD1 site; PRD1-BF1 inhibits transcription of the IFN-β promoter (13). Recently the murine homolog of PRD1-BF1, Blimp-1, was identified as a protein that is induced upon stimulation of the BCL₁ B cell lymphoma line with interleukin-2 (IL-2) plus IL-5 (15). Ectopic expression of Blimp-1 can drive B cell terminal differentiation, and Blimp-1 is expressed only in plasmacytomas and mature B cells; however, its mechanism of action is not well understood (15). On the basis of cross-competition of their binding sites, common transcriptional repressor activity, and plasmacytoma-specific expression, we hypothesized that PRF might be

identical to Blimp-1.

To test this hypothesis, we transfected 293T human kidney fibroblast cells with an expression plasmid encoding Blimp-1. An immunoblot developed with antiserum to Blimp-1 revealed that Blimp-1 was present in nuclear extracts from P3X plasmacytomas and in the transfected 293T cells but not in 18-81 precursor B cells (pre-B cells) or in mock-transfected 293T cells (Fig. 1). EMSAs were then done with these extracts with an oligonucleotide probe corresponding to the c-*myc* PRF site (Fig. 1). Complexes of identical mobility were observed for endogenous PRF in P3X cells and for the Blimp-1–transfected 293T cells, whereas no complex was detected for 18-81 or mock-transfected 293T cell extracts. The sequence specificity of these complexes was shown by the ability of PRF but not an unrelated sequence to compete the complexes. Finally, the complex from P3X extracts was completely ablated by antiserum against Blimp-1 but not by naïve antiserum. Thus, the protein in P3X cells that we identified as PRF is immunologically related to Blimp-1. The results obtained with EMSA and antibody ablation provide evidence that the c-*myc* repressor PRF is encoded by the *blimp-1* gene.

A site-directed mutation in the c-*myc* PRF site increases promoter activity 30-fold in plasmacytomas, which express PRF, but has no effect in fibroblasts and pre-B cells, which do not express the protein, showing that PRF represses c-*myc* transcription (11). To investigate the functional relation be-



**Fig. 1.** Blimp-1 binds to the c-*myc* PRF site. (Top) Nuclear extracts from various cells were prepared as described (26) and subjected to immunoblot with antibody to Blimp-1; arrow indicates Blimp-1. Lane 1, 18-81 cells; lane 2, P3X cells; lane 3, mock-transfected 293T cells; lane 4, Blimp-1–transfected 293T cells. (Bottom) Lanes 5 to 8, the same extracts were used for EMSA with a 25-bp PRF oligonucleotide (26). Lanes 9 to 13, EMSA of P3X nuclear extracts with PRF oligonucleotide probe in the presence of no competitor (lane 9), PRF oligo tetramer (lane 10), GATA (nonspecific) tetramer (lane 11), rabbit antiserum to Blimp-1 (lane 12), and naïve rabbit serum (lane 13). Arrow indicates the protein-DNA complexes.

Y. Lin, Department of Microbiology, Columbia University College of Physicians and Surgeons, New York, NY 10032, USA.
K. Wong, Integrated Program in Cellular, Molecular, and Biophysical Studies, Columbia University College of Physicians and Surgeons, New York, NY 10032, USA.
K. Calame, Department of Microbiology and the Integrated Program in Cellular, Molecular, and Biophysical Studies, Columbia University College of Physicians and Surgeons, New York, NY 10032, USA.

*To whom correspondence should be addressed.

Downloaded from www.sciencemag.org on May 20, 2008

tween PRF and Blimp-1, we tested the effect of ectopically expressed Blimp-1 on the activity of the c-myc promoter. Reporters dependent on a c-myc promoter with either wild-type or mutated PRF sites were cotransfected with a Blimp-1 expression plasmid into the 18-81 and 300-18 pre-B cell lines (Fig. 2, A and B, respectively). In both pre-B cell lines, wild-type and mutant promoters had similar activity in the absence of Blimp-1. Expression of Blimp-1 repressed the wild-type promoter by 70% in both cell lines, whereas the promoter harboring a mutation in the PRF site was not repressed (Fig. 2, A and B). Thus, ectopic Blimp-1 represses c-myc transcription in pre-B cells, and the repression depends on the presence of the PRF site at −290 bp. Because the function of Blimp-1 is the same as that previously shown for PRF, these data, in conjunction with the in vitro binding studies, suggest that PRF is encoded by the blimp-1 gene.

Blimp-1 is a nuclear protein with five zinc fingers in its COOH-terminus (15). Only two other target genes for Blimp-1 are known. Human Blimp-1 (PRDI-BF1) represses IFN-β transcription (13) and Blimp-1 activates J-chain transcription, although a binding site in the J-chain gene has not been identified (15). Transcriptional activation and repression in different gene contexts is frequently associated with zinc finger proteins including YY1 (16), Krüppel (17), and glucocorticoid receptor (18) and is often determined by binding of adjacent proteins. The Blimp-1 binding site in the c-myc promoter is near a YY1 binding site that functions as an activator site (19). Our

preliminary data show that Blimp-1 and YY1 associate in vitro (20), and it may be that Blimp-1 and YY1 interfere with one another's activity in the c-myc promoter. However, further studies will be required to understand the mechanisms that determine the activity of Blimp-1 on this and other promoters.

BCL$_1$ is a mature B cell line that, upon stimulation with IL-2 plus IL-5, differentiates into a plasma cell–like state (21). Blimp-1 is induced early in BCL$_1$ differentiation (15). On the basis of the ability of transfected Blimp-1 to repress the c-myc promoter, we predicted that differentiation dependent on induction of Blimp-1 in BCL$_1$ cells would cause a decrease in endogenous c-Myc. Seventy-two hours after BCL$_1$ cells were treated with IL-2 plus IL-5, differentiation was verified by increased immunoglobulin secretion and changes in cell size as indicated by changes in forward versus orthogonal scatter (14). c-Myc amounts during this period were assessed by immunoblot (Fig. 3A). After a transient increase, c-Myc decreased by ~75% between 1 and 2 hours of IL-2 plus IL-5 stimulation and remained low for 72 hours. Northern (RNA) analyses showed that 1 hour after stimulation,

Blimp-1 mRNA increased approximately five times (15) (Fig. 3B). These data are consistent with the notion that Blimp-1 represses endogenous c-myc transcription, resulting in decreased c-Myc protein.

Because Blimp-1 drives terminal B cell differentiation, we reasoned that the c-myc gene would be an important target for Blimp-1–mediated repression. To test this hypothesis directly, we transfected 18-81 pre-B cells with combinations of a neo–Blimp-1 expression plasmid, or a Blimp-1 antisense control, and the pSV2 c-myc expression plasmid, or a pSV2 control. Few colonies were obtained with the Blimp-1 expression plasmid (Fig. 4), and 16 of 16 analyzed did not express Blimp-1 (14). However, transfections with varying ratios of Blimp-1 and c-myc plasmids gave 17 to 65% the number of control colonies; four of five colonies analyzed expressed Blimp-1 (14). Thus, ectopic c-Myc blocked the growth-suppressing effect of high Blimp-1 expression, suggesting that repression of c-myc transcription by overexpressed Blimp-1 is directly responsible for the death of Blimp-1–overexpressing cells.

To obtain direct evidence that ectopic



**Fig. 2.** Blimp-1 represses the c-myc promoter in a PRF site–dependent manner in pre-B cells. Two micrograms of a luciferase reporter fused with either a wild-type (myc-Luc) or PRF-deleted (m-myc-Luc) c-myc promoter including −1100 to +580 bp from P1 (11) with 10 μg of Blimp-1 expression vector (pBDP1-F) or expression vector control (pBDP1-B) (15) were used to transfect 18-81 or 300-18 pre-B cells. Log-phase cells (5 × 10⁶) were collected by centrifugation and resuspended in 300 μl of culture medium, mixed with DNA, and subjected to electroporation at 960 μF and 240 V. Luciferase activity was measured 18 hours after transfection. Results show the average of at least three independent transfections. Error bars show standard deviations. (**A**) 18-81 cells. (**B**) 300-18 cells.





**Fig. 3.** Kinetics of Blimp-1 induction and c-Myc reduction during BCL$_1$ cell differentiation. (**A**) BCL$_1$ cells were treated with IL-2 + IL-5; whole-cell extracts were prepared at various times (15), and protein concentrations were measured by the Bradford assay (27). Ten micrograms of protein were subjected to electrophoresis on SDS–polyacrylamide gels (8%), transferred to a nitrocellulose membrane, and immunoblotted with polyclonal antiserum raised against the COOH-terminus of murine c-Myc. The bands were quantitated, and the amounts relative to that at 0 hours are shown. Several repeated experiments gave similar results. (**B**) RNA was also prepared and analyzed by Northern blotting with a blimp-1 cDNA probe (15) and a control β-actin probe. The relative amounts of blimp-1 mRNA are given below the lanes.



**Fig. 4.** c-Myc blocks the growth suppression effect of high Blimp-1 expression. A pBJ-neo plasmid containing either antisense or sense blimp-1 cDNA was cotransfected into 18-81 pre-B cells with the pSV2-myc expression plasmid or a pSV2 control. Cells were diluted into 96-well plates, cultured with G418 (800 μg/ml), and resistant colonies were counted 10 days later. Colony numbers obtained for different ratios of Blimp-1 sense (S) or antisense (AS) to c-myc plasmids were as follows: (i) 1:2 control (5 μg of Blimp-1:10 μg of pSV2): S = 34 ± 7, AS = 1033 ± 46; (ii) 1:2 (5 μg of Blimp-1:10 μg of pSV2-myc): S = 347 ± 73, AS = 2011 ± 153; (iii) 1:5 (2 μg of Blimp-1:10 μg of pSV2-myc): S = 340 ± 11, AS = 599 ± 24; and (iv) 1:10 (2 μg of Blimp-1:20 μg of pSV2-myc): S = 446 ± 30, AS = 684 ± 19. A graphic representation was generated from these data; for each transfection with the Blimp-1 plasmid, the corresponding transfection with antisense Blimp-1 was taken as 100%.

Downloaded from www.sciencemag.org on May 20, 2008

Blimp-1 can repress the endogenous c-myc gene, we made stable B cell transfectants in which Blimp-1 was controlled by a metallothionein promoter. Cadmium treatment of 18-81 transfectants induced Blimp-1 mRNA more than 10 times relative to controls and reduced endogenous c-Myc by more than 90% with similar kinetics (Fig. 5A). This result shows that Blimp-1 directly represses c-Myc expression in vivo. In addition, 18-81 cells expressing Blimp-1 died by apoptosis, as shown by the decrease in viable cells (Fig. 5B) and by fragmentation of nuclear DNA revealed by gel electrophoresis (14) and terminal deoxynucleotidyl transferase–mediated dUTP nick-end labeling (TUNEL) assay (Fig. 5C). However, induction of Blimp-1 in $BCL_1$ transfectants revealed terminal differentiation including increased surface expression of Syndecan (14) and secretion of immunoglobulin M (IgM) (Fig. 5D). The reason Blimp-1 caused apoptosis rather than differentiation in 18-81 cells was probably because Abelson murine leukemia virus (AMuLv)–transformed pre-B cells cannot activate nuclear factor kappa B, which is

required for immunoglobulin light-chain expression (22). Apoptosis induced by decreased c-Myc has also been reported in WEHI 231 (23) and Ramos (24) B cell lines.

Although c-Myc's role in blocking terminal differentiation has been well established, we have now shown that Blimp-1 specifically represses c-myc transcription as part of a program of terminal B cell differentiation. Our data show Blimp-1–dependent repression of c-myc and emphasize that growth and differentiation of B cells are exquisitely sensitive to c-Myc. It will be important to determine if Blimp-1 has other important targets or if blocking proliferation by way of c-myc repression is sufficient to terminal B cell differentiation. It will also be interesting to determine if immunoglobulin gene sequences overcome Blimp-1–dependent repression of c-myc transcription in plasmacytomas where the Blimp-1 site is not removed by translocation.

The restricted pattern of expression (11, 15) suggests that the Blimp-1–mediated suppression of c-myc transcription may be unique to B lymphocytes. However,

the human homolog PRD1-BF1 is induced upon viral infection of fibroblasts (13), and preliminary results show that Blimp-1–deficient mice die during embryonic development (25). Therefore, it will be important to determine if Blimp-1 also represses c-myc transcription in other lineages of terminally differentiated cells.

### REFERENCES AND NOTES

1. K. Marcu, S. Bossone, A. Patel, *Annu. Rev. Biochem.* **61**, 809 (1992); T. D. Littlewood and G. I. Evan, *Adv. Dent. Res.* **4**, 69 (1990).
2. D. A. Liebermann and B. Hoffman, *Stem Cells* **12**, 352 (1994); L. B. Hoffman and D. A. Liebermann, *Oncogene* **6**, 903 (1991); *Mol. Cell. Biol.* **11**, 2375 (1991); J. Geraudie, J. Hourdry, S. Vriz, M. Singer, M. Mechali, *Proc. Natl. Acad. Sci. U.S.A.* **87**, 3797 (1990).
3. H. M. Lachman and A. I. Skoultchi, *Nature* **310**, 592 (1984); D. Resnitzky, A. Yarden, D. Zipori, A. Kimchi, *Cell* **46**, 31 (1986); E. H. Westin *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* **79**, 2490 (1982); M. Einat, D. Resnitzky, A. Kimchi, *Nature* **313**, 597 (1985); O. Chisholm and G. Symonds, *Int. J. Cancer* **51**, 149 (1992); M. Selvakumaran, D. A. Liebermann, B. Hoffman-Liebermann, *Blood* **81**, 2257 (1993); J. Coppola and M. D. Cole, *Nature* **320**, 760 (1986); E. V. Prowchownik and J. Kukowska, *ibid.* **322**, 848 (1986); E. Dimitrowsky *et al.*, *ibid.* p. 748.
4. J. H. Miner and B. J. Wold, *Mol. Cell. Biol.* **11**, 2842 (1991); S. A. La Rocca, D. H. Crouch, D. A. Gillespie, *Oncogene* **9**, 3499 (1994).
5. K. Yokoyama and F. Imamoto, *Proc. Natl. Acad. Sci. U.S.A.* **84**, 7367 (1987); J. T. Holt, R. L. Redner, A. W. Nienhuis, *Mol. Cell. Biol.* **8**, 963 (1988); E. L. Wickstrom *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* **85**, 1028 (1988).
6. H. Q. Nguyen, M. Selvakumaran, D. A. Liebermann, B. Hoffman, *Oncogene* **11**, 2439 (1995).
7. A. E. Griep and H. Westphal, *Proc. Natl. Acad. Sci. U.S.A.* **85**, 6806 (1988).
8. X. Zhao *et al.*, *Sci. China Ser. B Chem. Life Sci. Earth Sci.* **38**, 580 (1995).
9. J. Adams *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* **79**, 6966 (1982); E. J. Keath, A. Kelekar, M. D. Cole, *Cell* **37**, 521 (1984).
10. S. Cory, *Adv. Cancer Res.* **17**, 189 (1986).
11. E. Kakkis and K. Calame, *Proc. Natl. Acad. Sci. U.S.A.* **84**, 7031 (1987); E. Kakkis, K. J. Riggs, W. Gillespie, K. Calame, *Nature* **339**, 718 (1989).
12. N. Tanaka, T. Kawakami, T. Taniguchi, *Mol. Cell. Biol.* **13**, 4531 (1993).
13. A. Keller and T. Maniatis, *Genes Dev.* **5**, 868 (1991).
14. Y. Lin, K. Wong, K. Calame, unpublished data.
15. C. A. Turner, D. Mack, M. M. Davis, *Cell* **77**, 297 (1994).
16. A. Shrivastava and K. Calame, *Nucleic Acids. Res.* **22**, 5152 (1994); Y. Shi, E. Seto, L. S. Chang, T. Shenk, *Cell* **67**, 377 (1991); N. Hariharan, D. E. Kelley, R. P. Perry, *Proc. Natl. Acad. Sci. U.S.A.* **88**, 9799 (1991); K. Park and M. L. Atchison, *ibid.*, p. 9804; J. R. Flanagan *et al.*, *Mol. Cell. Biol.* **12**, 38 (1992); K. J. Riggs *et al.*, *ibid.* **13**, 7487 (1993).
17. J. D. Licht, M. J. Grossel, J. Figge, U. M. Hansen, *Nature* **346**, 76 (1990); F. Sauer and H. Jackle, *ibid.* **353**, 563 (1991); *ibid.* **364**, 454 (1993).
18. D. D. Sakai *et al.*, *Genes Dev.* **2**, 1144 (1988); R. Miesfeld, P. J. Godowski, B. A. Maler, K. R. Yamamoto, *Science* **236**, 423 (1987); M. I. Diamond, J. N. Miner, S. K. Yoshinaga, K. R. Yamamoto, *ibid.* **249**, 1266 (1990).
19. K. J. Riggs, K. T. Merrell, G. Wilson, K. Calame, *Mol. Cell. Biol.* **11**, 1765 (1991).
20. J. Yu and K. Calame, unpublished data.
21. M. Blackman, M. Tigges, M. E. Minie, M. E. Koshland, *Cell* **47**, 609 (1986); K. Matsui *et al.*, *J. Immunol.* **142**, 2918 (1989).
22. Y. Y. Chen, L. C. Wang, M. S. Huang, N. Rosenberg, *Genes Dev.* **8**, 688 (1994); C. A. Klug *et al.*, *ibid.*, p. 678.
23. M. Wu *et al.*, *Mol. Cell. Biol.* **16**, 5015 (1996); M. Wu *et al.*, *EMBO J.* **15**, 4662 (1996).

**A**



**Fig. 5.** Induction of Blimp-1 alters properties of 18-81 and $BCL_1$ cells. 18-81 and $BCL_1$ cells were stably transfected with an expression vector in which *blimp-1* expression was dependent on the sheep metallothionein promoter (MT-B) (28) or an empty control (MT). (**A**) (Upper panel) Northern blot of Blimp-1 mRNA after treatment of a MT-B 18-81 transfectant with 20 μM cadmium. (Lower panel) Immunoblot from the same cells showing c-Myc after treatment with 20 μM cadmium. (**B**) Viability of 18-81 MT-B transfectant (●) and MT only (○), determined by trypan blue exclusion, after growth in varying concentrations of cadmium for 36 hours. (**C**) Detection of Blimp-1–induced apoptosis in 18-81 transfectants by TUNEL staining (29). 18-81 cells transfected either by MT-B or MT control vectors were grown without (−Cd) or with (+Cd) 20 μM cadmium for 36 hours, centrifuged onto slides, and then fixed with 4% paraformaldehyde. The TUNEL staining was done according to the manufacturer's instructions (Boehringer Mannheim). Arrows indicate apoptotic cells. (**D**) Cells ($10^6$) from $BCL_1$ transfectants containing MT or MT-B (MT-B1 to 3) were treated with 20 μM cadmium for 72 hours, and IgM in the culture medium was measured by enzyme-linked immunosorbent assay (15). Untransfected $BCL_1$ ± IL-2/IL-5 served as controls.

Downloaded from www.sciencemag.org on May 20, 2008

24. J. S. Kaptein *et al.*, *J. Biol. Chem.* **271**, 18875 (1996).
25. M. Davis, personal communication.
26. EMSA was done as described [C. Peterson, K. Orth, K. Calame, *Mol. Cell. Biol.* **6**, 4168 (1986)]. A 25-bp oligonucleotide corresponding to the *c-myc* PRF site (CGCGTACAGAAAGGGAAAGGACTAG) was used as a probe. Binding mixtures including 3 µg of nuclear extract protein, 1 ng of probe (~100,000 cpm), and 3 µg of poly(dI-dC) were incubated on ice for 30 min, then subjected to electrophoresis in a 6% polyacrylamide gel; for competition or super-shift, competitors (50×) or antiserum (1 µl) were incubated with nuclear extracts on ice for 15 min before addition of probe. GATA tetramer [A. Henderson, S. McDougall, J. Leiden, K. Calame, *Mol. Cell. Biol.* **14**, 4286 (1994)] was used as a nonspecific competitor. Antiserum to Blimp-1 was raised against the NH$_2$-terminus of Blimp-1 and did not

cross-react with other zinc finger proteins in protein immunoblot (15).
27. M. Bradford, *Anal. Biochem.* **72**, 248 (1976).
28. G. Peterson and J. Mercer, *Eur. J. Biochem.* **160**, 579 (1986).
29. T. Graeber *et al.*, *Nature* **379**, 88 (1996).
30. We thank M. Davis and D. Mack for the Blimp-1 expression plasmid and antiserum to Blimp-1; R. Pine for ISRE and PRD1 oligonucleotides; M. Dorsch for IL-2– and IL-5–containing supernatants; members of our laboratory for helpful discussions; and D. Cobrinik, R. Dalla-Favera, and A. Henderson for critically reading the manuscript. Supported by American Cancer Society (ACS) grant VM108, ACS grant 130, and U.S. Army Medical Research grant 17-94-J-4102 to K.C.

3 December 1996; accepted 27 February 1997

# Maintenance of Acetylcholine Receptor Number by Neuregulins at the Neuromuscular Junction in Vivo

Alfred W. Sandrock Jr.,* Stuart E. Dryer,*† Kenneth M. Rosen, Shai N. Gozani, Rainer Kramer, Lars E. Theill, Gerald D. Fischbach‡

ARIA (for acetylcholine receptor–inducing activity), a protein purified on the basis of its ability to stimulate acetylcholine receptor (AChR) synthesis in cultured myotubes, is a member of the neuregulin family and is present at motor endplates. This suggests an important role for neuregulins in mediating the nerve-dependent accumulation of AChRs in the postsynaptic membrane. Nerve-muscle synapses have now been analyzed in neuregulin-deficient animals. Mice that are heterozygous for the deletion of neuregulin isoforms containing an immunoglobulin-like domain are myasthenic. Postsynaptic AChR density is significantly reduced, as judged by the decrease in the mean amplitude of spontaneous miniature endplate potentials and bungarotoxin binding. On the other hand, the mean amplitude of evoked endplate potentials was not decreased, due to an increase in the number of quanta released per impulse, a compensation that has been observed in other myasthenic states. Thus, the density of AChRs in the postsynaptic membrane depends on immunoglobulin-containing neuregulin isoforms throughout the life of the animal.

The fidelity of neuromuscular transmission depends on the extraordinarily high density of AChRs in the postsynaptic muscle membrane. Developmental studies have pointed to the important trophic influence of the motor nerve in the regulation of endplate AChR density (1), an effect strong enough to override the suppression of AChR synthesis by muscle activity. Part of the nerve's local influence on AChR density is to promote the immobilization of AChRs, an effect mediated by the glycoprotein agrin (2). Another important local influence of the motor nerve is to increase the synthesis and insertion of AChRs into the postsynaptic membrane (3). In fact, endplate nuclei in developing and mature muscle are known to transcribe AChR subunit genes at a high rate as compared with that in nonsynaptic nuclei (4, 5). The effect of synthesis on local receptor density remains evident in mice that lack the principal cytoplasmic AChR anchoring protein rapsyn (6).

The most likely candidate for mediation of the motor neuron's influence on endplate AChR synthesis is ARIA (for acetylcholine receptor–inducing activity), a protein purified from brain extracts on the basis of its ability to stimulate the synthesis of AChRs in cultured myotubes (7, 8). ARIA is a member of the neuregulin family of ligands for the 185-kD transmembrane receptor tyrosine kinases ErbB2, ErbB3, and ErbB4

(also called Her2, Her3, and Her4), which are closely related to the epidermal growth factor (EGF) receptor (9, 10). Neuregulins are potent activators of muscle AChR synthesis, with a median effective dose (ED$_{50}$) of 25 to 50 pM (11); neuregulin mRNA can be detected in embryonic motor neurons when motor axons first invade peripheral muscle masses (12, 13) and is also abundant in adult motor neurons (13); neuregulin receptors are present in skeletal muscle cells and may be concentrated at the neuromuscular junction (14–16); neuregulin protein is concentrated in motor nerve terminals (15–18) and accumulates in the extracellular matrix of the synaptic cleft (12, 15, 18); and in mammalian muscle, neuregulin increases mRNA encoding ∈ (17, 19), an AChR subunit that replaces the γ subunit during development. Neuregulins may therefore mediate the nerve-dependent maturation of junctional AChRs (20) as well as enhance overall AChR gene expression at developing and mature nerve-muscle synapses.

More direct evidence of the role of neuregulins at neuromuscular junctions would require the selective inhibition or elimination of neuregulin activity, or both. When mice are genetically altered so that exons encoding the EGF-like domain (21) or the immunoglobulin (Ig)-like domain (22) of neuregulin or the neuregulin receptors ErbB2 (23) and ErbB4 (24) have been deleted, homozygous animals die on or about embryonic day 10 (E10) with defects of the heart, cranial ganglia, and hindbrain. This is well before the formation of neuromuscular synapses begins on about E15 (25). Heterozygous animals appear normal and are fertile. This, of course, does not exclude a subtle defect at the neuromuscular junctions.

Although brain-purified ARIA contained Ig-domain amino acid sequences, Ig-containing isoforms may represent a small fraction (about 10 to 20%) of the total that are present in motor neurons (13, 26). Other forms, in which a cysteine-rich region replaces the Ig-like domain (Fig. 1A), predominate. We studied mice deficient in Ig-containing neuregulins because these isoforms may be particularly important at the neuromuscular junction. The Ig-like domain binds heparin (8, 27), an affinity that may be responsible for the observed association of neuregulin with the extracellular matrix of the synaptic cleft (12, 15, 18). Thus, by accumulating at the endplate, Ig-containing neuregulins may exert a major effect on endplate AChR synthesis. In fact, molecules associated with the synaptic basal lamina have been shown to promote the synthesis of AChRs in denervated adult muscle (28), and they appear to have a selective effect on the ∈-containing (adult)

A. W. Sandrock Jr., Department of Neurobiology, Harvard Medical School, Boston, MA 02115, and Department of Neurology, Massachusetts General Hospital, Boston, MA 02114, USA.
S. E. Dryer, K. M. Rosen, S. N. Gozani, G. D. Fischbach, Department of Neurobiology, Harvard Medical School, Boston, MA 02115, USA.
R. Kramer and L. E. Theill, Amgen, Thousand Oaks, CA 91320, USA.

*These authors contributed equally to this work.
†Present address: Program in Neuroscience, Florida State University, Tallahassee, FL 32306, USA.
‡To whom correspondence should be addressed.

Downloaded from www.sciencemag.org on May 20, 2008

# EXHIBIT 61

# TAZ, a Transcriptional Modulator of Mesenchymal Stem Cell Differentiation

Jeong-Ho Hong,[1] Eun Sook Hwang,[3] Michael T. McManus,[1] Adam Amsterdam,[1] Yu Tian,[4] Ralitsa Kalmukova,[1] Elisabetta Mueller,[5] Thomas Benjamin,[4] Bruce M. Spiegelman,[5] Phillip A. Sharp,[1] Nancy Hopkins,[1] Michael B. Yaffe[1,2*]

Mesenchymal stem cells (MSCs) are a pluripotent cell type that can differentiate into several distinct lineages. Two key transcription factors, Runx2 and peroxisome proliferator–activated receptor γ (PPARγ), drive MSCs to differentiate into either osteoblasts or adipocytes, respectively. How these two transcription factors are regulated in order to specify these alternate cell fates remains a pivotal question. Here we report that a 14-3-3–binding protein, TAZ (transcriptional coactivator with PDZ-binding motif), coactivates Runx2-dependent gene transcription while repressing PPARγ-dependent gene transcription. By modulating TAZ expression in model cell lines, mouse embryonic fibroblasts, and primary MSCs in culture and in zebrafish in vivo, we observed alterations in osteogenic versus adipogenic potential. These results indicate that TAZ functions as a molecular rheostat that modulates MSC differentiation.

Pluripotent MSCs can differentiate into several distinct cell types, including osteoblasts and adipocytes (1, 2). Two key transcription factors, Runx2 (also called Cbfa1 or Pebp2αA) and PPARγ, drive MSCs to differentiate into either osteoblasts or adipocytes, respectively

(3–7), and the differentiation of each lineage appears to be mutually exclusive and transcriptionally controlled (8, 9). How these two transcription factors are regulated in order to specify these alternate cell fates is unknown.

The balance between MSC osteoblast and adipocyte differentiation is disrupted in various human diseases. For example, decreased bone formation accompanied by an increase in bone marrow adipogenesis occurs with aging and immobility or following corticosteroid use (10–14), whereas increased bone formation is observed in patients with progressive osseous hyperplasia who form heterotopic bone within their adipose tissue (15). In addition, MSCs are currently being explored as vehicles for cell-based skeletal therapies (16, 17). Therefore, investigating the

[1]Center for Cancer Research, Department of Biology and [2]Division of Biological Engineering, Massachusetts Institute of Technology, 77 Massachusetts Avenue, E18-580, Cambridge, MA 02139, USA. [3]Department of Immunology and Infectious Diseases, Harvard School of Public Health, Harvard Medical School, Boston, MA 02115, USA. [4]Department of Pathology, Harvard Medical School, 77 Louis Pasteur Avenue, Boston, MA 02115, USA. [5]Dana-Farber Cancer Institute and the Department of Cell Biology, Harvard Medical School, Boston, MA 02115, USA.

*To whom correspondence should be addressed. E-mail: myaffe@mit.edu



**Fig. 1.** TAZ is a Runx2 transcriptional coactivator for osteocalcin expression. (**A**) Down-regulation of TAZ by siRNA. Murine (m) and human (h) TAZ siRNA duplex oligonucleotides were transfected into murine C2C12 cells, and lysates were analyzed by immunoblotting (18). (**B**) Decreased octeocalcin expression after down-regulation of endogenous TAZ. Total RNA was prepared and osteocalcin gene expression at the indicated times after BMP-2 treatment was quantified by using real-time polymerase chain reaction (PCR) and normalized to β-actin expression. (**C**) TAZ expression in response to BMP-2. RNA and cell lysates from (B) were analyzed for TAZ mRNA expression by real-time PCR (upper panel) and for protein expression by Western blot analysis (lower panel). (**D**) Direct interaction between TAZ and Runx2. 293T cells were transfected with Flag-tagged TAZ, HA-tagged Runx2, or both, and total cell lysates (TCL) were analyzed by coimmunoprecipitation. (**E**) Stimulation of Runx2-driven gene expression by TAZ. Luciferase reporter activity from a construct containing six copies of the Runx2-binding site in the osteocalcin promoter was measured in cell lysates 24 hours after transfection and normalized to β-galactosidase activity. Below is a Western blot analysis of TAZ (wild-type or S89A) and YAP levels in the lysates. (**F**) 14-3-3 binding and nuclear localization of TAZ S89A mutant protein. (Left) Green fluorescent protein (GFP)–tagged TAZ wild-type and S89A localization in transfected C2C12 cells. (Right) C2C12 cells were transfected with Flag-tagged wt or S89A mutant TAZ. Protein from total lysates was immunoprecipitated with antibody to Flag, and TAZ or 14-3-3 was detected by immunoblotting. (**G**) Chromatin immunoprecipitation of TAZ with the endogenous osteocalcin promoter in response to BMP-2 stimulation. Stable Flag-tagged TAZ-expressing C2C12 cells were treated for 3 days with or without BMP-2, and Flag immunoprecipitates were analyzed for osteocalcin (OC) promoter occupancy by PCR.

Downloaded from www.sciencemag.org on May 19, 2008

mechanisms that fine-tune the balance between MSC osteoblast and adipocyte differentiation is likely to be of medical importance.

TAZ is a paralog (related molecule arising in a single species through gene duplication) of Yes-associated protein (YAP) that we identified in a proteomic screen for 14-3-3–binding proteins (*18*). The function of TAZ is unknown, although it can act as a transcriptional co-activator when overexpressed (*18, 19*). TAZ and YAP contain a WW domain that binds to Pro-Pro-X-Tyr motifs (where X is any amino acid) and a coiled-coil C-terminal domain that recruits core components of the transcriptional machinery (*18, 20*). A number of transcription factors including Runx2 and PPARγ contain Pro-Pro-X-Tyr motifs within their activation domains. Thus, interaction of TAZ with these and other transcription factors might be involved in mediating their transcriptional effects.

To investigate the function of TAZ, we designed small interfering RNAs (siRNAs) against the murine (m) or human (h) TAZ isoforms (fig. S1). These siRNAs differ at two base pairs and function as specific and nonspecific control siRNAs in mouse and human cell culture, respectively. The murine-specific TAZ siRNA, but not the human-specific siRNA,

decreased the abundance of TAZ protein within 24 hours when transfected into murine myoblast C2C12 cells (Fig. 1A). Neither siRNA had any effect on YAP expression. Treatment of C2C12 cells with bone morphogenic protein–2 (BMP-2) induces osteoblast differentiation as evidenced by an ~400-fold increase in Runx2-dependent expression of the osteocalcin gene, a late marker of osteoblast development (*21, 22*). Transfection of C2C12 cells with murine TAZ siRNA for 24 hours before exposure to BMP-2 inhibited osteocalcin gene expression relative to the effect of the human TAZ siRNA (Fig. 1B). BMP-2 treatment itself caused a 10- to 20-fold increase in the expression of both TAZ mRNA and protein over the ensuing 2 days in these cells, an effect that was blunted, but not eliminated, by siRNA treatment (Fig. 1C).

Thus, BMP-2 appears to stimulate a transcriptional program in which increased expression of TAZ, as well as subsequent TAZ-stimulated expression of the osteocalcin gene by Runx2, may be important for the osteoblast differentiation program. To test this idea, we performed immunoprecipitation experiments and verified a direct interaction of TAZ and Runx2 in transfected cells (Fig. 1D). TAZ ex-

pression caused a dose-dependent increase in Runx2-driven expression of an osteocalcin gene promoter fragment construct monitored in a luciferase reporter assay (Fig. 1E and fig. S2). 14-3-3 binds to TAZ through a site involving Ser[89], sequestering TAZ in the cytoplasm and limiting its ability to influence gene expression (*18*). Replacement of Ser[89] with Ala (S89A mutation) disrupted 14-3-3 binding and relocalized TAZ preferentially within the nucleus, often in punctate foci (Fig. 1F) (*18*). When we used an S89A mutant of TAZ, the TAZ-dependent transcriptional coactivation of Runx2-driven gene expression was enhanced 2 to 3 times (Fig. 1E). Similar results for Runx2 transcriptional coactivation were obtained in C3H10T1/2 mouse embryonic fibroblasts (fig. S3). Both the interaction of TAZ with Runx2 and the stimulatory effect of TAZ on osteocalcin gene promoter activity were dependent on the TAZ WW domain (fig. S7). We also generated stable C2C12 cell lines expressing Flag-tagged TAZ and observed a BMP-2–dependent targeting of TAZ to the endogenous osteocalcin promoter by chromatin immunoprecipitation. (Fig. 1G). Taken together, these data indicate that TAZ is a 14-3-3–regulated transcriptional coactivator for

Downloaded from www.sciencemag.org on May 19, 2008



**Fig. 2.** TAZ binds to PPARγ and inhibits transcription from the aP2 promoter. (**A**) Binding of TAZ to glutathione S-transferase (GST) fused with PPARγ. Immobilized GST-PPARγ was incubated with in vitro translated, [35]S-labeled YAP or TAZ, or with the ligand-dependent PPARγ-binding protein SRC-1, in the presence or absence of 1 μM Rosiglitazone, and analyzed by autoradiography. (**B**) Binding of PPARγ to GST-TAZ. Immobilized GST-mTAZ was incubated with in vitro translated [35]S-labeled PPARγ. The PPARγ doublet represents sites of alternative translational initiation. (**C**) Interaction of TAZ with PPARγ in cells. 293T cells were transfected with Flag-tagged TAZ or Myc-tagged PPARγ and analyzed by coimmunoprecipitation. (**D**) Inhibition of PPARγ-driven gene expression by TAZ. U2OS cells were transfected with an aP2 promoter–containing firefly luciferase reporter construct (aP2-Luc), a PPARγ expression vector [SV-sport–PPARγ2, (*6*)] and various amounts of plasmids encoding either wt-TAZ or the S89A TAZ mutant (EF-mTAZ-NFLAG or EF-mTAZ(S89A)-NFLAG, respectively). Total RNA in each sample



was equalized by addition of empty pEF-Bos vector DNA. Luciferase activity was measured after 24 hours in the presence or absence of 1 μM Rosiglitazone and normalized to the activity of a cotransfected *Renilla* luciferase reporter construct used as an internal control. (**E**) Inhibition of adipocyte differentiation by stable expression of TAZ. 3T3-L1 cells were infected with a control pBabe-puro retroviral vector (–) or a retroviral vector containing TAZ S89A. Puromycin-resistant cells were treated with Rosiglitazone and stained with

Oil Red O and photographed at 8 days (*6*). (**F**) Expression of fatty acid–binding protein aP2. Total RNA was isolated from cells in (E), and probed with an adipocyte-specific cDNA to aP2. Ethidium bromide staining (bottom) verifies equal loading of RNA in each lane. (**G**) Inhibition of PPARγ-dependent gene expression by TAZ S89A. Retrovirally infected cells were lysed at the indicated times after treatment with 5 μM Rosiglitazone, and PPARγ and C/EBPα protein levels were analyzed by Western blotting.

Downloaded from www.sciencemag.org on May 19, 2008

Runz2-stimulated osteocalcin gene expression and an important endogenous regulator of osteoblast differentiation.

PPARγ, a member of the nuclear hormone receptor superfamily, is a ligand-activated transcription factor that is critical for adipocyte differentiation (6, 7, 9, 23–25). Like Runx2, PPARγ also contains a Pro-Pro-X-Tyr WW domain–binding motif within its ligand-independent activation domain. We therefore investigated the functional interaction between TAZ and PPARγ. PPARγ bound in a ligand-independent manner to TAZ, but not to YAP, in experiments with tagged proteins in vitro and in transfected cells (Fig. 2A through C). In contrast to the stimulatory effect of TAZ on Runx2-driven gene expression, TAZ directly inhibited the ability of PPARγ to stimulate gene expression for the endogenous fatty acid–binding protein aP2, in both the presence and absence of the PPARγ-activating ligand Rosiglitazone, as assayed with a luciferase reporter construct (Fig. 2D). The inhibitory effect of TAZ on PPARγ-driven gene expression was even more pronounced when the constitutively nuclear S89A form of TAZ was used (Fig. 2D). Similar to what we observed with Runx2, the interaction of TAZ with PPARγ and the inhibitory effect of TAZ on aP2 gene expression required the TAZ WW domain (fig. S8).

To investigate the cellular role of TAZ on PPARγ-regulated genes, we generated stable 3T3-L1 cell lines expressing TAZ-S89A or a vector control, and we monitored adipocyte differentiation in response to Rosiglitazone. Enhanced expression of TAZ-S89A resulted in inhibition of adipocyte differentiation as revealed by suppression of Rosiglitazone-induced expression of aP2 and reduction in Oil Red O staining of the cells (Fig. 2, E and F). PPARγ participates in a positive feedback loop by driving transcription of its own gene, as well as that of other target genes such as the one for C/EBPα, as part of the normal adipocyte differentiation program (26). Overexpression of TAZ-S89A also inhibited these PPARγ-driven processes (Fig. 2G). Similar results were also observed with wild-type TAZ, although its effect was smaller. TAZ did not affect binding of PPARγ to its site on the aP2 promoter as seen from an oligonucleotide-binding assay (fig. S9). Instead, chromatin immunoprecipitation experiments localized TAZ to the endogenous aP2 promoter during these adipocyte differentiation experiments (Fig. 3D). Thus, TAZ may suppress adipocyte differentiation by transcriptionally repressing PPARγ-driven gene expression.

To further examine this possibility, we used siRNA to inhibit the production of endogenous TAZ in this same cell type (Fig. 3). After TAZ was depleted, the 3T3-L1 cells were placed in adipocyte differentiation medium containing various concentrations of Rosiglitazone. Cells were assayed 8 days later, by which



**Fig. 3.** Increased adipocyte differentiation from cells depleted of endogenous TAZ. (**A**) 3T3-L1 cells were transfected with control siRNA against GFP (C) or mTAZ-specific siRNA (T) for 36 hours and transferred to adipocyte differentiation medium. Cell lysates were examined for TAZ and YAP expression by Western blotting. (**B**) Adipogenesis in cells after inhibition of endogenous TAZ expression. As in (A), 3T3-L1 cells were treated with the indicated concentrations of Rosiglitazone for 8 days, stained with Oil Red O, and photographed. (**C**) Total RNA was isolated from cells shown in (B) and probed with an adipocyte-specific cDNA to aP2. (**D**) Stable 3T3-L1 cells expressing pBabe-puro retroviral vector control (−) or Flag-tagged wild-type TAZ were differentiated into adipocytes and analyzed by chromatin immunoprecipitation with the use of PCR primers for the endogenous aP2 promoter.

time TAZ expression was no longer inhibited. However, the transient reduction of expression of endogenous TAZ was sufficient to enhance ligand-induced adipocyte differentiation at each concentration of Rosiglitazone tested (Fig. 3, A through C). We conclude that TAZ is a transcriptional repressor of PPARγ-induced gene expression and an endogenous inhibitor of the adipocyte differentiation program.

Osteoblasts and adipocytes originate from the same MSCs through alternative activation of reciprocal transcriptional programs (8, 9). Our findings suggested that TAZ may influence cell fate during the MSC differentiation process, because Runx2, PPARγ, and TAZ are present in these cells (Fig. 4, A and B; fig. S4). To test this, we isolated primary MSCs from murine bone marrow, allowed them to proliferate in culture, and infected them with control retroviruses or with retroviruses encoding short hairpin RNAs (shRNAs) against TAZ. Retrovirus-infected cells were selected after 7 days of culture in medium

containing puromycin, and the entire surviving population of cells was assayed. Using this approach, we observed an ~75% reduction in TAZ protein expression (Fig. 4B). When these cells were subsequently cultured under conditions favoring osteoblast differentiation, the cells infected with the control retrovirus showed calcium deposition by 5 days (Fig. 4, C and D). In contrast, cells infected with the retroviruses encoding shRNAs against TAZ demonstrated almost no calcium deposition at this time, which revealed impairment of the osteoblast differentiation program. Conversely, when retrovirus-infected primary MSCs were cultured under conditions favoring adipocyte differentiation, the cells containing shRNA against TAZ demonstrated enhanced Oil Red O staining (Fig. 4E).

We wondered whether the increased adipogenic phenotype observed in cells lacking TAZ was blunted by the waning effectiveness and limited suppression of TAZ resulting from expression of siRNA or shRNA, respectively. We

REPORTS

**Fig. 4.** Bone marrow-derived MSCs depleted of TAZ show decreased osteogenesis and increased adipogenesis. (A) Concurrent expression of Runx2 and PPARγ in primary bone marrow–derived MSCs. Nuclear extracts from MSCs were analyzed by Western blotting with the indicated antibodies. (B) Depletion of TAZ with shRNA. MSCs were infected with a pSRP retrovirus control (V) or pSRP encoding TAZ short hairpin RNA (TAZsh). After puromycin selection for 7 days, the MSC population was analyzed for depletion of endogenous TAZ by Western blotting. (C and D) Impaired osteoblast differentiation TAZ-depleted MSCs. After 7 days of selection in puromycin, amplified cells were transferred to medium containing 0.1 μM dexamethasone, 50 μg/ml ascorbic acid, and 10 mM β-glycerophosphate for 5 days to induce osteoblast differentiation. Plates were stained with Alizarin Red S to visualize intracellular calcium deposition and photographed. (E) Enhanced adipocyte differentiation in TAZ-depleted MSCs. MSCs were induced to differentiate into adipocytes by culture in medium containing 1 μM dexamethasone, 5 μg/ml insulin, and 1 μM Rosiglitazone for 8 days, stained with Oil Red O, and photographed. (F) TAZ expression in knockout MEFs. TAZ expression was analyzed in whole-cell lysates from wild-type and TAZ$^{-/-}$ MEFs by using an antibody that recognizes both TAZ and YAP. (G) Enhanced adipocyte differentiation of TAZ knockout MEFs. Wild-type and TAZ$^{-/-}$ MEFs were infected with a PPARγ2-expressing retrovirus or a retrovirus vector control, and the infected cells were selected by using puromycin. Cells were induced with differentiation medium in the presence or absence of 1 μM Rosiglitazone as above, stained with Oil Red O, and photographed.







**Fig. 5.** Lack of skeletal ossification in TAZ-depleted zebrafish. (A) TAZ depletion in zebrafish embryos. Embryos were injected with a control morpholino oligomer (MO) or a TAZ-specific oligomer at the one- to two-cell stage and analyzed 1 to 2 days later by immunoblotting. (B) Morphology of TAZ-depleted zebrafish embryos at 2 dpf showing ventral curvature and pericardial edema. (C) Alizarin Red S staining of whole zebrafish embryos reveals absent skeletal ossification in TAZ-depleted embryos. Lateral and dorsal views of control- and TAZ-specific MO-injected embryos at 8 dpf. op: opercle; ch/bsr: ceratohyal and branchiostegal rays; cb5: ceratobranchial. (D) Hematoxylin-and-eosin staining of zebrafish sections reveals impaired bone development. Red arrows indicate normal bone morphology in control embryos, which is absent in TAZ-depleted animals. (E) A model for TAZ modulation of mesenchymal stem cell differentiation.

therefore addressed adipocyte differentiation in wild-type mouse embryo fibroblasts (MEFs) and TAZ$^{-/-}$ MEFs generated by homologous recombination (27) (Fig. 4F). MEFs were immortalized, infected with a retrovirus expressing PPARγ2, and cultured in medium containing Rosiglitazone to induce adipogenesis. Adipogen-

esis was more pronounced in TAZ$^{-/-}$ MEFs than in wild-type cells (Fig. 4G and fig. S5), consistent with a negative role of endogenous TAZ in the adipocyte differentiation process.

To investigate the in vivo role of TAZ on bone development, we used a zebrafish vertebrate model system. We cloned the zebrafish

TAZ ortholog (fig. S6) and used antisense morpholino oligomers injected at the one- to two-cell stage to decrease expression of TAZ (Fig. 5A). The TAZ-depleted embryos survived for up to 8 days after fertilization (dpf), and had developmental abnormalities including a ventral axis curvature and pericardial edema

Downloaded from www.sciencemag.org on May 19, 2008

(28) (Fig. 5B). Bone development was visualized in whole embryos by Alizarin Red S staining (Fig. 5C), along with hematoxylin-and-eosin staining of thin sections (Fig. 5D). In control animals, extensive skeletal development was evident in the cranial and pharyngeal region at 8 dpf. No bone formation was observed in any of the TAZ-depleted embryos at 8 dpf, the latest time point we could observe before embryonic death. These findings confirm a critical role for TAZ in osteoblast differentiation in vivo. We are unable to comment on the role of TAZ in adipogenesis in these embryos, because adipocytes have not been described in teleosts (although they presumably exist), and in other vertebrate species, fat deposition does not occur until the postnatal period (23).

One function of TAZ is as a transcriptional modifier of mesenchymal stem cell differentiation by promoting osteoblast differentiation while simultaneously impairing adipocyte differentiation, as we have shown (Fig. 5E). Differentiation of MSCs into osteoblasts is critically dependent on Runx2 (4, 5). Our findings implicate TAZ in this process: (i) TAZ functions as an endogenous coactivator of Runx2 in cells; (ii) stimuli that promote bone formation transcriptionally up-regulate TAZ concurrently with Runx2; and (iii) TAZ-deficient zebrafish embryos are defective in bone formation. In contrast, stem cell differentiation into adipocytes requires PPARγ-dependent transcriptional events that are directly inhibited by endogenous TAZ. Thus, TAZ may act as a molecular rheostat to fine-tune the balance between osteoblast and adipocyte development.

**References and Notes**
1. M. F. Pittenger et al., Science 284, 143 (1999).
2. A. I. Caplan, S. P. Bruder, Trends Mol. Med. 7, 259 (2001).
3. P. Ducy, R. Zhang, V. Geoffroy, A. L. Ridall, G. Karsenty, Cell 89, 747 (1997).
4. T. Komori et al., Cell 89, 755 (1997).
5. F. Otto et al., Cell 89, 765 (1997).
6. P. Tontonoz, E. Hu, B. M. Spiegelman, Cell 79, 1147 (1994).
7. E. D. Rosen et al., Mol. Cell 4, 611 (1999).
8. K. Nakashima, B. de Crombrugghe, Trends Genet. 19, 458 (2003).
9. E. D. Rosen, C. J. Walkey, P. Puigserver, B. M. Spiegelman, Genes Dev. 14, 1293 (2000).
10. P. Meunier, J. Aaron, C. Edouard, G. Vignon, Clin. Orthop. 80, 147 (1971).
11. R. Burkhardt et al., Bone 8, 157 (1987).
12. O. Kajkenova et al., J. Bone Miner. Res. 12, 1772 (1997).
13. S. Verma, J. H. Rajaratnam, J. Denton, J. A. Hoyland, R. J. Byers, J. Clin. Pathol. 55, 693 (2002).
14. M. E. Nuttall, J. M. Gimble, Bone 27, 177 (2000).
15. F. S. Kaplan, E. M. Shore, J. Bone Miner. Res. 15, 2084 (2000).
16. D. J. Prockop, Science 276, 71 (1997).
17. S. C. Chang et al., J. Surg. Res. 119, 85 (2004).
18. F. Kanai et al., EMBO J. 19, 6778 (2000).
19. C. B. Cui, L. F. Cooper, X. Yang, G. Karsenty, I. Aukhil, Mol. Cell. Biol. 23, 1004 (2003).
20. R. Yagi, L. F. Chen, K. Shigesada, Y. Murakami, Y. Ito, EMBO J. 18, 2551 (1999).
21. T. Katagiri et al., J. Cell Biol. 127, 1755 (1994).
22. S. Gallea et al., Bone 28, 491 (2001).
23. P. Cornelius, O. A. MacDougald, M. D. Lane, Annu. Rev. Nutr. 14, 99 (1994).
24. Y. Barak et al., Mol. Cell 4, 585 (1999).
25. N. Kubota et al., Mol. Cell 4, 597 (1999).
26. Z. Wu et al., Mol. Cell 3, 151 (1999).
27. Y. Tian, T. Benjamin, unpublished observations.
28. J.-H. Hong, N. Hopkins, M.B. Yaffe, unpublished observations.
29. Assistance from H. Jo and R. Nissen in zebrafish studies and S. Bissonnette in MSC studies is gratefully acknowledged. This work was supported by NIH grants CA042063 to P.A.S., and GM60594 and GM68762 and a Burroughs-Wellcome Career Development Award to M.B.Y.

**Supporting Online Material**
www.sciencemag.org/cgi/content/full/309/5737/1074/DC1
Materials and Methods
Figs. S1 to S9
References and Notes

11 February 2005; accepted 28 June 2005
10.1126/science.1110955

Downloaded from www.sciencemag.org on May 19, 2008

# Formation of Regulatory Patterns During Signal Propagation in a Mammalian Cellular Network

Avi Ma'ayan,[1] Sherry L. Jenkins,[1] Susana Neves,[1] Anthony Hasseldine,[1] Elizabeth Grace,[1] Benjamin Dubin-Thaler,[3] Narat J. Eungdamrong,[1] Gehzi Weng,[1]* Prahlad T. Ram,[1]† J. Jeremy Rice,[4] Aaron Kershenbaum,[4] Gustavo A. Stolovitzky,[4] Robert D. Blitzer,[1,2] Ravi Iyengar[1]‡

We developed a model of 545 components (nodes) and 1259 interactions representing signaling pathways and cellular machines in the hippocampal CA1 neuron. Using graph theory methods, we analyzed ligand-induced signal flow through the system. Specification of input and output nodes allowed us to identify functional modules. Networking resulted in the emergence of regulatory motifs, such as positive and negative feedback and feedforward loops, that process information. Key regulators of plasticity were highly connected nodes required for the formation of regulatory motifs, indicating the potential importance of such motifs in determining cellular choices between homeostasis and plasticity.

A mammalian cell may be considered as a central signaling network connected to various cellular machines that are responsible for phenotypic functions (1). Cellular machines such as transcriptional, translational, motility, and secretory machinery can be represented as sets of interacting components that form functional local networks. The central signaling network that connects the various machine networks also receives and processes signals from extracellular entities such as hormones or neurotransmitters and ions. Experimental work has defined how different pathways interact to form networks and small-scale regulatory configurations such as switches (2, 3), gates (4, 5), feedback loops (6, 7), and feedforward motifs (8, 9) that decode signal duration and strength and process information. Identifying and characterizing regulatory motifs can move us from thinking about individual components to considering the functions of groups of components that act in a coordinated manner. Understanding how the functional organization of cellular systems changes in response to information flow is an important goal in systems biology. For systems containing many components, obtaining an overview of the patterns of regulatory motifs and defining their interrelationships can provide a format for in-depth analysis of individual units using quantitative biochemical representations.

From data in the experimental literature, we constructed a system of interacting cellular components involved in phenotypic behavior and used graph theory methods (10–12) to analyze qualitative relationships between nodes (components) in a network. In signaling networks, activation is achieved as a response to a stimulus. Information propagates through the system by a series of coupled biochemical reactions to regulate components responsible for cellular phenotypic functions. Here, we identify the regulatory features that emerge during such information flow in a simplified representation of a mammalian hippocampal CA1 neuron. Such neurons are capable of plasticity as defined by their ability to undergo long-term potentiation of synaptic responses (13, 14).

We represented the CA1 neuron as a set of interacting components that make up a network of signaling pathways that connects to various

Departments of [1]Pharmacology and Biological Chemistry and [2]Psychiatry, Mount Sinai School of Medicine, New York, NY 10029, USA. [3]Department of Biological Sciences, Columbia University, New York, NY 10029, USA. [4]Functional Genomics and Systems Biology, IBM T. J. Watson Research Center, Yorktown Heights, NY 10598, USA.

*Present address: Scios Inc., 6500 Paseo Padre Parkway, Fremont, CA 94555, USA.
†Present address: Department of Molecular Therapeutics, M. D. Anderson Cancer Center, Houston, TX 77025, USA.
‡To whom correspondence should be addressed. E-mail: Ravi.Iyengar@mssm.edu

# EXHIBIT 62

## GLUCONEOGENESIS

# Re-evaluating the FOXO1–PGC-1α connection

**Arising from: P. Puigserver et al. Nature 423, 550–555 (2003).**

Increased expression of the gene encoding the enzyme glucose-6-phosphatase (G6Pase) contributes to the increased production of glucose by the liver that occurs in individuals with diabetes. Puigserver et al.[1] show that the transcription factor FOXO1 and the transcriptional co-activator PGC-1α act synergistically to stimulate the expression of genes in the gluconeogenesis pathway and propose that PGC-1α acts, in part, directly through FOXO1. Here we show that FOXO1 is neither required nor sufficient for the stimulation of G6Pase–luciferase fusion gene expression by PGC-1α. Our results indicate that the transcriptional interaction between FOXO1 and PGC-1α is indirect.

PGC-1α (for peroxisome proliferative activated receptor-γ co-activator-1α) interacts with several transcription factors and is an important regulator of mitochondrial biogenesis, respiration, thermogenesis and hepatic gluconeogenesis[2,3]. Puigserver et al.[1] show that FOXO1 and PGC-1α can physically interact with one another and that the combined action of PGC-1α and FOXO1 in various liver-cell types results in a synergistic induction of endogenous G6Pase gene expression. They also show that, in immortalized hepatocytes, mutation of FOXO1 binding sites in the G6Pase promoter abolishes the induction of G6Pase-fusion gene expression by FOXO1 alone, as well as the synergistic induction achieved in combination with PGC-1α (ref. 1).

On the basis of this result, the authors propose a model in which PGC-1α stimulates G6Pase gene expression, in part, through direct interaction with FOXO1 bound to the G6Pase promoter. However, an alternative explanation for their observations is that PGC-1α stimulates G6Pase gene expression through interaction with another promoter-bound transcription factor, distinct from FOXO1, and that the synergy between PGC-1α and FOXO1 occurs through interaction with the pre-initiation transcription complex. It was not easy for Puigserver et al.[1] to distinguish between these possibilities in immortalized hepatocytes because there was little effect of PGC-1α in the absence of FOXO1.

This is not the case in H4IIE hepatoma cells, however, in which both PGC-1α (ref. 4) and FOXO1 (ref. 5) independently induce G6Pase–luciferase fusion gene expression, although, as in immortalized hepatocytes, co-expression of both PGC-1α and FOXO1 results in a synergistic induction of fusion-gene expression (results not shown). We therefore generated plasmids in which two previously identified FOXO1 binding sites (designated IRS 1 and IRS 2; ref. 6) and two



| | | | Effect of FOXO1 on G6Pase–luciferase fusion gene expression | Effect of PGC-1α on G6Pase–luciferase fusion gene expression |
|---|---|---|---|---|
| −231 WT | | | 13.68 ± 0.91 (15) | 5.72 ± 0.40 (30) |
| −231 TM | | | 1.55 ± 0.06 (8) ** | 7.54 ± 0.54 (8) ** |
| −231 FB SDM | | | 7.33 ± 0.68 (8) ** | 5.42 ± 0.40 (9) |
| −231 FC SDM | | | 10.56 ± 1.29 (6) * | 6.15 ± 1.39 (15) |
| −231 TM+FB SDM | | | 1.04 ± 0.07 (5) ** | 9.79 ± 1.28 (3) ** |
| −231 TM+FB+FC SDM | | | 1.11 ± 0.03 (3) ** | 12.44 ± 0.72 (3) ** |
| −231 HNF-4 SDM | | | 14.50 ± 1.07 (5) | 1.12 ± 0.06 (3) ** |

**Figure 1 | Mutation of FOXO1 binding sites (IRSs 1, 2, 3 and FKHR B and C motifs) in the promoter of the gene encoding glucose-6-phosphatase (G6Pase) abolishes the induction of G6Pase fusion-gene expression by FOXO1 but not by PGC-1α.** H4IIE cells were transiently co-transfected with various G6Pase–luciferase fusion genes (12 μg) and expression vectors encoding Renilla luciferase (0.15 μg) and one of pBJ5 (3 μg), pBJ5-PGC-1α (3 μg), pcDNA3 (3 μg) or pcDNA3-FOXO1 (3 μg). The G6Pase–luciferase fusion genes incorporated either the wild-type (WT) promoter sequence, located between −231 and +66, or contained the same promoter fragment with site-directed mutations (SDMs) in the three IRS motifs (TM), the FKHR B (FB) and C (FC) motifs, and the HNF-4 binding site in various combinations, as indicated. The IRS 3 motif does not bind FOXO1 but its sequence is similar to that of IRS 1 and IRS 2 (ref. 6). After transfection, cells were incubated for 18–20 hours in serum-free medium, then collected and assayed for luciferase expression. Results are shown as the ratio of firefly luciferase activity, corrected for Renilla luciferase activity in the cell lysate, in FOXO1- and/or PGC-1α-stimulated versus control cells, expressed as fold induction; values are shown as mean ± s.e.m. for the indicated number of experiments, using at least three independent preparations of each luciferase fusion-gene plasmid and duplicate assays for each sample. Double asterisks, $P < 0.05$ versus WT; single asterisk, $P = 0.05$ versus WT for FC SDM.

recently identified FOXO1 binding sites (designated FKHR B and C; ref. 5) in the G6Pase promoter were mutated. We then investigated the effect of these mutations on the ability of PGC-1α to stimulate G6Pase fusion gene expression.

Figure 1 shows that mutation of these FOXO1 binding sites abolishes the induction of fusion-gene expression that is seen with FOXO1 alone. In contrast, the mutations do not reduce the induction of fusion-gene expression by PGC-1α, but actually increase the effect (Fig. 1). These results indicate that the effect of PGC-1α does not require interaction with FOXO1 bound to the G6Pase promoter, although PGC-1α can synergize with FOXO1 to stimulate G6Pase fusion gene expression (ref. 1, and data not shown).

On the basis of a 5'-deletion analysis, we previously identified a hepatocyte nuclear factor-4α (HNF-4α) binding site in the mouse G6Pase promoter, located between nucleotides −76 and −64, that seemed to mediate PGC-1α-stimulated G6Pase fusion gene expression[4]. A caveat for this approach is that the role for this HNF-4α binding site was only demonstrated in the context of a promoter fragment in which all four FOXO1 binding sites had been deleted. We therefore considered the possibility of

redundancy, whereby PGC-1α-stimulated G6Pase fusion gene expression could be mediated either through the HNF-4α binding site or through the FOXO1 binding sites.

To investigate this possibility, a mutated G6Pase promoter was generated that contained a site-directed mutation in the HNF-4α binding site but that had all four FOXO1 binding sites left intact. This mutation had no effect on FOXO1-stimulated fusion-gene expression (Fig. 1), whereas the induction of fusion-gene expression by PGC-1α was abolished, together with the synergistic effect of PGC-1α and FOXO1 (Fig. 1, and results not shown).

These results show that the HNF-4α binding site is required for the PGC-1α response and that the binding of FOXO1 to the G6Pase promoter is neither required nor sufficient for the stimulation of G6Pase fusion gene expression by PGC-1α. This conclusion is consistent with the observation that the ability of PGC-1α to stimulate G6Pase expression is completely lost in hepatocytes derived from mice lacking HNF-4α (ref. 7).

**Marcia M. Schilling, James K. Oeser, Jared N. Boustead, Brian P. Flemming, Richard M. O'Brien**
Department of Molecular Physiology and

Case 1:06-cv-00259-MPT    Document 664-5    Filed 05/30/2008    Page 9 of 45

Biophysics, Vanderbilt University Medical School,
Nashville, Tennessee 37232, USA
e-mail: richard.obrien@vanderbilt.edu

1. Puigserver, P. *et al. Nature* **423,** 550–555 (2003).
2. Finck, B. N. & Kelly, D. P. *J. Clin. Invest.* **116,** 615–622 (2006).
3. Lin, J., Handschin, C. & Spiegelman, B. M. *Cell Metab.* **1,** 361–370 (2005).
4. Boustead, J. N. *et al. Biochem. J.* **369,** 17–22 (2003).
5. Vander Kooi, B. T. *et al. Mol. Endocrinol.* **19,** 3001–3022 (2005).
6. Vander Kooi, B. T. *et al. J. Biol. Chem.* **278,** 11782–11793 (2003).
7. Rhee, J. *et al. Proc. Natl Acad. Sci. USA* **100,** 4012–4017 (2003).

**doi:**10.1038/nature05288

# EXHIBIT 63

doi:10.1016/j.jmb.2006.07.046

*J. Mol. Biol.* (2006) **362**, 173–183



Available online at www.sciencedirect.com

ScienceDirect



# B29 Gene Silencing in Pituitary Cells Is Regulated by Its 3′ Enhancer

## Cindy S. Malone[1]*, Ali I. Kuraishy[4], Francesca M. Fike[2] Ruchika G. Loya[1], Minil R. Mikkili[1], Michael A. Teitell[3,4] and Randolph Wall[2,3]

[1]Department of Biology California State University Northridge, Northridge CA 91330, USA

[2]Department of Microbiology Immunology, and Molecular Genetics, David Geffen School of Medicine, University of California at Los Angeles Los Angeles, CA 90095, USA

[3]Molecular Biology Institute David Geffen School of Medicine, University of California at Los Angeles Los Angeles, CA 90095, USA

[4]Department of Pathology and Laboratory Medicine, David Geffen School of Medicine University of California at Los Angeles, Los Angeles CA 90095, USA

*Corresponding author

B cell-specific *B29* (Igβ, *CD79b*) genes in rat, mouse, and human are situated between the 5′ growth hormone (GH) locus control region and the 3′ *GH* gene cluster. The entire *GH* genomic region is DNase 1 hypersensitive in *GH*-expressing pituitary cells, which predicts an "open" chromatin configuration, and yet *B29* is not expressed. The *B29* promoter and enhancers exhibit histone deacetylation in pituitary cells, but histone deacetylase inhibition failed to activate *B29* expression. The *B29* promoter and a 3′ enhancer showed local dense DNA methylation in both pituitary and non-lymphoid cells consistent with gene silencing. However, DNA methyltransferase inhibition did not activate *B29* expression either. *B29* promoter constructs were minimally activated in transfected pituitary cells. Co-transfection of the B cell-specific octamer transcriptional co-activator Bob1 with the *B29* promoter construct resulted in high level promoter activity in pituitary cells comparable to *B29* promoter activity in transfected B cells. Unexpectedly, inclusion of the *B29* 3′ enhancer in *B29* promoter constructs strongly inhibited *B29* transcriptional activity even when pituitary cells were co-transfected with Bob1. Both Oct-1 and Pit-1 bind the *B29* 3′ enhancer in *in vitro* electrophoretic mobility shift assay and in *in vivo* chromatin immunoprecipitation analyses. These data indicate that the *GH* locus-embedded, tissue-specific *B29* gene is silenced in *GH*-expressing pituitary cells by epigenetic mechanisms, the lack of a B cell-specific transcription factor, and likely by the *B29* 3′ enhancer acting as a powerful silencer in a context and tissue-specific manner.

© 2006 Elsevier Ltd. All rights reserved.

*Keywords:* B29 (Igβ, CD79b); Bob1 (OCA-B, OBF-1); DNA methylation; gene regulation, growth hormone

## Introduction

B29 (Igβ, CD79b) is an essential component of the B cell antigen receptor, and along with immunoglobulin and mb-1 (Igα, CD79a), is absolutely required for B cell development and function. *B29* is one of the earliest genes activated in B cell precursors and its expression continues through terminally differ-entiated antibody-secreting plasma cells.[1,2] Expression of *B29* is restricted to B cells with the exception of early stages in thymocyte development prior to T cell lineage commitment.[3] The rat, mouse, and human *B29* promoters contain highly conserved sequences with a core of essentially identical transcription factor binding motifs.[4–6] The *B29* promoter in each species has an essential octamer motif whose consensus is competent for Bob1 (OCA-B, OBF-1) co-activator binding.[7,8] Rat *B29* enhancers, designated DNase 1 hypersensitive sites (DHS) +4.4, +6.0, and +8.7, were identified downstream of *B29* in the intergenic region between the *B29* and the growth hormone (*GH*) genes. These regions are highly conserved among rat, human, and mouse. The *B29 DHS4.4* 3′ enhancer (DHS4.4) shows the highest enhancing activity and contains a consensus

Abbreviations used: *GH*, growth hormone; EMSA, electrophoretic mobility shift assay; DHS, DNase 1 hypersensitive site; TSA, trichostatin-A; 5-aza, 5-aza-2-deoxycytidine; HDAC, histone deacetylase; ChIP, chromatin immunoprecipitation.

E-mail address of the corresponding author: cmalone@csun.edu

octamer-binding site that, when removed, results in a loss of enhancing activity.[9] This consensus octamer site meets the requirements for Bob1 co-activator binding as well.[8]

The *B29* chromosomal locus in these mammalian species contains several closely linked tissue-specific genes. The *B29* gene is located between the skeletal muscle (SkM)-specific Na-channel α-subunit (*SCN4A*) gene and the pituitary-specific growth hormone (*GH-N*) gene in both human and rat genomes[10,11] (Figure 1(a)). In mice, *B29* is flanked upstream by the cardiac muscle-specific myosin alkali light chain gene and downstream by the *GH* genes (MGI Genetic map; NCBI). The human *B29* gene is situated between both pituitary and placenta-specific *GH* locus control regions and the downstream genes they control.[10,11] The pituitary-specific *GH* locus control regions is located only ~1.5 kb upstream from the *B29* gene transcription start site.[11] This entire region is enriched in histone H3 and H4 acetylation in pituitary cells suggesting an accessible "open" chromatin configuration.[12] Even so, the human *B29* gene remains silent.[13] In contrast, the rat genomic *B29* locus is histone H3 and H4 deacetylated while the *GH* region is acetylated in pituitary cells,[14] suggesting that *B29* silencing in rat pituitary cells depends on local histone deacetylation.

Contrary to expectation, we show that endogenous *B29* is not reactivated when rat GH3 pituitary cells are treated with the histone deacetylase (HDAC) inhibitor trichostatin-A (TSA) or with the DNA methylation inhibitor 5-aza-2-deoxycytidine (5-aza), suggesting that epigenetic modifications alone are insufficient for *B29* silencing in pituitary cells. Transiently transfected *B29* reporter constructs were functional in GH3 pituitary cells, but the addition of the B cell-specific octamer co-activator Bob1 resulted in increased promoter activity that was comparable to the activity seen in B cells. The addition of the *DHS4.4* 3′ enhancer increased *B29* promoter activity in rat Y3Ag1.2.3 B cells as expected, but surprisingly inhibited *B29* transcriptional activity in transfected GH3 pituitary cells even when co-transfected with Bob1. Both Oct-1 and Pit-1 transcription factors interact with the *DHS4.4* 3′ enhancer, suggesting a role for these factors in *B29* gene regulation. These data indicate that while epigenetic and transcription factor composition have likely roles in controlling *B29* gene expression, it is the paradoxical action of the *DHS4.4* 3′ enhancer, acting as a powerful context-specific silencer, that prevents *B29* activity in silent pituitary cells.

## Results

### HDAC inhibitor TSA did not reactivate B29 gene expression

The rat *B29* gene promoter and 3′ enhancers are acetylated at histone H3 and H4 in *B29*-expressing B cells, while these same regions are deacetylated in *B29*-silent pituitary cells.[14] These data correlate *B29* expression with *cis*-element H3/H4 acetylation and suggest that the acetylation state may control tissue-specific *B29* expression. Treatment of cells with the HDAC inhibitor TSA results in acetylation of chromatin and the reactivation of genes whose expression is regulated by histone H3 and H4 acetylation status.[15] Treatment of GH3 pituitary cells with TSA over three days was used to assess the reactivation of the silent *B29* gene in treated cells. At concentrations ranging from 10 nM to 2500 nM TSA, where the lowest concentration showed no effect on cell growth and the highest concentration showed high cell death, *B29* expression was not detected using sensitive RT-PCR and Southern blotting techniques (Figure 1(b)). These data indicate that the acetylation status of the *B29* promoter and 3′ enhancers does not exclusively control *B29* expression.

### B29 promoter and DHS4.4 3′ enhancer DNA methylation patterns correlate with tissue-specific expression and silencing

Resistance to TSA treatment can be indicative of more advanced gene silencing through dense DNA methylation at CpG dinucleotides.[16] Genomic



**Figure 1.** HDAC inhibitor TSA does not reactivate the *B29* gene in pituitary cells. (a) Schematic diagram of the rat *B29* and growth hormone (*GH*) genomic locus. The *B29* promoter, coding sequence and 3′enhancers are located between the muscle-specific sodium channel gene and the pituitary-specific *GH* gene. *B29* promoter and *B29 DHS4.4* 3′ enhancer transcription factor binding sites are shown. Rectangle, EBF; circle, octamer; spikey oval, Bob1; square, ETS; diamond, Sp1; oval, Ikaros; triangle, NF-kB. The cartoon is drawn to scale. Numbers indicate distances from the major start of *B29* transcription (+1). (b) Southern blots of *GH* and *B29* RT-PCR gels used to detect gene expression. GH3 pituitary cells were treated with TSA in increasing doses to the maximum tolerated dosage for three days before RNA was prepared, lanes 1–5. Lane 6, mock TSA; lane 7, no treatment; lane 8, water; lane 9, Y3Ag1.2.3 myeloma cell RNA; lane 10, GH3 pituitary cell RNA.

bisulfite sequencing was performed to evaluate potential DNA methylation at every cytosine within the *B29* promoter and *DHS4.4* 3′ enhancer (Figure 2). DNA methylation patterns were determined for two *B29*-expressing B cell lines (Y3Ag1.2.3, YB2/0), two *B29*-silent pituitary cell lines (GH3 and GC), and one non-B, non-pituitary *B29*-silent kidney cell line (NRK). The promoter region analyzed corresponds to a 488 bp fragment encompassing approximately 200 bp upstream of the *B29* minimal promoter, the entire *B29* minimal promoter, and the start of translation (Figure 2). The *B29* methylation pattern at six CpG dinucleotides shows high or total methylation in the *B29*-silent cell lines while these CpG dinucleotides show minimal to no methylation in the *B29*-expressing B cell lines. The pattern of *DHS4.4* DNA methylation was similar to that determined for the *B29* promoter (Figure 3). Five *DHS4.4* CpG dinucleotides within a 519 bp fragment showed high or total DNA methylation in the *B29*-silent GH3 and GC pituitary and NRK kidney cell

lines, while no DNA methylation was identified in the *B29*-expressing B cell lines Y3Ag1.2.3 and YB2/0 (Figure 3). These data indicate that the lack of *B29* gene expression in pituitary cells is related to DNA hypermethylation.

## DNA methylation inhibitor 5-aza did not reactivate B29 gene expression

Treatment of cells with the DNA methylation inhibitor 5-aza results in the activation of genes whose expression is silenced by CpG methylation.[17] GH3 pituitary cells were treated with 5-aza over three days and reactivation of the silent *B29* gene assessed. At concentrations ranging from 0.1 µM to 10 µM 5-aza, *B29* expression was not detected using sensitive RT-PCR and Southern blotting techniques (Figure 4). These data indicate that the *B29* promoter remains silent in DNA demethylated pituitary cells, possibly due to a lack of appropriate transcription factors.



**Figure 2.** Nearly complete DNA methylation of the *B29* promoter in silent pituitary cells. Genomic DNA from pituitary, kidney and myeloma cell lines was subjected to sodium bisulfite conversion, PCR amplification of a 488 bp fragment, subcloning and cycle sequencing. Unmethylated CpG sites are indicated by small vertical open ovals and methylated CpG sites are indicated by small filled ovals. At least ten clones from each cell line as indicated were bisulfite sequenced to obtain a representative sampling of DNA methylation patterns in each setting. Transcription factor binding sites are as indicated: rectangle, EBF; circle, Octamer; triangle, ETS; diamond, Sp1; oval, Ikaros. +1 indicates the major transcription start site. The cartoon is drawn to scale.



**Figure 3.** Dense DNA methylation of the *B29 DHS4.4* 3′ enhancer in pituitary cells. Genomic DNA from pituitary, kidney and myeloma cells was subjected to sodium bisulfite conversion, PCR amplification of a 519 bp fragment, subcloning and cycle sequencing. Unmethylated CpG sites are indicated by small vertical open ovals and methylated CpG sites are indicated by small filled ovals. At least ten clones from each cell line as indicated were bisulfite sequenced to obtain a representative sampling of methylation patterns in each setting. Transcription factor binding sites are by homology only (except Octamer) and are as indicated: rectangle, EBF; circle, Octamer; triangle, NF-κB. The cartoon is drawn to scale.

## B29 promoter activity in B29-silent GH3 cells was enhanced by co-expression of Bob1

The presence and function of essential transcription factors for *B29* promoter expression in GH3 pituitary cells was first analyzed by transient transfection of unmethylated *B29* promoter reporter constructs. *B29* promoter activity was detected that was statistically significant in *B29*-silent GH3 pituitary cells, albeit at lower levels than in *B29*-expressing Y3Ag1.2.3 B cells (Figure 5; B29). The *B29* promoter octamer motif interacts with ubiquitous Oct-1, B cell-specific Oct-2, and the B cell-specific octamer co-activator Bob1 (OCA-B, OBF-1),[7] a transactivating transcription factor expressed exclusively in B cells.[18–20] Co-transfection of the Oct-1 co-activator Bob1 elevated *B29* promoter activity in pituitary cells to levels comparable to B cells (Figure 5; B29/Bob). Oct-1 is a ubiquitous transcription factor expressed at high levels in both Y3Ag1.2.3 B cells and GH3 pituitary cells,[21] suggesting a role for Oct-1 in pituitary cell expression of the *B29*

promoter. The transfected *B29* promoter containing a mutated octamer site was not active (Figure 5; B29mOct), confirming a role for Oct-1 in pituitary cell expression of the transfected *B29* promoter. Co-transfection of a previously tested transactivation-negative but Oct-1-binding competent mutant Bob1 (Bob∆C) expression construct[22] resulted in no significant transactivation of the *B29* promoter construct as expected (Figure 5; B29/Bob∆C). The co-transfection of Bob1 in Y3Ag1.2.3 B cells showed no increase in activity presumably due to the high levels of endogenous Bob1 in this cell type (Figure 5; B29/Bob and data not shown).[7] The addition of Bob∆C resulted in no significant change in *B29* promoter expression in Y3Ag1.2.3 B cells (Figure 5; B29/Bob∆C). *B29* promoter constructs containing a mutated octamer site were expressed at lower levels in GH3 pituitary cells and Y3Ag1.2.3 B cells, and these levels were unaffected by co-transfection of Bob1 or Bob∆C expression constructs (Figure 5; B29mOct, B29mOct/Bob, B29mOct/Bob∆C). These data indicate that the octamer site



**Figure 4.** Methylation inhibitor 5-aza does not reactivate the *B29* gene in pituitary cells. Southern blots of *GH* and *B29* RT-PCR gels were used to detect gene expression. GH3 pituitary cells were treated with 5-aza in increasing doses to the maximum tolerated dosage for three days before RNA was prepared, lanes 1–6. Lane 7, mock 5-aza; lane 8, no treatment; lane 9, water; lane 10, Y3Ag1.2.3 myeloma cell RNA; lane 11, GH3 pituitary cell RNA.

is largely responsible for *B29* promoter activity in transfected GH3 pituitary cells, and that the lack of the B cell co-activator, Bob1, in these cells dictates, at least in part, the expression level of the *B29* promoter.

## DHS4.4 3' enhancer inhibits activity of the B29 promoter in GH3 pituitary cells

In addition to the functional octamer site identified in the *B29* promoter,[4] the *B29 DHS4.4* 3' enhancer contains a consensus octamer site predicted by binding sequence to interact with Bob1.[23] Addition of the *B29 DHS4.4* 3' enhancer to the *B29* promoter reporter construct resulted in the expected enhance-

ment of activity in *B29*-expressing Y3Ag1.2.3 B cells (Figure 6; B29+DHS). Co-transfection of Bob1 with the *B29* promoter + *DHS4.4* construct in Y3Ag1.2.3 B cells showed no increase in activity presumably due to the high levels of endogenous Bob1 in this cell type (Figure 6; B29+DHS/Bob and data not shown). The addition of transactivation deficient, but Oct-1-binding competent, Bob1 mutant (BobΔC) resulted in no significant change in *B29* promoter + *DHS4.4* expression (Figure 6; B29+DHS/BobΔC). Surprisingly, transfection of the *B29* promoter + *DHS4.4* construct into GH3 pituitary cells resulted in strong inhibition of promoter activity compared to the transfection of the *B29* promoter alone (Figure 6; B29+DHS and B29). In fact, addition of the *DHS4.4* inhibited promoter activity to background levels (Figure 6; basic constructs). Further, co-transfection of Bob1 did not overcome the inhibitory effects of the *DHS4.4* in GH3 pituitary cells (Figure 6; B29+DHS/Bob), but only increased activity to that of the promoter alone. Addition of BobΔC resulted in no significant change in *B29* promoter + *DHS4.4* expression in GH3 cells as expected (Figure 6; B29+DHS/BobΔC). These data suggest that the *DHS4.4* 3' enhancer has a key, activating role in the activity of the *B29* promoter in B cells and a novel inhibitory effect on *B29* promoter activity in *GH*-expressing pituitary cells.

## B29 DHS4.4 3' enhancer octamer site interacted with both Oct-1 and Pit-1 from GH3 pituitary cells in EMSA

Analysis of the *DHS4.4* octamer site by electrophoretic mobility shift assay (EMSA) showed a specific interaction with Oct-1 protein (Figure 7),



**Figure 5.** *B29* promoter expression is enhanced by co-expression of Bob1 in pituitary cells. Transient transfections of pGL3 *B29* promoter constructs with and without co-transfection of Bob1 were conducted in *B29*-silent GH3 pituitary cells (shaded bar) and *B29*-expressing Y3Ag1.2.3 myeloma cells (striped bar). The activity of each construct is expressed as the fold activation over the promoterless pGL3 basic firefly luciferase construct. A total of 10 μg of Bob1 expression construct (Bob) or 10 μg of transactivation-negative Bob1 C-terminal deletion mutant construct (BobΔC) was added to transient transfections of the pGL3 basic firefly luciferase construct (basic), the pGL3 *B29* promoter construct (B29), and the pGL3 *B29* promoter with a mutated Octamer motif construct (B29mOct). pGL3 firefly luciferase activities are pRL SV40

renilla luciferase normalized and are the average±SD of at least three independent transfections using at least two preparations of DNA.



**Figure 6.** Control of *B29* expression by a context-dependent *B29 DHS4.4* 3' enhancer molecular toggle. Transient transfections of pGL3 *B29* promoter and *DHS4.4* 3' enhancer constructs with and without co-transfection of Bob1 in *B29*-silent GH3 pituitary cells (shaded bar) and *B29*-expressing Y3Ag1.2.3 myeloma cells (striped bar). The activity of each construct is expressed as the fold activation over the promoterless pGL3 basic firefly luciferase construct. A total of 10 μg of Bob1 expression construct (Bob) or 10 μg of transactivation-negative Bob1 C-terminal deletion mutant construct (BobΔC) was added to transient transfections of the pGL3 basic firefly luciferase construct (basic), the pGL3 *B29* promoter construct (B29), and the pGL3 *B29* promoter and *DHS 4.4* construct (B29+DHS). pGL3 firefly luciferase activities are pRL SV40 renilla luciferase normalized and are the average±SD of at least three independent transfections using at least two preparations of DNA.

which was verified by competition with unlabelled octamer site oligonucleotides (lanes 2 and 10) and a lack of competition with unlabelled mutated octamer site oligonucleotides (lanes 3 and 11). Further, the addition of Oct-1 antibody resulted in competition and a supershift of the specific complexes (lanes 6 and 14). Although we assume the Y3Ag1.2.3 myeloma B cell line expresses Oct-2, the Oct-2 antibody did not compete or supershift a complex in Y3Ag1.2.3 under these conditions (Figure 7, lane 7). As expected, the Oct-2 antibody did not compete or supershift a complex in the GH3 pituitary cell line nuclear extracts (Figure 7, lane 15). These results suggest that Oct-1 regulates both the *B29* promoter and *DHS4.4* 3' enhancer in Y3Ag1.2.3 B cells and GH3 pituitary cells.

Pituitary cells express abundant Pit-1 transcription factor, whose consensus binding site is similar to that of the octamer consensus binding site.[21] Both Pit-1 and Oct-1 interact with A+T-rich *cis*-elements that may deviate from their respective consensus sequences.[24,25] Figure 7 shows that native Pit-1 specifically interacted with the *B29 DHS4.4* 3' enhancer octamer site, as shown by competition with unlabelled Pit-1 site oligonucleotides (lane 4) and a lack of competition with unlabelled mutated Pit-1 site oligonucleotides (lane 5). Further, the addition of Pit-1 antibody resulted in competition of the Pit-1-specific complex (lane 8). Pit-1 is not expressed in Y3Ag1.2.3 B cells and no Pit-1 complex appears using these extracts (lanes 9–16). *In vitro* transcribed and translated Oct-1 and Pit-1 also interacted with the *DHS4.4* octamer site (data not shown). Native Pit-1 specifically interacted with the *B29* promoter octamer site as well, as shown by competition with unlabelled Pit-1 oligonucleotides , a lack of competition with unlabelled mutated Pit-1 site oligonucleotides, and a competition of the Pit-1

specific complex upon addition of Pit-1 antibody (data not shown). *In vitro* transcribed and translated Pit-1 also interacted with the *B29* promoter octamer site (data not shown). Combined, the data suggest that both Oct-1 and Pit-1 could control the activity of *B29* expression in pituitary cells through exclusive or competitive interactions on functional octamer sites within the *B29* promoter and *DHS4.4*. Augmented activity from co-transfection with Bob1 (Figure 5) also suggests that Oct-1 is bound to at least some of the *B29* promoter reporter constructs even in the presence of Pit-1. Interestingly, the data also strongly suggest a model in which the *B29* promoter octamer site is occupied by Oct-1 at least some of the time, while the *DHS4.4* octamer site is occupied by Pit-1 and/or a powerful Oct-1 antagonist factor(s), since Bob1 transactivation fails in GH3 pituitary cells.

## *B29 DHS4.4* 3' enhancer is bound by Oct-1 and Pit-1 *in vivo* in GH3 pituitary cells by ChIP analysis

To corroborate the EMSA data shown above, chromatin immunoprecipitation (ChIP) was performed to determine Oct-1 and Pit-1 binding to the endogenous *DHS4.4* region in the B cell and pituitary cell lines. Figure 8 shows that both Oct-1 and Pit-1 specific antibodies immunoprecipitated the *DHS4.4* region in GH3 pituitary cells (top panel, lanes 3 and 4) whereas the negative control non-specific Ig antibody did not (top panel, lane 2). Oct-1 and Pit-1 specific antibodies were unable to immunoprecipitate the GAPDH promoter that does not contain a consensus octamer binding sequence (top panel, lanes 8 and 9), illustrating the specificity of these ChIP experiments. These data show that both transcription factors are bound to the *DHS4.4* region *in vivo* in GH3 pituitary cells. As expected, only the



**Figure 7.** *B29 DHS4.4* 3′ enhancer binds Oct-1 and Pit-1 by EMSA. Double-stranded oligonucleotides corresponding to the *B29 DHS4.4* 3′ enhancer Octamer site (B29 DHS Oct) were end-labelled and used in EMSA. The B29 DHS Oct probe was incubated with 20 μg of GH3 pituitary cell line nuclear extract (lanes 1–8) and 20 μg of Y3Ag1.2.3 B cell line nuclear extract (lanes 9–16). Reactions were co-incubated in the presence of: 500-fold molar excess of unlabelled B29 Octamer motif (Comp Oct, lanes 2 and 10); 500-fold molar excess of unlabelled B29 mutant Octamer motif (Comp mOct, lanes 3 and 11); 500-fold molar excess of unlabelled Pit-1 consensus motif (Comp Pit, lanes 4 and 12); 500-fold molar excess of unlabelled Pit-1 mutant consensus motif (Comp mPit, lanes 5 and 13); 0.5 μg of anti-Oct-1 antibody (Ab Oct1, lanes 6 and 14); 2 μg of anti-Oct-2 antibody (Ab Oct2, lanes 7 and 15); and 1 μg of anti-Pit-1 antibody (Ab Pit1, lanes 8 and 16). Specifically formed complexes are labeled Oct-1 and Pit-1 and denoted by arrows. Antibody supershifted complexes are denoted by SS and an arrow. Free Probe denotes uncomplexed endlabelled B29 DHS Oct probe. Results are representative of at least three independent experiments.

---

Oct-1 antibody immunoprecipitated the *DHS4.4* region in Y3Ag1.2.3 B cells (bottom panel, lanes 7, 8, and 9). This further corroborates the EMSA data shown above and is logical considering that Y3Ag1.2.3 B cells do not express the Pit-1 transcription factor.[18–20] Taken together, these data suggest that both Oct-1 and Pit-1 bind the *DHS4.4* region *in vivo* in pituitary cells, suggesting a role for these factors in activating and silencing the *B29* promoter in B cells and pituitary cells, respectively.

## Discussion

In rat pituitary cells, the *B29* gene, despite being embedded within the DNase I hypersensitive "open" *GH* chromosomal locus, has features of inactive chromatin that include locally-confined H3 and H4 histone deacetylation and a high level of promoter and 3′ enhancer CpG DNA methylation reported here.[14] Combined with the lack of a *B29*-dependent transcription-augmenting factor, the Bob1 co-activator, the expectation was that these epigenetic and genetic constraints were responsible for maintaining *B29* gene silencing. However, the apparent relief of these constraints did not reverse silencing despite promoter studies that indicated essential transcription factors were present and could promote expression and that Bob1 addition augmented this activity, as expected. Instead, a paradoxical role for the *DHS4.4* 3′ enhancer region was discovered because *DHS4.4* unexpectedly functioned as a strong silencing element in pituitary cells.

Multiple mechanisms, including histone deacetylation and CpG methylation, likely contribute to the tissue-specific restriction of the rat *B29* gene in *GH*-expressing pituitary cells. DNA methylation patterns of both the *B29* promoter and *DHS4.4* 3′ enhancer correlate with the silencing of the *B29* gene in pituitary and non-B cells and the expression of *B29* in B cells. The *B29* promoter and *DHS4.4* are CpG-poor, and are not considered to be part of so-called "CpG islands". During normal development, the control of expression for several CpG-poor or non-CpG island genes has been determined by DNA methylation analyses.[26] It remains unknown how many CpG-poor promoters are actually controlled by CpG methylation, but the *B29* promoter and *DHS4.4* are potential candidates for such regulation. Conversely, CpG-island containing promoters are generally kept free of DNA methylation and not controlled by methylation during normal development.[26] There are many examples of CpG-island containing promoters that are controlled by dense CpG methylation in aberrant silencing that occurs during transformation and cancer, but not normal development.[26]

Epigenetic silencing of genes is a progression of multiple events that includes histone modifications and DNA methylation.[27] Genes that are silenced by histone modifications alone are generally reactivated upon treatment with the HDAC inhibitor TSA. Histone modified and densely DNA methylated genes are not reactivated by TSA, but can be reactivated by 5-aza which inhibits DNA methyltransferases, with or without TSA.[16,17,28,29] These chemical treatments have been shown to reactivate many aberrantly or developmentally silenced genes, including the *B29* gene in classical Hodgkin lymphoma cells[30] and the *Pax5* gene in terminally differentiated B cell lines,[29] respectively. The fact that neither of these treatments reactivated the *B29* gene in the *GH*-expressing and *B29*-silent pituitary cell line was unexpected given the CpG DNA methylation patterns in the *B29*-silent and -expressing cell lines. These data suggested that the existing transcription factor repertoire may be inadequate for expression or responsible for silencing of the *B29* gene in *B29*-silent, *GH*-expressing pituitary cells, even when the chromatin had apparently been "opened" by inhibitors.

The well-characterized mouse *B29* minimal promoter was linked to a luciferase reporter and tested for activity in transfected *GH*-expressing pituitary



**Figure 8.** *B29 DHS4.4* 3′ enhancer binds Oct-1 and Pit-1 by ChIP. Chromatin was purified from GH3 pituitary cells (top panel) and Y3Ag1.2.3 B cells (bottom panel) and used in ChIP analyses. Chromatin was immunoprecipitated using normal rabbit immune sera (Ig, lanes 2 and 7), anti-Oct-1 antibody (Oct-1, lanes 3 and 8), and anti-Pit-1 antibody (Pit-1, lanes 4 and 9). The presence of immunoprecipitated chromatin was determined for the *B29 DHS4.4* 3′ enhancer region (DHS region, lanes 1–5) and the *GAPDH* promoter negative control (GAPDH promoter, lanes 6–10) by PCR using region-specific primers. Lanes 1 and 6 are positive control PCR reactions performed using the purified chromatin before immunoprecipitation (Input) and lanes 5 and 10 are negative control PCR reactions performed without the addition of any chromatin (no DNA).

cells. These transfected constructs remain devoid of both methylation at CpG sites and histone modifications, and should therefore reflect the activity of the *B29* promoter in pituitary cells without these constraints. The minimal *B29* promoter was active, albeit at a low level. This activity (fourfold above a promoterless control) suggests that transcription factors capable of supporting *B29* promoter are present, at least minimally, in *B29*-silent pituitary cells. This *B29* activity is similar to the levels seen in transfections of *B29*-silent T cell and fibroblast cell lines.[7] *B29* promoter activity comparable to that in B cells was achieved by co-transfection of the B cell-specific co-activator Bob1,[4,7] which is not expressed in pituitary cells.[18–20] These data suggest that the low level *B29* promoter construct activity in pituitary cells is at least partly due to a lack of Bob1 co-activator in these cells. They also suggest that lack of Bob1 may have prevented the endogenous *B29* activation with HDAC and methyltransferase inhibitors.

Addition of the *B29 DHS4.4* 3′ enhancer, which contains a consensus octamer site, was predicted to increase transfected B29 promoter activity in pituitary cells as in B cells. Genomic bisulfite sequencing analysis revealed the expected pattern of DNA methylation between pituitary cells and B cells. Similar to the *B29* promoter, the *DHS4.4* showed high-level methylation at CpG sites in *B29*-silent pituitary and kidney cells and no methylation in *B29*-expressing B cells. From these data, it was expected that addition of *DHS 4.4* to the *B29* promoter construct would enhance the activity of the *B29* promoter in both pituitary cells and B cells. Surprisingly, addition of the *DHS4.4* strongly repressed *B29* promoter activity in pituitary cells even with co-transfection of Bob1. This paradoxical silencing effect for the *B29 DHS4.4* 3′ enhancer requires further investigation to resolve its dual roles in controlling tissue-specific expression of the *B29* gene.

The octamer sites in both the *B29* promoter and the *DHS4.4* 3′ enhancer are bound by both Oct-1 and Pit-1 in EMSA and are responsive to Bob1 co-

activation, suggesting that this site plays a pivotal role in *B29* expression in B cells and *B29*-silent pituitary cells. Not all octamer sites that bind Oct-1 are transactivated by Bob1,[8,23] indicating the importance of this site in *B29* gene regulation. The mechanism of action of the octamer sites in the *B29* promoter and *DHS4.4* may involve differential binding of Oct-1/Bob1 and Pit-1 between B cells and pituitary cells, respectively. Pit-1 has been shown to be a potent silencer element as well as its more recognized role as an activator of transcription.[31] In situations that have yet to be fully delineated, Pit-1 protein dimer bound to DNA recruits the co-repressor N-CoR and inhibits transcription. In the absence of N-CoR co-repressor, Pit-1 dimer bound to DNA is an activator of transcription. The differential activity of Pit-1 dimer is partially based on the Pit-1 binding sequence, but other mechanisms must be involved, since the same *GH* enhancer Pit-1 site recruits N-CoR in *GH*-silent pituitary cells but not in *GH*-expressing pituitary cells.[21,31] Since the consensus octamer site found in both the *B29* promoter and *DHS4.4* varies distinctly from the Pit-1 consensus sequences evaluated in differential N-CoR recruitment studies, it is impossible to predict whether Pit-1 and N-CoR are involved in *B29* gene silencing in pituitary cells.[32] Interestingly, the highly methylated *DHS4.4* region interacts with both the Oct-1 and Pit-1 transcription factors *in vivo* by ChIP analyses, suggesting that this region is not as "closed" as previously assumed. It is possible that co-transfection of Bob1 did not increase activity of the *B29* promoter and the *DHS4.4* 3′ enhancer construct to greater than promoter alone levels in GH3 pituitary cells due to the presence of Pit-1 binding to the octamer sites in the *DHS4.4* and possibly the promoter octamer site as well.

The context-specific inhibitory action of the *DHS4.4* may function in concert with *B29* promoter and *DHS4.4* methylation to control *B29* gene silencing. It may be possible that the methylation status of the *B29* promoter and *DHS4.4* is irrelevant for silencing based on the ChIP results and that the

lack of *B29* gene expression in *GH*-expressing but *B29*-silent pituitary cells is controlled by transcription factor interactions (Pit-1 versus Oct-1/Bob1) and recruitment of co-repressors (N-CoR) at either or both the *B29* promoter and *DHS4.4* octamer-binding sites. The fact that the Oct-1 and Pit-1 transcription factors bind the heavily methylated *DHS4.4* region in pituitary cells adds a complexity beyond simple DNA methylation-induced gene silencing. The striking finding that the *B29 DHS4.4* 3′enhancer functions as a context-dependent molecular toggle switch to activate or repress *B29* opens up the possibility for dissecting the complex combination of genetic and epigenetic factors that control differential expression of the *B29* gene between *B29*-expressing B cells and *B29*-silent pituitary cells.

## Materials and Methods

### Cell culture, TSA, and 5-aza treatments

Cell lines were maintained at 37 °C in a humidified environment with 5% (v/v) $CO_2$. The rat GH3 cell line (ATCC) was grown in Ham's F12K (GibcoBRL, Rockville, MD) supplemented with 15% (v/v) donor Horse Serum (Omega, Tarzana, CA), 2.5% (v/v) fetal bovine serum (FBS) (Omega), 2 mM L-glutamine, 10 µg/ml of penicillin, and 10 units/ml of streptomycin. The Y3-Ag1.2.3 cell line (ATCC) was grown in 1.5 g/l sodium bicarbonate DMEM supplemented with 10% fetal bovine serum (Omega), 2 mM L-glutamine, 10 µg/ml of penicillin, and 10 units/ml of streptomycin. The rat NRK kidney cell line (ATCC) was grown in DMEM supplemented with 10% (v/v) calf serum (Omega), 2 mM L-glutamine, 10 µg/ml of penicillin, and 10 units/ml of streptomycin. TSA and 5-aza treatments were essentially as described with the exception of drug concentration optimized for each cell line.[30] The GH3 cell line was grown in media supplemented with increasing concentrations of TSA; 0 nM, 200 nM, 400 nM, 800 nM, 1000 nM, 2500 nM or 5-aza; 0 µM, 0.1 µM, 0.5 µM, 1 µM, 2.5 µM, 5 µM, 10 µM for three days, exchanging media and drug each day. The Y3-Ag1.2.3 cell line was grown in media supplemented with increasing concentrations of TSA; 0 nM, 10 nM, 15 nM, 25 nM, 50 nM, 100 nM, 200 nM or 5-aza; 0 µM, 0.1 µM, 0.5 µM, 1 µM, 2.5 µM, 5 µM, 10 µM for three days, exchanging media and drug each day.

### RNA preparation and RT-PCR

Total RNA was prepared from cell lines growing in log phase, TSA treated cell lines, and 5-aza treated cell lines using the RNeasy Miniprep kit with the Qiashreddder (Qiagen, Valencia, CA). The primers used for RT-PCR are 5′ to 3′ as follows: GH forward GCCTGCTCTGCC-TGC, GH reverse GACTGGATGAGCAGCAG; B29 forward AGAAAAGTTGCAGCCCCGTGC, B29 reverse TTGATGGTCCAACCTCAGATGC; GAPDH forward GATGACATCAAGAAGGTGGTG, GAPDH reverse GTCATACCAGGAAATGAGCTTG. Total RNA (200 ng) was subjected to the following RT-PCR conditions using the SuperScript One-Step RT-PCR System with PLATINUM Taq polymerase (Invitrogen, Carlsbad, CA): GH: 50 °C for 30 min, 94 °C for 2 min; 30 cycles of 94 °C for

30 s, 56 °C for 30 s, 70 °C for 1 min; 72 °C for 7 min 30 s. B29: 50 °C for 30 min, 94 °C for 2 min; 35 cycles of 94 °C for 30 s, 52 °C for 30 s, 70 °C for 1 min; 72 °C for 7 min 30 s. GAPDH: 50 °C for 30 min, 94 °C for 2 min; 35 cycles of 94 °C for 30 s, 48 °C for 30 s, 70 °C for 1 min; 72 °C for 7 min 30 s. Products were separated by electrophoresis on 1% (w/v) agarose gels and subjected to Southern blotting by standard procedures using Spotlight random primer labelled probes and chemiluminescent detection kit (BD Biosciences, Palo Alto, CA).

### Genomic bisulfite sequencing

Genomic bisulfite sequencing was performed as described.[30] Primers used for generating bisulfite treated clones are 5′ to 3′ as follows:

B29 promoter 5′, GTAGTAATATTATAGTTATGAAAGTAG-TAAT,

B29 promoter 5′ nested, GGGGAGGGGGTTTTTTAGGAT-TATTAGGAAT,

B29 promoter 3′, CCAATAACAAAACACAAAAAACAA-CACCAA,

B29 promoter 3′ nested, CATAATCACTACTCTATCTC-TAAACCCAAA,

B29 DHS 5′, GTATGTGGGAAAGATTGAGATTATAGATGTT,

B29 DHS 5′ nested, GTTGTGGATTTAGGTAGGTGAATTTT-TAGAT,

B29 DHS 3′, CCTCTTAAAACAAAAACACACCCCAAA,

B29 DHS 3′ nested, CTCCTCCATCAAAACCAAAAAAAT-TACTACCC.

4 µl sodium bisulfite-treated DNA was subjected to the following PCR conditions using Taq DNA polymerase (Fisher Scientific): Round 1 PCR, 95 °C for 3 min; 50 cycles of 94 °C for 30 s, 50 °C for 30 s, 70 °C for 2 min 30 s; 72 °C for10 min. Nested PCR, 95 °C for 3 min; 35 cycles of 94 °C for 30 s, 55 °C for 30 s, 70 °C for 2 min 30 s; 72 °C for10 min. Resulting PCR products were resolved on 1% BioGel (Q-BIOGene, Carlsbad, CA) 1XTAE gels, excised, purified using Gene Clean (Q-BIOGene), and ligated and transformed using TOPO-TA Cloning (Invitrogen). Plasmids were purified by Wizard minipreps (Promega, Madison, WI) and sequenced using M13 reverse sequencing primers, G-50 auto Seq purified (Amersham) and sequenced (Laragen, Los Angeles, CA).

### Plasmid constructs, transient transfections, and luciferase assays

*B29* promoter constructs used in transient transfection of Y3Ag1.2.3 B cells were pGL3 basic vectors (Promega) with the promoter sequences inserted HindIII to SacI, pGL3B29 and pGL3B29mOct.[7] *B29* promoter constructs used in transient transfection of GH3 pituitary cells were pRL null vectors (Promega) with the promoter sequences inserted HindIII to SacI, pRLB29 and pRLB29mOct. *B29* promoter and *DHS4.4* 3′ enhancer used in transient transfection of Y3Ag1.2.3 B cells were pGL3B29 with the *DHS4.4* sequences inserted into BamHI, pGL3B29+DHS and normalized to the simian virus 40 (SV40) promoter and enhancer construct pRL SV40 (Promega). *B29* promoter and *DHS4.4* 3′ enhancer used in transient transfection of GH3 pituitary cells were pRLB29 with the *DHS4.4* sequences inserted into BamHI, pRLB29+DHS and normalized to the SV40 promoter and enhancer construct pGL3 control (Promega). Bob1 and BobΔC

*B29 Gene Silencing in Pituitary Cells*

expression constructs were as described.[33] Y3Ag1.2.3 B cells and GH3 pituitary cells were transfected using the Effectene transfection method as described (Stratagene) using 600 ng of pGL3 vectors and 400 ng of pRL vectors. Bob1 and Bob∆C constructs were used at 1 µg and total amounts of DNA between samples were normalized by the addition of 1 µg of pBluescript where Bob1 and Bob∆C constructs were not used. Transfections were harvested 40–48 h post-transfection and dual luciferase assays were performed as described in the Dual Luciferase Reporter Assay System (Promega). All values are ±SD of at least three transfections using at least two preparations of DNA.

### Nuclear extracts and *in vitro* transcribed and translated (IVT) proteins

Crude nuclear extracts were prepared as described[34] Protein concentration was determined by the Bradford protein assay (BioRad Laboratories, Hurcules, CA). Oct-1, Oct-2 and Pit-1 *in vitro* translated protein (IVT) was prepared with TNT T7 coupled Transcription-Translation System (Promega).

### Electrophoretic mobility shift assays (EMSA)

EMSA as described[4] was performed with the exception of 5.5% of 50:1 polyacrylamide/bis-acrylamide; 0.5× TBE gels were run at 125 V for 2.5 h at room temperature. The 0.5 to 2 µl Oct-1, Oct-2, and Pit-1 antibodies (Santa Cruz Biotech, Santa Cruz, CA) used in EMSA were incubated in the binding reaction at 4° C over night. EMSA probes were double-stranded oligonucleotides 5′ end-labelled with [γ-$^{32}$P]ATP. EMSA probes were purified by G25 Sephadex spin column chromatography (Amersham). EMSA complementary double-stranded oligonucleotide probes 5′–3′ were as follows:

B29 Oct GTCTCAATTTGCATGGCAGG;

B29 mOct TCCCCTGGGTCTCACTCTAGAGGGCAG-GAAGGGGCCT;

Octamer TGTCGAATGCAAATCACTAGAA (Santa Cruz Biotech);

mOctamer TGTCGAATGCAAGCCACTAGAA (Santa Cruz Biotech);

Pit-1 TGTCTTCCTGAATATGAATAAGAAATA (Santa Cruz Biotech);

mPit-1 TGTCTTCCTTCCTATTCCTAAGAAATA (Santa Cruz Biotech);

B29 DHS Oct TTCCTGCTATTTTGCATACTCAGGC.

### Chromatin immunoprecipitation

A total of 200×10$^6$ GH3 or Y3Ag1.2.3 cells were fixed at room temperature for 10 min by adding formaldehyde directly to the culture medium to a final concentration of 1%. The reaction was quenched by adding glycine at a final concentration of 0.125 M for 5 min at room temperature. After two ice-cold PBS washes, the cells were collected and lysed for 10 min on ice in cell lysis buffer (5 mM Pipes (pH 8.0), 85 mM KCl, 0.5% (v/v) NP-40, protease inhibitors). The nuclei were resuspended in nucleus lysis buffer (50 mM Tris–HCl (pH 8.1), 10 mM EDTA, 1% (w/v) SDS, protease inhibitors) and incubated on ice for 10 min. Chromatin was sheared into 500 to 1000 bp fragments by sonication and was then pre-cleared with protein A-Agarose beads. The purified chromatin

was diluted with chromatin immunoprecipitation (ChIP) dilution buffer (0.01% SDS, 1.1% (v/v) Triton X-100, 1.2 mM EDTA, 16.7 mM Tris–HCl (pH 8.1), 167 mM NaCl, protease inhibitors) and immunoprecipitated overnight at 4 °C using the anti-Pit-1 (BABCO), the anti-Oct-1 (Santa Cruz) or normal rabbit immune sera. Immune complexes were collected with protein A-Agarose beads and were then washed and eluted. After protein–DNA cross-linking was reversed and the DNA was purified, the presence of selected DNA sequences was assessed by PCR. The primer pairs were as follows: DHS region 5′-CTGCCAGAGG-GAACCAGCTT-3′ and 5′-CTGGCTGCCTGGTCCC-TAGT-3′; and GAPDH promoter 5′-CCTGGTTCCTGC-AGCTCTCA-3′ and 5′-TGGAGTGTGCACCAAGGACA-3′. The PCR products were resolved on a 2% agarose gel.

## Acknowledgements

Supported by the California State University Northridge Research, Scholarship and Creative Activity Award (to C.S.M.) and NIH grants CA85841 and GM40185 (to R.W.) and CA90571 and CA107300 (to M.A.T.). M.A.T. was also supported by the Margaret E. Early Medical Research Trust and CMISE with a NASA URETI award NCC 2-1364. M.A.T. is a Scholar of the Leukemia and Lymphoma Society.

## References

1. Benschop, R. J. & Cambier, J. C. (1999). B cell development: signal transduction by antigen receptors and their surrogates. *Curr. Opin. Immunol.* **11**, 143–151.

2. Hermanson, G. G., Eisenberg, D., Kincade, P. W. & Wall, R. (1988). B29: a member of the immunoglobulin gene superfamily exclusively expressed on beta-lineage cells. *Proc. Natl Acad. Sci. USA*, **85**, 6890–6894.

3. Wang, H., Diamond, R. A. & Rothenberg, E. V. (1998). Cross-lineage expression of Ig-beta (B29) in thymocytes: positive and negative gene regulation to establish T cell identity. *Proc. Natl Acad. Sci. USA*, **95**, 6831–6836.

4. Omori, S. A. & Wall, R. (1993). Multiple motifs regulate the B-cell-specific promoter of the B29 gene. *Proc. Natl Acad. Sci. USA*, **90**, 11723–11727.

5. Thompson, A. A., Wood, W. J., Jr, Gilly, M. J., Damore, M. A., Omori, S. A. & Wall, R. (1996). The promoter and 5′ flanking sequences controlling human B29 gene expression. *Blood*, **87**, 666–673.

6. Nakazato, S., Nomoto, K., Kazahari, K. & Ono, M. (1998). Physical linkage of the B29/Ig-beta (CD79B) gene to the skeletal muscle, sodium-channel, and growth hormone genes in rat and human. *Genomics*, **48**, 363–368.

7. Malone, C. S. & Wall, R. (2002). Bob1 (OCA-B/OBF-1) differential transactivation of the B cell-specific B29 (Ig beta) and mb-1 (Ig alpha) promoters. *J. Immunol.* **168**, 3369–3375.

8. Tomilin, A., Remenyi, A., Lins, K., Bak, H., Leidel, S., Vriend, G. *et al.* (2000). Synergism with the coactivator OBF-1 (OCA-B, BOB-1) is mediated by a specific POU dimer configuration. *Cell*, **103**, 853–864.

9. Komatsu, A., Otsuka, A. & Ono, M. (2002). Novel regulatory regions found downstream of the rat B29/ Ig-beta gene. *Eur. J. Biochem.* **269**, 1227–1236.

10. Jones, B. K., Monks, B. R., Liebhaber, S. A. & Cooke, N. E. (1995). The human growth hormone gene is regulated by a multicomponent locus control region. *Mol. Cell. Biol.* **15**, 7010–7021.

11. Bennani-Baiti, I. M., Jones, B. K., Liebhaber, S. A. & Cooke, N. E. (1995). Physical linkage of the human growth hormone gene cluster and the skeletal muscle sodium channel alpha-subunit gene (SCN4A) on chromosome 17. *Genomics*, **29**, 647–652.

12. Ho, Y., Elefant, F., Cooke, N. & Liebhaber, S. (2002). A defined locus control region determinant links chromatin domain acetylation with long-range gene activation. *Mol. Cell.* **9**, 291–302.

13. Patrone, L., Henson, S. E., Wall, R. & Malone, C. S. (2004). A conserved sequence upstream of the B29 (Ig beta, CD79b) gene interacts with YY1. *Mol. Biol. Rep.* **31**, 1–11.

14. Osano, K. & Ono, M. (2003). State of histone modification in the rat Ig-beta/growth hormone locus. *Eur. J. Biochem.* **270**, 2532–2539.

15. Yoshida, M., Kijima, M., Akita, M. & Beppu, T. (1990). Potent and specific inhibition of mammalian histone deacetylase both *in vivo* and *in vitro* by trichostatin A. *J. Biol. Chem.* **265**, 17174–17179.

16. Lorincz, M. C., Schubeler, D., Hutchinson, S. R., Dickerson, D. R. & Groudine, M. (2002). DNA methylation density influences the stability of an epigenetic imprint and Dnmt3a/b-independent *de novo* methylation. *Mol. Cell. Biol.* **22**, 7572–7580.

17. Juttermann, R., Li, E. & Jaenisch, R. (1994). Toxicity of 5-aza-2′-deoxycytidine to mammalian cells is mediated primarily by covalent trapping of DNA methyltransferase rather than DNA demethylation. *Proc. Natl Acad. Sci. USA*, **91**, 11797–11801.

18. Gstaiger, M., Knoepfel, L., Georgiev, O., Schaffner, W. & Hovens, C. M. (1995). A B-cell coactivator of octamer-binding transcription factors. *Nature*, **373**, 360–362.

19. Luo, Y. & Roeder, R. G. (1995). Cloning, functional characterization, and mechanism of action of the B-cell-specific transcriptional coactivator OCA-B. *Mol. Cell. Biol.* **15**, 4115–4124.

20. Strubin, M., Newell, J. W. & Matthias, P. (1995). OBF-1, a novel B cell-specific coactivator that stimulates immunoglobulin promoter activity through association with octamer-binding proteins. *Cell*, **80**, 497–506.

21. Latchman, D. S. (2001). Transcription factors: bound to activate or repress. *Trends Biochem. Sci.* **26**, 211–213.

22. Babb, R., Cleary, M. A. & Herr, W. (1997). OCA-B is a functional analog of VP16 but targets a separate surface of the Oct-1 POU domain. *Mol. Cell. Biol.* **17**, 7295–7305.

23. Cepek, K. L., Chasman, D. I. & Sharp, P. A. (1996). Sequence-specific DNA binding of the B-cell-specific coactivator OCA-B. *Genes Dev.* **10**, 2079–2088.

24. Shewchuk, B. M., Asa, S. L., Cooke, N. E. & Liebhaber, S. A. (1999). Pit-1 binding sites at the somatotrope-specific DNase I hypersensitive sites I, II of the human growth hormone locus control region are essential for *in vivo* hGH-N gene activation. *J. Biol. Chem.* **274**, 35725–35733.

25. Malone, C. S., Patrone, L., Buchanan, K. L., Webb, C. F. & Wall, R. (2000). An upstream oct-1- and oct-2-binding silencer governs B29 (Igbeta) gene expression [In Process Citation]. *J. Immunol.* **164**, 2550–2556.

26. Jones, P. A. & Baylin, S. B. (2002). The fundamental role of epigenetic events in cancer. *Nature Rev. Genet.* **3**, 415–428.

27. Richards, E. J. & Elgin, S. C. (2002). Epigenetic codes for heterochromatin formation and silencing: rounding up the usual suspects. *Cell*, **108**, 489–500.

28. Cameron, E. E., Bachman, K. E., Myohanen, S., Herman, J. G. & Baylin, S. B. (1999). Synergy of demethylation and histone deacetylase inhibition in the re-expression of genes silenced in cancer. *Nature Genet.* **21**, 103–107.

29. Danbara, M., Kameyama, K., Higashihara, M. & Takagaki, Y. (2002). DNA methylation dominates transcriptional silencing of Pax5 in terminally differentiated B cell lines. *Mol. Immunol.* **38**, 1161–1166.

30. Doerr, J. R., Malone, C. S., Fike, F. M., Gordon, M. S., Soghomonian, S. V., Thomas, R. K. *et al.* (2005). Patterned CpG methylation of silenced B Cell gene promoters in classical Hodgkin lymphoma-derived and primary effusion lymphoma cell lines. *J. Mol. Biol.* **350**, 631–640.

31. Remenyi, A., Tomilin, A., Scholer, H. R. & Wilmanns, M. (2002). Differential activity by DNA-induced quarternary structures of POU transcription factors. *Biochem. Pharmacol.* **64**, 979–984.

32. Scully, K. M., Jacobson, E. M., Jepsen, K., Lunyak, V., Viadiu, H., Carriere, C. *et al.* (2000). Allosteric effects of Pit-1 DNA sites on long-term repression in cell type specification. *Science*, **290**, 1127–1131.

33. Chang, C. H., Fontes, J. D., Peterlin, M. & Flavell, R. A. (1994). Class II transactivator (CIITA) is sufficient for the inducible expression of major histocompatibility complex class II genes. *J. Exp. Med.* **180**, 1367–1374.

34. Lo, K., Landau, N. R. & Smale, S. T. (1991). LyF-1, a transcriptional regulator that interacts with a novel class of promoters for lymphocyte-specific genes. *Mol. Cell. Biol.* **11**, 5229–5243.

*Edited by J. Karn*

*(Received 18 July 2006; accepted 21 July 2006)*
Available online 28 July 2006

# EXHIBIT 64

# CARD11 mediates factor-specific activation of NF-κB by the T cell receptor complex

## Joel L.Pomerantz[1], Elissa M.Denny and David Baltimore[1]

Division of Biology, California Institute of Technology, Pasadena, CA 91125, USA

[1]Corresponding authors
e-mail: baltimo@caltech.edu or jpomeran@caltech.edu

**NF-κB is a critical target of signaling downstream of the T cell receptor (TCR) complex, but how TCR signaling activates NF-κB is poorly understood. We have developed an expression cloning strategy that can identify catalytic and noncatalytic molecules that participate in different pathways of NF-κB activation. Screening of a mouse thymus cDNA library yielded CARD11, a membrane-associated guanylate kinase (MAGUK) family member containing CARD, PDZ, SH3 and GUK domains. Using a CARD-deleted variant of CARD11 and RNA interference (RNAi), we demonstrate that CARD11 mediates NF-κB activation by αCD3/αCD28 cross-linking and PMA/ionomycin treatment, but not by TNFα or dsRNA. CARD11 is not required for TCR-mediated induction of NFAT or AP-1. CARD11 functions upstream of the IκB-kinase (IKK) complex and cooperates with Bcl10 in a CARD domain-dependent manner. RNAi-rescue experiments suggest that the CARD, coiled-coil, SH3 and GUK domains of CARD11 are critical for its signaling function. These results implicate CARD11 in factor-specific activation of NF-κB by the TCR complex and establish a role for a MAGUK family member in antigen receptor signaling.**
*Keywords*: CARD11/expression cloning/MAGUK/ NF-κB/RNAi

## Introduction

The NF-κB transcription factor is rapidly activated by diverse stimuli that alert a cell or organism to stressful or infectious conditions (Ghosh *et al*., 1998). These include UV and γ-irradiation, bacterial and viral products (e.g. lipopolysaccharide and dsRNA), pro-inflammatory cytokines (e.g. TNFα and IL-1), antigen recognition by the T and B cell receptor complexes, and apoptotic and necrotic stimuli. NF-κB regulates many genes involved in the development and function of the immune response, inflammation, cell growth control and anti-apoptotic responses.

Many stimuli activate NF-κB by causing the phosphorylation and destruction of IκBs, inhibitory molecules that retain NF-κB in the cytoplasm. The signal-induced phosphorylation of IκBs is accomplished by the IκB-kinase (IKK) complex, which is composed of two kinase subunits, IKKα and IKKβ, and a noncatalytic subunit,

NEMO/IKKγ (Karin and Ben-Neriah, 2000). Phosphorylated IκB is ubiquitylated and degraded by the 26S proteasome, allowing NF-κB to translocate to the nucleus to activate target genes. The IKK complex is activated by many stimuli, but the precise mechanism in most cases has not been firmly established.

Mice deficient in NF-κB subunits, or in molecules that signal to NF-κB, have revealed that the proper regulation of NF-κB is critical for normal innate and adaptive immune responses (Gerondakis *et al*., 1999). In the adaptive immune response, NF-κB is a critical target of antigen receptor signaling in B and T cells. In T cells, engagement of the T cell receptor (TCR) complex in concert with costimulatory signals (CD28) leads to the activation of multiple signaling cascades which induce programs of gene expression through several transcription factors including NFAT, AP-1 and NF-κB. These signaling responses are required for normal T cell development, proliferation and activation (Alberola-Ila *et al*., 1997). Genetic studies have determined that NF-κB plays an important cell autonomous role in these processes. T cells lacking c-Rel, RelA or IKKβ develop, but fail to proliferate normally in response to TCR/CD28 costimulation (Kontgen *et al*., 1995; Doi *et al*., 1997; Senftleben *et al*., 2001). In addition, the properties of mice transgenic for non-degradable forms of IκB have suggested a role for NF-κB in TCR-mediated thymocyte selection and in pre-TCR survival signals (Hettmann and Leiden, 2000; Voll *et al*., 2000).

The mechanism by which TCR signaling activates the IKK complex is poorly understood. Several molecules are required, including the ZAP70 tyrosine kinase, the SLP-76 adapter and the Vav GTP/GDP exchange factor (Costello *et al*., 1999; Herndon *et al*., 2001). These proteins participate in TCR-proximal events, signal to several targets and are not involved exclusively in NF-κB activation. Protein kinase Cθ (PKCθ) acts downstream of these molecules and is required in mature thymocytes for both NF-κB and AP-1 activation (Sun *et al*., 2000). A specific role in NF-κB induction by TCR triggering has been demonstrated for Bcl10, a caspase-recruitment domain (CARD)-containing protein first identified in the t(1;14)(p22;q32) translocation associated with B cell lymphomas of mucosa-associated lymphoid tissue (MALT; Willis *et al*., 1999; Zhang *et al*., 1999). This translocation places the *bcl10* gene in the immunoglobulin heavy chain locus and results in its overexpression, which may provide an anti-apoptotic advantage via NF-κB activation. Mice deficient in Bcl10 are severely immunodeficient due to defects in antigen receptor-induced lymphocyte activation and NF-κB induction (Ruland *et al*., 2001). Although Bcl10 has been shown to act upstream of the IKK complex, its mechanism of action has not been elucidated.

©European Molecular Biology Organization

As an approach to increasing our understanding of the regulation and biological roles of NF-κB, we have been interested in developing new methods for identifying signaling molecules in NF-κB-inducing pathways. Here we describe an expression cloning strategy based upon the observation that several known signaling molecules in NF-κB-inducing pathways will activate NF-κB when overexpressed in tissue culture cells. In this method, a cDNA expression library is subdivided into pools, each of which is assayed for the ability to activate an NF-κB-responsive reporter after transfection into cells. Positive pools are assayed in secondary screens to confirm their specificity and the clone responsible for an interesting pool's activity is purified by sib selection.

We demonstrate that this strategy identifies molecules of different biochemical types and can be used to isolate components of multiple signaling pathways. Using a mouse thymus expression library we have isolated the murine CARD11 cDNA. We present evidence that CARD11 cooperates with Bcl10 and functions between the TCR complex and the IKK complex in the activation of NF-κB in T cells.

## Results

### Establishment of the expression cloning screen

For efficient and economical screening, we used a quantitative and highly sensitive reporter assay for NF-κB activation. In this assay, pool DNA cloned into an expression vector driven by the cytomegalovirus (CMV) promoter was transiently transfected into 293T cells with the Igκ₂-IFN-LUC reporter, which contained two copies of the immunoglobulin κ light chain κB site (5′-GGGGACTTTCC-3′) upstream of the interferon-β minimal promoter (−55 to +19) (Fujita *et al.*, 1987) driving luciferase expression. For normalization of transfection efficiency and extract recovery, the transfection included the pCSK-lacZ vector (Condie *et al.*, 1990), which constitutively expresses β-galactosidase and is unaffected by NF-κB. To maximize the number of cDNAs that could be assayed, it was important to determine what complexity (number of cDNAs per pool) would allow reliable detection of a single active clone in a mixture of cDNAs. Pilot experiments using the cDNA for TRAF2, an adapter protein in the TNFα pathway (Rothe *et al.*, 1995), suggested that a pool complexity of 100 cDNAs would allow detection of molecules possessing 3-fold lower specific activity than TRAF2 in this assay (data not shown). The sensitivity of detection of luciferase and β-galactosidase activities allowed us to scale down the size of the transfection and to minimize the amount of pool DNA required (see Materials and methods).

To test this methodology, a portion of an arrayed human placenta cDNA expression library was subdivided into 561 pools of ~100 cDNA complexity. Plasmid DNA from each pool was assayed and pools were considered positive if they activated the reporter 3-fold or more relative to the activity observed with the empty expression plasmid pcDNA3. In addition, some pools were considered positive if they were 3-fold or more active than the average activity of a cohort of pools assayed in parallel. Positive pools were reassayed and their ability to activate the Igκ₂-IFN-LUC reporter confirmed. Of the 561 pools

assayed in this way, 41 were positive by these criteria, ranging in fold activation from 2.3-fold to 256-fold. An example of primary screening is shown in Figure 1A, in which 67 pools were assayed and those considered positive were pools 10 (4.5-fold), 12 (4.4-fold), 24 (16.7-fold), and 52 (8.3-fold).

We applied three secondary screens. First, we tested the NF-κB dependence of the activity of a pool by comparing its fold induction on the Igκ₂-IFN-LUC reporter to that on the MUT-IFN-LUC reporter, which contains mutations in the Igκ κB motifs (5′-ATCCACTTTCC-3′). Secondly, we tested which activities might function upstream of the IKK complex by assessing their activity in the presence of the IKKβ K44A kinase-dead dominant negative. Thirdly, as a control, we tested each κB-specific positive pool in the presence of kinase-dead TANK-binding kinase 1 (TBK1 K38A), an IKK-related kinase (Pomerantz and Baltimore, 1999) which should not block most pathways leading to NF-κB. Examples of these secondary screens are shown in Figure 1B. Of the 41 positive pools, 34 were dependent on the κB sites for activity. Each of these specific pools was inhibited by co-expression with IKKβ K44A, and one pool (pool 178) was also inhibited by co-expression with TBK1 K38A (Figure 1B).

To identify the cDNA responsible for a pool's activity, colonies derived from its glycerol stock were sib selected (see Materials and methods). For most pools, activity increased as the clone was purified, although the activity of some reached saturation in the assay before complete purification. An example of clone purification is shown in Figure 1C.

The identities of 25 specific clones are presented in Table I with the representative behavior of pools in primary and secondary screens, and their activities when purified. Six isolated molecules had been linked previously to pathways known to activate NF-κB. These included the ligand TRAIL, the TRAMP/DR3 and TNFR1 cell surface receptors, the TRAF2 and MyD88 adapter proteins and the IKK-i/ε kinase (see Table I for associated pathways). The other specific clones encoded the small GTPase rhoB, the MARCKS PKC substrate, the DLK cell surface protein and the Snk kinase. To our knowledge, NF-κB has not been linked to MARCKS, Snk or DLK previously, and rhoB has not been placed in a particular NF-κB-inducing pathway.

### Isolation of murine CARD11 from a mouse thymus expression library

The results from the human placenta library screen indicated that this methodology yields molecules of different biochemical types, both catalytic and non-catalytic, which mediate signaling in different pathways leading to NF-κB. With the aim of identifying molecules involved in lymphocyte signaling, we applied this screen using a mouse thymus cDNA expression library. Known molecules isolated from this library included: the TNFR1, LTβR, CD40 and TRAMP/DR3 receptors; the TRAF2, MyD88, TAB2, RIP3 and NOD1 adapters; the NIK kinase and the RelA subunit of NF-κB. In addition, we independently isolated four clones of a membrane-associated guanylate kinase (MAGUK) family member, the murine homolog of a human protein described while this work was in progress as CARD11 (Bertin *et al.*, 2001) or CARMA1

(Gaide *et al.*, 2001). The murine cDNA encoded 1159 amino acids (Figure 2B) and contained predicted CARD, PDZ, SH3 and GUK domains, in addition to a region predicted to form coiled coils (Figure 2A). The murine and human proteins are 88% identical.

The presence of PDZ, SH3 and GUK domains is characteristic of the MAGUK family of proteins, which function to cluster and localize multiprotein signaling complexes in several systems (Dimitratos *et al.*, 1999). The CARD is found in caspases, regulators of apoptosis and in proteins that signal to NF-κB (Reed, 2000). The isolation of murine CARD11 in our screen suggested that it might function as an adapter to coordinate signaling in an NF-κB-inducing pathway. In 293T cells, overexpression of the CARD11 cDNA activated the Igκ$_2$-IFN-LUC reporter, but not the MUT-IFN-LUC reporter (Figure 3A). Deletion of the first 115 amino acids containing the CARD abrogated this activity (Figure 3B), confirming the importance of this domain for NF-κB induction. Activation of NF-κB by CARD11 overexpression was inhibited by IKKβ K44A co-expression, but not by TBK1 K38A co-expression (Figure 3C), suggesting that overexpressed CARD11 activates NF-κB in 293T cells via IKK activation. Previous reports (Bertin *et al.*, 2001; Gaide *et al.*, 2001) also showed that overexpressed CARD11 can activate NF-κB but they did not place CARD11 in a physiological pathway.

### Involvement of CARD11 in TCR signaling to NF-κB

The presence of CARD11 in the mouse thymus cDNA library suggested that it might function to signal to NF-κB in T cells. Since the CARD-deleted mutant of CARD11 (ΔCARD) could not activate NF-κB in 293T cells, but retained other domains of the protein, we tested its potential inhibitory effect in Jurkat T cells on various stimuli. As shown in Figure 4, ΔCARD inhibited the activation of the Igκ$_2$-IFN-LUC reporter by αCD3/αCD28 cross-linking, while the wild-type protein enhanced the stimulation achieved with no effect on basal reporter activity (Figure 4A and B). The inhibitory effect of ΔCARD was specific; it had no effect on NF-κB activation by TNFα (Figure 4C) or dsRNA (Figure 4D), and did not inhibit the activation of an NFAT-responsive reporter, NFAT-LUC, by αCD3/αCD28 cross-linking (Figure 4E). Finally, ΔCARD also inhibited the activation of the Igκ$_2$-IFN-LUC reporter by PMA/ionomycin treatment but not that of the NFAT-LUC reporter (Figure 4F and G). These specific effects of the ΔCARD variant suggested that CARD11 mediates pathway-specific, factor-specific activation of NF-κB by TCR/CD28 cross-linking, and that the CARD was necessary for this signaling.

### CARD11 functions upstream of the IKK complex

In order to investigate how ΔCARD inhibited NF-κB reporter activation by αCD3/αCD28 cross-linking, we generated pools of Jurkat cells stably expressing myc-tagged wild-type and mutant CARD11 proteins by infection with Moloney murine leukemia virus-based retroviruses expressing these cDNAs linked to puromycin resistance (Figure 5A). A control, puro-resistant pool of Jurkat cells (puro$^R$ pool) was generated by infection with a parental virus containing no cDNA insert. Treatment of the ΔCARD Jurkat pool with αCD3/αCD28 cross-linking







**Fig. 1.** The expression cloning strategy. (**A**) Primary screening of pools. Pool DNA was transfected into 293T cells with the Igκ$_2$-IFN-LUC reporter and the pCSK-lacZ control vector and fold stimulation was determined as described in Materials and methods. (**B**) Secondary screening of positive pools. Positive pool DNA was assayed for the ability to stimulate the Igκ$_2$-IFN-LUC reporter, the MUT-IFN-LUC reporter or the Igκ$_2$-IFN-LUC reporter in the presence of IKKβ K44A or TBK1 K38A as indicated. The activities in the pools illustrated here were identified to be C/EBPδ (pool 73), TRAIL (pool 224), TNFR1 (pool 473), TRAF2 (pool 24), MyD88 (pool 72) and IKK-i/ε (pool 178). (**C**) Clone purification. The purification of the rhoB cDNA from pool 443 is illustrated. The activities of the original pool (complexity ~100 cDNAs) and that of the derived positive subpool (complexity of 24 cDNAs) are shown, as well as the activities observed in the clone identification matrix and for the isolated clone. In this matrix, the coordinates of the positive well were D, 2, X. A schematic of the conceptual clone identification matrix is illustrated. Actual values reading from left to right are 3.6, 39.6, 0.9, 0.7, 0.9, 39.3, 1.4, 63.4, 0.6, 61.2, 0.7 and 114.

**Table I.** Summary of isolates from the human placenta library and representative pool characteristics

| cDNA | No. of isolates | Type | Pathway | Rep. pool[a] | Igκ$_2$[b] | MUT[c] | IKKβ K44A[d] | TBK1 K38A[e] | Isolated clone[f] |
|---|---|---|---|---|---|---|---|---|---|
| TRAIL | 1 | Ligand | TRAIL | 224 | 3.1 | 0.6 | 1.1 | 3.0 | 19.0 |
| DLK | 2 | Ligand | ??? | 228 | 6.2 | 0.6 | 1.5 | 11.0 | 66.0 |
| TNFR1 | 2 | Receptor | TNFα | 473 | 87.1 | 1.8 | 0.7 | 67.7 | 108.0 |
| TRAMP | 4 | Receptor | Apo3L | 110 | 74.5 | 1.0 | 0.8 | 75.4 | 109.0 |
| TRAF2 | 2 | Adapter | TNFα | 24 | 25.2 | 2.9 | 2.0 | 25.4 | 46.8 |
| MyD88 | 1 | Adapter | IL-1/Toll | 72 | 30.2 | 3.8 | 3.6 | 19.7 | 999.0 |
| IKK-i/ε | 1 | Kinase | PMA/TCR | 178 | 7.6 | 1.3 | 0.9 | 1.4 | 53.5 |
| rhoB | 9 | Small GTPase | ??? | 501 | 3.2 | 0.8 | 0.3 | 2.7 | 20.3 |
| Snk | 1 | Kinase | ??? | 270 | 6.3 | 1.1 | 1.2 | 5.2 | 24.0 |
| MARCKS | 2 | Kinase substrate | ??? | 525 | 40.9 | 4.4 | 2.9 | 47.0 | 69.0 |

See Supplementary data at *The EMBO Journal* Online for further discussion.
[a]Pool identifier number.
[b]Fold stimulation elicited by the pool on the Igκ$_2$-IFN-LUC reporter.
[c]Fold stimulation elicited by the pool on the MUT-IFN-LUC reporter.
[d]Fold stimulation elicited by the pool on the Igκ$_2$-IFN-LUC reporter in the presence of IKKβ K44A.
[e]Fold stimulation elicited by the pool on the Igκ$_2$-IFN-LUC reporter in the presence of TBK1 K38A.
[f]Fold stimulation elicited by the isolated cDNA on the Igκ$_2$-IFN-LUC reporter.
???, pathway not known.

activated the NFAT-responsive reporter, but failed to activate the Igκ$_2$-IFN-LUC reporter, while the wild-type CARD11 pool and control puro[R] both activated both reporters (Figure 5B and D). Similar results were obtained with PMA/ionomycin treatment (Figure 5C and E). Thus, the stable pools recapitulated the phenotypes observed in transient transfections. Importantly, the levels of stably expressed myc-tagged proteins in these pools did not affect basal NF-κB activity in the absence of signaling (Figures 5 and 6).

We treated these Jurkat pools with a time course of αCD3/αCD28 cross-linking, and made nuclear and cytoplasmic extracts to assess the induction of NF-κB, AP-1 and NFAT DNA-binding activity. As shown in Figure 6A, the puro[R] control and wild-type CARD11-expressing pools activated NF-κB DNA-binding activity in response to αCD3/αCD28 cross-linking, while the ΔCARD pool failed to induce NF-κB. In contrast, all three pools induced NF-κB in response to TNFα treatment. The failure of the ΔCARD pool to induce NF-κB in response to αCD3/αCD28 cross-linking was specific since AP-1 and NFAT activities were induced in a manner comparable with that observed in the control and wild-type CARD11 pools (Figure 6A, lower two panels). Western blot analysis of cytoplasmic extracts revealed degradation of IκBα in the puro[R] control and wild-type CARD11 pools in response to αCD3/αCD28 cross-linking and TNFα treatment, while degradation of IκBα was only observed in the ΔCARD pool in response to TNFα (Figure 6B). Degradation of IκBβ was not observed in response to these stimuli. Western blotting with anti-c-myc antibodies revealed slightly lower expression of the myc-tagged ΔCARD protein than the myc-tagged wild-type CARD11 protein in their respective pools (Figure 6B, lower panel).

IKK IP-kinase assays confirmed a failure to activate the IKK complex in the ΔCARD pool in response to αCD3/αCD28 cross-linking, as compared with that observed in the control and wild-type CARD11 pools (Figure 6C). These results indicated that the ΔCARD mutant blocks NF-κB induction upstream of IKK complex activation, IκBα degradation and nuclear localization of NF-κB.

## Functional cooperation and association of CARD11 with Bcl10

Bcl10-deficient T cells display a factor-specific defect in NF-κB activation in response to TCR triggering or PMA/ionomycin treatment (Ruland *et al.*, 2001). These cells fail to activate the IKK complex in response to TCR triggering, while other signaling events are unperturbed. To assess a functional relationship between Bcl10 and CARD11, we transfected a Bcl10 expression vector into the puro[R] control, CARD11- and ΔCARD11-expressing Jurkat pools and assayed Igκ$_2$-IFN-LUC activity in the absence and presence of αCD3/αCD28 cross-linking. As shown in Figure 7A, transfection of Bcl10 into the control puro[R] Jurkat pool had no significant effect on reporter activity either in the absence or presence of stimulation by αCD3/αCD28 cross-linking. However, in the CARD11-expressing pool, transfection of Bcl10 resulted in a robust induction in the absence of TCR triggering, which was not significantly enhanced by αCD3/αCD28 cross-linking. In contrast, in the ΔCARD-expressing pool, transfection of Bcl10 resulted in no stimulation in the absence of αCD3/αCD28 treatment and no rescue of reporter induction by αCD3/αCD28 cross-linking. These results indicate that Bcl10 and CARD11 can cooperate in T cells to signal to NF-κB in a manner dependent on the CARD11 CARD. In addition, the block in TCR signaling to NF-κB that is imposed by the ΔCARD variant cannot be bypassed by Bcl10 overexpression. These data suggest that CARD11 and Bcl10 function at the same level of the signaling pathway between the TCR and IKK complexes.

To examine whether CARD11 and Bcl10 associate during TCR signaling, we assayed for myc-tagged proteins precipitating with anti-Bcl10 antibodies in lysates from puro[R] control, myc-tagged CARD11- and ΔCARD-expressing Jurkat pools. As shown in Figure 7B, we detected wild-type CARD11 co-precipitating with endogenous Bcl10 to an extent that was not reproducibly enhanced by αCD3/αCD28 cross-linking. In contrast, we failed to detect co-precipitation of the ΔCARD variant with endogenous Bcl10. These data suggest that CARD11



**Fig. 2.** Murine CARD11. (**A**) Schematic of murine CARD11 showing domains predicted by sequence homology. (**B**) Amino acid sequence of murine CARD11 and comparison to the human homolog. Domains in (A) and (B) are color matched.



**Fig. 3.** CARD11 activates the Igκ₂-IFN-LUC reporter when overexpressed in 293T cells, in a CARD-dependent manner, upstream of the IKK complex. (**A**) Titration of the murine CARD11 expression vector (ng) in the presence of 2 ng pCSK-LacZ and 20 ng Igκ₂-IFN-LUC or MUT-IFN-LUC reporters. (**B**) Titration of CARD11 or ΔCARD11 expression vectors in the presence of 20 ng Igκ₂-IFN-LUC and 2 ng pCSK-LacZ. Western blotting confirmed comparable expression of wild-type and ΔCARD proteins. (**C**) Two hundred nanograms of CARD11 expression vector were transfected with 20 ng Igκ₂-IFN-LUC and 2 ng pCSK-LacZ in the absence or presence of 100 ng of constructs expressing IKKβ K44A or TBK1 K38A.

and Bcl10 associate in a manner that is dependent on the CARD of CARD11 and independent of TCR signaling.

## RNA interference of CARD11 inhibits TCR signaling to NF-κB

To independently assess a role for CARD11 in TCR signaling to NF-κB, we used RNA interference (RNAi). Short hairpin RNAs can be expressed from RNA pol III promoters *in vivo* and processed to small interfering RNAs that silence genes in a sequence-specific manner (Brummelkamp *et al.*, 2002). We designed two short hairpin RNAs to silence the endogenous human CARD11 mRNA (Figure 8A) in Jurkat T cells and expressed them downstream of the human H1 RNA promoter. The sihCARD11-1 hairpin targets a region 260 nucleotides 5′ to the termination codon while sihCARD11-2 targets a region 1400 nucleotides 3′ to the initiation codon. As shown in Figure 8B, transient transfection of Jurkat T cells with either sihCARD11-1 or sihCARD11-2 inhibited induction of the Igκ₂-IFN-LUC reporter by TCR cross-linking by 70–75%. A control hairpin targeted to the luciferase mRNA of *Renilla reniformis* (siRenLuc) did not significantly inhibit. Co-transfection of sihCARD11-1 and sihCARD11-2 did not inhibit more than either transfected alone.

The sihCARD11-1 hairpin specifically targets the human CARD11 mRNA and not the murine CARD11 mRNA because it targets a 23 bp region in which the two homologues differ at five positions (Figure 8A). This allowed us to confirm the specificity of the inhibition mediated by sihCARD11-1 by rescuing its inhibitory effect with co-transfection of the murine CARD11 cDNA (Figure 8C). We compared several deletion variants for their ability to rescue sihCARD11-1-mediated inhibition of TCR signaling. As expected, the ΔCARD variant failed to rescue. Furthermore, deletion of the coiled-coil domain (ΔCC), the SH3 domain (ΔSH3) or the GUK domain (ΔGUK) also abrogated the rescuing activity of CARD11 cDNA, while deletion of the PDZ domain (ΔPDZ) had no effect. These results suggest that the CARD, coiled-coil, SH3 and GUK domains are all important for the signaling function of CARD11. Finally, the sihCARD11-1 hairpin did not significantly inhibit the induction of the Igκ₂-IFN-LUC reporter by TNFα, or the induction of the NFAT-LUC reporter by αCD3/αCD28 cross-linking, consistent with a pathway-specific, factor-specific role of CARD11 in NF-κB activation (Figure 8D and E). We have used lentiviruses to establish Jurkat pools that stably express short hairpin RNAs directed against CARD11. These pools display an 80% inhibition of Igκ₂-IFN-LUC reporter induction by TCR cross-linking, and an ~80% decrease in endogenous CARD11 protein levels (data not shown).



**Fig. 4.** ΔCARD specifically blocks NF-κB activation by αCD3/αCD28 cross-linking in Jurkat T cells. The indicated amounts (ng) of expression vectors for CARD11 or ΔCARD were co-transfected with 200 ng pCSK-LacZ and 1500 ng of either Igκ$_2$-IFN-LUC or NFAT-LUC into Jurkat T cells. Cells were stimulated with αCD3/αCD28 cross-linking, TNFα, dsRNA or PMA/ionomycin co-treatment as indicated.



**Fig. 5.** Generation of puro-resistant Jurkat pools expressing wild-type murine CARD11, the ΔCARD mutant or no murine CARD11 variant. (**A**) Schematic of viral constructs. Following integration, the CMV enhancer/chicken β-actin promoter fusion drives expression of an mRNA containing the inserted cDNA, an internal ribosomal entry site (IRES) and the puromycin resistance gene (PURO). (**B–E**) Jurkat pools were transfected with 200 ng pCSK-LacZ and 2800 ng of either Igκ$_2$-IFN-LUC or NFAT-LUC and stimulated with either αCD3/αCD28 cross-linking or PMA/ionomycin co-treatment as indicated.

## Discussion

Many pathways activate NF-κB by transducing signals to a core activation module consisting of the IKK complex, IκB, ubiquitylation machinery, proteasome, rel homo- or heterodimer and nuclear import factors. Pathway-specific molecules function in the link between stimulus recognition and IKK complex activation in an interplay that must elicit an appropriate response to the stimulus, in part through the coordinate regulation of other transcription factor systems. In an effort to better understand the disparate mechanisms for NF-κB activation, we have explored an expression cloning approach with the hope of finding new players, new mechanistic insights and, potentially, new pathways. To probe components used for lymphocyte signaling to NF-κB, we screened a mouse thymus expression library and cloned the murine CARD11 cDNA.

Our data indicate that CARD11 functions in the activation of NF-κB by TCR ligation and CD28 co-stimulation. Expression of a CARD-deleted CARD11 in Jurkat T cells specifically inhibits IKK activation, IκBα degradation, nuclear translocation of NF-κB and induction of a κB-dependent reporter by TCR/CD28 costimulation. The ΔCARD protein does not inhibit NF-κB activation by TNFα or dsRNA, nor does it block NFAT or AP-1 induction by TCR/CD28 costimulation. Two different short hairpin RNAs targeted to suppress the human CARD11 mRNA by RNAi also specifically inhibit κB reporter induction by TCR cross-linking, and this effect can be rescued by murine CARD11. These data assign CARD11 a pathway-specific, factor-specific role in the induction of NF-κB by TCR/CD28 signaling.

Importantly, ΔCARD also blocks NF-κB activation by phorbol ester/ionomycin treatment, which can bypass the requirements for other molecules, such as ZAP70, SLP-76 and Vav (Costello *et al.*, 1999; Herndon *et al.*, 2001), that function in TCR-proximal events. Even the block imposed by PKCθ deficiency can be bypassed by phorbol ester/ionomycin co-treatment, presumably through the recruitment of other PKC isoforms (Sun *et al.*, 2000). The effect of ΔCARD was reminiscent of that observed in Bcl10-deficient T cells, in which IKK and NF-κB activation by TCR cross-linking and PMA/ionomycin are blocked (Ruland *et al.*, 2001). CARD11 and Bcl10 probably



**Fig. 6.** ΔCARD blocks αCD3/αCD28 cross-linking-induced IKK activation, IκBα degradation and nuclear translocation of NF-κB. Jurkat pools were treated with αCD3/αCD28 cross-linking or TNFα for the indicated times in minutes, and nuclear and cytoplasmic extracts were prepared. (**A**) EMSA assays were performed with nuclear extracts using probes for NF-κB, NFAT and AP-1. The arrows indicate the specific inducible complexes as verified by their lack of binding to control probes containing binding site mutations (data not shown). Unbound probes are not shown. (**B**) Western blot assays were performed on cytoplasmic extracts using antibodies for IκBα, IκBβ or myc-tagged proteins. The asterisk indicates an ~77 kDa truncation of wild-type CARD11 that contains the myc-tagged N-terminus. No truncation was observed in the ΔCARD-expressing pool. (**C**) Jurkat pools were treated with αCD3/αCD28 cross-linking for the indicated times in minutes, and IKK IP-kinase assays were performed. The amount of radioactivity incorporated into substrate (top panel) was quantitated and fold activations were, from left to right, 1.0, 3.9, 4.8, 1.0, 2.9, 3.1, 1.0, 1.3 and 1.2. The lower panel shows a western blot with αIKKα to indicate the relative amount of IKKα in each sample.





**Fig. 7.** CARD11 and Bcl10 functionally cooperate and associate in T cells. (**A**) Igκ₂-IFN-LUC (1800 ng) was transfected into Jurkat pools expressing wild-type CARD11, ΔCARD or no cDNA insert in the presence of the indicated amounts (nanograms) of a Bcl10 expression vector (pc-FL-CIPER; Koseki *et al.*, 1999). Cells were treated with αCD3/αCD28 cross-linking as indicated. (**B**) Jurkat pools were treated with αCD3/αCD28 cross-linking for the indicated times in minutes, and immunoprecipitations using αBcl10 antibodies were performed. The immunoprecipitates (top panel) and lysates (6.5% of the IP input; bottom panel) were developed with α-myc primary antibody.

function together in this pathway, downstream of PKCθ. Overexpression of Bcl10 with CARD11 in Jurkat T cells synergistically activated NF-κB in a manner that was dependent on the CARD of CARD11, and the block in TCR/CD28 signaling imposed by ΔCARD expression could not be bypassed by Bcl10 overexpression. In addition, CARD11 could be immunoprecipitated with endogenous Bcl10 but ΔCARD could not. We conclude that the role of the CARD of CARD11 is to function with Bcl10 to transduce a signal from the TCR complex to the IKK complex. ΔCARD blocks specific signaling to NF-κB probably by decoupling the association of Bcl10 with other portions of the CARD11 protein and other CARD11-associated factors.

The precise mechanism by which Bcl10 and CARD11 function together in TCR signaling is presently unclear, but it may involve MALT1, a protein containing caspase-like, Ig-like and death domains (Akagi *et al.*, 1999; Morgan *et al.*, 1999). MALT1 and Bcl10 have been shown to associate and synergistically activate NF-κB when overexpressed in 293T cells (Lucas *et al.*, 2001). The t(11;18)(q21;q21) translocation, also associated with MALT lymphoma, results in the fusion of the C-terminus of the MALT1 protein to the N-terminus of the API2 protein. The API2–MALT1 fusion can also activate NF-κB when overexpressed (Lucas *et al.*, 2001).

It is intriguing to establish a role for a MAGUK family member in antigen–receptor signaling. MAGUK proteins function in other systems as molecular scaffolds for the assembly and clustering of signaling molecules into localized complexes (Dimitratos *et al.*, 1999). MAGUK proteins can interact with other proteins through each of their characteristic PDZ, SH3 and GUK domains as well as through specialized domains like the CaM kinase and calmodulin-binding domains found in the Lin-2 MAGUK subfamily. In *Caenorhabditis elegans*, Lin-2 is required for vulval induction and functions in a complex with Lin-7 and Lin-10 which is necessary for proper localization and aggregation of the Let-23 receptor tyrosine kinase at the basolateral membrane of vulval precursor cells (Kaech *et al.*, 1998). Mutations that affect this complex reduce Let-23 signaling and result in a vulvaless phenotype. Similarly, the mammalian PSD-95 MAGUK protein and related proteins bind to and cluster NMDA receptors and potassium channels at appropriate membrane locations in



**Fig. 8.** siRNAs targeted to CARD11 inhibit NF-κB activation by αCD3/αCD28 cross-linking. (**A**) The sihCARD11-1 and sihCARD11-2 shRNAs are depicted with the murine sequence corresponding to the human target sequence of sihCARD11-1 (mismatches indicated in green). (**B**) The indicated amounts (nanograms) of Pol III expression constructs for shRNAs were co-transfected with 200 ng pCSK-LacZ and 2700 ng Igκ₂-IFN-LUC into Jurkat T cells. Cells were stimulated with αCD3/αCD28 as indicated. (**C**) Jurkat T cells were transfected with 200 ng pCSK-LacZ and 2500 ng Igκ₂-IFN-LUC in the absence or presence of 100 ng of the sihCARD11-1 expression construct and 200 ng of the indicated CARD11 variant expression constructs. Cells were stimulated with αCD3/αCD28 as indicated. Western blot analysis indicated that expression constructs for CARD11 deletion variants express comparable protein levels within a ~2-fold range. (**D**) Jurkat T cells were transfected with 200 ng pCSK-LacZ and 2700 ng NFAT-LUC in the absence or presence of 100 ng of the sihCARD11-1 expression construct and stimulated with αCD3/αCD28 as indicated. (**E**) Jurkat T cells were transfected with 200 ng pCSK-LacZ and 2700 ng Igκ₂-IFN-LUC in the absence or presence of 100 ng of the sihCARD11-1 expression construct and stimulated with TNFα as indicated.

neurons (Sheng, 1996). In T cells, CARD11 may serve a similar role to coordinate complex assembly or appropriate membrane association of signaling molecules at the immunological synapse. Our RNAi-rescue experiments suggest that in addition to the CARD, the coiled-coil, SH3 and GUK domains each contribute to CARD11 function in this pathway. The investigation of their interaction partners will be required for an understanding of the mechanism of CARD11 signaling.

It will be important to assess CARD11 function in the developing mouse and in primary T cells. The closest homologs to CARD11 include CARD10 (Bimp1;

McAllister-Lucas *et al.*, 2001; Wang *et al.*, 2001) and CARD14 (Bimp2; Bertin *et al.*, 2001; McAllister-Lucas *et al.*, 2001), each of which contains coiled-coil, PDZ, SH3 and GUK domains and a CARD that can interact with Bcl10. While CARD11 appears to be the predominant family member expressed in lymphoid tissues, CARD14 and CARD10 may play similar roles to transmit signals from PKC-dependent pathways to NF-κB in tissues in which they are expressed (McAllister-Lucas *et al.*, 2001). Targeted mutagenesis of these genes in mice will be required to establish their nonredundant and overlapping functions.

The expression cloning strategy we employed should be versatile. The chief advantage of the screen is that it quantitatively screens for function—the ability to activate a κB-dependent reporter—and it applies no constraints on how the assayed pool achieves that function. As such, it has the ability to detect molecules that have distinct biochemical mechanisms and that serve in disparate signaling pathways. Importantly, the approach provides for facile isolation of the cDNA of interest through sib selection. It is worth noting that >90% of our isolated κB-specific clones contained full-length cDNAs. An attractive feature of the screen is the straightforward manner in which secondary screens can be performed at the level of the pool. Because the assay is quantitative, it is easy to assess dependence on κB sites for activity and also to measure and compare the effects of co-transfected molecules such as dominant negatives. In principle, any dominant-negative molecule could be used to target the discovery of cDNAs encoding components of a particular pathway, or components that function at a particular epistatic level of a pathway. Other secondary screens may give additional insight. For example, pools can be screened for the ability to synergistically activate the reporter with a particular co-transfected molecule or with an applied stimulus.

The screen employs modular components (cell line, reporter, cDNA library) and may be adaptable for the isolation of molecules that activate other transcription factors. Important criteria for establishing an analogous system include the choice of assay cell type, the cDNA library source tissue, and the sensitivity of the assay as determined by the background and induced activities of the transcription factor of interest. The latter will determine the optimal pool complexity for efficient screening and will be influenced by the number of transcription factor binding sites in the reporter.

## Materials and methods

### Preparation of the expression library for screening

*Escherichia coli* (DH10B) was transformed with DNA from 16 wells of an arrayed human placenta cDNA library (OriGene Technologies, Inc.) and plated on LB-agar plus ampicillin (100 µg/ml) to obtain ~100 colonies per plate. Colonies were scraped and a fraction of the pooled bacteria was stored as a 50% (w/v) glycerol stock at −80°C. Plasmid DNA was prepared from the remainder of the bacterial prep by the Qiagen QIAprep 8 Miniprep kit according to the manufacturer's protocol. The cDNAs in this expression library have been oligo(dT) primed, size fractionated and directionally cloned into pCMV6-XL3, which transcribes the cDNA under the control of the CMV promoter and contains an SV40 origin of replication. Sixteen wells represents 17% of the total library.

### Primary screen

293T cells were maintained in Dulbecco's modified Eagle's medium supplemented with 10% fetal calf serum (FCS), 100 U/ml each of penicillin and streptomycin, and 2 mM glutamine in humidified 5% CO$_2$ at 37°C. Cells were plated at $9 \times 10^4$ per well in 24-well dishes, 24 h before transfection by the calcium phosphate method. A total of 372 ng of DNA was transfected, including 2 ng of pCSK-LacZ, 20 ng of Igκ$_2$-IFN-LUC and 350 ng of pool DNA. The reference control transfection contained 350 ng pcDNA3 instead of pool DNA. The medium was changed 20–24 h following transfection, and 40–48 h following transfection, cells were lysed in 100 µl of reporter lysis buffer (Promega) at room temperature. Cells were scraped and spun at 13 000 r.p.m. at room temperature for 5 min to pellet debris. Twenty microliters of extract were used to measure luciferase activity using the luciferase assay system (Promega) and a luminometer (Optocomp I,

MGM instruments) integrating for 10 s after a 3 s delay according to the manufacturers' instructions. β-galactosidase activity was determined using 30 µl of extract and the chemiluminescent β-gal reporter gene assay (Roche) according to the manufacturer's instructions. Fold stimulation was calculated for each sample by dividing the luciferase activity, normalized to β-gal activity, to that observed in the pcDNA3 control sample.

### Secondary screens

To determine specificity, pool DNA was assayed as described above with the MUT-IFN-LUC reporter. Positive pools were considered specific if their activity on the MUT-IFN-LUC reporter was ≤30% of that observed on the Igκ$_2$-IFN-LUC reporter or if they stimulated the MUT-IFN-LUC reporter <1.5-fold. To determine the effect of IKKβ K44A or TBK1 K38A, transfections included 75 ng of either pRK-IKKβK44A (Woronicz *et al.*, 1997) or pc-TBK1 K38A (Pomerantz and Baltimore, 1999). Pools were considered inhibited by either dominant negative if in its presence the pool's activity on the Igκ$_2$-IFN-LUC reporter was reduced by ≥70% or if in its presence the pool stimulated the Igκ$_2$-IFN-LUC reporter <1.5-fold.

### Clone purification

A portion of the glycerol stock of a positive pool was plated on LB-agar ampicillin and individual colonies were grown in 1 ml LB-amp cultures in 24-well plates. Each 24-well plate was treated as a subpool; aliquots of each well culture were pooled and assayed in a single transfection. Once a 24-well plate subpool was identified as positive, new aliquots were pooled from the individual wells as rows, columns and levels in a conceptual $4 \times 3 \times 2$ matrix, for a total of nine axis pools. DNA from each axis pool was assayed, yielding the coordinates of the culture well containing the cDNA clone responsible for the activity of the subpool. DNA from the appropriate well culture was prepared, assayed and sequenced with an automated sequencer (Applied Biosystems) to obtain sequence at the 5′ and 3′ ends of the cDNA.

### Isolation of the murine CARD11 cDNA

An arrayed mouse thymus cDNA library (OriGene Technologies, Inc.) was screened essentially as described above. A single murine CARD11 cDNA clone was completely sequenced. It encoded an entire open reading frame with an in-frame stop codon 20 codons upstream of the first ATG. Sequence data have been submitted to DDBJ/EMBL/GenBank under accession No. AY135367. Residues 2–1159 were cloned into pIRESPURO (Clontech) fused in-frame to an N-terminal c-myc epitope (EQKLISEEDL) to generate pmCARD11. The ΔCARD expression construct (pΔCARD11) deletes residues 2–115 and retains the N-terminal myc epitope. The ΔCC expression construct (pΔCC) deletes residues 152–447, the ΔPDZ expression construct (pΔPDZ) deletes residues 669–752, the ΔSH3 expression construct (pΔSH3) deletes residues 779–844 and the ΔGUK expression construct (pΔGUK) deletes residues 956–1159.

### Transient transfections of Jurkat T cells

Jurkat T cells were grown in RPMI supplemented with 10% FCS, 100 U/ml each of penicillin and streptomycin, 2 mM glutamine and 50 µM β-mercaptoethanol in humidified 5% CO$_2$ at 37°C. On the day of transfection, $5 \times 10^5$ cells were plated in 2 ml in each well of a 6-well plate prior to incubation with DNA–Fugene 6 (Roche) complexes according to the manufacturer's instructions using a total of 3 µg of DNA and 9 µl of Fugene 6. Forty to forty-eight hours after transfection, cells were resuspended in 1 ml media with or without 10 ng/ml TNFα (R&D Systems, Inc.), 50 ng/ml PMA (Sigma) plus 1 µM ionomycin (Calbiochem), or 1 µg/ml each of αhuman CD3 (BD PharMingen 555329), αhuman CD28 (BD PharMingen 555725) and αmouse IgG$_1$ (BD PharMingen 02231D), and incubated for 4–6 h. For dsRNA treatment, 35 h after transfection, double-stranded poly(I)–poly(C) (Amersham Pharmacia Biotech) was added to the cells to a final concentration of 100 µg/ml and incubated for 15 h. Following stimulation, cells were lysed in 150 µl of reporter lysis buffer (Promega) for 10 min at room temperature. Debris was removed by centrifugation at 13 000 r.p.m. for 5 min at room temperature. Luciferase and β-gal activity were measured as described above using 20 and 50 µl of lysate, respectively. In each experiment, each sample was supplemented with the appropriate empty parental expression vector (pIRESPURO, pcDNA3 or pBSK) to keep the total amount of expression vector constant. Fold stimulation was calculated for each sample by dividing the luciferase activity, normalized to β-gal activity, by that observed in the unstimulated sample containing only empty expression vector.

### Generation of Jurkat pools stably expressing murine CARD11 and ΔCARD proteins

N-terminally myc-tagged wild-type and ΔCARD cDNAs were cloned into pCL-LZRS-Lox-IRES-PURO (provided by C.Lois) as depicted in Figure 5A. To package retroviruses, 293T cells were plated at 2 × 10⁶ per 10 cm plate 24 h prior to calcium phosphate-mediated transfection with 3 µg pCL-Ampho (Naviaux *et al.*, 1996) and 8 µg of either parental (no cDNA insert), murine CARD11 or ΔCARD retroviral construct. The medium was changed 24 h after transfection, and at 48 h after transfection viral supernatant was supplemented with polybrene (8 µg/ml) and added to Jurkat cultures. Forty-eight hours after addition of viral supernatant, Jurkat cells were resuspended in fresh medium containing puromycin at 0.5 µg/ml and selected for two weeks. Puro-resistant Jurkat pools were maintained in media containing 0.5 µg/ml puromycin.

### Electrophoretic mobility shift assays and western blot analysis of IκB degradation

For each timepoint, 10⁷ Jurkat cells were treated in 1 ml as described in the figure legends, pelleted, frozen, thawed and resuspended in 400 µl of buffer A [10 mM HEPES pH 7.9, 1.5 mM MgCl₂, 10 mM KCl, 0.5 mM dithiothreitol (DTT), and complete protease inhibitors (Roche)]. After 15 min on ice, NP-40 was added to a final 0.5%, the cells were vortexed and pelleted at 6000 r.p.m. for 2 min at 4°C. The cytoplasmic extract supernatant was used for western blot analysis. Nuclear pellets were resuspended in 25 µl buffer C (20 mM HEPES pH 7.9, 1.5 mM MgCl₂, 450 mM NaCl, 0.2 mM EDTA, 0.5 mM DTT, 25% glycerol and complete protease inhibitors) and incubated on ice for 20 min, vortexing at 5 min intervals. After centrifugation at 12 000 r.p.m. for 2 min at 4°C, protein concentration of the nuclear extract supernatant was determined by Bradford assay. NF-κB DNA-binding reactions contained 15 mM Tris pH 7.5, 1.5 mM EDTA, 1.5 mM DTT, 5% glycerol, 20 µg/ml bovine serum albumin (BSA), 150 µg/ml dIdC, ~0.1 ng of labeled probe and 3 µg nuclear extract in a total volume of 20 µl. Binding reactions were incubated at 30°C for 30 min and resolved on 4% polyacrylamide gels in 0.25× TBE. NFAT DNA-binding reactions were performed similarly and contained 15 mM Tris pH 7.5, 1.5 mM EDTA, 1.5 mM DTT, 5% glycerol, 20 µg/ml BSA, 100 mM KCl, 0.5 mM MgCl₂ and 200 µg/ml dIdC. AP-1 DNA-binding reactions were performed similarly and contained 15 mM Tris pH 7.5, 1.5 mM EDTA, 1.5 mM DTT, 5% glycerol, 20 µg/ml BSA, 0.5 mM MgCl₂ and 200 µg/ml dIdC. Probe sequences are as follows. For NF-κB: 5′-AATTCATGCAGTTGAGG-GACTTTCCCAGGCATGCAAGCT-3′; for NFAT: 5′-AATTCGGAG-GAAAAACTGTTTCATACAGAAGGCGAAGCT-3′; for AP-1: 5′-AATTCGCTTGATGACTCAGCCGGAACGAAGCT-3′. Cytoplasmic extracts were resolved on 10% SDS–PAGE gels, transferred to immobilon-P membranes (Millipore) and probed with antibodies to IκBα (Santa Cruz sc-371), IκBβ (sc-945) and the c-myc epitope (sc-40).

### IKK kinase assays

For each time point, 2 × 10⁶ Jurkat cells were resuspended in 1 ml media in the absence or presence of 1 µg/ml each of αCD3, αCD28 and αIgG for the indicated times at 37°C. Cells were pelleted and lysed in 1 ml IP lysis buffer (10 mM HEPES pH 7.9, 250 mM NaCl, 1% NP40, 1 mM EDTA, 50 µM DTT, 50 µM Na₃VO₄ and complete protease inhibitors) for 5 min at 4°C. Following removal of debris by centrifugation at 13 000 r.p.m. for 5 min at 4°C, 1 µg of αIKKα antibodies(sc-7218) were added and incubated at 4°C for 30 min. Subsequently, 10 µl bed of protein G–Sepharose (Amersham Pharmacia) was added and samples were rotated at 4°C for 1 h. Beads were washed twice with 1 ml IP lysis buffer, followed by a 1 ml wash with reaction buffer (10 mM HEPES pH 7.9, 5 mM MgCl₂, 1 mM MnCl₂, 12.5 mM β-glycerophosphate, 2 mM NaF, 50 µM DTT, 50 µM Na₃VO₄). Kinase reactions were initiated by adding 30 µl of reaction buffer plus 10 µM ATP, 5 µCi [γ-³²P]ATP and 1 µg of glutathione *S*-transferase–IκBα(1–62). After 30 min at 30°C, reactions were terminated with SDS–PAGE loading buffer, resolved on 12% SDS–PAGE gels, transferred to PVDF membranes and then exposed for quantitation using a Storm 860 PhosphorImager (Molecular Dynamics). Subsequently, membranes were western blotted using αIKKα antibody (sc-7606) to visualize the relative amount of IKK in each sample.

### Immunoprecipitations

For each time point, 4 × 10⁷ Jurkat cells were resuspended in 1.5 ml media in the absence or presence of 1 µg/ml each of αCD3, αCD28 and αIgG for the indicated times at 37°C. Cells were washed with 1 ml ice cold phosphate-buffered saline and lysed in 1 ml IP lysis buffer for 5 min at 4°C. Following removal of debris by centrifugation at 13 000 r.p.m. for

5 min at 4°C, 1 µg of αBcl10 (sc-5611) were added to 400 µl supernatant and incubated at 4°C for 1 h. Subsequently, 10 µl bed of protein G–Sepharose was added and samples were rotated at 4°C for 2 h. Beads were washed three times with 1 ml IP lysis buffer, boiled in SDS–PAGE loading buffer, resolved on 10% SDS–PAGE gels and transferred to PVDF membranes for western blotting with α-myc antibodies.

### RNA interference

Oligonucleotides were cloned into pSKKD1 (provided by X.F.Qin) to express the sihCARD11-1 and sihCARD11-2 hairpins downstream of the human H1 RNA promoter essentially as described (Brummelkamp *et al.*, 2002). The siRenLuc short hairpin RNA (provided by X.F.Qin) targets the sequence 5′-AAACATGCAGAAAATGCTG-3′. These constructs were cotransfected into Jurkat T cells with the appropriate reporters as described above.

### Supplementary data

Supplementary data are available at *The EMBO Journal* Online.

## Acknowledgements

We thank members of the Baltimore laboratory for helpful discussions and support, G.Nuñez for pc-FL-CIPER and J.Alberola-Ila, M.Boldin, L.Gammill, J.Kim, M.Laurent, M.Meffert, P.Sternberg and T.-M.Yi for critical reading of the manuscript. During the course of this work, J.L.P. was supported by a postdoctoral fellowship from the Helen Hay Whitney Foundation and is currently a Special Fellow of the Leukemia and Lymphoma Society. This work was supported by NIH grant AI42549-04.

## References

Akagi,T. *et al.* (1999) A novel gene, MALT1 at 18q21, is involved in t(11;18) (q21;q21) found in low-grade B-cell lymphoma of mucosa-associated lymphoid tissue. *Oncogene*, **18**, 5785–5794.

Alberola-Ila,J., Takaki,S., Kerner,J.D. and Perlmutter,R.M. (1997) Differential signaling by lymphocyte antigen receptors. *Annu. Rev. Immunol.*, **15**, 125–154.

Bertin,J., Wang,L., Guo,Y., Jacobson,M.D., Poyet,J.L., Srinivasula,S.M., Merriam,S., DiStefano,P.S. and Alnemri,E.S. (2001) CARD11 and CARD14 are novel caspase recruitment domain (CARD)/membrane-associated guanylate kinase (MAGUK) family members that interact with BCL10 and activate NF-κB. *J. Biol. Chem.*, **276**, 11877–11882.

Brummelkamp,T.R., Bernards,R. and Agami,R. (2002) A system for stable expression of short interfering RNAs in mammalian cells. *Science*, **296**, 550–553.

Condie,B.G., Brivanlou,A.H. and Harland,R.M. (1990) Most of the homeobox-containing Xhox 36 transcripts in early *Xenopus* embryos cannot encode a homeodomain protein. *Mol. Cell. Biol.*, **10**, 3376–3385.

Costello,P.S., Walters,A.E., Mee,P.J., Turner,M., Reynolds,L.F., Prisco,A., Sarner,N., Zamoyska,R. and Tybulewicz,V.L. (1999) The Rho-family GTP exchange factor Vav is a critical transducer of T cell receptor signals to the calcium, ERK and NF-κB pathways. *Proc. Natl Acad. Sci. USA*, **96**, 3035–3040.

Dimitratos,S.D., Woods,D.F., Stathakis,D.G. and Bryant,P.J. (1999) Signaling pathways are focused at specialized regions of the plasma membrane by scaffolding proteins of the MAGUK family. *BioEssays*, **21**, 912–921.

Doi,T.S., Takahashi,T., Taguchi,O., Azuma,T. and Obata,Y. (1997) NF-κB RelA-deficient lymphocytes: normal development of T cells and B cells, impaired production of IgA and IgG1 and reduced proliferative responses. *J. Exp. Med.*, **185**, 953–961.

Fujita,T., Shibuya,H., Hotta,H., Yamanishi,K. and Taniguchi,T. (1987) Interferon-β gene regulation: tandemly repeated sequences of a synthetic 6 bp oligomer function as a virus-inducible enhancer. *Cell*, **49**, 357–367.

Gaide,O., Martinon,F., Micheau,O., Bonnet,D., Thome,M. and Tschopp,J. (2001) Carma1, a CARD-containing binding partner of Bcl10, induces Bcl10 phosphorylation and NF-κB activation. *FEBS Lett.*, **496**, 121–127.

Gerondakis,S., Grossmann,M., Nakamura,Y., Pohl,T. and Grumont,R. (1999) Genetic approaches in mice to understand Rel/NF-κB and IκB function: transgenics and knockouts. *Oncogene*, **18**, 6888–6895.

Ghosh,S., May,M.J. and Kopp,E.B. (1998) NF-κB and Rel proteins:

evolutionarily conserved mediators of immune responses. *Annu. Rev. Immunol.*, **16**, 225–260.

Herndon,T.M., Shan,X.C., Tsokos,G.C. and Wange,R.L. (2001) ZAP-70 and SLP-76 regulate protein kinase Cθ and NF-κB activation in response to engagement of CD3 and CD28. *J. Immunol.*, **166**, 5654–5664.

Hettmann,T. and Leiden,J.M. (2000) NF-κB is required for the positive selection of CD8+ thymocytes. *J. Immunol.*, **165**, 5004–5010.

Kaech,S.M., Whitfield,C.W. and Kim,S.K. (1998) The LIN-2/LIN-7/LIN-10 complex mediates basolateral membrane localization of the *C.elegans* EGF receptor LET-23 in vulval epithelial cells. *Cell*, **94**, 761–771.

Karin,M. and Ben-Neriah,Y. (2000) Phosphorylation meets ubiquitination: the control of NF-κB activity. *Annu. Rev. Immunol.*, **18**, 621–663.

Kontgen,F., Grumont,R.J., Strasser,A., Metcalf,D., Li,R., Tarlinton,D. and Gerondakis,S. (1995) Mice lacking the c-*rel* proto-oncogene exhibit defects in lymphocyte proliferation, humoral immunity and interleukin-2 expression. *Genes Dev.*, **9**, 1965–1977.

Koseki,T., Inohara,N., Chen,S., Carrio,R., Merino,J., Hottiger,M.O., Nabel,G.J. and Nunez,G. (1999) CIPER, a novel NF-κB-activating protein containing a caspase recruitment domain with homology to Herpesvirus-2 protein E10. *J. Biol. Chem.*, **274**, 9955–9961.

Lucas,P.C., Yonezumi,M., Inohara,N., McAllister-Lucas,L.M., Abazeed, M.E., Chen,F.F., Yamaoka,S., Seto,M. and Nunez,G. (2001) Bcl10 and MALT1, independent targets of chromosomal translocation in malt lymphoma, cooperate in a novel NF-κB signaling pathway. *J. Biol. Chem.*, **276**, 19012–19019.

McAllister-Lucas,L.M. *et al.* (2001) Bimp1, a MAGUK family member linking protein kinase C activation to Bcl10-mediated NF-κB induction. *J. Biol. Chem.*, **276**, 30589–30597.

Morgan,J.A. *et al.* (1999) Breakpoints of the t(11;18)(q21;q21) in mucosa-associated lymphoid tissue (MALT) lymphoma lie within or near the previously undescribed gene MALT1 in chromosome 18. *Cancer Res.*, **59**, 6205–6213.

Naviaux,R.K., Costanzi,E., Haas,M. and Verma,I.M. (1996) The pCL vector system: rapid production of helper-free, high-titer, recombinant retroviruses. *J. Virol.*, **70**, 5701–5705.

Pomerantz,J.L. and Baltimore,D. (1999) NF-κB activation by a signaling complex containing TRAF2, TANK and TBK1, a novel IKK-related kinase. *EMBO J.*, **18**, 6694–6704.

Reed,J.C. (2000) Mechanisms of apoptosis. *Am. J. Pathol.*, **157**, 1415–1430.

Rothe,M., Sarma,V., Dixit,V.M. and Goeddel,D.V. (1995) TRAF2-mediated activation of NF-κB by TNF receptor 2 and CD40. *Science*, **269**, 1424–1427.

Ruland,J. *et al.* (2001) Bcl10 is a positive regulator of antigen receptor-induced activation of NF-κB and neural tube closure. *Cell*, **104**, 33–42.

Senftleben,U., Li,Z.W., Baud,V. and Karin,M. (2001) IKKβ is essential for protecting T cells from TNFα-induced apoptosis. *Immunity*, **14**, 217–230.

Sheng,M. (1996) PDZs and receptor/channel clustering: rounding up the latest suspects. *Neuron*, **17**, 575–578.

Sun,Z. *et al.* (2000) PKCθ is required for TCR-induced NF-κB activation in mature but not immature T lymphocytes. *Nature*, **404**, 402–407.

Voll,R.E., Jimi,E., Phillips,R.J., Barber,D.F., Rincon,M., Hayday,A.C., Flavell,R.A. and Ghosh,S. (2000) NF-κB activation by the pre-T cell receptor serves as a selective survival signal in T lymphocyte development. *Immunity*, **13**, 677–689.

Wang,L. *et al.* (2001) Card10 is a novel caspase recruitment domain/membrane-associated guanylate kinase family member that interacts with BCL10 and activates NF-κB. *J. Biol. Chem.*, **276**, 21405–21409.

Willis,T.G. *et al.* (1999) Bcl10 is involved in t(1;14)(p22;q32) of MALT B cell lymphoma and mutated in multiple tumor types. *Cell*, **96**, 35–45.

Woronicz,J.D., Gao,X., Cao,Z., Rothe,M. and Goeddel,D.V. (1997) IκB kinase-β: NF-κB activation and complex formation with IκB kinase-α and NIK. *Science*, **278**, 866–869.

Zhang,Q. *et al.* (1999) Inactivating mutations and overexpression of BCL10, a caspase recruitment domain-containing gene, in MALT lymphoma with t(1;14)(p22;q32). *Nat. Genet.*, **22**, 63–68.

*Received May 28, 2002; revised August 1, 2002;
accepted August 5, 2002*

# EXHIBIT 65

Cell, Vol. 49, 357–367, May 8, 1987, Copyright © 1987 by Cell Press

# Interferon-β Gene Regulation: Tandemly Repeated Sequences of a Synthetic 6 bp Oligomer Function As a Virus-Inducible Enhancer

Takashi Fujita, Hiroshi Shibuya, Haku Hotta,*
Kiyofumi Yamanishi, and Tadatsugu Taniguchi
Institute for Molecular and Cellular Biology
Osaka University
Yamadaoka 1-3
Suita-shi
Osaka 565, Japan

## Summary

Evidence is presented that virus-induced transcriptional activation of the human interferon-β gene is mediated by repeated sequence units each consisting of 6 bp. The repeated units are present in the region between −65 and −109 relative to the cap site. We chemically synthesized the "consensus" DNA sequence units and tested their ability to confer virus inducibility on cognate and noncognate promoters. Most of such sequence units when tandemly repeated indeed mediate virus-induced activation of the promoter sequences. The most efficient sequence unit, AAGTGA, contributes incrementally in virus-induced activation of transcription and manifests properties of an inducible enhancer. Evidence is also provided that suggests that interaction of a positive regulatory factor(s) with this regulatory region.

## Introduction

Interferons (IFNs) were originally defined as antiviral proteins (for reviews see Stewart, 1979; Lengyel, 1982; Weissmann and Weber, 1986). Among the three major species of IFNs (α, β, and γ), IFN-β is induced efficiently in fibroblasts by viruses and a synthetic double-stranded RNA, poly(I)-poly(C). Recently, attention has been focused on the role of IFN-β(s) as a regulator of cellular growth (Zullo et al., 1985; Kohase et al., 1986). The human IFN-β gene is intronless and exists in a single copy on human chromosome 9 (Ohno and Taniguchi, 1981; Houghton et al., 1981; Tavernier et al., 1981; Lawn et al., 1981).

We previously presented evidence that, as with the IFN-α genes (Ragg and Weissmann, 1983), induction of IFN-β by the above-mentioned inducers is mainly due to the transcriptional activation of the IFN-β gene, which is mediated by its 5′-flanking DNA sequences (Ohno and Taniguchi, 1983). Using the permanent transformation procedure, we also delimited DNA sequences involved in the induced gene expression in cultured mouse L929 cells (Fujita et al., 1985). The 5′ boundary of the DNA sequences required for the maximal induction of the IFN-β gene lies between nucleotides −117 and −105 with respect to the cap site (Fujita et al., 1985). Using various expression vector systems, Zinn et al. (1983) and Goodbourn

*Present address: The Wistar Institute, Philadelphia, Pennsylvania 19104.

et al. (1985) concluded that the 5′ boundary lies between −79 and −75 in mouse C127 cells (−77 and −73 by their numbering; for convenience, we use our numbering hereafter in this paper).

One of the interesting observations resulting from our study was that the level of induction of both human IFN-β mRNA and IFN-β activity in mouse L929 cells diminished in a stepwise manner as the 5′ deletion extended from −117 to downstream regions of the transfected gene (Fujita et al., 1985). We also noticed that this essential region basically consists of repeated hexanucleotide sequences that are quasi-contiguous to each other between −109 and −65. In view of these observations, we ascribed an incremental role to such unit sequences in gene induction, suggesting that each of the units constitutes an inducible regulatory sequence and that the induction level becomes higher as the number of such units increases (Fujita et al., 1985). Since DNA segments including this region function in either orientation (Fujita et al., 1985; Goodbourn et al., 1985), and from a distance under certain circumstances (Goodbourn et al., 1985), one may also postulate that such unit sequences are primarily responsible for the enhancer-like function of the DNA. To test directly whether or not such sequences account for the observed properties of the IFN-β gene regulatory region, we chemically synthesized the "consensus" hexamer sequences and studied their properties. The results presented here seem to support the views described above.

## Results

### Requirement of IFN-β 5′-Flanking Sequences for Viral Induction Identified in a Transient Expression System

For the present study, instead of using the time-consuming permanent transformation procedure, we developed a new transient expression system for the analysis of IFN-β gene regulatory sequences. A somewhat similar system has been successfully used by Goodbourn et al. (1985). We first linked the DNA segment of interest to the bacterial chloramphenicol acetyltransferase (CAT) gene and monitored the effect of the DNA sequence by measuring the CAT activity after virus induction. The cap site and level of the corresponding mRNA were also determined by S1 nuclease analysis (Berk and Sharp, 1977) (see below).

We first examined whether or not the 5′ border of the IFN-β gene sequence necessary for viral induction, as determined in the transient expression system, is compatible with our previous data. Figure 1 shows that the 5′ deletion mutant p-105cat is inducible by virus, but as the deletion proceeds to −93 (p-93cat) the level of CAT expression is dramatically reduced; with a deletion extending to −80, CAT activity becomes virtually nondetectable. The induced mRNA level reached about 7000 copies per cell in the case of p-105cat (see Experimental Procedures for the estimation of RNA copy number). Further-



**Figure 1. Expression of 5' Deletion Mutants in a Transient Expression System**

The basic structures of the 5' deletion IFN-β–CAT fusion genes are illustrated. Open blocks represent the repeated hexamer sequences present in the IFN-β 5'-flanking region (Fujita et al., 1985). TATA represents the consensus TATA box. The transcription initiation site of the IFN-β gene is indicated by an arrow (+1). L929 cells transfected with these genes were treated with culture medium (−) or were induced with NDV (+), and then CAT activities were measured (see Experimental Procedures).

more, essentially identical results with respect to the 5' sequence boundary were obtained by using a human amniotic cell line FL as the recipient and Newcastle disease virus (NDV) or Sendai virus or poly(I)-poly(C) as the inducer (results not shown). We also reached the same conclusion by applying a stable transformation assay to the same constructs in L929 cells (results not shown). Taken together with our previous data (Fujita et al., 1985),

```
                                                              IFN-β sequence
                                                    -55    -50      -40       -30
p-55cat   attaggaagcagcccagtagtaggttgaggccgttgagcaccgccgccgcaaggaatggtgcaGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          taatccttcgtcgggtcatcatccaactccggcaactcgtggcggcggccgttccttaccacgtctagGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C1    gggttgaaggctctcaagggcatcggTCGAAGTGAAAGTGAAAGTGAAAGTGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          cccaacttccgagagttcccgtagccagcctTCACTTTCACTTTCACTTTCACTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C2    gggttgaaggctctcaagggcatcggTCGAAATGAAAATGAAAATGAAAATGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          cccaacttccgagagttcccgtagccagctTTACTTTTACTTTTACTTTTACTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C3    gggttgaaggctctcaagggcatcggTCGAAGCGAAAGCGAAAGGCGAAAGGCGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          cccaacttccgagagttcccgtagccagctTCCCTTTCCCTTTCCCTTTCCCTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C4    gggttgaaggctctcaagggcatcggTCGAAAGGAAAAGGAAAAGGAAAAGGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          cccaacttccgagagttcccgtagccagctTCCCTTTTCCTTTTCCTTTTCCTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C5    ctgactgggttgaaggctctcaagggcatcggTCGAAATAAATGAAATGAAATAAATGAAAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          gactgaccccaacttccgagagttcccgtagccagctTTCTTTTCTTTTCTTTTCTTTTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C13   ctgactgggttgaaggctctcaagggcatcggTCGAAGTGAAAGTGAAAGTGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          gactgaccccaacttccgagagttcccgtagccagctTCACTTTCACTTTCACTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C12   aagggagctgactgggttgaaggctctcaagggcatcggTCGAAGTGAAAGTGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          ttcctcgactgacccaacttccgagagttcccgtagccagctTCACTTTCACTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT

p-55C1A   catcggTCGACCAGCTTGGGCTGCAGGTCGAAGTGAAAGTGAAAGTGAAAGTGAGACTCTAGAGGATCCGCTGAATAGAGAGAGGACCATCTCATATAAA
          gtagccagctGGTCGAACCCGACGTCCAGTTCACTTTCACTTTCACTTTCACTCTGAGATCTCCTAGGCGACTTATCTCTCTCCTGGTAGAGTATATTT
```

**Figure 2. Structures of Plasmid Constructs Containing Synthetic Oligomers**

The essential part of the DNA sequence of representative plasmid constructs is shown. Sequences in lowercase letters represent the vector pA10cat2. Large capitals represent synthetic sequences. Small capitals represent sequences from pSE-55 (see Experimental Procedures). Numbers indicate nucleotide positions relative to the IFN-β cap site.



Figure 3. The Synthetic Oligomer Sequences Render the IFN-β Promoter Virus-Inducible

The various IFN–CAT fusion genes (see also text for details) were transfected into L929 cells. Cells were induced by NDV (+) or were mock-induced (−), and CAT expression was measured. CAT activity indicated is the mean value from duplicate transfections.

these results show that essentially the same DNA sequences appear to be involved in induction in both the transient and stable transformation assays.

**Synthetic Hexamer Blocks Confer Viral Inducibility on a Truncated, Inert IFN-β Promoter**

The above findings prompted us to explore the functional role of the repeated sequences in viral induction by applying the transient assay. We first synthesized four DNA oligomers, each of which consisted of tandem repeats of one of the consensus sequences described previously (Fujita et al., 1985) (Figure 2). We then placed each of them upstream of an IFN-β promoter–CAT fusion gene, which itself is transcriptionally inactive (p-55cat, Figure 2). As shown in Figure 3, a tandem fourfold repeat of each of the hexanucleotide oligomers synthesized (except AAAGGA) conferred viral inducibility on p-55cat, albeit with different efficiencies. As in the case of the natural IFN-β sequence, CAT expression was undetectable in our assay if cells were not induced. The unit sequence AAGTGA was the most efficient, and the resulting expression level (gene p-55C1) was slightly lower than that of the deletion mutant p-105cat, which retained six blocks of the repeated units as judged by CAT activity (results not shown) and S1 analysis (see below). The single-base transitions AAGTGA to AAATGA and AAGGGA to AAAGGA resulted in 2-fold and more than 5-fold reductions, respectively, in the level of induced CAT activity. Even greater reductions were observed with nucleotide transversions: AAGTGA to AAGGGA and AAATGA to AAAGGA reduced the induction levels 6-fold and more than 15-fold, respectively. The different efficiencies of those oligomers have been reproducibly observed in this assay system. A simple purine-rich sequence, GAAA, which appears several times in the 5′ regulatory region of the human IFN-α and

IFN-β genes, failed to activate the distal CAT gene to a detectable level even when it was repeated seven times. The transcription initiation sites of these genes were confirmed by S1 mapping (see below). Since the repeat of the sequence AAGTGA gave rise to the highest induction level in our assay system, further work was focused on the properties of this sequence.

**Effect of Repeat Number, Orientation, and Location of the Synthetic Hexamer**

Next, we examined the effect of the repeat number and orientation of the oligomer AAGTGA on the induced gene expression. While a twofold repeat of AAGTGA (p-55C12) was insufficient to sustain the inducibility in this assay system, increase of the repeat number to three (p-55C13) resulted in low-level induction of the CAT gene (Figure 4A). Further increase (10-fold) of the induced CAT expression was observed by increasing the repeat number to four (p-55C1; Figure 4A). Thus the synthetic oligomer contributes incrementally to the inducibility of the hybrid gene. The inducibility peaked with the eightfold repeat of the oligomer (Figure 4B), and further repeat units (up to 12) did not alter the level of CAT gene induction (data not shown). The eightfold hexamer repeat also mediated virus-induced CAT gene expression when the same hybrid gene was introduced into host chromosomes of L929 cells (data not shown). As shown in Figure 4B, the oligomer operates in either orientation, although the efficiency of induction seems to be reduced when the oligomer is placed in the opposite orientation relative to the promoter sequence. To test whether the DNA segment can confer inducibility when it is placed at a distance from the promoter sequence, we introduced the oligomer consisting of the eight contiguous hexamers in either orientation at position +1630 of p-55cat and p-80cat (Figure 5). Al-



Figure 4. Synthetic Oligomer-Sequences Function in Either Orientation and Contribute Incrementally to Viral Induction
The IFN–CAT fusion genes indicated were transfected into L929 cells, and the CAT expression level was measured after cells were induced with NDV (+) or were mock-induced (−). Hatched blocks represent the AAGTGA repeat, and arrows indicate its orientation.

though the induction level was low, the synthetic block in either orientation mediated the induced expression of the CAT gene in p-80cat. Taken together, the data indicate that the oligomer displays the properties of an inducible enhancer. Interestingly, the block placed at the same position failed to induce CAT gene expression in a more extensively truncated deletion mutant, p-55cat. Hence, the presence of some of the repeat unit sequences (p-80cat contains two, and one of them is AAGTGA) or some other

sequence elements seems to be necessary to allow the function of the oligomer placed distal to the promoter in this expression system.

### A Hexamer Repeat Renders a Heterologous Promoter Virus-Inducible

To characterize further the properties of the hexamer sequence repeat, we constructed another set of chimeric genes, as depicted in Figure 6. In those constructs the



Figure 5. Effect of Distance on the Effect of the Synthetic Oligomer Repeats

The indicated IFN–CAT fusion genes, each containing the oligomer repeat at a large distance from the IFN-β promoter, were transfected into L929 cells. Cells were induced (+) or mock-induced (–), and CAT expression was measured.

DNA segment comprising the promoter (including TATA sequence) and cap site of the IFN-β gene was replaced by that of the human interleukin-2 (IL-2) gene (−81 to +51 from the cap site) (Fujita et al., 1986). Expression of the IL-2 gene is restricted to antigen- or lectin-activated T lymphocytes. The IL-2 promoter DNA segment that we used here is not functional per se unless activated by an additional DNA sequence (Fujita et al., 1986). When the hex-

amer repeat sequence was linked to the IL-2 sequence (pIL2C1A, pIL2C1B), the resulting hybrid genes became virus-inducible. As expected, doubling the number of hexamers resulted in a higher induction level of the CAT gene (about 4-fold), transcription of which started from the IL-2 gene cap site (see below). We also observed that induction was below the detectable level (<0.2% CAT acetylation) if the number of repeats was less than four (results



Figure 6. The Synthetic Oligomer Repeat Renders the IL-2 Promoter Virus-Inducible

The fusion genes illustrated were transfected into L929 cells. After cells were induced with NDV (+) or were mock-induced (–), the expressed CAT activities were determined. Arrows indicate the transcription initiation site of the human IL-2 gene.



**A**

Probe p-105cat p-93cat p-80cat p-66cat p-55cat p-55C1A p-55C1B p-55C1C p-55C1D Marker

Induction   − + − + − + − + − + − + − + − + − + − +

Correct mRNA ►

**B**

Probe pIL2-81cat pIL2C1A pIL2C1B No DNA Marker

Induction   −   +   −   +   −   +   −   +

Correct mRNA ►

Figure 7. S1 Mapping Analysis of the Various IFN–CAT Fusion Gene Transcripts

Mouse L929 cells were transfected with IFN–CAT fusion genes (A) or IL-2–CAT fusion genes (B). Cells were induced with NDV (+) or were mock-induced (−). Cytoplasmic RNA extracted 10 hr after induction (40 μg per lane) was subjected to the S1 mapping analysis. Arrows indicate positions of the protected probes corresponding to the correctly initiated mRNAs (A, 170 nucleotides; B, 205 nucleotides). In (A) the probe used for the analysis was 265 nucleotides; in (B) the probe was 286 nucleotides. Size markers were denatured $^{32}$P-labeled HaeIII fragments of pBR322; in (A) the DNA fragments were 234, 213, 192, 184, and 124 nucleotides, and in (B) the DNA fragments were 267, 234, 213, 192, and 184 nucleotides.

not shown). Again, the block did not lead to constitutive expression of the gene.

**Initiation Site and Level of the RNA Transcript**

In the series of experiments described above, the performance of the synthetic oligonucleotides linked to either the human IFN-β promoter or the human IL-2 promoter was determined by quantitating enzymatic activity of the CAT gene product. It was therefore important to demonstrate that the oligonucleotides indeed mediated the virus-induced activation of mRNA transcription from the legitimate initiation sites of the IFN-β and IL-2 genes. We then carried out qualitative and quantitative analysis, by S1 nuclease protection, of the mRNA produced by some of the above-described gene constructs. As shown in Figures 7A and 7B, the induction-specific RNA transcripts seem to be generated from the cap sites of the IFN-β and IL-2 genes, as judged by the sizes of the protected bands; as expected, the levels of such transcripts are correlated with the respective CAT enzyme activities described above. Thus, the incremental properties of the hexamer AAGTGA were confirmed by the S1 analysis. The induced

mRNA level was approximately 7000 copies per cell in the case of p-105cat and 1300 copies per cell in the case of pIL2C1B (see Experimental Procedures). The induced RNA copy number in the stable transformants, which contain several copies of the introduced IFN-β gene, is about 300 (Fujita et al., 1985). Although we do not know the copy number of the introduced gene in the transient assay, it is likely that the gene-dosage effect mainly accounts for the difference in the induced RNA copy number between the two assay systems. The superhelical nature of the transfected DNA in this assay may also contribute to augmenting the induction level (Weintraub et al., 1986). The somewhat lower level of CAT activity relative to the mRNA level in the case of pIL2C1B as compared with p-55C1B (see Figures 4B, 6, 7A, and 7B) may be explained as follows. The genes were constructed in such a way that CAT protein synthesis would initiate from the ATG codon of the IL-2 gene in pIL2C1B, whereas the synthesis would start from its own ATG in p-55C1B, and this difference may affect CAT activity in one way or the other (Fujita et al., 1986). Although we have not analyzed transcripts of all the gene constructs, it seems likely in view of these findings



Figure 8. Interaction of a Positive Regulatory Factor with the IFN-β Regulatory Sequence

(A) Construction of competitor plasmids (see Experimental Procedures). (B) Reporter plasmid is p-105cat, and competitor plasmid is pMLC1B. (C) Reporter plasmid is p-105cat, and competitor plasmid is pML-125/−38. (D) Reporter plasmid is pRSVcat (Gorman et al., 1982), and competitor plasmid is pMLC1B.

For (B)–(D) reporter plasmid (0.1 μg) and the indicated ratio of carrier and competitor plasmids (5 μg) were cotransfected into 6 × 10⁶ COS7 cells, and NDV-induced (closed circles) or mock-induced (open circles) CAT gene expression was monitored (for details see Experimental Procedures). The induced expression level of p-105cat without competitor (4% acetylation) was taken as 100% in (B) and (C). pRSVcat expression in the absence of competitor (7% acetylation) was taken as 100% in (D).

that the rest of the gene transcripts also contain the legitimate cap site.

## Cellular Factors Affecting the IFN-β Gene Regulatory Sequences

We next examined whether or not the IFN-β regulatory sequence or the synthetic hexamer interacts with positive or negative cellular factor(s) by using the following strategy. We placed either the natural regulatory sequence (−105 to −39) or the synthetic hexamer repeat sequence into the vector pMLRIIG, which contains the SV40 ori sequence (Figure 8A; Lusky and Botchan, 1981). The resulting plasmids were each cotransfected with p-105cat into COS7 cells. Interestingly, a significant level of constitutive expression of p-105cat became detectable, and virus induction resulted in only about a 3-fold increase in CAT expression in this transient assay (Figures 8B and 8C). This unique observation may be taken as an indication that this T-antigen-expressing cell line is in a "partially induced" state (see Discussion). Similar observations have been made previously by Tavernier et al. (1983). As shown in Figures 8B and 8C, an increased level of competitor DNA carrying the hexamer repeat or the natural regulatory sequence resulted in a strong inhibition of both induced and noninduced p-105cat expression, whereas no significant inhibition was observed in the case of a control gene, pRSVcat (Figure 8D).

## Discussion

We have previously shown (Fujita et al., 1985) that the 5′ boundary of the DNA sequences required for virus-

induced transcription of the human IFN-β gene lies between −117 to −105; we used mouse L929 cells transformed with various 5′ deletion mutants each integrated into the host chromosomes via the vector pSV2gpt (Mulligan and Berg, 1981). We observed that a deletion from −117 to −105 resulted in a marginal decrease in the induction level, whereas the level was reduced dramatically with a deletion extending to −93 (Fujita et al., 1985). We demonstrated in the present study that essentially the same sequences are required when the assay is carried out in a transient expression system. We also reached essentially the same conclusion by studying the induction of the same gene constructs when they have been stably introduced into the chromosomes of L929 cells (data not shown). Taken together, the data suggest that the transient induction of the transfected gene occurs essentially by the same mechanism as the induction of the gene integrated in the host chromosomes.

We suggested previously that the 5′-flanking region contributes incrementally to virus inducibility (Fujita et al., 1985). We also noted that the essential upstream region of the IFN-β gene consists of tandem quasi-repeats of homologous hexamer sequences. Thus our working hypothesis in the present study was that such hexamers would function as an essential unit and would contribute incrementally in functioning as a virus-inducible activator or enhancer. The results presented here support our previous suggestion that the hexameric sequence units account for the incremental contribution of the 5′-flanking region to virus-induced IFN-β gene expression. Incremental contribution of somewhat longer repetitive DNA sequences has also been reported in the promoter-en-

hancer regions of the metallothionein-I and *hsp70* genes and of SV40 (Stuart et al., 1985; Bienz and Pelham, 1986; Herr and Clarke, 1986).

Although we tested in this study the properties of "consensus" hexamer sequences and have not yet tested all of the hexamer sequences that are actually present within the region of interest, it is likely from our results (Figure 3) that most of the hexamers will be functional, albeit with various efficiencies. Interestingly, a comparison of the human and mouse IFN-β genes shows that AAGTGA ($-76$ to $-71$) of the human gene is replaced by the sequence AACTGA in the mouse gene; this hexamer sequence is also present at positions $-89$ to $-84$ of the human gene (T. Kuga and T. T., unpublished data). Since the presence of a pyrimidine residue within the hexamer seems to increase the efficiency of induction (Figure 3), the hexamer ATAGGA ($-96$ to $-91$) is likely to be functional while the consensus sequence (AAAGGA) is not. Also, as shown in Figure 7A, the hexamer AAGTGA, tandemly repeated eight times, seems to induce the IFN–CAT mRNA at an efficiency similar to that of the natural IFN-β gene upstream sequence (p-105cat). We do not know at present whether or not the contiguity of the hexamers is essential for function. At present, the possibility cannot be ruled out that fewer hexamer repeats in certain, possibly integral, helical DNA turns is sufficient to confer virus inducibility. Nor do we know whether a hexamer sequence such as AAGTGA per se is important for the conjectured interaction with cellular factors, since the report would also create five other repeated hexameric sequences: AGTGAA, GTGAAA, TGAAAG, GAAAGT, and AAAGTG. For these sequences, the number of actual repeats would decrease from four to three and from eight to seven in p-55C1A and p-55C1B, respectively. Recently, using a gel retardation method, we identified a cellular factor(s) that specifically interacts with the hexamer repeat. The binding of such a factor(s) is specifically competed out by the IFN-β upstream DNA sequences (T. F. and T. T., unpublished data). Thus, further studies such as footprint analyses may provide answers to the points raised above.

We have presented evidence that the hexamer repeat has the properties of an inducible enhancer (Figures 4, 5, and 6). It is interesting that the hexamer repeat induced CAT expression at a distance in p-80cat, in which two of the hexameric blocks (AAGTGA and AAGTGG) of the natural IFN-β gene sequence are still retained, whereas it failed to induce p-55cat, which lacks all of such blocks (Figure 5). We envisage the cooperative effect of the DNA sequences present upstream and downstream of the gene. Such cooperativity may be explained by a "looping model," such as the one put forth by Ptashne and his colleagues, in which the cellular factor(s) interacting with specific DNA sequences will interact at a distance (see Ptashne, 1986, for review).

Although little is known at present about the factor(s) that controls the induction-specific transcription of the IFN-β gene, the results of the competition experiments (Figure 8) strongly suggest the presence of a positive regulatory factor(s) that selectively interacts with the synthetic hexamer repeat as well as with the natural regulatory sequences of the IFN-β gene. It is well known that induction of IFN-β gene transcription does not require de novo protein synthesis (Fujita and Kohno, 1981; Raj and Pitha, 1981). An intriguing possibility is that the preexisting cellular factor(s) goes through a qualitative alteration such as phosphorylation upon induction so that the inactive form becomes the active form for mRNA transcription. A similar mechanism has been postulated for the heat shock transcription factor of Drosophila *hsp70* (Parker and Topol, 1984) and for the *trans*-activation by adenovirus E1A (Kovesdi et al., 1986). Since transfection of p-105cat into COS7 cells results in significant constitutive expression of the CAT gene without induction, such a factor(s) might be partly in the active form within the total population in this cell line. Interestingly, the critical 5' boundary of the DNA sequences required for constitutive expression of the IFN-β gene, in the autoreplicative vector pMLRIIG introduced into COS7 cells, also lies between $-105$ and $-93$ (S. Ohno and T. T., unpublished data). In contrast to our findings that the critical 5' boundary for IFN-β gene induction lies between $-105$ and $-93$ in L929 and FL cells, Maniatis and his colleague have found that the boundary lies between $-79$ and $-75$ in several cell lines tested but not in HeLa cells, where the result is essentially very similar to ours (Zinn et al., 1983; Fujita et al., 1985; Goodbourn et al., 1986; this study; T. Maniatis, personal communication). Such a difference can be explained by assuming that the cellular factor(s) may be present in a different state either quantitatively or qualitatively (or both) depending on the cell line; the sequence requirement would therefore depend on the state of the factor(s). Further work will be required to clarify this issue.

While this work was in progress, Goodbourn et al. (1986) reported that the inducible enhancer of the IFN-β gene is under negative control. By constructing a chimeric gene consisting of an IFN-β DNA segment ($-79$ to $-57$) and a thymidine kinase promoter sequence, they showed that the IFN-β gene segment causes the otherwise inactive (or very weak) promoter to be in a constitutively active state. Moreover, they provided evidence that such a constitutive element is repressed by a negative regulatory element. In this regard, Ryals et al. (1985) previously reported that a 46 bp DNA segment in the 5'-flanking region of the IFN-α1 gene functions as a positive control element in inducer-responsive IFN gene expression. Evidence for the presence of negative and positive regulatory sequence elements in the upstream region of the IFN-β gene was also obtained by Collins and his colleagues (J. Collins, personal communication). In our assay system, we could not identify any negative regulatory sequence element(s) that needs to be derepressed by virus induction within the IFN-β promoter ($-66$ to downstream) (Fujita et al., 1986; Maruyama et al., 1987; our unpublished observations). Hence, we would be in favor of referring to the region as a "silent promoter" that is readily activated by either cognate or noncognate enhancers or activators independently of viral induction (Maruyama et al., 1987), as previously shown by Ryals et al. (1985) with an IFN-α gene.

Our results presented here do not rule out the possibili-

Table 1. Hexanucleotide Sequences Homologous to
the Repeated Blocks of the IFN-β Gene

| Gene | Sequence | Position (from Cap Site) | Reference[a] |
|---|---|---|---|
| IFN-α₁1 | AAGGAA | −100 to −95 | Ryals et al. (1985) |
| | AACAGA | −88 to −83 | |
| | AAGTGG | −76 to −71 | |
| | AAGTGG | −54 to −49 | |
| IFN-α₁1 | AAATGA | −99 to −94 | Capon et al. (1985) |
| | AACTGA | −80 to −75 | |
| | AATGTT | −63 to −58 | |
| | AAATGA | −53 to −48 | |
| TNF-α | GAGTGA | +606 to +611 | Nedwin et al. (1985) |
| | GAATGA | +611 to +616 | |
| | GAATGA | +615 to +620 | |
| | GAGTGA | +619 to +624 | |
| | GAATGA | +623 to +628 | |
| | GAGTGA | +627 to +632 | |

[a] Source of sequence data.

ity that the function of the hexamer repeat is under nega-
tive control. In this regard, we observed that the SV40 en-
hancer placed just upstream of the hexamer sequence of
p-55C1B failed to exert its effect on distal CAT gene ex-
pression unless the recipient cells were induced by virus,
whereas the enhancer efficiently activated the distal CAT
gene without induction when placed just upstream of the
IFN-β promoter sequence of p-55cat (unpublished re-
sults). Similar results have been obtained by Kuhl and
Weissmann (C. Weissmann, personal communication).
These observations imply that either the hexamer itself or,
more likely, a negative protein factor bound to it may pre-
vent the function of the viral enhancer. However, even if
operative, such a mechanism would differ from the mech-
anism proposed by Goodbourn et al. (1986) in view of the
proposed DNA sequences required as an essential part
of such a negative element (region −57 to −38), since the
sequences do not correspond to the hexamer repeat re-
gion. Moreover, the hexamer repeat confers virus induc-
ibility on the IFN-β and IL-2 promoters in our expression
system. Hence, at present, we have no indication that the
hexamer repeats act as constitutive enhancer elements.
However, we cannot rule out the possibility that the repeat
mimics a constitutive element in certain cells. The results
presented in Figure 8 suggest that the hexamer repeat
may function as a constitutive enhancer in COS7 cells or
other virus-transformed cells. On the other hand, the
differences between our results and those of Goodbourn
et al. (1986) might be explained as follows: The DNA (−79
to −57) segment they use contains a sequence element
that resembles the SV40 enhancer core sequence (−68 to
−61; Goodbourn et al., 1986), and this element may be a
part of the constitutive enhancer describd by them. These
possibilities need to be further investigated.

Recent studies on other cytokine genes have revealed
that cytokines such as tumor necrosis factors (TNFs) are
also induced by viruses (Wong and Goeddel, 1986). In-
duction of IFNs and/or related proteins by growth factors

such as platelet-derived growth factor, TNF-α, and IL-2
has been reported, and these observations are of particu-
lar interest in understanding the mechanism of cell growth
control, since the IFNs have also been known as regula-
tors of cell growth (Zullo et al., 1985; Kohase et al., 1986;
Torres et al., 1982; J. Vilček, personal communication).
The hexamer-like sequences are also dispersed within
the genomes of IFN-α and TNF-α (Table 1). Thus, they may
also play a role in the expression of these genes, and elu-
cidation of the molecular mechanism of IFN-β gene ex-
pression may give us insight into the control of cell growth
as well.

**Experimental Procedures**

**Construction of Plasmids**
Essentially all constructions were done according to general proce-
dures (Maniatis et al., 1982). Various lengths of the 5′-flanking se-
quence of the human IFN-β gene were excised from pSE plasmids
(Fujita et al., 1985) by digestion with BamHI (at the 5′ deletion end) and
TaqI (at +19). After each TaqI site was converted to a HindIII site, the
fragments were introduced into the BglII and HindIII sites of pA₁₀cat₂
(Rosenthal et al., 1983) to generate p-105cat, p-93cat, p-80cat, p-66cat,
and p-55cat.

The DNA sequences shown in Figure 2 were chemically synthe-
sized. These synthetic DNAs were each ligated with SalI- and HindIII-
cleaved pA₁₀cat₂ and the BamHI–HindIII(TaqI) fragment from pSE-55
(Fujita et al., 1985) and were cloned into Escherichia coli to generate
p-55C1, p-55C13, p-55C12, p-55C2, p-55C3, p-55C4, and p-55C5. The
structures of the essential regions of these constructs are shown in Fig-
ure 2. The sequences 5′-(AAGTGA)₄-3′ and 5′-(TCACTT)₄-3′ were also
chemically synthesized and were then cloned into the HincII site of
M13mp11. Clones containing various copy numbers and different
orientations of the hexamer repeats were constructed. The cloned hex-
amer repeats were each excised by digestion with BamHI and HindIII.
After each HindIII site was converted to a SalI site, the fragments were
ligated with SalI- and HindIII-digested pA₁₀cat₂ and the BamHI–
HindIII(TaqI) fragment of pSE-55 to generate clones p-55C1A, p-55C1B,
p-55C1C, and p-55C1D.

To obtain pIL2C1A and pIL2C1B, fragments containing the repetitive
hexamer were excised from recombinant M13 phage RF DNA by XbaI
and HindIII, and the HindIII site was subsequently converted to a SalI
site. The fragments were ligated with SalI- and HindIII-digested
pA₁₀cat₂ and the XbaI–HindIII fragment of pIL2-81cat (Fujita et al.,
1986; the human IL-2 gene 5′-flanking region −81 to +51) and were
cloned in E. coli. Plasmids p-55C1E, p-55C1F, p-80C1E, and p-80C1F
were constructed in a similar manner by excising the hexamer repeat
sequences and introducing them into either p-55cat or p-80cat (see
Figure 5).

The constructions pML-125/−38 and pMLC1B are illustrated in Fig-
ure 8A. The IFN-β 5′-flanking sequence was excised from pSE-125 (Fuji-
ta et al., 1985) by BamHI (−125) and AvaII (−38). After the AvaII site
was converted to a BamHI site, the fragment was inserted into
pMLRIIG (Lusky and Botchan, 1981) to produce pML-125/−38. A DNA
fragment containing eight contiguous repeats of oligomer (AAGTGA)
was excised by BamHI and SalI from p-55C1B and was inserted into
BamHI- and SalI-digested pMLRIIG to produce pMLC1B.

**DNA Transfection and Induction of Gene Expression**
DNA transfection was performed by the DEAE dextran method as de-
scribed previously for L929 cells (Fujita et al., 1986).

For in vivo competition experiments, 6 × 10⁵ COS7 cells in a 10 cm
dish were treated with 5 ml of TBS buffer (Fujita et al., 1986) containing
0.1 µg reporter plasmid, 5 µg of carrier plus competitor plasmids, and
500 µg/ml DEAE dextran at 37°C; cells were then washed
and treated with chloroquine (150 µM) for 3 hr. Cells were further cul-
tured for 48 hr and were subsequently induced by NDV or were mock-
induced for CAT gene expression.

IFN induction was performed by NDV, Sendai virus, or poly(I)-
poly(C) as described elsewhere (Fujita et al., 1985).

**CAT Enzyme Assay**

Cells were harvested 12 hr after NDV induction for the CAT enzyme assay. Preparation of extracts and the enzyme assay were carried out as described previously (Fujita et al., 1986).

**S1 Mapping Analysis**

S1 nuclease analysis was performed exactly as described previously for analysis of IFN–CAT and IL-2–CAT fusion mRNAs (Fujita et al., 1986).

Plasmids p-105cat and pIL2C1B were each transfected into L929 cells as above, and after NDV induction the specific RNA transcripts were quantitated by S1 mapping as follows. The S1-protected DNA segments were each subjected to 6% polyacrylamide–6 M urea gel analysis and were run in parallel with the undigested DNA probe (1 $\mu$g of single-stranded carrier DNA was included in each sample to minimize the loss of DNA during gel electrophoresis). The intensity of the bands was compared with that of the undigested probe by densitometric analysis of the gel autoradiograph, and the radioactivity of the diagnostic bands was estimated as follows: radioactivity of the protected band = (input radioactivity of the undigested probe) × (intensity of the protected band)/(intensity of the undigested probe). Thus, the estimated radioactivities of the S1-protected bands were 1350 cpm and 257 cpm for p-105cat- and pIL2C1B-transfected cells, respectively (1). The specific radioactivity was $1 \times 10^{-5}$ cpm per molecule for both the IFN–CAT and IL-2–CAT probes (2). Since total RNA was isolated from $2 \times 10^6$ cells for S1 analysis, and transfection efficiency using our protocol is about 1%, estimated by the Tac (IL-2 receptor)–positive L929 cell population after transfection of pSVIL2R-3 (Hatakeyama et al., 1985), the transfected cell number should be about $2 \times 10^4$ cells (3). Thus, CAT mRNA copy number per transfected cell is calculated by (1)/[(2) × (3)]. Accordingly, the RNA copy number of p-105 cat is 6750 copies per cell, and the RNA copy number of pIL2C1B is 1259 copies per cell. We cannot strictly rule out the possibility that the number of transfected cells expressing the CAT mRNA is higher than the number of transfected cells expressing a detectable level of IL-2 receptor. If this is the case, the mRNA copy number per transfected cell is overestimated.

**Acknowledgments**

We thank Drs. C. Weissmann, T. Maniatis, and J. Vilček for invaluable advice and discussion. We also thank Drs. S. Itoh, M. Sato, Y. Eguchi, and Ms. K. Yamamoto for the preparation of chemically synthesized DNAs. We also thank Dr. E. L. Barsoumian for valuable comments and Ms. M. Nagatsuka for her excellent assistance. This work was supported in part by a grant-in-aid for Special Project Research, Cancer-Bioscience, from the Ministry of Education, Science, and Culture of Japan.

The costs of publication of this article were defrayed in part by the payment of page charges. This article must therefore be hereby marked *"advertisement"* in accordance with 18 U.S.C. Section 1734 solely to indicate this fact.

Received August 21, 1986; revised January 2, 1987.

**References**

Berk, A. J., and Sharp, P. A. (1977). Sizing and mapping of early adenovirus mRNAs by gel electrophoresis of S1 endonuclease-digested hybrids. Cell *12*, 721–732.

Bienz, M., and Pelham, H. R. B. (1986). Heat shock regulatory elements function as an inducible enhancer in the Xenopus *hsp70* gene and when linked to a heterologous promoter. Cell *45*, 753–760.

Capon, D., Shepard, H., and Goeddel, D. (1985). Two distinct families of human and bovine interferon-$\alpha$ genes are coordinately expressed and encode functional polypeptides. Mol. Cell. Biol. *5*, 768–779.

Fujita, T., and Kohno, S. (1981). Studies on interferon priming: cellular response to viral and nonviral inducers and requirement of protein synthesis. Virology *112*, 62–69.

Fujita, T., Ohno, S., Yasumitsu, H., and Taniguchi, T. (1985). Delimitation and properties of DNA sequences required for the regulated expression of human interferon-$\beta$ gene. Cell *41*, 489–496.

Fujita, T., Shibuya, H., Ohashi, T., Yamanishi, K., and Taniguchi, T. (1986). Regulation of human interleukin-2 gene: Functional DNA sequences in the 5′ flanking region for the gene expression in activated T lymphocytes. Cell *46*, 401–407.

Goodbourn, S., Zinn, K., and Maniatis, T. (1985). Human $\beta$-interferon gene expression is regulated by an inducible enhancer element. Cell *41*, 509–520.

Goodbourn, S., Burstein, H., and Maniatis, T. (1986). The human $\beta$-interferon gene enhancer is under negative control. Cell *45*, 601–610.

Gorman, C., Merlino, G., Willingham, M., Pastan, I., and Howard, B. (1982). The Rous sarcoma virus long terminal repeat is a strong promoter when introduced into a variety of eukaryotic cells by DNA-mediated transfection. Proc. Natl. Acad. Sci. USA *79*, 6777–6781.

Hatakeyama, M., Minamoto, S., Uchiyama, T., Hardy, R., Yamada, G., and Taniguchi, T. (1985). Reconstitution of functional receptor for human interleukin-2 in mouse cells. Nature *318*, 467–470.

Herr, W., and Clarke, J. (1986). The SV40 enhancer is composed of multiple functional elements that can compensate for one another. Cell *45*, 461–470.

Houghton, M., Jackson, I. J., Porter, A. G., Doel, S. M., Galtin, G. A., Barber, C., and Carey, N. H. (1981). The absence of introns within a human fibroblast interferon gene. Nucl. Acids Res. *9*, 247–266.

Kohase, M., Henriksen-DeStefano, D., May, L. T., Vilček, J., and Sehgal, P. B. (1986). Induction of $\beta_2$-interferon by tumor necrosis factor: a homeostatic mechanism in the control of cell proliferation. Cell *45*, 659–666.

Kovesdi, I., Reichel, R., and Nevins, J. R. (1986). Identification of a cellular transcription factor involved in E1A *trans*-activation. Cell *45*, 219–228.

Lawn, R. M., Adelman, J., Franke, A. E., Houck, C. M., Gross, M., Anajarian, R., and Goeddel, D. (1981). Human fibroblast interferon gene lacks intron. Nucl. Acids Res. *9*, 1045–1052.

Lengyel, P. (1982). Biochemistry of interferons and their actions. Ann. Rev. Biochem. *51*, 251–282.

Luskey, M., and Botchan, M. (1981). Inhibition of SV40 replication in simian cells by specific pBR322 DNA sequences. Nature *293*, 79–81.

Maniatis, T., Fritsch, E. F., and Sambrook, J. (1982). Molecular Cloning: A Laboratory Manual. (Cold Spring Harbor, New York: Cold Spring Harbor Laboratory).

Maruyama, M., Shibuya, H., Harada, H., Hatakeyama, M., Seiki, M., Fujita, T., Inoue, J.-I., Yoshida, M., and Taniguchi, T. (1987). Evidence for aberrant activation of the interleukin-2 autocrine loop by HTLV-1-encoded p40$^x$ and T3/Ti complex triggering. Cell *48*, 343–350.

Mulligan, R. C., and Berg, P. (1981). Selection for animal cells that express the *Escherichia coli* gene coding for xanthine-guanine phosphoribosyltransferase. Proc. Natl. Acad. Sci. USA *78*, 2072–2076.

Nedwin, G., Naylor, S., Sakaguchi, A., Smith, D., Jarrett-Nedwin, J., Pennica, D., Goeddel, D., and Gray, P. (1985). Human lymphotoxin and tumor necrosis factor genes: structure, homology and chromosomal localization. Nucl. Acids Res. *13*, 6361–6373.

Ohno, S., and Taniguchi, T. (1981). Structure of a chromosomal gene for human interferon $\beta$. Proc. Natl. Acad. Sci. USA *78*, 5305–5309.

Ohno, S., and Taniguchi, T. (1983). The 5′-flanking sequence of human interferon-$\beta$ gene is responsible for viral induction of transcription. Nucl. Acids Res. *11*, 5403–5412.

Parker, C. S., and Topol, J. (1984). A Drosophila RNA polymerase II transcription factor specific for the heat-shock gene binds to the regulatory site of an hsp 70 gene. Cell *37*, 273–283.

Ptashne, M. (1986). Gene regulation proteins acting nearby and at a distance. Nature *322*, 697–701.

Ragg, H., and Weissmann, C. (1983). Not more than 117 base pairs of 5′-flanking sequence are required for inducible expression of a human IFN-$\alpha$ gene. Nature *303*, 439–442.

Raj, N., and Pitha, P. (1981). Analysis of interferon mRNA in human fibroblast cells induced to produce interferon. Proc. Natl. Acad. Sci. USA *78*, 7426–7430.

Rosenthal, N., Kress, M., Gruss, P., and Khoury, G. (1983). BK viral enhancer element and a human cellular homolog. Science *222*, 749–755.

Ryals, J., Dierks, P., Ragg, H., and Weissmann, C. (1985). A 46-nucleotide promoter segment from an IFN-α gene renders an unrelated promoter inducible by virus. Cell *41*, 497–507.

Stewart, W. E., II (1979). The Interferon System. (New York: Springer-Verlag).

Stuart, G., Searle, P. F., and Palmiter, R. D. (1985). Identification of multiple metal regulatory elements in mouse metallothionein-I promoter by assaying synthetic sequences. Nature *317*, 828–831.

Tavernier, J., Derynck, R., and Fiers, W. (1981). Evidence for a unique human fibroblast interferon (IFN-β) chromosomal gene, devoid of intervening sequences. Nucl. Acids Res. *9*, 461–471.

Tavernier, J., Gheysen, D., Duerinck, F., Van der Heyden, J., and Fiers, W. (1983). Deletion mapping of the inducible promoter of human IFN-β gene. Nature *301*, 634–636.

Torres, B. A., Farrar, W. L., and Johnson, H. M. (1982). Interleukin 2 regulates immune interferon (IFNγ) production by normal and suppressor cell cultures. J. Immunol. *128*, 2217–2219.

Weintraub, H., Cheng, P. F., and Conrad, K. (1986). Expression of transfected DNA depends on DNA topology. Cell *46*, 115–122.

Weissmann, C., and Weber, H. (1986). The interferon genes. Prog. Nucl. Acid Res. Mol. Biol. *33*, 251–300.

Wong, G., and Goeddel, D. (1986). Tumour necrosis factors α and β inhibit virus replication and synergize with interferons. Nature *323*, 819–822.

Zinn, K., DiMaio, D., and Maniatis, T. (1983). Identification of two distinct regulatory regions adjacent to the human β-interferon gene. Cell *34*, 865–879.

Zullo, J. N., Cochran, B. H., Huang, A. S., and Stiles, C. D. (1985). Platelet-derived growth factor and double-stranded ribonucleic acids stimulate expression of the same genes in 3T3 cells. Cell *43*, 793–800.

# EXHIBIT 66

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-11280-RWZ

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,
and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

v.

ELI LILLY & CO.

<u>FINDINGS OF FACTS AND CONCLUSIONS OF LAW</u>

July 6, 2007

ZOBEL, D.J.

**Table of Contents**

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.    Background of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
       A.    Ariad's Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
       B.    Obtaining Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
       C.    Lilly's Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
       D.    Commencement of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
       E.    The Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
       F.    Post-Verdict Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
       G.    The Bench Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

III.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
       A.    Validity of the Patent Under 35 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . .  11
             1. Exceptions to Patentable Processes . . . . . . . . . . . . . . . . . . . . . . . .  12
             2. The Autoregulatory Loop Theorizes a Reduction in NF-κB Activity  .  14
                   a. Support for the Existence of the Autoregulatory Loop . . . . . .  15
                   b. Testimony of Ariad's Expert, Dr. Ravetch . . . . . . . . . . . . . . .  17
                   c. Cross-Examination of Dr. Latchman . . . . . . . . . . . . . . . . . . .  18
                   d. There Is Insufficient Evidence to Invalidate the Patent . . . . .  19
       B.    Inequitable Conduct During Prosecution of the '516 Patent . . . . . . . . .  20

1. The Legal Standard for Inequitable Conduct . . . . . . . . . . . . . . . . . . 20
    a.  Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    b.  Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
2.     The Allegedly Withheld Information . . . . . . . . . . . . . . . . . . . . . . . 23
    a.  Errors in Figure 43  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    b.  References Showing Inherent Anticipation . . . . . . . . . . . . . 24
3.     The Materiality of the Errors and Omissions in Figure 43 . . . . . 25
    a. The Description of Figure 43 Is Incorrect . . . . . . . . . . . . . . . 25
    b. Figure 43 Is Incomplete  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    c. Figure 43 Is Material Despite Its Late Addition to the Application
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    d. Figure 43 Is Not Cumulative  . . . . . . . . . . . . . . . . . . . . . . . . . 29
    e. The Errors in Figure 43 Are Material Under Both Standards . 30
4.     The Materiality of the Prior Art References . . . . . . . . . . . . . . . . 32
    a. The Cited References Are Not Cumulative  . . . . . . . . . . . . . 33
    b. Recognition Requirement for Inherent Anticipation . . . . . . . 37
5.     Evidence of Intent Concerning the Errors in Figure 43 . . . . . . . 40
    a. The Prosecuting Firm and Attorney History of the '516 Patent
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    b.  Evidence of Intent by Hausdorff  . . . . . . . . . . . . . . . . . . . . . 43
    c.  Evidence of Intent by Vincent . . . . . . . . . . . . . . . . . . . . . . . 44
    d.  Evidence of Intent by Clauss . . . . . . . . . . . . . . . . . . . . . . . 45
        (1) Clauss' Testimony on Materiality  . . . . . . . . . . . . . . . . 45
        (2) Clauss' Response to Office Action . . . . . . . . . . . . . . . 46
6.     Evidence of Inventor Baldwin's Intent to Conceal References . . 48
C.   Lilly's Prosecution Laches Defense  . . . . . . . . . . . . . . . . . . . . . . . . . 49
  1.     The Legal Standard for a Finding of Prosecution Laches  . . . . . 50
  2.     Analysis of Delays in the Prosecution of the '516 Patent . . . . . . 51
    a. Requirement to File an Appeal . . . . . . . . . . . . . . . . . . . . . . . 52
    b. Six Month Response to Office Actions . . . . . . . . . . . . . . . . . 53
    c. The Pre-'898 Applications  . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    d. Post Development Applications  . . . . . . . . . . . . . . . . . . . . . . 54
        (1) Prejudice to Public Rights  . . . . . . . . . . . . . . . . . . . . . 55
    e. Use of Transitional Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

I.      Introduction

Plaintiffs Ariad Pharmaceuticals, Inc., Massachusetts Institute of Technology, the

Whitehead Institute for Biomedical Research, and the President and Fellows of

Harvard College (collectively "Ariad"), owners and assignees of U.S. Patent No.

6,410,516 ("the '516 patent"), "Nuclear Factors Associated With Transcriptional

Regulation," complain that defendant Eli Lilly & Co. ("Lilly") infringed it.  Following a

fourteen-day trial in April 2006, a jury found that the four asserted claims were valid

against anticipation, enablement and written description defenses, and that use of

Lilly's Evista and Xigris products infringed the patent.  The jury awarded plaintiffs

damages in excess of $65 million.

The parties agreed that certain additional defenses were to be tried to the court.

Lilly asserts that the '516 patent is invalid because it attempts to claim non-patentable

subject matter under 35 U.S.C. § 101.  Even if the patent is valid, Lilly argues (1) that it

cannot be enforced because of inequitable conduct by plaintiffs during the prosecution

of the patent, or in the alternative; (2) that plaintiffs are estopped from recovering for

any infringement because they unreasonably delayed prosecution of the patent.[1]

Following a second trial focused on these issues, I find that: (1) the four claims

---

[1] Lilly also indicated in an August 1, 2006, pre-bench trial status conference that
it believed the '516 patent claims asserted in this case are invalid because they do not
satisfy the definiteness requirement of 35 U.S.C. § 112.  However, neither its pretrial
brief (Docket # 362) nor its proposed findings of facts (Docket # 397) discusses this
issue.  In addition, Lilly presented no evidence or argument on the issue of
indefiniteness during the bench trial.  Therefore, I do not address the indefiniteness of
the claims further in this opinion.

asserted are patentable; (2) Lilly has not proven inequitable conduct during patent prosecution; and (3) Ariad did not unreasonably delay prosecution of the '516 patent. Accordingly, the jury award stands.

## II.    Background of the Case

### A.    Ariad's Invention

In the mid-1980s, scientists at the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and Harvard University ("plaintiff institutions") identified a protein called Nuclear Factor Kappa B ("NF-κB").  Present in the cytoplasm of many different cell types, NF-κB is what is known as a transcription factor, a protein that affects gene expression.[2]  In the inactive state, NF-κB binds in the cytoplasm with another protein, Inhibitor Kappa B ("IκB"), to form a multi-protein complex.[3]  When NF-κB is activated by various stimuli external to the cell, the complex dissociates and free NF-κB is released.  This free NF-κB then travels into the cell nucleus and binds there to specific DNA sequences, causing the cell to produce proteins that are associated with many diseases, including cancer, AIDS, sepsis, and atherosclerosis.  Inhibiting this process has enormous and wide-ranging therapeutic effects.

---

[2] Gene expression is the process in which a gene's DNA sequence is converted into a protein in a cell.  Transcription refers to the step in this process by which a messenger RNA molecule is synthesized on the DNA template to transfer genetic information from the DNA to the RNA.  Stedman's Medical Dictionary (27th ed. 2000).

[3] There are several IκB proteins, including IκB-α and IκB-β, that bind to NF-κB and inhibit its activity.  (Defendant's Trial Exhibit ("DTX") 24-S at 653-54.)

The inventors filed a patent application on their invention.  After a sixteen year trek through the United States Patent and Trademark Office (the "PTO") littered with abandoned, divisional and continued applications, they were granted the '516 patent on June 25, 2002.[4]  Throughout much of the prosecution history of the '516 patent, questions concerning enablement under 35 U.S.C. § 112 delayed allowance,[5] in many instances because the claims called for the use of an "agent" or "substance" to effect a reduction or alteration in the level of NF-κB activity in the cell.  The PTO repeatedly rejected these claims because it said that the specification did not adequately describe all possible agents or substances encompassed by the claims.

## B.    Obtaining Allowance

---

[4] The complexity of the prosecution of the '516 patent is captured in the Related Applications section:

This application is a division of application Ser. No. 08/418,266 filed Apr. 6, 1995, U.S. Pat. No. 5,804,374 which is a continuation of U.S. Ser. No. 07/791,898, filed Nov. 13, 1991, abandoned which is a continuation-in-part of U.S. Ser. No. 06/946,365, filed Dec. 24, 1986, abandoned and of U.S. Ser. No. 07/318,901, filed Mar. 3, 1989, abandoned and of U.S. Ser. No. 07/162,680, filed Mar. 1, 1988, abandoned and of U.S. Ser. No. 07/341,436, filed Apr. 21, 1989, abandoned and of U.S. Ser. No. 06/817,441, filed Jan. 9, 1986, abandoned and of U.S. Ser. No. 07/155,207, filed Feb. 12, 1988, abandoned and of U.S. Ser. No. 07/280,173, filed Dec. 5, 1988, abandoned.

('516 Patent col.1 ll.5-17.)  Plaintiffs claim the benefit of priority of all of these applications and incorporate all of them by reference into the '516 patent.

[5] Title 35 U.S.C. § 112 states: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

5

On August 10, 2000, the primary examiner of the '516 application, Dr. Robert Schwartzman ("Schwartzman"), rejected all but one claim of the pending application as not adequately describing the agents used in claims drawn to methods requiring "an agent which has an effect on . . . NF-κB and/or IκB."   (DTX 2 at ADL823-33, ADL825.)[6] In response, Ariad sent the PTO a reply on September 12, 2001, canceling all previous claims.  It replaced the canceled claims with a new set of claims, 158-87, that did not require the use of agents to practice the claimed methods, along with six new claims, 188-93, that did include a limitation for the "administration of an agent . . ." to implement the method of claims 158-75.  (Id. at ADL872-88, ADL876-78.)  Two days later, in a telephone interview with Examiner David Guzo ("Guzo"),[7] Ariad's attorney authorized an examiner's amendment to, inter alia, cancel claims 188-193, the claims requiring the use of an agent.  (Id. at ADL923-53, ADL924.)  The remaining claims were subsequently allowed as amended by Guzo on October 4, 2001.  (Id. at ADL923.)

The allowed claims broadly cover a method of inhibiting the expression of a gene whose transcription is regulated by NF-κB in a eukaryotic cell.[8]  The only step required to practice the broadest patented method is to "reduc[e] NF-κB activity in the

---

[6] Pages in exhibit DTX 2, the '516 patent prosecution history, are marked in the form "ADL0000XXX."  In citations to DTX 2, the court has dropped the leading zeros in each page number.

[7] Examiner Guzo was supervised by Examiner Schwartzman.

[8] A eukaryotic cell is a cell containing a nucleus and is typical of all multi-celled organisms as well as some single-celled organisms.

cell such that the expression of said gene is inhibited."[9]  No particular agent or substance need be used, nor any particular step(s) performed, to reduce NF-κB activity in order to practice the invention.

### C.  Lilly's Drugs

Prior to the initial discoveries by the research team at plaintiff institutions, defendant Lilly applied for patents on two compounds, raloxifene hydrochloride and recombinant human activated Protein C ("aPC").[10]  As it happens, these two compounds inhibit NF-κB activity, although Lilly did not know this when it obtained its patents.  Lilly began marketing raloxifene hydrochloride under the brand name Evista to treat osteoporosis and has been selling aPC under the name Xigris to treat severe sepsis.  At the molecular level, these drugs treat osteoporosis and severe sepsis, respectively, by inhibiting NF-κB activity.

### D.  Commencement of Litigation

On the same day that the '516 patent was granted, Ariad filed the instant suit against defendant Lilly, alleging that Lilly's sales and marketing of Evista and Xigris constituted indirect infringement of twenty claims of the '516 patent.  Lilly filed a Combined Motion to Dismiss and Motion for Summary Judgment of Invalidity, contending that the earlier patents on its compounds anticipated the '516 patent and

---

[9] See '516 Patent claim 1 ("1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that expression of said gene is inhibited.") (emphasis added).

[10] Raloxifene hydrochloride is covered by United States Patent No. 4,418,068, issued Nov. 29, 1983.  The patent for aPC is No. 4,775,624, issued Oct. 4, 1988.

that the methods necessary to practice the '516 patent were not enabled by the written description.  I denied the motion but noted that the problem of enablement was troubling, given the broad claim language and the question whether the patent described actual methods for inhibiting NF-κB activity.  Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co., Civ. No. 02-11280, 2003 WL 21087115, at *1 (D. Mass. May 12, 2003) (Docket # 33).

Late in the discovery process, Lilly petitioned the PTO to reexamine the '516 patent pursuant to 35 U.S.C. § 302,[11] arguing that a large number of the patent's claims "encompassed numerous prior art methods employing compounds now known to necessarily modulate NF-κB activity."  Lilly Request for Reexamination, Case No. 05-280, April 4, 2005, at 1.  Lilly moved to stay the litigation pending the outcome of the PTO's reexamination, a motion I subsequently denied, as I was not persuaded that reexamination would simplify the issues for trial.  Ariad Pharmaceuticals, Inc. v. Eli Lilly and Company, Civ. No. 02-11280, 2005 WL 1342721, at *1 (D. Mass. June 06, 2005) (Docket # 149).  Lilly renewed its motion on January 17, 2006, after the PTO granted the reexamination request.  I again denied the motion, and the case went to trial in April 2006.

## E.    The Jury Trial

After a fourteen-day trial, the jury determined that none of the four claims

---

[11] Title 35 U.S.C. § 302 provides in pertinent part: "Any person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301 of this title . . . ."  35 U.S.C. § 302 (2002).

ultimately asserted were anticipated, either by prior art or public use, and it found all

the asserted claims adequately enabled and the written description adequate.  The jury

further found that a user of Evista directly infringed claims 80 and 95 of the '516 patent

and that a user of Xigris directly infringed claims 144 and 145 of the patent.[12]  It also

found Lilly liable for inducing infringement and contributory infringement by selling the

two drugs.  The jury determined the effective filing date of the patent to be April 21,

_____

[12] The four '516 patent claims found infringed (emphasized and grouped with the claims on which they depend) are:

7. A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB -mediated intracellular signaling, the method comprising altering NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified.

8. The method of claim 7, wherein NF-κB activity in the cell is reduced.

80. The method of claim 8 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

9. A method for reducing, in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB -mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

95. The method of claim 9, carried out on human cells.

14. A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

144. The method of claim 14 wherein reducing NF-κB  activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

145. The method of claim 14, carried out on human cells.

9

1989, and awarded Ariad a royalty of 2.3% on combined sales by Lilly of over $2.83 billion, or over $65 million in damages, as of May 4, 2006.

### F.    Post-Verdict Motions

Lilly contends that this award must be set aside because either the '516 patent is invalid, as it claims subject matter not allowed under 35 U.S.C. § 101,[13] or because the patent cannot be enforced as plaintiffs committed a culpable breach of the duty of disclosure and unreasonably delayed prosecution.  The parties agree that these issues raise questions of fact and law for the court.  See Arrhythmia Research Technology v. Corazonix Corp., 958 F.2d 1053, 1055 (Fed. Cir. 1992) ("Whether a claim is directed to statutory subject matter is a question of law."); Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP, 422 F.3d 1378, 1385 (Fed. Cir. 2005) ("[Prosecution laches] is to be decided as a matter of equity, subject to the discretion of a district court before which the issue is raised.").

### G.    The Bench Trial

A four-day bench trial addressing these issues began on August 7, 2006. Shortly before the commencement of that trial, the PTO, on August 2, 2006, issued a first Office Action in the merged ex parte reexamination proceeding that rejected 160 of the claims in the '516 patent, including the four at issue in this case.[14]  (Office Action in

---

[13] Title 35 U.S.C. § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

[14] In May 2006, the PTO merged Lilly's request for reexamination with a reexamination request of the '516 patent by Bawa Biotechnology Consulting, LLC.

Ex Parte Reexamination, Patent 6410516, August 2, 2006 (DTX 973A).)  The PTO

based its rejections partially on a determination that the claims were inherently

anticipated by certain prior art references listed in a review article co-authored by Dr.

Albert Baldwin ("Baldwin"), one of the inventors of the '516 patent.[15]  In its claim of

inequitable conduct, Lilly also charged Baldwin with intentionally withholding this

information from the PTO.

I examine each of Lilly's defenses below.

III.    Discussion

A.      Validity of the Patent Under 35 U.S.C. § 101

In Lilly's view, the '516 patent claims subject matter not allowed under 35 U.S.C.

§ 101 and is therefore invalid.  Specifically, it contends that the claims encompass the

NF-κB-IκB autoregulatory loop (the "Autoregulatory Loop"), a natural process in cells

that operates to reduce the activity of NF-κB.  Because natural phenomena are

excluded from patentable subject matter, it argues that any '516 claims encompassing

the Autoregulatory Loop are invalid and cannot be enforced.

Ariad's response is that the '516 patent does not claim a natural phenomenon

because, inter alia, (1) the patent claims a process, subject matter specifically allowed

by statute; and (2) the Autoregulatory Loop is only a theory and has not been proven to

exist in human cells in vivo.  (Docket # 398 ¶ 618.)  While not all processes are

_____

[15] The PTO's rejection of Ariad's claims does not end the re-examination.
Rather, it is merely an early step in the process.  Ariad may respond to the prior art,
propose amendments to its claims, or appeal the PTO's decision.  See 35 U.S.C. §§
301-306.

patentable, I find that Lilly has failed to show that the proposed model of the Autoregulatory Loop actually exists in nature and thus that a natural phenomenon is encompassed by the '516 patent's claims.

### 1. Exceptions to Patentable Processes

Ariad insists that an analysis of the scope of the patent's claims is not relevant to a determination of whether the patent claims unpatentable subject matter.  It argues that because the '516 patent claims describe the transformation of the activity state in cells, they meet the definition of a process, subject matter specifically allowed under 35 U.S.C. § 101, and the subject matter analysis ends.  In its view, any consideration of the scope of the claims only affects whether the claims are anticipated or properly disclosed, issues already decided in its favor by the jury.  (See Docket # 398 ¶¶ 572-83, 597-602.)  This position, however, oversimplifies the law.

Congress has broadly defined the subject matter that can be protected by patent.  Title 35 U.S.C. § 101 states simply that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefore . . . ."  The Committee Reports accompanying the Patent Act of 1952 emphasized the breadth of this statutory subject matter as "includ[ing] anything under the sun that is made by man."  Diamond v. Dier, 450 U.S. 175, 182 (1981) (quoting S. Rep. No.1979, 82d Cong., 2d Sess., 5 (1952); H.R. Rep. No.1923, 82d Cong., 2d Sess., 6 (1952)).  "Process," as used in the statute, is synonymous with

12

"method"[16] and means "a mode of treatment of certain materials to produce a given result."  Id. at 182.

Three exceptions exist, however, to the general principle that any process is eligible for patent protection: "laws of nature, natural phenomena, and abstract ideas." Id.  "The rule that the discovery of a law of nature cannot be patented rests, not on the notion that natural phenomena are not processes, but rather on the more fundamental understanding that they are not the kind of 'discoveries' that the statute was enacted to protect."  Parker v. Flook, 437 U.S. 584, 593 (1978).  A process, however, is not unpatentable merely because it contains a law of nature; a process employing a law of nature or natural phenomena in a useful way may be protected by patent.  Id. at 592 (distinguishing Morse's invalid claim, broadly covering the use of electromagnetism to print at a distance, from Neilson's allowed claim for a machine applying the principle that heated air increases the intensity of the heat in a blast furnace).  The court must examine what is sought to be patented in order to determine whether it falls within one of the statutory exceptions.  This determination occurs before any consideration whether that discovery meets the requirements for patentability under 35 U.S.C. §§ 102, 103 and 112.[17]  Id. at 593 ("The obligation to determine what type of discovery is

---

[16] See 35 U.S.C. § 100(b) ("The term 'process' means process, art or method . . .").

[17] Ariad's reliance on statements by the Federal Circuit disavowing scope as relevant to section 101 analysis is misplaced.  The discussion cited by Ariad in State Street concerned whether § 101 prevented the inventor from claiming so broadly as to block other potential inventions, not subject matter; the court had already considered subject matter and concluded that the claims were not directed toward "an unpatentable abstract idea."  State Street Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d

13

sought to be patented must precede the determination of whether that discovery is, in fact, new or obvious.").

Therefore, the asserted claims must be examined to see if they encompass any of these exceptions. If Ariad's claims are drafted so broadly that they encompass a natural process, they are invalid for claiming unpatentable subject matter.

### 2. The Autoregulatory Loop Theorizes a Reduction in NF-κB Activity

As noted above, Lilly argues that Ariad's asserted claims encompass a natural phenomenon, the Autoregulatory Loop. Lilly's scientific expert, Dr. David Latchman ("Latchman") described the Autoregulatory Loop as a natural process by which the activity of NF-κB in a cell is controlled by IκB-α via negative feedback. (Trial Tr. Day 1, 48:23-52:1.)[18] This process is triggered when an external stimulus causes NF-κB to disassociate from IκB in the cytoplasm of the cell. Free NF-κB then moves into the nucleus and binds to the cell's DNA. The bound NF-κB stimulates the production of

---

1368, 1374-77 (Fed. Cir. 1998) (refusing to find as unpatentable claims which, it was argued, were "sufficiently broad[] to foreclose virtually any computer-implemented accounting method . . . ."). The issue in SmithKline concerned whether the inevitable production of a previously patented synthetic substance as a by-product of the manufacture of a newly discovered man-made compound should be considered "naturally occurring" under § 101. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1342 (Fed. Cir. 2005). In neither case was the court simply considering whether the scope of the claims at issue encompassed a natural phenomenon. Cf. In re Bergstrom, 427 F.2d 1394, 1401 (C.C.P.A. 1970) (noting "appellants have neither merely discovered, nor claimed sufficiently broadly to encompass, what has previously existed in fact in nature's storehouse, albeit unknown," in concluding patented substance was not naturally occurring) (emphasis added).

[18] Citations to "Trial Tr." refer to the bench trial held August 7 through August 10, 2006.

various proteins in the cytoplasm, including certain cytokines,[19] but it also causes the

production of new IκB.  This newly produced IκB reenters the nucleus of the cell and

removes the bound NF-κB from the DNA, deactivating it and terminating production of

the gene for the induced proteins.  The deactivated NF-κB/IκB complex then moves out

into the cytoplasm completing the regulatory loop.  The NF-κB that was activated by the

external stimulus has been deactivated by the IκB that it caused to be generated,

naturally terminating the externally induced response.  (Id.; see also DTX 3037

(demonstrative video).)

### a. Support for the Existence of the Autoregulatory Loop

The possibility of an NF-κB--IκB regulatory loop was unknown in 1991 when the

'516 specification was initially submitted to the PTO and thus is not described in the

issued patent.[20]  (See DTX 33, ADL14830-ADL15018 (specification filed Nov. 13, 1991

with application 07/791,898).)  Latchman testified that reports on the existence of the

Autoregulatory Loop first appeared in three papers published in 1993. (Trial Tr. Day 1,

99:17-100:9.)  He cited a number of more recent articles as also supporting his

description of the Autoregulatory Loop, including a 1996 review paper by co-inventor

---

[19] Cytokines are secreted proteins that affect the functions of other cells and which are important for the interactions between cells in the immune response. (Docket # 69, 12 n.9; Hr'g Tr., 57:9-11, Jan. 13, 2004.)

[20] The 1991 application was a continuation-in-part of an earlier application, 07/341,436, which was ultimately abandoned.  The jury found the effective filing date of the '516 patent to be April 21, 1989, the date of this earlier application.

15

Baldwin.  (Id. at 54:22-589:19; DTX 24-S.)[21]  Latchman also discussed at length an

article by Ting & Endy describing the operation of the Autoregulatory Loop.  (Trial Tr.

Day 1, 60:5-75:10; DTX 469A.)[22]  This paper was published as a "Perspective" article to

comment on a longer article, published in the same issue of Science, authored by Dr.

Alexander Hoffman ("Hoffman") and, inter alia, co-inventor Dr. David Baltimore

("Baltimore").  (DTX 469.)[23]

As explained by Latchman, Ting & Endy described the operation of the

Autoregulatory Loop based on Hoffman's experiments comparing cells from natural

mice ("wild type") with cells from genetically engineered "knockout" mice.  These so-

called "knockout cells" have copies of the gene for IκB inactivated, so that there is no

functional IκB-α in the cells.  (Trial Tr. Day 1, 58:2-10, 64:13-17.)  In wild type cells, a

temporary external stimulus of TFN[24] results in only a short period in which NF-κB is

present in the nucleus of the cell and in no production of RANTES, a gene activated

only after prolonged exposure to NF-κB.  The induced active NF-κB is quickly

deactivated by new IκB-α produced by the binding of the NF-κB to the DNA before the

---

[21] Albert Baldwin, Jr., The NF-κB and IκB Proteins: New Discoveries and Insights, 14 Ann. Rev. Immunol. 649, 666 (1996) ("These results indicate that NF-κB and IκB are components of a mutual regulatory system in which the levels of one regulatory component control the activity or quantity of the other.").

[22] Alice Y. Ting & Drew Endy, Decoding NF-κB Signaling, 298 Science 1189 (2002) ("Ting & Endy").

[23] Hoffmann et al., The IκB-NF-κB Signaling Module: Temporal Control and Selective Gene Activation, 298 Science 1241 (2002).

[24] TFN is an inducer cytokine used by Hoffman to switch on NF-κB.  (Trial Tr. Day 1, 64:21-23.)

RANTES gene is expressed.  In knockout cells without the ability to produce IκB-α, a temporary external stimulus of TFN results in a prolonged period in which NF-κB is present in the nucleus of the cell and in the eventual production of the RANTES gene. (Id. at 64:11-69:24.)  Unlike the wild type, the level of NF-κB bound in the nucleus of the knockout cell is not reduced by the production of IκB-α, allowing time for the RANTES gene to be induced.  In Latchman's opinion, this demonstrates the ability of the Autoregulatory Loop to inhibit induced gene expression.  (Id. at 69:25-70:3.) Latchman described the results of additional experiments in which the external stimulus was sustained over a period of time.  Even with a continuous stimulus, he asserted that the Autoregulatory Loop operates to reduce the level of NF-κB mediated gene expression in the wild cells, albeit in an oscillatory fashion.  (Id. at 66:10-23, 73:15-74:10.)

### b. Testimony of Ariad's Expert, Dr. Ravetch

Ariad's expert, Dr. Jeffrey Ravetch ("Ravetch"), objected to Latchman's conclusion that the Autoregulatory Loop has been proven to exist in living cells.  (Trial Tr. Day 3, 10:17-21.)  He described the Autoregulatory Loop as a simplified model that poorly explains the experimental data.  (Id. at 17:13-18:7.)  In his opinion, there are multiple positive and negative regulatory loops operating in cells which, in the aggregate, create the results seen in experimental assays such as those conducted by Hoffman et al.  Ravetch rejected the view that just one loop explains the activity of NF-κB in the cell.  (Id. at 9:2-12.)  The patent claims a reduction of NF-κB in cells, which Ravetch sees as encompassing the net effect of all events, both positive and negative,

17

which occur when a stimulus influences the cell.  (Trial Tr. Day 3, 16:2-21.)

In addition, Ravetch testified that experiments using cells from knockout mice are conceptually flawed because they assume all other processes in the cell operate the same in the absence of the missing feature, an assumption he believes to be untrue.  (Id. at 13:4-14.)  Therefore, conclusions from these simplified models cannot be extrapolated back to normal cells because they do not take into consideration effects of the other components operating out of their normal context.  (Id. at 13:21-14:4; see also id. at 30:19-32.)  His opinion was that the scientific community has "established a model for the Autoregulatory Loop" to account for certain observations, but "there is considerable dispute and ongoing study to define its role in the NF-κB signaling pathway."  (Id. at 42:9-21.)  Ravetch also disputed that numerous scientific articles showed an acceptance by the scientific community of the existence and operation of the Autoregulatory Loop.[25]  (See Trial Tr. Day 4, 55:7-70:3.)  The articles, in his view, attempt to explain observations of experiments conducted with knockout mice, but the results are inconclusive because of the difficulties in interpreting signal transduction systems where the system has multiple interacting components.  (Id. at 73:9-12; see also Trial Tr. Day 3, 32:11-21 (describing a paper in which the authors note their experimental observations are not consistent with the model proposed for the

---

[25] At the bench trial, I initially reserved judgment on whether the articles on which Dr. Ravetch was cross-examined were admissible.  (See Trial Tr. Day 4, 55:6-9, 59:8-13.)  In response, Lilly's attorney laid the foundation with the witness to admit the portions read into the record under the hearsay exception for learned treatises.  Fed. R. Evid. 803(18) (allowing statements contained in scientific periodicals, established as a reliable authority by the testimony of an expert witness, to be read into evidence).  Therefore, this portion of Ravetch's testimony is admitted.

Autoregulatory Loop); id. at 34:2-36:15 (discussing a paper suggesting that a more complex model is necessary to explain the processes occurring in living cells).) Ravetch noted that, far from there being a settled theory congruent with the experimental data, there is still significant ongoing research attempting to explain the complex phenomena taking place within the cell.  (Trial Tr. Day 3, 23:4-7.)

Finally, Ravetch pointed out that the patent claims processes in living cells, while Latchman's opinion relied on in vitro research, such as the Hoffman paper (as described by Ting & Endy) to reach his conclusions concerning the Autoregulatory Loop.  (See id. at 36:21-37:3.)

### c. Cross-Examination of Dr. Latchman

On cross-examination, Latchman agreed that the experiments summarized by Ting & Endy were conducted in vitro on cell extractions, not in vivo.  (Trial Tr. Day 1, 134:11-18, 140:2-7.)  He also acknowledged that at his deposition he described the results of their research as "a step along the road," but not determinative of how IκB-α works in the human body.  (Id. at 148:8-23.)  In addition, he admitted that there were discrepancies between the computer model of the Autoregulatory Loop proposed by Ting & Endy and the Hoffman empirical data.  (Id. at 155:11-156:6.)  Latchman also noted that the computer models of the Autoregulatory Loop are "continually being refined and [that] Hoffman [] published a paper as recently as two or three months ago in which he's changed the model again."  (Id. at 156:6-10.)

### d. There Is Insufficient Evidence to Invalidate the Patent

The '516 patent is "presumed valid."  35 U.S.C. § 282.  In the instant case, Lilly

has the burden of proving facts by clear and convincing evidence showing that the patent is invalid.  North Am. Vaccine v. American Cyanamid Co., 7 F.3d 1571, 1579 (Fed. Cir. 1993).  Lilly has not met this burden.

While the evidence shows that there has been significant scientific research over more than a decade into the operation of the NF-κB signaling pathway, it has not established that the simplified model of the Autoregulatory Loop proffered by Latchman operates in vivo in normal cells.  Latchman admits that, not only does the current model not fully explain the experimental data, but that the model is continually being refined, even to the present day.  Scientists are conducting ongoing research to attempt to more fully explain what happens in cells when subjected to various external stimuli.  Ravetch described a complex system of multiple feedback loops, all interacting, to effect the changes in gene expression claimed by the patent.  In addition, the experimental data described in the literature has been collected using knockout cells in vitro that have not been shown to operate in all other respects as normal cells.  The experimental data cannot be fully explained by the current model.

Therefore, I credit Dr. Ravetch's testimony that the Autoregulatory Loop is "an incomplete model . . . subject to a significant amount of ambiguity and inconsistency" (Trial Tr. Day 4, 50:2-6) and find that Lilly has failed to prove by clear and convincing evidence that the Autoregulatory Loop exists in living cells in a way that is encompassed by Ariad's claims.

**B.   Inequitable Conduct During Prosecution of the '516 Patent**

Lilly asserts that Ariad, the inventors, and/or their attorneys failed to disclose to

20

the PTO material prior art that demonstrates inherent anticipation of the '516 patent

and also failed to disclose material errors in a figure contained in the patent.  Although I

agree with Lilly that the information that was not disclosed is material, Lilly has failed to

prove by clear and convincing evidence the requisite intent necessary to find

inequitable conduct and render the patent unenforceable.

### 1. The Legal Standard for Inequitable Conduct

The patent application process is conducted ex parte by inventors and their

representatives.  Applicants have a duty to prosecute applications with candor, good

faith, and honesty.  Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1099 (Fed. Cir.

2003); see also 37 C.F.R. § 1.56 ("Each individual associated with the filing and

prosecution of a patent application has a duty of candor and good faith in dealing with

the [Patent] Office.").  When coupled with an intent to deceive or mislead the PTO, a

breach of this duty constitutes inequitable conduct, which renders the patent

unenforceable.  Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226,

1233 (Fed. Cir. 2003).  An applicant breaches this duty by making affirmative

misrepresentations of material facts, failing to disclose material information, or

submitting false material information.  Duro-Last, 321 F.3d at 1099.

The Federal Circuit requires that a party asserting inequitable conduct show by

"clear and convincing evidence" the elements of materiality and intent to deceive.

Burlington Industries, Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988)

(expressing concern about "the habit of charging inequitable conduct in almost every

major patent case").  The analysis of inequitable conduct is a two-step process.  First

the court must determine, as a threshold matter, if both the materiality of the

information and the intent to deceive have been established.  Bristol-Myers, 326 F.3d

at 1234.  Once the court has determined that the factual basis for materiality and intent

exist, it must "weigh them to determine whether the equities warrant a conclusion that

inequitable conduct occurred."  Id. (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172,

1178 (Fed. Cir. 1995)).  This balancing means that a greater showing of one factor can

compensate for a lesser showing of the other.  Id.

### a.  Materiality

Information is material "where there is a substantial likelihood that a reasonable

examiner would consider it important in deciding whether to allow an application to

issue as a patent."  Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1315

(Fed. Cir. 2006) (citing 37 C.F.R. § 1.56 (1977)); accord Bristol-Myers, 326 F.3d at

1234; Molins, 48 F.3d at 1179 n.8.  Under this standard, information can be material

even though disclosure of it would not render the invention unpatentable.  Digital

Control, 437 F.3d at 1318.  However, information that is merely cumulative or less

pertinent than material considered by the examiner is not material in an inequitable

conduct analysis.  Molins, 48 F.3d at 1179.[26]

---

[26] In 1992, the PTO revised 37 C.F.R. § 1.56 to create a narrower definition of
materiality:

> [I]nformation is material to patentability when it is not cumulative to
> information already of record or being made of record in the application,
> and
>
> > (1) It establishes, by itself or in combination with other information, a
> > prima facie case of unpatentability of a claim; or

### b. Intent

That the withheld information is material, by itself, is inadequate to prove inequitable conduct.  There must also be a showing that the information was withheld with an intent to deceive or mislead the PTO.  Allen Organ Co. v. Kimball Int'l., Inc., 839 F.2d 1556 (Fed. Cir. 1988) ("[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct.").  "Intent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent."  Hebert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996).  However, intent to deceive or mislead the PTO can rarely be shown by direct evidence, it is usually inferred from the facts.  Bristol-Myers, 326 F.3d at 1239.  "[T]he involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive."  Digital Control, 437 F.3d at 1319 (internal quotations and citations deleted).  Mere error, even conduct that amounts to gross negligence, is not adequate to establish an intent to deceive.  Molins, 48 F.3d at 1181.  Where the alleged conduct is the nondisclosure of

---

(2) It refutes, or is inconsistent with, a position the applicant takes in:
(i) Opposing an argument of unpatentability relied on by the Office, or
(ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (1992).  Until recently, it was unclear if the Federal Circuit intended the PTO's 1992 updated definition of materiality to supplant existing case law.  See, e.g., Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Inc., 394 F.3d 1348, 1353 (Fed. Cir. 2005) (applying the amended Rule 56 where the patent was prosecuted after the effective date of the rule change); Purdue Pharma L.P. v. Endo Pharm. Inc., 438 F.3d 1123, 1129 (Fed. Cir. 2006) (same).  In Digital Control, however, the court made it clear that the 1992 revision did not replace the "reasonable examiner" standard, rather it supplemented it.  Digital Control, 437 F.3d at 1316.  The Federal Circuit explained that the new Rule 56 standard provides an additional test for materiality.  Id.

23

information, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold the information from the PTO.  Id.

### 2.   The Allegedly Withheld Information

According to Lilly, two errors made during prosecution of the '516 patent meet the threshold standard for materiality: (1) information that was incorrect was not provided to the PTO; and (2) references relevant to inherent anticipation of the claims were not disclosed.[27]

### a.  Errors in Figure 43

First, Lilly points to figure 43, three pages depicting a lengthy nucleotide sequence consisting of the letters A, C, G and T.  The central portion of the sequence has sequential groups of these letters identified by an additional single letter below each group of three representing the amino acid sequence.  ('516 Patent fig.43.)  The Brief Description of the Drawings describes this figure as "the nucleotide sequence and the amino acid sequence of IκB-α."  (Id. col.10 ll.16-17.)  The only reference in the specification to figure 43 states: "The nucleotide sequence of the IκB-α gene and the amino acid sequence of IκB-α are shown in FIG. 43." (Id. col.28 ll.16-17.)  Lilly argues that one skilled in the art reading the patent would expect figure 43 to describe the DNA and amino acid sequence for mammalian, specifically murine (mouse), IκB-α.

---

[27] An invention is patentable only if no relevant prior art contains all of the claimed elements.  If all of the claimed elements are disclosed in a single reference, that prior art expressly anticipates the invention.  If particular elements are missing but necessarily present in the prior art, that reference inherently anticipates the invention. Perricone v. Medicis Pharm. Corp., 432 F.3d 1368, 1375 (Fed. Cir. 2005); see also Herbert Schwartz, Patent Law and Practice § 4.I.C.1. (5th ed. 2006).

However, figure 43 actually shows the sequence of an avian (chicken) protein called pp40.  In addition, Lilly claims that the figure is incomplete and only shows portions of the amino acid sequence of pp40.  Ariad counters that pp40 is an IκB-α protein, therefore there is no error in the identification of the figure, much less a material misrepresentation.  As discussed below, I agree with Lilly that the fact that figure 43 does not represent mammalian DNA meets the threshold standard of materiality necessary to proceed with an evaluation of inequitable conduct.  In addition, I find that the sequence in the figure is indeed incomplete as alleged by Lilly.

### b.  References Showing Inherent Anticipation

Second, Lilly avers that Ariad failed to disclose references relevant to inherent anticipation of the claims in the '516 patent.  Specifically, Lilly argues that after the patent application was filed, at least one of the inventors published both a review article and a paper describing a number of prior art compounds as inhibitors of NF-κB activity.  Lilly claims that Ariad had a duty to disclose this information to the PTO.  It points to the results of the recent reexamination of the '516 patent, in which the PTO invalidated the claims at least partially on a determination that the claims were inherently anticipated by these references, as showing the materiality of the information withheld.  Because I do not find the information withheld was merely cumulative, as Ariad suggests, I conclude it is material.

25

### 3.   The Materiality of the Errors and Omissions in Figure 43

### a. The Description of Figure 43 Is Incorrect

Ariad does not dispute that figure 43 represents the nucleotide sequence of

avian pp40, not mammalian IκB-α.  (See Docket # 398 ¶ 275.)  However, it insists that

describing pp40 in figure 43 as "the IκB-α gene" is neither incorrect nor misleading and

therefore cannot support a claim of inequitable conduct.  This conclusion is based on

Ariad's assertion that "the term IκB-α refers to a family of proteins" capable of inhibiting

NF-κB and that "the scientific community has reached a consensus that pp40 is an IκB-

α protein."  (Id. ¶¶ 262, 256.)  Ariad further argues that the depiction of avian pp40 in

figure 43 is not misleading because the methods claimed in the '516 patent are not

limited to mammalian cells.[28]  It points to text in the '516 specification explicitly

describing the use of pp40, along with mammalian MAD-3, as potential sources for

DNA used to negatively regulate NF-κB activity in cells (and thus practice the patented

method) in support of this argument.  ('516 Patent col.32 ll.11-40.)

Ariad's argument is disingenuous.  While the '516 claims do broadly cover both

mammalian and non-mammalian cells, the specification describes the inventors' work

using a mammalian cell line.  ('516 Patent col.22 l.23 - col.28 l.18.)  The Detailed

---

[28] This assertion is correct.  Under the doctrine of claim differentiation the '516 claims must encompasses avian and other non-mammalian cells.  See Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").  Compare, e.g., '516 Patent claim 9 ("A method for modifying effects of external influences on a eucaryotic cell [characteristic of all life forms except primitive microorganisms] . . ."), with id. claim 94 ("The method of claim 9, carried out on mammalian cells.").

Description of the Invention leading up to the only paragraph referencing figure 43 begins, "[t]he following is a description of the . . . discovery of the NF-κB inhibitor IκB . . ." (Id. col.10 ll.46-52).  What then follows is a lengthy discussion of the discovery and isolation of IκB-α from a murine cell line called 70Z/3.  (Id. col.22 l.23 - col.28 l.18.)  The sole mention of figure 43 (describing it as "IκB-α") occurs in the text directly following a sentence describing how the inventors determined the characteristics of the IκB they isolated from this murine cell line.  (Id. col.28 ll.14-18.)  The obvious conclusion is that both sentences refer to the same protein.

One column later, the patent explicitly refers to "IκB prepared from the mouse [] cell line . . . ." (Id. col.29 ll.33-34.)  A page later, the specification states: "[as] a result of the work described herein, the IκB gene is now available . . . ." (Id. col.31 ll.57-58 (emphasis added).)  Latchman testified that in November 1991 when the application containing figure 43 was filed, pp40 was characterized as "an IκB-α like molecule."  It was not until several years later that pp40 was referred to simply as IκB-α.  (Trial Tr. Day 1, 98:7-99:16.)  Furthermore, while the terms "human," "mammalian," "murine," "mouse," and "70Z/3" occur throughout the specification, "avian" and "chicken" do not appear at all, and "pp40" appears only once.  Based on these facts, I find that a reasonable examiner would believe the sequence depicted in figure 43 to represent the nucleotide sequence and the amino acid sequence of murine IκB-α, not avian pp40.

### b. Figure 43 Is Incomplete

Latchman also testified that figure 43 is incomplete and does not show the correct full amino acid sequence even of pp40.  In particular, he stated that figure 43

shows an amino acid sequence that has 82 amino acids at the beginning of the figure

that are not present in pp40, but it is missing 56 amino acids at the end, for which are

substituted 10 amino acids that are not present in pp40. (Id. at 106:4-20.)  The missing

region corresponds to a portion of IκB-α necessary to inhibit DNA binding of NF-κB.

(Id.)  Based on a comparison of figure 43 with the published sequence of pp40, I credit

Latchman's testimony.[29]  Because there is no evidence that Ariad was aware of this

error while prosecuting the '516 patent, the error does not affect the issue of intent in

evaluating inequitable conduct.  See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling

Co., 439 F.3d 1335, 1341 (Fed. Cir. 2006) ("In an inequitable conduct determination

based upon a nondisclosure, the applicant must know, or should have known, of the

materiality of the reference for an inference of intent.").  However, it does increase the

---

[29] During the bench trial, Ariad moved to strike Latchman's testimony concerning the error in figure 43, arguing it was not previously disclosed in his expert report.  (Trial Tr. Day 1, 106:21-22.)  However, in its proposed findings of fact, Ariad did not contest his conclusions nor did it claim that figure 43 is correct, rather it attacked Latchman's credibility for failing to recognize this error previously and recommended that the court "find that Figure 43 corresponds to pp40 as Latchman originally testified."  (Docket # 398 ¶¶ 273-75.)  Ariad further asserts that "[t]here is no way to authenticate Latchman's analysis [comparing the sequences in figure 43 to the identical sequence presented in the Davis (1991) journal article]."  (Id. ¶¶ 281-82.)  However, in a separate section of its proposed findings, arguing that the information concerning figure 43 was merely cumulative, Ariad suggests that "[having] copies of [] Davis (1991) . . . , the patent examiner responsible for the examination of the '516 patent had available to him all the relevant information necessary to compare the sequences in figure 43 with the sequences disclosed for pp40 in Davis . . . ."  (Id. ¶ 251.)  Taking Ariad up on its offer, the court compared the amino acid sequences shown in figure 43 and Davis (1991), Fig. 3., and finds that Latchman's testimony accurately described figure 43 as not showing the correct amino acid sequence of pp40.  Having performed this tedious comparison, the court further credits Latchman's testimony that a skilled reader would not have checked the sequences in figure 43 against the published references.  (Trial Tr. Day 1, 105:14-15.)

materiality of the error, because it means that the amino acid sequence shown cannot

be used as described in the '516 patent to reduce the activity of NF-κB.

### c. Figure 43 Is Material Despite Its Late Addition to the Application

Ariad suggests that since figure 43 was added to the application in 1991, after

the 1989 filing date established by the jury, it is not necessary to the invention and

therefore cannot be material, even if wrong.  This argument fails under either standard

for materiality.  Under the "reasonable examiner" standard, the information does not

have to preclude patentability to be material.  E.g., Digital Control, 437 F.3d at 1318;

Bristol-Myers, 326 F.3d at 1237.  Even under the stricter standard promulgated by the

PTO in 1992, information that "is inconsistent with, a position the applicant takes in: . . .

(ii) Asserting an argument of patentability" is material.  37 C.F.R. § 1.56(b) (1992).  As

discussed infra, p. 30, Ariad responded to a PTO section 112 rejection by pointing to

the disclosure of IκB-α as enabling of its claims, thus "asserting an argument of

patentability."  Therefore, the error is material regardless of the patent filing date.[30]

---

[30] In addition, the standards of proof to establish the filing date differ between
patent prosecution and a jury trial on validity.  At trial, the patent '516 was presumed
valid and the defendant had the burden to show invalidity by "clear and convincing
evidence."  E.g., Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir.
2003); 35 U.S.C. § 282 (2002).  During prosecution, however, the examiner uses a
preponderance of the evidence standard, and in some cases the burden is shifted
to the applicant to prove the claims are patentable.  See 37 C.F.R. § 1.56 (2006)
(describing preponderance of the evidence as the standard to evaluate unpatentability
in determining materiality); Manual of Patent Examining Procedure ("MPEP") §
2112(V.) (shifting the burden of proof to applicant after an inherency rejection under 35
U.S.C. § 102 or a "prima facie obviousness" rejection under 35 U.S.C. § 103); see also
(Office Action in Ex Parte Reexamination, Patent 6410516, August 2, 2006 (DTX 973A)
at 8) ("[T]he existence of a final court decision of claim validity in view of the same or
different prior art does not necessarily mean that no new question is present, because
of the different standards of proof employed by the Federal District Courts and the

29

### d. Figure 43 Is Not Cumulative

Finally, Ariad's argument that any disclosure of the error in figure 43 was merely cumulative, because the examiner could have compared the sequence in the patent application with Davis (1991), Fig. 3, is unpersuasive.  (Plaintiffs' Trial Exhibit ("PTX") 143.)[31]  Indeed, as discussed supra, note 29, I find it unreasonable to expect the examiner to compare the sequences.  In any case, since figure 43 is not identical to the figure showing pp40 in Davis, even if the examiner had compared the sequences he would not necessarily have realized that figure 43 was an incorrect sequence of pp40 and not the sequence of murine IκB.  Id.

Ariad also suggests the information is cumulative because one of the examiners of the '516 patent, Dr. Schwartzman, was also the primary examiner of the application that issued as the '090 patent.  (Docket # 398 ¶ 239-40.)  It notified Dr. Schwartzman during the prosecution of the '090 patent that an identical figure in the '090 application was "not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein."  (Id.)  Presumably, Ariad believes that the examiner should sua sponte have applied this information to the examination of the '516 patent as well.  The duty of candor and good faith exists to ensure that patent applicants provide accurate material information to the PTO so that the examiner can efficiently and effectively assess their claims.  The duty of candor is not so lax that it requires an examiner to

_____

Office.").

[31] Nathan Davis, et al., Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors, 253 Science 1268, 1270 (1991).

compare nucleotide sequences or to track what figures are shared between divisional applications.  See also Armour & Co. v. Swift & Co., 466 F.2d 767, 779 (7th Cir. 1972) ("[W]e think that it is unfair to a busy Examiner . . . to assume that he retains details of every pending file in his mind when he is reviewing a particular application.").  Therefore, I decline to find that information concerning the errors in figure 43 is merely cumulative on that basis.

### e. The Errors in Figure 43 Are Material Under Both Standards

To determine the materiality of the error in figure 43, it is necessary to consider what information the examiner relied on in examining the '516 application during its prosecution.  The prosecution history shows that the examiner expressed concern on multiple occasions that the '516 application either did not satisfy the written description requirement or was not enabled.  (See, e.g., DTX 2 at ADL611-21, ADL613 (March 11, 1999 PTO Office Action rejecting twenty claims as "containing subject matter which was not described in the specification in such a way as to enable one skilled in the art . . . to make and/or use the invention."); id. at ADL478-88, ADL480 (October 1997 Office Action rejecting claims for lack of enablement and written description); id. at ADL447-55, ADL450-35 (January 1997 Office Action rejecting claims for lack of enablement); id. at ADL822-33, ADL824-25.)  In a July 1998 Office Action, the examiner rejected several claims because the specification failed to teach how to purify either the NF-κB or IκB protein.  Ariad responded that "the present application teaches how to make recombinant forms of the proteins."  (Id. at ADL570-88, ADL585.)  In response to the October 1997 Office Action, the applicants argued that there was adequate disclosure

31

to support, <u>inter alia</u>, that the "artificial induction of IκB could be used as a means of inhibiting NF-κB activities as its regulation of gene transcription." (<u>Id.</u> at ADL517-40, ADL529.)

These rejections and Ariad's responses show that the DNA sequence of IκB-α was material because Ariad asserted in an argument for patentability that it taught how to make the protein and thus enabled their claims. The correct sequence information was also necessary in order to incorporate IκB-encoding DNA into the appropriate vector for gene therapy as described by the '516 patent. ('516 Patent col.32 ll.12-63.) While pp40 is an inhibitor of NF-κB in chickens, it is not clear that it operates similarly in mammals. (Trial Tr. Day 1, 123:2-5.) Latchman testified that in order to have the greatest chance for success in human gene therapy, it is important "to have as much going for you as possible." (<u>Id.</u> at 101:14-23.) In particular, he warned that using a gene from a non-mammalian species is "more likely to raise an immune reaction and the protein is likely to have functional differences." (<u>Id.</u>) Thus, the information that the sequence showed avian pp40 and therefore was less likely to enable the claimed method without undue experimentation, would have been of interest to a reasonable examiner, particularly here where enablement was an issue. <u>Cf.</u> <u>Regents of Univ. of Cal. v. Eli Lilly & Co.</u>, 119 F.3d 1559, 1567 (Fed. Cir. 1997) (finding the disclosure of rat cDNA inadequate to fulfill the written disclosure requirement of a patent claiming human insulin-encoding cDNA). Finally, even if I accept Ariad's claim that pp40 is an IκB and thus could be used to make or use the invention, the sequence in figure 43 is not the correct sequence of pp40 as shown in Davis (1991). (PTX 143.) For these

32

reasons, I find that the error in figure 43 is material.

### 4.   The Materiality of the Prior Art References

Lilly also alleges that Ariad intentionally withheld certain references from the
PTO during prosecution of the '516 patent that were material to the question of inherent
anticipation.  "A patent is invalid for anticipation if a single prior art reference discloses
each and every limitation of the claimed invention."  Schering Corp. v. Geneva
Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Even if a limitation of the claimed
invention is missing in the prior art reference, the patent may still be anticipated if "the
missing characteristic is necessarily present, or inherent, in the single anticipating
reference."  Id.  Lilly points to several post-filing references related to the effects on NF-
κB activity of various compounds known before the filing date of the patent that it
believes should have been provided to the PTO.  Specifically, it cites several articles by
co-inventor Baldwin, including:

> Baldwin, A.S., The NF-κB and IκB Proteins: New Discoveries and Insights, Annu.
> Rev. Immunol. 14:649-81 (1996) (DTX 24-S);
>
> Baldwin, A.S., The Transcription Factor NF-κB and Human Disease, J. Clinical
> Investigation 107(1):3-6 (2001) (DTX 25);
>
> Scheinman et al., Role of Transcriptional Activation of IκB-α in Mediation of
> Immunosuppression by Glucocomcoids, Science 270:283-286 (1995) (DTX 28);
> and
>
> Holmes-McNary, M. and Baldwin, A.S., Chemoprotective Properties of trans-
> Resveratrol Are Associated with Inhibition of Activation of the IκB Kinase, J.
> Cancer Research 60:3477-3483 (2000) (DTX 473),

("the Baldwin references") as well as the relevant references cited in them as disclosing
that glucocorticoids, salicylates, cyclosporin A, and resveratrol (Res) – an active

33

ingredient in red wine – all inhibit NF-κB activity.  (DTX 24-S at 671; DTX 25 at 4; DTX 28 at 283; DTX 473 at 3481-82.)  When these references were brought to the PTO's attention in the reexamination proceedings, the PTO invalidated the claims at issue in this case as being inherently anticipated.  (Office Action in Ex Parte Reexamination, Patent 6410516, August 2, 2006 (DTX 973A).)  Lilly argues this demonstrates under both the "reasonable examiner" and stricter "prima facie case of unpatentability" standards that the references were material.  See Molins, 48 F.3d at 1179 (noting that "the result of a PTO proceeding that assesses patentability in light of information not originally disclosed can be of strong probative value in determining whether the undisclosed information was material").

Ariad's counters that these references: (1) were not material because they were cumulative to material already provided to the examiner; and (2) even if they were not cumulative, they were not material because the law at the time included a contemporaneous recognition requirement that one of ordinary skill would have had to recognize the missing information inherently disclosed.[32]

### a. The Cited References Are Not Cumulative

First, Ariad points to a 1994 paper by Ulrich Siebenlist ("Siebenlist 1994") (DTX 2 at ADL649-73)[33] provided to the PTO as an exhibit to a declaration (id. at ADL625-

---

[32] Ariad also argues that the references cannot be material because the jury found they do not make the asserted claims unpatentable.  (Docket # 398 ¶ 48.)  As discussed supra p. 21, the standards for materiality do not preclude information from being material even if the claims are ultimately found to be valid.

[33] Siebenlist et al., Structure, Regulation and Function of NF-κB, 10 Ann. Rev. Cell. Biol. 405-55 (1994).

27) by one of the inventors of the '516 patent, Dr. Baltimore.  This first declaration was

submitted in support of Ariad's response to a March 17, 1999 PTO Final Office Action

rejecting all pending claims for failing to satisfy the enablement requirement of 35

U.S.C. § 112.  (See id. at ADL610-21, ADL613; ADL697-704, ADL700.)  The copy of

the first Baltimore declaration in the PTO prosecution history contains the handwritten

notation, "Considered 11/19/99," followed by Examiner Schwartzman's initials.[34]

Siebenlist 1994 includes brief discussions relevant to inherent anticipation

including: (1) that cyclosporin A blocks activation of NF-κB (citing Schmidt et al. 1990)

(id. at ADL661); and (2) that the actions of steroids, including glucocorticoids, could be

explained by their complexing with NF-κB (citing Ray & Perfontaine 1994) (id. at

ADL664).  While Siebenlist 1994 does not mention resveratrol specifically, it does

discuss the inhibition of NF-κB activation by antioxidants.  (Id. at ADL659.)  Ariad

argues this is an adequate disclosure of resveratrol because it is an antioxidant.

Next, Ariad points to the response to an August 11, 2000 Office Action that it

sent to Examiner Schwartzman on September 12, 2001.  (Id. at ADL872-92.)  Again,

Ariad included a declaration by inventor Baltimore along with 100 pages of attached

references.  Baltimore described several classes of compounds that "are able to affect

---

[34] The initials are indecipherable, however they appear similar to those of the
examiner who initialed the '516 patent search history.  (See DTX 2 at ADL4.)
Furthermore, the notation on the first Baltimore declaration was dated the same day
Examiner Schwartzman signed an Office Action responding to the arguments made in
the Ariad September 21, 1999, response that included the declaration.  (See DTX 2 at
ADL707-16, ADL716.)  Finally, Matthew Vincent, the patent attorney for Ariad
prosecuting the '516 patent, testified that he recognized the initials as those of
Examiner Schwartzman.  (Trial Tr. Day 3, 53:18-25.)  Based on this evidence, I find that
the initials on the first Baltimore declaration are Schwartzman's.

NF-κB gene expression" including salicylates (citing, but not providing, a 1999 paper by Yan et al.).[35]  (Id. at ADL894-97, ADL895-96.)  This response included a copy of a 2000 paper by Fujihara ("Fujihara 2000")[36] citing an number of NF-κB inhibitors previously described including glucocorticoids, aspirin and antioxidants.  (Id. at ADL904-12, ADL904.)

Less than a month later, on October 4th, Examiner Guzo allowed the amended claims noting that he "ha[d] reviewed the last response and accompanying references which provide substantiating examples of the claimed methods."  (Id. at ADL923-53, ADL952.)  Ariad asserts that this language indicates that the examiner considered the post-filing references, including Fujihara 2000, and was aware of the 1999 Yan paper. Because these references, taken together, disclose use of the same prior art compounds as the references advanced by Lilly, Ariad argues that the withheld references are merely cumulative, and thus cannot be material.

Lilly's response is that the Baltimore declarations and accompanying references were provided only to contest claim rejections based on the written description and enablement requirements.  While the PTO did accept the references submitted in support of the applicant's response to the Office Action without an Information

---

[35] Yan et al., Aminosalicylic Acid Inhibits IκB Kinase α Phosphorylation of IκBα in Mouse Intestinal Epithelial Cells, 274 J. Biol. Chem. 36631 (1999).

[36] Fujihara et al., A D-Amino Acid Peptide Inhibitor of NF-κB Nuclear Localization is Efficacious in Models of Inflammatory Disease, 165 J. Immunol. 1004 (2000).

Disclosure Statement ("IDS"), the Manual of Patent Examining Procedure ("MPEP")[37] at

the time implied that the references would only be reviewed for the specific issue being

advocated.[38]  In addition, Ariad's response to the Office Action only discussed why the

provided references were relevant to the adequacy of the '516 disclosure, not to

inherent anticipation.  Ariad's patent attorney for the '516 application, Dr. Matthew

Vincent ("Vincent"), confirmed that Ariad did not read the publications at the time "with

any appreciation that someone might argue that they were relevant to inherent

---

[37] "The MPEP is commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters. While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith."  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995) (internal citations and quotations marks omitted).

[38] References normally must be submitted with an IDS to be considered by the PTO.  See 37 C.F.R §§ 1.97, 1.98.  The MPEP at the time of the '516 prosecution provided an exception for references submitted with an Office Action response, in pertinent part as follows:

> To the extent that a document is submitted as evidence directed to an
> issue of patentability raised in an Office action, and the evidence is timely
> presented, applicant need not satisfy the requirements of 37 CFR 1.97
> and 37 CFR 1.98 in order to have the examiner consider the information
> contained in the document relied on by applicant. In other words,
> compliance with the information disclosure rules is not a threshold
> requirement to have information considered when submitted by applicant
> to support an argument being made in a reply to an Office action.

MPEP § 609 C (3) (7th ed. July 1998) (emphasis added).  The next edition of the MPEP added a sentence to this exception to make it clear that the PTO only considered the reference for the issue proffered.  MPEP § 609.05(c) (8th ed., rev. 5, Aug. 2006) ("[C]onsideration by the examiner of the document submitted as evidence directed to an issue of patentability raised in the Office action is limited to the portion of the document relied upon as rebuttal evidence; the entirety of the document may not necessarily be considered by the examiner.").

37

anticipation." (Trial Tr. Day 3, 107:25-108:4.)  The PTO Notice of Allowability notes that the examiner amendments to the claims proposed by Ariad were authorized in a telephone interview with Vincent on September 14, 2001, only two days after the examiner received the 100-page document.  (DTX 2 at ADL924.)  Mr. Lieberstien, Lilly's patent expert, testified that this kind of examiner's amendment normally means allowance of the claims.  (Trial Tr. Day 2, 105:12-17.)  Lilly further notes that the sections of Siebenlist 1994 relevant to inherent anticipation are twenty pages removed from the sections Ariad drew to the attention of the examiner in the first Baltimore declaration.  It points out that there is no evidence in the prosecution history that the examiner was aware of the information in Siebenlist 1994 and Fujihara 2000 describing prior art compounds.  Finally, none of these references specifically mentions the use of resveratrol or red wine; rather they only discuss the more general use of antioxidants to inhibit NF-κB activity.

Given the limited purpose for which the references were proffered, the fact that they were not listed in an IDS, the exceedingly short time between the receipt of the second Baltimore declaration and the examiner's amendments suggesting allowance, and the lack of specific reference to resveratrol or red wine, I do not find that the Baltimore declarations and attachments adequately disclosed the prior art compounds described in the Baldwin references.  Therefore, the Baldwin references are not merely cumulative and thus may be material in an analysis of inequitable conduct.

### b. Recognition Requirement for Inherent Anticipation

Even if the Baldwin references are not merely cumulative, Ariad insists that a

38

reasonable examiner would not have considered them material because at the time the

PTO had a recognition requirement for inherent anticipation.  Under this doctrine, a

reference does not inherently anticipate an invention unless it both necessarily

includes the missing element and that missing element would be recognized as

necessarily included by a person of ordinary skill <u>at the time</u>.  In support of its position,

Ariad points to instructions to the examiner on inherent anticipation in the edition of the

MPEP in effect at the time of the '516 prosecution:

> To establish inherency, the extrinsic evidence must make clear that the
> missing descriptive matter is necessarily present in the thing described in
> the reference, and that it would be so recognized by persons of ordinary
> skill.

MPEP § 2112 (7th ed. July 1998) (citing <u>In re Robertson</u>, 169 F.3d 743, 745 (Fed. Cir.

1999) (internal quotations omitted).  Ariad contrasts this language with the subsequent

edition of the MPEP, which explicitly states that contemporaneous recognition is not a

requirement for inherent anticipation.[39]  It argues that this shows that a change in the

PTO's position on inherent anticipation occurred after the prosecution of the '516

patent which eliminated the recognition requirement.  (<u>See</u> Docket # 398 ¶¶ 121-124.)

The difficulty with this argument is that the 7th edition of the MPEP did not

require contemporaneous recognition, only an ultimate recognition of the inherency,

and it is not in conflict with the additional guidance provided in the later edition.

---

[39] <u>See</u> MPEP § 2112 (II.) (8th ed., rev. 5, Aug. 2006) ("There is no requirement
that a person of ordinary skill in the art would have recognized the inherent disclosure
<u>at the time of invention</u>, but only that the subject matter is in fact inherent in the prior art
reference.") (emphasis in original) (citing <u>Schering Corp. v. Geneva Pharm. Inc.</u>, 339
F.3d 1373, 1377 (Fed. Cir. 2003)).

Moreover, with one exception, the cases relied upon by Ariad, while requiring recognition by persons of ordinary skill, are silent as to whether that recognition must be contemporaneous with the date of the reference.  See Robertson, 169 F.3d at 745. ("the extrinsic evidence must make clear that the missing descriptive matter . . . would be so recognized by persons of ordinary skill") (internal quotations removed); Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268, (Fed. Cir. 1991) (same); Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1052 (Fed. Cir. 1994) ("EMS was required to prove . . . and that it would be so recognized by persons of ordinary skill.").  The sole exception that explicitly required contemporaneous recognition is Elan.  Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research, 304 F.3d 1221 (Fed. Cir. 2002) ("[I]t must be shown that the undisclosed information was known to be present in the subject matter of the reference."), vacated 314 F.3d 1299 (Fed. Cir. 2002), and superceded 346 F.3d 1051 (Fed. Cir. 2003).  However, that decision was vacated and the new decision does not contain a similar requirement. (Id.)  Also, as Lilly points out, Elan was decided after the '516 patent issued, so it could not have been considered by the examiner as a statement of the law at the time of the '516 prosecution.  I note that Schering, the case cited in the 8th edition of the MPEP, explicitly rejected both the holding in Elan and Ariad's reading of Continental Can as requiring contemporaneous recognition.  Schering, 339 F.3d at 1377.

        In addition, the examiner of the '516 patent continued to reject a claim even after Ariad argued that there was no contemporaneous recognition in the reference to support the examiners inherent anticipation rejection.  In that instance, Ariad asserted

that the reference Wall et al. could not be prior art because it did not "teach or suggest that NF-κB is a trans-acting nuclear factor, nor do they teach or suggest that NF-κB binds to the enhancer of the κ gene." (DTX 2 at ADL470-71.)  The examiner, in maintaining the rejection, stated that "[a]lthough these references do not teach the NF-κB--IκB-α complex, the role of NF-κB as a transcription factor or the presence of NF-κB binding sites in the expressed genes, these are inherent properties of the cells and the genes." (DTX 2 at ADL486.)  This indicates that the examiner of the '516 patent did not accept Ariad's argument that there was a contemporaneous recognition requirement for inherent anticipation.  Thus, the case law and the '516 examiner's actions support Lilly's position that a reasonable examiner would not reject references describing use of the prior art compounds because of a lack of contemporaneous recognition of their mode of action.

I therefore find that the Baldwin references are material because: (1) they disclose references pertaining to prior art compounds that the examiners, on reexamination, found were material to the issue of patentability; (2) they are not cumulative to references provided during the prosecution of the '516 patent, and; (3) a reasonable examiner, at the time of the prosecution of the '516 patent, would not have believed there was a contemporaneous recognition requirement for inherent anticipation.

### 5.    Evidence of Intent Concerning the Errors in Figure 43

Lilly argues that Ariad's patent attorneys were not only aware that figure 43 was not the sequence of IκB-α as described, but also that the information was material to

the asserted claims.  In addition, Lilly suggests that Ariad had a strong motivation to

conceal this information because disclosure might have required Ariad to refile the

application and lose the benefit of the transitional rules.  Without the benefit of the

transitional rules, the patent would have expired on January 9, 2006, twenty years from

its original filing date, rather than seventeen years from issuance, in 2019.  Lilly asserts

that the failure to inform the PTO of the error, coupled with the desire to secure an

additional thirteen years of patent monopoly, provides adequate circumstantial

evidence of an intent to conceal material information and justify a finding of inequitable

conduct.  (See Docket # 397 ¶¶ FF110-18.)

### a. The Prosecuting Firm and Attorney History of the '516 Patent

The complexity of the prosecuting attorney history of the '516 patent rivals that

of its PTO prosecution history.  Figure 43, identified as "the nucleotide sequence and

the amino acid sequence of IκB-α," was added as new matter in application

07/791,898, a continuation-in-part of several earlier Ariad applications, filed November

13, 1991.  (DTX 33 at ADL14822, 14851.)  This application was eventually abandoned,

but not before a continuation application, 08/418,266 ("the '266 application"), also

containing figure 43 was filed on April 6, 1995.  The '266 application spawned two

divisional applications containing figure 43, 08/463,397 ("the '397 application") and

08/464,364, which issued as the '516 patent.[40]  (See DTX 3300 (demonstrative exhibit

---

[40] A divisional application is a type of continuation patent application.  An
applicant is only allowed to claim one invention in a patent.  If the PTO determines that
an application contains more than one invention, it issues a restriction requirement and
the applicant must either abandon all but one invention or create one or more divisional
applications to pursue the other inventions in separate applications.  See generally

showing the '516 patent family lineage).)  The '266 application eventually issued as

U.S. Patent No. 5,804,374 on September 8, 1998.  After the claims were allowed, but

before the patent issued, figure 43 was deleted from the '266 application.  At that time

the applications were being prosecuted by the firm of Hamilton, Brooks, Smith &

Reynolds, P.C.  Lisa Warren ("Warren"), an attorney associated with that firm, filed an

amendment with the PTO on September 15, 1997, to remove figure 43 and more than

30 other figures.  (DTX 34 at ADL15351-71.)  Warren explained in the amendment that

the applicants did not believe the deleted figures were necessary for an understanding

of the invention.  (Id. at 15370.)  However, she also noted that "[i]t has recently come to

the Applicants' Attorneys' attention that figure 43 is not the nucleotide sequence of IκB-

α but the nucleotide sequence of pp40 rel-associated protein."  (Id.)  This information

apparently had been provided by Ariad employee Sharon Hausdorff ("Hausdorff").

(See Clauss Dep. Tr., 44:18-22, 62:2-6.)  The PTO subsequently disapproved the

request to amend due to confusion over the adequacy of the amendment.  (DTX 34 at

ADL15341.)

In late 1997, after this amendment was filed, but before it had been denied by

the PTO, responsibility for prosecution of the outstanding applications was transferred

to the firm of Foley, Hoag & Elliot LLP ("Foley Hoag").  (Id. at ADL15373.)  Dr. Isabelle

Clauss ("Clauss") was responsible for the day-to-day work on the applications.

However, Clauss had only limited recognition to prosecute patents for others before the

---

Herbert Schwartz, Patent Law and Practice § 2.III.D.6.c. (5th ed. 2006).

43

PTO.[41]   She worked with Vincent, who was the attorney at Foley Hoag responsible for the overall strategy for the prosecution of the Ariad applications.  (Trial Tr. Day 3, 44:16-25, 89:13-25.)  Vincent, an associate only three years her senior, testified that he provided guidance to Clauss and reviewed "substantive papers" she submitted to the PTO, as well as any other paper she brought to his attention.  (Id. at 90:19-23.)  However, Clauss would have handled "ministerial" actions, such as resubmitting documents, responding to requests for references and some amendments, on her own.  (Id. at 91:2-12).  On March 6, 1998, Clauss re-filed the previously disapproved amendment signed by Warren cancelling, inter alia, figure 43 and containing the admission that "Figure 43 is not the nucleotide sequence of IκB-α."  (DTX 34 at ADL15343-44.)  The PTO approved the resubmitted amendment and the patent on the '266 application issued without figure 43.

On January 12, 2000, after the claims were allowed on the divisional '397 application but before issuance, Clauss filed an amendment to delete the same figures that had been deleted in the '266 application, including figure 43.  The statement "[i]t has recently come to the Applicants' Attorneys' attention that figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein" appeared on the last page of the amendment, the same page bearing Clauss' signature.  (DTX 131 at ADL3629.)  Again, this information apparently had been provided by Ariad's Hausdorff.  (See Clauss Dep. Tr., 44:18-22.)  The PTO approved

---

[41] Clauss was granted limited recognition as a resident alien to prepare and prosecute patent applications under 37 C.F.R. § 10.9(b).  (See DTX 34 at ADL15345.)

the amendment and this patent also issued without figure 43.

In the beginning of 2001, Vincent moved his practice from Foley Hoag to Ropes & Gray LLP. The outstanding Ariad applications were transferred about the same time. (Trial Tr. Day 3, 44:1-6, 46:16-24.) Clauss remained at Foley Hoag and did no further work on any Ariad patent applications. The '516 patent ultimately issued on June 25, 2002. Lilly argues that the failure of Hausdorff, Vincent and Clauss to disclose the error in figure 43 to the PTO meets the threshold standard for intent necessary to consider a claim of inequitable conduct.

### b. Evidence of Intent by Hausdorff

Lilly's allegations fail as to Hausdorff. Hausdorff clearly was aware of the error, since she provided the information that figure 43 was incorrect in the '266 and '397 applications to the prosecuting attorneys. However, absent any showing that she intended the same information to be withheld on the '516 application, I cannot find an intent to mislead. It is troubling that PTO records show Hausdorff accompanied Vincent on two in-person interviews with Examiner Schwartzman during the prosecution of the '516 patent and after the figure had been removed from the other two patents. (See Interview Summary, April 7, 1998 (DTX2 at ADL495); Interview Summary, Jan. 26, 1999 (id. at ADL609).) However, Vincent's testimony did not establish that issues relevant to the figure were discussed or that Hausdorff intentionally withheld information. (Trial Tr. Day 3, 48:10-24.) She had previously disclosed the error to Clauss (who was not present at either PTO interview). As the representative of the client, she may have expected the patent attorneys at Foley Hoag to determine what

45

information was relevant to discuss with the examiner.[42]

### c.  Evidence of Intent by Vincent

Lilly's allegations against Vincent rest solely on the deposition testimony of Clauss.[43]  Clauss, not Vincent, signed both the '266 amendment resubmittal and the '397 amendment, each of which admitted the error in the figure.  Vincent testified that neither Clauss nor anyone else indicated to him that there was an issue with figure 43 during the pendency of the application for the '516 patent.  (Trial Tr. Day 3, 64:25-65:3.)  This is in conflict with Clauss' testimony, in which she stated that she discussed the issue regarding figure 43 with him.[44]  (See Clauss Dep. Tr., 57:18-22.) However, I find his testimony credible and therefore conclude that he did not conceal the error in figure 43, intentionally or otherwise.

### d.  Evidence of Intent by Clauss

Lilly's strongest evidence of misconduct is Clauss' failure to inform the PTO of the error in figure 43, but ultimately this too fails to rise to clear and convincing proof of

---

[42] In its proposed findings of facts, Lilly describes Hausdorff as "a patent agent at Ariad," however, it fails to cite to evidence in support of this description.  (Docket #  397 ¶ FF119.)  Even assuming she was a registered patent agent, there is still insufficient evidence to conclude that Hausdorff intentionally withheld the information concerning figure 43 from the PTO.

[43] Dr. Clauss did not testify at the bench trial; only a copy of her deposition testimony was available to the court.

[44] Clauss' testimony on the issue is, at best, equivocal.  She was uncertain about the time the conversations took place (Clauss Dep. Tr., 58:1-12), which patent applications they related to (id. at 58:13-19), whether the discussions included figure 43 being in error (id. at 68:5-19) or whether Vincent had seen the resubmittal to the PTO.  (Id. at 56:4-12.)

46

intent.  Clauss testified that she expected figure 43 to be canceled in the '516 application at some point.  However, it was standard practice at Foley Hoag to "prepare[] the figures once the case [was] indicated as allowable" to save money.  (Clauss Dep. Tr., 64:14-18, 67:1-10.)  This was the approach taken with the '266 and the '397 patents.  The '516 application was transferred to Ropes & Gray before the claims were allowed, therefore Clauss was no longer involved at the time she would normally have been expecting the figure to be corrected.  Lilly asserts, however, that Clauss had a duty to inform the PTO of the error earlier than allowance because she "made arguments for patentability based on the disclosure of IκB and/or IκB-encoding DNA."  (Docket # 402 ¶ CF291.)  It points to two separate responses to PTO Office Actions to support this claim.

### (1) Clauss' Testimony on Materiality

First, Lilly cites a response filed June 10, 1998, in which Vincent stated that the application provided "ample evidence . . . to fully enable those skilled in the art to practice the invention with respect to activation of expression of IκB."  (Docket # 397 ¶ FF97.)  Clauss admitted that, when this response was filed, the then existing claims called for an agent affecting NF-κB activity that consisted of all or a portion of DNA encoding IκB or all or a portion of IκB.  (Clauss Dep. Tr., 72:16-73:12.)  Clauss testified that she "[p]robably" considered figure 43 material to those claims.  (Id. at 72:16-73:12.)

However, this response was signed by Vincent, not Clauss.[45]  In addition, the

_____

[45] Dr. Clauss' signature appears only on the response attesting to the "Certification of Facsimile."  (DTX 2 at ADL517.)

response not only canceled the claims calling for an agent based on the sequence information of figure 43, but the remainder of the paragraph cited by Lilly discussed the binding of the NF-κB-IκB-α complex in general and not the use of an agent based on the sequence of IκB-α.  (DTX 2 at ADL529; compare id. at ADL465, claims 90, 92, with id. at ADL519 (canceling same).)  Therefore, Clauss' admission that figure 43 was material to claims 90 and 92 does not establish an intent to mislead.  These two claims, forwarded from the previous patent attorneys and which made the error in figure 43 material, were being canceled in the response filed by Foley Hoag.

### (2) Clauss' Response to Office Action

A little over a year later, on September 17, 1999, Clauss responded to a final PTO Office Action and defended the sufficiency of the disclosure with regard to gene therapy, explaining that an "expression vector containing IκB-encoding DNA can be introduced into an individual" and that "IκB itself . . . can also be introduced into cells to inhibit NF-κB . . . ."  (DTX 2 at ADL702.)  Lilly correctly points out that the only disclosure in the specification of such "IκB encoding DNA" is purportedly found in figure 43.  In addition, it asserts that Clauss was aware that the figure was not IκB-α when she defended the specification, and she was also aware that Ariad would lose the benefit of the longer patent term if they had to re-file the application.

Like Hausdorff's silence at PTO interviews, Clauss' failure to inform the PTO in September 1999 of the error in figure 43 is troubling.  However, this is a single error in a long and complicated patent prosecution.  It is easy in hindsight to portray a failure to act as something more than a mistake, oversight or negligence.  Molins, 48 F.3d at

48

1181 (expressing concern about "the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive.").  I do not find that Lilly has met its burden to show by clear and convincing evidence that Clauss made a deliberate decision to withhold the information from the PTO.  Compare M. Eagles, 439 F.3d at 1341 ("[A] failure to disclose a prior art device to the PTO, where the only evidence of intent is a lack of a good faith explanation for the nondisclosure, cannot constitute clear and convincing evidence sufficient to support a determination of culpable intent."), with Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Inc., 394 F.3d 1348, 1354 (Fed. Cir. 2005) (finding intent where applicant withheld relevant prior art for the PTO while at the same time disclosing it to the Food and Drug Administration in seeking approvals to sell device covered by patent).

Even though the error in figure 43 was material, Lilly has failed to meet the threshold showing necessary to prove intent and thus has failed to prove inequitable conduct.

### 6.   Evidence of Inventor Baldwin's Intent to Conceal References

The elements of inequitable conduct predicated on a failure to disclose material prior art are identical to those discussed supra, p. 21, Lilly must show by clear and convincing proof both (1) knowledge by the applicant of the prior art and its materiality; and (2) an intent to mislead the PTO.  Molins, 48 F.3d at 1178; M. Eagles, 439 F.3d at 1341.  Lilly identifies only Dr. Baldwin as possessing both the knowledge and intent necessary to meet the threshold for inequitable conduct.  (See Docket # 397 ¶¶ FF139-49.)  In particular, it argues that Baldwin was aware of his duty to disclose yet

49

intentionally failed to disclose the information on known NF-κB inhibitors based on his

deposition testimony:

> Q. Did you at any time consider disclosing your findings regarding
> Resveratrol in those experiments to the United States Patent Office?
>
> A. I mean I -- I considered it, but I -- again, I feel like that one would
> inundate the patent office with every report of -- of things that affect
> NF-κB one way or the other. It's -- you can do a search on NF-κB
> and it's endless.
>
> Q. Why is it you considered disclosing your findings regarding the
> effect of Resveratrol in your experiments to the United States
> Patent Office?
>
> A. Well, we signed -- we signed this document that says that was our
> obligation to do so at some point.

(Baldwin Dep. Tr. 171:16-172:5.)  This is a slender thread on which to hang a claim of

inequitable conduct.  Ultimately, it fails because Lilly has not established that Baldwin

was aware of the materiality of the withheld information.

There is no question that Baldwin was aware of the prior art, he was a co-author

of the papers describing it.  No evidence, however, suggests that Baldwin was aware of

the materiality of the information in the legal sense.  Baldwin is a scientist, not a patent

attorney.  His testimony admits to knowledge of his general duty to disclose "findings

regarding [his] experiments," but Lilly fails to show that he had any understanding that

a few short references to prior art compounds in a review paper had relevance to

inherent anticipation or that he was aware that they had not already been disclosed.  In

order to show the necessary intent, Lilly would first have to show that Baldwin not only

understood the need to disclose, but understood not only the concept of inherent

anticipation, but also that there was no need for contemporaneous recognition. Without such a showing, there is no reason to believe that Baldwin would understand, for example, that his statement that glucocorticoids had been used "for decades" could be relevant to the patent on his co-discovery of the mechanism by which NF-κB and IκB-α interact to suppress the expression of certain genes. A plain reading of Baldwin's testimony only admits to an understanding of the need to disclose the results of his current experiments, not his knowledge of the historical use of the same compounds.

Since the evidence fails to establish either knowledge of materiality or a motive to conceal, Baldwin's decision not to disclose background information concerning his current research is insufficient to prove by clear and convincing evidence an intent to deceive the PTO, and thus inequitable conduct.

### C.    Lilly's Prosecution Laches Defense

Lilly asserts that the sixteen-year delay between the initial filing of the application that eventually became the '516 patent and its issuance is unreasonable and unexplained, and resulted in material prejudice to the public and to litigants. It therefore argues that the '516 patent is unenforceable under the equitable defense of prosecution laches. This defense is based on the theory that a patent applicant should not be allowed to abuse the procedures for obtaining a patent in a way that unreasonably extends the patent grant and delays the release of the patented technology into the public domain.[46]

------

[46] Prior to June 1995, patent owners who experienced a long examination period before the patent issued in effect obtained an extension of the term of their patent grant. This occurred because the term of the patent grant was seventeen years from

51

## 1.    The Legal Standard for a Finding of Prosecution Laches

Obtaining a patent is often a lengthy process, with an average pendency in 2006

between application and either abandonment or grant of a U.S. Patent of over thirty-

one months.[47]  An inventor can deliberately extend the examination period while

preserving the original priority date through a number of techniques, including

responding to PTO actions as slowly as possible, filing continuation applications,

and/or abandoning and refiling applications.

Federal courts have long recognized that excessive delay by an inventor in the

prosecution of a patent may render it unenforceable.  See Woodbridge v. United

States, 263 U.S. 50, 63 (1923); Webster Elec. Co. v. Splitdorf Elec. Co., 264 U.S. 463,

466 (1924).  However, a series of recent Federal Circuit decisions make clear that the

---

the date of issuance; however a patent owner is granted priority on his or her invention
from at least the date of application.  Thus, a patent owner who experienced a long
examination period could potentially reap the rewards of a larger pool of infringing
defendants or a larger market from which to collect royalties.

In 1994 Congress changed the patent term from seventeen years from date of
issuance to twenty years from date of application.  This greatly reduced the ability of
patent holders to create so-called "submarine" patents, that is, patented technology
that remains unpublished until it surfaces years after application and surprises the
market and effectively eliminates the issue of prosecution laches for patent applications
filed after June 7, 1995.  See Uruguay Round Agreements Act, Pub. L. No. 103-465,
108 Stat. 4809, codified at 35 U.S.C. § 154(a)(2).  In addition, prior to 1999 patent
applications were kept confidential by the PTO, with the result that potential infringers
had no notice of a pending patent during its pendency.  The 1999 American Inventors
Protection Act provided for the publication of many patent applications 18 months after
filing, giving potential infringers notice of pending patents in some cases.  See Pub. L.
No. 106-113, 113 Stat. 1501, codified at 35 U.S.C. § 122(b).

[47] See U.S. Patent and Trademark Office, Performance and Accountability
Report (Fiscal Year 2006) at 22, available at
http://www.uspto.gov/web/offices/com/annual/ (last visited July 2, 2007).

defense of prosecution laches will only succeed in extraordinary circumstances. <u>See</u> <u>Symbol Techs. Inc. v. Lemelson Med.</u>, 277 F.3d 1361 (Fed. Cir. 2002) ("<u>Symbol I</u>"); <u>Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., L.P.</u>, 301 F. Supp. 2d 1147 (D. Nev. 2004) ("<u>Symbol II</u>"); <u>Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP</u>, 422 F.3d 1378, 1385 (Fed. Cir. 2005) ("<u>Symbol III</u>") (collectively the "<u>Symbol</u> Cases").  It is not enough for a defendant to show sequential divisional applications on various aspects of the invention, nor is it enough to merely show refiling of rejected claims or the use of continuation applications to add new subject matter. <u>See</u> <u>Symbol III</u>, 422 F.3d at 1385.  On the other hand, extreme delay extending the application process from 18 to 39 years, filing an application after allowance to postpone issuance, or repetitive filings that show a pattern of unjustifiably drawn out prosecution may constitute abuse of the patent system such as to amount to prosecution laches.  <u>Id.</u> at 1386.

### 2.  Analysis of Delays in the Prosecution of the '516 Patent

Lilly alleges that Ariad and/or their attorneys took advantage of PTO procedural rules to delay prosecution of the '516 patent in a manner that requires equitable relief from this court.  Because there is no evidence that Ariad violated any specific rule or that it intentionally delayed prosecution of the '516 patent, Lilly asks this court to examine the "totality of the circumstances" to conclude that there was unreasonable and unexplained delay sufficient to trigger laches.  <u>Symbol III</u>, 422 F.3d at 1385.  In particular, Lilly points to: (1) Ariad's refiling of continuation applications rather than appealing the PTO's final rejection of claims; (2) extending the time to respond to office

actions to the maximum six-month period allowed by statute; (3) prosecuting the claims

to the invention in multiple applications and abandoning those attempts when the

claims were rejected by the PTO; and (4) Ariad's use of transitional rules to avoid a

shortened patent term.

### a. Requirement to File an Appeal

Lilly has cited no authority to support its assertion that an applicant's decision to

abandon an application and file a continuation application, rather than appeal the

examiner's rejection of its claims, is an indication of unreasonable and unexplained

delay in prosecution. Indeed, the continued examination of applications is expressly

provided for by statute[48] and described as an alternative to appeal by the PTO. MPEP

§ 706.07(h) (8th ed., rev. 5, Aug. 2006) ("If an applicant files a request for continued

examination under this section after appeal, . . . it will be treated as a request to

withdraw the appeal and to reopen prosecution of the application"). Lilly asserts that

an appeal would have expedited prosecution and that "[t]here must be an obligation to

take a timely appeal." (Def.'s Pre-Trial Br. (Docket # 362) at 19.) In the absence of

evidence or case law to support these contentions, I decline to find that a decision not

to appeal a final rejection constitutes an unreasonable or unexplained delay in

prosecution.[49]

---

[48] See 35 U.S.C. § 132 ("Notice of rejection; reexamination.").

[49] The accuracy of Lilly's assertion that an appeal would have expedited prosecution is dubious. The Practising Law Institute advises practitioners receiving a final rejection to file a continuation application because, "[t]he backlog at the Board of Patent Appeals is often several years. . . . If, after the occurrence of one or more in-person interviews with an examiner (and supervising examiner if possible), as well

### b. Six Month Response to Office Actions

Lilly next claims that Ariad's use of the full six-month period provided by statute (35 U.S.C. § 133; see also MPEP § 710.02(a)(1)) to respond to Office Actions, rather than responding in the shortened regulatory period of three-months set by the PTO (MPEP § 710.02(b)), should be considered evidence of unreasonable delay.  Again, Lilly fails to cite any support for this proposition, nor does it show that use of the full six-month period is unusual or atypical in patent prosecution generally.  Rather, Lilly proposes that the additional time taken by Ariad in responding to the PTO compounds the other unreasonable delays they allege in prosecuting the patent.  Because I do not find the total time to prosecute the '516 patent unreasonable (see infra), the use of the full statutory period to respond to Office Actions is not unreasonable.

### c. The Pre-'898 Applications

Finally, Lilly points to the number of abandoned and refiled applications concerning the subject matter of the '516 patent as evidence of unreasonable and unexplained delay.  Specifically, Lilly points to the sixteen-year delay and the eight abandoned applications between the first Ariad application and the issuance of the '516 patent.  Between January 1986 and April 21, 1989, the date found by the jury to be the effective filing date of the '516 patent, Ariad filed seven patent applications.  These seven applications were eventually abandoned after being consolidated into the

as the filing of one or more continuation applications, it is clear that an important application will never get allowed by the examiner, it may be worth filing the appeal if the applicant is willing to wait for years."  Jeffrey R. Kuester, Prosecuting a Patent That Holds up in Litigation (or, Destroying a Patent Unaware), 669 PLI/Pat 1033, 1070 (West 2001).

07/791,898 application, filed November 31, 1991.  Ariad describes the filing of these

continuation-in-part applications as reasonable in order to "add further material

regarding the inventors' ongoing work with NF-κB, which had rapidly advanced the

field."  (Pls.' Supl. Trial Brief (Docket # 360) at 20 n.14.)  The Federal Circuit

specifically noted that such filings are common and justified as the development of an

invention progresses.  Symbol III, 422 F.3d at 1385.  Therefore, I do not find the

applications prior to the '898 application to be unreasonable or unexplained under

these circumstances.

### d. Post Development Applications

Thirteen months after the '898 application was filed, the examiner issued a

restriction requirement, finding the original claims were directed toward multiple

inventions.  (See DTX33 at ADL15159-70, ADL15166.)  Ariad elected to pursue a

subset of its claims that addressed a method of inducing gene expression.  (Id.)  The

examiner ultimately rejected all pending claims in a final Office Action dated July 6,

1994.  (Id. at ADL15222-30.)  Rather than appealing this decision, Ariad chose to file a

continuation application, 08/418,266, on April 6, 1995.  The inventions contained within

this application eventually resulted in three U.S. patents: (1) 5,804,375,  issued

September 8, 1998 claiming methods of identifying an antagonist of gene transcription;

(2) 6,150,090, issued November 21, 2000, claiming an improved assay for protein-DNA

binding; and (3) the '516 patent, issued June 25, 2002.  (DTX 3300.)

### (1) Prejudice to Public Rights

While prejudice to intervening public and private rights is a factor in determining laches, Ariad diligently, albeit serially, pursued the '898 application to obtain three patents on the inventions disclosed.  Nothing in the statute or regulations requires that an applicant pursue all of his or her inventions in parallel.  Indeed, the granting of the first patent might well be necessary for an inventor with limited resources to fund the prosecution of the remaining claims.  Here, the time between each of the three patents granted was only two years, and specification was public for only four years while the scope of the claims was uncertain.  This is a far cry from the almost 30-year period of uncertainly between the disclosures first made public by Lemelson in his 1962 and 1963 patents and the claims finally granted in 1989 and the early 1990s on those same disclosures.  See Symbol II, 301 F. Supp. 2d at 1155-56.  In addition, there is no evidence that Ariad specifically tailored its claims to cover intervening inventions by Lilly or others as the court found Lemelson had done with his late 1980s and 1990s claims.  Id. at 1156.  Given Ariad's diligent pursuit of the three patents eventually granted, I do not find the four-year period, during which the scope of what was to be claimed and what was to be dedicated to the public was uncertain, unreasonable or unexplained.

### e. Use of Transitional Rules

Lilly also suggests that Ariad's use of a provision in the 1995 transitional rules that allowed it to maintain a seventeen-year patent term from date of grant and their petitioning the examiner to withdraw his final rejection of their application to avoid loss

of potential patent term should be considered in the determination of prosecution laches.  However, Ariad's desire to obtain the maximum term for its patent grant, particularly when the rules were being changed, is neither unreasonable nor unexplained.  Indeed, Congress recognized the potential unfairness of changing the rules mid-stream and provided for transitional rules available to all inventors in similar circumstances.[50]  Therefore, I do not find Ariad's actions to maximize the term of their patent grant under the transitional rules relevant to determining laches.

Nothing in the prosecution history of the '516 patent shows the kind of willful conduct and deliberate delay by Lemelson found by the court to require equitable relief in Symbol II.[51]  While the prosecution of the '516 patent involved multiple applications, numerous interactions with the PTO and the significant passage of time, the inventors

---

[50] Title 35 U.S.C. § 154(c)(1) (2002) ("The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20-year term as provided in subsection (a), or 17 years from grant.").

[51] It appears that Lemelson's conduct in the Symbol Cases represents the only time a district court found a prosecution delay unreasonable and unexplained enough to trigger prosecution laches.  See Kothmann Enters., Inc. v. Trinity Indus., Inc., 2006 WL 89838, at *31 (S.D. Tex. Jan. 13, 2006) (comparing Symbol II to six cases with prosecution delays ranging between seven and fifteen years, but where laches was not found).  While Lilly traces the prosecution history of the '516 patent in excruciating detail, it fails to provide any evidence showing that this history was atypical of patents in its field or of similar scope.  The thirteen years between the '486 application, found by the jury to be the effective date of the '516 patent and its issuance, is significantly less than the 18- to 39-year delay in the Symbol Cases.  In addition, there is no evidence that Ariad refiled applications after its claims were allowed; rather, it pursued its inventions in the face of multiple rejections of most of its claims.  Cf. Symbol III, 422 F.3d at 1385 ("[R]efiling an application solely containing previously-allowed claims for the business purpose of delaying their issuance can be considered an abuse of the patent system.").

were seeking broad patent protection on evolving discoveries involving many inventions.  Lilly has failed to show that this conduct was unreasonable or unexplained under the circumstances.  This court does not find prosecution laches that would bar enforcement of the '516 patent.

## IV.    Conclusion

Because the four claims found infringed by the jury do not encompass unpatentable subject matter and the patent is not invalid due to inequitable conduct or prosecution laches, the '516 patent is valid and enforceable.

Judgment may be entered for plaintiffs in accordance with the verdict of the jury and the court's findings of fact and conclusions of law.


_____July 6, 2007_____                    _____/s/Rya W. Zobel_____
              DATE                                       RYA W. ZOBEL
                                            UNITED STATES DISTRICT JUDGE

# EXHIBIT 67

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **ARIAD PHARMACEUTICALS, INC.,** ) | |
| **MASSACHUSETTS INSTITUTE OF** ) | |
| **TECHNOLOGY, THE WHITEHEAD** ) | |
| **INSTITUTE FOR BIOMEDICAL** ) | **Civil Action No. 02 CV 11280 RWZ** |
| **RESEARCH, and THE PRESIDENT** ) | |
| **AND FELLOWS OF HARVARD** ) | |
| **COLLEGE** ) | **U.S. District Judge** |
| ) | **Rya W. Zobel** |
| **Plaintiffs,** ) | |
| **v.** ) | |
| ) | |
| **ELI LILLY AND COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**Of Counsel**
Paul R. Cantrell
Gilbert T. Voy
Alexander Wilson
Eli Lilly and Company
Lilly Corporate Center
Indianapolis, IN 46285
Telephone: (317) 276-3885
Facsimile: (317) 276-1294


Robert D. Bajefsky
David S. Forman
Howard W. Levine
Laura P. Masurovsky
Sanya Sukduang
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER L.L.P.
901 New York Ave., N.W.
Washington, DC 20001
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

/s/ Charles E. Lipsey
Lawrence R. Robins (BBO# 632610)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER L.L.P.
55 Cambridge Parkway
Cambridge, MA 02142
Telephone: (617) 452-1600
Facsimile: (617) 452-1666


Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER L.L.P.
11955 Freedom Drive
Reston, Virginia 20190
Telephone: (571) 203 2700
Facsimile: (202) 408-4400


**Attorneys for Defendant Eli Lilly and Company**

# TABLE OF CONTENTS

*Page(s)*

I.  INTRODUCTION ..................................................................................................1

II. LILLY IS ENTITLED TO JMOL THAT THE ASSERTED CLAIMS ARE
    INVALID UNDER 35 U.S.C. § 112 ....................................................................2

    A.  The Technology Underlying the '516 Patent................................................2

    B.  The Claims of the '516 Patent ....................................................................3

    C.  The Specification Describes Potential NF-κB Inhibitors Solely by
        Function ......................................................................................................4

        1.  Specific Inhibitor Molecules.............................................................5

        2.  Dominantly Interfering Molecules.....................................................6

        3.  Decoy Molecules ...............................................................................7

    D.  The Asserted Claims Fail to Satisfy the Written Description Requirement ...........8

        1.  The Written Description Requirement Prevents Patentees from
            Claiming Subject Matter They Did Not Invent...................................8

        2.  The '516 Patent Fails to Provide a Sufficient Written Description
            and Lilly Is Entitled to JMOL .......................................................11

        3.  The Court's Jury Instructions Prejudiced Lilly................................13

    E.  The Asserted Claims Are Invalid for Lack of Enablement..........................14

        1.  A Claim Purporting to Cover All Means or Steps for Attaining a
            Particular Result Is Invalid as a Matter of Law .........................14

        2.  The Specification Is Not Commensurate with the Claims' Full
            Scope................................................................................................15

        3.  Ariad's Claims Are Not Enabled for Therapeutic Use in Humans
            and Are Invalid as a Matter of Law .............................................19

    F.  Lilly Is Entitled to a New Trial on Enablement and Other Issues Affected
        by the Effective Filing Date.......................................................................22

        1.  Ariad's False Evidence Will Result in a Miscarriage of Justice................22

        2.  The Court's Erroneous Jury Instructions Prejudiced Lilly .......................23

3.    Lilly Is Entitled to a New Trial on the Issues Affected by the Effective Filing Date................................................................23

III.    CLAIMS 144 AND 145 ASSERTED AGAINST USE OF XIGRIS® ARE EITHER NOT INFRINGED OR INVALID ......................................................25

A.    Ariad Argued Inconsistent Claim Construction Positions......................................25

B.    Ariad's Inconsistent Claim Construction Positions Warrant JMOL.....................27

IV.    CLAIMS 80 AND 95 ASSERTED AGAINST EVISTA® ARE EITHER NOT INFRINGED OR ARE INVALID.............................................................................28

A.    Claim 95 Must Be Invalid or Not Infringed as a Matter of Law ..........................28

B.    Ariad's Evidence Did Not Establish Infringement as a Matter of Law................29

C.    Lilly Is Not Liable for Indirect Infringement Under Either § 271(b) or (c) ..........32

1.    Lilly Did Not Induce Infringement ............................................................32

2.    Lilly Did Not Contribute to the Alleged Infringement ..............................33

D.    Claims 80 and 95 Are Inherently Anticipated ......................................................35

1.    The Law of Inherent Anticipation..............................................................35

2.    The Jones Patent Inherently Anticipates Claims 80 and 95......................35

3.    Other Chemical Compounds Existing in the Prior Art .............................38

E.    The Court's Wrongful Exclusion of Evidence Warrants a New Trial..................41

V.    CONCLUSION......................................................................................................44

## TABLE OF AUTHORITIES

## CASES

*Page(s)*

*Acevedo-Garcia v. Monroig,*
  351 F.3d 547 (1st Cir. 2003) ................................................................................................1

*Ahern v. Scholz,*
  85 F.3d 774 (1st Cir. 1996) ..........................................................................................22, 23

*Amgen Inc. v. Hoehst Marion Roussel, Inc.,*
  314 F.3d 1313 (Fed. Cir. 2003) ....................................................................................27, 37

*Aro Manufacturing Co. v. Convertible Top Replacement Co.,*
  377 U.S. 476 (1964) ......................................................................................................33

*Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.,*
  750 F.2d 1569 (Fed. Cir. 1984) ........................................................................................20

*Automotive Technologies International, Inc. v. BMW of North America, Inc.,*
  No. 2006-1013, 2007 WL 2493281 (Sept. 14, 2007) ................................................18, 19, 21

*Brenner v. Manson,* 383 U.S. 519 (1966) ............................................................................11

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.,*
  246 F.3d 1368 (Fed. Cir. 2001) ....................................................................................35, 36

*C.R. Bard, Inc. v. Advanced Cardiovascular System, Inc.,*
  911 F.2d 670 (Fed. Cir. 1990) ..........................................................................................25

*Colon-Millin v. Sears Roebuck de P.R., Inc.,*
  455 F.3d 30 (1st Cir. 2006) ..............................................................................................22

*DSU Medical Corp. v. JMS Co.,*
  471 F.3d 1293 (Fed. Cir. 2006) ........................................................................................33

*Eli Lilly & Co. v. Barr Laboratories, Inc.,*
  251 F.3d 955 (Fed. Cir. 2001) ..........................................................................................42

*Enzo Biochem, Inc. v. General-Probe Inc.,*
  323 F.3d 956 (Fed. Cir. 2002) ......................................................................................9, 14

*Fiers v. Revel,*
  984 F.2d 1164 (Fed. Cir. 1993) ..................................................................................8, 9, 13

iii

*In re Fisher*,
    427 F.2d 833 (C.C.P.A. 1970) ...................................................................17

*Genentech, Inc. v. Novo Nordisk, A/S*,
    108 F.3d 1361 (Fed. Cir. 1997).............................................................15, 21

*Genentech, Inc v. Wellcome Foundation, Ltd.*,
    29 F.3d 1555 (Fed. Cir. 1994)...............................................................30, 31

*Guilloty Perez v. Pierluisi*,
    339 F.3d 43 (1st Cir. 2003)......................................................................1, 19

*In re Hyatt*,
    708 F.2d 712 (Fed. Cir. 1983)........................................................................15

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)....................................................................27

*Invitrogen Corp. v. Clontech Laboratories Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005).............................................................17, 18

*KSR International Co. v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007).....................................................................................42

*Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006).....................................................................31

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    481 F.3d 1371 (Fed. Cir. 2007).............................................................18, 19

*Manville Sales Corp. v. Paramount System, Inc.*,
    917 F.2d 544 (Fed. Cir. 1990).......................................................................32

*Montgomery Ward & Co. v. Duncan*,
    311 U.S. 243 (1940)...................................................................................1, 43

*National Recovery Techs., Inc. v. Magnetic Separation System, Inc.*,
    166 F.3d 1190 (Fed. Cir. 1999).....................................................................15

*New Railhead Manufacturing, L.L.C. v. Vermeer Manufacturing Co.*,
    298 F.3d 1290 (Fed. Cir. 2002).......................................................................8

*Noelle v. Lederman*,
    355 F.3d 1343 (Fed. Cir. 2004).......................................................................9

*Novo Nordisk Pharms., Inc. v. Bio-Technology General Corp.*,
   424 F.3d 1347 (Fed. Cir. 2005)................................................................38

*O'Reilly v. Morse*,
   56 U.S. 62 (1853).....................................................................14, 15

*Peters v. Active Manufacturing Co.*,
   129 U.S. 530 (1889)...................................................................9, 36

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007).........................................................30, 34

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005).............................................................42

*Plant Genetic System, N.V. v. DeKalb Genetics Corp.*,
   315 F.3d 1335 (Fed. Cir. 2003).........................................................15, 17

*Regents of University of Cal. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997) ........................................................ passim

*Reiffin v. Microsoft Corp.*,
   214 F.3d 1342 (Fed. Cir. 2000).............................................................8

*Schering Corp. v. Geneva Pharms., Inc.*,
   275 F. Supp. 2d 534 (D.N.J. 2002), *aff'd*, 339 F.3d 1373 (Fed. Cir. 2003) ................... passim

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005).......................................................35, 37, 42

*Spirtual Trees v. Lamson & Goodnow Manufacturing Co.*,
   424 F. Supp. 2d 302 (D. Mass. 2006) ......................................................1

*In re Swinehart*,
   439 F.2d 210 (C.C.P.A. 1971) .............................................................15

*University of Rochester v. G.D. Searle & Co.*,
   358 F.3d 916 (Fed. Cir. 2004).......................................................... passim

*In re Vaeck*,
   947 F.2d 488 (Fed. Cir. 1991).......................................................15, 16, 21

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991).............................................................8

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988)........................................................................20

*Water Techs. Corp. v. Calco Ltd.,*
    850 F.2d 660 (Fed. Cir. 1988)........................................................................32

*White v. Dunbar,*
    119 U.S. 47 (1886)........................................................................................27

*Whitfield v. Melendez-Rivera,*
    431 F.3d 1 (1st Cir. 2005)................................................................................1

*In re Wright,*
    999 F.2d 1557 (Fed. Cir. 1993)......................................................................15

## FEDERAL STATUTES

35 U.S.C. § 101 .............................................................................................................3

35 U.S.C. § 102.................................................................................................. passim

35 U.S.C. § 103...............................................................................................................42

35 U.S.C. § 112.................................................................................................. passim

35 U.S.C. § 271.................................................................................................. passim

Fed. R. Civ. P. 50(b)........................................................................................................1

Fed. R. Civ. P. 59............................................................................................................1

Fed. R. Evid. 801(c)......................................................................................................42

Fed. R. Evid. 801(d)(2)..................................................................................................43

Fed. R. Evid. 803(3)......................................................................................................43

Fed. R. Evid. 803(8).........................................................................................................9

Fed. R. Evid. 804(b)(3)..................................................................................................43

## MISCELLANEOUS

*Manual of Patent Examining Procedure* § 2112 (V)(8th ed. Rev. 2, May 2004) ........................41

## I.   INTRODUCTION

Defendant, Eli Lilly and Company ("Lilly"), renews its motion, pursuant to Fed. R.

Civ. P. 50(b), for judgment as a matter of law (JMOL) that the asserted claims of U.S. Patent No.

6,410,516 ("the '516 patent") do not satisfy the written description and enablement requirements

of 35 U.S.C. § 112, cannot be infringed by Lilly's accused products under 35 U.S.C. § 271, and

are invalid under 35 U.S.C. § 102.  JMOL is warranted if "there is no legally sufficient

evidentiary basis for a reasonable jury to find for the [non-moving] party."  *Guilloty Perez v.*

*Pierluisi*, 339 F.3d 43, 50 (1st Cir. 2003); Fed. R. Civ. P. 50(a)(1).  Here, as discussed in detail

below, a reasonable jury could not find for Ariad on any of these grounds.

If this Court denies Lilly's request for a JMOL, Lilly requests a new trial pursuant to Fed.

R. Civ. P. 59.  Courts will order a new trial if the "the verdict is against the demonstrable weight

of the credible evidence or results in a blatant miscarriage of justice."  *Whitfield v. Melendez-*

*Rivera*, 431 F.3d 1, 9 (1st Cir. 2005)(quoting *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 565

(1st Cir. 2003).  Grounds for a new trial include that "the verdict is against the weight of the

evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the

party moving; and may raise questions of law arising out of alleged substantial errors in

admission or rejection of evidence or instructions to the jury."  *Montgomery Ward & Co. v.*

*Duncan*, 311 U.S. 243, 251 (1940); *Spirtual Trees v. Lamson & Goodnow Mfg. Co.*, 424 F.

Supp. 2d 302, 303 (D. Mass. 2006)(quoting *Montgomery Ward*).

Lilly requests a new trial because:  (1) the Court's jury instructions and exclusion of

relevant evidence were contrary to law and significantly prejudiced Lilly; (2) the jury's verdict

on the validity and infringement issues (including those on which JMOL is sought) is against the

clear weight of the evidence and/or would result in a miscarriage of justice; (3) Ariad's

inconsistent claim constructions in connection with its infringement and validity proofs rendered

the trial fundamentally unfair and further prejudiced Lilly; and (4) newly available evidence refutes Ariad's defenses, including the allegation that claims 80 and 95 were not inherently anticipated.

## II.    LILLY IS ENTITLED TO JMOL THAT THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112

Title 35, U.S.C., Section 112 requires that the patent specification "describe" the invention and "enable" those skilled in the art to practice the full scope of the claimed invention without undue experimentation. This is the part of the statutory bargain received by the public in exchange for providing the patentee with the right to exclude others from practicing the claimed invention. The description requirement ensures that the patentee was actually in possession at the time of filing of what is later claimed. The enablement requirement ensures that the public has been taught how to make and use the invention so they may do so after patent expiration. Consistent with this statutory bargain, the level of required description and enablement in the specification necessarily increases with the scope of the claims and the unpredictability of the technology. The scope of the claims must be commensurate with the teaching in the patent—one simply cannot claim broadly but teach narrowly. Broad claims in an unpredictable field, such as those involved here, must be supported by a very substantial written description. To provide the necessary teaching, a patentee can provide a textual description of sufficient depth and breadth to teach those skilled in the art how to practice the full scope of the claimed invention or provide a sufficiently diverse group of actual examples of carrying out the claimed invention throughout its scope. As discussed below, the specification of the '516 patent does neither.

### A.    The Technology Underlying the '516 Patent

The work described in the '516 patent analyzed how a naturally-occurring protein, called "NF-κB," acts as an intracellular messenger by regulating the expression of certain genes. (PTX

1 at col.2, ll.26-31.)  By breaking open cells and studying their contents in a test tube ("*in vitro*"),

the inventors of the '516 patent determined that the inactive form of NF-κB is bound to another

protein, designated as "IκB," in the cytoplasm of a cell.  (*Id.* at col.2, ll.51-54; Day 2 Tr. 127:7-

10.)  In response to stimuli from outside the cell, IκB separates from NF-κB, which allows NF-

κB to travel from the cytoplasm to the nucleus where it binds to sites on the DNA and stimulates

the transcription of various genes, some of which play a role in the immune response.  (PTX 1 at

col.16, ll.22-28; Day 2 Tr. 127:7-10, 128:7-23; Day 3 Tr. 57:3-6, 61:15-16.)

**B.    The Claims of the '516 Patent**

The claims of the '516 patent are extremely broad, covering all ways of inhibiting NF-κB

in a cell and encompassing the administration of ***any*** chemical compound that inhibits NF-κB

activity.  The claims specify no disease, no particular chemical compound, no step of drug

administration, no requirement for an effective dose, and no patient population.  Claim 95 is

illustrative:

> A method for reducing, in human cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

(*See* Appendix A.)  As found by the Court, the "only step required to practice the broadest

patented method is to 'reduc[e] NF-κB activity in the cell such that the expression of said gene is

inhibited[;]' [n]o particular agent or substance need be used, nor any particular step(s)

performed, to reduce NF-κB activity . . . ."  (Slip Op. at 6-7.)[1]  "Each of these claims talks about

a method, and each of the claims describes a method for doing something, but it doesn't say what

---

[1] The Court's Findings of Facts and Conclusions of Law, dated July 6, 2007, from the bench trial on the issues of inequitable conduct and validity under 35 U.S.C. § 101 (D.I. 406) is referred to as "Slip Op. at __."

the method is. It simply gives the end result." (Jan. 13, 2004, Markman Tr. at 4:3-6.) The Court's construction was also reached by the PTO in finally rejecting the asserted claims. "[T]he sole method step is functional i.e. reducing NF-κB activity[;] . . . the claims would encompass any *in vitro* or *in vivo*, direct or indirect or natural or man-made means of reducing NF-κB activity." (PTO Final Rejection at 17.)[2]

###    C.    The Specification Describes Potential NF-κB Inhibitors Solely by Function

Although the claims of the '516 patent are very broad, covering all ways of inhibiting NF-κB, the specification of the '516 patent teaches little—only ***proposing*** that chemical compounds might be discovered that would affect NF-κB activity. (PTX 1 at col.34, l.66 - col.35, l.12.) The patent then speculates that, if found, such compounds could possibly affect certain diseases that are caused by the "overactivity" of NF-κB. (*Id.*) However, while the '516 patent proposes *in vitro* assays[3] to find such compounds (using a trial and error approach), it does not contain a single example where the assays were successfully used, nor does it describe the use of any inhibitor to reduce NF-κB activity in an intact cell or to treat any disease in an animal. Instead of describing actual chemical compounds that can inhibit NF-κB activity, the patent speculates that three different functional classes of chemical compounds will allegedly perform this task: (1) "a specific inhibitor molecule," (2) "'dominantly interfering' molecules," and (3) "'decoy' molecules." (PTX 1 at col.37, l.43 - col.38, l.22.)

---

[2] In the reexamination of the '516 patent, on July 6, 2007, the U.S. Patent and Trademark Office ("PTO") finally rejected the asserted claims as invalid over some of the same prior art cited to the jury. This document (D.I. 407) is cited as "PTO Final Rejection at __." This decision is cited herein as persuasive authority, demonstrating how another competent tribunal addressed the same issues now before this Court. It is also evidence that was not available at the time of the jury trial warranting a new trial.

[3] Those assays are the subject of separate U.S. patents not here in suit. (U.S. Patent Nos. 6,150,090 and 5,804,374.)

### 1.     Specific Inhibitor Molecules

According to the '516 patent, a "specific inhibitor molecule" is a molecule that binds to NF-κB and keeps it "anchored" in the cytoplasm.  (Day 3 Tr. 65:22-25; PTX 1 at col.37, l.44.) The patent identifies the naturally occurring protein "IκB" as a "specific inhibitor molecule." (PTX 1 at col.37, ll.48-49.)  The patent, however, does not teach how one is supposed to introduce a foreign IκB molecule into an intact cell.  Dr. Sharp (an inventor) specifically testified that, prior to 1991, no one in his laboratory could use "I-kappaB protein[s] to reduce NF-kappaB activity in cells" because they "couldn't introduce a protein into cells . . . ."  (Day 3 Tr. 33:3-8.) This testimony was confirmed by Dr. Baltimore (another inventor) who also testified (by deposition) that the '516 patent does not disclose a method for getting an IκB protein into a cell. (Day 11 Tr. 125:11-19; Day 3 Tr. 108:9-23.)  Lilly's expert, Dr. Latchman, testified that there is not a single working example in the patent of introducing IκB into an intact cell to reduce NF-κB activity.  (Day 11 Tr. 124:15-125:20; Day 13 Tr. 138:16-139:15.)  Ariad could not (and did not) rebut Dr. Latchman's testimony.

In response, Ariad offered conclusory expert testimony that it was possible to use "gene therapy" to get an IκB gene into a cell. (Day 13 Tr. 103:4-104:7.)  One need look no further than the morning newspaper[4] to see that human "gene therapy" even today is only a risky experimental procedure.  This reality refutes the suggestion that "gene therapy" could have been routinely practiced by physicians of only ordinary skill nearly two decades ago when the application for the '516 patent was filed.  Even if it was somehow possible to use "gene therapy" then, one following the teachings of the '516 patent would have used the ***wrong*** gene because the

---

[4] *See* Rick Weiss, *Role of Gene Therapy In Death Called Unclear*, Washington Post, September 18, 2007, at A4 (http://www.washingtonpost.com/wp-dyn/content/article/2007/09/17/AR2007091701588_pf.html).  (Ex. 1.)

DNA sequence for IκB described in the patent is incorrect.  Although the '516 patent purports to disclose mammalian IκB (at Figure 43), the molecule (and corresponding DNA) reported in Figure 43 of the '516 patent is in fact from a chicken protein called "pp40."  (Day 11 Tr. 132:9-133:3; Day 13 Tr. 53:20-24.)  However, even the reported description of the chicken sequence is *wrong*—it has incorrect amino acids at both the beginning and end of the sequence and is missing amino acids that are needed for proper function.  (Slip Op. at 27-28.)  Due to the errors in this sequence, this Court has specifically found that the Figure 43 "amino acid sequence . . . cannot be used as described in the '516 patent to reduce the activity of NF-κB."  (*Id*. at 29.)  Thus, although the claims specifically recite inhibiting NF-κB in human cells, there is no DNA sequence for human or mammalian IκB in the '516 patent—only a non-functional variant of a chicken protein.  While the patent suggests the possibility of using an "IκB-like protein" (PTX 1 at col.32, l.24), the structural features of what constitutes the class of "IκB-like" proteins are nowhere described.

## 2. Dominantly Interfering Molecules

The '516 patent also mentions "dominantly interfering molecules," which it characterizes as molecules that allegedly sit (inactively) on the NF-κB binding site in the nucleus and prevent NF-κB binding.  (PTX 1 at col.38, ll.15-17.)  The patent, however, does not identify any dominantly interfering molecules or explain what they look like.  Ariad's expert witness merely testified that dominantly interfering molecules must have separate binding and activation domains such that they bind to the NF-κB binding site but do not activate transcription.  (Day 13 Tr. 128:17-129:23.)  However, the structural knowledge of the NF-κB protein required to design such a molecule was not disclosed in the patent.  (Day 11 Tr. 144:5-7; Day 13 Tr. 131:4-6.)  The patent merely states a dominantly interfering molecule could be constructed  "*if* the DNA

binding domain and the DNA . . . activating domain of NF-κB are spatially distinct in the

molecule . . . ."  (PTX 1 at col.38, ll.8-10 (emphasis added).)  Ariad's expert agreed that the

"patent itself doesn't disclose in its text that the DNA binding domain and the . . . activating

domain of NF-kappaB are, in fact, separable or spatially distinct."  (Day 13 Tr. 130:10-24.)  And

there is no evidence that those skilled in the art could then have designed a compound that would

have those traits.  Dr. Maniatis (another inventor) admitted that, as late as the November 1991

filing date of the '516 patent, he had never prepared a dominantly interfering molecule to reduce

NF-κB activity in a cell.  (Day 3 Tr. 107:12-22.)[5]

### 3.  Decoy Molecules

"Decoy molecules" allegedly contain binding sites similar to the NF-κB recognition site

in the nucleus.  (PTX 1 at col.37, l.64 - col.38, l.5.)  Rather than binding to its correct recognition

site, the patent proposes that NF-κB could be fooled into binding to a decoy molecule instead.

The '516 patent, however, also does not describe an actual decoy molecule or contain an

example of using a decoy molecule to reduce NF-κB activity in cells.  Dr. Maniatis testified that,

as of November 1991, he had never used decoy molecules to reduce NF-κB activity in cells.

(Day 3 Tr. 106:10-15, 22-24.)  Moreover, for decoy molecules to work, one would need to

---

[5] One of Ariad's experts cited two articles (published in 1991 and 1993) that allegedly show making dominantly interfering molecules to inhibit NF-κB.  Aside from the fact that these publications were not available to supplement Ariad's disclosure at the time of the asserted 1989 filing date, the descriptions in these two articles do not fit the definition of a dominantly interfering molecule provided by Dr. Maniatis.  Dr. Maniatis testified that a dominantly interfering molecule **binds** to the recognition site in the nucleus ("sitting on [the] sequence") and thereby prevents NF-κB from binding.  (PTX 1037; Day 3 Tr. 75:10-76:23.)  In contrast, both articles describe mutating part of NF-κB itself (the p50 subunit of the p50-p65 combination) so that it is incapable of binding to its recognition site.  (PTX 137 at 288; PTX 160 at 1827.)  Further, as the subunits of NF-κB were not disclosed in the patent, one skilled in the art could not carry out the manipulations described in these papers as of the asserted effective filing date of the patent.

stabilize the decoy molecules so they would not be "chop[ped]" up or degraded by the cell.  (Day 11 Tr. 141:1-20.)  The '516 patent does not show how that could be done.  (*Id.*)[6]

### D.    The Asserted Claims Fail to Satisfy the Written Description Requirement

#### 1.    The Written Description Requirement Prevents Patentees from Claiming Subject Matter They Did Not Invent

Title 35, U.S.C., § 112, first paragraph, requires that the specification contain a "written description" of the full scope of the claimed invention.  *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997).  To prevent patentees from "preempt[ing] the future before it has arrived," the written description must demonstrate that the inventor had "possession" of the claimed invention at the time of filing.  *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir. 1993); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991).  This requirement ensures "that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification."  *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).

When the claims are so broad that they encompass use of a class of chemical compounds, as do the claims here, the written description must allow one skilled in the art to identify or describe the members of the class.  *Lilly*, 119 F.3d at 1568; *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927 (Fed. Cir. 2004).  The recitation of a common *function* performed by the class members is insufficient.  *Lilly*, 119 F.3d at 1568; *Fiers*, 984 F.2d at 1169; *Rochester*, 358 F.3d at 927.  It is not sufficient to define the class members by what they do or how they might

---

[6] Ariad pointed to a paper written in November 16, 1990, that discusses the use of decoy molecules.  (DTX 257.)  But this paper was written more than a year after the April 21, 1989 effective filing date claimed by Ariad and accepted by the jury and is not part of the written description of the patent.  *See New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002)("The adequacy of the written description . . . is measured from the face of the application….").

be discovered. *Lilly*, 119 F.3d at 1568; *Fiers*, 984 F.2d at 1171; *Rochester*, 358 F.3d at 927;

*Enzo Biochem, Inc. v. Gen–Probe Inc.,* 323 F.3d 956, 964 (Fed. Cir. 2002). Functional

descriptions must be "coupled with a known or disclosed correlation between function and

structure, or some combination of such characteristics.'" *Rochester*, 358 F.3d at 925 (citing

*Enzo*, 323 F.3d at 964). Furthermore, the identification of the structure of a single class member

is insufficient to describe the entire class because of the inherent unpredictability of performance

in complex biological systems. *See Lilly*, 119 F.3d at 1569; *Noelle v. Lederman*, 355 F.3d 1343,

1350 (Fed. Cir. 2004).

Applying this law, the Federal Circuit held that claims reciting the class of all vertebrate

insulin DNA sequences were not supported by a patent specification that only disclosed DNA

encoding rat insulin. *Lilly*, 119 F.3d at 1569. Although the specification did not provide any

common features for vertebrate insulin DNA sequences (*id.* at 1568), the patentee argued that the

patent satisfied the written description requirement because it provided a process by which the

DNA encoding human insulin and other vertebrate insulins could be isolated. *Id.* at 1566. The

Federal Circuit disagreed, explaining that an enabling method of obtaining the DNA is not

sufficient to describe the DNA itself and satisfy the written description requirement. *Id.* at 1567.

"[A] generic statement such as 'vertebrate insulin cDNA' . . . without more, is not an adequate

written description of the [class] because it does not distinguish the claimed [class] from others,

except by function." *Id.* at 1568. "A definition by function . . . does not suffice to define the

[class] because it is only an indication of what the gene does, rather than what it is." *Id*.

Because the phrase "'vertebrate insulin cDNA' . . . does not define any structural features

commonly possessed by members" of the class, "[o]ne skilled in the art therefore cannot . . .

recognize the identity of the members of the [class]." *Id*.

9

Likewise, in *Rochester*, the Federal Circuit held that a method claim similar to the one at issue here did not satisfy the written description requirement because the chemical compounds necessary to practice the claimed method were only described, as in the instant case, in terms of their function—by what they do and not by what they are. 358 F.3d at 927. The alleged invention in *Rochester* was a method for inhibiting the enzyme "PGHS-2." *Id.* at 918. The basic claim in Rochester's '850 patent is very similar to the claims at issue here:

| Claim at issue in *Rochester* | Claim 95 of the '516 Patent |
|---|---|
| "A method for selectively inhibiting PGHS-2 activity in a human host, comprising administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product to a human host in need of such treatment." *Id.* at 918. | "A method for reducing, in human cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced." (*See* Appendix A.) |

Rochester had argued that *Lilly* did not apply to method claims and, therefore, that no specific description of compounds usable in the claimed method was necessary. *Id.* at 926. The Federal Circuit rejected this argument, agreeing with the district court that it is "a semantic distinction without a difference." *Id.* The Federal Circuit explained that "[r]egardless [of] whether a compound is claimed *per se* or a method is claimed that entails the use of the compound, the inventor cannot lay claim to that subject matter unless he can provide a description of the compound sufficient to distinguish infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods." *Id.*

While the patent broadly claimed the method of using a class of "non-steroidal compounds" to inhibit PGHS-2 activity, it only described "assays for screening compounds, including peptides, polynucleotides, and small organic molecules to identify those that inhibit the expression or activity of the PGHS-2 gene product." *Id.* at 927. The patent did not identify any

actual compounds or provide any common structural features for the inhibitory compounds. *Id.* Accordingly, applying its precedent in *Lilly*, the Federal Circuit held that the patent did not satisfy the written description requirement: "[T]he '850 patent does not disclose just '*which* peptides, polynucleotides, and small organic molecules have the desired characteristic of selectively inhibiting PGHS-2.' Without such disclosure, the claimed methods cannot be said to have been described." *Id.* (emphasis added)(citation omitted). "[A] patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion." *Id.* at 930 n.10 (citing *Brenner v. Manson*, 383 U.S. 519, 536 (1966).

## 2.  The '516 Patent Fails to Provide a Sufficient Written Description and Lilly Is Entitled to JMOL

*Lilly* and *Rochester* should be applied here. The asserted claims of the '516 patent broadly encompass any method that inhibits NF-κB activity, including the administration of any and all chemical compounds that achieve the claimed result. However, as in *Lilly* and *Rochester*, the evidence, even when viewed in a light most favorable to Ariad, establishes that the '516 patent does *not* describe any structural characteristics common to the full scope of the class of NF-κB inhibitors encompassed by the claimed methods. (*See* §II.C, *supra.*)

While the patent uses the words "a specific inhibitor molecule," "decoy molecules," and "dominantly interfering molecules," these words are merely *functional* descriptions of the tasks that unknown molecules are supposed to perform—not descriptions of the molecules. Each has a different function and, by necessity, a different structure. The patent does not disclose a relationship between structure and function for these disparate categories of molecules.

In response to a rejection made by the Examiner during prosecution, the applicants specifically stated that "substances of structurally diverse types are, and would have been expected to be, useful in practicing the claimed methods. Thus, it would be *impractical and*

11

*unreasonable to require a structural definition* of each of the diverse kinds of agents useful in practicing the claimed methods." (DTX 17 at 8 (emphasis added).) Lilly's expert Dr. Latchman testified that this statement demonstrated "that we can't give you any guidance to structure because there's no guidance to give." (Day 12 Tr. 11:23-12:2.) Dr. Baltimore himself admitted that "[t]he classes of compounds which are able to affect NF-κB mediated gene expression in cells are structurally diverse." (DTX 13 at 2, ¶7.) Dr. Latchman explained that because the claim covers so many diverse molecules, they are "likely to be very different in terms of their structure and their chemical formula." (Day 12 Tr. 10:2-9.) Ariad's expert Dr. Kadesch *agreed* "that there's certainly no correlation between structure of small molecule inhibitors of NF-kappaB and their function." (Day 13 Tr. 133:5-12.) Indeed, the two Lilly products accused of infringing the claims (Evista,® a small organic molecule, and Xigris,® a large recombinant protein) have no common structural features.

Like the words "vertebrate insulin cDNA" in *Lilly*, and "non-steroidal compounds" in *Rochester*, the words in the '516 patent are not sufficient to identify the members of the class of all compounds that inhibit NF-κB. *See Lilly,* 119 F.3d at 1568; *Rochester*, 358 F.3d at 928. Given the unlimited number of disparate compounds encompassed by the claims, there is no meaningful way the specification could provide an adequate written description broad enough to support these claims. Further, as in *Rochester*, the specification does not identify any specific compounds that can inhibit NF-κB. As expressly found by the Court, the one compound allegedly identified in the specification by structure—IκB—has the *wrong* amino acid sequence and "cannot be used . . . to reduce the activity of NF-κB." (Slip Op. at 28-29.)

At best, and as also argued in *Lilly* and *Rochester*, the specification of the '516 patent reports assays that could potentially identify compounds useful in the method claims. Nowhere,

however, does the specification actually specify which compounds have the desired characteristic of reducing NF-κB activity.  As *Rochester* makes clear, claims reciting methods for inhibiting the activity of a biological process fail to satisfy the written description requirement when the specification describes the function of hypothetical compounds useful in such methods but fails to provide the precise identity of the compounds.  *Rochester*, 358 F.3d at 927; *see also Fiers*, 984 F.2d at 1171 (holding that the disclosure of a method for finding the desired DNA constituted "a wish, or arguably a plan, for obtaining the DNA," not a description of the invention).  In such a situation, the patent specification itself gives rise to the conclusion of invalidity without consideration of any other evidence.  *Rochester*, 358 F.3d at 930.

### 3.    The Court's Jury Instructions Prejudiced Lilly

If this Court denies Lilly's motion for JMOL, Lilly submits that a new trial is warranted for the reasons noted above and because of the Court's erroneous and prejudicial jury instructions.  This Court instructed that the written description "has to give a functional description of the claimed invention as of the time of the application . . ." and told the jury to "decide whether the written description in the '516 patent was sufficient to disclose the limitations of the claim and the scope of the invention." (Day 14 Tr. 117:25-118:10.)  As explained above, this instruction contradicts the holdings of *Fiers*, *Lilly*, and *Rochester* that a "***definition by function, as we have previously indicated, does not suffice to define the genus because it is only an indication of what the gene does, rather than what it is.***"  *Lilly*, 119 F.3d at 1568 (emphasis added); *see also Fiers*, 984 F.2d at 1171.  Functional descriptions are only permitted if they are "'coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics.'"  *Rochester*, 358 F.3d at 925 (citing

13

*Enzo*, 323 F.3d at 964).  The Court's instruction was contrary to established law and warrants a new trial.

### E.    The Asserted Claims Are Invalid for Lack of Enablement

#### 1.    A Claim Purporting to Cover All Means or Steps for Attaining a Particular Result Is Invalid as a Matter of Law

The claims asserted against Lilly broadly encompass all means or steps for attaining a particular result—the inhibition of NF-κB.  (*See* §II.B, *supra*.)  As found by the Court, the "only step required to practice the broadest patented method is to 'reduc[e] NF-κB activity in the cell such that the expression of said gene is inhibited[;]' [n]o particular agent or substance need be used, nor any particular step(s) performed, to reduce NF-κB activity . . . ."  (Slip Op. at 6-7.)

This attempt to patent all ways of employing a previously unappreciated natural phenomenon is not without precedent as even brilliant scientists have fallen prey to the temptation.  For example, in *O'Reilly v. Morse*, 56 U.S. 62, 112 (1853), Samuel B. Morse, the famed inventor of the telegraph, discovered a way to transmit a message by using electromagnetism, generated from an electric current, to cause a telegraph to print characters.  The patent claims reciting the specific instrumentalities Morse developed were upheld in every respect.  *Id.*  His eighth claim, however, attempted to claim every conceivable way of performing this function.  It was directed to the use of an electric current—***however developed***—for printing intelligible characters at a distance.  *Id.*  The Court struck down this claim, explaining that Morse claimed "an exclusive right to use a manner and process which he has not described and indeed had not invented, and therefore could not describe when he obtained his patent.  The court is of opinion that the claim is too broad, and not warranted by law."  *Id.* at 113.  The defect in Morse's eighth claim was that it was much broader in scope than the enabling disclosure he provided in his patent specification.  *Id.*

The defect is now recognized as a failure to provide an enabling disclosure commensurate in scope with the claim in violation of 35 U.S.C. § 112, first paragraph. *See In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983). "Enablement is ultimately a question of law . . . ." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339 (Fed. Cir. 2003)("*PGS*"). And in the special case where a claim purports to cover any and all means or steps for attaining a particular result, the invalidity of the claim follows as a matter of law. *Hyatt*, 708 F.2d at 714. It is impossible to present an adequate enabling disclosure of every conceivable way of achieving a particular result. *Id*. This is precisely the defect in the asserted claims of the '516 patent, and JMOL is thus warranted.

### 2.    The Specification Is Not Commensurate with the Claims' Full Scope

Consistent with the holding of *O'Reilly v. Morse*, the Federal Circuit has repeatedly held that in exchange for the right to exclude others from practicing the claimed invention, 35 U.S.C. § 112 requires that the patent specification teach persons skilled in the art "how to make and use the ***full scope*** of the claimed invention." *PGS*, 315 F.3d at 1339 (emphasis added); *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993); *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). A patent must teach how to make and use an invention as broadly as it is claimed—one cannot teach narrowly but claim broadly. *In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991). "The scope of the claims must be less than or equal to the scope of the enablement." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999). The problem is acute when the claim uses functional language. *In re Swinehart*, 439 F.2d 210, 212-13 (C.C.P.A. 1971)(noting that functional language may be "so broad that it causes the claim to have a potential scope of protection beyond that which is justified by the specification disclosure.").

15

For example, in *Vaeck*, the invention at issue was a chimeric gene that when expressed in cyanobacteria, produced proteins that were harmful to insects. 947 F.2d at 490. The specification provided a working example of using the claimed gene in a single strain of cyanobacteria. *Id.* The claims, however, broadly recited the ***function*** of using the chimeric gene to obtain the desired proteins in ***any type*** of cyanobacteria. *Id.*

Relying on the broad functional language in the claim, the Federal Circuit held the claims not enabled under 35 U.S.C. § 112. The Federal Circuit noted the "relatively incomplete understanding of the biology of cyanobacteria . . . as well as the limited disclosure by appellants of particular cyanobacterial genera operative in the claimed invention." *Id*. at 495. "There is no reasonable correlation between the narrow disclosure in appellants' specification and the broad scope of protection sought in the claims encompassing gene expression in any and all cyanobacteria." *Id.* The court further explained that there "must be sufficient disclosure, either through illustrative examples or terminology, to teach those of ordinary skill how to make and how to use the invention as broadly as it is claimed." *Id.* at 496.

Here, as discussed above and as in *Vaeck*, the claims asserted against Lilly are drafted using broad functional language and cover all means or steps for attaining a particular result— the inhibition of NF-κB. (*See* §II.B, *supra*.) But while the claims are quite broad, the specification is quite narrow. The specification only postulates three ***potential*** functional classes of agents to accomplish this goal: (1) decoy molecules, (2) dominantly interfering molecules, or (3) a specific inhibitor molecule, such as IκB. (*See* §II.C, *supra*.) There are no working examples in the patent of any compound falling within these broad classes or its use to inhibit NF-κB in cells, and there is certainly no explanation of how other molecules might accomplish

16

the same purpose.  (*Id.*)  Moreover, the provided amino acid sequence for IκB is wrong and cannot be used to inhibit NF-κB as required by the claims.  (*See* §II.C.1, *supra*.)

The facts here are even more compelling than those in *Vaeck*.  The claims of the '516 patent asserted against Lilly broadly cover *all* methods for inhibiting NF-κB activity in virtually *all cells*, including humans.  (Slip Op. 6-7.)  However, unlike *Vaeck*, there are no working examples in the patent of using any such inhibitors in *any cell type*.  (*See* §II.C, *supra*.)  The teachings of the '516 patent are simply not commensurate with its broad scope.  The broad functional language doomed the claim in *Vaeck*, and the result should be the same here.

Citing *Invitrogen Corp. v. Clontech Laboratories Inc.*, 429 F.3d 1052, 1071 (Fed. Cir. 2005), Ariad counters that one does not have to enable "future embodiments."  (Day 13 Tr. 115:18-20; Day 14 Tr. 82:17-19.)  But the ability to inhibit NF-κB in any eukaryotic cell (including humans) is not an "improvement" or a "future embodiment" but a necessary requirement to practice the asserted claims themselves.  The inhibition of NF-κB in intact cells was *not* unforeseen at the time of invention—it was the goal of the patent.  Ariad's argument is almost identical to the argument advanced in *PGS* and rejected by the Federal Circuit.  *PGS*, citing *In re Fisher*, 427 F.2d 833 (C.C.P.A.1970), argued that "an inventor should be allowed to dominate the future patentable inventions of others where those inventions were based in some way on his teachings."  *PGS*, 315 F.3d at 1340.  The Federal Circuit disagreed, stating that this language merely "sets the context for *Fisher's* holding that 'it is equally apparent . . . that [the inventor] must not be permitted to achieve this dominance by claims which are insufficiently supported and hence not in compliance with the first paragraph of 35 U.S.C. § 112.'"  *Id.*  An inventor is not allowed "to claim what was specifically desired but difficult to obtain at the time

the application was filed, unless the patent discloses how to make and use it." *Id.* This is what Ariad attempts to do here.

Further, the facts of *Invitrogen* are distinguishable. In *Invitrogen*, the claims were narrowly directed to a specific product, "genetically engineered RT [reverse transcriptase]." 429 F.3d at 1070. There were two "modes" of making the claimed product, point mutation and deletion mutation, and it was undisputed that the deletion method was adequately described. *Id.* at 1070-71. Notably, the claims in *Invitrogen* were not method claims broadly drawn to all methods for making the claimed product. For this reason, the court held that there was not an enablement problem, since the specification disclosed a mode for preparing the "full scope" of the claimed invention—an enzyme product. In contrast, the '516 patent does not recite a particular product for inhibiting NF-κB activity, but instead broadly claims all methods of doing so. The specification, however, neither describes any molecules that are capable of inhibiting NF-κB, nor does it possess any working examples in an intact cell.

As such, the facts of this case are much more similar to those of *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007), and *Automotive Technologies International, Inc. v. BMW of North America, Inc.*, No. 2006-1013, 2007 WL 2493281 (Fed. Cir. Sept. 6, 2007). In both cases, the Federal Circuit specifically rejected arguments that enablement of a single embodiment falling within the claims was sufficient to enable the full scope of the claimed invention. In *Liebel,* the court explained that "the full scope of the claimed invention includes, an injector system with and without a pressure jacket." 481 F.3d at 1380. The specification, however, only enabled the practice of an injection system with a pressure jacket. Accordingly, the court held that "the specification fail[ed] to fulfill the enablement requirement of § 112." *Id.* "The irony of this situation is that Liebel successfully pressed to have its claims include a

jacketless system, but having won that battle, it then had to show that such a claim was fully

enabled, a challenge it could not meet." *Id*.  Ariad fails to meet the same challenge.

Similarly, in *Automotive Technologies*, the claims at issue broadly recited "both

mechanical and electronic side impact sensors."  2007 WL 2493281, at *9.  But the specification

only enabled mechanical side impact sensors, which did "not permit one skilled in the art to

make and use the invention as broadly as it was claimed, which includes electronic side impact

sensors." *Id*.  Accordingly, since the specification failed to enable both "electronic and

mechanical side impact sensors," the Federal Circuit held the claims invalid under 35 U.S.C.

§ 112, stating that "[c]laims must be enabled to correspond to their scope." *Id*.

The application of the above legal precedent to the evidentiary record before this Court

demonstrates that no reasonable juror could have found that the specification of the '516 patent

enables the full scope of the broad claims at issue.  There is "no legally sufficient evidentiary

basis for a reasonable jury to find for" Ariad.  *Guilloty Perez,* 339 F.3d at 50.  Thus, JMOL is

warranted or, at the very least, a new trial.

### 3.    Ariad's Claims Are Not Enabled for Therapeutic Use in Humans and Are Invalid as a Matter of Law

All of the asserted claims encompass therapeutic use in humans.  Claims 95 and 145

specifically recite methods of inhibiting NF-κB in human cells, and the specification

contemplates the practice of the invention in humans.  The specification specifically discusses

the development of "drugs" that have "medical implications" in "health and disease" which can

be "introduced into the body" and states that the invention "is useful . . .  for inhibiting viral gene

expression in infected cells, such as in an individual infected with the HIV-1 or

cytomegalovirus."  (PTX 1 at col.3, l.24; col.4, l.26; col.13, l.11; col.32, ll.7-10, 46, 50-51.)  The

specification, however, does not identify any compound that will inhibit NF-κB in humans, does

not explain how to get an NF-κB inhibitor into the cells of a human patient, and does not provide examples of treating humans with an NF-κB inhibitor. The specification of the '516 patent merely provides an invitation to experiment, and while some experimentation is permitted, the amount of experimentation must not be unduly extensive. *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984).

Determining whether experimentation is "undue" requires balancing: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Each of these factors weighs heavily in demonstrating the non-enablement of claims encompassing human therapy. For example, concerning Factors (1)-(3), it is noted that in order to practice the full scope of the claimed invention, the would-be practitioner is first obliged to identify all means of inhibiting NF-κB activity in a human cell, including the identification of all chemical or biological compounds capable of use in human cells. The quantity of experimentation required to accomplish this is infinitely high considering the specification of the '516 patent fails to disclose any structural features shared by this limitless class of compounds, or any actual working example of a chemical or biological compound inhibiting NF-κB activity in a human cell. Furthermore, regarding IκB, the lone NF-κB inhibitor molecule purportedly disclosed in the patent, the inventors testified that it could not be effectively administered exogenously because it would be degraded by the body. (*See* § II.C.1, *supra*.) Further still, even if one could use, for example, gene therapy to overcome this problem, the amino acid sequence listed in the patent was not in fact mammalian IκB but an incomplete and erroneous sequence

derived from the chicken molecule, which this Court has held would not work to inhibit NF-κB. *Id.* Factors (2)-(3) also favor non-enablement. The patent provides no guidance as to how to inhibit NF-κB in humans, and there are no working examples of inhibiting NF-κB in cells. (Day 12 Tr. 25:5-13.)

Factors (4)-(5) also support a finding of non-enablement. The invention of the '516 patent purportedly relates to methods of treating disease in humans by reducing the activity of NF-κB. Although the specification mentions the development of "drugs," as noted above, the '516 patent is devoid of any disclosure regarding drug formulation or administration, the effective amount or dose required, or the patient groups to be treated. The lack of any such disclosure is particularly troublesome here as the invention of the '516 patent was allegedly in a new field and, therefore, one of skill in the art could not look to the prior art for any guidance. For this "new field" of technology, "it was especially important for the specification to discuss how" to practice the invention in humans. *Automotive Techs.*, 2007 WL 2493281, at *8. Here, "the specification provides 'only a starting point, a direction for further research' . . . [and] fails to provide 'reasonable detail' sufficient to enable" the inhibition of NF-κB activity in humans. *Id.* (citing *Genentech,* 108 F.3d at 1366).

Factors (6)-(7) further weigh in Lilly's favor because although the skill in the art is high, the technology is highly complex and unpredictable. (Day 12 Tr. 25:14-26:12.) The Federal Circuit has repeatedly held that inventions involving the biological and chemical arts are more unpredictable than the mechanical or electrical arts where a single embodiment may provide broad enablement. *Vaeck*, 947 F.2d at 496.

Finally, factor (8) strongly supports a holding of non-enablement because the claims, as thoroughly discussed above, are incredibly broad, covering all methods for inhibiting NF-κB in

humans.  Indeed, in testifying in support of Ariad on the enablement issue, Ariad's expert

witness did not even consider whether the claims encompass human therapy.  (Day 13 Tr.

116:11-24.)  Given the correct legal standard, no reasonable juror could find that the claims are

enabled, particularly for therapeutic use in humans.  As such, this Court should grant JMOL in

Lilly's favor.  At a minimum, a new trial on these issues is warranted.

     **F.**    **Lilly Is Entitled to a New Trial on Enablement and Other Issues Affected by the Effective Filing Date**

          **1.**    **Ariad's False Evidence Will Result in a Miscarriage of Justice**

The evidence at trial established that (1) the asserted claims are incredibly broad,

covering the inhibition of NF-κB by any means in virtually any cell type; (2) the teaching of the

patent is very narrow, lacking any example where NF-κB activity was inhibited in a cell; and (3)

molecular biology is a complex and unpredictable science.  As such, the "clear weight" of the

evidence established that the specification does not enable the full scope of the asserted claims,

including claims 95 and 145, which specifically recite use in human cells.  *See Ahern v. Scholz*,

85 F.3d 774, 780 (1st Cir. 1996); *Colon-Millin v. Sears Roebuck de P.R., Inc.*, 455 F.3d 30, 35

(1st Cir. 2006)(quoting *Ahern*).  In response, Ariad presented erroneous and prejudicial evidence

that the amino acid sequence of IκB described in Figure 43 of the patent could be used to inhibit

NF-κB.  Ariad's expert Dr. Kadesch testified that one could "take . . . that sequence Figure 43

down to the technician, and with various slight modifications, essentially have the machine make

the gene for you."  (Day 13 Tr. 60:21-24; Tr. 61:13-20.)  Dr. Kadesch further testified:

> Q.  So in the 1991 application where there's the disclosure of Figure 43, can you tell us how, if at all, that relates to disclosing an inhibitor of NF-kappaB?
>
> A.  Well, *it discloses it*.  I mean, I think that the clear indication, they call it an I-kappaB, and *presumably that's because it has I-kappaB activity*, which was shown in this paper, that's disclosed in the patent.

(*Id.* at 81:15-21 (emphasis added).)  Dr. Kadesch's testimony was false.  This Court has specifically found that the Figure 43 sequence is not mammalian IκB, but an ***"incorrect"*** and "*incomplete*" chicken sequence that "***cannot***" be used to inhibit NF-κB, and has labeled Ariad's argument that Figure 43 is correct as "disingenuous."  (Slip Op. at 26-29 (emphasis added).)  Moreover, it appears that Dr. Kadesch may have known about the sequence errors when he offered the qualification that it would require "slight modifications" to make the gene.  "A verdict may be set aside and new trial ordered 'when the verdict is . . . based upon evidence which is false, or will result in a clear miscarriage of justice.'"  *Ahern*, 85 F.3d at 780 (citations omitted).  Dr. Kadesch's false testimony was relied on by Ariad before the jury, prejudiced Lilly, and would result in a miscarriage of justice.  A new trial is warranted.

## 2. The Court's Erroneous Jury Instructions Prejudiced Lilly

The Court's incorrect jury instruction also warrants a new trial.  The Court instructed the jury that "[e]nablement means that the text of the patent must contain enough detail to enable, to teach a person skilled in the field at the time the patent was filed to make and ***use the invention*** without excessive experimentation.  If the patent does not allow such a skilled person to practice ***the claimed method***, then the claim is invalid. . . . So review the patent, review the evidence of the experts who explained the patent and the art at the time and decide whether the disclosure in the patent is sufficient to ***allow this hypothetical skilled scientist to practice the regulation of NF-kappaB***."  (Day 14 Tr. 115:19-117:6 (emphasis added).)  This instruction was wrong and prejudicial.  It is not enough that one skilled in the art could inhibit NF-κB by ***some*** method following the teachings of the '516 patent; the specification must enable the ***full scope*** of the claim, which covers ***all*** methods of inhibiting NF-κB in all eukaryotic cells.  (*See* §II.E.2, *supra*.)

## 3. Lilly Is Entitled to a New Trial on the Issues Affected by the Effective Filing Date

Ariad asserted, and the jury found, that the '516 patent is entitled to the April 21, 1989, filing date of Application No. 07/341,436 ("the '436 application"). In contrast, Lilly had argued that, at the very most, the '516 patent was entitled to the November 13, 1991, filing date of Application No. 07/791,898 ("the '898 application"). Given the deficiencies discussed above in the '898 application under § 112, which ultimately issued as the '516 patent, Lilly submits that there is no credible evidence supporting Ariad's entitlement to the 1989 date of the '436 application—an application that contains even *less* description than the '898 application and the issued '516 patent. The PTO made this very determination in its final rejection of Ariad's claims here at issue: "these claims are entitled to the filing date 11/13/91 of continuation application 07/791,898 for purposes of prior art." (PTO Final Rejection at 10, *see also* 11-16.)

Indeed, it appears that Ariad's entitlement to the 1989 filing date flows from the same false testimony offered by Dr. Kadesch. To support Ariad's entitlement to the 1989 filing date, Dr. Kadesch testified that one skilled in the art could have found the sequence for IκB based on techniques known in the art and the disclosure of the 1989 application. (Day 13 Tr. 61:21-24, 78:4-6.) But this testimony is contradicted by the Court's finding that when the inventors of the '516 patent tried to obtain the sequence for IκB, they obtained the *wrong* sequence. (Slip Op. at 26-29.) As the effective filing date determines the relevance of prior art, Lilly is entitled to a new trial. Based on the 1991 filing date, a November 16, 1990, article that discusses the use of decoy molecules (DTX 257) is invalidating prior art under 35 U.S.C. § 102(a), and certain of the articles discussing cyclosporin (e.g. DTX 194, 195, and 196; Day 9 Tr. 66:12-69:7) are invalidating prior art under § 102(b). Moreover, the jury's error in according Ariad a 1989 filing date was clearly the result of misperception of the capabilities of persons of ordinary skill in the

24

art, thereby calling into question the jury's findings on all of the written description and enablement issues. A new trial is thus warranted on all of these issues.

### III.    CLAIMS 144 AND 145 ASSERTED AGAINST USE OF XIGRIS® ARE EITHER NOT INFRINGED OR INVALID

Ariad contends that Lilly's marketing of Xigris® for the treatment of sepsis infringes claims 144 and 145 of the '516 patent. (*See* Appendix A.) As both claims require the reduction of NF-κB activity, Lilly's manufacture and sale of Xigris® by itself cannot infringe either claim. Thus, to demonstrate infringement of these claims, Ariad must establish as a threshold requirement that (1) patients who use Xigris® satisfy all the limitations of the claims, and then prove (2) that Lilly carried out the requisite elements of either inducement under § 271(b) or contributory infringement under § 271(c). *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir. 1990). Ariad, however, cannot even satisfy the threshold requirement. Given a consistent claim construction, the record demonstrates that either the treatment of patients with Xigris® does not satisfy the limitations of claims 144 and 145, or alternatively, those claims are anticipated by the established use of antibiotics in the prior art.

### A.    Ariad Argued Inconsistent Claim Construction Positions

During trial, Ariad's expert (Dr. Livingston) cited a publication by Lilly scientists (PTX 244) and testified that Xigris® works to combat sepsis by inhibiting NF-κB. (Day 5 Tr. 50:22-53:4.) Dr. Livingston, however, provided no explanation for *how* Xigris® accomplishes this task. Ariad presented *no* evidence at trial that Xigris® enters the cell and inhibits NF-κB internally. Dr. Livingston specifically admitted during cross-examination that *he did not even know whether Xigris® entered the cell*. (Day 5 Tr. 102:15-22.) Nevertheless, he still testified

that use of Xigris® infringed the claims, regardless of whether or not it entered the cell.  (*Id.*)[7]

Ariad specifically argued to the jury that the use of Xigris® infringes claims 144 and 145 because

these claims broadly cover drugs that "inhibit NF-κB."  (Day 14 Tr. 59:15-16, 63:17-18.)

      Ariad, however, took a different position as to the meaning of claims 144 and 145 when

the question was validity.  Lilly argued at trial that the use of antibiotics in the prior art

inherently anticipates claims 144 and 145.  Antibiotics have been administered at least "from the

time of Flemming, and that was just around the Second World War."  (Day 9 Tr. 95:4-6.)  The

evidence at trial established that by treating a patient with antibiotics, bacteria are killed, the

amount of LPS is reduced, and NF-κB activity is ultimately decreased.  (Day 9 Tr. 94:8-95:16.)

      Ariad countered that the claims should not be interpreted to cover antibiotics because

antibiotics do not enter the cell and block NF-κB internally.  (Day 14 Tr. 80:24-81:6.)[8]  Ariad's

counsel specifically stated during closing arguments:

> Antibiotics eliminate the inducer.  They do not inhibit NF-kappaB activity ***in the
> cell***. . . .  This claim requires that there is an external influence and then you block
> the NF-kappaB ***in the cell***.  If you are stopping the external influence, you may be
> stopping NF-kappaB activity, ***but you're not doing it in the way it's claimed***.
> ***These are not claims to just inhibiting NF-kappaB***, they're claims to doing it a
> certain way, certain method . . . . But there are lots of words in these claims, and
> they require that there's an external influence, and then you're ***blocking it
> internally***.  Antibiotics have nothing to do with this case.

(Day 14 Tr. 80:15-81:6 (emphasis added).)  Thus, to avoid invalidity, Ariad's counsel argued for

additional claim limitations not applied in assessing infringement:  "It is a question of whether a

---

[7]  The studies relied on by Dr. Livingston are legally insufficient to establish infringement for a
variety of additional reasons.  The doses used in the studies were 80 to 200 times higher than the
doses used by doctors treating patients.  (Day 7 Tr. 86:3-5, 88:24-89:1.)  There were no studies
in human patients, but only in cells examined outside the body. (*Id.* at 84:14-85:10, 88:12-15.)

[8]  Ariad also argued that in the short term, the amount of LPS would rise after treatment with
antibiotics because the killed bacteria would release LPS.   The levels of LPS, however, would
be reduced over time when the infection ended.  (Day 3 Tr. 24:6-25:15, 27:2-4, 42:4-14.)

compound . . . practices all the steps of the claim[s,] [a]nd there is ***more than just inhibiting NF-kappaB***." (*Id.* at 74:24-75:2 (emphasis added).)  Indeed, in responding to the fact that holding up an umbrella on a sunny day is a method of inhibiting NF-κB, Ariad argued that the umbrella was not a chemical composition that was "in the cell." (*Id.* at 80:15-20.)  But, as discussed above, Ariad took the ***opposite*** position when it came to demonstrating infringement, offering no evidence that Xigris® entered the cell.

### B.    Ariad's Inconsistent Claim Construction Positions Warrant JMOL

Ariad simply cannot obtain a broad construction for infringement, and a different, narrower one for validity.  Claims must be construed the ***same way*** for both validity and infringement.  *Amgen Inc. v. Hoehst Marion Roussel, Inc.,* 314 F.3d 1313, 1330 (Fed. Cir. 2003)("It is axiomatic that claims are construed the same way for both invalidity and infringement.").  Patent claims are not "like a nose of wax which may be turned and twisted in any direction." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1117 (Fed. Cir. 2004)(citing *White v. Dunbar*, 119 U.S. 47, 51 (1886).

Ariad's shifting claim construction arguments violate this precedent and warrant JMOL.  Claims 144 and 145 either cover drugs that inhibit NF-κB irrespective of whether the drugs enter the cell or they do not.  If the claims cover drugs that do not enter the cell, which is the construction of this Court (Slip Op. at 6-7) and the PTO during the reexamination of the '516 patent (PTO Final Rejection at 17), then use of antibiotics fall within the scope of the claims and the claims are invalid under 35 U.S.C. § 102.[9]  On the other hand, if the claims only cover drugs that actually enter the cell, then Ariad has presented no evidence that Xigris® satisfies this claim

---

[9] The PTO specifically rejected Ariad's argument that "stopping the external influence" (Day 14 Tr. 80:21-23) was not within the scope of the claims.  (PTO Final Rejection at 107-08.)

limitation.  Indeed, when specifically invited to provide such evidence, Ariad was unable to do so.  (Day 5 Tr. 102:15-22.)  Thus, either claims 144 and 145 are anticipated by the use of antibiotics or Xigris® does not infringe.  Ariad cannot have it both ways.

## IV.    CLAIMS 80 AND 95 ASSERTED AGAINST EVISTA® ARE EITHER NOT INFRINGED OR ARE INVALID

As with Xigris,® Lilly's manufacture and sale of Evista® (containing the active ingredient raloxifene) cannot directly infringe the asserted claims of the '516 patent.  To demonstrate infringement, Ariad must establish that (1) the patient's use of Evista® meets the claim limitations, and (2) that Lilly carried out the requisite elements of either inducement under § 271(b) or contributory infringement under § 271(c).  Ariad failed to satisfy either of these criteria.

### A.    Claim 95 Must Be Invalid or Not Infringed as a Matter of Law

Raloxifene was developed for treatment of post-menopausal osteoporosis (without any knowledge of NF-κB) because it mimicked in bone tissue the pharmacological effects of the estrogen lost by women after menopause.  (Day 8 Tr. 127:6-15; Day 8 Tr. 30:19-33:4.)  The evidence introduced at trial established that estrogen itself used for this purpose in the prior art inhibited NF-κB mediated gene expression.  For example, Dr. Boyce, Ariad's expert witness on the subject of "bone biology" (Day 4 Tr. 47:22-48:21), testified on cross-examination that in response to the administration of estrogen, a post-menopausal woman's "estrogen levels will go up . . . *and her NF-kappaB activity will go down*."  (Day 4 Tr. 95:23-96:4 (emphasis added).)  Lilly's expert witness (Dr. Manolagas) agreed.  (Day 8 Tr. 110:11-111:1, 116:19-22.)  There is no conflict in the expert testimony on this point.  The conclusion is, therefore, compelled that either this use of raloxifene does not infringe claim 95 or that claim 95 must be found to have been inherently anticipated by the prior art use of estrogen for the same purpose.

To avoid this anticipatory evidence, Ariad argued that estrogen does not fall within the claims because it does not prevent NF-κB from binding to its recognition sites in the DNA:

> [T]here is more than just inhibiting NF-κB. They have to do all this. And . . . for estrogen, Dr. Manolagas told you that the Chadwick paper on estrogen said that this didn't happen. He got very upset when I showed him that part of the paper. And I said it said *it doesn't bind to NF-kappaB recognition sites.*

(Day 14 Tr. 74:20-75:7.) Ariad further stated:

> "For *estrogen, it doesn't bind to the DNA*," which is what I just showed you. That's that hand-waving thing that if we don't look at the claims . . . we can get any result. That paper he relied on says "No binding to DNA," right? You can see it yourself. It says, "Needs to be reducing binding to the DNA binding sites." *It doesn't do that. Can't be an anticipation*.

(*Id.* at 78:9-17 (emphasis added); *see also* Day 12 Tr. 114:16-116:5.)

In so doing, Ariad blurred in the mind of the jury the distinction between claim 80, which literally recites inhibition of NF-κB binding to its recognition site, and claim 95, which does not. Because Ariad admitted through the testimony of its expert that estrogen inhibited NF-κB activity, and distinguished the estrogen prior art based on a limitation not found in claim 95, the conclusion necessarily follows that claim 95 is invalid under 35 U.S.C. § 102 as a matter of law. There is no principled rationale for concluding that the estrogenic pharmacology of raloxifene in bone tissue falls within claim 95 whereas the estrogenic pharmacology of estrogen itself in bone tissue does not.

### B.      Ariad's Evidence Did Not Establish Infringement as a Matter of Law

Ariad did not present sufficient evidence at trial to establish infringement as a matter of law. To show infringement, Ariad must demonstrate that the use of Evista® in humans for the treatment of post-menopausal osteoporosis "reduc[es] NF-κB activity in the cells." Ariad did not do this. Ariad's testing, conducted by its expert Dr. Smith, improperly examined the binding of a p50-p50 protein—which is *not* NF-κB as required by the claim. (Day 9 Tr. 31:10-19, 33:10-

34:9; Day 4 Tr. 22:19-23.)  NF-κB is composed of two "subunits" designated as p50-p65.  (*Id.*)

Dr. Smith did not rely on any actual testing with NF-κB because "there were some difficulties

with the tests."  (Day 4 Tr. 21:8-15, 22:19-23.)  Dr. Smith merely concluded that p50-p50 and

NF-κB (p50-p65) would bind "in a similar manner" based on structural data from the literature

on the p50 and p65 subunits.  (*Id.* at 40:25-41:13.)  Dr. Smith performed no testing to establish

that p50-p50 and NF-κB (p50-p65) act in the same way.

Furthermore, Dr. Smith's tests were not done in patients, or even with normal human

bone cells, but with HepG2 cells, *a liver cancer cell line*.  (Day 4 Tr. 27:16-28:3.)  There was no

testing to establish that liver cancer cells would behave the same way as normal human bone

cells.  While Ariad relied on the alleged ability of raloxifene to cause a different chemical, called

"BEF-1," to enter the nucleus and block binding of NF-κB to the DNA, there was no evidence

that BEF-1 is present in human bone cells.  Another Ariad expert, Dr. Boyce, testified that even

after conducting a search, he was not aware of *any* publication stating that bone cells express

BEF-1.  (*Id.* at 106:2-20.)  Dr. Boyce merely speculated "I think it's there."  (*Id.* at 106:13.)

Such speculation cannot establish infringement as a matter of law.  *See Pharmastem*

*Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1352 (Fed. Cir. 2007)(rejecting alleged

admissions that only "possibly" or "potentially" supported infringement).  Such evidence is also

not legally sufficient to prove infringement of the asserted claims because it does not compare

the claims to the accused act of infringement.  *See, e.g., Genentech, Inc v. Wellcome Found.,*

*Ltd.*, 29 F.3d 1555, 1561 (Fed. Cir. 1994).  There, Genentech tried to use a "chromogenic

substrate assay" to prove infringement, even though a "bovine fibrin plate assay" was required

by the claims.  *Id.* at 1566.  Genentech argued that the results from the chromogenic assay were

"comparable" to the results using the bovine fibrin assay by relying on publications, a statement

from a report that the assays were "similar," and expert testimony. *Id.* at 1566-67. The Federal Circuit, however, held that this evidence was not legally sufficient, and that the district court should have granted JMOL of non-infringement. *Id.* at 1565, 1567. The same holding is warranted here. *See also Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006)(rejecting conclusory expert testimony).

Finally, Ariad cannot rely on Lilly's U.S. Patent No. 6,545,027 ("the Berg patent") to establish infringement. With respect to the use of raloxifene in treating osteoporosis, the Berg patent states:

> [R]aloxifene does block the action of estrogen in some cells; however in other cell types, raloxifene activates the same genes as estrogen does and displays the same pharmacology, e.g., osteoporosis, hyperlipidemia.

(DTX 247 at col.2, ll.46-50.)

As noted in Section IV.A., above, however, acknowledgement that raloxifene has the same pharmacology in bone tissue (osteoporosis) as estrogen cannot be taken as evidence of infringement of claim 95 without compelling the conclusion that the same pharmacology displayed by estrogen itself would inherently anticipate the claim. With respect to claim 80, as noted above, Ariad contended before the jury that simply displaying the pharmacology of estrogen did *not* establish inhibition of NF-κB binding to its recognition site in the DNA.

The issued claim of the Berg patent refers to use of raloxifene to treat HIV infection, a disease of certain cells of the immune system, not post-menopausal osteoporosis, a bone cell disorder. (DTX 247, Certificate of Correction.) As noted above, the Berg patent makes clear that raloxifene can have different effects in different types of cells. Moreover, the claim says nothing about inhibiting binding of NF-κB to its recognition site, as recited by claim 80.

The actual experiments in the Berg patent were (1) conducted with "compound A," a raloxifene analog that is not raloxifene, and (2) used the same cancer cell line as Dr. Smith.

(Day 4 Tr. 11:20-22, 27:16-28:3.)  They are not experiments with raloxifene in post-menopausal women and are legally insufficient to prove infringement for the reasons noted above.  Ariad's infringement evidence failed to satisfy the claim limitations or approximate actual use of the product and warrants JMOL in Lilly's favor.

### C.    Lilly Is Not Liable for Indirect Infringement Under Either § 271(b) or (c)

#### 1.    Lilly Did Not Induce Infringement

Ariad also failed to make the necessary showing for induced infringement under 35 U.S.C. § 271(b).  This section requires that "the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement."  *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).  The patentee "has the burden of showing [1] that the alleged infringer's actions induced infringing acts ***and*** [2] that he ***knew*** or should have known his actions would induce actual infringements."  *Id.* at 553 (emphasis added).

Lilly argued during trial that Ariad could not satisfy the *Manville* factors, particularly factor (2), because of Lilly's subjective belief at all times relevant to this dispute that use of raloxifene to treat or prevent post-menopausal osteoporosis could not infringe the '516 patent.  (*See* Slip Op. at 7.)  In its response to Lilly's motion for JMOL, Ariad did not dispute Lilly's subjective belief but instead argued that under the second *Manville* factor, "Lilly cannot avoid infringement by contending that it acted on the good faith belief that the acts it induced did not constitute infringement."  (D.I. 320 at 16.)  Ariad advocated that "the subjective belief that the induced activity did not infringe does not constitute a defense to inducement," and that "the second [*Manville*] prong of the test for inducement only requires that Lilly intentionally induced the ***acts*** that constitute actual infringements."  (*Id.* (emphasis added)(citing *Water Techs. Corp. v. Calco Ltd.*, 850 F.2d 660, 668-69 (Fed. Cir. 1988).)

Ariad's formulation of the test for inducement, however, has now been specifically rejected by *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006)(en banc).  In *DSU*, the Federal Circuit held en banc that "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, ***not merely that the inducer had knowledge of the direct infringer's activities.***"  *Id.* at 1306 (emphasis added).  Accordingly, the basis for Ariad's allegations of inducement of infringement have now been authoritatively rejected as a matter of law by the Federal Circuit.  Thus, JMOL of no inducement of infringement by Evista® is warranted.  At the very least, Lilly is entitled to a new trial on this issue with an appropriately worded instruction based on *DSU*.

### 2.    Lilly Did Not Contribute to the Alleged Infringement

Ariad failed to present the necessary evidence to hold Lilly liable for contributory infringement under 35 U.S.C. § 271(c).  This statute imposes liability on "[w]hoever . . . sells within the United States . . . a component of a . . . manufacture, combination or composition, or a material . . . for use in practicing a patented process, constituting a material part of the invention, ***knowing the same to be especially made or especially adapted for use in an infringement of such patent***, and not a staple article or commodity of commerce suitable for substantial noninfringing use . . . ."  *Id.* (emphasis added).  On its face, the highlighted language requires knowledge that the accused "component" is "made or especially adapted for use in an infringement of such patent."  *Id.*  The U.S. Supreme Court specifically considered this language in *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 485 (1964).  There, the Court explained that "a majority of the Court is of the view that § 271(c) ***does*** require a showing that the alleged contributory infringer ***knew that the combination for which his component was especially designed was both patented and infringing***."  *Id.* at 488 (emphasis added).  The Federal Circuit has recently confirmed this point:  "[S]ection 271(c) was intended to

deal with . . . cases in which a party sells a particular component that is known to be intended for an infringing use and is useful only for infringement." *Pharmastem*, 491 F.3d at 1358.

Here, Ariad did ***not*** present evidence (1) that Lilly intended that its marketing of Evista® for the treatment of osteoporosis would infringe any claim of the '516 patent, (2) that Lilly knew its marketing of Evista® for the treatment of osteoporosis would infringe any claim of the '516 patent, or (3) that Evista® was "especially made" or "especially adapted" to inhibit NF-κB. All the evidence in the record establishes that Lilly developed Evista® without any knowledge of its alleged ability to inhibit NF-κB. The Lilly scientist (Larry Black) who developed raloxifene for the treatment of bone loss testified that he never even heard of NF-κB. (Day 8 Tr. 30:19-33:4; *see also* Day 8 Tr. 47:7-11, 55:18-25.) Further, as Evista® was launched prior to the issuance of the '516 patent, Lilly could not have "especially made" its product to infringe the claimed method. Indeed, this Court found that: "***Prior*** to the initial discoveries by the research team at [Ariad] . . . Lilly applied for patents on two compounds, raloxifene hydrochloride and [Xigris®]." (Slip Op. at 7 (emphasis added).) Based on the jury verdict, the Court then explicitly stated, "***[a]s it happen[ed]***, these two compounds inhibit NF-κB activity, ***although Lilly did not know this when it obtained its patents***." (*Id.* (emphasis added).) Although Lilly disagrees with the Court's findings that the two compounds inhibit NF-κB, the findings clearly show that Lilly did not believe that to be the case.[10] Accordingly, Ariad has not established a necessary element for contributory infringement, and a JMOL on this issue is warranted. At the very least, Lilly is entitled to a new trial on this issue given the lack of the requisite evidence to establish contributory infringement.

---

[10] As the Court's findings also apply to Xigris®, the finding of indirect infringement (under both § 271(b) and (c)) concerning this product is likewise contrary to law and JMOL is warranted. At the very least, Lilly is entitled to a new trial on this issue.

### D. Claims 80 and 95 Are Inherently Anticipated

#### 1. The Law of Inherent Anticipation

One cannot obtain a patent if the claimed subject matter was patented or described in a printed publication more than a year before the filing of the patent. 35 U.S.C. § 102(b). However, even if the later claimed subject matter is not expressly described, it may still constitute an anticipatory reference if the claimed subject matter was "inherent" in the reference. *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342 (Fed. Cir. 2005). Inherency can be established by showing that "the natural result flowing from" the teaching of the prior art "'would result in' the claimed product." *SmithKline*, 403 F.3d at 1343 (citation omitted). As found by this Court (Slip Op. at 38-41), the art need not recognize the missing subject matter at the time of the reference: "this court rejects the contention that inherent anticipation requires recognition in the prior art." *Schering*, 339 F.3d at 1377; *SmithKline,* 403 F.3d at 1343.

#### 2. The Jones Patent Inherently Anticipates Claims 80 and 95

Raloxifene was described in U.S. Patent No 4,418,068 ("the Jones patent"), assigned to Lilly, which issued in November 1983—six years before the earliest filing date of the '516 patent. The Jones patent teaches, *inter alia*, the administration of raloxifene in connection with breast cancer. (Day 8 Tr. 132:25-133:15.) The range of doses taught in Jones encompasses the specific dose of Evista® (raloxifene) doctors now prescribe for the treatment of osteoporosis. (Day 8 Tr. 134:14-21.) If the use of raloxifene in humans in 2006 infringes claims 80 and 95, then the use of raloxifene in humans in 1983, as described by the Jones patent must also fall within the scope of the claims. A product "which would literally infringe if later in time anticipates if earlier." *Schering*, 339 F.3d at 1379 (quoting *Bristol-Myers Squibb Co. v. Ben*

*Venue Labs., Inc.,* 246 F.3d 1368, 1378 (Fed. Cir. 2001); *Peters v. Active Mfg. Co.,* 129 U.S. 530, 537 (1889).

Ariad contends that the Jones patent does not inherently anticipate the claims for two reasons: (1) the Jones patent discusses the use of raloxifene in connection with breast cancer, as opposed to osteoporosis, and raloxifene was not effective as a breast cancer treatment in humans (*See* Day 14 Tr. 75:13-76:7);[11] and (2) the Jones patent cannot be an anticipatory reference because the described formulation is allegedly not bioavailable in humans, and therefore could not have entered the bloodstream and inhibited NF-κB.  These arguments are wrong as a matter of fact and law.

First, it is now clear that raloxifene *is effective* to treat patients who are at risk for breast cancer.  Evista® was specifically approved by the FDA for this use on September 14, 2007.[12]  Moreover, Ariad based its infringement proofs on tests using a *cancer* cell line as a model system for raloxifene's effect on osteoporosis.  (Day 4 Tr. 27:16-28:3.)  Ariad's own expert testified that the cancer cells were "a good model for looking at the actions of Raloxifene." (*Id.* at 28:7-8.)  If Ariad can rely on raloxifene's effect on cancer cells to show infringement, then Lilly must be able to rely on raloxifene's effect on cancer cells to show anticipation.  "That which infringes, if later, would anticipate, if earlier."  *Peters*, 129 U.S. at 537.

---

[11] The Court wrongly excluded Lilly's evidence that raloxifene is effective for breast cancer. (*See* Day 8 Tr. 15:15-16:1.)  This exclusion was prejudicial to Lilly and warrants a new trial, particularly in light of the approval by the FDA discussed below.

[12] Press Release, U.S. Food and Drug Administration, *FDA Approves New Uses for Evista[,] Drug Reduces Risk of Invasive Breast Cancer in Postmenopausal Women* (Sept. 14, 2007)(http://www.fda.gov/bbs/topics/NEWS/2007/NEW01698.html).  (Ex. 2.)  This document is a "statement" of a public agency and is admissible under Fed. R. Evid. 803(8).  This new evidence which could not have been discovered during the trial, at the very least, warrants a new trial on the issue of whether the Jones patent inherently anticipates the '516 patent under 35 U.S.C. § 102(b).

Second, the Jones patent disclosure is not limited to use in connection with breast cancer but describes human use of raloxifene in the specified dosage ranges for a number of noncancerous conditions as well.  (*See*, *e.g.*, DTX 879S at col.37, l.66-col.38, l.13.)  Use of raloxifene for these other conditions must also anticipate the claim regardless of whether or not raloxifene was effective in connection with breast cancer.

Third, Ariad's bioavailability arguments cannot apply to claim 80, which broadly covers the use of the invention in ***any eukaryotic cell***.  Clearly, a rat cell is "a eukaryotic cell" within the scope of the claim, and the Jones patent contains specific data showing raloxifene is bioavailable in rats.  (DTX 879S at col.33, l.60-col.35, l.39, col.35, l.41-col.36, l.54.)  Ariad has not challenged this data.

Concerning claim 95, which requires use in human cells, Ariad's bioavailability arguments hinge on Ariad's suggestion that Lilly needs to prove that the raloxifene described in the Jones patent had to have actually been used to inhibit NF-κB at the time of the prior art.  This is not correct.  It is not required that someone in the prior art actually perform the teaching in the prior art reference.  It is enough that the prior art reference ***enables*** someone to do so, even if it had ***not*** actually been done in the prior art.  *Schering*, 339 F.3d at 1380; *SmithKline*, 403 F.3d at 1344.  Thus, it is enough that by following the Jones patent, one would naturally inhibit NF-κB in humans under the circumstances described.  Lilly does not need to prove that someone actually used raloxifene to do so in 1983.

Moreover, as a prior art patent, the burden falls on Ariad to demonstrate that the Jones patent is non-enabling.  "[A] presumption arises that both the claimed and unclaimed disclosures in a prior art patent are enabled."  *Amgen*, 314 F.3d at 1354-55 (placing burden on patentee to

37

show that prior art patent is not enabling); *Novo Nordisk Pharms., Inc. v. Bio-Technology Gen. Corp.,* 424 F.3d 1347, 1354 (Fed. Cir. 2005).

The Jones patent states that the claimed invention is bioavailable in humans:  "The tests which have been applied to the compounds are believed to be clearly predictive of beneficial effects in humans, based on the effects in laboratory animals. . . . The route of administration of the compounds of this invention is not critical.  The compounds are known to be absorbed from the alimentary tract . . . ." (*Id.* at col.38, ll.44-49, 64-68.)  To overcome the presumption that the reference is enabling, Ariad would have to produce clear and convincing evidence to demonstrate the contrary.  Ariad has not done so.  Ariad relies on the testimony of a Lilly scientist that there was a "perceived concern" with the bioavailability of raloxifene in humans. (Day 8 Tr. 70:21-25.)  Perception is not reality, and this testimony does not establish that there was an "actual" problem with bioavailability, and certainly does not come close to establishing clear and convincing evidence of non-enablement.[13]  Accordingly, Lilly is entitled to JMOL that both claims 80 and 95 are inherently anticipated by the Jones patent.  At the very least, Lilly is entitled to a new trial on the issue.

### 3.    Other Chemical Compounds Existing in the Prior Art

Because of their broad scope, claims 80 and 95 cover the use of many compounds that existed in the prior art.  In addition to raloxifene (discussed above), estrogen (Day 4 Tr. 94:8-96:18; Day 8 Tr. 110:6-111:1), calcitriol (Day 9 Tr. 63:23-64:18), cyclosporin A (Day 9 Tr.

---

[13] The "perceived" bioavailability problem is described in the Evista® package insert and arose from the nearly complete conversion of raloxifene to a "glucuronide" metabolite.  (PTX 374 at 2.)  As further reflected in the package insert, this is not an actual bioavailability problem because of "interconversion" back to the active drug substance.  (*Id.*)  Thus, proof of a "perceived" bioavailability problem is not proof of an actual bioavailability problem and cannot as a matter of law suffice to negate the objective enablement in the Jones patent.

70:18- 71:3, 72:22-73:3), glucocorticoids (Day 9 Tr. 79:13-80:1), and salicylates/aspirin (Day 9 Tr. 86:8-87:1, 87:11-20) all inhibit NF-κB and have been doing so long before the 1989 priority date of the '516 patent relied on by Ariad. Although the evidence demonstrates that each of these compounds inhibits NF-κB, this paper will focus on calcitriol for the sake of brevity.

Lilly presented evidence that calcitriol (the active form of vitamin D) inhibits NF-κB activity. (Day 9 Tr. 63:23-64:18; Day 10 Tr. 64:22-65:1.) Calcitriol is the hormone "that makes you absorb calcium from your food." (Day 9 Tr. 61:21-62:8.) It is undisputed that the use of calcitriol had been published in numerous articles before the earliest filing date of the '516 patent. (DTX 179-182; Day 9 Tr. 62:9-21.) The research group of Dr. Manolagas (Lilly's expert) published an article in 1986 that specifically described experiments with calcitriol on human blood cells obtained from normal healthy volunteers—called peripheral blood mononuclear cells or "PBM cells." (DTX 178.) After the discovery of NF-κB, Dr. Manolagas's group again treated human PBM cells with calcitriol under the same conditions as his 1986 paper to test whether calcitriol inhibited NF-κB. (Day 9 Tr. 63:7-66:7.) Dr. Manolagas's group demonstrated that calcitriol did in fact inhibit NF-κB activity. The results of this work were published in 1995. (DTX 183 (hereinafter "Yu article"); Day 9 Tr. 62:22-64:18.)

Ariad did not present any evidence challenging the conclusion of the 1995 Yu article that calcitriol inhibits NF-κB. Instead, Ariad's expert at trial stated that the specific type of PBM cells used in the experiments in 1995 were not from the same patients as the cells used in the prior art articles and that the precise method for isolating the blood cells in 1995 was not exactly the same as the method used in 1986. (Day 13 Tr. 18:20-19:8; Day 10 Tr. 66:8-67:6.) Based on these alleged "differences," Ariad's expert argued that the experiments were not "conducted in

exactly the same way," and the results in the Yu article could not be extrapolated to how

calcitriol behaves in *all* humans before the filing date of the patent.  (Day 13 Tr. 20:7-10.)

Ariad's arguments, however, are not sufficient as a matter of law to avoid a finding of

inherency.[14]  The 1986 article discloses using calcitriol to treat human blood cells, and the 1995

article describes experiments—using the same type of cells as the 1986 paper—in which

calcitriol inhibited NF-κB.  Ariad's criticisms that the cells were from different patients, or

obtained by different methods and thus cannot be extrapolated, would lead to an impossible

standard for establishing inherent anticipation.  Without traveling into the past, it is simply not

possible to conduct *exactly* the same experiment under *exactly* the same conditions.  As stated by

the PTO in rejecting the claims at issue based on calcitriol, "[c]ontrary to patentee's argument,

evidence of an inherent property or effect present in a prior art document(s) need not be

demonstrated by 'repeating the use' of that prior art document."  (PTO Final Rejection at 82.)

A substantially similar argument was made by the plaintiff in *Schering*, in which the prior

art disclosure of the use of loratadine was found to anticipate claims to its metabolite, DCL:

"Plaintiff contends that this data may not be extrapolated to predict how *all* humans will

metabolize loratadine under *all* circumstances . . . ." *Schering Corp. v. Geneva Pharms., Inc.*,

275 F. Supp. 2d 534, 537 (D.N.J. 2002), *aff'd*, 339 F.3d 1373 (Fed. Cir. 2003).  However, based

on information after the patent's filing date that showed that loratadine does in fact metabolize to

DCL, the court rejected plaintiff's argument, noting that "[p]laintiff's experts merely suggest

*potential alternative bases* for disputing that certain animals other than humans metabolize

---

[14] While Yu clearly demonstrated that calcitriol inhibited NF-κB, the paper questioned whether
the inhibition of NF-κB was responsible for calcitriol's effect of reducing cell growth
(antiproliferative effect).  (Day 10 Tr. 69:8-18.)  The issue of whether calcitriol also affects cell
proliferation, however, is completely irrelevant to whether it inhibits NF-κB, and effects on cell
growth are certainly not a requirement of the asserted claims of the '516 patent.

loratadine to DCL," and that plaintiff's expert merely argued that "it was *plausible* that loratadine could be metabolized and excreted by humans without going through DCL." *Id.* at 538 n.3 (emphasis added). Ariad's experts similarly theorize that the "differences" between the tests in 1986 and 1996 *could* affect the results. These arguments did not create a genuine issue of fact in *Schering* and should not create one here. *See also Manual of Patent Examining Procedure* § 2112 (V)(8th ed. Rev. 2, May 2004)(explaining that once the PTO presents sufficient evidence that the missing subject matter is necessarily present in a prior art reference, "the burden shifts to the applicant to show an unobvious difference"). Dr. Manologas's group came as close as one could—purposely repeating the group's earlier work to determine if calcitriol inhibits NF-κB. Dr. Manologas's group determined it did, and none of Ariad's experts disagreed with the ultimate conclusion in the 1995 article. As such, the conclusion of inherency is compelled as a matter of law and JMOL is warranted. Lilly is at least entitled to a new trial on the issue.

### E.    The Court's Wrongful Exclusion of Evidence Warrants a New Trial

In the reexamination of the '516 patent, the PTO has now finally rejected the asserted claims as inherently anticipated over essentially the same compounds discussed above, including calcitriol, cyclosporin A, and glucocorticoids. (PTO Final Rejection at 35-111, 115.) The PTO was able to reach a different determination than the jury because the PTO could consider evidence that was *not* admitted into evidence in this case. This Court excluded from evidence articles published after the filing date of the patent, including the inventor's own publications, particularly those written by Dr. Baldwin (one of the inventors), that clearly demonstrate that prior art compounds inhibit NF-κB. (*See, e.g.,* DTX 24S; DTX 25; DTX 473.) For example, Dr. Baldwin wrote a 1996 article stating that, *inter alia*, glucocorticoids inhibit NF-κB activity. (DTX 24S at 671-72; Baldwin Dep. Tr. 179:2-180:9, 230:20-232:4.) Based on this article, the

PTO finally rejected claims 80 and 95 as inherently anticipated by the use of glucocorticoids in the prior art.  (PTO Final Rejection at 94-105.)

The Court, however, held that such publications were inadmissible hearsay and refused to allow their admission into evidence.  (D.I. 281 at 7:20-15:24; Day 9 Tr. 50:19-51:8, 55:19-56:5.) This ruling was wrong and prejudiced Lilly.  Lilly did not offer the articles "to prove the truth of the matter asserted" (Fed. R. Evid. 801(c)), but for the classic non-hearsay use of demonstrating the state of mind of those of ordinary skill—the central inquiry in assessing inherency.

To establish inherency, it was Lilly's burden to show that the "natural result" of prior art compositions would be to inhibit NF-κB.  *SmithKline*, 403 F.3d at 1343-44.  This inquiry is viewed from the perspective of one of ordinary skill in the art.  "[I]nherency, like anticipation itself, requires a determination of the meaning of the prior art.  Thus, a court may consult artisans of ordinary skill to ascertain their understanding about subject matter disclosed by the prior art, including features inherent in the prior art."  *Schering*, 339 F.3d at 1377; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 969-70 (Fed. Cir. 2001)(relying on later publications to show inherent anticipation).  Most questions in patent law are viewed from the perspective of those skilled in the art.  *See PGS*, 315 F.3d at 1339-40 (enablement viewed from the perspective of one of ordinary skill in the art); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc)(claims are interpreted from the perspective from one of ordinary skill); *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007)(same inquiry for obviousness under 35 U.S.C. § 103). Thus, the inherency inquiry focuses on an objective standard, how those skilled in the art would view the prior art references in view of the later published articles.  The use of the later published articles for this purpose is a non-hearsay use.  This is particularly so where Ariad's experts offered opinion testimony that the later published articles would ***not*** lead those skilled in the art

42

to believe the natural result of the prior art publications would be to inhibit NF-κB.  It was manifestly prejudicial to Lilly to exclude the evidence that contradicted this testimony.

Furthermore, even if the articles were offered for the "truth" of the matter asserted, they still should have been admitted as they fall within the established exceptions of the hearsay rule. Although the inventors have licensed the '516 patent to Ariad, they will receive a "financial benefit from this case."  (D.I. 281 at 14:7-8, 12:22-24.)  Accordingly, the inventor's admissions should have qualified as an admission of a party opponent under Fed. R. Evid. 801(d)(2). Alternatively, given that the statements made in the inventors' articles tend to show that the '516 patent is invalid, the statements were also a declaration against pecuniary interest under Rule 804(b)(3), particularly where the inventors were outside the subpoena power of the court and thus unavailable.  Finally, as the articles were used to demonstrate state of mind, they should have been admitted under the hearsay exception for state of mind evidence, Rule 803(3).

Lilly was undeniably prejudiced by the exclusion of this critical evidence.  Grounds for a new trial include that "the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence."  *Montgomery Ward*, 311 U.S. at 251.  Here, Ariad repeatedly argued that the patent office considered the inherency issues raised by Lilly and that there was no credible scientific evidence establishing that the prior art compounds actually inhibited NF-κB.  (Day 14 Tr. 73:20-74:5.)  "[Y]ou saw someone . . . take 60 articles . . . they all say that they inhibit NF-kappaB.  That's not proof. That's just someone saying yeah, yeah, yeah, yeah, yeah, okay."  (*Id.* at 74:7-11.)  Ariad simply could not have advanced such arguments if the jury would have been allowed to consider that the "someone[s]" included the inventors of the '516 patent themselves, and that the inventors clearly believed that prior art compounds inhibited NF-κB.  While there was some testimony about these

articles, the Court itself agreed (before the jury) that the articles were "not evidence," and none

of the articles were entered into evidence.  (Day 9 Tr. 50:19-51:8, 55:19-56:5.)  For all the above

reasons, Lilly requests a new trial if its motion for a JMOL is denied.

## V.    CONCLUSION

Accordingly, the asserted claims of the '516 patent should be held invalid under 35

U.S.C. §§ 102, 112, and not infringed under any section of § 271, and JMOL should be entered

in Lilly's favor.  In the alternative, the Court should order a new trial.

Respectfully submitted,

Date:    September 23, 2007              /s/ Charles E. Lipsey

**Of Counsel**                          Lawrence R. Robins (BBO# 632610)
Paul R. Cantrell                        FINNEGAN, HENDERSON, FARABOW,
Gilbert T. Voy                            GARRETT & DUNNER L.L.P.
Alexander Wilson                        55 Cambridge Parkway
**Eli Lilly and Company**               Cambridge, MA 02142
Lilly Corporate Center                  Telephone: (617) 452-1600
Indianapolis, IN  46285                 Facsimile: (617) 452-1666
Telephone: (317) 276-3885
Facsimile: (317) 276-1294

Charles E. Lipsey                       Robert D. Bajefsky
FINNEGAN, HENDERSON, FARABOW,           David S. Forman
  GARRETT & DUNNER L.L.P.               Howard W. Levine
11955 Freedom Drive                     Laura P. Masurovsky
Reston, Virginia 20190                  Sanya Sukduang
Telephone: (571) 203 2700               Jennifer A. Johnson
Facsimile: (202) 408-4400               FINNEGAN, HENDERSON, FARABOW,
                                          GARRETT & DUNNER L.L.P.
                                        901 New York Ave., N.W.
                                        Washington, DC 20001
                                        Telephone: (202) 408-4000
                                        Facsimile: (202) 408-4400
                                        **Attorneys for Defendant Eli Lilly and Company**

# APPENDIX A

## (PTX 1 at cols. 85-87)

The four claims (written to incorporate the limitations in the dependent claims) of the

'516 patent asserted against Lilly read as follows:

80.     A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells, which method comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB, such that NF-κB-mediated effects of external influences are modified.

95.     A method for reducing, in human cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

144.    A method for reducing bacterial lipopolysaccharide [LPS]-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells, wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

145.    A method for reducing bacterial lipopolysaccharide [LPS]-induced expression of cytokines in human cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent to those indicated as non-registered participants on September 23, 2007.


/s/ Charles E. Lipsey

# EXHIBIT 68



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-11280-RWZ

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,
and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

v.

ELI LILLY & COMPANY

## QUESTIONS TO THE JURY ON SPECIAL VERDICT

April 28, 2006

ZOBEL, D.J.

### INFRINGEMENT

#### Evista

1 (a)  Does a patient who takes Evista in accordance with the product label for

prevention and/or treatment of osteoporosis infringe claim 80 and/or claim 95 of the

'516 patent?

Claim 80:    YES___X___    NO_____

Claim 95:    YES___X___    NO_____

If the answer is YES as to one or both claims, please answer the corresponding

part of Questions 1 (b) and 1 (c).

If the answer is NO as to both claims, please answer next Question 2 (a).

### Inducement to Infringe

1 (b)  Did defendant Eli Lilly induce infringement of claim 80 and/or claim 95 by selling or causing a third party to sell Evista to such patients?

Claim 80:    YES__✗__    NO_____

Claim 95:    YES__✗__    NO_____

### Contributory Infringement

1 (c)  Did defendant Eli Lilly contributorily infringe claim 80 and/or claim 95 by selling or causing a third party to sell Evista?

Claim 80:    YES__✗__    NO_____

Claim 95:    YES__✗__    NO_____

## Xigris

2 (a)  Does a patient who takes Xigris in accordance with the product label for treatment of severe sepsis infringe claim 144 and/or claim 145?

Claim 144:  YES__✗__    NO_____

Claim 145:  YES__✗__    NO_____

If the answer is YES as to one or both claims, please answer the corresponding part of Questions 2 (b) and 2 (c).

If the answer is NO as to both claims, please answer next Question 3.

### Inducement to Infringe

2 (b)  Did defendant Eli Lilly induce infringement of claim 144 and/or claim 145 of the '516 patent by selling or causing a third party to sell Xigris?

Claim 144:  YES__✗__    NO_____

Claim 145   YES__✗__    NO_____

2

Contributory Infringement

2 (c)  Did defendant Eli Lilly contributorily infringe claim 144 and/or claim 145 by selling or causing a third party to sell Xigris?

Claim 144:  YES_____X_____    NO_____

Claim 145:  YES_____X_____    NO_____

Please answer next Questions 3 and 4 through 7 as to all claims.

## VALIDITY

Filing Date

3.  The effective filing date of the '516 patent is

a)  April 21, 1989        _____X_____

b)  November 13, 1991     _____

Anticipation

4.  Are one or more of the asserted claims of the '516 patent invalid because the claimed process was anticipated by a single prior art publication or reference?

Claim 80:   YES_____    NO___X_____

Claim 95:   YES_____    NO___X_____

Claim 144:  YES_____    NO___X_____

Claim 145:  YES_____    NO___X_____

5.  Are one or more of the asserted claims of the '516 patent invalid because the claimed process was anticipated by prior public use?

Claim 80:   YES_____    NO___X_____

Claim 95:   YES_____    NO___X_____

Claim 144:  YES_____    NO___X_____

3

Claim 145:   YES_____    NO___X___

Enablement

6. Are one or more of the asserted claims of the '516 patent invalid for failing to satisfy the enablement requirement?

Claim 80:    YES_____    NO___X___

Claim 95:    YES_____    NO___X___

Claim 144:   YES_____    NO___X___

Claim 145:   YES_____    NO___X___

Written Description

7. Are one or more of the asserted claims of the '516 patent invalid for failure to satisfy the written description requirement?

Claim 80:    YES_____    NO___X___

Claim 95:    YES_____    NO___X___

Claim 144:   YES_____    NO___X___

Claim 145:   YES_____    NO___X___

If you found infringement of one or more claims and also that those claims are valid, please answer next the questions concerning damages. That is, if you answered YES to one or more parts of Questions 1 and 2, and NO to each corresponding part of Questions 3 through 7, please answer next the corresponding questions concerning damages.

If you found either no claims to be infringed by answering NO to all parts of Questions 1 and 2, or if you found all infringed claims to be invalid by answering YES to all parts of Questions 3 through 8, please return your verdict to the court.

4

## DAMAGES

### Reasonable Royalty

8. What is the reasonable royalty for infringement of any valid claim?

_2.3_ %

## Evista

9 (a) What amount of Evista Net Sales should serve as the royalty base for

computing damages?

$ _2,418,553,338.00_

9 (b) The amount of damages attributable to Evista sales is

$ _____

## Xigris

10 (a) What amount of Xigris sales should serve as the royalty base for

computing damages?

$ _415,513,335.00_

10 (b)  The amount of damages attributable to Xigris sales is

$ _____

### Pre-Judgment Interest

11 (a) Should pre-judgment interest by awarded on the amounts determined in

Questions 9 (b) and 10 (b)?

YES_____    NO__X____

If the answer to Question 11 (a) is YES, please answer Question 11 (b).

If the answer to Question 11 (a) is NO, please return your verdict to the court.

11 (b) The rate of pre-judgment interest is _____%

_5-4-06_
DATE

_Jamie E. Crassman_
FOREPERSON'S SIGNATURE

5

## MEANING OF CLAIM TERMS

| Term | Court's Construction |
|---|---|
| Reducing NF-κB Activity | Decreasing the function of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, in response to certain stimuli |
| Reducing Binding of NF-κB to NF-κB Recognition Sites on Genes Which Are Transcriptionally Regulated by NF-κB | Decreasing binding of NF-κB to DNA sequences specifically recognized by NF-κB, where such DNA sequences are in genes whose transcription is regulated by increasing or decreasing NF-κB activity, and where binding denotes a chemical and/or physical interaction between NF-κB and specific DNA sequences. |
| So As to Reduce Bacterial Lipopolysaccharide-Induced Expression of Said Cytokines in the Cells | To decrease expression of cytokines in the cells, where expression of those cytokines is caused by bacterial lipopolysaccharide and where expression refers to the process by which the cell interprets its genetic information to make proteins |
| Immune Cells | Specialized cells that defend the body against infection. Immune cells are present in all body tissues, the blood stream, and the lymphatic system, and derive from a common precursor cell known as a hematopoietic stem cell. They include T cells, B cells, natural killer cells, monocytes and other monocyte derivatives, macrophages, neutrophils, eosinophils, mast cells, and basophils. Although these cells typically function to eliminate harmful foreign invaders, immune cells occasionally mistake the body's own tissues as non-self (causing autoimmune disease) or attack harmless foreign substances or donated organs (causing allergy or organ rejection). |

The parties have agreed to the definitions of the following terms:

| NF-κB | a protein factor that;<br>(a) resides in the cytoplasm as an inactive precursor bound to an IκB inhibitor protein;<br>(b) when released from the inhibitor, travels to the nucleus of the cell;<br>(c) once in the nucleus, functions to turn on transcription of certain genes by binding to specific DNA recognition sequences in those genes |
|---|---|
| A method for . . . in cells | These claims encompass methods wherein NF-κB is modulated in cells, regardless of where they are found. |

| NF-κB mediated intracellular signaling | Molecular communication within cells effected by, or conveyed through, NF-κB |
|---|---|
| Such that NF-κB-mediated effects of external influences are modified | Changing or altering effects that are both caused by an inducing substance outside the cell and are conveyed through NF-κB |
| Cytokines | Secreted polypeptides (proteins) that affect the functions of other cells, and which are important for the interactions between cells in the immune response. There are many different cytokines, one example of which is TNF-$\alpha$. |
| Activated by extracellular influences | Stimulated by one or more inducing substances outside the cell |

# EXHIBIT 69

**EXHIBIT REDACTED**

# EXHIBIT 70

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;        )
IMMUNEX CORPORATION, a Washington           )
corporation; AMGEN USA INC., a Delaware     )
corporation; AMGEN MANUFACTURING,           )
LIMITED, a Bermuda Corporation, and         )
IMMUNEX RHODE ISLAND                        )
CORPORATION, a Delaware corporation,        )
                                            )
            Plaintiffs,                     )
                                            )
      v.                                    )
                                            )
ARIAD PHARMACEUTICALS, INC., a              )
Delaware corporation, and THE WHITEHEAD     )
INSTITUTE FOR BIOMEDICAL RESEARCH,          )
a Delaware corporation,                     )
                                            )
            Defendants.                     )     Civil Action No. 06-259 (MPT)
_____ )
                                            )
ARIAD PHARMACEUTICALS, INC., a              )
Delaware corporation, MASSACHUSETTS         )
INSTITUTE OF TECHNOLOGY, THE                )
PRESIDENT AND FELLOWS OF HARVARD            )
COLLEGE, and THE WHITEHEAD                  )
INSTITUTE FOR BIOMEDICAL RESEARCH,          )
a Delaware corporation,                     )
                                            )
            Counterclaim Plaintiffs,        )
      v.                                    )
AMGEN, INC., a Delaware corporation;        )
IMMUNEX CORPORATION, a Washington           )
corporation; AMGEN USA INC., a Delaware     )
corporation; AMGEN MANUFACTURING,           )
LIMITED, a Bermuda Corporation, and         )
IMMUNEX RHODE ISLAND                        )
CORPORATION, a Delaware corporation, and    )
WYETH,                                      )
                                            )
            Counterclaim Defendants.        )
_____ )

## THE AMGEN ENTITIES' RESPONSES TO ARIAD'S
## THIRD SET OF REQUESTS FOR ADMISSION

Pursuant to Federal Rules of Civil Procedure 26 and 36, plaintiffs Amgen, Inc. ("Amgen"); Immunex Corporation ("Immunex"); Amgen USA Inc. ("Amgen USA"); Amgen Manufacturing, Limited ("Amgen Mfg."); and Immunex Rhode Island Corporation ("Immunex R.I.," together with Amgen, Immunex, Amgen USA, and Amgen Mfg. the "Amgen Entities") hereby object and respond to defendant ARIAD Pharmaceuticals, Inc.'s ("ARIAD's") Third Set of Requests for Admission. These responses are based on the Amgen Entities' present state of recollection, knowledge, and belief. They are subject to additional or different information that discovery may disclose, and, while based on the present state of recollection, are subject to such refreshing of recollection, and such knowledge or facts, as may result from further investigation by the Amgen Entities or their attorneys, or further discovery from ARIAD or third parties. The Amgen Entities reserve the right to supplement these responses.

## SPECIFIC OBJECTIONS AND RESPONSES

### REQUEST FOR ADMISSION NO. 235:

Admit that there is no use for ENBREL other than administration to patients.

### RESPONSE:

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

### REQUEST FOR ADMISSION NO. 236:

Admit that there is no use for KINERET other than administration to patients.

### RESPONSE:

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

### REQUEST FOR ADMISSION NO. 237:

Admit that ENBREL is prescribed for treatment of rheumatoid arthritis.

2

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 238:**

Admit that ENBREL is prescribed for treatment of polyarticular-course juvenile rheumatoid arthritis.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 239:**

Admit that ENBREL is prescribed for treatment of ankylosing spondylitis.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 240:**

Admit that ENBREL is prescribed for treatment of psoriatic arthritis.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 241:**

Admit that ENBREL is prescribed for treatment of plaque psoriasis.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 242:**

Admit that KINERET is prescribed for treatment of rheumatoid arthritis.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 243:**

Admit that YOU provide ENBREL's PRESCRIBING INFORMATION to doctors.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 244:**

Admit that YOU provide ENBREL's PRESCRIBING INFORMATION to patients.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 245:**

Admit that YOU believe that doctors prescribe ENBREL according to ENBREL's PRESCRIBING INFORMATION.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 246:**

Admit that YOU believe that patients use ENBREL according to ENBREL's PRESCRIBING INFORMATION.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 247:**

Admit that YOU provide KINERET's PRESCRIBING INFORMATION to doctors.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 248:**

Admit that YOU provide KINERET's PRESCRIBING INFORMATION to patients.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 249:**

Admit that YOU believe that doctors prescribe KINERET according to KINERET's PRESCRIBING INFORMATION.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 250:**

Admit that YOU believe that patients use KINERET according to KINERET's PRESCRIBING INFORMATION.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 251:**

Admit that YOU believe that at least some patients who use ENBREL in the UNITED STATES do so as directed by the FDA-approved label.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 252:**

Admit that YOU believe that most patients who use ENBREL in the UNITED STATES do so as directed by the FDA-approved label.

5

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 253:**

Admit that Amgen sells ENBREL in the UNITED STATES with the intent and expectation that patients who use ENBREL will do so as directed by the FDA-approved label.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 254:**

Admit that YOU believe that at least some patients who use ENBREL in the UNITED STATES do so according to instructions provided on or inside ENBREL packaging.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 255:**

Admit that YOU believe that most patients who use ENBREL in the UNITED STATES do so according to instructions provided on or inside ENBREL packaging.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 256:**

Admit that YOU believe that most patients who use ENBREL do so according to instructions provided on or inside ENBREL packaging.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 257:**

Admit that Amgen sells ENBREL with the intent and expectation that patients who use ENBREL will do so according to instructions provided on or inside ENBREL packaging.

6

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 258:**

Admit that YOU believe that at least some patients who use KINERET in the UNITED STATES do so as directed by the FDA-approved label.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 259:**

Admit that YOU believe that most patients who use KINERET in the UNITED STATES do so as directed by the FDA-approved label.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 260:**

Admit that Amgen sells KINERET in the UNITED STATES with the intent and expectation that patients who use KINERET will do so as directed by the FDA-approved label.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 261:**

Admit that YOU believe that at least some patients who use KINERET in the UNITED STATES do so according to instructions provided on or inside KINERET packaging.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 262:**

Admit that YOU believe that most patients who use KINERET in the UNITED STATES do so according to instructions provided on or inside KINERET packaging.

7

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 263:**

Admit that YOU believe that most patients who use KINERET do so according to instructions provided on or inside KINERET packaging.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 264:**

Admit that Amgen sells KINERET with the intent and expectation that patients who use KINERET will do so according to instructions provided on or inside KINERET packaging.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 265:**

Admit that etanercept is the generic name for ENBREL.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 266:**

Admit that ENBREL is sometimes referred to as TNFR:Fc.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that, in specific contexts, Enbrel® may sometimes have been referred to as a TNFR:Fc. The Amgen Entities deny, however, that the term "TNFR:Fc" always refers to Enbrel®, and on that basis otherwise deny this request.

8

**REQUEST FOR ADMISSION NO. 267:**

Admit that YOU have sometimes referred to ENBREL as TNFR:Fc.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that, in specific contexts, certain employees of the Amgen Entities may have referred to Enbrel® as a TNFR:Fc. The Amgen Entities deny, however, that the term "TNFR:Fc" always refers to Enbrel®, and on that basis otherwise deny this request.

**REQUEST FOR ADMISSION NO. 268:**

Admit that TNFR:Fc is the active ingredient in ENBREL.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that the active ingredient in Enbrel® is a dimeric fusion protein consisting of the extracellular ligand-binding portion of the human 75 kilodalton (p75) tumor necrosis factor receptor (TNFR) linked to the Fc portion of human IgG1. Except as expressly admitted herein, the Amgen Entities deny this request.

**REQUEST FOR ADMISSION NO. 269:**

Admit that recombinant human TNFR:Fc is the active ingredient in ENBREL.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that the active ingredient in Enbrel® is a dimeric fusion protein consisting of the extracellular ligand-binding portion of the human 75 kilodalton (p75) tumor necrosis factor receptor (TNFR) linked to the Fc portion of human IgG1. Except as expressly admitted herein, the Amgen Entities deny this request.

9

**REQUEST FOR ADMISSION NO. 270:**

Admit that anakinra is the generic name for KINERET.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 271:**

Admit that KINERET is sometimes referred to as IL-1 Ra.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that, in specific contexts, Kineret® may sometimes have been referred to as an IL-1Ra. The Amgen Entities deny, however, that the term "IL-1Ra" always refers to Kineret®, and on that basis otherwise deny this request.

**REQUEST FOR ADMISSION NO. 272:**

Admit that YOU have sometimes referred to KINERET as IL-1Ra.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that, in specific contexts, certain employees of the Amgen Entities may have referred to Kineret® as an IL-1Ra. The Amgen Entities deny, however, that the term "IL-1Ra" always refers to Kineret®, and on that basis otherwise deny this request.

**REQUEST FOR ADMISSION NO. 273:**

Admit that IL-1Ra is the active ingredient in KINERET.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that the active ingredient in Kineret® is a recombinant, nonglycosylated synthetic form of the human IL-1Ra,

10

which differs primarily from endogenous human IL-1Ra by the inclusion of a single methionine residue at its amino terminus. Except as expressly admitted herein, the Amgen Entities deny this request.

**REQUEST FOR ADMISSION NO. 274:**

Admit that non-glycosylated human IL-1Ra with an N-terminal methionine residue is the active ingredient in KINERET.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit that the active ingredient in Kineret® is a recombinant, non-glycosylated synthetic form of the human IL-1Ra, which differs primarily from endogenous human IL-1Ra by the inclusion of a single methionine residue at its amino terminus. Except as expressly admitted herein, the Amgen Entities deny this request.

**REQUEST FOR ADMISSION NO. 275:**

Admit that YOU promote the use of KINERET in the UNITED STATES.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 276:**

Admit that YOU intentionally promote the use of KINERET in the UNITED STATES.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 277:**

Admit that YOU promote the use of KINERET by patients in the UNITED STATES.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 278:**

Admit that YOU intentionally promote the use of KINERET by patients in the UNITED STATES.

**RESPONSE:**

Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities admit this request.

**REQUEST FOR ADMISSION NO. 279:**

Admit that the documents produced by YOU in this litigation that were authored, drafted or otherwise created by YOU or YOUR employees or agents are authentic for purposes of the application of Federal Rule of Evidence 901.

**RESPONSE:**

The Amgen Entities specifically object to this request as unduly burdensome. Subject to and without waiving the Amgen Entities' General and Specific Objections below, which are fully incorporated by reference herein, the Amgen Entities are without sufficient information to admit or deny this request and therefore deny this request..

## GENERAL OBJECTIONS

1.     The Amgen Entities object to ARIAD's Third Set of Requests for Admission to the extent that they purport to impose discovery or other requirements on the Amgen Entities greater than those authorized under, or permitted by, the Federal Rules of Civil procedure, the Rules of the United States District Court for the District of Delaware, and applicable case law. The Amgen Entities shall not comply with any purported obligation not imposed by law.

2.     The Amgen Entities object to ARIAD's Third Set of Requests for Admission to the extent that it calls for the production of information that is protected by the attorney-client privilege, the work product doctrine and/or any other applicable privilege or immunity. The

12

Amgen Entities will not produce information protected by such privileges or immunities. Moreover, nothing contained in these objections and responses is intended to be, or in any way constitutes, a waiver of any such applicable privilege or immunity.

3.    The Amgen Entities object to ARIAD's Third Set of Requests for Admission as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence 1) to the extent they seek information relating to sales of Enbrel® outside of the United States; and 2) because the definitions and instructions are overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

For instance, ARIAD's purported definition of "ENBREL" is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence as it not only includes the Amgen Entities' and Wyeth's commercially available products sold under the brand name Enbrel® and/or the respective generic name etanercept, but additionally includes "any analog, derivative or predecessor of the same whether commercially available or not." Analogs, derivatives and/or predecessors of Enbrel® are not at issue in, or relevant to, this case. ARIAD's purported definition of "KINERET" is similarly flawed.

4.    The Amgen Entities object to ARIAD's Third Set of Requests for Admission and to each and every request to the extent they are vague, ambiguous, and lack specificity as to the requested information. *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 107-108 (D.Del.2002) (J. Thynge) (requests for admission should be phrased so that they may be admitted or denied with little or no explanation or qualification).

5.    The Amgen Entities object to ARIAD's Third Set of Requests for Admission and each and every request to the extent that they call for information that can be readily obtained from other discovery already taken in this case and therefore are of no greater burden for ARIAD to obtain than for the Amgen Entities to obtain.

6.    The Amgen Entities object to ARIAD's Third Set of Requests for Admission and each and every request to the extent that they call for a legal conclusion. *Tulip Computers Int'l*

13

065028.1001

*B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 107-108 (D.Del.2002) (J. Thynge) (requests that seek legal conclusions are not allowed under Rule 36").

      7.     By responding to a request, the Amgen Entities do not concede the relevance or admissibility of the information provided.

      8.     The Amgen Entities reserve the right to supplement and/or amend these responses as discovery continues.

      9.     The Amgen Entities expressly incorporate each of the foregoing General Objections into each specific response to the requests set forth above as if set forth in full therein. An answer to a request shall not work as a waiver of any applicable specific or general objection to a request.

DB02:6454231.1                 065028.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Melanie K. Sharp (No. 2501)
Mary F. Dugan (No. 4704)
Jeffrey T. Castellano (No. 4837)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals
Marcus E. Sernel
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Drew Diamond
KIRKLAND & ELLIS LLP
South Figueroa Street
Los Angeles, CA 900017-5800
(213) 680-8400

Dated: December 21, 2007

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA Inc., Amgen Manufacturing Limited, and Immunex Rhode Island Corporation*

15

**CERTIFICATE OF SERVICE**

I, Melanie K. Sharp, Esquire, hereby certify that on December 21, 2007, I caused a copy

of The Amgen Entities' Responses to ARIAD's Third Set of Requests for Admission, to be

served on the following counsel of record in the manner indicated below:

**BY HAND DELIVERY & E-MAIL**

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

**BY E-MAIL (by agreement of counsel)**

Morgan Chu                          David Greenwald
David I. Gindler                    David R. Marriot
Amir A. Naini                       Cravath, Swaine & Moore LLP
Christopher M. Newman               Worldwide Plaza
Elizabeth L. Rosenblatt             825 Eighth Avenue
Irell & Manella LLP                 New York, NY 10019-7475
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276

Melanie K. Sharp (No. 2501)

065028.1001

# EXHIBIT 71

# EXHIBIT REDACTED