## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;
IMMUNEX CORPORATION, a Washington
corporation; AMGEN USA INC., a Delaware
corporation; AMGEN MANUFACTURING,
LIMITED, a Bermuda Corporation, and
IMMUNEX RHODE ISLAND
CORPORATION, a Delaware corporation,

    Plaintiffs/Counterclaim Defendants,

    v.

ARIAD PHARMACEUTICALS, INC., a
Delaware corporation, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,
a Delaware corporation, *et. al.*

    Defendants/Counterclaim Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-259 (MPT)

Public Version
Confidential Material Omitted

### DECLARATION OF MELANIE K. SHARP
### IN SUPPORT OF THE AMGEN ENTITIES' ANSWERING BRIEF
### IN OPPOSITION TO ARIAD AND THE INSTITUTIONS' MOTION
### FOR PARTIAL DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

I, Melanie K. Sharp, hereby declare as follows:

1.    I am a partner at the law firm of Young Conaway Stargatt & Taylor, LLP in

Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter.  I submit this

Declaration in connection with The Amgen Entities' Answering Brief in Opposition to Ariad's

and the Institutions' Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction.  I have

personal knowledge of the facts set forth herein and, if called as a witness, could and would

competently testify thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of selected pages from the

ARIAD Presentation to Amgen re Signal Transduction Drug Discovery dated May 11, 2000.

(AM-AR0218942, AM-AR0218998-219001).

3.      Attached hereto as Exhibit B is a true and correct copy of a May 15, 2000 letter from Harvey J. Berger to Amrit Shahzad.

4.      Attached hereto as Exhibit C is a true and correct copy of an May 04, 2001 email from Fritz Casselman to Vasant Gandhi.

5.      Attached hereto as Exhibit D is a true and correct copy of selected pages from an ARIAD Board of Directors Meeting on December 18, 2001 (ADL 0032460-32465).

6.      Attached hereto as Exhibit E is a true and correct copy of a May 4, 2006 CNBC transcript.

7.      Attached hereto as Exhibit F is a true and correct copy of an February 08, 2001 letter from Fritz Casselman to Dennis M. Fenton.

8.      Attached hereto as Exhibit G is a true and correct copy of Defendant ARIAD Pharmaceuticals, Inc.'s Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendant dated April 12, 2007.

9.      Attached hereto as Exhibit H is a true and correct copy of a Development and Qualification Report - Gene Expression Bioassay for sTNF-RI  (AM-AR0359308-395331).

10.      Attached hereto as Exhibit I is a true and correct copy of a Stipulation of Dismissal dated January 31, 2008.

11.      Attached hereto as Exhibit J is a true and correct copy of a Response to August 2, 2006 Office Action Summary of October 13, 2006 Examiner Interview, Statement of Concurrent Proceedings Under 37 C.F.R. § 1.565, and Supplemental Information Disclosure Statement dated November 09, 2006.

12.      Attached hereto as Exhibit K is a true and correct copy of a Response to July 6, 2007 Final Office Action, Summary of August 22, 2007 Examiner Interview, Statement of

2

Concurrent Proceedings Under 37 C.F.R. § 1.565, and Supplemental Information Disclosure Statement dated October 22, 2007.

13.    Attached hereto as Exhibit L is a true and correct copy of a November 02, 2007 letter from Amir A. Naini to Marcus E. Sernel and Robert C. Stanley.

14.    Attached hereto as Exhibit M is a true and correct copy of a January 18, 2008 letter from David Greenwald to Jamie H. McDole and David I. Gindler.

15.    Attached hereto as Exhibit N is a true and correct copy of a Covenant Not To Sue dated April 25, 2008.

16.    Attached hereto as Exhibit O is a true and correct copy of selected pages from Defendant ARIAD Pharmaceuticals, Inc.'s First Set of Interrogatories.

17.    Attached hereto as Exhibit P is a true and correct copy of selected pages from Counterclaim Plaintiffs ARIAD's and The Institutions' Third Set of Interrogatories to the Amgen Entities.

18.    Attached hereto as Exhibit Q is a true and correct copy of a May 21, 2008 Order from the Honorable Gregory M. Sleet in the case of *Elan Pharma International Ltd. v. Abraxis Bioscience*, C.A. No. 06-438 GMS.

19.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 22nd day of May, 2008.

_____
Melanie K. Sharp, Esq.

DB02:6839741.1

065028.1001

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on May 22, 2008, I caused to be electronically filed a true and correct copy of Declaration of Melanie K. Sharp in Support of The Amgen Entities' Answering Brief In Opposition To ARIAD and the Institutions' Motion For Partial Dismissal For Lack Of Subject Matter Jurisdiction with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on May 22, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

# EXHIBIT A



Non Confidential                           AM-AR0218942

# NF-κB PROJECT: NF-κB PATHWAY DRUG DISCOVERY
*Identification and validation of key NF-κB pathway targets*

- Inflammation involves recruitment of white blood cells from the blood to damaged or infected tissues

- Undue accumulation of these cells results in a wide range of inflammatory conditions:
  - Asthma, sepsis, psoriasis, and rheumatoid arthritis

- Binding of inflammatory molecules to specific receptors on leukocytes activates signal transduction pathways
  - Such pathways converge on the transcription factor, NF-κB
  - NF-κB pathway provides new anti-inflammatory drug targets

Ungemach Exhibit A, slide 57

Non Confidential                    AM-AR0218998

NF-κB PROJECT:  NF-κB PATHWAY DRUG DISCOVERY
*Identification and validation of key NF-κB pathway targets*

- NF-kB pathway genetic knockout and antisense

  - NF-κB gene deletion and antisense validate role of NF-κB
  - IKK gene deletion in cells block NF-κB activation

- Binding of inflammatory molecules to specific receptors on leukocytes activates signal transduction pathways

  - Such pathways converge on the transcription factor, NF-κB
  - NF-κB pathway provides new anti-inflammatory drug targets

Ungemach Exhibit A, slide 58

Non Confidential

AM-AR0218999

# NF-κB PROJECT: NF-κB PATHWAY DRUG DISCOVERY
## *Identification and validation of key NF-κB pathway targets*

- NF-κB proteins are dimeric transcription factors
- NF-κB exists in an inactive form bound to IκB

  - IκB functions as an inhibitory protein to NF-κB
  - IκB phosphorylation by IKK liberates NF-κB (active)
  - IKK is a key convergent target in the NF-κB pathway
  - IKK is a unique serine kinase ($\alpha/\beta/\gamma$ subunits)

- NF-κB pathway genetic knockout and antisense

  - NF-κB gene deletion and antisense validate role of NF-κB
  - IKK gene deletion in cells block NF-κB activation

Ungemach Exhibit A, slide 59



# EXHIBIT B

# REDACTED

# EXHIBIT C



"Fritz Casselman"                    To: <GandhiV@immunex.com>
<fritz.casselman@aria            cc:
d.com>                           Subject: NF-KB Term Sheet

05/04/01 10:52 AM

Dear Vasant,

I apologize for not responding to you earlier, but it has taken more time than anticipated to respond to your inquiry.

Attached is a proposed term sheet for an NF-KB license. I believe it reflects the terms we discussed on the telephone earlier, except that the royalty rate on products developed using the technology is set at 1%, not the 2% which I told you. The milestones are as we discussed, which represent an increase from the terms originally proposed to potential licensees approximately one year ago.

You raised specific question about the extent of our patent coverage, and requested access to the pending claims and office actions. You are familiar with the two U.S. patents and the European patent. These patents cover assays useful for identifying and developing compounds capable of modulating the function of NF-KB; under the proposed license, products developed using these assays would bear a 1% royalty. At present, we have not had patents issued which would require the payment of a 5% royalty, although we have method claims pending in the U.S. that, if issued, would accomplish that and we are considering seeking country-specific coverage in Europe and elsewhere to the same effect. We have decided that, given that we are offering non-exclusive licenses and prosecution is ongoing, it would not be advisable to release copies of the pending claims and relevant office actions.

I hope you find this explanation helpful, and I would be happy to discuss it with you further. I am traveling all next week, but return to the office on May 14. I look forward to speaking with you then.

Regards,

Fritz

Fritz Casselman
Senior Vice President &
  Chief Business Officer
ARIAD Pharmaceuticals, Inc.
26 Landsdowne Street
Cambridge, MA 02139-4234
Tel: 617-494-0400 ext. 208
Fax: 617-225-2860



fritz.casselman@ariad.com  NFKB Term Sheet 5-1-01.do

Non Confidential                    AM-AR0219149

# EXHIBIT D

# REDACTED

# EXHIBIT E

2 of 2 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop
Video, LLC.
All Rights Reserved.
CNBC/Dow Jones Business Video

**SHOW:** CNBC/DOW JONES BUSINESS VIDEO 3:17 PM EST

May 4, 2006 Thursday

**TRANSCRIPT:** 050401cb.y51

**SECTION:** BUSINESS

**LENGTH:** 747  words

**HEADLINE:** Ariad Pharmaceuticals -- Chairman & CEO Inter

**BYLINE:** Maria Bartiromo, Mike Huckman

**GUESTS:** Dr. Harvey Berger

**BODY:**

MARIA BARTIROMO, CNBC ANCHOR: Well, a David versus Goliath story in biotech to tell you about. A small biotech company took on big pharma and won big. We`re talking about Ariad Pharmaceutical`s victory today against Eli Lilly. Ariad is receiving at least $62.5 million and a percentage of future and past revenue from the sale of two drugs. CNBC`s pharmaceuticals reporter Mike Huckman is here now with another "First-on- CNBC" interview with Ariad`s CEO -- Mike.

MIKE HUCKMAN, CNBC PHARMACEUTICALS REPORTER: Yes, Maria, about 20 times the average daily volume traded in this stock so far today. The federal court jury decision in Boston this morning was unanimous that Lilly pay Ariad and its academic institution co-plaintiffs, including MIT and Harvard, the damages plus more than 2 percent of the drug sales from 2002 all the way through 2019. The jury says Lilly is infringing the Ariad Pharmaceutical`s patent on technology that Lilly uses to make its billion dollar blockbuster osteoporosis drug, called Evista and its $200 million septic shock drug called Xigris.

The stock of Ariad was halted when CNBC broke this news of the verdict this morning, but they spiked as soon as trading reopened. Right now, the stock is up 26 percent on very heavy volume. But in a strongly worded press release, Lilly says it will appeal. Quoting the company`s general council Robert Armitage: "I`ve never seen a jury verdict with which I so strongly dis-

agree. We are obviously confident that we will succeed on appeal." And he says, "The Ariad position is equivalent to discovering that gravity is the force that makes water roll downhill and then demanding the owners of all the existing hydro electric plants begin to pay patent royalties on their use of gravity." And so, on that note, let`s bring in Ariad Pharmaceuticals chairman and CEO Dr. Harvey Berger, joining us live first on CNBC from Boston this afternoon.

Dr. Berger, thanks for being here.

DR. HARVEY BERGER, CHAIRMAN & CEO, ARIAD PHARMACEUTICALS: Hello, Mike.

HUCKMAN: So your reaction to Lilly`s lawyer`s statement?

BERGER: Well, I think today is a very important day for Ariad, for our shareholders, and for science. As you pointed out, the jury found unanimously in our favor both in terms of infringement as well as validity of our patent. You know, I think each of the issues that Mr. Armitage addressed in his quote were largely dealt with by the jury and by the trial. Lilly put forth its best case and we were able to prevail. And the jury spoke today.

HUCKMAN: Dr. Berger, if this holds up on appeal, what kind of windfall could this mean for your company and your academic partners?

BERGER: Well, it`s a very important finding for Ariad and for our academic collaborators and colleagues. The numbers, which you put forth earlier, certainly speak to the damages which the jury has awarded us, the $65 million for a back sales as well as almost a 2 1/2 percent royalty on Xigris and Evista sales in the U.S. going forward through the end of the patent life. And so, those are very important numbers for us in the future. It doesn`t affect our guidance for this year, but certainly could kick in in the future.

HUCKMAN: And Dr. Berger, you`re not done yet. You think you can get royalties from other drug companies as well, correct?

BERGER: Well, there`s no question that NF-(kappa)B cell-signaling pathway plays an important role in many different diseases, not only septic shock and bone disease, osteoporosis, but as well as cancer and inflammation. And there certainly are opportunities for other companies to license our technology and our patents. And we are committed to broadly licensing this patent to other pharmaceutical companies, biotech companies. That`s never been a question. Academics, universities, can use the technology at no charge with no restriction, but pharmaceutical and biotech companies need to pay rent for the use of the intellectual property.

HUCKMAN: Need to pay rent and that`s what a jury said today. Dr. Harvey Berger, the chairman and CEO of Ariad Pharmaceuticals, thanks again for joining us first on CNBC after this favorable jury verdict.

And Maria, separately, I should add, this company is going to have data coming out on ASGRO, the big oncology conference next month on one of its pipeline products for rare cancer called sarcoma. So investors have that to look forward to as well.

BARTIROMO: All right, we`ll watch that. Thanks so much, Mike. Great interview, good story there, Mike Huckman.

**LOAD-DATE:** May 5, 2006

# EXHIBIT F

# REDACTED

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) | C.A. No. 06-259-MPT |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT ARIAD PHARMACEUTICALS, INC.'S SECOND
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Local Rules for the District of Delaware, Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") hereby supplements its responses to Plaintiffs' First Set of Interrogatories to Defendant as follows:

**INTRODUCTION**

This response is made solely for the purpose of this action. The response is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at the time of trial.

Objections to each interrogatory are made on an individual basis below. From time to time, for special emphasis, ARIAD will repeat in the specific objections certain objections also set forth in the general objections. The specific objections are submitted without prejudice to, and without in any way waiving, the general objections listed

below, but not expressly set forth in the response. The assertion of any objection to any interrogatory below is neither intended as, nor shall in any way be deemed, a waiver of ARIAD's right to assert that or any other objection at a later date. At this time, ARIAD shall not provide any information protected by any applicable privilege or doctrine.

No incidental or implied admissions are intended by the responses below. The fact that ARIAD has answered or objected to any interrogatory should not be taken as an admission that ARIAD accepts or admits the existence of any "facts" set forth or assumed by such interrogatory. The fact that ARIAD has answered part or all of any interrogatory is not intended to be, and shall not be construed to be, a waiver by ARIAD of any part of any objection to the interrogatory.

ARIAD's responses herein, and its disclosure of information, do not in any way constitute an acceptance of Plaintiffs' purported Instructions or its purported Definitions of words or phrases contained in its interrogatories. Consistent with applicable law, and without waiver or limitation of any of its objections, ARIAD has made a good faith effort to interpret the objectionable Definitions in Plaintiffs' interrogatories.

To the extent that ARIAD responds to any interrogatory, its responses reflect only the current state of knowledge, understanding, and belief of ARIAD with regard to matters about which inquiry has been made. As discovery in this matter is not yet complete, ARIAD may not yet have uncovered all information or facts pertinent to any such interrogatory and may not yet have identified or located all persons with knowledge of pertinent information or facts. ARIAD expects and consequently reserves the right to modify or supplement its response at a later time with any subsequently discovered fact or information that it may later recall or discover. ARIAD further reserves the right to change, amend or supplement any or all of the matters contained in this response as additional facts are ascertained, analyses are performed, research is completed and contentions are made. Furthermore, this response is provided without prejudice to using or relying on at trial any subsequently discovered information or facts, or information

omitted from these responses as a result of mistake, oversight, or inadvertence. ARIAD further reserves the right to produce additional facts and evidence at trial and to object on appropriate grounds to the introduction into evidence of any portion of these responses. This response is also given without prejudice to ARIAD's right to advance contentions or make claims not yet advanced or made in the present action and to supplement this response as appropriate.

## GENERAL OBJECTIONS

ARIAD asserts the following General Objections with respect to each interrogatory:

1. ARIAD objects to the First Set of Interrogatories and to each definition, instruction, and interrogatory therein to the extent that they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules for the District of Delaware ("Local Rules"), or any order or ruling by the Court in this action. ARIAD shall not comply with any purported obligation not imposed by law.

2. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein on the ground and to the extent that they purport to seek information protected by the work product doctrine, attorney-client privilege, or any other privilege or restriction on discovery. ARIAD will not produce information protected by such privileges or restrictions. Any inadvertent or unintentional disclosure of such information shall not be deemed a waiver of any applicable privilege or restriction.

3. ARIAD objects to the First Set of Interrogatories on the ground and to the extent that they seek information that is neither relevant to any claim or defense of a party, nor reasonably calculated to lead to the discovery of admissible evidence.

4. ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are overbroad, unduly burdensome, oppressive, or seek

information that is beyond the scope of discovery under the Federal Rules of Civil Procedure, including but not limited to Federal Rule of Civil Procedure 26(b).

5.       ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they are vague, ambiguous, or without sufficient specificity to identify what information is requested.

6.       ARIAD objects to Plaintiffs' Interrogatories as premature.  In particular, ARIAD objects to Plaintiffs' Interrogatories as premature to the extent that they seek information that ARIAD is not required to disclose at this stage of litigation.  In addition, ARIAD's investigation is continuing and may result in additional contentions.  For the foregoing reasons, ARIAD's responses are not complete and cannot be completed at this time, and are subject to revision.

7.       ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are compound and are actually multiple interrogatories, on the ground that they are an impermissible effort to circumvent the fifty interrogatory limit set forth in Local Rule 26.1(b).

8.       ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek information that is publicly available, in the possession, custody or control of Plaintiffs or any person or entity other than ARIAD, and is equally accessible to Plaintiffs through means less burdensome to ARIAD.

9.       ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they call for a legal conclusion.

10.       ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek personal information that is protected by statutory, constitutional, common law or privacy rights.  ARIAD reserves the right not to provide any of this information until it receives appropriate approvals.  To the extent that ARIAD responds to these Interrogatories by referring Plaintiffs to documents pursuant to Federal

Rule of Civil Procedure 33(d), nothing herein shall affect in any way the confidentiality designations, if any, of those documents.

11.    ARIAD objects to Plaintiffs' purported definitions of words and phrases contained in its interrogatories. ARIAD objects to Plaintiffs' definitions to the extent that they:   (i) are unclear, ambiguous, overly broad, or unduly burdensome; (ii) are inconsistent with the ordinary and customary meaning of the words or phrases they purport to define; (iii) seek to impose obligations different from, or in excess of, those created by the Federal Rule of Civil Procedure and the Local Rules; (iv) include assertions of purported fact that are inaccurate or at the very least are disputed by the parties to this action; or (v) incorporate other purported definitions that suffer from such defects.

12.    ARIAD, in particular, objects to the definition of "Ariad" set forth in paragraph 2 of the Definitions and Instructions to the extent it purports to impose discovery obligations on persons or entities other than the parties to this action, and to the extent it seeks discovery from individuals or entities over which ARIAD has no control.

13.    ARIAD, in particular, objects to the definitions of "identify," "identity," and "identification" set forth in paragraphs 6 and 7 of the Definitions and Instructions to the extent they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules, or any order or ruling by the Court in this action.

14.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information concerning patent claims and claim terms that have not yet been construed by the Court.  ARIAD reserves its right to modify or supplement its responses as a result of any rulings by the Court bearing on claim construction, and/or discovery bearing on claim construction.

15.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information dependent upon documents or other

information in the possession, custody and control of Plaintiffs, Plaintiffs' counsel, or third parties. ARIAD reserves its right to modify or supplement its responses in view of the discovery of information and review of documents received from Plaintiffs or third parties.

16.    ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent that they purport to require ARIAD to search for information that is not within its possession, custody, or control. ARIAD will use reasonable diligence to locate information within its control.

17.    ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent they call for information ARIAD does not have the authority to release. ARIAD will not disclose any of this information without approval.

18.    ARIAD expressly incorporates each of the foregoing General Objections into each specific response to the interrogatories set forth below as if set forth in full therein. An answer to an interrogatory shall not work as a waiver of any applicable specific or general objection to an interrogatory.

## RESPONSES TO SPECIFIC INTERROGATORIES

### INTERROGATORY NO. 2:

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to ENBREL, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to ENBREL that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that ENBREL infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether ENBREL infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

ARIAD supplements its initial response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

ARIAD supplements its response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory insofar as the Court has not yet construed the claims of the '516 patent, ARIAD's investigation is still continuing, discovery is ongoing, and Plaintiffs did not produce any documents in this action until April 11, 2007. ARIAD reserves the right to modify or supplement its responses as ARIAD continues its investigation and as ARIAD reviews documents produced and other information provided by Plaintiffs or third parties (including but not limited to documents and information regarding ENBREL and Plaintiffs' activities related to ENBREL). ARIAD further reserves the right to modify or supplement its responses based on subsequent rulings by the Court, including but not limited to claim construction.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Plaintiffs and Wyeth have been and are currently directly infringing, contributorily infringing, and/or inducing infringement of the '516 patent by, among other things, making, using, offering to sell, selling and/or importing ENBREL, without authority or license from ARIAD. Plaintiffs' and Wyeth's activities related to ENBREL

- 8 -

are currently believed to infringe at least the claims listed below. ARIAD's investigation is continuing and discovery is still ongoing. ARIAD has not had an opportunity to review Plaintiffs' April 11, 2007 document production, which appears to contain over half a million pages based on Bates ranges produced. ARIAD expressly reserves the right to modify or supplement the information provided below, including but not limited to adding or removing particular claims from the '516 patent.

| '516 Patent Claim | ENBREL |
| --- | --- |
| **Claim 1** | |
| 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said gene is inhibited. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 2** | |
| 2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said genes is inhibited. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds selectively to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes. |

| '516 Patent Claim | ENBREL |
|---|---|
|  | Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF selectively inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 5** |  |
| 5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-kB in a eukaryotic cell comprising reducing NF-kB activity in the cell such that expression of said cytokine gene is reduced. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor. Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity. NF-kB is a transcription factor that regulates certain cytokine genes. Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF reduces the level of expression of certain cytokine genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 6** |  |
| 6. A method for diminishing induced NF-kB-mediated intracellular signaling comprising reducing NF-kB activity in cells such that NF-kB-mediated intracellular signaling is diminished. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor. Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB-mediated intracellular signaling. Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF diminishes induced NF-kB-mediated intracellular signaling by reducing NF-kB activity in human cells. |
| **Claim 18** |  |
| 18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF |

| '516 Patent Claim | ENBREL |
|---|---|
| mammalian cells comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells. | (including the subtype of TNF called TNF-α) and renders it unavailable for binding to TNF receptor, thereby reducing TNF-α activity.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor causes intracellular signaling.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF-α reduces intracellular signaling caused by TNF-α by reducing NF-kB activity in human cells, which are a type mammalian cell. |
| **Claim 26** | |
| 26. The method of claim 1, carried out on mammalian cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on human cells, which are mammalian cells. |
| **Claim 27** | |
| 27. The method of claim 1, carried out on human cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on human cells. |
| **Claim 29** | |
| 29. The method of claim 26 or 27, carried out on lymphoid cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on lymphoid cells, including white blood cells of the immune system. |
| **Claim 37** | |
| 37. The method of claim 2, carried out on mammalian cells. | See claim 26. |
| **Claim 38** | |
| 38. The method of claim 2, carried out on human cells. | See claim 27. |
| **Claim 40** | |
| 40. The method of claim 37 or 38, carried | See claim 29. |

| '516 Patent Claim | ENBREL |
|---|---|
| out on lymphoid cells. | |
| **Claim 59** | |
| 59. The method of claim 5, carried out on mammalian cells. | See claim 26. |
| **Claim 60** | |
| 60. The method of claim 5, carried out on human cells. | See claim 27. |
| **Claim 61** | |
| 61. The method of claim 59 or 60, carried out on immune cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on immune cells, including white blood cells of the immune system. |
| **Claim 62** | |
| 62. The method of claim 59 or 60, carried out on lymphoid cells. | See claim 29. |
| **Claim 70** | |
| 70. The method of claim 6, carried out on mammalian cells. | See claim 26. |
| **Claim 71** | |
| 71. The method of claim 6, carried out on human cells. | See claim 27. |
| **Claim 72** | |
| 72. The method of claim 70 or 71, carried out on immune cells. | See claim 61. |
| **Claim 73** | |
| 73. The method of claim 70 or 71, carried out on lymphoid cells. | See claim 29. |
| **Claim 183** | |
| 183. The method of claim 18, carried out on human cells. | See claim 27. |

| '516 Patent Claim | ENBREL |
|---|---|
| **Claim 184** | |
| 184. The method of claim 18 or 183, carried out on immune cells. | See claim 61. |
| **Claim 185** | |
| 185. The method of claim 18 or 183, carried out on lymphoid cells. | See claim 29. |

Facts relating to the above include information in the '516 patent and its prosecution history, the references cited in the prosecution history, Plaintiffs' prescribing information for ENBREL, information provided on Plaintiffs' websites at http://www.amgen.com and http://www.enbrel.com, and U.S. Patent Nos. 5,395,760; 5,605,690; 5,712,155; 5,945,397; 6,201,105; 6,572,852; and Re 36,755.

**INTERROGATORY NO. 3:**

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to KINERET, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to KINERET that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories.

Additionally, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that KINERET infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether KINERET infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

ARIAD supplements its initial response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly,

indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

ARIAD supplements its response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory insofar as the Court has not yet construed the claims of the '516 patent, ARIAD's investigation is still continuing, discovery is ongoing, and Plaintiffs did not produce any documents in this action until April 11, 2007. ARIAD reserves the right to modify or supplement its responses as ARIAD continues its investigation and as ARIAD reviews documents produced and other information provided by Plaintiffs or third parties (including but not limited to documents and information regarding KINERET and Plaintiffs' activities related to KINERET). ARIAD further reserves the right to modify or supplement its responses based on subsequent rulings by the Court, including but not limited to claim construction.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Amgen Inc., Amgen USA Inc., and Amgen Manufacturing Limited ("Kineret-Related Entities") have been and are currently directly infringing, contributorily infringing, and/or inducing infringement of the '516 patent by, among other things, making, using, offering to sell, selling and/or importing KINERET, without authority or license from ARIAD. The Kineret-Related Entities' activities related to KINERET are currently believed to infringe at least the claims listed below. ARIAD's investigation is continuing and discovery is still ongoing. ARIAD has not had an opportunity to review Plaintiffs' April 11, 2007 document production, which appears to contain over half a million pages based on Bates ranges produced. ARIAD expressly reserves the right to

modify or supplement the information provided below, including but not limited to adding or removing particular claims from the '516 patent.

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 1** | |
| 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said gene is inhibited. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 2** | |
| 2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said genes is inhibited. | Under one way in which the Kineret-Related Entities infringe, KINERET binds selectively and competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor selectively inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 5** | |
| 5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-kB in a eukaryotic cell comprising reducing NF-kB activity in the cell such that expression of said cytokine gene is reduced. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates certain cytokine genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor reduces the level of expression of certain cytokine genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 6** | |
| 6. A method for diminishing induced NF-kB-mediated intracellular signaling comprising reducing NF-kB activity in cells such that NF-kB-mediated intracellular signaling is diminished. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB-mediated intracellular signaling.<br><br>Under one way the Kineret-Related Entities infringe, KINERET's binding to Il-1 receptor diminishes induced NF-kB-mediated intracellular signaling by reducing NF-kB activity in human cells. |
| **Claim 18** | |
| 18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-$\alpha$ activity in mammalian cells comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-$\alpha$ in the cells. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor, thereby reducing IL-1 activity.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to |

| '516 Patent Claim | KINERET |
|---|---|
| | its receptor causes intracellular signaling. Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor reduces intracellular signaling caused by IL-1 by reducing NF-kB activity in human cells, which are a type of mammalian cell. |
| **Claim 26** | |
| 26. The method of claim 1, carried out on mammalian cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on human cells, which are mammalian cells. |
| **Claim 27** | |
| 27. The method of claim 1, carried out on human cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on human cells. |
| **Claim 29** | |
| 29. The method of claim 26 or 27, carried out on lymphoid cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on lymphoid cells, including white blood cells of the immune system. |
| **Claim 37** | |
| 37. The method of claim 2, carried out on mammalian cells. | See claim 26. |
| **Claim 38** | |
| 38. The method of claim 2, carried out on human cells. | See claim 27. |
| **Claim 40** | |
| 40. The method of claim 37 or 38, carried out on lymphoid cells. | See claim 29. |
| **Claim 59** | |
| 59. The method of claim 5, carried out on mammalian cells. | See claim 26. |

| '516 Patent Claim | KINERET |
| --- | --- |
| **Claim 60** | |
| 60. The method of claim 5, carried out on human cells. | See claim 27. |
| **Claim 61** | |
| 61. The method of claim 59 or 60, carried out on immune cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on immune cells, including white blood cells of the immune system. |
| **Claim 62** | |
| 62. The method of claim 59 or 60, carried out on lymphoid cells. | See claim 29. |
| **Claim 70** | |
| 70. The method of claim 6, carried out on mammalian cells. | See claim 26. |
| **Claim 71** | |
| 71. The method of claim 6, carried out on human cells. | See claim 27. |
| **Claim 72** | |
| 72. The method of claim 70 or 71, carried out on immune cells. | See claim 61. |
| **Claim 73** | |
| 73. The method of claim 70 or 71, carried out on lymphoid cells. | See claim 29. |
| **Claim 183** | |
| 183. The method of claim 18, carried out on human cells. | See claim 27. |
| **Claim 184** | |
| 184. The method of claim 18 or 183, carried out on immune cells. | See claim 61. |
| **Claim 185** | |

| '516 Patent Claim | KINERET |
|---|---|
| 185. The method of claim 18 or 183, carried out on lymphoid cells. | See claim 29. |

Facts relating to the above include information in the '516 patent and its prosecution history, the references cited in the prosecution history, Plaintiffs' prescribing information for KINERET, information provided on Plaintiffs' websites at http://www.amgen.com and http://www.kineretrx.com, and U.S. Patent Nos. 5,075,222 and 6,599,873.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant
ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated: April 12, 2007

179674.1

- 20 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2007, the attached **DEFENDANT ARIAD**

**PHARMACEUTICALS, INC.'S SECOND SUPPLEMENTAL RESPONSES AND**

**OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO**

**DEFENDANT** was served upon the below-named counsel of record at the address and in the

manner indicated:

Melanie K. Sharp, Esquire                     <u>BY HAND and ELECTRONIC MAIL</u>
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire          <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire           <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800



Tiffany Geyer Lydon

# EXHIBIT H

# REDACTED

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-259-MPT |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH, | ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) ) ) | |

## STIPULATION OF DISMISSAL

WHEREAS on or about September 24, 2007, ARIAD Pharmaceuticals, Inc.,

Massachusetts Institute of Technology, The President and Fellows of Harvard College, and The

065028.1001

Whitehead Institute for Biomedical Research (collectively, "ARIAD") filed certain claims against Amgen, Inc., Immunex Corporation, Amgen USA Inc., Amgen Manufacturing, Limited and Immunex Rhode Island Corporation (collectively, "Amgen") for infringement of U.S. Patent Nos. 5,804,374 (the "'374 Patent") and 6,150,090 (the "'090 Patent").

WHEREAS, for the purpose of streamlining this litigation, ARIAD is willing, on the conditions described below, to withdraw its claims against Amgen for infringement of the '374 and '090 Patent.

NOW, THEREFORE, ARIAD and Amgen, on behalf of themselves and their successors and assigns, hereby stipulate and agree as follows:

1.    ARIAD agrees to dismiss its claims against Amgen for infringement of the '374 Patent and '090 Patent based on activities to the date of this Stipulation with prejudice, subject to the right in the future to assert claims for infringement of the '374 and/or '090 Patent based on activities that postdate the date of this Stipulation.

2.    ARIAD agrees that the exclusive venue for any future district court litigation instituted by ARIAD against Amgen asserting infringement of the '374 and/or '090 Patents will be the United States District Court for the District of Delaware.

3.    The parties agree to bear their own legal fees and costs arising out of the prosecution and defense of ARIAD's claims that are hereby being withdrawn.

2

4.     Neither party will rely on this Stipulation, or the dismissal of ARIAD's claims under the '374 or '090 Patents, as evidence in support of any claim, motion, demand or other request for any relief in this case, except for the purpose of enforcing this Stipulation.

Steven J. Balick (#2403)
sbalick@ashby-geddes.com
John G. Day (#2114)
jday@ashby-geddes.com
Lauren E. Maguire (#4261)
lmaguire@ashby-geddes.com
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888

*Attorneys for Counterclaim Plaintiffs*

Melanie K. Sharp (#2501)
msharp@ycst.com
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19801

*Attorneys for Counterclaim Defendants*
*Amgen, Inc., Immunex Corporation, Amgen*
*USA Inc., Amgen Manufacturing, Limited,*
*and Immunex Rhode Island Corporation*

Dated: January 31, 2008

SO ORDERED this _____ day of _____.

_____
Mary Pat Thynge
United States Magistrate Judge

3

# EXHIBIT J

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503            and            90/007,828

**Filed April 4, 2005**            **Filed December 2, 2005**

**Merged Pursuant to May 4, 2006 Merger Decision**
**Group Art Unit: 3991    Examiner: B.M. Celsa**

Patentees:     David Baltimore, Ranjan Sen, Phillip A. Sharp,
               Harinder Singh, Louis Staudt, Jonathan H.
               Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
               Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
               Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:-   6,410,516 B1            Serial No: 08/464,364

Issue Date:    June 25, 2002            Filed:    June 5, 1995

For      :     NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
               REGULATION

                                       1185 Avenue of the Americas
                                       New York, New York 10036
                                       November 9, 2006

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO AUGUST 2, 2006 OFFICE ACTION,
SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW,
STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565,
AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

An Office Action issued August 2, 2006 in connection with the
above-identified merged *ex parte* reexamination. The August 2,
2006 Office Action set a two (2) month period for filing a
response. Patentees petitioned, and on September 29, 2006 the
U.S. Patent Office granted Patentees' request for one (1)
month extension of time such that a response to the August 2,
2006 Office Action was due November 2, 2006. Thereafter, on
October 31, 2006 Patentee's petitioned for, and the U.S. Patent
Office granted Patentee's request for a one (1) week extension

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 92  of November 9, 2006 Response*

of time such that a response to the August 2, 2006 Office Action
is now due November 9, 2006. Accordingly, this Response is being
timely filed.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 92 of 92  of November 9, 2006 Response*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **RESPONSE TO AUGUST 2, 2006 OFFICE ACTION, SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

    and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 9th day of November, 2006.

                                _____
                                  Gary J. Gershik

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 92 of November 9, 2006 Response*

## <u>REMARKS</u>

Patentees respond below to the rejections set forth in the August
2, 2006 Office Action.  The following Table of Contents is
provided for reference:

<u>Table of Contents</u>

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION ................................................ | 6 |
|  | A. | Status of Claims Pursuant to 37 C.F.R. § 1.530(e).......... | 6 |
|  | B. | Rejections Made Moot by the Cancellation of Claims ........ | 6 |
|  | C. | Update of Concurrent Proceedings Under 37 C.F.R. §1.565........................................... | 6 |
|  | D. | Summary of Patentees' Response Set Forth in this Response.. | 8 |
| II. | SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW................... | 11 |
| III. | THE IMPROPER USE OF REFERENCES WHICH ARE NOT PRIOR ART AND A DECLARATION TO SUPPORT INHERENCY REJECTION IS *ULTRA VIRES*.. | 18 |
|  | A. | Statutory Grounds For Reexamination....................... | 18 |
|  | B. | Impermissible Grounds of Rejection in a Reexamination.............................................. | 18 |
|  | C. | The Inherent Anticipation Rejections in the August 2, 2006 Office Action are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute...................................... | 19 |
|  | D. | The Claims of the Subject Patent Are Method Claims and the Cited Prior Art References are At Most Evidence of What Occurred During A Prior Public Use................................................. | 21 |
| IV. | INCONSISTENCIES IN AUGUST 2, 2006 OFFICE ACTION................. | 24 |
|  | A. | Rejected Claims Reciting "Liver Cells" Should be Confirmed Patentable.................................... | 24 |
|  | B. | Rejected Claims Reciting Specific Ways of Reducing NF-kB Activity Should be Confirmed Patentable............. | 24 |
| V. | PROPER CLAIM CONSTRUCTION...................................... | 25 |
|  | A. | Claims Require a "Reasonable" Interpretation; The Examiner Improperly Expanded The Scope of the claims Beyond a Reasonable Interpretation......................... | 25 |
|  | B. | The Proper Interpretation of Method Claims Requires They Be Interpreted As Involving Affirmative Acts................. | 26 |
|  | C. | Different Claims Must Be Construed To Have Different Scope. | 28 |
|  | D. | Proper Construction of the '516 Claims.................... | 29 |
| VI. | REJECTIONS ON THE BASIS OF "INTERVENING REFERENCES"............. | 33 |
|  | A. | Numerous Claims Are Clearly Entitled To At Least An April 21, 1989 Effective Filing Date.............................................. | 33 |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 5 of 92  of November 9, 2006 Response*

|   | B. | Rejections On the Basis of "Intervening References" Should Be Withdrawn As To All Claims Entitled To At Least An April 21, 1989 Effective Filing Date | 34 |
|   | C. | Claims Entitled To At Least An April 21, 1989 Effective Filing Date And Rejected Solely On The Basis of "Intervening References" Should Be Confirmed Patentable | 34 |
|   | D. | Claim Rejections On The Grounds Of Anticipation or Obviousness Over The "Intervening References" Are Not Valid Even For Claims Entitled To a November 13, 1991 Filing Date | 39 |
|   |   | 1. Intervening References Relating To Protein Kinase | 39 |
|   |   | 2. Intervening References Relating To Cyclosporin A | 48 |
|   |   | 3. Intervening References Relating To N-Acetyl-L Cysteine | 61 |
| VIII. | THE CLAIMS ARE NOT INHERENTLY ANTICIPATED | | 64 |
|   | A. | Inherent Anticipation Requires a Showing That Each and Every Element of a Claim Necessarily Occurred in the Prior Art | 64 |
|   | B. | The References Used As "Extrinsic Evidence" Do Not Reproduce What the Prior Art References Describe And Therefore Fail to "Explain" What Occurred in the Prior Art References | 66 |
|   | C. | Even If the References Used As "Extrinsic Evidence" Were Deemed To Explain the Prior Art, the Cited Prior Art Does Not Teach Each and Every Element of the Claims Being Rejected | 79 |
| IX. | SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT | | 90 |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 6 of 92 of November 9, 2006 Response*

I.   INTRODUCTION

    A.   **Status of Claims Pursuant to 37 C.F.R. § 1.530(e).**

Canceled Claims:
 - Claims 7, 28, 39, 81, 83, 85, 86 and 203 have been canceled.

