IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
             )
   Plaintiffs/Counterclaim Defendants, )
             )
    v. )
             )
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.* )
             )
   Defendants/Counterclaim Plaintiffs. )

Civil Action No. 06-259 (MPT)

Public Version
Confidential Material Omitted

---

**THE AMGEN ENTITIES' ANSWERING BRIEF
IN OPPOSITION TO ARIAD AND THE INSTITUTIONS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON INEQUITABLE CONDUCT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

KIRKLAND & ELLIS LLP
Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen
USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: May 22, 2008

## TABLE OF CONTENTS

I.     SUMMARY OF ARGUMENT ............................................................................1

II.    NATURE AND STAGE OF THE PROCEEDINGS ........................................4

III.   COUNTERSTATEMENT OF FACTS ............................................................4

       A.    Inequitable Conduct During Prosecution of the '516 Patent. ...................5

       B.    Inequitable Conduct During Ex Parte Reexamination of the '516 Patent. ..............7

             1.    The PTO Consistently Denied ARIAD a Priority Date Earlier than
                   November 13, 1991 Because the Claimed Methods Were Not
                   Adequately Described in the '516 Patent's Predecessor
                   Applications. ....................................................................7

             2.    ARIAD Submitted and Relied Upon a False and Misleading
                   Declaration from its Expert in the Reexamination to Rebut the
                   PTO's Rejection of the Vast Majority of the Claims, Including
                   Every Claim Ever Asserted in This Case, as Unpatentable Over the
                   Prior Art. .......................................................................8

       C.    ARIAD's Expert, Dr. Kadesch Recants His Testimony from the Lilly
             Litigation Regarding the Validity of the '516 Patent.............................11

             1.    ARIAD's Written Description Expert from the Lilly Litigation
                   Recanted His Testimony that the '516 Patent Was Adequately
                   Described. ......................................................................11

             2.    ARIAD Took Affirmative Steps to Prevent the Disclosure of the
                   Kadesch Testimony to the PTO and Only Disclosed the Testimony
                   After Amgen's Extraordinary Efforts to Obtain and Publicly
                   Reveal the Testimony. ......................................................15

IV.    ARGUMENT........................................................................................17

       A.    ARIAD Cannot Cure Its Inequitable Conduct in Seeking to Obtain and
             Maintain the Claims of the '516 Patent. ...........................................19

       B.    Even if ARIAD's Inequitable Conduct Could Be Cured, ARIAD's
             Submissions to the PTO Fail as a Matter of Law. ................................23

V.     CONCLUSION......................................................................................26

## TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................................ 18

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.,*
    531 F. Supp. 2d 629 (D. Del. 2008) ...................................................................... 17

*Desper Prods. Inc. v. QSound Labs, Inc.,*
    157 F.3d 1325 (Fed. Cir. 1998) ............................................................................ 17

*Digital Control, Inc. v. Charles Mach. Works,*
    437 F.3d 1309 (Fed. Cir. 2006) ............................................................................ 19

*eSpeed, Inc. v. BrokerTec USA, L.L.C.,*
    480 F.3d 1129 (Fed. Cir. 2007) ............................................................ 19, 24, 25

*Ferring B.V. v. Barr Laboratories, Inc.,*
    437 F.3d 1181 (Fed. Cir. 2006) ............................................................................ 20

*First National Bank of Arizona v. Cities Services Co.,*
    391 U.S. 253 (1968) ................................................................................................ 18

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995) .......................................................................... 2, 18

*Nilssen v. Osram Sylvania, Inc.,*
    504 F.3d 1223 (Fed. Cir. 2007) ............................................................................ 20

*Nobelpharma AB v. Implant Innovations, Inc.,*
    141 F.3d 1059 (Fed. Cir. 1998) ............................................................................ 22

*Norton v. Curtiss,*
    433 F.2d 779 (C.C.P.A. 1970) .............................................................................. 22

*Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,*
    984 F.2d 1182 (Fed. Cir. 1993) ............................................................................ 19

*Pharmacia Corp. v. Par Pharm., Inc.,*
    4717 F.3d 1369 (Fed. Cir. 2005) .......................................................................... 19

*Rohm & Haas Co. v. Crystal Chemical Co.,*
    722 F.2d 1556 (Fed. Cir. 1983) ...................................... 2, 4, 19, 22, 23, 25, 26

*Young v. Lumenis, Inc.,*
    492 F.3d 1336 (Fed. Cir. 2007) ............................................................................ 24

DB02:6839643.1                                                                                      065028.1001

**Statutes**

35 U.S.C. § 120................................................................................................................ 20

37 C.F.R. §§ 1.555............................................................................................. 1, 18, 21

37 C.F.R. §§ 1.56........................................................................................ 1, 17, 18, 21

Fed. R. Civ. P. 56(c) ...................................................................................................... 17

**Other Authorities**

MPEP § 2001.06(c)......................................................................................................... 18

DB02:6839643.1

065028.1001

# I.    SUMMARY OF ARGUMENT

1.    ARIAD[1] committed inequitable conduct during the prosecution and reexamination of U.S. Patent No. 6,410,516 ("the '516 patent"). Its motion for partial summary judgment does not even challenge this. Instead, ARIAD attempts to isolate the inequitable conduct it committed during the reexamination from the inequitable conduct it committed during prosecution and then argue that it "cured" its inequitable conduct committed during the reexamination. As a matter of law, ARIAD is wrong. ARIAD's improper conduct and bad faith throughout prosecution and reexamination cannot be broken into separate events that can be addressed piecemeal. Consistent with the plain language of 37 C.F.R. §§ 1.56 and 1.555, which govern an applicant's duty of good faith and candor in front of the PTO, this pervasive and systematic misconduct in front of the PTO belies any later attempt to cure. 37 C.F.R. § 1.56 ("Rule 56") ("…no patent will be granted on an application  in connection with which fraud… was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct."); *see also* 37 C.F.R. § 1.555 ("Rule 555"). And even if it could cure its conduct during reexamination (which it cannot), ARIAD failed to do what is required under the law where "cure" of inequitable conduct is attempted.

