IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
　　　　　　　　　　　　　　　　　　　 )
　　　Plaintiffs/Counterclaim Defendants, )
　　　　　　　　　　　　　　　　　　　 )
　　　v. )
　　　　　　　　　　　　　　　　　　　 )
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.* )
　　　　　　　　　　　　　　　　　　　 )
　　　Defendants/Counterclaim Plaintiffs. )

Civil Action No. 06-259 (MPT)

Public Version
Confidential Material Omitted

## THE AMGEN ENTITIES' ANSWERING BRIEF IN OPPOSITION TO ARIAD AND THE INSTITUTIONS' *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY OF THE HONORABLE GERALD J. MOSSINGHOFF AND DR. AARON CIECHANOVER

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA  90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated:  May 22, 2008

## **TABLE OF CONTENTS**

I.     NATURE AND STAGE OF THE PROCEEDINGS. .........................................................1

II.    SUMMARY OF ARGUMENT. ................................................................................1

III.   GERALD J. MOSSINGHOFF'S TESTIMONY. .........................................................3

     A.   Mr. Mossinghoff's Expertise. ...............................................................3

     B.   Mr. Mossinghoff's Testimony Is Relevant And Admissible. ...................4

          1.   Testimony explaining the key background to the patenting process, with which a jury is unfamiliar, is relevant and admissible.........................4

          2.   Mr. Mossinghoff is eminently qualified to testify to issues related to materiality and the duty of candor owed to the PTO. .............................8

          3.   Testimony on issues relating to willfulness and the "objective recklessness" standard is relevant and admissible. ....................................12

IV.    DR. AARON CIECHANOVER'S TESTIMONY. .........................................................14

     A.   General Background. ...........................................................................14

          1.   Dr. Ciechanover is an expert on the relevant technology. .........................15

          2.   Dr. Ciechanover's opinions relate to technology implicated by the '516 patent and all asserted claims. .........................................................16

     B.   Dr. Ciechanover's Testimony Is Directly Relevant To The Issues In This Case. .19

          1.   Written description and enablement. .......................................................19

          2.   Novelty..................................................................................................21

V.     CONCLUSION.......................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Armament Sys. and Procedures, Inc. v. IQ Hong Kong Ltd.,*
2007 WL 1267877 (E.D. Wis. Apr. 27, 2007)................................................................. 9, 10

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.,*
2002 WL 1751381 (N.D. Tex. Apr. 4, 2002) ................................................................. 10

*Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.,*
79 F. Supp. 2d 252 (W.D.N.Y. 2000) .......................................................................... 8

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
68 F. Supp. 2d 508 (D.N.J. 1999) ............................................................................... 9, 12

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
326 F.3d 1226 (Fed. Cir. 2003) ................................................................................. 10

*Dura Auto. Sys. Ind. v. CTS Corp.,*
285 F.3d 609 (7th Cir. 2002) .................................................................................. 9, 10

*Enzo Biochem, Inc. v. Calgene, Inc.,*
188 F.3d 1362 (Fed. Cir. 1999) ................................................................................ 21

*Erickson v. Baxter Healthcare, Inc.,*
151 F. Supp. 2d 952 (N.D. Ill. 2001) ........................................................................... 24

*Frensenius Med. Care Holdings v. Baxter Int'l, Inc.,*
2006 WL 1329999 (N.D. Cal. 2006) ............................................................................ 23

*GFI, Inc. v. Franklin Corp.,*
265 F.3d 1268 (Fed. Cir. 2001) ................................................................................ 10

*In re Seagate Tech.,*
497 F.3d 1360 (Fed. Cir. 2007) .................................................................... 2, 7, 12, 13

*Oxford Gene Tech. Ltd. v. Mergen Ltd.,*
345 F. Supp. 2d 431 (D. Del. 2004) ............................................................................ 13

*Reiffen v. Microsoft Corp.,*
214 F.3d 1342 (Fed.Cir. 2006) ................................................................................. 21

*Smith v. Ford Motor Co.,*
215 F.3d 713 (7th Cir. 2000) .................................................................................. 23

*Sundstrom v. Frank,*
2007 WL 2916559 (E.D. Wis. Oct. 5, 2007) .................................................................. 10

DB02:6839681.1

065028.1001

*THK America, Inc. v. NSK, Ltd.,*
   917 F. Supp. 563 (N.D. Ill. 1996) ................................................................................ 24

*U.S. v. Rahm,*
   993 F.2d 1405 (9th Cir.1993) ...................................................................................... 23

*UCB Societe Anonyme v. Mylan Laboratories, Inc.,*
   2006 WL 839397 (N.D. Ga. 2006) ................................................................................ 8

**Other Authorities**

Manual of Patent Examining Procedure
   §§ 201.06, 201.07, 201.08.............................................................................................. 7

DB02:6839681.1

065028.1001

## I.    NATURE AND STAGE OF THE PROCEEDINGS.

The nature and stage of these proceedings are incorporated herein by reference as set forth in The Amgen Entities' Brief in Support of Their Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,410,516. (D.I. 588)  The parties' opening briefs regarding claim construction, and summary judgment and *Daubert* motions, were filed on April 25, 2008. Amgen[1] submits this answering brief in opposition to ARIAD's motion to exclude the expert testimony of the Honorable Gerald J. Mossinghoff and Dr. Aaron Ciechanover.

