IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;   )
IMMUNEX CORPORATION, a Washington   )
corporation; AMGEN USA INC., a Delaware   )
corporation; AMGEN MANUFACTURING,   )
LIMITED, a Bermuda Corporation, and   )
IMMUNEX RHODE ISLAND   )
CORPORATION, a Delaware corporation   )
                                                 )
       Plaintiffs/Counterclaim Defendants,   )
                                                 )
v.   )
                                               )
ARIAD PHARMACEUTICALS, INC., a   )
Delaware corporation, and THE WHITEHEAD   )
INSTITUTE FOR BIOMEDICAL RESEARCH,)
a Delaware corporation, et al.   )

      Defendants/Counterclaim Plaintiffs.

Civil Action No. 06-259 (MPT)

Public Version
Confidential Material Omitted

**AMGEN'S ANSWERING BRIEF ON CLAIM CONSTRUCTION**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

KIRKLAND & ELLIS LLP
Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: May 22, 2008

**TABLE OF CONTENTS**

I.     INTRODUCTION...................................................................................................... 1

II.    ANSWERS TO ARIAD'S FOUR QUESTIONS ................................................... 4

III.   ARIAD'S TECHNOLOGY BACKGROUND DISTORTS AND EXPANDS ON
       THE ACTUAL DISCLOSURE OF the '516 PATENT. .................................... 7

IV.    ARGUMENT ......................................................................................................... 12

       A.    The Claims Should be Construed to Encompass Only Intracellular
             Methods to Reduce NF-κB Activity. ...................................................... 12

             1.    The Claim Language and the Patent Specification Confirm That
                   The Claimed Methods Are Limited to Intracellular Actions. ................... 12

             2.    The Patent Specification Only Discloses Hypothetical Methods Of
                   Taking Intracellular Action For "Reducing NF-κB Activity." ................. 17

             3.    ARIAD's Admissions To The PTO Regarding The Limitation Of
                   The Claims To "Intracellular" Actions Confirms Amgen's
                   Construction. .................................................................................... 20

             4.    The Admissions Of ARIAD Inventors And Experts Confirm That
                   The Claims Are Limited To Intracellular Actions. ................................. 22

       B.    ARIAD's Constructions for "NF-κB," "NF-κB Activity" and Related
             Terms Are Not Supported. ..................................................................... 24

             1.    ARIAD's "NF-κB Signal Transduction Pathway" Is Artificially
                   Injected Into Five Of The Eight Disputed Terms Yet Exists
                   Nowhere In The 516 Patent Claims Or Specification. ......................... 24

             2.    ARIAD's Construction Of "NF-κB" Ignores The Patent's
                   Disclosure Of NF-κB Recognition Sequences And Introduces
                   Further Ambiguity Into The Claims. ................................................... 25

             3.    Amgen's Constructions Apply A Consistent Interpretation Of The
                   Term "Activity" As Used In The Claims. ............................................ 27

       C.    The Claims Do Not Require That the Claimed Method Be "Performed
             After the Pathway Has Been Initiated in Response to Application of a
             Stimulus Prior to the Performance of the Claimed Method" ........................ 28

       D.    The Claims Are Not Limited To Methods In Those Cells In Which NF-κB
             Is Present And Capable Of Acting As An Intracellular Messenger ................ 31

i

E.    The Claims Cannot Be Construed To Require A Comparison To Naturally
      Occurring NF-κB Activity. ................................................................. 32

F.    Amgen's Proposed Constructions Of The Disputed Terms Are Correct. ............. 34

      1.    "NF-κB" ....................................................................... 35

      2.    "NF-κB activity" ............................................................. 35

      3.    "reducing NF-κB activity in cells".......................................... 36

      4.    "NF-κB-mediated intracellular signaling" ................................ 37

      5.    "such that NF-κB-mediated intracellular signaling is diminished" .......... 37

      6.    "diminishing induced NF-κB-mediated intracellular signaling" ............. 38

      7.    "so as to reduce intracellular signaling caused by Interleukin-1 or
            Tumor Necrosis Factor-α in the cells." .................................... 39

      8.    "reducing Interleukin-1 or Tumor Necrosis Factor-α activity in
            mammalian cells"........................................................... 39

V.    CONCLUSION .................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Altiris, Inc. v. Symantec Corp.*
    318 F.3d 1363 (Fed. Cir. 2003)....................................................................................... 5

*Bates v. Coe*
    98 U.S. 31 (1878) ........................................................................................................... 12

*In re Am. Acad. of Sci. Tech Ctr.*
    367 F.3d 1359 (Fed. Cir. 2004)..................................................................................... 29

*In re Teleglobe Commc'ns. Corp.*
    493 F.3d 345 (3d. Cir. 2007)......................................................................................... 23

*Interactive Gift Express, Inc. v. Compuserve Inc.*
    256 F.3d 1323 (Fed. Cir. 2001)..................................................................................... 13

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*
    887 F.2d 1050 (Fed. Cir. 1989)..................................................................................... 24

*Mangosoft, Inc. v. Oracle Corp.*
    No. 2007-1250, 2008 WL 2039061 (Fed. Cir. May 14, 2008) ..................................... 15

*Markman v. Westview Instruments, Inc.*
    52 F.3d 967 (Fed. Cir. 1995)........................................................................................... 4

*Merck & Co. v. Teva Pharm. USA, Inc.*
    395 F.3d 1364 (Fed. Cir. 2005)..................................................................................... 15

*Netword, LLC v. Centraal Corp.*
    242 F.3d 1347 (Fed. Cir. 2001)..................................................................................... 10

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005)................................................................................passim

*Regents of the Univ. of Cal. v. Dakocytomation Cal. Inc.*
    517 F.3d 1364 (Fed. Cir. 2008)..................................................................................... 21

*Renishaw PLC v. Marposs Societa Per Azioni*
    974 F. Supp. 1056 (E.D. Mich. 1997)........................................................................... 34

*Renishaw PLC v. Marposs Societa' per Azioni*
    158 F.3d 1243 (Fed. Cir. 1998)..................................................................................... 32

*Schering Corp. v. Amgen Inc.*
    222 F.3d at 1347 (Fed. Cir. 2000) ................................................................... 25

*Spectrum Int'l., Inc. v. Sterilite Corp.*
    164 F.3d 1372 (Fed. Cir. 1998) ..................................................................... 21

*Symantec Corp. v. Computer Assoc. Int'l., Inc.*
    Nos. 2007-1201, 2007-1239, 2008 WL 1012443 (Fed. Cir. April 11, 2008) ............. 38, 40

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................................... 12

**Statutes**

35 U.S.C. § 112 ................................................................................................... 17

## I.    INTRODUCTION

The fundamental flaw with ARIAD's proposed claim constructions is that they seek to extend the scope of the patent claims well beyond anything the inventors described or claimed in the patent as their invention.    The '516 patent discusses the inventors' discovery of an "intracellular messenger" called "NF-κB," which exists only inside a cell and which can play a role in regulating gene transcription in the cell nucleus.    Attempting to capitalize on this discovery, the inventors sought to claim methods of "regulating the activity of NF-κB in cells" with the intended goal of altering inducible gene transcription.    According to the patent, the inventors hoped to "modify the effect of a variety of external influences" on the cell by either enhancing or inhibiting NF-κB through intracellular actions.    Although the inventors postulated several theoretical ways of doing this, the patent in fact fails to provide any working example of reducing NF-κB activity or any useful result that may be achieved by doing so.

Instead of being content with method claims limited to taking direct action inside the cell to inhibit NF-κB, ARIAD in this case attempts to expand the scope of the claims by concocting a multi-step "NF-κB signal transduction pathway" that begins outside the cell with the "occurrence of an external stimulus" and ends with the expression of a gene in the cell.    (ARIAD Op. Br. at 18)    This assumed pathway then serves as the foundation for ARIAD's proposed claim constructions.    ARIAD characterizes the claim term "NF-κB activity" as "the cascade of signaling that occurs along this pathway" and the term "reducing NF-κB activity in cells" as "impeding any one step" along this pathway.    (*Id.* at 18-19, 24-25)    But the asserted claims do not recite such "steps" and do not refer to any such "pathway."    The specification does not even mention an "NF-κB signal transduction pathway," let alone describe it as part of the invention.

The first recited step in ARIAD's constructed pathway occurs outside the cell -- the "occurrence of an external stimulus" -- and is the crux of the dispute between the parties.    By

1

artificially defining a pathway that extends outside the cell, ARIAD is trying to extend the scope of the claims to cover steps taken to impede one of the countless number of possible external stimuli to a cell. But such a step would have no interaction with NF-κB, and the patent says nothing about how one might impede or block such an occurrence so that a signal never reaches the inside of the cell. Consequently, ARIAD has no basis for including such a step within its claim scope. Indeed, the use of an exclusively extracellular molecule (like Amgen's ENBREL) to bind an external stimulus (like TNF-α) outside the cell so that it cannot bind to a cell surface receptor and send a signal inside the cell clearly makes no use of the inventors' discovery of NF-κB as an intracellular messenger. To be consistent with what the inventors actually did and disclosed in the specification, the claimed methods should be construed to require actions taken inside the cell to directly impact NF-κB.

The intrinsic record for claim construction – the claim language itself, the patent specification, and the prosecution history – all support the construction that limits the claims to actions taken inside the cell that directly affect NF-κB. As explained in Amgen's Opening Brief on Claim Construction, the patent claims state that the "reducing" step is performed "in cells." ARIAD has admitted as much in the reexamination of the patent, stating that the asserted claims are limited to methods of "intervening intracellularly" on NF-κB. (D.I. 571, Ex. U at 27-28) The patent specification describes NF-κB as a "second messenger" in the expression of genes and the methods of the patent as "based on use of the role of NF-κB as a second messenger." ('516 Patent at 35:42-45) In describing the model of action for NF-κB inside the cell, the patent clearly delineates between a "first messenger," e.g., a hormone or cytokine, like TNF-α, which can carry the "signals" outside the cell, and NF-κB as a "second messenger," which acts entirely inside the cell. (Id. at 16:36-49) By labeling the external stimulus as the "first messenger" and

2

making a clear statement in the specification that the claimed methods are limited to the role of NF-κB as an intracellular "second messenger," the patent specification refutes any claim construction that extends the scope of the claims to actions taken outside the cell.

