IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;
IMMUNEX CORPORATION, a Washington
corporation; AMGEN USA INC., a Delaware
corporation; AMGEN MANUFACTURING,
LIMITED, a Bermuda Corporation, and
IMMUNEX RHODE ISLAND
CORPORATION, a Delaware corporation,

    Plaintiffs/Counterclaim Defendants,

    v.

ARIAD PHARMACEUTICALS, INC., a
Delaware corporation, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,
a Delaware corporation, *et. al.*,

    Defendants/Counterclaim Plaintiffs.

Civil Action No.06-259 (MPT)

## DECLARATION OF MELANIE K. SHARP IN SUPPORT OF THE AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF NON-WILLFULNESS

I, Melanie K. Sharp, hereby declare as follows:

1.    I am a partner at the law firm of Young Conaway Stargatt & Taylor, LLP in Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter. I submit this Declaration in connection with The Amgen Entities' Reply Brief in Support of Their Motion for Summary Judgment on Non-Willfulness. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.    Attached hereto as Exhibit 1 is a true and correct copy of Reexamination Control Nos. 90/007,503 and 90/007,828, July 6 2007 Office Action.

3.    Attached hereto as Exhibit 2 is a true and correct copy of *Ex Parte* Reexamination Filing Data dated September 20, 2007.

4.      Attached hereto as Exhibit 3 is a true and correct copy of selected pages from the April 27, 2006 Jury Trial Transcript in *Ariad v. Lilly*, C.A. No.:102-cv-11280-RWZ (D. Mass).

5.      Attached hereto as Exhibit 4 is a true and correct copy of selected pages from the June 21, 2007 deposition of Thomas R. Kadesch in *Amgen, Inc. v. F.Hoffman-La Roche, Ltd*, C.A. No. 05-12237 WGY (D. Mass.).

6.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 6th day of June, 2008.


*/s/ Melanie K. Sharp*
Melanie K. Sharp, Esq.

DB02:6879097.1

065028.1001

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of Declaration of Melanie K. Sharp in Support of The Amgen Entities' Reply Brief in Support of their Motion for Summary Judgment of Non-Willfulness with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

_____/s/ Melanie K. Sharp_____
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

# EXHIBIT 1



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828 | 12/02/2005 | 6410516 | | 4525 |

| 23432        7590        07/06/2007 | EXAMINER |
|---|---|
| COOPER & DUNHAM, LLP | |
| 1185 AVENUE OF THE AMERICAS | ART UNIT |  PAPER NUMBER |
| NEW YORK, NY  10036 | | |

DATE MAILED: 07/06/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa

Bawa Biotechnology Consulting, LLC

21005 Starflower Way

Ashburn, VA 20147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,828.*

PATENT NO. *6410516.*

ART UNIT *3991.*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| | Control No. (90/007,503) 90/007,828 | Patent Under Reexamination 6410516 |
|---|---|---|
| **Office Action in Ex Parte Reexamination** | Examiner Bennett Celsa | Art Unit 3991 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

a☒ Responsive to the communication(s) filed on <u>17 November 2006</u> .    b☒ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.

2. ☒ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____.

Part II    SUMMARY OF ACTION

1a. ☒ Claims <u>1-6,8-27,29-38,40-80,82,84 and 87-202</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☒ Claims <u>7,28,39,81,83,85,86 and 203</u> have been canceled in the present reexamination proceeding.

3. ☒ Claims <u>see cont. sheet below</u> are patentable and/or confirmed.

4. ☒ Claims <u>see cont. sheet below</u> are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been  (7a)☐ approved  (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____.

   5☐ been received by the International Bureau in PCT application No. _____.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D.
11, 453 O.G. 213.

10. ☐ Other: _____.

cc: Requester (if third party requester)

**Continuation Sheet (PTOL-466)**                                                              **Reexam Control No.**

Rejected: claims 1-6, 8-18, 20-27, 29, 31-38, 40, 42-43, 47-51, 53-62, 64-73, 75-80, 82, 84, 88-97, 99-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-137, 139,140, 144-147, 149, 150, 154-157, 159, 160, 164-168, 172-175, 177, 178, 182-185, 192-193 and 197-201.

Confirmed: claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202.

Application/Control Number: 90/007,503; 90/007, 828                    Page 2
Art Unit: 3991

## DETAILED ACTION: *Reexamination: Final Rejection*

### *In Merged '7503 and '7828 Proceedings.*

*Procedural Posture*:

1. U.S. Patent No. 6,410,516 issued on June 25, 2002.

2. A request for reexamination, assigned control No. 90/007,503, was filed by a third party requester on April 4, 2005. Reexamination was ordered for the '7503 proceeding on June 8, 2005.

3. A request for reexamination, assigned control No. 90/007,828, was filed by a third party requester on December 2, 2005. Reexamination was ordered for the '7828 proceeding on December 12, 2005.

4. No Patent Owner's Statement was received in either reexamination.

5. Reexams 90/007,503 and 90/007,828 were merged on May 4, 2006.

6. First Office action (FAOM: dated August 2, 2006) in merged proceedings.

7. Patent Owner Amendment dated Nov. 17, 2006 (canceling claims 7, 28, 39, 81, 83, 85, 86 and 203), supplemental disclosure statement and Declaration of Dr. Verma along with accompanying exhibits is acknowledged.

The text of those sections of Title 35, U.S. Code not included in this action can be found in a prior Office action.

### *Status of the Claims*

U.S. Patent 6,410,516 claims 1-203 were initially subject to reexamination.

Canceled Claims: 7, 28, 39, 81, 83, 85, 86 and 203.

Pending Claims: 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202.

### **Informal Claim**

Patentee's amendment canceling claim 7 has resulted in claim 8 being improperly dependent upon a cancelled base claim. The Patent Owner is required to cancel the claim(s), or amend the claim(s) to place the claim(s) in proper dependent form, or rewrite the claim(s) in independent form.

### Purported Inconsistency Within the August 2, 2006 Office Action:

<u>Patentee Argument</u>: Each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 recite specific ways of reducing NF-κB activity, and have been rejected. In contrast, analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 also recite the same specific ways of reducing NF-κB activity, but have been confirmed patentable. No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable. Accordingly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 should be confirmed patentable. Amendment dated Nov. 17, 2006 page 17.

<u>Examiner Response</u>: Each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 have been rejected since there is prior art which raises rejections of these claims. In contrast, claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 have been confirmed patentable since none of the references cited in the 90/007,503 or 90/007,828 proceedings raised a substantial new question of patentability concerning these claims.

It is also noted that rejected claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 are dependent upon independent claims 1, 2, 5, 6, 8 and 9, respectively that are different from those of confirmed claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 which refer to independent claims 3, 10, 11, 12, 13, 14, 15, 16, 17 and 4, respectively.

### Ultra Vires Argument:

The patent owner response (pp.18-23) provides arguments as to why the ordering of the reexamination of the instant U.S. Pat. No. 6,410,516 in merged proceedings 90/007,503 and 90/007,828 is ultra vires and should be vacated. Patentee's petition to vacate was denied (10/6/05 and reconsideration 2/8/06) and the patent owner's district court appeal was ultimately dismissed by the CAFC (11/22/06) under Fed. R. App. P. 42(b) (of record: 11/22/06).

A summary of patentee's arguments and an Examiner rebuttal consistent with the October 6, 2005 petition denial and the Solicitor's "Memorandum of Points and Authorities In Support of Motion To Dismiss Or In the Alternative For Summary Judgement and Opposition to Plaintiff's Motion For Summary Judgement": pages 1-30

presented in *Ariad Pharmaceuticals v. Dudas* U.S. District Court (Eastern District of Va.)
(copy enclosed) follows:

1. Patentee Argues:  Inherency case *law and MPEP 2131.01 is not applicable since 35
USC 301-303 limits reexam to the use of "prior art" publications. Response* pp. 20-21.

Examiner Response:

Contrary to the patentee's position, reliance on extrinsic evidence to better
understand the teachings of a prior art reference has been common in reexamination
proceedings.  For example, in *In re Baxter Travenol Labs*, 952 F.2d 388 (Fed. Cir.
1991), the Federal Circuit rejected the patent owner's argument that the PTO could not
rely on declarations and other written materials submitted along with a prior art
publication to reject its claims in a reexamination.  952 F.2d at 390.  The Federal Circuit
explained that the declarations and other extrinsic evidence were properly relied upon
during the reexamination to explain the printed publication:

> Baxter argues that these depositions, declarations, and
> admissions are extrinsic evidence, which may not be
> considered when determining the anticipatory teaching of a
> reference.  This is incorrect.  Baxter acknowledges, as it
> must, that <u>extrinsic evidence may be considered when it is
> used to explain, but not expand, the meaning of a reference.</u>
> <u>Id.</u> (emphasis added).

The Federal Circuit upheld the anticipation rejection of the reexam claims based on the
prior art document itself, as illuminated by the extrinsic evidence.  <u>Id.</u>; <u>see also</u> *In re
Bass*, 314 F.3d 575, 576 (Fed. Cir. 2002) (extrinsic evidence of Schofield declaration
explaining teachings of Lucander prior art document establishes SNQ for
reexamination); <u>see also</u> *Heinl*, 143 F.Supp.2d at 604-05 (permitting use of extrinsic
evidence to explain a reference and finding "unpersuasive" patent owner's argument
that reexaminations are limited purely to prior art documents and any other materials
are prohibited).

Consistent with Federal Circuit case law, the MPEP provides that any claim
rejection in reexamination based on prior patents or printed publications may use

Application/Control Number: 90/007,503; 90/007, 828                    Page 5

Art Unit: 3991

extrinsic evidence, such as affidavits or declarations, to explain the meaning of the prior

art reference:

> Affidavits or declarations which explain the contents or
> pertinent dates of prior art patents or printed publications in
> more detail may be considered in reexamination, but any
> rejection must be based upon the prior patents or printed
> publications as explained by the affidavits or declarations.
> The rejection in such circumstances cannot be based on the
> affidavits or declarations as such, but must be based on the
> prior art patents or printed publications.MPEP § 2258 I. E.

Thus, it is appropriate for the PTO to consider extrinsic evidence in a

reexam proceeding to explain the meaning and contents of prior art.

<u>2. Patentee Argues:</u> *The method inherency rejections are based upon "prior public*
*use". Patent owner cites Schering Corporation v. Geneva et al, 339 F.3d 1373 (Fed. Cir.*
*2003), Cruciferous Sprout Litigation, 301 F.3d 1343 (Fed. Cir. 2002) and*
*MEHL/BIOPHILE International Corp. v. Milgraum, 192 F.3d 1362 (Fed. Cir. 1999) as*
*cases standing for the proposition that subject matter which is inherently described in a*
*patent or printed publication is applicable to anticipate a claimed invention only as a*
*prior public use of the inherently disclosed subject matter, and not as an anticipation by*
*the patent or printed publication. Patent owner quotes MPEP § 2217 as indicative of the*
*proposition that "a prior art patent or printed publication cannot be properly applied as a*
*ground for reexamination if it is merely used as evidence of prior public use .... ". Patent*
*owner additionally argues that the Court of Appeals for the Federal Circuit has held that*
*a <u>method</u> is inherently anticipated <u>only</u> by the actual public use of the method which*
*may or may not have been described in a printed publication.Amendment at pp. 21-23.*

<u>Examiner Response:</u>

It is clear from a consideration of *Smithkline Beecham Corporation et al v. Apotex*

*Corporation et al*, 403 F.3d 1331 (Fed. Cir. 2005), as well as from the precedential case

law cited by the patent owner above, that a prior art patent or publication containing an

enabling disclosure that inherently anticipates a claimed invention which was not

expressly known or appreciated at the time that the patent or publication was published

is to be regarded as an anticipatory prior art patent or printed publication. That the

inherent anticipation exists by reason of the fact that the claimed invention would be

produced by following the teachings of the patent or printed publication <u>does not mean</u>

<u>that the teachings of the patent or printed publication had to have been, or have to be,</u>

publicly performed prior to an applicant's invention. <u>Nor does it mean that the</u>
<u>anticipation is the result of a prior public use.</u> This follows from the principle that it is not
necessary that an invention disclosed in a patent or printed publication shall actually
have been made or practiced, provided that the disclosure in the publication is
described so as to have placed the public in possession of it. This further follows from
the uniform pronouncement in the case law "that inherent anticipation does not require
that a person of ordinary skill in the art recognize the inherent disclosure in the prior art
at the time the prior art is created." *Schering Corporation*, 403 F.3d at 1343.

Thus, so long as a patent or printed publication enables the practice of a method
that would inherently anticipate a different method not expressly disclosed in the patent
or printed publication, the patent or printed publication is considered to be an
anticipatory disclosure of the inherently disclosed method, even if at the time of
publication or issuance of the patent, the expressly disclosed invention had not been
practiced and a person of ordinary skill in the art would not necessarily have recognized
the inherently disclosed method. The patent or printed publication is not regarded as
evidence of <u>prior public use</u> of the inherently disclosed method; the cases do not require
that the inherently disclosed method be publicly performed at the time of patenting or
publication, therefore the reference is indeed a reference.

## *Withdrawn Rejection (s)*

Rejection of claim 203 (section X. on pages 52-55 of FAOM) under 35 U.S.C.
103(a) as obvious over *Baldwin and Sharp*, Proc. Nat'l Acad Sci. 85:723 (Feb. 1988) in
view of *Schorpp* et al. J. Mol. Biol. 202:307 (1988); . *Li* et al. Mol. Cell. Biol. 8:432
(1988); *Hai* et al. Cell 54 :1043 (1988) ; *Chu* et al. Nucleic Acids Res. 15:1311-1326
(1987); and *Molecular Biology of THE CELL*, 2nd Ed. (1989) page 423 is withdrawn in
response to the Patent Owner's amendment canceling claim 203.

Rejection of claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98
under 35 U.S.C. 102(b) as anticipated by *King James Version Bible* (1611) (excerpts),
*St. Leger* (The Lancet (5/79) 1017-20), *Dobrilla* (Hepato-Gastroenterol. <u>31</u> (2/84) 35-
37), and *Jones* (Pharm. & Tox. <u>60</u> (3/87) 217-20) as evidenced by *Blanco-Colio*
(Circulation <u>102</u> (8/00) 1020-6), *Holmes-McNary/Baldwin* (Cancer Res. 60 (7/00) 3477-
83) and *Manna* (J. Immunol. 164 (2000) 6509-6519).    See MEPP 2131.01 (evidence of
inherency) is hereby withdrawn. The role and bioavailabilty of red wine components
(resveratrol and other polyphenol anti-oxidants) involving regulation of NF-κB activity
with regard to a post-prandial hyperlipidemia is unclear.

Application/Control Number: 90/007,503; 90/007, 828                    Page 7

Art Unit: 3991

The rejection of claims 1-2, 5-6, 8-9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80, 82, 84, 88–89 and 93-97 under 35 U.S.C. 102(b) as being anticipated by *1970 PDR, Lefring et al.* (Crit. Care. Med. 2:3 (7/95) 1294-1303: References Cited Therein), *Nagasawa* et al.  (J. Cell. Phys. 109 (1981) 181-192), or *Rovera* et al. (Science 204 (1979) 868-970) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286), *Mukaida*  (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 is withdrawn in order to simplify issues for appeal since this rejection is cumulative to the anticipation rejection over the *Goodman and Gilman* reference in view of the same evidentiary documents.

### *Priority*

Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374
which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);
which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92) AND:
-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)
-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)
-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)
- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)
 -a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)
- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC §120 priority, the above-identified CIP applications (i.e. original specification and original claims) fail to adequately describe and/or enable the methods of currently pending claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202 of the instant Baltimore Patent claims subject to reexam. See MPEP 2258. Accordingly, **claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202** of the reexamination patent claims are entitled to the **filing date 11/13/91** of continuation application 07/791,898 for purposes of prior art. Every claim of the '516 patent recites at least one of the following features which the pre-1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;
b. support for the Baltimore patent claim limitations including (but not limited to):
-"reducing NF-κB activity" in a cell (especially mammalian/eukaryotic) and/or an enabling means thereof  e.g.administering a NF-κB inhibitor, to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as *required in all the claims*;

-"reduce binding of NF-κB to NF-κB recognition sites on genes which are
transcriptionally regulated by NF-κB" e.g. claims 25, 36, 47, 69, 80, 93, 144, 154 & 182;
-"inhibiting modification of an IκB protein, which modification otherwise reduces IκB
binding to NF-κB" e.g. claims 22, 33, and 44;
-"inhibiting degradation of an IκB protein" e.g.claims 23, 34, and 45;
-"inhibiting dissociation of NF-κB:IκB complexes" e.g. claims 24, 35, and 46.

It is noted that the written description requirement is satisfied only by describing

the actual invention, and not that which makes it obvious. *Lockwood v. American*

*Airlines, Inc.* 107 F.3d 1565, 1572. 41 USPQ2d 1961, 1968 (Fed. Cir. 1997).

1. Patentee's Argument:  *Claims 1-9,11, 18, 20, 21, 25-27, 29, 31, 32, 36-38, 40, 42, 43,*
*47-51, 53, 54, 58-60, 61, 62, 64, 65, 69-73, 75, 76, 80, 82, 84, 88, 89, 93-97, 106, 107,*
*109, 110, 114-117, 182-185, 192, 193 and 197-201 subject to "intervening prior art*
*rejections" are entitled to 35 USC 120 priority to the <u>April 21,1989 filing date</u> of the*
*<u>07/341,436 application</u>.* See response at pages 33-39; the declaration of Dr. Verma, ¶¶
16-21; and Claim Support Chart, attached as Exhibit 3 to the Declaration of Dr. Verma.

*Additionally, Patentee points out that to the extent support for the pending claims*
*appears in U.S. Serial Nos. 06/817,441, filed January 9, 1986; 07/155,207, filed*
*February 12, 1988; and/or 07/280,173, filed December 5, 1988, each of these*
*applications is incorporated by reference into the April 21, 1989 application on page 1,*
*lines 4-8 thereof (citing M.P.E.P. 608.01(p) (I)).*

*More particularly, Patentee notes that <u>contrary to the Examiner's assertions</u>:*

*1. Amino acid or nucleic acid sequences corresponding to NF-κB are not recited in the*
*pending claims nor are they necessary to enable these claims as of April 21, 1989.*

*2.The phrase "reducing NF-κB activity" in the pending claims finds support in*
*07/341,436 at p.5, lines 13-16: "Alteration or modification, whether to enhance or <u>reduce</u>*
*NF-κB <u>activity</u>  ... is referred to herein as regulation of NF-κB activity.".*

*3. "mammalian cells" & "eukaryotic cells" finds support in 07/341,436 at:*
*- p.1, lines 4-8 (incorporating 07/155,207, p. 77, lines 8-9): " NF-κB [is] present in a wide*
*variety of <u>mammalian cells</u>"; and*
*- p.1, lines 4-8, (incorporating 07/280,173, p.4, line 21): "In the present work with*
*<u>eukaryotic cells.</u>".*

*4. although "reducing NF-κB activity" in a cell ( especially mammalian/eukaryotic) and/or*
*an enabling means thereof (administering a NF-κB inhibitor) to effect various functions*
*(inhibit expression generally, reduce cytokine expression etc.)" is not disclosed in the*

subject patent, Patentees point to 07/341,436 at p. 23, line 22- p.30, line 25 describing
how one skilled in the art may proceed to reduce NF-κB activity.

5.  "reducing binding of NF-κB to NF-κB recognition sites on genes transcriptionally
regulated by NF-κB " in the pending claims is supported in 07/341,436 at:
- p.5, line 31- p.6, line 8: " NF-κB-mediated gene expression can also be selectively
regulated by altering the binding domain of NF-κB in such a manner that binding
specificity and/or affinity are modified.";
- p.24, lines 9-29: "According to the methods described herein, the expression of genes
under the control of one of these elements is subject to modulation by alteration of the
concentration or availability of NF-κB. This can also be carried out, according to the
present method, for any gene which contains an NF-κB binding site."; and
- the Title: "NF-κB -Mediated Transcriptional Regulation".

6.  "inhibiting modification of an I-κB protein, which modification otherwise reduces I-κB
binding to NF-kB" in the pending claims finds support in 07/341,436 at:
-p. 18, lines 28-29: "Inactive NF-κB is complexed with a labile inhibitor protein, I-κB.";
- p.19, lines 20-21: "The implication is that activation of NF-κB involves a modification of
I-κB and not NF-κB."; and
-p.5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or
modify the activity of NF-κB as an intracellular messenger and, as a result, to alter or
modify the effect of a variety of external influences, referred to as inducing substances,
whose messages are transduced within cells through NF-κB activity .... In particular,
the present invention relates to a method of regulating (enhancing or diminishing) the
activity of NF-κB in cells in which it is present and capable of acting as an intracellular
messenger, as well as to substances or composition useful in such a method."

7.  "inhibiting degradation of an I-κB protein" finds support in 07/341,436 at:
-p. 20, lines 1-3: "Various inducer then cause an alteration in I-κB allowing  NF-κB to be
released from the complex."; and
- p.5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or
modify the activity of NF-κB as an intracellular messenger and, as a result, to alter or
modify the effect of a variety of external influences, referred to as inducing substances,
whose messages are transduced within cells through NF-κB activity ....  "In particular,
the present invention relates to a method of regulating (enhancing or diminishing) the
activity of NF-κB in cells in which it is present and capable of acting as an intracellular
messenger, as well as to substances or composition useful in such a method.".

8.  "inhibiting dissociation of NF-κB/I-κB complexes" finds support in 07/341,436 at:
- p.19, lines 1-3: "... dissociating agents such as formamide and deoxycholate to
unmask very high levels of NF-κB activity."; and
-p. 20, lines 5-7: "The complex formation of NF-κB with  I-κB appears to be rapidly and
efficiently reversible ...."

2. Examiner Response:  Instant pending claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-
202 are denied 35 USC §120 priority to the April 21, 1989 filing date of the CIP
07/341,436 application for failure to satisfy 35 USC §120 for the reasons already
pointed out above and as further elaborated below in response to patentee's
arguments.  Accordingly, these claims are entitled to the filing date 11/13/91 of
continuation application 07/791,898 for purposes of prior art.

Initially, it is noted that patent owner arguments provided in Items 2-8 above
(*ipsis verbis* argument) will be addressed 1st, and the Item 1 (non-enablement and
possession argument) will be addressed 2nd.

**I. Even assuming direct (ipsis verbis) support was the legal standard for
satisfying 35 USC 112, 1st ¶, the Patent Owner's showing is not commensurate.**

**The Reexamination 6,410,516 Invention (08/464,364 filed application):**

The patent specification addresses (among others) the following related inventions:

**1.** Four transcriptional regulatory factors (including NF-κB) and encoding sequences for
use in screening putative binding proteins (see col. 3, lines 18-40);

**2.** Partial I-κB alpha (natural inhibitor) [1] c-DNA & protein sequence of (Fig. 43);

**3.** Natural Mechanism of Activation of NF-κB upon external stimulus:

**4.** Improved screening assay for identifying agonist or antagonist compounds (now U.S.
Patent 5,804,374); and

**5.** Methods for regulating NF-κB activated protein expression including:

"[M]ethods for regulating (inducing or preventing) activation of NF-κB controlling
expression of the immunoglobulin kappa light chain gene and other genes  whose
expression is controlled by NF-κB (e.g. HIV)" (col. 3, lines 54-67) including "regulating
(enhancing or diminishing) the activity of NF-κB in cells which it is capable of acting as
an intracellular messenger, as well as the substances or composition useful in such a
method" (col. 4, lines 28).

---

[1] It is unclear from the record whether the disclosed sequence is human or avian.

Application/Control Number: 90/007,503; 90/007, 828                    Page 11
Art Unit: 3991

### The 6,410,516 Patented Invention:

The Baltimore patent claims are directed to methods of reducing or otherwise modifying the naturally occurring transcription factor NF-κB activity in cells affecting gene expression. The following claim is illustrative:

*1.* A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the expression of said gene is inhibited.

Inhibiting expression of various types of genes (e.g. viral and cytokine genes in claims 3-5) in various cells, from mammalian to human, as well as various cell types including lymphoid, liver and immune cells is encompassed.

Although claims 1, 2 and 5 are open to any (mechanistic) means of directly or indirectly inhibiting (reducing) NF-κB activity or inhibiting (reducing) NF-κB intracellular signaling (claim 7), these claims would also encompass affecting NF-κB activity at the defined points of a proposed 6 step NF-κB induction mechanism (see Dr. Verma declaration: Schematic 3) which is particularly claimed (see claims 19-25).

### The Extent of the New Matter:

The following chart illustrates the extent of new matter added to the instant CIP patent disclosure of the 08/464, 364 application as compared to the parent 07/341,436 application relied upon for 37 CFR §120 priority:

| Application | specification | claims | Abstract | TOTAL PAGES |
|---|---|---|---|---|
| 08/464,364 | pp1-189<br>Fig. 1-43<br>Examples 1-15<br>Tables 1-2 | pp190-206<br>claims 1-88 | p207(4 sentences) | 207 |
| 07/341,436 | pp. 1-39<br>Fig. 1-4c (39-42c)<br>Example 15<br>Table 1 | pp. 40-45 | p46 (1 sentence) | 46 |

NOTE:  Table 1 of 07/341,436 corresponds to Table 2 of 08/464,364.
       Figures1-4c of 07/341,436 corresponds to Figures 39-42C of 08/464,364.

Application/Control Number: 90/007,503; 90/007, 828                    Page 12

Art Unit: 3991

A copy of the 07/341,436 application (minus the Abstract) is found in Exhibit 2 of Dr.

Verma's Declaration.   The missing Abstract is titled: "NF-κB -mediated Transcriptional

Regulations" and states: "Methods and compositions for altering or modifying NF-κB

activity in cells and for regulating NF-κB -mediated gene expression."


*Examples of Subject Matter Missing from the 07/341,436 application which is present in 08/464,364 application:Figures 1-38 and 43 and corresponding examples include:*

a. isolated transcription regulatory factors, including NF-κB cDNA & protein sequence;

b. isolated partial cDNA and protein sequence of natural inhibitor I-κB;

c. disclosure of evidence of NF-κB -I-κB  complex; and

d.  disclosure of assay for screening transcriptional regulators and for identifying agonist or antagonist compounds.

*Shared Subject Matter:*

1.  achieving "Negative Regulation" by addition to a biological system an effective amount of : I-κB or a decoy molecule or an "inhibitor molecule which is also a protein" in which "the gene can be identified … " or "dominantly interfering" molecules.  See instant '516 patent at col. 37 (Table 2) to col. 38, line 22);

2. Table exemplifying NF-κB recognized sequences (see instant '516 patent Table 2);

3. Instant '516 patent Example15 drawn to a "Demonstration of the Role of the NF-κB as Mediator in Regulation of a Gene in Non-Lymphoid Cells".

*Patentee items 2-8 above as well as the 125 page Claim Support Chart in Exhibit 3 of the Dr. Verma Declaration fails to satisfy 35 USC 112, ¶ 1 for the following reasons:*

a. The disclosure and limited examples in the *07/341,436* application directed to establishing nuclear NF-κB regulation of specific cytokine genes, such as interferon and specific cells such as lymphocytes and fibroblasts, is not a commensurate showing of the ability to broadly inhibit various other genes and cell types.

b. A hypotheses regarding intracellular signaling in the 07/341,436 application without isolation, sequencing (c-DNA, protein) and characterization of NF-κB and I-κB and their complex is not possession of the mechanism nor the ability to design inhibitors at any point of the proposed mechanism.  The absence of an inhibitor screening assay further makes drug design difficult if not prohibitive.

c. To the extent (as discussed above) that the reexamination claims broadly encompass new matter missing from the 07/341,436 application, the 07/341,436 application is clearly not commensurate in scope.

d. The 07/341,436 application fails to disclose an inhibiting compound, as well as the necessary conditions to effect inhibition e.g. means of addition to a biological system (*in vitro, in vivo*) and the corresponding effective amounts.

e. As discussed below the instant invention fails to satisfy §112, 1st ¶ with regard to an interfering compound necessary to practice the presently claimed method.

**II. Under the correct legal standard, the 07/341,436 application fails to satisfy 35 USC § 112, ¶ 1 for the instantly claimed invention.**

<u>A. The Correct Legal Standard:</u>

The written description requirement of § 112, ¶ 1 is set forth as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, ¶ 1 (1994) (emphasis added). Written description is independent of enablement. *Vas-Cath*, 935 F.2d at 1563, 19 USPQ2d at 1117 (recognizing the severability of the "written description" and "enablement" provisions of § 112, ¶ 1). Under 35 U.S.C. §120, patent claims are entitled to the benefit of the filing date of an earlier filed U.S. application if the subject matter of the claim is disclosed in the manner provided by 35 U.S.C. §112, 1st ¶ in the earlier filed application. See, e.g., *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 47 USPQ2d 1829 (Fed. Cir. 1998); *In re Scheiber*, 587 F.2d 59, 199 USPQ 782 (CCPA 1978). The examiner has the initial burden of presenting by a preponderance of evidence why a person skilled in the art would not recognize in an applicant's disclosure a description of the invention defined by the claims. *In re Wertheim*, 541 F.2d 257, 263, 191 USPQ 90, 97 (CCPA 1976).

The written description requirement, a question of fact, ensures that the inventor conveys to others possession of the claimed invention; whereas, the enablement

requirement, a question of law, ensures that the inventor conveys to others how to make and use the claimed invention." See 1242 OG 169 (January 30, 2001) citing *University of California v. Eli Lilly & Co* With regard to the description requirement.

Additionally, *ipsis verbis* inclusion of claim words from the specification into the claims does not necessarily satisfy the written description requirement. See *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998).

In *Eli Lilly,* the Court of Appeals for the Federal Circuit held that a "written description of an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *University of California v. Eli Lilly and Co.,* 43 USPQ2d 1398, 1405 (1997), quoting *Fiers v. Revel,* 25 USPQ2d 1601, 1606 (Fed. Cir. 1993).

Regarding a compound, the complete structure of a species or embodiment typically satisfies the requirement that the description be set forth "in such full, clear, concise, and exact terms" to show possession of the claimed invention. 35 U.S.C.112, ¶ 1. Cf. *Fields v. Conover,* 443 F.2d 1386, 1392, 170 USPQ 276, 280 (CCPA 1971). Alternatively, written description may be satisfied through disclosure of function and structure when there is a well-established correlation between structure and function:

> "[T]he written description requirement can be met by 'show[ing] that an invention is complete by disclosure or sufficiently detailed, relevant identifying characteristics … i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics.'" *Enzo Biochem. Inc. v. Gen-Probe Inc.,* 296 F.3d 1316,1324, 63 USPQ 2d 1609, 1613 (Fed. Circ. 2002).

> In contrast, without such a correlation, the capability to recognize or understand the structure from the mere recitation of function and minimal structure is highly unlikely. In this latter case, disclosure of function alone is little more than a *wish for possession;* it does not satisfy the written description requirement. See *Eli Lilly,* 119 F.3d at 1566 and 1568, 43 USPQ2d at 1404 and 1406; *In re Wilder,* 736 F.2d 1516, 1521, 222 USPQ 369, 372-73 (Fed. Cir. 1984).

B. "Reach-Through Claims" and Written Description:

Biotechnology and pharmaceutical drug discovery involves the time and expense of making and screening a large number of potential candidate compounds (upstream: research) in order to obtain a relatively small number of useful (e.g. therapeutically) compounds (downstream: application). A "reach-through claim" is an attempt by a discoverer of an "upstream research tool" to seek patent protection encompassing "downstream" inventions. See Stephen G. Kunin, Mark Nagumo, Brian Stanton, Linda S. Therkorn, and Stephen Walsh, *Reach-Through Claims in the Age of Biotechnology,* 51 AM. U.L. REV. 609-638 (2002) at pages 609-616 (overview) and pages 616-619 ("reach-through claim" definition) (copy enclosed).

