IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
　　　　　　　　　　　　　　　　　　 )
　　Plaintiffs/Counterclaim Defendants, )
　　　　　　　　　　　　　　　　　　 )
　　v. )
　　　　　　　　　　　　　　　　　　 )
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.* )
　　　　　　　　　　　　　　　　　　 )
　　Defendants/Counterclaim Plaintiffs. )

Civil Action No. 06-259 (MPT)

**Public Version
Confidential Material Ommited**

---

**THE AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 6,410,516**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: June 6, 2008

## TABLE OF CONTENTS

Page

I.    ARIAD DOES NOT CONTEST THAT, IF THE COURT ADOPTS AMGEN'S CLAIM CONSTRUCTION OF "REDUCING NF-κB IN CELLS," THEN ENBREL DOES NOT INFRINGE THE '516 PATENT. ................................... 3

II.   ARIAD HAS CLEARLY DISCLAIMED CERTAIN METHODS FROM THE SCOPE OF THE '516 PATENT CLAIMS, INCLUDING THE USE OF ENBREL. .............................................................................................. 4

      A.    ARIAD Has Clearly Disclaimed Use Of Extracellular Molecules From The Scope Of The '516 Patent Claims In The Reexamination At The PTO. ......... 4

      B.    ARIAD'S Expert Dr. Ravetch Admits That Use Of Anti-TNF-α Extracellular Drugs (Such As Enbrel) Do Not Infringe The '516 Patent. ............. 9

      C.    Neither The Testimony Of ARIAD'S Own Infringement Expert Nor Its Scientifically Unsubstantiated "100 Molecule" Hypothetical Support Its Arguments Of Why The Claims Should Cover Enbrel. ....................................... 11

III.  ARIAD FAILS TO SHOW THE EXISTENCE OF A GENUINE DISPUTE OF ANY MATERIAL FACT PRECLUDING SUMMARY JUDGMENT OF NO INDIRECT INFRINGEMENT. ..................................................................... 16

      A.    ARIAD Proffers No Evidence That Amgen Specifically Intended To Encourage Infringement Of The '516 Patent. ...................................................... 16

      B.    ARIAD Has Not Shown That Enbrel Has No Substantial Non-Infringing Uses. ...................................................................................................................... 18

IV.   CONCLUSION. .................................................................................................... 20

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alloc, Inc. v. International Trade Com'n,*
    342 F.3d 1361 (Fed. Cir. 2003) ................................................................. 19, 20

*Computer Docking Station Corp. v. Dell, Inc.,*
    519 F.3d 1366 (Fed. Cir. 2008) ................................................................. 7

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005) ................................................................. 20

*DSU Medical Corp. v. JMS Co., Ltd.,*
    471 F.3d 1293 (Fed. Cir. 2006) ................................................................. 16, 17, 18

*Manville Sales Corp. v. Paramount Systems, Inc.,*
    917 F.2d 544 (Fed. Cir. 1990) ................................................................. 17

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.,*
    303 F.3d 1294 (Fed. Cir. 2002) ................................................................. 17

*Reynolds Metals Co. v. Aluminum Co. of America,*
    457 F.Supp. 482 (D.C. Ind. 1978) ................................................................. 20

*Warner-Lambert Co. v. Apotex Corp.,*
    316 F.3d 1348 (Fed. Cir. 2003) ................................................................. 17, 18

**Statutes**

35 USC § 271(b) ................................................................. 3

As set forth in Amgen's opening brief, Amgen is entitled to summary judgment of non-infringement because: (1) Amgen's Enbrel product does not "reduce NF-κB activity in cells" under the correct construction of this term; (2) during reexamination proceedings in the PTO and in prior litigation ARIAD has disclaimed the use of molecules such as Enbrel that act outside the cell; and (3) Amgen cannot be found liable for any indirect infringement, because there is no dispute that in promoting and selling Enbrel Amgen does not encourage or induce doctors or patients to use Enbrel for the purpose of accomplishing the claimed method, and because there exist substantial noninfringing uses of Enbrel that preclude a finding of contributory infringement. For any one of these reasons, and for all of them, Amgen's motion for summary judgment of non-infringement should be granted.

ARIAD concedes that it cannot prevail on this motion if the Court adopts Amgen's construction of "reducing NF-κB activity in cells," which requires action to be taken directly inside of cells. Enbrel indisputably does not do this. Rather, Enbrel acts exclusively outside of cells to bind to a molecule known as TNF-α. This binding of TNF-α by Enbrel prevents TNF-α from binding to its receptor located on the surface of certain cells. Enbrel's mode of action thus has nothing to do with NF-κB or with reducing NF-κB activity in cells.

Even if the Court were to adopt some other construction of the claim term, however, Amgen is still entitled to summary judgment of non-infringement based upon ARIAD's clear disclaimers of claim scope during the reexamination of the '516 patent. In an apparent attempt to avoid prior art cited in support of the Examiner's rejection of the claims during re-exam, ARIAD clearly admitted that any extracellular molecule that prevents an external stimulus from "inducing the intracellular signaling pathway through which NF-κB activity is manifested" is not covered by the asserted claims. ARIAD made these admissions just recently in October 2007.

