IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;
IMMUNEX CORPORATION, a Washington
corporation; AMGEN USA INC., a Delaware
corporation; AMGEN MANUFACTURING,
LIMITED, a Bermuda Corporation, and
IMMUNEX RHODE ISLAND
CORPORATION, a Delaware corporation,

        Plaintiffs/Counterclaim Defendants,

        v.

ARIAD PHARMACEUTICALS, INC., a
Delaware corporation, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,
a Delaware corporation, *et al.*

        Defendants/Counterclaim Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.06-259 (MPT)

**Public Version**

**Confidential Material Omitted**

---

**DECLARATION OF MELANIE K. SHARP IN SUPPORT OF THE
AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF U.S.
PATENT NO. 6,410,516**

I, Melanie K. Sharp, hereby declare as follows:

1.     I am a partner at the law firm of Young Conaway Stargatt & Taylor LLP in

Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter. I submit this

Declaration in connection with The Amgen Entities' Reply Brief in Support of Their Motion for

Summary Judgment on Noninfringement of U.S. Patent No. 6,410,516. I have personal

knowledge of the facts set forth herein and, if called as a witness, could and would competently

testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of selected pages of

ARIAD's November 9, 2006 Response in Reexamination Control Nos. 90/007,503 and

90/007,828.

3.    Attached hereto as Exhibit B is a true and correct copy of Schematic 2 from ARIAD's November 9, 2006 Response in Reexamination Control Nos. 90/007,503 and 90/007,828.

4.    Attached hereto as Exhibit C is a true and correct copy of selected pages of ARIAD's October 22, 2007 Response in Reexamination Control Nos. 90/007,503 and 90/007,828, Oct. 22, 2007.

5.    Attached hereto as Exhibit D is a true and correct copy of selected pages from the November 11, 2005 Reply Expert Report of Dr. Jeffrey Ravetch in *Ariad v. Lilly*, C.A. No. 102-cv-11280-RWZ (D. Mass).

6.    Attached hereto as Exhibit E is a true and correct copy of selected pages from the October 21, 2005 Expert Report of Dr. Gordon Bernard in *Ariad v. Lilly*, C.A. No. 102-cv-11280-RWZ (D. Mass).

7.    Attached hereto as Exhibit F is a true and correct copy of selected pages from the April 3, 2008 deposition of Jeffrey Ravetch.

8.    Attached hereto as Exhibit G is a true and correct copy of selected pages from the March 26, 2008 deposition of Kathryn Calame.

9.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Executed this 6th day of June, 2008.

/s/ Melanie K. Sharp
_____
Melanie K. Sharp, Esq.

065028.1001

**CERTIFICATE OF SERVICE**

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of Declaration of Melanie K. Sharp in Support of The Amgen Entities' Reply Brief in Support of Their Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,410,516 with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

# EXHIBIT A

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503          and          90/007,828

Filed April 4, 2005          Filed December 2, 2005

**Merged Pursuant to May 4, 2006 Merger Decision**
**Group Art Unit: 3991   Examiner: B.M. Celsa**

Patentees:    David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:    6,410,516 B1          Serial No: 08/464,364

Issue Date:    June 25, 2002          Filed:    June 5, 1995

For    :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

1185 Avenue of the Americas
New York, New York 10036
November 9, 2006

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE TO AUGUST 2, 2006 OFFICE ACTION, SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

An Office Action issued August 2, 2006 in connection with the above-identified merged *ex parte* reexamination.  The August 2, 2006 Office Action set a two (2) month period for filing a response.  Patentees petitioned, and on September 29, 2006 the U.S. Patent Office granted Patentees' request for one (1) month extension of time such that a response to the August 2, 2006 Office Action was due November 2, 2006. Thereafter, on October 31, 2006 Patentee's petitioned for, and the U.S. Patent Office granted Patentee's request for a one (1) week extension

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 29 of 92 of November 9, 2006 Response*

therefore recognize that the claims are different in scope so as to avoid an interpretation in which claim terms are superfluous and/or redundant.

