IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )      Civil Action No. 06-259 (MPT)
)
Plaintiffs, )
)
v. )      Public Version
)      Confidential Material Omitted
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.*, )
)
Defendants. )

---

## THE AMGEN ENTITIES' REPLY IN SUPPORT OF THEIR *DAUBERT* MOTION TO PRECLUDE CERTAIN UNSUPPORTED AND UNRELIABLE OPINIONS OF DR. RYAN SULLIVAN RELATING TO DAMAGES

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Y. Gutman
J. Drew Diamond
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: June 6, 2008

**Table of Contents**

I.    ARGUMENT ...................................................................................................1

A.    Dr. Sullivan's "Litigation Risk" Theory Should Be Precluded. ..........................2

    1.    Dr. Sullivan's "Litigation Risk" Theory Has Been Rejected by the Federal Circuit and Other Courts.................................................................................2

    2.    Dr. Sullivan's "Litigation Risk" Theory Would Provide ARIAD With Windfall Damages .........................................................................................4

    3.    Dr. Sullivan's "Litigation Risk" Theory Is Based on Unreliable and Unsound Economic Principles.........................................................................5

    4.    Dr. Sullivan's "Litigation Risk" Theory is Based on Unsubstantiated Speculation and Unreliable Aggregate Statistical Data That Would Be Highly Prejudicial to Amgen If Presented to the Jury. ...............................6

B.    Dr. Sullivan's "Exclusivity" Opinion Should Be Precluded. ..............................7

    1.    Dr. Sullivan's "Exclusivity" Contention Improperly Seeks Damages More Than "Adequate to Compensate for the Infringement" ............................7

    2.    Dr. Sullivan's "Exclusivity" Contention is Speculative. ..........................9

    3.    Dr. Sullivan's "Exclusivity" Contention Flatly Contradicts the Record Evidence.................................................................................................10

C.    Dr. Sullivan Should Be Precluded From Opining That the Royalty Base Includes Sales of Enbrel That ARIAD's Infringement Expert Concedes Do Not Infringe the '516 Patent. ...............................................................................................15

    1.    Rheumatoid Arthritis ...........................................................................15

    2.    Psoriasis .............................................................................................16

    3.    Ankylosing Spondylitis........................................................................17

    4.    Dr. Sullivan Overstates the Royalty Base..............................................18

II.    CONCLUSION.............................................................................................19

DB02:6880799.1                                        065028.1001

## Table of Authorities

**Cases**

*Fromson v. Western Litho Plate and Supply Co.,*
    853 F.2d 1568 (Fed. Cir. 1988)..................................................................2, 3, 4, 5

*Georgia-Pacific Corp. v. US Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970)..................................................................8

*Inline Connection Corp. v. AOL Time Warner Inc.,*
    470 F. Supp. 2d 435 (D. Del. 2007)..................................................................14

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996)..................................................................3, 4, 5

*Mobil Oil Corp. v. Amoco Chem. Corp.,*
    915 F. Supp. 1333 (D. Del. 1995)..................................................................3, 4, 5

*Monsanto Co. v. Bayer Bioscience N.V.,*
    2005 WL 5989796 (E.D. Mo. Oct. 28, 2005)..................................................................2, 4

*Oiness v. Walgreen Co.,*
    88 F.3d 1025 (Fed. Cir. 1996)..................................................................9

*Pharmastem Therapeutics, Inc. v. Viacell Inc.,*
    2003 WL 22387038 at *2 (D. Del. Oct. 7, 2003)..................................................................14

*Riles v. Shell Exploration and Production Co.,*
    298 F.3d 1302 (Fed. Cir. 2002)..................................................................4, 8

*Timblin v. Kent General Hospital,*
    640 A.2d 1021 (Del. 1994)..................................................................6

**Statutes**

35 U.S.C. § 284..................................................................3, 4, 8

35 U.S.C. § 285..................................................................3

**Rules**

Fed. R. Civ. P. 37(c)(1)..................................................................14

Fed. R. Civ. P. 408..................................................................14

Fed. R. Evid. 702..................................................................8, 9, 15

ii

FED. R. EVID. 705 ................................................................................................................ 6, 7

DB02:6880799.1

065028.1001

## I.    ARGUMENT

ARIAD seeks to present a damage figure to the jury in this case that runs afoul of bedrock Federal Circuit precedent, is highly prejudicial, and finds no support in the evidence. The law provides unequivocally that damages should be "adequate to compensate" for the infringement and yet ARIAD seeks much more by way of legally impermissible and wholly speculative theories. First, ARIAD violates established precedent when it inflates its royalty rate with a "litigation kicker" of 0.625% to 2.5% above and beyond what the parties would have agreed to in a hypothetical negotiation. Second, ARIAD inflates its royalty rate by another 2.6% by speculating (without any basis) that the parties would have agreed to an exclusive license even though a *non*-exclusive license is all that was needed by Amgen (and ARIAD cannot contest otherwise). Third, ARIAD applies its improperly inflated royalty rate to a base that is itself improperly inflated by inclusion of damages for infringement of categories of sales that even its own infringement expert admits do not infringe any of the asserted claims.

