IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
                                  )
   Plaintiffs/Counterclaim Defendants, )
                                  )
   v. )
                                  )
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, )
                                  )
   Defendants/Counterclaim Plaintiffs. )

Civil Action No. 06-259 (MPT)

Public Version
Confidential Material Omitted

**THE AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF ITS *DAUBERT* MOTION
TO PRECLUDE CERTAIN PROFFERED OPINIONS OF DR. JEFFREY V. RAVETCH
RELATING TO WRITTEN DESCRIPTION AND INHERENT ANTICIPATION**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Y. Gutman
J. Drew Diamond
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

KIRKLAND & ELLIS LLP
Robert G. Krupka, P.C.
South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen
USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: June 6, 2008

## Table of Contents

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT.........................................................................................................2

    A.   Dr. Ravetch's Priority Opinions Are Based on the Wrong Legal Standard
        for Written Description and Must Be Excluded. .....................................................2

    B.   Dr. Ravetch's Inherent Anticipation Opinions Are Based on the Wrong
        Legal Standard and Must Be Excluded. ...............................................................10

    C.   Exclusion of Dr. Ravetch's Opinions Based on Incorrect Legal Standards
        is the Proper Remedy..........................................................................................11

III. CONCLUSION ...................................................................................................15

DB02:6879143.1                                                                  065028.1001

**Table of Authorities**

**Page**

**Cases**

*Atlas Powder Co. v. Ireco, Inc.,*
    190 F.3d 1342 (Fed. Cir. 1999) ...................................................................................11

*Corning Inc. v. SRU Biosystems,*
    No. Civ. A. 03-633 JJF, 2005 WL 2465900 (D. Del. Oct. 5, 2005)..................................14

*Corning, Inc. v. SRU Biosystems,*
    400 F. Supp. 2d 653 (D. Del. 2005) ..............................................................................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ........................................................1, 10, 11, 12, 13, 14, 15

*Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.,*
    237 F.R.D. 106 (D. Del. 2006) ......................................................................................15

*Genentech, Inc. v. Novo Nordisk A/S,*
    108 F.3d 1361 (Fed. Cir. 1995) ............................................................................8, 9, 10

*Herbert v. Lisle Corp.,*
    99 F. 3d 1109 (Fed. Cir. 1996) .................................................................................1, 13

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
    844 F. Supp. 336 (S.D. Tex. 1994).................................................................................3

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3rd Cir. 1994)...........................................................................................12

*Inline Connection Corp. v. AOL Time Warner, Inc.,*
    470 F. Supp. 2d 424 (D. Del. 2007) ......................................................................1, 12, 15

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,*
    2006 U.S. Dist. LEXIS 51869  (S.D.N.Y. 2006).............................................................15

*KB Home v. Antares Homes, Ltd.,*
    No. 04-1031, 2007 U.S. Dist. LEXIS 47273 .....................................................1, 12, 14, 15

*Lockwood v. American Airlines,*
    107 F.3d 1565 (Fed. Cir. 1997) ..................................................................................2, 3

*Malletier v. Dooney & Bourke, Inc.,*
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...........................................................................15

*Martin v. Mayer,*
    823 F.2d 500 (Fed. Cir. 1987) ........................................................................................3

ii

*Micro Chemical, Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003) ........................................................................15

*Neutrino Dev. Corp. v. Sonosite*, Inc.,
    410 F. Supp. 2d 529 (S.D. Tex. 2006) ......................................................1, 13

*Noskowiak v. Bobst SA,*
    2005 U.S. Dist. LEXIS 19536 (E.D. Wis. Sept. 2, 2005)..................................13

*Oxford Gene Technology Ltd. v. Mergen Ltd.,*
    345 F. Supp. 2d 431 (D. Del. 2004) ...............................................................15

*PowerOasis, Inc. v. T-Mobile USA, Inc.,*
    522 F.3d 1299 (Fed. Cir. 2008) ........................................................................3

