IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;       )
IMMUNEX CORPORATION, a Washington          )
corporation; AMGEN USA INC., a Delaware    )
corporation; AMGEN MANUFACTURING,          )
LIMITED, a Bermuda Corporation, and        )
IMMUNEX RHODE ISLAND                       )
CORPORATION, a Delaware corporation,       )
                                           )
    Plaintiffs/Counterclaim Defendants,    )   Civil Action No.06-259 (MPT)
                                           )
    v.                                     )   Public Version
                                           )   Confidential Material Omitted
ARIAD PHARMACEUTICALS, INC., a             )
Delaware corporation, and THE WHITEHEAD    )
INSTITUTE FOR BIOMEDICAL RESEARCH,         )
a Delaware corporation,                    )
                                           )
    Defendants/Counterclaim Plaintiffs.    )

**DECLARATION OF MELANIE K. SHARP IN SUPPORT OF THE
AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF ITS *DAUBERT*
MOTION TO PRECLUDE CERTAIN PROFFERED OPINIONS OF DR.
JEFFREY V. RAVETCH RELATING TO WRITTEN DESCRIPTION AND
INHERENT ANTICIPATION**

I, Melanie K. Sharp, hereby declare as follows:

1.    I am a partner at the law firm of Young, Conaway, Stargatt & Taylor LLP in

Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter. I submit this

Declaration in connection with The Amgen Entities' Reply Brief in Support of Its Daubert

Motion to Preclude Certain Proffered Opinions of Dr. Jeffrey V. Ravetch Relating to Written

Description and Inherent Anticipation. I have personal knowledge of the facts set forth herein

and, if called as a witness, could and would competently testify thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of selected pages from the

April 3, 2008 videotaped deposition of Jeffrey Ravetch, M.D., Ph.D, as well as selected pages

from the April 22, 2008 continued videotaped deposition of Jeffrey Ravetch, M.D., Ph.D.

3.      Attached hereto as Exhibit B is a true and correct copy of selected pages from U.S. Appl. No. 07/341,436, filed Apr. 21, 1989 at 30, ll. 4-11.

4.      Attached hereto as Exhibit C is a true and correct copy of selected pages from the March 17, 2007 videotaped deposition of David M. Livingston, MD.

5.      Attached hereto as Exhibit D is a true and correct copy of a Memorandum and Order from *Zenith Electronics Corporation v. PDI Communications Systems, Inc.*, No. 04-CV-4796 (N. D. Ill. Jan. 18, 2007).

6.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 6th day of June, 2008.


_____/s/ Melanie K. Sharp_____
Melanie K. Sharp, Esq.

DB02:6879096.1                                                                        065028.1001

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of Declaration of Melanie K. Sharp in Support of The Amgen Entities' Reply Brief In Support Of Its *Daubert* Motion To Preclude Certain Proffered Opinions Of Dr. Jeffrey V. Ravetch Relating To Written Description And Inherent Anticipation with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
---------------------------------------------X
AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA
INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX
RHODE ISLAND CORPORATION,

                    Plaintiffs,

                                Civil Action No.
                                06-259-(MPT)
vs

ARIAD PHARMACEUTICALS, INC. and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware
Corporation,

                    Defendants.
---------------------------------------------X
ARIAD PHARMACEUTICALS INC., THE MASSACHUSETTS
INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND
FELLOWS OF HARVARD COLLEGE and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,

                    Counterclaim Plaintiffs

vs.

AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC.,
AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE
ISLAND CORPORATION and WYETH,

                    Counterclaim Defendants.
---------------------------------------------X


          VIDEOTAPED DEPOSITION OF JEFFREY RAVETCH, M.D./PH.D.

                    April 3, 2008

                    - Volume I -

Page 98

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                           |
| 13:14:58 | 2  | A.      I will try to.                                   |
| 13:15:04 | 3  | THE WITNESS:  So can you read back the                   |
| 13:15:06 | 4  | question, please.                                        |
| 13:15:16 | 5  | (Record read.)                                           |
| 13:15:17 | 6  | A.      Not in the context of this case, no.             |
| 13:15:19 | 7  | Q.      At what point in this series of events           |
| 13:16:24 | 8  | that you've described is there induction of NF-kappaB    |
| 13:16:30 | 9  | activity?                                                |
| 13:16:31 | 10 | A.      Induction of activity begins with the            |
| 13:16:39 | 11 | engagement of an extracellular stimulus.                 |
| 13:16:42 | 12 | Q.      So is it your opinion that induction             |
| 13:16:52 | 13 | of NF-kappaB activity occurs with the binding of an      |
| 13:17:00 | 14 | extracellular stimulus to a cell?                        |
| 13:17:01 | 15 | A.      For -- yes, I do, for those stimuli              |
| 13:17:07 | 16 | that influence NF-kappaB.                                |
| 13:17:11 | 17 | Q.      And at that point, upon binding of a             |
| 13:17:18 | 18 | stimulus with a receptor on a cell, at that point,       |
| 13:17:26 | 19 | there is induced NF-kappaB activity?                     |
| 13:17:29 | 20 | A.      In a temporal fashion, you mean within           |
| 13:17:35 | 21 | milliseconds, microseconds; is there a time frame        |
| 13:17:38 | 22 | that we're talking about?                                |
| 13:17:40 | 23 | Q.      Well, that's what I'm trying to                  |
| 13:17:41 | 24 | understand.                                              |
| 13:17:42 | 25 | A.      Well, I don't know --                            |

Page 99

| | 1 | Jeffrey V. Ravetch, M.D./Ph.D. |
|---|---|---|
| 13:17:43 | 2 | Q.    I'm trying to understand when you say |
| 13:17:45 | 3 | there is an induction of NF-kappaB activity? |
| 13:17:48 | 4 | A.    And I answered that it's upon |
| 13:17:50 | 5 | engagement of an extracellular stimulus with its |
| 13:17:53 | 6 | receptor.  That's the answer. |
| 13:17:57 | 7 | Q.    How many molecules of stimulus? |
| 13:17:58 | 8 | A.    It would depend upon the specifics of |
| 13:18:01 | 9 | that cellular system. |
| 13:18:03 | 10 | Q.    Why? |
| 13:18:04 | 11 | A.    Different cells have different |
| 13:18:05 | 12 | thresholds for stimulation. |
| 13:18:07 | 13 | Q.    How do you determine what the |
| 13:18:09 | 14 | threshold is for stimulation? |
| 13:18:11 | 15 | A.    You perform an experiment. |
| 13:18:12 | 16 | Q.    What experiment? |
| 13:18:13 | 17 | A.    Well, if you define the cell and the |
| 13:18:15 | 18 | stimulus, we can do the experiment. |
| 13:18:16 | 19 | Q.    Does the nature of the experiment |
| 13:18:18 | 20 | depend on what cell? |
| 13:18:19 | 21 | A.    Does the nature of the experiment, or |
| 13:18:22 | 22 | do you mean the design of the experiment? |
| 13:18:24 | 23 | Q.    I wanted to start broadly with the |
| 13:18:26 | 24 | nature of the experiment? |
| 13:18:27 | 25 | A.    I don't use that term, so I don't know |

Page 100

|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D. |
|----------|----|----|
| 13:18:29 | 2  | what that means. |
| 13:18:29 | 3  | Q.    Does the design of the experiment |
| 13:18:31 | 4  | depend on the cell? |
| 13:18:33 | 5  | A.    Of course it does. |
| 13:18:34 | 6  | Cells will have different properties. |
| 13:18:35 | 7  | And you have to take them into account when you |
| 13:18:38 | 8  | design an experiment to test a particular question, |
| 13:18:40 | 9  | like what is the minimal cluster size required to |
| 13:18:44 | 10 | induce a specific cellular response. |
| 13:18:46 | 11 | Q.    Okay.  Is that described in the |
| 13:18:48 | 12 | patent? |
| 13:18:49 | 13 | A.    That was known in the art before this |
| 13:18:53 | 14 | patent was written. |
| 13:18:54 | 15 | Q.    Is it described in the patent? |
| 13:18:56 | 16 | A.    So, for example, without limitation, |
| 13:21:30 | 17 | in column 12, starting at line 41:  "NF-kappaB is now |
| 13:21:39 | 18 | known to be involved in a variety of induction |
| 13:21:42 | 19 | processes in essentially all types of cells, and is |
| 13:21:46 | 20 | thought to participate in a system through which |
| 13:21:48 | 21 | multiple induction pathways work, in much the same |
| 13:21:51 | 22 | manner as 'second messengers' (cyclic AMP, IP3) act, |
| 13:21:57 | 23 | resulting in transduction of a variety of |
| 13:21:58 | 24 | extracellular signals into specific patterns of gene |
| 13:22:01 | 25 | expression." |

Page 101

| | | |
|---|---|---|
| | 1 | Jeffrey V. Ravetch, M.D./Ph.D. |
| 13:22:02 | 2 | So to one of skill in the art, when |
| 13:22:05 | 3 | you invoke the second messenger models of cyclic AMP |
| 13:22:09 | 4 | and IP3, you're aware of the fact that those systems |
| 13:22:12 | 5 | depend upon a threshold level of signaling to induce |
| 13:22:15 | 6 | those second messengers. |
| 13:22:16 | 7 | Q.    So what you're saying, it would be |
| 13:22:18 | 8 | obvious, from what you just read, to one of skill in |
| 13:22:20 | 9 | the art that there is some threshold of stimulus |
| 13:22:25 | 10 | that's implicated for NF-kappaB activation? |
| 13:22:29 | 11 | A.    That there may be, depending upon the |
| 13:22:32 | 12 | cell type and the stimulus being used, in analogy to |
| 13:22:37 | 13 | what's been described for cyclic AMP and IP3. |
| 13:22:38 | 14 | Q.    And how does the patent tell you to |
| 13:22:40 | 15 | determine what that threshold is? |
| 13:22:42 | 16 | A.    I think that is clear to those of us |
| 13:22:45 | 17 | who work with these systems.  We know how to study |
| 13:22:48 | 18 | the clustering effect of receptors and their ligands, |
| 13:22:53 | 19 | so it's of general skill in the art. |
| 13:22:56 | 20 | Q.    The patent itself doesn't tell you -- |
| 13:22:58 | 21 | A.    I can continue searching, but I think |
| 13:23:00 | 22 | the general answer will be that the detailed |
| 13:23:04 | 23 | experimental protocols are those that were available |
| 13:23:08 | 24 | at the time to people who studied receptor ligand |
| 13:23:12 | 25 | signaling systems, and understood that an interaction |

Page 102

|         |    |                                                      |
|---------|----|------------------------------------------------------|
|         | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                       |
| 13:23:16 | 2  | could depend upon threshold effects.                |
| 13:23:21 | 3  | Q.    So you're saying it would have been           |
| 13:23:28 | 4  | obvious to someone from what was already known at the |
| 13:23:31 | 5  | time of the application for the '516 Patent how to  |
| 13:23:34 | 6  | determine what the threshold was; correct?          |
| 13:23:35 | 7  | A.    In general, yes.                              |
| 13:24:00 | 8  | To further expand -- there is no                    |
| 13:24:02 | 9  | question pending, I suppose so I shouldn't say      |
| 13:24:05 | 10 | anything.                                           |
| 13:24:05 | 11 | Q.    If you need to say something to              |
| 13:24:07 | 12 | complete your prior answer?                          |
| 13:24:08 | 13 | A.    I would like to.                             |
| 13:24:09 | 14 | In column 68, in describing the                    |
| 13:24:11 | 15 | experimental procedures for the induction of        |
| 13:24:13 | 16 | NF-kappaB by LPS, they describe the concentration   |
| 13:24:19 | 17 | SPUs to stimulate those cells.                      |
| 13:24:22 | 18 | Those concentrations don't come out of             |
| 13:24:25 | 19 | thin air, but come out of the experimental procedures |
| 13:24:29 | 20 | that one uses to determine what is the correct      |
| 13:24:31 | 21 | threshold level of stimulus to give rise to a       |
| 13:24:33 | 22 | response.                                           |
| 13:24:34 | 23 | So, those are the kinds of experiments             |
| 13:24:36 | 24 | that one would understand would be done to determine |
| 13:24:41 | 25 | for a particular stimulus what the threshold would be |

Page 132

                                Jeffrey V. Ravetch, M.D./Ph.D.

