IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
                                       )
       Plaintiffs/Counterclaim Defendants, )
                                       )
       v. )
                                         )
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.* )
                                       )
       Defendants/Counterclaim Plaintiffs. )

Civil Action No. 06-259 (MPT)

Public Version
Confidential Material Omitted

**THE AMGEN ENTITIES' REPLY BRIEF
IN SUPPORT OF THEIR *DAUBERT* MOTION TO PRECLUDE
CERTAIN INADMISSIBLE OPINIONS OF DR. KATHRYN CALAME
<u>RELATING TO EXPERIMENTS PERFORMED BY DR. JOEL POMERANTZ</u>**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Y. Gutman
J. Drew Diamond
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen
USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: June 6, 2008

                                                           

## TABLE OF CONTENTS

I.    ARGUMENT...................................................................................................................2

    A.    The Cases Cited By ARIAD Do Not Support Admission of Dr. Calame's Testimony Concerning the Pomerantz Experiments and Therefore Testimony Based on These Experiments is Properly Excluded. ...........................2

    B.    Dr. Calame Does Not Normally Rely Upon the Type of Work Conducted by Dr. Pomerantz, Whose Area of Expertise is Distinct From Dr. Calame's. .................................................................................................................8

II.   CONCLUSION ...............................................................................................................11

DB02:6879240.1

065028.1001

## TABLE OF AUTHORITIES

**Cases**

*Astra Aktiebolag v. Andrx Pharm., Inc.,*
   222 F. Supp. 2d 423 (S.D.N.Y. 2002) ........................................................5, 6

*Cryovac Inc. v. Pechiney Plastic Packaging,*
   430 F. Supp. 2d 346 (D. Del. 2006) ............................................................6, 7

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ...............................................................1, 9, 11, 12

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.,*
   285 F.3d 609 (7th Cir. 2001) ...........................................2, 3, 4, 7, 8, 9, 11

*Dyson Tech., Ltd. v. Maytag Corp.,*
   241 F.R.D. 247 (D. Del. 2007) ..................................................................9

*Ecolab, Inc. v. Amerikem Labs., Inc.,*
   98 F. Supp. 2d 569 (D.N.J. 2000) ................................................................5

*Gussack Realty Co. v. Xerox Corp.,*
   224 F.3d 85 (2d Cir. 2000) ....................................................................6,7

*In re TMI Litig.,*
   193 F.3d 613 (3d Cir. 1999) ...........................................................9, 10, 11

*Inline Connection Corp. v. AOL Time Warner,*
   470 F. Supp. 2d 435 (D. Del. 2007) ..............................................................6

*Monsanto Co. v. David,*
   448 F. Supp. 2d 1088 (E.D. Mo. 2006) ..........................................................6

*Monsanto Co. v. David,*
   516 F.3d 1009 (Fed. Cir. 2008) .................................................................6

*Ratliff v. Schiber Truck Co., Inc.,*
   150 F.3d 949 (8th Cir. 1998) ...................................................................6

*U.S. v. Gwathney,*
   465 F.3d 1133 (10th Cir. 2006) .................................................................5

*United States v. Casoni,*
   950 F.2d 893 (3d Cir. 1991) ....................................................................5

065028.1001

**Rules**

FED. R. CIV. P. 26(a)(2)(B) ...........................................................................................9

FED. R. CIV. P. 37(C)(1) ...............................................................................................9

FED. R. EVID. 702 .........................................................................................................12

FED. R. EVID. 703 ...........................................................................................................2

FED. R. EVID. 803(6) .......................................................................................................5

FED. R. EVID. 902(11) ......................................................................................................5

DB02:6879240.1

065028.1001

ARIAD seeks to flout the Federal Rules through a shell game of experts and testimony in order to present the hearsay experiments of one non-testifying consulting expert through the opinion testimony of another, all the while evading disclosure and precluding a fair opportunity for discovery and effective cross-examination. The core facts are largely undisputed. ARIAD retained Dr. Joel Pomerantz to perform NF-κB experiments in support of ARIAD's infringement allegations. Neither Dr. Pomerantz nor his work was disclosed during fact discovery, and he did not submit an expert report. Instead, ARIAD now offers Dr. Calame to testify about Dr. Pomerantz's experiments. But Dr. Calame was wholly uninvolved in the design and implementation of the experiments and had never before worked with Dr. Pomerantz. Even worse, she also could not explain or decipher some of Dr. Pomerantz's work.

