IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;   )
IMMUNEX CORPORATION, a Washington  )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING,  )
LIMITED, a Bermuda Corporation, and    )
IMMUNEX RHODE ISLAND              )
CORPORATION, a Delaware corporation,   )
                                  )
     Plaintiffs/Counterclaim Defendants,   )
                                  )
     v.                          )
                                  )
ARIAD PHARMACEUTICALS, INC., a    )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.*         )
                                  )
     Defendants/Counterclaim Plaintiffs.   )

Civil Action No.06-259 (MPT)

**Public Version**
**Confidential Material Ommited**

**DECLARATION OF MELANIE K. SHARP
IN SUPPORT OF THE AMGEN ENTITIES' REPLY BRIEF IN
SUPPORT OF THEIR MOTION TO PRECLUDE ARIAD'S PROFFERED
EXPERTS ON WILLFULNESS AND INEQUITABLE CONDUCT FROM
OPINING ON INTENT, STATE OF MIND, AND OTHER MATTERS**

I, Melanie K. Sharp, hereby declare as follows:

1.    I am a partner at the law firm of Young Conaway Stargatt & Taylor, LLP in

Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter. I submit this

Declaration in connection with The Amgen Entities' Reply Brief in Support of Their Motion to

Preclude ARIAD's Proffered Experts on Willfulness and Inequitable Conduct From Opining on

Intent, State of Mind, and Other Matters. I have personal knowledge of the facts set forth herein

and, if called as a witness, could and would competently testify thereto.

2.    Attached hereto as Exhibit 1 is a true and correct copy of selected pages from the

March 26, 2008 deposition of Kathryn Calame.

3.      Attached hereto as Exhibit 2 is a true and correct copy of selected pages from the transcript of the January 3, 2008 pretrial conference in *Energy Transportation, Inc. v. William Demant Holding A/S*, C.A. No. 05-422 (GMS) (D. Del.).

4.      Attached hereto as Exhibit 3 is a true and correct copy of selected pages from the transcript of the trial proceedings on January 24, 2008 in *Energy Transportation, Inc. v. William Demant Holding A/S*, C.A. No. 05-422 (GMS) (D. Del.).

5.      Attached hereto as Exhibit 4 is a true and correct copy of selected pages from the transcript of the trial proceedings on January 25, 2008 in *Energy Transportation, Inc. v. William Demant Holding A/S*, C.A. No. 05-422 (GMS) (D. Del.).

6.      Attached hereto as Exhibit 5 is a true and correct copy of selected pages from the transcript of the trial proceedings on January 29, 2008 in *Energy Transportation, Inc. v. William Demant Holding A/S*, C.A. No. 05-422 (GMS) (D. Del.).

7.      Attached hereto as Exhibit 6 is a true and correct copy of the April 24, 2007 order in *Telecordia Technologies, Inc. v. Lucent Technologies, Inc.*, C.A. Nos. 004-875, 876 (GMS) (D. Del.).

8.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 6th day of June, 2008.


                                    _____/s/ Melanie K. Sharp_____
                                    Melanie K. Sharp, Esq.

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 6, 2008, I caused to be electronically filed a true and correct copy of Declaration of Melanie K. Sharp in Support of The Amgen Entities' Reply Brief In Support Of Their Motion To Preclude ARIAD's Proffered Experts On Willfulness And Inequitable Conduct From Opining On Intent, State Of Mind, and Other Matters with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on June 6, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

# EXHIBIT 1

# REDACTED

# EXHIBIT 2

1

```
04:17:04   1        IN THE UNITED STATES DISTRICT COURT
           2        IN AND FOR THE DISTRICT OF DELAWARE
           3                    - - -
           4
           5   ENERGY TRANSPORTATION,    : Civil Action
               INC.,                     :
           6                             :
                   Plaintiff,            :
           7                             :
                   v.                    :
           8                             :
           9   SONIC INNOVATIONS, INC., :
               PHONAK HOLDING AG,        :
          10   PHONAK INC.,              :
               UNITRON HEARING, INC.,    :
          11   WILLIAM DEMANT HOLDING A/S,:
               OTICON A/S,               :
          12   OTICON INC.,              :
               WIDEX A/S,                :
          13   WIDEX HEARING AID CO. INC.,:
               GN RESOUND A/S,           :
          14   GN RESOUND CORPORATION,   :
               STARKEY LABORATORIES, INC.,:
          15   GENNUM CORPORATION,       :
               RESISTANCE TECHNOLOGY INC.,:
          16   BERNAFON AG,              :
               WDH, INC., and            :
          17   BERNAFON, LLC,            :
                                         :
          18       Defendants.          : No. 05-422 (GMS)
                                         :
          19                    - - -
          20            Wilmington, Delaware
                     Thursday, January 3, 2008
          21              9:30 a.m.
                       Pretrial Conference
          22                    - - -
          23   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
          24
          25
```

2

```
 1   APPEARANCES:

 2        EDMOND D. JOHNSON, ESQ.
          Pepper Hamilton LLP
 3             -and-
          MARTY STEINBERG, ESQ.,
 4        BRIAN M. BUROKER, ESQ.,
          MAYA M. ECKSTEIN, ESQ., and
 5        DANIEL VIVARELLI, ESQ.
          Hunton & Williams
 6        (Washington, D.C.)

 7                Counsel for Plaintiff

 8        MARY B. GRAHAM, ESQ.
          Morris, Nichols, Arsht & Tunnell
 9             -and-
          GREGORY C. GRAMENOPOULOS, ESQ.,
10        JOHN M. ROMARY, ESQ.,
          KAY HILL, ESQ., and
11        GERSON S. PANITCH, ESQ.
          Finnegan, Henderson, Ford, Farabow & Dunner
12        (Washington, D.C.)

13                Counsel for
                  Demant Defendants
14
          DONALD E. REID, ESQ.
15        Morris, Nichols, Arsht & Tunnell
               -and-
16        WILLIAM H. MANDIR, ESQ.,
          CARL J. PELLEGRINI, ESQ., and
17        BRIAN SHELTON, ESQ.
          Sughrue Mion
18        (Washington, D.C.)

19                Counsel for Widex
                  Defendants
20
                       - - -
21

22

23

24
25
```

3

1    THE COURT:  Good morning.  Happy New Year.

2  Please take your seats.

3         Counsel, this is an office conference, so the

4  rules of Court are in suspense.  You can sit if you want, or

5  you can stand, take your jackets off if you would like.

6         What I would like to do is start out with a

7  round of reintroductions, beginning with plaintiff.

8         MR. JOHNSON:  Your Honor, Edmond Johnson for the

9  plaintiffs ETG.  I have with me at counsel table Marty

10  Steinberg, Brian Buroker, Maya Eckstein and Dan Vivarelli.

11  They are all from Hunton & Williams.

12         THE COURT:  Good morning.

13         Ms. Graham.

14         MS. GRAHAM:  Good morning, Your Honor.  I am

15  here for Demant.  Sometimes they are called Oticon, so

16  people don't get confused about that.

17         THE COURT:  Can we refer to them as Demant

18  today?

19         MS. GRAHAM:  That is fine.  With me from

20  Finnegan & Henderson are John Romary, Greg Gramenopoulos,

21  Gerson Panitch, and Kay Hill.

22         THE COURT:  Good morning.

23         MR. REID:  Good morning, Your Honor.  Donald

24  Reid on behalf of Widex.  From the Sughrue firm we have Bill

25  Mandir, Carl Pellegrini, and Brian Shelton.

4

1    THE COURT:  Good morning.

2    Anybody else?

3    Okay.

4         What I would like to do first is address the

5  parties' motions in limine, as soon as I can pull those out.

6  Then we will talk for, depending, a moment or more,

7  depending, about the two motions in limine -- I view them as

8  motions in limine -- the two Daubert motions that the

9  plaintiff has filed.  I will do that.

10         I will tell you that there will be a ruling

11  coming very shortly announcing my decision to deny the

12  renewed motion to dismiss.

13         Then we will go through the actual proposed

14  final pretrial order, the various tabs, places that I have

15  tabbed, and I will invite counsel to remind me if I miss

16  something, I will go back and cover whatever issues that

17  might need to be covered.

18         There are a number of miscellaneous issues at

19  the end of the proposed final pretrial order which we

20  apparently need to address at greater or lesser degree.  We

21  will just see how things go.

