# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

June 16, 2008

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, Delaware 19801

**VIA ELECTRONIC FILING**

Re: *Amgen Inc., et al. v. ARIAD Pharmaceuticals, et al.,*
C.A. No. 06-259-MPT

Dear Judge Thynge:

We write on behalf of defendants and counterclaim plaintiffs (collectively, "ARIAD"). Although ARIAD is aware that the local rules do not contemplate the submission of sur-replies for the recently-concluded round of *Daubert* briefing, ARIAD respectfully requests that the Court afford it an opportunity to respond to Amgen's insinuations in one of its reply briefs (D.I. 680) that ARIAD counsel acted improperly in instructing a deponent — Dr. Joel Pomerantz — not to answer certain questions at a recent deposition. Because Amgen fails to explain the special context of and basis for those instructions, which were unique to this deposition, its insinuation that ARIAD counsel acted improperly is highly misleading and unfair. We regret that because of Amgen's failure to supply the Court with the requisite context, we are now compelled to burden the Court with this submission. We feel, however, that the implicit attack on the professionalism of ARIAD's counsel requires us to set forth the relevant background and context in some detail.

As ARIAD noted in its memorandum in opposition to Amgen's motion to preclude (D.I. 630), Dr. Joel Pomerantz, a non-testifying, consulting expert, was retained to determine whether the administration of Enbrel to relevant cells exhibiting NF-κB activity induced by tumor necrosis factor ("TNF") inhibited that induced activity. To answer the question posed to him, Dr. Pomerantz conducted a series of experiments using well-known, reliable biochemical assays, and recorded the results of those experiments in a laboratory notebook. Those experiments showed that Enbrel inhibits TNF-induced NF-κB activity. ARIAD's testifying expert on infringement, Dr. Kathryn Calame relied on the results of those experiments as support for her opinion that the administration of Enbrel infringes the asserted claims of the patent-in-suit.

The Honorable Mary Pat Thynge
June 16, 2008
Page 2

Pursuant to a stipulation governing expert discovery (the "Expert Discovery Stipulation" (*see* Exhibit 1)), Dr. Pomerantz's complete notebook was produced to Amgen.[1] And although the Expert Discovery Stipulation also conferred upon the parties the right to depose persons who performed "scientific or medical testing" on behalf of a testifying expert (*id.* ¶ 1), the parties ultimately agreed to forgo such discovery. In particular, at the end of February 2008, the parties "agreed that Amgen w[ould] not proceed with Dr. Pomerantz's deposition," but that "[i]f ARIAD decides to call Dr. Pomerantz as a witness, [ARIAD] agrees to make him available for deposition." (Exhibit 2, 2/27 – 2/26/2008 Lelutiu-Sernel email string.)

On April 7, 2008, however, after the close of expert discovery and just days before the deadline for dispositive and *Daubert* motions, Amgen "demand[ed]" Dr. Pomerantz's deposition. (Exhibit 3, 4/7/2008 Sernel letter.) On April 10, counsel for ARIAD responded to the April 7 letter, explaining that, while ARIAD still had no intention of calling Dr. Pomerantz at trial, ARIAD would agree to make him available for a 3-hour deposition. (Exhibit 4, 4/10/2008 Greenwald letter.) To prevent Amgen from turning Dr. Pomerantz's deposition — the right to which Amgen had freely waived in February — into a fishing expedition, ARIAD explained — on more than one occasion — that Dr. Pomerantz would be produced only upon "*explicit assurance that [Amgen's] questions will be limited to how he performed the experiments described in his notebook and how he recorded their results.*" (*Id.* (emphasis added); Exhibit 5, 4/22/2008 Greenwald letter ("our willingness now to give up the benefit of that agreement [to forgo Dr. Pomerantz's deposition] depends entirely on whether this deposition . . . will be reasonable in length *and focus, or whether instead, it will explore topics other than basic, objective facts concerning how Dr. Pomerantz performed his experiments and recorded their results.*").)

Critically, counsel for ARIAD made clear to counsel for Amgen during a subsequent oral meet-and-confer that, to ensure that Amgen would not venture beyond the limited areas as to which Dr. Pomerantz's testimony was relevant, ARIAD would instruct Dr. Pomerantz not to answer questions that went beyond those areas. Counsel for Amgen confirmed his understanding that counsel for ARIAD was making the ability to interpose instructions concerning scope was a fundamental basis upon which it would agree to allow Amgen to proceed with Dr. Pomerantz's deposition, several months after it had waived its entitlement thereto. (Exhibit 6, 5/7/2008 Sernel letter ("You have indicated that you will allow Dr. Pomerantz to provide testimony regarding his relevant background and the details of the experiments, including but not limited to what was done, how it was done, and why it was done. We do not agree that ARIAD is permitted arbitrarily to limit the scope of the deposition, *but understand that it is your position that you may interpose scope objections and instructions.*") (emphasis added)).

At Dr. Pomerantz's deposition, after again reiterating on the record that Dr. Pomerantz's testimony would be limited to the topics formerly identified and that Dr.

---

[1] Because Dr. Pomerantz is not expected to testify at trial pursuant to Federal Rules of Evidence 792, 703 or 705, he did not prepare a Fed. R. Civ. P. 26 expert report.

The Honorable Mary Pat Thynge
June 16, 2008
Page 3

Pomerantz would be instructed not to answer extraneous questions (Exhibit 7, Pomerantz Dep. at 6:4-10:9),[2] counsel for ARIAD permitted Dr. Pomerantz to answer more than 500 questions concerning how Dr. Pomerantz performed his experiments and recorded their results in his notebook.  And although Amgen now claims that counsel inappropriately "instructed Dr. Pomerantz not to answer nearly three dozen relevant questions" (D.I. 680 at 4-5; *see id.* at 9 n.20, 9-10, 10 n.23) out of the more than 500 questions that were asked, the reality is that all the questions Dr. Pomerantz was instructed not to answer suffered from one or more of the following deficiencies:  (1) they concerned the substance of communications between Dr. Pomerantz and counsel for ARIAD, which the parties had expressly agreed would be off-limits (*e.g.,* Exhibit 7, Pomerantz Dep. at 12:23-13:6, 13:20-25, 19:9-18, 22:20-23:2, 24:17-21, 26:23-27:13, 32:23-33:1, 39:21-40:8, 78:2-8, 87:15-23, 89:1-16, 96:17-97:16, 113:5-13); (2) they concerned topics outside the clearly agreed upon scope of this deposition of a non-testifying expert:  *i.e.,* the compensation Dr. Pomerantz received for performing consulting work for ARIAD, when Dr. Pomerantz performed his consulting work, whether Dr. Pomerantz ever read the '516 Patent or Dr. Pomerantz's undergraduate advisors (*id.* at 14:18-15:7, 29:23-30:18, 31:7-13, 123:8-12); and (3) they called for expert testimony on, among other things, the discovery of NF-κB, Enbrel's mechanism of action, claim construction issues, statistics, the academic reputation of Amgen's experts or the administration of Enbrel to live patients (*id.* at 59:9-13, 64:18-21, 67:6-68:17, 83:4-84:3, 86:4-20, 92:6-12, 101:7-12, 103:16-20, 110:10-111:3, 122:4-16, 128:7-129:2).

Even if the interposition of instructions were somehow relevant to the issues raised by Amgen's motion — which it is not — ARIAD respectfully submits that it is wrong for Amgen to insinuate that counsel for ARIAD acted inappropriately, particularly without providing the Court any part of the relevant context.   The record of expert depositions defended in this action will reveal that counsel for ARIAD has scrupulously adhered to the principles governing objections to deposition questions that apply in federal court and in this Court in particular.

Respectfully,

/s/ *John G. Day*

John G. Day

JGD: nml
Attachments

cc:     David Greenwald, Esquire (via electronic mail; w/attachments)
        Melanie K. Sharp, Esquire (by hand and via electronic mail; w/attachments)
        Marcus E. Sernel, Esquire (via electronic mail; w/attachments)

---

[2] *See* Exhibit 1 ¶ 3 ("The parties expressly agree . . . [that] they will not seek discovery into the substance of . . . any communications with counsel regarding the expert report . . . .".)