Pending Claims:
 - Claims 1-6, 8-27, 29-38, 40-80, 82, 84, 87-202 as issued on June 25, 2002 are pending in the subject patent.

Of these, claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-196 and 202 have been confirmed patentable in the August 2, 2006 Office Action.

    B.   **Rejections Made Moot by the Cancellation of Claims**

Patentees have cancelled claims 7, 28, 39, 81, 83, 85, 86 and 203 without disclaimer or prejudice to applicants' right to pursue related subject matter in a pending application in order to reduce the number of issues in this reexamination.   The cancellation of these claims renders moot their rejection including the rejection of claim 203 in section X on pages 52-55 of the August 2, 2006 Office Action.

The remaining rejection set forth in the August 2, 2006 Office Action are discussed below.

    C.   **Update of Concurrent Proceedings under 37 C.F.R. § 1.565**

*Petitions and Action in the U.S. District Court for the Eastern District of Virginia*

Patentees have previously petitioned the U.S. Patent and Trademark Office to declare the order initiating this reexamination *ultra vires*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 7 of 92  of November 9, 2006 Response*

in so far as it relied upon references and a declaration which are not prior art to support inherency rejections.    The petitions were denied.    Patentees then requested the U.S. District Court for the Eastern District of Virginia to review the denial of the petitions (06-CV-0679).    On October 3, 2006, the Court dismissed Patentees' request on the basis that Patentees have not suffered harm by the Patent Office's decision to reexamine the subject patent.    The Court did not rule on the substantive issues raised by Patentees concerning the scope of the Patent Office's authority to reexamine this patent including whether references published after the filing date might be relied upon to reject claims.


*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*

Patentees previously informed the U.S. Patent and Trademark Office that a jury trial at the U.S. District Court for the District of Massachusetts (*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*, 02-CV-11280-RWZ) unanimously found claims 80, 95, 144, and 145 of the subject patent valid and infringed. The art presented to the Court included art relating to glucocorticoids, cyclosporin A, antibiotics, 5-ASA and red wine.    Expert reports and testimony including reports and testimony from Dr. Manolagas on which the Examiner has relied in part in the August 2, 2006 Office Action, were also presented to the Court.    The jury also determined that the claims at issue were enabled and adequately described in U.S. Serial No. 07/431,436, filed April 21, 1989 and therefore entitled to an April 21, 1989 effective filing date.

From August 7, 2006 to August 10, 2006, an evidentiary hearing was conducted by the Court on four asserted defenses/counterclaims raised by Lilly which the Court did not submit to the jury.  The four issues presented were whether the subject patent is a) unenforceable because of alleged inequitable conduct during prosecution, b) unenforceable because of alleged prosecution latches, c) invalid for covering non-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 8 of 92  of November 9, 2006 Response*

patentable subject matter, and d) invalid for indefiniteness.  As of the date of the filing of this Response, the Court has not decided these defenses/counterclaims.


*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*

Patentees previously informed the U.S. Patent and Trademark Office that a Complaint for Declaratory Judgment of Patent Invalidity And Non-Infringement of U.S. Patent No. 6,410,516 was filed on April 20, 2006 in the U.S. District Court for the District of Delaware (*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.,* 06-CV-00259-KAJ).  In a written order on September 13, 2006, that Court a) denied a motion by ARIAD to dismiss the case for lack of subject matter jurisdiction, and b) denied as without prejudice a motion by ARIAD to dismiss for failure to join necessary and indispensable parties.  On September 25, 2006, ARIAD answered the complaint and denied the allegations of patent invalidity and non-infringement.  On November 3, 2006 the Court granted a motion by ARIAD for certification for appeal to the Court of Appeals for The Federal Circuit ("CAFC") of the Court's order denying the motion to dismiss for lack of subject matter jurisdiction.


**D.    Summary of Patentees' Response Set Forth in this Response**

In this Response, Patentees put forth their positions as follows:

1.    Reliance in the August 2, 2006 Office Action on references and a declaration which are not prior art to reject claims on the basis of inherency is *ultra vires* and contravenes the reexamination statute by relying as a basis for rejecting claims on references which a) are not "prior art consisting of patents and printed publications" and/or b) are evidence of a prior public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 9 of 92 of November 9, 2006 Response*

2.  Most of the claims rejected on "intervening references" dated between April 21, 1989 and November 13, 1991 are entitled to at least an April 21, 1989 filing date. These "intervening references," therefore, are not properly cited against such claims; and, in any event, do not anticipate or render obvious such claims.

3.  The claims, properly construed, require that NF-kB activity have first been induced in order to reduce such activity and obtain the results recited in the claims. So construed, the claims are not anticipated by the cited prior art which does not disclose each and every element of the claims, either expressly or inherently. The references characterized as "extrinsic evidence" of what occurred in the cited prior art do not refer to the prior art, do not repeat or explain any method disclosed in the prior art, and fail to establish that the elements not disclosed in the cited prior art methods necessarily occurred during the practice of such methods. The declaration characterized as "extrinsic evidence" does not overcome these shortcomings.

4.  More specifically, the cited prior art methods either (a) clearly do not involve reducing NF-kB activity at all or (b) do not necessarily involve reducing NF-kB activity. For example, cyclosporin A has its effects through a mechanism involving the transcription factor NFAT, not NF-kB; drinking red wine cannot, and does not, result in red wine acting on eukaryotic cells to reduce NF-kB activity in such cells; antibiotics act on bacterial cells, they do not reduce NF-kB activity in eukaryotic cells; administration of 5-ASA to ulcerative colitis patients in remission does not reduce NF-kB activity in such patients at all and/or necessarily; pretreatment of eukaryotic cells with an agent such as vitamin D or a glucocorticoid does not result at all or necessarily in reducing NF-kB activity in such cells.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 10 of 92  of November 9, 2006 Response*

These points are elaborated upon and additional points made in the detailed discussion which follows as well as in the Declaration of Dr. Verma, submitted herewith as **Exhibit 1** and incorporated by reference into this Response in its entirety.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 11 of 92  of November 9, 2006 Response*

II.   <u>SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW</u>

This Summary is filed pursuant to 37 C.F.R. § 1.560(b) to supplement
the handwritten Interview Summary prepared by Examiner Bennett Celsa
at the conclusion of an October 13, 2006 interview attended by
Examiner Celsa; Examiner Ponnaluri Padmashri; Supervisory Examiner
Deborah Jones; Dr. Inder Verma; David Berstein Esq.; John P. White,
Esq.; and Gary J. Gershik, Esq., and to provide a complete record of
the reasons warranting favorable action in the above-identified
reexamination which were discussed during the October 13, 2006
interview. ¯ Patentees acknowledge with appreciation the courtesy
extended by Examiners Celsa, Padmashri and Jones in connection with
the interview.

Patentees had requested the interview to discuss the grounds of
rejection set forth in the August 2, 2006 Office Action issued in
connection with this merged reexamination.   Patentees briefly
indicated that this response would reiterate Patentees' arguments
concerning the impropriety of relying on non-prior art evidence to
reject claims in the subject reexamination; and would provide a
detailed explanation of Patentees' entitlement to an April 21, 1989
effective filing date rather than the November 13, 1991 date accorded
by the Examiner for most claims rejected on the basis of "intervening
references".  Most of the interview was spent discussing the proper
interpretation of the claims and the lack of basis for the inherent
anticipation rejections set forth in the August 2, 2006 Office
Action.

To assist in understanding the claims, Patentees referred to
Schematics 1-8 (Exhibit 1 to the Declaration of Dr. Verma).
Patentees explained that NF-kB is a nuclear transcription factor that
unless and until activated resides as an inactive complex in the
cytoplasm of a eukaryotic cell (Schematic 1).  Upon activation by an
external influence capable of inducing the NF-kB pathway, the complex

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 12 of 92 of November 9, 2006 Response*

dissociates and NF-kB travels to the nucleus of the cell where it binds to specific binding sites present on genes that are regulated by NF-kB resulting in expression transcription of such genes (Schematic 2). See, e.g. column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; column 16, lines 22-63 of the subject patent. While NF-kB activity is essential to allow the cell to respond to the effects of harmful external agents, in some cases the activity can become excessive causing other undesirable effects. The entire NF-kB pathway from induction to gene expression can be separated into the six (6) segments shown in Schematic 2. The level of NF-kB activity over time induced by the presence of an external influence is represented by the color blue in the graph in the upper right hand corner of Schematic 2.

Patentees discovered and described the NF-kB pathway in eucaryotic cells. Patentees further provided ways of measuring NF-kB activity and of interfering with the pathway to reduce NF-kB activity. See, e.g. column 3, line 59 to column 4, line 28; and column 35, line 13 to column 38, line 24. Interference in the pathway can occur anywhere along any of the six (6) segments of the pathway, as represented by the arrows in Schematic 3. Patentees' claims are directed to achieving the specific claimed results by reducing NF-kB activity in cells based on interfering with segments of the pathway. Patentees' claims do not encompass prophylaxis, i.e. systems not exposed to an inducer, but instead are directed to reducing induced NF-kB activity so as to achieve desired results in cells, including cells of patients being treated.

Certain claims, e.g. claims 1, 2 and 5, are directed to methods of achieving the specific results recited in the claims by interfering along any of the six (6) segments shown in Schematic 3. Other claims, e.g. claims 8, 9, 10, 14, 95 and 145, require that the external influence "induce NF-kB-mediated intracellular signaling," i.e. require the persistence of at least the segment 1 involving

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 13 of 92  of November 9, 2006 Response*

induction and intracellular signaling, and only encompass interference in the NF-kB pathway along the remaining five (5) segments, each of which is intracellular (Schematic 4). Yet other claims more precisely define along which of the five (5) intracellular segments the reduction of NF-kB activity occurs: e.g. claims 20, 22, 24, 31, 33, 35, 42, 44 and 46 for segment 2 (Schematic 5); e.g. claims 23, 34 and 45 for segment 3 (Schematic 6); e.g. claims 21, 32, 43 and 89 for segment 5 (Schematic 7); and, e.g. claims 25, 47, 80 and 144 for segment 6 (Schematic 8).

Patentees also discussed the prior art which was cited in the August 2, 2006 Office Action to support inherent anticipation rejections. With respect to the remaining rejections in the August 2, 2006 Office Action, Patentees noted that they would cancel a few claims to reduce the number of issues in the reexamination.

Patentees explained that the so-called "extrinsic evidence" relied upon by the Examiner did not "explain" the cited prior art because the "extrinsic evidence" references did not even refer to the prior art and clearly did not reproduce the experimental conditions described in the cited prior art. Patentees indicated that this response would include a more detailed explanation, and such explanation appears herein. Because the "extrinsic evidence" provides information about experiments other than the experiments described in the prior art references it fails to provide an explanation of what necessarily occurred in the methods described in such prior art references. Patentees respectfully submitted that for this reason alone all of the rejections based on inherent anticipation were improper and should be withdrawn.

However, even assuming *arguendo* the "extrinsic evidence" could be relied upon to explain the cited prior art references, Patentees proceeded to explain with reference to Schematics 9-17 (Exhibit 1 to the Declaration of Dr. Verma) how the prior art references fail to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 14 of 92  of November 9, 2006 Response*

anticipate the claims being rejected based thereon.


Patentees discussed the rejection in section IV on pages 32-34 of the
August 2, 2006 Office Action based on 5-ASA.  Only one prior art
reference has been cited, namely, Dew (1983).  In Dew (1983),
however, no NF-KB inducer is described, and to the extent the disease
ulcerative colitis could be alleged to be an indication of NF-kB
activity, the patients in Dew (1983) were "in remission." See, e.g.
title, first paragraph, and second paragraph of Dew (1983).  Thus,
even if ulcerative colitis could be alleged to involve activation of
NF-kB, the patients in Dew (1983) were in remission.  Accordingly,
Dew does not involve necessarily involve reducing induced NF-kB
activity and therefore does not anticipate any now pending claim of
the subject patent which requires reducing NF-kB activity (Schematic
9).

Next, Patentees discussed the antibiotic art cited in the rejection
in section VI on pages 39-42 of the August 2, 2006 Office Action,
i.e. the 1970 Physician's Desk Reference ("1970 PDR").  The 1970 PDR
describes the use of antibiotics to treat bacterial infection in
subjects, including infection by Gram-negative bacteria which have
lipopolysaccharide ("LPS") in their cellular membrane.  Although it
is true that LPS *per se* is an inducer of NF-kB activity, antibiotics
kill bacteria or prevent bacteria from reproducing.  Administration
of antibiotics to a subject does not effect on the induction of the
NF-kB pathway by bacterial associated LPS which would continue to
induce NF-kB activity (Schematic 10).  Thus, antibiotics have no
effect on any of the six (6) segments of the NF-kB pathway.  In fact,
some antibiotics cause bacterial lysis which releases LPS causing
increased induction of NF-kB and increased not reduced NF-kB
activity. (See, e.g. Declaration of Dr. Verma ¶ 130, and references
referred to therein).  Accordingly, the use of antibiotics to treat
bacterial infection according to the 1970 PDR does not necessarily
reduce NF-kB activity and therefore does not anticipate the claims

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 15 of 92  of November 9, 2006 Response*

of the subject patent.

Patentees then discussed the cyclosporin A art cited in the rejections in sections IIb(8)- IIb(10) on pages 19-29, as well as the rejections relying on "intervening references" in sections IIa(5)-IIa(7) on pages 13-19, of the August 2, 2006 Office Action. Briefly, the activity of cyclosporin A has been shown to involve NFAT a transcription factor different from NF-kB. (Schematics 11-13 attached as Exhibit 1 of the Declaration of Dr. Verma and ¶¶ 28-32, 39-43, 49 and 60 thereof). A complete explanation of the cyclosporin A art appears below. Accordingly, the method using cyclosporin A described in the cited prior art does not necessarily involve reducing NF-kB and does not anticipate the claims of the subject patent.

Next, Patentees discussed the vitamin D art cited in the rejection in section III on pages 30-32 of the August 2, 2006 Office Action. The August 2, 2006 Office Action alleged that vitamin D reduces NF-kB activity based on the teaching of a single publication being used as "extrinsic evidence", Yu et al. (1995), and a Declaration by Dr. Manolagas. However, Yu et al. (1995) does not show that vitamin D necessarily reduced NF-kB activity in the cited prior art. In fact, Yu et al. (1995) acknowledged on page 10994 that any NF-kB effect of vitamin D "is a matter of conjecture." Moreover, vitamin D has been shown in several other references to actually induce the NF-kB pathway and increase rather than reduce NF-kB activity (Schematic 14). (See, e.g. Declaration of Dr. Verma ¶ 125, including references referred to therein.) Furthermore, Dr. Manolagas has admitted during deposition and during trial testimony that vitamin D increases rather than reduces NF-kB activity. (See, Dr. Manolagas deposition and trial testimony excerpts attached hereto as **Exhibit 2**.) Accordingly, the method of use of vitamin D described in the cited prior art does not necessarily involve reducing NF-kB activity and does not anticipate the claims of the subject patent.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 16 of 92   of November 9, 2006 Response*

Patentees then discussed the red wine art cited in the rejection in section VII on pages 42-47 of the August 2, 2006 Office Action. The prior art references asserted in support of this rejection are The Bible, St. Leger (1979), Dobrilla (1984) and Jones (1987). These prior art references describe use of red wine by subjects, but do not provide any details about the type of red wine, or the constituents of the red wine which is a complex mixture. Moreover, it is clear that consumed red wine *per se* is not contacting or entering any eukaryotic cell. In this regard, the prior art clearly does not enable any method, express or inherent, of using any specific type of red wine. Moreover, the prior art references do not disclose any inducer of NF-kB, thus making it uncertain whether any of the subjects had NF-kB activity to begin with, let alone NF-kB activity that was reduced (Schematic 15). Accordingly, the methods using red wine described in the prior art are not enabled, and moreover do not and cannot necessarily involve reducing NF-kB activity. Therefore, such methods do not anticipate the claims of the subject patent.

Patentees also discussed the glucocorticoid art cited in the rejection in section V on pages 34-39, and section XI on pages 55-60 of the August 2, 2006 Office Action. Generally, Patentees pointed out that it is not known how glucocorticoids work, and there is no evidence that they reduce NF-kB activity (Schematics 16 & 17). Even a 2003 article cited as "extrinsic evidence" by the Examiner acknowledges the lack of understanding of the mode of action of glucocorticoids. Padgett (2003) at p. 446 ("the story is not very clear"). Such lack of understanding of the mechanism by which glucocorticoids act cannot support the conclusion that reduction of NF-kB activity necessarily occurred during practice of a prior art method that used a glucocorticoid. On the contrary, when the effects of a glucocorticoid on NF-kB activity in human subjects were recently tested, the glucocorticoid was found to have no effect on NF-kB activity. (See, e.g. Declaration of Dr. Verma ¶¶ 96-100, including references referred to therein such as Hart et al). Accordingly, the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 17 of 92  of November 9, 2006 Response*

methods of use of glucocorticoids described in the prior art do not necessarily reduce NF-kB activity and therefore do not anticipate the claims of the subject patent.

Finally, Patentees pointed out certain unexplained discrepancies in the August 2, 2006 Office Action.  One such discrepancy involves the rejection of claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176, and 186, each of which recites "liver cells", but the confirmation of patentability of claims 52, 108, 118, 191 and 202 which also recite "liver cells."  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  During the interview, Examiner Celsa acknowledged that none of the cited art teaches reducing NF-kB activity in liver cells.  Accordingly, claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176, and 186 should be confirmed patentable as were claims 52, 108, 118, 191, and 202.

Another discrepancy involves the rejection of claims 22-24, 33-35, 55-57, 66-68, 77-79, and 90-92 which recite specific ways of reducing NF-kB activity, but the confirmation of patentability of analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 reciting the same specific ways of reducing NF-kB activity.  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  Accordingly, claims 22-24, 33-35, 55-57, 66-68, 77-79, and 90-92 should be confirmed patentable as were claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 18 of 92 of November 9, 2006 Response*

III. THE IMPROPER USE OF REFERENCES WHICH ARE NOT PRIOR ART AND A
     <u>DECLARATION TO SUPPORT INHERENCY REJECTION IS *ULTRA VIRES*</u>

### A.   Statutory Grounds For Reexamination

Statutory authority prescribes that in reexamination proceedings
consideration but the Patent Office be limited to "prior art
consisting of patents or printed publications" that have a bearing
on patentability. 35 U.S.C. § 301. *See also* 37 C.F.R. § 1.501.
Indeed, the Manual of Patent Examining Procedure ("MPEP") states that
substantial new questions of patentability must be based on "prior
art patents or printed publications." Prior art includes that relied
on in the reexamination request, that found elsewhere by the PTO, or
that in the patent file from submissions under 37 C.F.R. § 1.501.
All such art must be "prior art consisting of patents and printed
publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.

### B.   Impermissible Grounds of Rejection in a Reexamination

The Patent Office does not have statutory authority to entertain a
prior public use in a reexamination. 35 U.S.C. § 301, *et seq.*; e.g.,
M.P.E.P. § 2216 (Rev. 2, May 2004) ("Examples of such questions that
will not be considered are public use, on sale, and fraud.")

The lack of statutory authority cannot be circumvented by reliance
on a printed publication that merely describes the public use.  A
prior art citation "cannot include ... a statement as to the public
use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004);
"a prior art patent or printed publication <u>cannot</u> be properly applied as
a ground for reexamination <u>if it is merely used as evidence of
alleged prior public use</u> or on sale, insufficiency of disclosure,
etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Thus, it is clear that the PTO does not have statutory authority to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 19 of 92 of November 9, 2006 Response*

rely on, as a ground for reexamination, a printed publication which does not itself contain the necessary disclosure, but describes an alleged prior public use. For the purposes of this legal challenge to the subject reexamination proceeding Patentees also rely upon, and hereby incorporate by reference the Petitions, Requests for Reconsideration, and Pleadings filed in the Mandamus action initiated by Patentees in the U.S. District Court for the Eastern District of Virginia.

      **C.**    **The Inherent Anticipation Rejections in the August 2, 2006 Office Action are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute.**

As noted above, a reexamination must be based on "prior art consisting of patents and printed publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501. Nothing in the statute, the rules, or the M.P.E.P. dictates a different understanding. Indeed, even prior art patents or printed publications cannot be grounds for reexamination if used merely as evidence of alleged prior public use or on sale activity. MPEP 2217. Affidavits or declarations may be considered in reexamination to explain the content or pertinent date of a prior art patent or printed publication. *Id.* However, rejection on prior art "cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications." *Id.* at 2258(I)(E).

Likewise, an admission may not be the basis for establishing a substantial new question of patentability, although an admission may be used "to determine the scope and content of the prior art in conjunction with prior art patents and printed publications, whether such admissions result from patents or printed publications or from some other source." *Id.* at 2217 and 2258(I)(F)(1)-(2). "An admission as to what is in the prior art is simply that, an admission, and requires no independent proof. It is an acknowledged,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 20 of 92  of November 9, 2006 Response*

declared, conceded, or recognized fact or truth." *Id.* at 2258(I)(F)(2). However, information supplementing or further defining the admission is improper, as the admission must stand on its own. *Id.* at 2217.

It is clear that reexamination proceedings were designed to be limited in scope to consideration of prior art patents and printed publications, "lest the life of an issued patent be wasted and the patentee's legitimate rights be abused by third party requests for reexamination, for there are myriad grounds on which patentability is subject to challenge." *In re Lonardo*, 119 F.3d 960, 969, 43 USPQ2d 1262 (Fed. Cir. 1997)(Newman, J., dissenting and noting legislative history's "serious concern that reexamination not create new opportunities for abusive tactics and burdensome procedures")(quoting *In re Recreative Technologies Corp.*, 83 F.3d 1394, 1397, 38 USPQ2d 1776, 1778 (Fed. Cir. 1996)).

Despite the statute, the rules and the MPEP, the Examiner advances the following case law on pages 8-9 of the August 2, 2006 Office Action as relevant to the use of non-prior art references in a reexamination:

> The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." Atlas *Powder* Co. v. *Ireco* Inc., 190 F.3d 1342,1347,51 USPQ2d 1943,1947 (Fed. Cir. 1999). Thus the claiming of a new use, new function or unknown property which is inherently present in the prior art does not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ 430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter. 1993); *In re Cruciferous Sprout Litigation*, 301 F3d. 1343,64 USPQ2d 1202 (Fed. Cir. 2002); *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004). Although, normally, only one reference should be used in making a rejection under 35 U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be proper when the extra references are cited to show that a characteristic not disclosed in the reference is inherent. See MPEP 2131.01. Once a reference's teaching is shown to provide evidence or reasoning tending to show inherency, the burden shifts to Applicant to show an unobvious difference. MPEP 2112 (V).

Patentees respectfully point out that not one of the cases cited by

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 21 of 92 of November 9, 2006 Response*

the Examiner involves a reexamination or discusses what is a legitimate ground for rejection in a <u>reexamination</u>.

35 U.S.C. § 303 specifically refers to §§ 301 and 302, which require the basis of reexamination to be prior art, whether "patents or publications discovered by [the Director] or cited under the provisions of section 301 [for citation of prior art in a request for reexamination under section 302]." 35 U.S.C. § 303. The Examiner proffers no rationale for interpreting the reexamination statute in a different manner. Yet, the Examiner proceeds to assert that non-prior art documents can be considered during reexamination to show inherent anticipation as "extrinsic evidence" of what is inherent in a prior art reference even when such "extrinsic evidence" does not refer to or reproduce the teachings of the prior art being cited.

**D.    The Claims of the Subject Patent Are Method Claims and the Cited Prior Art References Are At Most Evidence of What Occurred During A Prior Public Use.**

Each of the prior art references cited in the August 2, 2006 Office Action expressly describes methods that were publicly used, e.g. drinking red wine. The cited prior art, therefore, merely provides evidence of the prior public use of the methods described.

The logic used in the August 2, 2006 Office Action is that when the methods described in the printed publications were practiced by the public, the claimed methods of the '516 Patent "inherently" were practiced. Clearly, however, anything that "inherently" happened, must have occurred *during the <u>public use</u>* of methods described in cited references.

Indeed, the August 2, 2006 Office Action relies on non-prior art references as "extrinsic evidence," as well as a Declaration offered by the Requestor, to allegedly "explain" what would have "inherently" happened during such public use. Clearly, the methods which are actually described in the cited prior art do not raise any

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 22 of 92  of November 9, 2006 Response*

substantial new question of patentability, and the August 2, 2006
Office Action does not allege otherwise.  What the August 2, 2006
Office Action effectively relies upon to support the inherent
anticipation rejections is evidence of a prior public use.

The Federal Circuit has held in standard patent prosecution that a
<u>method</u> is inherently anticipated only by the actual public use of the
method (which may or may not have been described in a printed
publication).[1]

A method of preparing and administering a food product rich in
glucosinolates was found to be inherently anticipated where members
of the public have "heretofore grown and eaten one of the many
suitable cultivars identified by its patents."  *In re Cruciferous
Sprout Litigation*, 301 F.3d 1343, 1351 (Fed. Cir. 2002).  However,
the rationale of this holding is prior public use, not prior
publication.  This rationale is not available as a ground for
rejection in a reexamination.

A claim to a method of hair depilation has been found inherently
anticipated on the basis of prior public use in an experiment
investigating the safety of a laser on guinea pig backs.  The
experiment was described in a printed publication, but it was the
public use which inherently anticipated, not the publication.  Again,
prior public use is not available as a basis for a rejection in a
reexamination.  *MEHL/BIOPHILE International Cor. v. Milgraum*, 192
F.3d 1362, 1366 (Fed. Cir. 1999).  Moreover, a different printed
publication that merely provided instructions for the use of the same
laser to remove tattoos from skin, where there was no prior public

---

[1] The Federal Circuit has found a claim to a *compound* inherently anticipated by a
disclosure in a *patent* of administering to a patient a precursor which was necessarily
converted in the patient to the compound.  *Schering Corporation v. Geneva et al.*, 339 F.3d
1373 (Fed. Cir. 2003).  However, the Federal Circuit in *Schering* explicitly stated that the
*method* of treatment claims were not inherently anticipated by such a disclosure.  *Id*, at 1381.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 23 of 92  of November 9, 2006 Response*

use, was held not to inherently anticipate a claimed depilation method. *Id* at 1365.

Accordingly, it is clear that inherent anticipation of a patented method only occurs during a prior public use, not in a printed publication describing that prior public use; and prior public use is not a permitted basis for a rejection in a reexamination.

The Office's own rules recognize that a prior art citation "cannot include ... a statement as to the public use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent or printed publication <u>cannot</u> be properly applied as a ground for reexamination <u>if it is merely used as evidence of alleged prior public use</u> or on sale, insufficiency of disclosure, etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Accordingly, the August 2, 2006 Office Action contains improper rejections of a patented method based on prior public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 24 of 92  of November 9, 2006 Response*

IV.  <u>INCONSISTENCIES WITHIN THE AUGUST 2, 2006 OFFICE ACTION</u>

**A.  Rejected Claims Reciting "Liver Cells" Should be Confirmed Patentable.**

As noted above, each of claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186 recite "liver cells" and have been rejected.  In contrast, claims 52, 108, 118, 191, and 202 also recite "liver cells" but have been confirmed patentable.  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  During the October 13, 2006 interview, Examiner Celsa acknowledged that none of the cited art teaches reducing NF-kB activity in liver cells.  Accordingly, each claim 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186 should be confirmed patentable.

**B.  Rejected Claims Reciting Specific Ways of Reducing NF-kB Activity Should be Confirmed Patentable.**

Similarly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 recite specific ways of reducing NF-kB activity, and have been rejected.  In contrast, analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 also recite the same specific ways of reducing NF-kB activity, but have been confirmed patentable.  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  Accordingly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 should be confirmed patentable.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 25 of 92  of November 9, 2006 Response*

V.    PROPER CLAIM CONSTRUCTION

On page 8 of the August 2, 2006 Office Action, the Examiner set forth
an interpretation of the claims of the subject patent.  The Examiner
stated:

> The USPTO must give claims their broadest reasonable interpretation, in light of and
> consistent with the written description of the invention in the application. See, *In re
> Donaldson Co.*, 16 F.3d 1189, 29 USPQ2d 1845 (Fed. Cir. 1994). With respect to claim
> 1 it is noted that the sole method step is functional i.e. reducing NF-kB activity.
> Accordingly, the claims would encompass any *in* vitro or *in* vivo, natural (indirect) or
> man-made (direct) means of reducing NF-kB activity. Indeed, most of the method steps
> recited in the Baltimore patent are purely functional with the exception of claim 7 and
> dependent claims 81, 83 and 85-87 which require "modifying NF-kB activity" (which
> are partially functional) and claim 203 which requires "introducing a nucleic acid decoy
> molecule into the cell" which requires an active step. The summary of the remaining
> reexamination claims provided in pages 12-15 of the '7503 request is herein
> incorporated by reference.

Patentees respectfully disagree with such an interpretation because,
among other things, the interpretation being advanced is unreasonably
broad, is contrary to the interpretation and understanding which a
person skilled in the art would have, fails to conform to the
doctrine of claim differentiation, and ignores the fact that a method
is being claimed.

    **A.    Claims Require a "Reasonable" Interpretation. The Examiner
Improperly Expanded the Scope of the Claims Beyond a
Reasonable Interpretation.**

To determine if prior art anticipates a claim or render it obvious,
the Examiner must first determine the proper scope of the claim.
While a claim is to be given a broad interpretation during
reexamination, this interpretation must be *reasonable* in light of the
specification.  *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).
Additionally, the Examiner must construe the claims as one of skill
in the art would interpret them.  *In re American Academy of Science
Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92  of November 9, 2006 Response*

By construing the claims so broadly that they would even cover actions that would kill the cell the Examiner adopts an interpretation contrary to that which would be understood by a person skilled in the art and has impermissibly given the claims an unreasonable, broad interpretation. *See In re Cortright*, 165 F.3d 1353, 1359 (Fed. Cir. 1999) (reversing the Examiner's rejection after finding that one skilled in the art would construe the claim more narrowly than had the examiner). When the claim terms "are examined through the viewing glass of a person skilled in the art," as they are supposed to be, it becomes clear that the Examiner's interpretation is not reasonable. *Phillips v. AWH Corp*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) *cert. denied*, 126 S.Ct. 1332 (2006) (quoting *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 406 F.3d 1359, 1363 (Fed. Cir. 2005)). Such broad interpretations are impermissible and must be refined. *See In re Marosi*, 710 F.2d 799 (Fed. Cir. 1983) (reversing a claim rejection under 35 U.S.C. §§102 or 103 that failed to interpret the claim in light of one skilled in the art).

Accordingly, the Examiner should interpret the claims so that their scope is commensurate with the specification as viewed by one skilled in the art. For an understanding of who would be a person skilled in the art, see Declaration of Dr. Verma, ¶ 3.

### B. The Proper Interpretation of Method Claims Requires They Be Interpreted As Involving Affirmative Acts.

To properly construe method claims, the Examiner must consider that a process is an act. *See Tilghman v. Proctor*, 102 U.S. 707, 728 (1881)(differentiating between a machine and a process). Courts have long since held that a "process requires that certain things should be done." *Cochrane v. Deener*, 94 U.S. 780, 788 (1877). Unlike a machine, a process requires an affirmative act to be taken. *Tilghman* at 728.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 27 of 92  of November 9, 2006 Response*

When interpreting method claims, a distinction must be made between "steps," which are descriptions of the elements of a process, and "acts" which are "the implementation of such steps." *O.I. Corp. v. Tekmar Co. Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). While "steps" can implicate §112, ¶ 6, "acts" do not. *Masco Corp. v. United States*, 1327 (Fed. Cir. 2002)(holding that "if an act is present, then the limitation is not a step plus function limitation"). The Federal Circuit has held process claims that describe steps with "ing" verbs ("gerunds") "acts." *O.I. Corp.* at 1583. Moreover, "a patentee can define a method or process claim containing steps that begin with a gerund . . . without necessarily subjecting the claim to §112 ¶6 limitations." *EBS Dealing Res. Inc. v. Intercontinental Exch. Inc.*, 379 F. Supp.2d 521, 527-528 (S.D.N.Y. 2005) (citations omitted). Method claims without a "step for" provision should not be construed as having a step-plus-function limitation, unless the limitation does not have an act, as courts are reluctant to impose §112 ¶6 "without a showing that the limitation contains . . . [no] act." *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002)(holding that "transmitting" was an act, not a function).

In the present case, the method claims contain gerunds such as "reducing". These gerunds clearly should be construed as acts, and the claims should be interpreted as acts that require affirmative steps be taken. See also, Declaration of Dr. Verma, ¶ 11.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 28 of 92  of November 9, 2006 Response*

### C.  Different Claims Must Be Construed to Have Different Scope.

When determining the proper scope of the claims, the Examiner must use an interpretation that provides meaning to all claim terms and prevents different claims from having the same scope.  *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). The doctrine of claim differentiation creates a presumption that each claim has a different scope and should be applied if this presumption is not rebutted.  *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)(applying the doctrine of claim differentiation where an alternate interpretation would make a claim superfluous).

The Examiner has improperly interpreted numerous claims so as to in effect have the same scope.   The Examiner has also construed independent claims and claims which depend on them in such a manner that they have the same scope.   Such an interpretation is improper under the doctrine of claim differentiation.   Indeed, where a claim limitation "already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) *cert. denied*, 543 U.S. 925 (2004) (holding that a dependent claim and the independent claim on which it depends do not have the same scope).  Additionally, by determining that claims with different limitations have the same scope, the Examiner has ignored the preference for applying a claim construction that "gives meaning to all the terms of the claim" over one that does not. *Merck & Co., Inc., v. Teva Pharmaceuticals, USA, Inc.*, 395 F3d 1364, 1372 (Fed. Cir. 2005) *cert. denied*, 126 S.Ct. 488 (2005).

In this case, there are numerous dependent claims reciting elements not present in the claims to which they refer that clearly do not have the same scope.  Similarly, independent claims recite elements not preset in other independent claims.   The Examiner should

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 29 of 92  of November 9, 2006 Response*

therefore recognize that the claims are different in scope so as to avoid an interpretation in which claim terms are superfluous and/or redundant.

### D.  Proper Construction of the '516 Patent Claims[2]

The invention of the subject patent is based on the pioneering work of the inventors including Dr. David Baltimore, which grew out of studies on how the immune system is regulated. The immune system consists of a variety of specialized cells and protects the body by attacking and eliminating harmful foreign organisms and substances. The inventors' work demonstrated that a particular factor in the cell, NF-kB, plays a central role in regulating how immune cells respond to external influences that are damaging to the body.  NF-kB functions as a transcription factor, which is activated in response to external stimuli and participates in regulating expression of particular genes, such as antibody and cytokine genes.  (Column 2, lines 20-45 and 54-59; column 12, lines 57-66, col. 13, lines 13 - column 14, line 54; and col. 17, lines 30-37; Declaration of Dr. Verma, ¶¶ 5-7.)

In the absence of inducing external stimuli, NF-kB is generally present in an inactive form in the cytoplasm of the cell.  In its inactive form, NF-kB is bound to an inhibitor protein called IkB, which prevents NF-kB from traveling to the nucleus. Upon activation in response to an external influence, NF-kB is released from its complex with IkB. The released NF-kB then moves to the nucleus, where it can participate in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes.  The entire NF-kB

---

[2]Patentees also refer the Examiner to the construction of certain claims in the District of Massachusetts litigation.  In this regard, Patentees refer the Examiner to the material cited in the Supplemental Information Disclosure Statement in Section IX herein discussing among other issues NF-kB activity and use of blocking drugs (and, material previously disclosed).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 30 of 92  of November 9, 2006 Response*

pathway from induction to gene expression can be separated into the six (6) general segments shown in blue in Schematic 2.  While NF-kB activity is essential to allow the body to respond to the effects of harmful external stimuli, in some cases the activity can become excessive causing other undesirable effects.   (See, e.g.,  column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; and column 16, lines 22-63 of the subject patent; Schematics 1 and 2; and Declaration of Dr. Verma, ¶¶ 8-9.)

The claims of the '516 patent are directed to various methods for providing a therapeutic benefit by intervening in the processes that constitute the NF-kB pathway, are associated with NF-kB activity, and cause subsequent NF-kB-regulated effects. In situations where there is excessive activation of NF-kB in response to external stimuli, the claimed methods are useful for modifying their potentially harmful effects.  The claims are directed to methods for modifying the body's naturally occurring response to such inducing external stimuli and specifically to reducing the harmful effect of such external influences by "reducing NF-kB activity."  The '516 patent claims are directed to various methods for providing a therapeutic benefit by intervening in the processes associated with NF-kB activity that cause subsequent NF-kB-regulated effects.   For example, see column 3, lines 59-67, where the patent explains that "As a result of this finding, it is now possible to alter or modify the activity of NF-kB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-kB activity. Alteration or modification, whether to enhance or reduce NF-kB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-kB activity."  These desired goals are achieved in the methods claimed in the '516 patent by reducing the ability of NF-kB to act as a messenger inside the cell, so as to regulate specific results recited in the claims, such as reducing NF-kB mediated gene

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 31 of 92 of November 9, 2006 Response*

expression.  When read in light of the teachings of the patent disclosure, one skilled in the art would understand the claims to require affirmative acts and, manipulative steps, calculated to achieve such specific results by reducing the ability of NF-kB to act as a messenger inside the cell. (Declaration of Dr. Verma, ¶¶ 10-11.)

The '516 patent teaches that one can reduce induced NF-kB activity by interfering anywhere along any of the six (6) segments of the NF-kB pathway as represented by the arrows in Schematic 3.  One skilled in the art would understand the claims of the '516 patent to be directed to achieving specified results by interfering along these segments so as to reduce NF-kB activity.  (Declaration of Dr. Verma, ¶ 12.)