2.    The underlying goals of the patent system must be considered in determining whether an act of inequitable conduct can be cured. The Court in *Rohm & Haas* articulated this principle:

> [s]urely, a very important policy consideration is to discourage all manner of dishonest conduct in dealing with the PTO. …. Clearly, we are faced with questions of both socioeconomic policy on one

---

[1]    In this brief, "ARIAD" will refer collectively to all of the named defendants. Similarly, unless otherwise specified, "Amgen" will refer collectively to all of the named plaintiffs.

hand, and morals or ethics on the other. We think we should not so emphasize either category as to forget the other.

*Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983). ARIAD does not contest in its motion that it improperly withheld material information from the PTO, but instead argues that its efforts to cure have mooted the issues. However, the totality of circumstances (*i.e.*, the materiality of ARIAD's misrepresentations and the pattern of its repeated and intentional deception in front of the PTO, including ARIAD's particular conduct with respect to each claim of inequitable conduct) must be examined to determine whether ARIAD can cure its inequitable conduct.

3.    ARIAD's actions through prosecution, including reexamination, of the '516 patent show a pattern of blatant disregard of the duty of candor and good faith in securing and maintaining the claims of the '516 patent. Specifically, during original prosecution of the '516 patent, ARIAD failed to disclose and, in fact, knowingly misrepresented the incorrect sequence contained in Figure 43 of the '516 patent in order to secure its claims.[2] Moreover, during reexamination, ARIAD and its representatives:

- submitted and relied on a declaration of Dr. Inder Verma in support of patentability that contained materially false and misleading statements directly contradicted by prior statements made in his previously published, peer-reviewed, scientific articles;

---

[2]    In its motion, ARIAD does not assert that it cured or can cure its inequitable conduct relating to Figure 43. Inequitable conduct committed during prosecution cannot be cured in reexamination. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1182 (Fed. Cir. 1995). Therefore, inequitable conduct remains to be tried regardless of the outcome of ARIAD's motion.

- deliberately withheld the contradictory articles and even attached a curriculum vitae ("CV") of Dr. Verma to his Declaration that omitted the inconsistent articles;

- knew that its expert from its litigation with Eli Lilly & Co. (the "*Lilly* litigation"), Dr. Thomas Kadesch, recanted his testimony that supported written description of the '516 patent claims while testifying about a similar claim term in a separate litigation, stating that the claims of the '516 patent lacked adequate written description;

- deliberately sought to conceal Dr. Kadesch's recantation from the PTO and Amgen by

  (a) its attorneys' improper designation - on behalf of a non-party to the litigation in which the deposition was taken - of the testimony as "highly confidential" to prevent Amgen from obtaining the testimony;

  (b) consistently refusing Amgen's requests to produce the testimony; and

  (c) failing to disclose the testimony to the PTO until Amgen finally acquired the testimony through a third-party subpoena.

4.    Moreover, ARIAD's belated submissions to the PTO do not and cannot cure its inequitable conduct. The Federal Circuit has made it clear that inequitable conduct cannot be cured during prosecution except in specific circumstances:

> Specifically, the narrow issue we now deal with is whether *voluntary efforts* during prosecution by or on behalf of an applicant, knowing that misrepresentations have been made to the examiner of his application, can ever alleviate its effect. Taking into account human frailty and all of the objectives of the patent system, we think it desirable to permit misdeeds to be overcome under certain limited circumstances…

                                                                          ****

DB02:6839643.1                                                                          065028.1001

> ...we also think it desirable to reserve the possibility of expiation of wrongdoing where an applicant chooses to take the necessary action *on his own initiative* and *to take it openly*.

*Rohm & Haas*, 722 F.2d at 1571-72 (emphasis added).   Nothing was "voluntary" about ARIAD's eleventh hour disclosures of information relating to its misrepresentations to the patent office.  To the contrary,  ARIAD made no effort to "comply" with its duty of candor until after it was called out by Amgen during this litigation.  Therefore, ARIAD's efforts to "cure" fall well outside the limited circumstances articulated in *Rohm & Haas*.

5.   Even under the facts as ARIAD recites them in its brief, it has not cured its inequitable conduct.  By pointing only to Amgen's pleadings and submissions without its own explanation and acknowledgment of its inequitable conduct, ARIAD's disclosures fail to provide the "clear, unequivocal, and convincing evidence" required by *Rohm & Haas* and instead simply left the Examiner "to formulate his own conclusions" -- something expressly rejected by the Federal Circuit.  Therefore, ARIAD's motion should be denied.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

The nature and stage of these proceedings are incorporated herein by reference as set forth in Amgen's Opening Brief in Support of its Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,410,516.  The parties filed their opening briefs on claim construction, dispositive motions, and Daubert motions on April 25, 2008.  This is Amgen's answering brief in opposition to ARIAD's motion for partial summary judgment on inequitable conduct.

## III.    COUNTERSTATEMENT OF FACTS

Although ARIAD's motion selectively focuses on its inequitable conduct during the reexamination, ARIAD's deception in front of the PTO started years before in the original

4

prosecution leading up to the '516 patent. As outlined below, ARIAD made false representations and withheld material information from the Examiner in order to secure the claims of the '516 patent, and this behavior continued into reexamination. ARIAD's continuing misconduct during the original prosecution of the '516 patent, as well as its particular misconduct during reexamination, is relevant to the unavailability of cure for ARIAD's inequitable conduct.

### A.    Inequitable Conduct During Prosecution of the '516 Patent.

Figure 43 of the '516 patent purports to show the nucleotide and amino acid sequence of IκB. But, as acknowledged in the report of one of ARIAD's experts in this case, there is no dispute that this figure is not IκB, but rather a partial, out-of-frame-sequence of a chicken protein called "pp40". (*See* Ex. 1 at ¶ 84)[3] There can be no dispute that ARIAD knew this during the prosecution and well before the '516 patent issued.