## II.    SUMMARY OF ARGUMENT.

1.    Mr. Mossinghoff is expected to offer testimony in this case that will assist the jury and the Court in determinations that require understanding the complex factual issues surrounding ARIAD's prosecution of U.S. Patent No. 6,410,516 (Ex. A, "the '516 patent").  Mr. Mossinghoff is undeniably qualified to offer his expertise regarding U.S. Patent & Trademark Office ("PTO") practice and procedure given his former status as a Commissioner of the PTO and a Patent Examiner, and decades of other related experience.   The complex sixteen-year prosecution history that resulted in the '516 patent and the continuing prosecution during the merged reexamination proceedings make this case especially appropriate for expert testimony to put the invalidity and unenforceability issues into context.  Mr. Mossinghoff's testimony will further assist the jury in determining whether ARIAD's allegations meet the new heightened "objective recklessness" test for willful infringement set forth in *In re Seagate Tech.*, 497 F.3d

---

[1]    In this brief, "Amgen" will refer collectively to all of the named plaintiffs.  Similarly, unless otherwise specified, "ARIAD" will refer collectively to all of the named defendants.  The "Institutions" will refer collectively to the President and Fellows of Harvard College ("Harvard"); the Massachusetts Institute of Technology ("MIT"); and the Whitehead Institute for Biomedical Research ("Whitehead").

1360, 1371 (Fed. Cir. 2007). If ARIAD's claim of willful infringement is not disposed of through summary judgment,[2] the new "objective" test requires the type of expert testimony that Mr. Mossinghoff can provide regarding the standards of commerce to be considered (including the rejection of the '516 patent in both the commercial marketplace and during reexamination) in determining whether there was an objectively high likelihood that Amgen's conduct constituted infringement of a valid patent. Thus, Mr. Mossinghoff is eminently qualified to offer relevant expert testimony helpful to the trier of fact on important issues, and ARIAD's motion to exclude him should be denied.

    2.     Dr. Aaron Ciechanover is a Nobel Laureate in Chemistry and is expected to offer scientific testimony about the fundamental biology of the '516 patent that is directly relevant to the invalidity of the patent claims for lack of adequate written description, enablement, and novelty. ARIAD admits that Dr. Ciechanover's testimony is relevant to at least the IκB limitations of several dependent claims (and thus is relevant to the full scope of the claims from which they depend). These limitations (including "reducing NF-κB activity in cells" by inhibiting the "modification" and/or "degradation" of IκB) are encompassed within the scope of all the asserted claims, the full scope of which must be described and enabled. That Dr. Ciechanover may not opine on the ultimate issues of invalidity is irrelevant. Dr. Ciechanover's scientific testimony is directly relevant to the adequacy of the written description and enablement of the '516 patent, and also provides the background for other of Amgen's scientific experts to consider and offer opinions regarding, among other things, the anticipation of the '516 patent claims. Dr. Ciechanover will testify regarding the biology of the ubiquitin system of regulated

---

[2]     Amgen has moved for summary judgment on the issue of willfulness. (D.I. 604, 605)

protein degradation -- a system whose discovery is attributed to him -- because this system plays an essential role in the regulation of NF-κB and IκB that is implicated by the '516 patent. ARIAD's motion to exclude him should thus be denied.

## III.    GERALD J. MOSSINGHOFF'S TESTIMONY.

As set forth in his expert reported dated January 18, 2008, Mr. Mossinghoff intends to offer testimony regarding inequitable conduct during the sixteen-year prosecution and ongoing reexamination of the '516 and related patents.  He does so necessarily against the backdrop of the rules and procedural requirements governing the filing and prosecution of patent applications in the PTO, including reexamination and the duty of candor and good faith owed to the PTO.[3]

Mr. Mossinghoff has also submitted a supplemental report dated February 21, 2008 to address ARIAD's allegation of willful infringement against Amgen.    Specifically, Mr. Mossinghoff analyzes the facts relevant to a determination of the "objective recklessness" threshold that ARIAD must meet to show willful infringement.[4]

### A.    Mr. Mossinghoff's Expertise.

Mr. Mossinghoff has a bachelor of science from St. Louis University, a law degree from George Washington University (where he also currently teaches Intellectual Property Law), and decades of relevant experience.[5]    His distinguished career includes positions as a Patent

---

[3]    Declaration of Gerald J. Mossinghoff; January 18, 2008 Expert Report of the Honorable Gerald J. Mossinghoff ("January 19, 2008 Mossinghoff Expert Report") (D.I. 600, at Ex. A)

[4]    Declaration of Gerald J. Mossinghoff; February 21, 2008 Supplemental Expert Report of the Honorable Gerald J. Mossinghoff ("February 21, 2008 Mossinghoff Supplemental Expert Report") (D.I. 600, at Ex. B)

[5]    *Id.* at Ex. A.

DB02:6839681.1

065028.1001

Examiner and as the Director of the Legislative Planning at the U.S. Patent & Trademark Office, as well as appointments as Commissioner of Patents and Trademarks, Deputy General Counsel of the National Aeronautics and Space Administration, and Assistant Secretary of Commerce, U.S. Ambassador to the Diplomatic Conference on the Revision of the Paris Convention.  He is also a member of the Patent Public Advisory Committee, established pursuant to P.L. 106-113, among other things, to advise the Under Secretary of Commerce on the policies, goals, and performance of the PTO.

**B.**     **Mr. Mossinghoff's Testimony Is Relevant And Admissible.**

    1.     Testimony explaining the key background to the patenting process, with which a jury is unfamiliar, is relevant and admissible.

Mr. Mossinghoff's testimony will help the jury to understand the complicated prosecution and family history of the '516 patent.  The facts and background of the patenting process and prosecution of the '516 patent are directly relevant to fundamental issues to be decided, including but not limited to the priority date (if any) to which the claims of the '516 patent are entitled, and various issues bearing on the noninfringement, invalidity, and unenforceability of the claims.