Rather than confront the intrinsic record, ARIAD simply ignores the evidence that contradicts its current position that the method claims should be construed to reach actions outside the cell. ARIAD tries to point to hypothetical examples in the specification as support for the theory that "reducing NF-κB activity in cells" can be done by "impeding" any step in their artificial pathway, including blocking external stimuli. But the hypothetical examples only disclose ways of "reducing NF-κB activity" by taking action inside cells. ARIAD points to nothing in the patent specification that discloses how to block the external stimuli. More to the point, the asserted claims expressly recite the limitations "intracellular" and "in cells" several times without any mention of "extracellular" or "outside of cells." Lacking any real intrinsic support, ARIAD is left to argue that the absence of any express disclaimer in the patent regarding external actions to reduce NF-κB activity means that such actions should be embraced by the claims. That argument, however, is inconsistent with the patent and the governing principles of claim construction.

In addition to its effort to expand the reach of the claims to actions taken outside the cell, ARIAD also seeks to add improper limitations to the claims in an attempt to fend off the validity attacks based on prior art. For example, ARIAD proposes to read into the claims a requirement that any "treatment" to reduce NF-κB activity be performed "after the pathway has been initiated in response to application of a stimulus." (ARIAD Op. Br. at 30) But the claims do not say this, and if ARIAD had wanted the claims to require a series of steps or conditions it should have drafted the claims that way during prosecution instead of attempting to import limitations into

the claims after the fact through claim construction. By ignoring the claim language and the intrinsic evidence, ARIAD tries to exploit the vague and indefinite claim terms in order to create a position from which to argue for infringement and validity.

Not only does ARIAD pay little attention to the intrinsic evidence, but ARIAD also ignores and even contradicts the claim construction positions and arguments it made on the same claim terms in prior litigation on this same patent against Eli Lilly (Civil Action No. 02-11280, D. Mass., hereinafter "*Lilly*"). It goes without saying that a claim construction that is grounded in the intrinsic evidence (as it must be) should not shift in the wind depending on the patentee's litigation positions. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995). Here, ARIAD takes positions that directly contradict those it argued (and prevailed on) in the prior case. ARIAD advanced, and the *Lilly* court adopted, a construction for "NF-κB-mediated intracellular signaling" that is indistinguishable from the construction proffered by Amgen (and now objected to by ARIAD) in this case. Similarly, ARIAD now proffers a construction for "reducing NF-κB activity in cells" that imports a comparison to the "naturally occurring" activity that ARIAD specifically and successfully argued *against* in the *Lilly* case. ARIAD is estopped from asserting diametrically opposite claim constructions in this case.

ARIAD's claim construction positions are driven more by their litigation positions than the intrinsic evidence. In contrast, Amgen has proposed claim constructions of a meaningful scope that give proper credit to the discovery made by the inventors as disclosed in the patent specification and provide appropriate boundaries to the claims. For these reasons, as explained in more detail below, Amgen urges the Court to adopt its proposed claim constructions.

## II.    ANSWERS TO ARIAD'S FOUR QUESTIONS

ARIAD poses "four fundamental questions" that it believes capture the claim construction disputes between the parties. However, these questions capture only some of the

4

relevant claim construction disputes, and Amgen has already addressed them in principle (if not directly) in its opening brief. For completeness sake, Amgen provides the following answers:

*First, the claims encompass only reducing NF-κB activity "in cells," i.e. intracellular methods of reducing NF-κB activity.* Because NF-κB activity is exclusively intracellular, the further limitation "in cells" requires that the reducing action must happen inside the cell as well. This plain reading of the claim language comports with the '516 patent specification, which hypothesizes only intracellular methods of reducing NF-κB activity, and ARIAD has admitted as much to the PTO during reexamination. All of this intrinsic evidence is further supported by the admissions of ARIAD's inventors and experts prior to this case;

**REDACTED**

The sum of the claim language and other intrinsic evidence, bolstered by these extrinsic admissions, compels the conclusion that only intracellular methods of reducing NF-κB are covered.

*Second, the claims do not recite or require an act of induction by an external stimulus prior to practice of the claimed method.* The PTO has already considered and explicitly rejected this argument, finding that such a strained construction "improperly requires that limitations be read into the claims." (*See* D.I. 571, Ex. V at 21; *see also* Section IV(C), *infra*) Not only is it improper to import such a limitation into the claim, but it is especially improper to require a new step to be performed prior to the performance of the claimed method. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). All that the claims require is that some non-zero level of NF-κB activity be reduced via the methods claimed. As the PTO noted, "[p]atentee's

5

reliance on their mechanism to read into the claims a proviso…requiring that any activation precede an inhibiting step…is not supported by the specification." (D.I. 571, Ex. V at 21)

*Third, the claims are not limited to methods practiced only in cells "in which NF-κB is present and capable of acting as an intracellular messenger."* There is no basis upon which to import this limitation into the claims to restrict them to certain cells and not others, especially where one of ordinary skill in the art did not know (and ARIAD admits its inventors did not know) what cells would qualify. (*See* ARIAD Op. Br. at 36, n. 40; *see also* Wall Decl., D.I. 586, Ex. C, March 7, 2008 Reply Expert Report of Randolph Wall, Ph.D., ("Wall Reply Report") at 5.) Some claims in the '516 patent are limited to certain types of cells (*e.g.* immune cells), or to cells from certain organisms (*e.g.* humans). ARIAD cannot layer on an additional limitation that appears nowhere in the claims and that would require further experimentation to define its scope.

*Fourth, the claims do cover natural processes by which NF-κB activity is reduced.* As with the second question above, the PTO has already considered and rejected ARIAD's attempt to limit the claims such that they "do not encompass natural processes by which NF-κB activity is reduced." (*See* ARIAD Op. Br. at 3; *cf.* D.I. 571, Ex. V at p. 20) Moreover, ARIAD itself argued against such a limitation in the *Lilly* case, calling such a limitation "impossible" and "indefinite." (*See* Amgen Op. Br. (D.I. 581), Ex. 3 at 5-6) There is no basis to read this indefinite limitation into claims where it is not included.

A considered and "full understanding of what the inventors actually invented and intended to envelop with the claim" refutes ARIAD's positions as to each of "fundamental" issues and the other claim construction disputes between the parties. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). For the reasons discussed in Amgen's Opening Brief and

6

further herein, this Court should reject ARIAD's proposed constructions and adopt Amgen's constructions, which derive (as they should) from the claim language and the intrinsic evidence.

## III. ARIAD'S TECHNOLOGY BACKGROUND DISTORTS AND EXPANDS ON THE ACTUAL DISCLOSURE OF THE '516 PATENT.

Under Federal Circuit precedent, this Court's construction of the '516 patent claims must be informed through understanding the nature and scope of the inventors' disclosure as provided in the patent specification. *See e.g. Phillips*, 415 F.3d at 1316 ("...the specification necessarily informs the proper construction of the claims"). ARIAD's "Scientific Background" does little to provide that understanding, however, as it largely ignores the totality of the '516 patent disclosure and instead interweaves that limited teaching with the after-the-fact scientific discoveries and theories of others over the more than twenty years since the alleged invention. (*See* ARIAD Op. Br. at 5-13) Even in discussing these later discoveries, ARIAD is selective in its discussion and fails to mention the many subsequent discoveries that are not helpful to its positions, such as the fact that NF-κB has been shown not only to induce gene expression, but also in certain circumstances to down-regulate it as well.[1]  In so doing, ARIAD seeks to impermissibly expand the boundaries of the '516 patent's alleged discovery and the knowledge of persons of skill in the art at the time of the alleged invention.[2]

---

[1]  *See e.g.* Ex. B, Shigeki Miyamoto and Inder M. Verma, *REL/NF-kB/IkB Story, in Advances in Cancer Research* 255, 259 (1995) (in which ARIAD's expert, Dr. Verma, acknowledges the ability of p50 to repress transcription); *see also* Wall Decl., Ex. A, January 18, 2008 Expert Report of Randolph Wall, Ph.D. ("Wall Report") at 6-34 (demonstrating that "the disclosure of ... the '516 patent ... simply provides a partial snapshot of the earlier NF-κB knowledge base as of November 13, 1991" and that "[b]oth contemporaneous and subsequent references, however, show that even that snapshot was incomplete and, in some aspects, wholly inaccurate").

[2]  ARIAD also misleadingly implies that the Nobel Prizes of Drs. Baltimore and Sharp have something to do with the work that is discussed in the '516 patent, despite unequivocal
(Continued...)

7

ARIAD supports very few of the statements in its "Scientific Background" with actual citations, rendering it very difficult to segregate what was actually disclosed or known at the time of the alleged invention from the significant knowledge that developed thereafter. In fact, ARIAD's "Scientific Background" cites only once to the '516 patent itself. (*Id.* at 8) Of the other limited citations in the discussion, most are to its expert's report that provides a summary of discoveries made after the filing of the original applications that resulted in the '516 patent. (*See id.* at 12-13, largely citing Dr. Ravetch's summaries of post-filing art).