The *Kunin et al.* article provides a framework for applying a written description analysis toward "reach-through claims" in conformance with the written description guidelines (MPEP 2163) and relevant CAFC case law. In a prophetic example of a disclosure of a newly discovered receptor, receptor screening assay and three screened agonist compounds containing no common core structure and lacking a structure activity correlation, the application of written description analysis found the isolated/purified receptor and agonist receptor screening assay of claims 1-2 patentable but the "generic" agonists compounds obtainable from the assay (claim 3) and the use of these agonists to treat disease (claim 4) unpatentable for failure to adequately describe the compound  claim 3 "generic" which rendered the corresponding therapeutic use of such compounds (of the same scope) equally unpatentable for lack of written description. See *Id.* at pp.621-622 (example patent claims 1-5); pp. 626-627 (case law summary) and pp.628-630.

The CAFC in the *University of Rochester v. G.D. Searle & Co.,* 358 F.3d 916, 69 USPQ2d 1886 (Fed.Cir. 2004) was faced with the application of both the written description and enablement requirements in the context of a reach-through method

Application/Control Number: 90/007,503; 90/007, 828                    Page 16
Art Unit: 3991

claim. [2] The problem addressed in *Rochester* was that traditional non-steroidal anti-inflammatory drugs (NSAIDS, such as aspirin, ibuprofen) obtained their anti-inflammatory effects by binding cyclooxygenase-2 (COX-2) but also had gastrointestinal side-effects caused by the NSAID binding a different cyclooxygenase (COX-1 related to the PGHS-2 gene expression). Accordingly, after obtaining a patent on an assay for screening compounds selective for COX-2 (i.e. didn't bind COX-1), the claim at issue in Rochester was a method drawn to the use of a "non-steroidal" COX-1 selective inhibitor obtainable from the screening assay.[3] Rochester's claim was invalidated for failing to meet the written description and enablement requirements of 35 U.S.C. Section 112, 1st ¶. Specifically, the court held that the written description requirement was not met due to the patent specification's failure to disclose any examples of COX-2 inhibitors. Additionally, with respect to enablement, it was held that the disclosure of a COX-2 inhibitor screening method without guidance on the characteristics of probable inhibitor candidates failed to enable one skilled in the art to isolate the claimed inhibitors without undue experimentation.

### iii. The Parent 07/341,436 application fails to satisfy 35 USC 112, ¶ 1:

The 07/341,436 application fails to adequately describe or enable the scope of the instantly claimed method invention for at least the following reasons:

a. *ipsis verbis* support is absent, but even if present would fail to adequately describe or enable the functional class of NF-κB inhibitors presently claimed;

b. fails to disclose a single NF-κB inhibiting compound;

c. lack of correlation of structure to function; and

d. fails to teach how to screen NF-κB -inhibiting compounds.

---

[2] Arguably, the CAFC in the *University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998) case already addressed the lack of a written description of a "reach-through" DNA compound claim in which the DNA was obtainable by screening a cDNA assay.
[3] Claim 1 drawn to a method for selectively inhibiting PGHS-2 activity in a human host, comprising administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product to a human host in need of such treatment is illustrative.

Application/Control Number: 90/007,503; 90/007, 828         Page 17
Art Unit: 3991

### *Claim Interpretation: Reexamination Standard*

Patent claims are examined on the basis of prior art patents or printed publications under the appropriate parts of 35 U.S.C. § 102 and §103. An admission may not be the basis for establishing a substantial new question of patentability, although patent owner admissions as to any matter affecting patentability may be utilized to determine the scope and content of the prior art in conjunction with patents and printed publications in a prior art rejection, whether such admissions result from patents or printed publications or from some other source. See MPEP § 2217.

During reexamination, claims are given the broadest reasonable interpretation consistent with the specification without reading specification limitations into the claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)). The 35 U.S.C. § 282 presumption of patent validity has no effect in reexamination (*In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)) and reexam is conducted according to the procedures established for initial examination under 35 U.S.C. §132,  § 305 and §1331 without the burdens and presumptions that accompany litigation of an issued patent. *Laitram Corp. v. NEC.Cow*, 952 F.2d 1357, 1360 (Fed. Cir. 1991); MPEP § 2258.

### *Claim Interpretation:*

With respect to independent claim 1 (which is representative) it is noted that the sole method step is functional i.e. reducing NF-$\kappa$B activity. Accordingly, the claims would encompass any *in vitro* or *in vivo*, direct or indirect or natural or man-made means of reducing NF-$\kappa$B activity.  Indeed, most of the Baltimore patent methods steps are purely functional with the exception of claim 7 and dependent claims 81, 83 and 85-87 that require "modifying NF-$\kappa$B activity" (which are partially functional) and claim 203 which requires "introducing a nucleic acid decoy molecule into the cell" which requires an active step.   The summary of the remaining reexamination claims provided in pages 12-15 of the '7503 request is herein incorporated by reference. See FAOM page 8.

1. Patentee Argues: *Reducing NF-κB activity in the claims encompasses using agents that interfere at any of six activation events spanning the membrane receptor, cytoplasm NF-κB-I-κB complex, translocation or nuclear protein transcription to inhibit gene expression (see schematic 1 or exhibit 1) and the claims should be restricted to* **affirmative acts and manipulative steps** *for interfering along* **any one of the six proposed NF-κB activating mechanism segments** *(claims 1, 2 and 5) unless limited to specific mechanism segments (claims 20, 22, 24, 31, 33, 35, 42, 44 and 46). Dr. Verma Declaration ¶¶ 5-15.*

*The model is summarized in the instant patent (col. 16) and by Dr. Verma as follows:*

> *Upon activation in response to signals triggered by the interaction of certain external influences with receptors on the surface on the cell, NF-κB is released from its complex with I-κB. The released NF-κB then moves to the nucleus of the cell, where it participates in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes. Dr Verma Declaration ¶ 8.*

*Accordingly, as described in the instant specification (bottom of col. 3-top of col. 4) the instant methods encompass "alter(ing) or modify(ing) the activity of NF-κB as an intracellular messenger" and thus regulates "NF-κB-mediated gene expression". See Dr. Verma Declaration ¶11.*

**Examiner's Response:**

The Examiner agrees that the term "reducing NF-κB activity" <u>at least</u> encompasses interference with any one of the six activation segments which liberates NF-κB from its complex to effectuate nuclear transcription, unless the claims specifically require interference at a particular segment.

Additionally, "reducing NF-κB activity" can also "involve several different steps including inhibiting the interaction of NF-κB with other transcription factors, inhibiting the NF-κB translocation of NF-κB to the nucleus, inhibiting the interaction of NF-κB with NF-κB binding sites on DNA, and altering the concentration or availability of NF-κB" (*Declaration of Dr. Thomas D. Gilmore* pages 6-7, ¶ 14 submitted by Patentee in Massachusetts District Court Litigation).

Accordingly, the term "reducing NF-κB activity" would encompass both <u>direct</u> and <u>indirect</u> interference with NF-κB activity, e.g. via other transcription factors or affecting NF-κB/I-κB amounts, via patentee's or other NF-κB mediated mechanism.

It is noted that "NF-κB-mediated transcription" is <u>broadly interpreted</u> by Dr. Verma to include the ability of NF-κB to enhance transcription by "recognized sites" on the genes which may include binding to an NF-κB enhancing sequence <u>but is not so limited</u>. The examiner agrees that the claims are not limited to regulation (inhibition or otherwise) of nuclear gene transcription by NF-κB only at NF-κB binding sites since the claims are not so limited and the instant description broadly encompasses the ability of NF-κB to act as a messenger to effect protein transcription  (see column 17). This interpretation is consistent with the instant patent teaching of using various known NF-κB enhancing sequences to obtain a "consensus sequence" for cell transfection to obtain modulation by NF-κB. Optionally, a more specific NF-κB binding site can also be introduced into a cell to obtain "discrimination among members of a related family of NF-κB binding sites". See instant patent col. 35-col. 37 (Table 2).

Finally, although the claims require "reducing NF-κB activity" the claims are not restricted to NF-κB-mediated affects but would include additional regulators working with, or independent of NF-κB.

The above-interpretation is further supported by the patentee response (dated 9/12/01, pages 6-10) in the 08/464, 364 application to a rejection in which it was argued that the instant invention encompasses:

a. affecting NF-κB signal transducing activity <u>directly</u> or <u>indirectly</u> ( page 6);

b. NF-κB modulation is <u>not limited to a particular mechanism</u>:

"Possession was manifested by the disclosed discovery of the signaling pathway and ways to identify and use inhibitors thereof. Thus, it is appropriate under the circumstances for Applicants to have defined the method of use with reference to agents identified or characterized by their method of selection or identification ... **The screening assays taught by the present application permit the identification or characterization of *substances that modulate NF-kB activity by various mechanisms*"**. (with emphasis: 9/12/01 response page 7);

c. use of a variety of classes of substances of <u>diverse and unrelated structure</u> that possess the capability (*in vitro* or *in vivo)* to modulate signal transducing activity:

> "…To the contrary, *a person of skill in the art would have reasonably expected that the screening steps of the prior claims would identify a diverse group of substances having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and use covered by the prior claims….* Even compounds regulating NF-κB by the same mechanism, such as by inhibiting modification or degradation of I-κB would have been expected to include any of a variety of different structure". … that such substances could then be used to modify NF-κB mediated signalling in cells, both *in vitro* and *in vivo*, as recited by the pending claims … Although the compounds regulating NF-κB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-κB signal transducing activity."

2. Patent Owner: *When read in light of the teachings of the patent disclosure, one of skill in the art would understand and interpret the claims to require affirmative acts and manipulative steps, calculated to achieve specific results.* Dr. Verma Declaration, ¶ 11.

Examiner Response:

The claimed invention is not so limited. Neither the specification nor the prosecution history place any restrictions on the means by which "NF-κB activity" is regulated (enhanced or reduced). Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural or man-made, or direct or indirect method of reducing NF-κB activity

3. Patent Owner: *The instant claims should be interpreted to require a first activating step which excludes prophylaxis, pretreatment or simultaneous activator and inhibitor administration; and thus be limited solely to treatment of an already NF-κB-induced cell or organism.* Dr. Verma Declaration ¶¶13-14.

Examiner's Response:

The claimed methods are drawn to "reducing NF-κB activity" to inhibit NF-κB regulated gene expression in a eukaryotic (or mammalian) cell. There is nothing in the independent claims compelling a person of ordinary skill in the art to include any particular steps including a 1<u>st</u> activation step.

Patentee's proposed interpretation of the instant claims improperly fails to give the claims the broadest reasonable interpretation consistent with the specification and improperly requires that limitations be read into the claims. As pointed out in instant patent:

> The subject invention further relates to methods of regulating (<u>inducing or preventing</u>) activation of NF-κB, controlling expression of the immunoglobulin kappa light chain gene and of other genes whose expression is controlled by NF-κB (e.g., HIV). ... See 6,410,516 patent col. 3, lines 54-58.

Patentee's reliance on their mechanism to read into the claims a proviso excluding "prevention" and/or requiring that any activation precede an inhibiting step (see Dr. Verma declaration, ¶¶ 7-8, 11-13) is not supported by the specification.

Further, to the extent that patentee's claim construction is tantamount to rewriting the claims to insert a negative claim limitation, it is noted that a negative limitation or exclusionary proviso must have basis in the original disclosure. *Ex parte Grasselli*, 231 USPQ 393 (Bd. App. 1983), aff 'd mem, 738 F.2d 453 (Fed. Cir. 1984).

In fact, patentee's proposed narrower claim interpretation is inconsistent with the prosecution history that indicates the patentee's desire to expand method claim coverage.

In a written description rejection of claims then pending (subsequently cancelled) the examiner asserted, *inter alia*, that:

The present claims are very broad, encompassing any type of cell from any organism, eukaryotic or prokaryotic, and in any location *in vitro*, ex vivo or *in vivo*. The claims further encompass **any agent or substance of any structure which has the claimed functional activity,** any assay to be used to identify the agent or substance and <u>**any method of contacting the cell with the agent or substance. (with emphasis).**</u> See 08/464,364 office action dated July 14, 1998 pages 4-10; at page 7, lines 3-8.

In response, patentee argued that their methods be broadly construed since:

a. one can affect NF-κB signal transducing activity <u>directly or indirectly</u> (08/464,364 applicant response dated 9/12/01 page 6);

b. NF-κB modulation is <u>not limited to a particular mechanism</u>:

Application/Control Number: 90/007,503; 90/007, 828                     Page 22
Art Unit: 3991

"Possession was manifested by the disclosed discovery of the signaling pathway
and ways to identify and use inhibitors thereof. Thus, it is appropriate under the
circumstances for Applicants to have defined the method of use with reference to
agents identified or characterized by their method of selection or identification ...
The screening assays taught by the present application permit the identification
or characterization of *substances that modulate NF-κB activity by various
mechanisms*". (with emphasis: 9/12/01 response page 7); and

c.  the instant method encompasses the use of  a <u>variety of classes of substances of
diverse and unrelated structure</u> that possess the capability *(in vitro or in vivo)* to
modulate NF-κB signal transducing activity:

"By definition, substances identified or characterized by the disclosed assays,
inespective of how widely they may vary from one another in chemical structure,
are useful for <u>inhibiting</u> or potentiating (as the appropriate case may be) NF-κB -
mediated cellular signaling. No more need be known of the chemical structure of
the substance to appreciate its utility in the claimed methods. To the contrary, *a
person of skill in the art would have reasonably expected that the screening
steps of the prior claims would identify <u>a diverse group of substances having any
of a wide variety of structures, with no common structure expected</u> to link the
function disclosed by the specification and use covered by the prior claims*. That
is, a person of skill in the art would have readily appreciated that all modulators
of NF-κB would not have the same or similar structure. Even compounds
regulating NF-κB by the same mechanism, such as by inhibiting modification or
degradation of I-κB, would have been expected to include any of a variety of
different structure". ... that such substances could then be used to modify NF-κB
mediated signalling in cells, both in vitro and in vivo, as recited by the pending
claims ...  Although the compounds regulating NF-κB mediated gene expression
may be diverse structurally, they all possess at least one common functional
characteristic, i.e., the capability to modulate NF-κB signal transducing activity."
(9/12/01 Patentee response pages 8 and10 08/464,364 application.).

### Relevant Case law: *Inherency*

i. *Inherency Standard*:

The legal standard for demonstrating inherency is as follows:

"the examiner must provide a basis in fact and/or technical reasoning to
reasonably support the determination that the allegedly inherent characteristic
necessarily flows from the teachings of the applied prior art." *Ex parte Levy*, 17
USPQ2d 1461, 1464 (Bd. Pat. App. & Inter. 1990).

### ii. Nature of the proof:

With regard to demonstrating inherency:

Any extrinsic (or intrinsic) source of evidence can be utilized. In fact, evidence of an inherent feature (e.g. in a method claim preamble) resulting from a reference practicing the steps of a method can be gleaned from applicant's own specification. See MPEP §2112.02; *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat. App. & Inter.1993).

### iii. Use of multiple documents permitted:

Although, normally, only one reference should be used in making a rejection under 35 U.S.C. §102, a rejection over multiple documents has been held to be proper when the extra documents are cited to show that a characteristic not disclosed in the reference is inherent. MPEP §2131.01.

### iv. §102 or §102/§103 product-by-process rationale is equally applicable to claims (compounds, methods, apparatus) relying on function and/or mechanism:

When compositions are claimed in terms of a function, property or characteristic and the composition of the prior art appears to be the same as that of the claim but the function, property or characteristic is not explicitly disclosed by the reference, the examiner may make a rejection under 35 U.S.C. §102 or §102/§103 rejection. . *In re Best*, 562 F.2d 1252, 1255, 195 USPQ 430, 433 (CCPA 1977). This same rationale applies to products, apparatuses, or processes claimed in terms of function, property or characteristics. See MPEP §2112.

### v. Anticipation Requires An Enabling Disclosure Not Actual Practice:

As recognized by the CAFC, "Anticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure." See *In re Donohue*, 766 F.2d 531,533[ 226 USPQ 619] (Fed. Circ. 1985; *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373,1380 [ 67 USPQ2d 1664] (Fed. Cir. 2003).

Accordingly, in *Smithkline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, [74USPQ2d 1398] (Fed. Cir. 2005) the Federal Circuit held that the district courts' use of "an actual practice standard" for inherent anticipation was clear error:

> Contrary to this court's precedents, the district court's analysis of inherent anticipation did not consider the teachings of the [prior art] separately from the actual production of PHC hemihydrate." Id. at 1344.

The *Apotex* court stated that what was actually done, or possible to do, in the prior art was "irrelevant since disclosure, not practice, is necessary for anticipation". *Id.*

Additionally, the threshold for enabling a prior art reference is lower than the threshold for enablement under 35 USC §112, 1st ¶ required for a patented invention insofar that the prior art reference need not demonstrate efficacy or utility. See e.g. in *Rasmusson v. Smithkline Beecham Corp.* 75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, No. 05-1313 (Fed. Cir. Nov. 20, 2006) concurring with the *Rasmusson* holding.

### vi. Contemporaneous Prior Art Recognition of Inherency Not Required

Inherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created. *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373 at 1377 [ 67 USPQ2d 1664] (Fed. Cir. 2003) citing *In re Cruciferous Sprout Litig.* 301 F.3d 1343,1351 [64 USPQ2d 1202] (Fed. Cir. 2002); *Mehl/Biophile Int'l Corp. v. Milgraum,* 192 F3d 1362,1366 [52 USPQ2d 1303] (Fed. Cir. 1999); *Atlas Powder Co. v. Hanex Prods, Inc.,* 190 F.3d 1342,1348-49 [51 USPQ2d 1943] (Fed. Cir. 1999).

Similarly, theoretical mechanisms or rules of natural law that are recited in a claim, that themselves are not patentable, do not need to be recognized by one of ordinary skill in the art for a finding of inherency. A person of ordinary skill does not need to recognize that a method or structure behaves according to a law of nature in order to fully and effectively practice the method or structure. *In re Ackenbach,* 45 F.2d 437, 439, 7 USPQ 268, 270 (CCPA 1930); *EMI Group North America, Inc. v. Cypress*

*Semiconductor Corporation*, 268 F.3d 1342, 60 USPQ 2d 1423, 1429 (CAFC Sept. 21, 2001).

The *EMI court* used the following hypothetical example to clarify this principle:

Humans lit fires for thousands of years before realizing that oxygen is necessary to create and maintain a flame. The first person to discover the necessity of oxygen certainly could not have obtained a valid patent claim for "a method of making a fire by lighting a flame in the presence of oxygen." Even if prior art on lighting fires did not disclose the importance of oxygen and one of ordinary skill in the art did not know about the importance of oxygen, understanding this law of nature would not give the discoverer a right to exclude others from practicing the prior art of making fires. *EMI Group North America, Inc. v. Cypress Semiconductor Corporation*, 268 F.3d 1342, 60 USPQ 2d 1423, 1429 (CAFC Sept. 21, 2001).

**vii. *Shift of Burden:***

Once the examiner provides evidence or reasoning tending to show the inherent presence of a property or function, the burden shifts to applicant. See *Ex parte Levy cited supra; In re Fitzgerald*, 619 F.2d 67, 205 USPQ 594 (CCPA 1980). See MPEP § § 2112- 2112.02. *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Since the PTO lacks facilities to compare prior art products or methods to that claimed, the *prima facie* case can be rebutted by evidence showing lack of the inherent feature in the prior art product or method. See *In re Best*, 562 F.2d at 1255,195 USPQ at 433. See also *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 227 USPQ 773 (Fed. Cir. 1985); *In re Brown*, 459 F.2d 531, 535, 173 USPQ 685, 688 (CCPA 1972).

**Outstanding Claim Rejections - 35 USC § 102 and 35 USC § 103:**

**I. PROTEIN KINASE C INHIBITORS (intervening prior art):**

1.    Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).

**Rejection Summary:** *Meichle* teaches the reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV

LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic, e.g. claims 1 or 2, or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

Meichle analyzed various Protein Kinase C inhibitors and their effect on both PMA- (phorbol 12-myristate-13-acetate) and TNF- (tumor necrosis factor) induced NF-κB activity in eukaryotic Jurkat cells. Using an EMSA binding assay similar to that disclosed in the '516 patent, Meichle found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, Meichle teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites.  As such (and as shown in Exhibit G-2 of the 90/007,503 Request, hereby incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

Additionally, because Meichle used a genetic construct comprising HIV LTR and NF-κB binding site, Meichle rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively prima facie obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes.   Therefore, it would have been immediately envisaged, or alternatively prima facie obvious, to regulate NF-κB activity as in Meichle in order to affect associated viral (e.g. HIV) gene expression.

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.

Examiner Response:  For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC § 120 for purposes of prior art.

2. Patentee Argument: *The Examiner has erroneously stated on page 10 of the Office Action that "Meichle teaches the reduction of NF-κB activity in induced cells ...." The experiments Meichle describes in which H7, H8 or staurosporine were administered to cells, including the specific experiments the Examiner relies on (portions of Figs. 2 and 3), were all conducted by* pretreating *cells with these protein kinase inhibitors for 30 to 45 minutes before cells were stimulated with any inducing substance. (Meichle at 8341-2, Figs. 2 and 3; Declaration of Dr. Verma, ¶ 149.) . See response at page 41.*

Examiner Response:

In response to patentee's argument that the reference fails to show certain features of patentee's invention, it is noted that the feature upon which patentee relies i.e, *in vitro* cell contacting with inducer prior to contacting with inhibitor is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass "pretreating" cells with an NF-κB inhibitor prior to introduction of an NF-κB inducing or activating compound (TNF or PMA in *Meichle*).

Further, it is noted that the patentee has overlooked the *conclusion* drawn from the *Meichle* reference experimental results. The reference clearly teaches to one of ordinary skill in the art that the disclosed kinase inhibiting compounds act to inhibit activated NF-κB regulated viral transcription in eukaryotic (mammalian) cells.

3. Patentee Argument:  *None of the experiments with TNF in Meichle are relevant to any of the '516 patent claims. Meichle reports various experiments conducted in two human leukemic cell lines, K562 and Jurkat cells. Meichle describes a series of experiments investigating whether in these cell lines, protein kinase C was necessary for the ability of tumor necrosis factor (TNF) to stimulate NF-κB binding activity. (Meichle at 8339, abstract). Meichle investigated this question by pretreating the cell with H7, H8 or staurosporine, three relatively non-specific protein kinase inhibitors. Id. Notably, the ability of TNF to stimulate NF-κB binding activity was unaffected by pretreatment with these inhibitors, and Meichle concludes that its ability to induce NF-κB binding activity* did not involve activation of protein kinases, *in particular protein kinase C (PK-C). (Dr. Verma Declaration ¶¶ 147-148.)*

Examiner Response:

Patentee, by underlining concentrating on TNF NF-κB activation, has failed to consider the *Meichle* reference teaching as a whole which also addresses phorbol ester (PMA) NF-κB activation and the use of protein kinase inhibitors H7, H8 and staurosporine to act as NF-κB inhibitors of PMA induced protein expression.

As taught by *Meichle* both TNF and PMA stimulate NF-κB dependent viral (HIV-1) protein expression. See *Meichle* p. 8339, particularly 2nd column: "Release of NF-κB can be achieved by treating cells with phorbol esters, "; and p.8340: "TNF, like PMA, strongly stimulated both HIV-1 and SV40 enhancer-driven chloramphenicol acetyltransferase gene expression in Jurkat cells."

The *Meichle* reference EMSA experimental evidence demonstrates that protein kinase inhibitors H7/H8 and staurosporine inhibit PMA-induced NF-κB activation in Jurkat cells. See *Meichle* p. 8341, left col. to top right col.: "H7 pretreatment of Jurkat cells impaired NF-κB activation by PMA (Fig. 2B, lane 3 versus 5)" and "At 150 nM, staurosporine blocked PMA but not TNF-induced activation of NF-κB (Fig. 2B, lanes 6 and 7)".

4. Patentee Argument: *Page 11 of the Office Action stated that Meichle teaches the use of PK inhibitors to reduce NF-κB -mediated gene transcription by reducing NF-κB activity and that because Meichle used a genetic construct comprising HIV LTR, Meichle either would anticipate or render obvious claims 3, 4, II, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. However, nothing in Meichle either suggests or provides any data showing that PK inhibitors inhibited gene expression induced by any agent, or could do so as a result of reducing NF-κB binding activity. Meichle reports experiments conducted with Jurkat cells transfected with two different CAT reporter constructs, each of which are described as containing a CAT gene and an enhancer with an NF-κB binding site. (Meichle at 8340). However, none of the experiments with these constructs, which are reported in Fig. 3, used a PK inhibitor. (Meichle at 8341, Fig. 3). Additionally, Meichle provides no data as to whether PK inhibitors affected expression of any endogenous gene. Therefore, one would not read Meichle as either describing or suggesting use of PK inhibitors to reduce NF-κB -mediated gene transcription by reducing NF-κB activity. (Declaration of Dr. Verma, ¶150).*

Examiner Response:

As discussed, *supra*, by concentrating on TNF NF-κB activation, patentee has failed to consider the *Meichle* teaching of PMA-induced NF-κB activation and the use of H7, H8 & staurosporine as NF-κB inhibitors of PMA- induced protein expression.

The CAT reporter and EMSA assays first established that both PMA and TNF act as inducers of NF-κB mediated viral (HIV-1 and SV40) gene expression in human (Jurkat) cells transfected with an HIV-1 long terminal repeat enhancer (comprising NF-κB binding site) or SV40 enhancer linked to a chloramphenicol reporter. See *Meichle* p.8340 and Fig.1, particularly Fig.1B establishing that "TNF, like PMA, strongly stimulated both HIV-1 and SV40 enhancer-driven chloramphenicol acetyltransferase gene expression in Jurkat cells".

Additionally, in a separate EMSA inhibition assay, *Meichle* further established that protein kinase inhibitors (H7, H8 and staurosporine) block PMA-induced HIV protein expression modulated by NF-κB in Jurkat cells. See *Meichle* p. 8341, bottom left col. to top right column: "H7 pretreatment of Jurkat cells impaired NF-κB activation by PMA (Fig. 2B, lane 3 versus 5)" and "At 150 nM, staurosporine blocked PMA but not TNF-induced activation of NF-κB (Fig. 2B, lanes 6 and 7)".

Accordingly, *Meichle* provides an enabled teaching of inhibiting NF-κB mediated viral (HIV or SV40) gene expression in induced human cells (Jurkat cells).

5. Patentee Argument:  *Meichle is missing critical controls necessary to show NF-κB effects. In his EMSA assays (Figs. 2 and 3), Meichle employed a 29 base pair oligonucleotide corresponding to a portion of the HIV enhancer. This sequence, however, has been shown to bind not only NF-κB but also other transcription factors including factors in the NFAT transcription factor family. To substantiate that the most slowly migrating complex observed in Meichle's EMSA assay corresponded to NF-κB, it would have been necessary to determine whether mutation of the putative NF-κB binding site abrogated binding. Without this control, the data is insufficient to support the conclusion that PK inhibitors reduced NF-κB binding activity. (Dr. Verma, Dec. ¶151).*

<u>Examiner Response:</u>

Initially, it is noted that the patentee has not provided any evidence challenging the reproducibility of *Meichle's* results nor has any evidence been provided concerning the contamination of *Meichle's* samples with other transcription regulaters  (NFAT family) that bind the NF-κB enhancer.

Additionally, the *Meichle* reference acknowledged the art-recognized use of the 29 base pair oligonucleotide HIV enhancer as a control for obtaining NF-κB -specific binding (citation 42 to *Baldwin* reference on p.8340) and provided its own experimental evidence demonstrating the ability of the HIV enhancer segment to adequately function as a control:

"The formation of the most slowly migrating complex could be inhibited by addition of excess unlabeled NF-κB oligonucle-otide (Fig. 1A, lanes 10 and 11) or an oligonucleotide containing the H2TFI binding site of the H-2K$^b$ promoter (42) (not shown). In contrast, the same amount of a size-matched oligonucleotide lacking a κB site did not compete (Fig. 1A, lane 12), indicating κB -specific binding. Induction of this complex was not inhibitable by preincubation of the cells with 30 uM cycloheximide for 30 min (not shown), which is characteristic of NF-κB activation (21, 24). " See *Meichle* p.8340, right column, 2nd ¶ under Results".

It is also noted that the 29 base HIV enhancer sequence used by *Meichle* comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and CMV found in Table 2 of the instant patent at col. 37 (as well as the consensus sequence) for vector insertion for use in conducting NF-κB modulation EMS assays. See instant patent col. 35, lines 54-col. 36, line 24.

Additionally, as pointed out in the instant patent:

A level of discrimination among members of a related family of NF-κB binding sites, by a modified NF-κB molecule, **can** also be introduced ... A copy of a cloned NF-κB gene can be mutagenized to alter the binding domain by well known techniques ...". Instant '516 patent col. 36, line 40–47 (with emphasis).

Thus, in accordance with the instant patent's teaching, it is not necessary, but merely optional to determine whether mutation of the putative NF-κB binding site abrogates binding.

Further, Meichle's EMSA assay is virtually identical to that disclosed in the instant patent with the exception of the use in the instant patent assay of an alternating duplex poly (di-dC)-poly(di-dC) copolymer as a competitor DNA species to increase sensitivity. See instant patent col. 18-19. [4]

In any event, patentee's argument is not commensurate with the instantly claimed invention that is not limited to reducing NF-κB activity by interferening with nuclear NF-κB binding at an NF-κB enhancing sequence. Per patentee's own model, the reference compound can be interfering with the ability of messenger NF-κB at the level of the cell membrane receptor or more likely at the level of the NF-κB-I-κB complex in the cytoplasm and still be within the scope of the instant claims e.g. claims 23 and 24. See Dr. Verma's Declaration ¶¶ 8 and 11.

Accordingly, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to inhibit NF-κB at the receptor and/or cytoplasmic segments of patentee's proposed model.

2.      Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as anticipated by Shirakawa (Mol. And Cell. Biol. 9 (6/89) 2424-30).

**Rejection Summary:** Shirakawa teaches reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (claims 1-2) expression of a cytokine protein (claim 5) in a eukaryotic cell.

---

[4] The parent 08/418,266 application drawn to the assay issued as U.S. Pat. No. 5,804,374.

Analogous to *Meichle* discussed *supra*, *Shirikawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The authors first demonstrated that IL-1 acted to induce NF-$\kappa$B activity in 70Z/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2). The EMSA binding and CAT reporter assays then confirmed that Protein Kinase Inhibitor H8 reduced NF-$\kappa$B activity and reduced the resulting CAT gene expression. More particularly, the treatment of cells with H8 using EMSA resulted in "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced $\kappa$ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-$\kappa$B activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, *Shirikawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-$\kappa$B –mediated gene transcription by reducing NF-$\kappa$B activity and reducing the binding of NF-$\kappa$B to NF-$\kappa$B binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request herein incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response:  For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Shirakawa does not show reduction of NF-$\kappa$B activity in induced cells since the experiments Shirakawa describes in which H8 was administered to cells, including the specific experiments the Examiner relied on (Fig. 1, portions of Fig. 2), were all conducted by pretreating cells with H8 for 2 hours before cells were stimulated with IL-I. In fact, Fig. 1 indicates that before being treated with IL-I, the cells were washed and the H8 removed. The use of H8 in this experiment as described by Shirakawa, therefore, was not in induced cells and could not have reduced any induced effect in the cell. See Shirakawa at 2425-2426.*  See Response at pages 46-47; and Declaration of Dr. Verma, ¶¶ 153 and 154.