ARIAD cannot dispute that Enbrel is an extracellular molecule that prevents an external stimulus, TNF-α, from binding to its receptor and inducing any intracellular signaling -- exactly the subject matter that ARIAD disclaimed in the PTO. ARIAD further admitted that the asserted claims are limited to "reducing the induced NF-κB activity by intervening in the signaling pathway by which NF-κB activity is manifested including particularly *intervening intracellularly* at a specific segment within the signaling pathway." Again, Enbrel does not intervene in any such signaling pathway.

ARIAD tries in vain to explain away its own admissions that the asserted claims do not cover the use of molecules such as Enbrel. But no amount of attorney argument or "simple illustrations" from ARIAD's current litigation counsel can diminish the impact of its prior admissions to the PTO. When those admissions are compared to the undisputed mechanism of action of Enbrel -- the binding of TNF-α entirely outside the cell -- the conclusion of non-infringement is unavoidable.

The clarity of ARIAD's disclaimer is further evidenced by the prior admissions of its own experts who agreed that the asserted claims of the '516 patent do not cover the use of extracellular molecules. For example, Dr. Ravetch (ARIAD's infringement expert in the *Lilly* litigation and invalidity and claim construction expert in this case) admitted in the *Lilly* case that "a method for using drugs designed to block other extracellular molecules from interacting with cells does not describe any of the claimed methods." Dr. Ravetch expressly stated that drugs that "block or inactivate TNF-α" fall outside the claims asserted in *Lilly* (which at the time he made this statement included dependent claims 70 and 71 asserted here and which are dependent on asserted claim 6), and one drug that Dr. Ravetch distinguishes is none other than Enbrel. It is inconceivable how ARIAD can survive summary judgment given these admissions.

As a separate and independent ground for granting Amgen's motion for summary judgment, ARIAD's evidence that Amgen has induced doctors and patients to practice the claimed methods by promoting and selling Enbrel for its FDA-approved uses falls well short of the legal standard required for showing infringement by inducing the actions of others. As described by the Federal Circuit, the showing required for inducement under 35 USC § 271(b) is the "specific intent to encourage another's infringement." ARIAD cites to no evidence showing that Amgen specifically intended for doctors or patients to reduce their NF-κB activity in some unspecified cells by administering Enbrel. Nothing in the product label or in any promotional materials used by Amgen mentions NF-κB or the use of Enbrel to reduce NF-κB activity. ARIAD's argument that Amgen "knew" this was the effect of giving Enbrel to patients suffering from rheumatoid arthritis or psoriasis fails to establish the requirements for showing inducement infringement. ARIAD admits that mere knowledge of the alleged acts is not enough and fails to come forward with any evidence of specific intent that Amgen encouraged doctors and patients to buy and use Enbrel to reduce NF-κB activity in their cells. Finally, there are substantial non-infringing uses of Enbrel, even under ARIAD's claim constructions and infringement theories, that preclude a finding of contributory infringement.

For these reasons, and others discussed below, Amgen submits that summary judgment of non-infringement is entirely appropriate, and even compelled by the facts and the law governing this case.

I.   **ARIAD DOES NOT CONTEST THAT, IF THE COURT ADOPTS AMGEN'S CLAIM CONSTRUCTION OF "REDUCING NF-κB IN CELLS," THEN ENBREL DOES NOT INFRINGE THE '516 PATENT.**

ARIAD offers no response to Amgen's argument that if the Court construes the claim element "reducing NF-κB activity in cells" to require that the method take place inside the cell, summary judgment must be granted in Amgen's favor. This is because it is undisputed that

Enbrel acts entirely outside of cells. As described in the claim construction briefing, the intrinsic record and the claim language only support the construction that the asserted claims are limited to actions taken inside of cells to directly inhibit NF-κB activity. Amgen urges the Court to adopt its proposed claim construction of "reducing NF-κB activity in cells" and grant summary judgment of non-infringement.[1]

## II.    ARIAD HAS CLEARLY DISCLAIMED CERTAIN METHODS FROM THE SCOPE OF THE '516 PATENT CLAIMS, INCLUDING THE USE OF ENBREL.

Even if the Court adopts a construction different than Amgen's proposed construction for the term "reducing NF-κB activity in cells," summary judgment of non-infringement is still warranted. ARIAD has clearly disclaimed, in its statements to the PTO about the scope of the pending claims (which include those at issue here), coverage for extracellular molecules that act like Enbrel. These statements of disclaimer are confirmed by the admissions of ARIAD's experts, both at the PTO and in the prior *Lilly* litigation, that molecules like Enbrel act in a way that is not covered by the '516 patent claims. ARIAD's efforts to explain away the admissions of its experts, and to create inapplicable and scientifically unsupported illustrations in this effort, all fail to save ARIAD's infringement case.

### A.    ARIAD Has Clearly Disclaimed Use Of Extracellular Molecules From The Scope Of The '516 Patent Claims In The Reexamination At The PTO.