### D.    Proper Construction of the '516 Patent Claims[2]

The invention of the subject patent is based on the pioneering work of the inventors including Dr. David Baltimore, which grew out of studies on how the immune system is regulated. The immune system consists of a variety of specialized cells and protects the body by attacking and eliminating harmful foreign organisms and substances. The inventors' work demonstrated that a particular factor in the cell, NF-kB, plays a central role in regulating how immune cells respond to external influences that are damaging to the body. NF-kB functions as a transcription factor, which is activated in response to external stimuli and participates in regulating expression of particular genes, such as antibody and cytokine genes. (Column 2, lines 20-45 and 54-59; column 12, lines 57-66, col. 13, lines 13 – column 14, line 54; and col. 17, lines 30-37; Declaration of Dr. Verma, ¶¶ 5-7.)

In the absence of inducing external stimuli, NF-kB is generally present in an inactive form in the cytoplasm of the cell. In its inactive form, NF-kB is bound to an inhibitor protein called IkB, which prevents NF-kB from traveling to the nucleus. Upon activation in response to an external influence, NF-kB is released from its complex with IkB. The released NF-kB then moves to the nucleus, where it can participate in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes. The entire NF-kB

---

[2]Patentees also refer the Examiner to the construction of certain claims in the District of Massachusetts litigation. In this regard, Patentees refer the Examiner to the material cited in the Supplemental Information Disclosure Statement in Section IX herein discussing among other issues NF-kB activity and use of blocking drugs (and, material previously disclosed).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 30 of 92  of November 9, 2006 Response*

pathway from induction to gene expression can be separated into the six (6) general segments shown in blue in Schematic 2.  While NF-kB activity is essential to allow the body to respond to the effects of harmful external stimuli, in some cases the activity can become excessive causing other undesirable effects.   (See, e.g., column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; and column 16, lines 22-63 of the subject patent; Schematics 1 and 2; and Declaration of Dr. Verma, ¶¶ 8-9.)

The claims of the '516 patent are directed to various methods for providing a therapeutic benefit by intervening in the processes that constitute the NF-kB pathway, are associated with NF-kB activity, and cause subsequent NF-kB-regulated effects. In situations where there is excessive activation of NF-kB in response to external stimuli, the claimed methods are useful for modifying their potentially harmful effects.  The claims are directed to methods for modifying the body's naturally occurring response to such inducing external stimuli and specifically to reducing the harmful effect of such external influences by "reducing NF-kB activity." The '516 patent claims are directed to various methods for providing a therapeutic benefit by intervening in the processes associated with NF-kB activity that cause subsequent NF-kB-regulated effects.  For example, see column 3, lines 59-67, where the patent explains that "As a result of this finding, it is now possible to alter or modify the activity of NF-kB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-kB activity. Alteration or modification, whether to enhance or reduce NF-kB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-kB activity." These desired goals are achieved in the methods claimed in the '516 patent by reducing the ability of NF-kB to act as a messenger inside the cell, so as to regulate specific results recited in the claims, such as reducing NF-kB mediated gene

# EXHIBIT B



Eukaryotic Cell In Which NF-κB Is Activated By The Presence Of External Influence Resulting In NF-κB Activity

1. Interaction of extracellular influence with receptor on cell membrane
2. Processes leading to disassociation of IκB:NF-κB complex
3. Degradation of IκB
4. Modification of NF-κB proteins
5. Transport of NF-κB to nucleus
6. Nuclear processes leading to gene transcription

November 9, 2006

# EXHIBIT C

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503          and          90/007,828

Filed April 4, 2005          Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

| | |
|---|---|
| Patentees: | David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis |

Patent No.:    6,410,516 B1              Serial No: 08/464,364

Issue Date:    June 25, 2002              Filed:    June 5, 1995

For      :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
              REGULATION

1185 Avenue of the Americas
New York, New York 10036
October 22, 2007

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO JULY 6, 2007 FINAL OFFICE ACTION, SUMMARY OF AUGUST 22, 2007 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

A Final Office Action issued July 6, 2007 in connection with the above-identified merged *ex parte* reexamination. The July 6, 2007 Final Office Action set a two (2) month period for filing a response. Patentees petitioned, and on September 29, 2007 the U.S. Patent Office granted Patentees' petition, for a one (1) month extension of time such that a response to the July 6, 2007 Final Office Action was due October 6, 2007. Thereafter, on October 1, 2007 Patentees petitioned for, and the U.S. Patent Office granted Patentees' petition for a two (2) week extension

ARI 84387

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 23 of 92 of October 22, 2007 Response*

*denied*, 516 U.S. 988 (1995), holding that a prior art method which sometimes yielded crystals of one polymorph but other times yielded crystals of a different polymorph, i.e. a method of which did not always produce the claimed polymorph, did not inherently anticipate. A further discussion of this issue appears below in Section III B(1)(b).