This Court must exercise its gate keeping function and exclude ARIAD's damages theories that contravene Federal Circuit law. The jury cannot be presented a damages figure that, without basis in law or fact, exaggerates damages by several hundred million dollars. No cross-examination can possibly cure the prejudice Amgen would suffer as a result. Thus, Amgen respectfully requests that Dr. Sullivan be precluded from improperly inflating the damages presented to the jury and that ARIAD's requested royalty rate and damages be adjusted accordingly.

**A.     Dr. Sullivan's "Litigation Risk" Theory Should Be Precluded.**

Far from justifying its novel position, ARIAD's arguments further highlight the very reasons Dr. Sullivan's "litigation kicker" (*i.e.* "litigation risk") theory must be precluded under Rule 702, thus reducing Dr. Sullivan's suggested royalty rate by between 0.625% and 2.5%.[1]

*1.     Dr. Sullivan's "Litigation Risk" Theory Has Been Rejected by the Federal Circuit and Other Courts*

ARIAD cannot distinguish Dr. Sullivan's "litigation risk" theory from the case law outlawing such theories. ARIAD's attempt to distinguish Dr. Sullivan's theory by claiming that these cases only "stand for the uncontroversial proposition that a patent holder may not recover litigation expenses under the guide of a reasonable royalty award" (ARIAD Opp. at 11)[2] belies a fundamental misunderstanding of the case law and must be rejected.

First, in *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir. 1988), the Federal Circuit specifically recognized that real-life license negotiations and hypothetical negotiations are different situations, but explained that the law has a means in

---

[1]   ARIAD argues that even if Dr. Sullivan's "litigation risk" theory is precluded, reducing Dr. Sullivan's royalty rate by 0.625% to 2.5% is inappropriate because Dr. Sullivan allegedly cannot subtract the amount attributable to his "litigation risk" theory from his analysis. (ARIAD Opp. at 17) But, Dr. Sullivan specifically calculated a royalty rate inflation for alleged license offers ▉REDACTED▉ as well as for alleged royalty rates in Amgen licenses ▉REDACTED▉ ▉REDACTED▉ (Amgen Opening Br., Ex. K at ¶¶ 55 n.57 and 61). Moreover, Dr. Sullivan confirmed at deposition that his "litigation risk" theory in this case results in an inflated royalty rate. (Ex. 1, Sullivan Dep. at 160-61). In any event, assuming ARIAD is correct, and Dr. Sullivan simply built his "litigation risk" adjustment into his analysis and cannot back it out, the appropriate remedy (based on ARIAD's own cited case law) would be complete preclusion. *See Monsanto Co. v. Bayer Bioscience N.V.*, 2005 WL 5989796 (E.D. Mo. Oct. 28, 2005) (holding that if inappropriate influences to an expert hypothetical negotiation were "intertwined with his analysis . . . to such an extent that they cannot be removed from his analysis . . the testimony . . . will be excluded").

[2]  Defendants-Counterclaim Plaintiffs' Memorandum In Opposition to Amgen's Motion To Preclude the Testimony of Dr. Ryan Sullivan. (filed May 22, 2008) (DI 636).

Sections 284 and 285 to recognize this distinction and increase the monetary award in appropriate cases:

> In a normal negotiation, the potential licensee has three basic choices: forego all use of the invention; pay an agreed royalty; infringe the patent and risk litigation. The methodology presumes that the licensee has made the second choice, when in fact it made the third. . . Whatever royalty may result from employment of the methodology, *the law is not without means for recognizing that an infringer is unlike a true "willing" licensee*; nor is the law without means for placing the injured patentee "in the situation he would have occupied if the wrong had not been committed. Increase damages under § 284 for willfulness is one such means. Attorney fees in "exceptional" cases under § 285 is another. Prejudgment interest is a third such means.

(emphasis added; citations omitted); *see also Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1581 (Fed. Cir. 1996) (rejecting the district court's inflation of the royalty rate because it "enhances a damages award, apparently to compensate for litigation expenses, without meeting the statutory standards for enhancement and fees"). This Court in *Mobil Oil Corp. v. Amoco Chem. Corp.*, 915 F. Supp. 1333, 1349 (D. Del. 1995) followed the Federal Circuit's guidance in *Fromson*, stating

> the proper method of recognizing that an infringer is not like a willing licensee is to consider increased damages under Section 284 for willfulness or for attorney's fees under Section 285, *rather than artificially inflating the royalty rate*.