*Samsung Elecs. Co. v. Quanta Computer, Inc.,*
    2006 U.S. Dist. LEXIS 66447 (N.D. Cal. Sept. 15, 2006) .................................13

*Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.,*
    295 F.3d 68 (Fed. Cir. 2002) ..........................................................................15

*SmithKline Beecham Corp. v. Apotex Corp.,*
    403 F.3d 1331 (Fed. Cir. 2005) ......................................................................10

*Synergetics, Inc. v. Hurst,*
    477 F.3d 949 (Fed. Cir. 2007) ........................................................................15

*Tristrata Technology, Inc. v. Mary Kay, Inc.,*
    423 F. Supp. 2d 456 (D. Del. 2006) ...............................................................15

*UMG Recordings, Inc. v. Lindor,*
    531 F. Supp. 2d 453 (E.D.N.Y. 2007) ............................................................15

*Zenith Elec. Corp. v. PDI Comm. Sys., Inc.,*
    522 F.3d 1348 (Fed. Cir. 2008) ......................................................................12

**Statutes**

35 U.S.C. § 102 ...............................................................................................11

35 U.S.C. § 112 .................................................................................................8

**Other Authorities**

WALKER ON PATENTS § 8.187 (2007).................................................................11

**Rules**

Fed. R. Evid. 702 .....................................................................................1, 12, 15

## I.    INTRODUCTION

Expert opinions are admissible only if: "(1) the testimony is based on sufficient facts or data, [and] (2) the testimony is the product of reliable principles and methods." *See* Fed. R. Evid. 702 ("Rule 702") Advisory Committee Notes; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The court in its gatekeeping function "must balance the need for the challenged evidence against the risk that it will confuse the jury and delay trial." *Inline Connection Corp. v. AOL Time Warner, Inc.,* 470 F. Supp. 2d 424, 430 (D. Del. 2007). In performing this function, expert testimony based on incorrect legal standards should be excluded because it "cannot assist the jury to resolve any fact relevant" at hand or it can "confuse or mislead" the jury. *See Neutrino Dev. Corp. v. Sonosite*, Inc., 410 F. Supp. 2d 529, 540 (S.D. Tex. 2006) ("Because Mr. Baker's analysis is based on a standard inapplicable to the proper inquiry under § 112, his testimony cannot assist the jury to resolve any fact relevant to Sonosite's enablement defense."); *KB Home v. Antares Homes, Ltd.,* No. 04-1031, 2007 U.S. Dist. LEXIS 47273 at *27 (N.D. Tex. June 28, 2007). Indeed, the Federal Circuit has stated:

> We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, .... but markedly incorrect law. Incorrect statements of law are no more admissible through "experts" than are falsifiable scientific theories.

*Herbert v. Lisle Corp.*, 99 F. 3d 1109, 1117 (Fed. Cir. 1996) (citations omitted). Thus, expert testimony based on the wrong standards must be excluded.

ARIAD argues that Dr. Ravetch was asked to apply the correct standard for the written description component of the priority analysis[1] and for inherent anticipation. (ARIAD's Opp.

---

[1]    As ARIAD noted in their Opposition Brief, Dr. Ravetch is proffered to opine on the issues of priority and anticipation. The priority analysis involves consideration, *inter alia*, of the

(Continued...)

Brief[2] at 4, 7) Whether or not Dr. Ravetch was properly instructed on the law, however, is not the issue. The issue is whether Dr. Ravetch actually applied the correct standards in performing his analyses. He did not. He applied and based his opinions on incorrect, legally impermissible standards for written description in the context of a priority determination and for inherent anticipation. He admitted this in his deposition, and his opinions and testimony are infected with these legally erroneous standards. Therefore, his opinions and testimony on written description for purposes of determining priority and for inherent anticipation are inadmissible and must be excluded.

## II.    ARGUMENT

### A.    Dr. Ravetch's Priority Opinions Are Based on the Wrong Legal Standard for Written Description and Must Be Excluded.