14:24:05   2        The only statement I can find is

14:24:06   3    paragraph 42 on page 17, which I say "I understand

14:24:08   4    the disclosure of identifying characteristics such as

14:24:12   5    structure, properties or functional characteristics

14:24:14   6    coupled with the correlation between structure and

14:24:16   7    function may satisfy the written description

14:24:22   8    requirement."

14:24:22   9        So beyond a more thorough

14:24:28   10   investigation of what was known to one of skill in

14:24:29   11   the art as of the effective dates that I put forward,

14:24:33   12   I would have to defer answering that question.

14:24:43   13       Q.    Well, let's look at paragraph 42.

14:24:49   14   Paragraph 42 is in the context of one of the legal

14:24:52   15   standards that you were informed about; correct?

14:24:54   16       A.    That's correct.

14:24:54   17       Q.    And in particular, this legal standard

14:25:01   18   in paragraph 42 relates to something called the

14:25:04   19   written description requirement; right?

14:25:06   20       A.    That's what it says, yes.

14:25:08   21       Q.    You applied the written description

14:25:10   22   requirement in connection with your priority date

14:25:17   23   analysis; correct?

14:25:18   24       A.    That's correct, yes.

14:25:19   25       Q.    In applying the understanding that you

Page 133

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                               |
| 14:25:21 | 2  | were provided of the written description requirement         |
| 14:25:23 | 3  | in the context of your priority analysis, did you            |
| 14:25:26 | 4  | consider the references cited on the face of the '516        |
| 14:25:30 | 5  | Patent to be part of the disclosure for written              |
| 14:25:32 | 6  | description purposes or not?                                 |
| 14:25:34 | 7  | A.    I consider what would be known to one                  |
| 14:25:36 | 8  | of skill in the art at the relevant date, and whether        |
| 14:25:39 | 9  | it would be indicative that the disclosure                   |
| 14:25:47 | 10 | demonstrated the inventors were in possession of the         |
| 14:25:50 | 11 | claimed invention.  And when I applied that standard,        |
| 14:25:53 | 12 | I determined that, in fact, it did meet the written          |
| 14:25:57 | 13 | description requirements for the claims I discussed          |
| 14:26:04 | 14 | with their priority dates.                                   |
| 14:26:05 | 15 | Q.    And you looked at two applications,                    |
| 14:26:08 | 16 | the '680 and the '436 application?                           |
| 14:26:10 | 17 | A.    Those are the two I commented on.  I                   |
| 14:26:12 | 18 | believe I looked at others, as well.                         |
| 14:26:14 | 19 | Q.    I think in subsequent reports you do?                  |
| 14:26:16 | 20 | A.    Perhaps in subsequent reports.  I have                 |
| 14:26:18 | 21 | the '436 listed here.  The '680 and the '516.  Those         |
| 14:26:25 | 22 | are the three I relied upon for the first report.            |
| 14:26:28 | 23 | Q.    In your priority date analysis, in                     |
| 14:26:30 | 24 | particular, you're looking at the disclosures of the         |
| 14:26:33 | 25 | '680, beginning on page 17 -- that's the '680                |

Page 134

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                           |
| 14:26:36 | 2  | application?                                             |
| 14:26:36 | 3  | A.    Yes.                                               |
| 14:26:37 | 4  | Q.    And the '436 application, beginning, I             |
| 14:26:40 | 5  | guess, it's only on page 22 of your opening report;      |
| 14:26:44 | 6  | correct?                                                 |
| 14:26:44 | 7  | A.    Yes.                                               |
| 14:26:52 | 8  | Q.    Now, in the context of the written                 |
| 14:26:54 | 9  | description portion of your priority analysis, did       |
| 14:26:57 | 10 | you consider, or did you understand that the analysis    |
| 14:27:06 | 11 | of written description included what would be obvious    |
| 14:27:09 | 12 | to one of ordinary skill in the art from the             |
| 14:27:11 | 13 | description that was provided in the applications?       |
| 14:27:14 | 14 | A.    I guess I wouldn't use the word                    |
| 14:27:28 | 15 | obvious.  But I did say that "The claimed invention      |
| 14:27:34 | 16 | was clear to one of skill in the art that the            |
| 14:27:40 | 17 | inventors were in possession of their invention."        |
| 14:27:43 | 18 | So, I considered what one of ordinary                    |
| 14:27:48 | 19 | skill in the art in the relevant time frame would        |
| 14:27:51 | 20 | know by reading the disclosure, and how that would       |
| 14:27:53 | 21 | inform that individual whether the inventors were in     |
| 14:27:57 | 22 | possession of the claimed invention.  And I did apply    |
| 14:27:59 | 23 | that standard.                                           |
| 14:28:01 | 24 | Q.    Did you understand that from the                   |
| 14:28:03 | 25 | standpoint of a written description analysis, you        |

Page 135

1          Jeffrey V. Ravetch, M.D./Ph.D.

14:28:06    2    were not limited to what was actually described in

14:28:09    3    the application, but you could consider what was

14:28:11    4    described, as well as what was obvious to one of

14:28:14    5    ordinary skill in the art?

14:28:16    6        A.    Yes.

14:28:16    7        Q.    When you say that, and I am in

14:28:24    8    paragraph 42, there is a sentence that starts "In

14:28:27    9    other words"; do you see that?

14:28:28   10        A.    Yes.

14:28:28   11        Q.    When you say, in paragraph 42, "The

14:28:31   12    claimed invention must be supported by the disclosure

14:28:34   13    of the application in such a way to show that the

14:28:36   14    inventors were in possession of the claimed

14:28:38   15    invention."

14:28:40   16          What did you understand the phrase "in

14:28:46   17    possession of the claimed invention" to mean?

14:28:48   18        A.    I have an understanding as a layman,

14:28:57   19    as a scientist and not in any legal sense.  So, I

14:29:01   20    can't offer a legal definition of what "possession of

14:29:05   21    the claimed invention" might mean.

14:29:07   22          Reading it as a scientist and one of

14:29:10   23    skill in the art at the time the patent was filed to

14:29:14   24    this particular priority date, to me it meant that

14:29:18   25    the inventor -- the claim that we were discussing is

Page 136

|  |  |
|---|---|
|  | 1 |
| 14:29:27 | 2 |
| 14:29:33 | 3 |
| 14:30:03 | 4 |
| 14:30:05 | 5 |
| 14:30:10 | 6 |
| 14:30:16 | 7 |
| 14:30:22 | 8 |
| 14:30:26 | 9 |
| 14:30:26 | 10 |
| 14:30:28 | 11 |
| 14:30:28 | 12 |
| 14:30:31 | 13 |
| 14:30:31 | 14 |
| 14:30:33 | 15 |
| 14:30:36 | 16 |
| 14:30:40 | 17 |
| 14:30:42 | 18 |
| 14:30:43 | 19 |
| 14:30:47 | 20 |
| 14:30:48 | 21 |
| 14:30:50 | 22 |
| 14:30:53 | 23 |
| 14:30:57 | 24 |
| 14:31:04 | 25 |

Jeffrey V. Ravetch, M.D./Ph.D.

supported by the disclosure such that the inventors
understood how one could practice that invention.

Q.    Just above that sentence in paragraph
42, you state an understanding that "The claimed
invention must be described in such a way as to make
clear to a POSA that the patent applicants invented
what is claimed in the issued patent."

Do you see that?

A.    Yes.

Q.    A POSA is what?

A.    Person of ordinary skill in the art.

Q.    And that's an abbreviation that you
use that the lawyers provided to you?

A.    I don't remember who first came up
with it, but it's one that I have adopted.

MR. HUMMEL:  It wasn't me, because I
hate that word.

MR. PALS:  I do, too.

THE WITNESS:  I kind of like it.

Q.    When you say the test is whether the
patent applicants invented what is claimed in the
issued patent, what did you understand that to mean?

A.    So I look at the claim.  I construe
the claim, as I have done, to understand what the

Page 137

| | | |
|---|---|---|
| | 1 | Jeffrey V. Ravetch, M.D./Ph.D. |
| 14:31:06 | 2 | claimed invention is.  And that from looking at the |
| 14:31:12 | 3 | patent as a whole, determine whether one of skill in |
| 14:31:17 | 4 | the art would be able to determine that, in fact, |
| 14:31:27 | 5 | from what's written in the patent as a whole, the |
| 14:31:31 | 6 | claim is disclosed in the invention -- in the |
| 14:31:36 | 7 | application. |
| 14:31:45 | 8 | Q.    And you did that analysis applying the |
| 14:31:47 | 9 | understanding that you indicated before? |
| 14:31:51 | 10 | A.    Of what one of skill in the art at the |
| 14:31:53 | 11 | time of the relevant filing date would have |
| 14:31:54 | 12 | understood, yes. |
| 14:31:55 | 13 | Q.    Right.  So, your analysis was what's |
| 14:31:58 | 14 | written in the application, both the '680 and the |
| 14:32:01 | 15 | '436 application for each of those two separate |
| 14:32:04 | 16 | analyses, what was written plus what was obvious to |
| 14:32:06 | 17 | one of ordinary skill from what was written; correct? |
| 14:32:11 | 18 | A.    Not just from what was written, but |
| 14:32:14 | 19 | what one of ordinary skill would know in reading the |
| 14:32:17 | 20 | application, and be able to bring his or her |
| 14:32:19 | 21 | expertise to be able to carry out the claimed |
| 14:32:25 | 22 | invention. |
| 14:32:28 | 23 | Q.    I think we're saying the same thing, |
| 14:32:30 | 24 | but let me just be clear, so we got it. |
| 14:32:32 | 25 | In each of the analyses of written |