Amgen does not dispute that, with the right indicia of reliability, an expert need not personally conduct every aspect of testing to be permitted to testify about the results of such testing. None of the cases cited by ARIAD, however, support its position that Rule 703 permits Dr. Calame to rely on the Pomerantz experiments under the circumstances present here. Instead, each cited decision relies upon evidence demonstrating that the underlying data was of a type typically and reasonably relied upon by the expert that is testifying. Such evidence of reliability is wholly absent here, and ARIAD's expert shell game threatens severe prejudice to Amgen.

The exception for experts to the general rule prohibiting reliance on hearsay and inadmissible evidence does not extend to the situation where one expert seeks to rely on the work of another with no prior connection or relationship to confirm that the data and experiments are reliable. Under *Daubert* and its progeny, this Court must exercise its gatekeeping function and preclude Dr. Calame's testimony with respect to the Pomerantz experiments. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993).

## I.     ARGUMENT

Dr. Pomerantz's work is not "of a type reasonably relied upon by experts in [Dr. Calame's] particular field" and thus Dr. Calame cannot be allowed to testify about these experiments at trial. FED. R. EVID. 703. The cases cited in ARIAD's Opposition Brief in fact support Amgen's position that the experiments lack sufficient bases for reasonable reliance. Dr. Calame has not worked with Dr. Pomerantz, had no control over or participation in the conduct or design of the experiments, and was unable to answer basic questions about the methodology and experimental design. And Dr. Pomerantz submitted no expert report in this matter, a textbook case of "surprise" evidence that prevented a full and fair opportunity for discovery. Because Dr. Calame lacks the necessary understanding of key aspects of the design and execution of the experiments, she cannot, consistent with the Federal Rules, testify as to her opinions regarding them.

### A.     The Cases Cited By ARIAD Do Not Support Admission of Dr. Calame's Testimony Concerning the Pomerantz Experiments and Therefore Testimony Based on These Experiments is Properly Excluded.

Dr. Calame's lack of any connection at all to the design or implementation of the Pomerantz experiments, compounded by the fact that she could not even provide second-hand information on many key questions about these experiments, renders her an unreliable proponent of this evidence at trial. ARIAD cites *Dura* for its proposition that "[a]n expert witness is permitted to use assistants ... and normally they need not themselves testify." *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002). What ARIAD fails to note is *Dura*'s requirement that the testifying expert "supervised [the assistants] carefully" and "rel[iance] on their assistance was standard practice in his field." *Id.* at 613. *Dura* further notes that reliance on others' work must be especially scrutinized where the others "aren't merely

2

gofers or data gatherers and exercise professional judgment that is beyond the expert's ken."[1] *Id.* There is nothing about Dr. Calame's reliance on Dr. Pomerantz's experiments that meets these criteria for admissibility.

Here, it is undisputed that Dr. Calame did not supervise Dr. Pomerantz and does not normally rely upon his work. In fact, she had no part in selecting Dr. Pomerantz to perform this work[2], has no opinions about his qualifications, and did not participate with Dr. Pomerantz in the design[3], conduct or supervision of the experiments. She also did not conduct any independent analysis[4] or verify his data calculations[5], but simply accepted them at face value. And she lacks

---

[1]    As discussed *infra*, significant judgment by Dr. Pomerantz, Dr. Ravetch and trial counsel was involved in designing the experimental protocol of the Pomerantz experiments (*see* discussion *infra*, at Section I(B); *see also, e.g.,* Ex. B, Pomerantz Dep. at 62:23-63:7: "Q. How did you decide what concentration of Enbrel to use in the experiments? A. I think I judged that it would be similar to serum concentrations in patients taking Enbrel. Q. And how did you calculate that? A. I think I saw it in the package insert or perhaps some information on the web. Q. And is any of that, those calculations, reflected in Pomerantz Exhibit 1? A. No."; *see also, e.g., id.* at 20:16-19; 25:8-17; 36:17-20; 108:6-12; 113:5-10.)