22         We will probably take a break around 12:30, if

23  we are still at it.  I suspect we will.

24         I don't recall that there is a lot of

25  controversy about the preliminary instructions.  The only

137

1       THE COURT: Why can't they be produced
2   unredacted pursuant to the confidentiality agreement in this
3   case that Sonic signed off on?
4       MR. GRAMENOPOULOS: I can answer for our side,
5   not for Sonic. From our side, it is okay. But I can't
6   answer for Sonic.
7       THE COURT: Why don't you agree on a form of
8   order, both sides, for me to sign. Let's do that. Then I
9   will leave it to you to schedule, on your own, your own
10  meet-and-confer, however you choose to do that, and
11  hopefully resolve this.
12      MS. ECKSTEIN: Thank you, Your Honor.
13      THE COURT: Yes, ma'am.
14      Let me simply ask you what of these
15  miscellaneous items you feel, that haven't been massaged to
16  the point of agreement you feel the need for guidance.
17      MS. ECKSTEIN: Your Honor, there is a difference
18  of opinion on authentication of documents which may resolve
19  a number of objections. I think it's on Page 56 of the
20  final pretrial order.
21      THE COURT: Okay.
22      MS. ECKSTEIN: Our proposals are actually very
23  similar, except I believe the defendants' proposal excludes
24  documents that were produced by a third party. And our
25  position is that there is simply no reason to believe that

138

1   third-party documents are not authentic. And, of course,
2   both proposals provide for an opportunity to challenge
3   authenticity, with a reasonable basis.
4       THE COURT: I thought the proposals were
5   reasonably similar as well. Is there a reason you can tell
6   me why you can't work this out?
7       MS. GRAHAM: I think we can work this out.
8       THE COURT: I am interested in hearing about
9   items where you think you really need direction from me.
10      MS. GRAHAM: Your Honor, I do have two, a couple
11  of those issues that I would personally ask to address with
12  the Court.
13      One is Item 3 on Page 12, which relates to
14  whether ETG gets to offer into evidence and argue to the
15  jury that defendants either are not relying on advice of
16  counsel or don't have advice of counsel. I know this Court
17  is well-familiar with this issue, at least from the
18  Telcordia case, which was before Seagate. And I would
19  submit that since Seagate the issue was found even easier,
20  and that under that case there should be no mention of
21  either a defendant having advice and not relying on it,
22  which Your Honor addressed already in Telcordia.
23      Your Honor found if the defendant had gotten
24  advice but elected not to waive privilege, there could be no
25  mention of that at trial. That was because of Knorr-Bremse

139

1   and the fact that in effect the jury would be being invited
2   to draw an adverse inference when the Federal Circuit said
3   you can't do that.
4       Your Honor, in Telcordia, however, also ruled
5   that a defendant who had not asked for advice, that that
6   fact could come into evidence. We would submit that since
7   the Seagate decision, if Your Honor has had an opportunity
8   to consider that, but Seagate is the decision that the
9   Federal Circuit rendered in August --
10      THE COURT: I am aware of Seagate.
11      MS. GRAHAM: I want to make sure. You are
12  probably more aware of it than I am.
13      THE COURT: Maybe, maybe not. I am aware of
14  Seagate.
15      MS. GRAHAM: I don't like to presume what other
16  people may be most familiar with.
17      THE COURT: That is not what I was asking. But
18  go ahead.
19      MS. GRAHAM: So under the Seagate decision,
20  there is no affirmative duty of due care. There is no
21  affirmative duty to get an opinion. So by, in effect,
22  asking a witness, well, you didn't get an opinion, did you,
23  on this, and the witness says, well, no, that's inviting the
24  jury that, well, they should have gotten an opinion and they
25  didn't. And that is not the law under Seagate.

140

1       So we would submit that the logic of Telcordia,
2   which is look at the consequences, in effect, of asking this
3   witness about this lack of evidence causes the jury to reach
4   a conclusion that you should have had something that you
5   don't have at trial.
6       We submit that Your Honor's logic from Telcordia
7   applies now with Seagate in both such circumstances. The
8   evidence should be out.
9       Moreover, the parties agreed to the AIPLA jury
10  instruction. That instruction specifically, the notes to
11  the AIPLA instruction specifically address the situation of
12  whether you have an opinion or you don't have an opinion.
13  And the AIPLA instruction, which is still based on a
14  totality of the circumstances notion, leaves under the
15  totality of the circumstances notion, they say there is a
16  number of factors, but they list three, one of which is in
17  brackets. The two that aren't in brackets are whether they
18  intentionally copied and whether they presented a
19  substantial defense to infringement.
20      In brackets is whether the relied on competent
21  legal advice. And the notes say -- and we left out this
22  bracketed part in what we submitted to the Court jointly --
23  it says the fact of whether the defendant relied on
24  competent legal advice should only be included if the
25  alleged infringer relies on a legal opinion as a defense to

141

1  an allegation of willful infringement. It is inappropriate
2  to draw an adverse inference that undisclosed legal advice
3  for which attorney-client privilege is claimed was
4  unfavorable and it is also inappropriate to draw a similar
5  adverse inference from failure to consult counsel.
6         So they have now wrapped in the two situations
7  from Telcordia that there should be no mention of this in a
8  jury instruction.
9         And this is the instruction, without that
10 bracketed part, that we submitted jointly to the Court.
11        So we submit that this issue has basically been
12 resolved, and they should not be able to get into the lack
13 of advice of counsel.
14        THE COURT: Well, the plaintiff responds, I
15 think, in part, at least, that this should have been raised
16 in a motion in limine. Apart from that, it is going to have
17 to be addressed, for the reason you just mentioned, it's
18 going to come up in the jury conference, in the prayer
19 conference.
20        MS. ECKSTEIN: We are prepared to do that.
21        MS. GRAHAM: In the meantime, Your Honor, they
22 are asking witnesses, well, you didn't have an opinion, did
23 you? So then there is a need for some kind of correction
24 that you shouldn't consider that. That's what we submit
25 would be unfair, to ask for that kind of evidence neutrals

142

1  part of the consideration.
2         MS. ECKSTEIN: We agree, the case doesn't allow
3  for an adverse inference. That is what the AIPLA notes go
4  to, an adverse inference. Nothing in the case law we have
5  found says you cannot raise this issue as one issue in the
6  consideration of the totality of the circumstances. And
7  there is a case from the Southern District of New York in
8  2007, SEB v. Montgomery Ward. It is 2007 WL-3165. There
9  the Court held, and I quote, "nothing in Knorr-Bremse
10 forbids a jury to consider whether an infringer sought the
11 advice of counsel in considering whether under the totality
12 of circumstances an infringement has been willful."
13        So we believe it is one of the factors, and our
14 jury instructions reflect that. It's to be considered
15 within the totality of the circumstances.
16        MS. GRAHAM: Your Honor, that case that she just
17 quoted from as relying on Knorr-Bremse, we now are in a
18 different ballgame in that Seagate says there is no duty.
19 So if you ask somebody that you didn't do something, the
20 clear inference is you should have done that. And there
21 isn't a duty.
22        So I believe that any jury hearing that question
23 is going to assume that the person should have gotten an
24 opinion. That would be unfair and prejudicial.
25        THE COURT: I will look at the issue. I will

143

1  revisit Seagate again and see if I agree with you.
2         MS. ECKSTEIN: That case did post Seagate.
3         THE COURT: What was is cite?
4         MS. ECKSTEIN: 2007 WL-3165. The case is SEB v.
5  Montgomery Ward. I would also suggest the Court look at
6  Golden Blount, which is a Federal Circuit case from 2006.
7         THE COURT: I have read Golden Blount a number
8  of times. But I will take another look.
9         MS. GRAHAM: Your Honor, may we have an
10 opportunity to address this Montgomery Ward case?
11        THE COURT: No. I will address it myself. Any
12 other of these paragraphs need to be addressed?
13        MS. GRAHAM: Another issue relates to the, what
14 reference can be made to the Court's Markman ruling.
15        THE COURT: Why does this always come up in
16 patent cases? The Court's Markman ruling is the Court's
17 Markman ruling. It is going to appear in a jury
18 instruction. It is that. It is not subject to anyone's
19 expert or by anyone else in this courtroom other than me.
20        MS. GRAHAM: Your Honor, our issue comes from
21 any matters that lead up to it and also the footnotes of the
22 Court's Markman opinion. So the body of the order gives the
23 rulings. And we have no problem with that.
24        THE COURT: That's it. That's the ruling.
25        MS. GRAHAM: Could I ask, is it your practice to