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) | |
|           Plaintiffs, | ) | C.A. No. 06-259-MPT |
|    v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) | |
| Defendants. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | ) ) ) ) ) ) ) | |
|           Counterclaim Plaintiffs, | ) ) ) | |
|    v. | ) ) | |
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) | |
|           Counterclaim Defendants. | ) ) ) | |

## STIPULATION REGARDING EXPERT DISCOVERY

The parties stipulate and agree that:

      1.     The parties shall produce their respective expert witnesses' final reports and curricula vitae, and shall also set forth their hourly rate charged in the case, any

prior expert retentions in the past 4 years in which the expert has given testimony to the extent not otherwise reflected in their CV (but the parties agree that they need not disclose their respective expert witnesses' engagement letters), and shall either identify (including by Bates number where available) or, if the document is not already in the possession of the opposing party, produce a clean copy of those documents that the expert witnesses relied on or considered in the course of preparing and rendering their opinions. In addition, the parties shall produce all scientific test results and all underlying data and documents for any scientific or medical tests performed or relied upon by a party's expert witness in connection with or in furtherance of this action. If a party's expert witness relies upon scientific or medical testing performed in connection with or in furtherance of this action by another person, the party shall also produce all other scientific or medical tests performed by that other person(s) whose testing is relied upon, which testing was performed in connection with or in furtherance of this action, as well as all underlying data and documents for any such test, and shall make that other person(s) available for deposition. The parties shall also be entitled to seek discovery regarding the substance of any communications concerning such scientific or medical tests between the testifying scientific expert and any other expert, person, or consultant who participated in the tests. Except as provided in paragraph 3 below, neither drafts, nor the content of notes or comments on any drafts, of any of the expert reports shall be discoverable, provided, however, that nothing in this agreement is intended to bar discovery of documents that are otherwise discoverable from a party or third party outside of the context of expert discovery or intended to alter the otherwise

2

applicable rules regarding a party's ability or inability to obtain prior testimony, reports or affidavits submitted by an expert witness in other actions.

2.    The parties need not produce, nor shall any party seek to discover, experts' notes, drafts of expert reports, affidavits, declarations or other written statements relating to this litigation or the content of communications with counsel relating to this litigation (collectively "expert materials"), except that the parties may pose deposition questions to experts regarding the substance of any legal or factual assumptions that the experts were asked to make in the course of preparing and rendering their opinions  The parties and experts do not have any obligation to retain expert materials.

3.    Subject to the restrictions set forth above, the parties shall be entitled to pose deposition questions regarding the process generally undertaken by experts in preparing reports, such as who prepared each section of the report, how much time was spent drafting the report, how many drafts of the report were prepared, or whom the expert spoke with during the course of drafting a report, and pose deposition questions regarding the content of any communications between any expert and any fact witness at any time in connection with preparation for this action. The parties expressly agree, however, that notwithstanding the provisions of this agreement, they will not seek discovery into the substance of any drafts of expert reports, the substance of any comments made on drafts of expert reports, the substance of any proposed edits to expert reports, the substance of any communications between a retained or a potential expert regarding engagement of the expert, the substance of any communications with

3

counsel regarding the expert report, or the substance of any discussions with counsel in

preparation for the expert's deposition, except as otherwise set forth above.

Dated: December 19, 2007

David Greenwald
CRAVATH, SWAINE & MOORE
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Tel: (212) 474-1922
dgreenwald@cravath.com

*Attorneys for ARIAD Pharmaceuticals, Inc.,
Harvard University, MIT and the Whitehead
Institute*

Dated: December 21, 2007

Jamie H. McDole
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601-6636
Tel: 312-861-2048
jmcdole@kirkland.com

*Attorneys for Amgen, Inc., Immunex
Corporation, Amgen USA Inc., Amgen
Manufacturing, Limited, and Immunex Rhode
Island Corporation*

4

Exhibit 2

Radu Lelutiu
04/07/2008 05:17 PM

To  David Greenwald/NYC/Cravath@Cravath

cc

bcc  April B. Kim/NYC/Cravath

Subject  Fw: Expert depositions schedule



View Threads

—— Forwarded by Radu Lelutiu/NYC/Cravath on 04/07/2008 05:17 PM ——



Marc Sernel
<msernel@kirkland.com>
02/27/2008 11:15 AM

To  Radu Lelutiu <RLelutiu@cravath.com>

cc  David Greenwald <DGreenwald@cravath.com>

Subject  Re: Expert depositions schedule

Radu,

I can confirm most of what is in your e-mail below, with a few revisions:

-- I believe that the party taking the deposition should have the discretion to choose the location within the city specified by the party defending the deposition. For example, for those depositions occuring in NY, we would expect to take those at Kirkland's NY office. Likewise, for example, we will agree to produce Dr. Ciechanover at your offices, or Dr. Wall at Irell's offices in LA, if that is your preference. We of course are happy to host any deposition that occurs in a city in which we have an office, but I think the party taking the deposition should be able to decide where they want to take it.

-- I am OK with 9:30 being the default start time for the depositions, and we can discuss as the depositions approach whether we may want to agree to an alternative start time for any particular deposition.

-- Per our discussion, let's agree that we will have up to 10 hours of deposition time with Dr. Ravetch, and you will have up to 10 hours of deposition time with Dr. Greene.

-- Please let me know when you plan to produce Dr. Ravetch at your earliest convenience. We are tentatively planning that this deposition will commence on either March 31 or April 1 in NY.

Please confirm that we have agreement on these revisions/additions to your email.

Thanks -- Marc

Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph
Chicago, IL 60601
(312) 861-2389
msernel@kirkland.com

Radu Lelutiu <RLelutiu@cravath.com>

02/26/2008 05:14 PM

To Marc Sernel <msernel@kirkland.com>

cc David Greenwald <DGreenwald@cravath.com>

Subject Re: Expert depositions schedule

Dear Marc:

This will confirm our conversation of a few hours ago about the expert deposition schedule.

Ciechanover - March 13 (New York - Kirkland offices)
Livingston - March 17 (Boston - location to be proposed by Kirkland)
Manbeck - March 20 (New York - Cravath offices)
Koch - March 20 (Chicago - Kirkland offices; or Ann Arbor - location to be proposed by Cravath)
Jackson - March 21 (Chicago - Kirkland offices; or Louisville - location to be proposed by Cravath)
Sullivan - March 25 (New York - Cravath offices)
Calame - March 26 (New York - Cravath offices)
Wall - March 27 (Los Angeles - Kirkland offices)
Bratic - April 1 (Houston - location to be proposed by Cravath)
Greene - April 3 (San Francisco - Kirkland offices)
Mossinghoff - April 4 (D.C. - Kirkland offices)

I assume you are amenable to hosting the depositions of Amgen's expert witnesses in cities where your firm has an office. For the sake of convenience, we would propose 9:30 a.m. as the default start time for all expert depositions, subject to subsequent adjustment.

We agreed that Amgen will not proceed with Dr. Pomerantz's deposition, and that ARIAD will not proceed with the deposition of Dr. Greene's assistant. If ARIAD decides to call Dr. Pomerantz as a witness, we agree to make him available for deposition. Amgen agrees to a similar protocol for Dr. Greene's assistant.

We will get back to you regarding Jeff Ravetch. As we discussed, if Amgen decides to pursue more than 7 hours with Dr. Ravetch, we will request a similar arrangement regarding Dr. Greene.

Regards.

Radu A. Lelutiu
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue, 4210
New York, NY 10019
(212) 474-1420
(212) 474-1000 (fax)

Marc Sernel <msernel@kirkland.com>

02/25/2008 04:40 PM

To Radu Lelutiu <RLelutiu@cravath.com>

cc

Subject Re: Expert depositions schedule

Radu – Let's plan to do this tomorrow afternoon sometime.  How is 3 PM central (4 PM eastern)?  Thanks
– Marc

Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph
Chicago, IL 60601
(312) 861-2389
msernel@kirkland.com

Radu Lelutiu <RLelutiu@cravath.com>

02/25/2008 12:51 PM

To Marc Sernel <msernel@kirkland.com>

cc

Subject Expert depositions schedule

Marc:

Do you have time today or tomorrow to finalize the expert depositions schedule?  Let me know when I can
call you.

Thanks.

Radu A. Lelutiu
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue, 4210
New York, NY 10019
(212) 474-1420
(212) 474-1000 (fax)

This e-mail is confidential and may be privileged. Use or
disclosure of it by anyone other than a designated addressee is
unauthorized. If you are not an intended recipient, please delete
this e-mail from the computer on which you received it.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is confidential and may be privileged. Use or
disclosure of it by anyone other than a designated addressee is
unauthorized. If you are not an intended recipient, please delete
this e-mail from the computer on which you received it.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Exhibit 3

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

| To Call Writer Directly: | (312) 861-2000 | Facsimile: |
| --- | --- | --- |
| (312) 861-2389 | | (312) 861-2200 |
| msernel@kirkland.com | www.kirkland.com | Dir. Fax: (312) 861-2200 |

April 7, 2008

**VIA E-MAIL**

David Greenwald
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019-7475

Re: *Amgen et al. v. ARIAD Pharmaceuticals, Inc.,* D. Del. Civil Action No. 06-259-MPT

Dear David:

I write regarding the deposition of Dr. Calame and the experiments purportedly conducted by Dr. Joel Pomerantz.

I wanted to put you on notice that, given the current state of the record, we intend to oppose admission of evidence and documents relating to the experiments set forth in the laboratory notebook bates-numbered ARI-KC00001-162. In short, we believe the deposition testimony provided by Dr. Calame establishes that she cannot lay the necessary foundation for the experiments and related documents to be admitted at trial.