In normal cells, in the absence of inducing stimuli, there is no activation of NF-kB, therefore no consequent NF-kB mediated intracellular signaling.  Such activation and signaling takes place in response to external influences that act on the cell.  Since the pending claims are directed to methods for reducing NF-kB activity, one skilled in the art would understand that the claimed methods do not cover prophylaxis, but instead are directed to methods in which NF-kB activity which has been induced is reduced. (Declaration of Dr. Verma, ¶ 13.)

Some claims, for example, claims 1, 2 and 5, are directed to methods of achieving specified results by interfering along any one of the six (6) segments shown in Schematic 3.  Other claims specify that the external influence "induce NF-kB-mediated intracellular signaling."  Thus, these claims require the persistence of at least the first step, i.e. stage 1 which induces intracellular signaling, but allow for the interference to occur along any of the remaining five (5) segments inside the cell (Schematic 4).  Examples of such claims are claim 8, 9, 10, 14, 95 and 145.  Yet other claims are more specifically directed to and specify that interference occurs along

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 32 of 92  of November 9, 2006 Response*

only one of the five (5) intracellular segments.  In this regard, claims 20, 22, 24, 31, 33, 35, 42, 44 and 46 specify that interference is along segment 2 (Schematic 5); claims 23, 34 and 45 specify that interference is along segment 3 (Schematic 6); claims 21, 32, 43 and 89 specify that interference is along segment 5 (Schematic 7); and claims 25, 47, 80 and 144 specify that interference is along segment 6 (Schematic 8).  (Declaration of Dr. Verma, ¶¶ 14-15.)

Thus, each of the following dependent claims, properly construed, specify interference along the specific segment in the NF-kB activity pathway which it recites.  To construe these claims otherwise would be contrary to the doctrine of claim differentiation and to the reasonable interpretation of these claims by one of skill in the art. The dependent claims that recite specific ways of reducing NF-kB activity by interfering at specific segments of the NF-kB pathway are the following:

20, 21, 22-24[3] & 25;
31, 32, 33-35[3] & 36;
42, 43, 44-46[3] &  47;
53, 54, 55-57[3] & 58;
64, 65, 66-68[3] & 69;
75, 76, 77-79[3] & 80;
88, 89, 90-92[3] & 93;
99, 100, 101-103[3] & 104;
109, 110, 111-113[3] & 114;
119, 120, 121-123[3] & 124;
128, 129, 130-132[3] & 133;
139, 140, 141-143[3] & 144;
149, 150, 151-153[3] & 154;
159, 160, 161-163[3] & 164;
167, 168, 169-171[3] & 172;
177, 178, 179-181[3] & 182; and
192, 193, 194-196[3] & 197.

---

[3]*See, also*, Section IV of the this response pointing out inconsistencies in the rejections set forth in the August 2, 2006 Office Action apparently acknowledging patentability of some but not all of dependent claims reciting substantially identical language.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 33 of 92  of November 9, 2006 Response*

VI.   <u>REJECTIONS ON THE BASIS OF "INTERVENING REFERENCES"</u>.

On pages 3-4 of the August 2, 2006 Office Action, the Examiner
alleged that all 203 claims of the subject patent are only entitled
to the benefit of a November 13, 1991 filing date, and rejected a
subset of the claims on references having an effective date between
April 21, 1989 and November 13, 1991 (the "intervening references").[4]

### A.   Numerous Claims Are Clearly Entitled To At Least An April 21, 1898 Effective Filing Date

Patentees maintain that numerous claims are clearly entitled at least
to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.

For the subset of claims against which the "intervening references"
are being cited Patentees direct the Examiner's attention to a Claim
Support Chart, attached as **Exhibit 3** to the Declaration of Dr. Verma.
This Claim Support Chart clearly shows support for the claims listed
in the April 21, 1989 application.  The portions of the April 21,
1989 application or of the relevant application(s) incorporated
therein by references and identified in the Claim Support Chart
convey with reasonable clarity the invention recited in the
corresponding claim(s) listed in the chart to one of skill in the
art.  See, also the Declaration of Dr. Verma, ¶¶ 16-21.  Patentees
point out that to the extent support for the pending claims appears
in U.S. Serial Nos. 06/817,441, filed January 9, 1986; 07/155,207,
filed February 12, 1988; and/or 07/280,173, filed December 5, 1988,
each of these applications is incorporated by reference into the
April 21, 1989 application on page 1, lines 4-8 thereof.   In
accordance with M.P.E.P. § 608.01(p)(I), claims are entitled to at

---

[4] *Pending claims which have been rejected on "intervening references" are:  1-8, 9,
11, 18, 20, 21, 25-27, 29, 31, 32, 36-38, 40, 42, 43, 47-51, 53, 54, 58-60, 61, 62, 64, 65, 69-
71, 72, 73, 75, 76, 80, 82, 84, 88, 89, 93-97, 106, 107, 109, 110, 114-117, 182-185, 192, 193,
197-199, 200 and 201.*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
Page 34 of 92  of November 9, 2006 Response

least the April 21, 1989 effective filing date of U.S. Serial No. 07/341,436 if supported by the disclosure of an application incorporated therein by reference.

### B.    Rejections On The Basis Of "Intervening References" Should Be Withdrawn As To All Claims Entitled To At Least An April 21, 1989 Effective Filing Date

As noted above, numerous claims rejected on the basis of "intervening references" are in fact entitled to at least an April 21, 1989 effective filing date. Therefore, each ground of rejection based on an "intervening reference" should be withdrawn with respect to each claim rejected on such ground which is entitled to the April 21, 1989 filing date. Specifically, the rejections set forth: in section I on pages 10-13; in section IIa on pages 13-18; in section VIII on pages 47-48; and in section IX on pages 48-51 of the August 2, 2006 Office Action should be withdrawn with respect to each pending claim rejected therein which is entitled to an April 21, 1989 effective filing date.

### C.    Claims Entitled To At Least An April 21, 1989 Effective Filing Date And Rejected Solely On The Basis Of "Intervening References" Should Be Confirmed Patentable

Because certain claims have only "intervening references" cited against them, such claims should be confirmed patentable as to each such claim found to be entitled to the April 21, 1989 effective filing date. Specifically, Patentees maintain that claims 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 are entitled to an April 21, 1989 effective filing date and have only "intervening references" cited against them. Accordingly, each of claim 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 should be confirmed patentable.

In addition to the Claim Support Chart discussed above, Patentees now address the Examiner's specific comments on pages 3-4 of the Office

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 35 of 92  of November 9, 2006 Response*

Action which relate to the claims being rejected on the basis of the intervening references.  The Examiner has alleged that:

> "every claim of the '516 patent (1-203) recites at least one of the following features which the pre-1991 applications fail to disclose:
>
> a.    an amino acid or nucleic acid sequence corresponding to NF-κB;
>
> b.    support for the Baltimore patent claim limitations including (but not limited to):
>
> -'reducing NF-kB activity' in a cell (e.g. especially mammalian/eukaryotic) and/or an enabling means thereof (e.g. administering a NF-kB inhibitor) to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as *required in all the claims*;
>
> -'reduce binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB' (e.g., claims 25, 36, 47, 69, 80, 93, 144, 154 and 182);
>
> -'inhibiting modification of an IkB protein, which modification otherwise reduces IkB binding to NF-kB' (e.g., claims 22, 33, and 44);
>
> -'inhibiting degradation of an IkB protein' (e.g., claims 23, 34, and 45);
>
> -'inhibiting dissociation of NF-kB:IkB complexes' (e.g., claims 24, 35, and 46)."

In response, Patentees note the following:

1. Contrary to the Examiner's assertion, amino acid or nucleic acid sequences corresponding to NF-kB are not recited in the pending claims or necessary to enable these claims as of April 21, 1989. See Declaration of Dr. Verma ¶ 17.

2. Contrary to the Examiner's assertion, the phrase "reducing NF-kB activity" in the pending claims is clearly supported by at least the following passages in of U.S. Serial No. 07/341,436, filed April 21, 1989 (the "April 21, 1989" application):

- page 5, lines 13-16: "Alteration or modification, whether to enhance or <u>reduce NF-kB activity</u> . . . is referred to herein as

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 36 of 92 of November 9, 2006 Response*

regulation of NF-kB activity."  See, also Declaration of Dr. Verma ¶ 17 and 18.


3. Contrary to the Examiner's assertion, the terms "mammalian cells" and "eukaryotic cells" in the pending claims are clearly supported by at least the following passages in the April 21, 1989 application:

- page 1, lines 4-8, incorporating U.S. Serial No. 07/155,207, page 77, lines 8-9: "NF-kB [is] present in a wide variety of <u>mammalian cells</u>"; and
- page 1, lines 4-8, incorporating U.S. Serial No. 07/280,173, page 4, line 21: "In the present work with <u>eukaryotic cells</u>." See, also, Declaration of Dr. Verma ¶ 18.


Patentees also note the Examiner's assertion that "'reducing NF-kB activity' in a cell (e.g. especially mammalian/eukaryotic) and/or an enabling means thereof (e.g. administering a NF-kB inhibitor) to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.)" is not disclosed in the subject patent. In this regard, Patentees respectfully direct the Examiner's attention to page 23, line 22 to page 30, line 25 of the April 21, 1989 application describing how one skilled in the art may proceed to reduce NF-kB activity in accordance with the invention.


4. Contrary to the Examiner's assertion, the phrase "reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

- on page 5, line 31 to page 6, line 8: "NF-kB-mediated gene expression can also be selectively regulated by altering the <u>binding domain of NF-kB</u> in such a manner that binding specificity and/or affinity are modified.";

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 37 of 92  of November 9, 2006 Response*

- on page 24, lines 9-29: "According to the methods described herein, the expression of genes under the control of one of these elements is subject to modulation by alteration of the concentration or availability of NF-KB. This can also be carried out, according to the present method, for any gene which contains an NF-kB binding site."; and

- in the Title: "NF-kB-Mediated Transcriptional Regulation". See, also, Declaration of Dr. Verma ¶ 19.

5. Contrary to the Examiner's assertion, the phrase "inhibiting modification of an IkB protein, which modification otherwise reduces IkB binding to NF-kB" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

-on page 18, lines 28-29: "Inactive NF-kB is complexed with a labile inhibitor protein, I-kB.";
- on page 19, lines 20-21: "The implication is that activation of NF-kB involves a modification of I-kB and not NF-kB."; and
- on page 5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or modify the activity of NF-KB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-KB activity.... In particular, the present invention relates to a method of regulating (enhancing or diminishing) the activity of NF-KB in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method." See, also, Declaration of Dr. Verma ¶ 20.

6. Contrary to the Examiner's assertion, the phrase "inhibiting degradation of an IkB protein" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 38 of 92 of November 9, 2006 Response*

- on page 20, lines 1-3: "Various inducer then cause an <u>alteration in I-kB</u> allowing NF-kB to be released from the complex."; and
- on page 5, lines 7-13 and 23-25: "<u>As a result of this finding</u>, it is now possible to alter or modify the activity of NF-KB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-KB activity.... Contrary to the Examiner's assertion, the phrase "inhibiting degradation of an IkB protein" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application: In particular, the present invention relates to a method of regulating (enhancing or <u>diminishing) the activity of NF-KB</u> in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method." See, also, Declaration of Dr. Verma ¶ 21.

7. Contrary to the Examiner's assertion, the phrase "inhibiting dissociation of NF-kB:IkB complexes" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

- on page 19, lines 1-3: "... <u>dissociating</u> agents such as formamide and deoxycholate to unmask very high levels of NF-kB activity."; and
- on page 20, lines 5-7: "The <u>complex formation</u> of NF-kB with I-kB appears to be rapidly and efficiently <u>reversible</u> ...." See, also, Declaration of Dr. Verma ¶ 21.

Patentees, thus, have shown where each of the terms mentioned by the Examiner has adequate support in the April 21, 1989 application. Accordingly, the claims containing these terms should be according to an April 21, 1989 effective filing date.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 39 of 92  of November 9, 2006 Response*

> **D.    Claim Rejections On The Grounds Of Anticipation or Obviousness Over The "Intervening References" Are Not Valid Even For Claims Entitled To A November 13, 1991 Filing Date.**

Patentees maintain that most of the claims being rejected on the basis of "intervening references" are in fact entitled to an April 21, 1989 effective filing date.  Patentees further maintain that each claim being rejected on the basis of "intervening references" are patentable over such references even with respect to any such claim determined to be entitled only to a November 13, 1991 filing date. In the sections which follow Patentees explain why each claim being rejected on the basis of an "intervening reference" is patentably distinct over such intervening reference assuming *arguendo* the claim is entitled to a November 13, 1991 filing date.

> **1.    Intervening References Relating To Protein Kinase**

> a. §102(b) or 103 - Meichle (5/90) - *Intervening* Art

On pages 10-11 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76,80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over, *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).    The Examiner summarized the rejection as follows: "*Meichle* teaches the reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes."

The Examiner also alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB, and that NF-kB activity

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 40 of 92  of November 9, 2006 Response*

can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.  Patentees maintain, however, that the Examiner 1) made the rejection under an incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner alleged that *Meichle* analyzed various Protein Kinase C Inhibitors and their effect on both PMA-(phorbol 12-myristate-13-acetate) and TNF-(tumor necrosis factor) induced NF-kB activity in eukaryotic Jurkat cells, and, using an EMSA binding assay purportedly similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C inhibitor H8 reduced PMA-induced NF-kB activity in these cells (Fig. 3, lane 7).  The Examiner alleged that other inhibitors also were shown to reduce NF-kB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, the Examiner concluded that *Meichle* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity and reducing the binding of NF-kB to NF-kB binding sites.  With reference to *Exhibit G-2* of the 90/007,503 Request, the Examiner alleged that *Meichle* expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.  The Examiner additionally alleged that because *Meichle* used a genetic construct comprising HIV LTR and NF-kB binding site, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively *prima facie* obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 41 of 92  of November 9, 2006 Response*

## Patentees' reply

In response, Patentees respectfully traverse the Examiner's ground of rejection.  Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date.  On this basis alone this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if these claims were not entitled to an April 21, 1989 effective filing date, *Meichle* does not anticipate the claims.

### I) Factual errors in August 2, 2006 Office Action.

The Examiner has erroneously stated on page 10 of the Office Action that "*Meichle* teaches the reduction of NF-kB activity in induced cells…."  The experiments *Meichle* describes in which H7, H8 or staurosporine were administered to cells, including the specific experiments the Examiner relies on (portions of Figs. 2 and 3), were all conducted by <u>pretreating</u> cells with these protein kinase inhibitors for 30 to 45 minutes before cells were stimulated with any inducing substance. (*Meichle* at 8341-2, Figs. 2 and 3; Declaration of Dr. Verma, ¶ 149.)

### ii) None of the experiments with TNF in Meichle are relevant to any of the '516 patent claims.

*Meichle* reports various experiments conducted in two human leukemic cell lines, K562 and Jurkat cells.  *Meichle* describes a series of experiments investigating whether in these cell lines, protein kinase C was necessary for the ability of tumor necrosis factor (TNF) to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 42 of 92  of November 9, 2006 Response*

stimulate NF-kB binding activity.  (*Meichle* at 8339, abstract).
*Meichle* investigated this question by pretreating the cell with H7,
H8 or staurosporine, three relatively non-specific protein kinase
inhibitors. *Id.* Notably, the ability of TNF to stimulate NF-kB
binding activity was unaffected by pretreatment with these
inhibitors, and *Meichle* concludes that its ability to induce NF-kB
binding activity did not involve activation of protein kinases, in
particular protein kinase C (PK-C). *Id.*  Therefore, none of the
experiments with TNF are relevant to any of the '516 patent claims.
(Declaration of Dr. Verma, ¶¶ 147-148.)

> *iii) Meichle does not show reduction of NF-kB activity in
> induced cells, as required by the claims.*

*Meichle* also purports to show that pretreating a cell with either H7
or staurosporine reduced the ability of PMA to stimulate NF-kB
binding activity.  In this regard, the Examiner has erroneously
stated on page 10 of the Office Action that "*Meichle* teaches the
reduction of NF-kB activity in induced cells…."  The experiments
*Meichle* describes in which H7, H8 or staurosporine were administered
to cells, including the specific experiments the Examiner relies on
(portions of Figs. 2 and 3), were all conducted by <u>pretreating</u> cells
with these protein kinase inhibitors for 30 to 45 minutes before
cells were stimulated with any substance. (*Meichle* at 8341-2, Figs.
2 and 3).  As apparent from the discussion of these experiments,
pretreatment was conducted to prevent a cellular response to inducing
substances by inactivating PK-C and PK-A (and most likely other
kinases) before stimulating the cell with any inducing agent.  (See
*Meichle*, at 8339, 8342). The use of these inhibitors as described by
*Meichle*, therefore, was not on induced cells and would not have
reduced any induced effect on the cells. None of the experiments in
*Meichle*, therefore, anticipate the pending claims requiring reducing
NF-kB activity. (Declaration of Dr. Verma, ¶ 149.)

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 43 of 92   of November 9, 2006 Response*

> *iv) Meichle provides no evidence whether PK inhibitors could prevent any agent from inducing expression of these constructs.*

The examiner also alleged on page 11 of the Office Action that *Meichle* teaches use of PK inhibitors to reduce NF-kB-mediated gene transcription by reducing NF-kB activity.  The Examiner also alleged that because *Meichle* used a genetic construct comprising HIV LTR, *Meichle* either would anticipate or render obvious claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, if these claims were entitled only to a November 13, 1991 filing date. However, nothing in *Meichle* either suggests or provides any data showing that PK inhibitors inhibited gene expression induced by any agent, or could do so as a result of reducing NF-kB binding activity. *Meichle* reports experiments conducted with Jurkat cells transfected with two different CAT reporter constructs, each of which are described as containing a CAT gene and an enhancer with an NF-kB binding site. (*Meichle* at 8340). However, none of the experiments with these constructs, which are reported in Fig. 3, used any PK inhibitor. (*Meichle* at 8341, Fig. 3).  *Meichle* simply provides no evidence whether PK inhibitors could prevent any agent from inducing expression of these constructs. Additionally, *Meichle* provides no data as to whether PK inhibitors affected expression of any endogenous gene.  Therefore, one would not read *Meichle* as either describing or suggesting any use of PK inhibitors to reduce or NF-kB-mediated gene transcription by reducing NF-kB activity. (Declaration of Dr. Verma, ¶ 150.)

> *v) Meichle is missing critical controls necessary to show NF-kB effects.*

In his EMSA assays (Figs. 2 and 3), *Meichle* employed a 29 base pair oligonucleotide corresponding to a portion of the HIV enhancer.  This sequence, however, has been shown to bind not only NF-kB but also other transcription factors including factors in the NFAT transcription factor family. To substantiate that the most slowly

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 44 of 92   of November 9, 2006 Response*

migrating complex observed in *Meichle*'s EMSA assay corresponded to
NF-kB, it would have been necessary to determine whether mutation of
the putative NF-kB binding site abrogated binding. Without this
control, the data *Meichle* provides are insufficient to support the
conclusion that PK inhibitors reduced NF-kB binding activity.
(Declaration of Dr. Verma, ¶ 151.)

Accordingly, even if the claims were not entitled to a filing date
prior to the date of *Meichle* (which they are), *Meichle* still would
not anticipate or render obvious the invention recited by each of
claims 1-8, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-
51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-
107, 109-110, 114-117, 192-193 and 197-201.    Accordingly, the
rejection of these clams based on *Meichle* should be reconsidered and
withdrawn.

### 2. §102(b) - Shirakawa (6/89) - *Intervening Art*

On pages 12-13 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62,
64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b)
as allegedly anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89)
2424-30).    The Examiner summarized the rejection by stating,
"*Shirakawa* teaches reduction of NF-kB activity in induced cells using
agents that inhibit protein kinase C."

The Examiner alleged that the instant claims are drawn to reducing
NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells
(e.g. claim 26) to effect inhibited expression of a gene under
transcriptional control of NF-kB, and that NF-kB activity can be
affected by diminishing induced NF-kB mediated intracellular
signaling (claims 6-9) to inhibit associated gene (claims 1-2)
expression of a cytokine protein (claim 5) in a eukaryotic cell.  Of
note, however, is that the Examiner 1) made the rejection under an

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 45 of 92 of November 9, 2006 Response*

incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner alleged that *Shirakawa* is analogous to *Meichle* discussed supra, and *Shirakawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The Examiner alleged that *Shirakawa* first demonstrated that IL-1 acted to induce NF-kB activity in 707/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2); the EMSA binding and CAT reporter assays then confirmed that Protein Kinase Inhibitor H8 reduced NF-kB activity and reduced the resulting CAT gene expression. More particularly, the result of treatment of cells with H8 using EMSA was that "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced k immunoglobulin expression was markedly inhibited ..." (p. 2425). The Examiner also alleged that these results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-kB activation was markedly inhibited by H8 in YT cells (Fig, 2B, lane 9)."

The Examiner then concluded that *Shirakawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity and reducing the binding of NF-kB to NF-kB binding sites. With reference to *Exhibit* G-2 of the 90/007,503 Request, the Examiner alleged that *Shirakawa* expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 46 of 92  of November 9, 2006 Response*

claims, i.e. claims 1-2, 5-6, 8, 9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97, are entitled to at least an April 21, 1989 effective filing date. On this basis alone, this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Shirakawa* does not anticipate the claims.

### i) *Factual errors in August 2, 2006 Office Action.*

On page 12 of the Office Action, the Examiner erroneously stated that "Shirikawa [*sic*] teaches the reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C." The experiments *Shirakawa* describes in which H8 was administered to cells, including the specific experiments the Examiner relied on (Fig. 1, portions of Fig. 2), were all conducted by <u>pretreating</u> cells with H8 for 2 hours before cells were stimulated with IL-1. (*Shirakawa* at 2426; Declaration of Dr. Verma, ¶ 153.)

### ii) *Shirakawa does not show reduction of NF-kB activity in induced cells, as required by the claims.*

*Shirakawa* reports various experiments conducted in a mouse pre-B cell line 70Z/3, and in human natural killer-like cell line, YT. *Shirakawa* describes a series of experiments conducted to determine whether the ability of IL-1 in these cells to stimulate NF-kB binding activity required the activity of cAMP-activated kinases. (*Shirakawa* at 2424). The experiments *Shirakawa* describes in which H8 was administered to cells, including the specific experiments the Examiner relies on, (Fig. 1, portions of Fig. 2) were all conducted by pretreating cells with H8 for 2 hours before cells were stimulated with IL-1. (*Shirakawa* at 2426). Again, as in *Meichle*, pretreatment was performed to prevent a cellular response to IL-1 by inactivating PK-C

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 47 of 92   of November 9, 2006 Response*

and PK-A (and most likely other kinases) before stimulating the cell with IL-1. (*Shirakawa* at 24325-26). The use of these inhibitors as described by *Shirakawa*, therefore, was not on induced cells, as assumed by the Examiner.  None of the experiments in *Shirakawa*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶ 153.)

> iii) *Shirakawa does not teach use of inhibitor while an inducer is also present.*

On pages 12-13 of the Office Action, the examiner also contended that based on CAT reporter assays described in Fig. 1, *Shirakawa* teaches use of PK inhibitors (H8) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity, and therefore would have practiced the above claims.  As noted above, in this experiment cells were pretreated with H8 for two hours before being treated with IL-1. (*Shirakawa* at 2425).  In fact, Fig. 1 indicates that before being treated with IL-1, the cells were washed and the H8 removed.  The use of H8 in this experiment as described by *Shirakawa*, therefore, was not in induced cells and could not have reduced any induced effect in the cell. (Declaration of Dr. Verma, ¶ 154.)

> iv) *Shirakawa is missing critical controls necessary to show NF-kB effects.*

Each of the three PK inhibitors (H7, H8 and staurosporine) in particular at dose ranges used in *Meichle* and *Shirakawa*, are relatively unspecific and in addition to PK-C and PK-A affect numerous kinases. Significantly, by inhibiting other kinases, these agents can inhibit transcription unrelated to effects on PKC, or NF-kB.  In particular, both H7 and H8 have been demonstrated to block gene expression and to inhibit mRNA chain elongation, most likely by inhibiting TFIIH kinase activity. (*Yankulov et al.* 1995; *Kumahara et*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 48 of 92   of November 9, 2006 Response*

*al.* 1999; Declaration of Dr. Verma, ¶ 155. ). Therefore, appropriate controls are a necessity in order to properly interpret the effects of such inhibitors on a transcriptional assay, such as CAT reporter assay, as being related to NF-kB. *Shirakawa* omits any such controls from CAT reporter experiment described in Fig. 1, such as, for example, evidence that H8 would not affect expression of appropriately matched CAT construct lacking an NF-kB binding site. One of skill would therefore not have read *Shirakawa* as teaching that one could use H8 to reduce NF-kB activity (Declaration of Dr. Verma, ¶¶ 152-155.)

Accordingly, even if the claims were not entitled to a filing date prior to the date of *Shirakawa* (which they are), *Shirakawa* still would not anticipate or make obvious the invention recited by each of claims 1-2, 5-6, 8, 9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97. Accordingly, the rejection of these claims based on *Shirakawa* should be reconsidered and withdrawn.

### 2.    Intervening References Relating To Cyclosporin A

A common fundamental flaw exists in all of the CsA art presented in the April 4, 2005 Request for *Ex Parte* Reexamination, and relied upon by the Examiner.  CsA has now been shown to have its effects through a different nuclear factor, NFAT, and not through NF-kB.  Patentees respectfully direct the Examiner's attention to the Declaration of Dr. Verma, ¶¶ 22-52, incorporated herein by reference, which explains this and other flaws in the CsA art cited.  For the sake of completeness, Patentees summarize all of the deficiencies of the each cited CsA reference in the sub-sections that follow.

### 1.  §102(b) or 103 - Schmidt (8/90) - *Intervening* Art

On pages 13-15 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54,58-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 49 of 92  of November 9, 2006 Response*

62,64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 under 35 U.S.C. 102(b) as allegedly anticipated, or alternatively rendered obvious under §103, by *Schmidt* et al., *J. Virology* 64:4037-4041 (August 1990).  The Examiner summarized the rejection by stating that, "*Schmidt* teaches administration of Cyclosporin A ("CsA") to cells which substantially reduced NF-kB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-kB activity.  In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes."

The Examiner alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB, and that NF-kB activity can be affected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.  Of note, however, is that the Examiner 1) made the rejection under an incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner also alleged that the *Schmidt* reference discloses that administration of CsA reduces NF-kB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-kB-regulated gene expression. The Examiner alleged that *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-kB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1 ug/ml] CsA (Fig. 1, lane 6; no B or A shifts) . . . ." See *Schmidt* at 4038. The Examiner also alleged that these results were confirmed using an NF-kB CAT reporter assay as described in the '516 patent, for example

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 50 of 92  of November 9, 2006 Response*

at Col. 17, line 66-Col. 18, line 23.


Thus, the Examiner alleged that *Schmidt* showed that CsA reduced PHA-induced NF-kB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-kB, and that *Schmidt* described the use of CsA at concentrations that reduce NF-kB activity and reduce NF-kB regulated gene expression. With reference to *Exhibit* G-1 of the 90/007,503 Request, the Examiner alleged that the *Schmidt* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent.


The Examiner reasoned that since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201; and the use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV) genes. The Examiner concluded that it would have been anticipated, or alternatively *prima facie* obvious to regulate NF-kB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene expression.


*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date. On this basis alone,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 51 of 92  of November 9, 2006 Response*

this rejection based on art after April 21, 1989 should be withdrawn.


Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Schmidt* does not anticipate the claims.


### I) *Factual errors in August 2, 2006 Office Action.*


On page 14 of the Office Action, the Examiner erroneously stated that "*Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent." Among other things, most critically *Schmidt* did not use the same oligonucleotide probe. The particular oligonucleotide probe used as the binding site determines the specificity of the EMSA for measuring NF-kB binding activity under a particular experimental condition. The oligonucleotide probe Schmidt used corresponds to a portion of the HIV enhancer, which has now been shown to bind other factors, such as NFAT. (Declaration of Dr. Verma, ¶¶ 25-27. )


### ii) *Schmidt does not show reduction of NF-kB activity in induced cells, as required by the claims.*

In the experiments relied on by the Examiner, CsA was not administered to Jurkat cells which had first been induced with PHA (*Schmidt*, Figs. 1 and 4). Instead, Jurkat cells were <u>simultaneously</u> treated with CsA and PHA. None of these experiments would therefore have carried out the various methods described by these claims. None of the experiments in *Schmidt*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶ 25.)


### iii) *A proper interpretation of Schmidt, in view of the '516 patent and other studies, indicates that CsA sensitive binding activity does not correspond to NF-kB, but instead corresponds to another factor, NFAT.*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 52 of 92  of November 9, 2006 Response*

In his attached Declaration Dr. Verma explains the basis for concluding that the effects of CsA are mediated through NFAT, not through NF-kB. (Declaration of Dr. Verma, ¶¶ 28-36.) With respect to *Schmidt*, Patentees emphasize that *Schmidt's* own experimental data supports this conclusion.

For example, *Schmidt* observed that PHA-induced binding to an HIV enhancer probe was CsA sensitive in Jurkat cells.  In contrast, however, as evident from the experiment reported in Fig. 24 of the subject patent where an HIV enhancer was not used, PHA alone did not induce NF-ƙB binding activity in Jurkat cells.  The HIV enhancer is now known to bind to NFAT.  Indeed, when *Schmidt* assessed induction of NFAT binding activity in Jurkat cells using an EMSA specific for NFAT, (*Schmidt*, fig. 2), there was "good activation of NFAT-1 with PHA alone, but not with PMA alone."  This data explains that the positive EMSA binding activity upon PHA induction that Schmidt observed with the HIV enhancer likely corresponded to NFAT. (Declaration of Dr. Verma, ¶ 31.)

Accordingly, even if the claims are not entitled to a filing date prior to the date of *Schmidt* (which they are), *Schmidt* still does not anticipate or make obvious the invention recited by each of claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201.  Accordingly, the rejection of these claims based on *Schmidt* should be reconsidered and withdrawn.

## 2. §102(b) or 103 - Emmel (12/89) - *Intervening Art*

On pages 15-16 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 under 35 U.S.C. 102(b) as allegedly anticipated, or alternatively rendered obvious under 103, by *Emmel*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 53 of 92  of November 9, 2006 Response*

et al., Science, *246* (Dec. 1989): 1617-20.  The Examiner summarized the rejection in the following assertion: "*Emmel* teaches administration of Cyclosporin A ("CsA") to cells which substantially reduced NF-kB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-kB activity.  In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes."

The Examiner alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB. For example, NF-kB activity can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.

The Examiner also alleged that similar to the *Schmidt* reference discussed above, the *Emmel* reference discloses that administration of CsA reduces NF-kB in cells (e.g. eukaryotic Jurkat cells) that inherently reduces NF-kB-regulated gene expression.  The Examiner alleged that, like *Schmidt, Emmel* described the effects of CsA on Jurkat cells that were induced with PHA and PMA and CsA was shown (Fig. 3, .01-1 ug/ml) to reduce NF-kB binding activity, and in the CAT reporter assay, cells were transfected with a CAT reporter gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-kB binding site incorporated into its regulatory region. The Examiner alleged that, as shown in Fig. 2D, CsA significantly reduced NF-kB activity thereby reducing the NF-kB-mediated expression of CAT, and as shown in Figure 3, 0.01-1 ug/ml (10-10000 ng/ml) CsA was found to reduce NF-kB binding activity. Thus, *Emmel* described the use of CsA at concentrations that reduce NF-kB activity and reduce NF-kB regulated gene expression, and as such, as shown in more detail

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 54 of 92  of November 9, 2006 Response*

in *Exhibit G-1* of the 90/007,503 Request, the *Emmel* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

The Examiner also alleged that since *Emmel* used the HIV LTR gene, *Emmel* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, and *Emmel's* use of the HIV LTR gene renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes.

*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice.  Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date.  On this basis alone, this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Emmel* does not anticipate the claims.

I) *Factual errors in August 2, 2006 Office Action.*

On page 16 of the Office Action, the Examiner stated that "*Emmel* describes the effects of CsA on Jurkat cells that <u>were</u> induced with

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 55 of 92 of November 9, 2006 Response*

PHA and PMA" (emphasis added). This does not accurately describe the experiments Emmel conducted. In the experiments of Emmel the Examiner relies on (Figs. 2D, 3), CsA was not administered to Jurkat cells that had been induced with PHA/PMA. Instead, Jurkat cells were <u>simultaneously</u> stimulated with PHA/PMA and CsA. In these experiments, CsA could not have reduced signaling that was occurring. (Declaration of Dr. Verma, ¶ 38.)

> *ii) Emmel does not show reduction of NF-kB activity in induced cells, as required by the claims.*

In *Emmel*, Jurkat cells were <u>simultaneously</u> stimulated with PHA/PMA and CsA. In these experiments, CsA could only have prevented the ability of PHA/PMA to induce signaling and not as the examiner assumes, have reduced signaling that was occurring. None of the experiments in *Emmel*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶ 38.)

> *iii) A proper interpretation of Emmel, in view of the '516 patent and other studies, indicates that CsA sensitive binding activity does not correspond to NF-kB, but instead corresponds to another factor, NFAT.*

In his attached Declaration Dr. Verma explains the basis for concluding that the effects of CsA are mediated through NFAT, not through NF-kB. (Declaration of Dr. Verma, ¶¶ 28-36 and 39-41.) With respect to *Emmel*, Patentees emphasize that *Emmel's* own experimental data supports this conclusion.

For example, Emmel observed that CsA "virtually eliminated" PHA/PMA-stimulated CAT expression driven by the intact IL-2 enhancer, and that CsA effectively prevented PHA/PMA-stimulated expression of CAT reporter driven by tandem repeats of an NFAT binding site. (*Emmel*, Figure 2B). Significantly, however, deleting the NF-kB binding site did <u>not</u> affect the ability of CsA to prevent PHA/PMA from inducing

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 56 of 92   of November 9, 2006 Response*

CAT expression. (*Emmel* at 1618, Figure 1).  These data clearly show that NF-kB does not play a role in mediating the effect of CsA on Il-2 gene expression.  Indeed, these data in *Emmel* confirm our current understanding that in Jurkat cells, CsA acts through NFAT, and not through NF-kB.  (Declaration of Dr. Verma, ¶ 40.)

> *iv) Emmel is missing critical controls necessary to show NF-kB effects.*

The oligonucleotide probe *Emmel* used would not have discriminated between NF-kB and NFAT binding activities.  Accordingly, multiple bands appear in extracts from PHA/PMA treated cells under the conditions *Emmel* used (*Emmel* Fig. 3).  (For example, compare with Fig. 24B of the subject patent indicating only a single inducible band in PHA/PMA-treated Jurkat cells.)  Appropriate controls would have been critical for the correct identification of the different complexes bound to the probe, and to the overall interpretation of the EMSA data.  (Declaration of Dr. Verma, ¶¶ 41-43.)

Accordingly, even if the claims are not entitled to a filing date prior to the date of *Emmel* (which they are), *Emmel* still does not anticipate or make obvious the invention recited by each of claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201.  Accordingly, the rejection of these claims based on *Emmel* should be reconsidered and withdrawn.

### 3. §102(b) or 103 – Brini (9/90) – *Intervening Art*

On pages 17-18 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 under 35 U.S.C. 102(b) as allegedly anticipated, or alternatively, rendered obvious under § 103, by *Brini,* Eur. Cytokine Net. 1: 131 -139 (Sept. 1990).  The Examiner

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 57 of 92  of November 9, 2006 Response*

alleged in summary that, "*Brini* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-kB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-kB activity.  In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes."

The Examiner alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g, claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB. For example, NF-kB activity can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The Examiner then alleged that the *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces NF-kB in cells (e.g. T-cells) that inherently reduces NF-kB-regulated gene expression. Particularly, the Examiner alleged that *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that had been induced with PHA; *Brini* assessed NF-kB activity in an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516 patent to assess NF-kB activity and binding (see '516 patent, columns 17-18); *Brini* concluded that "CsA reduced the PHA-induced binding of transactivating factors from T- cells and kB-like sequences which are present in the IL-2R alpha gene and in the HIV-1 LTR gene (Figures 3 and 4)", referring to *Brini* at page 137.  The Examiner also alleged that *Brini* reported the effects of CsA on expression levels of IL-2 Receptor-alpha (Brini at page 131 Abstract) which is taught by the '516 patent to be regulated by PHA-induced NF-kB activity in T-cells, referring to col. 17, lines 21-24 of the subject patent ("NF-kB is induced in T-cells by a transactivator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 58 of 92  of November 9, 2006 Response*

2 receptor alpha gene and possibly the IL-2 gene"). The Examiner then alleged that *Brini* described the use of CsA at concentrations that reduce NF-kB activity and reduce NF-kB regulated gene expression as allegedly shown in more detail in *Exhibit G-1* of the 90/007,503 Request, and that "the Emmel *[sic]* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent."

The Examiner also alleged that since *Brini* used the HIV LTR gene, Brini demonstrated that CsA reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, and *Brini's* use of HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, immediately envisaged, or alternatively, prima facie obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes.

*Patentees' reply*
In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice.  Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date.  On this basis alone this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Brini* does not anticipate the claims.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 59 of 92 of November 9, 2006 Response*

I) *Factual errors in August 2, 2006 Office Action.*

On page 17 of the Office Action, the Examiner erroneously stated that, "*Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that <u>had been</u> induced with PHA." (Emphasis added.)  Notably, in all experiments of *Brini*, "CsA was always added to the cells 30 min before stimulation" with PHA (Brini at 132).  (Declaration of Dr. Verma, ¶ 45.)

ii) *Brini does not show reduction of NF-kB activity in induced cells, as required by the claims.*

In *Brini*, "CsA was always added to the cells 30 min before stimulation" with PHA (*Brini* at 132).  None of the experiments in *Brini*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶¶ 44-46.)

iii) *The CsA influenced binding activity observed by Brini may illustrate what we now know, i.e. that it does not correspond to NF-kB, but instead corresponds to another factor, NFAT.*

In his attached Declaration Dr. Verma explains the basis for concluding that the effects of CsA are mediated through NFAT, not through NF-kB. (Declaration of Dr. Verma, ¶¶ 28-36 and 47-49.)

iv) *Brini is missing critical controls necessary to show NF-kB effects.*

T cells can exhibit substantial differences in their response to PHA and PMA.  As shown in Figure 24 A of the subject patent, PHA alone did not induce measurable amounts of NF-kB binding activity in the Jurkat T-cell line.  Without proper controls in *Brini*, there is no basis to assume that treatment of T-cells with PHA alone (as compared to treatment with both PHA and PMA) would similarly induce NF-kB

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 60 of 92  of November 9, 2006 Response*

activity so as to induce expression of any gene.  In fact, Brini reports that PHA appeared to induce binding activity of at least one other transcription factor, AP1, having binding sites in the IL-2 receptor promoter (*Brini*, Figure 5).  Lastly, as noted above, even assuming the complexes *Brini* detected by EMSA (Figs. 3 and 4) correspond to NF-kB, there is no correlation between the presence of these complexes in the EMSA assays (Figs. 3 and 4) and IL-2 receptor mRNA expression (Fig. 2).   These data therefore fail to provide any basis for concluding that with the experimental conditions *Brini* used, the IL-2 receptor expression was regulated in any way by NF-kB. (Declaration of Dr. Verma, ¶¶ 50-52.)