In two co-pending, sister patents to the '516 patent, ARIAD withdrew Figure 43 after allowance and just prior to issuance of the patents. ARIAD deleted Figure 43 from the first sister patent on May 13, 1998 while the patent issued on September 8, 1998. (Ex. 2 at 20) ARIAD deleted Figure 43 in the second sister patent on January 12, 2000 while that patent issued on November 11, 2000. (Ex. 3 at 22) In each case, ARIAD explained its last minute deletion of the figure using the same words: "[i]t has recently come to Applicants' Attorney's attention that Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein." (Ex. 2 at 20; Ex. 3 at 22) It is not clear precisely when this information

---

[3]    The exhibits cited in this brief are exhibits to the May 22, 2008 Declaration of Melanie K. Sharp in Support of The Amgen Entities' Answering Brief in Opposition to ARIAD's and the Institutions' Motion for Partial Summary Judgment on Inequitable Conduct and cited herein by Exhibit Number.

"[came] to Applicants' Attorney's attention," but it could not possibly have been only "recently" with respect to the second sister application from which the figure was deleted almost two years after deletion from the first.   More importantly to the instant motion, although the '516 patent was pending at the time that these actions were taken in the sister applications, ARIAD never deleted, but instead resubmitted Figure 43 during original prosecution and never told the Examiner that Figure 43 did not depict IκB.

At the same time, the sequence of IκB was important to patentability of the '516 patent. When the Examiner repeatedly rejected the claimed methods as non-enabled for *in vivo* use, ARIAD argued that the claims were enabled because one of skill in the art could practice the claimed invention by inserting or expressing the sequence for IκB.   (*See, e.g.*, Ex. 4, ADL0000697-704 at 702)   Among other things, this would necessarily require possessing the sequence of IκB.

**REDACTED**

And while Figure 43 provides the only (incorrect) sequence information in the patent regarding IκB ('516 patent, col.10, ll.16-17), ARIAD did not tell the PTO that Figure 43 was wrong, did nothing to correct the sequence of Figure 43, and did not delete it from the '516 patent.  Indeed, upon allowance, ARIAD resubmitted Figure 43 with its formal drawings even though it had "come to [its] attention" nearly five years prior that Figure 43 was wrong.   (Ex. 4 at ADL0000957-1015)     Figure 43 was not deleted until the reexamination of the '516 patent.  (Oct. 22, 2007 Response from '516 Patent Reexamination, D.I. 598, Ex. B)

065028.1001

**B.    Inequitable Conduct During Ex Parte Reexamination of the '516 Patent.**

In 2005, the PTO granted two petitions for Requests for *Ex Parte* Reexamination, finding that each petition raised a "substantial new question of patentability." (Orders Granting Requests for Ex Parte Reexamination dated Jun. 8, 2005 and Dec. 12, 2005, D.I. 598, Ex. A and I.) The two reexamination proceedings were merged on May 4, 2006. (Decision Merging Reexamination Proceedings dated May 4, 2006, D.I. 598, Ex. J) Currently, all asserted claims of the '516 patent stand rejected by the PTO as unpatentable over prior art. (Jul. 6, 2007 Final Office Action from '516 Patent Reexamination, D.I. 598, Ex. L)

   1.    The PTO Consistently Denied ARIAD a Priority Date Earlier than
         November 13, 1991 Because the Claimed Methods Were Not Adequately
         Described in the '516 Patent's Predecessor Applications.

ARIAD has a duty to disclose to the Examiner all information a reasonable examiner would consider in relation to written description, including testimony from its litigation experts pertaining to written description, for among other reasons, its impact on the effective priority date for purposes of judging anticipation. During reexamination, the PTO determined that the '516 patent was entitled to, at best, an effective filing date of November 13, 1991 because its predecessor applications "fail to adequately describe and/or enable the methods of the current Baltimore Patent claims subject to reexamination."[4] (D.I. 598, Ex. I at 4-5) Although ARIAD argued that a written description analysis is improper in reexamination (Ex. 6, pp. 1-9 at 3-4) the PTO found that such an analysis is proper and necessary to the priority determination because

---

[4]    The PTO did not determine whether the November 13, 1991 or the June 5, 1995 application provided written description and enablement of the claims because those issues were not presented in the reexamination. The PTO found the claims were not entitled to a priority date earlier than November 13, 1991, but did *not* find them entitled to that date, finding that "at best" the claims would be entitled to a November 13, 1991 priority date.

DB02:6839643.1                                                        065028.1001

"[t]his support analysis has not been shown to have been carried out in the prosecution of the patent." (Ex. 6, pp. 10-21 at 16)  In response, ARIAD argued for an earlier priority date by submitting a declaration by its proffered expert, Dr. Inder Verma.  (Ex. 7 at ¶ 16)  ARIAD also submitted the litigation opinions of its proffered expert Dr. Thomas Kadesch on written description from its dispute with Eli Lilly over the '516 patent (the "*Lilly* litigation").  (Ex. 6, pp. 22-25)

        2.      **ARIAD Submitted and Relied Upon a False and Misleading Declaration from its Expert in the Reexamination to Rebut the PTO's Rejection of the Vast Majority of the Claims, Including Every Claim Ever Asserted in This Case, as Unpatentable Over the Prior Art.**

In the August 2006 Office Action in the reexamination, the Examiner rejected 150 claims, including every claim ARIAD has ever asserted in this lawsuit, for anticipation and/or obviousness over the prior art.[5]  (Aug. 2, 2006 Office Action from '516 Patent Reexamination, D.I. 598, Ex. K)  In an attempt to rebut the Examiner's rejections and to secure patentability of the claims of the '516 patent, ARIAD submitted and relied upon a declaration by Dr. Inder Verma.  (Ex. 7)

In his declaration, Dr. Verma disagreed with the Examiner that the use of certain compounds in the prior art, including glucorticoids and red wine, inherently anticipated the rejected claims.  Dr. Verma represented to the PTO that there was "considerable uncertainty" regarding whether or not glucocorticoids actually inhibited NF-κB activity:

---

[5]    The prior art cited to known compounds, including glucocorticoids and resveratrol -- a component found in red wine -- that were either known or were later found to inhibit NF-κB as allegedly claimed by the '516 patent.