The '516 patent issued in June 2002 from an application filed on June 5, 1995.  It claims a relation, albeit a remote one, to an application filed in January 1986, which named only two of the thirteen named inventors of the '516 patent.[6]  Over the next five years (until 1991), a total of six continuation-in-part patent applications were filed, naming different but overlapping sets of

---

[6]     *See* Ex. A, '516 Patent, col.1, ll. 5-17.

researchers as inventors.[7]  In November 1991 these separate applications were merged into one continuation-in-part application.[8]  The application that then led to the '516 patent followed from a further continuation application that was filed in 1995.[9]  ARIAD claims priority for the asserted claims back to filings in 1988 and 1989, despite the fact that substantial new matter was added in later applications and there was not commonality of assignment until 1991.

Further adding to the duration and complexity of the prosecution and patent office procedure issues implicated in this case, the '516 patent is currently the subject of merged reexamination proceedings before the PTO.[10]  At this time, 150 of the originally-issued 203 claims of the '516 patent stand rejected, including all claims ever asserted by ARIAD in this case.[11]  In apparent agreement with the PTO's rejection in reexamination, ARIAD has canceled 104 of the claims, including 13 claims previously asserted in this case.[12]

Mr. Mossinghoff's testimony is necessary to allow the jury to understand the patenting and reexamination process in general and the specifics of ARIAD's effort to obtain and maintain the numerous claims in the technically complex subject matter of the '516 patent. ARIAD has

---

[7]   *See* Ex. A, '516 Patent, col.1, ll. 5-17.

[8]   *See* Ex. A, '516 Patent, col.1, ll. 5-17.

[9]   *See* Ex. A, '516 Patent, col.1, ll. 5-17.

[10]   January 19, 2008 Mossinghoff Expert Report at ¶ 43 (D.I. 600, at Ex. A)

[11]   January 19, 2008 Mossinghoff Expert Report at ¶¶ 49, 57 (D.I. 600, at Ex. A)

[12]   January 19, 2008 Mossinghoff Expert Report at ¶ 59 (D.I. 600, at Ex. A)

DB02:6839681.1                                                                                                      065028.1001

acknowledged that the jury requires background information on PTO procedures.[13]  ARIAD's

proposed solution is to show the video on basic PTO procedures and the parts of a patent, "An

Introduction to the Patent System."[14]  While Amgen agrees with ARIAD that, given the nature

and complexity of this case, the brief introductory video is appropriate in the upcoming trial, it is

also necessary and appropriate for Mr. Mossinghoff to supplement that very basic information.

ARIAD's bare assertion that testimony on PTO practice and procedure is "totally unnecessary"

ignores the convoluted and lengthy prosecution history and ongoing reexamination of the '516

patent.

Mr. Mossinghoff's testimony will provide the jury with a case-specific background

relevant to virtually every issue in this case.  Mr. Mossinghoff's testimony is necessary for the

jury to understand the complicated history of continuation-in-part, continuation, and divisional

applications that led ultimately to the issuance of the '516 patent.  This prosecution history is

directly relevant to priority, invalidity issues including written description, enablement, and

anticipation, and inequitable conduct during the prosecution of the '516 patent.

For example, despite a finding by the PTO in the reexamination that the claims of the

'516 patent are entitled to a priority date no earlier than November 1991, ARIAD asserts in this

case that the asserted claims are entitled to claim priority to applications filed in March 1988 or

April 1989.  The answer to this priority question is highly relevant to the invalidity issues in this

---

[13]  ARIAD's Memorandum in Support of Their Motion to Preclude Expert Testimony of Mr. Gerald J. Mossinghoff and Dr. Aaron Ciechanover ("ARIAD's *Daubert* Brief") at 14 (D.I. 579)

[14]  *See* Hon. Mary Pat. Thynge, *Preliminary Patent Jury Instructions (With Video) available at* http://www.ded.uscourts.gov/MPTmain.htm ("patent video").

case because it controls which references are or are not prior art. In addition, the written description and enablement issues in this case will involve consideration of the disclosures of various of the applications leading to the '516 patent. Yet the patent video does not address any of these complexities. It does not, for example, explain the differences between divisional (§ 201.06 of the Manual of Patent Examining Procedure ("MPEP")), continuation (§ 201.07), and continuation-in-part applications (§ 201.08 MPEP) that are relevant to the priority date analysis.[15] Nor does it even explain the significance of a priority date analysis or that the date relevant to a prior art analysis can shift for different claims, depending on which if any of the several applications that led to the '516 patent supports the claims of the patent.

For the PTO to grant a request for reexamination, a substantial new question of patentability based on published prior art references must be present.[16] An understanding of the procedure for reexamination and the reexamination of the '516 patent specifically is required for the analysis of several issues in this case, including noninfringement, inequitable conduct, nonwillfulness, and invalidity. For example, ARIAD filed a declaration during reexamination stating that extracellular agents (like Enbrel®) cannot reduce NF-κB activity in cells as required by the claims.[17] Moreover, the PTO's grant of reexamination of the '516 patent and rejection of 150 claims of the patent demonstrate that any infringement could not have been objectively reckless under *In re Seagate Tech. See In re Seagate Tech.*, 497 F.3d at 1374 ("A substantial question about invalidity or infringement is likely sufficient not only to avoid a preliminary

---

[15]    January 19, 2008 Mossinghoff Expert Report at ¶¶ 11-14 (D.I. 600, at Ex. A)

[16]    January 19, 2008 Mossinghoff Expert Report at ¶¶ 44 (D.I. 600, at Ex. A)

[17]    October 19, 2007 Second Declaration of Inder Verma at ¶¶ 60-61, 114 (D.I. 587, at Ex. E)

065028.1001

injunction, but also a charge of willfulness based on post-filing conduct."). The patent video does not cover any of these issues -- including priority dates, continuing applications, disclaimer of claim scope, grant of reexamination, and rejection and cancellation of claims in the context of reexamination -- that all bear directly on several issues in this case.