Because patent claims must be construed from the perspective of one of ordinary skill in the art at the time of the invention (*Phillips*, 415 F.3d at 1313) and in light of the intrinsic evidence including the specification (*id.* at 1314), it would be legal error to adopt broad claim constructions based on ARIAD's discussion of later-developed technology. Thus, it is important to distinguish what in ARIAD's technology background actually comes from the '516 patent or the prior art, as opposed to what became known later and is *not* in the '516 patent. Among the various scientific discoveries and theories described by ARIAD that are *not* in the patent are:

- "the phosphorylation of IκB by IκB 'kinases' ('IKKs')[3], and the subsequent degradation of that phosphorylated IκB"[4] from the NF-kB-IkB complex (ARIAD Op. Br. at 9);

---

admissions from the inventors that this is not the case. *See, e.g.* Ex. C, May 3, 2007 Deposition of Ranjan Sen, at 220:1-9: (Q. To your understanding, did Dr. Sharp win the Nobel prize for any of his work that had to do with NF-kappa B? A. The citation on the prize is almost exclusively for his work on RNA splicing, which has nothing to do with NF-kappa B. Q. And then obviously Dr. Baltimore's Nobel prize has nothing to do with NF-kappa B as well. A. That came before I -- before my time, yes.")

[3] The first identification and characterization of IκB kinase occurred in 1997: (*See* Ex. D, Didonato J, et al., *A Cytokine-Responsive IκB Kinase That Activates the Transcription Factor NF-κB*, *Nature* 1997 Aug; 388:548; *see also* Wall Report at 24.)

- that "phosphorylation and degradation of IκB lead to the release of NF-κB from its complex with that inhibitor molecule" [5] (*id.*);

- that "[p]hosphorylation of NF-κB also occurs, and is important to its activity"[6] (*id.* at 10);

- that "TNF-α-induced activation of NF-κB can lead to amplification of levels of TNF-α itself" (*id.* at 11);

- that "TNF-α ... stimulates the appearance of greater numbers of TNF-α receptors on certain cell surfaces" (*id.*);

- ARIAD's contention that "agents that inhibit the activity of NF-κB specifically can mitigate the symptoms of arthritis and psoriasis" (*id.* at 13); and

- that "compounds that inhibit IKKs... have been shown in animal models to reduce joint inflammation." (*id.*)

ARIAD cannot be permitted to expand the scope of the patent claims by introducing technology

that was neither known at the time of the purported invention nor discussed in the patent

---

[4]   Not until 1993 was it recognized that phosphorylated IκB was subsequently degraded: (*See* Ex. E, Henkel T, et al., *Rapid Proteolysis of IκB-α is Necessary for Activation of Transcription Factor NF-κB, Nature.* 1993 Sep 9;365(6442):182-5; *see also* Wall Report at 23.)

[5]   Even in the 1993 Henkel et al. paper (*see* footnote 4, above), the authors admitted that they did not then know whether IκB is degraded while complexed with NF-κB. (*See* Wall Report at 23.) It was not until 1995 that it was first demonstrated that that both phosphorylated and ubiquitinated IκB remain bound to NF-κB, and that the 26S proteasome recognizes the ubiquitinated IκB:NF-κB complex: (*See* Ex. F, Chen Z, et al., *Signal-Induced Site-Specific Phosphorylation Targets IκBα to the Ubiquitin-Proteasome Pathway, Genes Dev.* 1995 Jul 1;9(13):1586-97; *see also* Wall Report at 23.)

[6]   It was not until the 1994/95 time period that it was demonstrated that the generation of the p50 subunit of NF-κB requires the partial processing of the precursor molecule p105 by the ubiquitin-proteasome system: (*See* Ex. G, Palombella, V.J., et al. *The Ubiquitin-Proteasome Pathway is Required for Processing the NF-κB1 Precursor Protein and the Activation of NF-κB. Cell* 78(5):773-785, 1994; and Ex. H, Orian A, et al., *Ubiquitin-Mediated Processing of NF-κB Transcriptional Activator Precursor p105, J. Biol. Chem.* 1995 Sep 15;270(37):21707-14.; *see also* Wall Report at 33 and 34.) The use of proteasome inhibition to reduce such NF-κB activity was ultimately claimed in an unrelated patent filed by one of the named inventors in 1994. (*See* Ciechanover Decl., Ex. A, January 15, 2008 Expert Report of Aaron Ciechanover, M.D., D.Sc. at 16.)

9

specification. "The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *Phillips*, 415 F.3d at 1316 (citing *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001)).

ARIAD's discussion of TNF-α in its "Scientific Background" is also misleading. The only statement relating to TNF-α in the more than 80 columns of the '516 patent specification is a single sentence -- "IL-1 and TNF-α activate NF-κB binding and both have been shown known [sic] to induce β-IFN" -- that does not even describe the work of the inventors but rather the prior art work of another research group. ('516 patent at 17:32-33) Even this passing mention of TNF-α did not appear until the April 1989 application, yet ARIAD seeks to claim priority for some of the asserted claims back to priority filings in 1988.[7] And despite this lack of any meaningful disclosure in the '516 patent regarding TNF-α and its relationship with NF-κB, ARIAD's "Scientific Background" includes three pages of discussion of what is now known or theorized about TNF-α and its purported relationship with NF-κB. (ARIAD Op. Br. at 10-12)

Absent from ARIAD's "Scientific Background" is any discussion of the patent's disclosure relevant to "reducing NF-κB activity in cells." ARIAD discusses only examples of "reducing NF-κB activity in cells" that were developed well after the filing of the patent applications in this case. (*Id.* at 13) In any event, it is notable that the two post-filing examples ARIAD does discuss are *intracellular* actions to reduce NF-κB activity. (*See id.*, discussing decoy molecules and IKK inhibitors) Only later in its brief does ARIAD address the specification's disclosure of hypothetical means of "reducing NF-κB activity," but even then it

---

[7]  This single statement first appeared in the '436 continuation-in-part application filed on April 21, 1989. *See also* Wall Report at 92 (noting that the March 1989 '901 application "does not contain any disclosure of TNF-α or its relationship with NF-κB").

confuses the '516 disclosure (hypothetical intracellular action) with that which is not disclosed (such as extracellular agents that might act on inducing substances). (*Id.* at 26)  In so doing, ARIAD baldly proclaims that the asserted claims encompass extracellular molecules and methods of "reducing NF-κB activity." (*Id.*)  This is wrong, and ARIAD's misleading and out-of-context citation of the term "antagonists" in the patent distorts the nature of "the invention [] described in the specification." *See Phillips*, 415 F.3d at 1316. (*See also* ARIAD Op. Br. at 19, 26, 39; discussion *infra* at Section IV(A)(2))

ARIAD's "Scientific Background" also ignores the patent's reliance upon the concept of NF-κB's status as a "*second* messenger." (*See e.g.* '516 patent at 12:36-56; 16:30-49; 35:42-45)[8]  The wholly intracellular activity of these second messengers is discussed as distinct from the extracellular activities of "first messengers," *i.e.* extracellular inducing molecules. (*See, e.g. id.* at 16:47-49: "An important feature of this second messenger or mediator model is that the hormone (the first messenger) need not enter the cell.")  The patent then discusses NF-κB's activity as similar to that of known second messengers, noting that NF-κB "acts as a messenger to transmit the gene induction signal from the plasma membrane to the nucleus." (*Id.* at 16:32-35)  NF-κB's activity is never discussed in terms of an identified "NF-kB signal transduction pathway," and certainly not in terms of any such pathway that would extend outside the cell.

Because ARIAD's "Scientific Background" is only loosely tethered to the intrinsic evidence and seeks to sweep in much more than the inventors' discovered or disclosed, the Court should not rely upon it for purposes of claim construction but instead should use the disclosure of the patent specification in determining the proper meaning of the claim terms.

---

8    *See also* Wall Decl., D.I. 586, Ex. B, February 22, 2008 Rebuttal Expert Report of Randolph Wall, Ph.D. ("Wall Rebuttal Report") at 6-8.

11

## IV.    ARGUMENT

### A.    The Claims Should be Construed to Encompass Only Intracellular Methods to Reduce NF-κB Activity.

The intrinsic and extrinsic evidence make clear that the claims of the '516 patent should be construed to encompass only intracellular methods of reducing NF-κB activity: (1) the claim language plainly recites that the "reducing" step occurs "in cells" and that the intended result of the claimed methods is to reduce intracellular signaling; (2) the patent specification confirms that the claimed methods use the role of NF-κB as an intracellular messenger and discloses only hypothetical reducing actions taken inside the cell; (3) ARIAD has admitted to the PTO that the asserted claims are methods of "intervening intracellularly"; and (4) the inventors and ARIAD's own experts admit that the patent does not support claims to actions taken outside the cell. Thus, the claims are properly construed only when limited to actions taken inside the cell.

### 1.    The Claim Language and the Patent Specification Confirm That The Claimed Methods Are Limited to Intracellular Actions.

As the Federal Circuit has explained, claim construction begins with the language of the claim itself. *Phillips*, 415 F.3d at 1312. The Court in *Phillips* also confirmed that the specification "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also id.* (quoting *Bates v. Coe*, 98 U.S. 31, 37 (1878) ("in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims.")