Application/Control Number: 90/007,503; 90/007, 828                Page 33
Art Unit: 3991

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation section *supra*, the instantly claimed invention encompasses administering the inhibitor prior to or along with the inducing compound.

Further, it is noted that the patentee has overlooked the *Shirikawa* teaching of the ability of protein kinase inhibitors, such as H-8, to reduce IL-1 induced NF-κB activity and *inhibit* protein expression *resulting from* NF-κB activation. See *Shirikawa* p. 2425, right column under "Results".

3. Patentee Argument: *Shirakawa is missing critical controls to show NF-κB effects. Each of the three PK inhibitors (H7, H8 and staurosporine) in particular at dose ranges used in Meichle and Shirakawa, are relatively unspecific and in addition to PK-C and PK-A affect numerous kinases. Significantly, by inhibiting other kinases, these agents can inhibit transcription unrelated to effects on PKC, or NF-κB. In particular, both H7 and H8 have been demonstrated to block gene expression and to inhibit mRNA chain elongation, most likely by inhibiting TFIIH kinase activity. (Yankulov et al. 1995; Kumahara et al. 1999; Declaration of Dr. Verma, ¶155). Therefore, appropriate controls are a necessity in order to properly interpret the effects of such inhibitors on a transcriptional assay, such as CAT reporter assay, as being related to NF-κB. Shirakawa omits any such controls from CAT reporter experiment described in Fig. 1, such as, for example, evidence that H8 would not affect expression of appropriately matched CAT construct lacking an NF-κB binding site. One of skill would therefore not have read Shirakawa as teaching that one could use H8 to reduce NF-κB activity.* Response at page 47-48 and Declaration of Dr. Verma, ¶¶ 152-155.

Examiner Response:

The patentee has provided no evidence regarding the presence of protein kinases other than the PKA or PKC used to induce NF-κB activity in the *Shirikawa* assay samples. Similarly, the patentee has not provided any evidence challenging the reproducibility of *Shirakawa's* results nor has any evidence been provided concerning the contamination of *Shirakawa's* samples with transcription regulaters other than NF-κB.

As noted by *Shirikawa*, the use of protein kinase inhibitors to interfere with NF-$\kappa$B activity stemmed from the author's belief that the kinases PKA and PKC activate NF-$\kappa$B at the level of the cytoplasm by a phosporylation event involving the naturally occurring inhibitor I-$\kappa$B: "We, like *Baeurele and Baltimore* (5), favor the view that I-$\kappa$B is the target of phosphorylation; the phosphorylated I-$\kappa$B would presumably have a decreased ability to bind NF-$\kappa$B". *Shirikawa* at p. 2428, right column.  The patentee has provided no reason to challenge the inherent ability of the *Shirikawa* protein kinase inhibitors to interfere with NF-$\kappa$B activation at the level of the NF-$\kappa$B/ I-$\kappa$B complex.

Additionally, patentee's unsupported argument calling for controls at the level of nuclear transcription is not commensurate with the instantly claimed invention that is not limited to reducing NF-$\kappa$B activity by interfering with nuclear NF-$\kappa$B binding at an NF-$\kappa$B enhancing sequence. Per patentee's own model, compounds may interfere with the activation of NF-$\kappa$B at the level of the receptor, NF-$\kappa$B-I-$\kappa$B complex or translocation. See Dr. Verma Declaration ¶¶ 8 and 11.  Accordingly, deletion mutation analysis of the NF-$\kappa$B enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to interfere with NF-$\kappa$B at the receptor and/or cytoplasmic segments of patentee's proposed model.

*Shirikawa's* method uses protein kinase inhibitors (H8) that are *structurally* and *functionally* within the scope of instant claims since the treatment of eukaryotic cells with H8 in the EMSA assay resulted in the reduction of already induced NF-$\kappa$B activity and inhibition of protein expression. See *Shirikawa* "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced $\kappa$ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were *further confirmed* in a different cell line ("As was the case in 70Z/3 cells, NF-$\kappa$B activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, the *Shirikawa* reference provides an enabling disclosure of the ability of protein kinase inhibitors to reduce NF-$\kappa$B activity and the patentee has not provided any evidence challenging the reproducibility of *Shirakawa's* results.

## IIa. CYCLOSPORIN A (intervening prior art):

3.        Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, over *Schmidt* et al., J. Virology 64:4037-4041 (August 1990). See MPEP 2131.01 (evidence of inherency).

4.        **Rejection Summary:**  *Schmidt* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Schmidt* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-κB-regulated gene expression. In particular, *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1ug/ml] CsA (Fig: 1, lane 6; no B or A shifts) ....". See *Schmidt* at 4038. These results were confirmed using an NF-κB CAT reporter assay as described in the '516 patent, for example at Col. 17, line 66-Col. 18, line 23.

Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB. Accordingly, *Schmidt* described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression. As such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (herein incorporated by reference), the *Schmidt* reference expressly anticipates least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in

Application/Control Number: 90/007,503; 90/007, 828              Page 36
Art Unit: 3991

light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response:  For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Schmidt does not show reduction of NF-κB activity in induced cells, as required by the claims.  Patentee argues that Schmidt teaches <u>simultaneous</u> treatment with CsA and activator which is outside of the claim scope requiring prior cell induction.* See Response at page 51; Declaration of Dr. Verma, ¶ 25.

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with inhibitor, is not recited in the claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering the NF-κB inhibitor prior to, or with, an NF-κB activating compound.

Further, *Schmidt* teaches the addition of CsA during, as well as subsequent, to cell induced activation to reduce NF-κB activity. See *Schmidt*:  "... addition of CsA during the cellular activation phase completed abolished this binding" (page 4038 left column, last ¶) and  "Direct addition of CsA to a prepared nuclear extract from activated cells had no effect on the factor binding ..." (page 4038, right ¶, lines 1-8).

Application/Control Number: 90/007,503; 90/007, 828                    Page 37
Art Unit: 3991

3. Patentee Argument:  *Schmidt did not utilize the same Electrophoretic Mobility Shift Assay ("EMSA") in Jurkat cells (human T-cell leukemic cell line) disclosed in the '516 patent since Schmidt's EMSA assay differs by using HIV-LTR enhancer, instead of kappa immunoglobulin enhancer (kappa 3) to be activated by PMA and/or PHA. Schmidt's enhancing sequence fails to discriminate between the transcriptional regulators NF-κB and NFAT-1 which is a T-cell nuclear activation factor which binds -κB regulatory elements from the human immunodeficiency virus 1 (HIV-1).*  Response p.51, Dr. Verma Dec. ¶¶ 22, 26-30.

Examiner Response:

        The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific enhancer sequence (e.g kappa 3).  The instant claims require the use of a compound (e.g. cyclosporine) that exclusively or non-exclusively reduces NF-κB activity.

        The *Schmidt* EMSA assay for PHA/PMA activation utilized a conventional [5] 26 base HIV enhancer sequence that comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and "consensus sequence" found in Table 2 of the instant patent for vector insertion and use in conducting EMSA assays. See *Schmidt* at page 4037, right column; and instant patent col. 35, lines 54-col. 36, line 24; col. 37 Table 2.

        *Schmidt's* T-cell activation using PMA and PHA in the EMSA assay resulted in:

a. major B complex  to the NF-κB enhancer; and

b. more slowly migrating  A complex (Fig. 1, lane 3) which was more clearly seen when PHA alone was used (Fig. 1 lane 7).

        The *Schmidt* article utilized controls in performing both the EMSA and CAT assays. For example, after performing the following *controls, Schmidt* concluded that the major B complex was ascribed to the nuclear factor NF-κB because the complex appears identical to previously reported complexes (endnotes 2, 3 and 19) obtained with similar HIV κB oligonucleotide probes since:

(i) the shift was not detected with a mutant enhancer, nor was the B shift completed for by this mutant described in reference 19 (Baltimore Nature article); and

---

[5] Schmidt cites an article including one of the instant inventors (Dr.Baltimore) for support: Nabel, G. and D. Baltimore 1987 Nature (London) 326:711-713.

(ii) this induced shift comigrated with a shift formed with nuclear extracts from Namalwa cells, which contain a constitutively activated kB complex (citing reference 13). *Schmidt* found that "[A]ddition of CsA during stimulation with both PHA and PMA significantly reduced the major shift (B shift) and completely abrogated the A shift (Figure 1 lane 4)". See *Schmidt* at page 4037, right column.

Additionally, patentee's "control" argument regarding the lack of a deletion mutation nuclear DNA analysis to discriminate messenger NF-κB binding to NFAT enhancer instead of NF-κB enhancer is not persuasive since this argument is *not commensurate with the instant invention* which is not limited to NF-κB binding an NF-κB enhancing sequence. See instant claims 23 and 24; and Dr. Verma's claim interpretation analysis Declaration ¶¶ 8 and 11. Thus, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to inhibit at the receptor and/or cytoplasmic segments of patentee's proposed model.

4. Patentee Argument: *Schmidt's CAT reported data utilizing artificial transfected cells bearing foreign bacterial DNA is outside the scope of the instant invention since:*
*a. the instant claims are not drawn to an assay and thus don't incorporate specification assays utilizing bacterial constructs; and*
*b. human, mammal or eukaryote cells of the instant claims does not normally contain foreign bacterial DNA.* Dr. Verma declaration ¶ 33.

Examiner Response: The instant patent encompasses NF-κB occurrence and activation in host cell types, including T cell lines (H9, Jurkat) as well as NF-κB -related control (enhanced, reduced) of IL-2 production in said host cells as taught by *Schmidt*. See col. 26, lines 39-45; and col. 35. Neither the specification, nor the instant claims exclude the presence of bacterial DNA in eukaryotic or mammalian cells and in fact exemplify the presence of bacterial DNA in assays. In this respect, although not drawn to an assay, the instant claims clearly encompass both *in vitro* and *in vivo* NF-κB regulation.

Application/Control Number: 90/007,503; 90/007, 828     Page 39
Art Unit: 3991

5. Patentee Argument:  *Positive EMSA binding activity induced by PHA treatment that Schmidt observed with the HIV enhancer corresponds to NFAT since "when Schmidt assessed induction of NFAT binding activity in Jurkat cells using an EMSA specific for NFAT, (Schmidt, fig. 2), there was 'good activation of NFAT-1 with PHA alone, but not with PMA alone." Additionally, in Schmidt, CsA did not prevent PMA-induced binding activity to the HIV enhancer in Jurkat cells.  Verma Declaration ¶¶ 31 and 32.*

Examiner Response:

  *Schmidt*  (p.4037, left column) acknowledges the ability of both NF-κB and NFAT-1 to induce HIV gene expression by binding to HIV enhancers but proposed separate mechanisms upon co-activation.  Accordingly, separate inducers were selected:

 phytohemaglutinin (PHA) mimicking induction via the T-cell receptor; and
 phorbol myristate acetate (PMA) inducing via direct activation of protein kinase C.

  CsA activity was tested utilizing PHA and PMA together as well as separately. See *Schmidt*, page 4037, left column; page 4038, left column.

  *Schmidt's* T-cell activation using PMA and PHA in the EMSA assay resulted in:

a. major B complex  to the NF-κB enhancer; and
b. more slowly migrating  A complex (Fig. 1, lane 3) which was more clearly seen when PHA alone was used (Fig. 1 lane 7).

  The *Schmidt* article, after performing *controls,* concluded that the major B complex was ascribed to the nuclear factor NF-κB and found that  "[A]ddition of CsA during stimulation with both PHA and PMA significantly reduced the major shift (B shift) and completely abrogated the A shift (Figure 1 lane  4)". See *Schmidt* at page 4037, right column.

  After co-activation with PHA and/or PMA, the effects of CsA upon CAT inducibility conferred by HIV enhancer (κB-binding sites) in Jurkat cells was tested where it was found that CsA inhibited the PHA-derived activation signal but not the PMA signal (see Fig. 4: last four bars); and co-activation with PMA and PHA together (Fig. 4: about 47) exceeded PHA alone (Fig. 4: about 13) and PMA alone (Fig. 4: about 17).

Accordingly, *Schmidt* teaches (from two different assays utilizing HIV promoter) CsA inhibition of PHA and (PHA and PMA) NF-κB activated Jurkat cell binding and there is no evidence provided to rebut this teaching.

*Schmidt* further teaches that activation by PHA and PMA is synergistic (Fig. 4 and compare PHA and PMA alone and their combined activation).

Thus, the *Schmidt* reference teaches the ability of CsA to inhibit NF-κB activity in cells activated by PHA/PMA and thus enables the use of CsA to reduce intracellular NF-κB activity and inhibit NF-κB-mediated gene expression.

6. Patentee Argument: The *positive EMSA binding activity induced by PHA treatment that Schmidt observed with the HIV enhancer corresponds to NFAT in light of accumulated scientific evidence that CsA exerts its clinical effect through its ability to inhibit an intracellular enzyme called calcineurin that regulates the activity of NFAT (nuclear factor of activated T cells transcription factor)* citing:
*Exhibit 7: Loh et al., J. Biol. Chem. 271(18) (May 1996) pages 10891-10891;*
*Exhibit 13 : Giffin et al. Nature Structure Biology, 10(10) (Aug. 2003) pages 800-806;*
*Exhibit: 8: Hogan et al. Genes and Development, 17 (2003) pages 2205-2232;*
*Exhibit 14: Kinoshita et al. Immunity, 6 (March 1997) pages 235-244;*
*Exhibit 9 : Ho et al. Clin. Immun. And Immunopath. 80(3) (9/96) pages S40-S45.*

See Response at page 52; and Dr. Verma Declaration ¶¶ 22, 26-36 and 40.

Examiner Response:

The evidence of record supports CsA's ability to inhibit both NF-κB and NFAT regulated intracellular gene expression within the instant claims and the above-cited documents do not support patentee's assertion that CsA does not affect NF-κB activity. A brief summary of the patentee cited documents follows:

*Loh* teaches that the calcineurin phosphatase enzyme binds NFAT (which translocates to the nucleus to bind DNA) to reversibly regulate its activity. CsA addition results in rephosphorylation of NFAT and inhibition of NFAT activated transcription.

*Giffin* teaches that NFAT1 binds cooperatively as a dimer to the NF-κB site of human immunodeficiency virus 1 (HIV-1). See Abstract; p. 801 (Fig. 1) and p. 804.

*Hogan* teaches that the NFAT family of transcription factors are evolutionary related to the Rel/NFkB family but are distinguished by their regulation by cell surface-activated calcium ion with the cytosol bound calcium ion dependent serine

Application/Control Number: 90/007,503; 90/007, 828                    Page 41
Art Unit: 3991

phosphatase calcineurin.- NFAT complex. See Fig. 1 p.2207.  NFAT also acts
synergistically with transcription factors other that Fos and Jun. See Abstract and pages
2213-2214.

Kinoshita teaches that certain NF-AT (Rel) family members bind the κB
regulatory elements and synergize with NF-κB and Tat in transcriptional activation of
HIV-1, and enhance HIV-1 replication in T cells. See Abstract.

Ho teaches that calcineurin is an essential component of the T-cell activation
pathway involving the action of CsA that acts by inhibiting signal transduction pathways
(e.g. see page S42, Fig. 1). Ho teaches that one of the effects of CsA on cytokine
expression in Jurkat human T-cells results from the release of calcineurin that inhibits
NFAT regulated cytokine expression. See Ho Abstract; p. S43.

Contrary to patentee's assertion, the Ho reference acknowledges that CsA does
affect NF-κB activity in Jurkat cells citing the Emmel Science 246, 1617-1620 (1989)
teaching corresponding to endnote 30 for support:

Other targets for calcineurin are likely to play a role in this process. For example,
the transcriptional activity of NF-κB is inhibited by about twofold and certain AP-1
sites are inhibited by three-to fourfold (30). However, these effects are quite
small compared to the several hundred- or thousandfold inhibition of properly
initiated transcription at the NF-AT site (30).  Ho p.S43, right col. lines 22-29.

Additionally, it is art-recognized that CsA does affect NF-κB activity consistent
with the Schmidt and Emmel teaching. The following three articles (copies enclosed)
rebut patentee's assertion regarding NF-κB's lack of a role involving CsA
immunosuppresion:

Roman-Blas M.D. et al., Osteoarthritis and Cartilage, 14 (2006) pages 839-848 ;
Frantz et al. Embo J. 13 (1994) pages 861-870 ;
Meyer et al., FEBS Lett 413 (1997) pages 354-358.

Roman-Blas teaches therapeutic strategies based on the established role of
immunosuppressive agents, including CsA, to inhibit the NF-κB pathway: "Cyclosporin
A inhibits the protease activity of the 20S proteasome complex preventing I-κBα
degradation in murine macrophages, Jurkat lymphoma cells, and mouse and human T-
lymphocytes [72,73] " See Roman-Blas: p. 842 (right col.at bottom) to p. 843 (left col.) and
also p. 843 under "Conclusion" to p.844 including Fig. 3.
Frantz and Meyer represent endnotes 72 and 73, respectively cited in Roman-Blas.

*Frantz et al.* teach that calcineurin acts in synergy with PMA to inactivate I kappa B/MAD3, an inhibitor of NF-κB.

*Meyer et al.* teach that CsA is an uncompetitive inhibitor of proteasome activity and prevents NF-κB activation.

Accordingly, *Schmidt and Emmel* enable methods of using CsA to reduce NF-κB activity and inhibit NF-κB-mediated eukaryotic and viral gene expression.

5.      Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, by *Emmel* et al., Science, <u>246</u> (Dec. 1989):1617-20 See MPEP 2131.01.

**Rejection Summary:** *Emmel* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.

Similar to the *Schmidt* reference discussed above, the *Emmel* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. eukaryotic Jurkat cells which are a human leukemic  T- cell line)  that inherently reduces NF-κB-regulated gene expression.

Like *Schmidt*, *Emmel* described the effects of CsA on Jurkat cells that were induced with PHA and PMA and CsA was shown (Fig. 3, .01-1ug/ml) to reduce NF-κB binding activity. In the CAT reporter assay, cells were transfected with a CAT reporter gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-κB binding site incorporated into its regulatory region. As shown in Fig. 2D, CsA significantly reduced NF-κB activity thereby reducing the NF-κB-mediated expression of CAT. Additionally, as shown in Figure 3, 0.01-1ug/ml (10-10000 ng/ml) CsA was found to reduce NF-κB binding activity. Thus, *Emmel* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene

Application/Control Number: 90/007,503; 90/007, 828          Page 43
Art Unit: 3991

expression, and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503
Request (incorporated by reference), the *Emmel* reference expressly anticipates at least
claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89,
and 93-97 of the '516 patent.

Since *Emmel* used the HIV LTR gene, *Emmel* demonstrated that Cyclosporin A
reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-
107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Emmel's* use of the HIV
LTR gene renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117,
192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious since
HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it
would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB
activity as in *Emmel* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to
patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee argues that numerous claims are entitled at least to the
April 21, 1989 filing date of U.S. Serial No. 07/341,436. Response at page 54.*

Examiner Response: For the reasons discussed *supra,* the instant claims are not
entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to
the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Emmel does not show reduction of NF-κB activity in induced
cells, as required by the claims but teaches <u>simultaneous</u> treatment with CsA and
activator which is outside of the claim scope requiring prior cell induction. See
Response at page 55; Declaration of Dr. Verma, ¶ 38.*

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with activator prior
to inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention encompasses
"treating" cells with an NF-κB inhibitor prior to, with or subsequent to administration of
an NF-κB activating compound.

Further, the *Emmel* reference teaches the ability to measure CsA inhibition of "stimulated" untransfected as well as transfected Jurkat cells upon incubation of these cells for 40 hours with PHA (2ug), PMA (50 ng/ml) and CsA (concentratrions of 10-1000 ng/ml)..E.g. See Fig. 2, page 1618, left column. Accordingly, contrary to patentee's argument, the *Emmel* reference teaches the treatment of stimulated or activated cells with CsA in order to determine cyclosporin's effect on NF-κB activity e.g. effect of NFκ-B on the regulated gene chloramphenicol acetyltransferase or CAT.

3. Patentee Argument:  *Emmel did not utilize the same Electrophoretic Mobility Shift Assay ("EMSA") in Jurkat cells (human T-cell leukemic cell line) disclosed in the '516 patent since Emmel's EMSA assay differs by using HIV-LTR enhancer, instead of kappa immunoglobulin enhancer (kappa 3) to be activated by PMA and/or PHA. ·Emmel's enhancing sequence fails to discriminate between the transcriptional regulators NF-κB and NFAT which binds kB regulatory elements from the human immunodeficiency virus 1 (HIV-1).* Response at p. 56, Dr. Verma Dec. ¶¶ 39 and 41-42.

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific enhancer sequence (kappa 3).

However, the instant claims do require the use of a compound (e.g. cyclosporine) that reduces NF-κB activity (and concomitant transcription), but need not be an exclusive, or even, a selective NF-κB inhibitor. Additionally, any amount of reduced NF-κB activity and inhibition of NF-κB mediated gene expression is within the instant method claim scope.

*Emmel* teaches the ability of CsA to inhibit NF-κB activity in PHA and PMA activated cells as discussed in the rejection above, and herein summarized.

The *Emmel* EMSA-CAT assays for PHA and PMA activation utilized a conventional 26 base HIV enhancer sequence that comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and "consensus sequence found in Table 2 of the instant patent for vector insertion and use in conducting EMSA assays. See *Emmel* at p. 1618, Fig. 2 (D) citing endnote 17 to *Nabel and Baltimore* Nature article; and instant patent col. 35, lines 54-col. 36, line 24 and col. 37 Table 2.

Upon performing the CAT assay, *Emmel* concluded that "Smaller inhibitory effects of CsA were detected for the ability of the site to activate expression of CAT ...". *Emmel* at page 1618 bottom of middle column to top of 3rd column; and Fig. 2 (D).

*Emmel* further performed the nuclear extract EMSA to measure the NF-κB effects of CsA on the appearance of binding activity on various transcriptional regulators including NF-κB. Again *Emmel* concluded that CsA acted to inhibit NF-κB activity: "NF-κB binding was reduced 10 to 20% in nuclear extracts of CsA-treated cells". See *Emmel* at page 1618, right column and Fig. 3C.

In light of the assay evidence, *Emmel* enables the use of cyclosporine to reduce NF-κB activity and NF-κB mediated gene expression in activated T-cells.

4. Patentee Argument: *Emmel provides the following evidence that NF-κB does not mediate effects of CsA on gene expression and that CsA acts through NFAT, not through NF-κB:*
*- In the Fig. 1 CsA "sensitivity" assay of single deletion of IL-2 enhancer effects on CAT transcription, "deleting the NF-κB binding site did not affect the ability of CsA to prevent PHA/PMA from inducing CAT expression" (Dr. Verma: ¶ 40, lines 6-8).*

*- Emmel states: "A binding site for NF-κB is present in the long terminal repeat of the human immunodeficiency virus (HIV-LTR) (17), yet CsA "sensitivity" of the HIV-LTR is independent of this site (18)" (Emmel page 1619, middle column). See Dr. Verma's Declaration, ¶¶ 39-40.*

*-In the Fig. 2 CAT expression assay, CsA abolished the ability of tandem repeats of the NFAT construct to direct transcription of the CAT gene (page 1618, middle column and Figure 2); and*

Examiner Response:

The evidence of record indicates that CsA inhibits intracellular gene transcription via <u>both</u> NF-κB and NFAT within the instant claims scope.

Evidence of the ability of CsA to activate nuclear protein transcription (IL-2 or HIV) independent of the <u>nuclear</u> NF-κB enhancing sequence as in *Emmel* Fig. 1 for the IL-2 enhancer and as in reference (17) for HIV-LTR enhancer is not dispositive of the

ability of CsA to reduce NF-κB activity outside the nucleus i.e. at the level of the
cytoplasm NF-κB/I-κB complex.

Regarding the Fig. 1 CsA "sensitivity" assay, at best, the results of this assay are
<u>inconclusive</u> regarding CsA's affect on NF-κB activity. As noted by *Emmel*, more than a
single region is responsible for the inhibitor effect of CsA, and in this regard the CsA
"sensitivity" deletion assay (Fig. 1) is a ***relative*** measure of the importance of various
transcriptional binding DNA protein regions present on the IL-2 enhancer and
**additional assays were necessary** to "further define the effects of CsA on the function
of the IL-2 enhancer". See *Emmel* at page 1618, left column.

Accordingly, patentee's first two arguments addressing deletion of a nuclear NF-
κB binding site is not persuasive since such evidence is not determinative of the effects
of CsA on NF-κB activity and protein (e.g.IL-2 or HIV) transcription. Additionally, such
evidence overlooks the ability of CsA to interfere with NF-κB activity at the level of I-κB
in the cytoplasm. Further, the instant claims are not limited to inhibition of nuclear gene
transcription by NF-κB only at nuclear NF-κB binding sites.

With regard to the Fig. 2 assay and the *Emmel* statement that CsA abolished the
ability of the NFAT construct to direct transcription of the CAT gene, patentee overlooks
the fact that in the same CAT receptor assay (Fig. 2D) CsA *still inhibited* NF-κB
activated CAT expression albeit to a smaller extent as compared to NFAT (Fig. 2B).
Accordingly, the *Emmel* teaching of CsA reduction of NF-κB activity is within the instant
claimed scope that is not limited by NF-κB inhibitory degree or NF-κB exclusivity.
This is consistent with the *Emmel* Abstract teaching that cyclosporin A was found to
specifically inhibit the appearance of DNA binding activity of NFAT, AP-3, and to <u>a</u>
<u>lesser extent</u> NF-κB nuclear proteins that appear to be important in the transcriptional
activation of the genes for interleukin-2 and its receptor, as well as several other
lymphokines.

5. Patentee Argument: *Emmel's NF-κB inhibition data should be attributed to NFAT in light of the accumulated scientific evidence that indicates that CsA exerts its clinical effect through its ability to inhibit an intracellular enzyme called calcineurin which regulates the activity of the NFAT and that CsA does not affect NF-κB activity (e.g. inhibits Il-2 expression) in Jurkat cells*" (Dr. Verma, ¶¶ 34 for Schmidt and 40 for Emmel: response page 52 (top) for Schmidt and page 56 top for Emmel) *citing:*

*Exhibit 7: Loh et al., J. Biol. Chem. 271(18) (May 1996) pages 10891-10891;*
*Exhibit 13 : Giffin et al. Nature Structure Biology, 10(10) (Aug. 2003) pages 800-806;*
*Exhibit: 8: Hogan et al. Genes and Development, 17 (2003) pages 2205-2232;*
*Exhibit 14: Kinoshita et al. Immunity, 6 (March 1997) pages 235-244; and*
*Exhibit 9 : Ho et al. Clin. Immun. And Immunopath. 80(3) (9/96) pages S40-S45.*

*See* Response at page 52; and Dr. Verma Declaration ¶¶ 22 and 26-36.

Examiner Response:

As discussed *supra* under the *Schmidt* rejection the evidence of record supports CsA inhibition of both NF-κB and NFAT regulated intracellular gene expression within the instant claim scope and the above-cited documents do not support patentee's assertion that CsA does not affect NF-κB activity and the inhibition of IL-2 expression.

6.      Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103 by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990).

**Rejection Summary:** *Brini* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. T-cells) that inherently reduces NF-κB-regulated gene expression.

Particularly, *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516 patent to assess NF-κB activity and binding (see '516 patent, columns 17-18). *Brini* concluded that "CsA reduced the PHA-induced binding of transactivating factors from T-cells and κB-like sequences which are present in the IL-2R alpha gene and in the HIV-1 LTR gene (Figures 3 and 4)". See *Brini* at page 137. Additionally, *Brini* reported the effects of CsA on expression levels of IL-2 Receptor-alpha (*Brini* at page 131 Abstract) which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-cells. See '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (incorporated by reference), the Emmel reference expressly anticipates at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 85, 88-89, and 93-97 of the '516 patent.

Additionally, since *Brini* used the HIV LTR gene, *Brini* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Brini's* use of HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Brini* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee argues that numerous claims are entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436. Response at page 58.*

Application/Control Number: 90/007,503; 90/007, 828          Page 49
Art Unit: 3991

<u>Examiner Response:</u>  For the reasons discussed *supra,* the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. <u>Patentee Argument</u>: *Brini does not show reduction of NF-κB activity in induced cells, as required by the claims.  Brini teaches that "CsA was always added to the cells 30 min before stimulation with PHA" which is outside of the claim scope requiring prior cell induction.* See Response at p. 59; Dr. Verma, ¶¶ 44-46.

<u>Examiner Response:</u>

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with an inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation *supra,* the instantly claimed invention encompasses administering the NF-κB inhibitor prior to (e.g. pretreatment) or with the NF-κB activating compound.

Further, the *Brini* reference clearly addresses the ability of CsA to <u>inhibit</u> gene expression in a eukaryotic cell that is induced by PHA to release NF-κB and express protein: "Here we have examined the *inhibitory effect of CsA* on the activation of the IL-2Ralpha gene expression in primary human T lymphocytes induced by PHA (emphasis provided)." See p.132, left column, 2nd full ¶.

Additionally, *Brini* teaches that, unlike the IL-2 receptor beta subunit, the IL-2 alpha subunit is not expressed in resting T-cells, but only is expressed on the surface of activated T-cells. Accordingly, any CsA inhibition of IL-2 alpha subunit transcription shown in the *Brini* assays must result from the inhibition of already activated T-cells. See *Brini* at page 131, right column last ¶.

3. <u>Patentee Argument</u>: *The Examiner relies on  EMSA binding assays (Fig. 3 and 4) utilizing an oligonucleotide probe corresponding to the Il-2 receptor promoter or a sequence corresponding to a portion of the HIV LTR  both showed "several discrete-retarded DNA proteins" but neither of the EMSA Brini assays demonstrates whether the CsA sensitive binding activity corresponds to NF-κB. A control DNA sequence is important to distinguish NF-κB from other nuclear transcription factors, such as NFAT discussed in Schmidt and Emmel, so as to confirm the identity of any CsA-sensitive*

Application/Control Number: 90/007,503; 90/007,828          Page 50
Art Unit: 3991

*binding complexes and discriminate between* NF-κB *activity and NFAT binding activity.*
*Dr. Verma ¶¶ 47-49.*

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay
parameters including the use of a specific "control" enhancer sequence.   Additionally,
the instant claims are not limited to nuclear transcription inhibition only at an NF-κB
enhancer sequence.

Regarding the EMSA enhancer sequence, it is noted that *Brini* utilized an IL-2R-
alpha enhancing sequence (245-291) that comprised the underlined GGGAATCTCC
NF-κB binding sequence disclosed in the instant patent (col. 37, Table 2 3rd from the
bottom) recommended for use in EMSA binding assays.   It is further noted that the
underlined nucleotide sequence is within the scope of the instant patent's "consensus
sequence" (see col. 36, lines 5-15).

As pointed out in the instant patent, the utilization of mutation assays to obtain
selective NF-κB inhibition is optional. See instant patent col. 36, lines 40-55.
Accordingly, patentee's argument regarding the non-use by *Brini* of a discriminatory
control sequence is not commensurate to the scope of the instant claims that do not
require "selective" NF-κB inhibition.

Further, it is noted that the Examiner does not specifically rely on any one of the
particular *Brini* assay results but is considering the *Brini* teaching as a whole, which
includes all of the *Brini* assay results in light of what was known in the prior art regarding
CsA regulation of IL-2 receptor alpha chain expression.