ARIAD's rhetoric and revisionist history aside, there can be no question that ARIAD clearly limited the scope of the '516 patent claims during reexamination. In a 2006 submission to the PTO, ARIAD described a multi-step pathway beginning with the binding of external

---

[1]    Amgen's arguments that the construction of the claim term "reducing NF-κB activity in cells" does not encompass extracellular methods are presented in Amgen's Claim Construction Opening Br. at 17-21 (DI 581) and Amgen's Answering Br. on Claim Construction at 12-22 (DI 648).

stimuli to cell surface receptors that triggers signaling inside the cell[2] and asserted that the

pending method claims covered intervening at any step along this signaling pathway. (Ex. A,

Reexamination Control Nos. 90/007,503 and 90/007,828, Nov. 9, 2006 Response at 29-30; Ex.

B, Reexamination Control Nos. 90/007,503 and 90/007,828, Nov. 9, 2006 Schematic 2)  Then, in

its October 2007 communication to the PTO, after cancelling many of its issued patent claims,

ARIAD clearly and unequivocally stated that the remaining claims were narrower in scope than

it had previously argued:

> Broadly speaking, there are the two types of methods to obtain a cell exhibiting
> reduced NF-κB activity as follows: (a) reducing the induced NF-κB activity by
> intervening in the signaling pathway by which NF-κB activity is manifested
> including particularly intervening intracellularly at a specific segment within the
> signaling pathway; and (b) preventing the external inducing stimuli from inducing
> the intracellular signaling pathway through which NF-κB activity is manifested.
>
> Certain claims of the '516 Patent as issued covered both such types of methods.
> However, as discussed further in this response applicants maintain that the
> rejected *claims now pending are directed only to type (a) above.*

(Ex. C, Reexamination Control Nos. 90/007,503 and 90/007,828, Oct. 22, 2007, ARIAD

Response at 27-28 (emphasis added))  Every claim asserted in this litigation is encompassed

within the claims "now pending" as described by this October 2007 statement to the PTO.

ARIAD is wrong when it argues that these statements in October 2007 do not constitute

an admission that "extracellular methods" are excluded from the scope of the claims.  (ARIAD

Opp. at 11)  ARIAD's disclaimer is clear.  ARIAD acknowledged the existence of "two types of

methods" of reducing NF-κB activity in cells, and then unequivocally conceded that the

remaining claims of the patent cover only one of those methods -- the one involving "intervening

---

2    Notably, this description by ARIAD of the signaling pathway does not capture what Enbrel's
     mode of action either because Enbrel acts upstream of the binding of the external stimuli to
     the receptors.

intracellularly" and not the one involving "preventing external stimuli." This was a concession from its broader position in November 2006.[3]

Essentially, ARIAD argues that its claims still cover anything at all that interdicts its contrived "NF-κB signal transduction pathway" (a pathway that is mentioned or described nowhere in the patent).[4] ARIAD denies that its reexamination statements concede any portion of this pathway and now argues that the quoted statements were actually an attempt to distinguish a prior art reference by describing two methods of how a cell could become induced. But it is simply implausible to read this statement as now argued by ARIAD as anything other than a disclaimer of the second method — *i.e.*, blocking the external stimuli from inducing the signal pathway inside the cell. The act of disclaimer is further confirmed by ARIAD's description of the pending claims (and the asserted claims here) as related to the first of the two described methods as "including particularly intervening intracellularly."[5] Thus, if ARIAD is correct that

---

[3]  In its brief, ARIAD mixes and matches statements from its 2006 and 2007 submissions to the PTO in an attempt to obscure the fact that it clearly conceded that the scope of the remaining claims in 2007 were narrower than what it argued in 2006. When viewing the admissions in the time sequence in which they were made, ARIAD clearly admitted that "preventing external stimuli" was covered by claims pending in 2006 but was not covered by claims that remained in 2007. While ARIAD may or may not be correct that the examiner understood what ARIAD had disclaimed in 2006 (ARIAD Opp. at 12), it has no bearing at all on the scope of what ARIAD then disclaimed in 2007.

[4]  Amgen's arguments that ARIAD's contrived "NF-κB signal transduction pathway" is not the proper basis for claim construction in this case are presented in Amgen's Claim Construction Opening Br. at 21-23 and Amgen's Answering Br. on Claim Construction at 24-25, 28-31.

[5]  Although ARIAD seeks to emphasize the word "including" in its disclaimer to the PTO, there is nothing in ARIAD's October 2007 submission that suggests the disclaimer was limited in the way ARIAD now argues, and in fact there are no examples in the October 2007 submission of what ways of "intervening" were left other than those undertaken "intracellularly."

the '516 patent claims should be defined in terms of some "pathway," then the only sensible read of its statements to the PTO is that it has disclaimed any extracellular portion of this pathway by acknowledging that "preventing external stimuli" is not covered by the remaining claims. *See, e.g., Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1377-79 (Fed. Cir. 2008) (finding that statements during prosecution led to "clear disavowal" of scope of patent claims).