Accordingly, a method of using antibiotics according to the 1970 PDR to treat a bacterial infection does not necessarily involve a method of reducing induced NF-kB activity and, therefore, the inherent anticipation rejection based on the 1970 PDR set forth on pages 105-111 of the July 6, 2007 Final Office Action should be withdrawn.

The Examiners agreed to review the legal standard for an anticipation rejection on the basis of inherency and to reconsider the propriety of this rejection based on the use of antibiotics set forth in the July 6, 2007 Final Office Action.

The Antibiotic Art Cannot Anticipate a Method of <u>Reducing Induced NF-kB Activity.</u>

Next Patentees pointed out that contrary to the interpretation of the claims advanced in the July 6, 2007 Final Office Action, a number of claims <u>explicitly</u> require reducing induced NF-kB activity.  For example, Patentees pointed to claim 14 and claims dependent thereon as claims which explicitly require "reducing bacterial lipopolysaccharide induced expression of cytokines.

The 1970 PDR teaches that patients with a bacterial infection may be treated with one of the three antibiotics at issue.  According to the rationale advanced in the July 6, 2007 Final Office Action, such antibiotic therapy necessarily involves reducing LPS as a result of administering the antibiotic in the case of gram negative infections and thus necessarily involves reducing NF-kB activity.  However, obtaining a reduced level of "NF-kB activation" <u>does</u> <u>not</u> anticipate "reducing induced" NF-kB activity.  Antibiotics do not have any

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 24 of 92 of October 22, 2007 Response*

effect on NF-kB activity once the activity has been induced, and the
July 6, 2007 Final Office Action does not assert otherwise.
Therefore, the 1970 PDR does not anticipate a method which comprises
reducing induced NF-kB activity.

Accordingly, the use of antibiotics to treat bacterial infection by
a method disclosed in the 1970 PDR does not necessarily and
inevitably involve reducing induced NF-kB activity and therefore
cannot anticipate claim 14, claims dependent on claim 14, or any
claims directed to reducing induced NF-kB activity (e.g., claims 6,
8 and 9, and claims dependent thereon). See further discussion of
this issue in Section III.

The Examiners agreed to review and reconsider the applicability of
the inherent anticipation rejection based on the 1970 disclosure of
certain antibiotics in the PDR in so far as it was being applied
against claims which require reducing induced NF-kB activity. To
assist the Examiners, Patentees point out that claim 6 and claims
dependent thereon recite "diminishing induced NF-kB-mediated
intracellular signaling"; claim 8 and claims dependent thereon recite
"modifying effects of external influences ... which induce NF-kB-
mediated intracellular signaling by reducing NF-kB activity"; claim
9 and claims dependent thereon recite "reducing ... the level of
expression of genes which are activated by extracellular influences
which induce NF-kB mediated intracellular signaling"; claim 14 and
claims     dependent     thereon    recite    "reducing    bacterial
lipopolysaccharide-induced expression of cytokines." ; and claim 18
and claims dependent thereon recite "reducing ...activity so as to
reduce intracellular signaling caused by...".

Antibiotic Art has Been Improperly Applied to Claims Requiring
Reducing Induced NF-kB Activity in Cells so as to Reduce
Intracellular Signaling "Caused By Interlukin-1 or Tumor Necrosis
Factor-α".

Patentees also specifically discussed claim 18 and claims dependent

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92 of October 22, 2007 Response*

Necrosis Factor-α in the cells" as required by claim 18 and claims dependent thereon.

Therefore, there is no basis for maintaining the inherent anticipation rejection of claim 18 and claims dependent thereon over the disclosure of the 1970 PDR.

The Examiners agreed to review and reconsider the rejection of claim 18 and claims dependent thereon based on the use of antibiotics to treat bacterial infection according to the 1970 PDR.

ARI 84412

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 27 of 92 of October 22, 2007 Response*

III.    RESPONSE TO ART REJECTIONS

On pages 17-22, the July 6, 2007 Final Office Action sets forth an interpretation of the claims of the '516 Patent which suggests that many differently worded claims should be interpreted as having the same scope. To limit the issues in these proceedings, Patentees have herein cancelled more than 90 claims and respectfully direct the Examiner's attention to the pending rejected independent claims now pending, i.e. claims 6, 8, 9, 14 and 18, and to claims dependent thereon. Patentees maintain that the claim interpretation advanced in the July 6, 2007 Final Office Action (as well as that advanced in the earlier August 2, 2006 Office Action) is not applicable to the these now pending rejected claims. See, also the Second Declaration of Dr. Inder Verma, ¶¶ 6-10 , a copy of which is attached hereto as **Exhibit B.**

The entire contents of the Second Declaration of Dr. Inder Verma as well as that of the First Declaration of Dr. Verma is hereby incorporated herein by reference.