(emphasis in original). Thus, both the Federal Circuit and this Court have specifically rejected Dr. Sullivan's "litigation risk" reasoning for inflating his royalty.[3]

---

[3] The fact that these cases explain that -- for purposes of a hypothetical negotiation, patents are deemed valid and enforceable and will be infringed if the parties do not negotiate a license -- only underscores the relevance of this case law. These courts clearly understood *Georgia-Pacific* and the presumption involved with the hypothetical negotiation, yet still rejected Dr. Sullivan's theory which artificially inflates the royalty rate to allegedly recognize that an infringer is not like a willing licensee.

3

Moreover, contrary to ARIAD's contention, *Fromson, Mahurkar,* and *Mobil Oil* are not limited to obtaining "litigation expenses under the guise of a reasonable royalty." Indeed, all three cases identify increased damages under Section 284 for willfulness as a means to account for the distinction that "an infringer is unlike a true 'willing licensee.'" *Id.  Fromson* also identifies pre-judgment interest. ARIAD's alleged distinctions of these cases simply do not justify Dr. Sullivan's reliance on "litigation risk" to prop up a higher royalty.[4]

    2.    *Dr. Sullivan's "Litigation Risk" Theory Would Provide ARIAD With Windfall Damages*

ARIAD tries to argue that Dr. Sullivan's "litigation risk" theory does not award ARIAD damages more than adequate to compensate for Amgen's alleged infringement.  (ARIAD Opp. at 12-13).  But, ARIAD concedes, as did Dr. Sullivan in deposition, that his "litigation risk" theory would place ARIAD in a ***better*** position than it otherwise would have been in had Amgen's infringement not occurred.  (*Id.*)  Consequently, Dr. Sullivan's "litigation risk" theory violates a basic tenet of compensatory and patent damages law -- an award must place the patentee in the same position it would have been in absent infringement.  *See Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) (stating that patent law damages are compensatory damages which "by definition, make the patentee whole, as opposed to punishing the infringer").

---

[4] ARIAD's reliance on *Monsanto Co. v. Bayer Bioscience N.V.*, 2005 WL 5989796 (E.D. Mo. Oct. 28, 2005) is misplaced.  In that case, the accused infringer's damages expert attempted to depress the royalty rate by claiming that at a hypothetical negotiation, the defendant would have leveraged the validity of the patent-in-suit to reduce the royalty rate.  *Id.* at 14. Consistent with Amgen's position here, the Court found that such external factors had no place in a hypothetical negotiation and thus ordered the expert to remove such influences from his analysis or risk preclusion.  *Id.* at 15.  *Monsanto* certainly does not support Dr. Sullivan's effort to artificially inflate the royalty rate in this case.

ARIAD completely ignores this basic tenet in its opposition. And apparently finding no law to support Dr. Sullivan's contention (as none exists), ARIAD resorts to citations of litigation handbooks. But even these references do not condone Dr. Sullivan's artificial inflation of the royalty rate to account for "litigation risk" -- instead, they simply recite the same premise as *Fromson*, *Mahurkar*, and *Mobil Oil*, that an alleged infringer is not like a willing licensee. The law does not permit an artificial inflation as Dr. Sullivan suggests -- it requires that a patentee meet its burden of proof for willfulness, attorneys fees, and/or pre-judgment interest if monetary relief greater than that "adequate to compensate" is sought.[5]

### 3. Dr. Sullivan's "Litigation Risk" Theory is Based on Unreliable and Unsound Economic Principles

ARIAD next attempts to rationalize Dr. Sullivan's "litigation risk" theory and the illogical result that occurs if Dr. Sullivan's theory is accepted. In particular, under Dr. Sullivan's theory, the more "unenforceable" a patent is (*i.e.,* the higher likelihood a patent is found not infringed or invalid), the more a royalty rate should be inflated. ARIAD attempts to ignore the rationale behind Dr. Sullivan's theory, proclaiming in a footnote that "Amgen has concocted several absurd examples that supposedly illustrate the flaws in Dr. Sullivan's analysis." (ARIAD Opp. at 15 n.12). However, it is Dr. Sullivan's theory and logic that are "absurd," not Amgen's examples.

As explained in Amgen's opening brief, the flaw in Dr. Sullivan's theory is revealed by simply decreasing the probability of enforcement (*i.e.,* the less likely the patent is found infringed and valid) in Dr. Sullivan's "litigation risk" equation and leaving all else equal.

---

[5] ARIAD cannot meet any of these burdens of proof, and thus, even if ultimately found to be entitled to damages (which it is not), it will not be entitled to any damages beyond those "adequate to compensate" for Amgen's alleged infringement.

DB02:6880799.1
065028.1001

(Amgen Opening Br. at 21-22)  If a patent only had a 1% probability of enforceability (*i.e.* a 99% chance of being found not infringed and/or invalid), and a license rate of 2.5% is used, Dr. Sullivan's theory would yield an inflated royalty rate of *250%*.  (Amgen Opening Br., Ex. C at 175-76, Sullivan Dep. Ex. 12)  ARIAD concedes that "Amgen's math checks out."  (ARIAD Opp. at 15 n.12).  Dr. Sullivan's "litigation risk" theory does not.