The law on written description is clear -- while the meaning of terms, phrases, or diagrams in a disclosure can be viewed from the vantage point of one skilled in the art, all limitations must necessarily appear or be present in the specification. *Lockwood v. American Airlines,* 107 F.3d 1565, 1571-72 (Fed. Cir. 1997). A finding on written description, including one for priority purposes, must be based on *what is described*, not based on *what would be obvious* to one of ordinary skill in the art from the disclosure of the specification: "Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious

---

written description and enablement support (i.e., 35 U.S.C. § 112, ¶ 1 support) for the claimed inventions in the various applications in the family of applications leading to the '516 patent. ARIAD is proffering another expert, Dr. David Livingston to offer opinions on written description for validity purposes.

2    D.I. 632, Defendants-Counterclaim-Plaintiffs' Memorandum in Opposition to Amgen's Motion to Preclude Certain Opinions of Dr. Jeffrey V. Ravetch.

over what is expressly disclosed." *Id.*  Indeed, the Federal Circuit stated that the written description requirement is:

> not a question of whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure . . . . Rather, it is a question of whether the application necessarily discloses that particular device.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) (citing *Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987)) (emphasis in original); *see also, Hoechst Celanese Corp. v. BP Chems. Ltd.*, 844 F. Supp. 336, 340 (S.D. Tex. 1994) ("The test for the written description requirement is not whether a skilled artisan *would have known* that lithium iodide was 'suitable' in similar processes; the test is whether the artisan would have known, from reading the description, that the *inventor* of the '73 application *did know* of this suitability--and hence had possession of this invention." (emphasis in original).

ARIAD argues that the standard set forth in Dr. Ravetch's opening report is the correct standard for written description upon which to base his priority opinions and that Amgen took his admission of applying an incorrect standard out-of-context. (ARIAD's Opp. Brief at 4)  But Amgen extensively questioned Dr. Ravetch on what standard he applied. (*See* Ex. A, Dep. of Jeffrey Ravetch ("Ravetch Dep. Tr.") at 132:21-135:6; 136:21-140:9)  The question and answer cited by Amgen in their opening brief was Dr. Ravetch's clarification of his unclear testimony. ARIAD cannot now ascribe a different meaning to Dr. Ravetch's clarification of what he meant under oath -- he applied a standard that, as noted above, is impermissible under the case law:

> Q.    Did you understand that from the standpoint of a written description analysis, you were not limited to what was actually described in the application, but *you could consider what was described, as well as what was obvious to one of ordinary skill in the art*?
>
> A.    *Yes.*

(*Id.* at 134:24-135:6 (emphasis added))

Despite what ARIAD's counsel told Dr. Ravetch was the correct written description standard in a priority determination, Dr. Ravetch's expert reports and his deposition testimony clearly demonstrate that he *did not apply* the proper standard in his opinions. Indeed, his reports and testimony are replete with examples where, in analyzing the written description component of the priority question, he went far outside of what was actually disclosed in the '516 patent and its predecessor applications and relied on what one of ordinary skill in the art "could" have done in combination with the knowledge in the art or what was obvious based on the knowledge in the art. This type of supplementation of the disclosure is explicitly not permitted for written description.

For example, Dr. Ravetch opines in his opening report that a March 1, 1988 predecessor application "teaches that the claimed methods can be carried out in human immune cells." (ARIAD's Opp., Supp. Dec. of David Greenwald, DI 639, Ex. 25 at ¶ 47) However, Dr. Ravetch does not cite any -- because, in fact, there is not any -- actual disclosure of human immune cells for his opinions. Instead, he notes that the 1988 application discloses a murine pre-B cell line which he says is "often used to model human immune cells." (*Id.*) Then, despite no actual disclosure other than mouse cells in the 1988 application, he concludes that one of skill in the art could "extrapolate" and make the leap to conclude that "mammalian, human, and immune cells" are described in the application. (*Id.*) Clearly, this is not the correct standard for the written description.