Page 138

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                               |
| 14:32:34 | 2  | description that you perform in this case, you               |
| 14:32:37 | 3  | analyze under the viewpoint of the '680 application,         |
| 14:32:42 | 4  | the '436 application and a couple other applications         |
| 14:32:44 | 5  | in your rebuttal report, in each of those analyses,          |
| 14:32:48 | 6  | you looked at the application that you were                  |
| 14:32:50 | 7  | considering?                                                 |
| 14:32:51 | 8  | A.    Yes.                                                    |
| 14:32:51 | 9  | Q.    And you considered what was known to         |
| 14:32:59 | 10 | one of ordinary skill in the art, and what was               |
| 14:33:02 | 11 | obvious to one of ordinary skill in the art in               |
| 14:33:05 | 12 | assessing whether the written description requirement        |
| 14:33:08 | 13 | was met; is that correct?                                    |
| 14:33:09 | 14 | MR. HUMMEL:  Object to the form.             |
| 14:33:10 | 15 | A.    I guess I'm having trouble                  |
| 14:33:13 | 16 | distinguishing between known and obvious.  And I am          |
| 14:33:15 | 17 | not making that distinction.  Perhaps that's a legal         |
| 14:33:18 | 18 | distinction that I'm not catching.                           |
| 14:33:22 | 19 | I consider what was known to one of             |
| 14:33:24 | 20 | ordinary skill in the art, as far as I understood in         |
| 14:33:27 | 21 | evaluating the written description requirement.              |
| 14:33:32 | 22 | Q.    So you looked at the actual               |
| 14:33:38 | 23 | application, and what was obvious to one of ordinary         |
| 14:33:43 | 24 | skill in the art, from what was written and the              |
| 14:33:45 | 25 | background of that person, and then you determined           |

Page 139

|           |    |                                                        |
|-----------|----|--------------------------------------------------------|
|           | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                         |
| 14:33:48  | 2  | whether that established that the inventors were in,   |
| 14:33:53  | 3  | as you phrase it, in possession of the claimed         |
| 14:33:55  | 4  | invention?                                             |
| 14:33:55  | 5  | MR. HUMMEL:  Object to the form of the                 |
| 14:33:56  | 6  | question.                                              |
| 14:33:56  | 7  | Q.    Is that right?                                   |
| 14:33:57  | 8  | A.    I'm not sure.  I'm struggling with the           |
| 14:34:01  | 9  | nuances of the description that you're giving,         |
| 14:34:06  | 10 | because it's not quite the same as the one I'm using.  |
| 14:34:09  | 11 | But I suspect we're saying the same thing since I      |
| 14:34:12  | 12 | don't have any legal training to be able to parse the  |
| 14:34:16  | 13 | phrases.                                               |
| 14:34:17  | 14 | It is an evaluation that I performed                   |
| 14:34:24  | 15 | based on the disclosure in the patent application at   |
| 14:34:26  | 16 | the time we're talking about, and the level of skill   |
| 14:34:30  | 17 | of one at the time who would read the invention, read  |
| 14:34:34  | 18 | the disclosure, read the invention, and therefore be   |
| 14:34:37  | 19 | able to say, yes, the inventors invented what they've  |
| 14:34:42  | 20 | claimed.                                               |
| 14:34:43  | 21 | Q.    And you considered other references              |
| 14:34:45  | 22 | that had been published at the time, and other         |
| 14:34:48  | 23 | knowledge that the person of ordinary skill in the     |
| 14:34:50  | 24 | art would have?                                        |
| 14:34:50  | 25 | A.    Right.  I mean, as I recall, the                 |

Page 140

1           Jeffrey V. Ravetch, M.D./Ph.D.

14:34:53    2    person of ordinary skill is a hypothetical composite

14:34:58    3    of all knowledge available at the time.  Not just one

14:35:01    4    individual.

14:35:01    5           So, yes, it would be that one has

14:35:07    6    available to one all of the information that would be

14:35:09    7    relevant in order to practice the invention and

14:35:12    8    thereby determine that the inventors were in

14:35:15    9    possession of the invention.

14:35:20    10    Q.    In the last sentence of paragraph 42,

14:35:28    11    you state that "Identifying characteristics such as

14:35:33    12    structure, properties or functional characteristics

14:35:35    13    coupled with a correlation between structure and

14:35:37    14    function may satisfy the written description

14:35:40    15    requirement."  Do you see that?

14:35:41    16           MR. HUMMEL:  Objection.

14:35:42    17    Q.    What do you mean by "may satisfy"?

14:35:46    18    A.    Once again, this is language that I

14:35:53    19    was given by the lawyers.

14:36:00    20    Q.    Well, what did you understand the term

14:36:04    21    "may satisfy" or the phrase "may satisfy" to mean?

14:36:06    22    A.    It probably means it's a test that was

14:36:08    23    performed, and under certain circumstances, it was

14:36:11    24    sufficient.  For others it may not be sufficient.

14:36:12    25    That's what "may" would mean.  It's not all the time.

Page 144

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                       |
| 14:43:22 | 2  | have actually practiced methods claimed in the '516  |
| 14:43:25 | 3  | as long as those methods are described and enabled.  |
| 14:43:29 | 4  | In other words, none of the                          |
| 14:43:30 | 5  | requirements require proof in the form of            |
| 14:43:32 | 6  | experimental results that the inventors had practiced |
| 14:43:35 | 7  | the invention prior to filing their application.     |
| 14:43:38 | 8  | So that's the basis for my response                  |
| 14:43:40 | 9  | that the examples given in the patent are sufficient |
| 14:43:44 | 10 | to satisfy the enablement and written description    |
| 14:43:52 | 11 | requirements.                                        |
| 14:43:55 | 12 | Q.    Okay.  That's not my question.                 |
| 14:43:57 | 13 | My question is:  Is it correct that                  |
| 14:44:00 | 14 | the applications for the '516 Patent do not report an |
| 14:44:12 | 15 | actual experiment of any of the methods of the       |
| 14:44:12 | 16 | asserted claims of the '516 Patent?                  |
| 14:44:13 | 17 | A.    Is that the same as a working example?         |
| 14:44:16 | 18 | Q.    That would be my understanding.                |
| 14:44:18 | 19 | A.    Okay.  If that's the case, yes, then I         |
| 14:44:21 | 20 | agree that the patent does not provide working       |
| 14:44:24 | 21 | examples.  But still meets, to my opinion, the       |
| 14:44:29 | 22 | requirements of written description and enablement   |
| 14:44:31 | 23 | based on the knowledge of one of skill in the art and |
| 14:44:34 | 24 | the disclosure.                                      |
| 14:44:35 | 25 | Q.    But you do agree that the '516 Patent          |

Page 146

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                            |
| 14:46:21 | 2  | Q.    Do you agree that none of the                       |
| 14:46:32 | 3  | applications for the '516 Patent provide an amino         |
| 14:46:35 | 4  | acid sequence of NF-kappaB?                               |
| 14:46:37 | 5  | A.    Not that I could determine, but once                |
| 14:46:43 | 6  | again, the knowledge of that sequence was available       |
| 14:46:47 | 7  | during this time frame, and I just don't recall the       |
| 14:46:50 | 8  | precise time in which it was available. So, it was        |
| 14:46:53 | 9  | known to one of skill in the art in about this time       |
| 14:46:56 | 10 | frame what the sequence of NF-kappaB was. I have not      |
| 14:47:04 | 11 | found that reference to know exactly when it is.          |
| 14:47:07 | 12 | Q.    Okay. Let's be specific here.                       |
| 14:47:13 | 13 | In your opening report you address the                    |
| 14:47:15 | 14 | '680 application that was filed March 1, 1988, and        |
| 14:47:19 | 15 | the '436 application which was filed April 21, 1989;      |
| 14:47:29 | 16 | correct?                                                  |
| 14:47:29 | 17 | A.    That's correct.                                     |
| 14:47:30 | 18 | Q.    As of the filing of the '680                        |
| 14:47:35 | 19 | application, or the filing of the '436 application,       |
| 14:47:42 | 20 | the amino acid sequence for NF-kappaB was not known?      |
| 14:47:47 | 21 | A.    I don't know.                                       |
| 14:47:48 | 22 | Q.    Did you consider in forming your                    |
| 14:47:49 | 23 | opinions in this case whether that was known or not?      |
| 14:47:52 | 24 | A.    It wouldn't be relevant either way.                 |
| 14:47:54 | 25 | Q.    Do you know whether the nucleotide                  |

Page 147

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
|          | 1  | Jeffrey V. Ravetch, M.D./Ph.D.                              |
| 14:47:57 | 2  | sequence of NF-kappaB, of the gene encoding NF-kappaB       |
| 14:48:02 | 3  | was known as of the filing dates of the '680 or '436        |
| 14:48:07 | 4  | application?                                                 |
| 14:48:07 | 5  | A.    Again, I don't know the exact date                    |
| 14:48:09 | 6  | those sequences were obtained, but once again, it           |
| 14:48:12 | 7  | wouldn't have been relevant to my analysis in either        |
| 14:48:14 | 8  | event.                                                       |
| 14:48:15 | 9  | Q.    Do you know whether the structure of                  |
| 14:48:16 | 10 | NF-kappaB was known as of the filing dates of either        |
| 14:48:20 | 11 | the '680 or '436 applications?                              |
| 14:48:22 | 12 | A.    And by "structure" you mean what?                     |
| 14:48:25 | 13 | Q.    The same thing you meant in paragraph                 |
| 14:48:28 | 14 | 42 when you talked about a correlation between              |
| 14:48:30 | 15 | structure and function.                                     |
| 14:48:31 | 16 | A.    In that sentence, the structure could                 |
| 14:48:33 | 17 | be biochemical characteristics of a particular             |
| 14:48:37 | 18 | molecule.  That could inform on structure.                  |
| 14:48:41 | 19 | Q.    What do you mean by "biochemical                      |
| 14:48:44 | 20 | characteristics"?                                           |
| 14:48:44 | 21 | A.    Is it a protein, is it a nucleic acid,               |
| 14:48:48 | 22 | is it a carbohydrate, does it have certain properties      |
| 14:48:51 | 23 | in terms of molecular weight, migration under defined      |
| 14:48:55 | 24 | conditions?  The standard analyses that one knew how       |
| 14:48:58 | 25 | to do when analyzing an activity fraction.                 |

Page 204

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CIVIL ACTION NO. 06-259-(MPT)

-----------------------------------------x
AMGEN, INC., IMMUNEX CORPORATION, AMGEN
USA INC., AMGEN MANUFACTURING
LIMITED and IMMUNEX RHODE ISLAND
CORPORATION,

                    Plaintiffs,

        vs.

ARIAD PHARMACEUTICALS, INC.,
and THE WHITEHEAD INSTITUTE
FOR BIOMEDICAL RESEARCH, a
Delaware corporation,

                    Defendants.
-----------------------------------------x
(Caption continued on next page)


                    April 22, 2008

                    9 a.m.

                    Volume II

        Continued videotaped deposition of
JEFFREY V. RAVETCH, M.D., Ph.D., held at the
offices of Kirkland & Ellis, 153 East 53rd
Street, New York, New York, before Nancy
Mahoney, a Certified Shorthand Reporter,
Registered Professional Reporter and Notary
Public within and for the States of New York and
New Jersey.