DB02:6879240.1                                                                                                065028.1001

understanding as to why the experiments were carried out in certain ways.[6]  Dr. Calame's reliance is instead based solely on having read Dr. Pomerantz's lab notebook (prepared in anticipation of litigation) and the fact that he was ▆▆REDACTED▆▆ and had ▆▆REDACTED▆▆ ▆▆REDACTED▆▆ [7] Dr. Pomerantz does not qualify as a non-testifying "assistant" and Dr. Calame has been set forth to merely serve as an impermissible mouthpiece to introduce his work.  *See Dura*, 285 F.3d at 614.[8]

Nor can ARIAD band-aid the deficiencies in Dr. Calame's foundation through citations to Dr. Pomerantz's deposition testimony.  Dr. Pomerantz's "fact" testimony does little to address those deficiencies, especially where ARIAD repeatedly refused to allow Dr. Pomerantz to answer the relevant questions.  Counsel for ARIAD instructed Dr. Pomerantz not to answer nearly three dozen relevant questions in the three-hour deposition, including questions concerning his compensation (*see* Ex. B, Pomerantz Dep. at 14:18-24; 16:1-3); who designed the experiments that he ran (*id.* at 19:9-14; 78:2-8; 87:15-23); whether he read the '516 patent before designing the experiments (*id.* at 30:10-13); his own interpretation of the results of his experiments (*id.* at 58:16-25; 67:14-22), or whether the experiments were designed to attempt to approximate what would happen in actual patients taking Enbrel® (*id.* at 69:22-70:2; 110:10-14.) In any event, no matter what Dr. Pomerantz was permitted to testify about (and it was not much),

---

6   ▆▆▆▆▆REDACTED▆▆▆▆▆

7   (*See* Amgen Opening Br., DI 595 at 2-3)

8   *See also* discussion *infra* at Section I(B).

this does not lay the necessary foundation for admission of the experiments *through Dr. Calame.*[9]

None of the other cases cited by ARIAD support ARIAD's apparent position that an expert can always "reasonably rely" on experiments by others in a related field. Instead, in each case, the court cited evidence establishing the reasonableness of the reliance, such as evidence that the expert exercised some amount of control over the creation of the data, or that the data was derived from sources upon which such experts normally rely, or that the work was that of another testifying expert that would be subject to scrutiny through the expert process and at trial. Such hallmarks of reliability are wholly absent here.

Control over the creation of the data is one such hallmark. In *Ecolab,* for example, the expert relied on work performed by others under his direction and using testing methods designed by him. *Ecolab, Inc. v. Amerikem Labs., Inc.*, 98 F. Supp. 2d 569, 581 (D.N.J. 2000), *rev'd on other grounds.* As the *Ecolab* court noted, "[t]he fact that [the expert] developed the protocol and supervised its implementation in his laboratory suffices to establish his report and its conclusions as reliable and admissible." *Id.*; *see also Astra Aktiebolag v. Andrx Pharms., Inc.*,

---

[9] The contents of Dr. Pomerantz's notebook are inadmissible hearsay, and Dr. Pomerantz cannot lay a foundation for their admission. Although ARIAD claims to have laid such a foundation very recently through service of an executed certification (ARIAD Opposition Br. at 5, n. 4), this certification does not meet the requirements of FED. R. EVID. 902(11), as the notebook is not an 803(6) business record. Rule 902(11) provides for admission of "a domestic record of regularly conducted activity that would be admissible under Rule 803(6)...." FED. R. EVID. 902(11); *see also* FED. R. EVID. 803(6). Here, Dr. Pomerantz admitted that the notebook was a document prepared wholly in anticipation of litigation. (Ex. B, Pomerantz Dep. at 30:19-23: "Q. All of this work that's reflected in Pomerantz Exhibit 1 was done especially for Ariad in this litigation as opposed to for any other purpose, correct? A. Yes.") Documents created expressly for litigation lack the requisite indicia of reliability and trustworthiness necessary for the business records exception to apply. *See, e.g., United States v. Casoni*, 950 F.2d 893, 910-913 (3d Cir. 1991); *see also U.S. v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006) ("one who prepares a document in anticipation of litigation is not acting in the regular course of business.")

222 F. Supp. 2d 423, 491 (S.D.N.Y. 2002) ("[a]ll of the tests were performed under Dr. Davies'
direction and by appropriate personnel.")