144

1  just read to the jury in the jury instructions those
2  rulings?
3         THE COURT: The meaning of the disputed terms,
4  yes.
5         MS. GRAHAM: I wasn't sure if the ruling itself
6  in redacted form would be handed to the jury.
7         THE COURT: No. The ruling will not be handed
8  to the jury. What the jury will have, as you know, Ms.
9  Graham, will be the final instructions.
10        MS. GRAHAM: I only had one trial many years
11 before. I get these questions.
12        THE COURT: Mr. Blumenfeld has been over here
13 plenty of times, your partner, and others.
14        MS. GRAHAM: I don't mean to try the Court's
15 patience. I usually find it avoids mistakes if I ask
16 questions.
17        MR. MANDIR: Your Honor, I apologize if I should
18 know this. The concern that we have is that plaintiff will
19 ask a question to our expert that says, now, you know that
20 the defendants urged a specific claim construction and the
21 Court, Your Honor, he denied that. We think that that is,
22 one, irrelevant.
23        THE COURT: I agree with you, a hundred percent,
24 2000 percent.
25        MS. ECKSTEIN: We do, too.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

\-   \-   \-

| | | |
|---|---|---|
| ENERGY TRANSPORTATION, INC., | : | Civil Action |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM DEMANT HOLDINGS A/S, et al., | : | |
| | : | |
| Defendants. | : | No. 05-422 (GMS) |

\-   \-   \-

Wilmington, Delaware
Thursday, January 24, 2008
9:07 a.m.
Fourth Day of Trial

\-   \-   \-

BEFORE: HONORABLE GREGORY M. SLEET, Chief Judge

APPEARANCES:

        EDMOND D. JOHNSON, ESQ.
        Pepper Hamilton LLP
           -and-
        MARTY STEINBERG, ESQ.,
        BRIAN M. BUROKER, ESQ., and
        MAYA M. ECKSTEIN, ESQ.
        Hunton & Williams
        (Washington, D.C.)

                Counsel for Plaintiff

Westermann - direct

1    Q.    And they were in the patent base bought by him?

2    A.    That is correct, which is a ton of documents.

3    Q.    Now, Dr. Levitt's patents were filed in 1986.  Up

4    until this lawsuit was filed against Widex and Demant, up

5    until that time, have you heard anybody -- not just Widex

6    and Demant but anybody, any scientist, Dr. Graupe,

7    Mr. Egolf -- heard anyone ever say in that entire time that

8    Dr. Levitt's patents were invalid?

9    A.    No, I haven't.

10   Q.    Now, I believe in the opening statement, some prior

11   art was referred to.  There was a patent by Dr. Graupe.

12   Right?

13   A.    Correct.

14   Q.    And there were some articles by Mr. Best and Dr.

15   Egolf and Mr. Weaver.  Right?

16   A.    That's right.

17   Q.    Did Widex ever license Dr. Graupe's patent?

18   A.    No.

19   Q.    Did Widex ever pay Mr. Best or Dr. Egolf or Mr.

20   Weaver for their technology?

21   A.    No, we didn't.

22   Q.    Now, your company is not relying on any opinion of

23   patent counsel --

24              MR. MANDIR:  Objection, Your Honor.

25              (The following took place at sidebar.)

Westermann – direct

Page 770

1          THE COURT:  Could we hear the question?

2          MR. MANDIR:  I got it out quick.

3          MR. STEINBERG:  I am going to ask him, your

4    company is not relying on any opinion of patent counsel that

5    your products did not infringe the '850 or '749.  We can ask

6    that question.

7          MR. PELLIGRINI:  No.  The issue was, when we

8    discussed this earlier at your hearing, there was a question

9    of whether or not we had opinions or some people didn't get

10   opinions.  We did get an opinion, and we told them at the

11   deposition that we weren't relying on advice of counsel.

12   Based on your Telcordia decision, they shouldn't be able to

13   talk about the fact that we are not relying on advice of

14   counsel.

15         THE COURT:  I am not going to revisit what we

16   have already visited.  I think I issued a written ruling on

17   this, did I not?

18         MS. GRAHAM:  Yes.  Well, on an issue of this.

19         THE COURT:  It is a different issue?

20         MS. GRAHAM:  Yes.

21         MR. STEINBERG:  Your Honor, I am not asking this

22   witness whether they got an opinion and he is not using it.

23   I am just asking him if he is relying on any opinion of a

24   patent counsel in this case of infringement.  That is it.

25         THE COURT:  Is it not a little different.  Maybe

Westermann - direct

1    it isn't.  They did get an opinion.

2              MR. STEINBERG:  Right.  We understand that.  I

3    am not asking them about whether they got an opinion.

4              THE COURT:  That is the problem, they did get an

5    opinion.

6              MR. STEINBERG:  But they are not relying on it

7    in this case, which the case law says, whether or not they

8    got an opinion, if they are not relying on it affirmatively

9    in this case, you could ask the witness whether or not you

10   are relying on an opinion of counsel.  I am not asking

11   whether they got an opinion or not.

12             MR. PELLIGRINI:  We looked at your decision in

13   Telcordia from April of 2007.  Two situations.  One.  The

14   first party did not get an opinion.  You said, yes, did you

15   get an opinion.  Cisco did get an opinion, and you said in

16   that situation you cannot raise the issue of whether or not

17   you are relying on advice of counsel.  That is my reading of

18   the case.

19             MR. MANDIR:  That is exactly what our reading of

20   the case is.  You tell us why it is wrong.

21             MR. STEINBERG:  With all due respect, I believe

22   that opinion said you can't then ask if they got an opinion

23   in front of the jury.  I am not asking that.

24             THE COURT:  Do you agree with his

25   characterization now?

Westermann — direct

1          MR. PELLIGRINI:  No.

2          THE COURT:  What I was going to say is, let's

3     recapitulate.  Let me understand exactly what it is you are

4     attempting to ask and why there is an objection.

5          They got an opinion.

6          MR. STEINBERG:  I am not asking about that.

7          THE COURT:  They have elected not to rely on the

8     opinion of counsel.  You want to ask in front of this jury

9     this question, that you are not relying on the opinion of

10    counsel.

11         MR. STEINBERG:  On any opinion.  I am not asking

12    whether they got one and they are not relying on, which is

13    the harm found, they got one and they wouldn't show it to

14    them, so the jury was thinking in the back of their mind, it

15    must have been bad.  I am not asking that.

16         THE COURT:  Let me ask you this:  Why do you

17    want to advance this line of questioning, that is, albeit

18    they have an opinion, but they are not relying on it?

19         MR. STEINBERG:  Willfulness.

20         MS. ECKSTEIN:  It is one of the totality of the

21    circumstances.

22         THE COURT:  Is it that you want to argue to the

23    jury that having not, the fact that they are not relying on

24    an opinion of counsel is one of the factors that they can

25    consider in determining whether there was willful

Westermann - direct

1    infringement?

2              MR. STEINBERG:  That's correct.

3              THE COURT:  That is their position.

4              MR. MANDIR:  I understand.  That is --

5              THE COURT:  I wanted to make sure I understood

6    what their position was.

7              MR. MANDIR:  I understood that to be their

8    position.  You absolutely cannot do that.

9              THE COURT:  I am not going to rule on this

10   objection at the moment.  I want to go back and review my

11   decision in Telcordia, so that I am confident of the ground

12   that I stand on when I rule.

13             But I want you to argue for the record your

14   interpretation of what you think I ruled and why you believe

15   that ruling precludes this line of inquiry.

16             MR. PELLIGRINI:  It is my understanding of the

17   Telcordia case, there were two different situations.  The

18   first situation was one of the parties, Lucent, who did not

19   get an opinion of counsel, and the other party, Cisco, did

20   get an opinion and they said we are not waiving privilege.