Although our stipulation regarding expert discovery contemplated depositions of those persons who performed experiments to support testimony in this case, we reached agreement not to depose Dr. Pomerantz unless you decided to call him as a witness at trial. The reason why I raise this issue now is that if you have any intention of calling Dr. Pomerantz in an attempt to support admission of these experiments at trial, then we would demand that he be made available for deposition before dispositive motions are due in less than two weeks. If you do not provide Dr. Pomerantz for deposition in this timeframe, we will assume you are standing by your prior decision to rely solely on the testimony of Dr. Calame in an attempt to support the admissibility of these experiments. We reserve our right in either event to object to the admissibility of evidence regarding the experiments.

Please let me know your position on this issue as soon as possible.

Very truly yours,

Marcus E. Sernel

London    Hong Kong    Los Angeles    Munich    New York    San Francisco    Washington, D.C.

Exhibit 4

# CRAVATH, SWAINE & MOORE LLP

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1922

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

OF COUNSEL
CHRISTINE BESHAR

April 10, 2008

Amgen Inc. v. ARIAD Pharmaceuticals, Inc.,
No. 06-259-MPT

Dear Marc:

   I write in response to your April 7 letter regarding the experiments
conducted by Dr. Joel Pomerantz and Dr. Calame's reliance thereon.

   I do not understand the basis of your request for a deposition of Dr.
Pomerantz. As you note in your letter, we reached a reciprocal agreement not to depose
scientists who performed experiments whose results were reviewed and relied upon by
Drs. Calame and Greene. That agreement was predicated in part on our representation
that we did not intend to call Dr. Pomerantz as a witness at trial. That remains our
intention.

   Be that as it may, we will make Dr. Pomerantz available for a three hour
deposition at a location in Baltimore on the afternoon of May 12, starting at 2 p.m. We
will make him available for such a deposition only upon your explicit assurance that
your questions will be limited to how he performed the experiments described in his
notebook and how he recorded their results. Please let us know if you would like to

2

avail yourself of this opportunity, and, if so, whether you agree to so limit your
questioning.

Sincerely,

David Greenwald

Marcus E. Sernel
    Kirkland & Ellis LLP
        200 East Randolph Drive
            Chicago, IL 60601

Exhibit 5

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DeMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

OF COUNSEL
CHRISTINE BESHAR

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1922

April 22, 2008

Amgen, Inc. v. ARIAD Pharmaceuticals, Inc.,
No. 06-259-MPT

Dear Marc:

I write in response to your April 16 letter concerning Dr. Pomerantz's deposition.

As I stated in my April 10 letter, ARIAD has no present intention of calling Dr. Pomerantz at trial. Because ARIAD has not changed its position in this regard, we maintain our view that your request for a deposition (of any length) runs contrary to our reciprocal agreement —reached when you had already received and had weeks to review Dr. Pomerantz's complete lab notebook and Dr. Calame's expert report — to forgo depositions of non-testifying individuals who had performed experiments relied upon by a testifying expert.

The basis for the reasonable topical and durational limitations we wish to impose with respect to Dr. Pomerantz's deposition derives from this agreement. Although our December 19, 2007 Stipulation Regarding Expert Discovery conferred the right to depose individuals who performed "scientific or medical testing" relied upon by testifying experts, we agreed in February to forgo such depositions altogether. Hence, our willingness now to give up the benefit of that agreement depends entirely on whether this deposition — after the conclusion of the period for expert discovery — will be reasonable in length and focus, or whether instead, it will explore topics other than basic, objective facts concerning how Dr. Pomerantz performed his experiments and recorded their results. If you also wish to spend some of the half-day deposition asking him questions about his professional background, we will not object. But we will not consent to questioning concerning "everything relating to the experiments," as you propose.

2

       Please let me know if you wish to take Dr. Pomerantz's deposition on May 12, starting at 2 p.m., subject to the conditions set forth above and in my April 10 letter.   If we do not hear back within a week, we will let Dr. Pomerantz know that we will not require his time.

Sincerely,

David Greenwald

Marcus E. Sernel, Esq.
    Kirkland & Ellis LLP
       200 East Randolph Drive
         Chicago, IL 60601

BY EMAIL

Exhibit 6

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

| | | |
|---|---|---|
| To Call Writer Directly: | (312) 861-2000 | Facsimile: |
| (312) 861-2389 | | (312) 861-2200 |
| msernel@kirkland.com | www.kirkland.com | Dir. Fax: (312) 861-2200 |

May 7, 2008

**VIA E-MAIL**

David Greenwald, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019-7475

Re: *Amgen et al. v. ARIAD Pharmaceuticals, Inc.,* **D. Del. Civil Action No. 06-259-MPT**

Dear David:

I write to follow up on our meet and confer with respect to the Pomerantz and Ravetch depositions.

With regard to Dr. Pomerantz, we will proceed with his deposition next Monday, May 12, starting at 2:30 P.M at LAD Reporting, 10 North Calvert Street, Suite 141, Baltimore, MD 21202. We understand that you will only be producing Dr. Pomerantz for three hours (on the record) of deposition time. Assuming that Dr. Pomerantz is forthcoming and cooperative, we would expect to complete our deposition of Dr. Pomerantz in that timeframe. You have indicated that you will allow Dr. Pomerantz to provide testimony regarding his relevant background and the details of the experiments, including but not limited to what was done, how it was done, and why it was done. We do not agree that ARIAD is permitted arbitrarily to limit the scope of this deposition, but understand that it is your position that you may interpose scope objections and instructions. We of course reserve all of our rights, including the possible need to seek additional deposition time, or exclude testimony or evidence, depending on the testimony that is received from Dr. Pomerantz.

With regard to Dr. Ravetch, you have indicated that you will make Dr. Ravetch available for an additional 1.25 hours of deposition. The date that you have offered - - June 16 -- does not work for us. To accommodate Dr. Ravetch's schedule and health issues, we are willing to postpone the deposition until after the hearing with the Court on June 19. Please provide us a date later in the summer when Dr. Ravetch can be available to complete his deposition.

Very truly yours,

Marcus E. Sernel

London        Hong Kong        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

Exhibit 7

**5/12/2008  Pomerantz, Joel**

```
     0001
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
2
3        - - - - - - - - - - - - - - -+
                                      |
4        AMGEN, INC,  a Delaware      |
         Corporation, et al.,         |
5                                     |
                        Plaintiffs,   |
6                                     |
                                      | Civil Action No.
7          vs.                        | 06-259-(MPT)
                                      |
8        ARIAD PHARMACEUTICALS, INC., |
         a Delaware Corporation,      |
9                                     |
                        Defendant.    |
10                                    |
         - - - - - - - - - - - - - - -+
11                                    |
         AND RELATED COUNTERCLAIM     |
12       - - - - - - - - - - - - - - -+
13
14          Videotaped Deposition of JOEL POMERANTZ, Ph.D.
15                     Baltimore, Maryland
16                       May 12, 2008
17                        2:30 p.m.
18
19
20
21
22
23       Pages 1 - 136
24       Reported by:  Michele E. Eddy
25
```

**5/12/2008  Pomerantz, Joel**

1           P R O C E E D I N G S

2           JOEL POMERANTZ, Ph.D.,

3    having been duly sworn, testified as follows:

4           MR. GREENWALD:  Before we start the

5    questioning or before Mark starts the questioning, I

6    just wanted to put on the record certain things.

7    First, I would like the record to reflect that I have

8    today and will send follow-up by mail provided

9    Mr. Sernel with a copy of Joel Pomerantz's

10   certification of his notebook pursuant to Federal Rule

11   of Evidence 902 (11).  He has a copy.  I have a copy.

12   Dr. Pomerantz executed that today.

13           Second of all, I just wanted to quickly

14   respond to Mr. Sernel's letter to me of May 7th

15   concerning the, sort of, the ground rules in which

16   we're operating at this deposition.  Of course we've

17   had a lot of back and forth correspondence on this,

18   which I won't take up record time to reiterate.  I

19   just want to say a few things, first of all, we agree

20   that the record time for this deposition will be three

21   hours.  We've agreed to broaden the scope of this

22   deposition to include questioning regarding

23   Dr. Pomerantz's, quote, as you put it, "relevant

24   background."  I just wanted to state my understanding

25   of that concept.  I understand it to mean essentially

1    pedigree information, where he's worked, with whom

2    he's worked, what he does and practice familiarity

3    with the techniques.

4         Second, you write that the scope of the

5    deposition includes details of the experiments.  We

6    agree with that, including but not limited to what was

7    done, how it was done, and why it was done.  We agree,

8    and our original correspondences will reflect, that we

9    agree that what was done, that is to say the steps he

10   took, is appropriate questioning at this deposition.

11   How it was done, what steps he took to actually do

12   what's recorded in his notebook we agree is

13   appropriate and within the scope of this deposition.