Accordingly, even if the claims are not entitled to a filing date prior to the date of *Brini* (which they are), *Brini* still does not anticipate or make obvious the invention recited by each of claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201.  Accordingly, the rejection of these claims based on *Brini* should be reconsidered and withdrawn.

### *Conclusion – CsA Intervening Art*
In conclusion, none of the "intervening" art anticipates Patentees' claims even if the claims are not entitled to an April 21, 1989 filing date.  However, as explained in Section VI above, Patentees' claims are entitled to an April 21, 1989 effective filing date.  Accordingly, the rejections based on "intervening" art should be withdrawn because the claims rejected have an effective filing date before the "intervening" art date, and/or because the "intervening" art fails to teach subject matter falling within the claims.

In particular, claims 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 have only "intervening" art cited against them. Accordingly, claims 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 should be

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 61 of 92  of November 9, 2006 Response*

confirmed patentable because they have an effective filing date before the "intervening" art, and/or because the "intervening" art fails to teach subject matter falling within these claims.

### 3.    Intervening References Relating To N-Acetyl-L-Cysteine

On pages 47-48 of the August 2, 2006 Office Action, the Examiner rejected claims 18 and 182-185 under 35 U.S.C. 102(a) as allegedly anticipated by *Staal* et al., Proc. Nat'l Acad. Sci. 87:9943 (Dec. 1990) ('7828 appendix E: incorporated by reference). The Examiner alleged in summary that, "*Staal et al.* (see Abstract; page 9945; Figures 4-5) disclose a method of inhibiting TNF-α by blocking NF-kB activation in mammalian cells (e.g. Jurkat cells) by administration of N-acetyl-L-cysteine (NAC)."

The Examiner alleged that *Staal* teaches a method of inhibiting TNF-α activation and, thus, signaling, in mammalian cells by reducing NF-kB activity. Specifically, the Examiner alleged that *Staal* discloses inhibiting TNF-α stimulation of 293.27.2 and Jurkat cells by selectively blocking NF-kB activation by administration of N-acetyl-L-cysteine (NAC), referring to Abstract and Fig. 5. The Examiner alleged that reduction of intracellular TNF-α signaling is demonstrated by decreased expression of a betagalactosidase reporter gene in Jurkat cells, which are mammalian (human) in origin, referring to Fig. 4.

The Examiner also alleged that claim 182, depending on claim 18, further recites that reducing NF-kB activity comprising reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB, and that *Staal* anticipates claim 182 by teaching that high thiol levels (resulting from NAC administration) inhibit NF-kB activation by preventing phosphorylation of I-kB, since phosphorylation of I-kB is necessary for dissociation of NF-kB from its complex with I-kB. The Examiner

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 62 of 92  of November 9, 2006 Response*

alleged that since NAC administration keeps NF-kB complexed to its naturally occurring inhibitor I-kB, NF-kB is unavailable for binding NF-kB recognition sites on genes that are transcriptionally regulated by NF-kB. On this basis, the Examiner concluded that claim 182 is anticipated since NAC-mediated inactivation of NF-kB described in *Staal* inherently and necessarily results in reduced NF-kB binding to its recognition sites.

The Examiner also alleged that claims 183-185, depending on claim 18, and requiring that the method is carried out on human cells (claim 183), immune cells (claim 184), and lymphoid cells (claim 185), are also anticipated by *Staal*. The Examiner alleged that *Staal* discloses NAC inhibition of TNF-α stimulation in Jurkat cells (Fig. 4, p. 9945) which are cells derived from a human T-cell leukemia cell line, and, thus, are human, immune and lymphoid anticipating claims 183-185.

*Patentees' reply*

In response, Patentees note that *Staal* reports various experiments conducted in Jurkat cells, a human T cell lymphoma line, and 293.27.2, a cell line stably transfected with a CAT expression construct.   As *Staal* notes, NAC is a drug which can prevent a reduction in intracellular thiol levels by serving as a precursor for the intercellular thiol, glutathione (GSH). (*Staal* at 9943). In previous studies, *Staal* had observed in certain T cell lines that NAC prevented TNF from stimulating certain cellular responses. (*Staal* at 9943). In this regard, *Staal* reported that TNF stimulation caused a rapid transient decrease in intracellular thiol levels. (*Staal* at 9944). *Staal* here reports a series of experiments conducted to examine whether the ability of NAC to prevent a TNF-stimulated reduction in intracellular thiol levels also prevented TNF from activating NF-kB. (*Staal* at 9944).

Thus, the aim of the *Staal* study was to determine whether NAC, by inhibiting thiol levels, could act on cells before they experienced

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 63 of 92  of November 9, 2006 Response*

stimulation (*Staal* at 9944).   In particular, in the experiments specifically relied upon by the Examiner, cells were always treated <u>simultaneously</u> with both NAC and TNF-α. (*Staal* at 9945-46).   In these experiments, NAC therefore could not have inhibited TNF-α signaling by reducing induced NF-kB activity.   None of these experiments therefore have administered NAC to induced cells. (Declaration of Dr. Verma ¶¶ 160-162.)

Accordingly, *Staal* does not anticipate pending claims 18, 182 and 185, and the rejection based on *Staal* should be reconsidered and withdrawn.

Furthermore, claims 18, 182 and 185 are entitled to at least an April 21, 1989 filing date as explained in Section VI herein.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 64 of 92  of November 9, 2006 Response*

VIII.    THE CLAIMS ARE NOT INHERENTLY ANTICIPATED

A.    **Inherent Anticipation Requires a Showing That Each and Every Element of a Claim Necessarily Occurred in the Prior Art.**

A finding that a patent claim is anticipated requires a finding that all elements of that claim are found in a single prior art reference. *Studiengesellschaft Kohle m.b.H. v. Dart Industries* Inc., 726 F.2d 724, 727-28 (Fed. Cir. 1984). Any alleged inherency in extrinsic evidence requires that it "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Additionally, "inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Intl., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

1.    The Extrinsic Evidence Relied upon by the Examiner Does Not Establish That the Prior Art Necessarily Discloses All Elements of the Claims.

In contrast to the requirements of the inherency doctrine, the extrinsic evidence relied upon by the Examiner fails to demonstrate that the unstated elements in the prior art are *necessarily* present. At best, the Examiner has shown that it is *possible* that the prior art inherently disclosed unrecited elements of the claims. However, such a showing is insufficient to support a finding of inherent anticipation. *See Rapoport v. Dement*, 254 F.3d 1053, 1062-63 (Fed. Cir. 2001)(finding no anticipation because a treatment regime of three doses per day would not necessarily include administering a dose at the time of sleep, even though a dose *could* be administered at that time). Such findings of inherency based on mere "probabilities or possibilities" are improper. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that could be used to perform the same

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 65 of 92 of November 9, 2006 Response*

result with a slightly different structure). Even if the prior art
did sometimes encompass all of the elements of the claims, the claims
should still be allowed as "occasional results are not inherent."
*See Mehl/Biophile Int'l. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed.
Cir. 1999)(holding that prior art did not anticipate a claim
requiring a substantially vertical orientation even though practice
of the prior art would sometimes result in such an orientation).

Accordingly, the Examiner is not permitted to rely on prior art to
show inherent anticipation where the art does not *necessarily* require
that each and every claim element be present.

> 2.    Inherent Disclosure Cannot Be Shown By Inconclusive
>        Extrinsic Evidence.

The Examiner improperly has concluded that numerous prior art
references inherently anticipate the claims by relying on
inconclusive non-prior art documents to show the elements missing in
the prior art. *See Finnigan Corp. v. Int'l Trade Commission*, 180
F.3d 1354, 1366 (Fed. Cir. 1999)(holding that extrinsic evidence that
showed a set-up that could perform in either resonance or
nonresonance was insufficient to show inherent disclosure of
nonresonance). Similarly, because the prior art was capable of
producing differing results, only some of which encompassed the
claims, the requirement for anticipation by inherent disclosure has
not been met. *Glaxo Inc.v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed.
Cir. 1995) *cert. denied*, 516 U.S. 988 (1995)(holding that prior art
which did not always produce the claimed compound did not inherently
disclose it).

In this case, the extrinsic evidence cited by the Examiner fails to
conclusively demonstrate how the prior art references necessarily and
always involve each and every element of the rejected claims.
Therefore, the Examiner is not permitted to rely on this evidence to
show that the cited prior art inherently discloses all of the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 66 of 92  of November 9, 2006 Response*

elements of the present invention.

**B.   The Reference Used as "Extrinsic Evidence" Do Not Reproduce What The Prior Art References Describe And Therefore Fail to "Explain" What Occurred in the Prior Art References.**

As explained in this section, the "extrinsic evidence" does not consider what occurred in the cited prior art.  Thus, the "extrinsic evidence" fails to offer a conclusive explanation of what may have occurred in the prior art.

   *I) 5-ASA Art*

On pages 32-34 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 under 35 U.S.C. 102(b) as being anticipated by *Dew* (Br. Med. J. *287* (7/83):23-24)), as evidenced by *Baldwin II* (J. Clin. Invest. 107(1991):63-80), *Bantel* et al. (Amer. J. Gastroenterology *287* (2000):3452), *Yan* et al. (J. Biol. Chem. *274* (1999) 366631-36), and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application, which issued as the Baltimore '526 patent.

Patentees respectfully traverse this rejection, *inter alia*, because *Baldwin II*, *Bantel*, *Yan*, and the *David Baltimore Declaration* do not repeat the use described by *Dew*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 156-159):

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 67 of 92 of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Dew (7/83)<br>-administration of 5-ASA to human subjects.<br>-all human subject are in "remission". Title; p. 23 1st para.; p. 23 2nd para. | Bentel (2000)<br>✗ all subjects had "accute" ulcerative colitis. (p. 3453, bottom line, left column.)<br>✗ "newly developed" formulation of 5-ASA (p.3453, top para.; right column)<br>Baldwin II (2001)<br>✗ no data. This is a review.<br>Yan (99)<br>✗ mouse cells<br>2001 Baltimore Declaration<br>✗ no data. Refers to Yan (99) - mouse cells; & Castrillo (2000)- murine cells. |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there. Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

### ii) Antibiotics

On pages 39-42 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 under 35 U.S.C. 102(b) as allegedly anticipated by *1970 PDR* as evidenced by the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(*1998) 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076)(newly raised by the Examiner).

The Examiner cited to the subject patent (*Baltimore '516* Patent), on page 41, for the preposition that, "Once produced by gram-negative bacteria, LPS activates NF-kB, which translocates to the nucleus and binds to the NF-kB recognition sites on genes that are regulated, at least in part, by NF-kB." Patentees point out, however, that their patent offers no indication that antibiotics can reduce NF-kB

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 68 of 92  of November 9, 2006 Response*

activity.  Indeed, none of the cited references does so.

Thus, Patentees respectfully traverse this rejection, *inter alia*, because *Manolagas Declaration*, *Galdiero*, *Yang*, *Mori*, the *Baltimore '516 Patent* and *Yasutomi* do not repeat the use described by the *1970 PDR*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 126-131):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| <u>1970 PDR</u><br>-antibiotics are used to treat bacterial infection in human subjects<br>-antibiotic administered once subject has bacterial infection | <u>Galdiero (01)</u><br>✗ no antibiotic used.<br><u>Yang (98)</u><br>✗ no antibiotic used.<br><u>Mori (97)</u><br>✗ no LPS.  Induction is by TNF.<br>✗ no antibiotic.<br><u>Yasutomi (05)</u><br>✗ cell culture<br>✗ pretreats with an antibiotic.<br><u>'516 Patent</u><br>✗ no antibiotic used.<br><u>Manolagas Declaration</u><br>✗ no experiment, only commentary on the cited art is provided. |

Additionally, the *Manolagas Declaration* has been the subject of sworn testimony by Dr. Manolagas.  Certain portions of the sworn testimony calling in to question the conclusion in the *Manolagas Declaration* are attached hereto as **Exhibit 2.**

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

### iii-a) *Cyclosporin A - In Vivo Art*

On pages 19-23 of the August 2, 2006 Office Action, the Examiner

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 69 of 92  of November 9, 2006 Response*

rejected claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97 under 35 U.S.C. 102(b) as allegedly anticipated by the Physician's Desk Reference (PDR: 1985, pages 1811-13), *Griffith I* (Griffith et al., Ann. Surg. <u>196</u> (9/82):324-329), or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. <u>99</u> (12/84): 952-957), as evidenced by *Holschermann* et al., Circulation <u>96</u> (12/97) 4232-4238. The Examiner referred to M.P.E.P. 2131.01 and alleged that "*Holschermann* provides extrinsic evidence that the PDR 1985, Griffith I, and Griffith II references inherently anticipate the subject claims."

Patentees respectfully traverse this rejection, *inter alia*, because *Holschermann* failed to repeat the use described by any of *PDR 1985, Griffith I*, or *Griffith II*. *Holschermann* explains what occurred in a different experiment, or fails to explain what may have occurred during the use described by the *PDR 1985, Griffith I*, or *Griffith II*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 64-74):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| <u>1985 PDR</u><br>administration of cyclosporin is required -with adrenal corticosteroid (p. 1811 & 1813)<br>-4-12 hours prior to transplantation, either:<br>      orally<br>-at a dose of 14-18 mg/kg per day,<br>-continued postoperatively 1-2 weeks,<br>-then tapered by 5% per week to,<br>-maintenance level of 5-10 mg/kg per day.<br>      or, I.V.<br>-same as oral but at 1/3 the dose.<br>     (page 1813 of 1985 PDR)<br>✗ use of azathioprene not indicated<br>✗ use of aspirin not indicated | <u>Holschermann (12/97)</u><br><br><br>✗ "3 to 4 days after transplantation" (p. 4233, 1st par.)<br><br><br><br><br>✗ "3.4 ±0.3" mg/kg per day<br><br>& all patients received azathioprene<br>& all patients received aspirin |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 70 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| <u>Griffith I (1982)</u><br>cyclosporin administered<br>-with methylprednisone 1g,<br>-"just before"operation (p. 324),<br>      orally<br>-at a dose of 17.5 mg/kg per day,<br>-reduced postoperatively to<br>-4-10 mg/kg per day<br>-with 200 mg per day prednisone, reduced after 10 days<br>to 15-20 mg per day,<br>      or, I.V.<br>-same as oral but at 40% of the dose.  (p. 325)<br>-Antithymocyte Globulin <u>NOT USED</u> (p.325)<br>✗ use of azathioprene not indicated<br>✗ use of aspirin not indicated | <u>Holschermann (12/97)</u><br><br>✗ "3 to 4 days after transplantation" (p. 4233, 1st par.)<br><br>✗ "3.4 ±0.3" mg/kg per day<br><br><br><br><br>✗ all patients received antithymocyte globulin<br>& all patients received azathioprene<br>& all patients received aspirin |
| <u>Griffith II (1984)</u><br>cyclosporin administered<br>orally<br>-1-4 hours preoperatively, 10-17.5 mg/kg,<br>-postoperatively every 12 hrs, 5 mg/kg<br>-with prednisone, 0.2 mg/kg per day,<br>-with rabbit antithymocyte globulin<br>✗ use of azathioprene not indicated<br>✗ use of aspirin not indicated | <u>Holschermann (12/97)</u><br><br>✗ "3 to 4 days after transplantation" (p. 4233, 1st par.)<br>✗ "3.4 ±0.3" mg/kg per day<br><br>& all patients received azathioprene<br>& all patients received aspirin . |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

       *iii-b) Cyclosporin A - In Vitro Art*

On pages 24-26 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *Reed* et al., J. Immunol. *137* (7/86): 150-154, as evidenced by *Brini,* Eur. Cytokine Net. 1:131-139 (Sept. 1990). The Examiner referred to MPEP 2131.01 and alleged that *Brini* provides the evidence of inherency.

Patentees respectfully traverse this rejection, *inter alia*, because *Brini* does not repeat the use described by *Reed*.  Therefore, *Brini*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 71 of 92  of November 9, 2006 Response*

explains what occurred in a different experiment, and fails to explain what may have occurred during the use described by *Reed*.  The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 53-60):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Reed (7/86) | Brini (9/90) |
| - blood mononuclear cells (p. 150) | ✗ >95% pure CD3 T-lymphocytes (p. 132) |
| - PHA with PMA | ✗ PHA alone used as inducer (p.132) |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

> iii-c) Cyclosporin A - In Vitro Art

On pages 26-29 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *Kronke* et al. (PNAS USA 81(8/84) 5214-5218) and/or *Siebenlist* et al. (Mol. Cell. Biol. *6* (9/86) 3042-3049), as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al., Science, *246* (Dec. 1989):1617-20, and the *Dr. Manolagas Declaration*.  The Examiner referred to MPEP 2131.01 and alleged that *Schmidt, Emmel* and the *Manolagas Declaration* provide evidence of inherency.

Patentees respectfully traverse this rejection, *inter alia*, because *Kronke* or *Siebenlist* do not describe the claimed methods. (Declaration of Dr. Verma ¶¶ 61-63).  Furthermore, as explained at length in the Declaration of Dr. Verma, ¶¶ 28-36, we now know that CsA affects NFAT.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 72 of 92  of November 9, 2006 Response*

iv) *Vitamin D*

On pages 30-32 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *Tsoukas* (Science *224* (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74(8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. *74* (10/84) 1451-5) or *Rigby II* (J. Immunol. 135 (10/85) 2279-86), and *Manolagas* et al. (JCE&M, 63 (1986) 394-400), as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10590-4) and the *Declaration of Dr. Manolagas (*paragraphs 7-24) provided in the 90/007,503 request.

The Examiner alleged that *Yu* conducted experiments "under the same conditions utilized in *Tsoukas* and *Manolagas* (i.e. calcitriol application to PHA activated PBM cells)." This is not correct as explained in Declaration of Dr. Verma, ¶¶ 115-117, and summarized in the table that follows. For example, the cell populations were different. Therefore, Patentees respectfully traverse this rejection, *inter alia*, because *Yu and the Manolagas Declaration* do not repeat the use described by *Tsoukas*, *Manolagas*, or any of the other cited references. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 107-125):

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 73 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Tsoukas(6/84)<br>- PBMC cells | Yu (11/95)<br>✗ Yu(11/95) refers to Yu, JBC 1991 for method of purifying cells, which method is not used in the prior art. Thus, the PBMC used in Yu are different (purified, non-adherent monocytes) than the cells in prior art.  Yu acknowledges that any NF-kB effect is "matter of conjecture".<br><br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided.<br><br>✗ Manolagas admitted under oath at trial that, contrary to statements in his expert report, the study by Yu is "not connected" and "lacks correlation" with the prior art work.(Trial Testimony, day 10 p.68; day 13 p. 17; Manolagas Deposition, p.381-382) |
| Manolagas (86)<br>- PBMC cells isolated by method of Boyum (p. 395) | Yu (11/95)<br>✗ Yu(11/95) refers to Yu, JBC 1991 for method of purifying cells, which method is not used in the prior art. Thus, the PBMC used in Yu are different (purified, non-adherent monocytes) than the cells in prior art.  Yu acknowledges that any NF-kB effect is "matter of conjecture".<br><br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided.<br><br>✗ Manolagas admitted under oath at trial that, contrary to statements in his expert report, the study by Yu is "not connected" and "lacks correlation" with the prior art work.(Trial Testimony, day 10 p.68; day 13 p. 17; Manolagas Deposition, p.381-382) |
| Lemire I(8/84) & II(5/85)<br>- PBMC cells<br><br>Rigby I(10/84) & II(10/85)<br>- PBMC cells | Yu (11/95)<br>✗ Yu(11/95) refers to Yu, JBC 1991 for method of purifying cells, which method is not used in the prior art. Thus, the PBMC used in Yu are different (purified, non-adherent monocytes) than the cells in prior art.  Yu acknowledges that any NF-kB effect is "matter of conjecture".<br><br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided.<br><br>✗ Manolagas admitted under oath at trial that, contrary to statements in his expert report, the study by Yu is "not connected" and "lacks correlation" with the prior art work.(Trial Testimony, day 10 p.68; day 13 p. 17; Manolagas Deposition, p.381-382) |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 74 of 92 of November 9, 2006 Response*


Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.    Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

### v) *Red Wine*

On pages 42-47 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 under 35 U.S.C. 102(b) as allegedly anticipated by *King James Version Bible* (1611) (excerpts), *St. Leger* (The Lancet (5/79) 1017-20), *Dobrilla* (Hepato-Gastroenterol, 31(2/84) 35-37), and *Jones* (Pharm. & Tox. 60 (3/87) 217-20), as evidenced by *Blanco-Colio* (Circulation *102* (8/00) 1020-6), *Holmes-McNary/Baldwin* (Cancer Res. 60 (7/00) 3477-83) and *Manna* (J. Immunol. 164 (2000) 6509-6519).

Patentees respectfully traverse this rejection, *inter alia*, because *Blanco-Colio*, *Holmes-McNary/Baldwin* and *Manna* do not repeat the use described by the *Bible*, *St. Leger*, *Dobrilla*, or *Jones*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 132-146):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| The Bible<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 75 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| St.Leger (5/79)<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |
| Dobrilla (2/84)<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |
| Jones (3/87)<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

*vi) Glucocorticoid Art*

On pages 34-39 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *1970 PDR, Lefring* et al. (Crit. Care. Med.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 76 of 92 of November 9, 2006 Response*

*23* (7/95) 1294-1303: References Cited Therein), *Nagasawa* et al. (J. Cell. Phys. *109* (1981) 181-192), or *Rovera* et al. (Science *204* (1979) 868-970), as evidenced by *Baldwin I* (Annu. Rev. Immunol. *14* (1996) 649-81), *Auphan* et al. (Science *270* (1995) 286-290), *Scheinman* I (Mol. Cell. Biol. 15(2/95) 943-53), *Scheinman II* (Science *270* (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269(5/94) 13289-95) and *Padgett* et al., Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (raised by Examiner).

Initially, Patentees point out that one of the cited references, *Lefring* (1995), is not prior art, but has been cited as if it were with the notation "references cited therein." *Lefring* (1995) cites to 75 other references. Such citation without particularity is contrary to the rules of the Office and improper. *See*, e.g. 37 C.F.R. §̇ 1.104(c)(2). Accordingly, *Lefring* (1995) and the 75 references cited therein cannot constitute a basis for a proper rejection, and Patentees are not addressing *Lefring* (1995).

With respect to the remaining references, Patentees respectfully traverse this rejection, *inter alia*, because *Baldwin I*, *Auphan*, *Scheinman* I, *Scheinman II*, *Mukaida,* and *Padgett* do not repeat the use described by any of *1970 PDR*, *Nagasawa*, or *Rovera*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 75-101):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| **1970 PDR**<br>-glucorticoids (dexamethasone) are used in human patients | **Baldwin I (96)**<br>✗ no data. This is a review.<br>**Auphan (1995)**<br>✗ cell culture.<br>**Scheinmann I(2/95) & II(10/95)**<br>✗ cell culture; highly modified cells.<br>**Mukaida (5/94)**<br>✗ cell culture.<br>**Padgett (8/03)**<br>✗ no data. This is a review. |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 77 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Nagasawa (1981)<br>-leukemic T-cells (MOLT-3), non-tranfected. | Baldwin I (96)<br>✗ no data. This is a review.<br>Auphan (1995)<br>✗ modified cells, primarily Jurkat<br>Scheinmann I(2/95)<br>✗ transfected cell systems<br>Scheinmann II(10/95)<br>✗ HeLa cells (abnormal genotype)<br>Mukaida (5/94)<br>✗ human glioblastoma cell line<br>Padgett (8/03)<br>✗ no data. This is a review. |
| Rovera (1979)<br>-HL-60 cell line, non-transfected. | Baldwin I (96)<br>✗ no data. This is a review.<br>Auphan (1995)<br>✗ modified cells, primarily Jurkat<br>Scheinmann I(2/95)<br>✗ transfected cell systems<br>Scheinmann II(10/95)<br>✗ HeLa cells (abnormal genotype)<br>Mukaida (5/94)<br>✗ human glioblastoma cell line<br>Padgett (8/03)<br>✗ no data. This is a review. |

Furthermore, this rejection suffers from the fact that the mechanism of action of glucocorticoids is poorly understood and the effects of glucocorticoids have been observed to vary between different cell types.  In fact, some studies have shown that glucocorticoids have no effect on NF-kB.  (Declaration of Dr. Verma ¶ 97).

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

### vii) Endogenous Glucocorticoids

On pages 55-60 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *Goodman and Gilman's* (The Pharmacological

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 78 of 92  of November 9, 2006 Response*

Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner), as evidenced by *Baldwin I* (Annu. Rev. Immunol. <u>14</u> (1996) 649-81), *Auphan* et al. (Science <u>270</u> (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman I1* (Science <u>270</u> (10/95) 283-286), *Mukaida* (J. Biol. Chem. <u>269</u> (5/94) 13289-95), and - *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448) (newly raised by Examiner).   The Examiner summarized the rejection as follows: "*Goodman* & *Gilman* teach the naturally occurring <u>endogenous production</u> and release of glucocorticoids (<u>cortisol</u>) in response to many different types of environmental stressors which *inherently* results in the reduction of NF-kB activity that acts to inhibit expression, in a eukaryotic cell, of cytokines whose transcription is regulated by NF-kB.   In this respect, the NF-kB inhibiting evidence provided by the Baldwin I, Auphan, Scheinman I/II and the Mukaida documents, regarding the <u>synthetically administered steroid</u> <u>dexamethasone (DEX)</u> has been found to be analogous with what occurs upon release of the endogenous cortisol glucocorticoid as evidenced by *Padgett*" (Emphasis added.)

Patentees respectfully submit that data from studies conducted with synthetic dexamethasone in cell culture cannot offer any explanation of what may occur during endogenous cortisol production in humans. Certainly one of skill in the art would not find such data probative. (Declaration of Dr. Verma, ¶ 105).

Thus, Patentees respectfully traverse this rejection, *inter alia*, because *Baldwin I, Auphan, Scheinman* I, *Scheinman II, Mukaida,* and *Padgett* do not repeat the use described by *Goodman* & *Gilman*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 102-106):

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 79 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art | Highlights of Discrepancies |
|---|---|---|
| Goodman and Gilman (1980)<br>-in humans subjects<br>-endogenous cortisol | Baldwin I (96)<br>✗ no data. This is a review.<br>Auphan (1995)<br>✗ cell culture.<br>✗ dexamethasone (synthetic)<br>Scheinman I(2/95) & II(10/95)<br>✗ cell culture; highly modified cells.<br>✗ dexamethasone (synthetic)<br>Mukaida (5/94)<br>✗ cell culture.<br>✗ dexamethasone (synthetic)<br>Padgett (8/03)<br>✗ no data. This is a review. | The mechanism of action of glucocorticoids is poorly understood and differs in different cell systems. Thus, data in the post-April 21, 1989 using different chemicals in cell culture cannot explain what may have occurred with endogenous cortisol in a human before pre-April 21, 1989. |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

> **C.    Even If the References Used As "Extrinsic Evidence" Were Deemed To Explain the Prior Art, the Cited Prior Art Does Not Teach Each and Every Element of the Claims Rejected.**

As summarized above and detailed in the Declaration of Dr. Inder Verma, which is attached hereto as **Exhibit 1** and incorporated by reference herein, each of the rejections based on inherent anticipation is defective for lacking a showing that the uses described in the pre-April 21, 1989 references inherently practiced the methods Patentees now claim.  However, even if what is described in the pre-April 21, 1989 references would be properly explained, Patentees explain below that the pre-April 21, 1989 references cannot anticipate, inherently or otherwise, the methods Patentees now claim.

> 1)    5-ASA  -  Art Being Used To Reject Claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86 and 88-97.

The inherent anticipation rejection set forth on pages 32-34 of the August 2, 2006 Office Action is based on *Dew* (7/83), alone and as allegedly "explained" by *Baldwin II* (91), *Bentel* (2000), *Yan* (99) and

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 80 of 92  of November 9, 2006 Response*

*2/2001 Baltimore Declaration*.  The Examiner, on page 33, alleged that *Dew* teaches administration of 5-ASA to humans for the treatment of ulcerative colitis, and alleged that ulcerative colitis is associated with NF-kB activation.  *Dew*, however, unambiguously discloses in its Title and first two paragraphs that all of the patients who received 5-ASA were in "remission," and the study was focused on "preventing relapse" of ulcerative colitis.

Accordingly, the patients in *Dew* cannot be said to necessarily have had NF-kB activation (even if ulcerative colitis is associated with such activation).  There is no basis to assert that ulcerative colitis patients in remission have any NF-kB activation.  Thus, whatever may have happened in *Dew*, it is clear that *Dew* cannot anticipate Patentees' claims requiring reduction of NF-kB activity which is present.

Furthermore, *Dew* was investigating the use of high doses of 5-ASA for "preventing relapse" of ulcerative colitis in remission patients. As discussed above, Patentees' claims do not encompass prophylaxis, but rather are directed at reducing NF-kB activity.

*See also*, Schematic No. 9, and Declaration of Dr. Verma ¶¶ 156-159.

> 2)    Antibiotics - Art Being Used To Reject Claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178 and 182-186.

The inherent anticipation rejection set forth on pages 39-42 of the August 2, 2006 Office Action is based on the *1970 PDR*, alone and as allegedly "explained" by *Manolagas Declaration*, *Galdiero* (01), *Yang* (98), *Mori* (97), '*516 Patent* and *Yasutomi* (05).  The Examiner alleged on page 40 that gram-negative bacteria produce lipopolysaccharides ("LPS"), which induce NF-kB regulated cytokine production.  The

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 81 of 92   of November 9, 2006 Response*

Examiner also alleged that antibiotics, by killing the gram-negative bacteria, "act to inherently reduce LPS-induced and NF-kB-regulated cytokine production." On page 42, the Examiner alleged that "by blocking LPS that reaches the cell, administration of the 1970 PDR antibiotics to combat gram-negative bacterial infections would necessarily reduce NF-kB activity in human cells and thereby reduce cytokine expression."

Initially, Patentees respectfully point out that the PDR is, at best, evidence of a prior public use. As such, the PDR cannot be relied upon in a reexamination proceeding.

Patentees also point out that the quoted Examiner's language is unclear. To be sure, antibiotics kill bacteria or prevent bacteria from reproducing, which bacteria has LPS on its cell membrane. Antibiotics, however, have no effect on LPS. (Declaration of Dr. Verma, ¶ 127).

Should an antibiotic succeed in preventing bacteria from reproducing, the amount of bacteria is unchanged, and the bacteria still have LPS, which is still inducing NF-kB activity. (Schematic No. 10; Declaration of Dr. Verma, ¶ 128). Thus, antibiotics that may prevent bacteria from reproducing cannot reduce NF-kB activity as recited in the pending claims.

Should an antibiotic successfully kill the bacteria, the consequence would be the release of additional LPS from the dead bacteria. Killing the bacteria disrupts the integrity of its cell membrane, which releases and solubilizes additional LPS from the bacterial cell membrane. Such additional LPS would increase, not decrease, NF-kB activity. (Declaration of Dr. Verma, ¶¶ 129-130).

Thus, antibiotics cannot anticipate Patentees' claims because antibiotics either will not affect NF-kB activity or will increase

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 82 of 92  of November 9, 2006 Response*

NF-kB activity.

Furthermore, certain claims as discussed above, e.g. claims 8 and 9, require that the external influences continue to "induce NF-kB-mediated intracellular signaling," i.e. require the activation of segment 1 outside the cell to be maintained.  Thus, as shown in Schematic 4, the reduction of NF-kB activity in such claims must be occurring as a result of interference inside the cell.  (Declaration of Dr. Verma, ¶ 131).  Use of antibiotics clearly does not anticipate such claims.

>    3)    Cyclosporin A
>
>        i) *In Vivo*  -  Art Being Used To Reject Claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97.

The inherent anticipation rejection set forth on pages 19-29 of the August 2, 2006 Office Action is based on the *PDR 1995*, *Griffith I* (9/82) or *Griffith II* (12/84), alone and as allegedly "explained" by Holschermann (12/97).

Initially, Patentees respectfully point out that the PDR is, at best, evidence of a prior public use.  As such, the PDR cannot be relied upon in a reexamination proceeding.

Patentees also point out that in *Griffith I* and *Griffith II*, CsA was administered before transplantation.  Even if transplantation could induce NF-kB activity, which has not been shown, and even if CsA was shown to operate through NF-kB, which has not been shown, *Griffith I* and *Griffith II* cannot anticipate Patentees' claims requiring reduction of NF-kB activity that was first induced.  (Declaration of Dr. Verma, ¶¶ 25-27, 38 and 44-46.)

The *1985 PDR*, as the Examiner indicated, teaches CsA should be administered first before and then after surgery.  Again, even if surgery could induce NF-kB activity, which has not been shown, and

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 83 of 92  of November 9, 2006 Response*

even if CsA was shown to operate through NF-kB, which has not been shown, *Griffith I* and *Griffith II* cannot anticipate Patentees' claims requiring reduction of NF-kB activity.  (Declaration of Dr. Verma, ¶¶ 64-74).

                    ii) *In Vitro* – Art Being Used To Reject Claims 1-2,
                         5-9, 20-21, 25-29, 31-32, 36-40, 53-
                         54, 58-62, 64-65, 69-73, 75-76, 80-86,
                         88-89 and 93-97

The inherent anticipation rejection set forth on pages 19-29 of the August 2, 2006 Office Action is based on *Reed* (7/86), alone and as allegedly "explained" by *Brini* (9/90).

*Reed*, however, discloses experiments in which CsA was added to cells 20 to 30 minutes before any purported inducer was added to the cells. Even if CsA was shown to operate through NF-kB, which has not been shown, *Reed* cannot anticipate Patentees' claims requiring reduction of NF-kB activity.  (Declaration of Dr. Verma, ¶¶ 53-60).

A similar inherent anticipation rejection is set forth on pages 26-29 of the August 2, 2006 Office Action based on *Kronke* (8/84) and/or *Siebenlist* (9/86), each one alone and as allegedly "explained"  by *Schmidt* (8/90), *Emmel* (12/89) and *Manolagas Declaration*.

Patentees respectfully point out that none of the experiments described in *Siebenlist* used CsA in cells first induced with PHA and PMA.  Even if CsA was shown to operate through NF-kB, which has not been shown, *Siebenlist* cannot anticipate Patentees' claims requiring reduction of NF-kB activity.  (Declaration of Dr. Verma, ¶¶ 61-63).

*Kronke* does describe a single experiment in which cells were treated with CsA after exposure to PHA/PMA.  However, as is evident from Fig. 4 of *Kronke*, CsA treatment did not have a significant effect on the cell when added after cells had been induced with PHA/PMA.  *Kronke*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 84 of 92  of November 9, 2006 Response*

at 5217.  Indeed, when added four hours after induction, CsA did not alter TCGF (IL2) mRNA levels.  *Id.* at 5216.  Only when CsA was added either before or with PHA/PMA treatment was an effect on IL-2 expression observed.  *Id.* These data suggest that, while treatment with CsA appeared able to prevent induction of IL-2 expression, it had no substantial effect on induced IL2 expression.  Because the claims of the subject patent specify reduction of NF-kB activity that was first induced, *Kronke* cannot anticipate the claims (even if CsA was shown to operate through NF-kB, which it has not). (Declaration of Dr. Verma, ¶¶ 28-36).

Of course, as explained at length in the Declaration of Dr. Verma, ¶¶ 28-36, we now know that CsA affects NFAT. (*See also*, schematics Nos. 11-13).

> 4)   Vitamin D  -   Art Being Used To Reject Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97

The inherent anticipation rejection set forth on pages 30-32 of the August 2, 2006 Office Action is based on *Tsoukas* (6/84), *Lemire I* (8/84), *Lemire II* (5/85), *Rigby I* (10/84), *Rigby II* (10/85) and *Manolagas* (86), each one alone and as allegedly "explained" by *Yu* (11/95) and *Manolagas Declaration*.

Patentees respectfully point out, however, that none of *Tsoukas*, *Lemire I*, *Lemire II*, *Rigby II* or *Manolagas* administers calcitriol to cells in which NF-kB activity has been induced, as required by the claims. *Tsoukas* describes a series of experiments investigating the effect of calcitriol on proliferation and production of IL-2 protein (as measured indirectly by IL-2 activity) in PBM cells simultaneously stimulated with PHA.  *Manolagas* reports experiments investigating the effect of simultaneously administered calcitriol and PHA on proliferation and IL-2 activity in PBM cells.  *Lemire I* describe

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 85 of 92  of November 9, 2006 Response*

experiments investigating the effect of calcitriol on DNA synthesis
and IgG production in PBM cells simultaneously stimulated with a
number of different agents, either PHA, pokeweed mitogen (PWA) or
dermatophyton-O.  In *Lemire II*, cells were either pretreated or
simultaneously treated with calcitriol and a number of different
agents, either PHA, PWA, or con A.  In *Rigby II*, cells were always
stimulated with PHA in the presence of calcitriol.  Therefore, even
if calcitriol would be shown to operate through NF-kB, which it has
not, *Tsoukas*, *Lemire I*, *Lemire II*, *Rigby II*, or *Manolagas* cannot
anticipate Patentees' claims requiring reduction of NF-kB activity.
(Declaration of Dr. Verma, ¶¶ 107-125).