                                                

[T]here is considerable uncertainty relating to the potential mechanism of action of glucocorticoids in cells, including whether there are any potential effects on NF-κB...

\* \* \*

The mechanisms by which glucocorticoids, including dexamethasone, mediate inflammatory responses are poorly understood. ...

\* \* \*

[T]he fact that dexamethasone (or any other glucocorticoid) is administered to cells does not indicate that the administration of that glucocorticoid necessarily reduced induced NF-κB activity or NF-κB mediated-intracellular signaling.

(*Id.* at ¶¶ 82, 90, 101)

The affirmative representations to the PTO in reexamination made by ARIAD through the Verma Declaration, however, are flatly contradicted by statements made by Dr. Verma in his own earlier publications in the scientific community (the "Verma publications"). For instance, a paper co-authored by Dr. Verma explicitly set out to determine the biochemical basis for the repression of NF-κB by the glucocorticoid receptor. (Ex. 9) Dr. Verma unequivocally affirmed that studies showed that dexamethasone "leads to repression of NF-κB-activated transcription." (*Id.* at 11897) Likewise, in a review article contained in the "Handbook of Transcription Factor NF-kappaB", Dr. Verma stated that glucocorticoids "also inhibit the action of several transcription factors that are essential for immunity, such as ... NF-κB." (Ex. 10 at 203-204)

**REDACTED**

Similarly, Dr. Verma's declaration in the reexamination included statements questioning the inhibition of NF-κB by components of red wine that were also contradicted by his previous

9

publications. He represented to the PTO in his declaration that red wine is "a generic term covering many different mixtures having in common the characteristic of being of red color." (Ex. 7 at ¶ 133) Thus, he stated that one would not know "what, if anything, would have acted to reduce NF-κB activity in cells." (*Id.*) However, in the same review article discussed above, Dr. Verma specifically noted that "resveratrol, which is found in grapes and red wine, [has] been found to downregulate NIK and IKKα/β, resulting in inhibition of IKK activation, decreased IκBα-degradation, decreased p65 translocation, *and a decrease in NF-κB activity.* (Ex. 10 at 205 (emphasis added))

But ARIAD did not submit either of the Verma publications to the PTO when it submitted the Verma declaration. In fact, ARIAD effectively concealed these publications from the PTO by submitting only an abbreviated version of Dr. Verma's CV that omitted the very publications that contradicted Dr. Verma's declaration. (Ex. 7) After considering ARIAD's submission, including the false and/or misleading Verma Declaration, the PTO issued a Final Office Action, withdrawing the rejections based on red wine but maintaining the other rejections based on the previously cited prior art compounds.[6] (D.I. 598, Ex. L)

For six months following the submission of the Verma Declaration to the PTO, ARIAD made no attempt to disclose the Verma publications. Only when Amgen filed a claim of inequitable conduct based on the false and misleading declaration as shown by Verma's prior publications to the scientific community did ARIAD make any attempt to provide the

---

[6]    ARIAD requested and, due to a procedural technicality, was granted relief from the designation of the rejection as final. In its response, ARIAD canceled 96 of the rejected claims, including 13 claims previously asserted in this case. (*See* D.I. 598, Ex. B) The asserted claims stand rejected in the reexamination at this time.

10

publications to the PTO. (*See* Amgen's Reply to Counterclaim dated May 3, 2007, D.I. 221) Even then, ARIAD merely listed the publications by their first authors in an Information Disclosure Statement ("IDS") with twenty-six other references. (*See* Second Supp. IDS dated May 17, 2007, D.I. 574, Ex. 5 at 5-6)

Although ARIAD later resubmitted the Verma publications two additional times, the publications were listed each time by the first author. (Third Supp. IDS dated Jul. 3, 2007, D.I. 574, Ex. 8 at 2; Supp. IDS dated Feb. 20, 2008, D.I. 574, Ex. 18 at 2) Aside from denying Amgen's allegations of inequitable conduct and requesting that the Examiner "independently review the documents and their relevance to the claimed invention," ARIAD provided no further discussion of the facts of the Verma publications or the significance of their inconsistencies with the Verma Declaration. (*Id.*) To date, ARIAD has never provided its own detailed explanation of the alleged misconduct involving the Verma publications and has never argued that the claims of the '516 patent are patentable despite its misconduct.

**C.    ARIAD's Expert, Dr. Kadesch Recants His Testimony from the Lilly Litigation Regarding the Validity of the '516 Patent**

1.    ARIAD's Written Description Expert from the Lilly Litigation Recanted His Testimony that the '516 Patent Was Adequately Described.

ARIAD retained Dr. Thomas Kadesch as an expert on written description and enablement in the *Lilly* litigation. On April 27, 2006, after the initiation of the reexamination proceedings, Dr. Kadesch testified under oath at trial in the *Lilly* litigation that the '516 patent adequately described the claims that included the reduction of NF-κB activity in cells:

> Q.    Now, based on your review of these documents and your understanding as to what someone skilled in the art would know in the time frame 1989 to 1991, have you drawn any conclusions regarding the sufficiency of the disclosure, first we'll say of the '516 patent?

11

A. Yes. I think it was sufficient.

Q. And was it sufficient to show that the inventors were in possession of the invention that's claimed in the four claims we're talking about here?

A. As I understand the law, yes, it was.

(Ex. 11 at 48:19-49:3) Consistent with Dr. Kadesch's testimony, the jury ultimately found for ARIAD. (*See* Final Judgment entered on Sep. 10, 2007 in the *Lilly* Litigation, D.I. 510, Ex. A) Not even two weeks after Dr. Kadesch testified in the *Lilly* litigation, ARIAD provided the PTO with his favorable testimony. (Ex. 6 at 22-25)

The same attorneys who represented ARIAD during the *Lilly* litigation, who were from Kaye Scholer, LLP ("Kaye Scholer"), retained Dr. Kadesch as an expert for F. Hoffman-LaRoche, Ltd. ("Roche") in Roche's unrelated litigation with Amgen (the "*Roche* litigation"). During his deposition in the *Roche* litigation ("the Kadesch recantation testimony"), Dr. Kadesch offered his opinion that because a patent in dispute in that case, U.S. Patent No. 5,756,349, only provided examples of two types of mammalian cells, it did not provide adequate description to enable one of skill in the art to use the claimed methods in "vertebrate cells". (Ex. 12 at 235:11-236:2)

Because Dr. Kadesch's opinions in the *Roche* litigation contradicted his opinions in the *Lilly* litigation, he was asked about his opinions regarding the '516 patent. Dr. Kadesch acknowledged that the claims of the '516 patent broadly cover a wide range of cells:

Q. Just in terms of background, what are eucaryotic cells?

A. What are eukaryotic cells, eucaryotic cells are cells that – eucaryotic cells are distinguished from procaryotic cells in the sense that they typically contain a nucleus and a mitochondrion.