Expert testimony regarding procedures of the patent application process and reexamination proceedings is admissible and especially necessary in the unique circumstances of this case to provide the jury with an understanding regarding the prosecution history of the '516 patent. *See Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.*, 79 F. Supp. 2d 252, 256 (W.D.N.Y. 2000) (explaining in the context of reexamination proceedings that "[o]bviously PTO procedures are foreign to the average person, and it may be helpful to the jury to hear someone experienced in those procedures explain how they operate in terms that a layperson can understand"); *see also UCB Societe Anonyme v. Mylan Laboratories, Inc.*, 2006 WL 839397, at *2-3 (N.D. Ga. 2006) (denying motion to preclude expert report and testimony of patent law expert with respect to PTO procedures and policies, the patent applicant's duty of candor to the PTO, and the prosecution histories of the patents-in-suit). The convoluted and lengthy prosecution history and reexamination in the present case call out for expert testimony as to the additional details of prosecution and reexamination beyond what is covered by the Court's patent video.

> 2.    Mr. Mossinghoff is eminently qualified to testify to issues related to materiality and the duty of candor owed to the PTO.

Mr. Mossinghoff is also expected to offer testimony regarding issues of materiality and the duty of candor owed to the PTO. These issues are of course relevant to the allegations of inequitable conduct and given the backdrop of the complex prosecution history in the case are appropriately the subject of expert testimony.

8

ARIAD's objection that Mr. Mossinghoff is not qualified to opine on materiality is without merit.[18]    Contrary to ARIAD's assertions, Mr. Mossinghoff's consideration of the opinions of technical experts in his analysis is entirely proper and is not a ground to exclude his expert testimony relating to what information a reasonable examiner would consider material. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 68 F. Supp. 2d 508, 525-29 (D.N.J. 1999) (permitting Mr. Manbeck, a former patent examiner who is not an expert in virology, to rely upon the opinions of technical experts in testifying as to materiality of prior art references).

The cases cited by ARIAD to support its position to the contrary are inapposite.  None of the cases cited by ARIAD involve the current situation where an admitted expert in PTO practice and procedure has considered the opinion of a technical expert in offering his opinion as to what information a reasonable examiner would consider material.  For example, in *Dura Auto. Sys. Ind. v. CTS Corp.*, 285 F.3d 609, 612-616 (7th Cir. 2002), the court held only that a technical expert could not report the results of modeling exercises, undertaken by other employees whose expert reports were not disclosed in a timely fashion, because the soundness of the underlying expert judgment was at issue.  In reaching its opinion, the court specifically stated that "it is common in technical fields for an expert to base an opinion in part on what a different expert

---

[18]   As ARIAD correctly points out in its opening brief, Mr. Mossinghoff – unlike Mr. Manbeck on behalf of ARIAD -- does not propose to offer impermissible testimony on either subjective intent or the ultimate issue of inequitable conduct.  *See Armament Sys. and Procedures, Inc. v. IQ Hong Kong Ltd.*, 2007 WL 1267877, at *1 (E.D. Wis. Apr. 27, 2007) ("Thus, to the extent Manbeck would attempt to testify about ultimate legal issues, I would exclude or disregard that testimony.  If he were to testify, for example, that 'in my expert opinion, Mr. Parsons committed inequitable conduct,' I would disregard such testimony.").
(Continued...)

DB02:6839681.1                                                                 065028.1001

believes on the basis of expert knowledge not possessed by the first expert . . . ." *Id.* at 613. Here, the soundness of the underlying technical expert opinion is uncontested. ARIAD's citation to *Sundstrom v. Frank*, 2007 WL 2916559, at *7-9 (E.D. Wis. Oct. 5, 2007), actually supports Amgen's position. In *Sundstrom*, the court in fact **denied** the motion to exclude the testimony of a technical expert who, acknowledging that he was not an expert in a particular field, considered the opinions of others in forming his own opinion.[19] *Id.*

Information is deemed "material" if a "*reasonable examiner* would be substantially likely to consider it important in deciding whether to allow an application to issue as a patent." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (quoting *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001) (emphasis added)). Because the test for materiality involves whether a *reasonable examiner* would consider information material, courts have found former patent examiners qualified to render opinions on the issue of materiality. *See Armament*, 2007 WL 1267877, at *1 (denying motion to exclude testimony of former patent examiner that would "provide some *factual* context for *why* Parsons' behavior would have been inequitable, especially regarding the issue of materiality") (emphasis in original); *see also Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 2002 WL 1751381, at *34-35 (N.D. Tex. Apr. 4, 2002) ("Hitchcock does not propose to testify as a person of ordinary skill in the relevant art, but as a patent lawyer addressing the factual issues -- many of which stem from

---

Mr. Manbeck's proposed testimony on subjective intent and the ultimate issue of inequitable conduct is the subject of Amgen's motion to preclude pursuant to *Daubert*. (D.I. 597, 598)

[19] ARIAD's citation is especially unpersuasive as ARIAD actually cites to the court's quotation of the plaintiff's argument, as opposed to the court's analysis, in support of its position. *See Sundstrom*, 2007 WL 2916559, at *3-4 (excerpting Plaintiff's Brief in Support of its Motion to Exclude Testimony of Dr. Claiborn).

the arguably complicated prosecution history of the '207 patent -- that must be addressed before the court can reach a final conclusion regarding the legal issues [of estoppel and inequitable conduct].").