The asserted claims of the '516 patent recite a single method "step" of "reducing NF-κB activity *in* cells" with the intended goal of diminishing "NF-κB-mediated *intracellular* signaling*." Thus, the claim language itself recites actions and results that occur only inside the cell. Nothing in the claim language recites or even suggests that actions taken outside the cell

12

are within the scope of the claims. Limiting the claims to actions taken inside the cell is also wholly consistent with the undisputed understanding of one of ordinary skill in the art that NF-κB activity only occurs inside the cell.[9]

The specification also makes clear that the claimed methods are limited to actions taken inside the cell to directly inhibit NF-κB. The patent specification consistently distinguishes between NF-κB, as an "intracellular messenger," and "external influences," referred to as "inducing substances," which act outside the cell. ('516 Patent at 3:61-64) In the patent, the inventors asserted that with the knowledge of NF-κB and its activity it became possible to "modify the activity of NF-κB as an intracellular messenger" in order to "modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-κB activity." (*Id.* at 3:59-64) The specification makes this distinction between NF-κB and external influences even clearer in describing the external influences as a "first messenger" and NF-κB as a "second messenger." In describing the model of action for NF-κB inside the cell, the patent references the known model of "cAMP as a second messenger in the action of many hormones" where the hormone (like TNF-α) is the "first messenger." (*Id.* at 16:36-49) In this model, the first messenger is outside the cell while NF-κB is the messenger inside the cell. (*Id.* at 16:47-49) Significantly, the specification states that the claimed methods are "based on use of the role of NF-κB as a second messenger." (*Id.* at 35:42-43)

By clearly delineating between the external stimuli as a "first messenger" and NF-κB as a "second messenger," and by making a clear statement in the specification that the claimed

---

[9]  *See e.g.* Amgen Op. Br., at 18, n. 11 and testimony cited therein; *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) ("[I]t is important to bear in mind that the viewing glass through which the claims are construed is that of a person skilled in the art.")

methods are based on the use of the role of NF-κB as a "second messenger," the patent limits the claims to taking actions inside the cell that directly impact NF-κB and refutes ARIAD's position to the contrary. Actions taken outside the cell to block or inhibit the external influences or first messengers have nothing to do with the role of NF-κB as a second messenger acting inside the cell. And the inventors did not disclose or claim any such extracellular actions. Nowhere does the specification say that the inventors considered as part of their invention taking action to block the external influences outside the cell. Plainly, knowledge of NF-κB and its activity would not facilitate such extracellular actions at all. For example, blocking TNF-α so that it does not bind to its receptor on the cell surface requires knowledge of TNF-α and its structure (which is what Amgen did in developing Enbrel) and has nothing to do with the "use of the role of NF-κB as a second messenger." Thus, the intrinsic record requires that the claimed methods be construed as limited to steps that directly inhibit NF-κB inside the cell.

Despite the claim language and the limiting disclosure of the specification, ARIAD argues for a construction of the claim term "reducing NF-κB activity in cells" as being "inhibiting any step along the NF-κB signal transduction pathway ... without regard to the situs of the inhibiting agent." (ARIAD Op. Br. at 3) Recognizing that its proposed claim constructions do not specify what the "NF-κB signal transduction pathway" is, ARIAD argues in its brief that the "pathway" includes five steps with the first step being the "occurrence of an external stimulus, such as the binding of an agonist to its receptor on the cell surface." (*Id.* at 18) Through this disguise, ARIAD is attempting to preserve the ability to argue that extracellular actions that block the external stimulus, for example, to prevent one from binding to its receptor on the outside of the cell surface, results in reducing NF-κB activity as recited in the claim.

14

In attempting to stretch the claim language, ARIAD argues that the words "in cells" modifies only "NF-κB activity" rather than modifying the action step of "reducing NF-κB activity." ARIAD bases this position on a single grammatical rule ("keep related word[s] together")[10] and some inapplicable analogies.   While ARIAD's grammatical argument might have some force if NF-κB activity was known to exist outside of cells (thus "in cells" might provide a limitation on where the activity is to be measured), the undisputed understanding of one of ordinary skill in the art based on the patent disclosure was that "NF-κB activity" only exists inside the cell.[11] Reading the claim as ARIAD suggests would thus render the words "in cells" redundant and superfluous to the remaining claim language. The Federal Circuit has counseled that constructions which render claim terms redundant are not preferred and are usually incorrect.[12]   Also, the only recited method "step" in the claims is "reducing NF-κB activity" and the claim recites no limitation on how this is to be done.  Reading "in cells" as a limitation on where the "reducing" step is to take place provides some boundary on an otherwise

---

10   ARIAD's citation (ARIAD Op. Br. at 25, n. 33) to Strunk and White ignores the rule that needless words should be omitted.  *See e.g.* Ex. I, William Strunk Jr. and E.B. White, *The Elements of Style*, 23 (3d ed. 1979) ("[Rule] 17.  **Omit Needless words.**  Vigorous writing is concise.  A sentence should contain no unnecessary words, a paragraph no unnecessary sentences, for the same reason that a drawing should have no unnecessary lines and a machine no unnecessary parts.  This requires not that the writer make all his sentences short, or that he avoid all detail and treat his subjects only in outline, but that every word tell.")

11   *See* discussion at n. 9 *supra*

12   *See Mangosoft, Inc. v. Oracle Corp.*, No. 2007-1250, 2008 WL 2039061, at *1-3 (Fed. Cir. May 14, 2008) (affirming district court's rejection of a claim construction that would render a claim term "superfluous," and noting that the construction would "ascribe[] no meaning...not already implicit in the rest of the claim") (citing *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

unbounded claim scope and on the possible actions that could be taken to achieve the recited result. That is exactly how the specification describes the claimed methods – as relating only to actions taken inside of cells using the role of NF-κB as an intracellular messenger.

ARIAD's attempts to bolster its claim construction position by reference to three "everyday" but misguided analogies. (*Id.* at 25)   Indeed, these analogies quickly break down upon a cursory review, because the analogized thing that is being reduced is not limited to the context in which it is found (unlike NF-κB activity, which exclusively occurs "in cells"), and there is no patent specification which guides and provides context to the means of achieving the desired result. For example, "reducing the temperature of a liquid in a glass bottle" is an inapplicable analogy because "temperature of a liquid" is not a feature found solely within the glass bottle like NF-κB activity is found exclusively inside the cell. The patent makes clear that the "first messenger" does not enter the cell and that NF-κB is defined by its role as a second messenger inside the cell – that is what the inventors asserted that they discovered.

To make this analogy apply to the facts of this case, there would have to be some unique feature of the liquid in the glass bottle that only existed in the glass bottle that could be used to reduce the temperature of the liquid. To be able to patent a method of using that feature to reduce the temperature of the liquid in the glass, there must be sufficient disclosure of ways of doing it, and the claims would be properly limited by that disclosure and the prior art. The other two analogies -- powders in jars and sprained ankles -- are equally inapplicable. Nothing about the analogies suggests that the '516 patent is entitled to claim actions far removed from what the inventors did and discussed as their invention in the patent.

ARIAD finally argues that neither the asserted claims nor the specification "disclaims agents that act by inhibiting the binding of cytokines to cell surface receptors." (*Id.* at 26)   But

this position is neither accurate nor a correct representation of the law. The law does not permit a patentee to claim whatever is not expressly disclaimed. *See, e.g.* 35 U.S.C. § 112 ¶ 1 (the specification must describe the claimed invention in "full, clear, concise and exact terms.") "Because the patentee is required to 'define precisely what his invention is' … it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" (*Phillips*, 415 F.3d at 1312). Here, the claims are expressly limited to methods "in cells," and the specification makes clear that the invention claimed was to reduce NF-κB activity in the cell by taking direct action inside the cell.

2. The Patent Specification Only Discloses Hypothetical Methods Of Taking Intracellular Action For "Reducing NF-κB Activity."

ARIAD distorts the teaching of the specification in an attempt to find support for its extracellular construction of "reducing NF-κB activity in cells." ARIAD cites to the specification's disclosure of hypothetical ways that one might take direct action to inhibit NF-κB, but all of these methods are *intracellular*. (ARIAD Op. Br. at 19) The disclosure is "hypothetical" because the patent reports no examples of actual experiments that carry out the theorized methods. ARIAD also cites to the specification in an attempt to create an "NF-κB signal transduction pathway" that extends outside the cell, but nothing in the specification supports such a pathway. Finally, ARIAD cites to the patent's description of "antagonists" as something that could apply outside the cell, but the specification discusses only potential antagonists of NF-κB to be used inside the cell. ARIAD's failure to use the specification to support its extracellular position only confirms that Amgen's proposed construction of "reducing NF-κB activity in cells" is the correct one.

ARIAD initially argues that the "specification discloses several ways to limit the ability of NF-κB to act as an intracellular messenger." (*Id.* at 19) ARIAD points to hypothetical

17

intracellular means (intracellular decoy molecules, dominantly-interfering molecules, and excess IκB) citing column and line to the patent, in footnotes 24 and 25.  ARIAD then cites to its purported example of an extracellular embodiment, arguing in its brief that "[a]ntagonists can act on any step of the pathway, including the first [step]."[13]  (*Id.*)  Notably, this statement is not supported by any citation to the specification, and in fact the '516 patent describes antagonists that act inside the cell.   ARIAD later expands on this unsupported text to argue that "'antagonists', which include, antibodies and other cytokine antagonists like Enbrel" would be examples of extracellular inhibitors.  (*Id.* at 26)  Again, when making this statement regarding "antagonists" there is no citation to any section of the '516 patent.[14]  ARIAD's reluctance to cite to the actual disclosure of "antagonists" is not surprising when one views the context and sees that the patent is only referring to *intracellular* antagonists.

The reference in the '516 patent to "antagonists" occurs in columns 34 and 35, and only discusses an antagonist to something inside the cell:

> A gene encoding a transcriptional regulatory factors [sic] can also be used to develop in vivo or in vitro assays to screen for agonists or *antagonists of a factor-encoding gene or of the factor encoded by the gene.*  For example, genetic constructs can be created in which a reporter gene (*e.g.* the CAT gene) is made dependent upon the activity of a factor-encoding gene.  These constructs introduced into host cells provide a means to screen for agonists or *antagonists of the factor-encoding gene.*  The antagonists may be used to decrease the activity of the factors and thus may be useful

---

13  The so-called "NF-kB signal transduction pathway" is one created and described by ARIAD well after its patent applications were filed and bears no relation to the specification of the '516 patent.  Moreover, even if the pathway existed, nothing in the patent shows that the inventors had any ideas about interfering with it outside the cell as part of their invention.