In this regard, previous mutation-deletion analysis established a 5' IL-2R alpha
regulatory region (between −267 and −244) that shares high homology with the NF-κB
binding sites with kappa light chain immununoglobulin gene and an NF-κB binding site
for HIV-1 and is recognized by specific nuclear binding proteins including HIVEN86 and
NF-κB. This suggested that NF-κB activation may be due to dissociation from a
cytoplasmic inhibitor IκB. Brini at page 132, left column.

The *Brini* nuclear extract EMSA assays using an IL-2R-alpha probe containing an NF-κB binding site (Fig. 3) and an HIV-LTR probe containing an NF-κB binding site (Fig. 4) that confirmed the ability of CsA to retard the formation of two separate DNA-protein complexes one of which was concluded by *Brini* to be attributed to NF-κB. After reviewing their assay evidence the *Brini* authors concluded that CsA acted to inhibit NF-κB regulated expression, not at the nuclear level, but *indirectly* through its effect on the cytoplasmic I-κB inhibitor. Brini at p.137.

4. Patentee Argument:  *The fact that Brini observed a substantial level of binding activity in untreated cells makes it unlikely that the complexes Brini observed correspond to NF-κB, because one would not observe NF-κB activity in uninduced cells. (see '516 patent, Example 8 and Fig..24A). Moreover, CsA alone appears to increase levels of the complexes that Examiner interprets correspond to NF-κB. (Fig. 3, lane 2). In particular, the assumption that these complexes correspond to NF-κB is inconsistent with the premise that in the Brini experiments, NF-κB activity regulated IL-2 receptor expression, because there is no correlation between the presence of these complexes in the EMSA assays (Figs. 3 and 4) and IL-2 receptor mRNA expression (Fig. 2).  Dr. Verma Dec.¶¶ 50 and 52.*

Examiner Response:

Initially, it is noted that that patentee's argument is not commensurate with the instant claimed scope that is not limited to a specific assay e.g patentee's Example 8.

In any event, patentee's comparison between the instant patent Example 8 and Fig. 24A results with *Brini's* is not a valid comparison.

*Brini's* Fig. 3 assay gel retardation patterns utilized "human peripheral blood T-lymphocytes isolated from heparinized venous blood of healthy volunteers" (see *Brini* at p.132 under "Materials and Methods") whereas the instant patent's gel assays utilized Jurkat cells (a human T leukemia cell line).

Accordingly, under different experimental conditions, utilizing different cells (Jurkat leukemia cells), the instant patent's uninduced Jurkat cells were negative for NF-κB activity, whereas stimulated Jurkat cells contained detectable levels of NF-κB with combined PHA/PMA being synergistic. Instant Patent at: col. 73, lines 1-7.

Application/Control Number: 90/007,503; 90/007, 828          Page 52
Art Unit: 3991

However, the presence of NF-κB complexes in <u>uninduced Brini T-cells</u> may be explained by:

A: a difference in *NF-κB* regulation and CsA inhibition between Jurkat leukemic cells and human peripheral blood T-lymphocytes. This difference <u>is supported by *Brini*</u>: "CsA shows no inhibitory effect on the surface expression of the IL2Ralpha in the human Tcell Jurkat, whereas, in human mitogen activated PBMC (13) and in murine thymocytes (14) CsA inhibits the IL2R-alpha chain (Tac) surface expression". See *Brini* at page 131, right column;

B: the nature of *Brini's* PBMC sample since "constitutive expression" of NF-κB may be occurring in *Brini's* isolated human T-cell samples or the *Brini* isolated T-cell sample may have come from an individual who was experiencing, or had recently experienced, an NF-κB inducing stimulus (infection, virus etc.) or

C. different experimental conditions.

Regarding, the correlation between NF-κB release (upon PHA activation) and CsA inhibition of IL-2R-alpha expression, *Brini* attempted to delineate the CsA mechanism for reducing PHA-induced expression of IL-2R-alpha. In this respect, the Fig. 2 Brini assay results showed that "IL-2R-alpa mRNA's were readily induced by PHA and pretreatment with CsA at 1ug/ml before cell activation caused a significant inhibition of the IL-2R-alpha mRNA inhibition". *Brini* at p.134. Insofar that PHA acts to release NF-κB, the Fig. 2 data <u>suggests that NF-κB is playing a role in the ability of CsA to inhibit IL-2R-alpha expression in T-cells.</u>

5. <u>Patentee Argument</u>:  *Brini provides "no evidence as to whether PHA treatment alone would induce NF-κB activity so as to induce IL-2 receptor expression". In this regard, Examiner's reliance on data indicating cyclosporin's ability to slightly decrease (approximately 40-50%) PHA-induced IL-2 receptor alpha expression is insufficient. Additionally, patentee argues that the Examiner's interpretation of the instant '516 patent teaching that "NF-kB is induced in T cells ... by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene ..." is erroneous. Dr. Verma Declaration at ¶ 51.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 53
Art Unit: 3991

Examiner Response:

Initially, it is noted that *Brini* labels CsA as achieving "significant" inhibition of 41+3% (at 24 hours) and 52 + 4% (at 40 hours) of IL-2Ralpha mRNA induction. See p.134, left column and Fig. 2.

Additionally, as pointed out in the rejection above, the total *Brini* assay evidence in light of what was known in the art discloses that administration of CsA reduces NF-κB in cells e.g. T-cells that underlines reduces NF-κB-regulated gene expression.

As further pointed out above, *Brini* suggests a CsA mechanism in PMA/PHA activated T-cells (interference at the cytoplasm inhibitor level) that is consistent with patentee's own specification statement (now produced in context):

> Recently, NF-kappa.B has been implicated in several other inducible systems. For example, NF-kappa.B is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor .alpha. gene and possibly the IL-2 gene. Bohnlein et al., Cell, 53:827-836 (1988); Leung, K. and G. Nabel, Nature, 333:776-778 (1988); Ruben et al., Science, 241:89-92 (1988); Cross et al., Science, (1989); and Lenardo et al., Proc. Natl. Acad. Sci. USA, 85:8825-8829 (1988). '516 patent, col. 17, lines 20-28: relevant part underlined.

Accordingly both *Brini* and the instant patent (see underlined text above) teach that PHA (and/or PMA as underlined) activated T-cells release NF-κB to induce gene expression.

Thus, *Brini's* data indicating that CsA acts at the level of the NF-κB-I-κB complex to inhibit NF-κB regulation of IL-2 receptor- alpha gene expression is consistent with the above-referred to instant patent teaching. See also instant patent at col. 35, lines 13-20 regarding the role of activated NF-κB in IL-2R-alpha transcription.

6. <u>Patentee Argument</u>: *Without data, the Examiner has no basis to assume that treatment of T-cells with PHA alone (as compared to PHA and PMA) induce NF-κB activity so as to induce expression of any gene. In fact, Brini reports that PHA appeared to induce binding activity of at least one other transcription factor, AP1, having binding sites in the IL-2 receptor promoter (Fig. 5). Dr. Verma Declaration at ¶ 52.*

Application/Control Number: 90/007,503; 90/007, 828          Page 54
Art Unit: 3991

As discussed *supra*, it is clear from the *Brini* article that PHA (and PMA) activates NF-κB to induce gene expression. Additionally, *Brini* provides evidence that CsA reduces NF-κB activity indirectly at the level of its inhibitor I-κB and not directly at the level of nuclear protein transcription. See detailed *Brini* discussion at page 136-137.

With respect to AP1, although patentee is correct that Fig. 5B shows that APA binds a nuclear enhancer sequence upon PHA activation, the author further notes that "CsA does not affect AP-1 binding site" (see Fig. 5 explanation) and thus is not inhibiting directly at the nuclear level of transcription.

However, the argument that other NF-κB like factors (including APA) in addition to NF-κB, may be inhibited by CsA is irrelevant since the instant claims are not limited to exclusive NF-κB inhibition.

Additionally, to the extent that the patentee is arguing that *Brini* fails to completely elucidate the mechanism involving CsA inhibition of activated human T-cells gene expression it is noted that mechanisms need not be recognized by one of ordinary skill in the art for a finding of inherency. *EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, [60 USPQ 2d 1423] (CAFC Sept. 21, 2001).

### IIa. CYCLOSPORIN A  (references prior to 12/24/86)

7.     Claims 1-2, 6, 8-9, 20-27, 29, 31-38, 40, 64-73, 75-80, 82, 84 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by the Physician's Desk Reference (*PDR: 1985*) pages 1811-13, *Griffith I* (Griffith et al., Ann. Surg. 196 (9/82): 324-329) or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. 99 (12/84): 952-957) as evidenced by Holschermann et al., Circulation 96 (12/97) 4232-4238. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *PDR* (1985), *Griffith I and*, *Griffith II* teach cyclosporin A (CsA) administration of cells, which is shown from the teaching of *Holschermann,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different eukaryotic cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene (claims 1-2) expression in a eukaryotic cell.

The *PDR 1985*, *Griffith I* and *Griffith II* references all teach the *in vivo* administration of CsA to cardiac transplant patients.

*PDR 1985* teaches that CsA should be administered before and after surgery for 1-2 weeks at a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a final level of 5-10 mg/kg/day. When monitoring whole blood levels, a 24-hour trough value of 250-800 ng/ml CsA appeared to minimize side effects and rejection effects.

*Griffith I* reports the administration of 5-10 mg/kg/d of CsA (average 8 mg/kg/d); while *Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to obtain a targeted blood level of CsA of about 1000ng/ml.

*Holschermann* provides extrinsic evidence that the PDR 1985, Griffith I, and Griffith II references inherently anticipate the subject claims.

*Holschermann* essentially repeated the tests disclosed in the *Griffith I* and *II* references by administering 3.4 $\pm$ 0.3 mg/kg/day CsA to cardiac transplant patients, resulting in blood levels of 681 $\pm$ 176 ng/ml. PBM cells were isolated from the blood of the patients before and after CsA therapy, and nuclear extracts from the cells were prepared. Id. *Hölschermann* then conducted an EMSA assay using nuclear extracts. (see Figure 4) which is the same assay format taught by the '516 patent for determining whether compounds (i) reduce NF-κB activity and (ii) reduce binding of NF-κB to NF-κB recognition sites. See '516 patent, Col. 18, I.52 - Col. 20, I. 25.

*Holschermann* confirms that administering CsA to cardiac patients as taught by the prior art *PDR 1985* and *Griffith I* and *II* references necessarily inherently reduces NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected (Fig. 4), whereas cells separated from blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. Specificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides. *Id.* at 4236.

*Holschermann* also showed that the administration of CsA to these patients as taught in the prior art *PDR 1985* and *Griffith I* and *II* references reduced Tissue Factor

(TF) gene transcription, which is recognized as being regulated by NF-κB: "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237.

Thus, CsA, as administered in *PDR 1985* and *Griffith I* and *II*:

-inhibited expression of a gene whose transcription is regulated by NF-κB (instant claims 1 and 2 and their dependent claims);

-diminished NF-κB-mediated intracellular signaling (clm 6 and dependent claims); and

-reduced NF-κB-mediated effects of external influences (claims 7 and 8 and dependent claims).

Since CsA was shown to reduce binding of NF-κB in an EMSA assay which measures binding of NF-κB to NF-κB recognition sites, *Holschermann* confirms that the prior art administration of CsA to cardiac patients reduces NF-κB activity by "reducing binding of NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g. claims 25, 36 and 58). Additionally, because unbound NF-κB translocates to the nucleus, the reduced binding activity in the nucleus of cells reflected in *Hölschermann* means that CsA, as administered in *PDR 1985* and *Griffith I* and *II*, necessarily reduced NF-κB activity by:

A. "decreasing the level of NF-κB not bound in any NF-κB- IκB complex" (e.g. claims 20, 31 and 53); and

B. "inhibiting the passage of NF-κB into the nucleus of cells (e.g. claims 21, 32 and 54).

Furthermore, as *Hölschermann* indicates, CsA is recognized as being able to "abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB." *Id.* at 4237 (citing *Alkalay*). *Hölschermann* confirms that this effect on degradation of IκB is the mechanism by which CsA reduced NFκB in these cardiac patients. Thus, Cyclosporin A when administered to humans as in the *PDR 1985* and *Griffith I* and *II* references reduces NF-κB activity by:

A. "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g. claims 22 and 33); and

B. "inhibiting degradation of an I-κB protein" (e.g. claims 23 and 34).

Finally, as demonstrated by *Hölschermann*, the *PDR 1985* and *Griffith I* and *II* reference CsA administration to human patients reduced NF-κB activity in those patients'

peripheral blood mononuclear cells (PBM's comprised of lymphocytes and monocytes) which anticipates:

(1) eukaryotic cells (claims 1-2, 5, and 9);
(2) mammalian cells (claims 26, 37, 70, 82 and 94);
(3) human cells (claims 27, 38, 71, 84 and 95);
(4) immune cells (claims 61 and 72); and
(5) lymphocyte cells (claims 29, 40, 62, 73 and 97).

It is noted that the dosage and blood levels of CsA shown by *Holschermann* to reduce NF-κB activity is slightly lower than the dosages and blood levels of CsA taught in the *PDR 1985*, *Griffith I* and *II* references. Accordingly, an even greater reduction in NF-κB activity would result from the prior art administration of CsA to patients as described these references than shown in *Holschermann*. Moreover, regardless whether the effect of CsA in reducing NF-κB activity and resulting monocyte TF activation is direct (by directly affecting monocytes) or indirect (by interfering with stimulatory lymphocytes), *Holschermann* shows that CsA, as administered in the prior art references reduces NF-κB activity and resulting TF gene expression. Thus, its administration to cardiac transplant patients as taught in *PDR 1985*, *Griffith I* and *II* anticipates at least claims 1-2, 6, 8-9, 20-27, 29, 31-38, 40, 64-73, 75-80, 82, 84, 86 and 88-97 of the'516 patent, as set forth in more detail in *Exhibit H-1* of the 90/007,503 Request (incorporated by reference).

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Griffith 1981 and 1984 describe various clinical studies conducted to evaluate use of CsA in transplant patients. The 1985 PDR describes potential use of CsA in transplant patients. None of these references describes method of using CsA that would carry out the method recited in any of the claims. None of these references mention NF-κB, describes any external influence that would necessarily induce NF-κB activity or NF-κB mediated intracellular signaling or describe any effect of CsA necessarily resulting from or mediated through NF-κB. Moreover, I disagree that Holschermann provides any basis for concluding that such elements would necessarily have occurred in any prior use of CsA as described by Griffith 1981 or 1984, or the 1985 PDR. Dr. Verma Declaration ¶¶ 65 and 66.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 58
Art Unit: 3991

Examiner Response:

In response to patentee's arguments against the *Griffith (1981 or 1984)* and *1985 PDR* references individually, it is noted that the above rejection is based on the prior art teaching of these references along with the *Holschermann* evidentiary document. The *Holschermann* document is being cited to demonstrate that the *Griffith (1981 and 1984)* and *1985 PDR* teaching of administering CsA inherently produces inhibition of NF-κB activity within the scope of the instant claims. Accordingly, the prior art references anticipate the instant invention since these references enable the practice of a method that inherently is NF-κB-mediated. Contemporaneous recognition of NF-κB's role in the prior art method is not necessary for anticipation.

2. Patentee Argument: *The claims are directed to methods carried out on cells in which NF-κB activity has first been induced by some inducing stimulus (external influence). Neither the Griffith studies, nor the 1985 PDR identifies an external influence that would have necessarily induced NF-κB activity. Moreover, in the patient studies reported in Griffith 1981 and 1984, CsA was administered before transplantation. As the Examiner indicates, the 1985 PDR teaches CsA should be administered first before and then after surgery. There is no evidence that any of these methods of using CsA described in the pre-April 21, 1989 references art would necessarily involve administration of CsA in cells in which NF-κB activity has first been induced.* Dr. Verma Declaration ¶¶ 65-66 and 68.

Examiner Response:

As pointed out above, *Holschermann* provides evidentiary support for the prior art (Griffith 1981 and 1984; and 1985 PDR) methods *in vivo* "inherent" reduction of NF-κB activity and inhibition of NF-κB regulated intracellular eukaryotic gene expression. *Holschermann* teaches that CsA administration in cardiac transplant patients, as taught by the *Griffith and PDR* references, acts at the cellular level to inhibit NF-κB regulated gene expression (e.g. tissue factor).

The instant claims don't require identification of "an inducing stimulus" or "external influence" occurring in cardiac transplant patients that triggers the release of NF-κB. Additionally, to the extent that patentee is arguing that the references fail to

teach the mechanism of NF-κB activation occurring in these patients, courts have recognized that a mechanism need not be recognized by one of ordinary skill in the art for purposes of inherency.

Regarding, patentee's "first to induce" argument it is again noted that the claims do not specify that cell induction (at whatever level) occurs prior to the cell being contacted with an NF-κB inhibitor. The claims merely require a method that reduces NF-κB activity and inhibits NF-κB regulated gene expression. Additionally, as further discussed in the claim interpretation section *supra*, the instantly claimed invention would encompass administering an NF-κB inhibitor prior to, with or subsequent to the administration of an NF-κB inducing compound.

In any event, the *1985 PDR* reference teaches administeing the NF-κB inhibitor cyclosporine both prior and <u>subsequent</u> to the transplant, thus rendering patentee's "first to induce" argument moot.

Additionally, the *1985 PDR* and *Griffith* references teach <u>treating</u> cardiac transplant patients by administering CsA to "inherently" interfere with the NF-κB pathway (abolish inducible phosphorylation and degradation of IκB) to inhibit an NF-κB regulated effect as taught by *Holshermann*. The prior art teaching of treating patients with CsA is consistent with the patentee argument that the instant claims encompass "providing a <u>therapeutic benefit</u> by intervening in the processes that constitute the NF-κB pathway, are associated with NF-kB activity, and cause subsequent NF-κB regulated effects" (with emphasis). See Response p.30.

3. <u>Patentee Argument</u>: *The accumulated scientific evidence indicates that CsA exerts its clinical effect as an immunosuppressant through its effect on transcriptional factor NFAT. The only potential effect of CsA on gene expression which the 1985 PDR mentions is on expression of IL-2, which the data discussed above indicates is mediated not through NF-κB but through NFAT. Dr. Verma Declaration ¶ 67.*

Application/Control Number: 90/007,503; 90/007, 828                 Page 60
Art Unit: 3991

Examiner Response:

Initially, it is noted that the instant claims don't require the use of an <u>selective</u> NF-κB inhibitor and accordingly, CsA is still within the scope of the instant invention even if it down-regulates gene expression via both NF-κB and NFAT.

Further, it is the position of the Examiner that the accumulated scientific evidence indicates that CsA exerts its effect via an NF-κB mediated mechanism as indicated by:

*Schmidt & Emmel:* CsA inhibits NF-κB mediated IL-2 and HIV protein transcription.

*Brini:* CsA affects NF-κB mediated IL-2 receptor and HIV protein expression via a mechanism that includes interference with the NF-κB/IκB complex.

*Roman-Blas* et al (citing *Frantz et al.* and *Meyer et al.,* ) teaches therapeutic strategies (e.g. arthritis) based on the established role of immunosuppressive agents, including CsA, to inhibit the NF-κB pathway by affecting the NF-κB/IκB complex in murine macrophages, Jurkat lymphoma cells, and mouse and human T-lymphocytes.

*Holschermann* teaches that CsA administered to heart transplant patients interferes in the NF-κB pathway by abolishing inducible phosphorylation and degradation of I-kB to inhibit an NF-κB regulated effect (tissue factor expression).

4. <u>Patentee Argument:</u> *Patentee argues that Holschermann failed to "repeat the use" described in the PDR 1985 and Griffith I and II references noting differences in the timing and amounts of patient CsA administration as well as the further administration of azathioprene and aspirin. Additionally, Holschermann's in vitro manipulation of cells does not reflect what is occurring in the PDR 1985 and Griffith patients in vivo.* Response at pages 69-70; Dr. Verma Declaration ¶¶ 69 and 72.

Examiner Response:

As recognized by the CAFC, "Anticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure." See *In re Donohue*, 766 F.2d 531,533[ 226 USPQ 619] (Fed. Circ. 1985; *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373,1380 [ 67 USPQ2d 1664] (Fed. Cir. 2003).

As discussed in the rejection above, the *PDR 1985* and the *Griffith I and II* documents enable the use of cyclosporine (CsA) to treat cardiac transplant patients.

*Holschermann* provides *ex vivo* and *in vitro* assay (TF-mRNA expression; EMSA determined NF-κB binding activity in lymphocytes and monocytes) evidence obtained from transplant patient (and controls) correlative to human utility to establish CsA's ability to inhibit NF-κB regulated gene (i.e. TF) expression. *Holschermann* further elucidates the *in vitro* and *in vivo* mechanism by which CsA inhibits NF-κB activation.

The patentee has failed to provide any evidence to rebut the *Holschermann* teaching of the inherent effect of CsA upon administration to cardiac transplant patients including those disclosed in the *PDR 1985* and *Griffith* references. Nor has the patentee provided evidence and/or a scientific rationale that the referred to method differences between *Holschermann* and the *PDR 1985* and *Griffith* references would interfere with CsA's ability to regulate NF-κB-mediated gene expression.

A document teaching is presumed operable and enabled absent rebuttal evidence (MPEP § 2121 at 2100-64 to 2100-67). Additionally, the threshold for enabling an anticipatory document is lower than the threshold for enablement under 35 USC 112, first ¶ required for a patented invention. See *Rasmusson v. Smithkline Beecham Corp.* 75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.,* 81 USPQ2d (Fed. Cir. 2006).


5. Patentee Argument: *The authors observed that TF activity appeared to be reduced in PBMC's isolated from some, but notably, not from all patients after being administered CsA. Holscherman Fig. 2B.* .Dr. Verma Declaration, ¶ 70.

Examiner Response: The Examiner disagrees with Dr. Verma's analysis of the data presented in the *Holschermann* assays.

The *Holschermann* assays described in Figures 1-2 and Table 2 teach:

a. Fig. 1: In 10 samples from 10 different cardiac patients, isolated mononuclear cells had markedly increased TF generation after incubation with or without LPS compared with healthy control subjects (unrelated to increased monocyte counts).

b. Table 2: 10 samples of isolated mononuclear cells from 10 cardiac transplant patients before and after daily CsA administration were assayed for the effect of CsA on TF activity. Table 2 demonstrates that the degree of TF activity generated by mononuclear cells was inversely related to CsA blood levels which was reproducible. Additionally,

Application/Control Number: 90/007,503; 90/007, 828      Page 62
Art Unit: 3991

both Fig. 2A and Table 2 show that monocyte TF induction was reduced after CsA application in **all transplant recipients** and "Likewise, a similar inverse relationship between CsA blood concentrations and TF inducibility was observed when highly purified monocytes/macrophages were analyzed instead of whole mononuclear cells (Fig. 2B)". *Holschermann* at page 4234 (with emphasis). Fig.1,2 and Table 2.

Upon review of Fig. 2B it is clear that <u>at least</u> 9 out of 10 patient samples had decreasing TF activity with increasing CsA administration as indicated by negative sloping lines. It's only with respect to the lowest amount of TF activity (about $10ml/10^6$ cells) that CsA administration had only a slight effect on decreasing TF activity that would be expected in light of the small TF sample amount capable of being induced.

Additionally, patentee's argument is not commensurate to the claimed invention, which does not require CsA achieve 100% NF-κB inhibition and/or successfully treat 100% of the patients. In this respect, the Board of Patent Appeals and Interferences held that a method claim limitation reciting "inoculating said plant with <u>a nematode inhibiting</u> strain of *P.Cecapia*" was inherent to the reference Dart inoculating method using a *P.Cecapia* strain in light of patentee's specification page 18 teaching that *P.Cecapia* possessed an 18% nematode-inhibition rating. The Board held that the strain was "nematode-inhibiting" and met the claim that did not recite a specific degree of inhibition. See *Ex parte Novitski*, 26 USPQ2d 1389, 1391 (B.P.A.I. 1993).

6. <u>Patentee Argument</u>: *The only data relating to transcription of the TF gene in patients (Holschermann Fig. 3) fails to demonstrate any link between NF-κB activity and TF expression. In particular, Fig. 3 reports TF mRNA levels in cells directly isolated from patients before CsA treatment (lane 2) and after treatment (lane 5). Holschermann purportedly found significant activation of NF-κB in mononuclear cells directly isolated from patients before CsA treatment (Fig.4), but at the same time, did not observe detectable TF mRNA expression in such cells. (Fig.3, lane 2). These data show that in vivo, there was an apparent lack of correlation between purported NF-κB activity and transcription of the TF gene in the mononuclear cells of the transplant patients. Thus this data fails to support the inference that in transplant patients, TF gene expression is necessarily mediated by NF-κB or caused by induced NF-κB activity. Dr.Verma Declaration ¶ 71.*

Application/Control Number: 90/007,503; 90/007, 828          Page 63
Art Unit: 3991

Examiner Response:

Patentee's analysis is deficient in the following ways.

The *Holschermann* Fig. 3 assay of TF-mRNA expression employs a dye (e.g. ethidium bromide) that is less sensitive than the radiolabel employed in Fig. 4 for detecting NF-$\kappa$B in the EMSA assay and Fig. 3 is a colorimetric assay that is more difficult to visualize than the black and white radiolabel utilized in the Fig. 4 assay, especially when viewing a photocopy of a photocopy.

Upon viewing the original *Holschermann* document, even in black and white, the Examiner was able to visualize in Fig. 3 discernible bands representative of Lane 2 (*ex vivo* unpurified) and particularly Lane 3 (more pure sample), both of which represent the presence of TF mRNA in the *ex-vivo* blood samples. This observation is consistent with the *Holschermann* teaching (p.4235, right column, with emphasis) that

> "Cells obtained from transplant recipients in the presence of low baseline CsA blood levels (sample before CsA administration) **exhibited moderate TF mRNA expression** in the absence of LPS" (representative of Fig. 3 Lanes 2 and 3) and "a strong TF mRNA expression when challenged with LPS" (representative of Fig. 3, Lane 4 which is more readily visible).

Thus, contrary to patentee's argument, the presence of NF-$\kappa$B in human transplant patient's PBM's shown in the EMSA assay Fig. 4 Lanes 1-3 <u>correlates with</u> moderate TF mRNA expression in the same transplant patient as indicated in the Fig. 3 assay.

7. <u>Patentee Argument</u>: *With regard, to the Fig. 4 data, Holschermann provides no indication on how many patients this data is based on, or the degree to which the effect was reproducible from patient to patient.* Dr. Verma Declaration ¶ 72.

Examiner Response:

*Holschermann* (p. 4232, right column under "Methods" to p. 4233) describes the demographics of the ten heart transplant recipients and their "Baseline Patient Characteristics" (see Table 1) from which blood was extracted and purified for use in their assays and further discusses in detail the electrophoretic mobility shift assay (EMSA) utilized (see pp.4233-4234) to obtain the Fig. 4 data.

Application/Control Number: 90/007,503; 90/007, 828          Page 64
Art Unit: 3991

Regarding reproducibility, the article further indicates (p.4236, left column; and Fig. 4) that "In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected" and that the "[S]pecificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides" in which the "[A]nalysis was performed *in triplicate*". See explanation under Fig. 4 page 4236.

8. Patentee Argument: *Regarding the Fig. 4 data Holschermann provides, the apparent decrease in binding in extracts from CsA treated patients cannot be interpreted as showing decreased binding of NF-κB. Several studies (Giffin 2003, Kinoshita et al. 1997) have demonstrated that the consensus sequence that Holschermann used in the EMSA to assess binding of NF-κB binds other transcription factors, such as NFAT. Accordingly, the EMSA binding assay Holschermann used lacked sufficient controls, such as an appropriate antibody control, to confirm that the binding complex reported as being affected by CsA was in fact NF-κB. As the data in Fig. 4 is insufficient to demonstrate that CsA reduced NF-κB binding in the patients Holschermann studied, one could not reasonably infer from this study that NF-κB activity was reduced in all patients during prior use of CsA as described in 1985 PDR, Griffith 1981 and Griffith.* Dr. Verma Declaration paragraph 72.

Examiner Response:

Contrary to patentee's argument, the *Holschermann* document provided further evidence to confirm the NF-κB-mediated affect of CsA on gene expression in PBM's.

The established role of NF-κB in affecting gene expression in monocyte containing PBM's was recognized by the *Holschermann* document "[T]he observed decrease in TF mRNA expression in mononuclear cells obtained during high CsA blood levels led us to *investigate the activation of the transcription factor NF-κB, known to be required for TF gene transcription in monocytes*". See p.4235, right column.

Upon evaluating Fig. 4 data addressing the presence of NF-κB *both* before and after CsA administration, *Holschermann* concluded that "cells separated from the blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. See p.4236, left column.

Accordingly, the Fig. 4 evidence evidence suggests that the transcriptional activation of the monocyte TF gene is inhibited in the presence of high CsA blood

concentrations *in vivo* which acts to prevent the marked activation of the NF-κB transcription factor by its ability to abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB. See p. 4237, 2nd full ¶.

Regarding, the NF-κB consensus sequence utilized by *Holschermann* (5'-AGTTGAG<u>GGGACTTTCC</u>CAGGC-3') this sequence comprises the underlined <u>GGGAATCTCC</u> NF-κB binding sequence which corresponds to that disclosed in the instant patent specification (col. 37, Table 2 : 1st sequence) as well as the patent's "consensus sequence" (see Table 2, last sequence and col. 36, lines 5-15), both of which are suggested for use in EMSA assays.

Although, it is true that the *Giffin and Kinoshita* documents indicate the ability of the transcriptional regulator NFAT to bind an NF-κB binding sequence, unlike NF-κB, there is no evidence of record that NFAT regulates tissue factor (TF) transcription in peripheral blood monocytes (PBM'S). Additionally, there is no evidence of record that the role of NFAT  (and NF-κB) in regulating IL-2 expression is extrapolatable to TF expression in PBM's as alleged by the patentee. In this respect, it is also noted that the instant claims are not limited to exclusive NF-κB regulation of gene expression.

Regarding controls it is noted that *Holschermann* utilized controls employing monospecific antibodies against NF-κB family members in competitiive binding assays in order to ensure binding specificity. See p.4233, bottom ¶ and Fig. 4 description.

Finally, regarding reduced NF-κB <u>in all patients</u>, the instant claims do not require the use of an NF-κB inhibitor that achieves 100% NF-κB inhibition and/or successfully treats 100% of the patients.


9: <u>Patentee Argument</u>: *Holschermann does not provide a sufficient basis from which one could infer that the patients studied were characteristic of transplant patients treated with CsA as described in the cited references published before 1989. Both Griffith 1981 and Griffith 1984 note the effects of CsA in vivo can vary from patient to patient in part from the high incidence of toxicity and various side effects, and considerable variability in blood and tissue levels. Holschermann observed "a high inter-individual variation in monocytes TF inducibility." (p. 11). Dr. Verma Declaration ¶ 74.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 66
Art Unit: 3991

Examiner Response:

Enablement, and not actual reduction, is required for anticipation. As discussed above, the *Holschermann* document (p 4232, right col.under "Methods" to p.4233) describes in detail the demographics of the ten heart transplant recipients and their "Baseline Patient Characteristics" (see Table 1) from which blood was extracted and purified for use in their assays and additionally discusses in detail the EMSA assay utilized (see pp. 4233-4234). Further, patient variability, toxicity and side effects are common variables in any clinical study and the demographics and patient number in the *Holschermann* study would be expected to adequately account for these variables.