In an attempt to explain away these PTO admissions, ARIAD now tries to divert the attention from its contrived "NF-κB signal transduction pathway" and shift the meaning of these admissions to something having to do with the order in which reagents are added to any experiment and/or whether a patient is sick or well. Specifically, ARIAD argues that the statements to the PTO relate to the order that stimuli or inducing agents are added and to the difference between "prophylaxis" and "treatment."[6] This argument is belied, however, by ARIAD's attempt to distinguish the prior art use of antibiotics and their effects on the extracellular inducing stimulus LPS.

ARIAD's expert admits that antibiotics are administered when a person has a bacterial infection, *i.e.* when there is already an "induced" level of the external stimulus LPS. (*See* Amgen Opening Br.,[7] Ex. E, October 19, 2007 Verma Decl. at ¶ 114) Antibiotic administration is thus not "prophylaxis" as ARIAD calls it. There is also no question that, at least under ARIAD's theory, antibiotic treatment results in reduction of LPS, and thus a reduction in the level of LPS-induced NF-κB activity. (*See id.*) In its arguments to the PTO, ARIAD

---

6    Of course, this distinction appears nowhere in the intrinsic evidence of the '516 patent, and is merely an argument contrived by ARIAD to try to maintain the validity of its claims while attempting to still argue infringement by extracellular molecules.

7    DI 588.

distinguishes antibiotic reduction in the level of NF-κB activity from its claimed methods by characterizing antibiotics as merely "preventing further induction" of NF-κB activity (not claimed according to ARIAD), as opposed to "diminishing induced" NF-κB activity (claimed according to ARIAD). (*Id.* at ¶¶ 114-115) ARIAD's arguments only further confirm that Enbrel is not covered by the claims as Enbrel acts to interfere with the inducing stimuli outside a cell in order to prevent further induction as opposed to diminishing already induced activity.

While ARIAD goes to great lengths to argue that Enbrel does not operate like an antibiotic (ARIAD Opp. at 12-16), ultimately it cannot identify any differences that matter for purposes of claim scope and infringement. ARIAD attempts to distinguish LPS blockers from TNF blockers by arguing that an anti-cytokine agent (such as a TNF blocker) short circuits further TNF-induced production of TNF. Aside from the fact that the '516 patent specification never even suggests that TNF production is under the control of TNF-α, or that TNF-α production is under the control of NF-κB, ARIAD's distinctions are without consequence in terms of reducing NF-κB activity in cells. ARIAD states that LPS and TNF are extracellular molecules that can induce NF-κB activity by binding to cell surface receptors. (Amgen Opening Br., Ex. B, Calame Dep. at 220:16-20, 242:11-14) If preventing LPS from binding to cell surface receptors is not a claimed activity, then it must be that preventing TNF from binding to cell surface receptors is also not a claimed activity. ARIAD states that "antibiotics do not have any effect on NF-κB activity once the activity has been induced" (Ex. C, Reexamination Control Nos. 90/007,503 and 90/007,828, Oct. 22, 2007, ARIAD Response at 23-24), and the same can be said about extracellular TNF blockers like Enbrel.

It is finally noteworthy that while ARIAD attempts to explain away its admissions to the PTO that disclaim agents with an extracellular mechanism of action like Enbrel, it does not and

8

cannot point to anything in the '516 patent to support its arguments that the claims cover extracellular intervention or even anything about distinguishing between prophylaxis and treatment. The reality is that extracellular methods are not within the scope of the claims (lest they cover prior art that ARIAD clearly distinguished in re-exam), which is why ARIAD has conceded that "preventing external stimuli" is not a method covered by the claims. Thus, ARIAD cannot maintain an infringement case against an extracellular molecule like Enbrel under any claim scope consistent with the intrinsic evidence.

**B.    ARIAD'S Expert Dr. Ravetch Admits That Use Of Anti-TNF-α Extracellular Drugs (Such As Enbrel) Do Not Infringe The '516 Patent.**

Just as ARIAD cannot square its statements to the PTO with its infringement allegations in this case, ARIAD also cannot square its arguments in its opposition brief with the admissions made by its expert Dr. Ravetch in the *Lilly* case. Clear admissions by Dr. Ravetch (who is one of ARIAD's chief experts in this case) made in the *Lilly* case also undermine ARIAD's attempt to distinguish its statements regarding antibiotics and LPS in its brief, and cut directly against ARIAD's frivolous infringement allegations against an extracellular anti-TNF-α drug like Enbrel.

Although ARIAD contends it has maintained a "sharp distinction" between antibiotics and anti-TNF-α drugs like Enbrel (ARIAD Opp. at 15)[8], it in fact took the position in the *Lilly* case that they operate in the same way. Dr. Ravetch opined in that case that drugs that act

---

[8]  Contrary to ARIAD's arguments, Dr. Verma did not even mention let alone distinguish "anti-cytokine" agents like Enbrel from antibiotics in his 2006 Declaration. The most that can be said is that Dr. Verma argued that antibiotics do not interfere with the so-called NF-κB pathway.

directly on TNF-α and antibiotics are analogous inasmuch as they are distinct from the '516 patent claims:

> In my first report, I explained why I disagreed with Dr. Manologas' conclusion that one could practice the methods of the asserted claims by administering antibiotics. For many of the same reasons, a method for using drugs designed to block other extracellular substances from interacting with cells does not describe any of the claimed methods. For example, to the extent that these agents (such as anti-TNF-α antibodies) function by interacting extracellularly with a potential inducing stimulus, use of such agents would not describe any method that is performed on a eukaryotic or mammalian cell.