**A.    All Rejected Claims Now Pending Are Directed To Reducing Induced NF-kB Activity**

In the absence of external inducing stimuli, NF-kB is present in the cytoplasm of a eukaryotic cell in an inactive form, i.e. there is no NF-kB activity. In the presence of external inducing stimuli NF-kB activity is induced in a cell. Such induced NF-kB activity persists so long as the external inducing stimuli are present. Broadly speaking, there are the two types of methods to obtain a cell exhibiting reduced NF-kB activity as follows: (a) reducing the induced NF-kB activity by intervening in the signaling pathway by which NF-kB activity is manifested including particularly intervening intracellularly at a specific segment within the signaling pathway; and (b) preventing the external inducing stimuli from inducing the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 28 of 92 of October 22, 2007 Response*

intracellular signaling pathway through which NF-kB activity is manifested.

Certain claims of the '516 Patent as issued covered both such types of methods. However, as discussed further in this response applicants maintain that the rejected claims now pending are directed only to type (a) above. (See, e.g., column 2, lines 20-63; column 10, lines 31-55; column 12, lines 57-66; column 13, line 13 - column 14, line 54; column 16, lines 22-63; and column 17, lines 30-37 of the '516 patent; and First Declaration of Dr. Verma, ¶¶ 5-9.)

In applying the cited art against claims of the '516 patent in the July 6, 2007 Final Office Action the Examiner consistently asserted that the claimed method encompasses administering an inhibitor of NF-kB activity (i) prior to, (ii) simultaneously with, <u>and</u> (iii) subsequent to, administering an inducer of NF-kB activity. (See, e.g. page 27, lines 16-18; page 36, lines 20-22; page 59, lines 4-10; page 80, lines 21-23; page 91, lines 26-29; page 98, lines 12-16; and page 112, lines 24-30 of the July 6, 2007 Final Office Action.) However, with respect to claims 6, 8, 9, 14 and 18, and claims dependent thereon, the only rejected claims now pending, this assertion is not correct. The rejected claims now pending do not encompass either case (i) or case (ii).

    1)   All rejected, pending claims must be given their <u>broadest reasonable interpretation</u>

While a claim under reexamination is to be given a broad interpretation, this interpretation must be *reasonable* in light of the specification. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). Additionally, the claims must be construed as one of skill in the art would construe them. *In re American Academy of Science Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). For the broadest reasonable interpretation of the claims by a person skilled in the

ARI 84414

# EXHIBIT D

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>    Plaintiffs,<br><br>    v.<br><br>ELI LILLY AND CO.,<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 02 CV 11280 RWZ<br>)<br>)   RESTRICTED CONFIDENTIAL<br>)<br>)<br>)<br>)<br>)<br>) |

## REPLY EXPERT REPORT OF DR. JEFFREY RAVETCH

### I.    Introduction

1.    I have been asked to review portions of the expert reports of Lilly expert Dr. Gordon Bernard dated October 21, 2005, Lilly expert Dr. Manolagas dated October 21, 2005, and Dr. Lindsay dated October 21, 2005. I have been informed that the Court's Scheduling Order indicates these expert reports were to have been filed to respond Plaintiffs' experts on issues of infringement. The reports however refer to new references and make statements about them that do not appear relevant to infringement issues but instead appear to address anticipation.

2.    Lilly's experts did not refer to these references in any of their opening expert reports. If at trial Lilly is permitted to introduce new arguments about anticipation based on any new information (including prior use of raloxifene or aPC) included in these reports, I therefore reserve the right to submit a supplemental report to address such arguments, once Lilly fully explains them. I further reserve the right to testify at trial based on the opinions expressed in this report. These opinions are based upon the information I have received so far. They may be supplemented or modified if additional information is received. They may also be supplemented to reply to additional information or opinions provided by Lilly and its experts, as well as to any additional issues or evidence that may arise at trial.