A theory that rewards a patentee for having a marginally enforceable patent cannot be sound or reliable and must be excluded under FRE 702.

> 4.  *Dr. Sullivan's "Litigation Risk" Theory is Based on Unsubstantiated Speculation and Unreliable Aggregate Statistical Data That Would Be Highly Prejudicial to Amgen If Presented to the Jury.*

Finally, ARIAD apparently concedes that Dr. Sullivan's use of aggregate statistical data with respect to outcomes of patent infringement litigations is not admissible.  (ARIAD Opp. at 16)  Nonetheless, ARIAD contends that Dr. Sullivan should be permitted to present his opinions and use the aggregate statistical data as an illustration, with the Court providing the jury with an some sort of curative instruction.  (*Id.*)  However, a curative instruction in this regard will hardly ensure that the jury does not consider what "normally happens" with respect to defenses of invalidity and non-infringement.   Any admission or illustration of Dr. Sullivan's alleged aggregate statistics is sure to unduly prejudice Amgen.  *See Timblin v. Kent General Hospital,* 640 A.2d 1021, 1026 (Del. 1994) (reversing trial court's admission of "statistical evidence of what 'normally happens'" as highly prejudicial and lacking in probative value).  The jury should decide this case on its merits, not aggregate statistical data of unrelated patent infringement cases.

ARIAD also cites to Rule 705 to contend that Dr. Sullivan should be permitted to testify to his "litigation risk" opinion without first explaining his underlying aggregate data of patent

infringement litigation outcomes. (ARIAD Opp. at 16). But in such a situation, Amgen either foregoes cross-examining Dr. Sullivan on one of the fundamental bases for his "litigation risk" theory, or risks prejudicing itself by cross-examining Dr. Sullivan with the aggregate data. *See* FED. R. EVID 705 ("The expert may in any event be required to disclose the underlying facts or data on cross examination"). Amgen should not be required to choose between this rock and hard place. Dr. Sullivan's "litigation risk" theory and the statistical evidence on which it relies are inadmissible. No cross-examination can fairly redress that infirmity, and this is precisely the situation where the Court should exercise its gate-keeping authority to exclude Dr. Sullivan's "litigation risk" theory.

### B.    Dr. Sullivan's "Exclusivity" Opinion Should Be Precluded.

Dr. Sullivan's "exclusivity" opinion (inflating his suggested royalty rate by 2.6%)[6] is contrary to settled law, is based on speculation and conjecture, and flatly contradicts the record evidence.

> *1.    Dr. Sullivan's "Exclusivity" Contention Improperly Seeks Damages More Than "Adequate to Compensate for the Infringement"*

In its opposition brief, ARIAD readily admits that Dr. Sullivan's "exclusivity" opinion would provide Amgen with "more than a bare patent license to operate without the threat of infringement." (ARIAD Opp. at 25) Indeed, while Dr. Sullivan claims that the parties would have agree to a exclusive license as to Enbrel, he admitted in deposition that (1) ARIAD could have provided Amgen with a *non*-exclusive license to the '516 patent in June 2002 (the time of the hypothetical negotiation), and (2) such a *non*-exclusive license would "enable them, as part

---

[6] ARIAD does not contest that if the Court precludes Dr. Sullivan's "exclusivity" opinion, that Amgen's proper remedy is a reduction in Dr. Sullivan's suggested royalty rate by no less than 2.6%.

of the license, to use the '516 patent." (Amgen Opening Br., Ex. C at 24-25)    As follows, anything more than a bare, non-exclusive license would provide ARIAD windfall damages more than "adequate to compensate *for the infringement*," and thus is legally impermissible.

Section 284 places a ceiling on compensatory damages for patent infringement at "damages adequate to compensate for the infringement." *See* 35 U.S.C. § 284.  Indeed, the law of patent damages reflects the general law of compensatory damages, which "by definition, make the patentee whole, as opposed to punishing the infringer." *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002).  ARIAD attempts to change this well-settled law by arguing that "the focus of the inquiry is to ascertain the terms of the agreement that *would have best suited* the respective needs of the parties." (ARIAD Opp. at 25) (emphasis in original)  But ARIAD cannot concoct an exorbitant royalty rate based on some speculative argument as to what might have "best suited" the parties for some unrelated reasons.[7]  ARIAD's argument is the equivalent of assuming that the parties would have agreed to the purchase of a Rolls Royce license (and its accompanying price tag), when what is "adequate" is a Chevy or Ford to get the job done.   The law does not permit such an inflation of damages.

Dr. Sullivan's "exclusivity" opinion contradicts settled law on patent damages and on this basis alone must be excluded under FRE 702.