Similarly, Dr. Ravetch went well beyond the disclosure of the predecessor applications in an attempt to find support for different genera of compounds that could be used to reduce NF-κB activity. For example, ARIAD claims that the use of extracellular agents that bind to TNF-α and

reduce NF-κB activity are encompassed and described by the '516 patent and its predecessor applications. (*See e.g.*, ARIAD's Opp., Supp. Dec. of David Greenwald, DI 640, Ex. 32 at ¶ 68) Yet Dr. Ravetch admitted that the applications do not disclose the use of antibodies to target molecules outside of a cell to reduce NF-κB activity. Applying the incorrect legal standard, he relied on inferences from his opinions as to the "understanding" and "knowledge" of one of ordinary skill in the art and, nonetheless, opined that such use of antibodies to bind to extracellular agents and reduce NF-κB activity were adequately described in the applications for the '516 patent:

> Q.    Okay. *So the patent doesn't say use antibodies outside of a cell to reduce NF-kappaB activity in a cell, correct?*
>
> A.    *Right. The patent does not say that.* That's my understanding as one of skill in the art reading the patent and understanding what the patent's invention is and the purpose of the patent and then the knowledge that how one could modify external influences since external influences are defined as part the NF-kappaB activity.

(Ex. A, Ravetch Dep. Tr. at 260:6-16 (emphasis added))  This testimony demonstrates how far outside of the patent or its predecessor applications that Dr. Ravetch (and ARIAD) must go to support his written description positions.  He admits that antibodies are not described for extracellular use -- *i.e.*, to target and bind to a molecule outside of the cell in order to "reduce NF-κB activity."  But he cobbles together different parts of the patent to arrive at an "understanding" of what he considers to be "the purpose of the patent" and then makes the leap to an extracellular use of such antibodies by supplementing this "understanding" with his opinion as to what one of skill in the art "could modify."  This is not a written description analysis.

Dr. Ravetch also relied on his views as to what one of skill in the art could do or what would have been obvious to do in order to find adequate description in the predecessor applications for the use of other compounds that could be used to reduce to NF-κB activity.  For

5

example, Dr. Ravetch admitted in his report that the sequence of IκB was not known in the art until 1991. (DI 640, Ex. 32 at ¶ 71) Nonetheless, he stated the 1988 predecessor application provided adequate disclosure to use IκB to reduce NF-κB activity because "a POSA [a term ARIAD's counsel designated for a Person of Ordinary Skill in the Art] would know how to isolate IκB, given the disclosure of its function and location of the NF-κB-IκB complex in the cytosol." (DI 639, Ex. 25 at ¶ 48)

Similarly, Dr. Ravetch relied on what was allegedly obvious or what could allegedly have been done in the art in finding adequate written description in the predecessor applications for dominantly interfering molecules -- i.e., molecules designed to block NF-κB from binding to its binding site by binding to, but not activating transcription from, the NF-κB binding sites. Knowledge of the sequence and structure of NF-κB is required to construct a dominantly interfering molecule. Indeed, Dr. Ravetch states in his opening report that as of 1988, one of skill in the art would know how to construct dominantly interfering molecules because "[l]ike most transcription factors, NF-κB is composed of both a DNA binding domain … and a transcriptional activation domain." (Id. at ¶ 51) However, the 1988 predecessor application contained no description of the structure or domains of a NF-κB or of a dominantly interfering molecule.[3] Even when later predecessor applications referred to dominantly interfering molecules, the applications only speculated that it could be done "*if* the DNA binding domain and the DNA polymerase activating domain of NF-κB are spatially distinct in the molecule." (*See* Ex. B, U.S. Appl. No. 07/341,436, filed Apr. 21, 1989 at 30, ll. 4-11 (emphasis added))

[3]  **REDACTED**

DB02:6879143.1                    065028.1001

However, the sequence of NF-κB and the location of domains within the NF-κB molecule were also not disclosed in either the 1988 or the 1989 applications.[4]   Indeed, this information is not even disclosed in the '516 patent.[5]