Page 260

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | JEFFREY V. RAVETCH, M.D., Ph.D.                        |
| 08:15:56 | 2  | and antibodies are mentioned in the patent, so         |
| 08:16:00 | 3  | not for the purpose of extracellular activity.         |
| 08:16:06 | 4  | So it's a connection that I've made                    |
| 08:16:08 | 5  | from parts of the patent.                              |
| 08:16:08 | 6  | Q.    Okay.  So the patent doesn't say                 |
| 08:16:12 | 7  | use antibodies outside of a cell to reduce             |
| 08:16:14 | 8  | NF-kappaB activity in a cell, correct?                 |
| 08:16:16 | 9  | A.    Right.  The patent does not say                  |
| 08:16:18 | 10 | that.  That's my understanding as one of skill         |
| 08:16:22 | 11 | in the art reading the patent and understanding        |
| 08:16:24 | 12 | what the patent's invention is and the purpose         |
| 08:16:26 | 13 | of the patent and then the knowledge that how          |
| 08:16:30 | 14 | one could modify external influences since             |
| 08:16:34 | 15 | external influences are defined as part the            |
| 08:16:36 | 16 | NF-kappaB activity.                                    |
| 08:16:38 | 17 | Q.    Are you a person of ordinary skill               |
| 08:16:40 | 18 | in the art, Dr. Ravetch?                               |
| 08:16:40 | 19 | A.    As of 1988 or what date are we                   |
| 08:16:44 | 20 | referring to?                                          |
| 08:16:44 | 21 | Q.    Well, I mean, you indicated that                 |
| 08:16:46 | 22 | you were giving your understanding as one of           |
| 08:16:50 | 23 | skill in the art reading the patent.  So I want        |
| 08:16:54 | 24 | to understand where you are on this skill of art       |
| 08:16:56 | 25 | standpoint and what you meant by that answer.          |

# EXHIBIT B



PATENT APPLICATION SERIAL NO. 07 341436

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

050 08/17/89 341436
050 08/17/89 341436                    1 201     874.00 CK
                                       1 201     874.00 CK

S 20545  08/17/89  341436.        08-0380  020  201        437.00CR

PTO-1556
(5/87)

ADL 0001822

-30-

molecules bind to the decoy sequences, the number
which bind productively (result in increased trans-
cription) with an intact gene, decreases.

      Negative regulation can also be effected by the
05  introduction of "dominantly interfering" molecules
(see e.g., Friedman et al., Nature, 335:452-454
(1988). For example, if the DNA binding domain and
the DNA polymerase activating domain of NF-κB are
spatially distinct in the molecule, a truncated form
10  of the NF-κB molecule can be synthesized, using well
known techniques. A preferred embodiment would be a
truncated molecule retaining the DNA binding domain,
but lacking the RNA polymerase activating domain.
Such a "dominantly interfering" molecule would
15  recognize and bind to the NF-κB binding site,
however, the binding would be non-productive.
Because the activation portion of NF-κB would be
required for enhanced transcription, the truncated
molecule would exert no positive effect.
20  Furthermore, its occupation of the NF-κB binding
site effectively blocks access to any intact NF-κB
molecule which may be present in the cell.

      The present invention will now be further
illustrated by the following Exemplification, which
25  is not intended to be limiting in any way.

Exemplification

      The following demonstrates that NF-κB has the
role or mediator in cytokine gene regulation (in
this case, positive regulation of β-IFN gene
30  expression). NF-κB has been shown to interact with

ADL 0001855

# EXHIBIT C

# REDACTED

# EXHIBIT D

Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 04 C 4796 | DATE | JANUARY 18, 2007 |
| CASE TITLE | ZENITH ELECTRONICS CORPORATION v. PDI COMMUNICATION SYSTEMS, INC. | | |

**DOCKET ENTRY TEXT**

Motions [130] and [148] are denied without prejudice. Motion [120] is granted in part and denied in part. Motion [141] is granted. Plaintiff's infringement claims based on the '301 Patent and Claim 1 of the '513 Patent are dismissed. PDI's affirmative defense of inequitable conduct and request for a declaration that the patents are unenforceable are dismissed. PDI is entitled to a judgment declaring that (a) it has not infringed the '301 Patent or Claim 1 of the '513 Patent and (b) Claim 1 of the '301 Patent and Claim 1 of the '513 Patent are invalid based on anticipation. In open court on March 28, 2007 at 11:00 a.m., the parties shall present an original and one copy of a final pretrial order.

■ [ For further detail see attached     Notices (4) mailed by Judicial staff.
    Memorandum Opinion and Order.]

| | | Courtroom Deputy | CW |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ZENITH ELECTRONICS CORPORATION,      )
                                     )
                  Plaintiff,         )
                  Counterdefendant,  )
                                     )
     v.                              )      No. 04 C 4796
                                     )
PDI COMMUNICATION SYSTEMS, INC.,     )
                                     )
                  Defendant,         )
                  Counterplaintiff.  )


## MEMORANDUM OPINION AND ORDER


     This case concerns patents related to remote control
devices used to control televisions in hospital rooms.  In the
hospital room setting, remote control devices are hardwired to
the televisions.  The devices are hardwired in order to avoid:
(a) hazards such as electrostatic discharge near oxygen,
(b) interference from fluorescent lighting that would occur with
infrared remote control devices, (c) the need to change
batteries, and (d) the devices being lost.  As of the 1980's,
existing hospital rooms with television remote control devices
generally were constructed with a three-wire system that had one
end connected to the television and the other end to an analog
pillow speaker device placed near the patient.  The pillow

speaker contained both a speaker and the remote device to control the television.  As remote control devices were developed with a greater number of functions and which used digital signals, a need arose to develop a television-pillow speaker interface that could handle increased functions, but while still using the existing three-wire arrangements that were already in hospital room walls (to avoid rewiring costs) and without requiring batteries or another additional power source.

In the early 1990's, in response to this perceived need, Robert Mudra, an employee of plaintiff Zenith Electronics Corporation, developed the two patents that are at issue in this case.  The two patents are U.S. Patent No. 5,495,301 (the "'301 Patent") and U.S. Patent No. 5,502,513 (the "'513 Patent").  The patents include methods of operating a television with a three-wire pillow speaker.  To operate the television receiver, Mudra's invention used a pillow speaker that included an encoder chip, similar to the chip used in existing infrared remotes, to transmit serial digital data over the three wires already installed in most hospital rooms.  At the same time, the television used the existing wires to supply operating power to the encoder chip.  Mudra also disclosed a means for distinguishing between the digital data signals from the encoder chip and the simple key closure used by the old analog pillow speakers.  By 1997, three manufacturers, including Curbell

Electronics, had developed multifunction pillow speakers using Mudra's circuit to operate Zenith televisions using Zenith control codes.

In 2003, defendant PDI Communication Systems, Inc. worked with DiBoss, a Korean electronics manufacturer, to develop a 20-inch LCD television that met healthcare standards and could be used with pillow speakers that used Zenith control codes. PDI began marketing these televisions (the "P20LCD") in July 2003. Plaintiff alleges the P20LCD television receiver infringes its two patents. There is no allegation that defendant manufactures or distributes any infringing pillow speaker. Defendant has counterclaimed for a declaration that the two patents are invalid, unenforceable because of inequitable conduct, and not infringed by the P20LCD.

Presently pending are the parties' cross motions for summary judgment. Plaintiff contends it is entitled to summary judgment that defendant infringed Claim 1 of the '301 Patent and Claim 1 of the '513 Patent. Plaintiff also seeks summary judgment dismissing defendant's inequitable conduct defense. Defendant moves for summary judgment declaring that it did not infringe Claims 1 through 4 of the '301 Patent and Claim 1 of the '513 Patent. It also seeks summary judgment declaring that Claim 1 of the '301 Patent and Claim 1 of the '513 Patent are

- 3 -

invalid because anticipated by prior art.  The claims at issue in
the summary judgment motion are all method claims.

Claim 1 of the '301 Patent reads:

A method of operating a television receiver
wired to a remote housing including a speaker and
a multi function control signal encoder
comprising:
supplying operating power to said multi
function control signal encoder from the
television receiver over first and second wires;
supplying audio signals to said speaker from
said television receiver over said first wire and
a third wire; and
supplying encoded control signals from said
multi function encoder to said television
receiver over said first and second wires.

Claims 2 and 3 are dependent claims that do not require
separate analysis for purposes of resolving defendant's summary
judgment motion.  Claim 4 is not a dependent claim of Claim 1.
Like Claim 1 it is a method claim for operating a television
receiver wired to a multifunction control signal encoder.
Claim 4 includes the same first element as Claim 1.  The parties
make no arguments requiring consideration of the additional
elements of Claim 4.

Claim 1 of the '513 Patent reads:

A method of controlling a television
receiver in response to a key closure or data
pulses received from a remote location over a
pair of wires, the key closure having a
substantially longer duration than the data
pulses, comprising:
receiving said key closure and said data
pulses;

> decoding said data pulses with a
> microprocessor programmed to ignore said key
> closure;
> detecting said key closure with a timing
> circuit; and
> operating key closure identification
> circuitry in response to said timing circuit.

In this case, Federal Circuit law controls as to
substantive patent issues. As to procedural issues such as
summary judgment procedure, however, the Federal Circuit holds
that a district court should follow the law of the circuit in
which it is located. Arthur A. Collins, Inc. v. Northern Telecom
Ltd., 216 F.3d 1042, 1047-48 (Fed. Cir. 2000); Vivid
Technologies, Inc. v. American Science & Engineering, Inc.,
200 F.3d 795, 807 (Fed. Cir. 1999); Massey v. Del Laboratories,
Inc., 118 F.3d 1568, 1572 (Fed. Cir. 1997); Kim v. Conagra Foods,
Inc., 2004 WL 626140 *1 n.2 (N.D. Ill. March 26, 2004). As to
each motion for summary judgment, the entire record is considered
with all reasonable inferences drawn in favor of the nonmovant
and all factual disputes resolved in favor of the nonmovant.
Eiencorp, Inc. v. Rocky Mountain Radar, Inc., 398 F.3d 962, 965
(7th Cir. 2005); Estate of Moreland v. Dieter, 395 F.3d 747, 758
(7th Cir.), cert. denied, 545 U.S. 1115 (2005); Hall v. Bennett,
379 F.3d 462, 464 (7th Cir. 2004); Hudson v. Chicago Transit
Authority, 375 F.3d 552, 558 (7th Cir. 2004). The burden of
establishing a lack of any genuine issue of material fact rests

on the movant.  <u>Outlaw v. Newkirk</u>, 259 F.3d 833, 837 (7th Cir.
2001); <u>Wollin v. Gondert</u>, 192 F.3d 616, 621-22 (7th Cir. 1999).
The nonmovant, however, must make a showing sufficient to
establish any essential element for which it will bear the burden
of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322
(1986); <u>Binz v. Brandt Construction Co.</u>, 301 F.3d 529, 532 (7th
Cir. 2002); <u>Traylor v. Brown</u>, 295 F.3d 783, 790 (7th Cir. 2002).
The movant need not provide affidavits or deposition testimony
showing the nonexistence of such essential elements.  <u>Celotex</u>,
477 U.S. at 324.  Also, it is not sufficient to show evidence of
purportedly disputed facts if those facts are not plausible in
light of the entire record.  <u>See Yasak v. Retirement Board of
Policemen's Annuity & Benefit Fund of Chicago</u>, 357 F.3d 677, 679
(7th Cir. 2004); <u>NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d
231, 236 (7th Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995);
<u>Covalt v. Carey Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991);
<u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77
(7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988); <u>Shyman v. UNUM
Life Insurance Co. of America</u>, 2004 WL 609280 *2 (N.D. Ill.
March 25, 2004), <u>aff'd</u>, 427 F.3d 452 (7th Cir. 2005).  As the
Seventh Circuit has summarized:

> The party moving for summary judgment
> carries the initial burden of production to
> identify "those portions of the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits,

if any, which it believes demonstrate the absence
of a genuine issue of material fact." <u>Logan v.
Commercial Union Ins. Co.</u>, 96 F.3d 971, 978 (7th
Cir. 1996) (citing <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
265 (1986) (citation and internal quotation
omitted)). The moving party may discharge this
burden by "'showing'--that is, pointing out to
the district court--that there is an absence of
evidence to support the nonmoving party's case."
<u>Celotex</u>, 477 U.S. at 325, 106 S. Ct. 2548. Once
the moving party satisfies this burden, the
nonmovant must "set forth specific facts showing
that there is a genuine issue for trial." Fed.
R. Civ. P. 56(e). "The nonmovant must do
more, however, than demonstrate some factual
disagreement between the parties; the issue
must be 'material.'" <u>Logan</u>, 96 F.3d at 978.
"Irrelevant or unnecessary facts do not preclude
summary judgment even when they are in dispute."
<u>Id.</u> (citation omitted). In determining whether
the nonmovant has identified a "material" issue
of fact for trial, we are guided by the
applicable substantive law; "[o]nly disputes that
could affect the outcome of the suit under
governing law will properly preclude the entry of
summary judgment." <u>McGinn v. Burlington Northern
R.R. Co.</u>, 102 F.3d 295, 298 (7th Cir. 1996)
(citation omitted). Furthermore, a factual
dispute is "genuine" for summary judgment
purposes only when there is "sufficient evidence
favoring the nonmoving party for a jury to return
a verdict for that party." <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986). Hence, a "metaphysical
doubt" regarding the existence of a genuine fact
issue is not enough to stave off summary
judgment, and "the nonmovant fails to demonstrate
a genuine issue for trial 'where the record taken
as a whole could not lead a rational trier of
fact to find for the non-moving party . . . .'"
<u>Logan</u>, 96 F.3d at 978 (quoting <u>Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.
574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538
(1986)).

<u>Outlaw</u>, 259 F.3d at 837.


## I.   ANTICIPATION

First to be considered will be defendant's motion to declare Claim 1 of each patent invalid based on anticipation. Plaintiff contends the Claims were anticipated by the RCA J20525 television ("J20525") being used with the Curbell 205-E digital pillow speaker ("205E").  Undisputed evidence shows that the J20525 was used with the 205E prior to December 27, 1993, the pertinent date regarding anticipation of the two patents at issue.  Zenith states that PDI's motion fails to point to adequate evidence showing when the J20525 was used with the 205E. This contention is made despite the fact that Zenith otherwise indicates in its pleadings that the combination was used before December 1993.  Based on both Zenith's submissions and additional evidence cited by PDI in its reply, for purposes of PDI's summary judgment motion, it is uncontested that, prior to December 1993, J20525's were in hospitals being used with 205E's that had not been modified to add a battery.

The burden is on PDI to show anticipation by clear and convincing evidence.  <u>Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.</u>, ___ F.3d ___, 2006 WL 3792689 *3 (Fed. Cir. Dec. 26, 2006).  A prior art reference anticipates an

- 8 -

invention if it discloses each and every element of the claimed invention, either explicitly or inherently.  Id.

Even accepting that the J20525 was used with the 205E prior to December 1993, Zenith contends that this does not qualify as an anticipatory prior art reference because there was such a high rate of failure that, within a year of its introduction, J20525's were only being used with 205E's in which batteries were installed.  Zenith contends that prior art represented by actual use must be a viable use.  On PDI's summary judgment motion, it must be taken as true that there was a 40% failure rate and that, in 1992 or earlier, Curbell converted all or most 205E units to battery power.  This still means that, for almost a year (and possibly longer), the J20525-205E combination was in use without a battery and with a 60% success rate.  This is unlike the situation in United States v. Adams, 383 U.S. 39, 50 (1966), cited by Zenith, where the purported use was not operable.  Here, there were operable uses of the product from which methods could be discerned.  It does not matter that Curbell subsequently abandoned the non-battery version of the 205E.  Eolas Technologies Inc. v. Microsoft Corp., 399 F.3d 1325, 1334 (Fed. Cir.), cert. denied, 126 S. Ct. 568 (2005); Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998).  "[V]ery little use and very little publicity are required to constitute public use."  2 Donald S. Chisum, Chisum on Patents

- 9 -

§ 6.02[5] at 6-45 (2005). The J20525-205E combination qualifies as a prior public use. It must be considered whether, resolving all genuine factual disputes in Zenith's favor, clear and convincing evidence shows all the elements of the pertinent Claims are found in the J20525-205E combination.

### A.  Anticipation of '301 Patent Claim 1

Zenith contends Claim 1 of the '301 Patent is not anticipated by the J20525-205E combination because the evidence does not support that the J20525 provided "operating power" to the 205E as is set forth in the first element of Claim 1.[1] Zenith contends that the 205E obtained sufficient power by having a capacitor that stored power, thus acting like a battery. PDI contends that any power stored in the capacitor came from the television, which sufficiently satisfies the operating power element of Claim 1. There is no dispute that the 205E had a capacitor. There is also no dispute that the capacitor did not generate its own power and that the 205E used no outside power source other than the J20525. At least for purposes of PDI's summary judgment motion, it is also taken as true that the 205E required 5 milliamps ("mA") of current to operate, while the J20525 supplied a current of only .48 mA. That is why it was

---

[1]There is no contention by Zenith that a factual dispute exists regarding any other element of Claim 1 being present in the J20525.

necessary to have the capacitor. When the J20525 was on, it
supplied current to the capacitor which could accumulate enough
power to provide a sufficient current to operate the 205E. The
parties' dispute on this issue is not a factual one, but instead
is the legal question of how the first element of Claim 1 of the
'301 Patent should be construed. Zenith contends the J20525 does
not anticipate this element because the J20525 provided power,
while the capacitor provided operating power. PDI contends no
such distinction is contained in Claim 1. According to PDI,
since the J20525 is the only power source, it necessarily
provides operating power. To construe the Claim otherwise would
requiring reading into the Claim a limitation that the television
directly provide operating power.

PDI's construction is consistent with the plain language
of Claim 1. The element states "supplying operating power to
said multi function control signal encoder from the television
receiver over first and second wires." The source of all the
power being supplied to the 205E was the J20525. Therefore, the
J20525 was supplying operating power. There is no limitation in
Claim 1 affirmatively stating that the operating power must come
directly from the television or in full and continuous strength
from the television. Neither is there any limitation in Claim 1
negatively stating that the claimed invention does not use a
capacitor or any other boosting or temporary storage device.

- 11 -

Moreover, Zenith's proposed construction would be inconsistent
with the preferred embodiment set forth in the '301 Patent, which
includes two capacitors.  '301 Patent col. 2, ll. 60-63.  See
Planet Bingo, LLC v. GameTech International, Inc., ___ F.3d ___,
2006 WL 3615302 *4 (Fed. Cir. Dec. 13, 2006) ("specification
often supplies the critical context to construe the claim
language"); Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir.
2005), cert. denied, 126 S. Ct. 1332 (2006) (quoting Markman v.
Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995),
aff'd, 517 U.S. 370 (1996)) ("claims 'must be read in view of the
specification, of which they are a part.'").  In the embodiment,
the stated purpose of the capacitor is to "provide[ ] appropriate
operating voltages."  Regardless of whether such regulation of
the voltage increases or decreases (the embodiment does not
specify) the voltage being supplied from the television receiver,
the embodiment is consistent with leaving open the possibility of
there being a device between the television and pillow speaker
that regulates operating current.  Under the terms of the '301
Patent, having such a device does not preclude the television
from providing operating power.

      The undisputed evidence (construed in Zenith's favor),
clearly and convincingly shows that the J20525 supplied operating
power to the 205E through the first and second wires.  It is
unchallenged that the J20525 also satisfied all the other

elements of Claim 1 of the '301 Patent.  Therefore, the J20525
anticipated Claim 1 of the '301 Patent.  PDI is entitled to a
declaration that Claim 1 of the '301 Patent is invalid.  Since
the Claim is invalid, PDI is also entitled to summary judgment
dismissing Zenith's claim that the P20LCD infringed Claim 1 of
the '301 Patent.  Concomitantly, Zenith is not entitled to
summary judgment that PDI infringed Claim 1 of the '301 Patent.

## B.  Anticipation of '513 Patent Claim 1

Next to be considered is whether Claim 1 of the '513
Patent was anticipated based on the J20525.  Again, undisputed
facts support that the J20525-205E combination was in public use
sufficiently prior to the '513 Patent.  Zenith contends that the
J20525 did not anticipate this Claim because it did not satisfy
the second element of the Claim ("decoding said data pulses with
a microprocessor programmed to ignore said key closure") in that
the J20525 was not "programmed to ignore."  Zenith contends there
is no sufficient, uncontested evidence supporting that this
element was present in the J20525.  Zenith does not specifically
point to any other element of Claim 1 that it contends was not
anticipated by the J20525.  See Zenith Memo. in Opposition [152]
at 16-17.  Therefore, this is the only element that need be
considered regarding anticipation.  See United States v. Funds in
Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d
448, 463 (7th Cir. 2005) (party opposing summary judgment must

- 13 -

respond with properly supported arguments); Transamerica
Financial Services, Inc. v. Sykes, 171 F.3d 553, 555 (7th Cir.
1999) (party opposing summary judgment must inform the trial
judge of the reasons why summary judgment should not be entered
or waive the issue); Robyns v. Reliance Standard Life Insurance
Co., 130 F.3d 1231, 1237-38 (7th Cir. 1997) (same); Ulmer v.
Elkhart County, 2005 WL 1910909 *9 n.1 (N.D. Ind. Aug. 9, 2005)
(same); Ross Brothers Construction Co. v. International Steel
Services, Inc., 283 F.3d 867, 875 (7th Cir. 2002) (arguments
raised in a conclusory or underdeveloped manner are waived).