Other cases cite evidence that the information relied on is of a type indicated by
professional or regulatory guidelines as that normally relied upon by professionals in that
industry. *See, e.g., Inline Connection Corp. v. AOL Time Warner, Inc.*, 470 F. Supp. 2d 435, 443
(D. Del. 2007) (in which this Court cited "professional standards" in finding that "the type of
information and the manner in which it was acquired is reasonably relied upon by experts within
their field.")[10]; *see also Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008)
("scientific reports prepared by [the expert's] team [were] the type of reliance that is reasonable
for expert witnesses") and factual record below at *Monsanto Co. v. David*, 448 F. Supp. 2d 1088,
1091 (E.D. Mo. 2006), *aff'd in part, vacated in part, and remanded on other grounds* (the expert
conducted sampling and testing "according to Standard Operating Procedures...reviewed and
audited by the United States Environmental Protection Agency.")[11]

Reasonable reliance can also rest upon the admissible testimony of other experts, where
the requisite reliability is present. *See e.g. Astra Aktiebolag*, 222 F. Supp. 2d at 502; *Cryovac*
*Inc. v. Pechiney Plastic Packaging*, 430 F. Supp. 2d 346, 364 (D. Del. 2006) (expert allowed to

---

[10] In *Inline,* "defendants' experts compiled the appropriate data [from five separate telephone companies] and **used standard methods**" (*Inline*, 470 F. Supp. 2d at 442 (emphasis added)) and "Davis and Gallagher gathered data and generated their reports using methodologies consistent with the *Litigation Services and Applicable Professional Standards* of the AICPA-that is, they obtained information of a type and in a manner acceptable under the AICPA standards in forming opinions." *Id.* at 443.

[11] *See also Astra Aktiebolag*, 222 F. Supp. 2d at 493 (expert used standardized methods "approved in the United States Pharmacopoeia ("USP")...and well known in the field..."); *Gussack*, 224 F.3d at 94 (expert relied upon reports generated by the New York Department of Environmental Conservation); *Ratliff v. Schiber Truck Co., Inc.*, 150 F.3d 949, 955 (8th Cir. 1998) (finding reliance on police reports to be reasonable; police reports are "document[s] of the type reasonably relied upon by accident reconstructionists in forming their opinions.")

rely upon another testifying expert's admissible testimony)[12]; *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) (expert allowed to critique and thus rely upon the opposing party's expert testing.)

None of these cases support ARIAD's claim that "Rule 703 permits Dr. Calame to rely on the results of the infringement experiments even though she did not supervise their performance herself." (ARIAD Opposition Br.[13] at 6)  Dr. Calame had no involvement in the design or conduct of the experiments.  No established protocols or published standards determined the underlying experimental methods (which were, in fact, developed specifically for this case in anticipation of litigation by Dr. Pomerantz, Dr. Ravetch[14] and counsel for ARIAD.[15]) And despite their involvement, neither Dr. Pomerantz nor Dr. Ravetch submitted an expert report setting forth the experimental design or design decisions, a textbook case of "surprise" evidence that prevented a full and fair opportunity for discovery.  There is thus no evidence to support ARIAD's claim that Dr. Calame could reasonably rely on these experiments.

---

[12]  ARIAD is wrong when it claims *Cryovac*'s discussion of an expert's reliance on a fact witness' (not an expert's) corroborated recollection of experiments conducted prior to litigation is relevant here.  (ARIAD Opposition Br. at 8); *see also Cryovac,* 430 F. Supp. 2d at 363.  Here, Dr. Pomerantz's experiments were not disclosed during fact discovery, are not corroborated, and ARIAD claims work product protection over discovery into their design.

[13]  (DI 630, Defendants-Counterclaim-Plaintiffs' Memorandum in Opposition to Amgen's Motion)

[14]  Amgen only learned recently of Dr. Ravetch's involvement in the experimental design.  Dr. Ravetch's involvement was not identified in Dr. Calame's report, despite the fact that Dr. Ravetch was involved on several occasions, and "early before I started doing any experiments" (*See* Ex. B, Pomerantz Dep. at 75:25)

[15]  Dr. Pomerantz admitted that counsel for ARIAD (Amir Naini) participated in at least the experiments' design and the decision to order particular cell lines. (*See e.g.* Ex. B, Pomerantz Dep. at 20:11-21:5; 72:25-73:7; 73:23-74:19)

7

**B.    Dr. Calame Does Not Normally Rely Upon the Type of Work Conducted by Dr. Pomerantz, Whose Area of Expertise is Distinct From Dr. Calame's.**

The case on which ARIAD relies, *Dura,* further informs that an expert may be able to testify as to an opinion formed in part on the work of other experts, but only as to matters within her area of expertise, and not "for the purpose of vouching for the truth of what the [other expert] had told him." *Dura*, 285 F.3d at 613. This is because "[a] scientist, however well credentialed [she] may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Id.* at 614.