21   We are not going to rely on the advice of counsel defense.

22             So you said, for Lucent, it was proper to ask

23   whether or not you got an opinion.  For Cisco, since they

24   did get an opinion and were not waiving it, it was improper

25   to ask them whether or not they were relying on advice of

Westermann - direct

1   counsel, because to do so would essentially put the

2   inference in the jury that, obviously, was a bad opinion.

3            THE COURT:  You disagree with that.

4            MR. STEINBERG:  We disagree --

5            THE COURT:  You disagree with that

6   interpretation.

7            MR. STEINBERG:  Part of what he said is

8   accurate.  The company that got the opinion, you didn't want

9   the jury to be prejudiced by they got an opinion, they have

10  a visible opinion that says something, but they are now not

11  going to tell the injury.  That was your concern.

12           THE COURT:  The contents.

13           MR. STEINBERG:  The contents.  But it doesn't

14  change the law at all with respect to the issue of telling

15  the jury that they are not relying on any opinion in this

16  proceeding.

17           MS. ECKSTEIN:  Without referencing whether they

18  attempted to get one or didn't attempt to get one.

19           THE COURT:  Well, when you ask that gentleman

20  that question, if I were to permit that, what do you think

21  he is going to say?  He is going to say, wait a minute.  We

22  got an opinion.  It's sort of left out there for the jury to

23  speculate a little bit, or maybe a lot, as to why they are

24  not advancing the opinion.

25           MR. STEINBERG:  We would accept a stipulation

Westermann - direct

1   from them if they wish.

2                THE COURT:  To what?

3                MR. STEINBERG:  That they are not relying on an

4   opinion of counsel in this case.

5                MR. MANDIR:  Will you stipulate we got an

6   opinion?

7                MR. STEINBERG:  You don't want that.

8                THE COURT:  I don't really think you want that.

9                MR. MANDIR:  Right now you want to stipulate?

10               THE COURT:  I don't think you want to go that

11  road.

12               MS. GRAHAM:  I was going to say, this is not all

13  an issue of fact for this jury.  We are not relying on it.

14  The lawyers have had it.  It is a legal position in the

15  case.  That is not what this witness is about.  It seems to

16  me that there is no place in any event to ask this witness

17  about this.  The issue is going to come down in the jury

18  instructions --

19               THE COURT:  I am not sure this wouldn't be the

20  witness that you would ask.

21               MR. MANDIR:  If there is anyone, this would be

22  the guy.

23               MS. GRAHAM:  I am talking about what we are

24  relying on in the litigation.  It's contentions.  Those are

25  the things we advance, for example, in the jury

Westermann - direct

1    instructions.

2            THE COURT:  Whether you call them contentions or

3    however you label them, this would be the witness to whom

4    you would pose this question, for sure.  He is the corporate

5    rep.

6            MR. MANDIR:  We think it is an improper

7    question, but if it was, this is the guy.

8            THE COURT:  I am going to take a look at

9    Telcordia.  I am disinclined as I stand here to permit this

10   because I think it may work some mischief, unintentionally,

11   perhaps intentionally, that I am concerned about.  That is,

12   the jury, I think inevitably it is going to come out of his

13   mouth that, well, we did get an opinion.

14           MR. PELLIGRINI:  He said that at his deposition.

15           THE COURT:  So he is going -- I think it

16   reasonable for him to say that.

17           MR. MANDIR:  Yes.  But to be able to say, oh,

18   and you are not relying on it, it must not have been a very

19   good opinion.  That is the inference.

20           THE COURT:  That is the inference.

21           MR. STEINBERG:  There are two defendants here,

22   essentially two groups.  We will ask the other defendant,

23   are you going relying on it.  They are going to have to

24   answer.  If they are relying on opinion of counsel --

25           MR. MANDIR:  One did.

Westermann - direct

1      MR. STEINBERG:  May I finish?

2           If we don't want to take the chance that this

3   witness is going to have an inadvertent statement, if that

4   is your concern, they can stipulate, then we can argue to

5   the jury, they can stipulate, they are not relying on

6   counsel in this case, fine.  But for us to not have that at

7   all, that is part of our case.  Then there is no risk that

8   the witness is going to slip.

9           THE COURT:  What is your reaction?

10          MR. MANDIR:  That is the whole point of the

11  recent case law.  If you get an opinion and you are allowed

12  to rely on that opinion and there can't be any negative

13  adverse inference on that opinion, when you say did you get

14  an opinion, the answer, you are not relying on it --

15          THE COURT:  Here is what he is saying.  That

16  there would be no mention, maybe you could do this by

17  stipulation, of the fact that you got an opinion, but simply

18  that there is no reliance on the opinion of counsel by

19  either defendant.

20          MR. MANDIR:  So, if I understand it, I won't ask

21  him if he got an opinion.

22          MR. STEINBERG:  No.

23          MR. MANDIR:  But you are not going to raise in

24  closing argument, you didn't see any opinions here, did you,

25  or, you know, if there would have been an opinion you would

Westermann – direct

1    have seen it.  You are going to be silent about it.

2                    MR. STEINBERG:  If I say anything at all, I am

3    going to say neither party relied on an opinion of counsel

4    in this case, which is what we are perfectly permitted to

5    do.

6                    MR. MANDIR:  I think that is improper.

7                    THE COURT:  Is there a jury instruction on this

8    that lists the various factors?

9                    MS. ECKSTEIN:  The jury instruction states that

10   it is part of the totality of the instructions.

11                   MS. GRAHAM:  Yes.  But the jury instruction does

12   not include that we have agreed upon anything on advice of

13   counsel.  It does not state it one way or the other.

14                   THE COURT:  Apart from this rare interesting

15   scenario that is posed by this question, are you saying that

16   you believe that the party not getting an opinion is not a

17   factor that the jury could consider within the totality of

18   the circumstances?

19                   MS. GRAHAM:  I think we argued that one to Your

20   Honor and Your Honor disagreed on that one.  You did

21   disagree on this one.  But they are in a different position.

22                   THE COURT:  I am trying to think of a harmless

23   way for this to be addressed.

24                   MS. GRAHAM:  I don't think I was clear before.

25   I was trying to get at, it seems to me, it is harmless to

Westermann - direct

1    move on without this witness' testimony because this can be

2    addressed in a jury instruction, whatever Your Honor

3    decides, either to let him say it or not in his closing,

4    maybe if we could finish with the witness and then address

5    with Your Honor the legal question of what they can say in

6    closing or in the jury instructions, that would be a way to

7    get over it, at least right now with this witness and the

8    jury sitting here.

9              MR. MANDIR:  I guess that would mean that I am

10   not going to ask him whether or not he had an opinion.

11             THE COURT:  Let's leave the opinion of counsel

12   alone for now.  I am not sure that Ms. Graham is wrong.  But

13   I do agree, it would seem this would be the witness.  I

14   think I might understand the point.  I am not sure I do.

15   You are suggesting that this could somehow be addressed how?

16             MS. GRAHAM:  Well, what we are not --

17             THE COURT:  If not through this witness.

18             MS. GRAHAM:  I don't think I am articulating

19   very well.  It seems to me it is a legal issue of, everybody

20   knows that we are not relying on an opinion and we are not

21   going to bring up anything about it.

22             So there is no harm in waiting to address this,

23   let Your Honor decide how you want to rule in the jury

24   instructions, are you or aren't you going to let them bring

25   it up with respect to that defendant, that they don't have

Westermann - direct

1    an opinion of counsel.  We are not losing anything in front

2    of the jury.

3              The jury is going to know, if you allow it, that

4    Widex is not relying on advice of counsel, or if you decide

5    not to allow it, there won't have been harm in the meantime

6    putting it in.

7              There is lots of things in this case, defenses

8    that we are not relying on.  You wouldn't ordinarily go

9    through a witness and say you are or aren't relying on best

10   mode, for example.  That is what is peculiar about this

11   question.

12             MR. MANDIR:  I am willing, if it is acceptable,

13   I am willing to just not talk about it at all and figure it

14   out later in the jury instructions.

15             THE COURT:  As I listen more closely to Ms.

16   Graham, I think I am being persuaded to her point of view.

17             MS. ECKSTEIN:  I understand what she is saying

18   about certain defenses.  There are so many defenses that can

19   be brought and aren't raised.  About willfulness, though,

20   whether a party is relying on advice of counsel is a

21   specific element of a willfulness inquiry.  It is a little

22   different than just a latches defense or some other,

23   inequitable conduct defense, a separate affirmative defense

24   in and of itself.  This is an element of the willfulness

25   inquiry.