14        We had some follow-up conversations, which

15   you've attempted to memorialize here about questions

16   directed to why he did certain things.  And in

17   thinking more about this, I think I agree and I think

18   I agreed with you on the phone that questions about

19   why he used certain reagents, why he waited for

20   periods of time, things like that, execution of these

21   -- relating to how he executed the experiments, I

22   would agree is reasonably within the scope of this

23   limited deposition that we've agreed to,

24   notwithstanding the prior agreement not to depose

25   either's technical experts.

```
 1              And thinking about this more after our call
 2      and receiving the letter, however, it occurs to me
 3      there could be questions, why type questions that
 4      would conceivably invade work product privileges,
 5      attorney-client privileges.  As you know,
 6      Dr. Pomerantz is not and never has been not envisaged
 7      as a testifying expert.  And so, therefore, I think
 8      we'll just have to take each question as they come, of
 9      course, but to the extent that the "why questions"
10      would conceivably invade a work product, or simply go
11      beyond the scope of why he took certain steps in his
12      experiments, I may be interposing instructions.
13      Hopefully they won't be too disruptive.
14              MR. SERNEL:  Is that it?
15              MR. GREENWALD:  That's it.
16              MR. SERNEL:  Let me state real quickly, with
17      respect to the document you handed me that
18      Dr. Pomerantz executed today, you know, I've just had
19      a chance to flip through this, and I just want to make
20      clear on the record that I reserve all rights to
21      object to this insofar as you may try to use it later
22      to establish foundation or whatever, you know, having
23      just received it right now.
24              With respect to your -- your discussion
25      regarding the scope of the deposition, I think we've
```

1    already established that I think we disagree that

2    limitations should be placed on the deposition.  It

3    may be that the questions don't give you a problem,

4    but I certainly reserve all of our rights with respect

5    to the questions that I think I should be able to ask

6    and understand you may interpose your objections.

7         MR. GREENWALD:  That's fine to reserve

8    rights.  But I just want the record to reflect, which

9    I think your letter does, that we have discussed my

10   ability to interpose instructions not to answer on

11   scope grounds, which is a variation from the

12   traditional practice of depositions.  This isn't a

13   surprise to you.  You understand the position and

14   you've agreed that I can do that if I believe your

15   questions go beyond the scope that we've agreed to.

16        MR. SERNEL:  I agree that I will not be

17   surprised if you do that.  But I won't agree that

18   that's appropriate.  You can do that as you might,

19   but, you know, I don't think that would be appropriate

20   to do it for the questions I intend to ask.

21        MR. GREENWALD:  You also agree, though, that

22   we did have an agreement that we reached after you

23   received both Dr. Calame's report and Dr. Pomerantz's

24   notebook that neither side would depose sort of what

25   we call technical experts such as Dr. Pomerantz.

1           MR. SERNEL:  I agree that we had an

2    agreement.  I don't think that fairly reflects or

3    summarizes the agreement.  I think the correspondence

4    back and forth summarizes our position on that.  I

5    don't think it's worth arguing about.

6           MR. GREENWALD:  So with that, why don't we

7    note the time and get started with the questioning.

8           MR. SERNEL:  It looks like it's 2:40.  Let's

9    get started.

10          EXAMINATION BY COUNSEL FOR PLAINTIFFS

11   BY MR. SERNEL:

12       Q    Dr. Pomerantz, if you could state your full

13   name for the record, please.

14       A    Joel Leonard Pomerantz.

15       Q    Okay.  What is your current address?

16       A    My residence?

17       Q    Yes.

18       A    It's 104 Warrenton, Baltimore, Maryland,

19   21210.

20       Q    What is current employment address?

21       A    It's Johns Hopkins University School of

22   Medicine.

23       Q    And what's -- do you know the address of

24   that?

25       A    733 North Broadway, Room 607.

5/12/2008  Pomerantz, Joel

```
1    want to cut off any of your answers if you haven't
2    finished giving the answer.  So if you could tell me
3    if you have not finished an answer so that I can allow
4    you to finish, I'll -- I'll let you finish your
5    answer.
6            So will you agree to tell me if you haven't
7    completed an answer or if I've cut off one of your
8    answers?
9        A    Yes.
10       Q    Is there anything today that would prevent
11   you from testifying truthfully and accurately, such as
12   any medication or illness that we should know about?
13       A    No.
14       Q    Okay.  Now, Dr. Pomerantz, is it correct
15   that you were retained as a consultant by Ariad at
16   some point in time during the pendency of this case?
17       A    Yes.
18       Q    Do you recall approximately when you were
19   retained?
20       A    I think it was about a year ago.
21       Q    So May of 2007?
22       A    I think so.
23       Q    Okay.  And do you recall how you were first
24   approached to become a consultant for Ariad?
25            MR. GREENWALD:  Okay.  I'm going to instruct
```

```
1     on that, not to answer.  I think it goes beyond

2     relevant background.

3     BY MR. SERNEL:

4          Q    Are you going to follow your counsel's

5     instruction?

6          A    Yes.

7          Q    Do you recall who contacted you to become a

8     consultant for Ariad?

9          A    Yes.

10         Q    Who was that?

11         A    It was Amir Naini.

12         Q    Do you know how Mr. Naini came to contact

13    you to become a consultant in this case?

14         A    No.

15         Q    Do you know if anyone recommended you to be

16    Ariad's consultant in this case?

17         A    I don't know.

18         Q    Do you have any ideas or hypotheses?

19         A    No.

20         Q    And when Mr. Naini contacted you, what did

21    he -- what did he tell you?

22              MR. GREENWALD:  Okay.  Instruct not to

23    answer.  This goes to back and forth between counsel

24    and a consulting expert.  I don't view that as

25    relevant.
```

1    BY MR. SERNEL:

2        Q    Other than Mr. Naini, have you communicated

3    with any other lawyers that are working on behalf of

4    Ariad?

5        A    Dr. -- Mr. Greenwald.

6        Q    Anyone else?

7        A    Yes, I believe there are other attorneys at

8    Mr. Greenwald's firm.

9        Q    Do you recall any of their names?

10       A    No.

11       Q    Do you recall whether you had any

12   conversations with any other lawyers at Mr. Naini's

13   law firm?

14       A    No, I did not.

15       Q    Are you being compensated for the time

16   you've spent working as a consultant for Ariad?

17       A    Yes.

18       Q    And are you compensated at a particular rate

19   per hour?

20            MR. GREENWALD:  Here, too, I feel this goes

21   beyond relevant background.  I'm going to instruct not

22   to answer.  Details related to his compensation,

23   perfectly appropriate for testifying expert.  I don't

24   feel it's within the scope of the deposition here.

25            MR. SERNEL:  Even for purposes of bias to

**5/12/2008  Pomerantz, Joel**

1    find if this guy is being paid $500,000?

2         MR. GREENWALD:  I don't feel it's relevant

3    background here since he's not a testifying expert and

4    since it's outside the scope.

5         MR. SERNEL:  I'm going to make my record on

6    this.

7         MR. GREENWALD:  Okay.

8    BY MR. SERNEL:

9         Q    So you are being compensated at a particular

10   hourly rate, but Mr. Greenwald's not going to let me

11   ask what that rate is.

12        A    I think Mr. Greenwald is not going to let

13   you --

14        MR. GREENWALD:  Well, yeah, you can answer

15   that you're being compensated.  Beyond that I'm going

16   to instruct you not to answer.

17        Q    Okay.  How many hours have you spent working

18   as a consultant for Ariad on this matter?

19        MR. GREENWALD:  Here, too, I -- I instruct

20   not to answer.  I just don't see how it's relevant

21   background.

22        MR. SERNEL:  Okay.

23        MR. GREENWALD:  As I understand that concept

24   and as it developed during our conversations.

25   BY MR. SERNEL:

**5/12/2008  Pomerantz, Joel**

1      Q   Is it your typical practice to keep a

2  laboratory notebook for the experiments you do in your

3  lab as a scientist?

4      A   Yes.

5      Q   And did you follow those protocols or

6  procedures in maintaining this notebook that we've

7  marked as Pomerantz Exhibit 1?

8      A   Yes.

9      Q   Now, who designed the experiments that you

10  ran that are reflected in Pomerantz Exhibit 1?

11      MR. GREENWALD:  Objection.  Just let me

12  think.  Instruct not to answer.  I feel it invades

13  work product protection and is outside the scope of

14  our deposition.

15  BY MR. SERNEL:

16      Q   Are you going to follow your counsel's

17  instruction?

18      A   Yes.

19      Q   And so when Mr. Greenwald is instructing, so

20  I don't have to ask it every time, are you going to

21  follow his instruction not to answer each and every

22  time that he interposes such an objection?

23      A   I don't know.  I think so.

24      Q   Okay, well, I may have to ask you each and

25  every time whether you're going to follow your

5/12/2008  Pomerantz, Joel

1       Q     Did you do research to determine -- or

2    strike that.

3             Did you have knowledge prior to embarking on

4    your work in this matter that the THP-1 cell line was

5    involved in rheumatoid arthritis?

6       A     No.

7       Q     Before embarking on your work in this

8    matter, did you have knowledge that the THP-1 cell

9    line would respond to stimulation by TNF or IL-1?