*Rigby I* is the only pre-April 21, 1989 reference that describes use
of calcitriol in cells that have been stimulated by PHA.  (*Rigby I*,
page 1453, Figs 2 and 4.)  However, nothing of record shows that the
calitriol in Rigby I necessarily reduced NF-kB activity. (Declaration
of Dr. Verma, ¶¶ 118-125).

Finally, studies have shown that calcitriol in fact induces NF-kB
activity, as opposed to reducing it. (Schematic No. 14; Declaration
of Dr. Verma, ¶ 125).

> 5)    Red Wine    -    Art Being Used To Reject Claims 1-2,
>                        6-9, 20-21, 25-32, 36-41, 64-65, 69-
>                        76, 80-89 and 93-98

The inherent anticipation rejection set forth on pages 30-32 of the
August 2, 2006 Office Action is based on *The Bible* (portions),
*St.Leger* (5/79), *Dobrilla* (2/84), *Jones* (3/87), each one alone and
as allegedly "explained" by *Blanco-Colio* (8/00), *Holmes-
McNary/Baldwin*, and *Manna* (2000).

Initially, Patentees respectfully point out that use of red wine
cannot anticipate any of Patentees' claims because red wine could

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 86 of 92 of November 9, 2006 Response*

never be the agent reducing NF-kB activity.    Upon ingestion, the red wine is broken down into its components and digested.    Thus, red wine, as such, cannot be the agent reducing NF-kB activity as specified by Patentees' claims.    (Declaration of Dr. Verma, ¶ 133).

Patentees further point out that in each of the pre-April 21, 1989 references, namely *The Bible*, *St.Leger*, *Dobrilla*, and *Jones*, induction of NF-kB activity has not been established, nor has the inducer of NF-kB been identified.    Accordingly, even if red wine was shown to operate through NF-kB, which it has not, *The Bible*, *St.Leger*, *Dobrilla*, or *Jones* cannot anticipate Patentees' claims specifying reduction of NF-kB activity.    (Schematic No. 15; Declaration of Dr. Verma, ¶¶ 132-136).

Finally, *The Bible*, *St.Leger*, *Dobrilla*, and *Jones* do not enable use of red wine for any purpose since none of these references discloses the type of red wine used in each.    All red wine is certainly not equal and cannot be expected to have the same effects.    A non-enabling reference cannot anticipate a claim, inherently or otherwise.    (Declaration of Dr. Verma ¶¶ 133-137).

      6) Glucocorticoids    -    Art Being Used To Reject Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97

      i) *In Vivo* Art

The inherent anticipation rejection set forth on pages 34-39 of the August 2, 2006 Office Action is based on the *1970 PDR*, alone and as allegedly "explained" by *Baldwin I* (96), *Auphan* (1995), *Scheinmann I*(2/95) and *II*(10/95), *Mukaida* (5/94), and *Padgett* (8/03).

Initially, Patentees respectfully point out that the PDR is, at best, evidence of a prior public use.    As such, the PDR cannot be relied upon in a reexamination proceeding.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 87 of 92 of November 9, 2006 Response*

Furthermore, there is no showing that NF-kB activity was induced in the patients to whom the *1970 PDR* recommends administering glucocorticoids.  Because all of the pending claims specify reducing NF-kB activity that has been induced, the *1970 PDR* cannot anticipate the pending claims, inherently or otherwise.

Finally, the mechanisms by which glucocorticoids mediate inflammatory response are poorly understood still today.  Thus, there is no basis in the record to conclude that glucocorticoids necessarily reduce NF-kB activity.

*See also*, Schematic No. 17 and Declaration of Dr. Verma, ¶¶ 85-101.

        ii) *In Vitro* Art

The rejection set forth on pages 34-39 of the August 2, 2006 Office Action is based on *Nagasawa* (1981) or *Rovera* (1979),[5] alone and as allegedly "explained" by *Baldwin I* (96), *Auphan* (1995), *Scheinmann I* (2/95) and *II* (10/95), *Mukaida* (5/94) and *Padgett* (8/03).

Patentees respectfully point out that each of *Nagasawa* and *Rovera* reports on experiments where dexamethasone was administered to cells before or simultaneously with TPA.  Because all of the pending claims specify reducing NF-kB activity that has been induced, neither *Nagasawa* nor *Rovera* could anticipate the pending claims, inherently or otherwise.

Furthermore, neither *Nagasawa* nor *Rovera* describes any effect of TPA

---

[5] *Lefring* (7/95) is also cited in support of the rejection for "referenced cited therein". *Lefring* (1995), however, does not predate the 1991 date accorded to all of the claim by the Examiner.  *Lefring* (1995) cites to 75 other references.  Such citation without particularity is contrary to the rules of the U.S. Patent and Trademark Office and improper.  *See*, e.g. 37 C.F.R. § 1.104(c)(2).  Accordingly, *Lefring* (1995) or the 75 references cited therein cannot constitute a basis for a proper rejection and Patentees are not addressing *Lefring* (1995).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 88 of 92  of November 9, 2006 Response*

which could be attributed to NF-kB induction.  Thus, it is unclear whether the experiments described by *Nagasawa* or *Rovera* had any induced NF-kB activity, as specified by the pending claims.

Finally, the only conclusion *Nagasawa* makes regarding glucocorticoids in MOLT-3 cells is that administration had no effect on induction of MOLT-3 cells by TPA.  (*Nagasawa* at 185).  Similarly, the only conclusion that *Rovera* makes regarding glucocorticoids in HL-60 cells is that dexamethasone did not "block[] the response of HL-60 cells to TPA, even when the cells were pretreated with a concentration of the test compound 1000 times greater that the concentration of TPA used to induce differentiation." (*Rovera* at 869).  Such acknowledged lack of effects cannot be reconciled with the Examiner's assertion in the Office Action that glucocorticoids reduced NF-kB activity.

Indeed, the mechanisms by which glucocorticoids mediate inflammatory response are poorly understood even today.  Thus, there is no basis in the record to conclude that glucocorticoids necessarily reduce NF-kB activity.

*See also*, Schematic No. 16; Declaration of Dr. Verma, ¶¶ 75-84.

### iii) Endogenous Glucocorticoid

The rejection set forth on pages 55-60 of the August 2, 2006 Office Action is based on *Goodman and Gilman* (1980), alone and as allegedly "explained" by *Baldwin I* (96), *Auphan* (1995), *Scheinmann I*(2/95) and *II* (10/95), *Mukaida* (5/94) and *Padgett* (8/03).

Initially, Patentees respectfully point out that the pending claims require active steps.  As such, natural events cannot anticipate the claims.

Furthermore, there is no showing of record that the widely variable

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 89 of 92  of November 9, 2006 Response*

"environmental stressors" referred to on page 56 of the Office Action would necessarily induce NF-kB activity in a human subject.   Thus, there is no showing that the subjects of *Goodman and Gilman* had induced NF-kB activity, as specified by the pending claims.

Finally, there is no showing that the function of endogenous cortisol referred to in *Goodman and Gilman* is necessarily the same as the function of dexamethasone and other synthetic glucocorticoids referred to by the later references cited.

*See also*, Declaration of Dr. Verma, ¶¶ 102-106.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 90 of 92  of November 9, 2006 Response*

IX.  <u>SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT</u>

In accordance with their duty of disclosure under 37 C.F.R. §1.555, Patentees direct the Examiner's attention to the following disclosures, which are listed on Form PTO-1449 (**Exhibit 3**).  Copies of the disclosures listed below as items 1-8 including listed attachments are attached hereto as **Exhibits 4-11**, respectively.

1.    March 3, 2004 Memorandum Of Decision And Order on claim construction **(Exhibit 4)**;

2.    November 11, 2005 Reply Expert Report of Dr. Stephen Prescott, paragraphs 16-18 **(Exhibit 5)**;

3.    November 11, 2005 Reply Expert Report of Dr. Jeffrey Ravetch, paragraphs 6-9 **(Exhibit 6)**;

4.    November 11, 2005 Reply Expert Report Of Dr. Laurie H. Glimcher, page 11 and 12 **(Exhibit 7)**;

5.    November 11, 2005 Rule 26(b)(2) Reply Report of David M. Livingston, M.D., pages 17-18 **(Exhibit 8)**;

6.    November 22, 2005 Condensed Deposition of Stephen Prescott in Civil Case 02 CV 11280 RWZ, page 226, line 24 – page 242, line 25 and page 262, line 9 – page 267, line 20 **(Exhibit 9)**;

7.    November 30, 2005 Condensed Deposition of Jeffrey V. Ravetch in Civil Case 02 CV 11281 RWZ, page 40, line 8 – page 58, line 25 **(Exhibit 10)**; and

8.    Trial Transcript – April 26, 2006 Jury Trial Day 12, Second Session in Civil Case 02 CV 11281 RWZ, page 112, line 10 and page 124, line 16 **(Exhibit 11)**.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 91 of 92  of November 9, 2006 Response*


Pursuant to the May 4, 2006 Merger Decision, this Response is being filed in duplicate, each original bearing an original signature and identifying data for both reexamination files.


No fee, other than the enclosed fee of $180.00 for the filing of the Supplemental Information Disclosure Statement, is deemed necessary in connection with the filing of this Response.  However, if any additional fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 31-3125.

Respectfully submitted,


John P. White
Registration No. 28,678


Gary J. Gershik
Registration No. 39,992

Attorneys for Patentees
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this correspondence is being deposited this date with the U.S. Postal Service with sufficient postage as first class mail in an envelope addressed to:

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450.

Gary J. Gershik    11/9/06
Gary J. Gershik          /Date
Reg. No. 39,992

# EXHIBIT K

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503        and        90/007,828

Filed April 4, 2005        Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

| | |
|---|---|
| Patentees: | David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis |

Patent No.:    6,410,516 B1            Serial No: 08/464,364

Issue Date:    June 25, 2002            Filed:    June 5, 1995

For    :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

1185 Avenue of the Americas
New York, New York 10036
October 22, 2007

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION, SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

A Final Office Action issued July 6, 2007 in connection with the above-identified merged *ex parte* reexamination. The July 6, 2007 Final Office Action set a two (2) month period for filing a response. Patentees petitioned, and on September 29, 2007 the U.S. Patent Office granted Patentees' petition, for a one (1) month extension of time such that a response to the July 6, 2007 Final Office Action was due October 6, 2007. Thereafter, on October 1, 2007 Patentees petitioned for, and the U.S. Patent Office granted Patentees' petition for a two (2) week extension

ARI 84387

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 92 of October 22, 2007 Response*

of time such that a response to the July 6, 2007 Final Office
Action is now due October 20, 2007. However, since October 20,
2007 was a Saturday, a response filed on the next succeeding day
which is not a Saturday, Sunday or Federal holiday, i.e. Monday,
October 22, 2007, is to be considered timely filed under 37
C.F.R. § 1.7. Accordingly, this Response is being timely filed.


Patentees note that they are concurrently filing a Petition Under
37 C.F.R. § 1.182 And Request For Continued Reexamination.

ARI 84388

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 3 of 92 of October 22, 2007 Response*

## In the Specification

Please amend the specification of the subject patent under reexamination pursuant to 37 C.F.R. § 1.530(d)(1) as follows:

-delete the paragraph in column 10, lines 16-17; and

-amend the paragraph in column 28, lines 5-17 as follows:

The inhibitor fraction was treated with trypsin to test whether IkB is a protein (FIG. 35B). Tryptic digestion was stopped by the addition of bovine pancreas trypsin inhibitor (BPTI) and samples were analyzed for NF-kB inhibition. Trypsin treatment interfered with the activity of IkB, as shown by the complete inability of the treated sample to inhibit NF-kB activity (FIG. 35B, compare lanes 1 and 6). Trypsin that had been treated with BPTI had no effect (FIG. 35B, lane 5), demonstrating that the inactivation of IkB was specifically caused by the proteolytic activity of trypsin. It appears that IkB requires an intact polypeptide structure for its activity. The nucleotide sequence of the IkB-α gene and the amino acid sequence of IkB-α are shown in FIG. 43.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 92 of October 22, 2007 Response*

## In the Drawings

Please cancel Figure 43 from the subject patent under reexamination pursuant to 37 C.F.R. § 1.530(d)(3). In accordance with 37 C.F.R. § 1.530(d)(3) a copy of Figure 43 surrounded by brackets and identified as "Canceled" is attached hereto as **Exhibit A.**

ARI 84390

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 5 of 92 of October 22, 2007 Response*

**In the Claims**

Please amend the claims of the subject patent pursuant to 37
C.F.R. § 1.530(d)(2):

Specifically, please cancel the following claims[1]:

    (a)  1, and 20-27 and 29 which depend from claim 1;

    (b)  2, and 31-38 and 40 which depend from claim 2;

    (c)  3, and 42, 43 and 47-51 which depend from claim 3;

    (d)  4, and 192, 193 and 197-201 which depend from claim 4;

    (e)  5, and 53-62 which depend from claim 5;

    (f)  10, and 99, 100, 104 and 105 which depend from claim 10;

    (g)  11, and 106, 107, 109, 110 and 114-117 which depend from claim 11;

    (h)  12, and 119, 120 and 124-127 which depend from clam 12;

    (i)  13, and 128, 129 and 133-137 which depend from claim 13;

    (j)  15, and 149, 150 and 154-157 which depend from claim 15;

    (k)  16, and 159, 160 and 164-166 which depend from claim 16; and

    (l)  17, and 167, 168 and 172-175 which depend from claim 17.

In addition please add new claims 204-211 as follows:

204. (New) A method for reducing expression in a human cell of
a gene, the expression of which has been induced by an
extracellular polypeptide that activates NF-kB to act as an
intracellular messenger to transmit a signal that induces
expression of the gene from the plasma membrane of the cell
to the nucleus of the cell, which comprises contacting the

---

[1]Please note that in the response to the August 2, 2006 Office Action the following
claims were previously canceled: 7, 81, 83, 85, 86, 28, 39, and 203.

ARI 84391

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 6 of 92 of October 22, 2007 Response*

cell with a composition that inhibits transmission of the
signal so as to thereby reduce expression of the gene in
the cell.

205. (New) The method of claim 204, wherein the contacting of
the cell with the composition that inhibits transmission of
the signal is within the cell.

206. (New) The method of claim 204, wherein the extracellular
polypeptide is TNF-α.

207. (New) The method of claim 205, wherein the extracellular
polypeptide is TNF-α.

208. (New)  The method of claim 204, wherein the composition is
a protein.

209. (New)  The method of claim 205, wherein the composition is
a protein.

210. (New)  The method of claim 206, wherein the composition is
a protein.

211. (New)  The method of claim 207, wherein the composition is
a protein.

Support for new claim 204 may be found, *inter alia*, in column 3,
line 59 - column 4, line 28; in column 12, line 36 - column 13,
line 3; in column 15, line 54 - column 16, line 35; in column 2,
line 57; and in column 17, lines 30-37 of the '516 patent.

Support for new claim 205 may be found, *inter alia*, in column 3,
line 63-64 of the '516 patent.

Support for new claims 206 and 207 may be found, *inter alia*, in
column 17, line 30-36 of the '516 patent.

ARI 84392

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 7 of 92 of October 22, 2007 Response*

Support for new claims 208-211 may be found, *inter alia*, in column 16, lines 4-10; and in column 37, line 55-56 and 43-49 of the '516 patent.

Accordingly, each of new claims 204-211 is fully supported by the specification of the '516 Patent and raises no issue of new matter. These new claims are added in response to issues and/or arguments raised for the first time in the July 6, 2007 Final Office Action. Therefore, entry and consideration of new claims 204-211 is respectfully requested.

As a result of this Amendment the following claims are pending:

    (a)  confirmed patentable claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202;

    (b)  rejected claims 6 and 64-73 which depend from claim 6; 8 and 75-80, 82 and 84 which depend from claim 8; 9 and 88-97 which depend from claim 9; 14 and 139, 140, and 144-147 which depend from claim 14; 18 and 177, 178, and 182-185 which depend from claim 18; and

    (c)  new claims 204-211.

ARI 84393

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 8 of 92 of October 22, 2007 Response*

## REMARKS

Patentees respond below to the rejections set forth in the July 6, 2007 Final Office Action.  The following Table of Contents is provided for the Examiner's convenient reference.

Table of Contents

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION ................................................ | 15 |
|  | A. **Status of Claims Pursuant to 37 C.F.R. § 1.530(e)**..... | 15 |
|  | B. **Objection to Claim 8** ................................ | 15 |
|  | C. **Updated Status of Concurrent Proceedings Pursuant to 37 C.F.R. §1.565** ................................ | 17 |
| II. | SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW .......... | 21 |
| III. | RESPONSE TO ART REJECTIONS ............................. | 29 |
|  | A. **All Rejected Claims Now Pending Are Directed To Reducing Induced NF-kB Activity** .................... | 29 |
|  | 1) All rejected, pending claims must be given their broadest reasonable interpretation .............. | 30 |
|  | 2) Claim 6 Recites "diminishing induced NF-kB-mediated intracellular signaling"; Claim 8 recites modifying effects of external influences which induce NF-kB mediated intracellular signaling by reducing NF-kB activity in the cells such that NF-kB mediated effects ...are modified; Claim 9 Recites "reducing, in eukaryotic cells, the level of expression of genes which are activated"; Claim 14 Recites "reducing bacterial lipopolysaccharide-induced expression of cytokines"; and Claim 18 Recites reducing Interleukin-1 or Tumor Necrosis Factor-α activity ...so as to reduce "intracellular signaling caused by Interlukin-1 or Tumor Necrosis Factor-α in the cells" ................................ | 32 |
|  | 3) Each of Claim's 64-69, 75-80, 88-93, 139-144, 177, 178, and 182 Is Directed To Reducing Induced NF-kB Activity By Carrying Out A Specific Step Inside a Cell.............................. | 35 |
|  | B. **The Rejected Claims Now Pending Are Not Anticipated By The Cited Art. For Each Rejected Claim It Has Not Been Shown That Every Element Explicitly or Necessarily Occurs in the Cited Art. Moreover, Certain Cited Art Clearly Does Not Enable The Method Described Therein So That Even If Each Element Of A Rejected Claim Were Disclosed The Cited Art Such Art Would Not Anticipate**........ | 36 |

ARI 84394

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 9 of 92 of October 22, 2007 Response*

1)   CLAIM 14 AND CLAIMS 139, 140 and 144-147 WHICH DEPEND
     THEREON............................................... 38

a)   *The Method of Claim 14 and Claims Dependent
     Thereon Does Not Occur In Any Person To Whom
     Antibiotics Are Administered* ...................... 39

b)   *Performing Any Method Involving Administering An
     Antibiotic According to The Disclosure of the 1970 PDR
     Only Results In Killing Gram-Negative Bacteria
     Sometimes. Such Occasional Results Are Not Sufficient
     To Establish An Element of the Claims Necessarily or
     Inevitably Occurred....... ......................* 40

c)   *The Occasional Results Obtainable Following the
     Disclosure of the 1970 PDR Are Not Sufficient to
     Enable the Method Disclosed And Therefore Cannot
     Anticipate Claim 14 and Claims Dependent
     Thereon...........................................* 43

d)   *Administering An Antibiotic As Disclosed in The 1970
     PDR Does Not Anticipate Reducing Induced NF-kB
     Activity by Intervening Within the NF-kB Intracellular
     Signaling Pathway At A Specified Segment as Recited in
     Claim 139, 140 and 144...........................* 45

2)   CLAIM 18 AND CLAIMS 177, 178 and 182-185 WHICH DEPEND
     THEREFROM ........................................... 48

Rejection Based on Antibiotic Art ...................... 49

a)   *The Method of Claim 18 and Claims Dependent
     Thereon Does Not Occur In Any Person To Whom
     Antibiotics Are Administered* ...................... 49

b)   *Performing Any Method Involving An Antibiotic
     According To the 1970 PDR Only Results In Killing
     Gram-Negative Bacteria Sometimes. Such Occasional
     Results Are Not Sufficient To Establish An Element of
     the Claims Necessarily Or Inherently Occurs* ...... 49

c)   *The Occasional Results Obtainable Following The
     Disclosure of the 1970 PDR Are Not Sufficient to
     Enable the Method of Disclosed And Therefore Cannot
     Anticipate Claim 18 and Claims Dependent Thereon....* 49

d)   *Administering An Antibiotic As Disclosed In The 1970
     PDR Does Not Anticipate Reducing Induced NF-kB
     Activity by Intravening Within the NF-kB Intracellular
     Signaling Pathway at a Specified Segment as Required
     by Claims 177, 178 and 182........................* 50

e)   *Administering Antibiotics Does Not Involve*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 10 of 92 of October 22, 2007 Response*

Reducing NF-kB Activity "caused by"
IL-1 or TNF-α........................................... 50

Rejection Based on NAC Art ............................. 52

a) The Experiments Disclosed in Staal et al., Do Not
Involve The Method of Claim 18 or Claims 182-185 Which
are Dependent Thereon. ............................. 52

b) Staal et al. Do Not Enable the Method of Claim 18
Or Claims 182-185 ................................. 53

c) Staal et al. Do Not Anticipate Reducing
Induced NF-kB Activity in Human Cells,
as Recited in Claim 183 ........................... 55

3) CLAIMS 6, 8 AND 9 AND CLAIMS DEPENDENT THEREON ....... 56

Rejections Based on Antibiotic Art ..................... 60

a) The Methods of Each of Claims 6, 8 and 9 and of Claims
Dependent Thereon Do Not Occur In Any Person To Whom
Antibiotics Are Administered. At most administering
antibiotics prevents induction of the NF-kB
intracellular signaling pathway. A method which
comprises administering antibiotics is not a method
which involves reducing induced NF-kB activity...... 60

b) Performing Any Method Involving Administering An
Antibiotic According To the 1970 PDR Only Sometimes
Results in Killing Gram-Negative Bacteria. Such
Occasional Results Are Not Sufficient To Establish An
Element of the Claims Necessarily Or Inevitably
Occurred ......................................... 60

c) The Occasional Results Obtainable following the
Disclosure of The 1970 PDR Are Not Sufficient to
Enable the Methods Disclosed And Therefore Cannot
Anticipate Any Of Claim 6, 8 or 9 or Any Claim
Dependent Thereon ................................. 60

d) Administering An Antibiotic As Disclosed In The 1970
PDR Does Not Anticipate Reducing Induced NF-kB
Activity by Intervening Within the NF-kB Intracellular
Signaling Pathway At A Specified Segment as Required
by each of Claims 64, 65, 75, 76, 80, 88, 89
and 93............................................ 60

Rejections Based on Cyclosporin A Art .................. 61

ARI 84396

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 11 of 92 of October 22, 2007 Response*

    a)    *The Use of Cyclosporin A in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Each of Claims 6, 8 and 9 and Claims Dependent Thereon*............................... 61

    b)    *The Cyclosporin A Art Does Not Disclose The Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon*.......................................... 62

    c)    *The Cited Cyclosporin A Art Is Not Enabling And Therefore Cannot Anticipate the Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon*.......................................... 63

    d)    *The Cited Cyclosporin Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specified Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64-69, 75-80 and 88-93* ............................................. 64

Rejections Based on Protein Kinase C Inhibitor Art ...... 66

    a)    *The Use of a Protein Kinase C Inhibitor in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon*.......................................... 66

    b)    *The Cited Protein Kinase C Inhibitor Art Does Not Disclose the Method of Any of Claim 6, 8, 9 or any Claim Dependent Thereon* ........................... 67

    c)    *The Cited Protein kinase C Inhibitor Art Does Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon*.......................................... 68

    d)    *The Cited Protein Kinase C Inhibitor Art Does Not Disclose a Method Which Anticipates Reducing Induced NF-kB Activity by Intervening within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Recited in Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.* ......................................... 69

ARI 84397

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 12 of 92 of October 22, 2007 Response*

<u>Rejections Based on Vitamin D Art</u> ....................... 70

a)   *The Cited Vitamin D Art Does Not Disclose A Method of*
     *Using Vitamin D Which Anticipates Any Method Recited*
     *In Any of Claim 6, 8, or 9 and in any Claims Dependent*
     *Thereon* ........................................... 70

b)   *The Cited Vitamin D Art Does Not Enable The*
     *Performance of Any Method Which Anticipates a Method*
     *of Any of Claim 6, 8 or 9 or Any Claim Dependent*
     *Thereon* ........................................... 74

c)   *The Cited Vitamin D Art Does Not Anticipate Reducing*
     *Induced NF-kB Activity by Intervening at a Specific*
     *Segment Within the NF-kB Intracellular Signaling*
     *Pathway as Recited in Each of Claims 64, 65, 69, 75,*
     *76, 80, 88, 89 and 93.* ............................ 75

<u>Rejection Based on 5-ASA Art</u> ........................... 76

a)   *The Use of 5-ASA in Dew et al., Does Not Involve*
     *Reducing Induced NF-kB Activity As Required By The*
     *Methods of Claims 6, 8 and 9 and Claims Dependent*
     *Thereon.* .......................................... 76

b)   *Dew et al. Do Not Enable the Performance of a Method*
     *of Any of Claims 6, 8 or 9 or Any Claim Dependent*
     *Thereon* ........................................... 79

c)   *Dew et al. Do Not Disclose A Method Which Anticipates*
     *Reducing Induced NF-kB Activity by Intervening Within*
     *the NF-kB Intracellular Signaling Pathway at a*
     *Specified Segment as Recited in Claims 64-69, 75-80*
     *and 88-93.* ........................................ 80

<u>Rejection Based on the Endogenous Glucocorticoid Art</u> ...... 81

a)   *The Use of Endogenous Glucocorticoids Disclosed in*
     *Goodman and Gilman Does Not Involve Reducing Induced*
     *NF-kB Activity as Required by The Methods of Claims 6,*
     *8 and 9 and Claims Dependent*
     *Thereon.* .......................................... 81

b)   *Any Method Disclosed in Goodman and Gilman, Would At Most*
     *Only Involve Reducing Induced NF-kB Activity Sometimes.*
     *Any Such Occasional Result Is Not Sufficient To Establish*
     *An Element of the Claimed Methods Necessarily Or*

ARI 84398

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 13 of 92 of October 22, 2007 Response*

*Inevitably Occurs* ................................. 82

c) *Any Occasional Results Obtainable By Following The
Disclosure of Goodman and Gilman Is Not Sufficient to
Enable the Method of Any of Claims 6, 8 or 9 or Any
Claim Dependent Thereon* .......................... 84

d) *Goodman and Gilman Do Not Disclose A Method Which
Anticipates A Method Of Reducing Induced NF-kB
Activity by Intervening Within the NF-kB Intracellular
Signaling Pathway Inside a Cell at a Specific Segment
of the Pathway As Required by each of Claims 64, 65,*

*69, 75, 76, 80, 88, 89 and 93* ..................... 86

IV.  THE USE OF NON-PRIOR ART REFERENCES AND EVIDENCE SUBMITTED
IN A DECLARATION THAT GOES BEYOND EXPLAINING THE CONTENT OF
CITED PRIOR ART AS A BASIS FOR AN INHERENCY REJECTION IS
IMPROPER AND ULTRA
VIRES................................................. 88

A.  **Statutory Grounds For Reexamination** ............... 88

B.  **Impermissible Grounds of Rejection in a
Reexamination** ...................................... 88

C.  **The Inherent Anticipation Rejections in the August 2, 2006
and July 6, 2007 Office Actions Are Improper; They Rely On
Evidence Other Than "prior art consisting of patents or
printed publications" in Violation of the Reexamination
Statute**......................................... 89

D.  **The Claims of the '516 Patent Are Method Claims and the
Cited Prior Art Is At Most Evidence of What Occurred
During A Prior Public Use** .......................... 91

V.  <u>SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT</u> .......... 94

ARI 84399

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 14 of 92 of October 22, 2007 Response*

I.    INTRODUCTION

    **A.    Status of Claims Pursuant to 37 C.F.R. § 1.530(e).**

Issued Claims Confirmed Patentable
Claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113,
118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-
171, 176, 179-181, 186-191, 194-196, and 202 have been confirmed
patentable.

Canceled Claims
Claims 1-5, 7, 10-13, 15-17, 20-29, 31-40, 42, 43, 47-51, 53-62, 81,
83, 85, 86, 99, 100, 104-107, 109, 110, 114-117, 119, 120, 124-129,
133-137, 149, 150, 154-157, 159, 160, 164-168, 172-175, 192, 193,
197-201 and 203 have been canceled.

(To reduce the number of issues in this reexamination Patentees have
cancelled the claims listed above without disclaimer or prejudice.)

Rejected Claims
Claims 6, 8, 9, 14, 18, 64-74, 75-80, 82, 84, 88-97, 139, 140, 144-
147, 177, 178, 182-185 as issued on June 25, 2002 are now pending and
subject to rejection.

New Claims
New claims 204-211 have been added.

    **B. Objection to Claim 8**

The July 6, 2007 Final Office Action on page 2 objected to claim 8
for being dependent on canceled claim 7, and required Patentees to
rewrite claim 8 in independent form.

ARI 84400

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 15 of 92 of October 22, 2007 Response*

In response, Patentees respectfully direct the Examiner's attention to M.P.E.P. § 2260.01, which provides:

> If an unamended base patent claim (i.e., a claim appearing in the reexamination as it appears in the patent) has been rejected or canceled, any claim which is directly or indirectly dependent thereon should be confirmed or allowed if the dependent claim is otherwise allowable. The dependent claim should not be objected to or rejected merely because it depends on a rejected or canceled patent claim. No requirement should be made for rewriting the dependent claim in independent form.

Accordingly, claim 8 does not need to be rewritten and the objection to claim 8 should be withdrawn.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 16 of 92 of October 22, 2007 Response*

### C.    Updated Status of Concurrent Proceedings Pursuant To 37 C.F.R. § 1.565

*ARIAD Pharmaceuticals, Inc. et al. v. Eli Lilly and Co.*

Patentees previously informed the U.S. Patent and Trademark Office that a jury trial at the U.S. District Court for the District of Massachusetts (*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*, 02-CV-11280-RWZ) unanimously found claims 80, 95, 144, and 145 of the subject patent valid and infringed. The art presented to the Court included art relating to glucocorticoids, cyclosporin A, antibiotics, 5-ASA, and red wine. Expert reports and testimony including reports and testimony from Dr. Manolagas on which the Examiner has relied in part in the August 2, 2006 Office Action, were also presented to the Court. The jury also determined that the claims at issue were enabled and adequately described in U.S. Serial No. 07/431,436, filed April 21, 1989 and therefore entitled to an April 21, 1989 effective filing date.

From August 7, 2006 to August 10, 2006, an evidentiary hearing was conducted by the Court on four asserted defenses/counterclaims raised by Lilly which the Court did not submit to the jury. The four issues presented were whether the subject patent is a) unenforceable because of alleged inequitable conduct during prosecution, b) unenforceable because of alleged prosecution latches, c) invalid for covering non-patentable subject matter, and d) invalid for indefiniteness. On September 10, 2007 the Court entered a Final Judgment against Lilly.

On September 23, 2007, Lilly renewed its Motion for Judgment as a Matter of Law, or in the Alternative for a New Trial. On September 27, 2007, the Court issued an Order setting a briefing schedule on Lilly's motion. As set forth in the Order, all briefing is to be completed by December 24, 2007, and a hearing on Lilly's motion is scheduled for January 16, 2008.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 17 of 92 of October 22, 2007 Response*

*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*

A Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement of U.S. Patent No. 6,410,516 (the "'516 patent") was filed on April 20, 2006 in the U.S. District Court for the district of Delaware by Amgen Inc. and several affiliated companies (collectively, "Amgen") (*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, 06-CV-00259-MPT). In a written order on September 13, 2006, that Court (a) denied a motion by ARIAD to dismiss the case for lack of subject matter jurisdiction, and (b) denied without prejudice a motion by ARIAD a motion to dismiss for failure to join necessary and indispensable parties. On September 25, 2006, ARIAD answered the complaint and denied the allegations of patent invalidity and non-infringement. On November 3, 2006, the Court granted a motion by ARIAD for certification for appeal to the Court of Appeals for the Federal Circuit ("CAFC") of the Court's order denying the motion to dismiss for lack of subject matter jurisdiction. On December 29, 2006, the CAFC declined to hear that appeal.


On October 5, 2006, ARIAD filed a renewed motion to dismiss for failure to join indispensable parties. ARIAD moved in the alternative to transfer the case to the District of Massachusetts. On January 23, 2007, ARIAD moved to stay the case pending the present reexamination. On February 6, 2007, the Court denied without prejudice ARIAD's motion to stay. On March 27, 2007, the Court ordered that the case remain in the District of Delaware, and held that patent assignees Massachusetts Institute of Technology, President and Fellows of Harvard College, and the Whitehead Institute for Biomedical Research (collectively, the "Institutions") were necessary parties to the action.


On April 13, 2007, ARIAD and the Institutions asserted counterclaims against Amgen for infringement of the '516 patent, including

ARI 84403

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 18 of 92 of October 22, 2007 Response*

allegations of willful infringement. At the same time, ARIAD and the
Institutions filed and served affirmative claims for infringement of
the '516 patent, including allegations of willful infringement,
against Wyeth. Wyeth has moved to sever and stay the case as it
pertains to ARIAD and the Institutions' claims against Wyeth; the
Court has not ruled on Wyeth's motion to sever and stay.

On May 30, 2007, ARIAD and the Institutions moved to amend their
counterclaims to add claims of infringement of U.S. Patent No.
5,804,374 and U.S. Patent No. 6,150,090 against Amgen. The Court
granted this motion on August 27, 2007.

Amgen and Wyeth have asserted affirmative defenses with regard to
ARIAD and the Institutions' counterclaims, including allegations of
inequitable conduct in the prosecution of the '516 patent and in the
present reexamination. Patentees have furnished the U.S. Patent and
Trademark Office with Amgen's and Wyeth's filings containing such
allegations, as well as discovery responses, deposition transcripts,
and other materials from this matter.

Amgen, ARIAD, and the Institutions have consented to the jurisdiction
of Magistrate Judge Mary Pat Thynge, to whom the case was assigned
when Judge Kent A. Jordan was elevated to the Third Circuit Court of
Appeals. Judge Thynge has entered a scheduling order in the case,
setting the matter concerning the '516 patent for trial in November
2008.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 19 of 92 of October 22, 2007 Response*

II.   SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW

This Summary is filed pursuant to 37 C.F.R. § 1.560(b) to supplement
the handwritten Interview Summary prepared by Examiner Bennett Celsa
at the conclusion of an August 22, 2007 interview attended by
Examiner Celsa; Examiner Ponnaluri Padmashri; Supervisory Examiner
Deborah Jones; Dr. Inder Verma; John P. White, Esq.; and Gary J.
Gershik, Esq. Patentees seek herein to provide a complete record of
the reasons warranting favorable action in the above-identified
reexamination which were discussed during the August 22, 2007
interview.  Patentees acknowledge with appreciation the courtesy
extended by Examiners Celsa, Padmashri and Jones in connection with
the interview.

Patentees had requested the interview to discuss the grounds of
rejection set forth in the July 6, 2007 Final Office Action issued
in connection with this merged reexamination.  The interview was
spent discussing the proper interpretation of certain claims and the
flaws in the inherent anticipation rejections of such claims in the
July 6, 2007 Final Office Action.  Patentees noted that they were
considering canceling claims to reduce the number of issues in the
reexamination and address the grounds of rejection set forth in the
July 6, 2007 Final Office Action.

Claims Directed to a Method Involving Reducing NF-kB Activity by
Intervening At A Specified Segment Within the NF-kB Intracellular
Signaling Pathway Are Improperly Rejected Over Antibiotic Art.
Patentees first discussed certain claims rejected over antibiotic
art, such as claim 139 which recites a method "wherein NF-kB activity
is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB
complex," and claim 140 which recites a method "wherein NF-kB
activity is reduced by inhibiting the passage of NF-kB into the
nucleus of cells." (Emphasis added.)  Patentees pointed out that such
claims are clearly directed to a method wherein reducing NF-kB
activity is effected by intervening at a specified segment within the

ARI 84405

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 20 of 92 of October 22, 2007 Response*

NF-kB intracellular signaling pathway.

The use of antibiotics according to the 1970 Physician's Desk Reference ("1970 PDR") as set forth in the July 6, 2007 Final Office Action does not, and in fact cannot, inherently disclose reducing NF-kB activity by intervening with the NF-kB intracellular signaling pathway at the segments specified in these specific claims such as claim 139 and claim 140 since the antibiotics in question do not even enter mammalian cells. Patentees also pointed out that the rejection of claim 139 and claim 140 is inconsistent with the confirmation of patentability of claims 141-143 in the July 6, 2007 Final Office Action. Claims 141-143, like rejected claims 139 and 140, are directed to a method of reducing NF-kB activity by intervening at a specified segment within the NF-kB intracellular signaling pathway. Confirmed patentable claims 141-143 are analogous to claims 139 and 140 which have been rejected based on the use of antibiotics as discussed in the 1970 PDR. Importantly, there is no evidence or rationale in the July 6, 2007 Final Office Action establishing that the use of antibiotics is associated with reducing induced NF-kB activity by intervening within the NF-kB intracellular signaling pathway at the segments specified in claims 139 and 140, particularly since the Examiner previously acknowledged that antibiotics do not act at the specific segments of the intracellular pathway recited in claims 141-143.