Q. Do – does the eukaryotic kingdom encompass mammals, reptiles, insects, plants, mollusks, arachnids and birds?

12

A. Yes.

---

Q. And the claims that you are opining on in the '516 Patent, they begin in Column 82 and go all the way through Column 90 of the '516 Patent?

A. Yes.

Q. For example, Claim 1 is directed to or encompasses all eucaryotic cells, correct?

A. Yes.

Q. And Claim 6, for example, is just directed to cells?

Q. Correct?

A. Yes.

Q. It's not limited in any way, it encompasses all cells in the animal kingdom?

Q. Correct?

A. Yeah.

Q. And that would be millions and millions and millions of different types of cells?

A. That's correct.

Q. And even Claim 1 in being limited to the eucaryotic cells, that would be millions and millions of cells?

A. That's correct.

(*Id.* at 262:17-263:2; 265:2-266:5)

But when confronted with his prior testimony in the *Lilly* litigation that these claims satisfied the written description requirement, Dr. Kadesch unequivocally recanted his earlier *Lilly* testimony:

Q. You offer the opinion that the description in the '516 Patent, which I think we've agreed discloses the use of the invention in a

13

handful of genes or for a handful of genes and a handful of cells clearly allowed one of ordinary skill in the art to recognize that the Baltimore inventors invented what is claimed and that includes -- what is claimed would include the practice of the inventions and millions upon millions, in fact, all cells in the animal kingdom, correct?

THE WITNESS: That's correct.

Q. You at least considered, for example, with regard to Claim 1 in the '516 Patent that the claims were directed to the practice of the method in all eucaryotic cells, correct?

A. I did not consider it to be all eucaryotic cells. As the claim is written, it just says eucaryotic cells. It doesn't say all eucaryotic cells. So my understanding of -- my understanding of written description for the '516 Patent was not from the point of view of someone with legal expertise where I would interpret those claims that way I interpret the claims for the current patent, the '349 Patent. And the reason for that is that in terms of claim language, shall we say I've come to understand the necessity for claim language in a way that I didn't appreciate with the '516 Patent. If I had been asked the same series of questions around the '516 Patent, I would have said that the '516 Patent, as it's stated, cannot claim all cells.

Q. And cannot claim all eucaryotic cells?

A. That's correct.

----

Q. I just want to make sure I understand. As you sit here today, do you agree that the '516 Patent claims have adequate written descriptive support?

A. For --

Q. For all eucaryotic cells?

A. No.

(*Id.* at 267:12-270:16) Thus, contrary to what Dr. Kadesch testified to in the *Lilly* litigation, Dr. Kadesch, by no later than June 21, 2007, was clear that the claimed methods of the '516 patent in all cells, including all eukaryotic cells, are not adequately described.

14

2.      ARIAD Took Affirmative Steps to Prevent the Disclosure of the Kadesch
Testimony to the PTO and Only Disclosed the Testimony After Amgen's
Extraordinary Efforts to Obtain and Publicly Reveal the Testimony.

Members of Kaye Scholer were intimately involved with ARIAD's reexamination

counsel in the preparation of ARIAD's responses during the reexamination.  REDACTED

REDACTED   Petition for Extension of Time from '516 Patent

Reexamination, D.I. 510, Ex. Q)  However, neither ARIAD, its prosecuting counsel, nor counsel

at Kaye Scholer did anything to inform the PTO of the Kadesch recantation testimony.  To the

contrary, ARIAD and its representatives took affirmative actions to prevent disclosure to the

PTO.  Under the *Roche* protective order, only very limited circumstances involving clinical trials

and trade secrets -- which clearly did not apply to the Kadesch recantation testimony -- could be

designated "highly confidential material."  (Protective Order in the *Roche* Litigation, D.I. 510,

Ex. E at ¶ 3)  Yet, immediately following Dr. Kadesch's recantation, the Kaye Scholer attorneys

in the deposition designated the entire deposition transcript as "highly confidential - outside

counsel's eyes only" for the sole reason that "[the ARIAD] patent actually is in litigation

currently with Amgen."  (Ex. 12 at 283:11-20)  This designation blocked any access to the

Kadesch recantation testimony by the attorneys in this case.

Amgen diligently pursued several avenues, both through the *Roche* litigation and this

litigation, to try to obtain the Kadesch recantation testimony, but ARIAD and/or its counsel

repeatedly erected roadblocks to prevent Amgen from obtaining the testimony.  Amgen's efforts

to obtain the Kadesch recantation testimony included:

- Amgen directly asked Kaye Scholer on July 2, 2007 to remove the improper designation.
  (Flowers letter to Suh dated Jul. 2, 2007, D.I. 510, Ex. F at 2)

- Amgen requested on August 9, 2007 to meet and confer on this issue with Kaye Scholer. (Ex. 13)

- Amgen filed a motion on September 13, 2007 with the court in the *Roche* litigation to remove the improper designation. (Amgen's Motion to Remove the "Confidential" Designation from the Jun. 21, 2007 Dep. Tr. of Roche's Expert Dr. Thomas Kadesch dated Sep. 13, 2007 in the Roche Litigation, D.I. 510, Ex. G) This motion, however, was denied as moot only because Kaye Scholer represented that it would not call Dr. Kadesch at trial. (Ex. 14)