Mr. Mossinghoff's supporting opinion on materiality, addressing the factual issues that stem from the convoluted prosecution history and reexamination of the '516 patent, would be helpful to the trier of fact. Mr. Mossinghoff has opined on issues relating to the breach of the duty of candor and good faith by the applicants of the '516 patent and reexamination with respect to: (1) the inclusion of the admittedly erroneous Figure 43 (partial chicken protein represented to be IκBα in the '516 patent) during prosecution of the '516 patent and the failure to withdraw or at least advise the PTO about the erroneous figure, despite withdrawing it as erroneous in 1998 and 2000 during prosecution of two related patents; (2) ARIAD's submission in reexamination of the Declaration of Inder Verma for the purpose of defeating the examiner's finding that the '516 patent was inherently anticipated by various compounds and references describing the use of such compounds, which contradicts his earlier writings concerning these compounds; and (3) ARIAD's conduct relating to ARIAD expert Dr. Thomas Kadesch's recanted testimony (and attempts to block disclosure thereof), in which he disavowed his earlier testimony on ARIAD's behalf and instead admitted the failure of the '516 patent to describe the full scope of the claims.[20] These opinions, based on a well-founded analysis of PTO procedures and policies with respect to the prosecution history and pending reexamination of the '516 patent from the perspective of a reasonable examiner, will assist the trier of fact in deciding the issues in this case.

---

[20]    January 19, 2008 Mossinghoff Expert Report at ¶¶ 63-91 (D.I. 600, at Ex. A)

DB02:6839681.1                                                                                                      065028.1001

ARIAD's objections to Mr. Mossinghoff's anticipated testimony on the issues relating to an applicant's duty of candor to the PTO during patent prosecution and reexamination similarly fall flat. Formerly a Patent Examiner, the Director of the Legislative Planning at the U.S. Patent & Trademark Office, a Commissioner of Patents and Trademarks, and a member of the Patent Public Advisory Committee, advising the Under Secretary of Commerce on the policies, goals, and performance of the PTO, Mr. Mossinghoff is undeniably qualified to testify as to issues relating to PTO procedures and policies, including the duty of candor. *See UCB*, 2006 WL 839397, at *2-3 (denying motion to preclude testimony on the duty of candor from PTO practice and procedure expert with over twenty-five years of experience working in the PTO). In fact, ARIAD's own proffered expert, Mr. Manbeck, has previously testified as to the duty of candor and good faith, specifically discussing the same change to the duty of candor standard implemented by the PTO in 1992 that ARIAD now complains of with respect to Mr. Mossinghoff's report. *See Boehringer*, 68 F. Supp. 2d at 525.

<ol start="3">
<li>Testimony on issues relating to willfulness and the "objective recklessness" standard is relevant and admissible.</li>
</ol>

No genuine issue of material fact precludes entry of judgment of no willful infringement in favor of Amgen. But if the Court finds that a triable issue remains, Mr. Mossinghoff's expert testimony will assist the jury in its determination regarding the Federal Circuit's new test for willful infringement. *In re Seagate Tech.*, 497 F.3d at 1371, established a heightened "objective recklessness" test for willful infringement. Specifically, "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an *objectively high likelihood* that its actions constituted infringement of a *valid patent*." *Id.* (emphasis added). Mr. Mossinghoff is certainly in a position to provide the jury with his expert opinions regarding whether a company in Amgen's shoes was "objectively reckless" *vis-à-vis* the

'516 patent, given the circumstances surrounding the patent. For example, the Federal Circuit noted that "standards of commerce" are among the "factors a court might consider" in determining whether objective recklessness is present. *Id.* at 1371 n.5. ARIAD has not questioned that Mr. Mossinghoff is qualified to provide the jury with an understanding of the relevant standards of commerce in light of the rejection of the '516 patent during reexamination and in the commercial marketplace. *See Oxford Gene Tech. Ltd. v. Mergen Ltd.,* 345 F. Supp. 2d 431, 443 (D. Del. 2004) (denying motion to exclude testimony from a former in-house patent counsel on the standard of reasonable commercial behavior).

Considering the unique circumstances of this case, Mr. Mossinghoff's analysis of the commercial marketplace would be particularly helpful in providing the jury with a frame of reference upon which to base its conclusions on issues relating to willful infringement. Mr. Mossinghoff's testimony will provide the jury with an understanding of the reexamination procedure. Here, the PTO has rejected in reexamination 150 claims of the '516 patent, including all the claims that ARIAD has ever asserted in this case.[21] This is highly relevant to the "objective recklessness" inquiry. *In re Seagate Tech.*, 497 F.3d at 1374.

**REDACTED**

---

[21] January 19, 2008 Mossinghoff Expert Report at ¶¶ 49, 57 (D.I. 600, at Ex. A) ARIAD also cancelled an additional 104 claims. *Id.* at ¶ 59.

[22] **REDACTED**

including by the opinions of two independent registered patent attorneys.[23]  These legal opinions were corroborated in industry press.[24]  Having extensive experience with PTO practice and procedures with respect to patent prosecution and reexamination, Mr. Mossinghoff is particularly qualified to assist the jury in determining facts related to the issue of willful infringement by shedding light on the unique circumstances surrounding the PTO's rejection in reexamination of 150 claims of the '516 patent and the absolute rejection of the '516 patent in the marketplace.

Mr. Mossinghoff's testimony on the issues related to PTO practice and procedure, including the duty of candor, and ARIAD's baseless assertion of willfulness, are relevant, admissible and would be helpful to the trier of fact.  ARIAD's motion to exclude such testimony should be denied.

## IV.    DR. AARON CIECHANOVER'S TESTIMONY.

### A.    General Background.

Dr. Aaron Ciechanover intends to offer expert testimony in this case on the technological background relating to the central role of the ubiquitin-proteasome system in regulating the processing of NF-$\kappa$B and its activation through degradation of its natural inhibitor, I$\kappa$B.[25]  This testimony is directly relevant to the invalidity of the claims of the '516 patent for lack of written description, enablement, and novelty.