14  ARIAD does cite to a paragraph of its expert's report in support of its argument that "antagonists" can include extracellular, but its expert's opinion suffers from the same lack of context from the patent as ARIAD's arguments here.

> in the therapy of diseases associated with overactivity of a
> transcriptional regulatory factor.    Such agonists or antagonists
> identified by assays employing the factor-encoding genes of this
> invention are within the scope of this invention.

('516 patent at 34:66-35:12 (emphasis added)).   Thus, the only hypothetical "antagonists" to be

screened for are "of a factor-encoding gene" or the "factor encoded by the gene."[15]  As has been

discussed previously, genes are present in the nucleus of a cell, and transcription "factors" are

exclusively found inside cells as well.   Thus, any "antagonists" to these two chemical entities

mentioned in the specification must be limited to intracellular action as well.[16]   ARIAD's

attempt to take the term "antagonist" out of context and broaden it to encompass extracellular

molecules (such as ENBREL or TNF-α antibodies[17]) that may bind to cytokines and that are

nowhere mentioned in the '516 patent is completely without merit.

      Nor does ARIAD's creation of an "NF-κB signal transduction pathway" support the

argument that the claims should encompass extracellular activities.   The patent specification, in

fact, is clear that if any such pathway exists it is exclusively intracellular.   The patent discusses

---

15   *See, e.g.,* 03/07/08 Reply Report of Randolph Wall, Ph.D. ("Wall Reply Report") at 6 and 7
     (explaining that antagonists of factors or a factor encoding genes are intracellular).

16   See Ex. O, March 27, 2008 Deposition of Randolph Wall, Ph.D. at 157:11-20 ("Q. So why,
     then, do you feel that the sentence I just read you is drawing this distinction between
     intracellular and extra-cellular antagonists?    A.    Because it's in the context of the
     specification which always talks about reducing the factor and the factor's intracellular
     signaling.  Previously it is talking about tests for antagonists of the factor-encoding gene,
     which I would interpret to mean acting on the gene.")

17   Such antibodies are also not discussed in the '516 patent.  The only "antibodies" discussed in
     the specification are those "reactive with the genes or the encoded factors" (*see e.g. id.* at
     3:18-23), "raised against the factors and used as probes for factor expression" (*id.* at 4:45-
     46), or "specific for the IκB gene-encoded product" and used "for such purposes as
     identifying and isolating other IκB genes, IκB 'like' genes, and IκB-encoded products." (*See
     e.g. id* at 31:57-63)

NF-κB as having a role "not unlike the well known role of cAMP as a second messenger" ('516 patent at 16:36-37) and acting "as a messenger to transmit the gene induction signal *from* the plasma membrane to the nucleus." (*Id.* at 16:33-35 (emphasis added)). In other words, the "second messengers" like NF-κB start inside the cell and transmit messages solely inside the cell. Despite this explanation in the specification, ARIAD cobbles together citations to the patent specification attempting to support its artificial "NF-κB signal transduction pathway" and then contradicts the specification by extending the pathway outside the cell. (ARIAD Op. Br. at 18-19). These citations do not support, and there is no discussion of, a singular "NF-κB pathway" that encompasses extracellular activities. (See Amgen Op. Br. at 21-23). Instead, the specification's discussion is limited to that of *external influences* on cells (first messengers) that may lead to (among other things) intracellular signal transduction via NF-κB.[18]

        3.      ARIAD's Admissions To The PTO Regarding The Limitation Of The Claims To "Intracellular" Actions Confirms Amgen's Construction.

ARIAD boldly tells this Court that "because claims 6 and 18, and their associated dependent claims, relate directly to 'reducing NF-κB activity' without reference to the situs -- inside or outside the cell -- of the reducing agent, the methods of the asserted claims can be practiced by impeding any step along the NF-κB pathway." (ARIAD Op. Br. at 24) But less than seven months ago, ARIAD, in order to overcome a final rejection of its claims (including 6 and 18) expressly acknowledged that the asserted claims are limited to reducing methods that occur by "intervening intracellularly." (D.I. 571, Ex. U at 27)

---

18  *See* Wall Rebuttal Report at 6 ("NF-κB is inactive when it is complexed with IκB but may act as an intracellular messenger by being released from IκB, translocating into the nucleus, and/or binding to particular DNA sequences.")

It is settled Federal Circuit law that "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *See Phillips*, 415 F.3d at 1317; *accord Regents of the Univ. of Cal. v. Dakocytomation Cal. Inc.*, 517 F.3d 1364, 1374 (Fed. Cir. 2008) (affirming the district court's construction where the "the patentees' statements during prosecution, evince a clear intent to limit the claims"); *see also Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996) (noting "the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims.").

Here, ARIAD has explained to the PTO that the asserted claims encompass only those methods that involve "intervening intracellularly." (D.I. 571, Ex. U at 27)  As part of its recent statement to the PTO, ARIAD further explained what the claims *do not* cover -- methods that involve "preventing the external inducing stimuli from inducing the intracellular signaling pathway through which NF-κB activity is manifested." (D.I. 571, Ex. U at 27-28; *see also* Amgen Op. Br. at 20-21).  It is a bedrock principle of patent law that "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.'…This principle applies with equal force to arguments made by a patentee to sustain the patentability of claims during reexamination." *Spectrum Int'l., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998) (internal citations omitted).  Although ARIAD now argues that "none of the asserted claims … disclaims agents that act by inhibiting the binding of cytokines to cell surface receptors" (ARIAD Op. Br. at 26), ARIAD has, in fact, expressly disclaimed such extracellular intervention and should not now be heard to argue for a broader scope.

21

4.  The Admissions Of ARIAD Inventors And Experts Confirm That The Claims Are Limited To Intracellular Actions.

In addition to the overwhelming weight of the intrinsic evidence, extrinsic evidence from ARIAD's own witnesses supports the conclusion that the claims are limited to intracellular actions. Amgen is mindful of the caution from the Federal Circuit that "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318. The extrinsic evidence here, however, are party admissions as they are statements of ARIAD's inventors and experts *prior to* their focus on this case and allegations against ENBREL.

In the *Lilly* litigation, the accused products operated differently than ENBREL, and thus ARIAD could assert the claims more narrowly (*i.e.* more consistently with the patent disclosure) in an attempt to maintain their validity. As a result, inventor Dr. Thomas Maniatis testified that "I believe the methods in the patent addressed the intracellular activation of NF-kappaB. They don't deal with outside inducers ... that impinge on the cell, the stressors and so on." (Ex. J (April 12, 2006 *Lilly* Trial Transcript at 80:24-81:2)



---

19  The claims asserted at the time and addressed by Dr. Ravetch in his reports in the *Lilly* litigation included claims 71 and 72 (*See* Ex. K, October 20, 2005 Ravetch Report at ¶12 (listing the asserted claims)), which are also asserted in this case and dependent on asserted on claim 6.



Dr. Maniatis' and Dr. Ravetch's prior opinions are ARIAD admissions that contradict ARIAD's current attempt to construe the claims as encompassing the blocking of external stimuli to reduce NF-κB activity.

ARIAD is now attempting a 180-degree turn from the trial testimony and expert opinions it adduced in the prior *Lilly* case. Principles of estoppel should apply to prevent ARIAD from treating claim construction as a "nose of wax."[20]

---

[20] *See In re Teleglobe Commc'ns. Corp.*, 493 F.3d 345, 377 (3d. Cir. 2007) ("Judicial estoppel prevents a party from 'playing fast and loose with the courts' by adopting conflicting positions in different legal proceedings (or different stages of the same proceeding.")) Moreover, ARIAD's application of these claims is not consistent across issues even within this litigation, as seen by contrasting their Opening Brief on Claim Construction with their Daubert Motion to disqualify Amgen's expert Dr. Ciechanover. On the one hand ARIAD argues for purposes of claim construction that even non-specific inhibition of NF-κB activity by blocking TNF-α is encompassed within the claims, but then, on the other hand, argues that Amgen's expert Dr. Ciechanover's opinions regarding ubiquitin-mediated degradation are not relevant because this does not result in "specific inhibition of NF-κB." (*See* D.I. 579 at 20) These internal inconsistencies underscore the futility of ARIAD's positions.

**B.    ARIAD's Constructions for "NF-κB," "NF-κB Activity" and Related Terms Are Not Supported.**

ARIAD's ambiguous constructions for the foundational terms "NF-κB," "NF-κB activity," and "NF-κB-mediated intracellular signaling" import artificial limitations that are unsupported in the claims or other intrinsic evidence.

1.    ARIAD's "NF-κB Signal Transduction Pathway" Is Artificially Injected Into Five Of The Eight Disputed Terms Yet Exists Nowhere In The 516 Patent Claims Or Specification.

Not only does ARIAD create an "NF-κB signal transduction pathway" that it alleges to encompass extracellular actions, it then seeks to inject this "NF-κB signal transduction pathway" concept into five of the eight disputed terms. ARIAD's bald assertion that the patent describes a five-step singular "pathway by which the 'message' of an external stimulus is 'transduced within cells through NF-κB activity'" is unsupported by the intrinsic evidence. (ARIAD Op. Br. at 18) None of the disputed claim terms are defined in the patent or the prosecution history by reference to any five-step pathway. Plainly, this "pathway" is a post-hoc attempt to inject multiple steps and structure to the claims that only recite a single step – "reducing NF-κB activity in cells." Because this newly created concept of a "NF-κB signal transduction pathway" appears nowhere in the '516 claims or specification, would itself require construction, and is in fact incapable of consistent construction, to adopt this pathway as the basis for construing five of the claim terms in dispute would be legal error. *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (noting that "interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation…which is improper.")

24

2.    ARIAD's Construction Of "NF-κB" Ignores The Patent's Disclosure Of NF-κB Recognition Sequences And Introduces Further Ambiguity Into The Claims.