Regarding, *Holschermann's* statement of observing a high interindividual variation in monocyte TF inducibility, *Holschermann* goes on to further indicate that their study nevertheless showed that the levels of monocyte TF expression remained essentially constant in individual patients. See *Holschermann* p.4237, right column first full paragraph.

Accordingly, *Holschermann* provides a sufficient basis from which one could infer that the patients studied were characteristic of transplant patients treated with CsA as described in the cited references published before 1989.

8.      Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Reed* et al., J. Immunol. <u>137</u> (7/86): 150-154 as evidenced by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Reed* teaches cyclosporin A (CsA) administration of cells, which, as is shown from *Brini*, inherently reduces NF-$\kappa$B activity and thus would inhibit expression of genes whose transcription is regulated by NF-$\kappa$B activity. The inhibition is done by reducing binding of NF-$\kappa$B to NF-$\kappa$B recognition sites, which also decreases the level of NF-$\kappa$B not bound in a NF-$\kappa$B-I$\kappa$B complex, inhibiting the passage of NF-$\kappa$B into the nucleus of cells, inhibiting modification of an I$\kappa$B protein, and inhibiting degradation of an I$\kappa$B protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-$\kappa$B activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-$\kappa$B. For example, NF-$\kappa$B activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.The *in vivo* effect of CsA in reducing NF-κB activity in human PBM cells isconfirmed by tests using CsA in human PBM cell cultures.

For example, *Reed* taught the prior art use of CsA in human PBM cell cultures that had been induced with phytohaemaglutinin (PHA). In particular, *Reed* teaches that CsA (1ug/ml) significantly reduced PHA induced IL-2 R alpha gene transcription (Figs. 1 and 2) and Tac antigen surface expression (Fig. 3b) in human PBM cells:

> The data presented here demonstrate that CsA and DEX concentrations that inhibited PHA-induced proliferation by about 80 to 90% diminished by about 50% (on average) the expression of receptors for IL-2 on PBMC. This inhibition of IL-2 receptor expression occurred at least in part at a pretranslational level and involved a reduction in both high affinity and low affinity forms of the receptor. *Reed* at 152.

*Reed* also found that CsA reduced IL-2 gene transcription:"1ug/ml CsA and $10^{-4}$ M DEX completely blocked the PHA-induced accumulation of mRNA for IL 2 (Fig. 2)." *Id* at 151.

Several years later, *Brini* also looked at the effect of Cyclosporin A on IL-2 Receptor-α production and Tac antigen surface expression and confirmed *Reed's* results:

> These results are in accordance with Reed et al., who found that CsA inhibits Tac induction in mitogen-activated PBMC. The CsA-mediated reduction in Tac antigen expression on T-cells was reflected by a decrease in the steady state mRNA levels of the IL-2Rα chain (Figure 2). *Brini* at 137 (citations omitted).

*Brini* then went on, however, to show that CsA, as administered in the prior art, reduced binding of NF-κB to NF-κB recognition sites for more than one NF-κB -meditated gene:

> CsA reduced the PHA-induced binding of transacting factors from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figures 3 and 4). *Brini* at 137.

Notably, *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same HIV-1 LTR site as used by the instant '516 patent to assess NF-κB activity and binding. As such *Brini* concluded that CsA regulated IL-2Rα gene expression by reducing activation of NF-κB:

Taken together, these results suggest that one of the effects of CsA in the regulation of the IL-2Rα chain expression in human peripheral T lymphocytes is on the activation of sequence specific DNA-binding proteins which recognize sequences containing the NF-κB binding site. *Brini* at 137.

Using the same inducer, the same immune cells, and the same concentration of CsA as in *Reed*, *Brini* showed that CsA reduced NF-κB activity and NF-κB –mediated IL-2 Receptor-α gene expression in PBM cells. In this respect, the instant '516 patent confirms that the IL-2 receptor alpha (IL-2Rα) gene is regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* and the related human T-cell culture studies discussed below confirm that CsA necessarily and inherently reduced NF-κB activity and resulting gene expression in PBM cell cultures as taught in *Reed,* thus anticipating at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97. A claim element-by-element comparison is provided in *Exhibit H-2* of the 90/007,503 Request (incorporated by reference).

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Reed does not show reduction of NF-κB activity in induced cells, as required by the claims since Reed teaches "CsA was always added to the cells 20 to 30 minutes before other reagents (which included PHA)." Reed at 150.* Declaration of Dr. Verma, ¶¶ 54-55.

Examiner Response:

The feature upon which patentee relies (i.e, *in vitro* cell contacting with inducer prior to contacting with an inhibitor) is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation *supra*, the instantly claimed invention would encompass "pretreating" cells with an NF-κB inhibitor.

Further, the *Reed* reference clearly addresses the ability of CsA to <u>inhibit</u> gene expression in a eukaryotic activated cell : "Although both CsA and DEX inhibited IL-2 receptor expression by about 50%, only CsA blocked the PHA-mediated induction of IL-2 (receptor) responsivity in PBMC cultures". See *Reed* Abstract.

Application/Control Number: 90/007,503; 90/007, 828                    Page 69
Art Unit: 3991

2. <u>Patentee Argument</u>: *As discussed above, none of the data in Brini demonstrate that CsA either reduced NF-κB activity, or provide any basis for concluding that under the experimental conditions Brini used, IL-2 receptor expression was regulated in any way by NF-κB. Brini has no data regarding I-κB, let alone any data regarding degradation or modification of I-κB. Brini also does not provide data demonstrating that CsA inhibited translocation of NF-κB into the nucleus.* Dr. Verma Declararation, ¶ 56.

<u>Examiner Response:</u>

The argument that *Brini* fails to provide evidence linking CsA inhibition to NF-κB fails to appreciate the whole *Brini* reference teaching of CsA inhibition via NF-κB including teaching a mechanism involving inhibition of PPIase (*Brini* at page 137). The following is a summary of the *Brini* teaching:

A. Fig. 1: in vitro gel mobility shift assays using 245-291 IL-2Ralpha enhancer and HIV LTR enhancer comprising NF-κB binding sequences showed the same band increased with PHA was inhibited by CsA treatment 24 and 48 hours post-activation. See Abstract; page 132-133, Fig. 1; page 137, left column at top.

B. Fig. 2: northern blot IL-2Ralpha chain mRNA in human peripheral blood T-cells: "IL-2Ralpha mRNA's were readily induced by PHA and pretreatment with CsA at 1ug/ml before cell activation caused a significant inhibition of the of IL-2Ralpha mRNA induction" (page 134, left column). "The CsA-mediaed reduction in TAC antigen expression on T-cells was reflected by a decrease in the steady state mRNA levels of the IL-2Ralpha chain (Figure2)" (page 137 at top).

C. Fig. 3: T-cell nuclear extracts (gel mobility shift assay): gel retardation pattern using radiolabeled 245-291 IL-2Ralpha chain enhancer oligonucleotide sequence containing NF-kB binding sequence. Showed that "… CsA blocked the activation of specific transacting factor(s) able to interact with the regulatory sequence of the IL-2Ralpha." (page 135, left column).

D. Fig. 4: T-cell nuclear extracts (gel mobility shift assay): gel retardation patter using radiolabeled HIV-1 LTR oligonucleotide sequence containing NF-kB binding sequence. Showed the same pattern of binding activity as 245-295 IL-2 enhancer in Figure 3. See abstract; pages 134-135.

E. Figure 4: T-cell nuclear extracts (gel mobility: competitive binding assay) PHA-stimulated T-cells incubated for 15 minutes with 50-fold excess of unlabeled double stranded oligonucleotides of IL-2Ralpha, HIV-1 LTR or AP-1 site prior to addition of corresponding radiolabeled sequences. Unlabeled 291-245 IL-2Ralpha and unlabeled HIV-1 LTR blocked the formation of the corresponding radiolabeled oligonucleotide sequences. Pages. 135-136 and Figure 5 description.

Application/Control Number: 90/007,503; 90/007, 828          Page 70
Art Unit: 3991

In accordance with the Fig. 3 and 4 data *Brini* concluded that "CsA reduced PHA-
induced binding of transacting factors from T-cells and kB-like sequences which are
present in the IL-2Ralpha gene and in the HIV-1 LTR (Figures 3 and 4)" page137,
bottom ¶.

3. Patentee Argument: *The Brini 1990 inherency document fails to "repeat the use"
described in the Reed 1986 prior art document noting the following differences:*

Reed 7/86:                                          *Brini 9/90*
*PHA + PMA*                                         *PHA alone as inducer*
*PBMs (human peripheral blood mononuclear cells)*   *>95% pure CD3 T-lymphocytes)*

*It is further asserted that PBM cells (Reed at page 150):
a. do not refer to a single defined cell type but include a heterogenous cell population
comprised of T and B lymphocytes, NK cells, moncytes and macrophages;
b. vary depending upon protocol and conditions of isolation;
c. studies reported conflicting data in PBM cells regarding the particular endpoint Reed
measured, IL-2 receptor alpha expression.
See Attorney 11/17/06 Response pages 70-71; Dr. Verma Declaration ¶¶ 58-59 citing
Exhibit 15: David et al. Blood (1998) 165-172 at pages 165 and 170-171.*

Examiner Response:

        Initially, it is noted that the reference method must be enabled but there is no
legal requirement that the inherency evidence "repeat the use" as alleged by the
patentee.

        With respect to the first purported difference, the patentee is in error since both
*Reed* and *Brini* teach PHA alone as an inducer.

        With regard to the second difference addressing cell population (*Brini* human T-
cell vs *Reed* human PBM cells) and the citation of the *David* article, the following is
noted:

        Regarding different cell types, although the *David* article teaches that *Reed's*
heparinized Ficoll-Hypaque purified human PBM cells most likely comprise a
heterogenous cell population (T and B lymphocytes, NK cells, monocytes and
macrophages) it is noted that the the *David* article teaches that B lymphocytes failed to
express any IL-2R chains (Abstract, lines 8-9) and "[I]t has been shown that CsA acts

Application/Control Number: 90/007,503; 90/007, 828　　　　　　　Page 71
Art Unit: 3991

primarily on T lymphocytes sparing the immunocompetence of B cells and macrophages" (*Kronke* PNAS USA 81, 5214-5218 at 5214 left column, 1st full ¶).

In this respect, *Reed* specifically addressed in its assays the ability of CsA to inhibit PHA-mediated induced expression (e.g. IL-2R) <u>in T-cells</u> (e.g. see *Brini* abstract) by using a monoclonal antibody (anti-Tac or IgG2a) specific for activated and functionally mature human T-cells. See *Reed* at page 151, left column. Accordingly, it is clear that *Reed* was assaying IL-2 receptor alpha expression of a PBM T-cell fraction which is consistent with the *Brini* documents' acknowledgement of the *Reed* teaching that CsA inhibits IL2R alpha chain (Tac) surface expression in human mitogen (PHA) activated PBMC (*Brini* at page 131, right column).

In fact, <u>both</u> *Brini* and *Reed* address by assay, the ability of CsA to inhibit expression of a specific IL-2 receptor subunit using *anti-Tac monoclonal antibody* for activated and functionally mature human T-cells (See *Brini* at page 131, right column to page 132, left column and page 132, right column under "Flow cytometric analysis"; and *Reed* at page 151, left column, 1st ¶ and summary of citations (13) and (14) on p.154). In this respect, the *David* document does not address the *Brini and Reed* use of specific monoclonal assays (with controls) to target T-cell specific IL-2 receptors.

Regarding, the problems of IL-2R subunit expression being sensitive to blood collection and PBMC preparation (*David* p.171) and conflicting prior art data regarding IL-2R expression (*David* p.170, right column), it is noted that the *David* document teaches that using a blood collection and PBMC preparation protocol, such as heparinized Ficoll-Hypaque purified PBM cells (employed by both *David* and *Reed*) serves to address these problems.

4. <u>Patentee Argument</u>: *In support of his arguments regarding Reed, the Examiner also contends that "expression levels of IL-2 Receptor-alpha is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T cells." (8/2/06 Office Action at p.26). As noted before, the Examiner's interpretation of the '516 patent is erroneous as the passage the Examiner cites to notes only that " NF-κB is induced in T cells...by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene..." (Office Action at 25). As discussed above, the data in the '516 patent indicate that treatment of T cells with PHA alone does not result in any measurable activation of NF-κB, in*

*contrast to treatment with PMA, or PMA in combination with PHA. Moreover, the '516
patent examples the Examiner refers to (Fig. 24) were conducted with a human T-cell
lymphoma cell line, and not under the experimental conditions of Reed using PBM cells.*
Dr. Verma Declaration ¶ 60.

Examiner Response:

As pointed out in the rejection above, the *Brini* document suggests the mechanism

that produces *Reed's* CsA inhibition of T-cell expression of IL-2R alpha that is further

supported by patentee's own specification statement now produced in context:

> Recently, NF-kappa.B has been implicated in several other inducible systems.
> For example, <u>NF-kappa.B is induced in T-cells</u> by a trans-activator (tax) of HTLV-
> 1 or <u>by PMA/PHA treatment and thereby activates the IL-2 receptor .alpha. gene</u>
> and possibly the IL-2 gene. Bohnlein et al., Cell, 53:827-836 (1988); Leung, K.
> and G. Nabel, Nature, 333:776-778 (1988); Ruben et al., Science, 241:89-92
> (1988); Cross et al., Science, (1989); and Lenardo et al., Proc. Natl. Acad. Sci.
> USA, 85:8825-8829 (1988). '516 patent, col. 17, lines 20-28 (relevant part
> underlined).

Accordingly, both *Brini* and the instant patent (see underlined text above) teach that

PHA (and/or PMA as underlined above) activation of T-cells would release NF-κB and

affect protein expression. See also instant patent at col. 35, lines 13-20 (role of

activated NF-κB in transcription of IL-2R alpha).

The instant patent's Fig. 24 A displays the presence of NF-κB in nuclear extracts

prepared from Jurkat cells (human T-leukemia cells) stimulated by PHA, PMA or PHA

and PMA.

Patentee's statement that the '516 patent indicates in Fig. 24A that treatment of T

cells with PHA alone does not result in any measurable activation of NF-κB is not

accurate since "…extracts made from Jurkat cells which had been stimulated either with

PHA or PMA *contained detectable levels* of NF-κB". See instant patent col. 72, lines 65-

col. 73, line 6 and Fig. 24A, lane 5.

Accordingly, to the extent that the Fig. 24A data regarding <u>PHA activation in

Jurkat cells</u> *is even relevant* to <u>PHA activation in normal human T-cells (Brini and

Reed)</u>, measurable NF-κB activation in Jurkat cells did occur.

In any event, with respect to IL-2Rα  expression, *Brini* recognized that CsA

shows no inhibitory effect on surface expression of IL-2Rα  in the human Jurkat  T-cells,

in contradiction to the ability of CsA to  inhibit PHA induced  IL-2Rα  expression in

normal T-cells (as in *Brini*) and PBMC (as in *Reed*). See *Brini* p.131, right column (see

also *Brini* teaching of CsA inhibition of Tac or IL-2Rα surface expression in murine

thymocytes).

Accordingly, the Fig. 24A data showing detectable, but small NF-kB amounts in

PHA activated Jurkat leukemic T-cells, is consistent with the inability of CsA to inhibit IL-

2Rα expression in these cells as recognized by *Brini*.


5. Patentee Argument: *Regardless, we know now that CsA affects the activity of NFAT,
not* NF-κB. Dr. Verma Declaration ¶ 60.

Examiner Response:

It is noted that the instant claims do not require the use of a selective NF-κB

inhibitor. Accordingly, CsA is within the scope of the instant invention even if it down-

regulates a protein's expression via **both** NF-κB and NFAT.

In contradiction to patentee's argument, the accumulated scientific evidence

indicates that CsA exerts its effect via an NF-κB mediated expression mechanism for

different proteins (IL-2, IL-2 receptor: IL-2Rα  and Tissue factor or TF) in different

human and viral cell types:

*Schmidt and Emmel* references teach that CsA acts on NF-kB mediated IL-2
and HIV protein transcription.

*Brini* reference teaches that CsA affects NF-kB mediated IL-2 receptor and HIV
protein transcription including teaching a mechanism of action (at the level of the NF-κB
-IkB complex: inhibition of PPIase activity). CsA inhibits IL-2Rα  chain expression in T-
cells by NF-κB -like protein.

*Roman-Blas*  (citing Frantz et al. and Meyer et al.) The Roman-Blas document
teaches therapeutic strategies (e.g. arthritis) based on the established role of
immunosuppressive agents, including CsA, to inhibit the NF-κB pathway by affecting

the NF-κB-IκB complex in murine macrophages, Jurkat lymphoma cells, and mouse and human T-lymphocytes.

Holschermann teaches that CsA administered to heart transplant patients interferes in the NF-κB pathway (by abolishing inducible phosphorylation and degradation of IκB) to inhibit an NF-κB regulated effect (tissue factor expression).

9.     Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Kronke* et al.(PNAS USA 81 (8/84) 5214-5218) or *Siebenlist* et al.(Mol. And Cell Biol. 6 (9/86) 3042-3049) as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August 1990), *Emmel* et al. Science, 246 (Dec. 1989):1617-20 and the *Dr. Manolagas Declaration*. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Kronke*, or *Siebenlist* teach cyclosporin A (CsA) administration of cells, which, as is shown from the teachings of *Schmidt and Emmel*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The effect of CsA on reduction of NF-κB activity as administered in the prior art is also confirmed by tests involving the use of CsA in human T-cell (Jurkat) cultures including two prior art references, *Kronke* and *Siebenlist*. Using the same inducers, the same human immune cells, and the same concentration of CsA taught in *Kronke* and *Siebenlist*, *Schmidt* and *Emmel* provide confirming extrinsic evidence that the use of CsA in Jurkat cells reduced NF-κB activity. Thus, CsA is clearly recognized to have necessarily and inherently reduced NF-κB activity and resulting gene expression in those cells as called for by the instant claims. *Kronke* and *Siebenlist* each disclosed the use of phytohaemaglutinin (PHA: 1ug/ml) and PMA (50ng/ml) to induce human T-cells (Jurkat cells). These compounds are described in the instant '516 patent as being inducers of NF-κB activity (see e.g., '516 patent, col. 33, lines 52-59). *Kronke* and *Siebenlist* also reported on the effect of 1ug/ml CsA (among other concentrations) on

the cell cultures. Both references report that IL-2 (also known as "TCGF") gene transcription and/or expression was increased with administration of the NF-κB inducers phytohaemaglutinin (PHA) and phorbol 12-myristate-13-acetate (PMA), and that such induced IL-2 expression was reduced by CsA:

> The results of our study demonstrate that TCGF [IL-2] mRNA accumulation in induced Jurkat cells is diminished by CsA in a dose-dependent manner and that CsA acted by blocking TCGF mRNA transcription. *Kronke at page 5217.*

> \*         \*         \*         \*

> CsA at 1 ug/ml ... prevented IL-2 message induction. *Siebenlist at page.3044, Fig. 2.*

Using the same conditions and the same EMSA and CAT reporter assay formats as described in the instant '516 patent, the *Schmidt* reference clearly demonstrates that CsA as utilized in the *Kronke and Siebenlist* references reduced NF-κB activity in Jurkat cell cultures. *Schmidt* reported, however, that there were inducers of NF-κB, which had different mechanisms of induction than PHA-induction, for which CsA had no effect. Specifically, *Schmidt* found that phorbol 12-myristate-13-acetate (PMA)-mediated induction of NF-κB activity was not affected by CsA. The NF-κB CAT reporter assay confirmed this data, as depicted in Figure 4 ("CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039).

Similarly, *Emmel* describes the effect of 1ug/ml of CsA on NF-κB activity in Jurkat cells that had been induced with both PHA and PMA. As shown in Figure 1, 1ug/ml CsA (among other concentrations), reduced NF-κB activity ("NF-κB binding was reduced 10-20% in nuclear extracts of CsA-treated cells": *Emmel* at 1618). Furthermore, a CAT assay confirmed these results, as shown in Figure 2d (*Emmel* at 1618) which demonstrates that CsA significantly reduced NF-κB activity at the same 1ug/ml concentration taught in *Kronke* and *Sibenlist*, as shown by the reduced expression of the NF-κB regulated CAT gene in those cells.

Thus, as discussed above, and in the *Dr. Manolagas Declaration* (*Exhibit J:* ¶¶ 25-32 of 90/007,503 request: incorporated by reference), Schmidt and Emmel confirm that *Kronke* and *Siebenlist,* which disclose the inhibitory effect of CsA on NF-κB activity in Jurkat cell cultures, anticipate claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97of the '516 patent (and as shown in *Exhibit H-3* of 90/007,503 request: incorporated by reference).

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

Application/Control Number: 90/007,503; 90/007, 828          Page 76
Art Unit: 3991

1. Patentee Argument: *None of experiments in Siebenlist describe use of CsA in cells* ***first induced*** *with PHA and PMA and therefore none of the methods of using CsA that Sienbenlist describes would have reduced either induced NF-κB activity or induced NF-κB -mediated intracellular signaling. Kronke describes only a single experiment in which cells were treated with CsA after exposure to PHA/PMA, and concludes in the title of Table 1 "CsA does not inhibit PHA- and PMA- induced expression of TCGF receptors in Jurkat cells." Moreover, as is evident from Fig. 4, CsA treatment appeared to have a significant effect on IL-2 expression only when CsA was added either before or with PHA/PMA treatment, but not when added after cells had been induced with PHA/PMA. Kronke at 5217. Indeed, when added four hours after induction, CsA did not alter TCGF (IL2) mRNA levels. Id. at 5216. These data suggest that while treatment with CsA appeared able to prevent induction of IL-2 expression, it had no substantial effect on induced IL2 expression.* Declaration of Dr. Verma, ¶ 63.

Examiner Response:

The feature upon which patentee relies (*in vitro* cell contacting with inducer prior to applying an inhibitor) is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering an NF-κB inhibitor prior to, with or subsequent to the addition of an NF-κB activating compound.

Even assuming arguendo, that cell activation must precede inhibition as argued by the Patentee, the *Siebenlist* reference teaching encompasses Jurkat cell activation preceding CsA inhibition.

Initially, as discussed in the rejection above, *Siebenlist* clearly teaches CsA inhibition (or modification or reduction) of IL-2 expression in a eukaryotic or mammalin Jurkat cell resulting from an external stimulus (PHA and PMA) within the scope of the instant claims.

Additionally, *Siebenlist* teaches that "Jurkat cells were stimulated with PHA and PMA for the times indicated" (Fig. 2B bands) which demonstrated that "Jurkat cells are **rapidly inducible** for IL-2 with substantial amounts of IL-2 message apparent after 2.5 h of stimulation (with emphasis). High message levels for IL-2 were observed for well over 8.5 h (Fig. 2B)" (See *Siebenlist* right column, lines 15-20).

Siebenlist further teaches that "In the case of Jurkat cells, a 2.5- and 4.5-h stimulation were done also **in the presence of** CsA at 1ug/ml (see text), which prevented IL-2 message induction". See Figure 2. last two lines and Fig. 2B, last 2 bands.

The Siebenlist reference teaching of PHA and PMA stimulation done in the "presence of" CsA reads (chronologically) on addition of CsA either during or separately adding after PMA and PHA addition. Additionally, the rapid appearance of IL-2 message would support Jurkat cell activation prior to the action of CsA to further "prevent" ("or inhibit" or "diminish" or "modify") additional IL-2 message induction.

Patentee's arguments regarding Kronke are equally non-persuasive.

Patentee's Table 1 argument regarding Kronke's prior teaching (endnote 25) of lack of CsA inhibition of **IL-2 alpha- receptor** expression in Jurkat cells is not relevant to the rejection above regarding expression of **IL-2 (or TCGF)** in cloned leukemic T cells (Jurkat, subclone 32).

Patentee's second argument regarding Fig. 4 ("Time course of CsA action") that CsA only had a "significant effect on IL-2 expression" when introduced prior (1 hr: see circular first band, Fig. 4A) or "concurrent" with PHA and PMA (0 hr: see circular second band) is not persuasive since such an argument is not commensurate to the instant claims which do not recite a degree of inhibited expression.  In this respect, Fig. 4A circular bands 3-5 representing CsA administration 30 min, 1hr and 2 hr clearly demonstrate inhibition of TGGF (IL-2) expression as compared to the larger circular band representing the 6 hr induced (PMA and PHA) Jurkat cell. See also Kronke discussion of Fig. 4 on page 5216, right column 2nd full ¶.

Additionally, "As shown in Fig. 4, 1 hr preincubation or concurrent administration of CsA resulted in almost complete inhibition of TCGF mRNA production" (with emphasis) (Kronke at page 5216, right column). Both Fig 4a (2nd spot compared to uninduced and Induced) and Fig. 5 (lanes 3-5 compared to lanes 1 and 2) teach the concurrent administration inhibited but did not prevent IL-2 expression nor did it preclude cell activating signaling and transcription.

As discussed in the rejection above, *Kronke* clearly teaches CsA inhibition of IL-2 expression in a mammalin Jurkat cell resulting from an external stimulus (PHA and PMA) within the scope of the instant claims. See *Kronke page 5215 and Fig. 1; and pages 5216, right column ("CsA inhibits TCGF Gene Transcription") to 5217, left column and Fig. 4 and 5 with Table 2; and page 5217 under "Discussion to page 5218.*

### III.    VITAMIN D (CALCITRIOL) (references prior to 12/24/86):

10.    Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Tsoukas* (Science 224 (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74 (8/84) 657-61), *Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. 74 (10/84) 1451-5) or *Manolagas* et al. (JCE&M, 63(1986) 394-400 as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the *Declaration of Dr. Manolagas* (¶¶ 7-24) provided in the 90/007,503 request. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Tsoukas, Manolagas, Lemire I, Lemire II* or *Rigby I* teach administration of calcitriol to humans, which, as is shown from the teachings of *Yu*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

Calcitriol (1,25-dihydroxyvitamin $D_3$) is the active form of Vitamin D that has been administered to humans for decades.

There are numerous prior art publications that report the study of calcitriol in various human cell cultures, including human Jurkat (T-cell line) leukemic cells (citations omitted) and human peripheral blood monocyte ("PBM") cells, including *Tsoukas* (PBM), *Manolagas* (PBM) *Lemire I, Lemire II* and *Rigby I.*

*Tsoukas* and *Manolagas* teach that the administration of calcitriol (at least $10^{-8}$ M) in PBM cells reduced IL-2 activity; a result which was confirmed by *Lemire I, Rigby I* and *Lemire II* (e.g. *Lemire II* at 3034 demonstrated that calcitriol exhibited "a dramatic and specific reduction of IL-2 production by activated PBM ...").

Independent studies show that IL-2 expression is regulated, at least in part, by NFκB . See *Manolagas Declaration* at page 8, ¶ 15 and documents cited therein.

*Yu* et al. under the same conditions utilized in *Tsoukas* and *Manolagas* (i.e. calcitriol application to PHA activated PBM cells) found that calcitriol reduced NF-κB as well as NF-κB –regulated gene expression in PBM cell cultures. *Yu* described the use of Electrophoretic Mobility Shift Assays ("EMSAs" as in Ex.15 of the instant '516 patent) and the NF-κB binding sequence of human IL-6 promoter to demonstrate (by EMSA) that calcitriol administration "caused a significant reduction in the DNA-protein complex, as evidenced by the decrease in the intensity of this band (lane 4)" (see *Yu* at 10993 and Fig. 5). This data was confirmed using Western blot analyses (Figs. 1 and 3), which showed that calcitriol added to PHA-activated cells (as taught in *Tsoukas* and *Manolagas*) "caused a significant decrease in the expression of p50 [subunit of NF-κB] at all time points examined". *Id.* at 10991-2.   In an analogous manner in human Jurkat leukemic cells transfected with a CAT gene regulated by NF-κB and activated with PHA, *Yu* found that calcitriol cell application resulted in reduced NF-κB gene expression. See Yu at 10993.

Although the mechanism may not have been known at the time of the *Tsoukas, Manolagas, Lemire I, Lemire II* and *Rigby I* publications, the *Yu* reference evidence proved that the administration of calcitriol by these prior art references necessarily and inherently reduced NF-κB activity in induced human cells (PBM/Jurkat) and reduced expression of NF-κB-regulated proteins (IL-2). Thus, these prior art references anticipate at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 of the '516 patent as shown on an element-by-element basis in *Exhibit H-4, H5 and H6* of the 90/007,503 request (incorporated by reference).

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

Additionally, upon further consideration, the above rejection has been modified to withdraw the *Rigby II* reference that is cumulative.

1. Patentee Argument: *The cited publications describe experiments conducted in various types of cultured cells. None of these publications describe methods for using calcitriol in humans.* Dr.Verma Declaration ¶ 109

Application/Control Number: 90/007,503; 90/007, 828                    Page 80
Art Unit: 3991

Examiner Response:

Anticipation requires an enabling disclosure, not actual practice. The cited prior art, as well as the state of the prior art, as discussed in the *Manolagas Declaration* (items 1-10), teach the biological activities such as calcium metabolism, cell division, differentiation; and immunosuppression in humans of Vitamin D and its active metabolite 1, 25-dihydroxyvitamin $D_3$ (calcitriol) and present laboratory evidence correlative to *in vivo* utility. An applicant (enabling a patent claim) or an examiner (enabling a reference) need not provide data from human clinical trials to establish utility for an invention or for enablement of a reference. This is especially true regarding references that are presumed operable and enabled absent rebuttal evidence (MPEP § 2121 at 2100-64 to 2100-67).

2. Patentee Argument: *With the exception of Rigby I, the other prior art documents fail to administer calcitriol to cells in which NF-κB activity has first been induced by an external stimulus. Tsoukas 1984 and Lemire I simultaneously stimulate (with PHA or other activators) while Lemire II either pretreat or simultaneously treat with calcitriol.* Dr.Verma Declaration ¶¶ 111-114.

Examiner Response:

As discussed *supra*, the two steps upon which patentee relies (*in vitro* cell contacting with inducer underlined followed by applying an inhibitor) are not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instant invention encompasses administering an NF-κB inhibitor prior to, with or subsequent to administering an NF-κB activating compound.

Further, in contrast to patentee's argument, the prior art references establish the ability of calcitriol to "inhibit" protein (e.g. IL-2) production in an "activated" mammalian or eukaryotic cell(s) whether coincubated or subsequently contacted with an already actived cell as in *Tsoukas 1984* (Abstract, page1438 and Table 1) which teaches that vitamin D3 (calcitriol) "inhibited IL2" production in PHA "induced" human peripheral blood mononuclear cells (PBM) leucocytes when coincubated with PHA.

Similarly, *Manolagas 1986* taught the ability of calcitriol in the presence of PHA and calcium (Fig. 3) or a calcium chelator (EGTA) (Fig.4) to inhibit "PHA-activated PB*M". See also abstract.*

Contrary to patentee's argument, both the *Lemire I and II* references read on two separate steps with activation preceding the addition of calcitriol.

In *Lemire I*, human PBM cell cultures were activated with pokeweed mitogen (PWA), PHA or dermatophyton at the initiation of the culture period followed by the addition of $1,25-(OH)_2-D_3$ *(see p. 658 "Culture conditions" and p 659).*

Similarly in *Lemire II* (see pages 3032 under "Cell culture conditions" to top of page. 3033 (top)) the cells are first activated with PWA, concanavalin A or PHA followed by the addition of $10^{-8}$ M $1,25-(OH)_2$ which serves in the assays to suppress Ig production (see page 3033 under "Results and Discussion" and page 3034 right column: "... dramatic and specific reduction of IL-2 production by activated PBM incubated with $1,25-(OH)_2,-D_3$).