(Ex. D, Nov. 11, 2005 Ravetch Reply Rpt. at ¶ 7)[9]  Thus, although ARIAD's litigation counsel now sees "important distinctions" between antibiotics and drugs like Enbrel (ARIAD Opp. at 14, without any support in the record), Dr. Ravetch previously identified no meaningful distinction and instead focused on the "same reasons" they were distinct from the '516 patent claims (Ex. D, Nov. 11, 2005 Ravetch Reply Rpt. at ¶ 7).

Not only are ARIAD's arguments and distinctions regarding antibiotics and LPS inconsistent with Dr. Ravetch's admissions in the *Lilly* case, but Dr. Ravetch made flat-out admissions in that case that TNF-α blocking agents (such as Enbrel) are *not* covered by any of the asserted claims.  Dr. Ravetch referred to "extracellular substances" that block a variety of substances, such as LPS or TNF, and argued in the *Lilly* case that such substances were not covered by the claims:

> *a method for using drugs designed to block other extracellular substances from interacting with cells does not describe any of the claimed methods.* For example, to the extent that these agents (such as anti-TNF-α antibodies) function by interacting extracellularly with a potential inducing stimulus, use of such

---

[9]  Dr. Ravetch was opining on claims then asserted in the *Lilly* matter, including claims 70 and 71, which are asserted here, that depend on claim 6 and require that the method be practiced with human cells and immune cells respectively.

agents would not describe any method that is performed on a eukaryotic or mammalian cell.

> ...*the use of agents designed to block or inactivate TNF-α*, RANK-1, IL-1 or *LPS, does not practice any of the asserted claims* [including claims 70 and 71, dependent claims of claim 6]. By preventing an inducing substance from interacting with the cell, such agents instead act (assuming they were to be effective) before such signaling takes place.

(*Id.* at ¶¶ 7-8 (emphasis added)) And there can be no doubt that Dr. Ravetch was referring to drugs not only like Enbrel, but in fact to Enbrel itself. In the paragraph introducing the discussion quoted above, Dr. Ravetch noted that he was responding at least in part to "paragraphs 19 through 33" of an expert report prepared by *Lilly* expert Dr. Gordon Bernard. (*Id.* at ¶ 6) It is noteworthy that in paragraph 29 of Dr. Bernard's report, he specifically called out Enbrel among the TNF blockers he was referring to. (*See* Ex. E, Expert Report of Gordon Bernard at ¶ 29 (identifying Enbrel among the TNF blockers)) Thus, one of the "drugs" that Dr. Ravetch affirmatively argued was not encompassed by the claims was in fact Enbrel.

Antibiotics and anti-TNF-α drugs are both drugs that are administered to patients because they are thought to have an excess amount of some extracellular substance (*e.g.* LPS or TNF), and thus ARIAD cannot explain away the prior art or Dr. Ravetch's admissions as merely referring to "prophylaxis" and not "treatment." ARIAD's litigation-induced arguments in this case cannot possibly be squared with Dr. Ravetch's clear-cut admissions in the *Lilly* case. This evidence confirms the disclaimer of scope made in re-exam by ARIAD, and thus supports granting summary judgment of non-infringement.

C. **Neither The Testimony Of ARIAD'S Own Infringement Expert Nor Its Scientifically Unsubstantiated "100 Molecule" Hypothetical Support Its Arguments Of Why The Claims Should Cover Enbrel.**

The testimony of ARIAD's expert Dr. Calame also confirms that there is no infringement as a matter of law. Nothing in ARIAD's Opposition Brief compels a different conclusion. As

discussed above, ARIAD has conceded in its statements to the PTO that the following is not

covered by any remaining claim of the '516 patent:

> preventing the external inducing stimuli from inducing the intracellular signaling
> pathway through which NF-κB activity is manifested.

(Ex. C, Reexamination Control Nos. 90/007,503 and 90/007,828, Oct. 22, 2007, ARIAD

Response at 26) In her deposition Dr. Calame admitted that this is what Enbrel does:

> Q:     ... [T]he way Enbrel works is to prevent this inducing stimuli, TNF-alpha,
> from inducing intracellular signaling inside a cell via the NF-kappaB pathway?
>
> A:     That is my understanding.

(Amgen Opening Br., Ex. B, Calame Dep. at 223:13-17) When then confronted with diagrams

depicting the mechanism of action of Enbrel and its action of blocking induction or further

induction of intracellular activity, all Dr. Calame could say was that "this [was] getting into Jeff

Ravetch's territory"[10] and it was "not something [she] was prepared to render an opinion on."