### II.    Qualifications and Compensation

3.    I incorporate all the information about my qualifications and compensation included in my first Expert Report in this case dated October 21, 2005.

L-A0012455

### III.    Preparation and Materials Relied On

4.     In connection with my analysis and in preparing this report, I have reviewed certain portions of the expert reports of Lilly expert Dr. Gordon Bernard dated October 21, 2005 that of Lilly expert Dr. Manolagas dated October 21, 2005 ("Manolagas II"), and that of Lilly expert Dr. Lindsay dated October 21, 2005, as well as references cited in those sections. In addition, I have reviewed my first Expert Report, including some of the references and other materials cited in that report. In addition, I have reviewed and relied on publicly available scientific literature relevant to issues discussed in this report, additional Lilly documents, as well as my scientific and clinical experience.

5.     I have based my opinions in on my 25 years of experience in the field of molecular genetics and immunology, on the '516 patent and file history, the construction of terms in the asserted claims provided by the Court, references cited in the patent, in Lilly's expert reports, additional references cited here, as well as scientific literature in the field of the invention. I understand that discovery is ongoing in this matter, and I will avail myself of any documents and testimony relevant to this case, as appropriate, and will supplement my opinions as necessary based on discovery.

### IV.    Additional Arguments and References That Lilly's Experts Did Not Discuss in Their Validity Reports but Now Raise in Their Infringement Rebuttal Reports

#### A.         Infringement Rebuttal Expert Report of Dr. Bernard

##### (i)    Blocking Drugs

6.     In paragraphs 19 through 33 of his report, Dr. Bernard refers to articles discussing use of various drugs designed to inactivate certain extracellular substances or block them from interacting with cells, and in this manner, to prevent these extracellular substances from inducing or stimulating any response in the cell. In particular, Dr. Bernard refers to articles concerning use of agents to block or inactivate TNF-α, such as anti-TNF-α antibodies, use of an agent to block IL-1, such as an IL-1 receptor antagonist, and use of agents to block or inactivate endotoxin or LPS, such as anti-endotoxin antibodies. Dr. Bernard cites a number of these articles as describing numerous failed attempts to use such agents to treat septic shock and sepsis.

7.     To the extent it becomes necessary to address new arguments that Lilly's experts are allowed to raise, I expect to explain to the jury why these new references fail to demonstrate anticipation of any of the asserted claims. In my first report, I explained why I disagreed with Dr. Manolagas' conclusion that one could practice the methods of the asserted claims by administering antibiotics. For many of the same reasons, a method for using drugs designed to block other extracellular substances from interacting with cells does not describe any of the claimed methods. For example, to the extent that these agents (such as anti-TNF-α antibodies) function by interacting extracellularly with a potential inducing stimulus, use of such agents would not describe any method that is performed on a eukaryotic or mammalian cell.

8.     Additionally, the asserted claims require that gene expression or intracellular signaling be induced by an external influence, that is, an inducing substance found outside the cell. The claims then direct the manipulation of NF-κB in these cells in order to alter the

2

L-A0012456

response of the cell to such NF-κB inducing substances, such as LPS. For example, claims 80, 84 and 85 are all directed to methods in cells where external influences have induced NF-κB-mediated intracellular signaling, "comprising altering NF-κB activity in the cells such that NF-κB mediated effects of external influences are modified." As with antibiotics, the use of agents designed to block or inactivate TNF-α, RANK-L, IL-1 or LPS, does not practice any of the asserted claims. By preventing an inducing substance from interacting with the cell, such agents instead act (assuming they were to be effective) before such signaling takes place. Therefore, such drugs do not affect cells as Dr. Bernard argues, by "reducing NF-κB activity." In this regard, Dr. Bernard's conclusion that agents designed to block or inactivate TNF-α, IL-1 or LPS either "affect the NF-κB pathway" or target NF-κB mischaracterizes the way these drugs can potentially work.[1]

9.      Additionally, there would be no reason to assume that use of an agent designed to block or inactivate a single substance, such as LPS, would necessarily block or prevent other substances from stimulating NF-κB activity; NF-κB mediated intracellular signaling or expression of NF-κB regulated genes. Therefore, prior use of such a blocking agent could not have inherently anticipated any of the asserted claims, even assuming Dr. Manolagas' and Dr. Bernard's faulty interpretation that the asserted claims encompass methods for blocking particular inducing substances (such as LPS) from interacting with the cell. Lastly, with respect to use of agents to block TNF-α or IL-1, the articles Dr. Bernard refers to were published and discuss use of such agents only after 1991. Therefore, regardless of any other reason, these articles would not provide any evidence of anticipation.