---

[7] While it is true that *Georgia Pacific* factor 3 contemplates that the scope and nature of a license is either exclusive or non-exclusive, the *Georgia-Pacific* court did not authorize damages in excess of that "adequate to compensate for infringement." *Georgia-Pacific Corp. v. US Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Indeed, situations do exist where an exclusive license may be appropriate -- such as where a party with an exclusive license to a patent breaches its license by refusing to pay royalties.  Here, a compound exclusive license would provide ARIAD with damages more than "adequate to compensate for infringement," and therefore is improper as a matter of law.

2.    *Dr. Sullivan's "Exclusivity" Contention is Speculative.*

It is well-settled that expert opinions are inadmissible if they are formed from speculative, insufficient, or otherwise untrustworthy data. *See* Rule 702 Advisory Committee Notes ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted").    Despite this established law, Dr. Sullivan bases his "exclusivity" theory on speculative future profits of Enbrel[8] that he concedes are "uncertain." (Amgen Opening Br., Ex. C at 70-72) To continue the Rolls Royce analogy, ARIAD is essentially assuming that Amgen would have paid for the Rolls Royce for the damages period of 2002-present even though the Rolls Royce could not be driven by Amgen until a time starting in 2014 (when ARIAD contends that Amgen's other patents expire, and thus an exclusive license and the right to exclude "might" have some value). This attempt to boost the past royalty on the bootstraps of speculative future value makes no sense economically and is legally unsupported.

ARIAD attempts to justify the speculative nature of Dr. Sullivan's "exclusivity" theory by claiming that Dr. Sullivan's use of "uncertain" future profits is "good enough." (ARIAD Opp. at 24) But "good enough" is not sufficient under the law -- to include future profits in a damages award, ARIAD must satisfy a burden that is "commensurately greater than that for damages already incurred." *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996). Indeed, Dr. Sullivan made no effort to verify any of Amgen's "uncertain" future projections or justify his use of these "uncertain" future profits. He simply takes these speculative forecasts at their

---

[8] Dr. Sullivan speculates as to Amgen's future profits that are more than 12 to 17 years after the time of the hypothetical negotiation. (Amgen Opening Br., Ex. K at ¶ 66)

"uncertain" face value.[9] Dr. Sullivan's bare reliance on "uncertain" future profits cannot meet the "commensurately greater" burden required by established law. Therefore, Dr. Sullivan's "exclusivity" opinion does not meet the threshold requirement of reliability as required by FRE 702, and should be precluded.

      3.    *Dr. Sullivan's "Exclusivity" Contention Flatly Contradicts the Record Evidence.*

Not only is Dr. Sullivan's "exclusivity" opinion prohibited by the law, but it also finds no basis in the record evidence. The Court should exercise its gate-keeping authority to preclude this baseless theory from improperly influencing the jury. In the alternative, and as requested in Amgen's opening brief (pg. 18 n. 13), the Court should grant Amgen summary judgment that the scope of any hypothetical license between Amgen and ARIAD would be non-exclusive in nature as no genuine issue of material fact exists in this regard.

First, ARIAD points to Dr. Sullivan's expert report to show how he quantifies his unsupported "exclusivity" theory. (*See* ARIAD's Opp. at 19-20). But expert reports are not evidence. Moreover, noticeably absent from Dr. Sullivan's report are citations to actual evidence that the parties would have agreed to enter into an exclusive to Enbrel license during the hypothetical negotiation. (Amgen Opening Br., Ex. K at ¶¶ 62-67). Dr. Sullivan merely speculates that Amgen and ARIAD would have agreed to such an "exclusive to Enbrel" license and jumps straight to putting a price tag on his speculation. (*Id.*) However, this speculation is refuted by the record evidence, which shows that outside of the litigation context [REDACTED]

---

[9] ARIAD suggests that using "uncertain" future forecasts without any independent verification or justification is sufficient under the law to prove future injury. But if that were the case, then all future forecasts and projections would suffice to prove future injury. Certainly, this type of bare analysis cannot satisfy the heightened burden required to prove future injury.

**REDACTED**

Second, ARIAD attempts to fault Amgen for ARIAD's own expert's (Dr. Sullivan's)

failure to support his speculation that Amgen and ARIAD would have agreed to an "exclusive to

Enbrel" license in a hypothetical negotiation.  (*See* ARIAD's Opp. at 20-21)  In doing so,

ARIAD complains that a reason Dr. Sullivan's opinion is unsupported is because Amgen has

allegedly not produced particular documents relating to license negotiations between Immunex

and ARIAD that either no longer exist[10] or that are privileged.  ARIAD also blames Amgen's

damages expert, Walter Bratic, for the deficiencies in Dr. Sullivan's analysis because he did not

ask certain questions of particular Amgen employees.[11]  Simply complaining about the non-