Despite the need for the sequence and structure of NF-κB in order to design and make a dominantly interfering molecule, Dr. Ravetch stated that the lack of knowledge of NF-κB in 1988 was irrelevant to his analysis.  (Ex. A, Ravetch Dep. Tr. at 146:12-147:8)  He stated in his report that one of skill in the art could have isolated and sequenced NF-κB "using routine techniques."  (DI 640, Ex. 32 at ¶ 75)   Thus, by applying an obviousness or enablement analysis rather than a written description analysis, Dr. Ravetch concludes that dominantly interfering molecules were adequately described because "a person of ordinary skill in the art would know that they could be used to practice the claimed methods, and would know how to create molecules containing the DNA binding domain" as of 1988.  (DI 639, Ex. 25 at ¶ 51)

The claims of the '516 patent, under ARIAD's proposed claim construction, require induction of NF-κB activity prior to carrying out the claimed method of reducing the NF-κB activity.  However, in opining that the '516 patent's predecessor applications disclose such prior induction of NF-κB activity, Dr. Ravetch applied the same incorrect legal standard.  (Ex. A, Ravetch Dep. Tr. at 98:7-102:7)   In particular, Dr. Ravetch admitted that the '516 patent does not disclose an experiment showing a method of reducing NF-κB activity.  (*Id.* at 144:12-24)  Nonetheless, he stated that the description still met the written description requirement "based on the knowledge in the art and the disclosure."  (*Id.*)

---

4



5

Moreover, when asked how one of skill in the art, at the time of the application for the '516 patent, would know when induction of NF-κB activity took place, Dr. Ravetch continued to rely on what was obvious from the art. Although Dr. Ravetch stated that, in his opinion, induction of NF-κB occurs upon engagement of an extracellular stimulus with its receptor, he could not provide any evidence or support of the threshold of activity that would be required for activation. (*Id.* at 98:7-102:7) Rather, Dr. Ravetch opined that it would obvious to someone from what was known at the time of the application for the '516 patent to determine what the threshold was:

> Q.    So you're saying it would have been obvious to someone from what was already known at the time of the application for the '516 Patent how to determine what the threshold was; correct?
>
> A.    In general, yes.

(*Id.* at 102:3-7)

The opinions of Dr. Ravetch set forth above are not proper analyses of what the patent or any of its predecessor applications describe -- they are an exercise in supplementing the description with information not found anywhere in any of the predecessor patent applications. This analysis is not relevant to determining what the '516 patent predecessor applications actually described.

This is not the first case in which Dr. Ravetch has pieced together knowledge from the art in an improper and legally baseless attempt to support an opinion of compliance with 35 U.S.C. § 112, ¶ 1. In *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365-66 (Fed. Cir. 1995), the Federal Circuit dismissed Genentech's arguments based on Dr. Ravetch's opinions for enablement because he relied on the level of skill in the art rather than the disclosure of the

patent. In admonishing Genentech for supplementing a scant disclosure with knowledge in the art, the Court stated:

> Essentially, Genentech's argument is that the knowledge of one skilled in the art was sufficient to provide all of the missing information and, more specifically, that the disclosure of a DNA encoding hGH, when combined with prior art cleavable fusion expression techniques applied to non-human proteins, would enable the practice of the claimed method. *In support of this argument, Genentech points to the testimony of Dr. Ravetch*, who testified as to the knowledge of one skilled in the art, to the extensive description of enzymes in the reference textbook *Methods in Enzymology*, and to the specification's explicit reference to British Patent 2008123-A, which more fully details the potential use of trypsin in cleavable fusion expression.
>
> ****
>
> We agree with Novo. Genentech's arguments, focused almost exclusively on the level of skill in the art, ignore the essence of the enablement requirement. Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable. ... Tossing out the mere germ of an idea does not constitute enabling disclosure.
>
> ****
>
> It is true, as Genentech argues, that a specification need not disclose what is well known in the art. .... However, that general, oft-repeated statement is merely a rule of supplementation, not a substitute for a basic enabling disclosure. It means that the omission of minor details does not cause a specification to fail to meet the enablement requirement. However, when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required; there is a failure to meet the enablement requirement that cannot be rectified by asserting that all the disclosure related to the process is within the skill of the art. *It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.*