    The parties agree as to the construction of most of the
language contained in this element.  They agree terms should be
defined as follows.  "Data pulses" means a sequence of changing
voltage levels occurring within a period of time that is
representative of one group of available functions.  "Decoding
said data pulses" means processing data pulses and converting the
data pulses into instructions representative of the data pulses.
"Microprocessor" means one or more semiconductor processors
(e.g., an Infrared Data Processor and a Key Scan and
Identification Processor) contained in an integrated chip
circuit.  "Key closure" means the electrical continuity created,
and signal generated, between two terminals of a switch that is
caused by a physical movement of the switch's actuator.  The
parties disagree as to the meaning of "programmed to ignore."

Zenith contends it means programming that allows a microprocessor to ignore one signal during the decoding of another signal. PDI contends it means programming in the microprocessor that allows the microprocessor to ignore a key closure during the decoding of data pulses.

Zenith does not specifically rely on its claimed construction of "programmed to ignore" in arguing that PDI has not shown that the J20525 was programmed to ignore key closures. However, in arguing that the P20LCD infringes Claim 1 of the '513 Patent, Zenith contends that being able to differentiate between data pulses and key closures received at the same input pin necessarily means that the microprocessor is programmed to ignore the key closures. Zenith Memo. in Opposition [152] at 9 (citing Zenith Statement of Fact 98; Cook Dep. at 31 (Zenith Exh. 20)). Thus, under Zenith's theory of the case regarding the '513 Patent, a microprocessor being able to differentiate between data pulses and key closures satisfies the being-programmed-to-ignore-key-closures element of Claim 1.

Directly concerning whether the "programmed to ignore" element existed in the J20525, Zenith simply points to a purported contradiction between the deposition testimony and declaration of PDI's expert, William Mengel, which it contends shows there is a genuine factual dispute regarding the J20525's microprocessor being programmed to ignore key closures. In his

- 15 -

declaration, Mengel states:  "The microprocessor in the RCA
J20525 television was programmed to distinguish sustained signal
(longer duration) key closures delivered by the legacy analog
pillow speaker and fast switching (short duration) data
pulses delivered by the Curbell 205-E pillow speaker.  The
microprocessor in the RCA J20525 television also decoded the
data pulses."  Mengel Decl. ¶ 7 (PDI Exh. 6).  The declaration
is consistent with prior statements made at Mengel's first
deposition.  See Mengel Dep. at 59 ("the J20525 and after,
could decode and differentiate between a digital signal or an
analog signal if you consider the analog signal being analogous
to the dumb remote or the switch closure") (PDI Exh. D); id. at
103 ("the television set, I think I mentioned earlier, will
differentiate between a switch closure and a digital signal.
And it utilizes the same pair of wires for that").  Zenith points
to the following testimony from Mengel's second deposition,
which it contends is inconsistent with his declaration.  "The
microprocessor within the RCA/Magnavox and PDI LT20 P20LCD do not
ignore key presses.  All of them decode either key presses or key
closures and data pulses.  And in the '513, key presses are
differentiated outside of the microprocessor because their
microprocessor is programmed to ignore those key closures."
Mengel Dep. II at 119 (Zenith Exh. 21).

The testimony from the second deposition does not represent an inconsistency on Mengel's part regarding how the J20525 functioned. In each quoted statement, Mengel consistently states that the J20525 can differentiate between key closures (sustained analog signals) and data pulses (short digital signals). In the declaration and second deposition, he also adds that the J20525 can decode the data pulses. Zenith focuses on the additional conclusion in the second deposition that the J20525 does not ignore key closures. The other statements do not express a view on that issue so they cannot be said to be inconsistent with the statement from the second deposition. The statement regarding ignoring key closures, however, is a conclusion based on a particular construction of what is meant by ignoring key closures. At least as of the time of his second deposition, Mengel apparently understood being able to differentiate between key closures and data pulses as being able to recognize key closures and therefore would not constitute ignoring key closures. Construction of a patent claim, however, is a question for the court, not one for the parties' experts. Mengel consistently testifies that the J20525 could differentiate between key closures and data pulses while decoding the data pulses. Zenith points to no contrary testimony from its expert nor any other contrary evidence. Therefore, it is a clearly established, uncontested fact that the J20525 could differentiate

- 17 -

between key closures and data pulses while decoding the data pulses.

Based on Zenith's theory of the case (which apparently is essential to its infringement claim for Claim 1 of the '513 Patent), as well as its apparent construction of Claim 1 of its '513 Patent, the J20525 being able to differentiate between key closures and data pulses while decoding the data pulses necessarily meant that its microprocessor was programmed to ignore the key pulses. Thus, the J20525 anticipated this element of Claim 1 of the '513 Patent. No issue having been raised as to the J20525 anticipating all the other elements of that Claim, Claim 1 of the '513 Patent is invalid as anticipated.

Before finally reaching that conclusion, one other issue should be addressed. Zenith has moved to disqualify Mengel as an expert and to strike portions of his declaration.[2] For purposes of the present ruling, the motion to strike specific portions of the declaration need not be decided because it does not seek to strike the paragraph of the declaration that is pertinent to the issue presently being considered. Moreover, as previously

---

[2]PDI was not ordered to answer this motion. However, PDI's reply in support of its summary judgment motion was filed after Zenith filed its motion to disqualify, so PDI nevertheless had the opportunity to address issues raised in the motion to disqualify and did so to some extent. In any event, since the motion is not being granted, PDI could not have suffered any harm by not having an opportunity to directly respond to the motion in a separate brief.

discussed, the pertinent facts are also contained in Mengel's deposition testimony. The possible disqualification of Mengel, however, must be considered because it is his testimony which establishes that the J20525 is programmed to ignore key closures. PDI cites no other evidence supporting that fact.[3] Without Mengel's testimony, PDI could not establish facts essential to its invalidity defense upon which it bears the burden of proof.

Zenith's motion to disqualify Mengel is entirely based on arguments that Mengel has misunderstood patent law and therefore his ultimate conclusions on issues such as infringement have no validity because they are based on incorrect legal standards. While Zenith makes passing reference to Mengel's lack of academic training,[4] its focus is elsewhere. Zenith Motion to Disqualify [148] at 9. "More importantly, he has no legal background, training or expertise on which he could rely to form an 'expert' opinion as to infringement or validity." Id. No sufficient

---

[3]PDI contends that Zenith ignores that PDI also relies on Zenith's expert to establish that the J20525 had all the elements of Claim 1 of the '513 Patent. Evidence from Zenith's expert, however, is not relied upon to satisfy the programmed to ignore element. See Zenith Stmt. of Material Facts [143] ¶¶ 29, 33. Compare id. ¶¶ 31-32.

[4]Mengel, who is a senior member of the Institute of Electrical and Electronics Engineers, worked in the electronics industry for 39 years, including at RCA, Thomson Consumer Electronics, and Thomson Multimedia. His work involved management positions in operations, marketing, and engineering, many involving product development. He attended the Lawrence Institute of Technology, but did not obtain any degree.

- 19 -

basis is presented for disqualifying Mengel as a technical
expert.  On summary judgment, this court will not give credence
to the legal aspect of mixed conclusions of fact and law that are
based on incorrect legal standards.  The court, however, can do
that on a fact-by-fact basis as necessary without wholesale
throwing out all of Mengel's testimony.  See, for example, the
above discussion of his statements about the J20525 not being
programmed to ignore key closures.  Moreover, there is no reason
to throw out Mengel's testimony about technical matters.  Unless
his technical testimony is improperly conclusive or shown to be
inconsistent with the underlying evidence, it will be accepted.

As for possible testimony at trial, such questions are
premature.  Should this case reach trial, the court will instruct
the jury as to the law and counsel presumably will accordingly
prepare the expert witnesses and elicit testimony consistent with
the applicable legal standards.

At this time, the motion to disqualify and strike will be
denied without prejudice to including any appropriate motion in
limine in the final pretrial order and without prejudice to
raising any appropriate objections at trial.  To the extent
pertinent to any issue resolved in ruling on summary judgment,
the court will not credit conclusions of any expert that are
based on applying an incorrect legal standard.

PDI is entitled to summary judgment declaring that Claim
1 of the '513 Patent is invalid as anticipated.  Since the Claim
is invalid, PDI is also entitled to summary judgment dismissing
Zenith's claim that PDI infringed Claim 1 of the '513 Patent.
Concomitantly, Zenith is not entitled to summary judgment that
PDI infringed Claim 1 of the '513 Patent.


## II.  INFRINGEMENT OF '301 PATENT CLAIMS 1-4 AFFIRMATIVE DEFENSES

Although PDI has made a sufficient showing that Claim 1
of the '301 Patent is invalid as anticipated, on summary
judgment, there is no contention that dependent Claims 2 and 3
are also invalid as anticipated.  That would require that the
additional elements of the dependent claims not be limiting or a
showing that the additional elements of Claims 2 and 3 were also
anticipated by the J20525.  See In re Johnston, 435 F.3d 1381,
1384-85 (Fed. Cir. 2006).  There is no such argument or showing.
Although, on its summary judgment motion, Zenith contended only
that undisputed facts showed that Claim 1 of the '301 Patent was
infringed, there is no indication that Zenith is not pursuing
infringement of other claims of the '301 Patent.[5]  Therefore, it

---

[5]In its Amended Complaint, Zenith alleges PDI infringed
"at least Claims 1-3 of the '301 Patent."  Am. Compl. ¶ 12.  In
their joint statement as to claim construction of the '301
Patent, however, the parties construe Claims 1 through 4.  Am.
Joint Claim Terms--'301 Patent [43] at 5-6.  Zenith may or may

still must be considered whether PDI is entitled to summary judgment that it did not infringe Claims 2, 3, and 4 of the '301 Patent. Because the arguments regarding noninfringement of those claims also applies to Claim 1 of the '301 Patent, it will also be considered whether undisputed facts support that Claim 1 was not infringed.

PDI contends that using its P20LCD with Curbell, MedTek, and Crest pillow speakers originally intended for use with Zenith televisions cannot infringe Zenith's '301 Patent because the pillow speakers are all produced pursuant to licenses with Zenith. PDI contends the licensed sale of the pillow speakers exhausts Zenith rights under the '301 Patent or includes an implied license to use the pillow speakers with any television with which the pillow speakers will function. Zenith contends that neither of these affirmative defenses are adequately pleaded. On the merits, Zenith contends that the exhaustion doctrine does not apply to method claims. It also contends that neither exhaustion nor implied license applies because there is evidence of noninfringing uses. Also, Zenith contends undisputed evidence does not support that the licenses must be construed as

---

not be continuing to pursue a claim that Claim 4 of the '301 Patent is infringed. In any event, as to the arguments presently raised, there is no need to separately consider Claim 4. Therefore, the remaining analysis will apply to Claims 2-4 of the '301 Patent.

containing a reasonable expectancy of being used with non-Zenith televisions.