In an effort to sweep Dr. Pomerantz's work within Dr. Calame's areas of expertise, ARIAD baldly asserts that "Dr. Calame works in the same field as Dr. Pomerantz," apparently relying on the fact that both are generally "molecular biologists." (*See* ARIAD Opposition Br. at 8) But such a broad relationship does not support Dr. Calame introduction and reliance on experiments reflecting the distinct expertise of Dr. Pomerantz. In contrast to Dr. Pomerantz, Dr. Calame has never personally performed experiments with NF-κB[16], TNF-α[17], Enbrel[18], or TNF antagonists generally.[19] The simple fact that Dr. Calame and Dr. Pomerantz are both molecular biologists and that Dr. Calame has some familiarity with some of the generic types of assays and techniques used does not establish Dr. Calame as an expert in the same specialty as Dr. Pomerantz. Again *Dura* is instructive:



> A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician.

*Dura*, 285 F.3d at 614. If ARIAD wanted to introduce these experiments, it is Dr. Pomerantz, and not Dr. Calame, that has the knowledge and relevant expertise to testify.[20]    Without testimony explaining and justifying those discretionary choices, Dr. Calame's testimony "rest[s] on air" and is rightly excluded. *See Dura*, 285 F.3d at 615.[21]

Not only is the work of Dr. Pomerantz not from a source typically relied upon by Dr. Calame, but ARIAD admits the experiments are lawyer-designed and work product[22] and thus fall well outside Dr. Calame's typical area of reliance.    ARIAD specifically withheld the Pomerantz experiments during fact discovery on the basis that "[t]his investigation of potential infringement was initiated and is being performed at the direction of counsel in connection with the present litigation, and therefore documents concerning this testing are protected by the attorney work product doctrine." (Ex. C, June 21, 2007 letter from Betsy Rosenblatt to Jamie

---

[20] Of course, there are also problems with Dr. Pomerantz now testifying about the experiments, as he performed expert work (*see* Ex. B, Pomerantz Dep. at 13:23-24, wherein counsel called Pomerantz a "consulting expert") without submitting an expert report. *See* FED. R. CIV. P. 26(a)(2)(B) and 37(c)(1). He was also instructed not to answer many questions relating to the design of the experiments due to the extensive apparent involvement of ARIAD's litigation counsel. *See, e.g., Dyson Tech., Ltd. v. Maytag Corp.*, 241 F.R.D. 247, 250 (D. Del. 2007) ("Rule 26(a)(2)(B) requires disclosure of all information considered by a testifying expert … without regard to asserted privilege.") Therefore, these experiments could never be admissible in this matter.

[21] *See also In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) ("[the expert's] failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results.")

[22] (Ex. B, Pomerantz Dep. at 19:9-14: "Q. Now, who designed the experiments that you ran that are reflected in Pomerantz Exhibit 1? Mr. Greenwald: Objection. Just let me think. Instruct not to answer. I feel it invades work product protection and is outside the scope of our deposition.")

9

McDole)  Dr. Pomerantz admitted that counsel for ARIAD participated in the experiments'
design, including but not limited to the particular cells lines to use and other key design
decisions.[23]  As a result of ARIAD's broad assertion of work product protection, Amgen was
prevented a legitimate opportunity to take discovery with respect to these experiments.