Westermann - direct

1      THE COURT:  Well, I think she is simply

2  saying -- I don't want to mischaracterize what you are

3  saying -- we don't need to address that with this witness

4  right now because you can address it in the jury instruction

5  and in closings.

6      There is not going to be evidence that there was

7  affirmative reliance.

8      MS. ECKSTEIN:  As long as we have an

9  understanding that you are also not going to ask him.

10      MR. MANDIR:  I will not ask him.

11      MR. STEINBERG:  And that we can argue it.

12      THE COURT:  It depends.

13      MS. GRAHAM:  We will defer the issue until we

14  are in a better situation to address it.

15      THE COURT:  Okay.

16      MR. STEINBERG:  Fine.

17      (End of sidebar conference.)

18      THE COURT:  Sorry for the delay.  Is everyone

19  okay?

20      All right.

21  BY MR. STEINBERG:

22  Q.    Mr. Westermann, only a last question or two.  Since

23  your company has been put on notice that we've alleged that

24  your products infringed Dr. Levitt's patents, what have you

25  done to terminate or modify the infringement?

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| ENERGY TRANSPORTATION, INC., | : | Civil Action |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM DEMANT HOLDINGS A/S, et al., | : | |
| | : | |
| Defendants. | : | No. 05-422 (GMS) |

- - -

Wilmington, Delaware
Friday, January 25, 2008
9:00 a.m.
Fifth Day of Trial

- - -

BEFORE: HONORABLE GREGORY M. SLEET, Chief Judge

APPEARANCES:

　　　　　EDMOND D. JOHNSON, ESQ.
　　　　　Pepper Hamilton LLP
　　　　　　　-and-
　　　　　MARTY STEINBERG, ESQ.,
　　　　　BRIAN M. BUROKER, ESQ., and
　　　　　MAYA M. ECKSTEIN, ESQ.
　　　　　Hunton & Williams
　　　　　(Washington, D.C.)

　　　　　　　　　Counsel for Plaintiff

Christensen - cross

1    read the patent.  I didn't write the patent.

2    Q.    And the filter is all the way up here.  Right?

3    A.    The filter?

4    Q.    The filter?

5    A.    There is a filter, but the adaptive LMS filter

6    consists of all the three elements.  You cannot take them

7    away and say one element, another element.  All the three of

8    them go together to create the adaptive LMS filter.

9    Q.    Is the filter in a different box than the algorithm on

10   this chart?

11   A.    On the drawing?

12   Q.    Yes.

13   A.    It's indicated in a different box.

14   Q.    Now, you said that when you had the Jump 2 and the

15   Jump 3 platforms which included feedback cancellation,

16   patent searches were performed.  Isn't that your testimony?

17   A.    I think my testimony was that it included feedback

18   reduction.  But I said that patent searches were performed,

19   yes.

20   Q.    Did you do the patent search?

21   A.    I did not personally do the patent search.  We had, I

22   think I explained that we had a patent firm doing that.

23   Q.    But you are clear here that the company is not

24   offering any opinion of a patent counsel that it doesn't

25   infringe.  Correct?

Christensen - cross

1      MR. GRAMENOPOULOS:  Objection.  Sidebar, please.

2      THE COURT:  Sure.

3      (The following took place at sidebar.)

4      MR. GRAMENOPOULOS:  Your Honor, I think the

5  simple answer is he doesn't work at Oticon.  This is a legal

6  position which he has no knowledge of.  He doesn't have any

7  competence to answer that on the stand.  It is a ridiculous

8  question.

9      MR. STEINBERG:  They want to get in through the

10  back door they did some sort of patent search and they got

11  this opinion they are not infringing and they are trying to

12  avoid this whole issue.  We deserve a clarification for the

13  jury that neither of these defendants are offering an

14  opinion of counsel.

15      THE COURT:  Did this witness talk about --

16      MR. STEINBERG:  Yes, he did.

17      THE COURT:  Is this the witness we were talking

18  about earlier?

19      MS. ECKSTEIN:  A different witness.

20      MR. STEINBERG:  But the same topic.

21      MR. GRAMENOPOULOS:  The fact that you do a

22  search and don't find anything, I think, is relevant to the

23  totality of the circumstances.  An opinion of counsel is a

24  different issue and it goes to whether you had an opinion of

25  counsel on the specific Levitt patents.  We never found the

Christensen - cross

Page 1029

1    Levitt patents, so therefore we don't have an opinion of

2    counsel.  Very simple.

3              MR. STEINBERG:  But the witness answered we used

4    a patent firm to do that search.

5              THE COURT:  I am going to disagree with you on

6    this, Mr. Steinberg, and sustain the objection.  But I will

7    let you pursue an appropriate line of inquiry with this

8    witness, that he is competent, to which he is competent to

9    respond.

10             MR. STEINBERG:  May I ask him if he is aware of

11   any opinions being offered in this case?

12             THE COURT:  He has not been offered to suggest,

13   I don't think -- unless I have not been listening well, and

14   I have been trying to listen reasonably well, I don't think

15   he has been offered for the purpose you ascribe to him.

16             MR. STEINBERG:  Thank you, Your Honor.

17             (End of sidebar conference.)

18             THE COURT:  We are going to get there, ladies

19   and gentlemen.

20             You may proceed, Mr. Steinberg.

21             I have sustained the objection, I should say.

22             MR. STEINBERG:  Yes, sir.

23   BY MR. STEINBERG:

24   Q.    Now, when a patent search was done, do you know if

25   they looked for prior patents that had the words feedback

# EXHIBIT 5

Page 1243

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

—  —  —

ENERGY TRANSPORTATION,          :  Civil Action
INC.,                           :
                                :
          Plaintiff,            :
                                :
      v.                        :
                                :
WILLIAM DEMANT HOLDINGS A/S,    :
et al.,                         :
                                :
          Defendants.           :  No. 05-422 (GMS)

—  —  —

Wilmington, Delaware
Tuesday, January 29, 2008
8:50 a.m.
Seventh Day of Trial

—  —  —

BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                and a Jury

APPEARANCES:

          EDMOND D. JOHNSON, ESQ.
          Pepper Hamilton LLP
               -and-
          MARTY STEINBERG, ESQ.,
          BRIAN M. BUROKER, ESQ., and
          MAYA M. ECKSTEIN, ESQ.
          Hunton & Williams
          (Washington, D.C.)

                              Counsel for Plaintiff

Page 1494

1   patent counsel opinion or litigation counsel opinion?

2           MR. JOHNSON:  And if it's prelitigation.  I

3   don't think it's prelitigation.

4           MR. MANDIR:  It's certainly not prelitigation

5   because we had no idea.  We didn't know about these patents

6   that were asserted until we got sued.  So it's certainly

7   post-litigation.  There is no question about that.

8           THE COURT:  So neither party got an opinion of

9   counsel.

10          MR. ROMARY:  Before.

11          MR. MANDIR:  Before, absolutely not.

12          MR. ROMARY:  No.

13          THE COURT:  What is your view of that,

14  Mr. Steinberg?

15          MR. STEINBERG:  Well, Your Honor, there is

16  apparently no written opinion of counsel either and no

17  separate patent attorney who has opined.  I mean we're

18  talking about litigators, trial lawyers saying no, I don't

19  think he did it.

20          THE COURT:  Yes.

21          MR. STEINBERG:  I don't think that qualifies.

22          THE COURT:  I don't know.  I don't either.  So

23  your position would be that this should be a factor listed

24  among the factors that the jury should consider.

25          MR. STEINBERG:  And we shouldn't distinguish

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-875 GMS |
| | ) | |
| LUCENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-876 GMS |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

## I.    INTRODUCTION

On March 30, 2007, the court conducted a pretrial conference in the above-captioned actions.