10      A     No.

11      Q     Did you in the course of your work in this

12   matter research these issues to determine that the

13   THP-1 cell line was either involved in rheumatoid

14   arthritis or would respond to TNF.alpha or IL-1?

15      A     Yes, I did do research in the literature

16   while I was doing these experiments.

17      Q     Did you do that research before you ordered

18   the THP-1 cell line?

19      A     No.

20      Q     So was it Mr. Naini that suggested that the

21   THP-1 cell line was a good cell line because it had

22   these characteristics?

23            MR. GREENWALD:  I instruct you not to

24   answer.

25      Q     You're following your counsel's instruction?

1    You have to answer audibly.

2       A   Yes.

3       Q   Now, with respect to the Ramos cell line,

4    did you have any prior knowledge or experience with

5    that cell line to indicate to you that it might be

6    relevant to the issues that you were looking at in

7    this matter?

8       A   No.

9       Q   Did you do any research on the Ramos cell

10   line to inform yourself about its characteristics?

11      A   No.

12      Q   Now, when I've looked through this notebook,

13   I haven't seen any experiments that were done with the

14   Ramos cell line.  Is that correct?

15      A   Yes.

16      Q   Is there a reason why you ordered the Ramos

17   cell line, paid for it with Ariad's money and then

18   decided not to use it?

19      A   Yes.

20      Q   What's that reason?

21      A   Because we -- we were -- I was able to do

22   experiments with relevant cell lines and didn't need

23   to use any backup cell lines such as Ramos.

24      Q   Well, you weren't able to get the

25   experiments to work with the THP-1 cells, right?

1        A      The THP-1 cells that I used in my

2    experiments did not behave as expected and I was not

3    able to even do experiments with them.

4        Q      Okay.  So when the THP-1 cells didn't behave

5    as you expected them, why didn't you turn to the Ramos

6    cells that you had ordered at the same time to try

7    those?

8        A      I -- because I, instead, turned to a cell

9    line which was more relevant to rheumatoid arthritis,

10   which was another monocytic cell line called U937.

11       Q      Had you had a prior experience with a U937

12   cell line?

13       A      No.  No.

14       Q      Did you research the U937 cell line during

15   your work in this matter?

16       A      No.

17       Q      So when you say that the U937 cell line is

18   more relevant to the issues in this matter, you're

19   repeating something that somebody else told you?

20             MR. GREENWALD:  Objection.  Instruct you not

21   to answer as it goes to -- beyond the scope.

22       Q      What's your basis for saying that the U937

23   cell line is more relevant to the issues in this

24   matter?

25       A      More relevant than what?

**5/12/2008  Pomerantz, Joel**

1       MR. SERNEL:  I disagree.  I'm trying to find

2   out why we ordered cells here and they weren't used.

3       MR. GREENWALD:  I think he's -- I think he's

4   answered that question.

5   BY MR. SERNEL:

6       Q    Now, I notice on page ARI-KC 1 on Pomerantz

7   Exhibit 1 that you billed Ariad directly for these

8   cell lines that you ordered; is that correct?

9       A    Yes.

10      Q    And so these cell lines, the THP-1 cell line

11  and the Ramos cell line, were specifically ordered for

12  your work for Ariad and not for any other purpose,

13  correct?

14      A    Yes.

15      Q    Now, in this notebook, does this notebook,

16  Pomerantz Exhibit 1, reflect all of the work that

17  you've done on behalf of Ariad in this matter?

18      A    Yes.

19      Q    Did you ever take notes on any other scratch

20  pieces of paper or anywhere else that didn't make it

21  into this notebook?

22      A    No.

23      Q    Did you ever have phone conversations with

24  Mr. Naini or anyone else in the context of this work

25  that didn't make it into this notebook?

**5/12/2008  Pomerantz, Joel**

1     MR. GREENWALD:  Are you asking did he take

2     notes on conversations he had with Mr. Naini?

3     MR. SERNEL:  I'm trying to find out if there

4     are other documents that exist, whether you agree

5     they're discoverable or not, that are outside of this

6     notebook.

7     MR. GREENWALD:  Not only do I --

8     MR. SERNEL:  Are you instructing him not to

9     answer?

10    MR. GREENWALD:  Yes, I'll instruct him not

11    to answer.  We'll make it faster.  He's answered that

12    all the experiments he did are reflected in this

13    notebook.

14    BY MR. SERNEL:

15    Q    Now, I see the date here of May 14th, 2007

16    is the order date on this order.  Does this date help

17    you better pinpoint exactly when you were retained by

18    Ariad as a consultant in this matter?

19    A    I don't remember exactly when it was.

20    Q    It was obviously before May 14th, 2007?

21    A    Yes.

22    Q    And it could have been a month, two months

23    before then?  Is there any way to kind of bookend it

24    for me?

25    A    I think it was shortly before that.  I don't

**5/12/2008  Pomerantz, Joel**

1       A    Yes.

2       Q    Can you just summarize for me briefly what

3   that experience is?

4       A    Just to clarify, you want me to tell you my

5   experience with NF.kappa.B?

6       Q    Yes, generally what have you done and why do

7   you think you have the experience to do the

8   experiments.

9       A    The first time I worked on NF.kappa.B was

10  when I was an undergraduate at Brandeis University in

11  Ranjan Sen's lab where I was doing my senior honors

12  thesis.  And I worked on it for, I suppose about a

13  year, 1988 to 1989.  I also worked on NF.kappa.B while

14  a postdoctoral fellow with David Baltimore beginning

15  in 1997 and up until 2004 when I established my own

16  lab at Johns Hopkins in 2004 I continued to work on

17  NF.kappa.B up until the present day.

18      Q    Did you read the five -- strike that.

19           Have you ever read the '516 patent that's at

20  issue in this case?

21      A    I haven't read the whole thing.  I've read

22  some parts of it.

23      Q    Okay.  Do you recall when you first laid

24  eyes on the '516 patent?

25           MR. GREENWALD:  Instruct not to answer.

**5/12/2008  Pomerantz, Joel**

1     You're going far afield here.

2              MR. SERNEL:  I'm trying to figure out what

3     informed his design of these experiments and if he

4     read the patent beforehand or not.

5              MR. GREENWALD:  It doesn't have to do with

6     what he did, how he recorded the results, how he

7     performed the experiments.  It's going beyond that and

8     I'll instruct.

9     BY MR. SERNEL:

10        Q     Did you read the '516 patent before

11    designing the experiments that are reflected in

12    Pomerantz Exhibit 1?

13             MR. GREENWALD:  I instruct not to answer.

14        Q     Do you have any view one way or the other

15    whether a layperson would have been able to design and

16    implement the experiments that are in Pomerantz

17    Exhibit 1?

18             MR. GREENWALD:  I instruct not to answer.

19        Q     All of this work that's reflected in

20    Pomerantz Exhibit 1 was done especially for Ariad in

21    this litigation as opposed to for any other purpose,

22    correct?

23        A     Yes.

24        Q     You're not intending to publish the work

25    that is reflected in Pomerantz Exhibit 1 in any

**5/12/2008  Pomerantz, Joel**

1    journal or article or anything like that?

2        A    Not at present, no.

3        Q    Did you do any of this work that's reflected

4    in Pomerantz Exhibit 1 as part of your duties as a

5    professor at Johns Hopkins?

6        A    No.

7        Q    Did you attempt to do the work that's

8    reflected in Pomerantz Exhibit 1 in non work hours or

9    did you intermix it with your duties as a professor?

10            MR. GREENWALD:  I instruct not to answer.

11    This is not relevant background.  This is not how he

12    did the experiments, what he did or why he did them.

13    It's not even close.

14    BY MR. SERNEL:

15        Q    Let's turn to page ARI-KC 10 of the

16    notebook, please.

17            This appears to be the specification of the

18    TNF.alpha that you used in the experiments that are

19    reflected in the notebook, correct?

20        A    Yes.

21        Q    And have you previously done experiments

22    with TNF.alpha in your scientific career?

23        A    Yes.

24        Q    Can you very generally describe for me your

25    experience with experiments using TNF.alpha.

**5/12/2008  Pomerantz, Joel**

1        A     Do you mean prior to this work?

2        Q     Yes.

3        A     I used TNF.alpha previously as a stimulus

4    for NF.kappa.B in some of the experiments I did in the

5    course of my work.

6        Q     Do you recall what cell lines you used for

7    that work?

8        A     Yes, I used HEKT93 cells, jurkat T cells.

9        Q     Any others?

10        A     I think that's all that I can remember right

11    now.

12        Q     Okay.  And when you previously did work with

13    TNF.alpha, had you ordered it from this same vendor,

14    R&D Systems; do you recall?

15        A     I think so, yes.

16        Q     And then it looks like ARI-KC 11 is the

17    specification for the IL-1.beta that you used in some

18    of the experiments reflected in the notebook, correct?