Examiner Celsa suggested that an explanation for the rejection of these claims appears in the July 6, 2007 Final Office Action. Patentees have carefully reviewed the July 6, 2007 Final Office Action, as well as the Declaration of Dr. Manolagas and Exhibit H-10 which were submitted to the U.S. Patent Office by the requester of reexamination control number 90/007,503 and which are incorporated by reference into the July 6, 2007 Final Office Action. Patentees are unable to find any evidence or support for the proposition that antibiotics could anticipate a method of reducing induced NF-kB

ARI 84406

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 21 of 92 of October 22, 2007 Response*

activity "wherein NF-kB activity is reduced <u>by decreasing the level</u> <u>of NF-kB not bound in an NF-kB:IkB complex</u>" or "wherein NF-kB activity is reduced <u>by inhibiting the passage of NF-kB into the</u> <u>nucleus of cells</u>." (Emphasis added.) No specific discussion of claim 139 or of claim 140 appears in the July 6, 2007 Final Office Action. Exhibit H-10 has only the following quote separately repeated under each of the three (3) antibiotics being cited against claim 139: "Inherent. Reduction in LPS due to administration of antibiotic necessarily decreases NF-kB activation, and level of NF-kB not bound to NF-kB:Ikb complex." With respect to claim 140, Exhibit H-10 has only the following quote separately repeated for each of the three (3) antibiotics being cited against claim 140: "Inherent. Reduction in LPS due to administration of antibiotic in gram negative infection necessarily decreases NF-kB activation, and inhibits passage of NF-kB into the nucleus of cells." These conclusory statements provide no evidence or explanation how the use of antibiotics anticipates either a method which comprises reducing induced NF-kB activity, "wherein NF-kB activity is reduced by decreasing the level of NF-kB not bound in an NF-kB:IkB complex" or a method which comprises reducing induced NF-kB activity, "wherein NF-kB activity is reduced by inhibiting the passage of NF-kB into the nucleus of cells." Thus, there is no evidence or explanation in the July 6, 2007 Final Office Action how the use of antibiotics is reducing induced NF-kB activity at all, let alone by intervening within the NF-kB intracellular signaling pathway at the segment specified in the claims.

Therefore, Patentees maintain that claims such as claims 139 and 140 have been improperly rejected over the antibiotic art. Because claims 139 and 140 are rejected only on the basis antibiotic art, the rejection of these claims should be withdrawn and these claims should be confirmed patentable.

The Examiners agreed to reconsider the applicability of the inherent anticipation rejection as applied to claims such as claim 139 and

ARI 84407

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 22 of 92 of October 22, 2007 Response*

claim 140.


## Reduction of NF-kB Activity is Not Inherent To Any Method Disclosed in the PDR 1970.


Patentees next pointed out that the use of antibiotics does not necessarily kill bacteria, let alone necessarily comprise reducing induced NF-kB activity.  Numerous bacterial strains are resistant to antibiotics.  Specifically, the listing of bacteria in the 1970 PDR includes strains that are resistant to the respective antibiotic which the 1970 PDR suggest using against the strains.  Thus, when one skilled in the art treated a patient suffering from a bacterial infection following the disclosure provided in the 1970 PDR, the patient's bacterial infection would not necessarily or inevitably respond to the antibiotic.   Thus, for example, patients infected with a strain of the bacteria  resistant to the antibiotic would not respond to treatment with the antibiotic.

The Examiners acknowledged that resistant bacteria would not respond to an antibiotic to which they were resistant.  The Examiners also acknowledged that any given patient might be infected with resistant bacteria but a physician treating the patient would not know this to be the case.  Examiner Celsa questioned whether the  foregoing facts impact the propriety of the inherent anticipation rejection based on the 1970 PDR.   Patentees explained that an inherent anticipation rejection requires a showing that the purported inherently disclosed method necessarily and inevitably occurred in the prior art.   If practicing the method disclosed in the 1970 PDR sometimes does not result in killing bacteria, (and the disclosed method clearly does not necessarily or inevitably kill bacteria) the 1970 PDR cannot inherently anticipate the claimed methods.   In further reply to Examiner Celsa's inquiry, Patentees referred, for example, to *Glaxo Inc.v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) *cert.*

ARI 84408

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 23 of 92 of October 22, 2007 Response*

*denied*, 516 U.S. 988 (1995), holding that a prior art method which sometimes yielded crystals of one polymorph but other times yielded crystals of a different polymorph, i.e. a method of which did not always produce the claimed polymorph, did not inherently anticipate. A further discussion of this issue appears below in Section III B(1)(b).

Accordingly, a method of using antibiotics according to the 1970 PDR to treat a bacterial infection does not necessarily involve a method of reducing induced NF-kB activity and, therefore, the inherent anticipation rejection based on the 1970 PDR set forth on pages 105-111 of the July 6, 2007 Final Office Action should be withdrawn.

The Examiners agreed to review the legal standard for an anticipation rejection on the basis of inherency and to reconsider the propriety of this rejection based on the use of antibiotics set forth in the July 6, 2007 Final Office Action.

The Antibiotic Art Cannot Anticipate a Method of <u>Reducing Induced NF-kB Activity.</u>

Next Patentees pointed out that contrary to the interpretation of the claims advanced in the July 6, 2007 Final Office Action, a number of claims <u>explicitly</u> require reducing induced NF-kB activity. For example, Patentees pointed to claim 14 and claims dependent thereon as claims which explicitly require "reducing bacterial lipopolysaccharide induced expression of cytokines."

The 1970 PDR teaches that patients with a bacterial infection may be treated with one of the three antibiotics at issue. According to the rationale advanced in the July 6, 2007 Final Office Action, such antibiotic therapy necessarily involves reducing LPS as a result of administering the antibiotic in the case of gram negative infections and thus necessarily involves reducing NF-kB activity. However, obtaining a reduced level of "NF-kB activation" <u>does not</u> anticipate "reducing induced" NF-kB activity. Antibiotics do not have any

ARI 84409

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 24 of 92 of October 22, 2007 Response*

effect on NF-kB activity once the activity has been induced, and the July 6, 2007 Final Office Action does not assert otherwise. Therefore, the 1970 PDR does not anticipate a method which comprises reducing induced NF-kB activity.

Accordingly, the use of antibiotics to treat bacterial infection by a method disclosed in the 1970 PDR does not necessarily and inevitably involve reducing induced NF-kB activity and therefore cannot anticipate claim 14, claims dependent on claim 14, or any claims directed to reducing induced NF-kB activity (e.g., claims 6, 8 and 9, and claims dependent thereon). See further discussion of this issue in Section III.

The Examiners agreed to review and reconsider the applicability of the inherent anticipation rejection based on the 1970 disclosure of certain antibiotics in the PDR in so far as it was being applied against claims which require reducing induced NF-kB activity. To assist the Examiners, Patentees point out that claim 6 and claims dependent thereon recite "diminishing induced NF-kB-mediated intracellular signaling"; claim 8 and claims dependent thereon recite "modifying effects of external influences ... which induce NF-kB-mediated intracellular signaling by reducing NF-kB activity"; claim 9 and claims dependent thereon recite "reducing ... the level of expression of genes which are activated by extracellular influences which induce NF-kB mediated intracellular signaling"; claim 14 and claims dependent thereon recite "reducing bacterial lipopolysaccharide-induced expression of cytokines." ; and claim 18 and claims dependent thereon recite "reducing ...activity so as to reduce intracellular signaling caused by...".

Antibiotic Art has Been Improperly Applied to Claims Requiring Reducing Induced NF-kB Activity in Cells so as to Reduce Intracellular Signaling "Caused By Interlukin-1 or Tumor Necrosis Factor-$\alpha$".

Patentees also specifically discussed claim 18 and claims dependent

ARI 84410

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 25 of 92 of October 22, 2007 Response*

thereon requiring reducing intracellular signaling "caused by" IL-1 or TNF-α. Specifically, Patentees requested clarification of the Examiner's rationale for the position that the use of antibiotics according to a method in the 1970 PDR could inherently anticipate the claimed method. Patentees pointed out that under the rationale advanced in the July 6, 2007 Final Office Action, any reduction in NF-kB activity attributable to the use of an antibiotic according to a method disclosed in the 1970 PDR would have been "caused by" LPS, not by IL-1 or TNF-α.

Examiner Celsa responded that LPS can regulate gene expression of TNF-α and referred Patentees to the July 6, 2007 Final Office Action for further clarification. Patentees have reviewed the July 6, 2007 Final Office Action and find the following passage on page 106: "Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-kB activity resulting in the production of cytokines regulated by NF-kB. Cytokines whose genes are regulated by NF-kB (at least in part) include tumor necrosis factor alpha (TNF-α)." In Exhibit H-10 referenced in the July 6, 2007 Final Office Action, the following passage appears next to claim 18: "Inherent. Reducing LPS by administration of antibiotic for treatment of gram negative bacterial infection necessarily reduces bacterial-induced NF-kB-mediated TNF-α production and resulting TNF-α induced intracellular signaling. *See* Galdiero, Yang, and Mori references (showing LPS regulates gene expression of TNF-α, IL-6, IL-8 and IL-10 via NF-kB)."

Patentees respectfully point out that notwithstanding the factual inaccuracies in the cited passages, particularly the passage from Exhibit H-10, the passages do not state or provide evidence supporting the statement that a method of using an antibiotic according to the 1970 PDR would have necessarily and inevitably involve a method of reducing induced NF-kB activity in the cells so as to reduce intracellular signaling <u>caused by</u> Interleukin-1 or Tumor

ARI 84411

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92 of October 22, 2007 Response*

Necrosis Factor-$\alpha$ in the cells" as required by claim 18 and claims dependent thereon.

Therefore, there is no basis for maintaining the inherent anticipation rejection of claim 18 and claims dependent thereon over the disclosure of the 1970 PDR.

The Examiners agreed to review and reconsider the rejection of claim 18 and claims dependent thereon based on the use of antibiotics to treat bacterial infection according to the 1970 PDR.

ARI 84412

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 27 of 92 of October 22, 2007 Response*

III.    <u>RESPONSE TO ART REJECTIONS</u>

On pages 17-22, the July 6, 2007 Final Office Action sets forth an
interpretation of the claims of the '516 Patent which suggests that
many differently worded claims should be interpreted as having the
same scope.  To limit the issues in these proceedings, Patentees have
herein cancelled more than 90 claims and respectfully direct the
Examiner's attention to the pending rejected independent claims now
pending, i.e. claims 6, 8, 9, 14 and 18, and to claims dependent
thereon.  Patentees maintain that the claim interpretation advanced
in the July 6, 2007 Final Office Action (as well as that advanced in
the earlier August 2, 2006 Office Action) is not applicable to the
these now pending rejected claims.  See, also the Second Declaration
of Dr. Inder Verma, ¶¶ 6-10 , a copy of which is attached hereto as
**Exhibit B.**

The entire contents of the Second Declaration of Dr. Inder Verma as
well as that of the First Declaration of Dr. Verma is hereby
incorporated herein by reference.

**A.    All Rejected Claims Now Pending Are Directed To <u>Reducing</u>
<u>Induced</u> NF-kB Activity**

In the absence of external inducing stimuli, NF-kB is present in  the
cytoplasm of a eukaryotic cell in an inactive form, i.e. there is no
NF-kB activity.  In the presence of external inducing stimuli NF-kB
activity is induced in a cell. Such induced NF-kB activity persists
so long as the external inducing stimuli are present.  Broadly
speaking, there are the two types of methods to obtain a cell
exhibiting reduced NF-kB activity as follows: (a) reducing the
induced NF-kB activity by intervening in the signaling pathway by
which NF-kB activity is manifested including particularly intervening
intracellularly at a specific segment within the signaling pathway;
and (b) preventing the external inducing stimuli from inducing the

ARI 84413

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 28 of 92 of October 22, 2007 Response*

intracellular signaling pathway through which NF-kB activity is manifested.

Certain claims of the '516 Patent as issued covered both such types of methods. However, as discussed further in this response applicants maintain that the rejected claims now pending are directed only to type (a) above. (See, e.g., column 2, lines 20-63; column 10, lines 31-55; column 12, lines 57-66; column 13, line 13 - column 14, line 54; column 16, lines 22-63; and column 17, lines 30-37 of the '516 patent; and First Declaration of Dr. Verma, ¶¶ 5-9.)

In applying the cited art against claims of the '516 patent in the July 6, 2007 Final Office Action the Examiner consistently asserted that the claimed method encompasses administering an inhibitor of NF-kB activity (i) prior to, (ii) simultaneously with, <u>and</u> (iii) subsequent to, administering an inducer of NF-kB activity. (See, e.g. page 27, lines 16-18; page 36, lines 20-22; page 59, lines 4-10; page 80, lines 21-23; page 91, lines 26-29; page 98, lines 12-16; and page 112, lines 24-30 of the July 6, 2007 Final Office Action.) However, with respect to claims 6, 8, 9, 14 and 18, and claims dependent thereon, the only rejected claims now pending, this assertion is not correct. The rejected claims now pending do not encompass either case (i) or case (ii).

    1)    All rejected, pending claims must be given their <u>broadest reasonable interpretation</u>

While a claim under reexamination is to be given a broad interpretation, this interpretation must be *reasonable* in light of the specification. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). Additionally, the claims must be construed as one of skill in the art would construe them. *In re American Academy of Science Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). For the broadest reasonable interpretation of the claims by a person skilled in the

ARI 84414

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 29 of 92 of October 22, 2007 Response*

art see the previously filed Declaration of Dr. Verma, ¶¶ 5-9; and
the Second Declaration of Dr. Verma ¶¶ 6-10 submitted herewith.

The case of *In re Baker Hughes Incorporated* is instructive.  The
patent at issue in *In re Baker* claimed a composition and process used
to inhibit the release of toxic gas from a material comprising a
hydrocarbon and the toxic gas.  *In re Baker Hughes Incorporated*, 215
F.3d 1297, 1299 (Fed. Cir. 2000).  Relying on parts of the
specification that describe hydrocarbons as both liquids and gases,
the Board of Patent Appeals and Interferences held that the broadest
reasonable interpretation of the term "hydrocarbon" included both
gases and liquids.  *Id.* At 1303.  Upon review, the Federal Circuit
reversed this overly broad interpretation because it was inconsistent
with the purpose of the invention as disclosed in the specification.
*See id. (holding that "hydrocarbon" meant only a liquid as* "nowhere
in the written description is there an example of the claimed process
being used with a gaseous hydrocarbon.")

The now pending, rejected claims should not be construed so broadly
that they are given a meaning inconsistent with that which one of
skill in the art would attribute to them.  An interpretation contrary
to that which would be understood by a person skilled in the art is
an unreasonably broad interpretation.  *See In re Cortright*, 165 F.3d
1353, 1359 (Fed. Cir. 1999) (reversing the Examiner's rejection after
finding that one skilled in the art would construe the claim more
narrowly than had the examiner).  When the claim terms "are examined
through the viewing glass of a person skilled in the art," as they
are supposed to be, it becomes clear here that the Examiner's
interpretation is not reasonable.  *Phillips v. AWH Corp*, 415 F.3d
1303, 1313 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 1332
(2006)(quoting *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*,
350 F.3d 1327, 1338 (Fed. Cir. 2003)).  Such broad interpretations
are impermissible.  *See In re Marosi*, 710 F.2d 799 (Fed. Cir. 1983)
(reversing a claim rejection under 35 U.S.C. §§102 or 103 that failed

ARI 84415

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 30 of 92 of October 22, 2007 Response*

to interpret the claim in light of the interpretation which one
skilled in the art would have attributed to the claim).

    2)    Claim 6 Recites "<u>diminishing induced</u> NF-kB-mediated
    intracellular signaling"; Claim 8 Recites <u>modifying</u>
    <u>effects of external influences which induce</u> NF-kB mediated
    intracellular signaling <u>by reducing NF-kB activity</u> in the
    cells <u>such that NF-kB mediated effects ... are modified</u>;
    Claim 9 Recites "<u>reducing</u>, in eukaryotic cells, the level
    of <u>expression of genes which are activated</u>"; Claim 14
    Recites "<u>reducing</u> bacterial lipopolysaccharide-<u>induced</u>
    expression of cytokines"; and Claim 18 Recites "<u>reducing</u>
    Interlukin-1 or Tumor Necrosis Factor-α <u>activity</u> ... so as
    <u>to reduce intracellular signaling caused by</u> Interlukin-1
    or Tumor Necrosis Factor-α in the cells.".

More fully, independent claims 6, 8, 9, 14 and 18 read as follows:

    6. A method for diminishing induced NF-κB-mediated
intracellular signaling comprising reducing NF-κB activity
in cells such that NF-κB-mediated intracellular signaling
is diminished.

    8. A method for modifying effects of external influences on a
eukaryotic cell, which external influences induce NF-κB-
mediated intracellular signaling, the method comprising
reducing NF-κB activity in the cells such that NF-κB-mediated
effects of external influences are modified.[2]

    9. A method for reducing, in eukaryotic cells, the level
of expression of genes which are activated by
extracellular influences which induce NF-κB-mediated
intracellular signaling, the method comprising reducing
NF-κB activity in the cells such that expression of said

---

    [2]Claim 8 depends from canceled claim 7, but is presented
here as if written in independent form to facilitate
discussion.

ARI 84416

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 31 of 92 of October 22, 2007 Response*

genes is reduced.

14. A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

By reciting diminishing induced NF-kB mediated intracellular signaling by reducing NF-kB activity claim 6 is directed to reducing induced NF-kB activity. It is not directed to preventing induction of the NF-kB signaling pathway. Thus, only art involving administering an inhibitor subsequent to administering an inducer is relevant to the patentability of this claim.

Claim 8 recites modifying effects of external influence which induce NF-kB-mediated intracellular signaling by reducing NF-kB activity. The effects of external influences which induce NF-kB-mediated intracellular signaling result from the induction of the NF-kB signaling pathway caused by the external influence and the resulting NF-kB activity. Reducing this resulting NF-kB activity equates with reducing induced NF-kB activity. Thus, only art involving administering an inhibitor subsequent to administering an inducer is relevant to the patentability of this claim.

Similarly, claim 14 which recites reducing bacterial lipopolysaccharide induced expression of cytokines is directed to reducing induced NF-kB activity. It is not directed to preventing

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 32 of 92 of October 22, 2007 Response*

induction of the NF-kB signaling pathway. Thus, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to its patentability.

Claim 9 recites <u>reducing</u> the level of expression of genes which are <u>activated by extracellular influences which induce</u> NF-kB-mediated intracellular signaling. Thus, claim 9 is directed to reducing induced NF-kB activity. It is not directed to preventing induction of the NF-kB signaling pathway. Once again, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to the patentability of the claim.

Finally, claim 18 recites reducing IL-1 or TNF-$\alpha$ <u>activity</u> by reducing <u>NF-kB activity</u> in cells <u>so as</u> to <u>reduce intracellular signaling caused by</u> IL-1 or TNF-$\alpha$. Since IL-1 and TNF-$\alpha$ are inducers of NF-kB activity, claim 18 concerns reducing IL-1 or TNF-$\alpha$ induced NF-kB activity. Therefore, only art disclosing administration of an inhibitor subsequent to administering an inducer is relevant to its patentability.

In summary, none of claims 6, 8, 9, 14 or 18 (or the claims dependent thereon) can properly be construed to encompass administering an inhibitor of NF-kB activity (i) prior to or (ii) simultaneously with, administration of an inducer of NF-kB activity.

     3)    Each of Claims 64-69, 75-80, 88-93, 139-144, 177, 178, and 182 Is Directed To Reducing Induced NF-kB Activity By Carrying Out A Specific Step Inside a Cell.

Each of claims 64-69, 75-80, 88-93, 139-144, 177, 178 and 182 specify that the reducing of induced NF-kB activity is effected by a specified step which is one of the following:

    i.   decreasing the level of NF-kB not bound in an NF-kB:IkB complex;

    ii.  inhibiting passage of NF-kB into the nucleus;

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 33 of 92 of October 22, 2007 Response*

    iii.  inhibiting modification of an IkB protein;

    iv.  inhibiting degradation of an IkB protein;

    v.  inhibiting dissociation of NF-kB: IkB complexes; or

    vi.  reducing binding of NF-kB to NF-kB recognition sites.

Each of these steps, with the broadest reasonable interpretation attributable to it, requires that the step of reducing induced NF-kB activity take place at a specific intracellular segment within the NF-kB intracellular signaling pathway. (See first Declaration of Dr. Verma ¶¶ 14-15; and Second Declaration of Dr. Verma ¶¶ 10) To construe each of these claims as the Examiner has suggested, i.e. as covering reducing NF-kB activity by a step which occurs anywhere within the NF-kB intracellular signaling pathway is unreasonable in view of the requirement of 35 U.S.C. §112, paragraph 4, that a dependent claim must further define and limit the claim from which it depends.

Thus, each of dependent claims 64-69, 75-80, 88-93, 139-144, 177, 178 and 182, properly construed, specify a specific subcase in which the step of reducing induced NF-kB activity involves intervening at a specified segment within the NF-kB intracellular signaling pathway. To construe these claims otherwise is unreasonable.

B.    **The Rejected Claims Now Pending Are Not Anticipated By The Cited Art. For Each Rejected Claim It Has Not Been Shown That Every Element Occur Explicitly or Necessarily Occurs in the Cited Art. Moreover, Certain Cited Art Clearly Does Not Enable The Method Described Therein So That Even If Each Element Of A Rejected Claim Were Disclosed In The Cited Art Such Art Would Not Anticipate.**

The now pending, rejected claims are the following:

    a.    Claim 14 and claims 139, 140 and 144-147 which depend therefrom;

ARI 84419

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 34 of 92 of October 22, 2007 Response*

    b.   Claim 18 and claims 177, 178 and 182-185 which depend therefrom;

    c.   Claim 6 and claims 64-73 which depend therefrom;

    d.   claim 8 and claims 75-80, 82 and 84 which depend therefrom; and

    e.   claim 9 and claims 88-97 which depend therefrom.

For any of these rejected claims to be properly rejected each and every element of such claim must be disclosed in a single prior art reference, either explicitly or inherently, and such allegedly anticipating prior art reference must enable the allegedly anticipating disclosure.

In the sections which follow Patentees explain that the rejected claims now pending, are not anticipated, either inherently or explicitly, by the art cited against such claims. In support of their position Patentees submit as **Exhibit B** a Second Declaration of Dr. Inder Verma.

Certain of the art rejections in the July 6, 2007 Final Office Action are based on alleged explicit anticipation; other rejections are based on alleged inherent anticipation.

With respect to the inherent anticipation rejections, Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to allegedly "explain" the prior art. Patentees do not repeat that explanation in its entirety but hereby incorporate that response by reference into this response. Patentees note, however, that the Examiner appears to have ignored the fact that <u>none</u> of the purported extrinsic evidence concerns what occurred in the cited prior art. The Examiner does not

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 35 of 92 of October 22, 2007 Response*

dispute that <u>none</u> of the purported extrinsic evidence relates to any effort to reproduce any experiment in the cited art.  Instead, the Examiner has merely asserted that "enablement and not actual use is the legal standard for demonstrating inherency." (See, e.g., page 97, line 19; page 93, lines 18-20 of the July 6, 2007 Final Office Action.) and  proceeded to maintain the inherent anticipation rejections notwithstanding that <u>none</u> of the extrinsic evidence being relied upon addressed what element(s) of the claim necessarily and inevitably occurred in any specific cited reference.

Patentees certainly agree that for any anticipation rejection it is required that a prior art reference "must enable that which it is asserted to anticipate."  *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003).  A proper <u>inherent</u> anticipation rejection, however, must additionally include evidence to "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

Patentees, therefore, respectfully submit that all of the inherent anticipation rejections of record are fatally defective. Nevertheless, Patentees below explain why notwithstanding this improper reliance on the so-called extrinsic evidence, none of the cited art anticipates the rejected claims now pending.


    1)   CLAIM 14 AND CLAIMS 139, 140 and 144-147 WHICH DEPEND THEREON

Each of claims 14, 139, 140 and 144-147 is rejected solely on the ground that the claimed method is inherently anticipated by the disclosure in the 1970 PDR of instructions for using three antibiotics (gentamycin, tetracycline, and erythromycin).  In support of this ground of rejection the Examiner relies upon the *Manolagas*

ARI 84421

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 36 of 92 of October 22, 2007 Response*

*Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704),
*Yang* et al. (Nature *395(1998)* 284-288), *Mori* et al. (Eur. J.
Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi*
et al. *(J.* Immunology 175(2005) 8069-8076) which perport to "explain"
the disclosure in the 1970 PDR.

As an initial matter Patentees note that none of claims 14, 139, 140,
or 144-147 are specifically discussed in the July 6, 2007 Final
Office Action.  Rather these claims are merely grouped with other
claims which are worded differently and have different scopes.
Properly construed, these claims are not subject to the reasoning set
forth on pages 105-111 of the July 6, 2007 Final Office Action.

Patentees further note that in ¶¶ 113-123 of the Second Declaration
of Dr. Inder Verma, Exhibit B hereto, Dr. Verma discusses the flaws
in the Examiner's reasoning.  See particularly the table in ¶ 113
which provides a point by point discussion in response to the
Examiner's Rejection Summary on pages 105-107 of the July 6, 2007
Final Office Action; ¶ 114; ¶ 118; ¶ 119; and ¶¶ 121-123.

In the sections that follow, Patentees provide three reasons, each
of which is sufficient to require withdrawal of the inherent
anticipation rejection of claim 14, 139, 140 and 144-147 based on the
1970 PDR.  Patentees have additionally provided a fourth reason for
withdrawing the rejection as applied to claims 139, 140, and 144.

> a)   *The Method of Claim 14 and Claims Dependent Thereon Does
>      Not Occur In Any Person To Whom Antibiotics Are
>      Administered.*

According to the rationale advanced on pages 105-111 of the July 6,
2007 Final Office Action, administration of antibiotics to treat a
gram-negative bacterial infection results in killing the bacteria
which therefore no longer produce lipopolysaccharide ("LPS"), a known

ARI 84422

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 37 of 92 of October 22, 2007 Response*

inducer of NF-kB activity. Because there is less LPS in the subject to induce NF-kB activity, NF-kB activity is reduced.

Patentees respectfully point that even if this rationale as stated were accurate, it leads to the conclusion that administration of antibiotics, by killing gram-negative bacteria and causing a reduction in the level of LPS prevent induction of the NF-kB intracellular signaling pathway. This rationale does not support the conclusion that administering antibiotics, by killing gram-negative bacteria, and causing a reduction in the level of LPS, is reducing induced NF-kB activity as recited in claim 14 and in claims 139, 140 and 144-147 which depend therefrom.

As explained at length in the specification and by Dr. Verma, NF-kB is a nuclear transcription factor that unless and until activated is present only in an inactive complex in the cytoplasm of a eukaryotic cell. Upon activation by an external influence or stimulus capable of inducing activation the NF-kB signaling pathway, e.g. LPS, the inactive complex dissociates and NF-kB is created in a form which travels to the nucleus of the cell where it binds to specific binding recognition sites on genes that are regulated by NF-kB, resulting in transcription and often expression of such genes. Thus, although LPS when present induces NF-kB activity, its absence, as a result of administering an antibiotic has not effect on previously induced NF-kB activity, and such administration certainly does not involve reducing NF-kB activity. (See, e.g. column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; column 16, lines 22-63 of the subject patent; Declaration of Dr. Verma ¶¶ 8, 9; and Second Declaration of Dr. Verma ¶¶ 114.)

Because claim 14, 139, 140 and 144-147 recite reducing bacterial LPS-induced NF-kB activity, the administration of antibiotics cannot and does not result in the practice of the method recited in these claims.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 38 of 92 of October 22, 2007 Response*

For this reason alone, the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

> b)  *Performing Any Method Involving Administering An Antibiotic According To The Disclosure of the 1970 PDR Only Results In Killing Gram-Negative Bacteria Sometimes. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily or Inevitably Occurred.*

As Patentees' representative explained during the August 22, 2007 Examiner Interview and as Dr. Verma explained in his first Declaration in paragraph 128, resistant strains of gram-negative bacteria are widespread. Antibiotics would not kill such resistant strains contrary to the Examiner's rationale that administering antibiotics would kill such bacteria and thereby effect reduced levels of LPS and consequently reduced NF-kB activity. Resistant strains of gram-negative bacteria would continue to produce LPS, which would continue to induce the NF-kB signaling pathway. Thus, not only would administering the antibiotic not involve reducing LPS-induced NF-kB activity, such administration would not prevent further LPS-induced NF-kB activity from occurring.

Claims 14, 139, 140 and 144-147 are rejected as inherently anticipated by the administration of antibiotics according to the disclosure in the 1970 PDR. However, the 1970 PDR does not disclose each and every element of these claims as required for an anticipation rejection. Thus, the July 6, 2007 Final Office Action relies on purported extrinsic evidence including references published after the effective filing date of the rejected claims to argue that each and every element of the claimed method would inherently occur if antibiotics were used in a method according to the instructions in the 1970 PDR.

ARI 84424

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 39 of 92 of October 22, 2007 Response*

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

Even if the three cited antibiotics disclosed in the cited 1970 PDR *did* work as postulated by the Examiner, they only did so *sometimes*. The 1970 PDR does not teach a) which patients are infected with gram-negative bacteria as opposed to those infected with gram-positive bacteria or how to identify such patients b) which patients are infected by a strain which is not resistant to treatment by the antibiotics or how to identify such non-resistant strains of gram-negative bacteria, or c) which gram-negative bacteria produce LPS capable of inducing NF-kB activity since not all such bacteria produce LPS. Therefore, administering an antibiotic as instructed in the 1970 PDR would at most lead to occasional killing of gram-negative bacteria that produce LPS capable of inducing NF-kB. Therefore, the Examiner's theory at best shows that administration of an antibiotic as instructed in the 1970 PDR may, *possibly*, kill gram-negative bacteria that may possibly produce LPS capable of inducing NF-kB. (Declaration of Dr. Verma ¶¶ 128; and Second Declaration of Dr. Verma ¶¶ 113-114, 122-123)

However, a showing of mere "probabilities or possibilities" is insufficient to support a finding of inherent anticipation. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that <u>could be used</u> to obtain the same result). Where practice of the prior art only sometimes encompassed all elements of the claims, the art was held <u>not</u> to inherently anticipate because "occasional results are not

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 40 of 92 of October 22, 2007 Response*

inherent." *See Mehl/Biophile Int'l. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that prior art did not anticipate a claim requiring a substantially vertical orientation even though use of the prior art method would sometimes result in such an orientation). See, also, *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) (affirming a district court holding that practice of a prior art method sometimes yielding crystals of one polymorph but other times yielding crystals of another polymorph did not inherently anticipate a claim reciting only one of the polymorphs.)

In *Perricone v. Medicis Pharmaceutical Corporation*, a district court held a method claim for treating a sunburn by applying a specific compound to the affected area was inherently anticipated by prior art disclosing "topical application" of the compound to the skin. On appeal, the Federal Circuit reversed the finding of inherent anticipation determining that the prior art did not anticipate the claim and stating "the district court's inherency analysis goes astray because it assumes what [the prior art] neither disclosed nor rendered inherent" because the prior art did not disclose applying the compound to a skin sunburn. *Perricone v. Medicis Pharmaceutical Corporation*, 432 F.3d 1368, 1378 (Fed. Cir. 2005). It was deemed irrelevant that the prior art compound *may* sometimes have been applied to sunburned skin. *Id.* At 1379.

In the present case, the administration of antibiotics according to the 1970 PDR may at most, result in killing gram-negative bacteria, which is contrary to a critical assumption in the Examiner's theory how administration of an antibiotic anticipates the method of claim 14. Thus, even if the Examiner's rationale is accepted, occasional results are insufficient to establish inherent anticipation under controlling Federal Circuit precedent.

For this reason alone, the inherent anticipation rejection of claims

ARI 84426

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 41 of 92 of October 22, 2007 Response*

14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.


  c)  *The Occasional Results Obtainable Following the Disclosure*
      *of the 1970 PDR Are Not Sufficient to Enable the Method*
      *Disclosed And Therefore Cannot Anticipate Claim 14 and*
      *Claims Dependent Thereon.*


The occasional results that would have been obtained by practicing
the method of administering antibiotics in the 1970 PDR are
insufficient to enable the method disclosed and therefore cannot
anticipate claim 14 and claims dependent thereon.


"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate. A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled" *Elan
Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted). Courts have refused to find
anticipation based on prior art that is not enabling. For instance,
in *Rockwell Intern. Corp v.U.S.*, the Federal Circuit refused to
invalidate patent claims based on prior art which did not "provide
sufficient basic chemistry information to enable one skilled in the
art to grow epitaxial . . . semiconductors" (i.e. practice the
claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358,
1364 (Fed. Cir. 1998). Likewise, in *Application of Sheppard*, the
Court of Customs and Patent Appeals held that a prior art reference
which may have disclosed either the claimed compound *or* a different
compound was not enabling and therefore could not anticipate the
claim at issue. *Application of Sheppard*, 339 F.2d 238, 241-242
(C.C.P.A., 1964).


The 1970 PDR does not teach a) which patients are infected with gram-
negative bacteria or how to identify such patents b) which patients

ARI 84427

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 42 of 92 of October 22, 2007 Response*

are infected by a strain of gram-negative bacteria which is not resistant to treatment by the antibiotics or how to identify such non-resistant strains or c) which gram-negative bacteria produce LPS capable of inducing NF-kB activity since not all such bacteria produce LPS. Therefore, administering an antibiotic as set forth in the 1970 PDR would at most lead to occasional killing of gram-negative bacteria that produce LPS capable of inducing NF-kB. (Declaration of Dr. Verma ¶¶ 128; and Second Declaration of Dr. Verma ¶¶ 113-114, 122-123)

Prior art whose disclosure would have only sometimes led to the practice of the claimed method, like the prior art in *Rockwell* and *Sheppard*, does not enable one skilled in the art to practice the claimed method. The Examiner's rationale for the rejection, even if factually correct, at most shows that administration of antibiotics according to the 1970 PDR may *sometimes* kill gram-negative bacteria that produce LPS capable of inducing NF-kB. Accordingly, the 1970 PDR is not enabling for the method upon which the Examiner relies and the 1970 PDR cannot anticipate claim 14 and claims dependent thereon.

For this reason alone, the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR should be withdrawn.

> d)  *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Recited in Claims 139, 140 and 144.*

Dependent claims 139, 140 and 144 further limit claim 14 by reciting that reducing induced NF-kB activity occurs as a result of a step inside the cell. The Examiner's theory as to how the use of antibiotics anticipate these claims involves antibiotics killing gram-negative bacteria outside the cell so as to reduce the levels

ARI 84428

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 43 of 92 of October 22, 2007 Response*

of LPS present outside the cell. Therefore, claims 139, 140 and 144 should not be rejected as inherently anticipated by the 1970 PDR.

Claim 139 requires that reducing LPS-induced NF-kB activity be effected "by decreasing the level of NF-kB not bound in an NF-kB:IkB complex." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve decreasing the level of NF-kB not bound in an NF-kB:IkB complex. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121.)

Claim 140 requires that reducing LPS-induced NF-kB activity be effected "by inhibiting the passage of NF-kB into the nucleus of cells." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve inhibiting the passage of NF-kB into the nucleus of cells. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121.)

Claim 144 requires that reducing LPS-induced NF-kB activity be effected by a step that "comprises reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB." Neither the 1970 PDR nor the purported extrinsic evidence show that antibiotics or reduced LPS levels involve reducing binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 121)

In conclusion, Patentees have provided three reasons each of which independently warranting withdrawal of the inherent anticipation rejection of claims 14, 139, 140 and 144-147 based on the 1970 PDR. Patentees have additionally provided a fourth reason requiring warranting the rejection of claims 139, 140 and 144.

Because the inherent anticipation rejection of claims 14, 139, 140 and 144-147 is the only ground of rejection of these claims in the

ARI 84429

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 44 of 92 of October 22, 2007 Response*

July 6, 2007 Final Office Action, Patentees respectfully submit that
the rejection of claims 14, 139, 140 and 144-147 should be withdrawn
and these claims should be confirmed patentable.

ARI 84430

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 45 of 92 of October 22, 2007 Response*

2)   CLAIM 18 AND CLAIMS 177, 178 AND 182-185 WHICH DEPEND THEREFROM

Each of claim 18, 177, 178 and 182-185 are rejected as allegedly inherently anticipated by the disclosure in the 1970 PDR of instructions for administering three antibiotics (gentamycin, tetracycline, and erythromycin.) In support of these rejections the Examiner relies upon the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395 (1998)* 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076) which purport to "explain" the disclosure in the 1970 PDR.

Claim 18 and dependent claims 182-185 have additionally been rejected as allegedly anticipated by Staal et al., PNAS 87:9943 (Dec. 1990).

Therefore claims 177 and 178, are only rejected as allegedly inherently anticipated by the 1970 PDR.

Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to support the inherent anticipation rejections based on the antibiotics disclosed in the 1970 PDR and do not repeat that explanation here.

Patentees explain below the deficiencies in both the inherent anticipation rejection based on the 1970 PDR, and the anticipation rejection based on Staal et al.

ARI 84431

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 46 of 92 of October 22, 2007 Response*

Rejection Based on Antibiotic Art

As an initial matter Patentees note that none of claims 18, 177, 178
and 182-185 are specifically discussed in the July 6, 2007 Final
Office Action.  Rather these claims are merely grouped with other
claims which are worded differently and have different scopes.
Properly construed, these claims are not subject to the reasoning set
forth on pages 105-111 of the July 6, 2007 Final Office Action.

Patentees further note that in ¶¶ 113-123 of the Second Declaration
of Dr. Inder Verma, Dr. Verma discusses the flaws in the Examiner's
reasoning.  See particularly the table in ¶ 113 which provides a
point by point discussion in response to the Examiner's Rejection
Summary on pages 105-107 of the July 6, 2007 Final Office Action; ¶
114; ¶ 118; ¶ 120; and ¶¶ 121-123.

In the preceding Section, Patentees have provided four reasons why
claim 14 and claim dependent thereon are patentable over the 1970
PDR.  Each of the four reasons is also applicable to claim 18 and
claims dependent thereon.  Patentees do not repeat the explanations
here, but instead summarize them as follow:

a)   *The Method of Claim 18 and Claims Dependent Thereon Does
     Not Occur In Any Person To Whom Antibiotics Are
     Administered.*

b)   *Performing Any Method Involving An Antibiotic According To
     the 1970 PDR Only Results In Killing Gram-Negative
     Bacteria Sometimes.  Such Occasional Results Are Not
     Sufficient To Establish An Element of the Claims
     Necessarily Or Inherently Occurs.*

c)   *The Occasional Results Obtainable Following the Disclosure
     of the 1970 PDR Are Not Sufficient to Enable the Method*

ARI 84432

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 47 of 92 of October 22, 2007 Response*

> *Disclosed And Therefore Cannot Anticipate Claim 18 and Claims Dependent Thereon.*

d)  *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Required by Claims 177, 178 and 182.*

Accordingly, Patentees respectfully request that the Examiner reconsider and withdraw the inherent anticipation rejection of claim 18 and claims dependent thereon in view of each of these four reasons, and the discussion by Dr. Verma with respect to claim 18 and claims dependent thereon. (Declaration of Dr. Verma ¶¶ 127; and Second Declaration of Dr. Verma ¶¶ 120-121)

Furthermore, there is another reason why administering antibiotics according to the 1970 PDR does not anticipate claim 18 and claims dependent thereon.

e)  *Administering Antibiotics Does Not Involve Reducing NF-kB Activity "caused by" Il-1 or TNF-α.*

Claim 18 recites reducing NF-kB activity so as to reduce intracellular signaling "caused by" IL-1 or TNF-α. Antibiotics have no effect on intracellular signaling caused by IL-1 or TNF-α. While in the July 6, 2007 Final Office Action antibiotics are asserted to reduce levels of LPS, claim 18 is not directed to NF-kB activity induced by LPS. (Declaration of Dr. Verma ¶¶ 126-127; and Second Declaration of Dr. Verma ¶¶ 120) Claim 18 is directed to reducing NF-kB activity "caused by" IL-1 or TNF-α. There is no explanation whatsoever in the record how antibiotics could be used for reducing NF-kB activity caused by IL-1 or TNF-α.