- Amgen requested on November 15, 2007 that ARIAD produce the testimony and its associated expert reports and exhibits because of its direct relevance in this litigation. (*See* McDole Letter to Gindler dated Nov. 15, 2007, D.I. 510, Ex. I)

- Amgen subpoenaed Roche in this litigation. (Subpoena to F. Hoffman-LaRoche, Ltd. dated Dec. 8, 2007, D.I. 510, Ex. M)

- Amgen requested intervention from this Court because of ARIAD's refusal to produce the Kadesch recantation testimony. ███████ **REDACTED** ███████ ███████ **REDACTED** ███████

Each attempt by Amgen over the course of almost six months to gain access to the Kadesch testimony was denied, ignored, or subverted by ARIAD and its counsel at Kaye Scholer. While Amgen was urgently trying to obtain the Kadesch recantation testimony by any means possible, ARIAD did absolutely nothing to bring it to the PTO's attention. Amgen finally obtained the Kadesch recantation testimony on December 8, 2007 from Roche pursuant to subpoena and moved to amend its reply to assert an allegation of inequitable conduct based on the testimony three days later on December 11, 2007. (*See* Ex. 38; Plaintiff's Memorandum in Support of

16

Their Motion for Leave to Amend Their Reply to Defendant's Counterclaim, December 11, 2007, D.I. 510)

Only then, after all of its efforts failed to conceal the Kadesch recantation testimony, did ARIAD submit this damaging testimony to the PTO -- but ARIAD did so by simply citing it along with twenty-one other documents. (Ninth Supp. IDS dated Dec. 13, 2007, D.I. 574, Ex. 10 at 4)   ARIAD provided no explanation of what the testimony was, how it affected the patentability of the claims of the '516 patent, and why it was being cited at that time. (*Id.*)  In granting Amgen's motion to amend to add the Kadesch testimony to its allegations of inequitable conduct, this Court acknowledged that after Amgen's motion to amend, ARIAD submitted the Kadesch recantation testimony but noted that ARIAD made "no attempt to advise the PTO of potential misrepresentations."   (Memorandum Order: Amgen Entities' Motion for Leave to Amend, D.I. 539)  In response, ARIAD resubmitted the Kadesch recantation testimony to the PTO.  (*See* Supp. IDS dated Feb. 20, 2008, D.I. 574, Ex. 19)   Similar to its previous submissions, aside from summarizing Court documents and pointing to Amgen's submissions, ARIAD provided no explanation of its own for the Kadesch testimony nor argued patentability of the claims in light of its misconduct.

## IV.    ARGUMENT

Summary judgment cannot be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Desper Prods. Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998).  It is the moving party's burden to prove no genuine issue of material fact exists. *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 531 F. Supp. 2d 629, 633 (D. Del. 2008). The party opposing summary

judgment need show only that there is "sufficient evidence supporting the claimed factual dispute … to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (quoting *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 288-289 (1968)).

Applicants and their representatives are "required to prosecute patent applications in the PTO with candor, good faith, and honesty." *Molins*, 48 F.3d at 1178; *see also* Rule 56.  Under Rule 56,

> Each individual associated with the filing and prosecution of a patent application has a ***duty of candor and good faith*** in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. … The duty to disclose all information known to be material to patentability is deemed to be ***satisfied*** if ***all information known to be material to patentability*** of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98.

(emphasis added).  The same duty applies to patentees and their representatives in reexamination proceedings.  *See* Rule 555.  The duty of disclosure also extends to information from any litigation involving the subject matter for which the patent is sought.  MPEP § 2001.06(c).  It also extends to any information that refutes or is inconsistent with an argument an applicant makes for patentability.  Rule 56(b)(2)(i-ii).  Violation of this duty can constitute "inequitable conduct" and can result in loss of patent rights.  Rule 56; *see also Molins*, 48 F.3d at 1178. Moreover, Rule 56 specifically states:

> However, no patent will be granted on an application in connection with which fraud on the Office was ***practiced*** or ***attempted*** or the duty of disclosure was violated through ***bad faith*** or ***intentional misconduct***.

*Id* (emphasis added).

18

Inequitable conduct, with its genesis derived from Rule 56, consists of an affirmative misrepresentation of a material fact, a failure to disclose material information, or the submission of false material information, coupled with an intent to deceive. *eSpeed, Inc. v. BrokerTec USA, L.L.C.,* 480 F.3d 1129, 1135 (Fed. Cir. 2007) (quoting *Pharmacia Corp. v. Par Pharm., Inc.,* 4717 F.3d 1369, 1373 (Fed. Cir. 2005)). Information is considered "material" if a reasonable examiner would have considered it important in deciding whether to allow a patent application. *Digital Control, Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1316 (Fed. Cir. 2006). Submission of a false affidavit to the PTO is a material act with an assumed intent. *Rohm & Haas Co.,* 722 F.2d at 1571 ("… there is no room to argue that submission of false affidavits is not material. … While direct proof of intent to mislead is normally absent, such submissions usually will support the conclusion that the affidavit in which they were contained was the chosen instrument of an intentional scheme to deceive the PTO.").

Because of the factual nature of inequitable conduct, particularly of the intent to deceive, the Federal Circuit has cautioned against the granting of summary judgment in these situations. *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1190 (Fed. Cir. 1993) (holding that intent "requires the fact finder to evaluate all the facts and circumstances in each case" and that "[s]uch an evaluation is rarely enabled in summary proceedings.")

### A.     ARIAD Cannot Cure Its Inequitable Conduct in Seeking to Obtain and Maintain the Claims of the '516 Patent.

ARIAD cannot isolate and claim it has cured its inequitable conduct during the reexamination without addressing its overall culpable conduct. The Federal Circuit has established that, in evaluating inequitable conduct, a patentee's acts of misconduct should not be viewed in isolation. For example, in noting an overall "collection" of problems, the Federal Circuit has stated:

> However, this case presents a collection of such problems, which
> the district court evaluated thoroughly and considered, including
> making credibility findings, and it concluded that the record and
> testimony indicated repeated attempts to avoid playing fair and
> square with the patent system.    Mistakes do happen, but
> inadvertence can carry an applicant only so far.