---

[23]    Tamsen Valoir, *Generic Treatment Claims*, The John Marshall Law School Center for Intellectual Property Law News, Vol. 4, No. 3, at 15-17 (2003) (D.I. 606, at Ex. X); Steven R. Lazar, *Found in Translation Newsletter*, June 2006, at 3 (D.I. 606, at Ex. Y)

[24]    Sharon Begley and Laura Johannes, *Biotech Firm Says Lilly Drugs Step on Patent*, The Wall St. J., June 26, 2002, at B1 (D.I. 606, at Ex. Z)

[25]    Declaration of Aaron Ciechanover, M.D., D.Sc.; January 15, 2008 Expert Report of Aaron Ciechanover, M.D., D.Sc. ("Ciechanover Expert Report") (D.I. 627, at Ex. A)

1.     Dr. Ciechanover is an expert on the relevant technology.

Dr. Ciechanover's distinguished career includes receipt of the Nobel Prize in Chemistry in 2004 based upon his fundamental discoveries concerning how cells regulate the breakdown of intracellular proteins with specificity and the Albert Lasker Award for Basic Medical Research (often called the "American Nobel") in 2000 in honor of his contribution to the discovery and recognition of the significance of the ubiquitin system of regulated protein degradation.[26] Specifically, Dr. Ciechanover was part of the team that discovered ubiquitin-mediated proteolysis – the process whereby an enzyme system tags specific proteins (including IκB) with many molecules of a protein called "ubiquitin," which then serve to mark those proteins for transport to and degradation within a large multi-subunit protease complex called the proteasome.  As a result of Dr. Ciechanover's work, scientists now recognize that ubiquitin-mediated proteasomal degradation of intracellular proteins is involved in a broad array of cellular processes, such as the creation and activation of transcription factors (including NF-κB), and that aberrations in this system have been implicated in the pathogenesis of many human diseases.  Dr. Ciechanover's work has led to an increasing effort to develop mechanism-based drugs, one of which (a proteasome inhibitor called "Velcade") is already in commercial therapeutic use.[27]

---

[26]     *Id.* at 2-3.

[27]     Ex. B, Saito, Y and Kawashima, S, *Enhancement of neurite outgrowth in PC12h cells by a protease inhibitor*, Neuroscience Letters, Vol. 89, at 102-107 (1988) ("Saito").

2.    Dr. Ciechanover's opinions relate to technology implicated by the '516 patent and all asserted claims.

ARIAD is simply wrong when it states that the '516 patent and the full scope of "reducing NF-κB activity in cells" of the asserted claims does not implicate the ubiquitin-proteasome system or proteasome inhibitors.[28]    ARIAD admits that Dr. Ciechanover's testimony is directly relevant to the IκB limitations of several dependent claims.[29]    Contrary to ARIAD's assertions in their *Daubert* Brief, but entirely consistent with their claim construction position, all asserted claims of the '516 patent contain the limitation of "reducing NF-κB activity in cells," the full scope of which includes "inhibiting modification of an IκB protein," "inhibiting degradation of an IκB protein," and "inhibiting dissociation of NF-κB:IκB complexes."[30] ARIAD must admit this interpretation because these terms appear in claims dependent upon the asserted claims.[31]

---

[28]    **REDACTED**

[29]    ARIAD's *Daubert* Brief at 17 (D.I. 579)

[30]    ARIAD's Opening Brief on Claim Construction at 2-3  (D.I. 577)  In fact, ARIAD discusses the degradation of IκB extensively in its brief, but does not mention the ubiquitin-proteasome system that is central to any activation of NF-κB.  *Id.* at 9-10, 13, and 16-17.

[31]    *Compare* Claim 6 and dependent claims 66, 67, and 68, and claim 18 and dependent claims 179, 180, and 181.

16

The proteasome plays an essential role in the degradation of NF-κB's natural inhibitor, IκB. The inventors of the '516 patent have admitted as much.[32] NF-κB is regulated by the ubiquitin-proteasome system in at least two different ways: (1) by processing of the NF-κB family member "p105" to yield an NF-κB subunit called "p50," and (2) by the modification (*i.e.*, phosphorylation and ubiquitination) and subsequent degradation of IκB, which frees NF-κB from the NF-κB:IκB complex and allows the translocation of NF-κB into the nucleus, where it may, under certain circumstances, initiate specific transcriptional activity.[33] As a result of the link between the ubiquitin-proteasome system and NF-κB, treatment with known proteasome inhibitors blocks formation of the p50 subunit of NF-κB and prevents degradation of IκB bound to NF-κB, both of which would "reduc[e] NF-κB activity in cells" as required by the '516 patent claims.[34] ARIAD admits, however, that the correct mechanism by which NF-κB is activated -- the ubiquitination and subsequent degradation of IκB by the proteasome -- appears nowhere in the '516 patent.[35]

Dr. Ciechanover's testimony as set forth in his expert report will assist the jury in understanding this complex subject matter by providing it with the background and technical details of the relevant biology and the essential role the ubiquitin-proteasome system plays in

---

[32]   Ex. D, Dep. Tr. of Dr. Thomas Maniatis ("Maniatis Dep. Tr.) at 116:25 - 117:24; Ex. E, Dep. Tr. of Dr. David Baltimore ("Baltimore Dep. Tr.") at 86:6-21.

[33]   Ex. F, Palombella VJ, Rando OJ, Goldberg AL, Maniatis T., *The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B*, Cell. 1994, 78 Cell 773 (1994).

[34]   *Id.*

[35]   ARIAD's *Daubert* Brief at 19 (D.I. 579)

NF-κB and IκB regulation. Thus, in his expert report, Dr. Ciechanover provides a helpful discussion of at least the following: (1) how proteins like IκB are tagged for destruction through a process called "ubiquitination";[36] (2) how such tagged proteins are degraded by the proteasome;[37] (3) the regulation of ubiquitination and the degradation of proteins by the proteasome;[38] (4) the relationship between ubiquitination/degradation of proteins by the proteasome and NF-κB and IκB;[39] and (5) how that relationship resulted in a reduction of NF-κB activity in a cell through the inhibition of the proteasome.[40] The inclusion in Dr. Ciechanover's Expert Report of discussion from prior, peer-reviewed publications in prestigious journals merely underscores the fact that his opinions are based on science, and are *not* merely crafted for purposes of litigation.