ARIAD argues that the definition of "NF-κB" should include any DNA sequence to which NF-κB binds, not just those identified in the specification in Table 2. According to ARIAD, Table 2 is only the inventor's "prediction" of the sequences to which NF-κB can bind, and not an exhaustive (or even accurate) list that should limit the claims in any way. (ARIAD Op. Br. at 17-18) However, this is yet another example of how ARIAD is trying to broaden the claims to a meaning that is not supported by what the inventors knew or described in the patent. Both "NF-κB" and "NF-κB activity" are terms originally coined by the named inventors of the '516 patent.[21] Thus, at the time of the purported invention, the only proper way to construe the terms is by what the inventors knew and described at the time in the patent. *See e.g. Schering Corp. v. Amgen Inc.*, 222 F.3d at 1347, 1353 (Fed. Cir. 2000) ("this court interprets the claim at issue to cover no more than what the specification supported at the time."); *see also id.* at 1354 ("[t]o grant broader coverage would reward [the inventor] for inventions he did not make."). Amgen's proposed construction that includes reference to Table 2 is an attempt to give structure and meaning to the claim – the meaning consistent with the information provided by the inventors — rather than leave the claim unbounded by what may be included within its scope. In the specification, NF-κB is defined in a purely functional way as a protein possessing certain activities, including binding to its DNA recognition sequences.[22] As the patent states: "DNA

---

21    Although the terms were originally coined by Dr. Baltimore and some of his co-inventors, the meaning of these terms have in fact changed significantly over time as more and more has been learned about the NF-κB family of proteins and their activities.

22    *See e.g.* '516 patent at 31:65-32:3; 35:54-55; 37:1-42; *see also* Ex. L, September 26, 2007 Deposition of David Baltimore at 64:7-11; 65:1-9; *see e.g.* 65:6-9 (Q. ... So it was defined
(Continued...)

sequences known to contain NF-κB binding domains are shown in Table 2." The patent provides

no structure for NF-κB and discloses no nucleotide or amino acid sequence or structure for NF-

κB because at the time of the original patent filings the inventors did not know the structure or

sequence.    ████ **REDACTED** ████

Given the lack of any structural limitations and the reliance on purely functional descriptions, it

is entirely appropriate to include a limitation to the sequences of Table 2 in the construction of

"NF-κB" and "NF-κB activity."

While ARIAD argues that Amgen's definition of NF-κB is functional and circular

because it defines NF-κB by its activities, it is ARIAD's construction that eschews any structure

and compounds the circularity of the claims. ARIAD proposes to define NF-κB as a "DNA-

binding protein factor found in many eukaryotic cells" that "mediates the transcription of certain

genes by binding to specific DNA recognition sequences in those genes." (ARIAD Op. Br. at

37) As is apparent from its proposed definition, ARIAD refuses to accept any limitation on how

the term NF-κB could be interpreted or applied. ARIAD also cites to no information provided in

the patent for which cells it is found in, the structure of I-κB, or the "specific DNA recognition

sequences" to which it binds. ARIAD identifies those "specific" sequences only as those that

_____

not merely by binding to DNA but by binding to these particular sequence of DNA. A. Yes,
I am sorry. You are quite correct.")



bind NF-κB -- a wholly circular and indefinite construction. Without limiting the term to what was known and disclosed in the patent, the term is indefinite and the claims invalid. The claim must be construed to reflect the purported invention as claimed and as discussed in the patent, including the description of NF-κB as binding to the sequences in Table 2.

3.     Amgen's Constructions Apply A Consistent Interpretation Of The Term "Activity" As Used In The Claims.

ARIAD argues that the term "activity" must have the same definition whether it is used in the context of "NF-κB activity" or "Interleukin-1 or Tumor Necrosis Factor-α activity."[24] Although terms of course must be construed consistently in patent claims, the term "activity" must be informed by the context in which it is used – *e.g.*, NF-κB activity. This claimed activity is different than TNF-α activity, just like these are different from recreational or aerobic or seismic or any other kind of activity. The specification refers to cytokines such as TNF-α as first messengers, and proteins such as NF-κB as second messengers, and ascribes different activities to the different messengers. NF-κB has the enumerated activities described in the previous section, while TNF-α acts as an extracellular activator or inducing substance – not as "an intracellular messenger," "mediator"[25] or "transducer." (*See e.g.* '516 patent at 17:32-33: "IL-1 and TNF-α activate NF-κB binding and both have been shown known [sic] to induce ß-IFN.")

---

[24] It is in fact ARIAD's proposed constructions that are nonsensical. (*See e.g.* ARIAD Op. Br. at 22 (emphasis added) claiming that "[o]nly ARIAD's construction is workable, because it accords the term '*activity [of a molecule]*' a consistent definition that includes signaling *events that do not directly involve that molecule.*"); *see also* ARIAD's construction of "reducing NF-κB activity in the cells" which cannot be reconciled with the use of "in the cells" in claim 18. Claim 18 recites not only "reducing NF-κB activity *in the cells*" but also "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α *in the cells.*" (*See* '516 patent at 83:18-22)

[25] Amgen's proposed constructions do not, as ARIAD contends (ARIAD Op. Br. at 20), conflate "NF-κB activity" and "NF-κB-mediated intracellular signaling." Amgen's proposed
(Continued...)

27

Furthermore, the claim language itself differentiates between the activities of each molecule. If "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" requires construction — and Amgen believes this preamble language does not -- such construction must be consistent with the body of the claim, in which "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" comprises reducing "*intracellular signaling caused by* Interleukin-1 or Tumor Necrosis Factor-α in the cells." (*Id.* at 83:18-22 (claim 18)) Thus, reducing TNF-α activity, as used in claim 18, means reducing intracellular signaling caused by the TNF-α molecule, and a proper construction recognizes this activity and is consistent with the use of the term "intracellular signaling" elsewhere in the claims. Thus, Amgen's construction of limitations including the word "activity" are wholly consistent with their context in the intrinsic evidence.

**C.      The Claims Do Not Require That the Claimed Method Be "Performed After the Pathway Has Been Initiated in Response to Application of a Stimulus Prior to the Performance of the Claimed Method"**

Another significant flaw in ARIAD's proposed construction is that it seeks to import an additional step into the methods of all the asserted claims, the step of applying an external stimulus to initiate ARIAD's self-created "NF-κB signal transduction pathway." ARIAD seeks to import this "initiation" requirement through the word "induced" in the preamble of claim 6, and the reference to NF-κB activity "caused by" Interleukin-1 or TNF-α in claim 18. But the

---

constructions reflect, as required, the patent's disclosure of "NF-κB activity" as the ability to act as an intracellular *"mediator"* or "messenger" distinct from, although certainly related to, the resultant "NF-κB-*mediated* intracellular signaling." This is wholly consistent with the use of the terms in claim 6, wherein by reducing the activity of the mediator, the mediated occurrence is diminished. This is also consistent with the claim language. In fact, ARIAD argued as much in *Lilly.* (*See* D.I. 581, Ex. 3 at 7 (citing the '516 patent at 10:41-46, 12:36-56, 17:45-47)) Despite ARIAD's recent protests to the contrary, Amgen's construction of these terms is thus entirely consistent with the intrinsic evidence.

28

claims require only that there be some level of NF-κB activity that is reduced, and impose no limitation whatsoever on how or when this activity comes to be in existence.

ARIAD's attempt to import an application of a separate stimulus requirement is especially awkward because under ARIAD's view, the step is outside of the claimed method, *i.e.* it is supposed to occur "prior to performance of the claimed method." (ARIAD Op. Br. at 30). Amgen is unaware of any court that has endorsed a claim construction requirement that method steps be performed *prior to* performance of the claimed method steps themselves. It would appear that ARIAD wants to require this "pre-method" step to distinguish the prior art experiments (which ARIAD incorrectly contends would require application of a stimulus before introducing reducing agents to cells in order to meet the claims) while still asserting that patients' use of ENBREL infringes (since there is no application of any "stimulus" prior to taking ENBREL). But there is no pre-method step that can be required, as already confirmed by the PTO.

In the reexamination, ARIAD made the same argument that it makes here, and the PTO rejected it. The PTO expressly found that "[t]here is nothing in the independent claims compelling a person of ordinary skill in the art to include any particular steps including a 1st activation step."[26]   (D.I. 571, Ex. V at 20)   The PTO found the asserted claims "purely functional". (*Id.* at 17) and concluded that construing the asserted claims to require a prior

---

[26]  It is true that "[d]uring examination, 'claims ... are to be given their broadest reasonable interpretation consistent with the specification...'" *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004); *see also id.* ("Construing claims broadly during prosecution is not unfair to the applicant (or, [in reexamination], the patentee), because the applicant has the opportunity to amend the claims...[which] distinguishes proceedings before the PTO from proceedings in federal district courts on issued patents.")  In this situation, however, ARIAD's argument for importing this "prior application of stimulus" step into the claim violates the rules governing the claim construction disputes here as well.

induction step would be "tantamount to rewriting the claims to insert a negative claim limitation." (*Id.* at 21)

Despite the rebuke by the PTO, ARIAD presses this claim construction in its Opening Brief, chiefly arguing that the claims cover treatment of diseased patients, but do not cover prophylaxis. (ARIAD Op. Br. at 30 ("ARIAD contends that the asserted claims relate only to 'treatment'"); *Id.* at 29 (arguing that the [treatment/prophylaxis, prior/subsequent induction][27] distinction is highly meaningful.")) But neither the claims nor the specification support a limitation in the claims that the methods only apply to cells of patients with a disease. In truth, the inventors did not know nor did they speculate on how their methods could be used clinically. ARIAD's attempt to turn its functional claim language exclusively into a method of treating disease is supported only by extrinsic opinion evidence. (*Id.* at 29, citing Greenwald Decl. Ex. 21 at 6-7 (wherein Dr. Ravetch's opinions are unsupported by citation to intrinsic evidence)) Such extrinsic evidence, however, cannot be used to alter the meaning of the claims.