However, even if *Lemire I or II* is drawn to a single co-administration step, as alleged by the patentee, it is clear from both of these documents that calcitriol is inhibiting DNA syntheses and Ig production (IgG and IgM) production in *already activated cells* (See *Lemire I,* page 658, right column; *Lemire II* Abstract; page 3033 right col. under "Results and Discussion" and p. 3034, bottom right column).

3. Patentee Argument: *Yu (1995) fails to "replicate (or reproduce) the conditions" of the prior art references by use of a different PBM cell sample. Yu differs by using an additional Ficoll purification step to remove adherent monocytes which "constitutively" (i.e. naturally and therefore not stimulus induced) possess a vitamin D receptor (VDR) to obtain a non-adherent fraction comprising T and B lymphocytes, NK (natural killer) cells, monocytes and macrophages (citing David et al. Blood 1998 reference). In regard to evaluating the effects of calcitriol, removing the adherent (and calcitriol responsive) monocytes from the cell population would most likely hava a substantial effect on the overall effect of calcitriol in the cell culture."* See Dr. Verma Declaration ¶¶ 115-117; 11/17/06 Amendment at pages 72 and 73 reciting Trial Testimony day 13, page 17 Manolagas Deposition.

Examiner Response:

Contrary to patentee's argument, evidence of an inherent property or effect present in a prior art document(s) need not be demonstrated by "repeating the use" of that prior art document.

As recited in the rejection above, the prior art references (*Tsoukas, Lemire I, Lemire II and Rigby I*) teach that contacting peripheral blood monocyte cells with calcitriol inhibits PHA-activated cytokine expression and the *Yu (1995)* document provides extrinsic evidence to reasonably support that calcitriol's <u>immunological effect</u> is mediated by NF-κB.

With respect to patentee's assertion of the absence of the adherent monocyte fraction producing a "substantial effect" on calcitriol's effects in culture, it is not seen how the *Yu (1995)* teaching of *NF-kB involvement* in calcitriol protein inhibition of activated PBM's in its assays would differ from that expected in the prior art PBM samples.

Further, patentee's argument is not supported by subsequent evidentiary references including those submitted by the patentee which cite the *Yu(1995)* findings regarding NF-κB involvement in calcitriol protein inhibition in PBM cells.

In this respect the *Adams document* (p.2948, right col.) acknowledges the cell line specificity of NF-κB activity and additionally cites references that teach the <u>decreased NF-κB activity relating to calcitriol's inhibition of cytokine expression in PBM's</u> including the *Yu (1995)* teaching of the following:

- Down-regulation of NF-κB protein levels in activated human lymphocytes by vitamin D3;
- Jurkat T cell calcitriol treatment's decrease in activation of an NF-κB -CAT reporter gene and
- Calcitriol's ability to decrease DNA binding of NF-κB subunits in human lymphocytes, *through inhibition of expression of the p50 NF-κB subunit and its precursor p105*

Similarly, citing *Yu (1995),* the *Takeuchi* document indicates that " … it has been shown that 1 alpha, 25(OH)$_2$D$_3$ down-modulates NF-κB p50 protein and its precursor, p105 , in

human peripheral lymphocytes" which supports in a manner analogous to corticosteroids "... the involvement of *NFAT and* NF-κB in 1 alpha, 25(OH)$_2$D$_3$ mediated effects ... by which the steroid hormones exert their effects by targeting other transcription factors. ". *Takeuchi* at p.210, left col.

Each of the instant claims require "reducing NF-kB activity". The *Yu (1995)* teaching of calcitriol's <u>inhibition of NF-κB expression</u> in PBM's cells <u>would necessarily</u> "reduce NF-κB activity" and "reduce NF-κB mediated intracellular signaling" along every segment of patentee's intracellular proposed NF-κB messenger mechanism including interference at the level of the cytoplasm NF-κB / I-κB complex, translocation and nuclear protein expression.  See also *Declaration of Dr. Thomas D. Gilmore* pages 6-7, ¶ 14 *supra* under "claim interpretation" defining "reducing NF-κB activity" to encompass "altering the concentration or availability of NF-κB".

4. <u>Patentee Argument</u>: *Regarding the Yu (1995) Fig. 1 data evaluating the effects of calcitriol on NF-κB expression in PHA-activated human lymphocytes, there is no correlation between the time course for the processes measured in the earlier studies, such as IL-2 production and proliferation, and the purported inhibitory effects of calcitriol on NF-κB. In particular, Yu (1995) reports that substantial induction of p50 NF-κB expression occurred only 72 hours after treatment of PBMCs with PHA, with virtually no induction detectable at 24 hours (Yu 1995 at 10991; Fig. 1). In contrast, earlier studies observed that IL2 production peaked no later than 24 hours after PHA treatment. From this data, there is no basis for concluding that IL2 production was linked to induction of NF-κB activity. Dr. Verma Declaration ¶118.*

<u>Examiner Response</u>:

As discussed above, the *Yu(1995)* evidence need not "repeat the use" of the prior art references . Accordingly, the *Yu (1995)* assay results performed using their own samples and experimental conditions stand alone for their teaching of NF-κB involvement in calcitriol immunoregulation of human PBM's cells.

In this respect, the *Yu(1995)* document teaches that NF-κB in human lymphocyte samples was detectable in both the cytoplasm and nucleus by an anti- p50/ p105 antibody within 24 hours of PHA activation and "increased progressively" over a period of 72 hours. See *Yu (1995)*, right column.

Thus, the *Yu (1995)* document provides evidence of the presence of NF-κB in the prior art PBM's samples upon being contacted with PHA.

The constitutive or PHA- induced presence of NF-κB in immunological cells (e.g. B or T-cells) as indicated by the *Yu (1995)* evidence is consistent with the teaching of the instant patent. See col. 17, lines 20-52; col. 26, lines 40-46; col. 29, lines 46-56; col. 30, lines 40-55; and col. 68, lines 34-56.

It is further noted that *Yu (1995)* teaches the ability of calcitriol to inhibit the presence of NF-κB (p50 and p105) when added simultaneously with PHA or 24, 48, 64, 68 or 70 hours following addition of PHA. See *Yu (1995)* p. 10992, left col.; and Fig. 3.

5. Patentee Argument: *The CAT reporter experiments (Yu 1995: Fig. 6) do not reproduce any use of calcitriol described in the cited primary reference since the transfected Jurkat cells used by Yu differ significantly from the PBM cells and Jurkat cells used in the prior studies. In particular, the artificial (quadruple repeat) NF-κB binding site, on which the reporter construct was based, is not found in any endogenous gene, and would not have been present in any of the cells used in the earlier studies. There is no basis for assuming that the response of this reporter construct reflects the regulation of any endogenous gene. These CAT data therefore provide no basis for assuming that calcitriol, as used in the prior studies, would have necessarily affected NF-κB mediated gene expression.* Dr. Verma Declaration ¶¶ 121-122.

Examiner Response:

As discussed above, the *Yu (1995)* assay results performed using their own samples and experimental conditions stand alone for their teaching of NF-κB involvement in calcitriol immunoregulation of human PBM's cells.

In utilizing an "artificial" NF-κB consensus sequence quadruple repeat construct p(NF-κB)$_4$-CAT in human leukemic T-cells (Jurkat cells) the *Yu (1995)* document teaches that calcitriol inhibits NF-κB regulatory sequence driven transcription. See *Yu (1995)* page 10993, left column 2nd full ¶ and Fig. 6.

More particularly, the use of this "artificial" NF-κB repeat construct "demonstrated that the inhibiting effect of 1,25(OH)$_2$D$_3$ on NF-κB protein syntheses is of functional relevance to NF-κB -driven transcription" and additionally that the "inhibiting effect of the activity of this promoter by decreasing the levels of such proteins induced

Application/Control Number: 90/007,503; 90/007, 828                    Page 85
Art Unit: 3991

following lymphocyte activation rather than through a direct interaction of the 1,25 $(OH)_2D_3$ receiver with this DNA segment". [6]  *Yu (1995)* page 10994, left column.

As pointed out by *Yu (1995)*, the structure of the "artificial" NF-κB consensus sequence (in tandem) would ensure that "its transcription activity can be regulated only by proteins that recognize this consensus sequence." See *Yu (1995)*, left column. Accordingly, there is a scientific basis for assuming that the response of this reporter construct would reflect endogenous gene regulation mediated by NF-κB consensus sequence(s).

Thus, the *Yu (1995)* document provides evidence of NF-κB's role in activated cytokine gene expression which is consistent with the instant patent's teaching that cytokine (e.g. interferon) gene expression is activated, at least in part, by induction of NF-κB. See instant patent col. 13, lines 14-28; and col. 14, lines 40-60.

6. <u>Patentee Argument</u>: *The CAT reporter (Yu Fig. 6) and EMSA (Yu Fig. 5) assays do not replicate the use of calcitriol in already induced cells as required by the claims because the cells were pretreated with calcitriol for 40 hours before being stimulated with PHA in the CAT assay and the cells were simultaneously treated with both calcitriol and PHA in the EMSA assay.* Dr. Verma Declaration ¶¶ 122 and 124.

<u>Examiner Response</u>:

*Yu (1995)* need not reproduce the use but need only provide an enabling teaching for purposes of anticipation. Additionally, the patentee's arguments are not commensurate in scope since the instant claims do not require the performance of an assay (CAT reporter assay, EMSA or otherwise) nor the conditions relating thereto.

7. <u>Patentee Argument</u>:  *Regarding the electrophoretic mobility shift assay (EMSA) and Yu (1995) results in Fig. 5, it is questionable, absent appropriate antibody or mutational controls, that the bound complex (lane 4) represents <u>only</u> NF-κB binding activity (and not some other factor) since one would not expect to achieve significant competition with only a 5-fold excess of unlabeled competititor (Yu Fig. 5, lane 5); and competition with a "non-specific" oligonucleotide containing an AP-1 binding motif actually increased binding to the labeled EMSA probe (Yu Fig. 5, lane 7).* Dr. Verma Declaration ¶ 124.

---

[6] Vitamin D receptor (VDR) is a nuclear receptor that surfaces from the cytoplasm to bind ligand and translocates to the nucleus to affect transcription.

Application/Control Number: 90/007,503; 90/007, 828          Page 86
Art Unit: 3991

Examiner Response:

Using the same EMSA protocol, including the human IL-6 gene promoter, as in the instant patent, *Yu (1995)* confirmed the inhibitory effect of calcitriol on NF-κB expression as found in their previous assays. Additionally, the EMSA assays results (Fig. 5) are consistent with the results subsequently obtained in the CAT reporter assay (Fig. 6).

It is noted that the patentee has not provided any evidence challenging the reproducibility of the *Yu(1995)* results nor has any evidence been provided concerning the contamination of *Yu (1995)* samples with other transcription regulaters that bind the NF-κB enhancer.

Additionally, it is noted that the claims are not limited to NF-κB being the only mediator of calcitriol's immunoregulatory role in activated PBM cells.

8. Patentee Argument: *There is no evidence that NF-κB mediated any of the other effects of calcitriol that were investigated in the earlier studies described in the primary references. Calcitriol inhibited proliferation of PBMCs only when it was added during the first 24 hours data suggesting "that the antiproliferative effect of 1,25-(OH)$_2$D$_3$ is not the result of its effects on NF-κB." (Yu 1995 at 10994).* Dr. Verma Declaration ¶ 120; Patentee 11/17/06 response page 73 reciting admission of Dr. Manolagas in Trial Testimony, day 10, Manolagas deposition page 68.

Examiner Response:

Vitamin D$_3$ (calcitriol) affects bone and mineral (e.g. calcium) homeostasis, regulates the immune system and regulates cell growth, differentiation and death (apoptosis). See *Adams (2004)*, left column.

As pointed out in *Yu (1995)* at page 10994, and as admitted by Dr. Manolagas at trial, their data regarding calcitriol's inhibition of PBM cellular proliferation does not correlate to NF-κB activity

However, this result does not affect the above rejection which is directed to calcitriol's affect to reduce NF-κB activity related to calcitriol's PBM immunological effect and more particularly, the involvement of NF-κB in calcitriol's

immunosuppressive effect by inhibiting gene expression (e.g. cytokines such as IL-2) in PHA activated PBM's.

9. Patentee Argument: *Yu (1995) at p.10994, last ¶ states that "[T]he relevance of the inhibiting effects of 1,25(OH)$_2$D$_3$ on NF-κB proteins to the immunoregulating properties of this hormone is a matter of conjecture." Such speculation cannot reasonably support a conclusion that the effect of calcitriol on IL-2 production or cell proliferation provides evidence that use of calcitriol in any study described in any of the primary reference necessarily reduced NF-κB activity and consequent expression of NF-κB regulated proteins.* Dr. Verma Declaration¶120.

Examiner Response:

Patentee has failed to appreciate the context of the *Yu(1995)* teaching since one needs to consider what follows (starting with "Nevertheless .... to the end of the article) the author's speculation. When taken in context, the author is commenting on a proposed mechanism that takes into account "the down-regulating effect of 1,25(OH)$_2$D$_3$ on new syntheses of NF-κB related proteins" as sustaining activated lymphocyte function (which relies on both preexisting and "de novo synthesized NF-κB subunits") and the few hours delay needed for the lymphocyte to express the vitamin D receptor. Underline: In this context the author expresses his speculation as follows:

"In view of these considerations, it is *tempting to speculate* that the expression of the 1,25(OH)$_2$D$_3$ receptor following activation and the down-regulating effect of 1,25(OH)$_2$D$_3$ on new synthesis of *NF-κB*-related proteins represent a *biologic mechanism* whereby excessive lymphocyte activation might be prevented." *Yu (1995)* at page 10994, right column.

Accordingly, the author's speculation is not directed to the NF-κB mediated effect of calcitriol but toward a possible negative feedback mechanism regarding the calcitriol receptor underline: following calcitriol inhibition.

Application/Control Number: 90/007,503; 90/007, 828          Page 88
Art Unit: 3991

10. <u>Patentee Argument</u>: *Analyses of the IL-2 promoter in other studies has demonstrated that repression by calcitriol of IL-2 expression, as well as aspects of its immunosuppressive activity in T cells likely occurs through an NF-κB independent mechanism involving NFAT-driven transcription as a target. (Alroy et al 1995, Takeuchi et al. 1998 attached hereto as Exhibits 24 and 25). For example, Alroy et al. in PHA/PMA stimulated Jurkat cells, found when activated by calcitriol, the vitamin D3 receptor directly repressed the ability of NFAT to activate transcription of the IL-2 gene by interfering with assembly and binding of an NFAT/AP1 complex to the IL2 promoter, and thereby reduced IL2 gene expression. (Alroy at 6796, see also Alroy Figs. 3, 5 and 8). Similarly, Takeuchi found that calcitriol treatment of activated T cells "resulted in inhibition of NFAT complex formation" to the human IL-2 promoter NFAT site, as well as diminished NFAT-driven transcription of a reporter gene in calcitriol-treated Jurkat cells. (Takeuchi at 210, 215, Figs. 1 and 6). Notably, Takeuchi "found no significant effect of [calcitriol] on NF-κB binding activity under T cell activation conditions [ionomycin and PMA] used here." (Takeuchi at 215).* Dr. Verma Declaration ¶ 119.

<u>Examiner Response:</u>

The instant claims merely require the use of a compound (e.g. calcitriol) that exclusively <u>or non-exclusively</u> reduces NF-κB activity.

In this respect, as discussed *supra*, the *Adams* (exhibit 26) and *Takeuchi* (exhibit 25) documents specifically acknowledged the role of NF-κB in calcitriol inhibition of cytokine expression in PBM's citing the *Yu (1995)* document

Additionally, the *Adams* document further cites *Harant et al.* Eur. J. Biochem. 250, 63-71 (1997) (copy enclosed) which further positively cites *Yu (1995)* (Harant p. 64, left column) while additionally teaching the role of NF-κB in calcitriol's 50% inhibition of activated IL-8 expression in A3 human melanoma cells.

Accordingly, the ability of calcitriol to act via NF-κB (as demonstrated by *Yu 1995*) or NFAT, as demonstrated by *Alroy (exhibit 24)* and *Takeuchi (exhibit 25),* to affect cytokine expression does not adversely effect the instant rejection.

11. <u>Patentee Argument</u>: *Studies show that calcitriol treatment can increase NF-κB activity citing Adams et al. (2004) and Berry et al. (2002). Adams reports that calcitriol alone stimulated NF-κB activity in C3H10T1/2 cells. (<u>Adams</u> at 2948: Exh. 26). Berry reports that calcitriol increased NF-κB activity in a TPA-stimulated promyeloytic leukemia cells by stimulating phosphorylation and degradation of I-κB. (<u>Berry</u> at 183: Exh. 27). Such studies provide evidence that the Examiner is incorrect in assuming that calcitriol administration to cells reduces NF-κB activity. Dr. Verma Declaration ¶125.*

<u>Examiner Response</u>:

Vitamin $D_3$ (calcitriol) affects bone and mineral (e.g. calcium) homeostasis, regulates the immune system and regulates cell growth, differentiation and death (e.g. apoptosis). See *Adams (2004)*, left column.

The rejection is directed to <u>calcitriol's immunological (immunosuppressive) effect in (PBM's)</u> and more particularly, the involvement of NF-κB in calcitriol's immunosuppressive effect of inhibiting cytokine gene expression in PHA activated PBM's.

The *Adams* and *Berry* studies are not relevant to the above rejection since they address a different calcitriol effect (<u>cell growth, differentiation and apoptosis</u>) in <u>different cell types</u>, C3H10T1/2 mouse fibroblasts in *Adams;* and NB4 acute promyelocytic leukemia cells in *Berry*.

In this respect *Adams* (p. 2948, right col.) acknowledges the <u>cell line specificity</u> of NF-κB activity and additionally cites articles teaching the <u>decreased NF-κB activity relating to calcitriol's inhibition of cytokine expression in PBM's</u> including the *Yu (1995) teaching* and the *Harrant (1997)* teaching that in A3 human melanoma cells stably transfected with the IL-8 promoter luciferase construct, calcitriol inhibited activation of the reporter gene by 50%.

**IV. 5-ASA   (references prior to 12/24/86)**

11.      Claims 1-2, 5-6, 8-9, 20-27, 29, 31-38, 40, 53-62, 64-73, 75-80, 82, 84 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Dew* (Br. Med. J. 287 (7/83):23-24) as evidenced by *Baldwin II*, J. Clin. Invest. 107(1991):63-80, *Bantel* et al. (Amer. J. Gastroenterology 287 (2000):3452), *Yan* et al. (J. Biol. Chem. 274 (1999) 366631-36) and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application which issued as the Baltimore '516 patent. See MEEP 2131.01 (evidence of inherency).

**Summary:** *Dew* teaches administration of 5-ASA for the treatment of ulcerative colitis in humans, which inherently reduced NF-κB activity in the cells of the patients, by a mechanism including phosphorylation of IκB.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene  expression of a cytokine protein (claim 5) in a eukaryotic cell.

*Dew* teaches the administration (oral delayed release of up to 4.4 g/day) of 5-aminosalicyclic acid (5-ASA) to humans for the treatment of ulcerative colitis  (an inflammatory bowel disease).

Ulcerative colitis is recognized as being associated with NF-κB activation. See *Baldwin II* at Table 1.

*Bantel* conducted *in vivo* tests (tissue sample immunostaining using p65 NF-κB subunit antibody before/after 5-ASA administration) on human ulcerative colitis patients administered the same 5-ASA formulation (tradename MESALAZINE) in the same amounts (from 1.7-4.5 g/day) as in the *Dew* reference and reported that 5-ASA administration reduced NF-κB activity in the cells of these patients. *Bantel* at 3453. Specifically, *Bantel* found that (1) NF-κB activity is increased in patients with ulcerative colitis, and (2) therapeutic administration of 5-ASA (as in *Dew*) effectively reduced NF-κB activity in these patients. *Id.* at 3454-55.  Accordingly, *Bantel* concluded that "5-ASA is a potent inhibitor of NF-κB activation *in vivo*," at dosage levels and under the same conditions taught in *Dew*. *Id.* at 3456. Thus, *Dew's* administration of 5-ASA for ulcerative colitis inherently and necessarily reduces NF-κB activity in human cells.

Moreover, during prosecution of the Baltimore 08/464,364 application, while referring to the *Yan* reference (cited above), *Dr. Baltimore in his declaration* admitted

that 5-ASA reduces NF-κB activity as in the instant '516 patent claims: "Treatment of cells with such compounds as ... 5-aminosalicylic acid ... inhibits NF-κB mediated gene expression by a mechanism which includes inhibition of phosphorylation of I-κB proteins"(which is the naturally occurring NF-κB inhibitor). See *David Baltimore Declaration* ¶ 9.

Accordingly, the prior art *Dew* administration of 5-ASA necessarily and inherently reduced NF-κB activity and, thus anticipated at least claims 1-2, 5-6, 8-9, 20-27, 29, 31-38, 40, 53-62, 64-73, 75-80, 82, 84 and 88-97 as shown on an element-by-element basis in *Exhibit H-7* (herein incorporated by reference) provided by the requester in the 90/007,503 proceeding.

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *The claimed methods require a first cellular stimulus that induces NF-κB activity. Patentee argues that Dew's comparative study (sulfasalazine verse 5-amino salicyclic acid or 5-ASA) comprising the oral administration of coated 5-ASA to inhibit colitis in those patients in remission does not constitute "treatment of ulcerative colitis in humans" since these remission patients are not "currently suffering from active ulcerative colitis". There is no evidence that use of 5-ASA described in Dew would have involved administration of 5-ASA to cells in which NF-κB activity was induced since patients in Dew were not suffering from active colitis, but were in remission. The non-prior art evidence, including Bantel, relying on active colitis patients for induced NF-κB activity is not relevant to patients in remission as in Dew.* Dr. Verma Declaration ¶¶ 157 and 158

Examiner Response:

Patentee's argument is not commensurate to the instant claims that are not limited to "active" disease.

Additionally, there is no definition in the instant specification defining "treatment" to exclude <u>inhibiting inflammation</u> such as inhibiting ulcerative colitis.

In fact, as pointed out in the rejection above, *Dr. Baltimore's Declaration* (item 9) specifically states that 5-ASA is among:

"The classes of compounds which are able to affect NF-κB mediated gene expression in cells": "*Treatment* with cells with such compounds as ... 5-aminosalicyclic acid inhibits NF-κB mediated gene expression by a mechanism which includes inhibition of degradation of IκB proteins" (with emphasis). See 08/464,364 Declaration items 7 and 9.

Further, patentee fails to appreciate the *Dew* reference suggestion that high doses of 5-ASA, effective in maintaining remission in ulcerative colitis, "might be of value in *treating* ulcerative colitis". It is legally settled that anticipation does not require actual performance of a suggestion in a disclosure, but only requires that the suggestion be enabling to one of ordinary skill in the art. *Bristol-Meyers Squibb Co. v. Ben Venue Laboratories*, Inc. 246 F.3d 1368, 1379 (Fed. Cir. 2001); *In re Donohue*, 766 F.2d 531,533 (Fed. Cir. 1985). The *Dew* reference clearly enables the administration of oral coated 5-ASA to "treat" ulcerative colitis patients.

Still further, patentee's *assumption* that *Dew's* patients in remission with ulcerative colitis or proctitis were free of NF-κB activated cells is not supported by scientific evidence. In fact, patients undergoing ulcerative colitis remission with apparently normal mucosa, still possess higher expressed levels of cytokines including TNF, IL-1, IL-2, IL-6 and IL-8 (that are known to be regulated by NF-κB) (see *Bantel*, p. 2452, right column) as compared to normal patients <u>indicating the presence of "activated cells"</u> . See also enclosed: *Yamamoto et al.*, Inflamm. Bowel Dis. 11(6) (June 2005) pages 589-596 document at p. 589 (right column), p. 592 and p. 594 (right column).

Accordingly, the *Dew* study involving colitis remission patients necessarily involved the administration of 5-ASA to already "activated cells".


2. Patentee Argument:  *It is asserted that Dew does not mention NF-κB nor describe an external stimulus that would have induced NF-κB activity.* Dr. Verma Declaration ¶ 158.

Examiner Response:

Regarding the *Dew* reference's failure to mention NF-κB, or a stimulus activating NF-κB, it is noted that the rejection clearly points to evidentiary documents that

Application/Control Number: 90/007,503; 90/007,828                    Page 93
Art Unit: 3991

demonstrate that NF-κB and its activating stimulus is inherent to the *Dew* reference teaching including:

*Baldwin II*, J. Clin. Invest. <u>107</u>(1991):63-80,
*Bantel* et al. (Amer. J. Gastroenterology <u>287</u> (2000):3452),
*Yan* et al. (J. Biol. Chem. <u>274</u> (1999) 366631-36) and
*David Baltimore's Declaration* submitted Feb.2001 in the 08/464,364 application.

3. <u>Patentee Argument</u>: *Baldwin II, Bantel, Yan and the David Baltimore Declaration do not <u>repeat the use</u> described by Dew (Amendment at page 66-67). Additionally, the patients in the Bantel study could not have been "administered the same 5-ASA formulation (tradename MESALAZINE) in the same amount as in the Dew reference" since Bantel's patients were participating in a study "investigating the therapeutic effect of a newly developed mesalazine." (emphasis added) (Bantel at 3453). While, the 5-ASA Dew formulation was made by coating 5-ASA with **Eudragit S**, the formulation used in Bantel consisted of pellets coated instead with **Eudragit L**. (Bantel at 3453). In the absence of any evidence demonstrating these formulations to be equivalent, one cannot assume they would necessarily act in the same manner.* Dr. Verma Dec.¶ 159.

<u>Examiner Response:</u>

Contrary to patentee's argument, evidence of an inherent property need not be demonstrated by "repeating the use" of that prior art document. A prior art document need only provide an enabling disclosure for purposes of anticipation.

Patentee provides no evidence as to why 5-ASA formulations utilizing different methacrylic acid copolymers (EUDRAGIT) delayed release coatings would prevent 5-ASA cell treatment from reducing NF-κB activity and inhibiting NF-κB mediated gene expression by a mechanism which includes inhibition of phosphorylation of IκB proteins as admitted by *Dr. Baltimore* in his Feb. 2001 Declaration.

Once the examiner provides evidence or reasoning tending to show the inherent presence of a property or function, the burden shifts to the patentee to show the lack of the inherent feature in the prior art reference method.

## V. GLUCOCORTICOIDS (references prior to 12/24/86)

12.     Claims 1-2, 5-6, 8-9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88–89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Goodman and Gilman's* (<u>The Pharmacological Basis of Therapeutics,</u> (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner) as evidenced by *Baldwin I* (Annu. Rev. Immunol. <u>14</u> (1996) 649-81, *Auphan* et al. (Science <u>270</u> (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. <u>15</u> (2/95) 943-53), *Scheinman II.* (Science <u>270</u> (10/95) 283-286) and *Mukaida* (J. Biol. Chem. <u>269</u> (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (newly raised by Examiner). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary**: *Goodman & Gilman* teach the naturally occurring endogenous production and release of glucocorticoids (cortisol) in response to many different types of environmental stressors which *inherently* results in the reduction of NF-κB activity that acts to inhibit expression, in a eukaryotic cell, of cytokines whose transcription is regulated by NF-κB.   In this respect, the NF-κB inhibiting evidence provided by the Baldwin I, Auphan, Scheinman I/II and the Mukaida documents, regarding the synthetically administered steroid dexamethasone (DEX) has been found to be analogous with what occurs upon release of the endogenous cortisol glucocorticoid as evidenced by *Padgett*.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The instant claims broadly encompass the natural process in which an animal responds to environmental stressors by increasing production of endogenous glucocorticoids (cortisol, cortisone, hydrocortisone, corticosterone, aldosterone: see e.g. page 1473 Table 63-2) that are secreted into the bloodstream.  Increased glucocorticoids are produced in response to many different types of stressors including "agonal state, severe infections, surgery, parturition, cold, exercise, and emotional stress" (*Goodman and Gilman*, 1469,  "Example of Effective Stimuli of Secretion"). These elevated quantities of endogenous glucocorticoids are known to "prevent or suppress the inflammatory response that takes place as a consequence of the hypersensitivity reactions" (Goodman and Gilman, page 1479, left column, "Immune Responses").

However, it has been known since the mid-1990's, that glucocorticoids effect their immunosuppression by reducing NF-κB activity by preventing NF-κB from binding to the appropriate sites on the DNA and by increasing the transcription, expression

and/or release of IκB, thereby reducing the amount of activated NF-κB that can translocate into the nucleus. In this regard, several publications cited by Dr. Baldwin in his 1996 review article (*Baldwin I*), including *Auphan, Scheinman I, Schmeinman II and, Mukaida,* in addition to the *Padgett* document, provide extrinsic evidence that endogenously produced glucocorticoids, such as cortisol, are recognized to *necessarily and inherently* reduce NF-κB activity thus inhibiting cytokine production, *in vivo*, upon the body's release of glucocorticoids in response to external stimuli, such as stress, as described in *Goodman and Gilman*.

### a) Extrinsic Evidence of Inherency as Provided by *Auphan*

Auphan describes methods for reducing NF-κB activity in an induced leukemic T-cell line. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA and used EMSA, as described in the '516 Baltimore patent, to demonstrate NF-κB activity. See *Auphan* at 287-8. *Auphan* then exposed the cells to $10^{-6}$ M dexamethasone. Id. Auphan reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility shift assays (EMSAs) revealed that both AP-I and NF-κB DNA binding activities were elevated in nuclear extracts of activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB binding activity and reduced the amount of AP-1 binding activity . . . . DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo (Fig. 1D).
>
>           *       *       *
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat human T cell leukemia line stably transfected with a GR expression vector (Fig. 2A). . . . Inhibition of NF-κB activity was also observed in cells stimulated by either 12-O-tetradecanoryl-phorbal 13-acetate (TPA) alone or by tumor necrosis factor (TNF-α). Id. (citations omitted).

As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the transcriptional activation of the I-κBα gene" in these human leukemic cells and therefore, "by upregulating I-κBα protein levels, function to block nuclear translocation of NF-κB and DNA binding." *Baldwin* at 671. As discussed below, Dr. Baldwin's own results, as reported in the *Scheinman II* document discussed below, confirms this mechanism for glucocorticoid action.

### b) Extrinsic Evidence of Inherency as Provided by Scheinman I & II

Scheinman I and Scheinman II confirm that dexamethasone, as used in the prior art, reduces NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures. *Scheinman I* at 944. NF-κB activity was measured in at least two assay formats disclosed in the Baltimore '516 patent (EMSA and reporter assays) as well as Western blot

Application/Control Number: 90/007,503; 90/007, 828          Page 96
Art Unit: 3991

immunological assays. Dexamethasone was shown (Figs 1A and B; Fig. 4; and Fig. 7)
to reduce endogenous NF-κB activity in cells ("Pretreatment with DEX resulted in a
profound loss of TNF-α induced NF-κB as well as p50 homodimer (KBF1) gel shift
activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not
shown)." *Id* at 949. *Scheinman I* concluded that dexamethasone reduces NF-κB
activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also
> block their ability to bind DNA. In addition, we present new data showing
> that dexamethasone (DEX) treatment of HeLa cells causes a significant
> reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able
> to inhibit NF-κB activity by a novel mechanism involving a block of
> cytokine-induced nuclear translocation.
>
> *       *       *
>
> With EMSA analysis, we found that DEX treatment caused a marked
> reduction in the ability of NF-κB /Rel subunits to bind DNA despite the
> presence of equal amounts of NF-κB subunit protein in the EMSA DNA-
> binding reaction mixtures (Fig. 5, EMSA). *Id.* at 944,948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same
$10^{-7}$ M concentration as *Scheinman I* , reduces NF-κB activity as called for by the claims
that are the subject of this reexamination request. *Scheinman II* confirmed the *Auphan*
conclusion that dexamethasone inhibits TNF α induced NF-κB activity, at least in part,
by inducing the transcription of the IκB- α gene:

> Together, these data indicate that DEX treatment induces the transcription of the
> IκB- α gene. This induction results in the increased syntheses of the IκB- α
> protein. This increase in protein synthesis leads to the rapid turnover of the IκB-
> α protein associated with preexisting NF-κB complexes. In the presence of an
> activator such as TNF α, newly released NF-κB reassociates with the DEX-
> induced IκBα and thus reduces the amount of NF-κB translocating to the
> nucleus. *Scheinman II* at 286.