(*Id.* at 228:25-229:21) Dr. Calame could not explain how Enbrel's blocking of TNF-α could

possibly reduce any NF-κB-mediated intracellular signaling that had been induced by TNF-α,

which is what ARIAD acknowledges is required by the claims. Thus, even under ARIAD's

constructions, its infringement theories against Enbrel fall apart.

Furthermore, ARIAD's discussion of a "simple illustration" involving 100 molecules of

TNF (ARIAD Opp. at 18) finds no support in the patent or any other evidence. The

unsubstantiated scientific premise of ARIAD's "simple illustration" is that cells wherein NF-κB

has been activated produce more TNF and then secrete this TNF outside the cells to add to the

---

10 As discussed above, Dr. Ravetch's opinions from the *Lilly* case make clear his opinion that
TNF blockers like Enbrel cannot be encompassed within the claims of the patent. And Dr.
Ravetch has offered no new opinion on infringement in this case that could contradict his
statement from *Lilly*. (Ex. F, April 3, 2008 Ravetch Dep. at 63:6-14)

TNF already present. But the '516 patent says nothing about this. The '516 patent specification does not even identify TNF among the genes whose expression are regulated by NF-κB (*see* '516 patent, Table 2), let alone describe anything about any "cycle of pro-inflammatory cytokine production." ARIAD instead cites a modern-day *2007* handbook for this proposition. (ARIAD Opp. at 16) And just as there is nothing in the '516 patent about blocking external stimuli from inducing NF-κB activity, there is certainly nothing about blocking newly-expressed cytokines like TNF to reduce NF-κB activity in cells. Not surprisingly, the asserted claims of the '516 patent do not say anything about these extracellular actions either, as they all focus on the "NF-κB-mediated *intracellular* signaling" (claim 6) or "*intracellular* signaling caused by … TNF-α in the cells" (claim 18). Thus, ARIAD's "simple illustration" finds no support in the '516 patent and cannot provide the foundation for the Court's understanding of the issues.

Even assuming, however, that ARIAD's "simple illustration" did find support in the '516 patent, this illustration ignores key scientific principles and in fact supports Amgen's and not ARIAD's position. ARIAD ignores its own expert Dr. Calame's admission that TNF molecules that have already bound to TNF receptors (thus triggering NF-κB activity under ARIAD's view) cannot be bound up or blocked by Enbrel.[11] (Amgen Opening Br., Ex. B, Calame Dep. at 234:19-235:4) In other words, Enbrel does not do anything to "undo" any induction that has already taken place; it can only block further induction by TNF molecules. This is precisely paralleled by ARIAD's admission regarding antibiotics, that they are not covered by the claims

---

11  ARIAD's illustration also ignores that fact that expression of IκB, the natural inhibitor of
    NF-κB, is also up-regulated when NF-κB activity is increased. (May 22, 2008 Greene Decl.,
    Ex. A at 14 (DI 628)) This "feedback loop" is a natural braking mechanism on NF-κB
    activity, such that for any induction of NF-κB activity there is a natural reduction. (*Id.*)
    ARIAD's "simple illustration" completely ignores this intracellular feedback loop, which is
    of course completely unaffected by anything that Enbrel might do outside a cell.

because they "have no effect on NF-κB activity once the activity has been induced." (Ex. C, Reexamination Control Nos. 90/007,503 and 90/007,828, Oct. 22, 2007 ARIAD Response at 23-24).[12]

ARIAD's other counterargument -- that Dr. Calame's deposition testimony was actually focused on a loop of signaling involving TNF and NF-κB and "Enbrel still breaks the cycle of pro-inflammatory cytokine production" (ARIAD Opp. at 17-18) -- also misses the mark. The '516 patent specification does not discuss any sort of signaling loop. The distinctions drawn by ARIAD in reexamination between what is covered by the '516 patent and what is not covered does not involve a signaling loop. Quite simply, whether there is or is not a "signaling loop" that is broken by Enbrel is not relevant to the question of whether Enbrel reduces NF-κB activity in cells by interfering with "external inducing stimuli" (disclaimed by ARIAD in reexamination) or "intervening intracellularly" (maintained by ARIAD in reexamination).

The inability of Dr. Calame to explain how Enbrel could do anything beyond "blocking induction" or "preventing further induction" of NF-κB activity establishes the inconsistency of ARIAD's infringement positions in this case with its statements in the reexamination. Even in the situation where Enbrel is provided to a patient with previously-induced NF-κB activity, the most that Enbrel can do is prevent further induction of NF-κB activity. (April 25, 2008 Koch

---

12  Moreover, even an attempt to follow ARIAD's unsubstantiated example does not seem to lead to the conclusion ARIAD urges. In ARIAD's illustration, Enbrel blocks 75 of the TNF molecules in each administration. But because more TNF molecules are generated in each round (100, 100+25, 125+50, 175+100, etc.), the amount of extracellular TNF and (assuming ARIAD's theory) the level of intracellular NF-κB activity would thus be going up, not down. Thus, although ARIAD's "simple illustration" has many flaws in its assumptions and ignorance of scientific details, it does not even support ARIAD's position.