(ii)      **Additional Literature on Glucocorticoids**

10.      In paragraphs 34 through 36 of his report, Dr. Bernard refers to a number of articles relating to use of glucocorticoids in cells, animals and human subjects, including a number of articles published before 1988. To the extent it becomes necessary to address any new anticipation arguments that Lilly's experts make based on these articles, I expect to explain to the jury why these new references and any arguments Dr. Bernard makes fail to demonstrate anticipation of any of the asserted claims. Such a conclusion would be incorrect for at least the following reasons.

11.      My first expert report discussed the articles cited in footnotes 12 and 13. Dr. Bernard provides no information that changes my previous conclusion that none of these articles anticipates any of the asserted claims, either expressly or inherently. As I explained in my first report, I would disagree that any of these articles describes any use of glucocorticoids (including administration to humans) that would have necessarily carried out all elements of any of the asserted claims. Since Dr. Bernard provides no such evidence, I will not address these articles further.

---

[1]      Similarly, the statements Dr. Manolagas makes about OPG mischaracterize the possible mechanism by which OPG can potentially work as a drug.

L-A0012457

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE <br><br> Plaintiffs, <br><br> v. <br><br> ELI LILLY AND COMPANY, <br><br> Defendant. | 02-11280-RWZ <br><br> U.S. District Judge <br> Rya W. Zobel <br><br> **CONFIDENTIAL INFORMATION UNDER PROTECTIVE ORDER** |

## Expert Report of Dr. Gordon Bernard

### I. BACKGROUND

1. I am the Melinda Owen Bass Professor of Medicine, Department of Medicine, of the Vanderbilt University School of Medicine, Nashville, Tennessee, and the Director of the Division of Allergy, Pulmonary and Critical Care Medicine, at the Vanderbilt University School of Medicine, Nashville, Tennessee. I have a Bachelors of Science in Biology and Chemistry from the University of Southwestern Louisiana, Lafayette, Louisiana, and a Medical Doctor degree from Louisiana State University, New Orleans, Louisiana.

2. I was a Resident in Internal Medicine at the Department of Medicine, University of Kentucky, Lexington, Kentucky, and was the Parker B. Francis Fellow at the Division of Pulmonary and Critical Care Medicine, Department of Medicine, Vanderbilt University School of Medicine, Nashville, Tennessee.

3. I am the Director of the Division of Allergy, Pulmonary and Critical Care Medicine at Vanderbilt. I am also a member of the Advisory Council for the National Heart, Lung and Blood Institute.

4. I have attached a copy of my *curriculum vitae,* which lists my publications.

patent, column 17). Work not described in the patent has shown, however that TNF-α is also regulated in part by NF-κB and thus forms part of an inflammatory cascade.[8]

27.    TNF-α works to activate NF-κB through a receptor that resides on the surface of cells, known as the TNF Receptor. Thus, something that blocks TNF-α from activating the TNF receptor, either by interfering directly with either TNF-α (such as a TNF-α-antibody)- or its receptor (such as a TNF- α receptor blocker), would reduce NF-κB activity.

28.    Correspondingly, if reducing NF-κB activity was a successful mode of treatment for severe sepsis in humans, as Glimcher and Livingston suggest the claims of the '516 patent teach, a compound that blocked TNF-α from interacting with its receptor would be expected to be helpful in treating sepsis. In fact, such compounds have ultimately failed in clinical trials with sepsis patients.

29.    Because TNF-α is considered a key mediator in sepsis pathogenesis, several therapeutics directed to this cytokine were developed. Several monoclonal antibodies against TNF-α have been developed, including the recombinant humanized murine anti-TNF antibody Remicade (infliximab). See Glück 2004, Van Amersfoort 2003. In addition, fusion proteins containing the TNF receptor linked to immunoglobulin-Fc fragments have also been developed, including the TNF-R:Fc fusion protein Enbrel (enanercept). See Glück 2004, Van Amersfoort 2003. Both of these TNF antagonists are very effective against Crohn's disease (inflammatory bowel disease) and rheumatoid arthritis – diseases that are mediated by NF-κB. See Van Amersfoort, E.S., et al., Receptors, Mediators, and Mechanisms Involved in Bacterial Sepsis and Septic Shock, Clin. Microbiol. Rev. 16:379-414 (2003). However, all clinical trials with any anti-TNF-α therapeutic for treating severe sepsis has proved both "ineffective" and "unequivocally disappointing" See Glück 2004, Van Amersfoort 2003, Fisher et al., Treatment of Septic Shock with the Tumor Necrosis Factor Receptor:Fc Fusion Protein, New England Journal of Medicine, 334:1697-1702 (1996).