---

[10] While ARIAD attempts to sling mud by implying (without any basis) that Amgen "destroyed" an alleged term sheet relating to a counterproposal to ARIAD, the only evidence of such a counterproposal is an email from Immunex to ARIAD following up on a counterproposal purportedly ***sent to ARIAD***.  (Ex. 2, 3/28/02 Email from Gandhi to Casselman, ARI 71749)  Therefore, any copy of this counterproposal should necessarily exist in ARIAD's files, not Amgen's files.  Where is ARIAD's copy of this alleged document?  Despite its criticism of Amgen, ARIAD has not produced any such document, claiming that ARIAD "lost" it. (ARIAD Opp. at 5 n.4)  In any event, the relevance of this alleged "counterproposal" is suspect as there is no indication that it included rights to the patent-in-suit as opposed to other ARIAD NF-kB patents, there is no evidence that it related to rights to Enbrel, and there is certainly no indication that the parties discussed a compound-exclusive license in any form.  (*Id.*)  In fact, every indication is that such a counterproposal would be favorable to Amgen because the parties were "quite some distance apart."  (Ex. 3, 3/28/02 Email from Casselman to Gandhi, ARI 72435)

[11] Despite ARIAD's complaints, it had every opportunity to depose Amgen/Immunex on its license negotiations with ARIAD and on Amgen's acquisition of Immunex in 2002.  In fact, ARIAD served Rule 30(b)(6) notices on these very topics and Amgen (through witnesses Frank Ungemach and Brad Crawford) testified on such topics.  (*See* Exs. 4 and 5)  ARIAD even subpoenaed and deposed third-party Vasant Gandhi on his dealing with ARIAD while at Immunex.  (Ex. 6, Gandhi Subpoena)

11

existence of evidence (and without support or cause implying Amgen somehow acted inappropriately) is not sufficient to support Dr. Sullivan's "exclusivity" opinion.

Third, ARIAD attempts to improperly characterize **REDACTED** **REDACTED** as the one Dr. Sullivan is suggesting in his opinions, with its only support being mischaracterized testimony of Amgen's expert, Mr. Bratic. (*See* ARIAD's Opp. at 21) ARIAD is simply wrong. As an initial matter, Dr. Sullivan did not rely upon anything said by Mr. Bratic in forming his opinion, and this *Daubert* motion is about Dr. Sullivan's baseless opinions. More importantly, Dr. Sullivan never even attempted to support his "exclusivity" opinion with these two Amgen licenses.[12] In fact, ***Dr. Sullivan disagrees with ARIAD's contention*** in this regard, testifying that he does not believe these agreement are exclusive to Enbrel in the way he characterized exclusivity in his report:

**REDACTED**

Fourth, ARIAD argues that Dr. Sullivan's "exclusivity" opinion is supported because nothing would preclude ARIAD from offering an exclusive to Enbrel license to Amgen, and contends that the Institutions would have even supported such a license. (*See* ARIAD's Opp. at 21-22) But the fact that ARIAD would not have been precluded from offering an exclusive to

---

[12] It appears that ARIAD is now improperly attempting to support Dr. Sullivan's opinion with alleged evidence not identified in his expert report. Such an attempt is a violation of and foreclosed by Rule 26(a)(2)(B)(i) and the scheduling order in this case.

065028.1001

Enbrel license to Amgen is not evidence that it would have actually done so.  In addition, ARIAD's citation to an after-the-fact discussion between Dr. Sullivan and MIT employee Lita Nelson[13] cannot create support for an alleged exclusive to Enbrel license.  Ms. Nelson is only an employee of MIT -- not all of the Institutions -- and therefore does not speak on behalf of all the Institutions as ARIAD seems to suggest.



Finally, ARIAD contends that Dr. Sullivan supported his "exclusivity" opinion by citing



---

[13] Notably, Dr. Sullivan only talked to Ms. Nelson in drafting his reply report in this case -- after he had already formed his "exclusivity" opinion in his initial expert report and after receiving Mr. Bratic's responsive expert report.  (Ex. 1, Sullivan Dep. at 91)  Thus, this concocted conversation cannot be used as an "after-the-fact" basis for his opinion.

[14] In fact, Dr. Sullivan did not talk with anyone from ARIAD, Whitehead or Harvard in forming his opinions.  (Ex. 1, Sullivan Dep. at 91)

DB02:6880799.1                                                                                                                      065028.1001

**REDACTED**

To date, ARIAD has refused to produce the remaining documents to Amgen despite numerous requests by Amgen.[16]  ARIAD's attempt to use a document favorable to its position, but intentionally withhold other documents on the same subject, is improper and contrary to established law.  *See* FED. R. CIV. P 37(c)(1).  ARIAD has made its own bed on this issue (by arguing Rule 408 applies to this document and refusing production of other settlement documents), and thus should not be heard to now complain about preclusion.