*Id.* at 1366 (citations omitted, emphasis added). Dr. Ravetch does the same thing here in his opinions on written description in his priority analysis. By relying on what one of ordinary skill

DB02:6879143.1                                                                      065028.1001

in the art allegedly could have done, could have extrapolated, or would have known based on the disclosures of the '516 patent's predecessor applications, Dr. Ravetch's priority analysis was based solely on what would be allegedly obvious to one of ordinary skill in the art from the disclosures of the priority applications at issue -- rather than on the disclosures themselves -- and must be excluded.

**B.    Dr. Ravetch's Inherent Anticipation Opinions Are Based on the Wrong Legal Standard and Must Be Excluded.**

ARIAD attempts to shift the focus of the issue by stating that the term "always" "does not mean that *all* possible prior art references, however many may exist, must always or inevitably anticipate the claims." (ARIAD's Opp. Brief at 8 (emphasis in original))  Moreover, ARIAD argues that Dr. Ravetch did not "suggest that all prior art references must anticipate the patent for a claim to be anticipated." (*Id.*)  But Amgen never argued this.  It appears that the parties agree that a single prior art reference must "necessarily and inevitably" have practiced the claimed invention in order to inherently anticipate. (*See, e.g.*, Amgen's Opening Brief[6] at 6; ARIAD's Opp. Brief at 8.)

Moreover, as for written description above, the central issue here is not what standard for inherent anticipation Dr. Ravetch in his report says was the correct one, but what standard he actually applied in his opinions.  From Dr. Ravetch's reports and testimony, it is clear that Dr. Ravetch applied a standard which required that a single prior art reference must demonstrate that a reduction in NF-κB activity occurs 100% of the time and under any circumstance in order to inherently anticipate the claims of the '516 patent.  This is simply not required for inherent

---

[6]    D.I. 602, The Amgen Entities' Brief in Support of its Daubert Motion to Preclude Certain Proffered Opinions of Dr. Jeffrey V. Ravetch Relating to Written Description and Inherent Anticipation.

anticipation.  A reference need not show that achieving a different result is impossible. *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1343 (Fed. Cir. 2005).  In fact, it is well-settled that a ***single prior use*** is enough to invalidate a patent under 35 U.S.C. § 102. WALKER ON PATENTS § 8.187 (2007) ("Initially, it can be stated with confidence that anticipation will occur if even a single qualifying use has occurred.")  Therefore, if the reduction of NF-κB activity in cells is necessarily present (at least once) under the conditions disclosed in a reference, it inherently anticipates.  *Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342, 1347 (Fed. Cir. 1999).  Nothing in the law requires that the result must be proven to occur 100% of the time, each and every time, or under every circumstance.

But despite the overwhelming evidence in the prior art that certain well-known compounds reduced NF-κB activity in cells as required by the claims of the '516 patent, Dr. Ravetch stated that none of these references inherently anticipated the claims of the '516 patent because they did not "show", "demonstrate" or "state" that the compounds "necessarily and always" or "in all circumstances" or "in each and every time" reduced NF-κB activity.  (*See* Amgen's Opening Brief at 5-6)  Thus, Dr. Ravetch imposes a heightened requirement of absolute and universal proof that nothing else will happen.  This is not the correct standard for inherent anticipation.  Therefore Dr. Ravetch's opinions must be excluded.

C.    **Exclusion of Dr. Ravetch's Opinions Based on Incorrect Legal Standards is the Proper Remedy.**

Citing to *Daubert*, ARIAD argues that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (ARIAD's Opp. Brief at 10*)* While cross-examination, as discussed below, is appropriate for questions involving application

of fact in otherwise admissible expert testimony, Dr. Ravetch's testimony is *inadmissible* and the availability of cross-examination cannot change this.