## A.  Pleading Affirmative Defenses

Neither party has filed pleadings that contain much specificity.  Zenith's Amended Complaint does not identify the particular claims of the '513 Patent that are infringed.  As previously mentioned, the Amended Complaint refers to Claims 1-3 of the '301 Patent being infringed, but does not limit its allegations to those three claims.  The First Affirmative Defense pleaded by PDI is that it did not directly or indirectly infringe either of the patents at issue.  PDI contends this would include the exhaustion and implied license defenses since they are a basis for finding no infringement.  Merely showing that infringement did not occur is not itself an affirmative defense; plaintiff being the one to bear the burden of showing infringement.  Patent exhaustion and implied licensing are affirmative defenses.  See Monsanto Co. v. Scruggs, 459 F.3d 1328, 1335 (Fed. Cir. 2006); LG Electronics, Inc. v. Bizcom Electronics, Inc., 453 F.3d 1364, 1369 (Fed. Cir. 2006).  PDI also points to a letter it sent to Zenith shortly before this lawsuit was filed in which PDI contended there could be no infringement because the pillow speakers were licensed.  It also points to an answer to an interrogatory in which it made the same contention.  While neither the letter nor interrogatory answer

- 23 -

expressly uses the term exhaustion or implied license, it is clear that these doctrines are being invoked in the letter and interrogatory answer.  Zenith cannot contend that it was previously unaware that PDI has been contending that the licensing of pillow speakers precludes a finding of infringement. The exhaustion and implied license defenses are found to have been adequately pleaded.  Alternatively, Zenith would not be unduly prejudiced if PDI were to be permitted to now amend its pleadings to explicitly plead those defenses.

**B.  Exhaustion**

Claims 2, 3, and 4 of the '301 Patent are all method claims.  The exhaustion defense, however, does not apply to method claims.  LG Electronics, 453 F.3d at 1370; Glass Equipment Development, Inc. v. Besten, Inc., 174 F.3d 1337, 1341 n.1 (Fed. Cir. 1999) (dictum); Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Ltd., 2006 WL 1766434, *16 (D. Mass. June 28, 2006).  PDI contends this rule should be limited to situations where there are two separate patents, one containing apparatus claims and the other containing method claims.  That, however, was not the situation in LG Electronics.  LG Electronics involved multiple patents, but at least three of them contained both system[6] and method claims.  See LG Electronics, 453 F.3d

[6]A system claim generally is a type of apparatus claim. See U.S. Industries, Inc. v. Otis Engineering Corp., 254 F.2d

at 1368 (U.S. Patents Nos. 4,918,645 & 5,379,379); id. at 1375
(U.S. Patent No. 5,077,733); id. at 1369 ("The trial court,
nevertheless, found that the system claims in all patents except
the '509 patent were exhausted, but that the exhaustion doctrine
did not apply to the method claims."). The fact that the method
and system (apparatus) claims were in the same patent did not
prevent the Federal Circuit from applying the rule that the
exhaustion doctrine does not preclude the enforcement of method
claims.

     PDI also attempts to distinguish LG Electronics by
contending that the "the products whose sales were alleged to
exhaust the patent rights were not the subject of the asserted
patents." PDI Motion to Comment on Additional Authority [160]
at 2. Of course, if that were true, there would be no reason
whatsoever to apply the exhaustion doctrine. Application of the

_____

198, 200 (5th Cir. 1958); Charles E. Hill & Associates, Inc. v.
Compuserve Inc., 2003 WL 22327827 *9 (S.D. Ind. Sept. 26, 2003);
Stephen A. Becker, Patent Applications Handbook, § 2:20 (2006);
Note, "Extraterritorial Patent Infringement Liability after NTP,
Inc. v. Research in Motion, Ltd.," 32 J. Corp. L. 217, 228
(2006); Note, "Software Terminology: How to Describe a Software
Invention in a United States Patent Application," 29 Nova L. Rev.
693, 710 (2005). In LG Electronics, at least two of the patents
at issue included claims that could be characterized as apparatus
claims. See LG Electronics, 453 F.3d at 1374 ('645 Patent);
LG Electronics, Inc. v. Advance Creative Computer Corp., 212
F. Supp. 2d 1171, 1173 (N.D. Cal. 2002) ('733 Patent). Even
if a particular system claim is not an apparatus claim, it is a
product claim, which is the same general type of claim as an
apparatus claim. See "Extraterritorial Patent," 32 J. Corp. L.
at 228; Black's Law Dictionary at 1161 (8th ed. 1999).

exhaustion doctrine requires an unconditional sale of a patented device. _LG Electronics_, 453 F.3d at 1369.  The situation in _LG Electronics_ was as follows:

> Defendants purchase microprocessors and chipsets from Intel or its authorized distributors and install them in computers. Intel is authorized to sell these products to defendants under an agreement with LGE.  However, pursuant to this agreement, Intel notified defendants that, although it was licensed to sell the products to them, they were not authorized under that agreement to combine the products with non-Intel products.  LGE brought suit against defendants, asserting that the combination of microprocessors or chipsets with other [non-Intel] computer components infringes LGE's patents covering those combinations.  LGE did not assert patent rights in the microprocessors or chipsets themselves.

_Id._ at 1368.  That is essentially the same situation as in the present case.  Zenith licenses Curbell, MedTek, and Crest to produce the pillow speakers using Zenith's '301 Patent.  Zenith does not contend that the pillow speakers themselves infringe its patent rights.  Like LG Electronics, Zenith contends that using a third party's licensed product (a pillow speaker) with an unapproved product (non-Zenith television sets) infringes Zenith's patent rights.

Since the '301 Patent Claims at issue are all method claims, the exhaustion doctrine cannot apply.  It need only be further considered whether Zenith's infringement claim is precluded by an implied license.

## C.  Implied License

PDI bears the burden of establishing the implied license defense.  Id. at 1369.  It must show both "that the products have no noninfringing uses and that 'the circumstances of the sale . . . plainly indicate that the grant of a license should be inferred.'"  Id. (quoting Met-Coil System Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 686 (Fed. Cir. 1986) (quoting Bandag, Inc. v. Al Bosler's Tire Stores, Inc., 750 F.2d 903, 925 (Fed. Cir. 1984))).  While PDI bears the burden of persuasion as to no noninfringing uses, once it makes out a prima facie case, Zenith has the burden of production to show there is a noninfringing use and PDI must sufficiently rebut Zenith's showing.  See Met-Coil, 803 F.2d at 687.  See also Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1363-64 (Fed. Cir. 2006) (showing no noninfringing uses for purposes of proving contributory infringement).  Zenith's burden of production would include showing that the pillow speaker was actually used in a noninfringing way.  See id. at 1364.

Zenith contends that PDI has not satisfied its prima facie case in that it has not made a showing of no noninfringing uses.  In its opening brief, in which PDI primarily focuses on the exhaustion doctrine, PDI does not expressly contend that there are no noninfringing uses.  See PDI Memo. in Support

[141-2] at 2-7.  There is also no express statement to that
effect in its Local Rule 56.1(a)(3) Statement of Fact.  See PDI
Rule 56.1 Stmt. [143] ¶¶ 1-9.  PDI, however, does contend and
point to evidence that Curbell, MedTek, and Crest were licensed
to produce pillow speakers using all Claims of the '301 Patent
and that they did produce such speakers for use with televisions.
Evidence that products were produced that would (absent a
license) infringe the patent at issue is sufficient to meet the
prima facie burden of no noninfringing uses.  See Golden Blount,
438 F.3d at 1363 (evidence that instruction sheets for producing
licensed product provided for infringing uses only was sufficient
to satisfy prima facie showing of no noninfringing uses).  See
also Hoppe v. Baxter Healthcare Corp., 878 F. Supp. 303, 310
(D. Mass.), appeal dismissed, 53 F.3d 348 (Fed. Cir. 1995)
(satisfying the prima facie case does not necessarily require a
negative showing).  Since PDI met its burden of making a prima
facie showing of no noninfringing uses, Zenith had the burden of
production as to there being actual noninfringing uses.

    Noninfringing uses must be actual uses that occurred.
They need not be present uses, but they must have occurred at
some time and not merely be theoretical uses.  See Glass,
174 F.3d at 1342; Minebea Co., Ltd. v. Papst, 444 F. Supp. 2d 68,
163 (D.D.C. 2006).  That the noninfringing use actually occurred
is part of Zenith's burden of production.  See Golden Blount,

438 F.3d at 1364.   Zenith points to evidence that the pillow speakers were also used to control nurse calls and lighting. That evidence only supports that these were additional controls that were added to pillow speakers that still controlled a television as well.   There is no evidence regarding how this addition was accomplished.   It is unknown whether all of these were simply add-ons attached to a pillow speaker, but using entirely separate wiring and power sources, and therefore could not be a use of the pillow speaker itself.   Or whether any of these uses were modifications of a pillow speaker using the existing three-wire arrangement to obtain power from the television and/or send control signals and thus potentially were actual uses of a pillow speaker itself.   It is true that Zenith only has a burden of production which is a low standard of proof. It would not necessarily be required to show all the details of how the use was accomplished; PDI ultimately bearing the burden of showing by a preponderance of the evidence that the use did not constitute a noninfringing use for purposes of the implied license doctrine.   Zenith, however, must at least show there was a use of the pillow speaker for this purpose.   The conclusory deposition testimony that it points to does not make such a showing because it does not provide even the most minimal detail of how the control of the other devices was accomplished, whether by an add-on, through a modification, or without a modification.

- 29 -

Since PDI makes out a sufficient _prima facie_ case that there were no noninfringing uses of the pillow speakers and Zenith does not meet its burden of production that there were noninfringing uses of a pillow speaker, for purposes of summary judgment, it is taken as true that the pillow speakers had no noninfringing uses.[7]

Still to be considered is the scope of the licenses that existed, specifically whether they implied that the pillow speaker could be sold for use with non-Zenith televisions. Each of the three license agreements contained essentially the same granting language. "LICENSED PATENT," as used in the licenses, refers to all claims of the '301 Patent. Article I of each license, entitled "GRANT," reads:[8]

> 1. ZENITH agrees to grant and does hereby grant to LICENSEE a non-exclusive license to make, have made, use, sell or otherwise dispose of LICENSED APPARATUS under the LICENSED PATENT, and foreign

---

[7]Because Zenith does not meet its burden of production, it is unnecessary to consider PDI's argument that the pillow speakers were always used for infringing purposes because, even if they were additionally used for nurses calls and lighting, they were also still being used to control the televisions and therefore were an infringing use. No opinion is expressed regarding whether multiple uses of a single item can still be viewed separately in determining whether there were also noninfringing uses.

[8]The language in the MedTek and Crest licenses is identical. The bracketed language appears in the Curbell license. Article I of the Curbell license also includes the typographical error of using the plural term "LICENSED PATENTS."

- 30 -

> counterparts thereof, if any.  The term LICENSED
> APPARATUS, as used in this Agreement, means:
> A.    Any pillow speaker unit:
>       i.)  the manufacture, use or sale of which
> pillow speaker [remote control] unit is covered
> by the LICENSED PATENT, and
>       ii.) which pillow speaker [remote control]
> unit is manufactured, sold or otherwise disposed
> by LICENSEE, whether such LICENSED APPARATUS is
> sold or otherwise disposed of as a separate
> article of commerce or as part of [a remote
> control system for] a television system.