It is well settled that attorney work product, such as the Pomerantz experiments, is not the
type of data upon which experts can reasonably rely for purposes of Rule 703.  Exclusion of
expert testimony has been found appropriate where an expert retained strictly for litigation
purposes based his opinions solely on a plaintiff's self-report, and "[c]ommon sense alone
suggests that such evidence is 'based on an unreliable source of information.'"  *In re TMI Litig.*,
193 F.3d 613, 698 (3d Cir. 1999).  The Third Circuit in *In re TMI Litigation* applied the same
rationale to an expert's reliance on medical history summaries generated by trial counsel:

> [W]e share the District Court's concern over reliance on the summary sheets
> prepared by Trial Plaintiffs' counsel, and given to him by plaintiffs' consultant.
> As the District Court noted: 'No evidence has been placed on the record as to how
> those summary sheets were created.'  They have no demonstrated indicia of
> reliability, and it is the burden of the party offering the expert scientific testimony
> to demonstrate reliability by a preponderance of the evidence. Absent some
> evidence as to how the sheets were prepared and the sources of the information
> contained in them, it is impossible to assess their reliability.

*In re TMI Litig.*, 193 F.3d at 705 (internal citations omitted).  Finding the underlying data
"unreliable," the court held that the expert lacked "good grounds to rely on them to arrive at her
conclusion." *Id.* at 698.  The expert "should have done more.  She should have either reviewed
the study subjects' medical and hospital records or examined the subjects herself." *Id.* Similarly

---

[23]  *See supra*, discussion at n. 15.  Dr. Pomerantz also admitted that he himself lacked experience
with certain cell lines used and did not conduct research regarding those cell lines for this matter.
(*See* Ex. B, Pomerantz Dep. at 24:11-16)  When Amgen's counsel asked in follow-up how he
then selected the cell lines, counsel for ARIAD instructed Dr. Pomerantz not to answer. (*Id.* at
24:17-21; 25:2-17)

here, Dr. Calame made no attempt to verify the experimental data that she received from Dr. Pomerantz through litigation counsel.[24]

In *Dura*, the expert worked for the same consulting firm as the employees who conducted underlying modeling, and there was evidence that the expert normally relied on the work of such employees. Despite this, the Court excluded the expert's testimony. The court's reasoning is instructive. As in the present case, the underlying work involved several design decisions:

> [W]e must be realistic about expert evidence: Geraghty & Miller was hired to provide evidence favorable to Dura: so any margin of discretion in the construction of the groundwater-flow model could be expected to be exploited to Dura's benefit. That discretion was exercised not by [the testifying expert] but by Rumbaugh and the other affiants, for it was they who constructed the model ...***Without their testimony explaining and justifying the discretionary choices that they made, his testimony would have rested on air.***"

*Dura*, 285 F.3d at 615 (emphasis added). An understanding of the discretionary design decisions is critical to assessing the reliability and the probative value of the experiments. *Id.* Here, ARIAD offers no opportunity for Amgen to probe these discretionary choices -- only the unsupported expert opinion of Dr. Calame, who lacked knowledge of, and thus could not explain, those strategic decisions.

## II.    CONCLUSION

At bottom, ARIAD seeks to introduce hearsay data designed in anticipation of litigation by its litigation counsel and other paid experts through the testimony of another expert whose utter lack of knowledge about the experiments themselves renders her opinions unreliable and prevents effective cross-examination. Such testimony is prohibited under *Daubert* and the

---

[24] *See also In re TMI Litig.*, 193 F.3d at 671 ("nothing in the record before us ... indicates that [the expert] attempted to verify the source terms he took from Trial Plaintiff's counsel. Consequently, his dose estimates can not be ruled credible or reliable.")

Federal Rules of Evidence. For the reasons discussed in Amgen's Brief in Support of its *Daubert* Motion, and for the reasons discussed herein, Amgen respectfully request that this Court grant its motion under Federal Rules of Evidence 702 and 703 to preclude Dr. Calame from offering testimony about the Pomerantz experiments.

12

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____ /s/ Melanie K. Sharp _____

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800
(213) 680-8400

Siegmund Y. Gutman
J. Drew Diamond
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067
(310) 785-4707

Dated:  June 6, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,
Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,
Limited, and Immunex Rhode Island Corporation*

DB02:6879240.1                                                                                      065028.1001

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2006, I caused to be electronically filed a true and correct copy of THE AMGEN ENTITIES' REPLY BRIEF IN SUPPORT OF ITS DAUBERT MOTION TO PRECLUDE CERTAIN INADMISSIBLE OPINIONS OF DR. KATHRYN CALAME RELATING TO EXPERIMENTS PERFORMED BY DR. JOEL POMERANTZ with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

_____/s/ Melanie K. Sharp_____
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com