During the pretrial conference, the court heard brief oral argument on the parties' motions in limine

and reserved ruling on the following motions: (1) The defendants' motion to preclude Telcordia

Technologies, Inc. ("Telcordia") from presenting certain damages theories; (2) the defendants'

motion to preclude Telcordia from arguing that the invention of U.S. Patent No. Re. 36,633 (the

"'633 patent") was conceived before November 4, 1991, and from introducing uncorroborated

evidence of prior conception; (3) the defendants' motion to preclude Telcordia from introducing

evidence of Cisco Systems, Inc.'s ("Cisco") decision not to disclose advice of counsel and Lucent

Technology, Inc.'s ("Lucent") failure to seek legal advice; (4) the defendants' motion to preclude

Telcordia from introducing into evidence and/or relying upon at trial, the license and settlement agreements from *Bell Communications Research Inc. v. Fore Systems, Inc.*, 113 F. Supp. 2d 635 (D. Del. 2000) (the "*Fore* Case"); (5) Lucent's motion to preclude Telcordia from referring to the recent merger between Lucent and Alcatel S.A.; and (6) Telcordia's motion to preclude testimony of alleged inequitable conduct during prosecution of the '633 patent based upon the Gonzales article or private communications with France Telecom. Having considered the arguments raised in the parties' submissions (D.I. 302, 304,309-315, 326,327) and during the pretrial conference, the court will: (1) grant in part and deny in part the defendants' motion to preclude certain damages theories; (2) deny the defendants' motion regarding the introduction of uncorroborated evidence of prior conception; (3) grant in part and deny in part the defendants' motion regarding the advice of counsel; (4) grant the defendants' motion to exclude any reference to or reliance on the settlement and licensing agreements in the *Fore* Case; (5) grant Lucent's motion regarding the merger between Lucent and Alcatel S.A.; and (6) deny Telcordia's motion to preclude testimony regarding inequitable conduct during prosecution of the '633 patent. The court bases its rulings on the following reasons, among others.

## II.     DISCUSSION

### A.     The Defendants' Motion to Preclude Certain Damages Theories

The defendants contend that Telcordia should be precluded from seeking damages on revenue from products that do not infringe the '633 patent, which is directed to a synchronous residual time stamping ("SRTS") function. According to the defendants, their products, which they refer to as "boxes," can be outfitted with hundreds or thousands of different circuit cards, and the accused SRTS functionality resides on optional cards, which are priced, invoiced and sold separately from

2

the boxes into which they are inserted. Specifically, Cisco contends that it has sold only 3,109 SRTS cards and, as a result, a maximum of 3,109 of its boxes could potentially infringe. Cisco further contends that Telcordia seeks damages for over 200,000 of Cisco's boxes, including those that are not outfitted with SRTS-capable cards.

Likewise, Lucent contends that, although Telcordia seeks to offer a damages number based on all of Lucent's sales revenue for CBX boxes since April 2000, it never sold an SRTS-capable card to any customer for use with CBX and did not offer such a card until 2004. Lucent further contends that Telcordia seeks to offer a damages number based on all sales of its GX boxes since April 2000, even though only three customers bought an SRTS-capable card for those boxes, Lucent has not sold such a card since 2002, and the card was discontinued in 2004.

In sum, the defendants argue that Telcordia seeks damages for sales of their boxes to customers that never purchased any SRTS-capable cards, and who cannot possibly infringe the asserted claims. The defendants cite to *Golden Blount, Inc. v. Robert H. Peterson, Co.*, 438 F.3d 1354 (Fed. Cir. 2006) in arguing that Telcordia cannot recover for their sales of boxes, since there is no direct infringement associated with the those sales.

In response, Telcordia asserts that the defendants' motion in limine is a disguised and belated summary judgment motion on the issue of inducement and contributory infringement under 35 U.S.C. §§ 271(b), (c), and (f), which the court should not consider at this late date. As to the merits, Telcordia asserts that all of the accused products should be included in the damages base, because the defendants make and sell boxes that include components that are especially made or adapted for practicing the accused SRTS invention of the '633 patent. In other words, Telcordia argues that the defendants' manufacture and sale of the SRTS-capable boxes alone constitutes contributory

infringement. To support its position Telcordia relies on *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409 (Fed. Cir. 1996).

In *Stryker*, a lost profits case, the Federal Circuit held that the district court did not err when it awarded damages for the sales of implants that were sold with an infringing distal sleeve. 96 F.3d at 1416. The Federal Circuit specifically pointed out that over 16,000 sales of the implant did not result in the implant with a distal sleeve being implanted in a patient. *Id.* However, the court affirmed the district court's award based on how the implant systems were marketed and sold. *Id.* The court found that the implant and distal sleeve were marketed as a "total system." *Id.* That is, the sales agent would attempt to sell the entire system, implant and sleeve, to a surgeon. *Id.* The surgeons purchasing the systems would make the decision whether or not to use the distal sleeve in surgery. Therefore, the surgeon needed the entire system available during surgery and, because of this, "a responsible agent would make sure that the sleeves were available in the operating room for the surgeon." *Id.* at 1417. Based on these facts, the court held that the plaintiff was entitled to damages for every system sold, "because the compensable injury had already occurred – when the [system] was supplied to the surgeon instead of the [plaintiff's implant]." *Id.*

In *Golden Blount*, the Federal Circuit held that the district court should have excluded dealer returns of the infringing devices, because they did not represent instances of direct infringement. 438 F.3d at 1372-73. There, the devices sold by the defendant did not infringe until they were assembled in a certain configuration. *Id.* at 1360. Of the devices that the defendant sold, customers allegedly returned 802 before they were assembled into an infringing configuration. *Id.* at 1372. In concluding that the plaintiff could not recover for the 802 returned devices, the court noted, "it is hornbook law that '[l]iability for either active inducement of infringement or contributory

4

infringement is dependent upon the existence of direct infringement.'" *Id.* (citations omitted). The court then determined "there would be 802 fewer acts of direct infringement and [the defendant] would be liable for 802 fewer acts of contributory or inducing infringement," if the 802 devices were returned before they were assembled into an infringing configuration. *Id.* at 1373.

After having considered the submissions and arguments of the parties, the court concludes that *Golden Blount*, not *Stryker*, is more on point with the facts of the present case. Here, like *Golden Blount*, the defendants have sold devices, i.e. boxes, that are incapable themselves of performing the function that allegedly infringes the '633 patent. As such, direct infringement can exist only for the boxes sold with the SRTS-capable cards, or the SRTS-capable cards that the defendants sold to customers. Put another way, the devices or boxes sold without the SRTS-capable cards cannot directly infringe, even though they have been adapted for practicing the accused SRTS invention, because they cannot practice the invention without the SRTS-capable card. Accordingly, the court concludes that Telcordia can recover damages only for SRTS-capable cards sold by the defendants, and not for the total number of boxes the defendants sold.

The defendants also contend that Telcordia should be precluded from introducing evidence regarding Cisco's foreign sales of allegedly infringing products. Cisco argues that its foreign sales are irrelevant because Telcordia cannot connect them to an allegedly infringing domestic activity. Specifically, Cisco argues that Telcordia did not ask for foreign sales information during discovery, and that Telcordia's expert has merely doubled his damages figure to account for allegedly-infringing foreign sales.

Conversely, Telcordia argues, with citations to the record, that Cisco manufactures and tests the accused products in the United States, a statutory act of infringement. Telcordia further argues

5

that Cisco's representations regarding its failure to seek discovery on foreign sales are disingenuous, noting that Cisco produced its world-wide revenue figures for the products-in-suit, and that its Rule 30(b)(6) witness authenticated and explained those figures.

After having considered the parties' submissions and arguments, the court agrees with Telcordia that it has shown evidence of damages for foreign sales of allegedly infringing products. The court further concludes that Cisco has not shown (or even argued) any prejudice, much less undue prejudice, or jury confusion, that would result from allowing Telcordia to present evidence of foreign sales. As such, the court will permit Telcordia to introduce into evidence Cisco's foreign sales.[1]

### B.    The Defendants' Motion to Exclude Evidence of Prior Invention

In this motion, the defendants first contend that Telcordia should be precluded from arguing that the invention claims in the '633 patent was conceived before November 4, 1991. In its answering brief, and at the pretrial conference, Telcordia represented to the court that it "is not arguing that the invention claimed in the '633 patent . . . was conceived before November 4, 1991, and it is not attempting to introduce any evidence, let alone uncorroborated evidence that the claimed invention was conceived before that date." (D.I. 310, at 1; see D.I. 337, at 70:10-16.) Instead, Telcordia intends to present evidence of the work of Drs. Lau and Fleischer (the inventors of the '633 patent) that was completed prior to August 26, 1991, to demonstrate that the invention of the

---

[1] In making its ruling, the court notes that Cisco can effectively cross-examine Telcordia's expert in order to determine whether he has merely "doubled" Cicso's United States sales to arrive at a foreign sales damages number, and whether he has excluded Cisco's United States sales and/or foreign sales of non-infringing products from his analysis. If Telcordia's expert has in fact "doubled" the damages number or failed to remove non-infringing products from his analysis, Cisco can use these facts to its advantage in arguing to the jury.