19        A     Yes.

20        Q     Any reason why you chose IL-1.beta as

21    opposed to another form of IL-1?

22        A     I think I had used IL-1.beta previously.

23        Q     That wasn't a decision that you and Mr.

24    Naini discussed at all?

25             MR. GREENWALD:  Objection.  Instruct you not

1    to answer.

2    BY MR. SERNEL:

3        Q    Okay, let's turn to ARI-KC 12.  It appears

4    that the initial date on this page is May 20th, 2007.

5    Is that a correct interpretation of your handwriting?

6        A    Yes.

7        Q    It appears that the first experiments that

8    you did in your work on this case was May 20th, 2007

9    --

10       A    Yes.

11       Q    -- correct?

12            You start out using the THP-1 cells,

13   correct?

14       A    Yes.

15       Q    The handwriting on this page is all of your

16   handwriting?

17       A    Yes.

18       Q    And did you maintain custody and control of

19   your notebook throughout your record keeping of the

20   experiments in the notebook?

21       A    Yes.  Yes.

22       Q    Where's the original notebook today?

23       A    It's in my office at Johns Hopkins.

24       Q    Okay.  And has it ever left your office or

25   your lab from May 20, 2007 through present?

**5/12/2008  Pomerantz, Joel**

1      Q    And it appears that this experiment you

2   switch over to a jurkat cell line, correct?

3      A    Yes.

4      Q    Now, why did you switch to the jurkat cell

5   line in June of 2007?

6          MR. GREENWALD:  I caution you to answer only

7   to the extent it does not reveal communications

8   between yourself and counsel for Ariad.

9      A    I wanted to see whether I could stimulate

10  jurkat cells with IL-1 or TNF.

11     Q    Now, the jurkat cells that you used were not

12  ordered specifically for Ariad, correct?

13     A    Correct.

14     Q    This was a jurkat cell you had laying around

15  in the lab?

16     A    Yes.

17         MR. GREENWALD:  Objection to the term

18  "laying around," but you can take --

19     Q    And jurkat cells are T cells?

20     A    Yes.

21     Q    Did you ever discuss with counsel for Ariad

22  whether jurkat cells would be a relevant cell line to

23  look at for purposes of the work you were doing?

24         MR. GREENWALD:  I instruct not to answer.

25     Q    Was the decision to try the experiments in

1    jurkat cells your decision or your decision in

2    combination with someone else?

3           MR. GREENWALD:  Hold on a second.  I

4    instruct not to answer.

5    BY MR. SERNEL:

6       Q    You're going to follow your counsel's

7    instruction?

8       A    Yes.

9       Q    If at any time you feel the urge to answer

10   it even though he's instructed you, please tell me

11   that or else I'll assume that you're following your

12   counsel's instruction.

13      A    Okay.

14      Q    I'm not expecting you'll get that urge, but

15   I want to make sure that I haven't failed to close

16   that out.

17           There appear to be two conclusion type notes

18   at the bottom of ARI-KC 30.  The first one appears to

19   say, "Jurkats do not respond to IL beta."  Is that

20   correct?

21      A    IL-1.beta.

22      Q    IL-1.beta, sorry.

23           So that means that the jurkat cells did not

24   show any increase in luciferase activity when exposed

25   to IL-1.beta?

1    BY MR. SERNEL:

2         Q    Would you agree with me that "completely

3    blocks" connotes a stronger reduction in activity than

4    what you described as "partial inhibitory effect"?

5         A    It's a different experiment.  It's a

6    different type of experiment as opposed to a reduction

7    -- it's not a reduction.  It's a prevention of

8    induction.

9         Q    Well, that's what's going on at all times,

10   right?  And when Enbrel is interacting with TNF.alpha,

11   it's preventing induction of TNF.alpha activity,

12   correct?

13            MR. GREENWALD:  Objection, instruct you not

14   to answer.

15        Q    Let's look at ARI-KC 45.

16        A    Uh-hmm.

17        Q    Now, this is the bar graph that reflects the

18   samples that were set forth on ARI-KC 42?

19        A    Yes.

20        Q    By the way, again, I think you've testified,

21   I just want to make sure for every one of these, for

22   all 18 of these samples that were prepared and things

23   were added to over time, you did all that work with

24   your own hands and didn't rely on any assistance to do

25   that?

**5/12/2008  Pomerantz, Joel**

1    that was originally found in the kappa light gene.

2        Q    Did you refer to the '516 patent at all in

3    deciding which NF.kappa.B recognition sequence to use

4    in your experiments?

5        A    No.

6        Q    You understand that there are other

7    NF.kappa.B recognition sequences that are different in

8    certain respects from the canonical NF.kappa.B

9    sequence that's in the kappa light gene, correct?

10            MR. GREENWALD:  You can answer, but, again,

11    I think this is beyond the scope.

12        A    There are different kappa.B sites which may

13    differ in the exact sequence, yes.

14        Q    Okay.  This NF.kappa.B recognition sequence

15    was originally found in B cells, correct?

16        A    It was found in DNA.  The DNA is in all

17    cells.

18        Q    Right.  But the work that originally found

19    this canonical NF.kappa.B recognition sequence as you

20    referred to it was found in B cells, correct?

21            MR. GREENWALD:  Instruct you not to answer.

22    BY MR. SERNEL:

23        Q    If you look at ARI-KC 48 and then samples

24    13, 14, 15, 16, what stimulant is used in those?

25        A    It's the anti-CD3, anti-CD28, anti-IGG

**5/12/2008  Pomerantz, Joel**

1      A    I haven't done statistics on them.  But they

2   look pretty similar to me.

3      Q    Right.  And if you look at -- there appears

4   to be error bars on those bars, correct?

5      A    Yes.

6      Q    And it appears that the error bars overlap

7   such that, at least eyeballing it, there is no

8   statistically significant difference between what's in

9   bar 2 and what's in bar 3, correct?

10     A    I haven't --

11          MR. GREENWALD:  Hold on.

12     A    -- done the statistics, but they look pretty

13   similar.

14     Q    But looking at -- looking at this notebook

15   at face value, do you see any statistically

16   significant difference between bar 2 and bar 3?

17          MR. GREENWALD:  Hold on, hold on, hold on.

18   I feel this is going beyond what the experiments he

19   did and bleeding into his interpretation of the

20   results as an expert in something, be it chemistry,

21   statistics, math statistics, whatever.  Because of

22   that I'm going to instruct him not to answer.

23          MR. SERNEL:  I'm just trying to read

24   Dr. Pomerantz's charts here.

25          MR. GREENWALD:  And I agree, and --

1          MR. SERNEL:  I think Dr. Pomerantz is

2     probably the best person to ask.

3          MR. GREENWALD:  Look, it's fair to say

4     you've asked him about what the error bars are and

5     where they fall within.  I think that's fair.  I think

6     that's fair.  But then going beyond, you know, how do

7     you interpret that as a matter of statistics, given

8     that we haven't offered him up as an expert, he hasn't

9     put in a report, et cetera, I think that's beyond the

10    scope and that's precisely within the heartland of the

11    types of questions you and I agreed would not be asked

12    in this deposition.

13         MR. SERNEL:  I disagree that we agreed that

14    was out of bounds.

15         MR. GREENWALD:  Okay, we disagree.  All

16    right, whatever.

17         MR. SERNEL:  I vigorously disagree.

18    BY MR. SERNEL:

19    Q    If you see -- strike that.

20         What's set forth in the bar 3 on the

21    right-hand bar chart, that is when you added TNF and

22    then subsequently washed and added Enbrel before

23    harvesting, correct?

24    A    Yes.

25    Q    And what's in bar 2 of the right-hand bar

5/12/2008  Pomerantz, Joel

1       A    Yes.

2       Q    Other than your conversations with Mr.

3    Naini, just so I have a clear record, were there any

4    other area lawyers that were involved in any of the

5    decisions with respect to the design or implementation

6    of the experiments?

7            MR. GREENWALD:  Objection.  Instruct not to

8    answer.

9    BY MR. SERNEL:

10      Q    Did you have any direct conversations with

11   any other area lawyer other than Mr. Naini regarding

12   the design and choices for the experiments set forth

13   in Pomerantz Exhibit 1?

14           MR. GREENWALD:  You may answer the question.

15   I think it's a yes or no question, you may so answer.

16      A    No.

17      Q    Okay, let's turn to ARI-KC 77, please.

18           MR. GREENWALD:  KC 77?

19           MR. SERNEL:  77.  77.

20      Q    This appears to be, Dr. Pomerantz, an order

21   form for the U937 cell line that you subsequently used

22   to run some experiments?

23      A    Yes.

24      Q    Now, this one you billed to Johns Hopkins as

25   opposed to Ariad.  Any reason for that?

1      A     Because if you add a reducer, that implies

2   that you're adding something that reduces something

3   that is already induced.

4      Q     Well, do you think this Enbrel is an inducer

5   of NF.kappa.B activity cells?

6           MR. GREENWALD:  I instruct you not to

7   answer.