ARI 84433

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 48 of 92 of October 22, 2007 Response*

Patentees have reviewed the July 6, 2007 Final Office Action and noted the following passage on page 106: "Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-kB activity resulting in the production of cytokines regulated by NF-kB. Cytokines whose genes are regulated by NF-kB (at least in part) include tumor necrosis factor alpha (TNF-$\alpha$)." In Exhibit H-10 referenced by the July 6, 2007 Final Office Action, the following passage appears next to claim 18: "Inherent. Reducing LPS by administration of antibiotic for treatment of gram negative bacterial infection necessarily reduces bacterial-induced NF-kB-mediated TNF-$\alpha$ production and resulting TNF-$\alpha$ induced intracellular signaling. *See* Galdiero, Yang, and Mori references (showing LPS regulates gene expression of TNF-$\alpha$, IL-6, IL-8 and IL-10 via NF-kB)." Notwithstanding the factual inaccuracies in the cited passages, particularly the passage from Exhibit H-10, Patentees respectfully point out that these passages do not even allege that administering an antibiotic as disclosed in the 1970 PDR involves reducing "NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-$\alpha$ in the cells" as required by claim 18 and claims dependent thereon.

In fact, the rationale advanced by the Examiner, that administering an antibiotic results in reduced levels of LPS and therefore reduced LPS-induced NF-kB activity is inapplicable to claims 18 and claims dependent thereon. Moreover, the LPS - induced NF-kB intracellular signaling pathway is separate from either the IL-1-or the TNF$\alpha$-induced NF-kB intracellular signaling pathway.

Each of the foregoing reasons a) through e) are independently sufficient to warrant withdrawal of the inherent anticipation rejection based on the 1970 PDR of claim 18 and claims 177, 178 and 182-185 dependent thereon.

Moreover, because the inherent anticipation rejection based on the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 49 of 92 of October 22, 2007 Response*

1970 PDR is the only rejection raised against dependent claims 177 and 178 in the July 6, 2007 Final Office Action, Patentees respectfully submit that claims 177 and 178 should be confirmed patentable based on the foregoing reasons.


## Rejection Based on NAC Art

Claims 18 and 182-185 are further rejected on pages 111-113 of the July 6, 2007 Final Office Action as allegedly anticipated by Staal et al., who disclose that N-acetyl-L-cysteine ("NAC") "prevents this thiol decrease [which leads to NF-kB activation] and blocks the activation of NF-kB". (Abstract of Staal et al.)

In ¶¶ 106-112 of the Second Declaration of Dr. Inder Verma, Dr. Verma provides a detailed rebuttal to the reasoning set forth by the Examiner in support of the rejection of claim 18 and 182-185 over Staal et al.

In addition, Patentees provide the following reasons why the rejection over Staal et al., should be withdrawn.

> a)  *The Experiments Disclosed in Staal et al., Do Not Involve The Method of Claim 18 or Claims 182-185 Which are Dependent Thereon.*

As explained above, claim 18 recites a method "comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-$\alpha$ in the cells." "Caused By" is clearly past tense. Therefore claim 18 is directed to a method where there is intracellular signaling caused by IL-1 or TNF-$\alpha$, i.e. there is induced NF-kB activity.

All of the experiments of Staal et al. involve simultaneous treatment

ARI 84435

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 50 of 92 of October 22, 2007 Response*

with TNF-α and NAC.   There is no disclosure in Staal et al. of any
method involving using NAC for reducing IL-1 or TNF-α induced NF-kB
activity, i.e. reducing NF-kB activity so as to reduce intracellular
signaling caused by  IL-1 or TNF-α (Declaration of Dr. Verma ¶¶ 160-
162; and Second Declaration of Dr. Verma ¶¶ 106-109, 112)


In fact, NAC does not reduce induced NF-kB activity according to
Staal et al. themselves  Staal et al. point out that "low thiol
levels are required for _activation_" of NF-kB. (Page 9943, right
column, second full paragraph.)   Staal et al. elucidated that NAC
prevents the decrease of intracellular thiol levels.   For example,
in their Abstract, Staal et al. disclose that NAC "prevents this
thiol decrease [which leads to NF-kB activation] and blocks the
activation of NF-kB".   Decreasing thiol levels would have no effect
on induced NF-kB activity.  (Second Declaration of Dr. Verma ¶¶ 108)


Similarly, Staal et al., state that their findings demonstrate that
NAC blocks or inhibits cytokine-stimulated NF-kB activation.   Staal
et al. do not state that their findings show reducing cytokine-
stimulated NF-kB activity.


Accordingly, Staal et al. do not anticipate claim 18 or claims 182-
185.


    b)    *Staal et al. Do Not Enable the Method of Claim 18 or
          Claims 182-185.*


"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate.  A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures cited as prior art are not enabled" *Elan
Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted).  Courts have refused to find

ARI 84436

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 51 of 92 of October 22, 2007 Response*

anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The experiments in Staal et al. cannot be reproduced, and therefore, Staal et al. cannot anticipate the method recited in claims 18 or 182-185. Staal et al. do not describe how to obtain the cells they use. Specifically, the Jurkat tri-kB cells of Staal et al. were not available to, and could not be reproduced by the public, because the source of these cells is a "personal communication." (Second Declaration of Dr. Verma ¶¶ 110-111)

Since Staal et al., does not enable practicing the experiments which the Examiner relies upon as establishing an anticipation of claims 18 and 185-185, the rejection of these claims over Staal et al. should be withdrawn.

> c)    *Staal et al. Do Not Anticipate Reducing Induced NF-kB*
>       *Activity in Human Cells as Recited in Claim 183.*

The cells Staal et al. used were not only unavailable to the public, they were not human cells. (Second Declaration of Dr. Verma ¶¶ 109-110)

Therefore, to contrary to the Examiner's ground of rejection claim 183 which recites the method performed in human cells, is not

ARI 84437

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 52 of 92 of October 22, 2007 Response*

anticipated by Staal et al.

In conclusion, Patentees have provided two reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejection over Staal et al. as applied to claims 18 and 182-185. Patentees have additionally provided a third reason warranting withdrawal of the anticipation rejection based on Staal et al. as applied to claim 183.

Accordingly, Patentees respectfully submit that claims 18 and 177, 178 and 182-185 dependent thereon should be confirmed patentable.

ARI 84438

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 53 of 92 of October 22, 2007 Response*

### 3) CLAIMS 6, 8 AND 9 AND CLAIMS DEPENDENT THEREON

Each of the following claims has been rejected based on art relating to each of the same six compounds (or classes of compounds):

Claim 6 and claims 64, 65 and 69-73 dependent thereon;
Claim 8 and claims 75, 76, 80, 82 and 84 dependent thereon; and
Claim 9 and claims 88, 89 and 93-97 dependent therein.

Specifically, each of these claims is rejected as follows:

### 1. Antibiotic Art

The claims are rejected as allegedly inherently anticipated by the 1970 PDR disclosure of the use of three antibiotics (gentamycin, tetracycline, and erythromycin), as explained by purported extrinsic evidence in the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395 (1998)* 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076), as set forth on pages 105-110 of the July 6, 2007 Final Office Action.

### 2. CsA Art

The claims are rejected as allegedly: i) anticipated, or alternatively rendered obvious under §103, by *Schmidt* et al., *J. Virology* 64:4037-4041 (August 1990), as set forth on pages 35-42 of the July 6, 2007 Final Office Action;

ii) anticipated, or alternatively rendered obvious under 103, by *Emmel* et al., Science, *246* (Dec. 1989): 1617-20, as set forth on pages 42-47 of the July 6, 2007 Final Office Action;

iii) anticipated, or alternatively, rendered obvious under § 103, by *Brini,* Eur. Cytokine Net. 1: 131 -139 (Sept. 1990), as set forth on pages 47-54 of the July 6, 2007 Final Office Action;

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 54 of 92 of October 22, 2007 Response*

iv) inherently anticipated by the Physician's Desk Reference (PDR: 1985, pages 1811-13), *Griffith I* (Griffith et al., Ann. Surg. <u>196</u> (9/82):324-329), or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. <u>99</u> (12/84): 952-957), as evidenced by *Holschermann* et al., Circulation <u>96</u> (12/97) 4232-4238, as set forth on pages 54-66 of the July 6, 2007 Final Office Action;

v) inherently anticipated by *Reed* et al., J. Immunol. *137* (7/86): 150-154, as evidenced by *Brini,* Eur. Cytokine Net. 1:131-139 (Sept. 1990), as set forth on pages 66-74 of the July 6, 2007 Final Office Action; and

vi) inherently anticipated by *Kronke* et al. (PNAS USA 81(8/84) 5214-5218) and/or *Siebenlist* et al. (Mol. Cell. Biol. *6* (9/86) 3042-3049), as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al., Science, *246* (Dec. 1989):1617-20, and the *Dr. Manolagas Declaration*, as set forth on pages 74-78 of the July 6, 2007 Final Office Action.

3. <u>Protein Kinase C Art</u>
The claims are rejected as allegedly: i) anticipated by, or as obvious over, *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43), as set forth on pages 25-31 of the July 6, 2007 Final Office Action, and

ii) anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30), as set forth on pages 31-34 of the July 6, 2007 Final Office Action.

4. <u>Vitamin D Art</u>
The claims are rejected as inherently anticipated by *Tsoukas* (Science *224* (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74(8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. *74* (10/84) 1451-5), and *Manolagas* et al. (JCE&M, 63 (1986) 394-400), as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the

ARI 84440

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 55 of 92 of October 22, 2007 Response*

*Declaration of Dr. Manolagas* (paragraphs 7-24), as set forth on pages 78-89 of the July 6, 2007 Final Office Action.

5. 5-ASA Art

The claims are rejected as inherently anticipated by *Dew* (Br. Med. J. *287* (7/83):23-24)), as evidenced by *Baldwin II* (J. Clin. Invest. 107(1991):63-80), *Bantel* et al. (Amer. J. Gastroenterology *287* (2000):3452), *Yan* et al. (J. Biol. Chem. *274* (1999) 366631-36), and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application, as set forth on pages 90-94 of the July 6, 2007 Final Office Action.

6. Glucocorticoid Art

The claims are rejected as inherently anticipated by *Goodman and Gilman's* (The Pharmacological Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner), as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81), *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman I1* (Science 270 (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95), and - *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448) as set forth on pages 94-105 of the July 6, 2007 Final Office Action.

In addition, each of claims 66-68 (dependent on claim 6), claims 77-79 (dependent on claim 8), and claims 90-92 (dependent of claim 9) have been rejected based on art relating to only CsA and 5-ASA.

Patentees incorporate by reference their comments concerning this art as set forth in their November 6, 2006 response, and the first Declaration of Dr. Inder Verma.

Patentees also direct the Examiner's attention to the Second Declaration of Dr. Inder Verma and specifically to the following

ARI 84441

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 56 of 92 of October 22, 2007 Response*

paragraphs:

    1.  Antibiotics ...........¶¶ 113-118 and 121-123

    2.  CsA .................¶¶ 11-58

    3.  Protein Kinase C .....¶¶ 59-70

    4.  Vitamin D/Calcitrol...¶¶ 71-86

    5.  5-ASA ...............¶¶ 96-105

    6.  Glucocorticoids ......¶¶ 87-95

ARI 84442

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 57 of 92 of October 22, 2007 Response*

<u>Rejections Based on Antibiotic Art</u>

Patentees have provided above four reasons why claim 14 is patentable over the 1970 PDR above. Each of these four separate reasons is also applicable to claims 6, 8 and 9 and claims dependent thereon. Patentees do not repeat the detailed explanations here, but instead summarize the reasons as follow:

    a)   *The Methods of Each of Claims 6, 8 and 9 and of Claims Dependent Thereon Do Not Occur In Any Person To Whom Antibiotics Are Administered. At most administering antibiotics prevents induction of the NF-kB intracellular signaling pathway. A method which comprises administering antibiotics is not a method which involves reducing induced NF-kB activity.*

    b)   *Performing Any Method Involving Administering An Antibiotic According To the 1970 PDR Only Sometimes Results in Killing Gram-Negative Bacteria. Such Occasional Results Are Not Sufficient To Establish An Element of the Claims Necessarily Or Inevitably Occurred.*

    c)   *The Occasional Results Obtainable following the Disclosure of The 1970 PDR Are Not Sufficient to Enable the Methods Disclosed And Therefore Cannot Anticipate Any Of Claim 6, 8 or 9 or Any Claim Dependent Thereon.*

    d)   *Administering An Antibiotic As Disclosed In The 1970 PDR Does Not Anticipate Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway At A Specified Segment as Required by each of Claims 64, 65, 75, 76, 80, 88, 89 and 93.*

Accordingly, Patentees respectfully request that the Examiner reconsider and withdraw the inherent anticipation rejection based on

ARI 84443

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 58 of 92 of October 22, 2007 Response*

antibiotic art as applied against each of claims 6, 8 and 9 and claims dependent thereon in view of each of the preceding four reasons, and the discussion by Dr. Verma with respect to claims 6, 8 and 9 and claims dependent thereon. (Declaration of Dr. Verma ¶¶ 126-131; and Second Declaration of Dr. Verma ¶¶ 113-123)

## Rejections Based on Cyclosporin A Art

Two types of anticipation rejections are set forth in the July 6, 2007 Final Office Action: anticipation based on a purported explicit disclosure and anticipation based on an alleged inherent disclosure. Patentee in their November 9, 2006 response have pointed out the deficiencies in the extrinsic evidence relied upon as establishing an inherent anticipation.  In the sections that follow, Patentees provide additional reasons, each of which alone is sufficient to warrant withdrawal of all rejections based on CsA Art.  See the Second Declaration of Dr. Inder Verma ¶¶ 11-58 for detailed comments on the July 6, 2007 Final Office Action.

> a)   *The Use of Cyclosporin A in The Cited Art Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Each of Claims 6, 8 and 9 and Claims Dependent Thereon.*

Using CsA does not, and cannot, involve reducing induced NF-kB activity.  CsA is not shown as reducing induced NF-kB activity in any of the cited references.  At most certain of the cited references may be interpreted to suggest that use of CsA prevents induction of the NF-kB intracellular pathway.  Importantly, a number of examples in the cited references clearly indicate that using CsA does not involve reducing induced NF-kB activity.  For example, Schmidt et al. state, "direct addition of CsA to a prepared nuclear extract from activated cells <u>had no effect</u> on the factor binding, including binding of kB-binding factors (data not shown), <u>which suggests that inhibition</u>

ARI 84444

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 59 of 92 of October 22, 2007 Response*

occurs during the activation phase of NFAT-1 or the kB complex"
(emphasis added, page 4038, second column, second paragraph).
Further, Kronke et al., also of record, teach "when added 4 hr after
induction, CsA did not alter TCGF mRNA levels" (emphasis added, page
5216, 2nd column, second paragraph). Finally, although induction of
TCGF, also known as interleukin-2 (IL-2), is thought to be regulated
by NF-kB, Reed et al., also of record, point out that "previous
studies by us and by others have demonstrated that CsA (1 to 5ug/ml)
does not interfere directly with IL 2 receptor function in that CsA
fails to suppress IL 2-induced proliferation in long-term cultures
of activated T cells" (emphasis added, page 153, 2nd column, first
paragraph). Consequently, these results confirm that while
contacting a cell with, or administering CsA to, a person, may
possibly prevent induction of NF-kB activity by an external inducing
stimulus, such use or administration of CsA does not, and cannot,
involve reducing induced NF-kB activity. (Declaration of Dr. Verma
¶¶ 23, 25, 37-38, 46, 55-56, 62-63, 66; and Second Declaration of Dr.
Verma ¶¶ 12)


Because claims 6, 8 and 9 and claims dependent thereon require
reducing induced NF-kB activity, the prior art disclosures of using
or administering CsA are not and cannot be, a method for practicing
the claimed methods.


For this reason alone the anticipation and obvious rejections of each
of claims 6, 8 and 9 and of each of the claims dependent thereon
based on the CsA Art should be withdrawn.


   b)   *The Cyclosporin A Art Does Not Disclose The Method of Any
        of Claim 6, 8 or 9 or of Any Claim Dependent Thereon.*


The cited CsA references disclose experiments which may be
interpreted as showing that use of CsA prevents induction of the
intracellular signaling pathway NF-kB. Claims 6, 8 and 9, however,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 60 of 92 of October 22, 2007 Response*

are directed to reducing induced NF-kB activity. The experiments in the CsA references that purport to show a change in NF-kB activity all involve either pretreatment with CsA or simultaneous contact by, or administration of, CsA and a positive inducer of the NF-kB intracellular signaling pathway. None of these experiments involve first inducing NF-kB and then treating with CsA as reducing induced NF-kB activity. Therefore, such experiments do not anticipate the claims at issue, each of which requires claims reducing induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 25, 37-38, 45-46, 54-55, 62-63, 66; and Second Declaration of Dr. Verma ¶¶ 11-17, 22-28, 30-35, 37-50, 58)

For this reason alone the rejections of each of claim 6, 8 and 9, and of claims dependent thereon as being anticipated by or obvious over the cited CsA Art, should be withdrawn.

> c)    *The Cited Cyclosporin A Art Is Not Enabling And Therefore Cannot Anticipate the Method of Any of Claim 6, 8 or 9 or of Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain

ARI 84446

possession of the claimed subject matter." *In re Sheppard,* 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The experiments in the cited CsA references cannot be reproduced and therefore are not enabling. See the discussion of each reference in the Second Declaration of Dr. Verma ¶¶ 11-58.

For this reason alone, the rejections of each claim 6, 8 and 9 and of each claim dependent thereon based on the cited CsA Art, should be withdrawn.

*d) The Cited Cyclosporin Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specified Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64-69, 75-80 and 88-93.*

Each of claims 64-69, 75-80 and 88-93 further limit the respective independent claim from which they depend by reciting that the reducing of induced NF-kB activity occurs by intervening at a specific segment within the NF-kB intracellular signaling pathway. The CsA references cited in the July 6, 2007 Final Office Action report results observed at a specific segment within the NF-kB pathway when induction of the pathway is inhibited, but offer no evidence that use of CsA involves intervening at the specific segment within the NF-kB pathway as recited in each of claims 64-69, 75-80 and 88-93. (Declaration of Dr. Verma ¶¶ 56; and Second Declaration of Dr. Verma ¶¶ 11, 17, 22, 28, 30, 35, 41, 45, 49, 58)

Therefore, none of claims 64-69, 75-80 or 88-93 should be rejected as inherently anticipated by the CsA Art.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 62 of 92 of October 22, 2007 Response*

In conclusion, Patentees have provided clear reasons, each of which independently is sufficient to warrant withdrawal of the anticipation, and if applicable obvious, rejections of claims 6, 8 and 9 and of claims dependent thereon based on the disclosures of the CsA Art. Patentees have also provided a reason sufficient to warrant withdrawal of the rejection of each of dependent claims 64-69, 75-80 and 88-93. Accordingly, Patentees respectfully request all rejections based on CsA Art be reconsidered and withdrawn as currently applied to each of claims 6, 8, 9, 64-69, 75-80 and 88-93.

ARI 84448

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 63 of 92 of October 22, 2007 Response*

<u>Rejections Based on Protein Kinase C Inhibitor Art</u>

For detailed comments concerning the rejections on the basis of
Protein Kinase C Inhibitors in the July 6, 2007 Final Office Action
see ¶¶ 59-70 of the Second Declaration of Dr. Inder Verma.  A summary
of the reasons why the rejections of claims 6, 8, 9 and claims
dependent thereon on the basis of the Protein Kinase C Inhibitor Art
should be withdrawn follows.

> a)  *The Use of a Protein Kinase C Inhibitor in The Cited Art*
> *Does Not Involve Reducing Induced NF-kB Activity As*
> *Required By The Methods of Claims 6, 8 and 9 and Claims*
> *Dependent Thereon.*

A method which involves contacting a cell with, or administering to
a person, a protein kinase C inhibitor ("pKCi") does not, and cannot,
involve reducing induced NF-kB activity as recited in the rejected
claims.  Methods involving use of PKC inhibitor are not shown to
involve reducing induced NF-kB activity in the cited references.  At
most the cited references can be interpreted to disclose that pKC
inhibitors prevent or inhibit induction of the NF-kB intracellular
signaling pathway, and thereby prevent or inhibit the manifestation
of NF-kB activity.

Meichle et al. state "PK-C has not only been implicated in mediating
TNF activation of the transcription factor AP-1 [], but is also
likely to be involved in the <u>activation</u> of the IkB:NF-kB complex"
(page 8339, second column).  Likewise, Shirakawa et al. disclose "PKA
and PKC can <u>activate</u> NF-kB" and they hypothesize "that IkB is the
target of phosphorylation; the phosphorylated IkB would presumably
have a decreased ability to bind NF-kB." (page 2428, second column).
  Therefore, to the extent an inhibitor of protein kinase may have
any effect on the NF-kB intracellular signaling pathway and thereby
on NF-kB activity, (and it is unclear that it does have any such

ARI 84449

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 64 of 92 of October 22, 2007 Response*

effect), the only possible effect such an inhibitor could have would be to prevent or inhibit activation of NF-kB. Use of an inhibitor of protein kinase C cannot have any effect on induced NF-kB activity, and certainly cannot involve reducing induced NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 59-68)

Because each of claim 6, 8, 9 and claims dependent thereon are directed to reducing induced NF-kB activity, the use of a protein kinase C inhibitor as disclosed in the cited art does not, and cannot, involve practicing the claimed methods.

For this reason alone, the anticipation rejections of claims 6, 8 and 9 and of claims dependent thereon based on the protein kinase C inhibitor Art should be withdrawn.

> b)    *The Cited Protein Kinase C Inhibitor Art Does Not Disclose the Method of Any of Claim 6, 8, 9 or any Claim Dependent Thereon.*

The two cited protein kinase C inhibitor references, Meichle et al. and Shirakawa et al., disclose experiments which may be interpreted as showing that a protein kinase C inhibitor prevents induction of the NF-kB intracellular signaling pathway and thereby effects the appearance of NF-kB activity. However, each of claims 6, 8 and 9, recite <u>reducing induced NF-kB activity</u>. Thus, the experiments in the cited references that purport to show a change in NF-kB activity involve either pretreating cells with a pKCi or administering the pkci simultaneously with a purported inducer of NF-kB. Performing such experiments does not anticipate the rejected claims that recite reducing induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 148-149, 153-154; and Second Declaration of Dr. Verma ¶¶ 59-66)

For this reason alone, the anticipation rejections of each of claim 6, 8, 9, and claims dependent thereon based on Meichle et al. and

Shirakawa et al., should be withdrawn.

*c) The Cited Protein kinase C Inhibitor Art Does Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or of Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the disclosures prior art reference cannot be reproduced, then that reference is not enabling.

The disclosures of protein kinase C inhibitor cited in the July 6, 2007 Final Office Action cannot be reproduced. See the specific discussion as to each reference in the Second Declaration of Dr. Verma ¶¶ 70.

For this reason alone the anticipation rejections of claims 6, 8, 9 and claims dependent thereon based on the Protein kinase C Inhibitor Art, should be withdrawn.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 66 of 92 of October 22, 2007 Response*

> d)   *The Cited Protein Kinase C Inhibitor Art Does Not Disclose*
> *a Method Which Anticipates Reducing Induced NF-kB Activity*
> *by Intervening within the NF-kB Intracellular Signaling*
> *Pathway At A Specified Segment as Recited in Claims 64,*
> *65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93
further limit the independent claim by requiring that the reducing
of induced NF-kB activity involve intervening at a specific segment
of the NF-kB intracellular signaling pathway inside a cell.  The pKCi
references cited in the July 6, 2007 Final Office Action report
results observed at a specific segment of the NF-kB intracellular
signaling pathway, but provide no evidence that any pKCi is reducing
induced NF-kB activity by intervening at such specific segment as
required by each of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.
(Declaration of Dr. Verma ¶¶ 148-155; and Second Declaration of Dr.
Verma ¶¶ 67-69)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 is
inherently anticipated by any method involving the use of any pKCi
disclosed in Meichle et al. or Shirakawa et al.

In conclusion, Patentees have provided reasons, each of which
independently is sufficient to warrant withdrawal of the anticipation
rejections of claims 6, 8 and 9 and of claims dependent thereon based
on Meichle et al. or Shirakawa et al.  Patentees have provided an
additional reason warranting withdrawal of the rejection as applied
to dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.
Accordingly, Patentees respectfully request all rejections based on
Meichle et al. or Shirakawa et al. as applied to claims 6, 8, 9, 64,
65, 69, 75, 76, 80, 88, 89 and 93 be withdrawn.


Rejections Based on Vitamin D Art

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 67 of 92 of October 22, 2007 Response*

For detailed comments concerning the rejection on the basis of the basis of Vitamin D in the July 6, 2007 Office Action, see ¶¶ 71-86 of the Second Declaration of Dr. Inder Verma.    A summary of the reasons why the rejections of claims 6, 8, 9 and claims dependent thereon the basis of the Vitamin D Art should be withdrawn follows.

> a)    *The Cited Vitamin D Art Does Not Disclose A Method of Using Vitamin D Which Anticipates Any Method Recited In Any of Claim 6, 8, or 9 and in any Claims Dependent Thereon.*

Of the prior art vitamin D references cited in the July 6, 2007 Final Office Action, each reference other than Rigby I discussed below clearly does not disclose a method, the practice of which would anticipate any of claim 6, 8 or 9. These claims require reducing induced NF-kB activity, and the cited references do not disclose a method which does so.    Each specific reference is explained and inaccurate characterizations in the July 6, 2007 Final Office Action are noted by Dr. Verma.    (See Second Declaration of Dr. Verma ¶¶ 71-86)    The cited vitamin D references, therefore, do not anticipate the method of any of claim 6, 8 or 9.

One reference Rigby I purports to show an experiment where vitamin D was administered to PBM cells stimulated with PHA.    Rigby I et al. disclose calcitriol-mediated reduction in cellular proliferation and, in Figure 4, a reduction in the level of IL-2 production mediated by calcitriol over the course of 18 hours.    A noticeable reduction in IL-2 production is observed at 12 hours post-calcitriol treatment and, at 18 hours, no IL-2 is observed (Figure 4).    The production of IL-2 is thought to be regulated, at least in part, by NF-kB.    As explained below and in the Second Declaration of Dr. Verma, the results in Figure 4 cannot be a consequence of reducing induced NF-kB activity.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 68 of 92 of October 22, 2007 Response*

Schmidt et al. and Emmel et al., both of which are of record, have demonstrated that factors, other than NF-kB, can have a role in regulating IL-2 production. Schmidt et al. point out that the "NFAT-1-binding site ... has been implicated directly in playing a major role during transcriptional <u>activation of IL-2</u>" (emphasis added, page 4037, first column). Likewise, Emmel et al. state "NF-AT, AP-3 and to a lesser extent NF-kB ... appear to be important in the transcriptional activation of genes for interleukin-2.." (page 1617, abstract). Additionally, cellular proliferation, the result observed in Rigby I, is a process regulated by many factors, and therefore not necessarily regulated by NF-kB. Thus, cellular proliferation and IL-2 production are not necessarily or inevitably indicative of changes in NF-kB activity. Moreover and importantly, the cellular proliferation and IL-2 production results reported in Rigby I are <u>not</u> attributable to reducing induced NF-kB activity as explained by Yu et al., Takeuchi et al. and Alroy et al. (Second Declaration of Dr. Verma ¶¶ 77)

Yu et al. evaluated the effects of calcitriol on IL-2 production and cellular proliferation noting that:

> NF-kB enhances the expression of IL-2 and the IL-2 receptor, two molecules critical for lymphocyte proliferation. On the other hand, $1,25(OH)_2D_3$ inhibits IL-2 production and lymphocyte proliferation, raising the possibility that the antiproliferative effects of $1,25(OH)_2D_3$ could have been mediated via inhibition of NF-kB. However, the time courses of the effects of $1,25(OH)_2D_3$ on NF-kB expression and lymphocyte proliferation were different. Specifically, whereas $1,25(OH)_2D_3$ could inhibit cell proliferation only when it was added in the first 24 hr following activation <u>$1,25(OH)_2D_3$ decreased p50 and 105 levels when added to the culture as late as 64 hr following addition of the activating agent. This suggests that the antiproliferative effect of $1,25(OH)_2D_3$ is not the result of it effects on NF-kB</u>" (page 10994, first column).

Yu et al. demonstrated that the addition of calictriol 48 hours after activation with PHA inhibits the transcription of the <u>NF-kB subunits p50 and p105</u> as disclosed in Figure 1. On page 10992, Yu et al.

ARI 84454

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control *Nos.*: 90/007,503 and 90/007,828
*Page 69 of 92 of October 22, 2007 Response*

teach that "PBMCs were activated for 72 hr with PHA, and $1,25(OH)_2D_3$ was added either simultaneously with addition of PHA or 24, 48, 64, 68, or 70 hr following addition of PHA (Fig. 3).  The inhibiting effect of $1,25(OH)_2D_3$ on p50 and p105 was apparent when the hormone was added simultaneously with PHA or 24, 48, or 64 hr following addition of PHA." Therefore, Yu et al., demonstrate that whatever effect $1,25(OH)_2D_3$ has on IL-2 production, that effect is different from and not attributable to reducing induced NF-kB.

The time course of the effects of $1,25(OH)_2D_3$ observed by Yu et al. is notably different from the time course observed by Rigby et al. I.  Rigby I demonstrated in Figure 4, that the effects on IL-2 production of calcitriol on PHA-stimulated PBMs occurred within 18 hours, and after 18 hours no IL-2 production remained to inhibit. According to Yu et al., however, the only effect of $1,25(OH)_2D_3$, ie. its effect on transcription of p50 and p105 is only detected after 24 hours.

The effect of calictriol on cell proliferation and IL-2 production in Rigby et al. I occurs too rapidly to be attributed to the effect of $1,25(OH)_2D_3$ on the transcription of the NF-kB subunits p50 and p105. As described in the '516 patent, column 16, lines 22-28, "NF-kB is initially located in the cytoplasm in a form unable to bind DNA because it is complexed with IkB.  Various inducers then cause an alteration in IkB allowing NF-kB to be released from the complex. Free NF-kB then travels to the nucleus and interacts with its DNA recognition sites to facilitate gene transcription."  Thus, transcription of p50 and p105 genes is not needed for induction of NF-kB activity.

Takeuchi et al. and Alroy et al. both demonstrate that IL-2 production can be activated by any one of four factors: NF-kB, NFAT, AP-1 and OCT-3 (see Takuechi et al. at page 209).  Based on Yu et al.'s teaching that the only effect of $1,25(OH)_2D_3$ relative to NF-kB

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 70 of 92 of October 22, 2007 Response*

is its inhibition of transcription of p105 and p50, it is evident
that the results observed in Rigby et al. I in terms of cellular
proliferation and IL-2 production <u>did not</u>, and <u>could not</u> have
involved reducing induced NF-kB activity.  Therefore, the results
observed in *Rigby* I must have been due to a factor other than NF-kB
resulting in the reduced transcription of IL-2.

Furthermore, suppression production of p50 and p105 would not lead
to reducing induced NF-kB activity.  The only effect of vitamin D
relative to NF-kB shown of record is suppression of the production
of p50 and p105.  However, suppression of the production of p50 and
p105 would not lead to reducing induced NF-kB activity because
p65/RelA alone is sufficient to promote transcription of IL-2.  See
e.g. Nishiyama et al., page 704, Figure 4, discussed by Dr. Verma.
(Second Declaration of Dr. Verma ¶¶ 78-82)

For this reason alone the anticipation rejections of each of claim
6, 8 and 9, and of each claim dependent thereon based on the Vitamin
D Art, should be withdrawn.

    b)    *The Cited Vitamin D Art Does Not Enable The Performance of
    Any Method Which Anticipates a Method of Any of Claim 6,
    8 or 9 or Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable
that which it is asserted to anticipate.  A claimed invention cannot
be anticipated by a prior art reference if the allegedly anticipatory
disclosures  cited  as  prior  art  are  not  enabled"  *Elan
Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed.
Cir. 2003) (internal citations omitted).  Courts have refused to find
anticipation based on prior art that is not enabling.  For instance,
in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to
invalidate patent claims based on prior art which did not "provide

sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The cited Vitamin D art cannot be reproduced and is not enabling. See the discussion in the Second Declaration of Dr. Verma ¶¶ 84-86.

For this reason alone the anticipation rejections of each of claim 6, 8 and 9 and of each claim dependent thereon based on the vitamin D art, should be withdrawn.

*c) The Cited Vitamin D Art Does Not Anticipate Reducing Induced NF-kB Activity by Intervening at a Specific Segment Within the NF-kB Intracellular Signaling Pathway as Recited in Each of Claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 further limit the independent claim from which it depends by reciting that the reducing of induced NF-kB activity occurs by intervening at a specific segment within the NF-kB intracellular signaling pathway inside a cell. Vitamin D has no effect on reducing induced NF-kB activity. Moreover, any effect it may have on NF-kB does not involve reducing induced NF-kB activity by intervening at the specific segment within the NF-kB intracellular signaling pathway recited in any of claim 64, 65, 69, 75, 76, 80, 88, 89 and 93. (See also Declaration of Dr. Verma ¶¶ 108; and Second Declaration of Dr. Verma ¶¶ 76)

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 72 of 92 of October 22, 2007 Response*

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 should be rejected as inherently anticipated by any use of vitamin D disclosed in any of the cited Vitamin D Art.

In conclusion, Patentees have provided reasons, each of which independently warrants withdrawal of the anticipation rejection of each of claims 6, 8 and 9 and of claims dependent thereon based on the Vitamin D art. Patentees have also provided an additional reason warranting withdrawal of the rejection of dependent claims 64, 65, 69, 75, 76, 80, 88, 89 and 93.

Accordingly, Patentees respectfully request all rejection based on the cited Vitamin D art be withdrawn with respect to each of claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89 and 93.

ARI 84458

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 73 of 92 of October 22, 2007 Response*

<u>Rejection Based on 5-ASA Art</u>

For detailed comments concerning the rejection on the basis of 5-ASA in the July 6, 2007 Final Office Action see ¶¶ 96-105 of the Second Declaration of Dr. Inder Verma.  A summary of the reasons why the rejection of claims 6, 8, 9 and claims dependent thereon on the basis of the cited 5-ASA Art should be withdrawn follows.

> a)   *The Use of 5-ASA in Dew et al., Does Not Involve Reducing Induced NF-kB Activity As Required By The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.*

The sole 5-ASA art reference cited, Dew et al., does not anticipate claims 6, 8 and 9 and claims dependent thereon.  Dew et al. disclose administration of 5-ASA to prevent reoccurrence of ulcerative colitis in patients who "all were <u>in remission with ulcerative colitis</u> or proctitis and had passed three or less stools daily without blood or slime during the previous month" (emphasis added, page 23 of Dew et al).  Even if ulcerative colitis were associated with induced NF-kB activity, and there is no evidence that it is, the patients in Dew et al. were asymptomatic with respect to ulcerative colitis and therefore could not have been exhibiting induced NF-kB activity. Each of claims 6, 8 and 9 require reducing induced NF-kB activity. Therefore, Dew et al. does not disclose a method of reducing induced NF-kB.  (Declaration of Dr. Verma ¶¶ 156-158; and Second Declaration of Dr. Verma ¶¶ 95-103)

In the July 6, 2007 Final Office Action, the Examiner alleged that Yamamoto et al. teach patients in remission still have elevated cytokine levels, indicating NF-kB is active.  This assertion is misleading because Yamamoto et al. evaluated patients "who had been diagnosed with endoscopically and histologically confirmed UC" (page 590, first column).  Thus, the disclosure of Yamamoto et al. does not involve asymptomatic patients, such those in Dew et al.  When cytokine levels in patients with inactive disease are analyzed, the

ARI 84459

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 74 of 92 of October 22, 2007 Response*

levels are similar to healthy volunteers.  See the discussion by Dr. Verma of Braegger et al. and Mitsuyama et al., each of whom analyzed patients with inactive disease, i.e. patients in "remission", and showed that such patients in remission have cytokine levels similar to the cytokine levels of the healthy control patients. Specifically, Braegger et al. state "in patients with inactive disease, either as a result of surgery or treatment with steroids, the concentration of stool TNF alpha fell to those of control" (abstract).  Likewise, Figure 1 of Mitsuyama et al. demonstrates that the colonic levels of IL-8 in patients with inactive ulcerative colitis are no different from those observed in control patients. The Examiner has acknowledged on page 92 of the Final Office Action, that TNF and IL-8 are regulated by NF-kB.  Since the asymptomatic patients in Dew et al. would not have had elevated cytokine levels, these patients would not have had induced NF-kB activity.  (Second Declaration of Dr. Verma ¶¶ 101-102)

Moreover, the presence of proinflammatory cytokines and colonic inflammation have been shown to occur in NF-kB deficient mice. (Second Declaration of Dr. Verma ¶¶ 105)  Thus, regardless of what "remission" means in Dew et al., there is no evidence in the record showing that NF-kB is necessarily induced in patients with ulcerative colitis, and certainly nothing showing that NF-kB was necessarily induced in the patients of Dew et al.

An inherent anticipation rejection requires that the evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).  Dew et al. do not describe induced NF-kB activity as recited by the claims. Yamamoto et al. do not make <u>clear</u> that the patients of Dew et al. had induced NF-kB activity.