*See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1235 (Fed. Cir. 2007); *see also Ferring B.V.*

*v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1194 (Fed. Cir. 2006) (holding that a pattern of

material nondisclosures weighs firmly in favor of unenforceability).[7]  Similarly, the Court must

evaluate the totality of the circumstances in assessing whether to dispose of select allegations of

inequitable conduct on summary judgment.

As set forth above, the facts of this case show that ARIAD repeatedly breached its duty

of candor with the PTO.    ARIAD has, over a period of years, submitted false and misleading

information and has withheld material information from the PTO in an attempt to secure and

maintain the claims of the '516 patent.    During the original prosecution of the '516 patent,

ARIAD misrepresented material information -- specifically, that Figure 43 was the sequence of

IκB -- necessary to practice the claimed methods.    Yet, ARIAD never informed the Examiner

that the figure was incorrect and it was never deleted  -- in fact, Figure 43 was resubmitted --

prior to the issuance of the '516 patent.

---

[7]  Of course, each instance of inequitable conduct must be supported by a particularized factual
finding of intent based on testimony and/or documents directly related to each act. *Nilssen*,
504 F.3d at 1227-30. Here, ARIAD has not challenged the underlying inequitable conduct
(*i.e.*, materiality and intent to deceive), for each act of misconduct during reexamination.
(*See* Defendants-Counterclaims-Plaintiffs' Memorandum at Law in Support of Their Motion
For Partial Summary Judgment on Inequitable Conduct at 13, D.I. 574)  Indeed, the facts set
forth herein surrounding ARIAD's misconduct and its efforts to bury that misconduct
demonstrate the requisite materiality and intent to deceive for each of its improper acts
during reexamination.

ARIAD's misconduct continued as it attempted to maintain the claims of the '516 patent during reexamination in the PTO.    To claim the benefit of the filing date of an earlier application, that application must satisfy the written description requirement.  *See* 35 U.S.C. § 120.  In an effort to preserve an earlier effective date for prior art purposes, ARIAD argued through Dr. Verma's declaration that the claims were entitled to a 1989 effective date, yet concealed Dr. Kadesch's recantation and admission that the claims of the '516 patent were not adequately described.  Similarly, in rebutting the Examiner's prior art rejections (*i.e.,* in an attempt to support patentability), ARIAD relied upon statements in Dr. Verma's declaration that were clearly contradicted by Dr. Verma himself prior to his execution of the declaration.  (*See* Ex. 7)  ARIAD also submitted a truncated CV that omitted these very publications, apparently hoping that the Examiner would not see or consider them.  (*Id.*)

The affirmative steps ARIAD took to hide its misconduct provide further evidence of the significance of and bad faith in its misconduct.  Although ARIAD could have disclosed the fact of its misleading statements at any time, it concealed them until it was caught red-handed and its conduct exposed by Amgen's pleadings and submissions and by this Court's Order.  As demonstrated by its actions in preventing Amgen (or any other party) from obtaining the Kadesch testimony, ARIAD did all that it could to keep his recantation testimony from ever reaching the PTO or anyone else.

In doing whatever was necessary to obtain and preserve the '516 patent, ARIAD failed to play "fair and square" with the patent system.  This pervasive and intentional misconduct in front of the PTO belies any later attempt to cure.  *See* Rule 56 ("no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct."); *see also* Rule 555.

21

Moreover, the Federal Circuit looks "at the equities of the particular case and determine[s] whether the conduct before them ... was still so reprehensible as to justify the court's refusing to enforce the rights of the party guilty of such conduct." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir. 1998) (quoting *Norton v. Curtiss*, 433 F.2d 779, 793 (C.C.P.A. 1970)).

Not only should ARIAD be denied an avenue to cure because of the extent and pervasiveness of its misconduct, but it should also be prevented from curing because ARIAD did not and, indeed, cannot voluntarily cure its misconduct. Cure of prior misconduct may only be attempted "where an applicant chooses to take the necessary action *on his own initiative* and to *take it openly.*" *Rohm & Haas*, 722 F.2d at 1572 (emphasis added). The facts of this case clearly demonstrate that ARIAD never took any action to disclose either the Verma publications or the Kadesch recantation testimony on its own initiative. Each and every IDS filed by ARIAD occurred directly after or in response to Amgen's public filings in asserting its inequitable conduct defense. Moreover, the extremes to which ARIAD went to hide and prevent disclosure of the Verma publications and Kadesch recantation testimony, outlined above, evidences a complete lack of forthrightness on ARIAD's part. Even when it did disclose the publications and testimony, ARIAD was less than open -- ARIAD failed to acknowledge, and instead adamantly denied, to the PTO that it had, in fact, withheld any material information or misrepresented any facts that needed to be cured. (*See* D.I. 574, Ex. 8 at 2) By delaying and affirmatively concealing its misconduct until its actions were called out by Amgen in its pleadings, ARIAD foreclosed any opportunity to "voluntarily" cure its intentional misconduct.

**B.    Even if ARIAD's Inequitable Conduct Could Be Cured, ARIAD's Submissions to the PTO Fail as a Matter of Law.**

Even if ARIAD could cure its inequitable conduct (which it cannot), its eventual disclosure of the Verma publications and the Kadesch recantation testimony fails to do so. The Federal Circuit has made it clear that an applicant/patentee's prior misconduct can only be cured in very limited circumstances. *Rohm & Haas*, 722 F.2d. at 1572. In *Rohm & Haas*, the applicants attempt to rectify their submission of false and misleading affidavits in support of patentability by meeting with the Examiner and presenting him with all of the data that it previously misrepresented or omitted. *Id.* at 1557-58. While acknowledging that cure is possible in limited circumstances, the Court held that merely supplying the information to the Examiner was not enough. The Federal Circuit set forth the specific limited circumstance in which a prior misdeed can voluntarily be "cured".