Using this scientific discussion as a foundation, Dr. Ciechanover then concludes, among other things, that the experimental protocol in a prior art reference -- Saito, *et al.* -- necessarily and inevitably resulted in a reduction of NF-κB activity in cells.[41] He confirms this conclusion through a discussion of a reference – Palombella, *et al.* – wherein one of the inventors of the '516 patent discusses the use of the very same compound used in the Saito reference (*i.e.,*

---

[36] Ciechanover Expert Report at 11-13 (D.I. 627, at Ex. A)

[37] *See, e.g., id.* at 13.

[38] *See, e.g., id.* at 13-15.

[39] *See, e.g., id.* at 15-20.

[40] *See, e.g., id.* at 17-18, 20.

[41] *See, e.g., id.* at 17-18.

18

**REDACTED**

Other Amgen experts, such as Drs. Greene and Wall, use Dr. Ciechanover's discussion of the

ubiquitin-proteasome system in the context of their own opinions relating to, among other things,

anticipation and lack of written description and enablement.[44] *See Dura Auto.*, 285 F.3d at 613

("it is common in technical fields for an expert to base an opinion in part on what a different

expert believes on the basis of expert knowledge not possessed by the first expert").

  **B.**  **Dr. Ciechanover's Testimony Is Directly Relevant To The Issues In This Case.**

    1.  Written description and enablement.

   The '516 patent relates to the discovery of the intracellular transcription factor NF-κB.

Because the named inventors of the '516 patent knew very little about NF-κB and IκB at the time

of the applications that led to the '516 patent, they did not disclose the structure, sequence, or

specific uses of NF-κB or the structure, correct sequence, or specific uses of IκB. As Dr.

Ciechanover explains in his report, "[a]s of November 13, 1991, so little was known about the

mechanism by which canonical NF-κB was liberated from its natural inhibitor that no one could

---

[42] *See, e.g., id.* at 16-17.

[43] *See, e.g., id.* at 20.

[44] *See* Declaration of Randolph Wall, Ph.D., January 18, 2008 Expert Report of Randolph Wall, Ph.D. at 90 (D.I. 586 at Ex. A); Declaration of Warner Craig Greene, M.D., Ph.D., January 18, 2008 Expert Report of Warner Craig Greene, M.D., Ph.D. at 46 (D.I. 628 at Ex. A)

have disclosed anything that would have allowed others to recognize that the named inventors had actually invented a way of directly manipulating this aspect of the so-called 'NF-κB pathyway.'"[45]  Nor did they know or disclose the essential role of the ubiquitin-proteasome system in forming NF-κB or releasing NF-κB from its complex with IκB.[46]  Dr. Ciechanover explains in his report that "[e]ven proteasome inhibitors -- some of which had been in use long before November 1991 -- had not yet, by that time, been recognized to play a role in inhibition of NF-κB activation."[47]

ARIAD has attempted to manipulate the work of the named inventors into claims that are neither described nor enabled.  The claims of the '516 patent, including all of the asserted claims, specifically include within their scope "reducing NF-κB activity in cells" by inhibiting the modification of IκB and inhibiting degradation of IκB.[48]  The ubiquitin-proteasome system is essential to the modification and degradation of IκB.  The claims thus must necessarily include within their full scope methods of targeting the proteasome system (since the inventors identified no other mechanism not naturally occurring) even though the named inventors did not at the time know about the ubiquitin-proteasome system, how it functioned, or how inhibition of the

---

[45]  Ciechanover Expert Report at 22 (D.I. 627 at Ex. A)

[46]  Ex. D, Maniatis Dep. Tr. at 133:2 - 134:2 and 110:21 - 112:8; Ex. G, Dep. Tr. of Dr. Patrick Baeuerle ("Baeuerle Dep. Tr.) at 143:11-21.

[47]  Ciechanover Expert Report at 22 (D.I. 627 at Ex. A)

[48]  *See* Amgen's Opening Brief on Claim Construction at 12-16.  (D.I. 581)  This reading is consistent with ARIAD's proposed claim construction.  *See* ARIAD's Opening Brief on Claim Construction at 2-3.  (D.I. 577)

DB02:6839681.1                                                                                                              065028.1001

proteasome (something that had already been done in the prior art) necessarily and inevitably impaired the formation of NF-κB and the activation of NF-κB through the degradation of IκB.[49]

The '516 patent must describe and enable the full scope of the claims. *See Reiffen v. Microsoft Corp.,* 214 F.3d 1342, 1345-46 (Fed.Cir. 2006); *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1371 (Fed. Cir. 1999). All the asserted claims cover methods targeting the ubiquitin-proteasome system, which Dr. Ciechanover explains and discusses in detail in his expert report, but these methods are neither described nor enabled by the '516 patent. Dr. Ciechanover's testimony is thus directly relevant and helpful to the jury's determination of the issues in this case.[50]

      2.     Novelty.

In obtaining the claims of the '516 patent, ARIAD has claimed patent protection for methods that are now known to include the prior use of a wide range of compounds from aspirin to steroids.[51] Among this group is the known proteasome inhibitor ALLNal (also known as MG101) described in a paper by Saito *et al.*[52] The asserted claims of the '516 patent are anticipated by the work done in the Saito paper, which demonstrated the exposure of PC12 cells to NGF, which can induce NF-κB activity, in the presence and absence of the proteasome

---

[49] The inventors did not even acknowledge the degradation of IκB in the specification of the '516 patent. Instead, the patent only speculates as to its "dissociation." *See* Ex. A, '516 patent, col. 30, l. 43-55.