In short, ARIAD's suggestion that the claims cover "cells whose activated NF-κB levels are being modulated, have already been exposed to an NF-κB activity-inducing agent (such as TNF-α or IL-1)" but not cells "exposed to such an inducing agent only at the same time as, or after, an NF-κB inhibitor is added" (*Id.* at 29) is unsupported by any evidence, let alone intrinsic evidence. Whether cells have already been exposed to an agent, or are exposed at the same time as, or after, is all immaterial – all the claims require is a reduction of some level of NF-κB activity regardless of how that activity came to be in existence.

---

27  ARIAD's attempt to build this distinction into the claims derives from its argument in reexamination attempting to distinguish the currently rejected claims over the prior art upon which the Examiner's rejection relies. (*See* D.I. 571, Ex. V at 20)

ARIAD's few and misplaced citations to the specification are similarly unavailing. That some cells have constitutively active NF-κB (*id.* at 33, n. 37), that some cells have no apparent NF-κB activity (*id.* at 33, n. 38), and that cells can be induced with certain substances (*id.* at 32, n. 36), does not dictate a method for reducing NF-κB activity in cells that consists of ordered method steps that are not set forth in the claims.

### D.   The Claims Are Not Limited To Methods In Those Cells In Which NF-κB Is Present And Capable Of Acting As An Intracellular Messenger

ARIAD also improperly seeks to read into the claims the requirement that the "cells" are limited to those "in which NF-κB is present and capable of acting as an intracellular messenger." (*Id.* at 36)   This is ARIAD's attempt to avoid some invalidity arguments that the claims are indefinite, lack written description and are not enabled, as supported by admissions of its own expert.   But ARIAD's proposed definition lacks any definition or support in the patent specification, is indefinite and circular, and adds nothing to the claim.

At the time of the original patent filings, the inventors clearly did not know in which cells NF-kB was found or was active,[28] and thus, the patent specification fails to define which cells have NF-κB capable of acting as an intracellular messenger.   Instead, the specification supports construing the claims as encompassing *all* cells for those claims in which the term "cells" is found and *all* mammalian cells for those claims in which the term "mammalian cells is found," and so on.   The patent states:

> As described herein, NF-kB, was initially thought to be a B-cell specific factor involved in immunoglobulin gene regulation and has since been shown to be

---

[28]   ARIAD even now admits that the inventors did not know in which cells NF-κB was present and capable of acting as an intracellular messenger: "It would therefore have been impossible to claim the reduction of NF-κB activity in all eukaryotic species, because it would be impossible to assess whether each species expresses NF-κB." (*Id.* at 36, n. 40)

> inducible in *many, if not all, cell types* and to act as an intracellular transducer or
> mediator of a variety of external influences.

('516 patent at 10:41-46; *see also id.* at 12:36-41; 12:57-60)   In other words, the '516 patent's

purported inventors chose to broadly claim methods performed in all "cells," "mammalian cells,"

"eukaryotic cells," "immune cells," "lymphoid cells," etc. and if the inventors had intended to

further limit the claims, they could and should have done so.  ARIAD should not now be allowed

to cure its overly broad claims by reading in limitations in defiance of applicable Federal Circuit

precedent. *See Phillips*, 415 F.3d at 1312; *see also Renishaw PLC v. Marposs Societa' per

*Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (internal citations omitted) ("It is improper for a

court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any

need to interpret what the patentee meant by particular words or phrases in the claim.")

Moreover, ARIAD's proposed construction would necessarily build into the claimed

method the need for more experimentation to determine which "cells" would qualify.  In doing

so, ARIAD highlights one of the endemic problems with its constructions - they provide little

more than an invitation to experiment and not an actual invention.

E.     **The Claims Cannot Be Construed To Require A Comparison To Naturally
        Occurring NF-κB Activity.**

ARIAD argues that to assess whether NF-κB activity is reduced pursuant to the claims,

the activity has to differ from the NF-κB activity that occurs "naturally." (ARIAD Op. Br. at 38)

While the motivation for ARIAD's construction is spelled out – it purports to limit the claims

solely to artificial means of "reducing NF-κB activity in cells" to avoid an invalidity attack – the

construction has not only been rejected by the PTO, but ARIAD previously argued *against* this

claim interpretation, and won.

First, faced with the PTO's rejection of the asserted claims, ARIAD argued that only

artificial means were encompassed in the claims.  The PTO rejected ARIAD's attempt to limit

the claims in this way. (*See* D.I. 571, Ex. V at 20 (noting that the claims encompass any natural method of reducing NF-κB activity; *see also* Greene Decl., Ex. B, March 7, 2008 Reply Expert Report of Warner Craig Greene, M.D., at 20.)

Second, ARIAD also wholly ignores its prior arguments and admissions in the *Lilly* litigation. (*See e.g.* Amgen Op. Br. at 23-25, 27-28 and exhibits cited therein). Specifically, ARIAD argued in *Lilly* that requiring a comparison to "naturally occurring" NF-κB activity:

- "has no basis whatsoever in the claim language";
- "fails to give the word 'reducing' its ordinary meaning [and] [n]either the specification nor the file history of the '516 patent sets forth [a distinct] definition";
- "encompasses a variety of fluctuating states";
- "requires Plaintiffs to demonstrate that NF-κB activity is reduced such that it 'differs from its naturally-occurring activity…' a continually shifting standard [and] an impossible task";
- "render[s] this claim indefinite"; and
- "violate[s] the rules of claim construction."

(*Id.*, Ex. 3 at 5-6) Nothing in ARIAD's current conclusory argument addresses or explains ARIAD's complete departure from these prior positions.    In its current argument *for* the inclusion of this limitation, ARIAD asserts that this claim term requires "reduction of NF-κB activity to a greater extent than would occur in the absence of artificial intervention," but cites no evidence in the specification (and indeed there is none) of what conditions define such "NF-κB activity" "in the absence of artificial intervention" or how to measure it. (ARIAD Op. Br. at 38) ARIAD correctly argued in *Lilly* that importing such "naturally occurring" language into the claim by way of a contrived construction would present "an impossible task" in determining whether the claim was practiced. (*See* Amgen Op. Br., Ex. 3 at 5-6)

Despite its prior characterization of this language from the specification as a "remotely connected discussion of different words," ARIAD now unabashedly calls the same language an "express disclaimer of claim scope" (Amgen Op. Br., Ex. 3 at 5, n. 5; *cf.* ARIAD Op. Br. at 39) mentioning neither the reexamination nor the prior litigation in its short and conclusory argument. (*Cf.* ARIAD Op. Br. at 38 (citing the '516 Patent at 12:48-56); Ex. P, Defendant Eli Lilly's Opening Brief on Claim Construction in *Lilly*, at 14 (citing the '516 patent at 12:50-56); and ARIAD's Opposition Brief on Claim Construction in *Lilly*, at 5)

ARIAD convinced the *Lilly* court not to adopt this construction and ultimately prevailed in that jury trial. As such, ARIAD is estopped from now arguing for the adoption of this construction. *Cf. Renishaw PLC v. Marposs Societa Per Azioni*, 974 F. Supp. 1056, 1085 (E.D. Mich. 1997) (finding patentee estopped from asserting claim construction inconsistent with construction it prevailed on in prior litigation and noting that judicial estoppel "places a limit on litigants who argue whatever state of facts seems advantageous at a point in time, and who argue a contradictory state whenever self-interest may dictate a change.")

ARIAD's position in the *Lilly* case, and the PTO's position in the reexamination, are consistent with Amgen's position in this case. ARIAD's litigation-induced effort to import a negative limitation excluding natural processes from the claims should be rejected.

**F.    Amgen's Proposed Constructions Of The Disputed Terms Are Correct.**

ARIAD's constructions should be rejected because they do not align with the claim language, are not supported by the intrinsic evidence, and seek to expand the scope of ARIAD's patent rights while in other ways introducing unclaimed concepts and additional ambiguity. ARIAD's complete evasion of the prosecution history and its prior admissions in the *Lilly* case underscore the weakness of its positions.

The following is a summary of the key evidence and arguments that drive the claim construction decisions in this case both for the terms discussed above and additional terms in dispute between the parties.

1.    "NF-κB"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "a protein having each NF-κB activity" | "a DNA-binding protein factor found in many eukaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes." |

2.    "NF-κB activity"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "the ability to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 of the '516 patent" | "the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes." |

ARIAD's constructions of these terms introduce ambiguity and expand the scope of the claims beyond the patent's disclosure while at the same time importing unclaimed limitations. (See Amgen Op. Br. at 12-15) In particular:

- ARIAD construes "NF-κB activity" as "the ability of NF-κB to act as an intracellular messenger that regulates transcription of *particular* genes" – an overly broad and amorphous concept which would itself require construction.

- ARIAD also reads out the inventors' description of NF-κB recognition sequences in Table 2 – characterizing them as merely those "predicted." In so doing, ARIAD rewrites the claims to require further experimentation and fails to follow Federal Circuit precedent instructing that the best source for discerning the context of the claims is the description of the invention in the specification. (ARIAD Op. Br. at 17-18; see also Amgen Op. Br. at 12-14)

- ARIAD's constructions read in limitations not supported in the claim language:

35

- The limitations *"mediates the transcription of certain genes"* and *"regulates transcription of particular genes"* (*see* Amgen Op. Br. at 12-14) are not supported by the language of the asserted claims and their inclusion is inconsistent with the language of the '516 patent claims as a whole (because many non-asserted claims expressly claim such limitations.)

- The limitation *"found in many eukaryotic cells"* (*see* discussion *supra* at Section IV(D)) is wholly unsupported in the claim language and introduces ambiguity.