### c) Extrinsic Evidence of Inherency as Provided by *Mukaida*

*Mukaida* observed that IL-8 production was mediated by NF-κB in all cells they
previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-
κB-regulated IL-8 production by more than 60% at concentrations equal to and higher
than $10^{-8}$M. *Id* at 13290.

### d) Extrinsic Evidence of Inherency as Provided by *Padgett*

Consistent with the *Scheinman II* and *Auphan* references, *Padgett* teaches that
the body responds to external stressors by release of glucocorticoid hormones,
including cortisol, which bind glucocorticoid receptors expressed on a variety of immune

cells to interfere with NF-κB function, resulting in reduced cytokine production. See Abstract; p.445 (right column) to p. 446; footnotes 32 and 33; and p. 447 under "Conclusions".

*Thus, endogenous production of glucocorticoids in response to external body stimuli as described in Goodman and Gilman is now recognized as necessarily inherently reducing NF-κB activity as called for by the subject claims of the Baltimore '516 patent.* *See also '7503* Exhibit H8 *(incorporated by reference) application to claims regarding exogenous glucocorticoid administration.*

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Baldwin I, Auphan, Scheinman I, Scheinman II, Mukaida, and Padgett do not "repeat the use" described in Goodman and Gilman. The Auphan, Scheinman I and II and Mukaida evidentiary references in vitro assays do not provide data relating to clinical in vivo use of glucocorticoids in patients due to differences in cell type or mode of activation.* See Amendment pages 76-77 and Declaration of Dr. Verma, ¶¶ 75-101):

Examiner Response:

Enablement and not actual use is the legal standard for demonstrating inherency. Thus, there is no legal requirement that the inherency evidence "repeat the use" as alleged by the patentee.

In this regard, there is no requirement to provide data from human clinical trials to establish utility or enablement for an invention related to the treatment of human disorders. Additionally, an article teaching is presumed enabled absent rebuttal evidence. See MPEP § 2121 at 2100-64 to 2100-67; see also *Rasmusson v. Smithkline Beecham Corp.* 75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.,* No. 05-1313 (Fed. Cir. Nov. 20, 2006) concurring with the *Rasmusson* holding.

The above rejection provides evidence and reasoning demonstrating that the prior art enables methods of contacting glucocorticoids to eukaryotic (e.g human) immune cells that *inherently* reduces NF-κB activity affecting cytokine expression as

evidenced by the combined *Baldwin I*, *Auphan*, *Scheinman I*, *Scheinman II*, *Mukaida* and *Padgett* et al. evidentiary teaching.

Additionally, the evidentiary documents utilize *in vitro cell* systems and assays recognized by the patentee's own disclosure as relevant to evaluating NF-$\kappa$B activity and NF-$\kappa$B regulated expression. See *Auphan* mouse data; *Scheinman II* HeLa cells; *Auphan* Jurkat cells; *Mukaida* IL-8 promoter CAT reporter assay; and *Scheinmann I and II* CAT reporter and EMSA assays. See also *Padgett* at pages 144-145 summarizing >150 clinical studies and animal data.

2. Patentee Argument: *Auphan, Scheinman I and II and Mukaida evidentiary in vitro assays do not activate before inhibiting.* See Dr. Verma Declaration 88-93.

Examiner Response:

As discussed *supra*, the two steps upon which patentee relies, cell contacting with an inducer <u>followed by</u> applying an inhibitor, are not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instant invention encompasses prior, concomitant or subsequent cellular administration of the inhibitor relative to the administrion of the inducer compound.

Further, in contrast to patentee's argument, all of the evidentiary references teach inhibition of NF-$\kappa$B activated cells utilizing a glucocorticoid (cortisol or dexamethasone) regardless of the sequence of activation and inhibition. In this respect, the evidentiary documents teach glucocorticoid interference with NF-$\kappa$B activity and related NF-$\kappa$B mediated gene expression in eukaryotic cells or organisms composed of said cells.

3. Patentee Argument: *The glucocorticoid mechanism of action is poorly understood and the effects of glucocorticoids have been observed to vary between different cell types, citing Padgett, Hart 2000, Schule 1990, Padgett I and II, Bourke 1999, Han 2001 (exhibits 16-21) in support. 11/17/06 Amend. p.77 and Verma Declaration ¶¶ 95-101.*

<u>Examiner Response:</u>

The evidentiary documents teach the ability of glucocorticoids to interfere with NF-κB activity and NF-κB mediated expression of proinflammatory genes (e.g. *cytokine genes such as IL-2, IL-8 and TNF-alpha*) in <u>*eukaryotic* **immune cells**</u> or eukaryotic organisms composed of said cells.

As <u>summarized</u> by *Baldwin I* glucocorticoids inhibit NF-κB by *transcriptionally activating the I-κBα gene* in human immune cells and therefore upregulate I-κBα protein levels that function to block nuclear translocation of NF-κB and DNA binding. See *Baldwin I* p.671, right col. citing *Scheinman II,* and *Auphan* in endnotes 157 and 158. Accordingly, glucocorticoids act to promote the translation of I-κBα.

Additionally, contrary to patentee's argument, the enclosed rebuttal *Roman-Blas* et al. document recognizes NF-κB's role in a number of inflammatory disorders including arthritis and asthma, due to its mediation of proinflammatory cytokine genes. See *Roman-Blas* at page 839 (Summary) and pages 840-842.

As of 2006, it is recognized that anti-inflammatory glucocorticoids act to "induce expression of I-κB, causing an increased cystolic retention of NF-κB. See *Roman-Blas* at p. 842, right col. under "Inhibition of NF-κB by pharmacologic agents", citing *Auphan and Scheinman II,* respectively.

Regarding different genes or different cells, the *Roman-Blas* article recognizes that glucocorticoids *may further* act through different mechanisms involving the interaction of the activated glucocorticoid (nuclear) receptor (GR) with NF-κB (and other coactivators). See *Roman-Blas* p. 842, right column.

Patentee's documentary evidence is not commensurate in scope to the instantly claimed invention nor is the evidence sufficient to rebut the prima facie anticipation rejection showing above.

Patentee's argument that the *mechanism* of action of glucocorticoids has been observed to vary between different cell types, although true regarding non-immune cells, is nevertheless <u>*not commensurate*</u> to the instantly claimed invention which is not

cell specific. The instant claims encompass, as a species, the use of glucocorticoids in mammalian or eukaryotic immune cells to interfere with NF-κB activity at the level of the inhibitor and thus inhibit pro-inflammatory cell gene expression.

Accordingly, *Padgett* cited by the patentee (Dr. Verma Dec. ¶¶ 89 and 90) recognizes the *Scheinman II and Auphan* (page 446, left column and endnotes 32, 33) teaching of glucocorticoids to *promote the making of I-κBα in immune cells* and that induction of I-κB syntheses "might be limited to certain cell types, such as monocytes and lymphocytes" and additionally may "not be mutually exclusive" of other mechanisms. (page 446 left column to top of right column).

Although the patentee points to *Padgett* at page 447 (as well as *Schule 1990*) regarding the ability of the (nuclear) glucose receptor to "undoubtedly interfere with other transcriptional regulators" the primary focus of the anti-inflammatory effects of glucocorticoids centers on NF-κB inhibition. See *Padgett* p. 447 in entire context. To the extent there are *additional* mechanisms involving the glucocorticoid receptor, the instant claims are not limited to exclusive NF-κB mediated inhibition.

*Bergman I* (immunology 2004), *Bergman II* (Am. J. Resp. Biol. 2004) and *Hart 2000* are cited to challenge the role of NF-κB in dexamethasone's inhibition of cytokine transcription. See Exhibits 17-19; Dr. Verma Dec. ¶¶ 89, 97 and 98.

With respect to the *Hart 2000* biopsy evidence, Dr. Verma states that glucocorticoid administration increased NF-κB transcription and taught away from the glucocorticoid receptor's binding NF-κB.

However, the *Hart 2000* article distinguished their NF-κB DNA binding and NF-κB protein expression data obtained from alveolar macrophage bronchial biopsy patients receiving inhaled corticosteroid therapy since they had not examined "the expression of I-κBα in our biopsies" and thereby the authors recognized that "Glucocorticoids may rapidly induce I-κBα messenger RNA and protein synthesis (endnote 27 to *Auphan)*, and therefore I-κBα may mediate the effects of corticosteroids". *Hart 2000* at p. 230.

Similarly, *Bergman I and II* concluded that dexamethasone's inhibition of the cytokine *GM-CSF* was via a *post-transcriptional/ translational mechanism* that <u>does not exclude *post-translational* I-κBα production</u> which, like *Hart 2000,* was not addressed.

In fact, the finding that "GM-CSF is primarily regulated by *de novo* mRNA and protein syntheses" (*Bergmann II*, p. 561, left col.) is consistent with NF-κB being regulated by <u>*post-translational* I-κBα production.</u>

In this respect it is noted that both *Bergman I and II* reinforce NF-κB's role in dexamethasone's ability to inhibit GM-CSF expression (*Bergman I* at p. 433, right col.: "In summary, the data presented here confirm the key role of the NF-κB (-85/-76) and CLEO(-54/-31) elements in the proximal region of the human GM-CSF promoter in T-cell lines"; *Bergman II* abstract: "Taken together our data support an important role for the NF-κB and CLEO sites in the transcriptional control of GM-CSF expression in primary human T-cells …").

Dr. Verma's conclusion (Declaration ¶¶ 99 and 100 & exhibits 20 and 21) that NF-κB-mediated inhibition of cytokine release was not linked to <u>*post-translational* I-κBα production</u> in the *Han (2001)* study in <u>fibroblast-like rheumatoid synoviocytes (FLS)</u> and in *Bourke's (1999)* study in <u>brain cells</u> was <u>distinguished by both authors</u> as being "<u>cell type specific"</u>. See quoted language in *Bourke* at page 2118, bottom of left column to top of right column; and *Han et al.* at page 272 stating that "[T]his anti-inflammatory mechanism of glucocorticoid may differ depending on cell-type".

4.  <u>Patentee Argument</u>: When read in light of the instant patent disclosure, one of skill in the art would understand and interpret the claims to require affirmative acts and manipulative steps, calculated to achieve specific results and would not have understood the natural production and release of endogenous glucocorticoids as carrying out any of the '516 patent claims. Dr. Verma Declaration, ¶¶ 11 and 103.

<u>Examiner Response:</u>

The claimed invention is not so limited. Additionally, neither the specification nor the prosecution history place any restrictions on the means by which  "NF-κB activity" is

regulated (enhanced or reduced).  Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural (indirect) or man-made (direct) means of reducing NF-κB activity.

5.  <u>Patentee Argument</u>: *There is no showing in Goodman and Gilman (1980) in connection with the "environmental stressors" referred to ("agonal state, severe infections, surgery, parturition, cold, exercise and emotional stress"), of what, if anything, would necessarily induce NF-κB activity in cells in connection with any particular stressor, such that the induced NF-κB activity could be reduced as required by the claims. The Examiner refers to "hypersensitivity reactions" but provides no evidence, nor is there any reason to believe, that the different environmental stressors that the Examiner contends would cause production of endogenous glucocorticoids would necessarily be associated with "hypersensitivity reactions." (Office Action, at 56.)* Dr. Verma Declaration ¶ 104.

<u>Examiner Response:</u>

*Goodman and Gilman's* method of corticosteroid cell contacting in response to environmental stressors (e.g. an *NF-κB* inducing cellular event) is taught by the evidentiary documents as inherently reducing NF-κB activity and gene expression.

In response to the first argument, the instant claims do not require the identification of an NF-κB inducing stimulus. In any event, as discussed in the rejection above, the evidentiary documents, particularly the *Padgett* document, provides evidence that environmental stressors trigger NF-κB mediated immune dysregulation (overproduction of cytokines).

Regarding patentee's second argument addressing hypersensitivy reactions, *Goodman and Gilman* teach that the organism responds to stress by increasing blood levels of anti-inflammaory glucocorticoids, which as taught by *Padgett*, effect their action by binding glucocorticoid (GC) receptors and inhibiting cytokine production.

The nexus between between glucocorticoid production and the treatment of cytokine induced inflammatory disorders, such as hypersensititivity reactions, is addressed in detail in the rejection above and summarized briefly as follows:

*Goodman & Gilman* (p.1469, right col.) teach that stress results in *in vivo elevated* glucocorticoid (GC) hormone plasma concentrations which are anti-

that takes place as a consequence of the hypersensitivity reactions" (*Goodman and Gilman*, page 1479, left column, "Immune Responses": see also pages 1479-80 discussing anti-inflammatory properties).

The *Padgett* review article elaborates on clinical (">150 clinical studies") and animal data that demonstrates the relationship between stress and aberrant immune function contributing to poor health and the role of "stress hormones" to **suppress the production of proinflammatory cytokines and chemokines and downregulate the production of cytokines necessary for the generation of adaptive immune response.**" See *Padgett* pages 444 and 445 (left column, with emphasis). *Padgett* addresses the mechanism of action of glucocorticoids (GC) as follows:

"Being lipophilic molecules, GC hormones readily pass through the plasma membrane of all cells in the body. If a cell possesses a GC receptor (GR), that cell can be a target for action. There are two receptors for GC hormones, the GR and the mineralocorticoid receptor (MR). Because corticosterone has a higher affinity for MR than for GR [24], at low circulating levels glucocorticoid hormones bind preferentially to MR. Only at *high circulating or tissue levels* (i.e. during stress) is the GR occupied [25]. In immune cells, such as macrophages and T lymphocytes, the primary receptor for glucocorticoid hormones is GR; more specifically, the influence of glucocorticoid hormones on immune function is mediated by the GR [26] ". *Padgett p. 445, right column.*

Additionally, *Padgett* teaches that "Glucocorticoid receptors expressed on a variety of immune cells bind cortisol and interfere with the function of NF-κB which regulates the activity of cytokine-producing immune cells" (*Padgett* Abstract).

The *Baldwin I, Auphan et al., Scheinman I, Scheinman II* and *Mukaida* documents provide further evidence of the inherent intracellular mechanism of action of of the natural and synthetic corticosteroid's affect on "NF-κB activity" at the level of increasing inhibitor syntheses.

6. <u>Patentee Argument</u>:  *The Examiner has no basis for assuming that cortisol would necessarily affect NF-κB in the same way as dexamethasone since:*

*-. Goodman and Gilman describe cortisol while the later references are drawn to the NF-κB effects in experiments using synthetic steroid dexamethasone;*
*-. Padgett indicates glucocorticoids mediate two different receptors, the glucocorticoid receptor and the mineralocorticoid receptor (Padgett at 445);*
*- Goodman and Gilman (p. 1473) indicate, and as evidenced from numerous later publications, the spectrum of biological effects of different glucocorticoids can vary at least in part due to the different interactions of each distinct glucocorticoid with each of these receptors, and the specific pattern of receptor expression on any individual cell.*
*- Although the Examiner asserts that Padgett provides analogous "NF-kB inhibiting evidence" as that in Baldwin I, Auphan, Scheinman I/II and the Mukaida documents regarding dexamethasone, the <u>Padgett review provides no primary data, and does not discuss any experiments which examined the effect of cortisol (or any endogenous glucocorticoid) on NF-κB activity.</u> Dr. Verma Dec. ¶ 105; 11/17/06 Amendment p.78.*

<u>Examiner Response:</u>

The *Goodman and Gilman* reference teaching is <u>not limited</u> to cortisol but is directed to the glucocorticoid class of compounds comprising natural and synthetic corticosteroids which share a common core (steroid) structure and a common activity (e.g. anti-inflammatory):

"The naturally occurring corticosteroids cortisol and cortisone <u>as well as synthetic corticosteroids</u> such as prednisolone and triamcinolone are glucocorticoids". Goodman and Gilman p. 1473, right col. and Table 63-2: "Antiinflammatory Effect".  See also Goodman and Gilman page 1479-80 addressing "Anti-inflammatory Properties" of "[C]ortisol <u>and the synthetic analogs</u> of cortisol..."

Similarly, the later published documents provide inherent evidence of the ability of corticosteroids (generally), and dexamethasone (particularly), to treat inflammation by interfering with NF-κB- induced cytokine production in mammalian immune cells.

Although all glucocorticoids have different structures and biological activities, the above rejection focuses on the anti-inflammatory activity of glucocorticoids effected by binding the glucocorticoid receptor (GR) present on immune cells.

Regarding the ability of glucocorticoids to bind the glucocorticoid receptor (GR) and mineralocorticoid receptor (MR), *Padgett* points out that stress-inducing high

Application/Control Number: 90/007,503; 90/007, 828                    Page 105
Art Unit: 3991

plasma glucocorticoid levels results in glucorticoids binding the (GR) present on
immune cells responsible for immune function (e.g. cytokine production):

> "[O]nly at *high circulating or tissue levels* **(i.e. during stress)** is the GR occupied
> [25]. In immune cells, such as macrophages and T lymphocytes, the primary
> receptor for glucocorticoid hormones is GR; more specifically, the influence of
> glucocorticoid hormones on immune function is mediated by the GR [26] "

The argument that the *Padgett* review article lacks "primary data" or experiments
regarding the effect of cortisol (or any endogenous glucocorticoid) on NF-κB activity is
not persuasive since *Padget* relies on the results of previously conducted animal studies
as well as ">150 clinical studies" for their inherent teaching that natural <u>and</u> synthetic
glucocorticoids act via the same immune cell receptor (GC receptor) to inhibit NF-κB
mediated inflammation in cytokine-producing immune cells.

## VI. ANTIBIOTICS  (references prior to 12/24/86)

13.    Claims 1-2, 5-6, 8-10,12-18, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62,
64, 65, 69-73, 75, 76, 80, 82, 84, 88-89, 93-97, 99, 100, 104-105, 119-120, 124-129,
133-137, 139,140,144-147, 149,150,154-157, 159, 160, 164-168,172-175, 177, 178,
and 182-185 are rejected under 35 U.S.C. 102(b) as being anticipated by *1970 PDR:
pages* 1167 (GARAMYCIN<sub>TM</sub> :gentamycin), 1309-1310 (SUMYCIN<sub>TM</sub> : tetracycline),
1379-1380 (E-MYCIN<sub>TM</sub> :erythromycin)  as evidenced by the *Manolagas declaration,
Galdiero et al. (*Microbiology, <u>147</u> (2001): 2697-2704), *Yang* et al. (Nature <u>395</u> (1998)
284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent*
and *Yasutomi* et al. (J. Immunology 175(2005) 8069-8076) (newly raised by the
Examiner). See MPEP 2131.01 (evidence of inherency, including extrinsic publications
of any date and intrinsic evidence using applicant's own specification: see *Ex parte
Novitski* cited therein).

**Rejection Summary:**  As detailed in *Exhibit H-10* of the 90/007,503 request (herein
incorporated by reference), *1970 PDR* teaches administration of antibiotics such as
erythromycin, gentamicin, and tetracycline to kill bacteria in animals.  As evidenced by
the *Manolagas declaration*, gram (-) bacteria produce lipopolysaccharides (LPS) which
induce NF-κB regulated cytokine production. Antibiotics that kill gram-negative bacteria
thereby act to inherently reduce LPS-induced and NF-κB-regulated cytokine production.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims
1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene
under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claims 5 and 18) and reduce the effects of bacterial lipopolysaccharides (claims 12-17) on eukaryotic (e.g. mammalian) cells.

The instant claims are drawn to a method of inhibiting NF-κB activity (e.g. diminishing bacterially LPS induced NF-κB expression of cytokines mediated, for example, through intracellular signaling: in claims 6, 8-10) and associated gene (claims 1-2) expression (e.g. of a cytokine protein: claim 5) in a eukaryotic cell.

The *1970 PDR* teaches the administration of antibiotics (erythromycin, gentamicin, tetracycline) to treat gram-negative bacterial infections. Erythromycin, for example, is active against *H. pertusis* infections (*Id.* at 1379); and gentamicin sulfate (trade name GARAMYCIN) treats infections caused by *Pseudomona aeruginosa*, *Aerobater aerogenes*, *E.coli*, *Proteus vulgaris*, and *Klebsiella pneumoniae* (*Id.* at 1167). Tetracycline is a broad spectrum antibiotic (trade name SUMYCIN) which treats a variety of infectious gram (-) bacteria, including *E. coli* and *Shigella* (*Id* at 1309).

Gram-negative bacteria produce lipopolysaccharide (LPS), which when in contact with human cells induces NF-κB activity resulting in the production of cytokines regulated by NF-κB. Cytokines whose genes are regulated by NF-κB (at least in part) include tumor necrosis factor alpha (TNF-α) and interleukins 2, 6, 8 and 10 (IL 2, 6, 8 and 10). E.g., *Galdiero; Yang;* and *Mori.*   As noted in *Galdiero* (page 2700), "The lowest concentration of LPS able to induce cytokine release was 10 ng ml$^{-1}$ ".

Once produced by gram-negative bacteria, LPS activates NF-κB, which translocates to the nucleus and binds to the NF-κB recognition sites on genes that are regulated, at least in part, by NF-κB. E.g., *Baltimore patent*, Col. 2, lines 54-57 ("Release of active NF-κB from the I-κB- NF-κB complex has been shown to result from stimulation of cells by a variety of agents, such as bacterial lipopolysaccharide ... ").

In treating gram-negative bacterial infections, antibiotics kill bacteria or impair bacterial function thereby reducing bacterial production of LPS (*Manolagas Declaration*, ¶¶ 33-40).

For example, erythromycin has been shown to inhibit the activation of NF-κB in T cells; and in normal and inflamed human bronchial epithelial cells along with modulating IL-8 expression. See *Yasutomi* et al. at page 8068 at the bottom of the right column and footnotes 5-7 (citations therein).  *Yasutomi* further demonstrated the ability of tetracycline to inhibit lipopolysaccharides and NF-κB activation in human monocyte-derived dendritic cells and suppress NF-κB induced cytokine (e.g. IL-6, 10, 12p70, 13 and IFN-γ ) production. See Abstract, page 8071-8073, see Table 1 and Figures especially 1-3 and 8.

Application/Control Number: 90/007,503; 90/007, 828          Page 107
Art Unit: 3991

Thus, by blocking LPS that reaches the cell, administration of the *1970 PDR* antibiotics to combat gram-negative bacterial infections would necessarily reduce NF-κB activity in human cells and thereby reduce cytokine expression. As such, as shown on an element-by-element claim basis in *Exhibit H-10* of the 90/007,503 request (incorporated by reference), the disclosed 1970 PDR antibiotics would inherently anticipate the subject claims requiring LPS-induced NF-κB activity.

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

Additionally, the above rejection was modified to further remove the applicability of the above rejection to liver cells (claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186) since the above cited documents fail to teach that eukaryotic liver cells are affected by LPS-induced NF-κB activity so as to affect gene expression.

1. Patentee Argument: *The 1970 PDR reference teaches that antibiotics either kill bacteria or interfere with bacterial cell growth but do not act "by blocking LPS that reaches the cell," as alleged on p. 42 of the Office Action. Antibiotics have no effect on any of the 6 segments of the NF-κB pathway as illustrated in Schematic 10 of Exhibit 1. As also illustrated in Schematic 10, antibiotics neither act on the mammalian cell, nor do they act to interfere with the induction by the external influence to which the Examiner refers, i.e. LPS. Thus, one skilled in the art would not contemplate using antibiotics to "reduce NF-κB activity" as claimed. Even if one viewed the external stimulus as the bacterial infection, antibiotics act on the bacteria and do not act on any of the 6 segments of NF-κB pathway. Additionally, claims 8-9, 75-80, 82, 84, 88-98, are further directed to methods carried out on cells in which the "external influences induce NF-κB mediated intracellular signaling" in which the induction is maintained by the presence of the external influence. Killing bacteria, even if doing so could also remove the LPS, cannot practice any of the claims that require <u>maintained induction</u> by the external influence. Dr. Verma Declaration ¶ ¶ 127 and 131; 11/17/06 Amendment at pages 14 and 80-82.*

Examiner Response:

Although claims 8 and 9 (and dependent claims) require that the "external" (or "extracellular") influences induce *NF-κB signaling,* these claims <u>do not</u> require <u>maintained induction</u> as argued by the patentee.

Additionally, although the instant claims encompass patentee's 6 segments of the NF-κB pathway, they are not limited thereto, as discussed in the claim interpretation section *supra*.

Further, patentee's argument restricting the instant claim coverage to <u>direct effects</u> on the 6 segment pathway is not commensurate to the scope of the claims, since reducing cellular NF-κB activity in the instant claims encompasses both <u>direct</u> and <u>indirect</u> interference with NF-κB activity. Accordingly, treating gram (-) bacterial infections by killing or interfering with the growth of bacterial cells would necessarily reduce LPS levels and thereby indirectly "alter the concentration or availability of NF-κB" and "reduce NF-κB activity". Reducing intracellular LPS-induced NF-κB concentration necessarily decreases the level of NF-κB-I-κB complex, NF-κB translocation, NF-κB binding to its DNA recognition sites and the expression of NF-κB regulated and bacterial LPS-induced cytokines in cells.

3. <u>Patentee Argument</u>: *The premise that the use of antibiotics to treat bacterial infections would necessarily reduce LPS levels is incorrect. In this regard, the Manolagas declaration indicates that one possible (but not necessary) outcome of antibiotic treatment is to reduce LPS levels, contingent on completely resolving a bacterial infection. (Manolagas Decl. ¶¶ 38-39.) However, as acknowledged by the PDR there are several common reasons why antibiotic treatment fails to do so including:*
*-antibiotic-resistant bacterial cells;*
*-antibiotics can be bacteriocidal but also bacteriostatic which does not result in killing bacteria. (1970 PDR at 880, 1167, 1309, 1310, 1379);*
*-little effect on enteric bacteria, including LPS surface-containing gram (-) bacteria. Thus, the bacteria with LPS remains and continues to induce NF-κB. Dr. Verma Declaration ¶ 128.*

<u>Examiner Response</u>:

Initially, patentee's arguments addressing patient criteria, such as antibiotic resistance, antibiotic action (bacteriocidal/bacteriostatic) and targeting (enteric or otherwise) is not commensurate to the instant claims that are not so limited.

Additionally, as pointed out in the rejection above, the *1970 PDR* reference teaches the use of an antibiotic therapeutic protocol of <u>at least two days</u>, but often

longer, which <u>enables</u> the treatment of gram (-) patients (including guidance regarding

the screening for antibiotic resistant gram (-) infections) which reduces LPS levels. See

1970 PDR and antibiotic "Dosage and Administration" pages 1167, 1310 and 1380 for

gentamycin, tetracycline and erythromycin, respectively.

4. <u>Patentee Argument</u>: *As evidence that antibiotic treatment would reduce LPS levels,
Dr. Manolagas specifically refers to only (Galdiero (2001), Manolagas Declaration ¶¶
37-39). Galdiero however, neither mentions antibiotics, nor does the paper provide any
information relating to the effect of LPS in any human patient. Indeed, Galdiero
indicates that in cultured cells, even extremely low levels of LPS, such as 10ng/ml were
sufficient to induce release of cytokines from the cells. Dr. Manolagas' assumption that
in a patient, LPS levels to below 1ug/ml would no longer stimulate NF-κB -mediated
cytokine production therefore has no support in Galdiero, which indicates that 100-fold
lower levels of LPS (0.01 ug/ml) induced expression of such genes in cultured cells.* Dr.
Verma Declaration ¶ 129.

<u>Examiner Response:</u>

Patentee has mischaracterized the *Galdiero (2001)* teaching.

As described in *Galdiero (2001)*, the LPS dose dependent effect (minimum effect

at 10ng/ml and maximum effect at 1000 ng/ml or $1 \times 10^{-6}$/ml) of stimulating cytokine

(TNF-$\alpha$ and interleukins 6 and 8) production in Vitamin $D_3$-treated human THP-1 cells

(see Fig. 3 at page 2700) was "completely blocked" by the antibiotic polymyxin B (data

not shown).

The *Dr. Manolagas Declaration* statement mistakenly referred to the maximally

effective LPS dose, and NOT the minimally effective dose necessary to "completely

abrogate NF-κB -mediated cytokine production" in accordance with the *Galdiero (2001)*

cellular assay evidence.

Patentee fails to provide evidence that the *in vitro* LPS dose-dependent cytokine

cell release and the blocking effect of the gram (-) antibiotic polymyxin B found by

*Galdiero (2001)* is not equally applicable *in vivo* to other antibiotics including

erythromycin, gentamicin and tetracycline.

Additionally, as discussed in the rejection above, there is evidence supporting the ability of erythromycin, gentamicin and tetracycline to inhibit LPS and NF-κB activation. For example, erythromycin has been shown to inhibit the activation of NF-κB in T cells; and in normal and inflamed human bronchial epithelial cells along with modulating IL-8 expression. See *Yasutomi* et al. at page 8068 at the bottom of the right column and footnotes 5-7 (citations therein). *Yasutomi* further demonstrated the ability of tetracycline to inhibit lipopolysaccharides and NF-κB activation in human monocyte-derived dendritic cells and suppress NF-κB induced cytokine production e.g. IL-6, 10, 12p70, 13 and IFN-γ. See Abstract, pp. 8071-8073, Table 1 and Figures 1-3 and 8.

5. Patentee Argument: The following *studies indicate that antibiotic treatment can disrupt bacterial membranes, which by releasing and solubilizing LPS, can be expected to increase circulating LPS levels in the body:*
a. *Lepper et al.; Int. Care Med. 28:824-833 (2002) (Exhibit 28)*
b. *Shenep and Mogan, J. Inf. Diseases, 150:380-388 (1984) (Exhibit 29);*
c. *Hurley et al., Antimicrob. Agents Chemother. 351:2388-2394 (1991) (Exhibit 30);*
d. *Dofferhoff et al., Scand. J. Infect. Dis. 23:745-754 (1991) (Exhibit 31);*
e. *Mustafa et al., J. Infect. Dis. 160:891-5 (1989) (Exhibit 32).*
f. *Leeson and Morrison, Shock 2:235-245 (1994) (Exhibit 33).*
Dr. Verma Declaration ¶ 130.

Examiner Response:

Non-Beta lactam antibiotics (such as erythromycin, gentamicin and tetracycline) are clinically indicated since they do not act on the bacterial cell wall and thus release lower amounts of LPS endotoxins, with aminoglycosides, such as gentamicin, tobramycin and amikacin being shown to neutralize the effects of endotoxin. See *Lepper et al.*, pp.827-828 and Fig. 4; *Dofferhoff* at page 753.

Additionally, any antibiotic-induced endotoxin (LPS) release occurs quickly (within the first two hours) and is of short duration (ending within the first six hours) at which time the endotoxin is cleared as a result of the antibiotic treatment. See *Dofferhoff* at page 752 and Fig. 4; See *Shenep* at page 382, Fig. 1 and page 386, left column.