Decl., Ex. B at 3-6 (DI 590))  It does nothing to diminish the NF-κB-mediated intracellular signaling that has already been induced, as shown in the diagram below:



Fig 1:  Exhibit 17 of the deposition of Dr. Calame.  (*See* Amgen Opening Br., Ex. B, Calame Dep. at 228:17-231:13)

Thus, under any claim construction consistent with ARIAD's statements to the PTO, Enbrel does not infringe the '516 patent.  ARIAD's own statements to the PTO, and the statements of ARIAD's own experts,[13] compel a finding of non-infringement as a matter of law in this case.

---

13  Further supporting a finding of non-infringement are the publications of ARIAD's expert in the reexamination at the PTO, Dr. Verma.  Dr. Verma's publications are certainly relevant to the extent they help explain the mechanism of action of anti-TNF-α drugs, especially insofar as they describe these drugs using the same words that Dr. Verma uses to describe the prior art that he seeks to distinguish in the reexamination.  (*See* Amgen Opening Br. at 10, 18)

III.    **ARIAD FAILS TO SHOW THE EXISTENCE OF A GENUINE DISPUTE OF ANY MATERIAL FACT PRECLUDING SUMMARY JUDGMENT OF NO INDIRECT INFRINGEMENT.**

Even if ARIAD could somehow make out a direct infringement case -- and as discussed above it cannot -- ARIAD fails to introduce any evidence that Amgen possessed the specific intent to encourage others to infringe the '516 patent to support its indirect infringement allegations. ARIAD has also failed to introduce any evidence that refutes the evidence presented by Amgen that Enbrel has substantial non-infringing uses. Consequently, ARIAD has failed to create an issue of material fact precluding summary judgment of no indirect infringement.

A.    **ARIAD Proffers No Evidence That Amgen Specifically Intended To Encourage Infringement Of The '516 Patent.**

ARIAD has no evidence that Amgen intended to encourage others to infringe the '516 patent. Lacking evidence, ARIAD misapplies the law and suggests that the evidence of encouragement and specific intent are not needed because Amgen allegedly "knew" that use of Enbrel infringes the '516 patent. But specific intent is the key element to proving inducement of infringement. *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (*en banc*) ("inducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement"). Specific intent to encourage the infringement of another, rather than mere knowledge that another infringes, is required for indirect infringement. Because ARIAD's own evidence suggests that many patients do not have reduced NF-κB activity, Amgen's intent to infringe cannot be inferred merely from its sale of Enbrel.

On the other hand, the evidence about whether Amgen has encouraged any doctors or patients to use Enbrel in a manner that reduces NF-κB activity in cells is clear -- there is no such evidence, promotional or otherwise. This intent to encourage infringement element cannot be

replaced by whatever facts ARIAD alleges in place of actual evidence that Amgen intended to encourage others to use Enbrel in a manner that reduces NF-κB activity and thereby infringes the '516 patent. And the Federal Circuit has made clear that "[t]he 'mere' knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *DSU*, 471 F.3d at 1306. ARIAD cannot prove inducement to infringe.

ARIAD's cited authority does not support its claim that knowledge of infringement is a substitute for specific intent to encourage the infringement of another. In *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002), the accused infringer only disputed the asserted patent's validity and infringement, and presented no evidence or argument on any other element of the inducement inquiry. Thus, the Federal Circuit's decision in that case centered on the absence of any evidence or argument and is irrelevant to the inquiry here. And *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) found no inducement to infringe and states a standard for inducement that has been superseded by that announced in *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006), the *en banc* (in relevant part) Federal Circuit decision that clarified the strict specific intent standard this Court must apply. (*See* Amgen's Opening Br. at 21-24)

*Warner-Lambert* shows that intent to infringe cannot be shown by mere sale of a drug that may infringe unless there is also evidence that the alleged infringer actually intended for patients to infringe and/or encouraged doctors to infringe the method claimed. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363-64 (Fed. Cir. 2003). ARIAD's attempt to distinguish *Warner-Lambert* rests on the fallacy that Amgen "knows" that under its label its product is only being used in a manner that infringes the '516 patent, something that cannot even be proved

under ARIAD's own claim construction.[14]   As described below in Part III(B), even under ARIAD's claim construction, at least some of Enbrel's uses are indisputably non-infringing. Thus, *Warner-Lambert* cannot be distinguished from this case because in both instances there were known non-infringing uses of the accused products. And ARIAD's analysis further ignores the fact that the *Warner-Lambert* court's decision centered on whether the accused infringer *intended* for its product to be used in a manner that infringed the patent in suit. *Id.* at 1364. Thus, intent to infringe, not knowledge that a product is being used a particular way, is the touchstone of inducement of infringement. *DSU*, 471 F.3d at 1306.