30.    Antibodies against TNF-α were developed by multiple pharmaceutical companies (Knoll Pharmaceutical/Abbott, Bayer Corporation/Miles, Centocor, Cellltech Ltd.) and tested in patients with sepsis. Four large clinical trials failed to show that anti-TNFα antibody treatment decrease mortality in patients with severe sepsis.[9]

---

[8] Collart, M.A., "Regulation of Tumor Necrosis factor Alpha Transcription in Macrophages: Involvement of Four κB-Like Motifs and of Constitutive and Inducible Forms of NF-κB," Mol. Cell. Biol., 10:1498 (1990).

[9] See Abraham E, Anzueto A, Gutierrez G, Tessler S, San Pedro G, Wunderink R, et al. Double-blind randomized controlled trial of monoclonal antibody to human tumor necrosis factor in treatment of septic shock. Lancet 1998;351:929-933. Cohen J, Carlet J, for the intersept study group. INTERSEPT: an international, multicenter, placebo-controlled trial of monoclonal antibody to human tumor necrosis factor-alpha in patients with sepsis. Crit Care Med 1996;24:1431-1440. Panacek EA, Marshall JC, Albertson TE, Johnson DH, Johnson SB, MacArthur RD, et al. Efficacy and safety of the

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------------------------X
AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA
INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX
RHODE ISLAND CORPORATION,

                    Plaintiffs,

                                    Civil Action No.
vs                                  06-259-(MPT)

ARIAD PHARMACEUTICALS, INC. and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware
Corporation,

                    Defendants.
-----------------------------------------------X
ARIAD PHARMACEUTICALS INC., THE MASSACHUSETTS
INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND
FELLOWS OF HARVARD COLLEGE and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,

                    Counterclaim Plaintiffs

vs.

AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC.,
AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE
ISLAND CORPORATION and WYETH,

                    Counterclaim Defendants.
-----------------------------------------------X

VIDEOTAPED DEPOSITION OF JEFFREY RAVETCH, M.D./PH.D.

                    April 3, 2008

                    - Volume I -

|          |    |                                                       |
|----------|----|-------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                        |
| 11:05:46 | 2  | MR. PALS:  Thank you, that's helpful.                 |
| 11:05:48 | 3  | MR. HUMMEL:  And since he doesn't know                |
| 11:05:49 | 4  | what's going on on that side of the house,            |
| 11:05:52 | 5  | it's not surprising.                                  |
| 11:06:02 | 6  | Q.     In your opening report, you don't              |
| 11:06:03 | 7  | offer any opinion as to whether the use of Enbrel by  |
| 11:06:07 | 8  | patients infringes any claim of the '516 Patent;      |
| 11:06:14 | 9  | correct?                                              |
| 11:06:14 | 10 | A.     That's correct.                                |
| 11:06:14 | 11 | Q.     And you defer to others on that issue?         |
| 11:06:16 | 12 | A.     I have not been given any information           |
| 11:06:18 | 13 | as to how that's being handled, so I don't know who,  |
| 11:06:21 | 14 | if anyone, is handling it.  I presume someone is.     |
| 11:06:24 | 15 | Q.     Okay.  I would like to walk through            |
| 11:06:34 | 16 | your rebuttal report, similarly, Dr. Ravetch, just to |
| 11:06:40 | 17 | get an overview and make sure I'm clear on the lay of |
| 11:06:43 | 18 | the land here.                                        |
| 11:06:45 | 19 | Your rebuttal report is Exhibit 2.                    |
| 11:06:52 | 20 | Can you tell me how your rebuttal report was          |
| 11:06:54 | 21 | prepared?                                             |
| 11:06:54 | 22 | A.     The same general format that I                 |
| 11:06:58 | 23 | described for my opening report.  I drafted sections. |
| 11:07:01 | 24 | Some sections were provided to me by counsel, legal   |
| 11:07:07 | 25 | standards.  Sections that had to do with specific     |

# Exhibit G

# REDACTED