---

[15] ARIAD argues that this settlement offer is not subject to Rule 408 because it is allegedly not using the settlement in proving the "amount of a claim."  ARIAD's argument is specious at best.  ARIAD is attempting to use the settlement offer to prove a fact (the scope of a license) in order to inflate the royalty rate and prove its alleged claim of damages.  The *Eli Lilly* settlement offer falls squarely within the "prohibited uses" identified in Rule 408.  *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp.2d 435, 444 (D. Del. 2007) (excluding testimony and opinions on settlement offers used to support a reasonable royalty calculation); *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, 2003 WL 22387038 at *2 (D. Del. Oct. 7, 2003) (excluding settlement offers under Federal Rule 408 used to support a reasonable royalty calculation).

[16] The only reason that Dr. Sullivan obtained a copy of this document is because ARIAD did not find a duplicate copy of one of the documents it called back -- which was attached to a motion in the *Eli Lilly* case and produced by Lilly as part of a large production in response to an Amgen subpoena.  Moreover, ARIAD's implication that it has produced all *Lilly* settlement documents is actually a sleight-of-hand -- Ms. Allen only testified that the document Dr. Sullivan relied on was the only settlement offer that ARIAD ever made to Lilly, but is silent as to offers or counteroffers made by Lilly to ARIAD.  (Ex. 8, Allen 11/30/07 Dep. at 171-76).

Despite all of ARIAD's rhetoric and late attempts to bolster the record with new evidence, Dr. Sullivan's "exclusivity" opinion is unsupported and should be precluded under FED. R. EVID. 702. In the alternative, no genuine issue of material fact exists that the scope of any hypothetical license between Amgen and ARIAD would be non-exclusive in nature and thus Amgen is entitled to summary judgment as a matter of law.

### C.    Dr. Sullivan Should Be Precluded From Opining That the Royalty Base Includes Sales of Enbrel That ARIAD's Infringement Expert Concedes Do Not Infringe the '516 Patent.

Dr. Sullivan's royalty base in this case includes sales and/or doses of Enbrel that ARIAD's infringement expert Dr. Calame concedes do not infringe the '516 patent. Despite Dr. Calame's clear admissions regarding non-infringing categories of doses of Enbrel, ARIAD still claims that it is entitled to damages for every single dose of Enbrel that has ever been sold or used since the issuance of the '516 patent.[17] ARIAD cannot be permitted to allow its damages expert to turn a blind eye to the admissions of ARIAD's infringement expert and seek damages where it is undisputed that there is no infringement.

#### 1.    *Rheumatoid Arthritis*

Dr. Calame admitted in deposition that the only evidence she points to in her expert report to show that the administration of Enbrel to patients with rheumatoid arthritis allegedly infringes the '516 patent actually shows that one out of seven patents exhibited no reduction in NF-kB activity in any cell types tested, and thus would not infringe the '516 patent. (Amgen Opening Br., Ex. O at 153-54) This equates to at least fourteen out of every hundred doses

---

[17] However, even ARIAD concedes that not all doses of Enbrel infringe the '516 patent -- for example, ARIAD states that "as with any drug, there are some percentage of patients who do not respond." (ARIAD Opp. at 27)

(14%) of Enbrel administered to rheumatoid arthritis patients that (even under ARIAD's theory) would not infringe the '516 patent.

Despite this clear evidence and Dr. Calame's admission, ARIAD argues that because a patient allegedly has an 86% chance (calculated by subtracting fourteen non-responders from one hundred) of exhibiting a reduction in levels of activated NF-kB, that somehow ARIAD meets its infringement burden of proof by a preponderance of the evidence and thus can rightfully claim damages on every single (100%) dose of Enbrel. ARIAD's contention does not pass muster.

At least fourteen out of one hundred rheumatoid arthritis patients taking Enbrel do not exhibit any reduction in NF-kB activity -- this is undisputed. As a result, these 14 patients cannot infringe the '516 patent -- period. Infringement is not a statistical game, and ARIAD's argument -- if you have an 86% chance of infringing, all doses infringe -- makes no sense. With respect to each use or administration of Enbrel, there is either infringement, or there is not. Indeed, under ARIAD's illogical theory of infringement, if 51% of the administrations of Enbrel infringed the '516 patent, all doses of Enbrel would infringe. This is not the law. *See Joy Technologies, Inc. v. Flakt, Inc.* 6 F.3d 770, 775 -776 (Fed. Cir. 1993) ("method claims . . . are directly infringed only when the method is practiced"); *Philips Electronics North America Corp. v. Contec Corp.* 2005 WL 552509, at *4 (D.Del. 2005) (same).