Although expert testimony does not have to proven to be correct, it must be shown to be *reliable*. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir. 1994). Under Rule 702, the court retains "some gatekeeping responsibility" in determining whether an expert's testimony is reliable enough to be admitted. *Inline*, 470 F. Supp. 2d at 429 (citing *Daubert*, 509 U.S. at 600). Expert opinions are reliable, and thus admissible, only if: "(1) the testimony is based upon sufficient facts or data, [and] (2) the testimony is the product of reliable principles and methods." *See* Rule 702 Advisory Committee Notes ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."); *see also Daubert*, 509 U.S. at 592-93. Basing an opinion on an incorrect legal standard is not "reliable" under *Daubert* or the Federal Rules of Evidence.

Contrary to ARIAD's argument, the cases that Amgen cited in its opening brief provide ample authority for excluding Dr. Ravetch's opinions as inadmissible under the court's gatekeeping authority. (ARIAD's Opp. Brief at 10)    For example, ARIAD argues that *KB Home*, 2007 U.S. Dist. LEXIS 47273 (N.D. Tex. June 28, 2007), is irrelevant in that the court declined to preclude the expert testimony because it was mooted by the limitation in scope of the expert's testimony. *KB Home*, 2007 U.S. Dist. LEXIS 47273 at *27. But this does not diminish the court's clear statement that expert testimony based on improper legal standards should be precluded. *Id.* The court in *Zenith* agreed with the lower court's disapproval of the "wholesale throwing out of all of Mengel's testimony" and approval of the expert's testimony on only technical matters. *Zenith Elec. Corp. v. PDI Comm. Sys., Inc.*, 522 F.3d 1348, 1357 (Fed. Cir. 2008) (quoting *Zenith Elec. Corp. v. PDI Comm. Sys., Inc.*, No. 04-CV-4796 (N. D. Ill. Jan. 18,

2007), Mem. Op. at 20) (Ex. D). The Federal Circuit also agreed with the district court's caution

that it "will not give credence to the legal aspect of mixed conclusions of fact and law that are

based on incorrect legal standards." *Id.*

ARIAD's attempt to distinguish *Herbert*, 99 F.3d 1109 (Fed. Cir. 1996) is similarly

unavailing. In *Herbert*, the expert was opining on what actions would constitute inequitable

conduct under the law. The court excluded the opinions of the defendant's patent expert because

he relied on incorrect statements of the law of inequitable conduct in reaching his conclusions.

*Herbert,* 99 F.3d at 1115. Similar to *Herbert*, Dr. Ravetch relied on an incorrect legal basis in

setting forth his opinions. Thus, Dr. Ravetch's opinions based on incorrect legal standards are

inadmissible and must be excluded. *Id.* at 1117. Indeed, the Court explicitly noted that the

expert testimony based on incorrect legal standard was being excluded under the court's

gatekeeping authority:

> We encourage exercise of the trial court's gatekeeper authority
> when parties proffer, through purported experts, not only unproven
> science, … but also markedly incorrect law. Incorrect statements
> of law are no more admissible through 'experts' than are falsifiable
> scientific theories.

*Id.*; *see also Neutrino*, 410 F. Supp. 2d at 540 (S.D. Tex. 2006) ("Because Mr. Baker's analysis

is based on a standard inapplicable to the proper inquiry under § 112, his testimony cannot assist

the jury to resolve any fact relevant to Sonosite's enablement defense.")