The Article I contains no language limiting production or
sale to use with Zenith televisions.  Neither does Article III
entitled "TERMS AND CONDITIONS" nor Article IV entitled
"MISCELLANEOUS PROVISIONS."  Article IV of each agreement
contains ¶ 4 providing:  "LICENSEE agrees to mark all LICENSED
APPARATUS with the legend:  'Licensed under U.S. Patent
5,495,301.'"  There is no provision requiring that the licensed
apparatus also be marked with language stating that the licensed
apparatus may only be used with Zenith televisions.  Also,
Article IV of each agreement included ¶ 6 reading:  "This
agreement sets forth the entire Agreement and understanding
between the parties as to the subject matter hereof for the term
stated herein, and all pertinent prior discussions and
correspondence between the parties are reflected in the terms of
this Agreement.  Such terms can only be modified or amended by a
written instrument signed by duly authorized representatives of
both parties."  Article IV, Paragraph 5 of each agreement

provides that Illinois law governs the construction, interpretation, and performance of the agreement.

Zenith relies on references to Zenith televisions contained in the preambles of the agreements. The preamble of each agreement includes seven or more whereas clauses. The preamble of each agreement has a whereas clause or clauses mentioning Zenith commercial televisions. The preamble of the Curbell license includes: "WHEREAS, LICENSEE has developed a pillow speaker that is compatible with ZENITH commercial televisions and has expended significant resources in readying said pillow speaker for market." The preamble of the MedTek license includes: "WHEREAS, LICENSEE has developed and is marketing a pillow speaker that is compatible with ZENITH commercial televisions; and WHEREAS, ZENITH desires to have said compatible pillow speaker available to buyers of its commercial televisions; and . . . ." The preamble of the Crest license includes: "WHEREAS, LICENSEE has developed a pillow speaker that is compatible with ZENITH commercial televisions and is readying said pillow speaker for market. WHEREAS, ZENITH desires to have said compatible pillow speaker available to buyers of its commercial televisions."

The cited preamble language only recites that each licensee developed a pillow speaker that is compatible with Zenith televisions. It is not inconsistent with those statements

that the pillow speakers could also be compatible with
televisions manufactured by other companies.  The statement that
Zenith desires to have the pillow speakers available to buyers of
its commercial televisions does not also state that it desires,
let alone requires, they not be available to buyers of other
televisions.  Zenith receives royalty income from sales of the
pillow speakers alone even if it is not also receiving income
from the sale of a Zenith television as well.

Even if the recitals implied that the licensees were
limited to selling pillow speakers for use with Zenith
televisions, recitals of a contract are not binding obligations
unless referred to in the operative provisions of the contract.
In re GGSI Liquidation Inc., 351 B.R. 529, 565 (Bankr. N.D. Ill.
2006) (quoting McMahon v. Hines, 298 Ill. App. 3d 231, 697 N.E.2d
1199, 1204 (2d Dist. 1998)).  Instead, "recitals generally are
considered nonbinding explanations of the circumstances
surrounding the execution of a contract."  Cress v. Recreation
Services, Inc., 341 Ill. App. 3d 149, 795 N.E.2d 817, 838 (2d
Dist.), appeals denied, 205 Ill. 2d 578, 803 N.E.2d 480, 206
Ill. 2d 619, 806 N.E.2d 1065 (2003).  If inconsistent with
operative terms of the contract, the operative terms will
prevail.  Id. at 839; GGSI, 351 B.R. at 565.  Recitals can be
relied upon to determine the intentions of the parties and
otherwise as an aid in construing operative provisions of the

document in light of the document as a whole.  Cress, 795 N.E.2d
at 838-39.  Even viewed in light of the recitals, however, the
language of the operative provisions of the licenses cannot be
construed as limiting sales of pillow speakers to being used with
Zenith televisions.  The only reasonable construction of the
licenses is that the licensees were permitted to sell pillow
speakers for use with any type of compatible television,
regardless of manufacturer.

Zenith also points to testimony of a Curbell and a MedTek
employee that it contends shows those licensees understood the
licenses to be limited to marketing the pillow speakers for use
with Zenith televisions.  Even if such external evidence could be
considered in construing the licenses, the evidence does not
support the facts asserted by plaintiff.  The employees only
testified that they understood that the pillow speakers would
work with Zenith televisions.  They do not also testify that they
understood the licenses to be limited to sales for such use.  To
the contrary, the Curbell employee testified that, although he
recognized that the pillow speaker had to be used with a
television, he understood that the license applied only to the
pillow speaker, and not to any television.  Rockwood I Dep.
at 212 (Zenith Exh. 36).  When the MedTek employee testified that
he understood the license as applying to "Zenith products," he
limited such "Zenith products" to pillow speakers using Zenith

- 34 -

code and timing algorithm.  Kuciera Dep. at 43 (Zenith Exh. 46).
His understanding was that the pillow speakers would only work
with Zenith televisions because only Zenith televisions used
those specific codes, but he did not testify that he understood
the license to be limited to use with Zenith televisions.  Id.
at 43-44.  As is shown by the accused product, however, there are
non-Zenith televisions that recognize Zenith remote control
codes.

       The license agreements can only be construed as
permitting sale of the pillow speakers for use with any
compatible television, Zenith or not.  Therefore, PDI did not
infringe the '301 Patent by being involved in the manufacture,
sale, or distribution of televisions that would work with the
licensees' pillow speakers.  PDI is entitled to summary judgement
dismissing, in its entirety, Zenith's claim that PDI infringed
the '301 Patent.[9]  PDI is also entitled to summary judgment
declaring that it did not infringe the '301 Patent.  Since
unresolved issues may remain as to claims of the '513 Patent, no
judgment will be entered at this time.  Since it is entitled to a
declaration that Claims 1 through 4 of the '301 Patent were not

_____

       [9]In addition to the four claims of the '301 Patent that
have been considered, the '301 Patent also includes Claims 5-11.
Those Claims, however, relate to the remote control device
itself, not a television receiver.  Those claims are not at issue
in the dispute between Zenith and PDI.

infringed and a declaration that Claim 1 is invalid, it is
assumed that PDI will not be further pursuing any contention it
may have that Claims 2 through 4 are invalid or that Claims 1
through 4 are unenforceable based on inequitable conduct.

### III.   INEQUITABLE CONDUCT

As to the '513 Patent, Zenith apparently contends that
all 8 claims of the '513 Patent are infringed.[10]   Today's ruling
only resolves questions of validity and infringement regarding
Claim 1 of the '513 Patent.   The only summary judgment issue
presently before the court that may relate to the other 7 claims
of the '513 Patent is Zenith's motion for summary judgment
dismissing the inequitable conduct defense.   PDI bears the burden
of showing inequitable conduct by clear and convincing evidence.
Ulead Systems, Inc. v. Lex Computer & Management Corp., 351 F.3d
1139, 1146 (Fed. Cir. 2003).   PDI's inequitable conduct
contentions are based on the failure to disclose RCA's J20525 to
the Patent and Trademark Office.   An element of the inequitable
conduct defense would be that the J20525 was material to Claims
2-8 of the '513 Patent.   See id.; Board of Education v. American

----

[10]The Amended Complaint does not specify the claims of
the '513 Patent that are at issue.   See Am. Compl. ¶¶ 18-24.   The
parties' claim construction document for the '513 Patent,
however, addresses all 8 claims.   See Joint Claim Terms--'513
Patent [39].

BioScience, Inc., 333 F.3d 1330, 1343 (Fed. Cir. 2003).  Since

PDI makes no attempt to show or argue that the J20525 was

material to those Claims, the inequitable conduct defense will be

dismissed as regards those Claims.  As to Claim 1 of the '513

Patent and all claims of the '301 Patent, the inequitable conduct

defense will be dismissed without prejudice as moot.

### IV.  MOTION FOR NEGATIVE INFERENCE

One other pending motion has not yet been addressed.

Zenith has moved to draw an inference that the microprocessors

used in PDI's P20LCD and two other televisions (the P15LCD and

P23LCD) satisfy every step of each claim of the '513 Patent.

Zenith contends that it is entitled to such an inference because

PDI failed to provide documents regarding those devices that

Zenith contends are either directly possessed by PDI or that PDI

can obtain from DiBoss, which has refused to respond to Zenith's

requests.  PDI was never provided an opportunity to respond to

this motion.

The motion is now moot regarding Claim 1 of the '513

Patent.  Since resolution of the pending motions for summary

judgment did not necessitate examining the nature of any product

of PDI, it is unnecessary to resolve the motion at this time.

The motion is more appropriately raised as a motion in limine

filed with the final pretrial order.  The pending motion will be

denied without prejudice to filing any appropriate motion <u>in limine</u>, objection to exhibits, or other appropriate pleading as part of the final pretrial order.


## V.   CONCLUSION

It is possible that, having resolved issues regarding the '301 Patent and Claim 1 of the '513 Patent, the parties can reach a settlement regarding any remaining disputes based on the other claims of the '513 Patent.  Within two weeks, the parties shall meet to discuss the possibility of settling all or some of their remaining differences.  Even if the parties cannot resolve all their differences, they may be able to agree to a dismissal of the remaining claims concerning Claims 2-8 of the '513 Patent that will protect each side's rights while enabling a judgment to be entered regarding the Claims that have been ruled upon. Unless the case has been settled before then, in open court on March 28, 2007 at 11:00 a.m., the parties shall present an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1, including trial briefs, proposed voir dire questions (if there will be a jury), motions <u>in limine</u> with supporting briefs,[11] and

---

[11]At the time the pretrial order is presented, a date will be set for responding to any motions <u>in limine</u>, usually two weeks.

proposed jury instructions and/or findings of fact and conclusions of law.  In the pretrial order, the parties must be clear regarding the burdens of proof imposed on each party and the issues remaining in the case.  They also must make clear which issues, if any, are for a jury and which issues, if any, are for the judge to decide.  In accordance with the issues remaining for a jury and/or the judge, appropriate jury instructions and/or proposed findings of fact and conclusions of law must be submitted.  If the parties do resolve the case prior to March 28, 2007, they may submit an agreed proposed order and/or judgment to the courtroom deputy.

IT IS THEREFORE ORDERED that plaintiff's motions to draw negative inferences [130] and to strike the declaration of and disqualify defendant's expert [148] are denied without prejudice to raising appropriate issues in the final pretrial order. Plaintiff's motion for summary judgment [120] is granted in part and denied in part.  Defendant's motion for summary judgment [141] is granted.  Plaintiff's infringement claims based on the '301 Patent and Claim 1 of the '513 Patent are dismissed. Defendant-counterplaintiff's affirmative defense of inequitable conduct and request for a declaration that the patents are unenforceable are dismissed.  Counterplaintiff is entitled to a

judgment declaring that (a) it has not infringed the '301 Patent or Claim 1 of the '513 Patent and (b) Claim 1 of the '301 Patent and Claim 1 of the '513 Patent are invalid based on anticipation. In open court on March 28, 2007 at 11:00 a.m., the parties shall present an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1, including trial briefs, proposed voir dire questions (if there will be a jury), motions in limine with supporting briefs, and proposed jury instructions and/or findings of fact and conclusions of law.

                    ENTER:

                              UNITED STATES DISTRICT JUDGE

DATED:  JANUARY   18 , 2007

- 40 -