'633 patent was not taken from someone else. Given Telcordia's representations, the court will deny this part of the defendants' motion as moot.

The defendants further argue, however, that Telcordia should be precluded from presenting any "uncorroborated inventor evidence" regarding an earlier conception date for the '633 patent, because it is legally improper. (D.I. 304 Ex. 2, at 1, 3.) Telcordia counters that the evidence it will present is corroborated and, as a result, the court should deny the defendants' motion. The primary dispute between the parties is whether a June 6, 1991 memorandum from Dr. Lau may properly be considered to demonstrate the inventors' possession of key ideas regarding the SRTS invention.

The Federal Circuit developed a rule requiring corroboration "where a party seeks to show conception through the oral testimony of an inventor," because the court was concerned that "inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) (citations omitted). In order to determine sufficient corroboration, courts apply a "rule of reason" analysis and "examine[] all pertinent evidence to determine the credibility of the inventor's story." *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002). However, the Federal Circuit "does not require corroboration where a party seeks to prove conception through the use of physical exhibits." *Mahurkar*, 79 F.3d at 1577. When conception is being proven through physical exhibits, the concern that led to the development of the corroboration requirement no longer exists, because "[t]he trier of fact can conclude for itself what documents show, aided by testimony as to what the exhibit would mean to one skilled in the art." *Id.* at 1577-78.

Here, Telcordia has argued that it will use the June 6, 1991 memorandum from Dr. Lau to demonstrate that he possessed the key ideas of the invention of the '633 patent at the time of its writing. Thus, Telcordia is attempting to demonstrate an earlier conception date to rebut the defendants' invalidity claim through a physical exhibit, namely, the June 6, 1991 memorandum. Because the jury, aided by testimony as to what the memorandum would mean to one skilled in the art at the time, can determine for itself what the memorandum demonstrates, the court concludes that Telcordia is not precluded from presenting it as evidence. The court further concludes that any likelihood of jury confusion regarding the conception date of the '633 patent can be remedied by a proper limiting instruction. In other words, the court will permit Telcordia to present evidence on the June 6, 1991 memorandum, but will tell the jurors (through the use of a limiting instruction crafted by the parties) that they can consider the memorandum and accompanying testimony only as evidence to rebut the defendants' derivation of invention claim.

### C.    The Defendants' Motion to Exclude Evidence Regarding the Advice of Counsel

The defendants argue that Telcordia should be precluded from introducing evidence of their decision not to disclose advice of counsel pertaining to the patents-in-suit, or to argue that they did not properly seek legal counsel. Cisco specifically argues that Telcordia should not be permitted to introduce any evidence regarding its receipt and reliance on advice of counsel. Lucent specifically argues that Telcordia should not be permitted to introduce evidence regarding its failure to obtain advice of counsel. The court has distilled the parties' arguments into the following two considerations: (1) whether the jury may consider the fact that Cisco has obtained but not produced

any legal opinions or advice;[2] and (2) whether the jury may consider the fact that Lucent has not

obtained any legal opinions or advice. Both parties rely on the Federal Circuit's decision in *Knorr-*

*Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corporation*, 383 F.3d 1337 (Fed. Cir. 2004)

(en banc), as well as subsequent decisions from the Federal Circuit and district courts.

In *Knorr-Bremse*, the Federal Circuit "resolve[d] . . . the question of whether adverse

inferences of unfavorable opinions can be drawn [in a willful infringement analysis when a

defendant has failed to obtain or produce a exculpatory opinion of counsel.]" *Knorr-Bremse*, 383

F.3d at 1347. As to that question, the court held that it is not appropriate for the trier of fact to draw

an adverse inference and overruled precedent authorizing such an inference. *See id.* at 1344. The

Federal Circuit, however, expressly declined to resolve the question of whether "the trier of fact,

particularly a jury, can or should be told whether or not counsel was consulted (albeit without any

inference as to the nature of the advice received) as part of the totality of the circumstances relevant

to the question of willful infringement." *Id.* at 1347. Therefore, *Knorr-Bremse* left untouched the

totality of the circumstances standard that the jury may consider in its willful infringement analysis.

Since that decision, the Federal Circuit and several district courts have addressed the issue

left untouched by *Knorr-Bremse*. Generally, the cases seem to fall into two situations: (1) cases in

which the defendant obtained an opinion of counsel, but has asserted the attorney-client privilege

to withhold the opinion; and (2) cases in which the defendant has failed to seek or obtain an opinion

---

[2] During the pretrial conference, and in its briefing, Telcordia argued that Cisco had not obtained any opinions of counsel. (D.I. 337, at 87:1-88:3.) As expected, Cisco maintained that it had obtained legal advice regarding the patents-in-suit. To resolve the issue, the court ordered Cisco to produce for in camera review a sampling of documents that it would rely on as opinions of counsel. Cisco filed those documents on April 16, 2007. After having reviewed the documents, the court concludes that they constitute opinions of counsel received by Cisco in this litigation.

of counsel. In the latter situation, subsequent cases applying *Knorr-Bremse* have held that "[t]he fact that no opinion of counsel on the issue of infringement was acquired by [the] defendant may be considered by the trier of fact in its willful infringement analysis, but no inference may be drawn to suggest that such an opinion, had it been acquired, would have been unfavorable to [the] defendant." *IMX, Inc. v. LendingTree, LLC*, No. Civ. 03-1067-SLR, 2006 WL 38918, at *1 (D. Del. Jan. 6, 2006); *see Engineered Products Co. v. Donaldson, Co., Inc.*, 147 F3ed. Appx. 979, 991 (Fed. Cir. Aug. 31, 2005) (unpublished). This outcome makes sense, because one of the factors that the jury must consider in its willfulness analysis is "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992). Thus, permitting the plaintiff to tell the jury that the defendant did not obtain an opinion of counsel may indicate to the jury that the defendant did not act properly. *See Third Wave Technol. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 1016-17 (W.D. Wis. 2005) (*Knorr-Bremse* "did not say that it was improper for a jury to infer from [the] infringer's failure to consult counsel that the infringer had no prior knowledge of its opponent's patents or that it had not acted properly in other respects.")

On the other hand, in the former situation, the Federal Circuit has stated that the threshold showing a patentee must make in establishing willful infringement "cannot be satisfied merely by proof that the accused is asserting the attorney-client privilege to withhold an opinion of counsel." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1368 (Fed. Cir. 2006). This also makes sense to the court, because it can envision only one inference that the jury will draw from learning that the defendant has consulted counsel and obtained advice, but has chosen to assert the attorney-client privilege: that the opinion received by the defendant was unfavorable. This is

precisely the inference that would run afoul of the Federal Circuit's reasoned opinion in *Knorr-Bremse*, and an inference that this court will not permit the jury to draw. Given the foregoing discussion, the court will permit Telcordia to tell the jury that Lucent did not seek legal counsel with respect to the '633 patent,[3] but prohibit Telcordia from introducing evidence of Cisco's decision not to disclose advice of counsel pertaining to the patents-in-suit. *See McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 434 F. Supp. 2d 810 (E.D. Cal. 2006) (distinguishing cases in which the defendant consulted counsel and received an opinion but chose to assert the attorney-client privilege from cases in which the defendant did not seek legal counsel). Therefore, the court will grant in part and deny in part the defendants' motion.