8   BY MR. SERNEL:

9      Q     Do you think it's reasonable and

10  scientifically acceptable to assess the impact of

11  Enbrel on NF.kappa.B activity by adding it prior to

12  stimulation by TNF.alpha?

13          MR. GREENWALD:  Okay.  Objection.  And even

14  under one interpretation of that question, it's

15  instruction-worthy.

16          MR. SERNEL:  So are you instructing or not?

17          MR. GREENWALD:  Well, I think I will because

18  looking at it on the screen, it's so general it

19  doesn't relate to the experiments he did or how he did

20  them, so I'll instruct, yes.

21          MR. SERNEL:  Well, it's why he did them.

22  I'm trying to figure out why he ran these experiments.

23          MR. GREENWALD:  Yes, you asked that, and I

24  thought he answered it.  You asked that and I gave

25  that caution and he answered the question, and now

**5/12/2008  Pomerantz, Joel**

1    we're moving off to general -- what's generally

2    scientifically acceptable, at least that's the way I

3    interpret the question.

4    BY MR. SERNEL:

5        Q    Okay, did you run this experiment here where

6    you added Enbrel prior to TNF stimulation to determine

7    Enbrel's ability to diminish TNF.alpha-induced

8    NF.kappa.B activity?

9             MR. GREENWALD:  Objection.

10       A    I wanted to see what the end result would be

11   if I did the experiment this way without interpreting

12   how it was happening.

13       Q    And the result that you got from this

14   experiment was that Enbrel blocked the

15   TNF.alpha-induced TN-kappa-B activity, correct?

16            MR. GREENWALD:  Objection.

17       A    There was less activity in sample 10 than

18   there was in sample 4.

19       Q    And the conclusion that one can draw from

20   this is that Enbrel blocked the TNF.alpha-induced

21   NF.kappa.B activity, right?

22            MR. GREENWALD:  Objection.  Objection.

23       A    I just saw less activity in sample 10 than

24   in sample 4.

25       Q    Well, did you have controls in your

5/12/2008  Pomerantz, Joel

1    experiment in the case where TNF was the stimulant.

2    That was not true in the case where IL-1 was the

3    stimulant.

4        Q    Okay.  So would you agree with me that

5    Enbrel does not affect NF.kappa.B's ability to act as

6    an intercellular messenger as a result of IL-1

7    induction as opposed to TNF.alpha induction?

8            MR. GREENWALD:  Okay, I instruct you not to

9    answer.  This is going to expert interpretation of

10   what he just said.

11           MR. SERNEL:  I'm trying to figure out what

12   he's just said.

13           MR. GREENWALD:  I think he's answered it

14   very clearly what the data shows.

15       A    I just observed what I observed.  I didn't

16   interpret it.

17       Q    Do you feel you're not qualified to

18   interpret this data, Dr. Pomerantz?

19           MR. GREENWALD:  Objection.  I instruct you

20   not to answer.

21       Q    You do have background in -- in running

22   experiments relating to NF.kappa.B and publishing

23   those kind of results in established journals,

24   correct?

25       A    Yes.

1       Q     And in those published articles, you have,

2   in fact, drawn conclusions from experiments of the

3   type that are set forth in Pomerantz Exhibit 1,

4   correct?

5       A     Well, I've never used Enbrel before or any

6   drugs, and I have not -- I have not determined

7   mechanisms of actions of drugs.

8       Q     Okay.  So sitting here today, you don't have

9   any idea as to how Enbrel -- what Enbrel's mechanism

10  of action is?

11      A     Not completely.  I don't have a complete

12  idea of how Enbrel does whatever it does.  I just

13  added it into some experiments and observed the

14  results.

15      Q     Okay.  And you decided how to design these

16  experiments based on your conversations with Ariad's

17  counsel; is that how you decided to run these

18  experiments?

19            MR. GREENWALD:  Hold on a second.  I

20  instruct not to answer.  I don't see there's any way

21  he could answer that without invading privilege and

22  going beyond our agreed -- well, the scope of this

23  deposition.

24            MR. SERNEL:  And I disagree with that that's

25  out of bounds.

1    possibilities.

2         Q    And did Dr. Ravetch or Mr. Naini suggest a

3    preference for a particular order in which the

4    reagents would be added?

5              MR. GREENWALD:  I instruct not to answer.

6              MR. SERNEL:  Is that based on me including

7    Mr. Naini in the question or both?

8              MR. GREENWALD:  It's beyond the scope.  It's

9    also because it invades work product.

10   BY MR. SERNEL:

11        Q    Did Dr. Ravetch discuss a preference for a

12   particular order in which the reagents would be added?

13             MR. GREENWALD:  Hold on.  You may answer,

14   but I caution that in answering you not disclose the

15   contents of any communications to which counsel for

16   Ariad was a part of.

17        A    We wanted to see what would happen when

18   Enbrel was added both before and after.

19        Q    And Dr. Ravetch never suggested that the

20   experiment should be done only by adding Enbrel after

21   stimulation?

22             MR. GREENWALD:  Objection.

23        A    Say that one more time.

24        Q    Dr. Ravetch never suggested that the

25   experiment should be done only adding Enbrel after

1     Q   Okay.  Did you do any experiments to try to

2   determine and compare the effect of Enbrel prior to

3   TNF stimulation and then when it's added after

4   TNF.alpha stimulation?

5     A   Not directly.

6     Q   Can -- can conclusions be drawn from your

7   experiments directly or indirectly regarding the

8   difference between adding Enbrel prior to TNF

9   stimulation or adding it after TNF stimulation and its

10   impact on NF.kappa.B activity?

11     MR. GREENWALD:  I object and I also instruct

12   not to answer as beyond the scope.

13     A   You can observe the --

14     MR. GREENWALD:  Are you going to take my

15   instruction or --

16     THE WITNESS:  Yeah.  I'll take the

17   instruction.

18     Q   You could answer the question but for

19   Mr. Greenwald's instruction?

20     MR. GREENWALD:  Yeah, there's -- there's no

21   question he can.  The question is I'm -- I'm

22   instructing him not to.

23     MR. SERNEL:  We're all in agreement that he

24   could answer the question except for your objection.

25     MR. GREENWALD:  Only in the sense that if he

**5/12/2008  Pomerantz, Joel**

1        A     No.

2        Q     Okay, back to ARI-KC 116.  So these are,

3     again, experiments done with U937 cells?

4        A     Yes.

5        Q     And now we're focused on adding Enbrel only

6     after TNF.alpha stimulation; is that correct?

7        A     Yes.

8        Q     And at this point in time, I think from --

9     from this point forward, all of the experiments focus

10    on adding Enbrel after TNF addition as opposed to

11    before?

12       A     I just have to -- I think you're right, but

13    I'm just looking through it to check to see if you're

14    right because I don't remember exactly.  As I page

15    through, so far you're right.

16             Yes.

17       Q     And so I've asked this question kind of a

18    little different way, so I just want to clarify, make

19    sure we understand why this was done.  Do you recall

20    any decision that was made around this time to focus

21    exclusively on experiments where Enbrel was added

22    after TNF.alpha as opposed to before?

23             MR. GREENWALD:  Okay, I instruct not to

24    answer.

25       Q     Do you recall, you personally, making the

1    decision, separate and apart from any discussion with

2    counsel, to focus exclusively at this time on adding

3    Enbrel after TNF.alpha was added?

4              MR. GREENWALD:  Again I instruct not to

5    answer.  What difference does the sequencing of the

6    experiments make?  What matters for purposes of this

7    deposition, what experiments were done, how he did

8    them, how he recorded the results.  You're trying to

9    construct a timeline here, and I just fail to see how

10   it falls within the scope.  I mean, the timeline is

11   set forth clearly in the notebook.  Every day is

12   sedulously noted.

13             MR. SERNEL:  I'm trying to figure out why

14   things were done.  The design choices seem to be the

15   most important thing as to what these experiments are

16   all about.

17             MR. GREENWALD:  Well --

18             MR. SERNEL:  If the design choices aren't

19   important, then apparently you have no ability to

20   differentiate our prior art, I would assume, so ...

21             MR. GREENWALD:  I'm not getting into this.

22   This deposition, we agreed, would never even happen

23   after you got the report.

24             MR. SERNEL:  I never agreed to that.

25             MR. GREENWALD:  Yes, you did.

1      A    Yes, I think I've heard of that, but I don't

2    know exactly how it works.

3      Q    Were you surprised that you couldn't

4    reproducibly show an impact of kineret on NF.kappa.B

5    activity?

6      A    I didn't know what to expect, to be honest.

7      Q    Would you be surprised if someone, a

8    scientific expert looked at your data and concluded

9    that kineret would reduce NF.kappa.B activity in

10   cells?

11         MR. GREENWALD:  Okay, I instruct not to

12   answer.

13     Q    Let's look at ARI-KC 147, please.  This is,

14   looks like it's December 3rd, '07, correct?