Even if there was a possibility that the patients of Dew et al. had

ARI 84460

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 75 of 92 of October 22, 2007 Response*

induced NF-kB activity, such a possibility cannot support an inherent anticipation rejection.   "Inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in a single prior art reference.  *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).  By referring to Yamamoto et al., the July 6, 2007 Final Office Action merely raises the possibility that a patient in Dew et al. had induced NF-kB activity.  That possibility, however, is both clearly rebutted by others as discussed by Dr. Verma and insufficient as a matter of law to support a rejection on the basis of inherent anticipation.  Accordingly, an inherent anticipation rejection based on Dew et al. is not proper.


Finally, although Patentees have explained in their November 9, 2006 response the deficiencies of the purported extrinsic evidence being relied upon to explain Dew et al., the Examiner alleged that the difference between the formulations of 5-ASA used by Dew et al. and by the extrinsic evidence is of no consequence.  The Examiner is mistaken.  (Second Declaration of Dr. Verma ¶¶ 104)  Differences in formulation do matter and the use of different formulations in the non-prior art references relied upon to justify the inherency rejection establishes both that the non-prior art references are not being used to "explain" the prior art, and more importantly that these references do not show that the use of different formulations in Dew et al. inherently anticipates the claimed methods.


For this reason alone the anticipation rejections of each of claims 6, 8 and 9, and of claims dependent thereon based on Dew et al., should be withdrawn.


> b)   *Dew et al. Do Not Enable the Performance of a Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon.*

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled" *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v. U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Prior art is not enabling if it requires one of skill in the art to undertake "undue experimentation" to "gain possession of the claimed subject matter." *In re Sheppard*, 339 F.2d 238, 242 (C.C.P.A. 1964). Accordingly, if the prior art cannot be reproduced, then the reference is not enabling.

The disclosure of Dew et al. cannot be reproduced and is not enabling for the method disclosed. See the discussion in the Second Declaration of Dr. Verma ¶¶ 104.

For this reason alone the anticipation rejections of each of claims 6, 8 and 9 and of each claim dependent thereon based on Dew et al., should be withdrawn.

*c) Dew et al. Do Not Disclose A Method Which Anticipates Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway at a Specified Segment as Recited in Claims 64-69, 75-80 and 88-93.*

Each of dependent claims 64-69, 75-80 and 88-93 further limits the independent claim from which it depends by requiring that the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 77 of 92 of October 22, 2007 Response*

reducing of induced NF-kB activity involve intervening at a specific segment of the NF-kB intracellular signaling pathway inside a cell. Dew et al., at most report results observed at a specific segment, but provide no evidence that 5-ASA actually is reducing induced NF-kB activity by intervening at such specific segment as required by each of claims 64-69, 75-80 and 88-93. (Declaration of Dr. Verma ¶¶ 156-159; and Second Declaration of Dr. Verma ¶¶ 103)

Therefore, none of claims 64-69, 75-80 and 88-93 is inherently anticipated by any method disclosed in Dew et al.

In conclusion, Patentees have provided reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejections of claims 6, 8 and 9 and of claims dependent thereon based on Dew et al. Patentees have also provided an additional reason warranting withdrawal of the rejection as applied to dependent claims 64-69, 75-80 and 88-93. Accordingly, Patentees respectfully request all rejections based on Dew et al. As applied to claims 6, 8, 9, 64-69, 75-80 and 88-93 be withdrawn.

ARI 84463

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 78 of 92 of October 22, 2007 Response*

<u>Rejection Based on the Endogenous Glucocorticoid Art</u>

For detailed comments concerning the rejections on the basis of the Glucocorticoid Art in the July 6, 2007 Final Office Action see ¶¶ 87-95 of the Second Declaration of Dr. Inder Verma. A summary of the reasons why the rejection of claims 6, 8, 9 and claims dependent thereon on the basis of the Glucocorticoid Art should be withdrawn follows.

> a)  *The Use of Endogenous Glucocorticoids Disclosed in Goodman and Gilman Does Not Involve Reducing Induced NF-kB Activity as Required by The Methods of Claims 6, 8 and 9 and Claims Dependent Thereon.*

The sole Glucocorticoids reference cited, Goodman and Gilman, does not anticipate any of claims 6, 8, 9 or claims dependent thereon. Goodman and Gilman describe the production of endogenous glucocorticoids by the body in response to "agonal state, severe infections, surgery, parturition, cold, exercise and emotional stress" (Goodman and Gilman's page 1469, second column). As an initial threshold matter there is no evidence of record that any of these conditions referred to involves induced NF-kB activity. Each of claims 6, 8 and 9 as well as each claim dependent thereon is directed to reducing induced NF-kB activity. Because there is not showing that Goodman and Gilman disclose induced NF-kB activity, the claimed method cannot be anticipated. (Declaration of Dr. Verma ¶¶ 102-104; and Second Declaration of Dr. Verma ¶¶ 87-95)

Moreover, even if one or more of the conditions listed in Goodman and Gilman involved the presence of proinflammatory cytokines, this fact would not establish that there was induced NF-kB activity. Proinflammatory cytokines and inflammation has been shown to occur without NF-kB activity. (Second Declaration of Dr. Verma ¶¶ 95)

ARI 84464

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 79 of 92 of October 22, 2007 Response*

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Goodman and Gilman do not describe induced NF-kB activity as recited by the claims, and the purported extrinsic evidence does not make <u>clear</u> that Goodman and Gilman had induced NF-kB activity. (Declaration of Dr. Verma ¶¶ 102-104; and Second Declaration of Dr. Verma ¶¶ 87-95)

For this reason alone the anticipation rejections of each of claims 6, 8 and 9, and of claims dependent thereon based on Goodman and Gilman, should be withdrawn.

> b) *Any Method Disclosed in Goodman and Gilman, Would At Most Only Involve Reducing Induced NF-kB Activity Sometimes. Any Such Occasional Result Is Not Sufficient To Establish An Element of the Claimed Methods Necessarily Or Inevitably Occurs.*

Nothing of record establishes that the use of glucocorticoids necessarily or inevitably involves reducing induced NF-kB activity. Therefore, even if following the disclosure of Goodman and Gilman could, under some undefined circumstance, involve reducing induced NF-kB activity, (and there is no teaching in Goodman and Gilman of such a circumstance,) any such reducing would have only occurred occasionally. (Declaration of Dr. Verma ¶¶ 102-106; and Second Declaration of Dr. Verma ¶¶ 87, 94-95)

An inherent anticipation rejection requires that the extrinsic evidence "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Inherency may not be established by probabilities or

ARI 84465

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 80 of 92 of October 22, 2007 Response*

possibilities" but rather "must be necessarily present" in the single
prior art reference. *Crown Operations Int'l.; Ltd. v. Solutia Inc.*,
289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

Thus, even if following the disclosure of Goodman and Gilman could
occasionally involve reducing induced NF-kB activity this is
insufficient to establish inherent anticipation. Critical
information is missing from Goodman and Gilman including the type of
cell, the type of inducer, and the conditions for administering a
glucocorticoid to possibly effect reducing induced NF-kB activity.
Without such critical information in Goodman and Gilman, the most the
cited non prior art reference could ever show is that there was a
possibility of reducing induced NF-kB activity by following the
teaching of Goodman and Gilman (Declaration of Dr. Verma ¶¶ 103-105;
and Second Declaration of Dr. Verma ¶¶ 87-93)

However, a showing of mere "probabilities or possibilities" is
insufficient to support a finding of inherent anticipation. *See In
re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a
system claim was not anticipated by prior art that could be used to
perform the same result with a slightly different structure). Where
practice of the prior art only sometimes involves all of the elements
of a claim the art was held to <u>not</u> inherently anticipate because
"occasional results are not inherent." *See Mehl/Biophile Int'l.
Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that
prior art did not anticipate a claim requiring a substantially
vertical orientation even though practicing the prior art would
sometimes result in such an orientation). See, also, *Glaxo, Inc. v.
Novopharm, Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) (affirming a district
court holding that practice of a prior art method sometimes yielding
crystals one of two polymorphs but other times yielding the other did
not inherently anticipate a claim to only one of the polymorphs.)

In the present case, even accepting the Examiner's rationale advanced

ARI 84466

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 81 of 92 of October 22, 2007 Response*

in the July 6, 2007 Final Office Action, the use of glucocorticoids as taught by Goodman and Gilman would at most only *sometimes* have involved reducing induced NF-kB activity. Such an occasional result is insufficient to establish inherent anticipation under controlling Federal Circuit precedent.

For this reason alone the inherent anticipation rejection of each of claim 6, 8, 9 and each claims dependent thereon based on the Goodman and Gilman should be withdrawn.


   c)   *Any Occasional Results Obtainable By Following The Disclosure of Goodman and Gilman Is Not Sufficient to Enable the Method of Any of Claims 6, 8 or 9 or Any Claim Dependent Thereon.*


Any occasional result that might have occurred upon practicing any method disclosed by Goodman and Gilman would be insufficient to enable the method of any of claims 6, 8, 9 or any claim dependent thereon, and therefore, Goodman and Gilman cannot anticipate any of these claims.

"To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled"   *Elan Pharmaceuticals, Inc. v. Mayo Foundation*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (internal citations omitted). Courts have refused to find anticipation based on prior art that is not enabling. For instance, in *Rockwell Intern. Corp v.U.S.*, the Federal Circuit refused to invalidate patent claims based on prior art which did not "provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial . . . semiconductors" (i.e. practice the claimed process). *See Rockwell Intern. Corp v. U.S.*, 147 F.3d 1358,

ARI 84467

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 82 of 92 of October 22, 2007 Response*

1364 (Fed. Cir. 1998). Likewise, in *Application of Sheppard*, the Court of Customs and Patent Appeals held that a prior art reference which disclosed either the claimed compound *or* a different compound was not enabling and therefore could not anticipate the claim at issue. *Application of Sheppard*, 339 F.2d 238, 241-242 (C.C.P.A., 1964).

Goodman and Gilman do not disclose how to carry out a method which necessarily and inevitably involves reducing induced NF-kB activity using glucocorticoids (assuming it is even possible to carry out such a method.) Glucocorticoids have many effects and their mechanism of action is poorly understood. (Declaration of Dr. Verma ¶¶ 105; and Second Declaration of Dr. Verma ¶¶ 94-95)

Prior art whose disclosure would have only sometimes involved practicing the claimed method, like the prior art in *Rockwell* and *Sheppard*, does not enable one skilled in the art to practice the claimed method and therefore cannot anticipate the claimed method. The Examiner's rationale for the rejection, even assuming it were factually correct (which is unclear) would at most establish that the use of glucocorticoids as taught by Goodman and Gilman could *sometimes* have involved reducing induced NF-kB activity. Such a teaching in Goodman and Gilman does not enable the practice of the method of any of claim 6, 8, 9, or any claim dependent thereon.

For this reason alone the inherent anticipation rejection of each of claims 6, 8 and 9, and claims dependent thereon based on the Goodman and Gilman should be withdrawn.

> d) *Goodman and Gilman Do Not Disclose A Method Which Anticipates A Method Of Reducing Induced NF-kB Activity by Intervening Within the NF-kB Intracellular Signaling Pathway Inside a Cell at a Specific Segment of the Pathway*

ARI 84468

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 83 of 92 of October 22, 2007 Response*

> *As Required by each of Claims  64, 65, 69, 75, 76, 80, 88, 89 and 93.*

Each of dependent claims  64, 65, 76, 75, 76, 80, 88, 89 and 93 further limit the independent claim from which it depends by requiring that the reducing of induced NF-kB activity involve intervening at a specific segment within the NF-kB intracellular signaling pathway inside a cell.  Neither Goodman and Gilman, nor any of the non-prior art references cited in the July 6, 2007 Final Office Action, provide any information as to  how glucocorticoids work.  Certainly none of the cited references provide evidence that the use of glucocorticoids involves reducing induced NF-kB activity by intervening at the specific segment of the NF-kB intracellular signaling pathway as required in each of claims  64, 65, 69, 75, 76, 80, 88, 89 and 93.  (Declaration of Dr. Verma ¶¶ 102-103; and Second Declaration of Dr. Verma ¶¶ 93)

Therefore, none of claims 64, 65, 69, 75, 76, 80, 88, 89 and 93 is inherently anticipated by Goodman and Gilman and the rejection on this basis should be withdrawn.

In conclusion, Patentees have provided reasons, each of which independently is sufficient to warrant withdrawal of the anticipation rejections of each of claims 6, 8, 9 and claims dependent thereon based on Goodman and Gilman.  Patentees have provided an additional explanation warranting withdrawal of the rejection of dependent claims  64, 65, 69, 75, 76, 80, 88, 89 and 93.  Accordingly, Patentees respectfully request the rejections based on Goodman and Gilman as applied to claims 6, 8, 9, 64, 65, 69, 75, 76, 80, 88, 89 and 93 be withdrawn.

ARI 84469

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 84 of 92 of October 22, 2007 Response*

IV.  THE USE OF NON-PRIOR ART REFERENCES AND EVIDENCE SUBMITTED IN
     A DECLARATION THAT GOES BEYOND EXPLAINING THE CONTENT OF CITED
     PRIOR ART AS A BASIS FOR AN INHERENCY REJECTION IS <u>IMPROPER AND
     ULTRA VIRES</u>

   A.  **Statutory Grounds For Reexamination**

Statutory authority proscribes that in reexamination proceedings
consideration by the Patent Office be limited to "prior art
consisting of patents or printed publications" that have a bearing
on patentability.   35 U.S.C. § 301. *See also* 37 C.F.R. § 1.501.
Indeed, the Manual of Patent Examining Procedure ("MPEP") states that
substantial new questions of patentability must be based on "prior
art patents or printed publications." Prior art includes that relied
on in the reexamination request, that found elsewhere by the PTO, or
that in the patent file from submissions under 37 C.F.R. § 1.501.
All such art must be "prior art consisting of patents and printed
publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.

   B.  **Impermissible Grounds of Rejection in a Reexamination**

The Patent Office does not have statutory authority to entertain a
prior public use in a reexamination.  35 U.S.C. § 301, *et seq.*; e.g.,
M.P.E.P. § 2216 (Rev. 2, May 2004) ("Examples of such questions that
will not be considered are public use, on sale, and fraud.")

The lack of statutory authority cannot be circumvented by reliance
on a printed publication that merely describes the public use.  A
prior art citation "cannot include ... a statement as to the public
use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004);
"a prior art patent or printed publication <u>cannot</u> be properly applied as
a ground for reexamination <u>if it is merely used as evidence of
alleged prior public use</u> or on sale, insufficiency of disclosure,
etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

ARI 84470

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 85 of 92 of October 22, 2007 Response*

Thus, it is clear that the PTO does not have statutory authority to rely on, as a ground for reexamination, a printed publication which does not itself contain the necessary disclosure, but describes an alleged prior public use. In support of this legal challenge to the subject reexamination proceeding Patentees also rely upon, and hereby incorporate by reference the Petitions, Requests for Reconsideration, and Pleadings filed in the Mandamus action initiated by Patentees in the U.S. District Court for the Eastern District of Virginia.

      **C.    The Inherent Anticipation Rejections in the August 2, 2006 and July 6, 2007 Office Actions are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute.**

As noted above, a reexamination must be based on "prior art consisting of patents and printed publications." MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501. Nothing in the statute, the rules, or the M.P.E.P. dictates a different understanding. Indeed, even prior art patents or printed publications cannot be grounds for reexamination if used merely as evidence of alleged prior public use or on sale activity. MPEP 2217. Affidavits or declarations may be considered in reexamination to explain the content or pertinent date of a prior art patent or printed publication. *Id.* However, rejection on prior art "cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications." *Id.* at 2258(I)(E).

Likewise, an admission may not be the basis for establishing a substantial new question of patentability, although an admission may be used "to determine the scope and content of the prior art in conjunction with prior art patents and printed publications, whether such admissions result from patents or printed publications or from some other source." *Id.* at 2217 and 2258(I)(F)(1)-(2). "An admission as to what is in the prior art is simply that, an admission, and requires no independent proof. It is an acknowledged,

ARI 84471

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 86 of 92 of October 22, 2007 Response*

declared, conceded, or recognized fact or truth." *Id.* at 2258(I)(F)(2). However, information supplementing or further defining the admission is improper, as the admission must stand on its own. *Id.* at 2217.

It is clear that reexamination proceedings were designed to be limited in scope to consideration of prior art patents and printed publications, "lest the life of an issued patent be wasted and the patentee's legitimate rights be abused by third party requests for reexamination, for there are myriad grounds on which patentability is subject to challenge." *In re Lonardo*, 119 F.3d 960, 969, 43 USPQ2d 1262 (Fed. Cir. 1997)(Newman, J., dissenting and noting legislative history's "serious concern that reexamination not create new opportunities for abusive tactics and burdensome procedures")(quoting *In re Recreative Technologies Corp.*, 83 F.3d 1394, 1397, 38 USPQ2d 1776, 1778 (Fed. Cir. 1996)).

Despite the statute, the rules and the MPEP, the Examiner advances the following case law on pages 8-9 of the August 2, 2006 Office Action as relevant to the use of non-prior art references in a reexamination:

> The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." Atlas *Powder* Co. v. *Ireco* Inc., 190 F.3d 1342,1347.51 USPQ2d 1943,1947 (Fed. Cir. 1999). Thus the claiming of a new use, new function or unknown property which is inherently present in the prior art does not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ 430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter. 1993); *In re Cruciferous Sprout Litigation*, 301 F3d. 1343,64 USPQ2d 1202 (Fed. Cir. 2002); *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004). Although, normally, only one reference should be used in making a rejection under 35 U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be proper when the extra references are cited to show that a characteristic not disclosed in the reference is inherent. See MPEP 2131.01. Once a reference's teaching is shown to provide evidence or reasoning tending to show inherency, the burden shifts to Applicant to show an unobvious difference. MPEP 2112 (V).

Patentees respectfully point out that not one of the cases cited by

ARI 84472

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 87 of 92 of October 22, 2007 Response*

the Examiner involves a reexamination or discusses what is a
legitimate ground for rejection in a <u>reexamination</u>.

35 U.S.C. § 303 specifically refers to §§ 301 and 302, which require
the basis of reexamination to be prior art, whether "patents or
publications discovered by [the Director] or cited under the
provisions of section 301 [for citation of prior art in a request for
reexamination under section 302]." 35 U.S.C. § 303. The Examiner
proffers no rationale for interpreting the reexamination statute in
a different manner. Yet, the Examiner proceeds to assert that non-
prior art documents can be considered during reexamination to show
inherent anticipation as "extrinsic evidence" of what is inherent in
a prior art reference even when such "extrinsic evidence" does not
refer to or reproduce the teachings of the prior art being cited.

### D.   The Claims of the '516 Patent Are Method Claims and the Cited Prior Art Is At Most Evidence of What Occurred During A Prior Public Use.

Each of the prior art references cited in the August 2, 2006 Office
Action expressly describes methods that were publicly used, e.g.
drinking red wine. The cited prior art, therefore, merely provides
evidence of the prior public use of the methods described.

The logic used in the August 2, 2006 Office Action is that when the
methods described in the printed publications were practiced by the
public, the claimed methods of the '516 Patent "inherently" were
practiced. Clearly, however, anything that "inherently" happened,
must have occurred *during the <u>public use</u>* of methods described in
cited references.

Indeed, the August 2, 2006 Office Action relies on non-prior art
references as "extrinsic evidence," as well as a Declaration offered
by the Requestor, to allegedly "explain" what would have "inherently"
happened during such public use. Clearly, the methods which are
actually described in the cited prior art do not raise any

ARI 84473

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 88 of 92 of October 22, 2007 Response*

substantial new question of patentability, and the August 2, 2006
Office Action does not allege otherwise. What the August 2, 2006
Office Action effectively relies upon to support the inherent
anticipation rejections is evidence of a prior public use.

The Federal Circuit has held in standard patent prosecution that a
<u>method</u> is inherently anticipated only by the actual public use of the
method (which may or may not have been described in a printed
publication).[3]

A method of preparing and administering a food product rich in
glucosinolates was found to be inherently anticipated where members
of the public have "heretofore grown and eaten one of the many
suitable cultivars identified by its patents." *In re Cruciferous
Sprout Litigation*, 301 F.3d 1343, 1351 (Fed. Cir. 2002). However,
the rationale of this holding is prior public use, not prior
publication. This rationale is not available as a ground for
rejection in a reexamination.

A claim to a method of hair depilation has been found inherently
anticipated on the basis of prior public use in an experiment
investigating the safety of a laser on guinea pig backs. The
experiment was described in a printed publication, but it was the
public use which inherently anticipated, not the publication. Again,
prior public use is not available as a basis for a rejection in a
reexamination. *MEHL/BIOPHILE International Cor. v. Milgraum*, 192
F.3d 1362, 1366 (Fed. Cir. 1999). Moreover, a different printed
publication that merely provided instructions for the use of the same
laser to remove tattoos from skin, where there was no prior public

---

[3] The Federal Circuit has found a claim to a *compound* inherently anticipated by a
disclosure in a *patent* of administering to a patient a precursor which was necessarily
converted in the patient to the compound. *Schering Corporation v. Geneva et al.*, 339 F.3d
1373 (Fed. Cir. 2003). However, the Federal Circuit in *Schering* explicitly stated that the
*method* of treatment claims were not inherently anticipated by such a disclosure. *Id*, at 1381.

ARI 84474

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 89 of 92 of October 22, 2007 Response*

use, was held not to inherently anticipate a claimed depilation method.  *Id* at 1365.

Accordingly, it is clear that inherent anticipation of a patented method only occurs during a prior public use, not in a printed publication describing that prior public use; and prior public use is not a permitted basis for a rejection in a reexamination.

The Office's own rules recognize that a prior art citation "cannot include ... a statement as to the public use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent or printed publication <u>cannot</u> be properly applied as a ground for reexamination <u>if it is merely used as evidence of alleged prior public use</u> or on sale, insufficiency of disclosure, etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Accordingly, the August 2, 2006 Office Action contains improper rejections of a patented method based on prior public use.

ARI 84475

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 90 of 92 of October 22, 2007 Response*

V.    SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R. §1.555, Patentees direct the Examiner's attention to the following disclosures, which are listed on Form PTO-1449 (**Exhibit C**). Copies of the disclosures listed below as items 1-6 including listed attachments are attached hereto as **Exhibits 1-6**, respectively.

1.    July 16, 2007 Memorandum In Support of Eli Lilly And Company's Motion To Stay Entry of Judgement Pending Reexamination or For Settlement of Form of Final Judgement, Document 409, filed 07/16/2007, pgs. 1-18 in Civil Case 02 CV 11280 RWZ (**Exhibit 1**);

2.    August 22, 2007 Reply Memorandum In Support of Eli Lilly And Company's Motion To Stay Entry of Judgement Pending Reexamination or For Settlement of Form of Final Judgement, Document 414, filed 08/22/2007, pgs. 1-11, including Exhibits 2-6 in Civil Case 02 CV 11280 RWZ (**Exhibit 2**);

3.    September 10, 2007 Final Judgement, Document 417, filed 09/10/2007, pgs. 1-5 in Civil Case 02 CV 11280 RWZ (**Exhibit 3**);

4.    September 23, 2007 Memorandum In Support of Defendant's Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, A New Trial, Document 420, filed 09/23/2007, pgs. 1-53, including Exhibit 2 in Civil Case 02 CV 11280 RWZ (**Exhibit 4**);

5.    July 16, 2007 Declaration Of Laura P. Masurovsky For Eli Lilly And Company's Motion To Stay Entry Of Judgment Pending Reexamination Or For Settlement Of Form of Final Judgment, Document 410, filed 07/16/2007, pgs. 1-2, including Exhibits 2-13 in Civil Case 02 CV 11280 RWZ (**Exhibit 5**); and

ARI 84476

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 91 of 92 of October 22, 2007 Response*

6.   July 26, 2007 Plaintiffs' Opposition To Lilly's Motion To Stay
     Entry Of Judgment Pending Reexamination or for Settlement of
     Form of Final Judgement, Document 411, filed 07/26/2007, pgs.
     1-11, including Exhibit 2 in Civil Case 02 CV 11280 RWZ
     (**Exhibit 6**).

Pursuant to the May 4, 2006 Merger Decision, this Response is being
filed in duplicate, each original bearing an original signature and
identifying data for both reexamination files.

No fee is deemed necessary in connection with the filing of this
Response. However, if any additional fee is required, authorization
is hereby given to charge the amount of any such fee to Deposit
Account No. 31-3125.

                                        Respectfully submitted,


                                        _____
                                        John P. White
                                        Registration No. 28,678
                                        Gary J. Gershik
                                        Registration No. 39,992
                                        Attorneys for Patentees
                                        Cooper & Dunham LLP
                                        1185 Avenue of the Americas
                                        New York, New York 10036
                                        (212) 278-0400

I hereby certify that this correspondence is being deposited
this date with the U.S. Postal Service with sufficient postage as
first class mail in an envelope addressed to:

Mail Stop Ex Parte Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450.

_____    |0\22\07
John P. White              Date
Reg. No. 28,678

ARI 84477

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 92 of 92 of October 22, 2007 Response*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION, SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

    and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 22nd day of October, 2007.

_____
John P. White

# EXHIBIT L

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CA 92660-6324
TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CALIFORNIA 90067-4276

TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199
WEBSITE: www.irell.com

WRITER'S DIRECT
TELEPHONE (310) 203-7190
FACSIMILE (310) 203-7199

November 2, 2007

**VIA E-MAIL**

Marcus E. Sernel, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL  60601-6636

Robert C. Stanley
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.
303 Peachtree St., N.E.
Sun Trust Plaza, Suite 3500
Atlanta, GA  30308

Re:   *Amgen Inc. et al. v. ARIAD Pharms., Inc. et al.*, C.A. No. 06-259-MPT

Dear Marc and Robert:

I write to inform you that ARIAD has cancelled, among others, claims 1, 2, 5, 26, 27, 29, 37, 38, 40, and 59-62 in the pending '516 patent reexamination proceedings. As a result, these claims are no longer asserted in this case. We will be providing supplemental interrogatory responses in due course, but we wanted to inform you promptly of the claim cancellation.

Please let me know if you have any questions.

Very truly yours,

*/s/ Amir A. Naini*

Amir A. Naini

cc:   Counsel of Record

# EXHIBIT M

# CRAVATH, SWAINE & MOORE LLP

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1922

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR

OF COUNSEL
CHRISTINE BESHAR

January 18, 2008

*ARIAD v. Amgen*

Dear Jamie:

       Through this letter, ARIAD gives notice that it no longer intends in the above-referenced action against Amgen to assert that administration of Kineret infringes claims 6, 18, 70-73, 183-85 of the '516 Patent, or that administration of Enbrel infringes claims 73 and 183.

Sincerely,

*David Greenwald*

David Greenwald

Jamie H. McDole, Esq.
    Kirkland & Ellis LLP
       200 East Randolph Drive
         Chicago, Illinois 60601

Copy to:

David I. Gindler, Esq.
    Irell & Manella LLP
       1800 Avenue of the Stars, Suite 900
         Los Angeles, CA 90067-4276

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) |
| Plaintiffs, | )      C.A. No. 06-259-MPT |
| v. | ) ) |
| ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) |
| Defendants. | ) ) ) |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) ) ) ) |
| Counterclaim Plaintiffs, | ) ) ) |
| v. | ) ) |
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH, | ) ) ) ) ) |
| Counterclaim Defendants. | ) ) ) ) |

**COVENANT NOT TO SUE**

1.     ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard University and the Whitehead Institute for Biomedical Research (collectively, "ARIAD") hereby unconditionally and irrevocably covenant not to sue

Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Ltd., and Immunex Rhode Island Corporation (collectively "Amgen") for infringement of any claim of United States Patent No. 6,410,516 (the "'516 patent") at any time (whether before or after the date of this covenant) based on any activities proscribed under 35 U.S.C. § 271 involving Kineret® or anakinra. ARIAD hereby unconditionally and irrevocably covenants not to sue anyone who manufactures, markets, imports, sells or uses Kineret® or anakinra sold or supplied by Amgen for infringement of any claim of the '516 patent at any time (whether before or after the date of this covenant) based on any activities proscribed under 35 U.S.C. § 271 involving Kineret® or anakinra. The covenant set forth in this paragraph 1 extends to any claim in any reissued or reexamined version of the '516 patent.

2.     ARIAD further covenants not to sue Amgen or anyone who manufactures, markets, imports, sells or uses in the United States any Enbrel® or etanercept sold or supplied by Amgen for infringement of any claim of the '516 patent at any time (whether before or after the date of this covenant) based on any activities proscribed under 35 U.S.C. § 271 involving Enbrel® or etanercept, other than (i) for infringement of claims 6, 18, 70, 71, 72, 183 and 184 thereof or any claim that may emerge from the reexamination of the '516 patent that is substantially identical to those claims; or (ii) for infringement of any claim of the '516 patent that may emerge from the reexamination of the '516 patent in a form that is not substantially identical to a claim of the '516 patent that issued on June 25, 2002. The term "substantially identical" as used herein is intended to have the same meaning as that term is used in 35 U.S.C. § 252.

3.    Nothing in this covenant is intended to abridge ARIAD's right to pursue claims against Wyeth for violations of 35 U.S.C. § 271 involving Enbrel® or etanercept.

_____
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard College and the Whitehead Institute for Biomedical Research*

Dated:  April 25, 2008

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) | |
| | ) | C.A. No. 06-259-MPT |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT ARIAD PHARMACEUTICALS, INC.'S
## FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and other applicable rules of the Federal Rules of Civil Procedure, Defendant ARIAD Pharmaceuticals, Inc. requests that Amgen, Inc., Immunex Corporation, Amgen USA Inc., Amgen Manufacturing Limited, and Immunex Rhode Island Corporation respond under oath to the following First Set of Interrogatories within thirty (30) days after the date of service hereof.

## DEFINITIONS

A.    "ARIAD" shall mean ARIAD Pharmaceuticals, Inc.

B.    "DOCUMENT" as used herein shall mean every kind of recording of any form of communication or representation upon any tangible thing, including letters, words, pictures, sounds or symbols, or combinations thereof, whether recorded by handwriting, printing, photostatic or photographic means, magnetic impulse, tape, computer disk or any other form of data storage, data compilation or mechanical or electronic recording, and all other tangible things which come within the meaning of "writing" or "recording" as used in Federal Rules of Evidence Rule 1001 or "document" as used in Federal Rules of Civil Procedure Rule 34. Every

## **INTERROGATORIES**

**INTERROGATORY NO. 1**:

Please IDENTIFY each item of PRIOR ART constituting a patent or publication.

**INTERROGATORY NO. 2**:

For PRIOR ART under 35 U.S.C. § 102(b), please specify the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the PERSON who made the use or who made and received the offer, or the PERSON who made the information known or to whom it was made known.

**INTERROGATORY NO. 3**:

For PRIOR ART under 35 U.S.C. § 102(f), please IDENTIFY all PERSONS from whom, and describe in detail the circumstances under which, the invention or any part of it was derived.

**INTERROGATORY NO. 4**:

For PRIOR ART under 35 U.S.C. § 102(g), please IDENTIFY all PERSONS involved in, and describe in detail the circumstances surrounding, the making of the invention before the patent applicants.

**INTERROGATORY NO. 5**:

For each item of PRIOR ART that YOU contend anticipates any claim of the '516 PATENT, provide a chart that identifies where specifically in such item of PRIOR ART each element of each allegedly anticipated claim is found.

**INTERROGATORY NO. 6**:

For each item or combination of items of PRIOR ART that YOU contend renders obvious any claim of the '516 PATENT, provide a chart that identifies where specifically in such item or combination of items each element of each allegedly obvious claim is found, and explain all facts (and IDENTIFY all DOCUMENTS) showing any motivation to combine any such items of PRIOR ART.

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation,<br><br>                    Defendants. | C.A. No. 06-259-MPT |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>                    Counterclaim<br>                    Plaintiffs,<br><br>        v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH,<br><br>                    Counterclaim<br>                    Defendants. | |

**COUNTERCLAIM PLAINTIFFS ARIAD'S AND THE INSTITUTIONS'**

**THIRD SET OF INTERROGATORIES TO THE AMGEN ENTITIES**

AR0433148-165; AM-AR0441625-631; and AM-AR0442505-511 and any substantially similar procedures involving ENBREL, KINERET, or any other compounds.

E.      "NF-KB-RELATED ASSAY" shall mean any reporter gene assay utilizing a reporter gene located downstream of an NF-KB responsive element (including but not limited to NF-KB LUCIFERASE REPORTER ASSAY); any assay involving determination of the nuclear translocation of NF-KB (including but not limited to CELLULAR IMAGING ANALYSIS OF NF-KB); and any assay involving determination of the level of NF-KB-IKB complex, the level of IKB phosphorylation, the level of IKB, the level of interaction between NF-KB and any NF-KB regulatory element, the level of IKB, and/or the level of IKB expression.

F.      "IDENTIFY" or "IDENTITY" or "IDENTIFICATION" shall mean with respect to (a) a patent, its number, country of origin, and date of issue; (b) a publication, its title, date of publication, author and publisher; (c) all DOCUMENTS other than a patent or a publication, the name of the author, the type of DOCUMENT or writing, the date, the addressee and all other recipients, any title or description, and the present location; and (d) an individual, the name, job title, job description, and affiliation of the individual, along with the individual's work and home addresses and telephone numbers.

G.      "DOCUMENT" as used herein shall mean every kind of recording of any form of communication or representation upon any tangible thing, including letters, words, pictures, sounds or symbols, or combinations thereof, whether recorded by handwriting, printing, photostatic or photographic means, magnetic impulse, tape, computer disk or any other form of data storage, data compilation or mechanical or electronic recording, and all other tangible things that come within the meaning of "writing" or "recording" as used in Federal Rules of Evidence Rule 1001 or "document" as used in Federal Rules of Civil Procedure Rule 34.  Every draft or non-identical copy of a DOCUMENT is a separate DOCUMENT as that term is used herein.

H.      "PERSON" shall mean an individual, corporation, general partnership, limited partnership, limited liability company, governmental body, or any other private or public legal

**INTERROGATORY NO. 45**:

Identify any NF-KB-RELATED ASSAY performed by or for YOU, other than NF-KB LUCIFERASE REPORTER ASSAY and CELLULAR IMAGING ANALYSIS OF NF-KB, by stating for each such assay the name and technical nature of the assay, the IDENTITY of any DOCUMENTS sufficient to determine when, where, and by whom the NF-KB RELATED ASSAY was performed, the procedures employed to perform any such assay, and the IDENTITY of persons most familiar with any such assay.

**INTERROGATORY NO. 46**:

IDENTIFY the five individuals, at least three of whom are YOUR current employees, officers, or directors, who are most knowledgeable about each of the following topics (including each individual's job title, job description, employer, business and home addresses and telephone numbers):

- YOUR development and use of NF-KB LUCIFERASE REPORTER ASSAYS, the identity of compounds YOU have tested using such NF-KB LUCIFERASE REPORTER ASSAYS, the nature and extent of YOUR investigation of such compounds as drug candidates, and YOUR sales, costs and profits for any drug or compound that has been brought to market that has been tested, studied or analyzed using such NF-KB LUCIFERASE REPORTER ASSAYS;

- YOUR development and use of CELLULAR IMAGING ANALYSIS OF NF-KB, the identity of compounds YOU have tested using such CELLULAR IMAGING ANALYSIS OF NF-KB, the nature and extent of YOUR investigation of such compounds as drug candidates, and YOUR sales, costs and profits for any drug or compound that has been brought to market that has been tested, studied or analyzed using such CELLULAR IMAGING ANALYSIS OF NF-KB;

- YOUR development and use of any other NF-KB RELATED ASSAYS, the identity of compounds YOU have tested using such NF-KB RELATED ASSAYS, the nature and extent of YOUR investigation of such compounds as

- 10 -

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELAN PHARMA INTERNATIONAL LTD, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 06-438 GMS ) |
| ABRAXIS BIOSCIENCE, INC, | ) ) |
| Defendant. | ) ) |

## ORDER

At Wilmington this 21st day of May, 2008, having reviewed and duly considered the parties' arguments regarding whether the court has declaratory judgment jurisdiction over U.S. Patent No. 5,834,025 (the "'025 patent");

IT IS ORDERED that the court retains jurisdiction over the validity and enforceability declaratory judgment counterclaims regarding the '025 patent, even though the plaintiff, Elan Pharma International Ltd. ("Elan") has withdrawn its claims of patent infringement. The court finds that the plaintiff's withdrawal of its infringement contentions with respect to the '025 patent does not obviate the real and substantial legal dispute that exists between the parties.[1,2] *Medimmune, Inc.*

---

[1] Here, the plaintiff decided to withdraw its infringement contentions with respect to the '025 patent after the court issued its claim construction Order (D.I. 271) and Order (D.I. 445) denying clarification of the claim construction. Nothing, however, appears to prevent the plaintiff from appealing the court's claim construction Order and reinstating its infringement contentions with respect to the '025 patent should the Federal Circuit conclude that the court's claim construction was erroneous. See D.I. 447, at 1 ("Under the currently-entered (and still-disputed) claim construction, Elan sees significant logistical difficulties in presenting to a jury its theory of infringement of the '025 patent. Elan accordingly does not seek before appeal to prove infringement of the '025 patent, based on the court's claim construction . . ."); see id. at 1 n.1 ("Elan does not seek summary judgment per se of non-infringement on its '025 patent infringement claims. For purposes of expediting appeal, it does seek entry of final judgment (based only on the current claim construction, which Elan intends to appeal) . . ."). Accordingly,

*v. Genentech, Inc.*, 549 U.S. 118, 127 S. Ct. 764, 771 (2007) ("[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

/s/ Gregory M. Sleet
CHIEF, UNITED STATES DISTRICT JUDGE

---

the controversy between the parties still exists, because Elan has not abandoned its position that the defendant's activities with respect to Abraxane® are illegal. *See SanDisk Corp v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007) ("Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do.").

[2] Although Elan has stated several times that it concluded it could not pursue its infringement case with respect to the '025 patent, as of December 17, 2007, it did not file a Rule 54(b) motion. At this point it in the litigation, the court is not willing to entertain such a motion.

2