> The first requirement to be met by an applicant, aware of misrepresentation in the prosecution of his application and desiring to overcome it, is that he expressly advise the PTO of its existence, stating specifically wherein it resides. The second requirement is that, if the misrepresentation is of one or more facts, the PTO be advised what the actual facts are, the applicant making it clear that further examination in light thereof may be required if any PTO action has been based on the misrepresentation. Finally, on the basis of the new and factually accurate record, the applicant must establish patentability of the claimed subject matter. ... *It does not suffice that one knowing of misrepresentations in an application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome, leaving him to formulate his own conclusions*.

*Id.* at 1572 (emphasis added). If a patentee cannot meet this specific criteria, then its inequitable conduct cannot be cured.

Contrary to ARIAD's assertions, any cure by ARIAD of its inequitable conduct would have to satisfy the requirements set forth in *Rohm & Haas* and not *Young*. Unlike *Rohm & Haas*,

23

*Young* involved the failure to submit material information that rebutted attorney arguments made in support of patentability. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1341-43 (Fed. Cir. 2007). Specifically, because the statements were mere attorney arguments characterizing the prior art in an attempt to distinguish the claims from the prior art, the Court found that no affirmative misrepresentations occurred. Thus, the Court held that there was no intent to deceive and ***no inequitable conduct***. *Id.* at 1349. Indeed, the *Young* court distinguished their facts from *Rohm & Haas*. *Id.* ("...we regard that case as distinguishable, involving different facts, particularly because in that case the issue related to an alleged false affidavit, where a cure hurdle may be higher than here.")

Here there is inequitable conduct -- ARIAD admits as much for purposes of this motion -- and thus *Young* is inapplicable. The Verma Declaration contains materially false and misleading declaratory statements, *i.e.* evidence, not just attorney arguments, presented to the PTO in support of patentability. A misrepresentation made in conjunction with a declaration is "held to a higher standard." *See eSpeed*, 480 F.3d at 1136 (explaining that false statements made by patentees in sworn declarations or affidavits, as opposed to attorney argument, are "inherently material"). Similarly, as the facts above demonstrate, the Kadesch recantation testimony involves material information, directly recanting opinion testimony relating to arguments before the PTO, that was affirmatively withheld from the PTO with an intent to deceive.[8] "[W]here

---

[8]  Even if ARIAD disagrees that the testimony was a recantation, it was certainly material to patentability insofar as the testimony was not cumulative to anything ARIAD had previously submitted to the patent office and was testimony of its written description expert pertaining to written description of the '516 patent. This is especially the case where ARIAD submitted testimony of its choosing from Dr. Kadesch (from the *Lilly* litigation) and of its choosing from Dr. Verma, but then refrained from submitting (and in fact took steps to conceal) testimony and publications it must not have viewed as favorable.

24

intentional material misrepresentations have been made … a complete 'cure' must also be demonstrated by clear, unequivocal, and convincing evidence." *Rohm & Haas*, 722 F.2d at 1572.

ARIAD's inadequate attempts to "cure" its inequitable conduct cannot, as a matter of law, satisfy *Rohm & Haas*. By waiting and affirmatively concealing the Verma publications and the Kadesch recantation testimony and not disclosing its misconduct to the PTO until this misconduct was called out by Amgen in its pleadings, ARIAD cannot now say that *any* of its disclosures, however incomplete, were *voluntary*. Each disclosure was a consequence of Amgen and this Court's actions.

The disclosures in each of ARIAD's supplemental IDSs do not satisfy the *Rohm & Haas* test and do not, as a matter of law, cure its inequitable conduct. In each of its attempts, ARIAD failed to explicitly advise the PTO of the nature of the misconduct and where they could be found, what the actual facts were for the Verma publications and the Kadesch recantation testimony and that further examination may be required, and how this misconduct affected the patentability of the claims. When ARIAD finally submitted the Verma publications and the Kadesch recantation testimony, it simply buried them with numerous other references. (*See* D.I. 574, Ex. 5; D.I. 574, Ex. 10 at 4; *see also eSpeed*, 480 F.3d at 1137 (holding that submitting references by burying them in "a blizzard of paper" is not enough). ARIAD's subsequent efforts did no more than reference this Court's Order or Amgen's pleadings and submissions. (*See* D.I. 574, Ex. 8; D.I. 574, Ex. 18; D.I. 574, Ex. 19) This does not satisfy the *Rohm & Haas* requirements. Simply pointing to another parties' allegations and asking the Examiner to independently review the references and materials, is not the *mea culpa* necessitated by *Rohm & Haas*. *Rohm & Haas*, 722 F.2d at 1572 ("It does not suffice that one knowing of

25

misrepresentations in an application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome, leaving him to formulate his own conclusions.")    Indeed, ARIAD denied its misconduct. (*See* D.I. 574, Ex. 8 at 2, "...Patentees disagree with the allegations...")  Without providing its own explanation of its misconduct or even acknowledging that an inconsistency occurred, ARIAD failed to provide the "clear, unequivocal, and convincing evidence" that must be shown in order to voluntarily cure any misconduct. *Rohm & Haas*, 722 F.2d at 1572.

Finally, ARIAD is also wrong when it argues that its reference to Amgen's pleadings and submissions is sufficient to cure because, according to PTO regulations, an Examiner must consider all materials submitted in an IDS.  PTO regulations do not absolve ARIAD from the burden of making the showing required under Federal law.  To date, ARIAD has not satisfied the steps set forth by the Court in *Rohm & Haas* - it never directly discussed or explained either Dr. Verma's inconsistencies or the Kadesch recantation testimony with the Examiner and has never addressed the relevance of either to the patentability of the rejected claims of the '516 patent.

## V.    CONCLUSION

For the foregoing reasons, ARIAD cannot and did not cure its inequitable conduct regarding the Verma Declaration and the Kadesch recantation testimony.    Accordingly, ARIAD's motion for partial summary judgment on inequitable conduct should be denied.

26

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_(signature)_

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

Dated: May 22, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Immunex Corporation, Amgen USA Inc., Amgen Manufactu Limited, and Immunex Rhode Island Corporation*

27

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on May 22, 2008, I caused to be electronically filed a true and correct copy of The Amgen Entities' Answering Brief In Opposition To ARIAD and the Institutions' Motion For Partial Summary Judgment On Inequitable Conduct with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on May 22, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com