[50] Amgen has moved for summary judgment on the issue of invalidity for lack of adequate written description. (D.I. 583, 584 )

[51] January 19, 2008 Mossinghoff Expert Report at ¶¶ 49, 57 (D.I. 600, at Ex. A)

[52] Ex. B, Saito at 102-107.

inhibitor ALLNal.[53]  As discussed above, inhibiting the proteasome reduces NF-κB activity by taking action inside the cell.  Numerous publications confirm this, including publications by the named inventors of the '516 patent.[54]  As Dr. Ciechanover explains in his report, named inventor Dr. Maniatis co-authored a paper demonstrating that "both *in vivo* and *in vitro* treatment with known proteasome inhibitors could block formation of the p50 subunit of NF-κB."[55]  The inventors have also admitted that proteasome inhibitors, including specifically the inhibitor used in the Saito reference, inhibit NF-κB activity.[56]  ARIAD appears to now dispute this effect of the ubiquitin-proteasome system on NF-κB activity in cells.  Dr. Ciechanover's testimony will help the jury understand that ARIAD's litigation position is incorrect and contradicted by the literature, the understanding in the art, and the views of its own inventors.  Dr. Ciechanover explains in his report the actual effect of using the proteasome inhibitor as described in Saito *et al.*, concluding that "though unknown to the authors at the time, the experimental protocol in the Saito paper also would have had the actual effect of necessarily and inevitably inhibiting, via the

---

[53]  *Id.*

[54]  Ex. H, Foehr, et al., *NF-κB signaling promotes both cell survival and neurite process formation in nerve growth factor-stimulated PC12 cells.*, 20 J. of Neuroscience, 7556, 7557 (2000); Ex. F, Palombella, et al., *The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B*, 78 Cell 773 (1994).

[55]  Ciechanover Expert Report at 17 (D.I. 627 at Ex. A)

[56]  Ex. D, Maniatis Dep. Tr. at 117:25-118:10, 119:4-19, 223:15-224:21; Ex. E, Baltimore Dep. Tr. at 40:18-22; Ex. G, Baeuerle Dep. Tr. at 212:21-213:5.

065028.1001

proteasome, at least some of the induction of NF-κB that would otherwise have normally resulted from the treatment with NGF and therefore led to a reduction in NF-κB activity."[57]

Dr. Ciechanover is extraordinarily qualified to testify as an expert as to the ubiquitin-proteasome system, how proteasome inhibitors function, and what impact the proteasome system has on NF-κB activity. Dr. Ciechanover's testimony is thus directly relevant to the issue of whether proteasome inhibitors reduce NF-κB activity in cells. With his expertise, Dr. Ciechanover's testimony would be particularly helpful to the jury in its determination as to whether proteasome inhibitors reduce NF-κB activity in cells, including whether the inhibitor used in the Saito reference reduced NF-κB activity in the cells used in the reported work. That he does not explicitly construe every limitation in the claims has no bearing on the relevant and admissible testimony he can provide relating to the technology at issue in the patent and the prior art. *See Frensenius Med. Care Holdings v. Baxter Int'l, Inc.*, 2006 WL 1329999, at *4-6 (N.D. Cal. 2006) (denying motion to exclude testimony from technical expert who would provide background contextual information about prior art device without opining on the ultimate issue of invalidity); *see also U.S. v. Rahm*, 993 F.2d 1405, 1411 (9th Cir.1993) ("[N]ot every expert need express, nor even hold, an opinion with regard to the issues involved in a trial . . . . [T]he key concern is whether expert testimony will assist the trier of fact in drawing its own conclusion as to a 'fact in issue.'"); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case. The expert need not have an opinion on the ultimate question to be resolved by the trier of fact in

---

[57] Ciechanover Expert Report at 18 (D.I. 627 at Ex. A)

order to satisfy this requirement."); *Erickson v. Baxter Healthcare, Inc.,* 151 F. Supp. 2d 952, 968 (N.D. Ill. 2001) ("[A]n expert may explain principles without applying them or offering an opinion on the ultimate issue.").

ARIAD is also wrong when it argues that Dr. Ciechanover's testimony impermissibly retreads ground covered by Dr. Warner Greene. Dr. Greene, as one of the world's leading experts on NF-κB, has provided an opinion regarding whether the claims of the '516 patent (each requiring "reducing NF-κB activity in cells") are anticipated and therefore invalid. Dr. Ciechanover will provide testimony as to the technical and background information relating to the proteasome system and its specific impact on NF-κB activity and is, thus, not cumulative. Any overlap of expert testimony with respect to Saito *et al.* will be minor, but does not, in any event, warrant exclusion of Dr. Ciechanover's testimony. *See THK America, Inc. v. NSK, Ltd.*, 917 F. Supp. 563, 576 (N.D. Ill. 1996). Dr. Ciechanover's testimony is thus directly relevant and admissible, and should not be excluded.

## V.    CONCLUSION.

For the foregoing reasons, ARIAD's motion to exclude the expert testimony of the Honorable Gerald J. Mossinghoff and Dr. Aaron Ciechanover should be denied.

DB02:6839681.1                                                                                                    065028.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
South Figueroa Street
Los Angeles, CA  90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067
(310) 785-4707

Dated:  May 22, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,
Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,
Limited, and Immunex Rhode Island Corporation*

065028.1001

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on May 22, 2008, I caused to be electronically filed a true and correct copy of The Amgen Entities' Answering Brief In Opposition To Ariad And The Institutions' *Daubert* Motion To Preclude Expert Testimony Of The Honorable Gerald J. Mossinghoff And Dr. Aaron Ciechanover with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on May 22, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

## BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

_/s/ Melanie K. Sharp_
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

DB02:6783752.1                                                      065028.1001