3.    "reducing NF-κB activity in cells"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "taking action inside cells to directly inhibit (interfere or block) an NF-κB activity"[29] | "decreasing NF–κB activity that exists in cells in which NF–κB is present by inhibiting any step along the NF-κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF-κB under the same conditions, without regard to the situs of the inhibiting agent." |

ARIAD's construction of "reducing NF-κB activity in cells" adds ambiguity and expands the scope of the claims in certain respects while artificially limiting the claim scope through numerous unclaimed limitations. In particular:

- ARIAD's construction inserts an unclaimed and unsupported "NF-κB signal transduction pathway." Neither the claims nor the specification ever reference an "NF-κB signal transduction pathway," instead the specification discusses "the role of NF-κB as a second messenger." (*see* '516 patent at 35:42-43; *see also* Amgen Op. Br. at 21-23; discussion *supra* at Sections IV(A)(1) and IV(B)(1)). Moreover, the only "pathway" implicating NF-κB set forth in the specification makes clear that it exists wholly within cells. (*See* Wall Rebuttal Report at 8-9.)

- ARIAD's construction includes "without regard to the situs of the inhibiting agent," another unsupported limitation, and one which contradicts the express claim language by reading in a negative limitation expanding the scope of the claims so that "reducing NF-κB activity *in cells*" can occur *outside* cells, in direct contradiction to ARIAD's statement to the PTO that the asserted claims require "intervening intracellularly." (*See* discussion *supra* Sections IV(A)(1) and IV(A)(3))

---

[29] This claim construction applies to similarly-worded limitations in other independent claims of the '516 patent. (*See* discussion at Amgen Op. Br. at 16, n. 8)

- ARIAD's proposed construction expands the scope of any purported invention discussed in the specification — which is limited to only hypothetical means of intervening intracellularly. (*See* discussion *supra* at Section IV(A)(2))

- ARIAD limits the claimed "cells" to those "in which NF-κB is present" although ARIAD has admitted that the inventors did not know which cells those were -- thus reading into the claim a requirement for further experimentation.  (*See* discussion *supra* at Section IV(D))

- ARIAD imports a comparison to the "naturally occurring" activity, but ARIAD should be estopped from importing this limitation that it has admitted would render the claimed method "impossible" and "indefinite" and mandate comparison to a "continually shifting standard." (*See* discussion *supra* at Section IV(E); *see also* discussion at Amgen Op. Br. at 23-25)

    4.    "NF-κB-mediated intracellular signaling"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "molecular interactions within cells effected by, or conveyed through, NF-κB" | "the intracellular steps of the NF-κB signal transduction pathway." |

ARIAD advanced, and the *Lilly* court adopted, a construction for "NF-κB-mediated intracellular signaling" that is essentially the same as that proffered by Amgen in this case, and which does not import the unclaimed "NF-κB signal transduction pathway" limitation.   In particular:

- ARIAD successfully argued in *Lilly* (and offered expert declarations to support) that the proper construction of this term compelled by the claim language is "molecular communication within cells effected by, or conveyed through, NF-κB," a construction nearly identical to that offered by Amgen. (*See* Amgen Op. Br. at 26-29, and cited Exhibits)

- ARIAD's current proposed construction requires this Court to adopt ARIAD's ill-conceived and unclaimed *"NF-κB signal transduction pathway."*  (*See id.* at 21-23, 28-29; *see also* discussion *supra* Section IV(B)(1))

    5.    "such that NF-κB-mediated intracellular signaling is diminished"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "such that there is a decrease of any molecular interaction within cells effected by, or conveyed through, NF-κB" | "[such that NF-κB-mediated] signaling is reduced from an existing induced state to a lower state." |

ARIAD's construction of this term imports an unclaimed and ambiguous limitation in its attempt to read in a requirement of prior induction -- an assertion that the PTO has already rejected. In particular:

- ARIAD's construction reads in the unclaimed limitation *"from an existing induced state to a lower state."* (*See* discussion at Amgen Op. Br. at 29-30) Nothing in the term 'diminished' suggests that "diminished" requires reduction "from an existing induced state to a lower state" nor is there support for this additional limitation in the specification or claims. Furthermore, such a construction introduces significant ambiguity into the claim language as the terms "induced state" and "lower state" themselves require construction.

- Through this unsupported limitation, ARIAD would impose an unstated requirement of prior induction -- an assertion that the PTO has already rejected as "tantamount to rewriting the claims." (*See* discussion *supra* at Section IV(C))

    6.    "diminishing induced NF-κB-mediated intracellular signaling"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| Amgen believes that this phrase of the preamble is not limiting of the claim. If it is found to be limiting and requiring construction, it should be understood to mean "decreasing any existing molecular interaction within cells effected by, or conveyed through, NF-κB." | "inhibiting the intracellular steps of the NF-κB signal transduction pathway, performed after the pathway has been initiated in response to application of a stimulus prior to the performance of the claimed method." |

ARIAD's construction of the statement of purpose in the preamble of claim 6 imports unclaimed and ambiguous limitations and the requirement of prior induction that the PTO has rejected. In particular:

- This disputed preamble phrase merely states the purpose of the method of claim 6, adds nothing to the recitation of the method in the body of the claim (*see* Amgen Op. Br. at 31-34) and is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim." As such it is not limiting and does not require construction. *See Symantec Corp. v. Computer Assoc. Int'l., Inc.*, Nos. 2007-1201, 2007-1239, 2008 WL 1012443, at *4 (Fed. Cir. April 11, 2008)

- ARIAD's construction is improper even if this phrase is found limiting as it improperly reads into the claim the wholly ambiguous and unclaimed *"NF-κB signal transduction pathway."* (*See* discussion *supra* at Section IV(B)(1); Amgen Op. Br. at 21-23, 28-29)

- ARIAD's construction also improperly imports unclaimed limitations designed to artificially create ordered method steps where none are claimed, including the limitations: *"in response to application of a stimulus"; "prior to the performance of the claimed method"*; and *"performed after the pathway has been initiated."* The PTO has already rejected this "prior induction" or ordered steps argument. (*See* Amgen Op. Br. at 31-33; *see also* discussion *supra* at Section IV(C))

   7.  "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells"

| Amgen's Construction | ARIAD's Construction |
|---|---|
| "so as to take action inside cells to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α" | "So as to inhibit the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method, applied to the mammalian cells described in the preamble of the claim." |

ARIAD's construction improperly imports limitations without support. In particular:

- ARIAD's construction again relies upon and reads into the claim its ambiguous *"NF-κB signal transduction pathway."* (*See* Amgen Op. Br., discussion at 21-23, 28-29)

- ARIAD limits the intracellular signaling caused by IL-1 or TNF-α to solely NF-κB activity when in reality this intracellular signaling would include countless other molecular interactions. *See* Koch Decl., D.I. 590, Ex. A, February 22, 2008 Rebuttal Expert Report of Alisa Erika Koch, M.D., at 23)

- ARIAD's construction improperly imports an unclaimed limitation requiring prior induction, namely *"prior to the performance of the claimed method."* As discussed *supra* the PTO has already rejected this "prior induction" argument. (*See* Amgen Op. Br. at 35-37; *see also* discussion *supra* at Section IV(C))

   8.  "reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells"

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| Amgen believes that this phrase[30] of the preamble is not limiting of the claim. If it is found to be limiting and requiring | "decreasing intracellular NF–κB signal transduction induced by Interleukin-1 or Tumor Necrosis Factor-α that exists in |

---

30  The phrase "in mammalian cells" provides antecedent basis for the body of claim 18 and is limiting in that regard. (*See* Amgen Op. Br. at 37, n. 20)

39

| construction, it should be understood to mean "taking action inside the cell to directly inhibit (interfere or block) any molecular interaction within mammalian cells caused by Interleukin-1 or Tumor Necrosis Factor-α." | mammalian cells in which NF-κB is present and capable of acting as an intracellular messenger." |
|---|---|

ARIAD's construction of the statement of purpose in the preamble of claim 18 is unnecessary, as the phrase is not limiting, and ARIAD's construction adds nothing but unclaimed and unsupported limitations. In particular:

- This preamble phrase merely states the purpose of the method, is not limiting, and does not require construction. Further, it is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim." *See Symantec*, 2008 WL 1012443, at *4.

- ARIAD's construction is improper in any case. It improperly reads in several things: NF-κB concepts; a requirement for prior induction; and the need for further experimentation into the claim through the fabricated limitations "*intracellular NF-κB signal transduction induced by*" (See Amgen Op. Br. at 37-39) and "*in which NF-κB is present and capable of acting as an intracellular messenger*" (see discussion *supra* at Section IV(C) and IV(D))

- As discussed *supra* the PTO has already found that "[t]here is nothing in the independent claims compelling ... a 1st activation step." (*See id.* at 35-37; *see also* discussion *supra* at Section IV(C))

- Additionally, as discussed *supra*, the inclusion of a limitation on the claimed "mammalian cells" to those "*in which NF-κB is present and capable of acting as an intracellular messenger*" is not supported by the claim language or the specification and reads into the claim a requirement for further experimentation in order to practice the purported invention. (*See* discussion *supra* at Section IV(D))

## V.    CONCLUSION

For all the foregoing reasons, Amgen's proposed constructions derive from the claim construction principles set forth by the Federal Circuit in its *en banc* opinion in *Phillips v. AWH Corp.* and should be adopted.

40

Dated: May 22, 2008

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Melanie K. Sharp*

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391

(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,
Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,
Limited, and Immunex Rhode Island Corporation*

**CERTIFICATE OF SERVICE**

I, Melanie K. Sharp, Esquire, hereby certify that on May 22, 2008, I caused to be electronically filed a true and correct copy of The Amgen Entities' Answering Brief On Claim Construction with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on May 22, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com

DB02:6783752.1                                                        065028.1001