Application/Control Number: 90/007,503; 90/007, 828                    Page 111
Art Unit: 3991

The *1970 PDR* teaches an antibiotic therapeutic protocol of <u>at least 2 day</u>
duration. See antibiotic "Dosage and Administration" pages 1167, 1310 and 1380 for
gentamycin, tetracycline and erythromycin, respectively).

Accordingly, the *1970 PDR* therapeutic protocol <u>enables</u> the treatment of gram (-)
patients regardless of whether an initial spike of LPS occurs. Since the instant claims
fail to address therapeutic protocol (e.g. duration), the *1970 PDR* therapeutic daily
antibiotic protocol would result in an inherent reduction of NF-κB activity after as little as
6 hours by decreasing LPS-induced NF-κB intracellular amounts.

## VII. N-ACETYL-L-CYSTEINE (intervening prior art)

14      Claims 18 and 182-185 are rejected under 35 U.S.C. 102(a) as being anticipated
by *Staal* et al. *Proc. Nat'l Acad Sci* 87 :9943 (Dec. 1990) ('7828 appendix E:
incorporated by reference).

**REJECTION SUMMARY:** *Staal* et al. (see Abstract; page 9945; Figures 4-5) disclose a
method of inhibiting TNF-α by blocking NF-κB activation in mammalian cells (e.g. Jurkat
cells) by administration of N-acetyl-L-cysteine (NAC).

Instant claim 18 recites: A method for reducing Interleukin-1 or Tumor Necrosis
Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so
as to reduce intracellular signaling caused by Interleukin-1 or Tumor necrosis Factor-α
in the cells.

*Staal* teaches a method of inhibiting TNF-α activation and, thus, signaling, in
mammalian cells by reducing NF-κB activity. Specifically, *Staal* discloses inhibiting
TNF-α stimulation of 293.27.2 and Jurkat cells by selectively blocking NF-κB activation
by administration of N-acetyl-L-cysteine (NAC). See Abstract, and Fig. 5. Reduction of
intracellular TNF- α signaling is demonstrated by decreased expression of a beta-
galactosidase reporter gene in Jurkat cells, which are mammalian (human) in origin.
See Fig. 4. Accordingly, claim 18 is anticipated.

Instant claim 182, depending from claim 18, further recites that reducing NF-κB
activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which
are transcriptionally regulated by NF-κB. *Staal* anticipates claim 182 by teaching that
high thiol levels (resulting from NAC administration) inhibit NF-κB activation by
preventing phosphorylation of I-κB, since phosphorylation of I-κB is necessary for
dissociation of NF-κB from its complex with I-κB. Since NAC administration keeps NF-
κB complexed to its naturally occurring inhibitor I-κB, NF-κB is unavailable for binding

Application/Control Number: 90/007,503; 90/007, 828                        Page 112
Art Unit: 3991

NF-κB recognition sites on genes that are transcriptionally regulated by NF-κB. Thus, instant claim 182 is anticipated since NAC-mediated inactivation of NF-κB described in *Staal* inherently and necessarily results in reduced NF-κB binding to its recognition sites.

Instant claims 183-185, depending from claim 18, are also anticipated by *Staal*. These claims further require that the method is carried out on human cells (claim 183), immune cells (claim 184) and lymphoid cells (claim 185). *Staal* discloses NAC inhibition of TNF- α stimulation in Jurkat cells (see Fig. 4, p. 9945) which are cells derived from a human T-cell leukemia cell line, and, thus, are human, immune and lymphoid anticipating claims 183-185.

### *Discussion*

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.* Response at p. 63.

Examiner Response:  For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC §120 for purposes of prior art.

2. Patentee Argument: *Staal does not show reduction of NF-κB activity in induced cells, as required by the claims since "… the aim of the Staal study was to determine whether NAC (N-acetyl-cysteine), by inhibiting thiol levels could act on cells before they experienced stimulation." (Staal at 9944) and in the Staal experiments "… cells were always treated simultaneously with both NAC and TNF-α." (Staal at 9945-46). Response at pages 61-63. Dr. Verma Declaration ¶¶ 161-162.*

Examiner Response:

In response to patentee's argument that the reference fails to show certain features of patentee's invention, it is noted that the feature upon which patentee relies (i.e, *in vitro* cell contacting with activator prior to contacting with an inhibitor) is not recited in the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering the NF-κB inhibitor prior to or with an NF-κB activating compound.

Contrary to patentee's argument *Staal* does show that simultaneous administration of PMA, TNF-α and NAC results in "reduction of NF-κB activity in induced cells" since *Staal* demonstrates:

- inhibition of *basal level* stimulated B-galactosidase (B-gal.) cell production,
- > 95% inhibition of PMA stimulated cellular B-gal production, and
- about 70% inhibition of TNF-α stimulated cellular B-gal production.

See *Staal* at p. 9944 under "Results" and Fig. 1; See also p. 9945, right col. and Fig. 4 for analogous NAC "reduction of NF-κB activity in (PMA/ TNF-α) induced cells".

## VIII. NUCLEIC ACID DECOYS: (intervening prior art)

15.    Claims 1, 2, 20, 25-27, 29, 31, 36-38 and 40 are rejected under 35 U.S.C. 102(a) as being anticipated by *Bielinska* et al. *Science* 250 :997 (Nov. 16, 1990) as evidenced by *Ho*, PNAS USA 86 :6714 (1989) for purposes of defining clone 13B cells disclosed in *Bielinska*. See MPEP 2131.01: Multiple Reference 35 U.S.C. 102 Rejections (primary reference term meaning) ('7828 Appendix D: incorporated by reference).

**Rejection Summary:** *Bielinska* (e.g. at pages 197-198 and Fig. 1) discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 13 B-lymphoblastoid cells.

*Bielinska* discloses the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 12 B-lymphoblastoid cells. See, e.g., p. 997, Abstract at mid-¶ and p. 998 right hand column and Fig. 1D. Specifically, *Bielinska* discloses the use of phosphoroothioate oligonucleotides as decoy molecules that competitively bind NF-κB in clone 13 B cells. Id. These cells contain an HIV-CAT reporter gene construct that is transcriptionally- regulated by NF-κB by two κB binding sites found within the HIV enhancer. Fig. 1, and middle of right column on page 997.

*Bielinska* teaches that phosphorothioate oligonucleotides having an NF-κB binding site consensus sequence, GGGGACTTTCC (the same as disclosed in the instant '516 patent in Table 2 at col. 37), competitively bind NF-κB, reducing the amount of NF-κB/HIV enhancer-regulated transcription of chloramphenicol acetyltransferase (CAT). See p. 1000, fn. 19. Administration of these NF-κB decoy molecules in clone 13 cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998, right-hand column next to Fig. 1D.

Thus, *Bielinska* teaches reducing NF-κB activity in eukaryotic cells such that expression of a gene whose transcription is regulated by NF-κB is inhibited, as required

by instant claims 1 and 2. Specifically, as discussed above, *Bielinska* teaches a method of inhibiting expression of NF-κB/HIV enhancer-regulated CAT clone 13B lymphoblastoid cells. See e.g. p. 998, right-hand column next to Fig. 1D. This decrease in NF-κB is accomplished by administration of double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC. See p. 1000, fn 19.

*Bielinska* also teaches the methods of instant claims 20, 25-29, 31 and 36-40, which depend from claims 1 and 2.

Instant claims 20 and 31 are drawn to a method wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:I-κB complex. These claims are anticipated by the *Bielinska* teaching (discussed *supra*) that double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC, competitively bind NF-κB in clone 13B cells since binding of NF-κB by a decoy molecule necessarily decreases the amount of free NF-κB in the cell which necessarily decreases the level of NF-κB not bound in an NF-κB:I-κB complex.

Instant claims 25 and 36 are drawn to a method wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. As discussed for dependent claims 20 and 31, *Bielinska* discloses double-stranded oligonucleotide phosphorothioates that compete with the NF-κB binding site, thus reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

Instant claims 26-29 and 36-40 are drawn to reducing NF-κB activity in a cell resulting in inhibited expression of a gene regulated by NF-κB, wherein the method is carried out on mammalian cells (claims 26 and 37), human cells (claims 27 and 38), immune cells (claims 28 and 39) and lymphoid cells (claims 29 and 40). The *Bielinska* clone 13 B cells are human B lymphoblastoid cells and are thus, mammalian, human, immune, and lymphoid cells, as recited in the instant claims. See *Bielinska* p. 998 (left hand column at top) and *Ho* provided in Appendix C. *Bielinska* also anticipates instant claim 203 which is drawn to:

> A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes an NF-κB binding site that binds to NF-κB.

As discussed above, *Bielinska* teaches a method of inhibiting expression of a CAT reporter gene using a nucleic acid decoy molecule. Transcription of the CAT reporter gene is regulated by an NF-κB/HIV enhancer and the *Bielinska* decoy molecule possesses the NF-κB binding site consensus sequence GGGGACTTTCC disclosed in

Application/Control Number: 90/007,503; 90/007, 828    Page 115
Art Unit: 3991

the instant patent. *Bielinska* teaches that introduction of this NF-κB decoy molecule into the clone 13B cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998, right hand column next to Fig. 1D. Therefore, *Bielinska* teaches each and every element of instant claim 203.

### Discussion

Initially, it is noted that the above rejection was modified in response to patentee's amendment cancelling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. <u>Patentee Argument</u>: *Numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.* 11/17/06 amendment page 34.

<u>Examiner Response:</u> For the reasons discussed *supra,* the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC §120 for purposes of prior art.

### Final Status of the Claims

1. **Rejected**: claims 1-6, 8-18, 20-27, 29, 31-38, 40, 42-43, 47-51, 53-62, 64-73, 75-80, 82, 84, 88-97, 99-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-137, 139,140, 144-147, 149, 150, 154-157, 159, 160, 164-168, 172-175, 177, 178, 182-185, 192-193 and 197-201.

2. **Confirmed**: claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202.

3. **Cancelled**: 7, 28, 39, 81, 83, 85, 86 and 203

13.    **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire <u>two months</u> from the mailing date of this action.

**Extensions of time under 37 CFR § 1.136(a) do not apply in reexamination proceedings.** The provisions of 37 CFR § 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. § 305 and in 37 CFR §1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

Application/Control Number: 90/007,503; 90/007,828    Page 116
Art Unit: 3991

    **Extensions of time in reexamination proceedings are provided for in 37 CFR §1.550(c).** A request for extension of time must be filed on or before the day on which a response to this action is due, and it must be accompanied by the petition fee set forth in 37 CFR § 1.17(g). The mere filing of a request will not effect any extension of time. An extension of time will be granted only for sufficient cause, and for a reasonable time specified.

    The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional month, which will be granted even if previous extensions have been granted. In no event however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action. See MPEP § 2265.

### Service on the Other Party (3rd Party Request)

    After the filing of a request for reexamination by a 3rd party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR §1.248. See 37 CFR §1.550 (f).

### Patent Owner Amendment

    Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR § 1.530(d)-(j), must be formally presented pursuant to 37 CFR § 1.52(a) and (b), and must contain any fees required by 37 CFR §1.20(c). In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action. Further submissions will be governed by the requirements of 37 CFR §1.116, after final rejection and 37 CFR §41.33 after appeal, which will be strictly enforced.

### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR §1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR §1.33(c), automatically changed to that of the patent file as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, underlinedincluding the present reexamination proceeding, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination and Amendment Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

Application/Control Number: 90/007,503; 90/007, 828                    Page 118
Art Unit: 3991

### *Future Correspondences*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Bennett Celsa whose telephone number is 571-272-0807. The examiner can normally be reached on 8-5. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Deborah D. Jones can be reached on 571-272-1535. The fax phone number for the organization where this application or proceeding is assigned is 571-273-9900.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria, VA  22313-1450

Please FAX any communications to:
(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:
Customer Service Window
Attn: Central Reexamination Unit
Randolph Building
401 Dulany Street
Alexandria, VA  22314

*Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).*

Bennett  Celsa
Primary Examiner
Art Unit 3991

Conferees:

DEBORAH D. JONES
SPRE-AU 3991
CENTRAL REEXAMINATION UNIT

PADMASHRI PONNALURI
CRU EXAMINER - AU 3991

Application/Control Number: 90/007,503; 90/007, 828         Page 119
Art Unit: 3991

## TABLE OF CONTENTS

| PRIOR ART PENDING REJECTION SUMMARY | | PAGES |
|---|---|---|
| **I. PROTEIN KINASE C INHIBITORS (intervening prior art):**<br>Anticipation: *Meichle* (p.25) or *Shirikawa* (p. 31) ('7503 Exhibit. G2) of claims<br>1-6, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65,<br>69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, & 197-201. | | 25-32 |
| **IIa. CYCLOSPORIN A   (intervening prior art)**<br>Anticipation: *Schmidt* (pp. 35-36), *Emmel* (pp. 42-43) and *Brini* (pp. 47-48) ('7503 Exhibit G1)<br>of claims 1-6, 8-9, 11, 20-21, 25-27,29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73,<br>75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 & 197-201. | | 35-48 |
| **IIb. CYCLOSPORIN A (references prior to 12/24/86)**<br>A.  Anticipation: *PDR* (1985), *Griffith I*, *Griffith II* ('7503 Exhibit H1) of<br>claims 1-2, 6, 8-9, 20-27, 29, 31-38,40, 64-73, 75-80, 82, 84 and 88-97. | 54-57 | 54-75 |
| B. Anticipation *by Reed*  ('7503 Exhibit H2) of claims 1-2, 5-6,8,9, 20-21, 25-27<br>29,31-32,36-38, 40,53-54,58-62,64-65,69-73,75-76,80, 82, 84,88-89, and 93-97. | 66-68 | |
| C. Anticipation *by Kronke* and/ or *Siebenlist* ('7503 Exhibit H3) of claims<br>1-2, 5-6, 8,9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76,<br>80, 82, 84, 88-89, and 93-97. | 74-75 | |
| **III. VITAMIN D (CALCITRIOL) (references prior to 12/24/86)**<br>Anticipation by *Tsoukas, Manolagas, Lemire I, Lemire II and Rigby I* ('7503 Exhibits H4-H6)<br>of claims 1-2, 5-6, 8, 9,  20-21, 25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76,<br>80, 82, 84, 88-89 and 93-97. | | 78-79 |
| **IV. 5-ASA   (references prior to 12/24/86)**<br>Anticipation by *Dew* ('7503 Exhibit H7) of claims 1-2, 5-6, 8, 9, 20-27, 29, 31-38, 40,<br>53-62, 64-73, 75-80, 82, 84 and 88-97. | | 90-91 |
| **V. GLUCOCORTICOIDS (references prior to 12/24/86)**<br>Anticipation by *Goodman & Gilman* ('7503 Exhibit H8) of claims 1-2, 5-6, 8, 9, 20-21,<br>25-27, 29, 31-32, 36-38, 40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80, 82, 84, 88–89 and 93-97. | | 94-97 |
| **VI. ANTIBIOTICS (references prior to 12/24/86)**<br>Anticipation by *1970 PDR* ('7503 Exhibit H10) of claims 1-2, 5-6, 8-10,12-18, 20-21, 25-27,<br>29, 31, 32, 36-38, 40, 53-54, 58-62, 64, 65, 69-73, 75, 76, 80, 82, 84, 88-89, 93-97, 99, 100, 104-105,<br>119-120, 124-129, 133-137, 139,140,144-147, 149,150,154-157, 159, 160, 164-168,172-175, 177,<br>178, and 182-185. | | 105-107 |
| **VII. N-ACETYL-L-CYSTEINE  (intervening prior art)**<br>Anticipation by *Staal* of claims 18 and 182-185 ('7828 Appendix E). | | 111-112 |
| **VIII. NUCLEIC ACID DECOYS: (intervening prior art):**<br>Anticipation by *Bielinska* of claims 1, 2, 20, 25-27, 29, 31, 36-38 and 40<br>('7828 Appendix D). | | 113-115 |

# EXHIBIT 2

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

_Ex Parte_ Reexamination Filing Data  - September 30, 2007

1. Total requests filed since start of ex parte reexam on 07/01/81 . . . . . . . . . . . . . . . . . 8895[1]

    a. By patent owner                            3472    39%
    b. By other member of public         5258    59%
    c. By order of Commissioner         165    2%

2. Number of filings by discipline

    a. Chemical Operation                 2671    30%
    b. Electrical Operation               2958    33%
    c. Mechanical Operation           3266    37%

3. Annual Ex Parte Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | | |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | | |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |

4. Number known to be in litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2303    26%

5. Determinations on requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8557

    a. No. granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7845 . . . . . . . . . 92%

        (1) By examiner                        7732
        (2) By Director (on petition)       113

    b. No. denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 712 . . . . . . . . . . 8%

        (1) By examiner                        677
        (2) Order vacated                35

---

[1]Of the requests received in FY 2007, 23 requests have not yet been accorded a filing date, and preprocessing of 36 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for _Ex Parte_ and _Inter Partes_ Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

1

6.  Total examiner denials (includes denials reversed by Director) . . . . . . . . . . . . . . . . . . . 790

    a.  Patent owner requester                   439       56%
    b.  Third party requester                     351       44%

7.  Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency                         23.7 (mos.)
    b.  Median pendency                          18.4 (mos.)

8.  Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a.  All claims confirmed | 23% | 29% | 12% | 26% |
| b.  All claims cancelled | 7% | 12% | 21% | 10% |
| c.  Claims changes | 70% | 59% | 67% | 64% |

9.  Total ex parte reexamination certificates issued (1981 - present) . . . . . . . . . . . . . . . . . 5902

    a.  Certificates with all claims confirmed        1527    26%
    b.  Certificates with all claims canceled         613    10%
    c.  Certificates with claims changes          3762    64%

10.  Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.

    a.  Certificates - PATENT OWNER REQUESTER . . . . . . . . . . . . . . . . . . . . . . . . . . 2545

        (1)  All claims confirmed             581    23%
        (2)  All claims canceled             187    7%
        (3)  Claim changes               1777    70%

    b.  Certificates - 3rd PARTY REQUESTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3211

        (1)  All claims confirmed             928    29%
        (2)  All claims canceled             397    12%
        (3)  Claim changes               1886    59%

    c.  Certificates - COMM'R INITIATED REEXAM . . . . . . . . . . . . . . . . . . . . . . . . . . 146

        (1)  All claims confirmed             18    12%
        (2)  All claims canceled             30    21%
        (3)  Claim changes               98    67%

C:\Documents and Settings\LKryza\My Documents\zkryza\Reexam Reports\REXSTATz xp Sep2007.wpd

# EXHIBIT 3

Ariad v. Eli Lilly                              Day 13, Session 1
                           4-27-06

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.:1:02-cv-11280-RWZ

ARIAD PHARMACEUTICALS, INC.      )
MASSACHUSETTS INSTITUTE OF        )
TECHNOLOGY, THE WHITEHEAD         )
INSTITUTE FOR BIOMEDICAL RESEARCH)
and THE PRESIDENT AND FELLOWS OF  )
HARVARD COLLEGE,                  )
              Plaintiffs,         )
                                  )
     - vs. -                      )
                                  )
ELI LILLY & COMPANY,              )
              Defendants          )

********

JURY TRIAL
DAY 13, First Session

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

United States District Court
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
April 27, 2006

********

REPORTER:  LISA W. STARR, RPR,CRR,CSR
Tel:  617.771.8336

Ariad v. Eli Lilly                              Day 13, Session 1

4-27-06

Page 34

1    the defense cited to that I reviewed earlier today.  So, that

2    is by Dr. Weismann, the one where he concluded that the

3    effects of NSAIDS are quite unpredictable, in fact can give a

4    dangerous result at different doses.

5    Q.   And if you could look at Reference 11.  Again, that's a

6    1992 reference?

7    A.   1992, yes.

8    Q.   And did any of the questions that Mr. Drutchas ask you

9    alter your opinions that none of the references regarding

10   calcitriol or NSAIDS or glucocorticoids anticipate the Claims

11   80 and 95?

12   A.   They did not.

13   Q.   Thank you.

14          THE COURT:   Any recross?

15          MR. DRUTCHAS:   No, your Honor.

16          THE COURT:   Thank you, Dr. Prescott.  You are

17   excused.

18          (Witness excused).

19          THE COURT:   Whose next?

20                TOM KADESCH, sworn

21          THE COURT:   Could you tell us your full name?

22          THE WITNESS:  My name is Tom Kadesch.

23          MS. BEN-AMI:   If I may make a transition statement,

24   your Honor.

25          Well, the good news, ladies and gentlemen, is that

15dd0d7d-c2cd-4ea7-9658-cf3b06c5aaf9

Ariad v. Eli Lilly                                Day 13, Session 1
4-27-06

Page 48

1    One is what the person of ordinary skill in the art actually

2    is, who that person is and what that person knows, and what

3    that person is capable of doing.

4          The second is what was known in the art at the time,

5    what was known and, as a consequence, you would have in your

6    mind as you read the claims and thereby use that information

7    in order to practice the claims.

8    Q.   Now, have you read the '516 patent?

9    A.   I have read the '516 patent.

10   Q.   And have you --

11        THE COURT:   All of it?

12        THE WITNESS:  Yes, yes.

13        MS. BEN-AMI:   Someone has to.

14        THE WITNESS:  No one asked me if it was fun to read.

15   Q.   Have you read the 1989 application, Doctor?

16   A.   I've also read that word for word.

17   Q.   You haven't memorized it, though?

18   A.   No.

19   Q.   Now, based on your review of these documents and your

20   understanding as to what someone skilled in the art would know

21   in the time frame 1989 to 1991, have you drawn any conclusions

22   regarding the sufficiency of the disclosure, first we'll say

23   of the '516 patent?

24   A.   Yes.  I think it was sufficient.

25   Q.   And was it sufficient to show that the inventors were in

15dd0d7d-c2cd-4ea7-9658-cf3b06c5aaf9

Ariad v. Eli Lilly                              Day 13, Session 1

4-27-06

Page 49

1   possession of the invention that's claimed in the four claims

2   we're talking about here?

3   A.   As I understand the law, yes, it was.

4   Q.   And in your opinion, can you tell us, putting yourself

5   back into 1991 for the moment, based on the conventional

6   knowledge in the art, in your opinion would someone of

7   ordinary skill in the art as defined understand that the

8   inventors had really invented what they said?

9   A.   Absolutely.

10  Q.   And that's based on what was conventional and known in

11  the art at the time?

12  A.   Yes, and the description of the patent itself.

13  Q.   Now, let's look at the 1989 application for a moment.

14  Same question.

15        Let me just back up for a second.  No, let's just

16  look at the 1989 application for the moment.

17        In your opinion, does the 1989 application, going

18  back in time, imagining someone with skill in the art had

19  looked at it in 1989, given the conventional knowledge at the

20  time, in your opinion would that have shown that the inventors

21  were in possession of the claimed invention?

22  A.   Yes.

23  Q.   And that's based on your understanding of what was known

24  at the time?

25  A.   That was certainly a big part, yes.

# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-12237 WGY


AMGEN, INC.,                    ) DEPOSITION OF:
                               ) DR. THOMAS R. KADESCH
                               )
          Plaintiff,           )
                               )
     vs.                       )**CONFIDENTIAL**
                               )**RESTRICTED ACCESS***
                               ***OUTSIDE COUNSEL'S EYES
F. HOFFMANN-LA ROCHE LTD., a )ONLY****
Swiss Company, ROCHE           )
DIAGNOSTICS GmbH, a German     )
Company, and HOFFMANN-LA       )
ROCHE, INC., A New Jersey      )
Corporation,                   )
                               )
          Defendants.          )


          TRANSCRIPT of the stenographic notes of the

proceedings in the above-entitled matter, as taken by

and before LISA FORLANO, RMR, CRR, CSR, CLNR, Notary

Public, held at the offices of Duane, Morris, 1540

Broadway, New York, New York, on Thursday, June 21,

2007, commencing at 9:08 a.m.


LiveNote World Service     800.548.3668 Ext. 1

Kadesch, Thomas R.                                6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

**Page 266**

1    A    That's correct.
2    Q    And even Claim 1 in being limited to
3  the eucaryotic cells, that would be millions and
4  millions of cells?
5    A    That's correct.
6    Q    How many different types of eucaryotic
7  cells are there, any idea?
8    A    No.
9    Q    But you would agree -- I think you just
10  did, at least millions of types of cells?
11    A    Sure.
12    Q    In terms of eucaryotic organisms, there
13  are at least several million different species,
14  correct?
15    A    Terrific.
16    Q    And can you tell me, we looked at the
17  genes that are disclosed as being regulated by NF
18  Kappa B in the '516 Patent, that's at Table 2 at
19  Column 37, can you tell me how many eucaryotic cells
20  the '516 Patent describes as -- describes that one
21  can carry out the invention?
22    A    I don't remember.
23    Q    Would you agree that it's a fairly
24  small number of cells, on the order of a dozen or
25  so?

**Page 267**

1         MR. SUH:  Objection, form, vague.
2         THE WITNESS:  If I went back and looked
3  at the patent, I would not be surprised if it
4  were in that range.
5  BY MR. FLOWERS:
6    Q    So a handful of cells, correct?
7    A    Yeah.  If you have 12 fingers on each
8  hand.
9    Q    So in Exhibit 16, particularly in
10  Paragraph 88, which is on Page 28.
11    A    Yes.
12    Q    You offer the opinion that the
13  description in the '516 Patent, which I think we've
14  agreed discloses the use of the invention in a
15  handful of genes or for a handful of genes and a
16  handful of cells clearly allowed one of ordinary
17  skill in the art to recognize that the Baltimore
18  inventors invented what is claimed and that includes
19  -- what is claimed would include the practice of the
20  inventions and millions upon millions, in fact, all
21  cells in the animal kingdom, correct?
22         MR. SUH:  Objection to form, lacks
23  foundation.
24         THE WITNESS:  That's correct.
25  BY MR. FLOWERS:

**Page 268**

1    Q    And in fact, Claim 6 of the '516
2  includes not only cells in the animal kingdom, but
3  all living cells, correct, which would include
4  bacteria and plants?
5    A    It is my current understanding of what
6  that claim would involve.
7    Q    And so it was your opinion based on the
8  handful of genes and cells in the '516 Patent there
9  was adequate written description for practice of the
10  inventions in the '516 Patent in all living cells?
11         MR. SUH:  Same objection.
12  BY MR. FLOWERS:
13    Q    Correct?
14    A    I didn't consider that issue
15  specifically when I opined here in this document
16  from the Ariad/Lilly case.
17    Q    But you understood that what was being
18  claimed in the '516 Patent were methods for
19  practicing the inventions in all cells, all living
20  cells?
21    A    This is something that I did not
22  consider.  This aspect of the case I did not
23  consider when I wrote this opinion for the Ariad
24  case.
25    Q    You at least considered, for example,

**Page 269**

1  with regard to Claim 1 in the '516 Patent that the
2  claims were directed to the practice of the method
3  in all eucaryotic cells, correct?
4    A    I did not consider it to be all
5  eucaryotic cells.  As the claim was written, it just
6  says eucaryotic cells.  It doesn't say all
7  eucaryotic cells.  So my understanding of -- my
8  understanding of written description for the '516
9  Patent was not from the point of view of someone
10  with legal expertise where I would interpret those
11  claims the way I interpret the claims for the
12  current patent, the '349 Patent.  And the reason for
13  that is that in terms of claim language, shall we
14  say I've come to understand the necessity for claim
15  language in a way that I didn't appreciate with the
16  '516 Patent.  If I had been asked the same series of
17  questions around the '516 Patent, I would have said
18  that the '516 Patent, as it's stated, cannot claim
19  all cells.
20    Q    And cannot claim all eucaryotic cells?
21    A    That's correct.
22    Q    So there's not an adequate written
23  description in the '516 Patent to support the claims
24  that are drawn to all eucaryotic cells?
25         MR. SUH:  Objection.

68 (Pages 266 to 269)

LiveNote World Service     800.548.3668 Ext. 1

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 270

1    THE WITNESS: That would have been my
2    conclusion if I were to compare these two
3    documents at the same time, yes.
4    BY MR. FLOWERS:
5    Q    Your report and the '516 Patent, those
6    two documents?
7    A    Yes. No, no, the claims in the '349
8    Patent as compared to the claims in the '516 Patent.
9    Shall I elaborate?
10   Q    I just want to make sure I understand.
11   As you sit here today, do you agree that the '516
12   Patent claims have adequate written descriptive
13   support?
14   A    For --
15   Q    For all eucaryotic cells?
16   A    No.
17   Q    As you sit here today, do you believe
18   that the '516 Patent claims have adequate written
19   descriptive support for -- strike that.
20   MR. FLOWERS: Let's take a break and
21   we'll see if we can't finish up.
22   MR. SUH: Actually, before we go off
23   the record, I'm going to object to the whole
24   line of questioning with respect to the '516
25   Patent, as well as to the expert report

Page 271

1    submitted in the Ariad versus Eli Lilly case
2    as being outside the scope of the expert
3    report submitted in this case. So I'll just
4    mark that as a record.
5    VIDEO OPERATOR: This concludes tape
6    number seven in the videotape of Dr. Thomas
7    Kadesch on June 21, 2007.
8    The time is 5:16 p.m. and we are off
9    the record.
10   (Brief recess.)
11   VIDEO OPERATOR: This begins tape
12   number nine in the videotape of Dr. Thomas R.
13   Kadesch on June 21, 2007.
14   The time is 5:21 and we're back on the
15   record.
16   MR. FLOWERS: Dr. Kadesch, Amgen has no
17   further questions for you at this time. I
18   thank you for your time.
19   THE WITNESS: Oh, thank you.
20   MR. SUH: Actually, Roche has a few
21   questions.
22   BY MR. SUH:
23   Q    Dr. Kadesch, my name is Howard Suh. I
24   introduced myself on the record earlier and I
25   represent the Roche entities as Defendants.

Page 272

1    Dr. Kadesch, can you please take out
2    Exhibit 5, which Amgen's counsel marked as the Cotes
3    article, Immunoreactive erythropoietin in serum.
4    A    Yes.
5    Q    And specifically, I want to direct your
6    attention to Page 437 of this publication.
7    A    Okay.
8    Q    On Page 437, right above the
9    acknowledgements, there's a last paragraph. It says
10   in conclusion.
11   Do you see that?
12   A    In -- yes.
13   Q    And about a few lines down there's a
14   sentence that starts with bioassays and
15   immunoassays.
16   Do you see that?
17   A    Yes.
18   Q    That states: Bioassays and
19   immunoassays respectively reflect functional and
20   structural characteristics of erythropoietin and
21   estimates by these two different types of system are
22   unlikely to be identical. For example, precursors
23   and degradation products of erythropoietin as well
24   as the native serum hormone, which is itself almost
25   certainly heterogeneous may react in a

Page 273

1    radioimmunoassay.
2    Do you see that?
3    A    I do see that.
4    Q    Can you explain to me what the author
5    is referring to there?
6    A    Well, as I said throughout the day,
7    that the bioassay is a -- an assay for functional
8    erythropoietin, whereas the radioimmunoassay picks
9    up the presence of the protein, but not necessarily
10   an active protein or a full-length protein as I've
11   described earlier today.
12   Q    So, Doctor, does Exhibit 5, which Amgen
13   marked as the Cotes article, is that particular
14   statement within Exhibit 5 consistent with your view
15   that and RIA can pick up say, for example, fragments
16   of erythropoietin?
17   A    Yes.
18   Q    And that's a hypothesis that you have,
19   right?
20   A    That's correct.
21   Q    And it's a hypothesis that's also
22   shared by Cotes, et al, in Exhibit 5?
23   MR. FLOWERS: Objection, lacks
24   foundation.
25   THE WITNESS: It's not Cotes et al,

69 (Pages 270 to 273)

Confidential                                R000069