   **B.    ARIAD Has Not Shown That Enbrel Has No Substantial Non-Infringing Uses.**

   ARIAD also provides no evidence showing that Enbrel does not have substantial non-infringing uses. Despite ARIAD's arguments to the contrary, Dr. Calame admitted that not every patient who uses Enbrel infringes the '516 patent. This is no surprise as it is likely that the downstream effects of Enbrel involve many different intracellular processes. (Amgen Opening Br., Ex. B, Calame Dep. at 242:2-10)  After all, Enbrel was designed to bind to free TNF-α outside the cell; it was not "especially adapted for use in" affecting NF-κB activity and the inventors of Enbrel were unconcerned and unaware of any connection between Enbrel and NF-κB.  (April 25, 2008 Koch Decl., Ex. A at 33-34)  ARIAD's arguments that Dr. Calame's statements are somehow related to her not being able to test every patient who takes Enbrel does not detract from the fact that Dr. Calame does not believe that every Enbrel user infringes the '516 patent. (Amgen Opening Br., Ex. B, Calame Dep. at 161:14-18, 211:23-212:3)

---

14 ARIAD also states that "Amgen claims to promote Enbrel for infringing uses *only* (Amgen Br. at 24)" (ARIAD Opp. at 22 (emphasis in original))  Obviously, Amgen made no such statement on page 24 of its opening brief.

Although Enbrel is used to treat ankylosing spondylitis, ARIAD has presented no evidence that treatment of this condition with Enbrel impacts NF-κB. ARIAD does not cite to a single piece of evidence showing that treatment of ankylosing spondylitis with Enbrel impacts NF-κB. In fact, the DiChamp article cited by Dr. Calame in her report showed no reduction of NF-κB activity in any patients with ankylosing spondylitis who were treated with Enbrel. (*See* Ex. G, Calame Dep. at 150:21-151:10) The fact that Enbrel's label discloses a use (ankylosing spondylitis), (Amgen Opening Br., Ex. I, Enbrel Package Insert), for which ARIAD has presented no evidence of infringement precludes a finding of contributory infringement. *See Alloc, Inc. v. International Trade Com'n*, 342 F.3d 1361, 1374 (Fed. Cir. 2003) (holding that because instructions for installing flooring described infringing and noninfringing methods of installation there could be no liability for contributory infringement although the court made no determination regarding the frequency with which the different installation methods were used).

ARIAD's arguments regarding the 2007 DiChamp article are similarly misplaced. ARIAD argues that the fact that this article shows that at least one out of seven rheumatoid arthritis patients in the study showed no affect on NF-κB is somehow not relevant because FDA approval for Enbrel could be granted even if "a small subset of rheumatoid arthritis patients who take Enbrel do not respond to treatment." (ARIAD Opp. at 24) The issue here is whether there are substantial non-infringing uses of Enbrel, not whether the FDA approved Enbrel. In any case, the DiChamp article does not indicate whether the rheumatoid arthritis patients who were treated with Enbrel but showed no affect on NF-κB saw their symptoms improve or did not respond to the treatment. Because ARIAD's own evidence is a study that found that at least one out of seven rheumatoid arthritis patients treated with Enbrel do not show a change in NF-κB activity, it simply cannot be said that Amgen "know[s] [Enbrel] to be especially made or

especially adapted for use in an infringement of" the '516 patent as required by 35 U.S.C. 271(c). Even based on ARIAD's theories and evidence, a significant number of people who may take Enbrel will not infringe.

Finally, ARIAD argues that the amount of Enbrel sold for non-infringing uses (such as to treat ankylosing spondylitis, or to the at least one in seven rheumatoid arthritis patients who do not show a change in NF-κB activity) is not substantial. But the case law establishes that these uses (which are described on Enbrel's label) are substantial irrespective of the amount sold, *see Alloc*, 342 F.3d at 1374 (holding that any non-infringing method of installing flooring described in the flooring's instructions is a substantial non-infringing use), and ARIAD's cases do not support a different position. In *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1314 (Fed. Cir. 2005) the issue was conflicting testimony about the number of surgeries performed that infringed the patentee's patent. And in *Reynolds Metals Co. v. Aluminum Co. of America*, 457 F.Supp. 482, 509-510 (D.C. Ind. 1978), a thirty-year-old case, there was no evidence that any non-infringing uses were actually practiced. Thus, both of ARIAD's cases centered on the fact that there was no evidence or conflicting evidence about *any* non-infringing use. Here the amount of Enbrel sold to treat ankylosing spondylitis is known and undisputed. Likewise the fraction of patients who did not show changes in NF-κB after treatment with Enbrel in the study described in the DiChamp article is known to be at least one in seven, and is likely significantly higher than that. There is no dispute that there are substantial non-infringing uses of Enbrel and summary judgment of no contributory infringement is proper.

## IV.    CONCLUSION.

For the foregoing reasons, and for the reasons stated in Amgen's April 25, 2008 Brief in Support of Their Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,410,516, Amgen respectfully requests that summary judgment of non-infringement be granted.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

Dated: June 6, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Immunex Corporation, Amgen USA Inc., Amgen Manufactu Limited, and Immunex Rhode Island Corporation*

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of THE AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 6,410,516 with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com