2.    *Psoriasis*

Dr. Calame also admitted in deposition that, even under ARIAD's over-reaching infringement theory, the only alleged infringement evidence she points to for the treatment of psoriasis with Enbrel showed that four out of the ten psoriasis patients tested could have no infringement after the first three months of treatment. (Amgen Opening Br., Ex. O at 218-19) Again, ARIAD attempts to explain away Dr. Calame's admissions and the evidence it offers in

16

an attempt to prove that the administration of Enbrel to patients with psoriasis infringe the '516 patent. (ARIAD Opp. at 29)  In doing so, ARIAD points to no evidence that all administrations of Enbrel to patients with psoriasis infringe the '516 patent -- instead ARIAD simply cites to deposition testimony explaining that psoriasis is a chronic disease that cannot be fully cured. This is a far cry from coming forth with evidence of infringement to contradict its own expert's testimony.

### 3.    *Ankylosing Spondylitis*

Last, ARIAD contends that Dr. Calame opined in her expert report that the "administration of Enbrel to a patient suffering from rheumatoid arthritis, psoriasis, psoriatic arthritis or ankylosing spondylitis infringes the asserted claims of the '516 patent." (ARIAD Opp. at 26)  This is not true.  Dr. Calame concedes that the only article she cites that has any relation to ankylosing spondylitis (the DiChamp article) does not support a claim of infringement for treatment of that disease with Enbrel. (Ex. 9, Calame Dep. at 151-53)

Despite Dr. Calame's concessions and failure to address infringement regarding the administration of Enbrel to patients with ankylosing spondylitis, ARIAD attempts to resurrect its infringement position in this regard by raising and characterizing new evidence (never cited or discussed by an expert). (ARIAD Opp. at 30)  Specifically, ARIAD claims that an article *Treatment of Ankylosing Spondylitis by Inhibition of Tumor Necrosis Factor-α* allegedly shows that ankylosing spondylitis is associated with elevated levels of TNF-α. (*Id.*)  ARIAD then makes the leap (with no support whatsoever) that "[s]ince TNF-α has been demonstrated to be an NF-kB inducer, Enbrel acts by binding TNF-α and it is efficacious in treating ankylosing spondylitis, it is ***likely*** that the administration of Enbrel to an ankylosing spondylitis patient

17

infringes the '516 patent."[18] (*Id.*) (emphasis added)  ARIAD's bare attorney argument is simply irrelevant -- it certainly is not evidence and thus, does not withstand scrutiny.

Clearly, ARIAD has no admissible evidence that the administration of Enbrel to patients with ankylosing spondylitis infringe the '516 patent.

### 4.    *Dr. Sullivan Overstates the Royalty Base*

Despite these non-infringing doses of Enbrel, Dr. Sullivan's royalty base includes 100% of non-governmental sales of Enbrel from July 1, 2001 through the end of 2007.  Dr. Sullivan provides no alternative calculation in his expert report to exclude these non-infringing sales.  Put simply, Dr. Sullivan's "everything infringes" contention is completely unsupported, and completely undermined by the testimony of ARIAD's own infringement expert.  Thus, Dr. Sullivan's opinions should be precluded.  At the very least, Dr. Sullivan's royalty base should be reduced by at least 14% for doses taken by rheumatoid arthritis patients, reduced by at least 40% for doses taken by psoriasis patients, and eliminated all together for doses taken by ankylosing spondylitis patients.[19]

---

[18]  Of course, if this logic holds, then the claims of the '516 patent are invalid because there is TNF blocker prior art that predates the earliest priority dates asserted by ARIAD for these claims.  *See, e.g.,* DI 628, Dec. of Warner Greene (filed under seal), Ex. A at 43.

[19]  While Dr. Sullivan offers no opinion and makes no damages calculation by indication of Enbrel in his reports, Amgen's damages expert, Mr. Bratic, researched and reported sales of Enbrel by different indication.  (Ex. 10, Bratic Reply Expert Report at ¶ 10). 

**REDACTED**

## II.  CONCLUSION

For the foregoing reasons, Dr. Sullivan's opinion should be precluded as unsupported, unreliable, and unsound.  At the very least, Dr. Sullivan's contentions relating to "exclusivity" and a "litigation risk" should be precluded under Federal Rule of Evidence 702.  Based on Dr. Sullivan's quantification of these theories (2.6% for exclusivity and 0.625-1.25% or 1-2.5% for his "litigation risk"), Dr. Sullivan should also be precluded from offering any opinion concluding that the reasonable royalty rate applicable to this case is anything higher than 3.15%.

DB02:6880799.1

065028.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800
(213) 680-8400

Siegmund Y. Gutman
J. Drew Diamond
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067
(310) 785-4707

Dated:  June 6, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,
Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,
Limited, and Immunex Rhode Island Corporation*

20

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of The Amgen Entities' Reply in Support of Their *Daubert* Motion To Preclude Certain Unsupported and Unreliable Opinions of Dr. Ryan Sullivan Relating to Damages with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

            */s/ Melanie K. Sharp*
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com