In addition to the cases discussed above, courts have overwhelmingly rejected expert

testimony based on an incorrect legal standards and have held such testimony inadmissible. *See,*

*e.g., Samsung Elecs. Co. v. Quanta Computer, Inc.*, 2006 U.S. Dist. LEXIS 66447, at *33-38

(N.D. Cal. Sept. 15, 2006) (granting in part a motion to exclude expert opinions where the expert

relied on a questionable legal standard); *Noskowiak v. Bobst SA*, 2005 U.S. Dist. LEXIS 19536

(E.D. Wis. Sept. 2, 2005) (excluding expert testimony based on the wrong legal standards as irrelevant under Rule 702 and *Daubert* because it "may confuse the jury" and because cross-examination is an insufficient cure for the application of an incorrect legal standard). Thus, exclusion of Dr. Ravetch's improper opinions is the proper remedy.

ARIAD's reliance on *Corning Inc. v. SRU Biosystems*, No. Civ. A. 03-633 JJF, 2005 WL 2465900 (D. Del. Oct. 5, 2005), for the proposition that "the appropriate remedy would be to allow cross examination of Dr. Ravetch on the alleged deficiencies so the jury can determine what weight should be afforded his opinions" is grossly misplaced. (ARIAD's Opp. Brief at 9) The *Corning* case was tried to the court, not to jury. *See Corning, Inc. v. SRU Biosystems*, 400 F. Supp. 2d 653, 656 (D. Del. 2005). Where there is no jury to be misled or confused, considering inconsistencies between the expert's analysis and the correct legal standards could be considered in the weight afforded to his testimony. *Id.* at *1. However, where the case is being tried to a jury that can be misled or confused, as it is here, *Corning* is inapplicable. In circumstances of a jury trial, the law is clear -- expert testimony based on improper legal standards must be excluded. *KB Home*, 2007 U.S. Dist. LEXIS 47273 at *27.

Indeed, in a jury trial, cross-examination is not the appropriate remedy where an expert's opinions lack a proper legal basis. When stating that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," the Court in *Daubert* was addressing a dispute based on factual, not legal, bases. *Daubert*, 509 U.S. at 596. Where courts have held that cross-examination was the proper remedy, the expert testimony dealt with factual issues that go to the weight of the evidence, such as disagreements with the factual basis of the

14

expert's opinion[7]; credibility determinations[8]; accuracy of application of sound scientific methodology[9]; reliance on incorrect factual assumptions[10]; and the substance of opinions.[11] Each of these situations are strikingly different from the one before this Court.    Dr. Ravetch's opinions are improper because he based his opinions on incorrect legal standards. The appropriate remedy is therefore exclusion of the improper opinions.

## III.    CONCLUSION

For the foregoing reasons, Amgen's motion to preclude Dr. Ravetch's opinions based on legally incorrect standards under Federal Rule of Evidence 702  and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* should be granted.

---

[7]    *See, e.g., Inline*, 472 F. Supp. 2d at 613; *see also Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955 (Fed. Cir. 2007); *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

[8]    *See, e.g., KB Homes*, 2007 WL 1893370 at *11; *see also Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*, 237 F.R.D. 106, 112 (D. Del. 2006).; *Oxford Gene Technology Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 442 (D. Del. 2004).

[9]    *See, e.g., Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 81 (Fed. Cir. 2002); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 563 (S.D.N.Y. 2007); *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 457 (E.D.N.Y. 2007).

[10]    *See, e.g., Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 U.S. Dist. LEXIS 51869 at *20-22 (S.D.N.Y. 2006).

[11]    *See, e.g., Tristrata Technology, Inc. v. Mary Kay, Inc.*, 423 F. Supp. 2d 456, 463 (D. Del. 2006).

DB02:6879143.1    065028.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP


_____/s/ Melanie K. Sharp_____
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
South Figueroa Street
Los Angeles, CA  90017-5800
(213) 680-8400

Siegmund Y. Gutman
J. Drew Diamond
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067
(310) 785-4707

Dated:  June 6, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,
Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,
Limited, and Immunex Rhode Island Corporation*

065028.1001

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of THE AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF ITS *DAUBERT* MOTION TO PRECLUDE CERTAIN PROFFERED OPINIONS OF DR. JEFFREY V. RAVETCH RELATING TO WRITTEN DESCRIPTION AND INHERENT ANTICIPATION with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

    /s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com