**D.    The Defendants' Motion to Exclude Evidence Regarding the License and Settlement Agreements Resulting from its Litigation of *Bell Communications Research Inc. v. Fore Systems, Inc.***

In this motion, the defendants ask the court to exclude evidence and argument from Telcordia regarding the license and settlement agreements in the *Fore* Case. The defendants rely on Rule 408 of the Federal Rules of Evidence. Rule 408 provides that a license agreement may be excluded from evidence "where it (1) was reached under a threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation infringement." *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, No. C.A. 02-148 GMS, 2003 WL 22387038, at *2 (citations omitted). In determining whether the license agreement meets

---

[3] Lucent argues that Telcordia should be precluded from telling the jury that it did not seek legal counsel regarding the '633 patent because it had no notice of the '633 patent until Telcordia filed its amended complaint, nearly one year into the litigation. The court is not persuaded by this argument and finds that Lucent's notice of the '633 patent, or lack thereof, is not proper for a determination on a motion in limine, because it is a factual issue for the jury to decide after hearing the evidence presented.

11

any of the above-stated requirements, the court must look at the context in which the agreement was reached. *Id.* (citing *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988)).

In the present case, the license and settlement agreements between BellCore and Fore Systems arose as a direct result of the settlement of the *Fore* Case. Thus, they fall squarely within the prohibition of Rule 408. More important, however, is the fact that the license and settlement agreements provide a license for 78 patents, only 3 of which are involved in the present lawsuit. Permitting Telcordia to put the agreements into evidence and rely on them has the potential to confuse or mislead the jurors, because they do not paint an accurate picture of the value of the patents at issue in the present litigation. In addition, the jurors may be tempted to speculate as to the reasons the agreements contain licenses for patents that are not at issue here – business reasons known to only the parties who are signatories to those agreements. Because the license and settlement agreements arose as a result of the settlement in the *Fore* Case, and because permitting the jurors to hear evidence and testimony regarding agreements that pertain to 75 patents not at issue in this lawsuit has the potential to mislead or confuse them, the court will not permit Telcordia to introduce or rely upon the license and settlement agreements.[4]

---

[4] Telcordia argues that, at a minimum, the license and settlement agreements are relevant and probative of the non-obviousness of the patents-in-suit. The court cannot agree with Telcordia, and questions its reliance on *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 1360 (Fed. Cir. 1999). Here, Telcordia's agreements arose as a result of litigation. In *WMS Gaming*, the Federal Circuit did not state that the patentee's license agreements with competitors were entered into as a result of litigation, in concluding that they were "strong indicia" of non-obviousness. Because *WMS Gaming* does not stand for the proposition that all license agreements, no matter in what context they arise, are "strong indicia" of non-obviousness, the court places no weight on Telcordia's citation to and reliance on that case.

**E.    Lucent's Motion to Exclude any Reference to Its Merger with Alcatel S.A.**

Lucent contends that the court should not permit any reference to its merger with Alcatel S.A. ("Alcatel"), because it is not relevant to the disputed issues, and because it is highly prejudicial to Lucent. Specifically, Lucent contends that no Alcatel USA product has ever been in dispute here, because Alcatel USA has received a stay of Telcordia's case against it, pursuant to its statutory right. Lucent further contends that any reference to the merger would be misleading and confusing to the jury.

After having considered the parties positions, the court agrees with Lucent and further finds that Telcordia has not presented any reason for the court to allow the jury to hear that Lucent and Alcatel have merged. Put another way, Telcordia has not demonstrated to the court that the Lucent and Alcatel merger has any tendency of making any disputed fact more or less probable. First, although a merger has occurred, Telcordia does not dispute that Lucent and Alcatel USA are separate subsidiaries within the Alcatel-Lucent company.

In addition, while Telcordia maintains that the merger is relevant to Lucent's defense of laches, the court is not persuaded, especially considering that the Alcatel-Lucent merger did not occur until December 1, 2006 – more than two years after Telcordia filed this lawsuit. Laches is defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc). For a defense of laches, the defendant has the burden of proving that: (1) the plaintiff delayed in filing suit for an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and (2) the defendant

suffered material prejudice or injury as a result of the plaintiff's delay. *Id.* at 1028.  Neither of the above-stated factors that Lucent must prove to establish laches has any relevance to a merger with Alcatel that occurred after the initiation of this action. *See id.* at 1038 (explaining that courts must look for a change in the economic position of the alleged infringer *during* the period of delay) (emphasis added).  Accordingly, the merger has no bearing on Lucent's laches defense.

Finally, Telcordia contends that the merger is relevant to the biases of witnesses from France Telecom that Lucent intends to call to support its case.  Indeed, Telcordia contends that, at the outset of this litigation, France Telecom witnesses had biases in favor of Alcatel which, because of the merger, "directly translate[]" to Lucent.  (D.I. 312, at 2.)  Putting aside the fact that the allegedly biased witnesses are employees and former employees of France Telecom, a company that is not a party to this case, nor legally affiliated with any of the parties in this case, the court cannot fathom how any bias toward Alcatel during depositions that occurred *before* the merger between Alcatel and Lucent now "directly translates" to Lucent.   Nor has Telcordia provided any explanation for this theory of translating bias, which the court finds untenable.

In sum, after having considered all arguments and submissions, the court concludes that any marginal probative value of the merger "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Fed. R. Evid. 403.  The court, therefore, will grant Lucent's motion.

**F.     Telcordia's Motion to Preclude Testimony of Alleged Inequitable Conduct During Prosecution of the '633 Patent**

Telcordia's motion in limine asks the court to preclude testimony relating to alleged inequitable conduct by the inventors of the '633 patent. The court, however, need not address the merits of this motion, because it has determined that the motion is not a motion in limine. Rather, it is a stealth motion for summary judgment, which this court does not permit to be raised during the pretrial conference of civil patent cases.[5] This is evidenced by the fact that Telcordia does not discuss anywhere in its motion how it will be prejudiced if the court permits the defendants to introduce testimony regarding the Gonzales article and communications with France Telecom. Instead, reading like a motion for summary judgment, the motion states that it is legally incorrect for the defendants to introduce testimony regarding this evidence. (D.I. 302, at 1.) Moreover, Telcordia made the following summary judgment argument with respect to the motion during the pretrial conference: "they [the defendants] are relying on two types of conduct where there is controlling Federal Circuit authority which says that type of conduct does not constitute inequitable conduct *as a matter of law*." (D.I. 337, at 96:22-25.) Further, the motion does not discuss the exclusion of evidence or argue that certain testimony should be excluded under the Rules of Evidence, but asserts that an entire claim should be precluded. In other words, the structure of the motion and language used by Telcordia demonstrate to the court that Telcordia is seeking summary judgment under the

---

[5] The court's summary judgment process is one that is detailed and well-known to the parties – indeed it is part of their scheduling order. In accordance with the Scheduling Order (D.I. 22 ¶ 8; D.I. 83 ¶ 6) in the present case, the parties filed letter requests to submit motions for summary judgment, which the court then addressed during a teleconference. While Telcordia requested permission to move for summary judgment on seven different issues, it did not request to move for summary judgment on the inequitable conduct issue. Accordingly, it is too late in the day for Telcordia to request summary judgment on the inequitable conduct issue for the first time in a motion in limine.

15

guise of a motion in limine. Given the foregoing and Telcordia's failure to comply with the court's process, the court will deny Telcordia's motion.

## III.    CONCLUSION

For the reasons stated in the court's discussion, IT IS HEREBY ORDERED that:

1.    The defendants' Motion in Limine Number 1 Re: Unsupported Damages Theories (D.I. 304 Ex. 1) is GRANTED in part and DENIED in part. The motion is granted with respect to the defendants' total boxes sold and denied with respect to Cisco's foreign sales.

2.    The defendants' Motion in Limine Number 2 Re: Uncorroborated Evidence of Conception (D.I. 304 Ex. 2) is DENIED.

3.    The defendants' Motion in Limine Number 3 Re: Advice of Counsel (D.I. 304 Ex. 3) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Cisco and DENIED with respect to Lucent.

4.    The defendants' Motion in Limine Number 4 Re: *Telcordia v. Fore Systems* License and Settlement Agreements (D.I. 304 Ex. 4) is GRANTED.

5.    Lucent's Motion in Limine Number 5 Re: References to the Alcatel-Lucent Merger (D.I. 304 Ex. 5B) is GRANTED.

6.    Telcordia's Motion in Limine Number 4 to Preclude Testimony on Alleged Inequitable Conduct During Prosecution of the '633 Patent Based upon the Gonzales Article or Private Communications with France Telecom (D.I. 302) is DENIED.


Dated: April 24, 2007                                    /s/ Gregory M. Sleet
_____    UNITED STATES DISTRICT JUDGE

17