15     A    Yes.

16     Q    You're using the U937 cells --

17     A    Yes.

18     Q    -- correct?

19         And you're adding kineret after IL-1

20   stimulation and attempting to determine whether that

21   has any impact on NF.kappa.B activity, correct?

22     A    Yes.

23     Q    So if I read the bar chart, is it correct

24   that comparing bars 4 and 3 show the effect of kineret

25   on IL-1-induced NF.kappa.B activity?

1    other types of experiments?

2        A    Because it was easy to do the experiment and

3    I had familiarity with the system.

4        Q    Well, you had familiarity with doing emsas

5    as well?

6        A    I do have familiarity with doing emsas.

7    Reporters are easier assays to do.

8        Q    Easier in what way?

9        A    There's less -- I guess there's less labor

10    investment in getting the -- in determining the

11    outcome of the experiment; they're extremely

12    quantitative because the output of the lumen assays is

13    too many significant digits, and they're used --

14    they've been used for years in the field with

15    reliability and widespread acceptance.

16        Q    Well, emsas has been used in the field for

17    many years with wide acceptance, correct?

18        MR. GREENWALD:  Again, this is like an

19    expert deposition.  I instruct not to answer.  He did

20    what he did.  It speaks for itself.

21    BY MR. SERNEL:

22        Q    Why didn't you perform any supershift assays

23    in the context of these experiments?

24        A    I didn't need to.

25        Q    Why didn't you need to?

1     lines to use, that's an area where Dr. Ravetch had

2     more input than maybe you did in deciding that?

3         A    Yes.

4         Q    Are there any other areas where you recall

5     Dr. Ravetch having particular input into what to use

6     or how to run the particular experiments?

7              MR. GREENWALD:  Same caution as before.

8         A    I'm trying to think.  Not that I can think

9     of right now.

10        Q    Do you know whether any consideration was

11    given to what cell lines might be relevant to seeing

12    the impact of Enbrel on psoriasis patients?

13             MR. GREENWALD:  Okay, yeah, I instruct you

14    not to answer.

15             MR. SERNEL:  You allowed the same question

16    to be answered with respect to RAs.  I'm just asking

17    the parallel question on psoriasis.

18             MR. GREENWALD:  You know, maybe I should

19    have instructed on that, too.  What seems to me that

20    was done here were the experiments on these cell lines

21    and I allowed you to ask questions about what was

22    done, how it was done, how they were recorded.  Now

23    we're going into, you know, why didn't you do other

24    experiments on cell lines that may or may not have

25    been relevant to psoriasis.  And he can do this for

1    all of these diseases, and I just feel that's beyond

2    the scope of this non expert deposition and topical

3    scope and duration.

4    BY MR. SERNEL:

5        Q    Again, I'm just trying to exhaust everything

6    that Dr. Ravetch did, so if I'm kind of semi-repeating

7    the question, I'm just trying to figure out if there's

8    anything else there.

9            Is there anything else that you recall

10   Dr. Ravetch having input on other than choosing the

11   particular cell lines to use and possibly you

12   interacting with him, although you have more

13   experience in it, with respect to how the NF.kappa.B

14   reporter assays were instructed?

15           MR. GREENWALD:  Objection.  Objection.

16   Asked and answered.

17       A    I remember that the results with the THP-1

18   cells, that I couldn't get them to work in my hands,

19   were surprising, and I talked to Dr. Ravetch about

20   that.

21       Q    Do you recall what his reaction was?

22       A    He thought it was very surprising that I

23   couldn't get it to work because other people had, and

24   one possibility we considered, that I had a bad batch

25   of THP-1 cells.

**5/12/2008  Pomerantz, Joel**

1    activity?

2        A    I don't know, but the ones that I did -- I

3    didn't do -- I didn't do repeated experiments with

4    jurkats.

5        Q    And why didn't you do repeated experiments

6    with jurkat cells?

7        A    Because the monocytic sells were more

8    relevant to RA.

9        Q    And that was Dr. Ravetch's view?

10       A    Yes.

11       Q    Was it also Mr. Naini's view?

12            MR. GREENWALD:  Objection.  I instruct you

13   not to answer.

14   BY MR. SERNEL:

15       Q    Did you ever discuss with Dr. Calame the

16   different cell lines that you used for the different

17   experiments?

18       A    I think after the experiments were done,

19   yes.

20       Q    And do you recall the substance of that

21   conversation?

22       A    I think she asked me why -- similar to the

23   questions that you asked me, why I used the cell lines

24   that I did.

25       Q    Presumably you're giving me the same answers

1       A    No.   I think -- I think in that particular

2    paper, Warner Green provided a reagent that was used

3    in the study.

4       Q    Do you have any views one way or the other

5    as to whether Dr. Green is a respected scientist in

6    the area of NF.kappa.B?

7            MR. GREENWALD:  Hold on.  Yeah, instruction

8    not to answer.  What does that got to do with the

9    experiments he did?  That's classic expert deposition

10   stuff.

11           MR. SERNEL:  I'm just asking if about -- if

12   he's a fact witness, expert witness, whatever, he can

13   have views on things.

14           MR. GREENWALD:  I know, but it's outside the

15   scope and I -- it doesn't have to do anything with the

16   experiments he did in 2007.

17   BY MR. SERNEL:

18      Q    Now, this paper, publication number 2, talks

19   about a second sequence element located at 3 prime to

20   NF.kappa.B binding site regulates IL-2 receptor alpha

21   gene induction.  Do you see that?

22      A    Yes.

23      Q    Do you recall the nature of that work?

24      A    Vaguely, yes.

25      Q    Okay.  So by this time, in 1989, clearly you

**5/12/2008  Pomerantz, Joel**

1    were doing work related to NF.kappa.B, correct?

2        A    Peripherally related, yes.

3        Q    Okay.  And apparently this found a

4    recognition sequence in addition to the NF.kappa.B

5    recognition sequence that regulated the expression of

6    the IL-2 receptor alpha gene, correct?

7        A    Yes.

8        Q    How much were you aware of Dr. Sen's prior

9    work of NF.kappa.B at the time that you were his

10   undergraduate advisee?

11           MR. GREENWALD:  Hold on.  I instruct not to

12   answer as beyond the scope of this deposition.

13       Q    So it would appear to -- that of your 12

14   publications, ten of the 12 -- sorry, nine of the 12

15   are co-authored with one of the co-inventors on the

16   '516 patent, correct?

17       A    Let me just count really quickly.  Nine,

18   yes.  Of the peer-reviewed, right.

19       Q    And then of the two non-peer reviewed, both

20   of those were co-authored with Dr. Baltimore, correct?

21       A    That's correct.

22       Q    Then you've got three patents to your name,

23   all of which you are a co-inventor with one of the

24   inventors of the '516 patent, correct?

25       A    That's correct.

**5/12/2008  Pomerantz, Joel**

1    Q    And do you have any knowledge about the

2    positions of area or Amgen in the context of this

3    litigation?

4    A    No.

5    Q    Or do you have any knowledge as to Amgen's

6    -- strike that.

7         Do you have any knowledge as to the use or

8    dosing regimen of patients taking Enbrel?

9         MR. GREENWALD:  Mark, under what --

10        MR. SERNEL:  I'm trying to figure out if

11   there's any -- I'm trying to close him out as to

12   whether he's tied in his experiments to the real world

13   or not.

14        MR. GREENWALD:  Well, it's not what I --

15   it's not what I understood to be within the scope of

16   relevant background as I understand it.

17        MR. SERNEL:  Are you instructing?

18        MR. GREENWALD:  Yes, I'll instruct.  I'll

19   instruct.

20        MR. SERNEL:  Well, I don't know that I'm in

21   background.  I think I'm just summarizing the tie --

22   what these experiments are and how they relate to the

23   issues in the case.  And if he doesn't know or, you

24   know, he's just a fact guy, then we can leave it at

25   that.  Are you instructing?

1          MR. GREENWALD:  Yes, I'm instructing.  I

2     think it's beyond the scope of what we discussed.

3     BY MR. SERNEL:

4          Q    Would it be fair to say that you relied on

5     your education and professional background in the

6     choices that you made in designing and implementing

7     the experiments set forth in Pomerantz Exhibit 1?

8          A    I guess so, yes.

9          Q    And would you agree with me that throughout

10    your entire training as a scientist, you were being

11    advised as both an undergraduate, a graduate and a

12    postdoc by inventors on the '516 patent?

13         MR. GREENWALD:  Objection.

14         A    That was actually a year when I was in Karl

15    Cable's lab and not affiliated with the inventors.

16         Q    So -- let me ask a different question.  So

17    for one of the years of the dozen or so that you were

18    an undergrad, graduate or postdoc, except for one of

19    those years you were being advised by one of the

20    inventors on the '516 patent, correct?

21         A    Yes.

22         MR. SERNEL:  With the caveat that I think

23    Mr. Greenwald has improperly instructed not to answer

24    on a variety of questions to which we wholly disagree,

25    and I'll reserve my right to seek further testimony on